IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

JOHN H. RAMIREZ,                              §
          Petitioner,                  §
                                     §
V.                                            §          Civil No. 12-CV-410
                                     §
WILLIAM STEPHENS, Director,                   §
Texas Department of Criminal Justice,         §
Correctional Institutions Division,           §
          Respondent.                  §

PETITION FOR WRIT OF HABEAS CORPUS
BY A PERSON IN STATE CUSTODY

THIS IS A CAPITAL DEATH PENALTY CASE

GROSS & ESPARZA, P.L.L.C.
MICHAEL C. GROSS
Attorney-In-Charge
State Bar No. 08534480
Southern District of Texas Bar No. 12795
106 South St. Mary's Street, Suite 260
San Antonio, Texas 78205
(210) 354-1919
(210) 354-1920 (Fax)

Attorney for the Petitioner,
JOHN H. RAMIREZ

# TABLE OF CONTENTS

PAGE

I.      CONFINEMENT AND RESTRAINT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.     HISTORY OF PRIOR STATE COURT PROCEEDINGS . . . . . . . . . . . . . . . . . . 2

        A.      TRIAL PROCEEDINGS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

        B.      DIRECT APPEAL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

        C.      STATE HABEAS CORPUS PROCEEDINGS . . . . . . . . . . . . . . . . . . . . . 4

III.    PROCEEDINGS IN THIS COURT PURSUANT TO 18 U.S.C. § 3599 . . . . . . . 5

IV.     STATEMENT REGARDING EXHAUSTION OF STATE REMEDIES . . . . . . . 6

V.      STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

VI.     CLAIMS FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

        CLAIM I . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

                THE ABSENCE OF THE PETITIONER FROM THE
                COURTROOM AT A CRITICAL JUNCTURE IN HIS TRIAL
                VIOLATED HIS DUE PROCESS RIGHTS.

                STATEMENT OF FACTS
                IN SUPPORT OF CLAIM I . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

                ARGUMENT AND AUTHORITIES
                IN SUPPORT OF CLAIM I . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

        CLAIM II . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

                THE PETITIONER WAS DENIED HIS STATE AND
                FEDERAL CONSTITUTIONAL RIGHT TO A PUBLIC
                TRIAL.

                ARGUMENT AND AUTHORITIES
                IN SUPPORT OF CLAIM II . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

ii

CLAIM III . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

    THE PETITIONER'S RIGHT TO DUE PROCESS AND A
    FAIR TRIAL WAS VIOLATED WHEN HE WAS
    SHACKLED DURING TRIAL.

    ARGUMENT AND AUTHORITIES
    IN SUPPORT OF CLAIM III . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

CLAIM IV . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

    THE PETITIONER'S TRIAL COUNSEL FAILED TO
    PROVIDE EFFECTIVE ASSISTANCE OF COUNSEL.

    STATEMENT OF FACTS IN
    SUPPORT OF CLAIM IV . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48
        Defense counsel Jones' file shows no independent work pretrial . 48
        The migitator did not interview witnesses until after trial started . 49
        The mitigator prepared his trial report
        ***three days before the death sentence*** . . . . . . . . . . . . . . . . . 50
        The mitigator did not know the defense mitigation theory at trial . 50
        Lead trial counsel did not know why the mitigation
            investigation did not begin until after trial started . . . . . . . . 50
        Trial counsel Garza admitted the jury was not death qualified . . . 52
        Independent counsel confirmed the jury was not death qualified . 52
        Independent counsel confirmed the insufficient mitigation . . . . . . 53
        The defense psychological testing was invalid . . . . . . . . . . . . . . . . 54
        A psychologist should not also be the mitigator . . . . . . . . . . . . . . 54
        The Petitioner was incompetent to waive mitigation . . . . . . . . . . . 56

    ARGUMENT AND AUTHORITIES
    IN SUPPORT OF CLAIM IV . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56
        The standard for ineffective assistance . . . . . . . . . . . . . . . . . . . . . . 56
        Failure to submit selected veniremen to death penalty questions . . 61
            Venireman Gilbert . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63
            Venireman Castaneda . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66
            Venireman Benavidez . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69
            Venireman Johnston . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71
            Venireman Baucom . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74
            Venireman Bowman . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76
            Venireman Light . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

iii

Venireman Foutch . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

Venireman Lyles . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84

Venireman Leal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

Venireman Vermace . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

Failure to object to absence of the Petitioner during voir dire . . . . 92

Failure to object to violation of right to public trial . . . . . . . . . . . 95

Failure to object to shackling of the Petitioner . . . . . . . . . . . . . . 108

Failure to object to 404(b) evidence . . . . . . . . . . . . . . . . . . . . . . 114

Failure to present mitigating evidence . . . . . . . . . . . . . . . . . . . . 115

CLAIM V . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 127

THE AGGRAVATING FACTORS EMPLOYED IN THE
TEXAS CAPITAL SENTENCING SCHEME ARE VAGUE
AND DO NOT PROPERLY CHANNEL THE JURY'S
DISCRETION IN VIOLATION OF THE EIGHTH AND
FOURTEENTH AMENDMENTS TO THE UNITED STATES
CONSTITUTION.

VII.    THE PRESUMPTION OF CORRECTNESS OF 28 U.S.C. § 2254(d) & (e)
        SHOULD NOT ATTACH TO STATE COURT FINDINGS OF FACT . . . . . 129

VIII.   PRAYER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 132

IX.     VERIFICATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 133

X.      CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 134

EXHIBITS IN THE APPENDIX
Appendix I

Judgment and sentence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A

Indictment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . B

Order granting 90-day extension . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . C

Guadalupe Alejandro affidavit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . D

Maria Hinojosa affidavit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . E

John Ramirez, Sr. affidavit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . F

Priscilla Martinez affidavit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . G

Appendix II

Vickie Rivas affidavit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . H

Ashley Ramirez affidavit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . I

Alex Hernandez affidavit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . J

Dr. Joann Murphey affidavit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . K
Edward Garza affidavit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . L
Appendix III
Juror questionnaires (excerpts) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . M
Texas Court of Criminal Appeals opinion on direct appeal . . . . . . . . . . . . . . . N
State's proposed findings of fact and conclusions of law  . . . . . . . . . . . . . . . . O
Trial court's findings of fact and conclusions of law . . . . . . . . . . . . . . . . . . . . P

# IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| **JOHN H. RAMIREZ,** | § | |
| **Petitioner,** | § | |
| | § | |
| **V.** | § | **Civil No. 12-CV-410** |
| | § | |
| **WILLIAM STEPHENS, Director,** | § | |
| **Texas Department of Criminal Justice,** | § | |
| **Correctional Institutions Division,** | § | |
| **Respondent.** | § | |

## PETITION FOR WRIT OF HABEAS CORPUS
## BY A PERSON IN STATE CUSTODY

## THIS IS A CAPITAL DEATH PENALTY CASE

JOHN H. RAMIREZ, the Petitioner in the above styled and numbered cause, pursuant to 28 U.S.C. § 2254, petitions this Honorable Court to issue a writ of habeas corpus ordering the Petitioner's release from confinement on the ground that the Petitioner is being denied his liberty as a result of an illegal and unconstitutional judgment of conviction for capital murder and sentence of death.

## I.

## CONFINEMENT AND RESTRAINT

The Petitioner is confined on death row at the Polunsky Unit, Texas Department of Criminal Justice, Correctional Institutions Division, Livingston, Texas. William Stephens, the Director of the Texas Department of Criminal Justice, Correctional Institutions Division, is the state official responsible for the confinement of the Petitioner. The District Court of

1

Nueces County, Texas, 94th Judicial District, in and for Nueces County, entered the judgment and sentence under attack. <u>See</u> Exhibit A. The Petitioner is confined pursuant to this judgment imposing the death penalty for the offense of capital murder. <u>Id.</u> The Petitioner is indigent and has been indigent throughout all prior proceedings in this cause.

**II.**

**<u>HISTORY OF PRIOR STATE COURT PROCEEDINGS</u>**

**A.**

**TRIAL PROCEEDINGS**

Mr. Ramirez was arrested on February 20, 2008. (R - v.19 - 40).[1] He was charged with capital murder allegedly occurring on July 19, 2004, and indicted by the grand jury on October 7, 2004. <u>See</u> Exhibit B.

Jury selection began on October 22, 2008 and concluded on November 19, 2008. (R - v.6 - 1; R - v.15 - 1). Juror qualifications, exemptions, and general voir dire were held on October 22, 2008. (R - v.6 - 1). The parties announced on October 29, 2008, seventeen agreed juror strikes for having "expressed some opinion based on the Defendant's guilt or they've based an opinion about not being able to render the death penalty in any case or always rendering the death penalty based on any murder, any homicide." (R - v.7 - 1, 40, 43). The parties announced on November 4, 2008, fifty-two agreed juror strikes for

---

[1] The clerk's record from the trial will be referred to as "T and page number." The court reporter's record from the trial will be referred to as "R and volume and page number." The court reporter's record from the writ hearing will be referred to as "WHC and volume and page number." The exhibits are attached in the Appendix with Exhibits A-G in Appendix I, Exhibits H-L in Appendix II, and Exhibits M-P in Appendix III.

undisclosed reasons based upon a reading by counsel of the juror questionnaires.  (R - v.8 - 1, 4-7).   Individual voir dire lasted for seven days from November 10, 2008 through November 19, 2008.  (R - v.9 - 1; R - v.15 - 1).   Fifty-four veniremen (1, 3, 7, 11, 13, 15, 17, 18, 21, 22, 123, 23, 30, 31, 33, 34, 35, 36, 38, 39, 44, 47, 48, 49, 53, 55, 57, 58, 59, 60, 62, 63, 64, 65, 70, 77, 79, 80, 81, 82, 84, 85, 87, 88, 90, 92, 94, 96, 97, 98, 99, 100, 102, 103) were interviewed by the parties during individual voir dire.  Id.  The defense exercised thirteen peremptory challenges during individual voir dire, and the state exercised seven peremptory challenges.  Id.

After jury selection was completed, trial began on December 1, 2008.  (R - v.16 - 1).  Mr. Ramirez entered a plea of not guilty.  Id. at 12.  Both sides gave opening statements, the state called twenty-two witnesses, and the defense did not call any witnesses during the guilt/innocence phase of the trial.  (R - v.16 - 1, 12, 36, 42, 86, 142, 193, 225, 259; R - v.17 - 1, 9, 39, 65, 99, 123, 156, 176, 191, 211; R - v.18 - 1, 114, 188, 222, 237; R - v.19 - 1, 5, 49, 129).  The jury returned a verdict of guilty on December 5, 2008.  (R - v.20 - 1, 48).

The punishment phase of the trial lasted two days, December 5 and 8, 2008.  (R - v.21 - 1; R - v.22 - 1).  The state called five witnesses and the defense called the Defendant and Troy Martinez as witnesses.  Id.  The jury returned an affirmative answer to special issue number one and a negative answer to special issue number two on December 8, 2008.  (R - v.22 - 1, 36).  As required by the jury's verdict, the trial court sentenced Mr. Ramirez to death on December 8, 2008.  Id. at 37.

3

A Motion for New Trial was filed on January 12, 2009; a hearing was held on the Motion for New Trial on February 5, 2009; and the motion was denied on February 15, 2009. (T - 280-323, 358; R - v.23 - 1).  The Petitioner is illegally restrained in his liberty at the Polunsky Unit by Rick Thaler of the Texas Department of Criminal Justice - Correctional Institutions Division.

## B.

## DIRECT APPEAL

The Texas Court of Criminal Appeals affirmed this case in an unpublished opinion. Ramirez v. State, No. AP-76,100 (Tex. Crim. App., March 16, 2011).  A petition for writ of certiorari was not filed.

## C.

## STATE HABEAS CORPUS PROCEEDINGS

On April 19, 2011, a state writ of habeas corpus was filed with the 94th Judicial District Court.  Hearings were held on this writ on September 14 and 26, 2011; and October 21, 2011.  At the hearing, the trial judge took judicial notice of the trial pleadings in 04-CR-3453-C and without objection from the state took judicial notice of the exhibits attached to the writ – Exhibit A Judgment and Sentence; Exhibit B Indictment; Exhibit C Order of Court; Exhibit D affidavit of Guadalupe Alejandro; Exhibit E affidavit of Maria Hinojosa; Exhibit F affidavit of John Ramirez, Sr.; Exhibit G affidavit of Priscilla Martinez; Exhibit H affidavit of Vickie Rivas; Exhibit I affidavit of Ashley Ramirez; Exhibit J affidavit of Alex Hernandez; Exhibit K affidavit of Dr. Joann Murphey; Exhibit L affidavit of Edward Garza;

4

Exhibit M excerpts of juror questionnaires; and Exhibit N direct appeal opinion.  (WHC - v.2 - 4; WHC - v.4 - 74).  Since the trial judge took judicial notice of the family's affidavits outlined above, and to expedite the writ hearing, the state agreed that the family members need not be called at the writ hearing.  (WHC - v.3 - 4; WHC - v.4 - 74).  The trial judge at the habeas hearing also admitted into evidence Defense Exhibit 1 (attorney Jones' trial file on CD); Exhibit 2 (attorney fee vouchers); Exhibit 3 (Applicant's school records); Exhibit 4 (attorney fee vouchers); Exhibit 5 (Dr. Martinez's file); Exhibits 6-9 (defense journal articles from trial defense attorney's file); Exhibit 10 (Dr. Martinez time summary); and Exhibit 11 (excerpt from attorney Jones' trial file).  (WHC - v.2 - 23, 27; WHC - v.3 - 5, 6, 10, 63, 67, 167; WHC - v.4 - 15).

The Petitioner timely filed with the trial judge proposed findings of fact and conclusions of law.  The State filed on January 5, 2012 the proposed trial court's Findings of Fact and Conclusions of Law with an Order for the signature of the trial judge.  See Exhibit O.  The trial judge, ***four days later*** on January 9, 2012, simply signed the State's proposed findings of fact and conclusions of law, recommending that relief be denied.  See Exhibit P.  On October 10, 2012, the Texas Court of Criminal Appeals adopted the findings of fact and conclusions of law and recommendation of the trial judge and denied relief.

### III.

### PROCEEDINGS IN THIS COURT PURSUANT TO 18 U.S.C. § 3599

On October 11, 2012, the Petitioner filed with this Court a motion for appointment of counsel pursuant to 18 U.S.C. § 3599.  (Doc 1).  This Court appointed counsel on October

5

19, 2012 to represent the Petitioner in this federal habeas corpus proceeding challenging the Petitioner's state criminal conviction for capital murder and sentence of death.  (Doc 2).

Pursuant to 28 U.S.C. § 2244(d)(1), the one-year period of limitation for the filing of the federal petition for writ of habeas corpus begins to run when the judgment becomes final on direct appeal or the expiration of the time for seeking such review.  "'[A] conviction becomes final when a defendant's options for further direct review are foreclosed,' whether or not those options have been pursued." United States v. Gamble, 208 F.3d 536, 537 (5th Cir. 2000), citing United States v. Thomas, 203 F.3d 350, 352 (5th Cir. 2000); Kapral v. United States, 166 F.3d 565, 571 (3rd Cir. 1999); Rhine v. Boone, 182 F.3d 1153, 1155 (10th Cir. 1999), cert. denied, 528 U.S. 1084, 120 S.Ct. 808, 145 L.Ed.2d 681 (2000).  The one-year limitation period is tolled, pursuant to 28 U.S.C. § 2244(d)(2), during the pendency of a properly filed state application for post-conviction relief.  The Court of Criminal Appeals on direct appeal affirmed the judgment and sentence on March 16, 2011. Ramirez v. State, supra.  A petition for a writ of certiorari was due to be filed ninety days later on June 14, 2011.  The state writ was filed on April 19, 2011, before the direct appeal in this cause was final.  State habeas relief was denied on October 10, 2012, which is when the federal one-year limitations period began to run.  This federal writ petition, therefore, has been timely filed after the state application for post-conviction relief became final.

IV.

## STATEMENT REGARDING EXHAUSTION OF STATE REMEDIES

The Petitioner has exhausted the state remedies for the claims he is presenting in this original federal habeas corpus action.  The Petitioner's claims were made in the state habeas

action, proven at the hearing on the state writ in the trial court, but denied in state court.  The trial judge recommended denial of relief which was approved by the Court of Criminal Appeals.  The Petitioner has met the burden, pursuant to 28 U.S.C. § 2254(b)(1), that an application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court shall not be granted unless it appears that the Petitioner has exhausted the remedies available in the courts of the state.

**V.**

**STATEMENT OF FACTS**

The Petitioner, John Ramirez, is the son of Priscilla Martinez and John "Henry" Ramirez, Sr.  See Exhibits D, E.  Priscilla and Henry started dating when Priscilla was 16 and Henry was 18 and a senior in high school.  Id.  Henry was a user of marijuana during this time.  See Exhibit D.  Priscilla was a tough girl with a cigarette always behind her ear and looked as though she had been raised in the streets.  See Exhibit E.  She always dressed in a manner that looked "punked out."  Id.  She was immature for her age.  Id.  Soon after Priscilla and Henry began dating, Priscilla became pregnant with Ashley.  See Exhibit D. Priscilla and Henry were living with Henry's parents at the time.  See Exhibits D, E.  Henry was a heavy drinker and would stay up late at night playing cards and gambling.  See Exhibit D.  While pregnant with Ashley, Priscilla dropped out of high school.  See Exhibit F.

After the birth of Ashley, Priscilla and Henry moved into their own apartment.  See Exhibits D, E.  Henry's drinking worsened and contributed to arguments between Priscilla

7

and Henry.  Id.  Ashley's grandmother would visit and find Ashley in a filthy condition.  See Exhibit E.  Ashley's feet would "be just black.  She looked like she hadn't had a bath or been washed for a week."  Id.  Priscilla and Henry would leave Ashley with relatives for days and not return to get Ashley.  Id.  Once Ashley's grandmother found Ashley with a cousin after days with the cousin and Ashley was "just filthy and she was walking funny.  Id.  Ashley had a large boil on the inside of her thigh.  Id.  "I was just shocked that she could have a problem like this and no one seemed to have noticed or cared at all."  Id.  When confronted, Priscilla acted as if she was embarrassed that she had been caught not paying attention to Ashley.  Id.

When John was born, Priscilla was 18 and Henry was 20.  See Exhibit G.  There were problems between Priscilla and Henry due to Henry's drinking problem.  Id.  When John began talking, he had a lisp and slurred his words.  See Exhibit F.  When John was almost 2 years old, he started having stomach problems.  See Exhibit F, G.  John had a twisted intestine that required surgery.  Id.  The surgery was immediately required since this was a life threatening situation.  See Exhibit G.  John was in the hospital for ten days which was traumatic for him.  See Exhibit F.

Priscilla and Henry frequently fought.  See Exhibit G.  Henry had a drinking problem and Priscilla was drinking and smoking marijuana.  See Exhibits F, G.  Henry seemed to care only for partying and having fun with his buddies.  See Exhibit G.  Henry slapped Priscilla once during an argument.  See Exhibit D.  When Ashley was about 3 and John was about 2, Priscilla and Henry separated.  See Exhibit E.  This separation was hard on John because he

8

had been close to Henry.  See Exhibits E, G.  Priscilla then took the children and moved to Houston, Texas to be with her family.  Id.  Priscilla felt alone and abandoned by Henry.  See Exhibit D.  After this separation, Henry's drinking problem worsened, and he rarely saw John.  See Exhibit E.  Henry never again showed any interest in the children and never paid child support to Priscilla.  See Exhibit G.  The few times Henry came around the children, he would take Ashley with him but leave John behind at the apartment.  See Exhibits G, H.  Priscilla was left to explain to John why his father did not care to see him or do things with him.  See Exhibit G.  "It would be heart breaking when Henry would come and pick up Ashley to take her to his mother's and just leave John there crying."  Id.  Many times Henry would call and say he was on his way to pick up John and then would not show up at the apartment.  Id.  "John would sit at the window for hours waiting for him."  Id.

Priscilla would yell at Ashley and John and was very moody.  See Exhibit I.  If Ashley did not do was Priscilla asked of her, Priscilla would yell at Ashley right away.  Id.  If it was John, however, Priscilla would "smack him in the head or hit him with whatever she had in her hand at the time."  Id.  "There was always a lot of yelling, cussing and hitting going on at mom's house."  Id.  "Between the yelling and the hitting I think that she was pretty abusive of John."  Id.

Ashley went to live with her grandmother.  See Exhibit E.  While with her grandmother, Ashley was playing at the coffee table one day and asked, "Grandma, do you know how to make cocaine?"  Id.  Ashley then took a card and acted out how to chop up the

cocaine, make a line, roll up a piece of paper, and snort the cocaine through her nose.  Id.
Ashley stated her mother showed Ashley how to do this.  Id.

John lived with Priscilla, but Priscilla would send him to stay with relatives since Priscilla was with another man.  See Exhibit D.  A man, Joe Hernandez, moved in with Priscilla and John and was the father of John's younger brother, Alex.  See Exhibit G. Priscilla was working, drinking, and using drugs and really had a short fuse.  Id.  Any little thing would set off Priscilla, and she would yell at everyone and "slap whoever seemed at the time to have it coming."  Id.  "[I]t was not uncommon for [Priscilla] to yell at [John] or spank or slap him, especially as he got older."  Id.  One day at school when the kids were being checked for head lice, it was discovered that John had a cut on his head that resulted from Priscilla hitting John with a vacuum cleaner tube.  Id.  CPS got involved and almost removed John to a foster home until Priscilla's mother agreed to take John.  Id.

John would be upset since he did not get along with Joe Hernandez.  See Exhibit D. John felt that Priscilla was mean to John.  Id.  Priscilla would slap or hit John during the nine or ten years they lived in Houston.  See Exhibit E.  She had a short temper and would often yell at the kids.  See Exhibit D.  Priscilla had a couple of relationships with other men resulting in the births of Alex and Guadalupe.  Id.  John did not get along well with either of those men.  Id.  Priscilla later lived with Ascension Alvarez resulting in the birth of Guadalupe Alvarez.  See Exhibit G.  Ascension was mean to John and argued all the time with Priscilla.  Id.  These men did not care for John and Ascension would order John to wash

his hands and mouth before touching John's sister.  See Exhibits D, G.  John would see his mother beat these men.  See Exhibit K.

John was six years older than Alex and ten years older than Guadalupe, so John had a lot of responsibility for raising and looking after them when Priscilla was working or dating men.  See Exhibit E.  Their neighborhood was very rough and was in the projects and had drugs, gangs, violence, and crime was common.  See Exhibits E, G.  John never let anyone mess with Alex or Guadalupe.  See Exhibit J.  Whenever Ashley visited Priscilla there, "I would always be on 'high alert' because she always lived in a neighborhood that I never felt safe in."  See Exhibit I.  "I was always very relieved to get home after these visits, back to my own house where I felt safe."  Id.  It seemed as if the police were always there and someone was always getting arrested.  See Exhibit G.  John's uncle, who was five years older than John, was shot as a result of gang violence.  See Exhibit E.  Priscilla, looking back on this time frame, is "shocked at how chaotic and violent those eight or nine years that we spent in Houston were."  See Exhibit G.  "[I]t was an awful environment to have to raise children in."  Id.  "The violence and drugs and crime that was rampant in that neighborhood even crept into our apartment as it was during that time that [Priscilla] started using some cocaine."  Id.  The cocaine made Priscilla more moody and made their problems worse.  Id.

One of Priscilla's men, Joe Alvarez, attacked her with a knife and cut up Priscilla. See Exhibits E, J.  John witnessed this aggravated assault and called 911 for help.  Id. Alvarez was hiding outside Priscilla's apartment and as she entered, Alvarez attacked her

11

with a knife.  See Exhibit G.  They struggled at the doorway and John, who was 9 years old, witnessed his mother get cut eight times with a knife requiring stitches at the hospital.  Id.  John was terrified seeing Priscilla being cut up right in front of John.  Id.  The police arrived and arrested Alvarez.  Id.

John's grandmother does not know how John survived his childhood situation.  See Exhibit E.  "The environment that he grew up in was full of violence, neglect, crime, drugs and chaos."  Id.  John was "neglected, used and abused."  Id.  "John always only wanted a little love and attention but there was no one that gave him that on any kind of regular basis."  Id.  "Even his dad didn't pay that much attention to him."  Id.  "I think his life would have been so much different if he would have been in a better situation, but that was not to be."  Id.  John's mother, to punish him psychologically, would yell at him, tell him that she was ashamed of him, embarrass him, or threaten him with a weapon or dangerous object.  See Exhibit K.  Corporal punishment typically included spanking, slapping, ear or hair pulling, and shoving or pushing.  Id.  His mother would bite him, burn him, cut or puncture his skin, choke him, and attempted once to seriously injure or kill him as a form of punishment.  Id.  John feels like the physical violence, severe punishments, and suicidal thoughts had a significant effect on his childhood.  Id.  As a child, John experienced physical violence, had sleep difficulties, was very lonely, punished too severely, was very nervous, was accident prone, cried a lot, witnessed violence, was unhappy, had extreme fears, and suicidal thoughts.  Id.

