*AP- 76,100*

IN THE

COURT OF CRIMINAL APPEALS OF TEXAS

AP 76,100

JOHN HENRY RAMIREZ, Appellant

V.

THE STATE OF TEXAS

**ORIGINAL**

ON APPEAL FROM CAUSE

04-CR-3453-C

THE 94TH DISTRICT COURT,
NUECES COUNTY, TEXAS
\* \* \* \* \* \* \* \* \*
APPELLANT'S BRIEF
\* \* \* \* \* \* \* \* \* \*

FILED IN
COURT OF CRIMINAL APPEALS

APR 08 2010

Louise Pearson, Clerk

LARRY WARNER
ATTORNEY AT LAW
mail: 2945 Jacaranda Drive
Harlingen, TX. 78550
office: 422 East Harrison St.
Harlingen, Tx 78550
(956) 542-4784; 956 454 4994
email: office@larrywarner.com
website: larrywarner.com
STATE BAR # 20871500;USDC,SDTX 1230
ATTORNEY FOR APPELLANT
Board Certified, Criminal Law
Texas Board of Legal Specialization
(1983)
Member of the Bar of the
Supreme Court of the United States
(1984)

Appellant requests oral argument,
pursuant to TEX.R.APP.P.39.7
and TEX.R.APP.P.71.3 & 38

IN THE

COURT OF CRIMINAL APPEALS OF TEXAS

AP 76,100


JOHN HENRY RAMIREZ, Appellant

V.

THE STATE OF TEXAS


ON APPEAL FROM CAUSE

04-CR-3453-C

THE 94TH DISTRICT COURT,
NUECES COUNTY, TEXAS
* * * * * * * * *
APPELLANT'S BRIEF
* * * * * * * * *

LARRY WARNER
ATTORNEY AT LAW
mail: 2945 Jacaranda Drive
Harlingen, TX.  78550
office: 422 East Harrison St.
Harlingen, Tx 78550
(956) 542-4784; 956 454 4994
email: office@larrywarner.com
website: larrywarner.com
STATE BAR # 20871500;USDC,SDTX 1230
ATTORNEY FOR APPELLANT
Board Certified, Criminal Law
Texas Board of Legal Specialization
(1983)
Member of the Bar of the
Supreme Court of the United States
(1984)

Appellant requests oral argument,
pursuant to TEX.R.APP.P.39.7
and TEX.R.APP.P.71.3 & 38

## PARTIES AND INTERESTED PERSONS

1. John Henry Ramirez, Appellant

2. Hon. Carlos Valdez, District Attorney, Nueces County Courthouse, 901 Leopard, Rm 206;Corpus Christi, Texas 78401 3602 Attorney for the state at trial and on appeal 361 888 0410

3. Hon. Mark Skurka, Assistant District Attorney, Nueces County Courthouse, 901 Leopard, Rm 206;Corpus Christi, Texas 78401 3602 Attorney for the state at trial, at hearing on Motion for Trial, at hearing on bills of exception sbot 18475570; 361 888 0410

4. Hon. Grant Jones, 606 North Carancahua Street,Corpus Christi, TX 78476-1744(361) 815-2470, Attorney for the Defendant at trial

5. Hon. Ed Garza,719 S. Shoreline Blvd. - Suite 201 Corpus Christi, TX 78401-3526, (361) 888-8877; Attorney for the Defendant at trial

6. Hon. Larry Warner, Attorney for Appellant, mail: 2945 Jacaranda Drive, Harlingen, Tx 78550; Attorney for the Defendant at hearing on Motion for New Trial, at hearing on Bills of Exception, and on appeal

7. Hon. Hector René Gonzalez, Attorney for John Henry Ramirez at the trial (after the capital murder trial) of the underlying felonies; 2818 S Port Ave; Corpus Christi, TX 78405-2037

8. Hon. Michael Gross, Attorney on Application for post-conviction writ of habeas corpus,106 South Saint Marys Street, Suite 260, San Antonio, TX 78205 US

*Pursuant to TEX.R.APP.P.38.1(b),Appellant provides the following table of contents:*

## TABLE OF CONTENTS

PAGE

IDENTITY OF PARTIES . . . . . . . . . . . . . . . . . . ii

TABLE OF CONTENTS . . . . . . . . . . . . . . . . iii-iv

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . v-ix

STATEMENT OF CASE . . . . . . . . . . . . . . . . . . 1

STATEMENT REGARDING ORAL ARGUMENT . . . . . . . . . . 2-3

ISSUES PRESENTED . . . . . . . . . . . . . . . . . . 4

1.   The evidence is legally insufficient on guilt of capital murder. The evidence does not show beyond a reasonable doubt that John is responsible for the robbery of Pablo.

2.The evidence is factually insufficient on guilt of capital murder. The evidence is too weak to show that John is responsible for the robbery of Pablo.

3. The evidence is legally insufficient to support the finding of future dangerousness. The Court should reform the sentence to life imprisonment.

4. The evidence is factually insufficient to support the finding of future dangerousness. The Court should reform the sentence to life imprisonment.

5. The trial court erred in admitting extraneous offenses: the two robberies which took place after the murder and robbery alleged in the indictment.

6. There is egregious error in the instructions to the jury at punishment. The Judge did not tell the jury what to do if they could not agree on the answers to special issue number one.

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . 5

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . 26-33

ARGUMENT  . . . . . . . . . . . . . . . . . . . . . . 34

CONCLUSION AND REQUEST FOR RELIEF . . . . . . . . . . . 121-122

CERTIFICATE OF SERVICE  . . . . . . . . . . . . . . . . . 123

*Pursuant to TEX.R.APP.P.38.1(c),Appellant provides the following index of authorities arranged alphabetically and indicating the pages of the brief where the authorities are cited:*

## INDEX OF AUTHORITIES

**CASES**                                                                    **PAGES**


**Almanza v. State,**724 S.W.2d 805,(Tex.Crim.App.1986) . . . . . 115


**Barnes v. State,**62 S.W.3d 288(Tex.App.–Austin 2001,pet.ref'd) 75


**Bell v. Epps,** Civil Action No. 3:04CV212-B(N.D.Miss.June 20,2008)(not selected for publication)2008 WL 2690311 . . . . 50


**Bishop v. State,** 837 S.W.2d 431 (Tex. App.-Beaumont 1992, pet. granted) . . . . . . . . . . . . . . . . . . . . . . . 109


**Blankenship v. State,**673 S.W.2d 578,589(Tex.Crim.App.1984) . 48


**Booker v. State,** 103 S.W.3d 521 (Tex. App.-Fort Worth 2003, pet. ref'd) . . . . . . . . . . . . . . . . . . . . . . . 109


**Brewer v. State,**No. 05-96-00217-CR(Tex.App.–Dallas March 5, 1998,pet.ref'd) . . . . . . . . . . . . . . . . . . . . 66


**Bush v. State,** 628 S.W.2d 441 (Tex. Crim. App. 1982) (Capital murder) . . . . . . . . . . . . . . . . . . . . . . . . 97


**Cain v. State,** 958 S.W.2d at 405-10 . . . . . . . . . . . . 63


**Compton v. Hartley,**Civil Action No. 07-cv-02363-WYD slip op.at *22 (D.C.Colo Sept. 22, 2009)2009 WL 3052290 . . . . . . . . . 70


**Chandler v. State,**155 Tex.Crim. 41, 229 S.W.2d 71, Tex.Crim.App., February 08, 1950 (NO. 24643) . . . . . . . . 43

**Clewis v. State**, 922 S.W.2d 126(Tex.Crim.App.1996)   18,20,63-64

**Collazo v. State**, 623 S.W.2d 647, 648 (Tex.Crim.App.
[Panel Op.] 1981) . . . . . . . . . . . . . . . . . . . . 113

**Com. v. Zdrale**,608 A.2d 1037,1039 hn1(Pa.1992)  . . . . . . 57

**Cuddington v. Wilkins** (1614) Hob. 68, 80 Eng.Rep. 216 . . . . 55

**De la Hay v. State**,99 S.W.2d 941(Tex.Crim.App.1936) . . . . . 42

**Dornbusch v. State**,156 S.W.3d 859,872 hn34(Tex.App.–Corpus
Christi,pet.ref'd) . . . . . . . . . . . . . . . . . . . . 66

**Dowden v. State**, 537 S.W.2d 5 (Tex.Crim.App.1976) . . . . . 115

**Ellason v. State**, 815 S.W.2d 656 (Tex. Crim. App. 1991) . . . 81

**Elkins v. State**, 647 S.W.2d 663, 665 (Tex.Crim.App.1983) . . 112

**Ex Parte Adams**,768 S.W.2d 281,284(Tex.Crim.App.1989) . . . . 60

**Farris v. State**,117 S.W.798,799(Tex.Crim.App.1909) . . . . 74

**Farmers' & Mechs. Nat'l Bank v. Hanks**, 104 Tex. 320, 137 S.W. 1120,
1123 (Tex.1911) . . . . . . . . . . . . . . . . . . . . 59

**Fields v. State**, 500 S.W.500,502(Tex.Crim.App.1973) . . . . . 58

**First Nat. Bank of Eagle Pass v. Levine**,721 S.W.2d 287,
288(Tex.1986) . . . . . . . . . . . . . . . . . . . . 53

**Garcia v. State**,  827 S.W.2d 27 (Tex. App.–Corpus Christi 1992)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . 110

vi

**Garza v. Alviar**, 395 S.W.2d 821, 823 (Tex.1965) . . . . . . 65

**Goodman v. State**,66 S.W.3d 283,285 hn2(Tex.Crim.App.2001) . 48,63

*Gutierrez v. State,* 36 S.W.3d 509 (Tex. Crim. App. 2001) . 103

**Hardy v. State**,246 S.W.3d 290(Tex.App.–Houston 2008,pet.ref'd)
. . . . . . . . . . . . . . . . . . . . . . . 60

**Harris v. State**, 790 S.W.2d 568(Tex.Crim.App.1989) . . . . . 86

**Hicks v. Oklahoma**,447 U.S.343(1980) . . . . . . . . . . 117

**Hollinger    v.    State**,    911    S.W.2d    35,38-39(Tex.App.–Tyler
1995,pet.ref'd) . . . . . . . . . . . . . . . . . 58

**Jackson v. Virginia**,443 U.S.307(1979) . . . . . . . . . 43,61

**Jimenez v. State**, 32 S.W.3d 233, 242 (Tex.Cr.App.2000) . . 118

**Johnson v. Mississippi**, 486 U.S.578(1988) . . . . . . . . 3,78

**Johnson v. State**, 23 S.W.3d 1 (Tex.Crim.App.2000) . . . . 63,86

**Joske v. Irvine**,44 S.W.1059,1064(1898) . . . . . . . . . . 51

**Keeton v. State**, 724 S.W.2d 58(Tex.Crim.App.1987) . . . . . 84

**Kenisha Berry v. State**,233 S.W.3d 847(Tex.Crim.App.2007) . . 83

**King v. State**,638 S.W.2d 90 . . . . . . . . . . . 53

**Lawrence v. State**,240 S.W.3d 912(Tex.Crim.App.2007) . . . . 49

**Melanson v. Turner**, 436 S.W.2d 197, 198 (Tex.Civ.App.-Fort Worth 1968, no writ) . . . . . . . . . . . . . . . . . 65

**McGalliard v. Kuhlmann**, 722 S.W.2d 694, 697 (Tex.1986) . . . 71

**Moore v. State**, 700 S.W.2d 193, 201 (Tex.Crim.App.1985) . . . 112

**Pena v. State**,191 S.W.3d 133(Tex.Crim.App.2006) . . . . . . . 118

**Phillips v. State**,887 S.W.2d 267(Tex.App.-Beaumont 1994,pet.ref'd) . . . . . . . . . . . . . . . . . . . . . . . . . 78

**Rankin v. State**, 974 S.W.2d 707 (Tex. Crim. App. 1996) . . . 98

**Redwine    v.    State**,No.14-08-00731-CR.(Tex.App.-Houston Jan.28,2010)[unreleased]2010 WL 307914 . . . . . . . . . . 43

**Russell v. State**, 113 S.W.3d 530 (Tex. App.-Fort Worth 2003, pet. ref'd) . . . . . . . . . . . . . . . . . . . . . . . . . 107

**Scott v. State**,934 S.W.2d 396,398
(Tex.App.-Dallas 1998,no pet.) . . . . . . . . . . . . . . . 65

**Smith v. State**, 646 S.W.2d 452, 455 (Tex.Crim.App.1983) . . . . .

**State v. Ethington**,819 S.W.2d 854,859-860 hn6(Tex.Crim.App.1991)] . . . . . . . . . . . . . . . . . . . . . . . . . 113

**State v. Wilkinson**,879 A.2d 445,448 hn3(Vt.2005) . . . . . . 57

**Stephens v. State**, 717 S.W.2d 338, 340 (Tex.Crim.App.1986) . 73

**Stevenson v. State**,733 So.2d 177,181 hn5 ¶14(Miss.1998) . . . 57

**Stoddard v. State,**475 S.W.2d 744(Tex.Crim.App.1972) . . . . . 103

**Thompson v. State,**659 S.W.2d 649,654 hn10(Tex.Crim.App.1983)   86

**Tison v. Arizona,**481 U.S.137(1987) . . . . . . . . . . . . . 72

**United States v. Hoffecker,**530F.3d137,183 (3d Cir.2008) . . . 60

**United States v. Margolis,** 3 Cir., 1943, 138 F.2d 1002 . . . 48

**United States v. Partin,** 493 F.2d 750,760(5th Cir.1974) . 48-50

**Warren v. State,**562 S.W.2d 474(Tex.Crim.App.1978) . . . . . . 87

**Withers v.State,**  631 S.W.2d 595 (Tex. Crim. App. 1982) . . 104

**Wooden   v.   State,**   110   S.W.3d   542,546(Tex.App.–Fort   Worth
2003,pet.ref'd) . . . . . . . . . . . . . . . . . . . . . . . 73

**Yates v. Evatt,** 500 U.S. 391, 111 S. Ct. 1884, 114 L. Ed. 2d 432
(1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . 117

**CONSTITUTIONS:**
TEX.CONST.art.I,secs.13 & 19 . . . . . . . . . . . 60,78,118

U.S.CONST.amend.XIV . . . . . . . . . . . . . . . . 60,62,78

**CODES:**
TEX.PEN.CODE §7.02(a)(2) . . . . . . . . . . 26,28,45,72

**LAW REVIEW**
38 Tex.L.Rev. 361 (1960) . . . . . . . . . . . . . . 63

*Pursuant to Tex.R.App.P.38.1(a), Appellant provides the following statement of the case, stating concisely the nature of the case, the course of the proceedings, and the trial court's disposition of the case:*

### STATEMENT OF THE CASE

The defendant was indicted for capital murder. (RR Vol.16,p.11, lines 20-23)

The defendant pleaded not guilty and tried the matter to a jury. (RR Vol.16,p.12,line 5) "Not guilty."

The jury found the defendant guilty of capital murder.(RR 20 48/8) "...guilty of the offense of capital murder...."

The jury answered the special issues "Yes": "9  answer to Special Issue No. 1 is 'Yes,'" (RR 22 26/9) and "No": "Special Issue is 'No.'" . (RR 22 26/13)

The trial court sentenced the defendant to death. "10  2 I hereby sentence you to death." (RR 22 37/10)

1

*Pursuant to TEX.R.APP.P.38.1(e), TEX.R.APP.P.71.3, TEX.R.APP.P.39.1 and TEX.R.APP.P.39.2, Appellant provides the following statement regarding oral argument:*

### Statement Regarding Oral Argument

The appeal is certainly not frivolous, as a review of the summary of the argument will show. Viable questions on the legal and factual sufficiency of the evidence on guilt include whether merely pointing to another amounts to soliciting, encouraging, directing, or aiding, and whether a witness' answers on *cross-*examination (about who went through Pablo's pockets) can amount to a withdrawal of the witness' tenuous testimony on direct.

Viable questions on punishment include the legal sufficiency of the evidence to sustain the affirmative answer to the first special issue, considering that John's history only included a probated misdemeanor for possession of a firearm in a car, which is no longer even a crime, which probation was revoked for a class C misdemeanor, public intoxication, and a dismissed possession of a class B amount of marijuana.

Another serious issue is whether the trial court abused its discretion in admitting evidence of two robberies *subsequent to* the robbery/murder alleged in the indictment which the prosecutor said he needed to prove plan, in the face of direct evidence of plan from the state's own witness, Christina. The subsequentness and the lack of need for the extraneous offenses are both viable issues.

2

The dispositive issue on legal and factual sufficiency on guilt in a very similar case [plan *not* to hurt anyone, burglary, murder, reversal] has been decided long ago; however, abrogation of the voucher rule in this Court's opinion in **Palafox**, together with this Court's adoption of a review of the factual sufficiency of the evidence in **Clewis**, now require analysis anew.

On another issue, while the Court has definitively decided that extraneous offenses ought not to be admitted when there is already direct evidence of planning, the Court and Counsel could discuss whether any error was harmless beyond a reasonable doubt.

The decisional process would be significantly aided by oral argument. Counsel could respond to questions from Judges of the Court on how the proof of future dangerousness in John's case compares to that in its decisions in **Ellason, Kenisha Berry, Wallace**, and others.

The Court and Counsel could discuss this: John's essential criminal record consists of carrying a gun in a car. By the time this appeal is pending, the Legislature has decriminalized carrying a gun in a car. The Court and counsel could discuss whether this decriminalization is like the reversal of the conviction used to show future dangerousness in **Johnson v. Mississippi**. That conviction which was used to show future dangerousness was reversed. The Supreme Court of the United States then reversed the capital conviction on collateral attack because the conviction used to show future dangerousness had been reversed.

The Court of Criminal Appeals should allow oral argument.

*Pursuant to TEX.R.APP.P.38.1(e), Appellant provides this statement of issues presented:*

### ISSUES PRESENTED

1.   The evidence is legally insufficient on guilt of capital murder. The evidence does not show beyond a reasonable doubt that John is responsible for the robbery of Pablo.

2. The evidence is factually insufficient on guilt of capital murder. The evidence is too weak to show that John is responsible for the robbery of Pablo.

3. The evidence is legally insufficient to support the finding of future dangerousness. The Court should reform the sentence to life imprisonment.

