AP-76100

RECEIVED IN
COURT OF CRIMINAL APPEALS

DEC 03 2010

Louise Pearson, Clerk

No. AP-76,100

IN THE COURT OF CRIMINAL APPEALS OF TEXAS

---

JOHN HENRY RAMIREZ,
Appellant,

VS.

THE STATE OF TEXAS,
Appellee.

FILED IN
COURT OF CRIMINAL APPEALS

DEC 07 2010

Louise Pearson, Clerk

---

ON DIRECT APPEAL FROM THE 94TH DISTRICT COURT
OF NUECES COUNTY, TEXAS
TRIAL COURT NUMBER 04-CR-3453-C

---

BRIEF FOR THE STATE

---

James D. Rosenkild
State Bar No. 17279200
Assistant District Attorney
105th Judicial District of Texas
901 Leopard, Room 206
Corpus Christi, Texas 78401
(361) 888-0410
(361) 888-0399 (fax)

Attorney for Appellee

ORAL ARGUMENT REQUESTED

ORIGINAL

TABLE OF CONTENTS

IDENTITY OF PARTIES AND COUNSEL . . . . . . . . . . . . . . . iii

INDEX OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . iv

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . 1

STATEMENT REGARDING ORAL ARGUMENT . . . . . . . . . . . . . . 2

COUNTER-STATEMENTS OF ISSUES PRESENTED FOR REVIEW . . . . . . . 2

COURSE OF PROCEEDINGS BELOW . . . . . . . . . . . . . . . . . 3

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . 4

    Guilt Phase . . . . . . . . . . . . . . . . . . . . 4

    Punishment Phase . . . . . . . . . . . . . . . . . . 30

SUMMARY OF THE ARGUMENT . . . . . . . . . . . . . . . . . . . 41

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . 44

A. Reply to Appellant's Issue Presented for Review No. 1:
   The evidence, viewed in the light most favorable to the
   prosecution, is sufficient for a rational trier of fact
   to have found the essential elements of the crime beyond
   a reasonable doubt . . . . . . . . . . . . . . . . . . 44

B. Reply to Appellant's Issue Presented for Review No. 2:
   This Court should not conduct a factual sufficiency
   review of the evidence to support the conviction . . . . 53

C. Reply to Appellant's Issue Presented for Review No. 3:
   The evidence, viewed in the light most favorable to the
   jury's answer to the future-dangerousness special issue,
   is sufficient for a rational trier of fact to have found
   beyond a reasonable doubt that there is a probability
   that Appellant would commit criminal acts of violence
   that would constitute a continuing threat to society
   whether in or out of prison . . . . . . . . . . . . . . 54

D. Reply to Appellant's Issue Presented for Review No. 4:
   This Court should not conduct a factual sufficiency
   review of the evidence to support the jury's answer to
   the future-dangerousness special issue . . . . . . . . 63

E. Reply to Appellant's Issues Presented for Review No. 5:
   The trial court did not abuse its discretion admitting
   evidence of the related robberies during the State's
   case-in-chief . . . . . . . . . . . . . . . . . . . .  64

F. Reply to Appellant's Issue Presented for Review No. 6:
   The trial court properly instructed the jury that if it
   was unable to agree on the answer to the future
   dangerousness special issue, the presiding juror should
   not sign either form of answer to such issue, and there
   is nothing to suggest that the jury's unanimous
   affirmative answer to that issue was as a result of
   confusion over the "10-12" rule or the court's reading of
   its instructions . . . . . . . . . . . . . . . . . . .  75

PRAYER FOR RELIEF . . . . . . . . . . . . . . . . . . . .  81

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . .  81

## IDENTITY OF PARTIES AND COUNSEL

The following are parties to the final judgment of the trial court and their counsel in the trial court:

1) John Henry Ramirez, Jr., 1421 Papaya Court, Corpus Christi, TX 78415, represented by Edward F. Garza, 719 S. Shoreline Blvd., Suite 201, Corpus Christi, TX 78401, and Grant Jones, 5826 Beauvais Dr., Corpus Christi, TX 78414; and,

2) The State of Texas, represented by Mark Skurka, Vernon G. Schimmel, and Stephen Feil, of the Nueces County District Attorney's Office, 901 Leopard St., Rm. 206, Corpus Christi, TX 78401.

The following are appellate counsel:

1) Larry Warner, 2945 Jacaranda Dr., Harlingen, TX 78550-8658; and,

2) James D. Rosenkild of the Nueces County District Attorney's Office, 901 Leopard St., Rm. 206, Corpus Christi, TX 78401.

iv

INDEX OF AUTHORITIES

CASES                                                          PAGES

<u>Alba v. State</u>, 905 S.W.2d 581 (Tex. Crim. App. 1995)  . . 69 n.24

<u>Almanza v. State</u>, 686 S.W.2d 157 (Tex. Crim. App. 1985) . . .  76

<u>Barrios v. State</u>, 283 S.W.3d 348 (Tex. Crim. App.
2009) . . . . . . . . . . . . . . . . . . . . . . . . . . 80 n.32

<u>Berry v. State</u>, 233 S.W.3d 847 (Tex. Crim. App.
2007) . . . . . . . . . . . . . . . . . . . . . . . . 56, 63 n.22

<u>Brooks v. State</u>, No. PD-0210-09, 2010 WL 3894613, 2010
Tex. Crim. App. LEXIS 1240 (Tex. Crim. App. Oct. 6,
2010)(not yet reported) . . . . . . . . . . . . . . . . . .  53

<u>Brown v. State</u>, 270 S.W.3d 564 (Tex. Crim. App. 2008),
<u>cert</u>. <u>denied</u>, 129 S.Ct. 2075 (2009) . . . . . . . . . . .  46

<u>Burns v. State</u>, 761 S.W.2d 353 (Tex. Crim. App. 1988) . . . .  57

<u>Bustamante v. State</u>, 106 S.W.3d 738 (Tex. Crim. App. 2003)  .  53

<u>Butler v. State</u>, 769 S.W.2d 234 (Tex. Crim. App. 1989) . . .  45

<u>Camacho v. State</u>, 864 S.W.2d 524 (Tex. Crim. App. 1993) . . .  71

<u>Casey v. State</u>, 215 S.W.3d 870 (Tex. Crim. App. 2007) . . . .  73

<u>Clewis v. State</u>, 922 S.W.2d 126 (Tex. Crim. App. 1996)  . 44, 53

<u>Coble v. State</u>, No. AP-76,019, 2010 WL 3984713, 2010 Tex.
Crim. App. LEXIS 1297 (Tex. Crim. App. Oct. 13, 2010)(not
yet reported) . . . . . . . . . . . . . . . 55, 56, 56 n.18, 64

<u>Cockrum v. State</u>, 758 S.W.2d 577 (Tex. Crim. App. 1988) . . .  48

<u>Colella v. State</u>, 915 S.W.2d 834 (Tex. Crim. App. 1995) . . .  48

<u>Cuevas v. State</u>, 742 S.W.2d 331 (Tex. Crim. App. 1987)  . 57 n.19

<u>Druery v. State</u>, 225 S.W.3d 491 (Tex. Crim. App. 2007)  . 49, 56

<u>Estrada v. State</u>, 313 S.W.3d 274 (Tex. Crim. App. 2010),
<u>petition</u> <u>for</u> <u>cert</u>. <u>filed</u>, No. 10-6446 (U.S. Sept. 13,
2010) . . . . . . . . . . . . . . . . . . . . . . . 54, 55, 63

<u>Farris v. State</u>, 819 S.W.2d 490 (Tex. Crim. App. 1990)  . . .  49

Gardner v. State, 306 S.W.3d 274 (Tex. Crim. App. 2009),
 cert. denied, 131 S.Ct. 103 (2010) . . . . . . . 44 n.11, 56, 79

Gigliobianco v. State, 210 S.W.3d 637 (Tex. Crim. App. 2006)   73

Holladay v. State, 709 S.W.2d 194 (Tex. Crim. App. 1986)   49, 50

Jackson v. State, 17 S.W.3d 664 (Tex. Crim. App. 2000) . . .   79

Jackson v. Virginia, 443 U.S. 307 (1979)  . . 44, 44 n.10, 45, 53

Johnson v. State, 68 S.W.3d 644 (Tex. Crim. App. 2002) . . .   75

Keeton v. State, 724 S.W.2d 58 (Tex. Crim. App.
 1987) . . . . . . . . . . . . . . . . . . . . 56 n.18, 60

King v. State, 953 S.W.2d 266 (Tex. Crim. App. 1997) . . 59, 63

Kunkle v. State, 771 S.W.2d 435 (Tex. Crim. App. 1986) . . .   57

Laster v. State, 275 S.W.3d 512 (Tex. Crim. App. 2009) . . .   45

Lawton v. State, 913 S.W.2d 542 (Tex. Crim. App. 1995) . 75, 80

Maldonado v. State, 998 S.W.2d 239 (Tex. Crim. App. 1999) . .   53

Malik v. State, 953 S.W.2d 234 (Tex. Crim. App. 1987) . . 45 n.12

Martinez v. State, 924 S.W.2d 693 (Tex. Crim. App.
 1996) . . . . . . . . . . . . . . . . . 60, 60 n. 21, 62

Mays v. State, 318 S.W.3d 368 (Tex. Crim. App.
 2010) . . . . . . . . . . . . . . . . . 56 n.18, 56, 76

McGinn v. State, 961 S.W.2d 161 (Tex. Crim. App. 1998) . . .   64

McFarland v. State, 928 S.W.2d 482 (Tex. Crim. App. 1996) . .   79

Montgomery v. State, 810 S.W.2d 372 (Tex. Crim. App. 1991)
 (op. on reh'g) . . . . . . . . . . . . . . . . . . . 69, 73

Page v. State, 213 S.W.3d 332 (Tex. Crim. App. 2006) . . . .   69

Prystash v. State, 3 S.W.3d 522 (Tex. Crim. App. 1999) . 79, 80

Reed v. State, 744 S.W.2d 112 (Tex. Crim. App. 1988) . . . .   46

Resendiz v. State, 112 S.W.3d 541 (Tex. Crim. App. 2003) . .   79

Roberts v. State, 220 S.W.3d 521 (Tex. Crim. App. 2007) . . .   64

Robison v. State, 888 S.W.2d 473 (Tex. Crim. App. 1994) . . .   57

Russeau v. State, 291 S.W.3d 426 (Tex. Crim. App. 2009) . 55 n.17

Selvage v. State, 680 S.W.2d 17 (Tex. Crim. App. 1984) . . . 45

Shuffield v. State, 189 S.W.3d 782 (Tex. Crim. App.
2006) . . . . . . . . . . . . . . . . . . . . . . 52 n.15

Sparks v. State, No. AP-76,099, 2010 WL 4132769, 2010 Tex.
Crim. App. Unpub. LEXIS 629 (Tex. Crim. App. Oct. 20,
2010)(not designated for publication) . . . . . . . . . 60 n.21

Stuhler v. State, 218 S.W.3d 706, 719 (Tex. Crim. App.
2007) . . . . . . . . . . . . . . . . . . . . . . 80 n.32

Wesbrook v. State, 29 S.W.3d 103 (Tex. Crim. App. 2000) . . . 71

Williams v. State, 301 S.W.3d 675 (Tex. Crim. App. 2009),
cert. denied, 130 S.Ct. 3411 (2010) . . . . . . . . . 45, 69

Williams v. State, 937 S.W.2d 479 (Tex. Crim. App. 1996) 52 n.15

Young v. State, 283 S.W.3d 854 (Tex. Crim. App. 2009),
cert. denied, 130 S.Ct. 1015 (2009) . . . . . . . 49, 52, 58

CONSTITUTIONS, STATUTES, AND RULES

Act of May 25, 2005, 79th Leg., R.S., ch. 399, § 1, 2005
Tex. Gen. Laws 1091 . . . . . . . . . . . . . . . . 78 n.31

Act of May 28, 2005, 79th Leg., R.S., ch. 787, § 7, 2005
Tex. Gen. Laws 2705 . . . . . . . . . . . . . . . . 78 n.31

Act of May 28, 2005, 79th Leg., R.S., ch. 787, § 9, 2005
Tex. Gen. Laws 2705 . . . . . . . . . . . . . . . . 77 n.27

Tex. Code Crim. Proc. Ann. art. 4.04, § 2 (Vernon 2005) . . . . 4

Tex. Code Crim. Proc. art. 37.071, § 2(a)(1) . . . . . . . 78

Tex. Code Crim. Proc. Ann. art. 37.071, § 2(b)(1) (Vernon
Supp. 2010) . . . . . . . . . . . . . . . . . . . 54

Tex. Code Crim. Proc. Ann. art. 37.071, § 2(d)(1) (Vernon
Supp. 2010) . . . . . . . . . . . . . . . . . . . 58

Tex. Code Crim. Proc. Ann. art. 37.071, § 2(d)(2) (Vernon
Supp. 2010) . . . . . . . . . . . . . . . . . . . 77

Tex. Code Crim. Proc. Ann. art. 37.071, § 2(d)(3) (Vernon
Supp. 2010) . . . . . . . . . . . . . . . . . . . 77

Tex. Code Crim. Proc. art. 37.071, § 2(g) (Vernon Supp. 2010) . . . . . . . . . . . . . . . . . . . . . . 77, 77 n.27

Tex. Code Crim. Proc. Ann. art. 37.071, § 2(h) (Vernon Supp. 2010) . . . . . . . . . . . . . . . . . . . . . 4

Tex. Code Crim. Proc. Ann. art. 38.14 (Vernon 2005) . . . . . 46

Tex. Code Crim. Proc. Ann. art. 38.36(a)(Vernon 2005) . . 71 n.25

Tex. Penal Code Ann. § 19.03(a)(2)(Vernon Supp. 2010) 3 n.1, 45

Tex. R. App. P. 25.2(b) . . . . . . . . . . . . . . . . . 4

Tex. R. App. P. 38.1(e) . . . . . . . . . . . . . . . . . 2

Tex. R. App. P. 39.1 . . . . . . . . . . . . . . . . . . 2

Tex. R. App. P. 71.3 . . . . . . . . . . . . . . . . . . 2

Tex. R. App. P. 78.1(a) . . . . . . . . . . . . . . . . . 81

Tex. R. Evid. 103(a)(1) . . . . . . . . . . . . . . . 69 n.24

Tex. R. Evid. 403 . . . . . . . . . . . . 67, 69, 69 n.24, 73, 75

Tex. R. Evid. 404(b) . . . . . . 65, 66, 69, 69 n.24, 70, 71, 72

TREATISES

43 George E. Dix & Robert O. Dawson, Texas Practice: Criminal Practice and Procedure § 31.241 (2d ed. 2001) . . . . . . . 46

43A George E. Dix & Robert O. Dawson, Texas Practice: Criminal Practice and Procedure § 42.241 (2d ed. 2001) . . . . . 80 n.32

No. AP-76,100

| | |
|---|---|
| JOHN HENRY RAMIREZ, Appellant, | IN THE |
| v. | COURT OF CRIMINAL APPEALS |
| THE STATE OF TEXAS, Appellee. | OF TEXAS |

BRIEF FOR THE STATE

TO THE HONORABLE COURT OF CRIMINAL APPEALS:

STATEMENT OF THE CASE

This is a direct appeal by the defendant from a capital murder trial conducted from December 1-8, 2008, in the 94th District Court of Nueces County, Texas, before the Honorable Bobby Galvan. The jury found the defendant guilty of capital murder as alleged in the indictment for robbing a convenience store employee of $1.25 while stabbing or slashing him 29 times with a knife as the latter was returning to the store after carrying trash out to a dumpster. Its answers to the special issues resulted in a sentence of death.

