1

```
 1                    REPORTER'S RECORD
             APPELLATE COURT CAUSE NO. AP-76,000  76,100
 2            TRIAL COURT CAUSE NO. 04-CR-3453-C
                  VOLUME 9 OF 25 VOLUMES
 3

 4   THE STATE OF TEXAS      )     IN THE DISTRICT COURT
                             )
 5                           )
     VS.                     )     94TH JUDICIAL DISTRICT
 6                           )
     JOHN HENRY RAMIREZ      )     NUECES COUNTY, TEXAS
 7

 8

 9

10

11                       _____

12

13                     INDIVIDUAL VOIR DIRE

14                       _____

15

16

17

18

19            On the 10th day of November, 2008, the

20   following proceedings came on to be heard in the

21   above-entitled and numbered cause before the HONORABLE

22   BOBBY GALVAN, Judge Presiding, held in Corpus Christi,

23   Nueces County, Texas:

24            Proceedings reported by Stenograph

25   Machine.
```

FILED IN
COURT OF CRIMINAL APPEALS

OCT 0 6 2009

Louise Pearson, Clerk

2

```
 1   APPEARANCES:

 2   MR. MARK SKURKA
     SBOT NO. 18475570
 3   MR. VERNON G. SCHIMMEL
     SBOT NO. 24033039
 4   ASSISTANT DISTRICT ATTORNEYS
     901 Leopard, Rm. 205
 5   Corpus Christi, Texas 78401
     Phone: (361) 888-0410
 6
     ATTORNEYS FOR THE STATE
 7
     -AND-
 8
     MR. EDWARD F. GARZA
 9   SBOT NO. 07731200
     ATTORNEY AT LAW
10   719 S. Shoreline, Suite 201
     Corpus Christi, Texas  78401
11   Phone: (361) 888-8877

12   MR. GRANT JONES
     SBOT NO. 10917000
13   ATTORNEY AT LAW
     5826 Beauvais Dr.
14   Corpus Christi, Texas 78414
     Phone: (361) 815-2470
15

16   ATTORNEY FOR THE DEFENDANT,
     JOHN HENRY RAMIREZ
17

18

19

20

21

22

23

24

25
```

3

```
 1                        INDEX
                VOLUME 9 OF 25 VOLUMES
 2               VOIR DIRE PROCEEDINGS

 3   OCTOBER 10, 2008                          Page   Vol.
     Proceedings called by the Court.................. 6      9
 4
     ANNOUNCEMENTS:.................................... 6      9
 5     By Mr. Skurka.................................. 6      9
       By Mr. Garza................................... 6      9
 6     By Mr. Jones................................... 6      9

 7          (INDIVIDUAL QUESTIONING OF VENIREPERSONS)
     VENIREPERSON               Voir Dire      Page   Vol.
 8   JESUS ADAN JIMENEZ, NO. 1    7,13,38              9
     Peremptory No. 1 by the State.................. 55     9
 9   JAMES ALBERT KOLLAJA, NO. 2   58,64,68           9
     Challenge for Cause by the State............... 72     9
10   Granted........................................ 72     9

11   PATRICE NICOLE REED, NO. 3    73,81              9
     Challenge for Cause by the State............... 90     9
12   Defense concurs................................ 90     9
     Granted........................................ 90     9
13
     THOMAS ERNEST DREYER, NO. 7    91,97,127         9
14   Accepted by the State.......................... 141    9
     Peremptory No. 1 by Defense.................... 141    9
15
     PATRICIA MCGEE HUMPHREY, NO. 11  142,150,179,194 9
16   Challenge for cause by Defense................. 196    9
     Granted........................................ 196    9
17   Granted........................................ 196    9

18   Discussion on No. 123.......................... 199    9

19   LAWRENCE VAN HOOZER, NO. 13    204,211,238       9
     Accepted by the State.......................... 250    9
20   Peremptory No. 2 by the Defense................ 251    9

21   ANNE CHRISTINE MATTSON, NO. 15   252,259,292,299 9
     Accepted by the State.......................... 301    9
22   Peremptory No. 3 by Defense.................... 301    9

23   MARY ANN GILBERT, NO. 17    302,310,331          9
     Accepted by the State.......................... 353    9
24   Accepted by the Defense........................ 353    9
     Juror No. 1 admonished......................... 353    9
25
```

4

```
 1            (INDIVIDUAL QUESTIONING OF VENIREPERSONS)
                          (Continued)
 2   VENIREPERSON                    Voir Dire       Page    Vol.
     ANGEL R. ESCOBAR, NO. 18        355,361,385,404          9
 3   Agreed strike..................................   409     9

 4   Evening recess ................................   410     9
     Court Reporter's Certification.................   411     9
 5

 6            ALPHABETICAL INDEX TO VENIREPERSONS
     VENIREPERSON                    Voir Dire       Page    Vol.
 7   DREYER, THOMAS ERNEST, NO. 7    91,97,127                9
     Accepted by the State..........................   141     9
 8   Peremptory No. 1 by Defense....................   141     9

 9   ESCOBAR, ANGEL R., NO. 18       355,361,385,404          9
     Agreed strike..................................   409     9
10
     GILBERT, MARY ANN, NO. 17       302,310,331              9
11   Accepted by the State..........................   353     9
     Accepted by the Defense........................   353     9
12   Juror No. 1 admonished.........................   353     9

13   HUMPHREY, PATRICIA MCGEE, NO. 11  142,150,179,194        9
     Challenge for cause by Defense.................   196     9
14   Granted........................................   196     9
     Granted........................................   197     9
15
     JIMENEZ, JESUS ADAN, NO. 1      7,13,38                  9
16   Peremptory No. 1 by the State..................   55      9

17   KILLAJA, JAMES ALBERT, NO. 2    58,64,68                 9
     Challenge for Cause by the State...............   72      9
18   Granted........................................   72      9

19   MATTSON, ANNE CHRISTINE, NO. 15  252,259,292,299         9
     Accepted by the State..........................   301     9
20   Peremptory No. 3 by Defense....................   301     9

21   REED, PATRICE NICOLE, NO. 3     73,81                    9
     Challenge for Cause by the State...............   90      9
22   Defense concurs................................   90      9
     Granted........................................   90      9
23

24

25
```

5

1                    ALPHABETICAL INDEX TO VENIREPERSON
                          (Continued)
2    VENIREPERSON                    Voir Dire      Page'    Vol.
     VAN HOOZER, LAWRENCE, NO. 13    204,211,238             9
3    Accepted by the State...........................  250    9
     Peremptory No. 2 by the Defense.................  251    9
4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

8

1     THE COURT:  Court calls 04-CR-3453,
2  State of Texas versus John Henry Ramirez.  State ready
3  to begin?
4     MR. SKURKA:  State's ready.
5     THE COURT:  Is Defense ready?
6     MR. GARZA:  Defense is ready, also,
7  Judge.
8     THE COURT:  Okay.  Well, I guess, we'll
9  go ahead and begin if you-all are ready to go.
10     MR. SKURKA:  We're ready, Your Honor.
11     MR. JONES:  I'm not table ready, but
12  I'm ready.
13     THE COURT:  Yeah, well, we're working on
14  that.  We're working on that.  I'm going to see if we
15  can get a little table up here, make things.
16     MR. SKURKA:  We'll find a place to put it
17  back there, anything he wants.
18     (Pause in proceedings.)
19     (Venireperson enters courtroom.)
20     THE COURT:  All right.  Come on up here
21  and have a seat.
22     (Complies.)
23
24
25

7

1     VENIREPERSON NO. 1,
2     JESUS ADAN JIMENEZ,
3     VOIR DIRE EXAMINATION
4  BY THE COURT:
5     Q.   How are you?
6     A.   Pretty good.
7     Q.   All right.  You are juror No. 1.  Your name
8  is?
9     A.   Jesus Adan Ramirez.
10     Q.   Okay.  We have your questionnaires, so we
11  know a little bit about you, but we need to talk to
12  you about some things, all right?
13     A.   Okay.
14     Q.   And what we want here is a person who can
15  keep an open mind, okay, and we need -- we're looking
16  for a juror that can follow the law, all right, those
17  are the two things, all right?  And, I guess, we'll
18  talk about some stuff.
19     First of all, this is a criminal case.
20  Have you ever been a juror in a criminal case before?
21     A.   No, sir.
22     Q.   Okay.  Well, as you probably know, in a
23  criminal case, the State, they brought the charges,
24  they have the burden of proof, you understand that?
25     A.   Yes, sir.

9

1     Q.   All right.  That is, they have brought
2  allegations of capital murder against Defendant, over
3  here, but they got to prove it, okay?  The law says,
4  "State, you've got to -- you bring the charges, that's
5  fine," but they got to prove sit beyond a reasonable
6  doubt, all right?  That's the standard of proof.  And
7  we talked a little bit about this on -- on the day
8  you-all came in and filled out your questionnaires,
9  okay?  And we don't have a definition of what beyond a
10  reasonable doubt is, but it's the highest burden of
11  proof that we have in the criminal -- in all the law,
12  okay?  And it's not -- it's not beyond all doubt, but
13  it is beyond a reasonable doubt and -- and it's --
14  it's a high burden.  You okay with all that?
15     A.   Yes, sir.
16     Q.   Okay.  Now, as part of all this, of course,
17  is the concept of if they've got to prove it, well,
18  then he's innocent until they do.  And that's all of
19  our rights, right?
20     A.   Yes, sir.
21     Q.   In other words, if it's -- if it's incumbent
22  upon them to prove it, then you have to presume him to
23  be innocent until they've proven it, if they can prove
24  it, okay, we don't know if they can prove it or not.
25  They have to bring evidence, you know?  You just don't

1  -- they don't just says, well, we've got, no, you got
2  to bring the evidence, you have to convince the jurors
3  beyond a reasonable doubt and then and only then can
4  he be convicted.  You understand that?
5     A.   Yes, sir.
6     Q.   All right.  You got a problem with that?
7     A.   No, sir.
8     Q.   Okay.  So we're good there.  Okay.  Now, part
9  of being innocent until proven guilty, part of the
10  fact that the State has to prove their case, Defendant
11  doesn't have to do anything, because he doesn't have
12  the burden of proof.  In other words, when we're
13  charged in this country with a crime, we don't have to
14  do anything.  They have to prove it, okay?  And, as
15  part of that I don't -- if I'm a defendant, I don't
16  have to testify.  I don't have to testify.  It's my
17  right not to testify, because they got to prove their
18  case, okay?
19     Now, I don't know if the Defendant's
20  going to testify in this case or not, that's -- that's
21  a decision that, you know, his lawyers, maybe they
22  feel like, you know, what, we don't have -- we're
23  going to advise him not to testify, because -- because
24  we don't think they've proven their case, or for
25  whatever reason.  There's lots of reasons why a person

10

1    wouldn't want to testify.  Maybe he -- maybe he gets
2    nervous, maybe he laughs, inappropriately, you know?
3    Maybe he -- he doesn't have an education and --
4              But in any event, the question -- the
5    question I have for you is this:  If the law says you
6    can't hold it against him, all right, if he chooses
7    not to testify.  In other words, you can't -- if you
8    get selected on this jury, you can't go back and there
9    and say "You know what I'm not sure about the State's
10   testim-- their evidence, their witnesses, but this guy
11   over here, he didn't testify, so I'm going to -- I'm
12   going to put that in the State's column, I'm going to
13   give it a little weight, because he didn't tell me his
14   side of the story."  Can't do that.  Law says you
15   can't do that, all right?
16   A.    (Nods head.)
17   Q.    What I need to know is, are you going to hold
18   it against him?
19   A.    No, sir.
20   Q.    Okay.  So then you could follow the law and
21   the Constitution and -- and follow that instruction
22   that I give you.
23   A.    Yes, sir.
24   Q.    Okay.  Now, this charge is capital murder,
25   okay?  And what is capital murder?  Well, of course,

11

1    it's murder, right, the intentional taking of the life
2    of another, but it's more than that, it's like murder,
3    plus, okay?  And there's a number of ways that the
4    State can allege capital murder.  In this particular
5    way, the allegation is that the Defendant, on or about
6    July the 19th of '04, committed the offense of murder
7    while in the course or -- of committing or attempting
8    to commit a robbery, okay?  That -- that's the
9    allegation.  In other words, so -- so what we have is
10   -- is if the allegation of murder, plus the allegation
11   that while he committed murder, he was committing or
12   attempting to a commit a robbery.  That's what makes
13   it capital murder.  You understand that?
14   A.    Yes, sir.
15   Q.    Okay.  And that -- and that the State would
16   have to prove not just -- I mean, you might go back
17   and there say, "You know what, I think they've proven
18   the murder part.  I don't think they've proven the
19   robbery part," and that's -- that's an element of
20   capital murder.  You understand that?
21   A.    Yes, sir.
22   Q.    Okay.  Would you -- would you require the
23   State, as the law requires, to prove each and every
24   element of the offense?
25   A.    Yes, sir.

12

1    Q.    Okay.  Okay.  Now, you've never been on a
2    criminal jury before, so I'm going to tell you how it
3    works, okay?  This is -- this is how a trial works
4    when we -- when we have a jury.  We bring the jurors
5    in, we do this process, they get seated, and then the
6    State their evidence.  Defense, you know, they -- if
7    they want to present evidence they can.  If they don't
8    want to, they don't have to, because they don't have
9    any burden of proof.  And then we -- they do closing
10   arguments.  I read you the charge.  I give you this
11   packet.  And if you get on this jury, like every jury,
12   you get a packet at the end and that's like -- it's
13   like a -- kind of like an instruction manual, all
14   right?  It tells you the law that you're supposed to
15   apply and whatnot.  And then the jury decides whether
16   State has proven their case beyond a reasonable doubt,
17   each and every element of the offense.
18             If the Defendant is convicted, then we go
19   on to the second -- well, let me do this.  If he's
20   acquitted, that's the end of it.  It's over with.  You
21   go home.  All right?  If Defendant is convicted, then
22   we go on to the second part of the trial, okay?
23   That's called "the punishment phase."  In this
24   particular case, you will be asked to answer -- you
25   won't be asked to assess a punishment.  What you will

13

1    be asked to do is to answer two questions, okay?  You
2    think you could do that?
3    A.    Yes, sir.
4    Q.    Okay.  You think you could sit and listen to
5    the evidence, as a juror, and determine whether the
6    State has proven their case beyond a reasonable doubt?
7    A.    Yes, sir.
8    Q.    Okay.  And then, if -- if, in fact, you
9    believe they have, and the jury finds the Defendant
10   guilty, do you think you could, then, answer -- sit
11   with the jury and -- and answer these two questions?
12   A.    Yes, sir.
13             THE COURT:  Okay.  All right.  Okay.  At
14   this time, I'm going to turn the floor over to Mr.
15   Skurka.  He's the State's prosecutor.  And, of course,
16   he gets to go first, ask the questions first, because
17   he's got the burden of proof.
18             MR. SKURKA:  Thank you, Your Honor.
19             VOIR DIRE EXAMINATION
20   BY MR. SKURKA:
21   Q.    Good morning, Mr. Jimenez.  My name, again,
22   is Mark Skurka.  This is Geordie Schimmel.  He's one
23   of the assistant D.A.s here at the office.  And it's
24   going to be our privilege to present this case to you,
25   if you're sworn in as a juror on this case.

14

1    This is kind of like an audition kind of,
2  right?  You have to sit there and listen to us.  And
3  we're going to ask you some questions and go over some
4  laws, just like the Judge did with you.  I can tell
5  you, right off the bat, there's no right or wrong
6  answers.  Don't go in there and say, "Well, gosh, I've
7  got to answer in such a way that it will make Mr.
8  Garza happy or I've got to answer in such a way to
9  make Mark Skurka happy or the Judge happy," okay?  You
10 have your own feelings and opinions and stuff.  We
11 just need to know what they are.  Does that make
12 sense?
13    A.    Yes, sir.
14    Q.    'Cause we want to kind of start off on a
15 loyal -- a level playing field.  Remember a couple of
16 weeks when I was talking to you about a -- I think I
17 was talking about the Dallas Cowboys and Washington
18 Redskins, and I just don't like to Washington
19 Redskins, and that it showed that -- not that I'm a
20 bad person, but I just couldn't be fair when it comes
21 to the Washington Redskins.  And, you know, everybody
22 has their own feelings and their own opinions, and
23 stuff, but we're not here to argue with you about
24 them, we just want to know what they are, okay?
25         So you can answer all the questions, no

15

1  matter -- we'll let the chips fall where they may.  We
2  just want to know how you feel.  Is that okay?
3    A.    That's fine.
4    Q.    Okay.  Tell me about -- the very first issue
5  that we're going to talk about is the death penalty.
6  And just kind of tell me in your own words how you
7  feel about the death penalty?
8    A.    Well, I believe in the death penalty, if --
9  if we take -- if you take a life for a life.  But then
10 again, and there are certain situations where I do
11 believe the death penalty is necessary for repeat
12 offenders, or, you know, if they are a harm to
13 society.  Because I believe that, you know, give them
14 years in prison, it's just wasted money for, you know,
15 for them to sit there when they are not doing anything
16 for society.
17    Q.    That's pretty much what you said in your
18 questionnaire.  And we have a copy of the
19 questionnaire you filled out.  And I was struck by
20 that term "retake."  Can you expound on that a little
21 bit?
22    A.    I just think, like, you know, the old saying,
23 you know, "An eye for an eye," and that's what I feel
24 that that penalty is, you know?  You say that somebody
25 killed somebody, but yet, you want to kill them.  It's

16

1  just like an ongoing process and just more hate comes
2  out of it, more families are upset, more people are
3  upset.  And, I mean, it's already been done.  What has
4  been done has been done.
5    Q.    In other words, if you -- if a life has been
6  taken, why make it worst by taking another life?
7    A.    Uh-huh.
8    Q.    So you think that society shouldn't have the
9  death penalty?
10    A.    Oh, like I said, I do believe there are
11 certain situations where the death penalty is
12 necessary, so I do not believe it should be outlawed,
13 like.  But there -- you know, there are ways that
14 people go about it.
15    Q.    Like what?
16    A.    I don't know exactly, but...
17    Q.    Well, a minute ago you were saying something
18 like, well, if you're on death row, you're just
19 wasting time --
20    A.    Yeah.
21    Q.    -- up there and costing money.  So I'm trying
22 to figure out where you're -- which way you're kind of
23 thinking about.
24    A.    Well, like I said, like, I mean, I don't have
25 a problem with it, but I'm -- it's necessary, unless

17

1  it is absolutely necessary.
2    Q.    Okay.  So, would it -- in your questionnaire,
3  too, you put, "Although I do not believe the death
4  penalty ever ought to be invoked, as long as the law
5  provided for it I could assess the death penalty in
6  the proper case."  Is that how you feel?
7    A.    Yes, that's how I feel.
8    Q.    But the start of that sentence starts, "I do
9  not believe the death penalty ever ought to be
10 invoked."  So you don't think we should us it in our
11 society?
12    A.    Like I said, unless there's a reason for it.
13    Q.    Okay.  'Cause there's some people that say,
14 "My gosh, you know, we've come so far, you know?
15 We're in the 21st Century.  Why do we to have stuff
16 like this," and then some people say, "Well, you have
17 to have it in some cases."  How do you feel about
18 that, those statements?
19    A.    I can, you know, compare with that, because
20 I'm not against it, but I'm not for it.  It's
21 something that is there, and, I mean, I go -- the law
22 gives something that should be needed because they
23 think it should be needed.
24    Q.    So you're kind of right there in the middle?
25    A.    Yeah.

18

```
 1        Q.    You said, too, in your questionnaire, "But I
 2   would really have to think, because a person's
 3   entitled to life like everyone else."  When you're
 4   talking about that, you're talking about the suspect
 5   or the defendant, right?
 6        A.    Absolutely.
 7        Q.    Do you think people give up their
 8   entitlements to life if they've done certain bad
 9   things?
10        A.    I think, yeah, you reap what you sow.  I
11   would say that.
12        Q.    So what you're saying is people have to
13   suffer the consequences of their actions.
14        A.    Yes, sir.
15        Q.    Which is -- that's a normal reaction, too.
16   Ordinarily, you wouldn't want to -- kill people --
17        A.    No, sir.
18        Q.    -- or put them to death.  I'm talking about
19   the State, or people, but you know, there may be some
20   -- some, I guess, instances that it may be necessary.
21   Like -- like what kind of instances would you -- would
22   come to mind for you?
23        A.    I couldn't really tell, because, I mean, --
24        Q.    Well, --
25        A.    -- I don't know the law.
```

19

```
 1        Q.    -- a minute ago you said something about
 2   repeat offenders.  Remember you said that?
 3        A.    Yes, sir.
 4        Q.    That if somebody's like a, I guess, you'd
 5   call it a career criminal or something like that, --
 6        A.    Uh-huh.
 7        Q.    -- that would be some reason that you would
 8   have to maybe --
 9        A.    Yes, sir.
10        Q.    -- have the --
11        A.    I think that would show that they're not
12   getting better or they would endanger another person.
13        Q.    Sure.  What about, do you understand, though,
14   that the law that the Judge is -- is pretty much told
15   you or is going to tell you, either through the
16   questionnaire or the jury charge, is you don't have to
17   have a bad history in order to get the death penalty.
18        A.    Oh, yeah, I --
19        Q.    Does that surprise you?
20        A.    -- remember that question.
21        Q.    You remember that question?
22        A.    (Nods head.)
23        Q.    What do you think about that?
24        A.    No, it doesn't surprise me at all, because
25   there are serious situations, like in a case, I mean,
```

20

```
 1   it doesn't mean there has to be two killings for you
 2   to get one, you know?  It's not like a two to one or
 3   keeping score game on your life or the life you're
 4   living.
 5        Q.    So could you envision a situation, perhaps,
 6   where maybe the person's never committed any crime
 7   before, doesn't even have a traffic ticket, that you
 8   could vote for the death penalty?
 9        A.    Yes, sir, I do believe that.
10        Q.    Okay.  Why do you think that?
11        A.    Like I said, every situation, every
12   circumstance is different.  And depending on the
13   person, depending on what they did, shows what they're
14   likely to do in the future.
15        Q.    That's a good point.  Tell me about this,
16   when you first came into that room, remember we had,
17   like, I don't know, 200, 300 people in that big room,
18   and the Judge came down and everybody -- I don't if
19   you've ever been called for jury duty, but usually
20   it's on Monday, and, generally speaking, you know, you
21   might land on a D.W.I. case or somebody suing somebody
22   in a contract dispute, and the Judge came down and
23   said, "Folks, this is a criminal case and this is a
24   capital murder case where the Defendant could be
25   eligible for the death penalty," tell me what the
```

21

```
 1   first thing that struck your mind when you heard it
 2   was that kind of a case, that kind of a big case.
 3        A.    Well, like, I said, this is my first time
 4   being called for jury duty, so I wasn't -- didn't know
 5   what to expect, so it didn't really shock me or
 6   anything.  I just thought it was another case like any
 7   other.  But then, he was telling you about -- I
 8   listened to him tell when he was stating the law of it
 9   and how it is another crime while murder, because like
10   you-all said, you can't do the death penalty if it's
11   just murder, but it has to be with another kind of
12   charge.
13        Q.    That's pretty much right.  But -- but did it
14   upset you or worry you that, my gosh, here I am, I've
15   never even been on jury duty before and I got to do
16   the highest kind of case there is?
17        A.    No.  It didn't worry me, at all.  I was just,
18   you know, listening to what you-all had to say, and,
19   you know, what it is about.  I didn't know anything
20   about it.
21        Q.    And I appreciate it, 'cause judges and
22   lawyers like when people actually listen to us.
23   Sometimes we think we're -- that nobody's listening,
24   but I appreciate you listening to all of us, so we can
25   go over these things.  Because it's very true,
```

22

1  Mr. Jimenez, it doesn't matter if you're a first timer
2  on the jury or if you've been on five juries before,
3  you know?  All we want is people that can be fair,
4  listen to the evidence and make a decision based on
5  the evidence, okay?
6      A.   Yes, sir.
7      Q.   Tell me about this, when you saw the person,
8  and, you know, have you given a lot of thought about
9  the death penalty before you got called in that day or
10  because the questionnaire made you think about it are
11  more, or since then have you thought about it a lot
12  more?
13     A.   I never gave it thought.  I just sort of had
14  the same feelings, I mean, like, I'm -- like, I said,
15  I'm sort of in the middle of it.  I'm not for it.  I'm
16  not against it.  I know a lot of people have, you
17  know, a lot of things.
18     Q.   Some people tell us, "Well, gah, this is the
19  first time I've really had to think about it, 'cause
20  now I'm in that position."  How about you?
21     A.   I mean, I've thought about before, but that
22  was, like, my feelings towards it, it has to -- see
23  the circumstances on -- if it should be there or
24  should not be there for that individual or that case.
25     Q.   How do you feel about sitting on this type of

23

1  a jury?
2      A.   Okay.  I haven't, like, done it before or
3  anything, but --
4      Q.   I'm talking about a capital murder.
5      A.   Oh, a capital murder, sitting on a capital
6  murder case?  I don't really have any feelings.  I
7  think it's interesting on, maybe, to see how the law
8  does work.  Like, I've already learned a lot by the
9  time you-all gave us that PowerPoint, when we were
10  there the first time.
11     Q.   So it doesn't bother you or excite you or
12  worry you about having to make that decision?
13     A.   No.  I guess, I'm not to that point, yet.
14     Q.   Well, let's talk about that just a minute,
15  Mr. Jimenez, because I got to tell you, straight off
16  the bat, like I told you that very first day, the
17  State of Texas is going to ask at one part of this
18  trial, if we get that far, the State of Texas is going
19  to ask you, Jesus Jimenez, and 11 other people to
20  evaluate all of the evidence, make a decision on
21  whether this person is guilty or not and then ask you
22  to answer these certain questions, that we'll talk
23  about in a minute, in such a way that somebody's
24  life's going to be taken.  And it's that man right
25  there.  I want you to look at him for me.  That's John

24

1  Henry Ramirez.  We're not talking about somebody
2  you've seen on TV or some abstract thing on paper.
3  That's him.  Can you look at him and tell me that you
4  can listen to all the evidence, and if the evidence
5  points to such a way that he could -- should be
6  executed, you can vote for that?
7      A.   Yes, sir.
8      Q.   I want you still looking at him, too, and
9  tell me if you think that the evidence shows that he
10  should not be executed and the questions shouldn't be
11  answered a certain way can you vote for a life
12  sentence?
13     A.   Yes, sir.
14     Q.   And if you think -- it's like the Judge said,
15  if the State proves to you all the elements beyond a
16  reasonable doubt can you vote that he'd be guilty?
17     A.   Yes, sir.
18     Q.   And if the State doesn't prove all the
19  elements can you vote for not guilty?
20     A.   Yes, sir.
21     Q.   Okay.  It sounds to me like you're a pretty
22  fair guy and you're going down the middle of the road.
23  And it's very important about what the Judge said
24  about don't come in with, like, a, you know,
25  preconceived notions and wait till you hear everything

25

1  before you make a decision.  So right now, you're not
2  leaning one way or other?
3      A.   No, sir.
4      Q.   Okay.  Fine.  Thank you.  Tell me about what
5  kind of work did you do?  I see that you're
6  unemployed, now, but what kind of work did you used to
7  do, --
8      A.   Well --
9      Q.   -- or have you done?
10     A.   -- my first job, I worked at a university, at
11  U.T.S.A., when I was going to school, as an
12  orientation leader.  I had to, basically, take a class
13  for a semester and know all about the university.  So
14  I know U.T.S.A. like the back of my hand.
15     Q.   That's the one that gives, like, the new kids
16  tours and kind of shows them --
17     A.   Yes, sir --
18     Q.   -- around?
19     A.   -- my -- But this time, it was the first year
20  they had to stay overnight for two nights and stay
21  with us for three days.  So I had 30 people each week,
22  biology majors, which was my major, under my
23  supervision for the whole three days, from seven in
24  the morning, till 11 at night, so, but it was a great
25  job.

26

1    Q.   A lot of work, huh?

2    A.   Yeah, a lot of work, because they trained us

3    really hard, though.  We had to know everything about

4    that school and recite it, like, on top and walk

5    backwards while giving the tour.  So it was a -- I

6    loved the job, 'cause I love listening to people.

7    Like, that was my -- actually, I wanted to double

8    major in psychology.  And so, I got to hear a lot of

9    things from other people and help them out, and

10   actually had the knowledge to help them make their

11   college life easier.

12         And then the next job I had, I worked at

13   a movie theater.  But that was just a job to -- I love

14   movies, and I got to learn the theater.  But it was

15   actually the opening of Palladium, which was the

16   newest movie theater in San Antonio, which had a

17   restaurant, a bar.  I mean, so it was like a whole

18   family night thing if you went there.

19         And after that I came here and I worked

20   at a bait stand.  And I was a shrimperman for a while,

21   got to shrimp, actually, on the Bay of Corpus Christi.

22   That was an interesting job.

23   Q.   That's hard work.

24   A.   Yeah, that is definitely hard work.  Your

25   hands will be bleeding after that.

27

1    Q.   So are you -- are you saying that you went to

2    school as a biology major and psychology major?

3    A.   Double major.

4    Q.   And how far have you been on in school?

5    A.   I'm almost to my Associates.  I have four

6    more classes.  I just couldn't afford it, anymore.

7    But I went to Del Mar for a semester and got some more

8    -- a few more extra hours.  And I'm waiting to get my

9    Associates.  But, in January, I think I will be

10   leaving to T.S.T.C. for wind energy, so that way, I

11   can do a program for about seven or eight months --

12   well, it's a year and four -- a year and four months,

13   but I'll be done with it early, 'cause I pretty much

14   have all my basic credits.

15   Q.   I'm sorry, I didn't hear what you said,

16   T.S.T.A.?

17   A.   T.S.T.C.  Texas State Technical College.

18   Q.   Okay.  Where is that?

19   A.   Sweetwater, West Texas.  And I'll be working

20   for a wind energy program, which is like a new thing.

21   Like, it's the only college that has it in the United

22   States.  But I'll be making money to pursue my dream

23   to go back as a biology major, 'cause I do want to go

24   to med school, eventually.

25   Q.   Well, that's kind of where I was leading to.

28

1    Where do you want to end up?

2    A.   As a psychiatrist.

3    Q.   As a psychiatrist.  Oh.

4    A.   Yes, sir.

5    Q.   Because you've kind of bounced around with

6    things, but I was just trying to figure out what your

7    -- what your goal or what your ultimate plan was.

8    A.   That is my goal.

9    Q.   Why a psychiatrist?

10   A.   I've always been there to listen and, you

11   know, help people work out their problems.  I've sort

12   of been like that since elementary.  I guess, because

13   I had nobody to talk to, I helped everybody else

14   figure out their problems.  And in high school every

15   -- all of my friends would always be like, "You're the

16   only one I can talk to.  You're the only one that

17   helps me out.  You're the only one who actually

18   listens to me," and so I just got a drive to say,

19   "Hey, maybe I should be a psychiatrist."  And my uncle

20   was a doctor and he talked to me a little bit about

21   that.  And I figured out, you do have to go to med

22   school and do your residency for psychiatry.  And I

23   mean, I've always been a studious person, so, I think

24   I would enjoy it.

25   Q.   So the wind energy thing is just kind of a

29

1    side line to make money --

2    A.   To make money.

3    Q.   -- so you can go back and finish your school.

4    A.   Yes, sir.

5    Q.   Well, I've been -- I was in West Texas this

6    last summer.  There are a lot of windmills out there.

7    A.   Yeah.  Well, I'm excited for that.  I mean,

8    it's a great job.  And plus, I think our nation is,

9    like, really trying to find another source of energy,

10   and I think that will explode and it's nice to know

11   that I might have that knowledge before a lot of other

12   people get on it.

13   Q.   Yeah, that's a big boom.  Let me go back to a

14   few other things, here.  I need to ask you a couple of

15   other questions about your service here as a juror.

16   One of the things -- how do you feel about police

17   officers as witnesses?

18   A.   They're okay.  I mean, it's depending on the

19   police, you know, like of what happened and who was

20   there.  Because I know there are good cops out there,

21   but I also know that there are bad cops that do lie.  But

22   on the stand, I mean, I would hope that nobody would,

23   what is it called, purge, or?

24         THE COURT:  Perjure themselves?

25         VENIREPERSON NO. 1:  Yes.

30

1  Q.  (BY MR. SKURKA) We're just -- we didn't pass
2  a note about you, we're just wondering about if you're
3  related to Fred Jimenez, one of the lawyers here in
4  town?
5  A.  Yes, sir.  That's my uncle.
6  Q.  Fred and Anna?
7  A.  Yes.
8  Q.  His sister?  That would be your --
9  A.  Go Go.
10  Q.  -- aunt?
11  A.  Well, that's what I call her, Go Go.  Yes,
12  sir.
13  Q.  You call her what?
14  A.  Go Go.
15       MR. JONES:  Go Go.
16       VENIREPERSON NO. 1:  Go Go Power Rangers.
17  That's what I call her.
18  Q.  (BY MR. SKURKA) Go Go what, Power Rangers?
19  A.  Just, Go Go.
20       MR. SKURKA:  I'm going to have to spring
21  that on her, Judge.
22  Q.  (BY MR. SKURKA) I call her, Anna.
23  A.  Yeah.
24  Q.  No, we've known Fred for many years.  Have
25  you ever got to watch any of his cases or kind of

31

1  followed his cases?
2  A.  No, but he has defended me before.
3  Q.  Was he the one that handled your P.O.M. case,
4  your possession of marijuana case?
5  A.  Yes, sir.
6  Q.  Okay.  Now, you're currently on pretrial
7  diversion for that or what?
8  A.  Yes, sir.  I should be done in my -- is on
9  Wednesday and that's when I'll be done.  Because I
10  already finished everything and I just need to pay off
11  the court costs.
12  Q.  What court did that come out of, do you
13  remember the name of the Judge?
14  A.  Second floor, I think, third floor.  I -- I
15  don't remember.
16  Q.  It would be the 7th floor.  It's a
17  misdemeanor, correct, or a felony?
18  A.  I didn't know.  They have said it was a
19  misdemeanor.
20  Q.  Okay.  But that's usually the 7th floor, not
21  the 2nd floor.
22  A.  Okay.
23  Q.  The 7th floor is misdemeanor and the 8th and
24  9th are felonies, generally speaking.  But you don't
25  remember the name?

32

1  A.  No, sir.
2  Q.  And how long were you on pretrial diversion
3  for?
4  A.  For three months.
5  Q.  For three months.  And you think you're going
6  to complete everything successfully?
7  A.  Oh, I know I will.
8  Q.  What about -- you said he defended you on
9  that case.  Did you have a bad experience with a
10  police officer during that case?
11  A.  That case I did, because the police officer,
12  actually, -- I mean, I did smoke at the time.  I don't
13  smoke, anymore.  But I did smoke at that time.  And he
14  had got me out of the car and arrested me for warrants
15  and then both the cops searched my car twice, in front
16  of my face.  And then they arrested me, like I said
17  for the warrants, and put me in the back of the car
18  that I had out.  And I was telling them, you know,
19  like, "I was the driver, and, yeah, I had friends with
20  me, I was just helping them move a few things, like,"
21  blah, blah, blah.  But then they go in the back of the
22  house where my truck was parked, where I can't see
23  them, anymore, and then 20 minutes later come out with
24  a perfectly rolled joint, saying, "Is there anything
25  else in your car?"  And I said, "You know, that's not

33

1  mine."  And the guy even next to me that he arrested
2  said, "He didn't have anything in the car."  But they
3  said -- and he said, "Well, I'll take the charge for
4  him."  He's like, "Well, you can't take the charge,
5  because he was the driver," and he kept saying, "Well,
6  I know he didn't have anything in the car."  And I
7  knew myself I didn't have anything in the car.
8  Q.  So you think the cops had the cigarette?
9  A.  So either -- No.  I don't think the cop --
10  either could have been the cop or the three people who
11  were in there, one of three people that were in my
12  car.
13  Q.  Uh-huh.
14  A.  I don't know who it is and I'm not going to
15  blame anybody for it, and that's why I did what I had
16  to do for myself and get this --
17  Q.  So it's one of these deals where there's four
18  or five people in the car and the cop's going to get
19  one of them.
20  A.  Yes.
21  Q.  And they --
22  A.  But they said --
23  Q.  -- picked you as the driver.
24  A.  Yes, sir.  But they said they found it in my
25  middle console, which just seemed funny to me, because

34

1  I saw them search it twice in front of my face.
2      Q.   So do you think they put it there?
3      A.   I don't know what exactly happened.  I don't
4  know if somebody threw it when I wasn't looking, or if
5  they didn't, in fact, you know, put it there.  Because
6  I've heard about that before, about dirty cops that do
7  frame.
8      Q.   Well, we need to talk about that, because
9  I've got -- you got to put yourself in my shoes, here.
10     A.   Yes, sir.
11     Q.   There's going to be some policemen testify in
12 this case.  There's going to be probably half
13 policemen and half civilian witnesses.  And there will
14 be quite a few witnesses.  And -- and I just need to
15 know if that's going to effect you being a juror in
16 this case?
17     A.   Like I said, I don't have a problem with
18 police officers or, you know, civilians, like I said,
19 but every person has the ability to lie or tell the
20 truth.  It doesn't matter if they're wearing a badge.
21 It doesn't matter if they're wearing a necktie.
22 Anybody can be deceiving or anybody can be honest.
23     Q.   Here's my problem, what if -- I don't know
24 who these cops were that were involved in your arrest,
25 --

35

1      A.   Uh-huh.
2      Q.   -- but what happens if you're sitting there
3  on the jury and we're halfway through the trial, and
4  all of a sudden I call my next witness and it's an
5  officer whom maybe, like, you know, did something on
6  this case, pretty minor, and you go, "Oh my gosh,
7  that's the cop that was involved in my case.  I'm not
8  going to believe a word he's going to says?"
9      A.   Oh, I don't really -- I don't even remember
10 the cops that were -- arrested me.  Like, I don't
11 remember what they looked like.  I didn't pay much
12 attention.  Like I said, I was smoking at the time,
13 so, you know, there could have been a possibility.  So
14 I did do my time and I cleaned up my act and, you
15 know, I'm still the person I am right here.
16     Q.   Well, but you see my point of view.
17     A.   Yes, sir, I definitely see.
18     Q.   A person comes in, all of a sudden it clicks,
19 and you go, "Oh, my gosh, that's the guy.  I don't
20 believe him," even though he's got some kind of minor
21 part in this case, is that going to effect you in any
22 way?
23     A.   No, sir.
24     Q.   Okay.  What do you think the purposes of
25 trials are -- I'm sorry -- the purpose of punishment

36

1  is?
2      A.   I think the purpose of punishment is to set
3  an example to, you know, help others know that there
4  are consequences for their actions.
5      Q.   Do you think people -- when we punish people
6  in the Criminal Justice System is it more to
7  punishment them deter others or to rehabilitate the
8  person?
9      A.   I think it's to rehabilitate the person.  And
10 I mean, to do a little bit of both.
11     Q.   Do you think everybody can be rehabilitated?
12     A.   I do believe there are -- everybody does need
13 somebody to talk to, but I don't believe everybody can
14 be rehabilitated.
15     Q.   And why not?
16     A.   There's just certain cases where the mind
17 strays too far from the body.
18     Q.   Explain that for me.
19     A.   Like, you -- a person becomes so aggressive
20 or a person becomes so, in one way set on their
21 tracks, that there's no changing them back from all
22 the things they've already done.
23     Q.   Did you -- did you expect when you came into
24 the courtroom, either back then or today, that during
25 the trial that you'll get to hear both sides of the

37

1  story?  Would you expect to hear both sides of the
2  story?
3      A.   I'd expect to hear both sides of the story,
4  because -- but like once they said that it is your
5  duty -- the State's duty to -- I was expecting to hear
6  more from you-all.
7      Q.   And you will.  There's no doubt, 'cause we
8  have -- as the Judge explained, we have the burden of
9  proof.  But sometimes people say, "Well, you know, I
10 want to hear what he says," and, you know, if you want
11 to hear that, that's fine, but we do have this law,
12 like the Judge was saying, the Fifth Amendment.  But
13 some people say, "Look, you know, I don't care about
14 the Fifth Amendment, I still want to hear what he's
15 got to say for himself."
16     A.   Oh, no, I definitely agree with the law.  And
17 I think he can have the choice to do whatever he wants
18 to do in this case, because -- like the Judge said you
19 did bring the charges towards him.
20     Q.   So you're okay with him not -- so he may
21 testify, he may not, I have no idea.  But if he
22 doesn't testify, would you be able to still make a
23 decision?
24     A.   Oh, absolutely, I think, like I said, it's
25 his choice.

38

1      Q.   Okay.  Or some people do say, "You know, I
2   still want -- I expect to hear what he's going to
3   say," and they say, "I can't make a decision if I
4   don't hear his side."  But you're not that way or you
5   are that way?
6      A.   No, sir, I'm not -- I'm not expecting much.
7   Like I said, I'm a go to -- go by go guy.
8             MR. SKURKA:  Okay.  Thank you,
9   Mr. Jimenez.  That's all the questions I have.
10            THE COURT:  All right.
11            VENIREPERSON NO. 1:  Thank you.
12            VOIR DIRE EXAMINATION
13   BY MR. JONES:
14     Q.   Mr. Jimenez, my name's Grant Jones.  I'm
15   co-counsel here for Mr. Garza.  I don't think you saw
16   me at the first big meeting when you-all came to -- to
17   the central jury room.
18            I want to ask you a few questions about
19   the general rules that apply to the Criminal Justice
20   System.  Most people can be born and live their whole
21   lives and never come into contact with these rules
22   directly, but if you're picked to be on this jury,
23   you'll be directly involved with the application of
24   these rules.  And so the focus of my questions is to
25   test your understanding of those rules and also maybe

39

1   to teach you what those rules are, in addition to what
2   the Judge has already told you, okay?
3      A.   Yes, sir.
4      Q.   First of all, in the United States and in the
5   state of Texas, a person who's accused of a crime has
6   a right to trial by jury, okay?  In a case like this,
7   it's a right to a jury of 12 persons.  Do you agree
8   with the right to trial by jury?
9      A.   Yes, sir.
10     Q.   In -- in a criminal case?
11     A.   Yes, sir.
12     Q.   Why?
13     A.   'Cause I believe that everybody has a chance
14   to be proven innocent or be proven guilty.
15     Q.   Why -- why wouldn't you just let a Judge do
16   it?
17     A.   I think there should be more, like, minds
18   involved.  That way everybody can see -- everybody
19   brings something else to the table.  And I think
20   different perspectives looked at it can be -- have a
21   better way of making a decision.
22     Q.   Why wouldn't we just let the police make the
23   decision?
24     A.   'Cause they're there for the law, like to,
25   you know, like, for arrests or to control the outside

40

1   population.  They don't exactly know how to go by step
2   by step kind of process.  And plus, I think in that
3   way, they shouldn't have, like, the right to choose
4   the people that are arrested, you know, what's going
5   to happen to them.
6      Q.   In the United States, where is -- every
7   nation has a government.  And one of the fundamental
8   duties of a government is to set out a set of rules by
9   which people conduct themselves.  These are our laws,
10   okay?  And every -- every organized society has a
11   system for enforcing those rules, okay?  In the United
12   States where is -- from where does the power of
13   government come from?
14     A.   The people.
15     Q.   The people, right.  So any power that our
16   government has, our president, our governor, our
17   judges, comes ultimately from --
18     A.   The people.
19     Q.   -- you and I, right?
20     A.   Yes, sir.
21     Q.   Like, November the 4th, we went out and chose
22   who we want to lead us, right?
23     A.   Yes, sir.
24     Q.   So, who is the jury?
25     A.   They are the people.

41

1      Q.   The people.  You're a little -- little
2   segment of the people.  And in a criminal case the
3   government comes to you, the people, and says,
4   "Listen, we have evidence that one of our members has
5   committed a crime for which he should answer," and --
6   and you say, "Okay.  Show me."
7      A.   Uh-huh.
8      Q.   And if you agree with the government under
9   the rules that the Judge has told you, then you say,
10   "Yes, we agree with you, the person has committed,"
11   and then you authorize the government to do what?
12     A.   To?
13     Q.   Punished the person.
14     A.   Yes.
15     Q.   Some sanction to be imposed.
16     A.   (Nods head.)
17     Q.   So basically, under our system, before the
18   government can use its power to declare someone guilty
19   of a crime and after -- and if they find somebody
20   guilty to punish them, they have to get clearance from
21   who?
22     A.   The people.
23     Q.   The people, which in this -- which is in the
24   form of a?
25     A.   Jury.

42

1    Q.   Jury.  So you see why the jury is an
2 important --
3    A.   Oh, absolutely.
4    Q.   -- function?  In other words, it's -- it's
5 part of the -- it's a part -- it's part of our systems
6 of checks and balances.  You read about that in
7 school.
8    A.   Yes, sir.
9    Q.   It's a way that we limit government power.
10 So if you're on this jury, you're representing the
11 people, the source of the power, okay?
12         Now, the Constitution not only gives
13 defendants the right to a trial by jury, but also says
14 that that jury has to be impartial.  What does that
15 mean.
16    A.   Not swaying bias, not swaying one side to
17 other side.
18    Q.   That's right.  That's almost perfect.
19 Impartiality suggests that you're -- you come to the
20 task at hand with no prejudgment.  That's why Mr.
21 Skurka asked you if you knew anything about the case.
22 Some cases get a lot of publicity.  You read the paper
23 and you start getting an opinion about it.  And
24 sometimes that opinion, you cain't get rid of it.  So
25 when you come to the courtroom, you've already made up

43

1 your mind, right?  So you wouldn't be fair, right,
2 because you've already prejudged the case without
3 hearing it.
4         Also impartiality suggests you don't have
5 any leanings towards one side on the other.  And that
6 would -- like you said, that be biases.  And there's
7 all kinds of biases.  Like, you might be related to
8 the Defendant here.  He might be your nephew or
9 something.  Well, that's a family bias.
10    A.   Uh-huh.
11    Q.   Or maybe -- maybe you work as a -- as a nurse
12 or a doctor or a technician in an emergency room, and
13 you see people with gunshot wounds every day.  That
14 might create an occupational bias.  If you were
15 sitting -- if you were a juror on an arson case, okay,
16 and you were a fireman, you see why that might be a
17 problem?
18    A.   Uh-huh.
19    Q.   Okay?  So, an impartial juror is someone who
20 doesn't have any leanings towards one side or the
21 other, comes to the matter with basically an open mind
22 and tells the people that have the burden of proof,
23 "Show me."  Okay?
24         Now, also under our Constitution, we have
25 what we call a "presumption of innocence."  You've

44

1 heard that of that before.
2    A.   Yes, sir.
3    Q.   What does that mean?
4    A.   Innocent till proven guilty.
5    Q.   Okay.  So, if someone accuses you of some
6 wrongdoing, does that automatically mean that you were
7 guilty?
8    A.   No, sir.
9    Q.   Okay.  A presumption means that we assume or
10 take somebody to be innocent, until somebody shows us
11 otherwise, okay?  Do you agree with the presumption of
12 innocence?
13    A.   Oh, yes, sir.
14    Q.   Okay.  I think everybody does.  And I'm going
15 to get back to that, in just a minute.  Texas law and
16 the federal law also require that before a jury can
17 declare someone guilty they have to believe that he is
18 beyond a reasonable doubt.  That phrase "beyond a
19 reasonable doubt" describes the degree of certainty
20 which you must have before you can find somebody
21 guilty.  It is the highest degree of certainty
22 required by law.  Why do you think that is in a
23 criminal case?
24    A.   'Cause there is no "take backs," I guess.
25 Once you make a decision, you can't just take it back.

45

1 That's why they don't want any doubt in your mind when
2 you make this decision.
3    Q.   Okay.  What is -- when you're trying a
4 criminal case and a person is found guilty, what is --
5 what can happen?
6    A.   When you're trying a person to be found
7 guilty?
8    Q.   Yeah, what can happen after a finding of
9 guilty?
10    A.   They can go to prison.
11    Q.   What is prison?
12    A.   Prison --
13    Q.   The loss of?
14    A.   Freedom.
15    Q.   Freedom, liberty.  What if it's a fine?  Loss
16 of?
17    A.   Money.
18    Q.   Property.  In a capital case, it could be
19 loss of?
20    A.   Life.
21    Q.   Life.  Okay.  What does the American
22 Civilization value above all else?
23    A.   Freedom.
24    Q.   Freedom.  In other words, we value our
25 liberty, we value our lives and we value our property.

46

1    And we don't want anybody to take it away from us,
2    unless there's a really good reason to do so, unless
3    there's a strong basis for doing so.  Do you agree
4    with that?
5        A.   Yes, sir.
6        Q.   That's why they put "beyond a reasonable
7    doubt" as the standard of proof in a criminal case,
8    'Cause it involves the potential loss of liberty,
9    property and in this case life.  You agree with that.
10       A.   Yes, sir.
11       Q.   Okay.  Now, there's no definition for beyond
12   a reasonable doubt.  I could put five lawyers up here
13   and they can give you five different definitions.  But
14   I like to -- I have a little, I guess, you'd call it a
15   story, to illustrate what it means, what I think it
16   means.  And I didn't think this up by myself.  I got
17   it at a seminar.  Let's say you have a box.  And into
18   the box you put a small mouse, okay?  And down at the
19   bottom of the box, where it sits on the floor, there's
20   a little hole about that big, a couple of inches in
21   diameter.  And into the box you put a hungry cat who
22   likes to eat mice.  You put the top on the box and you
23   leave and come back in a couple of hours and you open
24   the box, the cat jumps out, but the mouse is gone.
25           Now, did the cat eat the mouse or did the

47

1    mouse escape through the hole?
2        A.   It could be either or.  The mice could have
3    squeezed through the hole and been frightened, or the
4    cat could have been faster than the rat and ate the
5    rat.
6        Q.   That's right.  But you used the word, "could
7    have."  Can you tell from the facts that I gave you
8    beyond a reasonable doubt what happened?
9        A.   No.
10       Q.   No.  Okay.  So that's the problem that the
11   jury has in a criminal case.  The government has the
12   duty to prove the case, and you listen to the evidence
13   and when all -- when the case is closed, they get back
14   in the jury room and they say, "Okay, what do we have,
15   and is it enough or we can say beyond a reasonable
16   doubt, with a high degree of certainty, that something
17   happened?"  What if you as a juror get back in the
18   jury room, and after a thorough discussion of all the
19   evidence, you say, "Gosh, I'm just not sure," what
20   would your verdict have to be?
21       A.   Not guilty.
22       Q.   Not guilty.  Right?  And what -- and that's
23   each what not guilty means.
24       A.   (Nods head.)
25       Q.   Not guilty does not mean a person is

48

1    factually innocent.  It means that the State has not
2    proved its case beyond a reasonable doubt.  Okay.
3           So you can imagine cases, can you not,
4    where -- where a person is accused of a serious
5    offense and the State doesn't have enough evidence to
6    prove it, maybe they -- maybe the prosecutor was
7    rushed into an indictment because of, you know,
8    publicity, or whatever, and they get to trial too
9    quickly, and so, you're saying, "You know what,
10   there's some evidence that this guy's guilty, but, you
11   know, I just -- I'm not sure.  This is a terrible
12   crime and they say he committed it, but I'm just not
13   sure, but, gah, I hate to let him go."  You see?
14       A.   (Nods head.)
15       Q.   Would you let him go?
16       A.   Yes, sir.
17       Q.   Yes.  All right.  So what that means, with
18   this presumption of innocence and proof beyond a
19   reasonable doubt, that sometimes a jury may have to
20   let somebody go that's actually guilty.  We have to
21   take that, okay?  We don't say, "Well, he might be
22   guilty, and, therefore, I'm just going to play it safe
23   and I'm going to find him guilty."  You can't do that,
24   okay?
25           Which is, in your mind, is it -- is it

49

1    worse to let a guilty man go free or that an innocent
2    person be convicted?
3        A.   I think it's worse for an innocent person to
4    be convicted.
5        Q.   Right.  Have you read stories recently, and I
6    think for the last two years, especially out of Dallas
7    County, there have been stories of people who have
8    been convicted of various crimes, sexual crimes,
9    particularly, and later had found to be factually
10   innocent because of D.N.A. testing?
11       A.   No, sir.  I have not heard about that.
12       Q.   If you read a story like that and found out
13   that some guy had been in prison for 20 years and
14   suddenly the D.N.A. evidence showed that he was
15   factually innocent and he was released, how would that
16   make you feel to read a story like that?
17       A.   I would be disgusted.
18       Q.   Okay.  You'd feel bad for the guy, wouldn't
19   you?
20       A.   (Nods head.)
21       Q.   Okay.  Well, these stories, when you read
22   them, the value of these stories is that it reaffirms
23   the importance, seriousness of your task, you know?
24   Before a person is declared guilty of a crime,
25   especially a serious crime, you really have to believe

50

1  they're guilty beyond a reasonable doubt, and if you
2  don't the law says you have to find the Defendant not
3  guilty.  And you're willing to do that.
4      A.    Yes, sir.
5      Q.    Now, if you're on jury the Judge will give
6  you some instructions.  And the -- he'll tell you that
7  the verdict -- what does verdict mean?
8      A.    The decision.
9      Q.    That's right.  Your decision has to be
10  unanimous.  What does that mean?
11      A.    Everybody.
12      Q.    Everybody has to agree.  However, -- that is,
13  everybody has to agree before there's a decision that
14  the Judge can act upon, okay?  However, that -- that
15  the verdict has to be unanimous does not mean that
16  you're -- you're -- it's your individual decision how
17  you vote.  It's not a democratic process.  In other
18  words, the jury, when they get to the voting stage,
19  don't take a vote, if it's ten to two for guilty, they
20  say, "Okay.  The guilty side gets the majority, so
21  we're going have a -- that's our verdict."  That's not
22  how it works.  Every individual juror has to make his
23  or her individual vote.  You understand that.
24      A.    Yes, sir.  What happens if they don't, like,
25  become unanimous.

51

1      Q.    Well, then, there's a hung jury and we have
2  to try the case over, again.  And sometimes that
3  happens.  And -- and sometimes judges would give
4  juries that are having trouble making a decision,
5  would give the jury special instructions to, please,
6  work as hard as you can here to make sure that you
7  don't -- you can't make a decision one way or the
8  other.  Because it takes a long time to try these
9  cases, right?  You don't want to keep trying them over
10  and over, again.  So it's a serious -- it's a serious
11  vote, but in the end you have to make a decision that
12  you can personally live with, okay?  You have got to
13  be intellectual and honest.  It's got to be a decision
14  that your conscience will -- that you will -- your
15  conscience will -- you'll feel good about it.
16          Now, the Judge will also instruct you if
17  you're on the jury that -- well, let me -- I'll ask
18  the question, what is -- what is the main purpose of
19  the jury, what -- what is their main function?
20      A.    I guess, to review the evidence or what's
21  happened --
22      Q.    They're fact --
23      A.    -- in the situation.  Fact finders.
24      Q.    They're fact finders.  That's what you are.
25  That's your highest purpose is to decide -- tell us --

52

1  tell us what the facts are.  We're going to try to
2  convince you what the facts are.  But in the end it's
3  you, the people, the source of the power that get to
4  tell us what the facts are.
5          And so, how do you determine what a fact
6  is?  How do you determine what the truth is?  Well,
7  that goes into the whole problem of evidence.  You'll
8  have a witness sitting on the chair.  The jury can
9  judge the credibility of that witness.  The jury can
10  decide how much weight and importance to give to that
11  witness's testimony.  And -- and you run into all
12  kinds of problems about whether people really see what
13  they see.  You know, you were talking about your
14  personal experience with -- that this officer may have
15  jumped to conclusions.  You reached an inference,
16  which, you know, may not be true, just -- You see how
17  that could happen?
18      A.    (Nods head.)
19      Q.    In other words, he didn't consider all the
20  possibilities.  He just jumped to the conclusion that
21  were you responsible, okay?  So, I want to ask you a
22  coup-- you know, sometimes -- on the American Flag, is
23  the -- you know, the American Flag has stars and
24  stripes, right?  What's the color of the top stripe?
25      A.    White?

53

1      Q.    Are you sure?
2      A.    Not positive.  But I would look at once
3  before I answered you, again.
4      Q.    Okay.  Have you ever been to New York?
5      A.    No, sir.
6      Q.    Never seen the statue -- the pictures of the
7  Statue of Liberty?
8      A.    I've seen pictures.
9      Q.    She lifts high the Torch of the Golden Gate.
10  In which arm does she hold the torch?
11      A.    The right arm.
12      Q.    Are you sure?
13      A.    No.
14      Q.    Okay.  So, what I'm -- those two questions
15  illustrate that sometimes things that we -- we see all
16  the time, we don't really -- on the phone pad, there
17  are two letters, you know the telephone pad, there are
18  two letters that aren't there.  Do you know which ones
19  they are?
20      A.    No, sir.
21      Q.    I don't either.
22      A.    I always (inaudible).
23      Q.    Okay.  So, but, you know, when a person gets
24  up and tells you, I saw this or I saw that, you really
25  need to analyze where are they have coming from, what

54

1  was their vantage point, what was the lighting, what
2  was their familiarity with the place, what was their
3  motive for observation, et cetera.  You can make a
4  list of 50 items on it, on how to judge whether a
5  person's accurately observing what they're reporting.
6  And that's what a jury does.  Could you do that if you
7  were on the jury?
8     A.    Yes, sir.
9     Q.    I'm confident that you could.  I would now
10 like to ask you some questions about the -- the Judge
11 told you what the elements of the -- of the offense
12 were.  In a capital murder case, you have -- you have
13 to have a murder, which is an intentional -- and
14 unjustified killing of a person.  But it has to be
15 coupled with another circumstance, an aggravating
16 circumstance.  In this case, the indictment alleges
17 that the homicide was -- occurred in the course of
18 committing a robbery.
19         MR. SKURKA:  Excuse me, Mr. Jones.
20         Judge, do you mind if we take a quick
21 recess, for just a minute?
22         THE COURT:  Yeah, okay.
23         MR. JONES:  Okay.
24         THE COURT:  We can do that.  Why don't
25 you wait in the -- in the jury room.

55

1         VENIREPERSON NO. 1:  Okay.
2         MR. SKURKA:  Thank you, Mr. Jimenez.  The
3  Judge will call you in, in a minute.
4         (Venireperson exits courtroom.)
5         MR. SKURKA:  Mr. Jones has an artful
6  presentation, it looked like it was going to continue,
7  but we're going to go ahead and exercise a peremptory
8  strike on this, Judge.
9         THE COURT:  All right.
10         MR. JONES:  Okay.
11         MR. SKURKA:  Just for the -- sometimes we
12 can work out a signal, maybe get the --
13         THE COURT:  Yeah.
14         MR. SKURKA:  -- Judge's attention.
15         THE COURT:  Otherwise, we'll be --
16         MR. JONES:  We'll be here a long time.
17         THE COURT:  Yeah.  We won't finish.
18         MR. SKURKA:  We're going kind of slow.
19         THE COURT:  We're going way slow.
20         MR. JONES:  Since we're recessed --
21         MR. GARZA:  There's no such thing as "way
22 slow," Judge.
23         THE COURT:  Oh, there is.  Oh, there is.
24 And, I mean, -- I mean, if they're going to exercise a
25 strike, there's no point in wasting --

56

1         MR. JONES:  And we'll do that, also.
2         THE COURT:  Yeah.
3         MR. GARZA:  We can already -- we'll work
4  that out.
5         MR. SKURKA:  We have the same thing.  We
6  have an agreement, so they have don't go south on us,
7  up there.
8         THE DEFENDANT:  He's out of there, right?
9         MR. JONES:  Huh?
10         THE DEFENDANT:  He's out of there.
11         MR. JONES:  He's out.  They struck him.
12         THE COURT:  Okay.  We're --
13         MR. JONES:  Now, that we're -- can I go?
14         THE COURT:  Yeah, there's -- there's a
15 little table there, if you want to --
16         MR. JONES:  No, I want to go to the
17 bathroom.
18         THE COURT:  Yeah, but there's also a
19 little table.  We need to bring it in.
20         MR. JONES:  Yeah, let's bring it in.
21 Okay.
22         THE COURT:  Come on, let's take a little
23 break.
24         MR. SKURKA:  I didn't mean to interrupt
25 you, Judge.

57

1         THE COURT:  No, no, that's fine.
2         MR. SKURKA:  I didn't know how to get
3  their attention.
4         THE COURT:  If you're going to strike,
5  there's no point in wasting our time.
6         (Short recess.)
7         (Venireperson enters courtroom.)
8         THE COURT:  All right, Mr. Jimenez, thank
9  you very much for your service, but I don't -- you're
10 not going to make it on the jury.  But we did
11 appreciate you coming in.
12         VENIREPERSON NO. 1:  All right,
13 appreciate it.
14         THE COURT:  Thank you so much.
15         (Venireperson exits courtroom.)
16         THE COURT:  Let's take a little break and
17 then we'll -- we'll get on the next one.
18         (Short recess.)
19         (Venireperson enters courtroom.)
20         THE COURT:  All right.  Come on in.
21 Right up here.  All right.  Mr. Kollaja?  All right.
22 Come on up.  Right up here.
23         (Complies.)
24         THE COURT:  All right.
25

58

1            VENIREPERSON NO. 2,

2           JAMES ALBERT KOLLAJA,

3         VOIR DIRE EXAMINATION

4  BY THE COURT:

5     Q.  All right.  Mr. Kollaja, how are you today?

6     A.  Fine.

7     Q.  All right.  We're here to talk to you about

8  some stuff.  Okay, first of all, you've been on a

9  criminal case before?

10    A.  Long time, over 30 years ago.

11    Q.  Okay.  It's been a while, but -- but you've

12  been through this before, maybe not on a capital

13  murder.  Okay.

14    A.  No.  It was a -- it was a burglary case.

15    Q.  A burglary case.  Okay.  Well, I mean,

16  essentially, here's what we want, all right, from --

17  from a juror.  We want someone that can keep an open

18  mind.  And if you can't keep an open mind, that's

19  okay, but you got to tell us if you can't.  And some

20  people can't.  All right?

21       We also want people that can follow the

22  law, okay, and we're going to talk to you a little bit

23  about that law.  Now, since you've already sat on a

24  criminal jury before you know a lot of this stuff.  I

25  mean, I know you -- it's been a while, but, you know,

59

1  it's the -- the State has brought these charges, okay,

2  and -- and -- and that's fine.  But, of course, you

3  know, the State has to prove them, I mean, State, you

4  bring them, you prove them.  All right?  And until you

5  prove them, you know, he's innocent.

6       You agree with that?

7    A.  Correct.

8    Q.  Okay.  I mean, and -- and they have to prove

9  them beyond a reasonable doubt.  And we don't -- we

10  don't have a definition of beyond a reasonable doubt,

11  but it's the highest standard of proof we have in all

12  the law, okay?

13    A.  Right.

14    Q.  You understand that.

15    A.  I do.

16    Q.  And then, of course, you applied that in that

17  case that you sat on some years ago and so you're --

18  you're familiar with that.  You don't have a problem

19  with that.

20    A.  I don't have a problem at all.

21    Q.  Okay.  All right.  Next thing, since the

22  State has the burden of proof, Defense has to --

23  doesn't have to do anything, the burden never shifts.

24  In other words, State gets up here, they present a

25  bunch of evidence.  Defense says, "You know, what, we

60

1  don't -- we're not going to present anything.  We

2  don't think you've proven your case beyond a

3  reasonable doubt.  We're not going to present

4  anything," including Defendant not testifying, 'cause

5  he doesn't have to.  You understand that?

6    A.  Correct.  Yes, I do.

7    Q.  All right.  And the law says that -- and I

8  don't know, he may or may not testify.  We don't know.

9  You know, I submit there's a lot of reasons why

10  somebody wouldn't want to testify, maybe their lawyer

11  tells them, "Look, they -- they don't -- they haven't

12  proven their case.  There's no need for you to

13  testify."  Maybe he's an uneducated person.  Maybe he

14  stutters when he have gets in high stress situations.

15  And this certainly is one, okay?  But -- but, in any

16  event, the law says you can't hold it against the

17  Defendant if he chooses not to testify.  You can't --

18  you know, you can't go back there and say, "You know

19  what, the State case, so, so.  You know what, this guy

20  didn't tell me his side, so, okay, I'm going to put a

21  little mark over here.  That's one for the State,

22  'Cause he didn't testify."  You can't do that.  You

23  understand that.

24    A.  I understand that.

25    Q.  You have a problem with that?

61

1    A.  No.

2    Q.  Okay.  All right.  Now, you've sat on a

3  burglary case before, but this is capital murder.  And

4  this is sort of murder, plus, okay?  You got -- you

5  got the murder, the intentional taking of the life.

6  And there's a number of ways to allege a capital

7  murder, but in this case what they're alleging is that

8  the Defendant, on a given day, committed on the

9  offense of murder and while in the course -- and he

10  committed the murder while committing or attempting to

11  commit a robbery, okay?  That's -- that's -- that's

12  the facts.  I mean, that's -- that's what they're

13  saying he did.  And -- and they get -- if they can

14  prove it, they get to a conviction.  Not just that

15  they prove the murder.  They have to prove that he

16  either was in the process of attempting or committing

17  a robbery.  You understand that.

18    A.  Yes.

19    Q.  All right.  They have to prove it all.  They

20  don't get to just say, "Well, I got seven out of

21  eight, so that's good enough."  That's -- that's not

22  how it works.  You understand that.

23    A.  I under that.

24    Q.  Okay.  And -- and, you know, I don't know

25  what the facts are, but they have to prove it all.

62

1   Okay.

2          Now, let me ask you, in that -- in that

3   burglary case was the -- that you sat on, was the jury

4   asked to assess punishment?

5      A.   No.

6      Q.   Or do you remember?  No?

7      A.   We found the Defendant not guilty,

8   insufficient evidence.

9      Q.   Okay.  All right.  In -- in Texas, a case

10  like this:  It works like this, jury gets seated.

11  State presents its evidence.  Defense, if they choose

12  to present any evidence can.  They don't have to,

13  because they have the burden of proof, they don't have

14  to do anything.  But, in any event, all the evidence

15  is presented.  The lawyers argue the case to you.  I

16  read you the law, the Charge.  You get that packet --

17  and, of course, you remember that probably from your

18  previous experience -- you get that packet of law to

19  take back there, called "the Charge", which is sort of

20  your instruction manual.  And then jury decides if

21  State can prove beyond a reasonable doubt all of the

22  elements of the offense.

23          If -- and, of course, you know this, if

24  -- if they don't prove it, you go home.  Case over.

25  All right?  If they do prove it, then we go on to the

63

1   punishment phase.  And, normally, in a -- in a normal

2   criminal case what happens is, like in that burglary,

3   if you had been asked to assess punishment, you would

4   either assess a number of years, perhaps probation

5   depending on the facts may be a possibility, and you

6   would give a punishment.  Okay?

7          Doesn't work like that in a capital

8   murder case, all right?  You don't -- you don't say,

9   "Life or death."  Okay?  What you do is you answer two

10  questions, okay?  Do you think you could do that?

11     A.   Yes.

12     Q.   Okay.  And -- and make no mistake, obviously,

13  you know, the -- the options, you know, it could lead

14  to somebody's death.  And you -- and you understand

15  that.  But -- but you don't actually say life or

16  death, you -- you just answer the questions

17  accordingly.  And you could do that.

18     A.   Yes.

19     Q.   Okay.  Now, do you think you could keep an

20  open mind in this case?

21     A.   Yes.

22          THE COURT:  Okay.  All right.  Well, I'm

23  going to turn the floor over to attorney for the

24  State, Mr. Skurka.  He gets to go first to speak with

25  you, 'cause he's got the burden of proof.

64

1          MR. SKURKA:  Thank you, Judge.

2             VOIR DIRE EXAMINATION

3   BY MR. SKURKA:

4      Q.   Good morning, sir.

5      A.   Good morning.

6      Q.   Could you pronounce your last name for me.

7      A.   Kollaja.

8      Q.   Kollaja.  Today we're going to talk about

9   some of the things we talked about last time when we

10  met with the big group of people.  As you can imagine,

11  it's kind of hard to talk to 2- or 300 people and get

12  their feelings, right off the bat, there.  And that's

13  why we had that questionnaire you had to fill out.

14  And today we'll probably go into a little more depth.

15  I have a copy of the questionnaire, just like all the

16  attorneys do and the Judge, so we're going to go over

17  some of those issues and feelings, how you feel about

18  the law in this case.

19          And I want to start by telling you

20  there's no right or wrong answers.  You know, you just

21  say it the way you need to say and how you feel.  No

22  one's going to get mad at you.  The Judge won't say,

23  "Well, you can't think that way.  You can't feel that

24  way."  We listen to what the jurors say to see if they

25  qualify on this jury.  Sometimes jurors qualify and

65

1   sometimes they don't qualify.  And that's no black

2   mark against them or anything.  'Cause sometimes

3   people do say, "Well, I have to say it this way,

4   'Cause the Judge wants me to say it this way," or, "I

5   had to say it this way, because the Prosecutor wants

6   me to say it this way or the Defense wants it."  No.

7   You just tell us how you feel and then we will deal

8   with how that is.  But no one's going to argue with

9   you, your feelings.  We just kind of know -- we need

10  to know what they are.  You might be very good on this

11  case, but bad on a different kind of case, or very

12  good on a different kind of case and bad on this kind.

13  I don't know.  We'll just explore that, okay?

14     A.   All right.

15     Q.   So -- and that's why we need candid -- you to

16  be candid with us and tell us how you feel.  And the

17  -- and the first thing I'm going to talk to you about,

18  of course, is the death penalty.  One of the -- when I

19  was reading your questionnaire, and stuff, I got the

20  impression that you have some pretty strong feelings

21  about that.  I just want you to tell me, in general

22  speaking, how do you feel about the death penalty?

23     A.   I personally have a problem or a conviction

24  that developed in the last, say, five to six years,

25  that, uh, I -- I don't think I could, you know,

66

```
1  convict somebody or come to a decision of a death
2  penalty in a case.  That's my own personal conviction.
3  I believe there's other options.  But I personally
4  have come to that conviction in the last five to six
5  years.
6      Q.   All right.  And again that's fine.  That's up
7  to you, you know?  I have my role to play.  He has his
8  role to play.  No one's going to argue with it.  So it
9  -- it sounds to me, what you're saying is, these
10  convictions are pretty strong, heartfelt, and that you
11  might be pretty good on maybe, you know, a D.W.I. case
12  or a -- you know, driving without insurance case.  But
13  when it comes to assessing the death penalty, you feel
14  like you just couldn't do that?
15      A.   No.
16      Q.   Under any circumstances.
17      A.   Correct.
18      Q.   Okay.  And I'm not here to try to change your
19  mind or anything like that.  The Judge just has to
20  make a decision on whether you can do that.  And so,
21  I'm going to -- and you -- you've kind of said that in
22  your questionnaire.  You say, "I would struggle with,"
23  you know, "making a decision on the death penalty."
24  You said stuff like, you're not in favor of the death
25  penalty, most of the time and you would -- would you
```

67

```
1  just struggle.  And I guess, this is your own pers--
2  and I think you said that, 'cause there's a question
3  the Judge has in the questionnaire, it says, "Do you
4  have any personal, moral, religious reasons that you
5  could not be a juror in this case," and you said,
6  "Yeah, I would have trouble in this type of case."
7  And so, that's pretty much how you feel.
8      A.   Right.
9      Q.   And again, it's okay to feel that way, but,
10  obviously, to sit on the jury, we need to make sure
11  people are -- are -- can handle those questions.
12      So even if the evidence showed that he
13  was guilty and even if the evidence showed the
14  question should be asked in a certain way that he
15  would get the death penalty, you just couldn't
16  participate in that kind of case; correct?
17      A.   May I -- I don't -- if the question was put
18  to me to that was the option, the death penalty, no, I
19  couldn't come to that.
20      Q.   Okay.  That -- that's all I need to know,
21  sir.  Thank you.
22      MR. JONES:  I need to ask --
23      THE COURT:  Yes.
24      MR. JONES:  -- him some questions.
25
```

68

```
1              VOIR DIRE EXAMINATION
2  BY MR. JONES:
3      Q.   We have a unique -- I don't know if it's
4  unique or not, it's -- it's the way the system is.
5  Back in the early days of the Texas Republic when they
6  had the death penalty certain offenses were -- death
7  penalty was one of the punishments available.  And if
8  the Defendant was found guilty, the jury went -- they
9  had a punishment -- verdict form.  And the Judge said,
10  "Write in what your punishment is," you know, 20 years
11  in prison or life, death, whatever.
12      And then the Texas Death Penalty Statute
13  was held unconstitutional, and then it was reenacted,
14  and this is our current system.  And under our current
15  system, the jury does not vote directly on the death
16  penalty, in the sense that they actually, you know,
17  take a vote and write it down on a piece of paper,
18  like, life or death, in a -- in a -- in a verdict
19  form.  Instead, the law requires that the jury answer
20  two special questions or special issues, okay?  One of
21  those questions is up on the board to your left.
22  Would you take a look at it.
23      A.   (Complying.)  Okay.
24      Q.   That would be Special Issue No. 1.  And
25  keeping in mind the jury would not get to that
```

69

```
1  question unless they had first found the Defendant
2  guilty of capital murder and then go into the
3  punishment trial.  And then on this bulletin board to
4  your right is the -- is Special Issue No. 2.  Take a
5  look at that.
6      A.   (Complying.)  Okay.
7      Q.   Now, in order to -- the Judge would tell you
8  that the -- in order to answer those questions, you
9  can consider all of the evidence in the case, the
10  first stage of the trial and the second stage of the
11  trial, consider all that and then you try to answer
12  those questions.
13      Now, you're also -- you will be permitted
14  to know the result of your answers to those questions.
15  If the jury answers, yes, to both questions -- no,
16  let's see.
17      MR. GARZA:  Yes or no.
18      Q.   (BY MR. JONES) Yes or no.  If it answers, yes
19  to the first question, and (pause) -- is there a
20  sufficient belief --
21      MR. GARZA:  If they answer that, no.
22      Q.   (BY MR. JONES) Yes.  So, if you answer that,
23  no, and the first one, yes, then it's -- the law
24  requires the Judge to assess the death penalty.
25  Doesn't have any discretion.  He has to.  If he sees a
```

70

1    yes answer and a no answer death is going to be the
2    result.  Also, you know that if -- if -- if Special
3    Issue No. 1 is answered, no, or if Special Issue No. 2
4    is answered, yes, then there's not going to be a death
5    penalty.  It's going to be a life sentence.
6             Now, if you're selected on the jury,
7    before you start hearing the case, you're going to
8    have to raise your right hand and take an oath that
9    you will -- I think the word goes, "a true verdict
10   render," which means that you have to be honest in
11   giving your answers.
12   A.    Uh-huh.
13   Q.    Okay?  So, you see what I'm getting at, here.
14   Given -- given your personal feelings about the death
15   penalty, and it's your -- those feelings come from
16   different sources, let's says that you're on the jury
17   and you consider all the evidence and you believe, you
18   believe beyond a reasonable doubt that the Defendant
19   would -- would be a continuing threat to society,
20   that's what you -- in other words, you couldn't answer
21   otherwise, based on the evidence, you don't of any
22   doubt, it's beyond a reasonable doubt; but then -- and
23   you also feel there's no mitigating circumstance that
24   would cause you -- cause the death penalty not to be
25   imposed, okay, in other words, you believe beyond a

71

1    reasonable doubt that the answer to 1 is, yes, and the
2    answer to 2 is, no.  And you're thinking to yourself,
3    "Well, you know what?  I know what's going to happen.
4    If I answer these questions truthfully, you know, the
5    death penalty is going to occur and I don't agree with
6    the death penalty.  I don't -- I feel uncomfortable
7    with it.  I don't want it to happen.  But if I answer
8    these questions truthfully like the -- I swore to do,
9    it's going to happen," okay?
10            Now you got a choice.  You can either
11   lie, which would be a violation of your oath, or you
12   can refuse to vote, which is a violation of your oath,
13   also, or you can tell us that, now, that, "I would not
14   be able to honestly answer those" -- in other words,
15   "I will not put myself in a position where I have to
16   answer those questions, because of my feelings about
17   the death penalty."
18   A.    I don't think I could put myself in that
19   position, and -- and --
20   Q.    Okay.
21            THE COURT:  You don't -- you don't think
22   you could take the oath.
23            VENIREPERSON NO. 2:  No.
24   Q.    (BY MR. JONES) The Judge said it.  You can't
25   take the oath.

72

1    A.    Correct.
2    Q.    Okay.  'Cause we don't -- we don't want
3    people playing games with this and we don't want
4    people sabotaging the system, you know, playing it to
5    get one way or the other.
6    A.    Right.
7    Q.    If you can't take the oath, that's fine.
8    We'll go to the next juror.
9             THE COURT:  Okay.
10            MR. JONES:  And that's -- that's --
11   that's fine.
12            THE COURT:  All right.
13            MR. JONES:  Thank you very much.
14            THE COURT:  Thank you very much.
15            VENIREPERSON NO. 2:  Thank you.
16            (Venireperson exits courtroom.)
17            MR. SKURKA:  Judge, the State would
18   move to challenge Juror No. 2, James Kollaja, for
19   cause.
20            MR. JONES:  No objection.
21            THE COURT:  All right.  That's granted.
22   Challenge by State and granted.  James Kollaja struck
23   for cause.
24            Okay.  I guess, let's take a little
25   break, and then we'll see if the 10:00s are about

73

1    ready.
2             (Short recess.)
3             THE COURT:  All right.  Are we ready for
4    the next person in?  I guess, we need Defense counsel.
5    Who is the next person?  Let me get...
6             MR. SKURKA:  Question No. 84.
7             THE COURT:  Okay.
8             MR. SKURKA:  And you might want to do
9    that right off the bat.  She knows the Defendant.
10            THE COURT:  Okay.  Bring him in.
11            (Venireperson enters courtroom.)
12
13            VENIREPERSON NO. 3,
14            PATRICE NICOLE REED,
15            VOIR DIRE EXAMINATION
16   BY THE COURT:
17   Q.    Hello.
18   A.    Hi.
19   Q.    You're -- you're Patrice Reed; --
20   A.    Yes.
21   Q.    -- is that right?  Okay.  All right.  Well, I
22   want to ask you some questions.  And the first
23   question I need to talk to you about is you know the
24   Defendant in this case, Mr. Ramirez.
25   A.    Yes, we want to school way back when.

74

```
1      Q.   Okay.  You went to high school?
2      A.   Yes.  My sister went to school with him.  I
3  didn't go to school with him, but I knew of him --
4      Q.   Okay.
5      A.   -- from my sister's classes.
6      Q.   Okay.  Well, would that pose a problem for
7  you in this case?
8      A.   No, it shouldn't.
9      Q.   Okay.  'Cause, I mean, here's the thing,
10  we -- we want -- we want two things from all of our
11  jurors that get on -- that get seated on this jury,
12  okay?
13      A.   Okay.
14      Q.   And first is we got -- you got to have an
15  open mind, okay?  And if this is a situation where,
16  "Gosh, you know, if -- I really didn't know him,
17  maybe, I'd be a better juror, maybe I feel
18  uncomfortable, because he knows my sister or he -- I
19  know him -- I know of him," we -- we need to know
20  that; or -- or if it's like -- if it's not going to
21  play any -- any role, at all, then we need to know
22  that, too.
23      A.   Okay.  Yeah, it shouldn't -- it shouldn't be
24  a problem, I mean, not to me.  I mean, I was thinking
25  about it, as well, would it be a problem, but, no, it
```

75

```
1  wouldn't be a problem.
2      Q.   It won't be a problem.
3      A.   No.
4      Q.   All right.  Well, then let's talk about some
5  other stuff.
6      A.   Okay.
7      Q.   Now, have you ever been on a criminal jury
8  before?
9      A.   No.
10      Q.   Have you ever been on a jury before?
11      A.   No.
12      Q.   Okay.  All right.  Then we'll -- some of this
13  stuff may be unfamiliar to you, some of it you might
14  remember from school.  All right?  First of all,
15  State's brought these charges, okay?  The charge is
16  capital murder, all right?  And we'll talk a little
17  bit about what capital murder is in a minute.  But --
18  but the State brings the charge, okay?
19      A.   Okay.
20      Q.   Law says this, law says, "State, you bring
21  charges, that's fine, but you got to prove them.  You
22  don't just get to -- you don't get to say someone did
23  this and it's just true, it's taken as true.  No, no.
24  You have to prove it."  And there's elements to
25  each -- to a crime.  It's kind of a like a recipe.
```

76

```
1  You have to prove all of it, okay?  And it's always on
2  them.
3      A.   Uh-huh.
4      Q.   Never on the Defense side, 'cause they've
5  brought the charge.  They got to prove them.  That's
6  what law says, okay?
7      A.   Uh-huh.
8      Q.   And -- and the standard of proof is beyond a
9  reasonable doubt.  You've probably heard that.
10      A.   Uh-huh.
11      Q.   You know, you probably remember that from
12  school, maybe T.V., stuff, CSI Miami, and stuff like
13  that.  We all watch that stuff.  And it's
14  entertainment, but beyond a reasonable doubt is what
15  we use here, okay?
16      A.   Okay.
17      Q.   All right.  There's no definition of what
18  that is.  But it's the highest standard of proof that
19  we have in all of law, okay?  And they got to prove
20  it, okay?  Do you have a problem with that?
21      A.   No, I don't have a problem with that.
22      Q.   Okay.  Make no mistake.  It's not beyond all
23  doubt, but it's a high burden.  Okay.
24          All right.  Now, law says, "Okay, State,
25  you got to prove it and until you prove it he's
```

77

```
1  innocent, until you prove he did it."  All right?  So
2  innocent until proven guilty.  And, you know, a lot of
3  times we have a -- we go through this jury selection
4  process and one of the lawyers says, "Well, how would
5  you vote right now if you had to take a vote," and, of
6  course, the answer's not guilty, 'cause they haven't
7  proven anything to you.  They haven't presented any
8  evidence.
9      A.   Okay.
10      Q.   All right.  So you don't have a problem with
11  the guilt -- the -- that the burden is always on them,
12  it never shifts and that he's innocent until they
13  prove, otherwise.
14      A.   Right.
15      Q.   Okay.  Now, let's talk a little bit about --
16  about this allegation.
17      A.   Okay.
18      Q.   Okay?  Allegation is capital murder.  And we
19  talked a little bit about that when you came the day
20  you filled out your form and everybody got a chance to
21  speak with the group, but I want to go over it a
22  little bit, again.  It's -- the allegation is murder,
23  plus, plus something else.  And there's -- there's
24  different ways to prove capital murder, but in this
25  case how they've alleged it is, they're saying that
```

78

1   this Defendant on the given date committed the offense
2   of murder, that is the intentional taking of another
3   person's life, and while -- he did so in the course of
4   committing or attempting to commit a robbery.  Okay,
5   they have to prove all that.  They don't just get to
6   prove murder and they get their -- to capital murder
7   conviction.  They don't -- they don't get to prove
8   that.  They don't get to -- they don't get there,
9   okay?
10      A.   Okay.
11      Q.   They don't -- they don't just get to say,
12   "Well, you know, we proved he attempted to rob him,
13   but we didn't prove that he committed the murder."
14   That's not enough, either.  They got to prove all of
15   it.  You understand that.
16      A.   Yes.
17      Q.   Okay.  Do you have a problem with that?
18      A.   No, I don't.
19      Q.   Okay.  Now, if you're selected on this jury,
20   this is how it's going to work.  State's going to
21   present their evidence.  Defense, if they want to,
22   they'll present evidence.  If they don't want to, they
23   don't have to, 'cause they don't have any burden,
24   okay?  Lawyers will argue the case to you.  I'll give
25   you a packet at the end of the case.  It's kind of

79

1   like an instruction book.  It has all the law that you
2   need to follow and you get to take it back there with
3   you to refer to it.  And then you deliberate to see if
4   the State can prove beyond a reasonable doubt the
5   elements of the offense.
6        Now, if the jury says, "You know what,
7   State?  No.  You didn't prove it beyond a reasonable
8   doubt," answer's not guilty, right?
9      A.   Right.
10      Q.   And then you go home.  Case closed.  If
11   however, you go back there and you deliberate and you
12   and the other jurors say "You know what?  State's
13   proven this proven this case.  They've proven the
14   charge beyond a reasonable doubt to us," and you come
15   to a unanimous verdict, guilty.
16        All right.  Then we move on to the second
17   phase of the trial.  Capital murder's a little
18   different than all of the other criminal cases that we
19   have.  Normally, in a criminal case, you would start
20   off the same, you'd -- you know, guilty, not guilty.
21   If they're guilty, then there's a range of punishment
22   that you'd assess.  Like, you know, you decide "All
23   right, we're on punishment.  This is maybe, let's say,
24   a whatever degree felony, the punishment range is
25   this," and then you write in what you think the

80

1   punishment is, that is, an amount of time in prison,
2   maybe probation for the charge would be applicable,
3   maybe a fine.  And that's how it would work, okay?
4      A.   Okay.
5      Q.   This is different.  You don't do that in this
6   case.  What you do is, you would answer questions,
7   okay?  And -- and I'm sure the lawyers will talk to
8   you about them.  There's -- there's two of them.  This
9   is Special Issue 1 and that right over your right
10   shoulder is Special Issue 2.  And you'd answer the
11   questions, okay?
12      A.   Okay.
13      Q.   You wouldn't say, "life or death," okay?
14   But, make no mistake, you know, depending on how you
15   answer the questions could lead to this person getting
16   the death penalty.  All right?
17      A.   Okay.
18      Q.   Could you do that?
19      A.   Yes.  I could.
20      Q.   Could you keep an open mind in this case and
21   wait and listen to all of the evidence, and wait till
22   the case is given to you for your deliberations before
23   you make up your mind about -- about -- about what
24   your decision should be?
25      A.   Yes.

81

1        THE COURT:  All right.  All right.  I'm
2   going to turn the floor over to Mr. Skurka.  He gets
3   to go first, 'cause he's got the burden of proof.
4        MR. SKURKA:  Thank you, Your Honor.
5            VOIR DIRE EXAMINATION
6   BY MR. SKURKA:
7      Q.   Good morning, Ms. Reed, how are you today?
8      A.   Good, thank you.
9      Q.   I got a few questions to ask you about your
10   feelings about some of the law or the issues in this
11   case.  And I'm going to tell you right off the bat,
12   there's no right or wrong answers to it.  You just
13   tell us how you feel about things.  No one's going to
14   get mad and say, "No, you can't answer it that way,"
15   or, "You got to do it this way."  In other words, I
16   don't want to you saying, "Well, I better say --
17   answer it this way, because the Judge wants me to
18   answer this way, or because Mr. Garza wants me to
19   answer this way," or something like that.  We just
20   want to know what your true feelings are and -- and --
21   and how you feel about them.  No one's going to say
22   you can't think that way or you're not entitled to an
23   opinion, and -- but we just need to know where you're
24   coming from, so we can make a decision in this case,
25   whether you're qualified in this jury.  Fair enough?

82

1    A.    Fair.

2    Q.    Do you mind moving the microphone a little
3    closer to you?  You kind of have a soft voice.  I want
4    to make sure everybody can hear you.

5    A.    Is that better?

6    Q.    That's -- That sounds fine.

7    A.    Okay.

8    Q.    Thank you, ma'am.  I need to start off by
9    asking what the Judge hit on you, first, too, because
10   you said that you know John Henry Ramirez, now you say
11   that it was your sister went to class -- school with
12   him?

13   A.    Yes.

14   Q.    And let's just start at the beginning.  Tell
15   me -- tell me all the stuff you know about him, how
16   you know him and all that stuff.

17   A.    I know that he had a few classes with my
18   sister in high school and that's about it.  I mean, I
19   used to see him a lot around the school, pretty cool
20   guy.  I mean -- I mean, I didn't have anything against
21   him, bad against him.  I just knew him from school.  I
22   just knew his face from school.  That's about it.  I
23   mean, we didn't really hang out or anything like that.

24   Q.    When you say that you knew his face, --

25   A.    Yes.

83

1    Q.    -- you had no classes with him?

2    A.    No, I didn't.

3    Q.    Okay.  And I went to Ray High School, so I
4    know there's a lot of people up there.  And I went to
5    my reunion and I find that they go, "Oh, I went to
6    school with you," and I go, "Oh, I remember you."

7    A.    Uh-huh.

8    Q.    Or maybe I remember their face and not their
9    name.

10   A.    Uh-huh.

11   Q.    Did you ever have conversations with him, or,
12   you know, hang out in the parking lot with him, or
13   just -- just to talk with him at all or just somebody
14   that you saw walking down hall?

15   A.    Just somebody I saw walking down the hall.

16   Q.    How was it your sister knows him?

17   A.    I'm not sure.  I know that they had -- they
18   shared classes.

19   Q.    Uh-huh.

20   A.    That's -- that's about it and...

21   Q.    Same kind of question.  Were they -- did
22   she -- did she count him as a friend?  Did they hang
23   out together?

24   A.    No.

25   Q.    Did they go out together or see each other?

84

1    A.    No, no.

2    Q.    You know, like, I'm talking, like, you know,
3    after school --

4    A.    After school?

5    Q.    -- or going to games or anything like that.

6    A.    No.

7    Q.    Would it be more of a, then, just an
8    acquaintance of your sister?

9    A.    Yes.

10   Q.    Now, when this happened on -- on the -- did
11   you see anything on the news about this or hear
12   something about his name on that?

13   A.    In the past, before, I mean, I really -- I
14   heard it on the news, I mean, the Crime Stoppers and
15   all that, that's about -- that's about it.

16   Q.    That's when you knew the name and put it
17   together with this case?

18   A.    Yeah, I knew we went to school with this guy,
19   and my sister's, like, "Yeah, I know him from high
20   school."  We're like, "Oh, okay," that's about it.
21   That's as far as that went.

22   Q.    And that's what I'm trying to figure out, how
23   much -- have you -- have you thought about that?  And
24   I'm guessing you were surprised when you walked in
25   that first day and you're sitting on the front row,

85

1    you know, after the Judge had -- and, you know,
2    separated everybody and you seen him sitting there,
3    right?

4    A.    Yeah.

5    Q.    What were your -- what's your first reaction
6    when you saw him sitting there?

7    A.    I was, like, it's a coincidence, because a
8    long time ago, I was looking at this on T.V., and then
9    I'm there and I'm looking right at him, and, I'm like,
10   "Okay, this is weird," that -- that's the first
11   reaction I had.

12   Q.    And I can understand that.  That's an
13   understandable reaction, and -- and, I guess, what I'm
14   trying to figure out is, what was your first reaction
15   about being on a jury that may have to decide this
16   guy's fate?

17   A.    My reaction was, I mean, it's really serious.
18   I mean, it's -- it's not a playing matter.  It's life
19   or death with this individual.  It was just so many
20   things I was thinking about.  I mean, you have to have
21   an open mind about this, like, the Judge was saying,
22   you know?  It's like, "Okay, let me just listen to
23   what -- what you have to offer, and" --

24   Q.    And I can --

25   A.    -- "go from there."

86

1  Q.   And I can understand that, but -- but put
2  yourself with the other, say, 200 people in that room
3  --
4  A.   Uh-huh.
5  Q.   -- that never seen him before in their lives,
6  had not gone to school with him, sister did not know
7  him, did not see him hanging around there, --
8  A.   Uh-huh.
9  Q.   -- those people, you probably have to admit,
10 have no prior preconceived notions or -- or -- and I'm
11 not saying bias for or against, but -- you are, but it
12 -- it would seem to me they would be more comfortable
13 making a decision on somebody they didn't know, than
14 somebody who did know him.
15 A.   Right.
16 Q.   Is that right with you or you tell me about
17 that.
18 A.   I feel that -- I mean, I -- kind of unsure,
19 like, I don't really -- I'm not really biased, I mean,
20 I -- I mean, I didn't hang around with him.  I'm not
21 -- I'm not saying that I'm for or against him.  I -- I
22 just know of him.  I just know him from school.
23 That's about it.
24 Q.   That's --
25 A.   That's as far as I'll go.  Yeah, I don't

87

1  see -- I'm not biased about it.
2  Q.   Okay.  The fact that, you know, he went to
3  Moody with you, or you saw him, is that going to -- I
4  mean, that's still going to be in your mind, right?
5  A.   Yeah, it's going to be in my mind.
6  Q.   It's always going to be there, right?
7  A.   Yeah, it's always going to be there.
8  Q.   Would it be easier for you to judge somebody
9  that maybe, you know, went to Ray High School and
10 somebody you didn't know, --
11 A.   Yeah, I would be easier.
12 Q.   -- rather than someone there?
13 A.   It would be easier.
14 Q.   Because, you know, make no mistake, Ms. Reed,
15 I mean, I told you-all that the very first day --
16 A.   Uh-huh.
17 Q.   -- the State's position is this -- the
18 Defendant committed a crime and the State is going to
19 ask for the death penalty.  I want you to look at him,
20 right there.
21 A.   Uh-huh.
22 Q.   Can you vote for that, if you think the
23 evidence warrants that, knowing him from before?
24 A.   Honestly, I can't.
25 Q.   Honestly what?

88

1  A.   I can't.
2  Q.   You can.
3  A.   No.  I have feelings about --
4  Q.   I can't hear if you say can or can't?
5  A.   I cannot.
6  Q.   You cannot.
7  A.   Yes.
8  Q.   Okay.  Well, I -- we -- I'm not trying to pin
9  you down, but --
10 A.   I understand.
11 Q.   -- I understand your position, because it
12 would be like me, if I'm a prosecutor and one of my
13 friends from high school, you know, committed a
14 robbery or burglary, and I say, "Oh, my gosh, I don't
15 want to do that, 'cause I know that guy."
16 A.   Right.
17 Q.   So you don't -- you feel that that's going to
18 interfere with your participating in this case, since
19 you know him?
20 A.   Well, it's kind of difficult to say.
21 Q.   Well, you just did.
22 A.   Yeah, I cannot, like, -- it's like, yeah, I
23 understand where you're coming from.  It's -- yeah, I
24 mean -- I mean, we went to school together, but, I
25 mean, I didn't hang around with him, but saying that,

89

1  okay, somebody from Ray and I didn't even know them,
2  like you're saying, it would be easier.  It would be
3  easier to consider that.
4  Q.   Nobody's mad at you.  However you want to do
5  it, 'cause you're in a unique position.  And that's
6  why we're spending this time with you.
7  A.   Uh-huh.
8  Q.   If -- if you can't do it and you feel like
9  you can't do it, because of you know him from the past
10 or he was in your sister's class, --
11 A.   Uh-huh.
12 Q.   -- just -- just tell us.  Is that right or
13 wrong?
14 A.   It's -- I think that's right.
15 Q.   Okay.  You just can't do it, --
16 A.   Yeah.
17 Q.   -- because of your prior knowledge of him.
18 A.   Yeah.
19 Q.   And that would make you uncomfortable or
20 maybe make something in the back of your mind where
21 you couldn't be a fair juror in this case.
22 A.   Right.  That would be my...
23     MR. SKURKA:  Thank, Ms. Reed, for your
24 honesty.
25     VENIREPERSON NO. 3:  Thank you.

90

```
1            MR. JONES:  I have no --
2            MR. SKURKA:  You don't have any
3   questions?
4            MR. JONES:  (Shakes head.)
5            THE COURT:  Okay.  Why don't you wait in
6   the jury room.
7            VENIREPERSON NO. 3:  Okay.  Thank you.
8            MR. SKURKA:  Thank you, Ms. Reed.
9            VENIREPERSON NO. 3:  You're welcome.
10           (Venireperson exits courtroom.)
11           THE COURT:  Okay.
12           MR. SKURKA:  Your Honor, the State
13  would move to challenge Juror No. 3, Patricia Reed,
14  for cause.
15           MR. GARZA:  We concur, Your Honor.
16           THE COURT:  All right.  She's struck.
17  That's okay.  That's okay.  I'll do it.  All right.
18  I'll do it.
19           MR. GARZA:  Who's up next?
20           MR. SCHIMMEL:  Dreyer.
21           (Venireperson enters courtroom.)
22           THE COURT:  Okay.  Thank you very much.
23  We're not going to need you, but we do appreciate your
24  service, very much.
25           VENIREPERSON NO. 3:  Thank you.
```

91

```
1            (Venireperson exits courtroom.)
2            THE COURT:  All right.  You ready to
3   bring in the next juror?
4            MR. GARZA:  Yes.
5            THE COURT:  Okay.
6            (Venireperson enters courtroom.)
7            THE COURT:  All right.  Mr. Dreyer why
8   don't you come on out, --
9            VENIREPERSON NO. 7:  Okay.
10           THE COURT:  -- and position yourself
11  about -- about up here, so -- so we can talk to you.
12
13              VENIREPERSON NO. 7,
14            THOMAS ERNEST DREYER,
15             VOIR DIRE EXAMINATION
16  BY THE COURT:
17    Q.   All right.  You're Thomas Dreyer?
18    A.   Yes, sir.
19    Q.   Okay.
20    A.   I have to be, nobody else will.
21           (Laughter in courtroom)
22    Q.   Okay.  All right.  Let's see here, have you
23  ever been on a criminal jury before?
24    A.   Once, many years ago.  It was a federal gun
25  case.  All we had to decide was whether an individual
```

92

```
1   knew he was lying when he signed the form.
2     Q.   Okay.  All right.  That was over at the old
3   federal courthouse, I guess.
4     A.   Yes, sir.
5     Q.   All right.  Well then, you know something
6   about this process.  What we're looking for is
7   basically this, and I -- I've told the panel this, but
8   we're looking for people that can keep an open mind,
9   one, that's really important, okay, and if you can't,
10  that's okay, but we do need to know, 'cause it
11  wouldn't be fair to one side or the other if somebody
12  had already made up their mind or they just can't keep
13  an open mind, okay?  Is -- can you keep an open mind?
14    A.   Oh, absolutely.
15    Q.   All right.  Second thing, we're looking for
16  people that can follow the law, okay, and we're going
17  to talk a little bit about that at this point.  Now,
18  since you've been on a criminal jury before, you know
19  that, you know, State brings charges, they got to
20  prove them, okay?  It's not -- it's not the Defense's
21  burden to do anything, really, okay?  State, you bring
22  charges, then you prove it.  All right?  And since
23  you've been on a criminal jury before you know that --
24  that the standard of proof is -- is beyond a
25  reasonable doubt; correct?
```

93

```
1     A.   Yes, sir.
2     Q.   Okay.  And that there's no definition of what
3   beyond a reasonable doubt is, but it is the highest
4   burden that we have in the legal system, okay?  You --
5   you follow me there.
6     A.   Uh-huh.
7     Q.   Do you have a problem with that?
8     A.   (Shakes head.)
9     Q.   No?
10    A.   Not a bit.
11    Q.   Okay.  Now, as part of this process, since
12  the law says, "Hey, State, you got to prove the case,"
13  the law says, "Hey, until you prove it, he's innocent
14  until you prove it," all right, you -- you agree with
15  that?
16    A.   Yes, sir.
17    Q.   All right.  And you -- and you -- you would
18  presume the Defendant innocent until the State could
19  prove to you beyond a reasonable doubt the elements of
20  the offense.
21    A.   Yes, sir.
22    Q.   And if they can't?
23    A.   Then he walks.
24    Q.   Then he walks.  All right.  Okay.  Now,
25  federal Court, in federal Court the Judge, if the
```

94

1   Defendant is found guilty, always does punishment,
2   okay?  So you didn't do punishment over there, I'm --
3       A.   No.
4       Q.   -- I'm sure.  Regardless of what your verdict
5   was.
6       A.   Well, actually, the verdict was guilty.  I
7   have no idea what the sentence was.
8       Q.   Okay.  All right.  Well, over here, in a
9   capital murder case -- well, let's talk about in a
10  noncapital murder case.  Let's say it's a criminal
11  case.  This is how it works.  Defendant in a criminal
12  case can ask for the jury to do the punishment, all
13  right?  And so, you know, the trial goes like this,
14  State presents their evidence -- and you know this --
15  State presents their evidence.  Defense can present
16  evidence if they choose.  If they don't want to, they
17  don't have to.  They argue the case to you.  I read
18  the Charge.  I give you the Charge.  You take it back
19  to the jury room.  And you know what the Charge is,
20  it's that packet of law, you got one in federal court,
21  no doubt.  And you deliberate and you decide whether
22  the State can prove each and every element of the
23  offense beyond a reasonable doubt.
24          If they can, then you go on to phase two.
25  If they have can't, game over.  You go home.  Done.

95

1   But if they do, in most criminal cases, what you do is
2   then you get to the punishment phase and there's a --
3   there's a range of punishment, depending on the level
4   of the offense, 2 to 10, 2 to 20, 5 to life, just
5   depends, okay?  But whatever it is, you know, you get
6   another Charge and then you make your decision.  And
7   the jury says, "Well you know, I think" -- you -- you
8   give punishment in that range.  That is, you give an
9   amount of time in prison or you give a fine or both or
10  perhaps probation's a possibility, okay?
11          Capital murder case is not like that, all
12  right?  Capital murder case, if we get to the
13  punishment phase of it, you don't say, "life or
14  death."  What do you is you answer questions.  And --
15  and here's one of them.  This is Special Issue 1.  And
16  then over your left shoulder, there, is Special Issue
17  2, on the board.  You answer questions.  But make no
18  mistake, depending on how you answer the questions
19  determines whether the Defendant would get life in
20  prison or the death penalty, okay?
21          So my question to you is this, you're
22  going to -- you're going to be asked to take an oath.
23  And that oath is to be able to, you know, to be able
24  to render a true verdict based upon the law and the
25  evidence presented to you.  And some people can't take

96

1   the oath, because they can't -- they can't consider
2   the full range of punishment, that is, life or death.
3   They just can't.  And, really, what we know -- we need
4   to know from you is, can you -- can you keep an open
5   mind about the full range of punishment prescribed
6   here?
7       A.   Yes.
8       Q.   Okay.  Now, capital murder.  What makes a
9   capital murder?  Well, there's a number of different
10  ways to allege a capital murder.  In this case what
11  they've alleged is a murder, which is the intentional
12  killing of another, that the Defendant committed the
13  intentional killing of another on the prescribed date
14  in Nueces County, and all that stuff.  But, over and
15  above that, they have -- they have alleged that he did
16  so while in the course of attempting to commit or
17  committing a robbery.  And so, State has to prove all
18  that to get a conviction for capital murder.  You
19  understand that.
20      A.   Uh-huh.
21      Q.   Yes?
22      A.   Yes, sir.
23      Q.   Okay.  And if they don't, then, you know, he
24  may be guilty of -- maybe he's guilt-- he might be
25  guilty of robbery, he might be guilty of murder, but

97

1   he wouldn't be guilty of capital murder.  You
2   understand that.
3       A.   Yes, sir.
4       Q.   And maybe he wouldn't be guilty of anything,
5   they can't prove any of it, all right, and you -- you
6   you agree with that.
7       A.   Yes, sir.
8       Q.   All right.  And you would hold the State to
9   their burden and require them to prove each and every
10  element of the offense for them to prevail on a -- on
11  a capital murder charge.
12      A.   Absolutely.
13          THE COURT:  All right.  All right.  Well,
14  I'm going to turn the floor over to Mr. Skurka, at
15  this time.  He's the attorney for the State.  He gets
16  to go first with you, 'cause he's got the burden of
17  proof.
18          MR. SKURKA:  Thank you, Judge.
19              VOIR DIRE EXAMINATION
20  BY MR. SKURKA:
21      Q.   Good morning, Mr. Dreyer.
22      A.   Good morning.
23      Q.   As the Judge said, I'm Mark Skurka.  I'm the
24  First Assistant District Attorney.  This is Geordie
25  Schimmel.  He's one of the assistant D.A.s.  And he's

98

1  the one that's assigned to this court on a daily
2  basis, so he'll be assisting me in the case if you get
3  a chance to present it to you and the rest of the 11
4  jurors, if you're so chosen on this case.
5          I'm going to start off by telling you
6  there's no right or wrong answers to anything you say.
7  We just kind of want to know where you're coming from,
8  how you feel about certain of these legal issues.  And
9  I agree with what the Judge says about it being a, you
10 know, being able to keep an open mind and follow the
11 law, consider everything.  I like to tell people
12 there's nothing automatic in the law.  You have to
13 listen to everything before you make a decision.
14         First question I want to ask you is, just
15 in general, how many do you feel about the death
16 penalty?
17     A.   I think it should be very judiciously
18 applied, very carefully, but I have no problem with
19 it, per se.
20     Q.   I get the impression from you, then, is,
21 "Hey, it's a pretty serious sentence, and if we're
22 going to do it, we want to make sure it's done right,
23 under the appropriate circumstances, if the law calls
24 for it and the evidence calls for it," right?
25     A.   Oh, yes.

99

1      Q.   It's just not a -- a decision you make
2  lightly; correct?
3      A.   No.  It's not a given.
4      Q.   And the law -- the law even says, our
5  legislature even says it's not for every murder case,
6  it's got to be a special kind of murder case, which is
7  usually murder, plus something else.
8      A.   Right.
9      Q.   Do you think that's a pretty good scheme to
10 have?
11     A.   I think it's -- I think so, yes.
12     Q.   And it makes sense, doesn't it?  'Cause
13 sometimes we don't always agree with laws.  I remember
14 when you had to drive 55, I didn't agree with that
15 law, too, much.  But, you know, a lot of times people
16 say, "Well, if he murdered somebody, it's
17 automatically a death penalty case," and it's not.
18 It's only a few certain cases that are set aside for
19 that.
20     A.   It depends on, I guess the word would be,
21 mitigating circumstances.
22     Q.   Well, actually, to even -- we haven't even
23 gotten there, yet.  But to even to qualify, to even
24 think about the death penalty, it's just got to be
25 murder, plus something else.  Like the Judge said,

100

1  murder plus robbery.  There's a bunch of other ones, a
2  few other ones, like, you know, murder a policeman on
3  duty or something like that.  The best example I can
4  give you is, like, if a police officer's off-duty and
5  in civilian clothes and walking down the street
6  minding his own business and somebody comes by and
7  shoots him and they don't know he's a cop, or
8  anything, and he's not, you know, working, he's
9  walking his dog, that's just plain murder.  But if a
10 cop's, you know, doing his duty, in uniform, answering
11 a call and helping somebody and you get shot, that's
12 capital murder.  So the difference is, you're still
13 killing somebody, which is both bad, but to be
14 eligible to even think about the death penalty, it
15 would have to be that one where he's in uniform.
16         So it seems to me like you kind of agree
17 with the legislative scheme that only those really bad
18 cases of murder plus something else should be even
19 eligible for the death penalty.  But again, it's not
20 automatic, like you said a minute ago, you have to
21 wait till you hear everything before you make the
22 decision.
23         When you -- when you walked into the
24 courtroom, I mean, came into the courtroom that day
25 and the Judge -- remember all those people that are

101

1  out there, and the Judge came down and says, "This is
2  a capital murder case.  This Defendant John Henry
3  Ramirez is -- could be facing the death penalty,"
4  what was your first reaction, what was the first thing
5  that hit you when you heard it was that kind of case?
6      A.   Interesting.
7      Q.   What do you mean?
8      A.   Well, I -- I like to be honest with you, up
9  until we got called for jury duty last month, I didn't
10 even realize the gentleman had been captured, yet.
11     Q.   Uh-huh.  So you thought it was interesting to
12 be on that type of case?
13     A.   Yes.
14     Q.   The -- the reason I ask is, because sometimes
15 people come in and they think they're going to hear
16 like a D.W.I. case or somebody suing somebody else in
17 a business or maybe somebody slipped and fell at
18 H.E.B., and then they go, "Oh, my gosh.  Capital
19 murder case?  I'm going to have to make a decision on
20 a death penalty?"  How does that strike you?
21     A.   I don't know how to answer that.
22     Q.   Well --
23     A.   I knew we were down there something serious
24 when I figured out that all of us were there for one
25 case.

102

1    Q.   Uh-huh.

2    A.   Okay.  But I had no idea how serious it was.

3    And passed that we sit there and wait and see what was

4    going on.

5    Q.   I don't know -- I watch the people's

6    reaction, when -- sometimes when the Judge says it,

7    you know I see people going, "Oh, my gosh," you know,

8    and then, you have people going, "Well, gosh, I better

9    listen a little closer, pay a little more attention,"

10   right, because they think it's going to be a simple

11   thing and it's -- it's not.

12        How do you feel about being on part of a

13   jury that has to make that awesome decision?  I mean,

14   it's a pretty awesome responsibility.  You and 11

15   other people, if you're chosen on the jury, has to

16   decide whether somebody's guilty or not, first of all,

17   and then decide the proper punishment.  How do you

18   feel about being part of that decision?

19   A.   I think I can handle the responsibility,

20   having the fate of someone's life literally in your

21   hands is kind of awesome.

22   Q.   It is.  I -- I think everybody takes it

23   lightly.  I know the State takes it lightly, before we

24   choose to go forward on these cases.  He's represented

25   by two very capable attorneys and very capable judge,

103

1    up there.  And so everybody wants to make sure all the

2    rights are protected and everything is done right.

3    But jurors have a very key point in this thing and I

4    just want to make sure that you're the kind of person,

5    Thomas Dreyer, can sit there and make those kind of

6    decisions if called upon.

7    A.   I -- I think I can make that -- I have no

8    problem with making that kind of a decision, but it's

9    going to -- it's going to take some doing on your part

10   to convince me.

11   Q.   And I -- and that's the way it's supposed to

12   be.  If that's the way -- I mean, I'm not going to

13   come in here and tell you, "Well, you should just look

14   at him and because the way he looks you should give

15   him the death penalty."  Of course not.  You have to

16   rely on evidence, and stuff.  And I anticipate I'm

17   going to show that you evidence, with the rest of the

18   jury.  And that's exactly right.

19        So you don't really have any problems in

20   making that kind of hard decision or tough decision,

21   if you get the proper information.

22   A.   Only insofar as -- as the level of proof

23   required.

24   Q.   Okay.

25   A.   It's a very high standard.

104

1    Q.   It is.  Well --

2    A.   And I'll be honest with you, there's been

3    times when -- when I read that paper that sentences

4    come down that I don't really understand or I don't

5    agree with, --

6    Q.   Uh-huh.

7    A.   -- but, at the same time, I just have to tell

8    myself, "Well, the jurors had access to the facts, and

9    the general public doesn't."

10   Q.   Man, I wish you would talk to a bunch of

11   other people out there in the media, be-- out there in

12   the community, because the people tell me that, too,

13   they say, "Well, did this guy get a hundred years on

14   this case and that guy only got probation," and I go,

15   "Every case is different."  And the jury hears that

16   stuff.  And -- and so, that's -- that's the way to

17   look at it.  I remember the -- remember the Rodney

18   King case where the police officer is beating that man

19   in the street and the media was asking, "Well, why did

20   they do this," and I'm going, like, "Look, all you saw

21   was a 30 second clip on T.V., over and over.  You

22   didn't hear what happened before, what happened after,

23   what led up to it."  No.  The jury's in a good

24   position for that.

25   A.   Going back to that case, in particular, I was

105

1    one of those who couldn't understand how they came

2    back with a not guilty.

3    Q.   Right.

4    A.   But, you know, like I said, I have to assume

5    that they had access to facts that I didn't.

6    Q.   Or -- well, you have to assume that they're

7    in a better position to make a decision.

8    A.   Right.

9    Q.   It's just like any --

10   A.   Kind of like a referee in a ball game.

11   Q.   Yeah, if you're not -- it's very hard to be a

12   referee when you're out in the bathroom when the play

13   takes place.  But you're out there in the field and

14   you're watching it and you see the whole thing --

15   A.   It makes a difference between sitting up in

16   the stands and being on the field with it.

17   Q.   Oh, yeah, big difference, big difference.

18   Well, good.  So, you -- you heard me say the very

19   first day, "Make no mistake, folks, the State is going

20   to seek the death penalty."  We anticipate bringing

21   you evidence that would prove to you beyond a

22   reasonable doubt that that gentleman is guilty and

23   also bring evidence in that shows that he should

24   receive the death penalty.  I want you to look at me

25   -- look at him and tell me, can you do that?  If you

106

1  think all the evidence shows that he's guilty and the
2  evidence shows that he should get the death penalty,
3  can you vote that way?
4      A.   Yes, I can.
5      Q.   I'm going to turn it around on you, now.  If
6  you think the State doesn't prove the case beyond a
7  reasonable doubt, can you vote not guilty?
8      A.   Absolutely.
9      Q.   And if the -- if there's some kind of
10 mitigating circumstance or something that makes you
11 think, well, he should get life, instead of death, can
12 you consider that, too?
13     A.   Yes, I can.
14     Q.   So, basically, you're open-minded.  You're
15 not leading one way or the other, and --
16     A.   I'm not coming in here with any preconceived
17 notions.
18     Q.   That's a good point.  Because the Judge --
19 you know, you just can't do that.  It wouldn't be fair
20 to the State or to the Defense to have already made up
21 your mind.  Now, you said something about you had
22 heard on the news, that you hadn't realized he had
23 been captured.  Remember you talked about that?
24     A.   Uh-huh.
25     Q.   Okay.  Remember what the Judge said, too, is

107

1  you can't make a decision, based on what you hear on
2  the news.  You may hear evidence about that in the
3  courtroom, but you can make a decision only on what
4  you hear in the courtroom, not from what you got from
5  the media.  You agree with that; correct?
6      A.   I -- I was listening to you-all make this
7  point several times, down there, --
8      Q.   Uh-huh.
9      A.   -- and what it brought to mind is these
10 standardized tests that we've all taken --
11     A.   Uh-huh.
12     Q.   -- that say, this -- this paragraph, these
13 are your answers, base your answer only on what's in
14 the paragraph?
15     Q.   You sound like a teacher, right?  The teacher
16 was sitting right there --
17     A.   I -- I was before I got --
18     Q.   I know.  That sounds like a teacher.  What
19 did you teach, by the way?
20     A.   Special Ed, a little bit of everything.  More
21 fun that way.
22     Q.   So you had different subjects you teach?
23     A.   (Nods head.)
24     Q.   I don't know how anybody can keep track of
25 all the stuff, between science and math and history

108

1  and all that stuff.
2      A.   Well, I very seldom gave the primary
3  instruction, you know, classroom.  It was mostly
4  back-up to what they were getting.
5      Q.   Helping, assisting those kids?
6      A.   (Nods head.)
7      Q.   And what level, high school, middle school?
8      A.   High school.  Six through 12.
9      Q.   Okay.  In your questionnaire, you pretty much
10 said that, and let me quoted it here, "I believe the
11 death penalty is appropriate in some capital murder
12 cases.  And I could vote for the death penalty in the
13 proper case."  That sounds like you wanted to make
14 sure it's appropriate in certain case and in the
15 proper case you could vote for it.
16     A.   Yes, sir.
17     Q.   And I guess the converse is also true.  If
18 it's not appropriate, you don't do it.
19     A.   Then I don't do it.
20     Q.   That's right.  Okay.  Now, the Judge hit on
21 this a little bit and I just want to touch on it for a
22 second about the reason this is capital murder.  We
23 talked about that.  There's about, I think, 12 or 13
24 different ways it can be a capital murder case.  In
25 this case we're alleging that this Defendant John

109

1  Henry Ramirez committed murder, plus tried to or
2  attempted to commit or committed robbery.  That's your
3  murder, plus a certain felony.  I think I talked about
4  it, like, it's rape, kidnapping, robbery, burglary or
5  something like that.  It's not like forging a check or
6  something.  But it's got to be a serious felony and it
7  has to be in the course of committing that.
8          And robbery -- and, basically, -- and the
9  Judge is going to give up more legal instructions if
10 you're selected on this jury -- basically, means
11 taking things by force.  If I just take something,
12 that's theft.  But if I take something by force, you
13 know, hitting the person or threatening to use force,
14 that's really robbery.  So, that's what makes do that
15 -- it's just in the course of committing those things.
16 And that's what makes it capital murder.
17          Now, if a person's found guilty of murder
18 plus robbery, or capital murder, it doesn't --
19 necessarily doesn't mean that he's going to get the
20 death penalty.  A lot of times people say, "Well, he's
21 guilty of capital murder.  He gets life -- he gets
22 death, automatically."  And I tell them, "No, it
23 doesn't work that way."  You go to the second part of
24 the trial.  The first part of the trial, all you
25 decide is did he do it or did he not do it, okay?

110

1    Guilty or not guilty.

2           The second phase of the trial, if you

3    find him guilty, generally, you decide what the

4    punishment is.  You might get to hear additional

5    evidence.  You might hear more background, or

6    something.  So you want to know what's going on before

7    you make that awesome decision of whether he gets the

8    death penalty or not.  Sometimes people say, "Well,

9    he's found guilty.  He automatically gets the death

10   penalty?"  I say, "No."  Sometimes people say, "Well,

11   I guess, we just vote, you know, here's death or

12   here's life and we check off one of them."  It's not

13   like that.  We answer two questions.  And I've got

14   them up here on the board.  I want to show them to

15   you.

16          Here, the first question is, "Is there"

17   -- excuse me, let me turn around this way a little

18   bit.

19   A.    Oh, I can do that.

20   Q.    The first question says this (showing board).

21   Now, this is assuming that he's been found guilty and

22   you're at the second phase.  Because, remember, he

23   walks if you found him not guilty.  "Is there a

24   probability that the Defendant would commit criminal

25   acts of violence that would constitute a continuing

111

1    threat to society?"  We kind of call that the "future

2    dangerousness question."  Is there a chance he could

3    be a danger in the future?  I have to ask you this,

4    you know how to read a crystal ball?  I don't, either.

5    A.    Not -- not this week, no.

6    Q.    I'm joking with you, because a crystal ball,

7    basically, means you can foresee the future.  And I

8    don't know anybody that can do that.

9    A.    Weatherman can.

10   Q.    They think they can.

11   A.    No, they don't.

12   Q.    They think they can.

13   A.    They're just paid too much to admit it.

14   Q.    Well, the question is, this is, do you know

15   what anybody's going to do in the future?  No.  Of

16   course, not.  You don't know what I'm going to do, the

17   Judge is going to do, anybody's going to do.  And the

18   law doesn't tell you that you have to know for sure.

19   It says, "Is there a probability," is there a good

20   chance that he would commit criminal -- it doesn't say

21   is it certain that he's going to commit.  Unless

22   you've got a crystal ball, you don't know what people

23   are going to do.  It just says, "Is there a

24   probability," is it more likely than not, "that the

25   Defendant would commit criminal acts of violence."

112

1           Some people say, "Well, gosh, Mark, don't

2    we only give the death penalty case if we think he's

3    going to murder somebody, again?"  And I say, "No, the

4    law doesn't require that it.  It just says if he's

5    going to commit criminal acts of violence," which

6    could be anything, beating somebody up, knocking them

7    away, stealing their lunch money, whatever it is.  But

8    the law -- what I'm trying to point out is, you don't

9    have to have another murder, thinking he's going to

10   kill somebody, again, before you give him the death

11   penalty.  Follow me?

12   A.    Uh-huh.

13   Q.    And the final part of that question is --

14   A.    I follow you.

15   Q.    -- I'm sorry -- did you have a question?

16   A.    No.  I'm with you.

17   Q.    The final part of the question is, "that

18   would constitute a continuing threat to society."

19   That's pretty self-evident.  If you think this, do you

20   think he's going to be a continuing threat to society?

21   Now, some people say, "Well, gosh, why don't you just

22   lock him up in jail for the rest of his life and that

23   way he won't be in society, he won't hurt anybody."

24   And I say, "Ah-ha, what about this?  Have you ever

25   heard anybody about prison guards getting killed, beat

113

1    up, people escape from prison, sometimes?"  It's hard

2    to believe that, but, actually, even if you're in

3    prison, you're in society.  Because who else is in a

4    prison?  Other prisoners, guards, you know, medical

5    people, there, maybe, educators help teaching them,

6    people that work in the prison?  So you're not, like,

7    you know, like, on a desert island where you're never

8    going to have a contact with another human being.

9           Society, it sounds kind of funny, but

10   prison does include society, doesn't it?  And the

11   question is, would you continue -- have you ever heard

12   of prisoners killing other prisoners?

13   A.    Oh, yeah.

14   Q.    Have you ever heard of prisoners killing

15   guards or people that work at the prisons?

16   A.    Does happen.

17   Q.    It does happen.  And you've heard of people

18   escaping from prison, probably, too.

19   A.    Unfortunately, that happens, too.

20   Q.    So the question is this, it doesn't say, do

21   you know for sure if he's going to murder somebody in

22   the future, or something like that, and -- but the

23   question is, "Is there a probability that the

24   Defendant would commit criminal acts of violence that

25   would constitute a continuing threat to society?"  And

114

1    you'll answer that question, yes or no.  Yes or no.
2           Now, the next question, then, is this
3    Special Issue No. 2.  This is kind of -- I call it the
4    "sum-up" question.  Remember, we're talking about the
5    mitigating circumstances?  Mitigating circumstances is
6    -- mitigating is a big word that, basically, means
7    anything that reduces the Defendant's moral
8    blameworthiness.  In other words, he did the crime,
9    but should he get a break, because of some extenuating
10   circumstances?  Let me give you an example.  Two guys,
11   both burglars.  Separate cases.  One burglar, you
12   think -- and you read in the paper and you say, you
13   hear that one burglar got five years probation and one
14   burglar got 29 years in prison.  And you're thinking,
15   "Gah, why did one guy get probation and one guy get 29
16   years in prison?"
17          Then you find out that the burglars
18   aren't quite equal.  What happened in one case is, the
19   burglar goes into a house, breaks down the door, gets
20   in the house and just tears up the whole house looking
21   for stuff.  I mean, he tears up the furniture, tosses
22   things over, breaks things; steals all the jewelry,
23   steals the T.V., the stereo, the CD, all that stuff.
24   And you find out he's been to prison twice before for
25   burglary.  But he's guilty of burglary, right?

115

1    A.   Uh-huh.
2    Q.   Change it to the next guy.  Other guy who's
3    also been convicted of burglary -- they've both been
4    convicted of burglary, but you find out what he did
5    was, he came in an unlocked back door.  He went in
6    the kitchen and he stole some bread and some food to
7    feed his family who was hungry.  Didn't tear anything
8    up, didn't steal anything of value, didn't take
9    anything, except some food to feed his family.  And
10   then you find out at the punishment part, this guy's
11   never even been in trouble, before.  He's never even
12   had a traffic ticket.
13          They're both guilty of burglary, 'cause
14   that's going into somebody's house and taking
15   something without permission.  But can you see how one
16   guy might get a high sentence and one guy get a low
17   sentence?
18   A.   Oh, yes, sir.
19   Q.   That's what this question's all about.
20   That's what it's all about.  Because it goes back,
21   every case is different.  The jury hears different
22   people and what the background is.  In the second part
23   of the trial, you might hear additional evidence about
24   this Defendant, you know?  Wouldn't you want to know
25   that, whether he was like a, you know, Boy Scout,

116

1    helped little old ladies across the street, or he's
2    been to prison 20 times before?  That's what helps you
3    make a decision on whether he gets the death penalty.
4           So the Judge tells you this in this
5    issue:  "After taking into consideration all of the
6    evidence," meaning the first part of the trial and the
7    second part of the trial, 'cause the first part of the
8    trial you just hear about pretty much that day, what
9    happened that day, and the second part of trial, you
10   might get to hear about, you know, background stuff,
11   like, have you been to prison 20 times, was he an
12   eagle scout, something like that.
13          So he says, "Listen -- look at all the
14   circumstances of the offense, that's stuff that
15   happened that day, "the Defendant's character and
16   background," you might hear people say he's a good
17   guy, you might hear people say he's been a bad guy all
18   his life, I don't know, "and the personal, moral
19   culpability of the Defendant is there sufficient
20   mitigating circumstance or circumstances to warrant
21   that a sentence of life, rather than death be
22   imposed"?
23          I like to tell people, it's kind of a
24   catch-all.  You think he's guilty of capital murder,
25   you think he's a continuing threat to society, looks

117

1    like you're on the road to the death penalty, but
2    wait, the Judge says, wait and check yourselves.
3    Before you enter the death penalty, take into
4    consideration all these other things.  Is there any
5    reason he should get something different, life in
6    that?  And see, it's a fair question, right?  You
7    might want to know about that person's background.
8    Maybe he was, you know, a decorated Vietnam Veteran,
9    you know, and just made one mistake and did something
10   wrong.
11          Here's the tricky part.  What is a
12   mitigating circumstance?  I can't tell you.  That's up
13   to these folks on the jury to decide.  'Cause some
14   people may say, "Well, you know, we should give him a
15   break, because, you know, he had a bad childhood," or,
16   "You know, his mother died when he was real young,"
17   or, "You know, -- you know he -- something happened to
18   him when he was a kid," or something like that.  And
19   some people say, "Look, hey, you know, I don't -- I
20   don't care if he was an eagle scout when he was a kid,
21   he still did this crime and he's got to pay the
22   consequences for it."
23          So the Judge can't tell you what's a
24   mitigating circumstance.  The Defense may bring those
25   up, but it's up to you to decide whether that's enough

118

1   to outweigh what he did to get the death penalty.
2   It's kind of like a balancing test, you know?
3       A.   Sounds pretty arbitrary.
4       Q.   Well, when you say, "arbitrary" --
5       A.   Well, let me -- let me rephrase that.  Not
6   arbitrary so much as it's personal.
7       Q.   Yeah.  And you know why?
8       A.   Personal outlook.
9       Q.   And it's subjective for a reason.  'Cause
10  he's different from every other person.  The Judge
11  can't say --
12      A.   That's the word I was looking for,
13  "Subjective."
14      Q.   Okay.  Subjective.  That's all right.  But it
15  should be, right?  Because there may be cases in a
16  capital murder case where the guy, like the two
17  burglars, before you know which one did the worst and
18  who did the best, you wouldn't be able to answer those
19  questions.  You want to have that stuff before you
20  make -- I mean, you're making a pretty critical
21  decision.  You want to know about their background,
22  and stuff.  And that would help you -- and this is
23  kind of a catch-all, like I said.  You're heading
24  towards the death penalty, but, stop, before you do
25  this, is there any reason to lower the sentence to

119

1   life?  And that's up to these 12 people over here.
2   They may think that enough and they may think it's not
3   enough.  But mitigating can be almost anything you it
4   to be.
5           And that brings me up to my next point.
6   Sometimes people say, "Well," maybe the guy's charged
7   with burglary, say, and he says, "Well, yeah, I did
8   the burglary, but I was drunk when I did it," or, "I
9   was high on drugs when I did it."  The law says that
10  is not a defense to the crime.  Voluntary intoxication
11  is not a defense to crime.  Right?
12      A.   (Nods head.)
13      Q.   You did the crime and you have to pay for it,
14  and that's not an excuse for a crime.  But
15  intoxication could be a possible mitigating
16  circumstance.  Maybe, you know, you ran over -- you
17  killed somebody driving drunk, or something like that,
18  which is bad, that's not really a mit-- it could be a
19  mitigating circumstance, it could not be, it's up to
20  you.  But I'll tell you, the Judge is probably going
21  to instruct that you while voluntary intoxication is
22  not a defense to the crime, you can't say, "I'm not
23  guilty," 'cause of that, it might be something you can
24  consider in punishment, if you think it.
25           But, again, you've got to decide whether

120

1   it's outweighed by all the other circumstances.  Are
2   we okay on this, on the special issue?
3       A.   Right.
4       Q.   It makes kind of sense, doesn't it?
5       A.   It makes sense.  I'm with you.
6       Q.   And that's the way it's supposed to do,
7   because we don't want it arbitrary to just say
8   everybody fits in a little, you know, cubby hole.
9   Everybody's different.  The evidence is all different.
10          So, I guess, to sum up on that part is,
11  if a person -- if the State doesn't prove the case
12  beyond a reasonable doubt, your vote would be not
13  guilty; correct?
14      A.   (Nods head.)
15      Q.   If the State does prove the case beyond a
16  reasonable doubt most likely your vote would be
17  guilty, but you're not automatically going to go for
18  the death penalty or life, you're going to wait to
19  hear other information, if it's presented to you, and
20  then answer those questions.  If you answer the first
21  question, yes, yes, he is a continuing threat to
22  society, based on his background, and, no, no, there's
23  no reason not -- none of these mitigating
24  circumstances, then the Defendant will be sentenced to
25  death.  If you answer in any other way, he gets a life

121

1   sentence.  Okay?
2       A.   Okay.
3       Q.   That's kind of how the scheme works.  Any
4   questions about that?
5       A.   Well, let me summarize a little bit, just to
6   make sure I've got it.
7       Q.   Sure.
8       A.   Okay.  It's basically two parts.  One's the
9   -- the second part is where we decide what happens in
10  case of a guilty verdict.
11      Q.   Correct.
12      A.   The first part is just getting to a yes or
13  no.
14      Q.   Yes.
15      A.   Okay.
16      Q.   We don't say, yes/no, we say, guilty or not
17  guilty, --
18      A.   Right.
19      Q.   -- if they -- if we prove the case beyond a
20  reasonable doubt.  And that's -- and that's how you're
21  supposed to keep it separate.  And that's -- that
22  makes sense, right?  You want to see if he's guilty,
23  first, before you decide what his punishment is.  And
24  then to make a decision, unless you have a crystal
25  ball, you probably want to know what's in his

122

1    background.  I mean, have you ever heard the
2    statement, sometimes you can predict what's going to
3    happen in the future by what's happened in the past?
4    You can't always.  It's not automatic, but it's a
5    pretty good road map of what things happen.
6              Okay.  Let me see if there's any other
7    questions.  You heard about -- so you can consider
8    everything in both ranges of punishment, life or
9    death, depending on what the evidence shows.
10   A.    (Nods head.)
11   Q.    We talked about the indictment.  The
12   indictment's not proof of guilt.  That just means the
13   grand jury has indicted him and brought him to case --
14   court on that, but that can't be used against him.
15             The Fifth Amendment, remember, I think
16   the Judge talked about it that first day?  Everybody
17   has a right for the First -- Fifth Amendment.  You can
18   testify if you want to, but if you don't have -- want
19   to you don't have to.  He doesn't have to testify.
20   They don't have to put on any evidence, at all.  It's
21   like you told me, earlier.  "It's up to you to prove
22   it."
23             And beyond a reasonable doubt, we talk
24   about that.  And it Judge is correct about saying
25   there's no exact definition, but I can tell you what

123

1    it's not.  Beyond a reasonable doubt doesn't mean
2    beyond all doubt, beyond any doubt, beyond a shadow of
3    a doubt, like you always see in the movies, and stuff.
4    All it just means is, it's a doubt that is helpful to
5    you in making -- whether a doubt exists that would
6    keep you from making a decision.  I didn't say that
7    right.  Let me -- let me say it a different way.  I
8    like to use --
9    A.    I under-- I understand what you're trying to
10   say.
11   Q.    I like to use examples, and that's the
12   easiest way for me.  It's like this, have you ever
13   flown on an airplane before?
14   A.    A couple of times.
15   Q.    Okay.  And when you went on that airplane,
16   did you know for sure whether it going to crash or
17   not?
18   A.    Never.
19   Q.    No.  And you go up in the airplane.  But what
20   did you do?  What did you look at?  You probably
21   looked at the plane, looked at the reliability of that
22   airline.  You probably see the -- the people work on
23   the plane, and the pilots.  And you look at all that
24   and you evaluate it and you get on the plane and fly,
25   right?

124

1    A.    I still don't know --
2    Q.    Because you don't know for sure --
3    A.    -- how that big old heavy thing is up there.
4    Q.    I have a hard time with that, too, but -- but
5    the point is, you still -- you don't know a hundred
6    percent sure the plane is not going to crash.  But you
7    have looked at everything and you've assembled the
8    stuff and you realize, "I'm going to take that plane,
9    because I think, beyond a reasonable doubt, it's not
10   going to crash, I mean, but I can't tell you that a
11   hundred percent."
12             And that's kind of what beyond a
13   reasonable doubt is.  There's a whole bunch of
14   different definitions.  It just doesn't mean all
15   doubt, shadow of a doubt.  And there's no way I could
16   prove to you all doubt, unless you were there and saw
17   it yourself.  You'd be a witness.  I couldn't -- you
18   couldn't testify -- I mean, you couldn't be on here.
19             Okay.  Let me finish up and see if
20   there's anything else I wanted to ask you.  What
21   instrument do you play in the Veterans Band?
22   A.    Baritone sax.
23   Q.    And how long have you been playing in that?
24   A.    Day one, 22 and a half years.
25   Q.    You know, "Ram" Chavez was on one of my

125

1    juries years ago.  He's a good guy.  And I just saw he
2    got a medal in the -- finally got his medal.
3              MR. JONES:  Four years late.
4              MR. SKURKA:  How?
5              MR. JONES:  Four years late.
6              VENIREPERSON NO. 7:  That's the Army for
7    you.
8    Q.    (BY MR. SKURKA) Well, he's been a good leader
9    for you guys.  You-all -- you-all do well.
10   A.    Well, he has.  There's been times in the past
11   when -- the -- the possibility of putting somebody
12   else in his position, but that group was put forth and
13   said, "No.  It ain't happening."
14   Q.    He's a good guy.  Like I said, he was on one
15   of juries a long time ago, so I met him before.  Oh,
16   there's one question I wanted to tell you about, there
17   was something about policemen.  And you understand
18   that policemen are held to the same standard as
19   everybody else.  Just because they're a policeman
20   doesn't mean they're God and they walk on water.  It
21   just says whether they tell the truth more -- less
22   likely or more likely to tell the truth than the
23   average person.
24             The law requires all witnesses to be
25   equal.  You know, you can't -- even if it's a priest,

126

1 a nun, or a cop, you know, you still have to be able
2 to evaluate them all equally.  So would you be able to
3 do that and treat a cop just like everybody else if a
4 cop testifies?
5     A.    Insofar as testimony, yes.  I'm not sure -- I
6 don't remember exactly how I answered that question.
7 I do hold -- well, police and judges, for example, to
8 a higher --
9     Q.    Sure.
10    A.    -- higher standard, but that's more in
11 behavior.
12    Q.    Yeah, but the point is this, just because a
13 policeman takes the stand, they're to be treated just
14 like every other witness, civilian or other.
15    A.    Yeah.
16    Q.    You can do that?
17    A.    Oh, yeah.
18          MR. SKURKA:  Fine.  I don't think I have
19 any other questions, unless you have any questions of
20 me, Mr. Dreyer.
21          VENIREPERSON NO. 7:  Not a one.
22          MR. SKURKA:  Okay.  Thank you.  I'll let
23 the defense lawyers talk to you, now.
24
25

127

1          VOIR DIRE EXAMINATION
2 BY MR. JONES:
3     Q.    The -- you made a statement which implied
4 that you have followed this case in the media to some
5 extent?
6     A.    Very little.  There really hasn't been that
7 much in the media, that I remember.
8     Q.    Do you remember reading about the case when
9 it first came out?
10    A.    When it first came out, yes, and I remembered
11 when the two young ladies were -- were indicted --
12    Q.    Uh-huh.
13    A.    -- and -- and charged.  And I couldn't even
14 tell you, right now, if they've gone to trial or not.
15 I kind -- I kind of lost -- I don't if it was just
16 'Cause I quit keeping up with it or it just dropped
17 out.
18    Q.    Well, sitting here, right now, knowing that
19 the media is your source of information, --
20    A.    You have to understand, I consider the
21 source.
22    Q.    You consider...  What -- what media facts do
23 you remember about the case, sitting here right now?
24    A.    Just the fact that there's three individuals
25 were accused of the crime, --

128

1     Q.    Okay.
2     A.    -- and two young ladies, like I said, were
3 indicted.  And I wasn't -- I wasn't even aware, until
4 we got called for jury duty, that this gentleman was
5 even caught, so...  That's pretty much it.
6     Q.    So you -- just from your reading -- you were
7 aware that he had not been caught, apparently, on the
8 night, or whenever this thing occurred.
9     A.    Right.
10    Q.    Did you --
11    A.    I remember reading it was suspected that he
12 had gone to Mexico, but nobody was sure about that,
13 either.
14    Q.    Okay.  Do you remember it, from your media
15 source, do you remember any details about where it
16 happened or details of how it happened or the place
17 where it happened, anything like that?
18    A.    It was a convenience store on Baldwin, I
19 believe.
20    Q.    Okay.
21    A.    And the only reason I remember that is I've
22 been in there for gas on occasion.
23    Q.    Okay.
24    A.    And I remember they said they didn't get
25 much.

129

1     Q.    Well, the Judge will tell you that we -- we
2 don't expect jurors to be ignorant of current events.
3 You know, we expect jurors will read the newspaper and
4 watch television.  But a jury will take -- a jury --
5 juror -- you've done this one time -- will take an
6 oath that they will decide the case based on what they
7 hear in the courtroom, and -- which means you have to
8 make a conscious effort to put aside, and you're just
9 not to consider, information you got from the
10 Caller-Times or other places, because it may or may
11 not be accurate.
12    A.    Like I said, I consider the source.
13    Q.    Okay.  You -- and you can do that if you're
14 on the jury.
15    A.    Oh, yes.
16    Q.    Now, this is a capital murder case where the
17 death penalty is a possibility.  And you say -- who
18 decides whether we get the death penalty and have the
19 death penalty, or not, who makes that decision?
20    A.    The jury.
21    Q.    No, I mean, who -- who -- who makes -- says
22 that that can be a form of punishment?
23    A.    It comes out of the legislature.
24    Q.    The legislature.  That's right, the
25 lawmakers.  The Texas legislature says that death

130

1  penalty can be invoked if certain --

2      A.   They set the criteria.

3      Q.   -- criteria are met.  And you told us that

4  you generally agree with that law, but -- that that

5  should be an option in some cases.

6           And on page 26 of your questionnaire, it

7  says, "On a scale of one to ten, how strongly do you

8  believe in the death penalty," and you used -- nine

9  being -- one being the least and ten being the

10 strongest, you put nine.

11     A.   Right.

12     Q.   I take it from that selection that you

13 believe that our society benefits from having the

14 death penalty?

15     A.   I believe so, yes, sir.

16     Q.   How would you -- how would you describe that

17 benefit?

18     A.   The best way to make sure it never happens

19 again by that individual.

20     Q.   Okay.  So, we remove the offender --

21     A.   That sounds harsh.

22     Q.   Well, --

23     A.   But I -- I don't think it is.

24     Q.   No, but it's -- it's a permanent removal of

25 the offender of society and protection of society.

131

1      A.   Right.

2      Q.   Okay.  And so --

3      A.   Like I said, standards --

4      Q.   Uh-huh.

5      A.   -- for that kind of sentence is pretty high.

6      Q.   That's right.

7      A.   Like I said, it's going to take some doing to

8  convince me that that's what's warranted.

9      Q.   Okay.  But you believe that in this -- year

10 2008, that -- that society benefits from having that

11 form of punishment, and so long as it's imposed under

12 that strict criteria.  Is that what you're telling me?

13     A.   Yes.

14     Q.   Okay.

15     A.   Not -- not so much as -- I've never believed

16 the death penalty is a deterrent, in and of itself,

17 for the simple reason before a death penalty is

18 carried out, there's so some much time elapses between

19 the sentence and the carrying out of that sentence.

20     Q.   So there's --

21     A.   I make no judgments as to whether or not

22 that's correct or not.

23     Q.   There's been a lot of debate about how fast

24 the -- you know, there's always appeals after cases,

25 and sometimes they take a long time and some people

132

1  argue those appeals ought to go faster.  Are you one

2  of those people that feels if the death penalty is

3  imposed it should be carried out rather quickly, so it

4  can be a deterrent?

5      A.   Most of the time, yes.

6      Q.   Now, you -- you -- I take it that you keep up

7  with current issues, you read the newspaper?

8      A.   Uh-huh.

9      Q.   You read more than one newspaper?

10     A.   No.

11     Q.   Okay.

12     A.   I watch Fox News a lot.

13     Q.   Okay.  Fox News?  And so your main source of

14 information about current events is from the local

15 newspaper and television.

16     A.   Right.

17     Q.   Uh, --

18     A.   And, occasionally, talk radio, yes.

19     Q.   Now, within the last few years, there have

20 been several, maybe more than several, stories, many

21 of them coming out of Dallas, Texas, about people who

22 have been convicted of crimes only to be found later

23 to be factually innocent of those crimes because of

24 D.N.A. testing.  I think D.N.A. is the main reason

25 that most of these cases were -- results were found to

133

1  be incorrect.  And have you ever read any of those

2  stories or heard anything about those stories?

3      A.   Yes, I have.  It looks like Dallas County's

4  got a problem.

5      Q.   Well, to the credit of the District Attorney

6  in Dallas County, he and many others are seeking to

7  right those wrongs as fast as possible.  When you read

8  a story about some guy that's been in prison for 20

9  years and then they find out he's really not guilty --

10 or innocent, how does that make you feel?

11     A.   Definitely feel bad for the guy.

12     Q.   Okay.  You have to, you know?

13     A.   I mean, it's -- how could you not?

14     Q.   Now, you agree that human beings are not

15 perfect, right?

16     A.   Oh, absolutely right.

17     Q.   And --

18     A.   I've also believed that if there's a way to

19 screw it up mankind will find it.

20     Q.   Now, in the legal system, you know, we're

21 human beings trying to work this system.  The Judge is

22 a human being.  I'm a human being.  If you're on this

23 jury, you're going to be a human being on a jury.  We

24 try out best not to make mistakes.  Just like that

25 airline pilot when he runs down the runway, carrying

**134**

1 you in the back, he's going to do his best not to make
2 a mistake before he gets to his destination, right?
3     A.    (Nods head).
4     Q.    Well, mistakes do occur.  And in the legal
5 system, in the Criminal Legal System, we have an
6 elaborate appellate process, the purpose of which is
7 to correct mistakes.  I can talk to you an hour about
8 how that works, but that's the purpose of it.  We --
9 we've got an elaborate procedure set up to undo
10 mistakes, if they really need to be undone.  The
11 problem in a -- in a death penalty case, is that after
12 the defendant is executed and it comes out later that
13 there was a mistake, you can't go back and correct it,
14 can you?
15     A.    Yeah, that's why the standards, I think, have
16 to be so high.  Because it is a very definite,
17 permanent --
18     Q.    Okay.
19     A.    -- ending to the problem.
20     Q.    So do you agree that, from time to time,
21 given that people are not perfect, that innocent
22 people can be convicted in our system?
23     A.    It's a possibility.
24     Q.    Okay.
25     A.    And I'm sure it's been done.

**135**

1     Q.    No, it's been done.  It's been proven, it's
2 been done.  And it's been done in capital murder
3 cases.  Now, you -- you told me that you think --
4     A.    Excuse me.  See, that's one of the problems I
5 have with the standards for the death penalty.  I've
6 got to put myself in a position to where I've got to
7 ask myself, "Well, what if he isn't?"
8     Q.    Okay.
9     A.    There's always that, "just in case."
10     Q.    Now, which underscores the seriousness of
11 your job if you find yourself on this jury.  Okay?
12 It's really serious business.
13            Now, you told me that you think,
14 generally, that the death penalty as a form of
15 punishment is a benefit to society.  You've also
16 agreed with me that from time to time, given that we
17 are human beings and we make mistakes, the system
18 makes mistakes and innocent people will be convicted,
19 from time to time.  Do you think the benefit of
20 capital punishment is sufficiently great to warrant
21 from time to time an innocent person being put to
22 death?
23     A.    Apparently.
24     Q.    No, I asked you.
25     A.    That's what I said, apparently --

**136**

1     Q.    Apparently --
2     A.    -- that's what I believe.
3     Q.    -- you do believe.
4     A.    Yeah.
5     Q.    Okay.  I love to ask that question, because I
6 get all kinds of different answers.  But once again,
7 if you're on the jury in a case like this and you get
8 right down to these final questions and you'll know
9 what's gonna happen if you answer them in a certain
10 way, but you're face to face, you know, with that --
11 that problem.  You want to -- you want to try to make
12 the right decision, because if you make the wrong
13 decision, there may be a point where you can't undo
14 it.
15     A.    That's absolutely correct.
16     Q.    Okay.
17     A.    To be honest with you, put in that position,
18 I wouldn't be able to consider the death penalty.  I
19 would -- I would be one of the hardest ones, I think,
20 to convince that that's the way to go.
21     Q.    Okay.
22     A.    If that makes sense.
23     Q.    Now, Mr. Skurka went over these -- these two
24 questions with you.  You know, the jury, if it reaches
25 that part of the trial, doesn't vote directly.  Some

**137**

1 can argue that you do vote directly.  But they don't
2 just go back there and say, "What are we going to give
3 this guy?  Are we going to give him life in prison or
4 20 years or 50 years or death," and they take a vote
5 and they write the word "death" on a piece of paper.
6 That's not how we do it.  Instead, the law requires
7 the jury --
8     A.    Nothing's that simple.
9     Q.    And, basically, the law -- the law requires
10 that your decision should be guided.  And -- and the
11 way you guide the jury -- and when I say, "guide," it
12 kind of forces you or commands that you take into
13 consideration certain things.  The law wants -- the
14 legislature wants you to think about certain things
15 before you -- before the -- the decision is made.  And
16 the decision is made by answering these questions.
17            If the jury finds a person guilty of
18 capital murder, he's eligible for the death penalty.
19 No question about it.  But the State cannot impose it,
20 unless these two questions are answered in a certain
21 way.  And when you take the jury oath, you're going to
22 tell the Judge that, if you get to these questions,
23 that you'll try to answer them truthfully.  And let --
24 let me ask you this:  Let's say that you hear all the
25 evidence and you're -- you hear all the punishment

138

1    evidence and you get down to answering these
2    questions, and kind of deep down in your heart you
3    think the guy ought to get the death penalty, okay?
4    That would be your off-the-cuff intuition.  Yet, on
5    the Special Issue No. 2, you feel like there's some
6    mitigating circumstances in the case that would argue
7    against the death penalty.  In other words, we're
8    weighing against the death penalty.  Do you feel like
9    that if you follow your road, you would have to answer
10   Special Issue No. 2, yes, there are mitigating
11   circumstances that weigh against the death penalty,
12   which would make it an a inappropriate question, could
13   you answer that question truthfully, even though it
14   may go against what you think really oughta happen?
15       A.   I would certainly hope so.
16       Q.   Okay.
17       A.   See the mitigating -- excuse me -- let me go
18   back a little bit.  I just -- I spent many years
19   managing fast food restaurants and convenience stores.
20       Q.   Uh-huh.
21       A.   Okay?  And every once in a while an employee
22   -- there were only two things that I would fire anyone
23   outright, with no discussion, no second chances, if
24   they lied to me about anything or if they stole from
25   me.

139

1        Q.   Uh-huh.
2        A.   Because at that point I can't trust them,
3    anymore.
4        Q.   Right.
5        A.   Anything else can be discussed.  And whether
6    they, you know, we got -- got into a shouting match,
7    somewhere, whatever circumstances were, I always made
8    it a point not to fire somebody just because I was mad
9    at them for whatever reason.  I would always try not
10   to do it on the spot, to wait until I've calmed down
11   and think about it.  And that's -- that's what
12   Question 2 comes in.  Yes, off-the-cuff, I may think
13   the death penalty's appropriate, but -- and I've got
14   to answer that, "but".
15       Q.   Okay.  Let -- let me go to another subject,
16   here.  You were in the military?
17       A.   Excuse me, sir, --
18       Q.   In the reserves.
19       A.   -- in the National Guard.  Yes.
20       Q.   Okay.  And over what period of time?
21       A.   I was commissioned in '74, served active
22   guard in the reserve through '80, and served inactive
23   until '82, when I resigned my commission.
24       Q.   How many -- how many years of active duty did
25   you have?

140

1        A.   Oh, active duty?
2        Q.   Yeah, where you're actually, were actually
3    out doing military service.
4        A.   90 days.
5        Q.   90 days.  Okay.
6        A.   That's why, as far as the Department of
7    Defense is concerned, I'm not relevant.
8        Q.   Oh, really?
9        A.   Yeah.
10       Q.   Okay.  Did you have any specialty in the --
11   in the Army?
12       A.   I was commissioned as a medical service --
13       Q.   Okay.
14       A.   -- corp platoon leader, and transferred to
15   infantry, where I was, in the Army, a platoon leader
16   for a number of years.
17       Q.   Okay.
18       A.   Basically, I taught my troops how to sit up
19   on a hillside and shoot at tanks and hopefully
20   survive.
21       Q.   Okay.  (Laughing)  Oh, okay.  Of course, I
22   guess, if you'd been in the reserves just within the
23   last ten years, you would have probably gone to Iraq
24   and --
25       A.   Oh, I probably would have.

141

1        Q.   -- Afghanistan.
2        A.   I resigned my commission in '82.
3            MR. JONES:  Okay.  That's all the
4    questions.
5            THE COURT:  All right.  Why don't you go
6    wait in the jury room and we'll get with you shortly.
7            VENIREPERSON NO. 7:  Okay.
8            (Venireperson exits courtroom.)
9            THE COURT:  All right.
10           MR. SKURKA:  State will accept this
11   juror, Your Honor.
12           MR. GARZA:  May we have a minute, Your
13   Honor?
14           THE COURT:  You may.
15           (Off-the-record discussion.)
16           MR. GARZA:  Judge, we'll exercise a
17   peremptory strike.
18           THE COURT:  All right.
19           (Venireperson enters courtroom.)
20           THE COURT:  All right, Mr. Dreyer, we
21   appreciate you coming in and talking to us.  You're
22   not -- you're not going to be on the jury, but we
23   appreciate your --
24           VENIREPERSON NO. 7:  Oh, well.
25           THE COURT:  -- willingness to come in

142

1   here and spend your time with us this morning.

2              Thank you very much for your service.

3   Appreciate it.

4              VENIREPERSON NO. 7:  Thank you-all.

5              MR. SKURKA:  Thank you, sir.

6              (Venireperson exits courtroom.)

7              THE COURT:  All right.  Let's take a

8   little break and then we'll start on the next one.

9              (Short recess.)

10             (Venireperson enters courtroom.)

11

12             VENIREPERSON NO. 11,

13           PATRICIA MCGEE HUMPHREY,

14           VOIR DIRE EXAMINATION

15  BY THE COURT:

16      Q.   All right.  Hi, how are you?

17      A.   Fine, thank you.

18      Q.   You are Patricia Humphrey?

19      A.   Yes.

20      Q.   All right.  And -- Okay.  We're going to talk

21  to you about a few things, some of which we've already

22  talked to you about the other day when you came and

23  you filled out your questionnaire, and we have your

24  questionnaires here.

25             First of all, we're looking for people

143

1   that can keep an open mind, okay, and we're looking

2   for people that can follow the law, all right?  Do you

3   think that you can be one of those -- do you think

4   that's you?

5       A.   I think so.

6       Q.   Okay.  I mean, because some people, they say,

7   "You know what, I can't.  I just can't.  I can't keep

8   an open mind about the case.  I can't follow the law,"

9   and that's okay.  We just need to know that, okay?  So

10  we're going to ask you some stuff.

11             First of all, this is a criminal case.

12  Have you ever been a juror on a criminal case before?

13      A.   I was a long time ago.

14      Q.   Okay.  What kind of case was it, do you

15  remember?

16      A.   Murder.

17      Q.   A murder case.  Okay.  Well, then you've got

18  some experience with this.  All right, now, were you

19  asked to assess punishment in that case?

20      A.   No.

21      Q.   No.  Okay.  All right, then let's talk about

22  some things.  And if you've -- you've been a juror on

23  a criminal case, a murder case, before then you know

24  the burden is on the State and it's always the State.

25  It never shifts.

144

1       A.   Right.

2       Q.   And that -- and that they have to prove each

3   and every element of the offense, that is, the State

4   beyond a reasonable doubt.

5       A.   Uh-huh.

6       Q.   Law says, "Look, State, you bring charges,

7   that's fine, but you prove them."

8       A.   Uh-huh.

9       Q.   All right?  He doesn't have to prove

10  anything, he -- he and his attorneys, they don't have

11  to do anything, okay?  He -- Mr. Skurka, that is, and

12  Mr. Schimmel, over there, they have to prove their

13  case.  They've made an allegation, now they have to

14  prove it.  You agree that that's the way it oughta be.

15      A.   That is the law.

16      Q.   That's the law, but some people -- some

17  people, despite that fact, don't like it and -- and

18  they think that the Defendant ought to prove his

19  innocence.  And that's okay.  But that's not you.

20      A.   No.

21      Q.   Okay.  Now, the standard of proof in a

22  criminal case, of course, as you know, 'cause you've

23  got experience with this, is beyond a reasonable

24  doubt.

25      A.   Uh-huh.

145

1       Q.   And we don't have a definition for that,

2   okay?  But it's the highest burden that we have in all

3   of the law, criminal or this otherwise, okay?  And

4   it's not beyond all doubt or beyond a shadow of a

5   doubt, but it is a high standard, okay?  Do you have a

6   problem with that?

7       A.   No.

8       Q.   And -- and could you, as the law requires,

9   hold the State to that burden of proof, that is,

10  "State, you got to prove each and every element of

11  this offense to me beyond a reasonable doubt or you

12  don't get there."

13      A.   Yes.

14      Q.   Okay.  And that is, if they prove seven out

15  of eight, they don't get there, all right?  It's not a

16  -- it's not like, you know, a best of seven series.

17  They got to prove, they got to run the table on it.

18  You understand that?

19      A.   Yes.

20      Q.   Now, as part of all of this, he's presumed to

21  be innocent until they can do that, if they can do

22  that.  Would you agree with that?

23      A.   Yes.

24      Q.   And can you -- can you agree to presume that

25  he is innocent, until they do or can, if at all, prove

146

1 he's guilty beyond a reasonable doubt?  Can you do
2 that?
3     A.    Yes.
4     Q.    All right.  Now, as part of that, that is,
5 the fact that he and all of us as citizens, the people
6 in this country, are presumed to be innocent until --
7 until proven, otherwise, he doesn't have to testify.
8 And I told you earlier, he doesn't have to do
9 anything.  In fact, Mr. Skurka, here, and Mr.
10 Schimmel, they put on their case, this side of the
11 table, they can just say, "We rest.  We don't put on
12 any evidence."  And included in that Defendant doesn't
13 testify.  Now, I don't know if he's going to testify
14 or not.  That's a decision that he and his lawyers
15 will make, and maybe his lawyers will tell him, "You
16 know what, I don't want to you testify, because I
17 don't think they've proven their case," or maybe --
18 maybe he gets nervous in high stress situations.  And
19 this certainly is one.  No doubt.  Maybe he's
20 uneducated.  Maybe he stutters.  We don't know.  But
21 like I said, I think there's a lot of reasons why
22 someone may not want to testify, but the law says you
23 can't hold it against him, okay?  The law says you go
24 back in that jury room, you can't talk about it if he
25 doesn't testify, you can't say, "You know what, I

147

1 don't know about Mr. Skurka's case, but, you know, I
2 sure would have liked to heard from him.  And I think,
3 since he didn't testify, okay, we're going to put this
4 in Mark Skurka's side of -- of the balance sheet.  I'm
5 going to hold it against him, because he didn't tell
6 me his side and I want to know.  I'm going to penalize
7 him."  You can't do that.  You understand that.
8     A.    Yes.
9     Q.    And I need to know if you would -- if you
10 would hold it against him if he chooses not to
11 testify.
12     A.    No.
13     Q.    Okay.  Now, that other case that you were
14 involved in was a murder.  And it wasn't a capital
15 murder; is that right?
16     A.    No.  It was a self-defense.  I don't know if
17 that -- that's what they --
18     Q.    That was the defense on it?
19     A.    That was the defense.
20     Q.    Okay.
21     A.    Uh-huh.
22     Q.    Well, you know, it sounds kind of funny that
23 things can be a plain murder, but there is a
24 difference between a plain murder, quote, unquote, --
25     A.    Uh-huh.

148

1     Q.    -- and a capital murder, okay?
2     A.    Yes.
3     Q.    And -- and that is, a murder is the
4 intentional taking of the life of another person.
5 Capital murder's a little different.  I like to call
6 it murder, plus murder plus something else.  And
7 there's a laundry list, but, in this case, what
8 they're saying is, that is the State over here,
9 they're alleging that not only did this defendant on a
10 particular day in Nueces County, Texas commit the
11 murder, but that he did so while attempting to or
12 while committing a robbery.
13     A.    Uh-huh.
14     Q.    Okay?  You understand that.
15     A.    Yes.
16     Q.    And so, for -- for the State to prevail they
17 have to prove not only that this defendant committed
18 the murder, but that he also did that extra part, that
19 at the same time he was attempting to commit or
20 committing a robbery.
21     A.    Uh-huh.
22     Q.    All right?  You understand that.
23     A.    Yes.
24     Q.    Would you hold them to that standard and make
25 them prove that as an element before you found this

149

1 person guilty of capital murder?
2     A.    Yes.
3     Q.    Okay.  Now, I mean, you might -- you might go
4 back in the jury room and say, "Well, you know what,
5 maybe I think he's guilty of the robbery or attempted
6 robbery, or maybe I think he's guilty of the murder,
7 but not -- not the robbery," and you have to find him
8 not guilty of that fact, at least, the capital
9 murder.  You may be -- maybe we would have submit a
10 lesser included to you, maybe we wouldn't, but -- but
11 we don't know at this point.  You don't know that.
12 But the point is, for them to prevail he has to prove
13 each and every element.  You understand that.
14     A.    Yes.
15     Q.    And you would -- you would hold the State to
16 that.
17     A.    Yes.
18          THE COURT:  Okay.  All right.  Then I am
19 going to turn the floor over to Mr. Skurka.  He gets
20 to speak with you, first, because he's got the burden
21 of proof.
22          Mr. Skurka.
23          MR. SKURKA:  Thank you, Judge.
24
25

150

VOIR DIRE EXAMINATION

BY MR. SKURKA:

1   Q.   Good morning, Ms. Humphrey, how are you?

2   A.   Fine, thank you, I'm fine.

3   Q.   My name is Mark Skurka. I'm a First

4   Assistant District Attorney. This is my co-counsel,

5   Geordie Schimmel. He's an attorney that works in the

6   D.A.'s Office, that's assigned to Judge Galvan's court

7   on a daily basis, so he'll be assisting me in this

8   case.

9         I'm going to go over some of the issues

10   and -- and the things that we've discussed, both with

11   the Judge and in the questionnaire. And I want to

12   tell you, right off the bat, there's no right or wrong

13   answers. We just want to know how you feel and -- and

14   what -- about some of the issues in this case and to

15   get to know you a little bit more. Our questionnaire

16   had some stuff, but, obviously, doesn't have

17   everything, and it's your chance to get to talk to us

18   about what your feelings are in a certain area.

19   A.   Okay.

20   Q.   Let me start by asking you about the death

21   penalty, just in general. I mean, if somebody came up

22   to you off the street and said, "How do you feel about

23   the death penalty," what would you say?

1   Q.   Good morning, Ms. Humphrey, how are you?

## 150

VOIR DIRE EXAMINATION

BY MR. SKURKA:

3   Q.   Good morning, Ms. Humphrey, how are you?

4   A.   Fine, thank you, I'm fine.

5   Q.   My name is Mark Skurka. I'm a First

6   Assistant District Attorney. This is my co-counsel,

7   Geordie Schimmel. He's an attorney that works in the

8   D.A.'s Office, that's assigned to Judge Galvan's court

9   on a daily basis, so he'll be assisting me in this

10   case.

11         I'm going to go over some of the issues

12   and -- and the things that we've discussed, both with

13   the Judge and in the questionnaire. And I want to

14   tell you, right off the bat, there's no right or wrong

15   answers. We just want to know how you feel and -- and

16   what -- about some of the issues in this case and to

17   get to know you a little bit more. Our questionnaire

18   had some stuff, but, obviously, doesn't have

19   everything, and it's your chance to get to talk to us

20   about what your feelings are in a certain area.

21   A.   Okay.

22   Q.   Let me start by asking you about the death

23   penalty, just in general. I mean, if somebody came up

24   to you off the street and said, "How do you feel about

25   the death penalty," what would you say?

## 151

1   A.   I believe in it.

2   Q.   It's that simple, I believe in it.

3   A.   Uh-huh.

4   Q.   Why?

5   A.   I think some crimes that are committed

6   warrant the death penalty.

7   Q.   Okay. Do you understand what the -- I think

8   you learned the last time we were all together was the

9   death penalty is not automatic. Just because a person

10   is convicted of capital murder does not mean he

11   automatically gets the death penalty, there's two

12   choices, death or life in prison.

13   A.   Yes.

14   Q.   You understand that?

15   A.   Yes.

16   Q.   So could you see that there may be

17   circumstances, if a person's found guilty of capital

18   murder, because of the circumstances behind the crime

19   or the person's background, they may get the death

20   penalty, but there may be circumstances where they're

21   convicted of capital murder, but because of

22   circumstances they may get a life sentence. Can you

23   understand that?

24   A.   Yes.

25   Q.   You agree with that?

## 152

1   A.   Yes.

2   Q.   That makes sense. You want to be able to

3   consider both sides --

4   A.   Uh-huh.

5   Q.   -- both punishment ranges fully. Can you do

6   that in this case?

7   A.   Yes.

8   Q.   Now, it says in your questionnaire that

9   you've heard a little bit about this case and I want

10   to talk to you a little bit about that for a minute.

11   You remember the Rodney King case, where those

12   officers were shown beating this man up with these

13   batons outside his car?

14   A.   Uh-huh.

15   Q.   And they showed this clip, it seemed to me,

16   over and over again. And they showed, like, a 15, 20

17   second clip.

18   A.   Uh-huh.

19   Q.   And if you looked at that, it looked like

20   five police officers beating a guy up. And you kept

21   seeing it over and over again. And a lot of people

22   thought, "Well, gah, Rodney King must be" -- I mean

23   "These police officers must be guilty of beating him

24   up," because that's all they saw was that clip.

25   A.   Uh-huh.

## 153

1   Q.   And then, come, you know, a year later,

2   whenever they tried it, low and behold the jury, who

3   heard all the facts of the case, made the decision

4   that the police officers were not guilty. Now,

5   whether you agree with that decision or not, would you

6   agree with me the proposition that probably the jury

7   in that case heard everything about that case, you

8   know, what happened before, what happened after, what

9   the circumstances leading around it, to make a better

10   decision than you and me just seeing 20 seconds on

11   T.V. that night?

12   A.   Yes.

13   Q.   Does that make sense?

14   A.   Uh-huh.

15   Q.   Now, you've heard something about this case

16   and my question to you is that the media stuff -- and

17   it's okay to have heard stuff on the news, I mean, we

18   don't live in a vacuum, here, the problem is if you've

19   already made up your mind and say, "Well, because I

20   saw this 20 second clip on the news, I've already made

21   up my mind." You haven't done that, have you?

22   A.   No.

23   Q.   Okay. And what you're going to do -- will

24   you be able to follow the Judge's instructions?

25   'Cause he's going to give you some written

154

1  instructions at the end of trial that says you are
2  instructed that you must make a decision on this case
3  based only on the evidence you hear in this courtroom
4  and nothing else.  So something you've heard at the --
5  you know, H.E.B. or from your friends or from the
6  media or from the newspaper, or whatever, is not to be
7  used in considering.  You can only consider what you
8  hear in the courtroom.  That's fair, isn't it?
9     A.    Yes.  And I agree with that.  I -- I -- do
10  need to say that I do listen to the news a lot.
11    Q.    Uh-huh.
12    A.    I followed the case when it happened.  I
13  wrote down the things that I had heard.  At the time,
14  I would have assumed that -- that he have did this.
15    Q.    Based on what you heard in the media.
16    A.    Based on what I heard in the media.
17    Q.    But now knowing the law about you have to
18  make a decision only on what you hear in the
19  courtroom, can you follow the Judge's instructions?
20    A.    Yes, I can, but I just needed to say that.
21    Q.    And I understand that.  It's -- and that's a
22  typical response.  You know, when I hear -- probably,
23  when I saw the thing on Rodney King and see these five
24  policemen beating the guy, I probably thought they
25  were guilty, too.  But, you know, that's a decision I

155

1  may have made, but I know that if I'm on the jury,
2  I've got to wait and a hear all the evidence in the
3  case, frankly.
4     A.    Right.
5     Q.    Do you see it that way?
6     A.    Yes.
7     Q.    Okay.  So it's not that unusual, because we
8  always -- my gosh, I thought the Cowboys were going to
9  go to the Super Bowl at the beginning of the season,
10  you know?  I went, "Oh, my gosh, what's happened to
11  them," you know, because you can't know what happens,
12  until you see what goes on.  And that's what you're
13  going to have to do on the jury.
14    A.    Uh-huh.
15    Q.    So, right now, you're presuming that he's
16  innocent and that we have to prove the case to prove
17  that he's guilty, right?
18    A.    Yes.
19    Q.    And the other things you may have heard in
20  the media is not going to influence you in this case.
21  You're going to make a decision based just what you
22  hear in the courtroom.
23    A.    Yes.
24    Q.    That's all I can ask you to do.  When you
25  first heard it was a capital murder case, you know,

156

1  that first day when all those 200, 300 people walked
2  in and you sat down and Judge Galvan came down and
3  said, "This is a criminal case, folks, and this is a
4  capital murder case, where this defendant, John Henry
5  Ramirez, may be eligible for the death penalty," tell
6  me what was your first reaction was when you heard
7  that, that it was that kind of case?
8     A.    My first reaction?  Well, that if you were
9  picked to be on the jury, you might have to judge that
10  this person needs to be put to death.
11    Q.    That's exactly right.  My question is -- I
12  like to watch people's faces when the Judge says that.
13    A.    Uh-huh.
14    Q.    And some people go, like, "Oh, no, oh my
15  gosh, what's happening"?  And, you know, people think
16  they're going to be called in for, like, a little
17  D.W.I. case or, you know, maybe suing -- some business
18  suing another business.  And they find out it's
19  capital murder and they start looking within
20  themselves, say, "Oh, my gosh, can I do that?  Can I
21  be on that part -- that kind of a jury?"  I just
22  wonder if anything like that struck you?
23    A.    A little bit.  It's a very serious things to
24  be on a jury that would say that they had to put
25  somebody to death.

157

1     Q.    It's an "awesome responsibility" people call
2  it.
3     A.    It's a tremendous responsibility.
4     Q.    It's a tremendous -- it's something I don't
5  take lightly, the Defense, nobody take is lightly.
6  That's why we're spending time being serious about it.
7  But, notwithstanding that, I want to know if it's the
8  kind of case that you could sit on and participate if
9  you have to make that kind of decision.
10    A.    I think it is.
11    Q.    Okay.  The reason I say that is, like I said,
12  I've actually seen people go, "Oh, my gosh, put me on
13  another case, you know?  I can do a burglary case, but
14  I can't make that issue."  How do you feel about
15  participating in that decision where you may have to
16  make that ultimate decision?
17    A.    Well, it makes me a little nervous.
18    Q.    Uh-huh.  And it should.  I mean, it's not
19  something you want to make a snap judgment on.  But
20  can you follow through with the decision in this case
21  if the law and the evidence warrants it?
22    A.    Yes.
23    Q.    Okay.  I'm putting you on your spot, because
24  I -- you know, a lot of times people say, "Oh, yeah,
25  Mark, I believe in the death penalty.  Yes, we should

158

1  have the death penalty.  Yes, it's a good law," and
2  then when you put them in that position they say,
3  "Well, make somebody else do it.  I can't do it.  Make
4  somebody else do it."  And I'm going to ask you right
5  now, Ms. Humphrey, to take a look at him.  That's him.
6  That's John Henry Ramirez.  Not somebody on the
7  newspap-- in the newspaper and the news.  That's him.
8  And I told you the very first day, I don't -- I don't
9  mess around, I tell people, "The State's going to come
10  to a time in this trial that we're going to ask 12
11  people, after giving them appropriate evidence, to
12  find him guilty beyond a reasonable doubt and evidence
13  that shows that he should get the death penalty, I'm
14  going to ask you for the death penalty."  I just want
15  to know if you, Patricia Humphrey, can vote that way
16  if the evidence calls for it?
17     A.   Yes.
18     Q.   Okay.  I have to ask you the other way, too.
19  If the State doesn't prove the case beyond a
20  reasonable doubt, can you vote not guilty?
21     A.   Yes.
22     Q.   And if the State has the evidence or they
23  bring in some mitigating circumstances and you say,
24  "Well, he's guilty, but maybe he should get a life
25  sentence, instead of the death penalty," can you

159

1  consider that, also?
2     A.   Yes.
3     Q.   So you sound like you're pretty open-minded
4  about things, right?
5     A.   Uh-huh.
6     Q.   You don't know what you're going to do now,
7  yet, right, because you haven't heard anything.
8     A.   Right.
9     Q.   And right now he is presumed innocent, as the
10  Judge said, 'cause I haven't put on any evidence, yet.
11     A.   Correct.
12     Q.   But I just want to know if you can follow
13  through.  Some people can talk a good talk, but they
14  can't walk the walk.  And I just want to know, can you
15  follow through if the evidence calls for that?
16     A.   Yes.
17     Q.   Okay.
18     A.   I -- You know, I -- the death penalty, when I
19  think of the death penalty, I think of if I were in
20  that situation, if I had someone I knew that had been
21  murdered, --
22     Q.   Uh-huh.
23     A.   -- and what were the circumstances.  Certain
24  circumstances, I think, are worse than other
25  circumstances.  So, in that respect, I definitely

160

1  believe in the death penalty, --
2     Q.   Okay.
3     A.   -- so...
4     Q.   Would you -- would you want -- I mean, you'd
5  want to be on a jury, not that -- I'm not saying that
6  right.  Most people don't want to be on a jury and
7  make that decision.
8     A.   Uh-huh.
9     Q.   But it's like they say, if I had to do my
10  civic duty, I had to do my civic duty and I'll -- I'll
11  see if the evidence says that.  If the evidence says,
12  no, the evidence says, no.  Like, for example, you had
13  this case 30 years ago and you said it was
14  self-defense, right?
15     A.   Uh-huh.
16     Q.   You apparently could have found him guilty of
17  murder or you could have found him not guilty because
18  it was self-defense.
19     A.   Uh-huh.
20     Q.   If you had made up your mind ahead of time,
21  you wouldn't be a very good jury, right -- juror,
22  right?  But you probably heard circumstances that made
23  it sound, "Hey, this guy's not guilty.  He had to
24  protect himself."
25     A.   Uh-huh.

161

1     Q.   And it's the same in every case.  You don't
2  make a decision ahead of time.  You wait till you hear
3  the evidence.  And that's all I'm asking, if you can
4  do that and follow through with it?
5     A.   Yes.
6     Q.   Okay.  Any questions about that?
7     A.   No.
8     Q.   All right.  Great.  Now, the reason this is
9  capital murder case, I know it sounds funny, but
10  sometimes we call it "plain murder."  If you just kill
11  a person, that's "plain murder", for lack of a better
12  word.  But murder -- capital murder is generally
13  murder plus something else, like, a -- plus a special
14  circumstance, like a child under six years old --
15     A.   Uh-huh.
16     Q.   -- or a cop who's on duty, or if you do it
17  while you're committing one of several felonies, like
18  rape, robbery, murder -- I'm sorry -- rape robbery,
19  burglary, kidnapping, things like that, serious
20  felonies.
21     A.   Uh-huh.
22     Q.   In this case, we're alleging that this
23  defendant committed murder while in the course or
24  attempting to commit robbery.  And robbery basically
25  means taking things by force or by threats of force.

162

1      A.    Uh-huh.
2      Q.    If I just go up there and grab your purse,
3    that's theft, 'cause I just stole something from you,
4    but if I go up there and hit you over the head and
5    take your purse, that's robbery, because I've used
6    force on you or maybe I said, "If you don't give me
7    your purse, I'm going to kill you," that's robbery.
8    So robbery tied in with a murder makes it a capital
9    murder.
10          Not every capital -- not every murder
11   case is a capital murder case.  I mean, if this was
12   just plain murder, we wouldn't be having this
13   discussion about the death penalty, 'cause he wouldn't
14   be eligible for it.  So in this case it's capital
15   murder only because of those facts.  Also, in this
16   kind of case, when you say there's two parts to the
17   trial, the first part is, did he do it or not, is he
18   guilty or not guilty?  The second part of the trial,
19   if you find him guilty, you go on to the punishment
20   phase.  And in the punishment phase you might get to
21   hear additional evidence.
22          Now, it makes sense, in the first part,
23   to figure out whether he did it or not, you probably
24   just hear evidence about that day, what happened that
25   day and the circumstances around that, but how would

163

1    you want to make a decision on what to punish him,
2    unless you knew some other things about him, right?
3    You might want to know if he's got good character or
4    bad character.  Maybe he's been in prison 20 times
5    before.  Maybe he's never been in trouble with the law
6    at all, never even got a traffic ticket.
7          So, the second part of the trial is you
8    might get to hear additional evidence, either from us
9    or the Defense, remember, they don't have to put on
10   anything, at all, he doesn't have to testify if he
11   doesn't want to, you remember that, the Fifth
12   Amendment.  But you might hear some additional
13   evidence to make a decision, then, on what his
14   punishment could be.  But it's not like you go in
15   there and say, "Well, I'm going to vote for death or
16   I'm going to vote for life."  You don't just check off
17   death or check off life.  You answer two questions.
18   And based on how you answer those questions is how the
19   Defendant is sentenced.
20          Now, the first question is on the board
21   behind you.  And I'd like you to read it with me, or
22   I'll read it for you.  This is -- this is pretending
23   that he's been found guilty of capital murder and
24   you're going on to the punishment phase.  You might
25   get to hear additional evidence and then the Judge

164

1    will ask you this question.  "Is there a probability
2    that the Defendant commit criminal acts of violence
3    that would constitute a continuing threat to society?"
4    We call that "the future dangerousness question."
5    And, essentially, you have to make a decision based on
6    some of these things.  Do you know how to read a
7    crystal ball?
8      A.    No.
9      Q.    Nobody does, right?  But how do you decide
10   what's going to happen in the future?  Sometimes
11   people say, "Well, the best indication of what's going
12   to happen in the future is by looking at a person's
13   past," --
14     A.    Uh-huh.
15     Q.    -- right, you know?  And, I mean, that's not
16   a hundred percent absolute, but that's a pretty good
17   gauge to look at.
18     A.    Uh-huh.
19     Q.    And you'd probably want to know, on the jury,
20   whether you should know this person's past before you
21   decide what his punishment is.
22     A.    Uh-huh.
23     Q.    That's kind of what this question looks at.
24   It says this, "Is there a probability that the
25   Defendant would commit criminal acts of violence"?

165

1    Probability doesn't mean certainty.
2      A.    Uh-huh.
3      Q.    Unless you can look in a crystal ball and
4    say, "Okay, I know in five years John Henry Ramirez is
5    going to be doing this," you can't do that, right?  It
6    doesn't tell you, you have to have certainty, a
7    hundred percent, it just says is it probable, is it
8    more likely than not that he would commit criminal
9    acts of violence?  It doesn't even say he's going to
10   murder anybody it else.  It just says, "criminal acts
11   of violence."  Could be anything.
12          Sometimes people say, "Well, Mark, you
13   can't give him the death penalty, unless you think
14   he's going to murder somebody, again," and I say, "No.
15   The law doesn't say that.  It just says if you think
16   he's going to commit criminal acts of violence."  So
17   if there's a chance, a good chance or more likely than
18   not, that he's going to commit some kind of violence
19   to other people that would constitute a continuing
20   threat to society.
21          "Society" is a word that we think about
22   people on the outside, as opposed to people on the
23   inside.  And I'm talking about prison.  'Cause
24   sometimes people tell me, "Well, gosh, Mr. Skurka, why
25   do we have to kill him, you know?  Why can't we just

166

1 lock him away, put him in prison for the rest of his
2 life where he can't hurt anybody?"  Here's my question
3 to you.  Who else is in a prison?
4     A.   People.
5     Q.   People.  Other prisoners.
6     A.   Uh-huh.
7     Q.   Right?  There may be guards there.
8     A.   Uh-huh.
9     Q.   There may be, like, medical people working
10 there, there may be administrators working there,
11 secretaries, so when you're put in prison, you're not
12 really removed from society, you're still interacting
13 with people, albeit, in a more confined circumstance,
14 but society, is what I'm trying to point out to you,
15 we don't put somebody out on a desert island where
16 they're all by themselves, there's no other human
17 beings around.  Have you ever heard any times about,
18 you know, maybe somebody getting hurt in a prison,
19 like a prisoner attacking another prisoner or a guard?
20 You've heard of that, right?
21     A.   Uh-huh.
22     Q.   So just locking them up in -- in prison,
23 putting them away from society, really doesn't take
24 them away from society.  There is that possibility.
25     A.   Uh-huh.

167

1     Q.   And so what this question that the Judge
2 posses to you is this, "Is there a chance he's going
3 to hurt somebody else in the future and be a danger to
4 our society?"  That's why we call it "the future
5 dangerousness question."
6          Now, you may get to hear other evidence.
7 You may hear, "This guy's been an eagle scout and a
8 good guy and helped little old ladies across the
9 street," or you may hear, "This guy's been to prison
10 20 times before and he -- this is his 25th felony," or
11 something like that.  That's the kind of background
12 you'd want to know in making that decision, right?
13     A.   Yes.
14     Q.   Again, we don't want anything automatic.
15 Just 'cause he's found guilty you automatically get
16 the death penalty.  You might want to look at this.
17 So the Judge is going to ask you to answer this
18 question yes or no, yes, there's a probability that
19 he'll commit criminal acts of violence and be a
20 continuing threat to society or no.
21          Then you go to the next question, and
22 it's right over here.  This is the one that deals with
23 that question we've talked about that first day called
24 "mitigating circumstances."  Mitigating circumstances
25 is anything that would lessen or make less the

168

1 Defendant's moral blameworthiness.  In other words, he
2 did the crime, but is there any reason we should give
3 him a break and lower his sentence?  Well, how can you
4 do a lower of a sentence if their sentence is the
5 same?
6          Well, think about this.  Say you have two
7 burglars, burglar one and burglar two, and they're
8 both convicted of burglary.  And you're sitting on the
9 jury.  In your first jury, you hear the surrounding
10 circumstances.  The first burglar went into a house,
11 kicked in the door, stole all the T.V.s, radios,
12 stereos, and everything, stole all the jewelry.  And
13 not only that, he tore up all the furniture, knocked
14 it over, broke things, and stuff.  And took off after
15 the burglary and you find out that that guy's been to
16 prison for burglary five times before.  Okay.  And you
17 think, "Okay.  I've got to make a decision on his
18 punishment."
19          The second guy has also been convicted of
20 burglary, 'cause burglary means breaking into
21 somebody's house and taking something that doesn't
22 belong to you, essentially.  But the second burglar's
23 a little different.  You find out that he didn't break
24 into the house.  The back door was unlocked.  He went
25 into the kitchen and stole some bread and some food to

169

1 go feed his kids who were hungry, 'cause he didn't
2 have a job and so he had to break in and go into
3 somebody's house without permission and stole food.
4 And then you find out that that guy's past, he's never
5 even been in trouble before, this is the first time
6 he's ever been arrested.  He didn't even have a
7 traffic ticket before.
8          Now, you look at the first -- both of
9 these guys are both guilty of burglary, right?
10     A.   Uh-huh.
11     Q.   But would you really punish them the same?
12     A.   No.
13     Q.   Why not?
14     A.   Because they were different.
15     Q.   That's right.  The circumstances were
16 different.  In the first case, there were aggravating
17 circumstances, stuff that made it look bad to make the
18 sentence go up.  In the second case, there were
19 mitigating circumstances.  I mean, he didn't break in.
20 He didn't steal anything else.  He could have taken
21 the T.V. and the stereos, but all he took was food,
22 'Cause his family was hungry.
23     A.   Uh-huh.
24     Q.   And he'd never been in prison before.  That's
25 the difference -- that's what mitigating circumstances

170

1  means.  Sometimes people call it, ext-- there's
2  "Extenuating circumstances," but lawyers like to use
3  their own words.  They make it mitigating
4  circumstances.
5       So in that case, you have to wait till
6  you hear everything to decide if there's any
7  mitigating circumstances that would keep him from
8  getting a higher punishment.  And what's what the
9  Judge tells to you do.  You think he's guilty of
10  capital murder.  Boom.  You think he's a -- a
11  probability that he's going to be a continuing threat
12  to society.  The Judge -- it looks like you're heading
13  toward the death penalty, but the Judge says, "Stop.
14  Wait."  Look at this next question.  "Take into
15  consideration all of the evidence," everything you've
16  heard, "including the circumstances of the offense,"
17  like what happened that day, "his character and
18  background," you know has he got good -- everybody's
19  going to say he's a good guy or everybody's going to
20  say he's a bad guy, or maybe he's got, you know, five
21  felonies in the past or maybe he was an eagle scout,
22  "And the personal moral culpability of the Defendant,"
23  take all of that together, "is there a sufficient
24  mitigating circumstance or circumstances to warrant
25  that a sentence of death -- life, rather than death be

171

1  imposed"?  In other words, we think he did this, he
2  did that, but look at everything else?  Is there
3  enough.  Is it sufficient.  Is it enough to outweigh
4  the death penalty?
5       I mean, say for example, the guy -- you
6  know, what is a mitigating circumstances?  I couldn't
7  tell you.  That's up to these 12 people on the jury.
8  The Judge is never going to give you a list that say,
9  this is a mitigating circumstance, this is a
10  mitigating circumstance, this is a mitigating
11  circumstances.  That's up to the jury to decide.  Some
12  people may say, "Well, you know, I don't care if he
13  was an eagle scout when he was a kid.  He still did
14  this crime.  He's got to pay for this crime."
15  Somebody may say, "Well, I don't care if he came from
16  a broken home.  You know, that's a mitigating
17  circumstances, but that's not enough, you know?"  So
18  just because you find a mitigating circumstance, does
19  that mean you automatically lower the sentence?  No.
20  The jury makes that decision.
21       I like to say it's kind of a balancing
22  test.  Is it enough to outweigh the death sentence?
23  If it is, you say, yes, if it's not you say, no.  See
24  what I'm saying?
25     A.   Uh-huh.

172

1     Q.   And that's why I did that trick question with
2  the burglary.  If you had started, you know, two
3  burglars, you wouldn't know what to do.  One was
4  aggravating.  One was mitigating.  And you'd probably
5  -- wouldn't you probably treat that second guy that
6  stole the bread easier than you treat the first guy?
7     A.   Yes.
8     Q.   Sure.  That's why you have to keep an open
9  mind.  The Defense may bring up some mitigating
10  circumstances for you to consider.  You have to decide
11  if that's enough, if those mitigating circumstances
12  are enough to lower the sentence.  Okay?
13       So, in essence, what happens is, you find
14  him guilty or not guilty.  If you find him guilty, you
15  then go -- answer that question, do you think he's a
16  continuing threat to society.  And then -- but before
17  you can give him the death penalty, you have to look,
18  again, look at everything.  And, look, be fair, is
19  there anything that would warrant that he gets life,
20  instead of death?
21       Does that question make more sense, now,
22  gives you a chance to talk about other things in the
23  past, --
24     A.   Uh-huh.
25     Q.   -- and whether it's mitigating --

173

1     A.   Uh-huh.
2     Q.   -- or not?  'Cause if you're closed-minded
3  and you're already going for the death penalty, you're
4  not going to consider this.  But it sounds like you're
5  open-minded and you'll listen to anything.  Okay?
6     A.   Okay.
7     Q.   That's all I need to do.  Do you have any
8  questions about that scheme?
9     A.   No.
10     Q.   It makes kind of -- it kind of makes sense,
11  doesn't it?  You know, you're not going to rush into
12  anything.  You want to hear everything, 'cause, as we
13  talked about earlier, it's a pretty serious decision
14  you have to make.
15     A.   Well, stealing food for your family is a
16  minor, minor offense.  Whereas, the other one you gave
17  as an example, --
18     Q.   Sure.
19     A.   -- is very bad.
20     Q.   Yeah.  And that's why I give you that example
21  to show the long reaches of stuff, 'cause when you
22  hear two burglaries you automatically think they're
23  both bad, but then you say, "Well, no, I'm going to
24  punish this one higher than I'm going to punish this
25  one."

174

1    A.    Uh-huh.

2    Q.    In this case that's what the -- the law gives

3   you had an opportunity.  If you don't think it's that

4   bad, you can give him a life sentence.  But if you

5   think it's not enough to give them a life sentence,

6   you just stick with the death penalty, okay?

7              That's how it's going to work.  Those are

8   the two questions.  You don't vote, yes and no, for

9   life.  So you can understand -- you can follow that,

10  and if you think the evidence says that -- the

11  question should be answered in such a way from the

12  evidence that he gets the death penalty, can you do

13  that?

14   A.    Yes.

15   Q.    And if -- the other way around, if you think

16  the questions are answered in such a way he should get

17  a life sentence based on the evidence, can you do

18  that?

19   A.    Yes.

20   Q.    Okay.  A couple of legal questions, real

21  quick are, you know the indictment is not evidence of

22  guilt.  Just the fact he's charged with it doesn't

23  mean he's necessarily guilty.

24   A.    Yes.

25   Q.    You know the Fifth Amendment means that he

175

1   has a right to testify if he wants to, but he doesn't

2   have to.  We can't force him to.

3    A.    Uh-huh.

4    Q.    And you can't hold that against him.

5   Sometimes jurors say, "Oh, my gosh, I want to hear his

6   side.  I want to hear his side."  Well, the law says,

7   and I know this Judge will probably instruct you, if

8   he doesn't testify you cannot hold that against him.

9    A.    Right.

10   Q.    I don't know if he's going to testify or not,

11  but I'm just telling ahead of time.  If he doesn't,

12  you can't hold that against him.  You can follow that

13  law; --

14   A.    Uh-huh.

15   Q.    -- correct?

16   A.    Uh-huh.

17   Q.    The burden of proof is beyond a reasonable

18  doubt.  As the Judge, said it's on the State.  We have

19  to prove the case.  He doesn't have to prove anything.

20  And beyond a reasonable doubt doesn't have a

21  definition, but it basically means it's not all --

22  beyond all doubt or any doubt or a shadow of a doubt.

23  You always hear that on T.V.  It drives me nuts.

24  Beyond a shadow of a doubt.  Well, the law doesn't say

25  that.  The first thing I tell people to look at is,

176

1   first of all, do you have a doubt?  If you have a

2   doubt, well, go to the next question, is it a

3   reasonable doubt?

4    A.    Uh-huh.

5    Q.    You know, is there a reason for my doubt?

6   Say, for example, a guy breaks in -- burglarize -- I'm

7   sorry -- robs a bank.  And the bank teller says,

8   "There's the guy that robbed me," you know, during the

9   trial the bank teller says, "That's the guy who robbed

10  me.  He was wearing a yellow shirts."  And then the

11  next person comes up, who's another teller, says,

12  "That's the guy who robbed me.  I saw him rob me.  He

13  was wearing a yellow shirt that day."  And then the

14  third witness is a bank guard who's outside on the

15  sidewalk and sees him getting away, and he says,

16  "That's the guy that robbed out our bank.  He was

17  running away from the bank with a bag of money and he

18  was wearing an orange shirt."  Well, you have to kind

19  of question, was he wearing a yellow shirt or an

20  orange shirt, but everybody says, "That's the guy,"

21  cause they saw his face.

22              So that doesn't -- if I could prove

23  everything a hundred percent, we won't have that.  And

24  that's all I'm trying to tell you.  We don't have to

25  prove things a hundred percent, --

177

1    A.    Uh-huh.

2    Q.    -- beyond all doubt.  There may be minor

3   things there, but that's up to the jury to decide if

4   they're enough for that.

5              How do you feel about -- oh, one last

6   thing on that, on the law part.  Voluntary

7   intoxication.  Now, follow me on this one.  The law

8   says, if you get drunk or you get high and you commit

9   a crime that's not an excuse for that crime.  That

10  doesn't excuse your crime.  But the law does say that

11  might be something that could be used in a mitigating

12  circumstance to give him a lower sentence.  Like that

13  question right says.  It doesn't mean you're not

14  guilty.  It just means something -- that might be

15  something the jury can consider to lower the sentence.

16              Does it mean you automatically lower the

17  sentence?  No.  It's up to the jury to say, "I don't

18  care if he was drunk or high.  He still, you know, did

19  this crime and he needs to answer for that."  Okay?

20  So, voluntary intoxication is not a defense to crime,

21  but it could be used in mitigation of punishment.

22  But, again, it's up to the jury what mitigation is.

23              You said in your -- in your questionnaire

24  something about you work around people who are on

25  probation and prison.  Is that from your job or what?

178

```
1       A.   It's from my job.
2       Q.   Is that from -- you're just in the
3  construction business, in general?
4       A.   Do hiring, a lot of hiring for the
5  construction company that I work for.
6       Q.   And my guess is sometimes they work out and
7  sometimes they don't, just like anybody else, right?
8       A.   Very much so.
9       Q.   You just can never tell, unless you have a
10  crystal ball and you can see what's going to happen,
11  but we know you don't have that.  Do you have any
12  questions for me about anything we've talked about?
13      A.   No.
14      Q.   The bottom line is can you be fair to both
15  sides in the case?
16      A.   Yes.
17      Q.   Can you be open-minded and wait to hear all
18  the evidence before you make a decision?
19      A.   Yes.
20      Q.   And if once you make a decision, can you
21  carry out with it, whichever way it is?
22      A.   Yes.
23           MR. SKURKA:  Okay.  Thank you, Ms.
24  Humphrey.
25           THE COURT:  All right.  Ms. Humphrey,
```

179

```
1  we're going to have to bring you back after lunch, so
2  the Defense, they get a chance to talk to you, as
3  well.  So we'll see you at 1:15.
4           VENIREPERSON NO. 11:  Okay.
5           (Venireperson exits courtroom.)
6           THE COURT:  All right.  We'll see you-all
7  after lunch.
8           (Noon recess.)
9           THE COURT:  All right.  I guess, it's
10  your witness.  Let's bring her in.
11          (Venireperson enters courtroom.)
12          THE COURT:  All right.  Go ahead and have
13  a seat.
14          I guess, Mr. Jones?
15          MR. JONES:  Okay.
16               VOIR DIRE EXAMINATION
17  BY MR. JONES:
18      Q.   Hi.
19      A.   Hi.
20      Q.   Okay.  Let's see, let me get your
21  questionnaire, here.  Under Texas law, a person has
22  the right to a trial by jury if they're accused of a
23  crime.  In a felony crime it's a jury of 12, okay?  Do
24  you agree with trial by jury?
25      A.   Yes.
```

180

```
1       Q.   I don't know anybody that doesn't.  It's a
2  very valuable right that we have as citizens.  Why do
3  you think that having trial by jury is a good thing?
4  Kind of grown up with it, but did you ever stop to
5  think why it's such a valuable thing to have?
6       A.   Well, you have more than one person deciding.
7       Q.   Deciding what?
8       A.   The outcome of what you're being tried for, I
9  guess?
10      Q.   Yeah.  You heard the Judge say that, in a
11  criminal case the standard of proof, the degree of
12  certainty --
13      A.   Uh-huh.
14      Q.   -- that's required is beyond a reasonable
15  doubt.  That's the highest degree of certainty
16  required in any kind of case in Texas.  It's the
17  degree of certainty required in criminal cases.  Why
18  do you think that our legislators assigned that degree
19  of certainty to a criminal case, rather than, say,
20  preponderance of the evidence or probable cause or
21  mere suspicion?
22      A.   Why do I think they did?
23      Q.   Yes.
24      A.   Well, I don't know.
25      Q.   Okay.
```

181

```
1       A.   Never really thought about, actually.
2       Q.   You probably have.  What's -- what is the --
3  what is the outcome -- if a person is found guilty of
4  a crime, what -- what can follow?
5       A.   Well, death, for one.
6       Q.   A sanction.
7       A.   Yes.
8       Q.   There's a sanction.
9       A.   Okay.
10      Q.   There's -- it could be, in this case, it
11  could be the death penalty --
12      A.   Uh-huh.
13      Q.   -- or prison or jail, or maybe a fine or a
14  fine and jail.  Going to -- what -- when you say
15  something goes to jail, what are they losing?
16      A.   Their privileges.
17      Q.   They're losing their?
18      A.   Their rights.
19      Q.   Their liberty.
20      A.   Uh-huh.
21      Q.   Their freedom, right?
22      A.   Uh-huh.
23      Q.   In our American Civilization, what do we
24  value more than anything else?
25      A.   (No response.)
```

182

1    Q.    "We hold these truths to be self-evident."

2    A.    Uh-huh.

3    Q.    I mean, "these" are life, liberty and the

4    pursuit of happiness.  In other words, liberty, we --

5    we value liberty highly in our civilization.  And so,

6    before the government can take it away, in the context

7    of a criminal case, we want to make sure that there's

8    a good reason to do so, okay, and that there's a need

9    to do it.  You can't just off the cuff do it.  In

10   other words, before the government can take away a

11   person's life or his liberty or his property, in our

12   system, we say that the evidence needs to be strong,

13   that's it's necessary.  Otherwise, we don't want to do

14   it, even if the person may be actually guilty.  Do you

15   agree with that?

16   A.    Yes.

17   Q.    You heard the Judge say that, in the criminal

18   case persons accused of crimes are presumed to be

19   innocent.

20   A.    Yes.

21   Q.    Do you agree with the presumption of

22   innocence?

23   A.    Yes.

24   Q.    Do you agree that the presumption of

25   innocence might require a judge or a jury to let

183

1    somebody go or find somebody not guilty that might be

2    actually guilty?

3    A.    Yes, I guess.

4    Q.    What does not guilty mean?

5    A.    That they did not find, not a hundred

6    percent, but within a reasonable doubt?

7    Q.    That's right.  That's exactly what not guilty

8    means.  Not guilty means the State hasn't proved their

9    case beyond a reasonable doubt?

10   A.    Uh-huh.

11   Q.    Doesn't mean that the Defendant is factually

12   innocent.

13   A.    Uh-huh.

14   Q.    Okay?

15   A.    Correct.

16   Q.    Doesn't mean that.

17   A.    Right.

18   Q.    It could mean that, but that's not --

19   basically, means the State didn't prove its case.  So,

20   do you agree that that high degree of certainty

21   should -- should apply in criminal cases, that that's

22   a good idea?

23   A.    Yes.

24   Q.    Which is worse in your mind, that a guilty

25   person go free or that an innocent person be

184

1    convicted?

2    A.    An innocent person be convicted.

3    Q.    Okay.  That would bother you more than the

4    other.

5    A.    Yes, I think so.

6    Q.    In the -- in the last few years there's been

7    some stories in the newspaper and on television of

8    cases where -- a lot of people who have been -- a lot

9    of the cases are coming out of Dallas, right now, of

10   people that have been convicted of crimes who later

11   been found innocent because of D.N.A. testing.  Have

12   you read any of those stories?

13   A.    I've heard it.  I -- I don't know that I've

14   read the stories, but I have heard that.

15   Q.    Some guy was in jail for, say, 15 or 20 years

16   and --

17   A.    Yes.

18   Q.    -- now they're letting him out, --

19   A.    Uh-huh.

20   Q.    -- because he was really not guilty in the

21   first place.  How do -- When you hear a story like

22   that, how does it make you feel?

23   A.    How does it make me feel?

24   Q.    Uh-huh.

25   A.    Makes me sad for that person that spent all

185

1    that time for something he didn't do.

2    Q.    Right.

3    A.    Provided that's absolutely truthful that he

4    did not do that.

5    Q.    What those stories underscore is the serious

6    nature of the jury's duty in a case like this.  In

7    other words, they -- before you find somebody guilty,

8    you need to -- proof beyond a reasonable doubt.

9    A.    Uh-huh.

10   Q.    Now, our Constitution gives us a right to

11   trial by jury.  And not only does it give us a right

12   to trial by jury, but it also says that that jury has

13   to be impartial, okay?  What does impartiality mean to

14   you?

15   A.    That you don't have a feeling for it either

16   way?

17   Q.    Okay.  That is -- that is one of the rea--

18   that is one of the definitions, that you have no

19   prejudgments.

20   A.    Uh-huh.

21   Q.    Okay?  Also means that you don't have any

22   leanings towards one side or the other, could be

23   biases.  Now, we live in a -- we have -- our First

24   Amendment gives us the freedom of speech and press,

25   and -- and we have newspapers and televisions, which

186

1 bombard us with advertisements -- and notice I said
2 that, first, -- and news about current events of all
3 kinds. And you've told us that -- that you have read
4 about this story, kind of kept up with it. The -- the
5 law does not require that jurors be ignorant of
6 current events. I mean, that -- that's just a given.
7 It's almost an assumption that you would be familiar
8 with current events. However, there's this problem of
9 the degree of your exposure and how it affected you.
10 You have told us in your questionnaire that you do
11 have an opinion based on -- on what you've read or
12 seen or heard in the media, although you -- I think
13 you characterized it as not conclusive.
14     A.    Well, it was what I said earlier, that when I
15 read about it -- or, actually, I listen to the news
16 when I get ready for work in the morning.
17     Q.    Uh-huh.
18     A.    I go to work rather early.
19     Q.    Right. Uh-huh. That's what you said.
20     A.    And they explained it all on the news. And
21 the gentleman was not caught --
22     Q.    Uh-huh.
23     A.    -- and he was at-large --
24     Q.    Uh-huh.
25     A.    -- and, I think, I explained that I felt like

187

1 he was guilty, --
2     Q.    Okay.
3     A.    -- from listening to the news.
4     Q.    Right. That's okay.
5     A.    Okay.
6     Q.    Uh, --
7     A.    He was the one person they didn't catch.
8     Q.    I -- I -- when I read these stories about
9 things that happen off in other cities and things --
10     A.    No, I --
11     Q.    -- like that, I -- you know, my wife says,
12 "What do you think about this?" I say, "I think the
13 guy's guilty," you know, --
14     A.    Yes.
15     Q.    -- based on what I've read in the story.
16 Now, the problem is when you do, has that affected
17 you? Needless to say, you know, once something is
18 inside your head, it's kind of hard to get it out,
19 okay? And, uh, the law would require, before you
20 could sit on a jury like this, for you to be able to
21 set aside everything you've heard or seen about this
22 case and any opinions you had about it. Now, only you
23 can answer this question. Do you think you can do
24 that?
25     A.    Well, I think I can.

188

1     Q.    Okay. In other words, let's say that you
2 didn't know anything about this case, at all, you've
3 never heard about it, you just got back from overseas,
4 and you didn't -- hadn't read a word about it, so you
5 don't know anything at all, right?
6     A.    Uh-huh.
7     Q.    So when Mr. Skurka gets up and starts putting
8 on your (sic) case, you're, quote, hearing it for the
9 first time.
10     A.    Uh-huh.
11     Q.    And your mind is -- you're asking questions
12 and trying to make up your -- make your decision as
13 you go along. But here you've already made a
14 decision, albeit based on, you know, reading the
15 newspaper. And so, what we worry about is a juror
16 that might get into a situation, instead of deciding,
17 you know, listening to the case and making a
18 determination of guilt or innocence, that they're
19 merely looking for confirmation of what they already
20 believe, see? In other words, they -- you'd have a
21 bias towards guilt, right now, because of -- of what
22 you've read. Would you say that's your -- your --
23     A.    I -- I don't think I have a bias. I think
24 it's there.
25     Q.    Uh-huh. Bias is a harsh word, but it -- but

189

1 it's really -- it's not -- it's okay to have bias, you
2 know? I wish there was a gentler word to describe it,
3 but it's a leaning. And there are all kinds of
4 biases. Like, for example, if I'm trying an arson
5 case, I probably would not seat a fireman on the jury.
6 Why?
7     A.    (No response.)
8     Q.    Oh, come on. You know why.
9     A.    I don't know, I hate questions.
10     Q.    I know. No, I'm not going to put the fireman
11 on the jury because he's got an occupational bias.
12     A.    Okay.
13     Q.    He's -- he's biased against fires, you know?
14 And I want him to be biased against fires. My house
15 is on fire, I want him to be really biased. I want
16 him to come put it out and save me, if I need saving,
17 okay?
18     A.    Uh-huh.
19     Q.    If I'm trying a D.W.I. case, I probably will
20 not seek a highway patrolman, one of those guys that
21 drives those sleek black and white cars out on
22 Interstate 77.
23     A.    Uh-huh.
24     Q.    Why not?
25     A.    Because he arrests D.W.I. people all the

190

1  time?

2      Q.    That's right.  He sees accidents.  He arrests

3  drunk people.  He's biased against drunk drivers.  And

4  I want him to be.  I want him to protect Interstate

5  77, 'cause I travel up and down it a lot, okay?  If

6  I'm trying an aggravated assault case, where there's

7  serious physical injury, I probably won't seat a

8  emergency room nurse or doctor on my jury.  Why?

9      A.    'Cause she sees that all the time.

10     Q.    They see it all --

11     A.    She's biased.

12     Q.    -- the time.  They have an orientation.  I

13  don't like to seat -- I won't seat lawyers, either,

14  'Cause they have occupational biases that might really

15  interfere with what we're doing here, okay?

16     A.    Uh-huh.

17     Q.    Okay.  So now, that's all I'm asking you.  I

18  mean, the fireman could -- it's not his fault that he

19  has an occupational bias or that -- the highway

20  patrolman, but it -- it could be that, you know, if

21  you're exposed to information about a case up to a

22  point that it might kind of make you lean a little bit

23  towards what your opinion is.

24          You think you're in that situation right

25  now or do you have a doubt that you are.

191

1      A.    Maybe a doubt.

2      Q.    Okay.  All right.  Did you see -- do you see

3  what I'm getting at here?

4      A.    I -- I'm not saying that I'm -- I -- I think

5  one way or the other.  I'm saying, I listened to the

6  news.  I made my Judgement.

7      Q.    Uh-huh.

8      A.    And if the State proves it, then it just

9  confirms what I did think.

10     Q.    Uh-huh.

11     A.    But then if they don't, I -- I think, I'm

12  open-minded enough.  I don't think I'm thinking about

13  it, too, biased.  Does that make sense?

14     Q.    Yes.  All -- but the --

15     A.    I'm just trying to be honest.

16     Q.    But what I worry about is, is that, if you

17  feel that way, which you have a right to feel that way

18  --

19     A.    Uh-huh.

20     Q.    -- because you've read the stories, I do it

21  all the time, is it going to make it easier for Mr.

22  Skurka to prove his case, 'cause you already know

23  something about it?

24          MR. SKURKA:  Judge, I'm going to object

25  to the line of questioning.  I think Mr. Jones should

192

1  direct her to what she's feeling now, today, instead

2  of when she heard this news story some time ago.  I

3  think the witness is trying to honestly express what

4  she felt back then, but the question should be, can

5  you make a decision based -- today and not go on with

6  this stuff from before.  It's just -- I'm asking him

7  to direct his question to how you do you feel now,

8  instead of how you felt back then.

9          THE COURT:  I think that's fair.  I mean,

10  here's the thing, he -- he's worried that -- you --

11  you seem to know a little bit more about this case

12  than the average person.  You -- you, obviously, watch

13  the news and it's -- you know, --

14          VENIREPERSON NO. 11:  I do.

15          THE COURT:  -- it's assorted interest.

16          VENIREPERSON NO. 11:  Well, I just watch

17  a lot of news in the morning.  I don't, anymore, but I

18  used to.  I just kind of have gotten a little turned

19  off to our news, lately.

20          THE COURT:  Okay.  Well, -- well, here's

21  the thing.  I got to tell you, I -- I watch the news a

22  lot, too, and I -- and -- and I -- you know, I got to

23  tell you, they don't always get it right, these cases.

24          VENIREPERSON NO. 11:  Oh, I agree.

25          THE COURT:  I mean, in fact, they're

193

1  often wrong.  But what he's worried about is that

2  you're going to -- you're going to have these things

3  that you saw on T.V., and then it may already just be

4  pushing you one way or another.  And really, what we

5  need is people to come in -- and we don't -- you know,

6  it's not that we want people that are in a vacuum, far

7  from it.  But we don't want people to be already

8  starting this way with the Scales of Justice, when we

9  haven't even started.  And -- and if that's you,

10  that's okay, but -- but we do need to know.  'Cause

11  this case is serious business.

12          VENIREPERSON NO. 11:  I understand.

13          THE COURT:  You know.  You know that.

14  And, you know, we just -- we just need to make sure.

15  Does that?  We need --

16          MR. JONES:  Right.

17     Q.    (BY MR. JONES) Would you say beyond a

18  reasonable doubt that it would not effect you?

19     A.    No, no.  I'll say, no.

20          THE COURT:  Okay.

21          VENIREPERSON 11:  I can't say.

22     Q.    (BY MR. JONES) You can't say.  Okay.

23          THE COURT:  Okay.

24     Q.    (BY MR. JONES) Keeping in mind the kind of

25  case it is, and, you know, a man's life may be at

194

1  stake, here, --

2  A.  Exactly.  As serious as it is.

3  MR. JONES:  Yes.  Okay.  No further

4  questions.

5  VOIR DIRE EXAMINATION

6  BY MR. SKURKA:

7  Q.  What do you mean when you say -- he said

8  beyond a reasonable doubt, it's not going to effect

9  you.  That's not really the standard.  The question is

10  this.  Again, and -- and you -- you explained this to

11  me earlier.  And what I had remember you saying was,

12  yeah, when you heard something about it on the news,

13  "I heard it.  I filed it away.  But if I'm sitting on

14  this jury, I know I have to set that aside, what I

15  heard before, and make a decision only on what I hear

16  in the courtroom."

17  A.  Yes.

18  Q.  Can you just still do that?

19  A.  Yes, I think, I can.  I'm just saying that I

20  walk -- I (pause) thinking that he was guilty, when he

21  was saying, you know, if you prove this or if you --

22  if what your case -- if it tends to go towards the

23  fact that he does seem guilty, well, I just say, oh,

24  yes, I -- I thought that way, anyway, will it sway me

25  that much more, am I just kind of leaning this way,

195

1  anyway?  Maybe subconsciously that he is guilty and

2  then when you start saying something that sounds as if

3  he have might really be guilty, then I'll just go on

4  over and say, yeah he's guilty.  I guess...

5  Q.  So you're saying that the suggestion is

6  planted in your mind and all you're looking for is

7  confirmation, or --

8  A.  No.

9  Q.  See, I don't think you're saying that.  I

10  think you're saying that, all things being equal, I

11  can be fair and wait till I hear the decision (sic)

12  and make the evidence, and make a decision based only

13  on the evidence you hear in the courtroom.  And that's

14  what I'm asking you to do.  Can you do that?

15  A.  I guess, so.  I think so.  But then I sound

16  like I contradict what he just asked me.

17  Q.  And that's what the Judge just needs to make

18  a decision on the thing.  It's like I said earlier,

19  you know, you might think something going in, but then

20  when you hear the evidence, you might think something

21  else.

22  A.  I would like --

23  Q.  The Judge is going to tell you, you can only

24  make a decision based on what you hear in here.

25  A.  Right.

196

1  Q.  So, the question, again, is, is the fact that

2  you heard something about that case, is that going to

3  interfere with you being a juror in this case?

4  A.  Let me just say, yes.  I'll just say, yes.

5  THE COURT:  Okay.

6  MR. GARZA:  Okay.

7  THE COURT:  All right.

8  MR. JONES:  I have no further questions.

9  THE COURT:  All right.  Why don't you

10  wait in the -- in the jury room, just a second.

11  VENIREPERSON NO. 11:  Okay.

12  (Venireperson exits courtroom.)

13  THE COURT:  All right.

14  MR. JONES:  Challenge.

15  MR. GARZA:  We challenge for cause, Your

16  Honor.  I think she's -- at worst she's equivocating.

17  At best she's already said it.

18  THE COURT:  Yeah, it's granted.  You

19  agree?

20  MR. SKURKA:  She came back -- Well, I'm

21  not going to agree to the challenge, but I agree --

22  THE COURT:  Well, --

23  MR. SKURKA:  -- that's what she said.

24  THE COURT:  -- I mean, this is --

25  we're --

197

1  MR. GARZA:  Judge, --

2  THE COURT:  -- this is too serious to --

3  MR. GARZA:  -- you can make a ruling on

4  --

5  THE COURT:  Yeah, I agree.

6  MR. GARZA:  -- on that.

7  THE COURT:  For the record, within her

8  questionnaire she says, "Mr. Castro stabbed and robbed

9  while taking out the trash, Times Market, on that

10  evening.  I think Mr. Castro had $2 in his pocket."

11  And she does know a lot about the case, which, of

12  course, is not -- I mean, a lot of people do, but, I

13  just -- I think she's --

14  MR. JONES:  She also stated --

15  THE COURT:  -- equivocated enough.

16  MR. JONES:  She also stated she had an

17  opinion.  Although she said it's not conclusive, she

18  has some opinion.  I'm not sure exactly what she meant

19  by the, but still, --

20  MR. SKURKA:  That didn't bother me.

21  MR. JONES:  -- she have couldn't -- she

22  couldn't say.

23  THE COURT:  All right.  Well, I'm going

24  to grant the challenge for cause.

25  All right.  Next person.  Hold on, let me

198

1  just get the questionnaire.  Let's see, who do we
2  have, Lawrence Van Hoozer?
3           THE BAILIFF:  Do you want to bring the
4  juror back in?
5           THE COURT:  Let's bring her back in, real
6  quick.
7           (Venireperson enters courtroom.)
8           THE COURT:  All right.  We appreciate
9  your service, but you're not going to be seated on the
10  jury.
11          VENIREPERSON NO. 11:  I'm sorry.
12          THE COURT:  No, don't be sorry.  Let me
13  tell you something.
14          MR. JONES:  No, don't be sorry.
15          MR. SKURKA:  You don't have to be sorry
16  about it.
17          THE COURT:  No, no, no.
18          MR. JONES:  Nuh-uh.
19          THE COURT:  Don't be sorry.  You gave us
20  honest answers and that's what we're looking for, so
21  thank you very much, we appreciate it.
22          MR. GARZA:  And that helped.
23          THE COURT:  No, no need to be sorry.
24          MR. JONES:  No, ma'am.
25          THE COURT:  Not at all.

199

1           (Venireperson exits courtroom.)
2           THE COURT:  All right.  Before the next
3  person comes in, I got a note that Juror No. 123, I
4  guess, --
5           MR. GARZA:  Hoozer?
6           MR. JONES:  Van Hoozer?
7           THE COURT:  -- set for which day?
8           THE COURT COORDINATOR:  Thursday the
9  12th.
10          THE COURT:  No, no, it's Thursday of the
11  week after.
12          THE COURT COORDINATOR:  Wednesday.
13          THE COURT:  Set for Wednesday of next
14  week?
15          THE COURT COORDINATOR:  No, this week.
16          MR. SKURKA:  123?
17          THE COURT COORDINATOR:  123.
18          Wait, wait, wait.  What do I have?  Let
19  me see.
20          MR. SKURKA:  We don't have 123 set for
21  Thursday --
22          THE COURT COORDINATOR:  Jana Malm.
23          MR. SKURKA:  -- of this week.
24          THE COURT COORDINATOR:  Did I copy it
25  wrong?

200

1           MR. SKURKA:  Probably.
2           THE COURT:  That can't 123.
3           MR. GARZA:  That is her name.
4           THE COURT COORDINATOR:  Yeah, Jana Malm.
5           COURT REPORTER:  When is she coming in?
6           THE COURT COORDINATOR:  She's going out
7  of the country starting Wednesday.
8           THE COURT:  From November the 12th --
9           THE COURT COORDINATOR:  But she's set for
10  --
11          THE COURT:  -- to the 27th.
12          THE COURT COORDINATOR:  -- the 20th.
13  Yeah, that's what it is.
14          MR. SKURKA:  Okay.  Help me out, what
15  number we're on?
16          THE COURT:  What number is this, Ann?
17          MR. JONES:  123.
18          THE COURT COORDINATOR:  No. 123.
19          THE COURT:  But she's set --
20          MR. SKURKA:  We're not talking to her
21  until next week.
22          THE COURT:  No.  But -- but she's going
23  to be gone --
24          THE COURT COORDINATOR:  She's leaving --
25          THE COURT:  -- starting this Wednesday,

201

1  --
2           THE COURT COORDINATOR:  -- Wednesday.
3           THE COURT:  -- and won't be back when we
4  -- when -- when her slot comes in.
5           MR. SKURKA:  And when will she be back?
6           THE COURT COORDINATOR:  Thanksgiving day,
7  --
8           THE COURT:  The 27th.
9           THE COURT COORDINATOR:  -- she said.
10          MR. SKURKA:  Well, then, I agree to
11  excuse her.  I don't think we could wait that long.
12          MR. JONES:  You just want to reschedule,
13  him (sic), is that a problem?
14          THE COURT:  Well, we can do that.  I
15  guess, we can hold her --
16          MR. GARZA:  Can't we reschedule her just
17  in case we don't get through by then?
18          THE COURT:  Yeah.
19          MR. SKURKA:  The only way you could
20  resched-- you talking about rescheduling her after her
21  thing or taking her early?  The only way you could do
22  is take her early, 'cause she's not going to be back
23  till Thanksgiving day, and we're starting as soon as
24  we get back.
25          THE COURT:  Well, do you-all want to try

202

1    -- I mean, you can talk about taking her early, if you
2    want to.
3             MR. SKURKA:  Yeah, but if she's leaving
4    Wednesday, is she going to be able to in come here
5    Wednesday and talk to us?
6             THE COURT COORDINATOR:  I didn't ask.
7             MR. SKURKA:  'Cause we're not here
8    Tuesday.
9             THE COURT:  Oh, we're not here tomorrow.
10            MR. SKURKA:  So it's got to be like today
11   --
12            THE COURT:  Okay.  Well, we could --
13            MR. SKURKA:  -- at five o'clock.
14            THE COURT:  Well, what do you-all want to
15   do?
16            MR. SKURKA:  I mean, I don't even have
17   her questionnaire here.  I don't even know if I like
18   her or not.
19            MR. JONES:  Put her at the end of the
20   line.
21            THE COURT:  You want -- I guess, we could
22   save her as a reserve, if that's okay by the two of
23   you, towards the end.
24            MR. GARZA:  Put her towards the end of
25   the line.

203

1             MR. SKURKA:  But the problem is you have
2    to exercise your strikes in the order they come.
3             THE COURT:  Well, that's what I'm asking,
4    if that's what you're asking to do, or if by agreement
5    you want to put her at the end of the line, I think,
6    you can.
7             MR. SKURKA:  How about if I go down and
8    get my questionnaire and I can look at it, first.
9             THE COURT:  Yeah, I'm not asking you to
10   make a decision, right now.
11            MR. JONES:  Why don't you call downstairs
12   and --
13            THE COURT:  But, I mean, it may be
14   something that we can -- you know, if it's okay by
15   both sides, we can put her at the end.  It's okay by
16   both sides.
17            MR. GARZA:  Yes.
18            THE COURT:  So let's -- let's -- anyway
19   that's just an issue that's come up.
20            All right, next person is Lawrence Van
21   Hoozer.  Bring Mr. Van Hoozer in.
22            (Venireperson enters courtroom.)
23            THE COURT:  All right, Mr. Van Hoozer,
24   come forward.  Have a seat up here.
25            (Complies.)

204

1             VENIREPERSON NO. 13,
2             LAWRENCE VAN HOOZER,
3             VOIR DIRE EXAMINATION
4    BY THE COURT:
5        Q.  All right.  You are Lawrence Van Hoozer; is
6    that right?
7        A.  Yes, sir.
8        Q.  Am I saying it right?
9        A.  That's right.
10       Q.  Okay.  All right.  Mr. Van Hoozer, we're
11   going to talk to you a little bit.  Let's see here,
12   you -- you have been on a criminal jury before.
13       A.  Yes.
14       Q.  Okay.  Looks like three years ago?
15       A.  It's about right.  I don't remember --
16       Q.  Okay.
17       A.  -- for sure the timing on that.
18       Q.  All right.  Well, in any event, then you have
19   some experience in what we're doing here.  You -- you
20   already are familiar with a lot of the concepts that
21   -- that we're going to go over --
22       A.  Yes.
23       Q.  -- with you, but I'm going to go over them
24   with you, anyway, okay, and you tell -- we'll talk
25   about them.  Now, look, here's the thing, what we have

205

1    need, as far as the jurors go, are people that can
2    keep an open mind, okay?  We don't want people that
3    come in here, they're already making a decision and
4    they haven't heard anything, yet, okay?  And if that's
5    you, that's okay, but that's -- that's just not
6    somebody that we can take as a juror, 'cause it
7    wouldn't be fair to one side or the other.  And the
8    second thing is we got to make sure that you can
9    follow the law, okay?
10            Now, this is a criminal case.  And, of
11   course, in every criminal case, the State has the
12   burden of proof.  You understand that?
13       A.  Yes.
14       Q.  All right.  And you -- and you, I'm sure, as
15   part of your service as a juror in this assault case
16   that you served on, you -- that -- that was -- that
17   was part of your instructions.
18       A.  Yes.
19       Q.  And, in addition, the State has to prove
20   their case beyond a reasonable doubt.  And we don't
21   have a definition for what that is, but it's the
22   highest standard that we have in all of the law, okay?
23   And it's -- it's not beyond all doubt, it's not beyond
24   a shadow of a doubt, but it is a high standard, okay?
25   And do you have a problem with that?

206

1    A.    No.

2    Q.    Okay.  You can follow that law.  Very good.

3          Okay.  Now, the State's got the burden of

4    proof and they must prove this case, the ele-- all of

5    the elements -- they must prove all of them to you.

6    In other words, they don't get to -- if there's eight

7    elements, they don't get to prove seven of them and

8    then you says, "Well, you know what, seven out of

9    eight's pretty good, so I'm going to vote with

10   guilty."  You understand, they have to prove every

11   element to you to -- to get a conviction.

12   A.    Yes.

13   Q.    Okay.  And, as part of that, Defendant here

14   is -- the law says he's innocent until proven guilty,

15   and -- and that -- that you must presume that he's

16   innocent until they can prove it.  They've brought the

17   charges, they got to prove it, okay?

18   A.    Yes.

19   Q.    And that -- and could you -- could you follow

20   that law and presume that he is innocent, unless they

21   can prove otherwise?

22   A.    Yes.

23   Q.    All right.  Now, this case -- well, let me

24   talk about one more thing along those lines.  They've

25   got the burden of proof.  Burden never shifts to the

207

1    Defense.  Which means Defense doesn't have to do

2    anything, you know?  We're always -- you know, growing

3    up, you know, we're -- we're Americans and we like to

4    be fair.  And we like to hear both sides before we

5    make a decision.  Criminal case doesn't work like

6    that, okay?  They've got the burden of proof, burden

7    never shifts, and what means is that they don't have

8    to do anything.  In other words, Mr. Skurka and Mr.

9    Schimmel over here, they'll -- I -- they'll put on

10   their case.  And if -- if Defense over here doesn't

11   want to do anything in terms of putting on witnesses

12   they don't have to.  And -- and the jury is not

13   allowed to say, "Well, you know what, they don't have

14   any witnesses, they have a lot more witnesses,

15   therefore, I'm going to rule in their favor."  You

16   follow me?

17   A.    Yes.

18   Q.    Okay.  And as part of that, very

19   significantly as part of that, Defendant doesn't have

20   to testify.  He's got a -- he's got a Constitutional

21   right not to testify, and -- and the law says, if --

22   if he doesn't testify you can't hold it against him,

23   okay?  And, of course, that comes out of the concept

24   that the burden of proof's over here.  And if the

25   burden of proof's over here, he doesn't have to say

208

1    anything, all right?  What you can't do is you can't

2    go back in the jury room and say, "You know,

3    Mr. Skurka, over there, he -- case is all right, but

4    I'm not really sure about it.  But, you know, what,

5    this guy over here, he didn't -- he didn't tell me his

6    side of the story, so I'm going to -- I'm going to put

7    that over here for Mr. Skurka and I'm going to put

8    that in his corner."  Can't do that.  All right?  Do

9    you have a problem with that?

10   A.    No.

11   Q.    All right.  You wouldn't hold it against him

12   if he have chose not to testify?

13   A.    No.

14   Q.    All right.  Okay.  Now, the charge.  This is

15   capital murder, which I like to call murder plus,

16   okay?  It's -- it's not just a regular murder.  Which

17   sounds kind of strange to say, a regular murder.  But

18   the fact of the matter is a murder, of course, is the

19   intentional taking of the life of another.  And that,

20   while it is a first degree felony, is not -- is not

21   what this is, which is a capital felony, which, of

22   course, means that the death penalty is an option.

23   Murder is not.

24         There's a -- and there's a number of ways

25   that they can show capital murder.  There's a laundry

209

1    list.  But, in this case, the State is alleging that

2    Defendant committed a murder, the intentional taking

3    of another's life on a given day in Nueces County,

4    Texas, but that he did so in the -- in the -- while

5    attempting to or while committing a robbery at the

6    same time.  So you got -- you got the murder, plus the

7    robbery, okay?  And that they have to prove, that is,

8    the State has to prove both.  They have to prove --

9    they don't -- they don't just get to get to capital

10   murder by saying, "Well, I got the murder, but, you

11   know, they didn't prove that he was attempting to or

12   committing a robbery at the same time."  I mean, he

13   may still be guilty of murder, and, you know, maybe --

14   maybe they'll -- that will be one of the options for

15   you, as a lesser included, maybe not.  Maybe -- maybe

16   robbery will be one of the options, or attempted

17   robbery, all right?  Maybe -- maybe you think, "Well,

18   maybe, you know what, I think he -- he robbed, he was

19   robbing him or he attempted to rob him, but I don't

20   think he committed the murder."  And the fact of the

21   matter is, you can't find him guilty of capital

22   murder, unless they've proved to you beyond a

23   reasonable -- all the elements, which includes both.

24         You think you could follow that law?

25   A.    Yes.

210

1    Q.   Okay.  Now, you -- I see here that, on that
2  case that you tried -- that you were a juror and the
3  Judge did the punishment.
4    A.   Yes.
5    Q.   Okay.  Now, in Texas, in the state court, we
6  have the first part of the trial, which is the guilt
7  or the innocence part, which is what you sat on, and
8  you -- jurors go back there and they determine whether
9  the State has proven their case beyond a reasonable
10  doubt and if the Defendant's acquitted the game's over
11  with.  Stop.  We go home.
12       If, however, Defendant is convicted by
13  the jury of capital murder, we go on to the second
14  phase.  Now, in most crimes, in fact, all but capital
15  murder, what's happened is -- happens on the second
16  phase, when the jury is asked to assess the punishment
17  is, they come up with a punishment that is -- that the
18  law -- there's a punishment range that the law
19  requires, okay?  Maybe it's -- depending on the
20  felony, okay?  Maybe it's a third degree.  Maybe it's
21  a second degree.  2 to 10.  Two to 20.  5 to 99 years
22  or a fine, maybe both, you know, and -- and you come
23  up with something, you know?  You come up with a
24  punishment -- punishment that you -- that the jury
25  feels appropriate.  Maybe there's a fine.  Maybe

211

1  probation is -- is assessed by the jury.  Okay?
2    A.   Yes.
3    Q.   Depending on the crime.  Capital murder is
4  different.  In capital murder cases, you don't say
5  life or death.  What you do is you answer questions.
6  And they're up here.  That's Special Issue No. 1.  You
7  go here and you got -- answer Special Issue No. 1.
8  And then you go to that other question that's around
9  your right shoulder and you answer Special Issue No.
10  2.  And then based upon your answers will determine
11  whether this Defendant got the death penalty or life
12  in prison.  Do you think you could do that?
13    A.   Yes.
14       THE COURT:  Okay.  All right.  Well, at
15  this time, then, I'm going to turn -- turn the floor
16  over to Mr. Skurka.
17       MR. SKURKA:  Thank you, Judge.
18       VOIR DIRE EXAMINATION
19  BY MR. SKURKA:
20    Q.   Good afternoon, Mr. Van Hoozer.  How are you
21  today?
22    A.   Very good.
23    Q.   As the Judge introduced me, my name is Mark
24  Skurka.  I'm the First Assistant D.A.  This is Geordie
25  Schimmel.  He's one of the attorneys -- assistant

212

1  D.A.s that are assigned to this court on a regular
2  basis, so he's going to be assisting me in the
3  presentation of this evidence, if you get selected on
4  this jury.  And that's what we're going to here to you
5  and talk today about seeing whether or not you're
6  qualified to sit on this jury.
7       Let me tell you at the beginning, there's
8  no right or wrong answers.  I don't want you to a
9  certain way that you think will make me happy or the
10  Judge happy or the Defense happy.  You just answer how
11  you feel and we can live with that and kind of delve
12  into why you feel this way or some of your feelings
13  about the issues in this case.  So, don't worry about
14  trying to, you know, please us or do a certain way,
15  you just tell us how you feel about that.  Fair
16  enough?
17    A.   Yes.
18    Q.   Okay.  First question I want to the ask you
19  about is, in general, how do you feel about the death
20  penalty?
21    A.   I believe that there should be a death
22  penalty if everything's proven.
23    Q.   Okay.  In other words, you can understand --
24  I'm assuming that means the opposite is true that, if
25  you don't think it's proven that he should get the

213

1  death penalty he should get a life sentence; correct?
2    A.   Yes.
3    Q.   Okay.  And that's what we're looking for, as
4  the Judge said, open-minded people, people who can
5  start at ground zero, know that right now he's
6  presumed innocent, 'cause I haven't proved anything,
7  yet, because we haven't heard any evidence.  Just
8  because he's presumed innocent, now, doesn't mean he's
9  always going to be innocent, 'cause you haven't heard
10  any evidence, yet.
11       And then, of course, there's two parts of
12  the trial.  The first part is whether he did it or
13  not, is he guilty or not, and the second part is that
14  you find out what kind of -- the punishment he gets,
15  life or death -- death penalty or life in prison.  And
16  again, that's not an automatic decision.
17       You know, remember that couple of weeks
18  ago when we first met, you walked in that courtroom
19  and you saw all the people, there, like, I don't know,
20  2-, 300 people in there, and the Judge came down and
21  said, "You know, this is a criminal case and you're
22  going to be hearing a capital murder case, which means
23  this defendant, John Henry Ramirez, may be eligible
24  for the death penalty," what's the first thing that
25  struck you or your first reaction when you heard it

214

1    was that kind of a case?

2       A.   I guess, I really don't know that I had a

3    reaction to that, just --

4       Q.   It wasn't one way or other.

5       A.   I mean, I was down here for jury duty and it

6    really didn't make much difference what the case was,

7    I guess.

8       Q.   And that's what a good citizen should say,

9    because it really doesn't matter if it's a D.W.I. case

10   or a contract dispute or a, you know, a shoplifting

11   case or a capital murder case, you know?  You're

12   supposed to hear the facts and make a decision based

13   on the facts they make.  And so, the reason I ask

14   people that is, sometimes I look at their faces when

15   the Judge says that and they go, "Oh, my gosh, you

16   know, it's a capital murder case.  I thought I was

17   just going to have a little D.W.I. case or this and

18   that."  But it didn't struck (sic) you one way or the

19   other.

20      A.   No.

21      Q.   You figured it's, as a -- I assume and as a

22   citizen your civic duty is just to serve whatever case

23   they call on you for; is that right?

24      A.   Yes.

25      Q.   And probably that's what happened to you a

215

1    few years ago when you were on this other jury report

2    (Sic), didn't really matter what kind of a case it was

3    you'd be able to do it.

4       A.   That's correct.

5       Q.   Let me follow up with that.  It's -- now that

6    you know it's a capital murder case and you may be

7    faced with that decision, how do you feel about

8    participating in that kind of decision, which may lead

9    to that ultimate sentence?

10      A.   I guess, I just feel the -- as a citizen

11   that's my duty.

12      Q.   Okay.  So, the fact that it's a capital

13   murder case isn't going to change anything about that.

14      A.   No.

15      Q.   The reason I asked that question is because

16   sometimes people say, "Well, gosh, you know, Mr.

17   Skurka, I believe in the death penalty, I think we

18   should have it, it's a good law to have," and then

19   when they're put in that position to have to actually

20   sit on a jury and make that, that's pretty awesome

21   responsibility, they say, "Oh, don't make me do it.  I

22   believe in it, but don't -- don't make me do it."  Do

23   you fit in that category?

24      A.   No.

25      Q.   Okay.  So you feel that no matter what case

216

1    it is and if it is a capital murder case, you can sit

2    here, listen to all the evidence and make a decision

3    based on the evidence.

4       A.   To the best of my ability, yes.

5       Q.   And that's all I'm going to ask you to do.

6    Because what happens in these cases are, some people

7    may be good for one jury may not be good for another

8    type of jury.  But you don't have any qualms about

9    sitting on a death penalty case; correct?

10      A.   No.

11      Q.   What did you do for a living before you

12   retired?

13      A.   I worked for Hi-V (ph.sp.) Food Store, which

14   is a retail grocery business, a lot like H.E.B., in

15   the upper midwest.

16      Q.   You-all have any H.E.B.s up in the upper

17   midwest?  Haven't made it that far?

18      A.   I -- I think they mostly go south, don't

19   they?

20      Q.   I guess, so, but it seems like they've grown

21   so much or taken over everywhere, but...

22      A.   That's true.

23      Q.   So that's your background in retail

24   management of a store like that?

25      A.   Yes.

217

1       Q.   Was it like a -- running a store, or a buyer

2    or --

3       A.   I was a store manager director.

4       Q.   Okay.  And you did that most of your life?

5       A.   I did it for about 20 years.  I actually

6    worked for the companies for about 35 years, started

7    out part-time with them.

8       Q.   You just kind of worked your way up, till you

9    got your own store?

10      A.   Yes.

11      Q.   Great.  Now, you -- looking at this case, we

12   know we're here, because this is not just a simple,

13   plain murder case.  I know that sounds terrible.  But,

14   in Texas, they have this legislative scheme that says

15   not every time a person gets murdered it's the death

16   penalty.  'Cause some people say that, "Oh, he

17   murdered somebody.  He can get the death penalty."

18   But the state of Texas says only on certain cases, you

19   know, killing a child, killing a policeman on duty, in

20   multiple murders, murder for hire.  In this case,

21   murder while in the course or attempting to commit

22   robbery.  In other words, if it is a serious felony,

23   like rape, robbery, burglary, like, kidnapping, it can

24   be a capital murder case.  So if you just rob somebody

25   you couldn't get the death penalty, if you just

218

1 murdered somebody you can't get the death penalty, but
2 it's possible if you have both of those combined.
3          You said you're from the upper midwest.
4 What kind of -- did they have the death penalty in the
5 state you're from?
6     A.   Yes, they did.
7     Q.   What state is that?
8     A.   I'm from Missouri and Iowa.
9     Q.   Missouri and Iowa?  And do you think that's a
10 good law to have on the books?
11    A.   Yes, I do.
12    Q.   In this case, as the Judge pointed earlier,
13 there's two parts of the trial.  There's the first
14 part, is guilt or innocence, then the second part is
15 punishment.  In the first part, if you find a person
16 not guilty, you don't even go to the second part.
17 It's just the State didn't prove the case beyond a
18 reasonable doubt.  And what the Judge says is exactly
19 right.  The burden is on the State in this case and
20 every case.  Every D.W.I. case, every shoplifting
21 case, the State has the burden of proof to prove the
22 case to you beyond a reasonable doubt.
23          Now, the Defense doesn't have to prove
24 anything.  The Defendant doesn't have to testify.  And
25 I think the Judge already went over that with you;

219

1 correct?
2     A.   Yes.
3     Q.   And you agree with those concepts of law?
4     A.   Yes.
5     Q.   Okay.  Now, when we talk about the two parts
6 of the trial, sometimes, if you've been on a jury
7 before, like, say it's a burglary case and you find
8 somebody guilty of burglary, the Judge tells you,
9 "Okay, jury, you've got a range of punishment from
10 five years to 99 years in prison and you pick which
11 number to fill in."
12          In a capital murder case, two things that
13 you should know is, number one, it's not automatic.
14 Just because he's found guilty of capital murder
15 doesn't mean he automatically gets the death penalty.
16 What you have is two choices, death or life in prison.
17 And you don't answer the questions by just saying,
18 "Okay.  He's guilty and I vote for death or I vote for
19 life."  You don't even have that.  You answer these
20 special questions that we have.  So it's not automatic
21 at all.
22          In fact, what you do is, you go to the
23 second part of the trial, you might get to hear
24 additional evidence about the case or about the
25 person's background.  For example, in the first part

220

1 of the trial you may just hear about what happened
2 that night.  You know, did he do it or did he not do
3 it?  In the second not part of the trial you might get
4 to hear background information, you know, what kind of
5 person he was in school or, you know, was he an eagle
6 scout or, you know, has he been to prison before or
7 has he been on probation before, those kind of things,
8 to help you make that decision on whether he gets the
9 death penalty or not, right?
10          So, what happens is, you have to -- say
11 for example, a person is found guilty of capital
12 murder.  We know it's not automatic, so you go to the
13 second part.  You might get to hear additional
14 evidence.  And then the Judge gives you these two
15 questions.  They're on the board here.  And if you'd
16 turn around with me and I'll read that with you.  The
17 first question is -- says, "Is there a probability
18 that the Defendant would commit criminal acts of
19 violence that would constitute a continuing threat to
20 society?"  We call that "the futures dangerousness
21 question."  In other words, is there a chance this
22 guy's going to be a danger in the future?  Now, unless
23 you have a crystal ball, which I don't see you have
24 one in your pocket, it's almost impossible to predict
25 what a person's going to do for sure in the future,

221

1 right?
2     A.   Correct.
3     Q.   And the law doesn't require me to prove it
4 with certainty.  It just says, "Is there a
5 probability?"  It doesn't say there's a certainty that
6 he's going to do these things.  It just says is it
7 probable -- more likely than not that he's going to
8 commit criminal acts of violence.  It doesn't even say
9 that he's going to have to murder, again.  You don't
10 just say, "Well, I'm thinking he's going to murder,
11 again.  That's the only ways I can give the death
12 penalty."  No.  The law says it can be any criminal
13 acts of violence, if you think there's a probability
14 that he's going to going to do that.  And it also
15 says, "that will constitute a continuing threat to
16 society."
17          Now, what is society is kind of up for
18 interpretation, but -- it's kind of hard to believe
19 this, but prison is actually part of society.  And you
20 know why I say that?  'Cause who's in a prison?  Other
21 prisoners, guards, people that work at the prison,
22 electricians, medical people, stuff like that.  So
23 people sometimes say, "Well, Mark, you know, why don't
24 you just give him a life sentence, put him in prison
25 and he'll never hurt anybody, again.  He won't be

222

1   around anybody to hurt anybody, again, and he couldn't
2   do these things, anymore." And I always say, "Well,
3   wait a minute, we don't put people out on a desert
4   island where there's no other human interaction. We
5   put them in a prison and there's other people in that
6   prison." Have you ever heard any stories about people
7   -- you know, prisoners attacking other prisoners,
8   hurting them?
9       A.   Yes.
10      Q.   Have you heard about, you know, maybe
11  prisoners hurting guards or trying to escape or
12  hurting people trying to escape from prison?
13      A.   Yes.
14      Q.   So -- so society, even though they're removed
15  from our mainstream society, they still interact with
16  other human beings. And there is that possible danger
17  they could be committing criminal acts of violence,
18  even while they're in prison. I say that, because
19  lots of times people say, "Well, you know, they're not
20  in society if you put them in prison." But do you see
21  what I'm saying? They could -- that is still part of
22  prison.
23      A.   Yes.
24      Q.   You know, maybe we should have a desert
25  island where we know they're not going to hurt

223

1   anybody, but we don't have that.
2       So the scheme would go like this, you
3   think a person's guilty, you found them guilty, you've
4   done that first part. Before you decide death or life
5   -- and, again, you don't vote death or life -- what
6   you do is answer this question: "Is it more likely
7   than not that the Defendant would commit criminal acts
8   of violence that would be a continuing threat to
9   society?" And how you decide on that? Well, you can
10  look at the case itself, what happened in the case
11  itself, and you can look at the background. Remember,
12  I said, "You don't have a crystal ball," so you might
13  wanna get -- you might get additional evidence to find
14  out, you know, his background. You know, was he an
15  eagle scout growing up? Did he help little old ladies
16  across the street or maybe he's been to prison ten
17  times before. This is his 11th felony. You would
18  want to know that kind of background to help you make
19  that decision.
20      You answer that question, then you come over
21  to this question. This question is what we call "the
22  mitigating circumstances question." And I hit on that
23  a little bit when we were in the same group. But,
24  basically, "mitigation" is a word that means, anything
25  that lowers the Defendant -- anything that reduces the

224

1   moral blameworthiness of the Defendant, anything that
2   would reduce his sentence or lessen his moral
3   blameworthiness. Well, what does that mean? I think
4   a lawyer wrote that question, probably. But another
5   way to look at it is, it's kind of the opposite of
6   aggravating circumstances. You know, certain things
7   can aggravate a sentence and certain things can
8   mitigating (sic) a circumstance, a sentence. You have
9   kids, right?
10      A.   Yes.
11      Q.   Do -- Say you had a kid, you have two kids,
12  and one kid -- and you have a curfew. They're
13  supposed to be home at 11:00. And your first kid --
14  I'm sure your kids never broke curfew. But the first
15  kid breaks curfew for the very first time and you
16  decide you're gonna ground him for a week. The second
17  kid breaks curfew, but it's not the first time he's
18  broken curfew, he or she has broken it 30 times
19  before. Would you treat them the same and ground them
20  both for one week? My guess is you'd probably do the
21  one who's only done it one time a lighter sentence
22  than the person who's done it 30 times, right?
23      A.   Yes.
24      Q.   Okay. That's kind of what mitigation's all
25  about. In other words, yes, he's guilty of capital

225

1   murder. Yes, he's a continuing threat to society.
2   But is there anything in his background or the
3   circumstances around this case that warrant he should
4   get life sentence, instead of a death sentence? The
5   best way I can tell you had that is every case is
6   different, every person is different, right.
7       If you -- you said you were on a D.W.I.
8   case before, right? Was it a D.W.I. or what was it?
9       A.   No. A fight between a ex-husband and a
10  boyfriend, --
11      Q.   Okay. So it's like an assault?
12      A.   -- just fighting -- Yes.
13      Q.   We can't call it "fighting" in here. We have
14  to --
15      A.   Okay.
16      Q.   We have to call it "assault." Another legal
17  word that we have to say. You can't say just
18  fighting. You have to say assault.
19      A.   Okay.
20      Q.   But -- but say, for example, say you're on a
21  burglary case and you had two burglars. And you're
22  going in there and you're thinking, "My gosh, both of
23  these guys have been convicted of burglary." There's
24  two different cases. And, -- but you're sitting as a
25  juror and you think, "Well, gah, burglaries are bad,

226

1  going into somebody's house and stealing something
2  without permission. I'm going to hammer them both,
3  'Cause that's bad to do that stuff." And all you
4  know, they've committed burglary.
5          Well, then, the second part of the trial
6  comes along and you find out there's differences
7  between these burglars. In the first case what
8  happened was, the burglar kicked in the floor, broke a
9  bunch of furniture, stole all the T.V.s, the radios,
10  the V.C.R.s, T.V.s, everything, stole all the jewelry.
11  And as he was leaving the house, he tore up the
12  furniture, you know, ripped things up, broke things,
13  just made a mess of the house. And then you find out,
14  too, that in -- going into his background, you find
15  out from the evidence that he's been to prison three
16  times before for burglary. This is his fourth
17  burglary conviction. It's -- At first, at the
18  beginning, all you thought was he's burglar. You
19  didn't know all the surrounding circumstances in his
20  background.
21          Now, look at the second burglar.
22  Completely different case. He's found guilty of
23  burglary, 'cause he went to somebody's house and stole
24  something without permission. But then you hear the
25  evidence in that case and you find out, well, he

227

1  didn't really kick in the door, he went in the back
2  door, it was unlocked. And even though there was
3  jewelry around and T.V.s and V.C.R.s stereos all he
4  did was steal a loaf of bread and some food to go feed
5  his kids who were hungry, 'cause he had lost his job
6  and he needed mon-- he needed something to feed his
7  kids. And then you find out that guy has never been
8  on probation before, never been to prison before,
9  never even been arrested before.
10          See how different those are? They're
11  both burglars, right? But in one case you have
12  aggravating circumstances and probably make it a
13  higher sentence, and mitigating circumstances which
14  might make it a lower sentence. You see what I'm
15  saying?
16  A.   Yes.
17  Q.   That's kind of what the difference is. You
18  want to say are there any mitigating circumstances
19  that would make me lower the sentence to give them
20  life, instead of death. It's kind of like a check on
21  the jury, you know? You think he's guilty of capital
22  murder, you think he's a continuing threat to society,
23  but the Judge says, wait, before you make that final
24  decision, "take into consideration all of the
25  evidence, including the circumstances of the offense,"

228

1  you know, what happened during the case, "his
2  character and his background," you know, was he an
3  eagle scout all his life or did he have a horrible
4  history, "and his personal moral culpability, is there
5  sufficient mitigating circumstances or circumstances
6  to warrant that a sentence of life, rather than a
7  death sentence, be imposed"?
8          Just because you hear a mitigating
9  circumstance, does that mean that you have to
10  automatically lower the sentence? No. Because the
11  court says, is there -- the law says, "is there a
12  sufficient mitigating circumstance," is it enough to
13  outweigh everything? And what is a mitigating
14  circumstance and how much weight do you give it? I
15  can't tell you. The Judge can't tell you. That's up
16  to these 12 people on the jury. They may look at the
17  case and say, "Well, you know, yeah, he was an eagle
18  scout 20 years ago and, yeah, he helped little old
19  ladies cross the street, you know, but he still did a
20  very bad crime, here, and even though, you know, maybe
21  he should get a break for that, it's not enough to
22  outweigh what he did in this case."
23          Other people may say, "Well, you know, he
24  came from a broken home, or he's very young, or blah,
25  blah, blah, and so we're going to give him a break and

229

1  give him life, instead of death." That's up to the
2  jury. Just -- my point is, just because there's a
3  mitigating circumstance doesn't mean you automatically
4  lower the sentence. It would have to be enough of a
5  mitigating circumstance or circumstances to warrant
6  that a sentence of life.
7          So you still even have to do the old
8  balancing act there, okay? So, it -- to me, it's a
9  kind of a good check, you know, it's like checks and
10  balances. You don't want to have a runaway train
11  saying, "Okay, we have to give him the death penalty."
12  They're saying, "Hey, let's look back. Before we do
13  it, is there anything that says maybe we should give
14  him a life sentence, instead of the death sentence?"
15  So that's kind of what the mitigating circumstances
16  question is.
17          If you answer the first one, yes, yes,
18  he's a continuing threat to society, and, no, there's
19  not enough reason -- or mitigating circumstance to
20  warrant that we lower the sentence, that defendant is
21  sentenced to death. If you answer it any other way,
22  he gets a life sentence. Okay? That's the -- that's
23  the scheme of things. How it works. Do you have any
24  questions about the special issues? And that's what
25  they call them, "special issues", instead of

230

1  questions.  I don't know why they just can't call them
2  questions.  They had to call the special issues.  But
3  that's essentially what mitigation evidence is.
4         So when we talk about that stuff, it's
5  like I said earlier, can you keep an open mind and, if
6  there's mitigating circumstances, can you open your
7  mind to them and say, "Hey, maybe there is a
8  mitigating circumstance," and if you think there's
9  enough, could you give a life sentence, instead of a
10  death sentence?  Could you do that, consider both of
11  them?
12     A.   Yes.
13     Q.   Okay.  And -- and that's the whole point.
14  And I have to answer (sic) both ways.  If you think
15  the evidence is that he's guilty and you -- a danger
16  to -- in the future and you think there's no
17  mitigating circumstances, can you vote for death?
18     A.   Yes.
19     Q.   And the opposite is, if you don't think he's
20  a continuing threat to society or you think there's
21  sufficient mitigating circumstance, can you vote for a
22  life sentence?
23     A.   Yes.
24     Q.   You're not locked into anything either way
25  right now; correct?

231

1     A.   Yes.
2     Q.   How do you feel about being on this kind of
3  jury?
4     A.   (Pause) Part of the duty.  I don't -- don't
5  see any problem with being on this type of a jury, I
6  guess.
7     Q.   Not one way or the other.
8     A.   No.
9     Q.   I have to ask you something, too, that's on
10  your questionnaire and it's about your son.  It said
11  he got arrested for drugs back in '98?
12     A.   Yes.
13     Q.   I don't mean to pry, but I need to ask a
14  little bit more about that.
15     A.   Fine.
16     Q.   Can you tell me a little bit about that
17  situation?
18     A.   He had some marijuana at his house.  And,
19  apparently, they came in and found some seeds or
20  something.  They had previously arrested him for that.
21  And then they came back, again, later and -- and
22  there's still a seed there that they took up and
23  rearrested him on, basically, the same thing, so...
24     Q.   When you say -- did it all happen the same
25  day or like a week later --

232

1     A.   No.  It was --
2     Q.   -- or what do you mean?
3     A.   -- like a couple of weeks later or something
4  like that, so...
5     Q.   Now, did that happen here or in one of the
6  other states you lived in?
7     A.   That was in one of the other states.
8     Q.   Okay.  And how old was he when this happened?
9     A.   (No response).
10     Q.   It doesn't have to be --
11     A.   Either 18 or 19, somewhere around there.
12     Q.   That's what I was trying to figure out, was
13  he a teenager, older --
14     A.   Yes.
15     Q.   -- or what?
16     A.   Just out of high school, I believe.
17     Q.   What happened on his case, if you can
18  remember?
19     A.   The first time they didn't do anything,
20  basically.  When they took him back the next time,
21  they told him he could get a lawyer, but he chose not
22  to.  And I think they gave him, like, a -- that day in
23  jail.
24     Q.   Uh-huh.
25     A.   And that was pretty all of it, so...

233

1     Q.   I was trying to figure out if he was on
2  probation for a period of time or went to jail or
3  what?
4     A.   He was -- he had a one-day jail sentence, I
5  believe, so...
6     Q.   Well, did it help him out?
7     A.   He's doing much better today.
8     Q.   Has he had any problem with drugs or anything
9  like that since that?
10     A.   Not that I'm aware of.
11     Q.   Okay.  And -- and what does he do for a
12  living, now, if you don't mind me asking?
13     A.   He is in management for Cummings Midwest, up
14  in midwest.  He works --
15     Q.   I don't know what that is.
16     A.   He works on -- in a diesel garage, basically.
17  He -- he oversees the people that go out into the
18  field working on the farmer's diesel stuff, out in
19  their fields and stuff like that.
20     Q.   Sounds like a pretty good job, huh?
21     A.   He's doing pretty well.
22     Q.   Okay.  So this -- this, for lack of a better
23  word, was like a bump in the road, this wasn't a long and
24  drawn-out process where he was in and out of rehab or
25  using, abusing harder drugs or anything like that?

234

1    A.   No, he was never in rehab and it was
2    basically a bump in the road, I guess.
3    Q.   Okay.  And it was because he was a kid,
4    basically.
5    A.   Right.
6    Q.   A young person.  Anything about that's
7    going to effect you being in this case?
8    A.   No.
9    Q.   Okay.  And the reason I ask is, you know, I'm
10   in the prosecution.  There's going to be police
11   officers testifying and they probably brought charges
12   against your son.  Is that anything going to --
13   lingering effects there's going to affect me -- or
14   affect you in this trial?
15   A.   I don't believe so, no.
16   Q.   Speaking of that, there's a part of the law I
17   need to go over with you.  It's called, "voluntary
18   intoxication."  The law says this, "Voluntary
19   intoxication is not a defense to crime."  In other
20   words, if you go get drunk and right -- and rob a
21   bank, you can't come to court and say, "Well, hey, I'm
22   not guilty of robbing that bank.  I was drunk or I was
23   high at the time."  It's not an excuse for the crime.
24   You understand that?
25   A.   Yes.

235

1    Q.   That makes sense, right?
2    A.   Yes.
3    Q.   But the law also says voluntar-- intoxication
4    may be considered as a possibility mitigating
5    circumstance for punishment.  In other words, okay,
6    maybe he burglarized this house, but he was drunk when
7    he did it and we're going to give him a break.  That
8    could be a mitigating circumstance.  Again, I'm not
9    telling you it is, but it's something that could be a
10   possible thing that the jury could -- could look at as
11   a possible mitigating circumstance.  And some --
12   again, the jurors may, "Look, you know, I don't care
13   if he was drunk or high, he's still going to be
14   punished appropriately because of that."  Do you see
15   what I'm saying?
16   A.   Yes.
17   Q.   That's kind of an example of a possible
18   mitigating circumstance.  The main thing you need to
19   know is, it doesn't excuse your crime, but it's
20   something the jury can decide to make a lower sentence
21   or a lesser sentence, but again it's up -- completely
22   up to the jury.
23        We talked about the indictment is no
24   evidence guilt, right?  Just because you're charged
25   with a crime doesn't mean you're guilty of a crime;

236

1    correct?
2    A.   Yes.
3    Q.   And the Fifth Amendment means he may testify,
4    he may not testify and you can't told it against him
5    if he doesn't testify.  You'll be able to follow that
6    law; correct?
7    A.   Yes.
8    Q.   And the burden is, of course, on the state.
9    We have to prove everything and we have to prove it
10   beyond a reasonable doubt.  And mostly, I can tell you
11   is beyond a reasonable doubt doesn't mean beyond all
12   doubt or any doubt or shadow of a doubt.  You always
13   hear that on T.V., right, "shadow of a doubt."  Well,
14   that's not the law.  The law just says I have to prove
15   it beyond a reasonable doubt.  I mean, there's no way
16   I could prove it to you a hundred percent.  I mean,
17   you have to be there and watch the whole thing and be
18   a witness to it to be able to prove it to you.  And
19   the law doesn't require me to do that, just says proof
20   beyond a reasonable doubt.
21        I don't think I had any other questions
22   about -- from your jury questionnaire.  The bottom
23   line is, you think you can be fair in this case?
24   A.   Yes.
25   Q.   Will you be able to listen to all the

237

1    evidence and make a decision only on the evidence you
2    hear in the case?
3    A.   Yes.
4    Q.   And again, if the evidence shows that he's
5    not guilty, can you vote not guilty?
6    A.   Yes.
7    Q.   And if the evidence shows he is guilty, can
8    you vote guilty?
9    A.   Yes.
10   Q.   And can you follow through on that?  If you
11   -- if you answer these questions in such a way he can
12   get the death penalty, can you follow through with
13   that?
14   A.   Yes.
15   Q.   And same thing, if he -- if you think the
16   questions should be answered in such a way he should
17   get a life sentence, can you do that?
18   A.   Yes.
19   Q.   Okay.  Any other questions you have of me,
20   Mr. Van Hoozer?
21   A.   Not that I'm aware of right now.
22        MR. SKURKA:  Thank you so much for giving
23   me your attention.  I'll let the defense lawyers talk
24   to you, now.
25        MR. GARZA:  May I proceed, Your Honor?

238

```
1          THE COURT:  Yes.
2               VOIR DIRE EXAMINATION
3  BY MR. GARZA:
4      Q.   Good afternoon, Mr. Van Hoozer.
5      A.   Good afternoon.
6      Q.   My name is Ed Garza.  I think I had
7  previously introduced myself back when you came in
8  with a larger group.  And sitting beside me is my
9  co-counsel, Mr. Jones, who was not present back then.
10 And then our client, of course, Mr. John Henry
11 Ramirez.
12          Mr. Skurka asked you how you felt about
13 the death penalty.  And I think, basically, you
14 answered that you're -- you're for it.
15     A.   Yes.
16     Q.   Is there a reason?
17     A.   I just believe that there's some -- some
18 things that warrant a death penalty in murder cases or
19 death caused by somebody to somebody else.
20     Q.   But you understand that's not the law in
21 Texas.
22     A.   Yes.
23     Q.   Is there -- I know it's probably something
24 you don't discuss very often with people, especially
25 if you're, you know, just kind of walking along.  But,
```

239

```
1  you know, it would be unusual or somewhat unique for
2  someone to come up and ask you your ideas or your
3  philosophy or, you know, your feelings about the death
4  penalty.  And, you know, I'm just -- I'm -- I'm going
5  to ask you some things a little different than what
6  the Prosecution's going to ask you.  And, like I said,
7  we're not trying to pry into your personal life, or
8  anything over there, but it's important that we know
9  how you feel about certain things, so that we can get
10 an idea as to your impartiality in this case.  'Cause
11 everyone accused of a crime has a right to be heard by
12 an impartial jury.  Do you believe in that?
13     A.   Yes.
14     Q.   What's "an impartial jury" mean to you, sir?
15     A.   Someone that goes in and listens to all the
16 evidence and makes a decision based on what's stated
17 at the trial.
18     Q.   Okay.  Let's just say, for instance, in this
19 case you haven't heard a single shred of evidence in
20 this case.  As my client sits here today, sir, do you
21 think he's guilty or innocent?
22     A.   He's innocent.
23     Q.   Why is that?
24     A.   Because I don't know anything about the case.
25 And all I know is somebody accused him of something
```

240

```
1  and that's it.
2      Q.   That's what we call "the presumption of
3  innocence."  You've heard of that?
4      A.   Yes.
5      Q.   What does it mean to you?
6      A.   That means you're innocent, unless someone
7  proves you're guilty.
8      Q.   And that's our system of justice.  That was,
9  you know, a law that was created many, many years ago,
10 that we've tried to adhere to for all these years,
11 by -- by people, ordinary people just like us.  Do you
12 believe that?
13     A.   Yes.
14     Q.   And we have certain institutions of
15 government, such as the Judicial Branch, the Executive
16 Branch, and then we have the Legislative Branch.  But
17 do you agree with me that the -- that the people in
18 this country are who really rule?
19     A.   Yes.
20     Q.   Do you believe that?
21     A.   Yes, I do.
22     Q.   Why do you think we should have the death
23 penalty?
24     A.   (No response.)
25     Q.   And once again, let me just tell you there
```

241

```
1  are no wrong or right answers.  I just kind of want to
2  know how you feel about it.
3      A.   I guess, I really don't know how to answer
4  that, other than that if somebody did something and it
5  was proved everything the -- had to be proved was
6  proved.  And giving, then, if there was an option for
7  the death penalty, with everything being proved, then
8  I think that that should be put in place.
9      Q.   Okay.  Now, unfortunately, of course, Texas
10 does have the death penalty.  We do have it, for
11 whatever reason, however-you feel about it, one way of
12 the other, pro or con.  And that is the law in Texas,
13 passed by our legislators and supported by the general
14 population.  Okay?  And I noticed that in your
15 questionnaire, toward the end you were asked that, "On
16 a scale of one to ten, how strongly do you believe in
17 the death penalty, with one being the least and ten
18 being the strongest," and you answered, "Ten."
19     A.   Yes.
20     Q.   Is that correct?
21     A.   Yes.
22     Q.   Am I -- am I correct in assuming, for the
23 sake of our representation and our duty to represent
24 our client, that you are a strong proponent of the
25 death penalty?
```

242

1   A.   Yes.

2   Q.   I also noticed that you mentioned, "Do you
3   believe the death penalty is imposed too often, not
4   often enough or about right," and you answered, "Not
5   often enough."  Do you think one or two executions per
6   month is enough?

7        MR. SKURKA:  Judge, I'm going to object
8   to that line of question.  He's putting a number on
9   that.

10   Q.   (BY MR. GARZA) Well, let me ask you this,
11   sir --

12        MR. GARZA:  I'll ask a different -- I'll
13   withdraw the question, Your Honor.

14        THE COURT:  All right.

15   Q.   (BY MR. GARZA) How do you know it's not
16   enough?

17   A.   That would be my belief that it's not enough.
18   From not actually sitting in and hearing everything, I
19   have no idea why people choose the way they choose, if
20   I don't have all the information.  But from what
21   little information that I get, I guess, that's what I
22   make my decision from.

23   Q.   Are you aware on the average about how many
24   people are executed in the state of Texas, personally?

25        MR. SKURKA:  Objection, Your Honor, that

243

1   doesn't -- that's not relevant to how many people are
2   executed in Texas, --

3        MR. GARZA:  Well, I think it is rela--

4        MR. SKURKA:  -- to this juror's
5   qualifications.

6        MR. GARZA:  It is relative, Your Honor.
7   I mean, based on the answer that he gave to this
8   questionnaire.  And I'm just --

9        THE COURT:  Well, I mean, --

10        MR. GARZA:  -- I'm just --

11        THE COURT:  -- I suppose you-all asked
12   the -- you-all that question in the questionnaire.  I
13   mean...

14        MR. SKURKA:  We never asked to quantify
15   it, Judge, on how many is enough.  I mean, the Court's
16   aware that sometimes there's legal impediments to
17   carrying that out and the courts go back to it.  But,
18   you know, to quantify it, saying, "Is two enough, ten
19   enough, 15 enough," that's not -- that's not a correct
20   line of questioning, Judge.

21        THE COURT:  Well, --

22        MR. GARZA:  Well, the question is, and
23   the answer was, "It's not enough," and I just want to
24   know what is he basing that answer on, Your Honor.

25        THE COURT:  Well, I think, he said that

244

1   he's basing it -- just basing it on the very little --
2   very little information that he has.

3        MR. SKURKA:  And I don't have a problem
4   with that.  I have a problem with him trying to
5   quantify and put a number to it.

6        MR. GARZA:  Well, it's general knowledge,
7   Judge.  You can read it in the paper every day.

8        THE COURT:  Well, I'll give you a little
9   latitude, but...

10   Q.   (BY MR. GARZA) Do you think the death penalty
11   deters crime?

12   A.   Yes.

13   Q.   Okay.  Mr. Skurka explained to you in general
14   concepts about how we try case down here through the
15   guilt/innocence phase, at first, and he's explained to
16   you that they have the burden of proving the case to
17   you beyond a reasonable doubt before you can make a
18   determination as to our client's guilt or innocence.
19   And then after that, and only after that, if he's
20   found guilty of the indicted offense of capital
21   murder, then you're going to be placed in a situation
22   of having to decide, based on how you answer those two
23   questions up there, as to whether or not the Judge is
24   going to assess a life or death sentence against him.
25   Okay?

245

1   A.   Yes.

2   Q.   Okay.  So, my question is:  Considering how
3   you feel about the death penalty, there is a -- that
4   Special Issue No. 1 of whether or not there is a
5   probability that the defendant would commit criminal
6   acts of violence that would constitute a continuing
7   threat to society, what kind of evidence would you
8   want to hear to help you or assist you in making that
9   determination?

10   A.   Basically, what has gone on in the life of
11   whoever it is from point A. To point B., from the
12   beginning to the end, and know -- to have some kind of
13   a knowledge of what that person is, was and possibly
14   will be.

15   Q.   Okay.  What about mitigating circumstances?
16   Does it matter to you or can you give some affect to
17   whether or not, after you've heard the case, let's
18   assume found my client guilty, can you truthfully --
19   or I -- can you -- can you give some effect to such
20   things as the gravity of the case, the gravity of the
21   circumstances of the case?

22   A.   I'm not following you're asking me.

23   Q.   Okay.  Let me ask you this:  Would it matter
24   to you if he was an eagle scout?

25        MR. SKURKA:  Judge, objection, I think

246

1  that calls for a commitment on pinning him down in the
2  case, Your Honor.
3          MR. GARZA:  No, it does not, Your Honor.
4  It doesn't call for commitment, at all.  I'm just
5  asking him would it -- I'm allowed to give, under the
6  Penry case, ask this -- this prospective juror what
7  effect he would give it, Judge.  I'm allowed to answer
8  that -- to ask that.
9          THE COURT:  I -- I think that's -- I
10 think that's a commitment, when you're asking that
11 particular question.  Now, I think you can ask it -- I
12 think you can ask in a broader sense about
13 mitigating -- mitigating circumstances.  But I
14 think -- I think, if you're -- if you're asking him
15 you're going to get -- you're going to give this
16 particular factor weight, I think that is asking for a
17 commitment.  But I think you can ask in a more general
18 sense that -- that same line of questioning.
19         MR. GARZA:  Okay.  Then that -- my -- the
20 objection is sustained?
21         THE COURT:  The objection is sustained.
22 But, I mean, in other words, -- look, I mean, what
23 he's trying -- I think Mr. Garza's trying to get at is
24 this:  You can consider things like being an eagle
25 scout, like people coming in and saying, "You know,

247

1  what, he's a good guy.  I've known him all my life.
2  He's a good guy," like, "You know, he used to do
3  things for the community," and those are things that
4  you can -- that you can consider as mitigating
5  circumstances.  And there's -- I mean, the list is
6  infinite as to what that is, so...
7          MR. GARZA:  Yes, Your Honor, but I'm also
8  entitled, I think, under the law to ask him if that is
9  something that he had could give some effect to,
10 because if he can't --
11         THE COURT:  I don't think you can ask
12 specific instances, --
13         MR. GARZA:  Okay.
14         THE COURT:  -- like an eagle scout.
15         MR. GARZA:  I'll try another way, then,
16 Judge.
17         MR. JONES:  There's case law supporting
18 the question.
19         (Off-the-record discussion between
20         counsel for the defense.)
21   Q.   (BY MR. GARZA) Then let me ask you this, Mr.
22 Van Hoozer, what factors would you consider or want to
23 consider in answering Special Issue No. 2?
24   A.   What else has gone on in that person's life.
25   Q.   Okay.

248

1    A.   I mean, to know more about that person and
2  where they started, how they got to where they were at
3  and where they're at today.
4    Q.   Okay.  "The best argument for the death
5  penalty is," and your answer was, "If you are found
6  guilty under the law."  What a does that mean?
7    A.   That means that after all the evidence was
8  presented and all the questions were answered and the
9  person was guilty, then that's how I arrived at that
10 answer.
11   Q.   Uh-huh.  And "The best argument against the
12 death penalty is," "I don't know."  What does that
13 mean?
14   A.   It means if the evidence is there and you go
15 through the whole thing and there isn't anything
16 mitigating, or whatever, then I don't have an argument
17 against the death penalty.
18   Q.   Okay.  What about someone being wrongly
19 accused and wrongly convicted in a death penalty case?
20 How would that affect you?
21   A.   I believe that, as one of you said I don't
22 remember, when you come before the people and a case
23 is presented and people make the decision based on
24 what was presented to them, then I would assume that
25 based on what happened was that the jury, the Judge,

249

1  whoever, made the decision based on the evidence that
2  was presented at the time which they believed was
3  true.
4    Q.   Have you read recently, at all, in the paper
5  about the cases where people that were originally
6  found guilty up in Dallas, and a lot of them are being
7  found innocent through D.N.A. testing, now?
8    A.   I've heard something about that, yes.
9    Q.   How -- what do you think about that?
10   A.   I think that at the time that that verdict
11 was made, it was based on the information that they
12 had at the time.  And I would believe that to the best
13 of their ability or my ability that they have felt
14 that they made the right decision.  And now that
15 D.N.A. in some cases is new evidence that they didn't
16 have at the time, then I believe that that person
17 should probably -- or should be free, or whatever the
18 next level of it is.  I'm not sure about that.  But
19 whatever the case, if -- if you have new evidence,
20 then that's what why you get new trials.
21   Q.   Uh-huh.  There is a concept that we all have
22 to labor under in regard to the issue of the term of
23 "reasonable doubt," which is a legal concept that we
24 really have no definition for, it arises from evidence
25 to a degree that proof convinces us in our mind

250

1  or satisfies our conscience, as you say, at the time.
2  Do you think it would be far worse to convict an
3  innocent man than to let a guilty man go, or vice
4  versa?
5      A.    Neither of them are right.  But based on the
6  information you have at the time, the decision you
7  make is based on the evidence that you have at the
8  time, that's all you have.  And I believe that you
9  make a decision and move on.  You don't look back and
10  question the decision you made, unless there's more
11  evidence or something changes that along the way.
12          MR. GARZA:  I'll pass the juror, Judge.
13          THE COURT:  All right.  Anything else?
14          MR. SKURKA:  No other questions.  Thank
15  you.
16          THE COURT:  Mr. Van Hoozer, will you
17  please wait in the jury room --
18          VENIREPERSON NO. 13:  Sure.
19          THE COURT:  -- just for a moment.
20          (Venireperson exits courtroom.)
21          THE COURT:  All right.  Mr. Skurka?
22          MR. SKURKA:  State will accept this
23  juror, Your Honor.
24          THE COURT:  All right.  Mr. Garza.
25          MR. GARZA:  Can we confer for a minute,

251

1  Your Honor?
2          THE COURT:  Yes.
3          (Off-the-record discussion.)
4          MR. GARZA:  Judge, we will exercise our
5  second peremptory.
6          THE COURT:  All right.  Let's take a
7  little break and we'll start up, again.
8          THE BAILIFF:  Judge --
9          THE COURT:  Yes.
10          THE BAILIFF:  -- do you want to bring in
11  --
12          THE COURT:  No.  Let's take a little
13  break.
14          (Short recess.)
15          (Venireperson enters courtroom.)
16          THE COURT:  Come on in, just for a
17  second.
18          THE COURT:  All right.  Mr. Van Hoozer we
19  appreciate you coming down here.  We're not going to
20  need your services, but we do appreciate your time.
21  Thank you so much.
22          VENIREPERSON NO. 13:  Appreciate it.
23          (Venireperson exits courtroom.)
24          (Venireperson enters courtroom.)
25          THE COURT:  Okay.

252

1          VENIREPERSON NO. 15,
2          ANNE CHRISTINE MATTSON,
3          VOIR DIRE EXAMINATION
4  BY THE COURT:
5      Q.    All right.  You are Anne Mattson; is that
6  correct?
7      A.    Yes, sir.
8      Q.    All right.  Well, we're here to talk to you
9  about some things, okay?
10      A.    All right.
11      Q.    And what we're looking for is jurors that can
12  keep an open mind and can follow the law, okay?
13      A.    All right.
14      Q.    And let me ask you this, you think you can
15  keep an open mind on this case?
16      A.    Yes, sir.
17      Q.    Okay.  I see that you may have heard some
18  things in the news, but -- and -- and I got to tell
19  you, I -- I've been doing this a while, and I can tell
20  you and I'm sure that all these lawyers in this room
21  will tell you that what you see in the news isn't
22  always right.
23      A.    That's true.
24      Q.    And with all due respect to the media, they
25  don't always get it right.  And -- and what we want is

253

1  for jurors to listen to the evidence that's presented
2  at trial.
3      A.    Yes, sir.
4      Q.    And not -- and not consider what -- what is
5  reported in the media, okay?
6      A.    Right.
7      Q.    Can you -- Do you think you can could do
8  that?
9      A.    Oh, yeah.
10      Q.    Okay.  All right.  Now, this is a criminal
11  case, okay?  And, of course, in criminal cases certain
12  rules apply.  Let's see here, you haven't been a juror
13  before.
14      A.    No, sir.
15      Q.    Okay.  But you probably know some of these
16  concepts, from -- from reading, from T.V., from
17  school.  And -- and one of the main concepts in a
18  criminal case is the State's brought these
19  accusations, okay?
20      A.    Yes.
21      Q.    And, at this point, that's all they are.
22      A.    Right.
23      Q.    All right?  They have to prove them, okay?
24  The charge here is capital murder.  And we're going to
25  talk about -- about that in a minute.  But -- but do

254

1  you have a problem with the concept that State brings
2  the charges and they have to prove it?
3      A.   No.
4      Q.   Okay.  The burden of proof is beyond a
5  reasonable doubt.  Okay?  You know, we don't have a
6  definition, but that's the highest standard in the
7  law, in all of the law.  Okay?  It's not beyond all
8  doubt or beyond a shadow of a doubt, but it's high.
9  Okay?  It's not just maybe, probably, it's more than
10  that, okay, it's -- could you follow that?
11     A.   Yes, sir.
12     Q.   Okay.  Now, in this country and in -- I'd
13  like to say it's an American invention, but it is not.
14  The fact that a person is innocent until proven guilty
15  is an ancient thing.
16     A.   Yes.
17     Q.   It's -- it's in the Bible.  The Roman's had
18  it.  The Greeks had it and we have it.  And the
19  concept is, "Hey, State, you brought these charges.
20  That's fine.  You brought the charges, but you got to
21  prove them.  And until you do prove them, if you can
22  prove them, Defendant in this case is presumed to be
23  innocent."
24     A.   Correct.
25     Q.   And you believe in that.

255

1      A.   Yes.
2      Q.   Okay.  As part of that, burden never shifts
3  to this table over here, the defense table, the burden
4  never shifts.  Always stays on the State.  Okay?  And
5  as part of the burden never shifting, State has to
6  prove their evidence, but the Defense doesn't have to
7  put any evidence forward, --
8      A.   Right.
9      Q.   -- 'cause it's not their burden.  And the law
10  says that you -- if they do nothing, you can't hold
11  that against the Defendant.
12     A.   Right.
13     Q.   One of the main issues about that is, of
14  course, Defendant's right not to testify.  That's a
15  Constitutional right.
16     A.   Yes, it is.
17     Q.   Okay?  It's -- it's in the Bill of Rights.
18  And a lot of people say, "Well, you know what, I know
19  the law says I can't hold it against him, but I
20  would," okay?  All right?  What I need to know from
21  you is, would you hold it against the Defendant if he
22  chooses not the testify?
23     A.   No.
24     Q.   Okay.  Now, this case is capital murder.
25  Okay?  And it sounds a little morbid to say it's not

256

1  just a regular murder.
2      A.   Right.
3      Q.   Okay?  That's just -- there's really no way
4  easy to put that, but this isn't a regular murder, and
5  there's a laundry list as to what qualifies as capital
6  murder.  I call it like a murder plus.  Okay?  In this
7  case they have alleged that the Defendant committed a
8  murder, that is, the intentional killing of another,
9  and, you know, in Nueces County, on a given day, and
10  that he did so while attempting to or while committing
11  a robbery.
12     A.   Uh-huh.
13     Q.   So you have the murder, plus the robbery or
14  the attempt to commit the robbery.  And they're going
15  to have to prove all of the elements of both of those
16  crimes.  You understand that?
17     A.   Yes.
18     Q.   All right.  And -- and maybe -- maybe you go
19  back to the jury room, if you're selected, and you
20  say, "You know, I think they -- I think they got the
21  murder, but I don't think they got the robbery," or
22  maybe vice versa, "I think -- I think he did commit
23  robbery and I don't think he committed murder."  You
24  understand, if they don't prove all the elements, they
25  don't get there.

257

1      A.   Right.
2      Q.   Okay?  Now, he may be guilty of something
3  else or maybe not.  Okay?  But you -- you have no
4  problem with making them prove all the elements beyond
5  a reasonable doubt.
6      A.   No.
7      Q.   All right.  And you understand, basically,
8  how this particular charge works.
9      A.   Yes, sir.
10     Q.   Okay.  Now, in Texas, in every criminal case,
11  the Defendant has the right to elect to have the jury
12  do punishment.  And in all other cases, other than
13  capital murder, what happens is, we pick a jury.  The
14  jury deliberates on guilt or innocence.  If they find
15  that the State hasn't proven their case beyond a
16  reasonable doubt, Defendant gets acquitted and the
17  trial's over.
18          If -- if the person is convicted, then we
19  go onto the second phase of the trial, punishment
20  phase.  And the jury then decides what punishment the
21  Defendant should get, a term of years in prison,
22  perhaps, perhaps probation, perhaps a fine, perhaps
23  probation and a fine, perhaps fine and time, okay?
24  Capital murder case is different, doesn't work like
25  that, you don't say life or death.  What you do is you

258

1 answer questions, okay?

2 A. Right.

3 Q. And -- and -- and the lawyers are going to

4 talk to you about this, but here's Special Issue No.

5 1. You'd ask -- you'd answer this question, that is,

6 "Is there a probability the Defendant would commit

7 criminal acts of violence that would constitute a

8 continuing threat to society?" You'd answer that

9 question, then you go to Special Issue No. 2, and

10 you'd answer that question. Basically, "After taking

11 into consideration all of the evidence, including the

12 circumstances of the offense," that's the -- that's

13 the charge, the guilt or innocence phase part, "the

14 Defendant's character and background and the personal,

15 moral culpability of the Defendant, is there a

16 sufficient mitigating circumstance or circumstances to

17 warrant a sentence of life, rather than death be

18 imposed?" And so, you would answer those two

19 questions.

20 And make no mistake, depending on the

21 answer of the questions will determine whether

22 Defendant gets a life sentence or a death sentence,

23 okay? What I need to know from you is, could you --

24 this is something that you can -- this is a law that

25 you can follow?

259

1 A. If I'm convinced that that's the correct

2 course, yes.

3 Q. Okay. So you could take the oath and say, "I

4 can deliberate on guilt or innocence and hold the

5 State to its burden. And then, if in fact Defendant's

6 convicted beyond a reasonable doubt, I could -- I

7 could take the oath to answer these questions."

8 'Cause when we begin the trial I'll give you the oath.

9 And the jurors will raise their right hand and I'll

10 say, "Do you solemnly swear that you'll render a true

11 verdict based upon the law and the evidence presented

12 to you?" And you could do that.

13 A. Yes, sir.

14 THE COURT: All right. Okay. All right.

15 I'm going to turn the floor over to Mr. Skurka. He's

16 -- gets to go first, 'cause he's got the burden of

17 proof.

18 MR. SKURKA: Thank you, Judge.

19 VOIR DIRE EXAMINATION

20 BY MR. SKURKA:

21 Q. Hi, Ms. Mattson, how are you?

22 A. Fine, thank you.

23 Q. As the Judge introduced me, I'm Mark Skurka

24 with the D.A.'s Office. This is Geordie Schimmel you

25 met him last week or a couple of weeks ago, I guess.

260

1 A. Uh-huh.

2 Q. He's the attorney, the assistant D.A., that's

3 assigned to Judge Galvan's court on a daily basis, so

4 he'll be helping me present the evidence and -- and

5 will assist me in presentation of the evidence to you,

6 if you're seated on this jury.

7 I'm going to start off by telling you,

8 there's no right or wrong answers to anything you say.

9 We just want to know how you feel about some of the

10 issues and the laws in this case. I don't want you to

11 answer in such a way that you make me feel like -- may

12 please me or the Judge or the Defense. You just tell

13 us how you feel and we will deal with that. Because

14 sometimes jurors think, "Well, I think he wants me to

15 say it this way, so I'll say it this way." We don't

16 want that. We want you to just give us your honest

17 opinion on some of these things, okay?

18 A. Yes, sir.

19 Q. We'll start off with this, you know, the main

20 -- one of the main issues is this case is the death

21 penalty. And I want to ask you, how do you feel about

22 that?

23 A. I feel like there are instances when that's

24 exactly what's required.

25 Q. And that was a good word that you used,

261

1 there's "instances." That tells me what you're saying

2 is, not in every murder case and not in every capital

3 murder case.

4 A. No.

5 Q. And -- and sometimes people came in the first

6 day and thought every murder case is eligible for the

7 death penalty.

8 A. No.

9 Q. And we have to tell them, no, it's only

10 certain cases that qualify as capital murder cases.

11 And when you say certain instances, there's certain

12 instances, would you agree with me, that maybe a

13 person found guilty of capital murder should get a

14 life sentence, instead of a death penalty?

15 A. There are occasions, yes, sir.

16 Q. It depends on what the evidence is.

17 A. Right.

18 Q. And I think that's what the Judge was trying

19 to hit on you early, he's saying, like, we want

20 somebody open-minded, that hadn't come in with any

21 preconceived notions. I told you at the very

22 beginning, the very first day, if you're seated on

23 this jury, there's going to come a day that I'm going

24 to ask you to find him guilty based on the evidence

25 that's presented. And I'm going to ask you to give

262

1  him the death penalty, answer the questions in such a
2  way that Defendant will get the death penalty.  I
3  want to you look at him and tell me, if -- if you're
4  on this jury, can Anne Mattson make a decision, if the
5  evidence calls for it, that he get a death sentence?
6      A.    I would not like to do that, personally, but
7  if that's required, then I can do that.
8      Q.    Okay.  And that's what we need to know.  I
9  don't think anybody likes to do it.  And I never tell
10  people -- and if you heard me say, do you want to be
11  on this jury and do this, do you like doing this?  No.
12  It's not fun for any of us.  But the bottom line is, I
13  don't want to say it's a job that somebody has to do
14  it, but, seriously, under your civic duty, you know,
15  we have to have jurors that come in and are willing to
16  -- to do that, however distasteful it may be.
17        Sometimes we have child abuse cases and
18  people say, "Man, I don't even want to hear about
19  child abuse.  That's so terrible, and stuff."  But,
20  you know, we need to have jurors to come in and make a
21  decision whether he did it or not, you know, in a
22  child abuse case.  And it may be very distasteful
23  hearing about these acts, but would you agree with me,
24  in our society, you want citizens to be able to come
25  and judge other people, right?

263

1      A.    Absolutely.  That's what protects everyone
2  else.
3      Q.    And that's right.  So, although it may be --
4  and it may be distasteful, it's not something you
5  relish doing or want to do it, --
6      A.    No.
7      Q.    -- I just want to know can you follow through
8  with it, if the evidence calls for that?
9      A.    Yes, I can.
10      Q.    Okay.  I'm going to ask it the other way,
11  too.  If the evidence is such away and the answer--
12  and the questions should be answer in such a way he
13  get a life sentence, can you do that, too?
14      A.    Yes, I can.
15      Q.    So, you seem to me to be a very fair person,
16  that you're willing to look at everything.  And --
17  and, you know, I'm sure all of us wish we didn't have
18  to be here.  But, you know, this is the law, this is
19  what the story is.  And I make no apologies.  This is
20  what we're thinking, our office -- or the D.A. and our
21  office has decided to seek the death penalty in this
22  case.  And so, I just want to make sure I have people
23  on the jury that can't just -- you know, here's a
24  better way to say it, some people tell me, "Hey, I
25  believe in the death penalty.  It's a good law.  I'm

264

1  glad we have it in Texas.  It's good.  It's good," and
2  I say, "Well, okay, do you want to be on the jury and
3  do it," and they go, "Oh, no, don't make me do it."
4  Are you --
5      A.    Talk's cheap.
6      Q.    Are you that way or are you one that could
7  actually sit down and carefully consider everything
8  and go through it?
9      A.    I have all the information and I'm allowed,
10  you know, the opportunity to carefully consider it,
11  yes, I could do that.
12      Q.    Okay.  But you see where I'm coming from.
13      A.    Yes, I do.
14      Q.    'Cause some people can talk the talk, but
15  they can't walk the walk.
16      A.    Can't do the deed.
17      Q.    And -- and I don't want to find fault with
18  them, you know, --
19      A.    No.
20      Q.    -- 'cause some -- if you can't do it, you
21  can't do it.
22      A.    That's right.
23      Q.    All you got to do is tell the Judge if you
24  can't do it.  But I just want to make sure you're not
25  just a person can say it, but you can do it if

265

1  necessary.
2      A.    If I have to.
3      Q.    If you have to.  And -- and it should be
4  based on the evidence; correct?
5      A.    Yes, sir.
6      Q.    When you first walked in a couple of weeks
7  ago that day, remember that day we had, like, 200, 300
8  people downstairs, and the Judge came down and said,
9  "Okay, folks, this is a criminal case and it's a
10  capital murder case.  This young man could be facing
11  the death penalty," what was your first reaction,
12  what's the first thing that crossed your mind when you
13  heard that?
14      A.    I hated to hear it, because he's a young man.
15      Q.    Okay.  Does that bother you because of that?
16      A.    Sure, it does.  I don't like to see any young
17  man have to throw their life away.
18      Q.    Would it have been a difference if the person
19  is, say, 50 years old, instead of 25 years old?
20      A.    I don't want to see anybody throw their life
21  away, but particularly young people.
22      Q.    Do you think that young people -- here's what
23  the answer-- my question is.  The law does not change
24  the offense or the punishment because of the age, --
25      A.    Right.

266

1    Q.    -- as long as you're an adult.

2    A.    I understand that.

3    Q.    In Texas you cannot execute people under 18

4    years of age.

5    A.    Right.

6    Q.    And that's probably a good law, --

7    A.    Yes.

8    Q.    -- you know?  You don't want to hold those

9    people to a standard.  But, on the other hand, if a

10   person's 25, 35, 45, 55, 65, the law is no different.

11   A.    No.  They're old enough to know.

12   Q.    And that was my next question.  Is that going

13   to effect you being on the jury because of his age or

14   his youth?

15   A.    No.  I just hate to see it.

16   Q.    Okay.  Will there be something in the back of

17   your mind saying, "Well, you know, all the evidence

18   points toward the death penalty, but because he's

19   young, I'm going to have to automatically give life"?

20   A.    No.

21   Q.    Okay.  Now, you understand youth is something

22   you can consider as a possible mitigating

23   circumstance.  Somebody may say, "Well, gosh, you

24   know, he is kind of young.  That doesn't excuse his

25   behavior, but that might be something to consider to

267

1    give him a lesser sentence."  Some people may say,

2    "Well, hey, he's old enough, he's such and such age,

3    he's old enough to know better."

4    A.    Well, I haven't heard the evidence, so I

5    can't make that decision, at this point.

6    Q.    And that's a good answer.  And -- but -- but

7    you see what I'm saying?

8    A.    Yes.

9    Q.    After you're a certain age, you know, 18 or

10   something, I mean, the law says you're obviously old

11   enough to go through this stuff.  But that's not going

12   to effect you being on this case, except it's kind of

13   sad, --

14   A.    Yes.

15   Q.    -- is what you're trying to tell me.

16   A.    Exactly.

17   Q.    Okay.  But just because he's young looking,

18   instead of like, you know, I always say, people have

19   stereo-types, they go in there and they expect to see

20   this horrible looking guy with tattoos all over him

21   and mashed up face, like a career criminal.  Then they

22   see this young man and they think, "Oh, my gosh, he

23   doesn't look that bad."  Let me ask you this, though,

24   isn't it true that we should make a decision as jurors

25   on what a person did and not what he looks like?

268

1    A.    Exactly.

2    Q.    For example, you might have a nice looking

3    person dressed up in a nice suit, and he looks

4    perfectly fine, but then you find out they've done all

5    these horrible things.  You can't make a decision on

6    what they look like.

7    A.    No, you can't.

8    Q.    You have to make a decision on what he did.

9    And you can do that?

10   A.    Yes, sir.

11   Q.    Great.  How do you feel about sitting on this

12   jury and making that kind of decision?

13   A.    Well, I think it's very a weighty thing.  And

14   if I had druthers, I wouldn't want to find myself in

15   that position.  But if I have to, I can do that.

16   Q.    That's -- Well, that's an intelligent answer,

17   because I don't think a lot of people want to be on

18   this jury.  'Cause -- 'cause, you know, remember I

19   asked you, "What was your first reaction?"  I watch

20   the jurors face.  And most people go, "Oh, my God, you

21   know, how can I sit on this case," 'cause they're

22   thinking they're going to get, you know, a little

23   D.W.I. case or slip and fall at H.E.B., and realize,

24   "Hey, I may be in that position to make the ultimate

25   decision."

269

1    A.    Right.

2    Q.    And the law says that only jurors can make

3    that decision.  Judge Galvan, as powerful as a

4    district judge is, he can't make that decision, 'cause

5    the law says, "No, the citizens have to make the

6    decision."  Carlos Valdez, my boss, the D.A., he can't

7    make the decision that somebody's going to get the

8    death penalty.  The law entrusts it with people.  And

9    that's nothing against Judge Galvan or any other

10   Judge, it's the law wants to put that responsibility

11   with the people.  That's fair, isn't it?

12   A.    Yes, it is.

13   Q.    And that way you won't have the government,

14   you know, running roughshod over people, you'd have --

15   doing that.

16   A.    That's tyranny.

17   Q.    That's -- that's right.  And, on the other

18   hand, though, but if you do have the law, sometimes

19   people and citizens expect jurors to uphold the law.

20   That's part of their duty, civic duty, too.

21   A.    Yes.

22   Q.    And, you know, if they didn't commit the

23   crime, jurors should find them not guilty.  It all

24   fits into that, our scheme of things.  And people

25   always talk about, you know, problems in the Criminal

270

```
1    Justice System, I always say, "Name me a better
2    system, you know.  Ours is -- it's got" --
3         A.    Precisely.
4         Q.    -- "flaws, but it's still the best one they
5    got out there."  So you understand that you may have
6    to make that awesome decision, but you think you can
7    do that.
8         A.    If I have to.
9         Q.    And that's the man.  We're not -- we're not
10   talking about some guy --
11        A.    I know.
12        Q.    -- you read about and hear about.  That's
13   him.  Look at him.
14        A.    I've looked at him.
15        Q.    Tell me, can you make that decision?
16        A.    If I have to.
17        Q.    Okay.  And -- and I'm not saying you want to
18   be overjoyed about making that decision --
19        A.    No.
20        Q.    -- or happy about making the decision.  It's
21   just, like, can you carry through it?
22             Okay.  Let's talk about the case.  Charge
23   is murder plus a robbery.  Basically, you can't get
24   the death penalty on just plain murder.  It's got to
25   be one of those special circumstances, like, killing a
```

271

```
1    kid under six, or killing a police officer on duty, or
2    killing somebody while you're robbing, raping,
3    burglarizing, kidnapping them.  And there's some other
4    things, too.  But the legislature has already set
5    aside which are those more heinous crimes, I guess,
6    that would fit the death penalty.  A lot of times
7    people come in and say, "Well, I thought everybody
8    that killed somebody could get it," and I have to tell
9    them no.  You don't get that.  It's only if it
10   qualifies for the death penalty.  And just 'cause it
11   qualifies for the death penalty, does it mean he
12   automatically gets the death penalty?  No.  What it
13   means is you have two choices, death or life.  And you
14   have to be able to fully consider both of those at the
15   beginning of trial.  So you're not leaning one way or
16   other, --
17        A.    No.
18        Q.    -- right now, are you?
19        A.    No.
20        Q.    Okay.  And the State has to prove all the
21   elements of murder and robbery or attempting to commit
22   robbery before you can even make that decision.  So I
23   tell people, there's two parts to the trial.  The
24   first part is guilt or innocence.  In other words, did
25   he do the crime charged or not?  If -- if you think
```

272

```
1    he's not guilty of that, the trial's over with.  If
2    you think he is guilty of that crime, then you go to
3    the second part of the trial.  And unlike what some
4    people think, they think that, "Well, they just go in
5    there and vote.  Well, I'll check off death or check
6    off life."  The Judge says that you have to answer two
7    questions.  And you answer those questions, again,
8    based on the evidence.
9             Now, you can use all the evidence you
10   heard in the first part of the trial, but you might
11   get to hear additional evidence.  You have hear about
12   the person's background.  You know, maybe he's been to
13   prison 20 times before, maybe he's never been to
14   prison.  Maybe he was a decorated war hero or an eagle
15   scout all of his life, you know, something like that.
16   So you have to decide, based on the evidence, what his
17   background is and if he warrants getting the death
18   penalty.  And that's probably something you want to
19   know, right?
20        A.    Absolutely.
21        Q.    Don't you want to know?  I mean, somebody may
22   come in and say, "Oh, he's a good guy, you know, he
23   went to church with me every Sunday," and some people
24   say, "Nah, he's been bad all his life."  I don't know.
25   That's what the Judge reserves these questions for.
```

273

```
1             And so let's just go through the
2    scenario.  Say you found the person guilty, you go to
3    the second part of the trial.  You may hear additional
4    evidence, and remember they don't have to put on any
5    evidence at all if they don't want to.  You can't hold
6    it against him if he doesn't testify.  And you may get
7    to hear additional evidence.
8             And then you answer these two questions.
9    And the first question is right behind you.  And I ask
10   you to turn around and look at that.  It says, "Is
11   there a probability that the Defendant would commit
12   criminal acts of violence that will constitute a
13   continuing threat to society?"  That's pretty
14   self-evident.  Do you have think he's going to be a
15   danger in the future?  Do you think he could hurt
16   somebody else or do some other crimes?
17             Let me go down and be a little more
18   specific, here.  The question says this:  "Is there a
19   probability."  It doesn't say certainty.
20        A.    Possibility.
21        Q.    'Cause unless you got a crystal ball --
22        A.    Don't know.
23        Q.    -- and you can tell what the future is, you
24   can't decide what's going to happen in the future.
25   And the law doesn't require me to.  It just says it's
```

274

1  more likely than not.  It also says, "the defendant
2  would commit criminal acts of violence."  That doesn't
3  mean you just think he's going to murder somebody,
4  again.  It could be any criminal acts of violence.
5  You know, beating up on a woman, or, you know, break
6  in some -- break into some-- somebody's house, or
7  something like that.  It doesn't have to be murder.
8  Some people say, "Well, do I think he's going to
9  murder, again?"  Well, it doesn't have to be that.
10  Could be almost any act of violence, "that would
11  constitute a continuing threat to society."  And
12  you've probably heard a phrase like that before.
13       This is what I want to key in on is the
14  word, "society."  Sometimes people say, "Well, Mark,
15  why don't you just look him in up in prison and that
16  way won't hurt anybody?"  And I always say, "Who else
17  is in prison?"  Who else would be?
18       A.  Police.
19       Q.  Uh-huh.
20       A.  Staff.  Other --
21       Q.  Guards?
22       A.  -- other inmates.
23       Q.  Other inmates.  He's -- it's not like we have
24  a desert island and we put them out there where
25  they'll never see a human being again.

275

1       A.  No.
2       Q.  So society -- prison is still part of
3  society, 'cause you're interacting with other human
4  beings.  So prison is part of society.  Have you ever
5  heard of anybody, like, prisoners attacking each other
6  or hurting another prisoner?
7       A.  Yes.
8       Q.  Have you ever heard them, like, attacking
9  guards or --
10       A.  Yes.
11       Q.  -- or maybe medical people or people --
12       A.  Yes.
13       Q.  -- that work there, you know?  So people can
14  still commit criminal acts of violence, even though
15  they're locked up, can't they?
16       A.  Yes, they can.
17       Q.  Okay.  So this is the question.  He's found
18  guilty of capital murder.  The question is, "Yes or
19  no, is there a probability that he commit criminal
20  acts of violence that will constitute a continuing
21  threat to society"?  You answer that question, "Yes, I
22  think he's a future danger, or, no, he's not."
23       Then you go to this next question.  And
24  this is what we call the "mitigating circumstance
25  question."  Mitigating is a word that basically means

276

1  anything that could reduce the Defendant's sentence or
2  anything that reduces his moral blameworthiness.  In
3  other words, he did the crime, but is there any reason
4  we should give him a lower sentence?  Say, for
5  example, you have two burglars, you have two different
6  burglary cases.  And, in the first case, the burglar
7  has -- you find out -- they're both convicted of
8  burglary, which basically means they went in
9  somebody's house and took something without
10  permission.  That's the definition of burglary.
11       The first burglar, you find out when you
12  hear the evidence that he broke into somebody's house,
13  he kicked in the door, destroyed the door, kicked it
14  off its hinges, went inside the house, stole the T.V.
15  and the stereo and the C.D. player and all the money
16  and jewelry in the store -- in the house.  And then as
17  he was leaving the house, he tore up the place, just
18  kind of ransacked the whole place and broke things and
19  tore it up.  And then you find out in his background
20  that this isn't his first burglary.  He's been in
21  prison three times before for burglary.
22       Now, you go to the second burglar.  The
23  second burglar is a guy who broke into somebody's
24  house and stole something.  But then you find out what
25  the circumstances are, is that, he actually didn't

277

1  kick in a door, or anything, he went in the back door
2  that was unlocked, he went around and searched the
3  kitchen.  He didn't steal the T.V., V.C.R., stereo and
4  all that stuff or jewelry, what he stole was a loaf of
5  bread and some food to feed his kids, 'cause he was
6  out of work and he needed some food to feed his kids.
7  And then you find out about his background, and you
8  find out the guys never been in trouble before with
9  the law.  This is the first time he's ever been
10  arrested.  He doesn't have that criminal background
11  like that other guy.
12       So when you start out, they're both kind
13  of equal.  They're both convicted of burglary.  But
14  are you really going to punish them exactly the same?
15       A.  No.
16       Q.  Probably not.
17       A.  Because it isn't warranted.
18       Q.  It wouldn't warrant it, because the facts and
19  circumstances say, one has aggravating circumstances
20  and makes the crime worse, so you should punish him
21  higher.  And one is mitigating circumstances that make
22  it less in the case.  Both convicted of burglars,
23  but that -- both convicted of burglary, but you can
24  see the reasons, the surrounding circumstances and
25  background, would make it -- one lower than the other.

278

```
1        And that's what this question's all
2   about, mitigating circumstances.  "Is there enough
3   mitigating circumstance or circumstances to warrant
4   that a sentence of life, rather than death be
5   imposed?"  In other words, you found him guilty of
6   capital murder, you think he's a continuing threat to
7   society.  The Judge says, "Wait, you got to answer
8   this next question.  Before he gets the death penalty,
9   "Take into consideration all the evidence, including
10  the circumstances of the offense," you know, what
11  happened that day and around there, "his character and
12  background," you know was he an eagle scout, has he
13  been to prison ten times before, "his personal, moral
14  culpability, is there a sufficient," is there enough
15  "mitigating circumstances or circumstances that
16  warrant that a sentence of life, rather than the death
17  be imposed?"  It's kind of like a check on the thing,
18  you know, remember, we balance --
19     A.    Uh-huh.
20     Q.    -- checks and balances?  He's heading for the
21  death penalty, but the Judge tells them, "Stop and
22  wait and look over everything, again.  Is there any
23  reason to give them a life, instead of death?"
24        What is a mitigating circumstance?  I
25  can't tell you.  That's up to the folks on the --
```

279

```
1      A.    Depends --
2      Q.    -- on the jury.
3      A.    -- on the situation, yeah.
4      Q.    It depend-- you said it exactly right.  It
5   depends on the situation.  The Judge is not going to
6   tell you, "This is a mitigating circumstances, so you
7   have to lower the sentence.  This is a mitigating
8   circumstance.  You have to lower, give them a life
9   sentence."  No.  It's up to the jury to decide whether
10  it's enough.  Remember earlier we were talking about
11  youth being a possible mitigating circumstance?  Some
12  jurors may say, "Well, gosh, you know, he's only 25
13  years old.  He's very young and maybe we should give
14  him a break."  Some other jurors say, "Hey, he's over
15  18.  He knows -- he's 25.  He knows what he did.  No.
16  I'm not going to give him a break, because of that."
17  But it's up to you to decide as a juror.  Just because
18  if you hear evidence of mitigating circumstance
19  doesn't mean you necessarily have to automatically
20  lower it.
21     A.    Right.
22     Q.    You have to kind of do a balancing test.  And
23  I always tell people, "Is it enough to outweigh all
24  the other stuff?  Maybe he was an eagle scout 20 years
25  ago, maybe he was, you know, helped little old ladies
```

280

```
1   across the street.  The question is, does that
2   outweigh all the other stuff that you would lower the
3   sentence?"  Does that make sense, now, --
4      A.    Yes.
5      Q.    -- the aggravating and the mitigating thing?
6      A.    This just offers an opportunity for mercy.
7      Q.    That's a good way to say it, too.  Because,
8   you know, might want to look at it and say, "Hey, Mr.
9   Skurka, you may have proved he's guilty, but you don't
10  -- there's nothing -- there's something in his
11  background that makes me think I should give a life
12  sentence."  And that's why the Judge kept telling you,
13  "You've got to be open-minded.  Can you consider life?
14  Can you consider death?"  And we have to make sure
15  you're okay, now.  Because if you're leaning one way
16  or other, you wouldn't be a good juror.  You wouldn't
17  be fair.
18     A.    No, it wouldn't be fair.
19     Q.    It wouldn't be fair to us or --
20     A.    Anyone.
21     Q.    -- to him.  So you understand what mitigating
22  circumstances is?
23     A.    Yes, sir.
24     Q.    Any questions about that?
25     A.    No.  I think it's pretty clear.
```

281

```
1      Q.    Okay.  One other thing I need to tell you is
2   a part of the law that's called, "voluntary
3   intoxication."  The law says this, "Voluntary
4   intoxication not a defense to crime."  In other words,
5   if you go voluntarily get drunk or get high and you
6   commit a crime that's not an excuse to the crime.  You
7   can't, like, get drunk, go rob a bank and when you go
8   to trial say, "Oh, not guilty.  I was drunk."  That
9   doesn't excuse the crime, does it?
10     A.    No.
11     Q.    The law does say, "Voluntary intoxication
12  could be a possible mitigating circumstance."  In
13  other words, somebody -- somebody who say, "Oh, yeah,
14  he robbed that bank, but he was drunk at the time, so
15  I'm going to give him a break 'cause of that."  But
16  other people may say, "Well, that doesn't excuse him.
17  He robbed a bank.  That's bad, you know?  I'm going to
18  -- I'm going to treat that as an aggravating
19  circumstance."  You know what I'm saying?
20     A.    Yes.
21     Q.    The main thing I want you to know is, being
22  drunk or high voluntarily is not a defense to crime,
23  but it's something that you might consider.  What
24  weight you give it is up to the jury.  Okay?
25     A.    Yes.
```

282

1    Q.   Some people say, "Well, he couldn't help it
2    because he got drunk," other people say, "No, he knew
3    what he was doing by getting intoxicated himself."  Is
4    that clear?
5    A.   Yes.
6    Q.   Okay.  The last few things I want to cover
7    with you is some legal words.  I think the Judge
8    talked about "indictment."  Remember, the indictment
9    is just when you're charged with a crime.  It's not
10   evidence of guilt.
11   A.   Right.
12   Q.   The Fifth Amendment.  He can testify.  He
13   doesn't have to testify.  And this Judge is going to
14   tell you, if he doesn't testify you can't hold it
15   against him.  Can you follow that law?
16   A.   Yes.
17   Q.   And I don't know whether he's going to
18   testify or not.  That's his decision with his
19   attorneys.  But the question is, you can't hold it
20   against him if he doesn't.
21   A.   Right.
22   Q.   And "beyond a reasonable doubt."  The Judge
23   was saying that's the highest burden we have.  Well,
24   it -- it is in the law, but, you know, the burden of
25   proof in this case is like in every other criminal

283

1    case, whether it be a D.W.I. or a shoplifting, the
2    State always has to prove the case beyond a reasonable
3    doubt.  So, it's nothing special in this type of case.
4    It's always that way.  And the only thing I can tell
5    you is, it doesn't mean beyond a shadow of a doubt or
6    beyond all doubt or beyond any doubt.  I mean, there's
7    no way I could prove this case to you a hundred
8    percent, unless like you were there and saw it
9    yourself and you'd be a witness.  You couldn't do
10   that.
11         So, beyond a reasonable doubt is
12   basically something that -- I always like to tell
13   people, "First of all ask yourself, 'Do I have a
14   doubt,' and then if you have a doubt ask you -- ask
15   yourself, 'is there a reason for my doubt, is there a
16   reason for it?'"  You know, somebody says, "Well, I
17   have a reasonable doubt.  Well, what is it?  Well, I
18   don't really have a reason?  Then how can it be a
19   reasonable doubt?"
20   A.   It's not reasonable doubt.
21   Q.   Well, good.  Now, tell me -- a couple of
22   things I need to ask you about is your situation with
23   driving your granddaughter --
24   A.   My granddaughter.
25   Q.   -- it says to school?

284

1    A.   I've raised her.  Yes.  She has no peripheral
2    vision, so she cannot drive a vehicle.  She's enrolled
3    at Del Mar and Incarnate Word University, and she
4    works.  So I'm the chauffeur.
5    Q.   How is that going to work with you if you get
6    selected on this jury?  Do you have a --
7    A.   Well, like I said, it would be very
8    difficult.
9    Q.   Well, let me tell you what the schedule
10   usually is.  The Judge usually starts at 8:30 or nine.
11   We'll take a break mid morning, 15, 20 minutes.  And
12   they usually take a break for lunch from 12 to 1:30.
13   We go again in the afternoon from 1:30 till five with
14   an afternoon break.  So I don't know how that fits
15   into your schedule with her classes and stuff, --
16   A.   Right.
17   Q.   -- but I'm sure the Judge told you this, I
18   think you came in when the early excuses, and it's not
19   a -- excuse, --
20   A.   No, I didn't.
21   Q.   -- but we're just one -- Oh, you didn't come
22   for that?
23   A.   No, I didn't.
24   Q.   Well, do you have somebody else that could
25   cover for you if you had to do it for this -- for a

285

1    week or two?
2    A.   Well, if we have to, we'll just work it out.
3    Q.   Okay.  So that's not an insurmountable
4    obstacle?
5    A.   Well, it -- like I said, it's a difficulty,
6    but it's --
7         THE COURT:  What -- what time --
8         VENIREPERSON NO. 15:  -- part of life.
9         THE COURT:  -- does she go?
10        VENIREPERSON NO. 15:  Well, she has
11   classes from 9 until 2:00 Monday, Wednesday and
12   Friday.  She has night classes on Tuesdays and
13   Thursdays from 5:30 until 10.  And then she works in
14   between that.
15   Q.   (BY MR. SKURKA) This is my suggestion, those
16   days she gets out at two, you tell her to study from
17   two to five, --
18   A.   Oh, yeah.
19   Q.   -- till you pick her up.  But she could stay
20   at the school, right?
21   A.   Yes, she can.
22   Q.   Okay.  And then, Judge, we're not --
23        THE COURT:  We won't -- we're not going
24   to go pass five.  If you're selected on this jury,
25   I'll be mindful of that.

286

```
1              VENIREPERSON NO. 15:  Okay.
2              THE COURT:  We'll work with you.
3              VENIREPERSON NO. 15:  Appreciate that.
4      Q.   (BY MR. SKURKA) Generally what happens, we
5  try to find a stopping point before five -- once in a
6  while we'll run a couple of minutes at five, just to
7  finish somebody, you know, at the last minute.  But,
8  like I said, the Judge will work with you.
9      A.   Okay.
10     Q.   So that sounds like it would work for you.
11     A.   Yeah.
12     Q.   And -- and if she doesn't have to be there
13 till nine, you'll have plenty of time to drop her off
14 before you get here at 8:30 --
15     A.   Right.
16     Q.   -- or 9 --
17     A.   Yeah, she could --
18     Q.   -- whenever the Judge starts.
19     A.   -- cool her jets in the meantime.
20     Q.   Well, I'm sure she appreciates you helping
21 her getting around school and everything.  You may
22 know Allen Kirksey; is that right?
23     A.   Yes.
24     Q.   How do you know him?
25     A.   His parents lived up the street from us a
```

287

```
1  long time ago.
2      Q.   Okay.  Is that -- so do you know Allen
3  personally and talk to --
4      A.   I know who he is.
5      Q.   -- him recently?
6      A.   No.  I haven't seen him in a long time.
7      Q.   Okay.  Like years or what?
8      A.   Several years.  At least ten.
9      Q.   Oh, ten years.  So if he is -- and I'm going
10 to tell you, he's a witness in this case.
11     A.   Okay.  Well...
12     Q.   He works at the police department as a
13 civilian employee, --
14     A.   Okay.
15     Q.   -- and stuff.  So my question is, if he comes
16 in here, is that going to effect you being on this
17 jury?
18     A.   No.  I would recognize him, probably, but
19 that's about it.
20     Q.   But that's about it?
21     A.   Yeah.
22     Q.   You wouldn't be considered like friends or --
23     A.   No.
24     Q.   -- go over to his house and him come over to
25 your house, --
```

288

```
1      A.   No.
2      Q.   -- anything like that?
3      A.   No.
4      Q.   And that's the only question the Judge is
5  going to say is just because you know him, are you
6  going to listen to what he says a hundred percent or
7  are you just going to evaluate him and treat him like
8  any other witness?
9      A.   Just like anybody else.
10     Q.   Thank you.  Is Lanette Joubert still working?
11     A.   I believe she is.
12     A.   She's been going at it strong.
13     A.   She's like that "Energizer Bunny".
14     Q.   When did you work for her, if you don't mind
15 me asking?
16     A.   I worked for her from 1980 something, till
17 1990.  I think I quit in 1990.
18     Q.   So about ten years or something like that?
19     A.   I worked for her when she was at Harris Cook,
20 and when she was in private practice.
21     Q.   She's been out there for quite some time, --
22     A.   Uh-huh.
23     Q.   -- I remember.  She's a good lawyer.  Can you
24 tell me the circumstances of the time you were a
25 victim of robbery, please?  It says, "Have you've been
```

289

```
1  a victim of crime," and --
2      A.   I --
3      Q.   -- it says, "Yes.  Robbery."
4      A.   -- had someone break into my house.
5      Q.   Okay.
6      A.   And took things when I was in the course of
7  moving.  I don't know if that's necessarily termed
8  "Robbery," or --
9      Q.   Yeah.
10     A.   -- or burglary, because they were -- I was
11 not present.
12     Q.   Technically that is burglary, --
13     A.   Okay.
14     Q.   -- instead of robbery.  Sometimes -- I always
15 tell my wife that houses get burglarized.  People get
16 robbed.  I was just --
17     A.   Yeah, well, I didn't --
18     Q.   I was just --
19     A.   -- know the distinction at the time.
20     Q.   No problem.  I was just curious about it.
21     A.   And I have forgotten to put on there that I
22 have a family member that was murdered.
23     Q.   Oh?  Tell me about that.
24     A.   It was my cousin.  But it was an ex-husband
25 who -- it was a murder/suicide.  He murdered her and
```

290

1    then he killed himself.

2       Q.   I'm sorry to hear that.  Did that happen here

3    --

4       A.   No.  That was --

5       Q.   -- in Corpus?

6       A.   -- in Wisconsin.

7       Q.   Wisconsin.  And how long ago was that?

8       A.   1981.

9       Q.   So that's been --

10      A.   In fact, --

11      Q.   -- some time ago.

12      A.   -- I had really had forgotten about it when I

13   filled out the form.

14      Q.   And I understand.  Well, we appreciate it

15   forward.  And the only question I'm going to ask you

16   is, is that going to effect you being on this jury?

17      A.   No.

18      Q.   Okay.  Well, the bottom line is this,

19   Ms. Mattson, you think you can be fair in this case?

20      A.   I believe I can.

21      Q.   Will you listen to all the evidence before

22   you make a decision?

23      A.   Yes, sir.  I want it all.

24      Q.   You're not going to prejudge anything?

25      A.   No.

291

1       Q.   If you think the evidence is going toward --

2    if the State proves the case beyond a reasonable

3    doubt, can you vote for guilty?

4       A.   If that's proven to me, yes, sir.

5       Q.   And if the State doesn't prove the case

6    beyond a reasonable doubt, can you vote not guilty?

7       A.   Then I will vote not guilty.

8       Q.   And if you -- if the evidence is such a way

9    that you answer these questions knowing that he'll get

10   the death penalty, can you do that --

11      A.   I can do it.

12      Q.   -- if the evidence is there?

13      A.   If the evidence is there, I can do it.

14      Q.   And if the evidence is not there --

15      A.   Then I won't.

16      Q.   -- and that maybe you decide there is some

17   mitigating circumstance to give a life sentence, can

18   you give a life sentence?

19      A.   Yes, I can.

20      Q.   Do you want to be on the jury?

21      A.   No.  Truthfully.  But I will, 'cause that is

22   my civic duty.

23      Q.   I don't -- And -- and that was a trick

24   question.  I didn't mean to say you want to.  Nobody

25   really wants to do this.  But --

292

1       A.   Yes.

2       Q.   -- it's -- it's clear that we need people

3    like you to be able to come forward and -- and do your

4    civic responsibility.  As corny as it sounds, it's

5    still true.

6       A.   Yes, it is.  It might be you in that chair

7    some day.

8       Q.   You'd want a good -- you'd want a person like

9    you to judge.

10      A.   I want somebody that's going to go by the

11   evidence and not what they think.

12           MR. SKURKA:  That will be fair.  That's

13   all we can ask you to do.  Thank you, Ms. Mattson.

14           VENIREPERSON NO. 15:  Thank you.

15           MR. SKURKA:  The defense lawyers may have

16   some questions for you.

17           VENIREPERSON NO. 15:  Okay.

18           THE COURT:  Mr. Garza?

19           MR. GARZA:  Thank you, Judge.

20           THE COURT:  Okay.

21               VOIR DIRE EXAMINATION

22   BY MR. GARZA:

23      Q.   Good afternoon, Ms. Mattson.

24      A.   Good afternoon.

25      Q.   I'm Ed Garza.  And I had previously

293

1    introduced myself to you back when we were in a larger

2    group downstairs on the first floor.

3       A.   Yes.

4       Q.   And my co-counsel here is Mr. Grant Jones who

5    was not there on that particular day.  And our client,

6    of course, is John Henry Ramirez.

7            I just have a few questions, 'cause I

8    think that, basically, you have answered everything

9    quite fairly, from what I can see.  But this question

10   about whether or not you had heard or seen anything

11   about this case through the newspaper accounts and

12   broadcast media, you said, "I remember seeing the news

13   report of the crime when it was committed and when the

14   arrests were made."  Is there anything about that that

15   has already caused you to form an opinion one way or

16   the other.

17      A.   No.  Because I really don't have a whole lot

18   of information.  All I remember is that there was

19   someone killed at a convenience store, that there were

20   three parties that purportedly were involved.  And I

21   think that there were two young ladies that were

22   arrested, first.  And then, subsequently, a young man

23   was arrested.  I don't know the outcome of the ladies'

24   trials, if they've been completed or not.  And that's

25   really all I can remember of it.

294

1    Q.   Okay.  But would it be safe to say and can we
2  assume, honestly, that you have not formed an opinion
3  as a consequence of those -- the dissemination of that
4  information?
5    A.   No, I have not.
6    Q.   In other words, then, I think, you've already
7  answered the question that you would be willing to sit
8  here and listen to all the evidence before you make a
9  decision.
10   A.   Yes, sir.
11   Q.   And be fair and impartial to both sides.
12   A.   Yes.
13   Q.   Going back to the question that I think Mr.
14 Skurka asked you, previously, is when you walked into
15 that room and -- and you saw or my client there for
16 the very first time and were you informed that this
17 was a capital murder case, what was your first
18 impression?  What were you thinking?
19   A.   Well, the first thing I thought when we came
20 in there was that this young man was one of the
21 attorney staff.  And after they told me that it was
22 capital murder, I was disappointed that such a young
23 man might be putting himself in a position where his
24 whole life is ruined.
25   Q.   Sort of tragic, isn't it?

295

1    A.   Uh-huh.
2    Q.   But, I guess, what we're asking you to do,
3  and sometimes you can or can't do it, you know, is to
4  set those matters aside, presume that our client is
5  innocent until -- until proven otherwise, --
6    A.   Exactly.
7    Q.   -- and -- and be a fair and impartial juror
8  in this case and be fair to both sides, --
9    A.   Right.
10   Q.   -- before you make any decisions.  And, of
11 course, the presumption of innocence.  We're assuming
12 that you at the present, not having heard anything at
13 all about this case, --
14   A.   Right.
15   Q.   -- agree that our client is innocent as he
16 sits there today.
17   A.   As far as I know, yes, sir.
18   Q.   I notice that the back of the questionnaire
19 where we asked you, "On a scale of one to ten, how
20 strongly do you believe in the death penalty, one
21 being the least and ten being the strongest," you
22 circled six.  That's kind of somewhat in the middle;
23 --
24   A.   It is.
25   Q.   -- is that correct?

296

1    A.   It is.
2    Q.   Is it fair to say that you'll be fair and
3  impartial and wait to make any sort of decisions in
4  this case, until you've heard all the facts?
5    A.   Yes, sir.
6    Q.   Okay.
7    A.   I want clear and convincing evidence.
8    Q.   Okay.  And, as a juror, you understand that
9  you have this tremendous power of having to use your
10 common sense and that we are employing you, we're
11 entrusting in you, we're asking you to take an oath
12 that you will swear and promise to us that you will
13 use all the common sense available to you in making
14 these determinations of -- with regard to all these
15 concepts.  Can you do that for us?
16   A.   To the best of myself ability.
17   Q.   Okay.  One of the other things I wanted to
18 ask you also was that, on one of the questions where
19 you were asked, "Do you believe the death penalty is
20 imposed too often, not often enough or about right?"
21 You answered, "Not often enough."
22   A.   I think there are circumstances that I have
23 seen, through the course of time, that I felt like
24 probably the better choice would have been a death
25 penalty.  And not being privy to the information, you

297

1  know, in fact, --
2    Q.   Uh-huh.
3    A.   -- from what I could see from the outside, I
4  think there are people that really are such disasters
5  and such a threat to society that the best course of
6  action would be to condemn them to death.
7    Q.   Completely take them out of society.
8    A.   Yes.  Because there is nothing there for you
9  to rehabilitate, and the only thing they know and the
10 only thing that they are is someone that's going to
11 just continue to ravage society, either confined or
12 free.
13   Q.   Okay.
14   A.   Unfortunate as that is.
15   Q.   You also -- you also answered, "Do you think
16 serving a life sentence in prison is more severe,
17 about the same or less severe than the death penalty,"
18 and you answered, "Less severe."
19   A.   It is.
20   Q.   Okay.
21   A.   Because when you're dead, you're done.  If
22 you're in a life sentence, in a small cell, with a
23 population that to me would be horrifying, I can't
24 imagine a punishment, ever, than to have to sit there
25 day after day with that.

298

1    Q.   Do you yourself have any personal knowledge
2  of on the average about how many people are executed
3  in the state of Texas per year?
4    A.   No, sir, I don't.
5    Q.   Okay.  Do you think it deters crime?
6    A.   Given what I see these days, I would have to
7  say, no.  Only thing it does is impede their progress.
8    Q.   (Pause)  Do you think that it impedes whose
9  progress?
10   A.   The criminal element.  It might slow them
11 down if they're in and out of jail a little bit, but
12 it does not deter them.  Maybe a few it would, but the
13 hardened ones, I don't think so.
14   Q.   Okay.  The situation involving your
15 granddaughter, insofar as her transportation needs, is
16 -- is that -- I know it's -- I know you've said that
17 it's going to be somewhat difficult, but that you
18 could try to work around it.  Is it -- is it going to
19 cause any sort of a distraction from your ability to
20 sit here and -- and listen to the evidence and -- and
21 assist us, you know, in all sincerity and with all
22 your heart and soul, I guess, in -- in helping us
23 bring this case to some sort of conclusion?
24   A.   No.  Because if I'm chosen to sit on the
25 jury, that's what I'll be here for.  Somebody's life

299

1  is in the balance and it can -- you just don't have
2  the luxury of thinking about other things.
3         MR. GARZA:  Okay.  Thank you, Ms.
4  Mattson.
5         VENIREPERSON NO. 15:  Yes, sir.
6         MR. GARZA:  I don't have any other
7  questions.
8         THE COURT:  All right.
9         MR. SKURKA:  Judge, I have a couple of
10 follow-ups, --
11        THE COURT:  Okay.
12        MR. SKURKA:  -- if you don't mind.
13            VOIR DIRE EXAMINATION
14 BY MR. SKURKA:
15   Q.   Ms. Mattson, pretend you're a -- in the
16 legislature in Austin, --
17   A.   Uh-huh.
18   Q.   -- and it comes up for vote whether Texas
19 should have the death penalty or not have it anymore,
20 how would you vote?
21   A.   I would vote to continue it.
22   Q.   Why?
23   A.   Because there are certain circumstances where
24 that's all that's left to us to do to protect society.
25   Q.   Tell me how you feel about drugs in our

300

1  society, in general?
2    A.   I hate them.
3    Q.   Why?
4    A.   Because they destroy people on both sides of
5  the fence.
6    Q.   Do you think people who use illegal drugs, do
7  you think that's more of a medical problem or a
8  criminal law problem?
9    A.   (No response.)
10   Q.   Do you understand my question?
11   A.   Yes.  And I'm trying to think of what is a
12 reasonable and rational answer to that.  I'd say that
13 it really is a law problem.
14   Q.   Okay.  In other words, sometimes people say,
15 "Well, he's just an alcoholic.  He's just an
16 alcoholic.  But it's a disease."  And then some people
17 say, "Well, we can't have guys driving drunk on the
18 street.  We have to have D.W.I. laws."
19   A.   It's rebellion, anyway you slice it.  They
20 know it's against the law before they start.
21   Q.   Well, what if people say, "Well, I'm
22 addicted," like you say alcohol is a disease?  What
23 about, you know, like, a heroin addict, "I have to
24 have it, you know, or I'll die?"
25   A.   I'm sorry.  You shouldn't have started.

301

1         MR. SKURKA:  Okay.  Okay.  Thank you, Ms.
2  Mattson.
3         THE COURT:  Anything else?
4         MR. GARZA:  No, Your Honor.
5         THE COURT:  All right.  Why don't you
6  wait, Ms. Mattson, in the jury room, for just a little
7  bit.
8         VENIREPERSON NO. 15:  Okay.
9         (Venireperson exits courtroom.)
10        THE COURT:  All right.  Mr. Skurka?
11        MR. SKURKA:  Can I have just a second,
12 Judge?
13        THE COURT:  Yeah.
14        (Pause in proceedings.)
15        MR. SKURKA:  Judge, we'll accept the
16 juror.
17        THE COURT:  Mr. Garza?
18        MR. GARZA:  May we confer?
19        THE COURT:  Sure.
20        (Pause in proceedings.)
21        MR. GARZA:  Your Honor, we'll exercise
22 our third peremptory.
23        THE COURT:  All right.  All right.  Let's
24 bring Ms. Mattson in.
25        (Venireperson enters courtroom.)

302

1      THE COURT:  All right, Ms. Mattson, we
2  really appreciate your service.  You are not selected
3  to be on the jury, but we appreciate your time.
4      VENIREPERSON NO. 15:  All right.
5      THE COURT:  And thank you, very much.
6      VENIREPERSON NO. 15:  Thank you.
7      (Venireperson exits courtroom.)
8      THE COURT:  Okay.  Let's see here, do we
9  have the next person?  Do we have the next person,
10  Frank?  Mary Ann Gilbert.
11      (Venireperson enters courtroom.)
12      THE COURT:  All right.  Come forward.
13      VENIREPERSON NO. 17:  To where?
14      THE COURT:  Right over here to this
15  chair.
16      (Complies.)
17
18      VENIREPERSON NO. 17,
19      MARY ANN GILBERT,
20      VOIR DIRE EXAMINATION
21  BY THE COURT:
22      Q.   All right.  You are Mary Anne Gilbert; is
23  that right?
24      A.   Yes, sir.
25      Q.   Okay.  All right.  I don't want you to be

303

1  nervous, okay?
2      A.   I'm okay.
3      Q.   We're just going to ask you some questions.
4  Now, first of all, we're looking for jurors that can
5  keep an open mind, okay?
6      A.   Okay.
7      Q.   You think that's you?
8      A.   I really do.
9      Q.   Okay.  Because, obviously, we don't want
10  people that have made up their minds before they come
11  in here.  It's not fair.
12      A.   Uh-huh.
13      Q.   Okay.  And -- and some people because maybe
14  they've seen things in the media can't.  I don't --
15  doesn't look like you have seen anything about this
16  case; is that right?
17      A.   Pardon me?
18      Q.   You haven't seen anything about this case?
19      A.   No, sir, I haven't.
20      Q.   Okay.  All right.  All right, then moving on.
21  All right.  The other thing is we need to know that --
22  we need to have jurors that can follow the law.
23      A.   Okay.
24      Q.   Okay?  And it looks like you were a juror on
25  a D.W.I. case.

304

1      A.   Yes, sir.
2      Q.   All right.  So that was a criminal case.
3  And, therefore, you -- a lot of this stuff, you're
4  going to -- you're going to know, 'cause you've
5  already had experience.  And, in fact, let's see, that
6  was -- that was just recently.
7      A.   In January.
8      Q.   Okay.  And the Court set the punishment.
9  Okay.  How -- how long was the trial, by the way?
10      A.   One day.
11      Q.   One day.  Okay.  Now, you know from that
12  experience, of course, that the State has the burden
13  of proof in every criminal case.
14      A.   Yes, sir.
15      Q.   You've got no problem with that, I take it.
16      A.   No, sir.
17      Q.   All right.  And you also know from that
18  experience that burden never shifts to the Defense.
19  You agree with that.
20      A.   Yes, sir.
21      Q.   Okay.  And, as part of that, a defendant in
22  any criminal case, this one is not any different in
23  that sense, in any criminal case in the state of Texas
24  a defendant is innocent until the State can prove
25  otherwise, if they can prove otherwise.

305

1      A.   Yes, sir.
2      Q.   All right.  You agree with that.
3      A.   Yes, sir.
4      Q.   And you can follow that law.
5      A.   Yes, sir.
6      Q.   All right.  And as part of that, and as part
7  of the fact that the burden never shifts to the
8  Defense, Defense doesn't have to do anything.
9      A.   Okay.
10      Q.   Okay?  Mr. Skurka and Mr. Schimmel, it's
11  their -- they brought these charges, they have to
12  prove the allegations to you, the jury, all right?
13  And Defense, here, Mr. Garza and Mr. Jones, they don't
14  have to present evidence.
15      A.   Okay.
16      Q.   The burden's not on them.  And most
17  importantly, as part of that, Defendant doesn't have
18  to testify.
19      A.   Okay.
20      Q.   Okay?  It's his -- it's his Constitutional
21  right, all right, Constitutional right to testify.
22  And, of course, it makes sense because, if they don't
23  have to bring -- if they don't have to bring forth any
24  evidence, then he doesn't have to testify.  Now, I
25  don't know if he's going to testify or not.  But the

306

1　law says you can't hold it against him, and I need to
2　know if you could follow that law.
3　　　A.　Yes, sir.
4　　　Q.　Okay.  You know from your previous experience
5　that the first part of the trial is the guilt or
6　innocence phase.
7　　　A.　That was the only phase we dealt with.
8　　　Q.　Okay.  In -- in -- in criminal cases in the
9　state of Texas, the Defendant has the right -- in most
10　criminal cases, I should say -- like in that D.W.I.,
11　he has the right to have the jury assess punishment --
12　　　A.　Yes, sir.
13　　　Q.　-- or the Judge, okay?  And that's -- and
14　that's true in most cases; that is, you go to the
15　first phase of the trial and jury decides whether the
16　State's proven their case beyond a reasonable doubt,
17　or if they say, no, case is over with.  Defendant's
18　found not guilty and everybody goes home.  If,
19　however, he's found guilty of the offense, then we go
20　to the punishment phase.  And then whatever, depending
21　on the degree of the offense there is a certain
22　punishment range, two to ten years, maybe, two to 20
23　years, five to 99 years.  Depending on that, then the
24　jury decides what to assess, that is, they can assess
25　maybe prison, maybe there's probation, maybe they can

307

1　add a fine and prison, a fine and probation, okay,
2　that would be the jury's duty.
3　　　A.　Okay.
4　　　Q.　Capital murder's a little different.  In one
5　way, the Judge would never be doing the punishment in
6　a capital murder case where the State is seeking the
7　death penalty, okay?  That's the jury's job.  But you
8　don't say life or death, which is the two
9　possibilities if the Defendant's found guilty of
10　capital murder, you answer questions.  And here's one
11　of them.  Special Issue No. 1, you the jury would
12　answer this question, that is, "Is there a probability
13　the Defendant would commit criminal acts of violence
14　that would constitute a continuing threat to society?"
15　　　A.　Okay.
16　　　Q.　And you'd answer that question.  And when
17　you're done answer, yes or no.
18　　　A.　Okay.
19　　　Q.　When you're done answering that question,
20　then you go over here to Special Issue No. 2.  "After
21　taking into consideration all the evidence, including
22　the circumstances of the offense," that's the guilt or
23　innocence phase part, "the defendant's character and
24　the background and the personal moral culpability of
25　defendant, is there a sufficient mitigating

308

1　circumstance or circumstances to warrant a sentence of
2　life imprisonment, rather than death sentence be
3　imposed?"  That is, you can look into his background,
4　okay?
5　　　A.　Okay.
6　　　Q.　Other people think he's a great guy.  Do --
7　peop-- was he an eagle scout?  Was, you know, maybe he
8　did work for the community.  You just take into
9　everything into consideration --
10　　　A.　Okay.
11　　　Q.　-- and answer that question, okay?  Could you
12　do that?
13　　　A.　Yes, sir.
14　　　Q.　Okay.  Now, this case we've talked about
15　capital murder.  And what is capital murder?  Well, as
16　strange as it may seem, you know, a murder -- there's
17　plain murder, which I -- you know, I almost shrug
18　every time I say that, there's murder so often, but
19　you know, there is plain murder, okay?
20　　　A.　Uh-huh.
21　　　Q.　And plain murder is not a capital felony.
22　That is, if you just do a plain murder, you're not
23　eligible for the death penalty.  There is a laundry
24　list of situations where capital murder is a -- is a
25　possibility.  And what they've alleged in this

309

1　particular case, that is the State, they've alleged
2　that there was a murder committed by this Defendant,
3　that is, the intentional taking of someone else's
4　life.  And, in addition, they've alleged that in the
5　course of committing that murder -- that the Defendant
6　committed the murder in the course of committing or
7　attempting to commit a robbery.
8　　　A.　Okay.
9　　　Q.　Okay?  So they have to -- to -- for them to
10　win, that is the State, to prevail in this case, to
11　prove to you beyond a reasonable doubt that Defendant
12　is guilty of capital murder, you got to not only prove
13　the murder, but also the robbery part, the attempt or
14　the robbery.  In the course of.  You understand that.
15　　　A.　Yes, sir.
16　　　Q.　And that they have to prove all the elements
17　to you beyond a reasonable doubt.  Could you follow
18　that law?
19　　　A.　Yes.
20　　　Q.　All right.  And -- and you may think, "Well,
21　you know what, I think he's guilty of robbery or
22　attempted robbery, but I don't think he's guilty of
23　murder."  And in which case he's not guilty of capital
24　murder.  Now, he may be guilty of robbery or the vice
25　versa.  You may think, "Well, he did the murder, but I

310

1  don't think he did the robbery."  He may be guilty of
2  something else, but you can't convict him of capital
3  murder, if you don't think they've proven all the
4  elements.  You understand that.
5     A.   Okay.  Yes, sir.
6     Q.   All right.  And you could follow that.
7     A.   Yes, sir.
8           THE COURT:  Okay.  All right.  I'm going
9  to turn the floor over to Mr. Skurka and he gets to go
10  first, 'cause he's got the burden of proof.
11          MR. SKURKA:  Thank you, Judge.
12              VOIR DIRE EXAMINATION
13  BY MR. SKURKA:
14     Q.   Hello, Ms. Gilbert.  My name is Mark Skurka.
15  I'm the First Assistant District Attorney.  This is
16  Geordie Schimmel.  He's the assistant D.A. that's
17  assigned to this court, so he'll be helping me in this
18  case, presenting it, if you're sitting this jury.
19          The first thing I want to tell you is
20  there's no right or wrong answers to anything you say.
21  We just want to know where you're coming from and how
22  you feel.  But I don't want you to answer in such a
23  way that you think the Judge wants to hear it or I
24  want to hear it or the Defense wants to hear it.  Just
25  tell us in your own feelings how you feel and we'll be

311

1  fine, okay?
2     A.   Okay.
3     Q.   Tell me about that first day -- remember,
4  that first day you were in the big jury room
5  downstairs and everybody walked in there, like, 2- or
6  300 people, --
7     A.   Uh-huh.
8     Q.   -- and when the Judge came down and said,
9  "Folks, this is a criminal case.  And it's a capital
10  murder case.  And if you're seated on this jury, you
11  may have to make a decision whether this guy gets a
12  death penalty or not," tell me what your first
13  reaction was when you heard that?
14     A.   Oh, wow.  It was kind of a -- Yeah.  Wasn't
15  expecting that.
16     Q.   Okay.  I don't think anybody was.
17     A.   No.
18     Q.   And -- and I -- I try to watch people on the
19  jury.  And sometimes I see them cringe.  Some people I
20  see go, "Oh, no."  Some people I see put their head in
21  their hands.  And some people kind of like sit up a
22  little straighter and listen a little more closely,
23  'Cause they know it's not a routine case.
24     A.   Uh-huh.
25     Q.   If you ever get called on jury duty, it's not

312

1  a D.W.I., or it's not a --
2     A.   Uh-huh.
3     Q.   -- you know, somebody suing somebody for
4  something.  Once that initial reaction, like, "Oh,
5  wow," this is a big case, then what did you feel?
6     A.   I don't watch the news, so I had no idea
7  that, you know, any of this was going on.  And so, I
8  guess, I was sitting there wondering what is going on,
9  you know?  What is it that happened that I -- you
10  know, that I don't know about?  So I was paying
11  attention, because, like I said, I didn't know --
12     Q.   You hadn't --
13     A.   -- hadn't heard --
14     Q.   -- heard anything about the facts of this
15  case?
16     A.   No, I hadn't.
17     Q.   Let me direct my question a little
18  differently.  How did you feel about being called to
19  sit on this kind of jury?  I know you've been on a --
20  was it a D.W.I. case or what?
21     A.   Yes, sir.  It was.
22     Q.   I mean, that's different.  But when you found
23  out that you may have to make that decision, how did
24  you feel, personally, about being put in that position
25  that you may have to sit in these chairs over here and

313

1  make a decision whether somebody lives or dies?
2     A.   I didn't see it as a burden.  I didn't see it
3  as a, like, I had won the lottery, either, but kind of
4  somewhere in the middle, that if someone's going to
5  get called for jury duty, I think that, you know, I am
6  smart, I can pay attention, I can be fair and
7  impartial, and it's like, you know, I think I'd make
8  an okay juror, is what I thought in my head, you know,
9  if it came to that.
10     Q.   Because when we see people come in there, you
11  probably saw them sitting around you, some people
12  going, "Oh, no, I could never sit on this kind of
13  case," --
14     A.   Uh-huh.
15     Q.   -- and some people kept saying, "Oh, yeah,
16  oh, buddy, I want to sit on this kind of case."  And
17  then there's some people that just said, "Look, you
18  know, I'm called for jury duty.  It's my civic
19  responsibility.  You know, whether it's a civil case,
20  a criminal case, whatever, I got to listen to the
21  evidence and make a decision."
22     A.   That's where I was at.
23     Q.   That's where you're at.  Okay.  I'm trying to
24  find different ranges.
25     A.   Yeah, but you summed it up perfectly, right

314

1    there.
2        Q.    Well, I've been doing this for a long time.
3    And I see different people --
4        A.    Yeah.
5        Q.    -- and you see their reaction. And some
6    people -- and I want to tell you the truth, I mean,
7    nobody wants to be on a jury like this --
8        A.    Uh-huh.
9        Q.    -- and have to make that decision. But my
10   question to you, Ms. Gilbert, is, if you're seated on
11   this jury, can you make a decision and follow through
12   with it?
13       A.    Yes, sir.
14       Q.    I mean, I told you all the very first day. I
15   said, you know, the State of Texas is seeking the
16   death penalty on that young man, right there. It's
17   not something you read about in the paper or see on
18   the news or hear about at the coffee shop.
19       A.    Uh-huh.
20       Q.    That's him. I want you to look at him and
21   tell me. Can you, Mary Ann Gilbert, look at him and
22   decide if he -- if you think the evidence is such, and
23   at such a point that he should get the death penalty,
24   can you vote that way?
25       A.    Yes, I could.

315

1        Q.    And I'm going to ask you the other way. If
2    you think that it is such -- that the evidence is not
3    there or you don't think he should get the death
4    penalty, he should get a life sentence, can you do
5    that, too?
6        A.    Yes, I could.
7        Q.    Okay. I don't see any hesitation there. You
8    feel that it's your civic duty to do whatever is right
9    in the case.
10       A.    Yes, I do.
11       Q.    And whatever the evidence is. And I don't
12   mean to put you on the spot, but some people say that,
13   "Oh, yeah, Mark, I believe in the death penalty. It's
14   a good law. We have should have it in Texas. Gosh,
15   we should do it," and then I say, "Okay. You come
16   over in the jury and do it," and they go, "Wait, not
17   me, not me. Let somebody else do it."
18       A.    Yes.
19       Q.    Are you that way?
20       A.    No.
21       Q.    Okay. You seem like a pretty have strong
22   woman. You've raised a bunch of kids.
23       A.    Yes, I have.
24       Q.    And, I'm sorry, your had a tragedy. Your --
25   your husband died, apparently?

316

1        A.    Yes, he did.
2        Q.    And how long ago was that, if you don't mind
3    me asking?
4        A.    Eleven years ago this December.
5        Q.    Okay. I'm not -- I don't want to pry in
6    here, but it seems like you've dealt with a lot of --
7        A.    I have.
8        Q.    -- momentous, big things in your life.
9        A.    I have.
10       Q.    Sometimes we have people in here and they've
11   never had to make a decision on anything serious, you
12   know. And then we've had people, like, have been in
13   the military and had to make life or death decisions,
14   or something.
15       A.    Uh-huh.
16       Q.    And I just want to know if you're a person
17   that can make a decision?
18       A.    I can.
19       Q.    Good. Good.
20       A.    I have four teenagers. I make them every
21   day.
22       Q.    That's funny. Tell me how you feel about the
23   death penalty? Before you came in -- before you came
24   in and were called to jury duty, --
25       A.    Uh-huh.

317

1        Q.    -- what were your general feelings about the
2    death penalty, before you had to come in here and
3    verbalize them?
4        A.    You know, it's not something that comes up in
5    conversation every day. And so, you know, it's not
6    something that's in my day-to-day life, but then are
7    you asking me my thoughts as I filled out the
8    questionnaire?
9        Q.    Yeah. I was just kind of thinking about
10   before and after. 'Cause a lot of people say, "I've
11   never really had to think about it," and this forces
12   them to, --
13       A.    Uh-huh.
14       Q.    -- but then some people they've always felt,
15   you know, for it of against it or whatever. And
16   sometimes people change. I've had people say, "You
17   know, for 20 years I thought it was bad, it was
18   horrible, but as I get older, I can see there's a
19   place for it sometimes." And some people the
20   opposite, you know.
21       A.    Uh, --
22       Q.    I'm just kind of trying to figure out where
23   you come from.
24       A.    I'm not a "bleeding heart liberal," but I'm
25   not a "staunch right-winger", either. So I'm kind of

318

1  in the middle, that I think that it's something that
2  is necessary in society. And, you know, -- but, as
3  the Judge said, you know, you've got to listen to the
4  evidence. You've got to follow this. And -- and it's
5  my hope that, if it were my son or my brother, you
6  now, that there would be a jury there that would do
7  all of those things and take it into consideration.
8  And is it necessary? Is there another way? They
9  haven't shown us one, yet.
10     Q.   Some people say, "Why -- you know, we're so
11  civilized, now. We're in the twenty-first century.
12  It's barbaric. We shouldn't even have to have this."
13  What do you think?
14     A.   Show me a better way. They haven't come up
15  with anything, you know. And, I guess, until there's
16  an alternative and until they outlaw it in Texas then
17  this is what we've got.
18     Q.   Well, do you think that should be the law?
19     A.   Yes, I do.
20     Q.   Like, if you were in the legislature and you
21  had the choice to vote for to continue the death
22  penalty or do away with it, how would you do vote?
23     A.   To keep it.
24     Q.   Why?
25     A.   I don't know if an -- as an alternative, it's

319

1  really, you know, if they can get together a
2  fact-finding committee and find an alternative to the
3  death penalty that's more of a deterrent to criminals,
4  then...
5     Q.   Well, the alternative is sentence them to
6  life. Put them away and lock them up and -- and you
7  don't have to kill them.
8     A.   I don't know.
9     Q.   You don't think that's a viable alternative
10  all the time?
11     A.   Life in prison without the possibility of
12  parole? Does that even exist in Texas?
13     Q.   It does.
14     A.   It does? Wow, I don't know.
15     Q.   Well, I think the Judge will instruct you in
16  this case that life is pretty much equal to that --
17  remember that first day he said, "40 years without" --
18     A.   40 years.
19     Q.   -- "the possibility of parole?" But the
20  question is -- and I'm not trying to commit you to one
21  way or the other, but when you say there's no
22  alternative to the death sentence, there is an
23  alternative. It's a life sentence.
24     A.   Well, --
25     Q.   And that's why the Judge says it's not

320

1  automatic --
2     A.   Uh-huh.
3     Q.   -- you give death or life. Sometimes people
4  say, "Well, he gets the death penalty. We found him
5  guilty of capital murder, he automatically gets the
6  death penalty," --
7     A.   Yeah.
8     Q.   -- and I have to tell them, "No, no. There's
9  two choices. You just don't automatically do
10  anything, you got to decide." And that's what takes
11  me to the next part. There's two parts to the trial.
12     A.   Uh-huh.
13     Q.   The first part is did he do it or not, --
14     A.   Yes, sir.
15     Q.   -- is guilty or not? And if you find out he
16  didn't do it or you think he's not guilty, you don't
17  even go to the second part. If you go to the second
18  part, just because you found him guilty, you don't
19  automatically get the death penalty. There's two
20  choices, death or life.
21     A.   Okay.
22     Q.   And you don't vote, like, I check off death
23  or I check off life. You actually answer these
24  certain questions in such a way is that determines
25  whether he gets the death or a life sentence.

321

1     A.   Uh-huh.
2     Q.   And in that kind of case, you -- what you do
3  is, you look at things like other things, the
4  circumstances surrounding the crime itself or maybe
5  the person's background. Unless you have a crystal
6  ball and you know what's going to happen in the
7  future, you don't really know what's happen --
8     A.   Uh-huh.
9     Q.   -- what's going to happen. But sometimes
10  people say, "Well, you can determine what the future's
11  going to be by looking at the past." Sometimes you
12  can say, "Well, he acted this way, so he's always
13  going to act this way."
14     A.   Uh-huh.
15     Q.   Or you can say, "Well, maybe he'll change,
16  maybe he won't," but you have to look at all the
17  evidence. And that's what the Judge is going to tell
18  you to do. So in this case, if, for example, he's
19  found guilty, you think there's enough evidence to
20  prove it beyond a reasonable doubt, you go to the next
21  phase, you might get to hear additional evidence.
22  Because remember, the first part of the trial you'll
23  hear about, you know, what happened that day of the
24  crime and around that, but then you might hear
25  additional evidence, like his background. Was he a

322

1 good guy? Was he a bad guy was? You know, was he an
2 eagle scout or, you know, was he in prison five times
3 before, you know? And you want to know his
4 background, to help you answer these questions.
5       The first question is behind you on the
6 board. I'd ask you to look at it. It says, "Is there
7 a probability that Defendant would commit criminal
8 acts of violence that would constitute a continuing
9 threat to society?" In other words, we call it "the
10 future dangerousness question."
11     A.   Okay.
12     Q.   Do we think he's going to be a danger to
13 society in the future?
14     A.   Okay.
15     Q.   In other words, "Is there a probability," it
16 doesn't say certainty, because there's no way I could
17 prove it to you with certainty, but is it more likely
18 than not, "that this defendant would commit criminal
19 acts of violence," doesn't say he has to murder
20 somebody else, again, but just acts of violence, "that
21 would constitute a continuing threat to society?" In
22 other words, is there a chance he's going to hurt
23 somebody else. And "society," remember we're talking
24 about society. I should point out to you that some
25 people say, "Well, all you got to do is lock him up in

323

1 prison. He can't hurt anybody." Who else is at a
2 prison?
3     A.   There's other human beings in prison.
4     Q.   That's right. There's inmates. There's the
5 warden. There's, you know, staff. There's -- there's
6 all kinds of people there. So would you agree with
7 me, just 'cause you put him in prison doesn't keep him
8 away from society, he's still in there interacting
9 with other people?
10     A.   Okay.
11     Q.   Have you ever heard anything about, you know,
12 prison guards getting beat up by inmates or inmates
13 hurting other inmates? You've heard of that before,
14 haven't you?
15     A.   Occasionally.
16     Q.   So it's not like we put them on a desert
17 island where they're never going to see human people
18 -- human beings, again. And the question basically is
19 this guy going to be a danger in the future, yes or
20 no?
21       Then you come to this question and that's
22 called "the mitigating circumstance question."
23 Mitigating circums-- mitigating basically means
24 anything that would lessen or make less severe the
25 sentence, or anything that reduces the defendant's

324

1 moral blameworthiness. In other words, he did the
2 crime, but is there any reason we should give him a
3 lower sentence because of these mitigating
4 circumstances? Now, you have kids, right?
5     A.   Yes, sir.
6     Q.   Do you punish your kids the same way every
7 time?
8     A.   (No response.)
9     Q.   What does it depend on?
10     A.   I punish them the same way every time.
11     Q.   Well, I guess, what I'm talking about the
12 length of punishment.
13     A.   Length of punishment.
14     Q.   Let's say -- Let me give you an example.
15     A.   You mean how long do I ground them for?
16     Q.   Yeah.
17     A.   Okay.
18     Q.   Here's the point. Say, for example, you have
19 two kids. One kid has -- has been a pretty good kid.
20 And they violated your curfew one time, you say he's
21 -- they have to be home by 11 o'clock, --
22     A.   Uh-huh.
23     Q.   -- and they get home late, and they have get
24 home five minutes after 11.
25     A.   Uh-huh.

325

1     Q.   And it's the first time they've ever been
2 late and violated curfew. They're first time
3 offenders, so to speak. And then you have another
4 kid. And I'm not saying they're your kids, 'cause I'm
5 sure they're very good. But, say, you have another
6 kid that he's never home on the curfew. He's always
7 late. This is the 15th time he's busted curfew, --
8     A.   Uh-huh.
9     Q.   -- and the last time, you know, he's done it,
10 he came in at three o'clock -- this time he's done it,
11 he came at three o'clock in the morning. He didn't
12 just barely miss it, he came in way bad.
13     A.   Uh-huh.
14     Q.   And you have to decide how long you're going
15 to ground him. Are you going to ground both of those
16 the same amount of time?
17     A.   No. You're right.
18     Q.   No. You're probably going to give that first
19 person a mitigating circumstance, 'cause he's only a
20 little late and it was only the first time he did it,
21 you'll probably only ground him for one week, where
22 the other kid you may ground for a long -- longer
23 time, a month, because he's done it a lot of times
24 before and he did it really bad. It's kind of a trick
25 question, but that's kind of what that question deals

326

1  with. You don't treat people the same, because of the
2  extenuating or mitigating circumstances.
3        If you start at the beginning and say,
4  you're a juror -- a jury, and there's two people that
5  committed burglaries. And the first burglar was a guy
6  who'd been to prison five times before for burglary.
7  In this burglary, he went inside the house, tore it
8  up, stole everything he could lay his hands on and you
9  find out he'd been to prison five times before for
10  burglary. The second burglary case you're sitting on
11  jury, it's his first time offense. He's never been
12  arrested for anything before, much less burglary. And
13  you find out he went into the house and all he took
14  was bread and food to feed his kids who were hungry,
15  didn't steal anything them -- like money or jewelry or
16  T.V.s, or anything like that, he did it for another
17  reason.
18        In the first case that would be
19  aggravating circumstances, been to prison before, tore
20  up everything, stole a bunch of stuff. In the second
21  case it would probably be mitigating circumstances.
22  They both did the burglaries, but wouldn't you treat
23  -- punish one harder than the other one? And that's
24  what this question's for.
25    A.    Okay.

327

1    Q.    For example, you think he's guilty of capital
2  murder. You found him guilty. You think, yes,
3  there's a continu-- he's a continuing threat to
4  society, but the Judge gives you this question and
5  says, "Wait, before he gets the death penalty, take
6  into consideration all of the evidence, including the
7  circumstances of the offense, his character and
8  background, his personal, moral culpability, and
9  everything else in his past and around that incident,
10  is there enough, "is there a sufficient mitigating
11  circumstance or circumstances to warrant that a
12  sentence of life, rather than death be imposed?"
13        In other words, he did the crime. He's a
14  continuing threat. Is there anything in his
15  background that would make me give him a lower
16  sentence? That's that balancing test, you know?
17    A.    Uh-huh.
18    Q.    Some people may have been to prison 20 times
19  before, some people may have never been prison.
20    A.    Uh-huh.
21    Q.    Some people may have a bad background, some
22  people may have a good background. It's like a checks
23  and balances. You want to -- before you just give
24  them the death penalty, you want to consider
25  everything, say, is there any reason, is it enough of

328

1  a reason to give them life, instead of death? Now,
2  does that make sense? It makes you reevaluate and
3  think and don't rush into things.
4    A.    Okay.
5    Q.    But what is a mitigating circumstance? I
6  don't know. I can't tell you. It's up to the jury.
7  Some people may say, "Well, he's very young, you know,
8  and he's young and so we should give him break," and
9  other people may say, "Look he's old enough. He's not
10  under 18. He's an adult, so he should know the
11  difference between right and wrong."
12    A.    Uh-huh.
13    Q.    Some people may say, "Well, he was a
14  decorated war veteran. He was a hero 20 years ago."
15  And some people say, "That's true, but, you know, he's
16  still got to pay for what he did and what -- his
17  heinousness of the crime outweighs that."
18    A.    Uh-huh.
19    Q.    In other words, the Judge ain't going to tell
20  you, I can't tell you what is a mitigating
21  circumstance. It's up to the jury to decide if that
22  is a mitigating circumstance and is it enough to lower
23  the sentence? There's nothing in here that says you
24  automatically lower the sentence, 'cause you hear some
25  kind of mitigating circumstance. It's up to the jury.

329

1  You do that balancing test. Okay?
2    A.    Okay.
3    Q.    One other part I should tell you about is
4  what's called "voluntary intoxication." If you get
5  voluntarily intoxicated, if you get high and drunk or
6  drugged, you can't just go up and say, "I'm not
7  guilty." Because voluntary intoxication is not a
8  defense or an excuse for crime. Do you believe that?
9    A.    Yes.
10    Q.    Yeah, you can't just go up there and say,
11  "I'm going to rob this bank, but I'm not guilty,
12  'Cause I was drunk when I did it." But the law does
13  say that is a possible mitigating circumstance.
14  "Yeah, he did the bad -- he did the bad crime, he
15  robbed the bank, but he was drunk when he did it, so
16  we may give him a break." "Other people say, "No,
17  we're not going to give him a break just 'cause he was
18  drunk," that's just something to consider.
19        And that's what the Judge will tell you
20  and the -- and the instructions will tell you. You
21  have to consider, keep an open mind about the
22  mitigating circumstances, but whether they're enough
23  to lower the sentence is up to the folks on the jury.
24    A.    Okay.
25    Q.    Okay? Does that make sense?

330

1    A.    It does.

2    Q.    Did I under -- did I explain that okay?

3    A.    You did.  Thank you.

4    Q.    Okay.  I don't think I had any other

5    questions on the questionnaire about -- for you.

6    Bottom line is, do you understand the indictment is

7    not proof that he's guilty.  It just means what he's

8    -- that he's been charged.  You understand that he has

9    a Fifth Amendment right.  He can testify if he wants

10   to, but if he doesn't testify he doesn't have to and

11   you can't hold that against him.  You agree with that,

12   right?

13   A.    Yes, sir.

14   Q.    The State has to prove the case beyond a

15   reasonable doubt.  Doesn't have to prove it beyond

16   all doubt or any doubt or shadow of a doubt.  It just

17   has to prove the evidence beyond a reasonable doubt.

18   Do you have any problems with that?  Do you understand

19   that?

20   A.    I understand that.

21   Q.    Okay.  So the bottom line, you think you'll

22   be fair in this case?

23   A.    Yes, I do.

24   Q.    Listen to all the evidence before you make a

25   decision?

331

1    A.    Yes.

2    Q.    Listen to all the evidence before you make a

3    decision?

4    A.    Yes, sir.

5    Q.    And if you have to make that awesome

6    decision, do you think you can actually do it and

7    carry it out?

8    A.    Yes, I do.

9    Q.    Okay.  Any questions of me, Ms. Gilbert?

10   A.    No, none.

11         MR. SKURKA:  Thank you so much for your

12   attention.

13         The defense lawyers may have some

14   questions, now

15         MR. JONES:  Not may, will.

16         VENIREPERSON NO. 17:  Okay.

17              VOIR DIRE EXAMINATION

18   BY MR. JONES:

19   Q.    Take a deep breath, 'cause I'm going to ask

20   you some more questions.

21   A.    Okay.

22   Q.    The purpose of my questions are to determine

23   whether you understand some of the basic rules --

24   A.    Okay.

25   Q.    -- that apply to criminal cases.  Most people

332

1    never have to apply these rules, because they're never

2    jurors, so they have no connect-- you know, they don't

3    find their way to the courthouse.

4    A.    Uh-huh.

5    Q.    I was in the military a long time ago.  And

6    during one of my training sessions, I noticed a jet

7    plane parked on the -- by the hanger, which had only

8    one seat in it.  A single pilot jet plane.  And I

9    asked my instructor, "How do you learn how to fly a

10   plane like that, if there's no second seat, where you

11   can have an instructor take you up and show you how to

12   do it?"  He said, "Well, it's real easy."  He said,

13   "We give you a book and you read it.  And you'll get

14   in it and you go fly it and you have to do it right

15   the first time."

16   A.    Okay.

17   Q.    Okay?  So that's kind of like being on a

18   capital murder jury.  Chances are, if you're on this

19   jury, you will never do it, again, in your entire

20   lifetime.  Kind of like serving on a grand jury.  You

21   just may get to do it one time.  So we want you do it

22   right the first time.  Okay?

23         The right to trial by jury is guaranteed

24   by the Constitution.  In a felony case you have -- in

25   Texas, you have a right to a jury of 12 persons.  And

333

1    not only do you have a right to a trial by jury of 12

2    persons, you have a right that those jurors be

3    impartial.

4    A.    Yes, sir.

5    Q.    What does that word mean to you?

6    A.    Impartial means that I haven't made up my

7    mind one way or another.

8    Q.    That's right.  That's definitely a part of

9    the definition is you come to the task with no

10   prejudgments.

11   A.    Exactly.

12   Q.    That's why Mr. -- the Judge and Mr. Skurka

13   asked you about your exposure to the media in this

14   case.

15   A.    Uh-huh.

16   Q.    And -- because sometimes that can be a source

17   of prejudgment.  It can come from other sources, also.

18   But you told us you have no prejudgments at this time.

19   A.    No, I do not.

20   Q.    You don't know what the facts are.

21   A.    No, other what they presented to us that day

22   in the courtroom --

23   Q.    Right.

24   A.    -- at jury duty.

25   Q.    And even those -- even those are not facts.

334

1   'Cause the only facts you can consider are those that
2   are proven in the courtroom.
3       A.   Yes, sir.
4       Q.   You -- you'll have to take an oath that
5   you'll do that.
6       A.   Yes, sir.
7       Q.   Now, also, impartiality suggests that you
8   have no leaning towards one side or the other, and
9   I -- I could not detect in your -- in your answers to
10  Mr. Skurka that you had any leanings towards one side
11  or other.
12      A.   No, sir, I do not.
13      Q.   A leaning is a bias.  And it's sometimes --
14  you inescapably have a bias.  Like, for example, if
15  you were related to the Defendant, you might have a
16  family bias.
17      A.   Uh-huh.
18      Q.   Or you were related to the injured parties,
19  you might have a bias -- association bias.  If I'm
20  picking a jury for a D.W.I., I'm probably not going to
21  seek a highway patrolman.
22      A.   True.
23      Q.   He's got an occupational bias, or a fireman
24  on an arson case, --
25      A.   Uh-huh.

335

1       Q.   -- or an emergency room doctor in an
2   aggravated assault case with serious bodily injury,
3   okay?  So we want the jury to be objective and
4   open-minded when they come to the task.  And you think
5   you can do that in this case.
6       A.   Yes, sir, I do.
7       Q.   Okay.  Now, the standard of proof in a
8   criminal case is beyond a reasonable doubt.  That's
9   the phrase that's used to describe the degree of
10  certainty --
11      A.   Uh-huh.
12      Q.   -- that you must have before you can declare
13  a fact to be true, okay?  I call it "the legal truth."
14  The facts that the jury finds to be true are the facts
15  which the Judge will act upon.  You know, if you find
16  the Defendant guilty certain things will happen.  If
17  you find the Defendant not guilty certain things will
18  happen, okay?
19           The -- Now, why do you suppose that our
20  legislature, the people that set up the system, chose
21  beyond a reasonable doubt to be the standard of proof
22  in criminal cases?
23      A.   I think I heard the Judge say that it was a
24  higher standard, a higher burden.
25      Q.   Why did they pick the higher standard, as

336

1   opposed to, say, preponderance of the evidence or
2   probable cause or mere suspicion or other standards of
3   proof?
4       A.   Because that way if the jury is sitting there
5   and somebody says, "You know, I have my doubts.
6   There's something that they didn't," then one person,
7   you know, he has that, you know, he says, "No, I
8   didn't -- I don't believe everything that the
9   prosecution presented," you know, so that you -- I
10  guess, it's a safeguard.
11      Q.   Okay.  What -- what's -- if a person is found
12  guilty of a crime, what -- what can happen?
13      A.   In this case or in general?
14      Q.   No, just in generally in a criminal case,
15  what --
16      A.   If a person's found guilty --
17      Q.   What happens after a finding of guilty?
18      A.   Sentencing.  And, I guess, sometimes the
19  sentencing is up to the jury and sometimes it's up to
20  the Judge.
21      Q.   All right.  So what -- so what can happen in
22  the sentence?  You can go to jail.
23      A.   Go to jail.  You can get --
24      Q.   You can get a fine.
25      A.   -- fined, probation, a jail term or in this

337

1   case, --
2       Q.   The death penalty.
3       A.   -- the death penalty.
4       Q.   Okay.  So if you go to jail, what do you
5   lose?
6       A.   You lose your freedom, you lose your right to
7   vote.
8       Q.   You lose your liberty.
9       A.   All those.
10      Q.   You get a fine, you lose your property.  If
11  you get the death penalty, you lose your life.
12      A.   Yes, sir.
13      Q.   And in our American Civilization, what do we
14  value the most --
15      A.   Life.
16      Q.   -- of all else?
17      A.   Life.
18      Q.   Life.  What else?
19      A.   Liberty.
20      Q.   And pursuit of happiness.  So, our -- the
21  people that set up the system said, if the government
22  is going to take those things away from us, from any
23  citizen, we want to make sure there's a good reason to
24  do so and there's substantial evidence that there's a
25  need to do something, okay?  It's not something we

338

1   just do, you know off the cuff.  Do you understand why
2   they put beyond a reasonable doubt, 'cause it --
3       A.   Yes, sir.
4       Q.   -- it relates to our liberty, okay?  Now, as
5   far as the role of the jury is concerned, every
6   society has to have a system of laws.  They have to
7   set up a code of conduct.  You know, governments have
8   to define what's prohibited conduct and they have to
9   set up a procedure for enforcing that code.  Of
10  course, we have our system here in this country.  And
11  then if a person, you know, violates the code, they're
12  -- some consequences follow.  In our -- in our
13  society, in our country, in our American Civilization,
14  from whence does the power of government come, where
15  does it come from?
16      A.   People.
17      Q.   That's right.  We just did it a few days ago
18  --
19      A.   Yes, we did.
20      Q.   -- right?  Elected a new set of legislators
21  and a new president.  The jury, who does the jury
22  represent?
23      A.   The jury represents the people.
24      Q.   The people.  Okay.  And so the way we've got
25  the sys-- the way the system is set up, before the

339

1   government can declare someone -- or before a person
2   can be found and declared guilty of a crime and before
3   the punishment can be assessed, we have to get the
4   permission of the -- from the source of the power.  In
5   other words, the jury has to sign off on it.
6       A.   Uh-huh.
7       Q.   Mr. Skurka comes in here and says, "Ladies
8   and gentlemen of the jury, I have evidence here that a
9   man has committed a serious crime.  And if you find
10  him guilty, I'm going to ask to you vote for a
11  particular sanction," and you say, "That's very
12  interesting.  Proceed."  Okay?  And if he does what he
13  says he's going to do, well then, you can give him
14  permission, give the Judge permission to carry out
15  what the law says will happen.
16      A.   Uh-huh.
17      Q.   You don't give him the permission, it can't
18  happen.
19      A.   Okay.
20      Q.   If you don't give him a verdict of guilty or
21  if you cannot make a decision then nothing's going to
22  happen.  At least, not -- not immediately, okay?
23      A.   Okay.
24      Q.   So do you agree with that system?  Do you
25  like that system?

340

1       A.   Yes, I do.
2       Q.   I think most people do.  A lot of people
3   don't think about it on a day-to-day basis, but the
4   jury is one of our major checks on the abuse of
5   government power.  In other words, we know there has
6   to be power and we know it has to be used, but we want
7   to make sure that it is not abused, okay, thus the
8   high standards.  And, in this case, where a man's life
9   is at stake, you can understand why.
10      A.   Yes, sir.
11      Q.   Okay.  Have you read in the last few weeks,
12  in the last few months, there have been cases -- not
13  cases, stories in the newspapers and magazines, I
14  think the Texas Monthly had the most recent one, about
15  people who have been in prison, who have been found to
16  be factually innocent because of D.N.A. analysis,
17  D.N.A. -- in other words, going back and applying the
18  D.N.A. technologist to their facts?  Have you read
19  about those --
20      A.   Actually, --
21      Q.   -- cases?
22      A.   -- I picked up that copy of Texas Monthly,
23  and I kind of glanced through it, but I did not read
24  the whole article.
25      Q.   The -- I think -- I haven't read it, either,

341

1   but I think it was giving stories of these particular
2   people and what they were doing when they were
3   released.
4       A.   Yes, sir.
5       Q.   When you read a story like, that a person's
6   been in jail for ten years, 20 years and then it turns
7   out he didn't do it, --
8       A.   Uh-huh.
9       Q.   -- how does it make you feel?
10      A.   I was like, wow, that sucks, you know, that
11  they've spent so much time in jail.  But, you know,
12  given the -- you know, either the technology didn't
13  exist at that time or they didn't have proper
14  representation to pursue test-- you know, the D.N.A.
15  testing.  But, you know, it's like, oh, wow, that's
16  cool, you know, that they were able to get exonerated.
17      Q.   Does it make you feel -- it makes you feel
18  bad, doesn't it, to read a story like that happened to
19  somebody?  You feel -- kind of feel bad for the guy?
20      A.   Kind of sort of.  You know, I'm not going to
21  cry myself to sleep over it, but, you know...
22      Q.   Now, in our American Legal System, we have
23  elaborate rules of appellate procedure.
24      A.   Yes, sir.
25      Q.   An appellate pro-- an appeal process.

342

1    A.    Uh-huh.

2    Q.    In both civil and criminal cases.  And the

3  purpose of that system is to correct errors, --

4    A.    Yes, sir.

5    Q.    -- you know, errors happen.  And they're

6  different tiers.  You can go all the way to the

7  Supreme Court of the United States if an error has

8  been committed.  The idea is that if it's bad enough

9  we're going to make them go back and do it over,

10  again, --

11    A.    Yes, sir.

12    Q.    -- or change the result.

13    A.    Yes, sir.

14    Q.    Now, these guys -- these stories that we

15  were -- we were discussing in the -- in the -- from

16  the Texas Monthly, these people were -- were alive,

17  right?

18    A.    Yes, sir.

19    Q.    And so the -- the appellate process got into

20  gear for them because of this new evidence and they

21  were exonerated and released.

22    A.    Yes, sir.

23    Q.    Okay.  Now, the problem with the death

24  penalty is that at some point you reach a point where

25  you can't go back and correct the mistake if it comes

343

1  later.

2    A.    That's true.

3    Q.    Okay?  So the reason I go into this is to

4  underscore the -- the importance of -- of applying

5  these -- these rules to beyond a reasonable doubt.

6    A.    Yes, sir.

7    Q.    Especially in a case like this.

8    A.    Yes, sir.

9    Q.    You don't want to make -- you jump into that

10  airplane that only has one seat, you want to fly it

11  right the first time.

12    A.    Exactly.

13    Q.    'Cause you're not going to get a chance to do

14  it, again.  Let's see, do you believe that society

15  benefits from the death penalty?  It's a form of

16  punishment, which is authorized by the legislature,

17  okay?  And so, obviously, our legislature thought it

18  was a good idea.  Do you believe that society benefits

19  from having that form of punishment available in some

20  cases?

21    A.    I think it makes us feel better as a society,

22  knowing that that is an alternate punishment.

23    Q.    Okay.

24    A.    That, what's the saying, "an eye for an eye"?

25    Q.    Okay.

344

1    A.    You know, I think that -- you know, if -- I

2  think that society would be discouraged as a whole if

3  they didn't have it.  You know, I don't know if it's

4  necessarily a deterrent like we want to believe that

5  it is, --

6    Q.    Uh-huh.

7    A.    -- but...

8    Q.    So what -- so in your mind, in your person--

9  in your mind, what is the -- the main benefit from

10  having it?  It makes us feel good or does it serve a

11  purpose?

12    A.    Well, obviously, it doesn't serve its

13  ultimate purpose, because these types of crimes still

14  occur.

15    Q.    Okay.

16    A.    (Pause) I don't know.

17    Q.    This is probably not a -- people normally

18  don't get asked this question every day, so you --

19    A.    You know, normally, when you're asked these

20  kind of questions you're sitting with your friends,

21  drinking a couple of beers or something, you know, and

22  -- and you're not -- you know, up here on a -- with a

23  microphone in front of you.

24    Q.    It's not like I called you up a week ago and

25  said, "I'm going to ask you this question.  I want you

345

1  to do some reading on it, --

2    A.    Yeah.

3    Q.    -- "and then, you know, collected your

4  thoughts, because I'm going to pop the question on

5  you."

6    A.    Can you ask me, again?

7    Q.    We have -- the death penalty is a form of

8  punishment, which is authorized by the legislature.

9  Do you think that society benefits by having that form

10  of punishment available in some cases, obviously, the

11  more serious cases, yes or no?

12    A.    Yes.

13    Q.    Okay.  And can you articulate the benefit or

14  benefits?

15    A.    I think I just did.

16    Q.    Okay.  Now, let's assume -- and we know we

17  are not perfect, human beings are not perfect.  We

18  make mistakes.  You know, none of us are, okay?  And

19  -- and this -- from -- do you agree that from time to

20  time -- and this is a fact -- that people who are

21  innocent get convicted of crimes?

22    A.    Do I agree with that?

23    Q.    Yes.

24    A.    Yes.

25    Q.    Okay.  I mean, we've had some dramatic

346

1    instances of that in our legal history.
2        A.    Yes, we have.
3        Q.    And -- and if you analyze these cases, you
4    can go back and see how it happened.
5        A.    Uh-huh.
6        Q.    There's all kinds of factors.  And we, as
7    practitioners in the system, try to avoid those
8    mistakes.
9        A.    Of course.
10       Q.    The prosecutor does it, the Judge does it,
11   every -- the police do it.  We don't like to make
12   mistakes, okay?  But they do happen.
13       A.    Yes.
14       Q.    Inevitably happen.  Sometimes they happen,
15   because people are -- don't follow the rules.
16       A.    Uh-huh.
17       Q.    Now, you've told me that you think society
18   benefits from having the death penalty as a form of
19   punishment available for certain serious cases.  Do
20   you think that benefit is -- is worth from time to
21   time executing an innocent person?
22       A.    (No response.)
23       Q.    Let's says one in 300 cases.
24       A.    I don't like those odds.
25       Q.    That's hard to answer, isn't it?

347

1        A.    It is very hard to answer.  I -- I like -- I
2    would like to believe that the Justice System works to
3    the benefit of the defendant, you know, through the
4    appellate process, you know, through those safeguards
5    and measures, that if someone is ultimately executed,
6    that everything that could possibly have been done in
7    his defense to prevent it or to find him innocent,
8    would have been done.  But if -- if, ultimately, that
9    it came down that there were no more appeals and that
10   the jury decided that, then that was the way that it
11   should have been.
12       Q.    You didn't answer my question, but when I
13   asked the question you paused.
14       A.    I always pause.
15       Q.    No.  When I asked that question to other
16   people almost every time they go, they pause.  Now,
17   but, under-- since we have -- we had it, we've got it.
18   And in order to be a juror in this case, you've got to
19   tell us that you can apply that punishment.  But the
20   fact it underscores the importance how serious your
21   job will be when a person's life is at stake.
22       A.    Yes, sir.
23       Q.    In other words, when you make your decision,
24   you don't want to be thinking, you know, five years
25   from now, after the Defendant's been executed, that

348

1    they pop up and say, "Oh, by the way, he happened to
2    be actually innocent," --
3        A.    Uh-huh.
4        Q.    -- because of this, this or this.  You want
5    to -- You see?  You see the certainty you need?
6        A.    Yes, sir.  And I believe in it.  I mean --
7    and do I believe that I could make that decision, yes,
8    I could.  Would I have any guilt later on down the
9    line?  I would hope that all the evidence would be
10   given to us, right then, that we would make the best
11   decision that we could with what we knew at the time.
12       Q.    Now, as far as talking about verdicts --
13   verdict is a decision -- in a case like this before --
14   a verdict requires a unanimous vote.
15       A.    Yes, sir.
16       Q.    A unanimous vote is the individual vote of
17   all 12 jurors.
18       A.    Yes, sir.
19       Q.    It's not a democratic process.  You
20   understand that.
21       A.    Yes, sir.
22       Q.    In other words, when you're voting for guilt
23   or innocence, you don't take a vote and the majority,
24   you know, wins.  It's -- you have to have -- each one
25   has to vote their own personal conscience.

349

1        A.    Yes, sir.
2        Q.    And if you get 12 people agreeing, then you
3    have a verdict that the Court can act upon.
4        A.    Yes, sir.
5        Q.    Now, let's talk about the -- the death
6    penalty.  A person can't get the death penalty in
7    Texas, unless they're first found guilty of capital
8    murder.  There's only two -- there's only two possible
9    punishments.  Actually, which punishments will be
10   imposed is already predetermined by the law, okay?
11   And what the jury does, it decides what conditions
12   require -- the law sets out certain conditions that
13   have to be met before a person gets the death penalty
14   or before they get life in prison.
15       A.    Yes, sir.
16       Q.    These two questions are the conditions.
17       A.    Yes, sir.
18       Q.    These two conditions have to exist.  And
19   you'll hear evidence related to those questions at a
20   second stage of the trial.
21       A.    Yes, sir.
22       Q.    There will be different rules of evidence,
23   and -- and then you'll be asked to -- and you'll know
24   the effect of your answers.
25       A.    Yes, sir.

350

1    Q.   In other words, if you find that the
2    Defendant will be a continuing threat to society and
3    you answer that, yes, and you answer the second
4    question, no, then what's going to happen?
5    A.   The death penalty.
6    Q.   That's right.  If you answer Special Issue
7    No. 2, yes, what's going to happen?
8    A.   Life in prison.
9    Q.   That's right.  I've -- I've always thought
10   that this -- if I had been asked to draft that
11   question, I would not have written it that way.  Can
12   you imagine a situation where you -- a jury would find
13   that the Defendant will commit criminal acts of
14   violence in the future that would not constitute a
15   continuing threat to society?  I mean, can you -- I
16   can't think -- I think criminal acts of violence are
17   always a threat to society, right?  But, anyway, you
18   know what they're asking.
19   A.   Yes.
20   Q.   Is a person likely to commit criminal acts of
21   violence in the future, period.
22   A.   Yes, sir.
23   Q.   And you assume they will be a threat to
24   society.
25   A.   (Nods head.)

351

1    Q.   And you get -- you can -- in order to answer
2    that question, you can consider all the evidence
3    that's before you.
4    A.   Uh-huh.
5    Q.   On Special Issue No. 2, Mr. Skurka went into
6    some of the things that you had can consider, the
7    Defendant's background, the facts of the case itself,
8    any mitigating circumstances.
9    A.   Uh-huh.
10   Q.   What does the word "to mitigate" -- or the
11   verb, "to mitigate" mean?
12   A.   To lessen.
13   Q.   Yes.  You're right.
14   A.   I'm an English major.
15   Q.   No, I know it.  I ask that question of so
16   many people and they kind of look at you blankly.  You
17   answered it quicker than anybody I've had in recent
18   years.
19   A.   Sorry.
20   Q.   It means to lessen.  That's right.  So it's
21   any evidence which is before you,  admits into
22   evidence, that you can consider that would cause to
23   you want to give a lesser punishment.  So in this case
24   there's only one lesser punishment.  What is it?
25   Life.

352

1    A.   Life in prison.
2    Q.   So and, basically, what's mitigating to you
3    is whatever you say it is.  And what's mitigating to
4    you may not be mitigating to a fellow juror.
5    A.   Exactly.
6    Q.   Like, if you find that the Defendant's age is
7    a mitigating factor, then you're free to act upon
8    that, give that evidence effect.  Okay?  And, in fact,
9    Special Issue 2 is how you give effect to mitigating
10   evidence, --
11   A.   Okay.
12   Q.   -- by answering that question, yes or no,
13   okay?  Okay.  I believe that's -- Do you have anything
14   else?
15            MR. GARZA:  (Shakes head.)
16            THE COURT:  Is that it?
17            MR. JONES:  Do you have any questions?
18            VENIREPERSON NO. 17:  No, sir.
19            MR. JONES:  Okay.  No questions.  I'm
20   finished.
21            MR. SKURKA:  I have no other questions,
22   Judge.
23            Thank you, ma'am.
24            THE COURT:  Okay.  Ms. Gilbert, can you
25   please wait in the jury room for a minute?

353

1            VENIREPERSON NO. 17:  Sure.
2            (Venireperson exits courtroom.)
3            THE COURT:  All right.  Mr. Skurka?
4            MR. SKURKA:  State will accept this
5    juror, Your Honor.
6            THE COURT:  Mr. Jones?
7            MR. JONES:  We'll accept this juror,
8    Juror No. 1.
9            THE COURT:  All right.  That's Juror No.
10   1.  Bring her back in.
11            (Venireperson enters courtroom.)
12            THE COURT:  All right.  Ms. Gilbert, you
13   have been selected to be on this jury, okay?
14            VENIREPERSON NO. 17:  Okay.
15            THE COURT:  So we believe that the trial
16   will begin December 1.
17            VENIREPERSON NO. 17:  Yes, sir.
18            THE COURT:  I'm not sure how long it's
19   going to take.  I can pretty much promise you it's
20   going to be that week and maybe the next week.  It's a
21   little unclear, okay?  But I don't want to you talk
22   about this case with anybody.  I don't want you to --
23   I really don't want to you read the -- and watch the
24   local -- read the local part of the paper or watch the
25   local news while this is going on.

354

```
 1        VENIREPERSON NO. 17:  Okay.  I don't
 2  typically, anyway, so...
 3        THE COURT:  Okay.  Well, that makes that
 4  a little easier.  But anyway.  So, I guess, we'll --
 5        VENIREPERSON NO. 17:  Will --
 6        THE COURT:  We'll be in touch.
 7        VENIREPERSON NO. 17:  You will.  Okay.
 8  You'll let me know.
 9        THE COURT:  We'll let you know if
10  anything changes, okay?
11        VENIREPERSON NO. 17:  Okay.  Thank you.
12        THE COURT:  Thank you so much.
13        (Venireperson exits courtroom.)
14        THE COURT:  All right.  Let's take a
15  little break.
16        (Short recess.)
17        THE COURT:  All right.  Go get Mr.
18  Escobar.
19        (Venireperson enters courtroom.)
20        THE COURT:  All right.  Mr. Escobar, come
21  on up.
22        VENIREPERSON NO. 18:  Here?
23        THE COURT:  Yes.  We're sorry for delay.
24        VENIREPERSON NO. 18:  That's okay.
25        THE COURT:  But, you know, it's a capital
```

355

```
 1  murder and, of course, it's serious business, so...
 2
 3              VENIREPERSON NO. 18,
 4              ANGEL R. ESCOBAR,
 5           VOIR DIRE EXAMINATION
 6  BY THE COURT:
 7     Q.   All right.  Now, we're going to talk to you
 8  about some things.  You have been -- been on a civil
 9  jury before, some time ago.
10     A.   Yes, sir.
11     Q.   Okay.  You know, really what we're looking
12  for here is two things:  One, we're looking for people
13  that can keep an open mind.  We want -- we want to
14  make sure that no one has some preconceived notions.
15  And some people do.  And that's okay, but we don't
16  want that for people on the jury, okay?  We want
17  people that can keep an open mind and follow the law.
18        Okay.  What's the law.  Let's talk a
19  little bit -- No.  Let me go back.  Can you keep an
20  open mind?
21     A.   Yes.
22     Q.   Okay.  Next, we need to know if you can
23  follow the law.  And we'll talk about that, okay?
24  First of all, in every criminal case, as you -- I'm
25  sure you know, State's got the burden of proof, okay?
```

356

```
 1  They brought the charges.  You know, you bring the
 2  charges, this's great, but you got to prove them, all
 3  right?
 4     A.   Uh-huh.
 5     Q.   And -- and you got no problem with that.
 6     A.   No.
 7     Q.   Okay.  And, of course, as part of that
 8  Defendant is innocent until they prove it, okay?  And
 9  until they prove it, he's presumed to be innocent, and
10  that's what the law says.  You're okay with that.
11     A.   I agree with that.
12     Q.   You can follow the law and you agree with
13  that.  Okay.  And along those same lines, since the
14  burden is over here on the State and it never shifts
15  over here to this table, the defense side, they don't
16  have to do anything.  They don't have to present any
17  evidence.  And -- and, you know, important in that is
18  Defendant doesn't have to testify.  You got a Fifth
19  Amendment right not to testify, okay?  And that makes
20  sense, really, because if they've got the burden of
21  proof, then they don't -- they don't need to do
22  anything, all right?  And it all kind of goes
23  together.  But do you -- do you have a problem with
24  that?
25     A.   No, sir.
```

357

```
 1     Q.   All right.  And some people say, "Well, you
 2  know, what, I hold it against the Defendant.  I -- I
 3  know it's his right, his Constitutional right, and all
 4  that, but I'm selected on a jury, I hold -- I'll be
 5  honest with you, I'll hold it against the Defendant."
 6  But you -- you wouldn't do that?
 7     A.   No.
 8     Q.   Okay.  All right.  Now, this case is capital
 9  murder, like we talked about, okay?  You know, the
10  death penalty is a possibility.  And -- and really and
11  truly what is capital murder, well, it's -- I like to
12  call it murder, plus, okay?  It's -- it's murder and
13  then there's a laundry list.  But, in this particular
14  case, they're alleging, that is the State, that the
15  Defendant committed murder, that is the intentional
16  taking of the life of another, on a certain date in
17  Nueces County, Texas, and all that, while in the
18  course of committing or attempting to commit robbery.
19  And that's the plus part.  So you got murder, while
20  attempting to or committing robbery, at the same time,
21  "In the course of," okay?
22     A.   Okay.
23     Q.   But the State has to prove all of that to get
24  a conviction for capital murder.  In other words, you
25  may think, "Well, you know what," -- you may go back
```

358

1   and say, "You know what, I heard the evidence and I
2   think they've proven the murder. But I've got a
3   reasonable doubt as to whether they've proven that he
4   was committing a robbery or attempting to commit a
5   robbery." You realize, you can't find him guilty of
6   capital murder. You understand that?
7       A.   Yes.
8       Q.   Maybe they'll to submit you lesser includeds,
9   like, perhaps, murder, and maybe not, but in any
10  event, to find Defendant guilty of capital murder,
11  they got to -- they got to prove all the elements.
12      A.   Right.
13      Q.   Okay. This is where they run the table, if
14  you will.
15      A.   Yes.
16      Q.   In other words, they got to get all of them.
17  They don't get -- they don't get eight out of nine and
18  say, "All right. We got eight out of nine, that's
19  pretty close. That's good enough." That doesn't cut
20  it. You -- you understand that.
21      A.   Yes, sir.
22      Q.   And you could follow that law.
23      A.   Yes, sir.
24      Q.   Okay. Now, we have a bifurcated system in
25  Texas. And then what that means is we do the guilt or

359

1   innocence phase, first. And if the Defendant is
2   acquitted, we all go home, all right? If, however,
3   he's found guilty of capital murder -- Well, let me --
4   let me back up. In most cases, if this was just a
5   plain murder, which I hate -- I hate saying that, but
6   I don't mean (sic) any other way to put it -- this was
7   a plain murder, the punishment range would be five to
8   99 or life, okay?
9           And then the jury, if they found him
10  guilty, they'd go back and they'd assess a number of
11  years and, you know, maybe they could even give him
12  probation, okay, but under certain circumstances,
13  okay? And they'd say, "Well, X number of years, and
14  we recommend probation or we don't recommend
15  probation. And we recommend a fine or we don't,"
16  okay? But there is -- there is, within those
17  perimeters, they -- they assess a punishment.
18          Capital murder's a little different,
19  okay? You don't say life or you don't say death. You
20  answer questions, okay? And this is the first one,
21  see? It's right up here over your left shoulder. "Is
22  there a probability that the Defendant would commit
23  criminal acts of violence that would constitute a
24  continuing threat to society?" And the jury would
25  answer that question, yes or no. After they do that,

360

1   then they would answer Special Issue 2, which is over
2   your right shoulder there. "After taking into
3   consideration all of the evidence, including the
4   circumstances of the offense," that is the guilt or
5   innocence phase part, "the Defendant's character and
6   background, and the personal, moral culpability of the
7   Defendant, is there sufficient mitigating -- a
8   sufficient mitigating circumstance or circumstances to
9   warrant a sentence of life imprisonment, rather than
10  death be imposed," okay? Basically, hey, you know
11  what, maybe there's mitigating facts. Maybe he --
12  maybe, yeah, he committed this act. But other than
13  that, he's been a great guy, otherwise, okay? He's an
14  eagle scout. Maybe he was -- maybe he's, you know,
15  done a lot for the community. Maybe he's just, you
16  know, mentored kids. Maybe -- he's a great guy,
17  otherwise. And there's, you know, the list of
18  possible mitigating circumstances, you know,
19  potentially endless, okay? But -- but that's for the
20  jury to decide whether a fact is a mitigating
21  circumstance or not. And -- and so, you will be asked
22  to answer this question as well. Could you, (a) sit
23  on this jury and determine whether the State has
24  proved their case beyond a reasonable doubt?
25      A.   I would think so.

361

1       Q.   Okay. And then -- and then if they did get
2   to the point of a conviction, that is conviction for
3   capital, could you answer these questions?
4       A.   I would try, yes.
5           THE COURT: Okay. All right. All right,
6   well, I'm going to turn the floor over to Mr. Skurka.
7           MR. SKURKA: Thank you, Judge.
8               VOIR DIRE EXAMINATION
9   BY MR. SKURKA:
10      Q.   Hi, Mr. Escobar, my name is Mark Skurka. I'm
11  the First Assistant District Attorney. And the fellow
12  -- he'll be back in a minute -- Geordie Schimmel, he's
13  assigned to Judge Galvan's court and he'll be the one
14  assisting me on this case if you get called -- if you
15  get sworn in on this jury.
16          Let me start off by telling you there's
17  no right or wrong answers to anything you say. We
18  just want to know what you feel or how you feel about
19  the law and what your position on some of the issues
20  are. But don't answer them in a way that you think
21  wants to hear it or the Defense wants to hear it or I
22  want to hear it, just tell us your own true feelings
23  about that case. Can you do that for us?
24      A.   Sure.
25      Q.   Thank you. When they asked a question in the

362

1   questionnaire about, "How do you feel about the death
2   penalty," you put, "Okay." I'm going to ask you to
3   elaborate a little more on that. If I was to come up
4   to you and say, "How do you feel about the death
5   penalty," what would you say, besides just okay?
6       A.   Okay. If somebody has been convicted,
7   somebody's been sentenced and that's the sentence, I'm
8   all right with it. I wouldn't be protesting against
9   it or anything like that. That's what I meant,
10  "Okay."
11      Q.   So do you think we should have the death
12  penalty in Texas?
13      A.   Yes. We have it.
14      Q.   Okay. But my question is, should we have it?
15      A.   Yes.
16      Q.   Some states have it. Some states don't. Do
17  you think it's good to have it in Texas?
18      A.   Yes, sir.
19      Q.   Why?
20      A.   I think it's necessary to deal with those
21  certain crimes that the death penalty is okay with and
22  follow the law.
23      Q.   That's a good point about following the law.
24  It really doesn't matter how we feel personally about
25  things, but if you want to be a -- good member of

363

1   your community, of your -- your city or your county,
2   or whatever, you want to be able to follow the law.
3       A.   Right.
4       Q.   And I don't make the law, clearly, doesn't
5   make the law, but it's been the law in Texas for some
6   time. And it's -- it's kind of clear that the state
7   of Texas takes a pretty seriously, too, because they
8   don't make just every case a capital murder case.
9       A.   That's right.
10      Q.   Rape is a very serious crime, but if you rape
11  somebody, you're not going to get the death penalty.
12  You know, forgery's a serious crime. That doesn't
13  mean you're gonna get the death penalty. They say
14  only certain times it can be applied. Like, if you
15  kill a cop on duty or kill a child under six, you
16  know, multiple murders, or in this case we have it in
17  committing another felony at the same time. And just
18  usually -- usually murder plus rape, robbery,
19  burglary, kidnapping, things like this. And, in this
20  case, we have robbery, murder plus the robbery. And
21  that's what makes it even eligible for a death penalty
22  case.
23          Does that mean they automatically get the
24  death penalty? No. There's two choices. Death or
25  life in prison. But as overall scheme, Texas pretty

364

1   much says -- it kills me when I go to other states and
2   they say, "Oh, yeah, you-all execute everybody." No.
3   There's only a few case even qualified for it. So we
4   have to tell them that we -- the state kind of weeds
5   out those cases and only reserves this for the more
6   serious cases. Would you agree with that?
7       A.   Yes.
8       Q.   How did you feel about it that first day in
9   the courtroom, remember, we were downstairs on the
10  first floor and there's, like, 2- or 300 people there,
11  and, you know, everybody's going in there and they
12  don't really know what it's for, till comes out and
13  says, "Look, this is a criminal case. And it's not
14  just any criminal case, it's a capital murder case.
15  This young man over here, John Henry Ramirez, could be
16  possibly facing the death penalty," tell me what was
17  the first thing that struck your mind when you heard
18  that it was that kind of case.
19      A.   It's going to be a long case.
20      Q.   It's going to be a long case?
21      A.   That's the first thing that came to my mind,
22  yes.
23      Q.   Once that part passed, how did you feel
24  about, you know, being on that type of a jury?
25      A.   (Pause) Just anxious.

365

1       Q.   What do you mean?
2       A.   Anxious, in that, you know, whether I'm going
3   to be selected or not. Just -- just...
4       Q.   Kind of anxious, like, "I wonder if they're
5   going to pick me or they're not going to pick me"?
6       A.   Yeah.
7       Q.   Or did you mean anxious like, "Oh, my gosh,
8   it's a capital murder case. It's going to tear up my
9   life and I'm not going to be able to sleep nights,"
10  and all this kind of stuff?
11      A.   No. I don't think that crossed my mind. It
12  was more of a -- something that just happens in one day.
13  It's not a -- something that just happens in one day.
14      Q.   Right. And I understand you're a busy
15  person. All of us are busy people, too. But, you
16  know, I was watching some of the jurors when said
17  that and some of them went, "Oh, my gosh," like, and
18  some people were going, like, "Oh, my gosh, I can't
19  sit on that case of kind. Give me a D.W.I., give me a
20  shoplifting case. I didn't know it was that." But it
21  wasn't kind of reaction, was it?
22      A.   No.
23      Q.   It was just how much time is this going to
24  take out of my busy schedule. Which is a concern, of
25  course, but we try to move things along pretty fast,

366

1  here.  And -- and I know you've been sitting there for
2  a while, but we've talked to, like, nine people today.
3  So we're kind of tired, too.  So we're going to move
4  this along.
5          But the bottom line is, how do you feel
6  about participating in this case, where you, Angel
7  Escobar, may have to sit in one of these jury chairs?
8  And there come a time, and I told you-all the very
9  first day, the State is asking for the death penalty
10 in this case.  If this Defendant's convicted and if
11 the evidence shows that he should get the death
12 penalty, can you, Angel Escobar, sit here and make
13 that decision for this case?
14     A.   Well, I feel a burden, in that, I would have
15 to make that -- those decisions, but it's part of what
16 we're here for.
17     Q.   What I'm hearing from you is -- and you can
18 correct me if I'm wrong -- is this not going to be an
19 easy task.
20     A.   That's right.
21     Q.   It's going to be something that's going to
22 weigh on me and I'm going to have to carefully
23 consider it before I vote for it.
24     A.   Yes, most definitely.
25     Q.   Is -- is that a good way to say it?

367

1      A.   That's right.
2      Q.   And that's the way it should be.  I don't
3  think anybody takes it lightly.  And as powerful as
4  this Judge is, as a district judge, he can't give
5  somebody the death penalty.  As powerful as Carlos
6  Valdez is as the district attorney, he can't give
7  somebody the death penalty.  Texas says it's got to be
8  12 people from the community of your peers to make
9  that ultimate decision.  And that's probably a good
10 law.  You don't want to have too much power in the
11 hands of the government.  You want the people to make
12 that decision.  Would you agree with that?
13     A.   Yes.
14     Q.   So it's like it may not be the funnest (sic)
15 case, it may not be a case you're happy about, but
16 would you agree with me these -- sometimes we need
17 people like jurors like yourself to come and make
18 those hard decisions?
19     A.   That's right.
20     Q.   Is that a fair assessment of what it is?
21     A.   Yes.
22     Q.   It's like some people say, you know, they get
23 called for jury duty and it's a child abuse case.  And
24 they go, "Oh, my gosh, I don't want to hear this
25 horrible thing that happened to this kid."  The

368

1  problem is we need jurors to sit there and make those
2  decisions whether a person's innocent or guilty of
3  hurting a child.  It's not fun or -- and it's
4  distasteful.  But it's a necessary thing that has to
5  be done.
6      A.   Right.
7      Q.   So that's kind of how you feel.  I wish it
8  was some other case, but if I'm called upon to do it
9  and the evidence is there, I can do it.
10     A.   That's right.
11     Q.   Is that fair to say?
12     A.   That's fair.
13     Q.   I don't want to put words in your mouth.  You
14 tell me if that's wrong.
15     A.   No, no.  You -- Pretty much.
16     Q.   Okay.  And -- and it should be something
17 that's not -- you should enjoy or have fun doing it.
18 And, obviously, you can see we-all take it very
19 seriously.  And we want the juries to.  But make no
20 mistake, I just want to make sure, if you can -- if
21 you make that decision or if the evidence points that
22 way, you can carry through it.
23     A.   I would think so, yes.
24     Q.   Okay.  And the reason I ask --
25     A.   I've never had to do it before, but...

369

1      Q.   And you'll probably never have to do it,
2  again.  'Cause this is a very rare occasion when we do
3  this.  But, I guess, -- you know, sometimes I hear
4  people, they'll say, "Mark, you know, the death
5  penalty is good in Texas.  We should have the death
6  penalty.  Yeah, that guy should get the death penalty.
7  Yeah, we can do it.  You-all can do it," and I say,
8  "Okay, you're going to be on the jury and you have to
9  look at the guy and you have to make the decision."
10 They go, "Wait, wait a minute.  I don't want to do
11 that.  I can't do that," you know?  They -- in other
12 words, they talk a good talk, but they can't really
13 walk the walk.
14          And -- and that's what we're looking for.
15 Can you actually follow through the decision, if
16 that's what the evidence calls for?
17     A.   I would hope so, yes.
18     Q.   Okay.  Okay.  And -- 'cause some people tell
19 us.  They say, "Look, I believe in the death penalty.
20 It's a good law.  I'm glad we have it.  But, Judge, I
21 can't do it.  I can't sit on that.  I can't make that
22 decision or I'll have, you know, religious problems or
23 moral problems or ethical problems.  I just cain't do
24 it."  Do you fit in that category?
25     A.   I don't think so.

370

1    Q.    Okay.  Tell me about making the decision on a
2    case like that.  Would you agree with me that you
3    would want to wait until you hear everything?
4    A.    Yes.
5    Q.    Would you agree with me that you'd -- it's
6    not automatic what's going to happen in this case?  In
7    other words, you can't say, "Just 'cause we found him
8    guilty, he's automatically going to get the death
9    penalty."   Says that there's two parts to the trial.
10   The first part is guilt or innocence.  Did he do it or
11   not?  The second part is the punishment.  Now,
12   sometimes and -- where you have to say whether he gets
13   death or life.  And some people tell me, "Well, gosh,
14   you know, they found him guilty.  Doesn't he
15   automatically get the death penalty?"  I said, "No.
16   There's two choices, death or life in prison."
17          And what happens is, you may get to hear
18   additional evidence to help you make that hard
19   decision, okay?  You might get to hear about the
20   person's background, you know, whether he was an eagle
21   scout for 20 years, or maybe he had been to prison for
22   20 years and committed 20 other crimes.  Or you may
23   hear anything.  You can use the circumstances of the
24   offense itself to help you make that decision.  And
25   that's the kind of stuff you want to do it, right?

371

1    A.    That's correct.
2          You don't want to just say, I look at him
3    and make a decision.  You can't do that.  But the --
4    but there will be a time where I'm going to ask you to
5    make that decision and based on just the evidence you
6    have.
7          Now, we talked about why this is capital
8    murder.  It's murder plus a robbery.  There's two
9    parts of the trial.  But when you get to the second
10   part of the trial, say, for example, you find
11   Mr. Ramirez guilty, you don't go in the jury room and
12   say, "Okay.  We vote for death," or, "We vote for
13   life," and check off one.  You answer some special
14   questions that are up there on the board.
15          There's two questions and there's one --
16   first one is called, "the future dangerousness
17   question," and the second one is called, "the
18   mitigating circumstances question."  I ask you to look
19   at that one behind you and read it along with me.
20   Say, for example, a person's been found guilty.  And
21   now you go to the second part and you may hear
22   additional evidence.  Remember, the Defendant can
23   testify, but he may not testify.  And you can't hold
24   that against him.  The Special Issue No. 1,  asks,
25   will say, "Is there a probability that the Defendant

372

1    would commit criminal acts of violence that would
2    constitute a continuing threat to society?"  In other
3    words, is it probable, is it more likely than not that
4    this guy is going to commit criminal acts of violence
5    and be a continuing threat to society?  It doesn't say
6    "certainty."  It's just says "probability."  'Cause
7    unless you have a crystal ball and can predict the
8    future, you don't know for sure what's going to
9    happen.  The law doesn't require me to prove it with
10   all certainty.  It just says, "probability."
11          It also says, "the Defendant will commit
12   criminal acts of violence."  That doesn't mean he's
13   necessarily going to murder people, again.  Some
14   people say, "Well, I can only give him the death
15   penalty, if I think he's going to murder somebody,
16   again."  But that's not what the law says.  It says if
17   there's criminal acts of violence that you think he
18   might do in the future.
19          And then that last part says, "would
20   constitute a continuing threat to society."  Some
21   people tell me, "Well, gosh, Mark, why don't you just
22   put him in prison for life?  Because that way he's out
23   of society.  He can't hurt anybody."  And I always
24   say, "Who else is in a prison?"  Who else is in a
25   prison?

373

1    A.    More people.
2    Q.    That's right.  There's other -- he still has
3    human interaction, right?  There's other guards,
4    there's other inmates, there's people that work in the
5    prison, there's all kinds of stuff.  It's not like
6    there's a desert island, we put him out there and
7    he'll never see another human being.  So would you
8    agree with me prison is part of society?
9    A.    Oh, yeah.
10   Q.    Oh, yeah.  Okay.  So that's the first
11   question.  Do you think he's going to hurt somebody in
12   the future and be a continuing threat to society?  You
13   answer that question, yes or no.
14          Then we come over to the second question,
15   the mitigating circumstances question.  Essentially,
16   mitigating, basically, means anything that would
17   lessen or make less severe the punishment.  In other
18   words, he did the crime, but is there any reason we
19   should give him a break and give him a lesser
20   sentence?  The lesser sentence in this case is life,
21   rather than death sentence be imposed.  "Mitigating"
22   means anything that would lessen or make less severe
23   -- or reduce the Defendant's moral blameworthiness.
24          What's that mean?  Mitigating is kind of
25   like this.  Say, you had two burglars.  You're sitting

374

1  on a jury and there's two different cases with two
2  different burglars.  And you first hear the case that
3  both of them are convicted of burglary and you now
4  have to decide what the punishment is.  Okay.  And you
5  think, "My gosh, I own a house.  I don't like
6  burglars.  I'm going to give him a high sentence,
7  both of them, without hearing any facts.  Then the
8  facts come in.
9          In the first case, you find out that
10  Burglar No. 1 has actually kicked in the door, broken
11  through the house -- broken into the house, gone into
12  the house, stolen all the jewelry, the money, the
13  T.V., the stereos, anything of value.  And then just
14  to top it off, he ransacks the house and breaks a
15  bunch of stuff and tears up the furniture and does all
16  this stuff.  And then you find out that that guy, this
17  isn't his first burglary.  He's had five other
18  burglaries in the past that he's gone to prison for.
19  He's kind of like a career criminal.
20          Now switch to the second burglar.  The
21  second burglar has committed burglary.  He's actually
22  gone in somebody's house without permission and stolen
23  something.  Well, but the facts are a little
24  different.  You hear in that case that he didn't kick
25  in the door or break in the window to get in.  He came

375

1  in through the back door what was unlocked.  He went
2  into the kitchen, did not steal any jewelry or T.V.s
3  or stereos around there, he went in the kitchen and
4  stole in bread and some food to feed his kids, 'cause
5  they were hungry.  He had lost his job and he needed
6  money and he needed food to feed his kids.  And that's
7  all he's took.  He just took bread and some food.  And
8  then you find out that guy's never been arrested
9  before in his life.  He's a first time offender.  He's
10  never even had a traffic ticket before.
11          Now, see, they're both equal in that
12  they're both equal of burglary, but would you really
13  punish them exactly the same?
14  A.    Probably not.
15  Q.    Probably not, right?  Because, in the first
16  case, those are aggravating factors that would raise
17  that sentence higher, right?  In the second one, those
18  are mitigating circumstances that you have to say,
19  "Well, you know, that's going to lower the sentence.
20  I'm not going to treat him as bad as I'm going to
21  treat this guy."  And that's what that question's all
22  about.  Is there any reason to give him a lesser
23  sentence of life, instead of death?
24          It's kind of like this, you found the guy
25  guilty of capital murder.  You've answered the first

376

1  question, "Yes.  I think he's going to be a future
2  danger to our community."  But  says, "Wait.  Before
3  you decide on that stop.  Take into consideration all
4  of the evidence, the circumstances of the offense,"
5  you know, happened that night and the surrounding
6  circumstances, "his character, his background," you
7  know, was he an eagle scout, a decorated war hero, or,
8  you know, maybe he's been to prison 20 times before,
9  "And his personal, moral culpability," ask yourself,
10  "Is there a sufficient mitigating circumstance or
11  circumstances to warrant that a sentence of life,
12  rather than death sentence be imposed?"  In other
13  words, he did the crime, but is there any of these
14  extenuating circumstances to make a lesser sentence?
15  And you answer that, yes or no.
16          Now, what is exactly a mitigating
17  circumstance?  I can't tell you.  Neither can .
18  Mitigating circumstances are what ever the jury thinks
19  they are.  For example, some people may say, "Well,
20  he's very young, you know?  I can't give him a death
21  penalty, because he's very young."  Other people might
22  come up and say, "Well, you know, he's over 18.  He's
23  old enough to know the difference between right or
24  wrong."  And some people might think that's a
25  mitigating factor and some people may say that's an

377

1  aggravating factor.  And what you have to do is use
2  this word, "sufficient."  Is it enough?  You kind of
3  have to do a balancing test and say, "Okay.  He was an
4  eagle scout when he was a kid.  But does that outweigh
5  what he did in this crime?  Okay.  He had a bad
6  childhood, but does that outweigh what he did in this
7  case?"  You see what I'm saying?
8          The power of the jury is too listen and
9  consider those things, but whatever weight you give to
10  it is up you.   Isn't going to say, "Okay, because he
11  came from a bad background, you must automatically
12  reduce his sentence."  It goes back to that, there's
13  nothing automatic.  But the -- the courts, to be fair,
14  they want a jury, don't rush into things, look at
15  everything.  Is there any reason you could lower the
16  sentence?  There may be.  There may not be.  But
17  that's up to the jury to decide.  You see what I'm
18  saying?  It's kind of a catchall question.  It's like
19  checks and balances, you know?  You're heading for the
20  death penalty, but before you do it, hey, is there any
21  reason to lower the sentence to life?  You may hear
22  evidence, you may not hear evidence of it.  But it's
23  up to the jury to ultimately decide what that is.
24  Okay with that?
25  A.    (Nods head.)

378

1      Q.    And that's kind of how the scheme works.
2   It's no just voting death or life.  You have to kind
3   of answer these questions and make a balancing test on
4   it.  For example, one -- one other law, I think,  may
5   give you is this.  It says this, "Voluntary
6   intoxication," voluntary intoxication, "is not a
7   defense to crime."  If you get yourself drunk or high
8   on drugs and you go commit a crime, does that excuse
9   your crime?  No.  The law says no.  The law says
10  voluntary intoxication is not a defense of crime, but
11  it is -- it could be a possible mitigating
12  circumstance.  Say, for example, you had a burglar
13  that breaks in a house.  And just 'cause he's drunk
14  and he gets messed up and does something.  Some jurors
15  -- some jurors may say, "Well, gosh, that's a
16  mitigating circumstance, 'cause he was drunk."  Other
17  people, "Well, look, I don't care if he's drunk or
18  not.  He still did the crime.  He's still got to pay
19  the time."  See what I'm saying?
20     A.    Yeah.
21     Q.    That's an example that it's not an excuse,
22  but it could be considered a mitigating circumstance.
23  And that's just what  wants you to do, open your mind.
24  Make sure that if you listen to stuff, you'll hear
25  everything before you make a decision.  And it's --

379

1   it's kind of fair the way they set it up that way.
2   That way you can decide based on all this other stuff,
3   too.
4      A.    Okay.
5      Q.    And, hopefully, you'll have information on
6   that to help you make the decision.  But, of course,
7   remember, the Defendant may put on evidence, the
8   Defendant may not put on evidence.  I'm talking about
9   both the first part of the trial and the second part
10  of the trial.  The Fifth Amendment still applies.  You
11  may hear from -- something.  You may not.
12          Some of the law stuff we want to talk
13  about is the indictment.  Just because you're charged
14  with a crime doesn't necessarily mean you're guilty of
15  the crime; correct?
16     A.    Correct.
17     Q.    That's just an allegation the State brings.
18  And it's up to the State to prove the case beyond a
19  reasonable doubt, right, they don't have to prove
20  anything.  It's just us that we have to put it on.
21  The Fifth Amendment.  He has the right to testify, but
22  if he doesn't want to testify he has that right, too.
23  And you can't hold it against him.  I know this Judge,
24  if he have doesn't testify, he'll tell the jury,
25  "Look, he's not going to testify and you can't hold

380

1   that against him."  Do you believe in that law?
2      A.    Yes.
3      Q.    And can follow that, correct?
4      A.    Yes.
5      Q.    Tell me about a couple of things on your
6   questionnaire.  No. 1, it says you're Catholic, but
7   you're not sure of the Church's position in the death
8   penalty.  Have you ever heard the Church talk about
9   that or the priest talk about it?
10     A.    What I consider the Church, I'm considering
11  the Vatican, the Pope.
12     Q.    Right.
13     A.    And, no, I'm not aware of it.
14     Q.    If you were told that the Church was against
15  the death penalty, would that make you ineligible to
16  serve on this jury?
17     A.    No.
18     Q.    Why not?
19     A.    I tend to think for myself.
20     Q.    Okay.  And -- and that's the right answer.
21  Some people say, "Well, gosh, you know," whatever
22  church it is.  I just use the Catholic Church,
23  because, sometimes people say, "well, my church says
24  this, so I can't do it."  And I'd say, "Well, if you
25  can't do it, let us know."  But some people say,

381

1   "Look, the Church has some teachings.  I follow most
2   of the teachings, but sometimes I make my own
3   decisions."  And that's kind of how you fit?
4      A.    That's right.
5      Q.    Okay.  There's also a question in here that
6   talks about police officers testifying.  And you
7   understand a police officer is treated in court just
8   like any other witness.  They're not any better, any
9   worse than that.  Some people say, "Well, gosh, any
10  police officer got up there, I'll believe everything
11  he says," or, if a police officer says, you know, "The
12  moon is made of green cheese," just 'cause he's a cop,
13  does that make that true?  No.  You have to treat them
14  just like everybody else.  Can you do that?
15     A.    Yes, definitely.
16     Q.    There is also a part in here that talked
17  about -- there was a question about if a person is
18  found guilty of capital murder, but he has no other
19  prior convictions, the law says that he have can still
20  get the death penalty.  And you didn't agree with that
21  law or what?
22     A.    (No response.)
23     Q.    Do you remember that question?
24     A.    No.
25     Q.    Let me read it for you, okay?  "The law in

382

1   Texas says that a person convicted of capital murder
2   may receive the death penalty, solely because of the
3   facts and circumstances of the crime, even if the
4   person has committed no other previous crimes.  Do you
5   agree with this law?"  What would you say?
6       A.   (No response.)
7       Q.   In other words, if you're not sure you
8   understand the question, the question says you don't
9   have to have 20 priors to be able to get the death
10  penalty.  You may not have any priors and you can get
11  the death penalty.  A few years ago there was a guy in
12  Houston that poisoned his kid with halloween candy,
13  just to collect the insurance.  The jury gave him
14  the highest sentence, life sentence, even though he
15  was a first-time offender.
16      A.   Uh-huh.
17      Q.   He had no priors, but the jury still gave him
18  the maximum sentence.  And that's what, basically,
19  what the law says here.  You know, he may have ten
20  priors.  He may have 20 priors.  He may have no prior
21  convictions.  You can make a decision just on what he
22  did in this case.
23      A.   I would think so.
24      Q.   So that would be okay with you, to make a
25  decision on that?

383

1       A.   Yes.
2       Q.   And I'm not saying whether he has a history
3   or not.  I'm just saying that all things being
4   considered, you can make a decision based on just the
5   evidence you have in front of you in this case.
6       A.   I would think so, yes, sir.
7       Q.   Okay.  Good.  Are you a better golfer than
8   Carlos Valdez?
9       A.   No.  But he's a lot better than I am.  We do
10  golf, quite a bit.
11      Q.   I understand that.  But that's my question.
12  Is he going to be bragging about it or something, that
13  he's a better golfer?  I've played golf with him.
14      A.   Yes.
15      Q.   He's not that good.  (Laughter in courtroom.)
16      A.   Well, I'm not -- I'm not very good at all.
17      Q.   Well, I know a few of us, Mr. Garza and I've
18  played together before, too, but he can only beat me
19  with a pencil when he's keeping score.  That's the
20  only that way Mr. Garza can win.
21           No.  Seriously.  I know you know Carlos.
22  I know you've met Mr. Schimmel a couple of times.  You
23  probably know  and probably these gentlemen, too.
24      A.   Right.
25      Q.   And the simpler question is this.  Obviously,

384

1   the case is brought by the D.A.'s Office, Carlos
2   Valdez, my boss, and everything.  I don't think he's
3   going to be in here in this case, 'cause he's trying
4   another case around the same time.  But is that going
5   to effect you sitting on this jury?  I mean, you'll be
6   able to listen to all the evidence and make a
7   decision, just -- despite knowing Carlos?
8       A.   Despite knowing Carlos?
9       Q.   I know.  I didn't say that right, did I?  I'm
10  sorry.  Is that going to interfere with you being on
11  this jury, just knowing Carlos or Geordie or one of
12  the other people here?
13      A.   I would hope not.
14      Q.   Okay.
15      A.   Okay?
16      Q.   Well, now, you're making these guys nervous,
17  over there, 'cause they're going to say, "Oh, my gosh,
18  he's already going to vote for Carlos, 'cause he --
19  knows Carlos."  My question is this.  Can you put
20  aside the fact that you know him and make a decision
21  only on the evidence in this case?  'Cause Carlos is
22  not going to be a witness.  He's not going to testify
23  and come in and say, "I saw John Henry Ramirez do
24  anything."
25      A.   Uh-huh.

385

1       Q.   But, you know, we just want to make sure that
2   you're not going to make a decision just because you
3   know Carlos, you're going to set that aside and make a
4   decision only on the evidence.  You'd be able to do
5   that, won't you?
6       A.   I would sure try, yes.
7            MR. SKURKA:  Okay.  Thank you, Mr.
8   Escobar.  That's all the questions I have.
9            VENIREPERSON NO. 18:  Okay.
10              VOIR DIRE EXAMINATION
11  BY MR. GARZA:
12      Q.   Mr. Escobar, good afternoon.  My name is Ed
13  Garza.  I introduced myself, previously, --
14      A.   Yes, sir.
15      Q.   -- when we were downstairs doing the general
16  voir dire and filling out these questionnaires.  You
17  know Mr. Jones, our previously elected D.A., who
18  wasn't with me that day.  And then, of course, our
19  client, John Henry Ramirez.
20           Let me direct your attention back about
21  four years ago when this crime first occurred.  I
22  guess, you weren't in the position of being the acting
23  city manager back then, but do you remember hearing
24  about this case?
25      A.   From the news, yes.

386

1    Q.   As -- as a pretty high-up city official, I'm
2    sure you may have had occasion to, uh, meet at times
3    with is the present city counsel -- or the city
4    manager at that time.  And, basically, in your
5    position today, you pretty much oversee and have to
6    have the chief of police report to you about certain
7    things that are going on insofar as police activities;
8    is that correct?
9    A.   That's correct.
10   Q.   Okay.  Did you have occasion at any time to
11   just casually be a little more informed about this
12   case, because of the position you were in back then
13   four years ago?
14   A.   No.
15   Q.   Have you had occasion to be briefed or be
16   told or casually been conversing with anyone presently
17   now in the position that you're in as the acting city
18   manager?
19   A.   No.
20   Q.   Okay.  Would it bother you, in any way, if
21   for some reason the police department didn't
22   sufficiently investigate this case and you'd have to
23   make the decision of actually acquitting our client?
24   How would that -- how do you think that would pan out
25   with the police department, considering that you do

387

1    oversee their -- their chief, and, you know, you've
2    got the power to hire and fire him, and stuff like
3    that, and whatever, and, I mean, basically --
4    A.   I would be disappointed.
5    Q.   Huh?
6    A.   I would be disappointed.
7    Q.   Okay.  In that sense, then, would it be safe
8    to say that you really have already formulated some
9    sort of an opinion about this case?
10   A.   I don't think so.  But, as you put it before
11   that, if it did not have the proper investigation, I
12   would be disappointed that they didn't do a proper
13   investigation.  Now, if you're referring to that they
14   did not have enough evidence, that's a different issue
15   to me, at least.  Okay?
16   Q.   As my -- as our client stands today indicted,
17   because he's been indicted, do you think he's already
18   guilty?
19   A.   No.
20   Q.   Do you understand the indictment process --
21   A.   Right.
22   Q.   -- and how that takes place?
23   A.   Right.
24   Q.   It takes place in secret, by members of the
25   grand jury.

388

1    A.   Right.
2    Q.   We're not allowed to go in there and
3    cross-examine any of their witnesses.  We're excluded
4    from that whole process.
5    A.   Right.
6    Q.   And it's based on probable cause alone, not
7    proof beyond a reasonable doubt, okay?
8    A.   Yes.
9    Q.   And there's -- it's -- it's just another sort
10   of fail-safe or another sort of net that this process
11   has to go through.  That's the very first net.
12   A.   Uh-huh.
13   Q.   Very first safety net.  There's a bigger one
14   to come after that.
15   A.   Right.
16   Q.   And there should be.  Don't you agree?
17   A.   There should be.
18   Q.   'Cause, alternatively, also one of the
19   purposes of the grand jury to meet in secret is what
20   if they're investigating a case where a certain
21   private individual or citizen, or whatever, is
22   innocent of the crime?  Wouldn't want all that
23   information to be out there in the general public if
24   it's not -- if it's not pursuing -- if it's not -- if
25   that person's -- it's to protect the innocent,

389

1    somewhat, also.  Do you see that that -- that is a
2    role of the grand jury, as well?
3    A.   I would think so, yes.
4    Q.   Okay.  Your thoughts on the -- your thoughts
5    on the -- on the death penalty itself.  I notice that
6    you just put okay.  You didn't bother to elaborate too
7    much more about that.  As a concept, you're an
8    educated man, you're an engineer by profession, how do
9    you really feel about it?
10   A.   I really feel okay with it, if it goes
11   through the proper courts and proper sentencing, and
12   it comes out to be the death penalty, I'm okay with
13   it.
14   Q.   Have you recently had occasion to read in the
15   newspaper, and, possibly, in some most recent issued
16   the periodicals about a lot of these people in Dallas,
17   Houston, and some places, where now, as a consequence
18   of D.N.A. testing, and stuff, they have actually found
19   out that these people have been found actually,
20   factually innocent?  How do you feel about that?
21   A.   I think that -- I feel okay with that, also,
22   if the evidence then or now shows that they're
23   innocent.  Now, if you asking me how do I feel about
24   the ones that got killed, because the evidence was not
25   found, I still feel okay with that, disappointed in

390

1  the system, that could not come up with the right --
2  or should say, the right decision.  And I'm sure
3  through the years --
4      Q.    I think we all, generally, agree that our
5  jury -- our Criminal Justice System works pretty
6  efficiently.
7      A.    Yes.
8      Q.    Certainly not without its flaws.  And that's
9  why it's important for us to know how you feel as a
10  potential juror, as a prospective juror, in our mind,
11  that -- that -- that because of how you feel and --
12  and -- and what your responses to our questions are,
13  that you're going to give us a fair trial in this
14  case, that you would give our client a fair trial.
15  How do you feel about fairness, in general?
16      A.    I think it's important to be fair all the
17  time.
18      Q.    What does "impartiality" mean to you?
19      A.    That, for example, that, if just because
20  Geordie is on this side, and I don't any of these
21  sides, and because I'm partial to him, that I'm going
22  to make a decision for -- in his favor, that's not.
23  It's where you -- if you know somebody and you don't
24  know somebody, you can still make a decision.
25  Impartial.

391

1      Q.    Okay.  Can we be safe in assuming that you're
2  going to come in here and -- and, essentially, give us
3  your impartial, common sense and thought and -- and --
4  and, in this whole process, that you're -- you're
5  coming into this situation, giving us a level playing
6  field in this case?
7      A.    I would hope so.  With my upbringing and you
8  try to treat everybody fairly and honestly, I would
9  try to do that, yes.
10      Q.    Well, believe it or not, I would want you to
11  be more than that.  You know why?  'Cause of the
12  concept of the presumption of innocence.  I would
13  think that, right now, you would only be fair to us,
14  right now, until you've heard all the evidence.  And
15  my question to you is, do you think our client's
16  guilty?
17      A.    At this point?
18      Q.    Yes.
19      A.    No.
20      Q.    And just 'cause he's been indicted, do you
21  think he's guilty?
22      A.    No.
23      Q.    But do you understand what I'm getting to,
24  with regard to the level playing field?  The
25  presumption of innocence tells us that we're not

392

1  deserving of a level playing field.  We deserve the
2  whole field.  You follow what I'm saying?
3      A.    Pretty much.
4      Q.    Do you agree with that?
5      A.    Well, you know, we're all human.  And,
6  obviously, as emotions occur, you make judgments from
7  it.  And I feel that I can make a judgement that I
8  feel is fair.
9      Q.    Okay.  Okay.  I noticed that on your
10  questionnaire, on the question of, "On a scale of one
11  to ten, how strongly do you believe in the death
12  penalty?  With one being the least and ten being the
13  strongest," you pretty much answered number five,
14  right down the middle; is that correct?
15      A.    If that's what you have, yes, sir.
16      Q.    Do you remember that question?
17      A.    (No response).
18      Q.    I know it's been a while.
19      A.    No, I don't.  But I'm sure I answered it.
20      Q.    Okay.  We would -- the -- the legal concepts
21  that we've been discussing here with you this
22  afternoon regarding the death penalty are very unique
23  because they don't apply to any other cases but this
24  kind of case, okay?
25      A.    Okay.

393

1      Q.    If you decide that our client has not been
2  proven guilty sufficiently beyond a reasonable doubt,
3  then it's all over.  We go home.  We pack it up and go
4  home.  Everything's done.  There's been a verdict
5  rendered of not guilty, okay?  However, if you should
6  sit on the jury and figure that the State has done its
7  job and they've proven it to you beyond a reasonable
8  doubt, then there's only two possible sanctions or
9  penalties that our client could be looking at.  Do you
10  know what those are?
11      A.    Well, the ones that are shown up here.
12      Q.    Well, okay, but they would be, either life or
13  death.
14      A.    Yes, sir.
15      Q.    Correct?
16      A.    (Nods head.)
17      Q.    Depending, of course, on how you answered
18  these -- these questions.
19      A.    Well, they're presuming that the first one
20  gets answered, that is guilty, then you go to this
21  one.
22      Q.    Correct.
23      A.    Right.
24      Q.    You go to these two.  Okay?  If you answer
25  yes to that one and no to this one, and you answer it

394

1 unanimously, as a complete, total -- each and every
2 one of you, all 12 jurors, then our client would be
3 looking at a death sentence.   Would have no other
4 choice, than to impose the death penalty, okay?  Do
5 you understand that concept?
6      A.   Yes.  Correct.
7      Q.   How do you feel about that?
8      A.   That they've proven it and that we've
9 decided?
10     Q.   Uh-huh.
11     A.   Well, that's what we're supposed to do.  I
12 might not enjoy it, might not enjoy being here, you
13 know, the amount of the time that I have to be here.
14     Q.   I understand.
15     A.   Okay.
16     Q.   I understand.
17     A.   All right.
18     Q.   I mean, it's -- it's versus winning the
19 lottery or going out and beating Carlos in a round of
20 golf or something like that, I understand.  I mean,
21 it's not -- it's pleasurable --
22     A.   No.
23     Q.   -- at all.  It's very serious.
24     A.   Right.
25     Q.   It's very serious.  And we want you to take

395

1 it seriously.  We really do.  We're entrusted with a
2 grave, serious responsibility of effectively
3 representing our client in this case.  And we feel a
4 tremendous need to know from each and every one of
5 you-all on this panel, you know, to tell us exactly
6 how you feel about this case, in order for us to make
7 a qualified decision about whether to keep you on this
8 jury or not.  The -- Mr. Skurka gave you some examples
9 of -- Well, let me just ask you, on Special Issue No.
10 1, you would be asked, "Is there a probability that
11 the Defendant would commit criminal acts of violence
12 that would constitute a continuing threat to society?"
13 What evidence, in your mind, do you think you would
14 want to hear in order to make a decision on that
15 tissue?
16     A.   Whatever they have to show me that.
17     Q.   But I -- I need a specific example.  What --
18 what would you want to hear?  What would you need to
19 hear?  In other words, look at that question.
20     A.   Uh-huh.
21     Q.   You're being asked to, basically, make a
22 prediction, make a supposition, determine a
23 probability, okay?  What -- what would convince you of
24 that?
25          MR. SKURKA:  Judge, I'm going to object

396

1 to that.  That calls for a commitment, what's specific
2 evidence.
3          MR. GARZA:  No, Your Honor, I'm only
4 asking what -- does he have a particular example,
5 Judge.  What -- what -- what would he need to convince
6 him of that.
7          MR. SKURKA:  Well, that's a specific
8 commitment question, saying, "What specifically do you
9 need to answer that question," and it should not be
10 based in that way.
11          MR. GARZA:  Judge, I'm only asking --
12          MR. JONES:  Well, look, --
13          MR. GARZA:  -- if he has a concept of
14 what he would need to make a --
15          THE COURT:  I think -- I think that -- I
16 think that's a better question.  Do you have a concept
17 of what you think would get you to that?
18          VENIREPERSON NO. 18:  Not at this time.
19     Q.   (BY MR. GARZA) Well, let me throw out some
20 examples.
21     A.   Go ahead.
22     Q.   Okay.  What about criminal history?  Would
23 that be something you would want to know or hear
24 about?
25     A.   Well, yes.

397

1     Q.   What about background?
2     A.   Of course.
3     Q.   What about character?
4     A.   Definitely.
5     Q.   Because, you know, one of the -- one of the
6 conditions that Mr. Skurka asked you is your answer to
7 question No. 10, which was, "The law in Texas says
8 that a person convicted of capital murder may receive
9 the death penalty solely because of the facts and
10 circumstances of the crime, if the person has
11 committed no other previous crimes.  Do you agree with
12 this law"?  Now, your initial answer was, "No."  Why
13 was that?
14     A.   (No response.)
15     Q.   Would it bother you?
16     A.   No.  I think, the word was "may" and also
17 "Solely."
18     Q.   And then on the subsequent question after
19 that it says, "If you are in favor of the death
20 penalty in some cases, do you also agree that a life
21 sentence might be appropriate in some cases under the
22 proper circumstances?"  In other words, I guess, what
23 we're needing to know from you is if under the proper
24 circumstances even if, let's just say for example as a
25 hypothetical, this is the only time and this is based

398

1    on the facts of this case alone, the State wants to
2    know can you -- because it is the law, can you
3    consider that law and assess the death penalty; or
4    conversely, even upon your consideration of that
5    law, if you saw that this was not an appropriate case
6    for the death penalty, could you assess the life
7    sentence?
8         A.    I believe so.  It depending on what they
9    provided me.
10        Q.    In other words, we want to know, like  says,
11   do you still have and can you maintain an open mind
12   until you hear all the evidence in this case before if
13   you answer any of these questions?
14        A.    (Nods head.)
15        Q.    And this is after, of course, you've made a
16   finding of guilt, let's just say.
17        A.    Uh-huh.
18        Q.    Okay.  You've already made a finding of guilt
19   and you've made a determination, you've made a
20   decision, okay, that -- that may start effecting you
21   -- the way you really think about this case and then
22   yo're gonna have to consider these questions.  In
23   other words, the train is rolling down the track.
24   It's in motion.  We're getting closer to a decision of
25   this person's life or death.

399

1         A.    And your question is?
2         Q.    And the question is can you give effect to
3    these matters, like his character, his background, his
4    history, whether he's ever been a drug abuser, whether
5    he's been abused as a child, if he's ever been
6    molested, if he's ever been, you know, any of these
7    kind of mitigating-type of factors that we may be able
8    to show you?
9         A.    Any of these factors that either one of you
10   can show, yes, I'll take into consideration.
11   Obviously, if I don't hear them or I don't know about
12   them, I'm not going to consider it.
13        Q.    And the law requires that we know whether or
14   not you can give effect to those matters.  Like,
15   aggravating, what does aggravating mean to you,
16   something aggravating?  What does that mean to you?
17        A.    Well, something that causes more threat of
18   some sort, something that is more irritating, more
19   obnoxious, something's more of that side of it.
20        Q.    And what about the mitigating?  What would
21   mitigating mean to you?
22        A.    Well, mitigating is other things that might
23   change my mind or add to my knowledge of something to
24   be able to make a determination.
25        Q.    (Pause) If -- if -- let's say, for instance,

400

1    if your son was on trial.  How would you -- would you
2    feel comfortable if one of the jurors might be the
3    boss of the chief of police or a good buddy of the
4    D.A., how would you feel about that, a person sitting
5    in trial of your son?
6         A.    I guess, I would feel suspicious that there
7    was a bias there.
8         Q.    A little bit of a leaning.
9         A.    Yes.
10        Q.    Isn't that correct?
11        A.    (Nods head.) Yeah.
12        Q.    Okay.  Have you had sufficient amount of time
13   to really think about whether or not you could sit as
14   a juror in this case, --
15        A.    Well, yes --
16        Q.    -- knowing those things and now that I've
17   brought them to your attention?
18        A.    Well, now, the first part of your question
19   have I thought about it?  Yes.  Particularly, of where
20   I am in my career and my job.
21        Q.    Right.
22        A.    And the up-coming -- whether I'm selected to
23   be city manager or not.  And starting December 1 to
24   devote two weeks to here, I -- I'm sure I would have
25   other things in my mind versus what I got.

401

1         Q.    Yeah.
2         A.    But --
3         Q.    Would it be safe to say it would be a
4    distraction to you?
5         A.    Well, yeah, of course.
6         Q.    A rather -- for lack of a better way saying
7    it, an unfair distraction.
8         A.    Well, I don't know about unfair, but it sure
9    would be annoying, yeah.
10        Q.    It would be bothersome.
11        A.    That's another word, yes.
12        Q.    'Cause I know you're in the final two of
13   being selected, and I think you've already indicated
14   that you're worried about your work schedule and how
15   this trial could affect it, or, -- and I believe
16   you -- are you having to be recertified for your
17   license, your engineering license?
18        A.    That's right.  I do have a December 4th and,
19   also, before the end of the year, my license lapses at
20   the end of the year.
21        Q.    Okay.  Well, if -- if it's going to be a
22   problem, we just need to know that.  We need to know
23   if it's going to be a problem.  And, if you think it's
24   really going to be a problem, then we just need to
25   know that.  Because, in all fairness, we need your

402

1  undivided, wholly committed attention to this
2  situation, if you can. It's only -- and it's only
3  fair. Because when we're talking about, you know, you
4  know, we're talking about fundamental rights that we
5  as Americans love and enjoy to have, and that's our
6  freedom, our right to pursuit of happiness --
7            THE COURT:  And it --
8       Q.   -- and if that's not going to be the
9  situation that -- that -- that you can assist us with,
10  we need to know that.
11           THE COURT:  And this trial's going to
12  take, certainly, that first week and maybe --
13           MR. GARZA:  And maybe the second week.
14           THE COURT:  -- maybe the second.
15           MR. JONES:  And maybe the second.
16           THE COURT:  Maybe the second. May be the
17  whole second.
18           MR. GARZA:  Day-in, day-out. Eight to
19  five.
20           THE COURT:  It may take -- it's going to
21  take five, maybe ten days, working days.
22           VENIREPERSON NO. 18:  5:30, I think, that
23  little thing said.
24           MR. JONES:  He gets to say.
25           VENIREPERSON NO. 18:  Okay.

403

1            THE COURT:  Five to ten working days, is
2  really what it is.
3            VENIREPERSON NO. 18:  Right.
4            THE COURT:  That's really what we're
5  looking at. So we need to know -- Mr. Garza makes a
6  good point, we need know if you can give us that time.
7  I mean, it's always --
8       Q.   (BY MR. GARZA) And Mr. Escobar, listen, if
9  you can't do it, just say so. We're not here to -- I
10  mean, we're not --
11           THE COURT:  I mean, unless the person is
12  retired, --
13           MR. GARZA:  Yeah.
14           THE COURT:  -- this is an inconvenience
15  to everybody.
16           MR. GARZA:  Absolutely. We're here every
17  day.
18           THE COURT:  But, I mean, unless you're
19  retired, this is an inconvenience, okay? And -- and
20  your situation is -- is not unlike a lot of other
21  folks who are busy at work. But we just -- we do need
22  to know if it's really going to affect you.
23           VENIREPERSON NO. 18:  It probably, will,
24  okay?
25           MR. JONES:  All right. That's all.

404

1            MR. GARZA:  Thank you.
2            MR. SKURKA:  May I follow up on that,
3  Judge.
4            THE COURT:  Yeah.
5            VOIR DIRE EXAMINATION
6  BY MR. SKURKA:
7       Q.   Mr. Escobar, appreciate your honesty and
8  candor, but I need to kind of pin you down a little
9  more.
10      A.   Okay.
11      Q.   We've had a lot of people -- and you probably
12  saw them on the first day -- come up to Judge Galvan
13  and say, "I have a business to run, Judge. I'm a sole
14  proprietor. I have to take my kids to school. I have
15  to do this and I have to do that," and, you know,
16  there's a difference between an inconvenience, which I
17  most assuredly grant you, we understand it's
18  inconvenient for everybody, but, on the other hand the
19  -- the question I have is, is it so much that you're
20  not going to be able to be a juror, that you can't
21  decide and -- and give him all your full attention?
22  'Cause, you told us how serious this case is -- was,
23  that -- I just find it hard to believe that somebody
24  with your experience as an engineer, who processes
25  information all the time and -- and knows the -- the

405

1  importance of the Criminal Justice System, would say
2  that you couldn't sit on this jury because of your
3  job. And I understand that -- that -- how serious
4  that is, too. But I'm just kind of curious, is it
5  really going to be that much of an affect on you that
6  you could not be a juror?
7       A.   I don't think that's what I'm saying. What
8  I'm trying to explain to you is that my approach to my
9  job is very important, okay? And being here a week
10  and not taking care -- if I get selected, and I'm the
11  city manager, and not taking care of what I'm supposed
12  to be doing, --
13      Q.   Uh-huh.
14      A.   -- particularly, this is the first time for
15  me to do that, I think it would be very distracting
16  for me.
17      Q.   Would it be -- would it substantially impair
18  your performance of being a juror in this case?
19      A.   I don't know. I don't know.
20      Q.   Here's the reason I say. Because whether
21  you're an interim manager, city manager or the
22  Director of Engineering, or whatever your job was, I'm
23  sure you take a week off to take a vacation, and
24  things go on. I'm sure that the city manager, in the
25  past, took time off and his assistant handled his job.

406

1   I'm sure that you, as the acting interim city manager,
2   you've been over here for two hours today or three
3   hours, here, and it's still going.  And -- and I
4   understand those are kind of comparisons that may not
5   be valid with a week or two off, but the simple matter
6   is, you're not, like, going to be in another country
7   or anything, you're just going to be across the
8   street, essentially, and making a decision on this
9   case.
10          And I know you're not to go -- if you're
11  probably like me, I go home after this court, and I go
12  down and do my other work that I have to do, that
13  Carlos Valdez expects me to do, and you probably do
14  some of the same things.  So I just need to know if
15  it's really going to affect you and you can't sit and
16  listen to the evidence and make a decision.
17      A.   (Pause) Well, let me -- let me just explain
18  it this way.  For example, I keep looking at the
19  clock, because I have a town hall meeting at six
20  o'clock all the way on the other side of town.  My --
21  my mind is not totally on what you're asking me.
22  I'm -- I'm thinking ahead, I'm going to be late, and
23  so forth.  But I understand.  If I'm going to sit here
24  in a trial for a week at a time or two weeks at a
25  time, whatever it is, and I know that my livelihood is

407

1   depending on how I -- I -- do my work at work, like I
2   said before, the best I can -- description I can give
3   you is it would be distracting.  And I would try to
4   give you my hundred percent, just like I would try to
5   give the citizens of Corpus Christi my hundred
6   percent.  And there's no 200 percent in me.
7       Q.   There's only so much of you.
8       A.   That's right.
9       Q.   Can I ask you a dumb question?  When is the
10  decision going to be made?  Is it like tomorrow or in
11  two weeks or what?
12      A.   I've been told that it will probably be
13  tomorrow, probably, but there's no assurance.  They --
14  they can either select one of us or postpone it, till
15  another interview or something else.
16      Q.   Okay.  And I'm just trying to think ahead.
17  Because -- and I hope -- I hope your career goes well.
18  And, obviously, I hope things happen.  But it may not
19  happen that way and you go back to your old job.  Will
20  your same time constraints -- because, you understand,
21  we're not going to start till December 1st.  If they
22  make a decision tomorrow, you're either going to be
23  very, very busy or you're going to go back to your old
24  duties and have those at-hand.  I don't know.
25      A.   Mark, --

408

1       Q.   You tell me.
2       A.   Mark, no.  It doesn't work that way.
3       Q.   Okay.  You tell me, then.
4       A.   If I'm selected tomorrow, obviously, I would
5   then be on the job, right there and then.
6       Q.   Right.
7       A.   If I'm not selected tomorrow and they select
8   the other individual, it will probably be another 30
9   to 45 days before they show up.  So I would continue
10  doing what I'm doing right now.
11      Q.   Okay.  That -- that clears things up.  That
12  makes sense, 'cause I was thinking, I should have
13  thought about the other guy would have to have time to
14  come over and take over and stuff like that.  But I'm
15  not saying anything against you.  I hope you get it,
16  too.  But we just want to know.
17          MR. SKURKA:  That's all the questions I
18  have, Judge.
19          THE COURT:  Okay.
20          MR. GARZA:  No other questions, Judge.
21          THE COURT:  All right.  Mr. Escobar,
22  could you wait in the jury room just a second, while I
23  talk to these lawyers?  I know you've got to get
24  someplace, but we --
25          MR. SKURKA:  You'll have an answer in

409

1   just a second.
2           VENIREPERSON NO. 18:  Okay.  Thank you.
3           (Venireperson exits courtroom.)
4           THE COURT:  All right.
5           MR. SKURKA:  I'm going to be nice and
6   agree, Judge.  I don't want him to mess up.  These
7   guys, you-all owe me one.
8           THE COURT:  Are you moving to strike?
9           MR. JONES:  Well, it's just for cause.
10          MR. SKURKA:  Well, let's just agree.
11          MR. GARZA:  It's agreed.
12          THE COURT:  Agreed.  Done.  Call him back
13  in.
14          (Venireperson exits courtroom.)
15          THE COURT:  All right.  Mr. Escobar, we
16  appreciate your time, but you're not going to be
17  selected on the jury, but we do appreciate your time
18  coming down here.
19          VENIREPERSON NO. 18:  Will not?
20          THE COURT:  You will not.
21          VENIREPERSON NO. 18:  Thank you.
22          THE COURT:  Okay?
23          MR. SKURKA:  We know you've got a lot of
24  stuff going on, but -- we'd love to have you, but...
25          MR. JONES:  If you get to be city

410

1    manager, I want you to spend my money quick and get

2    the streets fixed.

3              MR. SKURKA:  You can never escape

4    politics, can you?

5              (Laughter in courtroom.)

6              VENIREPERSON NO. 18:  Which street?

7              MR. SKURKA:  Which street.

8         MR. GARZA:  Just pick one.

9              MR. SKURKA:  Good luck, sir.

10             (Venireperson exits courtroom.)

11             THE COURT:  I guess, we're still on the

12   record.  Okay, guys, we'll see you on Wednesday.  Be

13   here at 8:15, though, 'cause we've got ten to do on

14   Wednesday, and none of us want to be here until 10:00

15   at night.

16             (EVENING RECESS.)

17

18

19

20

21

22

23

24

25

411

```
 1   THE STATE OF TEXAS )

 2   COUNTY OF NUECES   )

 3                     I, Mary Lopez Buitron, Official Court

 4   Reporter  in and for the 94th Judicial District Court of

 5   Nueces County,  State of Texas, do hereby certify that

 6   the above and foregoing  contains a true and correct

 7   transcription of portions of  evidence and other

 8   proceedings requested in writing by counsel  for the

 9   parties to be included in this volume of the Reporter's

10   Record, in the above-styled and numbered cause, all of

11   which  occurred in open court or in chambers and were

12   reported by me.

13                     I further certify that this Reporter's

14   Record of the proceedings truly and correctly reflects

15   the exhibits, if  any, admitted by the respective

16   parties.

17                     I further certify that the total cost for

18   the  preparation of this Reporter's Record is $_____

19   and was  paid/will be paid by_____.

20                     WITNESS MY OFFICIAL HAND this the ____

21   day of _____, A.D., 2009.

22

23   MARY LOPEZ BUITRON, CSR, RPR, Texas CSR #2731
     Expiration Date: 12/31/2009
24   Official Court Reporter, 94th District Court
     Nueces County, Texas, 901 Leopard, Room 901
25   Corpus Christi, Texas 78401
     (361)888-0658
```