1

1        REPORTER'S RECORD
         TRIAL COURT CAUSE NO. 04-CR-3453-C
2        APPELLATE COURT CAUSE NO. AP-76,~~000~~ 76100
         VOLUME 10 OF 25 VOLUMES

3

4    THE STATE OF TEXAS      )      IN THE DISTRICT COURT
                             )
5                           )
     VS.                     )      94TH JUDICIAL DISTRICT
6                           )
     JOHN HENRY RAMIREZ      )      NUECES COUNTY, TEXAS
7

8

9

10

11                  _____

12

13               INDIVIDUAL VOIR DIRE

14                  _____

15

16

17

18

19            On the 12th day of November, 2008, the

20   following proceedings came on to be heard in the

21   above-entitled and numbered cause before the HONORABLE

22   BOBBY GALVAN, Judge Presiding, held in Corpus Christi,

23   Nueces County, Texas:

24            Proceedings reported by Stenograph

25   Machine.

FILED IN
COURT OF CRIMINAL APPEALS

OCT 06 2009

Louise Pearson, Clerk

2

```
 1    APPEARANCES:

 2    MR. MARK SKURKA
      SBOT NO. 18475570
 3    MR. VERNON G. SCHIMMEL
      SBOT NO. 24033039
 4    ASSISTANT DISTRICT ATTORNEYS
      901 Leopard, Rm. 205
 5    Corpus Christi, Texas 78401
      Phone: (361) 888-0410
 6
      ATTORNEYS FOR THE STATE
 7
      -AND-
 8
      MR. EDWARD F. GARZA
 9    SBOT NO. 07731200
      ATTORNEY AT LAW
10    719 S. Shoreline, Suite 201
      Corpus Christi, Texas  78401
11    Phone: (361) 888-8877

12    MR. GRANT JONES
      SBOT NO. 10917000
13    ATTORNEY AT LAW
      5826 Beauvais Dr.
14    Corpus Christi, Texas 78414
      Phone: (361) 815-2470
15
      ATTORNEYS FOR THE DEFENDANT,
16    JOHN HENRY RAMIREZ

17

18

19

20

21

22

23

24

25
```

3

1                           INDEX
                    VOLUME 10 OF 25 VOLUMES
2              (INDIVIDUAL QUESTIONING OF VENIREPERSONS)

3    VENIREPERSON                    Voir Dire        Page  Vol.
     Voir Dire Proceedings Continued .................. 5     10
4    WENDELL LOVELY, NO. 21          6
     Dft's Challenge for Cause ........................ 13    10
5    Agreement by the State ........................... 14    10
     Accepted by the State ............................ 244   10
6    Venireperson Excused ............................. 14    10

7    ROBERTO CASTANEDA, NO. 22       16,28,58               10
     Dfs. Obj. To PJ No. 22 for Cause ................. 64    10
8    State's response to objection .................... 65    10
     Denied ........................................... 72    10
9    PJ No. 22 accepted by the State .................. 88    10
     PJ No. 22 accepted by Defense .................... 88    10
10   Juror No. 3 Instructed by Court .................. 88    10

11   JANA MALM MENARD, NO. 123       90
     PJ No. 123 Challenge by Defense .................. 113   10
12   PJ. No. 123 Excused .............................. 114   10

13   JEREMY JOHN CALBAT, NO. 23      115,153               10
     PJ No. 23 Accepted by State ...................... 190   10
14   PJ No. 23 Accepted by Defense .................... 190   10
     Juror No. 3 Admonished by Court .................. 190   10
15
     THOMAS DICUS M., NO. 30         193                   10
16   Peremptory No. 4 by the Defense .................. 244   10

17   DIANA LOUISE O'BRIEN, NO. 33    245                   10
     Strike for cause by Defense ...................... 296   10
18   Challenge for cause by Defense ................... 442   10
     Agreed strike by the State ....................... 296   10
19
     KENNETH L. STARKEY, NO. 31      298                   10
20   Peremptory No. 2 by the State .................... 346   10

21   NOE G. BENAVIDEZ, NO. 34        347                   10
     Accepted by the Defense .......................... 386   10
22   Juror No. 4 admonished ........................... 386   10

23   MEZA, THERESA, NO. 35           388                   10
     Challenge for Cause Overruled .................... 455   10
24   Peremptory No. 5 by Defense ...................... 455   10

25   Court Reporter's Certificate  .................... 456   10

4

```
 1              ALPHABETICAL INDEX TO VENIREPERSONS
        VENIREPERSON                 Voir Dire        Page  Vol.
 2      BENAVIDEZ, NOE G., NO. 34    347                    10
        Accepted by the Defense ........................... 386  10
 3      Juror No. 4 admonished ............................ 386  10

 4      CALBAT, JEREMY JOHN, NO. 23    115,153             10
        PJ No. 23 Accepted by State ....................... 190  10
 5      PJ No. 23 Accepted by Defense ..................... 190  10
        Juror No. 3 Admonished by Court ................... 190  10
 6
        CASTANEDA, ROBERTO, NO. 22     16,28,58            10
 7      Dfs. Obj. To PJ No. 22 for Cause .................. 64   10
        State's response to objection ..................... 65   10
 8      Denied ............................................ 72   10
        PJ No. 22 accepted by the State ................... 88   10
 9      PJ No. 22 accepted by Defense ..................... 88   10
        Juror No. 3 Instructed by Court ................... 88   10
10
        DICUS, THOMAS M., NO. 30       193                 10
11      Peremptory No. 4 by the Defense ................... 244  10

12      LOVELY, WENDELL, NO. 21        6                   10
        Dft's Challenge for Cause ......................... 13   10
13      Agreement by the State ............................ 14   10
        Accepted by the State ............................. 244  10
14      Venireperson Excused .............................. 14   10

15      MENARD, JANA MALM, NO. 123     90                  10
        PJ No. 123 Challenge by Defense ................... 113  10
16      PJ. No. 123 Excused ............................... 114  10

17      MEZA, THERESA, NO. 35          388                 10
        Challenge for Cause Overruled ..................... 455  10
18      Peremptory No. 5 by Defense ....................... 455  10

19      O'BRIEN, DIANA LOUISE, NO. 33   245               10
        Strike for cause by Defense ....................... 296  10
20      Challenge for cause by Defense .................... 442  10
        Agreed strike by the State ........................ 296  10
21
        STARKEY, KENNETH L., NO. 31    298                 10
22      Peremptory No. 2 by  the State .................... 346  10

23

24

25
```

**5**

1           P R O C E E D I N G S
2    NOVEMBER 12, 2008
3           MR. SKURKA:  Judge, I would just point
4    out, Juror No. 25 is coming in at 10:00, but I believe
5    that was one of the ones -- there was -- was an
6    agreement.  I had him on my list of agreements.
7           THE COURT:  Do we agree?
8           MR. GARZA:  That is true, Your Honor.
9    And I don't know why he stayed on.
10          THE COURT:  Well, I guess...
11          MR. SKURKA:  It's probably that court
12   manager you have.
13          THE COURT:  That will help us catch up a
14   little bit.
15          MR. SKURKA:  He's the one that was
16   hearing voices, Judge.
17          THE COURT:  There's one.  Okay.  Well,
18   who do we have?  Do we have Juror No. 123?
19          THE BAILIFF:  Yes, both of them are here.
20          THE COURT:  You want to do Juror No. 123,
21   I guess?
22          MR. GARZA:  Yes, sir.
23          THE COURT:  All right.  Let's bring him
24   in, Jana Malm.
25          THE BAILIFF:  Okay, Your Honor.

**6**

1           (Venireperson enters courtroom.)
2
3           VENIREPERSON NO. 21,
4           WENDELL PAUL LOVELY,
5           VOIR DIRE EXAMINATION
6    BY THE COURT:
7      Q.   Okay.  Come have a seat.  Wendel Lovely,
8    Juror No. 21?
9           MR. SKURKA:  This is 21, not 123.
10          THE COURT:  Apparently.  I guess 123 is
11   not here, yet.
12          MR. JONES:  Oh, I was looking for a lady.
13          MR. SKURKA:  It's nothing against you
14   Mr. Lovely, we're just starting to get our people
15   straight.
16     Q.   (BY THE COURT)  Mr. Lovely, we're going to
17   talk to you a little bit about.  Obviously, you -- you
18   were with us the other day.  And, okay, you have been
19   on a criminal jury before.
20     A.   It was the State versus this lady that was
21   incarcerated, and we took her parental rights away
22   from her.
23     Q.   Oh, okay, okay.  Well, that's actually sort
24   of -- that's a family case, but -- but that helps me a
25   little bit.

**7**

1           All right.  Now, in that case, the burden
2    was on the State by clear and convincing evidence.
3      A.   Yes.
4      Q.   Okay?  And it -- and for them to prevail --
5    and, I guess, they did.
6      A.   Yes.
7      Q.   The State, they had to -- State had to show
8    you by clear and convincing evidence their case,
9    okay --
10     A.   Yes.
11     Q.   -- essentially.  This is -- this is a little
12   bit different, this is a criminal case.  Now, in this
13   case, the State still has the burden, but it's even
14   higher than that.  Clear and convincing is here,
15   reasonable doubt is here.  This is beyond a reasonable
16   doubt.  It's higher than that standard, all right?
17   And we don't really have a definition of what it is,
18   but it is the highest standard in the law, in all the
19   law, okay?  Could you hold the State to that standard?
20     A.   Yes, sir.
21     Q.   All right.  I mean, basically, it works like
22   this:  Look, State's brought the charges against this
23   Defendant, all right, and the law says, "Look, State,
24   you bring the charges, that's fine, but you got to
25   prove them.  He doesn't have to prove them.  You bring

**8**

1    them, you prove them."  All right?  And that's how our
2    system works, and you got no problem with that, I take
3    it?
4      A.   No, sir.
5      Q.   Okay.  Now, as part of that, Defendant is
6    innocent until proven guilty.  That's part of our
7    system, and it's -- it's part of -- it comes from
8    England, and before that from Rome, and before that
9    from Greece.  And -- and the idea is, "Look, State,
10   you bring the charges, but until you prove them, if
11   you can prove them --" and maybe they can't "-- until
12   you prove them, the person is innocent until you prove
13   them guilty.  There's some places in the world where
14   you are -- State decides that you're guilty and they
15   charge you and you're guilty until you can prove your
16   innocence.  We don't do that here.  Until -- until you
17   prove it, everyone is innocent until proven guilty.
18   You agree with that law?
19     A.   Yes.
20     Q.   All right.  And you could -- you could
21   presume this Defendant to be innocent until the State,
22   if they can prove it?
23     A.   I must say I've seen some media coverage on
24   it.
25     Q.   Okay.  We're going to talk about that, too.

**9**

1    A.   But, yes, I agree with that.

2    Q.   You agree with that -- with that law?

3    A.   Yes.

4    Q.   Okay.  Now, look, I can tell you that I've

5  done a lot of trials, both sitting over there, sitting

6  over there and sitting here, okay?  And some of the

7  trials have gotten media coverage, and, quite frankly,

8  the media coverage has often been wrong, with all due

9  respect to the media, okay?  Not always, but, you

10 know, a lot of times it was wrong, and sometimes it

11 was somewhat right, but off-base, okay?

12            In any event, we want to make sure that

13 when we begin this trial that both sides start off

14 equally, okay?  You know, there was that O. J. Simpson

15 case, and there was -- there was nobody in the world,

16 in fact, Saturday Night Live did a skit -- I guess, it

17 was a rerun -- they did a skit the other day.  They

18 were trying to get jurors who hadn't heard of the

19 case, you know?  And one guy had a head injury and he

20 had completely forgotten and another guy, you know,

21 had amnesia.

22            We don't expect our jurors to live in a

23 vacuum, okay?  And -- and, you know, this is one of

24 those cases where, locally, it's sort of that way, it

25 gets a lot of attention, okay, and most people have

**10**

1  heard of the case.  But what we want are jurors that

2  can keep an open mind, all right?  That is, if they've

3  already come up to a conclusion before we begin,

4  that's not fair.  You agree with that?

5    A.   Yes.

6    Q.   Okay.  And another one -- the other thing is

7  we want people that can follow the law.  And we've

8  talked a little bit about the law and so far you've

9  told me you can follow the law, but you did tell me

10 that you'd seen some media coverage, okay?  What we

11 need to know is, is that media coverage going to get

12 in the way of you sitting -- of you just saying, "You

13 know, what, media coverage, whatever, I'm just going

14 to sit and listen to the evidence that's presented.

15 I'm only going to consider the evidence that's

16 presented in trial and I'm not going to consider the

17 media coverage I've heard, because it may or may not

18 be right," okay, or, are you going to say, "Well, you

19 know what, I've already kind of formed an opinion

20 based upon that media coverage, and in all fairness

21 maybe I shouldn't sit in this case".

22            And I got to tell you, before you answer,

23 there's no right or wrong answer to that question.  We

24 just need to know one way or the other.  You're not

25 going to -- you're not going to hurt anybody's feeling

**11**

1  here, no matter how you answer, okay?  So, how -- how

2  do you feel about that?

3    A.   I seen some media coverage a couple of three

4  years ago about these two ladies that were in the

5  police car, and they were, like, smirking and -- like

6  it was a big joke; and then about a week later, a

7  couple of weeks later, they were in front of the Judge

8  and they didn't think it was so funny, what had

9  happened.  And I thought back then, I says, "Well,

10 they're guilty."  They went to trial, they were found

11 guilty and they were convicted.  That's what I know

12 about that.

13            As far as for Mr. Ramirez, I -- I recall

14 he had fled to wherever.  And I made up my mind, I

15 thought, I says, "Well, if he fled, he's got something

16 to hide or he just doesn't want nothing to do with

17 this, whatever," and then I just forgot all about it.

18   Q.   Okay.

19   A.   And then -- I just forgot about it.  And then

20 I was called down here a few weeks ago and I

21 remembered about it, and that was about it.  I -- and

22 then, Monday, I was watching the 6:00 news and it

23 started coming on, and I turned it -- turned the T.V.

24 off, because it was -- it said something about jury

25 selection, so I got rid of that out of my mind.

**12**

1    Q.   Okay.

2    A.   As far as making up my mind, I have not made

3  up my mind on anything that I haven't heard the

4  evidence in, but the ladies that -- that were with

5  this case were convicted.  I believe they were guilty

6  and they were convicted of it and I made up my mind

7  then.

8    Q.   About them?

9    A.   Yes.  And I don't know the circumstances of

10 Mr. Ramirez, but I would have to have a tendency that

11 the State has a pretty strong case against him or we

12 wouldn't all be here, but I would have to hear the

13 evidence to have them prove that he's guilty of this

14 crime.

15   Q.   Okay.  Okay.  I mean, look, look, I -- I do

16 this myself, I'm watching T.V., and I hear a few

17 facts, and then I make, you know, my own mind -- and

18 my wife is a criminal defense lawyer and we talk about

19 that, too, "Oh, that guy's guilty or that guy's

20 guilty."  But really and truly, the fact of the matter

21 is it's very different when you sit through a jury

22 trial.  You've sat through a trial before.

23   A.   Yes.

24   Q.   It's very different.  You don't hear, like,

25 you know a sound bite, okay, you don't see just a

13

```
 1   little clip.  I mean, you really hear the -- the case
 2   in depth.  And -- and sometimes, you know, those
 3   little news clips that you get on the media just
 4   really -- really doesn't tell the case -- tell the
 5   facts of the case, how they really are, okay?  I -- I
 6   guess I just need to know if because you heard that
 7   stuff -- and I know that you -- you stated to us that,
 8   you know, you would sit and listen to the evidence in
 9   this case.  I just need to know if you're starting
10   them off even a little bit behind.
11       A.   Truthfully, yes.
12       Q.   Okay.
13               MR. GARZA:  Can we have a preliminary
14   hearing?
15               THE COURT:  Uh-huh.  Let me --
16               MR. GARZA:  Can we address the Court
17   outside the presence --
18               THE COURT:  Yeah.
19               MR. GARZA:  -- of the juror?
20               THE COURT:  Let me -- let me -- why don't
21   you step in the jury room.  I'm going to talk to these
22   folks.
23               (Venireperson exits courtroom.)
24               MR. JONES:  He's not qualified.  He's
25   prejudged the case.  He's leaning towards the State.
```

15

```
 1   really appreciate your honesty, okay?
 2               VENIREPERSON NO. 21:  Yes, sir.
 3               THE COURT:  Because that's exactly what
 4   we need.  We don't want people sandbagging us and then
 5   they get back in there and just weren't fair with us.
 6   And there's no way we can know unless you tell us, and
 7   thank you very much, okay?
 8               VENIREPERSON NO. 21:  Yes, sir.  Yep.
 9               THE COURT:  All right.  Thank you, Mr.
10   Lovely.
11               VENIREPERSON NO. 21:  Okay.
12               THE COURT:  If you need a work excuse?
13               VENIREPERSON NO. 21:  No, I'm -- I'm
14   cool.
15               THE COURT:  Okay.  All right.
16               Before you bring --
17               (Venireperson exits courtroom.)
18               THE COURT:  -- that next person, do we
19   have that Juror No. 123?
20               THE BAILIFF:  Roberto Castenada?
21               MR. JONES:  No, that's 20 -- he's 22.
22               THE COURT:  Well, we can take -- there's
23   nobody else there?
24               THE BAILIFF:  That's it.
25               THE COURT:  Okay.  We'll go ahead.
```

14

```
 1               THE COURT:  I mean, I -- I asked him, and
 2   he -- he volunteered to me before I even talked about
 3   that issue that he'd seen stuff about the case, and it
 4   seemed to indicate to me he wanted to talk to me about
 5   it.
 6               MR. JONES:  Right.
 7               THE COURT:  And when I explored it, I
 8   mean, I asked him flat-out just now, "Are you starting
 9   them off behind," and he said, "Honestly, yes."
10               MR. JONES:  That's a good -- that -- by
11   the way, I like that question.  That's a good way of
12   putting it, for a layman, and he -- and he answered it
13   pretty quickly.
14               THE COURT:  All right.  Mr. Skurka?
15               MR. SKURKA:  That's okay, Judge.
16               THE COURT:  All right.
17               MR. JONES:  He was honest.
18               THE COURT:  Yeah, he was honest.  He was
19   honest.
20               (Venireperson enters courtroom.)
21               THE COURT:  All right.  Mr. Lovely, I
22   really appreciate your honesty, okay?
23               VENIREPERSON NO. 21:  Yes, sir.
24               THE COURT:  And -- and you're -- you're
25   not going to be selected on this jury, and -- but I
```

16

```
 1               (Venireperson enters courtroom.)
 2
 3               VENIREPERSON NO. 22,
 4               ROBERTO CASTANEDA,
 5               VOIR DIRE EXAMINATION
 6   BY THE COURT:
 7       Q.   All right.  You are Mr. Castaneda?
 8       A.   That is correct.
 9       Q.   All right.  Mr. Castaneda, we're going to ask
10   you some questions, okay?
11       A.   Yes, sir.
12       Q.   You came in the other day and filled out the
13   questionnaire.
14       A.   That is correct.
15       Q.   And you listened to each one of our spiels,
16   the other day.
17       A.   Yes, sir.
18       Q.   Okay.  Now, you have been on a jury once
19   before, and it was -- it looks like it was a contract
20   situation.
21       A.   Correct.
22       Q.   A civil case.
23       A.   Correct.
24       Q.   Okay.  All right.  This is a little bit
25   different, this is a criminal case.  And we're looking
```

19

1  A.   Correct.
2  Q.   Okay?  But they've got to be proven.  Two
3  different things.  Do you agree with that?
4  A.   Yes, sir, I do.
5  Q.   And what the law says is, "Hey, State, you
6  bring the charges, that's fine, but until you can
7  prove it beyond a reasonable doubt, the charges that
8  you brought, we have to presume that the accused is
9  innocent until you prove it, if you can prove it."
10  A.   Okay.
11  Q.   Okay?  And that's not a -- that's not a --
12  that's not a new invention, that's ancient.
13  A.   Uh-huh.
14  Q.   It's in the Bible, it's the Romans --
15  A.   Right.
16  Q.   -- and Greeks, the English, they all had it,
17  okay?  You agree with that law?
18  A.   That's correct.  Yes, sir, I do.
19  Q.   So you could presume that the Defendant is
20  innocent until and if the State could prove the case
21  beyond a reasonable doubt to you.
22  A.   Right.
23  Q.   Okay.  Now, the burden of proof is always on
24  the State.  It never shifts over here, okay?  In other
25  words, there's some countries in the world where a

---

18

1  A.   Yes, sir.
2  Q.   One side has to -- has to prove the case.
3  A.   Correct.
4  Q.   But it's a pretty low standard, okay?
5  A.   Right.
6  Q.   Kind of like --
7  A.   Balancing.
8  Q.   -- tipping the scales.
9  A.   Yes, sir.
10  Q.   This is higher than that.  This is beyond a
11  reasonable doubt.  And there's no definition, but it's
12  the highest burden that we have in all of the law, all
13  right?  That being said, it's not beyond all doubt or
14  beyond a shadow of a doubt.  I mean, you know, it's
15  beyond a reasonable doubt, okay?
16  A.   Yes, sir.
17  Q.   You think you could hold the State to that
18  burden?
19  A.   Yes, sir.
20  Q.   No more or no less.
21  A.   That's correct.
22  Q.   Okay.  Now, as part of that, the law says
23  "State, you brought the charges, you got to prove
24  them," all right, because charges are just accusations
25  and accusations can be made.

---

1  for two things, okay?
2  A.   Yes, sir.
3  Q.   We're looking for jurors that can keep an
4  open mind, all right?  We want -- we want people to
5  come to court.  If they've already made up their mind
6  about the case, one way or another, that's not fair.
7  A.   Correct.
8  Q.   All right?  We want people that can keep an
9  open mind and come and listen to the evidence and --
10  and really see what -- see what the case is all about,
11  okay?
12  A.   Yes, sir.
13  Q.   And, two, we want people that can follow the
14  law, all right?
15  A.   Correct.
16  Q.   Do you think that's you?
17  A.   Yes, sir.
18  Q.   Okay.  Now, I'm going to talk about some
19  things about the law.  First of all, this is a
20  criminal case, and in every criminal case the State,
21  that is, the -- the State of Texas who's brought the
22  charges has the burden of proof, okay?  In this case
23  that you sat on before, I -- I'm willing to bet you
24  the burden of proof was preponderance of the evidence,
25  okay, which is sort of a probably.

---

20

1  Defendant is required to prove his innocence.  We
2  don't do that here.  Here we say, "You know what,
3  State, you accuse them, you prove it."
4  And the burden never shifts over here.
5  They don't have to do anything, that is, the Defense,
6  okay?  They -- they don't have to present any
7  evidence.  As part of that, the Defendant doesn't have
8  to testify, okay?  And it really makes sense, really,
9  because, if the burden of proof is on them, then these
10  folks don't have to do anything, all right.  And
11  that's the law.  And it's not just the law, it's
12  really -- it's under the U.S Constitution, all right?
13  It's part of the Bill of Rights.
14  But some people say, "Well, I can't
15  follow that law, and even though I know that's the
16  law, I can't follow it, and I -- not only would I want
17  to hear what he had to say, but if I went back there
18  and I wasn't sure about the State's case, you know,
19  maybe -- maybe it's kind of very close to the line,
20  and if this guy didn't testify, I'm going to put a
21  little mark over here for the State and that may knock
22  me over the top or I'm going to hold it against him
23  that he doesn't testify."
24  Now, I -- I will submit to you, I think
25  there's a lot of reasons why somebody wouldn't

21

1    testify, all right?  Maybe his lawyers think they
2    haven't proven the case and his lawyers advise him
3    "Don't testify, they haven't proven the case."  Maybe
4    he's not an educated person, maybe -- maybe he
5    stutters when he gets nervous, maybe he sweats
6    profusely when he gets nervous, okay?  Not all of us
7    are, you know, meant for the spotlight.
8        A.   Correct.
9        Q.   All right?  So there's a lot of reasons why
10   somebody may not want to testify but the bottom line
11   is I need to know from you whether you would hold it
12   against him if he didn't testify.  We don't know at
13   this point.  Would you hold it against him?
14       A.   No, sir, I wouldn't.
15       Q.   Okay.  Now, this case is capital murder and
16   -- which is sort of like murder plus, okay?  It's not
17   just murder.  And it sounds kind of strange to say,
18   "Plain murder," but there is such a thing as just
19   murder, okay?
20       A.   Yes, sir.
21       Q.   And murder, of course, is the intentional
22   taking of the life of another.  All right?
23       A.   True.
24       Q.   The allegations that the State has made here
25   is more than that.  They're saying, "capital murder,"

22

1    and -- and there's a laundry list of ways you can
2    prove capital murder, but in this particular -- that
3    the legislature has given us -- in this particular
4    instance, what the State is alleging is that this
5    Defendant, on the given day in Nueces County, Texas,
6    committed the offense of murder while in the course of
7    committing or attempting to commit a robbery, okay.
8            So they have to prove murder, plus at the
9    same time he was trying to rob somebody or did rob the
10   victim, okay?  That's what they have to prove.  And if
11   they can prove all of that, then the Defendant's
12   guilty of capital murder.  You understand that?
13       A.   That's correct.
14       Q.   Okay.  Now, it's not enough that they prove
15   just half of it.  They got to prove all of the
16   elements of the offense, okay?  That is, you may think
17   that they've proven the murder, but they may not have
18   proven the robbery part or vice versa.  You may think,
19   well, maybe they proved the robbery part, but they
20   didn't prove the murder part.
21           Now, you understand you can't find his --
22   this person guilty of capital murder, unless they
23   prove all of it, all of what they've alleged.  You
24   understand that?
25       A.   Yes, sir.

23

1        Q.   Would you hold the State to that burden?
2        A.   Well, he -- he'd have to prove -- he'd have
3    to prove both, that you're deciding where he was
4    attempting or actually committing the -- the robbery
5    --
6        Q.   Yeah, yeah.  I mean, they don't have to prove
7    that he actually committed it, they can prove that he
8    attempted to commit it.
9        A.   Attempted to commit.  Okay.
10       Q.   Okay?  Or they can prove that he did commit
11   it, okay, that -- they have to prove one of the two.
12       A.   Yes, sir.
13       Q.   And they can prove either one.
14       A.   Right.
15       Q.   But they have to prove one of them.  Now, he
16   may be guilty of something else.  Maybe he is guilty
17   of murder, but not capital murder.  I'm not saying
18   that, but what I'm saying is, for them to get to
19   capital murder, he's got -- they have to prove it all,
20   okay?  It's not like it's not like, you know, the best
21   of seven series or something like that.
22       A.   Right.
23       Q.   They've got to run the table.
24       A.   Correct.
25       Q.   They got to get him on -- I don't know how

24

1    many elements there are off the top of my head, seven,
2    eight, nine, I don't know, but, in any event, they got
3    to get them all, okay?  Would you hold the State to
4    that?
5        A.   Not to...
6        Q.   To require them to prove all the elements.
7        A.   Correct.
8        Q.   Beyond a reasonable doubt.
9        A.   Correct.
10       Q.   Okay.  Now, if they do -- well, let tell you
11   how it works.  In Texas, we have a bifurcated system,
12   okay?  That means we have two parts of the trial.
13   First part of the trial the jury would be asked to
14   listen to the evidence and determine whether the State
15   has proven beyond a reasonable doubt the charge, that
16   is, capital murder, all right?  So the jury goes --
17   after the case is done and after we submit it to you,
18   you go back to the jury room, you deliberate and then
19   the jury decides either guilty or not guilty of
20   capital murder.  If the answer's not guilty, that's
21   the end of the case, you go home, we all go home,
22   okay?
23       A.   Okay.
24       Q.   Done.  If, however, the Defendant is found
25   guilty of capital murder, then we go to the second

25

1  phase of the trial, which is the punishment phase.

2           Now, I will tell you there are two

3  punishments for capital murder in the State of Texas

4  for this charge, that is, life in prison or death

5  penalty, okay?

6     A.  Yes, sir.

7     Q.  But you don't say it that way, you don't say

8  life or death.

9     A.  Right.

10    Q.  In every other case in the State of Texas

11 where the jury decides punishment, they assess

12 whatever punishment is available.  Maybe it's a term

13 of years, maybe it's probation, maybe it's a fine,

14 maybe it's all of those things, okay, but not in a

15 capital murder.

16          In a capital murder, you're asked to

17 answer questions, and you answer two one of them, and

18 they're up here.  Here's one of them if you'll look

19 over your left shoulder, and then you answer this

20 question:  "Is there a probability that the Defendant

21 will commit criminal acts of violence that will

22 constitute a continuing threat to society?"  Jury

23 answers, yes or no.

24          Then the jury goes to Special Issue No.

25 2.  "After taking into consideration all the evidence,

26

1  including the circumstances of the offense," that's

2  the guilt or innocence phase, okay?

3     A.  Okay.

4     Q.  And then "the Defendant's character and

5  background, and the personal moral culpability of the

6  Defendant, is there a sufficient mitigating

7  circumstance or circumstances to warrant that a

8  sentence of life in prison, rather than a death

9  sentence be imposed," okay?

10    A.  Okay.

11    Q.  And this is sort of like you take in all,

12 everything.

13    A.  Uh-huh.

14    Q.  You take in the case and you take in

15 everything about the Defendant's background, has he

16 been a good guy, has he been a bad guy?  Does he have

17 a bad criminal history, does he have one at all?  Is

18 -- other than this particular day, you know, do you

19 hear evidence that he was a great guy or not?  And

20 then you answer that question, yes or no, the jury

21 does, okay?

22    A.  Correct.

23    Q.  My question to you is -- and some people say

24 they can't do this, okay, they can't -- they can't go

25 through a process like this that may potentially end

27

1  up in a death penalty, okay?  Some people say, "You

2  know what, if -- if that's -- if he's guilty of

3  capital murder, I'm not going to consider life.  I'm

4  not going to answer that question."  It's a knee-jerk

5  reaction, it's death every time.

6           Okay, what I need to know from you is,

7  could you follow the law, take the oath to listen and

8  see if the State has proven this case beyond a

9  reasonable doubt to you?  First, that is, could you

10 deliberate on the guilt or innocence on the capital

11 murder issue --

12    A.  Yes, sir.

13    Q.  -- first of all?

14    A.  Yes, sir.

15    Q.  And then if you found the Defendant guilty,

16 that is you and the rest of the jurors, could you

17 answer these questions truthfully?

18    A.  Yes, sir, I would.

19          THE COURT:  Okay.  All righty.  Well,

20 then, I'm going to turn the floor over to Mr. Skurka.

21 He gets to go first because he's got the burden of

22 proof.

23          MR. SKURKA:  Thank you, Judge.

24

25

28

1           VOIR DIRE EXAMINATION

2  BY MR. SKURKA:

3     Q.  Good morning, Mr. Castaneda.

4     A.  Good morning, sir.

5     Q.  As the Judge introduced me, my name is Mark

6  Skurka.  I'm an assistant district attorney.  This is

7  Geordie Schimmel.  He's also an assistant D.A. that's

8  assigned in Judge Galvan's Court on a daily basis, and

9  he's going to be assisting me in trying this case.

10    A.  Okay.

11    Q.  Let me begin by telling you there's no right

12 or wrong answers to anything you say.  All we want to

13 know is how you really feel about these things.

14    A.  Okay.

15    Q.  Sometimes jurors say, "Well, I better answer

16 it this way because I think the Judge wants me to

17 answer it this way."  You just tell us how you feel --

18    A.  Correct.

19    Q.  -- and we'll deal with that.

20    A.  Okay.

21    Q.  That fair enough?

22    A.  That's fair enough.

23    Q.  Good.  Tell me about this -- this.  When you

24 first came into that -- that jury room, remember, a

25 few weeks ago, when all these people were in there,

29

1  there was 2- or 300 people in there and the Judge came
2  down and most people didn't know what they were there
3  for until the Judge said, "This is a criminal case.
4  And not only is it a criminal case, but it's a capital
5  murder case where the death penalty could be a -- a
6  decision that you may have to make," what was the
7  first thing that struck your mind when you heard it
8  was that kind of a case?
9      A.   Well, being that I never -- I've been on one,
10  I've never -- what hit my -- what -- actually, what --
11  again, it surprised me.  I mean, you know, I've been
12  on civil, but never --
13     Q.   Uh-huh.
14     A.   -- criminal.  So, it -- it just opened me to
15  hear it, you know, what -- what kind of murder trial
16  or case it was going to be.
17     Q.   Once you heard that initial surprise -- I
18  think a lot of people were surprised -- what did you
19  think then?
20     A.   That if I was to be a juror and serve, I
21  would, you know, be fair and honest.
22     Q.   Sometimes I watch the people on the jury
23  panel down there, and the Judge says capital murder
24  and death penalty, and some of them go, "Oh, my gosh,"
25  like this, and some say, "Oh, my gosh," they get real

30

1  upset, and then some people go, "I better listen a
2  little closer, this is pretty important stuff," and
3  they straighten up and listen.  They may have been
4  kind of joking around before --
5      A.   Yes, sir.
6      Q.   -- but they take it seriously.
7      A.   That's correct.
8      Q.   How do you -- how did you --
9      A.   I take it serious.
10     Q.   That's how it was with you?
11     A.   Yes, sir.
12     Q.   So it didn't bother you that you were going
13  to have to be making this kind of decision if you get
14  called on this jury?
15     A.   No, sir.
16     Q.   Okay.  I mean, you didn't have any, like,
17  moral or religious reasons to say, "Well, I can't sit
18  on this kind of jury"?
19     A.   No, sir.
20     Q.   And that's fine if you do.  Some people say,
21  "Well, gosh, you know, I'm so against the death
22  penalty because of my religious convictions or my
23  moral feelings, I just couldn't sit on this kind of
24  case.  I can sit on a D.W.I. or a civil case, but not
25  this kind of case."  But that kind of thing didn't

31

1  affect you?
2      A.   No, sir, it didn't.
3      Q.   Okay.  And what you said is exactly right.
4  You said you thought you better listen and be fair to
5  everything --
6      A.   Correct.
7      Q.   -- and take it seriously.  Obviously, the
8  Judge takes it seriously, we take it seriously, the
9  Defense and Defendant takes it very seriously, but we
10  just need to know where you're coming from --
11     A.   Right.
12     Q.   -- to see if you can do that.  Because I told
13  you the very first day, I mean, I told you, "The State
14  is going to seek the death penalty."
15     A.   Correct.
16     Q.   "And if you're seated on this jury, there's
17  going to be a time that I'm going to ask you to review
18  all the evidence and find the -- and answer the
19  questions that -- that end up with this Defendant
20  being sentenced to death," and I want you to look at
21  him right now.  That's him, John Henry Ramirez.  If
22  you think the evidence is there, and if we prove to
23  you beyond a reasonable doubt that he's guilty and the
24  question should be answered in such a way that he gets
25  the death penalty, can you impose it as a juror?

32

1      A.   Yes, sir.
2      Q.   Okay.  And -- and I had to pin you down on
3  that because sometimes people say, "Well, gosh, you
4  know, I believe in the death penalty.  I think it's a
5  good law, but don't make me do it," you know?
6      A.   Right.
7      Q.   And -- and, you know, that's the person over
8  there, it's not somebody you read about, you know, on
9  -- in the paper or see on T.V.  That's him.
10     A.   Right.
11     Q.   So you think you can go through with it if
12  it's called upon?  Based on the evidence, of course.
13     A.   I'm sure I can.
14     Q.   Okay.  Now, it says that -- well, so how do
15  you feel about being on the jury?  Say you get picked
16  on this jury and you're in there, how do you feel
17  about being on the jury that has to make that ultimate
18  decision?
19     A.   Well, technically, I feel like I would be
20  serving the law, first of all.
21     Q.   Uh-huh.
22     A.   Again, you take everything into consideration
23  as far as, you know, evidence and witnesses and
24  proving guilty or not guilty --
25     Q.   Uh-huh.

33

1    A.    -- and then decide from there.
2    Q.    So it seems to me that you're pretty strong
3  in believing that the law of the land is the law of
4  the land.
5    A.    And we all have to obey it.
6    Q.    And -- and that's -- that's -- everybody has
7  to obey it, no matter if you're rich or poor, --
8    A.    Correct.
9    Q.    -- young or old, black or white, everybody
10  has -- is treated equally.  That's what America's
11  built on.
12    A.    Yes, sir.
13    Q.    You have to treat it -- and if, as a citizen,
14  like you and your family, you know you have to obey
15  the law or there's consequences if you don't.
16    A.    Correct.
17    Q.    And -- and that most people of age should
18  know that.
19    A.    Right.
20    Q.    Wouldn't -- did you think anything about
21  his -- his age or something when you first looked at
22  him?
23    A.    No, sir.
24    Q.    Okay.  Why not?
25    A.    Well, I mean, when -- you know, when I -- I

34

1  want to use the right word, but when somebody commits
2  a crime, if you will, okay, you don't -- they commit
3  it, but if it's female, male, young or old, it's a
4  crime committed, and that's what I -- I look at.
5    Q.    Some people say, "Well, gosh, you know, he
6  looks so young.  He looks so -- he looks like he
7  couldn't hurt a fly, right now, you know?  He looks
8  like a kid," and I always tell them what the law is,
9  you can't execute a kid under 18 years old.  The law
10  just says, in Texas, no, that's too young.  But would
11  you agree with me that anybody that's of age, like in
12  the mid 20s, doesn't really matter if they're 20, 25,
13  30, 35, 40, 45 once you're of age, you should know the
14  difference between right or wrong and what the law is?
15    A.    That's correct.
16    Q.    Okay.  And we're not talking about somebody
17  who's under 18.  Obviously, he's -- he's way over 18.
18  But sometimes people go, "Oh, my gosh, he looks so
19  young, he couldn't hurt anything."  Would you agree
20  with me with this statement, you can't judge people by
21  how they look, you judge them by what they do?
22    A.    That's correct.
23    Q.    Would that be a fair statement?
24    A.    That's a fair statement.
25    Q.    You know, I always say that because sometimes

35

1  people say, "Well, gosh, he looks so different," and I
2  go, "You can't make a decision on looks."
3    A.    Right.
4    Q.    Have you ever heard of that guy, Ted Bundy,
5  that killed all those women?  You know, he killed a
6  bunch of women.  He's a young, handsome-looking guy,
7  but he killed, I don't know, 15 women.  So you can't
8  make a judgement based on how they look.
9    A.    Right.
10    Q.    Not everybody looks like Charles Manson.  If
11  you remember Charles Manson.
12    A.    Oh, yeah.
13    Q.    I mean, you look at that guy, he looks scary.
14    A.    Uh-huh.
15    Q.    But would you agree with me that that's not a
16  decision you should make --
17    A.    Because of what he looks like.
18    Q.    -- because of what they look like?
19    A.    No, sir.
20    Q.    Okay.  Good.  We're on the same page, then.
21  Now, the Judge told you that this is murder plus
22  robbery, and I want to cover over that a little bit.
23  Remember, the law says you can only get capital murder
24  if it's a certain type of murder under certain
25  circumstances, generally, murder with something else

36

1  being there, like killing the cop on duty, or killing
2  a kid under six years old, or murder plus robbery,
3  burglary, kidnapping, rape, things like that.
4         So, in this case, what the Judge said was
5  exactly right, it can be while committing a robbery or
6  in the course or attempting to commit a robbery.  In
7  other words, it's like people tell me, well, say, for
8  example, somebody goes in to rob a bank and they go in
9  there with a gun and tell the teller, "Give me all
10  your money," but then the cops get there in time and
11  he never really gets any money, does that mean he
12  didn't commit robbery?
13    A.    No.
14    Q.    No.  He did commit robbery.  He was
15  attempting to commit robbery and he did commit
16  robbery, he just didn't get to finalize the robbery,
17  so to speak.  You see what I'm saying?
18    A.    Yes, sir.
19    Q.    So he can't get up there and say, "Hey, I
20  didn't -- I didn't actually take anything.  I didn't
21  get the money I wanted, so I'm not guilty."  He can't
22  say that.  Right?
23    A.    Okay.  Right.
24    Q.    And that's what the Judge -- the Judge will
25  give you some further instructions on that later if

37

1  you sit on this jury, but that's what it just says,
2  murder in the course of committing attempt --
3  committing a robbery or in the course of attempting to
4  commit robbery.
5          Now, there's two parts to the trial, what
6  the Judge said.  We use that big word called
7  "Bifurcated," but that basically means there's part
8  one and part two.  The first part, obviously, is did
9  he do it or not, is he guilty or not?  Because you
10 have to decide that first before you can decide what
11 the punishment is, right?
12     A.  Yes, sir.
13     Q.  And the law kind of goes in that little
14 procedure.  First of all, you just listen to all the
15 evidence about that night or that day and decide did
16 he do it or not.  If he -- if you don't think he did
17 it, then you find him not guilty.  If you think he did
18 it, you find him guilty, then you move on to the
19 second phase, and you're not supposed to kind of
20 combine those two.
21     A.  Right.
22     Q.  Even though in the second phase you can
23 consider everything you heard the first time because
24 obviously that's evidence, but the second part you
25 might get to hear additional evidence to help you

38

1  decide how to punish a person.  Don't you want to know
2  -- it would seem to me that you would want to know
3  what the person's background is before you make a
4  decision, because right now you know nothing about the
5  guy, right?
6      A.  That's correct.
7      Q.  I mean, he's presumed innocent, and you've
8  agreed with that, but you might get to hear additional
9  evidence.  Then you don't just vote, "Well, we vote
10 for death," or, "We vote for life," on the -- on the
11 verdict form.  What you do is you answer some
12 questions, we call them "special issues" that kind of
13 lead to decide, based on the evidence, if he's going
14 to get the death penalty or life in sentence -- or
15 life in prison, I'm sorry.
16         So -- and the -- and the scenario would
17 be you found him guilty, you go to the second phase of
18 the trial, you hear additional evidence, and you might
19 want -- you might get to hear, like, you know, he was
20 an Eagle Scout when he was a kid or maybe you hear
21 that he's been to prison ten times before.  Those are
22 the kind of things that you -- the circumstances you
23 want hear to decide how to punishment them.
24         And the questions are right there on the
25 board and I'll ask you to read the first one with me.

39

1  It says, "Is there a probability that the Defendant
2  would commit criminal acts of violence that would
3  constitute a continuing threat to society?"  We call
4  that "the future dangerousness question."  Basically
5  means do you think he's going to be a danger in the
6  future, is he going to hurt somebody else or commit
7  criminal acts of violence in the future?  Now, it
8  doesn't say that you know that for sure, for
9  certainty.  Unless you have a crystal ball, it's kind
10 of hard to tell what a person's going to do in the
11 future, but sometimes people say you can predict
12 what's going to happen in the future by looking at
13 their past, right?
14     A.  Right.
15     Q.  Okay?  And the law says, "Is there a
16 probability," which means more likely than not, "that
17 the Defendant would commit criminal acts of violence."
18 It doesn't even have to be murder.  Some people say,
19 "Well, gosh, I can only give him the death penalty if
20 I think he's going to murder again."  It doesn't say
21 that, it just says, "any criminal acts of violence,"
22 which could be, I don't know, burglary or kidnapping
23 or beating somebody up, assault, anything, "that would
24 constitute a continuing threat to society."
25         And society's a big word because some

40

1  people tell me, they say, "Well, Mark, you know, why
2  do you have to put the death penalty?  Why can't you
3  lock him up in prison?  That way he's away from
4  society and won't hurt anybody," and I always go,
5  "Wait a minute, who else is in a prison?"  Tell me.
6      A.  Who else?
7      Q.  Who else would be in a prison?
8      A.  Other -- other --
9      Q.  Other prisoners.  Who else?  Guards, medical
10 people, people that work at the prison, right?
11     A.  Society.
12     Q.  Society.  So prison is really in society?
13     A.  Yeah.
14     Q.  It's not like we have a desert island and we
15 put somebody out there where they never see another
16 human being.
17     A.  Correct.
18     Q.  So when people say, "Well, that will take
19 them away from society," I tell them, "there's still
20 other people there."  Have you ever heard about that
21 happening where, like, an inmate hurts a guard or
22 kills a guard --
23     A.  Yes, sir.
24     Q.  -- or hurts another person in prison?  That
25 happens, right?

41

1      A.    Trying to escape.

2      Q.    So just -- just putting them in prison isn't

3  going to lock them away from people forever, they

4  could still cause trouble.  And that's what the law

5  says, "Yes or no, is there a probability, is there a

6  good chance that the Defendant would commit criminal

7  acts of violence that would constitute a continuing

8  threat to society"?

9            Now you see why we call it "the future

10 dangerousness."  Yes or no, do you think he's going to

11 do that?  And you base it on probably what he did here

12 and what he did in the past because sometimes people

13 say, "Well, gosh, he doesn't have -- he hadn't been to

14 prison ten times before."  The law says you can make a

15 decision based on what he did in this case.  He may

16 not have any priors, but as long as you think he's a

17 continuing threat to society, you could answer that

18 question yes.

19           Then you answer the second question over

20 here.  The second question deals with that big word we

21 use called "mitigating circumstances."  I didn't know

22 what mitigate was --

23     A.    I didn't either.

24     Q.    -- so don't feel bad.  Before I went to law

25 school and started doing these cases, I didn't know

42

1  what mitigating either -- was either.  I guess an easy

2  way to say it is it's kind of the opposite of

3  aggravating.  There's aggravating factors and there's

4  mitigating circumstances.  Some people tell me it's

5  kind of like an extenuating circumstance, he did it,

6  but there's some extenuating circumstances.  The legal

7  definition is, "mitigating is anything that would

8  lower or make less severe the sentence, or anything

9  that would reduce the Defendant's moral

10 blameworthiness."  That sounds like lawyer talk,

11 again.

12     A.    Uh-huh.

13     Q.    Let's go to something easier to handle.

14 "Sufficient mitigating circumstances."  Say, for

15 example, you have two kids and you have an 11:00

16 curfew, and the 11:00 curfew is inviolate.  I mean,

17 you have to be home by 11:00.  And you have one kid,

18 and we'll call him, you know, Good Kid, he never

19 violates curfew.  He's always back by 11:00, got his

20 homework done, in bed by 11:00.  Never gives you any

21 trouble, and one time he comes home at 11:03.  First

22 time he's ever done that, and he came home at 11:03.

23 And you get mad at him and you say, "Why did you come

24 home at 11:03?  You're supposed to be home at 11:00."

25 He says, "Dad, I had a flat tire.  It took me 15

43

1  minutes to change a tire, and so, I would have been

2  home by 10:45, but, you know, I got -- I was a little

3  delayed."

4            The second kid, you have the second kid,

5  we'll call him the bad kid.  I'm sure you don't have

6  any bad kids.

7      A.    I don't have any kids at all.

8      Q.    Well, I'm just making --

9      A.    Yeah, yeah, right.

10     Q.    The second kid is -- comes in and he doesn't

11 come in just a little past 11, he comes in at 3:00 in

12 the morning, way past the deadline, and you say, "What

13 the heck happened to you?  Why were you so late," and

14 he says, "Oh, we had a party, and we're drinking and

15 we were having a good time and doing this, and -- and

16 I just didn't think about coming home."  And then this

17 isn't the first time he's done that, in fact, "This is

18 like the 15th time you've broke curfew."

19           Now, look to this, would you treat those

20 people in your punishment, they both violated curfew,

21 right --

22     A.    Uh-huh.

23     Q.    -- both equally did the same crime, but would

24 you punish them the same?

25     A.    No, sir.

44

1      Q.    No, it wouldn't make sense to you because the

2  first kid, he's got mitigating circumstances.  This is

3  the first time he was late, he was just three minutes

4  late and he had a pretty good excuse that he had a

5  flat tire.  So you might say, "Okay.  You broke the

6  rules and I'm going to ground you for a couple of

7  days," but that's it.

8            The second guy, oh, my gosh, he came in

9  four hours late.  He -- he's done it 15 times before

10 and he didn't even have a good excuse.

11     A.    Uh-huh.

12     Q.    Those are aggravating circumstances.

13     A.    Okay.

14     Q.    And that's what that -- that thing is for.

15 It says, "Okay, jury, do you think John Henry Ramirez

16 is guilty of capital murder, you think he's a

17 continuing threat to society," but the Judge says --

18 and it looks like he's headed toward the death

19 penalty, but the Judge says "Look at this Special

20 Issue No. 2.  Take into consideration all of the

21 evidence, including the circumstances of the offense,

22 his character and background and the personal moral

23 culpability of the Defendant, is there a sufficient

24 mitigating circumstances to warrant that a sentence of

25 life, rather than death sentence be imposed?"  In

45

1   other words, is there any reason that you should lower
2   the sentence?  There may not be, there may be.
3            Like in our first case -- the scenario I
4   told you about, there was a reason to give him a less
5   punishment of, like, two days grounded, where the
6   other guy probably got, you know, three months
7   grounded --
8       A.   Uh-huh.
9       Q.   -- but because there were reasons for it, and
10  that's what the Judge is saying, stop and consider.
11      A.   Okay.
12      Q.   Don't rush into anything.  Stop and think.
13  Is there anything about the circumstance of the
14  offense, like what happened that day, his character
15  and background, because you probably want to know.  I
16  mean, was this guy an Eagle Scout that helped little
17  old ladies across the street or has this guy been to
18  prison ten times before?  See, the second part of the
19  trial, you might get to hear some of that background
20  information, whether he's had any kind of history, if
21  he's a good guy, he's a bad guy, whatever.  You may
22  hear people get up there and say, "Hey, he's a good
23  guy.  I've known him forever and he's a good guy."
24  Then you may hear other people say, "Well, he's always
25  been bad kid, he's always been bad," you know?  I

46

1   don't know, you'll have to -- but the question is what
2   is a mitigating circumstance?  I can't even tell you
3   that.  That's up to the jury here to decide because
4   some people may say, "Well, you know, that -- that --
5   that's a mitigating circumstance, you know, he was an
6   Eagle Scout, maybe he's young, maybe we should give
7   him a break because of that."
8            Other jurors may say, "Look, I don't care
9   if he was an Eagle Scout, you know, 20 years ago.  He
10  still did this crime and he's got to pay the
11  consequence for this crime.  That's not enough."  And
12  that's what this says, is it enough, is it sufficient,
13  does it rise to a level that you have to kick out the
14  death penalty and give him a life sentence instead?
15  But that's up to the jury to decide.
16           This Judge will never tell you "This is
17  automatically a circumstance that you have to lower
18  the punishment."  And, my gosh, there's all kinds of
19  various things, you know, could be -- I said Eagle
20  Scout, but it could be, you know, come from a broken
21  home, or, you know, was a decorated war veteran, or,
22  you know, helped his mother with the laundry everyday.
23  I don't know, you know, but the question is, is it
24  enough to outweigh the death penalty?  And that's kind
25  of -- it's kind of like a balancing test the jury has

47

1   to do.  Is it enough to make it a real low sentence, a
2   life sentence instead of death sentence?  Maybe it's
3   not.
4            Now, one other thing I should point out
5   is sometimes people say -- well, there is a law that
6   goes like this, "Voluntary intoxication is not a
7   defense to crime."  If you go get yourself drunk or
8   high on drugs and you go commit a crime, can you say,
9   "Well, I'm not guilty, I was drunk when I did it?"
10  No.  The law says no.  Like the bank robber who goes
11  in and robs a bank and they catch him red-handed, and
12  he goes, "I'm not guilty.  I was drunk when I did
13  that."  No.
14           The law says that cannot be an excuse to
15  crime, but it might be a possible mitigating
16  circumstance.  Say somebody did a burglary case and
17  they were just drunk and went in a house and was
18  messing around in the house.  Well, it's not right,
19  but the question is, well, he did it because he was
20  drunk.  Some people might say it's a mitigating
21  circumstance.  Other people say, "I don't care if he
22  was drunk or not, you know, he still did this burglary
23  case."
24           You know, for example, like, we'd never
25  even have a D.W.I. case if you had that, because

48

1   people say, "Well, I was drunk, I'm not guilty of
2   D.W.I."  But that's a serious case in itself, okay?
3            Do you understand the scheme of that?
4       A.   Yes, sir.
5       Q.   Does that kind of make sense?
6       A.   Yes.
7       Q.   Because, first, you see whether he's guilty
8   or not --
9       A.   Uh-huh.
10      Q.   -- then you see if he's a continuing threat
11  to society, and -- but before you give the death
12  penalty, you have to go back and say, "Hey, let's look
13  at the big picture --"
14      A.   Picture.
15      Q.   -- is what I say.  Is there a sufficient
16  thing to warrant they get a sentence of life, rather
17  than death sentence?  And all the Judge is asking
18  to do is you have to consider these things, doesn't
19  mean you have to agree with these things, you know?
20           I mean, like I said, he may say he was
21  drunk when he did it, he may say he was an Eagle
22  Scout, he may say, "I've never been to prison before."
23  It doesn't matter.  It's up to the jury to decide how
24  much weight to give that.  Does that sound fair?
25      A.   Yes, sir.

**49**

1    Q.   Okay.  Any questions about that?
2    A.   No, sir.
3    Q.   So you understand that by sitting on this
4  jury, you're agreeing to listen to everything --
5    A.   Yes, sir.
6    Q.   -- and if -- and if the answer should be that
7  he -- the State doesn't prove the case beyond a
8  reasonable doubt, you have to find him not guilty,
9  right?
10   A.   Correct.
11   Q.   And if you do find that beyond a reasonable
12  doubt, you do find him guilty, correct --
13   A.   Correct.
14   Q.   -- and if the Court -- you answer the
15  questions in such a way that you think he deserves the
16  death penalty, can you vote that way and carry it out?
17   A.   Yes, sir.
18   Q.   And if you think that the questions are
19  answered in such a way that he's not a continuing
20  threat to society and maybe there are some mitigating
21  evidence -- circumstances, can you vote for a life
22  sentence, instead of a death sentence?
23   A.   Yes, sir, I can.
24   Q.   So you're kind of open-minded for either one.
25   A.   Yes.

**50**

1    Q.   And I'm guessing that you're going to wait
2  till you hear all the evidence.
3    A.   Correct.
4    Q.   And that's all we can ask a jury to do --
5  juror to do.  Thank you.
6         I need to ask you about this situation
7  about your nephew now.
8    A.   Okay.
9    Q.   It said some -- your nephew was involved in a
10  criminal case --
11   A.   Yes, sir.
12   Q.   -- and charged with murder or something?
13   A.   That's correct.
14   Q.   Can you tell me a little bit about that, when
15  that was, where it was?
16   A.   This happened back in '82, and it was in
17  Annaville.  He worked for Sinclair, which is now
18  Valero in Three Rivers as an operator.
19   Q.   Uh-huh.
20   A.   And, apparently, his wife was cheating on
21  him.  And his neighbor at one time or another when he
22  was in graveyard shifts would tell him that there was
23  -- there would be a Cadillac coming in at 1, 2 or 3:00
24  in the morning.  So he kind of asked him, "Well, next
25  time you see that Cadillac, I'd appreciate if you

**51**

1  called."  So he did.  He went home and caught her,
2  and, apparently -- I mean, this is hearsay, I wasn't
3  there, but what had happened is he ran through the
4  front door -- he came in through the garage, the back
5  door.  He ran through the front door, but as he was
6  trying to get his clothes and stuff --
7    Q.   You talking about the guy that was in the
8  car?
9    A.   The guy that was there, yes, sir.  And he was
10  trying to scare him, so he went for a -- for the gun
11  case and pulled out a shotgun.  And while he was
12  trying to scare him, she grabbed the shotgun and it
13  went off and hit the roof, and then he still followed,
14  so she went and got another one and he heard a click,
15  so he turned around and shot her --
16         THE COURT:  I think Tinker and Mike --
17         VENIREPERSON NO. 22:  -- three times.
18         THE COURT:  -- Hummell tried that case.
19         VENIREPERSON NO. 22:  Yes, sir.
20   Q.   (By MR. SKURKA) I recall that, but that was
21  past --
22   A.   Tinker.
23   Q.   -- '82.  That was later than '82, right?
24         THE COURT:  It was like '92.
25         VENIREPERSON NO. 22:  It was '92, I

**52**

1  think.
2    Q.   (BY MR. SKURKA) Yeah, I thought you said '82.
3    A.   I'm sorry, I did, I did.  I correct myself.
4    Q.   I remember that case, too.
5    A.   He was my nephew.
6    Q.   I started at the D. A.'s office in '86, and
7  the facts sounded very familiar to me.
8    A.   Yes, sir.
9    Q.   It was in their bedroom, I believe --
10   A.   That's correct.
11   Q.   -- is when it happened.  And what happened on
12  the case, do you remember?
13   A.   Well, he -- when he shot her, he said that
14  she shot him on the -- on the -- by the chest, and she
15  was in pain and everything else so he shot her two
16  more times to -- so she wouldn't be in pain, which was
17  a bad choice, in my case.  And, you know, I mean -- I
18  mean, it hurts, because he's a nephew that just lost
19  it at that time, but if I'd --
20   Q.   We have a part in the law called "voluntary
21  manslaughter" for that.  If you do some act under --
22  without clear reflection of thought, under passionate
23  -- it's kind of like a passionate-type thing.
24   A.   Yes, sir.
25   Q.   Did he get convicted of voluntary

53

1  manslaughter or found not guilty or was he found
2  guilty of murder?
3     A.   Uh --
4           THE COURT:  I think he got voluntary, 20.
5           VENIREPERSON NO. 22:  I think so.
6     Q.   (BY MR. SKURKA) I can't remember the details,
7  what happened, but you think that's probably what it
8  was, too?
9     A.   Yes, sir.
10    Q.   Yeah.  And then that's kind of what the law
11 provides for.  You can kill somebody intentionally,
12 like, you know, you went over there and intended to
13 kill somebody, or then you have sudden passion arising
14 from adequate cause, which makes it a lower thing,
15 instead of a full range of punishment of murder.
16    A.   Yes, sir.
17    Q.   And so, he didn't -- apparently, had to
18 suffer the consequences of that --
19    A.   Yes, sir.
20    Q.   -- although -- and now, it's like, basically,
21 he caught the "Sancho," but, you know, you can't --
22 you still can't kill him.
23    A.   Right.
24    Q.   Did you -- did you participate in that trial
25 in any way?  Did you, like, testify for somebody or

54

1  anything?
2     A.   No, sir, I didn't.
3     Q.   Did you follow it pretty closely?
4     A.   Yes, sir, I did.  I never went to a hearing,
5  for the simple reason that the family of the deceased
6  were close friends and I had a problem with it.
7     Q.   So you knew both of them.
8     A.   Even -- I knew her by friendship, and, of
9  course, he's -- he's a relative.
10    Q.   So you -- you were related to one person, but
11 the deceased was a friend, too.
12    A.   Correct.
13    Q.   So it put you in a bad position, huh?
14    A.   Correct.
15    Q.   Well, tell me about how you feel about what
16 happened to your nephew.  And the reason I have to ask
17 you this is --
18    A.   That's fine --
19    Q.   -- because --
20    A.   That's fine.  I -- everybody's responsible
21 for their own acts is my -- is my point of view.  If
22 you intend to do wrong -- of course, I put myself in
23 his shoes.  Lord knows what would have happened, but
24 in my opinion, if I had caught her, I would have done
25 away with her as far as divorce, "You just lost out

55

1  what we had," period, but everybody's different.
2     Q.   In other ways (sic), there's different ways
3  to handle that --
4     A.   Correct.
5     Q.   -- besides killing somebody.
6     A.   Correct.
7     Q.   And, again, going back to what you said
8  earlier about, you know, you believe in the law, the
9  law pretty much says you're not supposed to take
10 somebody's life.
11    A.   Well, at the same token, I do believe, if I
12 was in his case -- to come back to this incident, I
13 would have been more physical, if you will, by hand
14 versus weapons.
15    Q.   I understand.  Maybe slap the woman or hit
16 the man?
17    A.   You got to understand, she was my wife and I
18 would have, you know, be hurt --
19    Q.   Sure.
20    A.   -- I mean...
21    Q.   No one knows how a person's going to react in
22 that circumstance.  And, unfortunately, your nephew
23 may have made some bad decisions --
24    A.   That's what --
25    Q.   -- but the consequences are there --

56

1     A.   Right.
2     Q.   -- on these things.  I always tell people
3  whenever we see these, like, battered women getting
4  killed by their husbands or something like that, and,
5  I'm talking about get caught --
6     A.   Right.
7     Q.   -- cheating --
8     A.   Right.
9     Q.   -- and battered, I always say, "Why don't
10 they just get a divorce, why do they have to go kill
11 each other?"
12    A.   Right.
13    Q.   It's just crazy.  The reason I'm asking you
14 is because obviously our office prosecuted him.  Mike
15 Hummell used to work with me,
16    A.   Uh-huh.
17    Q.   -- the prosecutor in that.  Is there any bad
18 feelings towards --
19    A.   No.
20    Q.   -- the D.A.'s Office for doing their job?
21    A.   (Shakes head.)
22    Q.   Okay.  Because some people say, "Ah, you-all
23 put my brother in jail, you-all put my nephew in jail.
24 You-all are bad guys."  I'm just --
25    A.   No.

57

59

1    Q.   -- is there anything lingering there?

2    A.   In this case, it wouldn't be, in my part, a

3    judgement, cause, again, it went through court, it

4    went through jurors.  They decided and that's what

5    they came to.

6    Q.   And that's a fair answer because --

7    A.   That's a fair answer.

8    Q.   -- we all know it's up to the jury to decide.

9    We can think -- we can think all we want because we --

10   what we see on the news or read --

11   A.   Right.

12   Q.   -- or hearsay, but the jury makes the

13   decision.  And -- and you might be having to make a

14   pretty tough decision here, too.  It's an awesome

15   responsibility but you seem to think you're up to it,

16   right?

17   A.   Yes, sir.

18   Q.   And you can do whatever needs to be done?

19   A.   Correct.

20   Q.   If you think it goes one way, you can vote

21   that way, if you think it goes the other way, you can

22   vote the other way.

23   A.   That's true.

24   Q.   Okay.  I don't think I have any other

25   questions for you.  Do you have any questions of me,

1    selection, when we have the very grave responsibility

2    of representing this young man to make sure that we

3    pick or select or eliminate people that we feel can't

4    be fair and impartial.  And what we want to ask you

5    and talk to you about this morning is nothing personal

6    at all, but we do sort of, you know, want to get an

7    idea of -- of your -- your capacity to sit as a juror

8    and think through this process and -- and be fair to

9    both sides.

10   A.   Okay.

11   Q.   Okay?

12   A.   Yes, sir.

13   Q.   I noticed that in your questionnaire you

14   mentioned that when were you asked how you felt about

15   the death penalty, you stated, "It's the law and I

16   feel that we have to do what's right.  In this case,

17   the death penalty, if found guilty, it protects all of

18   us."

19   A.   That's correct.

20   Q.   What did you mean by that?

21   A.   Well, according to the -- the evidence, and

22   if it -- if it proves that he could be, again, a

23   threat to society, among the jurors it's -- it's

24   balancing on the -- on the evidence.  I meant if

25   that's what's -- was chosen by the whole jury, then I

58

60

1    Mr. Castaneda?

2    A.   No, sir, I don't.

3         MR. SKURKA:  Thank you so much for

4    listening to me.  I'll let the Defense talk to you

5    now.

6         VENIREPERSON NO. 22:  Thank you.

7         MR. GARZA:  May I proceed, Your Honor?

8         THE COURT:  Yes.

9         MR. GARZA:  Thank you.

10             VOIR DIRE EXAMINATION

11   BY MR. GARZA:

12   Q.   Good morning, Mr. Castaneda.

13   A.   Good morning, sir.

14   Q.   As you have -- as I have previously

15   introduced myself, I'm Ed Garza.  I'm a local attorney

16   here in Corpus Christi.  I'm a life-long resident of

17   Corpus Christi, born and raised here.  Mr. Grant

18   Jones, who was formally our D.A., elected D.A. years

19   back is my Co-Counsel.

20   A.   Okay.

21   Q.   And we represent, of course, John Henry

22   Ramirez sitting right there next to Mr. Jones.

23   A.   Okay.

24   Q.   It's very important for us as defenders, as

25   defense lawyers, to take the matters of jury

1    would also agree, that would be the case, is what I

2    meant.

3    Q.   How do you personally -- I know it's

4    something maybe you don't talk about every day, --

5    A.   Correct.

6    Q.   -- you know, in your --

7    A.   Correct.

8    Q.   -- in your -- in your day-to-day, either work

9    or, you know, --

10   A.   Right.

11   Q.   -- how you carry on, but how do you

12   personally feel about the death penalty?

13   A.   Honestly, being asked for the first time, I

14   feel we got to serve justice.  If the death penalty,

15   again, it's a threat to society, then I -- I would

16   vote or -- or agree to -- to do what's right.

17   Q.   Okay.

18   A.   What I'm saying is, it's not so much as far

19   as choosing for or against the death penalty, but if

20   he's a threat to society, I honestly feel that he's

21   done it once, or whatever the case may be, whatever

22   they prove, and if it's too many times, then I

23   honestly feel that somebody else from society is in

24   danger of their lives.  And it's -- it's just hard for

25   me to -- to think like that.

61

1    So depending on -- on the situation and
2  the case, again, he might even be innocent.  Again, it
3  all depends on the -- on the --
4    Q.  Well, basically, we want to know right now,
5  do -- do you feel like our client's guilty?
6    A.  Well, I can't -- I can't say yes or no,
7  because I don't know -- I haven't heard what happened.
8    Q.  What does the presumption of innocence mean
9  to you?
10    A.  I didn't really understand that as far as --
11    Q.  The presumption of innocence, what does that
12  mean to you as a legal concept?  What does it mean?
13  Do you agree -- and I think you did say that -- I
14  think you said that a defendant in a criminal case
15  should be presumed innocent until the State proves his
16  guilt beyond a reasonable doubt.  Do you agree with
17  that?
18    A.  To prove, yes, sir, I do.
19    Q.  Okay.  So --
20    A.  Beyond a reasonable doubt.
21    Q.  -- so right now, as my client sits there, is
22  he guilty or innocent?
23    A.  Of the crime?
24    Q.  Right.
25    A.  Yes, sir, he's guilty.  In my -- well, he's

62

1  charged on it, so I'm assuming he's guilty, yes.
2    Q.  And that's the way you feel about it,
3  honestly?
4    A.  Yes, sir.  Yeah, or he wouldn't be here.
5  That's how I look at it.
6    Q.  Okay.  So really, as far as the presumption
7  of innocence, we're safe in assuming that you probably
8  don't believe in that, you don't agree with it.
9    A.  No.
10    Q.  You don't agree with --
11    A.  Well, I don't -- agreeing to his innocence
12  and guilt, again, I don't know till I hear the
13  evidence.  He's here for the charge of committing a
14  crime.  Yes, I believe that, because he's here for it.
15    Q.  And because he's here for it, do you
16  automatically feel like he's guilty of it?
17    A.  No, sir.
18    Q.  Because I need to understand --
19    A.  Right, right, right.  No.
20    Q.  You've already made me a little nervous.
21    A.  Right.  No, no, no.
22    Q.  I'll be real honest with you.
23    A.  Right.  No, I'm honest, too, I mean...
24    Q.  Are you under the assumption that because
25  he's been indicted and we're here sitting before

63

1  trial, do you honestly believe the State must have
2  gotten their man?
3    A.  I don't know.
4    Q.  Well, because you answered that you did, so
5  I'm a little nervous about that.
6    A.  Well, you're -- you're assuming that, if the
7  State is saying if he's guilty.  I can't say he's
8  guilty until -- he's here for the reason that he
9  committed a crime.
10    Q.  But can you agree with me that he's innocent
11  until they do that?
12    A.  Yes, sir, he's innocent until proven guilty,
13  yes, sir.
14    Q.  That's what the presumption of innocence is
15  all about.
16    A.  Okay, okay.
17    Q.  You understand that's what we're talking --
18    A.  Yes, sir, now, I do.
19    Q.  -- about?
20    A.  Yes, sir.
21    Q.  But, see, you said that he must be here
22  because he committed a crime.  Is that -- is it safe
23  to assume that you've already formed an opinion?
24    A.  No, sir.
25    Q.  Okay.  But you figure he's here because of

64

1  that?
2    A.  Do I say he's here because he committed a
3  crime?
4    Q.  Uh-huh.
5    A.  According to what the -- the -- the case is,
6  yes, I'm sure -- I'm assuming he committed a crime.
7  That's why he's here, yes.
8    MR. GARZA:  Your Honor, can we take -- we
9  have a motion to present to the Court --
10    MR. SKURKA:  May I talk to him, first,
11  Judge, please?
12    THE COURT:  Do you pass?
13    MR. GARZA:  No, Your Honor, I do not.  I
14  want to take a motion up with the Court, outside the
15  presence of the juror.  I have not passed.  Before any
16  further questioning, Your Honor.  I have not passed
17  the juror.
18    MR. SKURKA:  Well --
19    THE COURT:  All right.  Well, I'll let
20  you do that, but, I mean -- okay.
21    Would you step in the jury room?
22    VENIREPERSON NO. 22:  Sure.
23    (Venireperson exits courtroom.)
24    MR. GARZA:  I think he has clearly
25  already said it, and quite clearly more than two or

65

1    three times, Judge, that he is under the assumption
2    that our client is guilty of a crime.  And -- and I
3    keep asking him, and there's no difficulty with the
4    other jurors in understanding the presumption of
5    innocence.  He has difficulty with it.  I don't think
6    he properly understands, one, the concepts of giving
7    us a clear playing field in this case.  So I think
8    he's already stated on the record, quite firmly, more
9    than two or three times that he has made an
10   assumption, therefore he has made -- he's biased and
11   he's made a decision about this case.  And, basically,
12   all he's going to do is end up rubber-stamping
13   whatever you-all can prove in this case.
14                 THE COURT:  Okay.
15                 MR. SKURKA:  May I respond, Your Honor?
16                 THE COURT:  Yes.
17                 MR. SKURKA:  Judge, I think this juror
18   was unsure about some of the terminology used.
19   When -- when he kept saying the presumption of
20   innocence, this juror didn't understand what that --
21   presumption of innocence, but when he asked him,
22   "Well, do you think that he's automatically guilty,"
23   he said, "No, I don't feel he's automatically guilty."
24   He says, and I even wrote down he quotes, "He is
25   innocent until proven guilty."  He just didn't

66

1    understand when it was called "the presumption of
2    innocence," because that's a layperson that doesn't
3    understand it all the time, but he did under the basic
4    concept that he's innocent until proven guilty.
5                 Mr. Garza also asked him, "Have you
6    already formed an opinion," and he said, "No, I have
7    not formed an opinion."  Now, what he was saying was,
8    I'm assuming that something's happened or he's charged
9    with something because he's here," but he didn't say
10   that he feels that he's already guilty because he's
11   here, and I'd ask permission to --
12                 THE COURT:  I -- I don't think you've
13   gotten there, Mr. Garza.  I think -- I think he is --
14   he has answered some questions that -- that give me
15   concern, and -- and you may end up -- I may end up
16   agreeing with you on a strike for cause, I'm not
17   there, yet, but I -- I agree with you that he has said
18   some things that causes me some concern.
19                 MR. SKURKA:  And, Judge, I don't have a
20   problem with you talking to him about that, too, --
21                 THE COURT:  I'm going to ask him.
22                 MR. SKURKA:  -- if you want to you,
23   because I think he just doesn't understand some of the
24   language.
25                 MR. GARZA:  May I have just a minute,

67

1    Judge?  I want to specifically state my objections and
2    quote the law on the matter to preserve the matter for
3    error, out of an abundance of caution, with respect to
4    bias.
5                 THE COURT:  Let me ask you, gentlemen, I
6    mean, here's where I'm at, and -- and we're shifting
7    gears a little bit, Mr. Garza.  I'm going to let you
8    make your objection.
9                 MR. GARZA:  Yes, Your Honor.
10                 THE COURT:  I got to get Ann working on
11   this.  I guess -- Tinker's thing's at 2.  I'm going to
12   --
13                 MR. JONES:  Tomorrow.
14                 THE COURT:  Tomorrow.
15                 MR. JONES:  Yep.
16                 THE COURT:  So he can bring in the
17   morning people.
18                 MR. JONES:  Yeah.
19                 THE COURT:  And neither will -- I'm a
20   little nervous about the 11:00 person.  I guess we can
21   try.
22                 MR. JONES:  When does it start?
23                 THE COURT:  It's at 2.
24                 MR. SKURKA:  I would bring the 11:00
25   person in at 10:00.  I don't foresee seating Juror No.

68

1    41.
2                 THE COURT:  Okay.  Well, we can call the
3    11:00 person for tomorrow and have him come in at 10,
4    okay?  So we'll do the -- we'll do the morning people,
5    then, Thursday morning people are going to have to go
6    to Friday morning.  Friday morning --
7                 MR. SKURKA:  Is it the Court's intention
8    to just not do away with all of Thursday?  I don't
9    know how long this thing is going to last.
10                 THE COURT:  I know, but, you know, when I
11   went -- we went to Carl's thing, it was two hours.
12                 MR. SKURKA:  I know.
13                 THE COURT:  If we're starting at -- we're
14   starting at 2 --
15                 MR. SKURKA:  I'm just wondering if we
16   could squeeze one in from, like, 1 to 2, something
17   like that, because it's not far to get over to the
18   place.
19                 THE COURT:  Well, I know, but...
20                 MR. SKURKA:  I'm just thinking out loud,
21   Judge.  I'm just kind of figuring if there's some way
22   --
23                 THE COURT:  I mean, in any event, even if
24   we could do that, we're still going to have to move --
25                 MR. SKURKA:  No, I understand, Judge.

**69**

1  I'm just trying to squeeze in what we can --
2  THE COURT: Okay. So let's -- let's --
3  MR. SKURKA: -- if it's possible.
4  THE COURT: -- we'll bring in the 11:00
5  person --
6  MR. SKURKA: At 10:00.
7  THE COURT: -- yeah, at 10, and then
8  let's move over -- I guess, we'll move Friday's
9  people. We'll move everybody over a notch, you know.
10  Now, do you-all want to try and do ten on
11  Friday?
12  MR. GARZA: Heck, yes.
13  MR. SKURKA: Doesn't matter to me, Judge.
14  MR. JONES: Next day's Saturday. We can
15  always sleep late.
16  MR. GARZA: Actually, Grant wants to work
17  on Saturday.
18  MR. SKURKA: How many do we have
19  scheduled for Friday?
20  THE COURT: We got this lady, 123, that's
21  one that we'll catch up. I want to eventually catch
22  up, so we don't have to keep doing this. We can try
23  and do one -- one extra one on Friday.
24  MR. JONES: We may get lucky and have
25  somebody disqualify.

**70**

1  THE COURT: And then we'll try to squeeze
2  in one extra person on Friday. But what's going to
3  have to happen is, you're going to have to just bump
4  everybody, just one -- one notch down the line, one
5  notch down the line, until we catch up, and then let's
6  try and to do ten a day, instead of nine --
7  COURT COORDINATOR: The one extra on
8  Friday, you want the extra in the morning or in the
9  afternoon?
10  THE COURT: Well, we're probably going to
11  --
12  MR. SKURKA: I would think in the
13  afternoon.
14  THE COURT: Yeah, because we've already
15  got -- we've already got an 11:00 coming in.
16  THE COURT COORDINATOR: So 1:30 or 3?
17  MR. SKURKA: Or we could come in at 1:00
18  Friday instead of 1:30.
19  MR. SCHIMMEL: We wouldn't necessarily
20  have to finish at 6. We could -- I know it's
21  horrible, we could finish at 7 or 8 or...
22  THE COURT: Well, I've got a wedding at
23  7, and then, --
24  MR. SKURKA: Or maybe Friday --
25  THE COURT: Friday night, I do have -- I

**71**

1  do have -- we do have something we need to get to,
2  Gene's thing.
3  MR. SKURKA: Was there any way we can
4  start at 1:00 on Friday?
5  THE COURT: Well, let's -- let's just --
6  we'll see how it goes. We'll just hit it hard.
7  MR. SKURKA: Because some of these
8  people, you never know, they made be through in 20
9  minutes.
10  THE COURT: Yeah, like, that first guy.
11  Okay. Let's bring them in in the
12  afternoon. I guess, bring in that person at 1:00 on
13  Friday.
14  COURT COORDINATOR: Okay.
15  THE COURT: Okay? Just keep us apprised.
16  COURT COORDINATOR: So --
17  MR. SKURKA: So, Ann, looking at my
18  notes, 48 will come in on Friday at what time, 1 or
19  1:30?
20  COURT COORDINATOR: 1.
21  MR. SKURKA: Okay, 48 is now moved to
22  1:00 Friday. I have my own little schedule, here.
23  That's why I'm just trying to keep it straight.
24  THE COURT: All right. That's what we'll
25  do. We'll do the best we can. All right, Ed.

**72**

1  MR. GARZA: Your Honor, my specific
2  objections and reason to challenge this particular
3  juror for cause is under Article 35.16(a)(10) of the
4  Code of Criminal Procedure, which has to do with
5  whether or not we've properly ascertained whether or
6  not this juror has formed an opinion or conclusion
7  that would influence his eventual verdict. Under the
8  totality of the circumstances, Your Honor, based on
9  his responses, I believe he should be discharged.
10  Also, I'd make the same similar objection
11  under 35.16(b) -- I'm sorry, (c)(2), which are the
12  challenges for cause that the Defense may be allowed
13  to make for those same similar reasons.
14  THE COURT: All right. Well, at this
15  time, it's denied. You may get there.
16  MR. GARZA: I'd ask the Court, then, to
17  make some further inquiries --
18  THE COURT: I will. Oh, I will.
19  MR. GARZA: -- for purposes.
20  THE COURT: I'm going to, I'm going to.
21  MR. GARZA: And note our exception.
22  THE COURT: Okay. Bring him back in.
23  I'm going to.
24  (Venireperson enters courtroom.)
25

73

```
1              VOIR DIRE EXAMINATION
2    BY THE COURT:
3         Q.   All right, Mr. Castaneda.
4         A.   Yes, sir.
5         Q.   You said a little while ago several things.
6    One, you said that you -- you said you felt like maybe
7    he must have done something to be here, there must
8    be -- I guess, here's the thing.  --
9         A.   Okay.
10        Q.   -- I need to know if because he's been
11   charged by the State, okay, that you're already
12   thinking he's guilty.
13        A.   No, sir.
14        Q.   Okay, because -- because when Mr. Garza
15   asked you about the presumption of innocence, you
16   said -- you know, you sort of indicated, "Well, you
17   know, I think he may be guilty."
18        A.   Well, what I -- I didn't understand
19   presumption, so I was assuming you were asking me he's
20   here for a reason.  That's why I said, "Yes, he's here
21   because he's been charged with a --"
22        Q.   Okay.
23        A.   -- is what I'm -- I didn't understand --
24        Q.   You didn't understand the question?
25        A.   -- the word.  And I assumed --
```

74

```
1         Q.   You didn't --
2         A.   -- I tried to answer it as honest as
3    possible.
4         Q.   Okay.  So you didn't understand what the --
5         A.   The question.
6         Q.   -- the question.  Okay.  Presumption.
7         A.   And next time I don't understand something I
8    better ask because I don't want to say something and,
9    you know, be wrong.
10        Q.   That's fine, that's fine.  But, I mean,
11   here's the deal:  We don't want -- you know, we don't
12   want you -- jurors that are going to say, "Hey, he's
13   already guilty."  That's not how our system works.
14        A.   No.
15        Q.   And if that's you, that's okay.  I don't -- I
16   want you to tell us how you feel, okay?
17        A.   Okay.
18        Q.   But, you know, I think it would be a sad
19   state of affairs if just because the State said you
20   did it that, you know, it would be true.
21        A.   Right.
22        Q.   Okay?  And that's why we have jurors.  But
23   some people think -- you know, some jurors come in and
24   they say, "Well, you know, he must have done something
25   or he wouldn't be here."  Is that you?
```

75

```
1         A.   Well, that's -- that's -- see, the -- I'm
2    misunderstanding the whole question.  Okay, he's here
3    because, apparently, he was charged with a -- the
4    crime --
5         Q.   Well, that is true, but, you know, maybe --
6         A.   -- and --
7         Q.   -- it wasn't even him.  Maybe it was somebody
8    else.
9         A.   Else.  Right.
10        Q.   Okay?
11        A.   And, now, by saying is he guilty, I can't say
12   he's guilty until I read the -- or see the evidence.
13   I mean, he's not -- he's guilty, is what I'm saying,
14   because he's not -- he hasn't presented -- or they
15   haven't presented him guilty.
16        Q.   Okay.  Well, you know, a lot of times when --
17   when we're doing a criminal voir dire, you'll have one
18   of the attorneys ask the panel and they'll say, "As he
19   sits here right now, is my client guilty or not
20   guilty," and then people say, "Well, I can't tell."
21   You know, the answer to the question is, "Well, he's
22   not guilty because he's not guilty until they --"
23        A.   Until they prove.
24        Q.   "-- they can prove it."
25        A.   Exactly.
```

76

```
1         Q.   Okay?  They don't get to just -- they don't
2    get to just say he did it and then it's true.
3         A.   Right.
4         Q.   Okay?
5         A.   Right.
6         Q.   Because this is a government of the people,
7    not of the State.
8         A.   Right.
9         Q.   The power of the government comes from the
10   people, it doesn't come from me, the Judge, it doesn't
11   come from the prosecutor over there, it comes from the
12   jury.
13        A.   Right.
14        Q.   And, ultimately, you know, sometimes people
15   think, "Man, this jury service is a big hassle."  You
16   know, it may be, but I submit to you that that is a
17   power that people still have, okay, and it's very
18   important that people serve on juries.
19        A.   Right.
20        Q.   And I think you agree with that.
21        A.   Yes, sir.
22        Q.   What we need to know, though, is are you --
23   are you -- because he's been charged, are you -- are
24   you already thinking he may have done something, are
25   you already thinking that maybe he's guilty?
```

77

```
1    A.   No, sir.
2         THE COURT:  Okay.
3         VENIREPERSON NO. 22:  No, I don't.
4         THE COURT:  Mr. Garza, you can continue.
5         MR. GARZA:  Thank you, Your Honor.
6         VOIR DIRE EXAMINATION
7    BY MR. GARZA:
8    Q.   Is it any clearer in your mind, now that
9    we've --
10   A.   Yes, sir.
11   Q.   -- tried to explain these matters is what I'm
12   trying to get at --
13   A.   Yes, sir.
14   Q.   -- as to whether or not you understand the
15   presumption of innocence?
16   A.   Yes, sir.
17   Q.   Okay.  Let me ask you one more time.  In your
18   opinion, sir, do you think my client is guilty or
19   innocent?
20   A.   Innocent.
21   Q.   Okay.  Do you understand why now?
22   A.   Yes, sir.  I should have asked when I didn't
23   know the question, and I would have been more -- more
24   --
25   Q.   You see, in our system, that's just the way
```

78

```
1    it is.
2    A.   Yes, sir, I understand.
3    Q.   That's the way it ought to be.
4    A.   Yes, sir.
5    Q.   That's the way we've fought for for years and
6    years and years.
7    A.   Yes, sir.
8    Q.   As my client, as he sits here, let's pretend
9    that he's got a quilt around him and that quilt stands
10   for innocence.  Now, it doesn't mean that they won't
11   come along and try to strip him of that quilt, you
12   know, because that's their job, they may try to do
13   that.
14   A.   Right.
15   Q.   They may, they may not.
16   A.   Right.
17   Q.   They may just strip part of it away, not all
18   of it.
19   A.   Correct.
20   Q.   And then we're going to be stuck with some
21   legal issues about, "Well, what have they proved, what
22   have they not proved," but it's their responsibility
23   to prove beyond a reasonable doubt each and every
24   element --
25   A.   Yes.
```

79

```
1    Q.   -- of the law and the charge set out in the
2    indictment in this case --
3    A.   Correct.
4    Q.   -- which is capital murder, the act of
5    committing murder while in the course of committing a
6    robbery, okay?
7    A.   Okay.
8    Q.   Now, if they prove the murder and they don't
9    prove the robbery, what happens?
10   A.   Well, it's not capital.
11   Q.   Correct.  It's not a capital murder, is it?
12   A.   Right.  No, sir.
13   Q.   It becomes murder, --
14   A.   Murder.  Right.
15   Q.   -- okay, a lesser included offense.
16   A.   Correct.
17   Q.   A lesser offense, okay?
18   A.   Yes, sir.
19   Q.   And then, at that time, you no longer have
20   the possibility of considering a life or death
21   sentence.
22   A.   Correct.
23   Q.   You might have to be asked to consider a -- a
24   term of years in prison, or even if our client is
25   qualified, the possibility of probation, okay?
```

80

```
1    A.   Okay.
2    Q.   Could you do that?
3    A.   Yes, sir.
4    Q.   You could consider that?
5    A.   Yes, sir.
6    Q.   The whole range of punishment?
7    A.   Yes, sir.
8    Q.   Okay.  And you can consider life or death if
9    --
10   A.   It goes to that.
11   Q.   -- the government does prove it --
12   A.   Correct.
13   Q.   -- one way or the other.
14   A.   That's true.
15   Q.   This idea or this concept of mitigating
16   circumstances, aggravating circumstances, I think,
17   you've already stated that that's a fair way to
18   achieve some sort of a decision.
19   A.   Yes, sir.
20   Q.   Okay?
21   A.   Yes, sir.
22   Q.   Now, we can't tell you what aggravating
23   evidence there may be or may not be in this case, or
24   whatever mitigating evidence there may or may not be
25   in this case, but are you capable, and what we need to
```

81

1   know is, are you -- can you consider and give some
2   effect to either kind of evidence in making a decision
3   as to whether our client should live or die?
4       A.   Could I consider it?
5       Q.   Yes, sir.
6       A.   Yes, sir, I can.
7       Q.   What would be, in your mind, some of the
8   things you'd want to hear about his character and
9   background?
10      A.   What would I want to hear --
11      Q.   Uh-huh.
12      A.   -- about his character and background?
13      Q.   Yes, sir.
14      A.   The type of person that he is.
15      Q.   Okay.  And you would be able to consider
16  those matters in determining whether or not there is a
17  sufficient amount of evidence to assist you in making
18  a decision one way or the other?
19      A.   Correct.
20      Q.   Okay.
21      A.   Yes, sir.
22      Q.   Because, you know, some people might just
23  come in here and say:  Well, you know what, State has
24  already proven to me that he has committed capital
25  murder and based on that solely alone, you know, even

82

1   though I can't predict the future, it has a natural
2   tendency, would you agree with me, that it might also
3   let you answer that Special Issue No. 1 that, "Hey, it
4   sounds to me like, you know, he's capable of
5   committing other criminal acts of violence that would
6   constitute a threat to society."
7       A.   You're talking about if he had -- if they
8   already proved --
9       Q.   Right.
10      A.   -- that he can?
11      Q.   Let's assume that.
12      A.   Yes, sir.  Yes, sir.
13      Q.   Right.  In other words, the train is rolling
14  down the track --
15      A.   Correct.
16      Q.   -- at high speed --
17      A.   Right.
18      Q.   -- on an incline, --
19      A.   (Nods head.)
20      Q.   -- okay?
21      A.   Right.
22      Q.   Would you be able to still keep an open mind,
23      --
24      A.   Yes, sir.
25      Q.   -- until you get to this part?

83

1       A.   Right.
2       Q.   Like Mr. Skurka said, we're leading toward
3   the death penalty, we're leading to it --
4       A.   Right.
5       Q.   -- and then at the very end, we're going to
6   ask you, is there something in here that you could
7   possibly listen to, or would you be one of those kind
8   of people that says, "Hey, I don't even want him
9   breathing the air I'm breathing"?
10      A.   Oh, no.  No.
11      Q.   Would that be something you would do?
12      A.   No, sir.
13      Q.   Because some people would.
14      A.   No.
15      Q.   And that's okay.
16      A.   Right.
17      Q.   It's all right, okay?  Some people feel that
18  way.
19      A.   Right.
20      Q.   That's all there is to it.
21           Mr. Castaneda, I just want to make clear
22  and understand, sir, that even if you answer Special
23  Issue No. 1 yes, that, in your mind, based on the
24  evidence proven to you beyond a reasonable doubt, --
25      A.   Right.

84

1       Q.   -- because, see, at this stage, we're at the
2   punishment stage.
3       A.   Correct.
4       Q.   The State still has the same burden.  They
5   don't have a lesser burden, they still have the high
6   burden of proving to you beyond a reasonable doubt
7   that our client would be a continuing threat to
8   society, okay?
9       A.   Uh-huh.
10      Q.   And if you so -- if you so find, would you be
11  capable of still maintaining an open mind and get to
12  listening to the evidence regarding these issues and
13  Issue No. 2 --
14      A.   Correct.
15      Q.   -- and if you feel that there is sufficient
16  mitigating circumstances to give him a life sentence,
17  instead, --
18      A.   Correct.  Yes, sir.
19      Q.   -- would you consider that?
20      A.   Yes, sir.
21      Q.   Even after you've already answered yes to
22  this.
23      A.   Well, answered yes to this to the proven --
24      Q.   Uh-huh.
25      A.   -- with beyond a reasonable doubt.

85

1    Q.   Right.
2    A.   Right.
3    Q.   Okay.
4    A.   But I would consider life -- I mean, consider
5    life in prison versus the death penalty.  Yes, I
6    would.
7    Q.   If there's sufficient mitigating --
8    A.   Mitigating.
9    Q.   -- circumstances.
10   A.   Exactly.
11   Q.   You could do that?
12   A.   Yes, sir.
13   Q.   Okay, sir.  And we can depend on that.
14   A.   That's right.
15   Q.   Is there any reason that you couldn't be fair
16   to both sides?
17   A.   No.
18   Q.   Is there anything going on in your life right
19   now, either at work or personal or anything at all
20   that would serve as any sort of a distraction to you
21   if you were chosen to be a juror in this case, like,
22   do you -- I don't believe you've indicated that you
23   have any vacation plans or --
24   A.   No, sir.
25   Q.   -- anything of that nature.

86

1    A.   No.  Actually, I'm retired from Celanese and
2    I'm working for another contractor, just for something
3    to do.
4    Q.   Okay.
5    A.   But I wouldn't have no problem.
6    Q.   It's not going to effect you or --
7    A.   No, sir.
8    Q.   -- they're not going to get mad at you?
9    A.   Well, I already asked them that I might have
10   to take some time off if I was to be chosen --
11   Q.   Okay.
12   A.   -- after I -- you know, took in the excuse,
13   and they didn't have a problem with it.
14   Q.   Okay.  Do you have any questions, at all,
15   about any of these proceedings here this morning?
16   A.   I don't have a question, but I do want to
17   apologize for not understanding the question and
18   assuming --
19   Q.   You don't have to apologize for anything,
20   sir.
21   A.   Well, I'm one of those that I like -- I like
22   to be straight, and being that I answered wrong, or
23   whatever the case may have been, and took you-all's
24   time, I --
25   THE COURT:  No.

87

1    MR. GARZA:  You don't have to apologize
2    for any of that, sir.
3    VENIREPERSON NO. 22:  Okay.
4    MR. JONES:  That's what we're here for.
5    VENIREPERSON NO. 22:  Okay.
6    MR. SKURKA:  Don't worry about that.
7    THE COURT:  You didn't inconvenience us,
8    at all.
9    MR. GARZA:  Thank you, sir.  I have no
10   other questions.
11   THE COURT:  Do you have anything else,
12   Mr. Skurka?
13   MR. SKURKA:  No.  I just want to thank
14   you, too, Mr. Castaneda, because, you know, some of
15   these concepts, lawyers are used to them, that's why
16   we need to talk to you-all and make sure it's all
17   straight with you-all.
18   VENIREPERSON NO. 22:  Yes, sir.
19   MR. SKURKA:  If you understand
20   everything, now, that's fine.
21   VENIREPERSON NO. 22:  Okay.
22   MR. SKURKA:  Thanks so much for your
23   time.
24   THE COURT:  All right, Mr. Castaneda, if
25   you'd wait in the jury room for just a minute.

88

1    VENIREPERSON NO. 22:  Yes, sir.
2    (Venireperson exits courtroom.)
3    THE COURT:  All right, Mr. Skurka?
4    MR. SKURKA:  Judge, the State will
5    accept this juror.
6    THE COURT:  Mr. Garza?
7    MR. GARZA:  Can we confer just a minute,
8    Judge?
9    THE COURT:  Yeah, absolutely.
10   (Pause in proceedings.)
11   THE COURT:  All right.  Where are we at?
12   MR. GARZA:  We'll take him.
13   THE COURT:  All right.  Bring Mr.
14   Castaneda in and then we'll take a little break.
15   (Venireperson enters courtroom.)
16   THE COURT:  All right, Mr. Castaneda,
17   you have been selected to be on this jury.  Now, we're
18   probably going to begin on December 1st, but I would
19   ask you to not read the local paper.
20   VENIREPERSON NO. 22:  Okay.
21   THE COURT:  And not watch the local news
22   because we want you to just come to court and get your
23   information from the courtroom.
24   VENIREPERSON NO. 22:  Yes, sir.
25   THE COURT:  All right?

89

```
1              VENIREPERSON NO. 22:  Yes, sir.
2              THE COURT:  All right.  And don't discuss
3   this case with anybody, --
4              VENIREPERSON NO. 22:  Okay.
5              THE COURT:  -- all right?  Not even your
6   family.  They may ask you -- may ask you about it.
7   Say, "I can't talk about it."
8              VENIREPERSON NO. 22:  Yes, sir.
9              THE COURT:  All right?  Till it's over
10  with, okay?
11             VENIREPERSON NO. 22:  Yes, sir.
12             THE COURT:  All right.  We'll be keeping
13  in touch.
14             VENIREPERSON NO. 22:  Okay.  Thank you.
15             THE COURT:  All right.  Let's take a
16  little break.
17             (Venireperson exits courtroom.)
18             (Short recess.)
19             THE COURT:  All right.  Let's push on.
20  Next person?
21             (Venireperson enters courtroom.)
22
23
24
25
```

90

```
1              VENIREPERSON NO. 123,
2              JANA MENARD MALM,
3              VOIR DIRE EXAMINATION
4   BY THE COURT:
5      Q.  All right.  How are you?
6      A.  Tired.
7      Q.  You're doing okay?  All right.  Well, you had
8   -- you are Jana --
9      A.  Malm.
10     Q.  -- Malm?  Okay, and you're going out of town
11  and we've agreed to take you out of order.
12     A.  Uh-huh.
13     Q.  You will be back by December the 1st, I
14  believe, correct?
15     A.  (Nods head.)
16     Q.  All right.
17     A.  But I do leave, again, on the 17th.
18     Q.  Oh, that will be fine.
19     A.  So...
20     Q.  That -- we can work with that.
21     A.  Okay.
22     Q.  Okay?  All right, we're going to talk to you
23  about a few things.  First of all, like I told you the
24  day everybody came in, we want people that can keep an
25  open mind and people that can follow the law.  If you
```

91

```
1   can't keep an open mind, please let us know, okay?  I
2   guess, that's the first thing.  Is there anything that
3   would keep you from keeping an open mind in this case?
4      A.  I don't -- I guess I don't know what my
5   options are, as far as --
6      Q.  Well, I mean --
7      A.  -- an open mind, being an open mind.
8      Q.  Well, I mean, some people, you know, they --
9   they say, "Well, you know what, I -- I think anybody
10  that's charged is guilty.  Can't keep an open mind."
11  Some people say, "Well, I've heard too much about the
12  facts of the case in the news and I've already formed
13  an opinion.  I can't keep an open mind."
14     A.  Uh-huh.
15     Q.  And other people say, "You know, no, I can
16  keep an open mind.  I can sit and listen to the
17  evidence and -- and make a decision based upon the
18  evidence and the law in this case."  And if that's
19  you, then, I guess --
20     A.  Well --
21     Q.  -- we need to know either way.
22     A.  -- I think I can.  But, initially, my -- my
23  mind is that, you know, it -- it's kind -- there's a
24  prejudice there, there's a bias there, you know, very
25  -- you know, at the beginning.  Until you hear the
```

92

```
1   facts, you kind of form an opinion, but I'm willing to
2   listen to the facts, for sure, because -- but, you
3   know, like everybody, you hear something -- I mean, I
4   have never heard of this case, except --
5      Q.  Okay.
6      A.  -- when they brought -- you brought us in.
7      Q.  Okay.  So you -- okay.  All right, well,
8   then, let's talk about some things.
9              First of all, this is a criminal case.
10  Let's see here, you haven't been a juror before.
11     A.  Nuh-uh.
12     Q.  You understand that in a criminal case it's
13  the State's burden of proof.
14     A.  Uh-huh.
15     Q.  All right?  They have to prove -- when they
16  bring the charges, they have to prove the charges,
17  okay?  They don't -- they don't just get to say,
18  "Well, you know, we allege this, and, therefore, it's
19  true," okay?  You agree with that, --
20     A.  Sure.
21     Q.  -- that the State should be -- should be
22  required to prove the evidence?
23     A.  Yes.
24     Q.  Okay.  Now, and -- and the burden of proof is
25  beyond a reasonable doubt.  And we don't have a
```

93

1  definition of that, but it's the highest burden that
2  we have in the law, okay?  And, you know, the -- you
3  know, that's -- that's not beyond all doubt, it's not
4  beyond a shadow of a doubt, but it is a high standard.
5  Would you -- could -- could you follow that law and
6  hold the State to that high standard?
7      A.   (Nods head.)
8      Q.   Yes?
9      A.   Yes.
10     Q.   Okay.  And I'm -- I see your nod, but she's
11  taking it down --
12     A.   I'll speak.
13     Q.   Okay.  Okay.  Now, because the State has the
14  burden of proof, the law says "Defendant, and
15  everybody, is presumed to be innocent until proven
16  otherwise."  In other words, "You brought the charges.
17  That's fine, you got to prove them, but until you do,
18  if you can, this Defendant is presumed to be
19  innocent," and you must presume him to be innocent.
20          Do you -- do you have a problem with
21  that, or -- I mean, if you do, please, let us know.
22     A.   Well, I mean, none of the facts have been
23  presented, but assuming he's the person that, you
24  know, had the knife, or whatever, and came in and with
25  intent to rob, which is what you guys told us, that

94

1  that was the accusation, or whatever, it's very --
2  it's hard to -- I mean, I would listen, definitely
3  listen to the -- to the thing, and I think I would be
4  objective, but, initially, when I first hear, I think,
5  "Oh, well, you know, that may have happened.  It
6  probably happened," you know, who knows, but I would
7  be objective.  I think I would be objective.
8      Q.   But you said something at the beginning of
9  your -- of that statement.  You said, "assuming he was
10  the one with the knife," and there's --
11     A.   Yeah.
12     Q.   -- I mean, there's -- I mean, there's --
13     A.   I mean --
14     Q.   Why would you assume such?
15     A.   Well, you can't, until you hear the evidence.
16     Q.   Right.
17     A.   So, I mean, I don't know why he -- how he was
18  arrested or how it came to be that, you know, they
19  picked him up, and, you know, took him in and -- and
20  indicted and all that, but there -- you know, there's
21  something there that causes people to believe he may
22  be the one that did this.  So I don't know.  I don't
23  know all the evidence, so -- but, you know, initially,
24  my thought is, "Well, if there was enough evidence to
25  bring him in, and all that, then they must have

95

1  something."
2          So, in my mind, I truly -- I say, "Well,
3  it's probably, it's probably true," but maybe not.  I
4  mean, if I hear everything, it may -- it may change my
5  mind.  It may --
6      Q.   I may --
7      A.   -- make me think --
8      Q.   Okay.  You're saying if you hear evidence it
9  may change your mind about the --
10     A.   My feelings.
11     Q.   -- bias that you already have?
12     A.   Right.
13     Q.   Okay.
14          MR. JONES:  We have a motion.
15          THE COURT:  Well, you know, what, I'm
16  going to go ahead and turn the floor over to Mr.
17  Skurka and we'll see where we get.
18          VOIR DIRE EXAMINATION
19  BY MR. SKURKA:
20     Q.   Hello, ma'am.
21     A.   Yes.
22     Q.   We have a few questions to ask you.  And
23  we're going to have to pin you down on this, okay?
24     A.   Okay.
25     Q.   And there's no right or wrong answers, but we

96

1  just want to --
2      A.   Okay.
3      Q.   -- make it clear.  The law says this, if
4  you've already reached in your mind a conclusion based
5  on what you've heard, either through hearsay or
6  whatever, media or whatever, that you've already made
7  the decision as to his innocence or guilt right now,
8  you cannot serve on this jury.
9      A.   Right.
10     Q.   So my question is, have you reached in your
11  mind, have you already formed an opinion as to whether
12  he's guilty or not, based on stuff you've heard about?
13     A.   Well, I haven't really heard anything about
14  the case, at all, except for what you guys told us the
15  first time we came in for jury duty.
16     Q.   Okay.
17     A.   So...
18     Q.   So you don't have any preconceived notions.
19     A.   I don't.  No, I just, you know, just -- I
20  guess, any -- it -- it's just -- it's one of those
21  things you -- it's hard to go into something with just
22  a total clean slate.  But, yeah, I think I can once I
23  start hearing everything.
24     Q.   Okay.  Again, so do you have any preconceived
25  notion or have you formed an opinion of whether he's

97

1  guilty or not, yes or no?
2      A.   Well, I -- it's hard to say, because I -- I
3  guess I have.  I guess I have in my mind but I'm
4  willing to open my mind to listen and hear everything,
5  but that's not what you wanted me to say.
6          MR. SKURKA:  I'm not trying to tell you
7  what to say.
8          THE COURT:  No, no, no.  Let me tell you
9  something, let me tell you something, you tell us
10  exactly how it is.  Don't -- don't -- don't think it's
11  going to hurt his feelings or his feelings or my
12  feelings.  We want to know how you feel.  There are no
13  wrong answers here.
14          VENIREPERSON NO. 123:  Uh-huh.
15          THE COURT:  None, okay?  You tell it like
16  it is and we're not disappointed or, you know, you
17  don't answer the question the way you want any of us
18  to -- to answer it.  You answer it the way you want to
19  answer it.
20          VENIREPERSON NO. 123:  Yeah.
21          THE COURT:  And if that means you've
22  already, you know, honestly, formed an opinion, that's
23  okay, but we --
24          VENIREPERSON NO. 123:  Well, I have -- I
25  have feelings.  I'm not sure it's an actual flat

98

1  opinion that I couldn't change.  You see what I'm
2  saying?
3      Q.   (BY MR. SKURKA) Well, the law says this,
4  right now you have to presume that this person is
5  innocent --
6      A.   Uh-huh.
7      Q.   -- right now.
8      A.   Uh-huh.
9      Q.   And that's because we call that "the
10  presumption of innocence."  Everybody starts out that
11  the State has to prove the case beyond a reasonable
12  doubt.  If you, God forbid, were charged with a crime
13  wouldn't you want to think that --
14      A.   Right.
15      Q.   -- you're innocent and that they have to
16  prove that you're guilty?
17      A.   Right.
18      Q.   So can you afford him that same feeling?
19      A.   Yes, I think, I can.
20      Q.   Okay.  That's good enough.  And -- and when
21  you say you've reached -- you think you've your mind,
22  I'm still lost, because you say --
23      A.   Well --
24      Q.   -- you have a --
25      A.   -- when I picture this --

99

1      Q.   -- you haven't heard anything about the case.
2      A.   When I picture -- when they told us what it
3  was and that it was a robbery, and there was a knife
4  and then a murder, I can picture something in my mind
5  -- maybe too many movies or something but -- so, in
6  that way, you can kind of form an opinion, just by
7  your mind making the pictures, you know?  But, you
8  know, he's not the person in my picture.  You see what
9  I'm saying?  I don't --
10      Q.   Have you ever heard on -- on stuff on news --
11  in the news where a person is charged with a crime --
12      A.   Uh-huh.
13      Q.   -- and then later on --
14      A.   Yes, sir.
15      Q.   -- they're found not guilty?
16      A.   I know of someone like that.
17      Q.   It -- it's happened before.
18      A.   Uh-huh, yes.
19      Q.   And so would it be right to say that it's not
20  fair --
21      A.   Correct.
22      Q.   -- to assume they're guilty just because
23  they're been charged with a crime?
24      A.   That's right.
25      Q.   Have you ever gotten a traffic ticket in your

100

1  life?
2      A.   Uh-huh, yes.
3      Q.   And sometimes people get this traffic ticket
4  and it's charging them with, like, running a red light
5  or speeding.
6      A.   Right.
7      Q.   And then some people say, "I don't care if I
8  got a ticket, that cop was wrong.  There was no stop
9  sign at the intersection or it was a green light that
10  I went through," and so they go to court --
11      A.   Right.
12      Q.   -- to fight it.
13      A.   Uh-huh.
14      Q.   The same kind of principle.  Just because
15  Mr. Ramirez is charged with capital murder does not
16  mean he's guilty, just like when a police officer
17  writes you a ticket.  The police officer writing you a
18  ticket just says you're charged with running a red
19  light.
20      A.   Uh-huh.
21      Q.   You can either plead guilty or not guilty,
22  and you go to a court and let the court or a jury
23  decide if you're guilty or not.  So, if I went up to
24  you and I said -- if you came up to me and said,
25  "Gosh, Mark, the other day I got a traffic ticket

101

1    running a red light," and I would go back here and I'd
2    say, "Oh, you're already guilty, you're already
3    guilty," that wouldn't be fair --
4        A.   Right.
5        Q.   -- of me to do that, right?
6        A.   Right.  I understand.
7        Q.   What would happen is I would have to presume
8    you're innocent, unless you even said you're -- unless
9    you -- you confessed or you admitted your guilt, or
10   somebody proved that you were guilty.  And that's what
11   our concepts of law are.  So that's what I'm trying to
12   figure out, how you -- I can't understand if you've
13   really reached a decision or not.
14       A.   I guess I haven't.
15       Q.   Okay.
16       A.   Yes.
17       Q.   Then why did you -- why did you tell the
18   Judge that -- that you think you may have, because
19   you've seen movies or T.V. shows or something?
20   Because I have in your questionnaire, it says, "Just
21   because someone is charged with capital murder they're
22   probably guilty."  And you put, "Disagree."
23       A.   Right.
24       Q.   Is that how you feel?
25       A.   Yes.

102

1        Q.   It says, "What one reads in the newspaper and
2    one sees on T.V. is a better source of information
3    than testimony heard in the courtroom," and you put,
4    "Disagree."
5        A.   Right.
6        Q.   Which makes it sound to me like you've been
7    there -- you know that a jury hears everything, where
8    the people in the media may not hear everything.
9        A.   Yes.
10       Q.   And then you put, "Based on what you know or
11   heard about the case, have you already formed a
12   conclusive opinion about the guilt or innocence of
13   John Henry Ramirez or what his punishment should be,"
14   and you put, "No."
15       A.   No.  Well, that "conclusive" makes a big
16   difference because there's some feelings, like I said
17   I had, just thinking about, "Oh, you know, something
18   happened.  Someone was killed," you know, that -- but,
19   yeah, I do, yeah, I -- that was a true statement, yes.
20       Q.   Okay.  And -- and you understand it's -- it's
21   a natural inclination to think that because you heard
22   something on T.V. or the news, well, such and such was
23   accused of stealing something, it's probably a natural
24   inclination, without knowing anything else, to think,
25   "Well, gosh, you know, maybe he did do it."

103

1        A.   Right, that's what I'm saying.
2        Q.   Okay.  But -- but you understand, if you're
3    sitting on this jury, you can't say, "Well, maybe he
4    did it."  You have to say, "He's innocent.  And until
5    the State proves that he's guilty, I can't say he
6    maybe have done it."
7        A.   Yes.
8        Q.   Does that make sense to you?
9        A.   Yes.
10       Q.   Can you follow that?
11       A.   Yes.
12            MR. SKURKA:  Okay.  Judge, did you want
13   to do anymore questions, or --
14            THE COURT:  No.  I'm --
15            MR. SKURKA:  -- do you want me to go
16   ahead and continue?
17            THE COURT:  No, you go ahead and
18   continue.
19            MR. SKURKA:  Thank you.
20       Q.   (BY MR. SKURKA) Okay.  Now, let's switch
21   gears a little bit.  Because from what you're telling
22   me -- what you just told me is you think you can be
23   open-minded and you haven't made a decision, right?
24       A.   Yes.
25       Q.   Okay.  Now, let's go to some -- to the next

104

1    things.  The death penalty is one of the big issues in
2    this case, and I'm going to ask you, straight out, how
3    do you feel about it?
4        A.   I believe in it.
5        Q.   Why?
6        A.   Well, I'm -- I guess, I'm got a very strong
7    Judeo-Christian background, and I believe in a lot of
8    that teaching, that, you know, that -- I don't believe
9    that if someone is truly guilty of murder and it is,
10   you know, is -- you know, I guess, enough time to, you
11   know, appeal or whatever, in case it was a wrong -- a
12   wrong decision, I believe that -- that death penalty
13   is -- is just.
14       Q.   Okay.  And have you always felt that way?
15       A.   For a long time, uh-huh.
16       Q.   Okay.  How do you feel about you being
17   responsible for that decision?
18       A.   Well --
19       Q.   I don't mean just you, but you and the jury.
20       A.   Right, and a jury.  Yeah, I think -- I think
21   I could do it.  I mean...
22       Q.   Because sometimes people say, "Oh, I saw that
23   on the news.  He's a bad guy.  You know, he should get
24   the death penalty," and people say, "I'm for the death
25   penalty, Mr. Skurka, I'm for it," and then when I put

**105**

1 them in the box and say, "Okay. That's him. Look at
2 him right there. That's John Henry Ramirez. It's not
3 somebody you read about the paper or see on the news,
4 that's him," I want you to look at him and tell me,
5 can you go ahead and follow through with that if you
6 think that the evidence warrants that he should get
7 the death penalty?
8    A.   I think I could.
9    Q.   Okay.
10    A.   I think I could. I don't like the idea of
11 having to do that, but I feel like that's just if it
12 merits -- if the evidence --
13    Q.   Based on the evidence, right?
14    A.   Uh-huh.
15    Q.   Okay. The reason I ask is because sometimes
16 the jury comes in -- remember that first day we had 2-
17 or 300 people in the room --
18    A.   Uh-huh.
19    Q.   -- and the Judge came down and said, "This is
20 a capital murder case, folks. You may have to decide
21 whether somebody lives or dies --"
22    A.   Right.
23    Q.   -- and I saw some people out there going, "Oh
24 my gosh, like, oh, I can't do that," and other people
25 said, "Oh, my gosh, there's no way I could do this

**106**

1 kind of case. Give me a D.W.I. case or a burglary
2 case. Don't give me a capital murder case --"
3    A.   Yeah.
4    Q.   -- did you feel that way?
5    A.   It was a scary thought. It was an awesome
6 responsibility.
7    Q.   And it should be thought of as an awesome
8 responsibility, but the question is, can you follow
9 through it if the law allows for it and the evidence
10 shows that you could?
11    A.   I think I can --
12    Q.   In other words --
13    A.   -- if I had to.
14    Q.   And I understand, but sometimes people can
15 walk the walk -- how do you say that?
16    A.   Talk the talk.
17    Q.   Talk the talk, but they can't walk the walk.
18 They're for the death penalty, but they just don't
19 want to be put in that position.
20    A.   Yeah.
21    Q.   How do you feel about being put in that
22 position?
23    A.   Well, if it were only me making the decision,
24 it would be harder, but if there were 12 of us, I
25 think I -- I could do it.

**107**

1    Q.   And that's why the law is set up that -- as
2 powerful as a Judge, like Judge Galvan is, and the
3 district attorney, they can't just -- the government
4 can't just say, "Hey, this guy gets the death penalty,
5 this guy doesn't get the death penalty." We have it
6 in Texas to have 12 people make that decision. You
7 think that's a good law to have it that way?
8    A.   Seems to be one of the -- you know, I don't
9 know any other one that would be better, necessarily,
10 so I guess so.
11    Q.   So you think you could participate in that
12 kind of decision if called upon to?
13    A.   I think I could if I had to, yes. I don't
14 want to, but...
15    Q.   And I'll tell you the honest truth, nobody
16 wants to be able to have to make that decision. But,
17 you know, some people say, "Well, it's my civic
18 responsibility to, you know, carry out the law, if the
19 law provides for that."
20         Now, we talked about your trips a little
21 bit, but you say they won't interfere with your --
22    A.   I have to go --
23    Q.   -- service here.
24    A.   -- on the 17th. And if it's more than two
25 weeks, that would cut into it.

**108**

1    Q.   It won't be more than two weeks, we're almost
2 positive of that. And where do you have to go on
3 these trips, anyway?
4    A.   Well --
5    Q.   Is this for your --
6    A.   -- today -- yeah, part of it is. The one --
7 the one in -- next month is. And then this month it's
8 actually where my husband's a pastor of a church, and
9 we're taking a team to Israel and the Middle East.
10    Q.   What church is he a pastor to?
11    A.   The Summit Church.
12    Q.   Where is that located?
13    A.   On Staples.
14    Q.   Where on Staples? Staples is such a long
15 street --
16    A.   Yeah.
17    Q.   -- I'm trying to figure out where it is.
18    A.   It's close to the Mall and to King High
19 School.
20    Q.   Okay. How about you-all's religion, is there
21 anything about the death penalty in your teachings,
22 like for it or against it?
23    A.   Well, I mean, my husband doesn't teach on it
24 or anything. It's just in the Bible that, you know,
25 that they didn't keep people incarcerated, you know,

forever and ever and ever, you know, for the death penalty. It was -- it was, you know -- it was --

Q. Carried out fast.

A. -- carried out, yeah.

Q. Now, the law here in Texas and most states are just because a person is convicted of capital murder, they're not led outside to the gang plank, you know --

A. Right.

Q. -- or executed right there, we have the appellate process. And sometimes that runs slow, sometimes it goes faster. But generally speaking, everybody's careful not to rush into things, and give the Defendant an opportunity to have his lawyer to look at the case and review it and see if there's any mistakes made, and that -- actually, you have the appellate process of appeals, whether you're convicted of D.W.I. or capital murder. That's for every case.

But I think a lot of times people say it takes too long for capital murder cases, but then the question is how much is too long? You don't want to rush into things, either. Does that affect you in anyway sitting on this jury?

A. What do you mean, the -- the fact that it would take too long to?



Q. If he was -- yeah, some people say, "Well, yeah, it takes too long for the appellate process to go through, for it to be carried out."

A. I really don't -- I don't know. I don't know about the length or any of that.

Q. You don't have any independent knowledge of how long it takes for an appeal to go through?

A. No. I guess I don't.

Q. How about the situation with your mom? You said that you're the primary caregiver for your mom.

A. Well, she's in an assisted living, but I have to provide for her bathing and her meds every day, and all the things I help her with because she's -- has memory problems and she can't -- I need to tend to her every day, at least once.

Q. Is that going to interfere with you being on the jury?

A. It would stress me, I think.

Q. I think the Judge probably told you that our schedule is like 8:30, take a break at 10 or so, midmorning, then we have an hour and a half for lunch. And then, we usually start at 1:30, and then maybe a midafternoon break. And, generally-speaking, we don't work past 5. I mean, it may carry over a few minutes, but not -- it's not going to be till like 6 or 7:00 at



night, every night.

A. Yeah.

Q. Is that a schedule that's workable for you or not?

A. Well, as far as my mom's concerned it is, but with my other commitments, it's not.

Q. What do you mean your other commitments?

A. Well, I'm a pastor's wife and I have meetings during the week with ladies, and things, so -- I mean, that would have to, I guess, be canceled. But that's -- I mean, there are things that I -- I'm busy with, so, yeah, that would definitely make a change in my life if it were two weeks -- a two-week trial.

Q. Is it a prob -- is it such a change in your life that would make you hard -- be hard for you to focus on this case?

A. I think it might, actually.

Q. Okay. Well, with -- like I said, there's no right or wrong answers.

A. Uh-huh.

Q. Obviously, both the Defense and us -- and the State want you to be able to --

A. Be there when I'm here --

Q. -- be there and be there 100 percent --

A. -- mentally.



Q. -- instead of worrying about it. We had a guy the other day that said, "Look, I'm already thinking about a meeting I have to go to today --"

A. Yeah.

Q. -- and he said, "I might be distracted." Do you think that might be your situation?

A. I am very easily distracted. Yes, I think it could.

Q. You're very what?

A. I'm easily distracted. I'm -- I think I have something that hasn't been diagnosed yet, or something.

Q. You have a lot of -- you have a -- it sounds like you have a lot going on, that you could be distracted; --

A. Yeah.

Q. -- is that right?

A. Yes.

MR. SKURKA: Okay. Judge, I don't have any other questions.

MR. JONES: I have a motion before we -- I begin.

THE COURT: All right. Can you wait in the jury room, please.

VENIREPERSON NO. 123: Sure.

113

1      (Venireperson exits courtroom)

2      MR. JONES:  I challenge this juror for

3  cause for a two reasons:  The totality of her answers,

4  I don't believe that she presumes the Defendant to be

5  not guilty.  She has a notion or a feeling that he is

6  guilty and will look at the trial as a -- simply as a

7  process of confirming what she already believes,

8  rather than having an open mind about what happened in

9  the first place and -- and does it show that the

10  Defendant committed a crime.

11      MR. SKURKA:  Judge --

12      MR. JONES:  No, let me finish.  No. 2 --

13      MR. SKURKA:  No, I'm just going to

14  agree.

15      MR. JONES:  Oh, you agree?  Okay.  Then I

16  need go no further.

17      THE COURT:  I agree.  This -- this

18  witness -- this potential juror, unlike the other one,

19  I really thought the other juror that we -- we

20  accepted, Juror No. 2, really misunderstood Mr.

21  Garza's question.

22      MR. JONES:  Yeah, we -- he came around to

23  it.

24      MR. GARZA:  And then we went off and

25  picked him, so now we've waived that objection.

114

1      THE COURT:  Well --

2      MR. JONES:  No, no.  I agreed with that.

3      THE COURT:  -- no, but not only that, but

4  I honestly believe that he misunderstood the question.

5      MR. GARZA:  Yes, he did.

6      THE COURT:  And I think he can be fair.

7  I think this lady, I agree with you, I think it's

8  different.  And it's less than what she said and more

9  of the impression that I got the way she said it,

10  quite frankly, so I'm going to sustain the challenge

11  for cause.

12      MR. SKURKA:  Well, I would -- it's an

13  agreement, Judge.  I agree.

14      THE COURT:  Okay.

15      MR. SKURKA:  I wasn't trying to interrupt

16  you, Mr. Jones, --

17      MR. JONES:  That's all right.

18      MR. SKURKA:  -- I was just trying to make

19  a deal.

20      MR. JONES:  That's fine.  Good.  Thank

21  you.

22      MR. GARZA:  We find you generally rude,

23  though.

24      (Venireperson enters courtroom.)

25      THE COURT:  All right.  Ms. Malm,

115

1  you're not -- you're not going to be seated on this

2  jury, but we do really appreciate you coming down

3  here, and we appreciate your candid answers to the

4  questions that we posed.

5      Thank you very much.

6      VENIREPERSON NO. 123:  Thank you.

7      (Venireperson exits courtroom.)

8      THE COURT:  All right.  Let's take a

9  little...

10      MR. JONES:  I'm just standing up to

11  stretch.

12      THE COURT:  Okay.  All right.

13      (Brief pause in proceedings.)

14      (Venireperson enters courtroom.)

15      THE COURT:  Come on up and have a seat up

16  here in the chair.

17

18      VENIREPERSON NO. 23,

19      JEREMY JOHN CALBAT,

20      VOIR DIRE EXAMINATION

21  BY THE COURT:

22      Q.   All right.  You are Jeremy Calbat; is that

23  correct?

24      A.   Yes, sir.

25      Q.   All right.  Now, Mr. Calbat, we're going to

116

1  ask you some questions here today.  You've already

2  filled out a questionnaire so we do know something

3  about you.  But, you know, pretty much straight-up,

4  we're ask -- we're looking for people that can keep,

5  one, an open mind, okay, and people that can follow

6  the law, all right?  And we're going to talk a little

7  bit about the law, but let's talk first about whether

8  you can keep an open mind, okay?

9      Are you somebody that you think can keep

10  an open mind in this case?

11      A.   I feel like I do.

12      Q.   Okay.  All right.  You have never been on a

13  jury before; is that right?

14      A.   That's correct.

15      Q.   Okay.  Well, let's talk about some things.

16  You probably know some of these things, even though

17  you haven't been on a jury before, but we're going to

18  talk about them.  First of all, the State's brought

19  these charges and they're capital murder charges, and

20  obviously they're serious, okay?  They brought them.

21  And as part of that, the law says, "State, you bring

22  charges, you got to prove them, okay?  You bring them,

23  you got to prove them."  You agree with that?

24      A.   Yes, sir.

25      Q.   Okay.  I mean, that's the law, they have to

117

1 prove it. Defense doesn't have to prove anything,
2 okay, because they -- they're the accused. But
3 State's brought them, they got to prove it, okay?
4        As part of that, the burden of proof is
5 beyond a reasonable doubt. Now, we don't have a
6 definition for what that is, but it is the highest
7 burden that we have in all of the law, not just
8 criminal law, all of the law, okay? It is not beyond
9 all doubt, it is not beyond a shadow of a doubt. It's
10 just what it says, it's beyond a reasonable doubt, and
11 that's the burden that the State has. Would you --
12 the law says that you have to hold them to that
13 burden. Could you follow that law?
14     A.   Yes, sir.
15     Q.   Could you hold them to that burden?
16     A.   Yes, Judge.
17     Q.   All right. Now, as part of them having the
18 burden of proof, the law says, "All right, State, you
19 brought charges, you got to prove them beyond a
20 reasonable doubt. And until you do, if you can at
21 all, Defendant is presumed to be innocent," all right?
22 Ancient concept. We got it from the -- from the
23 English, who got it from the Romans, who got it from
24 the Greeks. Nothing new. That's what the law says.
25        Defendant is presumed to be innocent

118

1 until they can prove it, if at all that -- if they
2 can, maybe they can't. Could you follow that law?
3     A.   Yes, sir.
4     Q.   Okay. Also as part of this, Defendant has a
5 right -- well, like I told you, earlier, they don't
6 have to do anything. They don't have to present
7 evidence, they don't have to present witnesses,
8 because they don't have the burden of proof. Never
9 shifts. Always stays on this side of the table, that
10 is, the prosecution side.
11        As part of that, Defendant doesn't have
12 to testify. Now, I submit to you there are many
13 reasons why a defendant may not want to the testify.
14 Maybe his lawyers have told him, "Hey, they haven't
15 proven their case. No need for you to testify."
16 Maybe he's uneducated, maybe he -- maybe he stutters
17 when he gets stressed out. Not all of us are meant
18 for the stage, okay? Not all of us are eloquent
19 speakers.
20        But, in any event, law says if the
21 Defendant chooses not to testify -- and we don't know,
22 he may, he may not -- but, if the Defendant chooses
23 not to testify, can't hold it against him. The
24 factfinder, that is, in this case the jury, can't hold
25 it against him. You can't go back to the jury room

119

1 and say, "Yeah, I'm not sure about the State's case,
2 but he didn't testify, so I'm going to put -- I'm
3 going to put that mark over here for the State, that
4 -- that hurts their side, that helps his side." You
5 can't do that.
6        I need to know from you, would you hold
7 it against Defendant if he chose not to testify?
8     A.   No, sir.
9     Q.   Okay. Now, let's talk a little bit about the
10 charge itself. This charge is capital murder. What
11 is capital murder? I like to think of capital murder
12 as murder plus, okay? It's murder plus something
13 else. And there's a laundry list that the legislature
14 has said that -- that are murders that can become
15 capital murders. And there's different things, but in
16 this case the State is alleging that the Defendant
17 committed a murder, that is, the intentional taking of
18 another's life, on the given day in Nueces County,
19 Texas, and in the course of doing -- while in the
20 course of attempting to or while committing a robbery.
21 That's how they charged it.
22        So there are certain serious felonies
23 that, if you do them and you commit a murder in the
24 process, then it becomes a capital murder, in this
25 case, robbery or attempting to commit robbery. Now,

120

1 the State has to prove all of it, okay? For them to
2 prevail on the -- on a capital murder conviction, they
3 have to prove all of the elements of the crime, and
4 that means they have to prove all of the elements of
5 murder, plus they have to prove that he was -- that
6 the Defendant was committing or attempting to commit a
7 robbery.
8        Now, you may go back there to the jury
9 room and say, "You know what, I think they've got --
10 they got the murder, but they don't -- they don't have
11 the robbery," or maybe vice versa, maybe you think --
12 they -- "I think they've proven an attempted robbery
13 and maybe he's guilty of that, but they don't have the
14 murder, they don't have the elements for it." You
15 understand, you can't find him guilty of capital
16 murder, unless the State proves each and every element
17 beyond a reasonable doubt. You understand that?
18     A.   Both. Yes, sir.
19     Q.   Both. The whole thing.
20     A.   Right.
21     Q.   It's not like a best of seven series, you
22 know, they got -- they got to run the table. They got
23 to get them all. And I -- I don't know exactly how
24 many elements there are, I haven't counted them up,
25 but they've got to prove them all to you. You

121

1  understand that?

2  A.  Yes, sir.

3  Q.  Could you hold the State to that burden?

4  A.  Yes, I could.

5  Q.  Okay.  And that it means that if they don't

6  prove one of the elements that you'd have to find them

7  guilty of at least of capital murder.  You understand

8  that?

9  A.  If they don't prove all the elements?

10  Q.  Of capital murder, you can't find him guilty

11  --

12  A.  Yeah.  Yes, sir, I could.

13  Q.  I mean, he may be guilty of something else,

14  maybe a lesser included, maybe not, okay, but you

15  can't find someone guilty of capital murder unless the

16  State proves all of the elements of capital murder.

17  A.  Yes, sir.

18  Q.  Okay.  And you could follow that.

19  A.  Yes, sir.

20  Q.  Okay.  Now, if you -- well, let me -- let me

21  back up a little bit.  In Texas, we have a bifurcated

22  trial system.  And all that means is, is that we have

23  two parts.  The first part is guilt or innocence

24  phase.  And what happens is the State presents their

25  evidence; Defense, if they want to can present

122

1  evidence.  They don't have to, of course, and then we

2  argue the case to you and we give you the Charge,

3  which is a packet of law, kind of an instruction book

4  of what to do, and you go back there and you

5  deliberate whether the State has proven beyond a

6  reasonable doubt the offense charged, in this case,

7  capital murder.

8  If the Defendant is acquitted of capital

9  murder, you go home.  Done, it's over with.  If the

10  Defendant is convicted of capital murder, there are

11  two options.  Defendant can get either life in prison

12  or the death penalty, all right?  But you don't say

13  life in prison or death.  You answer questions, okay?

14  And I'm going to walk down here and show you.

15  If you'll look over here, this is one of

16  the questions.  This is the first question.  Jury

17  would -- would be asked Special -- we call them

18  "Special issues," but questions, whatever, "Is there a

19  probability that the Defendant would commit criminal

20  acts of violence that would constitute a continuing

21  threat to society," and the jury would either answer

22  yes or no, okay?  You follow me?

23  A.  Yes, sir.

24  Q.  Okay.  Then -- oh, that's why you -- that's

25  why you turned that off.  Yeah, in any event -- this

123

1  is easier for me, so I'm going to --

2  MR. JONES:  Okay.  We've got to find a

3  common board, here.

4  THE COURT:  All right.  Well, we can --

5  we can -- all right, this is Special Issue 2, that is,

6  "After taking into consideration all the evidence,

7  including the circumstances of the offense," which is

8  the guilt or innocence part, the charge itself, "the

9  Defendant's character and background, and the personal

10  moral culpability of the Defendant, is there a

11  sufficient mitigating circumstance or circumstances to

12  warrant that a sentence of life imprisonment, rather

13  than the death sentence be imposed," and the jury

14  would have to answer yes or no to that question, okay?

15  Now, this question -- this is sort of

16  like taking -- taking everything into account, is

17  there any mitigating circumstance or circumstances to

18  give life instead of death?  And what can that be?

19  Maybe Defendant was a good guy, maybe he was a bad

20  guy, maybe Defendant's never been in trouble in his

21  life, maybe he's been in trouble a bunch.  You know,

22  there's -- mitigating circumstances are -- are things

23  that lessen, aggravating circumstances are things that

24  increase, correct?

25  A.  Yes, sir.

124

1  Q.  And you'd have to take into consideration all

2  of the things that -- that would be presented to you

3  in that -- in that, okay?  Could you -- could you --

4  could you sit and answer that question?

5  A.  Yes, sir.

6  Q.  All right.  So you could -- at the beginning

7  of this trial, I'm going to give the oath to the

8  jurors, and the oath is going to go something like

9  this, "Do you solemnly swear that you can render a

10  true verdict based upon the law and the evidence

11  presented to you in this case?"  Jurors take the oath.

12  All right?  So you could -- you could sit in this case

13  and determine whether the State's proven their case

14  beyond a reasonable doubt, first?

15  A.  Yes, sir.

16  Q.  And you could, then, if -- if, in fact, the

17  Defendant is found guilty of capital murder, you could

18  truthfully answer these questions?

19  A.  Yes, sir.

20  THE COURT:  All right.  Well, then, I'll

21  turn you over to Mr. Skurka.

22  VOIR DIRE EXAMINATION

23  BY MR. SKURKA:

24  Q.  Hi, Mr. Calbat.  How are you today?

25  A.  I'm all right.  How are you?

125

1    Q.   Okay.  Tell me about how you felt about the
2  first day.  Remember, you walked in that room with all
3  those people in there and you probably didn't know
4  what kind of case it was until the Judge came down and
5  said, "Folks, this is a criminal case and this is a
6  capital murder case.  If you get selected on this
7  jury, you may have to make a decision on whether this
8  person lives or dies."  How did you feel about that
9  when you first heard it was that kind of case?
10   A.   Uh --
11   Q.   What was your first reaction?
12   A.   -- interested, I guess.  You know, I've never
13  been a part of that, and -- and that's about it.
14  Just -- just curious about, you know, how the case
15  would go.
16   Q.   Some people I watch them and they go, "Oh,"
17  they hear it's a capital murder case and they go, "Oh,
18  my gosh, I got to do this," and they kind of freak out
19  or panic or worry about how to do that.  Did any of
20  that strike you that way?
21   A.   No.  The first time I learned the definition
22  of capital murder was when you explained it.
23   Q.   Okay.  I see.  So this was nothing that would
24  put you off on being this kind of jury, you -- in
25  fact, you were interested and curious about how it

126

1  worked, the system worked?
2    A.   Yes, sir.
3    Q.   Okay.  And the reason I say that is because a
4  lot of times people don't know how it works, until
5  they're actually called in and we explain things.  But
6  I just kind of wanted to feel -- and I noticed a lot
7  of people, too, you know, when they heard it's that
8  kind of case and, you know, they stood up and sat up a
9  little straighter, listened a little more attentively
10  to make sure they got everything, what the Judge and
11  the lawyers said.  Was that one -- you were one of
12  those people?
13   A.   Yes, sir.
14   Q.   Super.  And I should tell you before you
15  start, there's no right or wrong answers to any of
16  these things.  We just want you to know -- tell us
17  what your true feelings about the items are that were
18  in the issues we're going to talk about.  Don't answer
19  them in such a way you think the Defense wants to
20  hear, the Judge wants to hear, I want to hear, you
21  just tell us how you feel about the things, okay?
22   A.   Yes, sir.
23   Q.   And, of course, the big issue was the death
24  penalty.  If somebody came up to you a week ago,
25  before you had this jury selection notice where you

127

1  came in with that group of people, and they said,
2  "Hey, how do you feel about the death penalty," how
3  would you answer it?
4    A.   I'd -- if the crime fits, I -- I feel like I
5  can give the death penalty.  I -- I feel like it's
6  justified in our society.
7    Q.   When you say, "if the crime fits," I think
8  what you're saying is kind of what the legislature
9  says, the law says, it's not every case that gets the
10  death penalty, right?
11   A.   Correct.
12   Q.   You can't go forge a check or, you know,
13  steal somebody's bicycle and get the death penalty.
14  The law says only certain kinds of cases are even
15  eligible for the death penalty.  Remember, I kind of
16  gave you a list of the, like, killing a kid under six
17  or killing a policeman on duty or murder for hire or
18  killing several people or generally -- killing
19  somebody while you're committing robbery, burglary,
20  kidnapping and rape?  Those are the four main
21  felonies.
22       In other words, if you just rob somebody,
23  it's not capital murder.  If you just murder somebody,
24  it's not capital murder, but if you put the two
25  together that's what makes it eligible for the death

128

1  penalty.  Follow me on that?
2    A.   Yes, sir.
3    Q.   And -- and I don't know if you knew that
4  before or not, but a lot of times people come up to me
5  and say, "Hey, Mark, you now, how come that was a
6  murder case, how come you didn't give the death
7  penalty?"  Well, it didn't qualify.  So it sounds to
8  me you kind of go with that because what you said was
9  "If the crime fits."  So we know that this kind of
10  crime, if it's proven, murder plus robbery, fits those
11  kind of circumstances where you can get the death
12  penalty, so you -- the law kind of agrees with you.
13       THE COURT:  Mark, I -- I need to -- I
14  need to take a small break, just --
15       MR. SKURKA:  Sure.
16       THE COURT:  Just take five minutes.
17       (Short recess.)
18       (Proceedings continued.)
19       MR. SKURKA:  May I continue?
20       THE COURT:  Yes, I'm sorry.
21       MR. SKURKA:  Thank you, Judge.
22   Q.   (BY MR. SKURKA) I think where we left off, we
23  were talking about the punishment -- I'm sorry, the
24  proper case, and you said, "if it fits the crime," and
25  everything and how the legislature goes through and

129

1 says what cases are capital. And I said, "In this
2 case, we're alleging murder plus the robbery." And,
3 as the Judge instructed you, and I think we did the
4 very first day on my PowerPoint, it basically says
5 robbery is -- is theft or taking something by force or
6 by threats of force. And the law also says it doesn't
7 have to be a completed robbery. It says it can be a
8 murder while in the course of committing robbery or
9 attempting to commit robbery.
10          In other words, you don't always have to
11 have a completed crime to have a robbery. See what
12 I'm saying? Like, say, you rob a bank and they catch
13 you as you're leaving the bank. Well, you can't just
14 say, "Well, I didn't rob the bank, because I didn't
15 get away." You still committed robbery by taking the
16 stuff by force or threat. Do you follow me on that?
17    A.   Yes, sir.
18    Q.   Okay. We talked about the feeling about
19 making -- how do you feel about making that -- having
20 to be called upon to make that decision on whether to
21 give the death penalty or not on a case?
22    A.   I -- I feel like it -- it be interesting to
23 be able to serve and be able to be a part of that
24 decision.
25    A.   Okay. The reason I asked is, sometimes

130

1 people say, "Look, Mark, I'm for the death penalty. I
2 think it's a good law. I think we should have it,
3 and, yes, we should have the death penalty, but don't
4 put me in that position to do it myself." You see
5 what I'm saying?
6    A.   Yes, sir.
7    Q.   Some people believe in the death penalty.
8 But I tell them, "Look, you may be on this jury,
9 sitting in one of these chairs here, and there come a
10 time when I prove -- if I anticipate proving the
11 evidence to you beyond a reasonable doubt, that I'm
12 going to ask for the death penalty." And I told you
13 that the very first day, right, the State is seeking
14 the death penalty. Do you think you could do that?
15 And look at him right there. It's not somebody you
16 see on T.V. or read about in the news, that's him. Is
17 there a way you could participate in that decision if
18 you believe the evidence showed that he should get the
19 death penalty?
20    A.   I think so. I -- I hadn't really, I guess,
21 thought of it at that level until, you know, I -- I
22 hadn't really pondered at night as I'm going to sleep
23 whether I could sit there and say that, but...
24    Q.   That's kind of what I'm pinning you down on.
25 Do you think you could follow through with it?

131

1    A.   I -- I believe so.
2    Q.   You see what I'm saying? And it's okay
3 however you feel. It's just that some people say,
4 "Look, you know, I could do it, you know, but, I mean,
5 I believe in the death penalty, but just don't make me
6 be the one to actually do it." And sometimes people
7 say, "Well, I don't really decide that, the Judge
8 decides the death penalty." He doesn't. It's the
9 jury that makes the decision, based on how they answer
10 certain questions.
11          So you don't have a problem participating
12 in that decision if it's called for?
13    A.   No, sir, I don't.
14    Q.   Now, I'm going to turn it around on you. If
15 you believe that the evidence is such a way that he
16 should be found not guilty, can you find him not
17 guilty?
18    A.   Absolutely.
19    Q.   And if you think that maybe after you hear
20 all of the evidence and he should get a life sentence,
21 instead of a death, based on the circumstances, can
22 you give him a life sentence?
23    A.   Absolutely.
24    Q.   Okay. And so you're not leaning one way or
25 the other, death or life, right?

132

1    A.   I'm trying -- yeah, absolutely not, yeah.
2    Q.   And you're not supposed to. That's what
3 we're trying to -- to make sure you're not. And as
4 far as whether he's guilty or not right now the law
5 says that he's presumed innocent. As he sits right
6 now, he starts off presumed innocent. You can't just
7 say, "Well, I don't know yet, because I haven't heard
8 anything," because he has to start with innocence and
9 it's up to the State to prove the case beyond a
10 reasonable doubt. You agree with that concept?
11    A.   Yes, sir.
12    Q.   And -- and that just means, at this point,
13 because the trial hasn't started yet, you know, just
14 because he's presumed innocent at that -- at this time
15 doesn't mean he is innocent, it just means he's
16 presumed at this time because you haven't heard any
17 evidence, okay?
18    A.   Yes, sir.
19    Q.   Can you follow that part of the law?
20    A.   Absolutely.
21    Q.   The other part of the law is that he doesn't
22 have to testify if he doesn't want to. Under the
23 Fifth Amendment, he has that right to testify or not
24 testify, and if he doesn't testify, I'm pretty sure
25 this Judge is going to tell you, you can't hold that

133

1   against him.  Can you follow that law?

2       A.    Yes, sir.

3       Q.    Because some people say, "Hey, you know, I

4   want to hear both sides."  You may not hear both

5   sides.  You have to go with what the evidence that is

6   given you, and you can't say, "Well, he didn't

7   testify, so he must be guilty."  You can't do that.

8   You can't hold that against him.  Can you follow that

9   law?

10      A.    Yes, sir.

11      Q.    Okay.  And -- and that -- that goes to him

12  and anybody accused of a crime.  But, God forbid

13  you're accused of a crime, you would want them to have

14  to prove it, right?

15      A.    Absolutely.

16      Q.    And if you didn't want to testify, you didn't

17  feel like you could testify or have to testify, you

18  don't have to.  You can't hold that against him.  Now,

19  sometimes people also say, "Well, we found him guilty

20  of capital murder, so he automatically gets the death

21  penalty.  He's guilty of capital murder.  He

22  automatically gets the death penalty," and I have to

23  tell them, "Nothing in this world is automatic," okay,

24  except maybe -- well, I better not say it.  I was

25  going to say something about the Dallas Cowboys losing

134

1   on Sunday, but --

2       A.    Or Texas.

3       Q.    -- it seems like it's been automatic, lately.

4             Anyway, I'm just kidding.  Nothing's

5   automatic.  You have two choices, if you go to the

6   first part of the trial and you think there's not

7   enough evidence to prove him guilty beyond a

8   reasonable doubt, you vote not guilty.  If you think

9   there is enough evidence to prove beyond a reasonable

10  doubt, then you vote guilty.

11            Then you go to the next phase of the

12  trial.  In the next phase of the trial, instead of

13  automatically saying he gets the death penalty, you

14  may get to hear additional evidence about what the

15  guy's background is, you know, whether he's a good guy

16  or bad guy, you know, did he make good grades in

17  school or was he in, you know, the penitentiary ten

18  times before, you know?  So you want to make a

19  decision based on everything that you hear before you

20  make that ultimate decision whether he gets death or

21  life.

22            And the law says you don't vote for,

23  "Okay, we'll check off death here or life here."  You

24  don't check it off like that.  You answer two

25  questions, and it's how you answer those questions

135

1   determines what sentence he gets.  And the first

2   question is up there on the board, right here, and

3   I'll ask you to look at it with me.  It says, "Is

4   there a probability that the Defendant would commit

5   criminal acts of violence that would constitute a

6   continuing threat to society?"  We call that "the

7   future dangerousness question."

8             Basically, it says, is there a good

9   chance, a probability, doesn't say certainty, because

10  unless you have a crystal ball, it's kind of hard to

11  tell what somebody can do for sure in the future.  And

12  the law doesn't require me to prove for sure what he's

13  going to do, it just says, "Is there a probability

14  that the Defendant..."  And it also says, "would

15  commit criminal acts of violence."  That could be

16  almost any kind of act of violence.  It doesn't mean

17  you necessarily think he's going to murder somebody

18  down in the future, but is this guy, is it possible or

19  probable that he could hurt somebody down the line and

20  cause other -- do other criminal acts.

21            And finally, the third part says, "which

22  would constitute a continuing threat to society."

23  Sometimes people tell me, "Well, Mark, you know, why

24  do you have to give them the death penalty?  Why can't

25  you just give them a life in prison, because if you

136

1   put them in prison, that takes them away from

2   society."  And I say, "Wait a minute.  What is society

3   designed to be?"

4             Society really talks about everybody,

5   human people, human beings in society.  Who else is in

6   a prison besides the prisoner?

7       A.    Guards.

8       Q.    Guards, other prisoners, maybe people that

9   work in the prison, like maintenance people or medical

10  people, right?

11      A.    Uh-huh.

12      Q.    So, would you agree that even though you're

13  in prison, you're not removed from all other human

14  beings, right?

15      A.    That's correct.

16      Q.    I mean, unless we have, like, a desert

17  island, you're there by yourself, you'd -- you'd be

18  removed from society, but prison is still in society.

19  It sounds a little weird, at first, because, I mean,

20  you don't have all the benefits of open society, but

21  there's still people interacting around you.  Have you

22  ever heard of that happening before, where maybe a

23  prisoner hurts another prisoner or attacks a guard or

24  something like that?  You've probably heard that,

25      A.    Sure.

137

```
1    Q.   -- right?
2    A.   Sure.
3    Q.   So just because they're removed and put in
4  prison does that mean that they'll never commit any
5  other criminal acts of violence?
6    A.   Not necessarily.
7    Q.   No, the -- the opportunity is still there.
8         And so, the first question goes like
9  this.  You already think he's guilty and you voted
10 guilty for capital murder.  The next question is do
11 you think there's a chance or a good chance that the
12 Defendant would commit criminal acts of violence that
13 would constitute a continuing threat to society, yes
14 or no?  And how do you make that decision?  Well,
15 again, like you have -- you don't have a crystal ball,
16 but sometimes, would you agree with this theory,
17 sometimes you can tell what a person's going to do in
18 the future by what they've done in the past?
19   A.   Sometimes.
20   Q.   Sometimes you can.  It's not absolute, a
21 hundred percent, but you kind of want to know a
22 person's track record, for lack of a better word,
23 right?
24   A.   Uh-huh.
25   Q.   I mean, was this guy an Eagle Scout and made
```

138

```
1  straight A's in school or did this guy, you know, been
2  to prison ten times before, something like that?  So
3  you have to -- and that's what you have to do, you
4  wait until you hear all the other evidence.  Now, you
5  can still consider the circumstances of the event
6  itself, you know, if it's proven what he did that
7  night, you can consider that, also, but you probably
8  want to know more about his background, too.  And you
9  may get to hear additional evidence, like, good guy,
10 bad guy, what his track record is.  So you answer this
11 yes if you think he's a continuing threat to society,
12 and, no, if you don't think he is.
13        Then you go to the second question, which
14 is this one, it's a big word, what we call "mitigating
15 circumstances."  And I'll confess to you, I didn't
16 know what mitigating was, either, before I went to law
17 school.  But I like to tell people it's kind of like
18 the opposite of aggravating circumstances.
19 Aggravating means something that makes the punishment
20 worse and mitigating means something that makes the
21 sentence less.  In other words, it's still the same
22 crime, but is there any reason that you want to give a
23 lesser sentence of life, instead of the death
24 sentence?  Is there any reason to come down from death
25 to life?  In other words, you had found him guilty of
```

139

```
1  capital murder, you answered this Special Issue No. 1,
2  yes, I think he's a continuing threat to society, but
3  before you impose a death penalty, the Judge gives you
4  this next question, and it says this, "Take into
5  consideration all of the evidence, including the
6  circumstances of the offense," what happened that day,
7  was it a real heinous crime or was it just kind of a
8  minor deal, "the Defendant's character and his
9  background," and that goes into whether he's a good
10 guy, bad guy, if he has a criminal history or doesn't
11 have a criminal history, "and the personal and moral
12 culpability, is there a sufficient mitigating
13 circumstance or circumstances to warrant that a
14 sentence of life imprisonment, rather than death
15 sentence be imposed?"  In other words, is there any
16 reason, and is it enough reason to outweigh the death
17 penalty and give him a life sentence?
18        Well, that's up to the jury to decide.
19 What is a mitigating circumstance or circumstances is
20 completely up to the jury.  This Judge is not going to
21 go up there and say, "Well, because he made good
22 grades in school you have to give them a break and
23 give them a less sentence because he was, you know,
24 the, what do you call it, valedictorian in high
25 school, that doesn't mean he gets a lower sentence,
```

140

```
1  just because he's young, doesn't mean he gets a lower
2  sentence," it's up to the jury to decide, first of
3  all, is it a mitigating circumstances or -- and then,
4  is it sufficient enough?
5         Now, what can be a mitigating
6  circumstance is almost anything.  The only thing the
7  Judge is going to tell you you have to do is don't
8  close your mind to them.  You have to consider all
9  these things.  Whether you think it's mitigating and
10 you give effect to it is up to the jury.
11        Let's get away from the law stuff and
12 talk more -- a better example.  You've never been on a
13 jury before, right?
14   A.   No.  That's correct.
15   Q.   Okay.  Say there was two cases, two burglary
16 cases, and you're sitting there and you're going to be
17 a juror on both the burglar cases and they're separate
18 cases.  And you come in there and you say, "Well, gah,
19 two burglars?  They're bad.  I don't like people that
20 break into people's houses and steal something," which
21 is what burglary is, "that's bad.  I want to treat
22 them both the same and give them the highest
23 sentences, because I don't like burglars."
24        Well, they're both found guilty of
25 burglary, but then the facts and circumstances are a
```

141

1  little different.  Say, in the first burglary, what
2  happened was, a guy kicked in the back door, broke the
3  door down, went into the house, stole all the jewelry,
4  all the money, all the T.V.s and stereos and all the
5  equipment, all the valuables inside; and then when he
6  was leaving the house, he just tore up the house,
7  knocked things over, broke things, tore up furniture,
8  stuff like that.  And then you find out, in that case,
9  this isn't the first time he's been charged with
10  burglary.  He's been convicted of burglary and been to
11  prison five times before for burglary.  So that's the
12  first case.
13          Now, look at the second case.  In the
14  second case, the guy's charged with burglary.  He's
15  convicted of burglary because he broke into somebody's
16  house and stole something, that -- without consent.
17  But, in this case, it's a little different.  He didn't
18  kick in the back door.  What happened was the back
19  door was unlocked and he went in there.  He didn't
20  even go through the house and ransack the house.  He
21  went in the kitchen and he took a loaf of bread and
22  some food to go feed his family, his kids who were
23  hungry, didn't take the jewelry, didn't take any
24  money, he didn't take anything else, just stole food
25  out of the pantry to feed his kids.

142

1          And then you look at his background and
2  you find out this guy's never been to prison before,
3  in fact, this is the first time he's ever been
4  arrested for anything in his life.  Would you punish
5  those two guys the same?
6      A.  I wouldn't, no.
7      Q.  No, of course not.  Why not?  Because one is
8  worse than the other.  That's what -- that's what that
9  question's about.  In the first case, they're
10  aggravating circumstances, right, tore up the place,
11  stole everything, been to prison before.  In the
12  second case, it could be mitigating.  The jury may
13  say, "Hey, that's mitigating.  All he did was steal --
14  was steal was food.  All he did was -- he didn't break
15  anything or tear anything up."  And the jury may
16  consider he's never been to prison before.  That might
17  be a mitigating circumstance.  See how you don't know,
18  until you hear all the evidence?
19      A.  Yes, sir.
20      Q.  And then when you hear the evidence, then you
21  make that balancing test.  Is it enough to give him a
22  lesser sentence of life rather than death?  Now, do
23  you follow the scheme?  It makes kind of sense, right?
24      A.  Yes, sir.
25      Q.  It looks like you're heading for the death

143

1  penalty, because you found him guilty of capital
2  murder, you think he's a continuing threat to society,
3  but before do you that, the Judge says, "Hey, take the
4  big picture in, take in what happened that night, his
5  background, his character, his personal moral
6  culpability, is there enough of a mitigating
7  circumstances to outweigh that sentence of life,
8  rather than death?"
9          In other words, you do a little balancing
10  test.  Is it enough?  Some jurors may say, "I don't
11  care if he had -- was an Eagle Scout.  I don't care if
12  he had straight A's in high school.  He still did this
13  crime, you know?  We have to punish him for it, you
14  know?"  And other people may say, "Well, you know,
15  because of this and that, we'll give him a break."
16  It's up to the jury to decide, okay?  We can't tell
17  you what to do with this stuff.  But the law says you
18  have to keep an open mind and consider these things.
19  You may consider them and reject them and say, "Hey,
20  that's not enough to outweigh what he did, you know,
21  sorry."  Or you can just say, "Yes, there is," or,
22  "No, there's not."
23          So if you answer that question yes, or
24  this question yes, and this question no, no, there's
25  no reasonable to lower the sentence, this Defendant is

144

1  sentenced to death.  If you answer it any other way,
2  he gets a life sentence.  Follow me?
3      A.  Yes, sir.
4      Q.  Okay.  That's kind of the scheme, how it
5  works.  One other legal thing I should tell you about
6  is there's also a part of the law that says,
7  "Voluntary intoxication is not a defense to crime."
8  Voluntary intoxication.  In other words, if you go get
9  yourself drunk or you go get yourself high, you cannot
10  use that as an excuse to crime.  You can't go rob a
11  bank and say, "Oh, well, I'm not guilty of robbing
12  this bank, because I was drunk when I did it."  You
13  can't do that.  That's no excuse for a crime.
14          The law does say that it's a possible
15  mit- -- it could be a mitigating circumstance.  "Well,
16  we're going to give him a break, because he was drunk
17  when he did that."  Does that mean you automatically
18  give him a break?  No.  It's up to the Judge.
19  Remember I said it's not automatic.  It's that
20  weighing, that balancing test.  You have to decide if
21  that's enough or not, okay?
22      A.  Yes, sir.
23      Q.  Any questions about the mitigating
24  circumstances?  Does that make sense, now, aggravating
25  and mitigating?

145

1    A.   Yes, sir, it does.

2    Q.   It's kind of a trick thing because you hear

3  about two burglars, you think they're all the same,

4  right, but every case is different, and it depends on

5  what the facts are.  And I know that's what everybody

6  wants you to do, the Judge, the Defense and us, is

7  wait till you hear all the evidence before you make a

8  decision.  Can you do that?

9    A.   Yes, sir.

10    Q.   And you're not leaning one way or the other,

11  right?

12    A.   No, sir.

13    Q.   What did you think when you saw the Defendant

14  for the first time, because he seems to a young --

15  fairly young man.  Do you think that should make a

16  difference, how a person looks, on how you judge them?

17    A.   Not really.  But that's what I thought, he

18  was young.  I didn't notice until we were almost done

19  that he was sitting there, and, you know, he seems

20  very young.

21    Q.   Do you think that makes a difference on

22  making the decision in this case?

23    A.   (No response.)

24    Q.   By what a person looks like or how young he

25  is?

146

1    A.   No, no.  But, you know, it's just

2  unfortunate, maybe people haven't seen enough or been

3  around enough and they don't think things through,

4  but, no, you know, it's not a difference.

5    Q.   Okay.  Well, let me tell you what the law

6  says.  In Texas, you cannot give the death penalty to

7  somebody who's under 18 years of age.  That's what the

8  law says.  A 16 year old does the most horrible crime

9  in the world, can't give the death penalty.  It's only

10  -- and I assume you're saying because by the time

11  you're 18, you probably know the law and you probably

12  know the difference between right and wrong, right,

13  and then -- and so it really doesn't matter if you're

14  23, 33, 53, there's no time limits, age limits, is

15  what I'm trying to say, once you're past 18.  Would

16  you agree with that?

17    A.   Yes, sir.

18    Q.   Because -- and, now, you understand that

19  youth, the fact that he's young, can be a possible

20  mitigating circumstance.  Somebody may say, "Well,

21  gosh, you know, he's so young, maybe we shouldn't give

22  him the death penalty," then other people say, "Look,

23  he may be young compared to you and me, but he's old

24  enough to know better."  See what I'm saying?

25    A.   Yes, sir.

147

1    Q.   And -- and so would you agree with me that

2  age may be something to consider, but it could be

3  aggravating, it could be mitigating, depending on what

4  it is?

5    A.   Sure.  What I meant was, I don't even know if

6  he was under 18 at the time of the crime or whatever.

7    Q.   I'm telling you, he wasn't under 18.

8    A.   Okay.

9    Q.   He couldn't be or we wouldn't even be here.

10    A.   Well, okay.

11    Q.   I think the evidence is going to show he's

12  going to be much older than that, he just has a

13  youthful appearance.

14    A.   Okay.

15    Q.   Okay?  The second thing is appearance.  Would

16  you agree with me it doesn't matter what a person

17  looks like?

18    A.   I would agree, correct.

19    Q.   It's what they did, right?

20    A.   Yes, sir.

21    Q.   Sometimes people come in to jury duty -- and

22  I don't know, if you've never been on a criminal case

23  before, they expect to see Charles Manson sitting

24  there, right, big, scary-looking guy with unkept hair,

25  and crazy-looking?  And -- or maybe some guy with a

148

1  bunch of tattoos, biker-looking guy.  And they see a

2  guy that's, you know, cleaned up, dressed up, nice

3  looking and they think, "Well, how could he have done

4  that, you know?  He seems like such a nice guy."

5  Would you agree with me that you can't make a decision

6  based on that?

7    A.   Yes, I would.

8    Q.   Would you make a decision in this case based

9  on what he did, rather than what he looks like?

10    A.   Yes, I would.

11    Q.   And that's a fair thing to say, right?

12    A.   I believe so.

13    Q.   Okay.  Now, since -- there's a couple of

14  other things I want to go over.  The legal parts are,

15  first of all, No. 1 is, remember that a person has

16  been indicted by the grand jury, he's been indicted

17  for capital murder.  That doesn't mean he's guilty,

18  though.  Remember, that's just the charging inference,

19  and how the State brings the case.  And the Judge will

20  probably tell you that just because he's indicted

21  doesn't mean that he's guilty, right?

22    A.   Correct.

23    Q.   And he starts with the presumption of

24  innocence.  Do you agree with that?

25    A.   Yes, sir.

149

1    Q.   And the Fifth Amendment, meaning he can
2 testify if he wants to.  If he doesn't want to, he
3 doesn't have to.  You can't hold that against him.  I
4 don't know if he's going to testify or not, that's him
5 and his lawyer's decision, but you agree that you
6 won't hold that against him if he doesn't?
7    A.   Correct.
8    Q.   And you agree that right now he's presumed
9 innocent.
10    A.   Yes, sir.
11    Q.   Okay.  And that only changes once the State
12 proves it beyond a reasonable doubt.  And the State
13 has the burden of beyond a reasonable doubt, and it
14 doesn't mean beyond any doubt, all doubt, shadow of a
15 doubt, it just means beyond a reasonable doubt.  I
16 like to tell people to look at it two ways:  First of
17 all, do you have a doubt; and the second thing is, if
18 you have a doubt, do you have a reason for the doubt?
19         And the law doesn't require me to prove
20 everything to you a hundred percent beyond all doubt
21 or shadow of a doubt.  Have you ever flown on an
22 airplane before?
23    A.   Yes, sir.
24    Q.   Did you know for sure, for sure that plane
25 wasn't going to crash?

150

1    A.   No, sir.
2    Q.   You didn't.  Why did you get on it, then?
3    A.   You know, because it's probably going to get
4 where it's going.
5    Q.   That's right.  And you know why?  You
6 probably went on this plane and it looked like it was
7 in good operating order, and you probably saw the
8 pilots getting on, and you see it's a reputable
9 airline that maybe doesn't have a history of plane
10 crashes, and everything seems to be working in order
11 and everything like that, so you get on the plane.  Do
12 you know a hundred percent that that plane is not
13 going to crash?
14    A.   No, sure.
15    Q.   But you had a belief beyond a reasonable
16 doubt that plane wasn't going to crash or else you
17 wouldn't have taken it, right?
18    A.   Right.
19    Q.   It's kind of hard to define beyond a
20 reasonable doubt.  But all I'm trying to tell you
21 there's no way I could prove it to you beyond all
22 doubt, just like there's no way you can prove that the
23 plane isn't going to crash.
24    A.   Right.
25    Q.   There was a part in your questionnaire about

151

1 your church, and I think it said something about --
2 what -- what religion are you?
3    A.   Baptist, Christian.
4    Q.   Baptist.  And do they feel -- how do they
5 feel about the death penalty?
6    A.   (No response.)
7    Q.   Oh, you put, "Only God has that right."  So
8 they're against the death penalty?
9    A.   Yes.
10    Q.   And how do you feel about going against what
11 they think?  You say you disagree with them.
12    A.   Well, you know, in society that we live in
13 today, and if -- if the crime fits, I mean, that's --
14 that's the way we live and that's the way we go about
15 day to day, you know.  It's -- that's where we're at.
16    Q.   So you think the law of the land is the law
17 of the land, it should be obeyed.
18    A.   Yes, sir.
19    Q.   Would that be -- is that another way of
20 saying it?
21    A.   It's a better way than I could say, yeah.
22    Q.   I'm not trying to put words in your mouth,
23 I'm just trying to figure out where you're --
24    A.   Yeah.
25    Q.   Because some people say -- like Catholics,

152

1 for example, are against the death penalty, generally
2 speaking, but then some people say, "Well, look, you
3 know, if the Pope says this, I've got to do this.  I'm
4 against the death penalty," then other people say,
5 "Well, you know, the Church teaches that, but I have
6 my own mind and I disagree with that particular
7 teaching, and like my --" you think it's necessary in
8 some cases?
9    A.   Yes, sir.
10    Q.   That's what it sounds like to me, that you
11 wish -- you know, the death penalty is necessary and
12 -- in some cases.
13    A.   Yes, sir.
14    Q.   Not every case, but the case that it fits.
15 Okay.  I don't think I have any other question for
16 you.  Do you have any questions of me?
17    A.   No, sir.
18    Q.   The bottom line is, do you think you can be
19 fair and impartial in this case?
20    A.   Yes, sir, I do.
21    Q.   Listen to all the evidence before you make a
22 decision?
23    A.   (Nods head.)
24    Q.   And if you make a decision, can you follow
25 through with it?

153

1    A.   Yes, sir.

2         MR. SKURKA:  Thank you, Mr. Calbat.  I

3  appreciate you talking to me.

4         THE COURT:  Mr. Garza.

5         MR. JONES:  I'm going to do the

6  questioning.

7              VOIR DIRE EXAMINATION

8  BY MR. JONES:

9    Q.   How are you?  How do you pronounce your last

10  name?

11   A.   Calbat.

12   Q.   Calbat.  Now, how long have you lived in

13  Corpus Christi?

14   A.   I moved away at as younger teenage for a

15  couple of years, but pretty much all my life.

16   Q.   Okay.  So, you kind of grew up around here.

17   A.   Yes, sir.

18   Q.   Okay.  You have a son?

19   A.   Yes, I do.

20   Q.   Age 16?

21   A.   (Nods head.)

22   Q.   Does he live here in Corpus Christi?

23   A.   Yes, sir.  Orange Grove.

24   Q.   Does he live with you?

25   A.   No, sir.

154

1    Q.   Lives with his mother?

2    A.   Yes, sir.

3    Q.   Okay.  Do you see him regularly?

4    A.   Yes, sir.

5    Q.   Okay.  And, let's see, at age 16, where are

6  you in school at age 16?

7    A.   He's a junior this year.

8    Q.   Junior.

9    A.   Yes, sir.

10   Q.   Okay.  In Orange Grove.

11   A.   Yes, sir.

12   Q.   Now, let's see, you work at Valero, --

13   A.   Yes, sir.

14   Q.   -- right?

15   A.   Yes, sir.

16   Q.   And tell me specifically what kind of work

17  you do.  You wrote it down here, but...

18   A.   I'm an instrument technician.  I work

19  maintenance for them.  I repair -- I repair

20  instrumentation, technical measuring devices for the

21  refinery, as -- as they need to be repaired.

22   Q.   And how long have you worked for them in that

23  kind of work?

24   A.   In March it will be nine years.

25   Q.   Okay.  So you -- you're building up some

155

1  seniority there.

2    A.   Not really.

3    Q.   Not really?  That's not a long time?

4         MR. SKURKA:  Over there they have guys

5  have been there a long time.

6    Q.   (BY MR. JONES) Chances are you're not going

7  to get laid off.

8    A.   Well, you never know.

9    Q.   You're making gasoline.  Let's see, where did

10  you get your training for that job?

11   A.   I -- I started as a helper in -- in fitting

12  and installations, and I -- I didn't have any

13  training.  I just did that for several years before I

14  got hired and then at the same time as I got hired,

15  I -- I went to the technical school here at Del Mar.

16  But I was already hired when I did that, I did that

17  for my own.  So just experience.  I -- I started the

18  installation part of it in construction after I turned

19  18 and I -- I just...

20   Q.   So you started --

21   A.   I started on my 18th birthday.

22   Q.   -- on your 18th birthday?  So you --

23   A.   Actually.

24   Q.   -- you started working for them, so -- all

25  right, so -- now, let's get -- the purpose of this

156

1  questioning is to make -- let us satisfy ourselves

2  that you understand the rules that apply in a criminal

3  case.  It's particularly important in this case

4  because a man's life could literally be at stake,

5  okay?  I like to give the example of when I was in the

6  -- in the military, I flew in airplanes, and most of

7  the planes that I flew in had two seats in them.  When

8  you start out, you -- when you're learning how to fly,

9  you have an instructor that's usually in the back seat

10  and the student sits in the front.

11         One day we were on a training mission and

12  we were stopped at an airport and we were standing

13  outside the plane and I noticed a jet plane that had

14  only one seat in it.  And I asked my instructor, I

15  said, "How do you learn how to fly one of those planes

16  if there's only one seat?"  Okay, he says, "Well, you

17  get a guy that's got his wings and you give him this

18  book on how to fly that airplane, he goes and reads

19  the book and he gets in the plane and starts it up and

20  takes off and flies it.  That's how you do it."  He

21  said, "You have to do it right the first time."  And I

22  thought to myself, "Well, that's -- there's a lot of

23  things in life you have to do right the first time,"

24  okay.

25         There's some kinds of professions where

157

1 the -- the worker has to do the right thing every
2 time, almost, like the -- like Mr. Skurka asked you
3 about the airplane.  I want my pilot on those -- on
4 the Southwest Airlines to make no mistakes.  He's
5 taking me to Houston.  Is that the way you feel?
6     A.   For a pilot, yes.
7     Q.   If you were going to get surgery, you know,
8 you know, major surgery, you would want your surgeon
9 not to make any mistakes, right?
10     A.   Yes, sir.
11     Q.   So there's certain kinds of endeavors where
12 we want to make -- do the best we can the first time,
13 okay?  And most people go through their whole lives
14 and never have to serve on a jury, never get called,
15 but you have a -- and I take it that's your situation,
16 you've never been on a jury before.
17     A.   Correct.
18     Q.   And so, you've been -- you're potentially a
19 juror in one of the most serious kinds of cases that
20 can be tried in a Texas court.  You understand that?
21     A.   Yes, sir.
22     Q.   The -- the Texas Constitution and the United
23 States Constitution gives -- give citizens a right to
24 trial by jury in a criminal case.  In other words,
25 where the person's been accused of a crime, in a

158

1 felony case, you get a jury of 12.  Do you agree with
2 trial by jury as being a right that we have?
3     A.   Yes, sir.
4     Q.   Why -- why do you think it's a good thing to
5 have trial by jury?
6     A.   I think you have an opportunity for every
7 average day people from different walks of life to
8 come up with a united opinion.
9     Q.   Why can't we just let the Judge decide?
10     A.   Well, that's one person.
11     Q.   It's one person?
12     A.   He -- he can --
13     Q.   Why can't we just let the chief of police
14 decide?
15     A.   Because that's just one person.  And we all
16 have flaws and mistakes, you know?
17     Q.   All right.  Every society, our society and
18 every other society has to have a set of rules.
19 People, you know, they have to have a set of -- a
20 government and they have to decide what kind of
21 conduct is forbidden, and that conduct is set out in
22 the our Penal Codes.  We have to have a machinery for
23 enforcing those laws, you know, "Thou shall not
24 steal," et cetera, et cetera, okay.
25         And if almost -- when you have a set of

159

1 rules, you have to have some way of enforcing them,
2 which usually means a procedure for finding when
3 you've done something wrong, and then, too, whether --
4 you know there's some kind of sanction that follows
5 it, okay?  Well, under our law, when we have a trial
6 by jury, before a person can be declared guilty of a
7 crime and before he can be punished, a jury has to
8 sign off on it, okay?
9     A.   Okay.
10     Q.   And in our society from where does the power
11 of government come from?
12     A.   From the people.
13     Q.   That's right.  What did we do just a couple
14 of weeks ago?
15     A.   We voted.
16     Q.   We voted, put in -- we put in -- put in a
17 bunch of new legislators and other officeholders,
18 right?
19     A.   Yes, sir.
20     Q.   Okay.  And so, we voted for them.  They take
21 on that.  They become -- they get power to do things,
22 and you want them to do a good job, right?
23     A.   Yes, sir.
24     Q.   Okay.  So, basically, the jury -- the jury
25 system says that before the government can declare

160

1 somebody guilty of a crime, and before they can punish
2 him they have to get clearance, permission from a
3 jury.  They have to go to the source of the power.
4 That would be you, right, if you're on the jury.  What
5 is the jury?
6     A.   (No response.)
7     Q.   It's a cross-section of?
8     A.   People.
9     Q.   The people from where the power comes from,
10 okay?  So do you like that idea?
11     A.   I do.
12     Q.   Okay.  The jury is not a rubber stamp of the
13 District Attorney's Office.  The jury is not a rubber
14 stamp for the police department or the -- and while
15 the jury is a branch of the Court, it is not a rubber
16 stamp of the Court.  It is an independent body, okay.
17         What does a jury do, what is it's primary
18 function?
19     A.   To decide.
20     Q.   Decide what?
21     A.   Innocent or guilt.
22     Q.   It basically decides facts, what are the
23 facts, okay, and the Judge will tell you what facts
24 need to be found before you can declare somebody
25 guilty, okay?  So, basically, you decide what

161

1    happened, and if you believe -- well, let me get into

2    the standard of proof.  What is the standard of proof

3    in a criminal case, what degree of certainty do you

4    have to have before you can find somebody guilty?

5        A.    Beyond a reasonable doubt.

6        Q.    That's right.  That's the phrase we use.

7    It's the highest degree of certainty required in a --

8    in a legal case in a Texas court.  Why do you suppose

9    the legislators who created our system chose to assign

10    that standard of proof to criminal cases, or as a --

11    some lesser standard of proof, like preponderance of

12    the evidence?

13        A.    Because I suppose they want to make sure,

14    absolutely sure that -- that you're certain that

15    the -- that the -- that there is no doubt that the

16    person is guilty or innocent, or --

17        Q.    What's at stake?

18        A.    -- guilty.

19        Q.    What's at stake in a criminal case?

20        A.    Somebody's freedom.

21        Q.    That's right.  Liberty, right?

22        A.    Yes, sir.

23        Q.    And in our American civilization what do we

24    value most?

25        A.    Our freedom.

162

1        Q.    Our freedom.  Life, liberty and the pursuit

2    of happiness, okay?  So, before the government can

3    take it away by putting someone in jail or taking his

4    life of his property, we want to make sure that it's

5    necessary.  Is it really necessary?  Is there a good

6    -- is there a good reason to do this?  We just don't

7    want to do it, you know, haphazardly, okay.

8        So do you agree with all of that?

9        A.    Yes, sir.

10        Q.    Okay.  So the jury -- the jury performs a

11    very valuable function.  It's independent, not a

12    rubber stamp for anybody.  And -- now, not only did --

13    does a defendant have the right to a jury, but a

14    defendant who is also a citizen has a right to an

15    impartial jury.  What does that word mean to you,

16    "Impartial"?

17        A.    Somebody that's willing to hear the evidence

18    before they make a decision.

19        Q.    Okay.  A person is impartial if they come to

20    the task at hand with no prejudgment.  In other words,

21    they -- they don't have any opinion about the case one

22    way or the other, okay?  Also, they come to the task

23    without any leanings towards one side or the other,

24    which is another way of saying biases.  There are all

25    kinds of biases.  We all have them.  Like, for

163

1    example, if -- if you, as a juror, were -- had -- were

2    related to the Defendant, you were a nephew or uncle

3    or a cousin, that would be a family bias, okay?  If

4    you -- let's -- let's say that you were the victim of

5    a crime similar to the one that was on trial here, you

6    know, maybe you had a family member that was, then you

7    might have a situational bias.  There might -- it's

8    kind of like, have you ever had your house

9    burglarized?

10        A.    No, sir.

11        Q.    Well, if you ever-- if you have had your

12    house burglarized, it kind of gives you a bad feeling

13    about the whole thing, you know?  And so, if you're

14    called to sit on a jury in a burglary case, you might

15    have a bias about it, might have a leaning against the

16    defendant, just because of what happened to you, okay?

17        A.    If -- if I'm picking a jury in a D.W.I. case,

18    I'm probably not going to -- sit a highway

19    patrolman on my jury.  Why?

20        A.    Because he -- he sees them all day long.  I

21    mean, that -- he's the one that put them there.

22        Q.    Okay.  That's called "an occupational bias."

23        A.    Okay.

24        Q.    I'm trying an arson case, I'm probably not

25    going to let a fireman sit on the jury, okay?  Why?

164

1        A.    Occupational.

2        Q.    I want him to be biased.  I want the fireman

3    to be biased against fires, okay?

4        A.    Uh-huh.  My house is on fire, I want him to

5    get there quickly, put it out and to save me, if

6    necessary, okay?  Just like I want the highway

7    patrolman on Highway 77 to protect me if I'm -- while

8    I'm traveling to Houston, okay?  I want him to be

9    there. So, you know what -- you see what I'm saying?

10        A.    Yes, sir, I do.

11        Q.    In a criminal case, the best juror is one

12    that comes to a matter with an open mind, doesn't have

13    any leanings to one side or the other, is the kind

14    that say, "Okay, let me -- Mr. Prosecutor, you have

15    the burden of proof, what do you have?  You say this

16    man's guilty of a crime, let's hear the evidence.  You

17    want -- you know, if you -- if I find him guilty, you

18    want me to do certain things, then you prove that

19    that's the best thing to do."

20        That's your -- that should be your

21    attitude.  Do you think that can be your attitude if

22    you're on this jury?

23        A.    Absolutely.

24        Q.    Okay.  I believe you said you didn't -- you

25    don't know anything about the case from reading the

165

1  newspaper.

2      A.   Oh, I've read the newspaper, but I didn't

3  know, until we were almost done.  I remembered reading

4  it --

5      Q.   Okay.

6      A.   -- a long time ago.

7      Q.   But you didn't -- you didn't pay any

8  particular attention to the article, I mean, you don't

9  remember any specific facts?

10     A.   I remember there was a guy and either one or

11 two girls, and I -- I think that -- no, I don't know

12 much, other than I think they've already been

13 convicted.

14     Q.   Okay.

15     A.   And -- and I thought I remembered the

16 Defendant wasn't caught for a long time, or something

17 like that.

18     Q.   Okay.

19     A.   But, no, I didn't really put much thought

20 into it.

21     Q.   So, do those facts, knowing those facts from

22 the media -- and the law doesn't, you know, require

23 you to be uninformed about current events, do you have

24 any opinion, right now, about the guilt or innocence

25 of this Defendant?

166

1      A.   Not really.

2      Q.   You qualified your answer.

3      A.   What?

4      Q.   You qualified your answer.  You said, "Not

5  really."  Why did you say "not really" instead of no?

6      A.   No, I -- I don't -- I don't know if he's

7  guilty or innocent until I hear the evidence.  But,

8  no, the -- the trial, I mean, the way it's going, the

9  way I see it is you-all seem to be preparing as he's

10 guilty and focusing more on the punishment, and stuff

11 like, just as I read what's going on.

12     Q.   Okay.

13     A.   That's what I see, but, no, you know, I hope

14 he's not.

15     Q.   Okay.

16     A.   I'd hate to be in his shoes.

17     Q.   Okay.  So you think because we're asking you

18 questions about the punishment stage of the trial that

19 we -- you think we're going to get there?

20     A.   Yes.

21     Q.   Do you -- do you think that that -- that

22 feeling that you have about that would influence your

23 ability to reach a verdict in this case?

24     A.   No, I don't.  I would like to say just one

25 thing --

167

1      Q.   Sure.

2      A.   -- is -- about you're -- you're -- where

3  you're trying to get.  I personally wish that, if I

4  was in his shoes, I would hope that more people would

5  -- I'm biased for myself --

6      Q.   Uh-huh.

7      A.   -- would be more like me, because, you know,

8  I -- I feel like I would try to be fair if -- if there

9  were a doubt.

10     Q.   All right.  Let's go back.  As I told you,

11 the law does not -- with all the -- the media that we

12 have, television, newspapers, Internet, you can't

13 presume that our citizens who come in here would be

14 ignorant of current events.  And I read the newspaper,

15 I read about stories, and I -- I get -- I form

16 opinions based on just what I'm reading, "Oh, this guy

17 has done this or this guy has done that," and so

18 forth, okay.

19          But what you have to do as a juror,

20 you -- you have to consciously set that information

21 aside.  Sometimes that's hard to do, and only you can

22 tell me.  I think I'm sensing that you can do this.

23 "I know I've read all this, it came from the

24 newspaper, but I'm going to set this aside.  I'm going

25 to clean the slate.  I'm going to wait to see if

168

1  Mr. Skurka can prove the case, okay, and, if he can't,

2  I'm going to follow my oath and find the Defendant not

3  guilty."  Can you do that?

4      A.   I believe so, yes, sir.

5      Q.   And you keep saying, "I believe so."  I want

6  you to say "I can do it."

7      A.   I can do it.

8      Q.   Okay.  Because that's what the law requires,

9  and you're going to take an oath that you'll follow

10 the law.  The law says, if you have a reasonable

11 doubt, that you have to find the Defendant not guilty,

12 okay?  What does not guilty really mean?

13     A.   It means the State didn't prove their case.

14     Q.   Exactly.  Does not mean innocence.  Maybe

15 only God can know whether he's actually guilty or

16 actually innocent, but we deal with legal -- we have

17 to deal with legal truth, which is what human

18 beings can know, okay?  But, in your mind, if you have

19 a doubt, a reasonable doubt, then you have to say, not

20 guilty, which means, "Judge, the State didn't prove

21 their case."  You can do that.

22     A.   Yes, sir.

23     Q.   Okay.  Now, in any criminal case, the Judge

24 will tell you that -- what is a -- what is a verdict?

25 You said, "The jury has reached a verdict."  What does

169

1    that mean?

2        A.    They've come to a decision, --

3        Q.    Decision, --

4        A.    -- I suppose.

5        Q.    -- that's what it means.  A verdict is a

6    decision.  Before a jury can announce its decision,

7    they have to have a unanimous vote.  That means all

8    jurors have to vote the same way; however, that

9    doesn't mean that reaching that -- that point is a

10   democratic process, it's an individual process.  You,

11   individually, have to make a decision on the issues of

12   the questions that are presented to you and if

13   everybody has the same answer, then you've got a

14   verdict, okay.

15            So will you do -- will you follow that?

16       A.    Yes, sir.

17       Q.    Are you sure you can -- and it may be that --

18   that, you know, after fully discussing the evidence,

19   you might feel one way and 11 of the other jurors

20   might feel another way.  Do you think you could stick

21   to your vote if you strongly feel --

22       A.    Absolutely.

23       Q.    Okay.  That doesn't mean you shouldn't listen

24   to the other jurors and discuss it.  If you reach a

25   final decision and you're comfortable with it, you

170

1    think you can stick to it?

2        A.    Yes, sir.

3        Q.    Let me talk about beyond a reasonable doubt

4    just for a minute.  I want to give -- it's not give --

5    you're not given a definition.  You know it's the

6    highest degree of certainty that's required, and I

7    like to give an illustration of the problem of beyond

8    a reasonable doubt.

9            Let's say you have a box.  For the

10   record, I'm showing you the side of a box and down at

11   the bottom of the box there's a -- there's a hole near

12   its face, about two inches in diameter.  Into the box

13   you place a small mouse and also you place into the

14   box a cat that likes to eat mice.  You put a top on

15   the box and you come back an hour later, and you open

16   the box and the cat is still in the box, but the mouse

17   is gone, okay?  Did the mouse escape or did the cat

18   eat the mouse?

19       A.    Mouse escaped.

20       Q.    How do you know?

21       A.    I don't.

22       Q.    You don't.  Okay.  From the information that

23   I've given you, can you know beyond a reasonable doubt

24   what happened?

25       A.    You didn't give me much information.

171

1        Q.    Well, I know, but, I mean, you can't know,

2    can you?

3        A.    No.

4        Q.    Okay.  So that's the problem that a jury has

5    at the end of a case.  They -- they sit back in their

6    chair and say, "Okay, has the State given us enough

7    information that we believe to be true, upon which we

8    can make a decision to the degree of certainty that

9    the law requires?"  Now, I could add facts to that

10   illustration.  I could say you open the box, the cat

11   was still there and the box had blood all over it in

12   the inside.  That's circumstantial evidence of what?

13   The mouse probably got eaten.

14       A.    Probably.

15       Q.    Okay.  Of course, he could have been wounded

16   and escaped and left blood behind, but -- or if the

17   tail is sticking out, coming out of the cat's mouth,

18   you'd probably --

19       A.    My cat won't eat them.  He brings them.

20       Q.    He brings them --

21       A.    He just plays with them and leaves them.

22       Q.    You see what I'm talking about?

23       A.    Yes, I do.

24       Q.    And who gets to decide that?  That's what the

25   jury does, okay?

172

1        A.    (Nods head.)

2        Q.    And, I want -- and I want to talk about the

3    punishment issues.  Now, keep in mind, just because

4    I'm talking about these issues doesn't mean I think

5    this is -- we're going to get there.  I'm required by

6    law to do this, okay?  This is the only time that we

7    have a chance to talk to you about it.  So, when you

8    said, "Well, I feel like since we're talking about the

9    punishment issues that, you know, these people believe

10   we're going to get there," don't assume that, okay?

11       A.    Okay.

12       Q.    Because we're required to do this.  So you

13   don't know.

14       A.    All right.

15       Q.    All right.  Let's talk about -- I need to

16   under -- for you to satisfy myself that you understand

17   how this procedure works legislature set up.  In the

18   old days in a capital murder case, if the jury found

19   the Defendant guilty the jury would go back in the

20   box -- go back in the room at the punishment stage and

21   they'd say, "Okay, what are we going to give this guy,

22   life sentence, 50 years in prison, 25 years in prison

23   or are we going to give him the death penalty?"  And

24   they'd vote, say, for the death penalty.

25            Well, the foreman of the jury writes,

173

1  "Death," the word, "death" on a verdict form on a
2  piece of paper and hands it to the Judge, okay?  They
3  don't do that anymore.  You will never -- the -- the
4  foreman of -- of the jury will never write the word,
5  "Death," on any piece of paper, okay?
6          Instead, the jury in a Texas capital
7  murder case, if they get to that second stage, have to
8  decide whether certain conditions exist.  The
9  legislature has told us what those conditions are.  If
10  certain conditions exist the Defendant will
11  automatically get the death penalty.  If those
12  conditions do not exist then he won't.  He'll get
13  what?
14      A.  Life.
15      Q.  Life.  That's the only other choice, right?
16  So if that's -- if these conditions do not exist, then
17  he would get a life sentence.
18      A.  I didn't know that before coming in here.  I
19  didn't know that it's automatically death.  I --
20      Q.  No, it's not.  If -- if the -- if certain
21  conditions are found to be true, then the punishment
22  is death.
23      A.  Oh, I didn't --
24      Q.  If those conditions are not found to be true,
25  then it's life, okay?  So you can argue that you're

174

1  not voting on the death penalty directly, but you
2  really are, okay?  All right, let's take -- there are
3  two questions, or special issues that are given to the
4  jury.  Let's see, do you see the first one there on
5  the floor?
6      A.  Yes, sir.
7      Q.  Okay.  I'm looking at the one on the bulletin
8  board.  It's the same one.
9      A.  You want me to move it under?
10      Q.  No, no, no.  I know what it is.  I can see
11  it, if you can see it.  Call it Special Issue No. 1,
12  and it asks the jury, "Is there a probability that the
13  Defendant would commit criminal acts of violence that
14  would constitute a continuing threat to society?"
15          Do you understand that question?
16      A.  Yes, I do.
17      Q.  Is there anything -- is there anything you do
18  not understand about the question?
19      A.  No, sir.
20      Q.  Can you imagine a situation where you
21  believed that there was a probability that a Defendant
22  would -- will commit criminal acts of violence in the
23  future that would not be a continuing threat to see
24  society?
25      A.  Absolutely.

175

1      Q.  I don't like the -- the way the question's
2  written is kind of bizarre, to me.  But, anyway, it's
3  asking you is this guy going to be doing violent acts
4  in the future?  Now, what's the word "probability"
5  mean?
6      A.  Most likely.
7      Q.  Okay.
8      A.  If I tell you, "There's a probability it's
9  going to rain this afternoon," and you say, "Well, why
10  do you say that," okay, well then, I'm going to give
11  you certain facts.  I looked out -- I looked out
12  the window and there's a big, dark cloud over in the
13  north and it's coming this direction.  There's
14  lightening coming out of it.  I see people running to
15  their cars with umbrellas, okay?  I'm giving you facts
16  which support my opinion that there's a probability.
17  So probability is based on fact.  You agree with that?
18      A.  Probability is based on fact?
19      Q.  Yeah, that's right.  For example, let's take
20  in your work.  You work with these, what do you call
21  it, the --
22      A.  Instrumentation.
23      Q.  -- instruments, okay?  Those instruments have
24  parts, right?
25      A.  Uh-huh.

176

1      Q.  Right?
2      A.  Yes, sir.
3      Q.  And they -- they -- some of the times they
4  wear out; is that correct?
5      A.  Yes, sir.
6      Q.  And you replace them.
7      A.  Yes, sir.
8      Q.  And sometimes you will go into a -- to one of
9  those instruments and you'll look and you'll see a
10  part that looks like it's worn, okay, you just know
11  that from experience.  And you tell your supervisor,
12  "I think if we don't replace that part I think there's
13  a probability that it's going to fail within the next
14  30 days," okay?  See what I'm saying?
15      A.  Yes, sir.
16      Q.  Okay.  So what -- you're saying that there's
17  a probability is based on a fact, right?  What?
18      A.  The fact that --
19      Q.  That the part --
20      A.  -- it looks worn.
21      Q.  That's right.
22      A.  Yes.
23      Q.  So if you say there's a probability that
24  something's going to happen, you have to have some
25  facts to back that up.

177

1   A.   Yes, sir.

2   Q.   Okay.  And that's what the jury does in a

3   case.  You -- the State will try to offer evidence

4   that there is a probability and the Defense would

5   offer evidence that it's not, okay?  But you have to

6   decide.

7           And not only do you have to decide, but

8   you have to make a decision beyond a reasonable doubt,

9   okay?  Can you do that?

10   A.   Yes, sir.

11   Q.   Okay.  So, if you answer Special Issue No. 1,

12   yes, the Judge will instruct you to go forward

13   and answer Special Issue No. 2.  If you answer Special

14   Issue No. 1, look at it one more time, --

15   A.   Uh-huh.

16   Q.   -- no, the Judge will instruct you to stop

17   your deliberations and to return your answer to the

18   Court, at which time he will impose what sentence?

19   A.   It would be life.

20   Q.   That's right.  Because one of the conditions

21   has not been met, right?

22   A.   Correct.

23   Q.   Okay.  So -- but if Issue No. 1 has been

24   answered yes, well, that's one condition, so let's go

25   to the second, which is probably the most important

178

1   question that a capital murder jury will answer, okay,

2   is this question:  So let's look at it, again, it's

3   up there on the board.

4           What does -- said, "Take into

5   consideration all of the evidence, including the

6   circumstances of the offense, the Defendant's

7   character and background."  What does that mean,

8   "Character and background"?

9   A.   His history --

10   Q.   It's his history --

11   A.   -- past.

12   Q.   -- his biography, okay, the kind of person he

13   is.  If I say that -- if I say that you are a person

14   of good character, what does that mean?

15   A.   Means you're known -- you have a good

16   background, you -- you're known to -- to be of good

17   character.

18   Q.   Okay.  Do you agree that our -- that our --

19   that every society, and ours particularly, has a

20   certain set of rules of good conduct?

21   A.   Yes.

22   Q.   Okay.  Like honesty.  And if you say a person

23   has good character, that would basically say that

24   person confirms to that code of conduct.

25   A.   Correct.

179

1   Q.   If I'm an honest person, I'm a person of good

2   character.  If I don't steal, I'm a person of good

3   character, et cetera, okay.  Do you agree -- you agree

4   with that?

5   A.   More than than those two things, but, yes.

6   Q.   I mean, there's much -- of course, there's

7   much more to it, but -- so, now, a person's background

8   is, gosh, that's anything in his history, right, from

9   the day he was born, right?  And -- now, the next

10   one's a little more difficult.  "And the personal

11   moral culpability of the Defendant."

12          Okay.  Well, personal's easy, right?

13   A.   Uh-huh.

14   Q.   That's the Defendant.  What's -- what's

15   "Moral culpability" mean?

16   A.   His morals, how he conducts himself.

17   Q.   Okay.  Well, basically, it's the opposite of

18   that first one we talked about.  If you say a person

19   has good character, that means he conforms to a

20   certain code of conduct, to a large extent, so that he

21   has a reputation of that.  A person's moral

22   culpability is the extent to which -- culpability.

23   What does culpability mean?

24   A.   I'm not sure.  Capability?  Like that?

25   Q.   It means that you're subject to blame.

180

1   A.   Okay.

2   Q.   Okay?  If you're culpable, you're guilty.

3   A.   I didn't know that.

4   Q.   Okay?  See, I don't like them to use that

5   language.  That's -- that language was drawn out of a

6   Supreme Court case.  Basically I think that asks you

7   to consider this, and listen to me carefully, to what

8   extent has the Defendant, in the -- based on the facts

9   of the case, deviated from the standards of moral

10   conduct?  Did he deviate just a little bit or a whole

11   lot, okay?  You follow me there?

12   A.   No.  Say that again.

13   Q.   A person's moral culp- -- "the moral

14   culpability of the Defendant."  I'm suggesting that

15   that means that the jury consider to what extent that

16   the Defendant has deviated from the -- the code of

17   moral conduct --

18   A.   Okay.  All right, gotcha.

19   Q.   -- that the community accepts.  Could be a

20   little bit, it could be a whole lot, okay?  It's a

21   matter of degree.  So if he has personal moral

22   culpability, once again, that's a hard place to

23   understand, but that's what I -- from my reading --

24   A.   Makes a lot more sense now.

25   Q.   Okay, how it works?  Now, "Is there a

181

1    sufficient mitigating circumstance or circumstances to
2    warrant that a sentence of life, rather than death be
3    imposed"?
4         A.    (Shakes head.)
5         Q.    Okay.  This brings us to that -- the word,
6    "To mitigate," the verb, "to mitigate."  What does it
7    mean?
8         A.    To decide?
9         Q.    Nope.  And I don't blame you for not knowing
10   the meaning of that word.  As Mr. Skurka said, he
11   didn't -- he didn't learn what it meant till he got to
12   law school.
13        A.    He -- he explained that -- the opposite,
14   which --
15        Q.    He didn't really -- he didn't really define
16   it.  He defined it by giving it what he considers to
17   be its opposite meaning, okay?  The verb, "to
18   mitigate," is a simple definition.  It means to
19   lessen, okay, to lessen, to make less.
20              Now, in the context of a criminal case
21   where jurors are deciding punishment, a mitigating
22   circumstance is a circumstance which would cause you
23   to want to give a lesser punishment.  It's that
24   simple.  Is there anything, is there any fact in the
25   case which would cause you to want to give a life

182

1    sentence, rather than the death sentence?  Is there
2    anything in the case?  It's got to be based on the
3    evidence in the case.  Is there anything based on the
4    evidence in the case which makes me personally feel
5    that a life sentence is more just than a death
6    penalty?
7              Now, if your answer is yes, then that's
8    your vote.  Okay?  Now, let's say that the jury has
9    answered Special Issue No. 1 yes, but the jury answers
10   Special Issue No. 2 yes.  What sentence is going to be
11   imposed?
12        A.    That would be the death penalty.
13        Q.    Think again.
14        A.    Oh, I know what you mean.  I was -- I was
15   thinking just -- I -- I know exactly what you mean.
16        Q.    All right.  So if the jury answers --
17        A.    That would be --
18        Q.    -- yes --
19        A.    I don't know what the punishment would be if
20   they said yes to this one.
21        Q.    Okay.  Now, think about it.
22        A.    It would be --
23        Q.    If they answer --
24        A.    -- not death.
25        Q.    It would be not death, you're correct.

183

1    That's right.  So in order to get the death penalty in
2    Texas, Special Issue No. 1 has to be answered yes.
3         A.    Yes.
4         Q.    And Special Issue No. 2 has to be answered?
5         A.    No.
6         Q.    No.  So if the Judge looks at that verdict
7    form and sees "yes, no," the law requires he -- he
8    doesn't have any discretion, he has to impose the
9    death penalty, okay?
10        A.    Okay.
11        Q.    But if he looks at that verdict form and he
12   sees yes, to Special Issue No. 1 and yes, to Special
13   Issues No. 2, what punishment is he going to impose?
14        A.    Life, I suppose.  Less than death.
15        Q.    That's exactly right, you got it.  That's --
16   so you think you understand how it works?
17        A.    Absolutely.
18        Q.    Okay.  Now, on these two questions, both
19   sides can offer evidence.  There will be a second
20   stage of the trial, if we get that far, where we can
21   offer you evidence to help you make that decision.
22   And the standard of proof remains the same, beyond --
23   beyond a reasonable doubt.
24        A.    (Nods head.)
25        Q.    Do you have any questions at this point?

184

1         A.    No, sir.
2         Q.    You've kind of been going to school here.
3         A.    I know.  I -- you know, I'm learning
4    something.
5         Q.    In other words, if you get in that jet plane,
6    I want you to be able to fly it right the first time.
7         A.    Well...
8              MR. JONES:  Okay.  That's all I have,
9    Your Honor.
10             THE COURT:  I have one.
11             MR. JONES:  Oh, the Judge has one.
12             VOIR DIRE EXAMINATION
13   BY THE COURT:
14        Q.    Steve Calbat is who to you?
15        A.    My father.
16        Q.    Your father.  Okay.  Now, his -- his case,
17   would that have any -- would that make it difficult
18   for you to serve in this case or have nothing to do
19   with it?
20        A.    Nothing to do with it.
21             MR. SKURKA:  Can I follow up on that,
22   Judge, please?
23             THE COURT:  Uh-huh.
24
25

185

VOIR DIRE EXAMINATION

BY MR. SKURKA:

    Q.   Does your -- does your dad have the case
pending currently?

    A.   No, sir.

    Q.   How long ago was the case?

    A.   Four years, maybe.  Four years maybe.

    Q.   Okay.  Was that here in Nueces County?

    A.   Yes, sir.

        THE COURT:  Okay.

    Q.   (BY MR. SKURKA)  And I don't know -- I'm not
sure if I'm familiar with that.  Could you tell me a
little bit about it, please?

    A.   He --

        THE COURT:  It was done in federal.

        VENIREPERSON NO. 23:  He went to Bird
Island Basin, and he had drinks with a friend and came
back and -- and a federal officer was in his vehicle,
and my father hit the curb and hit his door, and it
ultimately ended up the officer lost his leg over it,
and -- and he was charged with assault and he served
three years -- or -- or two in a -- two in prison and
one out, or -- it was three years, I believe.  And
he's -- he's now out and off of parole, and that's
about that.

186

    Q.   (BY MR. SKURKA)  Well, I appreciate the Judge
bringing this up, because I was going to, either -- or
going to, also.  But, I guess, what I'm looking at is,
you know, it wasn't our office.  It was the
prosecutors over in the federal courthouse doing it.
But, still, it was law enforcement, you know, bringing
charges against him and everything.  Is that going to
work against us over here for any reason?

    A.   No, my father made a mistake, and I -- you
know, I -- it's unfortunate for the man.  I had to
watch that, and -- and, you know, the circumstances
were bad.  I had to -- when it was all done, and --
and, you know, I -- he wasn't sure about me.  I had to
go over there and tell him I apologize for him and his
family and shake his hand, and, you know, he wasn't
sure how to take me, at first, because -- just because
it's my father he was thinking, you know, that I'm
automatically was going to feel bad about him.  I feel
bad for the man.

    Q.   It does sound like it was a unfortunate
situation.

    A.   It was.

    Q.   He was, like, a park ranger or what?

    A.   Yes, sir.

    Q.   A park ranger, I see.  And so, you didn't

187

hold it against the government for --

    A.   Not at all.

    Q.   -- doing what they had to do.

    A.   Not at all.

    Q.   And -- and it sounds like you made peace with
the person that it was unfortunate that it happened
to.  Can I ask you a dumb question, then?  Do you
think alcohol or drugs can be an excuse to doing a
crime?

    A.   It's not an excuse.  I -- I do understand
how, you know, the person can -- can sometimes not be
fully aware of the repercussions, but it's no excuse.

    Q.   Okay.  And that's unfortunate with your dad,
but, I guess, you know, you understand the law is the
law and --

    A.   I understand.

    Q.   -- it has to be there.

    A.   I got to watch how the point system worked
because of, you know being federal, like what --

    Q.   You know about the points?

    A.   Well, I didn't till I -- I know a little bit
what -- what, I guess, what was automatic was they
charged with assault, and so that meant so many
points.  And then, I guess, the type of vehicle and
stuff like that, so...

188

    Q.   You know, that's not to many -- to much
different from the aggravating circumstances and
mitigating circumstances.  Like, if you're in federal
court and you have a drug case, if you have a lot of
drugs, it's going to go higher.  If you have less
drugs, it's going to go lower.  If you've got a prior
conviction for drugs, it's going to go higher.  If you
have no conviction for drugs, it's going to go lower.
So, it's kind of the same scheme.  I -- I just need to
know if you have some kind of grudge against law
enforcement or --

    A.   No.

    Q.   -- or anything like that.

    A.   No.  No, sir.

    Q.   I hope your dad's doing better now.

    A.   Thank you.

        MR. SKURKA:  That's all it questions I
have.

        THE COURT:  Anything else?

        MR. JONES:  No.

        THE COURT:  All right.  Mr. Calbat, would
you wait in the jury room --

        VENIREPERSON NO. 23:  Sure.

        THE COURT:  -- while I speak with these
lawyers?

189

1   VENIREPERSON NO. 23:  Sure.

2   (Venireperson exits courtroom.)

3   THE COURT:  Okay.  He may not remember,

4   but I was the prosecutor on that case.

5   MR. SKURKA:  That's what I was going to

6   ask.  I didn't want to say that.

7   THE COURT:  I was.

8   MR. SKURKA:  Because you knew something

9   about it.

10   THE COURT:  Yeah, he -- it was very much

11   like he said.  It was an accident that the -- the park

12   ranger lost his leg.

13   MR. JONES:  Unfortunately.

14   THE COURT:  It got smashed between the

15   door and the car, and he had some broken ribs and --

16   MR. SKURKA:  Was he in the courtroom,

17   Judge, do you remember?

18   THE COURT:  This?

19   MR. SKURKA:  This guy, watching?

20   THE COURT:  I don't remember.  I think we

21   even did it at the old courthouse.

22   MR. GARZA:  Was it a plea or a trial?

23   THE COURT:  It was a plea, but the issues

24   on punishment were contested, because it was

25   *assimilated crimes act, so they have basically

190

1   treated it as an intox assault for under Texas law,

2   and that's kind of how they did it.

3   MR. SKURKA:  Well, that's what I was

4   trying to figure.

5   MR. JONES:  How did it get the federal

6   jurisdiction, from the --

7   THE COURT:  Because it was on the -- the

8   seashore.

9   MR. SKURKA:  It happened on the seashore.

10   MR. JONES:  Oh, on the seashore.

11   MR. SKURKA:  That's what I was trying to

12   figure out.

13   THE COURT:  That's where that all came

14   about, but I don't think he's got a problem with it.

15   So what do you -- what say you, Mr. --

16   MR. SKURKA:  We'll accept him, Judge.

17   MR. JONES:  We'll accept him.

18   THE COURT:  All right.  Let's bring him

19   back.

20   (Venireperson enters courtroom.)

21   THE COURT:  All right.  Mr. Calbat, you

22   have been selected to be on this jury.  And we will

23   begin the trial, it looks like at this point December

24   the 1st.  We will call you.  We'll keep in touch with

25   you, okay?

191

1   VENIREPERSON NO. 23:  All right.

2   THE COURT:  I don't want you watching the

3   local news or read the local paper because -- I know

4   you don't know much about this case.  With all due

5   respect to the media, they don't get it right a lot of

6   the times.  But over and above that, you -- you're

7   only allowed to consider what's admitted into evidence

8   in court, okay?

9   VENIREPERSON NO. 23:  Yes, sir.

10   THE COURT:  The other thing is, I don't

11   want you talking about the facts of this case with

12   anybody, okay?

13   VENIREPERSON NO. 23:  All right.

14   THE COURT:  Somebody brings it up, say,

15   "Can't talk to you about this, not until the trial's

16   over with," all right?

17   VENIREPERSON NO. 23:  All right.

18   THE COURT:  All right, Mr. Calbat, we'll

19   -- we'll keep in touch, but be prepared to be with us

20   for the early part of December.

21   VENIREPERSON NO. 23:  Okay.

22   THE COURT:  Okay?  If you need a work

23   excuse, my bailiff can get that for you.

24   VENIREPERSON NO. 23:  I'm all right.

25   THE COURT:  Okay.  Thank you.  All right,

192

1   Mr. Calbat, thank you much.

2   MR. SKURKA:  Thank you, sir.

3   (Venireperson exits courtroom.)

4   THE COURT:  All right.  We only have one

5   other person here.  Obviously, we're going to have to

6   bring him back after lunch.  Why don't we bring him in

7   and tell him, I guess, 1:00, so we can get rolling.

8   MR. JONES:  We have till 1?

9   MR. SKURKA:  1.

10   THE COURT:  We'll have to have a quick

11   lunch today.

12   (Venireperson enters courtroom.)

13   THE COURT:  All right.  You are Mr.

14   Dicus?

15   VENIREPERSON NO. 30:  Yes, sir.

16   THE COURT:  All right, Mr. Dicus, we're

17   running a little behind.  At this point, we're going

18   to take a lunch break and bring you back right at

19   1:00, okay?

20   VENIREPERSON NO. 30:  Okay.

21   THE COURT:  And sorry about that.  We're

22   doing the best we can, but 1:00.

23   VENIREPERSON NO. 30:  All right.

24   THE COURT:  Okay?

25   VENIREPERSON NO. 30:  I'll be back, sir.

193

```
1        THE COURT:  All right.
2            (Venireperson exits courtroom.)
3            (Noon recess.)
4            (Venireperson enters courtroom.)
5        THE COURT:  All right.  All right.  Come
6   up.  All right, let's see.
7
8            VENIREPERSON NO. 30,
9         THOMAS MONROE DICUS,
10          VOIR DIRE EXAMINATION
11  BY THE COURT:
12       Q.   All right.  Let's see here, you are Thomas
13  Dicus?
14       A.   Yes, sir.
15       Q.   Is that how you say it?
16       A.   Yes, sir.
17       Q.   All right, very good.  All right.  Mr. Dicus,
18  we're going to talk to you a little bit, okay, first
19  me and then the lawyers.
20            Okay.  Now, Mr. Dicus, we're looking for
21  jurors that can keep an open mind, okay, and that can
22  follow the law, all right?  And we'll talk a little
23  bit about the law in a minute, but can you keep an
24  open mind, first of all?
25       A.   Yes, sir.
```

194

```
1        Q.   Okay.  All right.  You know what, I don't
2   have your questionnaire.  I left it back there.  Have
3   you ever been on a jury before?
4        A.   In this court, just downtown, like for
5   traffic tickets or something once, but that it was it.
6        Q.   Okay.  You actually got on the jury?
7        A.   Yes, sir.
8        Q.   Okay.  Well, that was a criminal case.
9        A.   Public intoxication, I think.
10       Q.   Yeah, that was a criminal case.  Now, the --
11  it's quite a swing from, you know, public intoxication
12  to capital murder, but we're going to talk about a few
13  things that are the same, okay.  First of all, in
14  every criminal case in the State of Texas the burden
15  is on the State to prove the crime, prove the charge.
16  They've brought the charges, they got to prove them.
17  And that's no different from that public intoxication
18  case that you sat on the jury on to this capital
19  murder.  I mean, that case is probably about the
20  lowest level of crime and this would be the highest.
21  But a lot of these same things apply.  Burden's on the
22  State, and I don't know if you recall -- when was
23  that, by the way, do you remember?
24       A.   Five or six years ago.  It's been a pretty
25  good while.
```

195

```
1        Q.   All right.  Well, you may remember that the
2   burden on the State was beyond a reasonable doubt.
3   You remember that?
4        A.   (No response.)
5        Q.   If you don't, that's okay.
6        A.   Nope.
7        Q.   Well, the burden of proof in a criminal case,
8   in every criminal case, is beyond a reasonable doubt.
9   And we don't have a definition as to what that is, but
10  it's the highest burden in the law, okay?
11            Now, it's not -- what it is not, it's not
12  beyond all doubt, it's not beyond a shadow of a doubt,
13  but it is the highest burden.  Would you be able to
14  follow the law and hold the State to that burden, no
15  more, no less?
16       A.   Yes, sir.
17       Q.   Okay.  Now, next thing I need to talk to you
18  about, and along those same lines, is this, the State
19  has to prove the charges, like I've already told you.
20  Defense doesn't have to do anything, okay?  They
21  brought the charges, they got to prove them.  And, as
22  part of that, Defendant is innocent until he's been
23  proven to be guilty.  They may or may not be able to
24  prove it, okay?  But Defendant is presumed to be
25  innocent until they can prove it.  And the law says,
```

196

```
1   "State, you -- you bring charges, you know what, maybe
2   you've got the evidence, maybe you don't, but you --
3   we don't just speculate about it.  You got to prove it
4   and you got to prove it to the people of the jury,"
5   which is the people, right?
6        A.   Yes, sir.
7        Q.   "State, you got to prove it to the people
8   what you've -- what the -- the allegations that you've
9   brought."  And that sounds fair, doesn't it?
10       A.   Yes, sir.
11       Q.   Okay.  You -- you agree with that?
12       A.   Yes, sir.
13       Q.   And you could -- and you could presume this
14  Defendant to be innocent until they prove it, if they
15  can?
16       A.   Yes, sir.
17       Q.   Okay.  Now, as part of that, if they've got
18  to prove it, that is the State, and the Defense
19  doesn't have to do anything, the burden never shifts
20  over to this side, in other words, there's some places
21  in the world where, you know, the State charges you
22  with something and you got to prove your innocence.
23  We don't do that here.  We don't do that here.  As
24  part of that, they don't have to put on any evidence,
25  and -- and as part of that, Defendant doesn't have to
```

197

1    testify.

2              And I'll submit to you there's lots of

3    reasons why somebody wouldn't want to the testify.

4    Maybe his lawyers say, "They haven't proven their

5    case.  We don't have to testify."  Maybe the

6    Defendant's not educated.  Maybe he gets nervous.

7    Maybe he stutters.  You know, maybe he's terrible at

8    getting in front of -- in front of people and just

9    gets petrified, okay?  Lots of reasons, all right?

10             But I -- the law says you can't hold it

11   against the Defendant if you're a juror in this case.

12   Now, if you would hold it against the Defendant, and

13   some people say they would, anyway, they say, "You

14   know what, I know that's the law, but, you know what,

15   I'd still hold it against him," okay?  I need to know

16   that.  Or would you say, "No, I -- I wouldn't hold it

17   against him?"  I need to know whether you'd hold it

18   against the Defendant if he chose not to testify.

19       A.   No, sir.

20       Q.   Okay.  Now, let's talk a little bit about the

21   charge, capital murder.  And you've heard -- you've

22   probably heard of capital murder before.  You've

23   seen -- seen it on the news.  You -- you know, I don't

24   know, you may watch CSI Miami or those kind of shows,

25   I don't know.

198

1        A.   I don't watch a lot of T.V., but...

2        Q.   Okay.  But you've heard of the capital murder

3    charge.

4        A.   Yes, sir.

5        Q.   What is it?  Well, there's murder, and -- and

6    murder is the intentional taking of a life of another,

7    okay?  And we know what that is.  What's capital

8    murder?  I like to call it, like, murder plus, okay?

9    There -- there's a laundry list that the legislature

10   has said that this type of murder is regular murder

11   and this type of murder is capital murder, okay.

12             In this case, the State is alleging that

13   the Defendant committed the offense of murder on X day

14   in Nueces County, Texas, and that while doing that, he

15   attempted -- he was in the process of committing or

16   attempting to commit a robbery, okay?

17       A.   Yes, sir.

18       Q.   That's what makes it capital.  In other

19   words, murder, but while trying to commit a robbery or

20   committing a robbery.  Two -- two big felonies put

21   together, in other words, okay?  The legislature has

22   said, you know, you get these two felonies put

23   together in combination of one another, and -- and

24   that's capital, okay?  You follow me?

25       A.   Yes, sir.

199

1        Q.   Okay.  Now, the law says, for the capital --

2    capital murder conviction, the State has to prove each

3    and every element of capital murder, that is, the

4    State can't just prove to you the murder part and not

5    the robbery part or the attempted robbery, okay?  And,

6    likewise, they can't just say, "Well, we came in here

7    and we've proven you a robbery," all right --

8        A.   Yes, sir.

9        Q.   -- to get the capital murder part.  Now, they

10   may be guilty of something else, but they have to get

11   -- prove all of the elements of the whole offense.

12   You understand that?

13       A.   Yes, sir.

14       Q.   Would you hold the State to that burden --

15       A.   Yes, sir.

16       Q.   -- make them prove all their elements?

17       A.   Yes, sir.

18       Q.   Okay.  Now, in Texas, in criminal cases we

19   have what's called the "bifurcated system," and that

20   is, you have the guilt or innocence phase.  In other

21   words, first part of the trial goes like this:  The

22   State tries to prove to the jury, through evidence

23   presentation that this Defendant's guilty of the

24   offense of capital murder.  And the Defense, they

25   might put on some evidence, they might not.  I suspect

200

1    they'll certainly ask the State's witnesses questions,

2    if nothing else.

3              But, in any event, after this case is

4    submitted to you for your deliberations, you know, the

5    lawyers will argue, do closing arguments, and I'll

6    read to you the Charge, which is like the packet that

7    you take back, kind of an instruction manual for the

8    jury, okay?

9        A.   (Nods head.)

10       Q.   Jury goes back there, deliberates and they

11   decide whether that the State's proven beyond a reasonable

12   doubt that this Defendant committed the offense of

13   capital murder as alleged, okay?

14       A.   Yes, sir.

15       Q.   If the -- if the jury finds this Defendant

16   not guilty, that's the end of the case.  If the jury

17   finds the Defendant guilty of capital murder, then we

18   go on to the second part of the trial, that is, the

19   punishment phase.

20             Now, were you asked to assess punishment

21   in that P.I. case that you sat on?

22       A.   No, they -- we found him not guilty.

23       Q.   Okay.  Well, see, if you found him not

24   guilty -- if you find this Defendant not guilty,

25   that's the end of the case.

201

1    In the second phase of that trial there
2  would be -- the jury would have been asked to assess a
3  punishment.  And I believe the punishment for that
4  offense is up to a $500 fine, okay?
5    A.  Yes, sir.
6    Q.  There's all kinds of different offenses, and
7  there's all different kinds of levels.  But, in any
8  event, when you get to the end of the trial and the
9  jury is -- is asked to assess punishment and they get
10  to that point, they assess the punishment.
11    Capital murder's a little different,
12  okay?  In capital murder trials, if Defendant's found
13  guilty of capital murder by the jury, then you go to
14  the second phase, but you don't say life or death,
15  okay, because those are the two things that can happen
16  if he's found guilty, life in prison, or death, death
17  penalty, okay?
18    But you don't write death, you don't
19  write life, you answer questions.  First question's
20  right there.  "Is there a probability the Defendant
21  would commit criminal acts of violence that would
22  constitute a continuing threat to society?"  Okay?
23  And then the jury would be asked to answer that yes or
24  no, all right?  Let me step down here.
25    After that question's answered, then the

202

1  jury would answer this question, "After taking in
2  consideration all of the evidence, including the
3  circumstances of the offense," which is the first part
4  of the trial, the guilt or innocence phase, the crime
5  itself, "the Defendant's character and background and
6  the personal moral culpability of the Defendant, is
7  there sufficient mitigating circumstance or
8  circumstances that warrant a sentence of life in
9  prison, rather the death sentence be imposed?"
10    So, basically, taking into the -- the
11  facts that have come in in the first part of the case
12  and that you may hear on the second part of the case
13  other things.  Maybe you'll hear about his background.
14  Is he a good guy, bad guy?  Has he had a bad criminal
15  history?  Is this his first offense?  You know, all --
16  there can be all kinds of mitigating facts, that is,
17  things that are in his favor; and then there may be
18  things that are aggravated, things that are presented
19  against him.  And then you would -- you would answer
20  this, that is, you, the jury, would answer yes or no
21  to this question.  You understand?
22    A.  Yes, sir.
23    Q.  All right.  At the beginning of this trial,
24  those people that are selected, I am going to give an
25  oath to, and the oath is going to be, "Do you solemnly

203

1  swear that you will render a true verdict based upon
2  the law and the evidence presented to you," and the
3  jury will say yes, okay?
4    A.  Yes.
5    Q.  What I need to know from you is, could you
6  take that oath?
7    A.  Yes, sir.
8    Q.  Okay.  That is, you could take the oath to
9  sit and listen to the evidence and determine whether
10  the State's proven their case, at least on the guilt
11  or innocence first -- part first beyond a reasonable
12  doubt?  You could do that?
13    A.  Yes, sir.
14    Q.  And then you could truthfully, if -- if, and
15  that's a big if, if the Defendant's found guilty of
16  capital murder, you could truthfully answer these two
17  questions?
18    A.  Yes.
19    Q.  Okay.  Because some people say, "Well, you
20  know, I can't do that, because I can't -- I can't
21  participate in something that could lead to the death
22  penalty."  Or some people say, "You know what, if he's
23  found guilty of capital murder, I don't care what any
24  of this other stuff is, they're automatically going to
25  get death."  But that's not you.

204

1    A.  No, sir.
2    Q.  All right.  You would -- you would -- you
3  would truthfully answer those questions and consider
4  all of the evidence presented to you.
5    A.  Yes, sir.
6    Q.  Okay.  All right.  Let me -- Mr. Skurka, let
7  me just -- I'm going to take one second.  Don't move.
8  I'll be right back, okay, then I'm going to turn it
9  over to Mr. Skurka.
10    (Brief pause in proceedings.)
11    THE COURT:  All right.  Mr. Skurka, go
12  ahead.
13    MR. SKURKA:  Thank you, Judge.
14    VOIR DIRE EXAMINATION
15  BY MR. SKURKA:
16    Q.  Good afternoon, Mr. Dicus, how are you today?
17    A.  Pretty good.
18    Q.  As the Judge introduced me, my name is Mark
19  Skurka.  I'm a first assistant district attorney, and
20  with me is Geordie Schimmel.  He's the assistant D.A.
21  that's assigned to this court, so he'll be assisting
22  in the presentation of the evidence in this case.
23    What I want to start by telling you
24  there's no right answers or wrong answers to this case
25  -- these questions that we propose to you, we just

205

1   need -- kind of need to know what your feelings are
2   about some of the issues in this case.  And we've got
3   your questionnaires, so we know most of what you're
4   thinking about, but we're probably going to follow up
5   on a few things, if that's all right, okay?
6       A.   Yes, sir.
7       Q.   I'm going to start off by asking you about
8   the death penalty.  How do you -- in general terms,
9   how do you feel about the death penalty?
10      A.   Well, I figure they deserve it, they can get
11  it.  If they don't deserve it, they don't get it.
12      Q.   That's a pretty simple way to answer it,
13  right?  If the evidence is there and it should be that
14  -- given, then you give it.  But if the evidence is
15  not there, they shouldn't be given it, they should be
16  given maybe a life sentence.  Is that pretty much how
17  it sums up?
18      A.   Well, if -- if the evidence is not there,
19  they should be off, I mean, if the evidence --
20      Q.   That's not guilty.
21      A.   Yes, sir.
22      Q.   But then if the evidence -- even if they're
23  found guilty, though, you understand it's not
24  automatically death, it's --
25      A.   Oh, no.

206

1       Q.   -- death or life imprisonment.  You follow me
2   on that, too, --
3       A.   Yes, sir.
4       Q.   -- correct?  What was your first reaction
5   when you heard that you were going to sitting on this
6   kind of case?  You remember that day where we had all
7   those people in the room and most people didn't know
8   what they were here for till the Judge came out and
9   said, "Look, this is capital murder case.  You might
10  have to consider the death penalty in this case with
11  this Defendant."  Tell me what your first reaction
12  was?  What's the first thing hit your mind when you
13  heard it was that kind of case?
14      A.   Well, you see them on -- sometimes you see
15  them on T.V., but I -- I didn't really think about it
16  a whole lot.
17      Q.   So it didn't bother you one way or the other
18  that you were going to be picked on this type of case?
19      A.   No, sir, I didn't -- I didn't think I would
20  be here today, so...
21      Q.   Why?
22      A.   I don't know, I just didn't.
23      Q.   But you didn't think one way or the other
24  about being -- making that decision.
25      A.   No, sir.

207

1       Q.   It's a far cry from like a public
2   intoxication case --
3       A.   Yes.
4       Q.   -- over in municipal court.  And, you know, I
5   -- I watch the jury, and sometimes I see them and, you
6   know, some of them go, "Oh, my gosh, I can't believe I
7   got this kind of case," and some people are going
8   like, "Gosh, can you believe this?  I can't do that,"
9   and then some people go, "Well, you know, I better
10  listen a little closer to what the Judge is saying,
11  this is a pretty darned important case."  Is that kind
12  of how you felt about it?
13      A.   Yes, sir.  I listen to everything.
14      Q.   Okay.  And that's what we want you to do
15  because the Judge takes it seriously, we take it
16  seriously, the Defense takes it seriously, and we need
17  jurors that are going to -- who are willing to sit
18  here and make a decision on this case and follow
19  through with that decision.
20           How do you feel about being part of -- of
21  a jury that may have to make that ultimate decision?
22      A.   I wouldn't have a problem with it.
23      Q.   Some people -- I ask that question because
24  some people will tell me, "Hey, Mark, I believe in the
25  death penalty, it's a good law.  I'm glad we have it

208

1   in Texas, it's a good law," and then I say, "Okay.  Do
2   you want to be on a jury to actually make that
3   decision," and they go, "Oh, no, not me.  Let somebody
4   else do that."
5           Do you feel that way at all, or do you
6   think that's part of your civic responsibility to do
7   whatever, you know, the Judge instructs you to do or
8   follow -- carry out the law?
9       A.   I figure it's our responsibility.
10      Q.   Okay.  And that's what a lot of people think.
11  They think, "I got called for duty -- jury duty.  I
12  got to do my best."  Probably, like you just did in
13  your other case in the municipal court, but some
14  people say, "This isn't the case for me."  And it's
15  okay, we just -- we just need to know.  Some people
16  say, "Well, I got religious convictions and I can't do
17  this because my church says no."  And some people say,
18  "Well, no, ethically, I just don't think I can do it."
19  And if they feel that way, that's okay, it's just we
20  need to know what's going on.
21           But you won't have a problem making that
22  decision?
23      A.   No, sir.
24      Q.   When we talk about making a decision, we're
25  not talking about some other deal, you know, something

209

1  you read about in the paper or see on the news, that's
2  him, right there.  Look at him, that's John Henry
3  Ramirez.  He's charged with capital murder, and -- and
4  there's going to be a time in this trial where I'm
5  going to ask the jurors to find him guilty, and if the
6  evidence sustains that, that he should be given the
7  death penalty and the question should be answered a
8  certain way.  I'm going to ask them to do that.  I
9  mean, I've told you-all since day one, the State's
10  seeking the death penalty.
11          Looking at him, do you think you can
12  carry through that if it comes to that point?
13     A.   Yes, sir.
14     Q.   I'm going to ask you the other way, now.  If
15  you think that the evidence is such that he's not
16  guilty, can you vote for that, too?
17     A.   Yes, sir.
18     Q.   And if you think the evidence is such that he
19  may be guilty but maybe he should get a life sentence
20  based on the evidence, can you do that?
21     A.   Yes, sir.
22     Q.   So you haven't closed your mind to anything,
23  right?  You're going to wait till you hear everything.
24     A.   Yes, sir.
25     Q.   And that's all we can ask you to do.

210

1  Sometimes people look at a person and they go, "Well,
2  gosh, you know, he looks so young," or "He doesn't
3  look like that bad a guy."  Would you agree with me
4  that you really can't judge somebody on how they look,
5  but you should judge them on what they did?
6     A.   Can't judge people by how they look.
7     Q.   That's exactly right.  And -- and sometimes
8  people say, "Well, gosh, you know, you know, maybe
9  he -- he's younger than me, so maybe I shouldn't
10  give -- I should give him a break because he's younger
11  than me."  Would you agree -- the law says, basically,
12  the death penalty -- you can't have the death penalty
13  for kids -- for people under 18, for kids, but it
14  doesn't say, if there's a difference between they're
15  23, 33, 43 or 53.  Do you understand that?
16     A.   Yes, sir.
17     Q.   Does that make sense to you that a person
18  over 18 is responsible for what they've done?
19     A.   Yes, sir.
20     Q.   Okay.  In other words, they -- by that age
21  they should know the difference between right or wrong
22  and, you know, how to obey laws and stuff, correct?
23     A.   Yes, sir.
24     Q.   So you agree with me that age and appearance
25  may not really have anything to do with what the

211

1  ultimate facts are or the ultimate decision is,
2  correct?
3     A.   Yes, sir.
4     Q.   Okay.  Now, the Judge has told you that this
5  is a capital murder because it's a murder plus
6  robbery.  Basically, that means you have to have
7  something in addition to the killing of someone,
8  unless it's something like, you know, killing a police
9  officer on duty, killing a child under six, you know,
10  multiple murders.  But if you kill somebody while
11  you're robbing, raping, burglarizing or kidnapping
12  them, you could get the death penalty.  They have to
13  both be kind of combined.  You can't just have murder
14  and you can't just have robbery, but if you have
15  murder in the course of committing robbery or
16  attempting to commit robbery, you can be eligible for
17  the death penalty.
18          And robbery, I think the Judge is going
19  to give you instruction.  Robbery basically means
20  taking property by force or threats of force, you
21  know.  If I just take something, that's theft.  But if
22  I take something and, you know, hit you over the head
23  with it that's robbery because I've used force against
24  you to take the thing.
25          But it doesn't necessarily mean it has to

212

1  be a completed robbery.  For example, a guy goes into
2  a bank, holds up the teller, "Give me all your money,"
3  takes the money bag, starts walking out the door and
4  the police catch him right before he gets out the
5  door.  He can't say, "Well, gosh, I'm not guilty of
6  robbery because I didn't get away with it.  I didn't
7  really get to keep the money."  That's -- that's not
8  right because if you're in the course of committing
9  robbery or attempting to commit robbery, you're still
10  guilty of robbery.  You follow that?
11     A.   Yes, sir.
12     Q.   That makes sense, right?  You can't just say
13  that.  Well, in this case, unlike most cases -- well,
14  in every criminal case, there's two parts of the
15  trial.  The first part is did he do it or not, is he
16  guilty or not guilty?  You listen to the evidence
17  about what happened that day and hear all the
18  testimony and decide is he guilty or not guilty?  Then
19  you -- if you find that he's not guilty and there's
20  not enough evidence, then you vote not guilty and the
21  case is over with.
22          The second part of the trial is the
23  punishment part.  If you have find a person guilty,
24  you go to the second part of the trial and you might
25  get to hear additional evidence.  You might get to

213

1  hear where in the first case, the first part of the
2  trial, you only heard about what happened that day.
3  In the second part of the trial you might get to hear
4  about a person's background to help you make a
5  decision on what kind of punishment he gets.  And,
6  probably, you want to hear something like that.  You
7  want to know, "Hey, has he been to prison ten times
8  before or has he never been to prison?  Has he, you
9  know, been an Eagle Scout and made straight A's in
10 school or he's always been in trouble with the law,"
11 you see what I'm saying?  You might get to hear that
12 and make that decision based on that.
13         And then once you make all that decision,
14 once you hear all the evidence, you answer two
15 questions.  And the questions are right there on the
16 board in front of you, and let's look at the first one
17 down here, which basically says, "Is there a
18 probability that the Defendant would commit criminal
19 acts of violence that will constitute a continuing
20 threat to society?"  And there's three words there --
21 three phrases I want you to key in on that.  The first
22 one is "probability," then "criminal acts of
23 violence," and then "society."
24         This is how it works:  Say in our
25 scenario that you've found them guilty of capital

214

1  murder.  You've now heard additional evidence about,
2  you know, good or bad background or whatever, then you
3  have to answer this question that the Judge poses.
4  "Is there a probability," and probability basically
5  means more likely than not, is it probable that the
6  Defendant will commit?  And unless you have a crystal
7  ball, there's no way you can tell for sure what's
8  going to happen, right?  And it doesn't tell me I have
9  to prove that.  It doesn't say, "Is it for certain
10 he's going to do these things?"  It just says, "Is
11 there a probability?"
12         Now, what do you think you could base
13 that probability on?
14      A.  Sometimes their past acts or --
15      Q.  That's exactly right.  Sometimes their past
16 acts, maybe the act that they're on trial for, maybe
17 anything, okay?  But I like to tell people, I don't
18 have a crystal ball, but sometimes you can predict the
19 future by what's happened in the past.  Not a hundred
20 percent, but the law doesn't require me to prove it a
21 hundred percent.  It just says is it probable that the
22 Defendant would commit criminal acts of violence?
23         And some people say, "Well, gosh, do you
24 think he's going to murder somebody, again, or has he
25 learned his lesson?  Maybe he'll never murder somebody

215

1  again.  The law doesn't say you have to murder
2  somebody again, it just says "criminal acts of
3  violence."  That could be anything.  That could be
4  assault, you know, breaking something, hurting
5  somebody, whatever it is.  So it doesn't mean that you
6  necessarily think the guy's going to murder somebody,
7  okay?
8      A.  Yeah.
9      Q.  And then the last thing said, "will
10 constitute a continuing threat to society."  You've
11 probably heard something like that before, continue --
12 "He's a threat to society," you know, "He'll continue
13 to be a threat to society."  Well, some people, again,
14 tell me, "Well, gosh, why do you have -- why do you to
15 put him to death, then?  Why don't you just lock him
16 up in prison for life and that way he won't be able to
17 hurt anybody, he won't be a continuing threat to
18 society?"
19         And I had to stop them and say, "Wait a
20 minute, who else is in a prison?"
21      A.  People.
22      Q.  People.  Guards, other inmates, maybe people
23 that work at the jail, like medical people or
24 maintenance people, or whatever.  So, it's not like we
25 put people on a desert island and they'll never see

216

1  people again, or never ever see society, again.  So
2  would you agree with me that prison is still part of
3  the society, correct?
4      A.  Yes, sir.
5      Q.  I mean, you've lost some rights, but you're
6  still interactive with people.  Have you ever heard
7  about that happening, where maybe an inmate attacked
8  another inmate and hurt of them, or, you know, inmate
9  hurt a guard or killed a guard, God forbid?
10     A.  Yes.
11     Q.  You've heard that, right?
12     A.  Yes, sir.
13     Q.  So just because you put somebody in prison,
14 would you agree with me that doesn't mean they're not
15 going to ever be able to hurt anybody because they can
16 hurt somebody, right?
17     A.  Yes, sir.
18     Q.  Okay.  But sometimes people say, "Well,
19 society is not including prison."  Prison does include
20 society, okay?  So that's the first question, "Is
21 there a probability that he commit criminal acts of
22 violence that will constitute a continuing threat to
23 society?"  In other words, is he going to be a danger
24 in the future?  And you answer that question yes or no
25 based on the first part of the trial, you know, what

217

1  he did this day, and any background information you
2  may have.
3          Then you go to the second question. And
4  the second question here is what's called the
5  "Mitigating circumstance question." Mitigation is a
6  word that we use, and lawyers toss it around, but not
7  many people know what it is. I know I didn't know
8  what it was before I went to law school. But
9  mitigating basically means anything that would lessen
10 or make less severe the punishment. In other words,
11 he did the crime, but is there any reason it should be
12 a less sentence or less severe sentence? It's also
13 defined as "Anything that reduces the Defendant's
14 moral blameworthiness."
15         Okay. What does that mean? Let's quit
16 talking like a lawyer and start talking like a -- in
17 real life. Well, have you ever heard of something
18 like, "Well, maybe he did this, but there was
19 extenuating circumstances why he did it, or maybe
20 there was some other kind of reason why he did it"?
21 That's kind of what this looks like because you're on
22 a jury, right? You have to decide is there any reason
23 that I should lessen his sentence and make it life,
24 rather than death? Is there any reason that we should
25 lower it or make less severe his sentence?

218

1          Well, let me give you an example. Say
2  you're on two burglary cases. They're separate
3  burglary cases and both people are convicted of
4  burglary. So you're going in there and you're
5  thinking, "Well, gosh, both people are guilty of
6  burglary. I don't burglars, they break into
7  somebody's house and steal something. I'm going to
8  give them the maximum sentence," and you think that
9  before you have hear any evidence.
10         Then the evidence comes along.
11         In the first trial, the burglar, you find
12 out, has kicked in the door, broken in the door,
13 ransacked the house, gone through everything, stolen
14 money, jewelry, T.V., V.C.R., all the stuff. And then
15 he also tore up the house while he was in there,
16 breaking things and tearing up the furniture and
17 ransacking the place. And then you find out his
18 background is he's been to prison five times before
19 for burglary. Okay, that's one scenario.
20         Now, look at this second burglar. The
21 second burglar is guilty of burglary because he went
22 in somebody's house and stole something without
23 permission, but then you hear the facts in that case.
24 And the background in this case is a little different
25 from the first one. In this case, the second case, he

219

1  didn't break in and kick a door down or break a window
2  to get in, the -- excuse me, the back door was
3  unlocked. Even though the house had jewelry, money,
4  T.V., V.C.R. and stereos, he didn't take any of that
5  stuff. What he did was sneaked into the kitchen,
6  stole a loaf of bread and some food, and took it to
7  feed his kids who were hungry because he lost his job
8  and he needed food for his kids.
9          And then you found out his background is
10 he hadn't been to prison five times before. This is
11 the first time he's ever even been arrested for a
12 crime, ever been charged with a crime, like a
13 first-time offender.
14         Wow, different facts, right? In first
15 case, those are pretty bad facts, right, and those
16 aggravating circumstances. In the second case, those
17 are kind of -- I mean, he's still not supposed to go
18 into somebody's house and steal something, but those
19 are those mitigating circumstances that you might give
20 him a lesser sentence. I mean, would you really
21 punish those guys equally?
22     A.  No, sir.
23     Q.  Of course not. It wouldn't make sense,
24 because of these extenuating, aggravating or
25 mitigating circumstances. In the first case, well,

220

1  gosh, he's been to prison five times before, he tore
2  up the place, he stole everything, kicked it in,
3  that's a lot worse than the second guy. Still against
4  the law, but, you know, you're not going to be that
5  bad to that guy. You're probably going to give him a
6  less sentence than the first guy.
7          And that's what that question is about,
8  Mr. Dicus. The Judge says, "Okay, you found him
9  guilty of capital murder, you think he's a continuing
10 threat to society, but before you vote for the death
11 penalty take into consideration all of the evidence.
12 Take the big picture in, including, you know, what
13 happened that day, the day of the offense and the
14 circumstances around that, you know -- the Defendant's
15 character and his background." You know, that's what
16 we're talking about. Does he have a criminal history,
17 does he not have a criminal history? Is he a good
18 guy, is he bad guy, and the personal moral culpability
19 of the Defendant. Is there sufficient, is there
20 enough mitigating circumstance or circumstances to
21 warrant that a sentence of life imprisonment, rather
22 than the death sentence be imposed?
23         In other words, it's kind of like a
24 check-all question. It looks like he's heading for
25 the death penalty because you found him guilty and you

221

1  think he's a continuing threat to society, but before
2  you impose the death penalty, you have to look at
3  everything and kind of check -- the jury has checked,
4  say, "Is there any reason we should give him a life
5  sentence or not?" If there is, there is.  If there
6  isn't, there isn't.
7          Now, what is a mitigating circumstance?
8  I can't tell you.  It's up to the jury to decide what
9  -- what it is.  Some people may say, "Hey, that's a
10  mitigating circumstance," and some people may say,
11  "No, that -- that really shouldn't do it."  Say, for
12  example, you find out all these things and you find
13  out the guy was a Eagle Scout in school and he made
14  straight A's in school when he was in high school.
15  Some people may say, "Well, gosh, we should give him a
16  break because of that, because he made good grades in
17  school."  Other people may say, "Hey, sorry, I don't
18  care if he made good grades or not ten years ago.
19  You've done this crime, you've got this background,
20  you have to suffer the consequences of that."
21          You see how I'm saying?  It can go either
22  way.  Just because it's a mitigating circumstance, a
23  possible mitigating circumstance, doesn't mean you
24  have to lower the sentence automatically.  Remember,
25  we're talking about that no automatic stuff.  It's the

222

1  same thing.  Just because you don't automatically give
2  the death penalty, you don't automatically give a life
3  sentence because you hear something like that.  You,
4  the jury, gives what effect it wants to on that kind
5  of case.
6          So it's -- it's -- and then, if you find
7  the circumstance, is it enough, is it sufficient?  You
8  have to kind of do a balancing test.  Okay, you've
9  been to prison five times before and he shot the guy
10  29 times and, you know, he tore up the place and --
11  but he was an Eagle Scout, you know?  Does that out --
12  does an Eagle Scout out-balance all those other
13  things?
14          A.  No.
15          Q.  Probably not in that case, but it's up to
16  you.  The Judge can't tell you, "Hey, you have to
17  lower the sentence right away because you've heard
18  this."  That's up to the jury to decide.  But the
19  Judge does say, "Hey, you have to think about
20  everything.  You have to consider it."  You know, it
21  may carry weight with you, it may not carry wait with
22  you, but you just can't close your mind and say,
23  "Okay, because I answered that question, he
24  automatically gets the death penalty."  This is kind
25  of a check on it.  Is there a mitigating circumstance

223

1  and is there enough?  And -- and that kind of makes
2  sense, right, the mitigating circumstance because
3  there might be exceptional circumstances where he
4  doesn't deserve the death penalty.  On the other hand,
5  the jury's free to fit -- fit -- use that the way they
6  see fit.
7          Speaking of that, the Judge may also give
8  you this law:  The law says voluntary intoxication is
9  not a defense to crime.  "Voluntary intoxication."  In
10  other words, if you go get yourself drunk or stoned or
11  high on drugs and you commit a crime, is that an
12  excuse for the crime?
13          A.  No.
14          Q.  No, it's not.  Voluntary intoxication is not
15  a defense to crime, but it could be a possible
16  mitigating circumstance where you give a less
17  sentence.  See what I'm saying?  Probably an example
18  might be used is if you go out and kill somebody, you
19  just want to kill them and shoot them in the head five
20  times, that's murder, right?  But if you drive drunk
21  and kill them in a car, that's called "intoxication
22  manslaughter," because you weren't really aiming to
23  kill somebody, but you were drunk, so you're going to
24  get a less sentence than that.
25          It can be almost any type of thing, and

224

1  -- but could it be a mitigating circumstance?  Yes.
2  Maybe it's not.  It's up to you.  And sometimes jurors
3  say, "I don't care if he was drunk or high on drugs,
4  he still did this crime and he's got to pay for it,
5  you know?"  And some people say, "Well, maybe we
6  should give him a break for that."  It's up to you as
7  a juror, okay?
8          Do you understand that question now?
9          A.  Yes.
10          Q.  Does the scheme kind of make sense to you,
11  how we kind of go through the process?  It's a lot
12  more involved than you probably thought, at first,
13  because a lot of people think, "Well, I just vote for
14  life or death," and you don't.  And you answer those
15  questions.  And I think they're pretty fair questions,
16  right?
17          A.  Yes.
18          Q.  You want to know what the guys's background
19  is and is there any reason to give him a less
20  sentence, and if there isn't, there isn't.  If there
21  is, there is.  Okay?
22          A.  Yes, sir.
23          Q.  Okay.  So the -- some last minute things I
24  want to cover you with is, you understand that -- you
25  can listen to all the evidence and would you consider

225

1  both possible punishments, death or life in prison,
2  right --
3      A.    Yes.
4      Q.    -- depending on what the evidence is.
5            The law also says that he's been
6  indicted, but that you can't hold that against him.
7  Just because a person's been indicted or charged with
8  a crime doesn't mean he's necessarily guilty.  And the
9  best example I can tell you is this case you had in
10  muni court, right?  I'm assuming a police officer
11  thought he was intoxicated, right, and charged him and
12  wrote him a ticket.  Did that mean he's automatically
13  guilty?
14      A.    (Shakes head.)
15      Q.    No.  It's up to the guy to either plead
16  guilty or the Judge or jury find him guilty.  And so,
17  just because you're charged with something doesn't
18  mean you're guilty.  And the same thing happens here,
19  whether it's P.I. or capital murder.  You understand
20  that he's not -- do you believe that he's not guilty
21  right now?
22      A.    Yes, sir.
23      Q.    All right.  And that's called "the
24  presumption of innocence."  As he sits here right now
25  he's presumed innocent.  Does it mean he is innocent?

226

1  No.  It just means that, at this point, he's presumed
2  innocent.  You have to think he's innocent because the
3  State hasn't proven the case to you beyond a
4  reasonable doubt.  You follow that, right?
5      A.    Yes, sir.
6      Q.    So you don't have any preconceived notions
7  that he's sitting there, he must have done something,
8  he's guilty.  You can't do that, can you?
9      A.    I don't have enough information to make that
10  decision.
11      Q.    But you have to start him with being
12  innocent.  We have to prove him guilty, right?
13      A.    Yes, sir.
14      Q.    This is -- I know, some countries they
15  actually start you guilty and you have to prove your
16  innocence.  This is America.  You're innocent until
17  proven guilty.
18            The law also says he can testify if he
19  wants to but he doesn't have to if he doesn't want to.
20  That's called the Fifth Amendment.  Remember, the
21  Judge is talking about that?
22      A.    Yes, sir.
23      Q.    And you cannot hold that against him if he
24  doesn't testify.  Will you be willing to follow that
25  law?

227

1      A.    Yes, sir.
2      Q.    Okay.  The next one is beyond a reasonable
3  doubt.  Beyond a reasonable doubt is not defined for
4  you by the Judge but I can tell you it doesn't mean
5  beyond all doubt or any doubt, a shadow of doubt,
6  something like that.  And in your questionnaire you
7  put something about, "If a person is found guilty
8  without a doubt, then they should be given the death
9  penalty."  Remember, it's not without a doubt, it's
10  without a reasonable doubt.  And I know we're kind of
11  splitting hairs, here, but when you say, "without a
12  doubt," that means a hundred percent, I have to prove
13  it a hundred percent, but the law doesn't require me
14  to prove it a hundred percent, it says beyond a
15  reasonable doubt.
16            Say, for example, you're a juror in a
17  murder case -- I'm sorry, a bank robbery case.  And
18  you're sitting there and -- and the first witness is a
19  teller who says, "That's the guy who robbed me at the
20  bank.  I recognize his face.  That's him.  And when he
21  robbed me, he was wearing a yellow shirt."  Then
22  another teller comes up on the stand and that teller
23  says, "That's the guy who robbed my other friend, the
24  teller.  That's him.  I recognize him.  I saw him
25  there at the counter and he was wearing a yellow

228

1  shirt."  Then you hear a next witness who's the bank
2  guard who came upon the robber as he was leaving the
3  bank out on the street on the sidewalk outside, and he
4  says, "That's him.  That's the guy I saw carrying out
5  the bag of money who had just robbed our bank.  That's
6  him.  I recognize him.  And he was carrying a gun and
7  a -- and a bag of money and he was wearing an orange
8  shirt that day."
9            You got a little bit of a discrepancy,
10  right?  Two people said yellow, one person said
11  orange, but three people said, "That's him.  I
12  recognize his face."  In other words, you may have a
13  doubt about what color shirt he was wearing, but is
14  there a doubt that he's the one that robbed it?
15  Probably not, based on those facts.  You see what I'm
16  saying?  The law doesn't require me to prove something
17  to you a hundred percent, without a doubt or any doubt
18  or shadow of a doubt.
19            Can you follow that, then?
20      A.    Yes, sir.
21      Q.    How long ago was this case when you were
22  convicted of a U.C.W?
23      A.    In '04.
24      Q.    '04.  And do you mind me asking how they --
25  they found the gun in your truck?  Were you pulled

229

1  over for something?

2      A.   Yeah, I was leaving a fishing tournament, and

3  the highway patrol pulled me over and he found a gun

4  in my truck.

5      Q.   Uh-huh.  Did you ever -- is that -- was the

6  gun just for personal protection?

7      A.   Yes.

8      Q.   Okay.  And -- because you know there's a

9  hunting and fishing exception to that sometimes

10  because sometimes people carry guns to shoot sharks or

11  something when they do that.

12     A.   No, it's a -- I have it in the -- well, I

13  used to carry it in my truck because I terminate a lot

14  of people with my job, never know who you're going to

15  run into sometimes, so...

16     Q.   Oh, my gosh.  So you did need it for personal

17  protection.

18     A.   Well, I just wanted to have it, just in case.

19     Q.   Uh-huh.  Do you have a concealed weapon

20  permit now?

21     A.   No, sir.  I don't have a gun anymore.  I

22  learned my lesson.

23     Q.   Well, that's an unfortunate situation.  But

24  you understand the law is you can't just -- now they

25  have concealed handguns, and stuff, but you -- there's

230

1  the reasons for the law.  Do you have any kind of ill

2  feelings about law enforcement or the police for

3  enforcing the law?

4      A.   No, sir.

5      Q.   All right.  Do you think you can be a fair

6  juror in this case?

7      A.   Yes, sir.

8      Q.   Will you listen to everything and make a

9  decision?

10     A.   Yes, sir.

11     Q.   And will you be able to follow through that

12  decision no matter what it is?

13     A.   Yes, sir.

14     Q.   Okay.  And I think that's all the questions I

15  have of you, Mr. Dicus.  Do you have any question of

16  me, that maybe I didn't explain something very well?

17     A.   No, sir.

18         MR. SKURKA:  Thank you so much for your

19  time.  I'll let the other lawyers talk to you now.

20         MR. GARZA:  May I proceed, Your Honor?

21         THE COURT:  Yes.

22         MR. GARZA:  Thank you.

23              VOIR DIRE EXAMINATION

24  BY MR. GARZA:

25     Q.   Good afternoon, Mr. Dicus.  My name is Ed

231

1  Garza, as I had previously introduced myself to the

2  large group when -- that you were in when we first

3  asked you to come in to fill out these questionnaires.

4  This is Mr. Grant Jones.  He's my Co-Counsel next to

5  me, and our client, John Henry Ramirez.

6              Sir, you've indicated in your

7  questionnaire that you don't know anything or have

8  heard anything, either through newspaper, counsel or

9  the broadcast media about this case; is that correct?

10     A.   Uh-huh.

11     Q.   You never heard about what happened?

12     A.   (Shakes head.)

13     Q.   Don't have any recollection of seeing --

14     A.   The only thing I know is I think I saw in the

15  paper when he got arrested but they said they were

16  looking for him for awhile, but that's about the only

17  thing I ever heard.

18     Q.   Okay.  Anything about that concern you?

19     A.   No, sir.

20     Q.   Did you develop or conceive any sort of a

21  opinion about that when you read it?

22     A.   No, sir.

23     Q.   At all?

24     A.   No.

25     Q.   Do you have any preconceived notions at all

232

1  about our client's -- about our client's innocence

2  here this morning -- this afternoon?

3      A.   I figure everybody's innocent until you get

4  proven guilty.

5      Q.   What does the presumption of innocence mean

6  to you?

7      A.   Well, my case with the gun, I had the gun in

8  the truck, you know, so I knew I was -- but it was

9  loaded and there was one in -- I mean, I didn't have a

10  leg to stand on, so, I mean...

11     Q.   Well, I guess, in that case, it would be easy

12  to say you were a witness to your own violation of the

13  law. --

14     A.   Yes, sir.

15     Q.   -- right?  It was effecting you --

16     A.   (Nods head.)

17     Q.   -- at the time.

18     A.   I was the only one effected, except for the

19  fellow that stopped me, so...

20     Q.   Okay.  But as far as the presumption of

21  innocence as a juror, what is your concept of that, or

22  as a prospective juror?

23     A.   I figure everybody's innocent until you get

24  shown they're not, you know?  I mean, I don't know how

25  to exactly say how somebody's innocent or guilty,

233

1   without -- without knowing, but, I mean, I ain't --
2   I'm not a mind reader, but I wasn't around when
3   anything happened, so I couldn't say one way or the
4   other, but...
5       Q.   But do you agree with the concept that
6   everyone is presumed innocent, until shown --
7       A.   Oh, yes.
8       Q.   -- or proven otherwise?
9       A.   Oh, yes, sir.  I believe that.
10      Q.   So, right now, if I asked you to cast a vote
11  as to my client's guilt or innocence, what would your
12  vote be?
13      A.   I couldn't give you one.
14      Q.   Why not?
15      A.   Because I don't -- I don't have any
16  information whether he did or didn't do what they
17  said.
18      Q.   Okay.  And that means, to me, you don't
19  understand the presumption of innocence.  Let me
20  re-explain it to you again.
21           As my client sits there today, this
22  morning -- this afternoon, he's presumed innocent.  --
23      A.   Yes, sir.
24      Q.   -- is he not?
25      A.   Yes, sir.

234

1       Q.   Okay.  So right now, if for some reason the
2   Judge were to direct you to render a verdict in this
3   case, what would your verdict be?
4       A.   Innocent.
5       Q.   Do you understand what I'm saying now?
6       A.   Yes, sir.  Now I understand.
7       Q.   Because I need to know that, otherwise you're
8   making me very nervous.
9       A.   I apologize for that.
10      Q.   Okay.
11      A.   But I understand now, sir.
12      Q.   Okay.  How do you feel about the death
13  penalty?
14      A.   Well, I guess if -- if you deserve it, you
15  should get it.  If you don't deserve it, you shouldn't
16  get it.  I mean, it's something if it's -- if it's --
17  if you're found needing it, then you should have it.
18  If you're found not having it -- needing it, then you
19  shouldn't have it.
20      Q.   In -- in your mind, what would be the best
21  argument for the death penalty?
22      A.   Well, if -- I guess if somebody killed
23  somebody and I guess they could get back what they
24  gave, but that would be about what I would think about
25  it.

235

1       Q.   You believe in an eye for an eye.
2       A.   Well, I don't know if it would be an eye --
3       Q.   Well, you tell me --
4       A.   -- for an eye.
5       Q.   You tell me how you believe.
6       A.   I just figure if you made your bed you ought
7   to sleep in it.
8       Q.   Okay.
9       A.   And I don't know if it's an eye for a eye, or
10  -- but...
11      Q.   Now, the Judge, I'm sure may have tried to
12  explain it to you earlier but, in Texas, the
13  commission of a murder does not -- our law does not
14  prescribe the death penalty for that kind of a -- for
15  that kind of an offense, okay?
16      A.   Yes, sir.
17      Q.   In order for the death penalty to be
18  considered or assessed as a punishment, it has to be a
19  murder plus, like the Judge tried to explain to you.
20  It has to be a murder, coupled with the commission or
21  in the course of committing yet another very serious
22  crime, whether it's a robbery, a kidnapping, a
23  burglary or something of that nature, or if you kill a
24  police officer or a fireman on the -- in the course of
25  his duty, or a child under six years of age, okay?

236

1   There's sort of a laundry list under which capital
2   murder fits under.  And -- only in those types of
3   cases can you or will you ever be allowed to consider
4   the death penalty as a punishment.
5           Do you -- do you understand the
6   difference?
7       A.   Yes, sir.
8       Q.   Okay.  Because I need to know that you do
9   understand the difference or is there some -- or do
10  you have some preconceived notion already where you
11  have made your mind up that, no matter how you hear, if my
12  client gets found guilty of murdering somebody, and
13  maybe doesn't get found guilty or you don't feel
14  like -- well, let me retract that.  Are you -- are you
15  the kind of person that leans for the death penalty
16  before you would consider life?
17      A.   No, sir.  I'm -- I don't make any decisions,
18  till I -- I mean, I'm a -- I guess I got an open mind,
19  you know.
20      Q.   Okay.  Well, let me ask you this, I'm just --
21  kind of need to know.  In your questionnaire when you
22  were asked on a scale of one to ten how strongly you
23  believe in the death penalty, you indicated -- one
24  being the least, ten being the strongest, you
25  indicated number nine.

237

1    A.   Yes, sir.

2    Q.   What does that mean?

3    A.   I mean, if -- I got an open mind, but if I

4    get -- I guess when I make a decision, I could -- I

5    could -- I agree with it, but if it's not the right

6    decision, then I wouldn't agree with it.  I don't

7    think every person should be given the death penalty,

8    but if -- I could -- I mean, I agree with it, but --

9    because some folks need it, but I don't think

10   everybody needs it.

11   Q.   Then you also answered to the question, "Do

12   you believe that the death penalty is imposed too

13   often, not often enough, or about right," you

14   indicated "Not often enough."  What -- what do you

15   mean by that

16   A.   Well, if I was -- if it was me, I wouldn't

17   want to the sit somewhere ten years.  If I had the

18   death penalty, I would go ahead and get it done.

19   Don't let me sit somewhere ten years.  That's what I

20   mean.  Sometimes you hear somebody 20 years, 25 years,

21   you know, but I wouldn't want to wait that long.  If

22   I'm guilty, let's do it.  But, I mean, it's not me,

23   it's -- that was my opinion.

24        What about someone that might be wrongly

25   convicted?  Let my give you an example.  You've heard

238

1    of these cases recently, maybe you read them in

2    newspaper articles, about people being found factually

3    innocent through the use of D.N.A., after they have

4    spent 10, 15, 20 years in jail.  There have also been

5    people sitting on death row who have been found

6    factually innocent.  Have you heard of that?

7    A.   Yes, sir.  It was somebody not too long ago,

8    I think.

9    Q.   What do you think about that?

10   A.   Well, I think he's -- he got pretty bad wrong

11   done to him.  He shouldn't have been in jail or found

12   guilty.

13   Q.   Yeah.

14   A.   But I guess he's lucky he was there 10 or 12

15   years to get out.

16   Q.   The appellate process has to sort of take its

17   time, whether you agree with it or not, to make sure

18   everybody's gotten it right.

19   A.   Yes, sir.

20   Q.   And that's why it's important that we sit

21   here and we talk to you and ask you certain questions,

22   which you might think, "Jesus, why are they asking me

23   such stupid stuff," you know what I mean?

24   A.   (Nods head.)

25   Q.   It's important.

239

1    A.   Yes, sir.  Everything that -- everything in

2    this case has to be important.

3    Q.   So we really need to know, you know, whether

4    or not you feel comfortable, we feel comfortable,

5    everybody feels comfortable, whether or not you can

6    sit in proper judgment in this case --

7    A.   (Nods head.)

8    Q.   -- for everybody concerned.

9    A.   Yes, sir.

10   Q.   Okay?  And is this the kind of case you think

11   you'd like to sit in?

12   A.   Well, to tell you the truth, I wouldn't like

13   to sit on no case, but it's my duty, so I got to,

14   so...

15   Q.   I mean, you know, I understand you're not

16   jumping for joy, but it's not exactly like winning the

17   lottery either.

18   A.   Well, you don't really want to -- I mean, you

19   got to have an open mind, but it's not something you

20   just want to run up to the front of the line for,

21   either.

22   Q.   Okay.  The reason we've talked about guilt,

23   innocence, punishment, all these kinds of things is

24   because this is the only chance we get to talk to you

25   about it, okay, so we have to talk about all the

240

1    possible possibilities, so to speak, okay?

2    A.   Yes, sir.

3    Q.   And that's why we need to ask you if you

4    understand the presumption of innocence, the State's

5    burden of proof, that they're the ones that have to

6    prove this case beyond a reasonable doubt, beyond a

7    reasonable doubt and what that means, okay?

8    A.   Yes, sir.

9    Q.   All those concepts?  To make sure that you do

10   understand them and that we can rely on those things,

11   based on your answers to our questions, okay?

12   A.   Yes, sir.

13   Q.   So, I'm going to kind of skip a little bit

14   and then go toward these special issues that we've

15   been discussing, okay --

16   A.   Yes, sir.

17   Q.   -- and ask you what -- what would be some of

18   the things that you would need to be convinced of in

19   your mind as to our client's future dangerousness,

20   which is Special Issue No. 1.

21   A.   Well, I guess you got to look at every person

22   as of their -- of them.  And, I mean, if he -- if he

23   was to show me that -- I mean, you -- you can't say

24   just because somebody's bad for a while don't mean

25   they're going to be bad forever, because you -- you

241

1   still hear about people that change, and so it's -- I
2   don't -- I guess till you have the information, you
3   really can't say how you'd make that decision.
4       Q.   And even then you're being asked to sort of
5   predict, it's no -- it's not a -- it's surely not an
6   exact science or anything, would you agree with me?
7       A.   Yes, sir.  It's not exact.
8       Q.   You're having to, basically, judge human
9   nature.
10      A.   Yes.
11      Q.   If you can, okay?  Or predict the weather, if
12  you can.
13      A.   Not here you can't.
14      Q.   Okay.
15      A.   But I figure there's a whole lot of brains.
16  And, if you got 10, 12 brains must be better than one
17  brain.
18      Q.   That's -- that's a good concept.  You might
19  be able to get it right, that's correct.  You might be
20  able to get it right, and there's some people that are
21  going to agree with certain things and others that
22  don't, okay?
23          So then that brings us down here to this
24  Special Issue No. 2, where you're being asked to take
25  into consideration the circumstances of the events,

242

1   the Defendant's character, his background.  Like
2   the -- the Defendant's character and background, what
3   are some of the things that -- you know, what does
4   character mean to you?
5       A.   What kind of person you are, what you -- what
6   you've done with your life.  I mean, I do refinery
7   work.  You got every kind of character in the world
8   out there working, so...
9       Q.   Okay.  And what about background?
10      A.   Well, I know some guys used to be pretty
11  sorry fellows and today they ain't too sorry, anymore.
12  They -- somewhere down the road they changed, so --
13  but at one time they was pretty sorry individuals, but
14  today they're not, so...  I mean, everybody has --
15  everybody has his opportunity to change.
16      Q.   Okay.  Can you take -- are -- you know, and
17  it -- and it's going to be up to you, if you're chosen
18  to be a juror in this case, as to what particular
19  aggravating circumstances and what particular
20  mitigating circumstances you're going to be asked to
21  give effect to, okay?
22      A.   Yes, sir.
23      Q.   And what I want to know is can you give
24  effect to both of them equally, consciously,
25  conscientiously and sincerely before you make up your

243

1   mind?
2       A.   Yes, sir.  I don't ever just make a hasty
3   decision.
4       Q.   Because, you know, some people will walk in
5   here and say, "Well, geez, man, this case is pretty
6   heavy.  Some gentleman lost his life.  And, geez, you
7   know, I don't care if he came from a bad family, he
8   came from an ugly background, a terrible background.
9   I don't care if he was an Eagle Scout.  I don't care
10  if he was an A student.  I just can't think of
11  anything that would make me believe that this guy's
12  blameworthiness can be lessened by those matters.  I
13  don't even want him breathing the air I breathe."
14      A.   I couldn't think that way.  I mean, you got
15  to -- you got to make the decision that -- I mean, I
16  don't think I could ever think somebody shouldn't
17  breathe the air I breathe, you know?
18      Q.   And I guess what we need to know is would you
19  had consider it, not only the aggravating, but also
20  the mitigating circumstances before you answer that
21  question?
22      A.   Yes, sir.
23          THE COURT:  Anything else?
24          MR. GARZA:  No, Your Honor.  I'll pass
25  him.

244

1           THE COURT:  All right.
2           MR. SKURKA:  No further questions.
3           THE COURT:  Why don't you wait in the
4   jury room for just a second and we'll be right with
5   you, okay, Mr. Dicus?
6           (Venireperson exits courtroom.)
7           THE COURT:  All right.  Mr. Skurka?
8           MR. SKURKA:  State will accept this
9   juror, Judge.
10          THE COURT:  Mr. Garza?
11          MR. GARZA:  We'll exercise our
12  peremptory, Judge.
13          THE COURT:  All right.  Bring him in.
14          (Venireperson enters courtroom.)
15          THE COURT:  All right, Mr. Dicus, you
16  were not selected to be on the jury, but we do
17  appreciate your time and you coming down here.  And
18  we're sorry we didn't get to you before lunch.
19          VENIREPERSON NO. 30:  No problem.
20          THE COURT:  All right.  Thank you for
21  your service.  We appreciate it.
22          VENIREPERSON NO. 30:  Thank you.
23          MR. SKURKA:  Thank you.
24          MR. GARZA:  Thank you.
25          (Venireperson exits courtroom.)

245

```
1          THE COURT:  Next we got Kenneth Starkey.
2          THE BAILIFF:  He's not here, sir.
3          THE COURT:  He's not here?  What about --
4   we got Diana O'Brien.  You-all ready to start that
5   one?
6          MR. SKURKA:  I'm okay, Judge.  I just
7   want to point out something off the record.
8          THE COURT:  Okay.  Off the record.
9          (Off the record.)
10         (Venireperson enters courtroom.)
11         THE COURT:  All right.  Come on up here
12  and have a seat.
13
14              VENIREPERSON NO. 33,
15              DIANA LOUISE O'BRIEN,
16              VOIR DIRE EXAMINATION
17  BY THE COURT:
18     Q.   All right.  You are Diana O'Brien; is that
19  right?
20     A.   That's correct.
21     Q.   All right, we want to talk to you about a few
22  things, okay?  First of all, we're looking for jurors,
23  obviously, but we're looking for jurors that can keep
24  an open mind and follow the law, all right?  And let's
25  begin with "keep an open mind."  Are you somebody that
```

246

```
1   you think you can keep an open mind in this case?
2      A.   I think so.
3      Q.   Okay.  All right, then let's talk a little
4   bit about the law.  First of all, this is a criminal
5   case.  Have you ever been on a criminal jury before?
6      A.   No.
7      Q.   No?
8      A.   I'm sorry, I have.  It was a federal court.
9      Q.   Okay.
10     A.   Sorry.
11     Q.   So you have been on a criminal case before?
12     A.   Yes.
13     Q.   All right.
14     A.   It was a drug case.
15     Q.   It was a drug case, all right.  Probably a
16  checkpoint case, wasn't it?
17     A.   No.  It was a -- he was buying drugs in
18  Memphis, but the drugs were coming from the Valley.
19     Q.   Okay, all right.  In that case, as in any
20  criminal case, the State, or over there they call it
21  "The Government," but the same -- same deal, --
22     A.   Okay.
23     Q.   -- State's got the burden of proof.  They
24  brought the charges, they got to the prove them, okay?
25  That's what the law says.  State just doesn't get to
```

247

```
1   accuse us and then it's true.  They have to prove
2   that, in fact, if we are charged we did the crime.
3   You -- you agree with that?
4      A.   Yes.
5      Q.   All right.  And -- and their burden of proof
6   is beyond a reasonable doubt, and -- and I know, for a
7   fact, that's the burden that was used over in federal
8   court --
9      A.   Yes.
10     Q.   -- when you did that case.  And that's the
11  burden that we have here, and that's in every criminal
12  case, okay, beyond a reasonable doubt.  And we don't
13  have a definition, but it is the highest burden of
14  proof in the law, okay?  Law says that that's the
15  burden of proof.  Now, it does not mean beyond all
16  doubt or beyond a shadow of a doubt, but it does mean,
17  you know, beyond a reasonable doubt, and that's --
18  that's a high burden.
19              Could you hold the State to that burden,
20  no more, no less?
21     A.   I think so.
22     Q.   Okay.  You say you think so.  What makes you
23  think maybe not?
24     A.   It's a tough thing to prove.
25     Q.   Well, I mean --
```

248

```
1      A.   If they have all their evidence in place and
2   they provide all their evidence saying that yes, this
3   is what happened, then, yes.
4      Q.   Okay.  I mean, you know, and the standard is
5   high for a reason, that is, because we don't want to
6   just take someone's liberty --
7      A.   Correct.
8      Q.   -- willy-nilly.  I mean, they got to have
9   their ducks in a row, okay?  Now, as part of that, our
10  law says a person is presumed to be innocent until the
11  State can prove otherwise, if they can prove
12  otherwise, okay?  That is, you know, until they prove
13  it, a person's presumed to be innocent.  That's what
14  the law says, and that's not anything new.  That's
15  ancient stuff that's been handed down to us from the
16  English and the Greeks and the Romans, and all the way
17  through Western Society, that -- do you -- can you
18  follow that instruction?
19     A.   I believe so.
20     Q.   Okay.  And sometimes lawyers will ask jurors,
21  "Well, if you had to vote right now, how would you
22  vote," and, of course, the answer is not guilty,
23  because State hasn't proven this case.  You haven't
24  heard anything yet.
25     A.   Correct.
```

249

1    Q.   You agree with that?

2    A.   That is correct.

3    Q.   And maybe they can and maybe they can't.

4    But, in any event, they certainly haven't done it at

5    this point.

6         All right, now, you know, all of these --

7    all of these concepts I'm talking to you about

8    intertwine, and the next one is the burden never

9    shifts over here to the Defense table.  They don't

10   have to do anything.  They don't have to present a

11   case.  They have to present a case, that is, the

12   State, but the Defense doesn't have to present a case,

13   and as part of not having to present a case, Defendant

14   doesn't have to testify.  That's a -- it's our Fifth

15   Amendment right.  It's part of the Bill of Rights.

16   It's, you know, it's all -- goes all the way back to

17   day one of our Constitution.

18        And the idea makes sense, really, because

19   if the Defense doesn't have any burden, then they

20   don't have to put on any evidence, including their own

21   client.  And I submit there's a lot of reasons why a

22   defendant wouldn't want to the testify.  Maybe his

23   lawyer told him not to, maybe he said, "You know what,

24   they can't -- they haven't proven their case, you

25   don't have to testify."  Maybe -- maybe he's

250

1    uneducated, maybe -- maybe he gets nervous in

2    situations such as this and starts stuttering, maybe

3    -- there's -- there's different reasons, right?

4         What I need to know from you is whether

5    you hold it against somebody, that is the Defendant in

6    this case, if he didn't take the stand?  We don't know

7    at this point, he may or may not, but if he doesn't,

8    would you hold it against him?

9    A.   I don't think so.

10   Q.   Well, because sometimes we have people say,

11   "Well, you know, if the case is close, I would hold it

12   against him," or, "You know, when I go back there, I

13   like to hear two sides of the story, and if I don't

14   hear his side, I'm just going to -- I'm going to hold

15   it against him.  I don't care what the law says."  I

16   mean, if that's you, that's okay, but we do need to

17   know.

18   A.   I think I can be open-minded.

19   Q.   Okay.  And you wouldn't hold it against him,

20   then, if he chose not to testify?

21   A.   I don't think so, no.

22   Q.   Okay.  All right.  Let's talk a little bit

23   about the charge itself.  It's capital murder, okay?

24   A.   Uh-huh.

25   Q.   And what is capital murder?  Well, it

251

1    certainly is murder, okay, which is the intentional

2    taking of the life of another, but it's murder plus,

3    murder plus something else.  And the legislature has a

4    laundry list of things that can be capital murder.

5    But, in this case, the State is alleging that the

6    Defendant committed the murder on a given date in

7    Nueces County, Texas, while in the course of

8    attempting to or committing a robbery, okay?  You

9    follow me?

10   A.   Yes.

11   Q.   And that to prevail on -- on this case, the

12   State needs to prove all of the elements of capital

13   murder, as alleged in the indictment, that is, they

14   have to prove the murder and they have to prove the

15   robbery or attempted robbery.  You follow me?

16   A.   Yes, I do.

17   Q.   Okay.  And they don't get to just -- they

18   don't get to just prove half of it and win, all right?

19   Not to say that there may -- he may be guilty of

20   something else or maybe nothing at all, but my point

21   is they have to prove all of the elements, okay?

22   A.   All or nothing.

23   Q.   All -- it's all or nothing.  They got do run

24   the table.  They don't get to -- they don't get best

25   of seven.  They have to prove them all.  Could you

252

1    hold the State to that burden?

2    A.   Yes.

3    Q.   All right.  Now, we have a bifurcated trial

4    system in Texas, which means that the first part of

5    the trial we do guilt or innocence.  State presents

6    their side.  Defense, if they want to they present

7    evidence, if they don't want to, they don't have to.

8    Do closing arguments.  I read to you the Charge.  Take

9    back the Charge.  That's kind of -- I call it the

10   juror's instruction manual, but it's a packet of law

11   that you take back there, and you deliberate as to

12   whether the State has proven their case beyond a

13   reasonable doubt.  And if the Defendant is acquitted,

14   that's the end of the case.  If the Defendant is

15   convicted, then we go to part two, which is the second

16   phase of the trial.

17        Second phase of the trial is the

18   punishment phase.  And if the Defendant is found

19   guilty of capital murder, there's two things that can

20   happen, life in prison or death, death sentence.

21   Well, you don't say that.  The jurors don't go back

22   and say, "You know, let's take a vote," and they come

23   to an agreement on life or death.  We don't do that.

24   We answer questions, okay?

25        And this is Question No. 1 over here, and

253

1    that is, "Is there a probability that the Defendant
2    would commit criminal acts of violence that would
3    constitute a continuing threat to society," and the
4    jurors would answer yes or no.  Then they would go to
5    the second special issue, which is right over your
6    right shoulder, and, "After taking into consideration
7    all the evidence, including the circumstances of the
8    offense," that is, what you hear at the first part of
9    the trial "and the Defendant's character and
10   background and the person moral culpability of the
11   Defendant, is there a sufficient mitigating
12   circumstance or circumstances to warrant a sentence of
13   life imprisonment, rather than death sentence be
14   imposed?"  Okay.
15              That is, you may hear on the second part
16   of the trial, if we get that far, other stuff, maybe
17   the Defendant's background.  Maybe he was a good kid,
18   maybe he was a bad kid.  Maybe he had a lot of
19   criminal history, maybe he didn't have any at all.
20   Maybe he did a lot for the community, maybe not, you
21   know?  And those are the kind of things that could be
22   mitigating circumstances.
23              But what's a mitigating circumstance is
24   really up to the jury.  Some people may think that a
25   particular thing is a -- is a mitigating circumstance

254

1    and other people may think, no, it doesn't mean
2    anything to me.  I mean, that's where the jury comes
3    in and that's their decision.
4              Beginning of the trial I'm going to give
5    an oath to the jury, and that is, it's going to go
6    something like this, "Do you solemnly swear that you
7    will render a true verdict based upon the evidence and
8    the law presented to you?"  And then the jurors, I
9    suspect, will say yes, I can.  So what I need to know
10   from you is, first of all, could you take that oath to
11   render a true verdict on the guilt or innocence phase
12   of this trial?
13       A.   Yes.
14       Q.   All right.  And secondly, if we get to the --
15   if he is convicted, the Defendant, that is, of capital
16   murder and we get to the special issues, could you --
17   could you answer those questions truthfully?
18       A.   I believe so, yes.
19       Q.   Okay.  Because some people, they say, "Well,
20   you know what, I -- I realize that this is the law,
21   and maybe it -- it's our civic duty, but I just can't
22   answer these questions truthfully because I can't
23   participate in the process that may lead to the death
24   penalty."  Or the flip side of that is, some people
25   say, "You know what, if he gets found guilty of

255

1    capital murder, I don't care about any of this in
2    Special Issue No. 2, it's always going to be death,
3    okay, no matter what."
4              And I need to know from you if you can
5    keep an open mind and answer these questions
6    truthfully?
7        A.   I believe so, yes.
8              THE COURT:  All right.  Well, I'm going
9    to turn you, then, over to Mr. Skurka at this time.
10             MR. SKURKA:  Thank you, Judge.
11                 VOIR DIRE EXAMINATION
12   BY MR. SKURKA:
13       Q.   Hello, Ms. O'Brien, how are you today?
14       A.   Just fine, thank you.
15       Q.   As the Judge introduced me, my name is Mark
16   Skurka.  I'm an assistant district attorney, and along
17   with Geordie Schimmel here, we'll be privileged to
18   present this case to you if you're selected on this
19   jury.
20             I want to tell you right off the bat,
21   there's no right or wrong answers to anything you say.
22   I don't want you to answer in such a way you think I
23   want to hear or the Judge wants to hear or the Defense
24   wants to hear, just tell us your true feelings about
25   some of the issues we talk about in this case and

256

1    we'll get through this, okay?
2        A.   Okay.
3        Q.   The first question I have is -- is how you
4    feel about the death penalty in general.
5        A.   I support the death penalty.
6        Q.   Why?
7        A.   I think there's -- it's some way of helping
8    prevent crime.  Some people think twice about
9    committing a crime if they know that they are facing
10   the death penalty.
11       Q.   So your biggest reason for supporting the
12   death penalty is because you think it deters other
13   people from doing the thing.
14       A.   I think we need to hold people accountable
15   for their actions.
16       Q.   Okay.  And so, it's -- in addition, it's
17   holding --
18       A.   Yes.
19       Q.   -- in addition to deterring others, that
20   person has to be held accountable for the crime.
21       A.   Correct.
22       Q.   So it's kind of several reasons.
23       A.   Yes.  I can't say it's just one specifically,
24   no.
25       Q.   Because some people say, "Well, gosh, you

257

1  know, we still have people doing these horrible
2  crimes, even though we have the death penalty, --
3      A.   That is true.
4      Q.   -- you know?  It's not really working," but
5  then some people say, "Yeah, but at least it deters
6  that person.  We know that person won't hurt anybody
7  ever again."  Does that make sense?
8      A.   Yes, it does.
9      Q.   But as the Judge has already pointed out some
10  things, and we pointed out the first day, certainly
11  things don't happen automatically.  And a lot of times
12  lay people get up here and say, "Well, it's a capital
13  murder, he must be guilty and he must get the death
14  penalty automatically."  And we always have to tell
15  them, "No, there's a process we have to go through and
16  you have to make sure he qualifies for the death
17  penalty."  Because, like I tell people, nothing's
18  automatic in this world.  You have to be able to be --
19  you must have heard the Judge say it a dozen times,
20  open-minded, wait till you hear all the evidence.  And
21  I'm assuming that probably as a teacher, you've been a
22  teacher for a long time, you have to do the same
23  thing, you make decisions and you want to have all the
24  evidence before you make a decision, right?
25      A.   I try to, yes.

258

1      Q.   Well, you don't -- I mean, your first day of
2  school when a kid walks in the door, do you look at
3  him and say, "He's going to be a C student.  This
4  one's going to be an A student.  This one's going to
5  be --"
6      A.   I try to be open-minded.
7      Q.   Right.  And -- and that's kind of what you're
8  supposed to do in this case.  Tell me about when you
9  first heard it was this kind of case, a capital murder
10  case, when the Judge came down, remember that big room
11  with, you know, --
12      A.   Yes.
13      Q.   -- 2- or 300 people in there, and nobody knew
14  exactly what they were called for till the Judge came
15  out and said, "Folks, this is a criminal case and this
16  is a capital murder case.  John Henry Ramirez, sitting
17  over there, could be facing the death penalty," what
18  was your first reaction when you heard it was that
19  kind of case?
20      A.   That it would be a tough case.
21      Q.   Why?
22      A.   It's a tough decision.  You have to listen to
23  a lot of evidence and then make your decision based
24  upon that evidence.
25      Q.   Tough decisions are probably confronted by

259

1  all of us in our daily lives.
2      A.   Yes.
3      Q.   Right?
4      A.   I agree.
5      Q.   Are those decisions that you're incapable of
6  making?
7      A.   No.
8      Q.   No.  And when you -- when we put you on a
9  jury, if you get selected on a jury, do you agree with
10  me that the law should be that 12 people make that
11  decision, not just one person like a judge having all
12  that power or the District Attorney's Office, would
13  you agree with me that's a pretty good system to have
14  the people decide whether they get the death penalty
15  or not?
16      A.   Yes.
17      Q.   What -- what you're -- what you're saying to
18  me is what I hear a lot of people say is, "My gosh,
19  this is an awesome responsibility.  It's -- it's
20  really the pinnacle decision I have to make."
21      A.   Well, it's easy to sit here and say, "I
22  believe in the death penalty," but it's something else
23  to sit here and say, "I believe and am I willing to
24  carry out that belief."
25      Q.   That's my question to you.  Can you, Diana

260

1  O'Brien, carry that out if you think the evidence
2  warrants it?
3      A.   If you can prove beyond a reasonable doubt
4  that he's committed the crimes he's been accused of, I
5  believe I can.
6      Q.   Okay.  And the secondary thing is, I can't
7  just prove it to you that he committed the crime, I
8  also have to show you or give you evidence to prove
9  that he should get the sentence, instead of a life
10  sentence.  Remember, it's not --
11      A.   Correct.
12      Q.   -- automatically done.
13      A.   Correct, it's not automatic.
14      Q.   So you'd follow that, right?
15      A.   Yes.
16      Q.   And that was my question.  Because I've had a
17  lot of people go up there and they'll tell me, "Mark,
18  you know, I'm glad we have the death penalty.  It's a
19  good law, I support it.  We should do good," and I
20  say, "Okay, I'll put you on a jury to make that
21  decision," and then they back off and go, "Oh, wait a
22  minute, not me.  Get somebody else to do it."  And,
23  unfortunately, with the jury system the way it is, you
24  don't necessarily have a chance to opt out and let
25  somebody else carry the ball.  You may have to carry

261

1   the ball.
2           And that's kind of my question to you.
3   How do you feel about doing that?  I mean, can -- some
4   people can talk the talk and some people can't walk
5   the walk.  I know that's kind of --
6       A.   It --
7       Q.   -- crude, right?
8       A.   No, but it is a tough decision.  I have
9   thought about it, and you're right, I've never been on
10  a jury where I've had to make that decision, but I do
11  believe in the death penalty and -- and if he can
12  prove his case, and, like I said, beyond a reasonable
13  doubt, and we can answer all these questions then yes,
14  I think I can.
15      Q.   Okay.  And -- and if you can't, that's fine,
16  too.  I just -- we just need to know.  Like I said,
17  some people, when they're faced with the decision,
18  they say, "Well, look, I -- I just can't do that."
19      A.   Right.
20      Q.   You know?  And some people say -- and I'll
21  tell you, I don't think anybody wants to do it.  We
22  had a juror a few minutes ago say, "Hey, I'm not going
23  to be racing to the head of the line to be in line to
24  do this, you know, but it's my civic duty, and if I
25  get the information and I make an intelligent decision

262

1   based on the evidence, I can follow through on that."
2   Is that kind of how you feel?  Maybe -- I don't know
3   if it's reluctance or uneasiness because nobody should
4   want to do that.
5       A.   Right.  I don't -- you know, I don't know
6   anyone that wants to volunteer to be --
7       Q.   Oh, no.
8       A.   -- on this jury.
9       Q.   You're right.
10      A.   But this is what our system is based upon.
11      Q.   Right.  Actually, there probably are some
12  people who would volunteer.  Those kind of people
13  worry me, too.
14      A.   Yes, I think I've taught a few of those.
15      Q.   Well, but you see what I'm saying.
16      A.   Yes, I do.
17      Q.   You look at my point of view.  I want to know
18  if I prove it to you, you can look at him, because
19  that's him.  Look at him.
20      A.   That's correct.
21      Q.   It's not somebody you just see on the news or
22  read about in the paper, that's him.  Can you look at
23  him and tell me that you can vote for death if the
24  evidence warrants it?
25      A.   If the evidence warrants it, then, yes, I

263

1   believe I can follow out those instructions.
2       Q.   Okay.  I'm going to turn that around on you,
3   now, because they're going to ask you the opposite.
4       A.   Uh-huh.
5       Q.   If you think that the evidence is there that
6   he's not guilty?
7       A.   If you don't prove your case.
8       Q.   Right.  Can you vote not guilty, then?
9       A.   Sure, I can vote not guilty.
10      Q.   And if the evidence is such a way and the
11  questions are answered in such a way that you think he
12  should get a life sentence instead of a death
13  sentence, can you vote that way?
14      A.   I believe I can.
15      Q.   Okay.  So you're equal both ways.  You're not
16  leaning toward the death sentence, you're not leaning
17  toward guilty at this point, right?
18      A.   No.
19      Q.   And that's where we want you to be.  Some
20  jurors come in and they have preconceived notions, and
21  they'll think this and think that and just kind of got
22  to be an equal slate.  And not only do they have to be
23  an equal slate, he's presumed innocent at this time.
24      A.   Correct.
25      Q.   Remember, the Judge said that?

264

1       A.   Yes, I do.
2       Q.   In our system the law, the State has to prove
3   the case beyond a reasonable doubt.  As he sits there
4   he's presumed innocent.  Does that mean he is
5   innocent?  No, it just means at this point in time
6   he's presumed innocent.  Because?  You haven't heard
7   any evidence yet.
8       A.   Correct.
9       Q.   You understand that?
10      A.   That's correct.
11      Q.   It's a presumption that you give him.  You
12  don't start him off guilty and then he has to prove
13  himself innocent.  You start him off innocent, then
14  the State has to prove him guilty.  And -- I mean,
15  that's what our Country is based on.
16           So looking back at this, how do you feel
17  about being -- if you got selected on this jury, how
18  would you feel about being on that and participating
19  in that decision?
20      A.   Well, if I had to do it, I'd do it.
21      Q.   Okay.  Not be --
22      A.   It's not --
23      Q.   It's not a happy thing to do.
24      A.   No, but it's part of our system.
25      Q.   Uh-huh.

265

1    A.   He's entitled to a fair jury.  Like I said,
2  is it going to be an easy decision?  Certainly not.  I
3  don't think it would be easy for anyone to sit here
4  and say, you know, "I'm going to put you to death."
5    Q.   Okay.  And that's why we have a system set
6  up.  He's got very capable attorneys representing him.
7  He's got a very capable Judge up there making the
8  calls on the legal decisions.  You see the -- all the
9  safeguards we have in the system --
10    A.   Yes.
11    Q.   -- to make sure.  And then it's a -- not a
12  joint decision, but it's a 12-person decision, not
13  one.
14    A.   Right.
15    Q.   So you think you can follow through with it
16  if you need to.
17    A.   I think I can follow the law.
18    Q.   All right.  Do you think what a person looks
19  like or how old he is has anything to do with the
20  decision of whether he's guilty or not and what
21  punishment they should get?
22    A.   Maybe if he was eight years old.
23    Q.   Okay.  You see where I'm going.  Because
24  sometimes people say, "Well, gosh, you now --" I know
25  I've tried criminal cases for 22 years, and it seems

266

1  to me that jurors always think that it's going to be
2  Charles Manson sitting there, right?  They have that
3  stereo-type image of Charles Manson or some
4  scary-looking biker guy, and sometimes they don't look
5  like that.
6    A.   No, he doesn't look like that.
7    Q.   He doesn't look like that.
8    A.   No, he does not.
9    Q.   But would you agree with me a jury should
10  make a decision on what he had did, instead of what he
11  looks like?
12    A.   Yes.
13    Q.   And talking about age, the laws in Texas says
14  you can't execute somebody who's under 18 years of
15  age.  You're not -- we can't execute juveniles here in
16  Texas.  And that's probably good law, but I think the
17  law also recognizes that once you're past 18, whether
18  you're 20, 30, 40, 50, you should be old enough to
19  recognize the consequences of your actions and obey
20  the law.  Would you agree with that?
21    A.   Yes.
22    Q.   So just because he may look young or his
23  appearance is some way, you would make a decision on
24  the evidence, not the way he looks.
25    A.   Correct.

267

1    Q.   Okay.  Do you understand that the reason this
2  capital murder, as the Judge said, it's murder plus
3  robbery.
4    A.   Yes.
5    Q.   And in this case, it says murder while in the
6  course of committing robbery or attempting to commit
7  robbery.  In other words, they could have finished a
8  successful robbery or were trying to rob somebody when
9  the killing took place.  Say, for example, you --
10  somebody robs a bank, and they're getting out the door
11  with a bag of money and they get caught by the cops.
12  Can he come to court and say, "Hey, I'm not guilty.  I
13  never got away with it.  I never got the money, so I'm
14  not guilty?"  No.  It says, "in the course of
15  committing robbery or attempting to commit robbery."
16  So it could be either way in that within the killing
17  takes place, and you have to have both of them
18  together.  And the law says, not every case, you heard
19  that the other day, not every murder case can you be
20  even eligible for the death penalty.  It's got to be
21  this special type of case.
22    A.   Yes.
23    Q.   Do you think that's a good scheme to have
24  where Texas only makes those really serious cases
25  death penalty cases?

268

1    A.   Seems fair.
2    Q.   All right.  Now, there's two parts of the
3  trial.  The first part is guilt or innocence, and the
4  second part is the punishment phase.  Remember that
5  just if you find the person guilty on the first part
6  doesn't mean he automatically gets the death penalty,
7  it goes to the second part.  And, of course, if he's
8  found not guilty, the trial ends there.
9    A.   Correct.
10    Q.   But let's just say, for purposes of this
11  demonstration, you found him guilty from the jury, now
12  you go to the second part of the trial.  In the second
13  part of the trial, you may get to hear additional
14  evidence about his background, his character,
15  whatever.  Generally speaking, in the first part of
16  the trial, you just hear about what happened, you
17  know, that day, about the crime --
18    A.   Correct.
19    Q.   -- itself and maybe the surrounding
20  circumstances of that crime.  Well, then, you find him
21  guilty of that crime, but then you go to the second
22  part.  Well, maybe you want to know what his
23  background is.  I mean, was he an A student in school,
24  or made honor roll, or, you know, has he been to
25  prison five times before, you know, what kind of

269

1  background does the guy have?  And you'd probably want
2  that to make a decision on what you're going to do
3  with this person, right?
4          In other words -- the law says this,
5  really:  The law says you can make a decision on the
6  death penalty based on just that first part of the
7  trial.  The law also says that you should consider
8  mitigating circumstances before you make the final
9  decision.  So let's say that in our scenario the
10  jury's found him guilty of capital murder.  You hear
11  -- heard additional evidence.  Maybe he's a good guy,
12  maybe he's a bad guy.  Maybe he's an Eagle Scout, you
13  know, maybe he's a roughneck in the neighborhood or
14  something, I don't know.
15          So you hear that evidence and then you
16  answer the special issues.  And the first -- and you
17  don't just vote, "Hey, I check off death or I check off
18  life," you answer the two questions and depending on
19  how you answer the questions the death penalty or life
20  sentence gets imposed.
21          And the first question is right there on
22  the board in front of you.  "Is there a probability
23  that the Defendant would commit criminal acts of
24  violence that would constitute a continuing threat to
25  society?"  Do you have a crystal ball?

270

1      A.   No.
2      Q.   You can't predict what a person's going to be
3  like down the line, can you?
4      A.   No.
5      Q.   No one can.  The law doesn't require me to
6  predict, for sure, what's going to happen.  That's why
7  it says, "Is there a probability?"  It doesn't say is
8  there a certainty that's going to happen.  So the law
9  doesn't require me to prove to you a hundred percent
10  for sure what's going to happen, it just says, "Is
11  there a probability."
12          The second part of the sentence -- the
13  question says, "that the Defendant would commit
14  criminal acts of violence."  It doesn't say he has to
15  necessarily murder somebody or commit capital murder
16  again.  Do you think he's a danger in the future to
17  commit further acts of violence, whatever they may be,
18  but it doesn't necessarily have to be murder.
19          Then the last part of the question says,
20  "That will constitute a continuing threat to society."
21  Sometimes people come up to me and they say, "Well,
22  Mr. Skurka, well, why do you have to seek the death
23  penalty?  You can just put him in prison.  That takes
24  him away from society."  And I always say, "Who is in
25  a prison?"  Tell me who's in a prison.

271

1      A.   Other criminals.
2      Q.   Right, other inmates that are in prison.  Who
3  else?
4      A.   Guards.
5      Q.   Guards.  Maybe people that work there, like
6  the warden and his staff, and maybe medical people or
7  maintenance people that work at the prison, right?
8      A.   Correct.
9      Q.   Okay.  So does that mean he's actually taken
10  away from society?  No, he's still interacts with
11  other human beings.  Now, a much more limited way,
12  but, you know, we don't have like a desert island, we
13  put them on a desert island, they'll never have social
14  interaction again.
15          So would you agree with me that society,
16  even though -- I'm sorry, that prison, even though
17  it's a little bit more hampered, is still part of
18  society, correct?
19      A.   Correct.
20      Q.   Okay.  And have you ever heard of that
21  happening, where people hurt guards or prisoners --
22      A.   Certainly.
23      Q.   Sure, that happens.  So just because you put
24  them in prison doesn't guarantee that he's never going
25  to commit criminal acts of violence again, does it?

272

1      A.   No.
2      Q.   Okay.  So, that's what the question is.
3  Based on that, the evidence you hear, is there a
4  chance he's going to be a danger in the future?  We
5  call that "the future dangerousness question."  And
6  it's kind of something, do you think he's going to
7  hurt somebody in the future, you know, and be a threat
8  to society?  And you answer that question yes or no.
9          Then we come to the second question, and
10  the second question is the mitigating circumstances
11  question.  Mitigating circumstances -- the word
12  "Mitigating" means anything that would lessen or make
13  less severe the punishment, anything that would make
14  -- lessen or reduce the punishment.  In other words,
15  he did the crime, but is there any facts or
16  circumstances that warrants that he get a lesser
17  sentence like life, instead of death?
18          Let me give you an example, and here's a
19  good one because you're a teacher, and I'm going to
20  take you back to my old days when I was in school.  Me
21  and my friend were both in the 8th grade and I was
22  always getting in trouble.  I was always called in the
23  principal's office, and I probably -- a lot of stuff
24  was for, you know, doing goofy things and stuff.  But
25  let's say I had been suspended five times before

273

1  because of something else I did, and say my friend and
2  I both did something bad together.  Let's say, a
3  violation of the school rules.  Now, me I had been
4  suspended five times before for this, and when the
5  violation happened, I did it really bad.  It was a
6  really bad violation of the -- of the school rules.
7            My friend, on the other hand, had never
8  been suspended before.  It was his first time he had
9  violated a school order.  And, actually, what happened
10  is, after he violated the school rule, he made up for
11  it somehow right away, and tried to fix what he had
12  done wrong, and admitted his guilt right away, or
13  something like that, and -- and tried to clean up what
14  he -- what mess he had made, or something like that,
15  okay?  And the principal here, says, "How am I going
16  to treat these people?  They both violated the school
17  rule."  But is the principal going to treat them both
18  the same?  Probably going to treat one person, me, the
19  bad one, worse, because I've had a background in doing
20  this, violating school rules.  So maybe I get
21  suspended for two weeks.
22            And then the other guy, maybe he doesn't
23  get suspended.  Maybe he only gets, you know, put on
24  probation for a week or maybe in-school suspension or
25  stay after school for a day or two.  And why is that?

274

1  A.    (No response.)
2  Q.    Because they both have different backgrounds,
3  right?  One person committed a lot of violations
4  before and he did really bad in this one, and the
5  second person had never committed a violation before.
6  And I know you're a teacher, not a principal, but
7  don't principals look at stuff like that when they
8  meet out punishment?
9  A.    They try to be fair and be equal.
10  Q.    Right.  Well, equal because of the violation
11  or equal because of the person's past?
12  A.    Equal because of the violation.
13  Q.    Right.  But would you agree that sometimes
14  the past has something to do with the thing, too?
15  A.    Occasionally.
16  Q.    Okay.
17  A.    But maybe they just didn't get caught.
18  Q.    Now, that's a good point.  That's a good
19  point.  Well, say you were on a jury, two different
20  juries and they were both burglary cases.  And
21  burglary basically means you break into somebody's
22  house and steal something without permission.
23  A.    Uh-huh.
24  Q.    And you're sitting there on the two juries
25  and you're thinking, "Both these guys are guilty of

275

1  burglary.  They both did something that I think is bad
2  and I'm going to give them the highest sentence I
3  can."  Then you hear the first case.  In the first
4  case what happened is, that burglar, what he did was
5  kicked in the kitchen door, broke the door, went into
6  the house, stole all the jewelry, stole all the money,
7  stole all the, what do you call, electronic equipment
8  and T.V.s and stereos and everything.  And then you
9  find out on the jury that he's been to prison ten
10  times before for burglary.
11            Now, switch scenario.  It's the second
12  burglar, completely different case.  In that burglary,
13  you find out he didn't break in the door, he opened
14  the back door because it was unlocked, and he went
15  inside the house and he didn't even go ransack the
16  house.  What he did was, he didn't take any money,
17  stereos, jewelry, anything like that, all he did was
18  go into the kitchen and steal a loaf of bread and some
19  food to go feed his family because he had lost his job
20  and he needed something to feed his family.  Didn't
21  take anything else except food.  And then you'll also
22  find out this guy hadn't been to prison ten times for
23  burglary.  He's never even been arrested before in his
24  life.
25            So you're sitting on the jury.  Would you

276

1  actually punish both of those guys equally?  Probably
2  not.
3  A.    Probably not.
4  Q.    Probably the first guy, because of the
5  aggravating circumstances you would go higher on and
6  the second guy you would probably go lower on because
7  of the other circumstances, and that's what that
8  question is designed to show.  "Is there a sufficient
9  mitigating circumstance to warrant that a sentence of
10  life, rather than death be imposed?"
11            Sometimes you hear people say, "Well,
12  there's extenuating circumstances," like in the second
13  guy thing, he could have stolen a bunch of stuff, he
14  didn't, he just took bread and food.  Now, it's wrong
15  to break -- go into somebody's house and take
16  something, but that's a lot different from the first
17  guy, right?
18  A.    Correct.
19  Q.    You always see -- sometimes you'll see that
20  in the paper.  You'll see one guy gets five years
21  probation and one guy gets fifty years in prison.  You
22  think why is that?  And I always tell people every set
23  of facts is different, every person's background is
24  different.  Maybe a first-time offender, maybe a
25  five-time loser, you never know.

277

1    That's what the Judge is asking you to do
2  in this case.  You found him guilty of capital murder.
3  You think he's a continuing threat to society, but
4  wait, jury, before you decide that, he says, "Take
5  into consideration all of the evidence, including the
6  circumstances of the offense," what happened that day,
7  "The Defendant's character and his background," you
8  know, what's his past like, "his personal moral
9  culpability, is there a sufficient mitigating
10 circumstance or circumstances to warrant that a
11 sentence of life, rather than death sentence be
12 imposed?"  In other words, he did the crime, but is
13 there a reason we should reduce that sentence?  That
14 would be the mitigating circumstance.
15   Now, what is a mitigating circumstance I
16 couldn't tell you.  That's up to the jury to decide.
17 Some people may say, "Well, you know, he's very young
18 and, or, you know, he was a war hero, he's a decorated
19 war hero, so we should give him a break, or, you know,
20 he made good grades in school years ago."  And other
21 people may say, "Look, I don't care about all those
22 things.  He still did the crime.  He's got to answer
23 for the consequences of that crime."
24   You see what I'm saying?
25   A.   Yes.

278

1    Q.   It's kind of a catchall on the jury,
2  catchphrase that says before you give him the death
3  penalty look over everything, look at the big picture
4  that day, whatever -- what else he did that day and
5  what else he's done in the past, or is he a good guy,
6  is he a good guy, is there any reason to lower it?  If
7  there's no reason to lower it, you vote no, and he
8  gets a death sentence.  If you -- if you do find
9  sufficient mitigating circumstances, then he might get
10 a -- he would probably get a life sentence.
11   And that's the other part.  It says it's
12 got to be sufficient.  Just because you find a
13 mitigating circumstance, do you mean -- does that mean
14 you'll automatically lower the sentence to life?  No.
15 The Defense may bring up something like that.  They
16 may bring up, you know, he was a good student in
17 school or he helped his mom, you know, with the --
18 bring home the groceries or something like that.  Does
19 that mean it necessarily outweighs the other stuff?
20 That's up to the jury to decide.  That's why it says,
21 "Is there sufficient," is it enough to make it less --
22 lower the sentence?  If it is, it is.  If it isn't, it
23 isn't.
24   But it's kind of a -- I like to call --
25 it was your last catchall question before you give the

279

1  death penalty, is any reason not to give the death
2  penalty?  There may be and there may not be, but the
3  law says you have to consider everything, listen to
4  everything before you make that decision because if
5  you do anything automatically, like, you answer that
6  first question, "Well, I think he's a continuing
7  threat to society, so I'm always going to say he gets
8  the death penalty," Judge says, "No, you've got to
9  answer the second question, too."
10   Wouldn't that do -- is that kind of fair
11 to you, too, to look at all that other stuff, too, and
12 decide?
13   A.   Certainly.
14   Q.   Sure.  And that's what it should be.  One of
15 the other laws the Judge may give you is this,
16 "Voluntary intoxication is not a defense to crime."
17 If you go get yourself drunk or high on drugs
18 voluntarily and you commit a crime, that's not an
19 excuse to the crime.  You can't say, "Well, I robbed
20 that bank, but I was drunk, so I'm not guilty."  No
21 way.  You can't do that.  What you can say, though,
22 the Judge may tell you, is that voluntary intoxication
23 is a possible mitigating circumstance.  Some people
24 may say, "Oh, well, he did that crime, but he was
25 drunk at the time, so we'll give him a break."  Other

280

1  people may say, "Look, I don't care if he was drunk or
2  not.  He knew what he was doing.  He got -- he gave --
3  he got himself drunk, so he has to pay the price."
4    You see what I'm saying?
5    A.   Yeah.
6    Q.   That's kind of an example of it.  Do you have
7  any questions about the scheme or -- of the procedure
8  or the special issues that we have?
9    A.   No, not at this time.
10   Q.   Okay.  Now, you teach business over at the
11 school?
12   A.   I teach introduction to business, web
13 mastering and multimedia.
14   Q.   I'm sorry, I didn't hear that last part.
15   A.   Multimedia.
16   Q.   What's that?
17   A.   We do a little bit of everything in that
18 class.  We do some desktop publishing, we do some
19 creating graphics, we do animation --
20   Q.   Boy, --
21   A.   -- presentations.
22   Q.   -- things sure changed since I was in high
23 school.  We didn't have that stuff.  When Mr. Jones
24 and Mr. Garza were in high school, I think they taught
25 them hieroglyphics on the wall, you know, as a

281

1  caveman.  Oh, I'm sorry.  I couldn't resist that.  No,
2  they're good guys, I was just teasing them, but -- but
3  so it's -- it's really changed a lot.  It's not just
4  business administration, it's other things, too.
5      A.   No, it's definitely changed quite a bit.
6      Q.   Good.  You like doing that kind of work?
7      A.   Yes, I do.
8      Q.   Tell me about your -- you're a Catholic, but
9  you disagree with the Church's position on that.  Can
10  you expound on that a little bit?
11      A.   It's just... I really can't.  I don't know
12  how I -- I just do.
13      Q.   Okay.  Well, and that's fine, I mean, I
14  understand --
15      A.   I know, it doesn't make a lot of sense,
16  because I'm not in favor of abortion, but yet, I
17  support the death penalty.
18      Q.   Well, you're not the only Catholic that's
19  told us that.  Sometimes Catholics will come in and
20  say, "Look, I believe in the Church teachings and I
21  try to follow them.  In this area, we disagree.  We
22  agree to disagree."
23      A.   That's -- that's pretty much it.
24      Q.   That's pretty much it.  And you feel that
25  way.  Okay.  And, again, there's no right or wrong

282

1  answer.
2      A.   Yes.
3      Q.   I'm not saying one way or the other.  I'm
4  just...
5      A.   Just what I believe.
6      Q.   Sure.  Now, a couple of legal questions I
7  want to go over with you is, first of all, the
8  indictment.  The fact that the person has been charged
9  with a crime doesn't mean he's guilty of the crime.
10      A.   Correct.
11      Q.   Do you believe that?
12      A.   Yes.
13      Q.   And you won't hold that against him that he's
14  been indicted, that doesn't mean he's guilty, right?
15      A.   Correct.
16      Q.   Sometimes people stay, "Well, he's there, he
17  must be guilty."  Well, you know, until you hear all
18  the evidence, you can't make that decision.
19      A.   Correct.
20      Q.   So do you agree with me, as he sits there
21  right now he's presumed innocent?
22      A.   That's correct.
23      Q.   And we have to prove he's guilty.  And the
24  same thing is some people say, "Well, I want to hear
25  his side of the story.  I want to hear him testify.

283

1  What's he going to say," and we have to tell them,
2  "The Judge will give you an instruction that says the
3  Fifth Amendment says you can testify if you want to,
4  but you don't have to testify, and you can't hold that
5  against the person."
6          You understand the Fifth Amendment?
7      A.   Yes.
8      Q.   And you won't hold it against him if he
9  doesn't testify, correct, if that's what the Judge
10  tells you?
11      A.   If that's what the Judge tells us to do.
12      Q.   And "beyond a reasonable doubt" is the
13  standard in this case.  And that's the standard in
14  every case, whether it's a D.W.I. or capital murder,
15  the State always has that standard.  And it's not
16  necessary -- I guess, the main thing I need to tell
17  you is it doesn't mean beyond all doubt, beyond a
18  shadow of a doubt, beyond any doubt.  I mean, there's
19  no way I could prove this case to you a hundred
20  percent --
21      A.   Correct.
22      Q.   -- unless you were, like, a witness and saw
23  the whole thing, then you couldn't be on the jury.
24  So, you only hold me to beyond a reasonable doubt,
25  correct?

284

1      A.   Correct.
2      Q.   I like to tell people it's kind of a two-step
3  process.  First of all it asks do I have a doubt, and
4  then if you have a doubt, ask yourself is it a
5  reasonable doubt?  In other words, there may be an
6  inconsistency here or there.  You know, somebody says,
7  "Well, it happened at 7:00," and somebody says, "It
8  happened at 7:15," and somebody else says, "It
9  happened at 7:10."  Well, there may be an consistency
10  about what exact time it happened, but did it happen?
11  You see what I'm saying?
12      A.   Yes.
13      Q.   Do you have any questions about anything?
14      A.   You-all said this was going to take
15  approximately two weeks?
16      Q.   Yes.
17      A.   Is that from opening arguments to closing
18  arguments, or is that also you're guessing on how long
19  deliberations would be?
20      Q.   We are guessing that's how much the -- long
21  the evidence will take.  It may only take a week.  We
22  built in some extra time.  We don't think it's going
23  to take necessarily two weeks, but I will tell you,
24  deliberations you can never tell.
25      A.   Correct.

285

1    Q.   Some juries take an hour to make a decision,
2    sometimes jurors take three days to make a decision.
3    But I think we're all agreed that the evidence is such
4    that it's -- you're not going to be tied up here for
5    weeks and weeks.  We think it will be through in two
6    weeks.
7    A.   Okay.
8    Q.   Any other questions?
9    A.   Not at this time.
10   Q.   Okay.  The bottom line is you think you can
11   be fair and impartial?
12   A.   I think so.
13   Q.   Listen to everything and make a decision
14   based only on the evidence?
15   A.   Yes.
16   Q.   And once you make a decision, can you follow
17   through with it?
18   A.   I believe so.
19   Q.   Thank you for your time, Ms. O'Brien.  I'll
20   let the Defense attorneys talk to you now.
21              VOIR DIRE EXAMINATION
22   BY MR. JONES:
23   Q.   Where do you teach?
24   A.   Calallen High School.
25   Q.   In my years as a -- as a trial lawyer, there

286

1    are two times of the year where there are two classes
2    of people who do not want to be called for jury
3    service.  One, there are farmers in the springtime or
4    in harvest time.  And the other are teachers at the
5    first day of school or for final exams.
6    A.   That's correct.  This trial is taking part
7    right before my semester exams.  It would be much
8    easier for me to serve in the summer.
9    Q.   What -- tell -- this case is -- this case has
10   started.
11   A.   Correct.
12   Q.   Jury selection.  And we never know how long
13   this will take, but just from past experience in this
14   county, the trial, including the verdict, you know,
15   the decision-making process, probably would end the
16   first week of December, very longest the second week
17   of December.  Assume the worst, okay?  When is your
18   finals?
19   A.   That third week of December.
20   Q.   Third week in December.  Okay.
21   A.   I have no idea what I'd do with my classes if
22   I was out for two weeks.
23   Q.   Two weeks before the final exam?
24   A.   Two weeks before semester exams.
25   Q.   Okay.  Now, all right, here -- I'm going to

287

1    ask the big question.
2    A.   Uh-huh.
3    Q.   See, the Judge just stood up.
4              THE COURT:  I'm just stretching.  I'm
5    just stretching.
6              MR. GARZA:  It's fixing to get deep in
7    here.
8    Q.   (BY MR. JONES)  Well, it -- it's very
9    interesting in -- the difference between in -- Judge
10   Galvan was a United States -- Assistant U.S. Attorney
11   at one time.  In federal court, if during jury
12   selection, I know in Judge Head's Court, if one of the
13   jurors says, "I'm a farmer," or, "teacher," he says,
14   "You're excused."  He just lets you go, you know?  In
15   state law it's not so easy.
16              But, in order for a juror to be -- to
17   fully perform his duties, okay, especially in a case
18   like this, you have to be able to give it your
19   undivided, full attention.
20   A.   Correct.
21   Q.   Sometimes the jury summons comes at the wrong
22   time.  You can imagine all the different situations.
23   Somebody's about to have a baby or they started a new
24   job, crops need planting, crops need, you know,
25   harvesting, first day, and so forth, okay?  Now, what

288

1    I would -- the only thing -- and you've got to be
2    honest with us, here.
3    A.   Uh-huh.
4    Q.   If this case should drag on until, you know,
5    the second week of December, that's going to be the
6    most important part of the case.  You may be hearing
7    -- you may be at the punishment stage of this case.
8    You're going to be hearing evidence and you're going
9    to have to be deliberating with 11 other people about
10   whether you give a life sentence or a death sentence.
11   A.   Yes.
12   Q.   And I can tell you from trying cases of this
13   kind in the past, that sometimes these jurors, when
14   they finish with one of these verdicts, they're --
15   they're worn out, you know, mentally worn out.
16   A.   Yes.
17   Q.   Sometimes they come out crying, or, you know,
18   they're just -- they put so much into it to try to
19   reach -- try to make the right decision.  So, how long
20   have you been teaching?
21   A.   20 years.
22   Q.   Okay.  Well, you're a veteran, and so you
23   know -- you know what's required of yourself.
24   A.   Yes.
25   Q.   If -- in the worst possible scenario, if we

289

1 get into that second week in December, are you going
2 to be distracted?
3     A. It will be tough.
4     Q. Okay. You didn't give me a straight answer.
5     A. Part of it will be -- depend upon the
6 behavior of my students while I'm gone because I've
7 never been out for two weeks, and, normally, when I am
8 out, I do not allow my students on the computers. And
9 I really don't know what I'm going to do with them if
10 I am out for two weeks.
11     Q. Okay.
12     A. You know, --
13     Q. Can you tell me --
14     A. -- especially right before semester exams.
15     Q. Can you tell me, beyond a reasonable doubt,
16 that you would not be distracted?
17     A. That I would not be distracted? No.
18     Q. Okay. And it's not your fault, you know,
19 like you say, that you say the jury summons comes in
20 January, no problem, you know, you can do it?
21     A. Yeah, in the summer, no problem.
22     Q. In the summer, no problem.
23     A. But I -- I -- you know, I'll be honest with
24 you, no, I cannot guarantee that I would not be
25 distracted. If I am selected, most likely I will be

290

1 on campus either before jury or after court, one of
2 the two, --
3     Q. Okay.
4     A. -- probably every day.
5     Q. All right. So you'd be keeping long hours.
6     A. Certainly.
7     Q. Sometimes we have jurors that work -- have
8 real important jobs. They work at night, for example,
9 and they -- they come to court, they're so tired they
10 can hardly, you know, sit up in their chair.
11     A. The educational process is not going to stop
12 just because --
13     Q. Oh, I know it's not.
14     A. -- I'm not in the classroom. I mean, --
15     Q. No, but see --
16     A. -- I can't let it happen.
17     Q. No, but just -- the students that you have,
18 they only come your way one time. That's your class
19 --
20     A. That's correct.
21     Q. -- and you want them to come and go --
22     A. I don't want to see them, again.
23     Q. -- with the best possible result. That's
24 right. You agree with that.
25     A. Yes.

291

1     Q. In other words, if -- if it would make you
2 feel bad if they got shortchanged because of --
3 because of this.
4     A. Yes.
5     Q. I mean, it's not like you're intentionally
6 shortchanging them, it's just that --
7     A. Correct.
8     Q. -- the fact --
9     A. Correct. I want to be fair to them, just
10 like I'd want to be fair, you know, on a jury.
11     MR. JONES: Okay. Can we have a
12 preliminary hearing?
13     THE COURT: Uh-huh.
14     MR. SKURKA: Judge, I'd like to follow-up
15 before we do that.
16     THE COURT: Okay. Go ahead.
17         VOIR DIRE EXAMINATION
18 BY MR. SKURKA:
19     Q. Ms. O'Brien, --
20     A. Yes.
21     Q. -- I understand when you say, "distracted,"
22 because I get that a lot from teachers, too, when I'm
23 picking juries. And generally speaking, it's -- I
24 will admit to you, you're usually -- you're one of the
25 exceptions. Usually the kids -- the teachers for the

292

1 first graders, they don't want to be away from the
2 kids, but if they're a middle school teacher, they
3 want to be away from their kids. And if they're high
4 school teachers, they figure they can take care of
5 themselves. That's just what I've seen.
6     A. Part of the problem is I teach specialized
7 classes. No one else knows my software. So even if I
8 let my kids on the computer, no one else can answer
9 their questions for them.
10     Q. Well, that was what I was going to follow-up
11 in because when I was in high school, we had
12 substitute teachers. There was others people that
13 could come in and --
14     A. Correct.
15     Q. -- and carry the ball while you're gone for a
16 short time. And Mr. Jones is right, we've had people
17 that have jobs and they -- basically, we say, "How is
18 this going --"
19     A. Yes.
20     Q. "-- to effect your job," and they say, "Well,
21 it's going to be tough. I'm just going to have to go
22 in a couple of hours at night, you know, put in my
23 orders or do my -- my supervising job, or do some kind
24 of work at home," and -- and, you know, I'll tell you
25 lawyers do that, too.

293

1    A.   Right.

2    Q.   We come -- I was here at work yesterday for a

3  couple of hours, even though the office was closed.

4  So we all know about working outside.  My question is

5  this, and I understand it's a distraction, because you

6  probably saw that very first day, people were coming

7  up to the Judge and say, "Look, Judge, I run my own

8  business --"

9    A.   Yes.

10    Q.   "-- and, you know, we'll have to shut down if

11  I'm not there."  And then other people will come up

12  and say, "Well, Judge, you know, it's real important

13  to my company that I'm there," and the Judge says,

14  "How many people are in your company," and they'll

15  say, you know, "Ten," and he'll say, "Well, they can

16  get along without you for a little while."

17            So I guess what I'm trying to figure out

18  is because you seem to be a qualified juror, I mean,

19  is it -- is it going to be such a distraction that

20  it's really going to substantially interfere with you

21  being on this jury?

22    A.   It -- it would be tough.

23    Q.   Well, does that mean --

24    A.   Because I --

25    Q.   -- that you would not listen to the evidence

294

1  and you would just be thinking about, you know, "Well,

2  how am I going to teach Homer in seventh period if I'm

3  not there," or is it going to be that, you know, it's

4  a nagging thing, because we all have other --

5    A.   Correct.  It is --

6    Q.   -- you know, all the jurors have other jobs,

7  and things --

8    A.   Right.  It's -- I'm not saying --

9    Q.   -- that they need to --

10    A.   -- it's not inconveniencing anybody that's

11  picked on a jury, unless maybe they don't have a job.

12  It's going to be an inconvenience.  It's a disruption

13  in their lives.

14    Q.   Sure.

15    A.   Like I said, I have not idea what I'm going

16  to have my kids do if I'm gone for a week or two.

17  I'm --

18    Q.   What have you done since -- remember, the

19  first day, a couple of weeks ago --

20    A.   Yes.

21    Q.   -- when we first met and the Judge told us

22  kind of what the --

23    A.   Correct.

24    Q.   -- schedule would be, did you go --

25    A.   I've been --

295

1    Q.   -- to your principal and say, "Look, you

2  know, there's a chance I may get called on this.  What

3  are we going to do"?

4    A.   Yes.  And she said, "Don't get picked."

5    Q.   She said that?  Well, it must be nice to be

6  so valuable.

7    A.   I'm not saying I'm an excellent teacher.  I

8  feel that I'm a good teacher, but I teach specialized

9  courses and, I can tell you, we don't have a sub that

10  knows my subject area.  No one else in my department

11  knows my subject area.  And -- so I can tell you, I

12  honestly don't know what I'm going to do with my

13  classes for two weeks that I'm -- I have been trying

14  to think of it, you know, coming up with ideas in case

15  I was picked, I decide, you know, here's going to be

16  my lesson plans for two weeks and what they can do

17  when I'm not there, or -- I even thought about, you

18  know, they can leave me notes every day on the board

19  and I go in and answer them every evening.

20            But, yeah, I'm just being honest, it's

21  going to be tough if I am out for two weeks.

22    Q.   So the bottom line is you think it will

23  substantially interfere with you?

24    A.   I think it would interfere with my...

25            MR. SKURKA:  Okay, thank you.

296

1            THE COURT:  All right.  Why don't you

2  wait in the jury room for just -- just a minute.

3            VENIREPERSON NO. 33:  Sure.

4            THE COURT:  I'm going to talk to these

5  lawyers.

6            (Venireperson exits courtroom.)

7            THE COURT:  All right.  Mr. Jones?

8            MR. JONES:  We move to strike her for

9  cause, because of her -- her employment.  And she's

10  said she couldn't give this task her full attention.

11  It's strictly the problem with teachers.

12            MR. SKURKA:  Well, I -- I don't think

13  she's arisen to that, Judge, because, you know, being

14  a distraction is one thing.  But I'm going to make it

15  easy --

16            THE COURT:  All right.

17            MR. SKURKA:  -- for the Court --

18            THE COURT:  But you asked her.

19            MR. SKURKA:  -- and I'm going to agree.

20            THE COURT:  I mean, even on -- even on

21  your part of it, she said, "I think it would be a

22  problem."

23            MR. SKURKA:  She kept saying said, "I

24  think it will be a problem.  I don't know.  It's a

25  distraction."

297

1    THE COURT: All right.

2    MR. SKURKA: But I'll agree --

3    THE COURT: All right.

4    MR. SKURKA: -- just to be nice.

5    I wish you would have brought that up a

6  long time ago, so I wouldn't have spent so much time

7  with her.

8    THE COURT: All right, let's take a

9  break.

10    (Short recess.)

11    (Venireperson enters courtroom.)

12    THE COURT: Okay. All right.

13  Ms. O'Brien.

14    MR. SKURKA: You're not in trouble. She

15  thought she was in trouble, Judge, being called to the

16  principal's office.

17    VENIREPERSON NO. 33: Right.

18    THE COURT: Called to the principal's

19  office. Well, actually, we've agree to let you go,

20  all right?

21    VENIREPERSON NO. 33: Thank you.

22    THE COURT: And maybe you can give us

23  some service over the summer one day or at a better

24  time of the year, okay?

25    VENIREPERSON NO. 33: Yes. Thank you

298

1  very much.

2    THE COURT: All right.

3    MR. JONES: Get your legislators to

4  change the law to give you an exemption.

5    VENIREPERSON NO. 33: That would be nice.

6    THE COURT: All right, let's take a

7  little break.

8    (Short recess.)

9    (Venireperson enters courtroom.)

10    THE COURT: All right. Come on in Mr.

11  Starkey. You are Kenneth Starkey. Have a seat over

12  here, please.

13    VENIREPERSON NO. 31: Yes, sir.

14

15    VENIREPERSON NO. 31,

16    KENNETH LEE STARKEY,

17    VOIR DIRE EXAMINATION

18  BY THE COURT:

19    Q.   All right, Mr. Starkey, we're here to talk to

20  you about some stuff, okay? First of all, we're --

21  obviously, you know, we're looking to pick a jury,

22  okay?

23    A.   Yes, sir.

24    Q.   And what we're looking to do is pick a jury

25  that can keep an open mind, all right? We don't want

299

1  people that have already closed their minds or made up

2  their minds before they've heard anything. You agree

3  with that, right?

4    A.   Yes, I do.

5    Q.   That wouldn't be fair, right?

6    A.   Right.

7    Q.   So what I need to know from you is that you,

8  are you somebody that can keep an open mind or have

9  you seen something or heard something in the news

10  about this case that, you know, you've already made up

11  your mind one way or the other?

12    A.   Well, when you told me, in other words, not

13  to pay any attention to the news or do anything, I

14  didn't -- I stopped watching the news.

15    Q.   Okay.

16    A.   I just stuck to watching movies.

17    Q.   Okay. Well, that's fine, but -- but maybe

18  you heard something beforehand.

19    A.   No.

20    Q.   Okay. So you can keep an open mind.

21    A.   Yes, sir.

22    Q.   All right. Next thing, let's talk about the

23  law. The law is that in every criminal case in this

24  country, it is the burden of the State, because they

25  bring the charges, to prove the case.

300

1    A.   Right.

2    Q.   All right? So -- and that's no different

3  here, okay? It's the State's burden. You state --

4  the law says, "State, you bring your charges. That's

5  fine, but you got to prove them. You don't just get

6  to say -- you know, you don't get to just accuse

7  someone and then it's true, okay? You charge them,

8  you prove it." And until that happens, the Defendant

9  over here, really all of us, all of us as people here

10  in this country, are innocent, until they prove it, if

11  they can.

12    Do you agree about with that?

13    A.   Yes, I do.

14    Q.   And would you presume that -- that the

15  Defendant is innocent until they've proven, if they

16  can, that he's guilty?

17    A.   That's what the -- what's what the country is

18  based on. I'm innocent until proven guilty.

19    Q.   Absolutely. But, you know, there's some

20  people that don't feel that way.

21    A.   Well, they are -- they're wrong.

22    Q.   They are wrong. And there are places in the

23  world where the opposite is true. And I -- I submit

24  that's not any place I want to live.

25    A.   No.

301

```
1    Q.   Okay? So that's how we do it here, innocent
2  till proven guilty.  And you have told me that you can
3  follow that law.
4          Now, let's see here, you have not been a
5  juror before.
6    A.   No, sir.
7    Q.   Which, that's okay.  The burden of proof is
8  on the State, but the -- the burden is beyond a
9  reasonable doubt, okay?  We don't have a definition of
10 what that is, but it is the highest burden that we
11 have in all of the law, criminal or otherwise, okay?
12 What it is not is beyond all doubt or beyond a shadow
13 of a doubt, but it is beyond a reasonable doubt, okay.
14         Would you hold the State to that burden,
15 no more, no less?
16   A.   No more, no less.  They got to prove it, they
17 got to prove it.
18   Q.   They got to prove it.  But some people would
19 say, "I hold them to a higher burden," or, "You know
20 what, that seems too high to me.  I hold them to a
21 lesser burden."  Would you follow the law on that
22 issue?
23   A.   I'll follow the law on that issue.  I mean,
24 you got to prove it, you got to prove.
25   Q.   That's it.
```

302

```
1    A.   And if you can't prove it, hey.
2    Q.   If you can't prove it, that's it, he walks,
3  goes home.  Okay.
4          Now, let's get to -- let's get to the
5  type of crime.  This is a capital murder, okay?  Well,
6  what's capital murder?  Well, you have murder, which
7  is the intentional taking of the life of another.  And
8  then you have capital murder, which is sort of like
9  murder plus.  The legislature has said that certain
10 types of murders because of the way they are
11 committed, or -- or the circumstances, are capital
12 murder.  And what's a capital murder?  Well, that
13 means the death penalty is a possibility.
14         Now, in this particular case, they're
15 alleging capital murder because they allege, that is
16 the State, that a murder was committed in the course
17 of committing or attempting to commit a robbery, okay?
18 So we have robbery or attempted robbery, plus the
19 murder, okay?  And for the State to prevail on a
20 capital murder or for them to get a capital murder
21 conviction they got to prove all of it.  You follow
22 me?
23   A.   Okay.
24   Q.   They don't just get to prove murder and then
25 say, "Okay, well, that's good enough.  Find him guilty
```

303

```
1  of capital murder."  No.  Now, you may be submitted
2  lesser included, that is, we may submit to you
3  murder, we may submit to you robbery, we may submit to
4  you attempted robbery.  That's unclear at this point.
5          But nonetheless, for the State to prevail
6  on the charge of capital murder, as they've alleged,
7  they've got to prove it all.  Would you hold them to
8  that burden to prove it all?
9    A.   Yes, I would.
10   Q.   Okay.  In other words, there's a number of
11 elements to capital murder and they don't just get
12 seven out of eight or eight out of nine, I don't
13 exactly what the number is, they got to run the table
14 on the deal to win.  You understand that?
15   A.   (Nods head.)
16   Q.   And you would hold them to that?
17   A.   (Nods head.)
18   Q.   Yes?
19   A.   Yes, I would.
20   Q.   All right.  Now, in a capital murder case,
21 assuming that there is a conviction, there's two
22 possibilities, life or death, okay?  But the jury
23 doesn't say life or death.  They don't -- they don't
24 go back and vote that way.  Doesn't work like that.
25 We have two parts of a trial in criminal law in Texas.
```

304

```
1  First part, guilt or innocence.  All the jury does is
2  they sit and listen to whether the State can prove
3  beyond a reasonable doubt this Defendant is guilty or
4  not guilty.  All right?
5    A.   Okay.
6    Q.   Defense doesn't have to do anything.  They
7  may present some evidence, they may not.  Jury hears
8  closing arguments.  I read to you the Charge, which is
9  the packet of law, kind of like an instruction manual.
10   A.   All right.
11   Q.   You go back there and you deliberate and you
12 decide whether the State's proven their case beyond a
13 reasonable doubt.  If the jury doesn't think so, and
14 they think Defendant's not guilty, they acquit him and
15 that's the end of the case, okay?  If, however, the
16 jury believes that the State has proven beyond a
17 reasonable doubt Defendant is guilty of capital
18 murder, we go on to the second phase, okay?  That's
19 the punishment phase, but we don't -- we don't -- like
20 I told you, the jury doesn't say death or life.
21   A.   Right.
22   Q.   Okay?  They answer questions.  And there's
23 question No. 1 right there over your right shoulder.
24 "Is there a probability that the Defendant would
25 commit criminal acts of violence that would constitute
```

305

1    a threat -- a continuing threat to society?"  And the
2    jury would answer yes or no, okay?
3        A.   All right.
4        Q.   You with me?
5        A.   Okay.
6        Q.   Okay.  Then if that -- once that's done, then
7    the jury answers the second question.  And I just
8    dropped it on myself.
9             All right.  "After taking into
10   consideration all of the evidence, including the
11   circumstances of the offense," which is the first part
12   of the case, --"
13       A.   Right.
14       Q.   " -- the Defendant's character and background
15   and the person's moral culpability, is there
16   a sufficient mitigating circumstance or circumstances
17   to warrant a sentence of life imprisonment, rather
18   than a death sentence be imposed," okay?
19       A.   Right.
20       Q.   So, basically, what is a mitigating
21   circumstance or circumstances?  I don't know.  That's
22   for the jury to decide.  Maybe -- maybe this is the
23   only bad thing he's ever done in his life.  Maybe he's
24   done a bunch.  Maybe he's got a big criminal history,
25   maybe he doesn't.  Maybe he's been a good person.

306

1    Maybe he's done a lot for the community, you know?
2    These are all things that you can consider, all right,
3    but it's up to the jury to determine what mitigating
4    circumstances are.
5        A.   Right.
6        Q.   You follow me?
7        A.   (Nods head.)
8        Q.   All right.  Now, then the jury would be asked
9    to answer this yes or no, okay?
10       A.   (Nods head.)
11       Q.   You with me?
12       A.   Yeah, I'm with you.
13       Q.   Okay.  Now, at the beginning of this trial, I
14   am going to ask the jurors to raise their right hand.
15   The jurors will take an oath, and the oath will be,
16   "Do you solemnly swear that you can render a true
17   verdict based upon the law and the evidence presented
18   to you?"  I suspect they'll say yes.
19            What I'm asking you is that very
20   question.  Can you take that oath in this case?
21   Because some people say, "Well, no, I can't take that
22   oath because I could never participate in a process
23   that could lead to the death penalty," okay?  And then
24   other people might say, "Well, you know, I -- I could
25   participate in such a process, but if I found him

307

1    guilty of capital murder, these questions mean nothing
2    to me.  I would always -- I would always answer them
3    in such a way that he'd get the death penalty because
4    I would -- I would never consider life.  I would never
5    consider all this mitigating stuff you're talking
6    about.  Just not going to do it."
7             So I need to know from you, could you
8    deliberate on guilt or innocence and could you
9    truthfully answer these questions?
10       A.   Yes, I can truthfully answer those questions,
11   and, yes, I can...
12       Q.   Consider all the evidence and --
13       A.   Uh-huh.
14       Q.   -- and wait before you make a decision on
15   guilt or innocence?
16       A.   (Nods head.)
17       Q.   Yes?
18       A.   I took an oath to defend this country, so I
19   can take a oath to do what I need to do as my civil
20   duty.
21            THE COURT:  Okay.  All right.  Well, I'm
22   going to turn the floor over to Mr. Skurka and he's --
23   goes first, because he's got the burden of proof.
24
25

308

1             VOIR DIRE EXAMINATION
2    BY MR. SKURKA:
3        Q.   Hi, Mr. Starkey.
4        A.   How you doing?
5        Q.   As the Judge introduced me, my name is Mark
6    Skurka.  This is Geordie Schimmel.  We're both
7    assistant D.A.s, and we'll be the ones presenting this
8    case to you on behalf of the State, if you're selected
9    on this jury.
10            I want to start off by telling you
11   there's no right or wrong answers to anything you say.
12   Just answer the questions how you feel or how you --
13   what your true feelings are and no one's going to
14   argue with you or anything.  We just want to know what
15   you feel, okay?
16       A.   Okay.
17       Q.   I'm going to ask you to move that microphone
18   just a little bit closer to you because you kind of
19   have a soft voice.  I want to make sure we all hear
20   you.
21       A.   All right.
22       Q.   Okay, thank you.  And that's the first
23   question I want to talk to you about because one of
24   the big issues in this case -- I think it's going to
25   be a big issue in this case -- is whether or not this

309

1    Defendant is going to get the death penalty or not. I
2    told you at the very beginning, you know, the State is
3    going to ask for the death penalty. After you hear
4    all the evidence, and everything, there's going to be
5    a point -- come to a point that that may happen.
6         I want to know how you feel about the
7    death penalty. You just tell me, in your own words.
8    A.   Well, I did write that down in that brief,
9    okay. I do believe in the death penalty but because I
10   also a church goer and I also believe in the Bible,
11   that it's wrong to do that. But I know in society,
12   sometimes we have to render some type of judgement, if
13   that's the case. But I'll do what I have to do.
14   Q.   It sounds to me -- and I don't want to put
15   words in your mouth --
16   A.   Right.
17   Q.   -- but it sounds to me like you're saying, "I
18   believe in the death penalty. My church says you're
19   really not supposed to take a life --"
20   A.   Right.
21   Q.   "-- but the law of the land is the law of the
22   land."
23   A.   Yes.
24   Q.   Is that a good way to say it or you --
25   A.   It's not a good way to put it, but --

310

1    Q.   You tell me how you feel.
2    A.   It's not a good way to put it, but these are
3    the laws I have to live with, okay? And, yeah, I can
4    say, yeah, I believe everything that the Bible tells
5    me and I'm not supposed to do this that or other, but
6    in life -- I'm not trying to sound like a hypocrite,
7    okay, but I got to do what I need to do because I live
8    in this world. And that's the bottom line, you know?
9    Q.   And you live in a country --
10   A.   And I live in a country that --
11   Q.   -- that has this law.
12   A.   -- that has this law.
13   Q.   And so you -- I guess, you're -- you feel
14   obligated or duty-bound to uphold that law.
15   A.   Yes, I do.
16   Q.   Okay. Is that going to cause you any, oh, I
17   don't know, ill feelings about it, you know, or
18   thinking that maybe you're going against your church's
19   teaching or -- or something like that, or no?
20   A.   Either way I can look at it, I can say,
21   "Yeah, I'm going against what the church is teaching,"
22   you know, because that -- that -- because I believe in
23   the Bible, but like I said, again, I still believe in
24   the law of the land, you know, and we got to work with
25   what we got to deal with.

311

1         I'm not going to have no ill feelings, as
2    per se. I'm not going to feel guilty, I have to do
3    my -- my civil duty, you know, but that's just
4    something I'm going to have to deal with the Man
5    upstairs when I get to see him, and He's going to be
6    the Judge against me, okay? That's what I have to
7    deal with.
8    Q.   Uh-huh. Because I was looking at your
9    questionnaire and it did say your church is against
10   the death penalty, but you disagree, and that you said
11   something about it, you know, we have to honor the law
12   of the land, and I -- I think a lot of people feel
13   that way. I don't think it's just necessarily your
14   religion. There's some people, like, who are
15   Catholics, for example. The Pope says, you know,
16   we're against the death penalty or the Church is
17   against the death penalty, but then I've had a lot of
18   people come up to me and say, "Well, you know, I'm
19   Catholic, but I believe in the death penalty, because
20   it's the law, and, you know, I may disagree with the
21   Church on that one bit, because I think I need this.
22   It's not that I'm rejecting the Church's teachings --"
23   A.   That is correct.
24   Q.   "-- I just can't agree with that one." But
25   that's kind of --

312

1    A.   That's kind of the way, yeah.
2    Q.   Okay. And there's nothing wrong with that, I
3    just need to know because some people are -- are
4    different. And there's no right or wrong answer, but
5    some people say, "You know, Mr. Skurka, I'm sorry, but
6    I'm just not going to be able to sleep nights, and --
7    and, you know, I feel bad going to church knowing that
8    I participated in this decision. I'm not going to be
9    able to face my pastor or my priest, or whatever."
10        That's not going to be you, though,
11   right?
12   A.   No.
13   Q.   Okay. You see where I'm coming from --
14   A.   Yeah, I understand.
15   Q.   -- because we need to know this because some
16   people, they say, "Yeah, I can do it," but then, in
17   the back of their mind, I don't want it messing up
18   their lives and thinking --
19   A.   It's an internal -- it's an internal thing
20   for certain people, and it might be something internal
21   for me. But, like I said, God going to have to really
22   have judgment against me, --
23   Q.   Well, --
24   A.   -- if that's the case.
25   Q.   -- say, for example, you were in the military

313

1   for 21 years.
2       A.   Yeah.
3       Q.   If were you in a war and you killed somebody?
4   I had to -- to protect my unit, or to protect my life
5   or to go out there and, say, like what's happening in
6   Iraq and Iran right now.  I mean, they going to have
7   to go out there to fight to protect some people that
8   they don't even know.
9       Q.   And if their church --
10      A.   And even --
11      Q.   -- says --
12      A.   -- even if their church says that even -- in
13  the Bible it say -- what some of the guys take with
14  them because I had a little green Bible what I took
15  with me every time I was out, you still got to do what
16  you got to do.
17      Q.   Okay.
18      A.   And it's -- so I may have some reservations
19  about it, but when it gets down to it, if there's
20  somebody shooting at you and you're shooting back
21  because you're trying to protect yourself while you
22  got a wounded man right there, you're trying to take
23  care of yourself and this individual, you're going to
24  do what you have to do.
25      Q.   Well, war is a certain thing.  The Court --

314

1       A.   It's a difference.
2       Q.   This is different, but it's still taking a
3   life.
4       A.   Right.
5       Q.   But it's taking life, not just --
6       A.   Not just --
7       Q.   -- willy-nilly.  I mean, --
8       A.   No.
9       Q.   -- we're going through a courtroom.  We've
10  got laws to uphold.  He has good lawyers to defend
11  him, and it's up to these 12 folks to make a decision.
12      A.   That is correct.
13      Q.   So it's okay with you to follow the law,
14  then?
15      A.   Yes.
16      Q.   Okay.  And -- and you see, I'm not trying to
17  belabor the point, but you see where I'm coming from?
18      A.   Right.
19      Q.   I want to make sure that you don't just say
20  "Well, yeah, I believe in the death penalty.  I think
21  it's good, but I don't know if I can carry it out."
22  And that's kind of what I'm looking at because that's
23  him.
24      A.   I understand.
25      Q.   Look at him, that's John Henry Ramirez.

315

1       A.   I understand.
2       Q.   Not somebody out there in, you know, you hear
3   about it in T.V. land or something like that.  There
4   may become a time because I told you the very first
5   first day, our office has decided to seek the death
6   penalty in this case.  So there's going to be a time
7   when I'm going stand in front of these 12 jurors and
8   I'm going to ask them to find him guilty based on the
9   evidence, and I'm going to ask them to give him the
10  death penalty, answer the question in such a way he'll
11  get the death penalty based on that evidence.
12           And I just want to make sure you can --
13  you can carry it through, if you think that's what's
14  appropriate in this case.  Can you do that?
15      A.   Yes, I can.
16      Q.   Well, I'm going to turn it around on you,
17  now, because the other answer is if you think that the
18  State doesn't prove the case, can you find him not
19  guilty?
20      A.   Yes, I can.
21      Q.   All right.  And if -- if you hear the
22  evidence and think he should get a life sentence, can
23  you give him a life sentence?
24      A.   Yes, I can.
25      Q.   It sounds to me like you want to carefully

316

1   consider everything before you make --
2       A.   Before I do anything.
3       Q.   -- any decision.  Because I can guarantee you
4   no one wants to be on a jury to make that of awesome
5   decision.
6       A.   No, because you're dealing with somebody's
7   life right there.
8       Q.   And you're right.  But you also are dealing
9   with upholding the law of the land, --
10      A.   Of the land.
11      Q.   -- too.  So it's like -- we had a juror
12  earlier say, "Look, I'm not going to be running to be
13  first in line to be on this jury, but if have to do my
14  civic duty, I have to do my civic duty."
15      A.   That is correct.
16      Q.   So you kind of feel that way, too.
17      A.   That's the truth.  I mean, hey, nobody wants
18  to ran and say, well, this, that or the other.  I'd
19  sit here like, "Man, I don't know."  But, no, you got
20  to do your job.
21      Q.   Well, see, we have people -- and I'm not
22  saying there's nothing wrong with them -- anything
23  wrong with them, but they'll say, "Yeah, I believe in
24  the death penalty, Mark.  I believe that it's good
25  law.  I believe we should do this, in bad cases we

317

1     should do it," and then they'll say, "But don't make

2     me do it.  Don't make me sit there and do it."

3         A.   Right.

4         Q.   And that's -- and that's what I'm looking

5     for.  You may agree with it, but if you can't do it,

6     you need to let us know.  But you think you can do it

7     if it's necessary?

8         A.   If it's necessary, yes.

9         Q.   Okay.  Tell me what you've heard of -- what

10    you thought -- first thought when you heard that this

11    was a death penalty case, when you came in that --

12    remember, that day where --

13        A.   Uh-huh.

14        Q.   -- we had like 2- or 300 people in here and

15    most people -- we didn't know what it was, or they

16    didn't know what it was till the Judge came and said,

17    "This is a capital murder case.  This Defendant is

18    charged with capital murder --"

19        A.   Right.

20        Q.   "-- and if you're on this jury, you may have

21    to make that ultimate decision."  What was your first

22    reaction to that?

23        A.   Well, anybody would -- well, for me, I said,

24    "What did I walk into or what I got selected for?"

25        Q.   Uh-huh.  It is a surprise.

318

1         A.   Yes.

2         Q.   Okay.  After that initial surprise wore off,

3     what did you think?

4         A.   Well, like I said and told you earlier, that

5     if that's what I got to do, that's what I got to do.

6         Q.   So, it sounds like you're a person that does

7     his duty, being in the military for so long, and this

8     is a duty as a citizen, --

9         A.   Yes.

10        Q.   -- a civic duty.  And you were in the Navy as

11    a chief petty officer?

12        A.   Yes, I was.

13        Q.   Is it true the chief petty officers really

14    are the ones that run the Navy?

15        A.   Chief petty officers run the Navy, run ships,

16    run commands.

17        Q.   I'm joking with you.

18        A.   I know.

19        Q.   I know they're the backbone.  It's just like

20    in the Army, they say, what do you call the sergeants,

21    or something weird like that?

22        A.   The sergeants, something like that.

23        Q.   But the C.P.O.'s the ones that run the Navy.

24    So that's a lot of responsibility.  You did that for

25    21 years.

319

1         A.   21 years.

2         Q.   And then now you work at CCAD over here and

3     everything.

4         A.   That is correct.

5         Q.   Tell me about the time -- you said -- but it

6     also said you worked at a prison or a community

7     correctional facility in Louisiana --

8         A.   Yes, I did.  It was --

9         Q.   -- for about a year or something?  What was

10    that about?

11        A.   -- off of Tulane Broad.  It was like -- it

12    was a state and municipal and federal.  It's like a

13    holding area for some -- also, for the boot camp, also

14    for people who got in trouble with drugs, and some

15    people waiting on municipal cases and some of them

16    waiting on state cases.  And, basically, all I was was

17    a jailer.

18        Q.   Uh-huh.

19        A.   That's all.  I basically with another -- they

20    called us "deputies" at the time, ran the tier for the

21    -- make sure they got their meals on time, make sure

22    that they went to their court cases, they got prepared

23    for court cases.  I set them up for transportation and

24    received them back into our facility.

25        Q.   You didn't work there very long, though, just

320

1     a year or two?

2         A.   It was about a year, year -- I say about a

3     year and a half.  That's about what it was.

4         Q.   Not your cup of tea or what?

5         A.   No, because I was in the military.  This was

6     my part-time job.

7         Q.   I see.  That was a part-time job --

8         A.   Yeah.

9         Q.   -- that you were in the military.  So it

10    wasn't anything you were trying to have a career in

11    law enforcement or being a jailer, it was just --

12        A.   I -- I thought about it.

13        Q.   -- about a job.

14        A.   I did thought about it after I got out, but

15    if I did, I probably was trying to go to -- probably

16    like I was trying to either go to the D.E.A. or

17    something to that effect.

18        Q.   Uh-huh.  I see your -- is it your daughter

19    that has applied for the U.S. Marshals, or something

20    like that?

21        A.   Yeah, my daughter did.  And right now she

22    doing some -- she works at an I.B.M. facility, getting

23    call services.

24        Q.   Okay.

25        A.   She was into resident, too, because she spent

321

1    a little stint in the Army.

2        Q.   Okay.  So she was in the Army, too, huh?

3        A.   Uh-huh.

4        Q.   I mean, she was in the Army.  How did you let

5    her do that?

6        A.   I told her I'd let her slide.

7        Q.   Okay.

8        A.   But just the majority of my children, they --

9    like my other daughter, she was into law enforcement

10   in high school.  They kind of like the law.

11       Q.   And your son?

12       A.   That's another story.

13       Q.   Okay, I understand.  Well, you can never tell

14   how people are going to turn out.  Whether you got

15   these kids, or not, sometimes they want to follow

16   their -- their family in their jobs --

17       A.   And then sometimes they don't.

18       Q.   -- sometimes they don't.  You just can't

19   figure that out.

20            I'm going to ask you a couple of

21   questions about this incident you -- this run-in you

22   had with the police where they pulled you and a

23   neighbor over or something like that?

24       A.   Yeah.

25       Q.   Do you mind me telling you -- asking when

322

1    that happened, where it happened, that kind of stuff?

2        A.   That happened -- that's been awhile, about --

3    I would say about, what, 2002 or 2003.  We went

4    looking around for homes.

5        Q.   Is that here in Nueces County?

6        A.   Yeah.

7        Q.   We lived off of -- off of Staples.  We both

8    lived across the street from one another.  We just

9    went just looking at homes, making a comparison, and

10   we was pulled over by an officer because we went in

11   one complex, I forgot what it's called, Huntington, or

12   something like that.

13       Q.   An apartment complex --

14       A.   No, no.

15       Q.   -- or a home?

16       A.   Home complex.  I'm trying to remember.  The

17   area's right there by H.E.B.  It was by --

18       Q.   By that new H.E.B. Plus?  That's Huntington

19   Park.

20       A.   Yeah, Huntington Park.  We just drove in

21   there.  We was looking at the homes.  I said, "They

22   looked pretty nice," I said, "Man, that would be a

23   pretty little home," and before I know it, the officer

24   came around and pulled us over.  And guy got out of

25   the car and said, "What are you doing?"  I said -- my

323

1    neighbor's not answering, I just said, "We're just

2    driving around looking at the homes."  And he said,

3    "You know you're not supposed to be here."  And I

4    looked at him and I said, "Why are you not supposed to

5    be here, if we're looking for homes?  We ain't doing

6    nothing," and the guy -- I don't know if the officer

7    had a bad day or what, he just said, "Well, let me see

8    your I.D. cards," and everything else.  I said "Sure,

9    ain't no problem," and my neighbor said, "What's the

10   problem of stopping us, if we're just looking," and

11   the next thing I know the guy got an attitude, "You

12   keep on talking and I'll arrest you," and I just

13   looked at him, like, "That don't make no sense, man,

14   all we doing is driving around looking at homes.  We

15   are homeowners.  We own homes, okay?"

16            So I said -- we just gave him the cards,

17   said, "No need to say nothing.  Let's just get out of

18   here."

19       Q.   Did it go any further past --

20       A.   No, it didn't go any past any further,

21   besides me and him talking.  And we was thinking about

22   calling him all kind of things but a child of God,

23   but, you know, but I -- that -- that didn't make any

24   sense.  I was thinking about it, I said, I mean,

25   there's a man -- in my own mind, back of my head, I

324

1    was saying to myself, I said, "I went to -- I went to

2    different countries and I did everything else to

3    protect this country and I got this idiot."  I'm not

4    saying whether he had a bad day or not, but, to me, he

5    probably did.  And all I wanted to do was look at some

6    homes possibility and who knows, maybe later own I

7    might have a chance to buy in that area.

8        Q.   Uh-huh.

9        A.   I said that's fine, I just -- put it to maybe

10   he having a bad day and move on about my business.

11       Q.   But he didn't escalate it or make it any

12   worse, right?

13       A.   He didn't escalate it any further and we

14   didn't take it no further either.

15       Q.   Okay.  Okay.  Here's my question, and you

16   probably know where it's coming from.  There's going

17   to be cops testifying in this case.

18       A.   Right.

19       Q.   There's going to be cops testifying.  I don't

20   think they're going to be all the witnesses, but, in

21   every criminal case, you almost always have cops.  But

22   they're not going to be testifying like eyewitnesses

23   who, you know, watched the crime or saw the crime, --

24       A.   Right.

25       Q.   -- they're just talking about how they did

325

```
1   follow-up investigation --
2       A.    Uh-huh.
3       Q.    -- and stuff like that.  And I need to know,
4   Mr. Starkey, is that going to bother you to listen to
5   the cops testify?
6       A.    No.
7       Q.    Why not?
8       A.    I don't take that one incident as everybody.
9   Everybody can have a bad day.  I can be -- I can be
10  nice and chipper one day, and then all hell's breaking
11  loose behind me, and I may -- shoot, I'd be venting it
12  out on everybody else because they said, "Hello," or,
13  "What's going on."  No, I just take that for what --
14  "You having a bad day, a moment, you keep going on
15  over there.  You're not going to interfere with me.
16  I'll continue on doing what I need to do."
17      Q.    Okay.  You see, that -- you know, that sounds
18  like me when I come home to my wife, and I'll snap at
19  my wife sometimes because I have a bad day, and she's
20  like, "What are you biting my head off for," and I'm
21  not mad at her, I'm mad at something that's happened
22  at the office.
23      A.    That's what I tell my wife and she says, "How
24  was your day," I'd say, "No, don't ask me how my day
25  was.  I keep work at work.  I'm home."  And that's
```

326

```
1   where I keep it.  I'm not saying it's easy to do
2   sometimes, but I concentrate on doing that.
3       Q.    So that's the only time you've had kind of a
4   run-in with law enforcement?
5       A.    No, because I was speeding and I got pulled
6   over and I gave the guy what I needed to give him, and
7   I say, "Hey, I was wrong."
8       Q.    Yeah.
9       A.    You know, I'm not going to sit here and say
10  that I'm a virgin of doing anything, no.  I've done
11  something wrong on that, and I say, "Hey, it's my
12  fault.  I got -- that was me," and I pay the price.
13      Q.    One time I was picking a jury and they were
14  all sitting out here, and I said, "Anybody had any law
15  -- run-in -- bad run-ins with law enforcement," and
16  guy goes -- a guy in the front row raised his hand,
17  and I go, "What happened," and he goes, "I almost got
18  arrested this morning on the way to jury duty," and I
19  said, "Oh, my gosh, what happened?"  And it turns out
20  he went into a convenience store that had just been
21  robbed and he was wearing similar clothing to what the
22  guy who had robbed him, like, the -- what do you call,
23  the BOLO call said like blue jeans and a striped
24  shirt, and that guy was wearing blue jeans and a
25  striped shirt.
```

327

```
1       A.    He fit the description.
2       Q.    So the cops, you know, put him against the
3   wall and stuff, and after a few minutes they figured
4   out he wasn't the guy.  But, you know, I go --
5       A.    He fit the description.
6       Q.    "-- Oh, my gosh, that happened to you today?"
7   And he goes -- I go, "Well, how do you feel about it,"
8   he goes, "Well, I'm not too happy with cops today, --"
9       A.    Uh-huh.
10      Q.    "-- you know?  But -- but he did realize they
11  were doing their jobs.  It matched the description,
12  and after a few minutes they detained him.  And, you
13  know, they didn't really rough him up or anything, but
14  they were asking him pretty hard questions.  And he's
15  like, you know, "What did I do?"  And then he found
16  out -- they wouldn't tell him, at first, that's what
17  made him mad.  And then he found out later that he was
18  -- matched the description of the guy, so then he kind
19  of understood.
20            So it sounds like that was something like
21  that, that it's going a little south, but it kind of
22  cooled off there for awhile.  Okay.  And you don't
23  think that's going to effect you at all?
24      A.    No.
25      Q.    Now, tell me about your daughter's situation.
```

328

```
1       A.    My daughter got pulled over -- not pulled
2   over.  My daughter was -- my son had gotten into an
3   accident, and they called me and I said, "I can't get
4   to him, right now," so I said, I told my daughter, I
5   said, "Go over there and see what's going on with
6   the -- at the accident," because Kenneth was just 17,
7   and he didn't really know something like that and he
8   was involved in an accident, I mean, according to the
9   accident.  If you get asked questions that don't mean
10  he may give a proper response because he also could be
11  in pain or from a concussion.  That can do anything to
12  somebody because I had that, too.
13      Q.    So you sent your daughter to kind of go check
14  on him.
15      A.    My daughter is going to be -- she's going to
16  not be -- I just say, I don't know if she's considered
17  combative, or whatever, but my daughter's going to ask
18  questions, and she's going to defend her brother
19  because she knows he's been in an accident, she knows
20  he's ain't going to be totally coherent to
21  questioning, and she just wanted to give information.
22  And when -- after I got there, I just saw that my
23  daughter was getting arrested.  And I said, "For
24  what," and she said, "The officer said for intervening
25  into an investigation."  I said, "She's defending her
```

329

1 brother, she's asking because her brother may not know
2 the answer, so she's going to give the answers.  I
3 sent her over here.  If you're going to arrest
4 anybody, arrest me for telling my child to go check on
5 her brother."
6     Q.   So what happened?
7     A.   She got, what was that, charged with -- like
8 I said, again, she got charged with intervening in an
9 investigation.  I tried to talk to the officer at the
10 time and the officer told me, said, "Well, it's up to
11 my partner."  His partner says, "It's up to you."  He
12 said, "Well, I'm taking her in."  I said, "She was
13 just doing what I told her to do.  If you want to take
14 somebody, take me, okay?  She's following my orders.
15 And my children, two of the three listen, and she was
16 doing what she was told.  That's all she -- she'll do
17 what she's instructed to do.  If I tell her to do
18 something, it's just about almost guaranteed done or
19 she going to tell me why she couldn't get it done."
20     Q.   So it's one of those things that maybe the
21 cops were doing the questioning and they didn't really
22 care who it was, they just didn't want anybody getting
23 in the way?  You think it was that?
24     A.   I -- I can't said yes or no, I don't know.  I
25 wasn't there.  All I do was trying to talk to the

330

1 officer, try and to get him -- get her released, but
2 instead, she didn't get released.  So, we had to pay
3 court costs and fees, and everything else.  And right
4 now she's still dealing with that.
5     Q.   Did that happen a long time ago or recently?
6     A.   That was -- well, she doing it right now.
7 She just got -- I say about a couple of months ago.
8     Q.   Okay.  So her case hadn't gone to court yet,
9 or anything?
10     A.   No.
11     Q.   And that's --
12     A.   She's --
13     Q.   -- happened here in Nueces County?
14     A.   The case -- she's getting, what's that
15 pretrial diversion, working on going to everything
16 that she's supposed to do.  She's going to classes,
17 community service --
18     Q.   Okay.
19     A.   -- and paying the fees and whatever.
20     Q.   You -- you know what pretrial diversion is,
21 right?  That means she won't have a conviction.
22     A.   Yeah, but I'm worried about it, because she's
23 also still trying to get into law enforcement, but I
24 don't know if that conviction's going to be on her
25 record after that.

331

1     Q.   No, it won't be.  That's -- that's what
2 pretrial diversion is.  So it won't -- it's more like
3 a contract and an agreement --
4     A.   Right.
5     Q.   -- between the Judge, the D.A.'s Office and
6 the probation department, that they do this kind of
7 informal probation.  And then if they do it all, then
8 the case doesn't get filed.
9     A.   It doesn't get filed?
10     Q.   Well, it either gets filed and then dismissed
11 or it doesn't get filed at all.
12     A.   Well, I hadn't had a chance talk to the
13 prosecutor, because if it was, I --
14     Q.   You did or you didn't?
15     A.   I didn't.  I was hoping that if she did,
16 because she follow through with everything, I'm not
17 saying it would -- well, I'm saying this, that I hope
18 it doesn't get put on her record because she's still
19 trying to go for as law enforcement.
20     Q.   Well, if she completes pretrial diversion, it
21 shouldn't -- you know.  But I got to ask you this,
22 now, because our office was probably doing the
23 prosecution of it, the cops were in that, is anything
24 about that going to effect you being in this trial?
25     A.   No, because nothing I can do about that

332

1 situation, and nothing my daughter could do, and all
2 we can do is abide by the law, and that's what we've
3 been doing.  And if that pretrial diversion helps her
4 to do what she needs to do, fine.  Yeah, it's money
5 out of people's pocket, but I'm still trying to obey
6 the law.
7     Q.   Well, again, I just need to know if you have
8 a grudge against the cops or the D.A.'s Office for --
9 for that?
10     A.   No, I just -- the only thing I have is that
11 maybe they should have just taken consideration what
12 was happening, what was considered -- what actually
13 happened, --
14     Q.   Yeah.
15     A.   -- what the child was doing.
16     Q.   Well, I've never been a cop, but I also --
17 but I know cops, you see them when they're trying to
18 control the scene and other people are kind of coming
19 over and trying to talk to them --
20     A.   Right.
21     Q.   -- and question them.  They don't really want
22 to hear that then, they just move everybody away
23 because I guess that's the way they're taught, or
24 something like that, and -- and sometimes they make
25 poor choices, too, and everything that maybe not been

333

1  done. But then sometimes I always say, "Well, you got
2  to look at their perspective. They may be trying to
3  work the accident case and then somebody's nagging on
4  them, or something like that, or they just don't want
5  to hear that." I mean, I'm not trying to defend them,
6  I'm just saying --
7      A.  No, I understand that.
8      Q.  -- sometimes that happens.
9      A.  I have to take that into consideration, too,
10  because, in doing my job, I have people telling me
11  this and this. And I say, "No, this is what I'm
12  instructed to do, this is what I have to do, this is
13  what I'm going to do. Now, if you want to throw in
14  some other interference in here, you got to get some
15  clarification from somebody else. Until this time,
16  this is what I'm supposed to do."
17      Q.  Okay. Tell me about how you feel about the
18  fact that it's not an automatic decision in this case.
19  Remember, the Judge said a lot of times people think
20  that just because you're found guilty of capital
21  murder you automatically get the death penalty, and we
22  have to tell them no, you don't automatically get
23  anything. What happens is, first of all, they have to
24  be found guilty of capital murder.
25          In this case, it would be murder plus

334

1  robbery. And that means killing somebody while in the
2  course of committing or attempting to commit robbery.
3  In other words, they were trying to rob them or did
4  rob them and killed them at the same time. Then --
5  that's the first part of the trial, is he guilty or
6  not, did he do it or not?
7          Then the second part of the trial is what
8  kind of punishment he should get. And it's by no
9  means automatic. You have to answer two questions.
10  You may get to hear additional evidence that says,
11  "Well, this guy's a bad guy or this guy's a good guy.
12  You know, maybe he was an Eagle Scout, maybe he made
13  good grades in school, or maybe he's been in prison
14  ten times before." You can't really make that
15  decision on death or life until you hear some more
16  background.
17          Now, you can make a decision based on
18  what happened that day or what happened that day, plus
19  his background, but the problem is -- the question is,
20  you can't make the decision just automatically. You
21  have to hear this -- you wait till you hear everything
22  and make a decision. And that's what those issues --
23  special issues talk about.
24          The first one down on that board says,
25  "Is there a probability that the Defendant would

335

1  commit criminal acts of violence that would constitute
2  a continuing threat to society?" In other words, is
3  there a chance, is it likely that this Defendant is
4  going to hurt somebody else in the future, hurt
5  somebody else in our society? And unless you have a
6  crystal ball, you don't know for sure what's going to
7  happen, and the question says, "probability." It
8  doesn't say for sure he's going to do it. So the law
9  doesn't require me to prove a hundred percent he's
10  going to do that.
11          The law also says, "would commit criminal
12  acts of violence." Sometimes people say, "Well, I can
13  only give the death penalty if I think he's going to
14  murder somebody again." Doesn't say you have to
15  murder, it just says "any criminal act of violence,"
16  if he's beating them up or hurting them or taking
17  something from them or something like that.
18          And the final part says, "a continuing
19  threat to society." And some people say, "Well, Mr.
20  Skurka, why don't you just lock him up in prison for
21  life, that way he won't hurt anybody," and I say,
22  "Wait a minute, who else is in prison?" You used to
23  work in one.
24      A.  Uh-huh.
25      Q.  There's guards there, there's probably

336

1  civilian employees, you know, like clerks or the
2  warden, there's probably medical people or maintenance
3  people, or something like that. In other words,
4  you're not isolated. It's not like you're putting him
5  on a desert island where you never have contact with
6  human beings again. So prison is actually part of
7  society. You've got some of your rights taken apart
8  -- I'm sorry, taken away, but that doesn't mean you
9  don't interact with society, right?
10      A.  Yeah, that's correct.
11      Q.  So have you ever heard about that happening,
12  like, maybe somebody in prison hurting another
13  prisoner?
14      A.  Yes.
15      Q.  Or hurting a guard?
16      A.  Yes.
17      Q.  Or hurting a civilian employee? I mean, that
18  happens, right? So would you agree with me that just
19  because you put them in prison doesn't mean they'll
20  necessarily never have a chance to hurt anybody else
21  again, right?
22      A.  That is true.
23      Q.  Okay. And that -- you probably saw that
24  firsthand when you worked at the jail that you worked
25  at or the holding facility.

337

1    So the Judge asked you to listen to all
2  the evidence and then decide is he a danger in the
3  future, is he going to hurt -- is there a chance he
4  could hurt somebody in the future?  Doesn't mean a
5  hundred percent, you know that for sure because no way
6  you could prove that, but do you think he's going to
7  hurt somebody down the line?
8    The second question is what's called
9  "mitigating circumstances question."  Mitigating
10  basically means anything that would lessen or make
11  less severe the punishment.  In other words, he did
12  the crime, but is there any reason, any mitigating
13  circumstances that warrant that we should give him
14  life instead of death?  In other words, it looks like
15  he's heading for the death penalty.  You found him
16  guilty of capital murder.  You look at this first
17  question, it says, "Yes, I think there's a chance he's
18  going to hurt somebody down the line," but before you
19  give the death penalty, you have to take into
20  consideration all of the evidence, including what
21  happened that day, the circumstances of the offense
22  and the surrounding circumstances, his character and
23  his background, you know, is he a good guy, is he a
24  bad guy, has he been to prison ten times before or
25  never been to prison before, his personal moral

338

1  culpability.  Is there enough, is it sufficient
2  mitigating circumstance to warrant that a sentence of
3  life, rather than death imposed -- impose, because it
4  looks like he's going for the death penalty.  He's
5  guilty, he's a continuing threat to society, but
6  before you give him the death penalty, you have to
7  review all the evidence and say "Is there anything
8  that would warrant he get a life sentence, a lesser
9  sentence than the death sentence?"
10    In other words, not everything's equal,
11  right?
12    A.  Right.
13    Q.  Some people may have mitigating circumstances
14  that point to them getting a life sentence.  Some
15  people may have aggravating circumstances, make it
16  worse, you know.  And that's what this question is all
17  about.
18    Here's an example.  Say you have two
19  burglars, you're sitting on a jury and there's two
20  different burglary cases.  The first burglar is a guy
21  who kicked in the back door of the kitchen, broke the
22  door off the hinges, went into the house, stole all
23  the jewelry, all the money, all the T.V.s, V.C.R.s,
24  stereos, all that stuff.  And then as he was leaving
25  the house he ransacked the house and broke things,

339

1  ripped up stuff and just tore up the whole house.  And
2  then you also hear in the evidence that that guy, it's
3  not been his first burglary.  He's been to burglary --
4  he's been convicted of burglary five times before.
5    Second case.  The second scenario, it's a
6  burglar.  He broke into somebody's house and stole
7  something that didn't belong to him, which is what
8  burglary is, but you find out he didn't kick a door or
9  break a window to get in, the door was unlocked.  When
10  he came in the back door it was unlocked, and even
11  though the house had jewelry, money, T.V., stereos and
12  stuff, what the guy did was go into the pantry and
13  stole a loaf of bread and some food to feed his kids
14  who were hungry because he had lost his job.  He
15  by-passed all that other stuff and all he stole was
16  food.  And you find out his background is this, that
17  guy's never been arrested for anything, this is the
18  first time he's ever been charged with anything.
19    So, both of them burglars.  Do you treat
20  them both the same?
21    A.  No.
22    Q.  No.  Why not?  One's got aggravating factors,
23  one's got mitigating factors.  That's the best way I
24  can explain what a mitigating circumstance.  Is it
25  something like in his background or the surrounding

340

1  circumstances which would -- that would warrant that
2  the jury gives him life instead of death?  That's --
3  remember the Judge was saying it's not automatic, you
4  got to listen to everything?
5    A.  Yes.
6    Q.  I mean, what if the guy was a war hero, maybe
7  you'd want to give him a break because of that; maybe
8  the guy was a -- came from a broken home, or, you
9  know, made straight A's in school; or maybe he's been
10  to prison ten times before, maybe he's hurt other
11  people, too.  You got to look -- weigh all that stuff.
12  And that's what the Judge tells you to do in this
13  case.  Looking at all that stuff, is it enough to
14  warrant that he gets life instead of death?
15    So you kind of got to do a further
16  balancing test.  Just because there's a mitigating
17  circumstance, does that mean he automatically gets --
18    A.  No.
19    Q.  -- a life sentence?  No, that's up to the
20  jury to decide.  Some jurors may say, "Well, you know,
21  we ought to give him a break because he was an Eagle
22  Scout and he made good grades in school."  Some jurors
23  may say, "Hey, I don't care if he was an Eagle Scout
24  or made good grades in school, that's not enough for
25  me to lower the sentence.  He's still got to answer

341

1  for this crime he did."  You see what I'm saying.
2  This Judge is not going to say, "Well, this is a
3  mitigating circumstance because he's young or this is
4  his first time offense, so you have to automatically
5  lower it," that's up to the jury to decide.
6      I kind of like to tell people like checks
7  and balances, it kind of checks the jury to say check
8  it over one more time, see if he really -- is there
9  anything that makes him get a lower sentence?  If
10  there is, there is.  If there isn't, there isn't.  But
11  we can't tell you what it is, it's up to the jury to
12  decide.  You-all have that power to do that stuff.
13      Now, one thing that may come up is this
14  fact, or this law, "Voluntary intoxication is not a
15  defense to crime."  Voluntary intoxication.  In case
16  -- in other words, if you go get yourself drunk or
17  stoned or high on drugs and you commit a crime, is
18  that an excuse to the crime?  Absolutely not.  The law
19  says absolutely not, but it may be something that you
20  would be a -- considered a mitigating circumstance.
21  Somebody may say, "Well, he robbed that bank, but he
22  was drunk when he robbed that bank, so we're going to
23  give him a break."  Other people may say, "Just
24  because he's drunk, he still robbed the bank, you
25  know?"  You got to -- that could be a mitigating

342

1  circumstance.
2      All you have to do is have an open mind
3  and listen to those things.  What you do with them is
4  up to you, okay?  But that's a way to give the jury a
5  chance to consider, "Hey, is there any reason we
6  should lower it to life instead of death," okay?
7      So if you answered the first question
8  yes, he's a continuing threat to society, and no,
9  there's no reason to lower the sentence, or it's not
10  enough reason to lower the sentence, that man over
11  there is sentenced to death.  If you answer it any
12  other way he gets a life sentence.  Do you follow me
13  with that scheme?
14      A.  Yes.
15      Q.  Does that kind of make sense to you about
16  considering the -- because I gave you that trick
17  question with the burglars, you think both burglars
18  are pretty bad, then you find out, "Hey, there's
19  extenuating circumstances," right?
20      A.  (Nods head.)
21      Q.  Maybe go higher, maybe go lower.
22      Do you think we should have the death
23  penalty in Texas?  Because some states have the death
24  penalty and some states don't.
25      A.  It's the law of the land.

343

1      Q.  The law.  Okay, and you -- you say in here,
2  too, in your questionnaire I'm looking at, it says you
3  don't think the death penalty is given often enough.
4  Why is that?
5      A.  I guess that got explained to me, what I may
6  consider giving somebody the death penalty because,
7  like you said, it it's not like capital murder, like
8  somebody -- he murdered somebody --
9      Q.  Just regular murder?
10      A.  Yeah, that got explained to me.  So, on that
11  question --
12      Q.  You were thinking it was all murder cases?
13      A.  Yeah, I did.
14      Q.  Don't feel bad.  There's a lot of people that
15  think -- people still come up to me and say, "Well,
16  this is murder.  Why didn't you get the death
17  penalty," and I go, "Hey, only a very few cases
18  qualify for the death penalty."  You know, the
19  legislature has said only those certain cases, like
20  murder plus robbery, rape, murder, killing a police
21  officer on duty, not just a regular killing is a death
22  penalty.  So that's kind of what you meant on that.
23      A.  Yeah.
24      Q.  I guess -- oh, a couple of other legal things
25  I want to talk to you about are the fact that he's

344

1  been indicted.  That doesn't mean he's guilty, right,
2  --
3      A.  Right.
4      Q.  -- that it just means he's charged.  And you
5  understand he's presumed innocent at this point --
6      A.  Until proven guilty.
7      Q.  -- till he's proven guilty.  Doesn't mean he
8  is innocent, it just means at this point he starts out
9  presumed innocent.
10      And the Fifth Amendment, he doesn't have
11  to testify if he doesn't want to and you can't hold
12  that against him.
13      A.  Right.
14      Q.  Some people say, "Well, I want to hear his
15  side of the story," and the Judge says, "If he doesn't
16  testify you can't hold that against him."  Can you
17  follow that law?
18      A.  Yes, I can.
19      Q.  And beyond a reasonable doubt, that's the
20  standard we have in this case and every case.  The
21  State always has to prove the case beyond a reasonable
22  doubt.  All it means is that -- it doesn't mean beyond
23  all doubt or any doubt or a shadow of a doubt.
24  There's no way I could prove it to you a hundred
25  percent, unless you were a witness and saw the whole

345

1 thing yourself, then you wouldn't be able to be on the
2 jury.
3            So you think you can be fair to both
4 sides?
5      A.   I can be fair --
6      Q.   Listen --
7      A.   -- to both sides.
8      Q.   -- to everything and make a decision based on
9 the evidence?
10     A.   Based on the evidence and what is put there.
11     Q.   Okay.  And then follow through whatever that
12 decision is.
13     A.   (Nods head.)
14           MR. SKURKA:  Okay.  Thank you, sir.
15           THE COURT:  All right.  Mr. Garza?  Or
16 who's up?
17           MR. JONES:  Yes, your turn.
18           VOIR DIRE EXAMINATION
19 BY MR. GARZA:
20     Q.   Mr. Starkey, my name is Ed Garza, and I had
21 introduced myself back about a week or two ago, I
22 guess, when we were down there in that big room and
23 you guys came in and filled out this questionnaire.
24     A.   Yes, sir.
25     Q.   My Co-Counsel over here is Mr. Grant Jones,

346

1 who wasn't there that day, and, of course, our client
2 is sitting right there next Mr. Jones, Mr. John Henry
3 Ramirez.
4            Sir, is there anything at all that would
5 keep you from being fair and impartial in this case?
6      A.   I try to be fair at all things in my life, so
7 nothing, I don't think, is going to interfere with
8 that.
9            MR. GARZA:  Thank you, sir.  I don't
10 think I have any questions of you.  I think you've
11 done a good job of answering all of our questions.
12           THE COURT:  All right.  Why don't you
13 wait in the jury room and I'm going to talk to the
14 lawyers.
15           VENIREPERSON NO. 31:  Yes, sir.
16           THE COURT:  Wait just a second.
17           (Venireperson exits courtroom.)
18           THE COURT:  All right, Mr. Skurka?
19           MR. SKURKA:  Judge, we're going to
20 exercise a peremptory strike.
21           THE COURT:  Okay.  All right.  Bring him
22 in.
23           (Venireperson enters courtroom.)
24           THE COURT:  Mr. Starkey, you did not get
25 selected to be on this jury, but we do appreciate your

347

1 time and service to the community.
2           VENIREPERSON NO. 31:  Thank you, sir.
3           THE COURT:  Thank you very much.  If you
4 need a work excuse, the bailiff can help you with
5 that.
6           (Venireperson exits courtroom.)
7           THE COURT:  All right.  Let's see, the
8 next person, I guess, is Noe Benavidez.
9           MR. SKURKA:  No. 34?
10           THE COURT:  Uh-huh.  Is Mr. Noe Benavidez
11 in?
12           THE BAILIFF:  Yes.
13           (Venireperson enters courtroom.)
14           THE COURT:  All right, come forward and
15 have a seat.
16
17           VENIREPERSON NO. 34,
18           NOE G. BENAVIDEZ,
19           VOIR DIRE EXAMINATION
20 BY THE COURT:
21     Q.   All right.  You are Noe Benavidez?
22     A.   Yes, sir.
23     Q.   All right.  All right, Mr. Benavidez, we want
24 to talk to you a little bit.  Now, Mr. Benavidez,
25 obviously you know we're looking to pick a jury, here,

348

1 all right?  And what we're looking for are for jurors
2 that can keep an open mind, all right?  Because if --
3 I mean, you agree with me that if someone can't keep
4 an open mind, they've already made up a decision and
5 they have -- we haven't started the case, that's not
6 fair to one side or the other.
7      A.   Yes.
8      Q.   And you'd agree with that, right?
9      A.   Yes, I do.
10     Q.   All right.  So we're looking for people that
11 can keep an open mind, people that are willing to give
12 a fair shake to this case.  So, is there anything,
13 maybe, that you've heard in the past or for whatever
14 reason that maybe you feel you can't keep an open mind
15 in this case?
16     A.   No.
17     Q.   Okay.  Then let's talk a little bit about the
18 law and can you follow the law.  All right, this is a
19 criminal case.  You have been a juror in a criminal
20 case before.
21     A.   Yes.
22     Q.   And, in fact, the jury was asked to assess
23 punishment in that case.
24     A.   Yes.
25     Q.   Okay.  So you know a lot of the concepts

349

1   we're talking about.  Like, first of all, it's the
2   State's burden of proof.  You understand that?
3       A.   Yes.
4       Q.   Okay.  Because you -- that's how it was in
5   the case that you did, and you understand that the
6   burden of proof in every criminal case is beyond a
7   reasonable doubt.  Do you remember that?
8       A.   Yes.
9       Q.   All right.  And that the State must prove
10  each and every element beyond a reasonable doubt.  You
11  agree with that?
12      A.   Yes.
13      Q.   And you would hold the State to that burden?
14      A.   Yes.
15      Q.   Okay.  Now, if you've sat on a jury before,
16  and it was three years ago, so it wasn't that long
17  ago, you -- you know that every person is presumed
18  innocent until the State proves they're guilty.
19      A.   Yes.
20      Q.   Do you agree with that?
21      A.   I agree.
22      Q.   All right.  And you could presume that this
23  Defendant is innocent until the State proves, if they
24  can prove that he's guilty.
25      A.   Yes.

350

1       Q.   Okay.  Then the next thing, he doesn't have
2   to testify.  Law says, "Look, State, if you got to
3   prove the case and the burden never shifts over here,
4   then he doesn't have to testify."  And there's lots of
5   reasons why a person may not want to testify.  Maybe
6   his lawyer has told him not to, maybe his lawyer's
7   said, "Hey, they haven't proven their case.  We don't
8   need to testify."  Maybe he's uneducated, maybe he's
9   -- maybe he's not the best speaker, maybe he gets
10  nervous, okay?
11           What I need to know from you is would you
12  follow the law that says I wouldn't hold it against
13  him if he didn't testify, or would you hold it against
14  him?
15      A.   I would not hold it against him.
16      Q.   Okay.  And you've gone through this before in
17  that prior case, which gets me to the next point.
18  You -- you actually were asked to do the punishment
19  phase of the trial, were you not?
20      A.   Yes.
21      Q.   Okay.  So you know that there's a bifurcated
22  system, that is, we have the guilt or innocence part
23  first.  If Defendant's found not guilty, well, we go
24  home, but if he's found guilty, then we go to the
25  second part, right --

351

1       A.   Right.
2       Q.   -- because you participated in that before.
3            Now, in that case, you say, I guess, jail
4   time was assessed, and you know that in most criminal
5   cases when the jury is asked to assess punishment,
6   there's a punishment range, right?
7       A.   Right.
8       Q.   I don't know what level this was, but there's
9   a punishment range.  Was this a misdemeanor that you
10  were on or was it --
11      A.   It was a drug.
12      Q.   Drug case, okay.  But there's a certain
13  amount of time in -- in custody that -- and -- and the
14  Judge tells you, you know, this is the amount of time
15  that you can -- these are the punishment ranges, you
16  know, we give two to ten years, you decide where it
17  falls if you get to the punishment phase, right?
18      A.   Yes.
19      Q.   Okay.  Capital murder's a little different
20  because that's what this is.  In a capital murder
21  case, we don't do it that way.  We do it a little
22  different.  We answer questions, okay?  And I'm going
23  to talk about those in a minute.
24           But what is capital murder?  Okay, well,
25  I like to call it murder plus, all right?  So we've

352

1   got murder, and you know what that is, right, that's
2   killing somebody else intentionally.
3       A.   Yes.
4       Q.   And -- but, yet, you have plus.  In this
5   case, they're alleging, that is the State, that the
6   Defendant committed this murder while attempting to or
7   while committing a robbery at the same time.  So it's
8   robbery or attempted robbery plus a murder.  Murder
9   plus, okay.
10           State has to prove all of the elements of
11  both crimes and they have to prove that it's all
12  together for them to prevail on a capital murder
13  charge.  You understand that?
14      A.   Yes.
15      Q.   Okay.  Would you hold them to that burden?
16      A.   Yes.
17      Q.   Okay.  Now, let's talk a little bit about how
18  this works.  You find -- let's -- you know, of course,
19  that if you find him not guilty, then we go home, it's
20  over with.  But if you find him guilty, then we go on
21  to the second phase.  And you've done this before,
22  but, like I said, it's a little different.  You don't
23  say -- I can tell you the two possibilities are life
24  or death, if -- if -- if the Defendant's found guilty
25  by this jury, okay?

353

1      A.   Okay.

2      Q.   Life imprisonment or death.  But you don't

3  say life or death like you did in your case, you

4  answer questions.  And here's Question No. 1, "Is

5  there a probability that the Defendant would commit

6  criminal acts of violence that would constitute a

7  continuing threat to society," okay?  Jury would

8  answer it yes or no.  Then after they answer that

9  question, then you go over and there's Special Issue

10  No. 2.  "After taking into consideration all of the

11  evidence, including the circumstances of the offense,"

12  which is the facts of the case, the guilt or innocence

13  part, okay, "plus the Defendant's character and

14  background and the personal moral culpability of the

15  Defendant, is there sufficient mitigating circumstance

16  or circumstances to warrant a sentence of life

17  imprisonment, rather than a death sentence be

18  imposed," and then the jury would answer yes or no.

19          And what's that question about?  Well,

20  you know, you may hear stuff about his past, not just

21  what happened that day, not just the crime itself, but

22  what kind of guy is he?  Is he -- has he been a good

23  guy, has he been a bad guy?  Does he have a lot of

24  criminal history, does he not have any?  Has he done

25  things for the community, you know, stuff like that.

354

1  And the jury gets to decide what they believe is a

2  mitigating circumstance or not.

3          Maybe they think -- maybe -- maybe things

4  like that are presented to you but you had don't find

5  them mitigating circumstances, maybe -- maybe you do,

6  okay, but that's what the jury does, okay, and you'd

7  answer that question yes or no.  You follow me?

8      A.   Yes.

9      Q.   Okay.  Now, at the end of -- well, when we

10  begin this trial at the end of jury selection we're

11  going to get a jury and they're going to sit right

12  over there, and I'm going to ask them to take an oath,

13  and the oath is going to go like this, "Do you

14  solemnly swear that you can render a true verdict

15  based upon the evidence and the law presented to you?"

16  I suspect they'll say yes, all right?

17          So I got to ask you right now, can you

18  render a true verdict, that is on guilt or innocence,

19  based upon the evidence and the law presented to you

20  in this case?

21      A.   Yes.

22      Q.   Okay?  And can you truthfully answer these

23  questions?  And before you answer that, if you get to

24  the second half of the trial, that is, the Defendant

25  is found guilty, I'll -- the question is can you

355

1  answer these questions?  And before you answer that,

2  I -- some people tell me, "Well, I can't do that

3  because I can't participate in the process that would

4  lead to someone's death, potentially," or they say, "I

5  can't do that because if we find them guilty of

6  capital murder, I don't care about this question

7  nonsense, I'm going to -- I'm going to recommend the

8  death sentence no matter what.  I'm not going to

9  consider anything that you guys bring me."

10          I need to know if you can truthfully

11  answer those questions, or would you fall into one of

12  those other categories where you just can't consider

13  the death penalty, you can't participate in a process

14  that would possibly result in the death penalty or you

15  wouldn't consider life imprisonment?

16      A.   I would be able to truthfully answer both of

17  those questions.

18          THE COURT:  Then with that, I'll turn the

19  floor over to Mr. Mark Skurka.

20              VOIR DIRE EXAMINATION

21  BY MR. SKURKA:

22      Q.   Hi, Mr. Benavidez.

23      A.   Hello.

24      Q.   My name is Mark Skurka, as the Judge

25  introduced me.  I'm a first assistant district

356

1  attorney.  This is Geordie Schimmel, he's another

2  assistant D.A., and together we'll be presenting this

3  case to you, if you're selected on this jury.

4          Start off by telling you there's no right

5  or wrong answers.  You just tell us how you feel about

6  certain things.  Don't answer in such a way that you

7  think I had want to hear, the Defendant wants to hear.

8  You just tell us how you feel and we'll deal with

9  that.  Fair enough?

10      A.   Yes, sir.

11      Q.   Okay.  I'm going go through this stuff,

12  that's going to be some -- some questions that you may

13  have not had to consider before, but we want to kind

14  of pin you down on some of these things, not to pick

15  on you or anything, but just to kind of feel -- feel

16  you out on how you feel on these things.

17          And the first thing I want to ask you

18  about is the death penalty.  I mean, I've told you-all

19  at the very first day that the State is going to ask

20  for the death penalty in this case if we prove the

21  case beyond a reasonable doubt.  So, tell me, how do

22  you feel about the death penalty in general?

23      A.   I feel I could give somebody a death penalty

24  if there was the evidence to warrant that.

25      Q.   Okay.  Do you have any hesitation or

357

1  reluctance to do the death penalty if it's called for?
2      A.   I would have some hesitation, but I feel with
3  -- if there was a enough evidence and without a doubt.
4      Q.   That's a good -- that's a good answer at the
5  part where you say you should have some evidence.
6  Nobody is happy about doing this, right?
7      A.   Yes.
8      Q.   I mean, it's a pretty serious case.  It's an
9  awesome responsibility to have the 12 people on the
10 jury make that decision.  But I want to know is if the
11 evidence is proven to you beyond a reasonable doubt,
12 can you go through with it?
13     A.   Yes.
14     Q.   Okay.  You see where I'm getting at?  Because
15 sometimes people will tell me, "Mark, I believe in the
16 death penalty.  It's a good law.  I'm glad we have it.
17 Yes, I believe in the death penalty.  That guy's a bad
18 guy.  He should be executed," and then I say, "Okay.
19 You get on the jury and do it," and they go, "Wait a
20 minute, not me, not me.  I don't want to have to do
21 that."  And I'll be honest with you, Mr. Benavidez,
22 that's him, right there.  Look at him.  That's John
23 Henry Ramirez.
24          There's going to be a time in this trial
25 where I'm going to ask you to listen to all the

358

1  evidence and make a decision where he gets put to
2  death.  Do you think you can follow through on that if
3  the evidence is there?
4      A.   Yes.
5      Q.   Okay.  And the answer -- the other part I
6  need to ask you is, if the evidence is not there, can
7  you give him a life sentence?
8      A.   Yes.
9      Q.   Okay.  In other words, you're not leaning one
10 way or the other, correct?
11     A.   That's correct.
12     Q.   And when you look at a person, can you -- do
13 you make a decision on how a person looks or what a
14 person does or did?
15     A.   No.
16     Q.   Well, it's like some people say, "Well, gosh,
17 you know," that first day you probably said, "he looks
18 kind of young, or he doesn't look like that bad a
19 guy."  Do you agree with me that you can't make a
20 decision on what he looks like, that you should make a
21 decision on what the evidence is that he did or didn't
22 do?
23     A.   Yes, I'll wait for the evidence.
24     Q.   In other words, you can't judge a book by its
25 cover.  You can't just look at somebody and make a

359

1  decision.  How -- how did you feel when you first
2  heard that it was going to be this kind of case?
3  Remember, a couple of weeks ago when all those people
4  in that room and the Judge said, "This is a capital
5  murder case.  You may have to decide whether this
6  person lives or dies?"  What struck you, Noe
7  Benavidez', you know, first thought when that heard --
8  when you heard it was that kind of case?
9      A.   Well, you know, capital murder case, you
10 know, they'll tell you that will lead to that, the
11 life or possibly death sentence.
12     Q.   But how did you feel about being part of the
13 process maybe?
14     A.   Not good, in a way, because I know if I got
15 -- as a juror, that that would be a very hard decision
16 to make.
17     Q.   Uh-huh.  What do you mean?
18     A.   Well, somebody's life is at stake.  I mean,
19 either way, right, life sentence is not -- not a piece
20 of cake, but also being executed is -- is not good.
21     Q.   Uh-huh.  And so what you're saying, it would
22 be a tough decision.
23     A.   Very tough.
24     Q.   Very tough.  Is it a -- is it something
25 that's doable, based on the evidence, though?

360

1      A.   Yes.
2      Q.   In other words, there's some people that say,
3  like I said, "Don't make me do it.  I believe in it,
4  but don't make me do it."  Some people can talk the
5  talk, but they can't walk the walk.  They'll say,
6  "Yes, I believe in the death penalty.  Yes, it's good.
7  Yes, it's this, but don't make me do it."  Do you
8  think you could do it if the evidence called for it?
9      A.   Yes, I think I can do it.
10     Q.   And I agree with you that it's not easy, it's
11 a tough decision.  But the question is, you know, I'm
12 looking for people that can actually follow through on
13 it and do it if it's called for.  And if you can't do
14 it, that's fine, too.  Just let me know if you can do
15 it or not.
16     A.   Yes, I can -- I feel I could do it.
17     Q.   Okay.  No problem.  I don't want to say no
18 problem because no one's happy about making that
19 decision, right?
20     A.   Right.
21     Q.   But it's -- it's like one of those things
22 that, you know, it's your civic duty to listen to all
23 the evidence and make a decision.  Do you think we
24 should have the death penalty in Texas?
25     A.   Yes.

361

1    Q.   Why?

2    A.   I think that would deter a lot of the crimes.

3    Q.   So, if you had a choice to vote, like, if

4  you're in the legislature and the government and you

5  had to vote for or against the death penalty, you

6  would vote to keep the death penalty.

7    A.   On certain crimes, yes.

8    Q.   Yeah.  You know what, that's a good point.

9  You said, "On certain crimes."  Because the law says

10  it is only on certain crimes.  Did you know that

11  before you came in jury duty, or did you think all

12  murder cases could get the death penalty?

13    A.   I thought all murder cases.

14    Q.   And a lot of people think that, and I always

15  tell them, "Well, you know, when you say 'only certain

16  cases,' that's what the law says.  I can't just go in

17  there and say, 'Okay, you murdered somebody, we're

18  going to seek the death penalty.'"  It's got to be one

19  of those special classes of murder cases, like, murder

20  plus something else, like robbing, raping, kidnapping,

21  burglarizing somebody.  You know, and I can't even

22  make that decision or the Judge can't even make that

23  decision on whether to give the death penalty.

24         You know who they put that decision with?

25    A.   (No response.)

362

1    Q.   The jury.  The jury is the only one that can

2  make the decision whether a person gets death or life.

3  You answer some certain questions, but by those

4  questions you-all determine whether the person gets

5  death or life.  You understand that?

6    A.   Yes.

7    Q.   It's not the Judge's decision, not the D.A.'s

8  decision.  It's up to the jury.  So if it's any

9  consolation to you, it's not you being responsible

10  yourself, it's 12 people that make that decision, as

11  citizens, which is probably the way it should be,

12  don't you think?

13    A.   Yes.

14    Q.   Yeah, you don't want to give the power to

15  just one person, you want to have the power spread out

16  to 11 jurors of his peers.

17         Sometimes people tell me, "Mark, you

18  know, we're such a civilized society now.  We

19  shouldn't have to have the death penalty, we should do

20  away with it.  I don't think we should have the death

21  penalty because we're too advanced, we're too good,

22  now."  Do you believe in that?

23    A.   No.

24    Q.   Why not?

25    A.   There again, certain crimes I think it -- it

363

1  warrants the death penalty.

2    Q.   In certain crimes and certain circumstances.

3  You understand the law says that certain crimes are

4  only eligible for the death penalty.  It doesn't mean

5  they automatically get the death penalty.  You still

6  have to decide whether it's death or life in prison.

7         For example, if you kill a kid under six

8  years old, you're eligible for the death penalty.

9  Does that means you automatically get it?  No.  If you

10  rob somebody and murder them, does that mean you

11  automatically get the death penalty?  No.  You have

12  two parts of the trial.  The first part of the trial

13  is guilt or innocence.  Did he do it or did he not do

14  it.

15         Remember, the trial you were on before,

16  the drug case?  First of all, you had to decide

17  whether he's guilty or not, right?

18    A.   Right.

19    Q.   And then if he's found not guilty, the case

20  is over with, right?

21    A.   Yes.

22    Q.   But then if you find him guilty, you go on to

23  the second part of the trial.  In the second part of

24  the trial, I think you-all sent the guy to jail or

25  something like that?

364

1    A.   Yes.

2    Q.   Okay.  You understand how it's going to work

3  like that in some regards but some ways it's

4  different.  In this case, the second part of the

5  trial, you might get to hear additional evidence.  The

6  first part of the trial, the guilt or innocence, is

7  basically, you know, what happened that day, the --

8  the crime itself and maybe the surrounding

9  circumstances, but after that, if you find him guilty,

10  you might get to hear additional evidence.

11         You might hear about this guy, whether

12  he's a good character or bad character; has he been to

13  prison ten times, has he never been to prison before;

14  was he an Eagle Scout or has he always been in trouble

15  with the law?  See what I'm saying?  You want to hear

16  that other evidence before you make a decision, don't

17  you?

18    A.   Yes.

19    Q.   You wouldn't do anything automatically,

20  right, just because you found him guilty, you'd

21  automatically give him the death penalty, right?

22    A.   Right.

23    Q.   You'd have to wait till you hear everything

24  before you decide that.  And it doesn't really matter

25  what he looks like or how old he is.  As long as he's

365

1  over 18, you make a decision on the evidence, correct?

2     A.   Yes.

3     Q.   Now, the two questions that you asked -- that

4  are asked of you after, say, for example, the person's

5  found guilty, the Judge will give you these two

6  questions, and the first question says this, "Is there

7  a probability that the Defendant would commit criminal

8  acts of violence that will constitute a continuing

9  threat to society?"  We call that "the future

10 dangerousness question."  Basically, do you think he's

11 going to hurt somebody else in the future?  Is there a

12 chance, a good chance, a probability, that the

13 Defendant would commit criminal acts of violence that

14 will constitute a continuing threat to society?

15          In other words, is there a good chance,

16 probability, that he's going to commit a criminal act

17 of violence.  Doesn't necessarily mean he's going to

18 murder somebody, again, but would he hurt somebody,

19 again, is there a chance he could hurt somebody?  And

20 that's all it is, a chance.  And would that constitute

21 a continuing threat to society?  And that makes sense,

22 right?  You -- you want to do something to people who

23 are going to -- you think are going to hurt somebody

24 in the future.

25          Some people tell me, "Well, gosh, Mark,

366

1  why don't you just take him out of society?  Why don't

2  you put him in prison for life, that way he won't hurt

3  anybody because he's been in prison?"  And I always

4  tell them, "Well, just because you're in prison

5  doesn't mean you're completely removed from society,"

6  because what else -- who else is in prison?  Who else

7  is --

8     A.   Prisoners.

9     Q.   Prisoners.  Other prisoners.

10    A.   And guards.

11    Q.   Guards, people like that.  Have you ever

12 heard about happening -- that happening, where an

13 inmate hurts another inmate or kills another inmate,

14 or somebody attacks a guard or hurts a guard?  You've

15 heard of that, right?

16    A.   Yes, sir.

17    Q.   So just because you're put in prison, does

18 that mean you're away from society and you can't hurt

19 anybody?  No.

20    A.   No.

21    Q.   It's kind of a trick question because some

22 people think, "Well, you're -- you're locked up and

23 you never come in contact with anybody, again."  Well,

24 that's not necessarily true.  I mean, if you were sent

25 out on a desert island, there's no one -- no other

367

1  human beings out there that might be true, but that's

2  not what we have.

3          So the first question is, based on the

4  evidence that you've heard, which is the first part of

5  the trial and any other background, you think he's

6  going to hurt somebody in the future.  Then you go to

7  the second -- you answer this question yes or no.

8          Then you go to the second question.  The

9  second question says this, it talks about mitigating

10 circumstances, and that's a big word that I had never

11 even heard of before I went to law school, but

12 mitigating basically means anything that would lessen

13 or make less severe the punishment.  In other words,

14 he did the crime, but is there any reason we should

15 give him a life sentence rather than a death sentence

16 impose, or is there any way to cut him a break, give

17 him a lesser sentence?  Because that's what mitigating

18 means, lessen or make less severe the punishment.

19          So, in a regular case, say you find him

20 guilty of capital murder, he's guilty, and you answer

21 this question yes, I think he's a -- yes, I think he's

22 a continuing threat to society, the Judge says before

23 you give the death penalty, you have to answer this

24 question, "Take into consideration all of the

25 evidence, including the circumstances of the offense,"

368

1  you know, like what happened that day, "the

2  Defendant's character and his background," you know,

3  his past, "and his personal moral culpability, is

4  there sufficient," is there enough, "mitigating

5  circumstance or circumstances to warrant that a

6  sentence a life, rather than the death sentence?"  I

7  mean, he's heading toward the death penalty, but the

8  Judge says, check it and see if you're sure that there

9  -- is there anything that's enough to show that he

10 should get a life sentence instead of a death

11 sentence?

12          Let me give you an example.  Do you have

13 kids, by any chance?

14    A.   Yes, I do.

15    Q.   Do you make decisions on how to punish your

16 kids sometimes if they violate a house rule or

17 something like that?

18    A.   Yes.

19    Q.   I'm sure your kids are wonderful kids but I'm

20 going to give you an example about kids.  Say a

21 household has two kids.  Kid No. 1, the curfew of the

22 house is 11:00 at night.  You're supposed to be home

23 at 11:00 at night.  The first kid comes home at 11:03.

24 You find out he's violated -- he broke the curfew,

25 right?  It's 11:03.  You ask him what happened.  You

369

1 find out he's had a flat tire.  And he would have been
2 home at 10:45, but he had to change the tire, so he
3 got home after 11.  And this kid has never broken
4 curfew before.  This is the first time he's ever
5 gotten home too late and those were the reasons why.
6 Now, you go on the second kid, and we'll
7 just call this "the bad kid" because this kid, he
8 doesn't come home just a little after 11, he comes
9 home at 3:00 in the morning, smelling of alcohol.  And
10 you say, "What's been going on with you?"  "Oh, I was
11 at a party and I forgot to come home.  I just didn't
12 make it home by 11:00.  I was just having -- partying
13 and fun."  And then this is the kid who -- this isn't
14 the first time he's broken curfew, he's broken it five
15 times before.
16 Okay, so you have two kids.  They both
17 broke curfew.  Would you treat them both equally the
18 same?
19 A.  No.
20 Q.  Probably not.  What would you do?  Generally
21 speaking, you'd probably give the guy who's committed
22 the -- who's done this before, you know, violated
23 probation -- violated curfew before a harsher
24 punishment than you did -- would you do the first one,
25 right?

370

1 A.  Yes.
2 Q.  Because the first one's his first time.  He
3 just barely missed it, and he had a pretty good
4 reason, there was "extenuating circumstances" to why
5 he was late for curfew.  But the second one, well,
6 gosh, it's night and day, right?
7 And that's what this question is designed
8 to do.  Just because he's found guilty of capital
9 murder, is there any reason that you should give him a
10 lesser punishment?  There may or may not be.  Is there
11 enough or not?
12 And what is a mitigating circumstance?
13 That's up to the jury to decide.  Some jurors may say,
14 "Well, look, you know, I don't care he came from a
15 broke home, or he was a straight A student or he used
16 to be in Boy Scouts.  That's not enough to go to a
17 lower sentence.  Other -- he's got to pay for what he
18 did."  See what I'm saying?  It's kind of like a
19 balancing test.  You got to decide should he get the
20 death penalty or is there a sufficient reason to give
21 him something less, like these -- I call them
22 "Extenuating circumstances" or mitigating
23 circumstances, you know?  And that's something that
24 you have to decide, as a jury, what effect, if any, to
25 give to him.

371

1 Just because you hear a mitigating
2 circumstance, like, "Oh, he was young or he was a good
3 student in school, or he was an Eagle Scout," does
4 that mean you automatically reduce his sentence?  No.
5 You balance it against everything else and decide is
6 that enough to give him a lower sentence.  Maybe it
7 is, maybe it isn't.  Just like the two kids.  You got
8 to wait till you hear -- know what all their
9 background is before you make a decision.
10 Now, one thing the Judge says, too, will
11 probably give you an instruction that says, "Voluntary
12 intoxication is not a defense to crime."  If you
13 voluntarily get yourself drunk or high on drugs and
14 you go commit a crime, is that an excuse to the crime?
15 No, absolutely not.  You can't just say, "Well, I
16 robbed a bank, but I was drunk, so I'm not guilty of
17 robbing a bank."  No, it's not a defense to crime.
18 However, it could possibly be a
19 mitigating circumstance.  But that's up to you.  One
20 jury (sic) may say, "Oh, gosh, you know, he was just
21 drunk when he did it, so we'll cut him a break and
22 give him a less sentence."  Other jurors may say,
23 "Look, I don't care if he was drunk or not.  He still
24 did this crime, and, you know, this background."  You
25 see what I'm saying?

372

1 A.  Yes.
2 Q.  You -- the jury gives the weight to it, what
3 they want to give it, okay?  Just because you hear it
4 doesn't mean that automatically it goes lower.
5 So that's how it works.  The scheme is,
6 you first decide whether he's guilty or not, then you
7 answer the question, "is there a chance he's going to
8 be a danger in the future, yes or no," and then you
9 answer that one, "is there any reason to lower the
10 sentence to life, instead of death?"  If you answer
11 the first question yes, and the second question no, he
12 gets the death sentence.  You answer any other way, he
13 can get a life sentence.
14 And, again, that's the person we're
15 talking about.  Can you look at him and tell me that
16 you can listen to all that evidence and make that
17 decision if the evidence calls for it?
18 A.  Yes, I can.
19 Q.  Thank you.  Any questions about how that
20 works?
21 A.  No.
22 Q.  It sounds like you want to be -- oh, you said
23 something about you want to be convinced that there's
24 enough evidence.  Remember that?
25 A.  Yes.

373

1    Q.   We call that "the burden of proof," how much
2  you have to be convinced.  And you said something
3  about, well, it has to be without a doubt.  And I need
4  to hold you back a little bit on that one because the
5  Judge is not going to tell you without any doubt or
6  all doubt, or shadow of a doubt, but the Judge's
7  instruction will be the jury has to find him guilty
8  beyond a reasonable doubt.  Beyond a reasonable doubt.
9        Now, unfortunately, that's not defined by
10  the law, but a lot of -- but I can tell you what it
11  doesn't mean.  It doesn't mean beyond -- without a
12  doubt.  It doesn't mean without a doubt.  It doesn't
13  mean beyond a shadow of a doubt or any doubt.  Let me
14  give you an example.  Say, for example, you're a juror
15  in a bank robbery case and you're sitting there in the
16  jury and the first teller comes up and says, "There's
17  the guy that robbed me.  I recognize his face.  He
18  came up and he demanded money with a gun.  And I
19  recognize him.  He was wearing a yellow shirt that the
20  day."
21        The second teller comes up and says,
22  "That's the guy who robbed our bank that day.  I saw
23  him rob the other teller.  He put a gun in her face
24  and took a bag of money.  That's the guy who robbed
25  him -- robbed her, and he was wearing a yellow shirt

374

1  that day."
2        Then the next -- third witness comes up
3  and he's a bank guard who tried to catch the guy
4  outside the bank right after it happened.  He says,
5  "There's the guy that was robbing the bank.  I
6  recognize his face.  He was walking out of the bank
7  with a bag of money in one hand and a gun in the other
8  and that day he was wearing an orange shirt."
9        Well, you got a little discrepancy,
10  right?  You got two people saying yellow shirt and one
11  saying orange shirt.  But do you really have a doubt
12  that this guy robbed the bank?  Because all of them
13  recognized his face and saw him, what he was doing,
14  but you might have something that's -- that's a little
15  different, inconsistency in the testimony.  Does that
16  -- was that enough to say that you don't believe it
17  beyond a reasonable doubt?  Probably not, because --
18  you see what I'm trying to say is?  I can't prove it
19  to you 100 percent.  There's no way you could do that,
20  and the law doesn't require me to do.  It just says,
21  "Beyond a reasonable doubt."
22        Can you follow that instruction?
23    A.   Yes.
24    Q.   Okay.  You know, just because he's indicted
25  does not mean he's guilty.  That just means the charge

375

1  is brought against him.  That means the State still
2  has to prove the case, correct?
3    A.   Correct.
4    Q.   And as he sits there now, he's presumed
5  innocent because we've not brought any evidence
6  against him.  That doesn't mean he is innocent, it
7  just means he's presumed at this time.  Why?  You
8  haven't heard any evidence yet, okay?  But you've got
9  to start him off at innocent.  It's not like other
10  countries where sometimes you're guilty and you have
11  to prove you're innocent.  This is America.  You're
12  presumed innocent and the State has to prove him
13  guilty.  And we have to do that in every case, every
14  criminal case that we bring.
15        You know about the Fifth Amendment, that
16  the guy can testify if he wants to, but if he doesn't
17  have -- want to he doesn't have to, right?
18    A.   Yes.
19    Q.   And you have can't hold that against him,
20  right?
21    A.   Right.
22    Q.   Sometimes jurors say, "Well, gosh, Mark, I
23  want to hear what he has to say.  I can't make a
24  decision unless he testifies."  And I always have to
25  tell them, "Wait a minute, if the Judge tells you he

376

1  doesn't testify, you can't hold that against him, you
2  got to follow that law," would you be able to do that?
3    A.   Yes.
4    Q.   Thank you.  I think you pointed out you're
5  not sure what your church's position is against the
6  death -- for or against the penalty; is that correct?
7    A.   Uh...
8    Q.   Do you know what your church's position is?
9    A.   No.
10    Q.   Okay.  Generally speaking, the Catholic
11  Church is against the death penalty, generally
12  speaking.  Is that going to have an effect on you in
13  this case?
14    A.   No.
15    Q.   Why not?
16    A.   I think that the death penalty is a -- or
17  could be a deterrence on certain -- certain crimes.
18    Q.   See what I'm getting at?  Some people say,
19  "Well, you know, I'm a Catholic and the Catholic says
20  I can't do this, and so, because of my religious
21  beliefs, I can't sit on a death penalty case."  Other
22  people who are Catholics say, "Look, you know, I
23  believe in the Catholic Church's teachings, but in
24  this one thing, I go my own way, I make up my own mind
25  about something."  Is that kind of how you fit in?

377

1    A.  Yes.

2    Q.  Okay.  In other words, you're not going to

3  lose any sleep if you go back and the priest says, you

4  know, the Catholic Church is against the death

5  penalty.  You're still going to make up your own mind?

6    A.  Yes.

7    Q.  And it doesn't matter how you feel.  We just

8  want to know what -- how it is.

9         Now, you understand, too, that police

10  officers may testify in this case.  Police officers

11  may testify in this case and they're to be treated

12  just like any other officer -- any other witness, I'm

13  sorry.  Just because a police officer testifies in

14  uniform, he's a policeman, does that mean his

15  testimony is better than everybody else's?  No.  He's

16  supposed to be treated just the say.  Can you do that?

17    A.  Yes.

18    Q.  Okay.  Do you have any other questions of us,

19  Mr. Benavidez?

20    A.  No, I don't.

21    Q.  Do you work at the Celanese plant in Bishop,

22  then?

23    A.  Yes, I do.

24    Q.  And how long have you been over there?

25    A.  24 years.

378

1    Q.  They've been having a lot of layoffs.  You've

2  been keeping your head above water there, huh?

3    A.  So far, yes.

4    Q.  Well, keep it up, man, because I know that's

5  been tough.  I know some people that got laid off.

6  That's a big plant, but they -- every once in a while

7  they seem to kind of go through all this stuff.  And

8  you're an operator out there?

9    A.  I'm a operation specialist.

10    Q.  What do you do?

11    A.  Basically, a unit supervisor.  I oversee the

12  day-to-day operations of four chemical units.  So I

13  have 15 operators under me.

14    Q.  Okay.  So you're not just an operator, you're

15  a supervisor of the operators.

16    A.  Yes.

17    Q.  So you pretty much make big decisions. --

18    A.  Yes.

19    Q.  -- a lot, and everything, and that --

20    A.  Get calls at 2 in the morning.

21    Q.  Say again?

22    A.  I said, I get the calls at 2 in the morning.

23    Q.  Sometimes being a supervisor isn't that much

24  fun, but what I'm saying is, you know how to make

25  decisions and sometimes probably tough decisions.

379

1    A.  Yes, I believe so.

2    Q.  In this case, although we don't think anybody

3  likes making the decision, you understand your civic

4  duty in this case.

5    A.  Yes.

6         MR. SKURKA:  Okay.  Thank you, Mr.

7  Benavidez.  I'll let the other lawyers talk to you

8  now.

9         THE COURT:  All right.

10            VOIR DIRE EXAMINATION

11  BY MR. GARZA:

12    Q.  Mr. Benavidez, thank you for being here, sir.

13  And my name is Ed Garza, I -- I think I introduced

14  myself to all of you-all when we had the big panel

15  downstairs.  This is Mr. Grant Jones.  He's my

16  Co-Counsel in this matter.  And, of course, this is

17  our client that we represent, Mr. John Henry Ramirez.

18         We're trying -- we're trying to ask these

19  questions that we're asking you to get a feel for

20  whether or not you can truthfully and honestly

21  participate in this kind of a case as a juror.  You've

22  already made references to the fact that when you

23  first came and found out that this was a capital

24  murder case wherein the State was asking for the death

25  penalty, it struck you as something, obviously, very,

380

1  very awesome, very important.

2    A.  Yes.

3    Q.  You still feel that way?

4    A.  I still -- yes.

5    Q.  Is it something that would obviously invoke

6  some serious thought in trying to assist us, if you

7  were chosen as a juror, in -- in coming to a decision

8  on all these legal issues?  Would you -- I'm sure you

9  would, it's kind of a dumb question, but I'm sure you

10  can assure us that you would do your best to -- to

11  take this very seriously.

12    A.  Yes.

13    Q.  It's important for everybody concerned

14  because the stakes are so high.  Would you agree?

15    A.  I agree.

16    Q.  The State of Texas is going to try to prove

17  this case, if they can, beyond a reasonable doubt.

18  And if and when they do or don't, you know, a lot of

19  things could -- could happen.  If they don't, of

20  course, we get to go home.  If they do, then, you

21  know, we have to proceed to this other segment of the

22  trial because there's always two parts to a criminal

23  trial in Texas.  And we use this big highfalutin word

24  called, "bifurcation," meaning there's a

25  guilt/innocence part and then there's a punishment

381

1  part, okay?

2          And in Texas, we also enjoy the

3  opportunity, if we wish to invoke it, to have the

4  Judge assess punishment in certain cases, okay?  In

5  this one, you can't.  By law, you guys are the ones

6  that have to make all the serious decisions, but based

7  on that decision, then you give the authority to the

8  Judge on what particular punishment he's going to

9  assess, depending on your verdict, okay.

10          So you-all have a great deal of power in

11  this situation.  And I guess as a benefit, we get to

12  use 12 people who can either put their minds together

13  or not, you know, depending on how -- how they see

14  things, okay?

15          But it's real important for us to know

16  that you're open-minded, fair, and that you can give

17  everybody involved an even chance.

18      A.  Yes.

19      Q.  Are you that kind of person?

20      A.  I believe I'm that kind of person.

21      Q.  I guess it would be like placing yourself in

22  this situation.  If you were, you know, on the

23  receiving end of the Criminal Justice System, if you

24  have been accused of a crime or something, I'm sure

25  you would want and would require and would want to

382

1  avail yourself of the same system.

2      A.  Yes.

3      Q.  Would you not?

4      A.  I would, surely would.

5      Q.  Yeah.  And then, of course, what if it

6  involved one of your family members, one of your

7  children or somebody like that?  It -- it makes it hit

8  closer to home and it makes you probably appreciate

9  our system a little bit more and that we have these

10  safeguards out there, okay?  And we're not saying it's

11  always perfect because I'm sure you've seen or read

12  where some people have been accused of crime, tried,

13  convicted, and then they serve this enormous amount of

14  years in jail and then they come up factually innocent

15  through DNA processes and things of that nature.  How

16  do you have feel about that?

17      A.  Yeah, that's -- that's tough.  Getting

18  convicted and knowing that you're innocent, and

19  spending time in jail, and coming back years later,

20  find out that you were right, you were innocent and

21  they -- they convicted you anyway.

22      Q.  And they've taken all those years out of your

23  life and exposed you to a whole, you know, horrible

24  kind of culture, probably, which, you know, would be

25  unimaginable to some of us who have never been there

383

1  and don't want to, and then to try to come back and

2  make a life.

3          So I guess what I'm trying to stress to

4  you is, it's important that we know, from our

5  questions to you, that you can assist us in this

6  matter and see if we can try to get it right the first

7  time.

8      A.  Yes, I can.

9      Q.  That's pretty important, don't you think?

10      A.  I -- yes, very important.

11      Q.  A big responsibility?

12      A.  Yes.

13      Q.  Is it one that you would take pretty

14  seriously?  I think you would.

15      A.  I would take it very seriously, yes.

16      Q.  Okay.  Is there anything going on at all in

17  your life right now, as far as vacation plans or

18  anything at work or anything that would distract you

19  in any way or keep you from giving every thought,

20  every consideration that would be required -- every

21  duty that would be required of you in this case?

22      A.  No.

23      Q.  Okay.  Could you serve as a juror in this

24  case?

25      A.  What do you mean?  I mean...

384

1      Q.  Well, is there any way you couldn't serve as

2  a juror in this case, like if you couldn't take the

3  oath that the Judge asked you about, --

4      A.  Oh, no.  There's --

5      Q.  -- if there's anything here about the

6  mitigating evidence that you can't consider, any

7  aggravating evidence that you couldn't consider?  You

8  know, anything at all that would preclude you from

9  being fair and impartial in this case?

10      A.  No.

11      Q.  I noticed in your questionnaire you were

12  asked that, "On a scale of one to ten, how strongly do

13  you believe in the death penalty, one being the least,

14  ten being the strongest," and you circled five, which

15  is pretty much right down the middle.  Is that the way

16  you feel about it?

17      A.  Yes.  I believe in it, but I don't believe

18  ever crime warrants the death penalty.

19      Q.  Okay.  You also indicated on the question of,

20  "Do you believe that the death penalty is imposed too

21  often, not often enough or about right," you

22  indicated, "about right."

23      A.  Yes.

24      Q.  Is that what you believe?

25      A.  Yes.

385

1    Q.   Okay.  And also, when you were asked, "Do you
2   think serving a life sentence in prison is more
3   severe, about the same or less severe than the death
4   penalty," you also put, "It's probably about the
5   same."
6    A.   Yes.
7    Q.   It kind of reminds me of the joke, which I
8   can't remember about when the guy goes in to the
9   doctor about a condition, and, you know, the doctor
10  comes up and tells him that he's got cancer and
11  Alzheimer's, both.  He says "You've got -- you've got
12  big problems.  You've got both cancer and
13  Alzheimer's," and that's kind of -- that's the kind of
14  situation this could possibly lead up to.  It wouldn't
15  be a -- you know, it's either a life or death
16  sentence, depending on whether or not the government
17  proves its case, okay.
18        And so would it be fair to say that you
19  would you try to treat your decision on a possible
20  punishment fairly and evenly?
21   A.   Yes.
22        MR. GARZA:  Okay.
23        THE COURT:  Is that it, Mr. Garza?
24        MR. GARZA:  I think so, Judge.
25        THE COURT:  All right.

386

1        MR. GARZA:  Thank you.  I appreciate your
2   answers.
3        THE COURT:  All right.
4        MR. SKURKA:  Thank you, Mr. Benavidez.
5        THE COURT:  Mr. Benavidez, will you wait
6   in the jury room while I speak to the attorneys for
7   just a second.
8        (Venireperson exits courtroom.)
9        THE COURT:  All right.
10        MR. SKURKA:  State will accept this
11  juror.
12        THE COURT:  Mr. Garza?
13        MR. GARZA:  Judge, can we confer just a
14  second, Judge?
15        THE COURT:  You may, you may.
16        MR. GARZA:  Thank you.
17        (Pause in proceedings).
18        MR. GARZA:  We'll also accept him, Your
19  Honor.
20        THE COURT:  All right, let's bring him
21  in.
22        (Venireperson enters courtroom.)
23        THE COURT:  All right.  Hello, again,
24  Mr. Benavidez.  All right, Mr. Benavidez, you have
25  been selected to be on this jury so I'm going to give

387

1   you some instructions, ones I've already given you,
2   but I don't want you to watch the local news or read
3   the local paper while this -- between now and December
4   1, okay.
5        We're going to be going to trial, I
6   believe, the first week of December.  I don't know if
7   it's going to spill into the second week or not, but
8   you might -- you might want to plan for, at the most,
9   those two weeks, first two weeks of December.  And
10  don't talk about the facts of the case with anybody,
11  okay?
12        VENIREPERSON NO. 34:  Okay.
13        THE COURT:  So we'll be keeping in touch.
14  We'll let you know if things change, okay?
15        VENIREPERSON NO. 34:  Okay.
16        THE COURT:  All right.  If you need a
17  work excuse, the bailiff will get you one.
18        VENIREPERSON NO. 34:  All right.
19        THE COURT:  Thank you very much, Mr.
20  Benavidez.
21        VENIREPERSON NO. 34:  Thank you, sir.
22        (Venireperson exits courtroom.)
23        THE COURT:  Okay.  That's Juror No. 4.
24        All right.  We've got one more person.
25  All right, bring him in.

388

1        (Venireperson enters courtroom.)
2        THE COURT:  All right.  Come on in, Ms.
3   Meza.  Go ahead and have a seat.
4        VENIREPERSON NO. 35:  Yes, sir.
5
6        VENIREPERSON NO. 35,
7        THERESA MEZA,
8        VOIR DIRE EXAMINATION
9   BY THE COURT:
10   Q.   All right.  How are you today?
11   A.   Just fine.
12   Q.   All right.  You are Theresa Meza; is that
13  correct?
14   A.   Yes, sir.
15   Q.   All right.  And we're going to talk to you
16  about some stuff, okay?
17   A.   Okay.
18   Q.   First of all, we're looking to pick a jury
19  here, okay, you know that.
20   A.   Yes.
21   Q.   And we're looking for people that can keep an
22  open mind and follow the law, okay?
23   A.   Okay.
24   Q.   So let's begin with the open mind.  Is there
25  anything that would keep you from keeping an open mind

389

1   in this case?

2       A.   I don't think so, sir.

3       Q.   Okay.  I know that you -- that you said that

4   you got some information from the media.

5       A.   But it's been so long, I don't -- I don't

6   think I can remember what it was, sir.

7       Q.   Okay.  So you have very little knowledge --

8       A.   Yes.

9       Q.   -- about it.

10      A.   Yes.

11      Q.   Now, you also must know, and I got to tell

12  you, I'm sure that all the lawyers in here agree with

13  me, you know, when the media reports something, they

14  don't always get it right.

15      A.   That's true.

16      Q.   Okay?  And a lot of times we're doing these

17  cases, and they'll report something and it will just

18  be completely wrong, okay?

19      A.   Yes.

20      Q.   But my point is this, we want you just to

21  come to court, and if you are selected on this jury

22  just consider the evidence that's presented to you

23  here and not what you've heard in the media.

24      A.   Okay.

25      Q.   You can do that?

390

1       A.   Yes, sir.

2       Q.   Okay.  Now, let's move on to the next thing,

3   that is, following the law.  I want to talk to you

4   about a few things.  And it looks like you have been

5   on a criminal jury before, but it's been a while.

6       A.   It's been maybe 20 --

7       Q.   That's all right.

8       A.   -- or more years.

9       Q.   That's okay.  I think we've already seated

10  some people on this jury that have never been on a

11  jury before, okay?  So that doesn't matter.  What I

12  will tell you is this, I'm going to talk to you about

13  some things and maybe your prior jury service may

14  help.

15          Now, first of all, in every criminal case

16  in the State of Texas, and you may remember this from

17  your prior jury service, or from just knowledge, just

18  personal knowledge, the State's got the burden to

19  prove the case.

20      A.   Yes, sir.

21      Q.   Okay?  The Defendant doesn't have to come in

22  here and prove his innocence.

23      A.   Yes, sir.  I know that.

24      Q.   All right.  There are places in the world

25  where it's that way and we're glad it's not, okay?

391

1       A.   Yes, sir.

2       Q.   I'm sure you would agree with me on that.

3       A.   Yes.

4       Q.   The next thing is the burden of proof is

5   beyond a reasonable doubt.

6       A.   Okay.

7       Q.   That's the burden.  And I -- and if you sat

8   on a criminal case, that was the burden of proof that

9   you had back then.  You may or may not remember that.

10      A.   It's been a long time.

11      Q.   Okay.  But, in any event, that's the burden

12  of proof, and that's the burden of proof in all

13  criminal cases, not just this case, not just the

14  capital case.  We had a fellow in here earlier that

15  had been on a jury, and -- and the -- it was a public

16  intoxication but the burden of proof was still beyond

17  a reasonable doubt.

18      A.   Yes, sir.

19      Q.   Okay?  And that's a high standard.  It's the

20  highest standard that we have in all of the law.  Now,

21  what it is not is it is not beyond all doubt, it's not

22  beyond a shadow of a doubt, it's beyond a reasonable

23  doubt, okay?

24      A.   Okay.

25      Q.   And what I need to know is could you follow

392

1   that instruction that -- and require the State to

2   prove this case beyond a reasonable doubt?

3       A.   Yes, sir.

4       Q.   Okay.  Now, because it's the burden of proof,

5   it is on the State, our law says that, "Look, State,

6   you bring the charges, that's fine.  Until you prove

7   it, Defendant is presumed to be innocent.  You may not

8   be able to prove it, but until you --" and that's

9   really all of our rights, right?

10      A.   Yes, sir.

11      Q.   Until -- if the State brings a charge against

12  us, you know, until they prove it, we're innocent

13  until proven guilty.

14      A.   That's true.

15      Q.   Okay?  You believe in that.

16      A.   Yes, sir.

17      Q.   Okay.  And you could follow that law.

18      A.   Yes, sir.

19      Q.   Okay.  Now, as part of all of that, going

20  along with all of that, Defense doesn't have to do

21  anything.  They don't have to present a case.  Because

22  why?  Because the burden's not on them.

23      A.   Yes, sir.

24      Q.   It's on the State, right?  As part of that,

25  the Defendant doesn't have to testify.

393

1    A.    That's true.

2    Q.    Okay?  And -- and the Constitution says he

3    doesn't have to testify.  And more than he doesn't

4    have to testify, the jury can't hold it against him.

5    The law says you can't -- you can't go back to the

6    jury room to deliberate and say, "You know what?

7    Mr. Skurka's case, kind of shaky, but you know what,

8    he didn't testify, so I'm going to -- I'm going to put

9    that over here in Mr. Skurka's, you know, side."

10   A.    Uh-huh.

11   Q.    You can't do that.  You can't --

12   A.    Yeah.

13   Q.    -- you can't hold it against him.  Would you

14   do that?

15   A.    I can do that, sir.

16   Q.    Okay.  You -- you could -- you could follow

17   the law that says you would not hold it against the

18   Defendant if he chose not to testify.

19   A.    I wouldn't hold it against him.  He has the

20   right to say yes or no to testify.

21   Q.    Yes.  And, you know, I tell the jury, there's

22   lots of reasons why a person wouldn't want to testify.

23   Maybe -- maybe his lawyers advise him not to because

24   he -- they think that the State hasn't proven their

25   case, okay?  There's lots of reasons.  Or maybe he's

394

1    uneducated, maybe he gets nervous, maybe he stutters.

2    A.    Yeah, I can -- I can understand that.

3    Q.    You can understand that, right?

4    A.    Yeah.

5    Q.    And, obviously, this is a --

6    A.    I'm a little nervous right now.

7    Q.    And you're not on trial.

8    A.    Yeah.

9    Q.    So -- okay.  So you wouldn't do that, all

10   right.  Now, let's talk a little bit about in case,

11   this type of case.  You may or may not remember, did

12   you -- were you asked to assess punishment in that

13   case where you were on the jury?

14   A.    Yes, sir.

15   Q.    Okay.  So then you know that we have two

16   parts of a --

17   A.    I think so.  I don't -- I can't really

18   remember.  I think we did.

19   Q.    You think you did?  Okay.  Well, then, you

20   know you have two parts of a trial.

21   A.    Yeah.

22   Q.    We call it "bifurcated," but there's two

23   parts to a trial, okay?  Guilt or innocence phase,

24   that is, the State tries to prove, you know, they

25   brought a charge, they try to prove that -- all their

395

1    elements and that the Defendant's guilty, okay, of

2    what they've charged them with.

3    A.    Yes, sir.

4    Q.    All right.  If the Defendant is acquitted,

5    that is, the State can't prove their case, we go home.

6    A.    All right.

7    Q.    Case is over.  If not, then we go to the

8    second part, which is the punishment part, okay?  And

9    I -- what kind of case were you on before, if you even

10   recall.

11   A.    I think was called -- the only thing I

12   remember, it was called a bandit, a car bandit, or

13   something like that.  I really don't remember.  It's

14   been too long.

15   Q.    Could be somebody had stolen a car?

16   A.    They stole a car, but I think there was other

17   --

18   Q.    Okay.

19   A.    -- charges against him, too --

20   Q.    Okay.

21   A.    -- when stealing the car.

22   Q.    Okay.  Well, in any event --

23   A.    No, he, wasn't stealing the car, he was --

24   hit the bumper in back, run into him, --

25   Q.    Uh-huh.

396

1    A.    -- and then I think he would try to steal --

2    or rob them, but I think there was other charges.  I

3    can't remember.  I think that's about --

4    Q.    Well, in any event --

5    A.    -- about as best I can remember.

6    Q.    That's fine.  In any event, most of the time

7    in criminal cases when we get to the second part of

8    trial, there's a -- there's a -- the legislature has

9    set a punishment range.

10   A.    Uh-huh.

11   Q.    Okay?  Maybe -- maybe it's 6 months to 2

12   years in jail, state jail, or maybe it's 2 years to 10

13   years in prison, or 5 years to 99 in prison.  And then

14   the jury decides, you know, okay, well, they talk

15   about it and they decide on what to give the

16   Defendant.

17   A.    Yes, sir.

18   Q.    Okay?  Capital murder's a little different,

19   okay, which is what this is, okay?

20   A.    Okay.

21   Q.    If we get to the second half of the -- of the

22   trial, you're asked to answer questions, okay?

23   A.    Okay.

24   Q.    All right.  And here are the questions.

25   Here's Question No. 1, "Is there a probability that

397

1  the Defendant would commit criminal acts of violence
2  that would constitute a continuing threat to society?"
3  And the jury would answer yes or no to that, okay?
4      A.  Okay.
5      Q.  Then up there, you see Special Issue No. 2,
6  with the -- the -- up there?
7      A.  Yeah, this one right here?
8      Q.  Yeah.  "After taking into consideration all
9  of the evidence, including the circumstances of the
10 offense," which, of course, is the first part of the
11 case, the guilt or innocence part, --
12     A.  Uh-huh.
13     Q.  "-- the Defendant's character and background
14 and the person's -- and the personal moral culpability
15 of the Defendant, is there sufficient mitigating
16 circumstance or circumstances to warrant a sentence of
17 life in prison, rather than a death sentence be
18 imposed?"  Okay?
19     A.  Okay.
20     Q.  And the jury would answer that yes or no.
21     A.  Yes, sir.
22     Q.  Okay?  And, basically, what are we talking
23 about here?  Well, we're -- you know, you may hear
24 other stuff about the Defendant.  Maybe -- maybe he
25 had a bad childhood, maybe he had a good childhood;

398

1  maybe he had a bad criminal history, maybe he -- this
2  is the first time he's ever been in trouble.  And the
3  jury would decide, you know, --
4      A.  Life or --
5      Q.  -- life -- basically, is there a reason to
6  give him life because there's mitigating circumstances
7  --
8      A.  Uh-huh.
9      Q.  -- which means circumstances that lessen, or
10 aggravating circumstances, which are circumstances
11 that make the situation worse.  You follow me?
12     A.  Yes, sir.
13     Q.  Okay.  So you -- basically, you'd have to
14 consider basically his whole life.
15     A.  Yes, sir.
16     Q.  Okay?  And then -- and then answer that
17 question.
18     A.  Okay.
19     Q.  Okay?  All right.  Now, at the end of this
20 trial, I'm going to -- well, not the end -- at the end
21 of this jury selection, I'm going to swear in the
22 jury.  They're going to raise their right hands --
23     A.  Okay.
24     Q.  -- and you may remember this from your
25 previous service.

399

1      A.  Yes, sir.
2      Q.  And -- and the -- and the oath is this, "Will
3  you render a true verdict based upon the law and the
4  evidence presented to you?"
5      A.  Yes, sir.
6      Q.  Okay?  And then the jury will say yes and
7  we'll begin the trial.  All right?
8      A.  Okay.
9      Q.  I need to know from you if you can take that
10 oath, okay?  And -- and that is, first, can you render
11 a true verdict on the guilt or innocence phase based
12 upon the law and evidence presented to you?  Is that
13 yes or no?
14     A.  Yes.
15     Q.  Okay.  And then on these -- can you answer
16 these questions truthfully, these two special issues?
17 And before you answer, some people tell me, "You know,
18 Judge, I can't do it, because -- I can't answer these
19 questions because I can't participate in the process
20 that could lead to someone's death, so I can't answer
21 these questions."
22     A.  I think I could.
23     Q.  You think you could?
24     A.  Yes.
25     Q.  Okay.  Well, let me ask you this, would you

400

1  -- would you answer Special Issue No. 2 and take into
2  consideration everything, rather than -- some people
3  say, "Well, you know what?  I would -- you know what,
4  forget Special Issue No. 2.  If he gets convicted of
5  capital murder, I'm going to always -- there's --
6  there's no considering mitigating -- I'm always going
7  to recommend the death penalty."
8      A.  No.
9      Q.  You could consider everything.
10     A.  Life in prison or death, depends on what --
11     Q.  Okay.  You could -- you could weigh all of
12 the facts that are presented to you.
13     A.  Yes, sir.
14     Q.  And answer that question truthfully.
15     A.  Yes.
16     Q.  Okay.  Let me talk to you a little bit about
17 the charge, capital murder.  What is it, okay?  I like
18 to call it murder plus, all right?
19     A.  Okay.
20     Q.  It's murder, which, of course, is the
21 intentional taking of someone else's life, but it's
22 more than that.  The legislature says only certain
23 types of murders are capitals, that is, what is
24 capital, meaning the death penalty is a possibility,
25 okay?

401

```
1         A.   Okay.
2         Q.   In this case, what they're saying is, that is
3    the State, that we've got a murder while in the course
4    of committing or attempting to commit a robbery, okay?
5    So you got the murder, and then they have to prove
6    together with the robbery or attempting to commit the
7    robbery, murder plus.
8         A.   Okay.
9         Q.   For the State to prevail, they have to prove
10   all of their elements of capital murder, okay?
11        A.   Okay.
12        Q.   In other words, they don't just get to get
13   seven out of eight elements, or eight out of nine,
14   whatever it is, they got to get them all.
15        A.   Yes, sir.
16        Q.   And would you hold them to that burden before
17   you found anyone guilty of capital murder?
18        A.   Yes, sir.
19             THE COURT:  Okay.  All right.  Well, I'm
20   going to turn the floor over to Mr. Skurka.
21             VOIR DIRE EXAMINATION
22   BY MR. SKURKA:
23        Q.   Hello, Ms. Meza, how are you today?
24        A.   Just fine, sir.
25        Q.   I know it's getting late in the day, so we're
```

402

```
1    going to kind of go through this, and just bear with
2    us because it's --
3         A.   I -- I have no limit time.
4         Q.   Okay.  You don't have to rub it in that
5    you're retired and we all work hard.
6         A.   Well, I put in my years.
7         Q.   I know you did.
8              THE COURT:  She put in her time.
9         Q.   (BY MR. SKURKA)  Where did you work before you
10   retired?
11        A.   Corpus Christi Army Depot.
12        Q.   The whole 33 years --
13        A.   Yes, sir.
14        Q.   -- and 2 months?
15        A.   Yes, sir.
16        Q.   I noticed you put 33 years and 2 months.
17        A.   Yeah.  And --
18        Q.   And how many hours and how many days?
19        A.   I didn't count the hours.
20        Q.   Well, I know somebody -- sometimes they'll
21   put 33 years, 2 months, 3 days and 2 hours, whatever.
22   Okay, so what do you do with your time now that you're
23   retired?
24        A.   Whatever I feel like doing.  I cook, knit,
25   crochet, read, watch T.V., do errands, take a trip
```

403

```
1    here and there.
2         Q.   So you sound like you keep yourself busy --
3         A.   Yes, sir.
4         Q.   -- with things you enjoy.
5         A.   Plus, I feed my cats and dogs.
6         Q.   Well, that's good.  And I know you're just
7    rubbing in that you're retired and you have the
8    ability to do all that stuff and we still have to
9    work.
10             I want to talk to you about a few things
11   today now, and there's no right or wrong answers to
12   anything you say, --
13        A.   Okay.
14        Q.   -- I just want to know how you feel, because
15   we're trying to see if you qualify as a juror in this
16   case.
17        A.   Okay.
18        Q.   So I don't want you to answer in such a way
19   that you think the Judge wants to hear it or I want to
20   hear it --
21        A.   Oh, no, it's --
22        Q.   -- or the Defense lawyer.
23        A.   -- how I feel.
24        Q.   You just tell us how you feel, perfect.  The
25   first question I want to ask you about is the death
```

404

```
1    penalty.  Tell me, in general, how you feel about the
2    death penalty.
3         A.   I believe in it.
4         Q.   Why?
5         A.   If a person has killed somebody, they should
6    pay for it.
7         Q.   Did you understand what the Judge said, just
8    because you kill somebody --
9         A.   It doesn't mean that he could --
10        Q.   Plain murder.
11        A.   Yeah.
12        Q.   It just means it has to be a special kind of
13   murder.
14        A.   Yes, sir.
15        Q.   In other words, the legislature has -- you
16   know, there's different ways to kill people, but the
17   only way you can face the death penalty is if it's
18   under certain circumstances.
19        A.   Yes, sir.
20        Q.   You understand that?
21        A.   Yeah, that if he did something else before he
22   killed somebody or in the process of doing it.
23        Q.   There you go.  It's usually at the same time
24   --
25        A.   Yeah.
```

**405**

1  Q. -- or, you know, killing a kid under six,
2  killing a policeman on duty, killing somebody while
3  you're robbing, raping, burglarizing them, --
4      A. Yes, sir.
5      Q. -- kidnapping them and everything. How do
6  you feel about you being part of the process, though?
7      A. I guess I feel good about it.
8      Q. Okay. So you think that's part of a jury
9  that you would want to be on or -- or not enjoy,
10 that's not the right word, but that you could
11 participate in?
12     A. Yes, sir.
13     Q. The reason I ask, Ms. Meza, is this, we're
14 not talking about somebody you see on the news or you
15 read about in the paper somewhere else. That's him.
16 Look at him. That's John Henry Ramirez.
17     A. Okay.
18     Q. If you're sitting this jury, there's going to
19 be a point in time, I guarantee you, because I told
20 you the very first day I met you, the State is seeking
21 the death penalty and one day I'm going to stand in
22 front of you and ask that you evaluate the evidence
23 and you come out and answer the questions in such a
24 way that that young man over there is going to be put
25 to death. And I want you to look in your heart and

**406**

1  tell me if Theresa Meza can do that, if the evidence
2  is there and the answers to the questions should be
3  that he receive death penalty? Can you do it, Theresa
4  Meza?
5      A. Yes.
6      Q. No hesitation there.
7      A. I don't think so.
8      Q. Okay. Good. Now, I'm not going to tell you
9  it's an easy thing. I'm not going to tell you it's a
10 fun thing.
11     A. No, it's --
12     Q. I'm not going to tell you --
13     A. -- it's a very hard one.
14     Q. -- it's a happy thing. And that's why people
15 should take it seriously. You can see how serious we
16 are. I was joking a little bit --
17     A. Yes.
18     Q. -- but we're pretty serious about this. But
19 I just want to know if -- if you can follow through
20 with what you say. Let me tell you why because you
21 seem like a woman with strong convictions, but I've
22 had people before, men and women, that say, "Hey, I
23 believe in the death penalty, Mark. It's a good --
24 it's a good law. We should have the death penalty.
25 And I read about these people that do these bad

**407**

1  things. I think they should be executed," and they're
2  all for the death penalty. And then I say, "Okay.
3  Come and sit in the jury box and make that decision,"
4  and they go, "Wait, a minute. Don't make me do it.
5  Make somebody else do it."
6          Do you feel that way or do you think you
7  can actually participate in if called upon make that
8  decision?
9      A. I think I could.
10     Q. Okay. You -- is that because you believe
11 it's your civic duty, or you believe it's the law, or
12 --
13     A. Uh, --
14     Q. -- you just think you can could be a fair
15 person and make --
16     A. A fair --
17     Q. -- that decision?
18     A. A fair person and weigh the evidence.
19     Q. You see where I'm coming from, though, --
20     A. Yes, sir.
21     Q. -- because some people, you know, they want
22 to be fair, but they just have some kind of nagging
23 thing like, "Oh, well, you know, it's against my
24 religion or it's against my morals, or -- or, you
25 know, I just couldn't be in that position," they want

**408**

1  somebody else to do it. You don't feel that way, at
2  all, do you?
3      A. Oh, no, sir.
4      Q. So no hesitation about that.
5      A. No.
6      Q. Okay. I have to ask it the other way, then,
7  because remember what the Judge said, just because
8  you're found guilty of capital murder, do you
9  automatically get the death sentence? No, there's two
10 choices, death or life in prison. So if you think the
11 evidence is such a way that the Defendant should get a
12 life sentence, can you vote for life sentence, too?
13     A. Yes, sir.
14     Q. Instead of a death sentence?
15     A. Yes.
16     Q. Looking at -- you looked at the guy a minute
17 ago, and I noticed -- sometimes people looked at him
18 for the very first time. Like, for example, that
19 first day, did you see him the very first day?
20     A. Yes, sir.
21     Q. Some people told us they didn't even know he
22 was the Defendant. They just thought he was a young
23 guy there, okay? You found out he was the Defendant,
24 what was -- what did you think about when you first
25 saw him?

409

1    A.   That he was very young to -- to ruin his
2 life.
3    Q.   To be in that kind of situation?
4    A.   Situation, yes, sir.
5    Q.   Do you think that you would have a hard time
6 making a decision because of his youth?
7    A.   I don't think so.
8    Q.   Okay.  The law in Texas says this, you can't
9 execute somebody under 18.
10    A.   Yes, sir.
11    Q.   If it's a juvenile, 16, 17, no matter what --
12 how bad the crime they did, you can't execute them.
13 And, obviously, he's not in that -- that category.
14    A.   No.
15    Q.   I think the evidence is probably going to
16 show he's in his 20s or mid 20s or something like
17 that.  So compared to you and me, he seems young, but
18 would you agree with me that people over that majority
19 age of 18 are old enough to know the --
20    A.   Yes, sir.
21    Q.   -- the law --
22    A.   They should know better.
23    Q.   -- and they know the difference between right
24 and wrong, right?
25    A.   Yes, sir.

410

1    Q.   So would you agree with me that whether
2 they're 25, 35, 45, 55, the law is the same to
3 everybody?
4    A.   Yes, sir.
5    Q.   I mean, if they're 15, that's another story.
6 But if they're 25, 35, 45, you would agree that they
7 should be old enough or responsible for their actions.
8    A.   Yes, sir.
9    Q.   So while you might look at youth as being
10 something to consider, that's certainly not something
11 that you're going to say, "Well, I can't make a
12 decision because he's so young."
13    A.   No.
14    Q.   Okay.  The second thing I was going to ask
15 you about is appearances.  Sometimes -- have you ever
16 seen people on -- you probably remember Charles
17 Manson, right?
18    A.   Yes.
19    Q.   You remember how he looked on T.V.?
20    A.   Uh-huh.
21    Q.   He was a scary-looking dude, right?
22    A.   Yes.
23    Q.   And some people come in here and they say,
24 "Well, gosh, you know, look at him.  He doesn't look
25 like that bad a guy.  He looks young.  He looks nice."

411

1    A.   Appearances are deceiving.
2    Q.   Say again?
3    A.   Appearances are deceiving.
4    Q.   Can be deceiving.  That's exactly right.
5 Would you agree with me that you need to make a
6 decision based on what he did, instead of what he
7 looks like?
8    A.   Yes, sir.
9    Q.   And, you know, if he's guilty or not
10 shouldn't be decided on, "Oh, poor little -- poor --
11 you know, poor young guy," or something like that, it
12 should make -- be a decision based on the evidence.
13    A.   Yes, sir.
14    Q.   When you first found that you may be on this
15 jury, that first day when those 2- or 300 people were
16 in there, remember when the Judge came down?
17    A.   Yes.
18    Q.   And I -- I kind of watched the jury, and the
19 Judge said, "This is a criminal case.  This guy could
20 be facing the death penalty."  What was your first
21 reaction when you heard it was that kind of case?
22    A.   I said, "Wow."
23    Q.   Wow.  After the initial shock wore off, what
24 did you think?
25    A.   I guess it's an interesting case.

412

1    Q.   Okay.  Did you have any reservations about
2 being on this case or were --
3    A.   No.
4    Q.   Let me tell you why, because sometimes I see
5 people, and the Judge says, "You could be facing the
6 death penalty, you may have to make a decision," and
7 then you see people going, "Oh, my gosh, I can't do
8 that," or they -- they kind of freak out, or -- and
9 they say, "Oh, my gosh, I couldn't do that."  And then
10 some people, "Well, I better listen a little closer.
11 This is a pretty important case."
12    A.   Yes, my reaction.
13    Q.   Is that kind of what --
14    A.   Yeah.
15    Q.   -- your reaction was?  And so you listened to
16 what the Judge said the other day, and then today,
17 obviously, you've said that you think you can listen
18 to all the evidence and make a decision, right?
19    A.   Yes.
20    Q.   And you understand this is -- it's capital
21 murder because it's a murder plus robbery.
22    A.   Yes, sir.
23    Q.   And it's in the course of committing or
24 attempting to commit robbery.  In other words, you
25 know, sometimes people say, "Well, you know, he didn't

413

1  finish the job." You know, you robbed a bank and you
2  got caught. The guy can't say, "Well, just because I
3  got caught, that means I'm not guilty," right?
4      A.   Yes, sir.
5      Q.   It just -- it means, in the course of
6  committing or attempting to commit robbery. So that
7  happens at the same time.
8              Also, there's two parts of the trial.
9  The first part is did he do it or not.
10     A.   Yes.
11     Q.   And only if you decide he did it, then you go
12  to the second part and what punishment he has.
13     A.   Yes, sir.
14     Q.   In the second part of the trial, you might
15  get to hear additional evidence. In the first part of
16  the trial, generally speaking, you hear what happened
17  that day and the surrounding circumstances of the
18  crime. But in order to decide what kind of punishment
19  he should get, like death or life, you might get to
20  hear additional evidence. You might get to hear his
21  background, like does he have a criminal history, does
22  he doesn't have a criminal history; has he been a good
23  boy all his life or has he been in trouble with the
24  law before; has he been an Eagle Scout, you know, and
25  made good grades in school, or has he always been in

414

1  trouble? You see what I'm saying?
2      A.   Yes, sir.
3      Q.   That helps you make up your mind. And -- and
4  we call it his background, so you can make an obvious
5  -- I'm sorry, a better informed decision.
6      A.   On what to give him.
7      Q.   Say -- on what to give him, exactly. And
8  when you go back on in the jury -- in the jury room,
9  if you found him guilty, you don't just go back there
10  and say, "Okay, how many vote for death and how many
11  vote for life," and check it off, you don't do that.
12  You answer two questions, as the Judge has showed you.
13     A.   Yeah.
14     Q.   And let's look over them real quick. It
15  says, "Special Issue No. 1," it's the one down at the
16  bottom, it says, "Is there a probability that the
17  Defendant would commit criminal acts of violence that
18  will constitute a continuing threat to society"?
19     A.   And you answer yes or no.
20     Q.   You answer yes or no. Do you have a crystal
21  ball?
22     A.   No, sir.
23     Q.   You know how to predict the future?
24     A.   No, sir.
25     Q.   The law doesn't require me to predict the

415

1  future. It doesn't say it is a certainty, do you know
2  for sure that he's going to do these things, the
3  question -- the question just says is it probable that
4  he's going to do it, --
5      A.   Yes.
6      Q.   -- more likely than not. Then it also says
7  would he commit criminal acts of violence? Sometimes
8  people say, "Well, I can only give the death penalty
9  if I think he's going to repeat the crime and do
10  another murder." But the law doesn't say that. The
11  law says any criminal acts of violence. It doesn't
12  necessarily have to be, you know, killing somebody.
13             And then the last part says, "constitute
14  a continuing threat to society." You probably heard
15  that phrase before.
16     A.   Yes.
17     Q.   Sometimes people come up to me and they say,
18  "Well, Mark, you know, why do you have to seek the
19  death penalty? Why don't you-all just put him in
20  prison for the rest of his life -- for life, and that
21  way he won't hurt anybody, he'll be locked up." And I
22  always say, "Wait a minute, who else is in a prison"?
23  Tell me. Huh?
24     A.   Other criminals.
25     Q.   Other prisoners.

416

1      A.   Yeah.
2      Q.   People that work in the prison, like the
3  guards.
4      A.   Yeah.
5      Q.   The warden, you know, his staff, probably
6  clerical people, maintenance people. In other words,
7  just because you put him in prison --
8      A.   Doesn't mean anything.
9      Q.   -- doesn't mean that he can never be around
10  people to hurt them. You see what I'm saying?
11     A.   Yes, sir.
12     Q.   We don't put them out on a desert island
13  where they'll never see another human being. The
14  question is, prison is -- the answer is prison is
15  still part of society. You've got some of your rights
16  removed, but you're still having interaction with
17  other people, which is society even though on a
18  limited sense. Would you agree with that?
19     A.   Yes, sir.
20     Q.   So just because he's in prison doesn't mean
21  he can't hurt anybody else, right?
22     A.   That's true.
23     Q.   Have you ever heard of that happening, where
24  people are in prison, they hurt other guards or
25  prisoners?

417

1    A.   Yes, sir.

2    Q.   That's not unusual, is it?

3    A.   No.

4    Q.   So that's what that question basically says,

5  "Is there a chance, a good chance, that he's going to

6  hurt somebody else in the future?"  That's why we call

7  it "the future dangerousness question."

8    A.   Okay.

9    Q.   And like you said, you answer it yes or no.

10        Then you go to the second question.  The

11  second question is a little more involved, and we call

12  it the mitigating question -- "mitigating

13  circumstances question."  Mitigating is a big word

14  that really means anything that would lessen or make

15  less severe the punishment.  That's what mitigating

16  circumstance is, anything that would lessen or make

17  less severe the punishment or anything that would

18  reduce a Defendant's moral blameworthiness.

19    A.   Okay.

20    Q.   Well, what does that mean?  Well, think of it

21  kind of as the opposite of aggravating circumstances,

22  or maybe think of it like extenuating circumstances.

23  He did the crime, but is there any reason that we

24  should lower it to warrant that a life prison -- in

25  prison, rather than death sentence be imposed.

418

1        Here's an example.  Say you have two

2  burglars.  You're on a jury and there's two different

3  burglars.  You hear the evidence and -- and burglars

4  are bad, right?  They break into somebody's house and

5  they steal something, and you don't like burglars, so

6  you say, "Well, these are pretty bad.  I'm going to

7  give them both high sentences," but then you hear the

8  evidence.

9        And in the first case this is the

10  circumstances of the burglary.  The guy went in and

11  kicked in the door, broke down the door, went into the

12  house, stole all the money, this -- the jewelry, the

13  stereo, the T.V., the V.C.R.s, took all the things of

14  value from the house.  Not only that, he ripped the

15  house apart.  He ransacked it, broke things, knocked

16  things over, tore things up.  And then you hear about

17  his background and you find out this isn't his first

18  burglary.  He's done five other burglaries before in

19  the past, okay?

20    A.   Okay.

21    Q.   So the second burglar comes along.  You're

22  trying another case and here's the second burglar.

23  He's still guilty of burglary because he broke into

24  somebody's house and stole something, but then you

25  find out the circumstances may be a little different.

419

1  In the second case, he didn't kick in the door or

2  break a window to get in.  The door -- the back door

3  was unlocked so he went in without breaking in.  And

4  what did he do?  He didn't steal the jewelry, the

5  money, the T.V., the V.C. (sic), stereos.  He went in

6  the kitchen and stole a loaf of bread and some food to

7  feed his family.  His kids were hungry because he had

8  lost his job.  Didn't steal all the other stuff, he

9  just stole food.  And you find out has this guy got

10  five prior burglaries?  No, he's never been in trouble

11  with the law before.

12        Would you -- would you -- now, you're on

13  the jury and you have to punish both these guys.

14  Would you punish them the same?

15    A.   No.

16    Q.   Why not?

17    A.   Because they're different crimes.

18    Q.   And there's different crimes and there's

19  different circumstances.  In the first case we had

20  aggravating circumstances.  It would go higher.

21    A.   Yes.

22    Q.   In the second case you had mitigating

23  circumstances.  You'd probably go lower.  I mean, all

24  he did was steal some food.  He's never been in

25  trouble for.  That's what this question's about,

420

1  Ms. Meza.

2    A.   Okay.

3    Q.   The Judge is saying, okay, he's guilty of

4  capital murder, you think he's a continuing threat to

5  society, so the jury, it looks like they're heading

6  toward the death penalty, right, --

7    A.   Right.

8    Q.   -- because he's a future danger to society

9  and he's guilty capital murder.  But before you vote

10  that way, you have to take into consideration all the

11  evidence, the big picture, --

12    A.   Uh-huh.

13    Q.   -- what happened that day, the circumstances

14  of that offense, his Defendant's -- the Defendant's

15  character and background, --

16    A.   Uh-huh.

17    Q.   -- you know, does he have good character, bad

18  character, good background, bad background; and his

19  personal moral culpability, is there sufficient

20  mitigating circumstance or circumstances to warrant

21  that a sentence of life, rather than death sentence be

22  imposed?  It's kind of a -- remember the old thing we

23  learned in government, checks and balances?

24    A.   Yes, sir.

25    Q.   It's kind of a check to say okay, you're not

421

1 going to automatically going to give the death
2 penalty. He may have some evidence or circumstances
3 that says that you should lower the sentence, but
4 here's what the key is: It has to be enough. It has
5 to be sufficient. It has to -- you have to kind of do
6 a balancing test. Like with those two burglars, --
7     A.   Yeah.
8     Q.   -- if you didn't know all the circumstances,
9 you wouldn't know how to treat them, right?
10    A.   That's right.
11    Q.   But -- and this case is the same way. That's
12 what that question does. What is a mitigating
13 circumstance is up to the jury. The Judge doesn't
14 come in and give you a list, "Okay, these are
15 mitigating circumstances." Some of the things we kind
16 of talked about were like, he was a straight A student
17 in school, he was a decorated war veteran, he always
18 helped his mother, you know, do the dishes, whatever
19 it could be.
20         Does that mean that it automatically
21 lowers the sentence to life?
22    A.   No, sir.
23    Q.   No. What it means is, is it enough to
24 outweigh all this other stuff?
25    A.   (Nods head.)

422

1     Q.   See what I'm saying?
2     A.   Yes, uh-huh.
3     Q.   You know, like the -- like the two burglars,
4 you know, it's -- you couldn't treat those guys the
5 same, right?
6     A.   No.
7     Q.   It wouldn't be fair. And the thing in here
8 is, just because you hear a mitigating circumstance,
9 do you automatically knock down the sentence to life?
10    A.   No.
11    Q.   No, it's got to be enough of a mitigating
12 circumstance to show that he deserves life instead of
13 death. But these 12 folks on the jury make that
14 decision. I can't tell you what a mitigating
15 circumstance is, the Judge can't. You have to decide.
16    A.   Okay.
17    Q.   In other words, some people may say, "Well,
18 you know, we ought to give him a break, you know. He
19 was a war hero and got a medal years ago. Or he did
20 very good and made straight A's in school, so we
21 should give him a break." Other people may say, "Hey,
22 I don't care if he made straight A's in school. He's
23 still got to pay for this crime, --"
24    A.   That's right.
25    Q.   "-- you know, he's got to do this." But the

423

1 -- but the Judge says you have to keep an open mind
2 and listen to all this evidence. What weight you give
3 it to is up to the jury.
4     A.   Okay.
5     Q.   So you're not going to close your mind.
6 You're going to listen to any evidence that --
7     A.   Yeah.
8     Q.   -- could possibly lower --
9     A.   I'll listen to all the evidence before I make
10 --
11    Q.   Right.
12    A.   -- up my mind.
13    Q.   Right. And that's the key, you just don't
14 want to automatically give him the death penalty.
15 That's not fair. You need to check yourself and say,
16 "Hey, is there any reason we should go lower, instead
17 of death?"
18         One thing the Judge might tell you, too,
19 is this law that says, "Voluntary intoxication is not
20 a defense to crime." In other words, if you commit a
21 crime while you're drunk or on drugs, does that mean
22 you're excused?
23    A.   No.
24    Q.   No, it doesn't. That's what the law says.
25 The Judge may also tell you, though, that's a possible

424

1 mitigating circumstance, you know? Say a guy robbed a
2 bank and he was drunk. Some jurors may say, "You
3 know, he's not a real bank robber. He was just drunk
4 when he did that, so we ought to give him a break."
5 Other jurors may say, "I don't care if he was drunk or
6 not. You don't rob banks." See what I'm saying?
7     A.   Uh-huh.
8     Q.   It's a possible mitigating circumstance. You
9 know, things like his age, maybe because he's young is
10 a possible mitigating circumstance; maybe because he
11 was intoxicated, it's a possible mitigating
12 circumstance; maybe because he came from a broken
13 home, it's as possible mitigating circumstance. But
14 it's up to the jury to decide is it enough to outweigh
15 everything else? Follow me?
16    A.   Yes.
17    Q.   Does that kind of make sense the way it
18 works?
19    A.   Yes, sir.
20    Q.   Because it's -- it's pretty careful and you
21 can't just rush into things.
22    A.   No.
23    Q.   You have to find him guilty beyond a
24 reasonable doubt, then you have to say he's a
25 continuing threat to society, and before you give the

425

1    death penalty, you take one big overview of
2    everything, you take any one big reason we should
3    lower that sentence, is there any kind of extenuating
4    circumstances or mitigating circumstances?"
5              Okay.  If you answer the first question
6    yes, and the second question no, that Defendant is
7    sentenced to die.  If he's -- if you answer it any
8    other way he gets a life sentence.  You think you can
9    participate in that scheme and make a vote after you
10   hear all the evidence?
11   A.   Yes, sir.
12   Q.   Okay.  Thank you, Ms. Meza.
13             THE COURT:  All right.  Mr. --
14             MR. SKURKA:  Judge, let me look at the
15   questionnaire and see if I have just any other
16   questions.
17             THE COURT:  Okay.
18   Q.   (BY MR. SKURKA) You said that your church has
19   one position against -- is against the death penalty,
20   but you disagree with that, correct?
21   A.   Yes.
22   Q.   Tell us why.
23   A.   I feel a person that's committed something
24   that's like murder should be punished.
25   Q.   Uh-huh.  Well, that's fine.  And, you know,

426

1    sometimes, you know, like Catholics, sometimes --
2    Catholic Church is against the death penalty.
3    A.   Yeah.
4    Q.   But, on the other hand, I get Catholics here
5    that come up and say, "Look, I believe in the Church's
6    teachings.  But as far as the death penalty, I make my
7    own decisions."
8    A.   That's my --
9    Q.   Is that how you --
10   A.   Yes.
11   Q.   -- kind of how you fit?  I don't want to put
12   words in your mouth, but that's kind of how it's done?
13   A.   Yeah.
14   Q.   You understand that policemen are to be
15   treated just like anybody else.  Sometimes people say,
16   "Well, just because he's a cop, I have to believe
17   everything he says."
18   A.   No.
19   Q.   The law says cops are treated just like
20   everybody else on the stand.  Can you do that?
21   A.   Yes.
22   Q.   One of the questions on -- on -- remember
23   that part about where there's a whole bunch of things
24   that said, "I agree with this, I disagree with this,"
25   remember that on the questionnaire?

427

1    A.   I think so.
2    Q.   You don't remember it?  It's okay.  It was a
3    long questionnaire, right?
4    A.   Yeah.
5    Q.   One of the ones, let me just go over it, it
6    says, like, "The death penalty is absolutely never
7    justified," and you put, "I disagree with it."  Then
8    you put, "I do not believe in the death penalty under
9    any circumstances", yet, you put "agree" with that.
10   A.   Did I put that?  I probably meant -- I was
11   tired by then.
12   Q.   Okay.  So do you believe the death penalty --
13   A.   Yes.
14   Q.   -- is appropriate --
15   A.   Yes.
16   Q.   -- in certain circumstances.
17   A.   Yes, sir.
18   Q.   Not in every case.
19   A.   Not in every case, but in some.
20   Q.   Not in every capital murder case.  It's just
21   if the evidence is, then these questions should be
22   answered, correct?
23   A.   Yes, sir.
24   Q.   And you know that.  The Judge already told
25   you.

428

1    A.   Yes, sir.
2    Q.   The death penalty could be an answer in a
3    capital murder case, but it could also be life.  It
4    just depends on what the evidence says.
5    A.   Yes, sir.
6    Q.   Are you open-minded to consider all those
7    things?
8    A.   Yes.
9    Q.   So you're not looking at him and saying,
10   "Well, I already think he's guilty and I'm going to
11   --"
12   A.   No.
13   Q.   "-- vote for the death penalty?"  That was
14   the next thing I was going to tell you.  As he sits
15   there, now, he's presumed to be innocent.
16   A.   Yes.
17   Q.   Remember, we -- the Judge said you start at
18   innocence.  You don't start at guilty and then work
19   your way to innocence.  The State has to prove the
20   case beyond a reasonable doubt in this case and every
21   other case.  So, can you consider him to be innocent
22   at this point?
23   A.   Yes.
24   Q.   And he should be because if you had to vote
25   right now, you would have to vote innocent because he

429

```
1    starts that way.
2        A.   Yes.
3        Q.   Now, does that mean he's always going to be
4    innocent?
5        A.   No.
6        Q.   That's a presumption of innocence.  I haven't
7    put on any case, so he's presumed innocent at this
8    point.  And you can -- you believe that, right?
9        A.   Yes.
10       Q.   He can testify if he wants to.  If he doesn't
11   want to he doesn't have to.
12       A.   That's true.
13       Q.   And if he doesn't testify, I'm sure this
14   Judge is going to tell you in the written instructions
15   you can't hold that against him.  You won't hold that
16   against him, will you?
17       A.   No.
18       Q.   You'll be able to follow the law?
19       A.   Yes.
20       Q.   And the burden of proof in this case is
21   beyond a reasonable doubt.  Doesn't mean beyond all
22   doubt or any doubt or shadow of a doubt.  I have to
23   prove the case beyond a reasonable doubt; --
24       A.   Yes, sir.
25       Q.   -- is that right?
```

430

```
1        A.   Yes.
2        Q.   There's no way I can prove it to you a
3    hundred percent, --
4        A.   No.
5        Q.   -- right, unless you, you know, were there
6    yourself and you saw it, that might be a way to do it.
7    And the law doesn't require me to, it just says,
8    "Beyond a reasonable doubt."
9            Do you have any questions of me about any
10   of these things we've talked about?
11       A.   No.
12       Q.   Do you think you want to be on this jury?
13       A.   I think so.
14       Q.   You think you could be a good juror?
15       A.   I think so.
16       Q.   You're not leaning one way or the other at
17   this point.
18       A.   No.
19       Q.   You're going to be straight down the road,
20   and the only thing you should be leaning toward now is
21   he's presumed innocent.
22       A.   Yes.
23       Q.   Because there hasn't been any other evidence.
24   But you could listen to all the evidence and make a
25   decision and follow through on that decision?
```

431

```
1        A.   Yes, sir.
2        Q.   That's all I can ask you to do, Ms. Meza.
3    Thanks so much for talking to me.
4        A.   You're welcome.
5            MR. SKURKA:  Don't leave, yet.
6            VENIREPERSON NO. 35:  Okay.
7            MR. SKURKA:  They may want to ask you
8    some questions.
9            MR. JONES:  I go?
10           THE COURT:  Yeah.
11               VOIR DIRE EXAMINATION
12   BY MR. JONES:
13       Q.   Ms. Meza, Mr. Skurka, in talking about the
14   standard of proof beyond a reasonable doubt, --
15       A.   Yes, sir.
16       Q.   -- he used the metaphor of 100 percent.  He
17   said he didn't have to prove his case a hundred
18   percent?  I dislike the use of that metaphor to
19   describe a degree of certainty.  You said -- he said,
20   "I don't have to prove my case 100 percent."
21           If -- if we did use that measure, what
22   percent would you require before you would find
23   somebody guilty?
24       A.   I guess it depends on the evidence.
25       Q.   In other words, if he proved his case by 95
```

432

```
1    percent?
2            MR. SKURKA:  Judge, I'm going to object
3    to him going into percentages.  That's not the law.
4    The standard is beyond a reasonable doubt.
5            THE COURT:  Well, --
6            VENIREPERSON NO. 35:  I don't think I can
7    give a percentage.
8        Q.   (BY MR. JONES)  Well, I know, I'm just saying,
9    if you find yourself in this jury, I don't -- I ask
10   you, please, not to use percentages.
11       A.   Oh, I wasn't.
12       Q.   Okay.  It's not -- it's not a fair way to
13   describe or define reasonable doubt.  Reasonable doubt
14   is a -- is a degree of certainty which only you can
15   know when you reach it, okay?
16       A.   Yes, sir.
17       Q.   You worked for the Army Depot for over 33
18   years?
19       A.   Yes, sir.
20       Q.   And when did you retire?
21       A.   June 3rd of 2006.
22       Q.   '06.  And the questionnaire says you were a
23   computer operator out there?
24       A.   Yes, sir.
25       Q.   And can you tell us -- can you tell me a
```

433

1  little bit more specifically what -- what you did?
2      A.  I worked with a main frame, computers, H.P.s,
3  many computers when I retired.
4      Q.  All right.
5      A.  And other jobs as required.
6      Q.  Okay.  So your -- your computer activity
7  supported the -- the job?
8      A.  Yes, sir.
9      Q.  The rebuilding of the aircraft that was going
10  on?
11     A.  No, sir.  I did -- mostly, it was for
12  production.
13     Q.  Production?
14     A.  Yes, sir.
15     Q.  Okay.  I think I know sort of what that
16  means.  But, anyway, it's a big, involved process, --
17     A.  Yes, sir.
18     Q.  -- right?  And they use computers to help
19  keep up with things.
20     A.  Yes.
21     Q.  And have you always lived in Corpus Christi?
22     A.  Yes, sir.
23     Q.  Okay.  So you're -- are you a native?  I
24  mean, you were --
25     A.  I was born and raised here.

434

1      Q.  Born and raised here.  Okay.  And you have
2  family here still?
3      A.  Just cousins.
4      Q.  Okay.  Now, on page 26 of your questionnaire,
5  Question 117 says, "How strongly do you believe in the
6  death penalty," and they gave you a scale and from one
7  to ten, ten being the strongest, and you circled ten,
8  which tells me that you strongly agree with --
9      A.  Yes.
10     Q.  -- the death penalty as a form of punishment.
11     A.  Yeah.  It depends on how bad the crime was.
12     Q.  I understand that, but the -- the death
13  penalty is a type of punishment as approved by our
14  legislature.
15     A.  Yes, sir, I know that.
16     Q.  And you agree with that.
17     A.  Yes.
18     Q.  Do you believe that our Texas society
19  benefits from having the death penalty as a punishment
20  option in some cases?
21     A.  (No response.)
22     Q.  Do we -- do we benefit by having the death
23  penalty?
24     A.  I think so.
25     Q.  Can you please tell me why you think we

435

1  benefit -- how do we benefit?  What benefit do we
2  derive from?
3      A.  I'm not sure if I can put it into words.  I'm
4  not very good at...
5      Q.  Well, do your best.
6      A.  I'm -- I figure that maybe people --
7      Q.  I beg your pardon?
8      A.  I'm not sure how to explain it, sir.
9      Q.  Well, keep in mind that this is the kind of
10  question that you're not normally asked.  You know,
11  it's not like --
12     A.  I know.
13     Q.  -- something that you're thinking about every
14  day, and this may be the first time coming in today
15  that you --
16     A.  I really thought --
17     Q.  -- processed --
18     A.  -- thought about, yes.
19     Q.  -- really thought about.  And so you -- you,
20  obviously, have some strong feelings here.
21     A.  I do.
22     Q.  I noticed --
23     A.  I believe that a person that's done a crime
24  --
25     Q.  Okay.

436

1      A.  -- like murder should be punished.
2      Q.  Okay.  So, is --
3      A.  And if he -- and if he's going to do it,
4  again, he should really be punished.
5      Q.  Okay.  So, if I ask the question, "Do you
6  think our society benefits from having this form of
7  punishment," you -- you don't know whether it benefits
8  or not.
9      A.  I don't.
10     Q.  But you do agree that -- that it's -- it
11  should be a form of punishment for the individual
12  involved, if it's called for, is that what you're
13  saying?
14     A.  Yes, sir.
15     Q.  Okay.  Now, the -- have you -- I think you
16  put here that you -- you read the newspaper, right?
17     A.  Yes, sir.
18     Q.  You keep up with current events?  Over the
19  past few years there's been stories in the newspaper
20  and on television and some -- now magazines.  I think
21  The Texas Monthly had a lead article on this subject -
22  of people who have been convicted of crimes and
23  sentenced to prison only to be released later when it
24  was found that they were factually innocent because
25  the DNA testing showed that they were innocent.

437

1    Have you read those stories?
2    A.    Yes, sir.
3    Q.    And you read about some guy that's been in
4    prison, say, for 20 years and they're letting him out,
5    you know?  When you read a story like that, how does
6    it make you feel?
7    A.    Well, like they don't have the advances in --
8    that we -- that we have now then back then.
9    Q.    But how do you feel about the person
10   involved?
11   A.    That he spent a lot of time he shouldn't have
12   spent in prison.
13   Q.    Uh-huh.  Now -- and when you read a case like
14   this, it's obviously -- it's obvious that some mistake
15   was made, right?
16   A.    Yes, sir.
17   Q.    And they get some -- sometimes there's more
18   than one --
19   A.    Yeah.
20   Q.    -- factor involved.  Would you agree that we
21   as human beings are not perfect?
22   A.    That's true.
23   Q.    And we try to do -- like when you were --
24   the job that you had at the Army Depot, you probably
25   --

438

1    A.    I did the best I could.
2    Q.    -- you did the best you could to make things
3    work the way they were supposed to, right?
4    A.    Yes.
5    Q.    Now, in the -- in our -- in our work here,
6    the legal -- the criminal law field, particularly, our
7    laws set up an elaborate appeal procedure in a case --
8    in cases like this.  And the purpose of the appeal
9    procedure is to correct errors, if they occur.
10   A.    Yes, sir.
11   Q.    I mean, we don't -- we don't like for -- in
12   other words, if the Constitution is violated in the
13   course of the criminal trial, or some mistake is made
14   that makes the proceeding unfair, we don't want to --
15   we want to come back and do it right.
16   A.    Yes, sir.
17   Q.    Okay?  And -- now, with these guys, like up
18   in Dallas, who have spent, you know, 15 or 20 years in
19   jail before the mistake was discovered, --
20   A.    Yes, sir.
21   Q.    -- they were alive, were they not?
22   A.    Yes, sir.
23   Q.    In other words, they -- they could still --
24   had some life left where they could be out and be
25   free.  The problem with the death penalty is that at

439

1    some point, if the person is executed, you run out of
2    time.
3    A.    That's true.
4    Q.    In other words, if it's discovered after
5    you've been executed that there was a mistake, you'd
6    have to live with the fact that you may have executed
7    an innocent person.
8    A.    Yes.
9    Q.    Okay.  Now, if you accept that, and we have
10   to accept it because we --
11   A.    Yeah.
12   Q.    -- know it's true, I mean, we've got many
13   examples of it, do you think having the death penalty
14   is worth from time to time executing an innocent
15   person?
16   A.    If that person is guilty, yes, sir.
17   Q.    No, I don't think --
18   A.    Oh.
19   Q.    You think just having the death penalty as a
20   form of punishment, do you think it's worth having
21   that option if it means that from time to time we
22   might, you know, have to execute an innocent person?
23   A.    I'm not sure about that question, sir.  I
24   don't know how to answer it.
25   Q.    It's a difficult question.

440

1    A.    Yes, it is.
2    Q.    Okay.  Do you have any opinion right now
3    about whether the Defendant is guilty or innocent?
4    A.    No, sir, because I haven't heard the
5    evidence.
6    Q.    You haven't heard the evidence.  Let me -- on
7    the -- do you -- Mr. Skurka explained how the -- how
8    the -- the death penalty -- how the penalties of death
9    or life are imposed in a criminal -- in a capital
10   case.
11   A.    Yes, sir.
12   Q.    Did you hear him explain that?
13   A.    Yes, sir.
14   Q.    You tell me in your own words, how does --
15   how does a defendant get -- what has to happen before
16   a defendant gets the death penalty in a case like
17   this, what -- what has to be found?
18   A.    The evidence that he's found guilty.
19   Q.    He has to be found guilty of the crime of
20   capital murder.
21   A.    Yes.
22   Q.    Okay.  What -- what are the other two things
23   that have to happen?
24   A.    That there's a sufficient evidence to -- or a
25   probability that he's going to harm somebody else.

441

1      Q.   Okay.  All right.  So that would be Special

2   Issue No. 1.

3      A.   Okay.

4      Q.   Okay?

5      A.   I guess that he's going to threaten somebody

6   else.

7      Q.   Okay.  That's Special Issue --

8      A.   Okay.

9      Q.   -- No. 1.  Uh-huh.

10     A.   Depends on his character.

11     Q.   Uh-huh.

12     A.   If he's done it before.

13     Q.   Okay.  And then Question No. 2, do you see it

14   there?

15     A.   Yes, sir.

16     Q.   Are there any words in that -- in that

17   question that you do not understand?

18     A.   No, sir.

19     Q.   What does personal moral culpability mean?

20     A.   His character.

21     Q.   Well, now, his character is in the line

22   above, "The --"

23     A.   Okay.

24     Q.   "-- Defendant's character and background --"

25     A.   His --

442

1      Q.   -- and it says, "-- and his personal moral

2   culpability."

3      A.   I can't say it.  Not his character, but the

4   way he presents himself?  I'm not saying it right.

5   I'm not good with words, sir.  I'm not sure how to

6   answer that one.

7      Q.   Okay.  On -- then down in the last section of

8   that question it says in -- "is there sufficient

9   mitigating circumstances" or a circumstance or a

10  circum- -- what is a mitigating circumstance?

11     A.   There's enough evidence or that he won't

12  commit the crime again.

13          MR. JONES:  Okay.  I don't have any

14  further questions.

15          THE COURT:  All right.  Anything else?

16          MR. SKURKA:  No, Your Honor.

17          THE COURT:  All right, why don't you wait

18  in the jury room for just a second, Ms. Meza, and

19  we'll be right with you.

20          VENIREPERSON NO. 35:  Okay.

21          (Venireperson exits courtroom.)

22          THE COURT:  All right.

23          MR. SKURKA:  We'll accept this juror.

24          MR. JONES:  We challenge for cause.

25  The ground is that she does not understand the words

443

1   that are in Special Issue No. 2.  She could not give

2   me a definition of personal moral culpability, nor

3   could she articulate in her own words the meaning of

4   mitigating circumstance, so those are two extremely

5   important concepts.

6          THE COURT:  Well, I mean, but --

7          MR. JONES:  Even -- even after the

8   district attorney spent some time -- and I think the

9   minimum qualification of a juror in a capital murder

10  case that will decide the life or death of another

11  human being, the juror should at least be able to --

12  to tell us in their own words what those -- those

13  words in the Charge mean, as the lay -- as our Juror

14  No. 1 did, the very first juror that we selected.

15          She was able to articulate and to

16  convince us that she knew exactly what those words

17  meant, but this lady was having difficulty -- I like

18  this lady, and she's a hard -- obviously a

19  hard-working person if you work for the Army Depot for

20  33 years, you've got to have something going for you,

21  and -- but she -- I don't think she grasped what is

22  required of her at the second stage of the trial.  So

23  we -- as demonstrated by the totality of her answers

24  to our questions here.

25          MR. SKURKA:  Our response, simply, Judge,

444

1   is there is no definition of personal moral

2   culpability.  The law doesn't decide -- doesn't define

3   that, the Judge doesn't define that.  That is designed

4   (Sic) by the jurors themselves.  For her to have a

5   different explanation or something that doesn't quite

6   fit Mr. Jones' definition does not disqualify her as a

7   juror.

8          The second part is the mitigating

9   circumstance stuff.  When I went through it with the

10  lady several times about mitigating circumstance, I

11  think you went through her -- with her, too, I think

12  Mr. Jones was just, unfortunately, confusing her.  I

13  think she understands the concept and verbalized that

14  to the Court.

15          We'd ask the Court to deny their

16  challenge for cause.

17          MR. JONES:  Well, I -- Your Honor, I -- I

18  didn't try to confuse her.  I just asked her the

19  question.

20          THE COURT:  Yeah, but you asked her

21  questions kind of in a tough way.  I mean, you know,

22  if you're not a lawyer and you're not used to this

23  process, that question is -- you know, I mean,

24  "Personal moral culpability."

25          MR. GARZA:  Well, but, Your Honor, this

445

1 is a capital murder case.  We want to know that jurors
2 know and understand --
3                THE COURT:  I fully --
4                MR. GARZA:  -- these concepts, Judge?
5                THE COURT:  I full understand that.
6 Let's get her back in here and explain some more about
7 it to her.  I'm not saying that, I mean, we're not
8 going to explain this to her, but, I mean, -- I mean,
9 you --
10                MR. GARZA:  But she's not going to
11 understand them and that's part of the problem.
12                THE COURT:  We don't know if she's not
13 going to understand them.  If she doesn't understand
14 them now --
15                MR. GARZA:  And we're entitled to a juror
16 that is going to understand these concepts.
17                THE COURT:  I agree.
18                MR. GARZA:  And give them effect like
19 they should under the law.
20                THE COURT:  I agree.
21                MR. GARZA:  And I don't think she can do
22 that, Judge.
23                THE COURT:  Well, I -- I disagree.  She
24 may or may not.  Let's bring her back.
25                MR. GARZA:  Well, then are you going to

446

1 give us a ruling, already, or --
2                THE COURT:  No, I'm not going to give you
3 a ruling already.  I'm not saying I'm not going to
4 sustain your challenge at some point.
5                MR. GARZA:  Okay.
6                THE COURT:  I just -- I just -- to cut
7 her off at that point, I just don't agree.
8                MR. JONES:  Well, then, if -- if the
9 meaning of, like, the phrase "personal moral
10 culpability" is the issue, here, I would ask that the
11 Court formulate a definition that -- and have the
12 Court give her the definition and -- rather than us go
13 back and forth.
14                THE COURT:  Well, I can -- let me -- let
15 me try and explain this question to her and see she
16 understands it, okay?
17                MR. JONES:  Okay.  I would like to have
18 that definition --
19                THE COURT:  Okay.
20                MR. JONES:  -- on -- on both of them, the
21 meaning of mitigating circumstance --
22                THE COURT:  Well, I'm going to talk to
23 her about what all this -- what this question entails.
24 I think she got the first part, I think you agree, the
25 Special Issue 1.

447

1                MR. JONES:  Yeah, I think she's got that
2 part.  The problem that I have with -- with the -- you
3 know, we -- we question these jurors, and in
4 particular the State, the State talks for five minutes
5 and asks a yes or no -- a question, you know, asks
6 leading questions.  But at some point we have to ask
7 the person, what does that mean?  You tell us what it
8 means.  Let them communicate with us.
9                THE COURT:  Well, let's --
10                MR. JONES:  I don't think she's
11 communicating --
12                THE COURT:  -- let's talk --
13                MR. JONES:  -- to me, at least, that
14 she's able to do that.
15                THE COURT:  Well, let's -- let's get her
16 in here and see if she does.
17                (Venireperson enters courtroom.)
18                VOIR DIRE EXAMINATION
19 BY THE COURT:
20     Q.   All right, Ms. Meza, --
21     A.   Uh-huh.
22     Q.   -- let's -- let's talk about -- you can sit
23 down.  Let's talk about Special Issue No. 2, okay?
24     A.   Okay.
25     Q.   All right.  "After taking into

448

1 consideration all of the evidence."
2     A.   Uh-huh.
3     Q.   Okay?  That means everything that's presented
4 to you at this trial, whether it's at the guilt or
5 innocence phase or the second half.
6     A.   Okay.
7     Q.   Everything.
8     A.   Yeah.
9     Q.   Okay?  "The circumstances of the offense,"
10 what's that?  That's -- that's --
11     A.   What he was found guilty or innocent.
12     Q.   The first part of the case.
13     A.   Uh-huh.  Yeah.
14     Q.   All right.  "And the personal -- and the
15 Defendant's character and background," and what's
16 that?
17     A.   His -- whatever he's done before, his home.
18     Q.   All right.  Maybe the way he grew up?
19     A.   The way he grew up.
20     Q.   Okay.  Maybe it can be -- I don't know, you
21 got anything else?
22     A.   How he did in school, if he went to school.
23     Q.   What kind of a guy he is?
24     A.   Yes, sir.
25     Q.   You know, maybe people come in and say, "You

449

1  know what, he's a great guy.  He's a great guy.  You
2  know, I can vouch for him.  He is of great moral
3  character, you know?  I think he's a good guy.  He --
4  you know, he used to mentor me as a child."  Maybe he
5  did community service.  I don't know, okay?
6      A.  Okay.
7      Q.  Maybe -- maybe some people come in here and
8  say, "Bad.  Bad guy."
9      A.  Okay.
10     Q.  "He's got a bad criminal history.  Bad guy."
11     A.  Uh-huh.
12     Q.  Okay?
13     A.  Yes, sir.
14     Q.  "And the personal moral culpability of the
15  Defendant."
16     A.  His attitude, I guess?
17     Q.  Okay.
18     A.  And how he treats people or...
19     Q.  But "culpability," you know what that means?
20  That means --
21         MR. JONES:  Objection, Your Honor, I
22  respectfully ask the Court to ask her what it means,
23  and not to tell her what it means.
24         THE COURT:  Well, okay.  I'll -- okay,
25  I'll consider your objection.

450

1      Q.  (BY THE COURT)  Do you know what that means?
2      A.  Uh...
3      Q.  "Culpability."
4      A.  Not really, sir.
5      Q.  Okay.  Culpability is blame.
6      A.  Blame?
7      Q.  Okay.  And the -- it's basically what you're
8  guilty -- you're guilty of.
9      A.  His guilt.  Okay.
10     Q.  "Personal moral --" you know what moral is?
11     A.  Yeah.
12     Q.  Blame.  Basically, personal moral guilt --
13     A.  Okay.
14     Q.  -- of the Defendant, okay?  Now, if you
15  consider all of this stuff, what we're asking you to
16  do is this, you take in -- you look at the crime, --
17     A.  Uh-huh.
18     Q.  -- okay?  You hear -- you're going to hear
19  the facts about it.
20     A.  Okay.
21     Q.  You look about his background.  You know,
22  maybe you hear he was a great guy and this -- this
23  particular crime was way out of his character.
24     A.  Okay.
25     Q.  Other than this day, and it was -- may have

451

1  been awful, but other than this day he's been a great
2  guy.
3      A.  Okay.
4      Q.  Okay?  He's always helped us.  He's always
5  been good to the community.  He's been good to his
6  mother.  He -- you know, he tutors kids on -- on, you
7  know, English.
8      A.  Whatever.
9      Q.  Whatever.
10     A.  Uh-huh.
11     Q.  Okay?
12     A.  Yeah.
13     Q.  The idea is, you're supposed to consider
14  everything about him.
15     A.  Yeah.
16     Q.  Not just what happened that day, everything.
17     A.  Everything in his life.
18     Q.  Everything in his life that's presented to
19  you.  Now, obviously, you can't consider anything that
20  isn't presented to you in this courtroom, but you --
21  you got to -- what we don't want is this, we don't
22  want people that will say, "You know what, he did the
23  crime, and, therefore, he gets the death penalty.  I'm
24  not going to consider anything."
25     A.  No.  I wouldn't do that.

452

1      Q.  If that's you, you need to tell us.
2      A.  No, I wouldn't do that.
3      Q.  Okay?  If that's you, you need to tell us.
4  But, if you would consider all of his background in
5  determining --
6      A.  Whether he gets life --
7      Q.  -- whether he should --
8      A.  -- or death.
9      Q.  Then we need to know that.
10     A.  Okay.
11     Q.  Which is -- which is it?
12     A.  I would consider the -- I can consider both
13  of them, depending on his background, his moral
14  character.
15     Q.  Okay.  Because earlier you said if he did the
16  crime, you know, then he -- well, I mean...
17     A.  If he -- we found him guilty, then he needs
18  to pay for it.  But, I don't know --
19     Q.  He gets -- okay, go ahead.
20     A.  -- I have to listen to the evidence to decide
21  whether it would be life in prison or death.
22         THE COURT:  Okay.  Mr. Jones, you can
23  continue to ask questions.
24         MR. JONES:  I don't -- I don't have any
25  other questions.

453

1      THE COURT:  Do you have anything else?

2      MR. SKURKA:  No, Your Honor.

3      THE COURT:  All right.  Why don't you

4  wait in the --

5      VENIREPERSON NO. 35:  Okay.

6      THE COURT:  -- jury room.

7      (Venireperson exits courtroom.)

8      MR. JONES:  Okay.  With all due respect

9  to the Court's attempt there and the lady's attempt to

10  answer the questions, she still does, in my opinion,

11  and this is the basis of my challenge for cause, is

12  she does not grasp the meaning of personal moral

13  culpability.  The question -- the jury instruction

14  says that she should consider that.  So when she's

15  considering that, personal moral culpability of the

16  Defendant, what is she considering?

17      THE COURT:  What do you consider personal

18  moral culpability of the Defendant?

19      MR. JONES:  It's -- I've -- I've thought

20  many, many times about it.  What it -- what it asks

21  the juror to do is to consider to what extent the

22  Defendant's conduct deviates or adheres to the moral

23  standards of the community.  Is it a severe deviation

24  or a slight deviation or a middle deviation?  Because

25  moral -- moral suggests a standard of conduct, okay.

454

1      Every society has a standard of conduct,

2  good and bad, okay, and -- and all of us, like,

3  "Character," when you say a person has good character,

4  you're saying he adheres to the commonly accepted

5  standards of good conduct, like some thrift or

6  whatever, you know?

7      Now, if you're personally -- moral

8  culpability, the word, "moral" suggests that there's a

9  standard out there of conduct that's generally

10  accepted by the community.  And, you know, it's -- it

11  has basis in our Judeo-Christian, you know, moral

12  system.  And that -- that question -- and I -- it was

13  picked -- it was drawn out of a Supreme Court case

14  written by, you know, lawyers; that they should have

15  framed it a different way.  I'd -- and it's my -- my

16  --

17      THE COURT:  It's your assertion that she

18  doesn't understand the -- the question.

19      MR. JONES:  That she doesn't understand

20  the question.  I think the question -- you know, it

21  took me hours.  One day I sat down in one of my

22  criminal cases, and what does this really mean?  And

23  the best I could come up with is it asked the juror to

24  consider when the Defendant engaged in the conduct, if

25  they found him guilty, and if he -- if she finds he

455

1  committed a robbery and a murder, at the time that he

2  engaged in that conduct to what degree did he deviate

3  from society's -- or deviate or adhere to society's

4  moral standards?  Was it a great deviation or was he

5  motivated by some other motive, you know, like -- like

6  fear or -- or self-defense or whatever --

7      THE COURT:  Okay.

8      MR. JONES:  But -- but --

9      THE COURT:  I -- well, I respectfully

10  disagree with you, Mr. Jones.

11      MR. JONES:  Okay.  Are we --

12      THE COURT:  So --

13      MR. JONES:  -- are we --

14      THE COURT:  -- I will overrule your

15  objection.

16      MR. JONES:  We will then exercise our

17  fifth peremptory challenge --

18      THE COURT:  Okay.

19      MR. JONES:  -- on Ms. Meza.

20      THE COURT:  Bring her in.

21      MR. GARZA:  Based on the Court's ruling.

22      MR. JONES:  Based on the Court's ruling.

23      THE COURT:  That's fine.  I got you.

24      (Venireperson enters courtroom.)

25      THE COURT:  All right, Ms. Meza, --

456

1      VENIREPERSON NO. 35:  Yes, sir.

2      THE COURT:  -- you are not going to be on

3  this jury, but we do appreciate your service.  Thank

4  you very much.

5      VENIREPERSON NO. 35:  You're welcome.

6      (Venireperson exits courtroom.)

7      THE COURT:  All right.  We'll see you-all

8  tomorrow.  I guess you-all want to get here at 8:15

9  tomorrow?

10      MR. SKURKA:  Do we have a schedule or

11  anything for tomorrow?

12      THE COURT:  Let's --

13      MR. SKURKA:  She's pointing to you.

14      THE COURT:  Oh, yeah, it's probably here

15  someplace.  Yeah, a bunch.

16      MR. GARZA:  Tomorrow and Friday?  Well,

17  can we have a copy of it?

18      (Evening recess.)

19

20

21

22

23

24

25

457

```
 1   THE STATE OF TEXAS )

 2   COUNTY OF NUECES   )

 3              I, Mary Lopez Buitron, Official Court Reporter

 4   in and for the 94th Judicial District Court of Nueces County,

 5   State of Texas, do hereby certify that the above and foregoing

 6   contains a true and correct transcription of portions of

 7   evidence and other proceedings requested in writing by counsel

 8   for the parties to be included in this volume of the Reporter's

 9   Record, in the above-styled and numbered cause, all of which

10   occurred in open court or in chambers and were reported by me.

11              I further certify that this Reporter's Record of

12   the proceedings truly and correctly reflects the exhibits, if

13   any, admitted by the respective parties.

14              I further certify that the total cost for the

15   preparation of this Reporter's Record is $_____ and was

16   paid/will be paid by_____.

17              WITNESS MY OFFICIAL HAND this the __7th__ day of

18   __October_____, A.D., 2009.

19

20   _____

21   MARY LOPEZ BUITRON, CSR, RPR, Texas CSR #2731
     Expiration Date: 12/31/2009
22   Official Court Reporter
     94th District Court
23   Nueces County, Texas
     901 Leopard, Room 901
24   Corpus Christi, Texas 78401
     (361)888-0658
25
```