1

1          REPORTER'S RECORD
         TRIAL COURT CAUSE NO. 04-CR-3453-C
2        APPELLATE COURT CAUSE NO. AP-76,~~000~~ 76 100
             VOLUME 11 OF 25 VOLUMES
3

4   THE STATE OF TEXAS      )      IN THE DISTRICT COURT
                            )
5   VS.                     )      94TH JUDICIAL DISTRICT
                            )
6   JOHN HENRY RAMIREZ      )      NUECES COUNTY, TEXAS

7

8

9

10

11          _____

12

13              INDIVIDUAL VOIR DIRE

14          _____

15

16

17

18

19          On the 13th day of November, 2008, the

20   following proceedings came on to be heard in the

21   above-entitled and numbered cause before the HONORABLE

22   BOBBY GALVAN, Judge Presiding, held in Corpus Christi,

23   Nueces County, Texas:

24          Proceedings reported by Stenograph

25   Machine.

**FILED IN**
**COURT OF CRIMINAL APPEALS**

OCT 0 6 2009

Louise Pearson, Clerk

2

```
 1   APPEARANCES:

 2   MR. MARK SKURKA
     SBOT NO. 18475570
 3   MR. VERNON G. SCHIMMEL
     SBOT NO. 24033039
 4   ASSISTANT DISTRICT ATTORNEYS
     901 Leopard, Rm. 205
 5   Corpus Christi, Texas 78401
     Phone: (361) 888-0410
 6
     ATTORNEYS FOR THE STATE
 7
     -AND-
 8
     MR. EDWARD F. GARZA
 9   SBOT NO. 07731200
     ATTORNEY AT LAW
10   719 S. Shoreline, Suite 201
     Corpus Christi, Texas  78401
11   Phone: (361) 888-8877

12   MR. GRANT JONES
     SBOT NO. 10917000
13   ATTORNEY AT LAW
     5826 Beauvais Dr.
14   Corpus Christi, Texas 78414
     Phone: (361) 815-2470
15

16   ATTORNEYS FOR THE DEFENDANT,
     JOHN HENRY RAMIREZ
17

18

19

20

21

22

23

24

25
```

3

```
 1                          INDEX
                  VOLUME 11 OF 25 VOLUMES
 2    VENIREPERSON              Voir Dire        Page   Vol.
      Proceedings Continued ........................... 4     11
 3
      ROBERT CASTANEDA, NO. 39        4                       11
 4    No. 39 Struck by Agreement ...................... 4     11

 5    AHMAD YAZDANINIA, NO. 36        5,10                     11
      No. 36 Struck by Agreement. ..................... 17    11
 6
      LONNIE JOHNSTON, NO. 38        18,30,64,76              11
 7    Accepted by the State ........................... 79    11
      Accepted by the Defense ......................... 79    11
 8
      Juror No. 5 Admonished .......................... 79    11
 9    No. 41 excused by Agreement. .................... 81    11

10    REID BAUCOM, NO. 44            83,94,125               11

11    Juror No. 6 Admonished. ......................... 157   11

12    SAMMY WAYNE MOSER, NO. 48     159,171,191,200          11
      Challenge for cause by Defense .................. 201   11
13    Granted ......................................... 201   11

14    No. 59 Struck by Agreement. ..................... 202   11
      Evening Recess .................................. 202   11
15    Court Reporter's Certificate .................... 203   11

16         ALPHABETICAL INDEX TO VENIREPERSONS
      VENIREPERSON              Voir Dire        Page   Vol.
17    BAUCOM,REID, NO. 44           83,94,125               11

18    Juror No. 6 Admonished. ......................... 157   11

19    CASTANEDA,ROBERT, NO. 39        4                       11
      No. 39 Struck by Agreement ...................... 4     11
20
      JOHNSTON,LONNIE, NO. 38       18,30,64,76              11
21    Accepted by the State ........................... 79    11
      Accepted by the Defense ......................... 79    11
22
      MOSER,SAMMY WAYNE, NO. 48     159,171,191,200          11
23    Challenge for cause by Defense .................. 201   11
      Granted ......................................... 201   11
24
      AHMAD YAZDANINIA, NO. 36        5,10                     11
25    No. 36 Struck by Agreement. ..................... 17    11
```

4

1         P R O C E E D I N G S
2   November 13, 2008
3              THE COURT:  When we were off the
4   record, I was told that there is somebody maybe we can
5   agree on?
6              MR. SKURKA:  Yes, Your Honor.  We've
7   reviewed the questionnaire on Juror No. 39.
8              THE COURT:  Okay.
9              MR. SKURKA:  He did not finish his last
10  five pages on the thing and he may have gone to school
11  with Mr. Ramirez at Moody High School --
12             THE COURT:  Okay.
13             MR. SKURKA:  -- so both sides have agreed
14  to excuse him.
15             MR. GARZA:  That's correct, Your Honor.
16             THE COURT:  All right.  We called him off
17  or we're going to try?
18             THE BAILIFF:  Okay.  Which juror?
19             MR. SKURKA:  If you can call 39 and tell
20  him he doesn't have to come.  He's scheduled to come
21  at 10.
22             THE COURT:  Okay.  We'll try and call him
23  off.
24             All right, what else?  We ready on the --
25  on Mr. Yazdaninia?

5

1              MR. SKURKA:  Yes, Judge.
2              THE COURT:  All right.  Now, you say that
3   he's got an issue?
4              MR. SKURKA:  He says that he has a sick
5   mother in Iran, and he's got a trip planned to Iran in
6   mid December.
7              THE COURT:  Okay.  We'll talk to him
8   about it.  All right, bring him in.
9              (Venireperson enters courtroom.)
10             THE COURT:  All right.
11
12             VENIREPERSON NO. 36,
13             AHMAD YAZDANINIA,
14             VOIR DIRE EXAMINATION
15  BY THE COURT:
16     Q.   All right.  You are Mr. Yazdaninia?
17     A.   Yes, sir.
18     Q.   All right.  Mr. Yazdaninia, we're going to
19  talk to you about a few things.  First and foremost, I
20  understand that you have a trip overseas.
21     A.   Yes, sir, that I attend every year.
22     Q.   Okay.
23     A.   Because of my ill mother that I visit every
24  year.
25     Q.   Okay.  Well, I certainly can understand that.

6

1     A.   Yes, sir.
2     Q.   When are you planning to leave?
3     A.   Well, I usually leave, according to that,
4   what I take my day off, personal day off from school.
5   I work for C.C.I.S.D.  I'm a teacher at Grant Middle
6   School.  And I talked to my principal, if it's
7   possible I can leave before the holiday starts, so a
8   week before holiday starts.
9     Q.   Okay.  So when is that?
10    A.   Well, I mean, our holiday is to -- this year,
11  I think it starts at December 14, I believe, or
12  something like that, but I'm intending to, you know,
13  to leave at that time.  I did not want to talk to you
14  about it because I haven't gotten my ticket, due to
15  financial problem that I have, so, I mean, I just need
16  some money to -- to travel, so...
17    Q.   So you are going to -- you plan to leave on
18  December the 14th.
19    A.   The 14, something like that, 14, or maybe
20  earlier, maybe later, but I have to go.  Somehow I
21  need to get to see her.
22    Q.   No, I -- look, look, I mean, if your mother's
23  ill, I mean, there's nobody here that wants to prevent
24  you --
25    A.   No, I understand --

7

1     Q.   -- from going.
2     A.   -- but I have proof that I can -- that I've
3   been there the last five, six years.
4     Q.   No, I believe you.
5     A.   Yes, sir.
6     Q.   We're not --
7     A.   No, I'm here, sir.  Sir, if I -- if I can
8   help in any way I'll be glad to serve, I have no
9   problem --
10    Q.   Okay.
11    A.   -- to do my civic duty, yes, sir.
12    Q.   Okay.  Well, here's kind of the deal.
13    A.   Yes, sir.
14    Q.   I don't expect this case would be going -- I
15  think it's -- we're going to start December the 1st.
16  Let's see here, that week -- I think December the 1st
17  is actually a Monday.  Let's see here, december the
18  1st is a Monday, and I can tell you that first week
19  through the 5th, we're going to be working, for sure.
20    A.   Yes, sir.
21    Q.   Okay?  And -- and then we might be working
22  through part or maybe even all of the next week, but I
23  think we'll be done by the 12th.
24    A.   Yes, sir.
25             MR. SKURKA:  I agree, Judge.

8

1    THE COURT: You think so?

2    MR. SKURKA: Yes, sir.

3    THE COURT: I -- what do you guys think?

4    MR. JONES: I'm sorry, I'm --

5    THE COURT: Well, he says he's leaving on

6    the 14th. I think we'll be done by the 14th, myself.

7    But, I mean, you guys know the evidence better than I

8    do.

9    MR. JONES: But --

10   THE COURT: If you don't think so --

11   MR. JONES: -- the problem is, the end of

12   the -- the end of the case, just because of the kind

13   of case it is, may be the most critical --

14   THE COURT: Uh-huh, I agree.

15   MR. JONES: -- part.

16   THE COURT: Okay.

17   MR. JONES: We don't know how long the

18   deliberations will last.

19   THE COURT: Okay.

20   MR. JONES: And any time lawyers estimate

21   how much time it's going to take, it usually takes

22   longer, so...

23   THE COURT: Well, we're hoping it's a

24   week.

25   MR. JONES: But given his -- his

9

1    situation with his parent, I'm --

2    THE COURT: Well, you want to talk about

3    this for a second?

4    MR. JONES: Well, I mean, he would be

5    distracted, I think. He'd be worried about it.

6    THE COURT: Well --

7    MR. JONES: Plus, he's -- if he's going

8    to be spending -- his airline tickets are going to be

9    --

10   THE COURT: He hasn't -- he hasn't bought

11   it, though.

12   MR. JONES: No, but if he gets it, it's

13   going to be an expensive ticket.

14   THE COURT: Yeah, no, I agree.

15   MR. JONES: And you can't -- he's going

16   to have problems, you know, rescheduling --

17   THE COURT: Okay.

18   MR. SKURKA: May I follow-up just on that

19   area?

20   THE COURT: Yeah, yeah. Why don't you

21   talk to him --

22   MR. SKURKA: Okay.

23   THE COURT: -- about it?

24

25

10

1    VOIR DIRE EXAMINATION

2    BY MR. SKURKA:

3    Q. Hi, Mr. Yazdaninia. Did I say it right?

4    A. It's close, sir.

5    Q. Close enough.

6    A. Yes, sir.

7    THE COURT: Close enough.

8    Q. (BY MR. SKURKA) So I don't feel bad. My name

9    is Skurka, and people have --

10   A. Yes, sir.

11   Q. -- trouble with that, too, so I'm --

12   A. Yes, sir.

13   Q. -- used to calling me Mark. How about that?

14   A. Yes, sir. And you call me Yaz, sir, Y-a-z.

15   The kids call me Yaz, Mr. Yaz.

16   Q. Mr. Yaz.

17   A. Y-a-z, yes, sir.

18   Q. Well, that makes it easy for all of us.

19   A. Much easier for all of us, yes, sir.

20   Q. We appreciate it.

21   A. Yes, sir.

22   Q. Let me -- let me get to the -- the gist of

23   the thing. You're -- you haven't bought a ticket,

24   yet, correct?

25   A. No, sir.

11

1    Q. You think -- or you're planning on leaving on

2    the 14th, which I think is a Sunday.

3    A. Yes, sir.

4    Q. Because it would be the end of the second

5    week.

6    A. Uh-huh.

7    Q. What we have here is a trial --

8    A. Yes, sir.

9    Q. -- that may take a week, probably, for sure,

10   but I don't think it's going to go much into the

11   second week.

12   A. Yes, sir.

13   Q. And if it does, it's not going to take the

14   whole week, --

15   A. Yes, sir.

16   Q. -- i don't believe. And that's just based

17   on, like, the attorney says, --

18   A. Yes, sir.

19   Q. -- a guess.

20   A. Yes, sir.

21   Q. And so I can almost -- my -- my suggestion

22   is, I would think 99 percent we'll be through by the

23   14th.

24   A. Yes, sir, I understand.

25   Q. Okay? So, here's the question.

**12**

1    A.   Uh-huh.
2    Q.   If you can -- if you're going to leave on the
3  14th and we can be through, can you sit on this jury?
4    A.   The main thing, sir, again, as I've said, I
5  would like to do my civic duty.  I've been on a civil
6  suit --
7    Q.   Uh-huh.
8    A.   -- and I enjoyed being in that, really.  But
9  the main thing in here for me is -- is my mother's
10  situation is that she's incapacitated.  She cannot
11  move, she cannot do anything on her own.  And,
12  actually, my family and a nurse taking care of her.
13    Q.   I see.
14    A.   And the main thing in my mind is pretty
15  much -- like last night I was on the phone.  They
16  constantly call me and talk to me.  And usually the
17  phone calls are like after 12:00 because that's the
18  only way they can get hold of me.  And usually up 2,
19  3:00, something, 2:00, an hour, two hours talking to
20  them, just because that's mother.  I mean, I'm sure we
21  all have mother to think about, you know, at this age
22  more think about them, and so I don't have -- my
23  father passed away awhile back, and -- and the main
24  thing is, I'm just worried about it.  It's just not
25  that I don't want to, but that's what, as I mentioned

**13**

1  on the -- on the form, that my concern's in her, and
2  if something happened I need to go, and that's part --
3  and my mind needs to be set.  And I know that you
4  mentioned something about open-minded.
5    Q.   Uh-huh.
6    A.   I do remember that, sir, I'm a teacher.  And
7  -- and I know being open-minded thing in jury case
8  like this, you know, you got to have open-minded.  And
9  in my mind occupied with, you know, problem that I
10  have over there, you know, because of my mother it's
11  going to be a little bit tough for me.  I can try.  I
12  mean, I'm -- again, as I said, whatever you-all set
13  for me is is fine, but --
14    Q.   And that's what we're trying to say, too.
15    A.   Yes, sir.
16    Q.   I'm so sorry about your mother's situation --
17    A.   Yes, sir.
18    Q.   -- but I can't really tell --
19    A.   Yes, sir.
20    Q.   -- if it's a thing that's been that way for a
21  long time --
22    A.   Yes, sir.
23    Q.   -- or it's getting steadily worse.
24    A.   Yes, is -- is getting steadily worse.
25    Q.   Okay.

**14**

1    A.   My mother's situation is getting worse.
2  That's the problem, they're constantly taking her to
3  the hospital, bringing -- since two or three years
4  ago, I know that her heart problem, part of her body
5  is -- is not movable, at all.  That's why she's not --
6  cannot even go to the rest room -- bathroom.
7    THE COURT:  She's pretty sick, at this
8  point.
9    VENIREPERSON NO. 36:  Pretty much sick,
10  yes, sir.
11    Q.   (BY MR. SKURKA) So -- so what you're saying
12  is, unfortunately something may happen during the next
13  two weeks that you may have to leave early.
14    A.   Yes, sir.  I might be --
15    Q.   Is that what you're saying?
16    A.   Yes, that's what I'm saying.  But, again, as
17  I said, I really -- I mean, I could have, you know, I
18  could have buy the ticket, but I -- I didn't have
19  money to buy it.  I'm trying to find, because of
20  financial problem that I have, and that's another
21  case.  I would have gone earlier if I could find the
22  money, but my main thing concerns really to serving is
23  just like my mind as, again I mentioned, open-minded,
24  it just got to have free mind to sit and listen to all
25  the argument that going on in here and --

**15**

1    Q.   So you think --
2    A.   -- and make up your mind.
3    Q.   So you think --
4    A.   That's all.
5    Q.   -- because of your mom's situation, that
6  might interfere with you being on the jury.
7    A.   That's what I'm trying to say.  And the main
8  thing, I have pretty much when they call me, I'm up to
9  1, 2:00 in the morning and next day I need to be in
10  here, a matter of being tired and, you know, concerns
11  about that situation.  Beside that one, there's no
12  other concerns that I have, sir.
13    Q.   Well, we think you'd make a fine juror, but
14  we don't think -- we don't want to really interfere
15  with your situation with your mom.
16    A.   Well, thank you very much, and hopefully any
17  time that, I mean, --
18    THE COURT:  All right.
19    A.   -- if I can come back and be a part of it,
20  I'll be, you know --
21    THE COURT:  All right.
22    Q.   (BY MR. SKURKA) We understand.  And what you
23  said is exactly right, this is such an important case
24  --
25    A.   Yes.

16

1    Q.   -- we want people to be focusing on it.

2    A.   Yes, sir.

3    Q.   And, unfortunately, you've got some personal

4    things.

5    A.   Absolutely.

6    Q.   Thank you for bringing that to our attention.

7    A.   Thank you, sir.  Appreciate it.  Thank you,

8    sir.

9         THE COURT:  Okay.  Mr. Yazdaninia, we're

10   going to do this, if it's okay, I think it's okay with

11   both sides.

12        MR. GARZA:  Yes.

13        THE COURT:  We're going to let you go --

14        VENIREPERSON NO. 36:  Yes, sir.

15        THE COURT:  You're not going to make it

16   on this jury.  Maybe in the future --

17        VENIREPERSON NO. 36:  Yes, sir.

18        THE COURT:  -- you may be in a better

19   situation to serve --

20        VENIREPERSON NO. 36:  Yes, sir.

21        THE COURT:  -- and we certainly want you

22   to be, okay?

23        VENIREPERSON NO. 36:  Thank you very

24   much, Judge.

25        THE COURT:  But we appreciate you coming

17

1    down here --

2         VENIREPERSON NO. 36:  Thank you.

3         THE COURT:  -- and talking to us and

4    being honest with us about things, --

5         VENIREPERSON NO. 36:  Thank you very

6    much.

7         THE COURT:  -- okay?

8         VENIREPERSON NO. 36:  Appreciate it.

9    Thank you, sir.

10        THE COURT:  All right.

11        VENIREPERSON NO. 36:  Is that it?

12        THE COURT:  If you need a work excuse --

13        VENIREPERSON NO. 36:  Yes, sir.

14        THE COURT:  -- my bailiff can help you

15   with that.

16        VENIREPERSON NO. 36:  Thank you very

17   much, sir.

18        THE COURT:  Thank you for coming, Mr.

19   Yazadaninia.

20        MR. SKURKA:  Thank you, sir.

21        (Venireperson exits courtroom.)

22        MR. SKURKA:  Judge, for the record, --

23        THE COURT:  Agreed strike?

24        MR. SKURKA:  -- the State will agree to

25   excuse Juror No. 36.

18

1         THE COURT:  All right.

2         MR. JONES:  That's...

3         THE COURT:  That's fine.  You know, I'm

4    afraid if his mom gets sick, then we've lost a person.

5         MR. JONES:  Yeah, right.

6         MR. SKURKA:  And that's why I wanted to

7    follow-up, because he didn't have plane tickets

8    bought.  I couldn't really tell if she was just in the

9    nursing home and he goes to visit her every so often,

10   or if she was really going downhill, but it sounds

11   like she's going downhill.

12        THE COURT:  All right.  We have the next

13   person, Lonnie Johnson (sic).

14        THE BAILIFF:  Yes, sir.

15        THE COURT:  Okay.

16        (Venireperson enters courtroom.)

17        THE COURT:  All right.  Come forward.

18

19             VENIREPERSON NO. 38,

20          LONNIE RAY JOHNSTON, III,

21            VOIR DIRE EXAMINATION

22   BY THE COURT:

23   Q.   You are Lonnie Johnston?

24   A.   Yes, sir.

25   Q.   All right.  We're going to talk to you about

19

1    a few things, okay?

2    A.   Okay.

3    Q.   We're looking to pick a jury here.

4    Obviously, you know that.

5    A.   Yes, sir.

6    Q.   And what we're looking for is people that can

7    keep an open mind.

8    A.   Of course.

9    Q.   All right?  Because it's not fair, otherwise,

10   right?

11   A.   No.

12   Q.   You agree with that?

13   A.   Of course not, yes.

14   Q.   And we want people that can keep an open

15   mind, and we want people that can follow the law.  So,

16   let me ask you question number one, can you keep an

17   open mind in this case?

18   A.   Yes, sir.

19   Q.   Okay.  Have you made up your mind about this

20   case one way or the other?

21   A.   No, I have not.

22   Q.   All right.  All right, then, let's talk about

23   the law.  You have never been on a criminal jury

24   before.

25   A.   No, sir.

20

1    Q.   Okay, that's okay.  We're going to talk to
2   you a little bit about what -- what it's about.  And
3   that is, first of all, in every criminal case in this
4   country the burden of proof is on the State, that is,
5   the State's brought the charges and the law says,
6   "State, you bring the charges, that's fine, but you
7   got to prove them because you brought them."
8    A.   Yes, sir.
9    Q.   You agree with that?
10   A.   Yes, sir.
11   Q.   Okay.  And the burden of proof -- you've
12  heard of it, I'm sure, you probably remember it from
13  school and you've seen it on T.V., and stuff like that
14  -- is beyond a reasonable doubt.  You ever heard of
15  that before?
16   A.   Yes, sir.
17   Q.   All right.  So beyond a reasonable doubt.
18  Now, we don't have a definition, but it is the highest
19  burden that we have in the law, okay?
20   A.   Okay.
21   Q.   And you agree that -- well, that's the law,
22  okay?  Could you hold the State to that burden?
23   A.   Yes, I would.
24   Q.   All right.  Now, it doesn't mean beyond all
25  doubt or beyond a shadow of a doubt, but it does -- it

21

1   is -- it is -- it's not just, you know, kind of sort
2   of, all right?
3    A.   Yeah.
4    Q.   It's more than that.
5    A.   Of course.
6    Q.   Okay, you could hold the State to that.
7        Now, as part of the concept that the
8   State's got the burden of proof.  Obviously, a person
9   -- if they've got the burden of proof, then a person's
10  innocent until they can prove it, right?
11   A.   Yes.
12   Q.   Okay.  And that's what the law says.  The law
13  says, "State, you got the burden of proof and until
14  you prove it, if you can prove it, you may not be able
15  to, but until you can prove it every person in this
16  country is innocent until proven otherwise."  You
17  agree with that?
18   A.   Yes, I do.
19   Q.   Okay.  All right.  And you could -- and --
20  and you could presume the Defendant in this case to be
21  innocent until they prove otherwise.
22   A.   Yes, sir.
23   Q.   If they can.
24   A.   That is true.
25   Q.   All right.  Now, intertwined with all of this

22

1   is the idea that the burden of proof never shifts.  In
2   other words, the Defense never has any burden to do
3   anything.  You follow me?
4    A.   Yes, I -- Defense doesn't have to prove
5   anything.
6    Q.   Defense doesn't have to prove anything.  They
7   don't have to put on any evidence, okay?  That's what
8   the law says.  And now some people say, "Well, I like
9   to hear both sides of the story," but it's not like
10  that because it's not about both sides of the story,
11  because you brought the charges and you got to prove
12  them, right?
13   A.   Of course.
14   Q.   Okay.  So we're not -- you know, it's not
15  exactly like that.  So, as part of that, the Bill of
16  Rights of our U. S. Constitution says Defendant
17  doesn't have to take the stand, all right?  And I
18  submit there's lots of reasons why that may be true,
19  okay?  Maybe -- maybe his lawyers say, "You know what,
20  we advise you not to take the stand because they
21  haven't proven their case," okay.
22       Maybe Defendant is just not -- just isn't
23  an eloquent speaker.  You know, he's not educated,
24  maybe he's -- maybe he just freezes up in high-stress
25  situations.  And you can understand why that would be

23

1   a high-stress situation.
2    A.   Of course.
3    Q.   Okay?
4    A.   Oh, yes.
5    Q.   You might even be a little nervous yourself
6   sitting there.  Maybe not.
7    A.   A little.
8    Q.   A little, right?
9    A.   Of course.
10   Q.   Yeah.  And you're not on trial.
11   A.   No, exactly.
12   Q.   Okay?  So, you know, there's lots of reasons
13  why a person may not want to testify, all right?
14  Would you -- could you follow the law that said a
15  Defendant does not have to testify and the jury can't
16  hold it against him?
17   A.   If that's what the law states.
18   Q.   That's what the law states.  Not only does it
19  say he doesn't have to testify and they can't make
20  him, but you can't go back there to deliberate and
21  say, "You know what, I'm -- I would have to hear from
22  him and if I don't hear from him, Mr. Skurka, you
23  get," that's the prosecutor over here, "Mr. Skurka
24  gets a star and so I'm going to tip the scales this
25  way for him."  Can't do that.

**24**

1     A.   No, sir.

2     Q.   You wouldn't do that?

3     A.   No, no.

4     Q.   Okay. All right. Let's talk a little bit

5 about the kind of case this is --

6     A.   Okay.

7     Q.   -- and the process. This is a capital murder

8 charge, okay?

9     A.   Yes, sir.

10     Q.   And -- and that means that it is the type of

11 murder in which the death penalty can be a punishment.

12     A.   Yes, sir.

13     Q.   All right. It can be triggered. But I think

14 it's a common misconception that every -- people think

15 that every murder is a capital, okay? You -- you seem

16 to understand that that's not the case.

17     A.   Yes, sir.

18     Q.   All right. There's plain murder, which I

19 kind of hate saying. I just haven't figured out a

20 better way to say it, but there's plain murder, which

21 is the intentional taking of another's life, and then

22 there's capital murder. And there's a laundry list

23 that the legislature has given us as to situations of

24 murder in which capital -- is capital murder, okay?

25        In this case, what -- and I like to call

**25**

1 it murder plus, okay? Think of it as murder plus.

2     A.   Okay.

3     Q.   In this case, the State is alleging murder,

4 plus, while in the course of committing or attempting

5 to commit a robbery, in the forcible taking of

6 something --

7     A.   Yes.

8     Q.   -- from another, okay?

9     A.   Okay.

10     Q.   So they have to prove the whole thing. They

11 don't get to say -- you don't -- they don't get to

12 say, "Well, we've proven you the murder, but the

13 robbery part..."

14     A.   Yeah.

15     Q.   Okay? Now, he may be guilty of murder or he

16 may be guilty of robbery or he may not be guilty of

17 anything, okay? But what I'm saying is this, they

18 have to prove each and every element of the offense of

19 capital murder for them to get a conviction for

20 capital murder. You follow me?

21     A.   Yes, sir.

22     Q.   Okay. Could you hold them to that -- to that

23 burden?

24     A.   Yes, sir.

25     Q.   In other words, they don't get to prove seven

**26**

1 or eight out of the elements and not prove all nine.

2 I don't know how many there are, but, you know,

3 there's -- there's a number of them. They don't just

4 get to get pretty close.

