1

```
 1                    REPORTER'S RECORD
              TRIAL COURT CAUSE NO. 04-CR-3453-C
 2           APPELLATE COURT CAUSE NO. AP-76,000 76100
                   VOLUME 12 OF 25 VOLUMES
 3

 4    THE STATE OF TEXAS      )      IN THE DISTRICT COURT
                              )
 5                            )
      VS.                     )      94TH JUDICIAL DISTRICT
 6                            )
      JOHN HENRY RAMIREZ      )      NUECES COUNTY, TEXAS
 7

 8

 9

10

11                 _____

12

13                 INDIVIDUAL VOIR DIRE

14                 _____

15

16

17

18

19            On the 14th day of November, 2008, the

20    following proceedings came on to be heard in the

21    above-entitled and numbered cause before the HONORABLE

22    BOBBY GALVAN, Judge Presiding, held in Corpus Christi,

23    Nueces County, Texas:

24            Proceedings reported by Stenograph

25    Machine.
```

FILED IN
COURT OF CRIMINAL APPEALS

OCT 06 2009

Louise Pearson, Clerk

2

```
 1   APPEARANCES:

 2   MR. MARK SKURKA
     SBOT NO. 18475570
 3   MR. VERNON G. SCHIMMEL
     SBOT NO. 24033039
 4   ASSISTANT DISTRICT ATTORNEYS
     901 Leopard, Rm. 205
 5   Corpus Christi, Texas 78401
     Phone: (361) 888-0410
 6
     ATTORNEYS FOR THE STATE
 7
     -AND-
 8
     MR. EDWARD F. GARZA
 9   SBOT NO. 07731200
     ATTORNEY AT LAW
10   719 S. Shoreline, Suite 201
     Corpus Christi, Texas  78401
11   Phone: (361) 888-8877

12   MR. GRANT JONES
     SBOT NO. 10917000
13   ATTORNEY AT LAW
     5826 Beauvais Dr.
14   Corpus Christi, Texas 78414
     Phone: (361) 815-2470
15

16   ATTORNEYS FOR THE DEFENDANT,
     JOHN HENRY RAMIREZ
17

18

19

20

21

22

23

24

25
```

3

```
 1                              INDEX
                      VOLUME 12 OF 25 VOLUMES
 2                         JURY SELECTION
     NOVEMBER 14, 2008
 3   VENIREPERSON                   Voir Dire         Page   Vol.
     Proceedings Continued ........................... 5     12
 4   Discussion on PJ 46 and 47. ..................... 5     12

 5   ROBERT ARNOLD, NO. 47          6,20,48                  12
     Accepted by the State. .......................... 61    12
 6   Peremptory No. 6 by the Defense. ................ 61    12

 7   ROLAND TREVINO, NO. 57         62,75,80,87,90     12
     Challenge for Cause by the State ................ 94    12
 8   Granted ......................................... 94    12

 9   JESSE LEE FOSTER, NO. 58       95,105,126               12
     Excused by Agreement ............................ 134   12
10
     JAY BLANTON, NO. 60            136,146,164,169,171      12
11   Peremptory No. 7 by the Defense ................. 176   12

12   ROBERT CORTINAS, JR., NO.62    177                      12

13   Noon recess ..................................... 190   12

14   JOE HOPKINS, NO. 53            190,202,239              12
     Accepted by the State. .......................... 260   12
15   Peremptory No. 8 by the Defense ................. 260   12

16   ROBERT CORTINAS, JR. NO. 62    263                      12
     Excused by agreement. ........................... 276   12
17
     JOSEFINA GARCIA, NO. 55        277,292,297              12
18   Challenge for Cause by the State. ............... 300   12
     Agreed Strike. .................................. 300   12
19
     JEANNE BOWMAN, NO. 63          301,314,342              12
20   Accepted by the State. .......................... 364   12
     Accepted by the Defense. ........................ 364   12
21   Juror No. 7 Admonished. ......................... 365   12

22   Evening Recess. ................................. 367   12
     Court Reporter's Certificate. ................... 368   12
23

24

25
```

4

```
 1              ALPHABETICAL INDEX TO VENIREPERSONS
      NOVEMBER 14, 2008
 2    VENIREPERSON                   Voir Dire        Page  Vol.
      ARNOLD, ROBERT, NO. 47         6,20,48                 12
 3    Accepted by the State. ........................... 61   12
      Peremptory No. 6 by the Defense. ................. 61   12
 4
      BLANTON, JAY, NO. 60           136,146,164,169,171      12
 5    Peremptory No. 7 by the Defense .................. 176  12

 6    BOWMAN, JEANNE, NO. 63         301,314,342              12
      Accepted by the State. .......................... 364  12
 7    Accepted by the Defense. ........................ 364  12
      Juror No. 7 Admonished. ......................... 365  12
 8
      CORTINAS, ROBERT, JR. NO. 62   263                      12
 9    Excused by agreement. ........................... 276  12

10    FOSTER, JESSE LEE, NO. 58      95,105,126               12
      Excused by Agreement ............................ 134  12
11
      GARCIA, JOSEFINA, NO. 55       277,292,297              12
12    Challenge for Cause by the State. ............... 300  12
      Agreed Strike. .................................. 300  12
13
      HOPKINS, JOE, NO. 53           190,202,239              12
14    Accepted by the State. .......................... 260  12
      Peremptory No. 8 by the Defense ................. 260  12
15
      TREVINO, ROLAND, NO. 57        62,75,80,87,90           12
16    Challenge for Cause by the State ................ 94   12
      Granted ......................................... 94   12
17

18

19

20

21

22

23

24

25
```

7

1    P R O C E E D I N G S
2    November 14, 2008
3                MR. SKURKA:  Judge, on this next
4    juror, actually Juror No. 47, Robert Arnold, --
5                THE COURT:  Uh-huh.
6                MR. SKURKA:  -- when we had our
7    conference a week ago about the excuses or the
8    agreements, --
9                THE COURT:  Uh-huh.
10               MR. SKURKA:  -- we had made a mistake and
11   the State had made a mistake and meant 46, not 47.  So
12   I've talked to Ms. Cortez --
13               THE COURT:  Meant 46 about what?
14               MR. SKURKA:  We agreed to excuse 46 and
15   not excuse 47.
16               THE COURT:  Okay.
17               MR. SKURKA:  So, to correct that, I told
18   Ms. Cortez that.  When Geordie and I discovered it and
19   so we went ahead and brought 47 in today.  And I've
20   told Mr. Jones, and he's got a copy of the
21   questionnaire, and everything, but I just want to make
22   sure that's reflected that 47 was not in agreement, it
23   was a mistake on our part.  I was out of town --
24               THE COURT:  Okay.
25               MR. SKURKA:  -- and we dismissed 46,

6

1    instead of 47.
2                THE COURT:  So we don't agree to excuse
3    47.
4                MR. SKURKA:  That's correct, Judge.
5                THE COURT:  And he's here.
6                MR. SKURKA:  And he's here.
7                THE COURT:  Okay.
8                MR. SKURKA:  I just wanted to clear that
9    up, for the record, Judge.  And I apologize for that
10   mistake.
11               THE COURT:  No, that's all right.  We've
12   got it fixed.
13               You know what, let me go grab his deal,
14   and I'll be right back.
15               (Pause in proceedings.)
16               (Proceedings continue.)
17               (Venireperson enters courtroom.)
18
19               VENIREPERSON NO. 47,
20               ROBERT MILES ARNOLD,
21               VOIR DIRE EXAMINATION
22   BY THE COURT:
23      Q.    All right, come forward.  Have a seat over
24   here.  All right, you are Robert Arnold; is that
25   right?

8

1       A.    Yes, sir.
2       Q.    Okay.  All right, Mr. Arnold, I'm going to
3    talk to you about some things, okay?  First of all,
4    obviously, Mr. Arnold, you know we're trying to pick a
5    jury here for a capital murder case, all right?  And
6    we're looking for two things.  One, we're looking for
7    people that can keep an open mind, okay?  And, if you
8    can't, it's okay.  Some people say they can't.  Some
9    people say, "Hey, you know, I've heard too much about
10   the case," maybe they haven't, but they just can't
11   keep an open mind, for whatever reason.  We need to
12   know if that's you.
13      A.    I feel like I can keep an open mind.
14      Q.    All right.  Now, let's go on to part two.
15   Part two is we're looking for people that can follow
16   the law, okay?  We're going to talk to you about what
17   that entails.  Let's see here, we've got your
18   questionnaires that you filled out the other day.  It
19   looks like you have never been a juror before.  Is
20   that fair?
21      A.    No, never been.
22      Q.    Okay.  That's okay.  No prior experience
23   necessary.  Okay, this is a criminal case.  And, in
24   every criminal case, the law says, "All right, State
25   of Texas --"

8

1                MR. JONES:  Your Honor, I'm sorry.
2                THE COURT:  That's okay.
3                MR. JONES:  Mr. Garza's not here, as the
4    Court can see.  He called me this morning and said he
5    had a flat tire.  He had a truck -- somebody coming to
6    fix it --
7                THE COURT:  Okay.
8                MR. JONES:  -- and he would be here.
9                THE COURT:  Okay.
10               MR. JONES:  I expect he'll be here pretty
11   quick.
12               THE COURT:  Okay.  Are you going to do
13   this juror then?
14               MR. JONES:  I will do this juror.
15               THE COURT:  Okay.
16               MR. JONES:  I forgot to tell the Court.
17               THE COURT:  Okay, that's not a problem.
18               MR. JONES:  He's on the way, but he --
19               THE COURT:  Okay.
20      Q.    (BY THE COURT) Okay, back on track.  It's a
21   criminal case, and the law says, "State of Texas, you
22   brought charges here, okay?  You bring the charges,
23   that's fine, but you got to prove them," okay?  In
24   this country, we don't just -- the government just
25   doesn't say, "You did it," and it's so, all right?  I

**9**

1  -- I think -- and that would be a horrible place?
2    A.   Yeah.
3    Q.   All right, you agree with me?
4    A.   Right.
5    Q.   And there are places like that, the
6  government says "You did it," and then it's -- all of
7  a sudden It's your burden to get yourself out of it.
8  We don't do that here, okay? And there's safety
9  catches that we have in the system and the first one
10  is "Government, you got to prove it." You -- you can
11  follow that law?
12    A.   (Nods head.)
13    Q.   Yes?
14    A.   Yes.
15    Q.   Okay, you got to talk, because she's typing.
16  I mean, I understand you, but we have to have a
17  record.
18        Okay. Now, then, along those same lines
19  is, the standard of proof -- and you may remember this
20  from school or maybe even T.V. -- is beyond a
21  reasonable doubt. That's the -- that's the standard
22  of proof in every criminal case, okay?
23    A.   Okay.
24    Q.   We don't have a definition for what that is,
25  but it is the highest standard of proof we have in all

**10**

1  of the law, okay? What it is not is beyond all doubt
2  because then you -- you would have -- if it was beyond
3  all doubt you would have to be a witness and then you
4  wouldn't be a jury, you would be a witness, okay? But
5  it's still high, all right.
6        And what I need to know from you is,
7  would you hold the State to that burden, beyond a
8  reasonable doubt? In other words, some people say,
9  "Gosh, that seems awful high and I wouldn't hold the
10  State to that burden. I -- I'd hold them to a lesser
11  burden." The law says beyond a reasonable doubt is
12  the standard. And like I said, there's no exact rule
13  for what that is, but it's the highest thing we've
14  got, okay?
15    A.   So are you saying if I --
16    Q.   Let me give you an example, okay? Let's say
17  this was a civil case, all right, so just to kind of
18  illustrate what beyond a reasonable doubt is not, so
19  that you can get an idea of what it is.
20        Civil case, let's say it was like a
21  contract dispute, two businesses were having a hassle,
22  they had a contract dispute and they'd come in here,
23  and we've tried some of those, okay? The burden of
24  proof in that case is called "preponderance of the
25  evidence." If you think of the Scales of Justice,

**11**

1  that's just tipping one side ever so slightly. Some
2  people like to call it 51 percent, all right? So you
3  can visualize what that is, right --
4    A.   Right.
5    Q.   -- 51 percent? Let's say the -- let's say
6  the -- the State is -- you know, they think that
7  there's a -- a bad parent and they want to take away
8  the child, okay? But they don't just get to take away
9  your kids, they have to prove it, right?
10    A.   Right.
11    Q.   Well, there's a higher burden to do that.
12  It's called "clear and convincing evidence," all
13  right? That's higher than this 51 percent thing,
14  okay? That's higher. All right, clear and
15  convincing, and that's pretty clear what that is,
16  right, clear and convincing. That seems fairly high,
17  right?
18    A.   So beyond a --
19    Q.   Beyond a reasonable doubt, that's even higher
20  than that, okay?
21    A.   Okay.
22    Q.   So that gives you kind of an idea of what
23  we're talking about, okay?
24    A.   Yeah.
25    Q.   Could you hold the State to that burden, make

**12**

1  them prove their case beyond a reasonable doubt?
2    A.   Yes.
3    Q.   All right. As part of the idea that the
4  State has to prove their case and they've brought the
5  charges and it's -- the burden's on them, the law
6  says, "Hey, look, over here, these guys over here, the
7  Defendant and his lawyers, they don't have to do
8  anything in this trial." Why? Because they don't
9  have to prove his innocence. They don't have to prove
10  anything. They brought the charges over here, the
11  State, and they got to prove them, and that's what the
12  law says.
13        And -- and as part of that, you must
14  presume that he is innocent, unless and until they can
15  prove the charges. And that's everybody's right,
16  that's not just this guy's right, that's everybody's
17  right. We are all, as people in this country,
18  presumed to be innocent until the State can prove
19  otherwise, if they can. You follow me?
20    A.   Yes, sir.
21    Q.   Do you agree with that law?
22    A.   Yes.
23    Q.   And could you presume that this person is
24  innocent until if the State can prove it?
25    A.   Yes.

13

Q.   Okay.  Now, also along that line, all these
things kind of go together.  The law says the burden
never shifts over here, and if the burden never shifts
over here, remember, I told you they don't have to do
anything.  They don't have to do anything.  As part of
that, Defendant doesn't have to testify.  It's in the
Constitution, it's in the Bill of Rights that
Defendant doesn't have to testify.

        Now, I think there's a lot of reasons why
Defendant wouldn't want to testify.  Maybe his lawyer
tells him not to.  Maybe he says "You know what,
State, over here hasn't proven the case.  I'm
instructing you not to testify."  Maybe he's not a
good speaker, maybe he just freezes up in a high
pressure situations, and would you agree this is a
high pressure situation for this person.

A.   Right.

Q.   I mean, there's no doubt.  But, in any event,
the law says the State can't make him testify if he
doesn't want to, okay?  Not only that, it goes beyond
that, all right?  Law says a juror that is selected
cannot hold it against him.  In other words, you can't
go back there into the jury room when you begin your
deliberations, if you're selected on this jury, and
say, "You know what?  I don't know about this guy's

14

case, the State's, but they didn't -- they didn't put
on any evidence, he didn't testify, okay?  So, State,
that's one for you."  You can't do that.

A.   Right.

Q.   Can't consider it.  Can't hold it against
him.  Your only role in the guilt or innocence phase
is to determine whether the State has proven their
case beyond a reasonable doubt.

        Could you follow that law and not hold it
against the Defendant that he -- if he chooses, I
don't know, he may testify, he may not, but it's his
choice.

A.   Right.

Q.   Could you do that?

A.   Yes.

Q.   All right.  Next thing, let's talk a little
bit about -- that -- that's in every criminal case,
okay?  And that's anything from, really, a traffic
ticket all the way up to this.

        Let's talk a little bit about what this
is, capital murder.  Okay.  There's such a thing as
murder, just murder, okay?  And what's murder?  Well,
murder is the intentional taking of the life of
another person, --

A.   Right.

15

Q.   -- all right?  If that's all you have, it's a
first degree felony, but it's not a capital felony,
okay?  And what's a capital felony?  A capital felony
is something that is a -- is a type of case that the
death penalty is a possibility, it's an option, okay?

A.   Right.

Q.   Now, what they're alleging here, that is the
State, is capital murder.  And what's that?  Well,
there's a laundry list of types of situations in which
you've got murder, plus something else, and because
you've got murder plus something else, it becomes
capital murder.

        In this particular case, they're saying
there's a murder, plus, at the same time, in the
course of committing a robbery or attempting to commit
a robbery a murder happens, a murder is committed.  So
you've got two serious offenses put together, robbery
or attempted robbery, and they can -- they can show it
that way.  In the course of doing that, the Defendant
commits a murder.

        And the legislature says if you put these
two serious offenses together at the same time, then
you get capital murder, all right?  You follow me?

A.   Yes, sir.

Q.   Okay.  And that's the allegation here.  Now,

16

law says this, there's -- there's -- I -- I need to
count these up, but there's a number of elements here,
all right?  That is, in Nueces County, Texas, on such
a given day, Defendant committed the offense of
murder, and in the -- in the course of doing so, he
was attempting to or committing a robbery, okay?

A.   (Nods head.)

Q.   And there's a lot -- there's elements.  It's
like a laundry list of things that State needs to
prove to get there.  Law says they don't get to prove
eight out of nine or seven out of eight, whatever it
is, they've got to prove them all to get capital
murder, each and every element, okay.

        Would you hold the State to that burden?

A.   Yes.

Q.   Okay.  Now -- and if they don't prove each
and every element, you'd find the Defendant not
guilty, right?

A.   Right.

Q.   Okay.  Now, if a defendant is found guilty of
capital murder there's two options, just two options,
life imprisonment or the death penalty.

A.   Right.

Q.   That's it, okay?  And the jury is going to
decide what happens but they don't say life or death.

19

1 That's not how we do it, okay? In a regular -- in
2 every other case that I know of in which the jury
3 assesses punishment, like in a murder case, they would
4 assess a number of years or maybe a fine, maybe both,
5 maybe probation, if that was a possibility, but they
6 would -- they would -- there's a prescribed amount of
7 time and punishment that can be done and the jury
8 would do that, okay?
9   A.   Right.
10   Q.   We don't do that here, we answer questions.
11 And if you'll look over this way -- I'm going to turn
12 this light on. Here's Question No. 1, "Is there a
13 probability the Defendant would commit criminal acts
14 of violence that would constitute a continuing threat
15 to society," and the jury would answer that yes or no,
16 okay.
17        Then if you come up -- bear with me here
18 and turn around. Special Issue 2, "After taking into
19 consideration all of the evidence, including the
20 circumstances of the offense," well, what's that?
21 That's the first part of the case, okay? That's what
22 happened, that, you know, the event, okay, --
23   A.   Yes.
24   Q.   -- that they've alleged, but, at this point,
25 if you're at this point, you've found the Defendant

18

1 guilty, so "circumstances of the offense, the
2 Defendant's character and background, and the personal
3 moral culpability of the Defendant, is there a
4 sufficient mitigating circumstance or circumstances to
5 warrant that a sentence of life imprisonment, rather
6 than a death sentence be imposed," okay?
7        This is sort of like take in everything.
8 There's the facts of the case, you know, the offense,
9 but you may be presented from either side other stuff,
10 okay, other stuff. Like his background. What kind of
11 a person was he? What kind of a guy has he been in
12 the past? Has he been a good guy in the past? Has he
13 been a bad guy in the past? Does he have a bad
14 criminal history? Has he never been in trouble
15 before, okay? These are things that you take into
16 consideration, and maybe these things are mitigating
17 circumstances, that is, other circumstances that may
18 warrant a sentence of life, rather than death, okay.
19 Taking into -- everything that's presented to you,
20 okay?
21        Now, obviously, the -- one side or the
22 other has got to present this to you, but, you know,
23 you just take in everything, everything in both phases
24 of the trial. You can answer this question, as well?
25   A.   Yes.

1   Q.   I mean, basically, the jury says, yes or no,
2 okay? Now, at the beginning of every trial, I always
3 ask the jury to raise their right hand and I swear
4 them in. And the oath goes like this, "Do you
5 solemnly swear that you will render a true verdict
6 based upon the law and the evidence presented to you,"
7 and the jury says "Yes."
8        I need to know if you can take that oath
9 so let's begin, let's start with the first question.
10 Could you take the oath to -- to do just that on the
11 guilt or innocence phase of this trial?
12   A.   Yes.
13   Q.   Okay. And -- and if we get to the second
14 half of the trial, which is this -- the questions,
15 some people tell me, "Judge, I can't do that because I
16 can't participate in some process that would lead to
17 the death penalty" or some other folks say, "Well, I
18 can't do that because if they find him guilty of
19 capital murder, that is the jury, I'm not following
20 this law. I'm just -- it's death. In my mind, it is
21 death. I'm not following these questions. I'm not
22 even going to consider it," okay?
23        I need to know if that's -- if that's you
24 or if you can truthfully answer these questions and
25 take that oath.

20

1   A.   I can answer them truthfully.
2        THE COURT:  Okay. I'm going to turn the
3 floor over to Mr. Skurka, attorney for the State, at
4 this point.
5        MR. SKURKA:  Thank you, Judge.
6             VOIR DIRE EXAMINATION
7 BY MR. SKURKA:
8   Q.   Good afternoon -- good morning. It was a
9 long afternoon yesterday, I guess I'm still stuck in
10 that. As the Judge introduced me, I'm Mark Skurka.
11 I'm a first assistant district attorney, and it will
12 be my privilege to present this case to you if you're
13 selected on this jury. We have Geordie Schimmel here.
14 He's also an assistant D.A. He's assigned to Judge
15 Galvan's Court on a daily basis, but he'll be helping
16 me present this case if you're selected on this jury.
17        I'm going to start off, Mr. Arnold, by
18 telling you there's no right or wrong answers to
19 anything you say. All we want to know is what your
20 true feelings are about some things. If you can do
21 something, that's fine. If you can't do it a certain
22 way, that's fine, too. We're not here to argue with
23 your beliefs or your feelings. We just want to make
24 sure that you can qualify, that would you be qualified
25 to sit on the jury, okay?

21

1    A.   Yes.

2    Q.   So I don't want you to be thinking you have

3 to answer questions the way I want to hear you answer

4 or the way you think the Judge wants to hear.  You

5 just tell us your true feelings and then we'll go from

6 there.  Fair enough?

7    A.   Fair enough.

8    Q.   Okay.  Let's start off about the biggest

9 issue, probably, in this case.  Clearly, there's going

10 to be two issues, whether the Defendant is guilty or

11 not, and then the second phase would be whether he

12 should get the death penalty or get a life sentence.

13 I just want to know how you feel about the death

14 penalty, in general.

15    A.   I think that if it's proven beyond a

16 reasonable doubt, and, as Judge Galvan said, if -- if

17 it's warranted, I would say it's -- it's reasonable,

18 but I would have to be fully convinced that it is 100

19 percent deserved of which, in my opinion, I would have

20 to see the case before I make that decision.

21    Q.   That's an intelligent answer because what

22 you're telling me is, "Hey, I believe in the death

23 penalty, but that doesn't mean I'm going to

24 automatically give it.  I'm going to wait to hear all

25 the facts and evidence before I decide that."

22

1    A.   Right.

2    Q.   Does that -- is that pretty much sum up what

3 you say?

4    A.   Without a doubt.

5    Q.   Okay.  You keep scaring me when you keep

6 saying, "without a doubt," though and "a hundred

7 percent."  Because, as the Judge told you a little bit

8 about beyond a reasonable doubt, that's what it means,

9 beyond a reasonable doubt.  It doesn't mean beyond all

10 doubt, it doesn't mean beyond a shadow of a doubt, it

11 doesn't mean a hundred percent.

12         In other words, I couldn't prove the case

13 to you a hundred percent unless you are a witness and

14 saw the whole thing, right?

15    A.   (Nods head.)

16    Q.   So don't hold me -- I'm going to ask you not

17 to hold me to a standard higher than what the Judge

18 said.  So all you have to do is decide beyond a

19 reasonable doubt, and what that is is up to you and

20 the other jurors' mind.

21         Let me give you an example of that.  Have

22 you ever flown on an airplane before?

23    A.   Yes, I have.

24    Q.   Before you went on the airplane, did you know

25 a hundred percent that that plain wasn't going to

23

1 crash?

2    A.   No, I didn't.

3    Q.   No.  But you probably went to the airport.

4 You probably went on a reputable airline that, you

5 know, had a safety record.  You probably looked at the

6 plane.  It looked like it was in good condition.  You

7 probably saw a mechanic or something fueling the

8 plane, or getting the plain ready to go.  You probably

9 saw the captain and the pilot, or whatever, getting

10 ready, and everything looked okay.  So you probably

11 got on the plane and left, right?

12         That's an example of beyond a reasonable

13 doubt.  I mean, you didn't know for sure or absolutely

14 that the plane wasn't going to crash, but you took in

15 all the evidence and you realized, "Hey, I think

16 beyond a reasonable doubt that plane is not going to

17 crash, so I'm okay to go on it."  You see what I'm

18 saying?

19    A.   Yes.

20    Q.   No one, you know, getting on a plane knows

21 for sure it's not going to crash, without a doubt it's

22 not going to crash, but, I mean, you had a feeling

23 beyond a reasonable doubt that you were going to be

24 okay and the plane was going to be all right.  You see

25 what my example means?

24

1    A.   Yes.

2    Q.   There's no way I could get up there and say a

3 hundred percent this is going to happen or something

4 like that, or I have to prove it to you a hundred

5 percent.  Do you follow me on that?

6    A.   Yes, I do.

7    Q.   I just want to make sure you're not making me

8 have a burden higher than what the Judge says.  You

9 wouldn't do that, right?

10    A.   I'll just have to see what -- what everything

11 amounts to, and then I have -- I mean, I --

12    Q.   Right.

13    A.   -- I couldn't judge -- I won't be able to

14 judge till I see the -- see the case fully.

15    Q.   And I don't want you to.  That's exactly the

16 right answer, but you -- you do agree with me I can't

17 prove to you something a hundred percent --

18    A.   Right.

19    Q.   -- something like that, okay?  And it's in --

20 what the Judge says is right, it's a high standard,

21 it's beyond a reasonable doubt.  I always like to tell

22 people two things:  Well, first of all, listen to the

23 evidence and then see if you have a doubt.  If you

24 don't have a doubt, you can just go ahead and vote,

25 but if you have a doubt, then ask yourself the second

25

1  question, is it a reasonable doubt?  Do I have a

2  reason for that doubt?  You know, is there something

3  you can point to and say, "That's my reason I have a

4  doubt."  That's what a reasonable doubt could be.

5      A.   Correct.

6      Q.   But again, it's not defined much more than

7  what the Judge said, it just means it's not beyond all

8  doubt or any doubt.  And it seems to me your

9  definition of the -- your feeling about the death

10  penalty, and you said in your questionnaire, "If it's

11  deserved.  If it's worthy," that tells me that you're

12  not just going to jump into it willy-nilly.  You're

13  going to wait until you hear all the evidence,

14  correct?

15      A.   Oh, yeah.

16      Q.   How did you feel about that when you first

17  came into the jury room.  Remember that day when we

18  had 2- or 300 people in there and you're all called in

19  there and you don't really know what kind of case it

20  is until the Judge comes down and says, "Folks, this

21  is a capital murder case.  This Defendant may be

22  facing a death penalty," what's the first thing that

23  struck your mind when you heard it was that kind of

24  case?

25      A.   I guess just the seriousness of it.  It's --

26

1      Q.   Explain.

2      A.   A person's life is on the line, so, I mean,

3  obviously it's a serious matter.

4      Q.   Have you ever been called for jury duty

5  before?

6      A.   I've been called, but I've never been

7  selected, never been picked.

8      Q.   But generally speaking, when you get called

9  for jury duty, you may be hearing a contract, you may

10  be hearing, you know, an injury at an H.E.B. where

11  somebody slipped and fell, you may be hearing a D.W.I.

12  case or a shoplifting case, and, then boom, it hits

13  you between the eyes, "This is a capital murder case."

14          Did you have any reaction because it was

15  that kind of case, that, maybe, "Oh, my gosh," because

16  I watch the people on the jury and sometimes they go,

17  "Oh, my God," they start freaking out, going, "I can't

18  make that decision, that's too tough."

19      A.   I never had any reaction.

20      Q.   No reaction that way.  Would it be fair to

21  say your reaction was like some people, you know, they

22  hear it's that kind of case, they maybe sit up a

23  little straighter, listen a little closer and say,

24  "Hey, this is a serious business, I better pay

25  attention."  Was that you?

27

1      A.   At the time, not really, because I knew we

2  weren't going to get too serious that day.  I mean,

3  now, yes.

4      Q.   But you understand now, right?  Did you see

5  other people around you and their reaction, that some

6  of them were that way, going, "Oh, my gosh," you know,

7  they're kind of going, "Oh, how can I do this"?

8      A.   Yeah, a couple of them, I would say.

9      Q.   Okay.  And they're -- look, I'm not trying to

10  argue with those people.  They have a right to feel

11  the way they have.  I just want to know if you felt

12  that way, that you couldn't be in that part?

13      A.   No.

14      Q.   Do that kind of thing.

15      A.   No, that's fine.

16      Q.   The reason I ask you that, Mr. Arnold, is

17  very simple.  I told you the very first day the State

18  is seeking the death penalty in this case.  Right up

19  front with you, I'm not going to beat around the bush,

20  and tell you that there's going to come a time in this

21  trial, if you're sitting on this jury, that the State

22  or I'm going to stand in front of you and say, "Based

23  on the evidence and based on everything you've heard,

24  I'm going to ask you to return a verdict that

25  sentences that young man to death."

28

1          I want you to look at him and tell me.

2  Go ahead and take a look at him right now.  It's not

3  somebody you read about in the paper or hear about in

4  the news, that's him.  Can you participate in that

5  decision if the evidence calls for that?

6      A.   Yes.

7      Q.   Okay.  The second part of that is -- is --

8  I'm going to turn it around on you because if you hear

9  the evidence and you think there's such a way that

10  he's not guilty, can you vote for not guilty?

11      A.   Yes, I can.

12      Q.   And if you think the evidence is such a way

13  or it amounts to such that maybe he shouldn't get the

14  death penalty, that he can get a life sentence,

15  instead?  Can you vote for that, if the evidence is

16  that?

17      A.   Yes.

18      Q.   Okay.  So it sounds to me like you're pretty

19  open-minded, you're not leaning one way or the other,

20  correct?

21      A.   I have no reason to lean in any direction.

22      Q.   And that's the way it should be.  That's why

23  we're looking at jurors.  Because sometimes jurors

24  come in here and say, "Well, you know, he looks so

25  young, maybe he's probably going to get a life

29

1  sentence," then other people say, "Oh, he looks like a
2  bad guy, maybe he's going to get a death sentence."
3          In other words, I always tell people,
4  "It's not right to make a decision based on how a
5  person looks," right?
6      A.   Right.
7      Q.   Would you agree with me that you should wait
8  to hear what the evidence is and decide on what he
9  did, instead of what he likes like, --
10     A.   Yes.
11     Q.   -- or how young he is or how old he is,
12 right?
13     A.   Right.
14     Q.   Okay.  When we talk about that, too, the only
15 thing that you should be leaning toward at this time
16 is innocent.  Because, remember, the Judge said
17 there's a presumption of innocence.  When he starts
18 this trial, and everybody starts their trial, you are
19 presumed innocent.  Does that mean you are innocent?
20 No.  It just mean that you're presumed, at this time,
21 because the State hasn't put on any evidence yet.  I
22 feel that that presumption will change after I put on
23 evidence but right now, if you had to vote, you would
24 have to vote that he's not guilty, right --
25     A.   Right.

30

1      Q.   -- because you're starting out that way.
2      A.   Yes.
3      Q.   That's the only time and, really, that's the
4  main time you have to be kind of leaning one way.  And
5  it's -- the Judge said it very well when he said "Just
6  because he's here doesn't mean he is guilty.  The
7  State has to prove the case."  Do you agree with that
8  concept of law?
9      A.   Yes.
10     Q.   I mean, God forbid, if you were on trial,
11 wouldn't you want to say, "Hey, I'm not -- I'm not
12 guilty.  They have to prove that I'm guilty"?
13     A.   Yes.
14     Q.   That's kind of the American system, right?
15 Some other countries, I mean, I don't know how they do
16 it, but they start them off guilty and they have to
17 prove their innocence.  But you understand that, so
18 you can be open-minded; is that right?
19     A.   Yes.
20     Q.   Let's talk about now participating in that
21 kind of decision.  You know, sometimes people say,
22 "Mark, you know, I believe in the death penalty.  It's
23 a good law.  We should have that law in Texas and I'm
24 all for it, but don't make me do it, don't put me on
25 that jury to do it."  They believe in it, but, you

31

1  know, they can talk the talk, but they can't walk the
2  walk.  And I'm kind of curious about you, do you feel
3  you can go through with it if it's called for?
4      A.   Yes, I definitely can.
5      Q.   Okay.  And other thing is, but can you go
6  through with it if you think it deserves a life
7  sentence, based on all the evidence?
8      A.   Yes.
9      Q.   Okay.  Tell me about your -- the thing about
10 the murder plus a robbery.  Remember, the Judge was
11 explaining the reason this is capital murder.  Some
12 people come in, like the first day, and I don't know
13 if you felt this way, some people think every murder
14 can be getting the death penalty, and we always have
15 to tell them no, it's only certain cases.  If you kill
16 somebody while -- while there's a policeman on duty,
17 or kill a kid under six, or kill several people at one
18 time, like a serial murder.
19     A.   Right.
20     Q.   Or you kill them while you're committing one
21 of four enumerated felonies, which is kidnapping,
22 rape, robbery or burglary.  Okay?  I think I used an
23 example of if you're forging a check and you killed
24 somebody, that's not capital murder.  It's got to be
25 in the course of committing one of those serious

32

1  felonies.  And that's probably right, correct?  You
2  don't want to just have the death penalty for
3  everybody charged with murder, it's only those certain
4  cases of murder.
5      A.   Right.
6      Q.   And the legislature feels that way, too,
7  because they don't go into that stuff.  So -- but the
8  thing I need to tell you is, it says that -- the Judge
9  told you it's in the course of committing or
10 attempting to commit robbery.  In other words, it
11 doesn't have to be a successful robbery or a completed
12 robbery.
13         Say, for example, it's a bank robbery
14 and somebody goes into the bank and holds a gun on the
15 teller and takes a bag of money from the teller and
16 he's gone outside and the cops are called and they
17 catch him on the sidewalk outside the bank.  Can he
18 get up on the jury -- at his trial and say, "Hey, I'm
19 not guilty.  I didn't really take the money.  I got
20 caught and I didn't take it"?  No.  Absolutely not.
21 As long as you take the property by force or threats
22 of force, that's robbery, okay?  Whether you get a
23 hundred dollars or one dollar, you know, or you get
24 away with it or not.  You agree with that?
25     A.   Yes.

33

1    Q.   Okay.  The jury -- you said you were called
2  for jury duty before, but never been picked, so I want
3  to tell you, quickly, about criminal jury cases.
4  Generally speaking, say you have a burglary case.
5  What happens is, you decide whether he's guilty or not
6  in the first part of the trial, and then in the second
7  part of the trial you decide what his punishment is
8  going to be.  And it will be something like from 5
9  years to 99 years in prison or 2 years to 20 years in
10  prison, and you pick a number.  In this case it
11  doesn't work that way.  You don't go to the second
12  part of the trial and say, "Okay, jury, let's see, I'm
13  going to vote for death or I'm going to vote for
14  life."
15         What happens in the second part of the
16  trial is you might get to hear additional evidence,
17  like -- the first part of trial is, generally
18  speaking, what happened that day, you know, did he do
19  it or not, is he guilty or not?  The second part of
20  the trial, you might get to hear additional evidence,
21  like, maybe he's been to prison five times before --
22    A.   Uh-huh.
23    Q.   -- or maybe he's never been to prison.  Maybe
24  he was a good kid in school, made straight As.  Maybe
25  he's always been in trouble with the law, you know, a

34

1  truancy student -- person.  You know, I don't know
2  what that could be, but that's what you want to look
3  in the background, probably, to help you make up your
4  mind on whether -- what kind of punishment he gets,
5  right?  Because you're supposed to -- just because
6  he's found guilty of capital murder, does that mean he
7  automatically gets a death penalty?  No.  You have to
8  wait until the second part of the trial, and you might
9  get to hear additional evidence.
10         After you hear that additional evidence,
11  the Judge is going to give you two questions to
12  answer.  You don't just vote death or life.  And
13  there's the first one on the board behind you, and I
14  want you to look over it with me for a minute.  "Is
15  there a probability that the Defendant would commit
16  criminal acts of violence that would constitute a
17  continuing threat to society?"  In other words -- and
18  I want to ask you to key in on a couple of words up
19  there.
20         "Probability."  That goes back to that
21  thing that I don't have to prove it to you for sure,
22  or certainty.  It doesn't say "certainty," it says "is
23  it probable," is it a good chance, is it more likely
24  than not?
25    A.   Yeah.

35

1    Q.   Because unless you have a crystal ball, you
2  can't look in the future and see what's going to
3  happen, and the law doesn't require me to do that.  It
4  just says, "Is there a probability."
5         The second part in the middle says, "the
6  Defendant would commit criminal acts of violence."
7  Sometimes people say, "Well, gosh, you know, I can
8  only give him the death penalty if I think he's going
9  to murder somebody again, or he's going to commit
10  capital murder again."  And I tell them, it doesn't
11  say that, it just says, "would commit criminal acts of
12  violence."  Doesn't have to be as bad as murder.
13         Would you agree with me that sometimes
14  that you can predict the future by what happened in
15  the past?
16    A.   With the right amount of evidence, I could
17  say -- yeah, I guess you probably could predict the
18  future -- well, you can't guarantee the future, but
19  you can predict it.
20    Q.   That's -- that's a good statement.  And
21  that's kind of what that's looking at, is it probable.
22  You know, just for example, I mean, like I'll give you
23  the best example, weathermen.  They always say, "I can
24  predict what the weather is," but they're not very
25  good at it sometimes, but -- but what they do is they

36

1  make a kind of a guess based on the evidence, and
2  stuff, "Well, because these storm fronts are moving
3  in, I think it's going to rain."  It's not a hundred
4  percent, but, you know, you have a probability of
5  rain.
6    A.   Right.
7    Q.   And then this last part of the question says
8  this, "that would constitute a continuing threat to
9  society."  You've probably heard that phrase before,
10  right, continuing threat to society?
11    A.   I think so.
12    Q.   Well, when we really sum that up it's called
13  "The future dangerousness question."  Do you think
14  he's going to be a danger in the future and hurt
15  somebody else in our society?  Well, some people say,
16  "Well, you know, society, Mark, you don't have to go
17  for the death penalty.  Just put him in prison.  If
18  you lock him up in prison with a life sentence, that
19  means he can't hurt anybody."  But I always tell them,
20  "Who else is in prison?"  Tell me.
21    A.   People.
22    Q.   What kind of people?
23    A.   Inmates.
24    Q.   Inmates, guards.
25    A.   Yeah.

37

1    Q.   People that work at the prison, maybe
2    maintenance people or, you know, medical people, the
3    warden, his staff.  So there's not -- it's not like
4    you're putting them on a desert island where there's
5    no persons around they can't hurt.  Would it be fair
6    to say that prison is part of society because you're
7    still interacting with human beings?
8    A.   Yes.
9    Q.   Have you ever heard that happening, where
10   somebody's hurting somebody in prison, --
11   A.   (Nods head.)
12   Q.   -- or, you know, hurting a guard or other
13   inmates?
14   A.   Yeah, sure.
15   Q.   So just because they're in prison, does that
16   mean they're locked away from society?
17   A.   No.
18   Q.   Not really.  So prison is still part of
19   society.  So the first question is basically, do you
20   think he's a danger in the future by hurting somebody
21   else, yes or no?  Based on the evidence you hear at
22   the first part of the trial, like what are the
23   circumstances at the first part of trial, how he did
24   the crime; and then the second part, his background,
25   you know, was he a good background, bad background?

38

1    Then the Judge asks you -- after you
2    answer that question yes or no, he asks you to go to
3    the second question.  This question is called "the
4    mitigating circumstances question," and that's a word
5    that most people haven't heard about, and I know I
6    never heard about it till I went to law school.
7    Mitigating is kind of -- the definition
8    means anything that would lessen or make less severe
9    the punishment, anything that would lower the
10   sentence.  It's kind of like the opposite of
11   aggravating factors, or mitigating factors.  In other
12   words, you have to -- like you said before, you have
13   to wait till you hear everything before you decide
14   what punishment to give.
15   Let me give you an example.  Say you're
16   called to jury duty and there's two burglary cases
17   you're sitting on.  Both burglars are guilty of
18   burglary, burglary meaning going into somebody's house
19   and taking something without permission.  Well, when
20   you first hear about that you think about, "Oh, my
21   God, burglary cases?  We should give him a high
22   sentence because burglary is bad."  Then you hear the
23   evidence.
24   In the first burglary case, here are the
25   facts:  He goes into somebody's house by kicking in

39

1    the door, kicks in the back door and breaks the door
2    off the hinges.  He goes into the house and steals
3    money, jewelry, T.V., stereos, ransacks the whole
4    house, tears up the whole house.  And then you also
5    hear in his background is that he's been to prison
6    twice before for burglary.  This is not his first
7    time.  Okay, that's one set of facts.
8    Now, go to the second burglary.  Guilty
9    of burglary.  He's -- he's broken -- he went into
10   somebody's house and stole something, but the facts
11   are a little different.  In that case you hear he
12   didn't kick in the back door.  What he did was the
13   back door was unlocked so he just went into the
14   kitchen.  That house had jewelry, money, stereos,
15   T.V.s, and all that stuff.  He didn't take any of that
16   stuff.  He went in the kitchen and stole a loaf of
17   bread and some food because he had lost his job and
18   his kids were hungry and he had to feed his kids.  He
19   didn't take any of that other stuff.
20   And then you hear about his background.
21   You find out that that guy's never even been arrested
22   for anything before.  This is the first time he's ever
23   been charged with a crime.  Okay, keeping those two
24   separate, they're both equally guilty of burglary,
25   right?

40

1    A.   Right.
2    Q.   But in one case would you really punish him
3    exactly the same?
4    A.   I wouldn't.
5    Q.   Why?
6    A.   Because the guy with the previous burglaries,
7    he's proven that he's going to do it over and over
8    again; and the other guy with a clean record, he made
9    one mistake, so maybe he'll -- maybe he doesn't need
10   to sit in prison for 20 years like the other guy.
11   Q.   See, it's kind of a trick question.  You
12   first think they're both guilty of burglary, but what
13   did you wait to hear?
14   A.   The evidence.
15   Q.   The evidence.  That's the key word.  And
16   that's what happens in this case.  The Judge says,
17   "Okay, you found him guilty of capital murder.  You
18   think he's a continuing threat to society.  But wait,
19   before you give the death penalty, take into
20   consideration all of the evidence, including the
21   circumstances of the offense."  That's the first part
22   of the trial.  I mean, did he shoot the guy 20 times
23   in the head, or was it, you know, maybe shot one time,
24   or anything that deals with the circumstances of the
25   offense.

43

1   The Defendant's character and his
2   background.  Does he have a good character or bad
3   character?  Are people going to get up and say, "Hey,
4   he was a good kid in school, he made straight A's," or
5   are people going to come up and say, "You know, he was
6   a bad kid all of his life."
7   Or his background.  That's the one we're
8   talking about he's been to prison for burglary or he's
9   never been arrested before.  And his personal moral
10  culpability, is there a sufficient mitigating
11  circumstance or circumstances to warrant that a
12  sentence of life imprisonment, rather than death
13  sentence be imposed?
14  So take all this stuff into
15  consideration.  Is there enough of these mitigating
16  circumstances to warrant that a sentence of life be
17  imposed?  Like in my burglary example, he didn't tear
18  up the house, he didn't steal anything except food.
19  That's kind of a mitigating circumstance, right?
20  A.  Yes.
21  Q.  The fact that he didn't kick in the door,
22  that it was unlocked, he didn't break anything, that's
23  kind of a mitigating circumstance.  The fact that, you
24  know, the reason why he was in there is to feed his
25  kids.  It wasn't for personal gain or greed or

43

1   old ladies across the street, he's still got to answer
2   for this crime and be punished for that crime, you
3   know?"  But you have to be open-minded to listen to
4   all the evidence.  Can you do that?
5   A.  Yes.
6   Q.  And if the evidence says that -- going
7   through all this stuff that you say, "Well, maybe
8   there is a reason after you hear all the evidence that
9   he should get a life sentence, can you vote that way?
10  A.  Yes.
11  Q.  And if the evidence is such that there may be
12  some mitigating circumstances, but it's not enough to
13  outweigh all the other stuff, can you vote for a death
14  sentence?
15  A.  Yes.
16  Q.  Okay.  It seems to me you're pretty
17  open-minded about that.  Do you think you are?
18  A.  I know I am.
19  Q.  Okay, that's a good answer.  We always say
20  "Think" and "can you, would you."  We've got to be
21  exact.
22  Now there's one other law I need to talk
23  to you about, it's called "voluntary intoxication is
24  not a defense to crime."  Voluntary indication.  In
25  other words, if you go get yourself drunk or high on

42

1   anything, you know, he was trying to get food, not,
2   you know, buy drugs or, you know, get money to go do
3   something else, steal, and the fact is he didn't have
4   a prior record, he'd never been in trouble with the
5   law before.  Those would all be mitigating
6   circumstances.
7   And that's simply what the Judge is
8   asking to you do in this case.  Is there enough of
9   these circumstances to lessen the sentence and make it
10  life instead of death?  Follow me?
11  A.  Yes.
12  Q.  And it makes sense.  Because what you want to
13  do as a jury is be very careful in your decision,
14  correct?
15  A.  Yes.
16  Q.  It's a pretty big decision.  What is a
17  mitigating circumstance is up to the folks on the
18  jury.  The Judge is not going to come up and say,
19  "Okay, because he was a good student in school, that
20  means you have to automatically lower the sentence,"
21  or "because he was an Eagle Scout, that means you have
22  to automatically lower the sentence."
23  It's up to the jury to decide is it
24  enough.  Some people may say, "Hey, I don't care if he
25  was an Eagle Scout.  I don't care if he helps little

44

1   drugs and you commit a crime, is that an excuse to the
2   crime?
3   A.  No.
4   Q.  Absolutely not.  The Judge will tell you
5   that's not a excuse or defense to crime.
6   A.  What that means is essentially that -- I
7   mean, you can't go rob a bank and then come back to
8   trial and say, "Well, I'm not guilty of robbing that
9   bank.  I was drunk when I did it."  The law says no.
10  The law does say that's a possible mitigating
11  circumstance, though.
12  You know, maybe you robbed the bank and
13  you were drunk, and some jurors say, "Hey, you know,
14  we ought to give him a break because he was drunk when
15  he did it."  Other people may say, "I don't care if
16  he's drunk or not, he robbed a bank."  See what I'm
17  saying?
18  A.  Right.
19  Q.  That's an example of a possible mitigating
20  circumstance.  You give effect to what you want.
21  Sometimes people may say, "Well, you know, he's very
22  young, you know.  Maybe we should give him a break
23  because he's very young."  Other people say, "Hey,
24  he's over 18.  He knows the law, he knows the
25  difference between right and wrong."  See what I'm

45

1  saying?
2      A.   Yes.
3      Q.   Did you notice that about him, because you're
4  a pretty young fellow, too.  He's around your age.
5      A.   Yeah.
6      Q.   Does that make any difference to you?
7      A.   Makes no difference.
8      Q.   Right.  You know why?  The law says anybody
9  over 18 is treated as an adult.  If he was 16 or 17,
10  we would not be here because the law says you can't
11  execute somebody that young.  But would you agree with
12  me that by the time you reach 18 and majority level,
13  you know, you should be able to tell the difference
14  between right and wrong or understand the law?
15      A.   Yes.
16      Q.   Sure.  Okay.  Now, that's not to say that you
17  can't consider youth as a mitigating circumstance.
18  That's up to the jury.  It's just that sometimes
19  people come into court and they think they're going to
20  see Charles Manson sitting over there, you know, or
21  some big scary biker-looking dude, you know, and --
22  and sometimes it looks different, right?  But would
23  you agree with me then you make a decision on what
24  they did and not what they look like?
25      A.   Yeah.

46

1      Q.   Fair enough?  Okay, Mr. Arnold, let me see if
2  I have any other questions to ask you.  I think the
3  bottom line is, I'm going to go over a couple of
4  things in the law.  First of all, remember that just
5  because he's indicted doesn't mean that he's guilty,
6  correct?
7      A.   Correct.
8      Q.   It's like when you have a traffic ticket,
9  just because a cop gives you a ticket, does that mean
10  you're automatically guilty?
11      A.   No.
12      Q.   It just means that he's charging you with
13  that.  And, again, who has to prove the case beyond a
14  reasonable doubt?
15      A.   The State.
16      Q.   The State does.  He doesn't have to prove
17  anything.  And -- the Judge mentioned that, too.  The
18  Defense can put on a case but they don't have to put
19  on a case, and if they don't put on the Defendant, or
20  if the Defendant doesn't testify, can you hold that
21  against him?
22      A.   No.
23      Q.   Of course not, because the law says, the
24  Fifth Amendment, which would be your right if you were
25  charged with a crime, everybody in America has a right

47

1  to remain silent.  Some people want -- it's a natural
2  thing to say, "Well, I want to hear both sides.  I
3  want to hear the other side of the story.  I want to
4  hear from him."  But, guess what?  That's not the law.
5  The law says, for whatever reason, he doesn't have to
6  testify and the jury can't hold that against him.
7              Can you follow that law?
8      A.   Yes.
9      Q.   It also says -- well, we've already talked
10  about beyond a reasonable doubt, so I don't think I
11  have any questions.  I just want to make sure you're
12  just going to go with what the Judge says, not beyond
13  all doubt or any doubt or shadow of a doubt or
14  anything like that.
15              Is there any reason you couldn't be on
16  this jury?
17      A.   No reason.
18      Q.   You think you could be fair and impartial and
19  listen to everything before you make a decision?
20      A.   Yes.
21      Q.   And if the evidence points toward, you know,
22  guilty, can you vote for guilty?
23      A.   Yes.
24      Q.   If the evidence point towards not guilty, can
25  you vote for not guilty?

48

1      A.   Yes.
2      Q.   If the evidence points that he should get the
3  death sentence, can you follow through with that and
4  give the death sentence?
5      A.   Yes.
6      Q.   If the evidence points that maybe he should
7  get a life sentence, maybe there's a mitigating
8  circumstance where he should get a life sentence, can
9  you vote for that?
10      A.   Yes.
11      Q.   You have no preconceived notions about
12  anything?
13      A.   No.
14              MR. SKURKA:  Okay, Mr. Arnold.  Thank you
15  for talking to me.  I think the Defense attorneys will
16  talk to you, now.
17              VOIR DIRE EXAMINATION
18  BY MR. JONES:
19      Q.   I noticed on your -- the questionnaire asked
20  what your opinions were about the death penalty.  The
21  death penalty is a form of punishment that's
22  authorized by the legislature to be imposed in certain
23  kinds of cases.  This is one of them, capital murder
24  cases.
25      A.   Okay.

49

1    Q.   One of the questions in the questionnaire
2  asked what types of offenses should the death penalty,
3  you know, be used for, and you put, "Murder."  I
4  think, you put -- did you put capital murder?  I think
5  you did, but you also put rape and sexual assault of a
6  child.  Those are -- those kinds of cases are
7  nonhomicide cases, they're not death cases, so they
8  don't involve murder.
9         Do I interpret your response to mean that
10  you would be in favor of laws that make the death
11  penalty available for rape and sexual assault of a
12  child?
13    A.   I think -- I'm not saying I want the death
14  penalty to be mandatory for those crimes, but, as far
15  as the -- in my opinion, a lot of people that assault
16  children sexually, or -- or rape that have a bad past,
17  --
18    Q.   Uh-huh.
19    A.   -- extremely bad past, I should say, before
20  they commit that crime, should be eligible for the
21  death penalty.
22    Q.   Now, how -- in the -- in a case like this,
23  the -- the jury -- the way -- way punishment is
24  assessed in a case like this is not exactly like it is
25  in a nondeath penalty case, okay?

50

1    A.   Okay.
2    Q.   The -- the penalty of death is actually
3  predetermined by the legislature to be imposed if
4  certain conditions exist.  The jury sort of doesn't
5  really vote directly on death.  They vote -- they
6  decide whether these conditions exist or not.  If they
7  do, well, then, the Judge has no discretion and must
8  impose the death penalty.  If the conditions do not
9  exist, then the Judge has to impose a life sentence.
10         Now, you could argue, well, if the jury
11  knows what the result of their answers to these
12  special issues are, they -- you can say they are
13  directly voting on it.  But what the law contemplates,
14  I believe here is that the jurors will try, to the
15  best of their human ability, to answer these questions
16  truthfully based on the evidence and let the chips
17  fall where they may, okay?
18         So, let's -- let's talk -- you tell me
19  now, what conditions must be met before a -- a person
20  can be -- get the death penalty in Texas.  What's the
21  first thing that has to happen?
22    A.   They must commit a crime -- they must be
23  proven guilty of a crime that entitles them to the
24  death penalty according to the law.
25    Q.   Exactly right.  The -- you have to be found

51

1  guilty of capital murder first, okay?  Now, what --
2  what are the next -- two more conditions.  What --
3  what are those conditions that must be met?  One's
4  behind one and one is to your right.
5    A.   The jury must agree or --
6    Q.   If -- if a person is found guilty of capital
7  murder, the trial moves into a second phase --
8    A.   Right.
9    Q.   -- and the jury will hear additional evidence
10  relevant to these two special questions, --
11    A.   Okay.
12    Q.   -- and then at the end of that process,
13  they'll go back into the jury room and will deliberate
14  and try to answer these questions.  Okay.  So, let's
15  go back.  One of the first conditions is a person has
16  to be found guilty of capital murder, and the second
17  one would be what?
18    A.   They have to -- the jury has to agree that
19  they're a continuing threat to society --
20    Q.   And as --
21    A.   -- prior to -- or after proven guilty.
22    Q.   Yeah, based on the evidence.
23    A.   Right.
24    Q.   Right?  And now, in order to answer that
25  question yes, the Judge will tell, which is by

52

1  statute, that the jury's must -- vote must be
2  unanimous, all 12 must agree.  However, there's a
3  little modification in the rules here about unanimous
4  verdicts.  If 10 of the jurors of the 12 want to vote
5  no on that question, that can be the verdict.  In
6  other words, if it's 10 to 2 in favor of the
7  Defendant, then they can vote no.
8    A.   Okay.
9    Q.   Now, the Judge will also instruct you that if
10  Special Issue No. 1 is answered no, that your
11  deliberations will stop, and you'll turn the verdict
12  over -- form over to Court.  If that happens, what
13  punishment is going to be imposed?
14    A.   Life in prison?
15    Q.   That's right.  Because that second condition
16  cannot be met, right?
17    A.   Right.
18    Q.   Well, let's assume for our discussion that
19  the jury has answered unanimously Special Issue No. 1
20  yes.  These questions call for a yes or no answer,
21  okay?
22    A.   (Nods head.)
23    Q.   Which takes you to Special Issue No. 2, which
24  is at your right hand.  Would you look at that for a
25  few minutes.

53

1    A.   (Complies.)

2    Q.   Tell me when you finish reading it.

3    A.   Okay.  Done.

4    Q.   Are there any words in that -- in that issue

5  or question that you do not understand?

6    A.   No, I understand it.

7    Q.   What does -- let's see, it starts off at

8  telling the jury is that they should take into

9  consideration all of the evidence, that means at both

10  stages of the trial, the evidence they heard about

11  guilt, whether person is guilty of the crime in the

12  first place, and all the evidence that they heard in

13  the second stage of the trial, circumstances of the

14  events, the Defendant's character and background.

15         What does character mean?  If I say

16  you're a person of good character, what do I mean?

17    A.   For most parts, an opinion.

18    Q.   It's always an opinion.

19    A.   It's based around personality in most cases I

20  would say, demeanor.  And if you think I have a good

21  character, you think that I carry myself well and

22  treat you as a respectable person; and if you think I

23  have a bad character, you probably think I'm just not

24  necessarily a bad person, but you may not choose to

25  talk to me, because you don't...

54

1    Q.   Do you agree that society, our society here

2  in the United States, here in Texas or Corpus Christi,

3  that we have a -- a general code of moral behavior

4  that everybody sort of agrees with?  There's certain

5  types of behavior that we consider to be good and some

6  that we consider to be bad?

7    A.   I don't think so, not anymore.  Maybe it used

8  to be like that.

9    Q.   Well, let's pursue that a little bit.  Do you

10  think people, generally, is it right steal?

11    A.   I don't think it's right to steal.

12    Q.   Is it right to lie?

13    A.   Sometimes.

14    Q.   Okay.  Is it -- you can go through the Ten

15  Commandments, if you want to, but I have suggested

16  that character, a good character means that the person

17  adheres to this moral standard, --

18    A.   Okay.

19    Q.   -- in his behavior, as observed by the

20  people.  If you have a person who lies all the time

21  and cheats and steals and runs around on his wife,

22  and, you know, you would say, what, they have --

23    A.   I would think that --

24    Q.   -- bad character?

25    A.   -- they don't -- they're probably a fairly

55

1  selfish person, just judging by the --

2    Q.   Okay.

3    A.   -- what he had to say happened, and maybe

4  they need to think of others a little more, rather

5  than themselves.

6    Q.   Uh-huh.  So, in your -- your opinion, you

7  don't think that the way our society is today, that we

8  have any core values of -- of which we consider to be

9  the standard of good behavior or bad behavior?

10    A.   Any core values?

11    Q.   Yeah.

12    A.   No.  I can't answer for everybody else, but I

13  would say that -- you said, "core values."  That's a

14  pretty broad term.  But, altogether, I don't think

15  that there's a cookie-cutter person that's cut out and

16  decided -- every one decides that's going to be a good

17  person.

18    Q.   Okay.  Well, like the -- I keep referring to

19  the Ten Commandments, which are part of our -- one of

20  the basis of our moral code.  One of them is, "Thou

21  shall not bear false witness against your neighbor,"

22  basically, "Thou shall not commit perjury."

23  Basically, do you agree with that rule?

24    A.   Tell me what perjury is.

25    Q.   It's a lie under oath in a judicial

56

1  proceeding.

2    A.   Yes.  I agree that.

3    Q.   Do you think that should be a core value?

4    A.   If you raise your hand right, yes, I do.

5    Q.   All right.  Let's go to the next one.  It

6  says you can consider his character or background.

7  Background is your history, your biography, where you

8  were born, and who you -- your family, your education.

9         The next -- the next phrase is, "and the

10  personal moral culpability."

11    A.   Can you say that again?

12    Q.   It says that -- it's up there on the board.

13  It says, "and the personal moral culpability of the

14  Defendant."  The question asks to you consider that.

15  So let's assume that you're on the jury and you're

16  back in the jury room and you're starting to

17  deliberate and the question asks to you consider that,

18  what will you think about?  What does it ask you to

19  consider?  What is moral culpability mean?

20    A.   That -- that person as a whole.  I would have

21  to consider their past.  I would have to look at the

22  person in the courtroom and --

23    Q.   Okay.

24    A.   -- sometimes expressions can tell feelings,

25  and then I would --

57

```
1    Q.   All right.  Let's go down to the second -- I
2  mean, to the last -- well, I guess, you'd want to call
3  it paragraph there.  It says, "Is there a sufficient
4  mitigating circumstance?"  Now, keep in mind before
5  the question has asked you to consider certain things,
6  and then it -- then it says, of the things that you
7  have considered, now, are any of them, or groups of
8  them, provide sufficient mitigating circumstances that
9  would make a life sentence more just than a death
10  sentence.
11          So what does the verb "to mitigate" mean?
12    A.   Let's see here, to -- I don't know what the
13  actual word "to mitigate" means, but, my opinion, it
14  means for me to see something that would say, "Okay,
15  that's a -- a good deed that this person did," or "he
16  proved himself as a good person at this point in
17  time," so maybe that's a -- maybe a checkmark on the
18  good side versus the checkmarks, or if there's any, on
19  the bad side, to kind of level things out.
20    Q.   So what would a good deed cause you to do?  I
21  mean, let's say you hear the evidence and you hear a
22  whole laundry list of good deeds.  What would those
23  tend to want you to do?
24    A.   It would probably convince me that this
25  person does have the capability of being a good --
```

58

```
1  good person, good citizen, and I would take that into
2  consideration before making any decisions.
3    Q.   Well, let's -- well, and just pursue this
4  just a little bit further and then I'll stop.  The
5  purpose of this second question is to give you an
6  opportunity to, what we call in the business, give
7  effect to certain kind of evidence.  Let's say in a
8  particular case you had -- you're presented with a
9  laundry list of good -- good conduct, the guy was an
10  all A student in school, he was a football hero, he
11  got a bronze star in the military, you know, things of
12  that -- that kind.
13          What would that -- how would you give
14  effect to that evidence?  What would you want to --
15  what would you -- what could you do with it in order
16  to answer that question?
17    A.   I --
18    Q.   What would it tend to want -- tend to make
19  you -- how would it tend to make you want to answer
20  that question?
21    A.   I would to have something to compare it with
22  before I could answer that question.
23    Q.   Okay.  So you might balance it against some
24  bad things.
25    A.   Yes, that's what I said earlier.
```

59

```
1    Q.   So what if the good overbalanced the bad?
2  What would that cause you to want to do in answering
3  that question?
4    A.   I would have to be presented with the good
5  versus the bad to answer that question because you
6  might -- somebody might consider making straight A's
7  good and robbery a store bad, and they might -- those
8  don't equal each other out.
9    Q.   Okay.
10    A.   Even though they are one to one.
11    Q.   All right.  Now, we were talking about the
12  conditions that have to be met before a person can get
13  the death penalty.  How would special -- in order to
14  get the death penalty, what answer does the jury have
15  to answer Special Issue No. 2, yes or no?
16    A.   There -- there cannot be any mitigating.
17    Q.   So what would the answer have to be there?
18    A.   No.
19    Q.   Okay.  So it takes a yes and a no, the Judge
20  looks at those two verdicts and says, okay, that's --
21  the law says what he has to do, okay.
22          Now, what if the jury answers that
23  question yes, what happens?  Yes, there are mitigating
24  circumstances that would make a life sentence more
25  just than a death sentence, what punishment would be
```

60

```
1  imposed?
2    A.   Life sentence.
3    Q.   That's correct.  Now, once again, we have a
4  general rule that verdicts have to be based on a
5  unanimous verdict, right?
6    A.   Right.
7    Q.   But the Judge will instruct you under the
8  statute that if 10 jurors vote to answer that question
9  yes, then the -- then that can be the verdict, that
10  can can the answer.  It doesn't take 12 to answer yes,
11  it only takes 10.  But it takes 12 to answer no, okay?
12    A.   Okay.
13    Q.   In other words, a vote in favor of the
14  Defendant only takes two less votes when you're at
15  this stage of the game.  You understand that?
16    A.   Yes.
17    Q.   I mean, you will have -- you don't have to
18  memorize what I say.
19          MR. JONES:  Okay.  That's all I have,
20  Your Honor.
21          THE COURT:  All right.
22          MR. SKURKA:  I don't have any other
23  questions, Judge.
24          THE COURT:  All right.  Will you wait in
25  the jury room for just a minute?
```

61

1           VENIREPERSON NO. 47:  Sure.
2           (Venireperson exits courtroom.)
3           THE COURT:  Okay.  Mr. Skurka?
4           MR. SKURKA:  Just one moment, Your Honor.
5           THE COURT:  Okay.
6           (Brief pause.)
7           MR. SKURKA:  We'll accept the juror,
8  Judge.
9           THE COURT:  All right.
10          MR. JONES:  We want to the confer.
11          THE COURT:  I'll give you some time.
12          MR. JONES:  Okay.
13          (Brief pause.)
14          MR. GARZA:  We're going to exercise a
15  peremptory strike on this juror.  That would be number
16  six for us, wouldn't it?
17          THE COURT:  That's No. 6, yes.  All
18  right.  Let's bring him in.
19          (Venireperson enters courtroom.)
20          THE COURT:  All right.  Mr. Arnold, you
21  were not selected to be on this jury, but we do
22  appreciate your time and service.
23          VENIREPERSON NO. 47:  Thank you.
24          THE COURT:  Thank you very much.
25          (Venireperson exits courtroom.)

62

1           THE COURT:  Okay.  I'm sure we've got the
2  next person.  That would be Rolando Trevino?
3           THE BAILIFF:  Yes, sir.
4           THE COURT:  Okay, bring him in.
5           (Venireperson enters courtroom.)
6           THE COURT:  Okay.  You know what, just
7  hold on just a second, Mr. Trevino, I don't have your
8  questionnaire.  Let me go get it.
9           (Pause in proceedings.)
10          (Proceedings continued.)
11
12          VENIREPERSON NO. 57,
13               ROLAND HASETTE TREVINO,
14               VOIR DIRE EXAMINATION
15  BY THE COURT:
16     Q.   All right.  I'm sorry about that.  You are
17  Roland Trevino?
18     A.   Yes.
19     Q.   Okay.  Now that we have your questionnaire.
20  I want to talk to you about some stuff, okay?
21     A.   Okay.
22     Q.   First of all, we're picking a jury for a
23  capital murder.  You know that.
24     A.   Yes.
25     Q.   And what we're looking for is people that can

63

1  keep an open mind.
2     A.   Okay.
3     Q.   Let's begin with that.  Can you keep an open
4  mind in this case?
5     A.   I believe so.
6     Q.   Okay.  When you say, "I believe so," we get
7  nervous when people say, "I believe so," okay?
8     A.   Okay.
9     Q.   And some people say, "I believe so," and that
10  means yes, but --
11     A.   Yes.
12     Q.   Okay.  If that's you, that's fine.  You
13  haven't heard -- let's see what you've heard.  You
14  heard anything about this case?
15     A.   No, just whatever is on T.V.
16     Q.   All right.  But you agree that -- you're not
17  going to consider that?
18     A.   Yes.
19     Q.   Okay.  Because it's not really fair to
20  consider stuff you see on T.V. because I got to tell
21  you something, you know, all of us have been doing
22  this a while, and I can vouch for the fact that what
23  you see on T.V. on the news isn't always right.
24     A.   Okay.
25     Q.   In fact, a lot of times it's flat-out wrong

64

1  about these cases, okay?  So you can just consider the
2  evidence that's presented to you if you're selected on
3  this jury; is that right?
4     A.   Yes.
5     Q.   Okay.  So you can keep an open mind.
6          Next thing we need to know is can you
7  follow the law, okay?
8     A.   Okay.
9     Q.   And you have not been a juror on a jury
10  before; is that right?
11     A.   Correct.
12     Q.   That's okay.  No prior service necessary
13  here, okay?
14     A.   Okay.
15     Q.   But I need to talk to you about some stuff
16  that you may or may not know.  You may remember this
17  from school, you may not, okay?  In every criminal
18  case in the State of Texas, I believe in this whole
19  country, quite frankly, the State has the burden of
20  proof.
21     A.   Okay.
22     Q.   Okay?  In other words, the State brings the
23  charges, the law says, "You brought them, you prove
24  them."  Do you agree with that?
25     A.   Yes.

65

1    Q.   Okay?  Over here, the Defense, they don't
2  have to prove anything.
3    A.   Okay.
4    Q.   Okay.  There are places in the world where
5  the State brings charges, and then you have to prove
6  that you didn't do it.  We don't do that here.
7    A.   Okay.
8    Q.   Every person in this country, and I -- and
9  I -- you know, every person in this country, even
10  people that are noncitizens have these rights.  It's a
11  great place to live.  And one of the reasons it's a
12  great place to live is because we have these rights,
13  all right?  And they're all of our rights.  They're
14  not just his, they're everybody's right, okay.
15         As part of that, the burden of proof is
16  beyond a reasonable doubt, and that's a high stand
17  standard.  It's not beyond all doubt, beyond a
18  reasonable doubt, all right?
19    A.   Okay.
20    Q.   It's a high standard, okay?  And we do that
21  because, you know, obviously the State is seeking to
22  take away -- the State is seeking to take away your
23  freedom or liberty, better be good.
24    A.   All right.
25    Q.   All right?  You got to have a good reason.

66

1    A.   Okay.
2    Q.   You got to have real strong evidence, not
3  just kind of sort of evidence.  You agree with that?
4    A.   Yes.
5    Q.   Could you hold the State to that burden?
6    A.   Yes.
7    Q.   Okay.  Next thing, law says that since the
8  State has the burden of proof, it never shifts over
9  here.  Defendant is presumed to be innocent until the
10  State can prove otherwise, if they can.  They may not
11  be able to.  All of us are presumed to be innocent
12  until charges are brought against us and they're
13  proven.
14    A.   Okay.
15    Q.   Okay?  And who are they proven to?  The
16  people.
17    A.   People.
18    Q.   The people, okay?  So, you got -- if you're
19  selected on this jury, you got to presume that he's
20  innocent until the State can prove to you otherwise,
21  if they can.  You can follow that law?
22    A.   Yes.
23    Q.   Yeah, we lawyers, we have -- we like to ask
24  this question of jurors.  And, in a way, I think it's
25  kind of silly, because it's a -- but it's a -- it's a

67

1  question that's never really asked but the question
2  goes something like this:  If you had to vote right
3  now, how would you have to vote?
4    A.   Right now he's not guilty.
5    Q.   That's it.  Okay?  And why?  You haven't
6  heard any of the evidence against him, hadn't been
7  presented to you.
8    A.   Uh-huh.
9    Q.   Okay?  And, you know, maybe the State will
10  present their evidence and it won't be any good.
11    A.   Right.
12    Q.   And if it's not any good, if it's not to that
13  standard, what do you do?
14    A.   He's not guilty.
15    Q.   That's it.  All right, now, the law says --
16  because the burden never shifts over here, never
17  shifts over here, always over there with the State.
18  The law says in the Constitution of the United States,
19  and we're not talking about something our legislature
20  has done, it is in the Constitution of the United
21  States.  It was in there first day.  It's in the Bill
22  of Rights, right out of the -- right out of the chute
23  and it's never been changed, and that is -- and it
24  makes sense, really, Defendant doesn't have to
25  testify.  Why?  Because they don't have to do

68

1  anything.  The burden is always over there with the
2  State, okay.
3         It makes sense, really.  The whole thing
4  kind of fits together.  You -- you bring the charges,
5  you got to prove them.  You don't have to do anything.
6  But it's even further than that.  Not only does he not
7  have to testify and they can't make him testify, jury
8  can't hold it against him, okay.
9         Now, I submit there's a lot of reasons
10  why a person may not want to testify.  Maybe his
11  lawyer tells him not to, maybe his lawyers say, "They
12  haven't proven their case.  I'm instructing you not to
13  testify."  Maybe he -- you know, not all of us are
14  meant for the stage, right?
15    A.   (Nods head.)
16    Q.   I speak very well in front of people because
17  I get a lot of practice, okay?  I mean, this is --
18  this is a place where I work every day.  But some
19  people get nervous in the courtroom, all right?
20  They're not used to it.  Maybe he -- maybe he stutters
21  when he gets nervous.  Maybe he sweats profusely.
22  Some people, they laugh inappropriately and people
23  take it wrong, okay?  They're nervous and they laugh.
24  I had a friend like that, you know?  He was nervous
25  and he laughed.  He'd get nervous, he'd laugh.  And

69

1  people would take it wrong, okay.

2          There's lots of reasons why somebody

3  doesn't want to testify, all right?  But the fact of

4  the matter is, regardless of the reason, if you're

5  selected on this jury, you can't hold it against him,

6  okay?  Would you follow that law and not hold it

7  against him if he chose not to testify?

8      A.   Yes.

9      Q.   Okay.  Because we don't know.  He may or he

10  may not.  But if he doesn't, I need to know that you

11  won't hold it against him.

12     A.   Okay.

13     Q.   All right.  Now, let's talk about this case,

14  specifically.  This case is a capital murder, okay?

15  And what's capital murder?  Well, within capital

16  murder is the word, "murder," right?  So we know

17  there's a murder alleged, all right?  So what's

18  murder?  Murder's the intentional taking of the life

19  of another.

20     A.   Uh-huh.

21     Q.   Okay, you follow me?

22     A.   Yes.

23     Q.   Murder -- I don't -- I don't know how else to

24  put it, plain murder, murder by itself, is not a

25  capital felony, which means -- what's that?  Well,

70

1  that means the death penalty is a possibility.

2  Capital felony, death penalty possibility.  Murder by

3  itself is not that.  It's a first degree felony, it's

4  a serious offense, but it's not the death -- you can't

5  get the death penalty for just murder, which sounds so

6  strange to say, "just murder."  Okay?

7          But this is murder plus.  And there's a

8  laundry list of things that the legislature has told

9  us that are capital murder, okay?  In this case, it's

10  murder plus robbery or attempted robbery, okay?

11  Robbery is a serious crime, right?

12     A.   Uh-huh.

13     Q.   Murder is a serious crime.  And the

14  legislature says if you commit a murder while you're

15  trying to, attempting to, or committing a robbery at

16  the same -- you know, when you -- put together, that's

17  a capital murder, and you can get the death penalty

18  for that, okay?

19     A.   Okay.

20     Q.   Now, there's a lot of elements.  I mean, they

21  got to prove all the elements of murder, and all of

22  the elements of -- of robbery, and they got to prove

23  in Nueces County, Texas, on the given day they've

24  said, okay?

25     A.   Okay.

71

1      Q.   Or on or about the given day they've said.

2  So there are a lot of elements they've got to prove.

3  Would you hold them to that burden and -- and have

4  them prove every element of the offense to you?

5      A.   Yes.

6      Q.   Okay.  Now, you've never been on a jury

7  before, but I'm telling you this is how the jury

8  system works.  The first part of the trial, the jury

9  decides guilty, not guilty.  That is, you hear the

10  evidence that's presented to you and you go back there

11  and you deliberate and you decide guilty or not

12  guilty.

13          If Defendant is found not guilty, that's

14  the end of the case, go home.  Okay?  If the Defendant

15  is guilty of capital murder, then we go on to phase

16  two, all right?  We call that "the punishment phase."

17  And, in most cases, other than capital murder, there

18  is a set, like, a punishment range.

19     A.   Uh-huh.

20     Q.   Like, for murder, it's 5 to 99 years or life,

21  maybe even probation is an option, a fine is an

22  option.  We don't do that in capital murder.  In

23  capital murder, there's two things that can happen if

24  they're found guilty of capital murder, that is, this

25  Defendant, if he's found guilty of capital murder, two

72

1  possibilities, life in prison or death.  I mean, and

2  they're both serious, okay, you agree with me?

3      A.   Yes.

4      Q.   Okay.  So, but how do we get there?  A little

5  bit different than -- the jury doesn't have a little

6  blank and they write death or life.  We don't do that,

7  okay?  We answer questions.  And here's the first one

8  over here if you'll look over your shoulder:  "Is

9  there a probability the Defendant would commit

10  criminal acts of violence that would constitute a

11  continuing threat to society?"  Okay?

12     A.   Okay.

13     Q.   That's a -- you know, is he going to be -- is

14  he going to be a continuing threat?  Do you think that

15  -- that it's more likely than not that he is going to

16  be a violent person in the future?

17     A.   Uh-huh.

18     Q.   Okay?  If you think -- if you think -- the

19  jury says yes or no.  If you think no, well then you

20  answer no.  If you think yes, well then you answer

21  yes.  And you go on to Special Issue No. 2.  "After

22  talking into consideration all the evidence, including

23  the circumstances of the offense," now that's a --

24  that's the first part of the case, okay, "the

25  Defendant's character and background, and the personal

73

1  moral culpability of the Defendant, is there a
2  sufficient mitigating circumstance or circumstances to
3  warrant a sentence of life imprisonment or a death
4  sentence be imposed?"
5          Now, at the second half of the trial, you
6  may be presented other evidence.  That is, not about
7  the crime because you already heard about the crime,
8  but you might be presented stuff like, you know, he's
9  a good guy, he helped kids.  Maybe he's a bad guy.
10  Maybe he's got a bad criminal history.  Good stuff,
11  bad stuff.  We don't know, okay.
12          And, really, what this question is asking
13  you to do is taking into consideration everything, not
14  just what happened that day, but everything that's
15  presented to you, what kind of guy he was, you know,
16  what his background is like, stuff like that, --
17      A.  Uh-huh.
18      Q.  -- should he get life or should he -- is all
19  of this stuff -- maybe you hear a bunch of good stuff,
20  and maybe -- and it's up to you to decide what these
21  mitigating circumstances are.  "Mitigating
22  circumstance" means something that would lessen the
23  punishment, okay?  It's something in his favor, you
24  know, and you basically look at all the things in his
25  favor and you say, "You know, do I think that there's

74

1  -- all this stuff in his favor is enough to warrant
2  life rather than death?"  Maybe other than that day he
3  was a great person, okay?
4      A.  Uh-huh.
5      Q.  And not to say he's not going to get
6  punished.  You know, you're already at life or death,
7  okay, so he's going to get punished, but -- but the
8  question is, you know, is there anything back there in
9  his background that warrants life, rather than death,
10  okay?  You understand that?
11      A.  Yes.
12      Q.  At the beginning of this trial, I'm going to
13  ask the jury to take an oath, and that oath goes like
14  this:  "Do you solemnly swear that you can render a
15  true verdict based upon the law and the evidence
16  presented to you," and the jury will say yes, but I
17  need to know from you, can you take that oath?
18      A.  Yes.
19      Q.  Okay.  Let's talk -- let's break it down.
20  Guilt or innocence.  Can you take the oath to hold the
21  State to their burden of beyond a reasonable doubt,
22  listen to the evidence and render a true verdict based
23  upon the law and the facts?
24      A.  Yes.
25      Q.  All right.  Second part, these questions.

75

1  Some people tell me, "I cannot participate in the --
2  in a -- I can't take your oath because I can't
3  participate in something that could lead to the death
4  of someone else," because that's a possibility here.
5      A.  Yeah.
6      Q.  All right?  And then other people say, "Well,
7  if -- if I find him guilty of capital murder, these
8  questions mean nothing to me, death.  I'm not going to
9  consider this stuff."
10      A.  Okay.
11      Q.  "I'm always going to vote death.  I don't
12  care about his background.  I don't care about this
13  one.  I don't care if he's not going to be a threat.
14  I'm always going to vote for death," okay?  I need to
15  know if you can truthfully answer these questions, or
16  if you're one of those people that's already decided
17  before you've heard anything.
18      A.  I can answer the questions.
19          THE COURT:  All right.  Mr. Skurka?
20              VOIR DIRE EXAMINATION
21  BY MR. SKURKA:
22      Q.  Hi, Mr. Trevino.  My name is Mark Skurka.
23  I'm a first assistant district attorney.  This is
24  Geordie Schimmel, he's also an assistant district
25  attorney.  He's the one that's assigned to Judge

76

1  Galvan on a regular basis, or a daily basis, and
2  together we'll be presenting this case to you, if
3  you're selected on this jury.
4          I want to start off by telling you
5  there's no right or wrong answers to anything you say.
6  We just want to kind of hear how you feel about
7  certain things, certain issues, to see if you'll be
8  qualified as a juror.  Please don't answer the
9  questions in a way you think that I want to hear you,
10  or the Judge wants to hear it, or the Defense wants to
11  hear it, you just tell us how you feel.  Can you do
12  that for us?
13      A.  Yes.
14      Q.  How do you feel about being on this type of
15  jury?
16      A.  I don't know if I want to.
17      Q.  Tell me about that.
18      A.  No.  I don't know, it just -- I don't -- I
19  don't like the idea.
20      Q.  Why?
21      A.  I just don't like it.  I don't know.
22      Q.  Okay.  You understand you have a perfect
23  right to the feelings you have, but, you know, some --
24  and people have told us, you know, some people will
25  say, "Gosh, you know, I don't know if I can do this

77

1    kind of case.  You know, if you would have called me
2    for a D.W.I. case or a shoplifting case, or a burglary
3    case, I can do that kind of case, but I'm not sure I
4    can do this kind of case it's a death penalty."  Is
5    that kind of where you're coming from?
6        A.   Yeah.
7        Q.   Okay.  Can you tell us a little more so the
8    Judge can help make a decision?
9        A.   I just don't like the idea.  I don't know.
10       Q.   Is that because of some kind of religious
11   reason or --
12       A.   No.
13       Q.   -- personal reasons?
14       A.   Personal reasons.
15       Q.   Just personal reasons?
16       A.   Uh-huh.
17       Q.   So, just to follow up, I'm not -- and, again,
18   I'm not arguing with you.  If you can't do it, you
19   can't do it.  But you understand, to be on this jury,
20   there's going to be -- if you get on this jury,
21   there's going to be a day in time where I -- you know,
22   I told you the very first day, the State is seeking
23   the death penalty.  If you're on this jury, there's
24   going to come a time that after the evidence is
25   presented I'm going to ask you to answer the questions

78

1    after hearing all the evidence that would lead to this
2    man's execution.
3             And look at him.  That's him.  It's not
4    somebody you read about in the paper or you hear about
5    on the news, that's him.  Do you think you could
6    participate in that kind of decision?
7        A.   I could, but I don't want to.
8        Q.   Well --
9             THE COURT:  I got to tell you, I --
10   there's very few people that --
11            VENIREPERSON NO. 57:  That want to, yes.
12            THE COURT:  -- want to.  And if you can't
13   do it, it's okay.  I mean, if you tell us right now,
14   if you say, "I cannot do this," we're not going to
15   make you do it.
16       A.   I wouldn't want to do it.  I could, but I
17   don't want -- want to.
18            THE COURT:  Okay.
19       Q.   (BY MR. SKURKA)  Well, I understand your
20   position because I think what you're torn in -- and I
21   may be wrong but sometimes people say, "You know, it's
22   my duty as a juror to -- it's my civic duty, and I
23   don't want to run away, I don't want to tell the Judge
24   I don't want to be a good citizen."
25       A.   Uh-huh.

79

1        Q.   But on the other hand, it sounds to me you
2    could be a good citizen and do your civic duty if it
3    was one of those other kind of cases.  But is it the
4    fact that you might have to decide the death penalty,
5    is that what's hanging you up on it?
6        A.   Yes.
7        Q.   Okay.  Like -- like it it was a burglary case
8    where you had to give, you know, probation or five
9    years in prison, or something like that, you could do
10   that kind of case?
11       A.   Yes.
12       Q.   But it's just because of your personal
13   feelings, it would be hard for you to vote in such a
14   way to give the death penalty.
15       A.   Yes.
16       Q.   Okay.  And when I say, "hard to do," and I
17   understand what you're -- the Judge was trying to
18   clear that up, too.  Like nobody wants to.  I'm not
19   telling you everybody's going to volunteer to do that,
20   but, on the other hand, it's okay to say whatever you
21   say.  If you feel that your feelings, your personal
22   feelings, are going to substantially interfere with
23   you sitting on this jury and make the decision on the
24   death penalty, if you can't -- if that would
25   substantially impair your ability to serve as a juror,

80

1    just tell us.
2        A.   I don't want to do it.
3        Q.   You don't want to do it.  Okay.  Thank you,
4    Mr. Trevino.  And, again, there's no right or wrong
5    answers in anything.  I can -- I could see you're
6    getting a little upset about having to be put in that
7    position.  And we're not trying to pick on you, we
8    just need to know where you're coming from, okay?
9        A.   Yes.
10            MR. SKURKA:  Thank you, Mr. Trevino.
11            THE COURT:  You-all want to ask him
12   anything?
13            MR. GARZA:  Thank you, Your Honor.
14            VOIR DIRE EXAMINATION
15   BY MR. GARZA:
16       Q.   I just want to ask you a few questions, if I
17   can.
18       A.   Okay.
19       Q.   I personally hate paying taxes.  You know
20   that?
21       A.   Yes.
22       Q.   I do, I hate doing that.  I hate yard work.
23   But, you know, as citizens, as people, as Americans,
24   as Texans, well, you know, we have to do that.
25       A.   Yeah.

81

1    Q.   Would you agree with me?

2    A.   Yes.

3    Q.   Okay.  And so what we need to know is, is

4  this the kind of case that would make you feel so

5  uncomfortable that you couldn't possibly assist us in

6  serving as a juror and listening to the case, taking

7  the oath and answering these questions because of how

8  you feel about the death penalty?  In other words, is

9  there a certain bias or is there a certain meaning

10  that you already have against the death penalty that

11  would maybe preclude from you being a fair and

12  impartial juror in this case?

13    A.   No.

14    Q.   No?

15    A.   No.

16    Q.   Are you sure?

17    A.   Uh-huh.

18    Q.   See, I mean, there's a lot of things we don't

19  like to do?

20    A.   Yes.

21    Q.   We might not like going to work, we might not

22  like having to serve in the Armed Forces, we might not

23  like paying taxes, paying for a ticket.  You know, we

24  have might disagree about why the police officer gave

25  us a ticket, and all that and whatever.  But, as good

82

1  citizens, you know, we -- we have to do those -- those

2  things.

3    A.   (Nods head).

4    Q.   And this is jury duty.  I mean, we're not

5  having to storm the beach, or avoid I.E.D.s, or a

6  sniper firing on us.  We're in air-conditioned

7  comfort.

8    A.   Uh-huh.

9    Q.   But it is a serious case.  It's a serious

10  case that could involve the taking of this young man's

11  life, depending on how you decide the case, okay?

12    A.   Yes.

13    Q.   And -- and what we need to know is, is

14  there -- is there -- I guess let me just ask this

15  question:  The way you feel about the death penalty,

16  do you think that this -- it would be -- it would be

17  too hard for to serve on this jury?

18    A.   I think it would be hard.

19        THE COURT:  The bottom line is this, I

20  think Mr. Garza explained it pretty well.  I don't

21  like paying taxes, either, but, you know what, I pay

22  it.  I don't like it.  You don't -- you don't want to

23  the serve on this jury.

24        VENIREPERSON NO. 57:  Yes.

25        THE COURT:  I can -- I can respect that.

83

1  Most people don't, but I need to know if you can.

2  Because some people say, "I can't.  I can't, Judge.  I

3  can't.  I'm not going to follow the law if you seat me

4  on this jury, I can't do it," and then other people

5  say, "Ooh, this is tuff, but if you call upon me to do

6  it, I'll follow the law.  I'll answer the questions.

7  Am I going to like it?  Am I going to enjoy this?  No

8  way.  But you call upon me to do it, I'll do what I

9  have to do."  And I need to know if that's you.

10        VENIREPERSON NO. 57:  That's the way I

11  feel.

12        THE COURT:  Okay.  Mr. Garza?

13        MR. GARZA:  Your Honor, can I continue

14  with some questions?

15        THE COURT:  Sure.

16        MR. GARZA:  Okay.

17    Q.   (BY MR. GARZA) Mr. Trevino, you remember

18  having heard something about this case on T.V.?

19    A.   Uh-huh.

20    Q.   What do you remember hearing about it?

21    A.   I just remember hearing about him, that they

22  couldn't find him.  Basically it.

23    Q.   Okay.  Have you formed any sort of opinion

24  about his guilt?

25    A.   No.

84

1    Q.   Okay.  Now, you answered about how -- when

2  you were asked how you felt about the death penalty,

3  you said, "I feel if found guilty and all the evidence

4  shows he would probably do it again, then I would say

5  okay."  Is that how you feel about it?

6    A.   Yes.

7    Q.   I know it's difficult, but I guess what we're

8  asking you is can you -- can you sit through this kind

9  of a case, if we pick you as a juror, and do your

10  duty?

11    A.   Yes.

12    Q.   Can you do that?

13    A.   Yes.

14    Q.   Okay.  You also indicated that you believed

15  the death penalty is appropriate in some capital

16  murder cases, and that you could vote for the death

17  penalty in the proper case.

18    A.   Yes.

19    Q.   Is that still true, also?

20    A.   Yes.

21    Q.   Okay.  "The best argument for the death

22  penalty is if it would be done again."

23    A.   If I think it would be done again?

24    Q.   How -- what -- do you think that the death

25  penalty prevents crime?

85

1    A.   No.

2    Q.   Do you think it deters crime?

3    A.   I think it deters it a little bit.  I don't

4  think it...

5    Q.   Do you think protects our society?

6    A.   No.

7    Q.   No?

8    A.   No.

9    Q.   Okay.  What about the best argument against

10 the death penalty?

11   A.   Best argument against it?

12   Q.   Yes, sir.

13   A.   Would be -- I think you could argue against

14 it if you don't think it would happen -- if you can

15 get away with it.  I don't know, I just got my mind...

16   Q.   What about the innocent people?  What if you

17 were innocent of the crime?

18   A.   If you're innocent, you shouldn't get death

19 penalty.

20   Q.   Right.  What if -- what if -- well, like,

21 let's talk about these issues here.  What if -- what

22 if after the State of Texas proves its case to you

23 beyond a reasonable doubt and then they're going to

24 ask you, "Is there a probability," under Special Issue

25 No. 1, "that the Defendant would commit criminal acts

86

1  of violence that would constitute a continuing threat

2  to society," what if they couldn't prove that to you?

3  What if they -- what if this was his first offense,

4  never had done something like that ever, at all,

5  could -- and -- and the State of Texas has no other

6  evidence to show you about that issue?

7    A.   Okay.

8    Q.   Would that be -- wouldn't that be sort of an

9  argument against the death -- death penalty?

10   A.   Yes.

11   Q.   Okay.  What if he was a -- an Eagle Scout?

12 What if he had been a decorated war hero?  What if he

13 had been involved in doing a lot of things in the

14 community and had a real good life up until the time

15 that this particular incident happened?  Would that be

16 an argument against the death penalty, in your mind?

17   A.   In my mind, it would be.

18   Q.   Okay.  You believe that the death penalty is

19 imposed about right.  That's what you answered in your

20 question.

21   A.   It's about right.

22   Q.   Okay.  And you also said that serving a life

23 sentence in prison would be more severe instead of the

24 same or less severe.

25   A.   Uh-huh.

87

1    Q.   Why did you answer it that way?

2    A.   Because you -- to me, you would have more

3  time in prison than if you were just lethal injection,

4  or anything.  You have to think about it longer, about

5  what you did.

6    A.   Okay.

7    Q.   And then, you were asked, "On a scale of one

8  to ten, how strongly do you believe in the

9  death penalty?  One being the least, ten being the

10 strongest," you answered, "Five."  Right down the

11 middle.  Is that how you feel about it?

12   A.   (Nods head.)

13   Q.   Okay.  Now, in spite of the fact that it

14 would make you feel very uncomfortable and difficult

15 for you to sit on this kind of a case, could you still

16 do it?

17   A.   I could.

18           MR. GARZA:  Thank you, sir.  I'll pass.

19           MR. SKURKA:  May I follow-up, Judge?

20           THE COURT:  Sure.

21                VOIR DIRE EXAMINATION

22 BY MR. SKURKA:

23   Q.   Hi, Mr. Trevino.  We're going to go talk a

24 little bit more about that because you've kind of

25 given different answers.  When I first asked you, you

88

1  said, "I don't know if I want to do it," then you

2  said -- you told the Judge, "I can't do it," and you

3  said, "I don't want to do it," then you kind of -- the

4  Defense lawyer kind of compared it with paying your

5  taxes, you don't like to do it, but you have to do it.

6           Well, I'll be honest with you, this ain't

7  like paying taxes.

8    A.   I know.

9    Q.   This is somebody's life.  Let me -- and

10 there's nothing wrong with feeling that you can't

11 participate in making a decision.  Let me give you an

12 example.  My wife loves animals.  She loves cats.  One

13 day we were driving down the highway and I hit a cat

14 on the -- in the car, and we pulled over to the side

15 to see if it was okay, and my wife was very, very

16 upset about this.  And we pulled over to the side of

17 the car -- to the side of the road, and this cat was

18 in -- it wasn't dead, it was in a lot of pain.  It was

19 a lot of pain.  And my wife was very upset about that.

20 And -- and it was clear that the cat was not going to

21 make it and the cat was suffering.

22   A.   Uh-huh.

23   Q.   My wife has a good heart.  She did not want

24 to see that cat suffer anymore.  She knew the right

25 thing to do was to take it to the vet and put it out

89

1  of its misery. I mean, she knew that was the right
2  thing to do. She's a smart women. She knows that
3  that cat couldn't be repaired, and it couldn't do
4  that. But she couldn't put the cat out of its misery
5  itself. You know what I'm saying?
6      A.  Yes.
7      Q.  She had to get somebody else to do it. She
8  wanted me to take care of it, and take it somewhere to
9  do that. Because, even though she knew the cat was
10  suffering, she could not put it out of its misery.
11  It's like, sometimes you see on T.V., these -- you
12  know, the kid has a horse and the horse breaks its leg
13  and they have to shoot the horse, but -- they
14  understand it needs to be done, but they don't want to
15  be the one responsible for doing it.
16     A.  Okay.
17     Q.  That's kind of what I see from you. Is that
18  a stupid story, or does that make sense?
19     A.  It makes sense.
20     Q.  Okay. And, you know, I love my wife to
21  death, she's a good person, but, you know, she just
22  could not follow through on -- on putting this animal
23  down.
24     A.  Yes.
25     Q.  And you seem to be the person that has pretty

90

1  strong feelings about this, right?
2      A.  (Nods head.)
3      Q.  Taking somebody else's life is pretty strong.
4  That's not the same as, you know, paying your taxes or
5  not paying your taxes. So, you know, hearing that
6  kind of position, is that the kind of person you are
7  that, you know, you know it needs to be done, and you
8  know it's a civic duty, but it would really weigh on
9  you and interfere with you actually sitting on the
10  jury.
11     A.  Yes.
12     Q.  Yes, it would?
13     A.  Yes.
14     Q.  Okay.
15          THE COURT: So you don't think you can do
16  this?
17          VENIREPERSON NO. 57: I don't think I
18  could do it.
19          THE COURT: Okay.
20          MR. SKURKA: That's all the questions I
21  have then, Judge.
22          THE COURT: Okay. Anything else?
23
24
25          VOIR DIRE EXAMINATION

91

1  BY MR. GARZA:
2      Q.  Mr. Trevino, we understand that you can't do
3  it, but I guess what we need to know is that
4  there's -- there's an oath you have to take that the
5  judge explained to you.
6      A.  Yes.
7      Q.  There's these issues that need to be
8  addressed, if we get there. There's the presumption
9  of innocence, the -- the State's burden of proof, our
10  client's Fifth Amendment right to remain silent and
11  not have to testify in this case. Can you follow the
12  law --
13     A.  I can follow the law.
14     Q.  -- and still serve as a juror in this case,
15  even though you don't want to do it?
16     A.  Yes, I could.
17          VOIR DIRE EXAMINATION
18  BY THE COURT:
19     Q.  Okay. All right. Here's the deal, Mr.
20  Trevino, you're going to have to tell us -- you --
21  you've gone both ways.
22     A.  Yes.
23     Q.  Only you know. You got to tell us, okay?
24  You -- you tell him one thing and you tell him
25  another. You got to tell us. If you can't do this

92

1  that's okay. If you can't follow the law and take
2  this oath, that's okay. You got to tell us. But I
3  got to know if you can or if you can't. If you can do
4  it, that's fine. If not, we'll get somebody else.
5  It's not -- it's not a big deal, but we got to know.
6  Can you do it or not?
7      A.  I can follow the law but I feel I can't do do
8  it.
9          THE COURT: Okay.
10          MR. JONES: I -- I don't if we get -- I
11  don't know what he means when he says he can't do it.
12  The jury -- the -- he has to be able to answer those
13  --
14          THE COURT: I know, and --
15          MR. JONES: -- special issues.
16          THE COURT: -- that's why I -- that's why
17  I'm asking him.
18          MR. JONES: If he --
19     Q.  (THE COURT) Can you -- Here's the deal, okay?
20  And I -- you know, Mr. Skurka said at the beginning,
21  don't answer this like you want him to hear -- we
22  don't -- it's you, okay? Don't -- you're not going to
23  hurt our -- my feelings or his or his or his. You're
24  not going to hurt our feelings, okay?
25     A.  Okay.

93

1   Q.   And -- but you're going to have to tell us --
2   you're going to have to -- because you're kind of on a
3   line.  We've got to put you on one side or the other.
4   I mean, and this is serious business, okay?  This is
5   not -- I know we all -- we're all very serious, here,
6   and -- and I know this is hard for you, okay?  This is
7   not something that you have ever had to confront in
8   your life.
9   A.   Uh-huh.
10   Q.   And you may never have to confront this
11   again, okay?
12   A.   Okay.
13   Q.   The law says, like I told you, I'm going
14   to -- I'm going to administer an oath.  Some people
15   tell me, "I cannot take your oath because I cannot
16   participate because of my personal feelings."  Other
17   -- nobody wants to sit on this jury.  Nobody.  You
18   know?  I -- I'm proud of you that you say it's not
19   something that you want to do.  I -- I want 12 people
20   on this jury that say, "You know what?  This isn't
21   something I want to do.  But, if I have to do it, I'll
22   do it."  Okay?  So I'm proud of you about that.
23         On the other hand, I need to know if you
24   can take the oath.  If you can't, it's okay.  But I
25   need to know from you, can you -- can you do this, can

94

1   you take the oath?  I know you don't want to.  That's
2   not the -- that's not the question.  Can you take the
3   oath or can you not take the oath?
4   A.   I can't take the oath.
5         THE COURT:  All right.  Go wait in the
6   jury room and we'll get right back with you.
7         (Venireperson exits courtroom.)
8         MR. SKURKA:  State will move to
9   challenge this juror for cause, Your Honor.
10         THE COURT:  I mean, I --
11         MR. JONES:  He can't take the oath.
12         THE COURT:  I -- I pushed him in as a
13   neutral way as I could, but I'm just -- he was -- he
14   went both ways, and I finally told him, "You got to
15   get on one side of the line or other, it's okay."
16         But he can't take the oath, so the
17   challenge for cause is granted.  Let's bring him in.
18         MR. SKURKA:  We appreciate his honesty,
19   so -- that's for sure.
20         (Venireperson enters courtroom.)
21         THE COURT:  Listen, Mr. Trevino, we told
22   you there's no right or wrong answers.  We appreciate
23   your honesty.  Thank you very much for serving.  You
24   know, it's -- it's just as much as a civic duty to
25   come in here and get on that witness stand and tell us

95

1   the truth than it is to serve on a jury.
2         So we thank you for your honesty.  And if
3   you need a work excuse, the bailiff can get that for
4   you.
5         VENIREPERSON NO. 57:  Okay.
6         THE COURT:  Thank you, very much.
7         VENIREPERSON NO. 57:  Thank you.
8         (Venireperson exits courtroom.)
9         THE COURT:  All right, let's take a
10   little break.  We're a little behind but that's okay.
11         (Short recess.)
12         (Venireperson enters courtroom.)
13         THE COURT:  All right.  Mr. Foster, we're
14   doing our best, but we're a little behind.
15         VENIREPERSON NO. 58:  That's all right.
16         THE COURT:  So, we're sorry, but...
17
18         VENIREPERSON NO. 58,
19         JESSE LEE FOSTER,
20         VOIR DIRE EXAMINATION
21   BY THE COURT:
22   Q.   Okay.  You are Mr. Foster?
23   A.   Yes.
24   Q.   Okay.  All right.  Mr. Foster, we're looking
25   for jurors, okay, and you know that.  And we're

96

1   looking for jurors that can keep an open mind, okay?
2   A.   All right.
3   Q.   Is that you?
4   A.   Yes.
5   Q.   Okay.  Second, we are looking for jurors that
6   can follow the law, okay?
7   A.   Yes.
8   Q.   You've never been a juror before.
9   A.   Never.
10   Q.   That's okay.  There's no requirement about
11   that.  Okay, let's talk about some concepts.  First of
12   all, in every -- in every case in the State of Texas,
13   criminal, that is, State's got the burden of proof.
14   They brought the charges.  The law says "You bring,
15   them, you prove them."  You agree with that?
16   A.   I agree.
17   Q.   Okay.  Second, the burden of proof is beyond
18   a reasonable doubt.  And I think -- I think I saw
19   something when I was flipping through your
20   questionnaire, and you even mentioned that term, okay?
21   Beyond a reasonable doubt is the highest standard we
22   have in the law, all right?  It's not beyond all
23   doubt, it's not beyond a shadow of a doubt, but it is
24   the highest standard, beyond a reasonable doubt.  Will
25   you you hold the State to that burden?

97

1  A. Yes.

2  Q. Okay. Next thing, the law says, "Okay,

3  State, you charge, you prove. Until do you so,

4  everyone in this country is presumed to be innocent,

5  until you can prove otherwise," all right? It's

6  called "the presumption of innocence." Ancient

7  concept. All right? It's been with -- it goes all

8  the way through Western society back to the Greeks,

9  okay? And the idea is, "Hey, State, unless you can --

10  until you can prove it, if you can prove it, every

11  person is innocent until proven guilty, and that

12  extends to the person charged in this case." Do you

13  agree about that?

14  A. I agree.

15  Q. Can you follow the law on that?

16  A. I can follow the law.

17  Q. And you understand that at this point, if you

18  had to vote, the Defendant would be not guilty.

19  A. At this point?

20  Q. At this point.

21  A. At this point, not guilty.

22  Q. Uh-huh. And if the State puts on evidence,

23  and -- and you don't think it rises to the -- to the

24  burden of proof that's required, that is, reasonable

25  doubt, what would you do?

98

1  A. Not guilty.

2  Q. Okay. Now, as part of all this -- these

3  things are all intertwined, okay? The next part of it

4  is, the Constitution of the United States says

5  Defendant doesn't have to testify. It's his right not

6  to, and it really makes sense because if the State's

7  got the burden of proof, then the Defense doesn't have

8  to do anything. And if the Defendant testifies, it's

9  just part of what the Defense may or may not do, but

10  they don't have to do anything and he doesn't have to

11  testify, okay. And that's in the Bill of Rights, and

12  it's been with us since day one of the Constitution,

13  okay?

14  But the law is a little bit stronger than

15  that. It's -- it goes beyond he doesn't have to

16  testify and they can't make him testify. The law says

17  the jury can't hold it against him. They can't --

18  they can't put a mark on the State's side if he

19  doesn't testify because this isn't about hearing both

20  sides of the story. This is about can they prove

21  their case.

22  We're not -- we're not running a race

23  here, and you see, you know, which runner ran the

24  fastest. They've got to prove their case. They got

25  to get across the finish line, and the race is, do

99

1  they get across the finish line or do they not. You

2  follow me?

3  A. Yes.

4  Q. Okay. So, would you hold it against the

5  Defendant if he chose not to testify?

6  A. No.

7  Q. Okay. This is a capital murder. Okay. That

8  means it's a capital felony, and what's a capital

9  felony? A capital felony is anything that -- that the

10  punishment -- a possible punishment is death, okay?

11  Serious business, all right? Well, murder, by and in

12  and of itself is not a capital felony. It's a first

13  degree felony, it's a serious felony, but it is not a

14  capital felony. And murder, of course, is the

15  intentional taking of the life of another.

16  That by itself doesn't get you there.

17  The legislature says there is a -- there is a laundry

18  list of what makes capital murder. Murder, plus.

19  Murder, plus something else, okay?

20  In this case, they're alleging murder,

21  plus robbery or attempted robbery, okay? Robbery, the

22  forcible taking of something from another, or the

23  threat -- you know, threat to take something. In

24  other words, I came to you and I said, "Give me your

25  money or I'm going to beat you up," and you gave me

100

1  your money. That would be robbery. Okay?

2  Attempted robbery, you know, can qualify

3  as well. I came to you and I said, "Give me your

4  money or I'm going to beat you up," then he beat me

5  up, okay? So it's still an attempted robbery because

6  I -- I threatened you with -- with force. Just

7  because I didn't fulfill it doesn't mean it's not an

8  attempted robbery, okay?

9  So what the State has to prove is

10  murder, while in the course of committing or

11  attempting to commit a robbery. They got to prove all

12  of it. And the legislature says, "Hey, if you get

13  robbery and murder and you put them together, that's

14  capital," okay, that's -- that's something that you

15  can get the death penalty for. You follow me?

16  A. Yes, I understand.

17  Q. Okay. Now, the law says you got to prove all

18  the elements, though. They bring the charges, they

19  got to prove all the elements, that is, that on the --

20  on the given day alleged, or on or about, okay, the

21  given day alleged, in Nueces County, Texas, that this

22  Defendant committed the offense of murder while in the

23  course of committing robbery or attempting to commit

24  robbery. They got to prove all of it. They don't

25  just get to prove seven out of eight, or eight out of

101

1  nine elements, whatever they -- number they are, okay?
2  They have to prove it all.
3         I need to know, if they don't prove it,
4  all the elements, what are you going to say?
5     A.  Not guilty?
6     Q.  And if they prove them all beyond a
7  reasonable doubt to you?
8     A.  Guilty.
9     Q.  Okay.  If -- well, let me back up.  We have a
10  bifurcated system in -- in the State of Texas, and
11  what is that?  That means the -- we got two parts to
12  the trial.  First part is guilt or innocence, okay?
13  We have a trial on guilt or innocence, and the State
14  tries to prove to you, as the jury, that the Defendant
15  is guilty beyond a reasonable doubt of capital murder
16  and you listen to the evidence and you finish and then
17  you had go back there and deliberate, and if you find
18  the Defendant guilty, well, then, we go on to the
19  second phase.  If you find him not guilty, what
20  happens?  You go home.  Okay?
21         Now, if you find him guilty of capital
22  murder two punishments are a possibility, life or
23  death.  Life in prison or the death penalty, all
24  right?  Both serious punishments.  But you don't say
25  life or -- normally, in a -- when the jury assesses

102

1  punishment, normally, they say, on every other crime,
2  let's say, murder, you know, it's 5 to 99 or life,
3  possibly probation.  So, they say -- in that kind of
4  case, they say, "Okay, well, I don't know.  We'll get
5  together and we decide on a punishment, maybe a fine,"
6  you know?  But there's a certain thing that's
7  prescribed.
8         Here it's different and you answer
9  questions.  You don't do that.  First question is over
10  your shoulder here, and if you'll look at it with me.
11  "Is there a probability that the Defendant will commit
12  criminal acts of violence that would constitute a
13  continuing threat to society" and the jury would
14  answer yes or no, okay?  You follow me?
15     A.  Yes.
16     Q.  And then -- and then you answer No. 2.
17  "After taking into consideration all the evidence,
18  including the circumstances of the offense," that's
19  the first part of the case, okay, what happened that
20  day, "the Defendant's character and background, and
21  the personal moral culpability of the Defendant, is
22  there sufficient mitigating circumstance or
23  circumstances that would warrant a sentence of life
24  imprisonment, rather than the death sentence be
25  imposed," and the jury would answer yes or no.  Okay?

103

1         Now, what do these questions mean?  Well,
2  this one here means will the Defendant probably, you
3  know, be a violent person to society in the future,
4  okay?  Future dangerousness.  All right?
5     A.  All right.
6     Q.  And that one, No. 2, basically, take into
7  consideration everything about the Defendant that you
8  hear in this courtroom, that is, not just what
9  happened that day.  You may hear from one side or
10  other the good or bad things about him, okay?  You
11  might hear he's a great guy.  You might hear that he's
12  done a lot of work in the community and other than on
13  this occasion, he's been -- he's been a perfect guy.
14  Maybe you'll hear bad stuff about him.  Maybe you'll
15  find out he's got a bad criminal history.  Maybe, you
16  know, he's just been an awful person, okay.  That's
17  what this question's about.
18         "Sufficient mitigating circumstances,"
19  you know, what is that?  Well, is there other stuff in
20  his life that should lessen the punishment, okay, that
21  should make it life instead of death?  Maybe -- and
22  it's really up to the jury.  What -- what is a
23  mitigating circumstance?  Mitigating, lessening,
24  circumstance.  Something about him or something that
25  happened, okay, in his background.

104

1         And the list is endless as to what that
2  is.  And some people may think a particular fact is a
3  mitigating circumstance like maybe he was an Eagle
4  Scout, and other people say, "That doesn't mean
5  anything to me," okay?  Do you follow me?
6     A.  Yes, I understand that.
7     Q.  Okay.  And you have to answer yes or no.
8  Now, at the beginning of the trial, I will ask the
9  jurors to raise their right hand.  We're going to
10  select a jury and when we get done, we're going to
11  have 12 people there.  In fact, we'll probably even
12  have some alternates.  And I'll ask them to raise
13  their right hands.  "Do you swear to render a true
14  verdict based upon the law and the evidence that's
15  presented to you," and the jury would say, "Yes."
16         I need to know if you can take the oath,
17  and let's -- let's do it in two parts.  First, can you
18  take the oath to do that, to take that oath to
19  deliberate on the guilt or innocence phase of this
20  trial?
21     A.  Yes.
22     Q.  And then we got the -- okay, let's talk about
23  the second part.  Some people tell me, "I can do the
24  first part.  I can see if the Defendant is guilty or
25  not guilty, but I cannot participate in these

105

1   questions, because I cannot participate in something
2   that would lead to a death penalty, okay?"  Or some
3   people say, "For me, it's a knee jerk thing.  If -- if
4   he -- if he's found guilty of capital murder, I'll
5   give him a fair trial on the first part but, I got to
6   tell you these special issues mean nothing to me.
7   I'm not going to follow the law.  I will always give a
8   death sentence if he's found guilty of capital
9   murder."  Okay.
10          Both of those people can't take the oath,
11  all right?  And it's okay.  If you can't do it, it's
12  fine, but I need to know if that's you, if you can
13  take the oath and answer these questions truthfully
14      A.   Yes, I can.
15      Q.   All right.  Well, then I'm going to turn you
16  over to Mr. Skurka.
17              VOIR DIRE EXAMINATION
18  BY MR. SKURKA:
19      Q.   How are you doing today, Mr. Foster?
20      A.   Good morning.
21      Q.   As the Judge introduced me, my name is Mark
22  Skurka.  I'm an assistant district attorney.  This is
23  Geordie Schimmel.  He's another assistant D.A., and if
24  you're selected on this jury, we'll be the ones
25  presenting the case to you.  I want to the start off

106

1   by telling you there's no right or wrong answers to
2   anything you say.  We just kind of want to know what
3   your feelings are and -- about some of the issues in
4   this case, and if you'll be qualified to sit on this
5   jury, okay?
6       A.   Okay.
7       Q.   So, when I say there's no right or wrong
8   answers, I don't want you to answer in such a way
9   that, "Ah, I better say it this way, because that's
10  the way the Judge wants to hear me say it," or "I want
11  to do it this way, because that's the way Mr. Garza,"
12  or I want to hear it.  You just tell us how you feel
13  about things, okay?
14      A.   Okay.
15      Q.   How do you feel about being picked -- or not
16  picked, but chosen that day to be on a possible
17  capital murder case?  Remember that first day when all
18  those people were in that room, and nobody knew what
19  they were there for till the Judge came out and said,
20  "Hey, this is a capital murder case.  There is a
21  chance that you may be having to decide on the death
22  penalty," what was your first reaction when you heard
23  it was that kind of case?
24      A.   Well, it's my duty as an American, and it's
25  my civil duty.

107

1       Q.   Uh-huh.  Did it upset you or worry you or
2   make you have second thoughts when you found out it
3   was that kind of case?
4       A.   No.
5       Q.   Why?
6       A.   It didn't matter what kind of case it was.
7       Q.   That's what I'm --
8       A.   I was picked on a jury.
9       Q.   That's what I'm getting at.
10      A.   And I'm doing what...
11      Q.   Did you see what some of the other people
12  around you reaction were?  Because I was watching
13  them, and sometimes I saw, when the Judge said, you
14  know, "This is a capital murder.  You may have to make
15  a decision whether this young man lives or dies," and
16  some people were going like, "Oh, my gosh.  It's that
17  kind of case?  I don't know."  You know, they thought
18  they were going to get a little shoplifting case or a
19  D.W.I. case, or something like that, and then when
20  they were confronted with it, they were thinking,
21  "Man, I don't know if I can do that kind of case."
22          I'm just kind of curious what your
23  reaction was.
24      A.   It didn't matter what kind of case it was.
25      Q.   Okay.  So you're not one of those ones that

108

1   shy away from this type of -- of decision.
2       A.   No.
3       Q.   And I'm not saying it's an easy decision, and
4   I'm not saying it's a fun decision, but it's almost
5   like it may be necessary in some cases.  Is that kind
6   of how you feel, or you tell me how you feel.
7       A.   I feel that when they call me to court, I'm
8   coming to court to do as they ask me to do and follow
9   the law and make my decision.
10      Q.   And that's really what a juror is supposed to
11  do.  Have you ever been on a jury before?
12      A.   Never.
13      Q.   Okay.  Basically, a jury is one person -- is
14  a group of people that decide what the facts are.
15  Now, we have a judge that tells us what the law are --
16  the law is, and we have lawyers that kind of explain
17  stuff, but the jury actually sits over here and
18  decides kind of what the facts are and what decisions
19  are to be paid made.
20          How do you feel about participating in
21  that type of decision because, you know, we're not
22  talking about something you see on the T.V. or read
23  about in paper.  That's him right there in that shirt.
24  Can you look at him and tell me that you can
25  participate in a decision if you hear all the evidence

1  and it shows that he should get the death penalty, can
2  you follow through with that?
3     A.  Yes, I can.
4     Q.  And I'm going to ask you the opposite way.
5  If you feel that the evidence is such a way that he
6  should get a life sentence, can you vote for that?
7     A.  Yes, I can.
8     Q.  So you're not leaning one way or the other.
9     A.  No.
10    Q.  Okay.  And -- and that's what we're looking
11  for, --
12    A.  Right.
13    Q.  -- to make sure that nobody's starting off in
14  the background with, you know, preconceived notions or
15  something.
16    A.  I have an open mind.
17    Q.  Fine.  That's what we want to hear.  I need
18  to ask you something, too, before we talk about the
19  presumption of innocence, is I notice that apparently
20  your son is on probation for a case?
21    A.  He was off last month.
22    Q.  He got off last month?
23    A.  October.
24    Q.  I don't want to the pry, but just -- can you
25  tell me a little bit about that?

1     A.  He was involved in a theft ring.  He got five
2  years in the federal pen and five years parole, and he
3  was off last month.
4     Q.  Okay.  Was that locally or somewhere else?
5     A.  Locally.
6     Q.  And I think in federal court they have a
7  different thing, they have, like, you do your time and
8  then you're kind of on probation or parole afterwards
9  for a while, right?
10    A.  He was a few years in federal and a few years
11  in state.
12    Q.  So he had to serve time in the state and the
13  federal thing?
14    A.  Yes.
15    Q.  Was it the same type of case, a theft case?
16    A.  It was all that case.
17    Q.  Oh, the same case.
18    A.  Same case.  No two different cases.
19    Q.  So, they prosecuted him over here at the
20  federal courthouse, and they prosecuted him at this
21  courthouse, too?  I'm trying to figure out where --
22    A.  I went to the federal courthouse.  That's all
23  I went to.
24    Q.  Okay.  But it didn't -- it didn't come out of
25  this case.

1     A.  No.
2     Q.  This courthouse, I'm sorry.
3     A.  No.
4     Q.  Okay.
5     A.  It was the old courthouse, federal
6  courthouse.
7     Q.  You see where I'm -- I don't know if you see
8  where I'm going, but...
9     A.  No, I don't.
10    Q.  Sometimes people say, "Well, you know, you're
11  part of -- the D.A.'s Office is part of the
12  prosecutors --
13    A.  No.
14    Q.  -- that, you know, put people away sometimes,
15  and prosecute them and stuff.  I just want to know if
16  there's kind of any ill feeling about, you know, the
17  prosecutors, both either at the federal side or the
18  state side for what they did.
19    A.  No.  I don't have any ill feelings.  What he
20  did, it was proved, and he got his punishment, and he
21  served his time, and he's back in society doing what
22  he's supposed to do.
23    Q.  All right.  Well, I'm glad to hear that.  And
24  again, I'm not trying to pry, but you can see where
25  I'm coming from.

1     A.  Uh-huh.
2     Q.  Because sometimes people say, "Well, you
3  know, the D.A.'s Office is the one that sent my
4  brother to prison," or the D.A.'s Office is the one
5  that --"
6     A.  They hold it told against you.
7     Q.  "-- got my cousin, and, you know, did this to
8  him."  And I just want to know if there's any ill
9  feelings about that.
10    A.  No.
11    Q.  Okay.  Did you have to testify in his case?
12    A.  No.
13    Q.  Okay.  You're just there to support him?
14    A.  Yes, he's my son.
15    Q.  And how old was he when this happened?
16    A.  23.
17    Q.  23.  What do you think about, when it comes
18  to age?  Because, you see, this young man here is --
19  is or was around that age when this stuff happened,
20  and I think he's a little older now, but I think the
21  evidence is going to show he's around mid 20s, and
22  stuff like that.  How do you think that affects you
23  sitting on this jury?  Because he's close to the
24  same age as your son.
25    A.  Well, as you get older, you mature and you

**113**

1  learn, and look back at your mistakes and learn from
2  your mistakes.
3     Q.   Okay.  What about the difference in age under
4  the law in responsibility?  For example, in Texas, the
5  law says you cannot get the death penalty if you're
6  under 18.  I mean, you could do the worst crime in the
7  world, and you're only 16 and 17, you're going to get
8  the death penalty because that's what the law says.
9  We don't execute people in Texas if they're under 18.
10         Now, that being said, the law says that
11 you can be eligible for it if you're 19, 20, 21,
12 whatever.  And some people say, "Well, gosh, you know,
13 23 is kind of young to be facing something like that."
14 Does that make any difference whether a person's 23,
15 33, 43, whatever?
16    A.   Well, you go by the law and what it says.
17    Q.   But do you --
18    A.   It does -- the age doesn't matter.
19    Q.   Okay.  That's what I'm trying to get at, does
20 it matter or not.  Because sometimes -- and I'll tell
21 you, some people have told us, and -- either in this
22 courtroom or the other ones, "You know, he looks so
23 young.  He looks so young."  And I'm always thinking,
24 like, "My gosh, are they making a decision just how he
25 looks, or shouldn't they be making a decision on -- on

**114**

1  what he did"?
2     A.   Right.
3     Q.   Would you agree with that?
4     A.   Yes.
5     Q.   So, just looking at him and -- and his
6  appearance or, you know, age, or something like that,
7  that -- that really shouldn't be a factor, should it?
8     A.   No.
9     Q.   I always have to tell people because a lot of
10 time people come in for jury duty and they expect to
11 see Charles Manson sitting there, you know, some
12 scary-looking guy that looks all bad and everything,
13 and evil, and not all defendants look like that,
14 right?
15    A.   Correct.
16    Q.   So would you agree with me you shouldn't make
17 a decision based on that?
18    A.   Correct.  Not on the age or anything.  On the
19 offense.
20    Q.   Okay.  Now, I also noticed that you've --
21 you've changed religions.  You were Church of Christ,
22 and then you went to Catholic.
23    A.   Correct.
24    Q.   I don't know what the Church of Christ felt
25 about death penalty.  What -- did they have any set

**115**

1  policy on that?
2     A.   It's not the same as Catholic.
3     Q.   Say again?
4     A.   It's not the same as Catholic.
5     Q.   Yeah, I know, but I just wondered if the
6  church -- So you're saying --
7     A.   They didn't preach the way the Catholics do.
8     Q.   So they never talked about it?
9     A.   The Catholics believe there's no death
10 penalty.  While I'm not -- there's church and
11 religion, and state law, and they're two different
12 things.
13    Q.   Well, that's what I'm trying to get after.
14 Because sometimes we've had people -- and, again, you
15 know, they can still believe in what they want to
16 believe because some Catholics will say, "Hey, look,
17 my church says it's against the Church's teachings so
18 I can't do it, Judge, because I got to follow my
19 church's teachings."  Other people say, "Well, the
20 church's teachings is that -- in that area, but, you
21 know, I still agree with the Catholic Church.  I just
22 don't agree with that one philosophy," or something
23 like that.
24    A.   Correct.
25    Q.   I'm just trying to figure out where you come

**116**

1  from in that.
2     A.   I base my decisions on the facts.
3     Q.   Uh-huh.
4     A.   The church -- like I said, the church and the
5  State and the law are separate.
6     Q.   Okay.
7     A.   I'm going to base it on what I hear.
8     Q.   So you won't have any --
9     A.   Conflict.
10    Q.   -- lingering problems or --
11    A.   No.
12    Q.   Because sometimes it weighs on people, and,
13 you know, they just say, "Well, gosh, I don't want to
14 do this because it feels like I'm going against the
15 Catholic church," and other people say, "Hey, the law
16 is the law.  You know, it's still the law of the land.
17 You know, you still have to obey that."  And some
18 churches say that, you know, says -- you know, they
19 don't necessarily say they're for or against the death
20 penalty, but they -- I think almost every church says
21 you need to obey the law, right?
22    A.   Correct.
23    Q.   That's pretty much it.  I'm just -- I'm just
24 curious about that because we get different people.
25 Some Catholics are still for the death penalty, some

117

1  are against the death penalty.  It doesn't really
2  matter.  We just need to know what it is.
3          When they asked you about the death
4  penalty in your -- your questionnaire it said, -- you
5  put, in your own words, "Should be given when
6  circumstances are met."  Explain that a little more.
7      A.   If you can prove that he deserves the death
8  penalty, beyond a reasonable doubt, we'll have to
9  decide -- or I'll have to decide.
10      Q.   Right.  And it's not just you, it is going to
11  be --
12      A.   Right.
13      Q.   -- all 12 people.  Thank God we don't have
14  one person making that decision.
15      A.   Right.
16      Q.   It's like, you know, the Judge is a powerful
17  district judge, but he can't decide somebody's death
18  penalty or not.  The D.A.'s Office, and my boss,
19  Carlos Valdez, he can't just say, "Well, we're going
20  to give this guy the death penalty."  We have to have
21  12 people.  So it's a -- what you call it, a group
22  effort, a collaborative effort to do that.
23          So no one has to say, "Well, I'm
24  responsible.  I'm responsible."  The jury did what the
25  jury did.

118

1      A.   That's why I said "I" or "we."
2      Q.   Right.  And that's -- to me, that should be
3  reassuring because it is a group decision.
4      A.   Uh-huh.
5      Q.   You don't have to be the one.  Because some
6  people say, "I -- I can't sleep at night.  I'll be
7  responsible for doing this," and I say, "Well, it's
8  not just you.  It's 12 people decide on that."  But,
9  essentially, the answer looks to me like you believe
10  in the -- you believe the death -- death penalty should
11  be given when circumstances are met.  When I see
12  circumstances are met, that sounds like when the
13  evidence is there, and the evidence convinces me to do
14  that.
15      A.   Correct.
16      Q.   So you don't believe that the death penalty
17  should be in every case, right?
18      A.   No.
19      Q.   In fact, I think the Judge has explained that
20  to you.  If you have just a regular murder case, it's
21  not automatically death sentence.  Only certain cases
22  even qualify for the death penalty.  And -- and, in
23  this case, it's because it's murder, plus a robbery.
24          If -- if you had the choice, if you were
25  in the legislature, and, you know, every year they

119

1  come along and they say, "We want to abolish the death
2  penalty."  Some people say, "We want to a polish it,"
3  some people, they want to keep it.  What would you
4  want to do if you were in the legislature and had to
5  make that decision?  Would you keep it or -- or vote
6  to do away with it in Texas?
7      A.   If I was appointed to the legislature and I
8  was representing the people, I would weigh my
9  decisions on what my constituents would want.
10      Q.   So you would kind of ask the people that you
11  represent how they feel about it?
12      A.   What they -- I'm there, I guess, for that
13  reason.
14      Q.   And that's exactly right, you do represent
15  the people.
16      A.   Uh-huh.
17      Q.   But, I guess, on a personal note, if you had
18  a choice, do you think we should have the death
19  penalty in Texas, or do you think it should be done
20  away with, on a personal choice?
21      A.   I think we should have the death penalty.
22      Q.   Can you tell me why?
23      A.   Some people deserve to die for actions they
24  do.
25      Q.   All right.  Pretty straight and simple.

120

1      A.   Uh-huh.
2      Q.   Pretty straight and simple.  Because, you
3  know, there's a lot of people -- I'm sorry, there's a
4  lot of states in the United States that don't have the
5  death penalty.  They think, you know, we're too
6  civilized now and that's a barbaric practice, and we
7  shouldn't have to do that.  And then other people say,
8  "Hey, in certain cases, it may be necessary."
9          How do you feel about that?
10      A.   Just as you say, "In certain cases, it's
11  necessary."
12      Q.   And the law basically says it's not in every
13  case.  Just because you're found guilty of capital
14  murder doesn't mean you automatically get the death
15  penalty, right?  Remember the Judge said --
16      A.   Correct.
17      Q.   -- you have to go to the second part of the
18  trial and decide whether or not it -- I believe it,
19  it's appropriate, I guess, is the word I should say.
20  Because in your questionnaire, you put -- they had a
21  choice to circle about five different answers, and you
22  put, "Although I do not believe the death penalty ever
23  ought to be invoked, as long as the law provides for
24  it, I could assess a death penalty in the proper
25  case."

121

1    To me that sounds like, "I really don't
2    think we should have the death penalty, but if the law
3    provides for it, I can do it."
4    Is that how you feel or is it stronger or
5    lesser than that?
6    A.   I feel the death penalty should be given if
7    the circumstances are correct for it.
8    Q.   Okay.  Now, the law says there's two parts to
9    the punishment issue.  Well, there's two parts of the
10   trial, guilt or innocence, and punishment phase.
11   First part you decide did I -- did he do it or did he
12   not do it?  The second phase is when you decide
13   punishment.  And you don't check off death or life,
14   you answer these two questions.  And I want to go over
15   them with you, quickly.
16   If you look behind you, please.  It says,
17   "Is there a probability that the Defendant would
18   commit criminal acts of violence that will constitute
19   a continuing threat to society," and you answer that
20   question yes or no.  The second part of the trial, you
21   might get to hear additional evidence.  Generally, the
22   first part of trial is just what happened that day,
23   did he do it or did he not?  You might get to hear
24   background, like, has he been in trouble before, has
25   he not been in trouble before?  Was he a straight A

122

1    student or was he always in trouble before, and then
2    you make that decision.
3    A couple of things I want to point out to
4    you in those words up there.  First of all, it says,
5    "Is there a probability?"  Not that it's a certainty,
6    it just says it's a probability, "that the Defendant
7    would commit criminal acts."  And so, the law doesn't
8    require that I do it -- prove it to you with
9    certainty, just says, "probability," which is a more
10   likely than not.
11   Then it says, "would commit criminal acts
12   of violence."  Sometimes people say, "Well, I would
13   only vote for the death -- death penalty if I think he
14   was going to murder again."  The law doesn't say that
15   you have to think he's going to murder again.  It just
16   says do you think he's going to commit criminal acts
17   of violence again.
18   And the third part says, "that would
19   constitute a continuing threat to society."  What does
20   that phrase mean to you, "continuing threat to
21   society"?
22   A.   If he's put back in the public, he could be a
23   threat to the other people.  He could hurt people, he
24   cop rob people, he can kill people.
25   Q.   What about people that say, "Well, why does

123

1    the State have to seek the death penalty?  Why don't
2    you just give him life in prison?  He'll be locked up
3    in prison.  He can't hurt anybody."  How would you
4    answer that?
5    A.   I could answer that -- that could be okay for
6    me.
7    Q.   Okay.  The reason I talk about that is
8    sometimes people say, "Well, if he's in prison, he
9    can't hurt anybody," and I always say, "Well, wait a
10   minute, who else is in prison?"  Who else would be
11   there?
12   A.   Other prisoners.
13   Q.   Other prisoners.  Who else?
14   A.   The people who run the prison.
15   Q.   That's right.  The warden, his staff, guards.
16   A.   Right.
17   Q.   There's -- so there's a lot of people.  It's
18   not like we put them on a desert island and they'll
19   never see another human being again.  Would you agree
20   with me then that in prison you're still part of
21   society because you're still interacting with people?
22   I mean, some of your rights are taken away, obviously,
23   but you still have the opportunity to intermix with
24   people, correct?
25   A.   Correct.

124

1    Q.   Have you ever heard of that happening before,
2    like a -- what do you call, a -- prisoners hurting
3    another prisoner, or kidnapping guards, or beating up
4    guards, or whatever, like that?  You've heard of that?
5    A.   I've heard that.
6    Q.   Yeah.  So just because you're in prison
7    doesn't necessarily mean you're never going to be a
8    threat to anybody again, right?
9    A.   Correct.
10   Q.   Okay.  The second -- after you answer the
11   first question yes or no, then you go to the second
12   question, and that deals with mitigating
13   circumstances.  Mitigating circumstances basically
14   means anything that would lessen or make less severe
15   the punishment.  In other words, he did the crime, but
16   is there any reason we should lower the sentence?  And
17   it's kind of like extenuating circumstance.  Is there
18   any reason -- he did the crime, but is there some kind
19   of thing, like, you know, maybe he's a war hero in the
20   Vietnam war and got medals.  Maybe he was a straight A
21   student in school.  Maybe he helped little old ladies
22   across the jury (sic) -- or he volunteered at some
23   churches, you know, something like that.
24   The law says before you give the death
25   penalty, because, say, you think he's guilty of

125

1    capital murder and you think he's a continuing threat
2    to society, before you vote for death, you have to
3    read that question and take into circumstances --
4    takes into consideration all those circumstances,
5    including the circumstances of the offense, his
6    background and character, and his personal moral
7    culpability and decide is there enough that would
8    outweigh the death penalty?  You see what I'm saying?
9        A.   Yes.
10       Q.   Only the jury can make the decision on what a
11   mitigating circumstance is.  If it's a mitigating
12   circumstance, does that mean you automatically lower
13   it to life?  No.  Remember that word says, "sufficient
14   mitigating circumstance."  In other words, is there
15   enough?  Does it outweigh the other stuff?  Some --
16   some jurors may say, "Well, you know, he was -- he was
17   a war hero.  He was a decorated veteran so I'm going
18   to give him a break."  Some people may say, "You know,
19   he was a good grade -- he made good grades in school
20   and volunteered at churches in the old days, you know,
21   and -- years ago, so I'm going to give him a break."
22       Other people may say, "Look, I don't care
23   if he was a war hero.  I don't care if he volunteered
24   in churches.  He's still got to pay for what he did.
25   That doesn't outweigh -- it doesn't reach that level

126

1    of making me give him a lesser sentence."  You see
2    what I'm saying?
3        A.   Yes.
4        Q.   Completely up to the jury.  Completely up to
5    the jury.  So, again, to sum it up, if you vote the
6    first question yes, yes there's a chance he's going to
7    hurt somebody else in the future, and, no, there's no
8    reason to lower his sentence, he gets a death
9    sentence.  If you answer it any other way, he gets a
10   life sentence.  Do you follow me in that scheme?
11       A.   Yes.
12       Q.   Okay.  I think I don't have any other
13   questions of you.  Do you have any other questions of
14   me?  Maybe I didn't explain something, or any other
15   questions about any of the parts of the trial?
16       A.   No.  I understand both these.
17       MR. SKURKA:  Great.  Okay, then, I'm
18   going to let the other lawyers talk to you now.  Thank
19   you, Mr. Foster.
20       VENIREPERSON NO. 58:  Okay.
21       VOIR DIRE EXAMINATION
22   BY MR. JONES:
23       Q.   The -- the right to trial by jury is a
24   Constitutional right that belongs to all of us, as
25   citizens.  And, in a felony case, you have a right to

127

1    12 citizens to decide the case.  Also, the right to
2    trial by jury is the right to an impartial jury.  What
3    does the word "impartial," mean to you?
4        A.   Make a fair decision, impartial, not on
5    either way, based on the facts.
6        Q.   Okay.  The word "impartial," first, means
7    that you -- a juror comes to the task with no
8    prejudgment about the case.
9        A.   Right.
10       Q.   Now, did you -- I don't think you know
11   anything about this case.
12       A.   I've heard of it.
13       Q.   Huh?
14       A.   I've heard of things on T.V.
15       Q.   On T.V.  Tell me -- tell me what -- what
16   facts, if you can remember, from -- from your contact
17   with the media.  Oh, let's -- let's -- wait.  I don't
18   want to -- I don't want to refer to that as facts.
19       A.   Okay.
20       Q.   I want to say -- let's say, "information."
21       A.   Right.
22       Q.   Because what's -- the information in the
23   newspaper may or may not be facts.
24       A.   Right.
25       Q.   The jury will determine what the facts are.

128

1    What information can you recall from -- from reading
2    the newspaper or watching television?
3        A.   Well, what I've heard, I'm not going to make
4    my decision on what I heard.  The media just blows
5    things out of proportion a lot of times.
6        Q.   That's not what I asked you.
7        A.   Okay.
8        Q.   I asked you what information can you recall
9    from your contact with the media?
10       A.   That him and two other women had a problem
11   with a man and he died.
12       Q.   Okay.
13       A.   Robbing.  Robbing them --
14       Q.   Okay.
15       A.   -- or him.
16       Q.   Anything else?  Any other details?
17       A.   That he ran off for awhile and they caught
18   him.
19       Q.   Uh-huh.  Okay.  Now, the law does not require
20   the jurors be ignorant of current events.  We have
21   freedom of the press in this country, we have
22   newspapers and televisions, the Internet, so you can
23   read on just about anything you want to.  The Judge
24   will give the jurors an oath, the ones that are going
25   to sit in the case, they'll decide the case based on

129

1   what they hear in the courtroom.

2           And -- now, the problem that a juror has,

3   that has read a lot about the case or talked a lot

4   about the case is what do you do with that information

5   that's inside your head?

6       A.   I just disregard it.

7       Q.   Okay.  You have to set it aside.

8       A.   Yes.

9       Q.   You know, that -- sometimes it's hard to do,

10  but you've got to consciously disregard it.  In other

11  words, if -- let's say that you say you read that

12  there were two women involved in this case, according

13  to the newspaper, right?

14      A.   I heard about it.  I don't read the

15  newspaper.

16      Q.   Right.  I'm talking about hearsay.  But let's

17  said, when you're on the jury and the State's proven

18  up the case, and you only hear evidence that one woman

19  was involved, okay?  And let's say a big issue in the

20  case is whether two people were involved.  Are you

21  going to fill in the bank with that information that

22  you have?

23      A.   No.

24      Q.   There's a tendency to want to do that, or,

25  you know, the -- impartiality suggests that you come

130

1   to the tasks with no expectations.  You don't know

2   what's going to happen.  You don't know whether Mr.

3   Skurka can prove his case or not.

4       A.   I believe nothing I hear and half of what I

5   see or partial what I see.

6       Q.   Okay.  But in a criminal trial, we have rules

7   of evidence and we -- the information that's presented

8   to you, we try to -- you know, there's -- we try to

9   give you as much reliable information as -- as we can.

10          Now, also, impartiality suggests that you

11  have no leanings toward one side or the other, okay?

12  Those are biases.  Mr. Skurka asked you about your

13  son's problems in federal court, and the reason he

14  asked you about that was, he's -- he's concerned that

15  you might have a leaning against him and maybe in my

16  favor because of your bad experience with your son.

17  You told him you didn't have a leaning, right?

18      A.   Correct.

19      Q.   Okay.  Sometimes you, you know, like, if you

20  were related to the Defendant or related to the

21  complaining parties in this case, that might create a

22  -- a family bias or a situational bias.  Sometimes

23  people have occupational biases.  For example, if you

24  were a policeman, I probably wouldn't want you sitting

25  on my jury.  Why?

131

1       A.   He's -- deals more with people, and maybe

2   he's got pre- -- thoughts in his head from experiences

3   that he's had or he's built up.

4       Q.   Like, if you were charged with D.W.I., would

5   you want a highway patrolman sitting on your jury?

6       A.   No.

7       Q.   Nope.  I wouldn't either.

8       A.   He might make an absolutely perfect juror,

9   don't know, but I'm not going to take a chance,

10  because he might have an occupational bias.

11          Okay, do you have consider yourself, at

12  this moment, right now, if -- to be a person who could

13  be impartial in this -- in a case like this?

14      A.   Yes.

15      Q.   Okay.  Now, this is a death penalty case.

16  When I say that, that's a case -- this is a case in

17  which the death penalty could be a punishment option,

18  okay?  The State of Texas has the death penalty as a

19  punishment, former punishment in certain cases, all

20  involve homicides that have some aggravating

21  circumstances attached to them.  And you've told us

22  that you, generally, agree with that law.  In other

23  words, you -- as a citizen, it's okay with you that we

24  have this form of punishment as an option in this

25  case.

132

1       A.   Yes, I agree.

2       Q.   Is it fair the say?

3       A.   Uh-huh.

4       Q.   So if you agree with that, that suggests to

5   me that you believe that -- that society has --

6   experiences some benefit by having that law.  For

7   example, it is a law in Texas -- it is against the law

8   in Texas to carry a handgun on or about your person

9   unless you have a license.  Do you agree with that

10  law?

11      A.   It is a law.  Yes, it is a law.

12      Q.   Do you agree with that law?

13      A.   Yes.

14      Q.   Do we -- do we -- do we benefit from a law

15  like that?

16      A.   It's up to the individual.

17      Q.   Well, probably do benefit from it because it

18  probably keeps -- if everybody was carrying guns, you

19  know, without a license, what might happen?

20      A.   A lot of violence.

21      Q.   You would be walking to lunch and get caught

22  in a cross-fire, right?  Two guys shooting it out, and

23  you're just minding your own business.  So we benefit

24  by not having to worry about that situation because we

25  have that law, right?

133

1    A.   Correct.

2    Q.   Okay.  And you can think of all kinds of laws

3  that are -- we experience a benefit.  Now, let's talk

4  about the death penalty.  How do you think society,

5  our society, Texas society, benefits from having the

6  death penalty as punishment option in some cases?

7    A.   Well, that's what the law is providing,

8  and -- and we follow the law.  I don't make my own

9  rules.  I've got to follow the law.

10   Q.   So you don't -- you don't -- you haven't

11 thought about it, or don't have any opinion about

12 whether we benefit or don't benefit from having this

13 punishment.

14   A.   Repeat that.  I didn't understand.

15   Q.   Well, I'm asking -- my question is --

16         MR. GARZA:  Let me interrupt.

17         (Brief pause.)

18   Q.   (BY MR. JONES) So, basically, you're saying

19 that if it's the law, then you'll -- that's what the

20 legislature says is the law, then I'll follow it if I

21 can.  You know, you'll do your best to follow -- to

22 apply the rules that are applicable in this case.

23   A.   Correct.

24   Q.   Okay.  Can you think of any reason why you

25 could not be a fair and impartial juror in this case,

134

1  any reason that we haven't asked you about?

2    A.   No.

3          MR. JONES:  Okay.  No further questions.

4          THE COURT:  All right.  Why don't you

5  wait in the jury room, Mr. Foster, and we'll be with

6  you in a minute, okay?

7          VENIREPERSON NO. 58:  Okay.

8          (Venireperson exits courtroom.)

9          THE COURT:  All right.  Mr. Skurka.

10         MR. SKURKA:  Can we have just a minute?

11         THE COURT:  Yes.

12         MR. SKURKA:  I think --

13         MR. GARZA:  Judge, I think we're going

14 to do a joint --

15         THE COURT:  Okay.

16         MR. GARZA:  -- agreement to go ahead and

17 let this juror go.

18         THE COURT:  Okay.

19         MR. SKURKA:  That's fine, Judge.

20         MR. GARZA:  We're going to pass him by

21 agreement, Judge.

22         MR. SKURKA:  The State agrees, Your

23 Honor, to excuse him.

24         THE COURT:  All right.  Let's bring him

25 back in.

135

1          (Venireperson exits courtroom.)

2          THE COURT:  All right.  Mr. Foster, you

3  were not selected to be on this jury, but we do

4  appreciate your time and effort in coming down here

5  and giving us honest answers.

6          VENIREPERSON NO. 58:  Thank you.

7          THE COURT:  If you need any work excuse,

8  the bailiff can get that for you, okay?

9          VENIREPERSON NO. 58:  All right.

10         THE COURT:  Thank you very much.

11         VENIREPERSON NO. 58:  Thank you, sir.

12         (Venireperson exits courtroom.)

13         THE COURT:  All right.  Next person, we

14 have Jay Blanton.  You want to bring him in?

15         MR. JONES:  Skurka, I checked -- I

16 checked the -- Your Honor, I checked the PACER.

17         MR. JONES:  Oh, I'm sorry.

18         THE COURT:  Do you want to take something

19 outside the presence?

20         MR. JONES:  No, no, I was just going

21 to -- I can do it in the next recess.  I have a

22 footnote for the last juror.

23         THE COURT:  Okay, I remember the name.

24         MR. GARZA:  Well, you were working.

25 We'll deal with it.

136

1          THE COURT:  Yeah, I thought so, I thought

2  so.

3          MR. JONES:  Yeah.

4          THE COURT:  Okay.

5

6              VENIREPERSON NO. 60,

7              JAY STUART BLANTON,

8            VOIR DIRE EXAMINATION

9  BY THE COURT:

10   Q.   All right, let's see, here.  Jay Blanton.

11 That's you.

12   A.   Yes, sir.

13   Q.   Okay.  Mr. Blanton, we're here to talk to

14 you.  We're trying to seat a capital murder jury,

15 okay?  You know that.  What we want to know is, first

16 of all, can you keep an open mind?

17   A.   Yes, sir.

18   Q.   Okay.  Because some people come in here and

19 say, "You know, I saw something in the news," and

20 maybe for some other reason.  I will tell you, if you

21 have seen something in the news, with all due respect

22 to the media, they don't always get it right.

23   A.   I know I did, but I can't remember exactly

24 what it was, just the fact of it.

25   Q.   Okay.  You understand if you're selected on

137

1  the jury, you got to say, "You know what, that means
2  nothing to me.  I'm just going to hear -- come and sit
3  and listen to the evidence presented to me, and that's
4  all I'm going to consider.  And I won't consider this
5  other stuff that I may have seen on T.V. because it --
6  quite frankly, it may be right, it may be wrong."
7  Flat out.
8       A.  I understand that, sir.
9       Q.  Okay.  Then let's talk about the case.  Okay.
10  You have been a juror on a jury before, criminal case.
11      A.  Yeah, like a very low misdemeanor.
12      Q.  Well, that's okay, because a lot of the
13  concepts are going to be the same, okay?  For example,
14  in every criminal case, just like in that case and in
15  this one, you know, a traffic ticket, all the way to
16  capital murder, the State brings the charges and they
17  got the burden of proof.  You understand that?
18      A.  Yes, sir.
19      Q.  You can follow that law?
20      A.  (Nods head.)
21      Q.  Yes?
22      A.  Yes.
23      Q.  Okay.  All right.  Because you don't -- you
24  nodded to me, but she's talking it down.
25      A.  I understand, I'm sorry.

138

1       Q.  All right.  Okay.  And, you know, moving on.
2  The burden of proof that you apply in that case was
3  beyond a reasonable doubt, all right?  We don't have a
4  definition of what that is but it's the highest burden
5  in the law.  It's not beyond all doubt or beyond a
6  shadow of a doubt, but it is a high burden.  Can you
7  follow that?
8       A.  Yes, sir.
9       Q.  Okay.  I mean, you hold the State to that
10  burden?
11      A.  Yes.
12      Q.  Beyond a reasonable doubt.
13      A.  Yes, sir, I can.
14      Q.  I mean, you've done it before.
15      A.  Yeah.
16      Q.  But can you do it again?
17      A.  Yes, sir.
18      Q.  Okay.  Now, law says Defendant is innocent
19  until the State can prove otherwise, if they can.
20  Okay?  That's how we do it here.  Some countries, you
21  know, they charge you and you're already guilty and
22  you got to prove your way out of it.  We don't do that
23  here, thankfully, okay?  Thankfully, we don't do it
24  that way here, but -- so everyone in this country, I
25  mean, citizens or noncitizens, every person that is

139

1  within these borders of the United States is innocent
2  until proven guilty, okay?  And the law says that.  I
3  mean, it's not a new concept.  It's gone all the way
4  back to the Greeks.  All of western societies have it.
5           So, could you presume the Defendant to be
6  innocent until the State proves otherwise, if they
7  can?
8       A.  Yes, sir, I could.
9       Q.  Okay.  All right.  You know, sometimes
10  lawyers will give this example:  If you had to vote,
11  how would you vote right now?
12      A.  I guess innocent, if I had to vote right now.
13      Q.  That's exactly right.  I mean, it's kind of a
14  silly example, really, because we never ask people to
15  do that.  There's a trial, first, okay?  But, you
16  know, let's say there is a trial and the State puts on
17  the evidence and you think, "That evidence isn't worth
18  a darn.  They haven't proven their -- their burden,"
19  how would you vote?
20      A.  Not guilty.
21      Q.  Absolutely.  All right.  As part of that,
22  these are all intertwined concepts, burden never
23  shifts to this side; always on the State, because they
24  brought the charges, okay?  That's what the law says.
25  As part of that, the Constitution says in the Bill of

140

1  Rights, from day one, defendant in a criminal case has
2  a right not to testify.  They can't make him testify,
3  the State.
4           And it goes even deeper than that.
5  Defendant, if he does not testify at his trial,
6  because, of course, Defense doesn't have to put on any
7  evidence.  They don't have any burden.  They have the
8  burden.  But if a Defendant doesn't testify, goes
9  deeper.  Jury can't even hold it against him.  You
10  can't give points to the State because Defendant
11  didn't testify, all right?  You follow me?
12      A.  Yes, sir.
13      Q.  Some people say, "Well, I want to hear both
14  sides of the story."  Now, wait a minute.  This
15  isn't -- this isn't like watching a race, okay, where
16  you see both -- both runners and whoever gets to the
17  finish line first.  Nuh-uh.  This is only whether the
18  State gets across the burden.  It's the only thing
19  we're looking for here, okay.
20           So can you follow that law, and if you
21  are selected on this jury, and the Defendant doesn't
22  testify, because he might, can you go back there and
23  -- and tell me that you would not hold it against him?
24      A.  Yes, sir, I wouldn't hold it against him.
25      Q.  Okay.  Now, this is a capital murder.  And

141

1  what's that? Well, it's a murder, obviously, because
2  we've got -- we've got the charge is murder because it
3  says murder, right? And what's a murder? Murder is
4  the intentional taking of the life of another. Murder
5  is not a capital felony in and of itself, okay.
6          Capital felony. What's that? Capital
7  felony is any felony in which the death sentence is a
8  possibility, okay? And that's this.
9          And why is it capital murder? Well,
10  capital murder is murder plus, murder plus something
11  else, okay? We have a murder in this case. It's the
12  allegation. And they're alleging that there's a
13  murder, plus while in the course of committing the
14  murder, they're alleging that the Defendant was
15  robbing or attempting to rob the victim, okay? So you
16  got murder, plus a robbery, two serious crimes, and
17  they're -- and they're together. You follow me?
18      A.  Yes, sir.
19      Q.  Okay. State has to prove all the elements of
20  that, okay? They have to prove all the elements of
21  murder itself, on the given day, in Nueces County,
22  Texas, this Defendant committed the offense of murder
23  while in the course of attempting to or committing
24  robbery, and they got to prove all the elements of
25  that, too. And there's, you know, there's a number of

142

1  elements. I don't know, eight, nine, ten, something
2  like that.
3          And law says for the Defendant to be
4  convicted of capital murder, they got to prove them
5  all. Would you hold them to that burden?
6      A.  Yes, sir.
7      Q.  Okay. Two possibilities if the Defendant is
8  found guilty, and we call it the "bifurcated system."
9  We got guilt or innocence phase. We see if the State
10  can prove their case beyond a reasonable doubt.
11  Defendant is found not guilty, what happens? We go
12  home. Case is over. Defendant is found guilty,
13  though, we go on to part two, phase two. And we don't
14  say life or death because those are the two
15  possibilities, life in prison or death, the only two
16  things that can happen in a murder trial if there's a
17  conviction.
18          We answer questions, and here's one of
19  them. If you'll look over your shoulder. "Special
20  Issue No. 1, Is there a probability that the Defendant
21  will commit criminal acts of violence that will
22  constitute a continuing threat to society?" Is this
23  guy going to -- do you think, is it probably --
24  probably more likely than not? Is it probably going
25  to be a threat to society violently? And you have to

143

1  answer that question yes or no, okay?
2          Then the jury would answer Special Issue
3  2. "After taking into consideration the evidence, all
4  the evidence, including the circumstances of the
5  offense." And what's that? Well, that's what
6  happened in the case, guilt or innocence phase, okay?
7  "The Defendant's character and background, and the
8  personal moral culpability of the Defendant, is there
9  sufficient mitigating circumstance or circumstances to
10  warrant that a sentence of life imprisonment, rather
11  than a death sentence be imposed?"
12          Second half of the trial, you might hear
13  more about the Defendant. The first half is just, you
14  know, did he do it or not and did the State prove it
15  beyond a reasonable doubt, all right? Second half,
16  you hear about his background maybe. Okay, maybe he
17  was a good guy other than this day. Maybe other than
18  that one incident, he's been a great person, and --
19  and you'll -- may hear that, I don't know. You may
20  hear he's been a bad guy all his life. You might hear
21  a mixed bag, okay?
22          Mitigating circumstances. Mitigating
23  meaning to lessen circumstances. Those are things
24  that would be in his favor, right? And then
25  sufficient, that means is there enough of that to

144

1  warrant a life sentence, rather than death? And you
2  have to make that decision.
3          And what's a mitigating circumstance?
4  Well, that's up to you, you know? Some people say a
5  particular thing. Maybe he was an Eagle Scout. Maybe
6  some people say, "No, that's a mitigating
7  circumstance," others would say it doesn't mean
8  anything. Maybe he did work for the community. They
9  may think that's a mitigating circumstance. Other
10  people say "It doesn't mean anything."
11          That's up to the jury, okay? I can't
12  tell you, as the Judge. The lawyers can suggest
13  what's a mitigating circumstance, but it's the jury
14  that decides that. Follow me?
15      A.  Yes, sir.
16      Q.  And, really, what we want you to do in this
17  question is take everything that you've heard,
18  everything that you heard and decide, "You know what,
19  after I've heard everything, not just the facts of the
20  case, but other things, too, is there enough there to
21  say, you know, what, life instead of death?" You
22  follow the question?
23      A.  Yes, sir.
24      Q.  Okay. Now, at the beginning of this trial,
25  that is after we've selected a jury, I'm going to --

145

1   I'm going to get the jurors to raise their right hand
2   and I'm going to ask them, I'm going to say, "Do you
3   solemnly swear that you will render a true verdict
4   based upon the law and the evidence presented to you?"
5   They will say, "Yes."
6        So my question to you is -- let's break
7   it down.  The first half of the trial, can you do
8   that, can you take that oath?
9        A.   Yes, sir.
10       Q.   All right.  Second half of the trial, I have
11   a little bit more problem with some people; that is,
12   some people say, "Yes, I could -- I could determine
13   whether the Defendant is guilty or not guilty, but I
14   cannot get to the second part, because answering these
15   questions could lead to this person's death, and I
16   cannot participate in such a process, morally,
17   whatever, okay?  It's just me."  All right.
18       Then I have other people that say, "Let
19   me tell you something, I could do the first half, but
20   if I find him guilty, I'm not -- I'm not participating
21   in this.  I'm not following your law.  He's always
22   going to get death in my mind," okay?  People feel
23   that way, and that's okay, but I need to know because
24   both of those people cannot take the oath, okay?  They
25   can't take the oath to -- to truthfully answer these

146

1   questions.  And I need to know, can you take the oath
2   to truthfully answer these questions?
3        A.   Yes, sir.
4        THE COURT:  Okay.  Mr. Skurka?
5        VOIR DIRE EXAMINATION
6   BY MR. SKURKA:
7        Q.   How are you doing, Mr. Blanton.
8        A.   Hello.
9        Q.   I'm Mark Skurka, the Judge introduced me
10   before.  I'm the first assistant district attorney.  I
11   have Geordie Schimmel here with me, and he's another
12   assistant D.A., and we're going to be presenting this
13   case if you get selected on this jury.
14       Let me tell you, there's no right or
15   wrong answers to anything you talk about.  All we want
16   to know is where you're coming from, how you feel or
17   react to some of the issues here.  So don't answer in
18   such a way you think, "Well, I better say it this way,
19   because Judge wants to hear it this way, or the
20   Defense wants to hear it or the State wants to hear it
21   this way."  You just tell us how you feel, and we'll
22   deal with it, okay?
23       A.   Okay.
24       Q.   Fair enough?  Let me start by asking you,
25   just in general, how you feel about the death penalty,

147

1   just off the top of your head?
2        A.   I'm, generally, in favor of it.
3        Q.   Why?
4        A.   Because I think there's some crimes that
5   that's the only proper punishment.
6        Q.   And that's the key word you've said, "some
7   crimes."  Do you think every crime should get the
8   death penalty?
9        A.   No, sir.
10       Q.   In fact, the Judge has probably explained, or
11   you've learned last week, or a couple of weeks ago,
12   that not every murder case is even eligible for the
13   death death penalty, it's only in certain cases that
14   -- when a person gets murdered, that the person's even
15   eligible for the death penalty.  Did you know that
16   before that?
17       A.   Yes, sir.
18       Q.   Because sometimes people say, "Well, gosh,
19   every murder case is going to be a death penalty
20   case," and I have to tell them, "No, it's only in
21   certain cases the legislature says."  And we use some
22   of those examples, like, killing a cop, or killing a
23   kid under six years old, or killing somebody while
24   you're raping them, robbing them, burglarizing them,
25   kidnapping, stuff like that.  It's only those few

148

1   certain cases that make it even eligible for the death
2   penalty.  You agree with that scheme of things?
3        A.   Yes, sir.
4        Q.   So when you say, "In some crimes, only some
5   crimes qualify," and only -- really, only some people
6   qualify for it, too.  If you're convicted of capital
7   murder, does that mean you automatically get the death
8   penalty?
9        A.   No, sir.
10       Q.   What -- what does that mean?  It means you're
11   eligible for one of the two sentences, death or life
12   in prison.  If you've been on a jury before, like,
13   say, on a -- on a burglary case, the range of
14   punishment is 2 to 20 and you just pick out a number
15   between there and see which one you think is
16   appropriate.  But here it's a little different, you
17   answer certain questions in such a way that that
18   person may get the death penalty, depending on how you
19   answer those questions.
20       When you came to the courtroom that first
21   time and found out, "Hey, this is a capital murder
22   case," when the Judge came in, remember, we had, like,
23   200 people in the room, and you heard it was a capital
24   murder case, what's the first thing that hit your mind
25   on that, when you heard it was kind of case?

149

1    A.   I don't remember.

2    Q.   You don't remember?

3    A.   I really don't.

4    Q.   Well, what I -- what I guess what I mean is,

5    I saw some people react when they're in there.  And

6    some people reacted, like, "Oh, my gosh, you know, I

7    can't believe I got this kind of case," and some

8    people said, "Well, you know, I guess one case is just

9    like any other, I got to a good juror either way," and

10   some people said, or looked at it like, "Well, I

11   better pay attention a little more, be a little more

12   careful about this case because it's a pretty serious

13   case."  How did -- how did you fit in there?

14   A.   Well, I definitely thought it was serious.  I

15   just -- I really don't remember exactly what I was

16   thinking.

17   Q.   Well, I'm just curious, how do you feel about

18   it now?  I mean, there -- there may come a point in

19   time, Mr. Blanton, where you're sitting on this jury,

20   and I'm going to stand in front of you and either me

21   or Mr. Schimmel is going to say, "Based on the

22   evidence, we believe that this guy is guilty, and

23   based on the evidence, we believe this man should be

24   sent to death."

25        And that's him, right there looking at

150

1    me.  That's John Henry Ramirez.  It's not somebody you

2    read about in the paper or hear on the news.  You

3    know, that's him right there.  Can you look at him,

4    right now, and tell me you can participate in that

5    decision that might lead to him -- his being --

6    getting the death penalty?

7    A.   Yes, sir.

8    Q.   Okay.  No hesitation there.

9    A.   No, sir.

10   Q.   Okay.  And the opposite should be true, too.

11   Can you look at him and tell me that if you think he's

12   not guilty, you can vote not guilty?

13   A.   Yes, sir.

14   Q.   And, again, based on the evidence.  And if

15   you think the evidence is such he should get a life

16   sentence instead of the death sentence, can you vote

17   for that, too?

18   A.   Yes, sir.

19   Q.   Okay.  So you're not leaning -- are you

20   leaning one way or another?

21   A.   I haven't heard any evidence, so...

22   Q.   And that's the right answer.  You can't be

23   leaning any other way, except as what the Judge said,

24   you have to be leaning right now toward not guilty.

25   A.   Not guilty.  Yes, sir.

151

1    Q.   Because you haven't heard anything.  That's

2    what we call the presumption of innocence, and that's

3    so important.  Just because the State is charged with

4    a crime, does that mean he's guilty of the crime?

5    A.   No, sir.

6    Q.   You agree with me the State has to prove the

7    case to you beyond a reasonable doubt?

8    A.   Yes, sir.

9    Q.   Okay.  And -- and he starts out with that

10   presumption just like everybody else does.  Does that

11   mean he's -- he is innocent?  No, it just means at

12   this point, he's presumed innocent.  You have to start

13   him as innocent, and then we have to prove him not --

14   prove him guilty.  It's not like -- I think, some

15   countries, they're guilty first and they have to prove

16   their innocence.  We don't do it that way here.

17        Well, we talked a little bit about the

18   death penalty.  I want to know a little bit more about

19   your background.  How do you know Mike Hummell and Pat

20   Wolter, please?

21   A.   I went to high school with Mike Hummell, and

22   I used to play poker with Pat Wolter a long time ago.

23   Q.   Is Pat a good poker player?

24   A.   I don't remember him being one, but...

25   Q.   I guess what I'm trying to find out is -- is

152

1    how often you see these guys, or have you seen them in

2    a long time or, you now, --

3    A.   I see --

4    Q.   -- still see them?

5    A.   I see Mike Hummell, like, at Boatner's

6    because I eat there and he eats there.  I just shake

7    hands with him.  And I haven't seen Pat, probably, in

8    20 years.

9    Q.   Okay.  So even though you know these guys,

10   would you consider them a close friend or anything

11   like that, or it's just kind of a school chum that you

12   knew, you know, 20 years ago, 30 years ago?

13   A.   Yeah, that's all.

14   Q.   Okay.  They both used to work with me at the

15   D.A.'s Office back when I started, and I was just

16   curious about that, if you hung around with them back

17   then, or anything like that?

18   A.   No.

19   Q.   I bet his -- Pat's wife doesn't let him play

20   poker anymore, right?

21   A.   This was like, probably, in the late 80s.

22   Q.   Okay.  Okay.  Nothing about them is going to

23   -- is anything about that going to affect you being on

24   this jury?

25   A.   No, sir.

153

1    Q.   The fact they used to work in the D.A.'s
2  Office, or anything, is that going to bother you, one
3  way or the other?
4    A.   (Shakes head.)
5    Q.   I need to ask you about your assault case
6  down in Kingsville 12 years ago.  Was it something,
7  like, you were charged, or was it assault --
8    A.   Yes.  I think it was a Class C misdemeanor.
9    Q.   Can you tell me a little bit -- I don't mean
10 to pry but I'm just kind of curious about what
11 happened there.
12   A.   I used to be an alcoholic, or, I guess I
13 still am, but I was trying to quit drinking on my own.
14 And when I would try to quit drinking, I couldn't
15 sleep, so I would kind of yo-yo back and forth between
16 no sleep and being drunk, and I had started acting
17 strangely.  And I -- one morning, when I went to work,
18 I -- I touched the -- one of the secretaries, I think,
19 on the shoulder, and she -- she filed the charge for
20 that, and she sued me, also.
21   Q.   Civilly and criminally, huh?
22   A.   Yeah.
23   Q.   And so, what happened on the criminal case,
24 it says you got deferred adjudication.
25   A.   Yes, sir.

154

1    Q.   And did you complete your probation term
2  successfully?
3    A.   Yes, sir.
4    Q.   And how long was it?
5    A.   I don't think it was even a year.
6    Q.   Sometimes those are, like, three months, six
7  months, nine months, something like that.  But you
8  never violated your probation, do anything else?
9    A.   No, sir.
10   Q.   And it was just a woman, like, I -- I'm
11 trying to figure out why she sued you civilly and did
12 the criminal case.  Was she trying to get money out of
13 you, or something?
14   A.   My lawyer said that they did the criminal to
15 get the money out of me, yeah.
16   Q.   Okay.
17   A.   And she did.
18   Q.   She did get some money out of you.
19   A.   (Nods head.)
20   Q.   Were you, like, in a high-ranking position in
21 the company that -- that --
22   A.   No, not really high, but I think they thought
23 it was going to be a lot more money, but...
24   Q.   Okay.  Did -- and I apologize for asking, but
25 was it more like a sexual harassment-type thing?

155

1    A.   Yes.
2    Q.   Okay.  And -- but there was a lawsuit on
3  that.
4    A.   Yes, sir.
5    Q.   How did you feel about this criminal charge
6  and the civil charge?
7    A.   I guess I thought that the criminal charge,
8  it was probably factually true.  I just didn't see
9  what difference it, you know.
10   Q.   All Class C assault is unwelcomed touching.
11   A.   Yes.
12   Q.   That's really all it is.  If I came up to you
13 right now and shoved you, that would be an assault,
14 because that's an unwelcomed touching.  Did it amount
15 to much more than that, just touch her on the
16 shoulder?
17   A.   No.  Yeah, that's all it was, yeah.
18   Q.   Okay.  And you said that was in your -- let's
19 just say "before life" when were you drinking and
20 stuff?
21   A.   Yes.
22   Q.   What made you stop drinking?
23   A.   That.
24   Q.   That was it?
25   A.   Yes.

156

1    Q.   That was your wake-up call, huh?
2    A.   Yes, sir.
3    Q.   How do you feel about alcohol and drugs in
4  relation to criminal cases?  Here's what I'm asking:
5  Sometimes people say, "This guy is an alcoholic and
6  he's got a disease," and so, when he gets caught
7  driving D.W.I., like the second or third time, they
8  say, "Hey, it's just a -- it's a disease he has.  It's
9  a medical condition."  Other people say, "Yeah, it
10 might be that, but you still -- the law is still you
11 can't drive and drink."  See what I'm saying?
12   A.   Yes.
13   Q.   I mean, I -- as far as I know, it's not
14 against the law to drink too much in your own home,
15 but when you're outside, especially behind a car,
16 driving and drinking, clearly, that's a legal thing,
17 instead of a medical thing.  I just kind of figuring
18 what -- what you feel about those statements?
19   A.   I think you're responsible for what you do,
20 whether you're drunk or high or whatever.
21   Q.   And that's what the law says.  The law says
22 it doesn't matter if you were drunk or high when you
23 did a crime, that's not a defense to crime.  Just flat
24 out.  You cannot use that.  Does that make sense to
25 you?

157

1    A.   Yes, sir.

2    Q.   I mean, you can't go rob a bank and say, "Oh,

3  I'm not guilty.  I robbed that bank, but I'm not

4  guilty because I was drunk."  You can't do that.  The

5  law says that's a possible mitigating circumstance,

6  but doesn't mean you can excuse your behavior for

7  that.

8         So is there anything about that -- and I

9  don't mean to dwell on that subject, is there anything

10  about those circumstances because, clearly, if you're

11  charged in court probably a prosecutor or law

12  enforcement came and put these charges on you, is

13  there going to be any, you know, ill feelings or, you

14  know, grudge against policemen, or the D.A.'s Office,

15  or the County Attorney's Office for doing their job

16  and doing their case?

17    A.   No, sir.

18    Q.   Okay.  You see where I'm coming from, right?

19  I -- I didn't think there would be, but sometimes

20  people say, "Well, you know, the D.A.'s Office is the

21  one that put my brother on probation," or, "The D.A.'s

22  Office, you know, took my cousin's, you know, license

23  away, or, you know, put him on probation."  And if you

24  feel that way, I just need to know.

25    A.   No.

158

1    Q.   It sounds to me like you're a person that

2  took responsibility for what happened, --

3    A.   I thought --

4    Q.   -- then -- then changed your life.

5    A.   I thought they treated me fairly.

6    Q.   Okay.  Well, then, you have a good

7  explanation in this case, and you want this person to

8  be treated fairly, correct?

9    A.   Yes, sir.

10    Q.   Just like you would want if you were being

11  charged.  Last thing I need to talk to you about in

12  that area is the deal in New Orleans in -- the bar

13  tab, or something like that?  Let me ask you, was Mike

14  Hummell with you?  No, I'm just kidding.

15         MR. GARZA:  He probably was.

16         MR. SKURKA:  He probably was.  No, I'm

17  just kidding.  We all know Mike, so...

18    Q.   (BY MR. SKURKA) Can you tell me a little bit

19  about that, what happened?

20    A.   I was working in New Orleans.  I was

21  launching a new -- I worked for Ernst & Young, and I

22  was flown into New Orleans office to work --

23    Q.   I'm sorry, I didn't hear who you worked for.

24    A.   Ernst & Young.

25    Q.   Okay.  That's a big C.P.A. firm?

159

1         Yeah.  And I was flown into New Orleans

2  to -- to work on a job there.  And we went out after

3  work, dinner for drinks, and they went home and I kept

4  drinking.  And I went into a bar, and they put --

5  well, some girls -- I think that -- some striper girls

6  came up, were talking to me, and everything, and I

7  think they ordered a bottle of champagne and put on it

8  my credit card, and I refused to pay, so the New

9  Orleans Police came and arrested me.  And I spent,

10  like, a night in jail, maybe -- maybe two nights, I

11  don't know, but I should have stopped drinking then

12  instead of waiting till '96, I guess.

13    Q.   What happened on that case in New Orleans?

14    A.   I paid the bill.

15    Q.   Okay.  That's all they -- you didn't get

16  actually charged with a crime?

17    A.   No.

18    Q.   Eventually just paid the bill?

19    A.   Yeah.

20    Q.   Sometimes you have to pick your battles, I

21  guess.

22    A.   Yeah.

23    Q.   That's an unfortunate experience.  Again, bad

24  experience with cops.  Did the cops mistreat you in a

25  way that you think cops are bad, or do something --

160

1  because, I've seen videos of New Orleans cops.

2    A.   Yes.  I have a lower opinion of New Orleans

3  cops than I do of most.

4    Q.   Okay.  Well, I'm not going to lie to you, I

5  saw some videos of New Orleans cops doing strange

6  things, too.  But, again, you have to look at my

7  perspective.  There's going to be cops testifying in

8  this case.

9    A.   Uh-huh.

10    Q.   They're not going to be probably the main

11  witnesses, but, clearly, they did the investigation

12  and work on the case.  Are you going to sit there and

13  say, "Goddang, I had a bad experience with cops, so

14  all cops are bad, --"

15    A.   No, sir.

16    Q.   -- or something like that?  Okay.  You'll be

17  able to evaluate them just like everybody else?

18    A.   Yes.

19    Q.   Okay.  This case is a capital murder

20  case, and I just want to go over the punishment issues

21  with you real quick.  The first issue is behind you.

22  I'd like you to read it with me, please.  This is, if

23  find the person guilty, you go on to the next part of

24  the trial.  The next part of the trial is, is there

25  a -- the first question is, "Is there a probability

161

1   the Defendant would commit criminal acts of violence
2   that would constitute a continuing threat to society".
3   Remember, the first part of trial is, generally, what
4   happened that day.
5           The second part of the trial is,
6   generally, what his background is.  You know, was he a
7   good person, was he a good character, bad character,
8   criminal record, no criminal record, whatever, and
9   then you answer that question.  The thing that -- the
10  key word I want you to key in on that is, is there a
11  probability.  Probability means more likely than not.
12  It doesn't mean for sure or certain.  It just says,
13  "probability."
14          It also says "...the Defendant would
15  commit criminal acts of violence."  Sometimes people
16  say, "Well, I'll only give the death penalty if I
17  think he's going to murder, again, or do a capital
18  murder, again," and I have to tell them, "No, it just
19  says 'any criminal acts of violence,'" and the last
20  part says, "constitute a continuing threat to
21  society."  What does that mean to you, "continuing
22  threat to the society?"
23      A.  Continuing to break the law, to steal and to
24  inflict violence.
25      Q.  You understand that even though a person --

162

1   sometimes people say, "Well, gosh, why don't you just
2   put him in prison for a life sentence, that way he
3   can't hurt anybody," and I always say, "Well, who else
4   is in a prison?"  Sometimes there's guards or other
5   inmates.  Have you ever heard of violence in a prison,
6   where they hurt guards or other prisoners or
7   something?
8       A.  Yes, sir.
9       Q.  Okay.  So would you agree with me that just
10  because they're locked up in prison doesn't
11  necessarily mean they're going to be kept from ever
12  hurting people, again?
13      A.  Yes, sir, I understand that.
14      Q.  And finally, this last part of mitigating
15  circumstances is one that says before you vote for the
16  death guilty, say you found him guilty of capital
17  murder, you think he's a continuing threat to society,
18  the Judge says, "Look, is there any other -- answer
19  this question, is there any other reason that he
20  should get a life sentence, instead of a death
21  sentence?"  And a life sentence being -- I'm sorry, a
22  death sentence being if there's no mitigating
23  circumstances, and a life sentence is there are
24  mitigating circumstances?
25          Remember those things I told you about

163

1   earlier, like, maybe he was an Eagle Scout, or he was
2   a good kid, or, you know, bad character -- good
3   character or bad character?  Some people may look at
4   that and say, "Well, you know, he was a good kid
5   before.  He was an Eagle Scout before.  I'm going to
6   lower the sentence and give him life, instead of
7   death."  Other people may say, "Well, no, I'm not real
8   sure about that.  I think it should be the death
9   sentence because I don't think there's enough in there
10  to warrant that a life sentence be imposed."
11          That's what the Judge asks you to do,
12  look at his background.  Look at everything.  Is there
13  any reason you should give him a lower sentence,
14  that's life instead of death?  You understand that?
15      A.  Yes, sir.
16      Q.  Okay.  You think you can follow that?
17      A.  Yes, sir.
18          MR. SKURKA:  Okay.  That's all the
19  questions I have at this point, Judge.
20          THE COURT:  All right.
21          MR. SKURKA:  Thank you, sir.
22          THE COURT:  Mr. Jones or Mr. Garza?
23          MR. JONES:  I'm going -- I'm going to do
24  it.
25

164

1                 VOIR DIRE EXAMINATION
2   BY MR. JONES:
3       Q.  The right to trial by jury is -- is not only
4   the right to have 12 citizens hear your case but also
5   it's a right to have 12 impartial jurors.  A right to
6   trial by jury is a right to an impartial jury.  What
7   does that word, "impartial," mean to you?
8       A.  Not biased either way.
9       Q.  Okay.  Impartiality suggests that you do not
10  have any leanings towards one side or the other.  Mr.
11  Skurka was asking you about your personal experience
12  over in Kingsville in the Criminal Justice System to
13  determine whether you had some negative leaning
14  against him, you know, "him" being the State.  That's
15  the -- there's all kinds of biases, so we have maybe a
16  family bias or a situational bias or occupational
17  bias.
18          As far as you know, do you have any
19  leanings towards one side or the other in this case?
20      A.  I don't have none that I can't -- I can
21  follow the rules that the Court sets for -- for being
22  a juror.
23      Q.  Okay.  You -- you hesitated in answering the
24  question.  Do you think you might have a leaning?  You
25  said -- you suggested -- your answer suggested, I

165

1    might have a leaning, but I can -- I can handle it.
2       A.   In this -- no, I don't have a leaning, no.  I
3    don't have a -- I can -- whatever it is, I can judge
4    this case on the rules that the case should be judged
5    on, and that's that.
6       Q.   Okay.  You were thinking about your answer
7    there.  What were you thinking about that you were
8    trying to say?
9       A.   Well, generally, not necessarily in this
10   case, I -- I tend to think criminals get away with too
11   much, I guess.
12      Q.   Okay.  That's all right.  That's something we
13   like to know about, okay?  Ideally, the ideal juror
14   comes to the task with a completely open mind, with no
15   expectations, and he doesn't know anything about the
16   case, and waiting to see what the State can prove,
17   okay?  Let's say that I am a -- I am a homeowner and
18   I'm called as a juror in a burglary of a habitation
19   case, and let's say that I've had my house
20   burglarized.
21            You know, frequently, when I pick a jury
22   in a burglary of a habitation case, we ask the members
23   of the panel, "How may people on the jury panel have
24   had their houses broken into," okay?  I'll have 15, 20
25   people sometimes raise their hand, okay?  Why would I

166

1    ask that question?
2       A.   To determine if they have a bias.
3       Q.   That's right, because if you've had your
4    house broken into, depending on the circumstances, you
5    might have a dim view of --
6       A.   But they would have to be prove to -- the
7    person would have to be proved to be a burglar before
8    that would even matter.
9       Q.   I understand.  But you can see how a person's
10   bad experience with a burglary might create an
11   attitude, you might say, or a -- or a -- or an
12   orientation which might tend to lean towards the
13   State?  In other words, here we go, again, you got a
14   -- I'm a juror in a burglary case.  If my house was
15   burglarized, and, you know, we're going to make sure
16   this guy --
17      A.   Well, we wouldn't need to feel any better to
18   convict somebody who was innocent of burglary to get
19   back at the guy who burglarized my house.
20      Q.   Okay.  But do you think a person's -- let's
21   say a person lives in a neighborhood where they got a
22   high crime rate.  You know, a lot of houses get broken
23   into.  There are fights and shootings and they're just
24   basically fed up with it all and they get called to
25   jury duty.  Can they be fair in a criminal case?

167

1       A.   Yes, sir.
2       Q.   Okay.  They might -- they might not have a
3    kind of a leaning toward the State because they feel
4    like -- in other words, they might have an agenda, if
5    you will.  In other words, if I -- if I feel like that
6    crime is a big problem, and, you know -- that I might
7    come to the task with an agenda.
8       A.   I don't see how it bases anybody's agenda to
9    convict someone that's not guilty of something in
10   doing it.
11      Q.   Well, I'm not -- but I'm not talking about
12   that so much as -- as your -- your position at the
13   beginning of the -- the task.  In other words, are you
14   going to be a little more open to his side of the case
15   than mine because of your feelings?  Are you going to
16   be -- the State has the burden of proof, and I would
17   hope that any -- anybody that sits on a jury is
18   constantly testing the case, the State's case.  You
19   know, they want to know, "Can you prove this?  This is
20   a serious case.  Do you have proof?  If you do, let me
21   see it.  How much do you have," rather than saying,
22   "Listen, I'm ready to convict this person.  All you
23   got to do is just who me some evidence."  See the
24   difference?
25      A.   The -- no, I would definitely require that

168

1    they fulfill their burden, which is beyond a
2    reasonable doubt.
3       Q.   Okay.  So you don't think that you would have
4    a leaning for the State, given what you just told me
5    while ago, that you tend to -- what did you say, they
6    -- yeah, criminals get away with too much?
7       Q.   No, I -- I think I can -- I can hold the
8    State to their burden of proof.
9       Q.   What do you mean by -- what's the basis of
10   your feelings, and I quote, "criminals get away with
11   too much"?
12      A.   Well, you know, they're sentenced to jail,
13   they got out early.  This is -- I -- it's not as much
14   of a problem as it used to be.
15      Q.   Uh-huh.
16      A.   You now, late 80s and early 90s, where pretty
17   much people were serving, like, maybe a tenth of their
18   sentence --
19      Q.   Uh-huh.
20      A.   -- and getting released.
21      Q.   Okay.  So do you -- do you feel like that,
22   like, our prisons give the inmates too many privileges
23   and amenities?
24      A.   Well, like, I said, I've had places where
25   I've worked, where people have had husbands who work

169

1    as prison guards, --

2        Q.   Uh-huh.

3        A.   -- and the prison guard -- I -- I thought it

4    was kind of outrageous what the prison guards had to

5    put up with.

6        Q.   Okay.

7             THE COURT:  Let me interrupt you.

8             MR. JONES:  Yes.

9                 VOIR DIRE EXAMINATION

10   BY THE COURT:

11       Q.   Let me ask you this, following up kind of

12   what he said.  I think what you're telling us is, you

13   know, I -- I would hold the State to the burden of

14   proof -- and you've found somebody not guilty before

15   in the trial you sat in before, so, obviously, there

16   is some evidence of that.  But let's say -- let's say

17   there's a conviction.  Let's say, you know what, you

18   hold the State to the burden of proof, and you hold

19   them to that burden, but they get there.

20       A.   Okay.

21       Q.   They have the evidence and they get there,

22   and then, you get over here and you -- we get to

23   punishment, and now you're thinking, "You know, what,

24   I think criminals get away with too much, and now we

25   got this guy where we want him," and would you --

170

1    would you -- would that influence the way that you

2    voted on these special issues?  The idea that

3    "Criminals get away with too much," would that

4    influence the second part, not holding them to the

5    burden.  I know you can do that because you told us

6    that, and, in fact, you found somebody not guilty in

7    that one trial you sat.  So, obviously, you know, I --

8    I think there's some evidence of that.  But you follow

9    my --

10       A.   Yeah, I just -- I'm just not sure what a

11   mitigating circumstance would be in my case, I mean,

12   from my -- I haven't --

13       Q.   Well, that's up to the jury, though.

14       A.   Yeah, and so I'm not sure whether I would

15   consider a mitigating circumstance.  If they were, you

16   know, abused as a child, but then there's people who

17   are abused as children and who don't commit crimes,

18   so, you know, I would have to --

19       Q.   But that's a potential one.

20       A.   Yeah.

21       Q.   That's something that people can consider.

22   Maybe -- maybe he was -- maybe he worked in the

23   community.  Many people say, you know, that matters to

24   me, that doesn't matter to me.  Are you telling me

25   that -- that there isn't anything --

171

1        A.   No.  I'm not saying that there isn't

2    anything.

3        Q.   Okay.

4        A.   I'm just -- I'm just not sure.

5        Q.   Well, you may never have thought about it,

6    before.

7        A.   Yeah.

8        Q.   This is a little -- it's a little bit off the

9    beaten path than what most human beings normally think

10   about, right?

11            THE COURT:  Okay.  Go ahead, Mr. Jones.

12                 VOIR DIRE EXAMINATION

13   BY MR. JONES:

14       Q.   Do you -- in your general observations about

15   the criminal justice system, do you think that people

16   charged with crimes have too many rights?

17       A.   No.

18       Q.   In your questionnaire, you said that you felt

19   there was too much time between the verdict and the

20   execution, which diminished the deterrent effect of

21   the death penalty.

22       A.   Yes, I believe that's true.

23       Q.   Why do you think that there's too much time

24   between the verdict and the execution?

25       A.   Because it takes ten years, generally, I

172

1    think.

2        Q.   Yeah, but what's going on in that period of

3    time?

4        A.   The -- the victim's family are waiting for

5    them to be executed.

6        Q.   No -- yeah, but what is the cause of the

7    delay?  What's going on?  There's something going on.

8        A.   There's appeals.

9        Q.   Appeals.  So are you saying that there should

10   not be appeals in capital cases, the most serious

11   criminal case on the books?

12       A.   No.  I think they should be structured where

13   they don't keep going back, covering the same -- same

14   ground over and over again.

15       Q.   Okay.  So do you think the -- you know, we

16   have an elaborate appeal process in criminal and civil

17   cases, for that matter.  And the purpose of the appeal

18   process is to correct mistakes.  You know, that's --

19   that's good.  Now, do you think it would be a benefit

20   to our society if we were less careful in a death

21   penalty case, than, say, a nondeath penalty case, and

22   limit our appellate rights?

23       A.   No, sir.  I just think they should be

24   structured so that you -- it gets done in a shorter

25   period of time than it takes right now.

173

1    Q.   Okay.  The -- now, you've told us that you're
2    generally -- in Texas, we have the death penalty as a
3    form of punishment.  It's authorized in certain of
4    many cases.  All of them have to be a homicide or a
5    murder plus, as the Judge said, some other aggravating
6    circumstances, as set out in the statute.
7           Now, do you believe that society, Texas
8    society, benefits from the death -- having the death
9    penalty as an option in certain cases?
10    A.   Yes.
11    Q.   What -- can you articulate or tell me what
12    that benefit is?
13    A.   There's deterrence, in that the -- the person
14    executed is absolutely deterred from ever committing
15    another crime.  There may a deterrent effect of -- on
16    other criminals who might -- who might commit a crime,
17    and then there's just the fact that it's sometimes an
18    adequate punishment.
19    Q.   Okay.  Just punishment, no matter what.
20    A.   Yes, sir.
21    Q.   Okay.  Now, have you -- and over the past
22    couple of years -- actually, it's been more than a
23    couple of years, but it seems like, recently, there's
24    been more stories about this.  And many of them, the
25    stories are coming out of Dallas County, that people

174

1    who are convicted of nondeath penalty cases have been
2    found to be factually innocent because of the -- the
3    D.N.A. testing.  In other words, because of the writ
4    of habeas corpus, their cases were reopened, and they
5    were found that they were not -- they were not -- they
6    were convicted by mistake.
7           Each case is different, and there's --
8    sometimes there are multiple reasons for that
9    happening.  But when you read this -- have you read
10    any of those stories?
11    A.   Yes, sir.
12    Q.   And when you read a story about some guy, you
13    know, been in prison for 20 years, and now they're
14    releasing him because the system has found that he was
15    convicted by mistake, how does that make you feel?
16    A.   I feel bad for the person.
17    Q.   Sure.  You feel bad for the person.
18    A.   Who spent all that time jail when he was
19    innocent, yes.
20    Q.   So, when you read stories about that, and you
21    -- and it proves, and you have to accept that -- that
22    the criminal justice system, like every other
23    institution in our society, is run by -- by nonperfect
24    people.  People make mistakes, right?
25    A.   Yes, sir.

175

1    Q.   We set up elaborate procedures to try not to
2    make those mistakes, okay, but they get made from time
3    to time, okay?  Now, in the case of these fellows from
4    Dallas, when it was discovered that they were
5    factually innocent, they were alive, okay, to be
6    released from prison.  In a death penalty case, after
7    a person is executed, there's no -- there's no chance
8    to undo that.  That's a final -- if a mistake was
9    made, the person is dead, you can't undo it.  Because
10    I haven't found out anybody that's been able to undo
11    and bring back -- a person back from the dead.  You
12    agree with that?
13    A.   Yes, sir.
14    Q.   So, if you -- if you believe and accept that
15    our society benefits from the death penalty, and you
16    said that you believe that it does, and you've
17    actually said -- given me specific reasons, is that
18    benefit worth the chance that, from time to time, you
19    know, maybe rarely, that we would convict and execute
20    an innocent person?
21    A.   In my view it is.
22           MR. JONES:  No further questions.
23           THE COURT:  Okay.  Anything else?  Mr.
24    Skurka?
25           MR. SKURKA:  No, Your Honor.

176

1           THE COURT:  All right.  Why don't you
2    have a wait -- wait just a second in the jury room.
3           VENIREPERSON NO. 60:  Okay.
4           (Venireperson exits courtroom.)
5           THE COURT:  All right.  Mr. Skurka.
6           MR. SKURKA:  One moment, Judge.
7           THE COURT:  Okay.
8           (Brief pause.)
9           MR. SKURKA:  Judge, we'll accept the
10    juror.
11           THE COURT:  All right.
12           MR. JONES:  I'd like to exercise a
13    peremptory challenge strike.
14           THE COURT:  No. 7?
15           MR. JONES:  No way he's going to sit on
16    this jury.
17           THE COURT:  All right.  Bring him in.
18           (Venireperson enters courtroom.)
19           THE COURT:  All right, Mr. Blanton, you
20    were not selected to be on this jury, but we
21    appreciate your time, and thank you for coming down
22    and spending time with us.  Thank you very much.  If
23    you need a work excuse, the bailiff can help you with
24    that.
25           VENIREPERSON NO. 60:  No.

177

1      (Venireperson exits courtroom.)

2      THE COURT:  All right, bring in the next

3  person.

4      (Venireperson enters courtroom.)

5      THE COURT:  You are Robert Cortinas?

6      VENIREPERSON NO. 62:  Good afternoon.

7      THE COURT:  Okay.  All right, have a

8  seat, Mr. Cortinas.

9

10          VENIREPERSON NO. 62,

11          ROBERT CORTINAS, JR.,

12          VOIR DIRE EXAMINATION

13  BY THE COURT:

14      Q.  Okay.  We've got your questionnaire.  And,

15  obviously, you know we're trying to pick a capital

16  murder jury, okay?

17      A.  Yes, sir.

18      Q.  I'm going to talk to you about some things.

19  First of all, we're looking for jurors that can keep

20  an open mind and follow the law, all right?

21      A.  (Nods head.)

22      Q.  Now, we're going to run till pretty close to

23  noon, but I'm thinking you're going to have to come

24  back after lunch, okay?

25      A.  Okay.

178

1      Q.  All right.  First of all, you heard about the

2  case.  You work nights.  The main -- we need to have

3  jurors that can keep an open mind and follow the law

4  okay?  We need to know if you can keep an open mind.

5  Say you've heard some stuff about the case and all due

6  respect to the media, they don't always get it right,

7  okay?

8      A.  Uh-huh.

9      Q.  So I need to know if you can keep an open

10  mind in this case?

11      A.  Yes, sir.

12      Q.  Okay.  And you understand that if you're

13  selected on this jury, you cannot consider things that

14  you may have heard.  It may not be accurate, okay?

15  You follow me?

16      A.  Yes, sir.

17      Q.  Okay.  All right.  You wouldn't do that?

18      A.  No.

19      Q.  Okay.  So you can keep an open mind in this

20  case, nothing else would prevent you from keeping an

21  open mind.

22      A.  No.

23      Q.  Okay.  Second, let's talk about the law, all

24  right, that you -- we need to talk to you about.

25  You've never been on a jury before; is that right?

179

1      A.  No.

2      Q.  No?  Okay.  Well, that's okay.  There is no

3  requirement that you have prior jury experience here.

4  All right, let's talk about some things.  The law says

5  the State brings the charges and the State has to

6  prove them.  You agree with that law?

7      A.  Yes, sir.

8      Q.  Okay.  And, I mean, there's some places where

9  State brings the charges and you're kind of already

10  guilty until you can prove otherwise, okay?  We don't

11  do that in this country.  Let's get to my second part

12  of my -- of my spiel on the law.

13          In this country, every person that is

14  within these borders is presumed innocent until the

15  State can prove otherwise, okay?  And we sometimes ask

16  kind of a silly question when we say, "Defendant is --

17  if you had to vote right now, how would you vote?"

18      A.  I don't know.

19      Q.  Well, see, that's what people say, and -- and

20  really and truly, it's kind of a silly question,

21  because we never ask people to do that.  I mean, we --

22  we wait and have a trial, right?

23      A.  (Nods head.)

24      Q.  But the fact of the matter is, he's not

25  guilty until they can prove otherwise.  You follow me?

180

1      A.  Uh-huh.

2      Q.  Okay?  So let's say we start the trial and

3  State presents almost nothing.  I mean, it's just bad

4  evidence.  You don't -- you don't buy it.  Well, how

5  do you vote?

6      A.  Let him go.

7      Q.  Not guilty.

8      A.  Yeah.

9      Q.  All right.  Well, that gets us to the burden

10  of proof.  Burden of proof is beyond a reasonable

11  doubt.  It's not defined, but it is the highest burden

12  in the law, in all of the law, okay?  You follow me?

13  Yes?

14      A.  Yes.

15      Q.  Okay.  And I need a vocal statement from you,

16  because she's --

17      A.  Oh, okay.

18      Q.  -- she's typing.

19      A.  Okay.

20      Q.  See, I get your nods, but she's typing, so...

21      A.  Yeah, okay.

22      Q.  Okay.  All right.  So it's -- it's the most

23  -- it's the highest burden.  It's not beyond all

24  doubt, okay?  It's not beyond a shadow of a doubt.

25  Because, otherwise, if it was a -- you know, if you

181

1  knew beyond all doubt, you would have been a witness,
2  okay, and if you're a witness, you can't be a juror.
3  But, make no mistake, it's a high burden.  They got to
4  prove it.  Would you hold them to that burden, the
5  State?
6     A.  Yes, sir.
7     Q.  Okay.  Now, along the same lines of these
8  things I'm talking about, that is, the State's got the
9  burden of proof, burden never shifts to the Defense,
10 Defense doesn't have to do anything in their trial.
11 They don't have to present evidence.  They can if they
12 want to, but law says they don't have to.  Why?
13 Because they don't have anything -- they don't have
14 anything -- they don't have to prove innocence.  He's
15 got to prove he's guilty.  You follow me?
16    A.  Yes, sir.
17    Q.  You agree with that?
18    A.  Yeah.
19    Q.  Okay.  As part of that, the law says -- and
20 not just the law, the U.S. Constitution, part of the
21 Bill of Rights.  You know, it's been with us since
22 the -- the Constitution was enacted.  And that is, the
23 Defendant doesn't have to testify, okay?  They can't
24 make him testify, the State doesn't.  And it's more
25 than that.  Jury goes back to deliberate, they can't

182

1  say, "I don't know about the State's case, but I'm
2  going to put a star over here in the State's corner,
3  because I didn't hear his side of the story."  Doesn't
4  work that way, flat out doesn't work like that, okay?
5     A.  Uh-huh.
6     Q.  Jury cannot hold it against the Defendant if
7  he chooses not to testify, okay?  There's lots of
8  reasons, I -- I submit why somebody wouldn't want to.
9  Maybe his lawyers told him not to.  Maybe his lawyer
10 said, "I don't want you to testify.  They haven't
11 proven their case."  Okay?  Maybe -- maybe the
12 Defendant gets stressed.  I had a friend that used to
13 laugh inappropriately when he got nervous, okay?
14 People took it the wrong way.  He wasn't laughing, he
15 was just stressed, okay?  Lots the reasons why
16 somebody wouldn't want to testify.
17          But I need to know from you, would you go
18 back there and hold it against him if he didn't -- if
19 he didn't testify?
20    A.  If he didn't go up?  No.  Because he doesn't
21 have to prove anything.
22    Q.  That's right, that's right.  Okay.  All
23 right, so it sounds like you can follow those laws.
24 And those laws that I just talked to you about, those
25 are in every criminal case.  I mean, this is a capital

183

1  murder, but those are in every criminal case, okay?
2          Now, let's talk a little about the law in
3  this case.  What is this case about?  What is capital
4  murder, okay?  Well, it's murder, right, because it's
5  -- murder is in the -- in the -- it's part of the --
6  the word, right, "capital murder."  But it's more than
7  murder.  Murder is the intentional taking of the life
8  of somebody else, okay?  This is like murder plus, all
9  right, and there's -- there's a list of things that
10 the legislature -- situations in which murder, plus
11 something else makes capital murder, okay?
12          In this case, the State is alleging that
13 the Defendant committed murder while in the course of
14 committing or attempting to commit a robbery.  Okay,
15 what's a robbery?  Well, forcibly taking something
16 from another is a robbery, right?  If I came and I
17 pointed a gun at you and you gave me your wallet, that
18 would be robbery.  If I came and I pointed a gun at
19 you and you punched me out and you didn't get -- I
20 didn't get your wallet, would that -- would that be
21 robbery?  Well, it would be attempted robbery, right?
22    A.  Yes, sir.
23    Q.  State can -- State wins either way on the
24 robbery, all right?  But if I came and stole something
25 from you, and you didn't know it, like, I picked your

184

1  pocket, that wouldn't -- that wouldn't be a robbery,
2  because there was no threats or force, okay?  You
3  follow me?
4     A.  Yes, sir.
5     Q.  Okay.  But the State has to prove robbery or
6  attempted robbery, plus murder, together.  They have
7  to put it all together to get to capital murder, all
8  right?  And there's a bunch of elements because they
9  got to prove murder and the robbery, and they got to
10 prove on a given day, they got to prove in Nueces
11 County, Texas, and they got to prove it's him.  All
12 right.
13          Would you hold them to their burden of
14 proof and make them prove all the elements of the
15 crime?
16    A.  Yes, sir.
17    Q.  Okay.  Next, we talked -- I told you what
18 capital murder -- how they're alleging they get to
19 capital murder, and I've told you that a capital is
20 robbery, plus a murder, okay, or attempted robbery,
21 plus a murder.  But what does capital murder mean?
22 Capital murder means that the death penalty is a
23 possibility, okay?  Murder is a bad crime, and murder
24 is a first degree felony but you cannot get death
25 penalty for just a murder.  Sounds funny to say, "just

185

1  a murder," right, because it's awful, but it's just a
2  murder. This is more than just a murder, okay? If
3  they have can prove their allegation then Defendant is
4  eligible for the death death penalty. And, right now,
5  it's just an accusation, right?
6      A.  Yes, sir.
7      Q.  I mean, the State can accuse anybody of
8  anything they want, but they got to prove it. You
9  follow me?
10     A.  Yes, sir.
11     Q.  Okay. In Texas, we have a bifurcated system,
12 that is -- what does that mean? That's just a big
13 word that means it's two parts, okay? First part,
14 guilt or innocence. The jury would be impaneled, and
15 then they would -- they would listen to the -- to the
16 facts and see if the State can prove their evidence
17 beyond a reasonable doubt that this Defendant is
18 guilty of the crime they've charged him with, okay?
19 And then, they vote, what, guilty or not guilty.
20         Not guilty verdict means it's over, we
21 stop. But if the -- if the jury finds the Defendant
22 guilty, we go on to the second part of the trial, the
23 punishment phase. And there's two things that can
24 happen, life in prison or death, okay? Serious --
25 serious punishments, okay? But you don't say death or

187

1  what kind of guy he is. Is he a good guy, is he a bad
2  guy? Has he done maybe things that would -- I don't
3  know, maybe he's been a good person to his family,
4  maybe he's been good in the community, maybe he's
5  never been in trouble before, maybe -- maybe he's an
6  Eagle Scout, okay?
7          Now, what is mitigating circumstances?
8  Well, mitigating is to lessen, right?
9  Circumstances -- lessening things, circumstances,
10 things that lessen. Is there enough things that
11 lessen, you know, that tend to weigh in his favor.
12 Let's just say, is there sufficient, right? What is
13 sufficient? That means enough, right? Is there
14 enough things in his favor, basically, to warrant a
15 life sentence, rather than a death sentence? You
16 follow me?
17     A.  Yes, sir.
18     Q.  Okay. And -- and what -- what is a
19 mitigating circumstances? Well, that's up to the
20 jury. These lawyers may suggest to you what a
21 mitigating circumstance is, but you know what? All it
22 is, is a suggestion. It's up to you, the jurors, the
23 people. The people decide what's a mitigating
24 circumstance, okay?
25     A.  Yes, sir.

186

1  life, you answer questions. I think I told you that
2  that first day when you came. You answer questions.
3          And these -- let's go over them. This
4  is -- this is the question, if you'll look over.
5  "Special Issue No. 1. Is there a probability that the
6  Defendant would commit criminal acts of violence that
7  would constitute a continuing threat to society?" All
8  right? What does that mean? Well, is he going to be
9  a -- is it probable that he's going to commit acts of
10 violence in society, all right? That's what that
11 means. And you would answer yes or no, okay?
12     A.  (Nods head.)
13     Q.  Then you go on to Special Issue No. 2. It's
14 over your right shoulder. "After taking into
15 consideration all of the evidence, including the
16 circumstances of the offense," well, what's that,
17 that's the guilt or innocence part, "the Defendant's
18 character and background, and the personal moral
19 culpability of the Defendant, is there a sufficient
20 mitigating circumstance or circumstances that would
21 warrant a sentence of life imprisonment, rather than a
22 death sentence be imposed?"
23         Now, what does this mean? Well, at the
24 second part of this trial, you may be given more
25 evidence, that is, about the Defendant's background,

188

1      Q.  And then there's an endless list of what it
2  could be. Maybe, you know, like I said, maybe --
3  maybe he was -- he did community service. And some
4  people would say, "You know what, that's a mitigating
5  circumstance." Some people would say, "No." Some
6  people might say, "That's enough of a mitigating
7  circumstance where I think I should vote for life in
8  prison, instead of death." Others would say, "Yeah,
9  that's good that he did that but it's not enough for
10 me. It's not sufficient." Okay? You follow this
11 question?
12     A.  Yes, sir.
13     Q.  All right. Now, at the beginning of the
14 trial, I always -- I always do this, and the jurors
15 raise their right hand, and I say, "Do you swear that
16 you can render a true verdict based upon what the law
17 and the evidence is presented to you in this case,"
18 and they say, "Yes." All right? I'm asking you, and
19 we're going to break it up, on the guilt or innocence
20 phase, can you render a true verdict based upon the
21 law and evidence presented to you in this case?
22     A.  Yes, sir.
23     Q.  Okay. Let's go to the second phase, if you
24 get to the second phase, and some people tell me, "I
25 cannot answer these questions, because it could lead

189

1  to someone's death, and I cannot participate in that."
2  Others say, "I don't care what these questions have to
3  say. If I find him guilty of capital murder, I'm
4  going to vote for death. I don't care about the law."
5         Now, for you to be able to -- I mean, we
6  need people that can follow the law and answer these
7  questions truthfully, okay? Can you take the oath and
8  answer these questions truthfully?
9  A.  Yes, sir.
10  Q.  All right. Well, Mr. Skurka, I'll give you a
11  little bit.
12         MR. SKURKA: Okay, Judge.
13         THE COURT: Do you want to go ahead and
14  start?
15         MR. SKURKA: Uh --
16         THE COURT: Or you want to wait until
17  after lunch.
18         MR. SKURKA: I don't really want to break
19  it up, Judge, --
20         THE COURT: Okay.
21         MR. SKURKA: -- if that's okay.
22         THE COURT: Let's do this, we're running
23  a little behind. I'm going to go ahead and send you
24  to lunch right now. I'm going to have to have you
25  come back about 1:00, all right?

190

1         VENIREPERSON NO. 62: At 1:00?
2         THE COURT: Yeah, I mean, I'm sorry.
3         VENIREPERSON NO. 62: No. That's okay.
4         THE COURT: At least we got partial the
5  way through, okay? So, the lawyers are going to talk
6  to you after lunch, okay?
7         VENIREPERSON NO. 62: Okay.
8         THE COURT: All right.
9         VENIREPERSON NO. 62: Be back by 1:00?
10         THE COURT: Yeah, be in the jury room,
11  just like you were before, at 1:00, and we'll continue
12  on with your part, all right?
13         VENIREPERSON NO. 62: Okay.
14         (Venireperson exits courtroom.)
15         THE COURT: All right. We'll see you-all
16  after lunch.
17         MR. SKURKA: Thank you, Judge.
18         (Noon recess.)
19         (Venireperson enters courtroom.)
20
21         VENIREPERSON NO. 53,
22         JOE RAY HOPKINS,
23         VOIR DIRE EXAMINATION
24  BY THE COURT:
25  Q.  All right. You are Mr. Joe Hopkins?

191

1  A.  Yes, that's right.
2  Q.  All right. Mr. Hopkins, let's see here. Mr.
3  Hopkins, obviously, we know -- you know that we're
4  here to pick a jury for a capital murder case, okay?
5  A.  That's correct.
6  Q.  And we're looking for people that can keep an
7  open mind and follow the law, okay?
8  A.  (Nods head.)
9  Q.  So, first of all, can you keep an open mind?
10  A.  Yes, sir, I sure can.
11  Q.  Okay. Some people say, "Well, I've heard
12  something about the case in the media," or -- or for
13  whatever reason they think they can. But that's not
14  you?
15  A.  No, sir, that's not.
16  Q.  Okay. All right. Now, you may have heard
17  something in the media. Have you?
18  A.  Well, I work for the media.
19  Q.  Okay.
20  A.  Kind of manager, but --
21  Q.  Okay.
22  A.  -- other than that.
23  Q.  With all due respect, the media doesn't
24  always get it right, okay?
25  A.  That's right.

192

1  Q.  And what we want is for people to come to
2  court and only base their decision based upon what's
3  presented in evidence, okay? Can you do that?
4  A.  Yes, sir, I sure can.
5  Q.  Okay. All right. Then let's talk about some
6  things. Have you ever been a juror before?
7  A.  I was on a murder case probably ten years ago
8  that got dismissed after a juror overheard during the
9  lunch, something or other --
10  Q.  Okay.
11  A.  -- overheard the -- one of the attorneys
12  talking, so --
13  Q.  Okay.
14  A.  -- it got dismissed.
15  Q.  All right. But then you know a lot of these
16  concepts we're going to go through because I'm sure
17  you were asked about them before, like, the proof in
18  this case, the burden's on the State to prove it. In
19  other words, the State's brought the charges. Law
20  says, "State, you bring the charges, then you got to
21  prove them." Do you follow me?
22  A.  Yes, sir.
23  Q.  And the burden of proof is beyond a
24  reasonable doubt, okay? You may be familiar with
25  that.

193

1    A.    Yes.

2    Q.    Beyond a reasonable doubt does not have a

3 definition but it is the highest burden that we have

4 in the law, okay?

5    A.    (Nods head.)

6    Q.    And -- and it's not -- what it's not is, it's

7 not beyond a shadow of a doubt or beyond a reasonable

8 doubt.  It's not those.  It's also not the lower

9 burdens that we have, like preponderance of the

10 evidence, okay?  Preponderance of the evidence, sort

11 of 51 percent.

12   A.    Right.

13   Q.    Civil case-type stuff.  There's also clear

14 and convincing, which is higher than preponderance.

15 Not that, either.  It's -- it's higher than that,

16 okay?

17   A.    Okay.

18   Q.    Could you hold the State to that burden?

19   A.    Yes.

20   Q.    Okay.  Now, as -- going back to the idea that

21 the State has the burden of proof, State always has

22 the burden of proof, okay?

23   A.    Right.

24   Q.    And the law says that, since the State's got

25 the burden of proof, there's a presumption of

194

1 innocence that everyone has.  They're presumed

2 innocent, unless someone can prove otherwise.  In

3 other words, this person is presumed innocent, unless

4 this man over here, these folks over here, can prove

5 otherwise, okay?

6    A.    Yes, sir.

7    Q.    And you have to -- you have to presume that

8 that's the case, all right?

9    A.    Okay.

10   Q.    So, at this point, it would be not guilty,

11 right?

12   A.    That's correct.

13   Q.    At this point.  You haven't heard any

14 evidence.  Now, maybe you hear some evidence and you

15 think, "Well, I think he's proven the case beyond a

16 reasonable doubt," what do you do?

17   A.    Recognize he's innocent, till proven.

18   Q.    All right.  But what if you hear some

19 evidence, and you hear some evidence that you don't

20 think is very good?

21   A.    Very good for?

22   Q.    For the State, for the State.  You don't --

23 you don't think their evidence --

24   A.    Oh, their evidence.

25   Q.    Yeah, the State's evidence.  You don't think

195

1 it -- you don't think it's -- you don't think much of

2 it.

3    A.    Well, like, you say, he's got to prove it

4 beyond a reasonable doubt, and that's a high standard.

5    Q.    Okay.  All right.  Now, this is a little

6 bit -- this is also along these same lines but a

7 little bit more involved.  The Constitution of the

8 United States and the Bill of Rights says that

9 Defendant cannot be required to testify at his trial.

10 He's got a right not to testify, and I think there's

11 lots of reasons why.

12        One, his lawyers may instruct him not to

13 because they think the State hasn't proven their case.

14 Maybe he -- maybe he's not good under pressure, maybe

15 he's not a speaker, just comes across wrong.  Some

16 people do.  All right?

17   A.    Sure.

18   Q.    But, in any event, law says not only can the

19 State not force him to testify but a juror can't hold

20 it against him, okay?  Some people say, "Well, I'm

21 going to hold it against him."  But I need to know if

22 that's you.  Would you hold it against him if he chose

23 not to testify?

24   A.    No, sir.  I've been there, done that.  I've

25 done trials before, so I realize...

196

1    Q.    Yeah, and I know you -- you've got some

2 experience in a murder case, so that gets me to my

3 next point, and that is, you were seated on that

4 murder case, and I take it that was just, I guess,

5 regular murder?

6    A.    Yes.

7    Q.    Okay?  Now, it's kind of hard to say,

8 "Regular murder," right, because murder's such a

9 horrible thing anyway.

10   A.    Right.

11   Q.    But, of course, that's the intentional taking

12 of the life of another.  And this is -- this is

13 murder, plus, okay?  This is murder, plus some other

14 special circumstance that the legislature has given us

15 a laundry list of.  In this particular one, the State

16 is alleging that the Defendant committed murder on a

17 given date, in Nueces County, Texas, while committing

18 or attempting to commit a robbery, okay.

19        So, -- so, basically, they've got two --

20 two serious felonies put together, all right?  And the

21 legislature said, "Well, if you got these two serious

22 felonies, you put them together, and that can be a

23 capital murder," okay?

24   A.    Yes.

25   Q.    And there's a number of elements because they

197

1    got to prove murder and they got to prove the robbery
2    or attempted robbery.  And, of course, what that's?
3    Well, that's the forcible taking of property from
4    another or the attempt to do so, okay?
5        A.   Uh-huh.
6        Q.   And they got to prove that.  And they've got
7    to -- I don't know how many elements there are, but
8    there's a number of them, okay?  Would you -- would
9    you make them prove all the elements of capital murder
10   before you found the Defendant guilty of capital
11   murder?
12       A.   Yes, I would.
13       Q.   Okay.  Now, I know you've been on a murder
14   case.  Have you ever been on another jury before?
15       A.   I might have been on something minor, but I
16   can't recall.
17       Q.   Okay.  In Texas, we have a bifurcated system,
18   all right, which means we got two parts of the trial.
19   The first part is guilt or innocence.  The first part
20   of the trial you -- you, if you're selected as a
21   juror, will be asked to go back in the jury room after
22   the first part of the case is done, after all the
23   evidence is presented to you, and determine whether
24   the State has proven their case beyond a reasonable
25   doubt, okay?

198

1        A.   Okay.
2        Q.   If the Defendant is acquitted, that's the end
3    of the case.  If Defendant is convicted, we go on to
4    the second part, which is the -- the penalty phase.
5    And there's two possibilities in a capital -- capital
6    case, on punishment, if a Defendant's found guilty;
7    there's life in prison or death.  Only two
8    possibilities.
9        But the jury doesn't say that.  They
10   don't -- in that murder case, if you were -- had been
11   asked -- had gotten that far and you were asked to do
12   punishment, and the Defendant had been found guilty,
13   that's 5 to 99 or life, and, in some cases,
14   probation's a possibility, and you can give a fine of
15   up to $10,000, okay?  And the jury would back and they
16   would -- there would be a little blank for you to
17   write, I don't know, whatever you thought was
18   appropriate.
19       We don't do that in capital cases.  We
20   answer questions, okay?  And here's the first
21   question, if you'll look over your left shoulder,
22   there.  "Is there a probability that the Defendant
23   would commit criminal acts of violence that would
24   constitute a continuing threat to society?"
25       MR. JONES:  Sorry, Judge.

199

1        THE COURT:  That's okay.  Okay?  And the
2    jury would answer this question yes or no.  All right,
3    basically, what is this?  "Is it more likely than not
4    the Defendant would commit criminal acts of violence,"
5    be a violent person, actually "commit acts of violence
6    that would constitute a threat to society," to others,
7    okay?
8        A.   Okay.
9        Q.   And you've got to make that determination.
10   Then, over here, "After taking --" this is a second
11   question, okay, "After taking into consideration all
12   of the evidence, including," what, "the circumstances
13   of the offense," which is the guilt or innocence part,
14   okay, "the Defendant's character and background, and
15   the personal moral culpability of the Defendant, is
16   there a sufficient mitigating circumstance or
17   circumstances to warrant a sentence of life
18   imprisonment, rather than death sentence be imposed?"
19       Okay.  At the second part of the trial,
20   you may hear a lot more stuff about the Defendant.
21   Maybe he was a great guy other than this incident.
22   Maybe he wasn't.  Maybe he had a good criminal
23   history, that is, he didn't have one.  Maybe he a bad
24   criminal history.  Maybe he was an Eagle Scout.  I
25   mean, and that's -- that's where these mitigating

200

1    circumstances are, okay?  Is there enough mitigation,
2    that is, lessening, okay, things that lessen his --
3    perhaps, his overall -- should lessen his overall
4    sentence, you know, if you hear enough good things
5    about him, it's sufficient, sufficient, enough
6    mitigating circumstances, to warrant life, rather than
7    death.
8        And you have to consider everything that
9    was admitted at the whole trial to answer this
10   question.
11       A.   So prior history's going to be entered into
12   in this trial?
13       Q.   Well, that's -- I mean, the State has to
14   prove their case, okay?  There's a whole lot of things
15   about a person's background that aren't relevant,
16   like, I don't know, like, if he was an Eagle Scout.
17   What does that have to do with whether he committed
18   this crime or not?
19       A.   Sure.
20       Q.   The first part of the case is only did this
21   Defendant commit this crime and did they prove it
22   beyond a reasonable doubt?  That's the only issue
23   you're going to -- you're going to be asked to -- to
24   -- and then -- then when you get to punishment, then
25   everything gets to come out, background, okay?

201

1    A.   Okay.
2    Q.   All right.  Does that make sense?
3    A.   Yeah, it does.
4    Q.   Okay.  And so, you know, you go through all
5  this stuff.  Now, at the beginning of the trial, I
6  will -- I always give an oath.  And you've gone
7  through this before, you know what I'm talking about.
8  I give an oath, and the jurors all raise their right
9  hand and they -- I say, "Do you solemnly swear that
10  you will render a true verdict based upon the law and
11  the evidence presented to you," okay?
12    A.   Okay.
13    Q.   And the jurors say, "Yes."  So I need to
14  know -- I need to ask you if you can take that oath.
15  And let's -- let's divide it up, okay?  First part,
16  can you do that on the guilt or innocence phase of
17  this trial, can you take that oath?
18    A.   Yes, I can.
19    Q.   Okay.  Now, let's go to the punishment phase.
20  Some people say, "I can do it on the guilt or
21  innocence phase, but, quite frankly, I cannot
22  participate in a -- in a proceeding that would
23  possibly lead to someone's death, so I cannot answer
24  these questions truthfully for you," all right?  And
25  others would say, "If -- if there was a -- if the jury

202

1  found him guilty, I'd give him a fair trial, in the
2  first part, but, for me, it's a knee-jerk deal.  I
3  mean, if he's found guilty of capital murder, I'm not
4  going to consider this stuff.  I'm not going to follow
5  your law.  I'm always going to recommend the death
6  penalty," okay?  There's people that feel that way,
7  okay?  But they can't -- neither of those instances
8  can answer these questions truthfully and take that
9  oath.  I need to know if you can answer these
10  questions truthfully if we get to that point and take
11  that oath?
12    A.   Yes, I sure can.
13         THE COURT:  All right.  Mr. Skurka.
14         MR. SKURKA:  Thank you, Judge.
15              VOIR DIRE EXAMINATION
16  BY MR. SKURKA:
17    Q.   Good afternoon, sir.  How are you doing
18  today?
19    A.   Doing pretty good.
20    Q.   The part of the case that we're going to talk
21  about today has a lot of different questions and
22  issues and feelings about different parts of the law.
23  What I'm going to tell you, right off the bat, is
24  there's no right or wrong answer in anything you say.
25  We want you to hear what you feel or how you react to

203

1  a certain thing.  And I don't want you to answer in
2  such a way that you think I want to hear it or the
3  Judge wants to hear it or they want to hear it.  You
4  see what I'm saying?
5    A.   Right.
6    Q.   Sometimes people will say, "Well, I guess, I
7  better answer it this way, because they want me to
8  answer it this way."  No, we just want to know what
9  your true feelings are.  No one is going to argue with
10  you about your beliefs or your feelings.  We just kind
11  of need to know where you're coming from.  Is that
12  fair enough?
13    A.   That's fair.
14    Q.   Good.  Tell me how you felt about when you
15  first were brought in that big room, remember that day
16  we had 200 or 300 people in the room and you found
17  out, or the Judge came down and said, "Okay, folks,
18  this is the Defendant, John Henry Ramirez, and you
19  may -- if you get on this jury, you may have to decide
20  whether he gets the death penalty or not," tell me
21  what your first reaction was when you heard it that
22  kind of a case?
23    A.   Honestly, I think, I can be fair and open and
24  honest.  You know, the -- the busy work schedules, you
25  know, honestly it was the first thing that came to my

204

1  mind.  I hate to diminish such a, you know, heinous
2  crime and what we're here for and what we're here to
3  serve on, but, you know, like I say, when he said a
4  two-week trial, you know, I'm thinking, "I could do
5  that, but I'm going to have to shuffle some things
6  around in my work schedule".
7         THE COURT:  It may not be quite that
8  long.  We don't know.
9         VENIREPERSON NO. 53:  Sure.  Sure.
10    Q.   (BY MR. SKURKA)  We kind of guess on the
11  outside, just in case.  We don't want people to say
12  it's going to be two days and they're stuck there for
13  five days, so we kind of estimate broadly on the
14  thing.
15    A.   Yeah.
16    Q.   And I'm sure you, and a lot of other people
17  thought the same thing, "Am I going to be able to miss
18  work that long," or, "I have a business to run," or I
19  have this, or maybe some people are, like, I always
20  say, junior high school teachers can't wait to get out
21  of having to go back to their kids in the junior high,
22  but, I don't know, I'm just saying that.
23    A.   Sure.
24    Q.   But the point is this, when I -- when I --
25  when the Judge says those things, sometimes you -- I

205

1    don't know if you saw the reaction around you, but
2    sometimes people are going, like, "Oh, my God, I have
3    to make that kind of decision?  Oh, my gosh, I thought
4    this was going to be like a D.W.I. case or a burglary
5    case, and now the Judge is saying I'm going to have to
6    make a death penalty decision," and -- and that's what
7    I'm kind of getting at.
8        A.  Yes.
9        Q.  Did you react that way --
10       A.  No.
11       Q.  -- like were you worried about that part of
12   the trial?
13       A.  No.  Honestly, that -- good, bad or
14   indifferent, that didn't enter into my thought
15   process, so...
16       Q.  So you're the kind of person that can deal
17   with a jury trial, whether it's a shoplifting case, a
18   arson case, a murder case?
19       A.  Yes.
20       Q.  Okay.  And that's what we're looking for, and
21   the jury should be able to do that.  There's no
22   special qualifications to make you sit on a capital
23   murder case.  That doesn't even -- you've never even
24   had to sit on a jury before.  Doesn't really matter.
25   All we're looking for is if you can be fair and listen

206

1    to the evidence and make a decision.  Do you think you
2    can follow through with that?
3        A.  Yes, I sure could.
4        Q.  Okay.  And it's okay -- and these people that
5    said they can't do it, you know, that's okay, we just
6    need to know.  But I -- I make no bones about it.  I
7    told you the very first day, the State is going to ask
8    for the death penalty.  There's going to come a time
9    in this case, Mr. Hopkins, if you're sitting over
10   there, I'm going to stand before you and I'm going to
11   say, "Based on the evidence and based on that stuff
12   that we've given you, that man right there should be
13   executed."  I want you to look at him, right now.
14   He's looking at me, but you look at him, now, and tell
15   me if you think that you can carry through that
16   decision, if it's called for based on the evidence?
17       A.  Yes, I could.
18       Q.  Okay.  No hesitation about that, right?
19       A.  Right.
20       Q.  And -- and I don't want to pick on people
21   that can't do that, but, you know, some people say,
22   "Well, don't make me make that decision.  You know, I
23   like the death penalty.  It's a good law, but don't
24   make me make that decision."
25       A.  Right.

207

1        Q.  And I'm -- I'm looking for people that, if I
2    prove it to them, they can follow through with it.
3    Are you that kind of person?
4        A.  Yes, that's fair enough.
5        Q.  In other words, you can't just talk the talk,
6    you got to walk the walk.  Because there's some people
7    feel that way, they say, "Oh, yeah, I believe in the
8    death penalty.  It's a good law, Mark.  Yeah, we
9    should do that.  Yeah, it's good, but don't make me be
10   that one to answer the question."  Okay.  So that
11   doesn't -- that doesn't fit you.
12           But I have to ask it the other way, too,
13   obviously, because the Defense would want somebody
14   just as fair as I want somebody fair, and the question
15   is, if we don't -- if the State doesn't prove the
16   case, can you vote not guilty?
17       A.  Sure can.
18       Q.  Sure.  That's the law.  And if the -- if the
19   State -- I'm sorry, if the evidence is such a way you
20   hear all the evidence and you decide, "Well, maybe he
21   shouldn't get the death penalty, maybe he should get a
22   life sentence," can you vote that way, too?
23       A.  Yes.
24       Q.  In other words, you're not leaning one way or
25   the other at this point, are you, on what punishment

208

1    to give.
2        A.  No.  Clean slate when you walk in.
3        Q.  And that's the way it should be.  A clean
4    slate as far as punishment goes.  The only thing that
5    you have to start out with is what we call the
6    "Presumption of innocence."  As he sits there right
7    now, Mr. Ramirez is -- is presumed to be innocent.
8    And that's because, in Texas, in America, you have to
9    be proven guilty beyond a reasonable doubt, and you
10   don't start out like having to prove your own
11   innocence, you start out with the presumption of
12   innocence and the State has to prove the charge -- the
13   case.
14           Just like the Judge says, if the State's
15   going to charge you, the State better back it up and
16   prove that case to you.  Do you understand that?
17       A.  Yes.
18       Q.  So you can -- you believe that now, that as
19   he sits here, he's presumed innocent?
20       A.  Yes.
21       Q.  Okay.  So if you had to vote right now, you'd
22   have to vote not guilty?
23       A.  Right.
24       Q.  Okay.  Now, just when I say it's a
25   presumption of innocence, that's exactly what it

209

1  means.  Right now he's presumed innocent.  That
2  doesn't mean he's all -- that doesn't mean he is
3  innocent.  It's just, right now, he's presumed
4  innocent because you haven't heard any evidence.  So
5  you got to start, not just with a clean slate is
6  equal, it's just like you got to consider him
7  innocent, first, and then I have to prove the case
8  beyond a reasonable doubt.
9          And I'll tell you, the State -- it's no
10 different in a capital murder case or a shoplifting
11 case, the State always has to prove the charges.  And
12 that's fair, right?  You don't want the government to
13 just say, "Okay.  All you do is charge someone and
14 that's all."  You have to back it up.  And, clearly,
15 the State is up here because we think we have the
16 evidence to prove him guilty and to prove that he
17 should get the death penalty.  But, you know, you will
18 abide by those decisions the Judge says about the
19 presumption of innocence, right?
20    A.   Yes.
21    Q.   And that goes into whether he testifies or
22 not.  Sometimes jurors, they'll come and tell us, and
23 say, "Well, yeah, I'll be fair, but, you know, I want
24 to hear his side of the story.  I want to hear what he
25 has to say," and I have to tell them, "Look, the Judge

210

1  is going to give you instructions if he doesn't
2  testify, you cannot hold that against him."  Because
3  that's the Fifth Amendment, that's just, bread and
4  butter law, you know, black letter law, that you have
5  a right, as anybody has a right.  He has a right, you
6  have that right, everybody has a right.  If they don't
7  want to testify, they don't have to.
8          And the Judge, I'm pretty sure, if he
9  doesn't testify, will give you an instruction that
10 says, "He didn't testify, you can't hold that against
11 him."  Can you follow that law?
12    A.   Sure can.
13    Q.   Okay.  And that's basic.  I'm -- I'm sure you
14 know that.  That's just basic stuff.  I don't know if
15 he's going to testify or not.  That's up to him and
16 his lawyers to decide, okay?  But if he doesn't
17 testify, you will be able to afford him that right,
18 that he does -- you're not going to use that to hold
19 against him.
20    A.   Okay.
21    Q.   Okay?  You can do that?
22    A.   Sure can.
23    Q.   Thanks.  Now, when we talk about the death
24 penalty, we -- we talk about it like that's for sure
25 what's it's going to happen.  I always have to tell

211

1  people it's not automatic.  Sometimes people say,
2  "Well, we found him guilty.  Obviously, he's going to
3  get the death penalty," and I say, "No.  There's two
4  choices."  This isn't like a situation where we're
5  railroading people into anything.  First of all, the
6  State has to prove him guilty beyond a reasonable
7  doubt.  That's the first part of the trial.  And then
8  if he's found guilty beyond a reasonable doubt, does
9  it seem automatic that he gets the death penalty?  No.
10 The Judge says that there's two choices, death or life
11 in prison.
12          And I think the Judge has already
13 explained to you that this is a capital murder,
14 because it's murder plus robbery.  And there's only
15 certain cases -- a lot of times people think, lay
16 people, that anytime you murder somebody, you
17 automatically are eligible for the death penalty, and
18 that's not what it is.  There's only those certain
19 crimes.  And I mentioned something the other day,
20 like, serial killers and killing a cop on duty, and
21 stuff, or killing somebody while you're robbing,
22 raping, burglarizing, kidnapping them, and stuff like
23 that, makes you eligible for the death penalty.  You
24 know, you can have a horrible murder case, but if it
25 doesn't qualify for the death penalty, it doesn't

212

1  qualify, and nothing that you or I can do about it.
2          So, in this case, it qualifies for the
3  death penalty because it's murder plus in the course
4  of committing a robbery.  And it doesn't even say you
5  have to have already, you know, got a successful
6  robbery.  It says, "in the course of committing
7  robbery or attempting to commit robbery."  Say, for
8  example, like you rob -- somebody is robbing a bank,
9  and they go in there and they hold the teller up at
10 gunpoint, and they get a bag of money and they're
11 heading out the door when the police catch them and
12 stop them.  Can he up to court and say, "Well, I'm not
13 guilty, because I didn't get away with the money.  I
14 didn't really get to steal the money?"
15          You can't do that.  That would be silly.
16 Or, you know, say he's got the gun in the teller's
17 face, says, "Give all your money," and the teller is
18 putting it together, and before she can hand over the
19 money, he's caught, you know, captured by the police.
20 Can he say, "Well, I didn't get any money.  I'm not
21 guilty"?  No.  The whole point is, did you get the
22 stuff by force or try to get the stuff by force or
23 threat?  See what I'm saying?
24    A.   Sure.
25    Q.   The -- the second part of this -- the murder

213

1    case, capital murder case, is you may get to hear
2    additional evidence.  Generally speaking, the first
3    part of trial you hear just about what happened that
4    day, did he do it or did he not do it?  Then the
5    second part of the trial, you might get to hear
6    addition evidence.  You might get to hear what his
7    background was.  I think the Judge used some examples
8    like was he an Eagle Scout or was he always in the
9    trouble with the law?  You know, has he been to prison
10   five times before or maybe this is his first first
11   felony, you know?  I don't know.
12            All I can tell you is you you have to
13   keep an open mind to hear all that evidence, because
14   that's probably what's going to help you decide how to
15   punished him, right?
16       A.   Yes.
17       Q.   Yeah.  And if you've never -- and if you
18   don't know a person, obviously, you -- you probably
19   never met John Henry Ramirez before, you don't know if
20   he did it that night and you don't know what kind of
21   background he has.  But once you hear that, that's
22   going to help you make a decision and the jury make a
23   decision.  Would you agree with me?
24       A.   Correct.
25       Q.   Okay.  And when you go to the second part of

214

1    the trial, there's two questions.  You don't just vote
2    death or life in prison.  There's two questions.  The
3    Judge went over them.  I'm going to go into them in a
4    little more detail with you.  And, if you turn around
5    and look at that one behind you, this is -- this is
6    supposing that the person has been found guilty,
7    you've heard other evidence and now you're ready to
8    vote.
9            The first issue says this, "Is there a
10   probability that the Defendant would commit criminal
11   acts of violence that would constitute a continuing
12   threat to society?"  We call that the "future
13   dangerousness question."  Is he going to be a danger
14   to the future -- in the future?
15            I want to you to key in on a few words
16   like this.  First of all, it says, "Is there a
17   probability."  It doesn't say "certainty."  It doesn't
18   say the State has to prove it for absolutely sure.
19   And since you probably work with numbers a lot, you
20   know what it's like, right?
21       A.   (Nods head.)
22       Q.   You know what the numbers are, but we don't
23   have to prove things a hundred percent.  It just says,
24   "Is there a probability?"
25       A.   Right.

215

1        Q.   Because unless you're a mind reader or
2    crystal ball reader, you can't tell what's going to
3    happen in the future.
4        A.   Right.
5        Q.   And the law doesn't require me to prove it,
6    you know, beyond all doubt, or whatever.  It just
7    says, "is it probable, more likely than not, that he
8    would commit these other crimes"?  And look at what it
9    says.  It doesn't even say it's a crime.  It just
10   says, "would commit criminal acts of violence."  Do
11   you think he's going to commit a criminal act of
12   violence, you know?  And that doesn't necessarily mean
13   you think he's going to murder again.
14            Sometimes people say, "Well, I would only
15   give the death penalty if I think he's going to commit
16   murder again in his life, or -- or, you know, commit
17   capital murder during life," but the law doesn't say
18   that.  It just says if you think he would commit
19   criminal acts of violence, which could be about almost
20   anything, you know?  It doesn't have to rise to the
21   level of murder.  You think he's going to hurt
22   somebody in the future, or something like that.
23            And the last part of the thing, it says,
24   "That would constitute a continuing threat to
25   society."  You've probably heard that phrase before,

216

1    we hear that a lot, "continuing threat to society."
2        A.   Correct.
3        Q.   But here's what one view of it is.  Some
4    people come up and say, "Why does the State have to
5    seek the death penalty?  You could just put him in
6    prison.  You put him in prison with a life sentence,
7    he can't ever hurt anybody again."  And I always say,
8    "Ah, contrary."  Really what happens is, does that
9    mean if he's in prison he could never, ever touch
10   somebody or hurt somebody again?
11       A.   No.  That's one of the things on the sheet of
12   the paper that I read in there, it that -- hurt --
13   kill somebody while in prison or a prison guard --
14       Q.   Uh-huh.
15       A.   -- then that constitutes a capital murder in
16   itself.
17       Q.   Right.  And that's true, but I guess what I'm
18   getting at is, who else is in the prison?
19       A.   Well...
20       Q.   Besides the person?
21       A.   Well, other prisoners.
22       Q.   Exactly.  Other prisoners, guards, maybe the
23   maintenance staff, or the warden and his people that
24   work there.  You see what I'm saying?  It's not
25   they're in a vacuum there.

217

1  A.  That's right.

2  Q.  If it was, hey, we put a person on a desert

3  island where they don't see any other human being,

4  then you could probably say, "Oh, yeah, put him on a

5  desert island, he could never hurt anybody again."

6  But that law -- but that question says, "a continuing

7  threat to society."  And even though their rights are

8  taken away to an extent when they're in prison, they

9  still have social interaction with other people.

10  A.  Right.

11  Q.  You see what I'm saying?

12  A.  Yes.

13  Q.  They deal -- still deal with human beings,

14  guards, prisoners, you know, wardens, and stuff like

15  that.  What I'm trying to get at, Mr. Hopkins is very

16  simply this, would you agree with me that even though

17  you're put in prison, he could still be a continuing

18  threat to society, right?

19  A.  Yes.

20  Q.  Because of the other people.  And you've

21  heard about that before, right?  You've heard about,

22  you know, people hurting guards, people are hurting

23  other prisoners, and stuff like that.  It just doesn't

24  make it all go away because you're locked up, right?

25  A.  Right.  I'm glad you pointed that out,

218

1  because that was the first thing that entered my mind,

2  was, "If you're locked up, you know, how does that

3  relate to outside society," but it's -- that's part of

4  the definition.

5  Q.  And that's why I go and tell jurors about

6  that society because people usually think "society"

7  is, you know, the outside world.  But society is

8  really, you know, everybody.  I -- I like to say it's,

9  like, social interaction, you know?  It's dealing with

10  other social -- with other human beings.

11  A.  Right.

12  Q.  Unless you're, like, on a desert island

13  where you're not going to seen anybody, you could hurt

14  somebody if you're still in prison.  And that's kind

15  of what that laws says, is it -- that question says,

16  are you going to be -- is it a chance, a good chance

17  that you're going to be a danger in the future?  Of

18  course, nobody can read the future, and stuff, but

19  would you agree with me that sometimes you can tell

20  what a person is going to do in the future by what

21  they've done in the past?  Sure.

22  A.  Could be a historical marker.

23  Q.  Sure.  We do that all the time.  I mean, is

24  it guaranteed, 100 percent?  No.  But can you -- you'd

25  certainly want to evaluate somebody by knowing what

219

1  else they've done in their life, right, either that

2  day of the crime, or, you know, before the crime, and

3  stuff like that.

4  Sometimes people say, too, they'll say,

5  "Well, you know, this is his first offense.  He's a

6  first-time offender, and how can we give the death

7  penalty to a first-time offender?"  The law, and, I

8  think, the Judge put in the questionnaire here, the

9  law says you can make a decision as a jury based on

10  just the crime itself because that might satisfy your

11  answers.  See what I'm saying?

12  A.  (Nods head.)

13  Q.  A few years ago -- you're probably too young

14  to remember this, but a few years ago there was a guy

15  in Houston that never been in trouble with the law

16  before, good neighbor, good guy, had a steady job.

17  And he took an insurance policy out on his son, and

18  then on Halloween he fed his son poison candy, and

19  made it look like, you know, somebody had poisoned

20  him.  Turned out it was him and he killed his own son.

21  Well, he was a first-time offender.  He was a

22  first-time offender, never had a traffic ticket

23  before, but the jury, because of the heinousness of

24  the crime, the seriousness of the crime, said, "We're

25  going to go to the maximum sentence.  We're not going

220

1  to give him a break because he's a first-time

2  offender."  You see what I'm saying?

3  A.  Yeah.

4  Q.  So the jury can make a decision based on the

5  crime itself and the circumstances of the case, and

6  any additional evidence, and background or not.  But,

7  you know, sometimes people tell me, "Well, you know, I

8  can only do this if he's been to prison five times

9  before or if he's got a horrible record."  And I say,

10  "But the law says you can make a decision based only

11  on what he did that day."  Do you agree with that?

12  A.  That's correct.

13  Q.  Does that make sense?

14  A.  I agree.

15  Q.  And while we're on that point, would you

16  agree with me it doesn't really matter what a person

17  looks like before you make a decision?

18  A.  That's correct.

19  Q.  Now, if you look at this guy over here, he

20  seems likes a fairly young person, right?  He's

21  probably in his mid 20s or so.  Would you agree with

22  me that it doesn't really matter how old you are, as

23  long as you're of legal age, like 18?

24  A.  Sure.

25  Q.  The State of Texas says you cannot execute

221

1    juveniles.  If you're 16 or 17, 15, and you commit the
2    most horrendous crime in the world, you still can't
3    get the death penalty because I think they recognize
4    that people under 18 may not have that maturity level
5    as somebody else.  But, you know, it stops at 18.  If
6    you're 18, 19, 20, 25, 35, 45, you see what I'm
7    saying?  There's no age limits.  And so, sometimes
8    people say, "Oh, you know, he's so young, you know,
9    maybe we shouldn't be so hard on him."  That's a valid
10   point, to an extent, but it's certainly not a
11   conclusory point.  Because once you hit that majority
12   age of 18, would you agree with me you're -- you're
13   responsible for your actions?
14       A.   Sure.
15       Q.   Okay.  Now, we've talked about the first
16   issue, and the first issue is, "do you think he's a
17   danger in the future?"  You answer that yes or no,
18   based on, you know, the crime itself and the
19   surrounding circumstances, and his past history, if he
20   has one or not.
21            Then you go to the second question.  The
22   second question is a little more involved, and it's
23   basically a question -- it's kind of a check and
24   balance on a jury.  Remember, sometimes when you hear
25   about in the government you have checks and balances

222

1    on the system?  That's kind of what this is because it
2    asks you about mitigating circumstances.
3            Mitigating circumstance, that word
4    "Mitigating" means, "anything that would lessen or
5    make less severe the punishment."  In other words,
6    they did the crime, but is there any reason to give
7    them a break and give them a life sentence, rather
8    than death sentence imposed?  Remember, we're talking
9    about the not automatic?  So, you might get to hear
10   additional evidence.  You might get to hear, like, the
11   Judge's example, maybe he was a decorated war hero
12   years ago in the war.  Maybe he was straight A
13   student, was in honor roll in his high school.  Maybe
14   he helped the church, you know, with volunteer work at
15   the church, you know.  And maybe it's the other way
16   around.  Maybe he's been to prison five times before.
17   Maybe he's always been a bad kid at school.  You know,
18   I don't know what it could be.
19            The question is, you have to look at this
20   and see is there enough of mitigating circumstances to
21   warrant that you would reduce the sentence and give
22   him life, rather than death?  Does that mean you have
23   to automatically reduce it because you hear mitigating
24   circumstance?  Nope.  The Judge says in this question,
25   "Is there a sufficient mitigating circumstance?"  Is

223

1    it enough?
2            You might get to hear a mitigating
3    circumstance like, "Oh, he's kind of young, you know?
4    I expected an older person."  Does that mean you
5    necessarily would vote to lower it?  No.  You might
6    hear, well, you know, he was a -- he was a war hero in the
7    first Desert Storm, you know?  He was a hero and got a
8    metal.  Does that mean you automatically lower the
9    sentence?  No.  It's got to be enough, it's got to be
10   enough to outweigh the other stuff.
11           Most people hadn't thought about that,
12   but have you ever seen in the newspaper, or something,
13   or on T.V. that maybe two guys were charged with
14   burglary.  And, in the same paper, it will say this
15   guy got 20 years in prison and this guy got 5 years
16   probation.  And people always come up in the street on
17   -- to me on the street, and say, "Mark, why that
18   happen?  They both got convicted of burglary.  They
19   broke into somebody's house and did something bad, and
20   stole something.  Why did one guy get 20 years and one
21   guy get 5 years probation?"  Well, what kind of reason
22   would you think that would happen?
23       A.   Mitigating circumstances on the second
24   person.
25       Q.   That's right.  Because what's the truth?

224

1    Every case is different.  Every person is different.
2    There's some kind of burglaries.  There's other kind
3    or burglaries.  And let me give you an example.  Say
4    you're sitting on the jury and you have to decide what
5    the punishment is.  Both guys are found guilty already
6    and now it's the punishment phase.  In the first
7    burglary -- and you hear they're both charged with
8    burglary, convicted of burglary.  In the first -- and
9    you're sitting there, "My gosh, I own a house.  I
10   shouldn't have -- I don't think people who break into
11   somebody's house and steal something without consent
12   are good people, and I want to go a high sentence on
13   all these guys, on both of these guys."
14           But then the evidence comes forward.  In
15   the first case, you hear this guy has kicked in the
16   back door, broken the door off of the hinges, stormed
17   into the house, gone in there and stolen money,
18   jewelry, T.V.s, V.C.R.s, stereos, everything of value.
19   You also hear while doing that, he's ransacked the
20   house, just torn it all up, tearing it apart, getting
21   this stuff.  You also hear that when he got rid of
22   this -- when he got this stuff, he traded it to for
23   money so he could buy narcotics to get high, something
24   like that, okay?  And then you hear his background.
25   You hear that this isn't his first burglary.  He's

225

1    been convicted of burglary three other times, okay?
2    That's one set of circumstances.
3              Now, look at the second burglary.  I'm
4    getting ready to trick you.  Here it comes.  The
5    second burglar broke into somebody's house, went in
6    somebody's house and stole something, which is against
7    the law, but then you hear the facts of that case is a
8    little different from the first one.  He didn't kick
9    the door in or break a window to get in the house.
10   The back door was unlocked, so he just opened the door
11   and went in.  The house had jewelry, money, stereos,
12   T.V.s, V.C.R.s, everything like that, he didn't take
13   any of that stuff.  He went in the kitchen and stole a
14   loaf of bread and some food because his kids were
15   hungry.  He had lost his job and his kids were
16   starving.  He needed to feed his kids.  Didn't take
17   any of the valuable stuff, just took food.  And then
18   you hear this guy hadn't been -- ever been in trouble
19   before in the law.  You know, he's never even been
20   arrested before.  He's never even had contacts with
21   cops.  This is the first time he's ever been arrested
22   for anything.
23             You look at those two, obviously they're
24   both equally guilty of burglary, but are you really
25   going to treat those two the same on punishment?

226

1    A.   No, because there's mitigating circumstances.
2    Q.   You understand the concept.  There are
3    mitigating circumstances.  In the first case, they're
4    kind of aggravating circumstances, right, tore up the
5    house, went and used the stuff to buy drugs, or
6    something like that, been to prison before.
7              In the second part, you didn't know what
8    he was going to get because you had to wait till you
9    hear all the evidence but then you hear he didn't kick
10   in the door and damage property.  He could have stolen
11   all these things but all he stole was food.  That's
12   still not right to go in somebody's house but it's a
13   mitigating circumstance.  He stole food to feed his
14   kids.  He didn't go, you know, sell the food, go buy
15   drugs, or anything like that.  And you find that he's
16   never been to prison before.
17             That's exactly what that question is for.
18   Is there mitigating circumstances or not?  Just
19   because he's found guilty, he doesn't automatically
20   get the death penalty.  The Judge says, "Okay, you
21   found him guilty of capital murder.  You think he's
22   guilty."  The first issue is, you think, "Yes.  Yes,
23   I think he's a continuing threat to society."  The
24   Judge then tells you, "Take into consideration all of
25   the evidence," I like to say, the big picture,

227

1    "Including the circumstances of the offense," like,
2    how heinous a crime was it?  What are the surrounding
3    circumstances before and after the crime, "his
4    character, his background."  You know, what -- he have
5    good character, bad character?  Is somebody going to
6    come in and say, "Yeah, he's good, he helped in the
7    church," or somebody say, "No, he's always been bad"
8              And the other one is the background, like
9    your criminal history.  Have you been arrested before,
10   have you been convicted before, that type of stuff.
11   And his personal moral culpability, is there enough,
12   is it sufficient enough of those mitigating
13   circumstances to warrant that a sentence of life,
14   rather than death be imposed?
15             In other words, the jury kind of may have
16   to do a balancing test, you know.  They may bring out
17   the fact, "Oh, was an Eagle Scout, you know, he was
18   good in school, he made straight A's."  But then you
19   have to outweigh that and see if it outbalances the
20   other stuff.
21             Some people may say, "Look, we ought to
22   give him a break, you know?  He was a war hero, you
23   know?  He did good.  He served honorably in his
24   Country's Armed Forces, or he was an honor student,
25   you know.  We're going to give him a break because of

228

1    that."
2              Other jurors may say, "No, I don't care
3    if he's an honor student.  I don't care if he's won a
4    medal ten years ago, he still did this crime and the
5    surrounding circumstances, I think he should get the
6    death penalty."  You see what I'm saying?  It's kind
7    of left up to the jury.  This Judge is not going to
8    tell you, "Well, Mr. Hopkins, you automatically have
9    to lower the sentence if you hear this."  It's got to
10   be enough of a mitigating circumstance.
11             You know, some people say, "Well, that's
12   nothing," some people don't.  That's up to the jury to
13   decide.  You follow me that on?
14   A.   Uh-huh.
15   Q.   Now, one other thing the Judge may tell you
16   about is this law:  It says, "Voluntary intoxication
17   is not a defense to crime."  Voluntary intoxication.
18   In other words, if you go and get yourself drunk or
19   high on drugs and you go rob a bank and you go up in
20   court and say, "Well, I'm not guilty I robbed that
21   bank, but, you know, I was drunk when I did it,"
22   absolutely not.  That is not an excuse or a defense to
23   crime.
24             The law does say, though, that might be a
25   possible mitigating circumstances.  "You know, he

229

1   committed the burglary, but, you know, he was drunk
2   when he did it, so maybe we'll lower the sentence and
3   not give him such a high sentence." But other people
4   may say, "I don't care if he was drunk or not, you
5   know, he's got to pay for what he did." You see what
6   I'm saying?
7       A.   (Nods head.)
8       Q.   It's just a -- I guess, the best way to say
9   it, is you have be able to consider everything, not
10  close your mind, listen to everything, and then make
11  that balancing test. You think you can do that?
12      A.   Yes.
13      Q.   Okay. Any questions about the -- the special
14  issues or anything?
15      A.   No. Just still waiting for the trick part of
16  your question.
17      Q.   Oh, that. I like -- I like to give these
18  people -- because everybody thinks that burglary is
19  one thing, and then they find out these results is not
20  all burglars, you know, steal electronics and stereos
21  and jewelry. Sometimes they just steal a loaf of
22  bread. Actually, I'm probably waiting for the first
23  person to do that.
24           Okay, let me finish up by saying just a
25  couple of more things about legal parts of the case.

230

1   Remember that just the fact that he's been indicted
2   does not necessarily mean he's guilty. That just
3   means the State has brought charges, and we have to
4   prove the case. And we have to do that in every case,
5   whether it's a capital murder, or whatever, it's up to
6   us to prove the case.
7            We've already talked about the Fifth
8   Amendment, and you understand he doesn't have to
9   testify, right?
10      A.   Right.
11      Q.   And you won't hold that against him. The
12  burden of proof is beyond a reasonable doubt. It
13  doesn't mean beyond all doubt, any doubt, a shadow of
14  a doubt. And sometimes people say, "Well, Mr. Skurka,
15  I need to know for sure, 100 percent, before I can
16  vote that way." And I say, "That's not what the
17  standard is. The Judge is going to tell you it's
18  beyond a reasonable doubt, not beyond all doubt or any
19  doubt."
20           It's not defined much more than that, but
21  I can just tell you an example for -- for example,
22  you've probably flown on an airplane before, right?
23      A.   Yes.
24      Q.   Okay. Before you got on that airplane did
25  you know 100 percent for a fact that it wasn't going

231

1   to crash?
2       A.   No.
3       Q.   But what did you do? You probably looked at
4   the airline and said, "Okay, this is a reputable
5   airline." You probably looked at the plane. It
6   looked like it was in good shape. You probably looked
7   at the pilot and said, "He seems to know what he's
8   doing." Everything seemed to be working right
9   mechanically on the plane, so you get on the plane and
10  leave, right?
11      A.   Uh-huh.
12      Q.   Now, do you know 100 percent that that
13  plane's not going crash?
14      A.   No.
15      Q.   No. So you figured, beyond a reasonable
16  doubt, that that plane wasn't going to crash, so you
17  went ahead and acted on that and took it. See what
18  I'm saying?
19      A.   (Nods head.)
20      Q.   There's almost no way I can prove to you
21  something 100 percent. You know, God forbid, who
22  knows when a plane is going to crash or not, but
23  people rely and make decisions beyond a reasonable
24  doubt every day. See what I'm saying?
25      A.   (Nods head.)

232

1       Q.   Okay. I think I just had a couple of
2   questions off your questionnaire. Tell me a little
3   bit about that case you said was a mistrial. When was
4   that, how long ago was that?
5       A.   Oh, it's a good period of time ago. I want
6   to say close to ten years ago.
7       Q.   That happened to me one time, where somebody
8   overheard something in the coffee shop when I was
9   trying the case. Was I the prosecutor on that case,
10  do you know?
11      A.   I don't remember.
12      Q.   You don't remember?
13      A.   I don't think so.
14           THIS COURT: Was this in Judge Pate's
15  Court?
16           VENIREPERSON NO. 53: I can't even tell
17  you what court it was in.
18      Q.   (BY MR. SKURKA) You don't remember what judge
19  it was?
20      A.   No.
21      Q.   Unfortunately, that's happened several times,
22  where somebody talks or they overhear something that
23  causes a mistrial. I was just wondering if it was one
24  of the ones that I was involved in. That's happened
25  to me one time.

233

1     A.    Yeah, I can't remember the judge or...

2     Q.    Do you remember what the case was about, the

3     facts were about?  I don't know how far you got into

4     the case before this happened.

5     A.    It was just a day into the case.  This was to

6     last three or four days, I think, and -- it might even

7     have been the same day, but I want to say we got into

8     the second day, and it was right after lunch that we

9     came back in and said the juror overheard the

10    Defendant, or prosecutor, I don't remember which one.

11    I know you're not supposed to talk to any of them

12    while the trial is going on, but, I guess, just the

13    mere fact of overhearing.

14    Q.    Right?

15    A.    And that's what happened.

16    Q.    And that's why the Judge tells you, as a

17    juror, "Don't listen to anybody about the case, don't

18    watch," you know, "news reports about the case," and

19    all that because you can overhear things in the

20    hallway or in the lunchroom downstairs.  So you never

21    really got that far in that case, huh?

22    A.    No, sure didn't.

23    Q.    Now, you understand that police officers may

24    testify in this case because they also did the

25    investigation and everything.  They're probably not

234

1     the most important witnesses in this case, but they,

2     obviously, are going to hear some people in there that

3     are police officers.  And you understand that the law

4     treats police officers as witnesses, just like anybody

5     else.  If it's a police officer, just because he's in

6     uniform, the jury can't give him more weight or

7     credibility just because he's a cop.  They have to

8     look at him just like anybody else.

9          It would be the same like if a priest or

10    rabbi was on the stand.  That sounds kind of funny,

11    but, you know, you'd want to believe a priest or a

12    preacher or a rabbi, but the law says you're equally

13    guilt -- not equally guilty, equally credible, and the

14    jury has to decide whether that is -- that person is

15    believable or not.

16          Does that make sense to you?

17    A.    Sure does.

18    Q.    Yeah, if a cop gets up on the stand and says,

19    you know, the moon is made of green cheese, that's

20    certainly not believable, you know?  So they're not to

21    be treated any better, any worse than anybody else.

22    Can you follow that law?

23    A.    Sure can.

24    Q.    And you understand -- you said something

25    about the appellate process in here and that sometimes

235

1     it takes a long for time the cases to go through the

2     appeal process.  And the only thing I can tell you is

3     that I think that there's a lot of concern on death

4     penalty cases that courts want to to make sure that

5     things were done right, lawyers get a chance to

6     re-evaluate things, and everything.

7          And, seriously, as a juror, you don't

8     have any control over that.  I don't have any control

9     over it.

10    A.    Sure.

11    Q.    It's just one of those things.  That's not

12    going to influence you and say, "Well, gosh, I'm going

13    to vote for a life sentence because if we give him the

14    death sentence, we'll be here forever waiting to hear

15    what happens."

16    A.    Yeah, I'm fair.

17    Q.    So you would -- you would do the evidence --

18    I'm sorry, make a decision on the evidence and not

19    really think about how long the appellate process is

20    going to take?

21    A.    Yes.

22    Q.    And I'll be honest with you, you know, some

23    people think that, but, you know, it's a pretty

24    serious decision, and -- and it probably should take

25    longer than it would, like, on a, you know,

236

1     shoplifting case or something.  I thought your answer

2     was the best on this question:  "Please, complete the

3     following sentence.  The best argument against the

4     death penalty is?"  Do you remember what you put?

5     "Nobody wins."  Nobody wins.

6     A.    That's true.

7     Q.    It's -- it's like -- would you agree with

8     this statement?  Some people say, "Gosh, you know,

9     we're such an advanced society.  You know, we've got

10    all these things.  We can land a man on the moon.  We

11    can do this, we can do that.  It's terrible that we

12    still have to have -- even have to have the death

13    penalty."  But, you know, in certain instances, you

14    have to have it.

15    A.    Right.

16    Q.    Would you agree with that statement?

17    A.    Yes.

18    Q.    Is that kind of how you feel?

19    A.    Yeah, it's -- yeah.

20    Q.    You wish you didn't even have to have it.

21    A.    Yeah.  A lot of people think an eye for an

22    eye, but, you know, that's just the way the laws are

23    written.

24    Q.    Uh-huh.  Well, an eye for an eye is a thing

25    that people think that you have to have equal thing.

237

1  But the law, basically, provides two choices for the
2  jury.  The jury may think the person's life needs to
3  be forfeited.  The jury may not think that.  But the
4  good thing is we rest that in the hands of the jury,
5  right?  No offense against the Judge, but judges, as
6  powerful as they are, cannot sentence somebody to
7  death.  You know, the D.A.'s Office, my boss, Carlos
8  Valdez, he can't just get mad at somebody and sentence
9  them to death.  You have to have people in the jury
10 that are willing to come forward and make a decision.
11         And I think it's probably the best way,
12 right, to have a jury make that decision.  Would you
13 agree with that?
14     A.   Yes.  So, the Judge can't overrule an
15 innocent or guilty --
16     Q.   No.
17     A.   -- sentencing part of the phase?
18     Q.   No.
19     A.   Okay.
20     Q.   What happens is, the Judge is duty-bound by
21 your answers to those questions, okay?  And I will
22 tell you, we've had judges on the bench -- and I don't
23 even know what this Judge's personal feelings about
24 the death penalty, but we've had judges who have been
25 against the death penalty, but they follow through

238

1  with the law.  If the jury answers those questions,
2  yes and no, yes, he's a continuing threat, and no,
3  there's no reason to lower the sentence, the Judge has
4  to impose what the jury gives them.  Follow me?
5      A.   Sure.
6      Q.   So I don't think that happens much anymore.
7  You hear that sometimes but it doesn't really happen.
8  And the Judge -- that's why we have juries.  On
9  capital murder cases, that's why we have juries.
10 Judges can't make that decision on punishment.  Only a
11 jury can do that.  And that's a pretty good safeguard,
12 isn't it?
13     A.   Uh-huh.  Sure is.
14     Q.   Any questions about anything we've talked
15 about?  Maybe I didn't explain things well or cover
16 anything that I could help you with?
17     A.   No.
18     Q.   Okay.  Mr. Hopkins, the bottom line is, you
19 think you'd be fair in this case?
20     A.   Yes.
21     Q.   Listen to all the evidence and make a
22 decision?
23     A.   Sure can.
24     Q.   If the Defendant doesn't testify, you're not
25 going to hold that against him?

239

1      A.   No.
2      Q.   And you understand that he starts with the
3  presumption of innocence and the State has to prove
4  the case?
5      A.   Yes.  And the bottom line is, whatever the
6  evidence is, can you follow through with it?
7      A.   Yes.
8      Q.   Whichever way it goes.
9      A.   Right.
10     Q.   And you're not leaning any way -- either way
11 right now, are you?
12     A.   No.
13         MR. SKURKA:  Thank you, Mr. Hopkins.  I
14 enjoyed talking with you.  I'll let the Defense
15 lawyers talk to you now.
16         VOIR DIRE EXAMINATION
17 BY MR. JONES:
18     Q.   Did you hear anything about this case when it
19 was first reported in the media?
20     A.   Actually, after I got home, I did.  I briefly
21 remember something and, you know, when it happened,
22 but I don't remember any details about the case.
23     Q.   That was my next question.  Do you remember
24 any details from the news stories that you were
25 exposed to?

240

1      A.   No, it -- I didn't even remember as many
2  details as, you know, was mentioned in the courtroom
3  when we were first brought together.  I -- I think I
4  do remember them mentioning him in the courtroom, with
5  the two accomplices that might have been involved, but
6  other than that, I don't recall any details or
7  anything that.
8      Q.   The -- the right to trial by jury is the
9  right to an impartial jury.  An impartial juror is one
10 that comes to the task with no prejudgments.  Do you
11 have any prejudgments about this case?
12     A.   No, sir, I don't.
13     Q.   Do you have any leanings towards one side or
14 the other for any reason?
15     A.   I do not.
16     Q.   Let's talk about these -- what it takes to
17 get the death penalty in Texas.  First of all, it is a
18 form of punishment that's authorized by law in certain
19 cases, although is it authorized only in cases where
20 there's been a homicide, plus there's been some other
21 aggravating circumstances.  The indictment in this
22 case allegations murder in the course of committing a
23 robbery.
24         From -- from what Mr. Skurka -- I'm going
25 to give you a test, now.  It's important that I -- you

241

1    convince me that you understand how this works because
2    you're going to have to do it if you're on the jury.
3       A.   Sure.
4       Q.   You're going to have to work the system.  How
5    does -- what -- what conditions have to be met before
6    a person can get the death penalty in Texas, what --
7    what needs to occur?  What's the first thing that has
8    to occur?
9       A.   Well, guilty beyond a reasonable doubt and
10   then --
11      Q.   Of what?
12      A.   Of the crime itself.
13      Q.   Yeah, murder.
14      A.   Yeah, well, murder, plus an additional --
15      Q.   All right.  So that's condition No. 1.  You
16   have to be found guilty of capital murder.  And then
17   there are two other conditions that have to be met.
18   What are they?
19      A.   The continuing society threat, if we think
20   that they're a threat -- for a continuing society,
21   threat to continuing society.
22      Q.   Okay.
23      A.   And then the -- the second phase over here,
24   which may have mitigating circumstances to it, to
25   determine whether or not there's life imprisonment or

242

1    in the harsher degree is the death sentence.
2      Q.   All right.  So on Special Issue No. 1, these
3    two special questions would be presented to you at the
4    second phase of the trial, if we get that far.
5      A.   That's right.
6      Q.   And the purpose of these two questions is to
7    determine the second two conditions of -- so let's say
8    -- let's say your -- your jury is confronted with
9    Special Issue No. 1.  Both sides can put on evidence
10   relevant to that question.  And how many -- what --
11   what does the answer to that question have to be
12   before it's -- it becomes a condition of the death
13   penalty?
14      A.   You referring to Question No. 1?
15      Q.   Yes.
16      A.   It has to be a yes.
17      Q.   A yes answer.  How many votes of the jury
18   does it take to get a yes answer?
19      A.   I would imagine all 12.
20      Q.   All 12.  How many votes does it take to get a
21   no answer?
22      A.   Just one out of the 12?  No?  They -- I
23   guess, they can be a hung juror.
24      Q.   I'm giving -- there's a new rule -- there's a
25   new rule.

243

1      A.   Okay.
2      Q.   The Judge will give you this rule if you're
3    on the jury, and you don't have to memorize it.  But
4    if 10 jurors vote no on that question, that can be a
5    verdict -- that's -- those 10 votes can -- can be the
6    verdict.  It doesn't -- if the vote is in favor of the
7    Defendant you can get 10 votes, rather than 12.
8          Okay.  So what -- if -- if the jury votes
9    no on Special Issue No. 1, the Court will instruct the
10   jury to stop deliberations and to return the verdict
11   to the Court.  What punishment will be imposed if you
12   don't get past Special Issue No. 1?
13      A.   Then that automatically brings it back to a
14   life sentence.
15      Q.   That's correct.  Let's say, for purposes of
16   our discussion, that the jury finds the answer to
17   Special Issue No. 1 to be yes, then the Judge will
18   instruct you to go to Special Issue No. 2, which is
19   off to your right.  Could you take just a few moments
20   and read that silently to yourself and tell me when
21   you're finished.
22      A.   Okay.
23      Q.   Is there any word or phrase in that question
24   that you did not understand?
25      A.   No, it's self-explanatory.

244

1      Q.   Okay.  So let's go through it.  The question
2    is -- is directing the jury to take certain things
3    into consideration.
4      A.   Correct.
5      Q.   Okay.  The first one is the circumstances of
6    the offense.  Well, you've already heard -- by the
7    time you get to this question, you've already heard
8    the evidence and found the Defendant guilty.
9      A.   Uh-huh.
10      Q.   Okay?  The second part says "the defendant's
11   character and background."  Well, background is -- is
12   your biography, it's your -- you know, what happened
13   to you as you were growing up, okay?  Let's talk about
14   that for a minute.  Now, keep in mind these -- these
15   things that the question is asking you to consider are
16   things that might form the basis of mitigating
17   circumstances, that might form the basis that you can
18   give effect to.  And that effect would be to -- to
19   believe that there's a -- that life is a more just
20   punishment than death, okay?
21          So let's talk about background.  What are
22   some of the things that the Defense or the State might
23   prove up to show the Defendant's background?
24      A.   Well, like you say, you could go from the
25   extreme good to extreme bad, that he's a volunteer in

245

1   church, like Mr. Skurka said all the way to having a
2   criminal history background and other -- just a bad
3   moral character in general in society that might lend
4   itself to being -- not being a mitigating
5   circumstance.
6       Q.   All right.  Let's say that the evidence
7   showed that the Defendant had a -- parents that abused
8   him as a child or didn't take care of him properly.
9   Would that be a -- information that you would consider
10  to be possibly mitigating?
11      A.   Yeah, that's possible.
12      Q.   Okay.  Would you consider -- if the evidence
13  showed that the Defendant had mental health problems
14  that were diagnosed by a mental health professional,
15  would you consider that as being possibly a mitigating
16  circumstance?
17      A.   Take anything into consideration, yes.
18      Q.   So, let -- let's say that -- let's say that
19  -- and I'm -- I'm getting it to a point here, I hope I
20  can make.
21      A.   Okay.
22      Q.   Let's say that the evidence shows that the
23  Defendant was born and his father abandoned him and --
24  and his mother, you know, was -- didn't attend to him
25  and actually abused him, okay, as he was growing up.

246

1   And let's -- let's assume you listen to that evidence
2   and you -- you find that it's true, you believe it,
3   okay?  How could you rationalize that as being a
4   circumstance which might justify a life sentence,
5   rather than a death sentence?
6       A.   Well I guess if he possibly grew up in a home
7   that was, you know, more loving or whatever, then he
8   might not have committed the crime or would prevent
9   him from, you know, from -- well, like I say, it's
10  just to make it a mitigating circumstance that you
11  might have to take into consideration.
12      Q.   Now, Mr. Skurka asked you -- he asked you
13  about the you know, a person's age, and, basically,
14  when you become 18 years of age, you're a legal adult
15  and you're presumed to be responsible for your
16  conduct.  You know, if you break the law, you can get
17  charged.  So if a person commits a crime -- let's say
18  you have ten defendants who commit -- who are found
19  guilty of the crime of burglary, let's say from 18 to
20  50 years.  Would you agree that those people are all
21  going to be equally subject to the same punishment?
22      A.   Yes.
23      Q.   I mean, would you give them all the same
24  punishment?
25      A.   I would, yes.

247

1       Q.   You would give everybody the same punishment,
2   regardless of the facts, just because they were found
3   guilty of the crime?
4       A.   I think it depends on an individual basis.
5       Q.   That's right.  Okay.  Now, when you say that,
6   what you do mean?
7       A.   Well, the 25 year old might be less capable
8   than the 18 year old.
9       Q.   Capable of what?
10      A.   Mental abilities, you know.  You know, the 18
11  year old might be a rocket scientist and the 25 year
12  old may have, you know, grown up in a different
13  society and different life and, you know, that's --
14  they've got to be taken on an individual basis.
15      Q.   Do you believe the doctrine of free choice,
16  that human beings have a choice to do good or do bad
17  if they choose?
18      A.   Sure.
19      Q.   Okay.  So, -- but if you believe in the
20  doctrine of free choice, are all people in the same
21  position, if you, you know, if they choose to do
22  wrong?  In other words, would you judge an 18 year old
23  the same way you had would judge a 25 year old or a 30
24  year old or 40 year old?
25      A.   Well, I think we've all got to live by the

248

1   laws of society, and what they -- you know, we've all
2   got to abide by the rules.  And I think the law
3   defines that by the time you reach age 18 you should
4   know what the rules are, regardless of whether you're
5   18 or 25.
6       Q.   What if the evidence shows you don't know
7   what the rules are?
8       A.   Well...
9       Q.   And there's a reason, I mean, that the
10  evidence shows that there's a reason why you don't
11  know what the rules are.
12      A.   Well, I -- I believe that you have to take it
13  upon yourself to learn those rules as you grow up in
14  society, and be let -- take that into your action,
15  every day actions.
16      Q.   So if a person chooses to break the law, I
17  mean, gets up in the morning and says, "Okay.  I'm
18  going to go down and I'm going to burglarize that
19  house," and there's no -- if that's proved, then
20  there's no other circumstance -- in other words, they
21  chose to break the rule, right?  So there's no other
22  mitigating circumstance -- I mean, there's no
23  mitigating circumstance that would cause you to give
24  less than the maximum punishment?
25      A.   Well, I mean, that's a two-part question

249

1  there.  So, yeah, there would be mitigating
2  circumstances.
3      Q.   Well, what does the mitigating circumstance
4  relate to?  It relates to your --
5      A.   Uh-huh.
6      Q.   -- to your adherence to the moral code of the
7  community, does it not?
8      A.   Yes.
9      Q.   Let's take -- I think Mr. -- I don't know, I
10 can't remember whether Mr. Skurka gave the example or
11 not.  Let's say you have a theft case, you have two
12 defendants.  One defendant goes into a convenience
13 store.  This guy is -- is a rich guy, he's a "trust
14 baby."  He's got -- he makes plenty of money.  He
15 doesn't need any money.  He goes into a convenience
16 store and steals a six-pack of beer just because it
17 thrills him or pleases him to do so, okay?
18     A.   Right.
19     Q.   Probably a Class C misdemeanor.  Another man
20 who's been laid off from his job and has four
21 children, has run completely out of money, he goes
22 into the same convenience store, he has no criminal
23 history, and he steals a -- a carton of eggs,
24 shoplifts a carton of eggs.  Both men are caught.
25          Both men have a jury trial in municipal

250

1  court and you're a juror on each case.  Maximum
2  punishment is $500, okay?  Are you going to give the
3  same -- both men have committed theft, right?
4      A.   Yes, they are.
5      Q.   Are you going to give each one the same
6  punishment?
7      A.   No.
8      Q.   Why not?
9      A.   Because, like you said, there's mitigating
10 circumstances, and, in the previous question, I
11 thought you were relating to a guilty or innocent
12 verdict, but where you related it back to the second
13 question, which, in my mind, I got away from your
14 ultimate point of whether it was mitigating
15 circumstances or not, so, yes, your -- your question
16 is?
17     Q.   Would you give the same punishment in my --
18 in my -- to each -- each defendant?
19     A.   No, because I think they're -- they've --
20 there's a different thought process going on behind --
21     Q.   Okay.
22     A.   -- each --
23     Q.   But it's against the law to steal, right?
24 It's immoral to steal.  They both stole.  So why
25 should we treat them any differently?

251

1      A.   Because there's different reasons why
2  somebody might do a crime.
3      Q.   But what is the reason it relates to?  It
4  relates ultimately to a moral value, does it not?
5      A.   Yes.
6      Q.   Okay.  They're both guilty of stealing.
7  They're both culpable for breaking the law, and
8  probably a moral rule, by stealing, okay?  But then
9  you have to say are the circumstances different, okay?
10 And the circumstances relate to the person's
11 adherence, he's willing to adhere or to deviate from
12 the moral code of the community.
13          Now, the guy that stole the eggs, what
14 was his problem?
15     A.   Didn't you say that he did that for family
16 purpose?
17     Q.   Yeah, to keep his kids from starving.  Well,
18 does that justify stealing?
19     A.   No.
20     Q.   No, it doesn't.  But -- but do you understand
21 why he did it?  Was he not confronted with two
22 competing moral values?
23     A.   Yes.
24     Q.   Okay?  One value is you don't steal.  The
25 other value is you don't let your kids starve to death

252

1  either, --
2      A.   No.
3      Q.   -- okay?
4      A.   Correct.
5      Q.   So that you can understand his dilemma?
6      A.   Yes.
7      Q.   And in that case you would want to give him a
8  lesser punishment.
9      A.   (Nods head.)
10     Q.   Okay.  Likewise, in a more serious case, can
11 you -- when you're -- when you're hearing evidence of
12 a person's background, can you consider whether that
13 person, because of the circumstances of his life, have
14 taken on and learned the moral values, you know, that
15 we expect of good citizens?
16     A.   I'm sorry, say that --
17     Q.   Well, I mean, --
18     A.   Okay.
19     Q.   -- has -- has this defendant or an any
20 defendant that you're sitting in judgment of had the
21 opportunity to -- to fully learn the -- how to act,
22 how to behave?  Did he learn what's -- I mean, how
23 does a child learn what's right and wrong?  Where does
24 he learn it?  He learns it from his parents.  He
25 learns it from school.  He learns it from his church.

253

1   Okay.

2            If you have a kid that was born into a
3   dysfunctional family and grew up on the streets, he's
4   going to be in a different situation, maybe, than a
5   person who grew up in a home where he had two parents,
6   where he had, you know, his parents read to him every
7   night, he went to school, he went to church, his
8   grandparents spent a lot of time with him, you know?
9   You see how that might be different?

10      A.   Right.

11      Q.   Okay.  If so you're on the jury, I don't know
12   what -- I can't tell you what evidence you're going to
13   hear, but could you had -- you can consider those
14   things as possible mitigating circumstances?

15      A.   Yes.

16      Q.   Okay.  Let's go down to the next one.  It
17   says, "personal moral culpability."  Well, I think
18   we've already talked about that.  What's moral
19   culpability mean?

20      A.   Just the standard of --

21      Q.   Doesn't that ask you to make a determination
22   of degree there?  You've already found --

23      A.   Yeah.

24      Q.   -- you've already found the defendant guilty
25   when you reach that question.  So is that redundant to

254

1   ask his personal moral culpability?  Does that ask for
2   something more than a finding of guilt?

3      A.   Yeah, to some degree.

4      Q.   Yeah.  I found the defendant guilty, but then
5   it's saying, "How guilty is he?"

6      A.   Uh-huh.

7      Q.   Do you get that?  In other words, there's a
8   degree problem here.  So, whether the -- a person's
9   moral culpability is more than just a finding that
10   he's guilty.  You've already found him guilty.

11      A.   Yes.

12      Q.   So this has got to be something more than
13   just a simple finding of guilty.

14      A.   Right.

15      Q.   And once again, I say -- I suggest to you
16   that that portion of the question directs you to
17   consider what the moral code of the community is and
18   to what extent the defendant may have deviated from
19   it, and the reasons that he deviated from it.  I mean,
20   obviously he deviated from it, if you found him
21   guilty, but is there a reason why he did?  How did he
22   get to that point, you know?

23      A.   No.

24      Q.   Okay.  And then -- and then the last part
25   tells you, if you consider all these things, would you

255

1   find a circumstance that you feel will make a life
2   sentence more just.

3      A.   Okay.

4      Q.   Now, you can't -- when you talk about being
5   an impartial jury, you can't assume anything.  When it
6   comes -- if you get to the punishment stage you have
7   no expectations.  In other words, which -- which is
8   more just, life or death.  Let me hear the evidence
9   and I'm going to balance.  I think you have -- I think
10   you have the idea.  Okay.

11           Now, what answer to Special Issue No. 2
12   must the jury find if the death penalty is going to be
13   imposed?

14      A.   If there's sufficient mitigating
15   circumstances, or if there's sufficient mitigating
16   circumstances, then it's going to revert it back to a
17   life sentence.

18      Q.   Okay.  If they answer yes.  So, in other
19   words, a yes answer to Special Issue No. 2 will
20   produce what?

21      A.   A life sentence.

22      Q.   A life sentence.  A no answer will produce?

23      A.   A death penalty.

24      Q.   Okay.  Once again, the rules of -- the rules
25   relating to unanimous verdicts are changed here.  If

256

1   the vote is against the defendant it has to be
2   unanimous.  So, in other words, a no answer to special
3   issue is all 12 people to agree.  However, a vote in
4   favor of the defendant is yes, there are some
5   mitigating circumstances that would make life a just
6   punishment over death, then it's 10 jurors that vote
7   yes can produce a verdict.

8      A.   Okay.

9      Q.   You understand that?

10      A.   Yes.

11      Q.   Okay.

12      A.   And I -- I would assume if it's half and
13   half, then it's considered a hung jury, until they're
14   -- they deliberate some more to come up with either a
15   10-2 or greater verdict on either side?

16      Q.   Well, the Judge will give you instructions
17   about what to do in that case, okay?  I'm not here to
18   tell you what would happen if you had a hung jury.
19   Don't worry with that.  Just call it like you see it.

20      A.   Okay.

21      Q.   Now, I want to ask you a couple of other
22   questions.  You were concerned in your general
23   statement, and I appreciate jurors who take the
24   time -- you don't normally get to think about this,
25   until you get called for jury duty, you take the time

257

1  to write how they feel here.  We asked one juror who
2  says, "How do you feel about the death penalty?"  He
3  said, "Okay."  That's all he said.  So I can't tell,
4  you know, what's on his mind.
5          You were concerned about the appellate
6  process, it takes too long.  And do you understand why
7  the appellate process take a long time?
8     A.  Yeah, I mean, don't get me wrong, I believe
9  in the country that we live in and the -- if, you
10 know, that they get a chance to appeal their case in
11 multiple instances.
12    Q.  Have you been reading -- seeing these stories
13 that have come out recently in the paper and on the
14 television, TV stations have carried the stories, and
15 a lot of the stories are coming out of Dallas County
16 about people who have been in prison, been convicted
17 of crimes and only to be found later to be innocent,
18 factually innocent because the D.N.A. testing shows
19 that they were not the person.   Have you read stories
20 like that or heard about them?
21    A.  Sure.
22    Q.  How do you feel when you read a story like
23 that?
24    A.  Well, you know, obviously, you feel, you
25 know, sorry for the people that were miss-accused.  You

258

1  just got to -- in my opinion, you've just got to look
2  back and say we live in a country that gives the
3  defendant the best opportunity to, you know, beyond a
4  reasonable doubt have a clean slate moving into it,
5  and, you know, if we get to that, where you get a jury
6  to finally make a decision, then obviously there's
7  such level of evidence that -- believability that got
8  him that -- that guilty verdict.
9     Q.  Do not these stories underscore the
10 seriousness of the jury's task, especially in a case
11 like this?
12    A.  Yes, it does.
13    Q.  Really, you've got to -- it's something you
14 really need to work harder on, try not to make a
15 mistake.
16    A.  Sure.
17    Q.  Now, you said you're in favor of the death
18 penalty, do you -- as a form of punishment for certain
19 serious cases.  Do you believe that our society
20 benefits from having the death penalty, that is, our
21 Texas society?
22    A.  Yeah, I think that there is some level of
23 deterrence by having the death penalty in place.
24    Q.  Okay.  So deterrence would be one benefit.
25 Any other benefits that you can articulate?  Keeping

259

1  in mind you haven't had a chance to really think about
2  this a great deal, but --
3     A.  Sure.
4     Q.  -- right off, just --
5     A.  Not right offhand.
6     Q.  Okay.  So deterrence is what comes to mind.
7     A.  Uh-huh.
8     Q.  Now, these cases that I just referred to, the
9  ones out of Dallas, they come from other parts of the
10 country, also.  The good news in those cases is that
11 -- is that the defendant is alive.  You think -- even
12 though 20 years has passed.  The mistake was
13 discovered and through the habeas corpus procedure,
14 they were able to correct the mistake and the person
15 was released.  However, you know, you may feel bad
16 about he lost his 20 years, but when you're dealing
17 with the death penalty, especially if you have an
18 accelerated appeal process that you're in favor of,
19 there comes a point, you know, after next -- you know,
20 there's no way you can go back and correct --
21    A.  Sure.
22    Q.  -- a mistake.  Now, given -- we know, I mean,
23 because it happens.  That from time to time innocent
24 people are convicted in our system.  We try very hard
25 not to do it, we have elaborate safeguards to set up

260

1  to not do it, but we know from time to time that it
2  does happen.
3          Do you think the benefits of the death
4  penalty are -- are worth executing an innocent person
5  from time to time?
6     A.  I believe so.
7          MR. JONES:  Okay.  No further questions.
8          THE COURT:  All right.  Why don't you
9  wait in the jury room and we'll be right with you,
10 okay?
11         VENIREPERSON NO. 53:  Okay.
12         (Venireperson exits courtroom.)
13         THE COURT:  All right.  Mr. Skurka, what
14 say you?
15         MR. SKURKA:  State will accept this
16 juror.
17         THE COURT:  What says the Defense?
18         MR. JONES:  We are going to exercise --
19 to use a peremptory challenge on this juror.
20         THE COURT:  Okay.  That's strike No. 8.
21         All right.  Let's call him in.
22         (Venireperson enters courtroom.)
23         THE COURT:  All right, Mr. Hopkins.  You
24 are not selected to be on this jury, but we do
25 appreciate your time in coming down and spending a

261

1  couple of hours with us.

2      VENIREPERSON NO. 53:  Okay.  So I was not

3  selected?

4      THE COURT:  You were not.

5      VENIREPERSON NO. 53:  Okay.

6      THE COURT:  Thank you.

7      (Venireperson exits courtroom.)

8      THE COURT:  I'm considering calling off

9  the last person because I can't stay late tonight.

10  I've got a wedding to go to, and I really kind of have

11  to go to something after --

12      MR. JONES:  Sounds like fun.

13      THE COURT:  Yeah.

14      MR. SKURKA:  We have a whole bunch of

15  people for Monday, though, Judge.

16      THE COURT:  I know, but I don't know what

17  to tell you.  I just can't do it today.  I mean, that

18  took an hour and a half, which is fine.  We're going

19  to take as long as we need.

20      MR. JONES:  We can take a short lunch

21  maybe Monday and just work and --

22      MR. SKURKA:  I would prefer you just

23  don't excuse them.  If they have to wait, they have to

24  wait, but they're coming in at 3:00 anyway.

25      THE COURT:  Yeah, I know, but here's the

262

1  thing:  I don't want somebody to come and wait two

2  hours and then we say, "Oh, sorry, we've got to go."

3      MR. SKURKA:  Why not?  Judges make us do

4  that all the time.

5      (Laughter.)

6      THE COURT:  That's the deal -- I mean --

7      MR. SKURKA:  I'm sorry.  You didn't put

8  that on the record, did you Mary?

9      THE COURT:  Yeah, I think she did.  I

10  think she did.

11      (Laughter.)

12      MR. SKURKA:  I see your point, Judge.

13      THE COURT:  Well, what -- do you think

14  we'll get there?  I mean...

15      MR. GARZA:  Judge, do whatever you think.

16  You're the Judge, you -- I think it's just something

17  that's going to take a while.  You know what, here's

18  what -- off the record.

19      THE COURT:  Off the record.

20      (Off the record.)

21      (Venireperson enters courtroom.)

22      THE COURT:  All right, Mr. Cortinas, have

23  a seat.  I've already talked to you, so I'm going to

24  turn the floor over to Mr. Skurka.

25

263

1      VENIREPERSON NO. 62,

2      ROBERT CORTINAS, JR.,

3      VOIR DIRE EXAMINATION

4  BY MR. SKURKA:

5      Q.  Okay.  Mr. Cortinas, we're back in action

6  now.  Sorry you had to wait so long but we're just

7  plowing right ahead so I'm going to go a little quick,

8  but stop me if I'm going too fast or if you have any

9  questions, okay?

10      A.  Okay.

11      Q.  And I'll start by telling you there's no

12  right or wrong answers to anything you say.  It

13  doesn't matter how you feel or what you feel.  We just

14  want to know what it is, okay?  I don't want you to

15  say, "Well, gosh, I better answer it this way because

16  that's the way the Judge wants me to answer it, or

17  this way."  We just want your true feelings.  Can you

18  do that for us?

19      A.  Yes, sir.

20      Q.  How do you feel about sitting on this type of

21  jury?  I mean, it's a pretty big case so you tell me

22  how you feel.

23      A.  I don't know.  I don't really feel anything,

24  you know.

25      Q.  So it doesn't make, like, any difference to

264

1  you what kind of case it is?

2      A.  No, because, you know, I think that, you

3  know, eventually everything's going to come out.

4      Q.  Uh-huh.  What do you mean?

5      A.  Well, like, you know, you got to first listen

6  to what's going on.  Like I said, when this happened,

7  I was working nights and I wasn't really -- I don't

8  really look at a lot of news or, you know, read the

9  paper, you know, so...

10      Q.  So it's not because anything that you saw on

11  T.V. is going to influence you or anything like that,

12  correct?

13      A.  No.

14      Q.  Okay.  I guess what I'm trying to get at is

15  sometimes people come in for jury duty on Mondays.  I

16  don't know if you've ever been called before, but

17  they'll come in there and the Judge says, "Okay.  You

18  go over here and you're going to do a D.W.I. case.

19  Okay, this group of people, you're going to go over

20  here and do a theft case.  These people over here

21  you're going to do a contract dispute where somebody's

22  suing somebody."

23      But, boy, you guys came in, those 2- or

24  300 people, and the Judge came down and said, "Folks,

25  this is a criminal case.  If you get selected on this

265

1   case this Defendant, that young man over there, could
2   be facing the death penalty."  How did you feel about
3   being maybe on that kind of jury?
4       A.   I don't know.  The thing I looked at it was,
5   you know, like, Wednesday?  I thought, you know, jury
6   duties are selected on Mondays and Tuesdays, and this
7   is a Wednesday.  What's going on?
8       Q.   It's a different one.  We have a special
9   venire, is what they call it.
10      A.   Right now I just, you know, not really, you
11  know, feel anything, you know.  It's just -- like I'm
12  just open right now, you know.
13      Q.   Good.  I just need to know because sometimes
14  -- I don't know if you saw all the people around you.
15  What did you see other people react, like when the
16  Judge said it's a capital murder case and you may have
17  to seek -- you may have to decide on the death
18  penalty?  Did you see anybody else's reaction around
19  you?
20      A.   Not really.
21      Q.   Well, I was watching people.  And sometimes,
22  I saw them and they'd go, like this, like, "Oh, my
23  gosh," and, oh, they have a reaction like panicking,
24  saying, "Oh, my gosh.  I can't sit on that kind of
25  case.  I don't believe in the death penalty," or,

266

1   "Man, that's too big a decision just for me to make,"
2   you know?  And then we had other people that kind of
3   said, "Hey, this sounds pretty important, you know.  I
4   better listen and make sure I understand everything
5   the Judge is saying."
6            Did you have any misgivings or feelings
7   about, "Wow, this is -- I can't do this kind of case"?
8       A.   Not really.
9       Q.   Why not?
10      A.   Like I said, I don't know, you know, I
11  didn't -- I'm not much into, you know, listening to
12  the news or weather or nothing like that.  I just
13  found out that this guy died, the attorney.  He says
14  "I remember him," you know, but I don't really pay
15  attention to the news or anything like that.
16      Q.   When you say "you remember him," what do you
17  mean?
18      A.   Like that -- that guy, that -- that attorney
19  that died?  I didn't know that he had passed away.
20           THE COURT:  Tinker.
21           VENIREPERSON NO. 62:  Yeah, Tinker.
22  Yeah, because, you know, I don't -- you know, like I'm
23  always busy, you know, doing --
24      Q.   (BY MR. SKURKA)  I understand.
25      A.   I don't -- I don't -- I stopped even

267

1   listening to the weather because I know they get it
2   wrong anyway so that's why I don't really listen to
3   the media.  I'm always doing something around the
4   house, or stuff, go outside and read the paper.
5       Q.   Well, it sounds like you keep busy but I
6   don't mean to keep talking to you about this but
7   sometimes people say, "Man, that's an awesome
8   responsibility."  You know, because we're not talking
9   about somebody you hear about in the news or read in
10  the paper, or somebody else.  That's him.  Take a look
11  at him, right there in the purple shirt.  That's John
12  Henry Ramirez.  I mean, it's not -- there's going to
13  be a time in this trial where I'm going to come behind
14  -- before you if you're sitting on the jury, and I'm
15  going to say, "Based on the evidence, Mr. Cortinas,"
16  and 11 other jurors, "I'm going to ask that you
17  sentence this person to be executed."  I want you to
18  look at him and tell me if you think you can
19  participate in that kind of decision if the facts and
20  the evidence warrant that.
21      A.   Well, if the facts come out, you know, yeah,
22  I think I could, you know, participate in them.  I can
23  -- I'll be open, you know, I'll be honest.  And, you
24  know, I'll -- I'm the one who's going to have to
25  decide that.

268

1       Q.   Well, it's not just you --
2       A.   Yeah.
3       Q.   -- it's the other jurors, too.
4       A.   Yeah, there's other people, yeah, I know.
5       Q.   It's everybody.
6       A.   Yeah.
7       Q.   I mean, and that's probably good.  You don't
8   want to just have one person, like a judge, or the
9   D.A. deciding, we have 12 people doing it.
10      A.   Yeah.
11      Q.   But make no mistake, I want to know if I have
12  in you, Robert Cortinas, a person that can carry out
13  that sentence if you think -- or carry out that
14  decision if you think that's what it -- it deserves.
15      A.   Yeah, I probably could.
16      Q.   Okay.  When you say you probably could, what
17  do you mean?
18      A.   Well, you know, I would have to listen to
19  both sides.  It's just like a quarter, you know, it's
20  got to sides of everything.  It's got the good or the
21  bad and it's, you know, not really the good or the
22  bad, but there's always two sides of the story, so...
23      Q.   Okay.
24      A.   And I would have to be open, you know, I have
25  to listen to make an honest opinion.  I'm going to

269

1  have to listen to -- you know, to it.
2      Q.   I know, but I'm -- there's two things I want
3  to cover with you.  First of all, pretend you've heard
4  enough evidence and you think he should get the death
5  penalty, can you vote that way?
6      A.   Yeah, if it came down to that, yes.
7      Q.   Okay.  And any hesitation with that?
8      A.   No.
9      Q.   Okay.  Now, the second part I need to talk to
10  you about because you said something about there's two
11  sides to every coin or there's two sides to the story.
12  You understand that the Defense doesn't have to put on
13  any evidence at all.  The State has to put on the
14  evidence.  But it's natural for people to think, "Hey,
15  I want to hear what both sides of the story are."  You
16  know, if you have a dispute, you know, say you're a
17  teacher, and one student says this and the other
18  student says that, well, you want to hear everything
19  before you decide what to do, right.
20           Probably in your job you want to hear
21  everything before you decide what to do.  But
22  sometimes in cases, in criminal cases, you don't get
23  to hear both sides.  How do you feel about that?
24      A.   Well, I know it would be hard, but it's --
25  it's always good to hear both sides.  But if it's only

270

1  going to be one side that I'm going to be hearing,
2  then it's -- I don't think it's going to be hard to
3  decide, I just, you know, I know it's going to be up
4  to you-all to do that so.
5      Q.   Up to us to decide or up to us to prove it?
6      A.   No, it's up -- it's up to you-all to prove,
7  you know, what he did it.
8      Q.   It is.  It's up to us to decide, but it's
9  natural for jurors to say, "Well, you know, I think
10  he's guilty, but, man, I would sure like to hear what
11  he has to say, you know?  Because if it was me, I
12  would get up on the stand and say what happened or why
13  I'm not guilty, or something like that."  That's just
14  natural for people to see that.  Like, gosh, you see
15  that on the shows on T.V. all the time, the guy gets
16  up there and defends himself or something like that.
17  But you don't have to do that, and I'm just wondering
18  if that's going to effect you being in this case, if
19  you don't hear the other side of the story?
20      A.   No, I don't think it's going to effect me.
21      Q.   Okay.  So you understand he doesn't have to
22  testify and you can follow that?
23      A.   Yes, sir.
24      Q.   Okay.  That's -- I don't mean to keep beating
25  a dead horse, I just want to make sure that you're

271

1  going to be qualified to -- you can hear everything.
2           When you talk about the death penalty,
3  and -- and just tell me what your initial reaction was
4  when you heard it was a death penalty case.  How do
5  you feel about the death penalty?
6      A.   That's something serious to me, you know,
7  having to face something in a way it's going to be
8  either death or life, but to me it's -- it's -- to me
9  it's something heavy, you know, like, you know, I
10  don't know.  I'm not really good with words, but like
11  I said, I'm just --
12      Q.   You're doing fine.  There's no special words.
13  You just tell us how you feel.  Did you want to say
14  something else?
15      A.   No, that's -- I think that's it because, you
16  know, like, I said, to me the death penalty is
17  something real serious, you know, and it's just -- I
18  think that's it.
19      Q.   Okay.  When you say it's -- it's real
20  serious, I think everybody agrees on that.  I think
21  everybody sitting on this jury is going to say, "I'm
22  not going to rush into judgment.  I'm not going to be
23  happy about making this judgment," but, you know, as
24  jurors doing their civic duty, they may have to make a
25  pretty tough decision.  Do you agree with that?

272

1      A.   Yes, sir.
2      Q.   Okay.  And just because it's heavy, does that
3  mean it's something that can't be done?
4      A.   No.
5      Q.   Now, you said something about in your jury
6  that -- in your jury questionnaire, that you think
7  that it takes too long for it to be carried out, if it
8  happens it should be done right away, right --
9      A.   Sir?
10      Q.   -- or within -- I think you said five years
11  or something.
12      A.   Yeah, that's what I said.  Because we got
13  guys in there that's been 13, 20, 30 years.  And, to
14  me, that's the taxpayers' money, you know.
15      Q.   It is, it is.
16      A.   They're like getting a free ride, you know.
17  I'm not sure it's -- Well, not a free ride, but, you
18  know, they get real good, you know, they get -- they
19  got T.V., like, satellite, you know.  They get to see
20  some of the pay per views and stuff.  And I don't know
21  if it's true or not, but I don't even got that.  I
22  just have basic T.V. and cable.
23      Q.   I'm not sure if they get pay per view T.V.,
24  but I can tell you this, sometimes it does take a long
25  time, I think that's indisputable.  But also it means

273

1  that you don't want to the rush into anything. Just
2  like the jury doesn't rush into anything, you want to
3  have an appellate court or other lawyers review the
4  decisions made and make sure they were the correct
5  ones, and stuff. So whether it's 5 years, 10 years,
6  15 years, you understand that being on the jury that
7  really shouldn't enter into your consideration. You
8  just go with what -- the evidence you have. You can't
9  -- you don't have any control. I don't have any
10  control over how long it takes for it to be carried
11  out. Do you have see that?
12     A.   Yes, sir.
13     Q.   Okay. That's not going to interfere with you
14  being on the jury, correct?
15     A.   No, sir.
16     Q.   Okay. Sometimes people say, "Well, gosh, I
17  might as well give them a life sentence. Because if
18  you give him the death sentence, he's going to be in
19  jail for a long time with the taxpayer money, ah, just
20  give him a life sentence, anyway." Would you think
21  about doing that?
22     A.   It's almost like being there life, I guess.
23  If you get the death penalty, because, like I said,
24  you see guys in there for a long time, you know, and
25  it's almost like -- it's almost like a life sentence

274

1  there, you know.
2     Q.   Well, it depends, I guess, on who you are and
3  how old you are. Sometimes people say, "Man, if it
4  was me, get it over with. Put me to death within a
5  few years." Other people will say, "Look, I'll hang
6  onto life whatever I can." Do you think the death
7  penalty is worth than life or the life penalty is
8  worth than death?
9     A.   I think that life is worse than death.
10     Q.   Why?
11     A.   Because, you know, you're -- from what I
12  understand life is you're in there until you're either
13  paroled or you have to do so much time, and I don't
14  know, it's just like being caged up, you know. To me,
15  it's like --
16     Q.   You wouldn't like it.
17     A.   No. I don't think I would like it.
18     Q.   Okay. But if you -- I mean, in all
19  seriousness, you probably have to admit that death is
20  worse than life, right?
21     A.   Right.
22     Q.   Maybe -- maybe you would think differently,
23  though. So my question is, if you were sitting in
24  there and had to decide, and you're thinking, "Well,
25  gosh, you know, I should give the death penalty, but,

275

1  you know, really, life is harder than death. I'm
2  going to vote for life all the time because I think
3  life is harder than death." Would you do it that way
4  or feel that way?
5     A.   No, because we know eventually we're going to
6  have to die one day, regardless of what happens. It
7  could be an accident. It could be, you know, so I
8  don't -- I know that's part of life. We're born to --
9  we're born to die, you know.
10     Q.   So you wouldn't be leaning towards a life
11  sentence?
12     A.   Well, like, I said, depends on the evidence I
13  hear, you know? It's -- but I won't have, you know,
14  -- I don't think I would have a problem with the death
15  penalty, you know, but then, again, you know, I don't
16  think would have a problem, you know, being honest and
17  deciding my own, you know, what's good.
18     Q.   Okay. Okay. I think that's all the
19  questions I have, right now, Mr. Cortinas. We may
20  have to take a little break, but we'll be back with
21  you shortly, okay?
22     A.   Okay.
23           MR. GARZA: That's fine, Judge. I don't
24  have any questions.
25           THE COURT: All right. Why don't you

276

1  wait in the jury room.
2           (Venireperson exits courtroom.)
3           THE COURT: All righty.
4           MR. SKURKA: Judge, I think both
5  Counsel and I agree that this -- this person is a
6  little -- we'll agree to excuse him.
7           THE COURT: Okay.
8           MR. GARZA: I think the way he's waffling
9  and going back and forth, he's going to have a
10  conceptual difficulty in understanding the issues,
11  Judge.
12           THE COURT: I think you're right.
13           MR. SKURKA: For the record, we agree on
14  62.
15           THE COURT: All right. Bring him in.
16           (Venireperson enters courtroom.)
17           THE COURT: Mr. Cortinas, you are not
18  selected to be on this jury, but we do appreciate your
19  time in coming down here and spending time with us.
20           VENIREPERSON NO. 62: Okay.
21           THE COURT: You need a work excuse?
22           VENIREPERSON NO. 62: No.
23           THE COURT: Okay. Thank you very much.
24           MR. SKURKA: Thank you, sir.
25           VENIREPERSON NO. 62: Thank you.

277

1    (Venireperson exits courtroom.)

2    THE COURT: Okay. We got the other two

3 folks here. Yeah, I agree with you guys. Let's go

4 off the record for a second.

5    (Off the record.)

6    (Venireperson enters courtroom.)

7    THE COURT: All right. Come forward.

8 You are Josefina Garcia?

9    VENIREPERSON NO. 55: Yes, sir.

10    THE COURT: All right. Have a seat.

11    VENIREPERSON NO. 55: Thank you.

12

13    VENIREPERSON NO. 55,

14    JOSEFINA GARCIA GARCIA,

15    VOIR DIRE EXAMINATION

16 BY THE COURT:

17    Q.   All right. Ms. Garcia, we are trying to pick

18 a capital murder jury, okay?

19    A.   Yes, sir.

20    Q.   You knew that already, --

21    A.   Yes.

22    Q.   -- because you came in the other day and you

23 filled out a questionnaire for us. All right, we're

24 looking for two things. One, we're looking for people

25 that can keep an open mind, okay?

278

1    A.   Yes, sir.

2    Q.   And we're looking for people that can follow

3 the law.

4    A.   Yes, sir.

5    Q.   Okay. Now, do you -- do you think you can

6 keep an open mind?

7    A.   Yes, sir.

8    Q.   Okay. Have -- you haven't formed an opinion

9 in this case?

10    A.   No, sir.

11    Q.   Okay. Let's see here, you say you heard it

12 on the news.

13    A.   Yes, sir.

14    Q.   And, obviously, a lot people have heard about

15 stories like this on the news, okay? And that's okay.

16 We just have to make sure that when you come to court

17 if you become a juror in this case that you don't get

18 your information from other sources, only from this

19 courtroom and that you could put that out of your

20 mind.

21    A.   Yes, sir.

22    Q.   Okay. Because with all due respect to the

23 media, they don't always get it right.

24    A.   That's true.

25    Q.   And so that's why we -- we like jurors just

279

1 to take in what's presented to them in the courtroom,

2 okay?

3    A.   Yes, sir.

4    Q.   Now, we also need to know if you can follow

5 the law. We're going to talk about that. You have

6 been -- you have been a juror on a civil case before?

7    A.   Yes, sir.

8    Q.   Sexual harassment case, some ten years ago;

9 is that right?

10    A.   Yes, sir.

11    Q.   Okay. Now, that's a civil case. The burden

12 of proof is a little different than it is here, okay?

13 In a civil case the person bringing the lawsuit has

14 the burden of proof. You following me?

15    A.   Yes, sir.

16    Q.   Okay. If I -- if I get into a conflict,

17 maybe a businesslike hassle with somebody, let's say

18 we have a contract and I sue them, it's my burden to

19 show that they have violated the contract, okay?

20    A.   Right.

21    Q.   Likewise, in this case the State brought the

22 charges, okay? State of Texas brought the charges and

23 the law says, "Hey, State of Texas, you bring the

24 charges, you got to prove them."

25    A.   That's true.

280

1    Q.   Okay? You agree with that?

2    A.   Yes, sir.

3    Q.   Okay. Now, the burden of proof that you had

4 in that civil case was by a preponderance of the

5 evidence, which is just a little bit more, 51 percent

6 we call it sometime, tipping the scales of justice

7 just ever so slightly, okay? There's also a burden of

8 proof in civil cases that's a little higher than that,

9 most notably in cases where the State seeks to

10 terminate someone's parental rights, okay? In that

11 kind of case the burden is higher than that 51 percent

12 that you did in your case. It's clear and convincing,

13 okay.

14    So it's -- you know, that's -- that

15 sounds pretty strong, right, clear and convincing.

16    A.   Yes, sir.

17    Q.   Okay. That's not just any willy-nilly deal.

18    A.   Yes, sir.

19    Q.   Okay? This -- the burden in this case

20 because it's a criminal case because the State is

21 seeking to take someone's liberty, is beyond a

22 reasonable doubt, okay? It is higher than both of

23 those, okay? There's no definition. It is not beyond

24 all doubt, okay? It's beyond a reasonable doubt. You

25 think you can follow that law?

281

1   A.   Yes, sir.

2   Q.   And you can hold the State to that burden?

3   A.   Yes, sir.

4   Q.   Okay.  Next thing, since the State has the

5   burden of proof, everyone within the borders of the

6   United States is presumed to be innocent, unless and

7   until the State can prove otherwise.  You follow me?

8   A.   Yes, sir.

9   Q.   Some places in the world the State decides

10   you're guilty and, boy, you got to -- you got to prove

11   to them that you're not guilty.  You're automatically

12   guilty, they say, and then it's -- the burden is on

13   you to get yourself out of it.  We don't do that here.

14   You follow me?

15   A.   Yes, sir.

16   Q.   Here there's a presumption of innocence.  And

17   that is, all of us are presumed innocent, including

18   the Defendant here in this case.  He's presumed to be

19   innocent, the law says that.

20   A.   Yes, sir.

21   Q.   Okay?  And that's something that we have had

22   in our -- you know, our background.  We had it, the

23   English had it, the Romans, the Greeks.  It's in the

24   Bible, even.  And -- and so if you had to vote right

25   now, since you haven't heard any evidence, you would

282

1   have to vote that the Defendant is not guilty --

2   A.   Right.

3   Q.   -- because they haven't proven to you

4   anything.

5   A.   Right.

6   Q.   And I don't know if they can prove it, we'll

7   see, okay?  But would you -- could you presume that

8   the Defendant is innocent until and if they can --

9   until they can prove it?

10   A.   Yes, sir.

11   Q.   Maybe they can't.  All right, you can do

12   that?  All right.  Now, as part of that concept, the

13   Constitution of the United States says Defendant

14   doesn't have a right to testify -- has a right not to

15   testify if he doesn't want to, okay?  And it really

16   makes sense, because they've got the burden of proof.

17   If they've got the burden of proof, then the Defense

18   doesn't have to do anything.  And as part of that,

19   they don't have to testify, okay?

20          And there's a lot of reasons why somebody

21   wouldn't want to testify.  Maybe his lawyers told him

22   not to and they say, "You know, what?  Don't

23   testify because we don't think they've proven their

24   case," all right?  Maybe he's somebody that gets

25   stressed, you know, doesn't do well in front of

283

1   crowds, doesn't do well in pressure situations.  He's

2   a bad speaker.  It a -- I had a friend who used to

3   laugh inappropriately when he got nervous, and a lot

4   of people would take it the wrong way.  But, in any

5   event, he -- he wasn't trying to be rude.  He just --

6   that's just how he got when he got stressed.

7          I don't know if that's the situation here

8   or not, but it gives you kind of an idea that there's

9   reasons why someone wouldn't want to testify.

10   A.   Right.

11   Q.   Okay, legitimate reasons.  And so I need to

12   know from you whether you would hold it against him if

13   he chose not to testify because the law says this, the

14   law says not only can they not make him testify, it's

15   more than that.  Jury can't go back there and say,

16   "Hey, that guy didn't testify.  That's one for the

17   State."  Nuh-huh.  If you -- law says you can't hold

18   it against him.  Could you follow that law?

19   A.   Yes.

20   Q.   Okay.  You wouldn't hold it against him if he

21   -- we don't know, but if he chooses not to --

22   A.   No.

23   Q.   Okay.  All right.  Now, what kind of case is

24   this?  Well, this is capital murder, and what's murder

25   -- capital murder?  Well, murder is in the -- in the

284

1   phrase there, so let's talk about that.

2          Murder.  What's murder?  It's the

3   intentional taking of another's life, right?

4   A.   Right.

5   Q.   But this is capital murder.  So what -- what

6   does that mean?  Well, capital murder is sort of like

7   murder plus, murder plus something else.  The

8   legislature said that some murders in special

9   circumstances become capital ones, and there's a list

10   of reasons.  In this case, the State is alleging that

11   the Defendant committed a murder while in the course

12   of committing or attempting to commit a robbery, all

13   right?  So those are two serious crimes.  The

14   legislature says you put them together and you got

15   capital murder.

16   A.   Right.

17   Q.   All right?  And what's a robbery?  Well,

18   that's forcibly taking something from somebody else.

19   I go and I hold a gun to you and you give me your

20   purse, all right?  Or maybe I -- maybe I go and I hold

21   the gun to you and you don't give me your purse and I

22   get scared and I run off.  Well, that's still an

23   attempt.  Or maybe you hit me with the purse and

24   knocked me out, okay?  But that's an attempted

25   robbery, right?

285

1    A.    Right.

2    Q.    Okay.  The State can -- can prove capital

3    murder if they prove that this Defendant, on the given

4    day, in Nueces County, Texas, committed the offense of

5    murder while he was robbing the victim or attempting

6    to go rob him, okay?

7    A.    Right.

8    Q.    That's how they get there.  Now, there's a

9    bunch of elements, okay?  That is, the things they

10   need to prove to get there.  And there's elements of

11   murder and there's elements of robbery or attempted

12   robbery, okay?  And they have to prove all of them to

13   get to capital murder, you follow me?

14   A.    Yes, sir.

15   Q.    They don't just get -- I don't know how many

16   there are, there's eight on nine or ten or something.

17   They don't get to prove, you know, seven out of eight

18   or eight out of nine.  They got to -- they got to run

19   the table.  They got to get them all.  Would you hold

20   them to that burden and require them to prove every

21   element of capital murder before you found this

22   Defendant guilty of such?

23   A.    Yes, sir.

24   Q.    Okay.  Now, what's capital murder?  Well, I

25   told you what it is, but what's the significance of

286

1    it?  Well, capital murders are murders in which the

2    death penalty is a possible punishment.  You follow

3    me?

4    A.    Yes, sir.

5    Q.    Okay.  So, the death penalty is a possibility

6    here.  So we have two possibilities if the Defendant

7    is found guilty, life in prison or the death penalty.

8    A.    Right.

9    Q.    All right.  Those are the only two things

10   that can happen.  We have what's called a bifurcated

11   system.  And what does that mean?  Well, that means

12   there's two parts, okay?  We have the guilt or

13   innocence phase and then we have the punishment phase.

14   Guilt or innocence phase is, the part of the trial

15   where the State tries to prove to you beyond a

16   reasonable doubt that the Defendant is guilty, okay?

17   If jury goes back and deliberates at that part of the

18   trial and they find the Defendant not guilty that's

19   the end of the case.  It's over with, okay?

20        If they find the Defendant guilty of

21   capital murder, then we go onto the second phase, the

22   punishment phase, okay?

23   A.    Yes, sir.

24   Q.    And like I told you, remember I told you

25   there was death or life as a possibility.

287

1    A.    Right.

2    Q.    But you don't go back there and deliberate

3    and say life or death.  We don't do it that way.  You

4    answer questions.  Okay.  Let's go over the questions.

5    Here's the first one, "Is there a probability that the

6    Defendant will commit criminal acts of violence that

7    will constitute a continuing threat to society?"

8         What does that mean?  Well, it means, is

9    he probably going to commit violent acts in the future

10   that's going to hurt others, okay?  That's essentially

11   what you have to answer.  Sometimes we call it "the

12   future dangerousness question."  And the jury would

13   have to answer yes or no, okay?

14        Then after they answer that question,

15   then they go on to the second question.  "After taking

16   into consideration all of the evidence, including the

17   circumstances of the offense," that's the first part

18   of the trial, right, the guilt or innocence phase --

19   A.    Right.

20   Q.    "-- the Defendant's character and background

21   and the -- and the personal moral culpability of the

22   Defendant, is there a sufficient mitigating

23   circumstance or circumstances to warrant a sentence of

24   life imprisonment, rather than death sentence being

25   imposed?"  Let's talk about that a little bit.

288

1         In the second part of -- the first part

2    of the trial all you're going to hear about is the

3    crime, okay?  That day, what went on that day, all

4    right?  And we're going to see if -- if the State can

5    prove what they're alleging, what they say the

6    Defendant did.  We don't know.

7    A.    Right.

8    Q.    But if they do, then the second part of the

9    trial, you can consider that, the -- the facts of the

10   crime.  You know, some crimes, you know, are worse

11   than others, right?

12   A.    Right.

13   Q.    Okay.  But it just -- every case is

14   different.  You would agree with me.

15   A.    That's true.

16   Q.    Okay.  So, you could consider that part of

17   the trial.  But then at the second half of the trial,

18   you might hear other things, like maybe the Defendant

19   was a good guy, other than this.  Maybe he -- he, you

20   know, did community service, he worked in the

21   community and, you know, was a good guy.  Maybe he was

22   a bad guy.  Maybe he had a bad criminal history.

23   Maybe he had none, okay?  All kinds of different

24   possibilities.  Maybe there's some good things, maybe

25   there's some bad things, maybe there's both.  We don't

289

1   know at this point.

2           And so you need to weigh everything.

3   It's kind of like a global question, you know, just

4   take in everything that's presented to you, take it

5   all into consideration.  That's what this question

6   entails, and ask yourself, "Is there sufficient

7   mitigating circumstances that warrant him getting

8   life, instead of death?"

9           Well, what's that?  Mitigating

10  circumstance.  Mitigate, of course, means to lessen.

11  You know, circumstances that lessen his -- perhaps his

12  culpability, okay?  He's guilty of the crime, but you

13  don't always punish people that commit a particular

14  crime the same way, depending on the circumstances and

15  depending on the facts, right?

16      A.   Right.

17      Q.   Maybe he's had a good background, maybe he's

18  had a bad background.  All of these things could be

19  mitigating circumstances.  Some people may think a

20  particular fact is not a mitigating circumstance.

21  Like, for example, maybe he was an Eagle Scout.  One

22  juror may think that's mitigating.  "Hey, he was a

23  good guy.  He was an Eagle Scout," Other's say, "You

24  know what?  I don't care.  That's not a mitigating

25  circumstance to me," okay?  But that's up to the jury,

290

1   and these lawyers will -- they will suggest to you

2   what a mitigating circumstance is but only the jury

3   gets to decide if it is a mitigating circumstance.  Is

4   it something that -- that lessens perhaps potentially

5   the punishment.  Are you with me?

6       A.   Yes.

7       Q.   Okay.  And then you have to ask yourself, is

8   there sufficient mitigating circumstances?  In other

9   words, maybe you go back there and you say, "Yeah,

10  there are mitigating circumstances, but it's not

11  enough.  It's not sufficient to warrant a life

12  sentence, rather than death."

13      A.   Okay.

14      Q.   Okay?  You understand basically what the

15  question's about?

16      A.   Yes.

17      Q.   Okay.  And that's the process.

18      A.   Okay.

19      Q.   What I need to know from you is this:  The

20  beginning of the trial, after we've selected all of

21  our jurors, we seat the jury right there and we'll

22  have a jury and we'll probably have a couple of

23  alternates, too.  And I -- I raise my right hand and

24  each juror will raise their right hand, and I -- I

25  give them an oath.  And the oath goes like this, "Do

291

1   you solemnly swear that you will render a true verdict

2   in this case based upon the law and the evidence

3   presented to you," and they say yes, okay?

4       A.   Right.

5       Q.   I need to know, can you take that oath -- and

6   we're going to break it up -- on the guilt or

7   innocence?  Can you take the oath, that oath, and

8   render a true verdict on the guilt or innocence in

9   this case based upon the law and the evidence

10  presented to you?

11      A.   Yes, sir.

12      Q.   Okay.  Now, let's go to the second part.  If

13  you do find the Defendant guilty, can you answer these

14  questions?  And before you answer that question, I'm

15  going to tell you, some people tell me, "Judge, I

16  can't do it.  I can't truthfully answer these

17  questions because I cannot participate in a process

18  that may lead to the death penalty, I can't -- for

19  moral or whatever reasons, I just can't do it."

20      A.   Right.

21      Q.   Other people tell me, "I could give him a

22  fair trial on a guilt or innocence phase, and I could

23  hold Mr. Skurka over there to their burden of proof,

24  but if I find that he's guilty of capital murder,

25  these questions mean nothing to me.  I will not follow

292

1   your law.  I will always recommend the death penalty.

2   I will not -- I will ignore both of these special

3   issues, and it is -- I will answer them in such a way

4   that I will not consider these mitigating

5   circumstances, or even this question, and I will

6   always answer it in such a way that the Defendant will

7   get a death sentence," okay.

8           Those people cannot take the oath because

9   they can't truthfully answer these questions, all

10  right?

11      A.   Right.

12      Q.   I need to know from you, can you truthfully

13  answer these questions and take that oath?

14      A.   Yes, sir.

15          THE COURT:  Okay.  All right.  I'm going

16  to turn the floor over to the attorneys.  Mr. Skurka?

17          VOIR DIRE EXAMINATION

18  BY MR. SKURKA:

19      Q.   Hi.

20      A.   Hi.

21      Q.   You sure are perky for an afternoon on Friday

22  afternoon.

23      A.   Oh, I just got out of work a while ago, so

24  thank God it's Friday.

25      Q.   I hear that.  But --

293

1   A.   Thank God it's Friday.

2   Q.   -- we're still here at work, too, but -- and

3   this really isn't work, this is really some serious

4   business where we've got to make a decision on how you

5   feel about being on this jury, okay?

6   A.   Okay.

7   Q.   So I'm Mark Skurka.  This is Geordie

8   Schimmel, and we're at the D.A.'s Office.  And it's

9   going to be our privilege to present this case if you

10  get called for this jury and actually get selected.

11  I'm going to tell you, right off the bat, Ms. Garcia,

12  that there's no right or wrong answers to anything you

13  say.

14  A.   Okay.

15  Q.   We just want to know how you feel.  I don't

16  want to you to say, "Well, I better say it this way

17  because that's the way the Judge wants it, or I better

18  say it this way because that's the way he wants it, or

19  he wants it."  I don't want you to do that.  You just

20  tell us how you truly feel about this case and we'll

21  get on with it, okay?

22  A.   Okay.

23  Q.   Is that fair enough?

24  A.   Fair enough.

25  Q.   Okay.  Let's go straight to some of the

294

1   issues in this case, and the first one is the death

2   penalty.  I mean, clearly, you heard that this is a

3   possible death penalty case.  So, tell me, how do you

4   feel in general about the death penalty?

5   A.   I feel if they deserves it I would -- I would

6   go ahead and approve of it.  But if they don't deserve

7   it, there's no reason for it.  You have to show the

8   evidence in order for that person to have the death

9   penalty.  If you don't have the evidence, we -- I

10  can't approve it.

11  Q.   That's a very intelligent answer and that's

12  the way it should be.  It should be based on the

13  evidence, right?

14  A.   Yes, sir.

15  Q.   It shouldn't be based on how old a person is,

16  what they look like, what race they are, what sex they

17  are, it should be based on what they did.

18  A.   Right.

19  Q.   Would that fair to say?

20  A.   Yes, sir.

21  Q.   How did you feel about it when you came in

22  the courtroom that -- remember that first day with 2-

23  or 300 people in there?  Some people didn't even know

24  he was a Defendant.

25  A.   I didn't know either.

295

1   Q.   You didn't know either.

2   A.   No, until the very end.

3   Q.   Say again?

4   A.   Not until the very end.

5   Q.   Not until the very end?

6   A.   Yes.

7   Q.   Now you saw him that day and now you see him

8   here today.

9   A.   Yes.

10  Q.   I want you to look at him and tell me, do you

11  think that you, Ms. Garcia, can participate in the

12  decision that might cause him to lose his life?

13  A.   To be honest with you, I'm very nervous.  I

14  didn't even want to come.  I haven't slept for two or

15  three days, and that's being honest.

16  Q.   That's all we want, ma'am.

17  A.   Thank you.

18  Q.   That's all we want.  No one here is going to

19  argue with how you feel.  You have a right to feel

20  that way, and -- but we have a right to figure out --

21  A.   Yes.

22  Q.   -- how you feel.  And -- and it's perfectly

23  fine.  Some people say, "I have to say it this way,

24  and I, you know, however," no.  If you feel -- you

25  feel nervous because it's a death penalty case.

296

1   A.   Yes.

2   Q.   Okay.  If it was just like a regular case,

3   like a -- oh, my gosh, a shoplifting case or a D.W.I.

4   where a person is not facing the death penalty, do you

5   think you'd would be better on that kind of case?

6   A.   No.  I'm just nervous, period.

7   Q.   So you just have a hard time sitting in

8   judgement of somebody --

9   A.   Yes.

10  Q.   -- and making that decision?

11  A.   Yes.

12  Q.   Okay.  And that's perfectly fine to feel that

13  way.  Some people can say -- some people say, "Hey, no

14  problem.  I can do any kind of case," and then some

15  people say, "Because it's a death penalty case, I just

16  can't do it."  Are you that kind of person?

17  A.   Yeah, I just can't.  I just get nervous.

18  Q.   Okay, and that's fine.  I'm just going to ask

19  you a couple of legal questions now, and maybe we'll

20  take a little shortcut.  It's real simple, listen to

21  my question:  Is the fact that you're sitting in

22  judgment of this person, and the fact that he may be

23  facing the death penalty and you may have to be one of

24  the ones that give it to him, is all that weighing so

25  heavily on your mind because you haven't slept and

297

1  you're very nervous, is that going to make it very
2  difficult or very -- you know, it will effect you
3  serving as a juror in this type of case?
4      A.   I'll be honest with you, yes.
5      Q.   Okay.  That's all I need to know, ma'am.
6  Thank you very much.  The other lawyers may have some
7  questions.  The Judge may have some questions.
8      A.   Thank you.
9          MR. SKURKA:  Thank your for your candor,
10  ma'am, your honesty.
11          VOIR DIRE EXAMINATION
12  BY MR. GARZA:
13      Q.   Ms. Garcia, my name is Ed Garza.  I think I
14  introduced myself to all of you-all back when we were
15  downstairs on the first floor.  I think it's very
16  natural and it's very difficult to sit in judgment of
17  another person either because of our core beliefs,
18  religious beliefs or just because of the way we were
19  raised or the kind of personality we have, the
20  character we have, things of that nature.  It's very
21  difficult.
22          But in our society, to be an American, to
23  be a Texan, we're sometimes, you know, having to be
24  called to duty in this case, okay?  Just like our
25  soldiers in Iraq, soldiers that fought in Desert

298

1  Storm, Vietnam, Korea, World War II.  I'm sure there
2  were a lot of young men and women that were very
3  nervous about that whole situation.
4      A.   Right.
5      Q.   Being put into combat and -- but -- but, you
6  know, as Americans, we had -- a lot of us have had to
7  shoulder those duties and we've done it.  We don't
8  know how, but we've done it --
9      A.   Right.
10      Q.   -- some of us.
11      A.   Right.
12      Q.   Okay?  And this is -- this is not much
13  different, but somewhat, okay?  And what I need to
14  know, what we need to know is, you know, the Judge has
15  already gone over a lot of legal issues where he's
16  asked you, you know, could you, could you, could you,
17  and you said you could, you could, you could, and you
18  did.  You know, can you set aside your nervousness and
19  said aside the -- the inability, maybe within your own
20  mind, to grapple with this and try to be fair and
21  impartial and sit in this kind of a case?
22      A.   If I have to as a citizen, yes.  I could,
23  yes.
24      Q.   You could do that?
25      A.   Yes.

299

1      Q.   And that's what we're asking.  I mean, who in
2  their right mind wants to sit through one of these
3  kind of cases?  Only -- only us crazy lawyers because
4  we've been trained to do it.
5      A.   Yeah.
6      Q.   We've been trained to do that.  And -- but
7  even for us, it's very stressful, okay?  Mr. Jones and
8  I used to have black hair at one time, many years ago,
9  okay?
10      A.   Not no more.
11      Q.   No.  But it's part of the --
12      A.   Well, we're all getting there.
13      Q.   And so we just -- you know, we know it's
14  difficult, we know it's hard, and sometimes people
15  say, "I can't.  I don't want to," but, you know, as a
16  citizen, as a person who's been called to jury duty,
17  who -- who will be asked to take a certain oath about
18  whether or not you can follow the law and whether or
19  not you'll hear all the evidence, and -- and based on
20  that evidence make a decision which might be a
21  difficult one, who knows, you know, we don't know,
22  yet.  You don't have any way of knowing and we don't
23  expect you to know, yet.  But -- but can you -- can
24  you sit through this kind of a trial?
25      A.   To be honest with you?

300

1      Q.   Yes, ma'am.
2      A.   Not really.
3      Q.   Okay.
4      A.   No, not really.
5          MR. GARZA:  All right.  Okay.
6          MR. SKURKA:  No, other questions, Judge.
7          THE COURT:  All right.  Why don't you
8  wait in the jury room and we'll get right back with
9  you.
10          VENIREPERSON NO. 55:  Thank you.
11          (Venireperson exits courtroom.)
12          MR. SKURKA:  Judge, we'd move to excuse
13  this jury for cause.
14          THE COURT:  Okay.
15          MR. GARZA:  That's fine, Judge.  We
16  agree.
17          THE COURT:  All right.  Agreed strike.
18          Let's bring her in.
19          (Venireperson enters courtroom.)
20          THE COURT:  All right.  Ms. Garcia, we're
21  going to go ahead and let you go.
22          VENIREPERSON NO. 55:  Okay.
23          THE COURT:  We really appreciate that you
24  were honest with us about this, okay?  And if you need
25  -- well, you said you were already off of work, so

301

1  you're good, right?

2          VENIREPERSON NO. 55:  But I have my

3  excuse anyway.  He already gave it to me.

4          THE COURT:  Okay.  Very good.  Thank you,

5  Ms. Garcia.

6          VENIREPERSON NO. 55:  Thank you.  Have a

7  nice evening.

8          THE COURT:  You too.

9          (Venireperson exits courtroom.)

10          THE COURT:  Okay.  Let's take a little

11  break and we'll finish up the last one.

12          (Short recess.)

13          (Venireperson enters courtroom.)

14

15          VENIREPERSON NO. 63,

16          JEANNE C. BOWMAN,

17          VOIR DIRE EXAMINATION

18  BY THE COURT:

19      Q.   Hello.  Come on in and have a seat, Ms.

20  Bowman.  All right.  As you know, we're trying to pick

21  a capital murder jury.

22      A.   Uh-huh.

23      Q.   And we're going down the line.  And what we

24  want for jurors are people that can keep an open mind

25  and that can follow the law, okay?

302

1      A.   Okay.

2      Q.   And we're going to see if we can -- let's

3  see, we'll talk about those things.  First of all,

4  some people tell me, for whatever reason, they can't

5  keep an open mind.  Is that you?

6      A.   I don't believe so.

7      Q.   You don't think you can keep an open mind?

8      A.   I mean --

9      Q.   You do think you can.

10      A.   I do.  That's not the way you worded the

11  question.

12      Q.   All right.  Okay.  The next thing, the law.

13  Let's talk about the law.  Let's see, you have never

14  been on a jury before, and that's -- that's okay.  All

15  right.  Let me go over some concepts.

16          Now, obviously, the State has brought the

17  charges, okay?

18      A.   Uh-huh.

19      Q.   Law says, "State you bring the charges, you

20  got to prove them."  You're okay with that.

21      A.   Correct.

22      Q.   Beyond that, the burden is beyond a

23  reasonable doubt, which is a high burden.  In fact,

24  it's the highest burden that we have in the law.  It's

25  not beyond all doubt because then you'd be a witness,

303

1  okay, but it's beyond a reasonable doubt.  High

2  burden.  Could you hold the State to that burden?

3      A.   Yes.

4      Q.   Okay.  Now, the law says that since the State

5  has the burden of proof, Defense has no burden, at

6  all.  They don't have to do anything.  They don't have

7  to present any evidence at the trial, and, if they

8  don't, that's okay.  The law says if they -- if the

9  State presents evidence, Defense does nothing, and you

10  believe that the State hadn't met their burden, then

11  you're obligated to find the Defendant not guilty,

12  okay?

13          They have the burden -- they have the

14  burden of proof.  What we have is the presumption of

15  innocence.  That is, he and everybody in our society

16  is presumed to be innocent, until if, you know, the

17  State can prove otherwise, that's fine.  But until

18  then, he's presumed to be innocent, okay?  And, you

19  know, sometimes we -- we ask jurors this question:  If

20  you had to vote right now, how would you vote?

21      A.   I -- I couldn't.

22      Q.   And see, that's -- that's what jurors

23  generally think -- and it's kind of a silly question,

24  really, because we would never do that.  There would

25  always be a trial and the State would present

304

1  something, okay?  But the fact of the matter is,

2  really, you have to vote not guilty because he's

3  presumed to be innocent until the State can do that.

4          Now, obviously, if the State presents --

5  we go to the trial, the State presents some evidence

6  and you don't think that they have met their burden,

7  of course, you find him not guilty, correct?

8      A.   Right.

9      Q.   All right.  Now, the Defendant has a right

10  under the Constitution, and it really makes sense,

11  because the State has the burden of proof, but it's

12  his right not the testify.

13      A.   Correct.

14      Q.   Okay?  He doesn't have to testify.  And it

15  goes further than that.  Not only does he not have to

16  testify, not only does the State not have the ability

17  to make him testify, to force him to testify, but the

18  law says the jury can't hold it against him, okay?

19  They can't go back there and say, "You know what,

20  okay, let's see, what do we have here?  We've got Mr.

21  Skurka is presenting these facts.  Defendant didn't

22  testify.  Okay, that -- that goes in Mr. Skurka's

23  column and I'm going to hold that against."  Can't do

24  that, okay.  Some people would.  And -- and some

25  people feel like, "Well, I need to hear both sides of

1  the story."  The law says, "Really, you don't.  Really
2  and truly, State's got to prove it and Defendant
3  doesn't testify, you can't hold it against him."
4  That's what the law says.  But we need to know from
5  you if you would hold it against him?
6      A.   I would not hold it against him if he chose
7  not to testify.
8      Q.   Okay.  All right.  Now, let's talk about
9  the -- the Charge.  And we have murder and capital
10  murder.  This is capital murder, capital meaning that
11  the death penalty is a possibility, okay?  The -- the
12  legislature has -- well, and, of course, what's
13  murder?  Murder is the intentional taking of the life
14  of another.  And that's a first degree felony and it's
15  a serious crime, but it's not a capital offense in and
16  of itself.
17          The legislature has -- has drawn up a
18  laundry list of situations where a murder can be a
19  capital murder.  In this particular case, what the
20  State is alleging is that the Defendant, on the given
21  date, in Nueces County, Texas, attempted to or was
22  robbing the victim when he murdered him, okay?  So we
23  have robbery and murder.  And the legislature says if
24  you -- if you put them together, that is, you commit a
25  murder while you're robbing or attempting to rob

1  someone, capital murder, okay?
2          And there's a -- there's a long list of
3  elements, because he has to prove, that is, Mr.
4  Skurka, he has to prove murder and he has to prove the
5  robbery or attempted robbery, okay?  And what's
6  robbery?  You know, some people think robbery is, you
7  know, I -- I -- I had a cousin of mine tell me the
8  other day, said, "Oh, did you hear?  I got robbed."  I
9  said, "Oh, really?"  He said, "Yeah, they broke in."
10  I said, "Really, at gunpoint?"  He said, "No.  They
11  broke through the wall and they stole a bunch of
12  stuff."
13          Well, that's burglary, okay?  That's not
14  robbery.  Robbery is the forcible taking, or the
15  threats to forcibly take something from you, that is,
16  I come up with a gun to you, and I say, "Give me your
17  purse," and you give me your purse, that's a robbery,
18  okay.  Or if I come over to you with a gun and I
19  attempt to rob you and you hit me over my head with
20  your purse and knock me out, I'm still guilty of
21  attempted robbery, okay?  The State can get there
22  either way in this, is what I'm saying, okay?
23      A.   Okay.
24      Q.   Now, if I -- if you weren't paying attention
25  and I grabbed your purse and walked off with it, that

1  wouldn't be robbery, that would be a theft, okay?  You
2  follow me?
3      A.   Okay.
4      Q.   Okay.  So they have to prove the robbery or
5  attempted robbery plus the murder.  And there's, oh, I
6  don't know, eight, nine, ten elements.  I'm not
7  exactly sure how many.  They have to prove -- the law
8  says, "You got to the prove them all, you don't just
9  get to prove some of them."  So, my question to you
10  is, would you require the State to prove all of the
11  elements of capital murder before you found the
12  Defendant guilty of capital murder?
13      A.   He would have to prove, if I'm understanding
14  you correctly --
15      Q.   Okay.
16      A.   -- that he was trying to steal something and
17  was threatening the person to do it and murdered the
18  person --
19      Q.   Correct.
20      A.   -- that's --
21      Q.   Right.  He -- he would have to prove on the
22  given day.
23      A.   At the same time.
24      Q.   Right.  On the given day.  I don't -- I --
25  the file is right over there.  I don't remember the

1  exact date, on the given day in 2004, in Nueces
2  County, Texas, this person, the Defendant, who's
3  charged in this case, murdered the victim, okay, while
4  in the course of robbing the person or attempting to
5  rob them, okay?  They have to prove all that.
6          In other words, you could prove, like,
7  nine out of the ten elements, but it wouldn't be that
8  guy.  You got to prove that person did it, or,
9  perhaps, they could prove the murder part, but not the
10  robbery to you, or the robbery, but not the murder.
11  And they may be guilty of something else, maybe one of
12  those two other crimes, but they wouldn't be guilty of
13  capital murder.  And my question to you is, would you
14  require -- would you require them to do what the law
15  requires, that is, prove every element of the offense,
16  before you found the Defendant guilty of capital
17  murder?
18      A.   Yes.
19      Q.   Okay.  Now, in Texas we have what's called a
20  "bifurcated system," that is -- what does that mean?
21  Well, that means there's two parts to the trial.
22  We've got the guilt or innocence phase.  Guilt or
23  innocence phase, the jury's impaneled, evidence is
24  presented, lawyers argue the case and you're given the
25  charge, which is your instruction book, okay?  That's

309

1  what I like to call it, packet of law, the instruction
2  book.  And you go back there and you deliberate, and
3  you determine whether the State's proven their case
4  beyond a reasonable doubt of the charge.  And then,
5  the jury either decides guilty or not guilty.
6           If the jury finds the Defendant not
7  guilty, case is over with.  We go home.  If the
8  Defendant is found guilty by the jury, then we go to
9  the second phase of the trial, the punishment phase.
10  And in Texas the punishment phase for a capital murder
11  is always done by the jury.  There's two possibilities
12  when we get to the punishment phase, okay, two things
13  that a defendant can get, two types of punishment,
14  life in prison or the death penalty, okay?  Find them
15  guilty of capital murder, two punishments, life or
16  death.
17           But you don't write life or death on a
18  verdict form, okay?  In every other kind of criminal
19  case, if the jury is asked to do punishment, like, in
20  a murder case, for example, the -- the punishment
21  range is 5 years to 99 years or life and up to a
22  $10,000 fine, and in some cases probation is possible.
23  And the jury goes back there and they deliberate and
24  maybe they come up with a number of years or maybe --
25  and a fine or maybe no fine.  You know, they do

310

1  something within the prescribed range.
2           Capital murder is different.  You don't
3  do death or life, you answer questions.  And here's
4  the first question that's over here over your left
5  shoulder here.  "Is there a probability that the
6  Defendant would commit criminal acts of violence that
7  would constitute a continuing threat to society," that
8  is, you know, will he probably do violent things to
9  others, okay?  And, you know, that's the question.
10  And the jury answers yes or no, all right?
11           After they do that, then they to Special
12  Issue No. 2, which is over your right shoulder.
13  "After taking into consideration all of the evidence,
14  including the circumstances of the offense," which is
15  the first part of the case, the guilt or innocence
16  phase, "the Defendant's character and background and
17  the personal moral culpability of the Defendant,
18  is there a sufficient mitigating circumstance or
19  sufficient mitigating circumstances that warrant a
20  sentence of life imprisonment, rather than the death
21  sentence be imposed?"
22           Okay, what does that all mean?  Well,
23  that -- at the second phase of the trial, you might
24  hear others things.  In the first phase all you're
25  going to hear about is the crime, okay, what happened

311

1  that day, all right?  And if they can prove it, well,
2  that remains to be seen.  But, obviously, if we're --
3  if we're at this point, we're assuming that they've
4  proven that fact, okay.  So -- but what this question
5  says you can consider everything that came in in the
6  first part of the trial.
7           The second part of the trial maybe more
8  stuff comes in, all right?  Maybe you hear good stuff
9  and bad stuff about it, maybe all bad, maybe some good
10  stuff, all right?  Maybe all good stuff at the second
11  phase of the trial, like, maybe he was an Eagle Scout,
12  maybe he did community service, he -- he worked with
13  children.  And -- and maybe this is the only bad thing
14  that, you know, as bad as it may be, is the only bad
15  thing in his background, okay?
16           My point is this:  There's -- mitigating
17  circumstances can be just about anything, okay?  And
18  it's for the jury to decide what is a mitigating
19  circumstance.  I mean, for example, let's say it's
20  presented to you at the second phase of the trial that
21  the Defendant was an Eagle Scout, okay?  A juror might
22  think, "You know, that is a mitigating circumstance,"
23  or maybe another juror says, "That doesn't mean
24  anything to me.  It's not a mitigating circumstance."
25  It's up to the jury to decide.  And these lawyers will

312

1  likely submit to you, argue to you that certain things
2  are or are not mitigating circumstances.  But the fact
3  of the matter is, it's the jury that decides what that
4  is and how much weight to give those circumstances,
5  okay?
6           All right.  So, basically, this question
7  asks you to take everything into consideration through
8  the whole trial, both phases, and then you need to
9  decide "Is there sufficient mitigating circumstances
10  to warrant life, rather than death?"  Okay?  Because
11  you might think there's mitigating circumstances, but
12  they're not sufficient to warrant life rather than
13  death or maybe you do, okay?  And that's the question
14  that you would be asked, and then the jury would
15  answer yes or no.
16           Now, at the beginning of this -- of every
17  trial, I raise my right hand and I -- I ask the jurors
18  to do the same, and then I swear them in, and I say,
19  "Do you solemnly swear that you will render a true
20  verdict based upon the law and the evidence as
21  presented to you," and then they say, "Yes."  And the
22  reason I bring this up is because I need to know if
23  you can do that, and let's take it in pieces.
24           Can you take that oath and render a true
25  verdict in this case based upon the law and the

313

1  evidence presented to you on the guilt or innocence
2  phase?
3      A.   Yes.
4      Q.   Okay.  And let's talk about the second phase.
5  And before you -- before you answer that, that's these
6  questions here.  And I have people tell me, "Look, I
7  can do the first part, okay, but I cannot participate
8  in the second part because I cannot participate in a
9  process that could lead to somebody's death, and,
10  therefore, I cannot answer these questions for you
11  truthfully."
12              Likewise, we have other people that say,
13  "Look, I, too, can give a fair trial to the Defendant
14  on the first phase and I could make the State prove
15  their case beyond a reasonable doubt.  But if we get
16  to this part, I don't care about the law.  In my mind,
17  if they find him guilty -- if we find him guilty, we,
18  the jury, he's always getting death.  I'm going to
19  ignore this.  So I'm going to always answer these
20  questions so that the death penalty will -- will
21  result," okay?  Those two -- neither of those two
22  people can take this oath because they're not
23  following the law, and that's okay, it's all right.
24  We just need to know if you can take the oath and
25  truthfully answer these two questions.

314

1      A.   I believe I can.
2          THE COURT:  Okay.  All right.
3          Mr. Skurka.
4              VOIR DIRE EXAMINATION
5  BY MR. SKURKA:
6      Q.   Hi, Mrs. Bowman.  How are you today?
7      A.   Fine, thank you.
8      Q.   I think we met before at Missy Medary's
9  house, at a Christmas party, or something.
10      A.   Uh-huh.
11      Q.   I know you and your husband are good friends
12  with her.
13      A.   Uh-huh.
14      Q.   Of course, I don't even recognize her,
15  anymore, she looks so skinny these days.
16      A.   Yeah.
17      Q.   Just drives me crazy when I see her in the
18  hallways.  She says -- you know how she told me how
19  she did it?
20      A.   No.
21      Q.   She said she listened to her mother, finally,
22  and ate the right foods for a change.  Just that
23  simple, huh?
24      A.   (Nods head.)
25      Q.   Anyway.  It's nice seeing you, again.  As the

315

1  Judge said, me and Geordie Schimmel, who had to leave
2  early for a doctor's appointment, we'll be the ones
3  presenting this case to you if you're actually seated
4  on this jury.  So today we're going to talk to you
5  about some questions.  And I'll tell you, right off
6  the bat, there's no right or wrong answers to
7  anything.  We just kind of need to know how you feel
8  about some of the issues and the laws in this case.
9  And, please, don't answer in a way that you think,
10  "Well, I better say it this way because that's the way
11  the Judge wants me to say it," or, "I better say it
12  this way because that's the way Mr. Skurka wants me to
13  say it," or "the Defense wants to say it."  We just
14  want to know how you feel about that, to see if you're
15  a qualified juror in this case, okay?
16      A.   Okay.
17      Q.   Tell me about when you first came in and you
18  heard it was a death penalty case.  What was your --
19  you know, your first reaction?  Remember that day with
20  all those people there and you come in for jury duty
21  and then the Judge comes out and says, "Folks, this is
22  a criminal case.  You may have to issue the death
23  penalty in this case," what was your first reaction
24  when you heard it was that type of case?
25      A.   That it was very serious and that it would be

316

1  a very long trial.
2      Q.   Okay.  You're probably right on both sides.
3  As compared to other cases, it might be a long trial,
4  because most criminal cases don't take a week or two.
5  Most of them are over in just a few days.  Sometimes
6  civil cases take weeks and weeks.  But, generally
7  speaking, criminal cases don't take a long time.
8              I will tell you, though, I'll kind of
9  give you the outside guesstimate.  It may only take a
10  week.  It may only take a week and a day.  You know,
11  we just try to tell people two weeks in case something
12  happens, you know, where it gets delayed or something
13  like that, and they want to know how it will affect
14  their work schedule, or whatever.  But I'm pretty sure
15  you won't be here like four or five weeks, or
16  something like that.  In fact, we think it may be
17  through sooner than two weeks, but we just don't know.
18  We just want to kind of give you an idea.
19              The second thing you said was that you
20  thought it was a very serious case.  I think everybody
21  in this room understands how serious it is because we
22  have a person's life at stake.  I'm obviously
23  representing, so to speak, the State of Texas and the
24  victim's family and the victim, and that type of
25  stuff, so everybody wants to take -- make sure

317

1 everything is done right in this case, that all the
2 T's are crossed, all the I's are dotted, because we
3 want do make sure it's -- it's a right decision.
4          And when we say it's a serious decision,
5 that's obviously right, because I don't think anybody
6 wants to be on this jury.  I don't think anybody is
7 volunteering and says, "Oh, yeah, I want to do this,
8 make that decision."  But, on the other hand, as
9 citizens, sometimes we're called upon to kind of make
10 those tough calls.  And I kind of want to know how you
11 feel about being in that position and having to make
12 that tough call like that.
13     A.    I think you're correct when you say nobody
14 wants to do that but it is required of U.S. citizens
15 to participate.
16     Q.    So it's kind of a civic duty too.
17     A.    Absolutely.
18     Q.    And that's a very logical answer because a
19 lot of people say, "Hey, oh, my gosh, that sure is
20 tough," but then when they start thinking about it,
21 they say, "Hey, if I believe in America and if I
22 believe in the jury system, I have to be willing to
23 participate in that."  Is that kind of how you feel
24 then?
25     A.    Correct.

318

1     Q.    And it's like nothing -- nobody's happy about
2 doing it, but -- but make no mistake, I told you-all
3 the very first day, right, I got up there and I said,
4 "Look, the State of Texas is seeking the death penalty
5 in this case."  There's going to come a time, Ms.
6 Bowman, if you're sitting on this jury with 11 other
7 people, I'm going to come in front of you and after
8 putting all the evidence on and the facts, I'm going
9 to ask that you, based the the evidence, sentence that
10 young man to die over there.
11          And I want you to look at him for me.
12 That's him.  John Henry Ramirez.  It's not anybody you
13 see about it on the news or read about in the paper.
14 That's him.  And I just want to know how you feel
15 about, do you think you could do that, if the law --
16 if the evidence is there and the law is there, could
17 you do that?
18     A.    I don't see how I have a choice.  I mean, I
19 think, I do have the ability to listen to facts and
20 make decision.
21     Q.    Okay.  When you say you don't have a choice,
22 that's kind of true, but kind of different.  Because
23 the Judge is going to say only certain people are
24 qualified for this jury.  Like, sometimes people get
25 up there and they'll say, "Look, because of my

319

1 religious reasons, I can never give the death penalty.
2 My church is against the death penalty, so I have to
3 follow the church.  I can never do the death penalty."
4 So they kind of have a choice of sitting or qualifying
5 to sit on this jury or not.  Some people say, "You
6 know, look, I believe in the death penalty, Mark.
7 That's a good law.  I think Texas should have it.
8 It's a very good law and I support the death penalty,
9 but, please, don't make me make that decision.  I
10 don't want to the one responsible for making that
11 decision."  If that's how they feel, that's how they
12 feel.
13          And then some people say, "Look, you
14 know, I don't -- I don't like doing this, I don't like
15 having to be -- make this decision, but no matter what
16 kind of case I'm called upon, whether it's a D.W.I. or
17 capital murder case, as a citizen that's my job to
18 listen to the evidence and make a decision that's fair
19 and just based on the evidence."  I'm just trying to
20 figure out where you fit in on this.
21     A.    I don't hold religious beliefs that make the
22 death penalty immoral.  I do have religious beliefs,
23 but that's not one of them.  I do believe that you
24 need somebody sitting in there who can listen to the
25 facts, and I've tried to think of a reason not to be

320

1 on the panel, but I have yet to come up with one.
2     Q.    Are you saying that you really don't want to
3 sit on this case, but you -- it's like everybody says
4 for any case, jury duty, they have work to do, they
5 have families to take care of.  It's an inconvenience
6 to everybody?
7     A.    It's the inconvenience, but that needs to be
8 put aside, if you believe in the jury system.
9     Q.    Well, that's exactly right, because that's
10 what I tell people all the time, "If you're not
11 willing to come down and sit on there, who is?"
12 Because, you know, sometimes people complain of our
13 criminal justice system, but it's still, to me, the
14 best in the world.  I mean, you have a lot of rights.
15 You have people of your peers deciding things.
16          For example, Judge Galvan, he's a
17 district judge, very powerful.  Can he sentence
18 somebody to death?  No.  Carlos Valdez, the district
19 attorney.  Can he sentence somebody to death?  No.
20 Who does?  12 people, people from -- the citizens from
21 the community have that power.  And that's probably
22 good to have that power rest with the people.  You
23 don't want to, like, a dictator or some guy just
24 saying, "Okay, I can decide who and when somebody gets
25 the death penalty."  You probably want the jury to

321

1  decide; correct?

2      A.   I kind of view it that the facts will decide

3  whether or not the person gets the death penalty.

4      Q.   Now, that's an intelligent answer because

5  what you're doing is making a decision on the facts,

6  not emotion, not sympathy, not this, not that.  You

7  didn't cause this to happen.  They caused it to

8  happen, so they may have to answer what happens,

9  right?  Is that a fair assessment?

10     A.   I think that's a good assessment, yes.

11     Q.   Okay.  Because -- and -- and it really

12 doesn't matter how you feel.  We just kind of want to

13 know what it is because there's some people that are

14 very for the death penalty, but they just can't make

15 that decision, it's to hard on them.  And then there's

16 certain people that say, "Oh, because of my beliefs,

17 my personal beliefs, I can't sit in judgment of

18 somebody."  But that's what I need to know.  If you

19 can sit there, participate in the decisions that might

20 lead to his execution, can you do that if the evidence

21 says so?

22     A.   I believe I can.

23     Q.   Okay.  I have to ask it the other way, too.

24 Because the other way is, if you believe that he's not

25 guilty, can you vote not guilty?

322

1      A.   Yes.

2      Q.   And if you believe, based on the evidence

3  that maybe he shouldn't get the death penalty, he

4  should get a life sentence, can you vote that way?

5      A.   Yes.

6      Q.   In other words, you're open-minded to the

7  punishment range, right?

8      A.   Correct.

9      Q.   You're not leaning toward death and you're

10 not leaning toward life at this point?

11     A.   Not at all.

12     Q.   Good.  And that's the way you're supposed to

13 be as a juror, and you have to start out equal on

14 that.  In fact, under what we call the presumption of

15 innocence, you have to presume right now that as he

16 sits there, he's innocent, right?

17     A.   Right.

18     Q.   And why is that?

19     A.   It's your job to prove that he is guilty.

20     Q.   Exactly.  And that's my job in this case and

21 any other kind of criminal case.  It's always the

22 State's burden.  As the Judge put it so eloquently,

23 "State, you bring the charges, State you have to prove

24 the charges."  You don't have to prove anything.  The

25 Defendant doesn't have to prove anything.  He's

323

1  presumed innocent.  That doesn't mean he is innocent.

2  It just means he's presumed innocent at the start of

3  the trial.

4          I anticipate I'm going to bring you

5  evidence to change that presumption to show that he's

6  guilty beyond a reasonable doubt.  But you got to

7  start him out as innocent -- I mean, not guilty,

8  right?

9      A.   Right.

10     Q.   Sure.  The Defendant may take the stand and

11 he may not take the stand.  It's up to him and his

12 lawyers.  And the Judge will tell you, if he doesn't

13 testify, you cannot hold that against him.  Do you

14 agree with that law?

15     A.   Uh-huh.

16     Q.   The Fifth Amendment?

17     A.   Yes.

18     Q.   Okay.  And it's kind of natural for some

19 jurors to say, "Well, you know, I want to hear both

20 sides of the story.  I want to hear what he says."

21 And that -- while that may be a natural inclination,

22 the law pretty much clearly says you cannot hold that

23 against him.  You understand that?

24     A.   Correct.

25     Q.   And the Defense may put on witnesses.  They

324

1  may not put on evidence.  They may put on something,

2  they may not, I don't know.  But, again, they have no

3  burden.  They don't have to prove anything.  We have

4  to prove it, and it's a burden that I take willingly

5  because I do it all the time.  Everybody starts with

6  the presumption of innocence before their trial, so

7  it's not -- I don't say it's not that big a deal, but

8  that's just the standard thing of the law.

9          Tell me about how -- do you think we

10 should have death penalty in Texas?

11     A.   Yes.

12     Q.   Why?

13     A.   Penalties are supposed to deter crime.  I

14 think if there's not an absolute -- and that, to me,

15 is an absolute penalty, then there may not be

16 deterrence.

17     Q.   But sometimes, you know, we're not -- there's

18 50 states, right?  And not every state has the death

19 penalty.

20     A.   Uh-huh.

21     Q.   But do you think Texas should still continue

22 to have the death penalty?  Because you hear about it

23 in the legislature every couple of years.  Somebody

24 says, "We need so abolish the death penalty," and so

25 far Texas has never abolished it.  Do you think it

325

1   should be abolished or do you think it should stay on
2   the books?
3       A.   I think it should stay on the books.
4       Q.   Because of the deterrence effect.
5       A.   Correct.
6       Q.   And the punishment effect.  Would you agree
7   with me the figure with the -- with the statement that
8   says, "I believe the death penalty in certain cases
9   where the law calls for it and the evidence calls for
10  it, but I don't believe the death penalty should just
11  be given automatically"?
12      A.   Correct.
13      Q.   That's right.  And that's exactly what the
14  law says.  Sometimes people come in on -- for jury
15  duty, and they think, "Well, it's a murder case and he
16  must automatically get the death penalty," and we have
17  to tell them, "No."  I guess the -- only the most
18  heinous crimes qualifies for the death penalty.  If he
19  kills a certain type of person, like a cop on duty or
20  a kid under six years old, or you kill more than one
21  person, or you kill somebody while you're robbing them
22  or raping them or burglarizing them or kidnapping
23  them, the legislature has set up a thing that says
24  those bad, bad cases, murder plus something, can get
25  the death penalty, but, by no means is it automatic.

326

1   And I think the Judge or anybody would tell you,
2   nothing's automatic in the law.  You have to listen to
3   the evidence and make a decision.
4            Okay.  So the reason it's capital murder,
5   the reason it's capital murder in this case, is
6   because we're alleging it's murder while in the course
7   of committing a robbery.  And when we say, "robbery,"
8   that basically means taking something by force or
9   threats of force.  If I just go up there and, you
10  know, pick your pocket and take your wallet, that's
11  theft, I just stole something.  But if I knock you
12  over the head and -- and -- or I say, "Give me your
13  wallet or I'm going to shoot you," and steal it,
14  that's -- that's robbery.  That's what it means.  The
15  Judge is talking about the difference between robbery
16  and burglary.
17           The only thing I also want to add to that
18  is it doesn't mean you have to have a completed
19  robbery.  The law says, "in the course of committing
20  robbery or attempting to commit robbery."  Say, for
21  example, a person goes in the bank and holds a teller
22  up and says, "Give me all your money," and the teller
23  is scared and starts getting the money together, but
24  the cops come in and catch the guy right there.  He
25  never got any money.  Does that mean he's not guilty

327

1   of robbery?  No.  Because the law says it's in the
2   course of committing or attempting to commit the
3   robbery.  It doesn't even have to be a completed
4   robbery.  It doesn't even have to matter how much it
5   is.  I mean, it's not like whether he took $5 or
6   $5,000.  It's still that robbery, which is that taking
7   of something by force or threats of force.  That's
8   what makes it capital murder.
9            Now, if you've ever been on another
10  criminal case, essentially what happens is once you
11  find somebody guilty, you pick a number of what their
12  punishment is.  Like, say for example, they're charged
13  with, you know, let's say just burglary, and the range
14  of punishment's 2 years to 20 years in prison.  Well,
15  that means that you're -- you pick a number and go
16  back and say, "Okay.  We think this case is worth, you
17  know, 18 years or 2 years or 5 years, 10 years.
18           Capital murder is a little different.
19  After you hear the first part of the trial, which is,
20  is he guilty or not, because that's the first thing
21  you have to do, you go to the second part of the
22  trial.  And the second part of the trial, you don't
23  just, you know, pick out a piece of paper and say,
24  "Okay, we vote for death," or, "We vote for life," you
25  answer some questions and based on how those questions

328

1   are answered the Defendant either gets a death
2   sentence or life in prison.
3            Sometimes people say, "Well, we just
4   answer questions.  The Judge is the one that actually
5   decides whether to give them death or life."  I tell
6   them no, that's the jury.  You make that decision
7   based on how they answer the questions.
8            The first part of the trial you'll
9   probably only hear evidence about what happened that
10  day, you know, the surrounding circumstances like
11  maybe before and during or after the crime.  But then
12  you may hear other evidence in the second part and --
13  to help you make a decision how to punish him.  You
14  might get to hear his background.  Does he have a good
15  background, does he have a bad background?  Was he a
16  decorated war hero, or has he been to prison five
17  times before?  Those are the kind of things that you
18  want the jury to have to decide what kind of
19  punishment he has, right?  Because you don't know this
20  guy from Adam, right?  You don't know what happened
21  before in his life, or something like that.  So you
22  might want to make that decision based on -- on the
23  evidence you hear in the second part.
24           That's not to say, the law also says you
25  can make a decision based on the evidence you hear in

329

1  the first part of the case. Sometimes people get the
2  death penalty and they don't have a prior criminal
3  history. They've just done something so heinous and
4  so bad that the jury thinks they should get the death
5  penalty, okay?
6            So, say, let's pretend that the jury has
7  found a person guilty and they've heard extra
8  evidence. You know, it may be additional evidence,
9  good or bad, about the person and then the Judge gives
10 them two questions to answer. The first one is behind
11 me on the board, and I ask you to look at it with me.
12 It says, "Is there a probability that the Defendant
13 would commit criminal acts of violence that would
14 constitute a continuing threat to society?" We call
15 that "the future dangerousness question." In other
16 words, quite simply, based on the evidence, do you
17 think he's going to be a danger in the future or to
18 our society, our community?
19           A couple of key words I want you to look
20 at with me. The first one, it says, "Is there a
21 probability." You see that, where it says,
22 "Probability"? It doesn't say certainty. It doesn't
23 say for sure it's going to happen. And the law
24 doesn't require me to say certainty. It says,
25 "Probability," which is generally more likely than

330

1  not.
2            The second part of it says, "the
3  Defendant would commit criminal acts of violence."
4  Now, criminal acts of violence could be anything.
5  Sometimes people on the jury say, "Well, you know, I
6  couldn't give him the death unless I think he's going
7  to murder somebody or he's going to commit capital
8  murder again." The law doesn't say that. It doesn't
9  have to be murder. It just says "criminal acts of
10 violence," which could be almost anything, any kind of
11 violent act.
12           The last part says, "that would
13 constitute a continuing threat to society." And
14 you've probably heard that phrase before. Sometimes
15 people say, "Well, gosh, State, why do you have to
16 seek the death penalty, again? Why can't you just put
17 him in prison, you know? The choice is life in
18 prison. Why don't you just give him life in prison?
19 He can't hurt anybody if he's locked up." And I
20 always tell them, "Wait a minute, do we give people a
21 life sentence, do we have stick them out on a desert
22 island somewhere where there's no other human beings"?
23 Of course not. We don't do that. We put them in
24 prison. And who else is in a prison?
25      A.   Prisoners and guards and employees.

331

1      Q.   That's exactly right. There's other people
2  in there. And we don't remove them from society. I
3  mean, some of their rights are taken away from them.
4  They're locked up. But they still have interaction
5  with other human beings. Have you ever heard any
6  stories about, you know, people in prison locked up
7  hurting other prisoners or guards or people that work
8  in prisons?
9      A.   I've heard of such things.
10     Q.   Sure. And that's not that unusual, it's just
11 that -- I guess what I'm trying to point out is,
12 people say -- when they read that question, "society"
13 doesn't include prison, and I have to say, "Wait a
14 minute. Prison does include society because even
15 though you're in prison you still have interaction
16 with society." In a lower scale, a smaller scale, but
17 you still agree that -- that prison would be part of
18 society, correct?
19     A.   Correct.
20     Q.   Okay. So that's the first question. Is he
21 going to be a future -- a danger in the future, is he
22 a continuing threat to society? You answer that
23 question yes or no. Then you go to the next question.
24 The next question is what we call "the mitigating
25 circumstances question." Mitigating basically is a

332

1  word that means anything that would lessen or make
2  less severe the punishment. In other words, he did
3  the crime but is there any reason we should give him a
4  lesser sentence than the death sentence? That's what
5  mitigating means, lessen or make less severe.
6            In other words, he did the crime, but is
7  there any -- and he's not a dangerous threat -- a
8  danger in the future, but is there any reason you
9  should give him a break and give him life instead of
10 death? In other words, I -- I like to tell people
11 it's kind of like a check on the jury. You think he's
12 guilty of capital murder. You think he's a continuing
13 threat to society. It looks like he's heading for the
14 death penalty. But the Judge says, "Stop and check
15 yourself, jury. Look at all of the evidence,
16 including the circumstances of the offense, the
17 Defendant's character and background, and the personal
18 moral culpability of the Defendant, is there a
19 sufficient mitigating circumstance or circumstances to
20 warrant that a sentence of life, rather than death be
21 imposed?" Is there -- not just that there's a
22 mitigating circumstance, but is it enough, is it
23 sufficient to outweigh the death penalty?
24           Let me give you an example of mitigating
25 circumstance. Say you're on two juries and they're

333

1  both burglars. Burglary basically means you go into
2  somebody's house and take something without
3  permission. And you're sitting there and you think,
4  "My gosh, both of these guys are convicted of
5  burglary? I'm going to give them the highest sentence
6  because I don't like burglars. And you kind of think
7  before you hear everything that "these are bad, I'm
8  going to go real high on them."
9            Then you hear the evidence. The first
10  part, the first burglar, you hear that facts, and you
11  had find out this guy has kicked in the door, broken
12  down the door to get in the house. He ransacked the
13  whole house, tore it up, messed it up, stole money,
14  stole jewelry, stole T.V., stole V.C.R.s, stole
15  stereos, cleaned them out pretty much. Then you find
16  out that he got these things and he went and sold them
17  to buy money to get drugs. Then you find out what's
18  his background, what's his history? This isn't his
19  first burglary. He's been to prison twice before for
20  burglary. He's a three-time loser, okay? Those are
21  facts of that case.
22            Now I'm going to ask you the second case.
23  Still a burglary. He went to somebody's house and
24  took something without permission, but the facts are a
25  little different. And in that case you find out he

334

1  didn't kick in the door or break in a window to break
2  into the house. The back door was unlocked and he
3  went into the kitchen. That house had jewelry,
4  stereo, T.V.s, money and everything, but all he took
5  was a loaf of bread and some food because he had lost
6  his job and his family was hungry and he needed to
7  feed his family. He stole something but it was just
8  food. He didn't touch all that other stuff. Then you
9  find out that he doesn't have a record, in fact, this
10  is the first time he's ever been arrested in his life.
11  All his life he's led a good life, but because of
12  these circumstances he was in, he had to get some food
13  for his kids.
14            You put those two side by side, both of
15  them are equally guilty, because it's still wrong to
16  go break into somebody's house and take something, but
17  would you treat those people the same on punishment?
18  A.   No, I would not.
19  Q.   You wouldn't. Why? Because one of them has
20  got aggravating factors that would probably make it
21  bad, and one has mitigating circumstances that would
22  make the sentence less severe. In the first case,
23  kicking in the door, breaking things to get in, as
24  opposed to, you know, opening the door that's
25  unlocked. Ransacking the house, taking everything

335

1  that wasn't nailed down, as opposed to could have done
2  that, but just took a loaf of bread and some food.
3            Taking the drugs -- taking the money and
4  going -- I'm sorry, taking the money and the stuff and
5  selling it to go buy drugs. The other guy, he was
6  just getting food for his kids because they were
7  hungry. This guy had been to prison twice before.
8  This guy had never been to prison. That second
9  scenario is kind of what mitigating circumstances in
10  this question is designed to be. Is there any reason,
11  mitigating reason to give him a lesser sentence, like
12  life, instead of death?
13            And that's what the Judge says. The
14  Judge says look at all the circumstances of the
15  offense, what happened that day. Look at his
16  background. Is it a good background, bad character?
17  Remember, he was telling you about being an Eagle
18  Scout or helping in his church or being a bad guy.
19  And his personal moral culpability. Is there enough
20  to warrant that you lower the sentence.
21            It's kind of like checks and balances.
22  Before you give them the death penalty, you've got to
23  look over the big picture and say, "Look, if there any
24  reason we should lower the sentence?" If there is you
25  do. If there isn't you don't.

336

1            What is a mitigating circumstance
2  specifically? I can't tell you that. That's up to
3  the jury to decide because some people may say, "I
4  don't care if he was a war hero, you know, got a medal
5  in the last war. I don't care if he was an honor roll
6  student, you know, and helped little old ladies across
7  the street. He still did this crime and it's bad. I
8  don't care if he came from a broken home. I don't --
9  you know, he's old enough to know what he's doing,"
10  something like that.
11            Other people may say, "Well, you know,
12  he's kind of young, you know, maybe we should give him
13  a break, because he's kind of young," or "Maybe we
14  should give him a break because he came from a broken
15  home." But the Judge is never going to tell you you
16  have to automatically lower the sentence if you hear
17  this evidence. It's up to the jury. Because some
18  jurors look at it differently.
19            It's kind of a balancing test. Okay, we
20  think all these things, but in a balancing scale does
21  this outweigh this? Is there enough mitigating
22  circumstances to make it a lesser sentence, instead of
23  a greater sentence? It's kind of like there's
24  aggravating circumstances and there's mitigating
25  circumstances.

337

1    What the Judge tells you, though, and the
2  instructions will be, you have to kind of be
3  open-minded and consider these things.  Because like
4  in that burglary scenario, if you had just heard
5  burglaries, right, you wouldn't know what to do.  Then
6  you heard those mitigating circumstances and you said,
7  "Well, yeah, I'm not going to treat this guy the same
8  as I did that other guy."
9        That's what that question is designed to
10 do.  You're trying to be fair to the person.  Before
11 you give him the harshest sentence you can, is there
12 any reason you should reduce it?  If there is you do,
13 if there's not you don't.  It's as simple as that.
14       So, if you answer the first question yes,
15 "Yes, I think he's a continuing threat to society,"
16 and you answer this question no, "there's no reason to
17 lower the sentence," John Henry Ramirez is sentenced
18 to death.  If you answer it any other way, he gets a
19 life sentence, okay?
20    A.   (Nods head.)
21    Q.   You see the scheme?  Does that make kind of
22 sense to you?
23    A.   Yes.
24    Q.   It does.  One other thing the Judge will
25 probably tell you is this, "Voluntary intoxication is

338

1  not a defense to crime," voluntary intoxication,
2  meaning if you go get yourself drunk or high on drugs
3  and you go commit a crime, is that an excuse for a
4  crime?  No.  The law says absolutely not.  It is not
5  an excuse to crime.  Now, the Judge may also tell you
6  that it could be a possible mitigating circumstance.
7  Say the guy robs the bank and he's drunk at the time.
8  Jurors are going to say, "Well, this guy's not a
9  professional bank robbery (sic), you know?  He was
10 drunk, so maybe we'll give him a lesser sentence."
11 Other people may say, "Look, I don't care if he was
12 drunk or not.  He got himself drunk and you can't rob
13 banks.  That's still bad, you know, so I'm going to
14 give him a higher sentence, no matter what."
15       You see what I'm saying?  That kind of
16 could be a mitigating circumstance, but it's up to the
17 jury to decide.  They may say, "Look, if you did that
18 to yourself, sorry, that's not going to help you out."
19 Other people may say, "We'll give him a break."
20 That's up to you, okay?  So that's what mitigating
21 circumstance is all about.
22    A.   All right.
23    Q.   Let me look over your questionnaire and see
24 if I have anything else to add.  I think I just want
25 to go over a couple of legal parts.  Do you think you

339

1  should make a decision on whether a person's guilty or
2  not by how a person looks?
3    A.   No.
4    Q.   Of course not.  What do you make a decision
5  on?
6    A.   The facts.
7    Q.   The facts and the evidence, correct?
8  Sometimes I saw people come in, you know, when they
9  first found out that he was the Defendant, they said,
10 "Oh, my gosh, he's so young.  He doesn't look like a
11 bad guy," because he's cleaned up and he looks good,
12 he's young.  People -- I think sometimes people expect
13 to see Charlie Manson sitting over here.  Do you agree
14 with me that appearance shouldn't have anything to do
15 with what the sentence should be?
16    A.   Correct.
17    Q.   And that it doesn't really matter how old you
18 are, as long as you're over 18, because in Texas it
19 says, you know, if you're 15 or 16, you're not going
20 to get the death penalty, because they're just not
21 going to do that.  But if you're over 18, I assume the
22 State figures that you know better, you understand the
23 consequences, you know, the difference between right
24 and wrong by the time you're over 18, right?
25    A.   Right, legal age.

340

1    Q.   The legal age, that's exactly right.  Okay.
2  Now, you understand that the indictment in this case
3  charges him with capital murder, but that doesn't mean
4  that makes him guilty of capital murder.
5    A.   Correct.
6    Q.   Just because he's charged with that doesn't
7  mean he's guilty, right?
8    A.   Right.
9    Q.   The second thing is, when we talked about the
10 First Amendment, he can testify if he wants to, but if
11 he doesn't want to, you can't hold that against him,
12 right?
13    A.   Correct.
14    Q.   And then the burden of proof is beyond a
15 reasonable doubt.  Basically, that means -- it means
16 that it's not being all doubt, any doubt, shadow of a
17 doubt.  Because if it's that way, I mean, there's no
18 way I could prove it to you.  It would have to be like
19 a hundred percent.  You would have to have seen the
20 case to be a witness on the case, and you couldn't be
21 a juror on that case.
22       So you understand the State doesn't have
23 to prove it like you hear on T.V., beyond a shadow of
24 a doubt.  You've heard that before?
25    A.   Correct.

341

1    Q.   But it's just beyond a reasonable doubt.  I
2  don't think I have any other questions of you.  Is
3  there any questions that maybe you -- oh, I see that
4  you may know the case officer in this case, Kelly
5  Isaacks?  Are you -- is that a friend of Missy's?
6    A.   We use the same hairdressers, so I've seen
7  her --
8    Q.   You use the same what?
9    A.   Hairdresser.
10    Q.   Oh.
11    A.   And I've only seen her there a couple of
12  times.  It's not as if we socialize.
13    A.   That's what I was asking.  So you don't
14  really know her, know her.
15    A.   No.
16    Q.   And you haven't ever talked to her about this
17  case, have you?
18    A.   No.
19    Q.   Well, I'm going to tell you, she's probably
20  going to testify in this case.  She was the detective
21  that worked on this case.  Just the fact you've heard
22  her name or if you go to the same hairdresser, that's
23  not going to influence you in this case, is it?
24    A.   I don't believe so.
25    Q.   Okay.  Because what happens is, whether you

342

1  know somebody or not, whether they're a cop or not,
2  you just have to judge their credibility once they get
3  up on the stand, right?
4    A.   Correct.
5    Q.   Just because it's a policeman doesn't mean
6  everything they say is a hundred percent.  You have to
7  treat them just like everybody else.
8    A.   True.
9    Q.   Can you do that?
10    A.   True, yes.
11    Q.   When I read your -- your questionnaire,
12  basically, it says -- a lot of times you say, "death
13  penalty if based on the facts and circumstances," if
14  it's appropriate in this case.  So that kind of tells
15  me it may not be appropriate in every case, but you'll
16  listen to the facts and if it's appropriate, you can
17  vote for it, if it's not, you don't vote for it.  Is
18  that fair to say?
19    A.   Yes.
20        MR. SKURKA:  Okay.  That's all the
21  questions I have, Ms. Bowman.  Thank you for talking
22  to me.  I'll let Defense lawyers visit with you now.
23        VOIR DIRE EXAMINATION
24  BY MR. JONES:
25    Q.   The -- the purpose of these questions and

343

1  this conversation is to permit us to satisfy ourselves
2  that you understand how the system works.  You've
3  never been on a capital murder jury before?
4    A.   Never been on a jury.
5    Q.   A jury before.  I'd like to give the example
6  when I was in the service, I flew airplanes.  And all
7  the airplanes that I'd flown had two seats.  And one
8  seat, when we were learning how to play an airplane,
9  you had the student sitting in the front seat and the
10  instructor sitting in the back seat.  One day we were
11  standing on the tarmac in an airfield, and I noticed a
12  jet plane which had only one seat in it.  And I asked
13  my flight instructor, "How do you learn how to fly a
14  plane like that if it only has one seat?"  He said,
15  "It's real simple.  First of all, you have to get your
16  wings.  Second of all, I give you a book on how to fly
17  that airplane, you read the book, get in the airplane,
18  turn it on and go fly it."
19        I thought to myself, "Well, yeah, you got
20  to do it right the first time."  He said, "Exactly."
21  Okay.  So --
22    A.   Uh-huh.
23    Q.   -- you may be in the position of that pilot,
24  you're learning the rules here, and we want you to do
25  this job correctly the first time, okay?  The right to

344

1  trial by jury is a right to an impartial jury.  What
2  does the word "impartial" mean to you?
3    A.   With no -- presumption of guilt or innocence.
4    Q.   No prejudgment.  Okay.
5    A.   Correct.  Based on gender, race.  It could be
6  anything.
7    Q.   So you come to the task with no prejudgments,
8  open-minded.
9    A.   Correct.
10    Q.   Don't know what had happened.
11    A.   Don't know what happened.
12    Q.   And impartiality also suggests that the jury
13  doesn't have any leanings toward one side or the
14  other, and that's basically biases.  For example,
15  if -- if the Defendant were related to your family, if
16  you were an aunt or a cousin, or something, that might
17  create a family bias.
18    A.   Correct.
19    Q.   If -- if you had a family member who --
20  who had been the victim of a similar crime that's
21  involved in a case like this, the bad feeling there
22  might cause you to be biased.  That would be a
23  situational bias.  Like, for example, if you were
24  accused -- if you had your house burglarized, and then
25  you found yourself on a jury involving a house

345

1  burglary, you know, your bad feelings about that case
2  might cause you to lean away from the Defendant or
3  lean towards the State.  You see how that can happen?
4      A.   I can see how that can happen to a juror.
5      Q.   It doesn't necessarily have to happen, it
6  could happen.
7      A.   True.
8      Q.   We have other biases, occupational biases,
9  like, if you were charged with D.W.I. would you want a
10 highway patrolman sitting on your jury?
11     A.   I assume I would not.
12     Q.   That's right.  That -- that patrolman could
13 probably be a perfect juror, however, because of his
14 occupation, or her occupation, they might have
15 leanings.  Like, I'm not going to put a fireman on an
16 arson jury.  But I want the fireman to be biased.  I
17 want him to be biased against fires.
18     A.   True.
19     Q.   My house is on fire, I want him to get there
20 quickly, I want him to put it out and save me if
21 necessary.  I want the highway patrolman to come to my
22 aid on Highway 77 when I'm driving to Houston, if I
23 get him on the phone, okay?
24     A.   Okay.
25     Q.   So, for the jury, to the best of his or her

346

1  ability, must be able to come to the task at hand with
2  an open mind.  Now, I -- listening to Mr. Skurka's
3  questions, do you have any social contacts with the
4  Skurkas?
5      A.   No.
6      Q.   All right.  So -- so whatever -- however you
7  know Mr. Skurka, will that effect you in any way in
8  this case?
9      A.   No.
10     Q.   Okay.
11     A.   I wouldn't say that I know him.  We've been
12 at the same place at the same time.
13     Q.   The same place, same time, but, I mean, you
14 don't --
15     A.   I don't "know" him.
16     Q.   -- go out to dinner with the Skurkas or
17 anything like that?
18     A.   No.
19     Q.   Okay.  The death penalty is a form of
20 punishment that's authorized under Texas law for
21 certain types of serious offenses.  Well, it's
22 authorized for a murder when the murder is associated
23 with some other crime and aggravating circumstances,
24 as the Judge indicated.
25          The punishment of death, death or life,

347

1  is already predetermined by the legislature, okay?
2  Which one it is depends on the existence of
3  circumstances, two circumstances.  And those
4  circumstances are determined by the answering of these
5  two special questions or issues.  What three -- what
6  -- let's talk about it in this way:  What three
7  circumstances have to exist before a person can get
8  the death penalty in Texas?  What's the first one?
9      A.   Has to be convicted of a crime.
10     Q.   Capital murder.
11     A.   Yeah.
12     Q.   Okay?  In a case -- if the person is -- the
13 Defendant is found guilty of capital murder, as Judge
14 Galvan said, the trial goes into a second phase, which
15 we call the punishment phase.  And at the second phase
16 of the trial in a case of this kind, the jury will be
17 given those two questions to answer.  Evidence will be
18 offered by both sides.  The defendant doesn't have to
19 put on evidence, but you could probably expect that it
20 would be.  At the close of the evidence the jury will
21 go back in the jury room and set out to answer the
22 questions.
23          Okay.  So condition -- what are the other
24 two conditions that have to be met before the death
25 penalty can be authorized?

348

1      A.   May I be allowed to look?
2      Q.   Yes.  That's why they're there.
3      A.   Okay.  Would he commit -- would he be a
4  threat to society, would he commit?
5      Q.   You have to answer that question yes.
6      A.   (Nods head.)
7      Q.   Okay.  And in order for the jury to answer
8  that question es, all 12 jurors have to vote yes.
9  Each -- each individual juror has to make an
10 individual decision based on the evidence of beyond a
11 reasonable doubt that that question should be answered
12 yes.  In fact, any decision you make as a jury has to
13 be an individual one.  It's not a democratic process.
14 You vote your conscious.  And if everybody agrees and
15 votes the same way, then you have a verdict, right?
16     A.   Okay.
17     Q.   All right.  So, let's say that the -- the
18 jury answers -- well, in order for the jury to answer
19 Special Issue No. 1 yes, you have to have 12 votes,
20 but there's a little change in the the rules.  In this
21 particular type of case, if the jury -- ten jurors
22 vote no, which is favorable to the Defendant, right --
23     A.   (Nods head.)
24     Q.   -- then the -- the presiding juror is
25 authorized to put down a verdict of no.  So it takes

349

1  10 votes to vote no if favorable to the Defendant and
2  12 against him.  You don't have to memorize that, that
3  instruction will be given to you.
4      A.   Okay.
5      Q.   I just wanted you to be exposed to it.  All
6  right, let's say that the jury returns a verdict of no
7  to Special Issue No. 1.  What happens?
8      A.   Well, then he would not get the death
9  penalty.
10     Q.   That's right.  Trial is over with.  You give
11 that verdict form -- in fact, you'll be told, if you
12 answer no to that question, to stop deliberations,
13 give the verdict to the Judge, the Judge will enter a
14 sentence of life, as required by law.  He has no
15 discretion to do otherwise, okay?
16         So let's say the jury answers the
17 question yes.  Go to the second.  Would you read the
18 question to yourself and then tell me when you're
19 finished.
20     A.   (Complying.)
21     Q.   Are there any words or phrase in that
22 question that you did not understand?
23     A.   I believe I understand all of the words.
24     Q.   Okay.  The question asks you -- asks you,
25 that is, the juror, to consider certain things.

350

1  First, the facts and circumstances of the offense of
2  which you -- you've heard about the first part of the
3  trial.  How was the offense committed, the manner of
4  its commission, you know, whatever.  The second thing
5  is that you're -- they want -- the law wants the --
6  you to consider the Defendant's character and
7  background that's before you in the evidence.
8          If I say that you are a person of good
9  character, what do I mean?
10     A.   Well, law abiding, honest, truthful.
11     Q.   It means that you adhere to certain -- a
12 certain code of conduct, does it not?
13     A.   True.
14     Q.   Do you agree that our society has certain
15 general moral rules to be a measure of good -- good
16 behavior or good character?
17     A.   Yes.
18     Q.   For example, does a person of good character
19 lie?
20     A.   No.
21     Q.   No.  Or cheat?
22     A.   No.
23     Q.   No.  You can go on and on, take the Ten
24 Commandments and Boy Scout law, okay, you'll find
25 those values.  So if a person has good character, you

351

1  sort of say, "Okay, well, this person adheres to that
2  code or has a reputation for adhering to that code,"
3  or if he doesn't, then you say "He's a person of bad
4  character.  That person is a liar," or "he's a drunk,
5  you know, he's -- he's a bad character."
6          What about background?  What's a person's
7  background?
8      A.   Your childhood, the past, what they're doing.
9      Q.   Their biography, right?
10     A.   (Nods head.)
11     Q.   Okay.  And, so, I mean, you could make a
12 whole laundry list of facts that relate to a person's
13 background.  But once that list is made, based on what
14 you hear in the evidence, then you have to take
15 those -- those various facts and ask yourself -- or --
16 or does this create a circumstance that would cause me
17 to want to vote for life rather than death?  Okay.
18         Let's go to the next one because those
19 two are kind of related to each other.  "And the
20 personal moral culpability of the Defendant."  What
21 does "moral culpability" mean?
22     A.   Their summation, the person's ability to be
23 moral.
24     Q.   You've come the closest to answering that
25 question than any juror that we have met in this case.

352

1  The ability to be moral, okay?  Why do you suppose
2  that, you know, we have your -- you have a child who
3  just turned 18.  Well, actually, she became an adult
4  last year, 17, right?
5      A.   (Nods head.)
6      Q.   Why do you suppose we -- we treat youngsters
7  under the age of 17 differently from people over 17 --
8  over 16?
9      A.   Because they're intellect has not formed, I
10 mean, completely developed.
11     Q.   Okay.  So does -- does the age of -- effect
12 -- does -- is a 16 year old's moral culpability less
13 than, say, a 25 year old's who you believe they engage
14 in the same kind of conduct?
15     A.   Under certain circumstances, yes.
16     Q.   Yes.  And we -- I mean, a 16 year old can be
17 real mature and -- but we sort of presume that these
18 young ages, that they haven't gotten to the point
19 where they fully are mature enough to know what the
20 moral codes are, but they have the judgment to follow
21 them.  Do you agree with that?
22     A.   Correct.
23     Q.   Okay.  So our law recognizes that there can
24 be circumstances which reduce a person's moral
25 culpability.  In other words, they may break a rule,

353

1  but how serious that break is depends on -- on the
2  moral code that they're breaking.  How far did they
3  deviate from the moral code?  Is there a reason for
4  them deviating from the moral code?  Give you an
5  example of that.
6      We have two -- two persons, two men of --
7  one man walks into a convenient store.  This person
8  is -- has money, okay, and he steals a six-pack of
9  beer.  He does so because it kind of thrills him to do
10 that.  He gets a kick out of, you know, shoplifting.
11 He gets caught and arrested for a Class C misdemeanor.
12      Another man walks into the convenience
13 store, instead of going to the beer locker, he goes to
14 the dairy locker and he steals a package of eggs,
15 carton of eggs.  And the reason he's doing it is that
16 he's been laid off from his job, and he's -- he's run
17 completely out of food.  He's got four kids and
18 they're -- they haven't eaten in two days, okay, and
19 he's desperate, so he just goes and does it.  He's
20 caught and arrested for a Class C misdemeanor.  There
21 are two jury trials and you're a juror on both cases.
22 Would you -- would you punish -- if I had -- assume
23 that the jury finds -- or let's say that you're the
24 judge, okay, in these two cases, and that the jury has
25 found both men guilty, would you issue the same kind

354

1  of punishment on both cases?
2      A.  I don't think I would.
3      Q.  Okay.  Would the man that stole the eggs get
4  a lesser punishment?
5      A.  Correct.
6      Q.  Why, why should he?  I mean, stealing is
7  stealing.
8      A.  It's the mitigating circumstances.
9      Q.  Okay.  Is it his moral -- is there a
10 reduction in his moral culpability?
11     A.  I think his reason for stealing is different
12 and it's -- and it's how it could comply with his
13 moral code.
14     Q.  So it's a -- it causes a reduction, right,
15 because of those circumstances.
16     A.  In the sentence.  Is that what you're saying?
17     Q.  Yeah, in the sentence.  Not whether he's
18 guilty or not.
19     A.  Correct.
20     Q.  Now, in the example -- in this example I
21 give, the man that stole the eggs is really confronted
22 with two competing moral rules, is he not?
23     A.  Correct.
24     Q.  One -- one moral rules, it's bad to steal.
25 The other one, it's bad to let your kids starve to

355

1  death.  So he's got a dilemma and he chooses to feed
2  his kids, okay?  So that would cause a reduction in
3  his moral culpability for that -- in that setting.
4      A.  Correct.
5      Q.  Okay?  Do you agree with that?
6      A.  Yes.
7      Q.  Okay.  Well, that's what that's about.  If
8  you're a juror on this case, you're going to hear
9  facts about the Defendant's character and his
10 background, okay, which will relate to his moral
11 culpability.  For example, you know, how did -- you
12 know, what were the circumstances of his upbringing?
13 Who taught him what to do?  How do your children know
14 what's right and wrong?
15     A.  Is that a rhetorical question?
16     Q.  No.  They learn from you.
17     A.  Correct.
18     Q.  They learn from their school, their teachers,
19 their church, other, you know, relatives, aunts and
20 uncles, grandparents, who teach them this is how you
21 do it, --
22     A.  Correct.
23     Q.  -- you know?  And so if you have -- you know,
24 some people come along in our society that don't get
25 proper instructions about what to do.  Of course, you

356

1  have to look at the circumstances to determine whether
2  they get any consideration for that.  There's a big
3  difference between some kid that's born in the ghetto
4  and grows up in the streets with no parental
5  supervision, you know, and a child that's born into a
6  upper middle class family with both parents, you know,
7  gets three square meals a day, goes to the Sunday
8  school, parents read to him, et cetera, et cetera,
9  okay?  The chance that he's going to pick up the moral
10 code is much greater, don't you agree?
11     A.  I don't know that for a certainty.
12     Q.  Okay.  Well, it would -- you have to think
13 about it.  I mean, can you imagine circumstances where
14 some young person may not have the same chance to
15 learn as others do?
16     A.  Correct.
17     Q.  Okay.  Like in these sexual assault cases
18 these young men get involved in, and the next thing,
19 the juvenile cases, and the -- the Defense lawyers and
20 the prosecutors, too, raise the question:  Who taught
21 this kid what to do?  How does he know what society
22 expects of him when he's relating to the opposite sex,
23 you know?  You know, some -- some kids, nobody teaches
24 them.  They just do what -- what they want to, you
25 know, as opposed to some other people that may have

357

1  plenty of training and they know exactly what they're
2  supposed to do or not.
3         So that's -- you think you understand
4  what that -- that question is asking you to do?
5     A.   It's asking me to decide what's a mitigating
6  circumstance and what is not.
7     Q.   Right.  And the mitigating --
8     A.   And each juror --
9     Q.   -- the mitigating -- yeah, and if it's --
10    A.   And each juror is going to make that
11 definition on their own.
12    Q.   They will decide what evidence -- for
13 example, the -- Defendant's age could be a
14 mitigating circumstance, okay?  And if you -- each
15 juror can decide what circumstance they're going to
16 consider to be mitigating.  For example, you may feel
17 like the Defendant's age is a mitigating circumstance
18 because it reduces his moral culpability under certain
19 circumstances.  The juror next to you says, "No, I
20 don't think so under these circumstances."  But you
21 can give affect to it if you believe that and -- when
22 you make your vote.
23    A.   Correct.
24    Q.   Okay?  But to give effect to a mitigating
25 circumstance means that you -- you're going to vote

358

1  for a lesser punishment.
2     A.   Correct.
3     Q.   Okay.  So, what answer to Special Issue No. 2
4  must appear if the death penalty is going to be
5  imposed?
6     A.   There is no mitigating circumstance that
7  warrants life, as opposed to death.
8     Q.   Right.  How many votes does it take to get a
9  no answer to that?
10    A.   I assume someone will tell me.
11    Q.   I already told you.
12    A.   Well ten, then.
13    Q.   A vote of no is against the Defendant, right,
14 because no is going to mean he's going to get the
15 death penalty.  So if it's bad for the Defendant, how
16 many votes do you need to have?
17    A.   You have to have all 12, is that what you're
18 saying.
19    Q.   12, right.  Now, there's a little exception
20 to the general rule.  If only 10 -- if 10 people vote
21 yes on that, yes means life.  If the Special Issue No.
22 2 is answered yes, the Defendant is going to get a
23 life sentence.  It only takes 10 votes for that
24 because it's favorable to the Defendant in this kind
25 of situation.

359

1     A.   Okay.
2     Q.   You don't have to memorize that.  The Judge
3  will give you those instructions you're exposed to,
4  okay?  Do you -- can you think of any reason that we
5  have not asked you about why you could not be a fair
6  and impartial juror in this kind of case?
7     A.   I don't think I have withheld anything.  I --
8     Q.   Yeah, okay, I'm going to ask you one more --
9  we've got a couple of more questions and then we're
10 going to stop.
11    A.   Okay.
12    Q.   Oh, you listed as your favorite book To Kill
13 a Mockingbird.
14    A.   Uh-huh.
15    Q.   Why is that your favorite book?
16    A.   I think Atticus did the right thing in the
17 face of adversity.
18    Q.   Great book.  Did you see the movie?
19    A.   Yes, I have.
20    Q.   That was a good movie, too.  In the last year
21 or so, there's been appearing in the newspaper or
22 magazines and television stories, many of them coming
23 out of Dallas County, of people who were convicted of
24 crimes.
25    A.   You're talking about like the 60 Minutes

360

1  expo?
2     A.   Yeah.  Did they have one about the D.N.A.
3  test?
4     A.   (Nods head.)
5     Q.   Okay.  Did you see that?
6     A.   Yes.
7     Q.   Okay.  When you saw -- when you learned about
8  those cases, how did that make you feel?
9     A.   It was one person's being self-serving that
10 wanted the cases -- want -- the D. A., correct?  Just
11 like I believe that would be the case in the
12 University boys that were charged with rape and it was
13 really the D.A. --
14    Q.   Is that Nifongs?  Is that the one?
15    A.   Duke.
16    Q.   Yeah, right.
17    A.   (Nods head.)
18    Q.   That case produced a new -- a new verb in the
19 English language, "to be Nifonged."  Okay?  But the
20 bottom -- what all that -- when you read about some
21 poor guy that got a 20-year prison sentence and, you
22 know, then they found out that he was really innocent,
23 how does that make you feel?
24    A.   The system failed.
25    Q.   The system failed, that's right.  It made

361

1  mistakes.  Why does the system fail?  Because we're
2  imperfect, okay?  I can tell you that because of those
3  cases in the -- those aren't the only ones, there are
4  a bunch in others parts of the country that elaborate
5  changes have been made to the system to minimize the
6  chance of that happening, okay?  But nobody can
7  guarantee it a hundred percent.  We can't because
8  we're not perfect.
9      A.   True.
10     Q.   But, you know, they -- well, anyway, they
11  got -- they're doing a lot to minimize the chance of
12  those kind of mistakes happening.  Now, you said
13  you're generally in favor of the death penalty.  Do
14  you think our society benefits from having that as a
15  form of punishment for these real serious cases?
16     A.   Yes.
17     Q.   How does our Texas society benefit from it?
18     A.   Well, I think when someone is executed people
19  look at the reason why this person was executed and,
20  perhaps, it will hopefully give someone a reason not
21  to behave in that same fashion.
22     Q.   It's a deterrent.
23     A.   Deterrent, right.
24     Q.   Deterrent is a legitimate reason for that
25  punishment.  Any other benefits that we might --

362

1      A.   If there's a person that does not seem to be
2  able to be rehabilitated to live by the moral code
3  that we find acceptable in society.
4      Q.   So, in other words, remove -- in the business
5  we call that "removal from society."
6      A.   True.
7      Q.   It's permanent removal for society's
8  protection, okay?  Now, keeping in mind what I said
9  before about being imperfect.  For those guys up in
10  Dallas, the good news in their case was that they're
11  alive.
12     A.   Uh-huh.
13     Q.   They've still got some life left and they can
14  live it outside the prison and be free.  In a death
15  penalty case, at some point the appellate processes
16  will run and the defendant will be executed.
17     A.   Right.
18     Q.   Which means that if a mistake is discovered
19  later, there's no way you can correct it, okay?  So,
20  if we accept -- if we accept the fact that society
21  benefits from the death penalty in the way that you
22  have observed, can we also accept the fact that from
23  time to time a innocent -- innocent people will be
24  convicted?  Do you think the benefits of the death
25  penalty are worth, from time to time, you know,

363

1  maybe -- maybe, you know, very infrequently executing
2  an innocent person?
3      A.   (No response.)
4      Q.   You answered the question correctly.
5      A.   Excuse me?
6      Q.   You paused when I asked that question.
7      A.   (Nods head.)
8      Q.   When I put a cost analysis against the death
9  penalty, almost everybody I asked that question to,
10  almost everybody, they've paused, okay?
11     A.   (Nods head.)
12     Q.   Now, we can't -- we can't not have a criminal
13  justice system.  We have to.  We'd have anarchy,
14  right?
15     A.   True.
16     Q.   So, obviously, what that question underscores
17  is the -- this is really important, this is serious
18  business, and we want you to give it, you know -- and
19  I'm sure you will, try not to make a mistake, okay?
20  And I -- I know you will do that if you find yourself
21  on the jury, okay?  That question just is a -- almost
22  everybody I ask it to they pause, and sometimes they
23  will not answer it and they want to think about it.
24  And sometimes they -- they leave my presence, so they
25  won't have to answer it, okay?  But I don't want you

364

1  to -- it's not fair for you to answer.  That's
2  probably, ultimately, a political question for our --
3  you know, our legislature to pan out, but it's a moral
4  question.  You answered the question to my
5  satisfaction --
6      A.   Okay.
7      Q.   -- because you paused, okay?
8              THE COURT:  Anything else?
9              MR. JONES:  No, I think that's it.
10             THE COURT:  Anything else, Mr. Skurka?
11             MR. SKURKA:  No, Your Honor.  Thank you,
12  ma'am.
13             THE COURT:  Okay, Ms. Bowman, will you
14  wait in the jury room for just a second?  We'll get
15  right back to you.
16             VENIREPERSON NO. 63:  Certainly.
17             (Venireperson exits courtroom.)
18             THE COURT:  All right, Mr. Skurka, what
19  say you?
20             MR. SKURKA:  Judge, we will accept this
21  flawless juror.
22             THE COURT:  Okay.  What say you, who was
23  making the call here?
24             MR. GARZA:  We'll accept her, also,
25  Judge.

365

1          THE COURT:  All right.  Let's bring her
2    in.
3          (Venireperson into courtroom)
4          THE COURT:  All right.  Mrs. Bowman,
5    you are on the jury.  So let me get -- I've already
6    told you that don't -- don't watch the local news,
7    read the local section of the paper while this is
8    going on.
9          VENIREPERSON NO. 63:  Okay.
10          THE COURT:  Okay?  Because we want you to
11    get all your information from the courtroom.  With all
12    due respect to the media, they are often wrong.
13          VENIREPERSON NO. 63:  I believe that.
14          THE COURT:  Often.  And -- okay, that's
15    that.  Don't talk to anybody about the facts of the
16    case.  If someone tries to talk to you about the case
17    say, "I can't talk to you about it till after the
18    trial is done," okay?
19          VENIREPERSON NO. 63:  I'll be out of town
20    Tuesday through Monday.  That's not an issue, Tuesday
21    the 19th.
22          MR. SKURKA:  I'm sorry, what did you say?
23          VENIREPERSON NO. 63:  I'll be out of town
24    Tuesday through Monday.
25          THE COURT:  Oh, no, no, we're not --

367

1          MR. SKURKA:  That will go fast because we
2    only had one strike.
3          MR. JONES:  It's always a good.  We spend
4    this much time --
5          MR. SKURKA:  Yeah, you want to have an
6    alternate.
7          THE COURT:  You want to have two.  You
8    want to have two.  Well, we got one today.
9          (Evening recess.)

366

1    That's the next thing.  We're going to start on
2    December the 1st.
3          VENIREPERSON NO. 63:  Okay.
4          THE COURT:  So that's not a problem at
5    all.
6          MR. SKURKA:  You won't have to come back
7    till December the 1st.
8          THE COURT:  Yeah.  We'll be keeping in
9    touch with you, but -- we'll let you know if that
10    changes, but we'll call and confirm and tell you when
11    the court case is going to begin, the trial itself,
12    but, no, this -- this next week is not a problem,
13    okay?
14          MR. SKURKA:  We'll be doing the same
15    thing with other jurors this next week.  Thank you,
16    ma'am.
17          THE COURT:  Thanks.
18          (Venireperson exits courtroom.)
19          MR. SKURKA:  Okay, we're halfway there.
20    I'm assuming you're going to want alternates.
21          MR. JONES:  We're going get alternates,
22    right, a couple?
23          THE COURT:  Yeah, we'll get a couple,
24    which means, I guess, each one of you gets a strike in
25    that range.

368

1    THE STATE OF TEXAS )

2    COUNTY OF NUECES   )

3                  I, Mary Lopez Buitron, Official Court Reporter

4    in and for the 94th Judicial District Court of Nueces County,

5    State of Texas, do hereby certify that the above and foregoing

6    contains a true and correct transcription of portions of

7    evidence and other proceedings requested in writing by counsel

8    for the parties to be included in this volume of the Reporter's

9    Record, in the above-styled and numbered cause, all of which

10   occurred in open court or in chambers and were reported by me.

11                 I further certify that this Reporter's Record of

12   the proceedings truly and correctly reflects the exhibits, if

13   any, admitted by the respective parties.

14                 I further certify that the total cost for the

15   preparation of this Reporter's Record is $_____ and was

16   paid/will be paid by_____.

17                 WITNESS MY OFFICIAL HAND this the ____ day of

18   _____, A.D., 2009.

19

20   _____

21   MARY LOPEZ BUITRON, CSR, RPR, Texas CSR #2731
     Expiration Date: 12/31/2009
22   Official Court Reporter
     94th District Court
23   Nueces County, Texas
     901 Leopard, Room 901
24   Corpus Christi, Texas 78401
     (361)888-0658
25