1

```
 1              REPORTER'S RECORD
           APPELLATE COURT CAUSE NO. AP-76,000  76100
 2          TRIAL COURT CAUSE NO. 04-CR-3453-C
              VOLUME 13 OF 25 VOLUMES
 3
    THE STATE OF TEXAS          )      IN THE DISTRICT COURT
 4                              )
                                )
 5  VS.                         )      94TH JUDICIAL DISTRICT
                                )
 6                              )
    JOHN HENRY RAMIREZ          )      NUECES COUNTY, TEXAS
 7
 8  _____
 9              INDIVIDUAL VOIR DIRE
10  _____
11
12
13
14
15
16
17
18
19
20      On the 17th day of November, 2008, the following
21  proceedings came on to be heard in the above-entitled and
22  numbered cause before the Honorable BOBBY GALVAN, Judge
23  Presiding, held in Corpus Christi, Nueces County, Texas:
24      Proceedings reported by Machine Shorthand.
25
```

**FILED IN
COURT OF CRIMINAL APPEALS**

OCT 0 6 2009

Louise Pearson, Clerk

2

```
 1   APPEARANCES:

 2   MR. MARK SKURKA
     SBOT NO. 18475570
 3   AND
     MR. VERNON G. SCHIMMEL
 4   SBOT NO. 24033039
     Nueces County Assistant District Attorneys
 5   901 Leopard Street, Room 205
     Corpus Christi, Texas 78401
 6   (361) 888-0410

 7   ATTORNEYS FOR THE STATE OF TEXAS

 8

 9   MR. EDWARD F. GARZA
     SBOT NO. 07731200
10   Attorney at Law
     719 South Shoreline, Suite 201
11   Corpus Christi, Texas 78401
     (361) 888-8877
12

13   AND

14   MR. JOHN GRANT JONES
     SBOT NO. 10917000
15   Attorney at Law
     5826 Beauvais Drive
16   Corpus Christi, Texas 78404-6173
     (361) 884-8141
17

18   ATTORNEYS FOR THE DEFENDANT,
     JOHN HENRY RAMIREZ
19

20

21

22

23

24

25
```

3

```
 1                           INDEX
                      VOLUME 13 OF 25 VOLUMES
 2                       VOIR DIRE PROCEEDINGS

 3    November 17, 2008                        PAGE    VOL.
         Proceedings Commence........................  5      13
 4            (INDIVIDUAL QUESTIONING OF VENIREPERSONS)
      PROSPECTIVE JURORS
 5    VENIREPERSON                    Voir Dire    Page    Vol.
         GLORIA E. LIGHT, NO. 65          5,15,40             13
 6    Accepted by the State............................ 60
      Accepted by the Defense.......................... 60
 7    Juror No. 8 Admonished........................... 60
      Discussion on Scheduling of Venirepersons........ 61
 8    Agreement to Excuse PJ No. 144................... 63
      PJ No. 71 Struck by Agreement.................... 64
 9
         LINDA HITE, NO. 70             65,76,92           13
10    Peremptory No. 3 by the State.................... 92

11    DAVID CHARLES KOCIAN, NO. 64     93,105,124,144     13
      Accepted by the State........................... 145
12    Peremptory No. 9 by the Defense................. 145
      Discussion on Scheduling of Venirepersons....... 145
13
      JOSEPHINE GUERRERO GOMEZ, NO. 77  150,162,188,202  13
14                                     204,207,209
      Challenge for Cause by the Defense.............. 211
15    Granted......................................... 213
      Discussion on Scheduling of Venirepersons....... 213
16
         TINA LOUISE TORREZ, NO. 79      218,226,242      13
17    Peremptory No. 4 by the State................... 242

18    CLARA ANN MUGUERZA, NO. 81       243,255,273       13
      Peremptory No. 5 by the State................... 275
19
         RYAN RICHARD HILL, NO. 80     276,287,303,321,323  13
20    Peremptory No. 6 by the State................... 323

21    ANTONIO G. MARTINEZ, JR., NO. 49    324,335,351    13
      Agreed Challenge for Cause by State and Defense.... 366
22
         LAURA LOPEZ HINOJOSA, NO. 82         367         13
23    Agreed Challenge for Cause by State and Defense.... 371

24    CHRISTINE FOUTCH, NO. 84        371,379,400        13
      Accepted by the State........................... 413
25    Accepted by the Defense......................... 413
      Juror No. 9 Admonished.......................... 414
```

4

1                           INDEX CONTINUED
    November 17, 2008 (Continued)              PAGE    VOL.
2
    Proceedings adjourned........................... 414    13
3   Court Reporter's Certification.................. 415    13

4
                 ALPHABETICAL INDEX TO VENIREPERSON
5
    VENIREPERSON                    Voir Dire    Page    Vol.
6   FOUTCH, CHRISTINE, NO. 84        371,379,400          13
    Accepted by the State........................... 413
7   Accepted by the Defense......................... 413
    Juror No. 9 Admonished.......................... 414
8
    GOMEZ, JOSEPHINE GUERRERO, NO. 77 150,162,188,202      13
9                                    204,207,209
    Challenge for Cause by the Defense.............. 211
10  Granted......................................... 213

11  HILL, RYAN RICHARD, NO. 80       276,287,303,321,323  13
    Peremptory No. 6 by the State................... 323
12
    KOCIAN, DAVID CHARLES, NO. 64    93,105,124,144       13
13  Accepted by the State........................... 145
    Peremptory No. 9 by the Defense................. 145
14
    LIGHT, GLORIA E., NO. 65          5,15,40              13
15  Accepted by the State........................... 60
    Accepted by the Defense......................... 60
16  Juror No. 8 Admonished.......................... 60

17  MARTINEZ, JR., ANTONIO G.,  NO. 49  324,335,351       13
    Agreed Challenge for Cause by State and Defense.... 366
18
    MUGUERZA, CLARA ANN, NO. 81      243,255,273          13
19  Peremptory No. 5 by the State................... 275

20  TORREZ, TINA LOUISE, NO. 79      218,226,242          13
    Peremptory No. 4 by the State................... 242
21

22

23

24

25

5

P R O C E E D I N G S

(November 17, 2008)

THE COURT: All right. Who's in there? Who do we have, the guy from Friday?

THE BAILIFF: Light and Hite.

MR. SKURKA: What number is that?

THE COURT: Okay. Well, I guess let's bring in Light. She's 65.

All right. Why don't you come over and have a seat. How are you today?

VENIREPERSON NO. 65: Fine. Thank you.

VENIREPERSON NO. 65,

GLORIA LIGHT,

VOIR DIRE EXAMINATION

BY THE COURT:

Q. All right. You are Ms. Light, right?

A. Yes, sir.

Q. Gloria Light. All right. Obviously, you know we're here to pick a capital murder jury, okay, and you are one of our prospective jurors and we're gonna talk to you about some things.

Now, first of all, first and foremost, what we want from a juror is people that can keep an open mind. I mean, if we have people that can't keep an open mind, well,

6

it's not fair. You agree with that, right?

A. Uh-huh.

Q. And some people can't and that's okay. We just need to know if that's you or not. Can you keep an open mind in this case?

A. I believe so.

Q. Okay. And when you say you believe so, what makes you think that maybe not? Now, some people when they say, "I believe so," that means yes.

A. Yes.

Q. But we as lawyers, that makes us kind of nervous.

A. To be honest with you, I really don't know anything at all about this case so I don't really have --

Q. You know what, that's just fine and dandy, okay? That's actually preferable.

Okay. The next thing we need to know is if you can follow the law, all right, and we're gonna talk a little bit about what that entails.

All right. You have been on jury before, a civil case?

A. Yes, sir.

Q. A malpractice. Is that a medical?

A. Uh-huh, yes, sir.

Q. Those have become somewhat of a rarity around here.

A. It was a few years ago.

7

Q. All right. Okay. Let's talk about some things. When you came in in the malpractice case, the plaintiff had the burden of proof, okay? The plaintiff had to prove to you whatever the malpractice was. It was their burden. In this case, the plaintiff is the State of Texas, okay? They've brought the charges, and just like in that case, they've brought the charges so they have to prove them, all right? They don't -- this -- they being the defendant and his lawyers, they don't have to prove anything?

A. Correct.

Q. Our law says that.

A. Uh-huh.

Q. The burden of proof -- and you're okay with that?

A. Yes.

Q. Okay. Now, the burden of proof in that case, I don't know if you recall or not, but it was by preponderance of the evidence which is like 51 percent or so. It's just a little bit more than just tipping the scales just a little bit, okay?

A. Okay.

Q. Sort of a probably standard, all right? We have a higher standard in criminal cases. You may know that. There's an intermediate standard which is called clear and convincing. That's higher than the standard that you used in that malpractice case and it's pretty self-explanatory. Clear and convincing, that sounds like a pretty strong language; do you

8

agree?

A. Yes.

Q. Okay. But what we have here is higher than that. It's beyond a reasonable doubt, all right? And sometimes I like -- you know, we don't have a definition of what that is, but when you think of it in terms of what it's not, it kind of gives you an idea of what it is. It is not preponderance of the evidence like the malpractice case. It is not clear and convincing. It's higher. On the other hand, it's not beyond all doubt, it's not beyond a shadow of a doubt. It is what it is, beyond a reasonable doubt, okay? Would you hold the State to that burden?

A. Yes.

Q. Okay. Next thing, along the same lines, the defendant in this case, like I told you, he has no burden, okay?

A. Uh-huh.

Q. The law says, State, you bring the charges, you prove them, and until you do, everyone is presumed to be innocent, okay? And that's an ancient concept going all the way back to the Greeks and Romans. The State brings the charges. If they can prove them, that's fine. Until you can, that person is innocent until proven guilty. Can you presume that?

A. Right, yes.

Q. And we lawyers, we like to do this. We like to ask

9

1    the jury somewhat, in my opinion, of an unfair question, but we
2    ask them, if you had to vote right now, how would you vote?
3        A.   Well, he's innocent, yeah.
4        Q.   All right.  Some people say, well, I can't vote
5    because I haven't heard anything, and that is the right answer,
6    okay?  He's innocent until they've proven otherwise, okay?  But
7    as a practical matter, what really happens is, you know, we
8    have a trial, and then the State presents evidence, and if you
9    don't find that it meets the standard then you find not guilty,
10   all right?  You agree with all that?
11       A.   Yes.
12       Q.   Okay.  Now, along those same lines, the law says if
13   they've got no burden of proof then they don't have to present
14   any evidence.  They don't have to put their client on, okay?
15   He doesn't have to testify.
16            Now, I think there's a lot of reason why
17   someone may not want to testify.  Maybe his lawyers think they
18   haven't proven their case and maybe his lawyers advised him
19   not to.  I had a friend who laughed inappropriately when he
20   got nervous and it would offend people.  You know, not all of
21   us are good speakers, not all of us do well under pressure.
22   Maybe his lawyers think he's not that kind of person, okay?
23   So, in any event, the law says not only does he not have to
24   testify, not only can the State not force him to testify, it
25   goes deeper than that.  The jury that's selected can't go back

10

1    there and consider it and hold it against him.  Some people
2    say, well, I like to hear both sides of the case and I like to
3    hear both sides of the story to make a decision.  It's -- this
4    isn't really like that, really, because they've got the burden
5    of proof.  And since they've got the burden of proof they've
6    got to cross the finish line and it's not like a race between
7    this side and that side.  It's all this side's -- the only
8    thing that matters is this side's ability to cross that line,
9    that reasonable doubt finish line.
10       A.   Okay.
11       Q.   Okay.  Can you -- can you follow that law and not
12   hold it against the defendant if he chooses not to testify?
13       A.   Yes.
14       Q.   Okay.  All right.  Now, let's talk a little bit about
15   the kind of case this is.  A lot of people think that when
16   someone takes a life of another intentionally, that the death
17   penalty is always a possibility, okay?  Not the case.  That
18   would be just regular murder, okay?  I've called it plain
19   murder, I've called it regular murder.  I don't know any other
20   way to say it.  It sounds inappropriate, but nonetheless,
21   intentional taking of a life of another, that's murder, and --
22   and that's a first degree felony and it's a serious offense,
23   but it is not capital in and of itself.  The legislature has
24   laid out a laundry list of things that are capital murder and
25   there's I don't know how many.

11

1            In this particular case what they're alleging,
2    that is, the State, is that they have a robbery or an
3    attempted robbery, and that the murder occurred while in the
4    course of doing that, okay?  So we have two major felonies put
5    together, the robbery or attempted robbery, and the murder
6    while in the course of committing.  And there's -- they've got
7    to prove them both together, okay, and that's what makes it
8    capital.
9            Now, there are a lot of elements, obviously,
10   because they have to prove the elements of both crimes.  The
11   law says for them to prevail, that is, the State.  They have
12   to prove all of the elements of capital murder.  You would
13   hold them to that?
14       A.   Yes.
15       Q.   Now, in a murder case, if let's say it was a plain
16   murder -- I don't -- just murder, like I told you, it was a
17   first degree felony and the punishment range is five years to
18   99 years or life.  We have a bifurcated system in Texas which
19   means the first part of trial is merely the guilt or innocence
20   phase.  That is, jury decides whether the -- after hearing all
21   the evidence presented, whether the State's met their burden,
22   and they either say guilty or not guilty.  And if they say not
23   guilty, well, the case is over with.  But if they say guilty,
24   then we go on to the second phase.  Now, if this was just a
25   murder case and the defendant was found guilty, the jury would

12

1    go back and decide between five years to 99 years or life, and
2    in some cases probation may be an option, and they would come
3    up with something and then they would write down the amount in
4    the little blank.  We don't do that in capital cases.  What we
5    do in capital cases is we answer questions.
6            You must know there's two possibilities if
7    someone's found guilty of capital murder in Texas and that is
8    life imprisonment or the death penalty, both serious
9    punishments, okay?  But like I said, they answer questions.
10   And the jury would first answer this one up here.
11           "Is there a probability that the defendant
12   would commit criminal acts of violence that would constitute a
13   continuing threat to society?"
14           Okay.  Is he probably gonna be a violent
15   person to people in the future?  Essentially, it's the future
16   dangerousness question is what we call it.  The jury would
17   answer yes or no.  Then the jury would go over to Special
18   Issue No. 2 which says, "After taking into consideration all
19   the evidence, including the circumstances of the offense" --
20   that's the first part of the case, the guilt or innocence --
21   "the defendant's character and background, and the personal
22   moral culpability of the defendant, is there a sufficient
23   mitigating circumstance or circumstances that warrant a
24   sentence of life imprisonment rather than a sentence of death
25   be imposed?"  Okay.  So what's that all about?

13

1          Well, the first part of the trial all you're
2    gonna hear about is the allegations of the crime itself.  In
3    other words, what happened that day, and if they can prove
4    that the defendant committed the offense of capital murder,
5    well, then you go to the second phase.  The second phase you
6    might hear a whole lot more.  Now, keep in mind, we had a
7    juror last week who said, well, you know, I -- when you're
8    talking about the second part so I assume we're getting there.
9    I said, no, we're not.  We have to legally talk about these
10   things, all right?  It's not -- it's not -- I don't mean to
11   suggest that we're getting there because we're talking about
12   this stuff, but we do need to talk to you about it at this
13   point because we don't get another chance to talk to you, all
14   right?
15          Now, this assumes that you have found the
16   defendant guilty and you get to consider everything on the
17   first part of the trial.  But at the second part of the trial
18   you may hear a bunch of other stuff about it, what kind of guy
19   has he been, other than that day.  Maybe he's been a good guy,
20   maybe he's been a bad guy.  Maybe he's a scoundrel, maybe he's
21   the best guy you'd ever know and just, you know, that was
22   completely out of character.  Do you follow me?
23   A.    Uh-huh.
24   Q.    Maybe he had a bad criminal history, maybe he's
25   clean.  And those are the mitigating circumstances or

14

1    aggravating circumstances, and then you have to decide whether
2    there are sufficient mitigating circumstances to warrant life
3    or death, okay?
4    A.    Uh-huh.
5    Q.    What is a mitigating circumstance?  Well, these
6    lawyers will suggest to you what that is, but the fact of the
7    matter is, it's up to the jury to decide what that is.  A juror
8    may think that maybe he was an Eagle Scout, okay?  Maybe he was
9    an Eagle Scout.  Well, that's a circumstance one juror may say.
10   The other juror may say, that doesn't mean anything to me.
11   That is not a mitigating circumstance, or if it is, it's not a
12   sufficient mitigating circumstance to meet this test, okay?  Do
13   you follow --
14   A.    Uh-huh.
15   Q.    -- how this questioning goes?  And the jury would
16   answer yes or no to this question.
17          Now, at the beginning of every trial -- and I'm
18   sure you were -- you went through this process when you sat as
19   a juror on this civil case.  You know, I raise my right hand,
20   the jurors all raise their right hands, and I swear them in,
21   and they swear to render a true verdict based upon the law and
22   the evidence presented to them and we begin.
23          What I need to know -- we're gonna break it up.
24   I need to know if you can take that oath in this case on the
25   guilt or innocence phase?

15

1    A.    Yes.
2    Q.    Okay.  Then let's go to the punishment phase if we
3    get there.
4          Some people tell me, Judge, I could do the guilt
5    or innocence phase, but answering these questions, I cannot do,
6    because I cannot participate in a process that can lead to the
7    possibility of a death penalty, all right?  I also get other
8    people that tell me, hey, look, I could give him a fair trial
9    on the first part of the case, but if we found him guilty, the
10   law means nothing to me.  It's death.  I'm not considering your
11   law.  I'm gonna answer the questions in such a way that the
12   defendant will get the death penalty and neither of those
13   people can take the oath.  I need to know if you can take the
14   oath on the second part of the trial as well?
15   A.    Yes.
16   Q.    All right.  Then I'm gonna turn you over to the
17   State.  They get to go first because they've got the burden of
18   proof.
19             VOIR DIRE EXAMINATION
20   EXAMINATION BY MR. SKURKA:
21   Q.    Good morning, Ms. Light.  My name is Mark Skurka, I'm
22   an assistant district attorney along with Geordie Schimmel
23   here.  We'll be the ones presenting the case to you if you're
24   selected on this jury.  The judge has gone over some legal
25   parts but I want to go over some more in a little more detail

16

1    and just to make sure we're all on the same page.
2          Let me start by telling you there's no right
3    or wrong answers to anything.  We just want to know how you
4    feel about certain things, so don't answer in such a way that
5    you think the judge wants to hear or I want to hear and the
6    defense wants to hear.  We just want to know how you feel,
7    okay?
8    A.    Okay.
9    Q.    Nobody's gonna argue with you about your feelings or
10   how you feel about certain things.  We just want to -- need to
11   make sure that you're qualified to sit in this case, okay?
12   A.    Okay.
13   Q.    Tell me about how you felt that very first day when
14   you found out it was a capital murder case.  The judge came
15   in -- remember that room with like two or 300 people in there
16   and the judge came down and said, "Folks, this is gonna be a
17   criminal case, and not just so that it's any criminal case.  If
18   you're selected on the jury, you might have to decide on
19   whether to give somebody the death penalty or not."  When you
20   heard it was that kind of a case, a possible death penalty
21   case, tell me what your first reaction was.
22   A.    Oh, intriguing, being part of the process, just
23   seeing how -- how it worked and just being part of it.
24   Q.    So it was kind of interesting and intriguing to you?
25   A.    Yeah.

1      Q.    And you had never been on a criminal case before?

2      A.    No, sir.

3      Q.    I think the judge pointed out you were on a civil

4    case?

5      A.    Correct.

6      Q.    You know, I was watching some people out there and I

7    don't know if you saw any of your neighbors around you in the

8    audience, some of them were going like, "Oh, my gosh, a capital

9    murder case."  And some people were going, "Oh, okay, that's

10   sounds good."  You know, it's like people -- I don't want to

11   say freak out, but they were going, "Oh, my gosh, I can't make

12   a decision like that.  I thought it was just gonna be like, you

13   know, a little shoplifting case or a DWI case."  And they found

14   out they're gonna have to make that kind of decision.

15            How did that strike you having to make that kind

16   of decision?

17     A.    I feel very strongly about the -- our court system.  I

18   feel like it's not perfect by any means, but that it is the

19   best that there is.  There's -- you'd be hard pressed to find a

20   better system.  I feel like it's a civic duty, that if I was in

21   his position that I would want people to be willing to

22   participate in it.

23     Q.    So it sounds to me that you've given an answer --

24   several jurors have -- it really doesn't matter what kind of

25   case it is, it's my civic duty to sit on a jury because that's

1    what the law called me to do?

2      A.    Pretty much.

3      Q.    Is that -- I don't want to put words in your mouth --

4      A.    No.  Yeah, that's --

5      Q.    -- but does that make sense?

6      A.    Yeah.

7      Q.    So when you heard it was a capital murder case and

8    there's a possibility of death penalty you're saying, "I'm here

9    to serve whatever they want me to serve as a juror.  As a

10   citizen, I have to come in and listen to the evidence and make

11   a decision based on that."  Is that pretty much how you feel?

12     A.    Pretty much.

13     Q.    The reason I ask that is because some people kind of

14   feel the same way as you, and they say, "Yeah, I understand

15   it's my civic duty.  I understand I have to make decisions, but

16   gosh, why do you start me off with such a big decision?"  It's

17   an awesome responsibility.  And although people shouldn't --

18   I'm not gonna say people are happy about sitting on a jury or

19   want to sit on a jury like that, but it's a pretty big

20   responsibility, and I just want to know if you feel that you

21   could actually carry that out, if called upon, based on the

22   evidence and the law?

23     A.    I believe so.

24     Q.    Okay.  Because we're not talking about, you know,

25   something in a vacuum.  We're not talking about something you

1    read about in the newspaper or hear on TV or something like

2    that.  That's him, right there.  Take a look at him.  That's

3    John Henry Ramirez.  When you first walked in the courtroom you

4    saw this guy sitting over there and you thought -- at least

5    some jurors probably thought, oh, my gosh, I might have to make

6    a decision whether he lives or dies.  Do you think you can do

7    that if the evidence calls for it?

8      A.    I believe so.

9      Q.    Okay.  The reason I ask is this because I've told you

10   from day one, I mean, we came out and we said, "Our office, the

11   DA's office, has decided to seek the death penalty in this

12   case."  As you know, there's two choices, death or life in

13   prison and we've decided to seek the death penalty.  I just

14   want to know if I've got a person up there in you that can

15   actually carry it out if they think the evidence is there.  And

16   when I say carry it out --

17     A.    I think you have --

18     Q.    I don't mean --

19     A.    I understand.  I think you have a person that will

20   look at both options.

21     Q.    That's what you have to have because that was my next

22   question.  You should be able to look at him too and say, "I

23   haven't made up my mind yet."  Maybe I hear the evidence and I

24   should give life.  Maybe I should hear the evidence, I should

25   give death.  Can you equally consider --

1      A.    Absolutely, yes.

2      Q.    -- both of those things?

3      A.    Yes.

4      Q.    And that's what we need to know.  Tell me what you

5    think about this statement.

6            "People shouldn't make decisions as a juror on

7    the way a person looks, but they should make the decision on

8    what they did."

9      A.    Repeat that, please.

10     Q.    "People shouldn't make a decision on how a person

11   looks, but should make a decision on what they did."

12     A.    I think you have to look at both.  It's unavoidable.

13   You're going to have first impressions.  That's a fact.  You're

14   gonna have first impressions, and that is strictly on

15   appearance, body language, a little bit, what have you.  That

16   is going to have some bearing.  I don't think you can avoid it.

17     Q.    In a court of law you think it should work that way?

18     A.    Umm...

19     Q.    Here's what I'm getting at.  Let me stop you because

20   I think we're getting off track a little bit.  We've had some

21   jurors come in and I asked them, "How did you feel when you saw

22   this guy was the defendant?"  Because a lot of people say,

23   "Well, gosh, you know, he looks very young.  He doesn't look

24   like he could hurt a fly."  He looks like this today.  And I

25   always tell them, "Wait a minute, you haven't heard any

21

1   evidence." And so when you make the decision based on a
2   person's youth and how they look today, you should really make
3   it based on what the evidence shows --
4       A.   Evidence, absolutely.
5       Q.   -- and is.
6       A.   Evidence is going to, hopefully in this situation,
7   and I believe in my decisions, it would be on the testimony.
8   But I can't lie to you either and say that first impressions
9   aren't going to have some bearing, but you have to listen to
10  the testimony.
11      Q.   Do you think age should be a difference on whether --
12  make a difference on whether somebody's guilty or not?
13      A.   No.
14      Q.   And let me preface that by saying, in Texas, the law
15  says you can't execute somebody over 18 years old (sic). If
16  you're 16 or 17 and do the worst crime imaginable, you're not
17  eligible for the death penalty. They say you have to be
18  majority of at least 18 years old. Do you believe that most
19  people know the difference between right and wrong by the time
20  they're 18 or know what the laws are by the time they're 18?
21      A.   Do they know what the laws are?
22      Q.   Well, I don't mean it that way. I guess know the
23  difference between right and wrong?
24      A.   I believe by the time they're 18 they know right from
25  wrong.

22

1       Q.   So whether a person is 25, 35, 45, 55, as long as
2   they're over 18, you think they should be held to the same
3   standard?
4       A.   Yeah.
5       Q.   Under the law?
6       A.   Under the law, yes.
7       Q.   Obviously, everybody has different views, but I just
8   want to know if the fact that he seems to be young -- here's
9   where I'm getting at. A lot of times people come in there and
10  tell them the person's charged with murder, capital murder and
11  they expect to see Charles Manson sitting over there, you know,
12  scary looking Charles Manson, and they found out it's a young
13  looking guy and they think, wow, he's a young looking guy. And
14  I always tell them, "Well, do you make a decision on how he
15  looks in the courtroom today, or do you make a decision on what
16  he did that day?"
17           Now, I always talk about Ted Bundy, you know.
18  Ted Bundy was supposed to be this handsome, dashing young man,
19  and you know, he killed a whole bunch of women. And if you
20  made a decision on how he looked that would probably be not
21  appropriate to what he did. And that's all I'm trying to get
22  at.
23           Do you have any problems about seeking the
24  death penalty, or if the evidence warranted it, seeking the
25  death penalty to a person that doesn't look like Charles

23

1   Manson, or isn't as young as Charles Manson, something like
2   that?
3       A.   No.
4       Q.   Okay. Do you think we should have the death penalty
5   in Texas?
6       A.   Yes.
7       Q.   Why?
8       A.   I think the first issues, specifically it's -- if
9   they're gonna be a continuing threat to society, the risk of
10  them being able to leave prison, even life, you still have that
11  chance of getting out. I would hate to be responsible for
12  giving someone life than getting out and performing another act
13  of violence against society. There's just some that I don't
14  think should be released into society.
15      Q.   Do you think it's good that a jury makes that
16  decision? Because I'll tell you, you know, as powerful as a
17  district judge is, Judge Galvan cannot sentence somebody to
18  death. As powerful as Carlos Valdez, the district attorney is,
19  he can't sentence somebody to death. Our laws say only 12
20  people sitting in our jury can make that decision. Do you
21  think that's a pretty fair arrangement?
22      A.   I think it's preferable. You know, the jury comes
23  through and they see the news and they read newspapers and you
24  can watch True TV, and you know, you're not really subjected to
25  it day in and day out so you don't get that cynicism or a bad

24

1   view of society, you know. We come in and we're basically, you
2   know, life's good. People are honest and you have to prove to
3   me that he's not. I think I can -- that freshness, I think, is
4   important. I think if a judge was responsible for making that
5   decision, that it could get dangerous because seeing what they
6   see day in and day out, it could make them --
7       Q.   A little more jaded or cynical?
8       A.   Yes, yes.
9       Q.   And that makes sense. And I didn't write the
10  Constitution, but that's probably a good reason. We didn't
11  want all the power to be in one person.
12      A.   Right.
13      Q.   We wanted to have the power to the people. And, you
14  know, sometimes people say, "Well, it's not the greatest system
15  in the world, there's been mistakes made." But would you agree
16  with me it's probably the best system we have out there?
17      A.   Yes.
18      Q.   Let's talk about some of the other parts of the
19  trial. Remember that this becomes a capital murder case only
20  if it's murder plus something else; plus a robbery, rape,
21  kidnapping -- burglary, robbery, kidnapping. And they also
22  have other parts, like killing a kid under six, or killing a
23  cop on duty, things like that. There's very few things that
24  even qualify for capital murder. In other words, sometimes
25  people tell me, "Well, gosh, you know, he murdered somebody, he

25

1  automatically gets the death penalty." I go, "No. What
2  happens is you have to have that kind of case that qualifies as
3  a death penalty, and then by no means is it automatic. You
4  have two choices, death or life in prison." And so a lot of
5  people, we have to kind of tell people the very first day it
6  doesn't work the way you think it does or the way it is on TV
7  God forbid. It's really kind of carefully considered out that
8  it's only gonna happen if certain requirements are met.
9          In this case, we're alleging murder while
10  committing robbery or attempting to commit robbery, and notice
11  that word "attempting" to commit robbery, or while in the
12  course of committing robbery. It doesn't have to be a
13  successful robbery. It doesn't have to be a finalized robbery.
14  It could be any time in the course of committing a robbery.
15  It's like a guy robs a bank and he's heading out the door with
16  a bag full of money and the cops catch him. Can he go up to
17  court and say, "Well, I'm not guilty, I didn't get away with
18  it, I didn't really get all the money." No. The law says as
19  soon as you take something by force, or by threats of force,
20  and you're taking something, whatever it is, that's enough to
21  be a robbery. Do you follow me on that?
22      A.  Uh-huh.
23      Q.  Okay. And in Texas, we don't have -- we have two
24  parts of the trial. The first part is guilt or innocence, then
25  the second part is punishment. The first part is whether he

26

1  did it or not. Did he do it or not? Is he guilty or not
2  guilty? And, generally speaking, the evidence is confined to
3  just, you know, what happened that day. Did he do the crime,
4  no matter what it is, did he do that crime? You might hear
5  some surrounding circumstances before and after, but generally,
6  you just hear that one thing.
7          Then the second part of the trial -- and I'm
8  sorry -- and then if you find him -- you can find him either
9  guilty or not guilty. If you find him not guilty, the trial
10  ends. If you find him guilty, then you go to the second phase
11  of the trial.
12          In most criminal cases, what you do, is you
13  get a range of numbers to pick from. Like say a burglary case
14  is two years to 20 years in prison. You know, some people can
15  give them a very high sentence or a low sentence. There's a
16  big range to fit in and you pick a number. In death penalty
17  cases it's a little different. You don't just vote, I vote
18  for death or I vote for life and check it off. You answer two
19  questions. And it's how the jury answers those questions
20  become -- tells the judge what he has to do in this case. And
21  they're behind you, and you've already talked about one and I
22  want to go over that one with you a little bit if you'd look
23  at it with me.
24          The second -- oh, I'm sorry. Before I talk
25  about the questions, before you get to that part, you might

27

1  get to hear some more evidence. You might get to hear some
2  from both the State or the defense, but remember the defense
3  doesn't have to prove anything about his background. You
4  might get to hear -- I think the judge said he was an Eagle
5  Scout, or maybe he was on the honor roll in high school. Or
6  you might hear, hey, he's a bad kid, always been in trouble
7  all his life. I don't know. So based on that evidence -- in
8  addition, you can use the evidence you heard on the first part
9  of the trial, like how heinous the crime was or it was a mild
10  crime or whatever, but then you go to the questions.
11          The first question says, "Is there a
12  probability that defendant would commit criminal acts of
13  violence that would constitute a continuing threat to
14  society?" We call that the future dangerousness question. In
15  other words, is he gonna be a danger in the future, you know,
16  to hurt somebody. The key words in there I want you to look
17  at is the first line it says, "Is there a probability --"
18  Now, unless you have a crystal ball and you can say for
19  certain what's gonna happen. There's no way we can prove that
20  to you, and the law doesn't require me to prove it beyond all
21  doubt or certainty. It just says is it probable which means
22  more likely than not.
23          The question then says, "-- that the defendant
24  would commit criminal acts of violence." That's kind of
25  broad. Criminal acts of violence can be anything. Sometimes

28

1  jurors say, "Well, I thought I could only vote for the death
2  penalty if I thought he was gonna murder somebody again or
3  commit capital murder again." And I tell them, It doesn't say
4  that. It just says criminal acts of violence. It could be
5  almost anything.
6          And then the last part says, "-- that would
7  constitute a continuing threat to society." And I think you
8  brought that up earlier about there are certain cases where
9  you think he will be a continuing threat to society. And
10  sometimes people tell me, "Well, you know, if -- why do you
11  seek the death penalty? Just lock them up in prison and that
12  way they can't hurt anybody." And you were mentioning the
13  fact that maybe later on they'll get out. But let me ask you
14  when they're in prison themselves, who else is in a prison?
15      A.  The criminals.
16      Q.  I know, but who else besides him?
17      A.  Guards.
18      Q.  Right. And who else?
19      A.  Other prisoners.
20      Q.  Other prisoners. Maybe people that work at the
21  prison, like the warden and his staff, or clerical people or
22  maintenance people. In other words, we don't put people on a
23  desert island where they're never gonna have interaction with
24  any other human being. In fact, have you ever heard of that
25  happening like, you know, prisoners, you know, hurting guards

1 or hurting other prisoners?

2    A.    Uh-huh.

3    Q.    Sure you have.  So just the fact that they've been

4 locked up in prison, does that mean that they're not gonna hurt

5 anybody else again?

6    A.    No.

7    Q.    Of course not.  And that's what I'm trying to point

8 out to you, continuing threat to society.  Prison is actually

9 still in society.  I mean, you have limited rights, but you're

10 still interacting with other people.

11    A.    Uh-huh.

12    Q.    And would you agree with me there?

13    A.    Yes.

14    Q.    It's kind of hard to think about.

15    A.    I hadn't thought about it before.

16    Q.    Most people don't think about that, but, you know,

17 you really still interact with other people in society.  So

18 it's not a guarantee they're gonna hurt anybody if you get sent

19 to prison.  And that's a question you have to say.  "Is there a

20 probability that the defendant would commit criminal acts of

21 violence that would constitute a continuing threat to society?"

22 Do you think he's gonna be a danger in the future?  And you can

23 make that decision based on the crime itself, and then maybe

24 his background.

25          The second question then goes to this board

1 here, and we call that the mitigating circumstance question.

2 Mitigating circumstance means -- mitigating, the word

3 mitigating means anything that would lessen or make less severe

4 the punishment.  In other words, he did the crime, but is there

5 any reason why you should lower the sentence, give him a break?

6 Well, let's think about that for a minute.

7          Mitigating circumstance.  Anything that reduces

8 the defendant's moral blameworthiness, and really, anything

9 that would lessen the sentence.  Have you ever seen in the

10 paper sometimes where it will be two people convicted of the

11 same crime and one gets like a high sentence of 20 years in

12 prison and one gets five years probation?  My wife used to tell

13 me, "How come that burglar got 20 years and that burglar got

14 five months probation or five years probation?"  Why would you

15 think something like that would happen?

16    A.    Because it would have to be the mitigating

17 circumstances.

18    Q.    It depends on what the surrounding circumstances are.

19 I always have to tell people, not all cases are alike, not

20 everybody's background is alike.

21          Let's give you an example.  Say, for example,

22 you're a juror on two burglary cases and both of them were

23 burglars and they both went into somebody house and stole

24 something without permission.  That's the definition of

25 burglary.  And you're thinking, my gosh, I'm a homeowner, I

1 don't like burglars.  I think we should hammer these guys

2 because they're both bad burglars.  Then you hear the facts

3 and circumstances of the case.  The first case is a burglar

4 where you hear that he is -- he has kicked in the back door,

5 broken the door off the hinges, kicked it in, ransacked the

6 whole house.  He stole money, jewelry, TV, VCRs, stereos, all

7 that expensive stuff.  And then, he went what he did was after

8 he got all this stuff, he took it to a fence and sold it to

9 buy drugs, you know, to get drugs.  And then you find out his

10 background, he's been to prison twice before for burglary.

11 His background is bad.  So you look at all that stuff.

12          Now you're having the second burglar.  Now,

13 he's also gone into somebody's house and stole something

14 without permission, but there's a little difference.  And you

15 hearing that that he didn't kick in the back door or breaking

16 the window to break into the house.  The back door was

17 unlocked and so he went into the kitchen through the back

18 door.  And you find out that that house had jewelry, money,

19 stereos, TVs, VCRs.  He didn't take any of that stuff.  All he

20 took was food and loaf of bread to feed his kids who are

21 hungry and lost his job, and so, he needed food to feed his

22 kids.  And that's all he did was steal food.  He didn't take

23 any of the other stuff.  And then you found out his background

24 was a little different.  Never been in trouble before with the

25 law.  That's the first time he's ever been arrested for

1 anything.

2          Now, you've got two burglars that are both

3 equally guilty of burglary, but would you punish them exactly

4 the same?

5    A.    Huh-uh.

6    Q.    Probably not, and that's a good example of this.  One

7 has aggravating circumstances that would make the sentence go

8 high; one has mitigating circumstances.  See it's kind of a

9 trick question because before you think about all the

10 surrounding circumstances you just consider both burglars.  But

11 I mean, the first guy tore up the house stealing everything

12 going and selling the stuff for drugs, bad criminal history.

13 Those are clearly aggravating circumstances.  In the other one,

14 you know, not breaking any in, stealing something but only

15 food; not taking the other stuff.  And, in fact, he had never

16 been in trouble before with the law.  My gosh, you're not gonna

17 give him a higher sentence as the other.  That's what this

18 question is all about.  That's really what it all boils down

19 to.  Because if you get to this question, you found the person

20 guilty of capital murder, you think he's a continuing threat to

21 society, but the judge says, Wait, jury, before you decide the

22 death penalty -- because it looked like he's heading that way,

23 right?

24    A.    Uh-huh.

25    Q.    Before you decide the death penalty, take into

33

1  consideration all of the evidence, look at the big picture,
2  including the circumstances of the offense, like what he did
3  that day. Was it a real heinous crime or was it kind of a
4  minor crime? You look at the defendant's character and
5  background. Good character, bad character; good background,
6  bad background, and his personal moral culpability. Is there
7  enough, is there sufficient mitigating circumstance or
8  circumstances to warrant that a sentence of life rather than
9  the death sentence be imposed? That's where you do that
10  balancing test just like the burglar. You know, if you had
11  made a decision without hearing all the evidence, it would have
12  been hard for you. But in that case you heard one had some
13  possible mitigating circumstances.
14          And what the judge said earlier is exactly
15  right. No one can tell you what's a mitigating circumstance.
16  It's up to the folks on the jury. The defense lawyer may
17  bring up stuff like he was an Eagle Scout, he was on honor
18  roll, something like that. I may bring other stuff up. You
19  just never know till you hear everything. And that's the kind
20  of background you want to hear before you make a decision.
21  And then the question is -- I always like to say it's kind of
22  like checks and balances, you know. You're looking like he's
23  gonna get the death penalty, but let's not rush into things.
24  Look at the big picture and say, is there enough to lower the
25  sentence. Just because there's a mitigating circumstance, a

34

1  possible mitigating circumstance, do you automatically lower
2  the sentence? No. Some people may say, well, okay, they said
3  he was a war hero and he was a decorated veteran. That's
4  still not enough to outweigh, you know, the crime what he did.
5  Other people may say, well, you know, because he was a hero in
6  the war, we're gonna give him a break. You see what I'm
7  saying? Amongst the jurors they can have trouble deciding
8  some mitigating circumstances.
9          All I'm telling you is it's up to the jury to
10  decide and it's got to be enough of a circumstance or
11  circumstances to outweigh it. Because almost -- I can say you
12  can always find good somewhere in a person, but you have to
13  say, is that good enough to outweigh all the other stuff. Is
14  that a fair assessment of how to look at things?
15  A.   Uh-huh.
16  Q.   I mean, you want don't want to rush into things. You
17  want to make sure you have everything and to make a decision.
18          Now, one other thing the judge may say is a law
19  that goes like this: Okay. Voluntary intoxication --
20          THE COURT: Mark, I need one second.
21          (Pause.)
22          THE COURT: I'm sorry. Go ahead.
23  Q.   (BY MR. SKURKA) One of the laws the judge may give
24  you says this. "Voluntary intoxication is not a defense to
25  crime." Voluntary intoxication, in other words, if you get

35

1  yourself drunk or high on drugs, and you go commit a crime, is
2  that an excuse for the crime?
3  A.   No.
4  Q.   Absolutely not. That's what the law says. The law
5  does say, however, that it's a possible mitigating circumstance
6  that you can consider in punishment. In other words, some
7  people may say, "Well, he robbed that bank but he was drunk
8  when he did it so we'll cut him a break." Other people may
9  say, "I don't care if he was drunk or not, that's not enough to
10  warrant to get him a lower sentence." He still shouldn't be
11  robbing the bank. See what I'm saying?
12  A.   Uh-huh.
13  Q.   And the judge says it's a possible mitigating -- the
14  law says it's a possible mitigating circumstance. It doesn't
15  mean it has to be.
16          Okay. The last little area I want to talk to
17  you is a few legal things. First of all, remember the person,
18  just the fact that he's indicted does not mean he's guilty of
19  the crime. He starts with the presumption of innocence. Do
20  you remember that, the judge talking about that?
21  A.   (Nodding head up and down.)
22  Q.   Basically, that means that everybody starts their
23  thing with the -- their trial with the presumption of
24  innocence. It doesn't mean he is innocent. It just means he
25  starts with that presumption. You can't start leaning against

36

1  him. You have to start him off with being innocent and I have
2  to prove the case beyond a reasonable doubt, which is pretty
3  fair. Like the judge said, "The State says if you're gonna
4  charge him with something you've got to back it up and prove it
5  beyond a reasonable doubt." And I will tell you, I have that
6  burden in this case and in every criminal case. There's
7  nothing special in a capital murder case. We always have to
8  prove the case. But the indictment doesn't mean anything.
9  It's just say way to bring them into court.
10          And remember the Fifth Amendment. A person
11  can testify if he wants to, but if he doesn't want to, he
12  doesn't have to. And you can't hold that against him. You
13  wouldn't hold it against him if he doesn't testify. And
14  remember, they don't have to put on any evidence. They could
15  put on evidence or they don't have to put any on evidence.
16          Would you like some water or something?
17  A.   Yeah, please.
18          THE COURT: Get her some water.
19          MR. SKURKA: The bailiff will get you
20  something.
21          VENIREPERSON NO. 65: I've got this crud
22  that's been going around the office.
23          THE COURT: I've got some cough drops too.
24          MR. SKURKA: I think we've all been fighting
25  off colds.

37

1        VENIREPERSON NO. 65:  It's just allergies in

2  Corpus.

3        THE COURT:  Especially with the cold fronts

4  blowing in all that cedar.

5        Q.     (BY MR. SKURKA) Okay.  And as I was saying, remember

6  he can testify, but he doesn't have to, and you can't hold that

7  against him.  They don't have to put on any evidence on and

8  that it's a natural thing for some jurors to say, "Well, gosh,

9  you know, I can't make a decision.  I want to hear the other

10  side of the story."  But you may not, you know, and you just

11  can't hold that against him.  You're making a decision based on

12  the evidence presented to you, not what they could have said or

13  should they have said something.  You can't do that.

14        And the burden in this case is beyond a

15  reasonable doubt.  All that means is it's beyond a reasonable

16  doubt.  It doesn't mean it's beyond all doubt or a shadow of a

17  doubt or any doubt.  I mean, there would be no way I could

18  prove it to you beyond all doubt.  I mean, you'd have to be a

19  witness and see the thing yourself, and of course, you

20  couldn't be on the jury.

21        So the bottom line is, you'd be able to listen

22  to all sides of the story -- I'm sorry.  You're not leaning

23  one way or the other, right?  Guilty or not guilty, at this

24  point, correct?

25        A.     Correct.

38

1        Q.     And you could consider both a life sentence or death

2  sentence equally, depending on what the evidence is?

3        A.     Yes.

4        Q.     How was it that you became a missionary?  Can I ask

5  you that?  You have such an interesting background.  I was

6  looking at it.  I was trying to figure out how you went from a

7  missionary to the oil and gas business?

8        A.     My first husband was a carpenter by trade in building

9  and we had been going to church and they had a -- guy came

10  and spoke about you know para missionary doing work that

11  supports and frees up missionaries who have been trained to do

12  the Bible studies and the preach part of it.  It frees them up

13  to be able to do what they went over to do and so we went over

14  and he built schools.  So that's how it started.

15        Q.     So that's when they call them, para missionaries?

16        A.     Uh-huh.

17        Q.     I never heard of that phrase.  But they're the ones

18  that kind of do, I guess for lack of a better word, lay the

19  groundwork --

20        A.     Yeah, support group.

21        Q.     -- and do the support stuff?  And it frees the other

22  people to do the preaching and the teaching and stuff?

23        A.     Right.

24        Q.     Because my understanding of missionaries, sometimes

25  they're helping growing crops and sometimes they're fixing

39

1  plumbing systems and sometimes they're building schools?

2        A.     We -- we have friends that ran the printing press for

3  tracks and that kind of thing; teachers that taught the kids

4  freed up the parents to do their work.  Yeah, I mean, it could

5  be anything.

6        Q.     That makes a lot of sense.  I didn't know how it

7  worked.  I just thought missionaries had to do everything.

8        A.     No.  We went -- it was a Christian school and like I

9  say, he built a teacher training college, some housing, some

10  primary schools.  That's what we did.

11        Q.     And where was this at?

12        A.     In Zambia and then we moved to Botswana and did more

13  bush work and started kind of a missionary supply center.  They

14  would come and stay and help them get vehicles repaired and

15  building supplies and whatever they needed.

16        Q.     Did you find that work rewarding?

17        A.     Extremely.

18        Q.     It seems like you did it for a long time?

19        A.     Uh-huh.

20        Q.     Aren't those areas kind of dangerous these days?  I'm

21  not sure where they're having all these civil wars but it seems

22  like some of those areas seem very dangerous now for

23  missionaries.

24        A.     Certain parts are, but it's like I can go in parts of

25  Corpus and it be just as dangerous.

40

1        Q.     That's a good point.

2        THE COURT:  That's a good point.

3        Q.     (BY MR. SKURKA) That's a good point.

4        A.     You learn which areas are dangerous and which areas

5  aren't, and you develop friends with the locals and they kind

6  of steer you, and actually, kind of protect you.  It's -- it

7  was a very good place to live.

8        Q.     Well, that's an intriguing background.  I don't think

9  I've ever met somebody who did that but that sure makes sense

10  because they need plumbers and carpenters just as much --

11        A.     Yeah.

12        Q.     -- as doing the teaching.

13        It was nice visiting with you, Ms. Light.  I

14  don't think I have any other questions.  I'll let the defense

15  lawyers talk to you now.

16        VOIR DIRE EXAMINATION

17  BY MR. JONES:

18        Q.     It's going to be me.  Let's see.  Where do we begin?

19  I'd like to start off where Mr. Skurka left off on these

20  special issues.  That's extremely important for anybody sitting

21  on a capital murder jury to understand the procedure you to

22  understand what is -- what your duties are.

23        First of all, the death penalty is an authorized

24  form of punishment in Texas.  It can be imposed only in certain

25  cases.  All of them are homicides which have an aggravated

41

1  circumstance attached to them, as the judge told you. You
2  basically told us in your answers to the questionnaire and in
3  your answers here that you generally believe that we should
4  have the death penalty for certain cases. It's true?
5      A.   Yes, sir.
6      Q.   Do you believe that the Texas society -- and I say
7  Texas because states have the choice to have the death penalty
8  or not. Do you think that Texas society benefits from having
9  the death penalty?
10     A.   I do.
11     Q.   Okay. Could you articulate what those benefits or
12 benefit, one or more?
13     A.   One or more. I think there's a lot to be said for
14 people if they know what the punishment is. They will kind of
15 tweak their behavior.
16     Q.   So a deterrence?
17     A.   A deterrence.
18     Q.   A deterrence is certainly a reason for sanctions.
19 Any other benefit?
20     A.   Like I said earlier, if you have somebody -- I mean,
21 he was bringing up, was it, Charles Manson, and the really
22 heinous crimes. There are some crimes that are just --
23     Q.   So offensive?
24     A.   -- unacceptable they're so offensive that -- that you
25 don't want someone like that in society.

42

1      Q.   Okay. So the benefit there would be removal from
2  society permanently?
3      A.   Correct.
4      Q.   But it has to be under that -- that circumstance.
5  You said the crime has to be something that's really --
6      A.   Yes.
7      Q.   -- offends the social conscious to a high degree.
8          Now, have you read -- it seems like these
9  stories are appearing more often lately -- I think *Texas*
10 *Monthly* last month had a lead article on these cases where
11 people have been found guilty only to be found innocent later
12 because of DNA testing?
13     A.   Yes.
14     Q.   A lot of the cases are coming out of Dallas.
15 Actually, they're occurring all over the United States, and
16 many of those cases over the past ten years have actually been
17 capital murder cases where people have been sentenced to death,
18 okay? Have you ever read a story like that or seen one on TV,
19 or --
20     A.   I have not -- I've read the headlines.
21     Q.   Right. You sort of kind of casually looked at it?
22     A.   Yeah.
23     Q.   How does it make you feel when you see a story like
24 that some guy got 20 years in prison and they finally found out
25 he was innocent and they're letting him out?

43

1      A.   You're glad that they discovered that he was
2  innocent.
3      Q.   Right.
4      A.   There is that relief. Like I said, it's an imperfect
5  process and you hope that the jurors do understand or do -- do
6  find the guilty plea knowing that it was probable.
7      Q.   Okay.
8      A.   You hope that they don't make mistakes, but it
9  happens. And yeah, it's -- it's nice knowing that --
10 especially now with DNA -- that they're able to discover that
11 people are innocent and let them out.
12     Q.   Do you -- do you agree that there are some
13 occupations which demand almost perfection? For example, when
14 you get on a plane to fly to Houston, do you expect your pilot
15 not to make any mistakes?
16     A.   When I walk out my door, I have to accept some level
17 of responsibility for accepting the risk of walking out of the
18 door. When I go over the bridge, I hope that the engineer did
19 a good job building it.
20     Q.   Okay.
21     A.   I get on a plane, I pray that the pilot had a nice
22 night's sleep and that he didn't have an argument with his
23 wife.
24          THE COURT:  All true.
25     Q.   (BY MR. JONES) Or if you ever have to -- so unlucky

44

1  to have to have major surgery, you kind of hope your surgeon
2  doesn't make any mistakes, right?
3      A.   Correct.
4      Q.   Now -- and so you can see while some occupations
5  there's a lot of stress on the professional?
6      A.   Yes.
7      Q.   Every day they're asked to perform without making
8  mistakes. But, like you say, they do make them, but they try
9  not to. So you're absolutely right that the system is not
10 perfect but it is probably the best system in the world. And
11 one reason it's the best system in the world is we have set up
12 in the criminal side of the -- criminal cases, an elaborate
13 appellate system, appeals system, and the purpose of which is
14 to correct mistakes. And these appeals can go all the way up
15 to the Supreme Court of the United States if the issue is
16 right, and that's good.
17     A.   Uh-huh.
18     Q.   And if mistakes are made, they can be corrected. And
19 these men that were released up in Dallas, the writ of habeas
20 corpus is a procedural vehicle by which that mistake was
21 corrected. Now, the good news for those men is that they were
22 alive.
23     A.   Correct.
24     Q.   See where I'm getting?
25     A.   Uh-huh.

45

1    Q.   When you have the death penalty, at some point after
2    the appeals system runs its course and there's been political
3    pressure on our legislatures to speed up the appellate process
4    in death penalty cases, and they have, there comes a point
5    where if the sentence is carried out, if it's discovered later
6    a mistake was made, like the guy's innocent, then you can't go
7    back and correct it, right?
8    A.   Correct.
9    Q.   Okay.  So I'm gonna ask you a question, and listen to
10   it carefully.  If we accept that, and as you believe, that
11   Texas society benefits from the death penalty, are those
12   benefits worth the chance of executing an innocent person from
13   time to time?  You've already answered the question.
14   A.   Pardon?
15   Q.   You've answered the question.
16   A.   Yes, I do believe that.  I was kind of wanting to
17   expand on it a little bit and --
18   Q.   Expand on it.
19   A.   -- kind of explain where I'm coming from.
20   Q.   Expand on it, please.
21   A.   As a Christian -- and, I mean, he's already brought
22   up my missionary service --
23   Q.   Right.
24   A.   -- you can assume that I've got very strong faith,
25   very strong stance on certain things.  I believe very strongly

46

1    that we must live under the rules in which we live --
2    Q.   Right.
3    A.   -- which is the foundation of why we're here.  I also
4    have a strong belief in that as long as a person is alive, they
5    have a chance of accepting Christ and becoming a believer and
6    having eternal life.  That's my faith.
7    Q.   That's your Christian faith.
8    A.   And I've had -- when I've talked to people about
9    being on a death penalty -- capital murder case, that's the
10   discussion, you know, that's what you guys are real concerned
11   about, where am I on the death penalty.  When a person dies,
12   that ends all chances of them becoming a believer and getting
13   eternal life.  And for me, that's very, very serious and very,
14   very important, so I have to weigh that and take that into
15   consideration.
16          There's stories of men in prison on death row
17   finding Christ becoming a believer.  That's important to me to
18   know that that work is going on in prisons.  Am I very quick
19   to -- so I guess what I'm trying to say is, yes, I do believe
20   that there is a point for the death penalty, but I also
21   believe that it has to be treated with very, very -- the
22   utmost respect, and knowing that it is final and that not only
23   if you believe that the person is not a believer, not someone
24   who has that eternal life.  When you sentence them to the
25   death penalty, you're sentencing them to a life without

47

1    Christ.  So it has to be taken very seriously.  I believe that
2    I can do that.  I don't know what else I can say to explain
3    where I am.
4    Q.   Well, the other day I asked an old friend of mine, I
5    said, "Well, we know for sure that innocent people get
6    convicted from time to time, in non-death penalty cases."  And
7    he said -- well, he said, "What do you want to do, do away with
8    criminal cases altogether just because of that chance, because
9    we'd have anarchy."  And he's right.
10   A.   Absolutely.
11   Q.   And so when I ask that question to you, I -- you
12   paused, and to me, that's an answer because it's a moral
13   dilemma we have.  However, when you're dealing with death -- as
14   one of the Supreme Court justices said, death is different --
15   we have to really be careful.
16   A.   Absolutely.
17   Q.   And I think you've already --
18   A.   And that's the point that I'm trying to make is do I
19   believe in the death penalty?  Absolutely.  I believe that, you
20   know, you talked about how far the capital murder in our laws
21   have gone back and I believe it's all biblically based.  So --
22   and I think that's one reason why I don't have problems with
23   the death penalty as I do believe that there is biblical
24   grounds for it, but I also believe that you have to treat it
25   with the respect and the diligence that it demands.

48

1    Q.   All right.  You've answered my question.  Now, let's
2    talk about the mechanics here and understanding of words.
3    Reaching the death penalty is a little bit different procedure
4    than in non-death penalty case.  In a non-death penalty case
5    the trial has two phases.  The first phase, did the person
6    commit the crime he's charged with.  If he's found guilty, then
7    you go to the second phase of the trial, which deals with
8    punishment.  And you hear evidence on that issue that you may
9    not have heard at the first stage of the trial.  Then at the
10   end of the evidence, the jury's given a charge and they're
11   asked to decide a punishment and they go back and they talk --
12   they say the range of punishment is two to ten years and they
13   go back and say, okay, we write five years, and they write
14   five, maybe they recommend probation, whatever, but they write
15   something on the verdict form and make a decision and write it
16   directly on a piece of paper and give it to the judge.
17          The death penalty case, that's no juror or the
18   foreman of the jury is not ever gonna write the word life or
19   death on a piece of paper.  I've got a little bit of a problem
20   with that, but that's what it is.  Instead the Court is going
21   to give you two questions, these special issues that Mr. Skurka
22   introduced you to.  And basically, those special issues set the
23   conditions which must be met before the life or death are
24   authorized.  And those conditions are determined by the
25   legislature our law makers who we voted and put in office,

49

1    okay?

2              So let's -- so basically, there's three

3    conditions that must be met before a person can get the death

4    penalty in Texas.  What is the first one?

5        A.    The first one is here.

6        Q.    The first one is he has to be found guilty of the

7    crime.

8        A.    Okay.

9        Q.    All right.  So once -- if a jury finds a person

10   guilty of capital murder, the case goes into a second phase.

11       A.    Now, may I ask a question?

12       Q.    Sure.

13       A.    They -- every time they're discussed, they seem to

14   linked.  The first phase is immaterial if it's capital murder

15   or murder or robbery or whatever.  Is this did he do it or not;

16   is that correct?

17       Q.    The first phase in any kind of criminal case is --

18       A.    Guilty or innocence.

19       Q.    Did the State prove its case beyond a reasonable

20   doubt; did he do it?

21       A.    Okay.  So after that, then it goes to the second

22   phase --

23       Q.    Which deals with --

24       A.    -- which deals with life or death.

25       Q.    Right.  Punishment.

50

1        A.    Punishment.

2        Q.    Okay.  Second stage is punishment.  And since these

3    special issues relate to punishment, that's why they're in the

4    second phase.  And you can -- and the -- you can make your

5    evidence relevant to these issues.  Both sides can offer

6    evidence and argue the evidence.  At some point the jury will

7    ask to be -- will ask -- will be asked to answer those

8    questions.

9              Okay.  So what is the second condition which

10   must be met before a person can get the death penalty?

11       A.    This one, the probability.

12       Q.    That he would commit criminal acts of violence in the

13   future?

14       A.    Correct.

15       Q.    How many votes of the jury are required to answer

16   that question yes?

17       A.    I have no idea.

18       Q.    Twelve, unanimous.

19       A.    Okay.

20       Q.    All votes against the defendant have to be unanimous.

21       A.    Okay.

22       Q.    The judge will instruct you, however, in this kind of

23   case there's an exception to the unanimous vote rule.  If ten

24   jurors vote no, the foreman of the jury is authorized to return

25   the verdict of no.  What happens -- oh, and the judge will also

51

1    instruct you that if this Special Issue No. 1 is answered no,

2    your deliberations will stop and you'll hand the verdict to the

3    Court.  What punishment will be imposed at that time?

4        A.    I have no idea.  I'm assuming life.

5        Q.    That's right, exactly right.  Because that question

6    has to be answered yes whether the death penalty is authorized.

7    Since you've answered it no, there's no reason to go forward,

8    right?

9        A.    Correct.

10       Q.    All right.  Let's say that the jury, however, answers

11   that question yes.  Okay.  And I believe from your early --

12   your answers to Mr. Skurka that you -- I think in your

13   questionnaire here that the likelihood that a person would

14   commit criminal acts of violence in the future is an important

15   consideration for you?

16       A.    Yes.

17       Q.    And that's one of the reasons for having the death

18   penalty, I think you said, right?  Yes?

19       A.    Yes.

20       Q.    All right.  So let's say the jury has answered that

21   question yes and then you're told to go to this question.  Now,

22   let's look at that question.  It's off to your right here.

23   Would you please read the question to yourself and tell me when

24   you're finished.

25       A.    Okay.

52

1        Q.    Okay.  The question asks you to determine if there

2    are mitigating circumstances that would justify a life sentence

3    rather than a death sentence, right?

4        A.    Uh-huh.

5        Q.    But it also asks you to consider certain things?

6        A.    Uh-huh.

7        Q.    If I ask you to consider something, what am I asking

8    you to do?

9        A.    Consider the circumstances or --

10       Q.    To consider means to think about --

11       A.    Yeah.

12       Q.    -- with a view toward giving effect to, okay?

13       A.    Okay.

14       Q.    Would you consider this -- and I'm asking you to

15   consider certain information with a view that you may take some

16   action, perhaps, that I'm asking?

17       A.    Okay.  Fair enough.

18       Q.    All right.  So what does it direct you to do?  Now,

19   keep in mind these considerations the legislature didn't just

20   think these up by themselves.  They're really directed by the

21   Supreme Court of the United States that have been incorporated

22   into this issue.  Well, the first thing is the circumstances of

23   the offense.  Well, you've already been through that at the

24   first stage of the trial, right, and you found the person

25   guilty?

53

1    A.   Okay.

2    Q.   And then it says the defendant's character and

3  background.  If I say that you are a person of good character,

4  what am I saying?

5    A.   It's --

6    Q.   Let me ask you this.  Do you have -- I'm sure you

7  have many friends, but I'll bet you've got a best friend,

8  right?

9    A.   Uh-huh.

10    Q.   Is that person a person of good character?

11    A.   Yes.

12    Q.   What do you mean by that?

13    A.   Trustworthy, high morals, basically has the same

14  views that I have.

15    Q.   Okay.

16    A.   Ethics.

17    Q.   So character relates to moral values, doesn't it,

18  ultimately?

19    A.   Yeah.

20    Q.   And every society has a general set of rules of right

21  and wrong and we all kind of agree in plight?

22    A.   More or less.

23    Q.   Yeah.  They're set out in the Ten Commandments, the

24  Boy Scout Law, and those kind of things.  And when you say a

25  person has good character or bad character, it's the degree to

54

1  which he adheres to or deviates from that standard; do you

2  agree?

3    A.   Correct.

4    Q.   What about background, what does that mean?  That's

5  pretty simple.

6    A.   Upbringing, anything that's happened in the past.

7    Q.   Social history?

8    A.   Yeah.

9    Q.   Now, let's see.  I think you've got a couple of kids,

10  right?  They're all grown?

11    A.   Uh-huh.

12    Q.   And did your kids get to visit Africa?

13    A.   Pardon?

14    Q.   Did your kids go to Africa?

15    A.   Uh-huh.

16    Q.   How old were they?

17    A.   Three and five.

18    Q.   And how long did you stay?

19    A.   Nine years.

20    Q.   Wow.  Well, I'm sure that had a big impact on their

21  perspective on the world, did it not?

22    A.   Yes.

23    Q.   So would it be fair to say in your own family, that

24  your two children, growing up had substantial contact with

25  their parents?

55

1    A.   Absolutely.

2    Q.   And their church?

3    A.   Actually, no.

4    Q.   No.  Okay.  Where does a child pick up and learn

5  what's right and what's wrong?

6    A.   From parents, from family situations.

7    Q.   Are there other sources that could be family?  Could

8  it be school, teachers, church?

9    A.   Peers.

10    Q.   Peers.  Somehow you reach the age of majority and you

11  hopefully know what to do, right?

12    A.   (Nodding head up and down.)

13    Q.   So do you agree that parental influence is important

14  in a young person's life?

15    A.   Yes.

16    Q.   All right.  Let's talk about the next consideration,

17  personal moral culpability of the defendant.  What does that

18  mean?

19    A.   I would say that would be in the defendant's

20  understanding of where they are morally.

21    Q.   Well, let's say --

22    A.   Understanding of right and wrong.

23    Q.   Okay.  This is not easy.

24    A.   Uh-huh.

25    Q.   It's easy to read the words but to articulate what

56

1  they mean is a little more difficult.

2          Let's say you're on the jury, and let's say you

3  hear evidence that when the defendant was growing up, his --

4  his father used to beat him and do all kinds of awful things to

5  him, okay?  You know, wouldn't let him go to school and all

6  kind of terrible things, and you felt like that was

7  significant.  And you felt like that that was a mitigating

8  circumstance that would justify a life sentence in the

9  particular case you were hearing.  But your fellow juror says,

10  now, wait a minute, Ms. Light.  You know, a lot of people grow

11  up and their fathers are mean to them, you know, and they don't

12  go around committing murder.  How would you justify your

13  reasoning that the child's bad upbringing was a mitigating

14  circumstance?

15    A.   I would -- they're absolutely right, not everybody

16  does.  That doesn't diminish the fact that some do.

17    Q.   Okay.

18    A.   I mean, it's --

19    Q.   What's wrong with the fellow juror's statement who

20  says, "Well, you know, people -- a lot of people grow up in bad

21  circumstances.  That's no excuse."  You see, the problem is

22  when you say, "that's no excuse," that's not the question.

23  We're not asking you does the mitigating circumstance provide a

24  defense to the case.  You've already found that he's guilty,

25  you see?  We're not asking whether it's a defense.  We're

57

1 asking whether it relates to his personal moral culpability.

2     A.   In this initially was asked open-minded and I would

3 say that this is the part where you have to have the most open

4 mind.

5     Q.   I agree. All right. Let me give you one more

6 example and then I'm gonna get on to a couple of other things

7 and we'll be finished.

8         About a year ago there was a case tried in

9 this courthouse that was a case of the defendant was a lady

10 who was a professional prostitute, had been since she was a

11 teenager. And on the -- on the day in question, she lured a

12 customer to her motel wherever she did her trade, and the

13 purpose was to rob the customer. And her pimp was in the room

14 and when the guy resisted, he was -- I think he was either

15 shot or stabbed, I can't remember. The evidence also showed

16 in that case that she was not caught right away, but in the

17 period when she was not, you know, under arrest, she committed

18 another similar robbery. This time the victim was not

19 injured. He had just got some money taken, pretty aggravating

20 circumstances. However -- and she was found guilty fairly

21 quickly by the jury. However, during the punishment stage of

22 the trial the defense attorneys were able to prove up that

23 when this defendant was 12 years old, her mother put her out

24 as a prostitute. Her mother was her first pimp. So -- and

25 that fact was argued as a mitigating circumstance to lessen

58

1 her moral culpability.

2         Why would that lessen her moral culpability

3 that her mother put her out as a prostitute?

4     A.   As we discussed earlier that parents have a very

5 strong influence on a child's character.

6     Q.   So when you're talking about moral culpability, it

7 involves -- first of all, you have to ask yourself does the

8 person know what the rules are, did he have an opportunity to

9 learn them in the first place. And then, second is, what was

10 the reason that he deviated from those rules, okay? Like

11 Mr. Skurka gave you the example of the two burglary cases. One

12 guy was stealing to feed his starving children. The other guy

13 was stealing to buy drugs. Okay. Why would -- why would the

14 person who was stealing to feed his starving children reduce

15 his moral culpability? Stealing is stealing, burglary is

16 burglary.

17     A.   Honestly, it's probably something you can relate to

18 as a person being in similar situation.

19     Q.   Okay. Well, in that case, was the man stealing for

20 his children faced with competing moral values? One value says

21 it's wrong to break into people's homes and steal, and the

22 other one says that it's wrong to make your kids starve to

23 death?

24     A.   Absolutely.

25     Q.   And we can empathize with that, can we not?

59

1     A.   Uh-huh.

2     Q.   That's just one example. Okay. I think you

3 understand. In fact, I know you understand.

4         Right to trial by jury is a right to an

5 impartial jury. An impartial juror is one that comes to the

6 task with no prejudgments, an open mind, and hopefully, with

7 no leanings towards one side or the other. A leaning is a

8 bias. Sitting here right now do you see -- is there any

9 reason that you know of that we may not have asked you about

10 that would keep you from being a fair and impartial juror in

11 this case?

12     A.   No.

13     Q.   I noticed that you've been the victim of a theft a

14 while back?

15     A.   Yeah. Back in my 20s, my house got burglarized. We

16 were on vacation. They came in, stole some things.

17     Q.   Would that experience transfer to this case?

18     A.   No.

19     Q.   Okay. You can see -- sometimes I defend from time to

20 time, a burglary of a habitation, and so when we're picking the

21 jury I say, "How many people on the jury panel have their had

22 their houses broken into?" Gosh, half the room raises their

23 hand so that causes me great stress because I don't want to see

24 the person on the jury who is so angry about his personal

25 situation that he's gonna transfer that anger to my client.

60

1     A.   Yeah. It was, like I said, a long time ago.

2     Q.   Okay. So it's not gonna affect you?

3     A.   No.

4     MR. JONES: Okay. That's it.

5     THE COURT: All right. Mrs. Light, why don't

6 you wait in the jury room. We'll be right back with you. Let

7 me speak to the lawyers.

8     VENIREPERSON NO. 65: Thank you for the cough

9 drop.

10     THE COURT: Oh, you're welcome.

11     MR. SCHIMMEL: Your Honor, the State will

12 accept this juror.

13     THE COURT: All right.

14     MR. JONES: We will also.

15     THE COURT: All right. Bring her in.

16     MR. JONES: That's No. 8, is it not?

17     THE COURT: That's No. 8.

18     (Venireperson enters courtroom.)

19     THE COURT: All right. Mrs. Light, you have

20 been selected to be on this jury. I know I've told you

21 already but let me reiterate the instructions. You know,

22 you've said you haven't heard anything about this case, and

23 that's fine. We don't want you watching the local news or

24 reading the local section of the paper while this case is

25 going on, because with all due respect with the media, they

61

1  don't always get it right.  We really want you just to
2  consider what you hear here, okay?
3            JUROR NO. 8:  Okay.
4            THE COURT:  Two, you can't talk to anybody
5  about the facts of this case.  If someone tries to talk to
6  you, say no.  After the case is over with, maybe, but until
7  then, no, okay?
8            And we expect this trial to begin December
9  1st.  Be prepared to block off at least that week.  The second
10 week is a possibility.  If anything changes, we'll let you
11 know, but we'll keep in touch with you just to confirm when
12 it's gonna happen, okay?
13           JUROR NO. 8:  Okay.
14           THE COURT:  All right.  Thank you very much.
15           JUROR NO. 8:  Thank you.
16           MR. SKURKA:  Thank you, ma'am.
17           (Venireperson exits courtroom.)
18           THE COURT:  All right.  That's No. 8.
19           Now, I've got to tell you, there's a couple of
20 things we need to talk about.  One, there's a lady from later
21 on in the week.  I know Ann probably brought that up to you
22 guys.
23           MR. JONES:  Which one?
24           THE COURT:  I don't remember what her name is
25 and I don't know if she's put it here.

62

1            MR. JONES:  Is there a problem?
2            THE COURT:  But we need to talk about maybe
3  tomorrow.
4            MR. SKURKA:  We don't know which one you're
5  talking about, Judge.
6            THE COURT:  Let me ask Ann.  She can come
7  tomorrow, and my point is, we may have to fit her in tomorrow.
8            The second thing is I think we bit way off
9  than more we can chew here.  There's 13 jurors and I did slow
10 us down by 15 minutes, but we're hitting the 10:00s and we
11 have an 8, three 8:30s and two 10s and they're all there.
12           THE BAILIFF:  No. 64 is here now.
13           MR. SKURKA:  I was hoping we had some
14 agreements on some of the other ones today.
15           THE COURT:  But we don't?
16           MR. JONES:  We haven't seriously gotten into
17 it.
18           MR. SKURKA:  I think there's four that we can
19 lose today for one reason or the other.
20           MR. JONES:  I think 71 was one of them.
21           MR. SKURKA:  Right, 71 is one.
22           THE COURT:  I guess my only point is this.  If
23 we need to start calling off afternoon people, most notably,
24 the 3:00s, it's real easy to do right now and reschedule them
25 for tomorrow or something.  You know, we might want to start

63

1  thinking about that.
2            MR. SKURKA:  Well, I think the ones that I
3  have that are possible ones this morning and I think there are
4  others --
5            THE COURT:  Let me talk to Ann about this.
6  Maybe you-all can visit for just a second.  Let me talk to her
7  about which juror that is and I'll be right back.
8            (Recess.)
9            THE COURT:  All right.  Let's get back on the
10 record.  A housekeeping matter, I mentioned that other juror
11 who I understand I got notes here, and this is Juror No. 144,
12 Linda Sonnevelt, and I got notes from Mr. Garza and Mr. Skurka
13 that you would agree to excuse her?
14           MR. GARZA:  That is correct, Your Honor.
15           MR. JONES:  That is correct.
16           MR. GARZA:  144.
17           MR. SKURKA:  That's correct, Your Honor.
18           THE COURT:  I know we've gone on a series of
19 people that, in my opinion, who are very fair and I understand
20 case in point.
21           MR. JONES:  She's almost a perfect juror.
22           THE COURT:  I agree.  I think she's going to
23 give this case a good, fair look.  But how are we looking this
24 morning with some of these folks?  Do we have any so that I
25 can -- I mean, I --

64

1            MR. SKURKA:  We'll agree on 71, Judge.
2            MR. GARZA:  That's correct.
3            THE COURT:  Okay.  Let's bring 71 in there.
4            THE BAILIFF:  We still have 60.
5            THE COURT:  Yeah, we're gonna excuse this
6  person.  Do we have 71 here?
7            THE BAILIFF:  Yes.
8            (Venireperson enters courtroom.)
9            THE COURT:  All right.  You are Debra Cotter;
10 is that right?
11           VENIREPERSON NO. 71:  Yes, sir.
12           THE COURT:  All right.  Ms. Cotter, you're
13 gonna get out of here quick today.
14           VENIREPERSON NO. 71:  Okay.
15           THE COURT:  You were not selected to be on
16 this jury, but we do appreciate your time.
17           VENIREPERSON NO. 71:  Okay.
18           THE COURT:  If you need a work excuse the
19 bailiff can do that for you.
20           VENIREPERSON NO. 71:  Okay.  Thank you.
21           THE COURT:  All right.  That's that one.  Why
22 don't we bring in Linda Hite.  She would be an 8:00.
23           THE REPORTER:  What number?
24           THE COURT:  That would be No. 70.
25           (Venireperson enters courtroom.)

65

1       THE COURT:  Come forward.  You are Linda Hite?

2       VENIREPERSON NO. 70:  Yes, sir.

3

4           VENIREPERSON NO. 70,

5           LINDA M. HITE,

6           VOIR DIRE EXAMINATION

7  BY THE COURT:

8       Q.   All right.  Let's see here.  All right.  Here's the

9  situation.  I think you know we're looking to pick a capital

10 murder jury and we're looking for open-minded people.

11      A.   Okay.

12      Q.   Some people aren't because maybe they've heard

13 something in the media and for maybe just for whatever reason

14 they're not open-minded and you agree it would be unfair to get

15 somebody on the jury like that?

16      A.   Right.

17      Q.   And it's okay if you're not, but if you are

18 open-minded, that's also okay, but we do need to know.  Can you

19 keep an open mind?

20      A.   Yes.

21      Q.   Okay.  All right.  That's one.  Two, we're looking

22 for people that can follow the law.  Let's see here.  We're

23 gonna see if that is you.  You have never been a juror before?

24      A.   No, sir.

25      Q.   That's okay.  No prior experience necessary, okay?

66

1       Now, I want to talk about some things.  The

2  law says this.  The law says -- it's a criminal case.  The law

3  says, State of Texas, you brought the charges, okay?

4       A.   Okay.

5       Q.   You brought the charges, State of Texas, you've got

6  to prove your case, all right?

7       A.   Okay.

8       Q.   You think that's fair?

9       A.   Yes.

10      Q.   Okay.  And as part of that, the defendant doesn't

11 have to prove anything, okay?  The defense side has no burden,

12 all right?

13      A.   Right.

14      Q.   They brought it, you prove it.  And as part of that,

15 the defendant is presumed to be innocent.

16      A.   Right.

17      Q.   And the law says, look, you brought the charges,

18 State, that's fine if you can prove it.  But until you do,

19 until you bring evidence to the people of this community that

20 proves beyond a reasonable doubt -- we'll talk about that in a

21 minute -- that this defendant is guilty of the crime and he did

22 it, you could follow that?

23      A.   Yes.

24      Q.   And we have -- on jury selection we do somewhat of a

25 silly example, but that is, if you had to vote right now, how

67

1  would you vote.  Now, some jurors say, well, I couldn't vote

2  because I haven't heard anything.

3       A.   Right.

4       Q.   And then others -- really, the right answer to that

5  is he's not guilty.

6       A.   Right.

7       Q.   Because you haven't heard anything, okay?  The fact

8  of the matter is we never -- we would never ask a juror to do

9  that.  That's a -- that's a nonsensical question.  But what we

10 would ask a juror to do is wait till after the State's put on

11 their evidence and then make a determination and sometimes

12 State's evidence isn't any good, okay?  And if you don't find

13 the -- that -- if you find that they haven't proven their case,

14 would you -- could you still presume him to be innocent until

15 they prove it?

16      A.   Yes.

17      Q.   Okay.  Now, as part of that, the burden in this case

18 is high.  It's beyond a reasonable doubt.  You've probably

19 heard that, you may remember that from government class and you

20 may remember that from, I don't know, maybe you're a -- you're

21 a buff.  It's the highest burden that we have in all of the law

22 and it's their burden, okay?  And it's -- what it is, is

23 sometimes it's easier to explain what it isn't to tell you what

24 it is.  In civil law, we have a burden of proof.  In most civil

25 cases it's preponderance of the evidence is like just ever so

68

1  slightly.

2       A.   Okay.

3       Q.   All right.  Let's say there's a car accident or let's

4  say there's a dispute between companies over a contract and the

5  plaintiff brings the case saying the other side violated.

6  Well, it would be their burden of proof, but it would be ever

7  so slight.

8       A.   Okay.

9       Q.   Okay?  Then there's also a higher burden called clear

10 and convincing evidence, okay?  Clear and convincing evidence

11 is pretty self-explanatory.  That's clear and convincing.  That

12 sounds pretty strong, okay?  But that -- that's the burden in

13 some civil cases, and most notably, when the State seeks to

14 terminate the parental rights of a parent over a child, okay?

15 Because maybe the State believes they have been a bad parent,

16 all right?  So they have to prove by clear and convincing to

17 the people.

18      A.   Okay.

19      Q.   All right.  This is even higher.  This is beyond a

20 reasonable doubt.  It's higher than clear and convincing.

21      Now, also what it's not, it's not beyond all

22 doubt.  It's not beyond a shadow of a doubt.  There's a key

23 word in that and that's reasonable doubt, beyond a reasonable

24 doubt.  Okay.  That kind of gives you an idea of what it's not

25 to tell you what it is, all right?

69

1     A.   Uh-huh.

2     Q.   Now, they have to prove that. As part of these

3   concepts I've already covered, the law says since the defendant

4   has no burden of proof and the burden never shifts over here,

5   they don't have to present any evidence. They being the

6   defendant. They don't have to put on testimony. The State

7   certainly does. If the State -- if we go to trial and the

8   State puts on no evidence, they don't prevail. But on the

9   defense side, they don't have to present evidence. They can

10   present no evidence and still prevail because the jury may

11   think the State hasn't proven their case. And as part of that,

12   the law says -- it's more than the law, it's the U. S.

13   Constitution says, defendant doesn't have to testify, okay?

14   And I believe there's a lot of reasons why that would be so.

15   Perhaps his lawyers say, "You know what, we're advising you not

16   to testify because we don't think they've proven their case."

17   Or perhaps -- I like to give the example, I had a friend who

18   laughed inappropriately when he got nervous, okay? And people

19   would get offended by it and he didn't mean anything by it. He

20   was nervous, okay? Some people aren't meant -- they're not

21   good speakers.

22     A.   Right.

23     Q.   And the jury may take it wrong and maybe, in their

24   opinion, the defense opinion, they tell him, "I don't think you

25   should testify because you're not -- some people are good

70

1   communicators, others are not."

2     A.   Right.

3     Q.   But the law says, in any event, not only can the

4   State call the defendant, not only does he have a right not to

5   testify, but you can't hold it against him. In other words,

6   you can't go back to the jury room and say, "Okay, let's weigh

7   this. Let's see, State's evidence, Defendant. Oh, he didn't

8   testify. Okay, that helps the State." You can't do that.

9   Could you follow that law and not hold it against him?

10     A.   Yes.

11     Q.   All right. Very good. Now, what kind of case is

12   this? Well, it's a capital murder. What does that mean?

13   Murder is in capital murder so we know it's at least murder,

14   right? Murder is intentional taking of a life of another.

15   Capital murder is I like to call murder plus. The legislature

16   has laid out a list of things that make capital murder. So you

17   got murder, which is the intentional taking of the life, and

18   then you have capital murder, special circumstances murder plus

19   something else. In this case, State is alleging that the

20   defendant committed murder while in the course of committing or

21   attempting to commit a robbery, okay? So it's all -- two

22   serious felonies put together. And the legislature says, all

23   right, if you can prove these two serious felonies at the same

24   time, then we -- we -- that's capital murder.

25     All right. And what is the significance of

71

1   capital murder? Well, the capital part means the death

2   penalty is a possibility. And what I just said is important

3   because it's possibility. There's two possible outcomes if a

4   defendant is found guilty of capital murder and there's other

5   ways to prove it, but in this case, that's the allegation,

6   okay? Life in prison or the death penalty. Those are the

7   only two things that can happen.

8     Now, a murder case -- in a murder case, there

9   is a punishment range, all right? It's five years to 99 years

10   or life, and sometimes probation is a possibility, okay? But

11   here we have life or death.

12     Now, criminal cases in Texas have to two

13   parts. They have the guilt or innocence phase. We go to

14   trial, the jury deliberates on whether the State's proven

15   their case and they return a verdict. And then there's the

16   punishment phase. What does the defendant get as the

17   punishment if he's found guilty? If the defendant is found

18   not guilty, the case is over with. Are you with me?

19     A.   .   Uh-huh.

20     Q.   All right. Now, let's assume this was a murder case.

21   If this was just a murder case -- and I don't know any other

22   way to say it but just plain murder as opposed to capital

23   murder. If the defendant is found guilty at the first stage,

24   you go to the punishment phase. If jury is asked to assess

25   punishment, the jury goes through and they look at the

72

1   background of the defendant, maybe, his criminal history, and

2   the facts of the case, all right? And they come up with a

3   number. It may be -- it may be ten years, maybe 50 years,

4   maybe even probation, if ten years or less is a possibility and

5   certain circumstances exist. They can assess a fine. That's

6   how that works. Capital is different. Yes, we do have the

7   guilt or innocence phase. The jury would deliberate as to

8   whether a defendant is guilty beyond a reasonable doubt of

9   capital murder. There's a lot of elements to that because you

10   have two crimes, okay? They've got to prove them all.

11     Would you hold them to that burden to prove

12   all the elements of the capital murder?

13     A.   Uh-huh.

14     Q.   Yes?

15     A.   Yes.

16     Q.   That's that. Okay. If we get to the second phase,

17   one would think, because of the example that I gave you about

18   murder that you had you'd say, the jury would go back and

19   deliberate and write in the little line life or death. But it

20   doesn't work like that, okay? We answer questions. And here's

21   the first one.

22     At punishment, the jury would answer this

23   question. "Is there a probability that the defendant would

24   commit criminal acts of violence that would constitute a

25   continuing threat to society?" Is he probably gonna be violent

73

1  to people in the future? Okay. That's basically what that is.

2  A. Okay.

3  Q. We call at the future dangerousness. The jury would

4  answer yes or no. If you don't think he's gonna be violent to

5  people in the future, then you'd answer no. But if the jury

6  believes that, then they answer yes. Then they go on to the

7  second question. Special Issue No. 2. "After taking into

8  consideration all of the evidence, including the circumstances

9  of the offense" -- that's the first part of the trial -- "the

10  defendant's character and background, and the personal moral

11  culpability of defendant, is there a sufficient mitigating

12  circumstance or circumstances to warrant a sentence of life

13  imprisonment rather than the death sentence be imposed?" Okay.

14  Now, what does this mean? Well, this is more of a global

15  question in a way. It's like taking into consideration

16  everything you hear in this case, the first part of the case

17  and the second part. At the second part you might hear all

18  kinds of things. You might hear the defendant's got a bad

19  criminal history. You might hear he's got no criminal history.

20  You might hear he's a great guy. You might hear he's not a

21  great guy. And you may hear a bunch of things about his past,

22  you know, what was he like as a child, how did he grow up,

23  because you've got, you know, background there. We talk about

24  his character, his personal moral culpability, okay? And so

25  you hear everything.

74

1  Now, you see that word -- there's a word

2  "mitigating circumstance" or "circumstances," all right? What

3  is that? Well, that's for the jury to decide. Maybe the

4  jurors may think, I don't know, he was an Eagle Scout. That

5  may be a mitigating circumstance. Maybe he did work in the

6  community. You know, really other than that day, he was a

7  great guy. You know, he did community service. He taught

8  children to read, okay? These are all possible mitigating

9  circumstances. And these lawyers will try and tell you what

10  they believe a mitigating circumstance in this case or an

11  aggravating circumstance in this case may be. But only the

12  jury gets to decide what that actually is. And so then the

13  jury decides whether there are sufficient mitigating

14  circumstances, because the jury may say, you know what, I do

15  think that's a mitigating circumstance that he was an Eagle

16  Scout. And the question becomes is there -- is that

17  sufficient? Is all of the mitigating circumstances that the

18  jury, you know, comes up with, are they sufficient to warrant

19  life rather than death? Because you might find that there are

20  mitigating circumstances, but it may not be sufficient to

21  warrant life or death taking the entire case as a whole,

22  everything that you hear, okay? You follow me?

23  A. Uh-huh.

24  Q. All right. And then, of course, you know, his

25  character. What's that? Well, what kind of guy is he, is he a

75

1  moral guy, is he not a moral guy? Is he ethical, is he not

2  ethical, okay? His personal moral culpability. That can be

3  looked at several different ways, but, you know, what's his

4  ethical background like. It's kind of a funny way of putting

5  it. If you found him guilty, but how guilty is he, okay? All

6  right. You'd answer those two questions and you'd answer that

7  yes or no just like this one.

8  At the beginning of every trial, I raise my

9  right hand, the jurors raise their right hand and I say, "Do

10  you solemnly swear you can render a true verdict based on the

11  law and the evidence given to you?" And then the jury says,

12  "Yes." I need to ask you -- and we're gonna break it down in

13  parts -- could you take that oath to render a true verdict,

14  based upon the evidence and law presented to you, on the guilt

15  or innocence phase?

16  A. Yes.

17  Q. Okay. Let's get to the second part. This gets a

18  little trickier for some people, okay?

19  A. Okay.

20  Q. Some people tell me, "Look, I can do that on the

21  guilt or innocence. I can determine whether the State's proven

22  their case beyond a reasonable doubt that he's guilty of

23  capital murder. What I cannot do is participate in the second

24  part because it may lead to someone's death, and I cannot do

25  that for whatever reason." Some people tell me, "Likewise, I

76

1  can give them a fair trial on the guilt or innocence phase, but

2  when we get here to these special issues, if we get there, I

3  don't care about your law. I'm gonna figure out a way to

4  vote -- I'm not gonna consider any of this. This is nonsense

5  to me. I'm only -- I'm gonna figure out a way to vote so that

6  he gets the death penalty, because if he gets found guilty of

7  capital murder, that's death for me every time." All right.

8  Neither of those people can take the oath because they would

9  not answer these questions truthfully, all right? They

10  wouldn't consider them properly. I need to know if you can

11  take that oath.

12  A. Yes.

13  Q. And give these questions the consideration that they

14  deserve?

15  A. Yes.

16  THE COURT: Okay. All right. Well, I'll turn

17  you over to Mr. Skurka.

18  MR. SKURKA: Thank you, Judge.

19  VOIR DIRE EXAMINATION

20  BY MR. SKURKA:

21  Q. Good morning, Mrs. Hite. How are you today?

22  A. Fine.

23  Q. We're gonna talk about some things here in a few

24  minutes and I want to tell you there are no right or wrong

25  answers to anything we talk about. I'll be the assistant DA

77

1  presenting the case along with Geordie Schimmel. And we don't
2  want you answering the questions the way you think the judge
3  wants to hear it or we want to hear it, or the defense wants to
4  hear it. We just want to hear your views on certain things.
5     A.   Right.
6     Q.   Would you do me a favor and move that microphone a
7  little closer to you. It's kind of in my way and maybe I can
8  hear your voice a little better. You have kind of a soft
9  voice, okay?
10    A.   Tell my husband that.
11         (Laughter.)
12    Q.   (BY MR. SKURKA) Well, maybe they say in the courtroom
13 you have a soft voice. At home, it's a different matter. I
14 know, my wife tells me the same thing. She goes, "You're using
15 your courtroom voice," and I go, "Well, sorry."
16         Tell me about being on this type of jury. Tell
17 me about how you felt when the judge said that this is a
18 capital murder case. Remember that day when there's two or 300
19 people in there and nobody knew what they were called for the
20 till the judge says, "This is a criminal case and that
21 defendant right there may be facing death penalty." Tell me
22 what your first reaction was when you first heard that.
23    A.   It was kind of -- I don't know. I guess, you know,
24 maybe my heart kind of stopped a minute, because it would be a
25 big -- it's a big responsibility. You're kind of holding

78

1  somebody else's life in your hands, and you know, so I just
2  kind of had to, you know, took a deep breath and thought a
3  minute.
4     Q.   What did you think?
5     A.   I think, like I answered on my questionnaire being,
6  you know, born and raised a Catholic, I was always taught God
7  is the only one that has the right to take a life. And I
8  always thought that I would dread if I would ever get to this
9  point. And we had a pastor one time and he -- he said he was
10 taught in the seminary that if someone knowingly takes a life
11 that they have lost all right to their life. Looking at it
12 that way, I could -- if evidence proved it, I could vote for
13 the death penalty.
14    Q.   Tell me about this. How did that conversation with
15 your priest come up? Was that like in --
16    A.   It was in a homily.
17    Q.   -- a sermon, a homily or was it like a one on one
18 thing?
19    A.   No, it was in a homily.
20    Q.   And how long ago was that?
21    A.   About five years.
22    Q.   Okay. I was just wondering if it was something that
23 like happened recently or something?
24    A.   Oh, no. It was about five years ago.
25    Q.   Was that here in Corpus or --

79

1     A.   No, sir.
2     Q.   -- when you lived somewhere else?
3     A.   It was when I lived in Florida.
4     Q.   Okay. Sometimes people think -- and you said you
5  were born and raised a Catholic, correct?
6     A.   Yes, sir.
7     Q.   I'm the same way and I understand that the Catholic
8  church has never -- are you aware of any kind of, I don't know
9  if they call it catechism or doctrine, where they just come out
10 and say -- I mean, like abortion, for example, you know it
11 says, we're against abortion?
12    A.   Right.
13    Q.   But have you ever heard the Pope or some kind of
14 edict coming out of the Catholic church from Rome that says the
15 Catholic church is the against the death penalty?
16    A.   We do teach that, yes, the Catholic church is against
17 the death penalty.
18    Q.   I mean, based on what? What I'm saying is --
19    A.   I honestly don't know if it is in the catechism.
20    Q.   See, that's what I was thinking?
21    A.   That would be something interesting since my husband
22 and I do teach RCIA.
23    Q.   Oh, you teach RCIA?
24    A.   Yes, sir. That is something I would have to look up.
25    Q.   For the record, RCIA is where you're converting into

80

1  Catholicism --
2     A.   Correct.
3     Q.   -- and you teach a class. I was just trying to help
4  the other folks out who may not be Catholic.
5     A.   Right.
6     Q.   Just on the record.
7     A.   Right.
8     Q.   And I don't want to -- it's kind of a debate I've had
9  with certain people that say -- they say, "Well, the Catholic
10 church is against it." And I go, "Well, where is that written?
11 Where is that said?" You know, you get these ecumenical edicts
12 coming out of the Vatican so often, but I've never just seen
13 that.
14    A.   Honestly, I can't say that I have either.
15    Q.   Is it something you kind of assume they're against
16 it?
17    A.   I think, well, you know, if we're against abortion,
18 which is killing a life --
19    Q.   Sure.
20    A.   ---- then it only stands to reason that you would be
21 against capital punishment.
22    Q.   Would you agree with me, though, there's a difference
23 between abortion and capital punishment?
24    A.   Yes, most definitely.
25    Q.   Yeah, sure. That's what I've always tried to pin

81

1 people down, and I haven't talked to a priest about that. I'm
2 always curious when people say they're against the death
3 penalty because I think Catholics are like a lot of other
4 religions where you still have to obey the law of the land, you
5 know?
6 A.    Exactly.
7 Q.    And the law is pretty clear, you don't kill people.
8 A.    Right.
9 Q.    And even though you Catholics don't want to take
10 lives just like anybody else, they see that it may be necessary
11 in some circumstances.
12 A.    Uh-huh.
13 Q.    Have you worried about this for a long time -- not
14 worried, that's not the right word. But you've always kind of
15 assumed in your life as a Catholic that they were against it
16 and it's only when this priest said for the first time --
17 A.    Exactly.
18 Q.    -- that that changed you?
19 A.    Right. Well, it made a little more sense. I think
20 always before then, I had just thought that there wasn't any --
21 you know, you didn't think about what happened that the murder
22 was committed. It was just you cannot -- you don't take a
23 life.
24 Q.    Sure.
25 A.    You don't take -- you know, it says, an eye for an

82

1 eye so.
2 Q.    Right.
3 A.    But I said after he had said that, it -- it made a
4 little bit more sense.
5 Q.    So essentially, what they're saying is, you're not
6 supposed to take a life, but if there's a reason for it, like a
7 law or a process in doing it, because when you said that if you
8 take a life, you lose all your rights?
9 A.    What he said if you knowingly take a life -- and I
10 guess what I -- what my mind is thinking, if someone committed
11 a -- was going to commit a robbery and their thought process
12 was, "I will do whatever it takes to get what I'm after," then
13 you're saying, you knowingly took the life. If that was not --
14 which, you know, what happened, and say you -- I don't know,
15 you robbed a store or something, and somebody came in behind
16 you. Your intent was not to kill, but it just happened, then,
17 to me, that's different.
18 Q.    And let me tell you, the law says it's kind of that
19 way too. Let me give you a couple of examples. Say a person
20 has gone into the store, a convenience store, to steal a candy
21 bar, and that's all they wanted to do was steal a candy bar.
22 They have no weapons on them, they have nothing on them. All
23 they want to do is shoplift a candy bar. Okay. Change the
24 scenario around and somebody says they're gonna go steal
25 something from the store but they have a gun on them.

83

1 A.    Right.
2 Q.    And they know that this person may resist at this
3 store. I mean, those are two different examples, right?
4 A.    Right, right.
5 Q.    Because if you went without a weapon it's kind of
6 unforeseen --
7 A.    Right.
8 Q.    -- that somebody's gonna die. But if you go in there
9 with a knife or a gun, you can't say, "Hey, I didn't know
10 anybody was gonna get hurt."
11 A.    Right.
12 Q.    I mean, it's not like you're going in there and
13 you're gonna go forge a check and somebody's gonna get hurt.
14 You know nobody's gonna get hurt when you're forging a check.
15 But when you go in there with a weapon, you can see that's
16 foreseeable.
17 A.    Uh-huh.
18 Q.    That's a big word the law uses. Is it a foreseeable,
19 inevitable thing that could possibly happen. You can't just
20 say, "Well, I didn't know anybody was gonna get hurt," and
21 you're packing a gun or a knife.
22 A.    Right.
23 Q.    Tell me about -- you seemed pretty strong in the
24 Catholic faith because of what you do. Is there gonna be any
25 kind of lingering thing in the back of your mind because of

84

1 that making that kind of decision because you said -- and I
2 agree with you, it's an awesome responsibility. How do you,
3 Linda Hite, feel about sitting on a jury having to make that
4 decision? And do you feel whether you can or cannot make that
5 decision?
6 A.    I could make the decision. If all evidence was
7 provided, proven that the murder was committed -- I mean, that
8 the murder was committed because, you know, they had the intent
9 that they were gonna get whatever and the murder happened, I
10 could live with myself. If that was not proven, no, I could
11 not.
12 Q.    So you're saying if the killing was kind of
13 incidental --
14 A.    Like you said, if a robbery was committed and, you
15 know, the weapon was not there, if they pick up something and
16 beat them over the head and it kills them, they -- you know,
17 the intention was not there that they hadn't -- you know, were
18 going to kill somebody. But you're packing a gun, you go into
19 rob someplace, your intent is you're gonna get what you want --
20 Q.    Whatever --
21 A.    -- regardless.
22 Q.    The law in Texas -- you always hear this on TV,
23 pre-meditated murder. Premeditated. You've heard of that,
24 right?
25 A.    Right.

85

1    Q.   Have you ever heard the judge ever say premeditated
2    here?
3    A.   No.
4    Q.   And you know why?  We don't have that requirement
5    premeditated.  Premeditated to me means you planned it out.
6    A.   You thought about it.
7    Q.   You thought about it.  You've spent some time
8    dwelling on it, how you're gonna do it.  In the law, we don't
9    have that.  What we have is do you have the intent to do it.
10   That intent can be formed in three days, in three hours, in
11   three minutes, in three seconds.  You can go into like -- we'll
12   just use that same story -- into a convenience store and you
13   didn't really intend to kill somebody.  But say you go in there
14   and you rob them and you're leaving.  All you wanted to do was
15   rob them.  So you're robbing them and you're walking out the
16   door and then you realize, hey, wait a minute, I left a witness
17   alive, that guy could testify against me, and so you go back
18   and kill the guy.  When you first went in the store you didn't
19   intend, you didn't premeditate and think you're gonna kill
20   somebody, but it kind of arose at the time.  And the law says
21   that's intentional murder because whether you planned it or
22   not, you did do it, and you had the intent to kill somebody,
23   because it may have been, you know, a split second decision or
24   walking out going, "Oh, my gosh, that's a witness, who can
25   testify against me."  See what I'm saying --

86

1    A.   Right.
2    Q.   -- that could be the intent.
3         Going back to the religious aspect though -- and
4    again, I'm not trying to pin you down.  I just want to kind of
5    know where you're coming from because everybody has a right to
6    their decision.  We've had people here on the jury that come in
7    and they say, "Hey, Mark, you know, I believe in the death
8    penalty, it's a good law.  I think Texas should have it and
9    it's a good law to have on the books and it deters criminals.
10   I'm for the death penalty.  But, Mark, don't make me sit on a
11   jury and make that decision.  I can't do it.  I believe it but
12   I can't do it."
13        Tell me how you feel about that, how that fits
14   in your character or your decision making and whichever way
15   you say is fine.
16   A.   No, I -- I mean, it's not something that you're
17   jumping up and down with joy, I'm gonna be on a jury.  But at
18   the same point in time, knowing myself, I would want someone
19   like me to sit on the jury because I'm gonna take it a little
20   bit -- not that others are gonna take it less seriously, but I
21   think I'm gonna look at the evidence a little bit harder to see
22   that that was proved, that the intent was there.
23   Q.   So -- and I agree with you, not everybody's jumping
24   for joy for doing this.
25   A.   Right.

87

1    Q.   But from my perspective --
2    A.   I understand.
3    Q.   I mean, I've told you-all the very first day that our
4    office has decided to seek the death penalty.
5    A.   Right, right.
6    Q.   And we're not talking about somebody you see on TV or
7    read about in the newspaper.  That's him.  Can you look at the
8    young man with me?
9    A.   Right.
10   Q.   That's John Henry Ramirez, not somebody else.  That's
11   him.  I want to know if you, Linda Hite, if you think the
12   evidence is there, can you look at him and vote in such a way
13   after the evidence is heard, that if you think the evidence is
14   there, that you could vote for death penalty?
15   A.   Yes.
16   Q.   And no hesitation there?
17   A.   No.
18   Q.   Okay.  And I have to ask you the other way, if you
19   think you can -- he should get a life sentence, can you do
20   that?
21   A.   Yes.
22   Q.   Do you know how Texas does the death penalty?
23   A.   No.
24   Q.   They do lethal injection.
25   A.   Okay.

88

1    Q.   Basically, what that means is a person, on the day
2    they're supposed to be executed, the guards come in and get him
3    and they take him down there and they kind of have a last meal,
4    then they walk down this hallway to this special unit where
5    they put him in this room, and the room has a gurney on it like
6    a hospital bed thing, and they have some, I guess, rubber tubes
7    or hoses that lead through a window to the other thing, so the
8    person injects them, doesn't just go stick a needle in his arm.
9    They have these tubes that kind of go in an IV and they feed
10   him these poisons, or not poisons, medicines, that actually
11   kill him.  And that's what's gonna happen to this man that's
12   smiling over there.  He can be led down that hall strapped down
13   to a gurney --
14        MR. GARZA:  Your Honor, I'm gonna object to
15   that comment made in front of this juror about him smiling.
16        THE COURT:  Sustained.
17        MR. GARZA:  And I'm gonna object to the
18   pointing of the -- of what's gonna happen to him.  He's
19   already making a presupposition that he's proven the case to
20   this juror, Your Honor.
21        THE COURT:  Sustained.
22        MR. GARZA:  That's a --
23        THE COURT:  Sustained.  I mean, look, here's
24   the deal --
25        MR. GARZA:  Can we excuse the juror, Judge?  I

89

1    would like to take a motion up in front of the Court and

2    outside the presence of the jury?

3              THE COURT:  Okay.

4              MR. SKURKA:  What do you need to do that for,

5    Judge, if the objection's sustained?

6              THE COURT:  Well, I'll let you do that.  If

7    you could just give us --

8              MR. GARZA:  Well, let me just ask this, Judge.

9    Can ask the juror to disregard that comment?

10             THE COURT:  I will.  I will.

11             VENIREPERSON NO. 70:  Sure.

12             THE COURT:  I mean, the fact of the matter is

13   -- and I like the answer that you gave a little while ago.  I

14   appreciate the fact that you're taking this seriously, I

15   really do, because while a good number of people do, some

16   people do not.

17             VENIREPERSON NO. 70:  Right.

18             THE COURT:  And this is a serious, serious

19   situation, and we all -- and, of course, nobody in here is

20   laughing.  You know, we're all taking this very seriously.  I

21   would instruct you to disregard those comments.  He is not

22   guilty at this time until the State can prove it, if they can.

23             VENIREPERSON NO. 70:  Right.

24             THE COURT:  We don't know if they can.

25             VENIREPERSON NO. 70:  Right.

90

1              THE COURT:  So there is no presupposition that

2    he is going to be found guilty.

3              VENIREPERSON NO. 70:  Right.

4              THE COURT:  And that -- that --

5              VENIREPERSON NO. 70:  It's like the example

6    you gave.  I mean, I don't know what's going through his mind.

7    It may have been nervousness, again, like you said.

8              THE COURT:  Well, that's true.  Some people --

9    I had a friend, boy, he would laugh inappropriately.  People

10   would get angry with him and he wouldn't mean any harm.  It's

11   just the way he was.

12             VENIREPERSON NO. 70:  Right.

13             THE COURT:  All right, Mr. Garza?

14             MR. GARZA:  Thank you, Your Honor.

15             THE COURT:  All right.  You may proceed,

16   Mr. Skurka.

17             MR. SKURKA:  Thank you, Judge.

18        Q.   (BY MR. SKURKA) What would happen if you went to

19   church Sunday before you started jury service and you had a

20   different priest, and for some reason that homily talked about

21   the death penalty and that priest says, "I just came back from

22   a seminar meeting with the Bishop and the other Cardinals or

23   whatever, and you know, it's gonna come out in the church that

24   the church is gonna take an official position that we're

25   against the death penalty, and I don't know what they're gonna

91

1    do."  But I'm just kind of curious if that would affect you

2    then being on this jury?  And again, whatever answer you say is

3    fine.

4         A.   No, I really don't think so.  You know, it's -- gosh,

5    it's hard.  I don't think so, because like I said, it always

6    before I was like, no, I could never do that.  But after, you

7    know, I say, Father Marty's homily, and he was somebody I

8    really liked, I mean, as far as priest goes, so, no, I think I

9    could still go on.

10        Q.   Even if the priest said that it was not --

11        A.   Right.

12        Q.   -- that it was against their policy?

13        A.   Right.  A life was taken.  I mean, I don't know

14   whether it was intentionally or not but it's still happened

15   regardless of what the church says or does not say, so I could

16   still go on.

17        Q.   And that's my bottom line.  Is your feelings with the

18   church or the church's policies gonna interfere with you

19   serving on a jury?

20        A.   No.

21             MR. SKURKA:  Okay.  Thank you, ma'am.  That's

22   all the questions I have.  Thank you, Your Honor.

23             THE COURT:  All right.  Mr. Garza.

24             MR. GARZA:  Thank you, ma'am.  I mean, thank

25   you, Judge.

92

1                   VOIR DIRE EXAMINATION

2    BY MR. GARZA:

3         Q.   Ms. Hite, I'm Ed Garza as I introduced myself

4    probably back when the whole group came down and we had you-all

5    fill out these questionnaires and gave you some general

6    concepts of the law.

7              In Texas, our rules require that whenever a

8    person is charged with a crime, and if they so ask for a jury

9    trial, that the jury be fair and impartial.

10        A.   Right.

11             THE COURT:  I think we need to take a little

12   break.  I need to take a little break.  Can you wait in the

13   jury room?

14             VENIREPERSON NO. 70:  Sure.

15             THE COURT:  All right.

16             MR. SKURKA:  Judge, the State will exercise a

17   peremptory strike.

18             THE COURT:  Okay.  That would be your strike

19   No. 3.  All right.  Let's bring her back in.

20             (Venireperson enters courtroom.)

21             THE COURT:  All right.  Ms. Hite, we really

22   appreciate you coming down here but you are not selected to be

23   on this jury, but we do appreciate your time and attention of

24   this case.  Thank you very much.

25             VENIREPERSON NO. 70:  Thank you.

93

```
 1            THE COURT:  If you need a work excuse, we can
 2   get that for you.
 3            VENIREPERSON NO. 70:  No, I'm good.  Thank
 4   you.
 5            THE COURT:  Thank you.
 6            (Venireperson exits courtroom.)
 7            MR. SKURKA:  I was trying to get your
 8   attention.
 9            MR. GARZA:  That's okay.
10            THE COURT:  I appreciate that.  I mean, if
11   you're gonna strike her, there's no point in us spending a
12   bunch of time if you're gonna strike her anyway.
13            Okay.  We have David Kocian, bring him in.
14   This is Juror No. 64.
15            (Venireperson enters courtroom.)
16            THE COURT:  All right.  You are David Kocian,
17   is that right?
18            VENIREPERSON NO. 64:  Kocian, uh-huh.
19
20                  VENIREPERSON NO. 64,
21                  DAVID CHARLES KOCIAN,
22                  VOIR DIRE EXAMINATION
23   BY THE COURT:
24       Q.   Mr. Kocian, we called you off on Friday, and I'm
25   sorry about that, but at least you didn't have to come all the
```

94

```
 1   way down here.
 2       A.   I was pulling into the parking lot at the time, but
 3   that's okay.
 4       Q.   I'm sorry.  Okay.  All right.  Well, you obviously
 5   know we're trying to pick a capital murder jury at this time?
 6       A.   Correct.
 7       Q.   Okay.  And we are looking for people that can be fair
 8   and impartial, and most notably, we're looking for people that
 9   can keep an open mind, okay?  And some people can't, and that's
10   okay, but it's really not okay.  It's not fair to the parties
11   if you can't, okay?
12       A.   Right.
13       Q.   My first question is, can you keep an open mind about
14   this case?
15       A.   Yes.
16       Q.   Okay.  Next, we're looking for people that can follow
17   the law, and we're gonna talk to you about that, all right?
18            Now, let's see.  You've never been on a jury
19   before.  That's okay.  No prior jury service necessary to sit
20   on this jury.  But we do need to talk about some concepts.
21            First of all, this being a criminal case, the
22   State has brought charges, okay?  The law says, "State, you
23   bring charges, that's fine, but you've got to prove them, all
24   right?"  You don't just get to -- you don't just get to say
25   defendant is guilty and it's so.
```

95

```
 1       A.   Right.
 2       Q.   Obviously, there are countries in the world where
 3   that's the case and defendant has to prove his innocence.  I
 4   think that would be a sad place to live, quite frankly.  We
 5   don't do that here.  The law says, you bring them, you prove
 6   them.  Do you agree with that law?
 7       A.   I do.
 8       Q.   Okay.  The law also says that the burden is proof
 9   beyond a reasonable doubt.  There's no definition.  But what I
10   like to do with jurors is sort of explain what's not, and that
11   gives us an idea of what it is, all right?
12       A.   Okay.
13       Q.   Civil case.  Let's say this was a civil case.  Let's
14   say Company A sues Company B over a contract, all right?
15   Company A would be the plaintiff.  They're bringing the case.
16   They would have the burden of proving that Company B violated
17   the contract, all right?
18       A.   All right.
19       Q.   But it's pretty much a pretty small burden.  It's
20   just tipping the scales ever so slightly.  Some people call it
21   51 percent.  It's kind of like probably, all right?  More
22   likely than not, but nothing else, all right?
23       A.   All right.
24       Q.   A higher burden than that is clear and convincing
25   evidence and that's got -- that in and of itself sounds -- you
```

96

```
 1   know, it kind of tells you what it is, clear and convincing,
 2   all right?  That's a higher burden than the 51 percent thing.
 3   And that's the kind of burden that we use in some civil cases,
 4   most notably, where the State is attempting to remove children
 5   from what the State believes are bad parents, all right?  They
 6   have to prove to the people of the jury by clear and convincing
 7   evidence, okay?  This is higher than that.  This is beyond a
 8   reasonable doubt, okay?  What it is not also is it's not beyond
 9   a shadow of a doubt, it's not beyond all doubt.  It's beyond a
10   reasonable doubt.  And I think the most important word in that
11   phrase is reasonable, beyond a reasonable doubt.  A high
12   burden, but not beyond all doubt.  Do you follow me?
13       A.   Yes, sir.
14       Q.   Okay.  Could you hold the State to that burden?
15       A.   Yes, I could.
16       Q.   Okay.  Now, as part of all of this, the law says,
17   okay, State, you've brought charges, that's fine, you've got to
18   prove them.  And until you do, defendant is innocent until if
19   you can prove the charges, okay?
20       A.   Correct.
21       Q.   You presume him to be innocent until they can prove
22   otherwise, if they can, okay?  Ancient concept goes back to the
23   Roman and the Greeks.
24       A.   Right.
25       Q.   All right.  Could you do that?  Could you --
```

97

1    A.    Yes, I could.

2    Q.    All right.  And we give an example around here that's

3    not a real world example, but the example is, if you had to

4    vote right now, how would you vote?  Well, the answer's not

5    guilty because they haven't proven anything.

6    A.    Right.

7    Q.    In a more real world situation we would begin the

8    trial and the State would present their evidence, and what

9    would happen if they could not prove to you beyond a reasonable

10   doubt the defendant's guilt?

11   A.    It would be not guilty.

12   Q.    Because they didn't get there?

13   A.    Correct.

14   Q.    Okay.  Now, as part of that, the law, the

15   Constitution of the United States says defendant does not have

16   to do anything, and he does not even have to testify.

17   A.    Right.

18   Q.    Okay.  His lawyers may advise him not to testify.

19   Maybe he's not a good speaker, maybe he's uneducated.  There's

20   lots of reasons.  But the fact of the matter is, State can't

21   call him as a witness, and if he doesn't want to testify, he

22   doesn't have to.

23   A.    Right.

24   Q.    Now, some people say, "Well, you know, I've got to

25   hear both sides of the story."  It just doesn't work like that,

98

1    okay?  This is not both sides of the story.  This is not a race

2    to the finish line.  The defendant is not running himself.

3    This is a race that the State is trying to win.  The State is

4    trying to cross the line of reasonable doubt.  And if they

5    can't do it, they don't get there, okay?

6         The law says, "Jury, not only does he not have

7    to testify, but you can't go back there and hold it against

8    him."  You can't go in that jury room and deliberate and say,

9    "Okay, here's the State's stuff.  Now, defense didn't testify.

10   Okay.  We're gonna give State some more points."  You can't do

11   that.

12   A.    Right.

13   Q.    Would you follow that law and not hold it against the

14   defendant if he chose not to testify?

15   A.    Yes, I would.

16   Q.    Okay.  Now, let's talk a little bit about this case

17   and what this case -- what the allegations are about.

18        The allegation is capital murder.  All right.

19   The defendant's charged with capital murder.  What is capital

20   murder?  Well, murder is within capital murder so it's

21   obviously murder, okay?  And what is murder?  Murder is the

22   intentional taking of the life of another.  But it's capital

23   murder, so what does that mean?  Well, I like to call it murder

24   plus, murder plus something else.  All right.  And there's a

25   laundry list that the legislature has given us instances in

99

1    which murder is a capital murder.  In this particular case, the

2    State is alleging that it's murder while in the course of

3    committing or attempting to commit a robbery, okay?  What's

4    robbery?  Well, robbery is the forcible taking of something

5    from another person or the threat to do so, okay?  If I went up

6    to you and I, you know, pulled a gun on you and said, "Give me

7    your wallet," and you gave me your wallet, well, that would be

8    a robbery, right?

9    A.    Correct.

10   Q.    Okay.  If I went up to you and I had that same gun,

11   and I said, "Give me your wallet," and you were a martial arts

12   expert and you punched me in the face and knocked me out, it

13   wouldn't necessarily be robbery, but it would be an attempted

14   robbery.  Do you follow me?

15   A.    Correct.

16   Q.    Okay.  The State can get there either way on a

17   robbery or attempted robbery, okay?  But what the law says is

18   this.  The legislature says this, "If you've got the murder

19   plus the robbery or attempted robbery, that is, the murder

20   happens in the course of committing or attempting to commit the

21   robbery or attempted robbery, then you've got capital murder."

22   There's a laundry list of things that they have to prove, the

23   elements, that is.  They've got to prove all of murder, they've

24   got to prove the robbery or attempted robbery.  They've got to

25   prove that he was the one that was the perpetrator, and they

100

1    got to prove in Nueces County, Texas, and they've got to prove

2    the on or about the date, okay?

3    A.    Right.

4    Q.    Would you hold the State to that and make them prove

5    all their elements?

6    A.    Yes, I would.

7    Q.    Okay.  All right.  Now, what makes capital murder

8    significant?  Well, the capital part means that the death

9    penalty's a possibility.  Now, in Texas, we have a bifurcated

10   system.  What does that mean?  Well, that means there's two

11   parts.  There's the first part which is guilt or innocence.

12   The State will try to prove to the jury beyond a reasonable

13   doubt of the defendant's guilt.  And if they do, then we go on

14   to the punishment phase.  If they don't, the case is over with.

15   The jury says not guilty, game over.  If the jury says, guilty,

16   we go to the second part and that's the punishment phase.

17        Now, the punishment phase -- let's say this

18   was a murder case, it would work exactly the same way in the

19   guilt or innocence phase.  If defendant's found guilty of

20   murder, then the jury would go in the jury room and then

21   there's a range of punishment, five to 99 years or life, up to

22   a $10,000 fine.  Probation is an option, in certain

23   situations, okay?  And then the jury would come up with a

24   punishment.

25        We don't do it that way in capital murder.  In

101

```
 1   capital murder, there's only two possibilities; one is life in
 2   prison and the other is death.  But you don't go back there
 3   and write life in the little blank or death in the little
 4   blank.  It doesn't work like that.  You answer questions.
 5   Here's the first one, it's over here over your left shoulder.
 6              "Is there a possibility that the defendant
 7   would commit criminal acts of violence that would constitute a
 8   continuing threat to society?"  Well, what does that mean?
 9   Well, would the defendant probably be violent with people in
10   the future?  Is he gonna be a violent person to people in the
11   future and the jury would answer yes or no.  Is that probably
12   true, okay?
13              Then the jury would go to the second question
14   that's over your right shoulder.  Now, this to me, is sort of
15   a global question.  "After taking into consideration all of
16   the evidence, including the circumstances of the offense" --
17   that's the first part of the trial -- "the defendant's
18   character, and background, and the personal moral culpability
19   of the defendant, is there a sufficient mitigating
20   circumstance or circumstances that warrant a sentence of life
21   imprisonment rather than a death sentence be imposed?"  All
22   right.  What does that mean?  Well, second half of the trial
23   -- first half all you're gonna hear about is, you know, the
24   allegation, and Mr. Skurka's gonna try to put on evidence to
25   show that the defendant was guilty of the crime.  The second
```

102

```
 1   part of the trial you hear a lot of other stuff, I suspect.  I
 2   don't know.  But I suspect you're gonna hear things like,
 3   did he have a criminal history, did he not.  Is he -- has he
 4   been a good guy other than this day, has he been a bad guy
 5   other than this day, you know.  And those are -- those are all
 6   -- you need to consider all of those things in answering those
 7   questions, okay?  So we've got the circumstances of the
 8   offense, we have the defendant's character.  You know, what
 9   kind of guy is he?  Is he a good guy, all right?  Was this --
10   was this crime an aberration, was this crime just completely
11   out of his character, his background?  What -- how did he grow
12   up, you know?  What kind of -- what kind of background did he
13   have?  Did he have loving parents, did he have parents that
14   were horrible?  That kind of thing, okay?  His personal moral
15   culpability.  What is -- what was his -- what was the basis
16   behind him forming his moral values?  How did his parents
17   bring him up, okay?  How guilty is he?  Now, we know he's
18   guilty, but how really guilty is he of this crime, okay?  Are
19   you following me?
20       A.   Yes, sir.
21       Q.   And you've got to consider all of those things.  Now,
22   once you consider all of those things, then is there sufficient
23   mitigating circumstance or circumstances?  What is a mitigating
24   circumstance?  Well, these lawyers will try and tell you what
25   they think the mitigating circumstance is, but a mitigating
```

103

```
 1   circumstance only the jury gets to decide, okay?  That is,
 2   let's say it is presented that the defendant was an Eagle
 3   Scout.  Maybe one of the jurors will say, "You know what, that
 4   is a mitigating circumstance.  I'll consider that."  Another
 5   juror says, "No, that's not a mitigating circumstance to me,"
 6   okay?  And the question then becomes, have enough sufficient --
 7   have enough mitigating circumstances been presented to you in
 8   the trial to warrant life rather than death if we get to this
 9   point, okay?  Do you follow me?
10       A.   Yes, sir.
11       Q.   In other words, you might think, "Hey, you know what,
12   he did community service, you know, he used to teach kids to
13   read.  And that is a mitigating factor and I am gonna consider
14   it."  And you may think it is sufficient that combined with the
15   other mitigating factors or mitigating circumstances that are
16   presented to you, you may think, it is sufficient.  Or you may
17   say, "Yes, that's a mitigating circumstance, but it's not
18   enough to warrant life rather than death," and the jury would
19   answer this question yes or no, okay?
20       A.   Yes, sir.
21       Q.   Okay.  Next thing, at the beginning of the trial, I
22   always -- I always raise my right hand, the jurors raise their
23   right hand, and I swear them in and the oath goes like this.
24              "Do you solemnly swear that you will render a
25   true verdict based upon the law and evidence presented to you
```

104

```
 1   in this trial?"  And they say yes.  I need to know if you can
 2   take that oath and let's break it up.  Can you, on the guilt or
 3   innocence phase, render a true verdict based upon the law and
 4   evidence as presented to you?
 5       A.   Yes, I can.
 6       Q.   Okay.  Let's go to the second phase.  If defendant's
 7   found guilty by the jury, you know, I have to ask the same
 8   question.  And some people tell me, I could do the first part,
 9   but I can't do the second because I cannot participate in any
10   process that may lead to someone's death.  And then some people
11   tell me, I'll give him a fair trial, but if he gets convicted,
12   these special issues mean nothing to me.  I will not consider
13   all of these things.  I will answer the questions in such a way
14   that the defendant will get the death penalty without
15   considering any of this.  And really, neither of those --
16   neither of those people are following the law and neither of
17   those people can take the oath, and it's okay for them to feel
18   that way.  It's just unfair to put somebody on a jury that
19   won't follow the law.
20       A.   That's true.
21       Q.   Okay.  So I need to know from you, can you take that
22   oath and follow the law?
23       A.   Yes, I can.
24              THE COURT:  All right.  Mr. Skurka.
25              MR. SKURKA:  Thank you, Judge.
```

105

VOIR DIRE EXAMINATION

BY MR. SKURKA:

3      Q.    Hi, Mr. Kocian, I'm Mark Skurka, I'm first assistant
4  DA along with Geordie Schimmel who had to step out for a
5  minute.  We'll be the ones presenting the case to you.  I want
6  to start off by telling you there are no right or wrong answers
7  to anything you say.  We just need to know how you feel about
8  some of the laws and the issues in this case.  I don't want you
9  to answer in such a way that you think, well, I better say it
10 this way because the judge wants me to say it that way or I
11 want you to say it that way, or the defense wants you to say it
12 that way.  We just want to know what your true feelings are so
13 we can make a decision and help the judge make a decision
14 whether you qualify or not?
15     A.    Okay.
16     Q.    Fair enough?
17     A.    Fair enough.
18     Q.    I told you-all the very first day the State is
19 seeking the death penalty in this case.  Do you remember you're
20 in that big room with all those people?
21     A.    Uh-huh.
22     Q.    And the judge came out and said, "This is a capital
23 murder case, folks.  This person could be facing the death
24 penalty."  How did you feel about that when you first heard it
25 was that kind of case?  What was the first reaction you had?

106

1      A.    I actually didn't have a reaction.  I was just
2  listening to exactly what you had said.  I don't know anything
3  about the case so it's -- I believe if a person has done a
4  crime, he needs to do the time, and so, I really didn't have a
5  reaction to what you said.
6      Q.    The reason I ask is because I was watching some of
7  the jurors.
8      A.    Right.
9      Q.    And there was kind of a ripple through the crowd, so
10 to speak, when they heard, some said, "Oh, my gosh, I may have
11 to be having to make that kind of decision."  Some people were
12 going like, "Oh, my gosh."  And then some people were maybe
13 like you that, you know, sat up a little straighter, listened a
14 little closer, "Hey, this is serious stuff, I better pay
15 attention."  Is that kind of how you felt?
16     A.    Yes, I did.
17     Q.    And it doesn't matter how you feel.  And those people
18 that have a reaction it's because they think that they can't
19 serve on that type of case.  They come in here thinking they're
20 gonna do, you know, a DWI case or shoplifting case.
21     A.    Right.
22     Q.    And they find out, boom, they got the biggest one.
23     A.    Right.
24     Q.    But that didn't bother you or make you hesitate or
25 anything?

107

1      A.    No, sir.
2      Q.    Okay.  Nobody wants to do this.  You know, I can tell
3  you pretty much nobody -- none of our jurors are claiming like,
4  "Hey, pick me, pick me," and it's not a happy thing to do or
5  make decisions.  But put yourself in my perspective, in my
6  side.  I want somebody that's actually gonna go through with it
7  if the evidence calls for that.  Can you be that kind of juror,
8  if the evidence proves that he should get the death penalty,
9  can you vote for it?
10     A.    Yes, I can.
11     Q.    Do you see what I'm saying?  I need people that can
12 kind of not just talk the talk, but walk the walk.  Because we
13 have people that say, "Hey, Mark, I believe in the death
14 penalty, it's a good law, we should have it in Texas.  I fully
15 support it."  And then I say, "Well, okay, then you're gonna
16 sit on a jury."  And they go, "Wait a minute, I don't want to
17 be the one that actually does it."
18     A.    That's right.
19     Q.    You see what I'm saying?  But you wouldn't have any
20 reservations or holding back on that because of any personal
21 feelings or anything?
22     A.    No, sir.
23     Q.    It sounds to me what you're saying is the law is the
24 law?
25     A.    That's right.

108

1      Q.    And if a person commits the crime you said he does
2  the time.  The only thing I have to caution you about there is
3  certainly nothing automatic in the courtroom.
4      A.    That's right.
5      Q.    Just because he's here, does that mean he's guilty?
6      A.    No, it does not.
7      Q.    Just because he's found guilty of capital murder,
8  does that mean he automatically gets the death sentence?
9      A.    No, it does not.
10     Q.    That's right.  It means, there's two choices, death
11 or life in prison.  There's a presumption in the law that says
12 a person is presumed innocent.  The State has to prove he's
13 guilty beyond a reasonable doubt.  Whether that's him, you,
14 anybody sitting out there, the State has to prove him guilty
15 beyond a reasonable doubt.
16          Now, the presumption of innocence means that
17 he's presumed innocent at this time.  It doesn't mean that he's
18 necessarily is innocent.  He's got to start with innocence and
19 then we have to prove him guilty.  You see what I'm saying?
20     A.    Yes, sir.
21     Q.    Sometimes jurors -- the lawyers ask a question like
22 well, right now, "If you had to vote, how would you vote?"  And
23 they go, "Well, I don't know, I don't have enough information
24 to vote."  And really, you have to vote innocent because you
25 have heard nothing.

109

```
1     A.   That's right.
2     Q.   Can you have that in your mind that he's presumed
3   innocent at this time?
4     A.   Yes, sir.
5     Q.   And, you know, I don't mean to sound corny, but you
6   know, that's America.  In other countries, I've heard that, you
7   know, you're guilty and then you have to prove you're
8   innocence.
9     A.   That's right.
10     Q.   But that's not the way we work here.  Another thing
11   we have here is the Fifth Amendment right.  Just because you're
12   accused of a crime, does that mean you can be forced to testify
13   against yourself?
14     A.   No, you can't.
15     Q.   Heck, no.  The law says, no, that's kind of the
16   cornerstone of our foundation.  Sometimes jurors say, "But I
17   want to hear both sides.  I want to hear both sides, Judge, and
18   I can't make a decision unless I hear from him.  I want to hear
19   what he said, because if I was charged, I'd want to hear."
20   Well, I'd want to be able to say it and that's not the law.
21   The law says you can testify if you want to, but if you don't
22   want to, you don't have to.  And, more importantly, the jury
23   can't hold it against him.  Do you believe that?
24     A.   Yes, I do.
25     Q.   I think the judge made an example.  Sometimes people
```

110

```
1   don't testify well because they're nervous in public speaking
2   or whatever?
3     A.   That's right.
4     Q.   Whatever it is.  And I don't -- I can't tell you if
5   he's gonna testify or not.  That's up to him and his lawyer,
6   but I can tell you if he doesn't testify the judge is gonna
7   tell you under the law, you can't hold that against him.  Can
8   you follow that part of the law?
9     A.   Yes, I can.
10     Q.   Okay.  One of the things about, you know, doing the
11   crime and doing the time is that there's such a range.  Like if
12   you're on a regular say burglary case, in a burglary case, the
13   range of punishment is generally two years to 20 years in
14   prison.
15     A.   Right.
16     Q.   And the range is that wide because some jurors -- I'm
17   sorry, some cases fit at the top, some fit at the bottom?
18     A.   Right.
19     Q.   And in this kind of a case it's a little different in
20   that you have two choices.  You don't just pick out death or
21   life in prison.  You have to listen to the evidence and make a
22   decision.  And the reason, of course, this is capital murder,
23   is because not every murder is eligible for the death penalty.
24   Did you know that before you came in last -- a couple of weeks
25   ago?
```

111

```
1     A.   I didn't know exactly what distinguished a murder
2   trial from a capital murder trial until you-all had told me
3   about it.
4     Q.   And that's understandable because a lot of people
5   don't understand.  They think every murder case is eligible for
6   the death penalty, and I have to tell them no.  The legislature
7   has said only those really more serious murder cases, as I
8   think the judge said life -- I'm sorry, murder plus something
9   else, killing a policeman on duty, you know, killing a kid
10   under six, murder for hire, serial murders, or murder while
11   you're raping, robbing, kidnapping or burglarizing somebody.
12     A.   Yes.
13     Q.   In other words, it can't -- I hate to say plain or
14   run of the mill murder.  It's got to be something a little
15   extra.  So people say, "Well, you know, I'm for the death
16   penalty."  You understand the State's already carves out just
17   very few cases that can get the death penalty?  Not every
18   murder can get it.  And I guess -- well, I'm not gonna tell you
19   why the legislature thinks that, but I think the point is if
20   you're gonna have a capital murder case, it better be a very
21   serious case.
22     A.   Yes, sir.
23     Q.   And just because you're charged with it doesn't mean
24   you're necessarily gonna get it or you're gonna get the death
25   penalty because there's another option, life in prison.
```

112

```
1        So the reason we have it here is because we're
2   alleging that Mr. Ramirez killed somebody or murdered somebody
3   while in the course of committing robbery, in the course of
4   committing robbery or attempting to commit robbery.  In other
5   words, it doesn't even have to be a successful robbery,
6   completed robbery.  As long as you try to take something by
7   force, or with threats of force, that's a robbery.
8        Say a guy goes in a bank and points a gun on a
9   bank teller and says, "Give me all your money," and the bank
10   teller gives them the money and then they start walking out of
11   the bank and they get caught right before they go out on the
12   street.  Well, can he go up there and say, "Well, I'm not
13   guilty.  I didn't finish the robbery, you know, I didn't get
14   away with it."  No.  What if he's right there at the teller
15   and says, "Give me all your money," and the teller, you know,
16   pushes the secret button, and before she even hands over the
17   money, the security guards grabbed the guy.  And he says,
18   "Well, wait a minute, I'm not guilty, I never got any money
19   from that."  It doesn't matter.  That would be silly.  And the
20   law doesn't require that.  It just says while in the course of
21   committing robbery or attempting to commit robbery.
22        And there's two parts of the trial.  The first
23   part is guilt or innocence, and the second part is the
24   punishment.  And we keep those separate because, number one,
25   you should make a decision on whether he did it or not before
```

113

1  you're even thinking about how to punish him, because if he

2  didn't do it, you're not gonna punish him. So there's two

3  parts of the trial first, the first part guilt or innocence.

4          Generally speaking, you only hear evidence

5  about what happened that day, you know, did he do the crime,

6  did he not do the crime. And you might hear some surrounding

7  circumstances about, you know, right before the crime, right

8  after the crime, and during the crime, that kind of stuff, but

9  generally, that's all you hear.

10          The second part of the trial, though, you

11  might get to hear the background of the person. In other

12  words, you probably want to hear the background before you

13  decide how bad the punishment should be, if it should be death

14  or life.

15          Now, the law also says, guess what, you can

16  make the decision based on just the crime itself. If it's so

17  heinous, so horrible, you can make the decision based on that.

18  There's no requirement that you have to be -- what do they

19  call those things -- two strikes you're out or three time

20  losers. There's no requirement of that. All it says is you

21  can consider the evidence at the first part and the second

22  part. And the second part of the trial you might get to hear

23  about stuff. You might get to hear, oh, he came from a broken

24  home, or, you know, his mother was an alcoholic, or you know,

25  he had -- he had trouble in school. Or you may hear the

114

1  opposite. You may hear he's a good guy, that he made straight

2  As in school, or that he was an Eagle Scout, you know. See

3  what I'm saying?

4      A.   Right.

5      Q.   I'm kind of tricking you to say wait till you hear

6  the evidence before you make the decision?

7      A.   Exactly.

8      Q.   And when you make the decision it's not just checking

9  off, I vote for death, I vote for life. What you do is you

10  answer some questions based on everything you hear. And the

11  questions the judge went over them with you. I'm gonna go over

12  them in a little more detail and ask you to look at number one

13  with me.

14          It says -- this is presupposing the person's

15  been found guilty, okay, and you've heard the evidence on the

16  second part of the trial. The judge then says, "Answer this

17  question. Is there a probability that the defendant would

18  commit criminal acts of violence that would constitute a

19  continuing threat to society?" We call that the future

20  dangerousness question. In essence, do you think he's gonna

21  be a danger in the future? The question or the point I want

22  to make to you is look at some of those words up there. It

23  says, "Is there a probability?" It doesn't say there's a

24  certainty because unless you got a crystal ball you can't tell

25  what's gonna happen in the future. The law doesn't require me

115

1  to prove that. It just says is it probable.

2          The law also says, it says, "Would commit

3  criminal acts of violence." Some people tell me, "Well, I

4  thought I could only vote for the death penalty if I think

5  he's gonna murder somebody again or commit another capital

6  murder." And I tell them, "That's not what the law says. It

7  just says commit criminal acts of violence. It could be

8  almost anything."

9          Then the last part says, "continuing threat to

10  society." You probably heard that before, continuing threat

11  to society. What does that mean to you?

12      A.   It means that if the man is not gonna -- that he's

13  gonna continue to threaten people, rob or steal, whatever that

14  that he is into, continue not to become a citizen of the states

15  and abide by their laws.

16      Q.   Okay. That's exactly right. The thing I need to

17  caution you about is sometimes people say this. "Well, you're

18  saying he's gonna be a continuing threat to society." But,

19  hey, remember you've got another choice, life sentence. You

20  could just lock him in prison for life in prison and he can't

21  hurt anybody. He won't hurt anybody if you lock him in prison.

22  And I always say, "Well, have you ever heard about prisoners

23  hurting other prisoners or hurting guards or something?" It

24  sounds a little funny, but prison is still part of society,

25  isn't it?

116

1      A.   Yes, sir.

2      Q.   Because you're interacting with other human beings?

3      A.   Yes, sir.

4      Q.   I mean, it would be different if we had like a desert

5  island. You put them on a desert island and they have no

6  contact with other humans, then for sure you can say, "I'm not

7  gonna hurt anybody." But would you agree with me that prison

8  is part of society and you could still be a threat to society?

9      A.   Yes, sir.

10      Q.   Even if you're in prison?

11      A.   Yes, you can.

12      Q.   It's kind of weird thinking about prison being part

13  of society, but it really is because if you decide society, you

14  know, intermixing with other people and having contact with

15  human beings. Because there's guards there, there's prisoners

16  there, there's workers at the prison, that kind of stuff.

17          Okay. Based on the evidence, you answer that

18  question yes or no, do you think he's gonna be a continuing

19  threat to society and could possibly commit other crimes? If

20  you answer that question yes, you go to the second question.

21  The second question is what we call mitigating circumstances

22  question. Mitigating is a word that basically means to lessen

23  or make less severe. I'm walking a little slow because my back

24  hurts today. I threw out my back this weekend. I don't always

25  walk that way. It just looks a little funny today.

117

1      Mitigating circumstance is the key word.
2   Mitigating means anything that would listen or make less severe
3   or anything that reduces the defendant's moral blameworthiness.
4   It sounds like some lawyer wrote that up, right?
5      A.   Yeah.
6      Q.   And probably did.
7      A.   Yeah.
8      Q.   I like to tell people it's kind of like the opposite
9   of aggravating circumstances. It's not something that makes it
10  worse. It's something that you can consider to give them a
11  lower sentence. You got a couple of kids, right?
12     A.   Yes, I do.
13     Q.   Don't you, when you say you have to punish your kids,
14  don't you look at the whole picture first and their background
15  before they make a decision? I'm gonna give you a deal because
16  I'm sure your kids never did this. But say you have two kids
17  and they're both accused of violating curfew. And in the
18  curfew violation, the first kid comes in and your curfew's at
19  11:00. The first kid comes in at 11:03. You start hammering
20  them and saying, "You're missing curfew. What's going on, you
21  missed curfew?" The first kid says, "Well, dad, yeah, I missed
22  curfew, I'm three minutes late. And the reason I'm three
23  minutes late is because I had a flat tire and I would have been
24  home at 10:45 but because of the flat tire it took me about 20
25  minutes to change it and so that's what it makes me late." And

118

1   then you look back and you say, "Well, you know, in all this
2   time he's had 11:00 curfew, this is the first time he's ever
3   missed curfew." So you may have to punish him because, you
4   know, he did miss curfew, but you're gonna probably listen to
5   all those other circumstances.
6           Now, look at your second kid, and for lack of a
7   better word, this is your bad kid. The bad kid comes in and he
8   doesn't come in at a little after 11. He comes in at 3:00 in
9   the morning, misses curfew by four hours. And then you ask
10  him, "Son, you know, what happened? Why are you so late?" And
11  he says, "Well, we were at a party and we just forgot about the
12  time, I forgot I had to be home at 11, and I don't really have
13  any excuse. I was just partying with my friends and stuff."
14  And then you — and then you talk to him and you realize, this
15  isn't the first time he's broken curfew. This is like the
16  fifth time this year that he's broken curfew. And he didn't
17  miss it, you know, by three minutes. He missed it by four
18  hours. Now, you look at them both and they're both equally
19  guilty of breaking curfew, right?
20     A.   Uh-huh.
21     Q.   But are you really gonna punish them the same?
22     A.   No, you're not.
23     Q.   Why not?
24     A.   One has disregard for your laws, if put it that way,
25  yes.

119

1      Q.   But you see, those things about only three minutes
2   late, never been breaking curfew before, and the fact he had a
3   flat tire kind of had a reason for it, that's mitigating
4   circumstances. That's kind of what that question is designed
5   for. You think he's guilty of capital murder, you think he's a
6   continuing threat to society. But wait. The judge says,
7   "Before you vote for the death penalty, take into consideration
8   all of the evidence, including the circumstances of the
9   offense, you know, what happened that day, how bad was the
10  crime, his character and background. Is it good character and
11  background, is it bad character and background, and the
12  personal moral culpability of the defendant. Is there a
13  sufficient mitigating circumstance?" And it also has got to be
14  enough. It's got to be enough of a mitigating circumstances to
15  warrant that a sentence of life rather than death sentence be
16  imposed. In other words, are there these extenuating
17  circumstances that means that I should lower the punishment?
18  He's still guilty of the crime, but it goes back to death or
19  life in prison.
20     A.   Right.
21     Q.   Some of those circumstances are aggravating, some may
22  be mitigating. But the point the judge is going to tell you is
23  you have to consider everything before you make your mind up.
24  Like if I had started you off by saying, your two kids broke
25  curfew, you'd think, oh, that's bad, I'm gonna punish them.

120

1   I'm gonna ground them each for a week. But then you find out
2   the circumstances are different. It's kind of a trick question
3   because you have to wait till you hear everything, and that's
4   all the judge is gonna say. Can you do that?
5      A.   Yes, I can.
6      Q.   And it makes sense, right?
7      A.   Yes, it does.
8      Q.   Because right now he's presumed innocent?
9      A.   Right.
10     Q.   You don't know if he did it, you don't know what his
11  background is. But the judge is gonna say, "Keep an open mind
12  until you hear everything."
13     A.   Right.
14     Q.   If there is enough to lower the sentence, is it
15  enough mitigating circumstance to lower it, lower it. If you
16  think there's not, you don't have to. The key to this: The
17  judge doesn't tell you what a mitigating circumstance is. It's
18  up to the folks on the jury. You know, some jurors may say,
19  "Well, you know, he was an Eagle Scout in school, he was on
20  honor roll, you know, he was a war hero, helped little old
21  ladies across the street, whatever it is. Because of that, I'm
22  gonna lower the sentence and give him life." Other people say,
23  "Look, you know, I don't care if he was on the honor roll. He
24  still did for this crime and he's got to pay for this crime."
25  Do you see what I'm saying?

121

1    A.    Right, exactly.

2    Q.    But you don't close your mind to these things until

3    you hear everything.

4    A.    Right.

5    Q.    And then if you hear it, is there enough?  That's up

6    to the jury to decide if it's enough to outweigh.  It's kind of

7    a balancing test.

8          One other thing the judge may say on the law is

9    voluntary intoxication is not a defense to crime.  Voluntary

10   intoxication.  If you go get yourself drunk or high on drugs,

11   is that an excuse to crime?  No, absolutely not.  The law does

12   say it's a possible mitigating circumstance, but that's one of

13   those things again.  Some people may say, "Well, he robbed that

14   bank but he was drunk when he robbed the bank so I'm gonna give

15   him a break."  Other people may say, "I don't care if he was

16   drunk or not, he still robbed the bank and he's got to pay for

17   that."  Do you see what I'm saying?

18   A.    Exactly.

19   Q.    Whatever effect it is you have to decide if it's

20   enough to lower the sentence --

21   A.    Right.

22   Q.    -- okay?  Does that make sense?

23   A.    Yes, sir.

24   Q.    It's kind of a fair scheme, isn't it?

25   A.    Yes, I believe it is.

122

1    Q.    You're not gonna rush into anything with the stuff.

2    The judge directs you to these questions, "Is he a continuing

3    threat to society and is there anything that should make him

4    get a lesser sentence?"  Because I think most of the jurors

5    said it's an awesome responsibility.  You don't want to run

6    headlong into something.  You want to be able to make a

7    decision.  And you think you can make that decision, if called

8    upon?

9    A.    Yes, I do.

10   Q.    Would you agree with me, it doesn't really matter

11   what a person looks like?  What really matters is what they

12   did.

13   A.    That's true.  That's true.

14   Q.    Because I'll tell you, sometimes people came into the

15   jury room that day and saw this young man sitting there and

16   they're thinking like, "Oh, my gosh, you know, he's so young,

17   he doesn't look that bad."  And I always say, "Well, can you --

18   you're not supposed to judge a book by its cover," right?

19   A.    That's right.

20   Q.    I've been practicing criminal law for 22 years and

21   juries always think it's gonna be like Charles Manson sitting

22   in there looking real bad and it's really never that way.  Or

23   those big biker looking scary dude.  But would you agree with

24   me you need to make a decision on what they did, not what they

25   look like?

123

1    A.    It would be on the evidence, yes.

2    Q.    It has to be on the evidence.

3          Now, a couple of legal things we need to talk

4    about again are just because he's indicted for capital murder,

5    does that mean he's guilty of capital murder?

6    A.    No.

7    Q.    The indictment is just a way the charges are brought

8    against him.  That doesn't mean that he's necessarily guilty.

9    It just means that we're charging.  As the judge said, we have

10   to prove the case.  And the State has to prove the case beyond

11   a reasonable doubt.  That doesn't mean beyond all doubt or

12   shadow of a doubt or any doubt.  People are always saying on TV

13   -- and it drives me nuts.  They say, "Well, you have to prove

14   it beyond a shadow of a doubt."  This judge is not gonna tell

15   you that.  And the definition he's gonna give just basically

16   means it's not all doubt, beyond any doubt, or anything like

17   that.  And we've already talked, I think, about the presumption

18   of innocence.  As he sits here now he's presumed innocent.  And

19   the Fifth Amendment.  He can testify if he wants to.  If he

20   doesn't want to, he doesn't have to, and you can't hold that

21   against him.

22         I'm trying to think if I have any other

23   questions.  Oh, you understand too that police officers are to

24   be treated like anybody else on the stand?  Sometimes people

25   say, well, he's a policeman, I have to believe everything he

124

1    says.  The law gives policeman no better rights of credibility,

2    you know.  It's like if there's a priest or a nun on the stand,

3    they're still treated like anybody else?

4    A.    That's right.

5    Q.    Can you do that?

6    A.    Yes, I can.

7          MR. SKURKA:  I don't think I have any other

8    questions of Mr. Kocian.  I appreciate you talking to me.  The

9    other lawyer is going to want to talk to you now.

10         MR. GARZA:  May I proceed, Your Honor?

11         THE COURT:  Yes.

12              VOIR DIRE EXAMINATION

13   BY MR. GARZA:

14   Q.    Good morning, Mr. Kocian.

15   A.    Good morning.

16   Q.    My name is Ed Garza.  I think I had previously

17   introduced myself to you and the other members of the jury

18   panel back when we were in the larger group downstairs.

19   A.    Yes, you did.

20   Q.    My co-counsel, Mr. Grant Jones, and our client, John

21   Henry Ramirez.

22         In Texas, under the rules of a criminal trial,

23   we're required whenever a defendant or an accused asks for a

24   jury trial, that he be given a trial by a jury of 12 impartial

25   members.  Do you agree with that rule?

125

1   A.   Yes, I do.

2   Q.   What does impartiality mean to you?

3   A.   To me, it means that it's gonna have to proven to me,

4   without a doubt, without a reasonable doubt, that he was -- the

5   crime was committed by him.

6   Q.   Would you agree with me that it sort of requires you

7   to come to the job, come to the situation, come to the task

8   without any preconceived notions?

9   A.   Right.  You need to come open-minded and just let the

10  evidence speak for itself.

11  Q.   Would you also agree with me that it requires you to

12  come in here without any biases or any leanings?

13  A.   Yes, it does.

14  Q.   Wouldn't that be something you would expect --

15  A.   Yes, I would.

16  Q.   -- if you were in that situation?

17  A.   That's right.  That's right.

18  Q.   I know this question's been asked of you, but I'm

19  gonna ask it anyway.  As you sit here today and see my client

20  sitting here, do you have any preconceived notions as to

21  whether or not he's guilty?

22  A.   No, I don't.

23  Q.   And if I were to ask you -- although we would never

24  do that, it's not something that happens in our courtrooms --

25  to vote as to his guilt or innocence, what would your vote be?

126

1   A.   As of right now, it would be not guilty.

2   Q.   And that's the correct answer.

3   A.   Okay.

4   Q.   What we mean by that is, of course, we actually have

5   to go through a trial before we ask you to do that?

6   A.   That's right.

7   Q.   We want to know and be assured that you know these

8   concepts and that you understand them and that you can adhere

9   to them, okay?

10  A.   Yes, sir.

11  Q.   Because it's very important.  Getting back to the

12  subject of certain biases, you know, let's say, for instance,

13  if you were Mr. Ramirez's uncle.  I don't think you could serve

14  on this jury because you'd have some sort of a family bias,

15  wouldn't you?

16  A.   That's correct.

17  Q.   And similarly, just as an example, if Mr. Jones and I

18  were trying a DWI, we might not want to pick a state trooper to

19  serve on that jury, would we?

20  A.   No, sir.

21  Q.   We'd have an occupational bias; is that correct?

22  A.   That's right.

23  Q.   Same thing with an arson case, we might not pick a

24  fireman.  Although we want them to do their job and be biased

25  in so far as trying to save our homes from being burned or

127

1   whatever?

2   A.   Right.

3   Q.   Okay.  But, you know, you understand how we to have,

4   you know, try to get people in here that are gonna be fair and

5   impartial to both sides in this case and be convinced, you

6   know, to whatever degree we can that you're gonna be fair and

7   impartial in this case?

8   A.   I understand.

9   Q.   Along those lines, this is a capital murder case,

10  which is as the judge had described to you, a murder plus

11  something else, okay?

12  A.   Uh-huh.

13  Q.   It's very unique in the law in that there's

14  situations where, you know, for example, somebody could come in

15  here, and God forbid, you know, shoot Judge Galvan, okay?  And

16  that would be murder, okay?  It wouldn't be a capital murder in

17  so far as how awful you would probably read about it in the

18  headlines and say, God, somebody, you know, walked into a

19  courtroom and just, you know, shot a judge, you know, which has

20  happened before, I think, somewhere in Atlanta.

21  A.   Yes, it did.

22  Q.   A defendant got loose and actually shot a judge.

23  And, of course, it's terrible.  But in Texas, that is not

24  capital murder.

25  A.   Right.

128

1   Q.   Maybe it should be, I don't know, but it's not.  And

2   as a consequence, our legislature has seen fit to define what

3   capital murder is, which is a homicide along with another very

4   aggravated criminal act, criminal episode essentially.  And so,

5   knowing that concept, of course, it's still fits under the same

6   requirements of being able to be unanimous in your verdict

7   before you find a verdict one way or the other of guilt or

8   innocence.

9   A.   Right.

10  Q.   Now, the reason we talk about all these kind of

11  things is because this is the only chance we really have to

12  talk to about these things, okay?

13  A.   Right.

14  Q.   We're not trying to do this because we are assuming

15  that you're supposing anything, but it's just this is the only

16  time we get to talk to you about all these things.

17  A.   Yes, sir.

18  Q.   Okay.  Do you agree with that?

19  A.   Oh, yes, sir, yes, sir.

20  Q.   It doesn't cause you any alarm to think that, well,

21  you know, well, why are we talking about all this and whatever,

22  because, I mean, are we here making certain assumptions that we

23  shouldn't be making or anything or what?

24  A.   Well, I feel this is a very large decision to be made

25  and you should have the right people on the jury.

129

```
 1     Q.    And it is important?
 2     A.    Yes, sir.
 3     Q.    Because it's important that we try and get it right
 4  the first time?
 5     A.    Yes.
 6     Q.    Because every now and then we actually -- not we, but
 7  some people have gotten it wrong.  Like have you read,
 8  recently, there's a Texas Monthly article about these 37 some
 9  odd people who mostly came out of the Dallas area who had been
10  convicted of certain rapes and murders, and things of that
11  nature and whatever, based on the identification of one or two
12  witnesses only.  And then they found out later that they were
13  actually innocent through the use of DNA.  Do you remember
14  reading or --
15     A.    I --
16     Q.    Maybe you read something --
17     A.    I didn't read it but I've heard of that before --
18     Q.    Of that happening?
19     A.    -- over the years, uh-huh.
20     Q.    How does that make you feel?
21     A.    Well, at that particular time, the cases that I
22  believe that they were talking about were ones early on during
23  the years before DNA evidence was.  And at that time, they --
24  the evidence put forth to jurors made them vote the way of that
25  he was guilty at that time.  Now, if the DNA evidence would
```

130

```
 1  have come up that there was no DNA evidence on this, the
 2  fingerprint was found on there because he worked their yard
 3  service at one time or something at that point, then -- so --
 4  but DNA evidence and all that isn't, I guess, 100 percent.  It
 5  just depends on how it's -- it's shown to you at the time.
 6     Q.    Does it bother you though that perhaps because of
 7  some unfairness, perhaps on the part of the district attorney's
 8  office and withholding evidence or something or whatever, that
 9  some innocent person was unjustly accused and convicted of a
10  crime?
11           MR. SKURKA:  Excuse me, Judge, he's not
12  talking about this district attorney's office, right?
13           THE COURT:  Well --
14           MR. SKURKA:  He's talking about up in Dallas,
15  right?
16           MR. GARZA:  Well, they get it right all the
17  time down here, of course.
18     Q.    (BY MR. GARZA) I'm just talking about -- I'm giving
19  an example.  But the one that's been notorious doing this is
20  the Dallas DA's office.
21     A.    Okay.
22     Q.    They've been notorious for doing this.  There are
23  certain constitutional laws and certain constitutional cases
24  that have come down that they have just outright violated, you
25  know?
```

131

```
 1           THE COURT:  Or at least the previous DA.
 2     Q.    (BY MR. GARZA) The previous DA had, not the present
 3  one.  He's trying to make things better, believe me.  But does
 4  it bother you that that kind of conduct went on that allowed
 5  innocent people to be convicted?
 6     A.    Well, sure.  I mean, it wasn't 100 percent right.  If
 7  you're saying that the DA held evidence that would have
 8  acquitted the witness, then, sure, that wasn't a fair trial any
 9  whatsoever.  And hopefully, I never have to sit on a trial like
10  that.
11     Q.    Hopefully you won't either.  And the other point that
12  I want to make about that situation that we were discussing
13  with the other jurors as well is that after 15, 20 years, these
14  people get released, but they were at least alive to be able to
15  be released, okay?
16     A.    Correct.
17     Q.    In a capital murder case, if we don't get it right,
18  we make a by mistake, and the appellate process goes through,
19  and we don't correct any of those mistakes or we don't find any
20  of those mistakes to be able to correct, a person's -- a person
21  could lose their life.
22     A.    Uh-huh, that's right.  Like you said on this, the
23  defendant's character and background, you know, it's -- that
24  should be brought before the jurors, what exactly what kind of
25  man was this.  I mean, he's gonna have friends that are gonna
```

132

```
 1  testify about him.  He's gonna have parents or in laws and
 2  they're gonna have to tell the truth.  If somebody was found
 3  guilty and it's on this is -- actually, if they're found guilty
 4  automatically have life.  Now, what we're determining is if
 5  they get death and these questions here are very good that we
 6  have to decide that or the jury has to decide that by listening
 7  to the background and what type of person that the defendant
 8  is.
 9     Q.    And I'm gonna get to that.
10     A.    Oh, okay.  I'm sorry.
11     Q.    No, that's okay.
12     A.    Well, I'm just stating to me that if found guilty,
13  that is a very important, very important question there.  You
14  can't -- it's hard to answer this question without knowing this
15  answer to me.  That's my opinion.  If someone never did wrong
16  and it was just kind of a freak deal then, sure, that's -- then
17  you'd have to weigh in all of this on your -- the way you would
18  answer these questions.
19     Q.    Correct.  And that's what we've asked you to do
20  because, see, first of all, you have to find our client guilty
21  if the State can prove their case to you beyond a reasonable
22  doubt.
23     A.    Correct.
24     Q.    And then you're gonna ask -- you're going to be asked
25  to start considering what is the appropriate punishment for our
```

133

1   client if you do find him guilty? What is the appropriate
2   punishment, is it life or is it death?
3       A.   Right.
4       Q.   And the way we reach that decision is based on
5   whatever evidence you hear to establish whether or not, one,
6   you can vote yes to that special issue number one, okay?
7       A.   Uh-huh.
8       Q.   Because it's like you yourself had mentioned, what if
9   this is a situational crime? What if this is the first and
10  only ever time that this has ever happened? Now, the law does
11  say that if you can -- you can take the circumstances of the
12  case and still decide that issue, okay?
13      A.   Right.
14      Q.   But we want to know if you will be open-minded enough
15  to hear any and all types of evidence including criminal
16  history, background, character, and things of that nature
17  before you make a decision as to whether or not you feel he's a
18  future dangerousness, that he's a person whose gonna -- who is
19  going to be a future danger to our society?
20      A.   Right.
21      Q.   Can you do that?
22      A.   Yes, I can did.
23      Q.   Can you keep an open mind about that?
24      A.   Yes, I can.
25      Q.   And you as the trier of the facts are the ones who

134

1   are gonna have to decide what evidence, in your mind, is going
2   to convince you of that, and if you're not convinced of it, you
3   can say no to that Special Issue No. 1.
4       A.   That's right.
5       Q.   And it would require you and nine others only, okay?
6   But, otherwise, if you're going to say yes and you're gonna be
7   convinced beyond a reasonable doubt that he is a continuing
8   threat to society, it's gonna take all 12 of you.
9       A.   Correct.
10      Q.   And that's -- that's before you get to Special Issue
11  No. 2, okay?
12      A.   Okay.
13      Q.   Before you even get to Special Issue No. 2. And if
14  you would, can you take a minute and read that Special Issue
15  No. 2 and let me know when you're done with it?
16      A.   Okay.
17      Q.   So he's taking into consideration the circumstances
18  of the offense and the defendant's character and background.
19  What does character mean to you?
20      A.   Character means the type of person that they are. I
21  mean, are they something as being a young person? Do they just
22  go out and party and get in at a certain time? Do they take
23  care of whoever, their family and their parents, and were they
24  good to people. Or character's gonna come up and just say all
25  the negative things about them too. And it's gonna kind of be

135

1   the type of person that they are.
2       Q.   Okay. Would it be -- let me just throw some examples
3   out. You're in business for yourself?
4       A.   Yes.
5       Q.   You're in the carpet business; is that correct?
6       A.   Yes, sir.
7       Q.   So maybe you've had a set of customers that you had
8   for quite a few years. And whenever they call you that they
9   need some carpet installed in their buildings or in their home
10  or whatever, knowing their track record for paying you and
11  things of that nature --
12      A.   Uh-huh.
13      Q.   -- you believe those people to be of pretty good
14  character and you enjoy doing business with them?
15      A.   Correct.
16      Q.   Correct?
17      A.   Uh-huh.
18      Q.   And they're trustworthy, they're honest, they're
19  forthright; is that correct?
20      A.   They have proven themselves to me, yes.
21      Q.   They have proven themselves to you. A moral code of
22  some sort?
23      A.   Right.
24      Q.   Correct?
25      A.   Correct.

136

1       Q.   It's something you would probably say, "I sure hope
2   somebody says that about me every now and then." Would that be
3   correct?
4       A.   Yes. Yes, sir.
5       Q.   And what about a person's background?
6       A.   Now, the background -- the background as far as --
7   are you talking about as in a situation of me being a business
8   owner or as --
9       Q.   Yeah, sure.
10      A.   Or as -- well, the only background I would have of
11  those particular people is like you say is how they pay their
12  account and how the sales people thought about them. And a lot
13  of customers become, you know, exactly friends of ours, and
14  hopefully become part of our family.
15      Q.   In the legal system, background can mean a lot of
16  other things. What would be some of the things that you would
17  want to know about a person's background to find out whether or
18  not there's a sufficient mitigating circumstance for you to
19  lessen their punishment or maybe even increase their
20  punishment?
21      A.   Well, exactly like I had just said before, I guess it
22  depends on the character or the type of person they were.
23  There's gonna be like how did they treat their friends? Were
24  they somebody that constantly pushed around, hit people, were
25  always violent at some time. There's people that are -- that

137

1   are perfect people, I mean, you just think.  And then you give
2   them a drop of alcohol or some dope and they just turn 100
3   percent to a complete devil.  And that's the things that you
4   would want to know of this is from friends and people that they
5   have been with.
6           The other backgrounds, like you said, is how
7   they took care of other people.  Not necessarily that -- not
8   that you take care of but being nice to people.  What do the
9   neighbors think of them.  I mean, was he always nice to them,
10  did he help them out, or was he with the one that always threw
11  trash in their yard as he was growing up, or disrespectful and
12  things of that nature.
13      Q.   What about in so far as background is concerned,
14  where he came from, how he was raised?  What if he was abused?
15  What if he lacked the nurturing?  What if he lacked parental
16  guidance?  What if he lacked parental correction?  What if
17  there is was no effective parental authority guiding this young
18  man through his life?  Would that make a difference to you?
19      A.   It would, and there again, it wouldn't.  There's a
20  lot of people that came from broken homes that wanted to
21  advance and become better themselves, work themselves through
22  college, worked hard to get away from this and bound that they
23  would never strike a person or one of their children.  There
24  again, now, if they were beaten, kept in closets, things of
25  nature, then that could drastically affect the mind and make

138

1   them maybe more violent.
2       Q.   What that special issue there is asking you is can
3   you give some effect to that person's background knowing and if
4   it's shown to you that that could be something that is making
5   this person act a certain way in trying to establish this
6   degree of culpability or his degree of guilt in this case?
7   Could you give it some effect to assist you in making a
8   decision?
9       A.   Yes, I could.
10      Q.   Because some people just say, well -- and it's like
11  you just said, it could or couldn't, you know, it just depends
12  on what I hear.  Some people they have been able to overcome
13  those things.  Would you agree with me it's a little more
14  difficult than the ideal situation where maybe a person's grown
15  up with two loving parents, grandparents, other family members
16  who was able to learn right from wrong and have the guidance of
17  those parents, the guidance of his teachers, perhaps the
18  teachings of his church, and things of that nature?
19      A.   Yes.
20      Q.   It would make a big difference, wouldn't it?
21      A.   Yes, it does.  It does.
22      Q.   Then this issue of personal moral culpability, what
23  does that mean to you?
24      A.   I guess to me it would mean exactly what the
25  defendant believes in himself or what he believes is right or

139

1   wrong.  And if for some reason in their mind they don't feel
2   beating up on people is wrong, then that's gonna be part of
3   their moral character, and so I guess that's exactly what it
4   means to me.
5       Q.   Kind of a blemish --
6       A.   That's correct.
7       Q.   -- in your mind?  Well, being moral is sort of a --
8   it's sort of a core belief that you either believe or don't
9   believe in something biblical or the Ten Commandments or
10  something like that.
11      A.   Right.
12      Q.   Culpability is -- would you consider it
13  blameworthiness?
14      A.   The --
15      Q.   Blameworthiness?
16      A.   No, I don't.  No, I don't.
17      Q.   Why not?
18      A.   Because there -- it's -- everybody can change.  I
19  mean, anybody can change.  It's what's deep down inside you
20  that just because you were raised up in a poor neighborhood
21  doesn't mean that you can't become president of the United
22  States.  It doesn't mean that you have limitations on what that
23  -- I see that every day that people limit themselves and they
24  don't have to.  You can do what you want to in this country,
25  and to say that just because my parents were born poor, I'm

140

1   gonna be poor; I have to steal and rob to get ahead in this
2   life, that's not true.  You just -- if you work hard, you will
3   -- you can succeed.
4       Q.   Correct.  And I -- you know, I'm not sure -- poverty
5   can certainly have an effect on certain people.  I always
6   remember my father telling me about Richard Todd who my dad
7   thought was a rather flamboyant person.  He was married to
8   Elizabeth Taylor and was a big movie producer.  He said that
9   Todd used to have this saying that says, "Being broke is
10  temporary, but being poor is pretty permanent."
11      A.   Right.
12      Q.   And I think studies have shown that poverty has a
13  very cyclical component that can continue for years and years
14  within a certain family.  But you're right, it doesn't
15  necessarily mean that people grow up to be evil or ugly, or
16  terrible, or a criminal.  They just never quite grow out of
17  that condition.  They have to work pretty hard all the rest of
18  their lives.
19      A.   It's true.
20      Q.   And they -- and there's some that do stay out of
21  trouble, by the grace of God, or through the grace of whatever.
22  But for some people it does become a dilemma, it becomes a very
23  big dilemma.
24          In the example that Mr. Skurka gives you about
25  the curfew and things of that nature, or I don't know if he

141

1  told you about the burglary story or not, about the differences
2  in punishments?
3      A.   Yes, sir.
4      Q.   As to, you know, the guy who breaks in the house and
5  tears everything up, steals valuables and whatever to support
6  his drug habit, has been convicted of doing that five times
7  versus the guy that does it because he's lost his job, he's got
8  four starving children and he finds the door open and walks in
9  and basically just takes a loaf of bread and some food to feed
10 his children.  That issue on the moral culpability is sort of a
11 degree of guilt situation where maybe if you're sitting on the
12 jury regarding the first burglary and you'd say, "Gosh, this is
13 a guy that just never learned his lesson.  You know what, I
14 just need to put the wood to him and that's all there is to it
15 and I'm gonna sentence him to 20 years."  But this other guy,
16 you know, even though he did commit a burglary and he knew it
17 was wrong, he was faced with a moral dilemma.  What would you
18 say his moral dilemma probably was?
19     A.   Well, he was -- no money, no money to support his
20 family.  And, you know, with no money and no family to support
21 would cause a lot of people to still to feed, and that --
22 that's the -- that's the circumstances that you're using right
23 there.
24     Q.   It makes a difference, doesn't it?
25     A.   It makes a lot of difference.

142

1      Q.   It's a mitigating circumstance, isn't it?
2      A.   Correct.
3      Q.   The dilemma was, I know that it's wrong to steal, but
4  how am I gonna let these children starve, I've got to do
5  something.
6      A.   That's right.
7      Q.   Okay.  And that may or may not be present in this
8  case, we don't know yet, you know.  But we need to know that
9  those circumstances are things that you can give effect to in
10 deciding, not automatically, that, God, if I find this man
11 guilty of this crime, you know, I'm going to just automatically
12 give him the death sentence.  I'm gonna think about it.
13     A.   Sure.
14     Q.   I'm gonna listen to the evidence, I'm gonna, you
15 know, weigh all of these situations and circumstances --
16     A.   That's right.
17     Q.   -- before I make that decision, okay?
18     A.   Right.
19     Q.   So if you answer yes to this that you feel that based
20 on whatever evidence is presented to you, that there is
21 sufficient mitigating circumstances and you answer -- if you
22 answer no and yes to the other, it's the death penalty?
23     A.   Right.
24     Q.   If you answer yes, and yes, that there is, then it's
25 a life sentence.

143

1      A.   Right.
2      Q.   Okay?
3      A.   Right.
4      Q.   And it has to be an independent decision on your
5  part.
6      A.   I agree with that.
7      Q.   Not a decision you get bullied into doing by the
8  other 11 or 12 depending whichever way they're leaning on this
9  case.
10     A.   Right.
11     Q.   The last question I'm gonna ask you is that do you
12 think that -- I mean, in Texas, the death penalty is the
13 legislative sanction, is a legislative punishment that in the
14 law allows through this process for that to be handed down as a
15 punishment, okay?  Do you think that we, as a society, we as
16 citizens of Texas, do you think that there is a benefit derived
17 from that?
18     A.   The benefit that you -- I guess you're asking me is
19 there a benefit for the death penalty for people that commit
20 crimes.  I believe just taking them off the street and
21 protecting society as it is.  If you have somebody that
22 committed murder on that and every time he takes a drink he
23 becomes extremely violent, then, you can't say that he's not
24 gonna take another drop of alcohol the rest of his life, that
25 he -- he may need to be taken off the street.  And if that –

144

1  if it is for capital murder, it's something that he did on
2  that, then, yes, I believe in the death penalty.
3      Q.   So you think it has a deterrent benefit?
4      A.   Yes.
5      Q.   And it also has a protective benefit?
6      A.   Correct.
7      Q.   Does all of that outweigh the possibility that
8  someone could be wrongly convicted and executed?
9      A.   I believe it can happen, but for I personally to make
10 this decision, I'm -- it's gonna have to be proven to me.  It's
11 -- and there -- and just like the judge said, a reasonable
12 doubt, that it's just -- I'm not gonna sit here lightly and
13 listen to this evidence and fall asleep.  It's gonna have to be
14 100 percent proven to me.
15          MR. GARZA:  Thank you, Mr. Kocian.  I have no
16 other questions.
17          VOIR DIRE EXAMINATION
18 BY MR. SKURKA:
19     Q.   I just have one follow up.
20     A.   Yes.
21     Q.   Remember that the law doesn't say 100 percent.  It
22 just says beyond a reasonable doubt.
23     A.   That's what I meant a reasonable doubt, not 100
24 percent.
25     Q.   You scared me when you said 100 percent.

145

1   A.   No, a reasonable doubt that it's proved to me.

2   Q.   And that's all I'm gonna ask you is beyond a

3   reasonable doubt, just not 100 percent?

4   A.   That's right.

5   Q.   There's no way I can prove to you 100 percent unless

6   you were there and saw the thing yourself.

7   A.   Right.

8        MR. SKURKA:  Thank you, sir.

9        THE COURT:  Mr. Kocian, wait in the jury room

10  while I speak with the lawyers and get right back with you.

11       VENIREPERSON NO. 64:  All right.  Thank you.

12       (Venireperson exits courtroom.)

13       MR. SKURKA:  Your Honor, State will accept

14  this juror.

15       THE COURT:  All right.  What says the defense?

16       MR. GARZA:  May we confer for a minute?

17       THE COURT:  Yeah.

18       (Counsel conferring.)

19       THE COURT:  What say you?

20       MR. GARZA:  Judge, we're going to exercise

21  another peremptory.

22       THE COURT:  All right.  That will be No. 9.

23       MR. GARZA:  Correct, Your Honor.

24       THE COURT:  Let's bring him in.

25       (Venireperson enters courtroom.)

146

1        THE COURT:  All right.  Mr. Kocian, you were

2   not selected to be on this jury but we do appreciate you

3   coming down here and spending time with us, and I'm sorry you

4   had to come down here twice.

5        VENIREPERSON NO. 64:  Okay.  Thanks.

6        THE COURT:  If you need work -- well, I guess

7   you own your own business?

8        VENIREPERSON NO. 64:  That's right.

9        THE COURT:  All right.  Thank you.

10       MR. GARZA:  Judge, can we --

11       THE COURT:  Hold on.

12       MR. GARZA:  Can we take a little break?

13       THE COURT:  Okay.  Look -- yes, yes.  The

14  answer's yes.  Let's do this.  We're gonna have -- at the rate

15  we're going -- and I did handicap us by 15 minutes, but we've

16  gone through three jurors this morning and we did excuse one.

17  That leaves us with nine.

18       THE DEFENDANT:  9.

19       THE COURT:  Nine left.  It's not gonna happen,

20  okay?  So, realistically, how many do you think we can get

21  through because she's gonna have to start rescheduling?

22       MR. SKURKA:  I think we can get to -- I think

23  three of them are gonna be eliminated, Judge.

24       THE COURT:  Okay.  Well, let's talk about it.

25       MR. SKURKA:  I've been talking about it since

147

1   last week.

2        THE COURT:  Okay.  Well, why don't you-all

3   talk about it right now on this bathroom break.  I just need

4   to know because we got nine coming in tomorrow, and if we're

5   gonna -- if you-all are gonna agree to excuse them, that's

6   fine.  If not, that's fine too, but, you know, I think we can

7   get through how many today?  Nine maximum.  I just -- at the

8   rate we're going.  And we can start the next person I'll do my

9   spiel and go to lunch on the next person.  But for the people

10  that are here which is 77, 79, 80 and 81, I mean, it seems to

11  me I can let 79, 80 and 81 go to lunch.  There's no point in

12  leaving them here, correct?  Unless -- unless you-all are

13  gonna agree on 77?

14       MR. SKURKA:  I don't think that's one of the

15  ones.  I had on my list 79, 81 and 82 were possible

16  agreements --

17       THE COURT:  79, 80 --

18       MR. SKURKA:  -- and I don't think they're

19  gonna be seated.  79 couldn't answer some of the questions

20  about the death penalty where it said --

21       THE COURT:  Okay.  Well, let's do this.  Let's

22  do this.  Frank, tell 79, 80 and 81 to come back after lunch.

23  77 has to wait, and then we can, you know, we can deal with

24  that issue.

25       79, 80 and 81, they're here, right?

148

1        THE BAILIFF:  Yes.

2        THE COURT:  Tell them to go to lunch.  Tell

3   them to come back after lunch.  Leave 77 here.  I want to try

4   to get to through my spiel with that person before we go to

5   lunch, and then you-all can do your thing with them after

6   lunch.  But at least we can get a little bit done before then.

7        MR. JONES:  Who is up next, 79?

8        THE COURT:  77 is up next.  All right.  Take a

9   little break.  Maybe you-all can talk.  But in any event,

10  don't you think we need to reschedule the 3:00s?  I mean, it's

11  just not happening.  Mark?

12       MR. SKURKA:  I think we can do some if we get

13  rid of these other three.

14       MR. GARZA:  Well, it's easy for him to say,

15  Judge, but we're in a pickle.  We're not -- we don't have that

16  same grace, okay?

17       MR. SKURKA:  And I understand, Judge.

18       THE COURT:  I understand.

19       MR. GARZA:  I just -- Mr. Jones and I have

20  looked over the remaining --

21       THE COURT:  Wait, wait.  Just tell her to wait

22  just a second, Frank.  Why don't you-all talk.  Look, if you

23  can't, it's okay.  I just -- if you-all aren't gonna agree, I

24  just need to cut those 3:00 people loose till tomorrow.

25       MR. GARZA:  At this point we can't.

149

```
1           THE COURT:  We'll be here till -- I mean, if
2  we try to do 13 -- well, it really be 12 -- we'll be here till
3  1:00 in the morning at the rate we're going which --
4           MR. GARZA:  It could be too that if we do --
5           MR. SKURKA:  That's pretty good --
6           THE COURT:  No, we're doing fine.  And I'm not
7  complaining about the speed.  My only thing is if we need to
8  reschedule them, right now I can do it.  I don't want the 3:00
9  people to drive here like that poor guy that we just did and
10 then we don't use them.  And right now, I have the ability to
11 call him off.  But let's take a break and we'll talk about it
12 in a minute.
13          THE BAILIFF:  Judge, the people that are going
14 for lunch, you want them back at what time?
15          THE COURT:  I guess 1:00.
16          (Recess.)
17          THE COURT:  I guess before we get to the next
18 deal, are we anywhere on agreements or --
19          MR. GARZA:  No.
20          THE COURT:  No.  All right.  Well, I'm gonna
21 call off the 3:00 people.  There's just -- I mean, we're --
22          THE COURT MANAGER:  Which is 85 and 87?
23          THE COURT:  Yeah.
24          Even so, that's still -- yeah, let's call
25 those people off for now.
```

150

```
1           THE COURT MANAGER:  For what time tomorrow?
2           THE COURT:  What time do we have?  I guess
3  we'll put them first thing in morning at 8:00.
4           MR. GARZA:  Who is up next?
5           MR. SKURKA:  77.
6           THE COURT:  77, Josephine Guerrero.  I guess
7  bring her in and I'll do my spiel with her and we'll go to
8  lunch.
9           MR. SKURKA:  We're coming back at 1.  Do we
10 have one at 1, Ann?
11          THE COURT MANAGER:  Uh-huh.
12          THE COURT:  Yeah, plus the other four.
13
14              VENIREPERSON NO. 77,
15            JOSEPHINE GUERRERO GOMEZ,
16              VOIR DIRE EXAMINATION
17 BY THE COURT:
18     Q.   All right.  Ms. Guerrero, how are you?
19     A.   Just fine, thank you.
20     Q.   Sorry about the wait.  We got a little behind.  This
21 is a serious case so we're giving it the time and attention
22 that it needs, okay?
23     A.   Okay.
24     Q.   I'm gonna talk to you about a few things and then
25 we're gonna go to lunch.  First of all, have you ever been on a
```

151

```
1  criminal case before?
2     A.   No.
3     Q.   Have you ever been on a jury before?
4     A.   No.
5     Q.   And that's okay.  We are looking for people that,
6  one, can keep an open mind, and two, will follow the law, okay?
7  Do you think that you can keep an open mind in this case?
8     A.   Yes.
9     Q.   Okay.  Well, some people say they can't because maybe
10 they saw something on TV or maybe they say they can't keep an
11 open mind just because some people just can't.  But you think
12 you can?
13    A.   Yes.
14    Q.   Okay.  Then let's talk a little bit about the law.
15 This is a criminal case, okay?  In every criminal case, the
16 State has the burden of proof, okay?  They brought the charges.
17 The law says you bring the charges, you prove them.  Do you
18 think that's fair?
19    A.   Yes.
20    Q.   Can you follow that law?
21    A.   Uh-huh.
22    Q.   Okay.  Now, the burden of proof is on them and what
23 is the burden?  It's beyond a reasonable doubt.  And what's
24 that?  Well, let me tell you what it's not.  It's not like if
25 we had a civil case, maybe we had like a contract case, a fight
```

152

```
1  between two businesses.  One would sue another and we'd have --
2  the one that was suing the other would have the burden of
3  proof.  They would have to prove the case to the jury.  And it
4  would be by preponderance of the evidence.  That is like if you
5  can think of the scales of justice, that's like tipping it over
6  just one -- just a little bit.  It would be 51 percent, okay,
7  proof.  That's -- to me, that's the easiest way to think of it,
8  51 percent, just a little bit more.
9     A.   Okay.
10    Q.   Then let's say the State was trying to take away some
11 children from somebody because the State felt like they were
12 not good parents, all right?  The burden of proof in that case
13 is clear and convincing, okay?
14    A.   Right.
15    Q.   That sounds pretty self-explanatory, right, clear and
16 convincing?
17    A.   Yes.
18    Q.   It sounds like it has to be pretty good stuff.
19 That's higher than the 51 percent, but it's not as high as this
20 the burden in this case, beyond a reasonable doubt.  That's
21 higher than clear and convincing, all right?  It's the highest
22 burden that we have in all of the law, criminal or otherwise.
23          But what it also is not, is it's not beyond all
24 doubt, it's not beyond a shadow of a doubt.  The most important
25 word in it, in my opinion is reasonable, beyond a reasonable
```

153

1  doubt. Okay?

2  A.  Okay.

3  Q.  Do you follow me?

4  A.  Yes.

5  Q.  Could you hold the State to that burden?

6  A.  (Nodding head up and down.)

7  Q.  Yes?

8  A.  Yes.

9  Q.  Okay. Now, as part of that, our law says that until

10 the State, if they can prove it -- we don't know if they can

11 prove this case or not, right?

12 A.  Right.

13 Q.  They brought the charges but they just say that this

14 defendant did this crime, but who has to be proven? The

15 people. The people hold the power here, okay? The State

16 brings the charges but they have to prove it to the people and

17 the law says that until you can prove it, you must presume that

18 the defendant is innocent until proven guilty. You've ever

19 heard of that before?

20 A.  Yes.

21 Q.  Innocent until proven guilty and that's how we do it

22 here. And I think it would be a sad place to live if it wasn't

23 like that, okay? You agree with that?

24 A.  Yes.

25 Q.  And you could presume the defendant to be innocent?

154

1  A.  (Nodding head up and down.)

2  Q.  Until and if the State could prove it otherwise?

3  A.  Correct.

4  Q.  Because sometimes we ask jurors at this point, well,

5  how would you vote. They get a little stumped. The fact of

6  the matter is you'd have to vote not guilty. Why? Because

7  they haven't proven anything?

8  A.  They haven't said anything.

9  Q.  They haven't said anything, okay? But a more real

10 life example is if when we begin the trial and State presents

11 their evidence, and they do present some evidence, but it's --

12 you go back there and you think that's not that good. They

13 didn't prove anything to me. What would you -- how would you

14 have to vote?

15 A.  If they haven't proven their point, no. Innocent.

16 Q.  Not guilty, right?

17 A.  Right.

18 Q.  Now, you understand that not innocent and not guilty

19 are different things, okay? I had a trial a couple of weeks

20 ago and I saw one of my jurors at a wedding this weekend and he

21 said, "You know, Bobby, I thought that guy was guilty, but they

22 didn't prove it to me beyond a reasonable doubt so we found him

23 not guilty." And there's nothing wrong with what that juror

24 did because the burden is beyond a reasonable doubt; he felt

25 like they hadn't gotten there yet; do you follow me?

155

1  A.  Yes.

2  Q.  Okay. Now, the Constitution says since the State's

3  got the burden of proof and the defense has not burden,

4  defendant doesn't have to testify, okay? And it's bigger than

5  that. Not only does defendant not have to testify, but the

6  jury can't hold it against him if he chooses not to. Do you

7  follow me?

8  A.  Yes.

9  Q.  Okay. Now, I think, you know, maybe these lawyers

10 tell him not to. Maybe his lawyers tell him they haven't

11 proven their case. Maybe he's just not somebody that speaks

12 well in public and his lawyers feel like, you know, he may --

13 he may not come off well. I had a friend who would laugh

14 inappropriately when he got nervous and he would annoy people.

15 Maybe he's one of those people. Maybe he's just not educated.

16 It's unclear, okay? But the point is this: The law says you

17 can't hold it against him if he chooses not to testify. Could

18 you follow that law?

19 A.  Yes.

20 Q.  Okay. Now let's talk about the type of case this is.

21 It's capital murder. Okay. Well, what's capital murder?

22 Well, murder is in that, right? So what is murder? Murder is

23 the intentional taking of a life of another, okay? But you

24 know, this is capital murder. Well, it's got to be something

25 else, right? I like to call capital murder, murder plus,

156

1  murder plus something else. The legislature has said there are

2  a newspaper of things that qualify as capital murder and

3  there's a laundry list.

4      In this case, the State as alleged that the

5  defendant committed or attempted to commit the offense of

6  robbery, and in the course of doing so, he committed murder.

7  Okay. So we got robbery plus murder. The legislature says if

8  you put these two serious crimes together, then that's capital

9  murder, okay?

10 A.  Okay.

11 Q.  All right. What's robbery? Well, robbery is the --

12 is the intentional -- the forcible taking of something from

13 another, or, you know, threatening to take -- to -- threatening

14 harm to get, you know, an item from another. For example,

15 let's say I came up to you and I held a gun to you and I said,

16 "Give me your purse, okay?" That would be robbery, right?

17 A.  Right.

18 Q.  And you'd give me your purse and I'd run off with

19 your purse. What if I came up to you and I held the gun and

20 you took the purse and in your purse was, you know, something

21 very heavy and you hit me on top of the head with it and

22 knocked me out, okay? Would I be guilty of robbery? Well, no,

23 I wouldn't be guilty of robbery, but I would be guilty of

24 attempted robbery, right?

25 A.  Right.

157

1    Q.   The State can get there either way on it.  In other
2   words, if they show a robbery or an attempted robbery in this
3   case, and then they can show that the defendant committed the
4   act of murder while in the process of doing that, then they get
5   there, okay?  Do you understand?
6    A.   Yes.
7    Q.   All right.  But you've got to understand there's a
8   lot of elements.  They've got to prove all the elements of
9   murder.  They've got to prove all the elements of robbery and
10  attempted robbery.  They have to prove this defendant, on the
11  given day in Nueces County, Texas, did so.  And the law says
12  they've got to prove all the elements.  Would you require them
13  to prove all their elements?
14   A.   Yes.
15   Q.   Now, we have two parts of a trial in Texas.  The
16  first part is guilt or innocence.  What's that?  Well, can the
17  State prove beyond a reasonable doubt that the defendant's
18  guilty of capital murder?  And if they can't, the jury finds
19  the defendant not guilty and the cases is over with.  You go
20  home.  But if they can, we go on to the second part, the
21  punishment phase.  The punishment phase I can tell you -- let
22  me back up.  There's two things that can happen if you're found
23  guilty of capital murder and they're both serious.  Life in
24  prison or the death penalty, okay?
25       All right.  But you don't say life or death.

158

1   You answer questions, okay?
2    A.   Okay.
3    Q.   All right.  Here's question number one if you read it
4   with me.
5       "Is there a probability that the defendant will
6   commit criminal acts of violence that would constitute a
7   continuing threat to society?"  What does that mean?
8    A.   If he gets out, if he's capable of doing it again.
9    Q.   Kind of, okay?  But let's go through it.
10  Probability.  All right.  Is it -- will he probably commit
11  criminal acts of violence.  Will he be violent with people in
12  the future?  Okay.  All right.  Now, the jury has to answer yes
13  or no, okay?
14   A.   Okay.
15   Q.   Now, then you go to Special Issue No. 2, it's the
16  second question.  It's over your right shoulder.  "After taking
17  into consideration all of the evidence, including the
18  circumstances of the offense" -- that's the first part of the
19  trial, okay?
20   A.   Okay.
21   Q.   The guilt or innocence phase.  "-- the defendant's
22  character" -- you know, what kind of guy is he, all right?  Has
23  he been a good guy or a bad guy, and his background, you know,
24  how did he grow up?  You know, did he have -- did he have a
25  good home, did he have a bad home?  How was he in school?  Was

159

1   he a good kid in school or was he a bad kid in school, that
2   kind of stuff. -- "and the personal moral culpability of the
3   defendant."  And that is, maybe, you know, sounds kind of
4   strange, but how guilty is he?  I mean, the circumstances may
5   be different for different crimes, all right?  How was he
6   brought up?  What moral values did his parents instill in him,
7   okay?  Do you follow me?
8    A.   Yes.
9    Q.   "Is there sufficient mitigating circumstance or
10  circumstances to warrant life rather than the death penalty be
11  imposed?"
12       This is kind of like the look at everything
13  question, okay?  The first part of the case all you're gonna
14  hear about is the allegations of the crime itself, all right?
15  You're not gonna hear about his background.  All you're gonna
16  determine is whether the State can prove beyond a reasonable
17  doubt that this defendant's guilty, okay?
18   A.   Okay.
19   Q.   The second part you can -- I don't know what you're
20  gonna hear, but you can hear about his life.  Is this
21  completely out of character?  Other than this day, has he been
22  a great guy?  Maybe the opposite is true.  Maybe he's got a bad
23  criminal history.  Maybe he's been a bad kid all his life.
24  Maybe he was a bad kid in school.  Maybe he was just a mean
25  guy.  Maybe he was a good guy, okay?  You have good things, bad

160

1   things, maybe.  I don't know what you're gonna hear, all right?
2       But down there it says, "Is there sufficient
3   mitigating circumstance or circumstances that warrant life or
4   death," right?  So you have to consider everything that's
5   presented to you in the case.  And you -- and you say, all
6   right, what's a mitigating circumstance?  Well, it's something
7   that makes it less, makes him maybe less culpable, okay?  Maybe
8   you think he was an Eagle Scout.  Let's say it's presented to
9   you and you think, that's a mitigating circumstance.  I'm just
10  giving you an example.  I don't know what the evidence is going
11  to be.  But maybe another juror thinks that's not mitigating.
12  That doesn't mean anything to me, okay?  Only the jury can
13  decide what a mitigating circumstance is.  These lawyers will
14  try and tell you what they think a mitigating or an aggravating
15  circumstances is, but only the jury can come up with that,
16  okay?
17   A.   Okay.
18   Q.   Like maybe he taught little kids to read.  You may
19  think, that's a mitigating circumstance.  Then the question
20  becomes you think take all the mitigating circumstances and you
21  say, is that sufficient?  Is that enough?  Yes, I think this is
22  a mitigating circumstance, but is it enough to warrant life or
23  death, and the jury would answer yes or no to this, okay?
24   A.   Okay.
25   Q.   I'm gonna ask the jury at the beginning of this case

161

1  to raise their right hand once we've selected them and say, do
2  you take -- do you take an oath?  Do you swear that you will
3  render a true verdict based on the law presented to you, okay?
4      A.   Okay.
5      Q.   Some people say they can't do that because they can't
6  participate in a process that will lead to someone's death.
7  Some people say, if they find him guilty of capital murder,
8  they will always assess the death penalty.  They won't follow
9  the law.  Neither of those people can take that oath.  They
10  cannot follow the law.  They've told me they can't.  Can you
11  take the oath and follow the law?
12      A.   I don't see why not.
13      Q.   Okay.
14      A.   As long as the evidence is, you know, one way or the
15  other.
16      Q.   No, I understand.  But you see what I'm saying?  Some
17  people just can't participate in this or some people they say,
18  "You know what, you take a life and I don't care about the law,
19  you're getting the death penalty in my book."  And I'm -- some
20  people are like that.  It's okay.  And neither of them are
21  following the law.  I need to know if you can follow the law?
22      A.   Yes.
23      Q.   All right.  Let's do this.  Let's break for lunch.
24  We'll see you after lunch about 1:00 and we'll start up again.
25  The lawyers are gonna get to ask you questions when we get

162

1  back, okay?
2      A.   Okay.
3          THE COURT:  All right.  See you after lunch.
4      (Noon recess.)
5          THE COURT:  Are you ready to go?
6          MR. GARZA:  We're ready.
7          THE COURT:  Let's bring her in.
8      (Venireperson enters courtroom.)
9          THE COURT:  All right.  Mr. Skurka, you're up.
10              VOIR DIRE EXAMINATION
11  BY MR. SKURKA:
12      Q.   As the judge introduced me, my name is Mark Skurka,
13  I'm an assistant district attorney, along with Geordie
14  Schimmel, the young man that was sitting here earlier.  We'll
15  be the ones presenting this case to you if you get selected on
16  this jury.  I want to start off by telling you there's no right
17  or wrong answers to anything you say.  We just need to know how
18  you feel about things on some of the issues and the law on this
19  case so we can make a decision whether you're qualified, okay?
20      A.   Okay.
21      Q.   Do you mind putting the microphone just a little bit
22  closer to you so we can hear you better?
23      A.   (Venireperson complies.)
24      Q.   I don't think the chair moves --
25      A.   No.

163

1      Q.   -- but the microphone does.
2      A.   Okay.
3      Q.   How's that?
4      A.   Is that better?
5      Q.   Yeah, that's fine.
6      A.   Okay.
7      Q.   We just want to make sure everybody can hear you
8  okay.
9          So let me ask you, ma'am, how did you feel about
10  it that first day -- remember that day we had that big room
11  full of people, like 200 people in that room, and the judge
12  came down and said, "Folks, this is a criminal case, and it's
13  not just any criminal case, it's a possible death penalty case,
14  that this young man over here could be facing the death
15  penalty."  Tell me how you first reacted when you heard it was
16  that kind of a case?
17      A.   It didn't phase me.
18      Q.   It didn't phase you at all?
19      A.   No.  It just seems that crime is getting higher and
20  higher.
21      Q.   Well, tell me a little more about that.
22      A.   Oh, it just seems like, you know, instead of working
23  for things, people are trying to take it from others, and they
24  don't want to work for it anymore.
25      Q.   Do you feel that's kind of a part of our -- I mean,

164

1  how our society is going these days?
2      A.   Yes, they are too used to people giving them
3  everything.
4      Q.   Well, we've always had crime probably.  Do you think
5  it's gotten worse in the last few years or it's always been
6  bad?
7      A.   I don't know if it's maybe media coverage.  It just
8  seems to me that it has gotten worse, you know.  The people
9  committing the crimes are getting younger and younger.  I don't
10  know if it has to do with the media, like I said, movies, TV,
11  whatever.  It just seems like a lot.  They're not being told
12  what's right and wrong anymore.
13      Q.   Is that because there -- do you think it's because
14  the way people grow up in their environment, or do you think
15  that it is something they just choose to be that way or what?
16      A.   Sometimes I think they choose this life because it's
17  easier for them.  Other times I think it's just because the
18  parents aren't around often enough.  There's just too many
19  single parent households.
20      Q.   Does that -- is that an excuse to commit crimes?
21      A.   No, it's not, but they've got -- they don't have
22  enough people -- how can I say it.  A single parent cannot
23  watch over the children and provide for them at the same time.
24      Q.   But would you agree with me sometimes even though a
25  person has a hard circumstance when they're growing up and

165

1 they're kids, maybe they don't have a second parent or
2 something like that, that doesn't necessarily mean they're
3 gonna turn out bad, does it?
4    A.   No, of course not.
5    Q.   In fact, there's quite a few people that have gone on
6 to many great things even though they came from a bad
7 neighborhood, you know, from the *barrio*, or, you know, having
8 one parent or a broken home or something like that.  Would you
9 agree with me on that?
10    A.   Yes, you can overcome it.
11    Q.   What do you think about people who use that as an
12 excuse?
13    A.   I don't -- I don't really -- everybody has a hard
14 life, let me put it that way, and everybody can swing one way
15 or the other.  It's just in their nature.
16    Q.   So what it sounds to me like you may have started out
17 with bad circumstances, but you can still make yourself
18 something better, right?
19    A.   Right.
20    Q.   In other words, just because, you know, your parents
21 weren't rich, or maybe you only had one parent or you had to --
22 your parents had to work two, three jobs, you know, then they
23 weren't around, that would not be an excuse to go take the easy
24 way out by committing crimes?
25    A.   No, it's not an excuse.

166

1    Q.   Okay.  What do you think about the age of a person?
2 I notice in your questionnaire you had something about you
3 don't think you should do the death penalty for I think you
4 said 13- and 15-year-olds, and stuff like that.  Do you
5 remember writing on that?
6    A.   Uh-huh.
7    Q.   Well, that's pretty much what the law says.  The law
8 says, in Texas, you can't get the death penalty if you're under
9 18 years of age.  They just made a deal.  You can do the worst
10 crime in the world if you're 16 years old, 17 years old, but
11 you can't get the death penalty.  And I guess that's, you know,
12 because they don't want to execute kids under 18.  And I'm
13 guessing that's because they figure once you're 18 you should
14 know the difference between right and wrong, correct?
15    A.   Correct.
16    Q.   And so does it matter to you what a person's age
17 would be as long as they're past 18 as to how they should be
18 punished?
19    A.   That one's tricky.  I'm thinking if you're 18, you
20 know, older than 18, you're pretty well on your own already and
21 you pretty well have time to think about what your life is
22 gonna be like.  Younger than that, I don't think a child really
23 understands.  But when you're a teen and you're out on your
24 own, you already know what's facing you.
25    Q.   Well, the law agrees with you, because like I said,

167

1 you're not gonna be treated the same if you're a kid under 18
2 as you are.  But, you know, some people say, "Well, you know,
3 he's only 21 or 22 or 23, 25.  They shouldn't be held as
4 responsible as somebody who is 35 or 45 or 55."  Do you agree
5 with that?
6    A.   I don't think age has anything to do with it.
7    Q.   Once you hit that maturity of 18 years old, you think
8 that?
9    A.   Yes.
10    Q.   What about how a person looks?  Does that matter?
11    A.   Oh, no.  I was just thinking looks young.  No, that
12 doesn't matter.
13    Q.   Well, the reason I'm asking is look at him.  That's
14 John Henry Ramirez.  He doesn't look like a real older person
15 or something like that.  I think the evidence is probably gonna
16 show he's around his mid 20s or so.  Would you agree with me
17 that you should make a decision on his case and his punishment
18 based on what he did and rather than what he looks like?
19    A.   You should make it on the facts, yes.
20    Q.   Because we've had people come in here -- and I'm not
21 saying they're wrong, I'm just saying that's how they feel.
22 I'd say, "What's the first thing you felt when you saw him?"
23 And they would say, "Oh, he's so young.  Oh, he's so young,"
24 like they were gonna -- I don't want to say -- use that as an
25 excuse or something.  How do you feel about people that say

168

1 that?
2    A.   It doesn't -- it doesn't affect me.  I'm not -- you
3 know, I know a lot of women my age they have that mother
4 syndrome in them.  I'm a mother but, you know, I think everyone
5 should be responsible.
6    Q.   Don't you have like four kids?
7    A.   I have four kids, yes, but my children were -- they
8 were working when they were 16.
9    Q.   Uh-huh.
10    A.   I didn't think -- you know, I wasn't gonna give them
11 anything more than a roof over their head, food on their table,
12 and clothes on their back.
13    Q.   So you've made sure you watched over them and let --
14 taught them between right and wrong and everything, right?
15    A.   Yes.
16    Q.   You have a son that's, you know, pretty close in age
17 to him?
18    A.   Uh-huh.
19    Q.   Sometimes people tell me, "Every time I look at the
20 defendant I think of my own son that age."  Is that something
21 that's gonna interfere with you being on this jury?
22    A.   No.
23    Q.   Why not?
24    A.   My son's in the Navy.  I've got one that's in the
25 Navy and I've got another one at home.  I just -- like I said,

169

1   I'm not -- I'm not very motherly.  I can't help it.  I had a
2   family, and I love my kids, but I'm not -- I can't -- I don't
3   --
4       Q.   I'm gonna have to disagree with you.  I think you're
5   very motherly.  The question is -- the question is, do you bend
6   over backwards?  They call it an enabler, when you enable
7   somebody.
8       A.   No, I don't enable anybody, not even my husband.
9       Q.   Well, that's a form of love.  When you're tough with
10  your kids and you're strict with them, that's still loving your
11  kids, right?  That's not bending over backwards and pampering
12  and giving them everything they want and say everything's okay,
13  right?
14      A.   No.  I -- you know, I mean, I'm the type of person
15  they fell off the bike, get off and get on it again.  You're
16  gonna ride it some day.  Do it now.
17      Q.   Tell me about which of your sons is in the Navy, the
18  31-year-old or the 25-year-old?
19      A.   The 31.
20      Q.   And how long has he been in the Navy?
21      A.   Since he was 18.
22      Q.   So he's kind of making a career out of it so far?
23      A.   Yes.
24      Q.   And what does he do in the Navy?
25      A.   I'm not really sure.  I just -- you know, when I talk

170

1   to him I just want to know how he is, you know.
2       Q.   You don't really care about his work or anything?
3       A.   Just as long as he works.
4       Q.   No, okay.  And your 25-year-old, what does he do?
5       A.   He -- he's -- he's going to Del Mar.  He's trying to
6   study criminal justice.
7       Q.   What does he want to be when he grows up?
8       A.   He's not sure yet.  He's 25.  I'm in trouble.
9       Q.   Well, don't feel that bad, Ms. Gomez.  It's one of
10  these things that sometimes kids know what they want right off
11  and sometimes they don't.  But at least he's in school and he's
12  gonna try different things, I guess, too.
13      A.   Yeah.
14      Q.   How do you feel about being a person that would have
15  to make this decision?  I mean, it's an awesome responsibility
16  that we have 12 people come over here and say, "Look, folks,
17  you have to decide whether somebody's guilty or not, and then
18  if you find them guilty, you have to decide whether they get
19  the death sentence or also based on the evidence."  How do you
20  feel about you being put in that position?
21      A.   I'll be honest.  If someone goes out and commits a
22  crime and it's proven that they've done it, I think that
23  they've made the decision for themselves.
24      Q.   Okay.
25      A.   So I would have no problem.

171

1       Q.   Okay.  And because -- and I'm not saying these people
2   are wrong, but some people told us, "Look, Mark, I believe in
3   the death penalty, it's a good law, I think we should have that
4   law.  I support the death penalty."  But then they have the big
5   but.  And they'll say, "But don't make me make that decision."
6   And I'm just wondering about you.  Can you follow through on
7   that decision if you think that's appropriate?
8       A.   I don't have any problem with it, yes, sir.
9       Q.   You don't have any problem with it.  No hesitation
10  about it?
11      A.   No.
12      Q.   Okay.  So you wouldn't have a problem being on this
13  jury and deciding whether somebody's guilty or not or what
14  punishment they should get?
15      A.   As long as the facts are out there and it's proven,
16  there's no -- I don't have a problem with it.
17      Q.   And that's important too, because what you're saying
18  is that it has to be proven to you.  The judge has already told
19  you before lunch, remember, that right now he's presumed
20  innocent?
21      A.   Right.
22      Q.   You cannot consider him guilty at all, and the fact
23  is, the State has to prove the case to you and the jury beyond
24  a reasonable doubt.  No defendant starts his case thinking he's
25  guilty and they have to prove he's innocent.  What they have to

172

1   do is -- the jury has to do is prove -- I'm sorry -- consider
2   that he's innocent and we have to prove he's guilty.
3       A.   Right.
4       Q.   That's America, right?  That's how we started.  And
5   that's a burden of proof on the State that we have in every
6   case.  As the judge said, if we brought the case, we should
7   back it up and prove it with the facts.
8           So you think if I proved the case to you, based
9   on the evidence, that he should get the death penalty, can you
10  look at him and give him the death penalty?
11      A.   Yes.
12      Q.   Okay.  And if you think that the evidence should be
13  that he should get a life sentence, can you give him a life
14  sentence?
15      A.   Yes, sir.
16      Q.   You're not leaning either way right now --
17      A.   No.
18      Q.   -- correct?  The only thing you're leaning right now
19  is that he's not guilty because he has to be proven guilty,
20  correct?
21      A.   Correct.
22      Q.   And, you know, he doesn't have to testify, right?
23      A.   Right.
24      Q.   There's a Fifth Amendment.  Sometimes there's natural
25  inclination for jurors to say, "Well, you know, I want to hear

173

1  his side of the story."  If it was me, I'd want to get up there
2  and explain to the jury.  And then some people say, "Well, you
3  know, I want to hear both sides."  And the judge, I think, has
4  already told you, you may hear him testify, you may not hear
5  him testify.  If he doesn't testify, though, you cannot hold
6  that against him.  Do you agree with that law?
7      A.    I agree with that, yes.
8      Q.    Okay.  So just because the fact that he doesn't
9  testify, that doesn't mean you can't make a decision, right?
10     A.    Right.
11     Q.    That just means you can't hold it against him.
12            The reason this is capital murder is because
13  it's murder plus a robbery.  Remember it's got to be a special
14  kind of murder or special circumstances.
15     A.    Yes, sir.
16     Q.    Just because you kill somebody doesn't mean you
17  necessarily face the death penalty.  What happens is it's not
18  automatic, in other words.  There's only certain type of crimes
19  can even qualify for the death penalty.  And then if it
20  qualifies like being one of those special crimes, do they
21  automatically get the death penalty?
22     A.    No.
23     Q.    No.  And why is that?  Because you go to the second
24  part of the trial and then you decide whether they should get
25  the death penalty or not.  And that's what happened at the

174

1  first trial.  The first part of the trial is guilt or
2  innocence.  Did he do it or did he not do it?  Is he guilty or
3  is he not guilty?  If he's not guilty, the case is over.  If he
4  is guilty, though, the State goes on -- we go on to the second
5  part of the trial and you might get to hear additional
6  evidence.  You might could get to hear about this guy's
7  background or his character.  You might get to hear he's a good
8  guy or maybe he's a bad guy.  Maybe he's been to prison ten
9  times before, maybe he's never been to prison.  Maybe he was an
10  Eagle Scout, or maybe he's always been in trouble with the law.
11  Do you see what I'm saying?
12     A.    Yes, sir.
13     Q.    And I'm sure with four kids you probably, when they
14  were growing up, you wanted to hear all the facts and
15  circumstances before you made a decision on punishing them
16  because you want -- it's like I always tell people, nothing is
17  equal in this world.
18            Have you ever heard of cases like on TV or in
19  the newspaper where it will say one burglar -- you know, two
20  guys convicted of burglary.  One guy gets 20 years in prison
21  and one gets five years probation.  Sometimes people will say,
22  "Well, how can that be?  They're both guilty of burglary."  One
23  guy -- one guy got 20 years and one guy got five years
24  probation.  Why would you think that would happen?
25     A.    You're asking me?

175

1      Q.    Uh-huh.
2      A.    The one that probably got five years either turned on
3  the other guy or it was the first time probably he did it and
4  he had never been in trouble before.
5      Q.    That's a very intelligent answer.  That's how it
6  works.  Because I tell people, every case is different, every
7  person is different.  You know, maybe the first guy got 20
8  years because he had been to prison before for burglary.  Maybe
9  the second guy had never been in trouble before so he got
10  probation.  See what I'm saying?
11     A.    Yes, sir.
12     Q.    It's kind of a trick question because you have to
13  wait till you hear everything before you make a decision.  Like
14  right now you can't look at him and say, "Well, I think it's
15  this because he looks like this."  No, you've got to wait to
16  hear the evidence.
17            In the second part of the trial you might get
18  to hear additional evidence, and then what happens is you
19  answer two questions.  You don't just vote, I vote for life, I
20  vote for death.  You answer two questions.  They're on the
21  board behind you and I'd like you to look at them with me.
22            This is presupposing the guy's been found
23  guilty of capital murder.  The judge puts this question to
24  you.  "Is there a probability that the defendant will commit
25  criminal acts of violence that would constitute a continuing

176

1  threat to society?"  We call that the future dangerousness
2  question.  In other words, is there a chance, is there a good
3  chance he could hurt somebody else in the future?  It doesn't
4  mean for sure because it's just a probability.  There's no
5  way, unless you've got a crystal ball, that you can look in
6  the future that I can prove it for sure or certainty.  The law
7  doesn't require me to.  It just says it's probable.
8            The second part says, "would commit criminal
9  acts of violence."  No, the second part in that question.  It
10  says, "criminal acts of violence."  Sometimes people say,
11  "Well, I can only give him the death penalty if I think he's
12  gonna murder somebody again or commit capital murder again."
13  The law doesn't say that.  It just says criminal acts of
14  violence, which could be anything in the jury's mind.  It
15  doesn't necessarily have to be murder.
16            And the last part I'd ask you to look at says,
17  "that would constitute a continuing threat to society."  And
18  you've probably heard that before, a continuing threat to
19  society.  What do you think that means to you?
20     A.    That one stumped me.  Continuing threat to society.
21  Would that be someone that is liable to commit a crime again no
22  matter what?
23     Q.    That's right.  It's not a trick question.  What it is
24  is somebody's life will be a threat to our society committing
25  more crimes.  The question I need -- the part I need to explain

177

1  to you is society because people keep telling me, they go,
2  "Well, you know, Mr. Skurka, you don't have to seek the death
3  penalty. You can give life in prison, and if he's locked up in
4  prison, he can't hurt anybody." Is that true?
5      A.    That's a society of its own.
6      Q.    That's exactly right. Prison is part of society. It
7  sounds a little funny, but, you know, some of your rights are
8  taken around. But in a prison, who else do you have? Other
9  prisoners, guards, jailers, you know, the warden, his staff,
10  you know, some maintenance people, whatever. In other words,
11  we don't put people on a desert island or completely remove
12  them from society so they can never ever hurt anybody. So
13  would you agree with me that you could still hurt somebody in
14  prison?
15      A.    Yes.
16      Q.    And you've probably heard about that happening
17  before, right?
18      A.    Yes.
19      Q.    Okay. So just being in prison doesn't lock them away
20  from society, right? They still have interaction with other
21  people. Would you agree with that?
22      A.    Yes, sir.
23      Q.    Okay. You answered that question yes or no based on
24  the evidence. Yes, he's a danger in the future, and no, he's
25  not. Then you go to the next question. The next question says

178

1  mitigating circumstances. Mitigating circumstances. The word
2  "mitigating" means anything that would lessen or make less
3  severe the punishment. In other words, he did the crime but is
4  there any reason to lower the sentence, give him a less severe
5  sentence?
6            I'm gonna give you a trick question now. I
7  want you to think about two burglary cases. Say you're
8  sitting on a jury and you have to decide the fate of two
9  burglars. They're both equally guilty. They both went into
10  somebody's house and stole something without permission.
11  That's burglary. But you hear the evidence and the first
12  burglar — and you're probably thinking, God, burglary's bad,
13  I'm gonna give these guys a tough sentence. But you hear the
14  first case. And the first case is a guy would kicked in the
15  back door, broke the door off the hinges, went through the
16  house, ransacked the house, stole money, jewelry, TVs,
17  stereos, VCRs, everything, okay, ripped up the whole house.
18  And then he got all that stuff, the loot, and went out and
19  bought drugs with it, traded it for drugs or bought drugs with
20  that stuff. And then you find out, this isn't the first time
21  he's been convicted of burglary. He'd been to a prison twice
22  before for burglary. He's like a three time loser.
23            Okay. Now switch gears and talk about a
24  second burglar. You're trying a case on another burglary case
25  and it's the same thing, he's guilty of burglary because he

179

1  went in somebody's house and stole something without
2  permission. But the facts in this case are a little different
3  from the first case. He did not kick in the door, he didn't
4  break in a window, break into the house. What he did was the
5  back door was unlocked and he just opened the door and went
6  in. That house had money, jewelry, TV, VCRs, stereos. He
7  didn't take any of that stuff. What he stole was a loaf of
8  bread and some food because he lost his job and his kids were
9  hungry and he needed some food to feed his kids, okay?
10           And then you hear that guy's never been in
11  trouble with the law before. He's never even been arrested
12  before. He never even got a traffic ticket before, okay?
13      A.    Okay.
14      Q.    That's kind of what mitigating circumstances are.
15  Would you treat those people the same?
16      A.    No.
17      Q.    No. The first one you'd probably give a higher
18  sentence because of the aggravating factors, and the second one
19  you'd probably give a less sentence because of the mitigating
20  circumstances. See, the fact that he didn't kick in the door,
21  you know, the fact that he just stole food, he didn't take
22  other stuff, and he had never been in trouble before. That's
23  an example of mitigating circumstances, see? If you start them
24  both equal, both guilty of burglary, they're both guilty of
25  burglary. But you have to wait till you hear all the

180

1  surrounding circumstances. Sometimes people call it like
2  extenuating circumstances or something like that.
3            In the first example, there was aggravating
4  circumstances. In the second example, there was mitigating
5  circumstances. Because I don't think anybody would punish
6  those guys exactly the same, right?
7      A.    No.
8      Q.    Because of the circumstances. And that's kind of
9  what the judge is telling you to do to answer this question.
10  Pretend that you found him guilty, you say yes. Yes, I think
11  he's a continuing threat to society. But jury, before you give
12  him the death penalty, take into consideration all of the
13  evidence, including the circumstances of the offense, like what
14  happened that day, his character and background. Is it good
15  character or is it bad character; and his personal moral
16  culpability. Is there a sufficient mitigating circumstance or
17  circumstances to warrant that a sentence of life rather than
18  death be imposed? It doesn't have to be just a mitigating
19  circumstance but it's got to be enough of a mitigating
20  circumstance to outweigh it. It's kind of like a balancing
21  test. Some people may say -- you may find out like -- "Whoa,
22  he was an Eagle Scout, or he made good grades in school, or he
23  was a decorated war hero in Desert Storm," something like that.
24  And some people say, "Well, you know, because he was a war hero
25  we're gonna give him a break and give him a less sentence.

181

1  Because he came from a broken home, we're gonna give him a
2  lesser sentence."  Other people may say, "I don't care if he
3  came from a broken home, I don't care if he made straight As in
4  school, he still has to pay for what he did."
5          What I'm trying to show you it's up to the jury
6  whether or not to lower the sentence or not.  Just because you
7  hear mitigating circumstances do you automatically lower the
8  sentence to life?  No.  It's up to the jury to decide.  Like
9  going back to that burglary example.  You heard some pretty
10 good mitigating circumstances.  He just stole food for his
11 kids, you know.  So that's what this question deals with.  In
12 other words, you don't want to rush into a death penalty.  You
13 want to review everything and say, "Is there any reason I
14 should give him life instead of death?"  See what I'm saying?
15 A.   Yes.
16 Q.   Does that kind of make sense to you --
17 A.   Yeah.
18 Q.   -- that you don't want to push it and you want to
19 hear the evidence, and then you say, well, is there enough?
20 What is a mitigating circumstance is up to the jury.  The judge
21 is not gonna say, "Well, just because he's young is definitely
22 a mitigating circumstance.  Just because of this is a definite
23 mitigating circumstance."  It's up to you to decide what's
24 mitigating.  Some people may say, "Well, I don't think it's
25 mitigating.  I think it's aggravating.  Just because he's young

182

1  he's still old enough to know about better."  See what I'm
2  saying?
3  A.   Yes, sir.
4  Q.   One thing the law also says is this.  The law says,
5  "Voluntary intoxication is not a defense to crime."  Voluntary
6  intoxication.  In other words, if you go get yourself drunk or
7  high on drugs and you go commit a crime, is that an excuse?
8  A.   No.
9  Q.   No.  The law says absolutely not.  If you've been
10 drunk or high when you commit a crime, that doesn't negate your
11 guilt.  Now, what the law does say it's a possible mitigating
12 circumstance.  It could be a mitigating circumstances.
13         You know, say a guy gets drunk and robs a
14 bank.  Some people may say, "Well, he robbed a bank, but, you
15 know, since he was drunk, we'll give him a break on that."
16 Other people will say, "I don't care if he was drunk.  He got
17 himself drunk and robbed the bank so you still have to pay for
18 it."  See what I'm saying?  That's one of those things I'm
19 saying could be a mitigating circumstance.
20         Do you have any questions about this?
21 A.   No.
22 Q.   Okay.  So the answer is if you find him guilty and
23 you answer this question yes; yes, I think he's a continuing
24 threat to society, and you answer no; no, there's not enough
25 mitigating circumstance to warrant that I give him life instead

183

1  of death, that man is sentenced to die.  If you answered any
2  other way, he gets a life sentence, okay?
3  A.   Okay.
4  Q.   Yes, no, death.  Yes or no or any other way you
5  answer it is gonna be a life sentence, okay?
6  A.   Okay.
7  Q.   And again, you have to start out equal.  You can't be
8  thinking one way or the other.  And you're that way, right?
9  A.   Uh-huh.
10 Q.   A couple of legal things we need to talk about are
11 the fact just because he's indicted doesn't mean he's guilty;
12 do you remember the judge said that?
13 A.   Yes.
14 Q.   The charges are brought against him, but that doesn't
15 mean anything until the State proves the case.  He has a Fifth
16 Amendment right to testify if he wants to but he doesn't have
17 to and you can't hold that against him, and you told us before
18 you wouldn't hold it against him.
19         The burden of proof is beyond a reasonable
20 doubt.  That means that we have to prove the case beyond a
21 reasonable doubt.  It doesn't mean beyond all doubt or a shadow
22 of a doubt or any doubt.  It just says beyond a reasonable
23 doubt.
24 A.   Yes, sir.
25 Q.   Which is what I tell people is -- you know, first of

184

1  all, you have to ask yourself do you have a doubt.  If you
2  don't have a doubt, you just go ahead and vote guilty.  And if
3  you have a doubt, ask the second question.  Is it a reasonable
4  doubt?  Do I have a reason for that doubt?
5          So then you make your mind up on that.  But
6  there's no way I could prove it to you beyond all doubt or any
7  doubt unless you were a witness and you saw the thing yourself,
8  and you couldn't be on the jury obviously.
9          Okay.  A few questions I have to ask you about.
10 You said you know somebody on probation but it said, "please
11 talk to me."
12 A.   Oh, it's -- I didn't know if the juvenile court thing
13 had anything to do with you-all.  My sister's -- it wasn't even
14 juvenile.  I guess it was CPS or something or other.  They took
15 her children away because she was on probation.  But I have no
16 contact with my mother or my sister anymore.  I haven't had any
17 for over a year.
18 Q.   Is that the one where you said in your questionnaire
19 that your sister used drugs, and after you found that out, you
20 quit talking to her?
21 A.   (Nodding head up and down.)
22 Q.   You feel pretty strongly against drugs, right?
23 A.   I feel very strongly because she has children.
24 A.   Uh-huh.
25 A.   If she had made that decision before she had

185

1    children, I think I would have worked with her.  But she had
2    her family and then she did the drugs and I think that's wrong.
3        Q.   Sometimes people say, "Well, it's not their fault.
4    They have a disease, it's a medical problem.  The law shouldn't
5    be involved in that stuff at all."  How do you feel?
6        A.   I don't think -- well, if you're surrounded by them,
7    if you grew up with people, then I think it's a disease.  If
8    you grew with them and you think it's right.  She did not grow
9    up with people that used drugs.  She went out and looked for
10   them.
11       Q.   So you're a little harder on somebody like that,
12   correct?
13       A.   Yeah, if they do it by choice, yes.
14       Q.   But what about people -- because I've heard of this
15   happen before -- some people whose parents were alcoholics are
16   not alcoholics because they want to go against that.  They grew
17   up around alcoholics and they chose not to drink because they
18   saw what happened to their parents?
19       A.   My father's an alcoholic.  I can't say any of us are.
20   We learned that you have to hold a job, you have to work.  I
21   mean, my father was good about making us work when we were
22   little.  When I was young, we were farmers from daybreak to
23   sundown, you know, and alcohol didn't impede him, but it did
24   make overall life hard.  And I just don't care to, you know, do
25   it.  You know, I don't want my children to have to grow up like

186

1    that.
2        Q.   But what you're saying, too, is you make a conscious
3    choice?
4        A.   Yes, you make a choice.  After you become a certain
5    age you make a conscious choice.
6        Q.   Just because your dad's an alcoholic doesn't make you
7    automatically an alcoholic?
8        A.   No.
9        Q.   A person who is an adult has choices whether it's
10   drugs or alcohol?
11       A.   Correct.
12       Q.   Would you agree with that?
13       A.   Yes.
14       Q.   Okay.  Do you think you can sit on this jury and be
15   fair to everybody?
16       A.   Yes.
17       Q.   You think you'll -- I mean, I have to ask that
18   question because they want to make sure you're fair, I want to
19   make sure you're fair, the judge wants to make sure you're
20   qualified, and you seem to be.  I just want to double-check.
21   You can listen to all the evidence and make a decision based on
22   just the evidence?
23       A.   Yes, I can.
24       Q.   And if the evidence is such that you think he's not
25   guilty, can you vote not guilty?

187

1        A.   Yes, sir.
2        Q.   And if the evidence is such you think he is guilty,
3    can you vote guilty?
4        A.   Yes.
5        Q.   And if the evidence is such that you think that he
6    should get a life sentence, can you answer those questions in
7    such a way where he gets a life sentence?
8        A.   Yes, sir.
9        Q.   And if somebody brings up evidence that there might
10   be some mitigating circumstances, can you really fairly
11   consider that before you make a decision?
12       A.   Yes, I can.
13       Q.   It doesn't mean you have to go along with it but you
14   have to be open-minded to consider it and think about it first?
15       A.   Yes.
16       Q.   And if the evidence is in such a way that you think
17   this question should be answered in such that John Henry
18   Ramirez gets a death sentence, can you vote for that?
19       A.   Yes, sir.
20       Q.   And I just want somebody that cannot just talk about
21   it but can actually do it, if it comes to it.  You think you
22   can do that?
23       A.   Yes, sir.
24       Q.   Is there any reason you couldn't be on this jury and
25   be fair and impartial to both sides?

188

1        A.   No, there's not.
2        MR. SKURKA:  Thank you so much for talking to
3    me, ma'am.  I'll let the defense attorneys talk to you now.
4              VOIR DIRE EXAMINATION
5    BY MR. JONES:
6        Q.   Your sister, how old is she, roughly?
7        A.   Debbie, roughly, I'd say about 30.
8        Q.   Thirty years old.  And she has children?
9        A.   Uh-huh.
10       Q.   How many children does she have?
11       A.   She has four.
12       Q.   And what are their age range?
13       A.   Let me see.  I'll be honest.  I can't even remember.
14   I think the twins, the babies are two.  Emily might be five
15   already, and Raymond's about 12.
16       Q.   Twelve?
17       A.   Yeah.
18       Q.   So she's got a pre-teenager?
19       A.   Yes.
20       Q.   Okay.  Is your sister married?
21       A.   No, she's not.
22       Q.   Are any of the children that she has, were they born
23   in wedlock?
24       A.   No.
25       Q.   Okay.  And you say that she grew up in a family where

189

1  this kind of behavior, that is, using drugs, was not condoned
2  or encouraged?
3      A.   Correct.
4      Q.   Okay.  Which brings me to my question.  And I think
5  most of us believe this way, that human beings, unless they're,
6  you know, retarded, have the power to choose.  We have free
7  will.
8      A.   Free will, yes.
9      Q.   In other words, we have the power to choose one
10  course of action over another.  Like we can choose to use drugs
11  or not.  Or we can choose to drive our car intoxicated or not,
12  you know, and so forth.  We can choose to -- well, you can go
13  on and on with that.  So -- now, let's -- I'm gonna jump
14  forward a little bit and talk about this second special issue,
15  because it really kind of gets to the heart of the case, if we
16  get that far.
17            You told me or I heard you answer one of
18  Mr. Skurka's questions that if -- that if a person kills
19  another person -- if a person kills another person, that
20  they've kind of sacrificed their own life, forfeited the right
21  to.  And I kind of got the impression when you said that that
22  if you found a person guilty of capital murder, that that's all
23  you need to know, that you would impose the death penalty no
24  matter what the evidence was otherwise.
25      A.   I'd like to think no.  It just -- it would depend,

190

1  like I said.  They forfeited their life to be free, yes.  I
2  believe that.
3      Q.   Okay.
4      A.   If they're gonna spend it in jail, they made the
5  choice when they decided to commit the crime.
6      Q.   All right.  So you weren't trying to convey the idea
7  that you would automatically vote for the death penalty?
8      A.   No.
9      Q.   I mean, the legislature gave us two choices, life or
10  death.  And so, can you conceive of a set of circumstances
11  where a person might be -- a life sentence might be a just
12  punishment in a capital murder case?
13      A.   Okay.  Say they went in to rob the store or
14  something, and someone came at them, you know, with a knife or
15  a gun or something, and they shot the person.  At first
16  intention they weren't intending to kill anybody.  They were
17  just intending to get away with, you know, whatever, products.
18  But when they feared for their life, they had to protect
19  themselves.
20      Q.   Okay.  Let me give you another example.  This is a
21  real case that happened.  It was a trial in this courthouse
22  about a year ago.  It was a lady defendant and she was a
23  professional prostitute and had been since the time she was a
24  teenager.  The State proved up that on the day in question that
25  she lured a customer to her motel room and waiting in the motel

191

1  room was her pimp who was there to rob the customer.  That was
2  the purpose of taking him there.  And they did, that is, the
3  pimp did, and it was a male.  And the -- the victim resisted
4  the robbery, and in the course of robbery was -- I can't
5  remember if he was shot or stabbed.  But anyway, the guy died,
6  okay?  And the evidence also showed that the defendant was not
7  caught right away.  About a period of a month had passed, and
8  during that period of month before she was arrested, she pulled
9  another robbery and had the pimp bring the guy to the
10  apartment, and this guy didn't get killed.  He got -- he got
11  away.
12            Now, during -- she was found guilty of capital
13  murder, okay?  And at the punishment stage of the trial, the
14  defense was able to prove up that when she was about 12 years
15  old, her mother sold her as a prostitute.  Her mother was her
16  first pimp, okay?  You're shaking your head.
17      A.   It's sad.
18      Q.   It's very sad.  Okay.  And so when the case was over
19  the jury answered Special Issue No. 2 yes.  And when we talked
20  to them after the case was over, that's what they talked about.
21  They said that was -- that was really -- we just couldn't
22  believe that that happened.  That was a mitigating circumstance
23  that caused them to want to vote a life sentence over.  Also
24  the evidence showed this lady had a really bad criminal
25  history.  She had been convicted of prostitution and assault

192

1  and drugs and a whole bunch of stuff, okay?  The lady was
2  like -- I forgotten how old she was -- she was in her early
3  30s.
4            So in that situation, you know, let's say you
5  had been on that jury, would you have looked at the fact that
6  the mother sold her as a prostitute when she was 12 years old?
7  Would that be a kind of a circumstance that you might
8  seriously consider?
9      A.   Life is sad, it was sad for her, it was hard for her,
10  but I didn't -- I don't see where she tried to better herself
11  afterwards.
12      Q.   Okay.
13      A.   So, I guess I would have.
14      Q.   So, at some point, she -- there was no reason --
15  well, I'm gonna interrupt my question and go back to this
16  Special Issue No. 2.  And you wouldn't get to Special Issue No.
17  2 unless you had answered this first question over here yes.
18  In other words, you -- the jury has already found that the
19  defendant, because of his history or whatever, that yes, if
20  he's out on the street again he's likely to commit criminal
21  acts of violence in the future.  It would be a continuing
22  threat to society.  Now you got to Special Issue No. 2.
23            Would you read that, please, and when you get
24  through reading it, let me know when you're finished.
25      A.   Okay.  The one that says "the defendant"?

193

1    Q.   Yeah, read it to yourself, and then when you finish
2    reading it let me know when you're finished.  Can you see it
3    fine?
4    A.   Uh-huh.  Okay.
5    Q.   Is there any word or phrase in that question that you
6    do not understand?
7    A.   The personal moral culpability.
8    Q.   Okay.  All right.  We'll get to that in a minute.
9    What about that -- right up at that first line, "taking into
10   consideration."  What does it mean to consider?
11   A.   To hear about it and just think about it.
12   Q.   That's it.  You said it.  Really to consider, if I
13   asked you consider this, I'm asking you to think about it.  But
14   it also -- usually when you ask somebody to consider something,
15   it's -- it's usually with the view that they do something.
16   A.   Oh, okay.
17   Q.   Okay?  In other words, if you were in market for a
18   computer I would say, "Well, you should consider buying a
19   Compaq computer because it's a great machine.  It's very
20   reliable.  You should consider this machine."  And when I asked
21   you to consider it, think about it with a view towards you
22   might buy it, okay?
23            Now, in this question, they ask you to consider
24   or think about certain things, right?
25   A.   Right.

194

1    Q.   And the first thing they ask you is to consider the
2    circumstances of the offense.  Okay?  You've already heard that
3    the first part of the trial, right?
4    A.   Right.
5    Q.   Now, sometimes I like to give this illustration.  The
6    jury's in the box at the second stage of the trial and the --
7    the defendant proves up that -- that the defendant had a really
8    bad childhood.  He was neglected and whatever.  Parents didn't
9    let him -- didn't make him go to school, etc., etc.  And so
10   you're listening to that and you think, well, you know what,
11   that's a circumstance which might cause me to want to vote for
12   a life sentence.  The juror next to you says, "No, no, there
13   are lots of people who were mistreated by their parents, okay,
14   when they were growing up.  They either didn't have parents or
15   the parents were bad to them or didn't make them do what they
16   were supposed to do, but these people don't go out and kill
17   people, you know.  It's no excuse."  Okay.  What's wrong with
18   that argument?
19   A.   Uh --
20   Q.   What's wrong with it is is the juror is talking about
21   that evidence in terms of being a defense to the crime itself,
22   okay?  And it's not.  He's correct, it's not a defense.  The
23   fact that your parents neglected you is not a defense to a
24   crime as say self-defense is.  In other words, if you were --
25   if you were confronted with deadly force and pulled out a gun

195

1    and shot the guy that was coming at you, that's a defense,
2    which goes to the question are you guilty or not guilty.  So
3    we're not talking about is it an excuse.  We're talking about
4    is it a factor that would cause you to want to reduce the
5    punishment, okay?
6            So let's go further.  So what's involved with
7    that?  To consider the defendant's character.  All right.  So
8    you think -- so this -- so -- if I say that you were a person
9    of good character, what does that mean?
10   A.   They're honest.
11   Q.   They're what?
12   A.   Good character.  They're honest.
13   Q.   Honest.  There are a lot of things it might mean.  It
14   might mean you're honest, you're trustworthy, you're thrifty,
15   you're hardworking.  You can probably make a whole laundry
16   list.  You can go to the Ten Commandments, go to the Boy Scout
17   Law, and you can get a whole list of rules and moral conduct.
18   So if a person has good character, it's really how much they
19   adhere to that standard.  A person who adheres to the standards
20   of moral behavior that are accepted in the community, they're
21   -- you say they have good character.  Do you agree with that?
22   A.   Yes.
23   Q.   What about background?  If the question asks you to
24   consider the defendant's background, what is that asking you to
25   do?

196

1    A.   Well, when you talk about background, you talk about
2    his childhood again.
3    Q.   That's right, his biography.
4    A.   How he was brought up.
5    Q.   How he was brought up.  Now, have you told me that,
6    in your mind, it doesn't make any difference how a person was
7    brought up when it comes to deciding punishment?
8    A.   It just -- I don't know.  I mean, everybody has it
9    rough.  It's not easy for anybody.  Even rich kids have it
10   rough.
11   Q.   Okay.  Well, the law requires you to consider the
12   defendant's character and his background, and it doesn't say
13   you have to do anything with it.  It just says you need to
14   think about it with a view toward voting for a life sentence.
15   And I think what I'm hearing you're saying is your personal
16   opinion that you can't consider that, seriously consider it as
17   a mitigating circumstance in a case like this?
18   A.   Maybe not.
19   Q.   Okay.  The next one says, "personal moral
20   culpability."  Do you remember the -- the little example that
21   Mr. Skurka gave you where it was a theft or burglary where one
22   guy came in and tore the place up --
23   A.   Yes.
24   Q.   -- and the other guy was stealing to -- stealing food
25   for his hungry kids?  You're the judge.  And he asks you, "Did

197

1   you give the two burglars the same punishment?"

2       A.   Oh, that was the moral culpability. The one did it

3   to feed his family.

4       Q.   Yeah, so --

5       A.   And the other one to drink, for his habits.

6       Q.   They're both guilty of burglary, right?

7       A.   Right.

8       Q.   But I believe you said that you would, if you were

9   setting the punishment, you wouldn't give the same punishment

10  to each one of them, right?

11      A.   Right.

12      Q.   Why not?

13      A.   Because one of them was trying to feed his family, he

14  was trying to do good for his family, and he'd never had any --

15  he'd never been in trouble before.

16      Q.   Okay.

17      A.   And the other one, the one that broke -- you know,

18  forcibly broke in, had been in and out of trouble and he was

19  feeding his habit.

20      Q.   So to carry this just a little bit further, what

21  difference does it make what the men's motive was when he broke

22  into the house, whether to feed his kids or just to enrich

23  himself? A crime's a crime.

24      A.   A crime's a crime, but, I mean, he -- he was just

25  doing it for his family. The other one was doing it for

198

1   himself and he stole things that -- you know, he really

2   burglarized the home.

3       Q.   He vandalized it, destruction?

4       A.   Of money, of value. The other one just took food.

5       Q.   Now, let's go back -- remember I asked you about free

6   will?

7       A.   Uh-huh.

8       Q.   And we have choices to make. When you talk about

9   moral culpability I think it requires two considerations or two

10  -- there's really -- it has two elements. One, does the person

11  involved, the defendant, does he know what the rules are?

12  Okay. You know, you talk about in your family you have a

13  strong family, and you know, your family grows up, they're

14  taught the right values. They, you know, have contact with

15  churches and teachers or other, you know, peers, they teach the

16  kids what they're supposed to do so by the time they get to be

17  18 years old they know what to do; do you agree?

18      A.   Yes.

19      Q.   Okay. Then the second element is, is there anything

20  going on that would keep a person from or would affect a

21  person's judgment about choosing the right course of action?

22  Mr. Skurka told you that intoxication is not a defense to a

23  crime. But it might be a mitigating circumstance which means

24  that it might be evidence that intoxication affected a person's

25  ability or his judgment in choosing the right course of action

199

1   based on the rules. Are you following me with this?

2       A.   Yes, sir.

3       Q.   So can you imagine some situations which might affect

4   a person's ability to make correct choices about this? Let's

5   take your sister. Your sister has chosen to use drugs. Is

6   there anything going on in her life which would affect her

7   judgment about this?

8       A.   Well, she doesn't hold a job, she doesn't like to

9   work.

10      Q.   Okay. Does she have any mental health problems?

11      A.   No.

12      Q.   You said your father was an alcoholic?

13      A.   She didn't grow up with my father. My mother

14  divorced my dad when she was little.

15      Q.   But your father's the biological father, right?

16      A.   Uh-huh.

17      Q.   Okay. Is there a possibility that she -- you know,

18  they say that alcoholism has a genetic factor or an addiction,

19  maybe it has a genetic factor. Do you think your sister might

20  carry a bad gene in that regard?

21      A.   It could be. But she's not an alcoholic so.

22      Q.   Well, it could be alcohol or some other drug.

23      A.   Yeah.

24      Q.   If that were the case, if it were -- you were able to

25  know that, would that be a mitigating circumstance?

200

1            MR. SKURKA: Judge, I'm gonna object to the

2   question as being a commitment question.

3            THE COURT: Sustained.

4            MR. SKURKA: It should be can you consider it

5   as a possibility.

6            THE COURT: Sustained.

7       Q.   (BY MR. JONES) Your --

8       A.   I could consider that -- I could consider it as a

9   possibility but --

10      Q.   Okay. Now, you say your sister -- your sister has

11  four children, a set of twins and two others. And all of the

12  kids are born out of wedlock and she's -- she's basically not

13  taking care of them because she's unemployed, right?

14      A.   (Nodding head up and down.)

15      Q.   So let's say that that 12-year-old, you know, becomes

16  13, 14, 15, 16, and then at the age of 17 commits a felony.

17  He's in court and his lawyer starts proving up all the things

18  that didn't happen in his life, or her, her own life. Would

19  that be a mitigating circumstance for that child because of

20  what his mother didn't do?

21           MR. SKURKA: Judge, again, I'm gonna object to

22  him saying --

23           THE COURT: Rephrase it.

24      Q.   (BY MR. JONES) Would you consider that as being

25  possible?

201

1    A.   It would be considered, but knowing -- knowing him
2  and knowing that there are -- she could have asked for help and
3  she didn't, or, you know, she just doesn't try to help and he's
4  -- he's --
5             THE COURT:  Well, wait a minute though.
6  That's not his fault that she doesn't try to ask for help.
7             VENIREPERSON NO. 77:  No, I mean, he -- given
8  a choice, if he asked anybody of the family -- you know, I
9  mean, they're trying to do right by him right now, but he's
10  got -- oh, nevermind.  I'm getting carried away here.  I'm
11  just saying anger issues would come to the front.
12    Q.   (BY MR. JONES)  What?
13    A.   Anger issues.
14    Q.   Okay.  You're talking about the 12-year-old.  Okay.
15  All right.  I think I've gone far enough with this.
16    A.   I know.  I'm kind of warped.
17    Q.   I know.
18             THE COURT:  No, it's something we don't
19  normally think about.  We do, but, you know, if you're not in
20  this business, you don't normally think about this.
21             MR. JONES:  Yeah, this is the problem with --
22  you know, it's not that you're called upon every day to think
23  about this deeply.
24    Q.   (BY MR. JONES)  Okay.  One more quick question.  That
25  verb "to mitigate."  Is there sufficient mitigating

202

1  circumstances?  What does the verb "to mitigate" mean?
2    A.   Reason, is there a reason.
3    Q.   Okay.  If a circumstance is a mitigating
4  circumstance, what will it cause you to want to do?
5    A.   Okay.  If there's a reason why it shouldn't be the
6  death penalty then it should be life in prison, right?
7    Q.   But what does the verb "to mitigate" mean?  I'm not
8  trying to put you on the spot here, but a man's life is at
9  stake here and you need to convince us that you understand what
10  the word means.
11    A.   I can't verbalize it.
12    Q.   Okay.
13    A.   Something to mitigate, a reason.  That's what I was
14  thinking it was a reason.
15             MR. JONES:  No further questions.
16             VOIR DIRE EXAMINATION
17  BY MR. SKURKA:
18    Q.   It essentially means a reason to go lower, less
19  severe punishment.  It's a word we don't come across.  But
20  remember what I said, mitigation means to lessen or make
21  lesser.
22    A.   Yes.
23    Q.   And you were trying to say that.  You said a reason.
24  Is there a reason to make less.  You just didn't finish that
25  train of thought; do you understand that?

203

1    A.   Yes, sir.
2    Q.   And the whole point on considering these mitigating
3  circumstances is not what you're gonna do with them before
4  you've heard of them.  The question is would you be open-minded
5  and listen to those things.  See what I'm saying?
6    A.   Yes.
7    Q.   Can you do that?
8    A.   I think I can.
9    Q.   Okay.  It's like -- were you there that day -- do you
10  follow football at all?
11    A.   No.
12    Q.   Do you know who the Dallas Cowboys are?
13    A.   Yes.
14    Q.   Do you know who they played last night?
15    A.   I'm not sure.
16    Q.   Well, they played the Washington Redskins.  And
17  remember that first day I told you I hate the Washington
18  Redskins?
19    A.   I remember that.
20    Q.   Now, tell me if I was on a jury and a guy walked in
21  who was on trial and he walked in and he sat down and the judge
22  said, "That guy's on trial," and he was wearing a Washington
23  Redskins jersey and I said, "I couldn't even consider
24  anything."  I'm automatically gonna go for the highest sentence
25  because he's a Washington Redskins fan.  That wouldn't be right

204

1  of me, right?
2    A.   Right.
3    Q.   And that's what the defense and we're trying to
4  figure out is.  Just because they have a reason, you can't hold
5  that thing against him.  I mean, what if the guy who is wearing
6  a Washington Redskins T-shirt turns out to be like the burglar
7  in the second example who just stole food from his family?  If
8  I wasn't close minded I would say, "I'm not gonna consider any
9  kind of mitigating circumstances because he's a Redskins fan."
10  But that would be wrong.  I'd have to be open-minded and say,
11  "Okay.  He's a Redskins fan, but, you know, he just stole food
12  for his family."  Or, you know, "He didn't really break in and
13  he didn't have any record."  See what I'm saying?
14    A.   Yes, sir.
15    Q.   It's kind of a trick question.  So you can consider
16  everything, right?
17    A.   (Nodding head up and down.)
18             MR. SKURKA:  Okay.  That's all I need you to
19  do.  Thank you.
20             VOIR DIRE EXAMINATION
21  BY THE COURT:
22    Q.   It's up to the jury to decide what a mitigating
23  circumstance is, okay?  And we can't tell you what would you
24  consider a mitigating circumstance.  I just need to know that
25  you can consider them.  I mean, if you -- if you -- and,

205

1    please, you got to tell us how you really feel. Because it
2    doesn't matter how you feel right now, okay?
3         A.    Okay.
4         Q.    You can tell us how you feel right now and it is
5    okay. It won't hurt any of our feelings. Here's the thing. I
6    need to know if you think that there's just nothing out there
7    -- there's no kind of mitigating circumstances that would ever
8    -- you would ever find sufficient to give a life sentence
9    rather than a death sentence -- and just wait with me. That
10   is, if you -- you know, I know -- I know from your answers that
11   you could give the defendant a fair trial on the first part of
12   the case, okay? You would make the State prove their case,
13   right?
14        A.    Yes.
15        Q.    Okay. That's not the issue that I'm concerned with.
16   The issue that I'm concerned with is, could you consider
17   mitigating circumstances, and -- you know, we can't tell you
18   what they're gonna be, but there has been suggestions of what
19   kind of things can be mitigating circumstances. Like a bad
20   childhood, like a lack of guidance. It doesn't mean that
21   you're gonna do it, but I need to know that these are types of
22   things that you can consider, okay? So I need to know if
23   you're gonna say, "You know what, everybody's had a hard life,
24   I'm just not gonna consider any." Because see, the fact of the
25   matter is, background is one of the things that, by law, you

206

1    have to consider. That doesn't mean that you say, "Yeah,
2    there's sufficient mitigating circumstances at the drop of a
3    hat." No. This question is a question that takes a lot of
4    thought and careful consideration. But if you're not gonna
5    consider the person's background, I need to know.
6         A.    I'd like to think I can, yes. I can consider the
7    background. I can be objective.
8         Q.    Okay. Is it possible that because -- after you
9    consider the background, after you consider the circumstances
10   of the offense, after you've considered the defendant's
11   character; that is, is he a good guy or a bad guy, and this
12   personal moral culpability, that's legalese, but essentially
13   it's like the burglars. Remember Mr. Jones was talking about
14   the burglars. The one burglar was trying to feed his family,
15   the other burglar was just, you know, wanting to go out to
16   party and get high, trash the people's place. I mean, it makes
17   a difference. Do you not --
18        A.    Yes.
19        Q.    -- agree? And that's what that's saying. And so
20   can you consider that really, really?
21        A.    I think I can, yes.
22              MR. JONES: I need to ask her some more
23   questions --
24              THE COURT: Go for it.
25              MR. JONES:  -- because that's not what I heard

207

1    her say.
2              THE COURT: Okay. You go right ahead. That's
3    why -- that's why I was concerned and that's why I followed up
4    with it.
5                      VOIR DIRE EXAMINATION
6    BY MR. JONES:
7         Q.    And keep in mind your viewpoint, there are no right
8    or wrong answers here. You're entitled to your viewpoint, your
9    feelings. But, you know, needless to say, I need you to be
10   honest with me as to what your feelings are because they will
11   affect how you will deliberate in this case.
12             You've made some pretty definitive and clear
13   statements that a person's background, that is, the fact that
14   you had a tough upbringing, you know, was neglected as a child,
15   etc., simply would not be something that would cause to you
16   want to be lenient or give a lesser punishment?
17        A.    That's how I came across.
18        Q.    No, you actually said it.
19        A.    I tend -- yeah, I tend to be harsh, I guess. I would
20   consider all the evidence, I would. I would consider the
21   background, I would take it into consideration. I'm not -- you
22   know, I'm not out to kill anybody or say, you know, so.
23        Q.    When you say, "you'll consider background," with a
24   view toward doing what?
25        A.    Deciding if the crime meets the lesser punishment.

208

1         Q.    Okay. The law says not only should you consider it
2    but you should fairly consider it, and I'm wondering whether
3    given your opinions and your feelings, that it doesn't make any
4    difference what a person's background is, at some point he
5    becomes, you know, -- I mean, you basically told me with your
6    own relatives here that if this 12-year-old, you know, starts
7    breaking the law, it doesn't make any difference that his
8    mother neglected him if he was so unfortunate to find himself
9    in a courtroom. Is that what you're telling us? If --
10        A.    Well, if it was -- if he was on trial, I wouldn't be
11   questioned. I wouldn't be there.
12        Q.    I know, you'd be biased.
13        A.    No, I wouldn't -- you know, you-all wouldn't have
14   even considered me.
15        Q.    Exactly.
16        A.    Because --
17             THE COURT: Yeah, no, that's true. You'd
18   never make it on the jury. But that's just an example.
19        A.    Yeah, I know, but it's different. You know, someone
20   that I have no contact with, I don't know or anything, compared
21   to someone that I raised as a baby.
22        Q.    (BY MR. JONES) But you could be -- if you're -- I
23   don't even want to contemplate this, but if your nephew is on
24   trial and you were sitting out in the audience as an interested
25   family member, okay, and the defense lawyer's getting up there

209

1  and saying, "You-all need to go easy on this kid because his
2  mother neglected him and so forth." Would you -- deep down in
3  your heart, would you be agreeing with that?
4      A.  No.
5      Q.  Or you would say, "No, I wouldn't agree with it"?
6      A.  I wouldn't agree with it, no. Because I was there
7  when they took him away.
8          MR. JONES: No further questions.
9          MR. SKURKA: Can I follow up, Judge, on just a
10  couple of things?
11         THE COURT: Yeah, you can follow up.
12             VOIR DIRE EXAMINATION
13  BY MR. SKURKA:
14     Q.  I'm a little confused because counsel keeps asking
15  about your grandson (sic) and all that stuff.
16         THE COURT: Nephew.
17     Q.  (BY MR. SKURKA) Nephew and all that. We're not
18  talking about specifically committing you to that situation. I
19  think what he's trying to say, in general, I mean, take out
20  somebody you know. In this case, you don't know John Henry
21  Ramirez?
22     A.  No.
23     Q.  You don't know what his background is, so you can't
24  really compare him to your loved one, your relative. And I
25  think that what the judge is trying to figure out is would you

210

1  be fairly able to consider any evidence before you act on it
2  about what kind of punishment he gets? Or are you gonna say,
3  "Well, I'm not gonna be satisfied with this," and make up your
4  mind before you even hear anything?
5      A.  No, like I said, I think I can be fair. I'd like to
6  think I am, you know, given the opportunity. But, you know,
7  it's up to you-all.
8      Q.  Will you listen to any evidence they may put on that
9  shows that he might be worth giving a chance to, give him a
10  life sentence?
11     A.  Yes.
12     Q.  Okay. You haven't closed your mind to that, have
13  you?
14     A.  No.
15     Q.  Okay. Well, see, do you understand his point of
16  view?
17     A.  I understand his point of view.
18     Q.  Will you listen to that stuff?
19     A.  I will listen to it and I can consider it.
20     Q.  You can consider it?
21     A.  Yes.
22     Q.  No matter what it is?
23     A.  Yes, sir.
24         MR. SKURKA: Thank you, ma'am.
25         VENIREPERSON NO. 77: Can I go?

211

1          MR. JONES: Yeah, I'm finished.
2          THE COURT: Why don't you wait in the jury
3  room. Let me talk to the lawyers.
4          MR. JONES: I'm sorry. I should have told you
5  I finished.
6          (Venireperson exits courtroom.)
7          MR. JONES: Your Honor, we move to strike this
8  juror for cause because given from the totality of her
9  answers, I do not think that she can fairly consider with a
10  view towards giving a life sentence the defendant's
11  background. And the defense, in a capital murder case, is
12  required by the Constitution of the Supreme Court to prove up
13  that background, especially if it's bad background, and to
14  argue to the jury that they should consider it as a mitigating
15  circumstance.
16         Her personal viewpoint is, is that it doesn't
17  make a difference what your background is, bad or good. At
18  some point, it can't be argued in her mind to be a reason for
19  showing leniency and that's just the way she feels. And I
20  think if the Court even has a doubt about this, that that
21  doubt ought to be resolved in favor of the defendant. But she
22  made a really clear answer the first time I asked her that
23  question when I asked her, "Do you think you could consider
24  that with a view toward, you know, giving a life sentence?"
25  And she says, "I don't think I can," you know. And her

212

1  statements about her sister and her nephew, put those two
2  together --
3          THE COURT: Except that -- except that -- and
4  I'm -- I'm on the fence with agreeing with you on the first
5  part of it. You didn't press her -- I mean, there may be
6  other reasons why she, on her nephew's case, feels
7  differently. I mean, it may very well be that the rest of the
8  family has jumped in and is raising that kid. Nobody's
9  explored that. And maybe that's her motivation. Maybe --
10         MR. JONES: I don't know.
11         THE COURT: We didn't explore that. But it
12  may very well be that, you know, she has jumped in and has
13  taken a motherly role with that child, or somebody else in the
14  family, and that's why she feels that way about that
15  situation. But I -- I -- but I -- I see where you're coming
16  from because although she does say she can consider everything
17  when I press her, it doesn't really feel that way, Mr. Skurka.
18         MR. SKURKA: All I can do, Judge, is
19  respectfully disagree with Mr. Jones' assessment of the
20  witness. The juror basically said, "I can consider these
21  things." Now, when Mr. Jones pressed her about this bad
22  background, there was too much -- in my opinion, too much
23  thoughts about the background she knew about with this young
24  man, this nephew of everything. And she said, "I have a hard
25  time excusing that because I know his background," the

213

1 nephew's and --

2       THE COURT: Exactly.

3       MR. SKURKA: -- that's completely different

4 from this.

5       THE COURT: I'm not considering the nephew

6 thing because no one asked her, "Why do you feel that way?

7 Why don't you feel that that should be a factor?" Maybe the

8 -- maybe someone else in the family has picked up the slack

9 and doing everything that a parent should do. We don't know.

10 But no one asked. But I got the feeling that she thinks she

11 can be fair.

12       MR. JONES: That's another thing, she

13 qualified her answer, "I think I can do it."

14       THE COURT: Which many people do. A lot of --

15 we don't like that, okay? We don't -- we call it qualifying

16 our answer. And when you ask a juror many times, they'll say,

17 "What do you mean?" Because when they say, "I think so," that

18 means to them yes. But nonetheless, I got -- you know, this

19 is a death penalty case, and I just -- I can't take the chance

20 on this, Mr. Skurka. I just think -- I'm gonna grant the

21 challenge for cause. I just -- I mean, I -- I think you may

22 be technically right, but with so much on line, I just don't

23 think I can go with you on this one.

24       MR. SKURKA: As long as you say I'm

25 technically right, Judge.

214

1       THE COURT: I think you may be technically

2 right, Mr. Skurka.

3       MR. SKURKA: I'm not gonna argue with the

4 Court.

5       THE COURT: But I've got to feel -- I got to

6 feel and I just -- that's, you know, how I see it. So let's

7 bring her in.

8       (Venireperson enters courtroom.)

9       THE COURT: All right. Ms. Guerrero, you were

10 not selected to be on this jury but we do appreciate you

11 spending a good part of your day with us, mostly waiting in

12 the jury room, and we're sorry about that. If you need a work

13 excuse, we can get that for you. Thank you very much for your

14 time, ma'am.

15       (Venireperson exits courtroom.)

16       MR. JONES: This is absolutely irrelevant, but

17 based on the information from her questionnaire --

18       THE COURT: Are we off the record?

19       MR. JONES: Yeah, we're off the record.

20       (Discussion off the record.)

21       THE COURT: All right. How far do you think

22 we're gonna get today, gentlemen, realistically? We've got

23 six more people.

24       MR. GARZA: About three.

25       MR. SKURKA: Well, some of the next ones may

215

1 disqualify themselves pretty fast.

2       THE COURT: Okay.

3       MR. SKURKA: But the next one specifically, I

4 think.

5       THE COURT: Why do you think the next one?

6       MR. SKURKA: Judge, it's religious reasons,

7 79. She has religious reasons, says every life is sacred and

8 she talks about religion quite a bit.

9       THE COURT: Okay. We'll hold for now.

10       MR. SKURKA: And then the same thing with No.

11 81, she says she's leaning toward a life sentence.

12       THE COURT: Okay.

13       MR. SKURKA: And she answered certain

14 questions. I mean, I'm gonna talk to her about those first.

15       THE COURT: But you think the rest of them --

16       MR. SKURKA: Are possible selections except

17 for No. 82. That's another one that has a religious problems.

18       THE COURT: Yeah, but we've got six more.

19       MR. SKURKA: She says she's very nervous about

20 it. She's a Sunday school teacher. I think those persons are

21 a chance that they may not qualify.

22       THE COURT: Okay. Here's where we are. Right

23 now there's two people here that have probably just been here

24 a half hour. I really don't mind sending either of those

25 folks home at this point. I don't really feel bad about it.

216

1 I'm not sure I want to leave them here another two hours and

2 then send them home.

3       MR. GARZA: If you send two home, how many do

4 you have left?

5       THE COURT: Well we've got six. Even if we

6 sent two home, we still have four.

7       MR. JONES: I'd send two home.

8       THE COURT: Yeah, I'm thinking that. We've

9 done one. We've got six people left here.

10       THE COURT MANAGER: Six or five?

11       MR. SKURKA: Well, we have six. But like I

12 said, I think three of them are gonna be disqualified pretty

13 quick.

14       THE COURT: Well, do you want to take those

15 people first? The next one's 79. We'll obviously take 79.

16 79. Who else?

17       We got to do 49 today. Because 49's already

18 been rescheduled once.

19       MR. SKURKA: That because they rescheduled it.

20       THE COURT: No, it's because we had the Tinker

21 thing.

22       MR. SKURKA: 49 couldn't come on Friday.

23       THE COURT: 49 couldn't come on Friday, so we

24 got to get that one done today for sure. Okay. Well, I guess

25 let's take a little bitty break and then we'll -- let's start

217

1    taking these folks that you think -- I mean, if that's okay by
2    the defense, that you think may disqualify themselves.  If
3    we're gonna get there --
4              MR. JONES:  If there's some matter upon which
5    we think they're gonna disqualify, we ought to get it right --
6              MR. SKURKA:  That's what I was gonna say.  I
7    may get in and be through in five minutes.
8              THE COURT:  Yeah, okay.  Let's do that.  Let's
9    go through those ones that we think may disqualify themselves,
10   and then once we go through those folks, then we'll get a real
11   good idea of how -- how we should handle this situation.
12             MR. SKURKA:  You got it, Judge.
13             (Recess.)
14             THE COURT:  Where are we at?  Tell me which
15   ones you think?  79 you think may have a problem?
16             MR. SKURKA:  79, 81 and 80.
17             THE COURT:  Let's call 79.  Let's get 79 in
18   here and see what is going on.
19             Let's bring in 79, that is, Tina Torrez.
20             (Venireperson enters courtroom.)
21             THE COURT:  All right.  Come forward.  You are
22   Tina Torrez?
23             VENIREPERSON NO. 79:  Yes, sir.
24             THE COURT:  All right.
25

218

1              VENIREPERSON NO. 79,
2              TINA TORREZ,
3              VOIR DIRE EXAMINATION
4    BY THE COURT:
5         Q.   We're trying to pick a capital murder jury here,
6    okay?
7         A.   Okay.
8         Q.   So we need to talk to you about some things, okay?  I
9    know you've been waiting and I'm sorry about that.
10        A.   It's okay.
11        Q.   Okay.  Now, you have -- you've given some answers in
12   your questionnaire.  You say every life is sacred beyond any
13   doubt to the best argument for and against the death penalty.
14   And, I guess, really, my question is this:  This is a capital
15   murder case.  And what is that?  That's a murder, an
16   intentional taking of the life of another, plus something else.
17   And because it's plus something else it makes it capital.  In
18   this case, the State is alleging that the defendant attempted
19   to or robbed the victim, and then in the process, murdered the
20   person, okay?  Do you follow me?
21        A.   Yes, sir.
22        Q.   Okay.  The significance of that is that -- and the
23   significant part about capital is that means that the death
24   penalty is a possibility, and you know that from the other day?
25        A.   Yes, sir.

219

1         Q.   Now, some people say, "I believe in the death penalty
2    in some cases, and I think it's an okay law."  Others say they
3    don't like it and they would never vote for it.  My question to
4    you is this:  Is this something that you cannot participate in
5    because of your beliefs or whatever?  I mean, and at this
6    point, there is no right or wrong answers, okay?
7         A.   Okay.
8         Q.   I don't want you to answer the question because you
9    want -- the way I want to hear it or the way anybody here wants
10   to hear it.  I want to know really, really how you feel, okay?
11        A.   Okay.  Depending on the circumstances, I think I
12   would be able to be objective and go either way depending on
13   the information I'm given.
14        Q.   Okay.  All right.  Well, let's talk about that.  In
15   every criminal case, the burden is on the State of Texas to
16   prove the case, all right?  Let's see here.  You've never been
17   on a jury before.  That's okay.  It's on the State.  They
18   brought -- the law says, "You bring the charges, you prove the
19   charges."  Okay?  You agree with that, you follow that law?
20        A.   Uh-huh.
21        Q.   As part of that, the defendant is presumed to be
22   innocent.
23        A.   Okay.
24        Q.   Okay.  And if you had to vote right now, you'd have
25   to vote not guilty, right, because he's innocent until proven

220

1    guilty.  Do you agree with that law?
2         A.   Yes.
3         Q.   Can you follow that law?
4         A.   Uh-huh.
5         Q.   All right.  The burden of proof is beyond a
6    reasonable doubt.  There's no definition, okay, but it's the
7    highest burden that we have in all of the law, okay?
8         A.   Okay.
9         Q.   It is not beyond all doubt, it is not beyond a shadow
10   of a doubt, but it's higher than all the other burdens that we
11   have.  There's a 51 percent rule sort of preponderance of the
12   evidence.  We use that in civil cases.  There's a higher burden
13   called clear and convincing.  We use that in cases where the
14   State's trying to remove children, okay?  Clear and convincing
15   sounds pretty high, right?  This is higher.
16        A.   Okay.
17        Q.   It's kind of weird, but I sort of define to jurors
18   what beyond a reasonable doubt is by telling them what it's
19   not.
20        A.   Okay.
21        Q.   Okay?  Now, the defendant doesn't have to testify.
22   The Constitution says that.  And it really makes sense because
23   if the State has the burden of proof, then don't have to do
24   anything, right?
25        A.   Right.

221

1    Q.   And if that's the case, then he doesn't have to
2    testify.  Now, it's even stronger than that.  Not only does he
3    not have to testify, but the jury can't go back there and say,
4    "You know what, he didn't testify, I have to hear both sides of
5    the story before I make a decision so I'm gonna -- I'm gonna
6    put this one for the State."  You can't do that, okay?  I need
7    to know if you would -- if you will follow the law and not hold
8    it against the defendant if he chose not to testify, or would
9    you hold it against him?
10   A.   I wouldn't hold it against him.
11   Q.   Okay.  We talked a little bit about capital murder,
12   what capital murder is.  And this is how a jury trial works in
13   Texas.  You have the guilt or innocence phase, okay?  The State
14   has to prove to you beyond a reasonable doubt defendant's
15   guilty of capital murder.  And he has to prove all of the
16   elements, the murder while in the course of committing the
17   robbery, or attempted robbery, that is, you know, if I came and
18   I tried to rob you.  What's robbery?  Well, you know, the
19   forcible taking of something from another, or maybe even by
20   threats.  If I came and pointed a gun at you and I said, "Give
21   me your purse," and you gave it to me, that's a robbery.  If I
22   -- if I came and did that and you happened to have a bowling
23   ball in there because it's really a bowling deal and you hit me
24   over the head with it and knocked me out, am I guilty of
25   robbery?  No, but I'm guilty of attempted robbery.  And -- and

222

1    in this situation, if they can prove an attempted robbery,
2    that's good enough.  Do you follow me?
3    A.   Yes, sir.
4    Q.   Okay.  But they have to prove it nonetheless.  And
5    the law says they have to prove all the elements of capital
6    murder.  They don't just get nine out of ten or 11 out of 12 or
7    whatever it is.  They have to run the table.  Would you make
8    them do that?
9    A.   (Nodding head up and down.)
10   Q.   Yes?
11   A.   Yes, sir.
12   Q.   Okay.  Now, like I told you, there's two parts.
13   That's the guilt or innocence phase.  If the defendant's found
14   not guilty, that's the end of the case.  If the defendant's
15   found guilty, we go on to part two.  What's part two?  Part two
16   is the punishment phase.  In a capital murder case, if the
17   defendant is found guilty, there's only two things that can
18   happen, life in prison or death penalty.  Both are pretty
19   serious, both pretty severe punishments, okay?
20   A.   Yes, sir.
21   Q.   But we don't say life or death.  The jury doesn't go
22   back and write a little blank life or death, okay, like they
23   would in every other kind of case.  Let's say this was a
24   regular murder and the jury was supposed to go back and assess
25   punishment.  The punishment range is five to 99 or life and up

223

1    to a $10,000 fine.  The jury would write like a number.  They'd
2    say like 25 years or 50 years, or maybe they'd say five years
3    and probation.  And then for the blank for the fine they might
4    put a fine, maybe not.  We don't do that here.  You answer
5    questions.  Here's the first one.
6           "Is there a probability the defendant would
7    commit criminal acts of violence that would constitute a
8    continuing threat to society?"  What does that mean?  Will the
9    defendant probably be violent to other people.  Do you think
10   so?  And the jury would answer yes or no, okay?
11   A.   Okay.
12   Q.   Then they go to the second question.  "After taking
13   into consideration all of the evidence, including the
14   circumstances of the offense."  That's the first part of the
15   case, right?  Remember the guilt or innocence?
16   A.   Right.
17   Q.   -- "the defendant's character and background" --
18   what's that?  Well, what's character?  Well, it's kind of the
19   person you are.  Are you a nice guy, you're not a nice guy?  Do
20   you live by a moral code, are you honest, you know, that kind
21   of stuff.
22   A.   Okay.
23   Q.   His background.  What's that?  Well, you know, how
24   did he grow up?  Was he abused as a child or did he have a
25   great upbringing.  Do you follow me?

224

1    A.   Yes, sir.
2    Q.   And then, "the personal moral culpability of the
3    defendant."  Well, I mean, it kind of fits in with -- with the
4    circumstances of the offense in that.  There's an example
5    that's given, that we've been given about two burglars, both
6    found guilty.  One of them just walked into a house because his
7    family was starving and he took a loaf of bread and some food.
8    The other one, he just wanted to go party with his friends, he
9    broke in and stole a bunch of TVs sold them, and they went
10   out and got high.  Why?  Because he just wanted to.  And he had
11   been in trouble a bunch of times before for burglary.  The
12   personal moral culpability of those two people are not the
13   same, correct?
14   A.   Correct.
15   Q.   And that's what that's all about, what's their
16   personal moral culpability.  And then, "Is there sufficient
17   mitigating circumstance or circumstances to warrant a sentence
18   of life imprisonment rather than the death sentence be
19   imposed?"  Okay.  Should they get life or death?  What -- what
20   causes that -- the jury to vote that way?  Mitigating
21   circumstances.  Well what's that?  Mitigating means to lessen
22   circumstances like, I don't know, maybe he was a great guy,
23   maybe he did community service, taught little kids how to read
24   that couldn't read, you know.  And maybe you think, that's a
25   mitigating circumstance because, you know, this particular day

225

1   was completely out of character for him.  And I'm not excusing
2   him for it.  We found him guilty and he's gonna get life or
3   death.  Those are both serious punishments, but maybe these
4   mitigating circumstances are sufficient to warrant life rather
5   than death, okay?  Maybe there's -- maybe you think, hey, that
6   is a mitigating circumstance but it's not sufficient to warrant
7   life rather than death because of all these other factors.
8   Okay?
9        A.   Okay.
10       Q.   And that's what the jury would have to weigh and the
11  jury would have to answer yes or no.
12            Okay.  Now, at the beginning of the trial I
13  have to swear the jury in and I say, "Do you solemnly swear
14  you will render a true verdict based on the law and evidence
15  presented to you?"  And the jury says yes or no, right?
16       A.   Right.
17       Q.   I need to know from you, can you take the oath on the
18  guilt or innocence and give this man a fair trial to see if
19  they can prove their evidence beyond a reasonable doubt?
20       A.   I believe so, yes.
21       Q.   Based upon the law and the evidence presented to you?
22       A.   Yes.
23       Q.   Okay.  Now, this second part's harder because some
24  people tell me, "I cannot participate in a process that may
25  lead to someone's death.  I can't answer your questions

226

1   because I can't do that."  That's me.  Or others tell me, "This
2   is nonsense.  I will figure out a way to vote -- if I find him
3   guilty, I'm gonna figure out a way to vote for death.  I don't
4   care about this other stuff.  I'm not gonna follow the law."
5   Both sides can't follow the law.  If you can't, it's okay.
6   We'll get somebody else, okay?  I need to know from you, can
7   you follow this law and answer these questions?
8        A.   I believe I can, yes, sir.
9             THE COURT:  Okay.  All right.  Mr. Skurka.
10            MR. SKURKA:  Thank you, Judge.
11            VOIR DIRE EXAMINATION
12  BY MR. SKURKA:
13       Q.   Hello, Ms. Torrez, my name is Mark Skurka, I'm an
14  assistant district attorney, along with Geordie Schimmel.
15  We'll be the ones presenting the case to you if you're selected
16  on the jury.  I want to start off by telling you there's no
17  right or wrong answers to anything.  All that means is don't
18  answer in a certain way that you think the judge wants to hear
19  you say it or I want to hear you say, or as the defense wants
20  to hear you say it.  We just want to know what your feelings
21  are about some of the issues in this case.  The important thing
22  as a juror, though, is some people think, well, it's my civic
23  duty, I have to sit on a jury.  But sometimes people try to sit
24  on a jury even though it might not be that kind of case that
25  they would be a good juror on or qualified to sit on.  So I

227

1   just want to let you know, it's okay to say something that may
2   go against what you think that we want to hear.  We just need
3   to know how you feel, okay?
4        A.   Okay.
5        Q.   In other words, it's just as okay to say you can't
6   serve on this kind of case as it is to say you can serve on
7   this kind of case, okay?
8        A.   Okay.
9        Q.   Now, saying all that, I want to talk about some of
10  the main issues in this case.  The judge has hit on a few
11  things but I want to go into a little more detail.  For
12  example, the first big issue, of course, in this case is the
13  death penalty.  If the defendant is found guilty, you might be
14  put in a position where you would have to vote in such a way
15  that he would get the death penalty.  How did you feel about
16  being put in that position?  Do you remember that first day we
17  had two or 300 people in there and you probably didn't know
18  what kind of case it was until Judge Galvan came down and said,
19  "Folks, this is a criminal case."  And some people probably
20  said, "Oh, it's gonna be a burglary case or a DWI case or
21  whatever."  And then the judge hit you over the head with it
22  and said, "Not only that, it's gonna be the highest kind of
23  criminal case.  In fact, it's a capital murder case and this
24  person right here is on trial and you may have to give them the
25  death penalty, if the law and evidence warrants that."

228

1        Tell me how you felt about being put in that
2   position?  What was your first reaction when you heard it was
3   that kind of case?
4        A.   My first reaction was that I really didn't have a
5   clear set opinion on anything.  It's not something I'm familiar
6   with or informed about.  So I guess my first was uncertainty
7   because I really didn't know enough about it.
8        Q.   And that's a fair thing.  Some people, you know, have
9   given a lot of thought to this and some people haven't.
10       A.   Right.
11       Q.   And we've had people before say, "I've never really
12  thought about it.  I never thought I was gonna be in that
13  position."  And sometimes people say, "Well, I used to feel
14  this way and now, as I get older, I feel this way about the
15  death penalty."  I'm just curious about you, when once you got
16  over that initial thing like you didn't have a clear set
17  opinion, or it was a little uncertainty, how did you feel after
18  that knowing that, I mean, here you are today to see if you're
19  qualified?  Has that changed?  How do you feel about it now?
20       A.   I feel that everyone deserves for you to have an open
21  mind.  You can't go into something and have your mind already
22  made up because that's not fair.
23       Q.   Well, that -- that's good and well, but let's talk
24  about the death penalty.  I told you the very first day --
25       A.   Right.

229

1    Q.    -- that the State is gonna ask for the death penalty
2    in this case. I don't like to blind side people and sandbag
3    them and stuff, but I just want to know. But I also want to
4    know -- and some people tell me, "You know, I do believe in the
5    death penalty, Mark, it's a good law. I think it's good and I
6    think we should have it in Texas, but I don't think I could
7    carry it out. I don't think I could be the one to do it, you
8    know." And there's nothing wrong with that. It's just, you
9    know, we just need to know how you feel. And I want you to
10   look at the guy. That's him right there, that's John Henry
11   Ramirez, not somebody on the news or in the paper somewhere.
12   That's him. How do you feel about being put in that position
13   where you might have to make that kind of decision about
14   whether that man lives or dies?
15   A.    I mean, I -- nervous, I mean, because everyone --
16   you've got to keep an open mind, base your information on the
17   facts that you're given.
18   Q.    Why do you feel nervous?
19   A.    Because I feel -- you know, you're -- I'm sitting up
20   here and everyone's staring and you get nervous.
21   Q.    I know. I'm talking about nervous about making the
22   decision?
23   A.    Because it's a big decision.
24   Q.    Right. And that's what I'm saying. Some people
25   would say, "Put me on a DWI case, put me on a shoplifting case,

230

1    put me on a burglary case, but Judge, I don't know if I can sit
2    on this kind of case because I don't know if I feel -- I could
3    be responsible for making that decision on whether a person
4    lives or dies." How do you react to that?
5    A.    I don't know how to answer. I mean, I think everyone
6    deserves the right to be -- you know, the evidence be presented
7    and you decide. And it's not fair just because I might be
8    nervous or afraid, you know. What if everybody -- what if all
9    150 feel that way and it's not fair that somebody doesn't get a
10   fair trial because everyone's nervous.
11   Q.    Okay. You're missing -- what I'm trying to get at is
12   this. It's okay to be nervous.
13   A.    Right.
14   Q.    I don't think anybody wants to be excited about
15   sitting on this trial and making that decision. But push on
16   come to shove, say you're on this jury and the judge tells you
17   have to listen to the evidence and make some decisions, and
18   those decisions might lead to somebody's life being taken away.
19   How do you feel about you, Tina Torrez, participating in that
20   kind of decision?
21   A.    I think I could do it. I mean, it's not something I
22   would want to do, but --
23        THE COURT: If you or a family member were
24   sitting over there in that chair as a defendant, would you
25   want somebody like you as a juror in this case?

231

1        PROSPECTIVE JUROR NO. 79: I think so.
2        THE COURT: All right. Go ahead.
3    Q.    (BY MR. SKURKA) When we talk about the death penalty
4    -- and that's why I made you look at him because we're not
5    talking about something in a vacuum or somebody talking about
6    it in a coffee shop. I mean, that's a real life person. If
7    you feel that way fine. If you don't, you don't, but some
8    people would say like, "I can't sit on that type of jury. I
9    can sit on another kind of jury. But just being responsible
10   for somebody's life or death, you know, I may not be able to
11   sleep at night. I may have a hard time struggling myself, or I
12   may vote one way because I'd be nervous about coming up there
13   and having that, you know, weigh on my mind." How does that
14   strike you or do you have any reaction to that?
15   A.    I'm sorry. I don't understand.
16   Q.    Well, what I'm saying is making that kind of
17   decision. Some people say, "Well, because of my religion or
18   ethical concerns, I may make a decision and it will weigh so
19   heavily on me it's gonna affect me that I'm the one, along with
20   my jury, is responsible for sending somebody to die." Is that
21   gonna have an effect on you, if you had to vote that way
22   because of the evidence?
23   A.    I don't -- I mean, I don't think so. I don't know.
24   I don't think it would affect me in a way where I wouldn't be
25   able to sleep or anything.

232

1    Q.    Well, in your questionnaire you said that every life
2    is sacred.
3    A.    Right. But you have to look at it on both sides. If
4    I --
5    Q.    Explain.
6    A.    Well, I don't know the story. I don't know what
7    happened. Somebody was murdered. Their life was sacred, but
8    his life is sacred also. Depending on the circumstances, if I
9    have to make a choice that, yes, this deserves this or that, I
10   think I can do that. I'm not gonna let it keep me up nights or
11   make myself sick about it. I'm going to look at the facts and
12   base it on that, the information that I'm given and base it on
13   that. I'm not gonna say, yes, because it's making me feel bad,
14   or I can't sleep, or say no because of the same thing.
15   Q.    Let me give you an example.
16   A.    Okay.
17   Q.    My wife loves animals. And one day we were driving
18   down the street, I'm off the highway somewhere, and I
19   accidentally hit a cat in the car. And the cat was very, very
20   injured. And we stopped the car and went over to the side and
21   it was clear the cat was suffering really bad. And my wife
22   knew that she had to make a decision about putting this cat's,
23   you know, life at the end and end this cat's life. And she
24   knew that, you know, in her mind, but in her heart, she just
25   couldn't put the cat out of its misery. And there's nothing

233

1  wrong with that, you know.  She's just believes in that stuff.
2  But even though she knew that was a decision, she couldn't do
3  it.  She couldn't follow through on that.  And sometimes jurors
4  say the same thing.  They'll say, "Look, you know, I believe in
5  the death penalty, I can follow the law, but I just can't
6  follow through with it knowing that I'm gonna be responsible
7  with the jury on sending somebody to death."  Do you feel that
8  way?
9      A.    I think I would be able to make a decision.
10     Q.    Okay.  Why do you think that?
11     A.    Because I had to make a decision when my mother was
12  ill, and it was something that would have to affect my family.
13  So it wasn't something I wanted to do but I knew it was
14  something I had to do.
15     Q.    So what you're saying is, was it some kind of thing
16  that maybe you had to make a decision whether she, you know,
17  continues on the machines or not?
18     A.    Uh-huh.
19     Q.    That's a very tough decision.  But, of course, you
20  made that decision because it's someone you love, and you
21  thought that would be better for them in the long run, right?
22     A.    Right.
23     Q.    Well, of course, in this guy's decision, you know,
24  sentencing him to death wouldn't make it better in the long
25  run.  It would take him from the face of the earth.  Is that

234

1  gonna affect you knowing it's somebody like that, that you're
2  not doing it to help them, but you're doing it to punish them?
3      A.    I don't think so.  Because it's not like we're --  I
4  would be purposely doing it to punish him.  The decision's made
5  based on -- how do I explain it?
6      Q.    That's not to punish somebody, by giving them the
7  death sentence?  You lost me on that one.
8      A.    Well, not like I'm intent on punishing him.  Like the
9  -- how do I explain it?
10          THE COURT:  Based on facts and circumstances.
11          VENIREPERSON NO. 79:  Right.
12     Q.    (BY MR. SKURKA) And I understand it's gonna be based
13  on facts and circumstances, but it does punish him, does it
14  not?
15     A.    Yes.
16     Q.    Okay.  Tell me about -- you say you're studying to be
17  a Catholic, correct?
18     A.    To make my confirmation and my first communion.
19     Q.    Well, congratulations.
20     A.    Thank you.
21     Q.    What about the Catholic church?  Do you know -- do
22  you do not know what the Catholic church feels about the death
23  penalty or how they feel?
24     A.    To be honest, not really.  I mean, I'm taking the
25  classes because it's something that my grandmother wants me to

235

1  do, and it's something we just started, so I know -- I believe
2  they're against it but I really -- it's not something we've
3  talked about in any of the classes I've been in.
4      Q.    That was my next part.  My follow up is because most
5  people will say the Catholic church is against the death
6  penalty and you're studying to be a Catholic, is that gonna
7  affect you --
8      A.    I --
9      Q.    Let me finish the question.
10     A.    Okay.
11     Q.    Do you see where I'm coming from?
12     A.    Yes, sir.
13     Q.    Is it gonna affect you if you're sitting here and you
14  get on the jury, and at your next class they tell you, "Well,
15  it's against the death penalty," and the next thing you know
16  you're sitting here and you're thinking, "Oh, gosh, this is
17  gonna be dilemma for me because the Catholic church, which I'm
18  trying to become a part of, is against the death penalty," and
19  it's gonna put you in a bad, you know, circumstance or bad
20  position.  Can you respond to that?
21     A.    I don't think it would affect me because there are --
22  like I said, I'm taking the classes but there are a lot of
23  things that the Catholic church believes in and follows that I
24  don't agree with.
25     Q.    Okay.  So even if the Catholic faith was against the

236

1  death penalty, that wouldn't bother you in voting for it
2  knowing that it would go against their teachings?
3      A.    I don't think it would.
4      Q.    All right.  Tell me about who your aunt is that's in
5  Legal Aid.  Who is that?
6      A.    Irma Torres McGregor.
7      Q.    Irma Torres McGregor.  Does she work here at the
8  courthouse?
9      A.    Uh-huh, yes, sir.
10          THE COURT:  She does the protective orders.
11          MR. SKURKA:  She does the protective orders?
12          THE COURT:  She's in here all the time.
13     Q.    (BY MR. SKURKA) Tell me about the situation with your
14  brother having a problem with drugs.  And I don't mean to pry
15  but --
16     A.    No, I understand.
17     Q.    -- I just kind of need to know what's going on.  Can
18  you tell me a little bit about that?
19     A.    He was involved with the wrong crowd and got, I think
20  it's several different charges against him.  And I know he was
21  in jail in San Antonio and he's been in and out of rehabs and
22  out of jail.
23     Q.    Is that the one you said also was at Charlie's Place
24  --
25     A.    Yes.

237

```
1    Q.   -- for a while too?
2    A.   Uh-huh.
3    Q.   So was he in jail here and in San Antonio or just San
4  Antonio?
5    A.   He was here and they sent him -- he was in Kerrville
6  -- no, Karnes City, and then from there, he was in San
7  Dominguez I believe it was, and then he was released from there
8  and that's when he was in Charlie's Place.
9    Q.   So he was actually in prison, right?  I mean --
10   A.   I don't know what the difference is.
11   Q.   Well, generally speaking, the difference is the jail
12 is the one where you sentence your time for misdemeanors and
13 prison is when you serve your sentence for felonies.
14   A.   Okay.
15   Q.   Was it a felony case or a misdemeanor case, do you
16 know?
17   A.   I think it was a felony.
18   Q.   All right.  What kind of drug was it involved, if you
19 don't mind me asking?
20   A.   I think it was marijuana but he was on the Naval
21 base.
22   Q.   Oh, because it was like a federal crime?
23   A.   Uh-huh, I think so.
24   Q.   I see.
25   A.   I know one of the charges was he had stolen some
```

238

```
1  jewelry from my sister and she pressed charges.
2    Q.   Sorry to hear that.  How -- you think -- how do you
3  think drugs affect crimes in the United States?
4    A.   I believe that drugs -- people get addicted to drugs
5  to a point where they commit crimes so they can get more drugs.
6    Q.   And you think that's a medical problem or a legal
7  problem?  In other words, you know, there's some people that
8  say, he's an alcoholic, you know, he got a felony DWI and he
9  really can't control himself because he's an alcoholic.  But,
10 of course, our laws say, "You can be an alcoholic all you want,
11 you just can't drive and drink at the same time," and these
12 people violate the law.  So do you think it's a medical problem
13 that maybe, you know, the doctors and hospitals should be
14 taking care of?  And I'm talking, you know, alcohol or drugs.
15 Or do you think that's something that the law should be
16 concerned about, the legal field, like the criminal justice
17 system?
18   A.   Well, the legal system because -- I never really
19 thought about it.
20   Q.   Well, just -- you know what I'm saying is because
21 some people might look at your brother and say, "It's clear he
22 has a problem with drugs.  He's sick.  It's a disease.  It's
23 something like that."  Other people may say, "Well, you know,
24 it's against the law.  He's got to go to court for it."  And
25 some people say, "They shouldn't even be in prison for that.
```

239

```
1  They should be going to some sort of special hospital or rehab
2  instead of going to prison."
3    A.   I think it should be more of a combination of both
4  because part of it could be medically, but, you know, the law
5  has to step in somewhere.
6    Q.   How do you feel about people who use drugs or alcohol
7  as an excuse to crime?
8    A.   It's a cop out.
9    Q.   Explain.
10   A.   They -- in my experience, people I've known who have
11 used that excuse use it just to try to get out of getting in
12 trouble for something they've done.
13   Q.   So you don't --
14   A.   It's not always the case but sometimes they'll use it
15 as an excuse.
16   Q.   Do you think everybody can be rehabilitated?
17   A.   I think everyone deserves a chance to try to be
18 rehabilitated.  I don't think everyone is – can be but
19 everyone deserves a chance to try.
20   Q.   On your questionnaire when the judge asked you on a
21 scale of 1 to 10 how strongly you believe in the death penalty
22 with 1 being the least and 10 being the most you put, "I cannot
23 say I believe or do not believe without knowing what the facts
24 are."  And I think the judge wasn't trying to tell you how
25 you're gonna vote in this case, but in general, how you feel
```

240

```
1  about the death penalty.
2         If somebody had come up to you a week before
3  you called up for jury duty and said, "Hi, Tina, you know,
4  what do you think about this death penalty?  Are you for it or
5  against it?"  And I'm talking about just in general terms, not
6  like in specific case, like I think you thought this was in
7  this specific case.
8    A.   Well, no.  Because either way without knowing what it
9  is, how can I make a decision if I believe in it or if I don't
10 believe in it?  Each situation is different.
11   Q.   I know, but just the general concept of having the
12 death penalty.  Do you understand what I'm saying?  See some
13 people are for -- some people say there should be a death
14 penalty in Texas.  Some people say there shouldn't be a death
15 penalty in Texas.  I'm trying to figure out how you feel about
16 just the fact that there's a death penalty, not specifically in
17 what case.
18   A.   I think there should be.
19   Q.   Why?
20   A.   Because depending on the situation and the case, I
21 just – I just feel there should.  I don't know how to answer
22 it.  I'm sorry.  I just think there should be, but I think each
23 case should be looked at as an individual.
24   Q.   And I'm not arguing with that part.  I'm just
25 wondering the concept, how do you feel about it.  Because some
```

241

1   people say, "We shouldn't even have it.  It doesn't work.  We
2   still have people committing crimes and murdering people.  Why
3   bother?"
4        A.   I'm sorry.  I believe there should be one, yes.  But
5   I -- specifically reasons that why I think, I wouldn't know how
6   to answer that.  I just think that it should be there.  It
7   should be in place for when it's needed.
8        Q.   Do you believe that people should -- you would think
9   that they should get life more than they should get the death
10  penalty?  I mean, would you be leaning one way or the other?  I
11  mean, would you be thinking, it should be life most of the time
12  or would you be leaning toward life as opposed to the death
13  penalty?
14       A.   I don't think I would -- without knowing, I can't say
15  I'm gonna vote more for this than that because I don't know.
16       Q.   What about -- sometimes people say, "Well, you know,
17  before I make a decision I want to hear what he has to say, the
18  defendant."  How do you feel about that if he doesn't testify?
19  Would you expect him to testify?
20       A.   No.
21       Q.   Or want him to testify?
22       A.   I mean, it would be easier if he would but I don't
23  see -- because I understand we have to do it based on what
24  we're given and I understand each of as individuals have a
25  right to not say anything.

242

1        Q.   But sometimes people say, "Look, Judge, I just can't
2   make a decision.  I've got to hear their side of the story.
3   I've got to hear his side of the story or they've got to put on
4   evidence and hear their side of the story before I can make a
5   decision."  Are you that type of person?
6        A.   I don't believe I am.
7             MR. SKURKA:  Thank you, Judge.  That's all the
8   questions I have.
9             THE COURT:  All right.
10            VOIR DIRE EXAMINATION
11  BY MR. GARZA:
12       Q.   Ms. Torrez, is there any reason why you couldn't be
13  fair and impartial to both sides in this case?
14       A.   I don't believe so.
15       Q.   Would you listen to all the evidence before you make
16  any decisions as to guilt or innocence or any decisions as to
17  those two special issues?
18       A.   Yes, I believe so.
19            MR. GARZA:  Thank you, ma'am.  I'll pass her.
20            THE COURT:  All right.  Why don't you wait in
21  the jury room and I'll talk to the lawyers.
22            (Venireperson exits courtroom.)
23            THE COURT:  Mr. Skurka, what say you?
24            MR. SKURKA:  We'll exercise a peremptory
25  strike, Judge.

243

1             THE COURT:  That's No. 4, I believe.  All
2   right.  Let's go ahead and bring her in, Frank.
3             (Venireperson enters courtroom.)
4             THE COURT:  All right.  Ms. Torrez, you were
5   not selected to be on this jury but we really appreciate you
6   coming down here and speaking with us.  And I'm sorry we
7   didn't get to you at the time we allotted to get to you, but
8   it's a serious case and we're, you know, giving it the right
9   attention, okay?
10            VENIREPERSON NO. 79:  Okay.  Thank you.
11            THE COURT:  Thank you very much.
12            (Venireperson exits courtroom.)
13            THE COURT:  All right.  I guess do you want to
14  go down the line or do you think this 81 may evaporate, maybe?
15            MR. SKURKA:  I think she's worse than that
16  one, but whatever you want to do, Judge.
17            THE COURT:  Well, what I definitely want to do
18  -- we're doing okay, I guess.  Let's try seeing Clara
19  Muguerza.
20            (Venireperson enters courtroom.)
21            VENIREPERSON NO. 81,
22            CLARA MUGUERZA,
23            VOIR DIRE EXAMINATION
24  BY THE COURT:
25       Q.   You are Clara Muguerza?

244

1        A.   Yes, sir.
2             MR. JONES:  Is that a G or a Y?
3             VENIREPERSON NO. 81:  It's a G.
4        Q.   (BY THE COURT) You --
5        A.   I sit right here?
6        Q.   Yes, you sit right there.  Obviously, you know we're
7   trying to pick a capital murder jury and we're running a little
8   behind.  It's a very serious case.  Sometimes things get a
9   little off schedule and we're sorry about that.
10            We want -- we want to talk to you about a few
11  things.  You filled out your questionnaire and we have that.
12  This is a capital murder case, okay, and what's that?  Well,
13  it's a murder, that's the allegation, and the State is alleging
14  the defendant committed a murder.  And a murder, of course, is
15  the intentional taking of the life of another, but it's capital
16  murder.  And what is that?  Well, I like to call it murder
17  plus, murder plus something else.  And there's a bunch of
18  different ways you can group capital murder.  There's somewhat
19  of a laundry list.
20            But, in this case, the State is alleging that
21  the defendant robbed or attempted to rob the victim, and in
22  the course of doing so, committed murder, okay?  So we've got
23  robbery and murder.  What's robbery?  If I came and I pointed
24  a gun to you and I said, "Give me your purse," that would be
25  robbery because that would be through force or threats and I

245

1   would be forcibly taking property from you.

2       A.    Correct.

3       Q.    And if I came and I -- and I, you know, pulled a gun

4   out and you gave me your purse, that would be robbery. I would

5   have completed it. But what if -- what if I came and robbed

6   you and I thought you had a purse, but instead, you had a

7   bowling ball. You were going bowling and you had your bowling

8   ball, and you hit me on top of the head and knocked me out,

9   okay? Would I be guilty of robbery? No. But I'd be guilty of

10  attempted robbery. The State can get there in either case.

11  They can show an attempted robbery or a robbery in the course

12  of committing a murder. Do you follow me?

13      A.    Uh-huh.

14      Q.    All right. But the thing about capital murder is

15  that the death penalty is a possibility. So when we say

16  "capital" that means death penalty is a possibility, all right?

17  And I need to talk to you a little bit about that. Some people

18  cannot sit in the process where there is a death penalty

19  possibility. Other people would always vote for death penalty

20  if they found the defendant guilty of capital murder. I can

21  tell you there's two possibilities, life or death. Life in

22  prison and the death sentence. They're pretty serious

23  punishments either way, okay?

24      A.    Uh-huh.

25      Q.    I need to know if you have any — I mean, if this is

246

1   something that you can do. If you can't sit through this

2   process, if you can't participate, that's okay, we'll find

3   somebody else. If you can, that's okay too. But I do need to

4   know because it is important.

5       A.    Well, I would be able to.

6       Q.    Okay. Can you keep an open mind?

7       A.    Oh, yes.

8       Q.    Okay. Because some people say, "You know what, I saw

9   something in the media or about this," or they'll say, "You

10  know, the State charged him, therefore, he's guilty in my mind

11  so I can't keep an open mind." Okay. That's really not fair.

12      A.    That's fine.

13      Q.    But if that's you, that's okay, we just need to know.

14  If you can keep an open mind, that's fine. But if you can't,

15  that's also fine. Can you keep an open mind?

16      A.    Yes.

17      Q.    Let's talk a little bit about the law. I've already

18  talked to you a little bit about it. We're gonna talk some

19  more. This is a criminal case. Let's see here. You have

20  never been on a jury before. No experience necessary. We have

21  plenty of jurors that are first timers, okay? That's not a

22  problem. But in every criminal case the law says, "The State

23  brings the charges, the State's got to prove it." Okay?

24      A.    Uh-huh.

25      Q.    And you agree with that?

247

1       A.    Yes, I do.

2       Q.    There are places in the world where that is not the

3   case and I think those places would be bad places to live just

4   -- just on that issue, okay? But in our country we don't do it

5   like that. We say, "State, you've got the burden of proof, you

6   bring the charges, you prove them, and until you do, the

7   defendant you've charged is innocent until proven guilty." If

8   they can prove it the case, okay? You agree with that?

9       A.    Yes.

10      Q.    And you could presume that the defendant is innocent

11  until proven guilty?

12      A.    Yes, sir.

13      Q.    All right. We lawyers have a little question that we

14  ask sometimes and we say, "If you had to vote right now, how

15  would you vote?" And some jurors they say, "Well, I can't vote

16  because I haven't heard anything." And other jurors -- the

17  right answer actually is not guilty because you haven't

18  presented anything.

19      A.    That's right.

20      Q.    That's really not a real world deal. The real world

21  deal is State presents their evidence. But if they do not

22  prove it to you beyond a reasonable doubt -- and we'll talk

23  about it -- that's the standard -- what would be your vote?

24      A.    If they couldn't prove to me, not guilty.

25      Q.    All right. Beyond a reasonable doubt is the standard

248

1   of proof in this case. We do not have a definition, but I like

2   to define it by telling the jury what it is not.

3           In a civil case, car wreck, contract dispute

4   between companies where one sues another -- the suing party we

5   call them the plaintiff -- they have a burden of proof just

6   like the State in this case. But that's preponderance of the

7   evidence, just tipping the scales of justice ever so slightly,

8   51 percent maybe. In a case in which the State seeks to remove

9   children because they think that a parent is a bad parent and

10  neglectful, their burden of proof is clear and convincing. It

11  sounds like pretty strong stuff, right, clear and convincing?

12  This burden is higher. Beyond a reasonable doubt is higher

13  than clear and convincing, okay? It's a high standard that we

14  have in all of the law.

15          What it is not, however, it is not beyond all

16  doubt. It is not beyond a shadow of a doubt. The most

17  important word in beyond a reasonable doubt is reasonable,

18  beyond a reasonable doubt. Could you hold the State to that

19  burden?

20      A.    To --

21      Q.    Beyond a reasonable doubt. The law says it's their

22  burden to prove this case beyond a reasonable doubt to you, the

23  jury.

24      A.    Well, it all depends. I mean, if the -- if

25  everything's there, then, you know, he would be found guilty or

249

1  not guilty, I mean.

2      Q.   Well, right.  But that's the standard of proof.  See,

3  I got to make sure that you're gonna -- that you're gonna hold

4  the State to beyond a reasonable doubt, okay?  Could you do

5  that?

6      A.   Yes.

7      Q.   I mean, that is the burden that the law requires and

8  it's the highest burden that we have in all of the laws.  But

9  it's hard because we don't have a definition.  So, to

10 illustrate to the jurors what that is, I tell them what it's

11 not.  It's higher than the 51 percent, it's higher than clear

12 and convincing.  It is not beyond all doubt.  It's in between.

13 Are you following me?

14     A.   Uh-huh.

15     Q.   One of the examples that's been used is have you ever

16 been on a plane before?

17     A.   One time.

18     Q.   But when you got on that plane, did you think that

19 you were gonna get to your destination?

20     A.   Yes.

21     Q.   You did, right?

22     A.   Uh-huh.

23     Q.   Okay.  And that's based upon what, maybe it was a

24 reputable airline?  Maybe you've seen service records or you've

25 heard that, you know, planes are much safer than cars, right?

250

1  And so you evaluated the situation and you got on that plane

2  because you felt like beyond a reasonable doubt you were gonna

3  get to your destination.  Did you know beyond all doubt that

4  that plane wasn't gonna crash?

5      A.   No.

6      Q.   No.  Right.  But you were satisfied?

7      A.   Yes.

8      Q.   That's kind of what it's like, okay?  And you can

9  hold the State to that burden?

10     A.   Uh-huh.

11     Q.   Yes?

12     A.   (Nodding head up and down.)

13     Q.   Okay.  Now, as part of all of this, the defendant

14 doesn't have to testify, okay?  The Constitution says he

15 doesn't have to testify.  And it really makes sense because if

16 the State's got the burden of proof, they don't really have to

17 do anything, right?

18     A.   Right.

19     Q.   Now, maybe -- maybe his lawyers -- there may be a lot

20 of reasons why he doesn't.  Maybe his lawyers say, "Hey, look,

21 don't testify because they haven't proven their case."  I had a

22 friend who used to laugh inappropriately when he got nervous

23 and people took it the wrong way.  Some people are not good

24 speakers in front of people.  They get nervous.  I don't.  I

25 can get in front of a bunch of people, it's not a problem, it's

251

1  because I've had a lot of practice.  But not everybody has

2  that.

3          So my point in all this is that there's lots

4  of reasons why somebody may not want to testify.  But the law

5  says, not only does he not have to testify.  The jury can't

6  hold it against him.  In other words, if the jury -- if you're

7  selected on a jury and you go back for deliberations to

8  determine whether they've proven their case, the State, you

9  can't say, "Well, you know what" -- and I don't know if you're

10 gonna testify or not, but if he chooses not to, you can't say,

11 "You know what, he didn't testify and I have to hear both

12 sides of it.  That's one for the State."  You can't do that.

13     A.   That's right.

14     Q.   Okay.  Can you -- can you follow that law, not to

15 hold it against the defendant?

16     A.   Yes, sir.

17     Q.   Okay.  Now, let's talk a little bit.  It's capital

18 murder and we've already talked about that.  We've talked about

19 life and death, the possibilities, serious punishments, both of

20 them.  The trial works like this.  The first part of the trial

21 it's called the bifurcated system, but that just means it's got

22 two parts, okay?  The first part, guilt or innocence.  Can the

23 State prove beyond a reasonable doubt that the defendant is

24 guilty of the offense?  If the jury says no, the case is over

25 with.  If the jury says guilty, though, then we go to the

252

1  second part, the punishment.  What happened?  Does he get life

2  or death, okay?

3      A.   Uh-huh.

4      Q.   Because it's not an automatic deal either way.  But

5  you don't say life or death.  You don't say, "Hey, you know,

6  let's vote.  Okay.  We all vote for life or we all vote for

7  death."  We don't do that.  You answer questions, and here's

8  one of them.

9          "Is there a probability that the defendant would

10 commit criminal acts of violence that would constitute a

11 continuing threat to society?"  Okay.  Basically, what does

12 that mean?  Will the defendant probably be violent with others

13 in the future, okay?  It's the future dangerousness question.

14 Is he gonna be a future danger.  And the jury would answer yes

15 or no.  Then they would go to Special Issue No. 2.  "After

16 taking into consideration all of the evidence, including the

17 circumstances of the offense" -- that's the first part of the

18 trial, remember I told you the guilt or innocence phase?

19     A.   (Nodding head up and down.)

20     Q.   -- "the defendant's character and background."  Now,

21 at this stage of the trial you what you hear a lot more things,

22 not just about what happened that day, but maybe about what

23 kind of guy he is, what's his character like.  Is he a good guy

24 or is he a bad guy?  Is he a person of high morals or is he

25 just a scoundrel?  We don't know.  Does he have a good criminal

253

1    history, meaning he's never been in trouble before, or is he
2    just been in trouble his whole life?
3                Then his background.  What's that?  How did he
4    grow up.  Did he come from a loving home, you know, or did his
5    father just beat him up all the time?  Was he sexually abused?
6    I mean, there's all kinds of things.  Or did he have a great
7    education, a lot of opportunities?  That's that.  "And the
8    personal moral culpability of the defendant."  That's a lot of
9    words, right?  That's a lot -- that's a local of legalese.
10               Let me give an example that we've been giving
11   and that is, two burglars, right?  Two people found guilty of
12   burglary.  One breaks into somebody's house because he wants
13   to get high with his girlfriend and they're gonna go off and
14   party in Las Vegas.  Okay.  So he breaks into all these houses
15   and steals TV and they trash the place, and then he's already
16   been to prison three or four times for it and he and his
17   girlfriend go to Las Vegas and they blow all these people's
18   money, okay?  That's one person.  The other person has three
19   children that are starving, he's lost his job.  He goes in a
20   back door that's unlocked and all he takes is food and he
21   doesn't even eat himself.  He takes it to feed the kids.  The
22   same crime, right, but is their personal moral culpability the
23   same?  In other words, should -- you know what I'm saying?
24   A.    Uh-huh.
25   Q.    One of them is -- one of them is a lot worse than the

254

1    other?
2    A.    Right.
3    Q.    But that's what that question's about, okay?  "Is
4    there sufficient mitigating circumstance or circumstances to
5    warrant a sentence of life imprisonment rather than the death
6    sentence be imposed?"  Okay.  What is that, sufficient
7    mitigating circumstances?  Well, maybe you might hear that he's
8    a great guy.  Maybe you might hear he was an Eagle Scout.
9    Maybe you might hear that he does community service, okay?  And
10   those may be mitigating circumstances.  Maybe you might hear
11   his childhood was horrible and his father used to beat him up,
12   and that -- does it excuse the crime?  No.  Because he's
13   already either getting life or death, okay?  The only issue is
14   does it make a difference here, okay?  And so what you do is
15   you take everything that's given to you in the whole trial --
16   this is what this question's about, everything that's given to
17   you in the whole trial, and you say, "Are there sufficient
18   mitigating circumstances?  Is there enough lessening
19   circumstances that warrant that we give him life instead of
20   death?"  And the jury would answer yes or no to that question,
21   okay?
22   A.    Okay.
23   Q.    Do you follow me?
24   A.    Yes.
25   Q.    I need to know -- at the beginning of every trial I

255

1    ask the jurors to take an oath.  "Do you solemnly swear that
2    you will render a true verdict based upon the law and the
3    evidence presented to you?"  And they says, I need to know
4    from you, can you do that in this case?  And do that to -- on
5    the guilt or innocence phase and on these questions?  Can you
6    truthfully answer these questions?
7    A.    Yes.
8             THE COURT:  Okay.  All right.  Mr. Skurka.
9             MR. SKURKA:  Thank you, Judge.
10               VOIR DIRE EXAMINATION
11   BY MR. SKURKA:
12   Q.    Good afternoon, ma'am.  How are you doing?
13   A.    Great.  Thank you.
14   Q.    My name is Mark Skurka and this is Geordie Schimmel.
15   We work for the District Attorney, Carlos Valdez, and if you're
16   seated on this jury we'll be the ones presenting the evidence
17   to you.  So I'm gonna tell you right off the bat, there's no
18   right or wrong answers to anything you say.  We just want to
19   know how you feel about some of the issues.  I don't want you
20   to answer in a certain way that you say, "Well, I better answer
21   it this way because that's what the judge probably wants me to
22   say, or that's what I think the defense lawyers want me to say
23   or the State wants me to say."  You just answer how you feel
24   and then we can deal with that.  Fair enough?
25   A.    That's fair.

256

1    Q.    The first issue I want to talk to you about is,
2    clearly, the death penalty because that's what this case may
3    come down to, whether you can sit on a jury and may ultimately
4    have to make that decision between life and death, and I want
5    to know how you feel about that.
6    A.    Well, my answer would be it all depends on the
7    circumstances, you know, and I don't have a problem going
8    either way.
9    Q.    I understand when you say that because it should
10   depend on the circumstances and what we call the evidence.
11   A.    Exactly.
12   Q.    But how do you feel about being put in that position?
13   You know that first day when all those people were called in to
14   jury duty and you didn't know what kind of a case was until
15   the judge came down and said, "Folks, this is a criminal case."
16   And some people thought, well, that's probably gonna be a DWI,
17   or a shoplifting case or something.  And then the judge says,
18   "This is a capital murder case.  If you're on this jury, you
19   may have to decide the death penalty or not."  What was your
20   first reaction when heard it was that kind of case?
21   A.    Well, really, I didn't really have any reaction.
22   Basically, the questions that we had to fill out, I filled them
23   out truthfully, you know.  And like I said, it all depends on
24   the evidence and I don't have a problem going either death or
25   life --

257

1    Q.    When we talk about -- I'm sorry.  I didn't mean to

2  interrupt you.

3    A.    No, that's okay.

4    Q.    When we talk about that, a lot of people tell me,

5  "Hey, I believe in the death penalty.  It's a good law.  We

6  should have that."  And then I say, "Look at this man over

7  here, that's him, look at him, John Henry Ramirez."  You may

8  have to make a decision on this jury whether he lives or dies.

9    A.    I understand.

10    Q.    You think you can make that type of decision?

11    A.    I think so, yes, sir.

12    Q.    Why?

13    A.    Because I have an open mind to begin with and I like

14  to see all the evidence, and I don't judge anybody for what

15  they've done until, you know, everything -- all the

16  circumstances, everything's laid -- you know, set on the table,

17  and I see everything, and then from there, I would know for the

18  --

19    Q.    And I appreciate you saying you want to wait for

20  everything.  I just want to know how you feel about having to

21  be put in that position to make that decision.  Because let me

22  tell you why I say that.  You know that first day when people

23  -- the judge made that announcement, I saw some of the jurors

24  and some of them went, "Oh, my gosh, I can't believe it's this

25  kind of case."  Some people said, "Well, you know, I better

258

1  listen."  And then some people are thinking -- saying, "Like,

2  oh, man, I thought this was going to be something else.  I

3  don't know if I could do that."  And each person is different

4  but you have to look in your heart and say, "Can I actually

5  participate in this type of case, and not just talk about the

6  death penalty but actually enforce it if it's necessary?"  Tell

7  me your reaction to that.

8    A.    Well, if it's necessary, then I would, but, you know,

9  it depends.  Like I said, you know, I need to see the evidence

10  and I don't have a problem going either way, and that's

11  basically the honest truth.

12    Q.    Why do you think we have the death penalty in Texas?

13    A.    I feel that there's death penalty because of the

14  crime that was committed, the way the person was murdered.

15  And, you know, the way it was done for the reason that it was

16  done, that's why.

17    Q.    How come in your questionnaire there was a part that

18  says whether you agree with this statement or not agree, and it

19  says, "The death penalty is absolutely never justified."  And

20  you put "yes" that you agreed with that?

21    A.    That it was never justified?

22    Q.    Right.

23    A.    You know, I -- I feel that, you know, like I said,

24  sometimes it is and sometimes it's not, you know, depending on

25  the crime, depending how they were murdered, you know, brutally

259

1  murdered, you know, so forth.  And that's probably why I

2  answered that way.

3    Q.    But it says, "You absolutely think it's never

4  justified, that we should never have it."

5    A.    Well, I -- well, that, I -- at the time when I was

6  filling that out, I honestly, you know, I might not have read

7  clearly what was, you know, being said because I was kind of

8  like in a hurry.  But it -- I do feel that sometimes it's

9  necessary, and then, it depends, like I said, you know, how the

10  crime is, how it was intentionally, you know, murdered, the

11  person, you know.  It all comes down to the circumstances.

12    Q.    I know.  But you understand when I read this it made

13  it sound like this person doesn't ever believe the death

14  penalty should go?

15    A.    Well, that was wrong.

16    Q.    Okay.  And there was another part in here where it

17  says, "I do not believe in the death penalty but I'm not sure

18  it is not necessary. "

19    A.    Uh-huh.

20    Q.    And you put you agreed with that statement too?

21    A.    Was it a question or --

22    Q.    Yeah, it's a statement whether you agree or disagree.

23  "I do not believe in the death penalty but I'm not sure it is

24  not necessary."

25    A.    Okay.  Well, like I said --

260

1    Q.    It makes it sound like you don't believe in the death

2  penalty.

3    A.    Well, to me, like I said, it can go either way and

4  some -- you know, it depends on the circumstances.  I must have

5  not read it correctly, but, you know, I don't disagree with not

6  having the death penalty and I don't agree.  It depends on,

7  like I said, on the circumstances.  I cannot --

8    Q.    I know, but you keep trying to make it sound like I'm

9  talking about a particular case.  I'm just talking about in

10  general.  You know, I'm not talking about this case.

11    A.    I believe -- I believe in the death penalty, and you

12  know, basically, I cannot sit here and say that I would or

13  wouldn't on this case.

14    Q.    I'm not asking you.  I'm just asking you in general.

15  Do you believe in -- what do you feel about the death penalty?

16  Not in a specific case and you don't need to say, based on the

17  circumstances.  I just want to know how you feel about the

18  death penalty in general as a concept we have in our law?

19    A.    I agree with it in some points.

20    Q.    Explain that.

21    A.    Okay.  I agree with it -- let me give you an example.

22  Say there was children involved and the person went into that

23  household and literally killed the entire family for no reason.

24  Then, in that case, I would think -- I would strongly feel that

25  they should deserve the death penalty.

261

1    Q.    So where children are involved?

2    A.    Yes.

3    Q.    What about in cases do you – about a case where you

4    murdered somebody while you're robbing them?

5    A.    Okay. Well, in that case, I would need to see the

6    evidence because maybe at that time that person that did the

7    murder wasn't thinking straight, and you know, problems

8    occurred in their life, and you know, they made a mistake. It

9    doesn't necessarily mean that they should get the death

10   penalty, you know, it depends. And that's the honest truth.

11   Q.    If somebody came to you before you -- did you ever

12   think about the death penalty before you got caled in for jury

13   duty? Because a lot of people tell us, "I've never even really

14   had to think about it and I've been kind of confronted with my

15   feelings." Did you ever give much thought to it before this?

16   A.    Well, I didn't know at the time when I came the very

17   first time that it was either gonna be a death penalty or life

18   sentence. I didnt know anything about that.

19   Q.    I know. But my question is, before you were called

20   in as a juror, how did you feel about the death penalty before

21   you had to answer questions like this?

22   A.    I didn't feel – honestly, I didn't feel anything

23   because, I mean, like I tell you before, in some circumstances

24   I would agree that he deserves the death penalty, and then, in

25   another case, depending on the situation, then I would feel

262

1    that doing certain life would be sufficient.

2    Q.    What kind of things would it take you to make up your

3    mind?

4    A.    Depending how the person was murdered, depending how,

5    you know, the victim was defensive, you know, how he was

6    approached, if he -- let me give you an example. If say the

7    person had a knife and stabbed him like a hundred times, and

8    you know, cut him up to pieces, you know, that was not called

9    for, so in that situation, I would do the death penalty.

10   Q.    So if it was multiple wounds, you'd kind of be

11   leaning toward the death penalty?

12   A.    Probably.

13   Q.    You said here – in your questionnaire it says, "The

14   law in Texas says that an intentional murder committed in the

15   course of committing or attempting to commit a robbery

16   qualifies as a capital murder in which the death penalty may be

17   imposed. Do you agree with this law?" And you put no. Can

18   you explain that, why you said that?

19   A.    Well, again, you know, I have an open mind. It all

20   depends on the circumstances. I cannot sit here and say,

21   "Well, you know what, I'm gonna give this person the death

22   penalty because of the crime that he did." Because I've never

23   heard of this story to begin with so i couldn't, you know,

24   really answer.

25   Q.    I know, but the judge is not talking about this

263

1    specific case. The judge, when he asks this question says,

2    that in a murder committed in the course of committing a

3    robbery. Do you remember the judge saying, 'Murder plus

4    robbery qualifies as a capital murder case where the death

5    penalty may be imposed." But you said you didn't agree with

6    the law on there?

7    A.    Did it say either yes or no, or did it –

8    Q.    It said yes or no.

9    A.    It said yes or no?

10   Q.    Uh-huh.

11   A.    Okay. Well, maybe I – you know, because at the time

12   that I was doing the questions, I was kind of like doing it

13   quickly so maybe I didn't really understand the question at the

14   time that I was answering and that's why.

15   Q.    Because this basically says, "The law says you might

16   be able to get the death penalty if you kill somebody while

17   robbing them," which is what the law has been explained to you

18   by the judge. But you said you didn't agree with it. You

19   think you just misread the question?

20   A.    Yeah. Well, there's a lot of cases that, you

21   know, that there - there's been murder and they don't get the

22   death penalty. They get life, you know, and so it -- you know,

23   like I said, it all depends, and that's basically my honest

24   truth. It all depends what the circumstances are in order to

25   weigh the situation either life or death.

264

1    Q.    But the point is to even qualify to be eligible for

2    the life or death sentence, which is capital murder, you have

3    to qualify under the law, and the law says, if you do it,

4    murder somebody while you're robbing them, that qualifies it.

5    You're saying you don't believe in that law or not?

6    A.    It's not that I don't believe. I believe, you know,

7    in the law, I just don't – I can't just -- you know, it

8    basically doesn't really give you the option to, you know,

9    write what you feel or anything. It just says yes or no.

10   Q.    Well, it says "please explain." You can write

11   something in there.

12   A.    I don't remember. It does say explain?

13   Q.    Do you want to see yours?

14   A.    No, I believe you. And basically, that's my answer.

15   But I do believe that it is -- it qualifies for death penalty

16   but -- and depending on the circumstances, and that's basically

17   what I feel.

18   Q.    But you understand it only depends on what the crime

19   is called. Like take, for example, a person can kill somebody,

20   chop their body up in a hundred different places and mail them

21   out to a hundred different places. You know what, that sounds

22   funny, but that's not a capital murder case. You couldn't get

23   the death penalty for that because it's just plain murder. See

24   what I'm saying? There's only certain type of cases that make

25   you eligible for probation. I mean -- not capital murder,

265

1  eligible for the death penalty, excuse me.

2      A.    For the death penalty.  So that wouldn't be committed

3  -- I mean, that wouldn't be --

4      Q.    That wouldn't even make a death penalty.  That sounds

5  funny, right?

6      A.    The way the law is?

7      Q.    Yeah.

8      A.    In some ways.

9      Q.    Well, that's what I'm trying to figure out because it

10  sounds to me like maybe I would have to prove that, you know,

11  the guy stabbed somebody a hundred times before you could give

12  the death penalty, and you know, the law doesn't require that.

13  They could be shot one time, stabbed one time, you know.

14      A.    Well, they have strange laws.

15      Q.    Say again?

16      A.    They have strange, you know, ways and laws, you know,

17  like for the example that you're giving me.

18      Q.    And I understand.  That's why we're talking about it

19  now because I just want to know if you're the kind of person

20  that needs that extra stuff.  Because what if I have the case

21  -- what if I have any case and he just stabbed the guy one time

22  and not, you know, a hundred times, or shot the guy one time.

23  It sounds to me like you're gonna say, well, I couldn't give

24  the death penalty for that kind of case because I could only do

25  it if it was like, you know, like you said, your words, a

266

1  hundred times, stabbed him 100 times.  Would it be more

2  difficult for you to do it that way?

3      A.    Well, like I said, it all depends, you know.  Like

4  say if it was one stab wound, right?  But he got the knife and

5  he was doing this, you know, (indicating).  It just depends

6  what it is.  I mean, I cannot sit here and tell you that, you

7  know, I'm gonna say the death penalty because of what he did or

8  say life, you know.  I need to hear the circumstances.

9      Q.    And I'm not gonna -- I can't tell you what the

10  circumstances of this case are and I can't commit you to say

11  what you're gonna vote for.  That's why I'm talking about

12  generics.  Because in your next question it says, "The law in

13  Texas says the person convicted of capital murder may receive

14  the death penalty solely because of the facts and circumstances

15  of the crime, even if the person has committed no other

16  previous crimes.  Do you agree with this law?"  And you put no.

17      A.    In that case, you know, say -- right there is saying

18  he's never committed another crime but just that one, you know,

19  and people make mistakes, you know.  And I, in that part, may

20  not give him the death penalty because he's never done crimes

21  before.  It's only happened at that time, and so, that's why I

22  answered that question.

23      Q.    And it's okay for you to feel that way.  I'm not

24  picking on you or trying to argue with you about that.  Because

25  some people may say that.  They say, "Look, I can only give the

267

1  death penalty if you show me, Mr. Skurka, that he's been

2  convicted of a lot of other crimes."  Is that what you're gonna

3  require me to do?  And if you are, that's fine.  I just need to

4  know.

5      A.    No, that's not what -- that's not why I'm saying what

6  I'm saying.  It's just I need to see the circumstance to see,

7  you know.  I cannot say death or life, which one I'm gonna --

8  you know, go and do because I need to see the circumstances.

9      Q.    I know, ma'am.

10          THE COURT:  Okay.  Look, look.  We've gone

11  around and around.

12          MR. GARZA:  Your Honor, I'm gonna object to

13  the --

14          THE COURT:  Look, here's the deal.  Here's the

15  deal, okay?

16          MR. JONES:  She already answered the question.

17          THE COURT:  I agree.

18          MR. GARZA:  It's asked and answered, Judge.

19          THE COURT:  I agree, but I'm gonna go over it

20  again.  Here's the deal, okay?  Capital murder means murder,

21  in this case, plus robbery, okay?  You have to consider -- if

22  you get to the guilty, you have to consider this question,

23  that is, only if you think he's a continuing threat to

24  society.  Then you get to the second question.  Circumstances

25  of the offense.  That in and of itself can be enough to

268

1  warrant a death sentence, okay, in and of itself?

2          VENIREPERSON NO. 81:  Right.

3          THE COURT:  But you've got to consider

4  everything, all right?

5          VENIREPERSON NO. 81:  That's right.

6          THE COURT:  You consider his history, you

7  consider what kind of guy he is, you consider his background.

8  And remember that personal, moral culpability?  Agreeing with

9  or disagreeing with the law is not the standard.  The standard

10  is, can you follow it?

11          VENIREPERSON NO. 81:  That's right.

12          THE COURT:  Can you follow the laws that we've

13  talked about; that is, can you sit here and determine, based

14  upon the evidence presented to you beyond a reasonable doubt

15  whether this defendant's guilty of capital murder?

16          VENIREPERSON NO. 81:  Yes.

17          THE COURT:  Can you truthfully answer these

18  questions and render a verdict based upon the law and evidence

19  presented to you on these two questions?

20          VENIREPERSON NO. 81:  Yes.

21          THE COURT:  Okay.  I mean -- Okay.

22      Q.    (BY MR. SKURKA)  Okay.  My question is this, ma'am.

23      A.    Yes.

24      Q.    What if the person doesn't have any priors?

25          THE COURT:  But you're asking --

269

1     MR. GARZA:  Once again, Your Honor, I'm gonna

2   object to the form of the question.  It's calling for a

3   commitment.

4     THE COURT:  You are asking for a commitment

5   and I've sustained some objections that you've made the other

6   way.

7     MR. SKURKA:  Let me rephrase it then, Judge.

8     THE COURT:  Okay.

9   Q.   (BY MR. SKURKA) The question asked from the

10   questionnaire says, "That a person convicted of capital murder

11   may receive the death penalty solely because of the facts and

12   circumstance of the crime," what he did that day.

13   A.   Right.

14   Q.   Even if the person has committed no other previous

15   crimes, and for lack of a better word, I call them first time

16   offenders.

17   A.   Okay.

18   Q.   Okay.  The law says that person can get the death

19   penalty.  But you told me a few minutes ago -- I thought you

20   told me a few minutes ago -- and you change it if I'm incorrect

21   -- that you said, "Well, I couldn't do" -- I thought you said,

22   "I may not be able to do the death penalty if this is only his

23   first time he's committed a crime."

24   A.   No.

25   Q.   Is that what you said or not?

270

1   A.   No.  What I'm trying to tell you is I need to see the

2   evidence in order -- I mean, I cannot give you a straight out

3   answer.  I mean, I've never seen him before, I don't know what

4   the crime's really about because I've never heard of it, and I

5   can't sit here and tell you, you know, yes, you know what, I'm

6   gonna give him the death penalty.

7   Q.   I'm not asking you that, ma'am.

8   A.   I understand that.

9   Q.   What I'm trying to say is, is it gonna weigh on you?

10   Are you gonna be leaning toward a life sentence instead of a

11   death sentence because he doesn't have any priors?

12     MR. GARZA:  Once again, Your Honor --

13     THE COURT:  Sustained.

14     MR. GARZA:  -- he's asking for a commitment,

15   Judge.

16     THE COURT:  Sustained.  You don't have to

17   answer that question.

18   Q.   (BY MR. SKURKA) How important to you is it that a

19   person has prior offenses in making that decision on giving the

20   death or life sentence?

21     MR. GARZA:  Once again, Your Honor, same

22   objection.

23     MR. SKURKA:  That is not a commitment

24   question, Judge.  I asked her --

25     THE COURT:  Look, here's the thing.  Is it

271

1   something that you would consider that he has prior

2   convictions?  I'm not saying that you have to say, Okay, he's

3   got prior convictions so I am going to, you know, give him the

4   death penalty.  I'm not saying that.  It is something that you

5   would consider as part of this overall picture?

6     VENIREPERSON NO. 81:  I would consider it,

7   like you said, in all, to see how his life was, if he was a

8   problem in society, if he was always in trouble, robbering

9   (sic) or if he's had other killings, you know.  It all depends

10   at the time of the hearing what I hear.  And basically, I

11   would be able to make a decision at that time, you know, and I

12   wouldn't have a problem.  But I understand what you're trying

13   to tell me.  I would put everything together and view it.

14   Before -- you know, I can't sit here and say, you know what,

15   you did it, you're guilty.

16     THE COURT:  Well, no, you haven't heard any

17   evidence.

18     VENIREPERSON NO. 81:  Of course not.

19     THE COURT:  But really, what we're talking

20   about is more of a punishment issue right now.  Assuming you

21   find the defendant guilty -- and that's a big assumption

22   because they have to prove it, okay?  It's a big assumption.

23     VENIREPERSON NO. 81:  Yes.

24     THE COURT:  And you know we had a juror

25   earlier in the week that said, "Well, I guess you already

272

1   think it's gonna be guilty."  No, this is -- we only get to

2   talk to you once, okay?  We don't get to do the guilt or

3   innocence first and then go to the second part and then say,

4   "Okay, now let's talk to the jurors again."  We only get to

5   talk to you.  That's why we're bringing this up now.  But the

6   question is this:  Could you consider, you know, a criminal

7   history?  I'm not saying that if his criminal history's bad

8   that means that you still have to give him the death penalty.

9   But I will say that it's something that you should consider,

10   weigh, okay?  And all -- all of his background that's

11   presented to you, everything should be weighed in light of

12   that question, and this one as well, okay?

13     VENIREPERSON NO. 81:  I agree with that.

14     THE COURT:  Can you do that?

15     VENIREPERSON NO. 81:  Yes.

16     THE COURT:  Now, the law says, the

17   circumstances of the offense can be enough, okay, to answer

18   these questions.  In other words, if you think that the

19   offense is so bad, then that, in and of itself, can aide you

20   in answering these questions.  But we're not gonna tell you

21   the facts.  That's improper at this point, okay?  But could

22   you consider merely the circumstances of the offense in

23   answering that question, yes?

24     VENIREPERSON NO. 81:  Yes.

25     THE COURT:  Yes?

273

1      VENIREPERSON NO. 81:  Yes.

2      MR. SKURKA:  I don't have any other questions,

3   Judge.

4      THE COURT:  Okay.  Defense.

5      VOIR DIRE EXAMINATION

6   BY MR. GARZA:

7      Q.   Ms. Muguerza, I believe you're trying your duty bound

8   best to understand these concepts, and I think you do

9   understand these concepts.  Do you understand that the first

10  part of the trial you're gonna have to listen to the evidence

11  to see if the State can prove the case beyond a reasonable

12  doubt before you make a decision as to my client's guilt or

13  innocence?  Because right now he's innocent until they prove

14  him guilty.

15     A.   That's correct.

16     Q.   Do you understand that?

17     A.   Yes.

18     Q.   That's called the presumption of innocence, okay?

19     A.   Uh-huh.

20     Q.   And they have to prove the case, they have the

21  burden, and they have to do it beyond a reasonable doubt.  Do

22  you do you understand that concept also?

23     A.   Yes, sir.

24     Q.   Okay.  Now, we have to talk about all this stuff like

25  oh, what if, and what if, and what if, and you know, what will

274

1   happen if you do find him guilty and all these special issues

2   because this is the only time we get a chance to talk to you

3   about everything, okay?

4      A.   Yes, sir.

5      Q.   Not because we've already made our minds up or

6   because, you know, we've made some sort of a determination.  It

7   doesn't matter what we think, okay?  It doesn't matter at all

8   what the lawyers think at all, okay?  What matters is that you,

9   as a juror, as a person, you know, can sit in this case and be

10  fair and impartial to both sides.  Do you know what I mean by

11  impartial?

12     A.   Yes.

13     Q.   What does that mean?

14     A.   To weigh out the situation and to be open-minded for

15  both, you know, his evidence and yours.

16     Q.   In other words, you come to the table to assume your

17  position as a juror without any opinions already or any

18  presuppositions about anything?

19     A.   Exactly.

20     Q.   And is that you?

21     A.   Yes.

22     Q.   Is that the same in so far as these punishment

23  issues, if we get there?

24     A.   Yes.

25     Q.   Can you be fair about that too?

275

1      A.   Yes, I am a very fair person here, out there.  I'm --

2   that's the way I am.

3      MR. GARZA:  Thank you, ma'am.  That's all the

4   questions I have.

5      THE COURT:  Anything else?

6      MR. SKURKA:  No, Your Honor.

7      THE COURT:  All right.  Why don't you wait in

8   the jury room and we'll get right back with you.

9      VENIREPERSON NO. 81:  Okay.  Can I get out

10  through here?

11     THE COURT:  Yeah, go right through there.

12     (Venireperson exits courtroom.)

13     MR. SKURKA:  Judge, we'll exercise a

14  peremptory strike.

15     THE COURT:  All right.  Let's bring her back

16  in.

17     (Venireperson enters courtroom.)

18     THE COURT:  All right.  Mrs. Muguerza, you

19  were not selected to be on this jury but we do appreciate your

20  time.  If you need a work excuse we can help you with that,

21  okay?  All right.  So I guess -- do you want to take a little

22  break.  Let's take a little break.

23     MR. GARZA:  Can we have a little break?

24  Mr. Skurka tired me out.

25     (Recess.)

276

1      THE COURT:  All right.  Let's bring him in.

2   Ryan Hill.

3      THE BAILIFF:  Judge, just to let you know, we

4   had four in there.

5      THE COURT:  All right.  Mr. Hill, come

6   forward.

7

8      VENIREPERSON NO. 80,

9      RYAN RICHARD HILL,

10     VOIR DIRE EXAMINATION

11  BY THE COURT:

12     Q.   I'm sorry, Mr. Hill.  We are working real hard in

13  here.

14     A.   All right.

15     Q.   I got to tell you.  I know you've been waiting.  We

16  are not messing around.  We are working real hard.  This is

17  obviously a very serious case so we're trying to do it right,

18  okay?

19     A.   Okay.

20     Q.   But we are sorry for the delay.

21     Okay.  We're looking for two things here for

22  our jurors.  We want people that can keep an open mind, okay,

23  because if they can't keep an open mind, it's not fair, right?

24     A.   Right.

25     Q.   And you wouldn't want a friend or family member or

277

1   yourself to be on trial if there were people that couldn't keep
2   an open mind about your case, right?
3       A.   Yes, sir.
4       Q.   Okay.  So is that you, can you keep an open mind?
5       A.   Yes, sir.
6       Q.   Okay.  You have heard some stuff about it in the
7   media, but I want to caution you what the media reports isn't
8   always right?
9       A.   Yeah.
10      Q.   And I'm gonna need you, if you're gonna be selected
11  on this jury to promise me that you're only gonna base your
12  decision based upon what comes into court in the courtroom, in
13  this courtroom, the evidence that's presented to you.  Can you
14  do that?
15      A.   Yes, sir.
16      Q.   Okay.  Now, then, let's go on to the next thing.  We
17  need to talk about the law.  I need to make sure you can follow
18  the law.  You have never been on a jury before.  That is not a
19  problem, but we need to talk to you about it.  This is a
20  criminal case, okay?
21      A.   Uh-huh.
22      Q.   That means the State's got the burden of proof.  The
23  law says, "State, you bring the charges, you've got to prove
24  them."  Okay?  Fair enough?
25      A.   Uh-huh.

278

1       Q.   You agree with that law?
2       A.   Yeah.
3       Q.   All right.  Burden of proof is beyond a reasonable
4   doubt.  You may remember that from school, maybe you -- maybe
5   you read, watch the History Channel, something like that,
6   *American Justice*, stuff like that.  There's no definition of
7   what it is, but let's talk about what it is not so that you can
8   get an understanding of what it is, okay?
9       A.   Okay.
10      Q.   It is not preponderance of the evidence.
11  Preponderance of the evidence is the burden in a civil case,
12  okay?  This was a contract case, maybe, between two businesses
13  fighting over a contract.  One side sues the other.  The side
14  that sues the other, the plaintiff, the one that brings the
15  case has the burden of proof, but it's just -- just tipping the
16  scales of justice ever so slightly, 51 percent, if you will?
17      A.   Uh-huh.
18      Q.   If the State seeks to take away kids from -- from a
19  person because they feel like they're unfit, the burden's
20  higher.  It's called clear and convincing.  I know that sounds
21  pretty clear, right, clear and convincing?
22      A.   Uh-huh.
23      Q.   This is higher than that.  This is beyond a
24  reasonable doubt, okay?  Are you following me?  It's the
25  highest burden that we have in all of the law.  And, of course,

279

1   it's because somebody's liberty is at stake here, all right?
2            Now, it is not beyond all doubt, because if it
3   was beyond all doubt you'd have to have been there, and if you
4   were there, they'd be calling you as a witness and you couldn't
5   be a juror, okay?
6       A.   Okay.
7       Q.   Do you follow what that is?
8       A.   Yes, sir.
9       Q.   Okay.  Would you hold the State to that burden beyond
10  a reasonable doubt?
11      A.   All right.
12      Q.   Yes?
13      A.   (Nodding head up and down.)
14      Q.   Yes?
15      A.   Uh-huh.
16      Q.   You have to speak up because she's taking it down.
17      A.   Yes.
18      Q.   Okay.  Now, the law says, "Defendant is innocent
19  until proven guilty."  I mean, that's right.  He's innocent,
20  okay, till the State can prove otherwise, if they can.  Maybe
21  they can't, okay?
22      A.   Okay.
23      Q.   It's what the law says.  It's an ancient concept.  It
24  comes from the Greeks.  Innocent until proven guilty.  And you
25  have to presume that he's innocent.  Some places in the world

280

1   if the State says you did it, you're guilty until you can prove
2   otherwise.  We don't do it like that.  Okay.  We -- we make the
3   State prove the charges here.  So could you presume the
4   defendant innocent until the State could prove otherwise?
5       A.   Yes, sir.
6       Q.   If they can at all.  We don't know.
7       A.   Yes, sir.
8       Q.   Okay.  Now, as part of this, the defense has no
9   burden.  State's always got the burden and so, because of that,
10  the law says defendant doesn't have to put on any evidence,
11  doesn't have to testify.  And there's a lot of reasons why he
12  may not.  Maybe his lawyers tell him not to.  Maybe they say,
13  "Hey, you don't need to testify.  They haven't proven their
14  case."
15      A.   Okay.
16      Q.   Or maybe -- maybe he's not a good speaker, you know,
17  maybe he's not somebody that does well in front of people.
18  Some people get really stressed in front of people.
19      A.   Yes.
20      Q.   I do this for a living so I don't have a problem with
21  it, but you know, some people that aren't used to it they get
22  very stressed out.  Maybe his lawyers tell him not to, okay?
23  It doesn't really matter why.  My point is, you can't hold it
24  against him.  In other words, the law says, "Not only can they
25  not call him as a witness, not only can't make him get

281

1   up here, if you're selected on a jury you can't hold it against
2   him." Some people say, "Well, I've got to hear both sides of
3   the story." But this isn't a race, okay? This isn't a race
4   between the State and the defendant. The only issue is whether
5   the State can get across the finish line which is reasonable
6   doubt, all right?
7      A.   Okay.
8      Q.   So would you -- would you follow that law and not
9   hold it against the defendant?
10      A.   Yes, sir.
11      Q.   Okay. All right. Now, let's talk about the crime
12   itself. The allegation is capital murder and what is that?
13   Well, murder is within it, so it's obviously murder, right?
14   Murder, the intentional taking of the life of another, okay?
15   Well, what's the capital part about? Well, I like to call it
16   murder plus, murder plus something else, and there's a list of
17   things the legislature has designated as things that are
18   capital murders. I'm gonna focus on this one, okay? In this
19   one, the legislature has said if you've got murder while in the
20   course of committing a robbery or attempting to commit a
21   robbery, two serious felonies put together, that's capital
22   murder, okay?
23      A.   Yes, sir.
24      Q.   And what's the capital signify? That means that the
25   death penalty is a possibility, okay? We got murder plus.

282

1   It's a qualifying murder if they can prove everything that
2   they've alleged, all right? So there's a lot of elements
3   because you got murder, plus you got a robbery, you've got to
4   show that it was this person charged on the given date -- on or
5   about the given day in Nueces County, Texas. Would you hold
6   the State to proving all of their elements before you found the
7   defendant guilty of capital murder?
8      A.   Yes, sir.
9      Q.   Okay. Now, we have a bifurcated system in Texas and
10   all that means is there's two parts. There's guilt or
11   innocence, okay? We have a trial and see if the defendant can
12   -- can -- if the State can prove that the defendant is guilty
13   beyond a reasonable doubt. If they don't, if -- if you think
14   you know what, you haven't met your burden. He's innocent
15   until proven guilty and you haven't met your burden beyond a
16   reasonable doubt, not guilty, okay? And you understand that's
17   what you have to do?
18      A.   Yes, sir.
19      Q.   If, however, the State meets their burden, we go to
20   the second phase, punishment. There are two possibilities in a
21   capital murder if the person's found guilty, okay? Life in
22   prison or death, both very serious penalties. You'd agree with
23   me on this?
24      A.   Yes.
25      Q.   Either one's pretty serious?

283

1      A.   Uh-huh.
2      Q.   Okay. And those are the only two possibilities. But
3   a jury doesn't go back and there and say, life, or after we've
4   considered everything, death. They don't do it like that. You
5   answer questions, okay? Here's the question, the first one.
6   "Is there a probability that the defendant would commit
7   criminal acts of violence that would constitute a continuing
8   threat to society?" What does that mean? Is it probable that
9   the defendant would be violent to people in the future. Okay.
10   You've got to make that call and say -- answer yes or no, okay?
11      A.   Okay.
12      Q.   Then you've gone to Special Issue No. 2. "After
13   taking into consideration all of the evidence, including the
14   circumstances of the offense" -- that's the first part of the
15   case, guilt or innocence -- "the defendant's character and
16   background," -- all right, what's that? Well, what's
17   character? Well, that's like, you know, what kind of guy is
18   he? Is he a straight up guy, you know? Is he a good person,
19   is he not, you know? Do you follow me?
20      A.   Yes.
21      Q.   Is he a liar and a cheat, or is he just a straight up
22   guy, and other than this day has been a straight up guy all his
23   life, okay?
24      A.   Yeah.
25      Q.   His background, what's his background? Well, what

284

1   was his childhood like? Did he have a good childhood? Was it
2   terrible? Maybe somewhere in between, all right? You may hear
3   these other things in the second part of the trial. Okay.
4   You've got to consider that. -- "and the personal moral
5   culpability of the defendant." That's a hard thing to
6   understand when you read it, right? The personal moral
7   culpability of the defendant.
8         Let me give you an example of what we've been
9   using, okay? Two guys get convicted of burglary. One of
10   them, all he wants to do is he likes -- he likes to use
11   cocaine and party with his girlfriend so he breaks into a
12   house and tears the place up and he steals TVs and, you know,
13   little kid's video game machine, and just trashes the house,
14   takes everything of value, you know, the wife's wedding ring
15   that was her grandmother's.
16      A.   Yeah.
17      Q.   And just sells it for dope and they use -- he and his
18   girlfriend go to Las Vegas and they use drugs and spend it all.
19   He gets arrested. Come to find out he's been to prison twice
20   before for a burglary, okay?
21         The second guy goes into somebody's house, but
22   he doesn't break in. He just goes in an unlocked door. And
23   the reason that he goes in is to steal food for his kids
24   because he's lost his job and he just can't feed the kids, and
25   he doesn't even eat the food himself. He's hungry too but he

285

1    doesn't eat -- he just takes the stuff for his kids, all right?
2        A.   Okay.
3        Q.   Do they have the same personal moral culpability?
4    No, not at all.  Their motivations are completely different.
5    Do you agree?
6        A.   Yes, sir.
7        Q.   And one of them is very self-motivated, very selfish.
8    And the other is wrong because you can't go into someone else's
9    house and take food.  But, you know, you can understand why
10   they should be treated differently.  Do you agree with that?
11       A.   Yes, sir.
12       Q.   And the punishment probably should be different.  Do
13   you agree?
14       A.   Yes, sir.
15       Q.   Okay.  That's what that part of the question's about,
16   all right?  Okay.  "Is there a sufficient mitigating
17   circumstance or circumstances to warrant a sentence of life
18   imprisonment rather than a death penalty being imposed?"  Okay.
19   What is a mitigating circumstance?  Well, it's something in the
20   defendant's favor.  It's something that lessens his perhaps --
21   it's a circumstance that's lessening.  Are you following me?
22       A.   Yeah.
23       Q.   Like maybe he taught little kids to read, you know,
24   maybe he was an Eagle Scout, maybe he was, you know, real good
25   to his mother, you know.  And these are just examples because

286

1    the only people that can determine what a mitigating
2    circumstance is, is the jury.  These lawyers will suggest
3    during this trial, I believe, if we get to that point, what
4    mitigating circumstances are, but only you, if you're selected
5    on this jury get to decide.  One juror may think, "Being an
6    Eagle Scout is a mitigating circumstance."  Another one may
7    say, "That doesn't mean anything to me."  Okay?  Are you
8    following me?
9        A.   Yes, sir.
10       Q.   Then you determine after you take in all these
11   things, is there sufficient mitigating circumstances, because
12   you might find -- you know, there are mitigating circumstances.
13   They are in his favor and I'm considering them.  But they are
14   not sufficient to warrant life rather than death, or you may
15   think they are sufficient to warrant life instead of death.
16   Are you following me?
17       A.   Yes.
18       Q.   Okay.  Basically, this question is asking you to take
19   the whole trial, everything that's presented to you and say,
20   "All right.  Based upon everything that I've heard, the
21   circumstances of the offense, his character, his background,
22   and his personal moral culpability, is there anything that I've
23   heard that warrants a sentence of life rather than death?"  Do
24   you follow that question?
25       A.   Yes, sir.

287

1        Q.   And the jury would answer yes or no to this question,
2    okay?
3        A.   Okay.
4        Q.   Now, at the beginning of this trial, I have to swear
5    in the jurors and the oath goes like this.  Do you swear that
6    you will solemnly render a verdict -- a true verdict based upon
7    what, the law and the evidence as presented to you?  They will
8    tell me yes.  What I need to know from you is, can you do that?
9    And before you answer, some people tell me, "I cannot because I
10   cannot participate in a process that could lead to the death
11   penalty."  Others will tell me, "If I find someone guilty of
12   capital murder, I'm not gonna follow this law.  I'm gonna
13   answer the questions in such a way so that he gets the death
14   penalty."  Neither of those people can take this oath.  But I
15   need to know from you if you can take the oath?
16       A.   Yes, sir.
17            THE COURT:  Okay.  Mr. Skurka.
18            MR. SKURKA:  Mr. Schimmel's gonna handle this
19   juror, Judge.
20            MR. SCHIMMEL:  Thank you, may I proceed?
21            THE COURT:  Yes, sir.
22                VOIR DIRE EXAMINATION
23   BY MR. SCHIMMEL:
24       Q.   Mr. Hill, hi.  My name is George Schimmel.  This is
25   Mark Skurka.

288

1        A.   Hello.
2        Q.   I just want to ask you a couple of questions and I
3    guess the first thing I'd like to tell you is that there really
4    isn't any right or wrong answers to the questions we're asking.
5    I just want to pretty much get the answers to what you're
6    saying -- I mean to what we're asking.
7             The first question I've got for you is when
8    you came in a couple of weeks ago and -- is this the first
9    time you were called for jury duty?
10       A.   For the summons that day, no.
11       Q.   You've been called before as a juror?
12       A.   Uh-huh.
13       Q.   Probably not as a capital murder jury though, right?
14       A.   Right.
15       Q.   What was your first thought when you came in and
16   found out it was a capital murder type case?
17       A.   I was pretty much surprised.  I didn't think it was
18   that bad.
19       Q.   Okay.  You didn't think like, "Oh, my God, this is
20   just something I can't possibly; do this is going to take way
21   too long of my life."
22       A.   The other ones before have just been minor things.
23   That's what I was kind of expecting.
24       Q.   Okay.  So not that big of a deal.  How would you feel
25   if you were actually selected to be on this kind of jury and

289

1  you had to make this kind of decision? How would you feel
2  about that?
3      A.   A little bit of mixed emotions, I guess. Really, I
4  mean, no feelings at all right now, just pretty much mixed
5  emotions. I would have to go through and see how I feel, but
6  right now, just nothing.
7      Q.   Okay. When you say "mixed emotions" do you mean --
8  is that a bad thing, or kind of good, kind of bad?
9      A.   Kind of good, kind of bad. I mean, I understand, you
10  know, what we're going through, you know. But, then again,
11  seeing somebody that might die from it, you know, that's a bad
12  emotion I have with it.
13     Q.   Do you think that emotion is so bad you wouldn't be
14  able to do this kind of thing?
15     A.   No.
16     Q.   Okay. Now, at some point, the State's gonna put on
17  evidence and I want to tell you just kind of quickly how these
18  trials work. There's a guilt innocence part of the trial where
19  the State puts on evidence. The defendant can if they want to,
20  they don't have to. And at the end of that, you as juror will
21  either decide whether the defendant was guilty or he wasn't
22  guilty. If you decide he's not guilty, the trial's over. But
23  if you decide he's guilty, then we go to the second part of the
24  trial which is totally different than any other kind of trial.
25     A.   Uh-huh.

290

1      Q.   And at that point, the State puts on different kinds
2  of evidence and I'll talk to you in a second, but we put on
3  evidence about special issues. Now, at some point, if we prove
4  it to your satisfaction, the State will be asking you to
5  convict this person and be asking for the death penalty. Is
6  that something you could do? Now, I mean, I know in theory a
7  person says the death penalty is not such a bad thing, you
8  know, and I understand that. But this is different because
9  we're talking about that guy right there. So I'm just gonna
10  ask you to take a look at him and to see -- I mean, is that
11  something you could do? Could you live with yourself if you
12  did it?
13     A.   Yes, sir.
14     Q.   Okay. That's not that big of a deal. Let me tell
15  you quickly about a little bit more about what the judge said
16  about how these cases work. I'm sure you've heard of murder
17  cases before. That's just a pretty much straight up thing
18  where somebody intentionally takes somebody else's life. In a
19  situation where if you had a guy who cut somebody up into
20  pieces and hid him in a suitcase for a year, that guy would not
21  be eligible to receive the death penalty for doing that.
22  That's nothing but a murder. The death penalty is a little bit
23  different. It's when you have a murder and something else,
24  either like maybe killing a child under six, killing a cop when
25  he was on duty, or murdering somebody while you were in the

291

1  course of doing something else, like a robbery or a burglary.
2  Do you think -- well, first of all, do you agree with our law?
3  I mean, do you think we should have a death penalty law in
4  Texas?
5      A.   Yeah.
6      Q.   How do you feel about it?
7      A.   If the crime's bad enough, I think they should.
8  Yeah, they deserve the death penalty.
9      Q.   Okay. But you don't have a problem with the law
10  itself?
11     A.   No.
12     Q.   You don't have any problem with the law?
13     A.   No, I have no problem with it.
14     Q.   Now, what I talked about a little earlier with those
15  special issues and about how the trial works and how we start
16  out with the guilt and innocence part of the trial and then we
17  move on from there to the special issues. Assuming that you do
18  find guilt, which you don't have to do. Those special issues
19  are right behind you, and I'd like to go over those with you
20  just really quickly and kind of clear up some things, or some
21  questions you might have.
22     A.   Okay.
23     Q.   Let's look at that first one over your left shoulder,
24  Special Issue No. 1. Read that really quick to yourself and
25  then we'll talk about it.

292

1      A.   Okay.
2      Q.   Okay. That's the Special Issue No. 1 and it's what
3  sometimes people call the future dangerousness or future danger
4  issue. And really, it's asking a couple of things. It's
5  asking if there's a probability that the defendant would commit
6  crimes of violence that would constitute a continuing threat to
7  society. Okay. I want to talk about three things. The first
8  one is that word "probability." It doesn't mean -- the State's
9  not telling you that you have to be certain that this person is
10  gonna go out into the world and do bad stuff. It's talking
11  about whether there's a probability. That's sort of like
12  50/50, but a little bit more, like 51/49. And I don't want you
13  to think that the State's trying to convince you beyond a doubt
14  100 percent certain that this person's gonna go out and do bad
15  stuff. That's just not what the standard is, number one.
16         Number two, is that idea about criminal acts.
17  Can you give me any -- any ideas or any definitions of what a
18  criminal act would be?
19     A.   Robbery, theft, running a red light, criminal acts
20  like that.
21     Q.   Okay. Running a red light might not quite be there
22  but --
23     A.   Yeah.
24     Q.   -- but you're dead on. The State doesn't have to
25  show you that this person probably would go out into the world

293

1    and murder, one.  Assault is a criminal act.

2        A.    Yeah.

3        Q.    I mean, beating up your wife could be a criminal act.

4    So I don't want you to think that the State's trying to say

5    that this person's got to be stopped from murdering in the

6    future because that's just not the standard.  And the third

7    thing is this:  Constituting a continuing threat to society.

8    Well, what is society?  I mean, who is in society?

9        A.    The public.

10       Q.    The public, right.  People are in society.

11       A.    Uh-huh.

12       Q.    Okay.  Some people might say, "Well, look, if this

13   guy's in prison for the rest of his life, how's he really gonna

14   be a continuing threat to society?  He's in prison."  What

15   would your answer be to that?

16       A.    He couldn't.

17       Q.    Well, let me ask you this.  Who else is in prison?

18       A.    Oh, yeah, the officers.

19       Q.    Okay.  Police or prison guards, officers.  What about

20   staff?  What about people like maybe nurses, or people who

21   serve the food --

22       A.    Maintenance.

23       Q.    -- stuff like that?  Maintenance.  Exactly.  Would

24   those people be society?

25       A.    Yes.

294

1        Q.    Okay.  So just because a person is locked up in

2    prison, it doesn't necessarily mean that they're not gonna hurt

3    anybody else?

4        A.    Yeah.

5        Q.    Okay.  That's pretty much it on the first Special

6    Issue.  Do you have any questions about any of that stuff we

7    just went over?

8        A.    No, sir.

9        Q.    Let's talk about that one real quick.  Could you read

10   that to yourself and then we'll talk about it.

11       A.    Okay.  I'm done.

12       Q.    Okay.  Basically, what this one is saying is -- well,

13   first of all, when you're on the jury, if you answer Special

14   Issue No. 1 no, you don't think he's gonna be a future danger,

15   that kind of stops the process right there.  This question

16   doesn't have to be answered.  But let's say that you answer

17   Special Issue No. 1 yes.  Yes, we, the jury, think he's going

18   to be a future danger to society, you go to that one.  And

19   basically, what this one says is that after you take into

20   consideration all the evidence, do you think that there are

21   mitigating circumstances to say that there should be a life

22   sentence instead of a death sentence?  Mitigating circumstances

23   pretty much just mean circumstances that would make less severe

24   what's going on.  It really could be anything.  I mean, I could

25   give you examples of it.  It could be this guy was a Boy Scout,

295

1    if he was really nice to his grandmother.  I mean, it could be

2    anything.  You just have to be able to consider things that

3    would possibly mitigate the punishment.  You need to consider

4    the circumstances of the offense, you need to be able to

5    consider character and background, and personal moral

6    culpability, which is kind of a weird way, I think, of saying,

7    blameworthiness, how blameworthy is this person in this case.

8    Can you think of any mitigating circumstances?

9        A.    No, not really.

10       Q.    Can you commit to thinking about whether there are

11   mitigating circumstances and leaving your mind open to the

12   possibility that the defense could raise them?

13       A.    Yeah.

14       Q.    Okay.  Now, I want to give you an example about two

15   different kinds of crimes kind of just to talk about this

16   issue.  The judge talked about it a little bit, but I want to

17   talk to you about two different kinds of murder, okay?  Let's

18   say that two people walk into a hospital on a given day, right?

19   And one guy walked into a hospital room and he looks at the

20   unconscious body of his wife.  And let's say that his wife has

21   been cheating on him, okay, and he's found this out.  He found

22   out because she got in a car wreck and now she's unconscious

23   and she was knocked out with her other lover.  And let's say

24   that this guy has kind of found out about this earlier and he's

25   taken out a really big insurance policy on his wife, right?  So

296

1    he doesn't want to see his wife alive.  He's upset and he's

2    angry with his wife as to what she did and he's been hoping

3    that she dies for a long time, and when no one's around, he

4    yanks the plug out of the wall and the breathing machine stops

5    and she dies.  All right.  He causes her death.  That's murder,

6    he did it for a bad reason and he was angry about it.  Right?

7    That's reason number one.

8              But let's say that in the second hospital room

9    across the hall, a guy walks in and sees his wife of 40 years

10   lying in a coma.  The doctors told him that the prognosis is

11   really bad.  She's not gonna come out of it.  And the problem

12   with this though is that for some reason she still feels a

13   whole lot of pain.  Actually, she's in incredible agony.  And

14   despite the fact that she's mostly unconscious, he can

15   actually see her wincing and crying and stuff.  When no one's

16   around, he pulls out the plug and she dies.  That's -- I mean,

17   as weird as that sounds, that's actually murder and that's

18   intentionally taking a human life.

19             What do you think the differences are between

20   those two different crimes?

21       A.    Well, one's done out of hate, the other one's done

22   out of feelings.

23       Q.    Okay.  That's true.  How does that change them in

24   your mind?

25       A.    Probably one -- the one that killed with the pain is

297

1  probably did it for a good reason out of his mind.
2      Q.   Okay.  So if you were on a jury and it was your job
3  to consider both of those crimes, do you think that you would
4  give the same punishment in both cases?
5      A.   No.
6      Q.   Okay.  So what you just did is consider mitigating
7  circumstances and you considered aggravating circumstances.  In
8  the one case you have a bad guy who wants to get maybe
9  insurance money and is kind of angry that his wife's cheating.
10  Those possibly are aggravating circumstances.
11      A.   Okay.
12      Q.   And in the other case, you considered a guy who was
13  pretty pathetic and who loved his wife and felt sorry for her
14  and didn't want her to be in pain.  Those possibly could be
15  mitigating circumstances.  So I just want to make sure that
16  we're clear on that issue.  Do you have any questions about
17  that?
18      A.   No, sir.
19      Q.   Okay.  I want to go over a couple of legal issues
20  with you.  The first one has to do with the indictment.  To get
21  here, this defendant had to be indicted by a grand jury.  But
22  that's pretty much just a group of people -- a group of people
23  sitting around deciding whether or not the police officers had
24  enough reason to file charges, okay?  It's not in any way
25  evidence of guilt.  So it's not actually something that you can

298

1  consider against him.
2      A.   Okay.
3      Q.   Are you okay with that?
4      A.   Yes, sir.
5      Q.   Okay.  Another thing that we need to cover is I think
6  the judge went over it briefly with you but it's the Fifth
7  Amendment.  And what it says is that this defendant doesn't
8  actually have to testify.  I mean, it's his Fifth Amendment
9  right not to testify if for whatever reason he decides not to,
10  or his lawyers decide it's a bad idea for him to and they tell
11  him he shouldn't testify.  But here's the catch.  If he doesn't
12  testify, you can't consider that as a circumstance against him
13  which means that if the State puts on its case and the defense,
14  for whatever reason chooses not to testify, and you go back in
15  that room, you can't say, "Man, I'm kind of close, but you
16  know, that guy didn't say anything so I'm just gonna give it to
17  the State."
18      A.   Yeah.
19      Q.   Or you can't say, "You know, I wonder what he didn't
20  say."  It's not something you guys can talk about.  Can you
21  promise that you'll do that?  I mean, can you promise that you
22  won't consider that against him?
23      A.   Yes, sir.
24      Q.   Okay.  Another issue that's gonna come up and always
25  comes up is the burden of proof in this case and the judge

299

1  talked about this also briefly.  It's beyond a reasonable
2  doubt.  It used to be that we could tell you what that meant
3  because there was a definition but there's not.  The definition
4  was kind of confusing anyway.  But basically, if after you hear
5  all the evidence, ask yourself if you have any doubt about it.
6  If you have a doubt -- if you don't have a doubt, you don't
7  have a doubt, there's nothing to worry about it.  If you do
8  have a doubt, next, ask yourself if you have a reason for the
9  doubt.  And I don't mean a reason like you feel sorry for
10  somebody, or maybe because you were tired that morning you
11  didn't hear everything.  I mean maybe you didn't believe the
12  witness or something like that.  So the issue is do you have a
13  doubt.  If no, that's it.  If you do have a doubt, ask yourself
14  if you have a reason for that doubt.
15      A.   Okay.
16      Q.   And another issue that comes up is the presumption of
17  innocence.  Now, right now, as this defendant sits here, like
18  the judge said, if you had to vote right now, you'd have to
19  vote not guilty.  The reason for that is because you haven't
20  heard any evidence.  But the way that that works is, through
21  the trial, you have to -- the presumption has to be that this
22  defendant is innocent.  You can't say, "Well, he was charged so
23  he's probably guilty."  I mean, you're just not supposed to do
24  that.  Now, once you've heard evidence and it convinces you of
25  his guilt, well, that's it.  That presumption of innocence is

300

1  gone.  It's not like -- it's not like a shield that he gets to
2  carry with him forever and ever.  It's almost like a bubble
3  around him.  And once you hear some evidence that convinces you
4  of his guilt, it sort of like pops the bubble and that
5  presumption is gone.
6          Do you have any questions about that?
7      A.   No, sir.
8      Q.   Okay.  Oh, and I'm sorry, there's one more thing I
9  want to go over with you.  It has to do with intoxication.
10  Sometimes you might hear during a trial that a person became
11  intoxicated and that's why they committed the crime.  Voluntary
12  intoxication is never a defense to a crime.  You can't say,
13  "Well, I got really drunk and that's the reason I beat that
14  person up."  I mean, if you got drunk on purpose then
15  everything that you did while you were drunk, the law says
16  basically you did it, right?
17      A.   Okay.
18      Q.   And so it's never a defense to crime, right?
19      A.   Yeah.
20      Q.   But perhaps it could be a mitigating issue like the
21  stuff we talked about in Special Issue No. 2.  But voluntary
22  intoxication, getting drunk or getting high or stoned or
23  whatever on purpose, never a defense.
24          I want to talk to you a little bit about some of
25  this stuff from your questionnaire.  You said -- you said

301

1    someone here – there was something that said, "Please complete
2    the following sentences.  The best argument for the death
3    penalty is" -- and you wrote none.  And then it says, "The best
4    argument against the death penalty is" -- and you also wrote
5    none.
6        A.    Uh-huh.
7        Q.    Now that we've talked to you and I talked to you and
8    the judge has talked to you, what do you think you would say
9    about that? What do you think the best argument for the death
10   penalty is?
11       A.    I guess how bad the crime is to tell you the truth.
12       Q.    Okay.  What about specifically taking a person out of
13   the mix, out of society so they can't do anymore harm?
14       A.    Okay.
15       Q.    Do you think that's a good reason also?
16       A.    Uh-huh.
17       Q.    Okay.  What do you think is a good reason not to have
18   the death penalty?
19       A.    I don't know.  I don't know.
20       Q.    Okay.  Can I ask you another question?  I know -- I
21   saw that you in your questionnaire wrote that you were a kayak
22   fisherman?
23       A.    Yeah.
24       Q.    Where do you do that?
25       A.    Here.

302

1        Q.    Do you do that out like by the T-heads and stuff?
2        A.    No, out towards the back of Mustang Island.
3        Q.    Okay.  Is it a surf kayak?
4        A.    No, it's a big kayak.
5        Q.    Just like a big, long kayak?
6        A.    Yeah.
7        Q.    Do you do fly fishing stuff or do you do bait
8    fishing?
9        A.    I'm picking it up but I'm not into that yet.
10       Q.    Okay.  Mostly just bait stuff?
11       A.    Lures.
12       Q.    Lures.  Okay.  Oh, and you work for Horton, right?
13       A.    Yes.
14       Q.    And you've been there for kind of a long time?
15       A.    Uh-huh, going on 14 years.
16       Q.    Okay.  Are you -- does it say led man or lead man?
17       A.    Lead man.
18       Q.    You're a lead man?
19       A.    Yeah.
20       Q.    Okay.  What does that mean you do?
21       A.    I just kind of did a work order for my supervisors on
22   what my crew has to do and I just got to make sure they follow
23   through with it.  Certain jobs have got to go out on certain
24   days, you know, we just got to make sure everything goes out on
25   a specific date.

303

1        Q.    Okay.  That kind of makes you like the boss, right?
2        A.    Yeah.
3        Q.    And you're in charge of like I think you said 14
4    people?
5        A.    Fourteen people.
6        Q.    Okay.  I think that's all I have for you.  Do you
7    have any other questions for me?
8        A.    No, sir.
9        Q.    Well, I think the defense will ask some questions to
10   you.  Thanks.
11       A.    All right.
12            MR. GARZA:  May I proceed, Your Honor?
13            THE COURT:  You may.
14                VOIR DIRE EXAMINATION
15   BY MR. GARZA:
16       Q.    Good afternoon, Mr. Hill.  My name is Ed Garza and I
17   represent John Henry Ramirez.  My co-counsel here is Mr. Grant
18   Jones.  I think I had previously introduced myself to you and
19   the other members of the panel when we were all downstairs
20   back, I think, on November 3rd or something like that.
21       A.    Yes, sir.
22       Q.    In Texas, when a person accused of a crime decides
23   that they want a trial by jury, they're entitled to have the
24   evidence in their case heard by 12 impartial jurors, okay?
25   What does impartial mean to you?

304

1        A.    I really don't know.  Same as others.
2        Q.    Do you -- you don't know what impartial --
3        A.    Impartial, no.
4        Q.    Impartiality means that you come to the task or
5    you're going to ask to sit there and listen to the evidence and
6    not have any preconceived notions or any preconceived opinions
7    about the case until you hear the evidence.  That's what
8    impartiality means.
9        A.    Okay.
10       Q.    It means you're fair to both sides.  You haven't
11   formed an opinion, you know, for or against either side.  Does
12   that --
13       A.    Okay.  That makes sense.
14       Q.    -- make sense to you now?
15       A.    Yes, sir.
16       Q.    And as my client sits here today, do you think he's
17   guilty or innocent?
18       A.    Innocent.
19       Q.    So that is what's called the presumption of
20   innocence.
21       A.    Okay.
22       Q.    Okay.  That's what we mean by the presumption of
23   innocence.  And like Mr. Schimmel tried to tell you or give you
24   an example of it, right now he's – he's surrounded by a magic
25   bubble or a bubble that you could imagine being the presumption

305

1   of innocence, okay?  And until it's punctured or he no longer
2   enjoys that protection, okay, that's what we're trying to get
3   you to understand that that is the presumption of innocence.
4   Okay.  We're not saying that it cannot be overcome the
5   presumption, if it possibly can, you know.  We want to know
6   that you're coming to the task, you're coming in here, if we
7   decide to pick you as a juror, without any pre-formed biases or
8   any leanings, that you're leaning one way or the other.
9       A.   Okay.
10      Q.   Is that fair enough?
11      A.   Yeah.
12      Q.   Is that you?
13      A.   Well --
14      Q.   Maybe?
15      A.   Yeah.  You kind of said you can't lean one way or the
16  other and I already told you, yeah.
17      Q.   Okay.  So it means you're not leaning one way or the
18  other, are you?
19      A.   Yeah.
20      Q.   Are you?
21      A.   There are trick questions here.  No.
22      Q.   Oh, I'm not even -- I haven't even started these.
23      A.   Okay.
24      Q.   I'm just getting warmed up.  Remember that movie?
25  I'm just getting warmed up.  Okay.  Let's just say this.  In so

306

1   far as what we mean by biases or leanings, let's say you are
2   John Henry's uncle and that you're family.  Could you be a
3   juror in his kind of a case?
4       A.   No.
5       Q.   Why?  Because?
6       A.   Blood.
7       Q.   Blood.  And there's a family bias, right?
8       A.   Yeah.
9       Q.   Let's say you're on trial for DWI.  Would you like to
10  have a state trooper on your jury?
11      A.   No, sir.
12      Q.   Why not?
13      A.   Because it's his job to put away those kind of
14  people.
15      Q.   There's an occupational bias, isn't there?
16      A.   Yeah.
17      Q.   What if you were on trial for arson, would you want
18  to have a fireman on your jury?
19      A.   No.
20      Q.   One more example of that, right?  Okay.  So what
21  we're looking for is people that are unrelated, unconnected,
22  unplugged, you know, to this whole situation that are going to
23  listen to all the evidence in this case in the first part of
24  the trial which is the guilt or innocence, okay?  Now, who has
25  the burden of proof in this case?

307

1       A.   They do.
2       Q.   The State does, don't they?  They have to prove it to
3   you beyond a reasonable doubt.  So what do we mean by
4   reasonable doubt?  Let me give you an example.  Say Horton
5   wants to send you to Houston because they need you to go buy
6   some parts.
7       A.   Uh-huh.
8       Q.   And they're gonna fly you over there, you've got to
9   get to the airport, you're gonna get on the plane.  Do you have
10  any reasonable doubt that that plane is hopefully gonna get you
11  to Houston --
12      A.   No.
13      Q.   -- that morning?  All right.  You're counting,
14  praying, whatever, or it's not even entered your mind that,
15  hey, more likely I'll get to Houston, get my job done, and come
16  back, right?
17      A.   Yeah.
18      Q.   So you don't have any reasonable doubt, you know,
19  that Southwest Airlines is probably a pretty good airline, they
20  have a good record, they'll get you to Houston and they'll get
21  you back, right?
22      A.   Yes.
23      Q.   All right.  Let me change the facts a little bit for
24  you.  Say that morning you're waiting around and you decide to
25  go to the restaurant and have a little breakfast.  And while

308

1   you're there, this guy dressed up like a pilot walks in there
2   and starts slamming back some martinis, about six or seven,
3   okay?
4       A.   Uh-huh.
5       Q.   And you're watching him do this the whole time.  Then
6   they call your flight and they want you to, you know, head to
7   the plane.  And as you're getting there, all of a sudden,
8   here's this guy greeting you, welcome on board, welcome on
9   board.  Are you gonna fly with that guy?
10      A.   No.
11      Q.   Why?
12      A.   Because he's pretty much drunk.
13      Q.   Without a doubt?
14      A.   Yeah.
15      Q.   A doubt based on reason where in your own sense and
16  in your own witness you saw him drinking?
17      A.   Uh-huh.
18      Q.   Right?  Do you follow the concepts?
19      A.   Yes, sir.
20      Q.   All right.  Now, this is a capital murder.  That's
21  real important.  It's real serious because we're talking about
22  a case where the State of Texas has already informed you that
23  if they can prove this case against our client, then you're
24  going to have to decide his punishment, okay?
25      A.   Okay.

309

1    Q.    And there's only two punishments provided by our
2    legislature for these kind of cases, and it's either life in
3    prison or the death penalty, okay?  You've heard of these
4    situations coming out of Dallas where a bunch of people now
5    have been getting found factually innocent of cases that they
6    were convicted of many years ago and had to serve a lot of
7    prison time and they found out through DNA that they didn't
8    have anything to do with the crime --
9    A.    Uh-huh.
10   Q.    -- that they were charged with.  Have you ever read
11   about that?
12   A.    Yeah, I read something.
13   Q.    Seen some stuff on it?  How does that make you feel
14   for those persons?
15   A.    Just sad knowing that they had to be there.
16   Q.    Pretty bad, right?
17   A.    Yeah.
18   Q.    Part of what they have had to endure, though, is that
19   they're still alive and now have been released, okay?
20   A.    Uh-huh.
21   Q.    But in a death penalty case, you know, if everything
22   goes wrong for our client -- which is why it's so important
23   that we get it right, and for some reason there's some sort of
24   DNA results later on that might exonerate him, but if he's
25   already been put to death -- you know, what I mean?

310

1    A.    Yeah.
2    Q.    -- what good does it do us?
3    A.    Yeah.
4    Q.    So it's important that we get it right.  Don't you
5    think?
6    A.    Yes, sir.
7    Q.    Okay.  And that's what we need to know.  Are you the
8    kind of person that can give this kind of a case the -- the
9    sincere conscientious effort to listen to all the evidence
10   before you make up your mind?
11   A.    Yes, sir.
12   Q.    Can you do that?
13   A.    Uh-huh.
14   Q.    The reason we have to talk about all this stuff, it
15   may make you think that why are they talking about all this
16   stuff, you know.  We haven't even heard any of the evidence.
17   You know, they're already talking about this man's guilt and
18   the death penalty.  Is there anything about that that bothers
19   you or anything?
20   A.    No, just --
21   Q.    Does it make you presuppose anything?
22   A.    No.
23   Q.    Does it make you think that if he's been indicted in
24   this case he's probably guilty of it?
25   A.    No.

311

1    Q.    Not at all?
2    A.    Huh-uh.
3    Q.    Okay.  The reason we have to talk to you about all
4    this is, is because this is the only time we get a chance to
5    talk to you about it all.
6    A.    Okay.
7    Q.    So we have to know how you feel, what you're
8    thinking, and what you can give effect to with respect to these
9    legal concepts, okay?  It's real important.
10           Let me kind of shift gears a little bit with
11   you here.  We've already discussed with you these Special
12   Issues over here and that's to say that we get to the point in
13   the case where it's been proven that, you know, perhaps our
14   client did commit this crime, and you make a finding of guilt.
15   Then you're going to be asked to decide his punishment, like I
16   had previously mentioned.  And depending on how you answer
17   these special issues depends on whether he gets a life
18   sentence or death, right?
19   A.    Uh-huh.
20   Q.    And how do we achieve that?  How do we get to that
21   point?
22   A.    You're asking?
23   A.    Uh-huh.
24   A.    I guess the evidence.
25   Q.    Okay.  Well, he has to be found guilty first of

312

1    capital murder, right?
2    A.    Yeah.
3    Q.    But if he doesn't get found guilty of capital murder,
4    say he just gets found guilty of murder, or say he gets found
5    guilty of robbery, then we don't even get to this Special
6    Issue.  We're gonna have to make a determination as to what
7    would be an adequate punishment for either one of the two
8    crimes.  And if they don't prove the capital murder then we're
9    talking about a whole different ball game; do you understand?
10   A.    All right.
11   Q.    Do you understand that?
12   A.    Yeah.
13   Q.    If they do prove the capital murder, it has to be
14   beyond a reasonable doubt before we even get to these issues,
15   okay?
16   A.    Okay.
17   Q.    Now, what are some of the things that you would want
18   to hear or consider as evidence in making a determination of
19   whether or not a person is a future threat to society, which is
20   that Special Issue No. 1?
21   A.    Yeah.  How was he before he committed the crime if he
22   did.
23   Q.    Like, was he a bad person?
24   A.    Yeah.
25   Q.    Was he a good person?  Did he commit other crimes?

313

1    Is he --
2        A.    Yeah.
3        Q.    Does he have a history?  Are those the kind of things
4    you would look for?
5        A.    Yes, sir.
6        Q.    I mean -- and I don't want to pin you down to any one
7    thing or the other, but in other words, I want to know some of
8    the things you would need to be convinced of that Special
9    Issue.
10       A.    What kind -- what he did with his life.
11       Q.    Okay.  Let's go to this Special Issue No. 2 and ask
12   you -- if you'll read it to for yourself and let me know when
13   you're done reading it.
14       A.    Okay.
15       Q.    Is there anything you've read that you don't
16   understand any of the words or anything?
17       A.    The last paragraph where "is there a significant
18   mitigating" --
19       Q.    Yeah.  That word?
20       A.    He kind of explained it to me.
21       Q.    Mitigating is kind of a difficult word to understand
22   and you don't see it every day maybe unless you're a lawyer and
23   you've studied what it means, okay?  But what mitigating means
24   is the opposite of aggravating, okay?  Aggravating can be
25   something really terrible, really bad, okay?  Like our client's

314

1    got several convictions for assaults and robberies and beating
2    people up, shooting people or knifing people, just, you know, a
3    terrible record.  That would be something aggravating, okay?
4        A.    Okay.
5        Q.    Mitigating would be something like, well, what if our
6    client -- let me see -- had been an A student.  What if he had
7    been an Eagle Scout?  What if he had been a decorated war hero?
8    What if he had a tremendous military record?  What if he was a
9    community organizer?  What if he was a person that, you know,
10   helped kids, okay?
11       A.    Uh-huh.
12       Q.    Those would be some factors of his good character,
13   right?  And so, see, up there at the very top where you're
14   asked about the whole circumstances of the offense, and the
15   defendant's character and his background, what do you -- what
16   do you -- what comes into your mind as something that you would
17   consider about a person's character?
18       A.    Did he play any sports, something like that.
19       Q.    Okay.  What about his -- what about him being a good
20   guy, a truthful person, a person you can depend on, a person
21   that was honest, a person that you would see and just, you
22   know, have a smile brought upon your face and you would say,
23   "Hey, I know that guy, he's always been a good dude."
24       A.    Yeah.
25       Q.    He's always been a good guy.  Isn't that his

315

1    character?  That's what we're talking about.
2        A.    Yeah.
3        Q.    A person's character.  Like how would you feel if I
4    told you I thought you were a person of good character?  What
5    would I be saying about you?
6        A.    Something about me, something good.
7        Q.    Right.
8        A.    Yeah.
9        Q.    What about a person's background?
10       A.    Where they grew up, what kind of job they have,
11   something like that.
12       Q.    Something productive?
13       A.    Schooling, yeah.
14       Q.    What about if he didn't have any of that?  What if he
15   had a bad background?  What if he came from an abused family?
16   What if he came -- what if he was a person of bad emotional
17   history, bad family history, maybe even some history of mental
18   retardation, drug usage, things of that nature?
19       A.    Uh-huh.
20       Q.    What we need to know is are those things that you can
21   give effect to in making a determination as to our client's
22   blameworthiness in this case?
23       A.    Okay.
24       Q.    Now, doesn't -- it doesn't mean are those things that
25   we want you to consider as to his guilt or innocence because at

316

1    this point, you've already found him guilty, okay?  We're not
2    asking you to use those tools as a way of confirming in your
3    own mind whether or not he's guilty or not.
4        A.    Uh-huh.
5        Q.    Because you've already done that.
6        A.    Yeah.
7        Q.    Okay.  What we're asking you to do is use those
8    factors, that evidence in assisting you in making a
9    determination of whether or not he needs the worst punishment
10   available, which would be death, or those factors that make a
11   difference to you in whether or not he should have his life
12   spared.
13       A.    Okay.
14       Q.    Okay?  In other words, does it assist you in
15   hammering him or do those factors make a difference in your
16   mind of where you say, well, you know what, I think there's
17   some mitigating circumstances in those matters that would
18   require me to say, hey, he needs a break?
19       A.    Okay.
20       Q.    I'm not gonna give the death penalty to him.  I think
21   he deserves maybe a life sentence.  Do you understand where I'm
22   going with that?
23       A.    Yeah, I understand.
24       Q.    Could you do that?
25       A.    Uh-huh.

317

1    Q.   Could you think about those things?  That's -- that's
2    what -- that's what give effect means.  Can you think about it?
3    Will you consider them?
4    A.   Okay.
5    Q.   I'm not asking you to do it.
6    A.   Yeah.
7    Q.   Because you might not want to.  That's your duty as a
8    juror, but I do need to know whether or not you'd consider
9    those things.  Because some people might say -- and they come
10   in here and say, "Well, you know, if the guy grew up in the
11   barrio, or he grew up in the ghetto, or, you know, was always
12   hungry, didn't have good parents, or you know, he was abused or
13   I don't care about all of that, I don't care, doesn't make any
14   difference to me," well, that's a person that cannot consider
15   those things, okay?
16   A.   Okay.
17   Q.   And at the same time, of course, we're also asking
18   you to consider the circumstances of the offense, you know,
19   which may be pretty bad, okay?  But, also, his character and
20   his background which might also be pretty bad, but bad in the
21   sense that there were things that he didn't necessarily want to
22   happen to him they did.  They happened to him.  You know,
23   nobody wants to grow up an abused child do you think?
24   A.   Yeah.
25   Q.   Nobody wants to grow up with drug addiction do you

318

1    think?
2    A.   No.
3    Q.   Some people might.  I mean, I don't know.  I mean,
4    it's a choice.  But it may not be one that really don't have --
5    A.   Yeah.
6    Q.   -- that much of a choice because it's what you see
7    day in day out.
8    A.   Yeah.
9    Q.   You know what I mean?
10   A.   Yeah.
11   Q.   You know, in our family -- maybe in your family your
12   mother and father, your family, your aunts your uncles, your
13   teachers, your church may have made a big difference in your
14   life, okay?
15   A.   Okay.
16   Q.   Some people might not have had that.  Not might have
17   had it.  They might not have been exposed to any of those
18   things, okay?  And all we're asking you to do is in asking you
19   to consider those things in determining not his guilt because
20   you've already done that, but how guilty is he.  Is he so
21   guilty that you feel like, man, you know, they just need to
22   take this poor guy outside and shoot him away, or God, you
23   know, I just -- the guy never had a chance in his life and we
24   need to give him one by giving him a life sentence instead.
25   A.   Okay.

319

1    Q.   Okay?
2    A.   All right.
3    Q.   That's what we mean by all that mumbo jumbo, you
4    know, for lack of a better way to call it, okay?
5    A.   Okay.
6    Q.   But we need to know that you understand those
7    concepts.  Can you consider those things?
8    A.   Yes.
9    Q.   You can consider them the wrong way or the right way.
10   It doesn't -- you know, it doesn't matter.  But we need to know
11   that you'll give some effect to it and think about it, and that
12   you won't just automatically disregard it?
13   A.   Okay.
14   Q.   It has to do with what the judge was asking you to do
15   as to whether or not you can follow the oath, you know, follow
16   the oath as to the first part of the jury trial and follow your
17   oath as to the second part of the jury trial?
18   A.   Okay.
19   Q.   Have I confused you?
20   A.   No, no, I'm fine.
21   Q.   Have I made it a little more understandable
22   hopefully?
23   A.   Yeah.
24   Q.   Okay.  Now, I'm gonna ask you another critical tricky
25   question.  Since our law provides the death penalty as a

320

1    punishment or as a sanction for the people that, you know,
2    might get found guilty of that behavior, do you think that we
3    as a society benefit from the death penalty?
4    A.   No.
5    Q.   Why not?
6    A.   We're still taking somebody's life.
7    Q.   Still a pretty awesome responsibility --
8    A.   Yeah.
9    Q.   -- isn't it?  In that some people seem to say that,
10   "Well, I think there is a benefit, one, it deters crime."  The
11   other, "It takes this person out of society to where we never
12   have to worry about him again at all."  Some people say that.
13   A.   Yeah.
14   Q.   Okay.  Is that such a benefit -- is it such a good
15   benefit that say that one out of 300 people that we execute
16   could possibly be an innocent person, would that be something
17   you could live with?
18   A.   If he was innocent, no.
19   MR. GARZA:  Okay.  I have no other questions,
20   Your Honor.  Thank you.
21   THE COURT:  Anything else?
22   MR. SCHIMMEL:  May I have one or two
23   questions, Your Honor?
24   THE COURT:  Sure.
25

321

VOIR DIRE EXAMINATION

BY MR. SCHIMMEL:

Q.   Mr. Hill, when we started talking and I asked you how
you felt about the death penalty, you said you had mixed
feelings.  Is that kind of what your mixed feelings were about?

A.   Yeah.  I really don't have a clear-cut answer to, you
know, how I feel about it.  It's -- I mean, I really don't know
to tell you the truth.

Q.   What would you do if -- if you weren't a fabricator
but you -- let's say that you were a lawmaker and that you
worked in Austin.  And let's say that the vote came up to take
the death penalty law off the books, we're gonna just get rid
of it completely.  What would you vote for?

A.   I would probably take it off.

Q.   You would?

A.   Yeah.

Q.   You just now -- you said to Mr. Garza that you didn't
think society would benefit from the death penalty.  Have you
felt that way for a long time?

A.   No.  I mean, it's -- I guess it's basically on the --
on the issue itself.  Like, I mean, I hear some people -- I
mean, I hear some crimes that are worse and they don't even get
the death penalty, and you know, others that do, so it's kind
of up there in the air.  You just really don't figure it out
when it comes to that.

322

Q.   Have you thought about much before today?

A.   No.

Q.   So --

A.   It only comes up when something happens like this
through, you know, in the news or something like that.

Q.   Is what you're saying basically that it just depends
on the crime?

A.   It depends on, you know, what they did really.

Q.   Okay.  So some crimes you would say would be
appropriate for it, some crimes you think it wouldn't?

A.   Yeah.  That's pretty much the way I feel, but if you
would ask me, could I deal with it not being there, yeah.

Q.   Okay.  And you think the world might be a better
place if it weren't there?

A.   I don't know about a better place.  I mean, but --

Q.   But if you were on the legislature you might vote to
get rid of the law?

A.   To get rid of it.

Q.   Instead just have life?

A.   Yeah, see that's what I'm saying.  I mean, if you
would ask me if I had a chance to get rid of it, yeah, I would
get rid of it.  But are there cases where some people need it
or deserve it, then, yeah, I see that too, but I just think
altogether we can do without it.

MR. SCHIMMEL:  Okay.  Thank you, sir.

323

THE COURT:  All right.  Anything else?

VOIR DIRE EXAMINATION

BY MR. GARZA:

Q.   I notice you work at Horton Automatics.  Do you know
Bob Beckett?

A.   Bob Beckett.  The name doesn't call me.

Q.   It doesn't ring a bell?

A.   It doesn't ring a bell.

MR. GARZA:  Okay.  All right.

THE COURT:  Why don't you wait in the jury
room and we'll be with you shortly.

(Venireperson exits courtroom.)

MR. SKURKA:  May we have just a moment, Your
Honor?

THE COURT:  Okay.

MR. SCHIMMEL:  Your Honor, the State will use
a strike on this juror.

THE COURT:  Okay.  Let's bring him in.

(Venireperson enters courtroom.)

THE COURT:  All right.  Mr. Hill, you were not
selected to be on this jury but we do appreciate you spending
the day with us essentially.  Sorry we were running behind.

VENIREPERSON NO. 80:  All right.

THE COURT:  Thank you.

MR. GARZA:  Thank you.

324

THE COURT:  All right.  You want to take five.
Let's take five and we'll hit it again.

MR. SKURKA:  That was No. 6 for us.  I have
No. 5 for us.

THE COURT:  That's 6.  5 was Clara Muguerza.

(Recess.)

THE COURT:  All right.  Antonio Martinez is
the next person No. 49.

VENIREPERSON NO. 49,

ANTONIO G. MARTINEZ, JR.,

VOIR DIRE EXAMINATION

BY THE COURT:

Q.   All right.  Mr. Martinez, come forward.  Have seat
here.  I'm real sorry we're behind.

A.   That's okay.

Q.   But this is a serious case and we're giving it the
attention it really deserves, okay?

Now, we're looking for jurors that can keep an
open mind, okay?  Some people can't because maybe they've
heard something or whatever.  You know, some people can't keep
an open mind.  They feel like someone is charged with a crime
then they must be guilty.  But I need to know if you can keep
an open mind?

A.   I believe so.

325

1    Q.    Okay. All right. Nothing pointing the other way?
2    A.    No.
3    Q.    Okay. Let's see here. You haven't heard anything
4  about the case in the media. Let's talk about the law. We
5  need to make sure you can follow the law.
6    A.    Okay.
7    Q.    You haven't been on the jury before which is fine.
8  No experience necessary here, okay?
9    A.    Good, because I have none.
10   Q.    That's all right. In every criminal case, the
11 burden's on the State of Texas to prove the case. The law
12 says, "State, you charged it, you got to prove it." Okay. You
13 agree with that law?
14   A.    Yeah.
15   Q.    The burden of proof is on them. The burden of proof
16 is beyond a reasonable doubt. You probably remember that from
17 school or maybe you watch American Justice or something like
18 that, okay? But, in any event, that's the highest burden that
19 we have in all of the law in Texas. I like to -- we have no
20 definition, but I like to illustrate to jurors what it is by
21 telling them what it's not. It's not preponderance of the
22 evidence. That would be the standard in a civil case. That's
23 like 51 percent. It's not clear and convincing evidence, which
24 is higher than that. That's the burden of proof that the State
25 would have if they were trying to remove children from a –

326

1  take away somebody's rights to be a parent. Clear and
2  convincing sound pretty strong since it's higher than that,
3  okay?
4          On the flip side, beyond a reasonable doubt
5  does not mean beyond all doubt, okay? It doesn't mean beyond
6  a shadow of a doubt, okay? Because if you -- if you -- if it
7  was beyond all doubt you probably would have seen the event
8  occur, and then you'd be a witness not a juror.
9    A.    Not a juror, yeah.
10   Q.    Okay. Beyond a reasonable doubt. Okay. Can you
11 follow that standard?
12   A.    I believe so.
13   Q.    All right. The law says this. The law says, Look,
14 if the State's got to prove their case beyond a reasonable
15 doubt to the jury, then the defendant's innocent until that's
16 done, if it can be done. The law says he's innocent until the
17 State proves otherwise if they can, all right? We ask the
18 jurors, "Well, how would you vote right now?" Most people say,
19 "Well, I can't vote because I haven't heard anything," and
20 that's logical. But the correct answer is, "I'd have to vote
21 not guilty because I haven't heard anything." But more real
22 world, if the State – we start trying this case and the State
23 starts putting on their evidence and they can't -- they put on
24 their case and you don't think they've met their burden, what
25 would you do?

327

1    A.    If I was given all the evidence and I don't think
2  they met their burden, I'd vote that way. I'd say, hey, you
3  haven't convinced me.
4    Q.    That's right. So you'd vote not guilty. I had -- I
5  had a juror on a case two trials ago that said – saw me at a
6  wedding and he said, "You know, we thought he was guilty but we
7  didn't think they had proven the case beyond a reasonable doubt
8  so that's why we acquitted him." There was nothing wrong with
9  what they did.
10   A.    That's --
11   Q.    That's how the system works, okay, that's how it's
12 supposed to work.
13          All right. As part -- intertwined in all this
14 is the idea -- well, it's not the idea. It's in the
15 Constitution that the defendant does not have to testify,
16 okay? And it kind of makes sense because if the State's got
17 the burden of proof, then the defense doesn't have to do
18 anything, including putting their client on the stand. And
19 they may believe the State hasn't proven their case and
20 advised their client not to. There may be other reasons. You
21 know, maybe he's not a good speaker, maybe he gets nervous,
22 okay? Whatever. In any event, it doesn't really matter
23 because the law says, not only can he not be called as a
24 witness, but the State – but the jury can't hold it against
25 him.

328

1    A.    That makes sense.
2    Q.    Okay. You can't go back there and say, "You know
3  what, I didn't hear from him so, State, that's a point for
4  you." You can't do that. Could you follow that law?
5    A.    Yeah.
6    Q.    All right. Good.
7    A.    It makes sense. It's right.
8    Q.    Okay. Now, let's talk a little bit about this case.
9  The allegation is capital murder. And what's that? Well,
10 certainly it's murder. And within the murder, of course, is
11 the intentional taking of a life of another. Capital murder is
12 like murder plus, okay? And the legislature has made a laundry
13 list of what murders are capital. And capital, of course,
14 means that the death penalty is a possibility. One of the ways
15 the State can prove capital murder is if they prove a robbery
16 or an attempted robbery, and in the course of doing so, a
17 murder occurs, okay?
18          What's a robbery? Well, I hold up a gun to
19 you and I say, "Hey, give me that book." That would be a
20 robbery. I just robbed you. I threatened you with violence,
21 or perhaps I forcibly took it from you, and that's robbery.
22          All right. The State can also get there on
23 this issue with an attempted robbery, that is, I pull a gun on
24 you and ask you for your -- tell you, "Give me that book," but
25 you're a martial arts expert and you roundhouse keep me in the

329

1   face and knock me out, okay?  Am I guilty of robbery?  Well,
2   no, but I am guilty of attempted robbery.  Do you follow me?
3       A.   Yeah.
4       Q.   Okay.  The law says that for the State to prevail
5   they have to prove murder plus robbery, two serious felonies,
6   and they've got to prove all the elements of both of them,
7   okay?  Robbery or attempted robbery.
8       A.   Well, there's a lot at stake.
9       Q.   There's a lot at stake here.  This is serious, okay?
10      A.   Yeah.
11      Q.   And the law says that -- basically, it goes like
12  this.  On the given day alleged in the indictment, in Nueces
13  County, Texas, the defendant committed, while in the course of
14  committing a robbery or attempted robbery, committed the
15  offense of murder, okay?
16      A.   Uh-huh.
17      Q.   And there's a lot of elements to it.  There's two
18  major crimes so there's all the elements plus, you know, the
19  place and the time and the person.  Would you require them to
20  prove them, all the elements as the law requires?
21      A.   Yes.
22      Q.   Now, our legal system, the criminal system is a
23  bifurcated system.  All that means is there's two parts.  Part
24  one, guilt or innocence.  Can the State prove beyond a
25  reasonable doubt to the jury the charge?  If the jury says, not

330

1   guilty, case is over.  But if the jury says guilty of capital
2   murder, we go on to part two.  Two possibilities, life in
3   prison or death.  Only two possibilities.  But you don't say
4   that.  You don't -- the jury doesn't go back and deliberate on
5   that, okay?
6       A.   Okay.
7       Q.   We answer questions.  And here's the first one if
8   you'll indulge me here.  "Is there a probability that the
9   defendant would commit criminal acts of violence that would
10  constitute a continuing threat to society?"  What does that
11  mean?  Well, we call this question the future dangerousness
12  question, okay?  Is it more likely than not that the defendant
13  will commit, you know, violent acts towards others, okay, in
14  the future?  And you have to answer yes or no, okay?
15      A.   Uh-huh.
16      Q.   Then after answering that question, you go over here,
17  "After taking into consideration all the evidence, including
18  the circumstances of the offense" -- that's the first part of
19  the case, guilt or innocence -- "the defendant's character and
20  background," -- well, what's that?  What 's character?  Well,
21  the kind of person he is, is he a good guy, a bad guy?  Is he a
22  liar?  Is he a truthful guy?  Is he honest, you know?
23                  -- "his background."  What's that?  Well, what
24  was his childhood like?  How did he grow up?  Did he have a
25  good family, did he have a bad one?  Was he abused as a child

331

1   or not, you know?  All those type things, okay?
2       A.   Uh-huh.
3       Q.   But you know you've got to consider that.  "The
4   personal moral culpability of the defendant."  That's a
5   mouthful, okay?  And it's words we don't normally use.  Let me
6   see if I can explain this one to you.  I'll use an example.
7   Burglaries, two burglaries.  One guy goes in, breaks into a
8   house because he and his girlfriend want to go get high and
9   drive to Las Vegas and party it up.  And he goes in and he just
10  trashes these people's house, takes all their TVs and
11  computers.  Their child had a video game system, took it --
12      A.   I get you.
13      Q.   -- and trashed the place.  Been to prison twice
14  before for burglary.  All right.  He gets caught.  The other
15  guy goes in and he just -- he's got three kids that are
16  starving, pretty much, because he's lost his job and he has to
17  feed them and he goes in and he gets food from the house.
18  Doesn't break -- doesn't mess up anything, does the best he can
19  to do the minimal amount of damage, okay?
20      A.   Uh-huh.
21      Q.   Do we punish them the same?
22      A.   One guy stole --
23      Q.   One guy stole to feed his kids.
24      A.   The other guy stole --
25      Q.   The other guy just trashed the house and just did it

332

1   just to get high.
2       A.   They both stole, they both committed a crime.
3       Q.   They are both guilty.
4       A.   Uh-huh.
5       Q.   But the question is do we punish them the same?
6   They're both guilty.  They both get convicted of burglary but
7   do we punish those people the same?
8       A.   I believe so.
9       Q.   Really?
10      A.   Yes.
11      Q.   You think that -- you think that someone whose been
12  to prison twice before for the same crime should get the same
13  punishment for someone whose never been in trouble their entire
14  life?
15      A.   If you've committed a crime, you should be punished
16  worthy of that crime.
17      Q.   Exactly, exactly.  But you don't think that -- you
18  don't think that you look into the circumstances of the
19  background of the person?  I mean, some people --
20      A.   Am I trying to justify it?
21      Q.   No, no.  They're gonna get punished.  Maybe one of
22  these goes to prison, maybe one of them gets probation, okay?
23  Maybe one of them gets two years in prison, maybe the other
24  gets 20 years in prison, but there's a difference; do you
25  agree?

333

```
1    A.   Between two and 20, yes.
2    Q.   No, I mean between these two cases?
3    A.   Yes, there is a difference.
4    Q.   Okay.  And you might give two years to the guy who
5   stole -- maybe you'd give him probation even if you think it's
6   appropriate.  I'm not trying to suggest what you give this guy.
7   What I'm trying to suggest is it's different and that the
8   person's personal moral culpability is different.  Do you agree
9   with that?
10   A.   I do.
11   Q.   Okay.  That's that.  "Is there sufficient mitigating
12  circumstance or circumstances that warrant life rather than a
13  death sentence be imposed?"  Okay.  Sufficient mitigating
14  circumstances.  Mitigating circumstances, to mitigate, to
15  lessen.  Circumstances can be anything.  Maybe -- maybe the
16  defendant -- now, you already found him guilty of capital
17  murder at this point and he's gonna get life or death, okay, so
18  he's getting punished.
19   A.   Uh-huh.
20   Q.   The question though is, is there -- is there enough
21  in his background to consider giving him life rather than
22  death?  That's this question essentially.  And what the first
23  part is to look at everything that's presented to you.  You're
24  probably gonna hear more about him on the second half should we
25  get there, than you did on the first half?
```

334

```
1    A.   Uh-huh.
2    Q.   Okay?  And a mitigating circumstance is something
3   that lessens maybe his culpability in some ways maybe, or
4   because he -- maybe he was a war hero.  Maybe he was in Desert
5   Storm and he saved a company of soldiers and you think, wow,
6   you know, I think that's a mitigating circumstance, all right?
7   Maybe he was an Eagle Scout.  Only you, as the juror, can
8   decide what a mitigating circumstance is, okay?  These lawyers,
9   I suspect, will suggest to you what a mitigating circumstance
10  is not.  Only the jury can decide.  But the question is, is
11  there enough mitigation to lessen the punishment and that's --
12  you have to answer that yes or no?
13   A.   That's a yes.
14   Q.   Okay.
15   A.   Definitely, yes.
16   Q.   Okay.  So that can be yes or no.  So can you do these
17  questions?
18   A.   Yes.
19   Q.   All right.  Because at the beginning of the trial I
20  always ask the jury to take an oath and everyone raises their
21  right hand and I ask, "Do you solemnly swear that you will
22  render a true verdict based upon the law and the evidence
23  presented to you?"  And they say yes.  But some people tell me
24  they can't take that oath in this case.  Why?  Because they
25  can't participate in a process that may lead to the death
```

335

```
1   penalty, or they feel like if they convict him, that this is
2   nonsense and they're not gonna follow the law, and to them,
3   it's a knee jerk reaction, death penalty every time.  And I'm
4   not criticizing those people.  They're fine to feel the way
5   they do.  It's just that they're not -- we don't want people
6   who aren't gonna follow the law, okay?
7    A.   Uh-huh.
8    Q.   And I need to know from you, can you take that oath
9   and follow this law, or are you one of like those two people
10  that --
11   A.   I could take that oath and follow the law.
12       THE COURT:  All right.  Mr. Skurka.
13       MR. SKURKA:  Thank you, Judge.
14            VOIR DIRE EXAMINATION
15  BY MR. SKURKA:
16   Q.   Good afternoon, Mr. Martinez.  My name is Mark Skurka
17  and this is Geordie Schimmel and we'll be presenting the case
18  to you if you're selected on this jury on behalf of the DA's
19  office.  I want to start off by telling you there are no right
20  or wrong answers to anything you say.  We just want to know how
21  you feel about some of the issues and the laws in this case.
22  Please, please, don't answer the questions and say, "Oh, I
23  think the judge probably wants me to say it this way so I
24  better say it this way," or, "The defense wants me to say it
25  this way."  Do you see what I'm saying?  Sometimes people couch
```

336

```
1   their answers thinking, I better say it this way or else I'll
2   get in trouble.  I can guarantee you, this judge is not gonna
3   get you in trouble with anything like that.  We just want to
4   hear how you feel.  Is that okay?
5    A.   Okay.
6    Q.   Okay.  Let's start off with some simple stuff.
7   That's not that simple because it's a big issue in this case
8   and it's the death penalty.  You know that this is a pretty
9   serious case and because the death penalty may be involved.
10  Just because he's charged with it doesn't mean he automatically
11  gets it, but, you know, that's a question we have to think
12  about in death penalty, so I just kind of want to see how you
13  feel about it.  Can you tell me, in general, how you feel about
14  the death penalty?
15   A.   It's warranted -- if it's warranted, then I mean, go
16  for it.  But, of course, the mitigating circumstances thing,
17  that kind of -- I don't know.  You have to look at everything
18  before you can just rush into making a decision about anything.
19  And as far as one way or the other, I mean, am I for it, like
20  die hard for death penalty?  Well, no.  I mean, who would be?
21  Who is?  Can I say, look, I'm gonna have to put you to death?
22  Yes, if it's warranted.
23   Q.   That's a pretty safe, fair answer because a couple of
24  things I picked out in it, is number one, if it's warranted,
25  you can give the death penalty, which tells me if it's not
```

337

1   warranted, you should get a life sentence; is that right?

2      A.   That's right.

3      Q.   And when you say, "if it's warranted," I'm assuming

4   you're meaning based on the evidence and the facts?

5      A.   Exactly.

6      Q.   Not based on sympathy, or what a person looks like,

7   or something like that.  It's just like, hey, if the evidence

8   is there, yes.  If the evidence is not there, then no.  I'm not

9   trying to put words in your mouth, but that's kind of how you

10   feel, right?

11      A.   Yes.

12      Q.   I mean, it's pretty straightforward on that thing

13   because -- and that's what the law says.  The judge spent a

14   long time talking to you about you can't rush into things.  You

15   have to answer these questions.  You have to consider

16   everything.  And what you said is right.  No one's happy about

17   having to sit on a jury like this.  No one should be, you know,

18   thrilled that they get the chance to put somebody to death, but

19   on the other hand, you know, we're a nation of laws and the law

20   in Texas is if you do this type of crime and the evidence is

21   such you should get the death penalty, you should get -- you

22   get the death penalty.  But the law also says is if the

23   evidence is not there, if it's -- if it's not enough evidence,

24   and you think you should give a life sentence, you have to vote

25   for a life sentence.  So you kind of feel that way it's kind of

338

1   your civic duty.  I'm not real happy about doing it but I

2   understand that, you know, somebody has to do that, and if I

3   have to do it, I have to do it.  Is that kind of how you feel?

4      A.   Yeah, I said it in ten words, you said it in 150.

5      Q.   That's because lawyers say it differently than

6   laypersons.

7      A.   No, I get you.

8      Q.   Well, here's an easy way to say it.  Some people talk

9   the talk, but can you walk the walk?

10      A.   Yes.

11      Q.   In other words, I've had people come up there, Mr.

12   Martinez, and say, "Hey, I believe in the death penalty, it's a

13   good law.  I think we should have the death penalty.  I support

14   the death penalty.  But, stop, don't make me do it, don't make

15   me carry it out."  And that's what I'm looking from our point

16   of view.  Do I have a person in Antonio Martinez that cannot

17   just talk about it but follow through with it if it's

18   warranted?

19      A.   Responsibly, yes.

20      Q.   And responsibly meaning, I'm thinking again you're

21   going back to if the evidence is there --

22      A.   Yes.

23      Q.   --and if the facts are there?  Okay.  When you first

24   heard it was that kind of case -- remember that day there was

25   about two or 300 people in there and you heard it was a

339

1   criminal case, and then you heard it could be a death penalty

2   case.  What was your first reaction when you heard that you

3   were called for that kind of case?

4      A.   I was curious, of course.  That was my first

5   reaction, curious.  I wanted to know a little bit more about

6   it.  I've never been on a jury before.  I've never been in a

7   courtroom before, you know.  I'm curious as to see.  And I

8   guess, not to sound cheesy or anything, but I want to do my

9   civic duty.  I mean, this is something that I want to do.

10      Q.   There's nothing cheesy about being an American, and

11   you know, you're right.  People think it's corny, you know, but

12   I don't think it's corny doing your civic duty.  You know

13   why?  Because that's what America is based on.  We have juries

14   make that decision.  We don't have like a dictator or some

15   president of the country, you know, saying, he dies, he doesn't

16   die, he does this.  You know, we don't want to have that.  This

17   judge is a powerful judge because he's a district judge.  But

18   guess what?  He doesn't have the power to sentence somebody to

19   death.

20      My boss Carlos Valdez, the DA, he can't just

21   come up and say, "I sentence you to death."  Our law puts that

22   power in the hands of the 12 jurors.  And I think it's -- I

23   think it's a good law because you want to protect people from

24   the government, and what better person to put that power in

25   with the people themselves.  So, you know, it -- it's maybe

340

1   not the greatest system in the world.  I mean, it's not

2   perfect, but it's still pretty much better than anything else

3   out there that I know about.  And so don't apologize.  It's

4   not cheesy for doing your civic duty.  I mean, that's what we

5   need people to come out and do that.

6      But, you know, that first day, I'll tell you I

7   saw some people out there in the audience.  And when the judge

8   said, "Look, folks, you may have to make a decision on a

9   capital murder case," and you may have seen them.  They were

10   going like, "Oh, my gosh, I can't do that."  They were kind of

11   freaking out.  They were thinking they're coming in for a

12   shoplifting case, or you know, a burglary case, or stealing a

13   car, and then they found out, man, I might have to decide if

14   that guy lives or dies.  And if they feel that way that's

15   okay.  I just -- you know, I just need to know.

16      But obviously, it sounds like you were curious

17   and realized, hey, this is pretty important, I better listen

18   to it and get a grasp on the law that the judge explains.  Is

19   that kind of how you felt?

20      A.   Yeah.  It's again, 200 words versus, yep.

21      Q.   Okay.  I'll try to slow down on my words.  Let's just

22   go back to some basics.  The law says that you have murder plus

23   something to make it capital murder.  Murder in this case

24   robbery.  And it says, robbery – attempting or -- I'm sorry,

25   committing robbery or in the course of committing robbery or

341

1  attempting to commit robbery. In other words, you don't have
2  to have a completed robbery, you don't have to have a
3  successful robbery. It's just if you try to rob somebody and
4  you kill someone during the course of that robbery. Say a
5  person goes into a bank and holds a gun on the teller and says,
6  "Give me all your money." And the teller's just about to give
7  them all the money when the cops break in and stop him from
8  robbing her. Can the guy go to court and say, "I'm not guilty
9  of robbery, I never got the money"? No. The law says, if
10 you're trying to commit robbery or attempting to commit
11 robbery, that's still a robbery. Follow me on that?
12     A.   Yes.
13     Q.   Okay. The law also says that there's two parts to
14 the trial. The first part is the guilt or innocence part, the
15 second part is the punishment part. And in most criminal cases
16 you only hear -- I mean, you only get to pick a number of years
17 for the punishment. Like, you know, stealing a car may be two
18 years up to ten years in prison. And, you know, you have a
19 range. You pick a number like two, five, eight or ten. Here
20 it's a little different because the first part of the trial you
21 decide whether he's guilty or not. Was he guilty of the crime
22 that day? And then the second part of the crime is what
23 punishment he has. And I think the judge already told you that
24 it's not automatic by any chance.
25          Sometimes people say, "He's guilty of capital

342

1  murder and he automatically gets the death penalty." You have
2  to say no. You have to look at everything and answer these
3  two questions.
4          A couple of words I want you to pick out in
5  the questions if you read Special Issue No. 1 with me behind
6  you it says, "Is there a probability that the defendant would
7  commit criminal acts of violence that would constitute a
8  continuing threat to society?" In other words, does this guy
9  have a chance to be a danger in the future? I mean, could he
10 hurt somebody down the line? And the key words I want you to
11 look at is "is there a probability." It doesn't say for sure
12 he's gonna do it, certainty?
13     A.   I'm not psychic.
14     Q.   There you go. So you don't have a
15 crystal ball up there that you can look into. The law doesn't
16 require the State to prove for sure he's gonna do that. It
17 just says it's probable.
18          The next part says, "would commit criminal
19 acts of violence." Sometimes people say, "Well, I thought I
20 couldn't vote for death penalty unless I thought he was
21 actually gonna murder somebody again or he's capable of, you
22 know, killing somebody and committing capital murder again."
23 And I say, "The law doesn't say you think he's gonna murder
24 again. It says if you think he's gonna commit criminal acts
25 of violence." And that could be anything, assaulting

343

1  somebody, you know, breaking into their house, whatever,
2  that's a violent act.
3          And the third part says, "constitute a
4  continuing threat to society." And you've probably heard that
5  phrase. What does that mean to you?
6     A.   Continuing threat?
7     Q.   To society?
8     A.   To society at large.
9     Q.   Right.
10    A.   I mean, what does it mean to me? Okay. Being a
11 continuing threat, that means you've been a threat in the past.
12    Q.   Uh-huh.
13    A.   You're still a threat right now so your track
14 record's already in the toilet.
15    Q.   You're right. We don't have a crystal ball but would
16 you agree with me sometimes you can tell what a person's gonna
17 do in the future by what they've done in the past?
18    A.   You can use history to predict, yeah.
19    Q.   Yeah. And what you said right was the best track
20 record, you know. Is that for sure it's gonna happen? No.
21 But it's a pretty good predictor and stuff. The question – go
22 ahead --
23    A.   Yeah, it's a pretty good predictor, but can't people
24 change?
25    Q.   Sure they can. Sure they can. And that's why I'm

344

1  saying, the law doesn't say for sure. It says probability, you
2  know. Certainly, people can commit change and rehabilitate
3  themselves. I'm just saying that's a pretty good indicator,
4  though, right, what they've done in the past?
5     A.   I agree with that.
6     Q.   I was gonna say something about the Dallas Cowboys
7  but I don't even want to go there with their predictions and
8  stuff this year. I know it's been up in the air.
9     A.   I was a mathlete, not an athlete.
10    Q.   Oh. Well, look at that last word society. Sometimes
11 people say, "Well, Skurka, why don't we just instead of giving
12 him the death penalty, lock him up in prison? If you lock him
13 in prison they're taken away from society and they can't hurt
14 anybody so why can't that solve all the problems?" And I say,
15 "Wait a minute. Who else is in a prison besides that
16 prisoner?"
17    A.   Correctional officers, I mean, warden, people that
18 actually just work there.
19    Q.   That's exactly right. In other words, even if you're
20 locked up in prison, you're still capable or could be capable
21 of hurting somebody, right?
22    A.   Uh-huh.
23    Q.   Have you heard of that happening before?
24    A.   Yes.
25    Q.   Sure. I mean, it's not the thing. Some people think

345

1    like you lock them up in prison it's like throwing them on a
2    desert island, they'll never see anybody again, never hurt
3    anybody.  But I always have to tell them, society -- prison is
4    still part of society.  You got some of your rights taken away
5    but you're still intermixing with other human beings, right?
6         A.   Uh-huh.
7         Q.   So would you agree with me that prison would be part
8    of society and just because you're locked up doesn't mean you
9    can't hurt anybody, right?
10        A.   I agree with that.
11        Q.   Okay.  So that's the first question.  Is there a
12   chance he's gonna hurt somebody in the future and be a
13   continuing threat to society?  And you answer that question yes
14   or no.
15             The second question is the mitigating
16   circumstances question and you answer that question yes or no.
17   But you look at what the big word the judge said was
18   mitigating circumstances.  Mitigating.  That word mitigating
19   means anything that would lessen or make less severe the
20   punishment.  In other words, he did the crime, but is there
21   any reason to give him a break and give him a lower sentence?
22   So the judge says -- it's kind of like checks and balances.
23   You think he's guilty of capital murder, you think he's a
24   continuing threat to society.  It looks like he's heading
25   toward the death penalty, but the judge says, "Stop, take into

346

1    consideration all of the evidence, including the circumstances
2    of the offense," -- you know, what happened that day, the
3    surrounding circumstances, his character and background.  Like
4    what good background, bad background.  His personal moral
5    culpability.  Is there enough?  Is it sufficient mitigating
6    circumstance or circumstances to warrant that a sentence of
7    life rather than a death sentence be imposed?  In other words,
8    he did the crime, but is there any kind of thing in his
9    background or the circumstances of the offense that would
10   warrant you cut him a break and give him a lower sentence?
11             What is a mitigating circumstances?  It's up
12   to these folks on the jury.  The judge is not gonna tell you,
13   well, if you hear this you have to lower the sentence.  If you
14   hear this you have to lower the sentence.  It's up to the
15   jury's mind.  I think the judge gave you several examples
16   about, you know, maybe he was a war hero or had good grades in
17   school or something like that.  Some people may say, "Well,
18   you know, he robbed that bank, and -- but, you know, he was an
19   honor roll student or he was a war hero."  Other people may
20   say, "We should lower the sentence."  Other people may say, "I
21   don't care if he's a war hero or made the honor roll.  He
22   still robbed the bank, he's got to pay for that."  And that's
23   what that question is kind of designed to say.  Is there
24   anything to make you give him a lesser sentence of life
25   instead of death?  Does it mean that because you hear a

347

1    mitigating circumstance, a possible one, that you
2    automatically lower it?  No.  It's kind of a balancing test.
3    You've kind of got to decide is there anything that balances
4    out that outweighs, you know, what he did the crime itself?
5    Maybe it was a really heinous crime.  Maybe it was his
6    background is real bad, but maybe he's got a few, you know,
7    redeeming qualities, you know.
8              The question is you just -- I guess the point
9    is, you just can't ignore those other things.  You have to
10   take the good with the bad and then make a balancing test.
11   It's kind of a fair way to look at it, don't you think?
12        A.   I agree.
13        Q.   The other part of the law that the judge may tell you
14   is called voluntary intoxication is not a defense to crime.
15   Voluntary intoxication.  If you go get yourself drunk or high
16   on drugs and you go commit a crime, is that a defense to crime?
17        A.   No.
18        Q.   Absolutely not.  The judge says, no, that's not a
19   defense to crime.  You can't rob a bank and say, "Oh, sorry, I
20   was drunk so you can't find me guilty of robbing that bank."
21   No.  The law does say it's a possible mitigating circumstance,
22   but again, the jury gives what effect it has.  Some people may
23   say, "Well, he did rob that bank, but he was drunk so we're
24   gonna cut him a break."  Other people may say, "I don't care if
25   he was drunk or not, you know, he did the crime he's got to pay

348

1    for it."  You see what I'm saying?  I can't tell you what a
2    mitigating circumstances is.  All I'm gonna say is the judge is
3    gonna tell you keep an open mind and listen to everything,
4    otherwise, you know, it goes back to that automatically finding
5    the death penalty.  You don't do that automatically.  You wait
6    till you hear everything.  And it sounds to me that you're
7    gonna wait to hear everything?
8         A.   Yeah, I'm not gonna give a biased opinion.
9         Q.   Of course not.  A couple of the other legal questions
10   I want to talk to you about is things like the indictment.
11   Remember he's charged with a crime right now.  He's been
12   indicted by the grand jury, but that doesn't mean he's guilty
13   of the crime, correct?
14        A.   That is correct.
15        Q.   The State has to prove the case beyond a reasonable
16   doubt and beyond a reasonable doubt basically means -- it
17   doesn't mean beyond all doubt, or shadow of a doubt, or any of
18   that.  You always hear it on TV.  You've got to find him guilty
19   beyond a reasonable doubt.  The law doesn't -- I'm sorry beyond
20   a shadow of a doubt.  The law says beyond a reasonable doubt.
21   In other words, is there a doubt?  If you don't have a doubt
22   you just go ahead and vote guilty.  But then, if you do have a
23   doubt, ask yourself, is there a reason for my doubt?  I mean,
24   is it just a feeling or a suspicion, or is there a reason for
25   it?  Here's an example.

349

```
 1            Say a person robs a bank, and the first witness
 2   in the trial is the bank teller, and he -- the bank teller gets
 3   up there and says, "There's the guy that robbed me, I recognize
 4   his face. He had a gun in his hand and robbed me of the money.
 5   And as he was leaving the bank I realized he was wearing a
 6   yellow shirt." The next person comes in and is another teller
 7   who was a couple of windows down and says, "There's the guy
 8   that robbed us that day. I saw him rob the other teller.
 9   That's the man. I recognize his face and he had a gun and a
10   bag of money when he left the teller's case, and he was wearing
11   a yellow shirt." The next witness is a bank guard who
12   encountered the guy out there on the sidewalk right outside the
13   door and actually captured him and said, "That's the guy that I
14   captured out there. I recognize his face. He had a bag of
15   money in one hand and gun in the other and he was wearing an
16   orange shirt that day." You've got a little bit of a
17   discrepancy. Two people said yellow shirt, one person says
18   orange shirt. But is that a reasonable doubt to think that he
19   didn't commit the crime? Well, you got three people that said
20   that's him, I recognize his face. You see what I'm saying?
21   A.    Uh-huh.
22   Q.    There's almost no way I can prove it to you 100
23   percent. The question is, is there a reasonable doubt to it.
24   You may have a doubt on what color shirt he had, right? But
25   does that amount to something as a reasonable doubt? That's
```

350

```
 1   kind of a corny example, but you see -- I guess what I'm trying
 2   to say is like the judge is gonna tell you, you don't have to
 3   prove it beyond all doubt, any doubt, shadow of a doubt.
 4            The last thing I want to talk to you about is
 5   the presumption of innocence. That basically means that at
 6   this point he is presumed innocent, nothing's been proven
 7   against him, and you have to consider him not guilty until the
 8   State proves the case. Just because he's presumed innocent,
 9   does that mean he's innocent? No. It just means right now
10   he's presumed innocent because the State hadn't put on any
11   evidence on the case. That presumption may change later on
12   once the State puts on the case. But you have to start him off
13   with innocent and the State has to prove him guilty. That's
14   just the law. It's as simple as that.
15   A.    Yes.
16   Q.    Makes sense?
17   A.    Yes.
18   Q.    Okay. I don't think I had any other questions of
19   you. Did you have any other questions about anything we talked
20   about?
21   A.    Not as of yet.
22            MR. SKURKA: Okay. Then I'll let the defense
23   talk to you now and I appreciate you visiting with me.
24
25
```

351

```
 1                VOIR DIRE EXAMINATION
 2   BY MR. JONES:
 3   Q.    The State of Texas has the death penalty as a form of
 4   punishment. It's authorized in only a certain number of cases
 5   that are all homicides and they all have an aggravating
 6   circumstance attached to them. Do you generally believe that
 7   we should have the death penalty as an option for those kind of
 8   cases?
 9   A.    Yes.
10   Q.    Do you believe that the State of Texas benefits from
11   having the death penalty?
12   A.    Say that again.
13   Q.    Does the State of Texas benefit from having the death
14   penalty as an option?
15   A.    Do we benefit?
16   Q.    Yes.
17   A.    Maybe in some respects, maybe as a deterrent.
18   Q.    Okay. A deterrent. That's certainly a reason for
19   having a certain kind of sanction. Any other benefit?
20   A.    No.
21   Q.    Do you personally believe that it is a deterrent?
22   A.    If I commit a crime and my life is on the line, yes,
23   I would think twice about committing a crime.
24   Q.    Okay. Have you read the stories recently, most of
25   them coming out of Dallas County, about the people being
```

352

```
 1   convicted of various crimes and they're now being found to be
 2   factually innocent?
 3   A.    No, I can't say that I have, no.
 4   Q.    The stories are appearing in newspapers. I think
 5   I've seen three or four in the last five months and *Texas*
 6   *Monthly* has a lead article on this. And basically, through the
 7   procedural vehicle of habeas corpus, the Dallas District
 8   Attorney's Office is finding out that just large numbers of
 9   people that they convicted, you know, ten, 20 years ago are
10   really not guilty here. They're factually innocent.
11            When you hear about that, or I mean, you just
12   now, I guess, heard about it for the first time, how does it
13   make you feel?
14   A.    Well, I just heard about it in Dallas for the first
15   time, but of course, you hear cases like that, well, not all
16   the time, but you hear them. Personally, I get angry.
17   Q.    Okay. So you -- so it doesn't please you that an
18   innocent person might get convicted and go to prison?
19   A.    How would that please me? Why would that please me?
20   Q.    It shouldn't.
21   A.    No, not at all. No. If somebody's innocent then
22   they shouldn't be punished. If they didn't do it, they
23   shouldn't be punished.
24   Q.    Do those cases -- don't those cases prove that we can
25   make mistakes in this business?
```

353

1    A.   Yes, of course.

2    Q.   It's a human institution and humans are not perfect.

3  In the criminal law, we have an elaborate appeal process --

4    A.   Yes.

5    Q.   -- the purpose of which is to correct mistakes.  And

6  in the case of these fellas up in Dallas, the good news for

7  them was at the time the mistake was finally discovered and

8  corrected, they were still alive.

9    A.   Yes.

10   Q.   Now, you can see in a death penalty case, after the

11 appeal process runs and the person's executed, if they discover

12 there was a mistake later, you can't go back and correct it,

13 right?

14   A.   No.  It would be my fault because I was on that jury.

15   Q.   Now, knowing that the system is not perfect and that

16 innocent people are convicted from time to time -- it doesn't

17 happen very often, but it does happen -- do you think the

18 benefits of having the death penalty are worth the risk of

19 convicting an innocent person of capital murder or executing an

20 innocent person from time to time?

21   A.   So you're saying -- okay.  Is the percentage all

22 right, is that what you're saying?  Okay.  Let's say half of 1

23 percent --

24   Q.   Maybe it's if 1 in 500 executions where the person

25 would be actually -- it's not very many but it's 1.

354

1    A.   Oh, and that one doesn't matter?

2    Q.   No.  I'm saying does that matter --

3    A.   That one does matter.

4    Q.   Okay.  Well, is -- but are there benefits --

5    A.   I value life.

6    Q.   Okay.

7    A.   I do value life, so I don't have a problem with

8  imposing the death penalty.

9    Q.   Okay.

10   A.   Even though I value life, okay?

11   Q.   But you understand --

12   A.   Now, you're trying to make me -- well, not to make

13 me.  You're telling me to put, I guess, credence in.  Okay.

14 One out of 500.  Is that okay?

15   Q.   I just picked that, which is not very many.

16   A.   Well, one out of two, one out of 10,000 it still

17 doesn't matter.  There's still that one.

18   Q.   Well --

19   A.   In a long roundabout way, is it beneficial, you know,

20 for us to still continue to have the death penalty when we

21 still kill that one?

22   Q.   Yes.

23   A.   Yeah.  Is it still beneficial?

24   Q.   That's kind of almost a philosophical question, isn't

25 it?

355

1    A.   A bit.

2    Q.   So, is it or isn't it, in your mind?

3    A.   We should keep the death penalty.

4    Q.   Okay.  So it's worth the cost, however small it might

5  be?

6    A.   Well --

7    Q.   However small it might be?

8    A.   You're trying to diminish -- you're trying to

9  diminish that.  You just said it right there.  It's worth the

10 cost however small that might be.  Okay.  What if it was

11 you put --

12   Q.   It would be --

13   A.    -- as an innocent man?  What if it was put in --

14   Q.   It would be 100 percent I.

15   A.   Uh-huh, yeah.

16   Q.   Or if it was your son or somebody from your family?

17   A.   Yeah, exactly, exactly.

18   Q.   Okay.  But in spite of the fact that that could

19 happen, you're not willing -- you're still willing to keep the

20 death penalty on the books?

21   A.   Yes.

22   Q.   Okay.  All right.  Let's talk about how the death

23 penalty is reached in the State of Texas.

24   A.   Okay.

25   Q.   There are three conditions that have to be met.  What

356

1  is the first one?

2    A.   Say that again.

3    Q.   Three conditions have to be met before the death

4  penalty can be imposed in Texas.  The first condition is the

5  defendant has to be found guilty of capital murder.

6    A.   Yes.

7    Q.   Okay.  That's -- that almost goes without saying.  If

8  a person is found guilty of capital murder, the trial goes into

9  a second phase which deals with the punishment.  Different

10 rules of evidence apply.  The jury can expect to hear

11 additional evidence that may have not been admissible at the

12 first part of the trial.

13   A.   Really?

14   Q.   Yes.  And also the evidence that you hear would be

15 relevant to the two questions that you see on either side of

16 you.

17   A.   Okay.

18   Q.   And it would be the answer of those two questions to

19 determine whether the death penalty would be imposed or not.

20 Let's take Special Issue No. 1, that's off to your left hand.

21   A.   Uh-huh.

22   Q.   In order for the jury to return a verdict of yes,

23 that is, answer that question yes, all 12 jurors must believe

24 the answer should be yes beyond a reasonable doubt.

25   A.   Uh-huh.

357

1    Q.    However -- the rules about -- the rules about
2    unanimous verdicts is a little bit changed.  The judge will
3    instruct you that if ten of the jurors believe the answer
4    should be no, which would be a favorable vote to the defendant,
5    right?
6    A.    Yes, correct.
7    Q.    Then the verdict can be returned as no.  In other
8    words, it doesn't take a unanimous vote.  Ten to two will
9    produce a no answer.
10   A.    Okay.
11   Q.    If the -- if the question is answered no, you will be
12   instructed to stop your deliberations and return a verdict to
13   the Court.  And when that happens, what punishment's gonna be
14   imposed?
15   A.    That would be life.
16   Q.    That's right because that condition has not been met.
17   A.    That's correct.
18   Q.    There's no need to go any further, right?
19   A.    No.
20   Q.    But if the jury answers the question yes, then it's
21   instructed to go to the second question --
22   A.    Yes.
23   Q.    -- which is to your right hand.  Would you read that
24   question to yourself and tell me when you're finished?
25   A.    Done.

358

1    Q.    Are there any words or phrases in that question that
2    you do not understand?
3    A.    No.
4    Q.    The question is asking -- well, first of all, the
5    main thing it's asking is are there any mitigating
6    circumstances that would cause you to want to vote for a life
7    sentence?
8    A.    I understand that.
9    Q.    But before -- but before it gets down to the
10   question, it asks you or directs the jury to consider certain
11   things.  What does the verb "to consider" mean?
12   A.    To take and listen and absorb and then decide.
13   Q.    You got it.  In other words, to consider means to
14   think about something, information with the view toward doing
15   something with it.
16   A.    I didn't catch your name, by the way.
17   Q.    Jones.
18   A.    Jones.  Sorry.
19   Q.    Just plain Jones.
20   A.    Sorry.
21   Q.    That's all right.  Now, to consider something means
22   to think about information, usually with a view toward doing
23   something with it.
24   A.    Uh-huh.
25   Q.    And so in this case, if they -- the first thing they

359

1    ask you to consider are the facts and circumstances of the
2    offense.  But you've already heard that in the first part of
3    the trial, right?
4    A.    Yes.
5    Q.    But you can think about the manner in which the
6    offense was committed and so forth, okay?
7          Then it says to consider the defendant's
8    character and background.  And what does it mean -- if I say
9    that you're a person of good character, what do I mean?
10   A.    Well, to me, that's going to be a lot different than
11   to somebody else.
12   Q.    No.  But if I say -- if I say somebody's a person of
13   good character, what am I saying about that person?
14   A.    To me it would be something like a loyal, a loyal
15   friend.  That's a person of good character to me.
16   Q.    Okay.  So loyalty is a moral value, right?
17   A.    Uh-huh.
18   Q.    Loyalty is good, being trustworthy is good.  Honesty
19   is good, right?
20   A.    Helpful, friendly, courteous, kind, obedient.
21   Q.    The Boy Scout Law, Ten Commandments and so forth.
22   Those are the rules that make up the moral code of our society?
23   A.    Uh-huh.
24   Q.    And the degree to which the person adheres to that
25   code and follows it is the way we judge his character.

360

1          Now, what about background, what does that
2    mean?  That's pretty easy.
3    A.    Pretty easy.  How somebody grew up, where they come
4    from, what they've done.
5    Q.    His biography, his history.  Now, the fact that that
6    question mentions background is not an accident.  The Supreme
7    Court of the United States has said that the defense attorneys,
8    in order -- if they're gonna do their job have to investigate
9    and prove up a defendant's background in a capital murder case,
10   good or bad, okay?
11   A.    Uh-huh, that's right.
12   Q.    So let's say, for example, not maybe this case, but
13   just in capital murder cases generally, you're on the jury and
14   you hear evidence of the defendant's background, how he grew up
15   and when -- he was born into a single parent family, mother was
16   poor and uneducated.  He wasn't required to go to school, he
17   was abused by his mother's boyfriends, etc., etc.  In other
18   words, the kid had a really bad upbringing, okay?  If you came
19   across evidence like that in a capital murder case, could you
20   consider it with a view towards it causing you to want to vote
21   for a lesser punishment?
22   A.    I would consider everything, including the
23   background, of course.
24   Q.    Okay.
25   A.    I mean, you have to know where you've been to see

361

1  where you're going.
2      Q.   Okay.  Let's say you're on the jury and you hear --
3  you hear evidence of bad background, poor defendant just really
4  had every disadvantage that you've heard about.  And you say,
5  "Well, you know, I'm really concerned about that and I think in
6  this particular case that because of his bad background, I'm
7  gonna vote for a life sentence."  And the juror next to you
8  says, "Hey, wait just a minute, you know, there are lots of
9  people that have bad backgrounds.  There are lots of people
10 that get born into, you know, every disadvantage when they're
11 growing up and they don't go out and commit crimes.  It's no
12 excuse, you know, that his mother beat him.  That's no excuse
13 for committing a crime."  So what's wrong with that argument?
14     A.   Well, there's no excuse but --
15     Q.   It's not -- excuse refers to that information as
16 being a defense.  You've already decided the person is guilty.
17 This question asks you to do something more than merely
18 deciding his guilt.  You've already decided it, okay?  You got
19 the idea there that, first of all, you've got -- you've got to
20 tell us if we give you background information, that you will
21 think about it with a view toward using it to convince yourself
22 to vote for a life sentence.
23     A.   Yes, I can.
24     Q.   You don't have to tell us how you're gonna vote.
25     A.   I can use information given, yeah, to --

362

1      Q.   That you might vote one way or about it?
2      A.   Of course.  That's called -- that's part of being
3  open-minded.
4      Q.   Right.  Okay.  We had a juror during this week who
5  said that she couldn't -- background didn't make any difference
6  to her, you know.  She wouldn't consider it.  Because in her
7  personal view that that was not relevant.
8           Okay.  Then we drop down to the next item, the
9  personal moral culpability of the defendant.  What does that
10 mean?  Personal means the defendant.  What does moral
11 culpability mean?
12     A.   What is his moral code.
13     Q.   Okay.
14     A.   I don't know.  I haven't been given that information
15 yet.
16     Q.   Okay.  Do you believe in the doctrine of free will?
17     A.   Yes.
18     Q.   In other words, that once a person reaches maturity
19 that we kind of assume that they've absorbed the moral code of
20 the society and they can make choices --
21     A.   Yes.
22     Q.   -- to follow or not to follow the rules, okay?  So
23 one aspect of moral culpability is -- is a determination that a
24 defendant knows what the rules are?
25     A.   Yes.

363

1      Q.   Okay.  And you can imagine some situations where a
2  person can be born into this world and grow up and maybe not
3  know what the rules are or never get any reliable instruction
4  about what they are?
5      A.   That can also happen, yes.
6      Q.   Okay.  Another aspect of moral culpability is after
7  you get passed the person knows the rules in life, then there's
8  a question about are there any circumstances in the case which
9  would affect his ability to make judgments about which course
10 of action to take, okay?
11     A.   Uh-huh.
12     Q.   Okay.  So, in other words, you say, okay, he knows
13 what the rules are, but at the time that he engaged in the
14 conduct, was something affecting his judgment?  Okay.  For
15 example, let's take alcohol.  I think the prosecutor said
16 voluntary intoxication is not a defense to crime.  In other
17 words, you can't get drunk and commit a crime and say, "Oh, I
18 was drunk and therefore I'm not guilty."  But it might be a
19 mitigating circumstances.  So what does that mean?
20     A.   You have to listen to all the factors before --
21     Q.   Well, if it's saying that intoxication might be a
22 factor in determining whether -- in determining whether or how
23 a person was exercising his judgment.
24     A.   Okay.
25     Q.   Okay.  So, of course, one side will argue that

364

1  voluntary intoxication, you know, you need to be real careful
2  about how you answer that question.  In other words, you can't
3  -- anyway, is there anything going on or maybe a person has a
4  low IQ, and maybe not very smart, okay?  Or maybe a person
5  might have a mental illness that might affect how he exercises
6  his judgment, got some screw loose someplace, okay?  So do you
7  feel like you understand what that means, moral culpability?
8      A.   Yes, I do.
9      Q.   Okay.  Now culpability.  Now, were you given the
10 illustration of the burglary where -- did they talk about it?
11 Okay.  The one burglar goes in, you know, to enrich himself;
12 the other burglar goes in to steal food to feed his kids.  And
13 you're the judge and you're hearing both cases and you're
14 assessing punishment.  And I think you told us you wouldn't
15 give the same punishment in both cases?
16     A.   At the -- yeah.
17     Q.   Okay.  Well, both of the defendants are guilty of
18 burglary, right?
19     A.   Yes.
20     Q.   Okay.  And so if you're not gonna give the same
21 punishment to both of them, why would you give a lower
22 punishment to the one that was stealing for his kids?
23     A.   I didn't say I was gonna give a lower punishment.
24     Q.   Okay.
25     A.   It's back to the two and 20.  There's mitigating

365

1  circumstances, you know.

2      Q.    So in the illustration the hypothet, the guy that

3  broke into the house to enrich himself and vandalized the

4  house, are you gonna -- say the maximum punishment is 20 years.

5  Are you gonna give him 20 and give the other guy 20 also?

6      A.    I don't know.

7      Q.    You don't know.  Okay.  Why would you -- why would

8  you give the person who was stealing to get food maybe a lesser

9  punishment?

10      A.    Well, is his crime warranted then?  Is that what

11  you're saying?

12      Q.    No.  If -- let's say you decided to give him a lesser

13  punishment.  What's your rational for doing so?

14      A.    I don't know yet.

15      Q.    You don't know yet.  Okay.  Isn't the person that's

16  stealing to feed his children have a lower moral culpability

17  than the person whose stealing to enrich himself?

18      A.    I might agree with that.

19      Q.    Do you -- tell me what the verb "to mitigate" means?

20      A.    To mitigate.  I guess I would say to really decide --

21  no, no, no.  To lessen.

22      Q.    To lessen.  That's right.  That's what it means.  Any

23  fact -- any fact which is before you in the evidence which

24  would cause you to want to vote for a life sentence or a death

25  sentence or a life sentence.  That would be a mitigating

366

1  factor.  Sorry.

2            MR. JONES:  Okay.  That's all.

3            THE COURT:  All right.  Anything else?

4            MR. SKURKA:  No, Judge, I don't have anymore

5  questions.

6            THE COURT:  All right.  Why don't you wait in

7  the jury room and we'll be right with you.

8            VENIREPERSON NO. 49:  All right.

9            (Venireperson exits courtroom.)

10            THE COURT:  Are they sitting in the dark?

11            THE BAILIFF:  They want to sit in the dark.

12            THE COURT:  Okay.  All right.  Mr. Skurka,

13  what say you?

14            MR. SKURKA:  Can you give us just a minute,

15  Judge?

16            THE COURT:  Yes.

17            (Counsel conferring.)

18            THE COURT:  All right.  Let's put it on the

19  record.  There's an agreement.

20            MR. GARZA:  There's an agreement to allow this

21  juror to be dismissed for cause, Your Honor.

22            THE COURT:  Okay.

23            MR. SKURKA:  I agree, Judge.

24            THE COURT:  All right.  Let's bring him in.

25            (Venireperson enters courtroom.)

367

1            THE COURT:  All right.  Mr. Martinez, you were

2  not selected to be on this jury, but we do appreciate you

3  coming down here and spending all this day with us.

4            VENIREPERSON NO. 49:  All right.

5            THE COURT:  Thank you very much.

6            VENIREPERSON NO. 49:  Thank you, sir.

7            THE COURT:  All right.  Let's get the next

8  juror in, Laura Hinojosa.

9            (Venireperson enters courtroom.)

10            THE COURT:  All right.  Ms. Hinojosa, sorry,

11  we're running way behind.

12            VENIREPERSON NO. 82:  I didn't eat lunch

13  because I thought it was gonna be an hour at 1:30, but that's

14  okay.

15            THE COURT:  And here's the thing.  I mean,

16  it's like you've spent so much time down here, I don't want to

17  make you come back on a different day.

18            VENIREPERSON NO. 82:  I don't want to come

19  back.

20            THE COURT:  Yeah, that's what I figured.

21            VENIREPERSON NO. 82,

22            LAURA LOPEZ HINOJOSA,

23            VOIR DIRE EXAMINATION

24  BY THE COURT:

25      Q.    This is a capital case and it's important and it's

368

1  taken longer than we anticipated today.  And I'm sorry about

2  that.  We're gonna make a decision about whether you get on

3  this jury today, okay, so you don't have to come back.

4            All right.  We're looking for people that can

5  keep an open mind and follow the law, okay?  I see you've seen

6  something in the news media about it.  Can you still keep an

7  open mind?

8      A.    What I've -- I remember Times Market but I -- I don't

9  know specifics.

10      Q.    Just very little?

11      A.    Yeah.

12      Q.    Okay.  That wouldn't preclude you then?

13      A.    No.  And I do know Sara from court reporting school

14  so I don't know if that --

15      Q.    That's okay too.  I mean, I just need to know.

16  Because some people come in here and they say, "Well, you know,

17  I saw something on TV," or maybe for some other reason, you

18  know, they just think I can't be fair and I guess you're the

19  only one that can tell us.

20      A.    Well, you know, honestly, when I left after filling

21  out the paper, I was very stressed and I did have -- I saw his

22  face and I felt sadness, so, that might exclude me.  I don't

23  know.

24      Q.    Well, let's -- let's cut to the chase then.  This is

25  -- this is a capital murder and what that means is -- and I --

369

1   I know we told you the other day, but, I mean, this is a death
2   penalty case, all right?  That's a possibility, that's what
3   makes -- that's what capital.  That means death penalty is a
4   possibility.  And I guess some people say, Look, I agree with
5   the death penalty, but when push comes to shove, they just
6   don't think they can do it.  And if that's you, that's okay.
7       A.   Yeah.
8       Q.   Okay?  That's okay.  It's all right.  Maybe if that's
9   you and you don't think you can do this, maybe, you know, you
10  come back on another case, a kind of case of DWI or a burglary,
11  or maybe even just a murder that doesn't involve the death
12  penalty, that's okay.  But we do need to know that.
13      A.   I think that would be me.  I don't think -- well, I
14  think if I did that, I think I would stress over it, you know.
15  I would definitely labor over that.  I would be --
16      Q.   Well, and of course, we want people -- I mean, this
17  is a serious decision.  We want people that will really take a
18  look at the case, but if it's gonna -- if it's something that
19  you feel like for whatever reason, you can't do.
20      A.   I feel like I would do what I had to do, but I think
21  I would definitely stress.
22      Q.   Okay.  Well, you tell us.  I mean, if you can't do
23  this, that's okay, but you've got to tell us.  Because what
24  you're telling me now is, yes, I can -- and it's hard because
25  you've probably never been put in this -- you've probably never

370

1   been picked on a capital murder jury before.  And I had a juror
2   the other day, you know, it's like I'll tell -- I'll tell you
3   what I told him.  I said, "You got to tell us what side of the
4   line you're on because it matters.  It makes a difference
5   procedurally."  Okay.  So I need to know from you that this is
6   something that you can do, or if it's just so stressful for you
7   you're just not gonna be able to do this duty.
8       A.   I think I'd be stressed and I probably wouldn't do a
9   good job.
10      MR. GARZA:  Your Honor, can we address the
11  Court outside the presence of the jury.
12      THE COURT:  Yes.  Let me talk to these lawyers
13  and we'll get right with you.
14      (Venireperson exits courtroom.)
15      THE COURT:  Okay.
16      MR. GARZA:  I think we can probably agree to
17  dismiss this juror for cause.
18      THE COURT:  I think if you seat her she's
19  gonna melt down eventually.
20      MR. SKURKA:  The State will agree on No. 82.
21      THE COURT:  All right.  Let's bring her in
22  then.
23      (Venireperson enters courtroom.)
24      THE COURT:  All right.  Ms. Hinojosa, we're
25  gonna go ahead and agree to let you go.  We really appreciate

371

1   you being honest with us, but we do appreciate your time and
2   all the time you've spent down here.  If you need a work
3   excuse, we can get you one.
4       VENIREPERSON NO. 82:  I have one, thanks.
5       (Venireperson exits courtroom.)
6       THE COURT:  All right.  We got one left.  Do
7   you want to take five?
8       MR. JONES:  No.
9       THE COURT:  All right.  Let's roll.  Go get
10  them.  Let's go get her.
11      MR. SKURKA:  What number are we on, 84?
12      MR. GARZA:  84.
13
14      VENIREPERSON NO. 84,
15      CHRISTINE FOUTCH,
16      VOIR DIRE EXAMINATION
17  BY THE COURT:
18      Q.   All right.  You are Christine Foutch; is that right?
19      A.   Yes.
20      Q.   I know you've been here a while.  This is a death
21  penalty case.  You can have a seat.
22      A.   Thank you.
23      Q.   And, so obviously, we're -- you know, it takes
24  careful attention, okay?  We thought the day would go a little
25  faster than it did and it didn't.  But the last thing I wanted

372

1   to do was after you had been here all afternoon was bring you
2   back a second day, okay?
3       A.   Sure.
4       Q.   So I'm sorry about that.  All right.  You have -- you
5   filled out a questionnaire and we have that.  Let's -- we need
6   to talk about a few things.
7       First of all, you haven't heard anything about
8   this case.
9       A.   No, sir.
10      Q.   You think you can keep an open mind?
11      A.   Yes, sir.
12      Q.   Okay.  Some people can't.  And that's okay too, but
13  it wouldn't be fair if we didn't have people that could.
14      A.   Right.
15      Q.   All right.  That's issue one.  Issue two is the law.
16  Let's talk about it.  Let's see here.  You have never been on a
17  jury before, and that's okay.  That's okay.  No prior service
18  necessary here.
19      Okay.  Let's talk about some things.  This is a
20  criminal case.  That means the State has the burden of proof.
21  The law says, "State, you've brought the charges, then you got
22  to prove them."  Okay?  And the burden always stays on the
23  State and never shifts over here to the defense.  Do you agree
24  with that?
25      A.   Yes.

373

1    Q.    Okay. Next thing, the burden of proof is beyond a

2 reasonable doubt. It's the highest burden that we have in the

3 law, okay? It's not beyond all doubt, but it is a high burden.

4 Could you hold the State to that burden?

5    A.    Yes.

6    Q.    All right. Since the State has the burden of proof,

7 the law says that the defendant in this case, and in any case,

8 is presumed to be innocent until and if the State can prove

9 otherwise, okay?

10    A.    Yes.

11    Q.    So that you have to presume the defendant innocent

12 till the State can prove otherwise. All right. You can do

13 that?

14    A.    Yes.

15    Q.    Okay. Because some people can't. Some people say,

16 well, he's charged therefore --

17    A.    Oh, right.

18    Q.    And there's places in the world like that. I don't

19 want to live in the places like that. I don't know about you.

20    A.    No.

21    Q.    Okay. So that's that. Other issue. And this one

22 gets a little bit more involved but it's part of the same

23 concept, and that is, the Constitution of the United States

24 says the defendant doesn't have to testify.

25    A.    Right.

374

1    Q.    Okay. Some people would hold it against him if he

2 didn't testify. The law says, not only does he not have to

3 testify, State can call him as a witness, but the jury can't

4 hold it against him.

5    A.    Right.

6    Q.    Okay. And would you hold it against the defendant?

7    A.    No.

8    Q.    Okay. All right. This case is a capital murder.

9 What does that mean? Well, it's murder plus, essentially what

10 a capital murder is, okay? Murder plus something else. This

11 particular case the allegation is murder in the course of

12 committing a robbery or attempting to commit a robbery?

13    A.    Okay.

14    Q.    So the legislature says, well, if you've got -- if

15 you commit these two serious felonies together, then capital --

16 it's capital murder and they can prove all of it. And the

17 capital part, of course, meaning the death penalty is a

18 possibility, okay? And the law says that State has to prove

19 all of the elements of the crime, and there's quite a few of

20 them because there's two major felonies together, okay?

21    A.    Okay.

22    Q.    And you would hold the State to that burden?

23    A.    Yes.

24    Q.    Okay. Now, we have two parts of the trial in Texas,

25 okay?

375

1    A.    Okay.

2    Q.    It's a bifurcated system. There's a guilt or

3 innocence phase, and then there's the punishment phase. Guilt

4 or innocence, what's that? That's just whether the State can

5 prove to the jury beyond a reasonable doubt that the

6 defendant's guilty of the crime.

7    A.    Okay.

8    Q.    And, you know, we'd have a trial about that, and the

9 jury can go back and deliberate. If the defendant is found not

10 guilty, then case is over with. If, however, the defendant's

11 found guilty, we go on to the second part of the trial. Two

12 things that can happen if a defendant's found guilty of capital

13 murder. There's only two possibilities, life in prison or the

14 death penalty. Okay. Both very serious punishments. Okay?

15    A.    Okay.

16    Q.    But the jury doesn't go back to deliberate and say,

17 "Hey, let's take a vote, what do we vote? Okay. Let's come up

18 with death or we come up with a vote, life." No, we don't do

19 that. They answer questions and here is one of them. "Is

20 there a probability that the defendant would commit criminal

21 acts of violence that would constitute a continuing threat to

22 society?" You know, is the defendant probably gonna do

23 criminal acts of violence against others in the future? That's

24 what that's all about, okay?

25    A.    Okay.

376

1    Q.    We can never be sure. But they're asking -- you

2 know, you can't read the future, okay?

3    A.    Right.

4    Q.    But what -- you know, what they're asking here is, is

5 it probably true that he will commit acts of violence and be a

6 continuing threat to society and the jury has to answer that

7 yes or no.

8    A.    Okay.

9    Q.    Okay?

10    A.    Uh-huh.

11    Q.    Then the jury will go to the second question. "After

12 taking in consideration all of the evidence, including the

13 circumstances of the offense" -- that's the first part of the

14 trial.

15    A.    Okay.

16    Q.    -- "the defendant's character and background." Well,

17 what's character? Well, that's what kind of guy he is. You

18 know, good guy, bad guy, moral guy, immoral guy, that kind of

19 thing. Background, what's that? Well, that's his childhood,

20 how he grew up, what is his family, you know, how did he grow

21 up, you know, in his family life, stuff like that, okay?

22    A.    Uh-huh.

23    Q.    -- " and the personal moral culpability of the

24 defendant." Well, that's kind of a mouthful, but that's

25 legalese sort of meaning his -- his culpability. I mean,

377

1  you've already found him guilty of the crime but it's sort of
2  like, well, how guilty is he. Let me give you an example. Two
3  guys get convicted of burglary. One guy, he's a career
4  burglar. He's been to prison twice before and he goes and he
5  breaks into a house and just trashes the place, just takes all
6  the people's jewelry and electronics and stuff like that.
7      A.   Uh-huh.
8      Q.   And he and his girlfriend go to Las Vegas and get
9  high on cocaine all weekend, okay? They finally catch him.
10  The other guy, he loses his job he's held for a long time, good
11  guy, but he runs out of money and he's got three kids that are
12  really hungry so he goes in the next door neighbor's house,
13  doesn't break in but he does go in, and he takes some food, and
14  all he does is take food to his kids. Never been in trouble in
15  his life, okay?
16      A.   Okay.
17      Q.   Can you see how the personal moral culpability of
18  those people would be different?
19      A.   I do see a difference.
20      Q.   Okay. And that's kind of what that's talking about.
21      A.   Okay.
22      Q.   All right? Then is -- and then taking into
23  consideration all this stuff because at the second part of the
24  trial you may hear a bunch of other stuff. Okay. The first
25  part is just about what happened that day, see if they can

378

1  prove the case, okay?
2      A.   Okay.
3      Q.   Maybe they can, maybe they can't. But if you get in
4  here, you're considering everything that happened that day and
5  maybe some other stuff, background stuff, okay?
6      A.   Okay.
7      Q.   "Is there sufficient mitigating circumstances to
8  warrant life in prison sentence rather than a death sentence
9  being imposed?" So what they want you to do is take everything
10  into consideration. Is there enough mitigating circumstances,
11  lessening things that are in his favor, you know. Maybe he was
12  a war hero in Desert Storm, okay? Maybe he saved 20 soldiers.
13  Maybe he was a war hero, he's got a bronze star. Maybe he was
14  just -- you know, he worked in the community with kids, stuff
15  like that.
16      A.   Okay.
17      Q.   And then you determine whether there's -- you know,
18  you might find mitigating circumstances, but they may not be
19  sufficient to warrant a life sentence, or maybe they are.
20  That's what the jury has to answer here.
21      A.   Okay.
22      Q.   Yes or no. And I need to know -- because I always
23  give an oath at the beginning of the trial. And I tell the
24  jury, "Do you swear to render a true verdict based upon the law
25  and evidence presented to you?" And then the jury will say,

379

1  yes. But I need to know if you can do that. And before you
2  answer, some people say, "I cannot because I cannot participate
3  in a process that could lead to the death penalty." Others
4  say, "If I find him guilty, I'm not -- I'm not gonna listen to
5  your law. I'm gonna rig these questions so that I will -- he
6  will always get the death penalty. I will not follow this
7  process." Neither of those people can truthfully take the
8  oath, okay?
9      A.   Okay.
10      Q.   I need to know if you can.
11      A.   Yes, sir.
12          THE COURT: Okay. All right. Mr. Skurka.
13          VOIR DIRE EXAMINATION
14  BY MR. SKURKA:
15      Q.   Hi.
16      A.   Hi.
17      Q.   How are you tonight?
18      A.   Fine. Thank you.
19      Q.   I say tonight because it seems like it has been a
20  long day.
21      A.   It has been.
22      Q.   And it has for all of us. Would you pronounce your
23  last name for me, please?
24      A.   Foutch.
25      Q.   Just like it's spelled?

380

1      A.   Yes, sir.
2      Q.   Let me tell you that there's no right or wrong
3  answers to anything you say. We just want to ask some
4  questions, see how you feel about some of the law and the
5  issues you feel in this case.
6          As the judge introduced me, my name is Mark
7  Skurka, I'm an assistant district attorney. This is Geordie
8  Schimmel, and together we'll be presenting this case to you if
9  you're selected on this jury. I'm gonna go through some of
10  these examples of law pretty quick, but if I don't explain
11  myself very well, just stop me or something because we've been
12  talking all day to jurors and I'm a little --
13      A.   Okay.
14      Q.   -- a little fumbly right now. Let's get some simple
15  things. First of all, how do you feel about the death penalty
16  just in general terms?
17      A.   I do support the death penalty.
18      Q.   Why?
19      A.   I do believe that it is a good deterrent. I believe
20  there are crimes that do constitute people giving up their
21  rights when they do things to others. I mean, I have children.
22  That's what I teach them to believe.
23      Q.   Well, and that's certainly a good answer because what
24  you're telling me is -- at least the words I'm hearing is you
25  think it's good because it deters other people from committing

381

1  crimes, and it certainly deters the person who committed the
2  crime. And I like the way you said, "in certain crimes you
3  need to have it." Which, I don't want to put words your mouth,
4  but does that kind of mean like, well, I understand we have the
5  death penalty for just a few crimes. Not every crime is going
6  to be eligible for the death penalty, only certain crimes. Is
7  that kind of how you feel?
8      A.   That's true.
9      Q.   And that's exactly what the law says. I think a lot
10  of people came in a few weeks ago on jury duty and they thought
11  every murder case is possible to face the death penalty and we
12  always have to tell them the difference between plain murder
13  and why this is capital murder because it's murder plus
14  something else. In this case, plus a robbery during the
15  commission of the offense. And a lot of other people say,
16  "Well, gosh, I thought everybody murder case gets the death
17  penalty." And I tell them, "No, the legislature makes it very
18  few cases to do it." And it's obvious, the worst kind of
19  cases, killing a kid under six, or killing an officer on duty,
20  or multiple murders, or killing somebody while you're robbing
21  them or raping them or kidnapping them or burglarizing them.
22  It's only those certain cases. So it seems to me that you
23  believe that there's a place and a time for the death penalty,
24  only in those kind of crimes that qualify for it, first; and
25  second, if the evidence is there to determine that it is?

382

1      A.   Yes, definitely.
2      Q.   I don't want to put words in your mouth.
3      A.   No. You said it very well. Thank you.
4      Q.   Well, we've been talking to a lot of people so I'd
5  just like to hear if that's what they're thinking. And it also
6  tells me that it sounds like you're gonna be pretty careful and
7  that you're not saying for sure every case --
8      A.   No, sir.
9      Q.   -- that a murder case is gonna get capital murder,
10  are you?
11      A.   No, sir.
12      Q.   And just the fact that they're charged with capital
13  murder, that doesn't mean they're necessarily guilty of capital
14  murder, right?
15      A.   No.
16      Q.   And the fact that just because they're found guilty
17  of capital murder, you don't automatically get the death
18  penalty. Remember, there's two choices.
19      A.   Right.
20      Q.   Are you open-minded toward both of the choices?
21      A.   I am open-minded. These are people and I do believe
22  they have a right to have a very fair trial. I mean, I would
23  want that for myself. I can't say more than if it was me, you
24  know. I haven't been in this position before so.
25      Q.   And that's a good example. You want those rights

383

1  yourself if you're ever charged with something, and you want to
2  make sure the jury's very careful in their consideration of the
3  thing?
4      A.   Yes.
5      Q.   But, you know, sometimes people say, "Well, he's
6  guilty of capital murder, automatically give him the death
7  penalty." I always tell them, "There's nothing automatic in
8  here." If it was automatic we wouldn't need jurors. The judge
9  would just say death penalty, the DA would say death penalty.
10  But the law says that only the jury can make that decision. A
11  district judge cannot sentence somebody to die. The DA's
12  office, the DA can't just say, "Well, we want to kill that
13  guy." Only people on the jury can do that. But again, the
14  jurors have to be open-minded and be willing to hear everything
15  before they make a decision. Can you be that kind of juror?
16      A.   Yes, I would definitely try.
17      Q.   How do you feel about being on this kind of case?
18      A.   A little nervous I'd have to say. Like I said, I've
19  never been on any type of jury, much less this type.
20      Q.   Well, let me give you something to make your mind at
21  ease. There's no qualifications to be on this kind of case.
22      A.   (Laughter.)
23      A.   Well, I take that back. You have to be fair.
24      A.   You've got somebody's life in your hands, it's
25  important, so that makes me a little nervous, you know.

384

1      Q.   And I understand that, but what I said is exactly
2  right. The judge is not gonna tell you, well, you can only
3  have been on three other juries for you to qualify to be on
4  this jury. All we're looking for is people to determine the
5  facts of the case. You're a fact finder. The judge will tell
6  you what the law is at the end of the trial. He's kind of gone
7  over it somewhat already, but the question is all the jury does
8  -- and I think you've said it -- you want to be a fair juror
9  because you'd want people to judge you fairly. And it's okay
10  to be a little nervous because, my, gosh, remember that first
11  day when you came in the courtroom and you saw all those people
12  there and the judge -- and you're probably thinking, gosh,
13  what's going on? And the judge came down and said, "Folks,
14  this is a criminal case." And a lot of people say, "Oh, I'm
15  gonna be getting a DWI or shoplifting or a burglary case." And
16  the judge said, "This a capital murder case. The defendant's
17  charged with murdering somebody while robbing them. That means
18  the jury may have to make a decision on the death penalty."
19  And I saw people out there in the audience. They were like --
20  some people were like going, "Oh, my gosh, I can't sit on this
21  kind of case." Then other people were going like, "Oh, yeah,
22  really?" You know, they were interested. And then some people
23  were saying, "Gosh, I better sit up a little straighter and
24  listen a little closer because this is pretty serious
25  business." How did you feel about when you heard --

385

1   A.   I was the one sitting up straight listening. I
2   pretty much did the whole time. But, yeah, it was surprising.
3   Q.   It was surprising and that's why you saw -- I don't
4   want to say the word freaking out, but some people were going
5   like, "Oh, my gosh, I could never do this kind of case. Give
6   me some other kind of case." And other people were kind of
7   blase about it. But then, I think the serious ones were the
8   ones who listened a little more closely and paid attention so
9   they could be good jurors.
10          The question is can you sit on that kind of
11  jury? I mean, if the judge -- if you're selected to sit on
12  this jury and you're qualified, can you sit there and make that
13  decision even though it's an awesome decision?
14  A.   I could make that decision. I mean, there are -- all
15  of us have very busy lives and hectic ones, and even tonight,
16  you know, I'm a little worried because my kids are home alone
17  right now and stuff, but I would do my best if I did get
18  selected.
19  Q.   And that --
20  A.   I take it very serious ly.
21  Q.   And there's some people out there that say, "Look,
22  Mark, I believe in the death penalty, it's a good law, I think
23  it's a good law, I support it, but don't make me make the
24  decision, don't make me."
25  A.   Yes.

386

1   Q.   And I always tell people, "Well, you know, it's your
2   civic duty sometimes to follow the law."
3   A.   Exactly.
4   Q.   And I think you fit in that category, you know. You
5   would prefer not to have to make that decision because I don't
6   think anybody is happy about it.
7   A.   No.
8   Q.   But the simple fact is, can you do your civic duty
9   and carry through with it, if that's what you think the
10  evidence is?
11  A.   Yes, sir.
12  Q.   You have to look at it from my perspective. I told
13  you the very first day the State's seeking the death penalty.
14  I don't like to sandbag people, blind side them. I tell them,
15  we're gonna ask for death penalty. There's gonna come a time,
16  Ms. Foutch, that I'm gonna stand in front of you and say,
17  "Based on the evidence and based on the facts of the case, I'm
18  gonna ask you to answer the questions in such a way that that
19  person over there is executed by the State." And I want you to
20  look at him and tell me, can you do that if the evidence calls
21  for it?
22  A.   Yes.
23  Q.   Okay. I'm gonna turn it around on you too and say,
24  is it true that if the evidence is not there, if we don't prove
25  the case beyond a reasonable doubt, can you find him not

387

1   guilty?
2   A.   Yes.
3   Q.   And simply, too, that if you think that he's guilty,
4   would you automatically vote for the death penalty?
5   A.   No.
6   Q.   Would you keep your mind open mind --
7   A.   Yes.
8   Q.   -- and equally consider life as well as death?
9   A.   Yes.
10  Q.   Okay. Because that's what we're looking for. The
11  judge said it perfectly the first time. We're looking for
12  open-minded people. And right now you're not leaning toward
13  the death penalty or toward a life sentence, right?
14  A.   Correct.
15  Q.   And that's good because you don't want to go in there
16  with any preconceived notions or judgments and such. You
17  probably want to wait till they hear the evidence?
18  A.   Exactly.
19  Q.   And that's all we're gonna ask you to do. The reason
20  this is a capital murder, as I said quickly, was it's murder
21  plus robbery. And it basically says, "while you're committing
22  robbery or attempting to commit robbery." In other words, you
23  can be trying to rob somebody or actually robbing them. It
24  doesn't have to be like a successful robbery or a complete
25  robbery. As long as you take something from somebody by force,

388

1   or the threats of force, that's robbery. And if you do the
2   murder while in the commission of that, that's what makes it
3   capital murder.
4          And just because it's capital murder -- you've
5   never been on a jury trial before, but generally speaking, in a
6   criminal case, what happens is there's a range of punishment.
7   Like say you're on a burglary case and the range of punishment
8   is two years to 20 years in prison. And the jury hears all the
9   evidence and they pick a number, you know, two years, five
10  years, ten years, 20 years. In this case, you don't pick a
11  number and you don't even pick death or life in prison. What
12  you do is answer two questions, and based on how those
13  questions are answered, he's sentenced to death or life. So
14  you don't check off we vote for death we vote for life.
15  A.   Okay.
16  Q.   The second -- the first part of the trial is,
17  generally speaking, just about what happened that day. Is he
18  guilty, is he not guilty. The second part of the trial you
19  might get to hear additional evidence, like what his
20  background. Is it good background, bad background, you know,
21  what other stuff in his past he may or may not have done. And
22  then after you hear that second part of the trial you might get
23  to then you hear -- I'm sorry, then you would decide on how to
24  answer the question. The first question is right behind you
25  and I ask you to read it with me.

389

1    A.   Okay.

2    Q.   "Is there a probability that the defendant would

3   commit criminal acts of violence that would constitute a

4   continuing threat to society?"  Now, we call that the future

5   dangerousness question.  In other words, do you think he can be

6   a danger in the future?  Key words in there I want you to look

7   at is the first one it says, "Is there a probability."  Now,

8   unless you got a crystal ball and you can say for certain

9   what's gonna happen, you can't answer that question.

10    A.   Right.

11    Q.   But the law doesn't require me to say for sure

12   certainly.  It just says probability.  The next part says,

13   "that the defendant would commit criminal acts of violence."

14   Sometimes people say, "Well, I could only give him the death

15   penalty if I think he's gonna murder again or do a capital

16   murder again."  And I say, "The law just says criminal acts of

17   violence.  That could be assaulting somebody, punching them in

18   the nose or whatever."

19           And then the last part of the sentence says,

20   "constitute a continuing threat to society."  You've probably

21   heard a phrase like that.

22    A.   Uh-huh.

23    Q.   The thing I want to point out to you is sometimes

24   people come up to me and say, "Well, Mr. Skurka, why do you

25   have to go for the death penalty?  Why don't you just put him

390

1   in prison and that way he can't hurt anybody again?"  And I

2   always say, "Well, wait a minute.  Just because you're locked

3   in prison doesn't remove you from society, because why not?

4   There's other people in the prison."

5    A.   People in prison.

6    Q.   Like who?

7    A.   Guards, prisoners, staff.  I mean, there's --

8    Q.   That exactly right.  It's not like we put people in

9   the desert island and they're never gonna see another human

10   being again.  Would you agree with me then that prison is a

11   part of society?

12    A.   Yes.

13    Q.   Sure.  So just because you put somebody away in

14   prison doesn't mean they're never gonna hurt anybody again?

15    A.   Correct.

16    Q.   I mean, their rights may be reduced, but they're

17   still exposed to society.  And have you heard about -- you've

18   heard about people like that hurting guards or hurting other

19   prisoners?

20    A.   (Nodding head up and down.)

21    Q.   So the first question is yes or no, is there a chance

22   he's gonna hurt somebody in the future.  You answer that yes or

23   no.  If you answer it yes, you go to the second question.  The

24   second question is called mitigating circumstance question, and

25   essentially, that means this.  "Is there anything that would

391

1   lessen or make less severe the punishment?"  Because the two

2   choices are death and life in prison.  The judge asks you, is

3   there a sufficient mitigating circumstance, a reason, you

4   should lower the sentence.  Because that's what that word

5   means.  Mitigating means lessen or make less severe.  In other

6   words, they did the crime, but is there a reason to reduce the

7   sentence and give them death -- life instead of death?

8    A.   Okay.

9    Q.   Now, I want to put you on the part -- put you on

10   trial here.  Not you on trial.  We'll put your kids on trial.

11    A.   Put my kids on.

12    Q.   Say you have -- and I'm sure your kids are perfect,

13   they're not like mine that give me a lot of problems.  But say

14   you have two kids and they're teenagers say, and you have a

15   curfew for them at 11:00.  And the curfew is 11:00, that's it.

16   The bottom line is curfew 11:00.  And what happens is one

17   night, two of them break curfew.  The first one comes in at

18   11:03, misses curfew by three minutes.  And you say, son, what

19   happened?  I'm assuming it's a boy because boys are always

20   worse than girls.  Son, what happened?  He says, I would have

21   been here at 10:45 and I had a flat tire and it took me 15 or

22   20 minutes.  I broke curfew because of that.  Then this kid is

23   your good kid because this is the first time he's ever broken

24   curfew.  He's been out a lot of times.  He's never broken

25   curfew before.  This is his first time.

392

1           Now, let's talk about the second kid which

2   we'll call the bad kid.  And I'm just kidding.  It's not

3   really your kid.  But say the second one comes in and he

4   doesn't come in at 11:03.  He comes in at 3:00 in the morning.

5   He comes in four hours past the deadline and he comes in

6   smelling like beer.  And you ask him, what's going on, why

7   were you late?  And he says, we were partying with my friends

8   and I forgot about the time, and gee whiz, darn it, I'm just

9   late.  That's all he says.  I was just drinking and partying

10   with my friends.  And then, unfortunately, this kid is, like I

11   said, your bad kid.  This isn't the first time he broke

12   curfew.  This is the sixth time so far this year he's broken

13   curfew before.  Okay.  They both broke curfew.  They're both

14   equally guilty of breaking curfew.  Are you really gonna

15   punish them the same?

16    A.   Probably not, no.

17    Q.   Probably not.  Why?  Because the surrounding

18   circumstances are different.  That's what that question's all

19   about.

20    A.   Right.

21    Q.   You know, a person will be guilty of capital murder,

22   but there may be aggravating circumstances to make it a death

23   sentence.  There may be mitigating circumstances that lower the

24   sentence.  But you got to wait till you hear everything.  When

25   I first said your two kids broke curfew, you didn't know?

393

1      A.    I didn't know, right.

2      Q.    But you can kind of see that's a mitigating part that

3  one was, you know, three minutes late, the other one is four

4  hours late.  One had a good reason, you know, to break curfew

5  because, you know, he had a flat.  The other one didn't have a

6  good reason.  And the one was the first time offender and this

7  other one wasn't.  See, it's kind of a trick question in that

8  is there enough to lower the sentence to life?  I didn't mean

9  to say trick question.  It's more of a check on the jury.

10  Remember checks and balances?

11      A.    Right.

12      Q.    You found the guy guilty of capital murder.  You've

13  answered that question, yes, he's a continuing threat to

14  society.  The judge says, "Okay.  It looks like he's heading

15  for the death penalty.  But, jury, open your mind and listen."

16  Can you consider all of the evidence, including what happened

17  that day, the circumstances of the offense and the surrounding

18  thing, like how heinous was the crime, how bad was his

19  involvement in it?  His character and background, was it a good

20  background or bad background?  Maybe the kid -- maybe the guy

21  was an Eagle Scout and was a war hero years ago in Desert

22  Storm.  Maybe the guy's always been in trouble with the law.

23  You have to listen to his character, both good or bad, and the

24  personal moral culpability.  Is there anything that would

25  warrant -- is it enough to warrant that you lower the sentence

394

1  to life instead of death?

2            What is a mitigating circumstances,

3  Ms. Foutch, is up to the jury.  The jury makes this decision.

4  The judge is not gonna say, "Well, because you hear this, you

5  have to lower the sentence.  Because you hear this, you have

6  to lower the sentence."  You may hear good and bad.  The

7  question is does the bad -- does the good outweigh the bad.

8  You know, some people may say, "Well, we're gonna give him a

9  break because he was on the honor roll, and he was a hero in

10  Desert Storm ten years ago."  Other people may say, "I don't

11  care if he was on the honor roll.  I don't care in he was a

12  hero in Desert Storm, he still did this crime and that doesn't

13  outweigh what he did."  You see what I'm saying?

14      A.    Yes.

15      Q.    It's kind of like when you're evaluating your two

16  kids.  One you may ground for a day.  One you ground for three

17  weeks --

18      A.    Right.

19      Q.    -- because of the differences.  And that's the trick.

20  To be a fair juror you have to wait till you hear that

21  evidence.  And it may be good, it may be bad, but you can't

22  just be leaning one way or the other because you probably want

23  to hear about their background, right?

24      A.    (Nodding head up and down.)

25      Q.    Now, the law also says voluntary intoxication is not

395

1  a defense to crime.  Voluntary intoxication.  If you go get

2  yourself drunk or high on drugs, is that an excuse to crime?

3      A.    No.

4      Q.    Absolutely not.  But the judge may say it's a

5  possible mitigating circumstance.  In other words, somebody

6  says, "Well, he robbed the bank but he was drunk when he robbed

7  the bank."  Some jurors may say, "Hey, you know, he was drunk

8  when he robbed the bank.  Let's give him a break and lower the

9  sentence."  Other people may say, "I don't care if he was drunk

10  or not, he still robbed the bank and he's got to be punished

11  for robbing the bank."  You see what I'm saying?

12      A.    Yes.

13      Q.    That's the thing that you can consider but what

14  effect you give to it is up to the jury.

15      A.    Okay.

16      Q.    Okay?  I guess the best way to say is you have to be

17  open-minded and will you listen and fairly consider all these

18  things before you, you know, make a decision?

19      A.    Yeah.

20      Q.    Okay?

21      A.    Yes.

22      Q.    And that's a fair scheme to follow, right?

23      A.    Oh, definitely.

24      Q.    You don't want to be jumping into anything one way or

25  the other?

396

1      A.    No.

2      Q.    And you probably want to know what the past is.  Now,

3  that doesn't mean you necessarily have to make a decision on

4  the past.  You can make a decision on just the crime itself.

5  The law says, if the crime is bad enough and you think that

6  outweighs any mitigating circumstance, that's fine.  But you

7  have to be able to listen and consider those things.  You know,

8  maybe he came from a broken home or maybe he was in a war or

9  something like that.  I don't know what it is.  If it is, then

10  the question is, is there enough.

11            Okay.  The last part I want to talk to you about

12  is a couple of things.  I know you got four kids and I can't

13  remember all their ages.  I think they're kind of younger and

14  teenagers and stuff?

15      A.    Yeah.

16      Q.    I hope they don't break curfew.

17      A.    Not so far.  Not so far.

18      Q.    Well, here's the thing.  Sometimes people say -- I

19  don't know if you felt that way, but you know that first day we

20  came in, some people didn't know who was on trial.  And the

21  judge pointed out to Mr. Ramirez over here, right?

22      A.    Yes.  And I didn't even see him that day either.

23      Q.    He was kind of stuck over there in the corner.

24      A.    Yeah.

25      Q.    But we're not talking about somebody you see on TV or

397

1   read in the paper.  That's him.  Do you think you can look at
2   him and tell me if you can make a decision based on the
3   evidence that may call for his execution, if the evidence
4   warrants it?
5       A.   Yes.
6       Q.   Okay.  The second thing I want to talk to you about
7   is sometimes people have told us in the jury, "Well, gosh, the
8   first thing I saw was he's kind of young, you know, and he
9   doesn't look that bad, you know."  And I tell them, "Well, you
10  can't make a decision on what a person looks like."  Right?
11      A.   Oh, definitely.
12      Q.   Sometimes people come in -- and I've been trying
13  cases for 22 years and they always think the guy is gonna look
14  like Charles Manson, or some biker dude, you know, all scary
15  looking guy.  And generally, they don't look like that.  Child
16  abusers, they always say, "Oh, they think it's some guy wearing
17  a rain coat, a dirty old man hanging around the playground."
18  It's not necessarily that way.
19           Would you agree with me that you make a
20  decision on what the person did and not what they looked like?
21      A.   Oh, yes.
22      Q.   Okay.  The last area I want to talk to about is some
23  legal questions.  First of all, remember that the indictment is
24  not evidence of guilt.  Just because he's been charged with a
25  crime doesn't mean he is guilty of the crime, correct?

398

1       A.   That's correct, yes.
2       Q.   And the other thing is the presumption of innocence.
3   Remember the judge says he starts presumed innocent.  If you
4   had to vote right now you'd have to vote innocent.
5       A.   He's innocent, yes, sir.
6       Q.   And that's because the State hadn't proven the case
7   or hadn't brought any evidence yet?
8       A.   Right.
9       Q.   Now, just because he's presumed innocent doesn't mean
10  he is innocent.  It's just he starts with that presumption of
11  innocence.  It's like a bubble, you know.  But once the
12  evidence comes you could burst that bubble, and say, "Oh, I
13  think he's now guilty beyond a reasonable doubt."  But you've
14  got to start them at innocent, right?
15      A.   Yes.
16      Q.   And that's just our law.  This is America and that's
17  why we do it that way.  He can testify if he wants to.  If he
18  doesn't want to, he doesn't have to.  And you can't hold that
19  against him.  I don't know if he's gonna testify or not.
20  That's up to him and his lawyers.
21      A.   Right.
22      Q.   But if he doesn't testify, this judge is gonna tell
23  you in the written instructions, you cannot hold that against
24  him.  And sometimes jurors say, "But gosh, you know, I want to
25  hear what he says.  I can't make a decision until I hear what

399

1   he says or what they put on."  And the law says, "No.  You've
2   got to make a decision based on the evidence you hear."  And
3   you can't just say, "Well, I'm gonna hold it against him
4   because he didn't testify."  You won't do that, will you?
5       A.   No, sir.
6            THE REPORTER:  Can you give me just a minute?
7            MR. SKURKA:  Sure.
8            (Pause in proceedings.)
9            MR. SKURKA:  Judge, I think -- are you ready,
10  Sara?
11           THE REPORTER:  Yes.
12      Q.   (BY MR. SKURKA) I think that's all the questions I
13  have, unless you have any questions of me?
14      A.   Not at this time.
15      Q.   The bottom line is can you be fair and impartial?
16      A.   I will do my best.
17      Q.   You have not made up your mind one way or the other?
18      A.   No, sir.
19      Q.   You'll listen to all the evidence before you make up
20  your mind?
21      A.   Yes.
22      Q.   That's all I can ask you to do.  Thank you, ma'am.
23      A.   Thank you.
24
25

400

1                 VOIR DIRE EXAMINATION
2   BY MR. JONES:
3       Q.   I get to ask the questions.
4       A.   Okay.
5       Q.   I'll try not to go over the same things that
6   Mr. Skurka did except for the ones that I'm concerned about.
7       A.   Okay.
8       Q.   We have -- we have the death penalty in Texas as a
9   form of punishment.
10      A.   Yes.
11      Q.   And it's only -- it's only available for homicides,
12  murders which -- and only available for murders that have some
13  kind of an aggravating circumstances attached to them.  I take
14  it from your responses in the questionnaire and from your
15  answers here is that you generally are in favor of that being a
16  punishment option in Texas?
17      A.   Yes.
18      Q.   Do you believe that Texas society benefits from
19  having that option for these kinds of offenses?
20      A.   Yes, I do.
21      Q.   What can you -- can you tell me what -- articulate
22  what benefit or benefits you see that the death penalty gives
23  us?
24      A.   You know, it's a little tough when you grow up with
25  it to some extent.  You know, I remember being in school and

401

1  having debate class and we'd have to debate the subject of the
2  death penalty.
3     Q.   Really?
4     A.   Yes. And I have to say, you know, maybe it's the way
5  we're raised a little bit, because I did live away from Texas
6  for a long time in states that did not have it. I do believe
7  they had a good court system but I didn't always agree with it.
8  I do still believe that the death penalty does hold a place for
9  some crimes.
10    Q.   Okay.
11    A.   I do believe that some people, even in prison, could
12  cause harm to other people, that yes, they are there because
13  they did something wrong, but they don't need to be at risk as
14  well.
15    Q.   Okay. In the old days — I say the old days, 20, 30
16  years ago when Texas had the death penalty, the Supreme Court
17  changed some rules.
18    A.   Uh-huh.
19    Q.   It used to be in a death penalty case the jury would
20  go back into the jury room and when the trial was over and
21  they'd say, "Okay, folks what do you want to do?" They'd say,
22  "Life or death?" They would write the verdict on a piece of
23  paper. Well, now the rules are that the Supreme Court
24  basically says that before a jury can assess the death penalty,
25  vote on the death penalty, they have to consider certain

402

1  things, okay? It's supposed to be -- instead of being an
2  arbitrary decision it is supposed to be a guided one.
3     A.   Right.
4     Q.   And there's much debate on whether the current system
5  really does guide or whether the jurors really are guided by
6  it.
7     A.   Okay.
8     Q.   But that's for our legislatures to debate. Really,
9  there are three conditions that must be met before a person can
10  get the death penalty in Texas. One, the person has to be
11  found guilty --
12    A.   Yes.
13    Q.   -- of capital murder. If that occurs, the State
14  moves into a second phase, the punishment phase. The jury
15  hears additional evidence, which are relevant to these two
16  special questions called special issues. How those two issues
17  are answered will determine which punishment is imposed. And
18  you'll hear evidence relevant to both of them.
19    A.   Okay.
20    Q.   And with that evidence, you'll attempt to make a
21  decision. On Special Issue No. 1, which is fairly clear, if
22  the jury answers yes to that question, it must agree that it's
23  yes by -- unanimously by a vote of all 12. If ten -- if ten
24  jurors vote no, that will authorize a verdict of no. In other
25  words, if the vote is in favor of the defendant, it only takes

403

1  ten votes to get a no verdict.
2     A.   Oh, okay. I understand.
3     Q.   But if it's against him it takes 12.
4     A.   Right.
5     Q.   If the jury votes no on Special Issue No. 1, it's
6  instructed to stop deliberations. They return the verdict form
7  to the Court, and the Court will assess what punishment?
8     A.   Okay.
9     Q.   No, what punishment? I'm asking you.
10    A.   Life.
11    Q.   Life because that condition is not met?
12    A.   Right.
13    Q.   If the jury votes yes, it's instructed to continue to
14  deliberate on the Special Issue No. 2. Would you read Special
15  Issue No. 2 and tell me when you're finished? Read it
16  silently.
17    A.   Okay. I'm done.
18    Q.   Is there any word or phrase in that question that you
19  do not understand?
20    A.   No. I do believe I understand it.
21    Q.   Okay. What's the verb "to mitigate" mean?
22    A.   To mitigate?
23    Q.   Yes.
24    A.   That means to lessen.
25    Q.   That's correct. To lessen what in this -- in the

404

1  context of this endeavor?
2     A.   Well, to lessen from the death penalty to life.
3     Q.   That's right. To lesser the punishment.
4     A.   The lesser the punishment, yes.
5     Q.   So the judge will instruct you that any evidence
6  that's before you which would cause you to want to vote for a
7  lesser punishment, that's a mitigating circumstance?
8     A.   Yes.
9     Q.   Okay. Now, in order to determine whether there are
10  mitigating circumstances, the question directs you to consider
11  certain things. The first one is the facts and circumstances
12  of the offense, which you've already heard about in the first
13  stage. The second is the defendant's character and background.
14  If I say that you're a person of good character, what does that
15  mean?
16    A.   That means that there are -- you do things
17  well in life for you and for other people.
18    Q.   Okay. Do you agree that our society has a general
19  code of moral conduct and certain things to be considered to be
20  moral and certain things to be considered to be immoral?
21    A.   Yeah. I mean, there can be some gray, but, yeah, I
22  do believe there's right and wrong.
23    Q.   Boy Scout Law contains a whole list of them, the Ten
24  Commandments. These are places that -- so a person who has
25  good character is somebody who tends to adhere to that code.

405

1    Someone's bad character is one that deviates from it.  What
2    about background, what does that mean?
3        A.   Their background is what they've done in the past.
4        Q.   That's right.  Their biography, their social history.
5        A.   Yeah.
6        Q.   In this kind of case, the Supreme Court directs the
7    defense to discover and to prove up the defendant's background
8    good or bad, okay?
9        A.   Okay.
10       Q.   And as you might expect in a case like this, you're
11   likely to hear evidence of a bad background, you know, like a
12   person's family history.  And you might hear evidence that the
13   defendant was born, you know, had a family that didn't take
14   care of him or abused him when he was growing up.
15       A.   Okay.
16       Q.   If you heard evidence of that kind, could you
17   consider it?  Let me -- before I ask you that question, what
18   does the verb "to consider" mean?
19       A.   To think about.
20       Q.   Exactly.  To think about with a view towards doing
21   something about what you're thinking about?
22       A.   Okay.  Yeah.
23       Q.   So, in this case, if you can consider this with a
24   view towards voting for a life sentence?
25       A.   Yes.

406

1        Q.   Okay.  It doesn't say you have to do it?
2        A.   Right.
3        Q.   It just says, think about it?
4        A.   Right.
5        Q.   Okay.  So if your -- if you're presented with
6    evidence about a person's background, will you consider it?
7        A.   Yes.
8        Q.   Okay.  All right.  And on the issue of whether in
9    your mind you should vote for life rather than a death
10   sentence.
11           Personal moral culpability, what does that
12   mean?
13       A.   That one's a little tougher.  I have a hard time
14   explaining it.  I kind of know how I feel about it but --
15       Q.   Do your best.
16       A.   I'm trying to.  You know, kind of what they're made
17   of, kind of simple, good or bad.  I mean, I guess I'm probably
18   saying it wrong, not saying what I want to say.  That one, like
19   I say, it's tough for me to explain.
20       Q.   And I think you were given the example of two
21   defendants --
22       A.   The two --
23       Q.   -- the two burglars.
24       A.   Uh-huh.
25       Q.   And one was the motive for the one stealing was to

407

1    feed his starving children, okay?
2        A.   Right.
3        Q.   And if you were the judge you probably wouldn't give
4    -- the punishment wouldn't be the same in those two cases,
5    would it?
6        A.   Right.
7        Q.   You'd probably give the guy that was stealing to help
8    his kids a lesser punishment.  How would you rationalize that
9    if somebody asked you?  They're both -- they both committed a
10   crime.  Burglary is burglary.
11       A.   Burglary is burglary.
12       Q.   Theft is theft?
13       A.   It is.
14       Q.   So how could you justify giving the one lesser
15   punishment than the other?
16       A.   Well, in the example I was given, the one didn't seem
17   to have a lot of care for anything, whereas the other one
18   seemed to be desperate and trying to take care of others, not
19   just doing it for their own self-gratification.
20       Q.   Okay.  Do you believe -- do you believe in the
21   doctrine of free will?
22       A.   Yes.
23       Q.   In other words, once we reach a certain stage of
24   majority, we have the power to choose?
25       A.   We do choose.

408

1        Q.   And we can choose one way or the other?
2        A.   Yes, sir.
3        Q.   Okay.  So the question of moral culpability really
4    has two elements if you will.  One is does -- does the person,
5    the defendant, know what the rules are?  In other words, did --
6    from the time that he was born until the time of that date of
7    the offense, is there evidence to show that he learned what the
8    rules were, okay?
9        A.   Okay.
10       Q.   Where did your -- you've got four kids?
11       A.   Yes.
12       Q.   Are they learning the rules?
13       A.   Yes, sir.
14       Q.   And where do they get those rules from?
15       A.   From me, from my their teachers, from their
16   grandparents, from their scout leaders.  I mean, it's endless.
17   I put them in things that they do learn these things.
18       Q.   That's where I got it.  Okay.  So do you agree that
19   some people in our society aren't so lucky to have the
20   advantages of your children?
21       A.   I do believe that, yes.
22       Q.   Okay.  So the question is in a particular case, does
23   the defendant know what the -- when we say that he knows what
24   the rules are?  Okay.  So you say, well, yes.  Then the next
25   part of the -- the next element of moral culpability is when

409

1   you have to choose between one course of action or another that
2   involves judgment.
3       A.   Yes.
4       Q.   Okay.  And the question is, is there anything going
5   on in this case which would affect the judgment of the
6   defendant in choosing a particular course of action?  For
7   example, in our hypothetical, the man who was stealing for his
8   -- to feed his children --
9       A.   Yes.
10      Q.   -- what was affecting his judgment?
11      A.   What was affecting his judgment?  At the time that he
12  would steal, his desperation to take care of his children.
13      Q.   Okay.  And that would cause you to --
14      A.   That -- you would weigh the difference between
15  feeding your hungry children that are starving and committing a
16  crime.  You would take the punishment to help them --
17      Q.   Okay.
18      A.   -- I believe.
19      Q.   But starving children was a factor that affected his
20  judgment?
21      A.   Yes.
22      Q.   Something that we can consider --
23      A.   Yes.
24      Q.   -- and give effect to --
25      A.   Yes.

410

1       Q.   -- in deciding what the punishment is?
2       A.   Yes.
3       Q.   There might be other things?
4       A.   Sure.
5       Q.   A person's mental ability, somebody that's borderline
6   retarded?
7       A.   Yes.
8       Q.   Somebody that may be under the influence of drugs or
9   alcohol which might -- depends on the circumstances.  But a
10  person may have a mental disease.  You know, it might affect
11  his ability to conform his conduct to the law.  Of course,
12  you'd have to have evidence on this?
13      A.   Yeah.
14      Q.   But these are things that might affect a person's
15  judgment, and if the juror feels like, well, gosh, you know,
16  that's unfortunate.  So does that help you with understanding
17  moral culpability?
18      A.   Yes.
19      Q.   Okay.  Moral -- the word "moral" suggests, once
20  again, a code --
21      A.   Right.
22      Q.   -- of conduct from the various sources that we
23  discussed.  And so we need to know, does the defendant know
24  what the code is; and number two, what affected his judgment on
25  the day in question?  And that might be an aggravating

411

1   circumstance.  It might be a mitigating one.  It depends --
2       A.   Okay.
3       Q.   -- on things.  I think you -- no, I'm convinced that
4   you understand what's involved here.
5            Now, in order -- what answer to Question No. 2
6   will reduce a life sentence?
7       A.   A life sentence?  An answer of no.
8       Q.   The question --
9       A.   Oh --
10      Q.   No, look at the question --
11      I'm sorry.  I misunderstood.  I'm sorry.
12      Q.   That asks for a yes or no answer.  And what answer
13  would produce a life sentence?
14      A.   No.
15      Q.   Okay.  If you answer that question no, you're saying
16  there's no mitigating circumstance --
17      A.   Oh, I'm sorry.  Okay.
18      Q.   No, you don't have to be sorry.  I just need you to
19  understand it.
20      A.   I guess I'm stuck on the first one that -- okay.
21      Q.   That's why I'm asking you the question.
22      A.   Right.  If you find mitigating circumstances you
23  would -- it would be a life sentence as opposed to the death
24  penalty.
25      Q.   In your book?

412

1       A.   Because if you found that it was -- these did not
2   lessen that, then it would be.
3       Q.   Now, a yes answer to number 2 means life, a no answer
4   means death.
5       A.   Okay.
6       Q.   Okay?  I like that because yes is a positive and no
7   is negative.  If you answer that -- if the jury answers that
8   question no, it takes a unanimous vote against the defendant,
9   it takes all 12.  Twelve people have to make an individual
10  decision that the answer should be no.
11      A.   Okay.
12      Q.   However, how many votes -- if it's a favorable vote,
13  how many votes does it take?
14      A.   Ten.
15      Q.   Ten.  So all the discussions are over and the final
16  vote is taken by the presiding juror it's ten to two for yes,
17  that's the verdict?
18      A.   Okay.
19      Q.   And that will produce, what sentence?
20      A.   Ten to two.
21      Q.   For yes?
22      A.   For yes.
23      Q.   And that --
24      A.   That would be -- that would be --
25      Q.   What kind of sentence?

413

1      A.    That would still be a life because you need a

2  unanimous 12.

3      Q.    That's right.  A life sentence.  See how it works?

4      A.    Yes.

5      Q.    If you find yourself on this jury and we get to this

6  -- I'm not saying we're even gonna get to this question.  It

7  may be the hardest question you've answered in your life.

8      A.    Right.

9      Q.    Because it's another person's life basically.

10     A.    Definitely.

11           MR. JONES:  Okay.  I don't have any further

12  questions.

13           THE COURT:  Anything else?

14           MR. SKURKA:  We have no other questions,

15  Judge.  Thank you, ma'am.

16           THE COURT:  All right.  Will you wait in the

17  jury room for a second while I talk to the lawyers.

18           VENIREPERSON NO. 84:  Yes.  Thank you.

19           (Venireperson exits courtroom.)

20           THE COURT:  All right.  What says the State?

21           MR. SCHIMMEL:  Your Honor, the State will

22  accept this jury.

23           THE COURT:  All right.  What says the defense?

24           MR. JONES:  We will accept her also.

25           THE COURT:  All right.  Let's bring her in.

414

1            MR. JONES:  No. 9.

2            (Venireperson enters courtroom.)

3            THE COURT:  All right.  Ms. Foutch, you have

4  been selected to be on this jury.  I know we talked about this

5  before.  Don't read the local paper, don't watch the local

6  news.  We just want you to get what -- you know, about the

7  facts of this case from the Court.  And don't talk to anybody

8  about the facts of the case.  If they try to talk to you, say,

9  no, I can't talk to you, okay?  When we're done, maybe, but

10  not now.

11           We expect this trial to begin on December 1st.

12  We will let you know.  In any event, we're gonna contact you

13  just to confirm, and if it changes we'll let you know, okay?

14           JUROR NO. 9:  All right.

15           THE COURT:  Thank you so much for spending the

16  day for us.

17           JUROR NO. 9:  Thank you.

18           MR. SKURKA:  Thank you.

19           MR. JONES:  Thank you.

20           (Proceedings adjourned.)

21

22

23

24

25

415

```
 1   THE STATE OF TEXAS          *

 2

 3   COUNTY OF NUECES            *

 4

 5           I, Sara E. Rivera, Official Court Reporter,

 6   in and for the 94th District Court of Nueces County, State of

 7   Texas, do hereby certify that the above and foregoing contains

 8   a true and correct transcription of all portions of

 9   evidence and other proceedings requested in writing by

10   counsel for the parties to be included in this volume of the

11   Reporter's Record, in the above-styled and numbered cause,

12   all of which occurred in open court or in chambers and were

13   reported by me.

14           I further certify that this Reporter's Record of the

15   proceedings truly and correctly reflects the exhibits,

16   if any, admitted by the respective parties.

17           WITNESS MY OFFICIAL HAND, this the 25th day of

18   September, A. D., 2009.

19

20

21   _____
     SARA E. RIVERA, Texas CSR 4626
22   Expiration date:  12/31/09
     Official Court Reporter
23   94th & 117th District Courts
     901 Leopard Street, Room 402
24   Corpus Christi, Texas 78401
     Telephone:  361-888-0751
25   Facsimile:  361-888-0209
```