1

1        REPORTER'S RECORD
   APPELLATE COURT CAUSE NO. AP-76,~~000~~ 76100
2      TRIAL COURT CAUSE NO. 04-CR-3453-C
        VOLUME 14 OF 25 VOLUMES

3
THE STATE OF TEXAS          )        IN THE DISTRICT COURT
4                           )
                            )
5  VS.                      )        94TH JUDICIAL DISTRICT
                            )
6                           )
                            )
   JOHN HENRY RAMIREZ        )        NUECES COUNTY, TEXAS
7

8  _____

9              INDIVIDUAL VOIR DIRE

10 _____

11

12

13

14

15

16

17

18

19

20    On the 18th day of November, 2008, the following

21 proceedings came on to be heard in the above-entitled and

22 numbered cause before the Honorable BOBBY GALVAN, Judge

23 Presiding, held in Corpus Christi, Nueces County, Texas:

24    Proceedings reported by Machine Shorthand.

25

**FILED IN**
COURT OF CRIMINAL APPEALS

OCT 06 2009

Louise Pearson, Clerk

2

```
 1   APPEARANCES:

 2   MR. MARK SKURKA
     SBOT NO. 18475570
 3   AND
     MR. VERNON G. SCHIMMEL
 4   SBOT NO. 24033039
     Nueces County Assistant District Attorneys
 5   901 Leopard Street, Room 205
     Corpus Christi, Texas 78401
 6   (361) 888-0410

 7   ATTORNEYS FOR THE STATE OF TEXAS

 8

 9   MR. EDWARD F. GARZA
     SBOT NO. 07731200
10   Attorney at Law
     719 South Shoreline, Suite 201
11   Corpus Christi, Texas 78401
     (361) 888-8877
12

13   AND

14   MR. JOHN GRANT JONES
     SBOT NO. 10917000
15   Attorney at Law
     5826 Beauvais Drive
16   Corpus Christi, Texas 78404-6173
     (361) 884-8141
17

18   ATTORNEYS FOR THE DEFENDANT,
     JOHN HENRY RAMIREZ
19

20

21

22

23

24

25
```

3

```
 1                            INDEX
                    VOLUME 14 OF 25 VOLUMES
 2                    VOIR DIRE PROCEEDINGS
```

```
 3   November 18, 2008                       PAGE    Vol.
     Proceedings Commence.......................... 5      14
 4
                   (INDIVIDUAL QUESTIONING OF VENIREPERSONS)
 5
     PROSPECTIVE JURORS
 6   VENIREPERSON                 Voir Dire     Page    Vol.
     MAURO VERA, NO. 85               5,20               14
 7   Agreement to Excuse by State and Defense.......... 28

 8   GUADALUPE LOPEZ, NO. 87           29,42             14
     Peremptory No. 10 by the Defense................. 61
 9
     EVELYN REYES, NO. 88             62,71,87           14
10   Peremptory No. 7 by the State.................... 89

11   DALE STEPHEN LYLES, NO. 90      90,100,119          14
     Accepted by the State........................... 138
12   Accepted by the Defense......................... 139
     Juror No. 10 Admonished......................... 139
13
     JOSEFA TREVINO, NO. 92         140,150,156          14
14   Challenge for Cause by the State................ 162
     Granted......................................... 163
15
     WALTER MOORE, NO. 94           163,172,191          14
16   Accepted by the State........................... 205
     Peremptory No. 11 by Defense.................... 205
17
     ELIZABETH RODRIGUEZ, NO. 96    206,218,237,260      14
18   Accepted by the State........................... 265
     Peremptory No. 12 by the Defense................ 265
19
     CONTESSA EBANKS, NO. 98           267              14
20   Discussion on Venireperson 98................... 266
     Challenge for Cause by the State................ 267
21   Granted......................................... 269

22   LORRAINE LEAL, NO. 97          270,283,304          14
     Accepted by the State........................... 315
23   Accepted by the Defense......................... 315
     Juror No. 11 Admonished......................... 315
24
     Proceedings adjourned........................... 316      14
25   Court Reporter's Certification.................. 316
```

4

1                    ALPHABETICAL INDEX TO VENIREPERSONS

2   VENIREPERSON                    Voir Dire        Page   Vol.
    EBANKS, CONTESSA, NO. 98           267                  14
3   Discussion on Venireperson 98.................... 266
    Challenge for Cause by the State................. 267
4   Granted......................................... 269

5   LEAL, LORRAINE, NO. 97          270,283,304            14
    Accepted by the State........................... 315
6   Accepted by the Defense......................... 315
    Juror No. 11 Admonished......................... 315
7
    LOPEZ, GUADALUPE, NO. 87          29,42               14
8   Peremptory No. 10 by the Defense................. 61

9   LYLES, DALE STEPHEN NO. 90       90,100,119           14
    Accepted by the State........................... 138
10  Accepted by the Defense......................... 139
    Juror No. 10 Admonished......................... 139
11
    MOORE, WALTER, NO. 94           163,172,191           14
12  Accepted by the State........................... 205
    Peremptory No. 11 by Defense.................... 205
13
    REYES, EVELYN, NO. 88            62,70,87             14
14  Peremptory No. 7 by the State................... 89

15  RODRIGUEZ, ELIZABETH, NO. 96    206,218,237,260       14
    Accepted by the State........................... 265
16  Peremptory No. 12 by the Defense................ 265

17  TREVINO, JOSEFA, NO. 92         134,150,156           14
    Challenge for Cause by the State................ 162
18  Granted......................................... 163

19  VERA, MAURO, NO. 85              5,20                 14
    Agreement to Excuse by State and Defense......... 28
20

21

22

23

24

25

7

P R O C E E D I N G S

(November 18, 2008)

1    THE COURT: All right. We're ready. Okay. I
2 guess we'll see how the morning goes, and we'll make a call
3 before lunch and see. Maybe people -- I don't mind waiting,
4 but once I get here I don't like --
5    MR. GARZA: If not, you're going to have to
6 start writing me excuses.
7    THE COURT: Excuses. All right. Let's bring
8 the first lady in. I guess it's Mauro Vera. All right.
9 Bring him in.
10    (Venireperson enters courtroom.)
11    THE COURT: All right. You are Mauro Vera,
12 right?
13    VENIREPERSON NO. 85: Yes, sir.
14
15    VENIREPERSON NO. 85,
16    MAURO VERA,
17    VOIR DIRE EXAMINATION
18 BY THE COURT:
19    Q.   Mr. Vera, we're looking to pick a capital murder jury
20 which is why we kept you till this morning. But in any event,
21 we're looking for two things. We're looking for people can
22 keep an open mind and we're looking for people that can follow
23 the law, okay?

*(Note: line numbering continues)*

Page 7 column:

1 case there was a burden of proof, okay? In this case, there's
2 a burden of proof. The State has the burden of proof. The law
3 says, you bring the charges; you prove it, okay? State brings
4 charges against people; they have to prove them. You agree
5 with that?
6    A.   Yes, sir.
7    Q.   All right. As part of that, their burden of proof is
8 beyond a reasonable doubt. And I can tell you that beyond a
9 reasonable doubt is the highest standard we have in the law.
10 What is it? Well, they don't have a definition, but let me see
11 if I can help you, okay? Preponderance of the evidence is the
12 civil case burden, okay? It's like tipping the scales one way,
13 just barely, okay, 51 percent proof. Are you following me?
14    A.   Yes, sir.
15    Q.   There's a higher burden in the law we call clear and
16 convincing. That's like the kind of burden we use in some
17 civil cases for some special issues, or we use it for
18 situations where the State tries to terminate a child -- a
19 parent's rights to a child, okay?
20    A.   Yes, sir.
21    Q.   Parental rights. So it's a higher burden, and it
22 sounds pretty self-explanatory, right, clear and convincing?
23    A.   Yes, sir.
24    Q.   It sounds like strong stuff, right?
25    A.   Yes, sir.

6

1    Now, some people say they can't keep an open
2 mind because they saw some stuff. You say you saw something on
3 TV?
4    A.   Yes, sir.
5    Q.   About the case. Do you remember much about it?
6    A.   Not really, just pretty much there was a murder,
7 somebody had gotten killed, and they were at the Times Market.
8    Q.   Okay. Okay. You're not alone. A lot of people have
9 heard about the case. And really they watch a little bit on
10 TV. But can you put that aside and just make your decision
11 based upon what you hear in the courtroom?
12    A.   Yes, sir.
13    Q.   All right. Can you keep an open mind?
14    A.   Yes, sir.
15    Q.   All right. Let's talk a little bit about the law.
16 If you -- you've never been on a jury before. That's not a
17 problem.
18    A.   I've been once, but not like this.
19    Q.   Oh, you have been once?
20    A.   The one I got picked for was to see if he was
21 incompetent to stand for trial. That's it.
22    Q.   Okay.
23    A.   It didn't last not even 30 minutes.
24    Q.   Okay. I got you. Well, that's kind -- that's a
25 quasi criminal proceeding, okay? But here's the thing, in that

8

1    Q.   Well, this is a higher burden than that, beyond a
2 reasonable doubt, okay? It is not also -- also it's not beyond
3 all doubt, okay, because if it was beyond all doubt, you'd have
4 to have been there and seen it yourself --
5    A.   Right.
6    Q.   -- for it to be beyond all doubt. All right. And if
7 you'd been there, then they'd be calling you as a witness,
8 okay? You'd actually be disqualified from being a juror. All
9 right. So you follow that?
10    A.   Yes, sir.
11    Q.   You can hold the State to that burden?
12    A.   Yes, sir.
13    Q.   All right. Next thing. The law says since the
14 State's got the burden of proof, the defendant doesn't have a
15 burden. You don't have to do anything. If you don't have to
16 do anything, then the defendant's presumed to be innocent,
17 right?
18    A.   Yes, sir.
19    Q.   We're all presumed to be innocent.
20    A.   Right.
21    Q.   Until if the State can prove otherwise?
22    A.   Right.
23    Q.   Can you presume the defendant to be innocent until
24 proven guilty?
25    A.   Yes, sir.

9

```
1    Q.   All right.  Let me ask you this.  We asked this
2  question of jurors:  How would you vote right now if you had to
3  vote?
4    A.   Well, I would have to vote not guilty because I
5  wasn't there to see it.
6    Q.   Yeah, that's right.  Now, that's not a real world
7  example.  The real world example is the State will present some
8  evidence, and then you need to decide whether they've proven
9  their case beyond a reasonable doubt.  What if they don't?
10   A.   If they don't?
11   Q.   If you hear some evidence and you think, well, you
12 know, there is some evidence that he did it.  I think he might
13 have done it, but I don't think they've proven it beyond a
14 reasonable doubt.
15   A.   He's not guilty.
16   Q.   That's exactly right.
17        All right.  Now, the next thing.  As part of
18 this, if they don't have a burden of proof, then he doesn't
19 have to testify, right?
20   A.   That's right.
21   Q.   Constitution says he doesn't have to testify.  You
22 can't make him testify.  But it goes deeper than that.  See,
23 it's not just he doesn't have to testify.  It's also the jury
24 can't hold it against him.  Some people say they would.  Some
25 people say, "Well, I got to hear both sides of the story before
```

10

```
1  I can make a decision."  This isn't like that, okay?  This
2  isn't a race between these two sides and see who crosses the
3  finish line.  This is a race to see if the State can get over
4  the line of reasonable doubt.  Are you following me?
5    A.   Yes, sir.
6    Q.   So, can you follow that law and not hold it against
7  the defendant if he chose not to testify?
8    A.   Yes, sir.
9    Q.   Okay.  Now, let's talk about the case itself.  Okay.
10 Let's talk about the allegation.  The allegation is capital
11 murder.  What's that?  Well, it's murder at least, right,
12 because it's got it in the word?  Capital murder.  Well, what's
13 murder?  It's the intentional taking of the life of another,
14 correct?
15   A.   Correct.
16   Q.   All right.  What's the capital part?  Well, when you
17 say capital in the law, that means the death penalty is a
18 possibility, okay?  The legislature has laid out a list of --
19 and they're all murder cases.  They're all homicides, all
20 right, homicide plus something else.  Capital murder is murder
21 plus, okay?
22   A.   Okay.
23   Q.   And that's in the State of Texas.  Now, special
24 circumstances.  In this case, the State is alleging that the
25 murder occurred while in the course of committing a robbery or
```

11

```
1  attempting to commit a robbery.  Well, what's a robbery?  Well,
2  a robbery is the forcible taking of property from another, or
3  maybe threats -- threats of force, and to obtain property,
4  okay?  Are you following me?
5    A.   Yes, sir.
6    Q.   Example:  I go rob you, I pull out a gun, I point a
7  gun at you.  You give me your wallet, okay?  That's a robbery.
8  All right.  What if I pull a gun at you and you -- you don't
9  give me your wallet?  You punch me in the face and knock me
10 out.  Am I guilty of robbery?  No, but I'm guilty of attempted
11 robbery.
12   A.   Attempted, yeah.
13   Q.   The State can get there either way.  So what the
14 State needs to prove is that this defendant on the given day in
15 Nueces County, Texas, did commit or attempt to commit robbery,
16 and in the process, commit murder, okay?  Those are two serious
17 felonies.  And the legislature says, you know, if you put two
18 serious felonies -- these two together, that's enough, okay?
19 Are you following me?
20   A.   Yes, sir.
21   Q.   All right.  There's a lot of elements because you got
22 two big crimes.  The law says they have to prove all the
23 elements to get to capital murder.  Would you hold them to that
24 burden?
25   A.   Yes, sir.
```

12

```
1    Q.   All right.  Now, in that case that you sat where they
2  had a -- when was that, by the way?
3    A.   About eight years ago or something.
4    Q.   That may have been before they changed the law.  It
5  used to be you had to have a jury trial even if it was agreed,
6  okay?  It may have been -- was it agreed?
7    A.   Yes, both attorneys pretty much told us the jury that
8  --
9    Q.   To find him incompetent?
10   A.   Yes.  So, that's why it was like 30 minutes and that
11 was it.
12   Q.   Well, they've changed the law on that, so we don't do
13 it that way anymore, if there's an agreement.  But in the old
14 days, that's what you had to do.
15        This is a little different.  In this case, kind
16 of like you did in that case, you have the trial and you go
17 back and you deliberate, and the only issue is, is he competent
18 or incompetent to stand trial, right?
19   A.   Right.
20   Q.   And you make the determination.
21        In this case what will happen is, if you're
22 selected, you'll go back and you'll deliberate after the first
23 part of the case, which is Mr. Skurka here is gonna try to
24 prove that this defendant is guilty of capital murder as
25 alleged in the indictment, okay?
```

13

1      A.   Okay.

2      Q.   All right.  And if you go back there and you find him

3  not guilty, the case is over with, all right?  If you find him

4  guilty, we go to a second part.

5            Now, there's two things that can happen in a

6  capital murder case:  Life in prison or death.  Both really

7  serious punishments; you'd agree, right?

8      A.   Yes, sir.

9      Q.   I mean, you know, either way it's a bad deal, all

10 right?

11     A.   Yes, sir.

12     Q.   It's all -- but you don't go back and decide, well,

13 you know what, life, death, okay?  I will tell you, the

14 decision is only -- can only be made by a jury.  It can't be

15 made by anybody else.  The president of the United States can't

16 order a death penalty.  There's no one in this country that can

17 order such a thing, except the people of this country, okay?

18 And that's the jury.

19           Now, when you go back to deliberate, like I

20 said, you don't put life or death.  You answer questions, and

21 here's the first one.  If you'll look over your shoulder here.

22 "Is there a probability that the defendant would commit

23 criminal acts of violence that would constitute a continuing

24 threat to society?"  What does that mean?  Is it probably true

25 that the defendant will be violent with people in the future,

14

1  okay?  You can't know that for sure.

2      A.   Right.

3      Q.   But you do have to answer this question.  It's just

4  probably, okay?

5            Now, you can answer yes or no.  Then you answer

6  Question 2.  "After taking into consideration all of the

7  evidence, including the circumstances of the offense --" well,

8  what's that?  That's the first part of the trial, okay, the

9  crime itself.  "-- the defendant's character and background,"

10 well, let's talk about that.  Character.  What's that?  What

11 kind of guy is he, right?  You know, is he a trustworthy

12 person?  Is he an honest guy?  Is he not, you know, is he a

13 good guy, bad guy?  All right.  Are you following me?

14     A.   Yes, sir.

15     Q.   Maybe other than this incident, he's been a great guy

16 all his life, okay?

17     A.   Okay.

18     Q.   Maybe he was a war hero, maybe he was in Desert Storm

19 and he saved a whole platoon of soldiers risking his own life,

20 okay?

21           All right.  And his background, what's that?

22 Well, maybe his military career, maybe his job, maybe he had a

23 job with a company, his childhood, right?

24     A.   Right.

25     Q.   Just his whole background, all right, his whole life.

15

1  "-- and the personal moral culpability of the defendant."

2  Okay.  That's a handful, right?

3      A.   Yes.

4      Q.   All right.  The lawyers wrote that.  But what it

5  means is this:  It sort of means how morally guilty is he.  Let

6  me give you an example.  Two burglars, okay?  One, he likes to

7  use cocaine and party with hookers, okay?  So he breaks into a

8  house and he steals all the TVs, he trashes the place, I mean,

9  just ruins the house, takes everything of value, sells it.  He

10 goes off, does -- you know, spends it on hookers and cocaine,

11 okay?

12     A.   Okay.

13     Q.   Second burglar, he has lost his job that he worked at

14 20 years, and he's got three kids that are hungry and they

15 haven't eaten in three days, and he goes into somebody's house

16 and he steals food, and he doesn't break anything, he doesn't

17 steal the TVs.  All he does -- and he hasn't eaten either, but

18 he doesn't even eat himself.  He just gives the food to the

19 kids.  They're both guilty, right?

20     A.   Right.

21     Q.   But their personal moral culpability is not the same.

22     A.   Right.  It's totally different.

23     Q.   Totally different, because one of them did it for

24 selfish reasons, right?

25     A.   Right.

16

1      Q.   And one of them did it for somebody else.  That's

2  what that question's about.  All right.

3            Then, "Is there sufficient mitigating

4  circumstance or circumstances to warrant a sentence of life

5  imprisonment or a death sentence be imposed?"  What's

6  mitigating?  That means to lessen, lessening circumstances.

7  Remember I told you like the war hero story?

8      A.   Okay.

9      Q.   Maybe he was a war hero.  That might be a mitigating

10 circumstance, okay?  Maybe he was an Eagle Scout.  Maybe he did

11 community service.  There's any number of things, okay, and

12 these lawyers will try to tell you what mitigating

13 circumstances are, or aggravating circumstances, like maybe a

14 criminal history.  Maybe he's been in trouble a bunch, okay?

15 We don't know at this point.

16           The point is, this question asks you to look at

17 everything, not just what happened that day, his whole life,

18 everything that gets presented to you, good and bad, all right?

19 And determine whether there are sufficient mitigating

20 circumstances, sufficient circumstances in his favor to warrant

21 life or death, okay?  Look, the fact that maybe he saved all

22 those soldiers, is that an excuse for the crime?  No, you found

23 him guilty.  He's getting punished, okay?  He's getting a life

24 sentence or he's getting a death sentence, okay?  It's not an

25 excuse for the crime, but maybe it might help him here.  Maybe

17

1  it won't. Maybe you say, "You know what, it is a mitigating
2  circumstance that is in his favor, but, you know what, it's not
3  sufficient to warrant life rather than death." All right. And
4  then the jury would answer that yes or no.
5      A.   Right.
6      Q.   Okay. The beginning of the trial I always -- I raise
7  my right hand and the jury has to raise their right hand, and I
8  say, "Do you solemnly swear that you will render a true verdict
9  based upon the law and evidence presented to you?" And then
10  they say yes.
11          I need to know from you if you can take that
12  oath. And before you answer, some people cannot take the oath
13  because they cannot participate in a process that could lead to
14  someone's death for whatever reason. Maybe their church says
15  that. Maybe they just feel that way, all right? And that's
16  okay for them to feel that way, but they can't follow the law.
17  Flip side, some people feel like if they find the defendant
18  guilty of capital murder, they're always getting the death
19  penalty. They're not gonna follow -- they're not gonna go
20  through this process that the law requires. Neither of those
21  people can be fair jurors in this trial. Why? Because they
22  can't follow the law. Remember, I told you at the beginning,
23  we're looking for people that can follow the law?
24      A.   Yes, sir.
25      Q.   I need to know from you, can you follow the law or

18

1  can you not participate for one of those other reasons?
2      A.   Can I speak?
3      Q.   Yes.
4      A.   In that question there that they gave me the last
5  time that I came in here.
6      Q.   Uh-huh.
7      A.   It pretty much asked me that same question. And can
8  I follow the law? Yes, I can. I did write on there I am a
9  minister. At this point in time I'm pretty much the pastor of
10  my church, and I can be totally honest with you and tell you
11  that I believe in my heart that only God is giver and taker of
12  life. But I also believe that the Bible says that I need to
13  obey the laws of the land, so I follow what the law of the land
14  tells me to follow, and how to follow it.
15      Q.   Well, you know, I've heard people say, "You know,
16  there's God's law and there's man's law."
17      A.   Right.
18      Q.   Okay? Now, in this case maybe they overlap, right?
19      A.   Right, yes.
20      Q.   You know, because God's law doesn't have to do -- if
21  I blow a speeding -- if I blow a stop sign, you know, there's
22  no God's law, you know, right?
23      A.   Right.
24      Q.   But, you know, this is a little different.
25      A.   Right.

19

1      Q.   And they may be overlapping, right?
2      A.   Right.
3      Q.   Well, I mean, here's the deal. Can you do this
4  though?
5      A.   Yes, I can.
6      Q.   Okay.
7      A.   I know I can.
8      Q.   Because that's him right over there.
9      A.   Right.
10      Q.   Okay?
11      A.   Right.
12      Q.   You may have to make a decision that could -- that
13  could decide whether he lives or dies, okay?
14      A.   Right.
15      Q.   Now, we've had a lot of jurors come in here and say,
16  "I'm not real excited about being on this jury." Well, you
17  know, what, kudos to them because I don't want people to be
18  happy about being on this jury, okay?
19      A.   Right.
20      Q.   But the thing is, it's a decision that we have to do.
21  It's a decision we have to make. And, you know, of course, we
22  don't know if we're gonna get there. Maybe they don't prove
23  their case against him, right?
24      A.   Right.
25      Q.   But we have to talk to you now because we don't get

20

1  to talk to you again.
2      A.   Right.
3      Q.   Okay? So you can -- you think you can do this?
4      A.   I know I can.
5          THE COURT:  All right. Mr. Skurka.
6          MR. SKURKA:  Thank you.
7              VOIR DIRE EXAMINATION
8  EXAMINATION BY MR. SKURKA:
9      Q.   Hello, Mr. Vera, how are you today?
10      A.   Fine.
11      Q.   We're gonna talk about some things, and we're gonna
12  talk about some issues that the judge has hit on a little bit.
13  I may go into a little more detail with you. What I want to
14  tell you at the very beginning is there's no right or wrong
15  answers. I don't want you to answer in such a way where you
16  think, gosh, I better say it this way because that's what
17  Mr. Skurka wants to hear, or I'll say it this way because
18  that's the way the judge wants me to say it. We just want to
19  hear what your feelings are, okay, to see if you're qualified
20  as a juror. And what I'm trying to say is it's just -- it's
21  okay to say you can't do things, just as it's okay to say you
22  can do things.
23      A.   Right.
24      Q.   You see what I'm saying?
25      A.   Yes, sir.

21

```
1    Q.   Certain times people say, "Well, you know, I can sit
2  on other kind of cases, but I can't sit on this one." It's
3  okay for them to say that. Some people say, "Well, gosh, I
4  better say it this way or the judge will get mad at me." I
5  don't think this judge is gonna get mad at you for telling me
6  how you feel. Okay?
7    A.   Yes, sir.
8    Q.   So knowing all that, let's talk about -- I want to
9  explore a little bit more with your feelings about the death
10 penalty. If I'm reading you right, it sounds like you're
11 saying in my heart, in my religious beliefs, I'm not supposed
12 to take somebody's life because only the big guy upstairs can
13 make that decision. But you also say, Hey, I live in this
14 world, and we have to obey laws. And you know, some of the Ten
15 Commandments are, you know, the same as the laws, right? Thou
16 shall not steal, thou shall not kill, stuff like that. But
17 there's kind of a conflict on that one about thou shall not
18 kill because obviously you're not supposed to murder somebody,
19 but then you may be put in a position where you on this jury
20 may have to kill somebody. And I hate to be so blunt about
21 that.
22   A.   No, I understand.
23   Q.   You see the dilemma, I guess, you're looking at.
24 And, you know, I'm not a preacher, obviously. I'm just a
25 lawyer trying to do his job, but I just kind of need to know
```

22

```
1  how you feel about that dilemma you're placing in this case.
2  And there's nothing wrong with being a pastor. There's nothing
3  wrong with feeling that way. I just kind of need to know how
4  it will affect you being on this kind of case.
5    A.   Well, affect me, I don't think it's gonna affect me
6  in any way wrong. My thing is, as like I was saying that when
7  you preach, you know, as a pastor, when I preach, I do my best
8  not to become a hypocrite, you know. And I want to be able to
9  teach my kids because I'm also a youth minister. But I want to
10 teach my kids the right and wrong biblically, you know. And
11 that's why I wrote in the paper that I know what the Bible
12 says. I don't know it all, you know, but I strive to learn it
13 the best way that I can. But I also know that it says for me
14 to abide by the laws of the land. And so if I don't abide by
15 the laws of the land, not only do I feel I get punished by the
16 law, but even by God. You know, I mean, there's consequences
17 that we put ourselves in, so, because of our consequences of
18 the sins that we commit in life, we have to pay the price. And
19 it doesn't mean that God can never forgive you for it, but
20 that's the consequence of what you have to go through in life.
21   Q.   Well, you said that very eloquently. And I think
22 you -- you realize obviously the -- I guess, I don't know,
23 moral dilemma that we have. And we've had all kinds of
24 religion, people -- Catholics, Protestants, Methodists,
25 whatever, and they say different things. Sometimes the
```

23

```
1  Catholics will say, well, because of the church's teachings, I
2  cannot give the death penalty because I have to follow the
3  church. And I know that's man's law and stuff, but, I just
4  can't follow those teachings. Other people say like you say,
5  Well, the Bible says an eye for an eye, you know, or I'm not
6  supposed to kill somebody, depending on how you feel about
7  certain things. I'm just wondering -- to me, it's just -- to
8  me, I would be in a predicament if somebody told me one thing,
9  but my teachings are something else. And I don't know if the
10 word "wrestling over it" is a good word but, you know, because
11 it's clearly you thought about this?
12   A.   Right.
13   Q.   So it's kind of come up either before or when you
14 found out this was a capital murder case, right?
15   A.   Yes, sir.
16   Q.   So what kind of -- did you think about this a lot
17 when you were filling out the questionnaire? Have you thought
18 about it since? Have you changed anything? Are you still
19 pretty much feeling that way?
20   A.   Well, I'm gonna put it to you in the terms that I
21 know how to do it. I didn't think about it. I prayed about
22 it. And I prayed and I asked God, you -- if this is what you
23 want for me, then it's gonna happen. And I'm willing to do
24 what needs to be done. And if this is not what you want from
25 me, then you're gonna make it happen, and it's not going take
```

24

```
1  place. And I'm at ease with what God wants for me in my life.
2  And if I need to be a juror, then God is going to bless me to
3  be a juror, you know. And I'm gonna be a fair juror. I'm not
4  gonna be one that's not gonna be fair, not one that's gonna
5  think, I think he killed somebody, I think he needs to
6  be -- no, if you bring me the evidence that says that he did
7  this, then I'm gonna be -- I'm gonna know what to find him as.
8  If they bring me the evidence that he didn't do it, then I'm
9  gonna know that he didn't do it, you know. I believe that the
10 ball's in your court --
11   Q.   It should be. You're right.
12   A.   -- not in my court. And until you prove because --
13 you know, I'm gonna be totally honest with you. When I first
14 found out what this was about, I had already forgotten about
15 this, what I saw on TV, until I was called for jury and I saw
16 what you-all presented to me there. My thing is, is that I
17 stopped to say, I got to put myself in his position, you know.
18 I mean, I want somebody to be fair also with me if I'm like me,
19 you know. That's just the way I see it, you know. I'm at ease
20 with what has to be done. You know, I don't feel that God's
21 telling me, no, you shouldn't do this. I just feel that what
22 takes place in here if I get picked as a juror, I know God is
23 gonna be with me, and he's gonna allow me to pick the right
24 thing that needs to be picked.
25   Q.   A couple of the things you said I want to go back
```

25

1  over because what you said, "the ball's in my court," that's a
2  pretty good way of saying it.  As the judge said, they don't
3  have to prove anything.  We have to prove the case beyond a
4  reasonable doubt.  And I'm not worried about that because
5  that's my job.  I'm here because I expect to prove it to you
6  beyond a reasonable doubt.
7  But I'm just kind of thinking about this, put
8  yourself in my position.  You said you put yourself in his
9  position.  You're sitting over here on this table and we have a
10  person whose basically against killing somebody, right, because
11  of God's law, and you may end up on this jury as opposed to,
12  say, somebody else whose not as in the position you're in.  And
13  I'm wondering if it's going to be in the back of your mind
14  thinking like, you know, is this really what God wants me to
15  do, or are you gonna be troubled by that?  I appreciate you
16  saying you prayed for it and for guidance and everything, but
17  it's kind of lingering with me whether I'm thinking like, gosh,
18  you know, he says this, but maybe in the back of his mind when
19  he actually gets in there he's gonna think, well, maybe God
20  doesn't want me to do this.  Am I gonna be able to go preach on
21  Sunday after on Wednesday deciding somebody should die?  How
22  can I tell my people, like you said, be a hypocrite?  How can I
23  tell my people don't kill anybody when I just voted to kill
24  somebody?
25  A.  Well, yeah.

26

1  Q.  You see what I'm saying?  I'm not trying to put you
2  on the spot, but it's a fair question, right?
3  A.  Right.  I understand.  Like I said, if that was -- if
4  that was the case where we had to decide whether to give him
5  the death penalty or we found him guilty -- if that was the
6  case, I don't feel in my heart that I wouldn't be able to go
7  back to preach.  I wouldn't feel that in my heart because I'm
8  doing the just thing, the justice that needs to be done here on
9  this earth, you know.
10  Of course, like, for instance, the judge had
11  explained to me a while ago that the only way that I would even
12  consider the death penalty is that if you can prove that he
13  wasn't somebody well enough to be in society, somebody well
14  enough to do -- he was a bad, bad person.  He was a person that
15  didn't, you know, deserve a second chance.  If he was a person
16  that just, like he said, with the robbery, cocaine, a person
17  that's -- his theory in his mind of just harming people, you
18  know.  You know, I tell you, like I said, you know, i was
19  instructed not to talk to anybody about this or nothing, but I
20  did talk to God, and I stopped to think, you know, as a
21  minister, as a pastor, it's real hard, sir, because in the
22  sense of what if this was my kid that got murdered, you know
23  what I'm saying?  Would I think, God, I'm sorry, but I don't
24  want this man to be alive.  See, I have to really swallow, as a
25  minister, that because it's not so much that because he killed

27

1  my kid, I want him to die, you know.  If this person deserves
2  what it was proven to him, then that's what needs to be done.
3  Q.  Well, I find your passion very rewarding the way
4  you've given this a lot of thought.  And whichever way you feel
5  is okay.  It's like what the judge said the very first thing
6  was, are you gonna be okay to do this or are your personal
7  feelings gonna interfere with you being a juror?  It's as
8  simple as that?
9  A.  I think I would be okay.
10  Q.  Okay.  You don't think it will interfere?
11  A.  No.
12  Q.  And you won't go back thinking, oh, my gosh, what
13  have I done voting this way?
14  A.  No.
15  Q.  Now, you said something else.  You said something
16  else about the defendant may -- you know, we have to prove
17  this, and he has to prove this.  But I -- can you hold on just
18  a second.
19  MR. SKURKA:  Judge, can we take a quick break
20  on this before I finish up on this?
21  THE COURT:  Yeah.  Can you wait in the jury
22  room for just a second?
23  VENIREPERSON NO. 85:  Yes, sir.
24  (Venireperson exits courtroom.)
25  MR. SKURKA:  Judge, I was handed a note by the

28

1  defense that I think we want to agree to excuse this person.
2  THE COURT:  Is that right?
3  MR. JONES:  Well, the thing that disturbs me,
4  I mean, I like this guy.  He's obviously a good fellow, but I
5  want him to be making his decision and not him having some
6  perception that he can -- God's gonna be telling him what to
7  do, you know, so --
8  THE COURT:  Fine by me.  If you want to agree
9  to let him go, fine by me.
10  MR. SKURKA:  We agree, Judge, from the State.
11  THE COURT:  Okay.
12  MR. JONES:  I mean, you know, --
13  THE COURT:  Bring him in.
14  MR. JONES:  -- no telling what he'll do.
15  (Venireperson enters courtroom.)
16  THE COURT:  All right.  Mr. Vera, you -- we do
17  appreciate you coming down here.  And we really appreciate you
18  giving careful attention and thought to this case.  You're
19  not -- you didn't get selected to be on the jury, but we do
20  appreciate your time, okay?
21  VENIREPERSON NO. 85:  Thank you.
22  THE COURT:  Thank you very much.
23  (Venireperson exits courtroom.)
24  THE COURT:  Okay.  Let's go off the record.
25  (Discussion off the record.)

29

```
1    THE COURT:  All right.  We got 87 here.  That
2  was you-all's call so --
3
4              VENIREPERSON NO. 87,
5              GUADALUPE LOPEZ
6          VOIR DIRE EXAMINATION
7  EXAMINATION BY THE COURT:
8    Q.   All right.  How are you?
9    A.   Pretty good.
10   Q.   All right.  You are Guadalupe Lopez?
11   A.   That's me.
12   Q.   All right.  Let's talk about some stuff.  We are
13 looking for open-minded jurors.  We are looking for people that
14 can follow the law, okay?  Do you think you can be open-minded
15 in this case?
16   A.   As far as I know, I can.
17   Q.   Okay.  Well, some people can't.  Some people say, You
18 know what, man, they indicted him, that's good enough for me,
19 okay?  I think that's a -- I personally think that if we lived
20 in a society where the State just said you were guilty, and you
21 were, that would be a pretty sorry place to live, quite
22 frankly.
23   A.   Sure.
24   Q.   There are places like that in the world, and I don't
25 want to live there, okay?
```

30

```
1    A.   Yes.
2    Q.   Okay.  Then let's talk about some stuff.  Let's see
3  here.  You haven't been on a jury before.  That's okay.  No
4  prior experience necessary, okay?
5    A.   Fine.  I qualify.
6    Q.   You do qualify, but we're gonna find out if you can
7  follow the law.
8         First of all, this is a criminal case, and every
9  criminal case the law says the State has the burden of proof.
10 You agree with that, correct?
11   A.   Correct.
12   Q.   And the idea is, hey, you brought the charges and you
13 prove them.  You prove them to the people of this community.
14 And if you can do that, that's fine.  But until you do, this
15 man over here is innocent until proven guilty, and that's all
16 our rights, every person in this country.  People say, we, the
17 citizens.  It's even more than, we, the citizens.  It's every
18 person in this country that's within these borders is entitled
19 to those rights, citizen or not.  You can be an illegal alien,
20 and you're still entitled to these rights, okay?
21        Now, if you had to vote right now, of course,
22 you'd have to vote not guilty, right, because they haven't
23 presented any evidence to you?  Do you follow me?
24   A.   Yes.
25   Q.   Now, the burden of proof is beyond a reasonable
```

31

```
1  doubt.  You may have heard that if you're a fan of American
2  Justice or something.
3    A.   I believe in American justice.
4    Q.   No, I mean, the TV show.  Have you ever seen that,
5  the TV show, American Justice?  In fact, I think they even did
6  a story on the Selena case.  But anyway, the point is this:
7  That's the burden of proof.  It's a high burden.  We don't have
8  a definition, but I like to illustrate what it is by showing
9  what it's not, okay?  Civil case.  Contract dispute between two
10 companies.  One company sues another.  What's the burden of
11 proof?  It's called preponderance of the evidence.  Kind of
12 like probably, all right?  51 percent, if you will, just
13 tipping the scales of justice ever so slightly.  All right.
14 Then a higher burden than that in some civil cases, most
15 notably when they try to take away a person's kids from them
16 because maybe the State says this parent is neglectful, okay?
17 Clear and convincing is the burden of proof.  And that sounds
18 like strong language, right?
19   A.   Yes.
20   Q.   Clear and convincing.  Well, this burden is beyond a
21 reasonable doubt.  It's higher than that, all right?  It is not
22 beyond all doubt.  It is not beyond a shadow of a doubt because
23 if it was beyond all doubt you'd have to have been there,
24 right?  You'd have to have seen the thing happen itself.  And
25 if you saw it, you would be disqualified from being on the
```

32

```
1  jury.  You'd be a witness.
2    A.   Yes.
3    Q.   Okay.  Beyond a reasonable doubt, and the key word in
4  that phrase is "reasonable," okay?  Do you think you understand
5  where we're at?
6    A.   Sure, I understand.
7    Q.   You can hold them to that burden?
8    A.   Of course.
9    Q.   All right.  Next thing, the law says defense has no
10 burden, none.  The State's got the whole burden, all right?
11 Burden never shifts over here.  And as such, the Constitution
12 of the United States says, hey, look, it really makes sense
13 because it says, hey, look, if they don't have a burden, then
14 he doesn't have to testify, okay, because they don't have a
15 burden.  And I submit there's a lot of reasons why, maybe his
16 lawyers tell him not to because they don't think that the case
17 has been proven, right?
18   A.   Right.
19   Q.   Maybe he's not a good person in front of people.  You
20 know, some people when they speak and they're nervous, they
21 give people the wrong impression.  I had a friend like that.
22 He got nervous; he'd laugh inappropriately.  And it would annoy
23 people.  They thought he was being -- he was being -- I don't
24 know, mocking them or something.  And he was just nervous,
25 okay?  I don't know.  My point is this.  There's lots of
```

33

1 reasons why somebody may not want to testify, but the point is
2 they can't make him.  And it's even further than that.  The
3 jury can't hold it against him.  In other words, you can't go
4 back there to deliberate and say, you know what, we got the
5 State's case, the defense didn't put on a case, so I'm gonna --
6 that's points for the State.  You can't do that.  All right.
7          Some people say, "Well, I got to hear both sides
8 of the story."  No.  It doesn't work like that.  This is not a
9 race between this table and that table to see who crosses the
10 finish line.  It's only a race to see if that table crosses the
11 line of reasonable doubt because they're the only people
12 running here, okay?
13     A.   Okay.
14     Q.   So I need to know from you, would you follow that law
15 and not hold it against the defendant if he chose not to
16 testify?
17     A.   I will.
18     Q.   All right.  Now, what kind of case is this?  This is
19 called capital murder.  And what does that mean?  Well,
20 certainly, there's murder involved, right?  That's the
21 allegation?
22     A.   Uh-huh.
23     Q.   What's a murder?  Murder is the intentional taking of
24 the life of another, okay?  And the capital, what does that
25 mean?  Well, capital means death penalty is a possibility.  And

34

1 the legislature has drawn out certain situations, all of them
2 involve a homicide, and they -- it's like murder plus, okay?
3 In this case it's murder plus robbery.  And if they can prove
4 that, then defendant's guilty of capital murder.  If they
5 can't, well, that's the end of the case, right?
6     A.   Right.
7     Q.   What's a robbery?  Well, let's say I came and I
8 pulled a gun on you.  I said, "Give me your wallet."  You gave
9 me your wallet.  That's a robbery.  I had a cousin the other
10 day, he told me, "Oh, Bobby, I got robbed."  I said, "Really?
11 What happened?"  He said, "Yeah, they broke into my store."  I
12 said, "Well, that's not robbery," okay, because he wasn't
13 there.  That's a burglary.  Robbery is when someone forcibly
14 takes something from you, okay, either by force or through
15 threats.  Let's say I held a gun to you, and you punched me and
16 you didn't get -- I didn't get your wallet.  I attempted to rob
17 you, right?  Okay.  The State can get there either way.  In
18 other words, what they need to show to win is that the
19 defendant attempted or committed a robbery, and in the course
20 of doing so, he killed somebody.  That's the elements of the
21 crime essentially.  The law says they have to prove it all, all
22 the elements, and there's nine or ten.  I don't know.  Would
23 you make them prove all their elements?
24     A.   So the key word is "attempt" as long as the attempt
25 is made?

35

1     Q.   Well, I don't know what the facts are, but there's
2 attempt or commit, either one.
3     A.   Okay.
4     Q.   Okay?  They can get there either way.  I don't know
5 what the facts are going to be.  The charge says he committed a
6 murder while in the course of committing or attempting to
7 commit a robbery.  They get there either way, okay?
8     A.   Right.
9     Q.   But they can't just -- they don't get there to
10 capital murder just with the murder, all right?  That's not to
11 say he wouldn't be guilty of murder if they can prove that.
12 He's got to be guilty of capital murder, okay?  Do you have
13 anymore questions about that?
14     A.   No, just --
15     Q.   Well, I mean, it's something that you're -- you know,
16 jurors come up here, and all of a sudden, there's this thing
17 that you're not used to dealing with, and it's serious and, you
18 know --
19     A.   It's just the words that are coming out, you know,
20 attempt and then I have to question that.
21     Q.   I want you to.  I want you to.  This is a serious,
22 serious case, okay?  This is why -- see, normally in a jury
23 selection we bring everybody in, and we do it all at once,
24 right?
25     A.   Right.

36

1     Q.   This is so serious, we do it one at a time.
2     A.   I understand.
3     Q.   Because we don't want to make a mistake.
4     A.   Correct.
5     Q.   Okay.  But you're following me there, right?
6     A.   Yes.
7     Q.   Would you make them prove all of their elements
8 before you found anyone guilty of capital murder?
9     A.   That's what I'm here for.
10     Q.   All right.  Very good.  That's what we want.  All
11 right.  Next thing.  There's two things that can happen if
12 someone's found guilty of capital murder, life in prison or
13 death sentence.  Both very serious punishments, okay?  Those
14 are the choices.  But the jury doesn't go back and say life or
15 death, okay?  First part of the trial you hear about, well, can
16 they prove it beyond a reasonable doubt this defendant did the
17 crime?  Jury finds him guilty.  We go on to the second part.
18 Jury finds him not guilty, that's the end of the case.
19          But if we go to the second part, you answer
20 questions.  Okay.  Here's the first question, if you look over
21 here.  "Is there a probability that the defendant would commit
22 criminal acts of violence that would constitute a continuing
23 threat to society?"  Well what does that mean?  Well, is he
24 probably gonna do violence to others in the future.  That's
25 that question.  And the jury would answer that yes or no, okay?

1   A.   Yes.

2   Q.   And then answer Question 2. "After taking

3   consideration of all of the evidence, including the

4   circumstances of the offense --" what's that?  That's the first

5   part of the trial, guilt or innocence phase.  "-- the

6   defendant's character --"  Okay, well, what's that?  What kind

7   of guy is he?  Is he an honest person?  Is he a good guy?

8   Other than this occasion, has he been a good person during his

9   life?  His background.  What's that?  Well, maybe his

10  childhood.  Maybe he was abused as a child.  Maybe he came from

11  a great upbringing, okay?

12  A.   Okay.  This second one is his character and his

13  background before the alleged --

14  Q.   No, it's his character and background -- it could be

15  up to now.  It could be up to now.  His whole life, okay?

16  A.   Okay.

17  Q.   And see, the second part -- the first part, all

18  you're gonna hear about is the crime itself.  And they're gonna

19  try and prove that he did it.  Maybe they can; maybe they

20  can't, all right?  The second part's different.  The second

21  part you hear about everything in his life.  It can be -- it

22  can be his character now.  It can be his character before the

23  crime, his whole life, okay?

24  A.   Yes.

25  Q.   And his background, same thing.  Maybe, you know, you

1   hear about he was in the military or maybe you hear, you know,

2   he did well in school.  He was an Eagle Scout, you know, stuff

3   like that.

4   A.   Okay.

5   Q.   "And the personal moral culpability of the

6   defendant."  Okay.  That's a handful, right?  That's a little

7   wordy.  Legalese is what I call that.  Okay.  Well, let's talk

8   about that.  Let me see if I can give you an example to make

9   you understand what this is talking about.  Two burglars -- I

10  mean, yeah, two burglars, okay, they both break into a house.

11  Burglar one -- they're both found guilty, okay?  Burglar one,

12  what was his motive?  Well, he broke in because he likes to

13  party with hookers and use cocaine, all right?  So he breaks

14  into this house, and he just trashes the place, takes

15  everything of value, their TVs, VCR, video game, jewelry,

16  everything.  And then just tears the place up, breaks down the

17  door to get in.  And then he goes, and he sells all the stuff

18  and blows it all on hookers and cocaine.  They finally catch

19  him.  Then you find out he's been to prison twice before, okay?

20          Second guy, worked at the same job 20 years,

21  lost his job because they laid him off, can't feed his kids.

22  The children haven't eaten for three days.  He hasn't either.

23  But he goes into an unopened door -- an unlocked door, and he

24  steals food; doesn't even eat the food, just gives it all to

25  the kids because they're starving, all right?  Both guilty of

1   burglary, right?

2   A.   Yeah.

3   Q.   But is their personal, moral culpability the same?

4   A.   No.

5   Q.   Not at all.  One is driven for self, very selfish

6   reasons, right?

7   A.   Right.

8   Q.   Not even good selfish reasons.  And the other one is

9   driven by the need to help his kids.

10  A.   Right.

11  Q.   All right?

12  A.   Yes.

13  Q.   That's what that question's about -- I mean, that

14  part of the question's about, okay?  You need to take into

15  consideration -- it's sort of like, you know, how guilty is he.

16  Does that make sense?  With that question, it makes sense,

17  right?  What are his motivations?  You're looking at me with a

18  blank look.

19  A.   You're trying to tell me how much bad and how much

20  good.

21  Q.   Well, that's what you got to consider.  See that's

22  exactly what you got to consider, okay?  You got to consider

23  everything.  Those two people, those two burglars, you wouldn't

24  punish them the same, would you?

25  A.   No.

1   Q.   No, not at all.  And that's what it's saying.

2   A.   That's what it says.

3   Q.   Then, "Is there a sufficient mitigating circumstance

4   or circumstances that warrant a sentence of life imprisonment

5   rather than a death sentence be imposed?"  Mitigating

6   circumstances, mitigating meaning to lessen, okay?  Lessening

7   circumstances.  Maybe you find out that he was a war hero in

8   Desert Storm, and he saved 20 soldiers risking his own life,

9   and he got a Bronze Star, maybe even a Congressional Medal of

10  Honor.  Would that be a mitigating circumstance?  It might be.

11  It might be.  Only the jury can decide what a mitigating

12  circumstance is.  These lawyers will suggest to you what they

13  think it will be, but only the jury decides.  And you may

14  decide, well, he was a war hero.  I think that's a mitigating

15  circumstance.  Is it an excuse for the crime?  No.  We found

16  him guilty, and he's going to be punished.  But is it a

17  mitigating circumstance?  You might say, yes, it is.  Okay?

18  A.   Yes.

19  Q.   Maybe you say it's not.  All right.  That's up to the

20  jury.

21          So the jury decides take in everything.  Maybe

22  there's bad stuff about him.  Take that in, too, okay?  And

23  then you decide is there sufficient mitigating circumstances to

24  warrant life or death because you may say that's a mitigating

25  circumstance, that fact that he was a war hero, the fact that

41

1    he was an Eagle Scout, the fact that he was just a good guy in
2    the community, but it's not sufficient to warrant life rather
3    than death, okay?  Or maybe it is.  But the jury has to answer
4    this question yes or no.  This is just taking everything that
5    you're presented, everything, and process it.  Do you follow
6    me?
7        A.   I follow you.
8        Q.   Okay.  Now, the beginning of every trial I ask the
9    jury to take an oath.  Do you solemnly swear that you will
10   render a true verdict based upon what, the law, and the
11   evidence as given to you.  And they say yes.  Some people
12   when -- and the reason I'm telling you this is because I want
13   to know if you can take this oath in this case.  Now, before
14   you answer, some people say, "I cannot because I cannot
15   participate in a process that may lead to someone's death."
16   Others will say, "If I find him guilty, this law means nothing
17   to me, I'm not considering it, I'm gonna answer these questions
18   in a way that he will get the death penalty, and I don't care
19   what your evidence is.  I will not consider it."
20            Neither of those people can take that oath,
21   okay, because they're not following the law.
22       A.   Yeah.
23       Q.   I need to know if you can take the oath.  And if you
24   can't, it's really okay.  We'll get somebody else.  But if you
25   can, I need to know that too?

42

1        A.   I'll follow the law to the T.
2        Q.   All right.  Mr. Skurka.
3            MR. SCHIMMEL:  May I proceed, Your Honor?
4            THE COURT:  Sure.  Mr. Schimmel.
5                VOIR DIRE EXAMINATION
6    BY MR. SCHIMMEL:
7        Q.   Mr. Lopez, my name is George Schimmel.  I'm one of
8    the prosecutors in here.  This is Mark Skurka.
9        A.   Hi.
10       Q.   I just want to ask you a couple of questions and go
11   over some of the stuff the judge talked about with you about,
12   kind of see how you feel about this stuff.  What I want to make
13   sure that you get right now is that it really doesn't matter
14   what you say.  There's not a right answer or wrong answer.
15   We're just kind of trying to figure out how you feel about some
16   of this stuff.  This is the one chance we get to ask these
17   questions.  If you do get selected to be on the jury and
18   something comes up, I'm not allowed to talk to you about what's
19   coming.  So no right or wrong answers, so I just want to go
20   over some stuff.
21            The first issue is, you've been on a jury
22   before, haven't you?
23       A.   No.
24       Q.   Never, ever?
25       A.   Never.

43

1        Q.   Okay.  How did you feel when you came to the
2    courthouse and you found out that -- what kind of case this
3    was?  It was a death penalty case, and you saw all the people?
4        A.   I just took it as a regular -- another doing my duty
5    like I'm supposed to.  It's call in for jury duty, death,
6    whatever, that's my duty to do it.
7        Q.   So it could have been a traffic ticket case --
8        A.   It could have been whatever, but the thing is I got
9    called and I'm doing my duty.
10       Q.   Okay.  What would it -- how would it make you feel to
11   end up being on a jury where you had to make that kind of
12   decision?
13       A.   I've made them before.  I made them when I was 18
14   years old.
15       Q.   Yeah, I saw that in your questionnaire.  You said you
16   made a lot of life or death calls?
17       A.   Yes.
18            THE COURT:  You were in Vietnam?
19            VENIREPERSON NO. 87:  Yes.
20       Q.   (By Mr. Schimmel)  You were in the Army?
21       A.   Yes.
22       Q.   From '62 to '70?
23       A.   To '70.
24       Q.   What kind of stuff did you have to do that you had to
25   make life or death calls there?

44

1        A.   When I was in Nam, I took over my platoon, 18 years
2    old.  I had a 12-man squad.  I had to send them out LPs, OPs,
3    bushes, ambushes, you know, search and seizure, destroy.  We
4    fought for three nights and two days.  You know, those are my
5    people.  I had to take care of them.  When I made a decision,
6    it was either life or death.  When I sent them out there to do
7    their duty, just like I do it.  If they do their duty, I do my
8    duty.  And I just don't stay behind and send them out to do
9    whatever they have to do.  I do it with them.  That's why I'm
10   saying, I'm here to do my duty, and I do my duty.  That's what
11   is called for.
12       Q.   Okay.  So it doesn't sound like you'd have a huge
13   problem being a juror in this kind of case?
14       A.   I don't.
15       Q.   Now, you were asking the judge some questions earlier
16   about whether all this stuff has to do with the word attempt or
17   something.  I want to go over with you what a capital murder
18   is.  The judge did.  I want to get through a little bit also.
19   It's a murder that's a different kind of murder.  I mean, you
20   might have a case where a guy chops up his wife, and he puts
21   her in a suitcase, and he mails her pieces of her body to Cuba,
22   right?  And that's nothing but a murder, just a plain and
23   simple murder.  And it might surprise you -- because that
24   sounds like a pretty bad murder, but that guy whoever did it,
25   couldn't get the death penalty.  But some murders are

45

```
1    different.  If you kill a child under the age of six, if you
2    kill a police officer while he's doing his police officer job,
3    or if you murder somebody while you're robbing them or, I
4    guess, burglarizing them or something like that.  Those cases
5    are different and they become the -- the law says they're
6    capital cases.  In those cases the death penalty can be
7    something that the State seeks.  So it's not really about -- I
8    mean, the only issue is whether or not -- I guess you're okay
9    with that law.  It sounds like you are.  But we're not really
10   trying to prove an attempt or not an attempt or anything.  The
11   only issue is it's a murder, and then it has this thing added
12   on to it.  It's a murder plus a robbery, or murder plus a rape,
13   or murder plus --
14        A.    I understand what you're saying.  The thing is, see,
15   I already know what the judge explained to me.
16        Q.    Yeah.
17        A.    I know exactly what he said.  But see, now I'm
18   hearing it from you, you're trying to implement me with the
19   death capital murder and all this stuff, you know, and I
20   already heard it from him, and you're telling me the same thing
21   he's telling me.  It's like if I go get picked for the jury,
22   that's what I'm gonna have in my mind, you know.  I don't need
23   to hear that whatever you're explaining again, the death
24   penalty and the criminal and the robbery and all this other
25   stuff.  Capital murder is capital murder, and I understand it.
```

46

```
1    But he explained it to me, you explained it to me, and if I get
2    picked, if I get picked, I'm going in there or I'm coming in
3    here, and I'm already seeing capital murder, capital murder,
4    capital murder.  You know, how many times do you have to
5    explain it to me?  I understand what it is.
6        Q.    Mr. Lopez, I'm sorry.  I didn't -- I'm not trying to
7    talk at you or anything, but it's just that I heard you ask a
8    question to the judge, and I didn't know if you wanted to ask
9    me that question also.  I was just giving you a chance to do
10   that if you wanted to.  I'm sure you can understand all this.
11   I think you can.  I just wanted to cover some of this in case
12   you had a question for me about it.  That's all.
13        A.    No, I don't.
14        Q.    Okay.  Well, let's talk about the way that the trial
15   works then.  What happens first is that there's the guilt and
16   innocence part of the trial.  Just like any trial in this
17   country, a jury decides on whether or not somebody's guilty or
18   not guilty.  But where it changes in this kind of case is that
19   after that, normally juries would decide a punishment in the
20   case.  You have the guilty part of the trial, the
21   guilt/innocence, and then you'd have punishment.  And then a
22   jury would kind of pick maybe a number they thought was
23   appropriate or probation or something like that.  But this case
24   is different.  And the only issue really, after the guilty
25   verdict, is life or death.  That's it.  And the way that a jury
```

47

```
1    decides life or death -- and I don't want to waste your time
2    and go over this stuff the judge already went over with you,
3    but it's those two things right behind you.  You answer those
4    special issues.  And there are a couple of things I want to
5    cover with you on that one over your left shoulder, Special
6    Issue No. 1.  I just want to go over some of the things it says
7    that other jurors have had problems with.
8             It says, "Is there a probability that the
9    defendant would commit criminal acts of violence that would
10   constitute a continuing threat to society?"  Okay.  It says, is
11   there a probability?  Probability.  It doesn't say, Mr. Lopez,
12   are you positive that he's gonna go out and do something bad
13   again.  It doesn't say that.  It says probability.  What does a
14   probability mean to you?
15        A.    That maybe or maybe not.
16        Q.    Exactly.  It's like -- it's like 51 percent versus 49
17   percent.  Not exactly 50/50, maybe a little better than 50/50.
18   Okay.  Do you know why it doesn't say is there a certainty that
19   he would go out and do bad stuff?
20        A.    Why?
21        Q.    Uh-huh.
22        A.    You don't know the person in the first place.
23        Q.    That's exactly right, because there's no possible way
24   that anybody could know that, but God.  You don't have a
25   crystal ball.  You just don't know.
```

48

```
1             Next, it says criminal acts of violence.  A lot
2    of jurors get hung up on the idea that that criminal act of
3    violence has to be another murder or another rape or another
4    robbery or something like that.  And it's true that those are
5    all criminal acts of violence, but it doesn't have to be that
6    way.  You might think he's gonna go out and commit an assault,
7    and that's a criminal act of violence, right?
8        A.    Right.
9        Q.    So I just don't want you to think going into this
10   that in order to consider this, you have to say, oh, yes, he's
11   gonna go out again, and he's gonna commit another murder.
12   That's not what the law says.
13            And the last thing is that part of the bottom
14   where it says you think he might be a continuing threat to
15   society, okay.  Sometimes people say, "Well, hey, man, if this
16   guy's locked up, how can he be a threat to society because
17   you've locked him up, you stuck him in a hole.  How is he gonna
18   get out and hurt somebody, right?"  I mean, a lot of people say
19   that.  But here's what we say when they ask us that question.
20   Who else is in a prison with prisoners?
21        A.    Same prisoners.
22        Q.    Well, okay, prisoners, yeah.  What about the people
23   who take care of them?
24        A.    Yeah, the guards, yeah.
25        Q.    The guards.  What about the people that feed them?
```

49

1    A.    Yeah.

2    Q.    And nurses, and maybe even like a warden, people like

3    that, chaplains who show up.  The point is that just because

4    you put somebody in prison, it might change a lot of your

5    social obligations.  It might change, you know, the normal

6    society you hang out in, but it still is like a society.  So

7    just because you get put in prison, it doesn't mean you can

8    never hurt anybody.

9    A.    Of course not.  You can even hurt yourself so, you

10   know, I understand where you're coming from.  I understand

11   every bit that you're telling me.

12   Q.    Okay.

13   A.    There's a lot of risk, whether he's free or whether

14   he's not free.  Whether he's in prison, he's still, you know --

15   there's a lot of ifs, buts, and ands.

16   Q.    Okay.  The other thing, if you read that question and

17   you decide, yes, I think that -- I think the defendant is going

18   to -- there's a probability he's going to commit these future

19   acts of violence.

20         At that point then you go to that one, the

21   Special Issue No. 2.  And basically it's just saying, you

22   consider all the evidence.  You consider -- you consider the

23   offense, which you've already heard about.  You consider

24   character and background, what you talked to the judge about,

25   and you consider moral culpability.  You consider all that

50

1    stuff.  And then you ask yourself, is there something that

2    mitigates all that?  Is there a sufficient mitigating

3    circumstance that would tell me that I should do life instead

4    of death?  All that's saying is, is there something that would

5    lessen the punishment?  That's it.  They're -- they're strange

6    words to you.  I don't know why they have to use those

7    particular words because they don't make anybody except lawyers

8    honestly, but is there something that would lessen the

9    punishment?  That's it.  Even if you hear from somebody who

10   said, "Oh, yeah, this guy helped me walk across the street

11   every morning," you know, that could be a mitigating

12   circumstance for you.  It could be, or it could not be, just

13   like the judge said.  The only issue at this point is whether

14   you can say, yes, I'm willing to consider -- I'm willing to

15   listen to possible mitigating circumstances.  That's it.  You

16   don't have to promise us what they're gonna be, anything like

17   that.  You just have to say, yes, my mind's open to all those

18   things.  And, I mean, I think you've already said that, and you

19   can say that, right?

20   A.    Of course.

21   Q.    Now, there are a couple of things I'd like to go over

22   with you, too, just sort of legal things.  One of them has to

23   do with the indictment.  Are you familiar with how that process

24   works?

25   A.    No.

51

1    Q.    Okay.  What happens is that after an arrest, a case

2    is presented to a grand jury, all they do is decide whether or

3    not there's enough evidence to charge somebody.  The cops have

4    probable cause.  Was the cop wrong in doing this?  Is he okay

5    to, you know, arrest this person?  And if the jury says, yes,

6    he's okay to arrest that person, he gets indicted, just like

7    that.  So it's not -- it's not evidence of guilt because it's a

8    different standard of proof.  It's like way down here and the

9    beyond the doubt stuff is way up here.  So I just don't want

10   you to hold it against him that he's gotten indicted because

11   that's not fair.

12   A.    Well, you can't do that, not at that stage.  Geez.

13   Q.    Well, I mean, at all during the whole trial because

14   all that's happened is that a grand jury said I think a cop had

15   enough information to file charges.  That's it.

16         Another issue is -- it's the Fifth Amendment,

17   but what it means is that he don't have to testify.  Now, a lot

18   of people say, "Oh, I'd like to hear both sides of the story.

19   I need to hear both sides of the story," and stuff like that.

20   I think that's a natural response.  If anybody told you a joke

21   and then walked away before they told you the punch line, you'd

22   wonder what was wrong with them and you'd want to know what was

23   coming, right?  But this is really different.  Here, the law

24   says -- the Constitution actually says that you can't even

25   consider the fact that the defendant doesn't testify.  You

52

1    can't even talk about it.  You're not supposed to think about

2    it.  I'm not sure the law can tell you what to think about, but

3    you're not supposed to comment on it, and you're not --

4    specifically, you're not supposed to consider it as a

5    circumstance against him because a person can decide not to

6    testify for a million reasons.  He might be -- he might be

7    scared of you.  He might think -- he might be intimidated by a

8    jury.  He might get nervous.  He might stammer.  He might

9    sweat.  He might do something that his lawyers thought would

10   make him look guilty, and then, even if it's not he shouldn't

11   testify.  So there are a lot of reasons why you can't consider

12   that against him.  And you can't actually even be a juror

13   unless you can basically promise us that you won't hold that

14   against him.

15   A.    I understand if -- if even by advice of his lawyers

16   not to testify, hey, that's the way it goes.

17   Q.    That's the way it goes.  And that's not something

18   you're gonna think about or worry about --

19   A.    Of course not.

20   Q.    Okay.  That's great.

21         Another issue -- the judge talked to you about

22   this a little bit -- I want to cover just really quickly is the

23   idea of beyond a reasonable doubt.  Now, you said somewhere in

24   your questionnaire when we asked you what the number one

25   argument for or against the death penalty, you wrote "proof

53

1 beyond doubt." And that's pretty much right. But we sometimes
2 get a little nervous about that because really the standard is
3 beyond a reasonable doubt. And it used to be that I was
4 allowed to come up and to read you a definition of what that
5 meant, and we'd all be happy, you know, we'd be done. But the
6 law changed, and I can't actually even really tell you what it
7 means. I mean, used to be that I could just define it and now
8 I can't. But basically beyond -- when you ask yourself about
9 beyond a reasonable doubt, you're asking yourself two
10 questions. You hear all the evidence, and you say to yourself,
11 do I have a doubt? Do I have a doubt about whether this person
12 did what they're saying he did? Do I have a doubt? If the
13 answer is no, well, that's it. You vote guilty, and you're
14 done.
15         Maybe you say though, yeah, I have a doubt.
16 Then you ask yourself if you do have a doubt, whether you have
17 a reason for the doubt. And it's got to be a reason based on
18 the evidence. Some people sometimes will say, Well, you know,
19 he's so young and his mom probably loves him, and I have a
20 doubt. That's not the same thing as a reasonable doubt because
21 that doubt wouldn't be based on the evidence. You see? That
22 doubt would just be based on someone feeling sorry for
23 somebody.
24     A.   That's based on your heart and emotions on that one.
25     Q.   Right. Right. And that's not what it's supposed to

54

1 be. The doubt's supposed to be based on the evidence that you
2 hear, and it's supposed to go toward an element of the offense.
3 In other words, it's a doubt that makes you think maybe he
4 didn't actually do it.
5         If you -- if you do have a doubt, but it's not a
6 doubt based on the evidence, then you can still convict him?
7     A.   Yeah, well, the doubt is there until all the evidence
8 on both sides is presented. Then you -- then you can, I guess,
9 take it from there and see where it leads, I guess.
10     Q.   That's mostly true. There's something I want to go
11 over -- another thing I want to talk to you about, sort of
12 along those lines. It's -- I think you're gonna hear about it
13 from the other side also, but it's called the presumption of
14 innocence. You've heard that before, right?
15     A.   Yes.
16     Q.   Okay. What that means is that a defendant is
17 presumed innocent during the trial. And as he sits here right
18 now, he's just a guy sitting here right now. He's not somebody
19 whose gonna get convicted, anything like that. He's innocent
20 until he's proven guilty. All right? He's presumed innocent.
21         It's sort of like a force field or like a bubble
22 around somebody, and if you hear evidence from the evidence
23 chair, the witness stand right there, and that evidence makes
24 you think that he's not innocent anymore, well, that bubble
25 just got popped. It's not something that you have to keep up

55

1 during the whole trial even after you think that he's guilty.
2 It's a presumption, but it's a presumption that can be
3 destroyed as soon as you hear evidence that convinces you
4 otherwise. Does that make sense?
5     A.   It makes sense to a certain point, but, you know,
6 that's -- that only comes if you only hear one side, but see,
7 you got two sides here, and that decision is not gonna be made
8 until you're in that room, and then you go over everything
9 that's done.
10     Q.   That's true.
11     A.   Everything.
12     Q.   That's true, but you know, like I was saying earlier
13 though, it's sort of like you're in a joke without a punch
14 line. You might not hear from the other side. I mean, a
15 defendant doesn't actually have to testify.
16     A.   No, I'm not talking about defendant. I'm talking
17 about the people representing him. Those are the ones that are
18 gonna speak for him. Those are the ones gonna say, hey, you
19 want to take the stand, take the stand. If you don't want to
20 take the stand, don't take the stand. Those are the ones that
21 advise him. Those are the defense attorneys. Those are the
22 ones that are gonna present the evidence that goes for him, and
23 you're gonna present the evidence that goes against him.
24     Q.   And if they want to do that, they can do that. I
25 mean, it's their right to do that. But it might be the defense

56

1 thinks, "Well, gosh, State, you know, the burden of proof here
2 is beyond a reasonable doubt, and we think that you didn't make
3 your burden. We think that you only got half the way there
4 instead of all the way there, so we're not gonna put on
5 evidence at all." And that's their right. So what that means
6 then at that point is you would have heard all the evidence
7 from the State, you would have heard nothing from the defense,
8 because they don't have to tell you anything, and because they
9 think that we haven't done our job, and then you go back and
10 then you deliberate. So you don't get to say, well, let's
11 consider the State versus the defense. You don't get to do
12 that. All you get to do is consider the State's evidence and
13 say is that enough?
14         THE COURT: Unless, of course, they do present
15 some evidence. Then you can consider it, whatever they
16 present.
17         MR. SCHIMMEL: Right.
18     A.   But you're gonna have 12 minds in there. It's not
19 just one.
20     Q.   (BY MR. SCHIMMEL) It's just -- I don't want you to
21 hold it against the defense if they don't put on evidence
22 because they don't have to. The law says they don't have to.
23 They're not required to. And in some cases, they don't want
24 to, I mean, because they think we haven't done our job.
25     A.   Okay.

57

1    Q.    Okay.

2    A.    Okay.

3    Q.    So this presumption of innocence stuff, just going

4    back to it, the only thing I was talking to you about that was

5    just that I don't want you to think that the presumption of

6    innocence is something that's there forever and ever and ever.

7    As soon as you hear evidence that would overcome it or destroy

8    it or undo it, that's enough.

9         Okay.  I want to talk to you just for a second

10   about some of the stuff that you wrote in your questionnaire

11   too.  Do you really have seven kids?

12   A.    Yes.

13   Q.    And you said that one of your favorite things to do

14   is hunt and fish and hang out with your grand kids?

15   A.    Yeah.

16   Q.    How many grand kids do you have?

17   A.    I have 12.

18   Q.    That's a lot of grand kids.  It probably gets pretty

19   expensive around Christmas time.

20   A.    I just finished taking care of my newborn.  I took

21   care of him from day one to about a year.  That's what I did

22   when I retired, took care of him while his mother went back to

23   work.  In fact, he grew up with me, so, you know, he calls me

24   daddy, you know; but he's got his daddy.  I take care of him.

25   That's what I was here for.  I guess that's why I was spared in

58

1    Nam while running in that jungle out there, you know.  Seven

2    kids are all mine.  And no, no two wives, no three wives, or

3    four wives.  It's just me and my wife.  We had seven kids.  A

4    lot of people say, "You got seven?  How many wives you got?"  I

5    only got one.

6    Q.    And you -- you worked at CCAD, right?

7    A.    Yeah.

8    Q.    And you worked there for --

9    A.    Thirty-six years, seven months and 14 days.

10        MR. SKURKA:  How many hours?  I'm just teasing

11   you.

12   A.    I don't know.

13   Q.    (BY MR. SCHIMMEL)  Was it a pretty good job?

14   A.    It was a great job.  I did my job.  I mean, I know a

15   lot of people say this and that, but I did my job because I did

16   it for the soldier in the field.  That's what we're there for.

17   A lot of people don't understand that that's what the job is

18   for, see.  And now, you got a lot of people in there saying,

19   you know, the war is bad, and, you know, we should get out.  I

20   say what are you doing here.  This is a war machine, this is --

21   this is for the soldier in the field so they can fight, you

22   know.  If that's your feeling, you shouldn't even be in here,

23   you know.

24   Q.    What did you do there?

25   A.    I used to be a bearing worker.  I used to clean

59

1    bearings for the choppers --

2    Q.    Oh, okay.

3    A.    -- and fixed wing and rotary.

4    Q.    Like taking them out and repacking them and stuff?

5    A.    No, no.  We used to rework them, everything, inspect

6    them.

7         THE COURT:  You rebuilt the whole thing,

8    right?

9         VENIREPERSON NO. 87.  Rebuild, yeah.

10   Q.    (By Mr. Schimmel)  And is that what you did for 36

11   years?

12   A.    Thirty-six years, yeah.

13   Q.    A long time.  I've got one more question to ask you

14   about.  You wrote somewhere that I think that you would

15   probably tend to believe police officers a little bit more than

16   the average person?

17   A.    Well, see, that comes from -- that comes from a

18   background, from my fathers, you know, where they say, you

19   know, the police officer is there to do his job and you, know,

20   tell the truth, and that's how I was brought up, you know.

21   And, you know, the bad guy is the bad guy, and the good guy is

22   the good guy.

23   Q.    I understand, Mr. Lopez.  I want to let you know the

24   law says you pretty much have to consider a police officer as a

25   witness.  You can't give him more credibility just because he's

60

1    a cop.  Maybe you can give him more credibility because of his

2    training or experience or something, but you can't just say,

3    well, I believe cops just because they have --

4    A.    Maybe it's just how he words -- how he puts his words

5    into, you know, describing what happened or what not happened,

6    you know, but overall.

7    Q.    But you can promise to consider a police officer

8    witness just like any other witness?

9    A.    Of course.

10   Q.    Okay.  I think that's all I have for you.  Do you

11   have any questions for me?

12   A.    No.  I think we explained that's supposed to be done,

13   I guess.

14   Q.    I think you're right.

15   A.    There's no if, buts and ands.  Like I told you, I'm

16   here to do a job, I'm here to do a duty to the best of my

17   ability.  If that's not enough, then I don't know what else can

18   be done.

19        MR. SCHIMMEL:  Well, thank you, sir.  We

20   appreciate your service.  I'll let the defense talk to you

21   now.

22        MR. JONES:  Can we have a preliminary hearing,

23   please?

24        THE COURT:  Yeah.  Can you wait in the jury

25   room, Mr. Lopez?

61

1      VENIREPERSON NO. 87:  Sure.

2           (Venireperson exits the courtroom.)

3      MR. GARZA:  Judge, we're gonna go ahead and

4  exercise a peremptory strike.

5      THE COURT:  Is that No. 10?  Looks like it.

6      MR. GARZA:  I've been around guys like that

7  for a long time.  So has Mr. Jones.  Believe me, he -- he

8  makes fast decisions.

9           (Venireperson enters courtroom.)

10     THE COURT:  All right.  Mr. Lopez, we

11  appreciate your service.  You were not selected to be on this

12  jury, but we do appreciate you coming down here.  It's people

13  like you that keep this thing going.

14     VENIREPERSON NO. 87:  That's fine.  Thank you,

15  sir.

16          (Venireperson exits courtroom.)

17     THE COURT:  All right.  Let's see, are we

18  ready for the next one?

19     MR. JONES:  What number --

20     MR. GARZA:  Can we take a little break?

21     THE COURT:  That was peremptory 10.

22     MR. GARZA:  You're gonna give us at least a

23  couple of extra or no?  Just kidding.  We'll be here forever.

24          (Recess.)

25     THE COURT:  Let's get Evelyn Reyes.

62

1           VENIREPERSON NO. 88,

2           EVELYN REYES,

3           VOIR DIRE EXAMINATION

4  BY THE COURT:

5      Q.   Hi, you are Evelyn Reyes; is that right?

6      A.   Yes, sir.

7      Q.   All right.  Well, obviously, you know we're looking

8  to pick a capital murder jury, okay?  And we are looking for

9  people who can keep an open mind.  Is that you?

10     A.   Yes.

11     Q.   Okay.  Because some people can't, and that's okay

12  too.  We need to know if you can follow the law also.  We're

13  gonna talk about that.  You've never been on a jury before.

14  That's okay.

15     A.   First time.

16     Q.   No experience necessary.

17          Okay.  Now, this is a criminal case.  What that

18  means is the State's got the burden of proof.  The law says you

19  bring the charges; you prove them, okay?  Do you follow me?

20     A.   Uh-huh.

21     Q.   The law says if that's the case, then the defendant

22  is innocent until proven guilty.  And that's really everybody.

23  We're all innocent until the State can prove otherwise, okay?

24  Do you follow that?

25     A.   Uh-huh.

63

1      Q.   Do you agree with that?

2      A.   Yes, sir.

3      Q.   All right.  Now, the burden of proof is beyond a

4  reasonable doubt.  And what's that?  Well, there's no

5  definition.  But I'm gonna tell you what it is by defining what

6  it's not, okay?  If this was a civil case, the burden of proof

7  would be preponderance of the evidence, like maybe a contract

8  case or something?

9      A.   Uh-huh.

10     Q.   All right.  That's kind of like if you can imagine

11  the scales of justice tipping it just ever so slightly, maybe

12  51 percent, if you will.  Higher burden than that is clear and

13  convincing, okay?  Clear and convincing evidence is the kind of

14  evidence they use in some civil cases and in some special

15  circumstances.  But, most notably, let's say the State's trying

16  to take away someone's parental rights because they think

17  they're bad parents.  That's the burden they use, clear and

18  convincing.  That sounds like strong stuff; you'd agree, right?

19     A.   Uh-huh.

20     Q.   That's just not willy-nilly evidence.  That's strong

21  stuff.  Well, this burden's higher than that, beyond a

22  reasonable doubt.  I've told you what it's higher than.  Let me

23  tell you what it's less than.  It's not beyond all doubt, okay,

24  because if it was -- the only way it could be beyond all doubt

25  is if you saw it, right?

64

1      A.   Right.

2      Q.   If you saw the alleged incident, then you would know

3  beyond all doubt one way or the other, right?

4      A.   Yeah.

5      Q.   But it's not that, okay, because you'd have to be a

6  witness instead of a juror.

7           The key word is beyond a reasonable doubt --

8  reasonable, okay?  All right.  Next thing.  Can you follow

9  that?

10     A.   Uh-huh.

11     Q.   And can you hold them to that burden?

12     A.   Uh-huh.

13          THE REPORTER:  Can you say yes or no, please.

14     Q.   (By the Court)  Yeah, you've got to say yes or no

15  because she's taking it down in, and uh-huh doesn't come out

16  too good.  Okay.

17          Now, as part of that, the Constitution of the

18  United States says, look, the defense has no burden.  And if

19  the defense has no burden, the defendant doesn't have to

20  testify, okay?  Maybe -- and I think there's lots of reasons

21  why that may be true.  Maybe his lawyers tell him not to.

22  Maybe they say, "Hey, look, maybe they haven't proven their

23  case.  In our professional opinion, we don't think that it's

24  proven their case."  And maybe he gets nervous in front of

25  people and just his lawyers think you're just gonna come across

65

1   wrong even if you're not guilty.  You're just -- some people
2   just don't do well in front of crowds.  You agree with me
3   there, right?
4       A.   Yes.
5       Q.   Okay.  I mean, some people do; some people don't.
6   Some of us get a lot of practice at it; some of us don't.
7           All right.  My question is, though -- well, let
8   me tell you this.  The law says, it's even more than the fact
9   that he doesn't have to or can't be made to testify.  It's more
10  than that.  The jury that's selected can't hold it against him.
11  All right.  So I need to know from you, would you hold it
12  against him if he chooses not to testify?
13      A.   No.
14      Q.   Some people say they would.  They say, "Well, I got
15  to hear both sides of the story before I could make a
16  decision."  It's not really like that.  It's not a race to the
17  finish line here.  The only race is to determine whether the
18  State can cross the line of proof beyond a reasonable doubt.
19  That's the only race that's going on here.  All right?
20          Now, this is a capital murder case.  And what
21  does that mean?  Well, it's obviously murder, right?  That's
22  the allegation is murder because it's in the -- it's in the
23  word capital murder.  And what's that?  The intentional taking
24  of the life of another.  All right.  And the capital part means
25  the death penalty is a possibility.  The legislature has given

66

1   us a laundry list of situations, all of them involving murder,
2   that murder plus something else gives you the capital murder,
3   okay?  It's murder plus.  In this case, murder plus robbery or
4   attempted robbery.  Well, what's that?  Well, robbery is the
5   forcible taking of property of another through either force or
6   threats of force.  So if I came and held a gun to you and I
7   said, "Give me your purse," and you give me your purse, that's
8   a robbery, right?  Okay.  Are you following me?
9       A.   Yes, uh-huh.
10      Q.   Attempted robbery; what's that?  Well, let's say I
11  came and held a gun to your head -- not to your head, but
12  pointed it at you, and you took your purse and you hit me on
13  top of the head with it.  And then you happened to have a
14  bowling ball in there, and you knocked me out, okay?  I would
15  not be guilty of robbery, but I would be guilty of attempted
16  robbery.  The State in this case must prove -- the allegation
17  is that this defendant committed a murder while committing a
18  robbery or an attempted robbery.  Two major crimes together is
19  what gets us to capital murder, okay?  Are you following me?
20      A.   Yes.
21      Q.   Okay.  But they don't have to prove robbery.  They
22  can prove attempted, okay?  There's a lot of elements to that
23  because you've got two crimes here, okay?  But would you hold
24  them to their burden proving all the elements of the crime
25  before you found the defendant guilty?

67

1       A.   Huh?
2       Q.   In other words, there's a lot of elements.  Elements
3   are the things that make up the crime like, you know, this
4   defendant on this given day in Nueces County, Texas, while in
5   the course of committing robbery.  And, of course, robbery has
6   those elements, commits a homicide, okay?  The law says they
7   got to prove everything.  They don't get to prove eight out of
8   nine or nine out of ten, how many there are.  They got to run
9   the table.  Would you require them to do that?
10      A.   Yes.
11      Q.   Okay.  Now, trials in Texas work like this.  It's a
12  bifurcated system.  What does that mean?  Well, that means
13  there's two parts.  Part one, guilt or innocence.  The jury
14  that's selected will determine whether the State can prove this
15  defendant is guilty of capital murder.  The jury goes back to
16  deliberate.  If they find him guilty, we go to the second
17  phase.  If they find him not guilty, we stop, okay?  Not
18  guilty; case is over.  But if there is a guilty finding, we go
19  on to part 2 and that part 2 is the punishment phase, we call
20  it.
21          Now, also there's only two things that can
22  happen if you're found guilty in Texas of capital murder, that
23  is, life in prison and the death sentence.  Both serious deals,
24  okay?  But you don't say life or death.  You answer questions,
25  okay?  And here's the first one.  "Is there a probability that

68

1   the defendant would commit criminal acts of violence that would
2   constitute a continuing threat to society?"  Okay.  What does
3   that mean?  Well, is he probably gonna be violent with people
4   in the future, all right?  That's what that means.  And the
5   jury would answer that yes or no, okay?
6       A.   Okay.
7       Q.   All right.  Next question.  "After taking into
8   consideration all of the evidence, including the circumstances
9   of the offense" -- well, what's that?  That's the first part of
10  the trial, okay -- "the defendant's character and
11  background" -- All right, what's that?  Well background is
12  obviously how you grew up, right, your childhood, but it can be
13  background all the way up until this moment, all right?  And
14  then defendant's character.  Well, what kind of a guy is he?
15  You know, is he an honest person?  Other than this day, was he
16  a great guy?  Maybe -- I don't know, he's just -- you know,
17  he's always somebody you can count on, that kind of thing.
18          And the personal moral culpability of the
19  defendant.  Okay.  That's -- that's a little harder, you know,
20  to understand what that is.  Let me give you an example so you
21  understand this.  Two burglars, okay?  One breaks into a house
22  just trashes the place, pulls everything down, steals
23  everything of value, okay, TVs, VCRs, you know, the Wii game,
24  everything, jewelry, everything, okay?  And he sells it all,
25  and he gets his money and he spends it on cocaine and hookers,

69

1　okay?  And he -- that's his deal.

2　　　　　　　The second guy lost his job of 20 years.  His

3　children haven't eaten in a couple of days.  He goes into a

4　house, not for himself, but to feed the kids.  He takes food.

5　He's hungry himself, but he doesn't even eat the food.  He

6　gives it all to the kids so they can eat that day, all right?

7　Can you see how the personal moral culpability of those people

8　is different?

9　　　A.　Yes.

10　　Q.　That's what that question is about, okay?

11　　　　　　　"Is there a sufficient mitigating circumstance

12　or circumstances to warrant life imprisonment rather than a

13　death sentence be imposed?"  Okay.  What this question is

14　asking you to do is circumstances of the offense.  What kind of

15　guy is he?  His background, moral -- personal moral

16　culpability.  Take all this stuff into considering.  Everything

17　that's presented to you on the whole trial, not just the first

18　part, because the first part is just, you know, evidence about

19　whether he did it or not.  The second part, stuff about his

20　whole life, okay?  And then you digest it and you determine

21　whether there's sufficient mitigating circumstances to warrant

22　life.

23　　　　　　　What is sufficient mitigating circumstances?

24　Well, mitigate meaning to lessen circumstances.  For example,

25　let's say he was in Desert Storm, a war hero, and he saved 20

70

1　people's lives.  Okay, you might think that's a mitigating

2　circumstance.  Maybe he was an Eagle Scout.  Maybe he used to

3　teach little kids to read that just -- that otherwise would

4　never learn, okay?

5　　　　　　　You may think all of these things are sufficient

6　or mitigating circumstances, okay?  Is it an excuse for the

7　crime?  Well, no.  He's been found guilty, all right?  Not an

8　excuse for the crime, but it may be something that would

9　warrant you lessening the punishment, that is, giving him life

10　instead of death.  Do you follow me?

11　　　A.　Uh-huh, yes.

12　　　Q.　Okay.  Now, what a mitigating circumstance is --

13　these lawyers will suggest to you what they are -- only the

14　jury gets to decide.  One person may get to say, "Hey, I don't

15　think that's a mitigating circumstance at all that he saved

16　those guys in Iraq."  And the other one may say, "I think it

17　is."  But regardless, there can be mitigating circumstances,

18　but they may not be sufficient, may not be enough to warrant

19　life rather than death.  You may find that there are some.

20　That's not enough based upon the whole picture.  That's the

21　question you got to answer here, okay?  That's a yes or a no

22　answer that the jury would have to make, all right?

23　　　　　　　Now, at the beginning of every trial I ask the

24　juror to take an oath, and that is, "Do you solemnly swear you

25　will render a true verdict render based upon the law and

71

1　evidence presented to you."  Okay?  And the jury says yes.

2　　　A.　Yes.

3　　　Q.　But some people can't do that in this case because it

4　involves a death penalty.  They say I can't -- I can't do it

5　because I cannot participate in the process that could lead to

6　a death penalty potential.  Or, others would say, "If I find

7　him guilty, I don't care about your law.  I'm not gonna follow

8　your law.  I'm gonna answer these questions in such a way he

9　gets the death penalty every time if I find him guilty."

10　　　　　　　Neither of those people can take the oath

11　because they're not following the law; they're not being fair,

12　okay?  And if that's how they feel, that's okay.  It's just not

13　okay to get on the jury, all right?  So I need to know from you

14　whether you can follow that law or not?

15　　　A.　Yes, I can follow the law.

16　　　Q.　Okay.  All right.  Mr. Skurka.

17　　　　　　MR. SKURKA:  Thank you, Judge.

18　　　　　　　VOIR DIRE EXAMINATION

19　BY MR. SKURKA:

20　　　Q.　Hi, Ms. Reyes.  My name is Mark Skurka.  I'm an

21　assistant district attorney along with Geordie Schimmel, the

22　guy that's usually sitting here, but he's running an errand

23　right now.  We'll be the ones presenting this case to you if

24　you're selected on the jury.  I want to start off by telling

25　you there's no right or wrong answers to anything you say.

72

1　Sometimes people say, Well, I better answer it this way because

2　that's the way the judge wants to hear me say it, or the State

3　wants to hear me or the defense wants to hear me say it.  And I

4　tell them no.  You've never been on a jury before, right?

5　　　A.　No, sir.

6　　　Q.　And there's no problem with that.  You don't have to

7　have previous experience in here.  What you have to do though

8　is just tell us the truth about how you feel about some of

9　these issues and everything.  Some -- and there's nothing wrong

10　with saying, "Well, for this reason or that reason I feel this

11　way.  I may not be fair not to sit on this jury, or I may have

12　a problem sitting on this kind of jury."  You see what I'm

13　trying to say?  It's okay to say you can't sit on a jury just

14　as well as it's okay to say you can sit on a jury.

15　　　A.　Okay.

16　　　Q.　Okay?  But we don't know you at all so we don't know

17　where you're coming from or what your beliefs are.  All we have

18　is this little questionnaire to tell us some things, but

19　certainly it doesn't tell us everything, okay?

20　　　A.　Okay.

21　　　Q.　So let's start with some of the big issues that are

22　gonna come up in this case.  The first one, as you probably

23　know, is going to be the death penalty.  When you first heard

24　it was that kind of case -- remember that day when you came in,

25　there was 2, 300 people in there?  Did you have any idea what

73

1    kind of case it was going to be?

2         A.    No.

3         Q.    Until Judge Galvan came down and said, "Folks, this a

4    criminal case." And a lot of people go, oh, okay. And he

5    said, "And may have to decide whether the person gets the death

6    penalty." Tell me what your first reaction to that was,

7    Ms. Reyes?

8         A.    First reaction was my first time getting called on

9    jury and it's a capital murder case, kind of overwhelming, I

10   guess.

11        Q.    Why?

12        A.    Capital murder is a big deal.

13        Q.    Do you realize that when you get called for jury

14   duty, it doesn't really -- it's kind of the luck of the draw.

15   I don't want to say you won the lottery, but, you know, it's

16   kind of the luck of the draw. You know, sometimes jurors come

17   in and they're gonna be on a DWI case, sometimes they're going

18   to be on a shoplifting case, sometimes they're going to be on a

19   civil case, and then sometimes they may have to do a death

20   penalty case. I want to tell you that just because you've

21   never done one before doesn't mean that you can't do one. The

22   part that the jury plays in this case is the fact finder. You

23   have to decide what the facts are. I will tell you though that

24   some people feel -- and, you know, I saw them that day or --

25   because I watched some of the jurors. And when the judge said

74

1    it's a death penalty case, some people are -- you might have

2    noticed this around you -- people were like, "Oh, God," you

3    know. And then some people were saying like, "Well, okay, you

4    know, I guess I got to do my job." And some people were like

5    freaking out because they were thinking of something else.

6    Whichever way you feel is okay. I just kind of want to know if

7    that's how you feel, oh, my gosh --

8         A.    Yeah.

9         Q.    -- I can't do this kind of case. You were freaking

10   out a little bit?

11        A.    (Nodding head up and down.)

12        Q.    Is it because it was that type of a case?

13        A.    Yes.

14        Q.    Okay. Would you feel that because it's that kind of

15   case, it would be more comfortable for you to sit on a

16   different kind of case? Maybe that's not the word.

17   "Comfortable" is not a good word. Because I don't think

18   anybody wants to sit on a capital murder case. I don't think

19   people -- I mean, I would be worried about people volunteering

20   to come down here and do that kind of stuff. But there's some

21   people, and it's legitimate, whatever they think is okay with

22   us. We just need to know because some people say, "Look, Mark,

23   I believe in the death penalty. I think it's a good law. I

24   think we should do it, but I can't be the one that makes that

25   decision, you're gonna have to get somebody else to do it."

75

1    And there's nothing wrong with feeling that way.

2         A.    Yeah.

3         Q.    It's just that if you can't serve on it because it's

4    this kind of case, you just need to tell us or the judge. If

5    it's because oh, my gosh, this is gonna weigh so heavily on me,

6    or I don't feel I've experienced enough to make that kind of

7    decision, or just because my feelings are gonna be interfere

8    with me sitting on this kind of case. You just need to tell

9    us.

10        A.    Okay.

11        Q.    So tell us how you feel about sitting on this kind of

12   case?

13        A.    I believe in the death penalty. Maybe -- I mean,

14   this is my first time. It is a little overwhelming to sit on

15   a capital murder case. I mean, I think I can do it, but then I

16   mean, I think it would be hard for me as well.

17        Q.    You're gonna have to tell us a little more why and

18   why you feel that way. And remember, there's no right or wrong

19   answer. You just tell the judge how you feel if you can do it

20   or you can't do it.

21        A.    I think I can do it.

22        Q.    Do you want to be able to do that? Do you want to

23   make that decision?

24        A.    I don't want to make that decision.

25        Q.    Okay. Well, let's talk about that a little bit. You

76

1    see what I'm saying when people come in, they think that

2    they're gonna sit on a routine case. And then some people will

3    say, "Look, I can't sit on that kind of case." Let me give you

4    an example. My wife loves animals, and one day we were going

5    down the road and I accidentally hit a cat in the car, and the

6    cat was very injured and we pulled over the side of the car --

7    pulled the car to the side of the road and tried to help the

8    cat because my wife loves animals, and this cat, I'm sorry, was

9    beyond repair; it was injured too bad. The cat was suffering.

10   My wife new that we should put the cat out of its misery

11   because it couldn't be fixed, you know, but she couldn't do it.

12   She couldn't bring herself to do that. She knew it was the

13   right thing to do. She believed that animals shouldn't suffer.

14   She believed that, but she couldn't, you know, put the cat down

15   or take it to the vet to put the cat down because it would hurt

16   her too much. You know, she's a wonderful woman and she

17   believed that, and it's not that, you know, she wanted to kill

18   a cat. It's not, but she knew in her heart that's what the

19   thing she should do. But she just couldn't do it. She had to

20   have somebody else take care of the cat and, you know, put it

21   out of its misery. Do you see what I'm saying?

22        A.    Yes.

23        Q.    And I don't know if you're kind of feeling the same

24   way. To me it seems like you're coming up there and saying,

25   Look, I believe in the death penalty, Mr. Skurka, I think it's

77

1  a good law, but, you know, push come to shove, if you're asking
2  me if I can answer the questions in such a way that that young
3  man is gonna die, I can't do it.
4      A.   Yeah.
5      Q.   So look at him and tell me, that's him, John Henry
6  Ramirez, not somebody you read about in the paper or hear about
7  in the news.  That's him.  Could you answer the questions if the
8  questions if the evidence was there in such a way that would
9  cause another human being to be executed?  Yes or no?
10     A.   Yes.
11     Q.   Yes you could.  Okay.  Okay.  A minute ago you were
12  acting like you didn't want to do it, you're not sure you could
13  do it.  So tell me about that.
14     A.   I believe in it and I feel like I can do it after
15  seeing evidence and hearing the facts.  If it comes down to
16  like hearing the whole trial, I believe I can do it.
17     Q.   If you had your choice, if you could tell the judge,
18  "Judge, I'm sorry, I just couldn't sit on this kind of case, I
19  would be better on a burglary case, a robbery case, a theft
20  case, I just couldn't do that," would you want to get out of it
21  that way and try to say, you know, I understand it's my civic
22  duty, but just put me on a different kind of case than this?
23     A.   No.
24     Q.   Why not?
25     A.   Because I mean I feel like -- I mean I can do it.  I

78

1  can -- you know.
2      Q.   Why do you think you can do it?
3      A.   Go on what I believe.
4      Q.   Just why?
5           MR. JONES:  Your Honor, I -- I don't know that
6  that's a fair question the way he's putting it to this juror.
7           MR. SKURKA:  I can ask her --
8           MR. JONES:  She's already said she can sit on
9  the jury.
10          THE COURT:  I'll let him ask the question but,
11  I mean, you've asked her several times.
12          MR. SKURKA:  I understand.
13     Q.   (BY MR. SKURKA) I'm just trying to figure out what
14  the root of it is, why you think you can participate in this
15  type of case?
16     A.   What the root of it is?  I mean, I feel like I can.
17  What I believe is I believe in the death penalty, and I think I
18  can do it.
19     Q.   Okay.  It's just because of your belief in the death
20  penalty?
21     A.   Yeah.
22     Q.   Is that right?
23     A.   After hearing all the evidence and all the facts and
24  going from there.
25     Q.   Sure.  I understand.  When you heard -- well, let's

79

1  talk about that a little more.  And I've read your
2  questionnaire about how you feel about the death penalty and it
3  says, "I feel if you committed a murder and there is enough
4  evidence, then it is only right for the death penalty or life
5  in prison."
6           Do you think that there has got to be a certain
7  type of case where you could find the person guilty and give
8  them the death penalty, or do you have -- do you have like, I
9  don't know, preconceived notions of what kind of case that
10  would have to be?
11          MR. JONES:  Your Honor, that's not a fair
12  question either.  The law says what kind of cases the death
13  penalty is authorized for.
14          THE COURT:  I'm not really sure I even
15  understand the question.
16          MR. SKURKA:  Okay.
17     Q.   (BY MR. SKURKA) Do you understand the question?  I'll
18  ask it again if you don't.
19     A.   Ask it again.
20     Q.   Okay.  Do you know -- do you understand that there's
21  certain kind of crimes that even qualify for the death penalty?
22     A.   Capital murder.
23     Q.   Right.
24     A.   Which is what you explained earlier which is murder
25  and another crime.

80

1      Q.   Right.  So you do understand --
2      A.   Yeah, so I understand.
3      Q.   -- there's only certain type of cases?  Okay.  And do
4  you understand there are certain kind of cases that it may be
5  that they're found guilty of capital murder but they may get a
6  life sentence instead of the death sentence?
7      A.   Uh-huh.
8      Q.   Okay.  You have to say yes or no?
9      A.   Yes.
10     Q.   You can't just shake your head.
11     A.   Yes.
12     Q.   Do you feel like you're leaning one way or the other
13  towards death or life imprisonment at this time?
14     A.   No.
15     Q.   How do you feel about age in making the decision?  I
16  will tell you, if you're on this jury, you'll probably be one
17  of the youngest ones on the jury.  How would that affect you if
18  at all?
19     A.   It wouldn't affect me.
20     Q.   How did -- what did you think of when you first came
21  in the courtroom and the judge said what kind of case it was,
22  and you found out who the defendant was?  Because some people
23  didn't even see him.  He was sitting in that little box over
24  there and you see him now --
25     A.   I saw him that day.

81

1    Q.   Okay.  You did see him that day.  How do you feel
2    about or what did you think when you first saw the person or
3    how young he looked?
4    A.   It doesn't -- well, age really doesn't matter.  I
5    don't know how old he is now.  He committed the crime.
6    Q.   Okay.  So would you agree with me that just because a
7    person may look young or his appearance is one thing, you
8    should make a decision based on what they did instead of what
9    they looked like?
10   A.   No.
11   Q.   No what?
12   A.   No, I don't think just on what he looks like I can
13   make a decision on it.
14   Q.   Okay.  Because some people say that.  We've had some
15   ladies come in here and say, you know, the first thing I
16   thought was, gosh, he looks so young, and stuff.  And I always
17   ask them, Well, is that gonna affect you sitting on this jury.
18   A.   No.
19   Q.   Okay.  I asked them, and that's why I asked you.
20   A.   Okay.
21   Q.   Because some people say that.  They could be the age
22   of their son or something like that and they say, Well, gosh,
23   you know, he's so young.  And some people come in with the
24   stereotype like it's going to be Charles Manson out there or
25   some scary looking guy, and then some people are a little

82

1    surprised about that.
2            And what do you think about people who abuse
3    drugs or alcohol?
4    A.   What I think about them?  I think that's wrong,
5    anybody who abuses drugs and alcohol.  I'm against all of that.
6    Q.   What about people who -- sometimes use it as an
7    excuse for their behavior?  Tell us your feelings about that.
8    A.   As an excuse?
9    Q.   For their behavior?  Well, he did that but, you know,
10   he's an addict, or he did that but he's an alcoholic, so you
11   can't really fault him because it's more of a medical problem
12   instead of a legal problem; do you see what I'm saying?
13   Because some people say, you know, yeah, he was DWI, but he's
14   an alcoholic, you know, you can't stop him.  It's a disease.
15   A.   He shouldn't be driving.
16   Q.   Okay.  That's the other point.  Because the law says
17   you can drink all you want, you just can't drink and drive at
18   the same time.  So would you consider it more of a medical
19   problem or a legal problem that the Court should take care of?
20   A.   A legal problem.
21   Q.   Okay.  How about with drugs, sometimes people say the
22   same thing?
23   A.   Same thing, drugs -- you know, alcohol.  I don't
24   think there's an excuse for it.
25   Q.   Okay.  And the law doesn't say that.  It says, if you

83

1    drink or drink or get yourself high and you go commit a crime,
2    that's not a defense to the crime, okay?
3            What do your folks do for a living?
4    A.   My mom doesn't work and my dad works at a refinery.
5    Q.   And did you go to school here in Corpus Christi?
6    A.   I graduated from UTSA in San Antonio.
7    Q.   No, I meant high school.
8    A.   High school.  Oh, yeah, I went to high school here.
9    Q.   Which one?
10   A.   King.
11   Q.   And then you went off to UTSA so you've just now come
12   back to town about a year?
13   A.   I graduated last year.
14   Q.   So you've been working for the city for about a year?
15   A.   Yes, sir.
16   Q.   Sometimes jurors say -- how do you feel about this
17   thing.  Sometimes jurors say, "Well, you know, I want to hear
18   all the evidence and stuff, but I want to make my mind -- I
19   want to hear both sides of the story."  Would you want to hear
20   both sides of the story in this case?
21   A.   Yes.
22   Q.   Okay.  And what do you mean when you say both sides
23   of the story?
24   A.   Both sides of the story as in all the facts and what
25   happened that day.

84

1    Q.   So are you saying that you would want to hear what
2    the defendant says happened that day, or would you want to hear
3    from him?
4    A.   No.  I said earlier, I answered his question no.
5    Q.   Okay.  Would you want to -- would you expect the
6    defendant -- I'm sorry, the defense lawyers to put on some
7    evidence, their own witnesses and stuff, before you could make
8    a decision?
9    A.   Yes, I'd like to do that.
10   Q.   Okay.  Even if it's not the defendant, you would
11   expect them to put some other witnesses on?
12   A.   Yes.
13   Q.   And -- okay.  You understand that's a natural
14   inclination.  People want to hear both sides of the story, but
15   sometimes that doesn't happen in the courtroom.  Sometimes the
16   State is the only one that puts on evidence, and they don't put
17   on any evidence.  Do you think you could make a decision
18   without them putting on any evidence or would you want to hear
19   their evidence?
20   A.   I'd want to hear their evidence.
21   Q.   Okay.  So you would want to hear from maybe not just
22   the defendant, because of the Fifth Amendment, but you'd expect
23   them to put on some evidence?
24   A.   Yes.
25   Q.   Okay.  What if the law says they don't have to put on

85

1  evidence, would it be something that you could follow or would
2  you think that, you know, I still want to hear everything,
3  Judge, you know, I want to hear what they have to say?
4      A.   If it's the law, then I wouldn't have to hear it.  If
5  it's the law then I wouldn't hear it.
6      Q.   Okay.
7      A.   No.
8      Q.   What do you think about the concept of beyond a
9  reasonable doubt?  What does that mean to you?
10     A.   Beyond a reasonable doubt.  Hearing all the evidence
11 and before you find him guilty.
12     Q.   But it just says how much evidence you have to hear.
13 You have to hear evidence beyond a reasonable doubt.  We have
14 to prove the case beyond a reasonable doubt.  What does that
15 mean to you?
16     A.   That you have to provide the evidence, enough
17 evidence.  I don't understand.
18     Q.   The question is enough, how much is enough.
19 Sometimes people say, "Well, look, you know, I couldn't find
20 him guilty and I couldn't give the death penalty on a case this
21 serious unless you prove everything to me beyond all doubt,
22 beyond, you know, 100 percent."  Is that what kind of evidence
23 -- how much evidence you would have to hear in this case before
24 you can make a decision?
25             MR. JONES:  Your Honor, that's not a fair

86

1  question.  She's never suggested that.  The standard of proof
2  in a criminal case is beyond a reasonable doubt.
3             MR. SKURKA:  Judge, I'm allowed to explore --
4             MR. JONES:  Unless he's trying to bait her
5  into saying 100 percent.
6             THE COURT:  Look, here's the thing.  We need
7  to know that you're gonna hold them to beyond a reasonable
8  doubt.  That's what the law says.  And we need to know if
9  you're gonna hold them to a higher standard or a lower
10 standard than the law requires, or beyond a reasonable doubt
11 what the law requires.  That's what he's really asking.  Do
12 you follow my questions?
13            VENIREPERSON NO. 88:  So I have to hear 100
14 percent of his?
15            MR. JONES:  No.
16            THE COURT:  No.  Okay.  Let's go back over
17 this.  Remember I told you there's no definition of reasonable
18 doubt, okay?  There's preponderance of the evidence.  That's
19 51 percent, remember?
20            VENIREPERSON NO. 88:  Yes.
21            THE COURT:  There's clear and convincing.
22 That's when they try to take away your child.  That's a higher
23 burden, right?
24            VENIREPERSON NO. 88:  Okay.
25            THE COURT:  Higher than that is beyond a

87

1  reasonable doubt.  It's not 100 percent, okay, because -- the
2  only way it could be 100 percent is if you were there and saw
3  it, right?
4             VENIREPERSON NO. 88:  That's right.
5             THE COURT:  Well, if you were there and saw
6  it, they'd be calling you as a witness.  You'd actually be
7  disqualified from being on the jury because you saw it happen.
8  And we want people on the jury that can be fair and impartial,
9  not witnesses.  Do you follow me?
10            VENIREPERSON NO. 88:  Yes.
11            THE COURT:  And what he's asking is, can you
12 hold him to that burden or would you require him to prove a
13 higher burden than the law requires or a lower burden than the
14 law requires?
15            VENIREPERSON NO. 88:  No, I can hold him to
16 that burden.
17            THE COURT:  All right.
18            MR. SKURKA:  Judge, I don't have any other
19 questions all right.  Any questions?
20            MR. JONES:  Yes.
21            THE COURT:  Okay.
22                VOIR DIRE EXAMINATION
23 BY MR. JONES:
24     Q.   Let's see.  Where do we start?  Tell me a little bit.
25 You work for the City of Corpus Christi?

88

1      A.   Yes, sir.
2      Q.   And you're in the recreation department?
3      A.   Parks and Recreation Department.
4      Q.   Tell me exactly what your duties are there.
5      A.   I'm an area supervisor for latchkey so I watch over
6  five of the latchkey sites.
7      Q.   Okay.  And what is your degree in college?
8      A.   Kinesiology, sports management.
9      Q.   Okay.  Did you do sports -- you must have done sports
10 in high school, right?
11     A.   Yes.
12     Q.   What sports did you like?
13     A.   Volleyball, basketball, and soccer.
14     Q.   Soccer.  Okay.  And did you play -- did you play
15 soccer in college?
16     A.   Yes.
17     Q.   Okay.  You're 23 years old?
18     A.   Yes.
19     Q.   It looks like you've got a good job at your age with
20 your credentials.  That's excellent.  Is this your first time
21 being on a jury?
22     A.   Yes, sir.
23     Q.   Okay.  The -- in Texas we have the death penalty as a
24 form of punishment for certain offenses.  The judge told you
25 what they are.  All of them involve murder and all of them

89

1  involve murder, plus some aggravating circumstance.  There are
2  two -- there's two forms of punishment that are available in a
3  death penalty or a capital murder case, life and death.
4          MR. GARZA:  Judge, can we have a hearing
5  outside the presence of the witness?
6          THE COURT:  Why don't you wait in the jury
7  room.  We'll be right with you.
8          (Venireperson exits courtroom.)
9          MR. SKURKA:  Judge, the State will exercise a
10  peremptory strike.
11          THE COURT:  Okay.  Let's bring her back in.
12          (Venireperson enters the courtroom.)
13          THE COURT:  All right.  Ms. Reyes, you were
14  not selected to be on this jury.  We do appreciate your time
15  in coming down here and doing your service to this community.
16  Thank you very much.
17          VENIREPERSON NO. 88:  Thank you.
18          THE COURT:  If you need a work excuse, we can
19  get one for you.
20          VENIREPERSON NO. 88:  I have one.  Thanks.
21          (Venireperson exits courtroom.)
22          MR. JONES:  Is that number 7 or 8 for them?
23          THE COURT:  That's what I was trying to figure
24  out.  Okay.  Who do we have up next?
25          THE BAILIFF:  Mr. Lyles.

90

1          THE COURT:  Mr. Lyles.  I don't have his deal.
2  Let me go get it.
3          All right.  Bring him in.
4
5              VENIREPERSON NO. 90,
6              DALE STEPHEN LYLES,
7              VOIR DIRE EXAMINATION
8  BY THE COURT:
9      Q.   All right.  Come on up and have a seat.  All righty.
10  You are Mr. Lyles; is that correct?
11      A.   Yes, sir.
12      Q.   All right.  Mr. Lyles, as you probably know, we are
13  trying to select a capital murder jury, and so that's what
14  we're in the process of.  We're looking for people that can
15  keep an open mind and people that can follow the law.
16      A.   Yes, sir.
17      Q.   So let's begin with part one.  Can you keep an open
18  mind in this case?
19      A.   Yes, sir, I think I can.
20      Q.   All right.  You have not heard anything about the
21  case?
22      A.   No.
23      Q.   Other than what you've heard in this --
24      A.   Yeah.
25      Q.   -- preliminary -- the preliminary part of the jury

91

1  selection?  Okay.  Let's see here.  All right.  You have been
2  been on a murder for hire case?
3      A.   Yes, sir.
4      Q.   And that was a capital murder then?
5      A.   Yes, sir.
6      Q.   So you know all this stuff I'm about to go over.
7      A.   Maybe.  I don't know.
8      Q.   I think you do.  I'm gonna run through it relatively
9  quickly with you since I think you already know what we're
10  doing here.
11          All right.  First of all, you know that the
12  State has the burden of proof in every criminal case?
13      A.   Yes, sir.
14      Q.   You know that the burden is beyond a reasonable
15  doubt; you've applied that before?
16      A.   Yes, sir.
17      Q.   All right.  It's not beyond all doubt, but it's the
18  highest standard we have in the law?
19      A.   I understand.
20      Q.   You can follow that law?
21      A.   Yes, sir.
22      Q.   You also know that the defendant is innocent until
23  proven guilty?
24      A.   Yes, sir.
25      Q.   Can you follow that?

92

1      A.   Yes, sir.
2      Q.   All right.  And you know that the defendant doesn't
3  have to testify?
4      A.   Correct.
5      Q.   And the jury can't hold it against him if he chooses
6  not to?
7      A.   No, sir.
8      Q.   And you'd follow that law?
9      A.   Yes, sir.
10      Q.   All right.  Next thing, you know that there are
11  certain kinds of crimes that are capital murders and certain
12  murders that aren't?
13      A.   Yes, sir.
14      Q.   All right.  One of them being murder for hire.
15      A.   Yes, sir.
16      Q.   You say you gave him 45 years.  Did they try that as
17  a capital murder?
18      A.   Yes, sir.
19      Q.   Okay.  Was he found guilty of a lesser included?
20      A.   I'm not sure exactly what that is.  He was --
21      Q.   I mean, was he found guilty of just regular murder
22  instead, or was he found guilty of capital?
23      A.   I'm not sure, to be honest.  I really don't know.
24      Q.   We'll get to that.
25      A.   I don't remember.

93

1    Q.   Well, murder for hire is one of those things that can
2    be a capital murder, okay?
3    A.   Okay.
4    Q.   There's others like murdering a child under the age
5    of six, murdering a policeman while in the course of his duty,
6    a fireman.  There's a laundry list.
7    A.   Yes, sir.
8    Q.   This particular case is capital murder.  Why?
9    Because the legislature says if you put robbery and murder
10   together, that's capital, okay?
11   A.   Yes, sir.
12   Q.   Now, what's robbery?  Well, if I pulled a gun to you,
13   you give me your wallet, that's a robbery.  The forcible taking
14   of property from another or by force or by threats, okay?
15   A.   Okay.
16   Q.   What if I do that same thing and instead of giving me
17   the wallet, you punch me in the face, and down I go.  I don't
18   get your wallet.  I didn't rob you, but I attempted to.  The
19   State can get there either way on this, all right?  They're
20   alleging that this defendant on a given day in Nueces County,
21   Texas, committed the offense of robbery or attempted robbery;
22   and in the course of doing so, committed murder --
23   A.   Yes, sir.
24   Q.   -- all right?  And the law says they got to prove all
25   their elements, and you know this because you've done this

94

1    before?
2    A.   Yes, sir.
3    Q.   Would you make them prove all their elements before
4    you found the defendant guilty of capital murder?
5    A.   Yes.
6    Q.   All right.  Now, in capital murder cases, if
7    defendant's found guilty there's two possibilities, life or
8    death.
9    A.   Yes, sir.
10   Q.   All right.  How long ago was this trial that you sat
11   on?
12   A.   Two years ago.  Mr. Skurka did it.
13   Q.   Okay.  Did you come in for individual jury selection?
14   A.   No, sir.  We did not do individual jury.  It was --
15   Q.   Okay.  Then maybe what it was is they didn't seek the
16   death penalty?
17          MR. SKURKA:  It was attempted capital murder,
18   Judge.
19          THE COURT:  Oh, okay.  It was.
20          MR. SKURKA:  It wasn't a completed one.
21   A.   No.  Yes, sir.
22   Q.   So then what happens there because it's an attempted
23   capital murder, it lowers it a degree to first degree, and so
24   that's why you assessed --
25   A.   Yes, sir.

95

1    Q.   Well, in that case you knew that there was the guilt
2    or innocence phase, that is, did the person do it, can they
3    prove it beyond a reasonable doubt?
4    A.   Yes, sir.
5    Q.   And so you've been to the second phase.  In the
6    second phase that's a first degree felony.  That's five to 99
7    or life and up to a $10,000 fine, right?
8    A.   Yes, sir.
9    Q.   Okay.  And then you guys went back there and you
10   deliberated, and you came up with this 45-year sentence?
11   A.   Yes, sir.
12   Q.   Capital murder is a little different, all right?
13   First part of the trial is just like that case.  You deliberate
14   on guilt or innocence; and if the defense's found not guilty,
15   it's over with.  If he's found not guilty, you don't put down
16   life or death because those are the only possibilities.  You
17   answer questions, okay?
18   A.   Yes, sir.
19   Q.   Let's talk about the question.  Here's the first one.
20   "Is there a probability that the defendant would commit
21   criminal acts of violence that would constitute a continuing
22   threat to society?"  What does that mean?  Is it probably true
23   that the defendant will be violent with people in the future?
24   A.   Yes, sir.
25   Q.   Okay.  The jury would answer that yes or no.

96

1    A.   Yes, sir.
2    Q.   Second question.  "After taking into consideration
3    all of the evidence, including the circumstances of the offense
4    --" that's the first part of the trial -- "-- the defendant's
5    character and background --"  Well, what's character?  What
6    kind of guy was he?  Is honest, truthful, has he been a good
7    guy the rest of his life?  Is he a person of good character?
8    All right.  And background.  What's that?  His childhood.
9    Maybe it was bad.  Maybe it was good.  His background.  What
10   about his criminal history?  That kind of thing, all right?
11   A.   Yes, sir.
12   Q.   And the personal moral culpability of the defendant.
13   That's a little harder.  It's a little harder to conceptualize
14   that but I've got an example for you, okay?
15   A.   Uh-huh.
16   Q.   Two defendants?
17   A.   Yes, sir.
18   Q.   Two burglaries.  One burglar he likes hookers and
19   cocaine, and he breaks into this house and he trashes the
20   place.  He pulls out every drawer, he just makes a complete
21   mess, takes everything of value, breaks things, just a bad
22   deal.  He sells it and he uses the money on hookers and
23   cocaine.
24   A.   Yes, sir.
25   Q.   Second guy, also guilty of burglary, and he's been at

97

1   his job for 20 years.  He has lost it because of layoffs.  No
2   fault of his own.  He's got three kids, and they're hungry, and
3   he can't provide.
4       A.   Yes, sir.
5       Q.   And he -- they haven't eaten in three days, and he
6   goes into a home through an unlocked home and takes nothing but
7   food.  And he hasn't eaten in three days either, but he doesn't
8   eat because he wants the kids to fill their bellies.
9       A.   Yes, sir.
10      Q.   All right.  Are the two people -- do they have the
11  same personal moral culpability?
12      A.   No, sir, I don't think so.
13      Q.   They do not.  That's what that's talking about, okay?
14  That's what that's talking about.
15      A.   Yes, sir.
16      Q.   All right.  Now, after considering all of those
17  things, is there sufficient mitigating circumstance or
18  circumstances to warrant a sentence of life imprisonment rather
19  than the death sentence be imposed?  All right.  This is like a
20  global question.  This is take into consideration everything in
21  the trial.  Now, I don't know what happened in this case that
22  you sat on, but on the second phase of the trial you probably
23  know from experience that you hear more than just did the
24  person do it or not.  You hear about the person's background,
25  is this their first offense; you know, what kind of a person is

98

1   he?  Capital murder, you might even hear more than you would in
2   a case like that.  And you've got to take into consideration
3   everything that's admitted into evidence.
4       A.   Yes, sir.
5       Q.   The whole trial, from start to finish.  Like maybe --
6   I'm just giving you an example -- maybe he's a war hero.  Maybe
7   he fought in Desert Storm, and he saved 20 soldiers from
8   getting killed, and they gave him the Congressional Medal of
9   Honor.  Maybe he teaches children that can't read to read, you
10  know.  And you may think those are -- those are mitigating
11  circumstances.  And you may think that is sufficient enough to
12  give him also life sentence.
13      A.   Yes, sir.
14      Q.   Okay?  Is it an excuse for the crime or not?  Well,
15  you found him guilty.  He's gonna be -- he's found guilty and
16  he's gonna be punished.  Not an excuse for the crime.  Maybe
17  you find out he's been abused as a child, and his father used
18  to beat him up, sexually molest him, okay?  Is it an excuse for
19  the crime?  No.  But can it be taken into consideration here?
20  Absolutely.  All right?  And these lawyers will try and tell
21  you what they think mitigating or aggravating circumstances
22  are; mitigating, of course, meaning to lessen and aggravating
23  you mean to ratch it up.  But only the jury decides.  One
24  person may say, "Well, he was an Eagle Scout.  That's a
25  mitigating circumstance in my heart, in my mind."  Another one

99

1   may say, "That doesn't mean anything to me, and I'm not gonna
2   consider it as a mitigating circumstance."  But in any event,
3   you go through this process, and you say, Is there enough to
4   warrant a life sentence rather than death, okay?
5           Now, at the beginning of every trial -- and, of
6   course, you know this, too -- I do the oath, right?
7       A.   Yes, sir.
8       Q.   "Do you solemnly swear that you will render a true
9   verdict based upon the evidence and law presented to you?"  And
10  all the jurors, they raise their right hand, and they say, yes,
11  and then they put on their little tags, right?
12      A.   Yes, sir.
13      Q.   There's people that come in here and they can't take
14  that oath in this case.  Why?  Because they cannot consider the
15  death sentence.  They will not vote that way.  They will not
16  participate in the process.  Other people they say, "I can give
17  them a fair trial in the first part, but if we find him guilty,
18  this law of yours means nothing to me.  I'm gonna rig it so he
19  gets the death penalty every time.  I'm not even gonna consider
20  all this stuff."  Neither of those people can take the oath in
21  this case.  My question to you is, can you take the oath and
22  follow the law in this case?
23      A.   Yes, sir, I think I can.
24          THE COURT:  All right, Mr. Skurka.
25          MR. SKURKA:  Thank you, Judge.

100

1               VOIR DIRE EXAMINATION
2   BY MR. SKURKA:
3       Q.   Hi, Mr. Lyles.
4       A.   Hello.
5       Q.   You never thought you'd be back here again so soon,
6   huh?
7       A.   No, sir, I didn't.
8       Q.   And just to refresh my memory, I think that was the
9   case where there was two people -- there was a man and a woman.
10  And were you on the case with the man defendant or the female
11  defendant?
12      A.   The man.
13      Q.   Okay.  Because I tried the -- there was actually two
14  codefendants.  We tried the female first.
15      A.   Yes, sir.
16      Q.   And then we tried the man.  Now, that case was a
17  little bit different because that was kind of a sting
18  operation --
19      A.   Yes, sir.
20      Q.   -- where a person wanted to hire somebody to kill
21  somebody, but thank God it never happened.  Nobody got killed
22  on the case.  But you know a little bit about the background,
23  so I want to kind of sail through some of these things.
24      A.   Okay.
25      Q.   But as the judge said, it's a little different.  Back

101

1    then you had a case where you still had to decide guilt or

2    innocence first?

3    A.   Yes, sir.

4    Q.   And in the second phase was you had to decide what

5    punishment.  But if I remember correctly, you had like a

6    minimum of five years, a maximum of 99 years, and you just

7    picked a number between those?

8    A.   Correct.

9    Q.   Here, it's going to be a little bit different because

10    you don't just pick a number, and you don't just say death or

11    life in prison.  You have some special issues that we have to

12    answer.  The first thing -- part of that I want to talk to you

13    about is the mere fact it's a death penalty case.  In this

14    case, it is a death penalty case.  How do you feel about the

15    death penalty in general?

16    A.   I mean, it's by the State and all, and I understand

17    what it means, I mean, somebody will be executed.  It depends

18    upon the circumstances, I guess, it depends upon what happens

19    during the case.  I do not have a problem with it, no, but it

20    depends upon the case.

21    Q.   When you say depends upon the case, I think what

22    you're really saying it depends on what the evidence is?

23    A.   What the evidence is, I'm sorry, yes, sir.

24    Q.   Because every case is different.

25    A.   Yes, sir.

102

1    Q.   And I know we're talking semantics, but really,

2    you're depending on what the evidence is.  And the law says

3    this.  If the evidence is such that you think the question

4    should be answered and he gets the death penalty, can you

5    follow through with that?

6    A.   Yes, sir, I can.

7    Q.   And I'm gonna turn it around and say if the evidence

8    is such that you think he should get a life sentence, can you

9    do that too?

10    A.   Yes, sir.  I don't have a problem either way.

11    Q.   Okay.  That's what I'm trying to figure out.  Are you

12    leaning one way or the other?

13    A.   Not -- no, sir.

14    Q.   The law also says that the State has to prove the

15    case beyond a reasonable doubt.  You learned that a couple of

16    years ago when you were in that case and just because a

17    person's charged with a crime doesn't mean he's guilty of the

18    crime, correct?

19    A.   Correct.

20    Q.   You have to hold the state to the burden, and it's

21    the burden of proof we have in every criminal case.  So it's

22    nothing more special because it's a capital murder case, but

23    make no mistake, we have to prove the case beyond a reasonable

24    doubt.  If we don't prove beyond a reasonable doubt, what's

25    your duty to do?

103

1    A.   It's not guilty.

2    Q.   That's exactly right.  Okay.  Let's talk about some

3    more things.  How did you feel about it when you heard it was

4    that kind of case?  Do you remember that day when you came in

5    the jury room and all those people were there?

6    A.   Yes, sir.

7    Q.   What's the first reaction you had?

8    A.   Different, just have never been on one before, have

9    seen it, you know, heard about it, all the trials and all.

10    Didn't understand that it took two things, as the judge just

11    said.  I thought if you killed somebody, you could have the

12    death penalty, but it's two things together that prove that you

13    could have the death penalty.

14    Q.   Be even eligible for it?

15    A.   Yeah, be eligible.  I didn't understand that until he

16    explained that that day.

17    Q.   And what you said, Mr. Lyles, is what a lot of people

18    think.  It's nothing against lay people, but, you know, they

19    don't work in the law enough.

20    A.   Yes, sir.

21    Q.   And people come up to me all the time and say, "Hey,

22    he murdered somebody; why didn't he get the death penalty?"  I

23    say, No, the law says only certain of those cases that he

24    murdered somebody –

25    A.   Yes, sir.

104

1    Q.   – special cases, like murder plus something else.

2    Other people -- and do you think that's a pretty good scheme

3    where the State says, "Look, not every murder case is going to

4    be the death penalty.  Only these certain cases even qualify

5    for it."

6    A.   Yes, sir.  It seems like a checkpoint in the law that

7    that you can do that.

8    Q.   And that's exactly right, because it's kind of like

9    we have checks and balances.  Not every case is gonna be this;

10    not every case is going to be that.  You have to wait to hear

11    all the evidence, but it's only certain cases even qualify for

12    the grand jury -- qualify for that type of case.  In this case,

13    it's because it's murder plus a robbery.  And that just

14    basically means you murder somebody while you're committing or

15    attempting to commit robbery.  It doesn't have to be a

16    finalized robbery or a complete robbery.  You can just be

17    trying the robbery.  As long as you're using force or threats

18    of force to take something, that's enough to prove robbery.

19    And the murder would be part of that too.  It would have to be

20    connected with the thing.

21    And that's probably pretty fair in our scheme of

22    things too; it's not like you just want to rush into anything

23    too; correct?

24    A.   Yes, sir.

25    Q.   And the law says you don't.  What you do in the first

105

1   part of the case is you hear what the person did that day, you
2   know, is he guilty of the crime, did he murder and rob
3   somebody, and then maybe the surrounding circumstances.  Then
4   you may go -- if you find him guilty, you go to the second part
5   of the trial, and then you might get to hear some background
6   evidence.  The background would be like, you know, does he have
7   good character or bad character?  Has he been to prison ten
8   times before?  Has he never been to prison before?  I don't
9   know what it is, and I can't tell you what it is in this case.
10  But then instead of going back there and voting off death or
11  life, you answer two questions.  I want to go through them with
12  you because it's a little different from your last trial.
13          Look at Special Issue No. 1.  Now, that's
14  presupposing that you found him guilty, you heard evidence, and
15  now you're ready to make a decision.  The judge asks you to
16  answer these questions.  "Is there a probability that the
17  defendant would commit criminal acts of violence that would
18  constitute a continuing threat to society?"  Some key words in
19  there I want you to focus on is the first line is probability.
20  It doesn't say certainty.  Unless you've got a crystal ball,
21  and you can see what's gonna happen in the future, then the law
22  doesn't require me to prove for sure what's gonna happen.
23      A.   Yes, sir.
24      Q.   The second part says, "the defendant would commit
25  criminal acts of violence," which is kind of broad, right?

106

1       A.   Yes, sir.
2       Q.   Sometimes people tell me, Well, Mark, I can't give
3   him the death penalty unless I think he's actually gonna go out
4   and murder somebody again or commit capital murder.  But the
5   law doesn't say that.  It just says criminal acts of violence.
6   So it could be, I don't know, assault, breaking into somebody's
7   house, some kind of violent act.
8           And the last phrase says, "that would constitute
9   a continuing threat to society."  What does that mean to you, a
10  continuing threat to society?
11      A.   It means a perpetual, keep doing it over and over
12  again.
13      Q.   Well, there's a possibility that they keep doing it
14  again.
15      A.   Possibility, that's right.
16      Q.   You don't know for sure, but sometimes you can kind
17  of tell what a person's going to do in the future by what
18  they've done in the past.
19      A.   Yes, sir.
20      Q.   Now, that's not 100 percent.  You've heard of people
21  changing or rehabilitating themselves, but it's a kind of a
22  good guideline.  And the key part in there I want to talk to
23  you about is society.  Some people say, they say, "Well, why
24  does the DA's office seeking the death penalty?  Why don't you
25  just lock them up in prison, give them a life sentence, and he

107

1   can't hurt anybody."  Well, I always have to remind them what
2   -- who else is in a prison with the prisoner?  Tell me.
3       A.   People who have been found guilty.
4       Q.   Right, other prisoners.  Who else?
5       A.   Other prisoners and --
6       Q.   And guards?
7       A.   -- guards, people who are there to protect other
8   people supposedly.
9       Q.   Yeah, and people that work in the prison, you know,
10  the warden, the maintenance people, the people who feed them
11  and stuff.  So it's not like you're out on a desert island and
12  there's no one around that you can hurt.  I guess what I'm
13  trying to point out is prison is still part of society.
14      A.   Yes, sir.
15      Q.   So you still interact with people?
16      A.   I understand that.
17      Q.   Have you ever heard of that happen to people like --
18      A.   Prison riot.
19      Q.   Prison riot or a guard getting hurt or prisoners
20  hurting other prisoners?
21      A.   Yes, sir.
22      Q.   So it's not just the fact that you've locked somebody
23  up in prison that's gonna keep them from hurting anybody,
24  right?  There's still that possibility.  And that's all that
25  the judge is asking.  Is it probable, more likely than not,

108

1   that he might commit other acts of crime and still be violent
2   in our society?  So you answer that question yes or no, again,
3   based on the evidence.
4       A.   Yes, sir, and what you can present.
5       Q.   Based on the evidence.
6       A.   That's right.
7       Q.   Then you go to the second question.  And the second
8   question is what's called the mitigating circumstances
9   question.  And I'm gonna go back to your other trial for a
10  minute, right?
11      A.   Yes, sir.
12      Q.   And it went from five years to 99 years or life.  My
13  guess is the legislature makes it that big a range of
14  punishment because that's 90 years -- 95 years difference.  It
15  makes it a difference because why?  If it's a really, really
16  bad case, you can go up the highest 99 years or life.  If it's
17  not that bad, you go down to the lowest.  If it's somewhere in
18  the middle, you go somewhere in the middle.  In other words, it
19  gives the power to jury to punish what they think is
20  appropriate in that case --
21      A.   Yes, sir.
22      Q.   -- under those circumstances.  That's kind of what
23  that question does.  It's a little different.  But bear with me
24  on this.
25      A.   Okay.

109

1    Q.   Because what that question says, are there any
2  mitigating circumstances?  That's the key word, "mitigating."
3  Mitigating basically means anything that would lessen or make
4  less severe the punishment.  This key word.  Anything that
5  would lessen or make less severe the punishment or anything
6  that reduces the defendant's moral blameworthiness.  In other
7  words, he did the crime.  He's guilty.  Yes, I think he's a
8  continuing threat to society, but we're back to that checks and
9  balances.  Before you give him the death penalty, the judge is
10 gonna tell you to take into consideration all of the evidence,
11 including what happened that day, the circumstances surrounding
12 that, his character and background, good character, bad
13 character, whatever, and his personal moral culpability.  Is
14 there sufficient -- is it enough of a mitigating circumstance
15 or circumstances to warrant that a sentence of life rather than
16 the death sentence be imposed?  In other words, I kind of
17 believe that you don't want to rush into things.
18   A.   Yes, sir.
19   Q.   You think he's a criminal that's got a violent -- he
20 could commit violence in the future, but is there any other
21 extenuating circumstances or anything that would choose that
22 would make you lower the sentence?  It's kind of the opposite
23 of aggravating circumstances.  You know, you have -- and what a
24 mitigating circumstance is up to the jury to decide.  The judge
25 is not gonna say, okay, this is a mitigating circumstance, this

110

1  is a mitigating circumstance, this is a mitigating
2  circumstance.  You might hear evidence that are possible
3  mitigating circumstances.  Well, you know, he was an orphan.
4  He didn't have -- he didn't come from a good home, or, you
5  know, he was an honor student in school, made straight As on
6  the honor roll, or he was a war hero or something like that.
7  Or, you may hear that he was a bad guy, been to prison ten
8  times before.  You see what I'm saying?
9    A.   Yes, sir.
10   Q.   It's not automatic that just because he -- you answer
11 that question yes, that he's automatically going to get the
12 death penalty.  The judge says look at the whole picture.
13   A.   Yes, sir.
14   Q.   What happened that day, what happened in the past.
15 Is there enough to lower the sentence?  If there is, you think
16 there's sufficient mitigating circumstance, it lowers it to
17 life.  If you don't think there's enough, then he gets the
18 death penalty.  But the jury kind of has to balance that,
19 because some people may say, 'Well, look, you know, I don't
20 care if he got an award -- an award in the war, a medal in the
21 war.  I don't care if he, you know, was an orphan, you know,
22 he's still got to pay for what he did."  Other people may say,
23 "Well, you know, we should give this guy a break because he was
24 a war hero or, you know, he came from a broken home."  It's up
25 to the jury to decide, and you have to weigh everything.

111

1    I think it's pretty good in our government that
2  we have checks and balances because you don't want people to
3  say automatically death penalty, automatically life sentence.
4  You've got to be open-minded.  Can you be open-minded, consider
5  everything?
6    A.   Yes, sir.
7    Q.   Are you leaning one way or the other right now?
8    A.   No, sir.
9    Q.   And it's kind of like a blank slate.  The only way
10 you should be leaning right now is that he's innocent because
11 right now the State hasn't proven any evidence, right?
12   A.   Right.
13   Q.   That's what we call the presumption of innocence.  It
14 doesn't mean he is innocent.  It just means right now he's
15 presumed innocent because we brought no evidence against him.
16     One last part of the law I want to talk to you
17 about is mitigating circumstances.  There's another part in the
18 law that talks about intoxication.  Voluntary intoxication is
19 not a defense to crime.  Voluntary intoxication.  If you go get
20 yourself drunk or high on drugs, can you go in to court and
21 say, "I'm not guilty, I was drunk when I did that crime?"  You
22 can't do that.  That's not an excuse to the crime.  If you go
23 rob a bank, can you say, "Well, I'm sorry, I was drunk at the
24 time, so you have to excuse me from robbing the bank."  No, the
25 law says you can't do that.  The law does say that's a possible

112

1  mitigating circumstance.  In other words, some people may look
2  at it and say, "Well, you know, he robbed a bank; he was drunk
3  when he did it, so maybe we'll give him a lower sentence."
4  Other people may say, "I don't care if he was drunk or not, you
5  know, he shouldn't be robbing banks."  See, before you hear the
6  evidence, it's hard to make a decision.  That's why the judge
7  is so careful about saying wait till you hear everything before
8  you decide.  And can you do that?
9    A.   Yes, sir.
10   Q.   That's the most important thing.  And the fact that
11 you were on a jury in another case, is that gonna affect you in
12 this case?
13   A.   No, sir.  I think --
14   Q.   It's different --
15   A.   I think it would help me, I mean, just to understand
16 what -- no surprises.  I know what's gonna happen, I know what
17 we're gonna go through, and we wait on the evidence.  See what
18 happens.
19   Q.   But you know the legal procedure more than a lot of
20 other people?
21   A.   Yeah.
22   Q.   But the question is just because I've done this
23 before with you, is that gonna have an effect?
24   A.   No, sir.
25   Q.   You know, it's almost like comparing apples and

1  oranges.

2      A.    Yes, sir.

3      Q.    Just because you voted one way in one case, does that

4  mean you're gonna vote one way -- the same way in the other

5  case?

6      A.    No, sir.

7      Q.    Okay.  You're not leaning toward guilty or innocent?

8      A.    No, sir.

9      Q.    And you're not leaning toward death or life?

10     A.    No, sir.

11     Q.    Okay.  Clean slate --

12     A.    Yes, sir.

13     Q.    -- so to speak.  Okay.  I need to ask you a few

14  questions about your -- on your questionnaire.

15     A.    Okay.

16     Q.    And I don't mean to pry, but I've got to talk to you

17  about this deal with your son having a problem with drugs.  I

18  know you probably think that --

19     A.    I figured it was gonna come up.

20     Q.    You figured we were gonna talk about it.

21     A.    Yeah.

22     Q.    Well, I'm sorry, but, you know, it's just one of

23  these things we have to talk about.

24     A.    No, I understand.  I put it down.  I understand.

25     Q.    Can you tell me a little bit about what happened and

1  what's going on?

2      A.    He got messed up with the wrong people and got on

3  some drugs.  And I want to say we lost him for about six

4  months, and we finally got him in the right situation, got him

5  cleaned up.  And he's been sober and straight for about two and

6  a half, three years now.

7      Q.    Good.  So he's kind of responded to the treatment?

8      A.    Yes, sir.  And we kept him in a good environment, and

9  he's very good.  He's doing very good right now.

10     Q.    Was there -- would he ever have charges brought

11  against him?

12     A.    No, sir.

13     Q.    Was it kind of a personal --

14     A.    No, sir.  It was close.  It was close several times,

15  but no.

16     Q.    Okay.  What do you think about people that use drugs

17  or alcohol as an excuse to their behavior?

18     A.    You did it to yourself.  You put it in your body,

19  whether it be drinking or drugs or whatever.  And you have to

20  pay for the consequences on your -- what you do, but, I mean, I

21  understand that under the influence, you may do things that

22  you're not accustomed to.  And he did.  From my standpoint,

23  that's the way I see that end.

24     Q.    Well, that kind of goes in what we were just talking

25  about the law.

1      A.    Yes, sir.

2      Q.    The law agrees with you.  It's not an excuse to the

3  crime, but can you see that certain times in a person under the

4  influence of drugs or alcohol may get a lesser sentence because

5  of that?

6      A.    Yes, sir, I can see it.

7      Q.    You know like, say, for example, we were talking

8  about, I think the judge is talking about the burglars and how

9  different they are.  I mean, what if you had a person charged

10  with drugs, using drugs the first time, he's a first time

11  offender, that guy might get probation --

12     A.    Yeah.

13     Q.    -- whereas if you caught a drug dealer who, you know,

14  had a pound of cocaine and was selling it to people, you might

15  treat him a little harsher.

16     A.    Yes, sir.

17     Q.    So, just the fact that a person under the influence

18  of drugs or alcohol, it could be a mitigating circumstance to

19  lower the sentence; it may not?

20     A.    It could be; yes sir.

21     Q.    And based on your own experience, you can see that?

22     A.    Yes, sir.  I can see it for sure.

23     Q.    I mean, I'm sure that -- I mean, a parent can punish

24  their kid horribly and say, I don't want to ever have you as a

25  son, disown you, kick them out of the house.  But there's some

1  mitigating circumstances in there, so you try to work with

2  them.

3      A.    My family went through a lot of rough times.  My wife

4  and I did.

5      Q.    Yeah, but at least I think you're in a good position

6  to talk to jurors about how -- not to talk to jurors -- to be

7  on the jury to say, yeah, I can give that some consideration.

8  And it could be any kind of mitigating circumstances.

9      A.    Yes, sir.

10     Q.    Intoxication?

11     A.    Yes, sir.

12     Q.    Come from a broken home, whatever, but you have to

13  really consider those things.

14     A.    Yes, sir.

15     Q.    And just like you had to consider your own kid

16  because, you know, we've had parents before, you know, they

17  call it tough love.  And they -- they're very tough?

18     A.    Yes, sir.

19     Q.    But you can see where there could be mitigating

20  circumstances --

21     A.    Very much so.

22     Q.    -- that make it up?

23     A.    Very much so.

24     Q.    Well, that sounds fair enough.

25          You also said in your questionnaire something

117

1  about -- when the judge asked you do you have any questions,
2  you said, "No, just some gray areas." Did we clear those up
3  for you or do you have any other questions about that?
4      A.   Yeah. The thing about during the robbery if you kill
5  somebody, I never understood that's the law, I guess, is what
6  you're saying, nor about things in the law, what creates the
7  circumstance for the death penalty and all.
8      Q.   That was one of your deals --
9      A.   Yeah.
10     Q.   -- where you thought about every murder case might
11  get it?
12     A.   Yes, sir. Yes, sir, I did.
13     Q.   Well, the bottom line, do you think you can be fair
14  in this case?
15     A.   Yes, sir, I think I can.
16     Q.   Would you listen to all the evidence before you make
17  a decision?
18     A.   Yes, sir.
19     Q.   And once the decision is made, can you carry through
20  with it?
21     A.   Yeah. Yes, sir. I don't have a problem with that.
22     Q.   You know that he doesn't have to prove anything?
23     A.   Yes, sir.
24     Q.   They can put on evidence if they want. They don't
25  have to. And you can't hold that against them if they don't.

118

1      A.   Correct.
2      Q.   Do you remember that?
3      A.   Yes, sir.
4      Q.   And the defendant may testify. He may not testify.
5  I don't know what he's gonna do. That's up to him and his
6  lawyers, but I can guarantee you if says he's not gonna
7  testify, the judge is gonna tell the folks on this jury, you
8  can't hold that against him.
9      A.   Yes, sir.
10     Q.   Can you follow that law too?
11     A.   Yes, sir.
12     Q.   The fact that he's been charged with this crime, does
13  that mean that he's guilty?
14     A.   No, sir.
15     Q.   Who makes that decision?
16     A.   The evidence and you.
17     Q.   Well, the evidence and the jury.
18     A.   Yes, sir. I'm sorry.
19     Q.   I don't make the decision.
20     A.   I know. I'm sorry.
21     Q.   That's okay. But you understand you have to wait
22  till all that?
23     A.   Yes, sir.
24     Q.   So just because he's indicted doesn't mean he's
25  guilty. If he doesn't testify, you won't hold that against

119

1  him?
2      A.   No, sir.
3      Q.   You presume him innocent. If know if you had to vote
4  right now, that's how you'd have to vote, innocent --
5      A.   Yes, sir.
6      Q.   -- because I have not proved anything.
7      A.   Yes, sir.
8      Q.   And remember the presumption just means you presume
9  him innocent. It doesn't mean he is innocent. Everybody
10  starts their trial with their presumption of innocence.
11     A.   Correct.
12     Q.   This is America. That's a fair way to do it. If
13  were you on trial, you don't want to be, you know, presumed
14  guilty and then have to prove your innocence. The State has to
15  prove the case against you.
16     A.   Yes, sir.
17     Q.   Okay. Any questions I can answer for you?
18     A.   No, sir.
19          MR. SKURKA: Okay. Thank you, Mr. Lyles.
20  I'll let the defense lawyers talk to you.
21          VOIR DIRE EXAMINATION
22  BY MR. JONES:
23     Q.   Let's see, I'd like to first ask you about your
24  occupation. You're a teacher?
25     A.   I'm a teacher. I'm a PE coach.

120

1      Q.   Where?
2      A.   A PE coach at Calk Elementary.
3      Q.   Oh, okay. And so how long have you been doing that?
4      A.   Ten years.
5      Q.   Wow, okay.
6      A.   I had a business before then and have a degree in
7  marketing.
8      Q.   And that's a big --
9      A.   Tell me about it.
10     Q.   -- big change?
11     A.   Second career. Third career.
12     Q.   Second career. Okay. I've heard about second
13  careers. So what was it that motivated you to go into
14  teaching?
15     A.   My wife told me to get a job. No.
16     Q.   Okay.
17     A.   No, I had sold my business after 15 years.
18     Q.   Yes.
19     A.   And I played Mr. Mom for a couple of years.
20     Q.   Yes.
21     A.   And my wife's a school teacher.
22     Q.   Oh, okay.
23     A.   And so we have the summers off, and we travel.
24     Q.   That's a good plan.
25     A.   And I love to play golf so.

121

1    Q.   Let's see, you've got kids --
2    A.   Twenty-four and 21.
3    Q.   Okay.  So they're out of the nest?
4    A.   Yes, sir.
5    Q.   Okay.  Now, as far as -- did you have to go back to
6    school to do this --
7    A.   No, sir.
8    Q.   -- the --
9    A.   No.  You can get certified and get your certificate.
10   I already have a degree so --
11   Q.   Okay.  You already had your degree.  Okay.  But your
12   primary duties are in athletics?
13   A.   Yes, sir.  Well, dealing with kids, kindergarten to
14   fifth grade.
15   Q.   All right.
16   A.   I see 450 kids every day.
17   Q.   Oh, my goodness.  All right.  So you -- all right.
18   You've been doing this for ten years?
19   A.   Yes, sir.
20   Q.   Okay.  And I presume that in your work, that you meet
21   all kinds of children?
22   A.   Yes, sir.
23   Q.   From all kinds of families?
24   A.   Yes, sir.  Broken homes, everything.
25   Q.   Everything.  Okay.  And you deal with those problems

122

1    directly?
2    A.   Yes, sir, unfortunately sometimes.
3    Q.   And I'm sure the school has an elaborate, I guess, --
4    I want to say plans or they've got ways of dealing with various
5    problems, right?
6    A.   Yes, sir.  We have counselors on campus.
7    Q.   Counselors?
8    A.   All of us are trained to do several things.  We take
9    additional training in dealing with the kids from counseling
10   to, you know, how -- mentoring, that type of thing, and stuff
11   like that.
12   Q.   Let me ask you about your jury service.  How long ago
13   was it?
14   A.   I want to say a year and a half.
15   Q.   Okay.
16   A.   Something like that.
17   Q.   Now, is attempted capital murder, if -- that's a
18   first degree felony, right?
19   A.   I'm not sure.  I don't know.
20   Q.   Well, did you-all assess -- the jury assess
21   punishment in this case?
22   A.   Yes, sir.  We gave him -- I think it was 45 years.
23   Q.   What was the range of punishment; do you remember?
24   A.   Five to 95 -- or 99 to life.
25   Q.   Ninety-nine or life.  It was a first degree felony?

123

1    A.   Yes, sir.
2    Q.   Now, why do you suppose that the legislature created
3    a range of punishment for that particular kind of offense?
4    A.   Just because every case is different and it depends
5    upon the circumstances, you know, somebody could be a good
6    citizens.  As you say, mitigating circumstances is what it
7    amounts to.
8    Q.   So that was gonna be my next question.
9    A.   Yeah.
10   Q.   Would it be fair to say that in that case, since the
11   jury did not give the man a life sentence, there must -- you
12   must have heard something in the case which made you feel like
13   that the sentence you gave was a just one?
14   A.   Yes.  Between the jurors, we -- I want to say we
15   discussed it for almost a day on the various ranges, and we
16   went from there.
17   Q.   In that case, did the defense -- after the man was
18   found guilty, did you-all hear evidence on the punishment phase
19   of the case?
20   A.   Yes, sir.
21   Q.   Did the defendant put on evidence?
22   A.   Yes, sir.  We heard from several of his people, if
23   that's what you're asking, yeah.
24   Q.   Right, family members?
25   A.   Yes, sir.

124

1    Q.   So you got to learn a little bit more about --
2    A.   -- about the individual.
3    Q.   -- about the individual?  In your -- in your
4    deliberations, did you discuss the evidence you heard at the
5    punishment stage?
6    A.   Yes, sir.
7    Q.   Did that figure into your final decision?
8    A.   Yes, sir, it did.
9    Q.   Okay.  You also discussed the offense itself?
10   A.   Yes, sir.
11   Q.   What happened, in other words, so the -- well, you
12   probably already experienced -- the procedure that you went
13   through applies in this kind of case also.
14   A.   Yes, sir.
15   Q.   Okay?  We just dress it up with some fancy language,
16   okay?  In Texas, three things have to occur before a person can
17   get the death penalty.  Keep in mind there's only two
18   punishments for capital murder.  What are they?
19   A.   The death penalty and life imprisonment.
20   Q.   Life imprisonment.  The first condition is the person
21   has to be found guilty of the crime, right?
22   A.   Correct.
23   Q.   If the person is found guilty, then the case moves
24   into the second phase, which deals with the problem of
25   punishment.  The jury can hear additional evidence.  There are

1   different rules of evidence.  And at some point the evidence

2   will close and the jury will retire to answer these two special

3   issues.

4              Condition number 2 is the jury must find off to

5   your, let's see, left hand there --

6       A.   Yes, sir.

7       Q.   -- that the answer to Special Issue No. 1 is yes.

8       A.   Yes, sir.

9       Q.   How many votes do you think it takes to get a yes

10  answer there?

11      A.   I don't know.  I guess it depends upon the jury.

12      Q.   Well, no --

13      A.   Are you talking about me personally?

14      Q.   No, just generally, the rules require what type --

15  you were told in that other case you were on -- that your

16  verdict had to be unanimous.

17      A.   Yes, sir.  That's correct.

18      Q.   Okay.  So that applies here.  Before --

19      A.   It has to be unanimous is what you're saying?

20      Q.   Yes.

21      A.   Okay.  I'm sorry.  That's what I thought you --

22      Q.   All 12.  And that's an individual decision --

23      A.   That's correct.

24      Q.   -- not a democratic decision.

25              Now, the rules are changed just a little bit in

1   this kind of case.

2       A.   Okay.

3       Q.   Let's say that 10 people vote no and two people vote

4   yes.  Ordinarily, that would create a hung jury, but under the

5   rules in this type of case, 10 votes for no, which would be

6   favorable to the defendant, you can get a verdict -- a verdict.

7       A.   Okay.

8       Q.   You would be instructed that if the answer to the

9   first issue is no, you'll stop deliberations, and the verdict

10  of the Court.  And what punishment would the judge assess?

11      A.   I would imagine he goes free.

12      Q.   No, no.  He doesn't go free.

13      A.   I don't understand.

14      Q.   What punishment would he get if the answer --

15      A.   Life in prison, I guess.

16      Q.   That's right.  And I say the judge assesses the

17  punishment.  Actually, the punishment is already predetermined

18  --

19      A.   Because of -- okay.

20      Q.   But you're permitted to know the effect of your

21  answers, so that's what I'm talking about.

22      A.   Okay.

23      Q.   So let's say that the jury in our discussion finds

24  the answer to issue No. 1 yes, then you're instructed to go on

25  to the special -- the second Special Issue.  Would you look at

1   it off to your right hand there, sir?

2       A.   Yes, sir.

3       Q.   And would you read it to yourself and tell me when

4   you're finished.

5       A.   (Venireperson complies.)  Okay.

6       Q.   Is there any word or phrase in that question that you

7   do not understand?

8       A.   No, sir.

9       Q.   Okay.  Now, you have probably already lived through

10  the thought process that this question asks you to engage in,

11  okay?

12      A.   Yes, sir.

13      Q.   So -- but I want to make sure that we understand the

14  words.

15      A.   Okay.

16      Q.   The question is asking you, is there any mitigating

17  circumstance.  What does the word "to mitigate" mean?

18      A.   Extraordinary or you know, whatever, just anything

19  out of the ordinary, mitigating anything that doesn't have to

20  do with the circumstance.

21      Q.   That's not what it means.  That's a word that's not

22  normally used in our daily conversations.  It's a lawyer word.

23      A.   I would agree with that.

24      Q.   It means to lessen.

25      A.   Okay.

1       Q.   And in the context of a criminal case, it means a

2   fact which if you believe to be true would cause you to want to

3   vote for a lesser punishment.  So in your case that you tried

4   earlier, there were probably some facts which you believed to

5   be true which caused you to vote for something less than a life

6   sentence.  I don't need to know what those facts are.  But

7   obviously, that was the case, right?

8       A.   Yes.

9       Q.   Because you hit a sentence right in the middle.  So

10  this question is asking you, are there any facts, mitigating

11  circumstances, that would cause you to believe that a life

12  sentence is more just than a death penalty in this case, okay?

13  Now, the question goes a step further in the top part of the

14  question.  It asks you to think about certain things to

15  consider.  The verb "to consider" means to think about, okay?

16  And in the context of a criminal case it's asking you to think

17  about certain things with a view toward doing something,

18  namely, voting for life or death.

19              Okay.  The first thing it tells you, you can

20  consider the facts and circumstances of the offense.

21      A.   Yes, sir.

22      Q.   You've already found the defendant guilty.  You had

23  all the details about how the offense was committed, etc.

24  Okay.  You can -- the law says you can think about that.

25      A.   Uh-huh.

129

1    Q.    Then it says, "the defendant's character and
2    background."  What is character mean?  If I say that you were a
3    person of good character, what do I mean?
4    A.    That -- high moral values, understand, I mean, right
5    from wrong.
6    Q.    Okay.  You -- do you agree that our society has a set
7    of moral values that we normally agree are the measure of good
8    conduct?
9    A.    Yes, sir.  That's why we have laws too.
10   Q.    We have laws.  We have the Ten Commandments.  We have
11   the Boy Scout Law.  Those values are stated in those documents.
12   A.    Yes, sir.
13   Q.    Okay.  If you say a person has good character, that
14   means that he generally adheres to that --
15   A.    To those laws, yes.
16   Q.    What about background, well, that's pretty easy.
17   That's a person's history, his biography, right?
18   A.    Yes, sir.
19   Q.    And so you can probably expect in a case like this
20   that you're gonna hear some evidence about background if we get
21   that far?
22   A.    Yes, sir.
23   Q.    Okay.  And all -- all the law requires is that you
24   take that information and consider it with a view toward you
25   might use it to justify voting for a life sentence rather than

130

1    a death sentence, okay?
2    A.    Yes, sir.
3    Q.    All right.  The next one says, "And the defendant's
4    personal moral culpability."  What does moral culpability mean?
5    Now, let's say before you try to answer the question, that you
6    what it is, and I want to say if you can articulate it.
7    A.    Well, I think I know, apparently I don't because the
8    lawyer words are what you said.
9    Q.    Sometimes people can know something and not be able
10   to --
11   A.    Articulate.
12   Q.    -- articulate what they know.
13   A.    Yes.
14   Q.    But I know that you know the answer to this, but I
15   want you to try to tell me in words.
16   A.    He's morally capable of doing it.  To me, that's what
17   it is.
18   Q.    Let's go back to the case of your previous jury
19   experience.  The jury in your case voted a 45-year sentence.
20   Would it be fair to say that the defendant in that case had a
21   reduced moral culpability because if he had -- if -- if he was
22   fully morally culpable, you would have given him a life
23   sentence?
24   A.    Correct, yes.  You know, when you're in the jury
25   room, you know, when you're sitting, it's done as a jury.  You

131

1    know that.
2    Q.    Sure.  It's a group decision.
3    A.    And we discussed it and between the 12 of us we
4    decided that.
5    Q.    All right.  Now let's -- I'm gonna suggest to you how
6    to think about --
7    A.    Okay.
8    Q.    -- moral culpability.  First of all, you start -- do
9    you believe in the doctrine of good will -- free will?
10   A.    Yes, sir.  It's up to you.
11   Q.    In other words, we, as human beings, have the power,
12   if you will, to choose alternate courses of action?
13   A.    Yes, sir.
14   Q.    Okay.  And, of course, we'd want to make the right
15   decisions.  So "moral" suggest that there is a code out there,
16   a set of rules that we learned from the day we were born?
17   A.    Yes, sir.
18   Q.    Your children, where do they learn their moral values
19   from?
20   A.    From their parents.
21   Q.    From their parents, from their teachers.
22   A.    Yes, sir.
23   Q.    From church, from Boy Scout leaders, from
24   grandparents, next door neighbors, in other words, adult peers.
25   A youngster picks up -- at some point learns what the rules

132

1    are.
2    A.    Yes, sir.
3    Q.    Okay.  So the first question is -- when you're trying
4    to judge moral culpability -- is what are the rules and does
5    the defendant know what they are?
6    A.    Okay.
7    Q.    Did he have the opportunity to learn them, okay?
8    A.    Okay.
9    Q.    Is there anything in his past that would have
10   interfered with his learning what the rules were, okay?  At the
11   time of the alleged conduct, did he -- was he fully aware of
12   what we expect adults to be aware of about the rules of moral
13   conduct, okay?
14         Now, the next question is, at the time that he
15   engaged in the conduct, is there any fact out there that would
16   relate to his exercise of his judgment?  Is there anything
17   interfering with his judgment about whether to take this course
18   or that course, okay?
19   A.    Yes, sir.
20   Q.    Now, let's see.  I don't know who gave the -- I think
21   the judge gave the hypothetical.  You have two people
22   committing a similar crime, a crime of theft.  One is stealing
23   to enrich himself.  The other is stealing to feed his starving
24   children, okay?  Well, obviously, if you're a judge in a case
25   like that, you're gonna give the guy for stealing to feed his

133

1  children probably a lesser punishment?

2      A.    Yes, sir.

3      Q.    Why?

4      A.    Because he's doing it for his family.

5      Q.    Okay.  That -- looking at his starving children and

6  facing his duty to take care of them is interfering with his

7  judgment, right?

8      A.    Yes, sir.

9      Q.    It's directing his judgment, actually.  So that would

10  be a mitigating circumstance.

11      A.    Yes, sir.

12      Q.    Okay.  Whereas the other guy -- the other person in

13  the hypothetical there ain't -- it's hard to rationalize.

14      A.    Yes, sir.

15      Q.    Okay.  Sometimes we have -- well, you understand.  In

16  other words, do we know the rules at the time in question?  Was

17  there anything going on in the life of the defendant which

18  would interfere -- for example, if a person has a mental

19  illness, or if the person has a diminished IQ, he's borderline

20  retarded, or intoxication, although intoxication depends on the

21  circumstances.

22      A.    Yes, sir.

23      Q.    In your own experience your son probably did some

24  things that he never would have done while he was sober, right?

25      A.    Yes, sir.

134

1      Q.    So that alcohol was -- or whatever he was taking was

2  interfering with his judgment.  And -- so, do you think -- does

3  that --

4      A.    I understand what you're saying, yes, sir.

5      Q.    Well, that's it.  That's basically it.  Now, the law

6  requires -- we don't have an option about these things.  The

7  Supreme Court of the United States directs defendants --

8  defense attorneys to investigate discovery and to prove up the

9  defendant's background, okay?  Or, to offer any evidence which

10  might relate to his moral culpability.  For example, if I were

11  representing a defendant who had a diminished mental ability,

12  like he was borderline retarded, I'd prove that up.

13      A.    Yes, sir.

14      Q.    Because that affects his ability to make judgments.

15      A.    Yes, sir.

16      Q.    Or even to know what the rules are in the first

17  place, okay?  Or if I'm representing a client that had -- that

18  came up in a deprived background, like some of the kids that

19  you -- that you teach --

20      A.    Yes, sir.

21      Q.    -- I would have to prove that up because that might

22  affect his knowledge of the value system and his ability to

23  make correct judgments.

24             Okay.  All right.  The -- real quickly -- and

25  I'm almost finished -- the right to trial by jury is the right

135

1  to an impartial jury.

2      A.    Yes, sir.

3      Q.    An impartial juror is one who comes to the task with

4  an open mind, with no prejudgments, and who doesn't lean toward

5  one side or the other.

6      A.    Yes, sir.

7      Q.    That's biases.  Is there anything -- do you know of

8  any reason why we could not assume that you would be a fair and

9  impartial juror in this case?

10      A.    No, sir.

11      Q.    Do you think you can be fair?

12      A.    Yes, sir.

13      Q.    Okay.  Come in --

14      A.    With a clean slate --

15      Q.    -- with a clean slate?

16      A.    -- as he said.

17      Q.    A clean slate, and just tell me what you got, and

18  I'll tell you whether you got know.

19      A.    Yes, sir.

20      Q.    Beyond a reasonable doubt is the standard of proof.

21  It's the highest degree of certainty required in a legal case

22  in a Texas court.

23      A.    Yes, sir.

24      Q.    Why do you think the legislature assigns beyond a

25  reasonable doubt on criminal cases?

136

1      A.    To make sure that the person -- I mean, you have to

2  prove it.

3      Q.    Okay.

4      A.    You have to prove it.

5      Q.    What's at risk -- what's at stake in a criminal case?

6      A.    You go to jail or not.

7      Q.    Loss of --

8      A.    Lawsuits --

9      Q.    Loss of liberties?

10      A.    Liberties, correct.

11      Q.    It could be loss of your life or your property,

12  correct?

13      A.    Yes, sir.

14      Q.    In this American civilization of ours, what do we

15  value most highly?

16      A.    Life.

17      Q.    Liberty and the pursuit of happiness, right?  So,

18  therefore, before the government can take those things away, we

19  need to be sure, strong evidence.  And there's a good reason to

20  do so.  We don't want to be too easy with that, okay?  Do you

21  agree with that?

22      A.    Yes, sir.

23      Q.    Okay.  And if you -- at the end of the case, if the

24  State hadn't proven their case to your satisfaction, you need

25  to return a verdict of what?

137

1    A.   Not guilty.

2    Q.   Not guilty.  Are these --

3    A.   Or --

4    Q.   If they don't, you know, if they don't prove that

5 he's a continuing threat to society, then you resolve that

6 doubt in favor of the defendant, and you vote in favor of him?

7    A.   Yes, sir.

8    Q.   Now, let me give you one illustration, and then I'm

9 gonna stop --

10    A.   Okay.

11    Q.   -- of beyond a reasonable doubt.  I didn't think this

12 story up, but I got it from somebody else.  Let's say you have

13 a box, and it's one of these file boxes we've got here.  Down

14 at the bottom of the box there's a little two-inch hole cut in

15 the side of it where it sits on the floor.  At the end of the

16 box you put a mouse.  And all of a sudden in the box you put a

17 hungry cat.  He likes to eat mice.  Put the top on the box, and

18 you come back an hour later; you open the box, and the cat's

19 still in the box, but the mouse is gone.  Did the cat eat the

20 mouse or did the mouse escape?

21    A.   You don't know.

22    Q.   Because you don't have enough information, right?

23    A.   No, sir, you do not.

24    Q.   So that -- that illustrates the problem that a jury

25 has in a criminal case.

138

1    A.   Yes, sir.

2    Q.   At the end of the case is the government -- has the

3 State given me enough evidence to convince me to this high

4 level of certainty so that I can make a decision?  And if they

5 haven't, well, then, the law says you have to vote in favor of

6 the defendant.

7    A.   Yes, sir.

8    Q.   Okay.  Do you agree with that?

9    A.   Yes, sir.

10    MR. JONES:  Okay.  I have no further

11 questions.

12    THE COURT:  Anything else?

13    MR. SKURKA:  We have no other questions,

14 Judge.

15    THE COURT:  All right.  Mr. Lyles, will you

16 wait in the jury room for a moment while I speak with the

17 lawyers?

18    VENIREPERSON NO. 90:  Yes, sir.

19    (Venireperson exits courtroom.)

20    THE COURT:  All right.  What says the State?

21    MR. SKURKA:  Judge, we'll accept the juror.

22    THE COURT:  All right.

23    MR. JONES:  Can we confer?

24    THE COURT:  Yes, sir.

25    (Counsel conferring.)

139

1    MR. JONES:  We're gonna accept this juror.

2    THE COURT:  All right.  Bring him in.  That

3 would be No. 10?

4    MR. SKURKA:  10.

5    (Venireperson enters courtroom.)

6    THE COURT:  All right.  Mr. Lyles, you have

7 been accepted on this jury, okay?

8    VENIREPERSON NO. 90:  Yes, sir.

9    THE COURT:  I know I told you this already,

10 but I want to reiterate, don't read the local section.  Don't

11 watch the local news until this case is over with.

12    VENIREPERSON NO. 90:  Yes, sir.

13    THE COURT:  If somebody tries to talk to you

14 about the facts of the case, say, "I can't talk to you.  After

15 the trial's over maybe I'll talk to you, but right now I'm not

16 going to do it."

17    VENIREPERSON NO. 90:  Yes, sir.

18    THE COURT:  Okay?

19    VENIREPERSON NO. 90:  Yes, sir.

20    THE COURT:  We believe this case is going to

21 begin December 1st.  We'll give you a call just to confirm

22 that with you.

23    VENIREPERSON NO. 90:  Okay.

24    THE COURT:  All right.  You might want to

25 figure on blocking off that week for sure; maybe the next

140

1 week.

2    VENIREPERSON NO. 90:  Okay.

3    THE COURT:  Okay?

4    VENIREPERSON NO. 90:  Yes, sir.

5    THE COURT:  All right, Mr. Lyles.  And if you

6 need a work excuse, the bailiff can get that for you.

7    All right.  Thank you, Mr. Lyles.

8    (Juror No. 10 exits courtroom.)

9    THE COURT:  No. 10.  Why don't we do this.  I

10 guess let's tell No. 94 and 96 to come back at 1:00.  We'll

11 bring in 92.  Why don't you tell them and bring in 92 and

12 we'll work till noon.

13    (Venireperson enters courtroom.)

14

15    VENIREPERSON NO. 92,

16    JOSEFA TREVINO,

17    VOIR DIRE EXAMINATION

18 BY THE COURT:

19    Q.   Okay.  You are Josefa Trevino; is that right?

20    A.   Yes, sir.

21    Q.   All right.  We're trying to pick a capital murder

22 jury.  You know that?

23    A.   Uh-huh.

24    Q.   That's why you're here.  We're running a little bit

25 behind.  But Ms. Trevino, this is a serious case so we're

141

1  giving it the time it needs, okay?

2      A.  Yes, sir.

3      Q.  That's, of course, why we're doing it individually,

4  one at a time.  Okay.  Let's see.  All right.  You have been on

5  a criminal case before?

6      A.  Yes, sir, with you.

7      Q.  Which case was that?

8      A.  Forgery.  I don't remember the name of the person.

9          MR. SKURKA:  I'm sorry.  I can't hear her,

10  Judge.

11          THE COURT:  It was in this courtroom.  She was

12  in a forgery case here.

13          MR. SKURKA:  Do you mind moving the microphone

14  a little closer to you?

15          MR. JONES:  What's the statistical possibility

16  of that?

17      Q.  (BY THE COURT) How long was the trial?

18      A.  Two days.

19      Q.  Okay.  Okay.  Well, then you know a lot of this

20  stuff.  If it was -- first of all, can you keep an open mind in

21  this case?

22      A.  Yes, sir.

23      Q.  Okay.  Because some people can't, you know.  They

24  say, "Well, I heard something in the news and it's already

25  done." But if you can, that's fine.  That's what we're looking

142

1  for, okay?

2      A.  Okay.

3      Q.  All right.  You've been in a criminal case before and

4  it wasn't that long ago, so you know the State's got the burden

5  of proof, okay?  The State brings the charges.  The law says,

6  State, you bring the charges, well, then you've got to prove

7  them, okay?

8      A.  Yes, sir.

9      Q.  Defense has no burden.  And because of that, the

10  defendant is innocent until proven guilty.

11      A.  Yes, sir.

12      Q.  You can follow that law?

13      A.  Yes, sir.

14      Q.  All right.  Then you also know the burden of proof is

15  beyond a reasonable doubt?

16      A.  Yes, sir.

17      Q.  The highest burden we have.  And you already --

18  you've already gone through this before.  Okay.  Next thing,

19  the law says since -- it really makes sense because the

20  defendant doesn't have a burden of proof.  The law says, all

21  right, look, they got no burden of proof, he doesn't have to

22  testify.  He doesn't have to testify, and you can't make him.

23  And more than that, the jury can't even consider it against

24  him?

25      A.  Right.

143

1      Q.  Okay.  Could you do that?

2      A.  Yes, sir.

3      Q.  All right.  Okay.  Now, let's see, I'm trying to

4  remember this case that we did.  Do you -- do you remember much

5  of the facts?

6      A.  Female.  It had a company.  She wrote a check of

7  those Discover card checks that they sent to a person, and then

8  she went to a tire place.

9      Q.  Okay, yeah.  That was Marroquin.

10      A.  Marroquin, that's right.

11      Q.  Delma Marroquin.

12          MR. SKURKA:  She went to a what place?

13          THE COURT:  She went to a tire place.

14          MR. SKURKA:  A tire place.

15      Q.  (BY THE COURT) It was Delma Marroquin?

16      A.  Yes, sir.

17          MR. SKURKA:  It was Delma Marroquin?

18          THE COURT:  Yes, sir.

19          MR. SKURKA:  I remember that case.

20          THE COURT:  Yes, sir.

21      Q.  (BY THE COURT) Now look, remember that case,

22  defendant -- defendant was acquitted in that case, as I recall?

23      A.  Yes, sir.

24      Q.  Okay.  Now, you may have thought she was guilty, I

25  don't know, but the State didn't prove their evidence beyond a

144

1  reasonable doubt, right?

2      A.  Correct.

3      Q.  Okay.  That's -- that's the burden here.  I had a

4  juror just this weekend tell me, you know -- it was a

5  completely different trial than yours -- and he said, "You

6  know, we thought he did it, but we didn't think the State

7  proved their case beyond a reasonable doubt." And that's --

8  and that juror did exactly the right thing.  You don't think

9  they proved it beyond a reasonable doubt, that's fine.  It's

10  not innocent versus guilty.  It's not guilty versus guilty,

11  okay?

12      A.  Yes, sir.

13      Q.  And you understand that concept?

14      A.  Yes, sir.

15      Q.  All right.  Now, in that case, you know, of course,

16  that we have two parts of the trial because you've been in a

17  trial before.  There's the guilt or innocence phase and then

18  there's the punishment phase.  Now, you didn't get to the

19  punishment phase --

20      A.  Correct.

21      Q.  -- because if the defendant's found not guilty, you

22  don't get there.  But we've got to talk about what if we get

23  there in this case.  We don't know if we're going to get there,

24  but we still got to talk to you about it, okay?

25          So the first part, guilty or not guilty.  All

145

1  right. Second part, punishment. This is a capital murder.
2  What's that? Well, it's murder, obviously, the intentional
3  taking of the life of another. But it's murder plus, murder
4  plus something else. In this case, murder plus robbery or
5  attempted robbery. That's the allegation, okay?
6          What's robbery? Well, let's say I pull a gun on
7  you, and I say, "Give me your money." And you say, "okay,"
8  then you give me your purse. I robbed you. Because I
9  threatened you -- or I could have done it by force. But, you
10  know, I can either threaten or use force to take something from
11  you, okay? It's a burden.
12          All right. Let's move along. What if I did the
13  exact same thing, but it wasn't a purse you were holding; it
14  was a bowling ball, you know, a carrying case, and you had a
15  bowling ball and you well over and hit me over the head and
16  knocked me out; am I guilty of robbery? No, but I'm guilty of
17  attempted robbery. And the reason I bring this up is the State
18  has alleged that this defendant committed the act of robbery or
19  attempted to do so, and in the course of doing so, killed
20  somebody. All right. That's right. That's what they have to
21  prove. All right?
22          So, it's murder plus, murder plus the robbery.
23  Two crimes. And, of course, you know from your prior service
24  that the State has to prove elements. They have to prove all
25  the elements. Would you require them to prove all the elements

146

1  of capital murder before you found someone guilty?
2      A.   Yes, sir.
3      Q.   All right. Next thing, in that case I think -- I
4  don't know if you were even going to do the punishment, should
5  you have found the person guilty. In any event, in this case
6  if you find -- if you get on this jury, and if the defendant's
7  found guilty, you will be asked to do punishment. Two
8  possibilities: life imprisonment or death, both serious
9  things, okay? You don't say number of years. It's life or
10  death. But you don't say life or death. You answer questions,
11  and here's one of them.
12          "Is there a probability that the defendant would
13  commit criminal acts of violence that would constitute a
14  continuing threat to society?" What does that mean? Well, is
15  it probably -- probably, more likely than not, 51 percent, that
16  the defendant would be violent with people in the future, okay?
17      A.   Okay.
18      Q.   All right. The jury answers yes or no. The second
19  issue, "After taking into consideration all the evidence,
20  including the circumstances of the offense --" that's the first
21  part of the trial, guilt or innocence -- "the defendant's
22  character and background --" what's that? Well, character,
23  what kind of guy is he? Is he an honest guy? Is he a
24  trustworthy guy? Has he been a great guy other than this
25  incident, okay? Background. What's that? Well, his

147

1  childhood. Was it a good one, was it a bad one? Did he get
2  abused as a child? You consider it, okay?
3          Third thing, his personal moral culpability.
4  All right. That is legalese written by a lawyer. But let me
5  tell you what it is. Let me give you an example.
6          Two people get convicted of burglary. One
7  person breaks into a house, just ransacks the place, just tears
8  the place apart. Takes everything of value, TVs, VCRs, CD
9  players, video games, wife's jewelry, everything, sells it, and
10  he spends it on hookers and cocaine, okay?
11          The second guy gets convicted of burglary. He's
12  been working at his job 20 years get laid off through no fault
13  of his own. The economy's bad. They lay him off. Times are
14  hard. They run out of money. Eventually, his three kids don't
15  have anything to eat. They haven't eaten in a couple of days.
16  He goes into somebody's house. He doesn't break in. He just
17  goes through an unlocked door. He takes food, he goes back,
18  feeds the kids, okay? He's starving himself, but he doesn't
19  eat. He wants to make sure the children really get their fill.
20  Now, they're both guilty of burglary, right, but is their
21  personal moral culpability the same?
22      A.   No.
23      Q.   It is not. It is not, okay? That's what that's
24  talking about, personal, moral culpability.
25      A.   Okay.

148

1      Q.   All right. After considering all this, is there
2  sufficient mitigating circumstance or circumstances that
3  warrant a sentence of life imprisonment rather than the death
4  sentence be imposed? Okay, what's that mean? What is a
5  mitigating circumstance? Well, mitigating means to lessen,
6  okay? Mitigating circumstance. Let's say I told you --
7  because one of the things you're gonna hear about is his
8  background. Let's say I told you he was in Desert Storm, and
9  he risked his own life in Desert Storm to save the lives of 20
10  soldiers, okay? And he got the Congressional Medal of Honor.
11  You might say that is a mitigating circumstance. That's
12  something in his favor. That's something good about him, okay?
13      A.   Okay.
14      Q.   Maybe he was an Eagle Scout. Maybe he used to teach
15  little kids to read that wouldn't otherwise ever learn, okay?
16  Mitigating circumstances, maybe if you feel like that's a
17  mitigating circumstance, okay? These lawyers will suggest to
18  you, I believe, during the trial, what a mitigating
19  circumstance is. Only the jury gets to decide. In other
20  words, you may say the fact that he saved all those 20
21  soldiers, that's a mitigating circumstance to me. The next
22  person may say, no, not to me, okay?
23          Now, does that mean that he is excused from the
24  criminal activity? No, you already found him guilty. It
25  doesn't excuse him for the crime. What this question's asking

149

1  is take into consideration his whole life. Is there mitigating
2  circumstances, first of all, all right? And then are they
3  sufficient to warrant life imprisonment? Because you might
4  say, you know the fact that he saved those 20 soldiers, it was
5  a mitigating circumstance. I'm putting that on his side of the
6  balance sheet, but it's not sufficient to warrant life rather
7  than death, or maybe it is. Or maybe it in connection with all
8  of the other mitigating circumstances versus the aggravating
9  circumstances, the bad things about him, warrants life rather
10  than death. That's only for the jury to decide, okay?
11      A.   Okay.
12      Q.   And you know this, because when I started that trial,
13  do you remember when I raised my right hand, and you raised
14  your right hand, and you took an oath to render a true verdict
15  based upon the law and evidence presented to you?
16      A.   Yes, sir.
17      Q.   Right? And then you-all put on your tags?
18      A.   Yes, sir.
19      Q.   Okay. I need to know if you can do that in this
20  case. And before you answer, let me stop you. Some people
21  tell me, you know, they say, "Well, I could sit on that forgery
22  case, but I can't sit on this one, and I can't take that oath
23  because I can't participate in the process that leads to
24  someone's death." Flip side. They say, "I'll give them a fair
25  trial on the first part, but if we find him guilty of capital

150

1  murder, your law means nothing to me, I'm gonna answer these
2  questions, make sure he gets the death penalty, and I will not
3  consider these issues." Those two people cannot follow the
4  law. And if they feel that way, it's okay; it's just not fair
5  to get on this jury. So I need to know from you, can you
6  follow the law?
7      A.   Yes, sir.
8          THE COURT: All right. Mr. Skurka.
9              VOIR DIRE EXAMINATION
10  BY MR. SKURKA:
11      Q.   Hi, ma'am. My name is Mark Skurka. I'm an assistant
12  district attorney along with Mr. Schimmel here. We'll be
13  presenting the case to you on this jury, if you're selected on
14  the jury. Today we're gonna talk to you about, in a little
15  more detail, on what the judge went into. Some of it is going
16  to be a little repetitious, but we kind of just need to go over
17  it a little bit more to make sure everybody's on the same page
18  as far as qualifying you as a juror. I can start off by
19  telling you there's no right or wrong answers to anything you
20  say. We just want to know how you feel about this case -- or
21  feel about some issues in this case. I don't want you to
22  answer in such a way that you say, "Well, I better say it this
23  way because that's probably what the judge wants me to say," or
24  "I better answer this way because that's the way the defense or
25  the State wants me to answer." We just want to know how you

151

1  feel, okay?
2      A.   Okay.
3      Q.   It's important to tell jurors that it's okay to say
4  how you feel even if it's not what you think that we want to
5  hear. Does that make sense?
6      A.   Yes.
7      Q.   Because these are some hard decisions, and we need to
8  explore with you, can you really sit on this type of jury. In
9  other words, it's okay for you to not sit on this jury, just as
10  much as it is okay for you to sit on this jury. Let me give
11  you an example. Remember that I kind of gave a corny example
12  the other day because I'm a big Dallas Cowboy fan, remember?
13  And I said, what if a guy comes up in a Washington Redskins
14  uniform. I'm sitting on the jury and they bring in the
15  defendant. That's the defendant, you know. I say, I hate the
16  Redskins. I'm automatically going to vote against him. I'm
17  already gonna think he's guilty. Well, I might be okay on some
18  other kind of jury, but I certainly wouldn't be good on that
19  kind of jury, right, because I'm already biased or prejudice?
20  And so it would be my duty to tell the judge, "Look, I can't be
21  fair in this case. He's a Redskin." But the Cowboys did beat
22  the Redskins, if you didn't know that.
23      A.   Yes, I knew that.
24      Q.   You did know that. Well, I just wanted to make sure
25  because everybody should know that. Okay. I know that's kind

152

1  of a silly example, but it really makes sense, right? If you
2  can't do it, you can't. If you can, you can. That's fine.
3  And the first question I want to talk to you about is the death
4  penalty because there's no doubt that's an important issue in
5  this case. Remember that first day when I came in there and I
6  told you, I said, "Look, the State of Texas has decided that
7  we're gonna seek the death penalty against this guy right
8  here." I want you to look at him and tell me, do you think you
9  could participate in that kind of case?
10      A.   Yes, sir.
11      Q.   Why?
12      A.   I need to see evidence and to detail, I need -- you
13  know, I'm sorry, but it is your burden to prove it and --
14      Q.   Well, you don't have to apologize. That's my burden
15  in every case.
16      A.   Right. So that's the type of person I am.
17      Q.   The reason -- you see what I'm saying though because
18  I know if you saw some other people around there that first
19  day. Remember there was 200 or 300 people in there, and the
20  judge came down and said, "Folk s, this is a criminal case
21  you're gonna serve on." And everybody looks at him and says,
22  Maybe it's a shoplifting case or DWI case. And then the judge
23  says, "It's not just that. It's going to be a capital murder
24  case. You, if you're picked on this jury, may have to serve on
25  that jury and make a decision on life or death." What was your

153

1   first reaction when you heard it was that kind of case?

2       A.   It's just weird because I've never served a jury on

3   that, and it's just something greater than what I've served.  I

4   didn't really judge or anything in that fact, but it was just

5   different.

6       Q.   Okay.  Well, I'm not really asking if you judged.  I

7   just thought -- do you know what I'm talking about?  Did you

8   see people they were going like, "Oh, my gosh, I can't believe

9   it's that kind of case."  And some people were affected by it

10  and some were not.  I was just kind of curious to know how it

11  affected you when you heard it was this type of case?

12      A.   Not to where it affected me to where I'm like

13  panicking or anything.

14      Q.   And I guess I said the work "freaking out."  That

15  sounds a little bad.  But there's people who are very honest

16  and they come up to us and they'll say, "Look, Judge, you know,

17  because of my religious beliefs or because of my moral beliefs,

18  or just because I can't handle making that kind of decision,

19  matter what it is, I can't sit on that type of trial."  And if

20  they say that, that's fine, you know, we're not gonna argue

21  with them.  We just need to know if they're qualified.  And I

22  just want to kind of know what your reaction to that is.

23      A.   I don't have to where it's -- you know, I'm -- it's

24  gonna affect me, and like you're saying, you know, with the

25  religious, no, it doesn't matter to me.

154

1       Q.   I just use that as an example.  It could be anything.

2       A.   But, no, I'm okay with it.

3       Q.   Some people just say, "I can't make that decision.

4   Only God makes that decision."

5       A.   Right.

6       Q.   Some people say, "Well, I have my own feelings on

7   that."

8       A.   Right.

9       Q.   So that's not gonna interfere with you sitting on

10  this jury?

11      A.   No, sir.

12      Q.   You said that in your questionnaire too, about "I

13  could give the death penalty only if it's shown that he has a

14  violent history."  Do you remember when you wrote that in your

15  questionnaire?

16      A.   Yes, sir.

17      Q.   The law in Texas doesn't require a person to have

18  prior offenses in order to get the death penalty.  In other

19  words, you can make the decision based on just the case itself.

20  He may never have a criminal history.  Maybe he doesn't even

21  have a traffic ticket.  Would that affect you or would that --

22  would you want to have more before you make that kind of

23  decision on whether he gets the death penalty or not?

24      A.   I do think so because automatically, I mean, I don't

25  think he should -- it has to be weighed, you know.  Maybe I'm

155

1   saying the wrong word, but it's just I want to know more as to

2   what can contribute to giving him the death sentence.

3       Q.   Okay.  Let me say it again, okay?  You may or may not

4   hear about his background.  You may not hear that he's got a

5   prior violent history.  You said in your statement here on the

6   questionnaire, "Death penalty is okay, but only if he's proved

7   to be a violent person and has a violent history."

8            What I'm saying is, the law says you can give

9   the death penalty even though he doesn't have a history or a

10  violent history.  Maybe he never even got a traffic ticket

11  before.  Would you require or would you want him to have a

12  violent history or the State to prove that before you could

13  vote for the death penalty?  In other words, his past, his

14  background, his violence?

15      A.   I do.

16      Q.   You do -- you would require that?

17      A.   Yes, sir.

18      Q.   Okay.  Because, you know -- I'm -- I can't commit you

19  to how you're gonna vote right now, but there's a part of the

20  law that says the State can rely just on the first part of the

21  trial.  Remember the judge said this first part and the second

22  part of the trial?  The State can just rely on the first part

23  of the trial, the facts and circumstances of the offense.  And

24  you don't have to have any other additional evidence or past

25  violent history.  So you're saying you would have a hard time

156

1   following that law; you would require a violent history?

2       A.   Yes, sir.

3       Q.   Or evidence of a violent history?

4       A.   Yes, sir.

5       Q.   Okay.  And that's okay if you do.  We just want to

6   know because --

7            MR. SKURKA:  Okay.  That's all the questions I

8   have.

9            MR. JONES:  Your Honor, I --

10           THE COURT:  Do you have questions you can ask

11  her.

12           MR. JONES:  Yeah.

13           THE COURT:  If you want to take something out

14  of the presence, we can.

15           MR. JONES:  Okay.  Maybe I can clarify because

16  I was gonna object to his question because I don't think it

17  was a fair question.

18           THE COURT:  Well you can ask questions.

19           VOIR DIRE EXAMINATION

20  BY MR. JONES:

21      Q.   Tell me again.  You said in your questionnaire if you

22  voted for the death penalty, you would be motivated to do so if

23  the defendant had a violent history, --

24      A.   Yes, sir.

25      Q.   -- right?  Are you saying that you would never vote

157

1  for the death penalty?  Actually, you don't vote for the death
2  penalty, okay?  The jury answers two Special Issues.  Let's
3  talk about the special issues.  The first one is off to your
4  left, okay?  If the jury finds the defendant guilty of the
5  offense charged, capital murder, then the case goes into its
6  second phase, which is the punishment phase of the trial, and
7  the jury will hear new evidence that's relevant to these two
8  questions, okay?  And in order to be a qualified juror in this
9  case, you have to tell the Court that you will honestly answer
10  these questions to the best of your ability based on the
11  evidence that you heard, okay?
12      A.    Okay.
13      Q.    Now, let's talk about Special Issue No. 1.  "Is there
14  a probability that the defendant would commit criminal acts of
15  violence that would constitute a continuing threat to society?"
16           That's a pretty straightforward question.  But
17  generally speaking in a case of this kind it's a murder case,
18  which is a violent act, right?  Can you conceive of a fact
19  situation where the violence -- the underlying offense was of
20  such a nature that you could infer that this guy might, you
21  know, commit acts like that in the future?
22      A.    Yes.
23      Q.    Okay.  That's what Mr. Skurka was saying is that even
24  though a person has no criminal history, he could still get the
25  death penalty if the underlying case is particularly, you know,

158

1  bad.  You know, like, for example, let's say you have a case
2  where somebody shoots somebody with a gun in the course of
3  committing, let's say, a -- I don't know, in case of a
4  kidnapping, okay?  They kidnap a person and they take them out
5  and they shoot them, okay?  Or a case where somebody kidnaps
6  somebody and takes them out and shoots them -- no, before they
7  shoot them they torture them, you know, and do all kind of
8  bizarre and horrible things, and then they shoot them, okay?
9  Well, one case is obviously more violent than the other, right?
10      A.    Correct.
11      Q.    And from that kind of facts you can infer that, gosh,
12  anybody would do that, I could reasonably believe that there's
13  a probability that he might do it in the future?
14      A.    Okay.
15      Q.    Okay.  So -- so the fact -- the fact that the
16  evidence may not show any criminal history of the defendant
17  does not mean you can't answer these questions truthfully; is
18  that what you're saying?  In other words, you can answer these
19  questions truthfully based on the evidence?
20      A.    On the evidence.
21      Q.    Yeah, right.
22      A.    Yes.
23           THE COURT:  I guess -- let me ask you this.
24  Let's cut to the chase here, because both lawyers have asked
25  you and you did tell me you could answer these questions.  The

159

1  law says this.  The law says -- and we're not trying to commit
2  you, okay?  The law says that you can answer these questions,
3  taking into consideration all these things, but one of the
4  things is the circumstances of the offense, okay?  Do you
5  follow me?
6           VENIREPERSON NO. 92:  Yes, sir.
7           THE COURT:  And the law says that you can
8  vote -- you know you can answer this yes.  Just like Mr. Jones
9  said, you can answer this yes just based upon the facts of the
10  case.
11           VENIREPERSON NO. 92:  Okay.
12           THE COURT:  All right.  And then you can come
13  over here and if that's all you're presented, you know, or
14  you're presented nothing else bad about the defendant, could
15  --
16           VENIREPERSON NO. 92:  Then it would be tough.
17           THE COURT:  Well, tough is one thing, but if
18  you can't do it, that's another.  If you can't, that's okay,
19  we just need to know.  If you cannot answer this question --
20  in other words, if you could never answer this question, if
21  you were just given the circumstance of the offense, you would
22  always vote for a sentence of life -- do you follow what I'm
23  saying?
24           VENIREPERSON NO. 92:  Yes, sir.
25           THE COURT:  If you need more than that.  I

160

1  mean -- I'm gonna let you -- well, okay, you sound like you've
2  got a question.
3           MR. JONES:  Well, I want to get down to what
4  we're talking about here.  Basically I think we're moving to
5  whether she can take the oath or not.
6           THE COURT:  Yeah, okay.  And I think she's
7  answered on Question 1 she could base that just on the one
8  situation.
9           MR. JONES:  Right.
10      Q.    (BY MR. JONES) Let's say that you're on a jury in a
11  capital murder case and you've heard all the evidence and both
12  sides -- both phases of the trial.  And you answer Special
13  Issue No. 1 and you say, you know what, I believe beyond a
14  reasonable doubt that that question should be answered yes,
15  okay?  And then you go to Special Issue No. 2, which is asking
16  you, are there any circumstances in the case that would warrant
17  me to vote for life rather than death?  And let's say that you
18  believed that the answer should be no, this case was so bad, I
19  haven't heard any evidence that would cause me to think that a
20  life was a more just punishment.  Okay.  But then you say
21  this -- and you know what's gonna happen.  You know that if you
22  vote yes to that and no to number 2, what's gonna happen?
23      A.    An acquittal.
24      Q.    No, no.  He's gonna get the death penalty.
25      A.    Oh.

161

1  Q.  The death penalty.  So you know the effect of your
2  answers, and you've honestly answered those questions yes and
3  no, and the judge -- you'll be told in the charge that will
4  result in the death penalty.  But then you say to yourself,
5  well, you know what, I didn't hear any evidence about violent
6  past, you know, like prior convictions for violent crimes.  And
7  that's the bottom line for me, so I'm going to answer this
8  question -- I'm gonna lie.  I'm going to vote yes just so that
9  he'll get the -- do you see what I'm saying?
10  A.  Yes, sir.
11  Q.  Would you do that?
12  A.  No.  I need -- I'm still sticking, you know, to the
13  part that I need to find out what's going on to get him to the
14  point where he's at right now to where I'm gonna be deciding.
15  Q.  You've said that an important consideration for you
16  would be a history of violent conduct, right?
17  A.  Correct.
18  Q.  Well that goes to the defendant's background.  So if
19  he has a lot of history of violent conduct, that would be an
20  important consideration.  If he doesn't have any, that would be
21  a consideration.  But you're not saying that if there's a total
22  absence of a prior convictions for violent conduct or a history
23  of violent conduct, that you're automatically gonna vote for a
24  life sentence?
25  A.  Correct.

162

1  Q.  You're not saying that?
2  A.  What I'm saying is if there's a violent history, I
3  would go rather to the death sentence.  But if there's no
4  proven, I would go to the life sentence.
5  Q.  Automatically?
6  A.  Automatically.
7  THE COURT:  Okay.  All right.  Why don't
8  you -- can you go to the jury room while I speak with the
9  lawyers?
10  VENIREPERSON NO. 92:  Yes, sir.
11  (Venireperson exits courtroom.)
12  MR. SKURKA:  The State would move to challenge
13  this juror for cause.
14  THE COURT:  What say you?
15  MR. JONES:  She didn't say the magic words.
16  THE COURT:  I think she did.  On your question
17  she said, "I would vote automatically."
18  MR. JONES:  Well, I know.  That's what I'm
19  saying.  She didn't say the magic words that would qualify
20  her.  I think that's an indispensable --
21  THE COURT:  I mean, you asked her and she said
22  I would -- I mean, to her, it's -- I mean, it is a good
23  consideration, obviously, if he's got a violent past.  But she
24  said automatically, and I just -- I think I'm gonna sustain
25  the State's motion.  Let's bring her in.

163

1  (Venireperson enters courtroom.)
2  THE COURT:  All right.  Ms. Trevino, you were
3  not selected to be on this jury, but we really appreciate your
4  service, and we're sorry we didn't get to you right on time.
5  Thank you for coming down here.  If you need a work excuse the
6  bailiff can get that for you.
7  VENIREPERSON NO. 92:  Thank you.
8  THE COURT:  See you after lunch.  We'll keep
9  going.
10  (Noon recess.)
11  THE COURT:  You can ask him to come in.
12  Mr. Moore, all right.
13  Mr. Moore, come on over and have a seat here.
14
15  VENIREPERSON NO. 94,
16  WALTER JOSEPH MOORE,
17  VOIR DIRE EXAMINATION
18  BY THE COURT:
19  Q.  All right.  You are Walter Moore; is that correct?
20  A.  Yes, sir.
21  Q.  All right.  Mr. Moore, you know we're trying to pick
22  a capital murder jury, and we're trying to find people who can
23  keep an open mind and be fair, okay?
24  A.  Yes, sir.
25  Q.  We also need people who can follow the law, okay?  So

164

1  we're gonna talk about a few things.  First of all, is there
2  anything that would keep you from keeping an open mind in this
3  case?
4  A.  No.
5  Q.  Okay.  I see you haven't heard anything about the
6  case?
7  A.  I have not.
8  Q.  That's fine.  I mean, some people have --
9  A.  I just moved here about three years ago.
10  Q.  That's fine.  I mean, some people have heard stuff in
11  the media, but it's okay, as long as they can put it aside.
12  Okay.  But you have not.  All right.  You can keep an open
13  mind.  You've never been on a jury before, but that's fine.  No
14  experience necessary.  Let's talk about a few things.  This is
15  a criminal case.
16  A criminal case means that the State has the
17  burden of proof.  They brought the charges.  The law says, you
18  bring them, you got to charge -- you charge them; you got to
19  prove it.  Do you accept that?
20  A.  Yes, sir.
21  Q.  All right.  The law says until you do, State,
22  defendant's innocent until proven guilty.  That's all of our
23  rights.  We don't make people prove their innocence here.
24  State's got the burden of proving.  Can you follow that?
25  A.  Yes, sir.

165

1    Q.    All right. Now, the burden of proof in this case is
2    beyond a reasonable doubt. There is no definition, but I like
3    to define it by it is not. It is not preponderance of the
4    evidence, which is the evidence that we would use in a civil
5    case, all right, contract dispute, kind of like a 51 percent,
6    right?
7    A.    Yes, sir.
8    Q.    Clear and convincing is another standard of proof
9    that we have in the law. That's a higher standard. That is
10   the type of standard that we use in some civil cases. But in
11   any event, almost notably when we have a -- the State's trying
12   to terminate parental rights, they have to use clear and
13   convincing evidence to prove that the parent is unfit, okay?
14   And that sounds pretty high, right, clear and convincing?
15   That's not -- I can tell you it's higher than the 51 percent.
16   This is higher than clear and convincing. This is beyond a
17   reasonable doubt, okay?
18   A.    Okay.
19   Q.    That's not beyond all doubt, okay, because to be
20   beyond all doubt, you'd have to have been there. You had to be
21   a witness, and then you'd be disqualified from being a juror.
22         Now, my question to you is this, and, of course,
23   the whole thing is reasonable. That's the key word in that
24   term, beyond a reasonable doubt. Could you hold the State to
25   that burden?

166

1    A.    Yes, sir.
2    Q.    All right. No more, no less?
3    A.    Yes, sir.
4    Q.    All right. Next thing, the law says, Constitution
5    says since the State's got the burden of proof, the defense has
6    no burden. They don't have to do anything. They don't have to
7    put on evidence. And most notably, they don't have to put on
8    their client. Some people say, "Well, I got to hear both sides
9    of the story." Huh-uh. This is not a race between the State
10   and the defense. This is only a race to see if the prosecution
11   gets over the finish line which is beyond a reasonable doubt,
12   okay? As part of that, defendant doesn't have to testify. And
13   it's deeper than that because not only does he not have to
14   testify. The law says the jury can't hold it against him.
15   They can't say, "State, all right, we've heard your case. What
16   about defense? Oh, defense hadn't presented anything. Okay.
17   We're gonna put some points over here for the State because
18   they didn't do anything." You can't do that. All right. Can
19   you follow that law not to hold it against the defendant?
20   A.    Yes, sir.
21   Q.    All right. Let's talk about the case itself. The
22   allegation is capital murder, and what is that? Well, it's
23   murder, for sure, the intentional taking of the life of
24   another. And the capital part makes it death penalty eligible,
25   okay? Capital murder. The legislature has given us a laundry

167

1    list of what things fall into capital murder. In this
2    particular case the allegation is that the defendant committed
3    a murder while in the course of committing or attempting to
4    commit a robbery, okay? So the legislature says you put
5    robbery and murder together. Those are two serious felonies.
6    That can get you to capital murder, all right?
7          What's robbery? Well, robbery is not burglary.
8    That's sometimes misconstrued. I had a cousin the other day
9    told me he was robbed. What he meant was someone had broken
10   into his business and burglarized him. Robbery is the -- is
11   taking property from another, either by force or by the use of
12   threats of violence, okay? If I came to you and I held a gun
13   to you and I said, "Give me your wallet," and you gave it to
14   me, that's a robbery. If I come to you and I say, "Give me
15   your wallet," and hold a gun to you and say, "I'm gonna shoot
16   you," but you punch me in the face and knock me out, that's
17   attempted robbery.
18         The point is, the State can get there either way
19   in this case if they can show either the robbery or the
20   attempted robbery; and in the course of doing so, the murder
21   occurs. Do you follow me?
22   A.    Yes, sir.
23   Q.    But the State has to prove all their elements. They
24   don't get to prove -- I don't exactly know how many, but
25   they're a good number because there's two felony cases here.

168

1    The State has to prove that this defendant in Nueces County,
2    Texas, on the given day committed the offense of murder while
3    in course of committing or attempting to commit a robbery, all
4    right? You have to prove all the elements. Would you require
5    them to prove all the elements?
6    A.    Yes, sir.
7    Q.    All right. Now, there are two things -- there are
8    two possibilities in a capital murder case, if the defendant is
9    found guilty. If the defendant is found not guilty, the case
10   is over with, all right? If the defendant's found guilty, we
11   go to the second part of the trial, okay, the punishment phase.
12   There's two possibilities: Life in prison or the death
13   penalty, okay? Both very serious punishments. But the jury
14   doesn't deliberate and say life or death. They answer
15   questions, okay? And let's talk about these questions. Here's
16   the first one.
17         "Is there a probability that the defendant
18   would commit criminal acts of violence that would constitute a
19   continuing threat to society?" All right. What does that
20   mean? Well, do we probably believe, that is, the jury, that
21   he will be violent with people in the future?" Okay. Future
22   dangerousness question. The jury answers that yes or no. All
23   right. Then they go to the second question.
24         "After taking into consideration all of the
25   evidence, including the circumstances of the offense --" that

169

1  is the first part of the trial, okay, the guilt/innocence
2  phase, "-- the defendant's character and background --" Well,
3  what's that? Character. Well, what kind of guy is he? Is he
4  an honest person? Is he a good person? Is he the type of
5  person that has high moral standards and that other than on
6  this occasion, he's been a good guy? Or is the opposite true,
7  he's a person of bad character, a liar and a cheat? Okay.
8  His background, what's that? Well, his childhood, how he grew
9  up, that kind of thing. Was he abused as a child? Did he
10  come from a good background, okay? Stuff like that. "-- and
11  the personal moral culpability of the defendant." All right.
12  That's -- that's a little legalese there. But what does that
13  mean? I like to give an example to illustrate that.
14          Two people found guilty of burglary, all
15  right? You're the judge. The facts of the first case.
16  Defendant breaks into a house, just trashes the place, tears
17  the place apart. Takes everything of value, TV, video games,
18  VCR, CD player, woman's jewelry, everything, everything he can
19  sell. He sells it all, spends the money on hookers and
20  cocaine, okay? That's one person.
21          The second person loses his job of 20 years,
22  not for -- not because of his own -- not because it's his
23  fault, but because the economy's had a downturn, and they're
24  down sizing. Eventually he can't get a job. He can't find a
25  job, they run out of money because they're already on the

170

1  margin anyway. He's got three kids. They need to eat. The
2  kids haven't eaten in three days. He goes into a house -- not
3  breaks in, but he goes through an unlocked door, steals only
4  food. He himself is very hungry, but he does not eat himself.
5  He wants to make sure that the kids eat their fill, and he
6  feeds his children. Now, they're both guilty of burglary.
7  Their personal moral culpability is not the same. You would
8  agree with that?
9      A.  Yes.
10     Q.  Okay. One does something for his own selfish
11  interests; the other one does something for someone else, okay?
12  All right. Now, after -- so I want you to consider all those
13  things. Is there -- after considering that, is there
14  sufficient mitigating circumstances or circumstances that
15  warrant a sentence of life imprisonment rather than a death
16  sentence? Okay. The second half -- the first part of the
17  trial, all you're gonna hear about is the alleged crime itself,
18  okay? The second half you may -- you're gonna hear about other
19  stuff, background, I suspect. I mean, it's up to the lawyers
20  to present this. Maybe a criminal history. Maybe there is no
21  criminal history. Maybe you'll -- what is a mitigating
22  circumstance? Well, example. Let's say he was a war veteran,
23  and he saved a platoon of soldiers at the risk of his own life
24  in the Gulf War, and he got the Congressional Medal of Honor.
25  You may consider that a mitigating circumstance, okay? Another

171

1  juror may not. Only the jury gets to decide what is a
2  mitigating circumstance. These lawyers will suggest to you
3  different things. Only the jury gets to decide, okay?
4          Maybe he's an Eagle Scout. Maybe he teaches
5  children to read in his spare time, okay? So what they want
6  you to do here is they want you to take in everything, all the
7  good, all the bad, the mitigating circumstances. Mitigating.
8  What does that mean? To lessen. Circumstances that lessen
9  perhaps not his culpability because he's guilty. It's not an
10  excuse for the crime, but it may be a factor to take into
11  consideration in the punishment, all right? So they want you
12  to consider that.
13          Now -- so you have to answer yes or no. Is
14  there sufficient mitigating circumstances? You might say,
15  "Yes, I think the fact that he was a war hero and that he saved
16  these people is a sufficient mitigating circumstance to -- to
17  give him life in prison." That compiled with the others. Or
18  you may say, "Yes, it is a mitigating circumstance, but it
19  isn't sufficient to warrant a life sentence rather than a death
20  penalty." Okay? Do you follow this question?
21     A.  Yes.
22     Q.  The jury would answer yes or no. At the beginning of
23  every trial I ask the jurors to take an oath. They raise their
24  right hand and I tell them, "Do you solemnly swear that you
25  will render a true verdict based upon the law and evidence as

172

1  presented to you?" And then they say yes. And I'm asking you
2  if you can take that oath in this case. And before you answer
3  some people tell me, "I can't take your oath because I cannot
4  participate in a process that could lead to the death penalty."
5  Or, "I can give him a fair trial on the guilt or innocence
6  phase, but if we get to punishment, I will not follow your law.
7  It means nothing to me. I am going to answer the questions in
8  such a way that he will always get the death penalty, not
9  giving any consideration to these questions." Neither of those
10  people can follow the law and take the oath. But I need to
11  know from you, can you follow the law and take the oath in this
12  case?
13     A.  Yes, sir.
14          THE COURT: All right. Mr. Skurka.
15          VOIR DIRE EXAMINATION
16  BY MR. SKURKA:
17     Q.  Hi, Mr. Moore. As the judge introduced me, my name
18  is Mark Skurka. I'm the first assistant district attorney
19  here. Along with Mr. Schimmel, we'll be the ones at the DA's
20  office presenting this case to if you get selected to sit on
21  this jury.
22          The first thing I want to tell you is there's
23  no right or wrong answers to anything you say. All we want to
24  know is learn a little bit more about you, about your
25  questionnaire, but as you might guess, it might lead to more

173

1  questions. And we just kind of want to see how you feel about
2  some of the issues in this case, okay? Let's start off with
3  the main one. I mean, obviously, the biggest issue in this
4  case is the death penalty. When you heard it was that kind of
5  case, remember that first day we were in that big room with
6  all those people, and the judge came down and said, "Look,
7  this is a capital murder case. You may be called upon to
8  decide if a person lives or dies." What was your first
9  reaction when you heard that it was that kind of case?
10  A.  Serious case.
11  Q.  I was watching some of the jurors out there, and I'll
12  tell you, I saw some of them go like, "Oh, my gosh, I can't do
13  this kind of case." And then I saw some people going like,
14  "Oh, I've got to find a way to get out of this." And then I
15  saw a lot of people just kind of sit up a little straighter,
16  listen a little closer and say, "You know, I'm here to do my
17  civic duty. I better make sure I listen to everything to what
18  the judge says." Did you feel that way?
19  A.  I would hope that I'd follow the latter case.
20  Q.  Well, I don't want to make fun of those other people,
21  but there's certain people that came out there and said, "I
22  can't sit on this kind of case because of my religion or
23  whatever." But you just thought, hey, this is a serious case.
24  I better pay attention, right?
25  A.  Yes, sir.

174

1  Q.  When we talk about the death penalty, you know, we
2  kind of use that word a lot and interchange it with capital
3  murder, but there's some facets of law I need to go over with
4  you about the capital murder cases and why it's a death penalty
5  case, a possible death penalty case. And I keep saying
6  possible because by no means is it absolute and is it
7  automatic. You have two choices: Death or life in prison.
8  Before you had jury duty that day, did you think that every
9  murder case could be possibly a death sentence case?
10  A.  I really hadn't thought about it in depth. But yeah,
11  I think probably in the back of my mind, I would have thought
12  that that would have been reasonable.
13  Q.  A lot of people thought that. And there's nothing
14  wrong because you just don't know enough about the law. But in
15  Texas, they have a scheme set up that says, Look, it's not just
16  every murder case can qualify for the death penalty. We're
17  gonna make these certain conditions on them. Killing a cop on
18  duty, you know, killing somebody while you're robbing them or
19  raping them or kidnapping them or burglarizing them; killing
20  somebody -- killing more than one person at the same time;
21  killing a child under six. In other words, they put these
22  special conditions on it to make it a capital murder case. And
23  it's nothing unusual where jurors think, well, I thought every
24  murder case gets the death penalty. I have to tell them, no,
25  it's just those certain cases. And it's probably good, right,

175

1  that the legislature said, "Look, we're not just gonna make it
2  available for every case. You got to have these certain
3  conditions meet." And I think most people agree with me that
4  those are more serious cases than just what's called plain
5  murder. I'm not saying plain murder is good or anything, but
6  it's kind of more of a filtering process, something that makes
7  it a higher level crime. I mean, like I think I told you-all
8  that day, you forge a check, you kill somebody at the same
9  time, that's not gonna be capital murder case. It's got to be
10  one of those serious crimes like robbery, rape, kidnap, murder,
11  burglary. And that's what makes it this kind of case. It's
12  the murder plus the robbery or the robbery plus the murder,
13  however you want to say it. Just the fact that it's a robbery
14  case doesn't necessarily mean it's a -- what do you call,
15  complete robbery. In other words, the law said if you -- if
16  you kill somebody while in the course of committing robbery or
17  attempting to commit robbery, you're guilty of the crime. It
18  doesn't matter how much you get, how far along you went in the
19  robbery, did you get away with the money, did you not get away
20  with money. As long as you took the property by force or
21  threats of force, you're guilty of robbery. And the judge will
22  give you more instructions at the end of the trial if you're
23  selected on this jury in a packet of instructions called the
24  jury charge. And that will give you some more depth on to the
25  law.

176

1  But how do you feel about participating in
2  that kind of case? I mean, you're called for jury duty, and
3  the next thing you know you may be sitting in the jury box having
4  to make that decision? How do you feel about you yourself
5  participating in that kind of decision?
6  A.  I think that it's my duty. I've never been one to
7  shirk my responsibilities.
8  Q.  And a lot of jurors say that. They say, you know,
9  I'm not real happy about having to do it. I'm not overjoyed to
10  be sitting on a jury making that decision, but the law is the
11  law and my duty is my duty. It's my civic duty to go through
12  with it. But we have certain people -- and I'm not saying
13  they're wrong or anything, but certain people will say, Look,
14  put me on a DWI case, put me on a shoplifting case. Don't put
15  me on this kind of case. But I'm reading from you that it
16  doesn't really matter what kind of case it is; I will do my
17  civic duty one way or the other?
18  A.  Yes, sir.
19  Q.  Is that better said?
20  A.  Yes, sir.
21  Q.  As the judge told you, there's nothing automatic in
22  this case. Just because a person's found guilty of capital
23  murder doesn't mean they automatically get the death penalty.
24  You have to kind of jump through some hoops and answer some
25  certain questions to get to that point. For example, in most

177

1   cases, say you had just a regular burglary case. You might
2   have a range of punishment from two years to 20 years in
3   prison, and you pick a number based on how serious the case is.
4   You might go to 20 years. You might go to two. You might go
5   in between. Who knows? In this case we don't pick out death
6   or life in prison. What we do is answer -- what the jury does
7   is answer certain questions, and based on how those questions
8   are answered, the decision is reached.
9            The first question is on the board behind you,
10  and I ask you to turn to look at it with me. And it basically
11  says this. This is presupposing a person's found guilty and
12  proven beyond a reasonable doubt, you go -- and you might get
13  to hear additional evidence. Then you answer that question.
14  "Is there a probability that the defendant would commit
15  criminal acts of violence that would constitute a continuing
16  threat to society?" The key words in there I want you to look
17  at is the fact is there a probability. Unless you got a
18  crystal ball, there's no way I could prove to you on certainty
19  that that person's going to do it, right? You don't know how
20  to look in the future to do that.
21            The second part says, "would commit criminal
22  acts of violence." Sometimes people say, "Well, you know,
23  Mr. Skurka, I can only give the death penalty if I think he's
24  gonna murder again, or he's gonna do a capital murder again."
25  And I tell them, "It just says criminal acts of violence. It

178

1   doesn't say you think he's gonna murder somebody again. It
2   could be any kind of act of violence."
3            And the third part says, "Would constitute a
4   continuing threat to society." What does society mean to you,
5   that word "society"?
6   A.   The general public.
7   Q.   General public. Okay. Let me ask you a trick
8   question now then. Some people come up to me and they say,
9   "Mark, why does the State seek the death penalty on this case?
10  Just lock him up in prison. He can get a life sentence, lock
11  him in prison, and he can never hurt anybody again." And I
12  say, "Well, there's a fallacy there. What that fallacy is, is
13  that there's no one else in prison with him." Because who else
14  is in a prison system?
15  A.   Other prisoners.
16  Q.   Other prisoners. Who else?
17  A.   Jailers, cops.
18  Q.   People that work at the prison, guards, you know,
19  maintenance people, the warden, his staff. So it's not like we
20  put somebody on a desert island where they're never going to
21  have social interaction again. So would you agree with me that
22  just putting somebody in prison doesn't necessarily mean they
23  can't hurt anybody?
24  A.   Definitely.
25  Q.   Right. And you probably heard about that, right, on

179

1   the news, maybe guards -- I'm sorry, guards getting attacked by
2   prisoners, or prisoners hurting other prisoners. We know that
3   happens. All I'm just trying to say is it sounds kind of funny
4   that prison is part of society, but it still is. You're not
5   completely away from society. I mean, you've lost some rights
6   and stuff like that, but you're not out there in nowhere land
7   or you're not in a vacuum where there's no one else there,
8   okay? It's kind of a thing that people say, well, you know,
9   society can't be prison and I have to tell them yeah, it is,
10  because there's other people in there.
11           Okay. You answer that question yes or no based
12  on the evidence. Then you go to the second question. The
13  second question is what we call the mitigating circumstances
14  question. It kind of goes like this. You've heard the
15  evidence and you think he's guilty of capital murder. You hear
16  the evidence and you answer that special question yes. Yes, I
17  think there's a chance that he can be a danger in the future.
18  It looks like he's heading toward the death penalty. But the
19  judge says, "Stop, wait. Before you give the death penalty, is
20  there any reason to give him a life sentence instead of a death
21  sentence?" It's kind of like checks and balances, you know.
22  You don't want to rush into things, and the judge is gonna tell
23  you to re-examine everything and see if there's a reason to
24  give him a life sentence rather than a death sentence. And
25  that's what mitigating circumstances means, anything that would

180

1   lessen or make less severe the punishment. In other words, he
2   did the crime, but is there any reason to give him a break?
3   Let's say, for example, I had a lady up here earlier had two
4   teenage sons. And we'll call one the good son and one the bad
5   son, just for purposes of the illustration. And her rules in
6   the household was curfews at 11:00. You must be home by 11:00
7   or else you violate curfew. And if you violate curfew, you're
8   gonna get grounded or whatever. Let's just say grounded.
9            The first son comes home at 11:03. He misses
10  curfew by three minutes. Mom says, Why did you miss curfew?
11  You know you're supposed to be home by 11:00. And he says, I
12  would have been home by 10:45, except I had a flat tire over
13  here on the way home. And I had to stop and change a tire, and
14  that took about 20 minutes or more and so that's what the
15  reason I'm late. And that's why I violated your curfew. And
16  this is kind of the good kid. He's never really broken curfew
17  before in his life. This is the first time he's ever broke
18  curfew. Okay. The mother's got to decide what kind of
19  punishment he gets.
20           The second son. Okay. The second son has also
21  violated curfew. The trouble is he didn't come in three
22  minutes after 11. He came in at 3:00 in the morning. He
23  busted curfew by four hours. Mom says, Why were you so late?
24  Why did you miss curfew? And he says, Well, I was at a party
25  with my friends drinking and having a good time. And, you

181

1  know, he smells like alcohol on his breath. And I just didn't
2  get around to coming home. Mom says, Okay. And then she
3  says -- this is her bad son, so to speak, and guess what, this
4  isn't the first time he's broken curfew. This is the fifth
5  time he's done it this year so, he's kind of got a bad history
6  of breaking curfew. Well, you go back. Mom's got to make a
7  decision. How much am I gonna ground these people? They both
8  violated my rules of curfew, but do you really think she's
9  gonna punish the first kid as bad as she's going to punish the
10  second kid?
11      A.   No.
12      Q.   Why not? And the reason is this, mitigating
13  circumstances. I think in your questionnaire you called them
14  extenuating circumstances, which is kind of similar, but the
15  whole point is that if you made a decision based on just what
16  the violation is, they broke curfew, wouldn't you want to know
17  all the surrounding circumstances before you decide punishment?
18  My gosh, that first kid three minutes late as opposed to four
19  hours late. The first kid had a pretty good reason for missing
20  curfew, having a flat. The other guy had no good reason. And
21  then the fact he'd never broke curfew before, and the other guy
22  had broken it five times before. Once you hear an example like
23  that, right, you can understand how something can be a
24  mitigating circumstance when the judge told you about the
25  burglar. And that's all this question asks you.

182

1          Look at all of the evidence, take into
2  consideration all the evidence, including the circumstances of
3  the offense. You know, how bad of an offense was it? Was it
4  a really heinous crime? Was it a fairly minor crime. His
5  character and background. Good background, bad ground. Has
6  he ever been in trouble with the law before? He's always in
7  trouble with the law. And his personal moral culpability. Is
8  there sufficient -- is it enough of a mitigating circumstance
9  to warrant that a life imprisonment rather than the death
10  sentence be imposed? In other words, just because you hear a
11  mitigating circumstance, a possible mitigating circumstance,
12  does that mean you automatically lower the sentence? No, you
13  kind of do a balancing test like that mother had to do. Okay.
14  You know, this one is worse than this one. Does it outweigh
15  everything else, you know? Because maybe the second kid, even
16  though he broke curfew by three hours or four hours and was
17  late and didn't have a really good excuse, maybe the weekend
18  before he had volunteered to help people at the old folks home
19  and, you know, helped out at school or brought home an A in
20  his class. Well, she may say, well, those are mitigating --
21  possible mitigating circumstances. It's good that you
22  volunteered at the old folks home. It's good that you made an
23  A in geometry, but that's not gonna outweigh what you did
24  here. You see what I'm saying? And I think it's a careful
25  way for the jury to consider everything and not rush into

183

1  anything, because you probably want to know what the
2  background is, if it's good or bad, before you, as a jury,
3  make that decision, right? That's only a fair question.
4          All I can tell you, too, is the judge can't
5  tell you what a mitigating circumstance is. It's up to you as
6  a jury to decide. Some people may say, "Well, yeah, I'm gonna
7  give them a break because of this. Maybe he's an orphan or he
8  came from a broken home or something." And then some people
9  say, "You know, I don't care if he came from a broken home, I
10  don't care if he's an orphan, he still did the crime; he still
11  did the time." The only thing you have to do is consider
12  everything. What weight you give to it is up to the jury.
13  And then you do that balancing test. It may be enough. Maybe
14  it's not enough. That's up to you as the jury.
15          One thing the judge may also tell you is this
16  part of the law, which says this. "Voluntary intoxication is
17  not a defense to crime." Voluntary intoxication. In other
18  words, if you went and got yourself drunk or high on drugs and
19  you go commit a crime, is that an excuse to the crime?
20  Absolutely not. The law says that in black and white. You
21  can't use that as an excuse for crime or a defense to crime.
22  However, the judge may say, that could be a possible
23  mitigating circumstance. Say a guy robs a bank. The jurors
24  go, yeah, he robbed the bank, but you know, he was drunk when
25  he did it so maybe we're not going to give such a high

184

1  sentence. Other people may say, Well, he robbed a bank and he
2  was drunk, but he still robbed the bank, you know. Just
3  because he was drunk doesn't mean I'm gonna lower the
4  sentence. Do you see what I'm saying?
5      A.   Yes, sir.
6      Q.   So intoxication could be one of those you could
7  consider, but it doesn't necessarily mean you have to consider
8  it. And the judge said possible mitigating circumstances.
9  Sometimes people will look at the defendant and they say,
10  "Well, gosh, you know, he sure seems young, or he doesn't look
11  like a bad guy." What's the problem with saying stuff like
12  that? Well, you're judging a book by their cover, right? Were
13  you surprised when you came in the courtroom and saw what he
14  looked like or how young he looked?
15      A.   No.
16      Q.   And it shouldn't make a difference. When you make a
17  decision as a jury you should make it on facts and evidence,
18  right? Although we've had, you know, some nice ladies coming
19  in here and say the first thing I saw was, you know, he's so
20  young, you know. And I'm thinking, are you gonna use that in
21  making your decision? The law says as long as you're over 18
22  years old, you to have face the consequences of your action. I
23  mean, we don't have the death penalty for kids who are 13 or
24  16, or something like that, which is probably right, you know.
25  But would you agree with me by the time you reach that age of

185

1  like 18 and you're an adult, you should know the difference
2  between right or wrong and should be responsible for your
3  actions?
4      A.   I agree with that.
5      Q.   Okay.  A couple of more legal things I want to talk
6  to you about is, number one, to qualify on this jury, you have
7  to kind have of start equal.  In other words, you can't be
8  leaning towards guilty; you can't be learning toward not
9  guilty.  You can't be leaning toward death penalty.  You can't
10  be leaning toward life sentence.  Are you leaning either way
11  right now?
12      A.   No.
13      Q.   The only way you should start out, really, is with
14  the presumption of innocence.  Right now as he sits there, he's
15  presumed innocent.  And why is that?  Because the State hasn't
16  brought you any evidence to prove to you beyond a reasonable
17  doubt.  Just remember that, the presumption of innocence is
18  just a presumption.  You presume him to be innocent right now.
19  Every case I've ever tried the guy starts with the presumption
20  of innocence.  Does that mean he is innocent?  No.  It just
21  means you haven't heard any evidence.  Do you see what I'm
22  getting at?  You don't start him behind in the count, you know,
23  in baseball.  He doesn't already have a strike against him
24  because he's here.  You have to start him out equal and assume
25  that he's not guilty unless the State proves it.  And that's a

186

1  burden we have to prove in this case, every other case, okay?
2          The indictment itself, the fact that he's
3  charged with a crime, that doesn't mean he's guilty either.
4  That just means a grand jury has found enough evidence to bring
5  him to court.  Does that mean he's guilty?  No.  It just means
6  he's charged that.  It still rests on the State to prove the
7  case beyond a reasonable doubt.
8          Sometimes jurors want to hear the other side of
9  the story.  They'll say, well, you know, you put on a good
10  case, State, but I want to hear what he has to say, or I want
11  to hear what the defense witnesses say.  And I have to caution
12  you.  I think the judge hit on this a little bit.  Remember
13  that the Fifth Amendment says you can testify if you want to.
14  If you don't want to testify, you don't have to.  And the judge
15  will tell you, you cannot hold that against him.  Do you agree
16  with that law?
17      A.   Yes.
18      Q.   And you can follow that law, correct?
19      A.   Yes.
20      Q.   Same thing with the defense.  You know they don't
21  have to put on any evidence at all.  Sometimes people say,
22  well, he didn't testify but they should have found some other
23  witnesses to testify.  They don't have to prove anything.  And
24  why is that?  The State has to prove the case beyond a
25  reasonable doubt.  As the judge said, if the State charges you

187

1  with something, the State better back it up and prove it.
2          Now, all that basically means is, you can --
3  the defense never has to prove anything.  We have to prove the
4  case.  Can you follow that law?
5      A.   Yes, sir.
6      Q.   And the rule of -- the standard, how much evidence?
7  The standard is beyond a reasonable doubt.  It doesn't mean
8  beyond all doubt, any doubt, shadow of a doubt.  I always hate
9  that when they say it on those TV shows, beyond a shadow of a
10  doubt because that's not really what the law is.  It just says
11  beyond a reasonable doubt, which I like to tell people is,
12  first of all, look, if you -- do you have a doubt?  If you have
13  a doubt, that's okay.  But then the question is, if you don't
14  have a doubt, you go ahead and vote for guilty.  But then if
15  you have a doubt, ask yourself is it a reasonable doubt?  In
16  other words, do I have a reason for the doubt?  I mean, I can
17  put my finger on it and it's because of this or that, not just,
18  well, I feel this or it could be this or maybe this.  You know,
19  is there a reason for the doubt?
20          When you were in the military, you said were you
21  in the Navy for like some 36 years.  Did you work --
22      A.   Twenty-eight years.
23      Q.   Twenty-eight years, I'm sorry.  Did you work on
24  airplanes the whole time or what?
25      A.   I was both service and aviation.  First 16 years I

188

1  was in the service Navy, and then I got my commission and I
2  spent the last 12 years as an aviation maintenance officer.
3      Q.   So that's taking care of airplanes?
4      A.   Yes, making sure that they're able to go fly.
5      Q.   What kind of airplanes did you work on?
6      A.   H-46s and P-3s.
7      Q.   I know a P-3 is that one that has the dome on it,
8  right?
9      A.   Well, the ones that the --
10      Q.   Base here --
11      A.   -- immigration uses -- not immigration --
12  naturalization.  The Border Patrol, the ones that they use have
13  the radome on it.  The Navy P-3 version does not have the
14  radome.  It's a sub hunter.
15      Q.   Okay.  That's what I was trying to figure out because
16  I know they have -- the PC3 is like the Navy's version -- a PC3
17  flies off the aircraft or the ship or something, and it goes
18  searches the water around it for submarines, correct?
19      A.   No.
20      Q.   Okay.  You tell me.
21      A.   P3 Charlie is shore-based.  It's a long range and has
22  submarine warfare, subdetection.  It also now its a new role is
23  now its old horizon targeting because it can go fly -- stay out
24  on patrol for 12 or 13 hours and fly out beyond where the
25  carriers are, you know.  Although it doesn't sit on the

189

1  carriers, it would launch from a shore base and be able to pick
2  out targets far out beyond what the fighters can go see or
3  beyond visual contact.
4      Q.   Is that kind of like what AWACS do for the Air Force?
5      A.   AWACS is very similar.  They're more like the -- they
6  pick out the targets and things.  They're more like the air
7  traffic controllers in the sky.
8      Q.   But they're kind of like the eye in the sky?
9      A.   The eye in the sky.  They direct everybody of where
10 to go, what to do, and who to do it to.
11     Q.   Yeah.  They're like air traffic controllers, but they
12 can also direct the traffic toward targets too, correct?
13     A.   Absolutely.
14     Q.   But the Navy doesn't have AWACS.  They have --
15     A.   Well, we use the P3 for that now.
16     Q.   P3 for that.
17     A.   That, and we use the E2.
18     Q.   Is the E2 a Hawkeye?
19     A.   E2 Hawkeye, yes.  That's the one that's got the
20 radome.
21     Q.   You can tell I read too much Tom Clancy novels and
22 stuff, right?
23     A.   Yeah.
24     Q.   No, it's interesting to hear about that.  But those
25 are the kind of thing you work -- do you kind of just work your

190

1  way up in the service?
2      A.   Yeah.
3      Q.   You got your commission?
4      A.   Yeah, I spent 16 years enlisted, got a degree,
5  applied for a commission, and the Navy was silly enough to make
6  me an officer.
7      Q.   Well, I don't think they regret it too much.  We had
8  a guy here earlier -- I'm not sure if he's on the jury -- but
9  he was a chief petty officer.  I said, is it true that chief
10 petty officers run the Navy?  He goes, you're darn right.
11     A.   Absolutely.
12     Q.   That's what he said.
13     A.   I made chief before I got my commission.
14     Q.   Well, so you were -- that's a pretty big
15 responsibility there.  Like I said, they're the backbone of the
16 Navy.
17          Okay.  I think we've covered all the legal
18 stuff.  The bottom line is this, do you think you can be fair
19 in this case?
20     A.   Yes, sir.  I think I can.
21     Q.   Will you listen to all the evidence before you make a
22 decision?
23     A.   Absolutely.
24     Q.   If you think the evidence is not sufficient enough
25 that you don't think he's guilty, can you vote guilty?  I'm

191

1  sorry, can you vote not guilty?
2      A.   Yes.
3      Q.   And if the evidence is there, that you think he is
4  guilty, can you vote guilty?
5      A.   Yes.
6      Q.   If the evidence is such that you answered those
7  questions that you think he should get a death sentence, can
8  you go follow through with that?
9      A.   Yes, sir.
10     Q.   And the opposite, if the evidence is such that you
11 think that there are mitigating circumstances that he should
12 get a life sentence, can you vote for that?
13     A.   Yes, sir.
14     Q.   Okay.  Bottom line is you're open-minded, will listen
15 to everything before you make a decision?
16     A.   Yes, sir.
17     Q.   That's all we can ask you to do.
18          MR. SKURKA:  Thank you, Mr. Moore.
19          MR. GARZA:  May I proceed, Your Honor?
20          THE COURT:  Yes.
21                VOIR DIRE EXAMINATION
22 BY MR. GARZA:
23     Q.   Good afternoon, Mr. Moore.  My name is Ed Garza.  I
24 think I had introduced myself previously when we met downstairs
25 in the big jury room.  And my co-counsel here is Mr. Grant

192

1  Jones, and our client is John Henry Ramirez.
2          I want to talk to you about -- well, there's so
3  many things we need to talk to you about, and the reason we do
4  that is because we only get this one chance to discuss the
5  issues in this case to make sure that you understand them for
6  us to make a good, informed decision on behalf of our client to
7  see if we can qualify you to be a juror in this case, okay?
8      A.   Yes, sir.
9      Q.   So some of the stuff we might ask you, you might
10 think is maybe kind of silly or you're wondering why are they
11 asking this.  But, like I said, this is the only chance we get
12 to do that, okay?  So we have to discuss everything, in other
13 words, okay, without presupposing that, oh, we've already made
14 this assumption or we've made that assumption.  But more
15 importantly, we need to make sure that you have not made any
16 assumptions in this case.
17          Whenever, in Texas, a person is called to jury
18 duty, he's being called to task to judge the facts of these
19 cases, and we need to know that you're going to be impartial,
20 okay?  What does impartiality mean to you?
21     A.   You make your decision based on the evidence that's
22 brought to you.  You're not presupposing anything.
23     Q.   Absolutely.  You come to the task without any
24 opinions, no presuppositions of any sort or anything like that,
25 no biases, no leanings of any sort; is that correct?

193

1    A.    Yes, sir.

2    Q.    Okay.  Now, in your questionnaire, though, I notice

3  that one of the last pages when you were asked on a scale of 1

4  to 10 how strongly you believe in the death penalty, one being

5  the least, 10 being the strongest, you indicated a 10.

6    A.    Yes, sir.

7    Q.    Why did you do that?

8    A.    I believe that it's a necessary part of our society.

9    Q.    Okay.  Do you think we benefit from it?

10   A.    Yes, sir.

11   Q.    How do we benefit from it?

12   A.    I think we benefit as a society that the individual

13 does not commit the crime again, and it goes along with the

14 continuing -- continued threat to harm other persons in

15 society.

16   Q.    Any other way?

17   A.    No.  I hemmed and hawed about the whole supposition

18 about, you know, it deters crime and things like that.  Well, I

19 spent six months over in Saudi, and they do public executions

20 over there.  And yeah, maybe it has an initial impact, but in

21 the overall course, I don't think that it really has as much as

22 a lot of people think it does.

23   Q.    Okay.

24   A.    But it keeps the criminal from committing another

25 like crime again and having that happen to another person or

194

1  persons.

2    Q.    That's an interesting answer.  So, let me ask you a

3  few more questions.  What would be the first requirement under

4  our law based on the things that have been explained to you

5  already?  What would be the first requirement before you were

6  asked to decide any of these two issues?

7    A.    They'd have to be a heinous crime.  It would have to

8  be a very, very serious crime to consider even the possibility

9  of the death sentence.

10   Q.    The judge explained to you that capital murder is a

11 homicide coupled with the commission of yet another pretty

12 serious offense?

13   A.    Yes, sir.

14   Q.    Is that what you understand it to be?

15   A.    Yes, sir.

16   Q.    And our legislature says that not all cases are

17 capital murder cases, okay?

18   A.    Uh-huh.

19   Q.    Let me give you an example.  Heaven forbid someone

20 walked in here and shot and killed the judge.  Would that be

21 capital murder?  You look stunned.

22         THE COURT:  Not unless it was in retaliation

23 for a ruling.

24         MR. SKURKA:  There are some standards where

25 that happens.

195

1    Q.    (BY MR. GARZA)  What I'm trying to tell you is not

2  all murders --

3    A.    Okay.

4    Q.    -- are susceptible or call for the death penalty as a

5  possible punishment.

6    A.    Okay.

7    Q.    Okay.  Somebody kills his wife, chops her into pieces

8  and mails her to the four corners of the earth.  Is that a

9  capital murder?

10   A.    No.

11   Q.    It's not.  Yes, it's heinous.  Yes, it's pretty

12 terrible, but it's not.  Okay?

13   A.    Uh-huh.

14   Q.    So my question was, again -- is, what would be the

15 first condition that would have to occur before you could

16 say -- before you would be asked to consider these two issues?

17   A.    Well, you're saying the first condition.  First

18 condition, in my mind, is that heinous crime coupled with the

19 murder the -- that, combined together is what makes it a

20 capital offense, my understanding from the judge and from --

21 before I ever have to go to these questions is that it's a

22 combination.

23   Q.    Well, wouldn't you have to find that person guilty

24 first?

25   A.    I'm sorry, I'm --

196

1    Q.    You're not following me?

2    A.    -- not following you.

3    Q.    In this proceeding, in this criminal proceeding,

4  there's two parts to a jury trial.  The first part of the jury

5  trial is the guilt/innocence.

6    A.    Right.  You'd have to find him guilty, and then you'd

7  make the decision of whether it's life imprisonment or it's the

8  death penalty.

9    Q.    Right.  That's where I'm getting to you.

10   A.    Oh, okay.

11   Q.    That would be the first condition you'd have to meet.

12   A.    Okay.  I thought you were asking what crime, not that

13 you had to find them guilty.  Okay.  Now I understand what

14 you're saying.

15   Q.    In this proceeding, the State of Texas would have to

16 prove beyond a reasonable doubt.

17   A.    Yes.

18   Q.    And those matters would be laid out and you would

19 consider as to whether or not my client is guilty or not, okay?

20 As he stands here before you -- and I don't want to beat this

21 dog to death -- he's presumed innocent, the presumption of

22 innocence and what that means, okay?  I think you understand

23 that, do you not?

24   A.    Yes, sir.

25   Q.    So the first call to order would have to be whether

197

1  or not you-all make a finding of guilt. If you don't, the
2  government doesn't prove their case, it's all over. We all go
3  home.
4      A.   Yeah.
5      Q.   We don't even have to get there.
6      A.   Yeah.
7      Q.   Okay? But we have to discuss this matter just in
8  case that could happen, okay?
9           Now, with respect to Special Issue No. 1, let's
10 say you've already made a decision among the other 12 -- the
11 other 11 jurors, including yourself, that the State has proven
12 their case to you beyond a reasonable doubt. You're going to
13 be asked, is there a probability that the defendant would
14 commit criminal acts of violence that would constitute a
15 continuing threat to society, okay? What kind of evidence
16 would you need to hear or want to hear to try and make that
17 determination?
18     A.   Has he been violent to people in the past.
19     Q.   Okay. Anything else?
20     A.   Not just one time. Has he -- has he shown a pattern
21 of violence towards people.
22     Q.   All right. Okay. That would assist you, wouldn't
23 it?
24     A.   Yes.
25     Q.   Okay. And it would also assist you if he hadn't any

198

1  pattern of any sort to try and determine if he's a future
2  dangerous -- a future danger to the society --
3      A.   Yes, sir.
4      Q.   -- we live in, correct?
5      A.   Yes, sir.
6      Q.   Okay. Our law says that in order for you to answer
7  that issue, it takes all 12 of you to answer it yes before you
8  can proceed to Special Issue No. 2 --
9      A.   Okay.
10     Q.   -- which would be a majority finding that, yes, based
11 on all -- everything you've heard in the case and based on any
12 punishment evidence, all 12 of you would have to answer yes to
13 that issue --
14     A.   Okay.
15     Q.   -- okay? But the statute also provides that if as
16 many as 10 of you decide that you want to answer that no, then
17 the trial is over, okay? Because if you can't get past Special
18 Issue No. 1, okay, then you're not supposed to come back to
19 No. 2. You're supposed to return a verdict informing the Court
20 that 10 of the 12 believe that, no, we do not see him as a
21 future danger, okay? The case is over and he gets a life
22 sentence.
23     A.   Okay.
24     Q.   Okay? Do you understand that?
25     A.   Uh-huh, yeah. You're saying 10 out of 12?

199

1      Q.   Ten out of 12.
2      A.   Okay.
3      Q.   Ten out of 12 works in his favor. If it's gonna work
4  against him, the statute requires 12 out of 12. Does that make
5  sense?
6      A.   Yes. Yes.
7      Q.   Why do you think that makes sense?
8      A.   If there's -- if there's that amount of doubt, then
9  it should go in the favor of the defendant.
10     Q.   Exactly. That's exactly right. Okay. All right.
11 Let's presuppose, once again, speaking hypothetically here,
12 that you get passed Special Issue No. 1, then you're gonna be
13 asked to consider Special Issue No. 2, okay? And I'm gonna ask
14 you if you turn around, do me the favor of reading it to
15 yourself, and then let me know when you're done reading it.
16     A.   (Witness complies.) Okay.
17     Q.   Okay. Is there anything up there that you don't
18 understand, any words?
19     A.   No. Now, between with what the -- the judge's
20 explanation and example and the government's, I feel more
21 confident with what I'm was -- what I'm understanding of this.
22     Q.   Okay. I'm gonna try explain to you a little
23 differently though, okay?
24     A.   Okay.
25     Q.   And I'm gonna do so by asking you some questions,

200

1  which I don't mean to embarrass you by or anything, but I just
2  want -- I want to make sure that you understand these concepts,
3  okay?
4      A.   Sure.
5      Q.   Mitigating -- the term "mitigate," to mitigate, the
6  verb, what does that mean to you?
7      A.   To lessen.
8      Q.   Absolutely. That's exactly what it means. Okay.
9  This issue came from a Supreme Court case written by lawyers,
10 written by what some people consider legal scholars, which are
11 the Supreme Court. And a lot of these words give certain lay
12 people, even us lawyers, a little bit of difficulty
13 understanding. But, anyway, we've had to interpret this for
14 many, many years since it was rendered, since it was decided.
15 But what it's asking you to do is that even though you've
16 already made a finding of guilt, okay, the matters that are up
17 there, we're not asking for you to consider as a defense to the
18 crime. We're asking you to consider it as a mitigation --
19     A.   Right.
20     Q.   -- if it can be sufficiently shown to you. It places
21 a certain burden on we, the lawyers, now since it's been
22 decided that we are in -- if we're going to undertake to
23 represent these folks in these kind of cases, it is our
24 responsibility to make investigations into our client's
25 background, into their character to present to you in a fashion

201

1  and a form where you will be able to give some consideration or
2  effect to that evidence in deciding one more time whether or
3  not our client deserves a life sentence, or, if we can't prove
4  it up to you sufficiently, the death penalty, okay?
5      A.   Okay.
6      Q.   So what would character mean to you, evidence of a
7  person's character?
8      A.   How they treat themselves, how they treat other
9  people, how they interact with other people, the things that
10 they do in day-to-day life.
11     Q.   Okay.
12     A.   How they conduct themselves.
13     Q.   Are they -- like if I were to say that you were a
14 person of good character, what do you think I would be saying
15 about you?
16     A.   That I treat people the way I would like to be
17 treated, that I deal with people fairly and honestly.
18     Q.   Fairness, honesty, trustworthiness?
19     A.   Yes.
20     Q.   Things of that nature?
21     A.   Yes.
22     Q.   Okay.  What about background?
23     A.   As far as?
24     Q.   A person's background?
25     A.   Well, their --

202

1      Q.   Their biology -- I mean, their biography, in other
2  words, their background, where they grew up, how they grew up.
3  What does that mean to you?
4      A.   The way they were raised, what kind of home they came
5  from.
6      Q.   Exactly.  Exactly, because then we lead up to this
7  other question about asking you to consider his personal moral
8  culpability, three very distinctive words, a person's moral
9  culpability.  What would that mean to you?
10     A.   What was the reason they did what they did.
11     Q.   Correct.  That's pretty close; it really is.  It's
12 been sort of explained to us through legal periodicals and
13 writings by other lawyers and scholars, and things of that
14 nature, that moral culpability is a -- is a form of
15 blameworthiness, okay?
16     A.   Okay.
17     Q.   A form of blameworthiness.
18     A.   Okay.
19     Q.   What do we mean by that?  Well, you've been given
20 those examples about the kids and the curfew and what the
21 extent of their blame is insofar as how you're going to
22 consider their punishment for doing something wrong.  Moral is
23 our compass, is our core values, correct?  Things that we've
24 learned through the Ten Commandments, the Boy Scout Code,
25 things of that nature?  Things that we've hopefully learned

203

1  from our parents, our teachers, our church, about how to try
2  and be good people, how to be good to each other and one
3  another and each other, okay?
4      A.   Uh-huh.
5      Q.   Do you believe that?
6      A.   Yeah.
7      Q.   Okay.  And what we need to know and what we need to
8  allow you to consider is whether or not certain defendants have
9  learned, first of all, what those values are.  Has he had a
10 chance -- has she or he had a chance to learn those values?
11 Would it make a difference?
12     A.   Yeah.
13     Q.   Okay.  And then the culpability comes down to the
14 same thing about these examples, okay, about the -- you know,
15 the person who goes out and, you know, commits a burglary to
16 steal things for his own self-serving needs, for his own
17 selfishness, versus the guy who, say, breaks or walks into
18 someone's home and finds the back door open and then all he
19 does is actually go in there to grab some bread and some food
20 to feed his hungry family because he's lost his job, okay?
21 Would you agree with me that there's a difference in the degree
22 of culpability?
23     A.   Yes.
24     Q.   There are certain moral conflicting values, are there
25 not --

204

1      A.   Yes.
2      Q.   -- that are going on in these people's minds,
3  especially the one who goes in to grab some food for his
4  family?  Do I violate the law or do I sit there and watch my
5  family starve?
6      A.   Yeah.
7      Q.   Okay.  That's what that means.
8      A.   Okay.
9      Q.   Can you give some effect and consider all those
10 matters in making a determination as to whether or not that is
11 a sufficient mitigating circumstance that would allow you to
12 consider a life sentence versus the death penalty?
13     A.   Yes, sir.
14     Q.   Could you do that?
15     A.   Yes, sir.
16     Q.   Mr. Moore, do you have any questions of us or
17 anything?
18     A.   No, not really.
19     Q.   The judge has probably explained or had mentioned
20 maybe back that we're in the process of selecting jurors, and
21 that we may end up starting testimony or hope to start
22 testimony by December 1st.  The case could run anywhere from 10
23 days to two weeks.  It is right before the holidays, right
24 before Christmas.  Anything at all going on in your life that
25 would be distracting to you if you were chosen as a juror?

205

1     A.    Nothing distracting, no.

2           MR. GARZA:  All right.  Thank you, sir.

3           THE COURT:  Anything else, Mr. Skurka?

4           MR. SKURKA:  No, Judge, I don't have any

5     other questions.  Thank you, Mr. Moore.

6           THE COURT:  Mr. Moore, please wait in the jury

7     room and we'll be right back with you.

8           (Venireperson exits courtroom.)

9           THE COURT:  All right.  What says the State?

10          MR. SKURKA:  We'll go ahead and accept this

11    juror, Judge.

12          THE COURT:  What says the defense?

13          MR. GARZA:  We'll use another peremptory,

14    Judge.

15          THE COURT:  All right.  That's No. 11, I

16    think.  All right.  Let's bring in Mr. Moore.

17          (Venireperson enters courtroom.)

18          THE COURT:  All right.  Mr. Moore, you were

19    not selected to be on this jury, but we do appreciate your

20    time and service to the community by coming down here.  Thank

21    you very much.  If you need a work excuse, the bailiff can get

22    that for you.

23          VENIREPERSON NO. 94:  All right.  Thank you.

24          THE COURT:  Thank you.  We'll take a little

25    break and be at it again.

206

1           (Recess.)

2           THE COURT:  All right.  The next person,

3     Elizabeth Rodriguez, right?  All right.  Let's bring her in.

4

5                  VENIREPERSON NO. 96,

6                  ELIZABETH RODRIGUEZ,

7                  VOIR DIRE EXAMINATION

8     BY THE COURT:

9     Q.    Hi.

10    A.    Hello.

11    Q.    All righty.  Okay.  I'm bringing you in because we're

12    picking a capital murder jury, okay?  And we need to talk about

13    some stuff.  First of all, we're looking for people who can

14    keep an open mind.  Is that you?

15    A.    I consider myself open-minded.

16    Q.    Okay.  Well, some people say because maybe I, you

17    know, seen some stuff about this in the news or whatever, or

18    whatever reason, some people just aren't open-minded.  But if

19    you are, that's fine.  If you think you're fine.  In fact, I

20    don't think you've seen anything about this?

21    A.    No, I haven't.

22    Q.    Okay.  All right.  The next thing we need to talk

23    about is the law.  We need to make sure that all of our jurors can

24    follow the law; otherwise, it's not fair, okay?  Now, let's see

25    here.  You've never been on a criminal case before.  That's

207

1     okay.  No experience necessary.

2           Let's talk about concepts.  First of all, this

3     is a criminal case.  That means the State has the burden of

4     proof.  The law says, State, you bring the charges, you got to

5     prove them.  Do you believe in that?

6     A.    Yes.

7     Q.    Okay.  As part of that the law says, Look, State, you

8     bring the charges, you got to prove them.  As part of that,

9     until you do, if you can, defendant is innocent until proven

10    guilty.  Do you follow me?

11    A.    I follow you.

12    Q.    In other words, some places the State charges

13    somebody with a crime, and they're guilty until they can prove

14    otherwise.  We don't do it that way here.  The law says, Hey

15    man, you bring the charges, you've got the evidence, that's

16    fine.  But until you show it to the people, he's innocent until

17    proven guilty.  And maybe they can't and maybe they can, okay,

18    but you follow that -- I mean, you agree with that, you follow

19    that?

20    A.    I understand it.

21    Q.    Okay.  Well, sometimes we ask this -- not a real --

22    real world question, but we ask it anyway.  If you had to vote

23    right now, how would you vote?

24    A.    I have no knowledge of the case, so I wouldn't be

25    able to answer that for you.

208

1     Q.    Okay.  We got two answers to that question.  That's

2     one of them, and the other answer is, I have to vote not guilty

3     because I haven't heard anything.

4     A.    Okay.

5     Q.    That's really the correct answer.  But that's not a

6     real world example.  A real world example is State puts on

7     their case, and you don't think they've met their burden, you

8     start him off innocent, they haven't gotten past their burden,

9     what do you do?

10    A.    Unless he's proven guilty and that all elements of

11    accusation have been proved, he's gonna be found not guilty.

12    Q.    I had a juror just the other day, Friday

13    night, saw him at a wedding and he said, "You know, I was a

14    juror in your court a few weeks ago and we tried -- we had a

15    trial, and you know what, we thought the guy was guilty, but we

16    didn't think they proved their case beyond a reasonable doubt."

17    Let's talk about that because that's the burden of proof,

18    beyond a reasonable doubt.

19          What it's not, it is not 51 percent.  That's

20    what we do in a civil case.  A civil case, let's say that --

21    let's say this wasn't a criminal case.  Let's say that we got a

22    company suing another company over a contract, okay?  The

23    plaintiff would have the burden of proof, but it's just by

24    preponderance of the evidence.  If you can think of the scales

25    of justice, it would just tip the one side ever so slightly.

209

1    This is higher than that.

2            But the next burden we have on the law is clear

3    and convincing evidence, and that sounds pretty strong to me,

4    quite frankly, clear and convincing, right?  You agree?

5        A.    I agree.

6        Q.    That's the kind of evidence you would need if the

7    State was trying to terminate your rights as a parent because

8    maybe the State is alleging that you're not a good parent.  So

9    they try to take away your child, but they don't just get to

10   pull your child.  They have to prove it to the jury by clear

11   and convincing evidence, okay?

12           This is higher than that.  It's beyond a

13   reasonable doubt, higher than clear and convincing.  It does

14   not have a definition.  On the other hand, it is not beyond all

15   doubt, okay?  Beyond all doubt would only be possible if you

16   were a witness, and you saw the whole thing yourself, right?

17       A.    True.

18       Q.    Okay.  But if you saw the whole thing yourself, you

19   couldn't possibly be a juror.  You'd be a witness.  And you

20   would be disqualified from being a juror.  So it's not

21   preponderance, it's not clear and convincing.  It's beyond a

22   reasonable doubt, but it's not beyond all doubt, okay?  And I

23   think the most important word in that phrase is "reasonable,"

24   beyond a reasonable doubt.  Would you hold the State to the

25   burden of beyond a reasonable doubt as the law requires?

210

1        A.    Yes.

2        Q.    Okay.  Now, the law says since the State's got the

3    burden of proof, defense doesn't have to do anything.  In other

4    words, they can really just sit on their hands the rest of this

5    trial.  The State presents their evidence.  They do nothing.

6    There was once a guy who fell asleep, a defendant.  The jury

7    acquitted him anyway.  He doesn't have any burden.  The State

8    can't make their burden and, you know, they don't get there.

9            And as part of that, the defendant doesn't have

10   to testify, okay?  The Constitution says defendant does not

11   have to testify.  The defendant does not have to put on

12   witnesses or evidence on his behalf.  But it's even stronger

13   than that.  But the -- the law says the jury can't hold it

14   against him.  In other words, when you go back to deliberate,

15   you can't say, "Hey, we got the State's evidence, and I'm gonna

16   consider that.  What did the defense do?  Well, they didn't do

17   anything.  Well, that goes in favor of the State."  Okay.

18           A lot of people say, "Well, I have to hear both

19   sides of the story."  Okay.  This isn't a race.  This isn't a

20   race who gets to the finish line, the State or the defense.

21   This is only a race to see if the State gets passed the

22   finished line, which is beyond a reasonable doubt proof to the

23   jury, okay?  Are you following me?

24       A.    I'm following you.

25       Q.    What I need to know -- because some people would say,

211

1    if he doesn't testify, you know, I'm gonna -- those are going

2    to be points against him.  I think there's lots of reasons why

3    somebody may not want to.  Maybe his lawyers advised him not to

4    because they think the State hasn't proven their case.  Maybe

5    -- I had a friend once who would laugh inappropriately when he

6    got nervous.  It used to really offend people, but, you know,

7    maybe he's that type of person.  Some people just melt down

8    under pressure, and maybe his lawyers think even if he's not

9    guilty, that maybe if he gets on the stand he'll give the wrong

10   impression to the jury, okay?  There's lots of reasons.  The

11   point being I need to know.  And if you would hold it against

12   him, that's fine; but I need to know if you would hold it

13   against him if he chose not to testify?

14       A.    I would not.

15       Q.    Okay.  Now, let's talk about the allegation.  The

16   allegation is capital murder, okay?  What is capital murder?

17   Well, it's certainly murder because it's within -- it's within

18   the word.  And murder, of course, is the intentional taking of

19   the life of another.  Capital murder -- the capital part means

20   the death penalty is a possibility.  And the legislature has

21   laid out a list of circumstances where murder becomes capital

22   murder.  Murder plus something else.  In this case, the State

23   is alleging there's a murder plus a robbery, okay, together.

24   So you got two serious felonies.  The legislature says if you

25   mix those two serious felonies, you put them together, then the

212

1    death penalty is a possibility.  It's a capital murder.

2            Now, what's a robbery?  It's not when someone

3    breaks into your house when you're not there.  Some people

4    think it is.  It's the -- it's the forcible taking of property

5    from another either by the use of threats or by the use of

6    force.  For example, if I came and I held you up with a gun and

7    said, "Give me your purse," and you gave me your purse, that's

8    a robbery because I took your purse by threatening your life,

9    okay?

10           Let's talk about something else.  What if I --

11   what if when you weren't looking I ran off with your purse?

12   It's not a robbery; that's a theft, okay?  Let's say -- let's

13   say I came up to you and I put the gun to you and I said, "Give

14   me your purse."  And really you weren't carrying a purse at

15   all.  You were going bowling, and what you had in the bag was a

16   bowling ball, and you hit me on top of the head and knocked me

17   out, okay.  That would be an attempted robbery because I didn't

18   get what I wanted, okay?

19           The law -- in this case, the State has alleged

20   that the defendant on the given date, in Nueces County, Texas,

21   committed a murder while in the course of robbing the victim

22   or attempting to do so, okay?  So they can get there either

23   way.  The robbery doesn't have to be complete, but they do

24   have to prove robbery or attempted robbery in a murder

25   results.  Do you follow me?

213

1    A.    Yes.

2    Q.    Okay.  That's how they get there if they can get

3    there.  That's the charge.  In Texas we have a bifurcated

4    system.  What does that mean?  That means there's two parts.

5    The first part, guilt or innocence.  Can the State prove beyond

6    a reasonable doubt the defendant's guilty of capital murder?

7    The State will present their case.  Maybe the defense presents

8    something and maybe they don't, okay?  But in any event, you

9    listen to everything presented to you if you're on this jury,

10   and you go back and you deliberate with the other 11 jurors,

11   okay?

12           Jury then finds the defendant guilty or not

13   guilty.  If the defendant's found not guilty, we go home.  If

14   the defendant's found guilty, we go to the second part, the

15   punishment phase.

16           All right.  What is the possible punishment to a

17   capital murder?  There's only two:  Life imprisonment or the

18   death penalty.  Okay.  Only two possible things that can happen

19   if someone's found guilty of capital murder.  But the jury

20   doesn't go back and deliberate and say, all right, let's take a

21   vote, it's life, or let's take a vote, it's death.  It doesn't

22   work like that.  You answer questions.  Here's the first one

23   right up here.  If you'll take a look with me.  "Is there a

24   probability that the defendant would commit criminal acts of

25   violence that would constitute a continuing threat to society?"

214

1    All right.  What does that mean, is it probable -- is it more

2    likely than not that the defendant would be violent with people

3    in the future?  That's essentially what that means, okay?  All

4    right.  And the jury would then answer that yes or no.

5           All right.  And you'd answer Special Issue 2

6    it's over your right shoulder there.  "After taking into

7    consideration all of the evidence, including the circumstances

8    of the offense --" what's that?  Well, that's the -- that's the

9    first part case.  Okay.  The guilt or innocence phase, "-- the

10   defendant's character and background."  What's character?  Is

11   he an honest person, a dishonest person?  Is he a liar?  A

12   cheat?  Stand-up guy?  Okay.  Character, the kind of person

13   that he is, his background.  What's that?  Well, his childhood,

14   how he grew up.  Maybe he had some military service.  Was he a

15   good kid in school, that kind of thing, you know, his whole

16   life basically, how he -- you know, how he was raised.  All

17   right?  That's that.  You consider that.

18           Next thing, the personal moral culpability of

19   the defendant.  Okay.  That's that one with the third dot next

20   to it.  That's lawyer talk, okay?  That's legalese.  But I like

21   to explain it like this.  I explain that as an example.  Let me

22   give you an example.  Two defendants are found guilty of

23   burglary, okay?  The first defendant breaks into a house, kicks

24   in the door, just trashes the house, pulls everything out,

25   takes everything of value, TVs, VCRs, CD player, computer,

215

1    video games, jewelry, everything he can sell, okay?  He sells

2    it, uses the money on cocaine and hookers, okay, just blows it.

3    And they finally catch him.

4           The second guy found guilty of burglary, but

5    it's a different situation.  This person had a job for 20

6    years, lost his job because, through no fault of his own, the

7    company downsized because the economy was bad, struggled for a

8    few months, and finally ran out of money, okay?  He's got three

9    children, and they're hungry, and they don't eat for a few

10   days.  This person doesn't break into a house, but goes through

11   an unlocked door, takes only food, goes back, feeds the kids.

12   He's hungry too, but he doesn't eat because he wants the kids

13   to eat.  All right.  Those two people do not have the same

14   personal moral culpability; you'd agree with me?

15   A.    I agree.

16   Q.    Okay.  Personal moral culpability.  That's what

17   that's about, okay, personal meaning the person's moral values,

18   culpability, guilt, blameworthiness.  They don't have the same

19   blameworthiness, okay?  That's what you have to consider.  It's

20   one of the things they want you to consider.

21           So after considering circumstances of the

22   offense, his character, background, personal moral culpability,

23   is there sufficient mitigating circumstance or circumstances to

24   warrant life imprisonment rather than the death sentence?

25           Okay.  Mitigating circumstance.  All right.

216

1    What does that mean?  Mitigating meaning to lessen, okay?

2    Lessening circumstances.  Okay.  Let's say you hear the

3    punishment phase, you hear about his background.  And one of

4    the things you hear is that he's a war hero.  He went to Desert

5    Storm and he saved -- he was very courageous one day and saved

6    20 soldiers' lives and risked his own to do it, okay?  You

7    might think, that's a mitigating circumstance, all right?

8    Maybe he was an Eagle Scout.  Maybe he was a great kid in

9    school.  Maybe he taught children to read in his spare time for

10   free, okay?  All of those things can be mitigating

11   circumstances.

12           Now, does it excuse him for the crime?  No.  You

13   found him guilty.  I'm not saying it's an excuse for the crime.

14   It's just like that other person, those other two guys, they're

15   both found guilty of the burglary, but the punishment probably

16   wouldn't be the same.  You'd agree, right?

17   A.    I agree.

18   Q.    Okay.  Same thing here.  So what you need to do is

19   examine, consider everything, and determine what are mitigating

20   circumstances.  Maybe you believe the war hero part is a

21   mitigating circumstance, but you think the Eagle Scout thing is

22   not, okay?  These lawyers will suggest to you what is a

23   mitigating circumstance or an aggravating circumstance, maybe

24   something that makes things worse.  Maybe a criminal history.

25   That would be an aggravating circumstance, if he had bad

217

1   criminal history before he did this, okay? Maybe he's got no

2   criminal history. That could be a mitigating circumstance, all

3   right? The point is this: Only the jury decides what is a

4   mitigating circumstance, okay? They get to decide, not these

5   lawyers, not me. The jury decides what is a mitigating

6   circumstance.

7           Okay. Then you have to decide whether all of

8   these mitigating circumstances are sufficient to warrant life.

9   So you may say, you know what, that deal about him being a war

10  hero and saving 20 lives, yes, that's a sufficient mitigating

11  circumstance, but it's not sufficient to warrant life rather

12  than death, or maybe it is sufficient to warrant life rather

13  than death, taking into consideration that plus other

14  mitigating circumstances that I have heard. Do you follow me?

15      A.   I'm following you.

16      Q.   Okay. That's the answer that the jury would have to

17  give yes or no, okay? After taking all that stuff into

18  consideration. This question says take everything into

19  consideration and then make your decision, okay?

20          Now, when a trial begins I always swear the jury

21  in, and I always tell them, Do you swear that you will render a

22  true verdict based upon what, the law and the evidence

23  presented to you? And they say yes. The reason I bring this

24  up to you now is I need to know whether you can take that oath

25  in this case. And before you answer some people tell me,

218

1   Judge, I cannot take your oath. Why? Because I cannot

2   participate in a process that could lead the death penalty. I

3   can't -- I can't take your oath to answer these questions

4   truthfully. The other person may say, "Yeah, I can give him a

5   fair trial on the first part, but if I find him guilty of

6   capital murder, this is nonsense to me. I'm not gonna follow

7   your law. I'm going to answer these questions so that every

8   time he's gonna get the death penalty regardless of what comes

9   forward, and I'm not even gonna consider it." All right.

10  Neither of those people can follow the law. Neither of them

11  can take the oath because they can't answer the questions

12  truthfully, okay? I need to know from you, can you take that

13  oath?

14      A.   I can take the oath.

15          THE COURT: All right. Mr. Skurka.

16          MR. SCHIMMEL: Your Honor, may I do this?

17          THE COURT: You may. Mr. Schimmel.

18          MR. SCHIMMEL: Thank you, Judge.

19          VOIR DIRE EXAMINATION

20  BY MR. SCHIMMEL:

21      Q.   Hi, Ms. Rodriguez, my name is George Schimmel. I'm

22  one of the prosecutors here. This is Mark Skurka.

23          MR. SKURKA: Hi.

24      A.   Hi.

25      Q.   (BY MR. SCHIMMEL) I just want to follow up with some

219

1   of the stuff the judge talked to you about and ask you some

2   more questions too. And I guess the first question I'm going

3   to ask you is -- well, first I've got to let you know is that

4   there really aren't any right or wrong answers about what I'm

5   asking you right now. This is just the only chance that you

6   and I get to talk to each other. If you do get selected to be

7   on the jury, we can't have any contact at all. So this is the

8   one chance I get to ask you questions and see kind of how you

9   feel about stuff.

10          And the first thing I want to know is how did

11  you feel as soon as you walked in that door downstairs and you

12  saw all those people and you figured out what kind of trial you

13  were sitting on? Were you nervous? Were you excited? Were

14  you scared?

15      A.   I honestly didn't have any feeling at all. I was

16  just accepting what was presented to me.

17      Q.   Okay.

18      A.   It's a new experience, I have to be honest. I've

19  never had to serve on a jury, and being asked about how I felt

20  about capital murder, and I have never given it a second

21  thought until I was asked on the documents I had to fill out.

22      Q.   Okay. Some people who were sitting there, you can

23  kind of see them go through their different mental processes

24  and some people just totally freak out. And, you know, they

25  say, oh, man, I could never possibly do something that would

220

1   end up, you know, ending the life of a human being. Other

2   people say, man, sign me up; when do I start. How did you feel

3   about being in that position, about possibly having to make

4   that decision?

5       A.   It's a little hard to have to determine that

6   someone's life should end, but it's not always gonna be the

7   lethal. You also have the option of life imprisonment. So id

8   it's something that it's his sentence, then it's to be

9   accepted.

10      Q.   So what you're saying is that if -- if the evidence

11  supported it and you felt like it was necessary, you could do

12  it?

13      A.   Yes.

14      Q.   Okay. And you could also -- if the evidence wasn't

15  there or you felt like that justice demanded, you could do

16  something else also?

17      A.   Yes.

18      Q.   Okay. I know that you have a couple of -- or

19  actually have three children, and at some point after this

20  trial, if it turns out that you do find this defendant guilty,

21  the State's going to be asking for the death penalty in this

22  case, and it's -- it's not -- we're not asking for the death

23  penalty of some person who you've never seen before. It's

24  actually that person sitting right there. And I'd like to ask

25  you just to -- I think you did take a quick look at him and

221

1  tell me if you think that that's actually something you'd be
2  able to do.  Some people when they're faced with it like that
3  just don't think it's something they could do.
4      A.    I feel I could do it.
5      Q.    Okay.  I think the judge explained to you why this is
6  a capital case, and it seems like you understand that pretty
7  well.  It's kind of strange that not every murder is capital.
8  It's kind of strange how it all works out like that.  But if
9  you cut up your husband and you buried him in the backyard, and
10  you invited all your friends over for a party because you were
11  so happy he was gone, as horrible as that might be, that
12  wouldn't be capital murder.  So it's not just a really bad
13  murder, like a lot of people think.  It's a murder, and then
14  like the judge was saying, something else, a murder in this
15  case plus robbery, but it could be plus a rape.  It could be
16  maybe a kidnapping, burglary.  It could be killing a child
17  under the age of six.  I mean, there are a number of things --
18  not a lot -- but a number of things that would actually
19  constitute a death penalty type case.
20          Do you -- do you agree with that?  I mean, do
21  you think that it's okay that the State has this kind of law?
22      A.    Yes.
23      Q.    If you were the person who makes the laws in Austin
24  for the State of Texas, and this law came up for a vote, do you
25  think you would be one of the people who voted for it to

222

1  continue the death penalty or against it?
2      A.    For it.
3      Q.    Okay.  Why do you think that you feel that way?
4      A.    There has to be a reason why it was initiated in the
5  beginning.  It's not something that was just blown out of
6  nowhere.  There's reasoning behind it, and it's just not one
7  vote that brings it forth.  It's going to be plenty of people's
8  votes.  It's a high voting -- it's not just one person's
9  thought, look, I want the death penalty.  It's gonna be a large
10  amount of people that are feeling that way.
11      Q.    Well, that's true.  But let's say that everybody's
12  supposed to toss their vote into a hat.  Which way would you
13  vote?  I mean, do you think we ought to keep it or do you think
14  that we ought to do away with it just like in some states go to
15  nothing but life imprisonment in this kind of case?  Or, do you
16  not really have any feeling either way?
17      A.    I honestly don't have a feeling on it.
18      Q.    Okay.  Like the judge was telling you, this kind of
19  trial has two parts.  There's the part in the very beginning
20  where a juror decides the guilt or innocence of the person
21  accused.  And after that, there's the punishment part of the
22  trial.  For the guilt/innocence part, you hear evidence, and
23  basically then the jury will make a decision and come out.  If
24  the jury decides that a defendant is guilty, it's only at that
25  point that you get to the second part of the trial, the

223

1  punishment part of the trial.
2          Now, in a lot of cases, like probably almost any
3  other case you could have been called for, it's either up to
4  the jury or judge to decide a number of years a person's going
5  to spend for a crime to commit.  If a person came in for a DWI
6  or for a burglary of a habitation, breaking into a house, and
7  you found him guilty, at that point you would sit down with the
8  other jurors and say, "Okay, what's the right number for this
9  case?"  But here, you don't do that.  And it's actually -- it's
10  very different from any other kind of criminal case because
11  once the jury finds guilt, then they answer these two special
12  issues the judge was talking about.  In answering those issues,
13  that's pretty much what determines whether the sentencing
14  should be a life sentence or a death sentence.  And I want to
15  go over some of they things with you a little bit because I
16  know that some jurors have had some questions about some of the
17  language on some of these things, and I just want to make sure
18  that -- I guess that you don't.
19          The first one, this is what happens after you
20  would have already found the defendant guilty.  Then you go
21  back and you start this part and you -- the first thing you do
22  is that Special Issue No. 1 right behind you.  And it's asking
23  you if there's a probability that the defendant would commit
24  criminal acts that would be a threat to society.  Okay.  The
25  first question is about that word "probability."  What does

224

1  that mean to you?
2      A.    Probability means is it gonna be habitual that he's
3  done this repeatedly, or is it something that was an isolated
4  incident?  Is there a probability of him committing it again
5  because it's habitual or is it isolated; was it just the
6  one-time experience?
7      Q.    Okay.  So what you're saying is those are the things
8  you look at to determine whether or not there was a
9  probability?
10      A.    Yes.
11      Q.    But even more basic than that, what does the word
12  "probability" mean?  Does it mean 100 percent certainty?
13      A.    No.
14      Q.    Okay.  Is there any way that if you were picked as a
15  juror you could tell whether or not somebody was 100 percent
16  certain to do something?
17      A.    No.
18      Q.    Okay.  I mean, you're not -- you're not God.  You
19  don't see the future.  You don't have a crystal ball.  The only
20  issue about that word "probability" is that it means basically
21  more likely than not, like not 50/50, maybe a little bit more,
22  like maybe 51.  The probability that a person's gonna commit
23  criminal acts, now that's another issue.  Some jurors say,
24  "Well, you know, I don't think that this guy is gonna go out
25  and do more capital murders.  I mean, I think he's kind of

225

1    learned his capital murder lesson.  He might not even murder
2    again."  But the issue isn't whether or not they're gonna go do
3    the same crime again.  It's whether or not they're gonna commit
4    criminal acts.  Can you -- can you think of anything that would
5    be a criminal act?
6         A.   For that individual?
7         Q.   No, no, just in general.  I mean, what's a criminal
8    act?
9         A.   Okay.
10        Q.   How about -- how about beating somebody up?
11        A.   That would be an assault.
12        Q.   Yeah.  I mean, that's a crime, right?
13        A.   Yes.
14        Q.   What this Special Issue No. 1 is saying is that if
15   it's a greater than 50/50 chance that a defendant is going to
16   commit criminal acts, not of the most heinous, egregious,
17   terrible kind, just if they're gonna go out and basically
18   commit crimes, that's what it's asking.  And do those crimes
19   constitute what it says there, a continuing threat to society?
20   Now, some jurors have issues with that because they say, "Well,
21   look, man, if this guy's just put in a box somewhere with, you
22   know, if we look him up and throw away the key, well, I mean,
23   that's not society, right?  That's just -- that's a prison.  He
24   can't hurt anybody in prison."  And it would be nice if that
25   were true, but tell me, who else is in a prison?

226

1         A.   There's gonna be other inmates.
2         Q.   Okay.  Inmates.  Who takes care of the inmates?
3         A.   There's gonna be the guards, the personnel.
4         Q.   Guards, the personnel.  What about the people that
5    feed the inmates?
6         A.   The workers.
7         Q.   The workers, right, maybe the warden, maybe the
8    warden's staff, maybe people who come in like health
9    professionals who take care of people.  So it's not like --
10   it's not really like it's just a box somewhere that
11   nobody can go in or out.  I mean, we're talking about a place
12   where really there are people.  I mean, that's a society.  So I
13   just want to make sure that we're kind of on the same page on
14   that one.
15            A person could be a continuing threat to society
16   even if they were only in prison.  Do you -- I mean, are you
17   with me on that or do you disagree?
18        A.   I understand you.
19        Q.   Okay.  Now, if you were on the jury and you already
20   found the defendant guilty, and you went over the Special Issue
21   No. 1, and you answered no, you would have said, no, I don't
22   think there's a chance he's gonna do more bad stuff in the
23   future.  No.  You're done.  But if you think that there is a
24   chance, then you go from Issue No. 1, and then you consider
25   Issue No. 2.  So if you do think he's gonna commit criminal

227

1    acts in the future, you say yes, and you go to Special Issue
2    No. 2.  And really, that's the mitigation question which
3    really, like the judge was saying, just means to make less, to
4    lessen, to make softer, to -- to lessen.  And it's asking --
5    you've heard everything in the trial, and I imagine that you
6    might hear other evidence after the trial, and you take all
7    that into account and you say to yourself, is there anything
8    I've heard that would cause me not to give a death sentence,
9    but instead to pull back and to only give a life sentence?
10   Like the judge was saying, we can't tell you what it is.  It's
11   kind of up to you to figure out what it would be, but the only
12   issue is whether or not you can sit here right now and say,
13   yeah, I could consider other things that could possibly lessen
14   or even could possibly, you know, not lessen.  I mean, my mind
15   is open to those things.
16            Like the judge was saying, I mean, if a person
17   helps a guy -- helps a little old lady cross the street a lot,
18   that could be a mitigating circumstance.  That could lessen it.
19   You could say, well, you know, yeah, maybe this thing was
20   pretty bad but, I mean, shoot, he does help this little old
21   lady cross the street every Thursday, so that's a good thing,
22   right?  Or you could say, Well, I don't care about that at all,
23   it doesn't affect me that he's nice to little old ladies.  Do
24   you see where I'm going?
25        A.   Yes.

228

1         Q.   So, I mean, would you be able to consider mitigating
2    circumstances?
3         A.   I would be able to consider mitigating circumstances.
4         Q.   Okay.  Now, if you heard all the evidence and you
5    believe that evidence beyond a reasonable doubt, could you
6    return a verdict of guilty?  I mean, the law says you have to
7    do that, but I'm just making sure that you can follow the law.
8         A.   I can follow the law.
9         Q.   And if you heard all the evidence, and it didn't
10   convince you beyond a doubt, can you return a verdict of not
11   guilty, like the law says you have to?
12        A.   Yes.
13        Q.   And if the State puts on evidence about these Special
14   Issues No. 1 and No. 2, could you consider in certain
15   circumstances that a life sentence might be appropriate based
16   on the evidence that you've heard?
17        A.   Yes.
18        Q.   And could you also consider based on the evidence
19   that you heard, possibly, that a death sentence would be
20   appropriate?
21        A.   Yes.
22        Q.   Okay.  I'd like to talk to you -- I just need to
23   cover some things with you really quick.  The first thing is
24   the indictment.  Do you know how that indictment process works
25   and what a grand jury is and all that stuff?  I mean, you've

229

1  never been on one, right?

2      A.   No.

3      Q.   Okay.  Basically if a cop arrests somebody, they

4  present a case to the DA's office, and the DA's office presents

5  it to a grand jury.  And it's the grand jury's role -- it's a

6  group of people, about 12 of them, who just decide whether or

7  not the police officers have enough evidence to file that case

8  in the first place.  That's all it is.  Did the cops have a

9  reason to file charges?  That's not the same thing as whether

10  or not somebody's guilty.  So the law says that a juror can't

11  say that just because somebody got indicted, that they're

12  probably guilty because it's a different -- it's a different

13  standard.  I mean, are you okay with that?

14     A.   I understand that.

15     Q.   Okay.  And other thing is the Fifth Amendment, but

16  really all that means is the defendant doesn't have to testify.

17  There are -- like the judge was saying, there are many reasons

18  why a person would choose not to testify.  They could not want

19  to, either their lawyers are advising him not to; they might

20  get really nervous in front of a lot of people, maybe they

21  sweat.  Like the judge was saying, there could be a lot of

22  reasons why somebody wouldn't want to testify.  And what the

23  law says is that you actually can't hold it against him.  And,

24  in fact, you can't even talk about it.  And it's a weird

25  situation to be in.  For a juror, it's almost like hearing a

230

1  joke, but there's not a punch line to it, you know?  And no

2  one's saying don't want to know what the punch line is.  No one

3  is saying that, but what everybody is saying is, don't hold

4  that against the defendant if for whatever reason he doesn't

5  testify.

6      A.   And I'm understanding that's his right?

7      Q.   Yeah, exactly, that's his right.  Would you be okay

8  with that too?

9      A.   Yes.

10     Q.   Okay.  The judge talked to you about what standards

11  of proof are, about how there's like the standard of proof in a

12  civil case, not this kind of case where it's just a little

13  bit of -- basically a little bit of convincing.  And this --

14  this is a lot different.  This is called beyond a reasonable

15  doubt.  And there's not a definition of that.  There's not

16  really a definition of what that means.  But I can tell you a

17  good way to think about it is like this.  You hear all the

18  evidence, and the first question that you ask yourself is

19  you're thinking about whether or not the defendant's guilty.

20  And you say, Well, do I have a doubt?  If the answer is, no, I

21  don't have a doubt, well, you're done.  You vote guilty, you go

22  to the next part of the trial.  But let's say that you do have

23  a doubt.  The next question you ask yourself is, is it a

24  reasonable doubt?  Do I have a reason for it?  And it's got to

25  be a reason that's based on the evidence.  It can't be a reason

231

1  like, well, he's really young, and I feel sorry for him, you

2  know, or, well, he looks like -- he looks like my husband's

3  cousin or something like that.  I mean, it has to be a reason

4  based on the evidence.  So the issue is, do I have a doubt?

5  And if you don't, he's guilty.  And if you do, you ask

6  yourself, do I have a reason for the doubt?  And if you have a

7  doubt, but you don't have a reason for it, you still vote

8  guilty because that's not a reasonable doubt.  Do you have any

9  questions about that?

10     A.   No.

11     Q.   You heard the judge talk about the presumption of

12  innocence.  What that means is that at this point you presume

13  the defendant to be innocent, and there's no reason why you

14  wouldn't.  I mean, you haven't heard any evidence yet, right?

15     A.   No.

16     Q.   Like the judge was saying, if you had to vote right

17  now, you heard -- have you heard our side put on anything

18  at all?  I mean, have we put on evidence?  Have we called in

19  witnesses?

20     A.   Have you called any witnesses now?  Is that what

21  you're asking me?

22     Q.   Yeah.  Have you heard --

23     A.   No.

24     Q.   You haven't heard us call witnesses, though, right?

25  So there's no reason why you would not presume the defendant to

232

1  be innocent.  It's almost like a little bubble, like a force

2  field or something around somebody.  And if you hear evidence

3  that convinces you that a defendant is not innocent, it pops

4  the bubble and it's gone.  It's just -- it means that going

5  into this right now, you have to presume the defendant is

6  innocent.  It doesn't mean that he is.  It means that going

7  into the trial and deliberating in the trial, you have to

8  assume that he is until you hear evidence that convinces you

9  that he's not.

10     A.   I understand that.

11     Q.   Okay.  Do you have any problems with that?

12     A.   No.

13     Q.   Okay.  I want to talk to you just a little bit about

14  your questionnaire.  What is Valence?

15     A.   It's a third party administrator company.

16     Q.   Oh.  Okay.  So do you --

17     A.   For health insurance.

18     Q.   Yeah.  How long have you worked there?

19     A.   Two years.

20     Q.   Are you -- do you go to the health fairs down here at

21  the county?  Are you ever down there?

22     A.   No.  I personally don't.  Maybe Driscoll Hospital

23  does because we're affiliated with the state program, Driscoll,

24  CHIPS, and Star Medicaid Program.  And then we also have a

25  commercial account in Georgia and Tennessee.  Because it is a

233

```
1    third party administrator we have -- we have the state
2    contract, and then we also have a commercial account in Georgia
3    and Tennessee.  Plus, I also work -- have a weekend job.
4    Q.   Yeah.  What's Bojon's?
5    A.   Bojon's is a surf shop in Port A.
6         MR. JONES:  I'm sorry?
7         THE COURT:  It's a surf shop in Port A.
8         MR. JONES:  Oh, okay.
9    A.   You have to come by there and check it out.
10   Q.   (BY MR. SCHIMMEL) Do you have surf boards too?
11   A.   Yes.
12   Q.   Do you have long boards?
13   A.   Yes.
14   Q.   Do you have Robert August long boards?
15   A.   I don't know what that is.
16   Q.   Okay.  I'll go by.
17   A.   You have to come by this weekend.
18        MR. SKURKA:  He's just showing off, Judge.
19   Q.   (BY MR. SCHIMMEL) Okay.  So you do that on the
20   weekends and then on the weekdays you do that TPA stuff, the
21   third party administrator stuff?
22   A.   My full-time job is with Valence.  And then my
23   weekend job is at Bojon's because I'm the sole provider of my
24   three children.
25   Q.   Is it a -- would it be hard for you sitting as a
```

234

```
1    juror in this kind of case since you have children who are
2    fairly young and since the defendant himself is fairly young?
3    A.   No.
4    Q.   I mean, you're not as a juror gonna be thinking, man,
5    that guy's only five years old or 10 years older than my
6    16-year-old or anything like that?
7    A.   I honestly believe that everything happens for a
8    reason and everyone's responsible for their own actions.
9    Q.   Okay.
10   A.   We're all grown-ups.  We're not -- we're not a
11   five-year-old or a 10-year-old.
12   Q.   On one of your questions you said that you didn't
13   participate because of -- because of your work and because of
14   your being a single mom.  But I think that you were talking
15   about extracurricular type stuff with your church?
16   A.   Oh, yes.
17   Q.   Okay.  Is that what --
18   A.   I am -- I am Catholic, but because of my hours and
19   what I have to do to support my familiy, I'm not able to have --
20   I mean, my sole role is my children.  So as far as having extra
21   time to go to church, I'm not able to do that because I'm
22   always working.
23   Q.   Okay.  You didn't mean you couldn't be on a jury or
24   anything?
25   A.   No.
```

235

```
1    Q.   Okay.  You just meant you --
2    A.   Yeah, it's just the availability of time is not there
3    for me.  It's either my children or work.
4    Q.   Okay.  You have a cousin also with CCPD?
5    A.   Yes.
6    Q.   Who is your cousin?
7    A.   Two.
8    Q.   Who are your cousins?
9    A.   Joe Vela.  And my other one is distant -- Torres.
10        THE COURT:  The commander?
11        VENIREPERSON NO. 96:  No.  He just started.
12   He's probably been on the force like two years.
13        THE COURT:  Okay.
14        VENIREPERSON NO. 96:  Joe Vela's been with
15   CCPD for a very long time.
16   Q.   (BY MR. SCHIMMEL) Do you ever talk to your cousin
17   Joe about any of these cases?
18   A.   We're not actually close because of my lifestyle.  I
19   don't see him quite often.
20   Q.   Okay.
21   A.   We don't get to visit.
22   Q.   Okay.  But there's nothing about your being a
23   relative to Joe Vela or Officer Torres that would make you not
24   be fair in this case?
25   A.   No.  I honestly don't even know when the -- when it
```

236

```
1    took place, when this incident happened.  I don't know anything
2    about it.  I don't get to watch TV very often.
3    Q.   Right.
4    A.   So to keep up with that --
5         THE COURT:  You're just a real busy person?
6         VENIREPERSON NO. 96:  Yes.
7    Q.   (BY MR. SCHIMMEL) It was four years ago.  But I guess
8    the only possible issue would be if maybe, you know, you would
9    call Joe Torres up and say, Hey, I've got this case, and he
10   says, oh, here's what you got to do.  It's nothing like that?
11   A.   No.
12   Q.   Okay.
13   A.   I don't involve my relatives in certain situations
14   that would put -- I don't -- there's no lines that I cross.  I
15   know better.
16   Q.   Okay.  And I know that you -- you do -- you don't go
17   to church as often as you'd like to, but you are a member of
18   the Catholic church.  Do you know the church's position on the
19   death penalty?
20   A.   I understand it.
21   Q.   I mean, I -- my understanding is that the church
22   disagrees with it, but I'm not completely sure about that.  Do
23   you know if they disagree with it?
24   A.   They don't -- they disagree with it.
25   Q.   Okay.
```

237

1    A.    I believe in God. I'm just not able to follow the
2  religion the way I want to because it's 5:00 in the morning
3  till 10:00 each day, you know, this is family -- this is work
4  and then family. And on the weekends I work from 8:00 until
5  7:00. So time for my church is not there for me, not by
6  choice, but by necessity.
7    Q.    Well, what happens, Ms. Rodriguez, if tomorrow the
8  Pope issues an edict and says, "Everybody who follows Catholic
9  teachings no longer can believe in the death penalty."
10    A.    But this is the law. This is religion. This is the
11  law.
12    Q.    Okay. So man's law is for man; God's law is for God.
13  Okay. And they're different. Okay. Well, I think I don't
14  have a lot more questions for you. Do you have any questions
15  for me?
16    A.    No.
17              MR. SCHIMMEL: I'll let the defense attorneys
18  ask you questions now. Thanks for your help.
19              VOIR DIRE EXAMINATION
20  BY MR. JONES:
21    Q.    I'm gonna ask you the questions. My name is Grant
22  Jones. I wasn't present on the first day when everybody got in
23  the room together.
24              MR. GARZA: That's why I'm making him do all
25  the work.

238

1              VENIREPERSON NO. 94: Yeah, I saw you there.
2              MR. JONES: I carry his briefcase also.
3              VENIREPERSON NO. 94: That could be a weapon.
4    Q.    (BY MR. JONES) Your day occupation -- your --
5    A.    My full-time job.
6    Q.    Your main job, your company processes insurance
7  claims, right?
8    A.    Yes.
9    Q.    Do you do any Medicaid work? Do you have federal
10  government contracts?
11    A.    This is a state program. We do Driscoll Star
12  Medicaid, which is part of Medicaid program, but it's an HMO
13  policy. So it's the State's way of controlling the misuse of
14  people who do traditional Medicaid. This is an HMO policy, so
15  everything has to be reverted back to the primary PCP. People
16  can't just go and seek services like they would with
17  traditional Medicaid. Some of them misuse it, so it's the
18  State's way of controlling that misuse. So if they want to go
19  see a specialist, they have to go ahead and get referred back
20  to their primary PCP. They can't just go.
21    Q.    I see. So your company -- your job is to watchdog
22  that and make sure that the rules are followed?
23    A.    Well, I'm customer service.
24    Q.    Okay.
25    A.    So when providers' facilities call in, our -- we give

239

1  eligibility, benefits, what needs to be authorized. As far as
2  claim processing, I don't do that. We have a different
3  department that's not even here. It's in Chicago.
4    Q.    Okay.
5    A.    They do the claim processing. It's run through a
6  different system. And our corporate office is in Chicago.
7  It's not here.
8    Q.    All right. So you don't get involved in the actual
9  claims?
10    A.    No. The only thing that I view on a claim is after
11  it's processed, and I'm viewing the information. If there
12  needs to be any research, I have to send it to get researched,
13  a request for research.
14    Q.    Have you ever testified in a court relating to your
15  work?
16    A.    No. The only -- the only court hearings that I have
17  is child support. That's it.
18    Q.    Okay. Well, I noticed that. I'm gonna ask you about
19  that in a minute.
20              Okay. Now, you've got -- let's see. You've got
21  three boys?
22    A.    I have three boys.
23    Q.    Three sons. And let's see, they range in age from?
24    A.    Sixteen to seven.
25    Q.    Sixteen to seven. And I presume that they're all in

240

1  school?
2    A.    They're all in school.
3    Q.    And I presume that you have someone to help you
4  with --
5    A.    I have family support.
6    Q.    Family support for their -- in other words, to look
7  after them while you're working?
8    A.    Yes.
9    Q.    Okay. Would that be your family, your immediate --
10    A.    My family. And actually my 16-year-old works with me
11  on the weekends.
12    Q.    Okay. So he's --
13    A.    He's with me.
14    Q.    Almost there. Yeah, he's almost at majority.
15              Does -- and I'm gonna ask you this. It's kind
16  of a personal question and you'll see the reason for it a
17  little bit later in our visit here. Let's see, how long have
18  you been divorced from the father of your children?
19    A.    Since 2000.
20    Q.    2000. Okay. So that's been a while back. And
21  has -- has your ex-husband -- well, obviously he's been --
22  hasn't been paying his child support?
23    A.    No. He's about $90,000 right now. He just got
24  released October 31st.
25    Q.    All right. So he's not fulfilling his responsibility

241

```
1    in that regard.  Does he -- since the divorce, has he stayed --
2    has he been exercising his visitation rights?
3         A.   No.
4         Q.   Okay.
5         A.   When it's convenient to his lifestyle.
6         Q.   Okay.  Do you think -- I mean, this question almost
7    answers itself.  Do you think it's important for a father of a
8    child, especially a boy child, to have regular contact with his
9    son?
10        A.   I think it is.
11        Q.   And why -- why is that important?  .
12        A.   When the children are born, you don't have choices.
13        Q.   Exactly.
14        A.   You have responsibilities.  That's just how I feel.
15   Their dad -- he thinks he has choices, and so he exercises
16   those choices.  Yet, I'm the one that carries the
17   responsibility because I don't get State assistance.  I thought
18   with him being confined in jail would maybe enlighten him and
19   maybe wake him up, but actually he stayed there 60 days versus
20   he was not supposed to be out until January.  And they gave him
21   that two day for one credit, so he was out October 31st.
22        Q.   Do you agree that one way that children learn what to
23   do and what the rules are and what -- you know, they pick up
24   their values from their parents?
25        A.   They do.  And my boys see me work and they see me --
```

242

```
1         Q.   I know, but if one parent is not there or is not
2    available --
3         A.   He's absent.
4         Q.   -- then the children are not getting from that
5    parent, are they?
6         A.   No, they're not.  But irresponsibility is not
7    something that I want them to learn.
8         Q.   Do your sons have access to any other male figure in
9    the family, like your father --
10        A.   They have my brothers and my father.
11        Q.   Do they have regular contact with them?
12        A.   Yes.
13        Q.   So those men can be a role model for them?
14        A.   Yes.  Besides, I keep my boys involved in baseball.
15        Q.   Okay.
16        A.   Their ROTC, through football.  This is where my life
17   resolves.  Not just work, but it's sports.
18        Q.   Okay.  Now, let's talk about being a juror on a
19   capital murder case.  The death penalty is a form of punishment
20   that's authorized by the Texas legislature, for certain types
21   of crimes.  The judge told you what they are.  They're all
22   murder, and they're all -- it's not usually.  They are murder
23   plus an aggravated circumstance.  Like in this case, the
24   indictment charges murder in the course of committing a
25   robbery.  Do you -- I think you told us that you're generally
```

243

```
1    in favor of that option, that punishment option and they have
2    it for these kind of offenses?
3         A.   Yes.
4         Q.   And do you believe that the Texas society -- and I
5    say Texas because the states have the choice to have the death
6    penalty or not, not all states have it.  Do you think Texas
7    benefits from having the death penalty?
8         A.   You know, I really don't have a personal opinion on
9    it.  I haven't really --
10        Q.   Thought about that?
11        A.   Uh-huh.
12        Q.   And that's okay.  That's the problem with these
13   cases, you know, people normally don't think about these
14   things, you know, in their every day, you know, coffee
15   conversation.  And they really don't -- are forced to think
16   about it until they get summoned to jury duty.  And suddenly
17   they're asked all these big questions.
18             Well, if you're on this jury, the first -- the
19   first part of the trial will be concerned with whether the
20   defendant is guilty of the offense charged in the indictment.
21   That's the first part or the first phase of the trial.  If the
22   defendant is found guilty of capital murder, then the case
23   moves to a second phase called the punishment phase where the
24   jury takes up the matter of punishment.  And in this kind of
25   case, the jury is presented with two questions or special
```

244

```
1    issues they call them.  An issue is a question.  And it is the
2    answer to those two questions that determines what punishment
3    will be imposed, okay?  The jury doesn't write down --
4    physically write down on a piece of paper life or death, okay?
5    Instead the jury answers these questions.  And then when the
6    answer is determined, that is, the statute determines what
7    follows as a consequence of those answers.  Do you follow me?
8         A.   Yes.
9         Q.   Okay.  Let's talk about those questions.  The first
10   one is at your left hand on the board.  Would you turn and look
11   at it and read it.
12        A.   Yeah.  And I do have neck surgery, so I'm not too
13   flexible in turning.
14        Q.   That's all right.  You can spin as much as you want
15   to up there.  Now, that question would be answered based on the
16   evidence that's before you.  Okay.  In fact, everything --
17   every time you vote on something, it's based on the evidence
18   that you hear in the courtroom.  In order for the jury to
19   answer that question yes, all 12 have to vote yes, a unanimous
20   verdict, okay?  That's generally the rule in criminal cases.
21   Verdicts require a unanimous vote.  However, there's a little
22   change in the rules in this kind of case.  If 10 of the jurors
23   vote no to Special Issue No. 1, that's a vote that's favorable
24   to the defendant.  Why is it favorable to the defendant?
25        A.   Because no one's voting in one direction.  There's a
```

245

1   reason --

2   Q.   Well, in order -- no one can get the death penalty in

3   Texas unless that question is answered yes.  That's a -- it's

4   an indispensable condition.

5   A.   By all 12 people.

6   Q.   By all 12 people.  So a vote no would be favorable to

7   the defendant, right?

8   A.   Yes.

9   Q.   Because that would mean he would get what punishment?

10   A.   He would get the life in prison.

11   Q.   That's right, because that condition is not met,

12   correct?

13   A.   Correct.

14   Q.   Okay.  So but if -- when the jury takes its vote, and

15   it's 10 to 2 for no, which is favorable to the defendant, the

16   law authorizes the foreman or the presiding juror to write down

17   the verdict no.  And a no answer would -- would also be

18   adjoined with an instruction to stop deliberations and deliver

19   the verdict to the Court who would then, by law, assess a life

20   sentence, okay?  You never get to the second question if that

21   one's answered no.

22         Let's assume though for our discussion that the

23   jury does answer the question yes, okay?  And you can spin your

24   chair to No. 2, okay?  Could you please read that question to

25   yourself and then tell me when you're finished.

246

1   A.   (Venireperson complies.)  Okay.

2   Q.   Is there any word or phrase in that question that you

3   do not understand?

4   A.   No, sir, it's been fully explained by everyone in

5   court here.

6   Q.   That question -- what does the verb "to mitigate"

7   mean?

8   A.   To mitigate.  We talked about it earlier.  Is

9   there --

10   Q.   Translate to mitigate into a simple -- into simple --

11   A.   Has he done anything in society that benefited it?

12   Has he --

13   Q.   The verb "to mitigate" means simply to lessen.  If

14   you go to the dictionary and look up mitigation or to mitigate,

15   you'll see the word "lessen," to lessen or make less.  In the

16   context of a criminal case when they talk about mitigating

17   evidence and mitigating circumstances, that's evidence which if

18   a juror believes it to be true would cause the juror to want to

19   vote for a lesser punishment.

20   A.   And then they're gonna take into consideration as far

21   as his character.

22   Q.   Right.  Well, I'm gonna get to that.  Now, mitigating

23   circumstance -- any fact, you know, of the fact that the

24   defendant, I don't know, was a Cub Scout, you know, if you

25   think that's a mitigating circumstance, you can -- you can give

247

1   it effect by voting for a life sentence.

2         Okay.  Now, let's talk about -- the question not

3   only asks you to consider whether there are mitigating

4   circumstances that would cause you to vote for a life sentence,

5   but it asks you to consider certain things in getting to that

6   final question.  Look up at the -- first of all, what does the

7   verb "to consider" mean?

8   A.   To consider.

9   Q.   You use the word all the time, but what does it

10   really mean?  If I ask you to consider something, what am I

11   asking you to do?

12   A.   I am going to have to go ahead and really take it

13   everything and look into it and see --

14   Q.   It simply means will you think about it.  I'm gonna

15   give you some information.  And I say, will you consider this,

16   that is, will you think about it with the view toward doing

17   something that I would like for you to do.  I want you to

18   consider the fact that my client was a Boy Scout, okay, with

19   the view towards you would vote for a life sentence.  It's

20   really not -- to consider means to think about it with the idea

21   that you're going do something or not do something, okay?  Does

22   that -- do you understand that?

23   A.   Yes.

24   Q.   Okay.  I think you do.  Okay.  All right.  So then

25   the question directs the jury to think about three specific

248

1   things or areas.  The legislature didn't make these up.  These

2   areas of consideration are directed by the Supreme Court of the

3   United States.  They're saying in a case like this, a jury must

4   think about or consider these matters before it reaches the

5   final decision.

6         Okay.  What's the first one up there?  The

7   circumstances of the offense.  Okay.  Well, the jury's already

8   heard that, right?  How was the offense committed, the manner

9   of its commission, etc.?  The second thing is the defendant's

10   character and background.  What does character mean?

11   A.   What he's made out of.

12   Q.   Hum?

13   A.   What is he made out of.

14   Q.   If I said you were a person of good character, what

15   am I telling you?  If someone asks me, what about this lady, is

16   she a lady of good character?

17   A.   Are you honest, are you hardworking?  That's

18   character.

19   Q.   Okay.  Those things that you mentioned are values,

20   are they not?

21   A.   But it also builds character.

22   Q.   Do you agree that our society has a certain set of

23   moral values that we sort of all agree upon, you know, like Ten

24   Commandments, the Boy Scout oath, the law, trustworthy, loyal,

25   helpful, friendly, courteous, kind, obedient, cheerful?

249

1    A.    That's a perfect world.

2    Q.    In a perfect world.  But those are good values,

3    right?  And so if a person adheres to those values, then we'd

4    say that they have good character, okay?  Whereas a person who

5    lies, you know, doesn't meet his obligation, you might say, is

6    a bad character, you know.

7          Now, background.  Well, background's pretty

8    easy.  What does that mean?

9    A.    That's his history.

10   Q.    That's his history.  Okay.  His biography, if you

11   will.  And you would expect in this kind of case if we get that

12   far, that you're gonna hear some background.  The defense

13   counsel in a capital murder case are directed -- it's their

14   duty to investigate the background of the defendant and to

15   offer that information to the jury, okay, and to argue its

16   significance as to the issue being decided, okay?

17         So if you're on the jury, will you consider the

18   defendant's background regardless of what it is?

19   A.    Yes.

20   Q.    You may not give it effect, but you may.  For

21   example, we may prove that in a case like this that the

22   defendant grew up in a very deprived family.

23   A.    But it doesn't justify it.

24   Q.    Okay.  I'm glad you said that.  Let's say that you're

25   on the jury and the defendant puts on evidence that shortly

250

1    after he was born his parents abandoned him and he kind of grew

2    up on the street, okay?  Just really had a terrible time.  He

3    had health problems and, you know, didn't go to -- dropped out

4    of school, etc.  And you're thinking about that.  Well, you

5    know, this kid didn't really have a good chance.  So I -- I

6    consider that to be a mitigating circumstance, and I'm gonna

7    vote for a life sentence.  And then the juror next to you says,

8    wait a minute, there are lots of kids that grow up, you know,

9    born into bad situations like this, you know.  They don't all

10   grow up and, you know, commit crimes.  It's no excuse, okay?

11   What's wrong with that argument?

12   A.    Well, I'm gonna have to be open-minded about

13   everything.

14   Q.    Okay.  Well, when they -- the word "excuse" suggests

15   that it's a defense, okay, with -- the jury gets to this

16   question.  You've already found the defendant guilty of the

17   crime, you know, and it -- you know, and you -- the fact that

18   his father beat him or something is not an excuse for

19   committing the crime, okay?  It's not a defense.  It would

20   cause you to let him go, okay?

21         This kind of evidence is evidence which goes

22   beyond.  It's in addition to the decision whether a person's

23   guilty or not guilty.  Do you follow me on that?

24   A.    Yes.

25   Q.    Okay.  It's a bigger -- it's a bigger question.

251

1          All right.  Now, the next one is a little bit

2    harder.  Let's go down, personal more culpability.  What does

3    that mean?  Well, personal means the defendant, and what does

4    moral culpability mean?

5    A.    His beliefs, his morality.

6    Q.    Okay.  But it's asking you to consider it toward the

7    end, that you might use it to vote for a lesser punishment.  So

8    when you think about a person's moral culpability, what thought

9    process are you going through?  You've done it before, just

10   never have articulated it.  Let me see if I can suggest a -- a

11   framework for thinking about it.

12   A.    I'm just not to use judging them first without

13   knowing them.

14   Q.    Well, let me suggest the framework to think about

15   moral culpability, okay?  First of all, our society does have

16   rules, okay?  We have laws, and we have moral rules that we

17   learn, you know, through our Judeo Christian traditions, Ten

18   Commandments, Boy Scout Law, the Penal Codes.  Those set out

19   the standards of conduct.  And we expect and presume that when

20   a -- when a citizen reaches a certain age, that they know what

21   those rules are, okay?  You have a son that's 16 years old.  In

22   two years he's gonna be an adult for many purposes, and society

23   is going to presume that at that stage that he knows what the

24   rules are, he knows what he's supposed to do and not supposed

25   to do, okay?

252

1          So the first component of thinking about moral

2    culpability is does the defendant know what the rules are.  Is

3    there anything in his background that would question or raise a

4    question about his knowing what the rules are?  For example, if

5    a person has a low mental ability, like is borderline retarded,

6    he's not retarded, but borderline, has a low IQ, that might

7    affect a person's ability to know and understand the rules,

8    right?

9    A.    True.

10   Q.    But a person -- okay, so -- or did a person grow up

11   in a family where he had access to people who were teaching him

12   the rules, okay?  So your children have -- are learning their

13   rules from you, from their grandfather, from their uncles and

14   their teachers.  And you take your son out to the marketplace

15   to work, he's learning from the other adults that are around

16   him.  He's learning things, right?

17   A.    Right.

18   Q.    You're giving him opportunities to learn what the

19   rules are and he's learning it.  I guarantee you he's learning

20   it.  That's the way I learned it.  I had a lot of contact with

21   both my parents, I had teachers, ministers and churches, Boy

22   Scout leaders etc., etc., when I was growing up.  One day I

23   woke up and I knew what the rules were, okay?

24         Do you believe in the doctrine of free will?  Do

25   you know what that means, that human beings have the power to

253

1 choose one course of action over another?

2     A.  Yes.

3     Q.  Sometimes preachers talk about free will. In other

4 words, we're free to sin.

5     So, which brings me to the second component of

6 moral culpability, and that is, is there anything that's going

7 on that affects a person's judgment about what course of action

8 they're gonna take? You know, you may know the rules, but in

9 making the judgment to go this way or that way, is there

10 anything going on that would affect a person's judgment? Now,

11 in the illustration that the Court gave you about the two

12 people that did the burglaries, one guy was stealing to support

13 his --

14     A.  -- his habits.

15     Q.  Okay. So he knows that it's against the law to

16 commit burglary. He knows it's against the law to steal,

17 right? And so, but he made a choice to do that in our

18 illustration. However, he did it for a reason, okay? And that

19 reason affected his judgment in taking one course of action

20 over another. And what was that reason?

21     A.  Are you referring to the one that did it for his

22 habits or are you referring to the one --

23     Q.  No, no, the one that was feeding his children.

24     A.  Okay. That was a survival method. But he should not

25 have reverted to that right there. There's other ways.

254

1     Q.  There's other ways, but you can understand --

2     A.  Honestly, I couldn't see -- I wouldn't understand why

3 he would have taken from someone else. I understand he did it

4 for his children. He felt he was doing right for his children,

5 but, you know, we can all work and find different ways. I have

6 personally done a contract for a whole year with my full-time

7 billings job --

8     Q.  Right.

9     A.  -- doing lawn contractor. I mean, I'm out there with

10 the lawn mower, weed eater. That was what I did. So reverting

11 to stealing from someone else is not just a --

12     Q.  So you if were the judge in a case like that, you

13 would tell this guy, say, look, I know your kids are starving,

14 but, you know, you can go down to the welfare department and

15 get some food, or, you know, you could -- you know, there are

16 other ways you could have gotten that food besides stealing,

17 breaking into that person's house?

18     A.  Yes.

19     Q.  So I'm gonna give you the same punishment as I give

20 this other guy.

21     A.  Umm...

22     Q.  You paused, right? There's a difference, right? The

23 -- there was -- his stealing to feed his kids is not an excuse

24 for the crime or even a justification for the crime, but it is

25 a way -- that motive affects his moral culpability. It's

255

1 something that would affect a person's judgment. Intoxication,

2 mental illness, okay? IQ, you know, mental ability might

3 affect a person's judgment. Do you agree with that?

4     A.  I understand that. I'm actually a CMA. So running

5 into people who are on medication with different --

6     Q.  Okay. There you go. When the question says consider

7 the person's moral culpability, it's basically asking you, did

8 you know what the rules were? Was there anything that was

9 affecting his judgment --

10     A.  Yes.

11     Q.  -- when he broke the rules? Okay. And if there is,

12 then there is a reason -- then you have to consider that with a

13 view toward giving him a lesser punishment because if you think

14 that's the right thing to do.

15     Okay. Do you think you understand?

16     A.  Yes.

17     Q.  Okay. Now -- we said that before a person can get

18 the death penalty that Special Issue No. 1 has to be

19 answered --

20     A.  By all 12.

21     Q.  All 12 how, yes or no?

22     A.  Yes.

23     Q.  Yes. How does Special Issue No. 2 have to be

24 answered in order to produce the death penalty?

25     A.  What do you mean? That, I'm not understanding.

256

1     Q.  Okay. That Special Issue No. 2 calls for a yes or no

2 answer, right?

3     A.  Okay.

4     Q.  Which answer, yes or no, will produce the death

5 penalty?

6     A.  Yes.

7     Q.  What?

8     A.  Yes.

9     Q.  Look at it again, especially the last part.

10     A.  I'm a little confused on what you want me to answer

11 your question.

12     Q.  Well, if the jury finds that there is sufficient

13 mitigating circumstances to justify a life sentence, then they

14 will answer that question yes.

15     A.  Okay. But I told you yes, and you --

16     Q.  Oh, I'm sorry. I thought you said no.

17     A.  No.

18     Q.  I apologize.

19     A.  I said yes.

20     Q.  That's correct. In other words, if the jury finds

21 that there are mitigating circumstances, then they would answer

22 that question yes. I always like to say yes means life. It's

23 a positive. How many votes does it take to get a yes answer on

24 Special Issue No. 2?

25     A.  Are we also gonna consider all 12 votes?

257

1    Q.   Remember we talked about --
2    A.   It would have to be yes.
3    Q.   It has to be yes.  That's a vote against the
4  defendant.
5    A.   Okay.
6    Q.   But a vote for the defendant on Special Issue No. 2,
7  how many votes does that take?  And what we said is a little
8  alteration to the rules.  A vote favorable to the defendant
9  only takes 10.  So if 10 jurors feel like that there are
10  mitigating circumstances that justify a life sentence, the
11  foreman of the jury can answer that question yes.
12    A.   Okay.
13    Q.   Yes will produce what sentence?
14    A.   Life in prison.
15    Q.   Correct.  If the jury answers no, however, which is a
16  vote against the defendant, okay, how many votes does that
17  take?
18    A.   If the jury answers no?
19    Q.   Right, that's against the defendant, it takes how
20  many votes?
21    A.   I'm not sure.
22    Q.   Unanimous.  Anything against the defendant takes 12
23  votes, okay?  General rule in criminal cases is unanimous
24  verdict to get any kind of decision, all right?  A vote of no
25  there means what punishment's gonna be imposed?

258

1    A.   Life.  This one's supposed to be yes in order to get
2  life in prison.
3    Q.   Yeah.
4    A.   So how are we gonna get no on this one?
5    Q.   If you answer it no.  But if the jury answers that
6  no, what punishment is the judge gonna give?  What punishment
7  follows the no answer there?  What is the result of the no
8  answer?
9    A.   Okay, honestly I'm confused already.
10    Q.   All right.  I'm gonna do it one more time.
11    A.   You turned me in circles.
12    Q.   Okay.  I'm sorry.  The answers to these questions --
13  both questions call for a yes or no answer.  The jury is
14  permitted to know the effect of their answers, in which when
15  you vote a certain way you know what's gonna happen?
16    A.   Okay.  So if this one, if it votes yes, all 12, we're
17  going to this level?
18    Q.   That's right.
19    A.   Okay.  And so when we vote yes on this one, it's
20  going to be life in prison.
21    Q.   You got it.
22    A.   Okay.
23    Q.   So if you vote no on that one, what's going to
24  happen?
25    A.   Then we're -- you had said the unanimous, and then

259

1  it's gonna go to the judge.
2    Q.   Yeah, with the no answer to number 2.  What
3  punishment is he gonna -- by law has to be imposed?  There's
4  only two choices.
5    A.   It's gonna be either the life imprisonment --
6    Q.   Or death?
7    A.   -- or the lethal injection.
8    Q.   But if you answer Special Issue No. 2 no, what
9  punishment is gonna be imposed?  The jury's saying there are no
10  mitigating circumstances that would justify a life sentence.
11    A.   I'm not sure.
12    Q.   You know the answer.  I just know you do.
13    A.   I just got a headache already.
14    Q.   I know, I know.
15    A.   You gave me a headache.
16    Q.   Look, the --
17    A.   I think I should have been taking down notes.
18    Q.   I know.  But both a yes or no -- Special Issue No. 2
19  calls for yes or no answer.  We've already -- if the jury
20  answers it yes with 10 -- at least 10 votes, that's gonna
21  produce a life sentence.  That's good.  That's positive.
22  That's favorable to the defendant, right?  But if the jury
23  says, no, there's not any mitigating circumstances that we
24  think are important enough to vote for a life sentence, you
25  answer that question how?

260

1    A.   So then the mitigating is gonna be to a lesser
2  sentence?
3    Q.   Right.  Yeah.
4    A.   Is that what you're asking me?
5    Q.   Yeah, but if the jury says there are no mitigating
6  circumstances, then they answer that question how?
7    A.   It's going to be the lethal.
8    Q.   The what?
9    A.   The lethal injection.
10    Q.   Yeah, but what -- what word are they gonna write on
11  the verdict form yes or no?
12    A.   I'm so confused now.  I'm not understanding what
13  you're wanting -- what you're asking me.
14    Q.   Okay.  I'm just asking you mechanically what
15  answer -- what will -- what events will follow if you answer
16  the question in a certain way.
17         MR. JONES:  Okay.  That's all I have.
18         THE COURT:  Anything else?
19         MR. SCHIMMEL:  Just a few more questions, Your
20  Honor.
21         THE COURT:  Okay.
22              VOIR DIRE EXAMINATION
23  BY MR. SCHIMMEL:
24    Q.   Ms. Rodriguez, I think just basically what Mr. Jones
25  was asking is, if you find the defendant guilty, the first part

261

1  of the trial, if you say, yes, he's guilty, then you answer
2  Question No. 1, and you say, yes, I think he's gonna keep doing
3  bad stuff. The answer to No. 1 becomes yes, and you look at
4  No. 2 and say, and no, there's no reason why we should not
5  impose the death penalty, yes, then no. That's the answer. If
6  you say yes, and then you say no to that, then that means that
7  the judge authorizes the death penalty be imposed. That's it.
8          But I just had a couple of quick questions for
9  you about some stuff that came up.
10          The first one, I was noticing when I was going
11  through some of this, you said that you had a hot check issue
12  with that guy trying to pay child support and not paying it.
13  Did -- did the DA's office -- they helped you with that,
14  didn't they?
15     A.  I ended up having to go to -- because I tried
16  collecting -- he wrote me like a $200 check for child support.
17  Of course, it bounced. And I couldn't collect it from him, so
18  I ended up having to go to the office down Weber and file it
19  with them. And it's been such a long time already, I really
20  don't remember the process of it, but I know you have to send a
21  certified letter to them, I guess. And finally, his -- but the
22  DA didn't get involved here.
23     Q.  Okay.
24     A.  They didn't get involved here at the courthouse
25  because I know I went there. They couldn't help me. They

262

1  actually directed me to the Flour Bluff constable, I think.
2     Q.  Judge Stoner?
3     A.  They weren't able to -- they tried. I think they
4  made attempts. And then I ended up having to go down to the
5  Weber office, and that's when his sister finally came and paid
6  the money. And that cleared that check.
7     Q.  Do you live out in Flour Bluff or something?
8     A.  Yes.
9     Q.  All right. I read that. At first, I was thinking,
10  oh, great, we helped her get her money and then you said he
11  owed you $90,000 --
12     A.  No. You can help me get $90,000.
13     Q.  Okay. Gosh, that's terrible.
14          The other thing I was going to ask you, you said
15  you actually cut lawns. That was your third job to take care
16  of your kids?
17     A.  Well, no, actually, before I did this, the Bojon's, I
18  had a lawn contract with a subdivision out in Flour Bluff. So
19  it's -- it's Shoreline Oaks and they're just building right
20  now. But it first started with a job for me and my sons to do.
21  But then I couldn't have them doing it out there because it is
22  a lot of physical labor, and I didn't like them using the
23  machinery. So my job was -- and it was a contract -- I was
24  supposed to take care of all the lawns, just the front lawns,
25  and then do like the model homes, the entryway, the pool hall.

263

1  The subdivision is in phase one right now. It's got like three
2  phases. Well, the income that I'm getting for each lawn wasn't
3  enough for me to acquire help, so I actually did at the very
4  end up with 32 lawns every week. So I'd break it up and I had
5  my framework, but because of my neck surgery, I wasn't able to
6  physically keep up with it anymore.
7     Q.  Oh, that was what you were talking about what
8  happened with your neck?
9     A.  I actually have severe degenerative disk disease, so
10  I do have a plate supporting my neck at C5, C6, and C7.
11     Q.  But that's when you said your child was helping on
12  the weekends, that's what he was helping you do?
13     A.  No. My older son helps meet right now at Bojon's.
14  I've been working at Bojon's for maybe the past two and a half
15  months.
16     Q.  Okay.
17     A.  And he works with me.
18     Q.  Okay. I just wanted to figure that out. One last
19  question. You said that on the list going over this stuff --
20  I'm honestly not trying to pry at all. I just wanted to figure
21  this out. You dropped charges on, I guess, it was your husband
22  at that time for assault or something?
23     A.  Actually, it was my fiance. And he did assault me
24  six weeks after the surgery. So for six weeks after the
25  surgery I'm supposed to wear a Miami brace, which is a hard

264

1  collar. And Dr. Prekowski is the one that did it. He's the
2  one that did the surgery. He did come home, and he was
3  intoxicated, and he did become violent to where I did call the
4  police. They did go out there. They did bring him in. And he
5  spent maybe like two nights -- but I dropped the charges. His
6  family -- when you have the surgery, it actually takes you a
7  whole year for it to fuse. You're not supposed to run or jump.
8  His family was very threatening because they were not happy
9  about him spending the night in jail to where I dropped the
10  charges. The only thing I wanted to do was get out -- get out
11  of the home. So I did relocate myself. I did get a
12  restraining order. And he went through anger management
13  classes, and we went our separate ways.
14     Q.  That's good. Do you feel like -- I mean, I guess a
15  lot of that stuff happened through this office here granting
16  the protective order and stuff like that?
17     A.  Through the courthouse here.
18     Q.  Yeah. Do you feel like -- I guess it did. I mean,
19  that happens that way in a lot of cases. Do you feel like the
20  DA's office or the county attorney's office did enough to help
21  you in that case?
22     A.  No, they did. They actually weren't very happy with
23  me dropping the charges.
24     Q.  Okay.
25     A.  They said it's actually not up to me. Even though I

265

1   drop them, the State can still implement them and prosecute him

2   for it. So my dropping them is not gonna even drop everything

3   completely. It's up to the State. But they didn't pursue it.

4   They didn't pursue it. And I just -- he seemed to have learned

5   his lesson and --

6       Q.   Okay. Well, I hope your neck gets better.

7           MR. SCHIMMEL: That's all I have. Thank you.

8           THE COURT: Anything else?

9           MR. JONES: No.

10          THE COURT: Okay. Why don't you wait in the

11  jury room. We'll be right back with you.

12          (Venireperson exits the courtroom.)

13          THE COURT: All right. What says the State?

14          MR. SKURKA: Could we have a moment, Judge?

15          (Counsel conferring.)

16          MR. SCHIMMEL: Your Honor, the State will

17  accept this juror.

18          MR. GARZA: Can we confer a minute, Judge?

19          THE COURT: You may. You may.

20          (Counsel conferring.)

21          MR. JONES: All right. We exercise a

22  peremptory challenge. How many is that?

23          THE COURT: It's 12. All right. Bring her

24  in.

25          (Venireperson enters courtroom.)

266

1           THE COURT: All right. Ms. Rodriguez, you

2   were not selected to be on this jury, but we do appreciate

3   your service and coming down here and spending the good part

4   of the day with us.

5           VENIREPERSON NO. 96: Well, thank you. Well,

6   you have to head out to Bojon's on the weekends.

7           MR. SKURKA: Can we go off the record just a

8   second?

9           (Discussion off the record.)

10          (Recess.)

11          THE COURT: Which person is this?

12          MR. SKURKA: We're looking at No. 98. She may

13  have medical problems. She says she's doing better, but I

14  just bring it to your attention.

15          THE COURT: This isn't No. 97, is it?

16          MR. SKURKA: 98, Judge.

17          MR. JONES: What if we called her in --

18          THE COURT: All right. Call her in first.

19          MR. SKURKA: And just let the judge ask about

20  the medical stuff?

21          MR. JONES: We can just agree.

22          MR. SKURKA: I'll agree on her.

23          MR. GARZA: On which one, on 98?

24          MR. JONES: Yeah.

25          THE COURT: Do you want to bring her in right

267

1   now and see what the deal is?

2           MR. JONES: Yeah, just maybe ask her the --

3   you know, this trial can put you under a lot of stress.

4           THE COURT: And then I guess if she says okay,

5   we'll just go right into her?

6           MR. JONES: If she thinks she can do it, then

7   we'll tell her go back and question her; or if she says no,

8   she --

9           THE COURT: I mean, if she says she can do it,

10  we'll roll on with her, I guess.

11          MR. JONES: Okay. That's fine, yeah.

12          THE COURT: All right. Let's bring her in.

13          MR. SKURKA: But she doesn't answer the

14  questions --

15          THE COURT: She is 98, that's Contessa Ebanks?

16

17              VENIREPERSON NO. 98,

18              CONTESSA EBANKS,

19              VOIR DIRE EXAMINATION

20  BY THE COURT:

21      Q.   Okay. You are Contessa Ebanks; is that how you say

22  it?

23      A.   Yes.

24      Q.   Okay. All right. We're looking to pick a capital

25  murder jury. You know that?

268

1       A.   Uh-huh.

2       Q.   And we're looking for people that can keep an open

3   mind and follow the law. Now, we got your questionnaire.

4       A.   Okay.

5       Q.   Okay. And within your questionnaire, you stated --

6   and I don't mean to get personal with you, but you did state

7   that you have -- you had a condition that you were taking

8   counseling for?

9       A.   Oh, yeah.

10      Q.   Okay. I guess I need to know if that's going to

11  affect -- because this is serious deal, okay? It's a capital

12  murder case. What does capital mean? That means the death

13  penalty is a possibility. This is serious stuff. And we had a

14  juror yesterday that said, I just -- you know, I've been up at

15  nights thinking about this, and I just can't do this, okay?

16  And if you can't, it's okay. All right. We'll get somebody

17  else. It won't hurt our feelings at all, okay?

18      A.   Yeah.

19      Q.   So I need to know. I mean, this is serious business,

20  and -- and I think even -- even one of the most seasoned

21  persons maybe that's even been through combat finds this a

22  stressful situation simply because the fact of the matter is,

23  this person over here, this process could lead to his death.

24      A.   Right.

25      Q.   Okay. It may be the most serious decision that you

269

1  ever make in your life, or one of them. Is that -- do you
2  think you can do that?
3      A.   No. I actually have been thinking about it since we
4  had our jury questionnaire. I could -- could come to like, I
5  guess, a decision based on like facts, but, when it comes to
6  the punishment part --
7      Q.   And some people tell me that. Okay. All right.
8              THE COURT: Do you-all want --
9              MR. GARZA: No, Judge, we don't have any
10  questions.
11             THE COURT: Okay. Why don't you wait in the
12  jury room and we'll be right back with you.
13             VENIREPERSON NO. 98: Sure.
14             (Venireperson exits the courtroom.)
15             THE COURT: All right. Who's going to make a
16  motion?
17             MR. SKURKA: I'll make a motion to challenge
18  her for cause, Judge.
19             MR. GARZA: No objection.
20             THE COURT: All right. Bring her back in.
21  Sustained.
22             (Venireperson enters courtroom.)
23             THE COURT: All right. Ms. Ebanks, we're
24  gonna go ahead and let you go. Thank you for coming down, and
25  we appreciate your honesty.

270

1              MR. SKURKA: Thank you.
2              THE COURT: All right, then. This is Lorraine
3  Leal.
4
5              VENIREPERSON NO. 97,
6              LORRAINE LEAL,
7              VOIR DIRE EXAMINATION
8  BY THE COURT:
9      Q.   Hello.
10     A.   Hello.
11     Q.   All right. You are Lorraine Leal?
12     A.   Yes, sir.
13     Q.   All right. We're picking a capital murder jury. You
14  know that from the first day you came in?
15     A.   Uh-huh.
16     Q.   But what we're looking for is people that can keep an
17  open mind, right?
18     A.   Uh-huh.
19     Q.   And people that can follow the law, okay? Can you
20  keep an open mind in this case?
21     A.   Pretty much, yes.
22     Q.   All right. Never been on a jury before. That's
23  okay.
24     A.   No.
25     Q.   All right. Let's talk about some things here. First

271

1  of all, you haven't heard anything about the case?
2      A.   No.
3      Q.   All right. Now, this is a criminal case, and the law
4  says in every criminal case, the State brings the
5  prosecution -- in other words, the State brings the charges,
6  the law says, State, you bring them, and you prove them. The
7  defense doesn't have to prove anything. That's how it works.
8  The burden's on the State. You can hold them to the burden --
9  to their burden, right?
10     A.   Uh-huh.
11     Q.   Yes? You've got to say yes.
12     A.   Yes.
13     Q.   Because she's punching it out. Okay. Next thing,
14  the burden of proof is beyond a reasonable doubt, and I -- I
15  defined -- there's no definition, but I try to tell the jury
16  what it's not, and that gives you an idea of what it is, okay?
17     A.   Okay.
18     Q.   In a civil case, like a contract dispute or a car
19  accident case where one party sues another, what would happen
20  was one party would sue another and they would be the
21  plaintiff, and they would have the burden of proof. The burden
22  of proof would be pretty small. That would be preponderance of
23  the evidence tipping the scales ever so slightly, okay?
24     A.   Right.
25     Q.   It's 51 percent, if you will, okay?

272

1      A.   Okay.
2      Q.   The next burden of proof is clear and convincing.
3  What's that? We use it in some civil cases for some special
4  issues, most notably when the State tries to take away
5  somebody's children, take away their rights to be a parent.
6      A.   Right.
7      Q.   They use the standard clear and convincing. That's
8  higher than that 51 percent, okay, and it's pretty
9  self-explanatory, really, clear and convincing. Pretty strong
10  stuff.
11     A.   Yes.
12     Q.   This is a higher burden than that. It's beyond a
13  reasonable doubt, and it's higher than those two.
14             Now, it is not so high that it's beyond all
15  doubt because if it was beyond all doubt, you would have had to
16  have been there and been a witness, and that would be an
17  impossibility. You wouldn't be qualified if you were a
18  witness.
19     A.   Right.
20     Q.   You'd be a juror, okay? So that gives you kind of an
21  idea of what beyond a reasonable doubt is.
22             Do you think you could follow the law and hold
23  the State to their burden on that?
24     A.   Yes, sir.
25     Q.   Now, the law says, okay, State, your burden to prove

273

1  it beyond a reasonable doubt, and until you do that, defendant
2  is presumed to be innocent, okay?  All of us.  We're all
3  presumed innocent until the State can prove otherwise if they
4  can prove otherwise.  That's no done deal, okay?
5          I need to know from you whether you could do
6  that, follow that law, presume the defendant innocent until and
7  only if the State can prove their case?
8    A.  Yes, sir.
9    Q.  Okay.  And we always ask this question -- it's
10  somewhat of a fair question, I think, but I'm gonna ask anyway.
11  What would you have to vote if you had to vote right now?
12    A.  I wouldn't.
13    Q.  See, that's what -- people answer either that way or
14  they say not guilty.  The right -- the actual right answer is
15  not guilty, but the fact of the matter is that's not a real
16  fair question because --
17    A.  Right.
18    Q.  -- we would never ask anyone to vote before a trial
19  was presented, okay?
20          Now, I've seen a lot of trials and sometimes
21  I've seen strong evidence, and sometimes I've seen evidence
22  that's so minimal, it's even shocking that it was presented,
23  okay?  But the fact of the matter is, if the State doesn't
24  present enough evidence to prove to you beyond a reasonable
25  doubt of the defendant's guilt in this case, what would you do?

274

1    A.  If they can't prove, then I do have a reasonable
2  doubt, it would be a not guilty.
3    Q.  Okay.  All right.  Let's move on to the next thing.
4  It's part of the same set of things.
5          Okay.  The law says this.  The law says
6  defendant doesn't have to testify.  Why?  Well, it kind of
7  makes sense because if State always has the burden of proof,
8  and it never shifts over here, then the defense doesn't have to
9  present anything, okay?  Some people say, "Well, I've got to
10  hear both sides of the case," you know.  No.  It's not about
11  that.  This isn't a race to the finish line where the State's
12  running and the defendant's running and we see who gets there
13  first.  It's not like that.  The only race we have here is to
14  see if the State crosses that line, that burden beyond a
15  reasonable doubt.
16          The law says he doesn't have to testify, and
17  it's even stronger than that.  It says, not only does he not
18  have to testify, but you jurors, you can't hold it against him.
19  If they don't present any evidence, if they just sit on their
20  hands, and these guys don't prove their case beyond a
21  reasonable doubt, you can't -- you can't hold that against him.
22    A.  Right.
23    Q.  Do you follow me?
24    A.  Yes.
25    Q.  Could you follow that law and not hold it against the

275

1  defendant --
2    A.  Yes.
3    Q.  -- if he chose not to testify?  Okay.  All right.
4  The next thing, let's talk a little more specific about this
5  case.  What is the allegation in this case?  Well, the charge
6  is capital murder.  You've been told that.
7    A.  Right.
8    Q.  And what is that?  Well, it's certainly murder
9  because that's within the phrase, right, capital murder?  It's
10  within the two words.  And murder, of course, is the
11  intentional taking of another one's life, okay?
12    A.  Yes.
13    Q.  Okay.  Capital.  What's the capital part signify?
14  The capital part means the death penalty is a possibility, and
15  the legislature has said there are certain kinds of murders,
16  murders plus something else, plus a special circumstances that
17  qualify, okay?  If I, you know, walk right outside with a gun
18  and I shoot somebody, that doesn't make it a capital murder.
19  It makes a murder which is a first degree felony, and it's a
20  serious offense, but it isn't necessarily capital murder.
21          In this case, what the State is alleging is that
22  the defendant, on a given day in Nueces County, Texas, while --
23  while robbing or attempting to rob someone murdered them.
24  Okay.  So we got murder and robbery or attempted robbery in
25  the -- put together.  Okay.  That's what makes this capital

276

1  murder.  Okay.  That's the allegation.
2          The legislature says if you put those two major
3  felonies together, robbery and murder, then you've got a
4  capital murder.
5          Okay.  What is robbery?  The robbery is the
6  forcible taking of property from another, either through force
7  or threats, okay?  For example, I come up to you and I hold a
8  gun to you, and I say, "Give me your purse."  And you give me
9  your purse, I've committed a robbery, right?
10    A.  Right.
11    Q.  All right.  What if I came up to you and did the same
12  exact thing, said, "Give me your purse."  I thought it was a
13  purse, but really you're an avid bowler, and it's your bag for
14  your bowling ball, and you hit me over the head with the
15  bowling ball and knock me out.  I don't get to rob you.  Am I
16  guilty of robbery?  Well, maybe not, but I'm guilty of
17  attempted robbery, right?
18    A.  Right.
19    Q.  They get there either way.  In other words, robbery
20  plus murder, attempted robbery plus murder, is capital murder.
21  Okay.  Do you follow me?
22    A.  Yes.
23    Q.  All right.  Now, the law says -- there's a bunch of
24  elements because we got two crimes.  There's got to be this guy
25  and it's got to be in Nueces County, Texas, and it's got to be

277

1   on or about the given day, okay?

2          The law says the State has to prove all their
3   elements.  They don't get to prove like nine out of ten or
4   whatever it is, okay?  They got to prove them all.  That makes
5   sense really, too, because, I mean, the State could prove every
6   element, and one element is it's not him, right?

7   A.  Right.

8   Q.  But you've got to prove every element.  So would you
9   hold them to that burden and make them prove every element
10  before you found this defendant guilty of capital murder?

11  A.  Yes, sir.

12  Q.  Okay.  All right.  In Texas, criminal trials work
13  like this, bifurcated system.  What does that mean?  Two parts.
14  Two parts.  First part, all we do is hear evidence about
15  whether the State can prove the allegation, that is, guilt or
16  innocence.  Well, not really guilt or innocence.  It's guilty
17  or not guilty.  All right.  We call it the guilt or innocence
18  phase, but it's really the guilty/not guilty phase.  If the
19  State can prove the defendant guilty, then we go on to the
20  second phase.  If they find -- if the jury find s the defendant
21  not guilty, the case is over with.  We go home, okay?

22          Let's talk about the instance if the defendant
23  is found guilty, okay?  There's two things that can happen in a
24  capital murder case if a defendant's found guilty in Texas,
25  only two punishments:  Life in prison or the death penalty.

278

1   They're both very serious.

2          Now, on the second part of the case you may hear
3   more stuff, okay, and we'll talk about that in a minute.  But,
4   in any event, second phase of the trial you hear more stuff,
5   and the jury doesn't say life or death after they -- when they
6   go back for deliberations, like they say guilty or not guilty.
7   They say the -- they answer questions, and here's one of them.

8          "Is there a probability that the defendant would
9   commit criminal acts of violence that would constitute a
10  continuing threat to society?"  What does that mean?  Is it
11  probably true -- is it more likely than not, 51 percent maybe,
12  that the defendant would commit criminal acts of violence that
13  would constitute a continuing threat?  Is it more likely than
14  not that he is going to be violent with people in the future,
15  okay?  It doesn't mean he has to be a killer, but, you know,
16  he's got to be violent.

17  A.  Right.

18  Q.  Okay.  The jury would answer yes or no.  Then they
19  would go over to No. 2.  "After taking into consideration all
20  the evidence, including the circumstances of the offense" --
21  what's that?  That's the first part of the trial, guilt or
22  innocence phase -- "the defendant's character and background."
23  Well, what's character?  Character's like what kind of person
24  he is.  Is he an honest person?  Is he a trustworthy person?
25  Is he a person of high moral standards?  Okay.  And what's his

279

1   background?  You know, of course, the opposite can be true.  Is
2   he a person of bad character, you know, is he a liar, a cheat,
3   and a thief?  Those are all -- those are all characteristics of
4   a person's character, right?

5          And his background.  What's that?  Well,
6   that's, you know, how he grew up, his family life, how did he
7   grew up as a child, was he abused, or did he have a great
8   childhood, you know?  Do you follow me?

9   A.  Yes.

10  Q.  All right.  And the personal moral culpability of the
11  defendant.  That's a hard thing to -- when you read it to know
12  what it means, right?  You agree with me; that's legalese?

13  A.  Yeah.

14  Q.  Okay.  Let me try to give you an example of what that
15  is.  Two burglars.  One burglar breaks into a house to steal.
16  One burglar breaks into a house, just trashes the place, just
17  trashes the house, steals everything of value, TVs, VCRs, CD
18  player, computer, jewelry, anything of value, sells it, spends
19  all the money on cocaine and hookers, okay?

20  A.  Okay.

21  Q.  That's one person.  A second person, worked at a job
22  20 years, gets laid off, got three kids, single parent, and
23  they pretty -- they've been living -- they're barely making it
24  as it was even with the job that he had.  And now, all of a
25  sudden, they got no money.  So what he does is, he goes into

280

1   someone's house.  He doesn't break in, but the door's open, and
2   he steals food because the kids hadn't eaten in three days.
3   And he hasn't eaten in three days.  But he doesn't eat it
4   himself.  He just feeds it to the kids, makes sure they get a
5   nice meal.

6          Now, do you think the personal moral culpability
7   of those two people is the same?

8   A.  No.

9   Q.  It is not.

10  A.  Huh-uh.

11  Q.  That gives you an idea of what that's about, okay?

12  A.  Yes.

13  Q.  Personal moral culpability, how blameworthy are they.
14  They're both guilty, okay?  They both did something wrong.

15  A.  Right.

16  Q.  Okay.  But one of them did something extremely
17  selfish and the other one -- you know, I guess, it's selfish in
18  the sense that he's wrong to take from others, but it was for
19  the benefit of a third party?

20  A.  Right.

21  Q.  Okay.  Now, after considering all that, is there a
22  sufficient mitigating circumstance or circumstances to warrant
23  a sentence of life imprisonment rather than a death sentence be
24  imposed?  All right.  What is a mitigating circumstance?
25  Mitigating means, of course, to lessen, all right, a lessening

281

1    circumstances. Well, what could that be? Well, maybe you hear
2    at the second part of the trial the defendant is a war hero.
3    He saves a platoon of soldiers in Iraq, and at the risk of his
4    own life. He got a medal for it, a Congressional Medal of
5    Honor, okay? You might think that is a mitigating
6    circumstance, okay? Is it justification for the crime? No.
7    You found him guilty. And if we're at this point he's getting
8    life or death, so it's not an excuse for the crime.
9        A.    Right.
10       Q.    The question is, is it a mitigating circumstance?
11   Maybe you hear he was an Eagle Scout, maybe you hear he's just
12   good in the community.
13             Now, what is a mitigating circumstances, only up
14   to the jury to decide. These lawyers may try and tell you what
15   it is. They'll suggest to you what they think it is. Only the
16   jury gets to decide. Because you might say, "Well, I don't
17   think that the fact that he was an Eagle Scout is a mitigating
18   circumstance, but I think the war hero thing is a mitigating
19   circumstance." Or, maybe you say, "I don't think any of this
20   stuff is a mitigating circumstance." It's up to you, in other
21   words.
22       A.    Right.
23       Q.    So what is this question about? Is there sufficient
24   mitigating circumstances? Is it enough? In other words,
25   taking everything in the whole trial together, is there enough

282

1    good stuff about him to warrant a life sentence rather than a
2    death sentence? Does it outweigh the bad that I've heard?
3        A.    Right.
4        Q.    Okay. Because considering the circumstances of the
5    offense, I don't know what his background's like. Maybe he had
6    a bad criminal history. Maybe he's always been in trouble,
7    okay? Maybe the crime itself is so bad that you think that in
8    and of itself, okay? But you've got to consider all this
9    stuff.
10       A.    Uh-huh.
11       Q.    What this question says is hey, look, stop and
12   consider everything because maybe the good outweighs the bad
13   and, therefore, he deserves life. He doesn't deserve to walk
14   because we've already gotten past that. Can you do that?
15       A.    Yes.
16       Q.    Okay. Because, see, what happens is at the beginning
17   of the trial I ask the jurors -- I swear them in, and they --
18   what I ask them to do is do you swear that you'll render a true
19   verdict based upon the law and evidence presented? They say
20   yes. Some people cannot do that in this kind of case because
21   they say, "I cannot participate in the process that could lead
22   to a death penalty." Others say, "If I find him guilty, I'll
23   give him a fair trial. But if I find him guilty, these
24   questions mean nothing to me. I will not follow your law. I
25   will always vote in such a way that he will get the death

283

1    penalty. I'm not going to consider it." And neither of those
2    people can take that oath. It's okay for them to feel that
3    way, but it isn't okay for them to get on that jury, okay?
4        A.    Yes.
5        Q.    I'm asking you, can you take that oath?
6        A.    Yes.
7             THE COURT: Okay. Mr. Skurka?
8             MR. SKURKA: Thank you, Judge.
9                  VOIR DIRE EXAMINATION
10   BY MR. SKURKA:
11       Q.    Hi, Ms. Leal, how are you today?
12       A.    Just fine. Thank you.
13       Q.    I know it's late in the day, but there's a few
14   questions I need to go over with you. And so I'm going to
15   start by telling you there's no right or wrong answers to
16   anything you say. We just kind of want to know how you feel.
17   Please don't answer a question and say, "Well, I better answer
18   it this way because that's probably the way the judge wants me
19   to say it --
20       A.    Right.
21       Q.    -- or the defense wants to say it, or you want me to
22   say it." You just tell us how you feel, and we'll deal with
23   all that. As the judge said, it's a pretty serious case and we
24   want to make sure we have a person that's qualified for the
25   jury, okay?

284

1        A.    Yes, sir.
2        Q.    Are you related to the Leal family over at CCPD?
3        A.    No.
4        Q.    Okay. I thought you said --
5        A.    My dad was a police officer. He's retired, but it
6    was the Harlingen Police Department.
7        Q.    I'm sorry. There's about three Leals that work over
8    at CCPD.
9        A.    I can imagine.
10       Q.    That's why when I saw the Leal family, I thought that
11   you were related to them because there's a bunch of them over
12   there.
13       A.    No. It's just -- we're mainly from the Valley. I
14   moved here about 20 years ago.
15       Q.    Okay. Okay. Because we all know the Leals. They
16   call -- in fact, the father they call Papa Leal. That's his
17   nickname. He's got two sons over there.
18             Okay. Let's talk about some of the issues in
19   this case, if I could. And the first issue, as you might
20   guess, from all the lead-in to all this is the death penalty.
21       A.    Uh-huh.
22       Q.    Just tell me in your own words how you feel about the
23   death penalty, in general.
24       A.    Actually, to tell you the truth, I really never
25   thought about it, if that's an answer. There really have

285

1   been -- I don't watch that much TV, so I never watch that much
2   news. Any trial, any cases, I've never really paid attention
3   to them. Personally, as long as I get straight answers and
4   facts, and it's proven to where the death penalty is something
5   that should be considered, I would have no problem with it.
6       Q.   And that's kind of what I'm getting at. I'm not
7   trying to tell you how you're going to do in this case, but
8   it's like some people said exactly what you say. I've never
9   really thought about it before I was confronted with it.
10      A.   Right.
11      Q.   So let's take you back to that day and remember we're
12  in there, gosh, there's like 2 or 300 people downstairs. What
13  about a week or two before that? If somebody had seen you like
14  at a cocktail party or a coffee shop and for some reason the
15  story came up or something came up about the death penalty,
16  what would you have said? You just feel about the death
17  penalty in general before you were kind of confronted with it?
18      A.   Just actually the way I've always thought is if there
19  is a reason enough and the crime fit the penalty, I would have
20  no problem with the death penalty.
21      Q.   You sound like you're saying when you say a reason, I
22  hear evidence?
23      A.   Evidence --
24      Q.   If there's evidence for facts to say that. And you
25  say if it fits that --

286

1       A.   If it's the crime. If it goes with the crime, if it
2   goes with the severity of the crime.
3       Q.   That's a good word to use because you understand in
4   Texas, not every murder case is a capital murder case.
5       A.   Exactly.
6       Q.   A lot of people have come to us and told us, well, I
7   thought every murder case could be facing the death penalty.
8   And we have to tell them no. The legislature says only certain
9   kind of murder cases can face that. So if people are worried
10  about, you know, it's just given indiscriminately in every
11  murder case, no, it's not. The law has set out those certain
12  more heinous crimes, I guess, those more serious crimes --
13      A.   Exactly.
14      Q.   -- where you're eligible for the death penalty, like
15  killing a cop on duty, killing a kid under six, you know,
16  killing more than one person at the same time; or while you're
17  robbing, raping, kidnapping, or burglarizing. I mean, those
18  are serious felonies; would you agree?
19      A.   Yes.
20      Q.   So I think you agree with the law that you probably
21  think I understand why it's not just for every case.
22      A.   Yes.
23      Q.   It's only those certain cases. That's kind of what
24  you meant when you say --
25      A.   Yes.

287

1       Q.   -- if it fits the crime?
2       A.   The severity of the crime, exactly.
3       Q.   And then you said there's a reason for it. I mean,
4   you would want to have all the evidence at first?
5       A.   Yes, sir.
6       Q.   And, of course, that's what you should have. Some
7   people come and tell us that, "Look, I believe in the death
8   penalty. I think it's a good law. I think we should have the
9   law on the death penalty. I'm for the death penalty. But
10  don't make me be the one to make that decision because it's an
11  awesome responsibility."
12      A.   Yes.
13      Q.   How do you feel about being put in that position,
14  that you might have to make that decision?
15      A.   It is my responsibility, if I am chosen as a juror.
16  And like, you know, my father was a police officer, was a
17  detective. He raised us to take this very seriously, not to
18  try to get out of it like mostly everybody does. You go -- if
19  you're chosen, answer honestly. My mom's the same way. She's
20  in the health field, so we just always have been taught to take
21  this very seriously, and it is a responsibility we have to
22  take.
23      Q.   To respect jury duty?
24      A.   To respect jury duty --
25      Q.   Do your civic duty --

288

1       A.   Exactly.
2       Q.   -- I guess?
3       A.   Yes, sir.
4       Q.   And I understand that's good. But you understand
5   where I'm coming from. Some people say, you know, I could be a
6   juror. Give me a DWI case. Give me a shoplifting case.
7       A.   Yeah.
8       Q.   Give me a burglary case. Don't make me do this kind
9   of case. Did you feel that way --
10      A.   No, sir.
11      Q.   -- when the judge told you what kind of case it was?
12      A.   No, sir.
13      Q.   Okay. The reason I ask is because it's very simple.
14  We're not talking about something you heard in the news or read
15  about in the paper or somewhere else. That's him that man in
16  the purple shirt. There's gonna come a time -- and I told you
17  the very first day -- I don't mince words -- the State has
18  decided to seek the death penalty in this case. And if you're
19  sitting on that jury one day, Lorraine Leal may be forced to
20  look at all the evidence and make a decision that could lead to
21  that person's execution. Can you look at him and tell me you
22  can do that if you think the evidence is there?
23      A.   Yes. Uh-huh.
24      Q.   No hesitation about that?
25      A.   No, sir.

289

1  Q.  Notice how it says, "if the evidence is there"?

2  A.  Yes, sir.

3  Q.  Because I want to ask you the other way.  If you

4  think that the person is not guilty, can you look at him and

5  say you're not guilty based on the evidence?

6  A.  Yes, sir.

7  Q.  And if you think that maybe he shouldn't get the

8  death sentence, maybe the evidence shows or points to him

9  getting the life sentence, can you vote for that?

10  A.  Yes, sir.

11  Q.  That's what I'm trying to figure out if you're

12  leaning one way or the other.

13  A.  No, sir.

14  Q.  You're not.  Okay.  That's fine I'm not trying to

15  pick on you.

16  A.  No, no.  I understand.

17  Q.  I need to know which way you're going, because some

18  people say, "Look, if he's found guilty, I'm automatically

19  going to give him the death penalty."  And I always tell them,

20  "It's not automatic.  There's certain questions you have to

21  answer before you can do something like that."  So, you don't

22  have a problem being a part in this type of jury in a capital

23  murder case?

24  A.  No, sir.

25  Q.  And you're not leaning one way or the other?

290

1  A.  No.

2  Q.  Remember the judge talked about presumption of

3  innocence.  Everybody starts their trial with the presumption

4  of innocence.  Remember they told you that little test how

5  would you have to vote if you had to vote right now?

6  A.  Right.

7  Q.  And what that basically means is that means you have

8  to start them off at innocent.  It's up to the State to prove

9  that he's guilty beyond a reasonable doubt.  In other words,

10  this isn't like other countries where they say, well, you're

11  guilty and you have to prove your innocent.  The jury has to

12  come in here and say, you know, I believe he's innocent, and

13  the State has to prove he's guilty.

14  Now, I will tell you that's just a presumption.

15  It doesn't mean that he is innocent.  It's just right now he's

16  presumed innocent because you haven't heard any evidence --

17  A.  Exactly.

18  Q.  -- toward him.  Now, I anticipate that the

19  presumption's going to change once I start putting on evidence.

20  But you have to start at that beginning, that he's presumed

21  innocent.  Can you do that?

22  A.  Yes, sir.

23  Q.  And remember the judge says he doesn't even have to

24  testify if he don't want to, and you can't hold that against

25  them.  That's the old Fifth Amendment; remember that?  He has a

291

1  constitutional right just like you would or anybody else would.

2  Sometimes jurors say, "Well, gosh dog it, I want to hear both

3  sides of the story.  I want to hear what he says, because if it

4  was me, I would testify and try to defend myself."  But the law

5  says, no.  The judge says, we'll give you instructions, if he

6  doesn't testify, that says you can't hold that against him.

7  Can you follow that law?

8  A.  Yes, sir.

9  Q.  Okay.  And you understand the importance of that law

10  too, because if somebody says, "Well, I want to find him guilty

11  just because we didn't hear from him," that wouldn't be fair

12  either, would it?

13  A.  No.

14  Q.  Okay.  Now, you know this is a capital murder case

15  because it's murder plus a robbery?

16  A.  Yes.

17  Q.  I don't want to spend a whole lot of time in there.

18  You'll hear what a robbery is.  Essentially, it's that taking

19  something by force or threats of force.

20  And there's two parts to this trial.  Have you

21  ever been on a jury before?

22  A.  No, sir.

23  Q.  Okay.  It's very simple.  And every criminal case is

24  like this.  There's two parts to.  The first part is, did he do

25  it or not?  Is he guilty or not?  You don't think about how to

292

1  punish him yet because you haven't even found him guilty yet.

2  A.  Right.

3  Q.  Because if you find -- if you don't think there's

4  enough evidence beyond a reasonable doubt, your vote would

5  be --

6  A.  Not guilty.

7  Q.  -- not guilty.  Okay.  And if it is beyond a

8  reasonable doubt, you find him guilty.  Then there's the second

9  part of the trial.  Generally speaking, the first part of the

10  trial is just about what happened that day.  What are the

11  surrounding circumstances of the crime itself and did he commit

12  the crime?  The second part of the phase, if you find him

13  guilty, you go on to more background stuff, more other

14  information about the person.  Is he a good guy?  Is he a bad

15  guy?  Does he have a long history with the law?  Does he

16  have -- you know, never been in trouble with the law, you know,

17  anything?  Do you see what I'm saying?

18  A.  Yes.

19  Q.  That's what helps you make up your mind on what the

20  punishment is.  The law says just because you find him guilty

21  of capital murder, you don't automatically give the death

22  penalty.  And you can't be a fair juror if you do that.  You

23  listen to everything, and then based on that evidence, that

24  maybe that extra evidence, so to speak, you might be able to

25  make a decision on that.  And you answer two questions.  If

293

1    you're ever on a criminal jury, generally speaking, there's a
2    range of punishment like, say, two years to 20 years in prison.
3    And people always say, "Well, why do they make it so wide a
4    range?" And I go because every case is different and every
5    person is different.
6              Have you ever seen that in the news where, you
7    know, reading the newspaper that somebody gets sentenced to
8    burglary and gets 20 years in prison? And then in another
9    courtroom, somebody gets sentenced to burglary and gets five
10   years probation. And you think, well, why did one guy get 20
11   years and one guy get probation? What kind of reason would
12   you think that would be?
13       A.   It's the mitigating circumstances the judge was
14   talking about.
15       Q.   That's right. It's either mitigating circumstances
16   or aggravating circumstances. You know, the guy who got 20
17   years in prison, the maximum sentence, there's probably
18   something horrible about his crime or his background, maybe
19   because of the highest. On the other hand, the person who got
20   probation, maybe he's a first time offender. Maybe he doesn't
21   have a bad history. You answered that exactly right. That
22   tears people up. They always think everything should be equal.
23   And I say, well, every case is different.
24            So the judge tells you to answer these two
25   questions. The first one is right behind you on the board, and

294

1    there's some key words I want you to look at. The first --
2    part -- it says is there a probability. In other words, is
3    there a good chance, not certainty, because unless you got a
4    crystal ball and you can look in the future, there's no way I
5    can prove to you 100 percent what's going to happen in the
6    future. And the law doesn't require me to. It just says, is
7    it probable that he would do these things. It also says,
8    "would commit criminal acts of violence." Some people say,
9    "Well, gee, Mark, I can't give the death penalty unless I think
10   he's going to murder somebody again or do another capital
11   murder." And I say, "It doesn't say he has to be committing
12   another murder. It says commit criminal acts of violence. It
13   could be like, you know, punching somebody in the nose, you
14   know, just any kind of crime of violence."
15            And the last part says, "would constitute a
16   continuing threat to society." Can you tell me what that
17   means to you, that phrase, "continuing threat to society"?
18       A.   Would continue to do criminal acts, try to rob
19   people, maybe assault somebody, just --
20       Q.   Yeah.
21       A.   -- in that threat.
22       Q.   The key what we call it is future dangerousness.
23   He's gonna be a danger in the future to our society. But some
24   people say, "Well, gosh, why do you have to seek the death
25   penalty? You could give him a life sentence, and that locks

295

1    him up and he can't ever hurt anybody." And then I always say,
2    wait a minute, what happened -- who else is in a prison besides
3    the defendant?
4        A.   The other prisoners.
5        Q.   Exactly.
6        A.   Is that who you're talking about?
7        Q.   It's not a trick question.
8        A.   I was all --
9        Q.   It's not a --
10            MR. SKURKA:  Could we get her some water?
11       A.   I have some.
12       Q.   (BY MR. SKURKA) That's okay.  It's not a trick
13   question or there or anything. But seriously, prison, there's
14   other prisoners, there's guards, there's people that work at
15   the prison. In other words, what I'm trying to say is, you
16   know, when you're locked in prison, that doesn't mean you're on
17   a desert island where no one else is around. There's other
18   human beings you still interact with. Have you ever heard
19   about that in prison, like maybe somebody hurting another
20   prisoner or, you know, prisoners attacking the guards or
21   something like that? You've heard of that?
22       A.   Yes.
23       Q.   So would you agree with me just because you're locked
24   up in prison doesn't mean you can never hurt anybody again?
25       A.   Right.

296

1        Q.   Okay. It sounds a little funny because it says
2    society and you think like in the outdoor in the open society.
3    And prison is really its own society because they still got
4    people around there, right?
5        A.   Right.
6        Q.   Okay. So that's what that question says. Is he
7    gonna be a danger in the future, so to speak; yes or no. If
8    you answer that question yes, then you go to the next question.
9    The next question is the mitigating circumstances question.
10   And I think the judge did a pretty good example about the
11   different burglars and how you would treat different people.
12   But the key word, of course, is mitigating. And that means
13   anything that would lessen or make less severe the punishment.
14   They did the crime. Is there any reason to give him a break
15   and give him life instead of the death penalty? Can you make
16   that decision before you hear anything? No. And what you --
17   what the judge is telling you to do is this: Okay. You found
18   him guilty of capital murder. You think he's guilty. You
19   think he's a continuing threat to society. He might hurt
20   somebody in the future. But stop. Before you make a decision,
21   the judge tells you, take into consideration all of the
22   evidence, including the circumstances of the offense, like what
23   happened that day? Did he have a big role in the crime, a
24   small role in the crime? Was it a really horrible, heinous
25   crime, or was it kind of not that bad? Then you look at his

297

1   character and his background.  Remember that second part of the
2   trial?  You might get to hear was he a good guy or was he a
3   bad guy?  Did he have good character or did he have bad
4   character?  And his personal moral culpability, taking into
5   consideration all that, is there enough?  Is it sufficient of a
6   mitigating circumstance to warrant that a sentence of life
7   rather than the death sentence be imposed?  I think that's what
8   the State of Texas does.  They don't want you rushing into
9   anything.  And it's kind of like the old checks and balances,
10   you know, you always used to hear in school about the
11   government checks on stuff because it looks like he's heading
12   for the death penalty.  But before you give the death penalty,
13   look at everything and see if there's any reason to give a life
14   sentence.
15        Mitigating circumstance could be anything – if
16   the jury thinks it's a mitigating circumstance.  There's no
17   definition.  It's not like you say, well, because he's an
18   orphan I have to lower the sentence; because he came from a
19   broken home, I have to lower the sentence; because his dad was
20   an alcoholic, I have to lower the sentence.  You know, because
21   he made good grades in school and was on the honor roll back
22   then.  You know, because he was a war hero, I have to lower the
23   sentence.
24        What I'm saying is just to consider all those
25   things, but you, the jury, give whatever weight that you

298

1   think's important.  In other words, some people may say, "Well,
2   you know, he came from a broken home and maybe we should lower
3   the sentence because of that."  Or, you know, "He was an Eagle
4   Scout in high school, so maybe we should give him a break
5   because he was an Eagle Scout in high school."  That could be a
6   possible mitigating circumstance, but other jurors may say,
7   "Look, that doesn't outweigh all the other bad things."  It's
8   kind of like, is there enough good that outweighs all the bad
9   that he's done.  There may be some good things in there, but
10   the question is, is it enough to outweigh all the bad things?
11   Some people may say, "Well, that's good that he was an Eagle
12   Scout, but that doesn't excuse his behavior and make me give
13   him a lower sentence."  Do you see what I'm saying?
14      A.   Yes, sir.
15      Q.   I guess the base word to say is open-mindedness.
16   Remember the judge said -- the first thing the judge said,
17   would you be able to listen to everything and consider it and
18   give fair consideration of his background and the circumstances
19   of the defendant.  Some people may say, "Yeah, I can consider
20   that and reduce the sentence."  Some people may say, "No, I
21   don't think that's enough."  You see what I'm saying?
22      A.   Yes.
23      Q.   That up to the jury.  The defense may bring evidence
24   about that, but that doesn't mean you have to necessarily lower
25   the sentence.

299

1        Mitigating is kind of like the opposite of
2   aggravating.  Some reasons it might go low; some reasons it may
3   go high.  Mitigating would make it less in a sense.
4        Do you think that's kind of a fair question to
5   ask before you make a hard decision --
6      A.   Yes.
7      Q.   -- like this?  Because you want to know the
8   background.  And you want to know if there's any reason.  But
9   I'm looking for jurors that can follow through with it.  If you
10   think there's -- he's guilty and that you think, yes, he's a
11   continuing threat to society, and no, there's not enough to
12   outweigh the mitigating circumstances, can you sentence him to
13   death?
14      A.   Yes, sir.
15      Q.   And if you -- the other way, if you think that there
16   is a possible mitigating circumstance, or you think, no, I
17   don't think there's a chance he's gonna hurt somebody else, can
18   you vote for a life sentence?
19      A.   Yes, sir.
20      Q.   I keep saying vote for death or life, but you really
21   don't check off death or life when you answer those questions.
22      A.   Right.
23      Q.   The last thing I want to talk to you about on this
24   part is a law that you may hear in this case is this.
25   "Voluntary intoxication is not a defense to crime."

300

1   voluntary intoxication.  In other words, if you go get yourself
2   drunk or high on drugs, can you go up to the Court and say,
3   well, I'm not guilty because I was drunk when I did that?
4   Absolutely not.  It's not a defense or an excuse to crime.  You
5   can't just go rob a bank and say, "Well, I'm not guilty of
6   robbing that bank because I was drunk when I did it."  No,
7   because that's not an excuse to crime.  However, it's a
8   possible mitigating circumstance.  Maybe some juror will say,
9   "Yeah, he robbed the bank, but, you know, that's a mitigating
10   circumstance that he was drunk.  So I'm gonna give him a lower
11   sentence."  Other people may say, "Well, I don't care if he was
12   drunk or not if he robbed the bank.  He still robbed the bank
13   and he's got to pay for that."  Do you see what I'm saying?
14      A.   Yes.
15      Q.   So intoxication may be a possible mitigating
16   circumstance.  Again, just like anything else, it may lower the
17   sentence, but it doesn't have to lower the sentence.  Okay.
18   Are you with me on the scheme?
19      A.   Uh-huh.
20      Q.   Does that make sense going through all those things?
21      A.   Yes, sir.
22      Q.   Because you got to start off that he's guilty.
23   Then -- you know, then you have to answer that question and the
24   other question before you can get to the death penalty.  And I
25   think it's pretty careful – clear that everybody will want the

301

1 juror to be careful about this.

2 The last few things I want to talk to you about

3 are a couple of legal issues. Remember that just because he's

4 indicted, that he's charged with a crime, does that mean he's

5 guilty of the crime?

6 A. No, sir.

7 Q. No, it just means the State has brought charges. Who

8 has to prove the case beyond a reasonable doubt?

9 A. (Indicating.)

10 Q. I do. Go ahead, you can lay that burden on me

11 because that's my job. That's exactly right. And I have that

12 burden in this case and every other case. I've tried plenty of

13 cases, and they all start with, I have to prove them guilty

14 beyond a reasonable doubt. And that's the way it should be,

15 right?

16 So that doesn't bother me at all. All I want to

17 make sure is the burden of proof is beyond a reasonable doubt.

18 It's not beyond all doubt or a shadow of a doubt, any doubt.

19 You know, you always hear that stuff on TV, and it drives me

20 crazy because the judge is gonna tell you it's only beyond a

21 reasonable doubt. Don't hold me to a standard higher than

22 that.

23 A. Right.

24 Q. I mean, there's no way like you could believe it – I

25 could prove it to you 100 percent unless you were there and you

302

1 saw the whole thing, and then you couldn't be a juror in the

2 case. Do you see what I'm saying?

3 A. Uh-huh.

4 Q. Some people say, "Well, I have a doubt." And then my

5 question is, well, is it a reasonable doubt. Do you have a

6 reason for that doubt? Not that, oh, it just feels that way or

7 something. I mean, is there a real reason that you can put

8 your finger on things, because of this, I think this.

9 The other thing, I think we talked about the

10 Fifth Amendment. He doesn't have to testify. You're not

11 gonna hold that against him?

12 A. No.

13 Q. The defense doesn't have to put on evidence. They

14 can just remain silent. After I finish, they don't have to say

15 anything, and you cannot hold that against him.

16 A. Right.

17 Q. It's a natural inclination that sometimes people want

18 to hear both sides of the story, but you may not hear that.

19 You won't hold that against him, right?

20 A. No, sir.

21 Q. And you shouldn't because I have to prove the case.

22 They have to prove nothing.

23 I don't think I have any other questions for

24 you. I think you said something about your church is against

25 the death penalty?

303

1 A. Yes, they are.

2 Q. But you don't agree with that?

3 A. No, sir.

4 Q. Tell me a little bit about that, please.

5 A. I go to the one on Saratoga. They are always

6 discussing -- because they're involved in a lot of -- or they

7 were on the news a lot, and they want you to be involved in

8 praying over them. And it's nothing I particularly agree with.

9 Q. What do you mean praying over them?

10 A. You know, you pray for them and you pray for --

11 Q. Pray for who?

12 A. For whoever was on trial, whoever committed whatever

13 act, they do get involved a lot with -- and not so much

14 involved personally, but they'll read the paper, they'll watch

15 the news, they'll become involved in saying, you know, if any

16 of you-all have heard about this or read about this, and we

17 want to pray for that person and --

18 Q. Somebody who's on trial or been convicted?

19 A. Trial, been convicted, or has committed some type of

20 serious crime that they just feel that the person was -- I

21 don't know, that the person didn't mean to do it or -- it's not

22 my opinion. It's -- like I said, my parents have raised me to

23 be fair, but there is times when something that's serious needs

24 to be handled by the Court. It needs to be handled by the

25 judge and whatever lawyers and whatever jury is.

304

1 Q. Okay. So if I'm reading you right, what you're

2 saying is even though your church kind of is against the death

3 penalty, you have your own mind and you make your own

4 decisions?

5 A. I have my own mind and my own opinion.

6 Q. That's fine. We have people here who are Catholics,

7 and they say, Look, my church is against the death penalty, but

8 that's just not one of the teachings that I follow.

9 Okay. I don't think I have any other

10 questions. Do you have any questions of me? I know I've been

11 talking a while. I hope I explained everything to you okay.

12 A. Yes, you did.

13 Q. If you have any other questions, that's fine. But,

14 if not, I'll let the other lawyers talk to you now. Thank you,

15 Ms. Leal.

16 MR. GARZA: May I proceed, Your Honor?

17 THE COURT: Yes.

18 MR. GARZA: Thank you.

19 VOIR DIRE EXAMINATION

20 BY MR. GARZA:

21 Q. Ms. Leal, my name is Ed Garza. I had previously

22 introduced myself, I think, back when you-all were together as

23 a group.

24 A. Yes, sir.

25 Q. And my co-counsel is Mr. Grant Jones, and our client,

305

1    over here is John Henry Ramirez.

2         What is Trisun C. C. River Ridge?

3    A.   Trisun Care Center River Ridge is a nursing home.

4    Q.   Oh, it's a nursing home?

5    A.   Yes.

6    Q.   All right. Okay. And you're the director of human

7    resources?

8    A.   Yes, sir.

9    Q.   Is that correct?

10   A.   Yes.

11   Q.   How long have you been there, two and a half years?

12   A.   Two and a half years, going on three.

13   Q.   Okay. How did you get into that business or into

14   that --

15   A.   Sheer luck.

16   Q.   Really?

17   A.   Yeah. I had some courses in HR, and I've had

18   management background, so when they were looking for somebody,

19   you know, a friend of a friend referred me to them, and I got

20   the job.

21   Q.   Okay. And you've been living here in Nueces County

22   for about 20 years?

23   A.   About 20 years.

24   Q.   Okay. Whenever a person is on trial here in Texas,

25   we ask that jurors come before the task of being on jury duty

306

1    with an open mind and with a sense of impartiality, okay?

2    A.   Yes, sir.

3    Q.   What does impartiality mean to you?

4    A.   It means that I don't -- I'm not partial to him

5    either being guilty or not guilty. It's like he said, it's up

6    to you to prove to me that he's innocent. I really don't have

7    an opinion on it coming in. And he is innocent right now until

8    you prove him, you know, innocent, period, where he proves him

9    guilty.

10   Q.   Okay. Now, do you understand we don't have to prove

11   anything?

12   A.   Yeah, that's right. Sorry.

13   Q.   Okay.

14   A.   Until he proves him guilty or --

15   Q.   Yeah. I just want you to understand the concepts or

16   the fact that they have the burden of proof and that it has to

17   be beyond a reasonable doubt. What does reasonable doubt mean

18   to you?

19   A.   That if I have any doubt on the evidence that they

20   presented, then that is a reasonable doubt to prove him

21   whichever way that we -- the jury decides.

22   Q.   Okay.

23   A.   I have to have no doubts whatsoever, but if there's

24   doubts pertaining to their evidence.

25   Q.   And if you have a doubt as to the evidence, and if

307

1    you have a doubt as to the case, then you would have to return

2    a verdict of not guilty?

3    A.   Not guilty.

4    Q.   Is that correct?

5    A.   Yes, sir.

6    Q.   Okay. Now, in Texas, only certain cases, like the

7    judge has explained to you, are capital murder cases, okay?

8    A.   Yes.

9    Q.   In other words, they have to be a homicide or a

10   murder coupled with yet another very serious crime such as a

11   robbery or a kidnapping or a burglary, or a rape or something

12   like that?

13   A.   Yes.

14   Q.   Okay? Because not all murders have available the

15   death penalty as a possible punishment, okay?

16   A.   Yes, sir.

17   Q.   There can be some horrific terrible, you know,

18   factual murders that occur, but the death penalty is not a

19   punishment for any jury to consider in those kind of cases.

20   A.   Right.

21   Q.   Okay? So there are two parts to a criminal trial all

22   the time. The first part is the guilt/innocence part, okay?

23   And then if need be, there's also a punishment part, okay? If

24   you don't get to the punishment part, well, then everybody just

25   goes home.

308

1    A.   Right.

2    Q.   It's over with, okay? But in Texas, in order for you

3    to consider these two special issues, what has to occur first?

4    A.   I'm sorry. I don't understand the question.

5    Q.   Before you can consider these two special issues --

6    A.   Right.

7    Q.   -- okay, what part of the trial has to occur first?

8    A.   That we give a guilty decision.

9    Q.   Okay.

10   A.   These two questions behind me.

11   Q.   So, in other words, you have to convict our client --

12   A.   Right.

13   Q.   -- don't you, before you can even consider these

14   issues; is that correct?

15   A.   Yes.

16   Q.   Okay. Special Issue No. 1, the future dangerousness

17   issue, requires that all 12 jurors decide unanimously that our

18   client would constitute or continue to be a threat to society?

19   A.   Right.

20   Q.   He'd have to decide that unanimously, okay?

21   A.   Right.

22   Q.   Because it would go against his -- it would go

23   against his interest, wouldn't it?

24   A.   Yes.

25   Q.   So, therefore, it would be fair to say that all 12

309

1  should decide --
2      A.   Should agree.
3      Q.   -- unanimously, correct?  Okay.  Now, if you were to
4  say if -- if the State has no way of convincing you through any
5  of their evidence that there is a probability that he would be
6  a continuing threat to society, then you would say no to that
7  issue, wouldn't you?
8      A.   Right.
9      Q.   Now, the rules say up to 10 of you there's only
10 needed up to 10 of you to agree to that issue in order to stop
11 the trial right there and then submit that verdict to the
12 judge.  And what would happen at that time, in your
13 understanding of these concepts?
14     A.   With this first question?
15     Q.   Right.
16     A.   Would -- I'm sorry, I have to read it again.  If we
17 all, like you said, 10 agree that he is not a threat to
18 society, then the -- it would be life imprisonment --
19     Q.   Correct.  That's exactly right.
20     A.   It wouldn't be death.
21     Q.   That's exactly right.  Everything stops right there.
22     A.   Right.
23     Q.   But, if things don't go favorably, let's just say,
24 and all 12 of you decide that you are convinced that he is a
25 continuing threat to society, then and only then do we ask you

310

1  to consider Special Issue No. 2, okay?
2          Now, Mr. Skurka went over it with you, and you
3  read it, and he gave you some examples.  Do you understand that
4  particular issue?
5      A.   Yes, sir.
6      Q.   What does mitigating mean to you?
7      A.   There is a circumstance that allows -- that he should
8  get life imprisonment and not death.  There is something in
9  his -- like he told me the question -- like the judge told me
10 the question, there's something in his background, there's a
11 situation that surrounded the crime itself that would deem it
12 life imprisonment and not death.
13     Q.   Okay.  Would it mean it's sort of lessens --
14     A.   It lessens the crime.
15     Q.   Okay.  That's what it means.  It means it lessens it.
16     A.   Excuse me.
17     Q.   And we would ask you to consider the circumstances of
18 the offense, the defendant's character and background, and the
19 personal moral culpability, okay?
20         Now, what does character mean to you?
21     A.   Character means it's almost like their personality,
22 the way they have carried themselves throughout their lives,
23 the way they act with other people, the way they associate with
24 other people in their everyday surroundings.
25     Q.   Would it have to do with things -- like if I were to

311

1  say that you're a person of good character, what would I be
2  saying about you?
3      A.   Just that I have a good moral character, a good --
4  basically good person, hardworking person.  It could mean a
5  range of things.
6      Q.   Okay.  It's like a code of values, isn't it, sort of?
7  Trustworthiness, honesty, the Ten Commandments, the Boy Scout
8  Creed --
9      A.   Right.
10     Q.   -- things of that nature that you learn.  It's some
11 of the things you might learn at church, correct?
12     A.   Yes, sir.
13     Q.   What about background?
14     A.   Background --
15     Q.   What does background mean to you?
16     A.   Background means where I grew up or where anybody
17 grew up, part of the neighborhood we grew up in, what kind of
18 family life did I have, what kind of school life did I have,
19 friendships, no friendships.  It's my background.
20     Q.   And then let's get down to this personal moral
21 culpability.  I think the judge told you that has to do with
22 the degree of a person's guilt or a person's blameworthiness,
23     A.   Right.
24     Q.   Okay.  He gave you the comparison between the guy
25 that was out trying to burglarize and make money --

312

1      A.   Right.
2      Q.   -- for his coke habit, and other immoralities versus
3  the guy who had to make the moral choice of having to steal or
4  watch his family starve.
5      A.   Right.
6      Q.   That sort of created a dilemma for that person,
7  didn't it?  Does that last situation create a degree of guilt
8  for that person compared to the other persons that you can
9  consider?
10     A.   Yes, sir.
11     Q.   And do you understand what we're asking you to
12 consider?
13     A.   Yes.
14     Q.   Okay.  Now, a person's morality is sort of a person's
15 code of core values that we're hoping he or she has learned,
16 okay?
17     A.   Okay.
18     Q.   But would you agree with me that there might be
19 situations in which people are brought into this world or
20 raised where maybe they have not had an opportunity to learn
21 what these values are?
22     A.   Yes, there are some situations, uh-huh,
23 circumstances.
24     Q.   And so, therefore, they're incapable of knowing
25 whether a particular decision they make is a good one or a bad

313

1  one?

2      A.   Right.

3      Q.   Do you agree with that?

4      A.   Yes, sir.

5      Q.   Okay.  So that they had no way of knowing the degree

6  of their culpability.  If the evidence should show something to

7  that effect, what that question there is asking you is, can you

8  give it some effect, can you give it some thought?  Will you

9  give it some consideration?

10     A.   Yes, sir.

11     Q.   Or is it something that just wouldn't matter to you?

12     A.   No.  I would think about it.

13     Q.   Okay.  We, as lawyers, defense lawyers especially, as

14  a consequence of the case where this language came from -- it

15  was a Supreme Court case that came down several years ago --

16  have now the obligation whenever we represent a client in these

17  types of cases, we have the obligation to investigate and bring

18  forth and try to sufficiently show a jury a person's background

19  for you to consider in giving this question your consideration,

20  okay?

21     A.   Yes, sir.

22     Q.   And so, if you've answered issue No. 1 yes, then

23  you've also gone over here to Special Issue No. 2.  Depending

24  on how you answer Special Issue No. 2 is going to determine

25  whether our client gets either a life or death sentence?

314

1      A.   Right.

2      Q.   Okay?  So, in other words, once a decision has been

3  made by you as a juror along with your other fellow jurors that

4  he is guilty of the offense of capital murder, that sort of

5  sets everything in motion.

6      A.   Right.

7      Q.   Serious things.  And then once you decide Issue No. 1

8  unfavorably toward our client, there it goes again.

9      A.   Right.

10     Q.   The train is going down the track, okay?  But then

11  you come to this issue here, and you have to give some real

12  serious thought to whether or not depending on how you answer

13  that, he's either gonna get a life or death sentence.  So

14  either way you cut it, it's not any kind of a cake walk.

15     A.   No, sir.

16     Q.   Is it?  It's pretty serious.  So if you vote yes,

17  that you feel that there are certain sufficient mitigating

18  circumstances, then -- and our client basically ends up with a

19  life sentence.

20     A.   Right.

21     Q.   If you vote no, which will have to be, you know, all

22  of you-all unanimously, then he gets -- that authorizes the

23  judge to impose a death sentence.

24     A.   Yes, sir.

25     Q.   Okay.  Do you understand all that?

315

1      A.   Yes, sir.

2      Q.   Is there any reason at all, ma'am, that you couldn't

3  be fair and impartial to both sides in this case?

4      A.   No, sir.

5      Q.   Okay.  Anything at all going on in your employment at

6  your job, any planned vacations, anything at all that would

7  interfere with your services as a juror in this case --

8      A.   No, sir.

9      Q.   -- during the month of December?

10     A.   No.

11          MR. GARZA:  Thank you, ma'am.  I don't think I

12  have any other questions.

13          THE COURT:  Anything else?

14          MR. SKURKA:  We have nothing else.  Thank you,

15  Ms. Leal.

16          THE COURT:  Please wait in the jury room.

17  We'll be right with you.

18          (Venireperson exits courtroom.)

19          THE COURT:  What says the State?

20          MR. SKURKA:  State will accept her.

21          THE COURT:  All right.  What says the defense?

22          MR. GARZA:  We'll accept also, Your Honor.

23          THE COURT:  All right.  Bring her in.

24          (Venireperson enters courtroom.)

25          THE COURT:  All right.  Ms. Leal, you are on

316

1  the jury.  We will be probably starting on December 1.  That's

2  our plan.  In any event, we'll let you know if that changes,

3  but we'll call and let you know.  We're gonna give you a call

4  to confirm, okay?

5          JUROR NO. 11:  Okay, sir.

6          THE COURT:  Don't watch the local news or read

7  the local paper while this is going on.  If somebody tries to

8  talk to you say, no, no, I can't talk to you.  I can't talk to

9  about this.  After the case is done, we can have a chat, but

10  not while it's going on, okay?  All right.  Thank you so much

11  for coming in.

12          JUROR NO. 11:  Thank you.

13          MR. SKURKA:  Thank you, ma'am.

14          (Juror exits courtroom.)

15          MR. SKURKA:  Progress.

16          THE COURT:  Progress.  I guess we're off the

17  record.

18          (Discussion off the record.)

19          (Proceedings adjourned.)

317

```
 1   THE STATE OF TEXAS          *

 2

 3   COUNTY OF NUECES            *

 4

 5            I, Sara E. Rivera, Official Court Reporter,

 6   in and for the 94th District Court of Nueces County, State of

 7   Texas, do hereby certify that the above and foregoing contains

 8   a true and correct transcription of all portions of

 9   evidence and other proceedings requested in writing by

10   counsel for the parties to be included in this volume of the

11   Reporter's Record, in the above-styled and numbered cause,

12   all of which occurred in open court or in chambers and were

13   reported by me.

14            I further certify that this Reporter's Record of the

15   proceedings truly and correctly reflects the exhibits,

16   if any, admitted by the respective parties.

17            WITNESS MY OFFICIAL HAND, this the 25th day of

18   September, A. D., 2009.

19

20

21   _____
     SARA E. RIVERA, Texas CSR 4626
22   Expiration date:  12/31/09
     Official Court Reporter
23   94th & 117th District Courts
     901 Leopard Street, Room 402
24   Corpus Christi, Texas 78401
     Telephone:  361-888-0751
25   Facsimile:  361-888-0209
```