John was placed in special education during the fifth grade.  See Exhibits D, G.  The school officials wanted John to see a doctor and start taking medication.  Id.  John was having behavior problems in class by getting out of his seat and clowning around.  Id.  John has a school history of speech problems, behavior problems, and learning problems.  See Exhibit K.  School records indicate John graduated under a special education permit, without passing statewide testing, from which he was exempted by special education.  Id.  John could not graduate in the regular educational program.  Id.

When John's grandmother was preparing to move back to Corpus Christi, Texas, John begged her, "Don't desert me, don't leave me behind."  See Exhibit D.  John would often say that he did not believe his mother loved him.  Id.  Priscilla let John go to Corpus Christi with his grandmother.  Id.  After John moved back to Corpus Christi, his father's family and his father would call to say they were coming to pick up John but then would never show up to get John.  See Exhibits D, H.  To this day, "John still carries some hurt and anger in him for how his dad ignored him while he was growing up."  See Exhibit H.  Eventually someone would call and say they had gotten busy or had to do something else.  See Exhibit D.  John would become very upset over this.  Id.  John would say, "It doesn't matter; he never did anything for me anyway.  I don't have a father."  See Exhibit G.

John would tell his grandmother that he could never please his mother.  See Exhibit D.  He would make dinner for the children, clean the house, wash the dishes, dust, instruct the children on their chores and homework since Priscilla was gone when the children

13

returned from school.  Id.  John said that no matter what he did, he could never please his mother.  Id.  She would be mad at him all the time and yell at John and the other children.  Id.  John felt physically and emotionally abused by his mother.  See Exhibit K.

When John was sixteen, he worked at the Boys and Girls Club and gave his mother half his pay check.  See Exhibits G, I.  John enjoyed organizing activities for and playing with the younger kids there.  See Exhibit I.  He really enjoyed the kids and they really liked him.  Id.  Everyone had a great time and liked it when John was in charge.  See Exhibit J.  John cared about his family and felt responsible to help out everyone.  See Exhibit G.  He would use his money to take Alex and Guadalupe to the beach, fishing, and paddle boating.  See Exhibit J.

John was jealous of how well Ashley lived as opposed to how rough things were for John.  See Exhibit G.  One Christmas at Ashley's grandmother's house, Ashley had numerous toys, clothes, and gifts, but John received only a package of socks.  Id.  This was extremely difficult on John and only added to his frustration with his father not paying attention to him.  Id.  It was obvious that John wished he could have been brought up with Ashley.  See Exhibit E.  He would comment on how much better she was than he.  Id.  "I think about the potential that John had and how well his sister was able to become successful and it just makes me sad."  Id.

John worked hard to graduate from high school and graduate from boot camp with the U.S. Marines.  See Exhibits D, E, F, G, H, I, J.  He was doing well and making good choices.

14

Id.  John, however, became involved with Laura.  Id.  She was a stripper and cared only about herself.  Id.  She kept asking John to leave the Marine Corps.  Id.  This was John's first serious relationship, and he did not know how to deal with it.  See Exhibit G.  Laura told John that if he returned to the Marines, he did not love Laura.  See Exhibit D.  The problem was that "the only thing John ever wanted in his life was to be loved and he just didn't know how to deal with this."  Id.  "[I]t was hard for him to resist the love and attention that Laura gave him that he had wanted all his life."  See Exhibit E.  John started to go downhill.  Id.  John was discharged from the Marines and Laura left him.  See Exhibit G.  John then changed for the worse.  See Exhibit D.  He started drinking heavily, using drugs, and hanging out with a bad crowd.  Id.  He would easily become angry.  See Exhibit E.  A few months later John was shot.  See Exhibit G.  His whole attitude had changed, and he gave up on trying to make anything of himself.  See Exhibit F.  A few months after that, this capital murder case arose.  See Exhibit G.

John made suicide attempts that Marine Corps psychologists believed were genuine. See Exhibit K.  John attempted suicide by overdose and jumping from a building.  Id.  He was hospitalized for psychiatric care and received medication.  Id.  He was diagnosed with borderline personality disorder.  Id.  He has a lengthy family and personal history of multiple substance abuses.  Id.  Witnessing violence was a normal occurrence for John during childhood.  Id.  He saw his mother stabbed multiple times in an altercation with her boyfriend who was the father of John's half-brother.  Id.  John witnessed his uncle shot in a gang related incident.  Id.  John was himself shot twice in the chest confronting a man who had

threatened his aunt.  Id.  John suffered extensive and repeated abuse at home resulting in CPS placing him with his grandmother.  Id.  He has a school history of hyperactivity, speech problems, behavior problems, and learning problems.  Id.

John instructed his attorneys to not present any mitigation evidence at his trial.  Id. The defense psychologist, Dr. Martinez, was present during this discussion.  Id. Dr. Martinez was of the opinion that John understood the potential consequences of this decision especially since John indicated that he hoped the jury would sentence him to death.  Id.  Dr. Martinez did not indicate in his notes, however, of any consideration that John was clinically suicidal during this time frame because of an undiagnosed mental disorder.  Id.  When John made the suicidal statement that he hoped the jury would sentence him to death, Dr. Martinez failed to propose any further specific testing for depression.  Id.  In fact, Dr. Martinez never attempted specific testing for the presence of depression or any other serious mental disorder. Id.  In the opinion of Dr. Murphey, "the evaluation of John's decision to forego testimony about mitigating circumstances was badly flawed.  It is more likely at the time of making this decision John was suicidal and irrational, based on the data reported by Dr. Martinez."  Id.

Currently, John reports suicidal ideation and has a history of suicidal ideation and attempts.  Id.  His report of prior suicidal attempts is verified from his military records and "it is assumed that his current report of suicidal ideation is accurate and reflects his thoughts and feelings accurately."  Id.  "His profile is consistent with excessive fighting, a history of dysfunctional family relationships, and alienation and mistrust of other people."  Id.  "These characteristics are consistent with his diagnosis of Boderline Personality Disorder and his history of victimization by child abuse."  Id.  John "may harbor distorted or even delusional

16

beliefs that affect his decision-making as, for example, in his decision to forego presentation of mitigation evidence."  Id.

**VI.**

**CLAIMS FOR RELIEF**

**CLAIM I**

**THE ABSENCE OF THE PETITIONER FROM THE COURTROOM AT A CRITICAL JUNCTURE IN HIS TRIAL VIOLATED HIS DUE PROCESS RIGHTS.**

**STATEMENT OF FACTS IN SUPPORT OF CLAIM I**

Jury selection began on October 22, 2008 and concluded on November 19, 2008.  (R - v.6 - 1; R - v.15 - 1).  Juror qualifications, exemptions, and general voir dire were held on October 22, 2008.  (R - v.6 - 1).  The parties announced on October 29, 2008, seventeen agreed juror strikes for having "expressed some opinion based on the Defendant's guilt or they've based an opinion about not being able to render the death penalty in any case or always rendering the death penalty based on any murder, any homicide."  (R - v.7 - 1, 40, 43).  The parties announced on November 4, 2008, fifty-two agreed juror strikes for undisclosed reasons based upon a reading by counsel of the juror questionnaires.  (R - v.8 - 1, 4-7).

The following occurred on November 4, 2008:

> THE COURT:  All right.  Okay.  Let's call the case, Cause No. 04-CR-3453-C.  Now, we are here once again on pretrial.  The other day Counsel for the State and Counsel for the Defense were here and we agreed to strike through Juror 35 and we also agreed on Juror No. 67.

17

MR. GARZA: That's correct.

THE COURT: So we took a recess so that the lawyers for the State and Defense could go through all of the other questionnaires to see if there were any potential jurors that we could agree on and I think we've done that; is that correct?

MR. GARZA: We have, Your Honor.

THE COURT: Okay.  You want to read me off the names?

MR. GARZA: Yes, I'll have Mr. Schimmel do that, if it please the Court.

THE COURT: Okay.

MR. SCHIMMEL: George Schimmel for the State and I can read those to you, Judge.

THE COURT: Okay.

MR. SKURKA: We have Juror No. 37, 40, 42, 43, 45, 47, 50, 51, 52, 54, 56, 61, 66, 68, 69, 72, 73, 74, 75, 76, 78, 83, 86.

THE COURT: Hold on, I have to switch pages here.  All right, 83.

MR. SCHIMMEL: Yes, sir, 83, 86, 89, 91, 93, 95, 107, 109, 110, 114, 115.

THE COURT: Yeah, you're getting ahead of me, Geordie.

MR. SCHIMMEL: Sorry.

THE COURT: I'm at 93.

MR. SCHIMMEL: I'm 95.

THE COURT: Okay.

MR. SCHIMMEL: 107.

18

THE COURT: Okay.

MR. SCHIMMEL: 109.

THE COURT: Okay.

MR. SCHIMMEL: 110.

THE COURT: All right.

MR. SCHIMMEL: 114.

THE COURT: Okay.

MR. SCHIMMEL: 115.

THE COURT: Uh-huh.

MR. SCHIMMEL: 117.

THE COURT: Uh-huh.

MR. SCHIMMEL: 118.

THE COURT: Okay.

MR. SCHIMMEL: 119.

THE COURT: All right.

MR. SCHIMMEL: 120.

THE COURT: Okay.

MR. SCHIMMEL: 121.

THE COURT: Okay.

MR. SCHIMMEL: 129.

THE COURT: All right.

MR. SCHIMMEL: 133.

THE COURT: Okay.

MR. SCHIMMEL: 135.

THE COURT: All right.

MR. SCHIMMEL: 136.

THE COURT: All right.

MR. SCHIMMEL: 138.

THE COURT: Okay.

MR. SCHIMMEL: 139.

THE COURT: All right.

MR. SCHIMMEL: 140.

THE COURT: All right.

MR. SCHIMMEL: 143.

THE COURT: Okay.

MR. SCHIMMEL: 145.

THE COURT: Okay.

MR. SCHIMMEL: 147.

THE COURT: All right.

MR. SCHIMMEL: 149.

THE COURT: All right.

MR. SCHIMMEL: 150.

THE COURT: Okay.

MR. SCHIMMEL: 153.

THE COURT: All right.

MR. SCHIMMEL: 154.

THE COURT: Okay.

MR. SCHIMMEL: And 157.

THE COURT: All right.

MR. GARZA: That's correct, Your Honor, on behalf of the Defendant.

THE COURT: All right.

MR. GARZA: We're in agreement that those are the challengeable for cause.

THE COURT: Okay, and you've discussed this with your client and he's in agreement with this?

MR. GARZA: That's correct, Your Honor.

THE COURT: All right.  Then those folks will be struck for cause, the ones that Mr. Schimmel read off.  And – and, Ann, I'll give you this list so that we can – we've already sent out notices for the first two days which happens to be Monday and Wednesday.  We've got Veterans day in the middle so those two days are already booked and Ann Cortez will start working on the rest of the – on the rest of the jurors.

MR. GARZA: Okay.

COURT COORDINATOR: I gave already Grant their copy.

21

THE COURT: Okay. You gotten a copy of this?

MR. GARZA: Yes, Your Honor.

MR. JONES: Yes.

THE COURT: Okay.

COURT COORDINATOR: Any changes or –

THE COURT: Well, we're going to be giving this to the jurors. If you've got any –

MR. JONES: Are we going to do – let them read it in the hall?

THE COURT: Yeah, or in the jury room.

MR. JONES: Okay, good. You're not going to read it out loud to them?

THE COURT: Nuh-huh, no.

MR. JONES: Yeah, that works.

THE COURT: Yeah. And anything else.

MR. JONES: So we're go for Monday, right?

THE COURT: We're going to try to do nine a day.

MR. JONES: Okay. What time do we start on Monday?

THE COURT: 8:30.

MR. JONES: 8:30, okay.

THE COURT: We're going to try and do 9 a day. We're going to try to bring in 2 at 8:30, 2 at 8:30, 2 at 10, 1 at 11 and then 1:30 is – 2 at 1:30, 2 at 3, and hopefully we can get 9 out – knocked out a day.

22

MR. JONES: Are you going to have the telephone numbers of everybody?

COURT COORDINATOR: The bailiff does.

MR. JONES: Yeah, sometimes – I remember when we tried the case over in the 117th that we – like one morning we got way ahead and the – I don't know, if it was the bailiff or the court manager got on the phone and called these people and they came in.

THE COURT: Okay.

MR. JONES: They came in so it's possible, you know.

THE COURT: Okay.  We may have to do that.

THE BAILIFF: I already did that.

MR. JONES: Yeah, in other words, people like scheduled for 2 would come in 11.

THE BAILIFF: Yes, sir, yes, sir.

THE COURT: Yeah, we can do that.  We'll see how it goes.

THE COURT: Anything else?  All right.

MR. JONES: Okay, good.  Thank you.

(Adjournment.)

Id.

The above record reflects that counsel was present but does not reflect that the Petitioner, John, was present.  Defense counsel has given an affidavit regarding the above November 4, 2008 hearing.  See Exhibit L.  In his affidavit, counsel confirms that John was not present during this proceeding.  Id.

23

Defense attorney Ed Garza testified at the writ hearing.  He testified that he did not take to the Petitioner the juror questionnaires for these 52 venireman and did not discuss with the Petitioner whether or not to excuse these veniremen.  (W - v.3 - 90).  The Petitioner did not know at the time that these 52 veniremen were being released.  Id.

## ARGUMENT AND AUTHORITIES
## IN SUPPORT OF CLAIM I

The Confrontation Clause of the Sixth Amendment to the United States Constitution states that, "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . ."  The Fourteenth Amendment to the United States Constitution makes the guarantees of the Confrontation Clause obligatory upon the States.  Pointer v. Texas, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965).

One of the basic rights of the Confrontation Clause is the right of the accused to be present in the courtroom at every stage of his trial.  Lewis v. United States, 146 U.S. 370, 13 S.Ct. 136, 36 L.Ed. 1011 (1892).  "The prisoner is entitled to an impartial jury composed of persons not disqualified by statute, and his life or liberty may depend upon the aid which, by his personal presence, he may give to counsel and to the court and triers, in the selection of jurors."  Id.  It is reversible error to qualify jurors for a trial in the absence of the accused. Id.

In the case at bar, the Confrontation Clause guaranteed John the right to be present in the courtroom during any agreement to excuse fifty-two jurors.  The personal presence of John was required during this period of the proceedings.  It was reversible error to agree to the excusal of veniremen in the absence of John.

A defendant in custody can never waive his right to be present at every stage of his trial because he does not have control over his presence or absence.  Diaz v. United States, 223 U.S. 442, 455, 32 S.Ct. 250, 56 L.Ed. 500 (1912).  There exists a reasonable presumption against waiver of such fundamental constitutional rights and courts do not presume acquiescence in the loss of such rights.  Johnson v. Zerbst, 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938).

In the case at bar, John was in custody since his arrest on February 20, 2008.  He was unable to waive his right to be present during the agreement to excuse veniremen because he did not have control over his presence or absence.  There cannot be a presumption that John waived his right to be present during the agreement to excuse veniremen.

A defendant has a due process right to be present at his trial "whenever his presence has a relation, reasonably substantial, to the fulness of his opportunity to defend against the charge." Snyder v. Massachusetts, 291 U.S. 97, 105-106, 54 S.Ct. 330, 78 L.Ed. 674 (1934). "So far as the Fourteenth Amendment is concerned, the presence of a defendant is a condition of due process to the extent that a fair and just hearing would be thwarted by his absence, and to that extent only." Id., 291 U.S. at 107-108.  Due process does not require the presence of a defendant "when [his] presence would be useless, or the benefit but a shadow." Id., 291 U.S. at 106-107.  An absence of a defendant, for example, from the reading of the jury instructions or the rendering of the verdict is not harmless error because there was a reasonable possibility of prejudice.  Wade v. United States, 441 F.2d 1046 (D.C. Cir. 1971).

25

The court reasoned as follows:

> The Sixth Amendment guarantee of the right to confront adverse witnesses – is in good part a constitutional recognition of a psychological influence.  Though perhaps to a less degree, the same influence pertains to the right of confrontation of defendant and jury, ***aside from the usefulness the accused may be to his counsel*** . . . [T]here is the reasonable possibility that the jury speculated adversely to the defendant about his absence from the courtroom.

Id. (emphasis added).

Article 33.03 of the Texas Code of Criminal Procedure requires the personal presence of the accused at trial in all felony cases except when the accused voluntarily absents himself after pleading to the indictment or information or after the jury has been selected.  Bath v. State, 951 S.W.2d 11, 22 (Tex. App. - Corpus Christi 1997, pet. ref'd), cert. denied, 525 U.S. 829, 119 S.Ct. 80, 142 L.Ed.2d 62 (1998).  This right of the accused to be present at trial "is entailed within a defendant's right to confront witnesses against him under the United States and Texas Constitutions."  Id. citing Miller v. State, 692 S.W.2d 88, 90 (Tex. Crim. App. 1985).  "The right cannot be waived until after the jury has been selected."  Bath v. State, supra, 951 S.W.2d at 22; Miller v. State, supra, 692 S.W.2d at 91.  A trial judge's "hearing of venirepersons' excuses while appellant was absent from the courtroom has constituted error."  Bath v. State, supra, 951 S.W.2d at 22; Weber v. State, 829 S.W.2d 394, 396 (Tex. App. - Beaumont 1992, no pet.).

In the case at bar, the veniremen were already assigned to the Petitioner's specific case when the veniremen appeared in court.  The trial judge assigned to preside over the

26

Petitioner's trial also functioned as the general assembly judge over the prospective veniremen *__already assigned to the Petitioner's specific case.__*  The Petitioner's trial, therefore, had begun at the time of the exemptions, excuses, and qualifications.  It was constitutional error for the trial judge to proceed with the fifty-two juror strikes in the absence of the Petitioner.  The absence of John during the qualification of the venire panel was not harmless error because there was a reasonable possibility of prejudice.

It is impossible to confidently say, on the whole record, that this constitutional error was harmless beyond a reasonable doubt.  The absence of John during the agreement to excuse fifty-two veniremen created a reasonable possibility of prejudice.  It was not harmless error to exclude John during the agreement to excuse veniremen.  This was a violation of John's protections under the Sixth Amendment Confrontation Clause and a violation of his due process rights.  John should receive a new trial.

**CLAIM II**

**THE PETITIONER WAS DENIED HIS STATE AND FEDERAL CONSTITUTIONAL RIGHT TO A PUBLIC TRIAL.**

**ARGUMENT AND AUTHORITIES
IN SUPPORT OF CLAIM II**

The Petitioner, John, was arrested for capital murder on February 20, 2008.  (R - v.19 - 40).  He stood accused in Count 1 of a four count indictment of the murder of Pablo Castro by stabbing him with a knife in the course of committing or attempting to commit robbery. See attached Exhibit B.  He stood accused in Counts 2 and 3 of the aggravated robbery of April Metting and Ruby Pena.  Id.  He stood accused in Count 4 of evading arrest.  Id.

27

Jury selection began on October 22, 2008 and concluded on November 19, 2008. (R - v.6 - 1; R - v.15 - 1).  Juror qualifications, exemptions, and general voir dire were held on October 22, 2008. (R - v.6 - 1).  Defense counsel has provided an affidavit regarding the voir dire proceedings held on October 22, 2008.  See Exhibit L.  The juror qualifications, exemptions, and general voir dire on October 22, 2008 were held in the central jury room of the court house.  Id.  Attached to the affidavit are photographs of the entrance to the central jury room and the interior of the central jury room as it appeared on October 22, 2008.  Id.  Defense counsel personally observed on October 22, 2008 uniformed guards posted at the entrance to the central jury room depicted in the first photograph attached to the affidavit. Id.  These guards prevented the general public from entering the central jury room when the court conducted juror qualifications, exemptions, and general voir dire in this case.  Id. Defense counsel personally observed the guards exclude members of the public from entering the central jury room during jury selection on this day.  Id.  The only people allowed to enter the central jury room were court personnel, attorneys, the Defendant, and members of the venire panel.  Id.  Members of the public were not allowed to enter the room during this jury selection.  Id.

The state called as a witness at the habeas hearing Lieutenant Isaac from the Nueces County Sheriff's Office. (WHC - v.2 - 28-29).  He testified that armed guards were standing in front of the central jury room.  Id. at 33.  Lt. Isaac is very familiar with defense attorney Ed Garza.  Id. at 34-35.  He considers Ed Garza to be very truthful and cannot disagree and

has no reason to disbelieve Ed Garza's claim in his affidavit that members of the public were not allowed to enter the central jury room during jury selection in this cause.  Id. at 35-36. Lt. Isaac testified that he did not have anything personally that would lead him to disagree with Ed Garza regarding the exclusion of the public from the central jury room during jury selection.  Id. at 36, 41.

No discussion or reasons appear in the record to explain the expulsion of the public at the beginning of voir dire.  (R - v.6 - 1).  The Petitioner was tried and later convicted by jury on December 5, 2008.  (R - v.20 - 1, 48).  He was sentenced to death three days later. (R - v.22 - 1, 36).

The presence of the public in the courtroom helps insure honest proceedings.  Addy v. State, 849 S.W.2d 425, 429  (Tex. App.-Houston [1st Dist.] 1993, no pet.).  If an accused is denied the presence of the public, he is denied a public trial, unless the trial court can articulate on the record some compelling reason for excluding them.  Id.  The Sixth Amendment to the Constitution of the United States and Article I, Section 10 of the Texas Constitution both provide that in all criminal prosecutions, the accused shall have a speedy public trial.  The Texas Code of Criminal Procedure mandates that the proceedings and trials in all courts shall be public.  Tex. Code Crim. Proc. Ann. art. 1.24.  The Supreme Court of the United States has declared a four-part test for determining whether an accused has been denied the right to a public trial:

> (1) the party seeking to close the hearing **must advance an overriding interest** that is likely to be prejudiced;

29

(2) the closure must be no broader than necessary to protect that interest;

(3) **the court must consider reasonable alternatives**; **_and_**

(4) **the court must make findings adequate to support the closure**.

Waller v. Georgia, 467 U.S. 39, 48, 104 S.Ct. 2210, 2216, 81 L.Ed.2d 31 (1984); see also United States v. Edwards, 303 F.3d 606, 616 (5th Cir. 2002), cert. denied, 537 U.S. 1192, 123 S.Ct. 1272, 154 L.Ed.2d 1025 (2003).

This constitutional right is not to be abrogated without a showing consistent with the four factors listed above. "[T]here is no significant textual difference in the language guaranteeing the right to a public trial in the Sixth Amendment to the United States Constitution and Article 1, Section 10 of the Texas Constitution, [and courts] will not construe the Texas Constitution as conferring any greater protection to a criminal defendant than the federal constitution." Andrade v. State, 240 S.W.3d 217 (Tex. App. - Houston [14th Dist.] 2007, pet. ref'd), citing Fletcher v. State, No. 14-96-01158-CR, 1998 Tex. App. LEXIS 5929, (Tex. App. - Houston [14th Dist.] Sept. 24, 1998, pet. ref'd)(not designated for publication)(stating Texas follows the United States Supreme Court and the federal courts of appeal concerning a criminal defendant's right to a public trial).

Public trials have played an important role in the administration of justice in this country and have their roots in our English common law heritage. Andrade v. State, supra, citing In re Oliver, 333 U.S. 257, 266, 68 S.Ct. 499, 504, 92 L.Ed. 682 (1948) ("without

exception all courts have held that an accused is at the very least entitled to have his friends, relatives, and counsel present, regardless with what offense he may be charged."). The value of the openness lies in the fact that people not actually attending trials can have confidence that standards of fairness are being observed. Press-Enterprise Co. v. Superior Court of California, 464 U.S. 501, 508, 104 S.Ct. 819, 823, 78 L.Ed.2d 629 (1984). The sure knowledge that anyone is free to attend gives assurance that established procedures are being followed and that deviations will become known. Id. The requirement of a public trial is for the benefit of the accused. Andrade v. State, supra at 225; Waller v. Georgia, supra, at 46. The public is able to see that the accused is fairly dealt with and not unjustly condemned. Id. The presence of spectators also ensures the accused's triers are aware of their responsibility and its importance. Id. A public trial also ensures generally that the judge and prosecutor carry out their duties responsibly. Id. The right to a public trial is not absolute however. Addy v. State, supra. The right to a public trial must be balanced against other interests essential to the administration of justice. United States v. Osborne, 68 F.3d 94, 98 (5th Cir. 1995).

In Andrade, supra, the trial court did not totally close the courtroom to all spectators, instead, it ordered the removal of a single person, one of the defendant's attorneys, for violating a standing procedural order by arguing with the trial court. This fact distinguished this situation from Waller v. Georgia, supra. In Waller v. Georgia, the Supreme Court addressed a total closure of a courtroom for a motion to suppress hearing when it adopted the

31

four factor test for determining when a defendant's right to a public trial is outweighed by other considerations.  Id., 467 U.S. at 45.