4. The evidence is factually insufficient to support the finding of future dangerousness. The Court should reform the sentence to life imprisonment.

5. The trial court erred in admitting extraneous offenses: the two robberies which took place after the murder and robbery alleged in the indictment.

6. There is egregious error in the instructions to the jury at guilt/innocence. The judge did not tell the jury what to do if they could not agree on the answer to special issue number one.

4

Pursuant to TEX.CODE CRIM.P.art.38.1 (g), Appellant provides a statement of facts, concisely and without argument the facts pertinent to the issue or points presented, supported by record references.

### Abstract of all the testimony

Here is an accurate abstract of all the testimony presented at trial, which the Judges of the Court of Criminal Appeals may use in determining the legal and factual sufficiency of the evidence:

**Principal persons:**

| | | |
|---|---|---|
| John | John Henry Ramirez, | Defendant, Appellant |
| Pablo | Pablo Castro | The man who was stabbed and robbed |
| Christina | Christina Chavez | Accomplice, testifies, pleaded out for 25, lesbian girlfriend of other accomplice, Angela |
| Angela | Angela Rodriguez | Accomplice, went through Pablo's pockets, dropped $1.25 on console of van; Angela does not testify |

INDEX                         VOLUME 16 OF 25 VOLUMES

2                    TRIAL PROCEEDINGS

DECEMBER 1, 2008

Page  Vol.

5

9    STATE'S WITNESSES                    Direct Cross V.Dire

Vol.


LYDIA SALINAS....................... 42,81  69         16


Pablo said he only had one dollar. Saw girl, Angela, come in store; John Henry Ramirez had been in store before.Saw Pablo take out trash. Saw Pablo Castro in pool of blood outside store. People were screaming "He's dead!"

10   MARIANO CERVANTES ................... 86      125         16

136    138


Saw man and woman hitting Pablo Castro. Saw man and woman going through Pablo's pockets. Saw Pablo die. Identified man in "orange shirt" in courtroom as man who hit Pablo.

On cross, said he could not remember man going through Pablo's pockets, but girl did, the "girl was the one".

13   STATE'S WITNESSES (Cont'd)          Direct Cross V.Dire Vol.

MICHAEL WENZEL ...................... 142    189        16

Policeman. Got trauma call. Went to scene. Man down. Man not bleeding. Man dead.

Secured scene. Located 2 witnesses (Butt and Cervantes) and

6

Clerk. Interviewed Butt and Cervantes. Relates roles of id techs and detectives. Last to leave scene. Calls engine company to wash down scene. Saw throat wound. Did not see any other wounds.

17   STATE'S WITNESSES (Cont'd)                Direct  Cross V.Dire Vol.

KASHIF ISHAN BUTT ................... 193     216            16

                  18                                         222

   224

Grocery store owner from two blocks away. Goes to carwash near Market Times store.

Id's John Henry Ramirez as one who, with girl, was punching old man, Pablo Castro.

Did not see any stabbing motion. Was half a football field away. Light good. No obstructions. Not able to help Pablo. Definite on direct that guy and girl took something from Pablo's pocket. Not sure what. Waffles on cross. Says pretty sure they took something from Pablo's pocket.

APRIL METTING ...................... 225     250            16

                  19                                         255

Young mother with baby in car at Whataburger about 1 mile from Times Market. In drive through. Christina asks to use her phone. Car window broken. John Henry Ramirez comes up, puts 5 ½ to 6-inch

blade knife to April's throat, says give me all your money, give me your purse. Christina says give me your purse. She gives them her purse. She screams. Purse contains wallet with husband's credit card. April recognizes photo of her wallet, red with stripe. They got 30 or $40.

GREG KINANE ........................ 259

16

20

Corpus Christi policeman for 22 years.

Not dispatched to second Whataburger robbery, but went anyway.

Sequence: convenience store, Whataburger 1, Whataburger 2

Whataburger 1 was at Staples and Baldwin.

Kinane was first officer at scene.

Contacted victim, Ruby Peña

Broadcast Bolo, red van, shaved head hispanic male, 17-19, hisp. girl shoulder length hair, same age, serrated knife

INDEX

VOLUME 17 OF 25 VOLUMES

2                          TRIAL PROCEEDINGS

DECEMBER 2, 2008

Page  Vol.

3         Continuation   of   trial

8

proceedings................. 6      17

        4    STATE'S WITNESSES (Cont'd)            Direct

Cross V.Dire  Vol.

            GREG KINANE (Cont'd) ................       7

    17

        5    RUBY PENA HINOJOSA ................. 9      33

    17

Works at hospital. Works 12 hour shifts. Went to Whataburger about 11 pm. Two lanes, A and B. In lane nearer building. Skinny hispanic girl comes up and asks to use her cellphone. Ruby says no, go inside. Man places knife against Ruby's neck and says give me your money. Ruby says she does not have any money. Ruby pushes button to close window. Man goes to passenger side and begins banging on passenger side window with knife.  Knife 5 to 6 inches long blade. Serrated.

Ruby puts car in reverse. Man and girl drive off. Ruby gives statement to Officer Kinane. Ruby leaves car for police.  Gets car back 3 hrs later. Gives police written statement.  Ruby ids John Henry Ramirez as man who robbed her.

            TANYA FLORES OELSCHLEGEL ............ 39      63

        17

                6

                        Hearing  out  of  the  presence  of  the

jury........... 40    17

       7     In Re:  Witness Tanya Flores Oelschlegel

Criminal investigation officer. Call. Goes to Whataburger number 1.
Meets April Metting. Metting had 1 ½ yr. old child w her. Mom
extremely upset. Hand cut. Mom had given robbers money.

Officer Flores had gone out through neighborhood looking for van.
 Robbers left one van at Whataburger number 1. Van impounded and
put in safe lot.  Officer Flores learned man at convenience store
had died, now homicide. Other officers pursue van in which robbers
fled. Officers catch two females. Return to Whataburger 1 for show
up id.  **April Metting ids Christina.**

       8    STATE'S WITNESSES (Cont'd)          Direct
Cross V.Dire  Vol.

        JAMES GRAY ......................... 65
   17

Lt. with Corpus Christi pd. Responds to second Whataburger robbery
at Texan and Alameda.   Lt. encounters van matching bolo
description.  **Lt. Gray Id's John Henry Ramirez as driver of van.**
Lt. stops van, gets out with shotgun. Van takes off. Pd stops for
lights, stop signs. Van does not. Pd loses van. Lt. hears that
other officers found van, have 2 females in custody. Bloodhounds
brought in from penitentiary.

       9    MIKE FRAKES ........................ 99

17

CCPD. Frakes **finds red van** stopped in woods. Calls for backup. Gets backup. Draw guns. Approach van. **Van empty**. Engine hot. Broadcast that they found van. Found van about 40 yards from the road.

RALPH VASQUEZ ...................... 123   141

17

10

CCPD; paralleled chase. Went to near where van was found. Spotted two females. Told them to sit still. One said, "Shoot me." Both were under influence of alcohol or drugs. With Officer Chapa, **arrested the two females. Both were covered with blood.**

151

ROBERT CHAPA ...................... 156

17

CCPD. Sniper. **Back up** officer for Vasquez. Vasquez has someone at gunpoint. Goes there. Gets out. Draws gun. One girl sitting. One standing. Standing one won't get on ground. Tackles standing one. **Arrests both girls**. Mirandizes both. Both intoxicated. **One with white shirt had blood on shirt**. Takes Angela to scene of earlier robbery for positive identification.

11   FRANK PEREZ ...................... 176   185

11

17

CCPD; Bike patrol. **Found bloody sandal** in grassy area away from where suspect vehicle had been.Called id tech. Did not touch sandal. Id tech got sandal. Blood where foot goes. Small sandal, size 5. Perez **identifies sandal** in court as one he found in grassy area away from where suspect vehicle had been.

187

12   VICTOR CASARES ...................... 191   202

17

CCPD; Officer from other side of town. Comes to where women are detained and van found.

Along brush line in smashed-down grass **finds a bloody rag, away from the area where the van was** found, as if someone had thrown the rag down. The **blood was fresh**, not hazed-over or cracked like old blood.

13   Hearing out the presence of the jury ............. 203   17

In Re:  Graphic photos

Judge admits sx90 and 91. Others not admitted.

14

STATE'S WITNESSES (Cont'd)        Direct Cross

V.Dire  Vol.

15    ALLEN KIRKSEY ...................... 211

17

**Crime scene tech.** Takes pictures of items around body. Pics of: **gold 10k ring,** **quarter, bloodstained pay stub, bloody white envelope** with Pablo's name on it.  Id's and ct admits: gold ring, quarter.

Attends Pablo's autopsy. Takes postmortem fingerprints of Pablo.  Got Pablo's shirt w holes in it.  Got **bloody pants.** Sent pants to Dps for dna test. Got tube of **Pablo's blood.**  Took blood to dps.  Got **blood from white envelope** w Pablo's name on it. Got dollar bill that was near t shirt that was near doorstep of red Ford van. **Bloodstains on shirt. Bloodstains on blue bic lighter.** Pants had bloodstains. Underneath pants **bloody dollar bill** wadded up w **bloodstained Caesar's pizza receipt** in wadded up dollar bill. Got **vodka bottle** w latent **fingerprints and bloodstains.** Gilbert Lopez **Visa Card w bloodstains.**  **Photo of small boy** from red wallet, photo had **latent fingerprint.**

**Finger**print from mirror in maroon 1999 van.

***

CHRISTINA CHAVEZ

Pleaded guilty. Got 25 years in plea bargain. Saw John stab ole man. Saw Angela go through old man's pockets. Saw Angela drop $1.25

13

on console of van where Christina was. Saw both Whataburger robberies. John did them both. John played with the knife at Angie's mother's house. The plan was not to hurt anyone but to take the money and leave. John hurt his hand. John's hand was wrapped. John drove the van which all three, John Angie and Christina, were in. He drove it into bushes at The Cuts. He got away. The pd arrested Christina and Angie. Christina is a lesbian with 4 children; her mom and her sister take care of the children. One died. She was first pregnant at 14.

Officer Prebul

Investigator w Ccpd. Found white rag near van. Ordered to give it to Officer Carrasco so dogs could sniff it. Got it back from Officer Carrasco. Sent it to dps lab. Ided rag in court, minus holes cut in rag, usually done by dps.   Prebul and female office Kelly Isaaks took clothing from Angela, sports bra and capri pants. Pants had stains on front pocket and on back. Prebul ids clothes in court as ones he took and sent to dps lab.

18 222

>        7        **Marsha Parker.**

>        9        **fingerprint examiner**

SX 168, 169, 170 latent prints match known prints of John Henry Ramirez taken by Parker.

168 is from driver's side mirror, 169 is from cd case found in

console of Ford van, 170 is

from back of photo of small boy found in wallet on floor of maroon Dodge van. 18 234

***

18 237

7       A.       **Roberta Garcia.** **18 238 Jhr told Ruby that **they'd just stabbed someone.**

He looked sweaty. He had been running. He wanted in her house. She did not let him in her house. He said that he had stabbed her sister. She was worried about her sister. She asked John where her sister was. He said he thought she got away. He had a knife. His hand was cut, it was a big cut. He was bleeding "profusely". He ran away.

***

19 49

20      A.       My name is **Pamela Smith**. Dna analyst for dps lab. John's dna on passenger side door handle of van. Steering wheel of Ford van, Pablo Castro and John. Pablo's blood on Pablo's jeans.

T shirt inside Ford van, Pablo Castro. 19 97 T shirt inside Ford Van mixture that   16   was consistent with John Henry Ramirez, Angela 17 Rodriguez, and Pablo Castro. 19 99 All three people's skin cells were on that tshirt. 19 101 Visa card blood, John.   19

15

102 Blood on Vodka bottle Pablo Castro.   19 103 Blood on pizza receipts, Angela Rodriguez and Pablo Castro.   19 104 Armrest from the Dodge Van, Pablo Castro's blood.   19 105 Bloodstained dollar bill in Ford van, Pablo Castro.   19 106 Gearshift from Ford van, Pablo Castro.   19 107 Bloodstained Bic lighter near gearshift, John.19 108 bloody envelope and pay stub in parking lot, Pablo Castro.   19 109 [repeat] front door pocket, John.   19 111 Bloody back of Christina Chavez' tank top, Pablo Castro.   19 111 Bloody Back of Christina Chavez' tank top, John Henry Ramirez.   19 114 Bloody front of Angela Rodriguez' shorts, Pablo Castro's blood. 19 114-116 Bloody white towel from Brewster St., John Henry Ramirez. 19 117 Bloody size 5 sandal found near vans, Pablo Castro's blood.

\*\*\*

19 129

       7     **Dr. Rey Fernandez.**

       9     **doctor** ; 19 153/11 **top wound** on left side of Pablo Castro's back **entered lung** and was **fatal**; 19 163/21 **carotid** artery severed, **fatal**; 19 163/24 **internal jugular** vein cut in two, **fatal**; 19 165/5 both fatal;   19 163/3 **external jugular** severed, **fatal**;


\*\*\*

John Henry Ramirez, Sr.

16     Q.   Now, you know -- the **Defendant is your son,**

   17   right?

   18      A.   That's correct

\*\*\*

Divorced. **Did not support John regularly. Did not see him often.**
Sr.'s mom was to raise daughter and Sr.'s exwife was to raise John

\*\*\*\*\*\*

8  Witness Name                    Direct  Cross V.Dire Vol.

            TROY MARTINEZ ........................ 11     8

      22

            9

**Psychologist. John voluntarily** decided not to put on two
grandmothers and another witness and voluntarily told his lawyers
to read Psalm 51, verse 3 and then to **rest and close without
putting on more witnesses.**

### *Statement of Facts* related to each particular issue

1.   The evidence is legally insufficient on guilt of capital
murder. The evidence does not show beyond a reasonable doubt that
John is responsible for the robbery of Pablo.

10   MARIANO CERVANTES ................... 86      125         16
                                           136      138

      Saw man and woman hitting Pablo Castro. Saw man and woman
going through Pablo's pockets. Saw Pablo die. Identified man in

17

"orange shirt" in courtroom as man who hit Pablo.

On cross, said he could not remember man going through Pablo's pockets, but girl did.

17   STATE'S WITNESSES (Cont'd)          Direct Cross V.Dire Vol.
KASHIF ISHAN BUTT .................... 193      216         16
          18                                                222
   224

Grocery store owner from two blocks away. Goes to carwash near Market Times store.

Id's John Henry Ramirez as one who, with girl, was punching old man, Pablo Castro.

Did not see any stabbing motion. Was half a football field away. Light good. No obstructions. Not able to help Pablo. Definite on direct that guy and girl took something from Pablo's pocket. Not sure what. Waffles on cross. Says pretty sure they took something from Pablo's pocket.


CHRISTINA CHAVEZ


Pleaded guilty. Got 25 years in plea bargain. Saw John stab ole man. Saw Angela go through old man's pockets. Saw Angela drop $1.25 on console of van where Christina was. [See if John was there in that van.] Saw both Whataburger robberies. John did them both. John played with the knife at Angie's mother's house. The plan was not to hurt anyone but to take the money and leave. John hurt his hand. John's hand was wrapped. John drove the van which all three, John Angie and Christina, were in. He drove it into bushes at The Cuts. He got away. The pd arrested Christina and Angie. Christina is a lesbian with 4 children; her mom and her sister take care of the children. One died. She was first pregnant at 14.


2.The evidence is factually insufficient on guilt of capital murder. **Clewis v. State**, 922 S.W.2d 126(Tex.Crim.App.1996) The evidence is too weak to show that John is responsible for the robbery of Pablo.


10   MARIANO CERVANTES ................... 86      125         16
                                             136    138


Saw man and woman hitting Pablo Castro. Saw man and woman

18

going through Pablo's pockets. Saw Pablo die. Identified man in "orange shirt" in courtroom as man who hit Pablo.

On cross, said he could not remember man going through Pablo's pockets, but girl did.


17   STATE'S WITNESSES (Cont'd)          Direct Cross V.Dire Vol.
KASHIF ISHAN BUTT ................... 193     216          16
                18                                       222
     224

Grocery store owner from two blocks away. Goes to carwash near Market Times store.

Id's John Henry Ramirez as one who, with girl, was punching old man, Pablo Castro.

Did not see any stabbing motion. Was half a football field away. Light good. No obstructions. Not able to help Pablo. Definite on direct that guy and girl took something from Pablo's pocket. Not sure what. Waffles on cross. Says pretty sure they took something from Pablo's pocket.


CHRISTINA CHAVEZ

Pleaded guilty. Got 25 years in plea bargain. Saw John stab ole man. Saw Angela go through old man's pockets. Saw Angela drop $1.25 on console of van where Christina was. Saw both Whataburger robberies. John did them both. John played with the knife at Angie's mother's house. The plan was not to hurt anyone but to take the money and leave. John hurt his hand. John's hand was wrapped. John drove the van which all three, John Angie and Christina, were in. He drove it into bushes at The Cuts. He got away. The pd arrested Christina and Angie. Christina is a lesbian with 4 children; her mom and her sister take care of the children. One died. She was first pregnant at 14.


     3. The evidence is legally insufficient to support the finding of future dangerousness. The Court should reform the sentence to life imprisonment.
     19 49


20     A.   My name is **Pamela Smith**. Dna analyst for dps lab. John's dna on passenger side door handle of van. Steering wheel of Ford van, Pablo Castro and John.  Pablo's blood on Pablo's jeans.

T shirt inside Ford van, Pablo Castro.  19 97 T shirt inside Ford
Van mixture that   16   was consistent with John Henry Ramirez,
Angela 17  Rodriguez, and Pablo Castro.  19 99 All three people's
skin cells were on that tshirt. 19 101 Visa card blood, John.  19
102 Blood on Vodka bottle Pablo Castro.  19 103 Blood on pizza
receipts, Angela Rodriguez and Pablo Castro.   19 104 Armrest from
the Dodge Van, Pablo Castro's blood.  19 105 Bloodstained dollar
bill in Ford van, Pablo Castro.  19 106 Gearshift from Ford van,
Pablo Castro.  19 107 Bloodstained Bic lighter near gearshift,
John.19 108 bloody envelope and pay stub in parking lot, Pablo
Castro.  19 109 [repeat] front door pocket, John.  19 111 Bloody
back of Christina Chavez' tank top, Pablo Castro.   19 111 Bloody
Back of Christina Chavez' tank top, John Henry Ramirez.  19 114
Bloody front of Angela Rodriguez' shorts, Pablo Castro's blood. 19
114-116 Bloody white towel from Brewster St., John Henry Ramirez.
19 117 Bloody size 5 sandal found near vans, Pablo Castro's blood.