In his appeal from the trial court's judgment and sentence to that effect, the appellant presents six issues for review: one challenging the legal sufficiency of the evidence to support the conviction; one challenging the factual sufficiency of the evidence to support the conviction; one challenging the legal sufficiency of the evidence to support the finding of future dangerousness; one challenging the factual sufficiency of the evidence to support the finding of future dangerousness; one contending that the trial court erred in admitting evidence of extraneous offenses; and, one contending that the punishment

1

charge contained egregious error because it did not tell the jurors what to do if they could not agree on the answer to the future-dangerousness issue.

## STATEMENT REGARDING ORAL ARGUMENT

Although the State believes that the facts and legal arguments are adequately presented in the briefs and record, that the dispositive issues have been authoritatively decided, and that the decisional process would not be significantly aided by oral argument, see Tex. R. App. P. 39.1, because Appellant requested oral argument, the State does as well. see Tex. R. App. P. 38.1(e) & 71.3.

## COUNTER-STATEMENTS OF ISSUES PRESENTED FOR REVIEW

1. The evidence, viewed in the light most favorable to the prosecution, is sufficient for a rational trier of fact to have found the essential elements of the crime beyond a reasonable doubt.

2. This Court should not conduct a factual sufficiency review of the evidence to support the conviction.

3. The evidence, viewed in the light most favorable to the jury's answer to the future-dangerousness special issue, is sufficient for a rational trier of fact to have found beyond a reasonable doubt that there is a probability that Appellant would commit criminal acts of violence that would constitute a continuing threat to society whether in or out of prison.

4. This Court should not conduct a factual sufficiency review of the evidence to support the jury's answer to the

2

future-dangerousness special issue.

5. The trial court did not abuse its discretion admitting evidence of the related robberies during the State's case-in-chief.

6. The trial court properly instructed the jury that if it was unable to agree on the answer to the future-dangerousness special issue, the presiding juror should not sign either form of answer to such issue, and there is nothing to suggest that the jury's unanimous affirmative answer to that issue was as a result of confusion over the "10-12" rule or the court's reading of its instructions.

<u>COURSE OF PROCEEDINGS BELOW</u>

John Henry Ramirez (hereinafter, "Appellant") was charged by indictment on October 7, 2004, with one count of capital murder[1], two counts of aggravated robbery, and one count of evading arrest, all alleged to have occurred on July 19, 2004. (I C.R. at 2-4). However, Appellant was not captured until February 20, 2008. (I C.R. at 11-12; II R.R. at 7-8; XIX R.R. at 29-41). On October 21, 2008, the trial court granted Appellant's motion to sever the capital murder count from the other counts, and the parties agreed that the capital murder case would be tried first. (I C.R. at 227-222; V R.R. at 4-22). A jury was selected for the capital murder case from November 10-19, 2008, (I C.R. at 373-

---

[1]<u>See</u> Tex. Penal Code Ann. § 19.03(a)(2)(Vernon Supp. 2010). The 2005 amendment to Section 19.03 merely added another means of committing the offense and did not pertain to this case.

3

374; IX R.R. - XV R.R.), and the case was tried to it from December 1-5, 2008, (I C.R. at 374; XVI R.R.-XX R.R.; XXIV R.R. at State's Exh. 1-150; XXV R.R. at State's Exh. 151-226). The jury found Appellant guilty of capital murder as alleged in the indictment. (I C.R. at 246, 374; XX R.R. at 48). After receiving additional evidence, (I C.R. at 374-375; XXI R.R. at 16-132; XXV R.R. at State's Exh. 227-233, Defendant's Exh. 3-4; see also XXII R.R. at 4-11), the jury answered the future-dangerousness special issue affirmatively and the mitigation special issue negatively, resulting in a sentence of death. (I C.R. at 254, 256, 375; XXII R.R. at 36-37). The sentence was imposed on December 8, 2008, and the trial court's judgment was signed that day. (XXII R.R. at 37; I C.R. at 258-261, 375).

Appellant filed a motion for new trial on January 12, 2009, (I C.R. at 280-323; see also I C.R. at 324-347), that was heard on February 5, 2009, (I C.R. at 375; XXIII at 5-166, State's Exh. 4, 6-28, Defendant's Exh. 1-3), and denied on February 15, 2009. (I C.R. at 358, 375).

Appeal to this Court is automatic, pursuant to Tex. Code Crim. Proc. Ann. arts. 4.04, § 2 (Vernon 2005), & 37.071, § 2(h) (Vernon Supp. 2010) and Tex. R. App. P. 25.2(b). (See also I C.R. at 262 [January 12, 2009, Notice of Appeal]).

<u>STATEMENT OF FACTS</u>

<u>Guilt Phase</u>

In July of 2004, 23-year-old Christina Chavez was involved in a relationship with Angela Rodriguez. They each had children

4

and all lived together in San Antonio. On the weekend before July 19th, they made arrangements for the care of their children and the two of them came to Corpus Christi to stay at Rodriguez's mother's house. Rodriguez's younger sister, 21-year-old Ruby Garcia, and Garcia's children lived there as well. (XVIII R.R. at 113-119, 131-132, 157-164, 237-240, 257-259, 266).[2]

Appellant was a friend of Rodriguez and Garcia but was not welcome in their mother's home. Nonetheless, he met up with Rodriguez and Chavez there on the weekend that they were visiting. While there, Appellant--who they called "Guero" or "White Boy John"--took out a serrated knife that was about 8" long and was playing with it. (XVIII R.R. at 125-128, 181-182, 241-242, 260).

When Rodriguez's mother discovered that Appellant was in her home and made him leave, Rodriguez and Chavez went to a friend's house, where Garcia and Appellant later picked them up. After going to a restaurant, Chavez, Rodriguez, and Appellant dropped Garcia off at her house and returned to Rodriguez's friend's house, where they took some of the friend's things to pawn in order to get money for drugs. During the time they were driving around together in Appellant's van, he showed Garcia his knife.

_____

[2]Chavez testified that, as a driver at the capital murder scene and as a party to the two related robberies, she entered into a plea bargain agreement with the State whereby she pleaded guilty to three counts of aggravated robbery, for which she received concurrent 25-year sentences, and agreed to testify truthfully in any case involving Appellant or Rodriguez. (XVIII R.R. at 119-124, 178-180).

(XVIII R.R. at 127-129, 252-255, 265).

Appellant, Chavez, Rodriguez, Garcia, and others "partied" for three days, using Xanax, "psych meds," cocaine, marijuana, and alcohol, until they ran out of money and drugs on July 19th. Appellant dropped Rodriguez, Garcia, and Chavez off at Rodriguez's and Garcia's mother's house but he returned at around 7:30 p.m. and picked up Rodriguez and Chavez. The three then came up with the idea to "grab some people" and take their money. Chavez said they did not have a plan to rob any specific place or person; rather, they were just going to go look for someone to rob. Appellant had the knife that Chavez had seen earlier. (XVIII R.R. at 129-134, 166, 176-178, 181-182, 243-246, 260-261).

The three set out in two maroon vans. Chavez was driving one in which Rodriguez was a passenger and Appellant was in the other one. At around 10:30 p.m., they ended up at a Times Market convenience store at 1902 Baldwin and Riggan, where Lydia Salinas and Pablo Castro happened to be working. Salinas was the cashier and manager and Castro cleaned, stocked the cooler, and took out trash. About a half hour earlier, Salinas told Castro, whom she had known for 10-15 years, that it was his turn to buy dinner. He replied that he couldn't because he only had a dollar. So, Salinas called her sister and asked her to bring them some food. When her sister arrived, Salinas saw her drive by the front of the store and park on the other side. When her sister brought the food into the store, Salinas asked her why she had parked where she did. She replied that there were some people in front working

on a van. (XVI R.R. at 41-45, 47-52; XVIII R.R. at 134-135, 185-186).

Although Chavez said that none of the three went into the store, Salinas said that after she and Castro had eaten, a woman she had never seen before but later identified as Rodriguez came in around 11:00, asked to use the "facilities," and left promptly after doing so. Shortly thereafter, as Salinas was counting the money, Castro said that he was going to throw out the trash. (XVI R.R. at 53-56, 71-77, 84; XVIII R.R. at 186-187).

Just before this, Mariano Cervantes and Kashif Butt got off work at another convenience store about two blocks away and decided to go to a self-serve car wash across Riggan from the Times Market to wash their cars. They arrived around 11:30 and began washing their cars. (XVI R.R. at 86-90, 194-197).

Chavez said that a man had come out of the store with a trash bag and was heading in the direction of the car wash when Rodriguez got out of the van they were in to ask him something. Rodriguez then came back. Then, Chavez said, all of a sudden she saw Appellant fighting with the man and Rodriguez went back to see what was going on. Chavez said that she saw Appellant just stabbing the man "too many [times] to count" with the same knife he'd been playing with earlier until the man fell on his knees and then on his back. Chavez said that "[t]hen I see John pointing to Angela, like -- he was just pointing, so she went and picked his pocket." She said, however, that she never saw either Rodriguez or Appellant actually take anything from the man. She

7

also claimed that Rodriguez was trying to get Appellant off the man. Chavez said that Rodriguez then came back to her van and dropped $1.25 on the console. Chavez claimed she didn't remember if Rodriguez said anything but that as far as she knew, the money came from the man's pockets. She said that Appellant went to his van. Chavez could see the man lying down gasping for breath as they took off. (XVIII R.R. at 135-141, 164, 169-172, 182-186).

Butt said that as he and Cervantes were about to wash their cars, he heard some noises coming from the Times Market parking lot across the street. It sounded like someone arguing or fighting. Butt alerted Cervantes, who said that it looked like a lady and a man were hitting an older man really hard. The older man was between the younger man and the woman and both appeared to be hitting the older man in the chest, arm, and face. The man looked like he was trying to get out of the way. Cervantes told Butt that they should try to help the man and after he put the nozzle back in the holder, they headed across the street. Butt said that the Hispanic male and female were punching the man in the face and kicking him, that they beat him until he dropped, and even then continued to kick him. He added that both the male and the female seemed to be doing an equal amount of hitting. He said that the older man was trying to defend himself by blocking the punches and kicks by putting his arms up to ward off the blows. He could not see any weapons in the hands of either the assailants or the victim. He didn't see any downward stabbing motions but rather forward punching motions. Cervantes also said

8

that he did not notice any weapons. He said that the female assailant was wearing white t-shirt and baggy pants. (XVI R.R. at 90-93, 101, 127, 136, 197-203, 207, 219-220, 223).

Butt said that after the man fell down, the male and female assailants went through the man's pockets. Butt thought that they got something out of the man's pocket but he couldn't tell what it was. The two assailants then left the scene in two vans.[3] (XVI R.R. at 202-207, 216-219, 221-224). Cervantes said that it looked like "they" and/or "the girl" were reaching in or taking things from the man's pockets before leaving the scene in two vans.[4] (XVI R.R. at 92-95, 125, 132-135).

Both Cervantes and Butt said that the area was well lit and that their view of the crime scene--about 30-35 yards away--was unobstructed. Indeed, Cervantes was able to recognize the male assailant as a high school classmate as soon as he saw him, although he didn't know his name. (XVI R.R. at 102-104, 108-110, 122-123, 126-127, 135, 140-141, 209, 215-216, 220-221).

As soon as Cervantes and Butt reached the man, it was

---

[3]While at trial, Butt initially said that they left in one van, (XVI R.R. at 204-206, 216), after reviewing the statement he made to the police at the time--four-and-a-half years earlier--he said that it was two vans. (XVI R.R. at 206-207, 216-218).

[4]While at trial, Cervantes initially said that he didn't see anyone going through the man's pockets, (XVI R.R. at 92-93, 126), and that he couldn't remember the color of the vans, (XVI R.R. at 94, 134), after reviewing the statement he made to the police at the time, he recalled that he had been able to tell them the color of the vans, and that it looked like "they" and/or "the girl" were reaching in or taking things from the man's pockets. (XVI R.R. at 99-102, 126, 129, 135)

apparent that something more serious than a beating had happened. Cervantes said the man was lying face up and had blood on his face. While he was conscious, he wasn't responding. Cervantes said that the man's head tilted back and he could see a severe gash in his throat. Although he only recalled seeing the cut on the man's neck, Cervantes said that there was a lot of blood on his shirt as well. Butt also said that there was blood coming from the man's throat, that he was bleeding badly, and that his face was swollen from being struck. Butt said that the man was barely alive. A photograph was admitted that depicted what Cervantes and Butt encountered upon reaching the man. Cervantes tried to comfort the man, who was gargling blood. (XVI R.R. at 95-99, 110-119, 207-208, 212-213; XXIV R.R. at State's Exh. 17).

About this time, a young girl walked into the store and told Salinas that there was a man lying outside, bleeding. Thinking that Castro had already come back from taking out the trash, Salinas announced that she was going outside and proceeded to do so, where she saw someone lying in a pool of blood. She ran back into the store and dialed 911, continuing to call out for Castro. While this was going on, Cervantes tried to keep the man alert and assure him that help was on the way. But the man stopped moving and stopped breathing. Salinas then went back outside, noticed Castro's shoes and hat were lying there, realized it was him lying between her truck and the dumpster, and started screaming. Cervantes, Butt, and a neighbor were all screaming, "He's dead," and the neighbor prevented Salinas from approaching

10

Castro's body (XVI R.R. at 56-59, 83, 97-98, 207-208).

Corpus Christi Police Department (CCPD) officer Michael Wenzel was dispatched to the scene a little before 11:30 p.m. based upon a 911 trauma call and arrived within a minute. The first thing he noticed was a dumpster and a man lying on the ground in a big pool of blood with people standing around him. Wenzel checked on the man, who was not conscious or breathing and appeared to be dead. He contacted the dispatcher to say that he needed more units, a supervisor, and I.D. personnel. Paramedics were already en route. The body was about six feet from the dumpster and it looked like the man had been stabbed in the neck or that his throat had been slashed. At that point, Wenzel didn't see any other wounds. (XVI R.R. at 142-155).

As soon as his backup arrived and was able to protect the crime scene, Wenzel made contact with Cervantes, Butt, and Salinas, the last of whom identified Castro as the victim. From Cervantes and Butt, Wenzel was able to get a description of the assailants and what they were wearing, and learned that the female assailant had gotten into the passenger side of a red conversion van and that the male assailant had gotten into the driver's side of another red conversion van and had fled the scene. Wenzel had this information broadcast ("BOLOed") to alert other officers to be on the lookout for these vehicles and persons. (XVI R.R. at 155-163, 206-207, 209).

Meanwhile, Appellant, Rodriguez, and Chavez went to a paint and body shop so Appellant and Rodriguez could rinse off the

blood they had on them. From there, the three went to a Whataburger restaurant near the intersection of Baldwin and Staples. Appellant was still in one van and Chavez and Rodriguez were in the other one. (XVIII R.R. at 142-144, 166-168).

April Metting was in the drive-through lane of that restaurant sometime after 11:00 p.m., looking at the menu board with her two-year-old son in the back seat, when a female[5] approached her window and asked if Metting had a phone she could use. The woman said she had just gotten into a fight and pointed to blood stains on her shirt. Metting said the woman was wearing a white t-shirt with blood on it. Metting told her to go in the restaurant and use the phone there. At that moment, a man whom Metting later identified in the courtroom as Appellant, jumped up, put a knife at her neck, and told her to give him all her money. Metting screamed, grabbed the knife, and pushed it back,

---

[5]It is not clear whether this was Chavez or Rodriguez. Metting said that she later learned it was Chavez and referred to the woman as Chavez throughout her testimony. She said that the woman was wearing a black rosary. (XVI R.R. at 229, 231-233, 235, 244, 250-251, 254). On the other hand, Chavez testified that Appellant and Rodriguez had robbed Metting, after which Rodriguez told her to get out of the van she was in and into the other van. (XVIII R.R. at 143-145). As will be discussed, after being captured, both Chavez and Rodriguez were returned to the Whataburger, where one officer said that Metting identified Chavez, and another officer said "they" were identified. (XVII R.R. at 61-62, 147). Chavez also said that either she or they were identified at the Whataburger show-up. (XVIII R.R. at 155). It is not clear from the photos of them if either was, or both were, wearing a black rosary. (XXIV R.R. at State's Exh. 74-75, 77-78). Chavez said that she did not know why Metting would have identified her as she stayed in the van as Appellant and Rodriguez were doing everything. (XVIII R.R. at 165-167).

cutting her fingers in the process. Metting then gave Appellant her purse, in which she had a black and red wallet containing a money order, photos, a credit card, and maybe $30-40 in cash, and said, "Please, don't do this in front of my son." But Appellant grabbed her from the back of her neck with one hand and again put the knife to her neck while saying, "Shut up, bitch." The female also told her to shut up. Appellant and the woman then walked away, got into one of two vans in the parking lot, and drove off. At that point, a restaurant employee came out. Metting told her to go get the license plate number. The employee did so and the two waited for the police to arrive. Metting said the knife Appellant held to her neck had a fixed blade that had ridges on it. She thought it was around six inches long. Metting was familiar with the Times Market where the murder had occurred and estimated it was a mile or two away. (XVI R.R. at 225-259; XVIII R.R. at 166-169; XXIV R.R. at State's Exh. 25-41).