5     A.   Yeah.

6     Q.   They have to get them all.

7     A.   Yeah.

8     Q.   You -- you could hold them to that burden.

9     A.   Oh, yes.

10     Q.   All right. Now, in -- in Texas we have

11 what's called a "bifurcated system," all right? What

12 does that mean, all right? That means that there's

13 two parts to the trial, okay? First part is guilt or

14 innocence. That is, the State tries to prove to the

15 jurors that Defendant's guilty of the charge they've

16 brought, --

17     A.   Yes, sir.

18     Q.   -- okay? If they are unsuccessful and the

19 jury finds theDefendant not guilty, the case stops.

20 If however, they're successful and -- then we go on to

21 the punishment phase, which is the second part of the

22 trial.

23        In the second part of the trial, if the

24 Defendant is found guilty of capital murder, there's

25 two possibilities, life in prison or death, okay?

**27**

1 It's not just -- it's not just death automatically or

2 life automatically, okay?

3     A.   Yes, sir.

4     Q.   But you don't say life or death. The jury

5 doesn't -- I mean, most cases, like, let's say it was

6 a regular murder, the jury would come back with a

7 punishment, maybe a number of years, maybe probation,

8 maybe a fine would be added, maybe a combination of

9 those, okay? But we don't do that in capital murder.

10 Capital murder we answer questions, okay? And here's

11 the first question, they call it "Special Issues."

12 "Is there a probability the Defendant would commit

13 criminal acts of violence that would constitute a

14 continuing threat to society," okay?

15     A.   Okay.

16     Q.   Okay. And the jury would answer yes or no,

17 then you go on to Special Issue No. 2, "After taking

18 into consideration all of the evidence, including the

19 circumstances of the offense," that's the first part

20 of the trial, okay, the guilt or innocence part, and

21 then, "the Defendant's character and background and

22 the personal moral culpability of the Defendant, is

23 there a sufficient mitigating circumstance or

24 circumstances to warrant a sentence of life

25 imprisonment, rather than death sentence be imposed?"

28

1  Okay?

2       And what is this all about?  Well, the

3  first part of the trial, you're just going to hear

4  about whether the State can prove that this Defendant

5  is guilty beyond a reasonable doubt or not guilty.

6  And you're pretty much just going to hear about what

7  happened that day, okay, if they can -- see what they

8  can -- prove that -- what they've alleged that day.

9       A.   Yes, sir.

10      Q.   Unclear at this point because we haven't

11  heard anything, okay?

12      A.   Of course.

13      Q.   The second part of the trial you may hear

14  other things, like, I don't know, about his

15  background, maybe his criminal history.  What kind of

16  guy was he?  Is he a good guy?  Is he a bad guy?  Does

17  he do work for the community?  Is he -- is he

18  generally a good person to his fellow man, all right?

19      A.   (Nods head.)

20      Q.   And -- and then you can decide whether taking

21  into consideration everything, sort of like a global

22  look, okay?

23      A.   Okay.

24      Q.   Not just that day, but everything.

25      A.   Yes.

29

1       Q.   Everything about the person.  Does it -- does

2  -- you know, these -- are there enough mitigating

3  circumstances or, you know, that -- that warrant a

4  life sentence, rather than a death sentence?  All

5  right?  And then the jury would answer yes or no to

6  that question, okay?

7       A.   Okay.

8       Q.   Now, I need to know from you -- well, let me

9  -- let me tell you this.  At the beginning of every

10  trial, I give the jurors an oath, and that oath goes

11  something like this, "Do you solemnly swear that you

12  will render a true verdict based upon the law and the

13  evidence," and then the jury says, "Yes."  But I need

14  to ask you, can you take that oath, first of all, to

15  render a true verdict on the guilt or innocence phase,

16  based upon the law and the evidence presented to you?

17  Can you do that?

18      A.   Yes, sir.

19      Q.   Okay.  And then I need to ask you on these

20  two questions.  And before you answer, I want to tell

21  you, some people tell me, "I just -- you know, I could

22  participate perhaps in the guilt or innocence phase,

23  but I can't get to this phase.  I can't participate

24  and I can't take your oath because I cannot answer

25  questions that may lead to someone's death, okay?  I

30

1  can't do that myself."

2       A.   Of course.

3       Q.   Or, some people say, "Look, if I -- I could

4  also participate in the guilt or innocence phase, but

5  if he gets convicted of capital murder, I don't care

6  about these special issues.  I'm going answer them in

7  such a way I think somebody that gets convicted of

8  capital murder should always get death, no matter

9  what," okay?  Those people can't take the oath, all

10  right?

11      A.   Of course not.

12      Q.   Okay.  I'm asking you, can you take the oath

13  and truthfully answer these questions if we get to

14  that point?

15      A.   Yes, sir.

16           THE COURT:  Okay.  All right, I'm going

17  to turn the floor over to Mr. Skurka, and he's the

18  prosecutor for the State.  He gets to go first because

19  he's got the burden of proof.

20           VENIREPERSON NO. 38:  Okay.

21           VOIR DIRE EXAMINATION

22  BY MR. SKURKA:

23      Q.   How you doing today, Mr. Johnston?

24      A.   I'm doing good, how are you?

25      Q.   My name is Mark Skurka.  I'm an assistant

31

1  district attorney, and the young man that was with me

2  a few minutes ago is Geordie Schimmel.  He's also an

3  assistant D.A.  He's the one that's assigned to Judge

4  Galvan's Court, so he's going to be helping me present

5  the evidence in this case if you get selected on this

6  jury, okay?

7       A.   Yes.

8       Q.   I want to start off by saying there's no

9  right or wrong answers.  All you have to do is tell us

10  how you feel.  I don't want you to answer in such a

11  way you think I want to hear it or the Judge wants to

12  hear it or they want to hear it.  I just want to know

13  how you truly feel about something, okay?

14      A.   Of course, yes, sir.

15      Q.   Fair enough.  When you first heard -- when

16  you first heard it was a capital murder case or you

17  heard there may be a death penalty case, remember that

18  first day when you walked in and found out it was that

19  kind of case, what was your first reaction?

20      A.   My first reaction, I didn't really know what

21  to think because I -- I know nothing about the case,

22  as far as anything goes so I just knew it was a

23  capital murder trial, and I didn't even know what the

24  -- what the punishment would be, you know, but...

25      Q.   Yeah, capital murder means there's a chance

32

1   for death penalty.
2       A.   Yes.
3       Q.   And the Judge, I think, told you that pretty
4   soon when he first came in --
5       A.   Yes.
6       Q.   -- and he said it's a capital --
7       A.   Yes.
8       Q.   -- murder case.  When you heard it was that
9   kind of case and you may have to sit on that type of
10  jury, what was your reaction?
11      A.   I didn't -- I didn't, like, shy away from it.
12  I feel it's like our duty to serve on a -- on a jury.
13  And we have to be open-minded, and I...
14      Q.   Okay.  Did you see other people around you in
15  the audience react?  They all reacted differently,
16  didn't they?
17      A.   Of course, everybody's going to have a
18  different reaction when it's this type of case.
19      Q.   Right.  And I saw -- and I was watching them,
20  because I saw some people going like, "Oh, my gosh, I
21  can't believe I got this kind of case," --
22      A.   Yes, sir.
23      Q.   -- and then some people said "Well, that's
24  interesting, but, you know, I got to serve and do what
25  I got to do."

33

1       A.   Yes, sir, it's our duty.
2       Q.   Is that kind of how you felt?
3       A.   Yes, sir.
4       Q.   Okay.  Because sometimes people say -- and
5   it's okay to say this, they say, "Well, look, if you
6   know, I thought it was going to be a D.W.I. case or a
7   burglary case.  And, my gosh, now, I'm going to have
8   to make this kind of decision, I can't do that.  I
9   can't sit on that kind of case."  Did you feel that
10  way?
11      A.   No, sir.
12      Q.   Why not?
13      A.   I don't know, I just -- it didn't bother --
14  it didn't bother me, like -- I don't know, I -- I just
15  didn't feel like I couldn't make the choice.  I felt
16  that if I was selected, I'd make the right choice
17  according to the facts that are presented.
18      Q.   That's a good answer because that's the way
19  you should do it, make a decision based on the facts
20  that's presented.  You didn't come in with any
21  preconceived notion, right?
22      A.   No.
23      Q.   You didn't say, "Well, I know he must be
24  guilty because he looks guilty," did you?
25      A.   Oh, no, of course not.

34

1       Q.   And you understand that you have to wait
2   until you hear everything before you make such a
3   decision.
4       A.   Oh, of course.
5       Q.   But make no mistake, I told you the very
6   first day, the State is going to seek the death
7   penalty.  If you're seated on this jury, there's going
8   to be a time that sometime in this trial when I'm
9   going to stand before you and ask you to find him
10  guilty, based on the evidence.  And I'm going to ask
11  you to answer the questions in such a way that that
12  guy gets the death penalty.  And we're not talking
13  about somebody you just, you know, hear about on the
14  news.  There he is, right there in that shirt.
15      A.   Yes.
16      Q.   Look at him and tell me, can you participate
17  in that decision if it calls for it?
18      A.   Yes, sir.
19      Q.   Okay.  No hesitation there.
20      A.   (Shakes head.)
21      Q.   Okay.  It's not something that people want to
22  do, are happy to do.
23      A.   Of course not.
24      Q.   But you understand as part of our Judicial
25  Justice System, we need people to come out and make

35

1   those kind of hard decisions.
2       A.   Of course, a jury of your peers.
3       Q.   Very good.  "Jury of your peers."  You know,
4   even as powerful as the district judges like Judge
5   Galvan or the District Attorney Carlos Valdez, they
6   can't make that decision.  We trust the people, the
7   jurors, to make that kind of decision.  Do you agree
8   with that system?
9       A.   Yes, sir.
10      Q.   People complain about our system, but it's
11  still the best in the world, don't you think?
12      A.   I agree.
13      Q.   And it may not be perfect, but it's better
14  than a lot of other ones, --
15      A.   (Nods head.)
16      Q.   -- right?  And you understand that's a pretty
17  awesome responsibility.
18      A.   Oh, it definitely is.
19      Q.   I mean, you're a young guy.
20      A.   Yes, sir.
21      Q.   You're going -- If you're on this jury,
22  you're probably going to be one of the youngest people
23  on the jury.
24      A.   Okay.
25      Q.   You feel like you can step up in those shoes

36

1    and fill those shoes and do it?
2        A.   I don't -- I don't believe my age will really
3    play that big a factor in it.
4        Q.   Good answer, because you know what I was
5    going to ask you next?  Look at him.  He seems kind of
6    young himself, doesn't he?
7        A.   Yes, sir.
8        Q.   He's probably just a little older than you or
9    maybe just a little older than you.
10       A.   He looks it.
11       Q.   Does that have any effect on you?
12       A.   No.
13       Q.   Would you agree with me that you should judge
14   people by what they did and not what they look like or
15   how old they are?
16       A.   Of course, you can't judge people on what
17   they look like.
18       Q.   All right.  And even age, because in Texas,
19   they have a law that says you cannot seek the death
20   penalty on people under 18 years of age.  I mean, they
21   could do the worst crime in the world and if they're
22   16 years old, they can't get the death penalty.  But
23   the law also says over 18, you know, I guess they
24   recognize that if you're over 18, you're old enough to
25   know the difference between right or wrong, or you're

37

1    old enough to know what the law is, correct?
2        A.   Of course, you are.
3        Q.   Do you agree with that?
4        A.   Yes, sir.
5        Q.   I mean, you seem like a pretty mature guy for
6    your age, and I wish I was that mature when I was 22.
7    But the seriousness is, age may be something that factor
8    you think about, but do you think that's really going
9    to make the decision on what the outcome of the case
10   is?
11       A.   Not -- no, not age.  Basically, because you
12   have to hear everything in the case, you can't make a
13   decision just based upon age
14       Q.   Right.  But as long you're over 18, I mean,
15   -- I mean, obviously, I mean, the law says you can't,
16   you know, give the death penalty to somebody under 18.
17       A.   Of course.
18       Q.   But do you agree that over 18 you should know
19   what's going on and -- and face the consequences of
20   your actions?
21       A.   Yes, I believe once you're 18, you -- you
22   definitely know the difference between right and
23   wrong.
24       Q.   Sure.  Tell me about the death penalty.  Now,
25   that's one of the big issues, and we've hit on it a

38

1    little bit, but just tell me, in general, if somebody
2    had come up to you, you know, before you got --
3    because I know what happens is, you come in the jury
4    room and then you start really thinking about it a
5    lot.  Had you thought about the death penalty before,
6    and, if so, what were your feelings?
7        A.   My feelings, I'm not really like -- of
8    course, I'm not, like, overly for the death penalty,
9    because I -- of course, nobody ever likes to see
10   people die.  But I'm not against it in any way.  I'm
11   -- if the case and the crime were to permit it, it
12   would be one of the possible choices that you're going
13   to have to make, but I'm not saying that every case
14   warrants the death penalty.
15       Q.   That's exactly what the law says.  You said,
16   "Every case doesn't warrant the death penalty."  The
17   law says the same thing, because in Texas there's only
18   a few certain types of case you can even be eligible
19   to get the death penalty.  You know, if you kill a cop
20   while they're on duty, or, you know, killing a kid
21   under six years old, or killing more than one person
22   at the same time, or if you kill them while you're
23   raping them, kidnapping them, burglarizing them, or
24   robbing them, those kind of cases, and there's a few
25   more where they're eligible for the death penalty.

39

1        So you kind of agree with how the Texas
2    Court set it up that way, the law sets it up, right?
3        A.   Yes.
4        Q.   I mean, if you forge a check or you steal
5    something, that doesn't necessarily mean you're going
6    to get the death penalty.
7        A.   No.
8        Q.   It's got to be a very serious crime.
9        A.   Yes, sir.
10       Q.   And it's not automatic by any means, right?
11       A.   Oh, no.  Definitely not.
12       Q.   Sometimes people say, "Well, gosh, you know,
13   we found him guilty of capital murder, and he
14   automatically gets the death penalty," and I have to
15   say, "Wait a minute, there's two choices, death or
16   life in prison, depending on what the evidence says."
17       A.   Yes, sir.
18       Q.   Have you ever read in the paper, like, maybe
19   it will say something, or on the news it will say
20   "This guy who was charged with burglary got 20 years
21   in prison, and this guy who got charged with burglary
22   got 5 years probation."  Why -- why do you think that
23   happens?
24       A.   I guess there's different circumstances in
25   every case, that no case is going to be alike.  And

40

1 different jurors, they pick different -- different
2 sentencing. That's as far as I can tell.
3     Q.   And that's an excellent answer. Different
4 circumstances call for different punishments. Maybe
5 one person, you know, the guy got 20 years had been in
6 prison before for burglary and it's his third time
7 he's been to prison for burglary. The second guy,
8 maybe he's a first-time offender, you know, he's never
9 even been arrested before and he gets probation, okay?
10 See what I'm saying?
11     A.   Yes.
12     Q.   You can't judge until you hear all the facts.
13     A.   Of course not.
14     Q.   And that's what the Judge was very careful in
15 going over with you. You can't prejudge things and
16 you have to wait. Because if you just say, two
17 burglars, and you think, well, why aren't they given
18 the same, well, there's probably a reason why they're
19 not given the same.
20     A.   Yes, sir.
21     Q.   And that's what -- the kind of decision
22 you're going to have make in this case. So you don't
23 think you'll have a problem participating in this type
24 of case?
25     A.   No, sir.

41

1     Q.   Even though it may be called upon -- it's an
2 awesome responsibility and it's something that -- that
3 certainly nobody wants to do or likes to do it, but if
4 it comes to it, I want to know if you can carry it
5 out?
6     A.   Yes, sir.
7     Q.   You see what I'm getting at? From my point
8 of view, I want to know if you don't just talk the
9 talk, but if you'll walk the walk.
10     A.   Yes.
11     Q.   You will see what I'm saying?
12     A.   (Nods head.)
13     Q.   Because it's okay because people sometimes
14 say, "Well, gosh, Mark, I believe in the death
15 penalty. It's a good law. I'm glad we have it in
16 Texas. We need to do something about crime." And
17 then I say, "Okay, well, come sit on the jury and make
18 that decision." They say, "Whoa, not me. Let
19 somebody else do it."
20     A.   Of course.
21     Q.   You know? You don't feel that way, though.
22     A.   Well, it's a tough decision. We see a lot of
23 people -- I could see how a lot of people would be
24 afraid of having to make the decision.
25     Q.   It's -- and it's okay. I'm not trying to

42

1 fight with those people.
2     A.   Oh, yes, sir.
3     Q.   I need -- from my point of view, I need
4 people that will carry it out if they think that.
5     A.   Yes.
6     Q.   Are you one of those people?
7     A.   Yes, sir.
8     Q.   Okay. The Defense is probably going to ask
9 you the opposite. They're probably going to say,
10 "Gosh, you know, if you listen to all the evidence,
11 does that mean you're always going to vote for a death
12 penalty? Can you consider a life sentence and give
13 them a life sentence, if that's what the evidence
14 calls for"?
15     A.   Of course.
16     Q.   And you can do that, too, can't you?
17     A.   Of course.
18     Q.   Of course. Well, you seem to be pretty
19 open-minded about that. Sounds like you're going to
20 wait until you hear everything.
21           Let's talk about why this is a capital
22 murder case. I -- I mentioned it a second ago about
23 it's murder plus something else, in this case, murder
24 plus robbery. And the law says if you kill somebody
25 or murder them while you're in the course of

43

1 committing or attempting to commit robbery, then it's
2 capital murder. You're eligible for the death
3 penalty. Doesn't mean you're automatically going to
4 get it, it just means that's one of the two options
5 that's available.
6           Robbery, I think the Judge will give you
7 some instructions at the end of the trial, will say
8 basically taking something by force or threats of
9 force. In other words, if you just take something
10 that's theft. But if you take something and hit
11 somebody over the head with something, you know, take
12 it or you say, "I'm going to hurt you if you don't
13 give me your wallet," that would be robbery. You
14 understand that?
15     A.   Yes, sir, I do.
16     Q.   The law does not say it has to be a
17 "Completed robbery." Now, that sounds funny, but if
18 you say, robbery -- well, here's an example. Say
19 you're a juror on a robbery case, and a guy goes into
20 a bank to rob a bank and he goes up to the teller and
21 sticks the gun in her face, says, "Give me all your
22 money." And the teller, of course, is scared of this
23 threat and gives him all the money. And he's going
24 out of the bank with the bag of money and the police
25 get called and they catch him right there at the bank.

44

1    He's never gets away with it. He's still got the
2    money. Can he come to court and say, "Hey, I'm not
3    guilty. I -- I didn't actually finish the robbery. I
4    didn't get away."
5        A.   No.
6        Q.   No. But -- that's silly, right?
7        A.   Yes.
8        Q.   It's kind of a trick question because people
9    will say, "Well, gosh, you know, I'm not guilty. I
10   didn't actually -- I didn't get away with the money.
11   I didn't actually get to take all the money." Or it
12   could be anything, he could be in the middle of
13   robbing the teller and, you know, the teller's handing
14   him the money and the police come in and stop him. He
15   goes, "I never got any of the money." Does that mean
16   it's not a robbery?
17       A.   No. It's still a robbery.
18       Q.   Of course not. Okay, it's kind of a tricky
19   legal thing, but it's not that trickery because it
20   makes sense. Just because a person goes in there and
21   holds a gun on somebody and says, "Give me all your
22   money," I mean, that's a robbery, right, when that
23   happens. It doesn't matter if he's actually finished
24   it or not. Do you agree with that, then?
25       A.   Yes, sir.

45

1        Q.   Do you agree with the fact that just because
2    a person is charged with a crime doesn't necessarily
3    mean they're guilty of the crime?
4        A.   Of course not.
5        Q.   Okay. What does that mean? That's what we
6    call "the presumption of innocence."
7        A.   Uh-huh.
8        Q.   As he sits right now -- there right now, do
9    you understand that he is presumed innocent?
10       A.   Yes.
11       Q.   He doesn't start with anything. He doesn't
12   have to prove anything. And, as the Judge said very
13   eloquently, the State has to prove the case beyond a
14   reasonable doubt. He has to prove nothing. He
15   doesn't even have to testify if he doesn't want to
16   because the Fifth Amendment guarantees that if he
17   doesn't testify we can't hold that against him.
18       You wouldn't hold it against him, would
19   you, if he doesn't testify?
20       A.   No. That's -- that's an amendment, it's the
21   law. You can't --
22       Q.   That's exactly right, it's the law. But some
23   people -- and, again, you know, I'm not trying to pick
24   on anybody, but some people say, "Look, Mark, I want
25   to hear both sides of the story, and I can't make a

46

1    decision unless I hear from him." And I have to tell
2    them, "Well, you're not going to qualify as a juror
3    because you have to follow the law that says if a
4    person exercises those rights, you can't hold it
5    against him." Would you be able to do that and not
6    hold it against him?
7        A.   Yes, sir.
8        Q.   And just because he's charged by indictment,
9    the grand jury has indicted him, does that mean he's
10   guilty?
11       A.   No, not at all.
12       Q.   Not at all. The other thing is the burden of
13   proof. In this case and every criminal case, it's
14   beyond a reasonable doubt. Do you watch much T.V.
15   about these crime shows or police shows or anything?
16       A.   Yeah, I've seen them, seen them before, yes,
17   sir.
18       Q.   Well, they're so entertaining, but they're so
19   inaccurate sometimes.
20       A.   I can imagine how.
21       Q.   I know there's this movie out there, it's an
22   old movie, it's called, "Shadow of a Doubt," "Beyond a
23   Shadow of a Doubt." And you had always hear that on
24   T.V., "Well, you got to prove it beyond a shadow of a
25   doubt." Guess what, this Judge is never going to tell

47

1    you you have to do it that way. The Judge is going to
2    say you have to prove it beyond a reasonable doubt.
3    It doesn't mean beyond all doubt, any doubt, shadow of
4    a doubt, anything like that. What it basically means
5    is you have to have -- be sure in such a way that
6    you -- that it's beyond a reasonable doubt. I just
7    don't want you holding the State to a burden that
8    would be unfair for me because there's no way I
9    could show it to you a hundred percent, right.
10       The only way I could prove to you a
11   hundred percent if you were a witness and you saw the
12   the whole thing yourself. That would be impossible
13   for me to do that --
14       A.   Of course.
15       Q.   -- because you wouldn't be on the jury. And
16   beyond a reasonable doubt doesn't mean that you have
17   to do that. All it just means is just beyond a
18   reasonable doubt, not beyond all doubt or any doubt,
19   because I've had some jurors come up and say, "Well,
20   Mark, you have to prove it to me 100 percent." I say,
21   "Well, it doesn't say a hundred percent. It says
22   beyond a reasonable doubt." Follow me on that?
23       A.   Yes, sir.
24       Q.   Okay. Let me talk about the -- format
25   the trial goes. The Judge hit on this a little bit,

48

1  but I want to cover it with you. The first part of
2  the trial, if you're selected on this jury, is guilt
3  or innocence. The second part of the trial, if you
4  get to that, is the punishment evidence, punishment
5  part of the trial.
6          The first part of the trial is just
7  basically did he do it or not, is he guilty or not of
8  the crime? The State has to prove all the elements
9  beyond a reasonable doubt, and if the State doesn't
10  prove all of the elements, what does that mean?
11     A.   If they don't prove all the elements, then
12  he's I guess acquitted and innocent.
13     Q.   That's right. Well, we call it actually "not
14  guilty."
15     A.   Not guilty.
16     Q.   Not guilty because the State hadn't proven
17  the case beyond a reasonable doubt. He doesn't have
18  to prove he's innocent, but the -- the State has to
19  prove that he's guilty. But that's a word,
20  "Acquitted," is fine.
21     A.   Okay.
22     Q.   But if the State does prove the case beyond a
23  reasonable doubt to the jury's satisfaction, what
24  would your duty be?
25     A.   To -- guilty?

49

1     Q.   To find him guilty, right. So, if you find
2  him guilty -- if you find him not guilty, the case is
3  over with.
4     A.   (Nods head.)
5     Q.   But if you find him guilty, the jury does,
6  then you go to the second part of the trial. And the
7  second part of the trial you might get to hear
8  additional evidence. Like, the first part of the
9  trial is usually just what happened that day, you
10  know, the surrounding circumstances of the crime,
11  maybe before the crime, after the crime, but it's
12  really about what happened that day, right?
13     A.   Yes, sir.
14     Q.   The second part of the trial, in order to
15  help you decide what punishment he gets because,
16  remember, it's not automatic --
17     A.   Of course.
18     Q.   -- you got to -- you might get to hear other
19  stuff about his background. You might get to hear
20  that the person has, you know, been an Eagle Scout and
21  was on the honor roll in school. And then you might
22  hear, well, no, he's been to prison ten times before.
23  You see what I'm saying?
24     A.   Yes.
25     Q.   It's kind of like those burglary cases I told

50

1  you about where you don't know what the punishment's
2  going to be till you know what the surrounding
3  circumstances are. And so, you might get to hear this
4  additional evidence, and then once you hear that part,
5  does that mean you go back in the jury room and say,
6  "Well, I vote for death or I vote for life"? No, it
7  doesn't work that way. You don't just vote death or
8  life. What you do is answer two questions. And it's
9  how you answer those questions is what happens to the
10  Defendant.
11          So, you've heard the evidence in the
12  first part of the trial, you think he's guilty. The
13  second part of the trial you get to hear additional
14  evidence. You may get to hear additional evidence
15  about his background, you know, good or bad. Then you
16  go and answer two questions. They're on the board,
17  here, and I'm going to ask you to turn around behind
18  you and look at that first one.
19          The first one says, "Is there a
20  probability that the Defendant would commit criminal
21  acts of violence that would constitute a continuing
22  threat to society?" We call that "the future
23  dangerousness question." In other words, is he going
24  to be a danger to us in the future, right? And you've
25  probably heard words like "continuing threat to

51

1  society" before and that's kind of a catch phrase.
2          But I want you to highlight on a couple
3  of words on there. The first question -- part of the
4  question says, "Is there a probability." Probability
5  means more likely than not. There's no way, unless
6  you have a crystal ball and can look in the future,
7  that you know for sure what's going to happen, right?
8     A.   Of course.
9     Q.   And the law doesn't require me to do that.
10  The law just says is it probable, doesn't say for sure
11  or certainty. The second part says, "that the
12  Defendant would commit criminal acts of violence,"
13  which could be almost any act of violence. It doesn't
14  necessarily mean you think he's going to kill again
15  because some people say, "Well, I can only give the
16  death penalty if I think he's going to murder somebody
17  again or commit capital murder again." But the law
18  doesn't say it has to be that much. It just says
19  would -- if you think he's going to commit criminal
20  acts of violence, anything like that.
21          And the last part says, "would constitute
22  a continuing threat to society." What does society
23  mean to you?
24     A.   Like, a community or basically anywhere.
25  Anywhere that anyone would live, go.