In Osborne, supra, the Fifth Circuit addressed a partial closure situation and distinguished Waller, finding it applied only to total closures and adopted a modified version of the Waller factors for cases involving only a partial closure of a courtroom.  United States v. Osborne, supra, 68 F.3d at 98-99.  The Fifth Circuit determined that there must only be a "substantial reason" for the partial closure.  Id.  It has been noted that a trial court's authority to keep order in the courtroom is a "substantial reason" justifying the partial closure.  United States ex. rel. Orlando v. Fay, 350 F.2d 967, 971 (2nd Cir. 1965) (holding the guarantee of a public trial means only that the public must be freely admitted so long as those persons and groups who make up the public remain silent and behave in an orderly fashion so that the trial may continue).  Limitations on public attendance may be imposed where they are necessary to protect a State's interest that outweighs the defendant's right to public scrutiny.  Addy v. State, supra, citing Rovinsky v. McKaskle, 722 F.2d 197, 200 (5th Cir. 1984).  Protection of witnesses from extreme embarrassment or intimidation that would traumatize them or render them unable to testify is an overriding State interest sufficient to justify partial or complete exclusion of the press or public.  Id.  No State's interest, however compelling, can sustain the exclusion of press and public from part of a trial, absent findings of necessity articulated on the record.  Globe Newspaper Co. v. Superior Court, 457 U.S. 596, 606-609, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982).

32

None of these issues pertaining to limitations that justify closure existed in the case at bar.  In the case at bar, there was a <u>Waller</u> situation – a total closure of the courtroom to the public.  There is literally nothing in the record that justifies this total closure of the courtroom at voir dire when the four factors of <u>Waller</u> are considered:  (1) the party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced; (2) the closure must be no broader than necessary to protect that interest; (3) the court must consider reasonable alternatives; and (4) the court must make findings adequate to support the closure.  <u>Waller v. Georgia</u>, <u>supra.</u>  There was no overriding interest that was advanced by any party, much less the State, and no prejudice would have been suffered by the State had the Petitioner received moral support from his family and friends during jury selection or if the public had been allowed access.  A total closure in this case was far broader than necessary and there was no evidence in the record or elsewhere that reasonable alternatives were ever explored by the court before the public was expelled.  Certainly, there were  no findings "adequate to support the closure" listed by the court to substantiate its decision.  This was a textbook violation of the Petitioner's constitutional rights, and he was therefore prejudiced by this violation of this most basic right.

The <u>Waller</u> court noted that, "The parties do not question the consistent view of the lower federal courts that ***the defendant should not be required to prove specific prejudice in order to obtain relief for a violation of the public-trial guarantee***.  **We agree with that view** . . ."  <u>Waller v. Georgia</u>, <u>supra</u>, 467 U.S. at 40-41 (emphasis added).  The Court cited

33

in a footnote additional authorities in support of this proposition of necessarily implied prejudice:

> See, e. g., Douglas v. Wainwright, 714 F.2d 1532, 1542 (11th Cir. 1983) (citing cases), cert. pending, Nos. 83-817, 83-995; see also Levine v. United States, 362 U.S. 610, 627, n. (1960) (BRENNAN, J., dissenting) ("[The] settled rule of the federal courts [is] that a showing of prejudice is not necessary for reversal of a conviction not had in public proceedings").  The general view appears to be that of the Court of Appeals for the Third Circuit.  It noted in an en banc opinion that a requirement that prejudice be shown "would in most cases deprive [the defendant] of the [public-trial] guarantee, for it would be difficult to envisage a case in which he would have evidence available of specific injury."  United States ex rel. Bennett v. Rundle, 419 F.2d 599, 608 (1969).  While the benefits of a public trial are frequently intangible, difficult to prove, or a matter of chance, the Framers plainly thought them nonetheless real. See also State v. Sheppard, 182 Conn. 412, 418, 438 A. 2d 125, 128 (1980) ("Because demonstration of prejudice in this kind of case is a practical impossibility, prejudice must necessarily be implied"); People v. Jones, 47 N.Y.2d 409, 416, 391 N.E.2d 1335, 1340 (1979) ("The harmless error rule is no way to gauge the great, though intangible, societal loss that flows" from closing courthouse doors).

Id.

The Court distinguished in Waller the usual remedy of a new trial and noted the remedy should fit the violation, and since it was a pretrial motion to suppress hearing that was closed to the public in that particular case, a new, public suppression hearing was a proper remedy.  Id., 467 U.S. at 41.  On remand, the defendant would only be entitled to a new trial if the new suppression hearing were to suppress material evidence not suppressed in the first trial.  Id.  The Waller court reversed and remanded because of the total closure of

a pre-trial hearing and the ensuing violations of that appellant's rights.  The Court also noted,

however, pertinent to the instant case that:

> We also have extended that right not only to the trial as such ***but***
> ***also to the voir dire proceeding in which the jury is selected***."
> Press-Enterprise Co. v. Superior Court of California, 464 U.S.
> 501 (1984).

Id., 467 U.S. at 44.

There is no question by the United States Supreme Court that a ***violation of the public***

***right to trial at the voir dire stage is a violation of the public right to trial***.  See Press-

Enterprise Co. v. Superior Court of California, supra (hereinafter Press Enterprise I)

(government failed to show compelling interest to justify closing of voir dire despite grounds

raised in court's closure order, absent consideration of closure alternatives, court could not

constitutionally close voir dire).

In Press-Enterprise I, the United States Supreme Court dealt with the issue of right to

public trial as it pertains to the closing of voir dire in a rape/murder case of a teenage girl.

Id.  This was a First Amendment case and not a Sixth Amendment analysis since both the

state and defense requested a closed voir dire.  Press-Enterprise moved to attend the trial

which started with voir dire.  Id., 464 U.S. at 503.  They were allowed only to attend general

voir dire, but not individual, on the rationale from the state that reporters in the courtroom

would make the prospective jurors less candid to questioning.  Id.  Most of the voir dire was

closed to the public.  Id.  Press-Enterprise moved for the transcript of the closed proceedings

and was denied.  They appealed the decision after being denied, seeking an appellate

mandate and rehearing on the issue after the defendant had already been convicted and

sentenced to death.   Id.   The appellate court denied their motion and the United States

Supreme Court granted certiorari and reversed the lower appellate court's ruling.   In

discussing the lengthy history of open jury selection throughout common law history, the

Supreme Court noted:

> For present purposes, how we allocate the "right" to
> openness as between the accused and the public, or whether we
> view it as a component inherent in the system benefitting both,
> is not crucial.   **No right ranks higher than the right of the**
> **accused to a fair trial.**   But the primacy of the accused's right
> is difficult to separate from the right of everyone in the
> community to attend the voir dire which promotes fairness.
>
> The open trial thus plays as important a role in the
> administration of justice today as it did for centuries before our
> separation from England.   **The value of openness lies in the**
> **fact that people not actually attending trials can have**
> **confidence that standards of fairness are being observed; the**
> **sure knowledge that anyone is free to attend gives assurance**
> **that established procedures are being followed and that**
> **deviations will become known.   Openness thus enhances**
> **both the basic fairness of the criminal trial and the**
> **appearance of fairness so essential to public confidence in**
> **the system**.

Id., 464 U.S. at 508 (emphasis added).

The Supreme Court vacated the lower court's decision regarding the closure order for

a petitioner who was not even a defendant and remanded.   The lower court of appeals then

analyzed the decision in Press-Enterprise I and found no First Amendment right of the public

to attend voir dire but held it for actual criminal trials.   Press-Enterprise Co. v. Superior

36

Court, 478 U.S. 1, 106 S.Ct. 2735, 92 L.Ed.2d 1 (1986) (hereinafter Press-Enterprise II).  The

Supreme Court granted certiorari a second time even though the petitioner in Press-

Enterprise I had already been remedied, finding that these violations are capable of repetition

and not moot.  Press-Enterprise II, supra, 478 U.S. at 6.  The Supreme Court reversed the

lower appellate court again for not recognizing the critical importance of jury selection,

noting:

> Plainly, the defendant has a right to a fair trial but, as we have repeatedly recognized, one of the important means of assuring a fair trial is that the process be open to neutral observers.
>
> The right to an open public trial is a shared right of the accused and the public, the common concern being the assurance of fairness.  Only recently, in Waller v. Georgia, 467 U.S. 39 (1984), for example, we considered whether the defendant's Sixth Amendment right to an open trial prevented the closure of a suppression hearing over the defendant's objection.  We noted that the First Amendment right of access would in most instances attach to such proceedings and that "the explicit Sixth Amendment right of the accused is no less protective of a public trial than the implicit First Amendment right of the press and public."  Id., at 46.  When the defendant objects to the closure of a suppression hearing, therefore, the hearing must be open unless the party seeking to close the hearing advances an overriding interest that is likely to be prejudiced.  Id., at 47 . . . Here, unlike Waller, the right asserted is not the defendant's Sixth Amendment right to a public trial since the defendant requested a closed preliminary hearing.  Instead, the right asserted here is that of the public under the First Amendment.  See Gannett, supra, at 397 (POWELL, J., concurring).  The California Supreme Court concluded that the First Amendment was not implicated because the proceeding was not a criminal trial, but a preliminary hearing.  However, the First Amendment question cannot be resolved solely on the label

> we give the event, i. e., "trial" or otherwise, particularly where
> the preliminary hearing functions much like a full-scale trial.

Id., 478 U.S. at 7 (emphasis added).

"[The] presumption [of the right to public trial] may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest. The interest is to be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered." Id., 478 U.S. at 9-10, citing Press-Enterpise I, supra. These cases demonstrate that jury selection is considered part of the criminal trial for right to public trial purposes and that the Supreme Court considers the right to be a critical one, even to the point of reaffirming the value of the right in a case where the petitioner had already been remedied. Press-Enterprise II. This right arguably takes on more critical importance when it is the defendant who brings the violation of this right to the court's attention post-conviction, especially in a situation where the record is barren of any analysis or narrowly tailored reasons for closure of the court room during voir dire in the case at bar.

This is not a right that requires a showing of harm or prejudice. Of the two classes of harm, the right to public trial falls in the second class of constitutional error of "structural defects." United States v. Gonzalez-Lopez, 548 U.S. 140, 126 S.Ct. 2557, 165 L.Ed.2d 149 (2006). "These [structural errors] 'defy analysis by "harmless-error" standards' because they 'affec[t] the framework within which the trial proceeds,' and are not 'simply an error in the trial process itself.'" Id., 548 U.S. at 148-149, citing Waller v. Georgia, supra (the violation

38

of the right to public trial is an example of structural error).  These structural errors are assessed this way because of the difficulty in proving the effect of the error.  Id., 548 U.S. at 149, n. 4, citing Waller v. Georgia, supra (violation of the public-trial guarantee is not subject to harmlessness review because "the benefits of a public trial are frequently intangible, difficult to prove, or a matter of chance.").

In Waller, one of the defendants failed to object to the closure of the public from the suppression hearing.  Waller v. Georgia, supra, 467 U.S. at 42, n. 2.  The Court, however, still reversed and remanded that case and allowed the state appellate court to determine if that defendant was procedurally barred from seeking relief as a matter of state law.  Id.  No such procedural bar would apply in Texas.  Texas Rule of Evidence 103(d) authorizes a reviewing court to take notice of fundamental or structural errors affecting substantial rights although they were not brought to the attention of the court.  Blue v. State, 41 S.W.3d 129 (Tex. Crim. App. 2000).  Some rights, such as the presumption of innocence, are widely considered so fundamental to the proper functioning of our adjudicatory process as to enjoy special protection in the system.  Id.  A principal characteristic of these rights is that they cannot be forfeited.  Id.  Such rights are not extinguished by inaction alone.  Id.  Instead, if a defendant wants to relinquish one or more of them, he must do so expressly.  Id.  A violation of a fundamental constitutional right, such as the violation of the public right to trial at the voir dire stage, therefore requires no objection.  Should this court deem an objection is required, which would be a position opposed to the above cases, the following Claim discusses

39

ineffective assistance of counsel for failing to object to the violation of this fundamental constitutional right.

Federal courts also note that no showing of harm is required for violations of this right.  "[T]he cases on this issue are clear: 'once a petitioner demonstrates a violation of his Sixth Amendment right to a public trial, **he need not show that the violation prejudiced him in any way**.  The mere demonstration that his right to a public trial was violated entitles a petitioner to relief.'"  Owens v. United States, 483 F.3d 48, 31 (1st Cir. 2007), citing Judd v. Haley, 250 F.3d 1308, 1315 (11th Cir. 2001) (emphasis added).

In Owens, it was noted in analyzing the issue in that case:

> However, **this was not a mere fifteen or twenty-minute closure; rather, Owens' trial was allegedly closed to the public for an entire day while jury selection proceeded**.  Jury selection is, of course, a crucial part of any criminal case.  See Gomez v. United States, 490 U.S. 858, 873, 109 S.Ct. 2237, 104 L.Ed.2d 923 (1989) ("Jury selection is the primary means by which a court may enforce a defendant's right to be tried by a jury free from ethnic, racial, or political prejudice . . . or predisposition about the defendant's culpability . . . .").  Furthermore, even if the courtroom was closed because of inattention by the judge, courts have expressed concern in the past where a court officer's unauthorized closure of a courtroom impeded public access.  See, e.g., Walton v. Briley, 361 F.3d 431, 433 (7th Cir. 2004) ("Whether the closure was intentional or inadvertent is constitutionally irrelevant."); Martineau v. Perrin, 601 F.2d 1196, 1200 (1st Cir. 1979) (noting Sixth Amendment concern where marshals locked courtroom doors without authorization); see also United States v. Keaveny, 1999 U.S. App. LEXIS 3630 at 4 (1st Cir. 1999) ("[C]onstitutional concerns may be raised even by a court officer's unauthorized partial exclusion of the public.").

Id., 483 F.3d at 63.

As in Owens, the closure in the case at bar was for an entire day of jury selection.  As in Waller, it was a total closure.  There was no justification for this constitutional violation.  "The public trial guarantee has been considered so important that courts have reversed convictions or granted habeas relief where the courtroom was closed for the announcement of the verdict, United States v. Canady, 126 F.3d 352, 364 (2d Cir. 1997), where a trial inadvertently ran so late one night that the public was unable to attend, Walton v. Briley, 361 F.3d 431, 433 (7th Cir. 2004), and where the trial was closed for the testimony of just one witness, United States v. Thunder, 438 F.3d 866, 868 (8th Cir. 2006)."  Owens v. United States, supra, 483 F.3d at 61.

In the instant case, on day one of jury trial where the jury is being selected in a capital murder case, the courtroom doors were totally closed to the public and family and friends without justification that appears anywhere in the record.  See Exhibit L.  None of the Waller factors were expressed, discussed, or even considered before the wholesale expulsion of family and friends of the Petitioner and general public took place.  This is a textbook constitutional violation as expressed in Waller and one that should not have occurred in the Petitioner's trial.

There is no legitimate way to remedy this federal and state constitutional violation without the granting of a new jury trial to the Petitioner since a redo of jury selection itself is an impossibility at this post-conviction stage and would be meaningless as a remedy.  This violation is not something that requires a showing of prejudice by the Petitioner as the United

41

States Supreme Court has noted. The only remedy that exists for this violation is a new trial for the Petitioner.  The Petitioner should receive a new trial in this cause.

## CLAIM III

### THE PETITIONER'S RIGHT TO DUE PROCESS AND A FAIR TRIAL WAS VIOLATED WHEN HE WAS SHACKLED DURING TRIAL.

### ARGUMENT AND AUTHORITIES IN SUPPORT OF CLAIM III

The Fifth Amendment of the United States Constitution states, in part, that, "No person shall be deprived of life, liberty, or property, without due process of law . . ."  The Sixth Amendment to the United States Constitution states, in part, that, "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury . . ." The Fourteenth Amendment of the United States Constitution states, in part, that, "No State shall . . . deprive any person of life, liberty, or property, without due process of law . . ."

Handcuffing or shackling a defendant, prior to his conviction, where a juror can see the restraint, violates due process absent some essential state interest.  Holbrook v. Flynn, 475 U.S. 560, 106 S.Ct. 1340, 89 L.Ed.2d 525 (1986).  Pivotal to the right to a fair trial and due process, as guaranteed by the Fifth, Sixth, and Fourteenth Amendments, is the principle that "one accused of a crime is entitled to have his guilt or innocence determined solely on the basis of the evidence introduced at trial, and not on grounds of official suspicion, indictment, continued custody, or other circumstances not adduced as proof at trial."

42

Holbrook v. Flynn, supra, citing Taylor v. Kentucky, 436 U.S. 478, 485 (1978).  The Supreme Court has recognized that "certain practices pose such a threat to the 'fairness of the factfinding process' that they must be subjected to 'close judicial scrutiny.'"  Holbrook v. Flynn, supra, citing Estelle v. Williams, 425 U.S. 501, 503-504 (1976).  If a defendant is forced to wear prison clothes before the jury, "the constant reminder of the accused's condition implicit in such distinctive, identifiable attire may affect a juror's judgment."  Holbrook v. Flynn, supra.  Such a practice is unconstitutional "since no 'essential state policy' is served by compelling a defendant to dress in this manner.'"  Holbrook v. Flynn, supra.

Shackling is the sort of inherently prejudicial practice that should be permitted only where justified by an essential state interest specific to each trial.  Holbrook v. Flynn,  475 U.S. at 568-569,; Estelle v. Williams, supra, 425 U.S. at 503, 505 (making a defendant appear in prison garb poses such a threat to the "fairness of the factfinding process" that it must be justified by an "essential state policy").  Since shackling involves a "probability that prejudice will result that it is deemed inherently lacking in due process," Estes v. Texas, 381 U.S. 532, 542-543 (1965), "little stock need be placed in jurors' claims to the contrary."  Holbrook v. Flynn, supra, citing Sheppard v. Maxwell, 384 U.S. 333, 351-352 (1966); Irvin v. Dowd, 366 U.S. 717, 728 (1961).  "Even though a practice may be inherently prejudicial, jurors will not necessarily be fully conscious of the effect it will have on their attitude toward the accused."  Holbrook v. Flynn, supra.  "Whenever a courtroom arrangement is challenged as inherently prejudicial, therefore, the question must be not whether jurors actually

articulated a consciousness of some prejudicial effect, but rather whether 'an unacceptable risk is presented of impermissible factors coming into play.'"  Holbrook v. Flynn, supra, citing Williams, 425 U.S., at 505.

In Illinois v. Allen, 397 U.S. 337 (1970), the Supreme Court stated that a defendant may be prejudiced if he appears before the jury bound and gagged.  "Not only is it possible that the sight of shackles and gags might have a significant effect on the jury's feelings about the defendant, but the use of this technique is itself something of an affront to the very dignity and decorum of judicial proceedings that the judge is seeking to uphold.'"  Id.  No person should be tried while shackled except as a last resort.  Id.

Shackling after conviction and during capital sentencing proceedings is also unconstitutional.  Elledge v. Dugger, 823 F.2d 1439, amended, 833 F.2d 250 (11th Cir. 1987), cert. denied, 485 U.S. 1014 (1988).  A defendant has the right to be present during his trial without any restraints being used upon him.  Culverhouse v. State, 755 S.W.2d 856 (Tex. Crim. App. 1988), cert. denied, 488 U.S. 863 (1989).  It is within the trial judge's discretion to shackle the defendant if this action is required by the circumstances.  Id.  If the judge orders the defendant shackled, the record should reflect the particular reasons for this restraint.  Id.  The trial judge abuses her discretion if the record fails to reflect sufficient reasons for the actions of the judge in shackling the defendant.  Id.  A formal hearing may be required before the judge orders shackles if the actions supporting the order by the judge did not occur in the presence of the judge or were not within the personal knowledge of the

44

judge.  Id.  A hearing and findings must precede the order of restraint.  Gamage v. State, 630 S.W.2d 309 (Tex. App. - San Antonio 1982, pet. ref'd).  A conviction will be reversed if the record fails to reflect conduct by the defendant justifying shackling.  Penn v. State, 628 S.W.2d 179 (Tex. App. - Corpus Christi 1982, pet. ref'd).

Shackling is permissible only when a defendant has become so insulting, abusive, and disruptive that an orderly trial is impossible and, even then, it is an abuse of discretion to employ shackles when less drastic security measures will adequately and reasonably suffice. Kennedy v. Cardwell, 487 F.2d 101 (6th Cir. 1973), cert. denied, 416 U.S. 959 (1974); Spain v. Rushen, 883 F.2d 712 (9th Cir. 1989), cert. denied, 479 U.S. 910 (1990).  For example, it was deemed permissible to shackle a defendant after he attacked a witness in front of the jury.  Smith v. State, 638 S.W.2d 200 (Tex. App. - Houston [1st Dist.] 1982, no pet.). Removal from the court room provides a less drastic measure.  Illinois v. Allen, supra.  A defendant loses his constitutional rights in this context only if, after he has been warned by the judge about his disruptive behavior, he still conducts himself in a manner so disorderly, disruptive, and disrespectful of the court that his trial cannot be continued.  Id.  Between shackling and removal from the court room, shackling is the least acceptable.  Id. (Brennan, J., concurring).  Improper shackling requires automatic reversal based upon the constitutional violation.

In Rhoden v. Rowland, 172 F.3d 633 (9th Cir. 1999), the trial judge ordered the defendant shackled during trial but did not establish a compelling need for the shackling.  Id.

at 635.  The defendant was escorted to and from the courtroom outside the jury's presence and was instructed to keep his feet under counsel table.  Id.  It was established that at least three jurors had seen the shackles during trial.  Id.  Five jurors saw the shackles during some part of the trial, and the shackling was not mentioned during jury deliberations.  Id. at 636. The shackles were visible to the jury while in the jury box, but the lower court held that the shackling had little actual impression on the jury.  Id.  The Ninth Circuit held that since the jury saw the shackles, the case involved violent crimes, and the evidence was disputed, the trial judge's error in shackling the defendant substantially influenced the jury's verdict.  Id. at 637.  The defendant was granted habeas relief.

In the case at bar, the Petitioner was shackled with leg irons running through an eye bolt in the floor of the court room.  See Exhibit L.  Even though a table blocked the jury from seeing the leg irons and the eye bolt, every time the Petitioner arose or moved in his chair, the sound of the leg irons moving through the eye bolt was audible.  Id.  At no time during the jury selection, pretrial motions, or any part of the trial was there any acting out or misconduct of any type by the Petitioner.

The state called Sgt Eric Gonzales of the Nueces County Sheriff's Office to testify at the writ hearing.  (W - v.2 - 42).  He testified that the Petitioner was in leg irons and shackled at the central jury room on the first day of jury selection.  Id. at 49-51.  He testified that the Petitioner may have entered (but he does not remember specifically) the central jury room through the main door which is where potential jurors congregate.  Id. at 50-51.

46

It is clear that the shackles on the Petitioner were audible both during the guilt/innocence phase of the trial and during the punishment phase of the trial, and the jurors discussed this shackling even during deliberations.  There is no evidence that the Petitioner was disorderly in any way during the trial.  The trial judge abused his discretion in shackling the Petitioner since the record fails to reflect any reasons, let alone sufficient reasons, for the shackling.  A formal hearing was not conducted before the judge ordered the shackles.

Since the shackling was audible in the courtroom, the case involved violent crimes, and the evidence was disputed, the trial judge's error in shackling the Petitioner substantially influenced the jury's verdict.  This shackling posed such a threat to the fairness of the factfinding process that it should have been subjected to close judicial scrutiny - but it was not.  The Petitioner was forced to wear leg irons before the jury, and this wearing of leg irons was a constant reminder to the jury of the Petitioner's condition.  This shackling may affect a juror's judgment.  Such shackling of the Petitioner was unconstitutional since no essential state policy was served by compelling the Petitioner to be shackled.  Since this shackling of the Petitioner involved a probability that prejudice will result, it is deemed inherently lacking in due process, and little stock need be placed in jurors' claims to the contrary.  The shackling was inherently prejudicial, and the jurors will not necessarily be fully conscious of the effect it will have on their attitude toward the accused.  Since the shackling of the Petitioner has been challenged as inherently prejudicial, therefore, the question must be not whether jurors actually articulated a consciousness of some prejudicial effect since there

47

existed in the shackling of the Petitioner an unacceptable risk of impermissible factors coming into play.  A new trial should be ordered since the record fails to reflect conduct by the Petitioner justifying the shackling.  A new trial should be ordered since this shackling violated the Petitioner's right to a fair trial and due process and due course of law as guaranteed by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

## CLAIM IV

### THE PETITIONER'S TRIAL COUNSEL FAILED TO PROVIDE EFFECTIVE ASSISTANCE OF COUNSEL.

### STATEMENT OF FACTS IN SUPPORT OF CLAIM IV

**Defense counsel Jones' file shows no independent work pretrial.**

Defense attorney Jones testified at the writ hearing that WHC Exhibit 1 is a complete copy of his file regarding the trial in this cause.  (W - v.2 - 21-24).  No where in his file is there any indication that he interviewed any witnesses or conducted any factual investigation regarding the guilt/innocence phase of the trial or the mitigation phase of the trial.  All that is contained in his file are newspaper articles, legal articles on moral culpability and other legal subjects, maps, motions, doscovery from the state, notes for argument, a passage from Psalms, invoices, the indictment, and subject areas for voir dire questions.  (WHC Exhibit 1).  He testified that WHC Exhibit 4 contained a complete and accurate copy of the vouchers reflecting the time he worked in this cause.  (W - v.4 - 5-7).