    4.  The  evidence  is  factually  insufficient  to  support  the
finding  of  future  dangerousness.  The  Court  should  reform  the
sentence to life imprisonment.


    The  Court  of  Criminal  Appeals  should  review  all  the  evidence,
as set out above. Instead of using the **Johnson v. Va.** reasonable
juror standard, it should use the measure set out in its opinion in
**Elbert Clewis v. State,infra.**


    5. The trial court erred in admitting extraneous offenses: the
two robberies which took place after the murder and robbery alleged
in  count  one  of  the  indictment;  count  one  was  severed  for  a
separate trial.


    Background:

    The indictment at first had four counts: capital murder, the

first  Whataburger  robbery,  the  second  Whataburger  robbery,  and

evading  arrest.  The  defense  moved  for  a  separate  trial  on  the

capital  murder  count.  The  judge  granted  the  defense  motion  for  a

separate trial on the capital murder count. The trial court granted

the defense's 404b motion. (RR 4 150/18-4 152/8)The state said it

did not have any 404b evidence.

    20               MR. SKURKA:  Judge, we have no 404(b)

      21  evidence, as Mr. Garza and I discussed yesterday or

      22  the other day.  Any other extraneous offenses are

      23  actually in the indictment --

The parties said and the Judge agreed that the two Whataburger
robberies, which occurred after the robbery/murder of Pablo, would
be admitted at any punishment phase.

Here is the discussion:

    18             "Then next page, 404(b) motion.  You-all

      19  have anything on this one?

      20             MR. SKURKA:  Judge, we have no 404(b)

      21  evidence, as Mr. Garza and I discussed yesterday or

      22  the other day.  Any other extraneous offenses are

      23  actually in the indictment --

      24             THE COURT:  Okay.

      25             MR. SKURKA:  -- in the indictment
itself

  151

     1  so I don't have -- anticipate any other ones.

     2             THE COURT:  Well, it's granted.

     3             And then we have -- next page we have

21

4    "Notice of Unadjudicated Extraneous Crimes at

5    Punishment."  Do you have any of those, about the

6    escape?

7                    MR. SKURKA:  Judge, what's happened

on

8    that, and in fact, I don't believe that I have to

give

9    notice under 37.07 for capital murder cases.  In

other

10   cases we do have to give notice but in capital

murder

11   cases there's an exception to that; however, I will

12   tell the Court I have given Mr. Garza notice of the

introduce,

13   Defendant's prior history that I intend to

unlawful

14   including an arrest for public intoxication,

15   carrying a weapon, possession of marijuana, some

16   incidents that are in his military records, his

17   probation officer to testify, and maybe elements of

18   the escape.

Court,

19                    I will -- I'll be frank with the

evidence

20   we're not going to probably bring in all the

21   about his recapture and stuff but we will certainly

night,

22   bring in evidence that he was not located that

23   he was -- alluded the police department and wasn't

22

24   arrested for four more years.

25            THE COURT:  Okay.

152

1            MR. SKURKA:  But I've given Mr. Garza

2   documents on all those.  I think I owe him one more

3   police report on the public intoxication.  Mr.

4   Schimmel has given him copies of his military records

5   that show some incidents of violence in that that we

6   intend to introduce and then those other crimes.

7            THE COURT:  Okay.

8            MR. GARZA:  That is correct, Your Honor."  (RR 4 150/18-4 152 /8)

***

The trial judge granted the defense motion to sever count one, the capital murder count, for a separate trial.

The prosecutor told the Judge at the charge conference on the instructions at guilt/innocence that he offered the extraneous offenses to prove plan:

19 193

6            MR. SKURKA:  Also, I would point out,

23

7  Judge, the extraneous offenses that were brought in to

8  show the intent, or the other thing of robbery --

9                    THE COURT:  Well --

10                    MR. SKURKA:  -- since he robbed the two

11  Whataburgers, I brought those in to show the intent or

12  motive or plan or intent was to rob, and the other

13  ones since they just kept doing robberies.

\* \* \*

6. There is egregious error in the instructions to the jury at punishment. After the judge instructed the jury on "yes" and on the "no" options for special issue number one, the judge told the jury:

12                    "In the event the jury is unable to agree

24

13   upon Special Issue No. 2 (sic) under the conditions

14   and instructions outlined above, the Presiding Juror

15   will not sign either form of answer to Special -- of

16   this Special Issue.

Pursuant to TEX.R.APP.P.38.1(g), Appellant provides the following summary of the argument, a succinct and accurate statement of the argument made in the body of the brief not merely a repetition of the issues or points presented for review:

### SUMMARY OF ARGUMENT

1.   The evidence is legally insufficient on guilt of capital murder. The evidence does not show beyond a reasonable doubt that John is responsible for the robbery of Pablo.

While there was direct evidence that John stabbed Pablo, John's act of pointing to Angela before she picked Pablo's pockets is too ambiguous to prove that he "solicits,encourages, directs, aids, or attempts to aid the other person to commit the offense" of robbery. TEX.PEN.CODE §7.02(a)(2) The witness Cervantes, who said that he saw both the man and the woman go through Pablo's pockets, effectively withdrew his own testimony on cross-examination. The witness Butt, who at first said that both the man and the woman went through Pablo's pockets, effectively withdrew his own testimony on cross-examination.

2.The evidence is factually insufficient on guilt of capital murder. The evidence is too weak to show that John is responsible for the robbery of Pablo.

On cross-examination Butt effectively withdrew his testimony

saying John had gone through Pablo's pockets.

Cervantes never identified John in court. He identified the "man in the orange shirt". There is no evidence that John was the man in the orange shirt. Cervantes first said the man and the woman had gone through Pablo's pockets. Cervantes then waffled on whether the man had gone through Pablo's pockets.

Christina, the state's star accomplice witness, never said that the man went through Pablo's pockets. The prosecutor never asked her.

One witness vacillated on who went through Pablo's pockets. First he said "they". Then he said "she".

There was direct evidence of a plan "not to hurt anyone but to take the money and leave". There was direct evidence that John stabbed Pablo. John's pointing to Angela was too ambiguous to prove "solicits,encourage,direct,aids, or attempts to aid". The proof fails on the capital circumstance, robbery.

The state's witness Christina was like the paid informant in **Clewis**, an interested witness whose evidence was subject to factual sufficiency analysis because of its interestedness, especially since the witness twice changed her testimony on the stand after the prosecutor cautioned her that the jury "would find it hard to believe" what she first said.

While there was direct evidence that John stabbed Pablo,

27

John's act of pointing to Angela before she picked Pablo's pockets is too ambiguous to prove that he "solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense".TEX.PEN.CODE §7.02(a)(2)

Both Butt's testimony and that of Cervantes, each of whom effectively retracted his testimony on direct that the man had gone through Pablo's pockets, is factually insufficient to prove that John is responsible for the robbery precisely because it is vacillating, unsure, and self-contradictory.

Clewis adopted a factual sufficiency analysis like that in civil law. When the witness' own testimony is vacillating, unsure, and self-contradictory, it is subject to being deemed factually insufficient.

The testimony of Butt and of Cervantes is like that of the identification witness who said, "He sure favors him." Cervantes said the man in the "orange shirt" was the person he saw. The record does not reflect that John Henry Ramirez was the man in the orange shirt.

The Court should find the evidence factually insufficient and should order a new trial.

3. The evidence is legally insufficient to support the finding of future dangerousness. The Court should reform the sentence to life imprisonment.

28

John's criminal record consists of three things: one, something that is no longer a crime, possession of a gun in a car; two, a dismissed charge of class B possession of marijuana; and three, public intoxication. Future dangerousness should be made of sterner stuff.

Like Ellason, John was shot. Like Ellason and Berry, John used drugs. Unlike either, he was a Marine.

The facts of the crime were not such as to warrant a finding of future dangerousness. There was no torture. There was no extensive planning. In other cases, this Court has found that the crime was "routine", reprehensible, but "routine", so as not to sustain a finding of future dangerousness, even though it was a sex-murder.

4. The evidence is factually insufficient to support the finding of future dangerousness. The Court should reform the sentence to life imprisonment.

Using the **Clewis** standard instead of the **Jackson** standard, the Court should find the evidence of future dangerousness so weak as to be factually insufficient.

John's criminal record consists of three things: one, something that is no longer a crime, possession of a gun in a car; two, a dismissed charge of class B possession of marijuana; and three, public intoxication. Future dangerousness should be made of

sterner stuff.

Like Ellason, John was shot. Like Ellason and Berry, John used drugs. Unlike either, he was a Marine.

The facts of the crime were not such as to warrant a finding of future dangerousness. There was no torture. There was no extensive planning. In other cases, this Court has found that the crime was "routine", reprehensible, but "routine", so as not to sustain a finding of future dangerousness, even though it was a sex-murder.

5. The trial court erred in admitting extraneous offenses: the two robberies which took place after the murder and robbery alleged in the indictment.


The indictment originally had four counts: capital murder, Whataburger robbery at Staples and Baldwin, Whataburger robbery at Texan, evading arrest.

The defense moved to sever the capital count for a separate trial. The trial court granted the motion.

The defense moved to disclose 404b evidence.

The prosecutor told the Judge he did not have any 404b evidence.

The parties all thought that the two Whataburger robberies would come at the second phase of the trial if there were a

30

punishment trial.

At guilt innocence, the state's star witness, Christina, the accomplice who had pleaded out for 25 years, gave unassailed evidence of plan.

The prosecutor told the Judge at the charge conference on the instructions at guilt/innocence that he offered the extraneous offenses to prove plan. 19 193

The state did not need the extraneous offenses to prove plan, since it had unattacked, unimpeached evidence of plan from its own witness Christina.

The trial court abused its discretion in admitting the extraneous offenses: the two robberies at the two Whataburgers which took place after the robbery and murder of Pablo. The state did not need proof of those robberies to prove plan.

The error was not harmless beyond a reasonable doubt. The jury which answered the special issues, knowing the effect of their answers, was the same jury which heard the evidence on guilt, including the evidence of the two extraneous offenses, the two Whataburger robberies. Since the jury assessed death, the Court cannot say that the error was harmless beyond a reasonable doubt. The Court should remand for a new trial.

6. There is egregious error in the instructions to the jury at punishment. After the judge instructed the jury on "TEX.R.APP.P."

31

and on the "no" options for special issue number one, the judge told the jury:

    12            "In the event the jury is unable to agree

       13  upon Special Issue No. 2 (sic) under the conditions

       14  and instructions outlined above, the Presiding Juror

       15  will not sign either form of answer to Special -- of

       16  this Special Issue.

So, the Judge did not tell the jury what to do if they could not agree on the answer to special issue number one.

There was no objection.

So, the test is whether the error is egregious.

The error is egregious. This is a capital murder prosecution and we are at the punishment stage. Just because the jury answered the question does not mean that the Judge should not have told the jury what to do if they could not agree on the answer.

Had the jury not been able to answer the question, the Court would have imposed a life sentence.

32

The Court should find that the error is not harmless beyond a reasonable doubt. It should order a new trial on punishment.

*Pursuant to TEX.R.APP.P.38.1(h), Appellant provides the following argument or the contentions made, with appropriate citations to the authorities and to the record:*

### ARGUMENT

1.   The evidence is legally insufficient on guilt of capital murder. The evidence does not show beyond a reasonable doubt that John is responsible for the robbery of Pablo.

The following questions arise on the legal sufficiency of the evidence of guilt in the context of the proof presented by this record:

1.Was there direct evidence from non-accomplice witnesses that John robbed Pablo?

There was, colorably. Mario Cervantes, the nearby-store employee, and Butt, the nearby-store owner, provided direct evidence that the man and the woman went through the old man's pockets. Cervantes first said neither the man nor the woman went through the old man's pockets. Then he said he had told the police that "they" did. Then, in court, he said that "the girl was the one." Cervantes never identified John as that man. Butt only identified John as being with the woman when both were punching the old man.

Review Cervantes' and Butt's testimony:

10   MARIANO CERVANTES ................... 86      125         16

34

136      138

Saw man and woman hitting Pablo Castro. On *direct* says that he did *not* see man or woman go through old man's pockets.  Saw Pablo die. Identified man in "orange shirt" in courtroom as man who hit Pablo. On *cross*, said he could not remember man going through Pablo's pockets, but girl did. On *re-direct* says he gave police statement saying that "they" went through old man's  pockets. In court, on re-direct says he remembers, and that the girl was the one.

Here is what Cervantes said on direct examination:

"did you see either the man or woman who was

    22  attacking the one man try to do anything around his


    23  clothing or get something from him?

    24     A.   No, I didn't see that.

    25     Q.   Did you see the woman do anything to go


93

    1  through the man's pockets?

    2     A.   No, sir.

    3     Q.   Did you see the man do that?

    4     A.   No.

35

5      Q.     What did you see?

6      A.     From what I saw, the short -- I mean, the
--

7   the time that I saw it, it just looked like they
were

8   hitting him, just hitting him a lot, hitting him

9   really hard.  It didn't look -- I mean, I couldn't

10   tell if they were trying to steal something from
his

11   pockets because I wasn't really looking for that."
(RR 16 92-93)

Here is what he said on re-direct examination:

24      A.     Yes, on the statement it shows that that

25   night I told them it looked like **they were reaching**

16 102

102

1   **like stuff from his pockets and stuff.**

2      Q.     **Is that what you remember happening?**

3      A.     **Yeah, now I do.**  I mean, from -- after

36

4   reading.

5      Q.   Okay.  You just couldn't remember that

6   earlier?

7      A.   Like I said, this is like four or five
years

8   ago.

9      Q.   I know, I'm not fussing at you.

10      A.   No, I know.

11      Q.   I'm just trying to tell you -- show to the

12   jury that you did see it that night.

13      A.   Yes, sir.

14      Q.   So tell the jury exactly what you saw her
do

15   or he do about taking something from the pockets.

16      A.   **It looked like the girl, you know, was the**

17   **one that was kind of trying to take something from
him**

18   and both of them were I guess beating him, beating
the

37

19   older gentleman." (RR 16 101-102)

There are two reasons why Cervantes' testimony does not prove that John robbed Pablo. One is that Cervantes never identified John in court as the actor. Two is that Cervantes effectively withdrew his testimony on direct that the man, whoever the man was, had gone through Pablo's pockets.

Cervantes never identified John as the man who went through the old man's pockets. Cervantes said the man in the "orange shirt" was the one he had seen at the Market.  The record does not say that John Henry was the man in the "orange shirt" in the courtroom. The prosecutor never asked the Judge to let the record reflect who the man in the orange shirt was. The Judge never granted any such request.

On re-direct, Cervantes says that the girl "was the one" who went through Pablo's pockets.  This is at variance with Cervantes' testimony that he had told the police that "they" went through Pablo's pockets.

Here is Cervantes' testimony on identification on *direct-*examination by the state:

Did Cervantes identify John in Court?

He did not. He identifies someone in an "orange shirt".  (RR 16 103/4) The prosecutor never asks the Judge to let the record reflect who the man in the orange shirt is. The Judge never lets

38

the record reflect that.

So, Cervantes identifies the man in the orange shirt, but the record does not reflect who the man in the orange shirt was. Then Cervantes says that the girl was the one who was trying to take something from the old man's pockets.   (RR 16 101-102)

17   STATE'S WITNESSES (Cont'd)          Direct Cross

V.Dire Vol.

KASHIF ISHAN BUTT ................... 193     216          16

            18                                        222

   224

Grocery store owner from two blocks away. Goes to carwash near Market Times store.

Id's John Henry Ramirez as one who, with girl, was punching old man, Pablo Castro.

Did not see any stabbing motion. Was half a football field away. Light good. No obstructions. Not able to help Pablo. Definite on direct that guy and girl took something from Pablo's pocket. Not sure what. Waffles on cross. Says pretty sure they took something from Pablo's pocket.


On direct Butt said:

"they kept beating him and

8  after a while they went through his pockets.  I think

9  they got something out of his pocket and then took

10  off." (RR 16 102)

11      Q.   When you say that they went through his

12  pockets, who are you saying?

13      A.   I'm talking about the guy and the girl"
(RR 16 102)

On cross-examination, Butt says:

"[W]here these people were

24  going through Mr. Castro's pockets.  Did you see both

25  of them do it, one of them do it, how many people do

222

1  it?

2      A.   I'm pretty sure both of them are doing
it." (RR 16 221-222)

There is only one more witness, Christina. Look at what she did not say:

Pleaded guilty. Got 25 years in plea bargain. Saw John stab

40

ole man. Saw Angela go through old man's pockets. Saw Angela drop $1.25 on console of van where Christina was. Saw both Whataburger robberies. John did them both. John played with the knife at Angie's mother's house. The plan was not to hurt anyone but to take the money and leave. John hurt his hand. John's hand was wrapped. John drove the van which all three, John Angie and Christina, were in. He drove it into bushes at The Cuts. He got away. The pd arrested Christina and Angie. Christina is a lesbian with 4 children; her mom and her sister take care of the children. One died. She was first pregnant at 14.

Christina said Angela went through the old man's pockets. Christina did not say that John went through the old man's pockets. Christina affirmatively said John did not go through the old man's pockets.

18 140-141


20        "Q.   Did you see him take anything -- **her take**

          **21   anything from him or John Henry Ramirez take anything**

          **22   from the man?**

          **23     A.   No, sir.**

          24     Q.   Did you **see John Henry Ramirez also going**

41

25   through the pocket?

141

1      A.    No, sir. " (RR 18 140-141)

The physical evidence does not support the premise that John
went through Pablo's pockets. The state's expert said that the
bloodstained dollar bill in the Ford van had Pablo Castro's blood
on it, not John's.(RR 19 105)

This Court has held that the self-contradictory testimony of
a witness will not prove an element of the offense beyond a
reasonable doubt and has reversed the trial court's judgment. **De la
Hay v. State**,99 S.W.2d 941(Tex.Crim.App.1936) This Court quoted the
self-contradictory testimony on the deadliness of the quirt:

> "None of the witnesses claimed this to be a deadly weapon
> except the assistant county attorney, and his testimony
> is self-contradictory on this point. ***[T]he assistant
> county attorney, testified: 'I am not an expert in lines
> of deadly weapons. I have used a weapon as a deadly
> weapon hunting, but never against an individual. I would
> say that I think, from my own personal knowledge, that
> this is a deadly weapon, I think it would depend on the
> manner of its use. I would say that it might not be or
> might be, I don't think that anybody could say that it is
> a deadly weapon. I never saw it before until I got it out
> of our file when this trial started.'" **De la Hay** at 941

It is accurate to characterize Contreras' testimony as self

42

contradictory on whether John went through Pablo's pockets or not. The Court should find that Contreras' testimony fails to make John responsible for the robbery.