CCPD officer Tanya Flores Oelschlegel was working the graveyard shift when she overheard a dispatch for a robbery with injuries at the Times Market, followed by the BOLO for the persons and vehicles involved in that incident. She passed by the scene and saw it was secured so decided to check the streets in the area. Within minutes of the first call, she heard another call go out for an aggravated robbery at the Whataburger, which she said was less than a mile from the Times Market, so she proceeded to the Whataburger location. Upon arrival, Oelschlegel saw a maroon van parked in the area near the drive-through lane.

13

She contacted Metting, who was crying, terrified, and holding her child. Metting recounted the details of her robbery and described her assailants and their vehicle. Oelschlegel put out another BOLO, which was very similar to that from the Times Market homicide. (XVII R.R. at 38-56, 62; XXIV R.R. at State's Exh. 59).

At approximately the same time, CCPD Lt. Kelly Isaacks, who was then working as a detective, was called and advised to go to the Times Market, where it appeared that a clerk had been beaten, robbed, and had died. She arrived and spoke with officers on the scene, who informed her that an aggravated robbery had been called in from the Whataburger about ten minutes after the assault on Castro had been called in. The proximity of the two incidents in time and location, the similar descriptions of the parties and vehicles involved in both incidents, and the fact that a knife was used in both incidents, led Isaacks to believe that the two were related. She therefore sent another detective to the Whataburger location. She then spoke briefly with Cervantes, Butt, and Salinas. The former two were very confident they could make an identification if they saw the assailants again; the latter identified Castro as the victim. Cervantes and Butt provided a very good description of the assailants and the vans they left in. (XIX R.R. at 5-26, 47).

CCPD crime scene technician Allen Kirksey was dispatched to the Times Market scene at 11:47 p.m. regarding an injured party. Upon arrival, however, he discovered that it was actually a homicide scene. Kirksey spoke with Wenzel and Isaacks directed

14

his attention to several items she had identified as evidence, including a gold ring in the blood next to Castro's body and some papers that were lying nearby. Salinas identified the ring as belonging to Castro. Kirksey then took notes, located physical evidence, photographed the scene, and collected the physical evidence. One of those items was an envelope with "Pablo" written on it and with what appeared to be blood on it, containing a pay stub made out to Castro. Another was a 25¢ coin. Various photographs of Castro, the scene, and the surrounding area were admitted and described by the witnesses. Salinas noted that there was a security light on a pole that illuminated the store's parking lot and that the area was always well lit. (XVI R.R. at 59-84, 104-129, 131-132, 164-193, 210-214; XVII R.R. at 210-241; XVIII R.R. at 95-98; XIX R.R. at 17-20; XXIV R.R. at State's Exh. 1-15, 17-24, 90-104).

Meanwhile, having successfully robbed Metting, Appellant, Rodriguez, and Chavez drove to another Whataburger near the intersection of Texan Trail and Alameda. Ruby Pena Hinojosa was at the menu board in the drive-through lane at that restaurant during her "lunch" break on the night shift at a nearby hospital, when she said a maroon van pulled up to her right side. A woman got out, went to Hinojosa's passenger side window, and asked if she could use her cell phone. Hinojosa gestured, "No, go inside." As she was pointing at the restaurant, a man whom she later identified in the courtroom as Appellant, suddenly appeared at her driver's side window. He put a knife to the side of her neck

15

and asked for her money. She told him she didn't have any. After
Appellant gestured again, Hinojosa was able to pull away from him
and hit the remote control to raise her window. When she did so,
Appellant kind of "swaggered back" and was able to withdraw his
hand. Appellant then went around the back of Hinojosa's car to
the passenger side and started repeatedly banging at her window
with the knife as the woman was watching. Hinojosa thought
Appellant was going to break her window so, because there was a
car in front of hers, she backed up and the two assailants left
in the van down Texan Trail without getting any money. After they
left, Hinojosa pulled up to the pick-up window and called the
police on her cell phone. Hinojosa said that she remembered
Appellant's face as he was about twelve inches away from her, the
area was well lit, and nothing obscured her view of him. She said
that the knife was 5-6" long and had a serrated blade. She said
that the female assailant had long, wavy hair and was thin.[6]
(XVII R.R. at 8-37; XVIII R.R. at 145-147; XXIV R.R. at State's
Exh. 44-58).

CCPD officer Greg Kinane had heard the BOLOs regarding the
Times Market and first Whataburger incidents and was headed in
that general direction, hoping to intercept the vans, when he
heard another broadcast at around 11:40 p.m. regarding the second
Whataburger incident. Because he was in the vicinity, he answered
that call, where he met Hinojosa. She was able to give him a

---

[6]According to Chavez, it was Appellant and Rodriguez who
attempted to rob Hinojosa. (XVIII R.R. at 146).

description of her assailants, their vehicle, and the direction
they were headed. Because the information he received from
Hinojosa matched that from the earlier BOLOs, Kinane put out
another one, saying that a red van with a Hispanic male and two
Hispanic females was going in the direction of Staples and Ray
High School from the location of the Whataburger on Texan Trail.
He also noted that a serrated-blade knife had been used. Kinane
estimated the distance between the two Whataburgers was about a
mile and a half. He estimated that the Times Market and two
Whataburger incidents had all occurred within fifteen minutes.
Det. Isaacks said that she received a report of the second
Whataburger incident about seven minutes after the first one. She
was confident that the suspects were moving and continuing to
commit offenses. She dispatched another detective to the Texan
Trail Whataburger. (XVI R.R. at 260-275; XVII R.R. at 6-7; XIX
R.R. at 27-29).

CCPD officer James Gray and his partner, Chris Crago, were
working the downtown area when they heard the broadcasts about
the Times Market and Whataburger incidents. They were driving
southbound on Staples en route to the second Whataburger location
when they met a maroon van matching the description of the
suspect vehicle heading in the opposite direction. As it passed
their unit, they shined their spotlight on it and saw a female
and a male he later identified in the courtroom as Appellant in
the front seats. The officers made a U-turn, turned on the lights
of their marked unit, caught up with the van, and initiated a

17

traffic stop. When the van pulled over and stopped, Gray exited the passenger side of his unit with a shotgun. As soon as he did so, the van took off again and turned on Brownlee, where it accelerated hard. The officers fell in behind the van with their lights and siren on but the van was going up to 70 m.p.h. in a residential area. Because the van kept running stop lights whereas the officers had to slow down for each intersection, by the time they reached Leopard, the van was already going under I-37 about two blocks ahead of them. The van took a right on Winnebago and that was the last time the officers saw it. Gray said that they had pursued the van for two miles. While doing so, they continued to broadcast its description, direction, and speed. As it happened, this pursuit started in the vicinity of the first Whataburger incident, where Ofr. Oelschlegel and Metting were still at the scene. Oelschlegel had just heard a broadcast regarding the second Whataburger robbery when she noticed a maroon van driving on Staples that matched the description of the one that fled and she saw an officer behind it attempting to pull it over. Metting pointed at the van as it went by and said, "Yeah, that looks like it, that looks like the van." (XVII R.R. at 59-61, 63-96; XXIV R.R. at State's Exh. 60).

Chavez said that during this pursuit, Appellant was driving the van, Rodriguez was in the passenger seat, and she was in the back. She said there was no doubt that the police were chasing them. As they did so, Chavez was trying to pour vodka out the window. She ended up falling on the floor and couldn't get back

up because Appellant was driving too fast.  Appellant never
stopped until he drove into an area surrounded by bushes
somewhere on the north side of town. Appellant and Rodriguez
attempted to punch or kick a window open on the van so that they
wouldn't have to open a door and cause the interior light to come
on. When they were unable to do so, they opened a door and all
jumped out and started running. Rodriguez fell and Appellant
helped her up. They started running again. As Chavez emerged from
the bushes on top of a ditch, she could see nothing but police
cars converging on the area. She turned around and saw Rodriguez
sitting on the grass. She could no longer see Appellant. As
Appellant had been hitting the window, Chavez noticed that his
hand was wrapped up. She didn't know if he had injured it
earlier. (XVIII R.R. at 148-154, 178-180).

        As Chavez noted, by this time, police from all over town had
heard the broadcasts and calls for all available units and had
begun converging on the area. Among those was CCPD officer Mike
Frakes, who was driving with only his spotlight on in an isolated
area about a mile from where the van had been last seen. Frakes
saw what appeared to be a red reflector in a wooded area and
shined his spotlight in that direction. There, he could see what
looked like the right rear corner of a red van that had been
driven about 40 yards off the road into brush so thick that one
could hardly walk through it. He and Officer Delgado, a back-up
officer Frakes had called for, approached what turned out to be
an older Ford conversion style van with their guns drawn but

19

found it to be empty. Frakes said the engine was hot so he could tell it had just been abandoned. Knowing that whoever drove it was probably nearby, he broadcast that information. (XVII R.R. at 98-121; XXIV R.R. at State's Exh. 70-73).

CCPD officer Ralph Vasquez was in the vicinity and heard Frakes's and Delgado's broadcast. He circled around to the other side of the brushy area to see if he could locate the suspects. Although it was pitch dark, Vasquez noticed something moving so he went in that direction where he found two females by a ditch matching the description that had been broadcast. One was sitting down and one was standing up. Because Vasquez said they were acting kind of "crazy," when he got out of his unit, he drew his weapon and ordered them not to move. He said the one sitting down, who was subsequently identified as Chavez, complied with his order but the other one, subsequently identified as Rodriguez, was making  aggressive moves toward him, yelling and screaming, "Well, shoot me, go ahead and shoot me." (XVII R.R. at 122-137, 144-146, 152-154; XXIV R.R. at State's Exh. 76).

CCPD officer Robert Chapa heard Vasquez radio that he had someone at gunpoint by the railroad tracks, so he went to that location where he heard Vasquez ordering the females to get on the ground and saw that one was not complying. Chapa tackled and arrested her and Vasquez proceeded to arrest the other one. Chavez acknowledged that Rodriguez was combative. (XVII R.R. at 130, 145, 155-172, 174; XVIII R.R. at 155).

Vasquez said that Rodriguez was wearing a white sports bra

20

and jean shorts and that Chavez was wearing gray warm-up pants
and a white muscle shirt. Once Chavez and Rodriguez were placed
in police cars, Vasquez and Chapa said they were laughing,
giggling, and making faces at each other like it was all a big
joke. Both Vasquez and Chapa believed that Chavez and Rodriguez
were under the influence of drugs or alcohol. (XVII R.R. at 140-
144, 146, 148-154, 174; XXIV R.R. at State's Exh. 74-75, 77-78).

Vasquez and Chapa transported Chavez and Rodriguez back to
the first Whataburger location in separate cars. There, Metting
identified at least Chavez and perhaps Rodriguez as well.
Cervantes, who was also there, said that Rodriguez looked like
the female assailant he had seen but he wasn't 100% sure as she
was by then just wearing a sports bra rather than the shirt he'd
seen the assailant wearing earlier. Chavez acknowledged that
either she or both were identified at the Whataburger. After
that, Chavez and Rodriguez were transported to the police
station. (XVI R.R. at 128-131; XVII R.R. at 61-62, 146-148, 172;
XVIII R.R. at 155).

There, CCPD crime scene investigator John Prebul took
photographs of the two of them. He noted that Rodriguez was not
wearing shoes.  Then, after Det. Isaacks collected their
clothing, which appeared to have blood stains, Prebul sent it off
to the Department of Public Safety (DPS) lab for analysis. It
appears that specimens of Chavez's and Rodriguez's blood were
also obtained at this time and submitted to the DPS lab for
analysis. (XVIII R.R. at 188-207, 217-220; XIX R.R. at 41-43; XXV

21

R.R. at State's Exh. 171-188, 190-191, 194).

Meanwhile, back in the area where the van was abandoned, a search was underway for the male assailant and any related evidence. Isaacks said that the search efforts were unprecedented, involving nearly every uniformed CCPD officer, a Coast Guard helicopter, and bloodhounds from a nearby prison. Just after Chavez and Rodriguez had been apprehended, CCPD officer Victor Casares found a white hand towel or rag that appeared to have fresh blood. CSI Prebul later sent the towel to DPS for analysis. CCPD officer Frank Perez found a black sandal with blood on it lying close to where the van was found. (XVII R.R. at 82, 172-173, 175-202; XVIII R.R. at 206-217, 220; XIX R.R. at 29-31; XXIV R.R. at State's Exh. 79-89; XXV R.R. at State's Exh. 189).

While this was going on, across town, at around 12:30 a.m., Garcia heard a knock at the door of the house she shared with her and Rodriguez's mother. It was Appellant, who she said was drenched in sweat and gasping for breath like he had been running. His clothes were soiled and had pieces of grass on them. He was wearing a white shirt and gym shorts. He had a cut on his right hand, which was bleeding profusely. Garcia asked Appellant what was wrong and he said that they had stabbed someone. Worried about her sister, Garcia asked Appellant where she was. He replied that he didn't know--"that they got away...and that he stabbed her." Garcia asked where Rodriguez was and Appellant said, "I don't know, Whataburger." Garcia told Appellant to

22

leave. When she did so, Appellant had a look on his face like what was he going to do and paused like he wanted to stay there, but then he took off running. Garcia then drove off to look for Rodriguez, believing that she had been stabbed and was hurt. (XVIII R.R. at 246-252, 255-256, 262-265).

The search for the male suspect continued all night and into the following day to no avail. However, early that morning, the police were able to identify a suspect through the vehicle registration of the van that had been left behind at the first Whataburger location. With that information, they obtained a mug shot of Appellant, which they showed to Ofr. Gray, who recognized him as the person he saw driving the van. Appellant's identity and his photo were then disseminated to everyone involved in the search for him. The following day, Garcia contacted Det. Isaacks and recounted the details of Appellant's early morning return to her house. It was then that Isaacks realized that Appellant had eluded the manhunt. (XVII at 97, 172-173; XIX R.R. at 31-36).

The Dodge van that had been left behind at the first Whataburger location was impounded and taken to a CCPD garage to be processed for fingerprints and other evidence. The Ford van that was involved in the chase and driven into the brush was also taken to the garage. (XVII R.R. at 57-59; XVIII R.R. at 22; XXIV R.R. at State's Exh. 59).

The morning after crime scene tech Kirksey left the Times Market crime scene, he went to the Nueces County Medical Examiner's office and attended Castro's autopsy to photograph the

23

injuries, collect any physical evidence, and take postmortem fingerprints. He noted that Castro's t-shirt had four slits in the back that appeared to be where a knife entered the shirt and similar slits on the front and that both it and Castro's jeans appeared to have blood on them. For that reason, Kirksey submitted them to the DPS lab for DNA analysis. He also retrieved a vial of Castro's blood from the medical examiner and took it to the DPS lab to be used to compare with the blood on the items submitted for analysis. Kirksey also collected a control sample from the envelope containing the pay stub he had found by Castro's body. (XVIII R.R. at 6-21, 98-99; XXIV R.R. at State's Exh. 105-108).