52

1    Q.   Anywhere that there's other people, right?
2    A.   Of course, yes.
3    Q.   Okay.  What if -- sometimes people come up to
4    me and say, "Well, Mark, why don't you just put him --
5    why do you seek the death penalty?  Why don't you just
6    put him in prison?  Because if you put him in prison,
7    they're locked up, they can't hurt anybody."  And I
8    always say, "Wait a minute, who else is in a prison"?
9    A.   They're all human beings.  Doesn't matter if
10   they're in prison or not.
11   Q.   That's right.  There's other guards -- I
12   mean, there's guards --
13   A.   Of course.
14   Q.   -- there's prisoners, there's people that
15   work at the prison, like a warden and clerical people,
16   probably maintenance people, all those kind of folks.
17   So it's not like we put them on a desert island and
18   they're the only human being out there, right?
19   A.   Of course not.
20   Q.   Have you ever heard of that happening, like
21   guards getting attacked or inmates attacking other
22   inmates or stuff like that?
23   A.   I seen shows where it happened before.
24   Q.   Yes.  Well, it happens not just on -- on T.V.
25   A.   Oh, of course, I'm just saying --

53

1    Q.   It really happens, right?
2    A.   Yes.  I've never known of a case directly,
3    but...
4    Q.   No, I know, but you -- you understand that
5    could happen, right?
6    A.   Yes, sir, of course.
7    Q.   So when people say, "Just putting him in
8    prison takes him away from society," that's not
9    exactly right.
10   A.   No.
11   Q.   It sounds kind of funny, but prison is
12   actually part of society because you're still
13   interacting with other human beings, right?
14   A.   Uh-huh.
15   Q.   Okay.  So that's how that first question's
16   phrased.  Is there a good chance, is it probable that
17   this Defendant might commit other criminal acts of
18   violence that would be a continuing threat to society?
19   Is there a chance he's going to be a danger in the
20   future?
21   A.   (Nods head.)
22   Q.   So you answer that question yes or no.
23   A.   (Nods head.)
24   Q.   Then you go to the next question.  The second
25   issue says this -- and before I talk about the whole

54

1    long explanation for it, let's talk about the word
2    "mitigating," because that's the mitigating
3    circumstance question.  Mitigating basically means
4    anything -- this word "mitigating," means anything
5    that would lessen or make less severe the punishment.
6    In other words, he did the crime, but is there any
7    reason to give him a break and give him a life
8    sentence, instead of the death sentence.  In other
9    words, you think he's guilty, you think he's a
10   continuing threat to society, but hold on, before you
11   give him the death penalty, is there any mitigating
12   circumstances or reasons to warrant that life, rather
13   than death be given?
14   Well, remember we were talking about not
15   automatic, right?  You have to look at everything
16   else.  Mitigating is kind of like the opposite of
17   aggravating factors.  Remember that burglary example I
18   gave you earlier?
19   A.   Uh-huh.
20   Q.   Okay?  And I said, "Well," you said "every
21   facts and circumstances are different"?
22   A.   Yes.
23   Q.   Say you had a burglar -- two burglary cases,
24   one burglar here, one burglary here.  Two separate
25   cases and you're as a juror.  But you hear, "Burglary,

55

1    that's bad, just going into somebody's house and
2    stealing something without permission, and -- I don't
3    like burglars.  I want to punish these guys both real
4    tough," and then you hear the facts and circumstances.
5    In the first burglary, a guy has kicked
6    in the back door, take -- broken the door off the
7    hinges, gone through the house, ransacked the house,
8    stolen money, jewelry, T.V., V.C.R., stereo, ransacked
9    the whole house, broke a bunch of stuff, tore up a
10   bunch of stuff, and then you find out in his past,
11   guess what, he's been to prison five times before for
12   burglary.
13   Now, look at the second guy.  The second
14   guy is convicted of burglary, too, because he went in
15   somebody's house and stole something, but you hear the
16   circumstances of that and they're a little different.
17   What happened was, he didn't break in the house, the
18   door was unlocked in the back and he just went into
19   the kitchen.  He went into the kitchen.  He did not
20   steal money, jewelry, T.V., V.C.R. and stereo, he went
21   in there and stole some bread and some food to feed
22   his kids because he had lost his job and his kids were
23   hungry and needed some food.  He could have stolen all
24   those other things, but he didn't.  All he did was
25   take some food.

56

1    And then you find out about his criminal
2 history and he has none. He's never even been
3 arrested before. Unlike this guy who had five prior
4 burglaries, this guy has never even had a traffic
5 ticket before. They're both equally guilty of
6 burglary but would you really punish them the same
7 way?
8    A. No.
9    Q. Why not?
10   A. Well, because of the -- it's totally
11 different cases. That guy has been, you said, five
12 times for burglary and ransacked the place. I think
13 the other guy was trying to -- didn't have no money,
14 you know, trying to get it for his kids, you know?
15 That's --
16   Q. So --
17   A. -- completely different.
18   Q. So what you've done is done two things:
19 You've looked at the crime itself and the
20 circumstances of the crime, and you've looked at the
21 guys' background, and you've come up with two
22 different answers. In the first case, those are
23 aggravating factors. Those are bad factors and
24 probably make your sentence go high.
25    In the second case, the sentence would

57

1 probably go lower because he didn't do anything as
2 bad. That's what mitigating circumstance is all
3 about, is there a reason to go lower than higher? And
4 we all know that, you know, life is lower than -- than
5 death, so the Judge tells you this: "You found him
6 guilty of capital murder, you think he's a continuing
7 threat to society, but wait a minute, jury, before you
8 decide to give him the death penalty, stop, take into
9 consideration all of the evidence, the circumstances
10 of the offense," you know, what happened that day and
11 the surrounding circumstances, "his character and his
12 background," remember I told you, maybe he was an
13 honor roll student or something, or maybe he's always
14 been in trouble with the law, "and the personal moral
15 culpability of the Defendant," is there sufficient
16 mitigating circumstances or circumstances? Is there
17 enough of these circumstances to warrant that a
18 sentence of life, rather than the death sentence be
19 imposed?
20    In other words, is there, like,
21 extenuating or mitigating circumstances to say, "Look,
22 you know, I'll give him a break"?
23   A. Uh-huh.
24   Q. What is a mitigating circumstance? I can't
25 tell you. It's up to the jury to tell. Because some

58

1 people will say, "Well, yeah, we should give him a
2 break, because, you know, he was an honor roll student
3 and he was an Eagle Scout." Some people may say, "I
4 don't care if he's an Eagle Scout, you know, he still
5 did this crime and he's got to pay the punishment."
6    In other words, the Judge is not going to
7 say if you see any mitigating circumstances you
8 automatically have to go lower, the Judge says is it
9 enough, it there a sufficient mitigating circumstance?
10 So you kind of have to balance them out and say,
11 "Well, you know, he was a war hero, or maybe he was,
12 you know, made straight A's in school or came from a
13 broken home." And then other people may say, "Well,
14 you know, he shot the guy 29 times, or, you know, he
15 buried the body and kicked up the -- tore up the body
16 afterwards, or he'd been to prison ten times before."
17 You have to -- you have to balance all that stuff.
18    The only thing I can tell you is the
19 Judge is going to tell you, you have to keep an open
20 mind and consider the big picture before you give the
21 death penalty. And it's kind of -- remember in school
22 we always heard about checks and balances? It's kind
23 of like a final check. Before you do it, is there any
24 reason not to do it, is there any reason to give him a
25 life sentence?

59

1    So are you open-minded to that and
2 consider, hey, if they bring up some evidence that
3 says maybe he should get a life sentence, can you
4 consider that, too?
5    A. Yes.
6    Q. And understand that just because they bring
7 it up doesn't mean you automatically have to lower the
8 sentence. Some people may say, "Look, I don't care if
9 that happened, he still did this crime. It's still a
10 bad crime. Based on all this other stuff and the big
11 picture, I still think it outweighs those mitigating
12 factors." Okay?
13   A. Okay.
14   Q. That's pretty much how that question works.
15 Does that make sense to you?
16   A. Yes, it does.
17   Q. Yeah. It's kind of, you know, just to make
18 sure everything is done right, you want to cover
19 everything.
20    One thing the Judge may give you, too, is
21 the law says that "Voluntary intoxication is not a
22 defense to crime." Voluntary intoxication. That
23 means if you get yourself drunk or high or stoned, or
24 whatever, and you go commit a crime, that's not an
25 excuse for the crime. I mean, I can't go get drunk,

60

1  go rob a bank and say, "Well, I'm not guilty of
2  robbing the bank because I was drunk." No. As long
3  as it's voluntary intoxication, it's not a defense to
4  crime. Do you agree with that?
5      A.   Of course, yes.
6      Q.   Sure, that makes sense. And the law also
7  says, though, that it might be a -- it could be
8  considered a mitigating circumstance. Maybe you want
9  to give him a break because he was drunk or stoned,
10 maybe not. It's a possible mitigating circumstance.
11 That's what it is, it's just a possible mitigating
12 circumstance. A person's age can be a possible
13 mitigating circumstance, you know, his background
14 could be a mitigating circumstance. Almost anything
15 could be a mitigating circumstance. Doesn't mean it's
16 necessarily going to lower the sentence, it's got to
17 be enough of one to lower the sentence. You got that?
18     A.   Yes, sir.
19     Q.   Any questions about that?
20     A.   No, sir.
21     Q.   Do you think that scheme is pretty good to be
22 considered about doing these kind of cases?
23     A.   I'm sorry?
24     Q.   Do you think that scheme is a pretty good one
25 to be -- so you would be careful about, you know,

61

1  doing these kind of cases?
2      A.   Yes, sir.
3      Q.   So you understand that you're going to listen
4  to everything before you make a decision, correct, on
5  the first part of the trial.
6      A.   Yes, sir.
7      Q.   And you understand that you not going to
8  automatically do anything, right?
9      A.   No.
10     Q.   And you understand those facts of law that
11 the Judge talked to you about, the parts of the law
12 about, you know, indictment, you can't charge -- just
13 because he's charged doesn't mean he's necessarily
14 guilty, right?
15     A.   Yes, sir.
16     Q.   In fact, you even put, "Not all cases warrant
17 the death penalty." That gives me the impression you
18 say, "Hey, I can understand the death penalty in
19 certain cases, but not in all cases."
20     A.   Of course.
21     Q.   It's up to the facts.
22     A.   Every case is different.
23     Q.   Now, the law also says that policemen are
24 treated the same just like other people. Sometimes
25 people say, "Well, you know, he's a policeman. I have

62

1  to automatically believe what he says." And I always
2  tell them, "Well, look, a policeman's supposed to be
3  given the same weight as anybody else."
4      A.   Yes.
5      Q.   If a policeman comes up in uniform and he
6  says, you know, the moon is made of green cheese, that
7  doesn't mean that you have to automatically believe
8  them, right?
9      A.   No, of course not.
10     Q.   Would you agree with me, though, that
11 policemen should be treated just like everybody else?
12     A.   Yes.
13     Q.   I see you're still going to school, right?
14 Are you taking further schooling?
15     A.   No, I've already graduated.
16     Q.   Oh, you've already graduated from this
17 course.
18     A.   Yes, sir.
19     Q.   I'm sorry, I've got you mixed up with
20 somebody else. And you work on helicopters?
21     A.   Yes, I build helicopters for Black Hawk and
22 Appaches.
23     Q.   Okay. Do you-all just repair them or do
24 you-all actually build them?
25     A.   We build them. Oh, well, we -- they come

63

1  back from Iraq and we tear them down, then rebuild
2  them with new parts. Overhaul.
3      Q.   Okay. So it's kind of like rebuilding them
4  from scratch, overhauling them.
5      A.   Yes, sir.
6      Q.   And you work on the engine part?
7      A.   Yes, sir.
8      Q.   What made you go into that field?
9      A.   My dad worked out on the Base and they had a
10 program when when I was in high school to where I
11 could earn college credits while I was in high school.
12 And while I was in college, I was getting paid to go
13 to college. And I knew it was a good career, of
14 course, because my dad was out there, so I decided to
15 do it.
16     Q.   Did your dad work out there for a long time?
17     A.   He's been out there for about 20 years.
18     Q.   It seems like everybody I know that works at
19 CCAD has been there 20, 30 years. So it's good for a
20 young fellow like you to get a good job like that
21 early in your career.
22     A.   Yes, sir.
23     Q.   Do you have any questions about anything
24 we've talked about that maybe I didn't explain
25 something very well?

64

1    A.   No, not at this time.

2         MR. SKURKA:  Okay.  It was nice talking

3    to you.  I appreciate you listening to me and

4    answering all my questions.  I'm going to let the

5    other lawyers talk to you now.

6         VENIREPERSON NO. 38:  Okay.

7         MR. SKURKA:  Thank you, sir.

8         THE COURT:  All right.

9         MR. GARZA:  May I proceed, Your Honor?

10        THE COURT:  Mr. Garza.

11        MR. GARZA:  Thank you.

12             VOIR DIRE EXAMINATION

13   BY MR. GARZA:

14   Q.   Good morning, Mr. Johnston.

15   A.   Good morning, how are you?

16   Q.   My name is Ed Garza, as I had previously

17   introduced myself back I think on the 3rd when we

18   filled out these questionnaires.  And sitting next to

19   me is my Co-Counsel, Mr. Jones, --

20   A.   Hello.

21   Q.   -- and, of course, our client, --

22   A.   Hello.

23   Q.   -- John Henry Ramirez.  Is there any reason,

24   sir, in your mind, that you couldn't be fair and

25   impartial to both sides in this case?

65

1    A.   No.

2    Q.   Okay.  The reason we talk to you about all

3    these concepts, you know, the guilt-innocence phase,

4    the punishment phase, these special issues and all

5    those things is because this is going to be the only

6    time we really get to talk to you.

7    A.   Oh.

8    Q.   Okay?

9    A.   Yes, sir.

10   Q.   This is the only time we get to talk to you,

11   okay?

12   A.   Okay.

13   Q.   One-on-one, that is --

14   A.   Yes, sir.

15   Q.   -- and -- and, incidentally, too, I want to

16   remind you that, as -- as a juror, if you get picked

17   in this case, you're going to be referred to sometimes

18   as the trier of the facts, okay?  You're going to have

19   to decide factual issues in this case because the

20   Judge, essentially, decides all the legal issues,

21   okay?

22   A.   Yes.

23   Q.   Because he is a trained attorney and he's an

24   elected judge and he is the one that gets to decide

25   those matters, okay?

66

1    A.   Okay.

2    Q.   We, the lawyers, will talk about certain

3    legal issues to you and things of that nature.  We get

4    to make an opening statement, you know, perhaps at the

5    beginning of the trial before you hear any testimony,

6    and then after you hear the testimony we get to also

7    do what are called "final arguments," okay?  But,

8    under the law in Texas, whatever we say to you is not

9    evidence, okay?  Whatever we say to you, okay.

10        The only evidence you'll be allowed to

11   consider will be what you hear from that witness stand

12   because it will be under oath.

13   A.   Okay.

14   Q.   See the difference?

15   A.   Oh, okay, yes.

16   Q.   Okay?  So what I'm talking to you about today

17   here, or Mr. Jones or Mr. Skurka, you know, is not

18   evidence of anything, okay?

19   A.   Okay.

20   Q.   And, basically, when we argue the case to

21   you, we are just trying to kind of give you a synopsis

22   or a -- what we believe to be -- is going to be a road

23   map of the case, you know, what the evidence will

24   hopefully show or not show.  And then in final

25   argument, we're going to dissect the evidence you've

67

1    already heard and -- and argue and advocate for our

2    client on our part of the case, and, of course, the

3    State will do the same thing, okay?

4    A.   Okay.

5    Q.   But whatever we say to you, since we're not

6    under oath, and even though we are officers of the

7    court is not evidence for to you consider, okay?

8    A.   Okay.

9    Q.   We're just sort of arguing things to you at

10   those phases of the trial to see if there's any

11   last-minute convincing we can possibly do, and that's

12   all.

13   A.   Okay.

14   Q.   You understand the reasoning on that?

15   A.   Yes, sir.

16   Q.   Does it make sense?

17   A.   Yes, sir.

18   Q.   So, essentially, the only matters that you

19   will be called upon to decide are what you hear right

20   there from that witness stand, okay?

21   A.   Okay.

22   Q.   And you'll have to use your common sense to

23   decide if that person testifying is telling you the

24   truth, part of the truth or none of the truth based on

25   what they're saying and what their background might

68

1   be, any motivation or anything like that, okay?
2       A.   Okay.
3       Q.   So, it's important, and we always ask
4   perspective jurors not to leave their common sense in
5   the parking lot.
6       A.   Oh, no, you can't.
7       Q.   Okay?  Can you do that for us?
8       A.   Yes, sir, I will.
9       Q.   I think you can, too.  I just want to discuss
10  with you what I think you already know pretty well, is
11  that the State of Texas has to prove this case to you
12  beyond a reasonable doubt, okay?
13      A.   Yes.
14      Q.   Reasonable doubt is not something that is
15  naturally defined or anything, or whatever, but we can
16  sort of kind of give you some examples of it.  And,
17  you know, one of the ones that we've been using is
18  when you generally say you're going to take a trip for
19  vacation, or something, you're going to get on a
20  plane, at that point, if you have bought your tickets
21  through a reasonable airline, whatever, you have good
22  reason to believe that you should be able to get to
23  your destination.
24      A.   Yes, sir.
25      Q.   Is that correct?

69

1       A.   Yes, sir.
2       Q.   Okay.  But let me sort of change the facts a
3   little bit so we can get to the issue of reasonable
4   doubt.  Say you're sitting in the cocktail lounge
5   waiting for your flight to be called and you see this
6   guy walk up in a uniform who looks somewhat like a
7   pilot and he's carrying one of those bags behind him.
8   Have you ever seen those guys at the airport when they
9   show up, the pilots?
10      A.   I have not but I can imagine.
11      Q.   Okay.  Then let's just pretend that, you
12  know, he's a guy in uniform, and stuff, and whatever,
13  and then all of a sudden he sits at the bar and starts
14  throwing back about six or seven, eight martinis, huh?
15      A.   Oh...
16      Q.   Huh?  And you're going, "Gee, I sure hope
17  that's not the guy I'm going to fly with, you know"?
18      A.   Yes, sir.
19      Q.   And you see him leave the cocktail lounge,
20  and then you go up the jet lane and whatever, and sure
21  enough, you get up to your plane and he's the guy
22  that's greeting you at the door.  Are you going to
23  have a little bit of doubt about getting on that
24  airplane?
25      A.   Yes, definitely, I would.

70

1       Q.   That's what we're talking about.
2       A.   Okay.
3       Q.   Okay?
4       A.   Okay.
5       Q.   You see the difference?
6       A.   Yeah, definitely.
7       Q.   All right.  Now, you know like
8   what Mr. Skurka and the Judge have aptly described to
9   you as there's two parts to every criminal trial in
10  Texas, there's the guilt-innocence first and then the
11  punishment, if we have to get there.  If you don't
12  feel the State of Texas has met their burden, and
13  if they don't, are you going to feel bad about
14  acquitting our client?
15      A.   I'm sorry?
16      Q.   If for some reason in this trial the State of
17  Texas doesn't prove their case, are you going to --
18  are you going to feel bad about acquitting our client?
19      A.   No, not at all.
20      Q.   All right.  And then, of course, after that,
21  if it does happen that they do prove their case to you
22  beyond a reasonable doubt, we get to the punishment
23  phase and then we get to discuss with you, and it
24  becomes a whole new trial where the State still has
25  the burden of proving to you beyond a reasonable doubt

71

1   through reasonable and competent evidence that, one,
2   there could be a probability that the Defendant would
3   commit criminal acts of violence that would constitute
4   a continuing threat to society, okay?
5       A.   Okay.
6       Q.   Have you given any thought to what you would
7   want to hear or would need to hear to convince you of
8   our client's capacity to be a continuing threat to
9   society?
10      A.   No, I haven't really thought about it too
11  much.  I haven't -- I really don't know anything about
12  this case or -- basically, I'd have to hear, like, I
13  guess just like everything, you know?  You have to
14  take everything in and then make your decision.
15      Q.   Would you want to hear about his background?
16      A.   Of course.
17      Q.   Would you want to know if he's ever been in
18  trouble before?
19      A.   Well, yes.
20      Q.   If he has any sort of criminal history?
21      A.   Of course.
22      Q.   Okay.  Or if he's, conversely, never been in
23  trouble before?
24      A.   Of course, yes, I would want to hear about
25  his past.

72

1    Q.   Okay.  Now, this Special Issue No. 2, I want
2    to just kind of discuss a little bit about it and I
3    want to ask you some questions about your
4    understanding of these issues.  And I don't mean to
5    embarrass you or anything because there's a lot of
6    words out there that basically are like legal words.
7    They're --
8    A.   Uh-huh.
9    Q.   -- you know, these words up there come from
10   a very -- a very prolific Supreme Court case, okay,
11   that was decided a long time ago, okay, by the Supreme
12   Court.  And Mr. Jones and I have been lawyers for,
13   combined, maybe about 70 years, and it's still
14   difficult for us to figure out what some of those
15   people up there on the Supremes are telling us, okay?
16   We call them "the Supremes."
17         But to you, in your mind, can you tell me
18   what a Defendant's character and background would mean
19   to you?
20   A.   Well, it -- like his character and
21   background.  It would, basically, I guess, tell me
22   just -- I can't think of the words to put it.  His
23   background would tell me, like, where he came from and
24   how -- how his background would influence his choices
25   and --

73

1    Q.   Absolutely.  What about his character?
2    A.   Well, I really can't say because I -- I'd
3    have -- like, each character is different, you know?
4    Each person has a different character.  Like, it's
5    kind of hard just to, like, generalize it, you know?
6    Q.   Is -- is there anything that immediately
7    grabs your mind about what "character" means?
8    A.   What character means, like -- like, how you
9    are and how you -- how you -- I guess, how you're
10   presumed by other people and how you --
11   Q.   How you're viewed by other people.
12   A.   Yes.
13   Q.   How other people regard you.
14   A.   Yes.
15   Q.   Isn't that true?
16   A.   Yes.
17   Q.   Okay.  Exactly what it means.  Can you -- can
18   -- before you make up your mind one way or the other,
19   would you be able to sit down and listen to any
20   evidence concerning potentially our client's character
21   and background before you decide his fate?
22   A.   Yes.
23   Q.   Could you do that?
24   A.   Oh, yes, I could.
25   Q.   You see, that's what that special issue's all

74

1    about because, see, if the trial goes a certain way,
2    and we don't know, --
3    A.   Of course.
4    Q.   -- where he gets found guilty, let's just
5    say, and you say yes to that special issue, well, it's
6    like a train rolling down the track, you know, at that
7    point maybe without any brakes, --
8    A.   Okay.
9    Q.   -- okay?  And then we're asking you, well,
10   you know, before we either, you know, end up in a dry
11   gulch, or wherever, with that train, can you consider
12   these issues in possibly saying that, "Well, even
13   though he did this and even though we think he's a
14   threat to society, we think that there's some
15   sufficient mitigating circumstances having to do with
16   his character, his background and his personal moral
17   culpability that would convince us that he does not
18   deserve the death penalty."
19   A.   Yes, sir, because it's -- I guess, I look at
20   it like two different stages because that's the facts
21   that they present and then that one's about his
22   background and character, of course, so it's pretty
23   much you have to make two different decisions on
24   whether he's guilty.  And then, of course, the
25   mitigating or, I guess, circumstance.

75

1    Q.   Okay.  And you understand that the mitigating
2    is kind of a -- it's not a word that we generally --
3    or, you know, --
4    A.   Yeah.
5    Q.   -- the general deals with on a daily basis.
6    We do, as lawyers, you know, --
7    A.   Yes.
8    Q.   -- all day long, but, even then, you know,
9    until this case came out several years ago, we still
10   had to grapple with the idea, well, what -- what does
11   it really mean, what does it mean, you know, and how
12   do we explain it to people and juries in these types
13   of cases, you know, and will they understand expert
14   testimony on this matters and things of that nature?
15   And we need to be sure that -- that these things like
16   character, background, personal moral culpability are
17   things that you can give some effect to, okay.
18        But once again, it's up to you how you
19   want and what effect you want to give it, --
20   A.   Yes.
21   Q.   -- you know, good or bad, good or bad, okay,
22   --
23   A.   (Nods head.)
24   Q.   -- in making your decision.  Can you do that?
25   A.   Yes, sir.

76

1    Q.   Okay.  And we realize and understand that
2  it's a serious responsibility.
3    A.   Yes, a very --
4    Q.   And it's one --
5    A.   -- very much so, yes, sir.
6    Q.   -- that we all have here, too.
7    A.   I'm sorry?
8    Q.   It's one that we all share.
9    A.   Yes.
10    Q.   Okay?  And it's important that we try to get
11  it right.
12    A.   Yes.
13    Q.   Do you agree with that?
14    A.   Oh, definitely.
15         MR. GARZA:  Thank you, sir.  I don't
16  think I have any other questions for you.
17         THE COURT:  All right.
18         MR. SKURKA:  Judge, I have just one quick
19  follow-up --
20         THE COURT:  Okay.
21         MR. SKURKA:  -- if I might.
22         THE COURT:  Okay.  Okay.
23         VOIR DIRE EXAMINATION
24  BY MR. SKURKA:
25    Q.   On one of the questionnaire questions it

77

1  says, "The law in Texas says a person convicted of
2  capital murder may receive the death penalty solely
3  because of the facts and circumstances of the crime,
4  even if the person has committed no other previous
5  crimes.  Do you agree with this law?"  You put, "Yes."
6    A.   I'm sorry?
7    Q.   Okay.  Let me read it, again.
8    A.   Okay.
9    Q.   One of the question in the questionnaire
10  said, "The law in Texas says that a person convicted
11  of capital murder may receive the death penalty solely
12  because of the facts and circumstances of the crime,
13  even if the person has committed no other previous
14  crimes.  Do you agree with this law?  Yes or no?"  And
15  you put, "Yes."
16    A.   Well --
17    Q.   And that's fine to say that because the law
18  says -- remember, I was giving you those examples of
19  person being convicted five times before and a person
20  who's never been to prison before?  You do not have to
21  only give the death penalty if the person has been
22  convicted before.
23    A.   Correct.
24    Q.   It can be just on the facts and circumstances
25  of that case.  You understand that?