**The mitigator did not interview witnesses until after trial started.**

Dr. Troy Martinez testified during the writ hearing.  (W - v.3 - 6).  A summary of the time he spent on this case is at WHC Exhibit 10.  He was appointed to act as both defense psychologist and mitigator during the trial of this cause.  Id. at 8.  He testified that WHC Exhibit 5 is a complete copy of his file except that the Petitioner's Marine Corps records were excluded and a few pages from the offense report were excluded.  Id. at 8-10.  He testified that his instructions from trial defense counsel were to perform a psychological evaluation assessment of the Petitioner.  Id. at 11.  He was never given a letter providing him with specific duties to perform for counsel.  Id. at 11-12.  He interviewed the Petitioner for 2.5 hours on July 16, 2008.  Id. at 42.  He met with defense counsel for 1.0 hour on July 18, 2008 and did not meet with counsel again until October 8, 2008 for 1.0 hour.  Id. at 42-43.

He agreed that jury selection began in this case on October 22, 2008.  Id. at 14-15.  He began his records review on October 15, 2008 which was seven days before jury selection.  Id. at 15.  He requested the Petitioner to complete a mitigation survey.  Id. at 35. On the survey, the Petitioner identified 20 witnesses with whom the Petitioner had a quality of relationship.  Id. at 36-37.  Regarding mitigation interviews, however, he interviewed the Petitioner and only five witnesses – Guadalupe Hinojosa; Josie Smithwick; John Ramirez, Sr. (the Petitioner's father); Guadalupe Alejandro; and Guadalupe Alvarez.  Id. at 15-16. Five days after jury selection began, Dr. Martinez interviewed his first mitigation witness, grandmother Guadalupe Hinojosa, on October 27, 2008, for 1.75 hours.  Id. at 17, 28, 29. He next interviewed teacher Smithwick on October 29, 2008, for 1.5 hours.  Id. at 28, 29.

He interviewed the Petitioner's father on October 30, 2008 for ½ an hour.  Id.  He interviewed grandmother Guadalupe Alejandro on November 15, 2008 (which was four days before jury selection ended) for 1.5 hours.  Id. at 28-29.  He interviewed half-sister Guadalupe Alvarez for 15 minutes on November 16, 2008.  Id. at 29.

**The mitigator prepared his trial report three days before the death sentence.**

He completed his report on December 5, 2008 after preparing it for 2.0 hours on December 4, 2008.  Id. at 30.  The Petitioner's sentencing phase of this death penalty trial began on December 5, 2008.  Id.  Defense counsel never requested input from Dr. Martinez regarding jury selection issues.  Id.

**The mitigator did not know the defense mitigation theory at trial.**

When asked what was the defense mitigation theory of the trial, Dr. Martinez was unable to provide any such theory.  Id. at 30.  Dr. Martinez had no notes in his file regarding any conversations with trial defense counsel as to mitigation strategy or theory in this case.  Id. at 39-41.  When Dr. Martinez and trial defense counsel met with the Petitioner on December 7, 2008 in an attempt to convince him to allow counsel to proceed with a mitigation case, no one advised the Petitioner what witnesses could be called to testify for mitigation.  Id. at 31-35.

**Lead trial counsel did not know why the mitigation investigation did not begin until after trial started.**

Trial defense counsel Ed Garza testified at the writ hearing.  (W - v.3 - 62).  He identified WHC Exhibits 6, 7, 8, and 9 as legal articles he obtained during the representation

of the Petitioner in this cause.  Id. at 62-63.  He identified WHC Exhibit 4 as containing his vouchers for his work as trial defense counsel in this cause, and he confirmed that he recorded on those vouchers all work he performed in this cause.  Id. at 63-65.  He reviewed the time summary chart of Dr. Martinez at WHC Exhibit 10 and confirmed that it accurately reflects the date and times counsel met with Dr. Martinez in this case.  Id. at 71-72.

He stated that defense attorney Jones was in charge of the sentencing phase of the trial.  Id. at 72-73.  As such, he did not interview any sentencing witnesses.  Id. at 73.  He did not know why Dr. Martinez would have interviewed only 5 of the 20 mitigating witnesses identified by the Petitioner.  Id. at 74-75.  He was unaware that Dr. Martinez did not begin interviewing mitigation witnesses until after jury selection began in this cause.  Id. at 75.  He had no knowledge that mitigation witnesses were not interviewed pretrial.  Id. at 78.  He testified that it caused him concern that mitigation witnesses were not interviewed until during jury selection and that Dr. Martinez did not complete his report until the day the Petitioner was convicted.  Id. at 78.  He agreed that it would be difficult to determine juror profiles regarding mitigation if mitigation interviews did not begin until after the start of jury selection.  Id. at 75, 77-78.  He agreed that no witnesses were subpoenaed for the sentencing phase of the Petitioner's trial.  Id. at 75.  He did not interview any witnesses regarding testimony for the sentencing phase of the trial.  Id. at 91-94.  He testified that defense counsel would not have interviewed sentencing witnesses until after Dr. Martinez had interviewed them.  Id. at 91-92.

**Trial counsel Garza admitted the jury was not death qualified.**

He had no notes in his file regarding discussions with defense attorney Jones as to mitigation strategy or theory of this cause.  Id. at 75-76.  He was familiar with the Colorado method for selecting jurors in death cases and how that method allows for stripping questions and getting to whether or not a venireman is a death qualified juror.  Id. at 79.  He did not know why the Colorado method was not used in the Petitioner's case, and he knew that there was no strategic reason for not employing this method in the Petitioner's case.  Id. at 80.  He reviewed Venireman Gilbert's testimony as a sample of how the defense conducted jury selection in this case.  Id. at 97-99.  He agreed that attorney Jones' questioning of that venireman gave only generalized answers instead of the specialized answers that one would be looking for to death quality a juror.  Id. at 100.  He never saw any jury selection information from the person hired by attorney Jones regarding what that person suggested for jury selection ideas.  Id. at 94.  When counsel attempted to convince the Petitioner to proceed with the sentencing phase of the trial, counsel did not inform the Petitioner about which witnesses could say what about the Petitioner.  Id. at 95-96.

**Independent counsel confirmed the jury was not death qualified.**

Eric Perkins testified at the writ hearing.  (W - v.4 - 16).  He has defended a death penalty trial in the past.  Id. at 16.  He described how the Colorado method allows defense counsel to discover the death penalty proclivities of a potential juror.  Id. at 18-19.  He testified that counsel cannot rely upon the questionnaire alone to determine whether or not

a venireman is death qualified.  Id. at 19-20.  The Colorado method is the only method of which he is aware that allows defense counsel to death qualify a venireman.  Id. at 22-25.

He reviewed the voir dire questioning of the venireman who were selected as jurors in this cause.  Id. at 26.  He is of the opinion that the jurors were not properly death qualified by defense counsel.  Id. at 27-28.  He is of the opinion that, based upon the general questions asked by defense counsel, "there is no way to grade their death qualification on a one to seven scale" particularly since some of the jurors selected indicated on their questionnaires that they were "automatic death."  Id. at 27-28.  "[T]he questions that needed to be asked weren't being asked" to see how strongly in favor of the death penalty in the Applicant's case were these jurors.  Id. at 29.  This caused him concern and he was surprised that these particular defense attorneys failed to attempt to death qualify the jurors.  Id. at 30.  He was surprised at the deficiency of the questioning of the veniremen by defense counsel.  Id.

**Independent counsel confirmed the insufficient mitigation.**

He testified that WHC Exhibits 6-9 from defense counsel's trial file indicte that a mitigation investigation should begin as early as possible on a case.  Id. at 30-31.  Exhibit 6 from trial defense counsel's file stated that defense counsel "now recognize that it is disastrous to wait until the eve of trial to consult a mental health expert."  Id. at 32.  The mitigation investigation in the Petitioner's case that was not started until after trial began would not have been of any use at that late period of time.  Id. at 33-34.  Exhibit 8 from trial defense counsel's file stated that if a client refuses to cooperate any longer regarding

mitigation, counsel should still proceed regardless of the client's resistance.  Id. at 35.  Under the circumstances of the Petitioner's case, where he was clinically depressed and severely clinically suicidal, Mr. Perkins was of the opinion that "You absolutely have to" proceed with the mitigation case regardless of the Petitioner's resistence.  Id. at 36.  Deciding not to proceed with the mitigation case under these circumstances is deficient performance.  Id. Counsel failing to death qualify the jury was also deficient performance.  Id. at 36-37.  Mr. Perkins testified that, given the above issues in the Petitioner's case, "There's no other conclusion you can draw other than that the death penalty [in the Petitioner's case] was tainted by the lack of questioning and qualification of that jury."  Id. at 37.

### The defense psychological testing was invalid.

Dr. Joann Murphey testified at the writ hearing.  (W - v.3 - 103).  She reviewed multiple records in this cause in her duties as a psychologist to include calling Dr. Martinez and obtaining his complete file and raw data from testing.  Id. at 107-108.  The single test that Dr. Martinez administered to the Petitioner in this cause for trial was the personality assessment inventory, and Dr. Martinez's file indicated that this test was invalid.  Id. at 108-109, 117.  That test takes approximately 30 minutes to administer.  Id. at 109.  It is not a definitive test an anything since psychologists use a battery of tests to look for commonalities among tests.  Id. at 109-110.

### A psychologist should not also be the mitigator.

Dr. Murphey was concerned that Dr. Martinez interviewed only 5 of the 20 mitigation witnesses identified by the Petitioner.  Id. at 110-111.  She has a professional concern having

the trial defense psychologist also act as the mitigator in a death case.  Id. at 111.  She was alarmed that Dr. Martinez did not begin his mitigation interviews with family and other witnesses until after the start of trial.  Id. at 112.

Gerald Byington testified at the writ hearing.  (W - v.3 - 137).  He has been the mitigator in over 100 death penalty trials.  Id. at 138.  He is alarmed that the same person in the Petitioner's trial acted as the mitigator and as the psychologist.  Id. at 140-141.  The American Bar Association and the Texas Bar Association have guidelines regarding death penalty cases and both require separate people be the mitigator and psychologist.  Id. at 141.  He interviewed all 20 mitigation witnesses identified on the survey the Petitioner gave Dr. Martinez.  Id. at 141.  He is very concerned that Dr. Martinez interviewed only 5 of the 20 witnesses.  Id. at 142.  He is very concerned that Dr. Martinez did not begin interviewing any mitigation witnesses until after trial started since this affected defense counsels' ability to select jurors amenable to the mitigation strategy in a death case.  Id. at 143.  His review of the trial defense attorneys' vouchers revealed that counsel interviewed a mitigation witness only after the start of trial.  Id. at 144.  The mitigator should be involved with defense counsel during jury selection to identify characteristics of potential jurors that may be open to the defense mitigation strategy.  Id. at 144-145.  The records of all trial participants for the defense do not reflect any such strategy or any mitigation strategy or theory for the Petitioner's case.  Id. at 145.  He review of all the defense records in this case indicate that trial defense counsel were unprepared for the sentencing phase of the trial.  Id. at 150-154.

**The Petitioner was incompetent to waive mitigation.**

Dr. Murphey's testing of the Petitioner revealed that his state of depression was extremely high, and the concern with extremely high depression is that it negatively influences one's thinking.  Id. at 113.  She noted in Dr. Martinez's file that the Petitioner had indicated that if he was not so depressed he probably would make a different decision about his case.  Id. at 115.  Her testing also revealed that the Petitioner's suicide index scale was the highest she has ever seen during her years of practice and that this suicidal state existed prior to the trial in this cause.  Id. at 114, 117.  Her review of the records indicated that Dr. Martinez had no objective data from which to conclude that the Petitioner was competent to waive the sentencing phase of his trial.  Id. at 118.  Dr. Martinez's work in this case did not meet the standard that most psychologists would employ if they were going to offer an opinion about a person's mental function and ability to waive mitigation.  Id. at 121.  It is her opinion that the Petitioner was not able to make a rational decision to waive mitigation.  Id.

## ARGUMENT AND AUTHORITIES
## IN SUPPORT OF CLAIM IV

**The standard for ineffective assistance.**

Effective assistance of counsel is a right guaranteed by the Sixth Amendment of the United States Constitution, applied to the States through the Fourteenth Amendment of the United States Constitution, and also guaranteed by Article I, Section 10 of the Texas Constitution and Article 1.05 of the Texas Code of Criminal Procedure.  State v. Thomas, 768 S.W.2d 335, 336 (Tex. App. - Houston [14th Dist.] 1989, no pet.).  The federal test for

effective assistance of counsel stated in <u>Strickland v. Washington</u>, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) is also the test in Texas.  <u>State v. Thomas</u>, <u>supra</u> at 336, <u>citing</u> <u>Wilkerson v. State</u>, 726 S.W.2d 542, 548 (Tex. Crim. App. 1986).  Under this test, one must show that counsel's performance was deficient and that the deficient performance prejudiced the defense.  <u>Id.</u>  Prejudice means there is a reasonable probability that but for counsel's acts or omissions, the outcome of the proceeding would have been different, and a reasonable probability is a probability sufficient to undermine confidence in the outcome.  <u>Strickland v. Washington</u>, <u>supra</u>.  An ineffective assistance of counsel claim is a mixed question of law and fact subject to plenary review under the <u>Strickland</u> test.  <u>Baxter v. Thomas</u>, 45 F.3d 1501, 1512 (11th Cir. 1995).

The Supreme Court of the United States has recently conducted a materiality standard for a <u>Brady</u> claim which is the same showing required to demonstrate the above prejudice from counsel's deficient performance.  <u>Kyles v. Whitley</u>, 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995).   Materiality does not require a defendant to demonstrate by a preponderance of the evidence that the absence of the error would have ultimately resulted in an acquittal or a life sentence.  <u>Id.</u> at 1566-1567.  The test is whether the error undermines confidence in the jury's sentence of death or conviction for capital murder.  <u>Id.</u> at 1566.  This is not a sufficiency of the evidence test - that is, the defendant is not required to demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would have been insufficient evidence remaining to convict or return a sentence of death. <u>Id.</u>  The reviewing court should view the favorable evidence and determine if it reasonably

57

puts the whole case in such a different light so as to undermine confidence in the verdict.  Id.;

See Lindsey v. King, 769 F.2d 1032, 1042 (5thCir. 1985)(suppressed impeachment evidence

may have consequences for the case far beyond discrediting the witness' testimony).

Materiality must be assessed in terms of the suppressed evidence considered as a whole, not

item by item.  Kyles v. Whitley, supra, 115 S.Ct. at 1567.  Prejudice under Strickland should

be considered in the same manner.  See also Wesley v. Johnson, 83 F.3d 714, 719 (5th Cir.

1996)(prejudice analysis should not focus on determination of outcome but on whether error

ensures that the result of the proceeding was fundamentally unfair or unreliable); Lockhart

v. Fretwell, 506 U.S. 364, 371, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993).

Thorough factual investigation is required for effective representation.  Powell v.

Alabama, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932).  "It is not enough to assume that

defense counsel thus precipitated into the case thought that there was no defense, and

exercised their best judgment in proceeding to trial without preparation.  Neither they nor the

court could say what a prompt and thorough-going investigation might disclose as to the

facts."  Id. at 58; See Strickland v. Washington, supra, 466 U.S. at 691.  "Strategic choices

made after less than complete investigation are reasonable precisely to the extent that

reasonable professional judgments support the limitations on investigation.  In other words,

counsel has a duty to make a reasonable investigation or to make a reasonable decision that

makes particular investigations unnecessary."  Strickland v. Washington, supra, 104 S.Ct. at

2066; see Kimmelman v. Morrison, 477 U.S. 365, 385, 106 S.Ct. 2574, 91 L.Ed.2d 305

(1986).  Counsel's failure to at least seek out an expert witness is outside the range of

competent assistance.  Elledge v. Dugger, 823 F.2d 1439 (11th Cir. 1987).  The Fifth Circuit

has discussed counsel's omissions as follows:

> Whether counsel's omission served a strategic purpose is a
> pivotal point in Strickland and its progeny.  The crucial
> distinction between strategic judgment calls and plain omissions
> has echoed in the judgments of this court.  For example, in
> Nealy we found counsel's performance deficient and stressed
> that at a post-conviction hearing, the defense counsel did not
> testify that such efforts would have been fruitless, nor did he
> claim that the decision not to investigate was part of a calculated
> trial strategy.  He simply failed to make the effort.  Counsel did
> not **choose**, strategically or otherwise, to pursue one line of
> defense over another.  Instead, [he] simply abdicated his
> responsibility to advocate his client's cause.

Loyd v. Whitley, 977 F.2d 149, 158-159 (5th Cir. 1992), cert. denied, 508 U.S. 911, 113

S.Ct. 2343, 124 L.Ed.2d 253 (1993), citing Nealy v. Cabana, 764 F.2d 1173, 1178 (5th Cir.

1985)(emphasis in original).

Failure to interview witnesses or discover readily available evidence is an error in trial

preparation, not trial strategy.  Kenly v. Armontrout, 937 F.2d 1298, 1304 (8th Cir.), cert.

denied sub nom, Delo v. Kenly, 502 U.S. 964, 112 S.Ct. 431, 116 L.Ed.2d 450 (1991).  Any

decision or judgment that flows from lack of diligence in preparation and investigation,

therefore, is not protected by the presumption in favor of counsel having acted reasonably.

Id.  "Tactical decisions must be made in the context of a reasonable investigation, not in a

vacuum.  'It is not enough to assume that counsel . . . thought there was no defense, and

exercised [his] best judgment . . .'"  Bouchillon v. Collins 901 F.2d 589, 597 (5th Cir. 1990),

citing Powell v. Alabama, supra.

Counsel is ineffective during the penalty phase of a capital trial when counsel fails to adequately investigate and present mitigation evidence.  Baxter v. Thomas, supra.  When determining whether defense counsel conducted a reasonable investigation, the reviewing court looks at three factors: (1) whether a reasonable investigation should have uncovered the mitigating evidence; (2) whether the failure to put this evidence before the jury was a tactical choice by trial counsel; and (3) if the choice was not tactical, whether there is a reasonable probability that absent the errors, the sentencing body would have concluded that the balance of the aggravating and mitigating circumstances did not warrant a sentence of death.  Id. at 1513.  "Our case law rejects the notion that a 'strategic' decision can be reasonable when the attorney has failed to investigate his options and make a reasonable choice between them."  Id. at 1515.

Counsel is ineffective during the penalty phase of a capital trial when counsel fails to prepare and present evidence of a defendant's mental state at the time of the offense.  Hill v. Lockhart, 28 F.3d 832 (8th Cir. 1994).  Regarding the presentation of mitigating factors:

> In the context of a capital sentencing hearing, it is particularly important that counsel not be allowed to shirk her responsibility. Thus, while we defer to legitimate, strategic decision-making, from the perspective of strategic competence, we hold that defense counsel must make a significant effort, based on reasonable investigation and logical argument, to ably present the defendant's fate to the jury and to focus the attention of the jury on any mitigating factors.

Hall v. Washington, 106 F.3d 742 (7th Cir.), cert. denied, 522 U.S. 907, 118 S.Ct. 264, 139 L.Ed.2d 190 (1997), citing Kubat v. Thierat, 867 F.2d 351, 369 (7th Cir. 1989); see Harris v. Dugger, 874 F.2d 756 (11th Cir. 1989); Osborn v. Shillinger, 861 F.2d 612 (10th Cir.

1988); Hyman v. Aiken, 824 F.2d 1405 (4th Cir. 1987); King v. Strickland, 748 F.2d 1462 (11th Cir.), cert. denied, 471 U.S. 1016 (1984); Bolder v. Armontrout, 713 F.Supp. 1558 (W.D. Mo. 1989); Mathis v. Zant, 704 F.Supp. 1062 (N.D. Ga. 1989).

A jury must be afforded the ability to consider and give effect to any relevant mitigating evidence proffered by a defendant as a basis for a sentence less than death. Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978); Eddings v. Oklahoma, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982); Skipper v. South Carolina, 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986); Penry v. Lynaugh, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989).

### Failure to submit selected veniremen to death penalty questions.

Voir dire is critical to ensuring that a defendant's Sixth Amendment right to an impartial jury will be honored. Rosales-Lopez v. United States, 451 U.S. 182, 188, 101 S.Ct. 1629, 68 L.Ed.2d 22 (1981). Without an adequate voir dire, it is impossible to remove veniremen who will be unable to follow the jury instructions and evaluate the evidence. Id.

During voir dire, especially in capital cases, "certain inquiries must be made to effectuate constitutional protections[.]" Morgan v. Illinois, supra, 504 U.S. at 730. This includes an inquiry into the views of the veniremen regarding the death penalty. Id., 504 U.S. at 731. "The process of voir dire is designed to cull from the venire persons who demonstrate that they cannot be fair to either side of the case." Id., 504 U.S. at 734 (emphasis in original). "[G]eneral fairness" and "follow the law" type questions fail to

"detect those jurors with views preventing or substantially impairing their duties in accordance with their instructions and oath." Id., 504 U.S. at 734-735. An "inadequacy of voir dire" will lead a reviewing court to doubt that a defendant "was sentenced to death by a jury empaneled in compliance with the Fourteenth Amendment . . ." and will lead that reviewing court to conclude that the death sentence cannot stand. Id., 504 U.S. at 509. Regarding this issue:

> As to general questions of fairness and impartiality, such jurors could in all truth and candor respond affirmatively, personally confident that such dogmatic views are fair and impartial, while leaving the specific concern unprobed. More importantly, however, the belief that death should be imposed ipso facto upon conviction of a capital offense reflects directly on that individual's inability to follow the law. [Citation omitted]. Any juror who would impose death regardless of the facts and circumstances of conviction cannot follow the dictates of the law. [Citation omitted]. It may be that a juror could, in good conscience, swear to uphold the law and yet be unaware that maintaining such dogmatic beliefs about the death penalty would prevent him or her from doing so. A defendant on trial for his life must be permitted on voir dire to ascertain whether his prospective jurors function under such misconception. The risk that such jurors may have been empaneled in this case and "infected petitioner's capital sentencing [is] unacceptable in light of the ease with which that risk could have been minimized."

Id., 504 U.S. at 506-507.

A juror in a death penalty case must be able to consider mitigating evidence. Eddings v. Oklahoma, 455 U.S. 104, 114, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982). The juror determines the weight to be given to mitigating evidence, but the juror cannot give such evidence no

weight by excluding such evidence from their consideration.  Id., 455 U.S. at 114-115.  "The Eighth Amendment requires that the jury be able to consider and give effect to all relevant mitigating evidence offered by [the defendant]."  Boyde v. California, 494 U.S. 370, 377-378, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990).  Mitigating evidence, such as good conduct in jail, need not relate to culpability for the crime committed, and such evidence is "'mitigating' in the sense that [it] might serve 'as a basis for a sentence less than death.'"  Tennard v. Dretke, 542 U.S. 274, 285, 124 S.Ct. 2562, 159 L.Ed.2d 384 (2004).

### Venireman Gilbert

Venireman No. 17, Gilbert, was the first juror selected in this case.  (R - v.9 - 302-353).  In her juror questionnaire, she stated that she disagreed with the statement that, "Criminal defendants deserve sympathy and compassion because they are usually victims of bad circumstances and factors beyond their control."  See attached Exhibit M (excerpts of the questionnaires are attached for privacy reasons; the entirety of the questionnaires will be produced at the hearing on the writ).  She stated that the death penalty is appropriate for a person who has committed no other previous crimes "if evidence is presented that the person may commit more crimes or circumstances are so heinous."  Id.  She stated that, on a scale of 1 to 10 with 10 being the most in favor of the death penalty, she was a 7.  Id.

During individual voir dire of Venireman Gilbert, the trial judge informed Gilbert: (1) the state has the burden of proof; (2) the defense never has the burden of proof; (3) a defendant is presumed innocent; (4) a defendant is not required to testify; (5) the jury in a

63

capital case answers two special issues; and (6) the definition of capital murder.  Id. at 302-310.  During individual voir dire by the state, Gilbert stated that: (1) the decision whether somebody lives or dies was not viewed by Gilbert as a burden; (2) she could vote to put Mr. Ramirez to death; (3) she can make a decision; (4) the death penalty is necessary in society; (5) there is not a better way to punish people than the death penalty, the death penalty should be the law, and she would vote to keep the death penalty the law even if her vote would result in the abolition of the death penalty; and (6) she understood the special issues.  Id. at 313, 314, 316, 318, 322-329.

During individual voir dire by the defense, Gilbert stated that: (1) the definition of "impartial" is that she has not yet made up her mind; (2) she was not leaning toward one side or the other; (3) she would be objective and open minded; (4) people value their life the most; (5) if a person was wrongfully convicted and later released from prison after twenty years, she would "[k]ind of sort of" feel bad for the person but she would not "cry myself to sleep over it;" (6) the appellate process corrects any trial errors; (7) we "feel better as a society, knowing that [the death penalty] is an alternate punishment;" (8) "an eye for an eye" and "society would be discouraged as a whole if they didn't have [the death penalty];" (9) if a person is likely to commit criminal acts of violence in the future, then the person is assumed to be a threat to society; (10) "to mitigate" means to lessen; and (11) what is mitigating to her may not be mitigating to a fellow juror.  Id. at 333-335, 337, 341-344, 350-352.