Butt's "I think they got something out of his pocket" and Butt's being "pretty sure" that it was both of them and not just the girl is inadequate to support a capital conviction and sentence of death. Reversing a judgment of conviction, the Fourteenth Court noted in an opinion about to be released: "[N]either should a reviewing court permit proof of an essential element of the offense only by testimony that is admittedly uncertain." **Redwine v. State**, No. 14-08-00731-CR. (Tex.App.-Houston Jan.28,2010)[unreleased]2010 WL 307914

A rational juror could not have found John responsible for robbing Pablo based on Contreras', Butt's, and Christina's testimony. **Jackson v. Virginia**,443 U.S.307(1979) The last thing Contreras said was that the girl was the one going through Pablo's pockets. Butt was shaken on cross, and only pretty sure. Christina was definite that John did not go through Pablo's pockets.

2.Was such direct evidence from non-accomplice witnesses effectively withdrawn on cross-examination?

Evidence provided on direct may be withdrawn. **Chandler v. State**,229 S.W.2d 71(Tex.Crim.App.1950) In Chandler, this Court noted that the trial Judge could have withdrawn the testimony. In

43

John's case, the witness Contreras withdrew his out-of-court statement to the police by saying on redirect that the girl was the one who was going through Pablo's pockets. Butt's being saying he was "pretty sure" amounted to withdrawing his prior testimony. Christina, an accomplice as a matter of law and the state's star witness, was definite that John did not go through Pablo's pockets.

3. Was there direct evidence from an accomplice witness that John robbed Pablo?

No. Christina was definite that John did not go through Pablo's pockets.

4. Was there any testimony from an accomplice witness that John was responsible for Angela's robbing Pablo? Was that testimony corroborated so as to connect John with the commission of the offense, rather than merely showing that a crime had been committed?

Christina said that John and Angela and Christina planned not to hurt anyone but to take the money and leave. Christina was an accomplice as a matter of law. There was no evidence to corroborate Christina's testimony that John planned the robbery.

We are talking about the robbery, not the murder. Christina said that John pointed to Angela before Angela went through Pablo's pockets. There is no evidence to corroborate Angela's statement that John pointed to Angela before Angela went through Pablo's

44

pockets. The physical evidence does not corroborate that statement; the state's expert said that the blood on the dollar bill found in the van belonged to Pablo: (RR 19 105) Bloodstained dollar bill in Ford van, Pablo Castro.

Even if there were evidence to corroborate Christina's statement that John pointed to Angela before Angela went through Pablo's pockets, focusing on the robbery, John's act of pointing to Angela before she picked Pablo's pockets is too ambiguous to prove that he "solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense" of robbery. TEX.PEN.CODE §7.02(a)(2)

In order to convict a defendant as a party to an aggravated offense, the state must prove that the defendant was criminally responsible for the aggravating element. **Wooden v. State**, 110 S.W.3d 542,546(Tex.App.-Fort Worth 2003,pet.ref'd) So, to make John responsible for capital murder, it must prove that he was responsible for the robbery of Pablo. Christina affirmatively said that John did not go through Pablo's pockets. Christina, an accomplice as a matter of law, said that John and Christina and Angela planned to take the money and leave.(RR 18 181) The state's theory was that the two Whataburger robberies corroborated Christina's testimony about the plan. The prosecutor told the Judge at the charge conference on the instructions at guilt/innocence that he offered the extraneous offenses to prove plan. 19 193

45

So, the if the Whataburger extraneous offenses corroborate the accomplice testimony of Christina that John planned, will the evidence of plan, plus presence, plus flight be sufficient to connect John to commission of the robbery? It will not because Christina's testimony about plan is from one who twice committed perjury on the stand in front of this jury in this trial, only to be corrected by the prosecutor and only then to change her testimony. Note that at first Christina said that there was no plan.

"8     Q.     You just ended up at that Whataburger and

9   robbed somebody at the drive-through?

10     A.     Yes, sir.

11     Q.     Now, it may be for hard for the jury to

12  believe that you just went from the Times Market and

13   just happened upon somebody at the drive-through at

14   the Whataburger, by the menu board, and decided to rob

15   them at the last minute.  How did it really go down?

16     A.     I guess we didn't have any money so we

46

went

17  to the next Whataburger.

18      Q.    Well, you got some money at that
Whataburger.

19  Why did you go to the next Whataburger and rob
them?

20      A.    I had no choice over that.

21      Q.    What do you mean you had no choice?

22      A.    I wasn't driving.

23      Q.    Christina --

24      A.    Yes, sir.

25      Q.    -- you could have gotten out of that
van at

148

1  anyone of those places --

2      A.    Yes, sir.

3      Q.    -- at the Whataburgers, couldn't you
have?

4      A.    Yes, sir.

47

```
5      Q.    You didn't, though, did you?

6      A.    No, sir."   (RR 18 147-148)
```

The essence of Judge Cochran's example of the Cretan Liar in **Goodman v. State**, 66 S.W.3d 283,285-286 hn3&4,fn3&4(Tex.Crim.App.2001) seems to be that the testimony of a convicted perjurer may be legally sufficient evidence. Other courts have compromised that proposition. **United States v. Partin**, 493 F.2d 750,760(5th Cir.1974) **Partin** dealt with a witness who was an admitted perjurer on the subject of the trial. The United States Court of Appeals for the Fifth Circuit noted:

> "Here, there were two witnesses, instead of one, but they were 'two of a kind'- both ex-convicts of felony and both self admitted perjurers, committed on more than one occasion. What makes this all the more critical is that without these witnesses the prosecution had no case on Count 5.
>
> It has been held that where an admitted perjurer testified in a criminal prosecution, the trial court must charge that the testimony of that witness is to be scrutinized with care, **United States v. Margolis**, 3 Cir., 1943, 138 F.2d 1002."
>
> **Partin** at 760 hn7

Of course, this Court is not bound by decisions of intermediate Union courts of appeal. **Blankenship v. State**, 673 S.W.2d 578,589(Tex.Crim.App.1984)

> "While this Court is not bound by opinions of federal courts of appeals, it is clear that the cited circuit court decisions have struck an appropriate balance between the questioned individual constitutional right and the necessity for orderly procedure in the courts of the land."·

48

**Blankenship** at 589 [self-representation]

However, this Court does consider decisions of other jurisdictions:

Texas courts may consider and rely on decisions of courts of other jurisdictions. **Lawrence v. State,**240 S.W.3d 912(Tex.Crim.App.2007)

"Numerous decisions of other appellate courts, including Texas courts of appeals and courts of other jurisdictions, are in accord with our holdings...." **Lawrence v. State,**240 S.W.3d 912, 918 hn12 fn24(Tex.Crim.App.2007)

The example of the Cretan Liar in **Goodman, supra,** is distinguishable. The Cretan Liar had been convicted of perjury in cases other than the one in which he was testifying. From the prosecutor's viewpoint, Christina twice committed aggravated perjury before the very eyes of the jurors before whom she testified (RR 18 147/10;18 147/20). She committed aggravated perjury before the jury the first time when she said they just happened to go to the first Whataburger to rob and she committed aggravated perjury again when she said she had no choice. She had, after all, pleaded guilty and waived any claim of duress.(RR 18 120/16-18 123/1)

The concern of the Court of Appeals in **Partin** was that the perjurers who testified for the prosecution had committed perjury in that very case before they came to court to testify for the

49

prosecution.

> "(Nothing said about the assessment of credibility of witnesses convicted of felony and guilty of perjury as to the very subject matter then on trial)." **Partin** at 761 hn7

**Partin** was reversed because the trial judge did not caution jurors to receive with caution and weigh with great care the testimony of perjurers who had perjured themselves on the very subject of the trial. "**Partin** dealt with a witness who was an admitted perjurer on the subject of the trial...." **Bell v. Epps**, Civil Action No. 3:04CV212-B(N.D.Miss.June 20,2008)(not selected for publication)2008 WL 2690311

Christina perjured herself, the prosecutor thought, on the very subject of the trial.  Was there a plan, or not? Did they just happen to go to the first Whataburger and rob April Meeting there, or was there a plan? The prosecutor needed to prove that there was a plan in order to make John responsible for the robbery of Pablo. He did not like Christina's answer that they just happened to go to the first Whataburger to rob. He got Christina to change her story...after she had said there was no plan, after she had committed aggravated perjury on the subject of the very trial itself.

In **Goodman** the Court talked of a continuum in reviewing the factual sufficiency of the evidence: one perjurer vs. one boy scout,

50

one perjurer vs. twelve boy scouts.

The Court should establish such a continuum with the legal sufficiency of the evidence. When the case turns on the testimony of one accomplice witness who has committed aggravated perjury on the very subject of the trial, the Court should deem that testimony legally insufficient.

Without proof of plan, the evidence fails to make John responsible for the robbery of Pablo beyond a reasonable doubt. Contreras and Butt both effectively withdrew their testimony that John went through Pablo's pockets.        Christina's testimony about plan is not corroborated.

Inferences    from    evidence    must    be    reasonable. **Joske    v.    Irvine**, 44    S.W. 1059, 1064 (1898)

"There    is    no    direct    testimony    that    Joske 'requested    or    directed'    the    arrest,    and    we are    of    the    opinion    that    such    fact    cannot be    reasonably    inferred    from    the circumstances.    'An    inference    is    a deduction    which    the    reason    of    the    jury makes    from    the    facts    proved.'    1    Rice,    Ev. §    36.    If    the    jury    cannot    reasonably    make the    deduction,    the    law    does    not    authorize it.    Upon    the    whole    case,    we    are    of    opinion that    the    probative    force    of    the    testimony does    not    go    beyond    the    point    of    creating    a mere    surmise    or    suspicion    that    Joske 'requested    or    directed'    the    arrest,    and

51

that, therefore, under the principles above discussed, there is not, in legal contemplation, 'any evidence' of that fact." **Joske v. Irvine, 44 S.W. 1059, 1064 (1898)**

The following reasoning depends upon unreasonable inferences:

Christina said John agreed to a plan to rob. Christina said John was the actor in the first and second robberies at Whataburgers. April Metting and Ruby Garcia, the complaining witnesses in the first and in the second Whataburger robbery identified John as the robber in the first and in the second Whataburger robbery. The testimony of April Metting and Ruby Garcia corroborates the testimony of Christina that John agreed to a plan to rob.

Here is the flaw in the reasoning. John's committing Whataburger robberies one and two does not corroborate the accomplice Christina's testimony that he agreed to a plan to rob. It is equally as likely that John intended to rob but did not agree to any plan. It is equally as likely that John and Christina and Angela decided to go to the first Whataburger after the Times Market produced little money.

Just because the jury returned a general verdict does not make drawing the inference that John agreed to a plan from the evidence of the two Whataburger robberies a reasonable inference.

The corroboration of Christina's testimony about plan is

52

important because plan plus presence plus flight might make John responsible for the robbery of Pablo, and thus sustain a verdict of capital murder, while mere proof of presence plus flight would not. Mere presence at the crime scene or flight therefrom, either standing alone or combined, is insufficient to sustain a conviction. **King v. State**,638 S.W.2d 90

Reconsideration of the insufficiency of the testimony of an admitted perjurer is consistent with the law of England that was adopted by the first statute of the Republic.

> "The Constitution of the Republic of Texas, 1836, Art. IV, Sec. 13, 1 Laws of Texas 1074, provided that Congress should as early as practicable enact by statute the Common Laws of England. In response to that constitutional mandate, the Congress of the Republic of Texas, on January 20, 1840, declared that 'the Common Law of England ... should continue in force until altered or repealed by Congress.' 2 Laws of Texas 177."**First Nat. Bank of Eagle Pass v. Levine**,721 S.W.2d 287, 288(Tex.1986)

Perjurers were foresworn. They just could not testify, period.

> "At common law, convicted felons and perjurers were incompetent to testify in court proceedings. The rule has a long history. Its antiquity is attested by a detailed discussion in Glanvill, the oldest systematic treatise on the English common law (circa 1187). In addition to other penalties, Glanvill states that those duly convicted of perjury "shall lose their law for ever, and thus rightly

incur the lasting mark of infamy. This penalty is justly ordained, so that the fear of such punishment shall prevent all men from swearing a false oath...." **Glanvill**, ii. 19 (G. Hall ed. 1965). A person who "lost his law" was no longer considered oathworthy and, according to Glanvill, "he shall never again be allowed as a witness in court." Id., ii. 3.

The same rule is confirmed in Bracton. In a section dealing with the punishment for those convicted of perjury, Bracton states:

*91 They incur perpetual infamy and lose the lex terrae, so that they will never afterwards b[e] admitted to an oath, for they will not henceforth be oathworthy, nor be received as witnesses, because it is presumed that he who is once convicted of perjury will perjure himself again.

**Bracton, On the Laws and Customs of England**, f. 292b, at 346 (S. Thorne ed. 1977). Later authorities are to the same effect. See 1 Co. Inst. 6b (11th ed. London 1719); 2 M. Hale, Historia Placitorum Coronae, c. 37, at 277 (Glazebrook ed. 1971) (1st ed. London 1736); 1 Starkie's Law of Evidence, 83 (Boston 1826).

Although conviction of a felony or perjury rendered the convict incompetent as a witness, the English cases also held a pardon of felony operated to restore a person's competency to testify. In the leading case of **Cuddington v. Wilkins** (1614) Hob. 68, 80 Eng.Rep. 216, the court stated the king's pardon extinguishes a felony conviction and clears the convict of the crime and the infamy attending conviction. Later cases specifically recognized that a pardon restores competency to testify. See, e.g., Sir Henry Fine's Case (1623) Godb. 288, 78 Eng.Rep. 168; Elizabeth Cellier's Case (1680) Raym. 369, 83 Eng.Rep. 192; Rex v. Gully (1773) 1 Leach 98, 168 Eng.Rep. 151; Leyman v. Latimer (1877) 3 Ex.D. 15; Hay v. Justices of Tower Division of London (1890) 24 Q.B.D. 561. See also 2 Hale P.C. c. 37, at 278; 4 Bl. Comm. *402.

Despite this general rule, some doubt existed in the early seventeenth century about the effect of a pardon in the case of perjury. In Brown v. Crashaw (1612) 2 Bulstr. 154, 80 Eng.Rep. 1028, Sir Edward Coke, then Chief Justice of the King's Bench, expressed the opinion that "if one be attainted of felony, and pardoned, he shall not afterwards be sworn of a jury, for that he is not probus, & legalis homo." Coke held to a similar view in cases of perjury. In the Institutes he states: "So odious was perjury, that by the law of God it was not to be pardoned: Non misereberis eius, &c." 3 Co.Inst. c. cv. (London 1797). However, Coke's view was rejected by the later authorities:

55

[I]f the king pardon these offenders [including perjurers], they are thereby rendered competent witnesses, *92 tho their credit is to be still left to the jury, for the king's pardon takes away poenam & culpam in foro humano, M.12 Jac. B.R. Cuddington & Wilkins(b): but yet it makes not the man always an honest man, and therefore he shall not be a juryman 11 Hen. 4.41. but yet may be a witness against the opinion of my lord Coke in Crashaw's case....

2 Hale, P.C., c. 37, at 278; see also 4 Bl. Comm. *402. The point was settled by Lord Chief Justice Holt in a series of decisions allowing the testimony of convicted perjurers who had been pardoned. See Rex v. Crosby (1695) 2 Salk. 689, **229 91 Eng.Rep. 584 (dictum); Rex v. Griepe (1697) 12 Mod. 139, 88 Eng.Rep. 1220; Rex v. Ford (1701) 2 Salk. 690, 91 Eng.Rep. 585; Anon. (1701) 3 Salk. 155, 91 Eng.Rep. 748 (all stating that at common law the king may pardon perjury and thereby wipe away the convict's disability as a witness); accord Dover v. Maestaer (1803), 5 Esp. 92, 170 Eng.Rep. 749.

III.

These common law rules were altered by legislation in England. By the statute of 5 Eliz. c. 9 (1563), Parliament declared perjury to be a statutory crime and provided that no person convicted of perjury would thereafter be received as a witness in any court of record in the realm unless the conviction were reversed. Later cases interpreted this provision to take away the power of the king's

pardon to restore a person to competency as a witness if he was indicted and convicted under the statute. See, e.g., Rex v. Griepe (1697) 2 Salk. 513, 91 Eng.Rep. 437; 2 Hawkins, Pleas of the Crown 548, § 52 (8th ed. 1824). However, the statute of Elizabeth did not change the effect of a pardon in cases of common law perjury. See Dover v. Maestaer, supra (testimony of witness admitted when he produced a King's pardon for conviction of common law perjury). Likewise, a pardon by act of Parliament would remove the disability even in the case of statutory perjury. Rex v. Ford, supra."State v. Merriman

287 S.C. 74, 337 S.E.2d 218(S.C.App.1985)

Many American jurisdictions simply do not permit convicted perjurers to testify. "The oath of a person convicted of perjury ... shall not be received in a proceeding in court." **State v. Wilkinson**,879 A.2d 445,448 hn3(Vt.2005). "As a convicted perjurer, Barrett was incompetent to testify...." **Stevenson v. State**,733 So.2d 177,181 hn5 ¶14(Miss.1998) "In a criminal proceeding, a person who has been convicted in a court of this Commonwealth of perjury ... shall not be a competent witness for any purpose, although his sentence may have been fully complied with, unless the judgment of conviction be judicially set aside or reversed" **Com. v. Zdrale**,608 A.2d 1037,1039 hn1(Pa.1992)

Texas, like South Carolina, passed a statute, in rule form, in derogation of the common law, allowing the testimony of perjurers.