Dr. Rey Fernandez, the Nueces County Medical Examiner, performed that autopsy. He said that Castro had his clothes on when he was brought to the morgue and that the cuts on his shirt corresponded to the cuts on his body and were consistent with knife wounds. Castro had 29 sharp force injuries, including 10 stab wounds and 19 incised wounds, eight of which were defensive wounds. The depths of some of the wounds were consistent with being stabbed with a 6" knife. Castro had four stab wounds on his upper back, all of which were at least 4" deep and one of which went into his left lung and was a fatal injury. He had two fatal stab wounds on his neck, one of which cut the external jugular vein, and the other of which severed the carotid artery and the internal jugular vein. He also had stab wounds in the areas of both collar bones, on the front of his left shoulder, and on his

24

left upper arm, and incise wounds on his chin, lower neck, nose, eyelid, ear, and behind the ear. Some of those wounds were consistent with Castro getting cut while moving around trying to get away from the attack. He also had defensive wounds on his forearm and hands. Additionally, Castro's eyelid and neck were bruised and he had lacerations on his lip. Fernandez said that the cause of Castro's death was multiple sharp force injuries, consistent with being stabbed by a knife. He could not say whether the wounds were from a serrated knife or not. There was no evidence of alcohol, marijuana, cocaine, heroin, or any other abusive or illegal drugs in Castro's body. The manner of Castro's death was classified as a homicide. (XIX R.R. at 125-126, 129-187; XXIV R.R. at State's Exh. 105; XXV R.R. at State's Exh. 199-226).

After attending the autopsy and collecting evidence there, Kirksey then went to the CCPD impound warehouse, where he photographed the interior and exterior of the Ford van, including the contents found inside it. He then inventoried all of the contents, collected any physical evidence, collected blood swabs from it, and processed it for latent fingerprints. Among the items he found and processed were: a white t-shirt with apparent blood on it; a dollar bill; a cigarette lighter with an apparent bloodstain on it; another wadded up dollar bill with apparent bloodstains on it that had a pizza receipt with apparent bloodstains on it inside the bill, found underneath a pair of jeans; a vodka bottle with apparent bloodstains and bloody

fingerprints on it; a VISA bank card with the name Gilbert Lopez on it that appeared to have bloodstains on it; and, a red wallet containing Metting's identification, under which was a photograph of a young boy. Kirksey then looked for possible bloodstains or samples in the van and found them on the steering wheel and its cover, the driver side door armrest[7], the passenger side door pocket, and the gear shift. He then submitted the items themselves or samples of what he believed to be blood on them to the DPS lab for analysis. Kirksey was also able to lift a number of latent fingerprints from the van and its contents, including one from the driver's side mirror and one from the backside of the photograph of the young boy. (XVIII R.R. at 21-49, 55-94, 99-109; XXIV R.R. at State's Exh. 43, 72, 109-142, 148-150; XXV R.R. at State's Exh. 151-164, 166-168, 170).

He then conducted a similar procedure on the Dodge van. Among the items Kirksey found in it was a CD case with "White Boy John" written on the inside cover, from which he was able to lift a latent fingerprint. He also found what appeared to be a bloodstain on the passenger door handle. (XVIII R.R. at 49-55, 73-74, 90-92; XXIV R.R. at State's Exh. 59, 143-147; XXV R.R. at State's Exh. 165, 169).

Det. Isaacks testified that the police tried for years to find Appellant. They asked for assistance from the F.B.I., formed

---

[7]Despite Kirksey's testimony that this was the passenger side armrest, his photographs suggest that this was really the driver's side armrest. (Compare XXIV R.R. at State's Exh. 129-131 with State's Exh. 136-140).

a task force with the U.S. Marshals service, monitored his family around holidays, set up a "trap and trace" on his grandmother's phone, had the case highlighted on "Crime Stoppers," and even were given a segment on "America's Most Wanted" that was broadcast nationally. They followed every tip but had no luck until the U.S. Marshals task force finally apprehended Appellant on February 20, 2008, near the Texas-Mexico border. Once in custody, specimens of his blood were obtained and submitted to the DPS lab for analysis. (XIX R.R. at 36-48; XXV R.R. at State's Exh. 194-195).

CCPD latent fingerprint examiner Marsha Parker fingerprinted Appellant and compared his known prints to the prints collected in the two vans and their contents. She found that his prints matched those found on the driver's side mirror on the Ford van, on the back of the photograph of the young boy found in the Ford van, and on the CD case found in the Dodge van. (XVIII R.R. at 222-236; XXV R.R. at State's Exh. 168-170, 192-193).

DPS crime lab manager Pamela Smith was a DNA examiner at the time the lab received blood samples from Castro, Rodriguez, and Chavez, and did the DNA profiles on their blood. By the time that Appellant had been apprehended and his blood samples were received, Smith had been promoted to lab manager, where she supervised thirteen people, five of whom work with DNA, including Robin Olson-Castro, who did the DNA profile on Appellant's blood. Smith reviewed Olson-Castro's work and her report pertaining to this case and agreed with the results she obtained. Smith and

27

Olson-Castro prepared two charts: one showing all of the evidence that had been submitted, whether or not the items were tested and compared to the known DNA profiles of Castro, Chavez, Rodriguez, and Appellant, and if so, what the results were; and, the other showing more detailed information on each of the pieces of evidence that had been tested and, except in one instance, positively linked to one or more of them. Smith also provided a copy of the notes she took as she examined each item of evidence other than the swabbings, showing the stains that were tested and where they came from. (XIX R.R. at 49-81; XXV R.R. at State's Exh. 196-198).[8]

The results of such analysis were as follows: blood on the Ford van's passenger handle was found to be Appellant's; blood on the Ford van's steering wheel was found to be a mixture of Castro's and Appellant's; blood on the jeans Castro was wearing was found to be his; blood on the t-shirt found in the Ford van was found to be Castro's; epithelial cells on that t-shirt were found to be a mixture of Appellant's, Rodriguez's, and Castro's; blood on Metting's husband's bank card, found in the Ford van, was found to be Appellant's; blood on the vodka bottle found in the Ford van was found to be Castro's; blood on the pizza receipt found in the Ford van was found to be a mixture of Rodriguez's and Castro's; blood from the Dodge van's front passenger side

---

[8]The copy of the reporter's record that the State is using in preparation of this brief is missing pages 49-51 of State's Exh. 198. (XXV R.R. at State's Exh. 198).

door arm rest was found to be Castro's; blood on the dollar bill
found under the pants in the Ford van was found to be a mixture
of Castro's and possibly Chavez's and/or Rodriguez's; blood on
the Ford van's gear shift was found to be Castro's; blood on the
cigarette lighter found in the Ford van was found to be
Appellant's; blood on the Ford van's steering wheel cover could
not be interpreted; blood from the envelope containing the pay
stub found in the Times Market parking lot was found to be
Castro's; blood from the Ford van's passenger side door pocket
was found to be Appellant's; blood from Chavez's tank top was
found to be a mixture of Castro's and possibly Chavez's and/or
Rodriguez's; blood from another stain on that tank top was found
to be Appellant's; blood on Rodriguez's shorts was found to be a
mixture of Castro's and possibly Chavez's and/or Rodriguez's;
blood from another stain on those shorts was found to be
Castro's; blood from the towel found in the brush near where the
Ford van was abandoned was found to be Appellant's; blood from
another stain on that towel was found to be a mixture of
Appellant's and an unknown individual; and, blood from the bottom
of the sandal found near where the Ford van was abandoned was
found to be Castro's. (XIX R.R. at 87-119, 127; XXIV R.R. at
State's Exh. 85, 106-108, 148, 150; XXV R.R. at State's Exh. 151,
153, 155-160, 162-167, 189-191, 194-195, 197).

At trial, Metting identified the wallet that Kirksey found
in the Ford van as the one that Appellant took from her at the
Whataburger. She also identified the bank card that Kirksey found

in that van as her husband's, which had been in the wallet. (XVI R.R. at 247-250; XXIV R.R. at State's Exh. 42-43).

Salinas said that she learned through the news that Appellant was involved in the crime. She recognized him as a customer who used to visit friends in a house next door and said that he was familiar with the store. She also identified Rodriguez in a photo lineup. (XVI R.R. at 67-68, 76-77).

Cervantes and Butt identified Appellant in the courtroom as the person they saw attacking Castro. (XVI R.R. at 102-103, 209-210). Chavez identified Appellant in the courtroom as the person she saw stab Castro. (XVIII R.R. at 137-138). Ofr. Gray identified Appellant in the courtroom as the person he saw driving the van that eluded him during the pursuit. (XVII R.R. at 71). Garcia identified Appellant in the courtroom as the person who came to her house with his hand cut soon after the crime and said that they had stabbed someone. (XVIII R.R. at 256). Chavez said that Appellant told her he was going to keep the knife as a souvenir. (XVIII R.R. at 156).

<u>Punishment Phase</u>

Records of Appellant's military service were admitted, which reflected the following: Appellant came from a broken home and had a long history of being violent and acting out his needs. He indicated that his family had a long history of legal problems due to a history of violence. Although he indicated that a history of physical and emotional abuse resulted in his mother losing custody of him, that must have been inaccurate or only

30

temporary because Appellant listed her as his next of kin and as
his life insurance beneficiary and had her name tattooed on his
chest. He claimed to have had a history of remedial education or
of learning disorders, and to have been treated with Ritalin for
ADHD; however, he denied having any developmental delays.
Appellant graduated from high school in May, 2002, on schedule
and with average grades but had a history of suspensions for
disrespecting teachers and fighting with other students;
Appellant indicated that he got in fights nine times a year. (XXV
R.R. at State's Exh. 231).

He enlisted in the U.S. Marine Corps (USMC or Marines)
Reserve for eight years in October, 2002, but less than two
months later, he requested to be instead enlisted in the regular
component of the Marines for four years. At the time of
enlistment, Appellant indicated that he had previously smoked
marijuana twenty times, with the last time being in June, 2002.
He completed combat training, achieved an expert rifle score, was
trained as an electrician and a field radio operator, received
good conduct and national defense service medals, and was
promoted to grade E-2. However, Appellant then went absent
without leave on July 2, 2003, reportedly due to an inability to
see his fiancee, was deemed a deserter the following month, was
apprehended by the police in Corpus Christi on November 14, 2003,
and turned back over to military authorities in Hawaii, where he
faced a court-martial. (XXV R.R. at State's Exh. 231).

He was referred for a mental health evaluation after making

31

a suicide attempt on December 19, 2003, when he reportedly twice
jumped out a second story window due to depressive issues
involving his inability to see his fiancee. The first time, he
landed on his feet; the second time, he landed flat and passed
out. The evaluating psychologist found Appellant "appears to have
a pervasive need to be with his fiancee to the extent that he
becomes despondent and acts out his frustrations. This latest
acting out also involved the use of alcohol and his STAT Alcohol
Level at 1012 on December 29, 2003 was .116." According to
Appellant, his depressive symptoms had been present throughout
much of his life to varying degrees with them being much more
acute over the past two weeks. Appellant was diagnosed as having
a long-standing personality disorder with borderline antisocial
and dependant traits that existed before he entered military
service, rendered him psychiatrically unsuitable for full duty,
and was not expected to improve with available military mental
health treatment. (XXV R.R. at State's Exh. 231).

Although this psychologist recommended "an expeditious
administrative separation for a personality disorder," Appellant
was instead apparently tried and convicted in a December 24,
2003, summary court-martial proceeding for being AWOL, as well as
for being disrespectful in language toward a non-commissioned
officer, for failing to obey a general order, and for being drunk
and disorderly, all on December 20th. He was reduced in rank,
forfeited a month's pay, and was given thirty days confinement.
(XXV R.R. at State's Exh. 231).

Appellant was released from the brig on January 17, 2004--
five days early due to good conduct. However, on January 25,
2004, he again failed to obey an order by wrongfully consuming
alcohol when underage. He was counseled in a non-judicial
proceeding and advised that his continued failure to follow
verbal and written orders had not only shown a disregard for
regulations but had "also led to continued trouble where
previously you have committed other offenses, now you continue to
make threats of harming yourself and others." As a result,
Appellant was placed on restriction and extra duties for fourteen
days. (XXV R.R. at State's Exh. 231).

Several days later, Appellant had another mental health
evaluation, where he said, "I am look [sic] forward to putting
all my problems behind me and being surrounded by my loved ones
again." The psychologist noted that Appellant continued to have a
strong desire to be home due to his dependent personality issues
and that he would continue to act out due to having antisocial
issues. He continued to "strongly recommend" that the command
initiate an expeditious administrative separation for a
personality disorder. Appellant was also referred to the director
of the base substance abuse counseling center for screening,
where it was determined that Appellant did not meet the criteria
for alcohol abuse or dependence at that time. No further
treatment was recommended because Appellant "has no desire for
treatment and no desire to remain on active duty." (XXV R.R. at
State's Exh. 231).

As a result of all of this, and the fact that Appellant's reaction to all of the efforts to help him remain a Marine had been "an unwillingness to fulfill his service obligation and highly and consistent disruptive behavior," he was discharged from the Marines on March 9, 2004, under other than honorable conditions "due to a pattern of misconduct." (XXV R.R. at State's Exh. 231).

Lt. Isaacks testified that back when she was a detective and about three months before the Times Market homicide, she was called out on an aggravated assault case at around 11:00 p.m. on March 13, 2004, to go to a hospital and interview Appellant, who was a gunshot victim. She learned from the doctors that Appellant's injuries were not life threatening and that he was conscious so she went in to speak with him and find out who had shot him and what had happened in order to get started with her investigation. Isaacks said that she introduced herself and immediately smelled a strong odor of alcohol coming from Appellant, who was then 19 years old and underage for consuming alcohol.[9] He had two gunshot wounds--one in the abdomen area and the other in the right shoulder area-- but there was no medical reason he couldn't talk to Isaacks or give a statement. Nevertheless, Appellant told her he did not want to get his friends involved and that he wasn't going to cooperate. He then refused to answer any questions so Isaacks was not able to learn

---

[9]Isaacks miscalculated Appellant's age as 20 rather than 19. (XXI R.R. at 100).

34

where the shooting occurred, who had done it, or who was with him at the time. Isaacks believed that Appellant had something to hide that may have led to him being shot. In her opinion, Appellant was not a peaceful and law-abiding citizen. (XXI R.R. at 96-104).

CCPD officer Patrick McMenamy testified that he had previously come into contact with Appellant on March 25, 2004, when he noticed that one of his brake lights was out and initiated a traffic stop.  When he contacted Appellant, McMenamy noticed the smell of marijuana coming from the passenger compartment of his car. McMenamy had Appellant exit his vehicle, patted him down, placed him in the back of the patrol car, and called for a backup officer. When that officer arrived to watch Appellant, McMenamy searched Appellant's car and found a .25 caliber handgun under the front seat and a half-smoked marijuana "blunt" in the ashtray. McMenamy then arrested Appellant for possession of marijuana and for unlawfully carrying a weapon. McMenamy identified Appellant in the courtroom as the person he arrested. (XXI R.R. at 43-59; XXV R.R. at State's Exh. 229-230).

Nueces County community supervision officer Sydney Morris testified that Appellant pleaded guilty to the unlawfully carrying a weapon charge on April 16, 2004, and was placed on deferred adjudication probation. The associated possession of marijuana charge was dismissed as part of a plea bargain agreement. Morris's department did drug and alcohol assessments on Appellant when he appeared for an intake session eleven days

later; these indicated serious problems with both drugs and
alcohol. Her department also did an educational assessment that
indicated that Appellant had an 8.1 grade level. Morris was aware
that Appellant had a high school diploma and said that her
department's educational assessment was just a short test to
screen for those who have no more than a 6th grade educational
level because probationers at that level must be referred to
classes in order to bring that level up to where they would
hopefully be able to hold jobs. Morris said that there was
nothing in her department's file that indicated that Appellant
had any kind of mental illness or that he had a low I.Q..
Appellant advised that he was unemployed and listed as
references, his grandmother and his mother. At the prosecutor's
request, Morris had checked her department's records and found
that a woman with the same name as Appellant's mother was on
felony probation for possession of a controlled substance.
Appellant advised that he first tried marijuana at age 12 and
that he smoked ½ ounce daily; he had last smoked it eight days
earlier, on April 19th. Appellant also admitted using cocaine on
one occasion and using Xanax on two occasions. (XXI R.R. at 60-
72, 77-87, 94-95; XXV R.R. at State's Exh. 232, Defendant's Exh.
4).