78

1    A.   Yes.
2    Q.   It's kind of a wordy question but there's an
3  example that we used to use in Houston years ago on
4  Halloween night.  This man had taken an insurance
5  policy out on his kid and he fed his own kid poison
6  Halloween candy and killed him.  That kid was -- that
7  guy was like a good member of the community.  Nobody
8  ever -- he had never had a traffic ticket, never got
9  in trouble before, but after that, they called him
10  "The Candy Man."  And he was given the death sentence
11  or life sentence, the highest sentence he could get,
12  even though he was a first-time offender, he had no
13  priors.
14         You understand because of the
15  circumstances of that case the jury could decide to
16  give him the maximum sentence even though he hadn't
17  been to prison before because of the circumstance of
18  the case?
19    A.   Yes.
20    Q.   That's all I wanted to remind you, you don't
21  have to have a person that's been to prison ten times
22  before.  It could be any of the surrounding
23  circumstances.  Remember that question said look at
24  all of the evidence, including the case itself.
25    A.   Yes.

79

1    Q.   Can you do that?
2    A.   Yes, I will.
3         MR. SKURKA:  Okay, thank you.  That's all
4  I have, Judge.
5         THE COURT:  All right.
6         MR. GARZA:  No more questions.
7         THE COURT:  Why don't you wait in the
8  jury room, Mr. Johnston, for just a second.  I'm going
9  to discuss with the lawyers.
10         VENIREPERSON NO. 38:  Okay.
11         (Venireperson exits courtroom.)
12         MR. SKURKA:  Judge, on the record,
13  State will accept this juror.
14         MR. GARZA:  We will, also.
15         THE COURT:  All right.  This Juror No. 5.
16  Let's bring him in.
17         (Venireperson enters courtroom.)
18         THE COURT:  All right, Mr. Johnston,
19  you are on the jury, okay?
20         VENIREPERSON NO. 38:  Okay.
21         THE COURT:  Now, here's the deal, I think
22  I've already told you, and -- and I don't want you
23  watching the local news or reading the local paper,
24  okay?  I just want you to get the facts on this case
25  from courtroom, okay, what comes through that witness

80

1   chair and the exhibits that are admitted into
2   evidence, all right?
3          VENIREPERSON NO. 38:  Yes, sir.
4          THE COURT:  I don't want you talking to
5   anybody about this case.
6          VENIREPERSON NO. 38:  Okay.
7          THE COURT:  Somebody tries say, "No, no.
8   Can't talk to you.  Judge told me I can't talk about
9   the facts of the case at all until the case is over
10  with," okay?
11         VENIREPERSON NO. 38:  Yes, sir.
12         THE COURT:  Now, I expect we're going to
13  start this trial on December the 1st.  It may -- it
14  will take that week for sure.  It may spill into the
15  next week, so you might want to let your employer
16  know.
17         VENIREPERSON NO. 38:  Okay.
18         THE COURT:  And I think it will take
19  those two weeks, all right?
20         VENIREPERSON NO. 38:  Okay.
21         THE COURT:  All right.  Thank you very
22  much for coming down and we'll be keeping in touch.
23  We'll let you know if things change.
24         VENIREPERSON NO. 38:  Okay.  So you --
25         THE COURT:  We'll call you and let you

81

1   know when to come down here, but I'm just telling you
2   that's tentatively what it's looking like, okay?
3          VENIREPERSON NO. 38:  Okay.
4          THE COURT:  Okay.  Thank you very much.
5          VENIREPERSON NO. 38:  Thank you.
6          THE COURT:  If you need work excuse,
7   bailiff can get it for you.
8          VENIREPERSON NO. 38:  All right.  Thank
9   you.
10         (Venireperson exits courtroom.)
11         THE COURT:  All right.  Let's take a
12  little break, gentlemen.
13         (Short recess.)
14         MR. SKURKA:  I think we have an
15  agreement.
16         THE COURT:  On who?
17         MR. GARZA:  On Juror 41, Judge, we're
18  going to go ahead and mutually agree to excuse him.
19         MR. SKURKA:  That's correct, Judge.  The
20  State agrees to excuse No. 41, also.
21         THE COURT:  Okay.
22         MR. GARZA:  I -- you know, we can see
23  that there's probably some occupational bias on that
24  matter.
25         THE COURT:  Okay.  Well, I wonder if he's

82

1   here.  We'll ask Frank.
2          MR. SKURKA:  Did we put 39 on the record?
3          THE COURT:  All right.  Let's go off the
4   record.
5          (Off-the-record discussion.)
6          THE COURT:  All right.  So we agreed on
7   Gerald Rogen, correct?
8          MR. SKURKA:  Yes, Your Honor.
9          THE COURT:  All right, Gerald Rogen is
10  gone by agreement.
11         MR. JONES:  What was his number?
12         THE COURT:  His number was 41.  You
13  missed the story about the -- being chased at the
14  Republican --
15         MR. SKURKA:  That was a pretty good
16  story.
17         THE COURT:  Okay.  Then, I guess, the
18  next person is Reid Baucom.
19         MR. SKURKA:  44?
20         MR. GARZA:  Yes.
21         THE COURT:  Are they here?  Bring him in.
22         THE BAILIFF:  Okay.
23         (Venireperson enters courtroom.)
24         THE COURT:  You are Mr. Baucom?
25         VENIREPERSON NO. 44:  Yes, sir.

83

1          VENIREPERSON NO. 44,
2          REID BROWNING BAUCOM,
3          VOIR DIRE EXAMINATION
4   BY THE COURT:
5      Q.   All right, Mr. Baucom, we're going to talk to
6   you about some things.  Obviously, we're looking to
7   pick a jury, okay, and you know that.  We need to talk
8   to you about two things.  We're looking for people
9   that can keep an open mind, okay, and people that can
10  follow the law, okay.
11         So let's begin with keep an open mind.
12  Let me get to your questionnaire here.  Do you think
13  that you can keep an open mind in this case?
14     A.   I think so.
15     Q.   Okay.  Because some people say, "Well, you
16  know, I just can't, or maybe I've seen something in
17  the news and I'm already leaning one way or the other
18  because of that," or for whatever reason.  We just
19  want to make sure that you can keep an open mind.  And
20  if you can't it's okay, but we do need to know.
21     A.   Right.  I think I can.
22     Q.   Okay.  Okay.  All right, next thing.  This is
23  a criminal case, obviously.  Let's see here.  You have
24  never been on a criminal jury before.
25     A.   No, sir.

84

1    Q.   Okay.  Well, we want to talk to you a little
2  bit about the law in criminal cases.  Some of it you
3  probably already know.  But, in any event, in every
4  criminal case in the State of Texas, the burden is on
5  the State of Texas to prove the charges, okay?  They
6  bring the charges, but the law says, "That's fine if
7  you bring the charges, but you got to -- you bring
8  them, you got to prove them."  And the State just
9  doesn't get to say that person's guilty and then it's
10 so.  They got to prove them to -- to the people, to
11 the jury, okay?  You got any problem with that?
12   A.   No, sir, I don't.
13   Q.   You can follow that law.  Okay, then
14 the next thing is the burden of proof is beyond a
15 reasonable doubt.  You've probably heard that before,
16 beyond a reasonable doubt.  And that's their burden,
17 okay, it's on the State.  And it's the highest burden
18 that we have in the law, but it -- it's not defined.
19           What it isn't, it's not beyond all doubt
20 or beyond a shadow of a doubt.  It's what it is,
21 beyond a reasonable doubt.  And the lawyers will
22 probably give you some examples of what they -- to
23 illustrate what they think it means, okay?  Could you
24 hold the State to that burden?
25   A.   Yes, sir.

85

1    Q.   Okay.  Now, as part of the fact that the
2  State's got the burden of proof, the law says if the
3  State's got the burden of proof, well, everyone
4  is presumed to be innocent until they can prove
5  otherwise, okay?  In other words, we presume everyone
6  to be innocent until evidence is brought that can
7  change that presumption.  You follow me?
8    A.   Yes, sir.
9    Q.   Okay.  And in this case the Defendant here,
10 Mr. Ramirez here, is presumed by law to be innocent,
11 unless and until if they can prove otherwise.  You
12 follow me?
13   A.   Yes, sir.
14   Q.   Is that -- you could follow that?
15   A.   Yes, sir.
16   Q.   And presume him to be innocent?
17   A.   Yes, sir.
18   Q.   Okay.  Now, also as part of all that, since
19 the State has the burden of proof, the Defense doesn't
20 have to do anything, they don't have to present
21 evidence.  Now, some people say, "Well, you know what,
22 I like to hear both sides of the story, and -- before
23 I can make a decision."  Well, it doesn't really work
24 like that, okay?  It doesn't work like that because
25 they've got the burden of proof.  It's doesn't -- it's

86

1  not even, okay?  They've got a burden and they have to
2  prove it.  And, as such, they don't have -- the burden
3  never shifts over here.  They don't have to present
4  evidence.
5           As part of that, Defendant doesn't have
6  to testify under the law.  Now, it's -- it's beyond
7  just the law, it's in the Constitution.  Defendant
8  doesn't (sic) have a right to testify, and -- and it's
9  all -- you know, because they don't have burden of
10 proof.
11          Now, I -- I submit there's lots of
12 reasons why a person may not want to testify.  Maybe
13 his lawyers advise him not to testify because they
14 don't think they've proven their case, okay?  Maybe --
15 maybe the Defendant gets very stressed and just
16 can't -- he stutters when he gets on the stand.  I
17 mean, there's a lot of reasons, okay?  But the bottom
18 line, Mr. Baucom, is that I need to know from you
19 whether you can follow that law or whether you would
20 hold it against him if he -- if he didn't testify.
21 Either way is okay, but we need to know.
22   A.   Yeah, I can understand why he wouldn't want
23 to testify.  I don't think I could do it, either.  I
24 understand that.  That's reasonable.
25   Q.   Okay.  But would you follow that law and

87

1  not -- see, it's -- it's not that -- that they can't
2  make him testify, it's more than that.  If you're
3  selected on the jury, you can't go back in the jury
4  room and go, "Okay, let's see, this is what the State
5  presented.  Defense didn't present anything, so I'm
6  going to give State more points because he didn't
7  testify.  He didn't tell me his side of the story,
8  therefore, that hurts him.  I'm going to put some more
9  over here on the State's side."  You can't do that.
10 And, if you would do that, that's okay, but we need to
11 know that, okay?
12   A.   Yes.
13   Q.   Because that's really not -- that's not
14 really following the law.  I need to know from you
15 whether you would hold it against him or you could
16 follow the law and not hold that against him.
17   A.   I believe I could follow the law there.
18   Q.   Okay.  You wouldn't hold it against him?
19   A.   No.  I can understand that.
20   Q.   Okay.  All right.  Now, let's talk about the
21 charge then.  The charge is capital murder.  And, as
22 we've been going through this process, I -- and I've
23 been explaining to the different potential jurors
24 about the situation, I talk about "plain murder."  And
25 I hate that term but I haven't come up with a better

88

1  one, all right? "Plain murder." What's plain murder?
2  Well, it's the intentional taking of another person's
3  life. That's plain murder, all right? It's not
4  called "plain murder," we just -- I'm saying that to
5  differentiate it from capital murder.
6          The legislature says that there are
7  certain types of murders that are capital, that is,
8  the death penalty is a possibility. Just taking
9  someone's life is not necessarily a capital murder,
10  okay? Some people think that. "You take a life,
11  well, then maybe the State could take yours," but it's
12  not like that.
13          Capital murder is murder plus, okay,
14  murder plus something else, plus a special
15  circumstance. And there's a laundry list that the --
16  that the legislature has given us. In this case,
17  what -- what the State has alleged is that this
18  Defendant committed a murder while in the course of or
19  attempting to commit a robbery, same time, okay? So
20  they got -- they put -- I mean, two serious crimes
21  together and the two serious crimes together make the
22  capital murder. You follow me?
23      A.  Yes, sir.
24      Q.  Okay. So, we got robbery, and of which, of
25  course, is the forcible taking of something from

89

1  another. Not just theft, robbery. Okay? You
2  forcibly take or threaten to take something from
3  another, and they put the two together.
4          Now, that gives us capital murder.
5  And -- and the law says that for someone who's found
6  guilty of capital murder, the State has to prove all
7  of the elements. That is, they have to prove the
8  robbery and the murder, all of it. And they don't get
9  to prove seven out of eight or eight out of nine,
10  whatever the number of elements there are. They have
11  to prove it all.
12          Would you hold the State to that burden
13  and require them to prove all of the elements before
14  you found the Defendant guilty of capital murder?
15      A.  Yes, sir.
16      Q.  Okay. Now -- okay. Now, you've never been
17  on a criminal jury before but let me explain to you
18  how it works. A lot of this stuff that we just talked
19  about, you know, a lot of jurors know that because
20  they've read it or maybe they remember it from school
21  or maybe they even saw it on T.V., or whatever. One
22  thing that a lot of jurors don't know is that our
23  system in -- in Texas, the jury system, is bifurcated.
24          And what does that mean? Well, that
25  means you got a first part of the trial, which is the

90

1  guilt or innocence phase. In other words, the
2  beginning of the trial would go some like this, the
3  State would try to prove to you as the jury their case
4  beyond a reasonable doubt through evidence, okay? And
5  the Defense, they might present evidence, they might
6  not. They might just -- they might just use -- choose
7  to cross-examine the State's witnesses and test their
8  evidence that way, okay.
9          Then you'll hear closing arguments. I'll
10  read to you the Charge, which is a packet of law that
11  you get. Sort of -- sort of like an instruction
12  manual for the jury and you get to go back there and
13  deliberate, okay? You follow me?
14      A.  Uh-huh.
15      Q.  Then you determine whether the State's proven
16  their case beyond a reasonable doubt, guilty, not
17  guilty. If the jury comes back not guilty, the case
18  is over with, okay?
19      A.  (Nods head.)
20      Q.  If the jury finds the Defendant guilty of
21  capital murder, we go on to the second phase of the
22  trial, which is the punishment phase. Now, normally
23  in criminal cases, other than a capital murder, there
24  is a punishment range, okay? Let's say, 5 years to 99
25  years or life, okay? And then the jury would go back

91

1  there on the punishment part and they'd say, "Well,
2  you know, based upon all the facts and circumstances,
3  we think it's X," you know, they decide. You don't do
4  that in a capital murder case, all right?
5          I will tell you, there's two
6  possibilities in punishment if a Defendant is found
7  guilty of capital murder. And, of course, we've
8  talked about one, that's death, death penalty. The
9  other is life in prison. There's two possibilities.
10  But you don't say life or death, that's not what the
11  jury does. The jury answers questions, okay, and then
12  based upon the answers to those questions determine
13  what the sentence is.
14          And if you'll look over here, over your
15  shoulder here, here's the first question, "Is there a
16  probability the Defendant would commit criminal acts
17  of violence that would constitute a continuing threat
18  to society?" That's Question 1, and the jury would
19  answer yes or no, okay?
20          After they answer that question, then
21  they would -- if you turn around in your right
22  shoulder there is Special Issue No. 2, the second
23  question. "After taking into consideration all of the
24  evidence, including the circumstances of the offense,"
25  the first part of the trial, the guilt or

92

1 innocence part, okay, "the Defendant's character and
2 background and the personal moral culpability of the
3 Defendant, is there a sufficient mitigating
4 circumstance or circumstances to warrant a sentence of
5 life imprisonment, rather than the death sentence be
6 imposed?" You understand?
7    A.  Yes.
8    Q.  In other words, first part of trial, guilt or
9 innocence, you just hear about what happened that day.
10 You know, that's what they're going to try and prove.
11    A.  Right.
12    Q.  Okay?  And I don't know if they can prove it
13 or not, okay?  Maybe -- maybe the Defendant will be
14 found not guilty.  Maybe State can't prove its case.
15 But if they find -- if the jury finds the Defendant
16 guilty, then you answer these questions.  And this
17 part talks about not just what happened that day, but
18 about everything.  Maybe you'll hear about the
19 Defendant's background, what kind of guy he was.  Was
20 he a good guy, was he a bad guy?  You know, did he
21 help others?  You know, is he a bad guy his whole
22 life, bad criminal history, good criminal history, you
23 know?  That kind of thing.
24         In other words, you have to take
25 everything, everything that's presented to you in

93

1 making this determination, not just the case,
2 everything that's presented to you, okay?
3    A.  (Nods head.)
4    Q.  You follow me?
5    A.  Yes.
6    Q.  And then the jury would answer yes or no to
7 that question.  All right.  The beginning of the case,
8 I am going to ask the jurors that are selected to
9 raise their right hand and I will -- I will ask them
10 to take an oath.  And that oath is, "Do you solemnly
11 swear that you will render a true verdict based upon
12 the law and the evidence presented to you," and they
13 will say yes, okay.
14         I need to know if you can take that oath,
15 okay?  First of all, I need to take -- know that you
16 can take the oath to -- based upon the law and the
17 evidence, to hinder a true verdict, guilty or not
18 guilty, based upon the evidence in this case.  Can you
19 do that?
20    A.  Yes, sir.
21    Q.  Okay.  And the second part I need to know, if
22 we do get to the second part and we get to these two
23 questions, I'm going to -- I'm going to ask if you can
24 do that.  And -- and let me stop you before you answer
25 because what sometimes people tell me is this, they

94

1 say, "You know, Judge, I can't -- I can't answer those
2 questions because I can't participate in a process
3 that can lead to someone's death, potentially."  Okay.
4         And other people say, "Well, you know
5 what, if we find him guilty of capital murder, I'm not
6 -- I'm not going through this process.  He gets
7 automatic death as far as I'm concerned," all right?
8 But if -- if either one of those is you, that's fine,
9 okay, but we need to know whether you can take the
10 oath to answers these true -- these two questions
11 truthfully or not.  Could you do that?
12    A.  Yes, I believe I could do that.
13         THE COURT:  Okay.  All right.  Well,
14 then, I'm going to turn the floor over to Mr. Skurka.
15         VOIR DIRE EXAMINATION
16 BY MR. SKURKA:
17    Q.  Hello, Mr. Baucom, how are you this morning?
18    A.  I'm pretty well.
19    Q.  Good.  Today we're going to talk about some
20 things, and follow up some stuff that happened that we
21 talked about the other day in court that first day we
22 had all those people in there.  I'm going to start off
23 by telling you there's no right are right or wrong
24 answers to anything you say.  We just want to know how
25 you feel, to see if you're qualified as a juror, okay?

95

1    A.  Yes, sir.
2    Q.  I don't want you to answer the question such
3 a way you think the Judge wants to hear it or the
4 Defense wants to hear it or I want to hear it.  You
5 just answer it the best way you know how and we'll
6 deal with that, okay?
7    A.  Yes, sir.
8    Q.  I see that you're -- you used to work at
9 Reynolds for some time?
10    A.  Yes.
11    Q.  How long have you been retired or -- from
12 Reynolds?
13    A.  Just about two years.
14    Q.  Two years.  What do you like to do with
15 yourself nowadays?
16    A.  I mess around with computers.  And then I go
17 around town passing out Gospel tracts --
18    Q.  Okay.
19    A.  -- just a couple of days a week.
20    Q.  For the church you go to?
21    A.  No, no, no.  I wrote it myself.  It has
22 nothing to do with any church.
23    Q.  Is that right?  You wrote your own Gospel
24 tract?
25    A.  That's exactly right.

96

1    Q.   Tell me what motivated you to do that.
2    A.   Well, the things that the Lord has done for
3    me in my life, and I just wrote that out and give that
4    out to share with people.  And I don't advertise any
5    particular church or denomination or anything.
6    Q.   Uh-huh.
7    A.   There's no phone number, address or name on
8    that thing I pass out.  I just pass it out free.  It's
9    one thing that you get in a whole day's time that's
10   free.  Everything else there's some kind of cost, I
11   don't care what they say.
12   Q.   Well, that's very inspirational, sir.  That's
13   nice to do that.  And it's good because,
14   unfortunately, sometimes with churches people have
15   their own agenda and stuff.  And it sounds to me like
16   you're across-the-board thanking the Lord for what
17   you've been given and trying to share that, huh?
18   A.   Right.  I guess, so, yeah, if I understand
19   your question.  I...
20   Q.   I understand.  Well, I'm just -- because
21   sometimes people are retired and they just -- I just
22   like to hear what kind of activities they like to do
23   and stuff, and I'm just kind of curious what you came
24   from.
25            Now, you are belonging to the Bay Area

97

1    Fellowship Church.
2    A.   Yes.
3    Q.   Okay.
4    A.   Well, I don't really belong, I just attend.
5    Q.   You just go to that?
6    A.   Right, I just go there.
7    Q.   Tell me this, do they have --
8    A.   And I don't advertise that.
9    Q.   Oh, I understand.
10   A.   Yeah.
11   Q.   I'm just kind of curious what their position
12   toward the death penalty is, if they have anything
13   stated like that, or do they even talk about it?
14   A.   They don't talk about it.
15   Q.   So you don't know if there's any one way or
16   the other they are?
17   A.   I doubt if they're one way or the other.  I
18   think it's -- I think it's -- each case is different.
19   I think that's, you know...
20   Q.   I understand, and that's fine.  I'm just kind
21   of curious how you feel about it in -- in particular.
22   If I came up to you on the street and said, "Hey, how
23   do you feel about the death penalty," how would you
24   answer that?
25   A.   I'd say I'd have to look at the circumstances

98

1    that are involved.  But as far as the death penalty,
2    I'm for the death penalty, but according to the
3    circumstances of the -- of the case.
4    Q.   So what you're saying is you support it as
5    the law, the death penalty; correct?
6    A.   Yes.
7    Q.   But you're not just going to give it out
8    willy-nilly.  You're going to make sure it's
9    appropriate in that kind of case?
10   A.   Heaven -- yes, sir.  That's -- it's a very
11   important decision.  That's...
12   Q.   I don't want to put words in your mouth.  You
13   tell us.
14   A.   Well, I believe that is one of the most
15   important decisions that a person will make in a -- in
16   a pretty good considerable time because that's a --
17   that's a heavy decision that needs to be weighed
18   carefully.
19   Q.   And I think everybody agrees with you because
20   you can see we're pretty serious in here about it and
21   you saw how no one takes it lightly.  But I'll be
22   honest with you, I told you the very first day when
23   you were called into jury duty, I told all those
24   people in that room, "The reason you're here is
25   because the State is seeking the death penalty in this

99

1    case."  And, you know, I'm -- I don't make bones about
2    it, you know, that's -- that's what we're seeking.
3    And I'm -- I'm looking to see if I have a person in
4    you and the other jurors that can follow through on
5    that, if they decide it is appropriate in a certain
6    case.  Are you that kind of person?
7    A.   Absolutely.
8    Q.   And that's what I want to say is because some
9    -- and, you know, some people are for the death
10   penalty, some people are against the death penalty,
11   some people don't know.  It doesn't matter to me what
12   -- what they feel.  I'm never going to tell somebody,
13   "You can't think that way," or, "You can't feel that
14   way."  But put yourself in my perspective.  I need to
15   make sure I have somebody who if I present the case
16   and they find him guilty under the proper evidence,
17   and if there's evidence that shows that he should get
18   the death penalty, can they follow through with it?
19   And -- because some people say, "Hey, Mark, I'm for
20   the death penalty.  It's a good law.  I'm glad we have
21   it.  Crime is out of hand.  We need to do something,
22   but, please, don't make me be the one to do that
23   answer, to make that decision."
24            Are you that kind of person that you're
25   worried about making that kind of decision?

100

1    A.   No.

2    Q.   Okay.  And -- and what it sounds to me like

3  you're going to want to wait till you hear everything

4  and you're not going to pull the trigger too early on

5  something till you want to make sure everything's

6  done.

7    A.   I wouldn't want to do that on -- I wouldn't

8  want that done to me and I wouldn't want to do that to

9  somebody else.

10   Q.   That is a very good answer because that's

11 what we're looking for, jurors who want somebody as

12 fair as they would be to judge a person if they were

13 on trial.  You can be that person, right?

14   A.   Absolutely.

15   Q.   Okay.  Now, the reason we talk about the

16 death penalty is because that's a first -- that's one

17 of the major issues in this case.  When you heard it

18 was that kind of case -- I don't know if you've ever

19 been called for jury duty before, but, you know,

20 sometimes on Monday, people come in there and they

21 think, "Oh, I'm going to get a trespassing case or a

22 shoplifting case or a D.W.I.," and then they find out,

23 "Folks, this is a capital murder case.  You may have

24 to make that decision."

25        When you heard that from Judge Galvan a

101

1  couple of weeks ago when we were in that big room,

2  what did you think?

3    A.   I was just a little bit surprised.

4    Q.   A lot --

5    A.   Of course, I had no idea what I was there

6  for.

7    Q.   And nobody did.

8    A.   No.

9    Q.   And that's exactly right.  You come in there,

10 and -- and, in fact, most of the time if you're on

11 jury duty, you never know what it is.  It's kind of

12 the luck of the draw.  But, I don't know, I'm

13 wondering if your first reaction was, you know, after

14 your surprise, what other reaction would you have --

15 did you have?

16   A.   Well, right at first I thought I'm not

17 qualified to be on this type of jury because that is a

18 heavy, very weighty decision.  And then I -- then I

19 thought about it and I thought, "Wait a minute, I'm

20 actually more qualified than most people."

21   Q.   Explain that, please.

22   A.   Well, I believe --

23   Q.   Both of those statements.

24   A.   I believe that I would honestly look at the

25 those -- at the case itself and -- and weigh it -- try

102

1  to weigh it just as fairly as I possibly could.

2    Q.   Well, why did you think at first that you

3  wouldn't be qualified, then?

4    A.   Well, that's just something -- I've worked

5  in -- for corporations all my life and just really not

6  had a lot -- not been very high up the ladder.  And

7  this -- a person is pretty high up the ladder on this

8  case.

9    Q.   Well, let me tell you what I think everybody

10 will tell you.  It doesn't matter about jurors.

11 Jurors are there to be factfinders.  You could be the

12 president of a company, a doctor, a lawyer, a C.E.O.,

13 doesn't matter.  Anybody --

14   A.   Right.

15   Q.   -- that -- and that's what need on jurors, a

16 cross-section of the community.  We have housewives,

17 manual laborers, white-collar workers, blue-collar

18 workers.  It doesn't matter.  That's what we want to

19 have on a jury.  We don't want to have, you know, 12

20 elderly white men on the jury.  We want women, we want

21 diversity, we want Blacks, Hispanics and everything,

22 and from all walks of life.  And, you know, you come

23 from one walk of life, but the person next to you on

24 the jury may be somebody completely opposite from you.