Defense counsel failed to probe the juror regarding the juror's views on the death penalty in the case at bar - i.e., for someone convicted of murder in the course of committing

robbery.  Defense counsel failed to ask the juror if such a conviction would cause the juror to automatically believe that Mr. Ramirez would be a future danger regarding special issue one.  Defense counsel failed to ask the juror if such a conviction and a finding of future dangerousness would cause the juror to not consider mitigating evidence.  Defense counsel failed to ask if the juror would be able to consider and give effect to all relevant mitigating evidence offered by Mr. Ramirez.  Defense counsel, in effect, failed to determine whether the juror had dogmatic views regarding the death penalty in the case at bar which would call into question whether the juror was truly fair and impartial.  It may be that this juror could, in good conscience, swear to uphold the law and yet be unaware that maintaining such dogmatic beliefs about the death penalty in the case at bar would prevent the juror from being truly fair and impartial.  Mr. Ramirez was on trial for his life and counsel should have ascertained whether this prospective juror functioned under such misconception.  The risk that such jurors may have been empaneled in this case and infected Mr. Ramirez's capital sentencing is unacceptable in light of the ease with which that risk could have been minimized had counsel conducted a proper voir dire.

The failure of defense counsel to conduct a proper voir dire was deficient performance.  Counsel's deficient performance, therefore, prejudiced Mr. Ramirez and resulted in an undermining in the confidence in the outcome of this trial.  A proper voir dire was critical to ensuring that Mr. Ramirez's Sixth Amendment right to an impartial jury would be honored.  Given the inadequate voir dire in the case at bar, it was impossible for defense counsel to remove veniremen who would be unable to follow the jury instructions and

evaluate the evidence.  Counsel failed to make certain inquiries to effectuate constitutional

protections including an inquiry into the views of the veniremen regarding the death penalty.

The "general fairness" and "follow the law" type questions posed by defense counsel failed

to detect those jurors with views preventing or substantially impairing their duties in

accordance with their instructions and oath.  This inadequacy of voir dire results in a strong

doubt that Mr. Ramirez was sentenced to death by a jury empaneled in compliance with the

Sixth and Fourteenth Amendments.  In such a case, the death sentence cannot stand.

### Venireman Castaneda

Venireman No. 22, Castaneda, was the second juror selected in this case.  (R - v.10 -

16-88).  In his juror questionnaire regarding his feelings about the death penalty, he stated

that, "In this case the death penalty if found guilty protects all of us."  See attached Exhibit

M.  He stated that he disagreed with the statement that, "Criminal defendants deserve

sympathy and compassion because they are usually victims of bad circumstances and factors

beyond their control."  Id.  He stated that the death penalty is appropriate for "taking other

peoples lifes for no reason."  Id.  He stated that, on a scale of 1 to 10 with 10 being the most

in favor of the death penalty, he was a 7.  Id.  He stated that any person, man or woman,

young or old, who commits murder should pay with their own life.  Id.

During individual voir dire of Venireman Castaneda, the trial judge informed

Castaneda: (1) the state has the burden of proof; (2) the defense never has the burden of

proof; (3) a defendant is presumed innocent; (4) a defendant is not required to testify; (5) the

jury in a capital case answers two special issues; and (6) the definition of capital murder.  Id.

at 16-27.  During individual voir dire by the state, Castaneda stated that: (1) he could impose the death penalty upon Mr. Ramirez since "technically, I feel like I would be serving the law, first of all;" and (2) Mr. Ramirez's age or the fact he looked young was not important.  Id. at 31-34.

During individual voir dire by the defense, Castaneda stated that: (1) he would vote for the death penalty for Mr. Ramirez if it was proven that Mr. Ramirez was a "threat to society;" (2) Mr. Ramirez is guilty of capital murder or he would not be here; (3) he could consider evidence in making a decision as to whether Mr. Ramirez should live or die; (4) he would want to hear what type of person is Mr. Ramirez; (5) he would be able to keep an open mind; and (6) if he found Mr. Ramirez to be a future danger, he would still consider mitigating circumstances.  Id. at 59-62, 80-81, 83-85.

Defense counsel failed to probe the juror regarding the juror's views on the death penalty in the case at bar - i.e., for someone convicted of murder in the course of committing robbery.  Defense counsel failed to ask the juror if such a conviction would cause the juror to automatically believe that Mr. Ramirez would be a future danger regarding special issue one.  Defense counsel failed to ask the juror if such a conviction and a finding of future dangerousness would cause the juror to not consider mitigating evidence.  Defense counsel failed to ask if the juror would be able to consider and give effect to all relevant mitigating evidence offered by Mr. Ramirez.  Defense counsel, in effect, failed to determine whether the juror had dogmatic views regarding the death penalty in the case at bar which would call into question whether the juror was truly fair and impartial.  It may be that this juror could,

in good conscience, swear to uphold the law and yet be unaware that maintaining such dogmatic beliefs about the death penalty in the case at bar would prevent the juror from being truly fair and impartial.  Mr. Ramirez was on trial for his life and counsel should have ascertained whether this prospective juror functioned under such misconception.  The risk that such jurors may have been empaneled in this case and infected Mr. Ramirez's capital sentencing is unacceptable in light of the ease with which that risk could have been minimized had counsel conducted a proper voir dire.

The failure of defense counsel to conduct a proper voir dire was deficient performance.  Counsel's deficient performance, therefore, prejudiced Mr. Ramirez and resulted in an undermining in the confidence in the outcome of this trial.  A proper voir dire was critical to ensuring that Mr. Ramirez's Sixth Amendment right to an impartial jury would be honored.  Given the inadequate voir dire in the case at bar, it was impossible for defense counsel to remove veniremen who would be unable to follow the jury instructions and evaluate the evidence.  Counsel failed to make certain inquiries to effectuate constitutional protections including an inquiry into the views of the veniremen regarding the death penalty. The "general fairness" and "follow the law" type questions posed by defense counsel failed to detect those jurors with views preventing or substantially impairing their duties in accordance with their instructions and oath.  This inadequacy of voir dire results in a strong doubt that Mr. Ramirez was sentenced to death by a jury empaneled in compliance with the Sixth and Fourteenth Amendments.  In such a case, the death sentence cannot stand.

**Venireman Benavidez**

Venireman No. 34, Benavidez, was a juror selected in this case and was the third juror. (R - v.10 - 347-387). In his juror questionnaire, he stated that he disagreed with the statement that, "Criminal defendants deserve sympathy and compassion because they are usually victims of bad circumstances and factors beyond their control." See Exhibit M. He stated that the death penalty was appropriate for murder. Id. He stated that, on a scale of 1 to 10 with 10 being the most in favor of the death penalty, he was a 5. Id. He stated that the death penalty is just and necessary and gives the criminal what he deserves. Id.

During individual voir dire of Venireman Benavides, the trial judge informed Benavides: (1) the state has the burden of proof; (2) the defense never has the burden of proof; (3) a defendant is presumed innocent; (4) a defendant is not required to testify; (5) the jury in a capital case answers two special issues; and (6) the definition of capital murder. Id. at 347-355. During individual voir dire by the state, Benavides stated that: (1) he could assess the death penalty if the evidence warranted that sentence; and (2) he felt we should have the death penalty in Texas to deter crime and he would vote to keep the death penalty in Texas. Id. at 356, 358, 360-361.

During individual voir dire by the defense, Benavides stated that: (1) the state seeking the death penalty is very important; (2) he would take this case seriously; (3) the stakes are high; (4) he could be open minded and fair; (5) he would want the same system if he were a defendant; (6) it would be difficult being convicted if you were innocent; (7) being a juror

is a big responsibility; (8) he would be able to concentrate on this case; (9) he believes in the death penalty but does not believe every crime should result in the death penalty.  Id. at 379-385.

Defense counsel failed to probe the juror regarding the juror's views on the death penalty in the case at bar - i.e., for someone convicted of murder in the course of committing robbery.  Defense counsel failed to ask the juror if such a conviction would cause the juror to automatically believe that Mr. Ramirez would be a future danger regarding special issue one.  Defense counsel failed to ask the juror if such a conviction and a finding of future dangerousness would cause the juror to not consider mitigating evidence.  Defense counsel failed to ask if the juror would be able to consider and give effect to all relevant mitigating evidence offered by Mr. Ramirez.  Defense counsel, in effect, failed to determine whether the juror had dogmatic views regarding the death penalty in the case at bar which would call into question whether the juror was truly fair and impartial.  It may be that this juror could, in good conscience, swear to uphold the law and yet be unaware that maintaining such dogmatic beliefs about the death penalty in the case at bar would prevent the juror from being truly fair and impartial.  Mr. Ramirez was on trial for his life and counsel should have ascertained whether this prospective juror functioned under such misconception.  The risk that such jurors may have been empaneled in this case and infected Mr. Ramirez's capital sentencing is unacceptable in light of the ease with which that risk could have been minimized had counsel conducted a proper voir dire.

The failure of defense counsel to conduct a proper voir dire was deficient performance.  Counsel's deficient performance, therefore, prejudiced Mr. Ramirez and resulted in an undermining in the confidence in the outcome of this trial.  A proper voir dire was critical to ensuring that Mr. Ramirez's Sixth Amendment right to an impartial jury would be honored.  Given the inadequate voir dire in the case at bar, it was impossible for defense counsel to remove veniremen who would be unable to follow the jury instructions and evaluate the evidence.  Counsel failed to make certain inquiries to effectuate constitutional protections including an inquiry into the views of the veniremen regarding the death penalty.  The "general fairness" and "follow the law" type questions posed by defense counsel failed to detect those jurors with views preventing or substantially impairing their duties in accordance with their instructions and oath.  This inadequacy of voir dire results in a strong doubt that Mr. Ramirez was sentenced to death by a jury empaneled in compliance with the Sixth and Fourteenth Amendments.  In such a case, the death sentence cannot stand.

### Venireman Johnston

Venireman No. 38, Johnston, was a juror selected in this case and was the fourth juror. (R - v.11 - 18-81).  In his juror questionnaire, he stated that he disagreed with the statement that, "Criminal defendants deserve sympathy and compassion because they are usually victims of bad circumstances and factors beyond their control."  See Exhibit M.  He stated that, on a scale of 1 to 10 with 10 being the most in favor of the death penalty, he was a 7.5. Id.  He stated that the death penalty is just and necessary.  Id.

71

During individual voir dire of Venireman Johnston, the trial judge informed Johnston: (1) the state has the burden of proof; (2) the defense never has the burden of proof; (3) a defendant is presumed innocent; (4) a defendant is not required to testify; (5) the jury in a capital case answers two special issues; and (6) the definition of capital murder. Id. at 18-30. During individual voir dire by the state, Johnston stated that: (1) he could assess the death penalty; (2) age of a defendant has no effect on whether or not to assess the death penalty; and (3) he could consider mitigating evidence. Id. at 33, 34, 36-37, 60.

During individual voir dire by the defense, Johnston stated that: (1) he could be fair and impartial; (2) he would want to hear about a defendant's background and criminal history in determining a proper sentence; (3) he could not really define character; (4) he would listen to evidence of character and background; and (5) this is a serious case. Id. at 64-65, 71, 73, 76.

Defense counsel failed to probe the juror regarding the juror's views on the death penalty in the case at bar - i.e., for someone convicted of murder in the course of committing robbery. Defense counsel failed to ask the juror if such a conviction would cause the juror to automatically believe that Mr. Ramirez would be a future danger regarding special issue one. Defense counsel failed to ask the juror if such a conviction and a finding of future dangerousness would cause the juror to not consider mitigating evidence. Defense counsel failed to ask if the juror would be able to consider and give effect to all relevant mitigating evidence offered by Mr. Ramirez. Defense counsel, in effect, failed to determine whether

the juror had dogmatic views regarding the death penalty in the case at bar which would call into question whether the juror was truly fair and impartial. It may be that this juror could, in good conscience, swear to uphold the law and yet be unaware that maintaining such dogmatic beliefs about the death penalty in the case at bar would prevent the juror from being truly fair and impartial. Mr. Ramirez was on trial for his life and counsel should have ascertained whether this prospective juror functioned under such misconception. The risk that such jurors may have been empaneled in this case and infected Mr. Ramirez's capital sentencing is unacceptable in light of the ease with which that risk could have been minimized had counsel conducted a proper voir dire.

The failure of defense counsel to conduct a proper voir dire was deficient performance. Counsel's deficient performance, therefore, prejudiced Mr. Ramirez and resulted in an undermining in the confidence in the outcome of this trial. A proper voir dire was critical to ensuring that Mr. Ramirez's Sixth Amendment right to an impartial jury would be honored. Given the inadequate voir dire in the case at bar, it was impossible for defense counsel to remove veniremen who would be unable to follow the jury instructions and evaluate the evidence. Counsel failed to make certain inquiries to effectuate constitutional protections including an inquiry into the views of the veniremen regarding the death penalty. The "general fairness" and "follow the law" type questions posed by defense counsel failed to detect those jurors with views preventing or substantially impairing their duties in accordance with their instructions and oath. This inadequacy of voir dire results in a strong

doubt that Mr. Ramirez was sentenced to death by a jury empaneled in compliance with the Sixth and Fourteenth Amendments.  In such a case, the death sentence cannot stand.

### Venireman Baucom

Venireman No. 44, Baucom, was a juror selected in this case and was the fifth juror. (R - v.11 - 83-158).  In his juror questionnaire, he stated that he disagreed with the statement that, "Criminal defendants deserve sympathy and compassion because they are usually victims of bad circumstances and factors beyond their control."  See Exhibit M.  He stated that the death penalty was appropriate for murder.  Id.  He stated that, on a scale of 1 to 10 with 10 being the most in favor of the death penalty, he was a 10.  Id.  He stated that the death penalty is just and necessary and gives the criminal what he deserves.  Id.

During individual voir dire of Venireman Baucom, the trial judge informed Baucom: (1) the state has the burden of proof; (2) the defense never has the burden of proof; (3) a defendant is presumed innocent; (4) a defendant is not required to testify; (5) the jury in a capital case answers two special issues; and (6) the definition of capital murder.  Id. at 83-94. During individual voir dire by the state, Baucom stated that: (1) he is in favor of the death penalty; (2) he had no problem in assessing a death sentence; (3) continuing threat to society means the defendant will be a nuisance; (4) he would want to know the background of a defendant; (5) he could consider mitigating evidence; and (6) he could be fair.  Id. at 98, 99-100, 104-105, 112, 119, 121, 124.

During individual voir dire by the defense, Baucom stated that: (1) the death penalty is not automatic; (2) the death penalty is a deterrence; (3) the death penalty is assessed if the

jury answers "yes" to special issue one and "no" to special issue two; (4) character means how a person acts in front of another person; (5) personal moral culpability means what was going through a person's mind when the offense was committed; (6) to mitigate means to lessen the punishment; and (7) Jesus did not get a fair trial. Id. at 140, 141, 145-146, 147, 152, 155.

Defense counsel failed to probe the juror regarding the juror's views on the death penalty in the case at bar - i.e., for someone convicted of murder in the course of committing robbery. Defense counsel failed to ask the juror if such a conviction would cause the juror to automatically believe that Mr. Ramirez would be a future danger regarding special issue one. Defense counsel failed to ask the juror if such a conviction and a finding of future dangerousness would cause the juror to not consider mitigating evidence. Defense counsel failed to ask if the juror would be able to consider and give effect to all relevant mitigating evidence offered by Mr. Ramirez. Defense counsel, in effect, failed to determine whether the juror had dogmatic views regarding the death penalty in the case at bar which would call into question whether the juror was truly fair and impartial. It may be that this juror could, in good conscience, swear to uphold the law and yet be unaware that maintaining such dogmatic beliefs about the death penalty in the case at bar would prevent the juror from being truly fair and impartial. Mr. Ramirez was on trial for his life and counsel should have ascertained whether this prospective juror functioned under such misconception. The risk that such jurors may have been empaneled in this case and infected Mr. Ramirez's capital

sentencing is unacceptable in light of the ease with which that risk could have been minimized had counsel conducted a proper voir dire.

The failure of defense counsel to conduct a proper voir dire was deficient performance. Counsel's deficient performance, therefore, prejudiced Mr. Ramirez and resulted in an undermining in the confidence in the outcome of this trial. A proper voir dire was critical to ensuring that Mr. Ramirez's Sixth Amendment right to an impartial jury would be honored. Given the inadequate voir dire in the case at bar, it was impossible for defense counsel to remove veniremen who would be unable to follow the jury instructions and evaluate the evidence. Counsel failed to make certain inquiries to effectuate constitutional protections including an inquiry into the views of the veniremen regarding the death penalty. The "general fairness" and "follow the law" type questions posed by defense counsel failed to detect those jurors with views preventing or substantially impairing their duties in accordance with their instructions and oath. This inadequacy of voir dire results in a strong doubt that Mr. Ramirez was sentenced to death by a jury empaneled in compliance with the Sixth and Fourteenth Amendments. In such a case, the death sentence cannot stand.

### Venireman Bowman

Venireman No. 63, Bowman, was a juror selected in this case and was the sixth juror. (R - v.12 - 301-366). In her juror questionnaire, she stated that she disagreed with the statement that, "Criminal defendants deserve sympathy and compassion because they are usually victims of bad circumstances and factors beyond their control." See Exhibit M. She stated that the death penalty was appropriate for murder, crimes where children were victims,

76

and for repeat criminals.  Id.  She stated that the death penalty is just and necessary and gives the criminal what he deserves.  Id.

During individual voir dire of Venireman Bowman, the trial judge informed Bowman: (1) the state has the burden of proof; (2) the defense never has the burden of proof; (3) a defendant is presumed innocent; (4) a defendant is not required to testify; (5) the jury in a capital case answers two special issues; and (6) the definition of capital murder.  Id. at 301-313.  During individual voir dire by the state, Bowman stated that: (1) she could assess the death penalty; and (2) we should have the death penalty in Texas.  Id. at 321, 324.

During individual voir dire by the defense, Bowman stated that: (1) the death penalty is assessed if the jury answers "yes" to special issue one and "no" to special issue two; (2) good character means law abiding, honest, and truthful; (3) background means a person's past, childhood, what they are doing; (4) moral culpability means a person's ability to be moral; (5) privileged people may not be moral; (6) each juror will decide what is mitigating; and (7) society benefits from having the death penalty available.  Id. at 348-349, 350, 351, 356, 357, 361.

Defense counsel failed to probe the juror regarding the juror's views on the death penalty in the case at bar - i.e., for someone convicted of murder in the course of committing robbery.  Defense counsel failed to ask the juror if such a conviction would cause the juror to automatically believe that Mr. Ramirez would be a future danger regarding special issue one.  Defense counsel failed to ask the juror if such a conviction and a finding of future

dangerousness would cause the juror to not consider mitigating evidence.  Defense counsel failed to ask if the juror would be able to consider and give effect to all relevant mitigating evidence offered by Mr. Ramirez.  Defense counsel, in effect, failed to determine whether the juror had dogmatic views regarding the death penalty in the case at bar which would call into question whether the juror was truly fair and impartial.  It may be that this juror could, in good conscience, swear to uphold the law and yet be unaware that maintaining such dogmatic beliefs about the death penalty in the case at bar would prevent the juror from being truly fair and impartial.  Mr. Ramirez was on trial for his life and counsel should have ascertained whether this prospective juror functioned under such misconception.  The risk that such jurors may have been empaneled in this case and infected Mr. Ramirez's capital sentencing is unacceptable in light of the ease with which that risk could have been minimized had counsel conducted a proper voir dire.

The failure of defense counsel to conduct a proper voir dire was deficient performance.  Counsel's deficient performance, therefore, prejudiced Mr. Ramirez and resulted in an undermining in the confidence in the outcome of this trial.  A proper voir dire was critical to ensuring that Mr. Ramirez's Sixth Amendment right to an impartial jury would be honored.  Given the inadequate voir dire in the case at bar, it was impossible for defense counsel to remove veniremen who would be unable to follow the jury instructions and evaluate the evidence.  Counsel failed to make certain inquiries to effectuate constitutional protections including an inquiry into the views of the veniremen regarding the death penalty.

The "general fairness" and "follow the law" type questions posed by defense counsel failed to detect those jurors with views preventing or substantially impairing their duties in accordance with their instructions and oath. This inadequacy of voir dire results in a strong doubt that Mr. Ramirez was sentenced to death by a jury empaneled in compliance with the Sixth and Fourteenth Amendments. In such a case, the death sentence cannot stand.

### Venireman Light

Venireman No. 65, Light, was a juror selected in this case and was the seventh juror. (R - v.13 - 5-61). In her juror questionnaire, she stated that she was uncertain about the statement that, "Criminal defendants deserve sympathy and compassion because they are usually victims of bad circumstances and factors beyond their control." See Exhibit M. She stated that the death penalty was appropriate for brutal murders, multiple murders, and torturing crimes. Id. She stated that, on a scale of 1 to 10 with 10 being the most in favor of the death penalty, she was an 8. Id. She stated that the death penalty is just and necessary. Id.

During individual voir dire of Venireman Light, the trial judge informed Light: (1) the state has the burden of proof; (2) the defense never has the burden of proof; (3) a defendant is presumed innocent; (4) a defendant is not required to testify; (5) the jury in a capital case answers two special issues; and (6) the definition of capital murder. Id. at 5-15. During individual voir dire by the state, Light stated that: (1) she could assess the death sentence; and (2) she believes we should have the death penalty in Texas. Id. at 18-19, 23.

79

During individual voir dire by the defense, Light stated that: (1) society benefits from having the death penalty even if it results in an innocent person being executed; (2) the death penalty means a life without Christ; (3) the death penalty is biblically based; (4) the death penalty is assessed if the jury answers "yes" to special issue one and "no" to special issue two; (5) good character means trustworthy, high morals, and the same views that Light has; (6) background means what happened in the past; and (7) personal moral culpability means where a person is morally.  Id. at 41, 45-46, 46-47, 50-53, 54, 55.

Defense counsel failed to probe the juror regarding the juror's views on the death penalty in the case at bar - i.e., for someone convicted of murder in the course of committing robbery.  Defense counsel failed to ask the juror if such a conviction would cause the juror to automatically believe that Mr. Ramirez would be a future danger regarding special issue one.  Defense counsel failed to ask the juror if such a conviction and a finding of future dangerousness would cause the juror to not consider mitigating evidence.  Defense counsel failed to ask if the juror would be able to consider and give effect to all relevant mitigating evidence offered by Mr. Ramirez.  Defense counsel, in effect, failed to determine whether the juror had dogmatic views regarding the death penalty in the case at bar which would call into question whether the juror was truly fair and impartial.  It may be that this juror could, in good conscience, swear to uphold the law and yet be unaware that maintaining such dogmatic beliefs about the death penalty in the case at bar would prevent the juror from being truly fair and impartial.  Mr. Ramirez was on trial for his life and counsel should have ascertained whether this prospective juror functioned under such misconception.  The risk

80

that such jurors may have been empaneled in this case and infected Mr. Ramirez's capital sentencing is unacceptable in light of the ease with which that risk could have been minimized had counsel conducted a proper voir dire.

The failure of defense counsel to conduct a proper voir dire was deficient performance. Counsel's deficient performance, therefore, prejudiced Mr. Ramirez and resulted in an undermining in the confidence in the outcome of this trial. A proper voir dire was critical to ensuring that Mr. Ramirez's Sixth Amendment right to an impartial jury would be honored. Given the inadequate voir dire in the case at bar, it was impossible for defense counsel to remove veniremen who would be unable to follow the jury instructions and evaluate the evidence. Counsel failed to make certain inquiries to effectuate constitutional protections including an inquiry into the views of the veniremen regarding the death penalty. The "general fairness" and "follow the law" type questions posed by defense counsel failed to detect those jurors with views preventing or substantially impairing their duties in accordance with their instructions and oath. This inadequacy of voir dire results in a strong doubt that Mr. Ramirez was sentenced to death by a jury empaneled in compliance with the Sixth and Fourteenth Amendments. In such a case, the death sentence cannot stand.

### Venireman Foutch

Venireman No. 84, Foutch, was a juror selected in this case and was the eighth juror. (R - v.13 - 371-414). In her juror questionnaire, she stated that she disagreed with the statement that, "Criminal defendants deserve sympathy and compassion because they are

usually victims of bad circumstances and factors beyond their control." See Exhibit M. She stated that the death penalty was appropriate for killing children or innocent people who were at the wrong place at the wrong time. Id. She stated that, on a scale of 1 to 10 with 10 being the most in favor of the death penalty, she was a 10. Id. She stated that the death penalty is just and necessary. Id.

During individual voir dire of Venireman Foutch, the trial judge informed Foutch: (1) the state has the burden of proof; (2) the defense never has the burden of proof; (3) a defendant is presumed innocent; (4) a defendant is not required to testify; (5) the jury in a capital case answers two special issues; and (6) the definition of capital murder. Id. at 371-379. During individual voir dire by the state, Foutch stated that: (1) she supports the death penalty; (2) she could assess the death penalty; (3) she would not automatically vote for death if a defendant was convicted of capital murder; and (4) she could be fair and impartial. Id. at 380, 385, 387, 397, 399.