TEX.R.EVID.601 A person insane at the time of the event or when tendered as a witness is incompetent to testify. So are children **"or other persons"** who, after being examined by the court, appear not to possess sufficient intellect to relate transactions with respect to which they are interrogated. TEX.R.EVID.601

Even though TEX.R.EVID.601 on its face appears to require only that the witness be able to recount the event, this Court has interpreted TEX.R.EVID.601 to mean that the rule does not permit a child to testify if the child does not know "it is wrong to lie". **Fields v. State**, 500 S.W.500,502(Tex.Crim.App.1973) One of the three elements in making a determination of competency to testify is "to be able to understand the moral responsibility to tell the truth." **Hollinger v. State**, 911 S.W.2d 35,38-39(Tex.App.–Tyler 1995,pet.ref'd)

If children who do not know it is wrong to lie may not testify, why should those who do know it is wrong to lie but flout the oath be able to have legal force given to their testimony? Perjurers are the "other persons" mentioned in TEX.R.EVID.601. A judicial gloss on TEX.R.EVID.601 required that child witnesses know that it was wrong to lie. The court should impose a judicial gloss on 601 providing that those who commit perjury on the very subject of the trial at which they testify may not have probative force given to their testimony.

Statutes in derogation of the common law no longer have to be

strictly construed. The proscription against strict construction and the requirement of liberal construction have been Texas law since the Revised Civil Statutes of 1895. See **Farmers' & Mechs. Nat'l Bank v. Hanks**, 104 Tex. 320, 137 S.W. 1120, 1123 (Tex.1911).

> "Section 3, General Provisions, of our Revised Statutes 1895, p. 1103, provides 'that the rule of the common law that statutes in derogation thereof shall be strictly construed, shall have no application to the Revised Statutes, but said statutes shall constitute the law of this state respecting the subjects to which they relate, and the provisions thereof shall be liberally construed with a view to effect their objects and to promote justice.' "

The object of TEX.R.EVID.601 cannot have been that persons who commit aggravated perjury on the very subject of the trial at which they testify may indeed testify and have probative force given to their testimony, even though they know that it is wrong to lie and that they have a moral responsibility to tell the truth. How does it promote justice for the Rule to give probative force to the testimony of one who presumptively knows that it is wrong to lie and that he has a moral responsibility to tell the truth, yet on the very subject of the trial at which he testifies, nevertheless commits aggravated perjury, repeatedly? That is precisely what Christina did.

It is inconsistent with the objects of TEX.R.EVID.601 and with the promotion of justice that a child who does not know it is wrong to lie or a child who does not understand that he has a moral

responsibility to tell the truth may not testify, yet one who knows that it is wrong to lie and who also knows that he has a moral responsibility to tell the truth, may lie about the very subject matter of the trial at which he is permitted to testify, and his testimony will have probative force.

This interpretation of TEX.R.EVID.601, giving probative force to the testimony of those who perjure themselves on the subject of the very trial at which they give evidence, does not promote justice; it bolsters perjury. Justice condemns perjury. Perjury and aggravated perjury are crimes. TEX.PEN.CODE §§37.02 & 37.03. Subornation of perjury is condemned. TEX.PEN.CODE §37.02; **Hardy v. State**,246 S.W.3d 290(Tex.App.-Houston 2008,pet.ref'd) Subornation of perjury violates the guaranty of due process. **United States v. Hoffecker**,530F.3d137,183 (3d Cir.2008); U.S.CONST.amend.V,amend.XIV. Perjury violates the guaranty of due course of law. **Ex Parte Adams**,768 S.W.2d 281,284(Tex.Crim.App.1989)TEX.CONST.art.I,secs.13 & 19

The Court should reconsider its opinion in **Goodman, supra**. It should determine that giving probative force to the testimony of perjurers who commit perjury as to the very subject of the trial at which they testify does not advance the objects of TEX.R.EVID.601 and does not promote justice.

The Court should determine that Christina's testimony that John

60

agreed to a plan to rob does not constitute legally sufficient evidence to make John responsible for the robbery of Pablo. It should do so because her testimony about plan should not have legally probative force, since she committed perjury on the very subject of the trial at which she testified. (It should also find that her accomplice testimony about plan was not corroborated.)

**Christina's accomplice testimony that John stabbed Pablo was not corroborated.**

Cervantes, Butt, and Christina each said s/he saw some of what happened. Cervantes said nothing about John stabbing Pablo. Butt said he did not see any stabbing motion. Christina said John stabbed Pablo. Christina was an accomplice. No knife was presented as evidence or admitted. John's blood and Pablo's blood were both on the steering wheel of the Ford van, said Pamela, the dna expert.

There was no evidence that the blood on the steering wheel from Pablo was put there at the same time as John's blood. It is not reasonable to infer that John must have stabbed Pablo because both John's blood and Pablo's blood was on the steering wheel; we cannot tell from the evidence when it was put there. True, all the evidence has to do under Texas law requiring corroboration of an accomplice is connect the defendant to the offense. But under **Jackson v. Virginia**, 443 U.S.307(1979) the test is whether a rational juror could have reached this verdict on this evidence, lest the defendant be deprived of his liberty, or in our case, his life, without due

process of law. U.S.CONST.amend.XIV

Here is the reasoning process from the evidence, followed by a criticism of the flaws in the reasoning. Christina said that John stabbed Pablo. Pamela said that John's blood and Pablo's blood were both on the steering wheel of the Ford van. John's blood and Pablo's blood must have been put there at the same time. John must have had Pablo's blood on John's hands. Therefore, John must have stabbed Pablo.

But there is no evidence that the blood from each was put there at the same time. Without evidence that the blood was put there at the same time, it is not reasonable to conclude that John must have put the blood on the steering wheel. Without evidence that the blood was put there at the same time, it is not reasonable to conclude that John must have had Pablo's blood on John's hands. Angela's and John's and Pablo's blood is all on the t-shirt. (RR 16 97) Pablo's blood is on Angela's shorts. (RR 16 114)

The Court should conclude that the physical evidence does not corroborate Christina's accomplice testimony that John stabbed Pablo.

The Court should set aside the conviction for capital murder.

2.The evidence is factually insufficient on guilt of capital murder. The evidence is too weak to show that John is responsible for the robbery of Pablo.

62

This Court has addressed the methodology and standards of review regarding factual sufficiency issues in several recent cases. These cases include: **Clewis v. State**, 922 S.W.2d 126 (Tex.Crim.App.1996) (announcing and adopting factual sufficiency review in criminal cases); **Cain v. State**, 958 S.W.2d at 405-10; **Johnson v. State**, 23 S.W.3d 1 (Tex.Crim.App.2000).

### Adoption of the civil standard of factual insufficiency

This Court has explained how how to analyze factual sufficiency questions in a criminal case. It noted that Justice Calvert set forth the proper inquiry in his authoritative and succinct article "No Evidence" and "Insufficient Evidence" Points of Error, 38 Tex.L.Rev. 361 (1960). Justice Calvert noted that:

> "Insufficient evidence" points may, and should, be sustained when the record discloses either of the following situations: (a) the evidence is factually insufficient to support a finding of a vital fact, or (2) the finding of a vital fact is so contrary to the great weight and preponderance of the evidence as to be clearly wrong."

Thus, evidence to support a criminal conviction may be factually insufficient in two distinct ways. In the first, the evidence in support of the existence of a vital fact, considered as standing alone, is factually too weak to support it.

The problem is defining the point at which legally insufficient evidence shades into factually insufficient evidence which shades into factually and legally sufficient evidence. **Goodman v. State**,66 S.W.3d 283,285 hn2(Tex.Crim.App.2001)

### Standard: Factual sufficiency

63

Viewing the evidence neutrally, without the prism in favor of the verdict, the evidence is too weak on the vital fact of whether John robbed Pablo. When conducting a factual sufficiency review, we examine the fact finder's weighing of the evidence.FN14 We consider all the evidence, but we do not view it in the light most favorable to the verdict.FN15 When performing the factual sufficiency review, the Court must be "appropriately deferential" so as to avoid substituting its judgment for the fact finder's. The Court will set aside the fact finding only if it so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. **Clewis v. State**, 922 S.W.2d 126,133(Tex.Crim.App.1996)(en banc).

### The physical evidence

The physical evidence does not connect John to the robbery of Pablo.

The physical evidence did not make a plea bargain to get out of the death penalty, as Christina did. The physical evidence was not impaired by the passage of four years from the date of the event until the date of testimony, as Cervantes was. The physical evidence did not "think" that it was "pretty sure" about how things "seemed" after being some distance away from the event, as Butt was. The physical evidence was the dollar, the bloody dollar. It did not have John's dna on it. It had Pablo's. (RR 19 105) Bloodstained dollar bill in Ford van, Pablo Castro.

64

Here are the reasons why the evidence is factually insufficient to prove that John was responsible for the robbery of Pablo:

### Cervantes' testimony

Cervantes never identified John as the man in the orange shirt whom he identified in the court room. Cervantes testimony was self-contradictory. First he said that the man did not go through Pablo's pockets. Then he referred to a statement that he had given the police nearer the time of the event. But the last thing Cervantes said was "the girl was the one" who went through the Pablo's pockets.  Changing testimony may be factually insufficient. **Scott v. State**, 934 S.W.2d 396,398 (Tex.App.–Dallas 1998,no pet.) The Dallas Court of Appeals cited the word "inconsistent" in Judge Calvert's benchmark article:

> "Under the long-existing civil standard of review, a claim of factual insufficiency should be sustained if the appellant shows either: "(a) the evidence is factually insufficient to support a finding of a vital fact...." Robert W. Calvert, "No Evidence" and "Insufficient Evidence" Points of Error, 38 Tex. L. Rev. 361, 366 (1960); see also **Garza v. Alviar**, 395 S.W.2d 821, 823 (Tex.1965); **Melanson v. Turner**, 436 S.W.2d 197, 198 (Tex.Civ.App.-Fort Worth 1968, no writ). Under the first prong of this standard, a verdict must be reversed if the evidence adduced in support of a vital fact, considered alone, is so uncertain, inconsistent, improbable, or unbelievable that, although constituting some evidence of probative force, it would be "clearly unjust" to allow the

verdict to stand. Calvert, 38 Tex. L. Rev. at
366-67." **Brewer v. State,** No.
05-96-00217-CR(Tex.App.-Dallas March 5,
1998,pet.ref'd)

### Butt's testimony

On cross-examination Butt effectively withdrew his
testimony saying John had gone through Pablo's pockets. Butt's
saying he was "pretty sure" that John had gone through the old
man's pockets, combined with his inconsistent, changing evidence,
is so "uncertain, inconsistent...that...it would be 'clearly
unjust' to allow the verdict to stand." **Calvert, supra**, at 366-
367. It would be unjust because this appeal is about whether the
state proved capital murder or, alternatively, first degree
murder. It is about whether the state proved that John was
responsible for the robbery of Pablo.

A capital conviction and sentence of death should not
rest upon such tenuous, inconsistent, and uncertain testimony,
about which the witness was "pretty sure". A witness' out of
court statement that she was "pretty sure" appellant was the man
she rented the motel room to so that she was 80% sure, could have
been factually insufficient. However, at trial she said she was
100% sure. The court did not find the evidence factually
insufficient. **Dornbusch v. State,**156 S.W.3d 859,872
hn34(Tex.App.-Corpus Christi,pet.ref'd) In John's case, Butt's
*in*-court testimony that he was "pretty sure" the man went through

66

Pablo's pockets is like the motel-clerk's out-of-court statement

that she was "pretty sure" that Dornbusch was the man she rented

the motel room to. The Court should find Butt's evidence

factually insufficient to prove that John robbed Pablo because it

is "uncertain", as Justice Calvert puts it. Webster defines

"uncertain" as "indefinite, problematical, untrustworthy,

dubious, not known beyond doubt, doubtful". "uncertain."

Merriam-Webster Online Dictionary. 2010.Merriam-Webster Online.

30 March 2010

http://www.merriam-webster.com/dictionary/uncertain>   Butt was

uncertain; his testimony was doubtful. The Court should find

Butt's testimony about whether John went through Pablo's pockets

factually insufficient.

### Interested witness: test

Christina was an interested witness. She got something

for her testimony, a plea bargain. The testimony of an interested

witness is subject to factual sufficiency review.


Christina never said anything about John going through

Pablo's pockets. There is simply no evidence at all from

Christina on that subject.

### Uncertain

Butt's testimony was not clear, direct, and positive.

All he could say was "I think" and that he was "pretty sure". .

"I think  9  they got something out of his pocket and then took 10  off." (RR 16 202) "24 [G]oing through Mr. Castro's pockets. Did you see both 25  of them do it, one of them do it, how many people do 222  1  it?      2      A.   I'm pretty sure both of them are doing it." (RR 16 221-222)

Then Butt added more uncertainty with what things "seemed" like.

"13      Q.   Okay.  Do you recall if anything was taken

14  from Mr. Castro's pockets?

15      A.   It seemed like there was something.

16      Q.   What was it?

17      A.   I can't tell, it was further away." (RR 16 222)

Webster defines "seems" as "to give the impression of being"·"seems." Merriam-Webster Online Dictionary. 2010. Merriam-Webster Online. 30 March 2010 <http://www.merriam-webster.com/dictionary/seems>

Butt did "think" that he was "pretty sure" that it "seemed"

that they both got something out of the old man's pockets but he

could not tell what it was because he was too far away.

68

This is the "uncertain" evidence Judge Calvert noted. "Think", "pretty sure", and "seemed" make Butt's evidence factually insufficient to make John responsible for the robbery of Pablo.

The Court should determine that the physical evidence is factually insufficient to connect John to the robbery of Pablo. Look at what Pamela Smith, the dna/blood expert said:

RR 19 49  20      A.   My name is **Pamela Smith**. Dna analyst for dps lab.  John's dna on passenger side door handle of van. Steering wheel of Ford van, Pablo Castro and John.  Pablo's blood on Pablo's jeans. T shirt inside Ford van, Pablo Castro. 19 97 T shirt inside Ford Van mixture that  16  was consistent with John Henry Ramirez, Angela 17 Rodriguez, and Pablo Castro.  19 99 All three people's skin cells were on that tshirt. 19 101 Visa card blood, John.  19 102 Blood on Vodka bottle Pablo Castro.  19 103 Blood on pizza receipts, Angela Rodriguez and Pablo Castro. 19 104 Armrest from the Dodge Van, Pablo Castro's blood.  19 105 Bloodstained dollar bill in Ford van, Pablo Castro.  19 106 Gearshift from Ford van, Pablo Castro.  19 107 Bloodstained Bic lighter near gearshift, John.19 108 bloody envelope and pay stub in parking lot, Pablo Castro. 19 109 [repeat] front door pocket, John. 19 111 Bloody back of Christina Chavez' tank top, Pablo Castro. 19 111 Bloody Back of Christina Chavez' tank top, John Henry Ramirez.  19 114 Bloody front of Angela Rodriguez' shorts, Pablo

69

Castro's blood. 19 114-116 Bloody white towel from Brewster St., John Henry Ramirez. 19 117 Bloody size 5 sandal found near vans, Pablo Castro's blood.

### The blood on the steering wheel

Cutting to the chase, the presence of Pablo's blood and John's blood on the steering wheel of the Ford van might show that John had Pablo's blood on John's hands if there were evidence to show that both samples were put there at the same time, not the case here. Pablo's blood and John's blood on the steering wheel of the Ford van does not support a rational inference that John robbed Pablo, however. When the blood of the victim and the blood of the defendant are found mixed together, the state may draw reasonable inferences from the fact of the mixture. **Compton v. Hartley**, Civil Action No. 07-cv-02363-WYD  slip op.at *22 (D.C.Colo Sept. 22, 2009) 2009 WL 3052290 It was reasonable for the state in Compton to infer from the dna that the blood of the defendant, Compton, and the blood of the victim were both on the glove found in the dumpster behind Compton's house.

### John's blood not on the dollar bill

The Court should evaluate the factual sufficiency of the physical evidence to prove that John robbed Pablo. The physical evidence is factually insufficient to support a finding that John robbed Pablo; John's blood is not on the dollar. 19 105

70

Bloodstained dollar bill in Ford van, Pablo Castro.

**The subsequent Whataburger robberies are too weak to corroborate Christina's testimony that John agree to a plan to rob.**

The evidence of *plan* from Christina is factually insufficient. She is an interested witness. She made a plea bargain to get out of the death penalty. The testimony of an interested witness is subject to factual sufficiency review.

> "The uncontradicted testimony of an interested witness cannot be considered as doing more than raising an issue of fact unless that testimony is clear, direct, and positive, and there are no circumstances in evidence tending to discredit or impeach such testimony." **McGalliard v. Kuhlmann**, 722 S.W.2d 694, 697 (Tex.1986).

In reviewing the jury's weighing of Christina's testimony on plan, the Court should consider her patent perjury on the subject of plan, the very subject of the trial at which she testified. Her willingness to commit perjury, twice, plus her interestedness, makes her testimony factually insufficient to show that John robbed Pablo.

There was direct evidence of a plan "not to hurt anyone but to take the money and leave", but that evidence came from an accomplice, Christina. There was direct evidence that John stabbed Pablo, also from the same interested perjuring accomplice, Christina. John's pointing to Angela was too ambiguous to prove "solicits, encourage, direct, aids, or attempts to aid". The proof fails on the capital circumstance, robbery.

71

The state's witness Christina was like the paid informant in **Clewis**, an interested witness whose evidence was subject to factual sufficiency analysis because of its interestedness, especially since the witness twice changed her testimony on the stand after the prosecutor cautioned her that the jury "would find it hard to believe" what she first said. The paid informant in Clewis got paid with money, we may conclude. The interested witness in John's case, Christina, got paid with being spared the death penalty. See **Tison v. Arizona**, 481 U.S.137(1987)

Both Butt's testimony and that of Cervantes, each of whom effectively retracted his testimony on direct that the man had gone through Pablo's pockets, is factually insufficient to prove that John is responsible for the robbery precisely because it is vacillating, unsure, and self-contradictory.

Clewis adopted a factual sufficiency analysis like that in civil law. When the witness' own testimony is vacillating, unsure, and self-contradictory, it is subject to being deemed factually insufficient.

**Pointing is too weak to show "solicits, encourages, directs".**

John's act of pointing to Angela before she picked Pablo's pockets is too ambiguous to prove that he "solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense".TEX.PEN.CODE §7.02(a)(2)

72

The state must prove that John is responsible for the murder of Pablo and for the robbery of Pablo in order to prove capital murder. One state's theory is that John is responsible as a party to the robbery of Pablo by Angela. There was evidence from the accomplice, Christina, that John pointed to Angela before Angela went through Pablo's pockets.