As part of the drug and alcohol assessment, Morris's
department did a Substance Abuse Self Screening Inventory
(SASSI), which is designed to measure whether there is a low or
high probability that an offender has a substance abuse problem.

36

To the statement on that inventory, "My troubles are not my fault," Appellant answered, "True." To the statement, "I am very respectful of authority," Appellant answered, "False." To the statement, "I like to obey the law," Appellant answered, "True." To the statement, "Some crooks are so clever that I hope they get away with what they have done," Appellant answered, "True." To the statement, "I need to have something to do so I don't get bored," Appellant answered, "True." To the statement, "Sometimes I wish I could control myself better," Appellant answered, "True." To the statement, "I break more laws than many people," Appellant answered, "True." To the statement, "I have sometimes been tempted to hit people," Appellant answered, "True." To the statement, "I have never broken a major law," Appellant answered, "False." To the statement, "When I was a teenager, I began drinking or using other drugs regularly," Appellant answered, "True." To the statement, "I am a binge drinker/drug user," Appellant answered, "False." (XXI R.R. at 87-93; XXV R.R. at State's Exh. 233, Defendant's Exh. 3).

CCPD officer Michael Wertanen testified that he thereafter came into contact with Appellant on May 31, 2004, at around 11:00 p.m., when he was dispatched to a disturbance at an apartment complex. Another officer who had arrived before Wertanen advised the latter that he had two people running from him. As the other officer drove through the neighborhood, Wertanen walked it, looking over privacy fences. Eventually he came across Appellant in a back yard, crouched down next to a house. Wertanen jumped

37

the fence and saw two open 18-packs of beer in Appellant's immediate vicinity. Appellant didn't live at the house or know the people who did or have a good explanation for why he was there. It was obvious to Wertanen that Appellant had been drinking. His speech was slurred and he could smell alcohol on his breath. Appellant was 19 at the time and under age for drinking. Wertanen arrested him for public intoxication. Everything was going fine until Wertanen handcuffed Appellant. At that point, Appellant started mouthing off. As Wertanen began to walk Appellant out of the yard, the latter started to pull away and said he didn't need Wertanen to escort him. Wertanen then placed Appellant on the ground and noticed him grimacing. When Wertanen asked what was wrong, Appellant advised that he had been shot and was still recovering from the wound. Wertanen identified Appellant in the courtroom as the person he arrested. (XXI R.R. at 30-43).

CSO Morris said that a motion to revoke Appellant's community supervision was filed after Morris's department filed a violation report because Appellant failed to report to them in May, 2004, failed to pay his supervision fee in May, 2004, and committed the offense of public intoxication on June 1, 2004. Her department never got to the point of suggesting that Appellant go through particular treatment programs because when he committed the public intoxication offense, they were obligated to file a violation report. Morris said that she would not consider Appellant to be a good probationer, noting that he failed to

38

report within a week after being placed on community supervision. She said that at the time Appellant was arrested in February, 2008, there was still an open warrant for his arrest on the motion to revoke his community supervision. (XXI R.R. at 72-77).

Betty Mendez testified that she was Castro's common-law wife and that they had been together for four years. She said he was 45-years-old when he died and had four children between the ages of 12 and 16, two of whom lived with Castro and Mendez. He also had six stepchildren from his previous marriage whom he saw frequently. Mendez said that Castro had gone to work around 4:00 on July 16th, after they had eaten at Little Caesar Pizza. He only had a dollar when he left for work that day, after receiving change from purchasing some soft drinks. Mendez said that Castro usually got off work at midnight but when he hadn't returned home that night by 12:30 or 12:40, Mendez went to the Times Market where she saw police cars, blood everywhere, and someone covered with a sheet. Salinas approached her and advised her that it was Castro who was dead. Mendez said that she collapsed and was carried into the store. She had been deeply affected by Castro's death, as had his children and stepchildren. (XXI R.R. at 16-30; XXV R.R. at State's Exh. 227; see also XVI R.R. at 46-47 and XXIV R.R. at State's Exh. 1, introduced during the guilt phase).

Appellant then called his father, John Henry Ramirez, Sr., who testified that he and Appellant's mother, Priscilla Martinez Ramirez, had a female child out of wedlock when Ramirez was 17 and in high school. The two then married when Ramirez was 18 and

39

his wife was 16, before Appellant was born. They later divorced before Appellant started school. Ramirez said that he was given visitation rights but that Appellant's mother did not want child support and wanted to raise the children on her own. As a result, Ramirez did not regularly visit Appellant as he was growing up, basically abandoning him, for which he now felt terrible. At some point, Appellant's sister went to live with Ramirez's parents but Appellant stayed with Ramirez's ex-wife. Ramirez said that he loved Appellant. (XXI R.R. at 114-132).

Although in his opening statement, Appellant's attorney had indicated that the defense planned to put on more evidence regarding Appellant's background, (XXI R.R. at 105-114), when the punishment phase reconvened after recessing for the weekend, he advised the trial court that after the defense team, including the defense mitigation expert and psychologist, met with Appellant for over an hour the previous evening, Appellant advised that he wanted them to rest their case on punishment without calling any further witnesses. He also instructed his team not to argue against the death penalty during closing arguments but instead to merely read several Biblical passages. Appellant's attorney advised the court that it was his impression that Appellant had thought this out very carefully. He had given Appellant his personal opinion on the matter but in the end, Appellant clearly communicated that he wanted to take this course of action and the attorney was inclined to follow his instructions. The court questioned Appellant, who said he was

doing this of his own free will and no one was influencing him. The court then called Dr. Troy Martinez, the defense expert, who said that he believed Appellant was competent to make this decision. He, too, was of the opinion that Appellant had carefully thought out this course of action and that his instructions were knowingly and voluntarily and intelligently made.  The defense then rested. (XXII R.R. at 4-19).

Additional facts necessary for a resolution of the issues Appellant presents for review will be set out in the replies to such issues.

<u>SUMMARY OF THE ARGUMENT</u>

[Issue 1]  The evidence was sufficient for a rational trier of fact to have found beyond a reasonable doubt that Appellant murdered Castro while in the course of committing robbery or attempted robbery. There was ample evidence to corroborate Chavez's testimony that Appellant stabbed Castro as Appellant's attorney seemed to acknowledge in arguing that Appellant should be convicted only of murder. There was also ample evidence for the jury to have rationally inferred that Appellant had the requisite intent to rob Castro either before or during the commission of his murder.

[Issue 2] In light of this Court's recent decision in <u>Brooks</u>, and because the Court will have undertaken a <u>Jackson</u> legal sufficiency review of the evidence in resolving the first issue Appellant presents for review, it should not conduct a factual sufficiency review of the evidence to support the

conviction.

[Issue 3] The jury could rationally conclude, based upon the circumstances of the offense itself--including Appellant's state of mind, the calculated nature of his acts, the forethought and deliberateness exhibited by the crime's execution, and the fact that he was not acting under duress or the domination of another at the time of the commission of the offense--that Appellant would more likely than not represent a continuing threat to society. But while such circumstances would seem to be sufficiently compelling to support the jury's finding, there was more. Appellant had a long history of being violent. He had a history of school suspensions for disrespecting teachers and fighting with other students. He was diagnosed as having a long-standing personality disorder with borderline antisocial and dependant traits. He was discharged from the Marines under other than honorable conditions "due to a pattern of misconduct." He also had a history of run-ins with the police and refused to cooperate, and in fact re-offended, while on probation. Thus, there is ample evidence in the record--certainly more than a "mere modicum"--to support the jury's conclusion that, more likely than not, Appellant would continue to commit criminal acts of violence that would constitute a continuing threat to society, whether in or out of prison.

[Issue 4] Because in the twelve years since this Court held that a factual sufficiency review of the jury's answer to the future-dangerousness special issue is not constitutionally

42

required, it has consistently declined to conduct such a review in other cases, and because Appellant has failed to show why, in spite of such precedent, such a review should be conducted in this case, the Court should not undertake such a review.

[Issue 5] The trial court did not abuse its discretion in finding that evidence of the subsequent Whataburger robberies had relevance apart from character conformity and in admitting such evidence in the State's case-in-chief. Although Appellant failed to object to the admission of such evidence under Rule 404(b), it was nonetheless admissible as same transaction contextual evidence. Moreover, evidence of the robberies was admissible as proof of Appellant's motive, opportunity, intent, preparation, plan, knowledge, and/or identity, as well as to rebut what the State could reasonably have believed was going to be Appellant's defensive theory--that there was no plan, intent, or attempt to rob Castro. Finally, the trial court did not abuse its discretion in finding that, although relevant, the probative value of the evidence of the robberies was not substantially outweighed by the danger of unfair prejudice.

[Issue 6] The trial court properly charged the jury that if it was unable to agree on the answer to the future dangerousness special issue, the presiding juror should not sign either form of answer to such issue. The court's mistake in reading that instruction was apparent when comparing it to the court's written charge and in hearing it in the context of the entire charge. But in the end, this mistake, if even deemed an error, was not

harmful, much less egregious, because the jury did agree
unanimously on the affirmative answer to that special issue and
there is nothing to suggest that such answer was as a result of
confusion over the "10-12" rule or the court's reading of its
instructions.

ARGUMENT

A. Reply to Appellant's Issue Presented for Review No. 1: <u>The
   evidence, viewed in the light most favorable to the
   prosecution, is sufficient for a rational trier of fact to
   have found the essential elements of the crime beyond a
   reasonable doubt</u>.

In the first issue Appellant presents for review, he
contends that "[t]he evidence is legally insufficient on guilt of
capital murder. The evidence does not show beyond a reasonable
doubt that John is responsible for the robbery of Pablo."
(Appellant's brief at 34).

This contention is without merit.

Texas has adopted the standard set out in <u>Jackson v.
Virginia</u>[10] as the legal sufficiency standard in direct appeals.
<u>Clewis v. State</u>, 922 S.W.2d 126, 132 (Tex. Crim. App. 1996);
<u>Butler v. State</u>, 769 S.W.2d 234, 239 (Tex. Crim. App. 1989). The
question under that standard is whether, after viewing the
evidence in the light most favorable to the prosecution, any
rational trier of fact could have found[11] the essential elements

---

[10]443 U.S. 307 (1979).

[11]Based on that evidence and reasonable inferences therefrom.
<u>See</u> <u>Gardner v. State</u>, 306 S.W.3d 274, 285 (Tex. Crim. App. 2009),
<u>cert</u>. <u>denied</u>, 131 S.Ct. 103 (2010).

44

of the crime beyond a reasonable doubt. <u>Jackson</u>, 443 U.S. at 319;

<u>Williams v. State</u>, 301 S.W.3d 675, 683-84 (Tex. Crim. App. 2009),

<u>cert</u>. <u>denied</u>, 130 S.Ct. 3411 (2010); <u>Butler</u>, 769 S.W.2d at 239.

> During a legal sufficiency review, this Court has written,
>
> an appellate court must not usurp the role of the factfinder. Appellate courts are ill-equipped to weigh the evidence; unlike the factfinder--who can observe facial expressions and hear voice inflections first-hand--an appellate court is limited to the cold record. Our role on appeal is restricted to guarding against the rare occurrence when a factfinder does not act rationally . . . .

<u>Laster v. State</u>, 275 S.W.3d 512, 517 (Tex. Crim. App.

2009)(citations omitted).

Appellant was convicted of capital murder. <u>See</u> Tex. Penal

Code § 19.03(a)(2). Therefore, under a hypothetically correct

jury charge,[12] the essential elements of the offense were: (1) a

person; (2) intentionally; (3) caused the death of an individual;

(4) in the course of committing or attempting to commit robbery.

<u>See</u> <u>Selvage v. State</u>, 680 S.W.2d 17, 20 (Tex. Crim. App. 1984).

Of these elements, Appellant seemingly only challenges the

sufficiency of the evidence supporting the fourth one--the

finding that the murder occurred while Appellant was in the

course of committing or attempting to commit robbery. In that

regard, he claims that Chavez's testimony that the three set out

to rob people and that, after stabbing Castro, Appellant motioned

---

[12]Sufficiency of the evidence should be measured by the elements of the offense as defined by the hypothetically correct jury charge for the case. <u>Malik v. State</u>, 953 S.W.2d 234, 240 (Tex. Crim. App. 1987).

to Rodriguez before she went through Castro's pockets, was not corroborated. He also argues that there is no evidence that he personally went through Castro's pockets. (Appellant's brief at 34-61). However, on the last two pages of his argument under this issue, he also claims that Chavez's testimony that Appellant stabbed Castro was not corroborated. (Appellant's brief at 61-62). Thus, the State will address both contentions.

An "accomplice" is an individual who participates with a defendant before, during, or after the commission of a crime and acts with the requisite culpable mental state. See Brown v. State, 270 S.W.3d 564, 567 (Tex. Crim. App. 2008), cert. denied, 129 S.Ct. 2075 (2009). The trial court instructed the jury that Chavez was an accomplice if any offense was committed. (I C.R. at 240-242, ¶11).

The Code of Criminal Procedure provides that a conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed and the corroboration is not sufficient if it merely shows the commission of the offense. Tex. Code Crim. Proc. Ann. art. 38.14 (Vernon 2005). "The rule is one of evidence sufficiency. It does not address or limit the admissibility of the testimony of an accomplice." 43 George E. Dix & Robert O. Dawson, Texas Practice: Criminal Practice and Procedure § 31.241 (2d ed. 2001)(emphasis in original). In that regard, this Court has written:

> The test as to the sufficiency of the corroboration is
> to eliminate from consideration the evidence of the

46

accomplice witness and then to examine the evidence of
other witnesses with the view to ascertain *if there be
inculpatory evidence, that is evidence of incriminating
character which tends to connect the defendant with the
commission of the offense.*  If there is such evidence,
the corroboration is sufficient; otherwise, it is not.

Reed v. State, 744 S.W.2d 112, 125 (Tex. Crim. App.
1988)(emphasis in original).

> 1. Evidence that Appellant stabbed Castro

Chavez testified that she saw Appellant stab Castro. (XVIII
R.R. at 137-138). As noted, Appellant argues that such testimony
was not corroborated. However, non-accomplice evidence tending to
connect Appellant with the commission of that offense included
the following: Appellant was the only person seen at any time
during the time surrounding the crimes with a knife. In addition
to Chavez, Garcia also saw him playing with it. (XVIII R.R. at
127-128, 134, 253-255, 265). Metting said that Appellant had a
similarly described knife when he robbed her. (XVI R.R. at 230-
235,  256-257). Hinojosa said that Appellant had a similarly
described knife when he attempted to rob her. (XVII R.R. at 13-
14, 18-20, 22-23, 30, 35). Although they did not see a weapon,
Cervantes and Butt saw Appellant and Rodriguez striking Castro in
the face, arm, and chest, before Castro collapsed. When they
reached Castro a moment later, they found him in a pool of blood
and with his throat slit. (XVI R.R. at 90-92, 95-96, 99, 103,
133, 135-136, 197-203, 207, 210, 220, 223). When Appellant later
showed up at Garcia's home, he had a big gash on his hand that
was bleeding profusely and he said that "they" had stabbed

47

someone. (XVIII R.R. at 247-252). The medical examiner said that Castro had 29 stab or slash wounds. (XIX R.R. at 143). Appellant fled from the area and was not captured for four years. (XIX R.R. at 36-48). Blood on the steering wheel of the Ford van that Appellant had been driving was found to be a mixture of his and Castro's blood. Blood on the gear shift of that van was Castro's. Blood on the t-shirt and vodka bottle found in that van was Castro's (XVIII R.R. at 61-63, 68-72; XIX R.R. at 91-92, 95-97, 102-103, 106).