25 Maybe, you know, years younger to you, a different

103

1  race, a difficult sex.  Does that matter?  Of course

2  not.  That's -- that's why we want to have people like

3  that.

4        So when you said you felt like you may

5  not be qualified, you just thought because you

6  didn't -- you hadn't really done -- I'm not sure I

7  understand what you meant.

8    A.   Well, that's just a little bit of weighty

9  decision.  And anytime there's a weighty decision, the

10 ordinary person would like to just shove it off on

11 somebody else, but sometimes -- I found out that

12 sometimes you, yourself, are the qualified one.

13   Q.   Uh-huh.  Some people -- on that first day, I

14 saw people out in the audience because I watch their

15 reaction because I kind of want to see what they look

16 like, and some of them, I go -- they go (indicating)

17 and some of them go, "Oh, my gosh, I can't believe I'm

18 on this case," and they start having like a --

19 freaking out.

20        And then some people say, "Gosh, that is

21 a surprise, but I better listen a little closer and

22 pay attention to what the Judge is saying because this

23 is a pretty serious case."  Is that kind of how you

24 felt?

25   A.   That's how I felt.

104

1    Q.   Okay.  Because you see different types.  And
2    I'm not saying anybody's right or wrong, but some
3    people will tell us, "You know, Mark, put me on a
4    D.W.I. case, put me on a shoplifting case.  I can do
5    that, but I don't want to handle that big, awesome
6    responsibility."  So how do you feel about handling
7    that awesome responsibility?
8    A.   I believe I could handle it.
9    Q.   Okay.  You know, we're talking about stuff --
10   you know, we always talk about stuff in general.  But
11   in here we're more specific.  We're not talking about
12   the death penalty in some other county or state or
13   some guy you've seen before.  That's him, right there.
14   Take a look at him.  That's John Henry Ramirez.  You
15   understand that I told you the first day there's going
16   to be a time to come in this trial if you're selected
17   on this jury that the State is going to come up and
18   say that, based on the evidence and the circumstances
19   of this case, you should answer the questions in such
20   a way that that man gets executed.
21        I want you to look at him and tell me,
22   can you do that if you think the evidence qualifies
23   him for that?
24   A.   Yeah, if it -- if the evidence qualifies him,
25   I believe I could.

105

1    Q.   Okay.  Any hesitation about that?
2    A.   No.
3    Q.   Okay.  The other part I want to ask you is
4    the opposite.  Can you look at him and say, "Look, I
5    know you're innocent, and you're presumed innocent
6    because the Judge has said that the State has to prove
7    the case beyond a reasonable doubt."  You believe
8    that, too, right?
9    A.   Yeah, I believe that, too.
10   Q.   And if the evidence is such a way that you
11   think that maybe the question should be answered in
12   such you get a life sentence, can you vote for that,
13   also?
14   A.   Yeah.
15   Q.   You -- so what you're telling me is that
16   you're -- you've got no preconceived notions that --
17   which way you're going to vote right now; correct?
18   A.   No.  I --
19   Q.   And that's --
20   A.   -- don't have any idea.
21   Q.   That was -- that's the perfect answer because
22   you don't want to be that.  And you see what -- we're
23   talking about qualifying jurors is, you don't want to
24   be leaning too far to the State, you don't want to be
25   leaning too far to the Defense.  You should be right

106

1    in the middle about what you're going to do on guilt
2    -- I'm sorry, on punishment or death penalty or life
3    sentence.
4         But it's clear that you have to consider
5    him presumed innocent at this point because you
6    haven't heard any evidence; correct?
7    A.   That's right, I haven't heard a thing.
8    Q.   That's right.  So if you had to vote for it
9    right now, you -- you'd have to vote not guilty
10   because you haven't heard anything.
11   A.   I'm absolutely not qualified at this moment.
12   Q.   That's right.  No, I hear you.  And talking
13   about decisions, a big decision, my gosh, it seems
14   like you've lived a long, full life, and you've raised
15   four kids, or so, and been married to the same woman
16   for 29 years, you've probably made a few hard
17   decisions in your life.
18   A.   Yes, sir.
19   Q.   And -- and part of being on the jury is
20   making those decisions because that's how our system
21   works, right?  I mean, people complain about the
22   American Justice System, but, you know, show me a
23   better one, you know?  There's -- there's -- sometimes
24   mistakes happen, but we -- everybody tries to do the
25   best.  And the most important thing to me about the

107

1    death penalty is the State can't decide on the death
2    penalty.  This Judge can't decide who gets the death
3    penalty.  Our legislature has entrusted it with the
4    people, with the 12 people on the jury.  So, it means
5    the people decide.  Isn't that a fair statement to
6    have it that way?
7    A.   That -- that's the fairest thing in the
8    world, I believe.
9    Q.   Right.  You don't want to have some dictator
10   saying, "Okay, he gets put to death or she doesn't,"
11   you know?  You don't want to do that.  So we rest that
12   in the power of the -- of the people, which is
13   probably the best way to do it.
14        Now you understand, too, that sometimes
15   people looked at -- at him when he first -- when he
16   came in the room a couple of weeks ago, and they said,
17   "Man, that's the guy?  He looks so young.  He doesn't
18   look like he could hurt a fly."  And some people say,
19   -- well, you know, I think when people have criminal
20   jury cases they always expect to see Charles Manson
21   sitting there, you know, some bad-looking guy and then
22   they see maybe he doesn't look that bad.
23        Would you agree with me that you
24   shouldn't make a decision as a juror based on how
25   somebody looks, that you should make a decision on the

108

1    way -- what they did?

2        A.   Absolutely.  You can't tell by looking.

3        Q.   Okay.  You can't judge a book by its cover,

4    right?

5        A.   Absolutely not.

6        Q.   But some people say -- they'll say, "Oh, he's

7    so handsome," or "She's so pretty," or something like

8    that.  That's not any reason to make a decision, is

9    it?

10       A.   Absolutely not.

11       Q.   Okay.  And what about people being young or

12   not?  Because sometimes people say, "Well, you know,

13   he's so young, you know.  He's just not very

14   experienced or something."  The law says in Texas the

15   State can -- you cannot execute a person under 18

16   years of age.  I mean, if it's a juvenile, if he's 16,

17   17 years old, and he does the worst crime imaginable,

18   you can't get the death penalty because the law says

19   you can't.  But anything over 18 is -- I guess, the

20   State recognizes that those people have the mentality,

21   are grown up enough to know the difference between

22   right and wrong and the consequences of the action.

23   Do you agree with that?

24       A.   I agree.

25       Q.   So it doesn't really matter if you're 21, 31,

109

1    41, 51, you're responsible as long as you're over 18;

2    correct?

3        A.   Absolutely.

4        Q.   Sure.  Now, the reason this is a capital

5    murder case and -- and that he could face the death

6    penalty is that this is murder plus robbery, and the

7    Judge told you what robbery was.  It's basically a

8    forced theft.  You steal something, but you hurt

9    somebody while doing did it or threaten to hurt

10   somebody while doing it.  The thing I need to tell you

11   is it says, "in the course of committing or attempting

12   to commit robbery."

13            In other words, it doesn't have to be a

14   necessarily completed robbery, it could be in the

15   course of committing robbery.  Say, for example,

16   somebody's robbing a bank and they get the bag of

17   money and they're heading out the door and they get

18   caught by the police right out the door.  Can he go to

19   court and say, "Hey, I'm not guilty.  I didn't get

20   away with it so I didn't really take the money?"

21   Well, that's not going to work.

22            The robbery takes place as soon as you

23   put -- hurt somebody or put them in fear of their

24   circumstances.  Doesn't really matter how much you got

25   away with or if you got away with anything.  That's

110

1    still robbery.  You follow me on that?

2        A.   Yes, sir, I follow that.

3        Q.   Okay.  And in this case there's two parts to

4    the trial.  The first part is the guilt or innocence

5    phase, which is basically did he do it or not, and the

6    second phase is the punishment phase.  In the first

7    part of the trial you generally hear what happened

8    that day, around the crime, you know, what happened at

9    the crime itself, maybe before or after the crime, and

10   what happened -- to just help you determine whether

11   the person is guilty of that crime.  If you don't

12   think that the person is guilty of the crime and the

13   State hasn't proved it beyond a reasonable doubt, you

14   would vote not guilty and the case would be over.

15            But if you do think the State has proved

16   the case beyond a reasonable doubt you go on to the

17   second part of the trial.  And the second part of the

18   trial we call "the punishment phase."  And,

19   essentially, you might get to hear additional

20   evidence.  You -- in order to decide what kind of

21   punishment he gets, you might get to hear what his

22   background's like.  Does he have a good background or

23   bad background?  Is he a good character or a bad

24   character?  You know, has he been to prison ten times

25   before, or, you know, was he an Eagle Scout in school?

111

1    You know, that kind of stuff, to help you make a

2    decide -- decision on what punishment.

3            The reason you -- you hear all that

4    evidence, then you answer some certain questions.  You

5    don't just go back there and say, "Well, I vote for

6    death," or, "I vote for life," and check off the

7    appropriate box.  No, you answer certain questions and

8    based on how you answer those questions is what the

9    decision is going to be.

10           The first question is up there behind

11   you.  I'm going to ask you to look at it in more

12   detail now.  It says, "Is there a probability that the

13   Defendant would commit criminal acts of violence that

14   would constitute a continuing threat to society?"  We

15   call that "the future dangerousness question."

16   Basically, do you think he's going to be a danger in

17   the future, okay?  He's done this crime, but do you

18   think he's going to be a danger in the future.

19           And the key words I want you to look at

20   is that first line that says, "Is there a

21   probability."  It doesn't say the State has to prove

22   with certainty because there's no way I could prove to

23   you for sure what's going to happen, unless, you know,

24   we have a crystal ball and you can look at the future.

25   And it doesn't require me to do that.  It just says is

112

1    it probable, is it more likely than not that he would
2    commit these other crimes?  Follow me?
3        A.   Yes, sir.
4        Q.   Because I don't -- nobody can predict the
5    future.  The next part says, "would commit criminal
6    acts of violence."  That's pretty broad, "criminal
7    acts of violence."  Sometimes people say, "Well, we
8    could only give the death penalty if we think he's
9    going to actually commit another murder or another
10   capital murder."  And I tell them, "No, it doesn't say
11   it has to be murder.  It says says 'any criminal acts
12   of violence.'"  Could be, you know, kicking somebody,
13   assaulting somebody, beating them up, whatever it is.
14   Could be -- so it doesn't necessarily have to be some
15   -- you think he's going to commit another murder.
16            And the last line says, "that would
17   constitute a continuing threat to society."  Have you
18   ever heard that phrase before?
19       A.   Yes, sir.
20       Q.   And what does that mean to you?
21       A.   That somebody's going to be a nuisance out
22   there.
23       Q.   Okay.  Probably a little more than a
24   nuisance.
25       A.   Well, yeah.

113

1        Q.   But the point is, could he commit criminal
2    acts of violence in the future and be a threat to
3    society?
4        A.   Exactly.
5        Q.   Well, sometimes people say, "Well, gosh, why
6    do you have to put him -- do the death penalty?  Why
7    don't you just lock him up in prison?  Give him a life
8    sentence and he's in prison, he won't hurt anybody."
9    And I always have to remind them, "Wait a minute, who
10   else is in a prison besides that person?"  Tell me.
11       A.   Other people like him.
12       Q.   That's right.  Other inmates.  There's guards
13   there.  There's probably people that work in the
14   prison, like, you know, maintenance people or the
15   warden and his family.  In other words, we don't have
16   like a desert island where you set them out there and
17   they never have any human contact again, right.
18            So prison is actually part of society.  I
19   mean, you've got some rights taken away from you, but
20   would you agree with me you're still seeing other
21   people, still interacting with other people?
22       A.   Yes, sir.
23       Q.   So the fact that they put somebody in prison,
24   does that mean they'll never hurt somebody again?
25       A.   No.  Absolutely not.

114

1        Q.   And why is that?  Have you ever heard about,
2    you know, prisoners attacking other prisoners or
3    prisoners attacking guards, you know, things like
4    that?
5        A.   Yes, sir.
6        Q.   It happens, right?
7        A.   That's right.
8        Q.   In other words, it's not fool proof that they
9    can't hurt anybody just because you lock them up,
10   right?
11       A.   Exactly.
12       Q.   Okay.  So that's kind of what that question
13   says.  Is there a good chance, is it probable that the
14   Defendant would commit criminal acts of violence that
15   would constitute a continuing threat to society?  And
16   you answer that question yes or no.
17            Then you go to the second question.  And
18   read it with me up, here.  The Special Issue No. 2, we
19   call that "the mitigating circumstance question."
20   Mitigating circumstance is a word that basically means
21   "anything that would lessen or make less severe the
22   punishment."
23       A.   That's what this word "mitigating" means.
24   Big word.  Some lawyer dreamed it up, probably.  But
25   basically, that's what it means, is there any reason

115

1    to lessen or make less severe the punishment?  In
2    other words, he did the crime, but is there any reason
3    that you should give him a break for it and give him
4    life, instead of the death sentence.
5            What is a mitigating circumstance is up
6    to the jury to decide.  Essentially, you can think of
7    it kind of like the opposite of aggravating
8    circumstances.  You know, there's certain things that
9    are aggravating circumstances and certain things that
10   are mitigating circumstances.
11            Let's get away from the law talk for a
12   minute and give you an example.  Say, for example,
13   you're called on a jury on two burglary cases.
14   There's two burglars.  They're both equally guilty of
15   burglary because they both went into somebody's house
16   and stole something that didn't belong to them.
17   That's burglary, okay.
18            And so you're sitting there and you're a
19   homeowner and you're thinking, "Man these guys are
20   both burglars.  This is bad.  I'm going give them a
21   high sentence because they're both burglars."
22            And then you hear the surrounding facts
23   and circumstances.  And the first burglar, the guy has
24   broken into a house.  He's kicked in the door.  He's
25   gone in the house and ransacked the room, torn it up,

116

1   taken all the money, all the jewelry, all the T.V.s,
2   V.C.R., stereos, all that stuff of value, taken it all
3   away.  And you also hear that -- in the punishment
4   phase of the trial that this isn't his first burglary.
5   He's been to prison seven times before for guess what?
6   Burglary.  Okay?  That's your first burglar.
7           Now, switch the scenario to the second
8   burglar.  Here's the second burglar.  The second
9   burglar has also gone into somebody's house and taken
10  something without permission, but then you hear the
11  surrounding circumstances of the background.  And
12  they're like this.  This burglar didn't kick in the
13  back door.  The back door was unlocked and he went
14  into the kitchen.  He goes into the kitchen and he
15  steals a loaf of bread and some food because he lost
16  his job and he needed some food to feed his kids.
17  They were hungry.
18          The house had jewelry and money and T.V.s
19  and V.C.R.s and stereos.  He didn't take any of that
20  stuff.  All he did was take the food.  And you also
21  find out, what about his background?  This guy hadn't
22  been to prison seven times for burglary.  This is the
23  first time he's ever been arrested in his life.  He
24  doesn't have any prior criminal history.
25          Now, when you first started out, right,

117

1   they're both burglars, right?  Would you treat those
2   burglars the same?  Probably not, right?  One of them
3   has aggravating factors and you'd probably make it a
4   higher sentence, and the other burglar has mitigating
5   circumstances to make it less.  So mitigating is just
6   a big, fancy word saying is there any kind of
7   circumstances or reason that you should lessen the
8   sentence?  I don't think anybody sitting on a jury
9   would give that second guy the same thing you got the
10  first guy, right?
11  A.    That's right.
12  Q.    I mean, there was -- you didn't know that at
13  first, right, until you heard everything.  You thought
14  he was just another darn burglar.  But then when you
15  find out, hey, he just stole food, he didn't steal the
16  other stuff, and he didn't kick in the door.  He went
17  in, it was unlocked, and he's never been arrested
18  before, it makes a difference to you, right?
19          That's kind of what question addresses,
20  Mr. Baucom, that, "Is there enough mitigating
21  circumstance to warrant that a sentence of life in
22  prison be imposed, rather than death?"  What is a
23  mitigating circumstances is up to the folks on the
24  jury.  This Judge is not going to tell you, "Well, you
25  heard this and you automatically have to lower the

118

1   sentence."  It's got to be enough to lower the
2   sentence to life instead of death.
3           In other words, you may hear, "Well, he
4   was a war hero; or you know, he made straight A's in
5   school, he was on the honor roll; he helped little old
6   ladies across the street," but you also made hear that
7   he's been to prison ten times before, you know what
8   I'm saying?  So you have to wait till you hear
9   everything and then if you hear it, is it enough to
10  make it go lower?
11          So to sum up, it's kind of like this, say
12  you had found him guilty of capital murder, he's
13  guilty of doing the crime.  You look at the special
14  issue and you say, "Yes, I think he is -- there is a
15  chance he's going to commit other criminal acts that
16  might hurt somebody in the future."  But before you --
17  and looks like he's heading toward the death penalty,
18  but the Judge says, "Stop, jury, wait.  Before you
19  impose the death penalty, look in -- take into
20  consideration all of the evidence, everything you've
21  heard in the courtroom, including the circumstances of
22  the offense," that means, you know, what happened that
23  day and the surrounding circumstances, "the
24  Defendant's character and his background," you know,
25  does he have good character, bad character, good

119

1   background, bad background, "and his personal moral
2   culpability," is there enough, is there enough reasons
3   "To warrant that a sentence of life, rather than a
4   death sentence be imposed?"
5           It's kind of like a balancing test you
6   have to do.  You have to say, "Okay, I think he's
7   guilty, I think he's a future danger, but is there any
8   reason I should give him a life sentence?"  If there
9   is, then you give him a life sentence and vote yes.
10  If there isn't, you say no, and he gets a death
11  sentence.  If you answer the first question yes and
12  the second question no, this Defendant is sentenced to
13  death.  You see how it is?  You don't just vote yes or
14  no for death or life, you answer these questions.
15          What do you think of that, you think
16  that's a pretty fair system to check on the jury to
17  make sure they've covered everything before they make
18  that big decision?
19  A.    Yes, I think that is very fair.
20  Q.    And wouldn't you want to know what his
21  background is, you know?
22  A.    Absolutely.
23  Q.    Okay.  Remember, though, he can testify if he
24  wants to, if he doesn't want to, he doesn't have to.
25  You can't hold that against him, okay?  And you can

120

1    also make the decision based on just the heinousness
2    of the crime itself.  If the crime is a real terrible
3    crime and he's never been to prison before or never
4    been arrested before, you -- that doesn't mean you
5    don't have to do it.
6                In other words, it's not just a
7    first-time offender.  It can be anybody get the death
8    penalty, whether they've been to prison ten times or
9    never been to prison before.  You follow me on that?
10   A.    Yes, sir.
11   Q.    But you got to look at everything.  And will
12   you keep an open mind about these things?
13   A.    Yes, sir.
14   Q.    And -- and if there is some type of thing
15   that says, "Hey, I didn't think about that, but maybe
16   that would make me lower the sentence," could you
17   lower the sentence to life, instead of death?
18   A.    Yes.
19   Q.    Depending on what you hear --
20   A.    Right.
21   Q.    -- right?  And that's the bottom line what
22   you have to do.
23                One of the other things that the law says
24   is this, "Voluntary intoxication is not a defense to
25   crime."  Voluntary intoxication.  In other words, if

121

1    you go get yourself drunk or high on drugs and you
2    commit a crime, can you say, "Hey, I'm not guilty.  I
3    was drunk when I did that crime."  No, absolutely,
4    not.  The law says voluntary intoxication is not a
5    defense to crime.  The law also says, though, it may
6    be considered as a possible mitigating circumstance.
7    You know, some people will say, "Well, he robbed that
8    bank, but he was drunk when he did, so I'm going to
9    give him a break."  Other people may say, "I don't
10   care if he was drunk or not when he robbed that bank,
11   he's still got to pay for what he did.  He's got
12   suffer the consequences.  It was his own fault he went
13   out and got drunk or high on drugs."  You follow me on
14   that?
15   A.    Yes, sir, I understand that.
16   Q.    All right.  So mitigating circumstances are
17   up to the jury and what effect you give it is up to
18   the jury, too.  You just have to be open-minded and be
19   able to listen to everything.  Can you do that?
20   A.    Yes, sir.
21   Q.    Okay.  The last few parts I want to cover
22   with you are some legal questions, just to kind of go
23   over them.  Remember, just the fact that he's been
24   indicted by the grand jury doesn't mean he is guilty.
25   That just means he's charged with it.  The State still

122

1    has to prove the case beyond a reasonable doubt.  You
2    follow that?
3    A.    Yes.
4    Q.    Because some people say, "Well, he's sitting
5    there.  He must have done something.  He must be
6    guilty."  And we have to say, "No, everybody is
7    presumed innocent until the State proves he's guilty
8    beyond a reasonable doubt."  Can you do that?
9    A.    Yes, sir.
10   Q.    And you believe he's innocent until he's
11   proven guilty, right?
12   A.    Yes, sir.
13   Q.    And the Fifth Amendment.  He can testify if
14   he wants to, but if he doesn't want to, he doesn't
15   have to.  And the law says you cannot hold it against
16   him.  Some people -- and it's kind of a natural thing,
17   people say, "Well, I want to hear the other side of
18   the story.  I want to hear what he says."  But I think
19   you mentioned it earlier with the Judge, some people
20   don't testify for whatever reason.  But the point is,
21   if he doesn't testify, I'm pretty sure this Judge is
22   going to tell you you can't hold that against him.
23   Would you be able to follow that law?
24   A.    Yes, sir.
25   Q.    Beyond a reasonable basically means that I

123

1    have to prove the case beyond a reasonable doubt, and
2    it's the burden in this case or any case, it doesn't
3    really matter.  All I can tell you is it doesn't mean
4    proof beyond all doubt or any doubt or shadow of a
5    doubt.  You always hear it on T.V., right, beyond a
6    shadow of a doubt.  That always kills me because
7    that's not what the true standard is.
8                The law doesn't say I have to prove it to
9    you beyond all doubt or any doubt.  I mean, it would
10   be hard for me to do that unless you were a witness
11   and saw the whole thing, but the law doesn't require
12   me to.  It just says beyond a reasonable doubt.  So
13   the first thing I always tell me is, "Well, do you
14   have a doubt?  And, if you have a doubt, is there a
15   reason for a doubt?  Is there a reason for it, you
16   know?"
17                Let me see if there's any other questions
18   I want to cover with you.  You understand that police
19   officers are treated just like anybody else on the
20   stand.  They're not any better or any worse.  So if
21   you have a policeman testify, they're -- they're not
22   given any extra special credit just because they're
23   cops.  You see what I'm saying?
24   A.    Yes, sir.
25   Q.    The law says every citizen is treated the

124

1  same, so whether it's the nun or a priest or a
2  preacher or a cop gets up on the stand, they're still
3  all equal. Do you believe that?
4      A.   Yes, sir.
5      Q.   Okay. And you can't just believe everything
6  they say just because what they -- what they do or
7  what their job is. You feel like you could be on this
8  jury?
9      A.   Yeah, I feel I could.
10     Q.   You feel you can be fair to both sides?
11     A.   Yes, sir.
12     Q.   You feel that you'll wait till you hear
13  everything before you make a decision?
14     A.   Yes, sir.
15     Q.   And if you make a decision, can you carry
16  through with it?
17     A.   Yes, sir.
18     Q.   Okay. Do you have any questions of me, Mr.
19  Baucom, because maybe I didn't explain something very
20  well or anything that I can go over with you?
21     A.   You went over it pretty well. Yeah, I think
22  you've done it before.
23          MR. SKURKA: Well, I've been -- I've been
24  working here 22 years, but I just try to make sure
25  that everybody follows everything. Thank you so much

125

1  for your time, Mr. Baucom.
2          VENIREPERSON NO. 44: Thank you.
3          MR. SKURKA: I'll let the Defense
4  attorneys talk to you now.
5              VOIR DIRE EXAMINATION
6  BY MR. JONES:
7      Q.   The -- under the Texas law and the federal
8  law, the person -- citizen who's been charged with a
9  crime has a right to trial by jury. In a felony case,
10  he has the right to be tried by a jury of 12 citizens.
11  Not only does the Defendant in this case, because he's
12  a citizen, have a right to a jury of 12, he has a
13  right to have that jury be impartial. A
14  constitutional right to jury trial is a right to an
15  impartial jury. You understand that?
16     A.   Yes, sir.
17     Q.   What does that word, "impartial," mean to
18  you?
19     A.   Somebody that's going to judge that trial
20  based on those facts as they're given, not on some
21  preconceived notion that they've got made up in their
22  mind.
23     Q.   Okay.
24     A.   They're going to look at it from ground zero.
25     Q.   Well, one factor, one part of the definition

126

1  of impartiality is just what you said. A person who
2  is impartial comes to the task with no prejudgments
3  about -- about the matter. They have a, as the Judge
4  said, open mind.
5          Also, impartiality suggests that the
6  juror has no leanings toward one side or the other.
7  Those are biases. For example, if you were related to
8  the Defendant, you're an uncle or, you know -- you
9  would have a family bias. If you were related to the
10  injured -- the person that got killed in this case,
11  you would have a relational bias, okay, maybe a family
12  bias.
13          They're all kinds of biases. There are
14  occupational biases. For example, if I am trying an
15  arson case, I'm not likely to put a fireman on my
16  jury. Why?
17     A.   Well, he may have a little bias about that
18  one.
19     Q.   Okay. I want -- I want firemen to be biased
20  against fires, okay? I want policemen to be biased
21  against drunk drivers, et cetera, okay? I want
22  emergency room doctors who sew people up to be biased
23  against gunshot wounds and stabbings and those kind of
24  things. All right?
25     A.   Yes, sir.

127

1      Q.   But in -- in -- so you can imagine different
2  occupations might bring a bias to the courtroom, just
3  because that's the way it is. Might be hard for them
4  to hear the case.
5          Now, one of the questions that the Judge
6  asked you or mentioned to you was about the Fifth
7  Amendment. The Fifth Amendment says that a defendant
8  does not have to testify, and also says that if he
9  doesn't, you can't use that against him. That's one
10  of the most difficult rules to follow, okay, because
11  -- because -- I always say the street logic says, the
12  street morality says that, you know, "If a person
13  didn't do it, he ought to get up and say so, okay? I
14  want to hear both sides of the story," okay? But in
15  the -- in our criminal law system, that's not the
16  case. The Defendant doesn't have to any anything,
17  doesn't have to testify and the State can't argue he's
18  guilty because he remains silent.
19          Do you -- do you agree with that rule.
20     A.   Yes, I absolutely do.
21     Q.   Why?
22     A.   Because a person that's not a good testifier
23  and a good talker could get up there and just say the
24  wrong thing, and the jury take it wrong and understand
25  it wrong --

128

1    Q.   Uh-huh.

2    A.   -- and he could actually be hurting himself,

3    and -- unintentionally, by his own words, and be

4    misunderstood or something from that jury.  So it's

5    really -- I would say, right off hand, a lot of times

6    it's better for a guy not to say anything because he's

7    not a professional talker.