During individual voir dire by the defense, Foutch stated that: (1) we should have the death penalty in Texas and society benefits from having the death penalty as an option; (2) mitigate means to lessen; (3) good character means you do things well in life for you and others; (4) background means what a person has done in the past; (5) she could consider mitigating evidence; and (6) personal moral culpability means if a person is good or bad. Id. at 400, 403, 404, 405, 406.

Defense counsel failed to probe the juror regarding the juror's views on the death penalty in the case at bar - i.e., for someone convicted of murder in the course of committing

robbery.  Defense counsel failed to ask the juror if such a conviction would cause the juror to automatically believe that Mr. Ramirez would be a future danger regarding special issue one.  Defense counsel failed to ask the juror if such a conviction and a finding of future dangerousness would cause the juror to not consider mitigating evidence.  Defense counsel failed to ask if the juror would be able to consider and give effect to all relevant mitigating evidence offered by Mr. Ramirez.  Defense counsel, in effect, failed to determine whether the juror had dogmatic views regarding the death penalty in the case at bar which would call into question whether the juror was truly fair and impartial.  It may be that this juror could, in good conscience, swear to uphold the law and yet be unaware that maintaining such dogmatic beliefs about the death penalty in the case at bar would prevent the juror from being truly fair and impartial.  Mr. Ramirez was on trial for his life and counsel should have ascertained whether this prospective juror functioned under such misconception.  The risk that such jurors may have been empaneled in this case and infected Mr. Ramirez's capital sentencing is unacceptable in light of the ease with which that risk could have been minimized had counsel conducted a proper voir dire.

The failure of defense counsel to conduct a proper voir dire was deficient performance.  Counsel's deficient performance, therefore, prejudiced Mr. Ramirez and resulted in an undermining in the confidence in the outcome of this trial.  A proper voir dire was critical to ensuring that Mr. Ramirez's Sixth Amendment right to an impartial jury would be honored.  Given the inadequate voir dire in the case at bar, it was impossible for defense counsel to remove veniremen who would be unable to follow the jury instructions and

evaluate the evidence. Counsel failed to make certain inquiries to effectuate constitutional

protections including an inquiry into the views of the veniremen regarding the death penalty.

The "general fairness" and "follow the law" type questions posed by defense counsel failed

to detect those jurors with views preventing or substantially impairing their duties in

accordance with their instructions and oath. This inadequacy of voir dire results in a strong

doubt that Mr. Ramirez was sentenced to death by a jury empaneled in compliance with the

Sixth and Fourteenth Amendments. In such a case, the death sentence cannot stand.

### Venireman Lyles

Venireman No. 90, Lyles, was a juror selected in this case and was the ninth juror.

(R - v.14 - 90-140). In his juror questionnaire, he stated that he disagreed with the statement

that, "Criminal defendants deserve sympathy and compassion because they are usually

victims of bad circumstances and factors beyond their control." See Exhibit M. He stated

that the death penalty was appropriate if a person kills another person without malice. Id.

He stated that, on a scale of 1 to 10 with 10 being the most in favor of the death penalty, he

was an 8. Id. He stated that the death penalty is just and necessary. Id.

During individual voir dire of Venireman Lyles, the trial judge informed Lyles: (1)

the state has the burden of proof; (2) the defense never has the burden of proof; (3) a

defendant is presumed innocent; (4) a defendant is not required to testify; (5) the jury in a

capital case answers two special issues; and (6) the definition of capital murder. Id. at 90-99.

During individual voir dire by the state, Lyles stated that: (1) he did not have a problem with

the death penalty; (2) he could assess the death penalty; (3) continuing threat to society

means the defendant may possibly commit other crimes; (4) he sat on another jury with the same prosecutor as in this case; and (5) he can be fair.  Id. at 101, 102, 106, 112-113, 117.

During individual voir dire by the defense, Lyles stated that: (1) he agreed that mitigate means to lessen; (2) good character means knowing right from wrong; and (3) he could be fair.  Id. at 127, 129, 135.

Defense counsel failed to probe the juror regarding the juror's views on the death penalty in the case at bar - i.e., for someone convicted of murder in the course of committing robbery.  Defense counsel failed to ask the juror if such a conviction would cause the juror to automatically believe that Mr. Ramirez would be a future danger regarding special issue one.  Defense counsel failed to ask the juror if such a conviction and a finding of future dangerousness would cause the juror to not consider mitigating evidence.  Defense counsel failed to ask if the juror would be able to consider and give effect to all relevant mitigating evidence offered by Mr. Ramirez.  Defense counsel, in effect, failed to determine whether the juror had dogmatic views regarding the death penalty in the case at bar which would call into question whether the juror was truly fair and impartial.  It may be that this juror could, in good conscience, swear to uphold the law and yet be unaware that maintaining such dogmatic beliefs about the death penalty in the case at bar would prevent the juror from being truly fair and impartial.  Mr. Ramirez was on trial for his life and counsel should have ascertained whether this prospective juror functioned under such misconception.  The risk that such jurors may have been empaneled in this case and infected Mr. Ramirez's capital

sentencing is unacceptable in light of the ease with which that risk could have been minimized had counsel conducted a proper voir dire.

The failure of defense counsel to conduct a proper voir dire was deficient performance.  Counsel's deficient performance, therefore, prejudiced Mr. Ramirez and resulted in an undermining in the confidence in the outcome of this trial.  A proper voir dire was critical to ensuring that Mr. Ramirez's Sixth Amendment right to an impartial jury would be honored.  Given the inadequate voir dire in the case at bar, it was impossible for defense counsel to remove veniremen who would be unable to follow the jury instructions and evaluate the evidence.  Counsel failed to make certain inquiries to effectuate constitutional protections including an inquiry into the views of the veniremen regarding the death penalty. The "general fairness" and "follow the law" type questions posed by defense counsel failed to detect those jurors with views preventing or substantially impairing their duties in accordance with their instructions and oath.  This inadequacy of voir dire results in a strong doubt that Mr. Ramirez was sentenced to death by a jury empaneled in compliance with the Sixth and Fourteenth Amendments.  In such a case, the death sentence cannot stand.

### Venireman Leal

Venireman No. 97, Leal, was a juror selected in this case and was the tenth juror.  (R - v.14 - 270-316).  In her juror questionnaire, she stated that she disagreed with the statement that, "Criminal defendants deserve sympathy and compassion because they are usually victims of bad circumstances and factors beyond their control."  See Exhibit M.  She stated

86

that the death penalty was appropriate for killing children or elderly or for murder with a selfish act such as robbery.  Id.  She stated that, on a scale of 1 to 10 with 10 being the most in favor of the death penalty, she was a 5.  Id.  She stated that the death penalty is just and necessary.  Id.

During individual voir dire of Venireman Leal, the trial judge informed Leal: (1) the state has the burden of proof; (2) the defense never has the burden of proof; (3) a defendant is presumed innocent; (4) a defendant is not required to testify; (5) the jury in a capital case answers two special issues; and (6) the definition of capital murder.  Id. at 270-283.  During individual voir dire by the state, Leal stated that: (1) she had no problem with the death penalty; (2) she could assess the death penalty; (3) continuing threat to society means a person would continue to rob or assault people; and (4) she would vote for life if mitigating evidence existed.  Id. at 285, 288, 294, 299.

During individual voir dire by the defense, Leal stated that: (1) mitigating means a circumstance exists that lessens the crime and results in a life sentence rather than the death sentence; (2) character means a person's personality; (3) good character means a good, hardworking person; (4) background means were a person grew up, their family history, and school history; (5) a poor upbringing could result in a person not knowing right from wrong and she would consider this evidence; (6) a finding of mitigating circumstances results in a life sentence; and (7) she could be fair.  Id. at 310, 311, 312-313, 314, 315.

Defense counsel failed to probe the juror regarding the juror's views on the death penalty in the case at bar - i.e., for someone convicted of murder in the course of committing

robbery.  Defense counsel failed to ask the juror if such a conviction would cause the juror to automatically believe that Mr. Ramirez would be a future danger regarding special issue one.  Defense counsel failed to ask the juror if such a conviction and a finding of future dangerousness would cause the juror to not consider mitigating evidence.  Defense counsel failed to ask if the juror would be able to consider and give effect to all relevant mitigating evidence offered by Mr. Ramirez.  Defense counsel, in effect, failed to determine whether the juror had dogmatic views regarding the death penalty in the case at bar which would call into question whether the juror was truly fair and impartial.  It may be that this juror could, in good conscience, swear to uphold the law and yet be unaware that maintaining such dogmatic beliefs about the death penalty in the case at bar would prevent the juror from being truly fair and impartial.  Mr. Ramirez was on trial for his life and counsel should have ascertained whether this prospective juror functioned under such misconception.  The risk that such jurors may have been empaneled in this case and infected Mr. Ramirez's capital sentencing is unacceptable in light of the ease with which that risk could have been minimized had counsel conducted a proper voir dire.

The failure of defense counsel to conduct a proper voir dire was deficient performance.  Counsel's deficient performance, therefore, prejudiced Mr. Ramirez and resulted in an undermining in the confidence in the outcome of this trial.  A proper voir dire was critical to ensuring that Mr. Ramirez's Sixth Amendment right to an impartial jury would be honored.  Given the inadequate voir dire in the case at bar, it was impossible for defense

counsel to remove veniremen who would be unable to follow the jury instructions and evaluate the evidence.  Counsel failed to make certain inquiries to effectuate constitutional protections including an inquiry into the views of the veniremen regarding the death penalty. The "general fairness" and "follow the law" type questions posed by defense counsel failed to detect those jurors with views preventing or substantially impairing their duties in accordance with their instructions and oath.  This inadequacy of voir dire results in a strong doubt that Mr. Ramirez was sentenced to death by a jury empaneled in compliance with the Sixth and Fourteenth Amendments.  In such a case, the death sentence cannot stand.

### Venireman Vermace

Venireman No. 100, Vermace, was a juror selected in this case and was the eleventh juror.  (R - v.15 - 50-89).  At this point in jury selection, the defense had exercised 13 of its 15 peremptories.  Id. at 49.  In her juror questionnaire, she stated that she disagreed with the statement that, "Criminal defendants deserve sympathy and compassion because they are usually victims of bad circumstances and factors beyond their control."  See Exhibit M.  She stated that the death penalty was appropriate for murder.  Id.  She stated that, on a scale of 1 to 10 with 10 being the most in favor of the death penalty, she was a 10.  Id.  She stated that the death penalty is just and necessary.  Id.

During individual voir dire of Venireman Vermace, the trial judge informed Vermace: (1) the state has the burden of proof; (2) the defense never has the burden of proof; (3) a defendant is presumed innocent; (4) a defendant is not required to testify; (5) the jury in a

capital case answers two special issues; and (6) the definition of capital murder.  Id. at 50-58.
During individual voir dire by the state, Vermace stated that: (1) the death penalty is
appropriate if the defendant is a threat to society; (2) she could assess the death penalty; (3)
continuing threat to society means commit crimes of violence; and (4) a defendant would be
violent in prison and not try to better himself.  Id. at 58-59, 60, 61, 62, 65.

During individual voir dire by the defense, Vermace stated that: (1) if a person was
convicted, had a violent background, and was a threat to society, that person should get the
death penalty; (2) in determining if a person is a threat to society, she would want to hear
about his background, upbringing, and criminal history; and (3) special issue two requires
the jury to evaluate a defendant's background, why the crime was committed, character, and
family.  Id. at 81, 85.

Defense counsel failed to probe the juror regarding the juror's views on the death
penalty in the case at bar - i.e., for someone convicted of murder in the course of committing
robbery.  Defense counsel failed to ask the juror if such a conviction would cause the juror
to automatically believe that Mr. Ramirez would be a future danger regarding special issue
one.  Defense counsel failed to ask the juror if such a conviction and a finding of future
dangerousness would cause the juror to not consider mitigating evidence.  Defense counsel
failed to ask if the juror would be able to consider and give effect to all relevant mitigating
evidence offered by Mr. Ramirez.  Defense counsel, in effect, failed to determine whether
the juror had dogmatic views regarding the death penalty in the case at bar which would call

90

into question whether the juror was truly fair and impartial.  It may be that this juror could, in good conscience, swear to uphold the law and yet be unaware that maintaining such dogmatic beliefs about the death penalty in the case at bar would prevent the juror from being truly fair and impartial.  Mr. Ramirez was on trial for his life and counsel should have ascertained whether this prospective juror functioned under such misconception.  The risk that such jurors may have been empaneled in this case and infected Mr. Ramirez's capital sentencing is unacceptable in light of the ease with which that risk could have been minimized had counsel conducted a proper voir dire.

The failure of defense counsel to conduct a proper voir dire was deficient performance.  Counsel's deficient performance, therefore, prejudiced Mr. Ramirez and resulted in an undermining in the confidence in the outcome of this trial.  A proper voir dire was critical to ensuring that Mr. Ramirez's Sixth Amendment right to an impartial jury would be honored.  Given the inadequate voir dire in the case at bar, it was impossible for defense counsel to remove veniremen who would be unable to follow the jury instructions and evaluate the evidence.  Counsel failed to make certain inquiries to effectuate constitutional protections including an inquiry into the views of the veniremen regarding the death penalty.  The "general fairness" and "follow the law" type questions posed by defense counsel failed to detect those jurors with views preventing or substantially impairing their duties in accordance with their instructions and oath.  This inadequacy of voir dire results in a strong doubt that Mr. Ramirez was sentenced to death by a jury empaneled in compliance with the Sixth and Fourteenth Amendments.  In such a case, the death sentence cannot stand.

**Failure to object to absence of the Petitioner during voir dire.**

The Confrontation Clause of the Sixth Amendment to the United States Constitution states that, "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . ."  The Fourteenth Amendment to the United States Constitution makes the guarantees of the Confrontation Clause obligatory upon the States.  Pointer v. Texas, supra.

One of the basic rights of the Confrontation Clause is the right of the accused to be present in the courtroom at every stage of his trial.  Lewis v. United States, supra.  "The prisoner is entitled to an impartial jury composed of persons not disqualified by statute, and his life or liberty may depend upon the aid which, by his personal presence, he may give to counsel and to the court and triers, in the selection of jurors."  Id.  It is reversible error to qualify jurors for a trial in the absence of the accused.  Id.

In the case at bar, counsel failed to object that the Confrontation Clause guaranteed John the right to be present in the courtroom during any agreement to excuse fifty-two jurors.  The personal presence of John was required during this period of the proceedings.  It was reversible error to agree to the excusal of veniremen in the absence of John.  Counsel should have preserved this error by making a proper objection.

A defendant in custody can never waive his right to be present at every stage of his trial because he does not have control over his presence or absence.  Diaz v. United States, supra.  There exists a reasonable presumption against waiver of such fundamental

92

constitutional rights and courts do not presume acquiescence in the loss of such rights. Johnson v. Zerbst, supra.

In the case at bar, John was in custody since his arrest on February 20, 2008.  (R - v.19 - 40).  He was unable to waive his right to be present during the agreement to excuse veniremen because he did not have control over his presence or absence.  There cannot be a presumption that John waived his right to be present during the agreement to excuse veniremen.  (R - v.8 - 1-7).

A defendant has a due process right to be present at his trial "whenever his presence has a relation, reasonably substantial, to the fulness of his opportunity to defend against the charge."  Snyder v. Massachusetts, supra.  "So far as the Fourteenth Amendment is concerned, the presence of a defendant is a condition of due process to the extent that a fair and just hearing would be thwarted by his absence, and to that extent only."  Id., 291 U.S. at 107-108.  Due process does not require the presence of a defendant "when [his] presence would be useless, or the benefit but a shadow."  Id., 291 U.S. at 106-107.  An absence of a defendant, for example, from the reading of the jury instructions or the rendering of the verdict is not harmless error because there was a reasonable possibility of prejudice.  Wade v. United States, supra.  The court reasoned as follows:

> The Sixth Amendment guarantee of the right to confront adverse witnesses – is in good part a constitutional recognition of a psychological influence.  Though perhaps to a less degree, the same influence pertains to the right of confrontation of defendant and jury, ***aside from the usefulness the accused may be to his counsel*** . . . [T]here is the reasonable possibility that

the jury speculated adversely to the defendant about his absence
from the courtroom.

Id. (emphasis added).

Article 33.03 of the Texas Code of Criminal Procedure requires the personal presence
of the accused at trial in all felony cases except when the accused voluntarily absents himself
after pleading to the indictment or information or after the jury has been selected.  Bath v.
State, supra.  This right of the accused to be present at trial "is entailed within a defendant's
right to confront witnesses against him under the United States and Texas Constitutions."
Id. citing Miller v. State, supra.  "The right cannot be waived until after the jury has been
selected."  Bath v. State, supra, 951 S.W.2d at 22; Miller v. State, supra, 692 S.W.2d at 91.
A trial judge's "hearing of venirepersons' excuses while appellant was absent from the
courtroom has constituted error."  Bath v. State, supra, 951 S.W.2d at 22; Weber v. State,
supra.

In the case at bar, the veniremen were already assigned to the Petitioner's specific case
when the veniremen appeared in court.  The trial judge assigned to preside over the
Petitioner's trial also functioned as the general assembly judge over the prospective
veniremen **_already assigned to the Petitioner's specific case._**  The Petitioner's trial,
therefore, had begun at the time of the exemptions, excuses, and qualifications.  It was
constitutional error for the trial judge to proceed with the fifty-two juror strikes in the
absence of the Petitioner.  The absence of John during the qualification of the venire panel
was not harmless error because there was a reasonable possibility of prejudice.  Counsel was
ineffective in failing to object to John's absence.

94

It is impossible to confidently say, on the whole record, that this constitutional error was harmless beyond a reasonable doubt.  The absence of John during the agreement to excuse fifty-two veniremen created a reasonable possibility of prejudice.  It was not harmless error to exclude John during the agreement to excuse veniremen.  This was a violation of John's protections under the Sixth Amendment Confrontation Clause and a violation of his due process rights.  John should receive a new trial.

### Failure to object to violation of right to public trial.

The Petitioner, John, was arrested for capital murder on February 20, 2008.  (R - v.19 - 40).  He stood accused in Count 1 of a four count indictment of the murder of Pablo Castro by stabbing him with a knife in the course of committing or attempting to commit robbery.  See attached Exhibit B.  He stood accused in Counts 2 and 3 of the aggravated robbery of April Metting and Ruby Pena.  Id.  He stood accused in Count 4 of evading arrest.  Id.

Jury selection began on October 22, 2008 and concluded on November 19, 2008.  (R - v.6 - 1; R - v.15 - 1).  Juror qualifications, exemptions, and general voir dire were held on October 22, 2008.  (R - v.6 - 1).  Defense counsel has provided an affidavit regarding the voir dire proceedings held on October 22, 2008.  See Exhibit L.  The juror qualifications, exemptions, and general voir dire on October 22, 2008 were held in the central jury room of the court house.  Id.  Attached to the affidavit are photographs of the entrance to the central jury room and the interior of the central jury room as it appeared on October 22, 2008.  Id.  Defense counsel personally observed on October 22, 2008 uniformed guards posted at the

entrance to the central jury room depicted in the first photograph attached to the affidavit.
Id. These guards prevented the general public from entering the central jury room when the
court conducted juror qualifications, exemptions, and general voir dire in this case.  Id.
Defense counsel personally observed the guards exclude members of the public from
entering the central jury room during jury selection on this day.  Id.  The only people allowed
to enter the central jury room were court personnel, attorneys, the Defendant, and members
of the venire panel.  Id.  Members of the public were not allowed to enter the room during
this jury selection.  Id.

No discussion or reasons appear in the record to explain the expulsion of the public
at the beginning of voir dire.  (R - v.6 - 1).  Counsel did not object to the lack of public trial.
The Petitioner was tried and later convicted by jury on December 5, 2008.  (R - v.20 - 1, 48).
He was sentenced to death three days later.  (R - v.22 - 1, 36).

The presence of the public in the courtroom helps insure honest proceedings.  Addy
v. State, supra.  If an accused  is denied the presence of the public, he is denied a public trial,
unless the trial court can articulate on the record some compelling reason for excluding them.
Id.  The Sixth Amendment to the Constitution of the United States and Article I, Section 10
of the Texas Constitution both provide that in all criminal prosecutions, the accused shall
have a speedy public trial.   The Texas Code of Criminal Procedure mandates that the
proceedings and trials in all courts shall be public.  Tex. Code Crim. Proc. Ann. art. 1.24.
The Supreme Court of the United States has declared a four-part test for determining whether

an accused has been denied the right to a public trial:

> (1) the party seeking to close the hearing **must advance an overriding interest** that is likely to be prejudiced;
>
> (2) the closure must be no broader than necessary to protect that interest;
>
> (3) **the court must consider reasonable alternatives**; ***and***
>
> (4) **the court must make findings adequate to support the closure**.

Waller v. Georgia, supra; see also United States v. Edwards, supra.

This constitutional right is not to be abrogated without a showing consistent with the four factors listed above. "[T]here is no significant textual difference in the language guaranteeing the right to a public trial in the Sixth Amendment to the United States Constitution and Article 1, Section 10 of the Texas Constitution, [and courts] will not construe the Texas Constitution as conferring any greater protection to a criminal defendant than the federal constitution." Andrade v. State, supra, citing Fletcher v. State, supra (not designated for publication) (stating Texas follows the United States Supreme Court and the federal courts of appeal concerning a criminal defendant's right to a public trial).

Public trials have played an important role in the administration of justice in this country and have their roots in our English common law heritage. Andrade v. State, supra, citing In re Oliver, supra ("without exception all courts have held that an accused is at the very least entitled to have his friends, relatives, and counsel present, regardless with what offense he may be charged."). The value of the openness lies in the fact that people not

97

actually attending trials can have confidence that standards of fairness are being observed.

Press-Enterprise Co. v. Superior Court of California, supra.  The sure knowledge that anyone

is free to attend gives assurance that established procedures are being followed and that

deviations will become known.  Id.  The requirement of a public trial is for the benefit of the

accused.  Andrade v. State, supra at 225; Waller v. Georgia, supra, at 46.  The public is able

to see that the accused is fairly dealt with and not unjustly condemned.  Id.  The presence of

spectators also ensures the accused's triers are aware of their responsibility and its

importance.  Id.  A public trial also ensures generally that the judge and prosecutor carry out

their duties responsibly.  Id.  The right to a public trial is not absolute however.  Addy v.

State, supra.  The right to a public trial must be balanced against other interests essential to

the administration of justice.  United States v. Osborne, supra.

In Andrade, supra, the trial court did not totally close the courtroom to all spectators,

instead, it ordered the removal of a single person, one of the defendant's attorneys, for

violating a standing procedural order by arguing with the trial court.  This fact distinguished

this situation from Waller v. Georgia, supra.  In Waller v. Georgia, the Supreme Court

addressed a total closure of a courtroom for a motion to suppress hearing when it adopted the

four factor test for determining when a defendant's right to a public trial is outweighed by

other considerations.  Id., 467 U.S. at 45.

In Osborne, supra, the Fifth Circuit addressed a partial closure situation and

distinguished Waller, finding it applied only to total closures and adopted a modified version

98

of the Waller factors for cases involving only a partial closure of a courtroom.  United States v. Osborne, supra, 68 F.3d at 98-99.  The Fifth Circuit determined that there must only be a "substantial reason" for the partial closure.  Id.  It has been noted that a trial court's authority to keep order in the courtroom is a "substantial reason" justifying the partial closure.  United States ex. rel. Orlando v. Fay, supra (holding the guarantee of a public trial means only that the public must be freely admitted so long as those persons and groups who make up the public remain silent and behave in an orderly fashion so that the trial may continue).  Limitations on public attendance may be imposed where they are necessary to protect a State's interest that outweighs the defendant's right to public scrutiny.  Addy v. State, supra, citing Rovinsky v. McKaskle, supra.  Protection of witnesses from extreme embarrassment or intimidation that would traumatize them or render them unable to testify is an overriding State interest sufficient to justify partial or complete exclusion of the press or public.  Id.  No State's interest, however compelling, can sustain the exclusion of press and public from part of a trial, absent findings of necessity articulated on the record.  Globe Newspaper Co. v. Superior Court, supra.

      None of these issues pertaining to limitations that justify closure existed in the case at bar.  In the case at bar, there was a Waller situation – a total closure of the courtroom to the public.  There is literally nothing in the record that justifies this total closure of the courtroom at voir dire when the four factors of Waller are considered:  (1) the party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced; (2)

the closure must be no broader than necessary to protect that interest; (3) the court must consider reasonable alternatives; and (4) the court must make findings adequate to support the closure.  Waller v. Georgia, supra.  There was no overriding interest that was advanced by any party, much less the State, and no prejudice would have been suffered by the State had the Petitioner received moral support from his family and friends during jury selection or if the public had been allowed access.  A total closure in this case was far broader than necessary and there was no evidence in the record or elsewhere that reasonable alternatives were ever explored by the court before the public was expelled.  Certainly, there were  no findings "adequate to support the closure" listed by the court to substantiate its decision. This was a textbook violation of the Petitioner's constitutional rights, and he was therefore prejudiced by this violation of this most basic right.