> "15       A.    Then I see John pointing to
> Angela, like —
>        16  he was just pointing, so she went and picked his
>        17  pocket." (RR 18 140)

In order to convict John of capital murder, the state must prove that John was responsible for the murder *and* for the robbery as well. **Wooden v. State**, 101 S.W.3d.542,547-548(Tex.App.--Fort Worth 2003,pet.ref'd)

> "In order to convict a defendant as *548 a party to
> an aggravated offense, the State must prove that the
> defendant was criminally responsible for the
> aggravating element. See **Stephens v. State**, 717
> S.W.2d 338, 340 (Tex.Crim.App.1986). In other words,
> the defendant must have, with intent to promote or
> assist the aggravated robbery, solicited,
> encouraged, directed, aided, or attempted to aid the
> other person in committing the aggravating element.
> For example, in Stephens, the court found the
> evidence legally insufficient to support a
> conviction for aggravated rape when there was no
> evidence the defendant in that case was in the room
> with the other participants in the rape when they
> made the threat against the victim that aggravated
> the offense, nor that the defendant knew the other
> participants had threatened the victim. Id. at 339."
> **Wooden** at 547-8

Pointing is too ambiguous to prove soliciting,

encouraging, or directing. When Farris pointed out a cow running on the range as his own to the purchaser, the cow belonging to Hamilton, this was positive evidence.**Farris v. State**,117 S.W.798,799(Tex.Crim.App.1909)  In Farris, the other evidence, that the cow belonged to Hamilton and that after Farris pointed to the cow the purchaser took possession of the cow, make the pointing clear, since Farris pointed to it as his own. The other evidence in John's case does not make the meaning of the pointing clear.

There are three reasons why the testimony about John's pointing to Angela before Angela picked Pablo's pocket is factually insufficient to prove that John solicited, encouraged, or directed Angela to rob Pablo, thus making John responsible for  Angela's robbing Pablo and thus making John liable for capital murder. One, the testimony that John pointed to Angela is from Christina, an accomplice as a matter of law. Two, Christina's testimony that John pointed to Angela is uncorroborated. Three, pointing in the context of this evidence is too ambiguous to be factually sufficient.

In **Farris**, we had the testimony of Hamilton that Hamilton owned the cow and we had the testimony of the purchaser that Farris pointed to the cow as his own. In John's case, all we have is the uncorroborated testimony of the accomplice, Christina.

Similarly, the evidence was legally sufficient that any rational jury could have found beyond a reasonable doubt all the essential elements of aggravated robbery and defendant's guilt as

74

a party to the offense; evidence included defendant's conduct during training at the restaurant where he worked, inquiring about depositing receipts, calling the restaurant to ask if they needed help on the day of the robbery, purchasing ski masks and gloves, obtaining gun, and pointing out the person who handled the money at the restaurant. **Barnes v. State**,62 S.W.3d 288(Tex.App.–Austin 2001,pet.ref'd) In **Barnes** as in **Farris**, the other non-accomplice evidence gives meaning to the pointing. In Barnes, the Court noted:

> "This finds support in testimony that appellant prematurely asked questions in training about how IHOP's receipts were deposited and his three telephone calls to IHOP on the day of the robbery." **Barnes** at 298 hn19

The Court should find that the evidence is factually insufficient to make John responsible as a party to Angela's robbery of Pablo.

The Court should find the evidence factually insufficient and should order a new trial.

3. The evidence is legally insufficient to support the finding of future dangerousness. The Court should reform the sentence to life imprisonment.

John's criminal record consists of three things: one, something that is no longer a crime, possession of a gun in a car; two, a dismissed charge of class B possession of marijuana; and three, public intoxication. Future dangerousness should be made of sterner

stuff.

Like Ellason, John was shot. Like Ellason and Berry, John used drugs. Unlike either, he was a Marine.

The facts of the crime were not such as to warrant a finding of future dangerousness. There was no torture. There was no extensive planning. In other cases, this Court has found that the crime was "routine", reprehensible, but "routine", so as not to sustain a finding of future dangerousness, even though it was a sex-murder.

### John's criminal record

John's criminal record consists of three things: one, something that is no longer a crime, possession of a gun in a car; two, a dismissed charge of class B possession of marijuana; and three, public intoxication. The prosecutor summarized John's criminal record in his argument for death:

9          "You will hear that the road he took was

10   even when he was on probation for carrying a gun.
He

11   didn't complete that probation successfully; that
he

12   committed another crime, public intoxication while
he

76

13  was on there.  You heard that he had been shot by a

14  gun," (RR 22 29)

There was more to it. The evidence showed that John had had a gun *in a car.* "14     A.   It was March 25th of 2004." (RR 21 45)          12     A.   Yes, I contacted him on a traffic stop. (RR 21 45) "[T]he right rear passenger brake light was

4  out on the vehicle, which is a violation of the  5  traffic law...." (RR 21 46) " [W]hen I looked underneath the front of the 24  driver's seat I found a small caliber handgun.  It's a  25  .25 Raven." (RR 21 49)

Before September 1, 2007, TEX.PEN.CODE art.46.02 provided: "(a) A person commits an offense if he intentionally, knowingly, or recklessly carries on or about his person a handgun, illegal knife, or club." After September 1, 2007, the same section provided: "(a) A person commits an offense if he intentionally, knowingly, or recklessly carries on or about his person a handgun, illegal knife, or club if the person is not...inside or directly en route to a motor vehicle that is owned by the person or under the person's control." TEX.PEN.CODE art.46.02

A death sentence which was based on a felony conviction which was reversed after upholding of the death sentence violates

U.S.CONST.amend.VIII. **Johnson v. Mississippi**, 486 U.S.578(1988) Johnson's death sentence was vacated because at the time the state habeas corpus was heard he had no longer been convicted of the underlying conviction for second degree assault with intent to commit first degree rape, although, of course, both assault and rape were still crimes at the time the state habeas was heard and determined.

A death sentence based upon a conviction for a matter which is no longer even a crime also violates TEX.CONST.art.I,sec. 13, which provides that "Excessive bail shall not be required, nor excessive fines imposed, nor cruel or unusual punishment inflicted." Article I,sec.13's prohibition on cruel and unusual punishment has generally been interpreted to mean the same thing as the Eighth Amendment's. **Phillips v. State**,887 S.W.2d 267(Tex.App.-Beaumont 1994,pet.ref'd)

Johnson did not raise his complaint until collateral attack; the Supreme Court determined that the question could still be raised on state habeas.

> "Finally, we are not persuaded that the state court's conclusion that under state law petitioner is procedurally barred from raising this claim because he failed to attack the validity of the New York conviction on direct appeal bars our consideration of his claim." **Johnson** at 586 hn4

John raises his complaint here on appeal.

In John's case, the possession of a gun in a car is no longer even a crime. TEX.PEN.CODE art.46.02 See: Acts 1995, 74th Leg., ch.

998, § 3, eff. Sept. 1, 1995; Acts 1997, 75th Leg., ch. 165, § 10.02, eff. Sept. 1, 1997; Acts 1997, 75th Leg., ch. 1221, § 1, eff. June 20, 1997; Acts 1997, 75th Leg., ch. 1261, § 24, eff. Sept. 1, 1997; Acts 2007, 80th Leg., ch. 693, § 1, eff. Sept. 1, 2007.

This is a more marked difference than in **Johnson**, where the underlying assault with intent to commit rape conviction had been set aside but the act was still a crime at the time the matter came before the state Supreme Court on habeas. In Johnson the jury relied upon unreliable evidence, a conviction that was later overturned. In John's case, the legislature of the state which prosecuted him and got the death penalty relying upon his conviction for carrying a gun in a car, has now made carrying a gun in a car not illegal.

The prosecutor in Johnson relied on the conviction to ask for the death penalty. The prosecutor in John's case did the same:

9              "You will hear that the road he took was

10   even when he was on probation for carrying a gun." (RR 22 29)

The prosecutor in Johnson argued that Johnson was dangerous because he had been convicted in New York of second degree assault with intent to commit first degree rape. After Johnson was convicted of capital murder in Mississippi, the New York Court of Appeals gave Johnson a new trial on the assault/rape charge.

79

The Supreme Court of the United States decided that the jury in the capital case had relied on unreliable evidence of dangerousness. In John's case, the Legislature of Texas has decided that it is not dangerous for one to carry a concealed handgun in a car he owns or controls. The determination of the legislative branch of government should be given effect. The jury in John's case relied on unreliable evidence that society required "protection" from him because he was dangerousness. The unreliable evidence was the conviction for carrying a gun in a car he controlled.

The society needs protection

17  from people like John Henry Ramirez and the things

18  that he did.

19 You can tell very easily that that road

20  that John Henry Ramirez was on with these crimes that

21  he had, albeit minor, the drugs, the alcohol, the gun,

22  culminated that night on July 19th in a terrible,

23  terrible bump in that road.  The death of one person,

The Court of Criminal Appeals of Texas should remand for

80

a new sentencing hearing.

### Ellason, Kenisha Berry, Wallace

The evidence of future dangerousness was legally insufficient. The Court of Criminal Appeals of Texas should compare the evidence in its own opinions in the following cases, in which it set aside the death penalty and reformed the sentence to life imprisonment without parole. The Court may also note instances in which the finding of future dangerousness was upheld on the basis of prior acts of violence and intended violence in the capital case, evidence lacking in John's trial. Upon review, it should reform the sentence to life imprisonment without parole.

**Ellason v. State**, 815 S.W.2d 656 (Tex. Crim. App. 1991) (Capital murder): The judgment was reformed to reflect a sentence of life imprisonment where there was insufficient evidence to support an affirmative answer to the second special issue. The facts of the offense itself were insufficient for an affirmative answer because there was no showing that the murder was planned or intended prior to the burglary, and the defendant went to the victim's home unarmed. The other evidence showed that the defendant was nineteen years old at the time of the crime, was dependent on amphetamines, had been forced to give up a promising football career in school when he lost his big toe in a hunting accident, had committed burglaries shortly before the murder offense, had quarreled with his in-laws, and had participated in the "violent sports" of hunting and

football.  There  was  positive  psychiatric  testimony  that  the
defendant was amenable to drug treatment.

In John's case, there was no plan to murder, according to the
state's own witness, Christina. The plan was to take the money and
leave and not hurt anybody, Christina said. John was young, like
Ellason, recently a Marine, though not a successful one, according
to documents the state itself introduced.

Like **Ellason**, John was involved with drugs.. One [test]for
alcohol and drugs and one  4  for alcohol, and both results
indicated serious 5  problems." (RR 21 79) He and Angela and
Christina had been on a three-day drug binge before these events
took place. We never got to hear the testimony about how John's
mother had told him every day "I hate you. You fucked up my life."
Instead, John's remorse prompted him to tell his lawyers to read
from the Bible: "For I know my transgressions, and my sin is always
before me." Psalm 51:3 John's dad said he had effectively abandoned
him.

Like Ellason, John had been shot. We do not know the details.
We know from documents which the state introduced that instead of
giving up a promising football career like Ellason, he lost the
chance to go on with his first success: Gyrene, Devil Dog, Jarhead,
Marine.

Instead  of  psychiatric  testimony  about  being  amenable  to
treatment, like Ellason, we heard that John had decided to have his

82

lawyers read "For I know my transgressions, and my sin is always before me." Psalm 51:3 This is a positive indication of remorse and to be considered in weighing the legal sufficiency of the evidence to support the finding of future dangerousness.

This Court found that the evidence was legally insufficient to support a finding of future dangerousness on worse evidence. Kenisha Berry killed her baby and abandoned another of her children. **Kenisha Berry v. State,**233 S.W.3d 847(Tex.Crim.App.2007)

This Court found that the evidence was legally insufficient to support the jury's finding at the penalty phase of a capital-murder trial that the defendant, if allowed to live, would commit criminal acts of violence in the future so as to constitute a continuing threat, whether in or out of prison, and thus the Court of Criminal Appeals would reform trial court's judgment to reflect a sentence of life imprisonment and not a sentence of death, even though defendant murdered one of her children and subsequently abandoned another and lacked remorse for those crimes; defendant had been dangerous only toward those of her children whose existence she wanted to hide from her favored mate, and there was a very low probability that she would have any more children if sentenced to life in prison. Vernon's Ann.Texas C.C.P. art. 37.071, § 2(b)(1).

John's instruction to his lawyers to read "For I know my transgressions, and my sin is always before me." Psalm 51:3 instead of arguing at the punishment phase indicates remorse. This Court

83

reformed the sentence of Kenisha Berry, who did not show remorse. The Court should consider John's remorse. It should reform the sentence to life imprisonment without parole because the evidence is legally insufficient to support the finding of future dangerousness.

This Court determined that a finding that a capital murder defendant would commit acts of violence in the future which would constitute a continuing threat to society was not sufficiently supported by evidence that the murder, in course of robbery, was unprovoked and cold-blooded, absent psychiatric evidence, character evidence or any evidence showing that defendant had committed violent acts in the past. **Keeton v. State**, 724 S.W.2d 58(Tex.Crim.App.1987)

There was absolutely no evidence of prior violent acts in the past. None. The result should be the same as in **Keeton**; the Court should reform the sentence to life without parole.

Misdemeanor possession of a gun in a car, no longer a crime, a dismissed misdemeanor charge of possession of marijuana, public intoxication...that is the criminal record of John Henry Ramirez. The prosecutor said that the officer who stopped John for having one taillight out and arrested him for a .25 under the driver's seat, would offer her opinion about John's reputation. The question the prosecutor asked sounded like a reputation question, but did not use that word. The officer stated her opinion was that he was not a

"peaceful" and law-abiding citizen. The state did not ask her to name the persons she had talked to, or how long ago, or where they lived, or when they had heard of John, or how. The question was asked in the form usually seen for reputation. Even if it were construed as relating to character, the failure to make clear what the basis of the opinion was, makes the opinion less compelling than the bad character evidence required for the legal sufficiency of a finding of future dangerousness.

The prosecutor told the jury it would be reputation evidence:

"that this

> 9  Defendant, her opinion of his reputation in the
>
> 10  community was that he was not a peaceful and
>
> 11  law-abiding citizen." (RR 21 15)

The form of the question does not make it clear whether the inquiry is about reputation or, alternatively, about character:

"[D]o you have an opinion on

> 23  whether or not he's a peaceful and law-abiding
>
> 24  citizen?
>
> 25      A.   Yes, I do.    104
>
> 1    Q.   And what is that opinion?
>
> 2        A.   He is not." (RR 21 103)

85

The Court of Criminal Appeals should determine that this is not sufficient evidence of bad character to support a finding of future dangerousness. It should do so because the neither the question nor the answer mentions the word "character" and because we cannot tell if this is reputation evidence or, alternatively, character evidence. The prosecutor said it was going to be reputation evidence. Even if it is construed as character evidence, it is from only one person, one person who encountered John for one burnt-out taillight and arrested him for a misdemeanor that the Legislature has decriminalized, and who gave no information about the basis of her opinion...whatever it was about.

There was absolutely no evidence of prior violent acts in the past. None. This Court itself decided that unlawfully carrying a weapon in a car, a now-decriminalized misdemeanor, is not violent. "We are unwilling to say that carrying a weapon is per se a 'violent' or 'aggressive' act of and by itself. See **Johnson v. State**,650S.W.2d414(Tex.Cr.App.1983)." **Thompson v. State**,659 S.W.2d 649,654 hn10(Tex.Crim.App.1983)The result should be the same as in **Keeton**; the Court should reform the sentence to life without parole.

This Court upheld the finding of future dangerousness when the state introduced evidence that the defendant had been convicted of a felony. **Harris v. State**, 790 S.W.2d 568(Tex.Crim.App.1989) In John's case all it offered was a conviction for a misdemeanor which is no longer a crime, a dismissed misdemeanor possession of

86

marijuana, and public intoxication.

This Court set aside a finding of future dangerousness on stronger evidence than that presented in John's case.**Warren v. State**,562 S.W.2d 474(Tex.Crim.App.1978) In the penalty stage of a capital murder prosecution, this Court held that the evidence as to the offense charged together with evidence of defendant's prior conviction of felony theft, which was not shown to have involved any violence, was insufficient to sustain finding that there was probability that defendant would commit criminal acts of violence constituting a continuing threat to society, in the absence of evidence of past violence, evidence that violence was initially intended during burglary charged, or evidentiary predictions of future violence. V.T.C.A., Penal Code § 19.03(a)(2); Vernon's Ann.C.C.P. art. 37.071.**Warren v. State**,562 S.W.2d 474(Tex.Crim.App.1978)

Warren had been convicted of a felony, John only of a now-decriminalized non-violent misdemeanor, as well as public intoxication. In John's case, as in Warren's, there just was no evidence of past violence. In John's case, as in Warren's, there was not any evidence that any violence was planned during the robbery. In John's case, in fact, there was positive evidence from the state's own witnes, Christina, that the plan was not to hurt anybody but to take the money and leave.

87

The state had stronger evidence for future dangerousness in Warren, but this Court set aside the finding of future dangerousness and reformed the sentence to life without parole. That is what the Court of Criminal Appeals should do here.

4. The evidence is factually insufficient to support the finding of future dangerousness. The Court should reform the sentence to life imprisonment.

Using the **Clewis** standard instead of the **Jackson** standard, the Court should find the evidence of future dangerousness so weak as to be factually insufficient. It should do so because there is no evidence of extensive planning, no evidence of prior violence, no evidence predicting future dangerousness, no evidence amounting to bad character, no evidence of torture, nothing in the facts of the murder itself to indicate future dangerousness. Pablo was innocent, but no more innocent that Kenisha Berry's baby; this Court set aside the finding of future dangerousness in Berry nonetheless.

The Court should find the evidence of future dangerousness factually insufficient and should grant appropriate relief.

5. The trial court erred in admitting extraneous offenses: the two robberies which took place after the murder and robbery alleged in the indictment.

The indictment originally had four counts: capital murder, Whataburger robbery at Staples and Baldwin, Whataburger robbery at Texan, evading arrest.

88

The defense moved to sever the capital count for a separate trial. The trial court granted the motion.   The defense moved to disclose 404b evidence.