This was ample evidence to corroborate Chavez's testimony that Appellant stabbed Castro. Indeed, in his closing argument, Appellant's attorney argued that he was guilty of murder, but only murder. He acknowledged that Appellant brutally killed Castro and that, but for evidence that he robbed Castro, the evidence was overwhelming. (XX R.R. at 22-29).

Thus, eliminating from consideration Chavez's testimony, there was evidence of incriminating character which tended to connect Appellant with the commission of the offense. Cf. Colella v. State, 915 S.W.2d 834, 836-39 (Tex. Crim. App. 1995)(non-accomplice testimony placed defendant in company of accomplice witness and defendant possessed weapon of the type used in murder, had the opportunity to commit the murder, and fled the area shortly thereafter); Cockrum v. State, 758 S.W.2d 577, 579-82 (Tex. Crim. App. 1988)(defendant in company of accomplice before and after offense, his nervous demeanor after the crime suggested guilty knowledge, he was seen with a weapon similar to

48

that used in the offense, and he fled the area shortly
thereafter).

2. Evidence that Appellant robbed or attempted to rob Castro

As noted, Appellant argues that the evidence fails to show
that he was "responsible" for Castro's robbery because there is
no evidence that he personally went through Castro's pockets and
because Chavez's testimony that the three set out to rob people
and that, after stabbing Castro, Appellant motioned to Rodriguez
before she went through Castro's pockets, was not corroborated.[13]
But as this Court has noted in another capital murder case
involving a robbery:

> Capital murder occurs when a person intentionally
> commits murder while in the course of committing or
> attempting to commit robbery.  The State did not bear
> the burden of proving that the appellant completed the
> theft of the victim in order to establish the
> underlying offense of robbery or attempted robbery.
> Rather, the requisite intent to rob may be inferred
> from circumstantial evidence, particularly Appellant's
> assaultive conduct.

Young v. State, 283 S.W.3d 854, 862 (Tex. Crim. App. 2009), cert.
denied, 130 S.Ct. 1015 (2009)(emphasis in original; citations
omitted). Moreover, in Holladay v. State, 709 S.W.2d 194, 198-202

_____

[13]Interestingly, elsewhere in his brief, Appellant argues that
there was no need for the State to put on evidence of the two
Whataburger robberies because, "The state had direct evidence from
a non-accomplice, Butt, that John robbed Pablo" and that, "the
evidence of his responsibility for Pablo's robbery was direct but
weak, not overwhelming." (Appellant's brief at 99). He also argues
that Chavez's accomplice testimony was corroborated by DNA evidence
of Castro's blood on the dollar bill found in the van and of his
own DNA in the van. (Appellant's brief at 106-107). Finally, he
argues, "Here, evidence of the plan to commit robbery was not only
available, it was presented, and scarcely scathed on cross-
examination." (Appellant's brief at 107-108).

(Tex. Crim. App. 1986), this Court held that the accomplice witness rule does not require the non-accomplice testimony to corroborate a defendant's connection to the specific element that raises the offense from murder to capital murder--here, the underlying robbery or attempted robbery. See also Druery v. State, 225 S.W.3d 491, 497 (Tex. Crim. App. 2007)(noting that holding); Farris v. State, 819 S.W.2d 490, 506-507 (Tex. Crim. App. 1990)(refusing to overrule Holladay).

With those two points in mind, evidence supporting the jury's finding that Appellant murdered Castro while in the course of committing robbery or attempted robbery included the following:

When they ran out of money and drugs, Appellant, Rodriguez, and Chavez came up with the idea to "grab some people" and take their money. They didn't have a plan to rob any specific place or person but rather were just going to look for someone to rob. (XVIII R.R. at 133). As would prove to be their modus operandi in the subsequent Whataburger robberies, when the three got to the Times Market, Rodriguez got out of a van and approached Castro, who was outside the store carrying a trash bag, to ask him for something; soon thereafter, Appellant confronted Castro with a knife. (XVIII R.R. at 134-137). After seeing Appellant stab Castro outside the Times Market until he collapsed, Chavez saw Appellant point to Rodriguez, who thereupon went through Castro's pockets. (XVIII R.R. at 140). After Castro fell down, Butt saw Appellant and the female assailant go through Castro's pockets.

50

He thought they got something out of Castro's pocket but he couldn't tell what it was. (XVI R.R. at 202, 204, 222). Cervantes said that it looked like "they" and/or "the girl" were reaching in or taking things from Castro's pockets. (XVI R.R. at 93, 100-104, 126, 129, 135). Chavez said that after this, Rodriguez returned to the van she was in and dropped $1.25 on the console. Although Chavez said that she didn't remember Rodriguez saying anything, as far as Chavez knew, the money came from Castro's pockets. (XVIII R.R. at 141, 186). Within minutes of this incident, Appellant and a female companion robbed Metting after Appellant placed a serrated knife to her neck, while her young son was in the backseat. (XVI R.R. at 229-234, 256-257). Moments later, Appellant and a female companion attempted to rob Hinojosa after Appellant placed a serrated knife to her neck. (XVII R.R. at 13-23, 30). Back at the Times Market, Castro's ring was located off his hand but near his body, as was an envelope with "Pablo" written on it, containing a pay stub made out to Castro, and a 25¢ coin. (XVII R.R. at 223-225, 228-236, 239-241; XVIII R.R. at 97-98; XIX R.R. at 18-20). Appellant's fingerprints were found on the photograph of the young boy found in the Ford van, underneath Metting's wallet. She had testified that her wallet contained, among other things, photos. (XVI R.R. at 234; XVIII R.R. at 37-39, 65, 92-94, 233-234). Appellant fled from the area and was not captured for four years. (XIX R.R. at 36-48). Appellant's blood was on Metting's husband's bank card, which was found in the Ford van. Her wallet was also found there. (XVI R.R.

at 248-250; XVIII R.R. at 35-39, 63-68, 73). Blood on a Little Caesar's Pizza receipt found on the front passenger doorstep of the Ford van was a mixture of Castro's, and Rodriguez's. (XVIII R.R. at 65-66, 72; XIX R.R. at 103). Blood on a dollar bill found wadded up with a Little Caesar's Pizza receipt dated July 19, 2004, in the Ford van was a mixture of Castro's and possibly Chavez's and/or Rodriguez's. (XVIII R.R. at 65-66, 72, 74; XIX R.R. at 105).[14]

From this, a jury could have rationally inferred that Appellant had the requisite intent to rob Castro either before or during the commission of his murder. See Young, 283 S.W.3d at 862.[15] Indeed, in his closing argument, Appellant's attorney acknowledged that robbery was the trio's motive but that Castro was not an intended robbery victim. Rather, their intention was to rob the Times Market and Castro was just in the wrong place at the wrong time. He acknowledged that some money was taken from Castro's pocket but contended that that was just an afterthought, constituting nothing more than theft. (XX R.R. at 22-29).

---

[14]Castro's wife testified that they had eaten at a Little Caesar's Pizza establishment on the day of his death but this testimony occurred during the punishment phase. (XXI R.R. at 25).

[15]In a capital murder prosecution for murder during the course of committing or attempting to commit robbery, the State must prove that the defendant formed the intent to rob before or contemporaneously with the murder. See Shuffield v. State, 189 S.W.3d 782, 791 (Tex. Crim. App. 2006); Williams v. State, 937 S.W.2d 479, 483 (Tex. Crim. App. 1996).

### 3. Conclusion

Because the evidence was sufficient for a rational trier of fact to have found beyond a reasonable doubt that Appellant murdered Castro while in the course of committing robbery or attempted robbery, cf. Bustamante v. State, 106 S.W.3d 738, 739-41 (Tex. Crim. App. 2003)(evidence found sufficient under similar facts and argument); Maldonado v. State, 998 S.W.2d 239, 242-44 (Tex. Crim. App. 1999)(same), the first issue he presents for review should be overruled.

B. Reply to Appellant's Issue Presented for Review No. 2: This Court should not conduct a factual sufficiency review of the evidence to support the conviction.

In the second issue Appellant presents for review, he contends "[t]he evidence is factually insufficient on guilt of capital murder. The evidence is too weak to show that John is responsible for the robbery of Pablo." (Appellant's brief at 62).

However, this Court recently held that the Jackson v. Virginia standard is the only standard that a reviewing court should apply in determining whether the evidence is sufficient to support each element of a criminal offense that the State is required to prove beyond a reasonable doubt, and that all other cases to the contrary, including Clewis, are overruled. See Brooks v. State, No. PD-0210-09, 2010 WL 3894613, at *14, 2010 Tex. Crim. App. LEXIS 1240, at *57 (Tex. Crim. App. Oct. 6, 2010)(not yet reported).

For this reason, and because this Court will have undertaken a Jackson review of the evidence in resolving the previous issue,

the second issue Appellant presents for review is without merit and should be overruled.

C. Reply to Appellant's Issue Presented for Review No. 3: <u>The evidence, viewed in the light most favorable to the jury's answer to the future-dangerousness special issue, is sufficient for a rational trier of fact to have found beyond a reasonable doubt that there is a probability that Appellant would commit criminal acts of violence that would constitute a continuing threat to society whether in or out of prison</u>.

In the third issue Appellant presents for review, he contends "[t]he evidence is legally insufficient to support the finding of future dangerousness. The Court should reform the sentence to life imprisonment." (Appellant's brief at 75).

This contention is without merit.

The future-dangerousness special issue asks a jury to decide "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." <u>See</u> Tex. Code Crim. Proc. Ann. art. 37.071, § 2(b)(1) (Vernon Supp. 2010)[16]; <u>Estrada v. State</u>, 313 S.W.3d 274, 280 (Tex. Crim. App. 2010), <u>petition</u> <u>for</u> <u>cert</u>. <u>filed</u>, No. 10-6446 (U.S. Sept. 13, 2010).

Because the term "society" includes both the prison and non-prison populations, this Court has construed the future-dangerousness special issue to ask whether a defendant would constitute a continuing threat "whether in or out of prison" without regard to how long the defendant would actually spend in

---

[16]This subsection has not been amended since July, 2004, when this offense was committed.

54

prison if sentenced to life. See Estrada, 313 S.W.3d at 281. Indeed, this issue focuses upon the character for violence of the particular individual, not merely the quantity or quality of the institutional restraints put on that person. See Coble v. State, No. AP-76,019, 2010 WL 3984713, at *6, 2010 Tex. Crim. App. LEXIS 1297, at *21 (Tex. Crim. App. Oct. 13, 2010)(not yet reported).

Therefore, in reviewing the legal sufficiency of the evidence to support the jury's affirmative answer to the future-dangerousness special issue, this Court views the evidence in the light most favorable to the jury's answer to this special issue and determines whether any rational trier of fact could have found[17] beyond a reasonable doubt that there is a probability that Appellant would commit criminal acts of violence that would constitute a continuing threat to society "whether in or out of prison." See Estrada, 313 S.W.3d at 284; see also Coble, 2010 WL 3984713, at *5, 2010 Tex. Crim. App. LEXIS 1297, at *13. In undertaking such review, each case must be resolved on its own facts, Estrada, 313 S.W.3d at 284, keeping in mind that this special issue focuses upon the internal restraints of the individual, not merely the external restraints of incarceration. Coble, 2010 WL 3984713, at *6, 2010 Tex. Crim. App. LEXIS 1297, at *22. Therefore, only if, after viewing all of the record evidence, this Court concludes that a rational jury would necessarily have entertained a reasonable doubt about Appellant's

---

[17]Based on that evidence and reasonable inferences therefrom. See Russeau v. State, 291 S.W.3d 426, 433 (Tex. Crim. App. 2009).

55

future dangerousness, will it find that the evidence is legally insufficient. Coble, 2010 WL 3984713, at *5, 2010 Tex. Crim. App. LEXIS 1297, at *13-14. The Court rarely reverses a judgment on a claim of insufficient evidence to support a finding that the defendant will be a danger in the future, and it does not do so lightly. See Berry v. State, 233 S.W.3d 847, 864 (Tex. Crim. App. 2007).

In making that finding, a jury may consider a variety of factors.[18] The circumstances of the offense itself can be among the most revealing evidence of future dangerousness and alone may be sufficient to support an affirmative answer to that special issue. Mays, 318 S.W.3d at 390 n.83 (citing Druery, 225 S.W.3d at 507); see also Gardner, 306 S.W.3d at 304 ("this Court has repeatedly said that, if the circumstances are sufficiently cold-blooded or calculated, then those facts may alone support a

---

[18]Including, but not limited to, the following:
1. the circumstances of the capital offense, including the defendant's state of mind and whether he or she was working alone or with other parties;
2. the calculated nature of the defendant's acts;
3. the forethought and deliberateness exhibited by the crime's execution;
4. the existence of a prior criminal record, and the severity of the prior crimes;
5. the defendant's age and personal circumstances at the time of the offense;
6. whether the defendant was acting under duress or the domination of another at the time of the commission of the offense;
7. psychiatric evidence; and,
8. character evidence.
Coble, 2010 WL 3984713, at *7 n.24, 2010 Tex. Crim. App. LEXIS 1297, at *25 n.24 (citing Keeton v. State, 724 S.W.2d 58, 61 (Tex. Crim. App. 1987)); Mays v. State, 318 S.W.3d 368, 390 n.83 (Tex. Crim. App. 2010)(citing Keeton).

finding of future dangerousness").

For this reason, this Court has adopted the following protocol in reviewing the sufficiency of the evidence to support the jury's affirmative finding regarding future dangerousness:

> We first look at the facts of the crime itself. If the offense was shown to be sufficiently cold-blooded or calculated, then the facts of the offense alone may support a finding that the defendant will pose a continuing threat to society. If, however, the facts of the case were not sufficiently compelling, we look for other evidence to support the jury's finding, such as psychiatric evidence, character evidence, prior criminal record, prior extraneous offenses, and possible mitigating factors such as the defendant's youth or state of mind at the time of the offense.

Kunkle v. State, 771 S.W.2d 435, 449 (Tex. Crim. App. 1986).

In that regard, this Court is not to balance mitigating and aggravating evidence so as to determine, independently of the jury's verdict, the "appropriateness" or "justness" of imposition of the death sentence in a given case, Burns v. State, 761 S.W.2d 353, 356 n. 4 (Tex. Crim. App. 1988), but rather is to ensure that there exists more than a "mere modicum" of evidence in the record to support the jury's conclusion that it is probable Appellant would commit criminal acts of violence that would constitute a continuing threat to society. Burns, 761 S.W.2d at 356. As used in this issue, "probability" means that the evidence indicates that it is more likely than not Appellant represents a continuing threat to society. See Robison v. State, 888 S.W.2d 473, 481 (Tex. Crim. App. 1994).[19]

---

[19]See also Cuevas v. State, 742 S.W.2d 331 (Tex. Crim. App.
(continued...)

In its determination of the special issues, the jury is entitled to consider all the evidence presented at the guilt phase of the trial, in addition to the evidence presented at the punishment phase, Young, 283 S.W.3d at 863, and in accordance with Tex. Code Crim. Proc. Ann. art. 37.071, § 2(d)(1) (Vernon Supp. 2010),[20] the jury was specifically instructed that in determining the issues, it was to do so. (I C.R. at 252-253, ¶¶ 7 & 8).