8    Q.   Any other reasons why you agree with that?

9    A.   And that's probably the reason you need to

10   hire an attorney.

11   Q.   Okay.

12   A.   Any reason for what, now?

13   Q.   For the right to remain silent.

14   A.   I don't know.  That's in the Constitution, so

15   there's -- there's a reason, but I -- I don't know.

16   Q.   Who has -- who brings the charges in a

17   criminal case?

18   A.   That's right, the State does.  So they're the

19   only ones that really have to say anything.

20   Q.   Okay.

21   A.   I forgot about that.

22   Q.   Who has the burden of proof in a criminal

23   case?

24   A.   The State.

25   Q.   Now, I may have misunderstood you, but the

129

1    Judge said -- he said, you know, the Defendant doesn't

2    have to testify and -- and would you hold that against

3    him and you said, "No, I think it's a good idea for

4    him not to testify."  And I -- I -- the way you said

5    it, I -- I sensed that you thought it was a good idea

6    because if he gets up, he's going to incriminate

7    himself, you know.

8         And -- in other words, he's going to --

9    you had an assumption there that he's probably guilty

10   and then it would be stupid for him to get up and

11   testify.

12   A.   No.  If he is guilty, he could incriminate

13   him -- I mean, he could -- if he's not guilty, he

14   could get up and testify and incriminate himself in

15   the mind of the jury.  They're hearing things through

16   their own filter and he could say the wrong thing,

17   unintentionally, and not being on the same plain as

18   some of them are.  And so he could incriminate

19   himself, even if he's not guilty.  If he is guilty,

20   well, you know, but...

21   Q.   Well, sitting here right now, do you have any

22   feelings that the Defendant is guilty and if you're

23   picked on the jury, you're simply going to be looking

24   for confirmation of -- of what you already feel?

25   A.   I really don't -- I don't know what I feel.

130

1    I don't know what I'd feel, actually.

2    Q.   Well, ideally, if you're -- if you're picked

3    as a juror, you should come to the task with no

4    expectations.  You don't know what happened.  I don't

5    know, you know?  The State said -- has charged this

6    Defendant with a crime.  The State has the burden of

7    proof.  I don't know whether the State can prove it or

8    not, okay?  I'm here to see, okay?  Could that -- does

9    that -- would that be your -- your position if you

10   started --

11   A.   Yes, I believe so.

12   Q.   Okay.  You qualified your answer, "I believe

13   so."

14   A.   Yeah, well, I -- I'm not a God.  I have -- I

15   have to qualify everything I say, yeah.

16   Q.   Okay.  Now, do you believe in the -- in trial

17   by jury?

18   A.   Absolutely.

19   Q.   Why do you believe in trial by jury?  Why is

20   that important, especially in a criminal case?

21   A.   Well, I've read a little bit about it, not

22   much.  But the jury of the peers, like he -- like he

23   said about the break-in on the house, where the guy --

24   two people broke in houses.  And that's the reason the

25   law says, you break in a house, bingo, you're adios

131

1    to, you know, get some kind of punishment, whatever it

2    says.  But that's the reason you have a jury is to

3    kind of interpret, well, this guy -- one person --

4    there's some big difference between those two robbers,

5    I mean, the two -- not robbers, thieves, big

6    difference there, and that's what the jury is for is

7    to look at those things involved --

8    Q.   Well, a judge can do that.

9    A.   -- and temper the law.

10   Q.   Well, a judge could do that.  Why don't we

11   have just have judges set punishment?

12   A.   Well, that's -- that's what they do in some

13   other countries and I -- it's --

14   Q.   I just wanted to --

15   A.   We have a jury by peers here, you know, which

16   you know better than I do --

17   Q.   Why don't we just let the chief of police

18   decide it?  He investigated the case and he says the

19   guy's guilty, that should be good enough, right?

20   A.   No.  He'd let all his relatives go and

21   everybody else would go to -- get the penalty.

22   Q.   Okay.  Well --

23   A.   I mean, I don't know the new police -- oh,

24   well, yeah, I do, but -- not really, but I've seen his

25   name.

132

1    Q.   We don't normally think about this, but, you
2  know, every society, including our own, has to have a
3  system of -- of laws which define what conduct is
4  forbidden.  We have to have a system for enforcing
5  those laws.  And we have to have a system of sanctions
6  for people who choose not to follow the law, okay.
7            And, now, from -- from where does that
8  power come?  Where does the government get its power
9  in this country?
10    A.   Get it from the people.
11    Q.   That's right.  And we just did it about a
12  week ago, didn't we, on November the 4th?  We put in a
13  bunch of new -- put in a new president, governors and
14  a bunch of other people, right?
15    A.   Yes, sir.
16    Q.   All right.  So the -- in the United States
17  the power of the government comes from the electorate.
18  Who's on the jury?
19    A.   The people.
20    Q.   The people.  It's a little cross-section of
21  the people, right, from this -- from this county, this
22  judicial district, right?
23    A.   Peers.
24    Q.   Now, so under our system, before the
25  government can declare someone guilty of a crime and

133

1  -- and impose a sanction on him, it's got to get the
2  approval of the source of the power, namely, the
3  people, okay?  That's the jury.  Do you agree with
4  that?
5    A.   Yes, sir.
6    Q.   You think that's a good way to do business?
7    A.   Best in the world.
8    Q.   Okay.  So the jury is an -- is an independent
9  body.  It's actually part of the Judicial Branch, but,
10  as it functions, it's an independent body.  It's not a
11  rubber stamp of the district attorney's office or the
12  court or any -- or the police department or anybody
13  else.  They sit apart, okay, and they -- they come
14  into the courtroom and -- and say, "Okay, Mr.
15  Prosecutor, you say you've got an indictment, here.
16  Let's hear it, okay?  And I'm not going to let you do
17  anything unless you prove what you say beyond a
18  reasonable doubt.  If you can't do it," then what --
19  what are you going to do in that case?
20    A.   Not guilty.
21    Q.   Not guilty.  That's what not guilty means, is
22  it not?  It means the State hasn't proved their case.
23    A.   Yes, sir.
24    Q.   Do you agree with that system that a person
25  who's been found not guilty should be -- should be

134

1  discharged?
2    A.   Yes, sir, yeah.
3    Q.   Don't you run the risk of from time to time
4  of letting a person who's actually guilty go free?
5    A.   There's risk, yeah.
6    Q.   Okay.  Is it worse to convict an innocent
7  person or to let a guilty person go free?  Which is
8  worse?
9    A.   It's probably worse to -- oh, worse to
10  convict a -- I mean, to convict a innocent person.
11    Q.   That's right.  Have you read stories -- it
12  seems like in the last couple of years there's been a
13  lot of stories in the newspaper, on the television,
14  some magazines have picked up the stories about cases
15  coming, particularly out of Dallas County, about
16  people who have been convicted of various crimes,
17  particularly sexual crimes, only to be found later
18  that they were factually innocent because the D.N.A.
19  testing showed that they were?
20    A.   Oh, yes, sir.
21    Q.   When you read a story -- have you read those
22  stories like those?
23    A.   Oh, yes, sir.
24    Q.   When you read a story like that, how does it
25  make you feel?

135

1    A.   I feel like society's wrong.  I've seen
2  people have been locked up 15, 20 years, and I
3  thought, boy, that's horrible.
4    Q.   Okay.  So does it make if you feel bad when
5  you read a story about -- you feel bad for the --
6    A.   Sure does, sure does.
7    Q.   So you have to -- you have to confront the
8  fact that in our -- in our system innocent people can
9  be convicted from time to time because we're
10  imperfect, right?
11    A.   Absolutely.
12    Q.   Okay.  Now, we go to great ends to avoid
13  that.  It mean, like beyond a reasonable doubt is the
14  standard of proof in a criminal case, okay.
15            Why do you think the legislature imposed
16  that high standard of proof, the high degree of
17  certainty required by beyond a reasonable doubt?  Why
18  -- why do you suppose that that's applied to criminal
19  cases, rather than some lesser standard like
20  preponderance of the evidence or probable cause?
21    A.   Because this is something more serious.
22    Q.   Why is it more serious?
23    A.   It's more serious than just a fine or
24  something like that.
25    Q.   What's at stake in a felony criminal case?

136

1    A.   A person's freedom or their life.
2    Q.   You got it.  It's American -- our American
3 Civilization values what above all?
4    A.   Life.
5    Q.   Liberty.
6    A.   Yeah, liberty, freedom.
7    Q.   Okay.  And so we set it up.  Before the
8 government can take that away, we've got to be sure
9 that it's necessary.  We want to be right.  We just
10 don't want to do it off -- off-the-cuff, right?  Do
11 you agree with that?
12    A.   Absolutely.
13    Q.   Now, in a -- I'm working up my way to another
14 question, here.  In -- in criminal cases, we have an
15 elaborate appeal process.  If the Defendant is found
16 guilty, he has a right to appeal this case.  It can go
17 up all the way to the Supreme Court of the United
18 States, depending on what the issues are.
19         And the purpose of that appeal process is
20 to correct mistakes.  We have don't like to make
21 mistakes.  If we think a big one has been made we have
22 a machinery for correcting it.  Like those guys that
23 got released in Dallas after serving -- there was --
24 there was an appellate remedy that allowed that to
25 happen, okay?  The good news for those guys were is

137

1 they were alive, okay?  If they had been convicted of
2 capital murder back then, and -- 20 years ago, they
3 probably would be dead now, right, because the
4 sentence would have been carried out.
5    A.   Yes, sir.
6    Q.   Okay.  Now, on your questionnaire, on page
7 26, it has the scale thing, and, you know, like, it
8 says, "How strongly do you believe in the death
9 penalty."  Circle one to ten."  And you -- you selected
10 ten being the strongest.  Why did you select ten?
11    A.   Run that -- some of those questions were kind
12 of difficult to --
13         MR. JONES:  May I approach?
14         THE COURT:  Yeah.
15         VENIREPERSON NO. 44:  Yeah, run the
16 question by me.  I'd have to look at that question.
17         MR. JONES:  We'll let you look at it
18 directly, okay?
19         THE COURT:  Why don't you look at it.  I
20 have to make -- I have to make a short phone call.  Be
21 right back.  In the meantime, can you look at it?
22         VENIREPERSON NO. 44:  Sure.
23         MR. JONES:  Just look at it, so you'll
24 know what I'm -- this part right here.
25         VENIREPERSON NO. 44:  Let's see.  Oh,

138

1 yeah.
2         (Document perused.)
3         (Short recess.)
4         THE COURT:  All right.  Sorry about that,
5 guys.
6    Q.   (BY MR. JONES)  Okay.  We're back on the
7 record.  Now, let's see, I was asking you about the --
8 your questionnaire, there.  You selected ten on that
9 scale.
10    A.   Yes, sir.  I remember that question.  That
11 question on the piece of paper, here, you ask for a
12 cut and dried answer, and without any -- I put ten
13 there, thinking in my mind that if the evidence and
14 the whole -- all the criterion were met and everything
15 presented, that I do believe in the death penalty.
16 But then, again, if it didn't meet all those
17 criterion, then I'd put a one.
18         So, in other words, this is asking the
19 question without any qualification, so it's really a
20 --
21    Q.   That -- that's why I'm asking you --
22    A.   Yeah.
23    Q.   -- if you want to clarify it.  You weren't
24 just saying that from a political standpoint I'm
25 strongly in favor of the death penalty?

139

1    A.   Absolutely, yeah, I'm --
2    Q.   You're not saying that?
3    A.   Right, I'd have to look at each case myself.
4    Q.   Okay.  Now, you've said that you're generally
5 in favor of the death penalty as being a form of
6 punishment that we should have in Texas.
7    A.   Yes.  If the individual case warrants it.
8    Q.   I understand.  But it's a -- it's a type of
9 punishment which the legislature has authorized --
10    A.   That's right.
11    Q.   -- for certain kinds of cases.  Obviously,
12 they're the more serious cases, right?
13    A.   Yes.
14    Q.   But you believe that that's a good idea to
15 have that option.
16    A.   I think so.  But, you know, I'd have to look
17 at the case.  I mean, I couldn't say for a particular
18 case.
19    Q.   No, just generally.
20    A.   In generally, yes.
21    Q.   Generally.
22    A.   Generally, I think it's a good option.
23    Q.   Okay.  Now, why -- why do you think our
24 society benefits from having that option, from having
25 the death penalty?  What -- I mean, the legislature

140

1  passed it. I'm sure they debated it and talked about
2  it and -- and I'm sure they discussed how our society
3  would benefit by having the death penalty as an option
4  in some serious cases.
5          How do you feel about that or how do you
6  think our society benefits
7      A.  Well, there's a lot of controversy about
8  that, but --
9      Q.  I want to know what you feel.
10     A.  Well, the way I feel is that we have -- we do
11  have the best trial system in the world.
12     Q.  Okay.
13     A.  We have the jury that can look at the case.
14  So it's -- the death penalty, in other words, it's not
15  automatic.
16     Q.  Uh-huh.
17     A.  So each case has to be judged on its own
18  merit.  And if a case warrants it, they get -- the
19  death penalty is available.  If the case doesn't
20  warrant the death penalty and maybe life imprisonment
21  or something else, then that's also available.  So
22  this -- this way everything is available and each case
23  has to be judged on its own merit.
24     Q.  I -- with all due respect to you, sir, I
25  don't think you answered my question.

141

1      A.  Oh, I'm sorry.
2      Q.  What I'm saying is what benefit do we enjoy
3  or experience from having the death penalty as a form
4  of punishment?
5      A.  What benefit?  Well --
6      Q.  Society.  What -- how are we better off by
7  having that, rather than not having it?
8      A.  Well, one thing is, I learned, I hadn't
9  thought about before, but in that prison, that is a --
10  there are other people in there in danger.  And so,
11  that -- that's one benefit right there.
12     Q.  Okay.  That it would remove certain people
13  from our midst, right?
14     A.  Right, or inside the prison, even, you know?
15     Q.  Okay.  So is that -- is that the benefit that
16  you think we -- we enjoy or experience, that certain
17  people will be removed from society permanently so
18  they can't cause us anymore problems?
19     A.  It may send a message to potential criminals.
20     Q.  Okay.
21     A.  To a certain degree.
22     Q.  That would be a benefit.  It would be a
23  deterrence to others who might be inclined to commit
24  those kinds of offense.
25     A.  That's right.

142

1      Q.  Okay.  So removal and deterrence are the two
2  things that would you think about as a benefit, right?
3      A.  Yes.
4      Q.  Okay.  You know, most people don't get into
5  this discussion every day, so you're --
6      A.  Yeah, it's --
7      Q.  -- we're hitting you cold with it.  I can see
8  your brain --
9      A.  Yeah.
10     Q.  -- turning and thinking about these
11  questions, but this is our only chance to talk to you.
12     A.  Yeah.
13     Q.  Now, we've discussed the -- the reality that
14  from time to time, you know, innocent people will be
15  convicted of crimes.  Do you think the benefits of the
16  death penalty are -- are worth from time to time
17  executing an innocent person?
18     A.  Well, one thing I think is that there's --
19  Texas is pretty high on the list for -- in the nation.
20  But overall, out of the number of crimes that are
21  committed, there's only a very few people get the
22  death penalty.
23     Q.  Okay.
24     A.  Percentage wise.  I have no idea -- you
25  fellows would know, but I have no idea, but it's not a

143

1  huge number percentage wise.
2      Q.  Okay.
3      A.  So...
4      Q.  So, in other words, if by chance maybe 1 in
5  300 death penalty cases an innocent man is executed,
6  that's -- that's a cost that you're willing to pay in
7  order to have the benefits of the death penalty?
8      A.  I -- I don't think that that many -- I don't
9  think that happens that much.
10     Q.  Okay.  But -- but even if it happens anytime,
11  you're -- you're willing to accept that as a -- as one
12  of the costs of having the benefit?
13     A.  That's a potential thing that could happen.
14     Q.  Okay.  You know, like the National Rifle
15  Association said that people have -- having handguns
16  is a right that's -- that's so important that it's --
17  that's it's -- was willing to have it at the price of
18  people being shot from time to time, you know?  So --
19  okay, well, I think you answered my question.
20          Now, under the Texas procedure that the
21  Judge explained to you in -- in the opening and that
22  Mr. Skurka went over, the jury -- if the jury finds a
23  person guilty of capital murder, what other -- what
24  two punishments are available?
25     A.  Life in prison or the death sentence.

144

1    Q.   That's right.  There's only two options.

2    A.   That's right.

3    Q.   Now, the jury today, in 2008, does not --

4    faced with that decision does not go back in the jury

5    room and write life or death on a piece of paper, on a

6    verdict form.  Instead, they're given these two

7    questions.  What these two questions do is determine

8    whether two conditions exist, and the legislature says

9    that if these two conditions exist, then the death

10   penalty is -- is automatic, okay?

11   A.   Uh-huh.

12   Q.   If they don't exist, then the life sentence

13   is automatic.  So what are the two -- Well, there's

14   actually three conditions that have to be met before a

15   person can get the death penalty in Texas.  What is

16   the first one?

17   A.   Well, see, the first one is it a capital, a

18   murder?

19   Q.   They have to be found guilty of the offense.

20   A.   Right.

21   Q.   Okay.  All right, given that, then there's

22   two more conditions.  What is the next condition?

23   A.   Let's see.  Okay, capital murder.  And then I

24   guess this one (indicating).

25   Q.   Okay.  How does that question have to be

145

1    answered?  What finding has to be made there before --

2    to meet one of the conditions?

3    A.   They'd have to say yes.

4    Q.   That's right, exactly.  It's got to be a --

5    call that "a continuing threat."

6    A.   Right.

7    Q.   Okay.  And this -- there has to be evidence

8    on that and you have to find that beyond a reasonable

9    doubt.

10   A.   Yes.

11   Q.   Now, the Judge will instruct you, if we get

12   that far, that if you answer that question no your

13   deliberation stops.  And the Judge -- the verdict form

14   and the Defendant gets what punishment?

15   A.   Not guilty.

16   Q.   Exactly.  Okay.  Because that condition can't

17   be met.

18        THE COURT:  Rather life.

19   Q.   (BY MR. JONES) Life.  He gets -- oh, I'm

20   sorry.  He gets life.

21        THE COURT:  He's still guilty.

22   Q.   (BY MR. JONES) He's still guilty --

23   A.   Oh...

24   Q.   -- but he gets a life sentence --

25   A.   Okay.

146

1    Q.   -- if you answer that question no.

2    A.   Oh, okay.

3    Q.   Okay.  Does that make sense?

4    A.   Yes.

5    Q.   Okay.  Then -- all right.  So then -- but if

6    you answer the -- the jury answers the question yes,

7    then you proceed to Special Issue No. 2, which is --

8    can you see it from your chair there?

9    A.   Yes, sir.

10   Q.   Okay.  Now, what answer to that question

11   will -- will cause the death penalty to occur?  The

12   question asks for a yes or no answer.  What answer

13   will produce the death penalty?

14   A.   I say a yes would get you -- would get him a

15   life -- life in prison.  A no -- let's see, a no would

16   get him the death penalty.

17   Q.   You got it, you got it.  You understand it.

18   Now, let's look at the question.  If I'd been in the

19   legislature at the time that was written, I would have

20   written it different.  It was not written for the

21   common man, but we have it and we're going to have to

22   deal with it.

23   A.   Yeah.

24   Q.   The Supreme Court says that before a person

25   can get the death penalty, the jury's decision has to

147

1    be a guided one.  And the purpose of these issues is

2    to guide the jury, okay?  So let's say this issue

3    tells you to take certain things into consideration.

4    What's the first one?  "Circumstances of the offense."

5    Okay, well, you've already found the Defendant guilty,

6    so you've heard all the facts about what happened, so

7    you can consider that, the manner in which the offense

8    was committed, et cetera.

9         Then the next thing is "the defendant's

10   character and background."  If I say that you, sir,

11   have -- are a man of good character, what does that

12   mean?

13   A.   That means that, in front of you, I've

14   behaved in such a manner to lead you to believe that I

15   have good character.

16   Q.   Okay.

17   A.   But only in front of you.

18   Q.   Well, but do you agree that -- that our

19   society has a certain basic moral code?  In other

20   words, we have certain standards of behavior, which

21   everybody generally agrees are good conduct.

22   A.   Yes, sir.  Pretty much, yeah.

23   Q.   Okay.  It's bad to steal.  It's -- you know,

24   it's -- you know, the Ten Commandments.  These are --

25   these are moral values that we kind of generally

148

1    accept as our society.  They -- they go back to the
2    beginning -- to our Judeo-Christian beginnings, okay?
3    Do you agree?
4        A.   Yes, sir.
5        Q.   Now, do you agree that if a person is -- has
6    good character -- if you say a person has good
7    character that means that, generally, as far as you're
8    concerned, conforms to that standard?
9        A.   Yes.
10       Q.   If I say you have good character, that means
11   that I -- I think you're trustworthy, you're loyal,
12   helpful, friendly, courteous guy, you know, the Boy
13   Scout.  In other words, you conform -- from my
14   experience in dealing you, you have good character.
15       A.   Yes, sir.
16       Q.   Now, background.  Well, background is your
17   personal history, your biography, you know, where you
18   were born, how you grew up, what schools you went to,
19   health problems, you may have had, you know, whatever.
20   That's -- that's easy, okay, and you would expect to
21   hear that kind of evidence in a case like this.
22           Now, the next one's a little more
23   difficult.  "The personal moral culpability of the
24   Defendant."  What does that mean and what is that
25   asking you to consider?

149

1        A.   What -- what things -- what was going through
2    a person's mind and what kind of pressures was he
3    under when he committed this thing.
4        Q.   That's the closest in this trial that --
5    you've come the closest to answering the question of
6    anybody.  What was going on in his mind?  Now, the
7    word, "moral" suggests, as the word, "character"
8    suggests there's a standard out there someplace,
9    right?
10       A.   Yeah, probably.
11       Q.   Okay.  Probably that same general standard of
12   moral conduct that we kind of all generally accept,
13   would be a measure of whether a person is a good man
14   or a bad man, right?  Now "culpability" means?
15       A.   Guilt.
16       Q.   Guilt -- well, it means that you're subject
17   to blame, okay?  So if a person steals, he's morally
18   culpable because he's broken one of the -- the moral
19   codes, okay?  So, when you're considering that, what
20   was going on in his mind, what -- what value system is
21   this guy operating under, you know, at the time that
22   he's engaged in the conduct, how do you consider that
23   as being -- possibly being a mitigating circumstance?
24       A.   Well, like he was saying about the two
25   robberies, you know, one of them his kids were

150

1    starving at the house.  And, you know, he had --
2        Q.   Okay.  All right.  In both cases, the -- the
3    two people were guilty of the crime, right?  What was
4    it -- I think it was burglary that he said?
5        A.   It was a theft or -- yes, sir.
6        Q.   Theft.  Okay, one person stole because he was
7    greedy and just wanted to get some extra money without
8    working for it.  The other guy was stealing to --
9    they're both guilty, right?
10       A.   Right.
11       Q.   Of the crime.
12       A.   Yeah.
13       Q.   But are they both morally culpable to the
14   same degree?
15       A.   No.
16       Q.   No.  Why?  Stealing is stealing.
17       A.   Yeah.  Right, but that other one had -- had
18   different motivation involved, a lot -- a more -- more
19   acceptable reason for doing it.
20       Q.   Okay.  So it's --
21       A.   He had to feed his children, you know.
22       Q.   Well, when the legislature sets up ranges of
23   punishment, they not only ask the jury to find whether
24   the Defendant is guilty of the crime, but they also
25   ask you to decide how guilty is he, you know?  In

151

1    other words, what punishment are we going to give him?
2            And so, that's -- that's basically what
3    that -- the "personal moral culpability," what was
4    going on in his mind, what was motivating him, and...
5            Now, the example that Mr. Skurka gave
6    you, the two guys, they're both guilty of theft.  And,
7    you know, you say, "Well, why should I give one a
8    lesser punishment than the other?"  Because there are
9    other factors involved, are there not?  And I think
10   where you run into these factors are -- and this is
11   where the mitigation or to lessen comes in, when you
12   have -- when a person is confronted with competing
13   moral values and he engages in the conduct, like the
14   person who was stealing to -- to feed his family, he
15   was faced with two competing moral values, right?
16       A.   Yes, he was.
17       Q.   What are they?  What are there?  One, was the
18   duty to support his -- to feed his kids, right?
19       A.   Right.
20       Q.   The other one was the duty not to steal,
21   okay?  And he was faced with, "What do I do," you
22   know?  Well, he picked one, okay?  And so the jury can
23   say, "Okay.  Well, that, I can -- I can understand
24   that.  We're not going to," you know, you can see how
25   a person can get into that situation.  And you -- and

152

1   you give him credit for that, you know, you adjust the
2   punishment accordingly to reach a just result.
3       A.   Yes.
4       Q.   Okay.  I think you understand that.
5       A.   Pretty well, yeah.
6       Q.   Okay.  Now, do you -- let's drop down to that
7   last little paragraph.  You understand what the word
8   "To mitigate" means, the verb "to mitigate."
9       A.   That means a circumstance that's -- like a
10  motivation that...
11      Q.   Let -- let me assist you.
12      A.   Good deal.
13      Q.   The verb "to mitigate" means to lessen.
14      A.   To lessen?
15      Q.   To lessen.
16      A.   Okay.
17      Q.   And, in the context of a criminal case, a
18  mitigating circumstance is one that would cause you to
19  want to vote for a lesser punishment.  It's that
20  simple.
21      A.   Yeah.
22      Q.   The Judge will instruct the jury that they
23  determine what is the mitigating circumstances.  If
24  you're on the jury, you'll be hearing all this
25  evidence.  You can pick out any fact that's in

153

1   evidence before you and choose to believe it to be a
2   mitigating circumstance.  For example, you can
3   consider his age to -- for you to be a mitigating
4   circumstance, or the fact that he may have served in
5   the military to be a mitigating circumstance or
6   something that happened in his upbringing you can
7   consider.  Whether he was confronted with competing
8   moral values when he engaged in the conduct, if he
9   did, et cetera, okay?
10          So you think you understand what the word
11  "To mitigate" is?
12      A.   Yes, sir.
13      Q.   And you -- there's virtually no limitation on
14  what you can -- there is no limit limitation on what
15  you can consider to be a mitigating circumstance if it
16  is in evidence, okay.
17          The Judge will also tell you that the
18  jurors don't have to agree on what is a mitigating
19  circumstance.  You can say, "Well, I think the man's
20  age is a mitigating circumstance, a young fellow."
21  The other juror says, "I don't think so.  I don't
22  consider it to be so."  You-all don't have to agree.
23          Now, one other rule which we haven't
24  discussed is you've been told that, just generally, in
25  a criminal case a verdict requires a unanimous

154

1   decision before the jury can announce its verdict, 12
2   people have to vote.  But, in this case, if -- if 10
3   people vote yes, okay, it takes 10 votes to get a yes
4   or no answer; you don't have to have 12.  And that
5   benefits the accused, does it not?  In other words, it
6   takes a little bit less to get to a life sentence.
7   Okay.  Ten people vote yes, then the Judge will just
8   follow the instruction.  Doesn't require a vote of 12.
9           Now, I want to ask you -- let's see,
10  you're retired?
11      A.   Yes.
12      Q.   Okay.  And -- and you -- one of your hobby --
13  or your pastimes is to write these religious tracts?
14      A.   I just wrote one; one.
15      Q.   You've just written one?
16      A.   Right.
17      Q.   Did I encounter you at the steps of the
18  courthouse the other day?
19      A.   I don't -- I don't -- there's so many people
20  out there, I don't remember who I saw.
21      Q.   But did you hand these out at the courthouse?
22      A.   I did.  Sure did.
23      Q.   Have you done that in the past or was that
24  the first time you had done it?
25      A.   I probably done it three or four times.