The Waller court noted that, "The parties do not question the consistent view of the lower federal courts that ***the defendant should not be required to prove specific prejudice in order to obtain relief for a violation of the public-trial guarantee***.  **We agree with that view** . . ."  Waller v. Georgia, supra, 467 U.S. at 40-41 (emphasis added).  The Court cited in a footnote additional authorities in support of this proposition of necessarily implied prejudice:

> See, e. g., Douglas v. Wainwright, 714 F.2d 1532, 1542 (11th Cir. 1983) (citing cases), cert. pending, Nos. 83-817, 83-995; see also Levine v. United States, 362 U.S. 610, 627, n. (1960) (BRENNAN, J., dissenting) ("[The] settled rule of the federal courts [is] that a showing of prejudice is not necessary for

reversal of a conviction not had in public proceedings"). The general view appears to be that of the Court of Appeals for the Third Circuit. It noted in an en banc opinion that a requirement that prejudice be shown "would in most cases deprive [the defendant] of the [public-trial] guarantee, for it would be difficult to envisage a case in which he would have evidence available of specific injury." <u>United States ex rel. Bennett v. Rundle</u>, 419 F.2d 599, 608 (1969). While the benefits of a public trial are frequently intangible, difficult to prove, or a matter of chance, the Framers plainly thought them nonetheless real. <u>See also State v. Sheppard</u>, 182 Conn. 412, 418, 438 A. 2d 125, 128 (1980) ("Because demonstration of prejudice in this kind of case is a practical impossibility, prejudice must necessarily be implied"); <u>People v. Jones</u>, 47 N.Y.2d 409, 416, 391 N.E.2d 1335, 1340 (1979) ("The harmless error rule is no way to gauge the great, though intangible, societal loss that flows" from closing courthouse doors).

<u>Id.</u>

The Court distinguished in <u>Waller</u> the usual remedy of a new trial and noted the remedy should fit the violation, and since it was a pretrial motion to suppress hearing that was closed to the public in that particular case, a new, public suppression hearing was a proper remedy. <u>Id.</u>, 467 U.S. at 41. On remand, the defendant would only be entitled to a new trial if the new suppression hearing were to suppress material evidence not suppressed in the first trial. <u>Id.</u> The <u>Waller</u> court reversed and remanded because of the total closure of a pre-trial hearing and the ensuing violations of that appellant's rights. The Court also noted, however, pertinent to the instant case that:

> We also have extended that right not only to the trial as such ***but also to the voir dire proceeding in which the jury is selected***." <u>Press-Enterprise Co. v. Superior Court of California</u>, 464 U.S. 501 (1984).

<u>Id.</u>, 467 U.S. at 44.

There is no question by the United States Supreme Court that a ***violation of the public right to trial at the voir dire stage is a violation of the public right to trial***.  See Press-Enterprise Co. v. Superior Court of California, supra (hereinafter Press Enterprise I) (government failed to show compelling interest to justify closing of voir dire despite grounds raised in court's closure order, absent consideration of closure alternatives, court could not constitutionally close voir dire).

In Press-Enterprise I, the United States Supreme Court dealt with the issue of right to public trial as it pertains to the closing of voir dire in a rape/murder case of a teenage girl. Id.  This was a First Amendment case and not a Sixth Amendment analysis since both the state and defense requested a closed voir dire.  Press-Enterprise moved to attend the trial which started with voir dire.  Id., 464 U.S. at 503.  They were allowed only to attend general voir dire, but not individual, on the rationale from the state that reporters in the courtroom would make the prospective jurors less candid to questioning.  Id.  Most of the voir dire was closed to the public.  Id.  Press-Enterprise moved for the transcript of the closed proceedings and was denied.   They appealed the decision after being denied, seeking an appellate mandate and rehearing on the issue after the defendant had already been convicted and sentenced to death.  Id.  The appellate court denied their motion and the United States Supreme Court granted certiorari and reversed the lower appellate court's ruling.   In discussing the lengthy history of open jury selection throughout common law history, the Supreme Court noted:

> For present purposes, how we allocate the "right" to openness as between the accused and the public, or whether we view it as a component inherent in the system benefitting both, is not crucial. **No right ranks higher than the right of the accused to a fair trial.** But the primacy of the accused's right is difficult to separate from the right of everyone in the community to attend the voir dire which promotes fairness.

> The open trial thus plays as important a role in the administration of justice today as it did for centuries before our separation from England. **The value of openness lies in the fact that people not actually attending trials can have confidence that standards of fairness are being observed; the sure knowledge that anyone is free to attend gives assurance that established procedures are being followed and that deviations will become known. Openness thus enhances both the basic fairness of the criminal trial and the appearance of fairness so essential to public confidence in the system**.

Id., 464 U.S. at 508 (emphasis added).

The Supreme Court vacated the lower court's decision regarding the closure order for a petitioner who was not even a defendant and remanded. The lower court of appeals then analyzed the decision in Press-Enterprise I and found no First Amendment right of the public to attend voir dire but held it for actual criminal trials. Press-Enterprise Co. v. Superior Court, supra (hereinafter Press-Enterprise II). The Supreme Court granted certiorari a second time even though the petitioner in Press-Enterprise I had already been remedied, finding that these violations are capable of repetition and not moot. Press-Enterprise II, supra, 478 U.S. at 6. The Supreme Court reversed the lower appellate court again for not recognizing the critical importance of jury selection, noting:

Plainly, <u>the defendant has a right to a fair trial but, as we have repeatedly recognized, one of the important means of assuring a fair trial is that the process be open to neutral observers</u>.

The right to an open public trial is a shared right of the accused and the public, the common concern being the assurance of fairness.  Only recently, in <u>Waller v. Georgia</u>, 467 U.S. 39 (1984), for example, we considered whether the defendant's Sixth Amendment right to an open trial prevented the closure of a suppression hearing over the defendant's objection.  We noted that the First Amendment right of access would in most instances attach to such proceedings and that "<u>the explicit Sixth Amendment right of the accused is no less protective of a public trial than the implicit First Amendment right of the press and public</u>."  <u>Id.</u>, at 46.  When the defendant objects to the closure of a suppression hearing, therefore, the hearing must be open unless the party seeking to close the hearing advances an overriding interest that is likely to be prejudiced.  <u>Id.</u>, at 47 . . . Here, unlike <u>Waller</u>, the right asserted is not the defendant's Sixth Amendment right to a public trial since the defendant requested a closed preliminary hearing.  Instead, the right asserted here is that of the public under the First Amendment.  <u>See</u> <u>Gannett</u>, supra, at 397 (POWELL, J., concurring).  The California Supreme Court concluded that the First Amendment was not implicated because the proceeding was not a criminal trial, but a preliminary hearing.  <u>However, the First Amendment question cannot be resolved solely on the label we give the event, i. e., "trial" or otherwise</u>, particularly where the preliminary hearing functions much like a full-scale trial.

<u>Id.</u>, 478 U.S. at 7 (emphasis added).

"[The] presumption [of the right to public trial] may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest.  The interest is to be articulated along with findings specific enough that a reviewing court can  determine whether the closure order was properly

entered." Id., 478 U.S. at 9-10, citing Press-Enterpise I, supra.  These cases demonstrate that jury selection is considered part of the criminal trial for right to public trial purposes and that the Supreme Court considers the right to be a critical one, even to the point of reaffirming the value of the right in a case where the petitioner had already been remedied.  Press-Enterprise II.  This right arguably takes on more critical importance when it is the defendant who brings the violation of this right to the court's attention post-conviction, especially in a situation where the record is barren of any analysis or narrowly tailored reasons for closure of the court room during voir dire in the case at bar.

This is not a right that requires a showing of harm or prejudice.  Of the two classes of harm, the right to public trial falls in the second class of constitutional error of "structural defects."  United States v. Gonzalez-Lopez, supra.  "These [structural errors] 'defy analysis by "harmless-error" standards' because they 'affec[t] the framework within which the trial proceeds,' and are not 'simply an error in the trial process itself.'"  Id., 548 U.S. at 148-149, citing Waller v. Georgia, supra (the violation of the right to public trial is an example of structural error).  These structural errors are assessed this way because of the difficulty in proving the effect of the error.  Id., 548 U.S. at 149, n. 4, citing Waller v. Georgia, supra (violation of the public-trial guarantee is not subject to harmlessness review because "the benefits of a public trial are frequently intangible, difficult to prove, or a matter of chance.").

In Waller, one of the defendants failed to object to the closure of the public from the suppression hearing.  Waller v. Georgia, supra, 467 U.S. at 42, n. 2.  The Court, however,

105

still reversed and remanded that case and allowed the state appellate court to determine if that defendant was procedurally barred from seeking relief as a matter of state law.  Id.  No such procedural bar would apply in Texas.  Texas Rule of Evidence 103(d) authorizes a reviewing court to take notice of fundamental or structural errors affecting substantial rights although they were not brought to the attention of the court.  Blue v. State, supra.  Some rights, such as the presumption of innocence, are widely considered so fundamental to the proper functioning of our adjudicatory process as to enjoy special protection in the system.  Id.  A principal characteristic of these rights is that they cannot be forfeited.  Id.  Such rights are not extinguished by inaction alone.  Id.  Instead, if a defendant wants to relinquish one or more of them, he must do so expressly.  Id.  A violation of a fundamental constitutional right, such as the violation of the public right to trial at the voir dire stage, therefore requires no objection.  Should this court deem an objection is required, which would be a position opposed to the above cases, this ineffective assistance of counsel claim for failing to object to the violation of this fundamental constitutional right preserves this error.

Federal courts also note that no showing of harm is required for violations of this right.  "[T]he cases on this issue are clear: 'once a petitioner demonstrates a violation of his Sixth Amendment right to a public trial, **he need not show that the violation prejudiced him in any way**.  The mere demonstration that his right to a public trial was violated entitles a petitioner to relief.'"  Owens v. United States, supra, citing Judd v. Haley, supra (emphasis added).

In Owens, it was noted in analyzing the issue in that case:

> However, **this was not a mere fifteen or twenty-minute closure; rather, Owens' trial was allegedly closed to the public for an entire day while jury selection proceeded**. Jury selection is, of course, a crucial part of any criminal case. See Gomez v. United States, 490 U.S. 858, 873, 109 S.Ct. 2237, 104 L.Ed.2d 923 (1989) ("Jury selection is the primary means by which a court may enforce a defendant's right to be tried by a jury free from ethnic, racial, or political prejudice . . . or predisposition about the defendant's culpability . . . ."). Furthermore, even if the courtroom was closed because of inattention by the judge, courts have expressed concern in the past where a court officer's unauthorized closure of a courtroom impeded public access. See, e.g., Walton v. Briley, 361 F.3d 431, 433 (7th Cir. 2004) ("Whether the closure was intentional or inadvertent is constitutionally irrelevant."); Martineau v. Perrin, 601 F.2d 1196, 1200 (1st Cir. 1979) (noting Sixth Amendment concern where marshals locked courtroom doors without authorization); see also United States v. Keaveny, 1999 U.S. App. LEXIS 3630 at 4 (1st Cir. 1999) ("[C]onstitutional concerns may be raised even by a court officer's unauthorized partial exclusion of the public.").

Id., 483 F.3d at 63.

As in Owens, the closure in the case at bar was for an entire day of jury selection. As in Waller, it was a total closure. There was no justification for this constitutional violation. "The public trial guarantee has been considered so important that courts have reversed convictions or granted habeas relief where the courtroom was closed for the announcement of the verdict, United States v. Canady, supra, where a trial inadvertently ran so late one night that the public was unable to attend, Walton v. Briley, supra, and where the trial was closed for the testimony of just one witness, United States v. Thunder, supra." Owens v. United States, supra, 483 F.3d at 61.

107

In the instant case, on day one of jury trial where the jury is being selected in a capital murder case, the courtroom doors were totally closed to the public and family and friends without justification that appears anywhere in the record. See Exhibit L. None of the Waller factors were expressed, discussed, or even considered before the wholesale expulsion of family and friends of the Petitioner and general public took place. This is a textbook constitutional violation as expressed in Waller and one that should not have occurred in the Petitioner's trial. Counsel was ineffective for failing to preserve this error.

There is no legitimate way to remedy this federal and state constitutional violation without the granting of a new jury trial to the Petitioner since a redo of jury selection itself is an impossibility at this post-conviction stage and would be meaningless as a remedy. This violation is not something that requires a showing of prejudice by the Petitioner as the United States Supreme Court has noted. The only remedy that exists for this violation is a new trial for the Petitioner. The Petitioner should receive a new trial in this cause.

**Failure to object to shackling of the Petitioner.**

The Fifth Amendment of the United States Constitution states, in part, that, "No person shall be deprived of life, liberty, or property, without due process of law . . ." The Sixth Amendment to the United States Constitution states, in part, that, "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury . . ." The Fourteenth Amendment of the United States Constitution states, in part, that, "No State shall . . . deprive any person of life, liberty, or property, without due process of law . . ."

Handcuffing or shackling a defendant, prior to his conviction, where a juror can see the restraint, violates due process absent some essential state interest.  Holbrook v. Flynn, supra.  Pivotal to the right to a fair trial and due process, as guaranteed by the Fifth, Sixth, and Fourteenth Amendments, is the principle that "one accused of a crime is entitled to have his guilt or innocence determined solely on the basis of the evidence introduced at trial, and not on grounds of official suspicion, indictment, continued custody, or other circumstances not adduced as proof at trial."  Holbrook v. Flynn, supra, citing Taylor v. Kentucky, supra. The Supreme Court has recognized that "certain practices pose such a threat to the 'fairness of the factfinding process' that they must be subjected to 'close judicial scrutiny.'"  Holbrook v. Flynn, supra, citing Estelle v. Williams, supra.  If a defendant is forced to wear prison clothes before the jury, "the constant reminder of the accused's condition implicit in such distinctive, identifiable attire may affect a juror's judgment."  Holbrook v. Flynn, supra. Such a practice is unconstitutional "since no 'essential state policy' is served by compelling a defendant to dress in this manner.'"  Holbrook v. Flynn, supra.

Shackling is the sort of inherently prejudicial practice that should be permitted only where justified by an essential state interest specific to each trial.  Holbrook v. Flynn,  475 U.S. at 568-569,; Estelle v. Williams, supra, 425 U.S. at 503, 505 (making a defendant appear in prison garb poses such a threat to the "fairness of the factfinding process" that it must be justified by an "essential state policy").  Since shackling involves a "probability that prejudice will result that it is deemed inherently lacking in due process," Estes v. Texas, supra, "little stock need be placed in jurors' claims to the contrary."  Holbrook v. Flynn,

supra, citing Sheppard v. Maxwell, supra; Irvin v. Dowd, supra.  "Even though a practice may be inherently prejudicial, jurors will not necessarily be fully conscious of the effect it will have on their attitude toward the accused."  Holbrook v. Flynn, supra.  "Whenever a courtroom arrangement is challenged as inherently prejudicial, therefore, the question must be not whether jurors actually articulated a consciousness of some prejudicial effect, but rather whether 'an unacceptable risk is presented of impermissible factors coming into play.'"  Holbrook v. Flynn, supra, citing Williams, 425 U.S., at 505.

In Illinois v. Allen, supra, the Supreme Court stated that a defendant may be prejudiced if he appears before the jury bound and gagged.  "Not only is it possible that the sight of shackles and gags might have a significant effect on the jury's feelings about the defendant, but the use of this technique is itself something of an affront to the very dignity and decorum of judicial proceedings that the judge is seeking to uphold.'"  Id.  No person should be tried while shackled except as a last resort.  Id.

Shackling after conviction and during capital sentencing proceedings is also unconstitutional.  Elledge v. Dugger, supra.  A defendant has the right to be present during his trial without any restraints being used upon him.  Culverhouse v. State, supra.  It is within the trial judge's discretion to shackle the defendant if this action is required by the circumstances.  Id.  If the judge orders the defendant shackled, the record should reflect the particular reasons for this restraint.  Id.  The trial judge abuses her discretion if the record fails to reflect sufficient reasons for the actions of the judge in shackling the defendant.  Id.

110

A formal hearing may be required before the judge orders shackles if the actions supporting the order by the judge did not occur in the presence of the judge or were not within the personal knowledge of the judge.  Id.  A hearing and findings must precede the order of restraint.  Gamage v. State, supra.  A conviction will be reversed if the record fails to reflect conduct by the defendant justifying shackling.  Penn v. State, supra.

Shackling is permissible only when a defendant has become so insulting, abusive, and disruptive that an orderly trial is impossible and, even then, it is an abuse of discretion to employ shackles when less drastic security measures will adequately and reasonably suffice. Kennedy v. Cardwell, supra; Spain v. Rushen, supra.   For example, it was deemed permissible to shackle a defendant after he attacked a witness in front of the jury.  Smith v. State, supra.  Removal from the court room provides a less drastic measure.  Illinois v. Allen, supra.  A defendant loses his constitutional rights in this context only if, after he has been warned by the judge about his disruptive behavior, he still conducts himself in a manner so disorderly, disruptive, and disrespectful of the court that his trial cannot be continued.  Id. Between shackling and removal from the court room, shackling is the least acceptable.  Id. (Brennan, J., concurring).  Improper shackling requires automatic reversal based upon the constitutional violation.

In Rhoden v. Rowland, supra, the trial judge ordered the defendant shackled during trial but did not establish a compelling need for the shackling.  Id. at 635.  The defendant was escorted to and from the courtroom outside the jury's presence and was instructed to keep

his feet under counsel table.  Id.  It was established that at least three jurors had seen the shackles during trial.  Id.  Five jurors saw the shackles during some part of the trial, and the shackling was not mentioned during jury deliberations.  Id. at 636.  The shackles were visible to the jury while in the jury box, but the lower court held that the shackling had little actual impression on the jury.  Id.  The Ninth Circuit held that since the jury saw the shackles, the case involved violent crimes, and the evidence was disputed, the trial judge's error in shackling the defendant substantially influenced the jury's verdict.  Id. at 637.  The defendant was granted habeas relief.

In the case at bar, the Petitioner was shackled with leg irons running through an eye bolt in the floor of the court room.  See Exhibit L.  Even though a table blocked the jury from seeing the leg irons and the eye bolt, every time the Petitioner arose or moved in his chair, the sound of the leg irons moving through the eye bolt was audible.  Id.  At no time during the jury selection, pretrial motions, or any part of the trial was there any acting out or misconduct of any type by the Petitioner.  Counsel was ineffective for failing to object to the shackling of the Petitioner.

It is clear that the shackles on the Petitioner were audible both during the guilt/innocence phase of the trial and during the punishment phase of the trial, and the jurors discussed this shackling even during deliberations.  There is no evidence that the Petitioner was disorderly in any way during the trial.  The trial judge abused his discretion in shackling the Petitioner since the record fails to reflect any reasons, let alone sufficient reasons, for the shackling.  A formal hearing was not conducted before the judge ordered the shackles.

112

Since the shackling was audible in the courtroom, the case involved violent crimes, and the evidence was disputed, the trial judge's error in shackling the Petitioner substantially influenced the jury's verdict.  This shackling posed such a threat to the fairness of the factfinding process that it should have been subjected to close judicial scrutiny - but it was not.  The Petitioner was forced to wear leg irons before the jury, and this wearing of leg irons was a constant reminder to the jury of the Petitioner's condition.  This shackling may affect a juror's judgment.  Such shackling of the Petitioner was unconstitutional since no essential state policy was served by compelling the Petitioner to be shackled.  Since this shackling of the Petitioner involved a probability that prejudice will result, it is deemed inherently lacking in due process, and little stock need be placed in jurors' claims to the contrary.  The shackling was inherently prejudicial, and the jurors will not necessarily be fully conscious of the effect it will have on their attitude toward the accused.  Since the shackling of the Petitioner has been challenged as inherently prejudicial, therefore, the question must be not whether jurors actually articulated a consciousness of some prejudicial effect since there existed in the shackling of the Petitioner an unacceptable risk of impermissible factors coming into play.  A new trial should be ordered since the record fails to reflect conduct by the Petitioner justifying the shackling.  A new trial should be ordered since this shackling violated the Petitioner's right to a fair trial and due process and due course of law as guaranteed by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

**Failure to object to 404(b) evidence.**

The Petitioner raised as a point of error on direct appeal error in admitting evidence of the subsequent aggravated robbery and attempted aggravated robbery at the guilt phase. See Exhibit N at 26. Defense counsel requested 404(b) notice which was granted on October 3, 2008. Id. at 26-27. At that time, all four counts in the indictment included the 404(b) evidence. Id. at 27. Counsel later filed a motion to sever the capital murder charge from the other counts of the indictment which was granted on October 21, 2008. Id. The prosecution indicated at the hearing that the state still intended on introducing evidence of the subsequent offenses alleged in Counts 2-3. Id. Counsel "failed to preserve this matter for appellate review because he did not challenge the prosecutor's representations at the admissibility hearing that the State's notice to the defense was adequate, and he did not object at trial that the defense did not have adequate notice of the State's intent to introduce evidence of extraneous offenses." Id. at 30. Counsel was ineffective for failing to preserve this matter for appellate review.

At a hearing on October 29, 2008, the state presented evidence of evading arrest, aggravated robbery, and attempted aggravated robbery. Id. The prosecution claimed that this evidence was admissible as same-transaction contextual evidence or as extraneous-offense evidence tending to show motive, intent, plan, preparation, identity, "and such." Id. at 30-31. Defense counsel failed to object to this evidence under Rule 404(b). Id. at 31. When the evidence was admitted during trial, counsel failed to object. Id. at 31-32. As a result, "Appellant's complaint that this evidence was not admissible under Rule 404(b) is not

114

preserved because appellant never objected on this basis." Id. at 32.  Counsel was ineffective

for failing to preserve this error and failing to make a 404(b) objection for the exclusion of

this evidence.

### Failure to present mitigating evidence.

The Sixth Amendment guarantees criminal defendants the effective assistance of

counsel.  That right is denied when a defense attorney's performance, in failing to properly

investigate and discover mitigation evidence in a capital case, falls below an objective

standard of reasonableness and thereby prejudices the defense.  Wiggins v. Smith, 539 U.S.

__, 123 S.Ct. 2527, 2535, 156 L. Ed. 2d 471 (2003).  Defense counsel has a duty to conduct

the "requisite, diligent" investigation into his client's background.  Williams v. Taylor, 529

U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (O'Connor, J., concurring).  Counsel is

ineffective during the penalty phase of a capital trial when counsel fails to present mitigation

evidence.  Baxter v. Thomas, supra.

Prior to trial, defense counsel and their mitigation expert, Dr. Martinez, met with

Guadalupe Alejandro, John's maternal grandmother, and only Dr. Martinez Maria Hinojosa,

John's paternal grandmother.  See Exhibits D, E.  The defense team, however, did not "ask

me much about John's background from when he was growing up."  See Exhibit D.  Ms.

Hinojosa briefly spoke to defense counsel "but when I did it didn't seem to me that he knew

much about John."  See Exhibit E.  John's father spoke to defense counsel for 5-10 minutes

in the hallway outside the courtroom the day before he testified.  See Exhibit F.  Prior to trial,

he spent an hour with Dr. Martinez regarding John's personal history.  Id.  I did not seem as if counsel had spoken to Dr. Martinez about his testimony.  Id.  Counsel never informed him about what questions would be asked at trial and as a result a lot of information was never presented by him during trial.  Id.  Prior to trial counsel spoke to John's mother one time.  See Exhibit G.  No one from the defense team ever interviewed Vicki Rivas (John's aunt), Ashley Ramirez (John's sister), or Alex Hernandez (John's half-brother).  See Exhibits H, I, J.

During the trial, Ms. Alejandro and Ms. Hinojosa often felt intimidated by the complainant's family and by the prosecutor that was handling the case."  See Exhibits D, E.  Men from the complainant's family said derogatory things to John's family and one man got up and started taking off his jacket like he was going to fight.  Id.  John's family all had to quickly leave the courtroom just to get away from the man.  Id.

During the sentencing phase of the trial the prosecutor was always turning around and giving a thumbs up or smiling and gesturing at the complainant's family.  See Exhibits D, E.  Ms. Alejandro heard the prosecutor say to the complainant's family, "The grandmothers are going to testify and we're [] going to have fun with them."  See Exhibit D.  Ms. Hinojosa heard the prosecutor say he was "going to have a good time when we took the stand."  See Exhibit E.  John overheard this comment and then over the weekend he told his family that he did not want his family to testify as he did not want anyone to be mean to them.  See Exhibits D, E.  At the time of trial, John's mother had a warrant out for her arrest.  See

Exhibit G.  On the day counsel asked her to come to court, she was arrested and could not testify.  Id.

During the punishment phase of the trial, counsel called the Petitioner's father as a witness.  (R - v.21 - 114).  The Petitioner's father testified about his age, his children, his family, he divorced John's mother, he was not ordered to pay child support, he did not regularly visit John, he basically abandoned John, and John's mother raised John.  Id. at 114-123.  On the next day of trial, counsel notified the court that counsel and the defense expert (Dr. Martinez) met with John and John directed them to not call any more witnesses and to simply read a bible verse to the jury for argument.  (R - v.22 - 4-12).  Counsel rested and did not call any witnesses before the jury.