The prosecutor told the Judge he did not have any 404b evidence.

The defense clearly did not want the two Whataburger robberies to be admitted.   The trial judge made it clear that he had already decided to let in evidence of the two Whataburger robberies which took place after the Times Market robbery of Pablo:

> 13              "We're also here because Mr. Skurka
>
> 14   intended to introduce extraneous offenses, 404(b) at
>
> 15   the time of trial, as I understand it.
>
> 16              MR. SKURKA:  That's correct, Judge.
>
> 17              THE COURT:  I already heard about the two
>
> 18   other robberies, I guess agg robberies, so I don't
>
> 19   think we need anymore evidence on those issues.  I
>
> 20   mean, I pretty much heard the whole -- the whole
>
> 21   shebang." (RR 7 4)

At an earlier stage of the pretrial:

"18          Then next page, 404(b) motion.  You-all

19  have anything on this one?

20          MR. SKURKA:  Judge, we have no 404(b)

21  evidence, as Mr. Garza and I discussed yesterday or

22  the other day.  Any other extraneous offenses are

23  actually in the indictment –


24          THE COURT:  Okay.

25          MR. SKURKA:  -- in the indictment

itself

    151

1  so I don't have -- anticipate any other ones.

2          THE COURT:  Well, it's granted."  (RR

4 150-151)

***

At pretrial, the parties and the Judge discussed the extraneous

offenses:

6          MR. SKURKA:  -- is previously we had a

7  motion in limine -- I'm sorry, in our discovery

8  motion, it's a 404(b) motion, and I want to make

90

sure

9  and I think Defense Counsel has already reiterated

10  that, that I -- even though the counts are severed,

11  the State still intends to bring the evidence from

12  Count 2, 3 and 4 into the case in chief as -- as the

13  same transactional context or res gestae of the

14  offense, and I believe Mr. Garza has already told

us

15  at a previous hearing that he had no objection to

16  that, like me treating it as a 404(b) extraneous

17  evidence and that he is not going to object to the

18  introduction of that even though the jury will not

be

19  charged on that; is that correct?

20              MR. GARZA:  At punishment, you mean.

21              MR. SKURKA:  No, sir, I'm talking

about

22  in case in chief we have -- they're charged with one

23  crime of aggravated -- I'm sorry, capital murder.

The

24  State is intending since these incidents all

91

happened

25   right at the same time that we do intend to introduce

9

1   that evidence into the case in chief.

2                    THE COURT:  As a 404(b).

3                    MR. GARZA:  As an extraneous offense and

4   I don't really think I need to argue that.  That's

5   clearly going to be admissible in that regard.

6                    THE COURT:  Well, at least you've given

7   him notice and he can fight about it.

8                    MR. GARZA:  We have notice, Judge, and

9   then we can still -- we can still lodge whatever

10   objections we feel are necessary to protect the

11   record --

12                    THE COURT:  Sure.

13                    MR. GARZA:  -- and our client's best

14   interest in the matter but I -- I'm not -- I think

92

15   what Mr. Skurka is trying to say or establish is

that

16   I have already waived some sort of objection to

that?

17                    MR. SKURKA:  No, what I meant was it

was

18   understood since all the cases were going to be

tried

19   together all that evidence was going to come

together.

20                    MR. GARZA:  Oh, I understand.

21                    MR. SKURKA:  I want the Defense

Counsel

22   to know that -- and the Defendant to know that just

23   because he's going to have a Jury Charge on capital

24   murder, that's not to say that other evidence is

still

25   going to come in.  He's not going to be able to

limit

10

1   just to the killing of Pablo Castro.  The State is

2   going to try to -- is going to -- intends to

93

introduce

   3  that evidence of Count 2, Count 3 and Count 4 in the

   4  case in chief.

   5           THE COURT:  And so basically what he's

   6  saying is he's going to try to move this in 404(b)

and

   7  you just need to know that because you've asked for

   8  notice --

   9           MR. GARZA:  That's correct.

  10           THE COURT:  -- and I think the other

  11  point is that even if the Court doesn't allow it in

on

  12  404(b) I -- if he gets convicted of capital murder

--

  13           MR. SKURKA:  It would come in.

  14           THE COURT:  -- he certainly gets to

prove

  15  it up.

  16           MR. GARZA:  I understand.

  17           THE COURT:  Okay.

  18           MR. GARZA:  And, of course, if he

doesn't

19   get it in under 404(b) he'll get it in under 37.07.

20          THE COURT:  Yeah.

21          MR. SKURKA:  I just want to make sure,

22   and I know Counsel probably understands this but I

23   just to make sure Counsel and the client have

24   discussed the fact that just because he's limining

25   what he's going to be charged with that may not
limit

11

1   the evidence that's going to be presented.

2            In other words, I don't intend to

3   introduce evidence of just the capital murder case,
I

4   intend to introduce all that evidence in the case
in

5   chief so I believe it would be coming in anyway,

6   whether he severs it or not.

7          THE COURT:  Okay.

8          MR. SKURKA:  Has Mr. Garza conveyed
that

95

9  to his client and his client fully understands that?

10                    MR. GARZA:  I have, Your Honor." (RR 5 8-11)

The trial judge then severed count 1, the capital count for a separate trial. (RR 5 11)

It is the Judge's discretion which is under review. The record shows that the defense thought the extraneous robberies would come into evidence if there were a punishment trial. That is the first thing the defense lawyer said when confronted with the prospect that they would come in: "At punishment, you mean." (RR 5 8/20)

The parties all thought that the two Whataburger robberies would come at the second phase of the trial if there were a punishment trial.

At guilt innocence, the state's star witness, Christina, the accomplice who had pleaded out for 25 years, gave unassailed evidence of plan.

The prosecutor told the Judge at the charge conference on the instructions at guilt/innocence that he offered the extraneous offenses to prove plan. (RR 19 193)

The state did not need the extraneous offenses to prove plan, since it had unattacked, unimpeached evidence of plan from its own witness Christina.

The trial court abused its discretion in admitting the extraneous

96

offenses: the two robberies at the two Whataburgers which took place after the robbery and murder of Pablo. The state did not need proof of those robberies to prove plan.

The error was not harmless beyond a reasonable doubt. The jury which answered the special issues on punishment, knowing the effect of their answers, was the same jury which heard the evidence on guilt, including the evidence of the two extraneous offenses, the two Whataburger robberies. Since the jury assessed death, the Court cannot say that the error was harmless beyond a reasonable doubt. The Court should remand for a new trial.

Motive

The defendant was tried and convicted of killing a police officer. At the trial, the State showed that the defendant was in the act of burglary of a drugstore in an attempt to get narcotics. A deputy sheriff arrived and defendant killed him. The State brought out evidence at trial that showed that defendant injected drugs in order to get high. Held: It was proper to show that defendant was committing burglary as this was part of the res gestae; however, it was improper to show that defendant used drugs in order to get high as this was neither part of the res gestae or motive. Drug use was motive for burglary, not murder. Error was compounded by the "inflammatory details concerning use of the drug with a syringe in order to get high." **Bush v. State**, 628 S.W.2d 441 (Tex. Crim. App. 1982) (Capital murder)

97

The probative value of the robberies was low. Butt said John went through Pablo's pockets. The prejudicial value was high. The distraught young mother, April Metting, who could not even talk when the police found her, raised the emotional level of the trial. Ruby Garcia, the woman who raised the window of her car at the second Whataburger, also raised the emotional level of the trial. The Whataburger was down the street from the courthouse, the Whataburger was a place the jurors could see themselves being.

Scheme, Plan, 403 analysis

Evidence of extraneous offenses was improperly admitted on the issue of scheme or plan:

The trial court incorrectly concluded that evidence of molestation of complainants other than the complainant in this case was admissible because it was evidence of "common scheme or plan." The court failed to determine both how the evidence showed such a plan, or how such a plan, if it existed, was relevant to this case. The court also failed to articulate its Rule 403 analysis. **Rankin v. State**, 974 S.W.2d 707 (Tex. Crim. App. 1996) (Aggravated sexual assault)

It does not appear that there is a 403 analysis in this record. Butt testified on direct that John went through Pablo's pockets. The state did not need the two Whataburger robberies. Their prejudicial impact was high and their probative value low. What did they prove?

98

That there was a plan to rob? So what? The state had direct evidence from a non-accomplice, Butt, that John robbed Pablo. The trial Judge abused his discretion in admitting the two robberies subsequent to the Times Market robbery of Pablo.

The following decisions are distinguishable:

 Harris,  790 S.W.2d 568, case 2 (Tex. Crim. App. 1990) (Capital murder): Evidence that a co-defendant had stolen the vehicle the defendant drove and that the defendant and others had committed another robbery on the night of the murder was inadmissible. In the case of the vehicle theft, the state failed to show the defendant's participation and knowledge. In the case of the second robbery, there was no showing that it was part of a continuous course of conduct with the murder and therefore it was not part of the res gestae. However, error was harmless and conviction was affirmed where the conviction was based on accomplice testimony corroborated by the finding of the victim's property and vehicle near the defendant's home and the defendant's subsequent sale of the victim's gun. Because of this overwhelming evidence of guilt, reversal was not required, particularly where the subsequent robbery would have been admissible at punishment.

In John's case, the evidence of his responsibility for Pablo's robbery was direct but weak, not overwhelming. It was weak because Christina was an interested witness who got something for her testimony who twice was willing to perjure herself on the subject

99

of the trial. She never said John robbed Pablo and the prosecutor never asked her that. Since she was the state's star witness, it is an appropriate inference that she did not see John rob Pablo. Cervantes waffled on whether John went through Pablo's pockets. But said he did "think" that he was "pretty sure" that that was the way things "seemed". John's blood is not on the dollar. This is not overwhelming evidence that John robbed Pablo.

Wyle, 777 S.W.2d 709 (Tex. Crim. App. 1989) (Capital murder): Extraneous offenses of unlawfully carrying a weapon and possession for marijuana were improperly admitted where the weapon possession occurred at least a day before the primary offense and was not part of a plan to commit it, and the marijuana possession occurred after the offense but was not a part of flight. Wyle, 777 S.W.2d 709 (Tex. Crim. App. 1989) (Capital murder):

In John's case, both Whataburger robberies occurred after the robbery of Pablo at the Times Market and were not part of flight.

Admission of evidence that capital felony homicide defendant used heroin was not improper for the record was replete with evidence that defendant lived with a heroin addict and was a frequent user of heroin himself and that the motel where killing took place was frequented by dope addicts. "The jury was confronted with the aimless acts of three people that culminated in the death of Gregory. To understand these acts and determine the relative culpability of these three persons, it was necessary to put their

relationship into a proper perspective. Smith's testimony as to the appellant's use of heroin tended to explain the relationship between these three people. The evidence of appellant's heroin use was an integral part of his relationship with Loudres and Smith, and thus is inseparable from the events involving all three persons leading up to the death of Gregory. Affirmed. Brooks, 599 S.W.2d 312 (Tex. Crim. App. 1979) (Capital murder)

There was no need to establish comparative responsibility here. Christina had already pleaded guilty and Angela was not on trial with John before the same jury. The probative value of the Whataburger robberies was outweighed by their prejudicial effect.

Where the defendant, at the time of his arrest, admitted possession and sale of marijuana, an extraneous offense, evidence of the admissions should have been suppressed. The evidence was not necessary to the jury's understanding of the charged offense. Rogers v. State, 853 S.W.2d 29 (Tex. Crim. App.), aff'd in part and rev'd in part, 862 S.W.2d 47 (Tex. App.-Houston [14th Dist.] 1993, pet. dismissed) (Burglary, possession of methamphetamine)

The jury could understand the robbery of Pablo without evidence of the Whataburger robberies. Butt identified John as the man who was punching Pablo and who went through Pablo's pockets. Christina said John stabbed Pablo. The jury did not need two more robberies to understand the offense.

Under Tex. R. Crim. Evid. 403, after the defendant objects to

the admissibility of extraneous offenses, the State has the burden to show the relevance of the evidence to a contested issue other than the likelihood that the defendant would act in conformity with his other criminal activity. If some other relevance is shown, the defendant must then object that the prejudicial effect of the evidence outweighs its probative value, and has the burden to show this. Tex. R. Crim. Evid. 404. Here, the evidence that the defendant walked around nude with an erection in front of his children was relevant to his credibility and to his intent in touching his daughters. However, the daughters both testified and corroborated each other, and were not seriously impeached. The marginal probative value of this evidence was outweighed by its prejudicial impact and exclusion was required. Montgomery, 810 S.W.2d 372 (Tex. Crim. App. 1991), conviction aff'd on remand, 821 S.W.2d 314 (Tex. App.-Dallas 1991) (Indecency with child)

What contested issue? John did not testify. He did plead not guilty. Merely pleading not guilty does not allow admission of extraneous offenses. The defendant objected to the Whataburger robberies at pretrial; the defense lawyer noted that they were admissible "at punishment". The trial judge severed the capital count for a separate trial. The Whataburger robberies then became 404b material. The trial judge abused his discretion in admitting them into evidence because they were not relevant to any *contested* issue. While the state may say they were relevant to plan, the state

had direct evidence of plan and did not need the extraneous offenses. Indeed, from Butt and Christina's testimony together, the jury had direct evidence of the offense of murder and the offense of robbery. It did not need to prove plan.

In order to preserve a complaint for appellate review after a plea of guilty, the defendant must obtain either an express or implied ruling on his motion to suppress before entering his plea. Here, although the record reflects no express ruling on the motion, the case is remanded to the court of appeals to determine whether there was an implied ruling. *Gutierrez v. State*, 36 S.W.3d 509 (Tex. Crim. App. 2001) (Possession of cocaine) The trial court at least impliedly overruled defendant's objection to the extraneous offenses by agreeing that the extraneous offenses would come into evidence.

To extrapolate from this Court's opinion in **Stoddard v. State**, 475 S.W.2d 744(Tex.Crim.App.1972), in which it quoted, "'The word 'automobile' is not a talisman in whose presence the Fourth Amendment fades away and disappears.'", The words plan and res gestae and continuing course of conduct are not words in the face of which the prohibition against extraneous offenses goes away and disappears. The judge must still do the 403 balancing test and include his analysis in the record.

In another similar case, the defendant was working on a pistol in his home while his wife was seated next to him. The couple's puppy jumped on wife's lap and she pushed it away

103

whereupon the puppy jumped upon the defendant's lap and while pushing dog away gun discharged killing wife. Defendant had given statement to police that he and his wife had some marital problems while they were stationed in Hawaii and that he had been married twice before. At trial, these statements were admitted into evidence. Held: These statements were not relevant to any issue before the jury. "For such evidence to be admissible, it must tend to establish the truth of a proposition material to the issues." Even when such inferences have probative value they may be rejected if there is a danger of misleading the jury or creating undue prejudice. The court concluded that the prejudicial effect of this evidence outweighed any probative value it may have had. Reversed. **Withers v.State**,  631 S.W.2d 595 (Tex. Crim. App. 1982) (Involuntary manslaughter)

The prejudice was undue. The state already had the testimony of Butt and of Christina. Butt did not need to be corroborated. He said it was John who was punching Pablo and that he was pretty sure that John took something from Pablo's pocket. Christina said John stabbed Pablo. The Whataburger robberies were unnecessary. April Metting, the young mother with the baby, evoked sympathy. The jurors could see themselves in Ruby Garcia's place at the Whataburger. The prejudice was great and the probative value less.

The prejudicial effect of the extraneous offenses was great

104

but their probative value was slight in comparison to the direct evidence given by the state's witness Christina. The error was not harmless beyond a reasonable doubt because the evidence was admitted at the guilt/innocence phase of the trial and prompted the jury to find John guilty of capital murder rather than first-degree murder.

Even when evidence might be admissible to rebut a defensive theory, in John's case "afterthought", the trial court must still engage in a proper 403 404 probativity-prejudicial-effect analysis.

Christina's eyewitness evidence was so strong, she said she saw John stab Pablo and then point to Angela who then picked Pablo's pockets, that the probative value of the extraneous offenses was outweighed by the prejudicial effect of the hysterical young mother with baby and the other woman whose passenger-side window John banged on with a knife. All the jury had to do to reject the "afterthought" defense was to believe Christina. Although the extraneous offenses may have rebutted the "afterthought" defensive theory, not all extraneous offenses which rebut defensive theories are admissible. If the prejudicial effect of the extraneous offenses outweighs the probative value of the extraneous offenses, then the trial court errs in admitting those extraneous offenses.

Photographs of apparently unconscious naked women who were

not the alleged victims of the charged offense were inadmissible because their prejudicial impact "far outweighed" their probative value. The error was not harmless because of the number and nature of the photographs. Casey,  160 S.W.3d 218 (Tex. App.-Austin 2005, no pet.) (Sexual assault) So it was with the hysterical April Metting and the first Whataburger robbery.

In John's case, the prejudicial impact of the the young mother with the baby, April Metting, was substantial. The second woman, Ruby Garcia, whose window was banged on with a knife, also furnished substantially prejudicial evidence. The Court should find that the emotional impact of the hysterical young mother with the baby was not harmless beyond a reasonable doubt because of her youth, her baby, her hysteria, and her sympathetic character.  Similarly, the Court should find that the prejudicial effect of the woman whose window was banged on with a knife was not harmless beyond a reasonable doubt because the nature of the testimony was such that the jurors could all imagine themselves being at a Whataburger in their own town and being attacked.


Christina's evidence was substantial. She was an eyewitness. She said she saw John stab Pablo and saw John direct Angela to pick Pablo's pockets. Her accomplice testimony was corroborated by the dna evidence of Pablo's blood on the dollar bill found near the step of the abandoned van 40 yards off the roadway and

106

John's dna in the van, tending to show John's connection to the crime.

The probative value of the extraneous offenses was far outweighed by the prejudicial effect of the hysterical young mother with her baby and the woman whose passenger-side window was banged on with a knife at a Whataburger in the jurors' home town. The Court of Criminal Appeals should find that the trial court abused its discretion in admitting the extraneous offenses over objection and should remand for a new trial.

When there is other evidence of intent (scheme,plan,design, or motive), it is reversible error to admit evidence of extraneous offenses. **Russell v. State**, 113 S.W.3d 530 (Tex. App.-Fort Worth 2003, pet. ref'd) (Capital murder): Evidence of extraneous murder offenses was improperly admitted, and reversal was required. While the evidence was arguably relevant to the defendant's intent, there was other evidence of intent available. The prejudicial impact of the evidence outweighed its probative value. Harm was shown, and reversal is required.