Viewed in the light most favorable to the jury's finding, the evidence supporting its conclusion that, more likely than not, Appellant would commit criminal acts of violence that would constitute a continuing threat to society is as follows:

The circumstances of offense and Appellant's apparent state of mind were incredibly cold-blooded. For reasons no more compelling than the fact that after three days of "partying," they had run out of drugs and money with which to buy them, Rodriguez, Chavez, and Appellant--armed with his knife--decided to go out looking for people to rob. They happened upon Castro, a husband and father of few means, who was working the night shift at a convenience store and had the misfortune to be carrying out

---

[19](...continued)
1987), where this Court held that a venire member who defined "probability" to include, among other things, "stronger than possibly," "less than likely...somewhere between potential and likely," and "not necessarily 'more likely than not'," did not exhibit a faulty understanding of the term. 742 S.W.2d at 346-47 (emphasis added).

[20]This subsection has not been amended since July, 2004.

the trash at that moment, and Appellant proceeded to stab or slash him twenty-nine times, all over the front and back of his upper torso including slitting his throat, until he collapsed, at which time Rodriguez and perhaps Appellant went through his pockets and took what little money he had--$1.25. Apparently more disappointed with the amount of their loot than distraught over having just senselessly murdered someone, Appellant and his accomplices--after driving somewhere to wash off Castro's blood--made their way to a fast food restaurant, where Appellant robbed a woman by placing his knife to her throat while her child was in the backseat. Moments later, Appellant and his accomplices went to another fast food restaurant, where Appellant attempted to rob yet another woman by placing his knife to her throat. After then eluding the police during a high speed chase through residential streets as Appellant repeatedly raced through intersections without slowing down, he parted company with his accomplices and made his way back to one of their mother's and sister's house, where rather than express concern about his victims or companions, he apparently unsuccessfully sought refuge. Appellant's guilty conscience evidently didn't get the best of him over the next four-and-a-half years as he eluded a nationwide manhunt until he was captured near the Mexican border. And at some point in his crime spree, he told his accomplices that he was going to keep his knife as a souvenir. Such actions certainly demonstrated a wanton and callous disregard for the sanctity of human life. Cf. King v. State, 953 S.W.2d 266, 272 (Tex. Crim.

App. 1997)(sheer brutality of murder where victim was stabbed 37 times and his jugular vein and pulmonary artery were severed could indicate to a jury that the defendant was a future danger to society); <u>Martinez v. State</u>, 924 S.W.2d 693, 697 (Tex. Crim. App. 1996)(noting "each additional thrust [of a knife] potentially indicating to any rational juror that such a personal act requires a wanton and callous disregard for human life").[21]

As to other <u>Keeton</u> factors surrounding the circumstances of the offense itself, the calculated nature of Appellant's acts and the forethought and deliberateness exhibited by the crime's execution were evidenced by the similar manner in which Castro, Metting, and Hinojosa were robbed; the latter two were just fortunate to avoid having their throats slit, either due to cooperation with Appellant or the ability to get away from him. And, Appellant was certainly not acting under duress or domination.

Thus, a jury could rationally conclude that a person who would: slaughter an innocent man in the manner that Appellant did here in order to steal money for drugs; immediately thereafter

---

[21]The finding in <u>Martinez</u> that a rational jury could perceive that the use of a knife to repeatedly stab a fallen victim showed a wanton and callous disregard for human life, sufficient to merit an affirmative answer to the future dangerousness issue, was recently cited by this Court as an example of how the circumstances of the offense can be among the most revealing evidence of future dangerousness and alone may be sufficient to support an affirmative answer to that special issue. <u>See</u> <u>Sparks v. State</u>, No. AP-76,099, 2010 WL 4132769, at *25 n.81, 2010 Tex. Crim. App. Unpub. LEXIS 629, at *73 n.81 (Tex. Crim. App. Oct. 20, 2010)(not designated for publication).

rob or attempt to rob two women at two other locations by placing a knife to their throats; and, tell his accomplices that he was going to keep his knife as a souvenir, would more likely than not represent a continuing threat to society.

But while the circumstances of the offense and the events surrounding it would seem to be sufficiently compelling to support the jury's finding, here there was more.

Appellant had a long history of being violent. He had a history of school suspensions for disrespecting teachers and fighting with other students. He was discharged from the Marines under other than honorable conditions "due to a pattern of misconduct" that included summary court-martial for desertion, being disrespectful toward a non-commissioned officer, failing to obey a general order, and for being drunk and disorderly, as well as subsequently being counseled in non-judicial proceedings for continued failure to follow orders and "continu[ing] to make threats of harming yourself and others." While in the Marines, Appellant was diagnosed as having a long-standing personality disorder with borderline antisocial and dependant traits, and his reaction to efforts to help him had been "an unwillingness to fulfill his service obligation and highly and consistent disruptive behavior."

He also had a history of run-ins with the police. He refused to cooperate with them when, four months before the present offense, he was shot. Two weeks later, he was arrested for possession of marijuana and for unlawfully carrying a pistol. A

61

month later, when the probation department did drug and alcohol
assessments, he advised that he first tried marijuana at age 12,
smoked ½ ounce daily, and last smoked it eight days earlier. He
also admitted using cocaine and Xanax. In answering a self
screening inventory during those assessments, Appellant replied
that his problems were not his fault, that he was not very
respectful to authority, that some crooks were so clever that he
hoped they got away with what they had done, that he broke the
laws more than most people and had broken a major law, and that
he had sometimes been tempted to hit people. A month later--and
two months before the present offense--Appellant had to be taken
to the ground by a policeman after being uncooperative when he
was arrested for public intoxication. And, the probation
department thereafter filed a violation report that prompted a
motion to revoke Appellant's community supervision for committing
the public intoxication offense as well as failing to report or
pay his supervision fee.

     With this criminal resume, there is ample evidence in the
record--certainly more than a "mere modicum"--to support the
jury's conclusion that, more likely than not, Appellant would
continue to commit criminal acts of violence that would
constitute a continuing threat to society.

     Appellant's behavior in school and in the military certainly
evidenced his complete disrespect for law and authority, as did
his ongoing run-ins with the law and refusal to cooperate while
on probation. Cf. Martinez, 924 S.W.2d at 697 (defendant's

intentional and habitual disobeyance of the law with behavior such as his blatant and apparently frequent underage drinking showed a complete disrespect for the law and authority); King, 953 S.W.2d at 271 (background showed escalating pattern of disrespect for the law from which jury could draw inference of future dangerousness). Indeed, several of Appellant's crimes were committed while he was on probation. The fact that all of this occurred within the first 20 years of Appellant's life lends further supports to the jury's conclusion.

Because it cannot be said that a rational trier of fact could not have found beyond a reasonable doubt that a probability existed that Appellant would commit violent criminal acts in the future, his third issue presented for review should be overruled.

D. Reply to Appellant's Issue Presented for Review No. 4: This Court should not conduct a factual sufficiency review of the evidence to support the jury's answer to the future-dangerousness special issue.

In the fourth issue Appellant presents for review, he contends "[t]he evidence is factually insufficient to support the finding of future dangerousness. The Court should reform the sentence to life imprisonment." (Appellant's brief at 88).[22]

However, this Court has held that a factual sufficiency review of the jury's answer to the future-dangerousness special issue is not constitutionally required, see Estrada, 313 S.W.3d

---

[22]While under this issue, Appellant makes reference to the fact that this Court set aside the finding of future dangerousness in Berry, that was based on this Court sustaining the defendant's challenge to the legal sufficiency of the evidence to support that special issue. See 233 S.W.3d at 860-64.

at 285; McGinn v. State, 961 S.W.2d 161, 169 (Tex. Crim. App. 1998), and has consistently declined to conduct a factual-sufficiency review of the evidence to support the jury's answer to such issue. See Coble, 2010 WL 3984713, at *4, 2010 Tex. Crim. App. LEXIS , at *13; Roberts v. State, 220 S.W.3d 521, 526 (Tex. Crim. App. 2007)(citing examples of such cases).

For this reason, and because Appellant has failed to show why, in spite of such precedent, such a review should be conducted in this case, the fourth issue he presents for review is without merit and should be overruled.

E. Reply to Appellant's Issue Presented for Review No. 5: <u>The trial court did not abuse its discretion admitting evidence of the related robberies during the State's case-in-chief</u>.

In the fifth issue Appellant presents for review, he contends that "[t]he trial court erred in admitting extraneous offenses: the two robberies which took place after the murder and robbery alleged in the indictment." (Appellant's brief at 88).

This contention is without merit.

Among the items set out in Appellant's "First General Motion for Discovery and Inspection" were a request for notice of the State's intent to introduce, in its case-in-chief, "evidence of other crimes, wrongs, or acts not arising in the same transaction as the offense charged," (I C.R. at 74-75), and a request for notice of the State's intent to introduce, at the punishment phase, evidence of extraneous crimes or bad acts that had not resulted in a final conviction. (I C.R. at 76). During a pretrial hearing where that motion was heard, the prosecutor pointed out

64

that the State had no "404(b) evidence" other than the offenses
set out in the indictment, which contained the two robbery counts
and the evading arrest count. He also noted that, while not
required to do so, he had given the defense notice of what he
intended to introduce during the punishment phase. Appellant's
attorney acknowledged that this was correct. (IV R.R. at 150-
152).

At a subsequent pretrial hearing, the trial court heard
Appellant's motion to sever the capital murder count from the
other counts in the indictment. (I C.R. at 227-229). During that
hearing, the prosecutor pointed out that even if the counts were
severed, the State still planned to present evidence, during its
case-in-chief in the capital murder trial, regarding the other
counts "as the same transactional context or res gestae of the
offense" and that the defense had previously stated that it was
not going to object to the introduction of that evidence. When
Appellant's attorney questioned whether the prosecutor was
referring to the punishment phase, the latter responded that he
was referring to his case-in-chief. Appellant's attorney then
replied, "As an extraneous offense and I don't really think I
need to argue that. That's clearly going to be admissible in that
regard," adding that the defense could still lodge whatever
objections it felt was necessary. Appellant's attorney said that
he had advised Appellant that the State intended to introduce
evidence of the other counts in its capital murder prosecution
even if those counts were severed. Appellant acknowledged that he

understood evidence of those crimes might come in during the case-in-chief and, if not, would be admissible at the punishment phase. (V R.R. at 4-12). Before concluding, the court and parties discussed the fact that they might need to set aside time during another pretrial hearing to resolve the "404(b) issue" and that the parties were free to brief the issue before then. (V R.R. at 18-22).

During a subsequent pretrial hearing, the trial court noted that the parties were there to go over the jury list and also "because [the prosecutor] intended to introduce extraneous offenses, 404(b) at the time of trial." The court then noted that it had heard about the two robberies during the previous hearing [when evidence of them was presented in conjunction with Appellant's "Motion for Discovery and Preliminary Hearing Relating to Pretrial Identifications of Defendant" (I C.R. at 61-71; IV R.R. at 6-150)] so did not need to hear any more evidence regarding them. The State therefore presented testimony regarding the remaining evading arrest charge. (VII R.R. at 4-29).

At the conclusion of such testimony, the prosecutor argued that evidence of the robbery and evading arrest counts should, notwithstanding the granting of Appellant's motion to sever, "still come in and be introduced under 404(b) as the same transaction context or one of the other findings under other crimes, wrong, or act, including motive, intent, plan, preparation, identity and such." In addition to showing motive or intent to rob Castro, he argued, it was almost impossible to

separate the incidents because they were "so interrelated and
correlated together." When the court brought up the Rule 403
balancing test, Appellant's attorney said that would be the
defense's objection--"Far more prejudicial than supplying any
probative value in this matter." He also said that while there
was clearly a homicide, he didn't know if the State could prove
the intended robbery and "they're trying to do it through the
back door by using these other robberies...that occurred at the
Whataburger..." and "that the prejudicial value of allowing that
to be done would far outweigh the probative value of the case in
chief." The prosecutor pointed out that if that were the case and
the State needed that evidence to prove its elements, that would
favor admissibility. (VII R.R. at 30-34).

The court indicated that it was leaning toward finding the
robberies admissible to show motive, opportunity, intent, and
plan, noting that the three crimes happened minutes apart, in the
same area of town, with the same parties and the same van. The
prosecutor argued that the evading charge was also evidence of
motive because flight is evidence of guilt, and that, in any
event, evidence of flight was always admissible. After thinking
about it, the court ruled that evidence of the robberies would be
admissible, noting their closeness in time, with the same motives
and modus operandi. It decided to research the evading arrest
question, adding that the parties were free to brief the issue
for the court. Appellant's attorney then advised that "if and
when the issue does arise we may ask to have the jury removed and

67

take it up with the Court and possibly...reurge the motion which I think we have to do out of an abundance of caution so we don't waive our error on that." The court noted he could do that and that the court would also give a limiting instruction. (VII R.R. at 34-39).[23]

Three weeks later, at the conclusion of voir dire, the trial court noted that it still needed to make a ruling on the admissibility of the evading arrest evidence. It noted that it had received but had not yet read the case law the State had submitted. Although the defense had not submitted anything, the court gave it another opportunity to do so before ruling. (XV R.R. at 181).

It does not appear that the court thereafter made that ruling on the record. But Appellant did not lodge any objections when Metting, Oelschlegel (the officer who first contacted her), Hinojosa, Kinane (the officer who first contacted her), or Gray (the officer who pursued Appellant) testified at trial. Nor did he object when any of the other officers testified regarding hearing broadcasts of the various crimes and responding accordingly, to Chavez's testimony regarding such offenses, or to the various crime scene personnel and expert witnesses who testified regarding evidence relating to such offenses.

Thus, as a preliminary matter, since Appellant only lodged a

---

[23]Although it doesn't appear that either party requested such limiting instruction on the record, (XIX R.R. at 189-199), it was nevertheless included in the court's charge. (I C.R. at 242 ¶12).

Rule 403 objection as to the admission of evidence regarding the robbery offenses during the pretrial hearing, he should not now be heard to complain that such evidence was not admissible under Rule 404(b) but rather only that, although relevant, the probative value of such evidence was substantially outweighed by the danger of unfair prejudice. <u>See</u> Tex. R. Evid. 403.[24]

Rule 404(b) provides that evidence of other crimes, wrongs, or acts is not admissible "to prove the character of a person in order to show action in conformity therewith"; however, it may be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, or identity. Tex. R. Evid. 404(b).

A trial court's ruling on the admissibility of extraneous offenses is reviewed under an abuse of discretion standard. <u>Williams</u>, 301 S.W.2d at 687. Under this standard, as long as the trial court's ruling was at least within the zone of reasonable disagreement, its ruling will be upheld. <u>Montgomery v. State</u>, 810 S.W.2d 372, 391 (Tex. Crim. App. 1991)(op. on reh'g).

---

[24]That is, Appellant's objections as to the admission of evidence regarding the robbery offenses during the pretrial hearing may have been sufficient to preserve Rule 403 error with respect to its admission, <u>see</u> Tex. R. Evid. 103(a)(1), but no 404(b) objection was ever made so he in effect conceded that such evidence was relevant and admissible if not substantially outweighed by the danger of unfair prejudice. He does not complain about the admission of evidence regarding the evading arrest offense, perhaps recognizing that flight is admissible as a circumstance from which an inference of guilt may be drawn and so long as the extraneous offense is shown to be a necessarily related circumstance of the defendant's flight, it may be admitted to the jury. <u>See</u> <u>Alba v. State</u>, 905 S.W.2d 581, 586 (Tex. Crim. App. 1995).

Furthermore, if the trial court's ruling was correct under any theory of law applicable to the case, in light of what was before the trial court at the time the ruling was made, then the appellate court must uphold the ruling. <u>Page v. State</u>, 213 S.W.3d 332, 337 (Tex. Crim. App. 2006).

Here, the trial court did not abuse its discretion in ruling that evidence of the robberies was admissible.