155

1       Q.   Okay.  Do you -- is the courthouse your --
2   one of your places where you hand these out?
3       A.   Just once in a while.
4       Q.   Once in a while.
5       A.   Uh-huh.
6       Q.   Okay.
7       A.   Because there's a big crowd that comes
8   through that door down there, believe it or not.
9       Q.   And tell me, again, the purpose of your doing
10  that?  You're exercising your right of free speech,
11  for sure, I know that, but what is your -- why do you
12  take the time to do that?
13      A.   Because I think it will help people.
14      Q.   Okay.
15      A.   In fact, I know for a fact that it will help
16  them.
17      Q.   All right.  Are you familiar with the New
18  Testament?
19      A.   So-so.
20      Q.   Okay.  And what prominent figure in the New
21  Testament got the death penalty?
22      A.   Jesus himself.
23      Q.   Right.  You think he got a fair trial?
24      A.   No.
25      Q.   Okay.

156

1     A.   Have you ever studied that trial?

2     Q.   I haven't -- I've read articles about it, and

3   there's -- but there's reams, there's books written on

4   the fairness and the manner of that trial.

5     A.   I bet there has.

6     Q.   Yeah, for sure.  Not likely to have happened

7   in the United States.  Okay.  You -- is that enough?

8            MR. JONES:  Okay, that's all I have.

9            THE COURT:  All right.

10            MR. SKURKA:  We have no other questions,

11   Judge.

12            THE COURT:  Okay.  Why don't you wait in

13   the -- in the jury room.  I'm going to talk to the

14   lawyers and we'll call you back in a moment, okay?

15            VENIREPERSON NO. 44:  Okay.  Thank you,

16   folks, for your time.

17            THE COURT:  Thank you.

18            MR. JONES:  Thank you for your time.

19            (Venireperson exits courtroom.)

20            THE COURT:  All right.  Mr. Skurka, what

21   say you?

22            MR. SKURKA:  Just one moment, Your Honor.

23            (Brief pause.)

24            MR. SKURKA:  We'll accept the juror,

25   Judge.

157

1            MR. JONES:  We'll accept.

2            MR. GARZA:  We'll accept, Judge.

3            THE COURT:  All right.  That's Juror No.

4   6.  Bring him in.

5            (Venireperson enters courtroom.)

6            THE COURT:  All right.  Mr. Baucom, --

7            VENIREPERSON NO. 44:  Yes, sir.

8            THE COURT:  -- you have been selected

9   to be on this jury.  So, here, I'm going to give you

10   some instructions, and I've probably already done

11   this, but I don't want you to read the local paper or

12   watch the local news for the next few weeks, okay?

13            VENIREPERSON NO. 44:  Okay.

14            THE COURT:  Because we just want you to

15   get the evidence that comes in in this courtroom.

16   With all due respect to the media, they don't always

17   get it right.  So, we want you to get it only from

18   what comes in in this courtroom, okay?

19            VENIREPERSON NO. 44:  Yes, sir.  I've

20   seen some of that stuff in the media.

21            THE COURT:  Yeah, I mean, they don't

22   always get it right.

23            VENIREPERSON NO. 44:  Yes.

24            THE COURT:  It's a fact, okay?

25            VENIREPERSON NO. 44:  Yeah, I know.  I

158

1   agree.

2            THE COURT:  Okay.  Now, the other thing,

3   Mr. Baucom, this trial should start on the 1st of

4   December.  It's going to at least take that week.  It

5   may spill into the next week.  Just letting you know.

6   We'll be keeping in touch with you about that and let

7   you know when to come back.  I don't want you to talk

8   about this case with anybody, okay?

9            VENIREPERSON NO. 44:  Okay.

10            THE COURT:  Somebody tries to talk to you

11   about it you say, "Nuh-uh, Judge said don't -- I

12   can't talk to you about the facts of this case."  When

13   the case is over with, that's something else, but

14   right now, don't talk to anybody about it, okay?

15            VENIREPERSON NO. 44:  Yes, sir.

16            THE COURT:  All right.  We'll keep in

17   touch.  So we'll see you soon.

18            VENIREPERSON NO. 44:  Okay.

19            THE COURT:  All right.

20            VENIREPERSON NO. 44:  Thank you very

21   much.  You-all have a nice day.

22            MR. SKURKA:  You, too, sir.

23            (Venireperson exits courtroom.)

24            THE COURT:  Okay.  Do we have the next

25   person, Frank?

159

1            THE BAILIFF:  Yes, sir.

2            THE COURT:  I mean, let's take a little

3   bit of a break and then we'll -- we'll finish with

4   this next person.

5            (Short recess.)

6            (Venireperson enters courtroom.)

7            THE COURT:  This is Sammy Moser.

8

9            VENIREPERSON NO. 48,

10            SAMMY WAYNE MOSER,

11            VOIR DIRE EXAMINATION

12   BY THE COURT:

13     Q.   Hold on, Mr. Moser, just a second, okay?

14     A.   Okay.

15     Q.   I'm sorry, Mr. Moser, I just had to get your

16   questionnaire.  All right.  You are Sammy Moser; is

17   that correct?

18     A.   That's correct.

19     Q.   Okay.  Mr. Moser, you have an ill relative;

20   is that right?

21     A.   My dad.

22     Q.   Okay.  Your dad's got cancer?

23     A.   Yes, sir.

24     Q.   And that may -- does he live here locally

25   or --

160

1    A.   He's in Oklahoma.
2    Q.   He's in Oklahoma, okay.  And would that -- I
3    can tell you this trial is going to start -- I mean,
4    obviously, we're going to take up some of your time
5    today, and then from here it's going to start like
6    December 1, and it's going to go for at least a week,
7    maybe two.  Is this situation with your dad getting
8    critical or --
9    A.   He's had his first chemo last week.
10   Q.   Okay.
11   A.   And I don't know how that goes, I --
12   Q.   I'm sure he's up in age.
13   A.   Yes, he is.
14   Q.   Okay.  Well, I guess, really and truly, what
15   we need to know, and that's all of us, that's me,
16   that's the Prosecution, that's the Defense, we need to
17   know if that is going to be a distraction for you to
18   the point where, you know, maybe sometime down the
19   road you could be a great juror at service, or if it's
20   not.  And only you can tell us.
21   A.   At this time, it's not a problem.
22   Q.   Okay.
23   A.   I mean, but I can't look into the future.  I
24   just --
25   Q.   No, I understand that.  But, I mean, are you

161

1    going to be able to give us your full -- I mean,
2    assuming that, you know, the situation doesn't --
3    doesn't get any worse, I mean, are you going to be
4    able to give us your full attention in this case?
5    A.   Oh, yeah.
6    Q.   Okay.  All right.  Then let's -- let's move
7    on to the next thing, and that is, we're looking for
8    jurors -- we're picking a jury here, obviously, you
9    know that, and we're looking for two things and
10   they're both important.  But the first one is people
11   that can keep an open mind, all right?  That is, some
12   people come in here and they say, "You know what, I've
13   already made up my mind.  I saw something on T.V.," or
14   whatever, "I've already made up my mind," or, "I'm
15   already leaning one way or the another."  We don't
16   want that, okay, because that's not really fair, all
17   right?  And I need to know if that's you.
18   A.   That's not me.
19   Q.   Okay.  Next thing we need to talk about, what
20   this is all about, the type of case and the law
21   involved in it, okay?  Let's see, you have served on a
22   murder case before.
23   A.   Yes, sir.
24   Q.   So you're very familiar, then, with what
25   we're doing here.  "Sent to insane hospital for

162

1    treatment."  Do you remember the Defendant's name?
2    A.   No, I don't.
3    Q.   You remember the facts?
4    A.   Barely.  This was many years ago.
5    Q.   Yeah.
6    A.   It was a young man that was very -- it was
7    very obvious he had some mental problems.
8    Q.   Uh-huh.
9    A.   And he had killed his mother with a shotgun.
10   Q.   Oh, okay.  Well, then, you know a lot of the
11   concepts we're going to go through, like it's the
12   State's burden of proof, okay?  Do you agree with
13   that?
14   A.   Uh-huh.
15   Q.   Could you hold the State to their burden of
16   proof?  I mean, you've done this before, but -- but
17   you could do this; correct?
18   A.   Yes.
19   Q.   Okay.  So you have more experience than most
20   folks that we have coming in here so I'm going to go
21   through some of these concepts a little quicker.  And
22   you -- you stop me if it -- if I get too far ahead of
23   you, but it's their burden of proof.  The law says,
24   "Look, State, you brought the charges, you've got to
25   prove them, okay?  You don't just get to say somebody

163

1    did it and it's true and then they have to prove
2    they're innocent."  We don't do it that way in this
3    country, okay.
4          You don't have a problem holding them to
5    their burden of proof?
6    A.   No, I don't.
7    Q.   Okay.  And then, of course, the burden of
8    proof -- and you know this from your prior service --
9    is beyond a reasonable doubt, okay?
10   A.   (Nodding head.)
11   Q.   And -- and you're nodding.  And, you know, of
12   course, this isn't beyond all doubt or beyond a shadow
13   of a doubt, it's beyond a reasonable doubt.  It's the
14   highest the standard that we have in criminal law.
15   Could you hold the State to that burden?
16   A.   Yes.
17   Q.   Okay.  Now, as part of our system, says,
18   "Look, State, you bring the charges, you prove them,
19   but, as part of that, until you prove anything against
20   anybody, they're innocent until proven guilty."
21   A.   Yes.
22   Q.   Okay?  That is, "All right, you bring
23   charges, but, you know, you haven't told us anything.
24   You don't -- you don't just get to say, 'Hey, that
25   guy's guilty and it's so, you got to prove it,'" okay?

164

1  It's part of that innocent until proven.  You believe
2  in innocence until proven guilty?
3      A.  Yes.
4      Q.  And you could follow that law?
5      A.  Yes.
6      Q.  That is, if this man here that's charged in
7  this case is innocent, and you could -- you could
8  believe him to be innocent until the State proves
9  otherwise?
10     A.  That's right.
11     Q.  Okay.  Now, as part of that, the law says,
12  "Look, if he's innocent until proven guilty, if the
13  State's got the burden of proof, if the burden never
14  shifts over here, then Defense doesn't have to do
15  anything.  They don't have to present any witnesses.
16  They don't have to present any evidence."
17          They might.  They might not.  As part of
18  that, Defendant doesn't have to testify.  Constitution
19  says that.  Bill of Rights.  Okay?  And it really
20  makes sense because if they've got the burden of proof
21  then they don't have to do anything.
22          You know, I submit there's a lot of
23  reasons why a defendant wouldn't want to the testify.
24  Maybe his lawyers told him, "Don't testify.  They
25  haven't proven their case."  Maybe -- you know, not

165

1  all people are good speakers, you know?  Maybe --
2  maybe he gets stressed out and stutters when he gets
3  stressed out.  Maybe he's just not a good speaker, you
4  know.
5          But the question really is, some people
6  say, "You know, I'll hold it against him."  Okay?  Law
7  says you can't.  Law says, "Look, you cannot -- State,
8  you cannot call him as a witness," But it goes even
9  further than that.  Factfinder, whether it's, you
10  know, the jury or in some cases the Court, says,
11  "Look, factfinder, you can't hold it against him,
12  okay?"  You can't say, "State, all right, I hear your
13  evidence.  Defense -- Defense doesn't present anything
14  so you know what, I'm going to put a star over here.
15  It's a little bit more.  I'm going to tip the scales a
16  little bit more because he didn't testify and I want
17  to hear both sides of the story."
18          I need to know if you can follow the law
19  and not hold it against him if he chose not to
20  testify?
21     A.  I can.
22     Q.  Okay.  All right.  Now, you -- you've sat on
23  a murder case before and I -- I assume it was a -- you
24  know, quote, unquote, plain murder, standard murder.
25     A.  (Nods head).

166

1      Q.  Okay.  And in the case you had -- well, see,
2  you -- you know all about the bifurcated system, that
3  is, the case begins, guilt or innocence phase.  You --
4  you sat on that, and you -- you wait and listen to
5  the evidence, and then at the end of the case -- and
6  you know the process, you decide whether the State's
7  proven their case beyond a reasonable doubt; correct?
8      A.  Correct.
9      Q.  And you've done that.  You understand that.
10     A.  I do.
11     Q.  And then in your -- in that case, in the
12  murder case, the punishment range is 5 years to 99
13  years or life, and, in some cases probation is a
14  possibility.  Says -- I see from your questionnaire
15  that -- that the jury did assess punishment.  And, as
16  you recall, the jury came up with a number, right?
17     A.  Yes.
18     Q.  Okay.  So the jury comes up with a -- they go
19  back there and they deliberate, again, and they come
20  up with a punishment based upon what the law
21  prescribes as the punishment range.
22     A.  Yes.
23     Q.  Okay.  Capital murder is not like that, it's
24  a little different, okay?  Capital murder, there's two
25  options: Life imprisonment or death.  Only two

167

1  options if the Defendant's found guilty of capital
2  murder, okay?  But you don't say life or death, you
3  answer these questions.  And we've got one up here.
4          If -- if a -- if the Defendant is found
5  guilty of capital murder, jury would then go to the
6  second phase, the punishment, and they'd -- if you'll
7  turn around here, they'd answer this question: "Is
8  there a probability that the Defendant would commit
9  criminal acts of violence that would constitute a
10  continuing threat to society," and the jury would
11  answer yes or no, okay?
12          Then on -- then you'd answer Special
13  Issue No. 2.  "After taking into consideration all of
14  the evidence, including the circumstances of the
15  offense," that's your guilt and innocence phase stuff,
16  "And the Defendant's character and background and the
17  personal moral culpability of the Defendant, is there
18  a sufficient mitigating circumstance or circumstances
19  to warrant that a sentence of life imprisonment,
20  rather than a death sentence be imposed?"  Okay?  And
21  the jury would answer yes or no to that.
22          And that's basically everything that you
23  hear in the case.  Okay?  Maybe you hear good stuff
24  about the Defendant, maybe not.  Maybe you hear the
25  facts of the case in the first part, and then you hear

168

1 a bunch of good stuff or maybe you hear a bunch of bad
2 stuff or maybe it's a mixed bag, okay, about his
3 background, what kind of guy he is, okay?
4     A.   Yes.
5     Q.   And then you'd answer that question.  All
6 right?  Okay.  Now, do you think you could answer
7 these two questions?
8     A.   Yes.
9     Q.   Okay.  Now, what is capital murder?  Well,
10 you know what murder is.  Murder is the intentional
11 taking of the life of another.  Capital murder is like
12 murder plus.  Okay?  The legislature has said there
13 are certain murders, and because of the facts and
14 circumstances they become capital.  And what's
15 capital?  Capital means the death penalty is a
16 possibility.
17         In this case, the State has alleged
18 murder while in the course of committing or attempting
19 to commit a robbery, okay?  So we have -- and then
20 they're together, murder plus robbery or attempted
21 robbery.  They don't just get to prove one or the
22 other.  Okay?  They may be guilty of one or the other,
23 but unless they prove the whole thing together, they
24 don't get capital murder in this case.  You understand
25 that?

169

1     A.   I understand that.
2     Q.   Okay.  And that -- and, of course, what's
3 robbery?  Well, that's the -- you know what robbery
4 is, right?  That's the forceable taking of something
5 or threatening to take something from somebody else by
6 force, okay?
7     A.   Yes.
8     Q.   All right.  So, they have to do it all.
9         Now, the law says that the State has to
10 prove all of the elements of capital murder to get a
11 conviction.  And I don't know how many there are.
12 There's about seven, eight, nine, something like that.
13 They got to prove all of them.  They don't get to just
14 get pretty close.  They don't get eight out of nine or
15 seven out of eight to get there.  The law says you got
16 to prove them all, okay?
17         Could you -- could you hold the State to
18 that burden, --
19     A.   Yes.
20     Q.   -- to prove them all?  All right.
21         Now, I mean, at the beginning of the case
22 -- and I'm sure you remember this from your prior
23 service -- you take an oath, right?
24     A.   Yes.
25     Q.   Each of the jurors raise their right hand and

170

1 they take an oath to render a true verdict based upon
2 the law and the evidence presented to you.  Okay.  And
3 the jury says yes, and then we begin.  I need to know,
4 can you take that oath to sit as a juror and listen to
5 the evidence and render a true verdict on guilt or
6 innocence on the guilt or innocence phase of this
7 trial?
8     A.   Yes.
9     Q.   Okay.  Now, the next thing.  If -- if
10 Defendant is found guilty tea of capital murder by the
11 jury then we go to the second phase.  The next
12 question, of course, is can you -- can you answer
13 these questions?  And before you answer that, I want
14 to tell you that some people say, "Look, I could sit
15 as a juror on the guilt or innocence phase, but when I
16 got to the punishment, I could not answer questions
17 that could lead to someone's death," or some people
18 tell me, "Look, they find -- if we can find him guilty
19 of capital murder, I don't care about the law and all
20 this stuff.  I'm just going to -- it's going to be
21 death for me.  I'm not going to consider any of this
22 stuff.  That may be the law, but that's not -- I'm not
23 going to apply it or follow it."
24         I need to know that you could take the
25 oath, not only to -- now, you've already told me on

171

1 the guilt or innocence phase to render a true verdict
2 based upon the law and evidence, but could you
3 truthfully answer these two questions if called to do
4 so?
5     A.   Yes.
6         THE COURT:  Okay.  All right.  I'll turn
7 the floor over to Mr. Skurka.
8         MR. SKURKA:  Thank you, Judge.
9         VOIR DIRE EXAMINATION
10 BY MR. SKURKA:
11     Q.   Hi, Mr. Moser.  My name is Mark Skurka.  I'm
12 the first assistant district attorney.  This is
13 Geordie Schimmel.  He's also an assistant district
14 attorney that works and is assigned to Judge Galvan's
15 Court.  And, together, we'll be presenting this case
16 to you if you're selected on this jury.
17         I want to the start off by telling you
18 there's no right or wrong answers to anything you say.
19 We just want to hear what you truly feel about some of
20 these issues or laws that we're going to talk about
21 this.  Now, the reason that this is such an important
22 case, of course, is because John Henry Ramirez, over
23 here, the Defendant, could be facing the death
24 penalty.
25         A couple of things that we need to start

172

1  off with.  When I say, "could be facing," that's
2  because he's got to be found guilty first and right
3  now he's presumed innocent.  Do you agree with that?
4      A.   I agree with that.
5      Q.   In other words, the State has to prove the
6  case beyond a reasonable doubt.  And that's in this
7  case and in every criminal case, whether it be
8  shoplifting or D.W.I.  Do you believe that concept of
9  law?
10     A.   I do.
11     Q.   The law also says that death penalty is not
12 automatic.  Sometimes people tell me -- and I don't
13 know if you knew this before but a lot of times people
14 have told us, "Well, I thought every murder case is
15 eligible for the death penalty."  And we have to tell
16 them, "No, only certain cases that the legislature has
17 set out to be capital murder cases."  And I know the
18 Judge says, "plain murder," we say, "plain murder."
19 It's not really plain, but what capital murder is,
20 it's got to be kind of an elevated-type of murder,
21 murder plus something els.
22          In other words, like, you know, killing
23 somebody while you're robbing, raping, kidnapping
24 them, burglarizing them, you know, killing a kid under
25 six, killing a cop on duty, that type of stuff.  Only

173

1  those are even qualified to be a death penalty case.
2          So that's why the charges are brought
3  against him, is because we're alleging, the State is
4  alleging that he committed murder while in the course
5  of committing robbery, and "robbery" meaning taking
6  something by force or by threats of force.  It doesn't
7  even have to be a completed robbery.  In other words,
8  you could be doing the robbery and kill somebody and
9  it could be capital murder.  So, it's got to kind of
10 be both of those things.
11          When we talk about the death penalty,
12 some people propose this, "Well, I believe in the
13 death penalty.  I think it's a good law.  I think it's
14 good and everything, but, please, don't make me part
15 -- to make that decision."  Now, you probably agree
16 with me, it's an awesome responsibility if you get
17 called upon to be on this on this jury, correct?
18     A.   Yes, sir.
19     Q.   How do you feel about being on that type of a
20 jury?
21     A.   Well, I've never spent a lot of time, other
22 than my belief system.  I just -- I believe that if
23 you commit a crime, you should pay for it.
24     Q.   Okay.  And the law says -- and I know that
25 some people say, "Well, it's an eye for an eye.  If

174

1  you murder somebody, you must automatically be killed
2  yourself."  But the law in Texas is essentially this:
3  There's two choices, death or life in prison.
4  Sometimes people who get convicted of capital murder
5  get the death sentence after they hear all the
6  circumstances.  Sometimes people who are convicted of
7  capital murder get a life sentence, depending on the
8  circumstances and background.
9          Do you agree with that scheme, that it
10 should be one or two of those things?
11     A.   I do.
12     Q.   In other words, it's not always going to be
13 capital murder, to where you're convicted and get the
14 death penalty, there's a chance you might get a life
15 sentence, depending on what a person's background and
16 history is, correct?
17     A.   Correct.
18     Q.   Do you believe that?
19     A.   I do.
20     Q.   So you can consider both life in sentence or
21 the death penalty equally?
22     A.   Yes.
23     Q.   You know, and I'm -- and I should have said
24 "Based on the circumstances."
25     A.   Well, that was the key word.

175

1      Q.   I -- I almost left it out, but I got it in
2  there.  And -- and that's what the law says.  The law
3  and the Judge, in order to see if you qualify, has to
4  make sure that you're open-minded, that you're not
5  going to say, "Well, I'm automatically going to say
6  he's guilty just because he's sitting there."  Are you
7  going to do that?
8      A.   No.
9      Q.   The Judge is also going to want to know if
10 you're automatically going to give him the death
11 penalty just because he's found guilty.  Are you going
12 to wait till you hear everything and then decide
13 should he get the death penalty or should he get a
14 life sentence?
15     A.   I'm going to refer back to the circumstances
16 and at the end of the arguments.
17     Q.   Sure.  The circumstances and the evidence.
18 Because right now you have no idea of his background,
19 if he was a good boy, was he a bad boy; he's been to
20 prison 20 times before, has he never been to prison,
21 you know, any of that kind of stuff.  All we have to
22 do is make sure that you're equal and you can listen
23 to both -- everything and decide what's the proper
24 punishment.  Can you do that?
25     A.   Yes.

176

1    Q.   How do you feel about having to make that
2  decision, though?  I mean, some people -- this is why
3  I say that.  Some people that first day, you know, we
4  had those 2- or 300 people in there, and the Judge
5  came down and says, "Okay, folks, this is a criminal
6  case and that man over there is facing -- could be
7  facing the death penalty," what -- what struck your
8  mind when you heard it was that kind of case?
9    A.   Well, when someone's life is at stake, you --
10  that's not an easy thing to -- I mean, that's always a
11  problem.
12    Q.   Okay.
13    A.   But you -- I'm a citizen of this United
14  States and we have to protect each other.  And I think
15  that's the way we do it, is we -- we have a good court
16  system.
17    Q.   That's a good answer because that's the way
18  it should be, right?
19    A.   Yes.
20    Q.   In other words, you have laws to protect
21  society, correct?  If somebody breaks those laws, they
22  have to face the consequences.  But, on the other
23  hand, it's not something that -- that -- a fun thing
24  to do, sitting on a jury like that, or something that
25  you're happy about doing.  It's almost one of those

177

1  things like, "Hey, I wish I didn't have to sit on a
2  jury, but if I'm called to do my civic duty, I'm going
3  to be do my civic duty."  Is that kind of where you
4  fit in?
5    A.   Yes.
6    Q.   And it's probably important, too, that all
7  that power doesn't rest with one person.  In other
8  words, Judge Galvan, he's a judge, but he can't
9  sentence somebody to death.  The district attorney,
10  Carlos Valdez, can't say, "Oh, I'm going to sentence
11  this guy to death."  The people have that power with
12  the jury.  So it doesn't matter how mad the Judge is
13  at somebody, or the D.A. is mad at somebody, only 12
14  people, citizens like you, can make that decision.
15    A.   I'm glad.
16    Q.   Fair system to you?
17    A.   I'm glad it's that way.
18    Q.   And it should be that way, right?  We don't
19  want to have a dictator telling us what to do and how
20  to do that.  But make no mistake about it, there's
21  going to be a time, I've told you-all that the very
22  first day, the State is going to seek the death
23  penalty and there's going to be a time I'm going to
24  stand in front of this jury, and say, "Based on the
25  evidence, based on the circumstances, I'm going to ask

178

1  you to answer the questions in such a way that that
2  man right there is executed."
3    Can you do that if the evidence calls for
4  it?
5    A.   If the evidence shows that.
6    Q.   Okay.  I'm going to tell you -- ask you to do
7  another thing.  If the evidence shows that he should
8  get a life sentence, can you vote for a life sentence,
9  too?
10    A.   Yes.
11    Q.   Okay.  So it doesn't matter.  You're going to
12  go with whatever the evidence says, right?
13    A.   Whatever the evidence says.
14    Q.   That's fair enough.  Now, let me tell you,
15  we've talked about why it's murder, let me talk about
16  -- or capital murder, let's talk about what happens in
17  the scheme of things different from the other trial
18  you were on and other cases.  Generally speaking, a
19  jury finds -- there's two parts, guilt or innocence,
20  and the punishment phase.
21    Generally speaking, in the guilt or
22  innocence phase, you hear just what happened that day,
23  you know, what -- what happened at the crime, what he
24  did, what he didn't do, did he do it, you know, is he
25  guilty or not?