The following evidence was available to counsel had they properly investigated the case and called the following witnesses to testify.  John is the son of Priscilla Martinez and John "Henry" Ramirez, Sr.  See Exhibits D, E.  Priscilla and Henry started dating when Priscilla was 16 and Henry was 18 and a senior in high school.  Id.  Henry was a user of marijuana during this time.  See Exhibit D.  Priscilla was a tough girl with a cigarette always behind her ear and looked as though she had been raised in the streets.  See Exhibit E.  She always dressed in a manner that looked "punked out."  Id.  She was immature for her age. Id.  Soon after Priscilla and Henry began dating, Priscilla became pregnant with Ashley.  See Exhibit D.  Priscilla and Henry were living with Henry's parents at the time.  See Exhibits D, E.  Henry was a heavy drinker and would stay up late at night playing cards and gambling.

117

See Exhibit D.  While pregnant with Ashley, Priscilla dropped out of high school.  See Exhibit F.

After the birth of Ashley, Priscilla and Henry moved into their own apartment.  See Exhibits D, E.  Henry's drinking worsened and contributed to arguments between Priscilla and Henry.  Id.  Ashley's grandmother would visit and find Ashley in a filthy condition.  See Exhibit E.  Ashley's feet would "be just black.  She looked like she hadn't had a bath or been washed for a week."  Id.  Priscilla and Henry would leave Ashley with relatives for days and not return to get Ashley.  Id.  Once Ashley's grandmother found Ashley with a cousin after days with the cousin and Ashley was "just filthy and she was walking funny.  Id.  Ashley had a large boil on the inside of her thigh.  Id.  "I was just shocked that she could have a problem like this and no one seemed to have noticed or cared at all."  Id.  When confronted, Priscilla acted as if she was embarrassed that she had been caught not paying attention to Ashley.  Id.

When John was born, Priscilla was 18 and Henry was 20.  See Exhibit G.  There were problems between Priscilla and Henry due to Henry's drinking problem.  Id.  When John began talking, he had a lisp and slurred his words.  See Exhibit F.  When John was almost 2 years old, he started having stomach problems.  See Exhibit F, G.  John had a twisted intestine that required surgery.  Id.  The surgery was immediately required since this was a life threatening situation.  See Exhibit G.  John was in the hospital for ten days which was traumatic for him.  See Exhibit F.

Priscilla and Henry frequently fought.  See Exhibit G.  Henry had a drinking problem and Priscilla was drinking and smoking marijuana.  See Exhibits F, G.  Henry seemed to care

only for partying and having fun with his buddies.  <u>See</u> Exhibit G.  Henry slapped Priscilla once during an argument.  <u>See</u> Exhibit D.  When Ashley was about 3 and John was about 2, Priscilla and Henry separated.  <u>See</u> Exhibit E.  This separation was hard on John because he had been close to Henry.  <u>See</u> Exhibits E, G.  Priscilla then took the children and moved to Houston, Texas to be with her family.  <u>Id.</u>  Priscilla felt alone and abandoned by Henry.  <u>See</u> Exhibit D.  After this separation, Henry's drinking problem worsened, and he rarely saw John.  <u>See</u> Exhibit E.  Henry never again showed any interest in the children and never paid child support to Priscilla.  <u>See</u> Exhibit G.  The few times Henry came around the children, he would take Ashley with him but leave John behind at the apartment.  <u>See</u> Exhibits G, H.  Priscilla was left to explain to John why his father did not care to see him or do things with him.  <u>See</u> Exhibit G.  "It would be heart breaking when Henry would come and pick up Ashley to take her to his mother's and just leave John there crying."  <u>Id.</u>  Many times Henry would call and say he was on his way to pick up John and then would not show up at the apartment.  <u>Id.</u>  "John would sit at the window for hours waiting for him."  <u>Id.</u>

Priscilla would yell at Ashley and John and was very moody.  <u>See</u> Exhibit I.  If Ashley did not do was Priscilla asked of her, Priscilla would yell at Ashley right away.  <u>Id.</u>  If it was John, however, Priscilla would "smack him in the head or hit him with whatever she had in her hand at the time."  <u>Id.</u>  "There was always a lot of yelling, cussing and hitting going on at mom's house."  <u>Id.</u>  "Between the yelling and the hitting I think that she was pretty abusive of John."  <u>Id.</u>

Ashley went to live with her grandmother.  <u>See</u> Exhibit E.  While with her grandmother, Ashley was playing at the coffee table one day and asked, "Grandma, do you know how to make cocaine?"  <u>Id.</u>  Ashley then took a card and acted out how to chop up the cocaine, make a line, roll up a piece of paper, and snort the cocaine through her nose.  <u>Id.</u> Ashley stated her mother showed Ashley how to do this.  <u>Id.</u>

John lived with Priscilla, but Priscilla would send him to stay with relatives since Priscilla was with another man.  <u>See</u> Exhibit D.  A man, Joe Hernandez, moved in with Priscilla and John and was the father of John's younger brother, Alex.  <u>See</u> Exhibit G. Priscilla was working, drinking, and using drugs and really had a short fuse.  <u>Id.</u>  Any little thing would set off Priscilla, and she would yell at everyone and "slap whoever seemed at the time to have it coming."  <u>Id.</u>  "[I]t was not uncommon for [Priscilla] to yell at [John] or spank or slap him, especially as he got older."  <u>Id.</u>  One day at school when the kids were being checked for head lice, it was discovered that John had a cut on his head that resulted from Priscilla hitting John with a vacuum cleaner tube.  <u>Id.</u>  CPS got involved and almost removed John to a foster home until Priscilla's mother agreed to take John.  <u>Id.</u>

John would be upset since he did not get along with Joe Hernandez.  <u>See</u> Exhibit D. John felt that Priscilla was mean to John.  <u>Id.</u>  Priscilla would slap or hit John during the nine or ten years they lived in Houston.  <u>See</u> Exhibit E.  She had a short temper and would often yell at the kids.  <u>See</u> Exhibit D.  Priscilla had a couple of relationships with other men resulting in the births of Alex and Guadalupe.  <u>Id.</u>  John did not get along well with either of

120

those men.  Id.  Priscilla later lived with Ascension Alvarez resulting in the birth of Guadalupe Alvarez.  See Exhibit G.  Ascension was mean to John and argued all the time with Priscilla.  Id.  These men did not care for John and Ascension would order John to wash his hands and mouth before touching John's sister.  See Exhibits D, G.  John would see his mother beat these men.  See Exhibit K.

John was six years older than Alex and ten years older than Guadalupe, so John had a lot of responsibility for raising and looking after them when Priscilla was working or dating men.  See Exhibit E.  Their neighborhood was very rough and was in the projects and had drugs, gangs, violence, and crime was common.  See Exhibits E, G.  John never let anyone mess with Alex or Guadalupe.  See Exhibit J.  Whenever Ashley visited Priscilla there, "I would always be on 'high alert' because she always lived in a neighborhood that I never felt safe in."  See Exhibit I.  "I was always very relieved to get home after these visits, back to my own house where I felt safe."  Id.  It seemed as if the police were always there and someone was always getting arrested.  See Exhibit G.  John's uncle, who was five years older than John, was shot as a result of gang violence.  See Exhibit E.  Priscilla, looking back on this time frame, is "shocked at how chaotic and violent those eight or nine years that we spent in Houston were."  See Exhibit G.  "[I]t was an awful environment to have to raise children in."  Id.  "The violence and drugs and crime that was rampant in that neighborhood even crept into our apartment as it was during that time that [Priscilla] started using some cocaine."  Id.  The cocaine made Priscilla more moody and made their problems worse.  Id.

One of Priscilla's men, Joe Alvarez, attacked her with a knife and cut up Priscilla. See Exhibits E, J.  John witnessed this aggravated assault and called 911 for help.  Id. Alvarez was hiding outside Priscilla's apartment and as she entered, Alvarez attacked her with a knife.  See Exhibit G.  They struggled at the doorway and John, who was 9 years old, witnessed his mother get cut eight times with a knife requiring stitches at the hospital.  Id. John was terrified seeing Priscilla being cut up right in front of John.  Id.  The police arrived and arrested Alvarez.  Id.

John's grandmother does not know how John survived his childhood situation.  See Exhibit E.  "The environment that he grew up in was full of violence, neglect, crime, drugs and chaos."  Id.  John was "neglected, used and abused."  Id.  "John always only wanted a little love and attention but there was no one that gave him that on any kind of regular basis." Id.  "Even his dad didn't pay that much attention to him."  Id.  "I think his life would have been so much different if he would have been in a better situation, but that was not to be." Id.  John's mother, to punish him psychologically, would yell at him, tell him that she was ashamed of him, embarrass him, or threaten him with a weapon or dangerous object.  See Exhibit K.  Corporal punishment typically included spanking, slapping, ear or hair pulling, and shoving or pushing.  Id.  His mother would bite him, burn him, cut or puncture his skin, choke him, and attempted once to seriously injure or kill him as a form of punishment.  Id. John feels like the physical violence, severe punishments, and suicidal thoughts had a significant effect on his childhood.  Id.  As a child, John experienced physical violence, had sleep difficulties, was very lonely, punished too severely, was very nervous, was accident

prone, cried a lot, witnessed violence, was unhappy, had extreme fears, and suicidal thoughts.
Id.

John was placed in special education during the fifth grade.  See Exhibits D, G.  The
school officials wanted John to see a doctor and start taking medication.  Id.  John was
having behavior problems in class by getting out of his seat and clowning around.  Id.  John
has a school history of speech problems, behavior problems, and learning problems.  See
Exhibit K.  School records indicate John graduated under a special education permit, without
passing statewide testing, from which he was exempted by special education.  Id.  John could
not graduate in the regular educational program.  Id.

When John's grandmother was preparing to move back to Corpus Christi, Texas, John
begged her, "Don't desert me, don't leave me behind."  See Exhibit D.  John would often say
that he did not believe his mother loved him.  Id.  Priscilla let John go to Corpus Christi with
his grandmother.  Id.  After John moved back to Corpus Christi, his father's family and his
father would call to say they were coming to pick up John but then would never show up to
get John.  See Exhibits D, H.  To this day, "John still carries some hurt and anger in him for
how his dad ignored him while he was growing up."  See Exhibit H.  Eventually someone
would call and say they had gotten busy or had to do something else.  See Exhibit D.  John
would become very upset over this.  Id.  John would say, "It doesn't matter; he never did
anything for me anyway.  I don't have a father."  See Exhibit G.

John would tell his grandmother that he could never please his mother.  See Exhibit
D.  He would make dinner for the children, clean the house, wash the dishes, dust, instruct

the children on their chores and homework since Priscilla was gone when the children returned from school.  Id.  John said that no matter what he did, he could never please his mother.  Id.  She would be mad at him all the time and yell at John and the other children.  Id.  John felt physically and emotionally abused by his mother.  See Exhibit K.

When John was sixteen, he worked at the Boys and Girls Club and gave his mother half his pay check.  See Exhibits G, I.  John enjoyed organizing activities for and playing with the younger kids there.  See Exhibit I.  He really enjoyed the kids and they really liked him.  Id.  Everyone had a great time and liked it when John was in charge.  See Exhibit J.  John cared about his family and felt responsible to help out everyone.  See Exhibit G.  He would use his money to take Alex and Guadalupe to the beach, fishing, and paddle boating.  See Exhibit J.

John was jealous of how well Ashley lived as opposed to how rough things were for John.  See Exhibit G.  One Christmas at Ashley's grandmother's house, Ashley had numerous toys, clothes, and gifts, but John received only a package of socks.  Id.  This was extremely difficult on John and only added to his frustration with his father not paying attention to him.  Id.  It was obvious that John wished he could have been brought up with Ashley.  See Exhibit E.  He would comment on how much better she was than he.  Id.  "I think about the potential that John had and how well his sister was able to become successful and it just makes me sad."  Id.

John worked hard to graduate from high school and graduate from boot camp with the U.S. Marines.  See Exhibits D, E, F, G, H, I, J.  He was doing well and making good choices.

Id.  John, however, became involved with Laura.  Id.  She was a stripper and cared only about herself.  Id.  She kept asking John to leave the Marine Corps.  Id.  This was John's first serious relationship, and he did not know how to deal with it.  See Exhibit G.  Laura told John that if he returned to the Marines, he did not love Laura.  See Exhibit D.  The problem was that "the only thing John ever wanted in his life was to be loved and he just didn't know how to deal with this."  Id.  "[I]t was hard for him to resist the love and attention that Laura gave him that he had wanted all his life."  See Exhibit E.  John started to go downhill.  Id.  John was discharged from the Marines and Laura left him.  See Exhibit G.  John then changed for the worse.  See Exhibit D.  He started drinking heavily, using drugs, and hanging out with a bad crowd.  Id.  He would easily become angry.  See Exhibit E.  A few months later John was shot.  See Exhibit G.  His whole attitude had changed, and he gave up on trying to make anything of himself.  See Exhibit F.  A few months after that, this capital murder case arose.  See Exhibit G.

John made suicide attempts that Marine Corps psychologists believed were genuine. See Exhibit K.  John attempted suicide by overdose and jumping from a building.  Id.  He was hospitalized for psychiatric care and received medication.  Id.  He was diagnosed with borderline personality disorder.  Id.  He has a lengthy family and personal history of multiple substance abuses.  Id.  Witnessing violence was a normal occurrence for John during childhood.  Id.  He saw his mother stabbed multiple times in an altercation with her boyfriend who was the father of John's half-brother.  Id.  John witnessed his uncle shot in a gang related incident.  Id.  John was himself shot twice in the chest confronting a man who had

threatened his aunt.  Id.  John suffered extensive and repeated abuse at home resulting in CPS placing him with his grandmother.  Id.  He has a school history of hyperactivity, speech problems, behavior problems, and learning problems.  Id.

The following illustrates why counsel were ineffective in failing to recognize that John was unable and incompetent to direct counsel to not call any further witnesses during the punishment phase of the trial.  John instructed his attorneys to not present any mitigation evidence at his trial.  Id.  The defense psychologist, Dr. Martinez, was present during this discussion.  Id.  Dr. Martinez was of the opinion that John understood the potential consequences of this decision especially since John indicated that he hoped the jury would sentence him to death.  Id.  Dr. Martinez did not indicate in his notes, however, of any consideration that John was clinically suicidal during this time frame because of an undiagnosed mental disorder.  Id.  When John made the suicidal statement that he hoped the jury would sentence him to death, Dr. Martinez failed to propose any further specific testing for depression.  Id.  In fact, Dr. Martinez never attempted specific testing for the presence of depression or any other serious mental disorder.  Id.  In the opinion of Dr. Murphey, "the evaluation of John's decision to forego testimony about mitigating circumstances was badly flawed.  It is more likely at the time of making this decision John was suicidal and irrational, based on the data reported by Dr. Martinez."  Id.

Currently, John reports suicidal ideation and has a history of suicidal ideation and attempts.  Id.  His report of prior suicidal attempts is verified from his military records and "it is assumed that his current report of suicidal ideation is accurate and reflects his thoughts

and feelings accurately." Id. "His profile is consistent with excessive fighting, a history of dysfunctional family relationships, and alienation and mistrust of other people." Id. "These characteristics are consistent with his diagnosis of Boderline Personality Disorder and his history of victimization by child abuse." Id. John "may harbor distorted or even delusional beliefs that affect his decision-making as, for example, in his decision to forego presentation of mitigation evidence." Id.

Counsel is ineffective during the penalty phase of a capital trial when counsel fails to present mitigation evidence. Baxter v. Thomas, supra. The failure to present the above evidence to the jury could not have been a tactical choice. Had the above evidence been presented to the jury, there is a reasonable probability that John would have received a life sentence rather than a death sentence.

Defense counsel's performance was deficient in failing to present this mitigation testimony. Counsel's deficient performance prejudiced Mr. Ramirez and resulted in an undermining of confidence in the outcome of the proceeding. There exists a reasonable probability that, but for this deficient performance, the result of the proceeding would have been different. Mr. Ramirez should receive a new sentencing hearing.

## CLAIM V

**THE AGGRAVATING FACTORS EMPLOYED IN THE TEXAS CAPITAL SENTENCING SCHEME ARE VAGUE AND DO NOT PROPERLY CHANNEL THE JURY'S DISCRETION IN VIOLATION OF THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

In the case at bar, the trial judge instructed the jury, in pertinent part, to answer the following question during the punishment phase of the trial: Do you find from the evidence beyond a reasonable doubt that there is a probability that the Defendant would commit criminal acts of violence that would constitute a continuing threat to society?  A capital punishment statute is unconstitutional if it permits the arbitrary and capricious infliction of the death penalty.  Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972).  "A vague aggravating factor employed for the purpose of determining whether a defendant is eligible for the death penalty fails to channel the sentencer's discretion." Stringer v. Black, 503 U.S. 222, 235, 112 S.Ct. 1130, 117 L.Ed.2d 367 (1992).  An aggravator which asks whether a defendant "exhibited utter disregard for human life" barely passes constitutional muster if it includes a limiting instruction that it was the action of a "cold-blooded, pitiless slayer." Arave v. Creech, 507 U.S. 463, 113 S.Ct. 1534, 123 L.Ed.2d 188 (1993).  Cold-blooded and pitiless are not subjective, but instead describe a defendant's state of mind which is ascertainable from the surrounding facts.  Id.

In Texas, there is no limiting instruction and there is no definition of the terms "probability," "criminal acts of violence," and "continuing threat to society."  See e.g., Patrick v. State, 906 S.W.2d 481, 494 (Tex. Crim. App. 1995); Chambers v. State, 903 S.W.2d 21, 35 (Tex. Crim. App. 1995); Clark v. State, 881 S.W.2d 682, 698-699 (Tex. Crim. App. 1994).  This leaves Texas juries to guess at the meaning of these terms and thus at the meaning of the entire first special issue.  This allows a criminal act of violence to be anything a juror wants to believe it is.  This is why the Texas scheme is unconstitutional.  A statute

which permits jurors to return a death sentence based on anything they want to believe is arbitrary and capricious and therefore unconstitutional under the Eighth and Fourteenth Amendments to the United States Constitution.  The aggravator found in the first special issue fails to channel the sentencer's discretion, in violation of the Eighth and Fourteenth Amendments.  The sentence in this case should be vacated and Mr. Ramirez should receive a new sentencing hearing.

## VII.

## THE PRESUMPTION OF CORRECTNESS OF 28 U.S.C. § 2254(d) & (e) SHOULD NOT ATTACH TO STATE COURT FINDINGS OF FACT.

### The law in general.

28 U.S.C. §§ 2254(d)(2) and 2254(e)(1) state as follows:

> (d)    An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim . . .
>
>     (2)    resulted in a decision that was based on an **unreasonable determination of the facts** in light of the evidence presented in the State court proceeding.
>
> (e)(1)  In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a **determination of a factual issue** made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

(emphasis added).

129

2254(d)(2) provides for habeas relief if the state court's determination of the facts was **_unreasonable_** in light of the evidence presented in the state court proceeding.  If the state court's determination of the facts was reasonable, then 2254(e)(1) comes into play and presumes the court's **_reasonable_** determination to be correct unless the petitioner rebuts this presumption by clear and convincing evidence.  A petitioner is entitled to an evidentiary hearing to present this rebuttal evidence.  *Demosthenes v. Baal*, 495 U.S. 731, 735, 110 S.Ct. 2223, 109 L.Ed.2d 762 (1990); *Patton v. Yount*, 467 U.S. 1025, 1028, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984); *Sumner v. Mata*, 449 U.S. 539, 550, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981).

The above language from 2254(d)(2) and (e) regarding "determination of the facts" and "determination of a factual issue" language is identical to the language of superseded 28 U.S.C. § 2254(d).  "[I]f a word is obviously transplanted from another legal source, whether the common law or other legislation, it brings the old soil with it."  *Evans v. United States*, 504 U.S. 255, 260, 112 S.Ct. 1881, 119 L.Ed.2d 57 (1992).  "Determination of a factual issue" from superseded 2254(d) refers to basic, primary, or historical facts but not to mixed questions of fact and law, which apply a legal standard to the historical-fact determinations. *Thompson v. Keohane*, 516 U.S. 99, 110, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995).  The question of competency to stand trial, for example, is a mixed question of law and fact. *Washington v. Johnson*, 90 F.3d 945, 951 (5th Cir. 1996), *cert. denied*, 520 U.S. 1122, 117 S.Ct. 1259, 137 L.Ed.2d 338 (1997).

The language from 2254(d)(2) regarding whether the determination of the facts was unreasonable in light of the record evidence is substantially the same as the language in superseded 2254(d)(8) regarding whether the factfinding was fairly supported by the state court record.   Under superseded 2254(d)(8), a petitioner was entitled to a hearing if the factual determination by the state court was not fairly supported by the record as a whole since such an unreasonable determination of the facts is not afforded a presumption of correctness.   *Townsend v. Sain*, 372 U.S. 293, 313, 316, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963); *Purkett v. Elem*, 514 U.S. 765, 769, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995); *Parker v. Dugger*, 498 U.S. 308, 316-317, 320, 323-324, 111 S.Ct. 731, 112 L.Ed.2d 812 (1991); *Carriger v. Stewart*, 132 F.3d 463, 473-475 (9th Cir. 1997), *cert. denied*, 523 U.S. 1133, 118 S.Ct. 1827, 140 L.Ed.2d 963 (1998); *Jackson v. Herring*, 42 F.3d 1350, 1366 (11th Cir. 1995).   A federal hearing is required if the factual determination was unreasonable in light of the evidence in the record where the record evidence strongly contradicts the state court findings of fact so that the federal court cannot rely on the state court findings of fact or where the evidence supporting the petitioner's claim is compelling.   *Shillinger v. Haworth*, 70 F.3d 1132, 1136-1138 (10th Cir. 1995); *Cola v. Reardon*, 787 F.2d 681, 698 (1st Cir.), *cert. denied*, 479 U.S. 930, 107 S.Ct. 398, 93 L.Ed.2d 351 (1986); *Fitch v. Estelle*, 587 F.2d 773, 777 (5th Cir.), *cert. denied*, 444 U.S. 881, 100 S.Ct. 170, 62 L.Ed.2d 111 (1979).

In the case at bar, the trial judge merely signed the State's proposed findings of fact and conclusions of law.   See Exhibits O, P.   The trial judge did not independently compile

131

his own findings of fact and conclusions of law.  Given the above facts set out in Claims I -

V, and since the trial judge merely signed the State's proposed findings of fact and

conclusions of law within four days of receiving it, the presumption of correctness of 28

U.S.C. § 2254(e)(1) should not attach to the state court's findings of fact and conclusions of

law.

## VIII.

## <u>PRAYER</u>

WHEREFORE, PREMISES CONSIDERED, the Petitioner prays that this Court: (1)

vacate the Petitioner's conviction for capital murder and death sentence, or in the alternative,

vacate the judgment affirming his conviction and death sentence on direct appeal, or in the

alternative, vacate the death sentence; (2) order and conduct an evidentiary hearing at which

proof may by offered and argument may be offered concerning the allegations of this

Petition; (3) permit the Petitioner, because of his indigence, to proceed without prepayment

of costs and fees; (4) allow the Petitioner a reasonable time in which to amend this Petition;

(5) provide for discovery as requested by the Petitioner and grant the Petitioner the authority

to obtain subpoenas in forma pauperis for witnesses and discovery of documents and other

information necessary to prove the facts as alleged in this Petition; (6) grant the Petitioner

sufficient funds to secure expert testimony necessary to prove the facts as alleged in this

Petition; (7) enter findings of fact and conclusions of law recommending that the Petitioner's

conviction and sentence be vacated and that the Petitioner's case be remanded for a new trial

or a new sentencing hearing; and (8) grant such other relief as law and justice may require.

Respectfully submitted,

GROSS & ESPARZA, P.L.L.C.

/s/ Michael C. Gross
Michael C. Gross
Attorney-In-Charge
State Bar No. 08534480
Southern District of Texas Bar No. 12795
106 South St. Mary's Street, Suite 260
San Antonio, Texas 78205
(210) 354-1919
(210) 354-1920 (Fax)

Attorney for the Petitioner,
JOHN H. RAMIREZ

## IX.

## <u>VERIFICATION</u>

**STATE OF TEXAS**                    §
                                      §
**COUNTY OF BEXAR**                   §

Before me, the undersigned authority, appeared Michael C. Gross, Counsel for the Petitioner and on his behalf, on this the 9th day of October 2013, and who being by me duly sworn did depose and say that each and every allegation of fact contained in the foregoing Petition For Writ Of Habeas Corpus is true and correct.

/s/ Michael C. Gross
Michael C. Gross

SWORN AND SUBSCRIBED to on this 9th day of October 2013.

/s/ Christina Garcia
Notary Public In And For The State of Texas

133

## X.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 9th day of October 2013, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to Greg Abbott, Attorney General, P.O. Box 12548, Austin, Texas 78711-2548, and I certify that there are no non-CM/ECF participants.

/s/ Michael C. Gross