Here, evidence of the plan to commit robbery was not only available, it was presented, and scarcely scathed on cross-examination.

Christina's evidence was substantial. She was an eyewitness. She said she saw John stab Pablo. Butt said he saw John go through Pablo's pockets. The state did not need to prove plan

because it had direct evidence of murder and direct evidence of robbery.

The probative value of the extraneous offenses was far outweighed by the prejudicial effect of the hysterical young mother with her baby and the woman whose passenger-side window was banged on with a knife at a Whataburger in the jurors' home town. The Court of Criminal Appeals should find that the trial court abused its discretion in admitting the extraneous offenses and should remand for a new trial.

When the state has and presents unequivocal evidence on the charged offense, and when the presentation of the evidence on the extraneous offenses takes more time than the presentation of the evidence of the charged offense, then admission of the extraneous offenses over objection is error and a new trial will be ordered.

The prejudicial impact of one of two extraneous offenses substantially outweighed its probative value on the issue of identity, and its admission was error. The extraneous offense involved sexual misconduct which is inherently inflammatory, and the presentation of the evidence of the extraneous offense took considerable time in proportion to the evidence of the charged offense. The state had unequivocal identification testimony. Harm was shown because the defendant was improperly tried for the collateral offense rather than the charged offense. Reversed and

remanded for a new trial. **Booker v. State**,  103 S.W.3d 521 (Tex. App.-Fort Worth 2003, pet. ref'd) (Aggravated robbery):

The hysterical evidence from the young mother with her baby at the first Whataburger was as inflammatory as evidence of a sexual offense because of the youth of the mother and the presence of her baby as well as the evidence of the young mother's hysteria. The presentation of the evidence on the two extraneous offenses took more time than Christina's direct evidence of the stabbing and Butt's evidence of robbery. The result should be the same as in **Booker**, a new trial.

When the state's case is circumstantial, the admission of extraneous offenses is more likely to be approved. Extraneous offenses may be admissible when the crime is a signature crime and identity is in issue. **Bishop v. State**,  837 S.W.2d 431 (Tex. App.-Beaumont 1992, pet. granted), aff'd,  869 S.W.2d 342 (Tex. Crim. App. 1993) (Burglary of habitation, aggravated sexual assault)

In John's case, neither of these applies. The state's case was direct, not circumstantial. Christina said she saw John stab the old man. Christina said she and John and Angela agreed not to hurt anybody but to take the money and leave. She then said she saw John point to Angela who then picked the old man's pockets. This is direct evidence, so the extraneous offenses are not admissible simply because the state had a circumstantial evidence

109

case.

The two Whataburger robberies are very much alike, but neither is like coming upon an old man at a store taking out the trash and beating him up and stabbing him and then picking his pockets. In each Whataburger robbery Angela asks to use the driver's phone first and then John either got in the driver's side window or went around to the passenger side window and tried to break in. So, the extraneous offenses were not admissible as signature crimes because they were not similar to the charged offense of murder and robbery of Pablo, the old man at Times Market.

When the state's evidence is direct, the state does not need the extraneous offenses. **Garcia v. State**, 827 S.W.2d 27 (Tex. App.-Corpus Christi 1992) (Indecency with child): Erroneous admission of extraneous offense evidence deprived the defendant of a fair trial. Four witnesses testified over defendant's objection concerning uncharged acts of sexual misconduct with persons other than the complainant in the charged offense. The complainant's testimony was clear and unequivocal. The State contended that the evidence was admissible on the issue of intent, but the intent could have been inferred from the complainant's testimony about the defendant's rubbing her breasts. The extraneous incidents, on the other hand, concerned simple kissing and hugging and did not lead to any inference

110

about intent. The evidence was therefore not relevant, and even if it were, its potential for prejudice outweighed its probative value.

The only issue upon which the extraneous offenses were relevant was plan. But Christina's testimony that she and John and Angela all agreed "not to hurt anybody" but to "take the money and leave" was clear and unequivocal. She pointed out John in the courtroom as the one who stabbed the old man. She unreservedly stated that John pointed to Angela who then picked the old man's pockets. The potential for prejudice of the extraneous offenses, although relevant to plan, was much greater than the probative value of the extraneous offenses to prove plan.

Probative value does not just mean did the extraneous offenses prove plan. It means did the state need the extraneous offenses to prove plan. Here, as in **Garcia**, the state did not need the extraneous offenses to prove plan since the state's own witness Christina was clear and unequivocal about the agreement, the plan among her, John, and Angela. There was no need for inference; the evidence was direct.

As in Garcia, the extraneous offenses were more prejudicial than probative. The young, hysterical mother with her baby provided testimony likely to prompt a verdict based on emotion. The second woman, whose passenger-side window was being attacked

111

with a knife, likewise provides testimony likely to prompt a verdict based on emotion. The Court should find that the trial court erred in admitting the extraneous offenses. The Court should require a new trial.

The Second Court of Appeals set out the general rule on extraneous offenses:

> "It is a fundamental principle of law that an accused is entitled to be tried on the accusation made in the State's pleading and not for some collateral crime or for being a criminal generally. **Smith v. State**, 646 S.W.2d 452, 455 (Tex.Crim.App.1983). Therefore, the State is generally prohibited from proving prior specific acts or extraneous offenses committed by the accused. **Elkins v. State**, 647 S.W.2d 663, 665 (Tex.Crim.App.1983).

> This evidence may, however, be admissible to establish the similarities between the primary offense and the extraneous offense. **Moore v. State**, 700 S.W.2d 193, 201 (Tex.Crim.App.1985). Nevertheless, the State failed to demonstrate a high degree of similarity between the instant coin robbery offense and the extraneous armored car offense. In light of the insufficiently distinctive characteristics between the two offenses, the relevancy of the evidence does not outweigh its prejudicial

112

potential. See **Collazo v. State**, 623 S.W.2d 647, 648

(Tex.Crim.App. [Panel Op.] 1981)."

[The Court of Appeals' decision granting a new trial was

only reversed by the Court of Criminal Appeals because the trial

lawyer did not make his objection about extraneous offenses out

of the presence of the jury. **State v. Ethington**,819 S.W.2d

854,859-860 hn6(Tex.Crim.App.1991)]

Neither of the two Whataburger robberies was so similar to

the Times Market robbery as to be a signature crime. In each

Whataburger robbery Angela approaches the driver and asks to use

the driver's cellphone. Then John either assaults the driver if

the window is down or tries to break in the passenger side window

when the driver shuts the driver's window.  At Times Market,

Pablo is just going out to empty the trash. John and Angela beat

him. John stabs him. Angela picks his pockets.

Referring to **Collazo, supra**, an armored car is not a coin

store and a grocery store is not a Whataburger. The Whataburger

robberies were not so similar as to be admissible. The error was

not harmless beyond a reasonable doubt because the young,

hysterical mother with her baby evoked so much sympathy and the

second woman was also in a position in which the jurors could

imagine themselves...at a Whataburger drive thru in their

hometown not too far from the courthouse where they sat.

113

Error was indeed preserved for review when the defense counsel objected to the extraneous offenses out of the presence of the jury pretrial; he did not have to renew the objection in the presence of the jury.  Pretrial objection to admission of extraneous offenses preserved error, even though defendant did not object at trial; at trial defendant did not state "no objection." Vernon's Ann.Texas C.C.P. art. 40.09, subd. 6(d)(3) (Repealed). **Wyle v. State**,777 S.W.2d 709,715 hn13 fn5(Tex.Crim.App.1989)

The Court should remand for a new trial.

6. There is egregious error in the instructions to the jury at punishment. After the judge instructed the jury on "TEX.R.APP.P." and on the "no" options for special issue number one, the judge told the jury:

12              "In the event the jury is unable to agree

          13  upon Special Issue No. 2 (sic) under the conditions

          14  and instructions outlined above, the Presiding Juror

          15  will not sign either form of answer to Special -- of

114

16   this Special Issue.

So, the Judge did not tell the jury what to do if they could not agree on the answer to special issue number one.

There was no objection.

So, the test is whether the error is egregious. **Almanza v. State**, 724 S.W.2d 805, (Tex.Crim.App.1986).

> "On the other hand, if no proper objection was made at trial and the accused must claim that the error was 'fundamental,' he will obtain a reversal only if the error is so egregious and created such harm that he 'has not had a fair and impartial trial'-in short 'egregious harm.' " **Almanza** at 806 [quoting from the 1984 opinion]

The error is egregious. This is a capital murder prosecution and we are at the punishment stage. Just because the jury answered the question does not mean that the Judge should not have told the jury what to do if they could not agree on the answer.

Had the jury not been able to answer the question, the Court would have imposed a life sentence.

This Court has found egregious error in instructions to the jury in a capital case. **Dowden v. State**, 537 S.W.2d 5 (Tex.Crim.App.1976) Dowden was a prosecution for aggravated robbery. An instruction which permitted jury to convict if they found that defendant had "recklessly" placed person in fear of imminent bodily injury or death authorized jury to find guilt upon set of circumstances that could not constitute any offense alleged, and was

115

prejudicially erroneous. Vernon's Ann.C.C.P. art. 36.19; V.T.C.A., Penal Code §§ 12.42(d), 29.02. 29.03

In John's case, the jury is not told what to do if it cannot agree. The result of the error is egregious, or out of the ordinary. In a non-capital case, the judge does not tell the jury what to do if they cannot reach a verdict. S/He may use an Allen charge to encourage them to try to reach a verdict. If they cannot, a mistrial results. The consequence of the error in John's case is of life or death proportions. If the jury could not agree, then John would get a life sentence. So, the result of not telling the jury what to do if they could not agree is out-of-the-ordinary, or egregious.

It is egregious. And it does involve life or death. But it is not egregious just because it involves life or death. It is also egregious because the judge never tells the jury what to do if it cannot reach a verdict...except [and there's the egregiousness] in capital cases, and even then only in those capital cases which reach the point of deliberation upon a verdict at the punishment phase.

Habeas corpus relief was granted because the error in jury instructions concerning malice, which shifted the burden of proof, was not harmless. To properly apply the Chapman test in these circumstances, the court must evaluate how the instructions would affect the evidence actually before the jury. A mere finding that the jury verdict would have been the same is insufficient. Because the evidence concerning the defendant's intent to kill at least one

116

victim was not clear, harm was shown. **Yates v. Evatt**, 500 U.S. 391, 111 S. Ct. 1884, 114 L. Ed. 2d 432 (1991) The jury instructions violated the guaranty of due process because they shifted the burden of proof. U.S.CONST.amend.XIV

The lack of an instruction on what to do if the jurors could not agree violates the guaranty of due process. U.S.CONST.amend.XIV It violates the federal guaranty of due process for the reasons stated in Yates, the faulty instructions affect how the jury would evaluate the evidence. The judge did not tell the jury what to do if they could not agree on whether the state had proven that John would be a future danger.

It also violates federal due process because Texas did not follow its own law. **Hicks v. Oklahoma**, 447 U.S. 343 (1980) The Supreme Court of the United States found that the state court's failure to follow its own law on jury instructions violated the guaranty of due process, U.S.CONST.amend.XIV, even though the sentence was within the statutory range, because if the state had followed its own law in jury instructions, the jury might, might have imposed a lesser sentence. The Supreme Court of the United States noted in Hicks:

> "It is argued that all that is involved in this case is the denial of a procedural right of exclusively state concern. Where, however, a State has provided for the imposition of criminal punishment in the discretion of the trial jury, it is not correct to say that the defendant's interest in the exercise of that discretion is merely a matter of state procedural law. The defendant in such a case has a substantial and legitimate

expectation that he will be deprived of his liberty only to the extent determined by the jury in the exercise of its statutory discretion, cf. Greenholtz v. Nebraska Penal Inmates, 442 U.S. 1, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979), and that liberty interest is one that the Fourteenth Amendment preserves against arbitrary deprivation by the State. See Vitek v. Jones, 445 U.S. 480, 488-489, 100 S.Ct. 1254, 1261, 63 L.Ed.2d 552, citing Wolff v. McDonnell, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935; Greenholtz v. Nebraska Penal Inmates, supra ; Morrissey v. Brewer, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484. In this case Oklahoma denied the petitioner the jury sentence to which he was entitled under state law, simply on the frail conjecture that a jury *might* have imposed a sentence equally as harsh as that mandated by the invalid habitual offender provision. Such an arbitrary disregard of the petitioner's right to liberty is a denial of due process of law." **Hicks** at 345 hn 2 & 3  [emphasis added,lw]

It also violates the guaranty of due course of law. TEX.CONST.art.I,secs.13 & 19. It does so because the due course of law, what the Judge is supposed to tell the jury, is set out in TEX.CODE CRIM.P.art.37.071 sec.2(d)(2), sec.2(f)(2) John is to be deprived of his life without due course of law because the Judge did not instruct the jury in accord with the course of law due under TEX.CODE CRIM.P.art.37.071 sec.2(d)(2), sec.2(f)(2) The guaranty of due course of law is generally interpreted in accord with the guaranty of due process of law. The two state constitutional provision provides at least the same level of protection as the federal one. **Jimenez v. State**, 32 S.W.3d 233, 242 (Tex.Cr.App.2000) (McCormick, P.J., concurring) (due process clause in federal constitution and due course of law provision in state constitution mean the same thing). Perhaps more. **Pena v. State**,191 S.W.3d 133

118

(Tex.Crim.App.2006)

This is worse than the error in **Hicks, supra**, in which the instructions given did not permit a lesser penitentiary sentence than the 40 years imposed. In John's case, the correct instructions "might", to use **Hicks**' word, might have resulted in a life without parole sentence rather than a death sentence. So, the Court cannot say that the error is harmless beyond a reasonable doubt. **Hicks** at 346 hn2 & 3 The Supreme Court of the United States characterized the speculation, the "mightness", that the jury would have given the same sentence, 40 years, instead of a possible sentence as low as 10 years if they had been properly instructed, as a "frail conjecture". **Hicks** at 346 hn 2&3.

In John's case, the Court of Criminal Appeals of Texas should evaluate how the erroneous instructions would affect the evidence before the jury. Here is the effect: The jury were not told what to do if they could not agree on whether the state had proven that John would be a future danger. The state may say, "Well, it doesn't matter, because the jury found that he would be a future danger. So, they did agree." That argument is rejected by the decision of the Supreme Court of the United States in Yates that the jury verdict would have been the same.

How can we know that the verdict would have been the same? We cannot. Remember, this is the only instance in Texas law in which the Judge is required, required to tell the jury what to do if they

119

cannot agree.  This instance is a capital prosecution, seeking the death penalty, in which the defendant has been convicted of capital murder, and the process had moved to the punishment phase, and both parties have rested and closed on the evidence. In every other trial in a Texas court of record in every criminal case, the Judge says nothing about what to do if the jurors cannot agree in the initial instructions. In an Allen charge, the Judge might tell them to keep deliberating.

The indictment, what was left of it, charged capital murder. The evidence showed John had been convicted of a misdemeanor that is no longer a crime, and public intoxication, and a misdemeanor possession of marijuana charge had been dropped. The prosecutor argued that we need protection from John, because he had gone down the wrong road. John's lawyers argued his remorse: "My sin is always before me." Psalm 51:3 The instructions did not tell the jurors what to do if they could not agree on whether to find that John would be a future danger. Had they not agreed, he would have gotten life without parole. Without direction, they agreed upon an answer that prompted a death sentence. The error was, consequently, not harmless beyond a reasonable doubt.

The Court should find that the error is not harmless beyond a reasonable doubt. It should order a new trial on punishment.

*Pursuant to Tex. R. App. Proc. 38.1(i), Appellant provides a short conclusion that clearly states the nature of the relief sought:*

### CONCLUSION AND REQUEST FOR RELIEF

The Court should find the evidence legally insufficient on guilt of capital murder. The proof fails on robbery. The Court should review the evidence on murder, which was submitted to the jury.

The Court should find the evidence factually insufficient on guilt of capital murder. The proof is too weak to make John responsible for robbing Pablo. The Court should grant a new trial.

The Court should find the evidence legally insufficient on future dangerousness. It should reform the judgment to reflect a sentence of life without parole.

The Court should find the evidence factually insufficient on future dangerousness. It should reform the judgment to reflect a sentence of life without parole.

The trial court abused its discretion in admitting the two extraneous offenses. The prejudice far outweighed the probativity. The Court should remand for a new trial.

The trial court did not tell the jurors what to do if they could not agree on special issue number one. The error was egregious because only in a capital prosecution does is the judge supposed to give such an instruction. The error was not harmless beyond a reasonable doubt because the instruction was the difference between life and death. The Court should remand for a new trial.

Law Office of Larry Warner
Respectfully Submitted
April 3, 2010

By:

Larry Warner
Attorney at law
2945 Jacaranda Drive
Harlingen, Texas 78550 8658 45
956 454 4994
email: office@larrywarner.com
website: larrywarner.com
State Bar of Tx 20871500;
USDC,SDTX 1230
Bd.Cert.,Crim.Law,
Tx.Bd.Legal Specialization(1983)
Member of the Bar of the
Supreme Court of the United States
(1984)

122

IN THE COURT OF CRIMINAL APPEALS OF TEXAS

NO.AP 76,100

JOHN HENRY RAMIREZ VS. THE STATE OF TEXAS

ON DIRECT APPEAL FROM THE 94TH DISTRICT COURT NUECES COUNTY

TRIAL COURT NO.04-CR-3453-C

THE STATE OF TEXAS VS. JOHN HENRY RAMIREZ

### *CERTIFICATE OF SERVICE*

I, Larry Warner, certify that I mailed a true and correct copy of Appellant's Brief, the document to which this certificate is attached to:

Armando Villalobos, District Attorney, Cameron County Courthouse 964 East Harrison Street, Brownsville, Tx 78520

Law Office of Larry Warner

Respectfully Submitted

April 3, 2010

By:

Larry Warner
Attorney at law

2945 Jacaranda Drive

Harlingen, Texas 78550 8658 45

956 454 4994

email: office@larrywarner.com

website: larrywarner.com

State Bar of Tx 20871500;

USDC,SDTX 1230

Bd.Cert.,Crim.Law,

Tx.Bd.Legal Specialization(1983)

Member of the Bar of the

Supreme Court of the United States (1984)

123