To begin with, and notwithstanding Appellant's failure to object under Rule 404(b), the subsequent robbery offenses were admissible as same transaction contextual evidence. They were intertwined, inseparable parts of an event leading to Rodriguez's and Chavez's--and ultimately, Appellant's--capture and the discovery of evidence linking Appellant to Castro's murder and robbery. They happened within minutes of one another in the same general area of town and resulted in a series of police broadcasts that caused officers from all over the city to converge in an area in an effort to locate the persons and vehicles involved, whose descriptions were evolving and whose whereabouts were becoming more certain. This resulted in the spotting and stopping of Appellant and his van moments after the second Whataburger robbery, followed by a chase and the abandonment of the van and the capture of Rodriguez and Chavez. This and the abandonment of the first van at the first Whataburger, in turn, led to the identity of Appellant and evidence linking him to Castro's murder and robbery. Had the one van not been abandoned at the first Whataburger and the second

van abandoned after the chase, Appellant's identity might never have determined and the DNA evidence linking him to Castro's murder and robbery might never have been obtained. While Cervantes recognized Appellant as a former classmate, he did not know him and probably would never have been able to identify him had he not been linked through his van's registration, resulting in a photo lineup. That same lineup allowed Metting and Hinojosa to identify their attacker as well. There was hardly a witness that didn't recount the series of crimes in explaining how that witness came to be involved in the case. It is hard to imagine how the trio's capture and evidence linking them to Castro's murder and robbery could have been explained without relating details of the Whataburger robberies.[25] Cf. Camacho v. State, 864 S.W.2d 524, 531-32 (Tex. Crim. App. 1993)(evidence of subsequent crimes part of the same contextual evidence and helped establish defendant's intent during capital murder for which he was charged); Wesbrook v. State, 29 S.W.3d 103, 114-15 (Tex. Crim. App. 2000)(evidence of three additional killings from evening of charged offense admissible without a limiting instruction as same transaction contextual evidence).

Second, and notwithstanding Appellant's failure to object under Rule 404(b), evidence of the robberies was admissible as proof of Appellant's motive, opportunity, intent, preparation,

---

[25]Additionally, although not suggested at trial as a basis for its admissibility, evidence of the robberies might also have been proper under Tex. Code Crim. Proc. Ann. art. 38.36(a)(Vernon 2005) as "relevant facts and circumstances surrounding the killing."

plan, knowledge, and/or identity, as well as to rebut what the
State could reasonably have believed (in light of his attorney's
representation during the pretrial hearing) was going to be
Appellant's defensive theory--that there was no plan, intent, or
attempt to rob Castro. The subsequent robberies not only tended
to corroborate Chavez's testimony that the trio had as their plan
when they set out that night, to rob people for drug money, and
that Appellant thus had robbery as a motive and as his intent
when he murdered Castro--and indeed likely robbed or attempted to
rob him--but also tended to prove Appellant's identity because
the characteristics of the crimes were so distinctively similar
that they constituted a "signature;" in each instance, a female
accomplice initially contacted the victim to distract him or her,
followed by Appellant placing a serrated knife to the victim's
throat in order to effectuate a robbery. In that regard,
Appellant's attorney attempted to discredit Cervantes's
eyewitness account by, among other things, establishing that he
was nearsighted, and attempted to discredit Butt's eyewitness
account by establishing that his recollection at trial varied
from the statement he made at the time of the offense, four years
earlier.

Thus, even if Appellant had objected under Rule 404(b), the
trial court would not have abused its discretion in finding that
evidence of the Whataburger robberies had relevance apart from
character conformity.

Moreover, the trial court did not abuse its discretion in

finding that, although relevant, the probative value of the evidence of the robberies was not substantially outweighed by the danger of unfair prejudice. See Tex. R. Evid. 403; Montgomery, 810 S.W.2d at 391. Unfair prejudice refers not to an adverse or detrimental effect of evidence but to an undue tendency to suggest a decision on an improper basis, commonly an emotional one. Casey v. State, 215 S.W.3d 870, 883 (Tex. Crim. App. 2007). Rule 403 favors admissibility of relevant evidence, and the presumption is that relevant evidence will be more probative than prejudicial. Montgomery, 810 S.W.2d at 389.

In that regard, this Court has written:

> [A] trial court, when undertaking a Rule 403 analysis, must balance (1) the inherent probative force of the proffered item of evidence along with (2) the proponent's need for that evidence against (3) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency of the evidence to be given undue weight by the jury that has not been equipped to evaluate the probative force of the evidence, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted.

Gigliobianco v. State, 210 S.W.3d 637, 641-42 (Tex. Crim. App. 2006).

Here, the trial court could have reasonably concluded that the inherent probative force of the evidence of the Whataburger robberies was considerable, since it corroborated Chavez's testimony that the trio set out to rob people to obtain money for drugs and that Appellant was the one wielding the knife during Castro's murder. The trial court could have also reasonably concluded that the State's need for such evidence was

73

considerable since one of the elements it had to prove was that
Castro's murder took place while in the course of committing or
attempting to commit robbery, and because it helped explain how
Appellant and his accomplices came to be captured and how
evidence linking him to Castro's murder and robbery was obtained.
The trial court could have reasonably concluded that the evidence
did not have a tendency to confuse or distract the jury from the
main issues in the case in light of its announced intention to
give a limiting instruction to the effect that the jury could
only consider the evidence in determining Appellant's identity,
motive, opportunity, intent, or plan in connection with the
capital murder, and because rather than confuse, it actually
helped explain how Appellant came to be linked to that offense.
The trial court could have reasonably concluded that the evidence
did not have a tendency to suggest decision on an improper basis
in light of its announced intention to give a limiting
instruction, and because the facts of the robberies paled in
comparison with the brutality of the charged offense. The trial
court could have reasonably concluded that the evidence did not
have any tendency to be given undue weight by the jury that was
not equipped to evaluate its probative force in light of its
announced intention to give a limiting instruction. Finally, the
trial court could have reasonably concluded that it was unlikely
that presentation of the evidence would consume an inordinate
amount of time or merely repeat evidence already admitted.

  For these reasons, the trial court, after balancing the

74

various Rule 403 factors, could have rationally concluded that
the probative value of the evidence was not substantially
outweighed by the countervailing factors specified in the rule.
Cf. Lawton v. State, 913 S.W.2d 542, 552-53 (Tex. Crim. App.
1995)(trial court did not abuse discretion in admitting evidence
of crime spree, which was important for building an accurate
understanding of what occurred during the offense and of
defendant's motives and intentions in killing the victim, and in
corroborating the accomplice testimony, and while highly
prejudicial, not the type of prejudice which concerns Rule 403);
Johnson v. State, 68 S.W.3d 644, 650-52 (Tex. Crim. App.
2002)(extraneous offenses were highly probative because State was
required to show murder was committed during course of robbery
rather than the theft being an afterthought, because they placed
the primary offense in context of the scheme carried out that
night, and because they tended to prove defendant's identity as
the perpetrator, and such evidence was not unfairly prejudicial).

Therefore, the trial court did not abuse its discretion in
admitting the evidence and the fifth issue Appellant presents for
review should be overruled.

F. Reply to Appellant's Issue Presented for Review No. 6: <u>The
trial court properly instructed the jury that if it was
unable to agree on the answer to the future dangerousness
special issue, the presiding juror should not sign either
form of answer to such issue, and there is nothing to
suggest that the jury's unanimous affirmative answer to that
issue was as a result of confusion over the "10-12" rule or
the court's reading of its instructions</u>.

In the sixth issue Appellant presents for review, he
contends that "[t]here is egregious error in the instructions to

75

the jury at punishment. The Judge did not tell the jury what to do if they could not agree on the answers to special issue number one." (Appellant's brief at 114-115).[26]

This contention is without merit.

When it became apparent that Appellant was about to rest on punishment, the trial court asked if there were any objections to the proposed punishment charge. The State had no objections. Appellant objected to paragraphs 8 and 12 of the proposed charge and submitted two proposed instructions with respect to those paragraphs, neither of which pertained to the future-dangerousness special issue. The trial court overruled both objections and denied Appellant's "motions" requesting the proposed instructions. Appellant's attorney then stated to the trial court that the defense had no other objections to the proposed punishment charge. (XXII R.R. at 12-19; I C.R. at 264-272).

Thus, as Appellant acknowledges, because he failed to raise this specific claim in the trial court, his sentence may be reversed only if he establishes error and that error caused egregious harm. See Mays, 318 S.W.3d at 397 (citing Almanza v. State, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985)).

Here, there was no error, much less egregious error.

---

[26]The quoted issue is taken from the table of contents of Appellant's brief (Appellant's brief at iv) since it appears to be the crux of what he presents on pages 114-115 of his brief and because the issue as set out on page 4 of his brief has an obvious incorrect reference to "guilt/innocence."

The trial court instructed the jury that the only punishment options were death or life in prison. (I C.R. at 250, ¶ 1; XXII R.R. at 20).

The trial court then instructed the jury that if it returned an affirmative finding on Special Issue No. 1 [the future-dangerousness special issue] and a negative finding on Special Issue No. 2 [the mitigation issue], the court would sentence Appellant to death but if it returned a negative finding on Special Issue No. 1 [the future-dangerousness issue], the court would sentence Appellant to life in prison. See Tex. Code Crim. Proc. art. 37.071, § 2(g) (Vernon Supp. 2010).[27] (I C.R. at 251-52, ¶ 5; XXII R.R. at 21-22).

In accordance with Tex. Code Crim. Proc. Ann. art. 37.071, § 2(d)(2) & (3) (Vernon Supp. 2010),[28] the trial court instructed the jury that it may not answer Special Issue No. 1 [the future-dangerousness special issue] "yes" unless all jurors agreed to such answer and that it may not answer that special issue "no" unless ten or more jurors agreed, and that members of the jury need not agree on what particular evidence supports a negative answer to that special issue. (I C.R. at 253, ¶ 10; XXII R.R. at 23).

---

[27]The trial court instructed the jury in accordance with Article 37.071 as it existed at the time of the July, 2004, commission of the offense. The 2005 amendment to this subsection did not affect the wording of this instruction. See Act of May 28, 2005, 79th Leg., R.S., ch. 787, § 9, 2005 Tex. Gen. Laws 2705, 2707.

[28]These subsections have not been amended since July, 2004.

Finally, the trial court charged, "In the event the jury is unable to agree upon an answer to Special Issue No. 1 [the future-dangerousness special issue] under the conditions and instructions outlined above, the Presiding Juror will not sign either form of answer to the Special Issue." (I C.R. at 255, ¶ 11).[29]

Thus, contrary to Appellant's assertion, the trial court did indeed tell the jury what to do if it could not agree on the answer to the future-dangerousness special issue.[30]

Granted, the trial court did not inform the jurors of the effect of a failure to agree on this special issue, but Tex. Code Crim. Proc. art. 37.071, § 2(a)(1)[31] expressly prohibited it from

---

[29]In reading this instruction to the jury, the court mistakenly said "Special Issue No. 2" instead of "Special Issue No. 1." Even the court reporter noted that this was incorrect. (Compare XXII R.R. at 24 with I C.R. at 255, ¶ 11).

[30]While as noted, the trial court misread its instruction, there is nothing in the record to suggest that the jury did not follow the court's written instruction or that it was confused by the conflict, and Appellant does not make such assertions. It bears noting that a similar instruction followed the trial court's instructions regarding answering Special Issue No. 2, the mitigation special issue, (I C.R. at 257, ¶ 13; XXII R.R. at 26), so the court's mistake in reading the charge may well have been evident to the jury when hearing the instruction in the context of the entire charge. In any event, as Appellant notes, the jury unanimously answered the future-dangerousness issue in the affirmative. The trial court polled the jurors on their answers to each of the special issues. (I C.R. at 254, ¶ 11; XXII R.R. at 36-37).

[31]The 2005 amendments to this subsection did not affect this prohibition. See Act of May 25, 2005, 79th Leg., R.S., ch. 399, § 1, 2005 Tex. Gen. Laws 1091; Act of May 28, 2005, 79th Leg., R.S., ch. 787, § 7, 2005 Tex. Gen. Laws 2705, 2706.

doing so.

And as this Court noted in McFarland v. State, 928 S.W.2d
482 (Tex. Crim. App. 1996), in overruling a similar complaint
where the jury was given a nearly identical instruction, there is
no constitutional prohibition to concealing from jurors the
consequences of their deliberations, so long as they are not
misled into believing that ultimate responsibility for the
verdict rests elsewhere, and because the jury was instructed not
to answer a special issue if a unanimous affirmative answer or a
ten-juror negative answer could not be reached, the jury was
given an avenue to accommodate the complained-of potential
disagreements. Id. at 519; accord Prystash v. State, 3 S.W.3d
522, 532 (Tex. Crim. App. 1999). Indeed, this Court has
repeatedly rejected claims that capital murder defendants'
constitutional rights were violated when trial courts denied
their requests to inform juries that the failure to answer a
special issue would result in a life sentence. See Resendiz v.
State, 112 S.W.3d 541, 549 (Tex. Crim. App. 2003); see also
Gardner, 306 S.W.3d at 302; Jackson v. State, 17 S.W.3d 664, 677
(Tex. Crim. App. 2000) (rejecting "12-10" challenge in a case
where jury was deadlocked twice and inquired about the effect of
a hung jury).

Moreover, in rejecting a similar complaint regarding an
earlier version of Article 37.071, this Court noted:

> [W]hile it is true that the jury is instructed that
> they may not answer any of the special issues in a
> manner that would result in a life sentence unless ten

79

> jurors agree to that answer, this instruction follows
> the instruction that the jury may not answer any of
> the special issues in a manner resulting in capital
> punishment unless the verdict is unanimous. Under these
> facts, appellant's argument that jurors will be misled
> lacks merit; every juror knows that capital punishment
> cannot be imposed without the unanimous agreement of
> the jury on all three special issues. The jury is not
> informed of the consequences of a hung jury, but each
> juror will know that without his or her vote the death
> sentence cannot be imposed.

Lawton, 913 S.W.2d at 559.

Indeed, in Prystash, this Court explained that the "10-12"
rule ensures the proper level of jury deliberation by not
informing the jury of the consequences of a non-verdict, while at
the same time ensuring that the death penalty will not be imposed
without the unanimous consent of the jury. 3 S.W.3d at 536-37.

Thus, the trial court did properly charge the jury regarding
what to do in the event it could not agree on the answer to the
future-dangerousness issue and the court's mistake in reading
that instruction was apparent when comparing it to the court's
written charge and in hearing it in the context of the entire
charge.[32] But in the end, this mistake, if even deemed an error,
was not harmful, much less egregious, because the jury did agree
unanimously on the affirmative answer to that special issue and
there is nothing to suggest that such answer was as a result of

---

[32]Egregious harm is less likely to be found if reading the
charge as a whole suggests that the charge overall communicated
accurate information. See, e.g., Barrios v. State, 283 S.W.3d 348,
352-53 (Tex. Crim. App. 2009); Stuhler v. State, 218 S.W.3d 706,
719 (Tex. Crim. App. 2007); see generally 43A George E. Dix &
Robert O. Dawson, Texas Practice: Criminal Practice and Procedure
§ 42.241 (2d ed. 2001).

confusion over the "10-12" rule or the court's instructions.

Accordingly, the sixth issue Appellant presents for review should be overruled.

<u>PRAYER FOR RELIEF</u>

For the foregoing reasons, the State respectfully requests that the judgment of the trial court be affirmed. <u>See</u> Tex. R. App. P. 78.1(a).



_____
James D. Rosenkild
State Bar No. 17279200
Assistant District Attorney
105th Judicial District of Texas
901 Leopard, Room 206
Corpus Christi, Texas 78401
(361) 888-0410
(361) 888-0399 (fax)

<u>CERTIFICATE OF SERVICE</u>

This is to certify that a copy of this brief was mailed this 3rd day of December, 2010, to Appellant's attorney, Larry Warner, 2945 Jacaranda Dr., Harlingen, TX 78550-8658, to his writ attorney, Michael Gross, 106 S. Saint Mary's St., Suite 260, San Antonio, TX 78205-3630, and to Jeffrey L. Van Horn, State Prosecuting Attorney, P.O. Box 12405, Austin, TX 78711.

_____
James D. Rosenkild