179

1    The second part of the trial you might
2  get to hear additional evidence.  Instead of just that
3  day, you might want to hear about his background.
4  Well, this guy's been to prison 20 times before, or
5  this guy was an Eagle Scout and made good grades in
6  school, was in honor roll, you know?  See what I'm
7  saying?  You might want to hear some more background
8  to make a decision.
9    Probably in your case before you got to
10  hear about his medical background or psychiatric
11  background before you can make a decision.  You didn't
12  make a decision on his punishment just by the case,
13  you'd make it on all the background.
14    Now, in Texas what we do is -- we call it
15  "The punishment phase," but in the capital murder
16  case, we don't just vote death or life and check off
17  one or the other.  You answer these two questions
18  based on everything.  And they're behind you on the
19  board, and let's look at the first one.  It says, "Is
20  there a probability that the Defendant would commit
21  criminal acts of violence that would constitute a
22  continuing threat to society?"  In other words, is he
23  -- is he going to be a danger in the future to
24  society?
25    In that question, some of the key words I

180

1  want you to look at is it says, "Is there a
2  probability?" It doesn't say it's a certainty. I
3  mean, there's no way I could prove to you for sure
4  what's going to happen in the future, and the law
5  doesn't require me to. It just says, "Is there a
6  probability," is it more likely than not like that
7  he's going to do these things?
8       It also says you don't even have to wait
9  and see -- wait and see if he's going to murder again.
10 It just says, "criminal acts of violence." Some
11 people say, "Well, do I think he's going to murder
12 again or commit another capital murder?" It doesn't
13 require that level. It just says, "criminal acts of
14 violence."
15      And the last phrase says, "a continuing
16 threat to society." You've probably heard that
17 before, right?
18     A.  Yes.
19     Q.  Sometimes people come up to me and say,"
20 "Well, why is the State seeking a death penalty? Why
21 do you have to have a death penalty? Why don't you
22 just give him a life sentence and lock him up in
23 prison, then he'd be away from society." And I always
24 say, "Well, wait a minute, what else is -- who else is
25 in a prison?" There's other inmates, there's guards,

181

1  there's people that work in the prison, like clerical
2  people, the warden and his staff, things like that.
3  So if you really put somebody in prison, does that
4  mean he can't hurt somebody else again?
5      A.  No.
6      Q.  No. And you've probably heard of that
7  happening before, right?
8      A.  Yes.
9      Q.  So, we don't of this system where you're put
10 on a desert island and you'll never see another human
11 being so you can't hurt anybody. So would you agree
12 with me that prison can still be considered part of
13 society, right?
14     A.  Yes.
15     Q.  Okay. So the first question, based on all
16 the evidence, both the circumstances of the crime and
17 the surrounding circumstances and maybe his
18 background, you would have to decide is guy going to
19 be a danger in the future, is he capable of hurting
20 somebody in the future, yes or no?
21     A.  (Nods head.)
22     Q.  Then you go to the second question. The
23 second question is what we call "the mitigating
24 circumstances question." And, essentially, what that
25 says is, mitigating is a big word that basically means

182

1  "anything that would lessen or make less severe the
2  punishment."
3      In other words, he did the crime, but is
4  there any reason, is it a sufficient reason to lower
5  the sentence to life, instead of death? Is there,
6  like -- some people call it different things, like
7  "extenuating circumstances" or "reasons," or something
8  like that. And mitigating circumstances just
9  basically means anything that reduces the defendant's
10 moral blameworthiness, anything that would lessen or
11 make less severe the punishment.
12      In other words, is there any reason to
13 cut him a break and give him a life sentence instead
14 of death? Let me give you an example. Two burglars.
15 You have two burglary cases that are completely
16 separate, and you're called to sit and decide the
17 punishment of these people. They're both guilty of
18 burglary. That means they went into somebody's house
19 and stole something without permission.
20      The first burglar, you find out the facts
21 of that case are he kicked in the door, broke down the
22 door, ransacked the whole house, stole all the money,
23 jewelry, T.V., V.C.R.s, everything of value. And then
24 you also hear about his background is this is not his
25 first burglary. He's been into the prison three times

183

1  before for burglary, stop.
2      Go to the second guy. The second
3  guy is also guilty of burglary. What he did was go
4  into somebody's house and take something without
5  permission but the circumstances are a little
6  different. He didn't kick down a door or break a
7  window to get in. The back door was unlocked so he
8  opened it and went in the kitchen. He didn't go into
9  the house, even though the house had jewelry, money,
10 T.V., V.C.R. and stereos, he didn't go take any of
11 that stuff. He took a loaf of bread and some food
12 because he lost his job and his kids were hungry and
13 he needed to feed his family.
14      And you find about his background, and,
15 lo and behold, he's never even been arrested before.
16 This is the first time he's ever gotten charged with a
17 crime. He hasn't been to prison three times before.
18      So looking at those two widely separate
19 things, they're both guilty of burglary, right? It's
20 still wrong to go into somebody's house and take
21 something, but would you treat those guys exactly the
22 same?
23     A.  No.
24     Q.  Of course not. What would you do? The first
25 one has aggravating circumstances and you'd probably

184

1  make the sentence go up; the second one has mitigating
2  circumstances and it would go down. It's very hard to
3  say what a mitigating circumstance is but you can see,
4  and the second part is, he didn't break in and didn't
5  destroy property. All he stole was food. He didn't
6  take anything else. He didn't even have a record. So
7  you'd probably treat that guy lesser than the other
8  guy.
9          And that's what that question is all
10  about. Is there a reason to go to a lesser sentence
11  of life instead of death? Is there enough reason to
12  go? Is it sufficient?
13          Now, what is a mitigating circumstances
14  is up to the jury to decide. You can't -- the Judge
15  is not going to tell you, "This is a mitigating
16  circumstance, this is a --" it's up to the jury, and
17  it's just not defined that way. The point you have to
18  do to be qualified on this jury is you have to listen
19  to all the evidence and the circumstances and see if
20  there's anything that would make you lower the
21  sentence. For example -- but it's up to the jury.
22          Some people may say, "Well, yeah, he was
23  an Eagle Scout or he was on the honor roll in school,
24  but that was years ago and he's still got to pay for
25  what he did in this crime." Other people may say,

185

1  "Well, look, you know, he's not all bad. He -- he was
2  an Eagle Scout, he was on the honor roll, so maybe we
3  should cut him a break and give him something less."
4  See what I'm saying?
5      A.  Uh-huh.
6      Q.  It's the same evidence but different people
7  treat it different way. And the question is, you have
8  to do that balancing test and say "Is it enough, you
9  know? Sure he did some good things back in his life.
10  Sure he helped his mother. Sure he was a good kid in
11  school, but does it outweigh what he did in this
12  crime"? See what I'm saying?
13      A.  Yes.
14      Q.  So essentially what's happening is, you found
15  the guy guilty of capital murder. You've answered the
16  Special Issue No. 1 yes, "Yes, I think he's a
17  continuing threat to society," but before you impose
18  the death penalty, the Judge gives you this question
19  and he says, "Stop and wait. Look at -- take into
20  consideration all of the evidence, look at the big
21  picture, including the circumstances of the offense,"
22  you know, that -- the crime itself, how heinous was
23  it, how bad it was, whatever, "the defendant's
24  character and his background," does he have good
25  character or bad character, does he have a good

186

1  background or bad background, "and his personal moral
2  culpability, is there sufficient --" is there enough
3  circumstances or mitigating circumstances to warrant
4  that you life -- sentence to life, instead of a death
5  penalty?
6          It's -- I like to tell people it's like a
7  checks and balances system. It looks like he's
8  heading toward the death penalty, but the jury is
9  asked to look at everything else just to make sure
10  that there's nothing that would lower the sentence.
11  If there is something, you should lower it to a life
12  sentence. If it's enough, that's what the law says,
13  lower it to a life sentence. But if there's not
14  enough, if it's not sufficient enough, you would
15  answer that question no.
16          So if you answer the first question yes,
17  he's a continuing threat to society, and no, there's
18  no reason to lower the sentence, he gets a death
19  sentence. If you answer it any other way he gets life
20  in prison. Does that make sense to you?
21      A.  Yes.
22      Q.  It's -- it's kind of a careful consideration
23  for the jurors. It's like you said earlier, you know,
24  nobody wants to do this but they got to do their civic
25  duty, and I think the Judge is telling you, "Hey, look

187

1  at everything. It's a though decision. It's a big
2  decision. See if there's any reason to lower it. If
3  there's not, there's not, and you do your duty. If
4  there is, there is and you do your duty." Okay.
5          So you open-minded to listen about maybe
6  background stuff, information.
7      A.  Yes.
8      Q.  He may put on evidence, he may not. I don't
9  -- I don't know, but you have to be able to consider
10  everything before you make that decision, okay? But
11  it's up to the jury.
12          One law that the Judge may tell you, too,
13  is voluntary intoxication is not a defense to crime.
14  "Voluntary intoxication." In other words, if you go
15  get yourself drunk or high on drugs and you go commit
16  a crime, can you say that's an excuse for the crime?
17  No. The law says no. You can't go rob a bank and
18  say, "Well, I'm not guilty because I was drunk, you
19  know, when I robbed that bank" No, can't do that.
20          But the Judge may say that that's a
21  possible mitigating circumstance. You can't consider
22  it as an excuse of crime, but maybe that's a reason to
23  go lesser on the sentence. Maybe it is. Maybe it
24  isn't. Maybe some people say, "Well, I don't care if
25  he was drunk or not. He still did the crime." Some

188

1  people say, "Well, he was drunk. Let's give him a
2  break." See what I'm saying?
3      A.   Uh-huh.
4      Q.   So that's one of the laws. Do you have any
5  question about any of the -- special issues that
6  we talked about?
7      A.   No.
8      Q.   Does that -- does that kind of make sense to
9  you, the way it kind of follows down the line?
10     A.   It's pretty clear.
11     Q.   Okay. So the bottom line is you'll be
12 open-minded. You haven't decided you're going to give
13 a death sentence or a life sentence, right?
14     A.   No.
15     Q.   You'll wait --
16     A.   No.
17     Q.   -- till you hear everything. I know that
18 sounds silly, but I have to ask, and make sure you're
19 not leaning one way or the other.
20          And you understand that being charged
21 with the case doesn't mean he's guilty. Just because
22 he's been indicted by the grand jury doesn't
23 necessarily mean he's guilty of the crime. He's
24 presumed innocent. You believe in that?
25     A.   Yes.

189

1      Q.   And the Fifth Amendment. He may testify, he
2  may not. But if he doesn't testify, the Judge is
3  going to tell you you can't hold that against him. Do
4  you believe that?
5      A.   Yes.
6      Q.   Okay.
7      A.   I have a question now.
8      Q.   Sure.
9      A.   The Defense doesn't have to testify.
10     Q.   Right.
11     A.   Or give evidence. It's all left to you.
12     Q.   Correct. That's my burden in this criminal
13 case and in every criminal case, whether I'm trying a
14 D.W.I. or shoplifting case. Because America has set
15 it up that you're not considered guilty and you have
16 to prove your innocence, the State has to prove he's
17 guilty beyond a reasonable doubt. The Defendant
18 doesn't have to put on any testimony. They don't have
19 to put on any witnesses at all. The Defendant doesn't
20 have to testify if he doesn't want to. And under our
21 system he's allowed that right and you can't hold it
22 against him.
23          It's like the Judge said very early on,
24 you know, "If the State is going to bring charges, the
25 State has got to prove the charges," okay? I mean, if

190

1  you were, God forbid, charged with a crime, why should
2  you have to prove that you were not guilty? I mean,
3  the State has to prove you're guilty if they're
4  bringing those allegations. Okay? Does that answer
5  your question?
6      A.   Yes.
7      Q.   And beyond a reasonable doubt basically means
8  -- it doesn't means beyond all doubt, beyond any
9  doubt. It just means beyond a reasonable doubt. In
10 other words, there's no way I can prove this to you,
11 you know, 100 percent, and the -- and the law doesn't
12 require me to. It just says prove it beyond a
13 reasonable doubt.
14          So you can consider life, if the verdict
15 -- I'm sorry, if the evidence points that way;
16 correct?
17     A.   Yes.
18     Q.   And you can consider death if the evidence
19 points that way; correct?
20     A.   Yes.
21     Q.   Do you have any questions about anything
22 we've talked about?
23     A.   Not so far.
24          MR. SKURKA:  Okay. I think that's all
25 the questions I have of you, Mr. Moser. I'll let the

191

1  Defense lawyers talk to you now. Thank you, sir, for
2  your attention.
3          MR. GARZA:  May I proceed, Your Honor?
4          THE COURT:  Yes.
5               VOIR DIRE EXAMINATION
6  BY MR. GARZA:
7      Q.   Good afternoon, Mr. Moser.
8      A.   Good afternoon.
9      Q.   I'm Ed Garza. I think I introduced myself to
10 you and the rest of the panel when we converged
11 downstairs a few weeks ago to fill out these
12 questionnaires. And this is Mr. Jones sitting next to
13 me. He is my Co-Counsel in this matter. And our
14 client, Mr. John Henry Ramirez. Okay?
15          What did you think about this
16 questionnaire when you started reading through it and
17 filling it out?
18     A.   It's very extensive.
19     Q.   Asks a lot of questions, doesn't it?
20     A.   Yes, it does.
21     Q.   We're --
22     A.   Not quite sure how to fill each one out. I
23 mean, it's -- you do your best.
24     Q.   Okay. Personally, I know it's something
25 maybe you don't talk about on a daily basis, but what

192

1 is your attitude toward the death penalty?

2     A.   My attitude toward the death penalty?

3     Q.   Yes, sir.

4     A.   I -- you may not like my answer.

5     Q.   Like we said, we have -- there is no wrong or

6 right answers --

7     A.   Okay.

8     Q.   -- and that's why -- it's kind of -- Mr.

9 Skurka asked a lot of questions and I heard you say,

10 yes and no, and yes and no, and yes and no, but I

11 never heard --

12     A.   If you read my paper --

13     Q.   Yes.

14     A.   -- I -- I grew up in the church.

15     Q.   From what I can tell, you're a deacon at your

16 church, are you not?

17     A.   Yes.

18     Q.   Yes, sir.

19     A.   And I -- I have a great understanding of

20 God's Word, and I'm -- and I believe, from what I read

21 in the Scripture, that God is the author of -- of

22 punishment phases, and I base my decisions on what He

23 has given in His Scripture.  So, I -- if you take

24 someone's life, you got to answer for it.

25     Q.   Yes, sir.  So according to some of the

193

1 Scripture, of course, there's the proverbial "Eye for

2 and eye."

3     A.   I think I put that in my deal.

4     Q.   Yeah.  Now, do you -- do you believe that

5 there is a big difference, which obviously there is,

6 between God's Law and man-made law?

7     A.   No, because I think our Constitution was

8 based on that.  And our laws are -- our laws are, I

9 think, fair.

10     Q.   Okay.

11     A.   And if we didn't have that -- God gave us

12 that Constitution, I'm convinced of that, so -- and we

13 have people that are much smarter than I am that put

14 those together.  And I think it's a very fair system.

15     Q.   Okay.  You answered that in your

16 questionnaire when you were asked, "Do you think the

17 death penalty is applied fairly," you indicated, "No."

18 And your explanation was that, "Some cases that are

19 proven wrong through D.N.A. testing."

20     A.   We have a lot of people, I feel, that was --

21 went through cases, and -- and I don't know why

22 they're -- it could have been jury, it could have been

23 evidence, but now they're free based on D.N.A.

24 evidence.  Would you not agree?

25     A.   Yes.  I'm -- we're -- we're big proponents of

194

1 that.  These are people that have been actually --

2 have factually found innocence, you know, for a lot of

3 reasons, they --

4     A.   They didn't get there by accident, it was by

5 evidence that -- wrong evidence, I -- I feel.

6     Q.   Sometimes, would you believe, it was -- I

7 mean, if you -- if you've read some of these articles,

8 there's a -- there's a leading article in this month's

9 issue of Texas Monthly where there's several people

10 whose stories have sort of been brought out about

11 their wrongful convictions, okay --

12     A.   Uh-huh.

13     Q.   -- and how they served 15, 20, you know,

14 some-odd years in prison until finally they were

15 exonerated.

16     A.   I think that's great.

17     Q.   You know?  And -- and thank God, at least,

18 they were -- they're among the living.  There are

19 people that lived through the ordeal, okay?

20     A.   Yes.  And I -- but I -- you know, I'm not

21 holding anyone responsible.  All of us make mistakes,

22 even prosecutors.

23     Q.   Sure.  Even defense lawyers.

24     A.   Yes.

25     Q.   We're certainly not perfect.  But this is the

195

1 kind of case that is so serious that we have to put

2 forth an enormous amount of -- of skill, knowledge,

3 experience, fairness, to hope, to hope that we get it

4 right.

5     A.   Yes.

6     Q.   Do you agree with that, sir?

7     A.   I agree with that.

8     Q.   Because if we don't, and like you've stated

9 here, something does go wrong and we unjustly or -- or

10 wrongfully, you know, convict this man, and he is

11 sentenced to a death sentence of some sort, before

12 anything else happens and he gets executed, God

13 forbid, and we find out later on that we didn't get it

14 right, how would that make you feel?

15     A.   Make me feel bad, just like it does for all

16 of those men that were unjustly.  But our court system

17 is still the greatest in the world.

18     Q.   I agree with you.  I agree with you.

19     A.   Even though there is injustice.

20     Q.   Yes, sir.  Do you understand the concept of

21 the presumption of innocence?  I think you do.

22     A.   Yes, I do.

23     Q.   Right now, if I asked you to render a

24 verdict, what would your verdict be?

25     A.   It would not -- I have no -- I do not know

196

1   the man. I've heard nothing about him.
2       Q.   Okay.  Then you don't understand the
3   presumption of innocence.
4       A.   Well, he's innocent until proven guilty.
5       Q.   So, right now, if I asked you to render a
6   verdict, what would your verdict be?
7       A.   It would be innocent.
8       Q.   Right.  Okay.  All right, I just want to make
9   sure you do understand it.
10      A.   Oh, yeah.
11      Q.   Okay.  Reasonable doubt.  What does that mean
12  to you?
13      A.   Reason -- if it -- if I -- if there's
14  something in evidence that just doesn't add up, I have
15  to take that into consideration.
16      Q.   Some sort of doubt based on reason.
17      A.   Uh-huh.
18      Q.   Is about as easy as I can try to define it
19  because there really is no definition, you have to use
20  your common sense.  And the burden of proof -- I
21  noticed that you asked Mr. Skurka, and you wanted to
22  ask him a question about are -- you know, do you have
23  to prove this, are you -- what were you trying to get
24  to in your question there?
25      A.   Well, I was wondering if you was going to

197

1   have anything to say.
2       Q.   And what if I didn't?
3       A.   He -- he explained it.
4       Q.   And I'm not going to saying I --
5       A.   He said it's all --
6       Q.   -- I'm not saying I won't, but what if I
7   didn't, would it bother you?
8       A.   I have to hear what he has to say and make a
9   decision based on that, but I would certainly think
10  that you would have something to say.
11      Q.   Okay.  But you understand I don't have to.
12      A.   Right, I understand that.
13      Q.   We're the ones being accused.  They're the
14  ones bringing the charge.  It's their burden.  We
15  don't have to do anything.  We don't have to say
16  anything.  That's our Fifth Amendment right.  Do you
17  believe in that?
18      A.   Yes, I do.
19      Q.   Okay.  Or do you -- and you can tell us if
20  you feel otherwise, if you feel like, "Well, you know,
21  if somebody is accused of a pretty serious crime and
22  they're looking at the death penalty I think they
23  better tell me a little bit about what's going on
24  here."
25      A.   I would think so.

198

1       Q.   Is that the way you feel?
2       A.   Yes.
3       Q.   So honestly, honestly speaking, if that's the
4   way you feel, then you have a certain bias about this
5   case.  You would want to hear something from our
6   client, you would want to hear something that would
7   help you understand why you he did it.
8       A.   Certainly.  I want to hear both sides.
9       Q.   But you understand that that's not the law.
10      A.   That's not the law.  I know that.
11      Q.   But you would still have that feeling or have
12  that -- that leaning, that inclination that would, and
13  could possibly, --
14      A.   Yes.
15      Q.   -- hinder your ability to take the oath in
16  this case possibly; or hinder your ability to serve as
17  a fair and impartial juror in this case.  Would that
18  be fair safe to say?
19      A.   Uh-huh.
20      Q.   You understand what I'm trying to tell you?
21      A.   Yes.  You're trying to tell me that you don't
22  have to say anything.  But what I just said was I
23  would like to hear both sides of the story and...
24      Q.   Okay.
25      A.   But I, you know --

199

1       Q.   Well, let me -- let me just finish asking
2   you.
3       A.   Okay.
4       Q.   Say you don't.  Say you don't.  Is that
5   something that is going to fall -- in your
6   decision-making process, is it going to fall in their
7   column or is it going to fall in our column?
8       A.   Well, you -- the law was read to me.
9       Q.   And we need truthful, honest answers, Mr.
10  Moser.
11      A.   Oh, yeah.
12      Q.   Okay?  And, you know, like we said, if -- you
13  know, we need to know this.
14      A.   Huh.  I -- I could listen to the burden of
15  proof.  You got me trapped.
16      Q.   Well, I don't really.  I just -- and I'm not
17  trying to corner you, but do need to know how you feel
18  about it.
19      A.   Yeah.
20      Q.   And some people do, and that's okay.  It's
21  absolutely okay.  It's human nature, I think, quite
22  honestly.  Even though we sit here as lawyers day in
23  and day out trying to try these cases, and we ask that
24  question of people and they say they understand the
25  concept, but they still say, "Yeah, but you know what?

200

1   I just don't know how that I can -- I can honestly
2   make a decision if I don't hear from the other side."
3       A.   Yeah, I agree with you.
4       Q.   And that's what we need to know.  Do you
5   agree with that?
6       A.   Yeah.
7           MR. GARZA:  Your Honor, can we have a
8   hearing outside the presence of the juror?
9           MR. SKURKA:  May I have just a couple of
10  follow-up questions, Judge?
11          THE COURT:  Yeah, you may, but...
12              VOIR DIRE EXAMINATION
13  BY MR. SKURKA:
14      Q.   Mr. Moser, are you saying that you would have
15  to hear from them before you can make a decision in
16  this case?
17      A.   Well, I was thinking there for a while that I
18  could hear the burden of proof from your side --
19      Q.   Uh-huh.
20      A.   -- but the way he phrased the question, it
21  kind of caught me off guard, and I -- you know, I'm
22  not saying that you wouldn't give me all the
23  information, but if I'm making a decision based on a
24  man's life I want to hear all of the evidence.
25      Q.   So would you require them to put on

201

1   something?
2       A.   I would think they would.
3       Q.   Okay.  You understand that's not the law,
4   though.
5       A.   I understand that's not the law.
6       Q.   But that would interfere with you?
7       A.   That's -- I don't have an answer for that.
8           MR. SKURKA:  Okay, Judge, that's all the
9   questions I have.
10          THE COURT:  Okay.  Why don't you wait in
11  the jury room for a second, Mr. Moser --
12          VENIREPERSON NO. 48:  Okay.
13          THE COURT:  -- while I speak with these
14  guys.
15          (Venireperson exits courtroom.)
16          THE COURT:  All right, Mr. Garza?
17          MR. GARZA:  Challenge for cause.
18          THE COURT:  Sustained.
19          MR. GARZA:  Thank you, Your Honor.
20          MR. SKURKA:  You're always confusing
21  these people, Ed.
22          THE COURT:  Bring him on in.
23          (Venireperson enters courtroom.)
24          THE COURT:  All right.  Mr. Moser, you
25  were not selected to be on this jury.  We do

202

1   appreciate your time coming down here and sharing your
2   thoughts with us.  Thank you very much for your
3   honesty.
4           VENIREPERSON NO. 48:  Thank you, sir.
5           MR. GARZA:  Thank you.
6           MR. SKURKA:  Thank you, sir.
7           (Venireperson exits courtroom.)
8           MR. SKURKA:  I don't know if you want
9   to get this on the record or not, Judge, but we have
10  one tomorrow that we've already agreed on --
11          THE COURT:  Oh, what number is that?
12          MR. GARZA:  No. 59.
13          MR. SKURKA:  No. 59.
14          MR. GARZA:  Ms. -- Ms. Rutter.
15  Apparently, she has a hearing impairment, Your Honor,
16  that will probably preclude her from being a --
17          THE COURT:  Okay.  Then 59 is excused by
18  agreement.  I don't think -- I think Ann took it off
19  the list.
20          (Evening recess.)

203

```
 1    THE STATE OF TEXAS  )

 2    COUNTY OF NUECES    )

 3

 4

 5              I, Mary Lopez Buitron, Official Court Reporter

 6    in and for the 94th Judicial District Court of Nueces County,

 7    State of Texas, do hereby certify that the above and foregoing

 8    contains a true and correct transcription of portions of

 9    evidence and other proceedings requested in writing by counsel

10    for the parties to be included in this volume of the Reporter's

11    Record, in the above-styled and numbered cause, all of which

12    occurred in open court or in chambers and were reported by me.

13              I further certify that this Reporter's Record of

14    the proceedings truly and correctly reflects the exhibits, if

15    any, admitted by the respective parties.

16              I further certify that the total cost for the

17    preparation of this Reporter's Record is $_____ and was

18    paid/will be paid by_____.

19              WITNESS MY OFFICIAL HAND this the ____ day of

20    _____, A.D., 2009.

21

22    MARY LOPEZ BUITRON, CSR, RPR, Texas CSR #2731
      Expiration Date: 12/31/2009
23    Official Court Reporter
      94th District Court
24    Nueces County, Texas
      901 Leopard, Room 901
25    Corpus Christi, Texas 78401
      (361)888-0658
```