1

1                 REPORTER'S RECORD
          APPELLATE COURT CAUSE NO. AP-76,000 *76100*
2          TRIAL COURT CAUSE NO. 04-CR-3453-C
              VOLUME 15 OF 25 VOLUMES

3

THE STATE OF TEXAS      )     IN THE DISTRICT COURT

4                  )

                  )

5  VS.              )     94TH JUDICIAL DISTRICT

                  )

6                  )

  JOHN HENRY RAMIREZ      )     NUECES COUNTY, TEXAS

7

8  _____

9               INDIVIDUAL VOIR DIRE

10 _____

11

12

13

14                              FILED IN
                       COURT OF CRIMINAL APPEALS

15

16                      OCT 06 2009

17                    Louise Pearson, Clerk

18

19

20    On the 19th day of November, 2008, the following

21 proceedings came on to be heard in the above-entitled and

22 numbered cause before the Honorable BOBBY GALVAN, Judge

23 Presiding, held in Corpus Christi, Nueces County, Texas:

24    Proceedings reported by Machine Shorthand.

25

2

```
 1   APPEARANCES:

 2   MR. MARK SKURKA
     SBOT NO. 18475570
 3   AND
     MR. VERNON G. SCHIMMEL
 4   SBOT NO. 24033039
     Nueces County Assistant District Attorneys
 5   901 Leopard Street, Room 205
     Corpus Christi, Texas 78401
 6   (361) 888-0410

 7   ATTORNEYS FOR THE STATE OF TEXAS

 8

 9   MR. EDWARD F. GARZA
     SBOT NO. 07731200
10   Attorney at Law
     719 South Shoreline, Suite 201
11   Corpus Christi, Texas 78401
     (361) 888-8877

12

13   AND

14   MR. JOHN GRANT JONES
     SBOT NO. 10917000
15   Attorney at Law
     5826 Beauvais Drive
16   Corpus Christi, Texas 78404-6173
     (361) 884-8141

17

18   ATTORNEYS FOR THE DEFENDANT,
     JOHN HENRY RAMIREZ

19

20

21

22

23

24

25
```

3

INDEX
VOLUME 15 OF 25 VOLUMES
VOIR DIRE PROCEEDINGS

November 19, 2008                                        PAGE    Vol.
Proceedings Commence.............................   5      15

(INDIVIDUAL QUESTIONING OF VENIREPERSONS)

PROSPECTIVE JURORS
VENIREPERSON                        Voir Dire      Page    Vol.

ANDREW VELA, NO. 99                 5,18,36                15
Accepted by the State............................   49
Peremptory No. 13 by the Defense.................   49

RUTH VERMACE, NO. 100               50,58,75,88            15
Accepted by the State............................   88
Accepted by the Defense..........................   88
Juror No. 12 Admonished..........................   89
Agreement on PJ No. 101..........................   90

FELIX GUAJARDO, NO. 102             91,104,126            15
Accepted by the State............................ 133
Accepted by the Defense.......................... 134
Alternate No. 1 Admonished....................... 134
Discussion on Juror PJ 104....................... 134
Agreement to Excuse PJ No. 104................... 136

ROBERT DELEON, NO. 103              137,150,174           15
Accepted by the State............................ 177
Accepted by the Defense.......................... 177
Alternate Juror No. 2 Admonished................. 177
End of Voir Dire Proceedings..................... 177

Discussion In Re:  Recap of Jurors Chosen........ 178    15
Discussion In Re:  Trial Matters................. 180
End of Proceedings............................... 182
Court Reporter's Certification................... 183


ALPHABETICAL INDEX TO VENIREPERSON

VENIREPERSON                        Voir Dire      Page    Vol.

DELEON, ROBERT, NO. 103             137,150,174           15
Accepted by the State............................ 177
Accepted by the Defense.......................... 177
Alternate Juror No. 2 Admonished................. 177

4

ALPHABETICAL INDEX TO VENIREPERSONS
(Continued)

| VENIREPERSON | Voir Dire | Page | Vol. |
|---|---|---|---|
| GUAJARDO, FELIX, NO. 102 | 91,104,126 | | 15 |
| Accepted by the State........................... | | 133 | |
| Accepted by the Defense.......................... | | 134 | |
| Alternate No. 1 Admonished...................... | | 134 | |
| VELA, ANDREW, NO. 99 | 5,18,36 | | 15 |
| Accepted by the State........................... | | 49 | |
| Peremptory No. 13 by the Defense................. | | 49 | |
| VERMACE, RUTH, NO. 100 | 50,58,75,88 | | 15 |
| Accepted by the State........................... | | 88 | |
| Accepted by the Defense.......................... | | 88 | |
| Juror No. 12 Admonished......................... | | 89 | |
| Agreement on PJ No. 101.......................... | | 90 | |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

5

1      P R O C E E D I N G S

2              (November 19, 2008)

3              THE COURT: Are we ready?

4              MR. SKURKA: Yes, sir.

5              MR. JONES: Sort of, yes.

6              THE COURT: All right. Let's see. Where are

7   we?

8              MR. JONES: You know where Mr. Garza is? He's

9   over in federal court.

10             THE COURT: Yeah, he told me. He told me.

11             MR. SKURKA: Is he there for an arraignment or

12  something like that, or is he there for getting sentenced?

13             MR. JONES: I think he's there for a

14  sentencing. No, he's got a sentencing.

15             (Recess.)

16             THE COURT: All right. We have this guy

17  Andrew Vela. I guess let's go ahead and bring him in.

18             MR. JONES: Mr. Vela, that's No. 99?

19             THE COURT: Yeah, that's No. 99.

20

21                  VENIREPERSON NO. 99,

22                     ANDREW VELA,

23                  VOIR DIRE EXAMINATION

24  BY THE COURT:

25     Q.   Come forward and have a seat over here. All right.

6

1   You are Andrew Vela; is that right?

2      A.   Yeah.

3      Q.   Okay. We're gonna go over some stuff. First of all,

4   you have not heard anything about the case. Second, do you

5   think you can keep an open mind in this case?

6      A.   Yeah.

7      Q.   All right. Let's talk about -- we need people that

8   can keep an open mind and you've already said you can. We need

9   people who can follow the law, okay? Let's talk about the law.

10  You've never been on a jury before and that's okay. This is a

11  criminal case, okay? In criminal cases, the State always has

12  the burden of proof. They brought the charges, they've got to

13  prove it. That's what the law says. You bring them, that's

14  fine, but you've got to prove it if you bring them, okay? All

15  right. You're okay with that?

16     A.   Yes.

17     Q.   Okay. That means defendant is innocent until proven

18  guilty, okay? And that's an ancient concept. It goes all the

19  way back to the Greeks, okay? And the idea is, Okay, State,

20  you bring charges, you've got to prove them, and until you do,

21  if you can, everyone is presumed innocent. All right. So you

22  have to presume this gentleman to be innocent until and if the

23  State can prove otherwise. You can do that?

24     A.   Yes, sir.

25     Q.   All right. If you had to vote right now, what would

7

1   you have to say?

2      A.   If I had to like judge on him right now?

3      Q.   Yeah.

4      A.   I couldn't. I don't --

5      Q.   Well, you couldn't, and it's not a real fair question

6   really, but the fact of the matter is you have to vote not

7   guilty because no one's proven anything to you, right?

8      A.   Oh, yeah.

9      Q.   All right. No one's proven anything to you, right?

10     A.   Yeah.

11     Q.   What they do have to do is prove it beyond a

12  reasonable doubt. You probably heard that, right? Maybe you

13  remember it from school, maybe you've seen it on TV?

14     A.   Yeah.

15     Q.   Beyond a reasonable doubt. Well, what is that? We

16  don't have a definition, but let's talk about what it's not and

17  that will give you an idea of what it is, okay? It's not

18  preponderance of the evidence. What's preponderance of the

19  evidence? That's the evidence that you'd need in a civil case,

20  like a car accident or a contract dispute between companies.

21  Preponderance of the evidence, if you can imagine the scales of

22  justice, you know, tipping ever so slightly one way. Maybe you

23  can think of it as like 51 percent proof, okay? A little bit

24  better than 50 percent.

25             Okay. Above that is clear and convincing

8

1   evidence, okay? Clear and convincing evidence is the kind of

2   evidence that we need if the State wants to take away

3   somebody's children because they're not good parents. And

4   that -- that's pretty self-explanatory, right, clear and

5   convincing? That sounds like strong evidence, right?

6      A.   Yeah.

7      Q.   This is higher than that. This is beyond a

8   reasonable doubt, all right? Now, it's higher than those two

9   standards. What it's lower than is beyond all doubt, okay?

10  Well, there's no way that you could ever know beyond all doubt

11  unless you saw it yourself. And if you saw it yourself, you

12  couldn't sit over there as a juror, right?

13     A.   Yeah.

14     Q.   Okay. You'd be a witness?

15     A.   Yeah.

16     Q.   All right. So now you get an idea of what beyond a

17  reasonable doubt means?

18     A.   (Nodding head up and down.)

19     Q.   Okay. Would you hold the State to that burden like

20  the law requires?

21     A.   Yes.

22     Q.   All right. The next thing, defendant -- the

23  Constitution of the United States. We've had it since day one,

24  all right, the day they wrote the Constitution. It's actually

25  part of the Bill of Rights. But right out of the shoot, okay,

9

1 defendant doesn't have to testify at his trial. And it really
2 makes sense because if they've got the burden of proof and
3 there's no burden over here, they don't have to do anything.
4 They don't have to present not only their client, they don't
5 have to present any evidence at all, okay? Maybe -- and
6 there's lots of reasons why you wouldn't want to testify.
7 Maybe his lawyers tell him not to. Maybe they say, I'm
8 advising you not to testify because they haven't proven
9 anything about the case. That's my professional opinion as an
10 attorney, okay? Maybe he's not good in front of people. You
11 probably know people like that, right?
12    A.   Yeah.
13    Q.   They get -- you know, they get in front of people and
14 they just --
15    A.   Fall apart.
16    Q.   -- fall apart. Lots of people are like that, okay?
17 The lawyers in this courtroom, we get a lot of practice, but
18 some people don't get practice, you know, and some people just
19 aren't good in front of people and maybe his lawyers think,
20 you're not gonna come off well. Even if you're not guilty,
21 you're gonna come off wrong, all right?
22        My point is this. There's lots of reasons why
23 someone wouldn't want to testify. The point is this. If you
24 go back there and you're a juror, not only can that not make
25 him testify, but you can't hold it against him. In other

10

1 words, you can't go back there and say, "Okay, the State
2 presented their case. The defense didn't present anything so
3 that -- you know, I'm gonna hold that against him and I'm gonna
4 put another star in the State's case." No, can't do that.
5 Some people say, "I want to hear both sides of the story."
6 This is not a race to the finish line between the State and the
7 defense. There's only one race going on here and that's
8 whether the State can meet their burden beyond a reasonable
9 doubt. They have to cross the finish line. They don't have to
10 do anything. Do you follow me?
11    A.   Yeah.
12    Q.   Can you follow that law and not hold it against the
13 defendant if he chose not to testify?
14    A.   Yes, sir.
15    Q.   All right. The next thing, let's talk about what
16 this case is about, okay? What is the charge? The charge is
17 capital murder, okay? What is that? Well, it's murder for
18 sure, right, because it says murder in capital murder? Murder,
19 of course, is the intentional taking of the life of another.
20 Well, what's that capital part all about? Well, capital means
21 the death penalty as a possibility, okay? The legislature has
22 said there are certain murders that we think deserve the death
23 penalty possibility, okay? A regular murder would be five to
24 99 years or life. Capital murder is a little different.
25 There's only two things that could happen in capital murder,

11

1 life in prison or the death sentence. So the legislature has
2 decided that the crime is so bad that the minimum that you'd
3 get is life in prison, all right?
4        Now, there's a number of ways. It's not just
5 one, but let's be specific about this one. What makes capital
6 murder in this case? The State is alleging that the defendant,
7 this fella over here, on the given date in Nueces County,
8 Texas, committed a murder while in the course of committing a
9 robbery. The legislature says, you know, robbery's a serious
10 felony, murder's a serious felony, and if you put them
11 together, that makes capital, okay? Murder plus all, all right?
12    A.   Yeah.
13    Q.   Let's say I came up to you with a gun and I said,
14 "Give me your wallet." And you gave me your wallet. I would
15 have robbed you, all right, because I, through either force or
16 threats, took property from you. Okay. What if I came -- what
17 if I was a pick pocket and I -- you didn't even know I took
18 your wallet, I would not have robbed you. I would have stolen
19 from you. It may be a theft from a person but it's not a
20 robbery, okay? What if I held a gun -- what if I held a gun to
21 you and said, "Give me your wallet," and you punched me in the
22 face and knocked me out? I would not have finished the robbery
23 but I would have attempted to rob you, okay? The law says that
24 in a capital murder such as this one, the State can either
25 prove the defendant was -- robbed the person or attempted to

12

1 rob. They don't have to show that the robbery was complete,
2 but they do have to show at least an attempt, okay? Do you
3 follow me?
4    A.   Yes.
5    Q.   All right. Now, there's a lot of elements here
6 because you've got two felonies. The law says you've got to
7 prove them all. Would you make them prove them all to you?
8    A.   Yes.
9    Q.   All right. Now, let's talk about some other stuff.
10 In Texas, we have a bifurcated trial system. What does that
11 mean? That's just a legalese word for saying there's two parts
12 to the trial. Part one, guilt or innocence. Okay. That's the
13 guilt or innocence phase. But it's not really guilt or
14 innocence. We call it the guilt or innocence phase, but
15 really, it's the guilty/not guilty phase. Because you may
16 believe a defendant did a crime, but you may believe that the
17 State hasn't met their burden of proof, okay?
18        All right. So what do we do the first part of
19 the trial? Well, the State presents evidence. The defense
20 presents evidence, if they choose. They don't have to, but if
21 they want to, they can. And then the jury determines whether
22 the State has proven the charge beyond a reasonable doubt. If
23 they do not and you find the defendant not guilty, the case is
24 over with. If, however, the State is able to prove their
25 charge, then -- and you find the defendant guilty of capital

13

1　murder, then we go on to part two, okay?  What do we do at part
2　two?  Well, I told you already there's two possibilities, life
3　or death, right?  This is what we call the punishment phase.
4　This is where we determine whether defendant gets life in
5　prison or death.
6　　　　　　　In most cases, the jury goes back and
7　deliberates.  Let's say -- remember I talked to you about
8　murder, it's five to 99 or life?
9　　　A.　Yeah.
10　　　Q.　They would go back there and they would deliberate
11　and they would come up with a punishment.  They'd say, hey,
12　well, how much do you want?  Well, whatever, and they come up
13　with a number of years.  We don't do that in capital murder
14　cases.  We answer questions.  And here's the first one, if
15　you'll turn around.
16　　　　　　　"Is there a probability that the defendant would
17　commit criminal acts of violence that would constitute a
18　continuing threat to society?"  Well, what does that mean?  Is
19　it probable, more likely than not, that the defendant would be
20　violent with people in the future?  We call that the future
21　dangerousness question, and the jury would answer that yes or
22　no.  All right.  Then they would go to Question 2.
23　　　　　　　"After taking into consideration all of the
24　evidence, including the circumstances of the offense" --
25　What's that?  Well, that's the first part of the trial that

14

1　you've already heard, okay, the crime itself.  "-- the
2　defendant's character and background --"  All right.  What's
3　that?  Well, what's character?  Well, what kind of guy is he?
4　Is he honest, is he truthful, is he trustworthy, okay?  Were
5　you ever a Boy Scout?
6　　　A.　Yeah.
7　　　Q.　Okay.  Do you remember the boy -- the creed?
8　　　A.　Yeah, a little bit, yeah.
9　　　Q.　All right.  That's kind of what character's about.  I
10　know it's been a while for all of us, okay?  But that's kind of
11　what the creed's about, you know.  Is he a bad character, is he
12　a liar, a cheat, a thief, okay?  And background, what's that?
13　Well, how you grew up, how was your childhood?  Was it good,
14　was it bad?  Did you have a nice home where you had parents
15　that supported you, or did, you know, did your father beat you
16　up all the time and sexually molest you?  You know, background.
17　Maybe, you know, how did he do in school?  Was he in the
18　military?  What is his military background?  Do you follow me?
19　　　A.　Yeah.
20　　　Q.　Okay.  Then the next thing, "and the personal moral
21　culpability of the defendant" -- more legalese.  What does that
22　mean?  Let me give you an example.  Two burglars, okay?  One
23　burglar, he likes cocaine and hookers so he breaks into a house
24　and he just trashes the place, takes everything of value, TVs,
25　computers, jewelry, any electronic device, anything he can

15

1　sell.  And not only does he trash the house but he sells it all
2　and he blows it on cocaine and hookers.  Okay.  They catch him.
3　　　　　　　The second guy, a hardworking guy, but, you
4　know, he's got a big family, they barely make ends meet but,
5　you know, he works hard and they make it.  The economy takes a
6　downturn and he loses his job and they quickly run out of
7　money.  And he tries to get a job, but it's just not working
8　out.  The kids haven't eaten in a few days so he goes in -- he
9　doesn't break into a house.  He goes through an unlocked door
10　and all he takes is food and he goes home and he feeds the
11　kids, okay?  And he's hungry too, but he doesn't eat because he
12　wants the kids to eat.  All right.  Those people have a
13　different personal moral culpability.  Do you see what I'm
14　saying?
15　　　A.　Yes.
16　　　Q.　Okay.  Personal being yourself; moral, those are your
17　morals, your code of ethics, right?
18　　　A.　Right.
19　　　Q.　Culpability, your blameworthiness, okay.  One --
20　they're both guilty, right?
21　　　A.　(Nodding head up and down.)
22　　　Q.　It doesn't -- the circumstances don't excuse the
23　crime, okay?  But maybe you punish them differently, right?
24　That's what that's asking you to do, okay?  Maybe you punish
25　people differently based upon the past.

16

1　　　　　　　Okay.  Is there sufficient mitigating
2　circumstance or circumstances to warrant a sentence of life
3　imprisonment rather than death?  All right.  What does that
4　mean?  Mitigating means to lessen, to lower, okay?  Lowering
5　circumstances.  Okay.  Let's say you hear that this defendant
6　was a war hero and he saved a bunch of soldiers in Iraq, risked
7　his life to save people, okay?  You may say, that's a
8　mitigating circumstance, that's in his favor.  That's a good
9　thing he's done in his life and it's very significant.  Maybe
10　he was an Eagle Scout, okay?  Maybe he taught little kids to
11　read in his spare time, all right?  Those all may be mitigating
12　circumstances, all right?  But the question asks you, "Is there
13　sufficient mitigating circumstance or circumstances?"  In other
14　words, you may say, "Well, mitigating circumstances.  I think
15　the thing about being a war hero is.  I don't think that the
16　thing about being an Eagle Scout is.  That doesn't really
17　matter."  And you decide and the jury decides what that is.
18　And these lawyers will suggest to you what things are, but only
19　the jury gets to decide what is a mitigating circumstance.  And
20　a mitigating circumstance to you might not be one to your next
21　door neighbor on the jury.  In other words, your next door
22　neighbor could say, "I do think the fact that he was an Eagle
23　Scout's a mitigating circumstance."
24　　　　　　　Okay.  Now, you can find mitigating
25　circumstances, but you may not find that they're sufficient,

17

1 or you may find that they're sufficient. In other words, what
2 this question is asking to you do is take into consideration
3 everything you've heard at this trial and all the good stuff
4 about him. Is it sufficient to warrant a life sentence rather
5 than a death sentence, okay? You weigh the good and the bad
6 and you think, is the good enough to give him life rather than
7 death? Do you follow the question?
8    A.  Yes.
9    Q.  And the jury would answer that yes or no. Yes,
10 there's enough mitigating circumstances to warrant life means,
11 of course, what? He gets life. No, there are not enough
12 mitigating circumstances means he gets death. Okay. That, of
13 course, assumes that you have found that he is a danger. If
14 you don't find he's a future danger, well, then, it doesn't
15 really matter if you answer this question.
16         Okay. Now, at the beginning of every trial I
17 ask the jurors to take an oath. "Do you swear you will render
18 a true verdict based on the law and the evidence presented to
19 you?" Okay. And they say "yes." But some people can't take
20 that oath in this case. Why? Some people tell me they can't
21 participate in a process that can lead to the death penalty.
22 They don't believe it and they just -- they just won't do it.
23 Other people say, "Well, I'll give him a fair trial on the
24 first part of the trial, but if I find him guilty of capital
25 murder, your law means nothing to me, I'm not gonna follow your

18

1 law. I'm gonna figure out how to answer these questions so he
2 gets death at all times. I don't care what this says." Okay?
3 Neither of those people can be fair in this case because that's
4 not what the law is, all right? And the legislature has put
5 these -- put these laws on the books for a reason, okay? And
6 we have to follow them.
7         So can you take that oath and answer these
8 questions truthfully?
9    A.  Yes, sir.
10        THE COURT: All right. Mr. Skurka.
11        MR. SCHIMMEL: May I proceed, Your Honor?
12        THE COURT: Oh, yeah, Mr. Schimmel.
13        MR. SCHIMMEL: Thanks, Judge.
14            VOIR DIRE EXAMINATION
15 BY MR. SCHIMMEL:
16    Q.  Hi, Mr. Vela, my name is George Schimmel. This is
17 Mark Skurka.
18        MR. SKURKA: Good morning.
19    A.  Good morning.
20    Q.  (BY MR. SCHIMMEL) What I'd like to do right now is
21 just for the next few minutes is kind of go over some of the
22 stuff the judge talked about with you and also talk to you just
23 a little bit about your questionnaire and to clear up any
24 questions you still might have or, I guess, just to kind of get
25 your feelings about stuff.

19

1         At this point, there's absolutely nothing you
2 can say that is wrong. All I'm trying to do is kind of get
3 your feelings about the things that we're talking about and
4 kind of see whether you'd be right to be on this jury or
5 whether you think you'd be right to be on this jury.
6         Have you ever been on a jury before?
7    A.  No.
8    Q.  Okay. Have you ever gotten called for jury duty?
9    A.  Yeah, once.
10    Q.  Okay. When was that?
11    A.  It was like last year sometime, I believe.
12    Q.  Did you end up going and showing up for it?
13    A.  Yes, I showed up for it.
14    Q.  But did you sit in the panel but just not get picked
15 to be on the jury?
16    A.  Yeah.
17    Q.  Okay. What kind of case was that?
18    A.  I'm not sure actually. I don't even think they told
19 us.
20    Q.  Okay. There probably weren't as many of you that
21 time as there were this last time, right?
22    A.  Actually, I think there was a lot more.
23    Q.  Really, the first time you got called?
24    A.  Yeah.
25    Q.  Okay.

20

1         THE COURT: Did you ever make it up to a
2 courtroom?
3         VENIREPERSON NO. 99: No.
4    Q.  (BY MR. SCHIMMEL) Oh, you were probably -- was it
5 here in this county?
6    A.  Yeah.
7    Q.  You were probably just downstairs in the central jury
8 room and they were gonna pick you and send you off to one of
9 the courtrooms or something?
10    A.  Yes, sir.
11    Q.  Well, this is -- this is a different kind of case and
12 there's a pretty good chance that you'll never, in the rest of
13 your life, get picked to be on this kind of jury. It's totally
14 different. The way that the trial works is it's different and
15 what's at stake is pretty different. When you found out that
16 this was a capital murder case, what were your first thoughts?
17    A.  I really didn't know what to think. This is the
18 first time I had actually been picked, you know, to even come
19 this far so, open-minded pretty much.
20    Q.  Were you -- were you nervous that, you know, the
21 ultimate outcome of this thing might be a person's death? Were
22 you excited to be part of the process like that? Were you
23 nervous?
24    A.  No. I mean, it's different, you know. I've never
25 done something like this before so it's just new to me really.

**21**

1  I was just taking it all in so. I wasn't nervous or anything,
2  you know, just kind of going through.
3      Q.  Okay. Do you think if you had to answer that
4  ultimate question, it's something that you could do?
5      A.  Yes.
6      Q.  Now, a lot of people -- I know that you're not -- I
7  think that you, in your questionnaire, said that you were in
8  favor of the death penalty, I mean, in the right circumstances,
9  obviously?
10      A.  Yes.
11      Q.  A lot of people can be in favor of the death penalty,
12  but then when push comes to shove, when they're confronted with
13  the reality of it, they say, "It's all well and good, you know,
14  I think that it deserves to be on the books and I like that our
15  society has that law, but please don't make me be the one to
16  make that decision because it's just too much for me." So what
17  I'd like to ask you to do now -- it's a little bit unusual,
18  but I'd like to ask you to take a look at the defendant in this
19  case. And I'm not asking you to say whether you think he's
20  guilty, obviously, or anything like that. But do you think
21  that knowing that your decision could result in that person
22  right there, that person's life being taken, is that still
23  something you think you could do and that you could do it?
24      A.  I believe so, yes.
25      Q.  Okay. I mean, no real hesitation. If the law was

**22**

1  there and the facts were there, then you could make the right
2  decision?
3      A.  Yes.
4      Q.  Okay. Like the judge was saying to you, Mr. Vela,
5  there are two parts to this trial and where it's different from
6  most trials, it's the same in that you hear the guilt/innocence
7  part whether or not you think the person's guilty or not
8  guilty. And after that's over, that's the first phase and then
9  you switch over to the second phase. If the jury decides if
10  the person is not guilty, the trial is over. If you decide
11  that he's guilty, then you start thinking about the punishment
12  stuff, and that's what the judge read to you and that's what's
13  behind you. I don't want to go over it -- I don't want to beat
14  a dead horse or go over this too much but there are a couple of
15  things I want to talk to you about.
16          So let's say that you find this defendant
17  guilty. Your next issue is Special Issue No. 1 and then
18  Special Issue No. 2. And there are things about that Special
19  Issue No. 1 that I would like to talk to you about. The first
20  one is one that some people get hung up on is the word
21  probability. "Is there a probability someone's gonna commit
22  criminal acts of violence in the future and be a threat to
23  society?" A probability. Is there anyway that you could know
24  with 100 percent certainty whether or not someone was gonna do
25  something in the future?

**23**

1      A.  No.
2      Q.  Okay. I mean, you're laughing, but why -- why is
3  there no way you could know?
4      A.  Because anybody can change. Anybody can do anything
5  at any point.
6      Q.  That's true. Do you have a crystal ball?
7      A.  No.
8      Q.  Do you know if it's gonna rain two weeks from now?
9      A.  No.
10      Q.  Do you know whether or not I'm gonna sell my car or
11  buy a new car?
12      A.  No.
13      Q.  There's no way that you could know -- I should tell
14  it because the battery just died, but there's no way that you
15  could know with 100 percent certainty what's gonna happen in
16  the future. And that's the reason that that word probability
17  is there. It's really just more likely than not. Do you think
18  he's probably. Say 51 percent certainty, do you think he's
19  probably going to do bad stuff in the future, not are you
20  positive he is. Because if we had to prove, you know -- if we
21  had to show you that -- if we had to make you positive that he
22  was gonna do something bad, we just couldn't do that. I mean,
23  there's no way to make you positive because you can't know that
24  sort of thing.
25      A.  Yeah.

**24**

1      Q.  That's the first thing I want to talk to you about.
2  The second thing is where it says, "would commit criminal acts
3  of violence." Some people say, "Well, I think that -- I think
4  that there's a chance he's gonna do something wrong, but I
5  don't think he's gonna murder anybody again. I mean, I think
6  he's kind of learned his lesson about murder." The issue is
7  not -- is not whether he's going to commit this kind of crime
8  again. It's just whether he's gonna commit criminal acts of
9  violence. So let me ask you this: Do you think that beating
10  up your girlfriend, say, is a criminal act of violence?
11      A.  Yes.
12      Q.  Yeah, it sure is. So we're not saying -- we don't
13  have to say that this person's gonna go out and just go on a
14  killing spree. I mean, it could be something as minimal
15  compared to this kind of crime, as minimal as beating up
16  somebody in bars. So I just don't want you to think that it's
17  our job to prove to you that, you know, he's gonna go out and
18  do all kinds of awful stuff.
19          The last thing is that part that says, "would
20  constitute a continuing threat to society." Have you ever
21  heard that expression before, like a threat to society --
22      A.  Yes.
23      Q.  -- or a threat to the public or something?
24      A.  Yes.
25      Q.  Well, some people sometimes say, "Well, look, man, if

25

1  this guy ends up in prison for the rest of his life, well, hey,
2  he's out of society, right, so how can he possibly be a threat
3  to society? I don't need to worry about the death penalty."
4  And there's an issue with that. There's a problem with that,
5  and this is what it is. Who else is in a prison with a
6  prisoner?
7      A.   Other people.
8      Q.   Right, right. Other prisoners for sure.
9      A.   Yeah.
10     Q.   But what about the people who take care of him?
11     A.   Well, you're right. Guards --
12     Q.   Like the guards maybe. And the people who feed him,
13 you know, and just generally, the prison staff?
14     A.   Yes.
15     Q.   And those people are in society, right?
16     A.   Yes.
17     Q.   So, I mean, is it possible that a person could be in
18 prison and still be a threat to society?
19     A.   Yes.
20     Q.   Have you ever heard of people in prison fighting with
21 each other?
22     A.   Yes.
23     Q.   Have you heard about that or maybe heard about
24 prisoners killing, you know, guards, or people like that?
25     A.   Yes.

26

1      Q.   Okay. So even though a person could be in prison --
2  this is my only point -- they can still be a threat to society
3  under certain circumstances?
4      A.   Yes.
5      Q.   Okay. The -- the next issue is, if you answer that
6  first question yes, you're saying, yes, I think there's a
7  probability that he's gonna do this bad stuff in the future.
8  If you answer yes, then the next thing that you do is go to
9  this Special Issue No. 2. And there's a lot about it that
10 people get hung up on, but basically, in a nutshell, all that
11 question is asking you is after you've looked at all the
12 evidence, is there anything that would -- and that word
13 mitigate means lessen. But is there anything that would lessen
14 the sentence, anything?
15         It could be like the judge was saying -- I
16 mean, it could be a list things like you look at the offense,
17 you look at the person's background and you look at the
18 person's character, you know, like, I don't know, what
19 character means to you, but like how they grew up, you know,
20 their moral fiber, stuff like that, who they really are. And
21 you look at their personal moral culpability. I don't really
22 know exactly what that means other than to tell you it means
23 how blameworthy this person is in this case. I mean, how --
24 yeah, it's his fault, but how much is it really his fault? Is
25 he really really blameworthy or just a little blameworthy.

27

1  You look at all that stuff together and then you ask yourself,
2  is there something that should lessen the punishment? Should
3  it not be a death sentence? Should it instead be only a life
4  sentence, right? And the only issue, really, at this point,
5  is that you're able to say, "Yeah, State, I can consider
6  mitigating circumstances. I could consider stuff that might
7  lessen the punishment. If they show me that he's this great
8  guy, and you know, helped his grandmother with her knitting
9  every Sunday, well, I mean, yeah, I think that's a mitigating
10 circumstance." Or maybe you can say, "That's just ridiculous.
11 Of course that's not mitigating circumstances. I don't care
12 if he helped somebody with the knitting." The only issue is
13 whether you'll be able to consider it. And that just means
14 think about it. It doesn't mean you have to make up your mind
15 right now and that you have to promise somebody, Oh, yes, I
16 will say that that is a mitigating circumstance. It just
17 means that right now, sitting here, you haven't already made
18 up your mind and that you're willing to still think about
19 those things.
20     A.   (Nodding head up and down.)
21     Q.   I mean, can you basically promise us that you can
22 consider mitigating circumstances and not say whether they're
23 mitigating or even aggravating?
24     A.   Oh, yes.
25     Q.   But you can think about it?

28

1      A.   Yes.
2      Q.   Okay. And can you also -- can you also, I guess,
3  basically promise that if you hear all the evidence and the
4  evidence convinces you beyond a reasonable doubt that this
5  person was guilty, then you can vote that he's guilty?
6      A.   Yes.
7      Q.   And if you hear the evidence but it doesn't convince
8  you of his guilt -- let's say that you have doubts -- can you
9  promise that you can vote not guilty?
10     A.   Yes.
11     Q.   And if you hear -- if you vote guilty and you hear
12 all the evidence and you think that he's gonna be violent in
13 the future and you think that there's nothing that can deter
14 from the death penalty, can you vote for the death penalty?
15     A.   Yes.
16     Q.   And the opposite question. If you think that he's
17 not gonna be a danger in the future, do you think that you can
18 vote for a life sentence instead?
19     A.   Yes.
20     Q.   Okay. So, at this point, basically what you're
21 saying, Mr. Vela, is that your mind isn't made up, you're
22 open-minded about this stuff, and you can consider both sides?
23     A.   Yes, sir.
24     Q.   Okay. There are a few legal things I want to go over
25 with you pretty briefly. One, the fact that somebody's been

29

1   indicted just means that the grand jury thought there was
2   enough evidence to charge him, not to convict him, just to
3   charge him, so you can't consider that against him. And you
4   can -- you can do that, right?
5       A.   Yes.
6       Q.   Okay. The Fifth Amendment just means that a
7   defendant doesn't have to testify if they don't want to, and
8   like the judge was saying, there are a million reasons why
9   somebody might not want to. Maybe they just get nervous, maybe
10  their lawyers think the State hasn't proven its case. You
11  know, there are a lot of reasons. And if a defendant doesn't
12  testify, not only can you not comment on it, but you can't
13  consider that against him. And you can do that, right?
14      A.   Yes, sir.
15      Q.   Okay. Beyond a reasonable doubt that -- I just want
16  to tell you -- I don't need to tell you what it means. I can
17  tell you what it doesn't mean. It doesn't mean beyond a shadow
18  of a doubt. It doesn't mean beyond all doubt. There would be
19  no way in the world for the State to convince you of something
20  beyond all doubt and the reason for that is what?
21      A.   Nobody knows for sure.
22      Q.   Well, yeah. I mean, if -- if you had no doubt about
23  something, don't you think maybe you'd be a witness?
24      A.   Yes.
25      Q.   I mean, you wouldn't -- you wouldn't be a juror,

30

1   you'd be on the witness stand instead.
2       A.   Yes.
3       Q.   It's just the State's job to convince you beyond a
4   reasonable doubt. And the way that you ask yourself about
5   whether or not you have a doubt is just like they say, after
6   you've heard the evidence, do I have a doubt? And if you -- if
7   you don't have a doubt, well, that's the end of it. You vote
8   guilty. But let's say that you do have a doubt. Your next
9   question to yourself should be, well, do I have a reason for
10  that doubt? Is it a reasonable doubt? Is it a doubt that I
11  feel just because maybe I felt sorry for this guy, or is it a
12  doubt that I feel because of evidence and stuff I've heard from
13  the witness stand? If it's that kind of doubt, then you have a
14  doubt. If it's just a doubt that you have because maybe you
15  feel sorry for somebody, you don't have a reason for it. It's
16  not a reasonable doubt and you can still vote guilty.
17           You might hear -- you might hear testimony about
18  voluntary intoxication and I just want to tell you that
19  voluntary intoxication, like getting drunk or getting stoned or
20  whatever on purpose, is never a defense to crime?
21      A.   Yes.
22      Q.   Can you think of why that would be?
23      A.   Why it would be a defense?
24      Q.   No, why it should not be a defense?
25      A.   Oh, because you're doing it on your own and nobody's

31

1   forcing you.
2       Q.   Exactly. Otherwise, somebody would say, "Yeah, sure,
3   you know, I beat up my wife," or, "Yeah, sure, I robbed that
4   bank, but, hey, I was drunk, you know, I'm sorry." And they'd
5   say, "Okay, well, go home; sorry to bother you. Don't do
6   that."
7           Now, stuff like that could possibly be
8   mitigating circumstance, maybe if you think it is. But it is
9   never a defense to a crime. So if you hear evidence during the
10  guilt/innocence part that somebody was voluntarily intoxicated,
11  that is not something that you should say, well, maybe that
12  means he's not guilty.
13           And the last thing that I want to talk to you
14  about -- the last legal thing I want to talk to you about is
15  what's called the presumption of innocence. Everybody starts
16  in this forum right here presumed innocent. And what that
17  means is that you, if you get picked to be on the jury sitting
18  here, you can't go into it thinking, "He's guilty and he's got
19  to prove his innocence to me," okay? It's like that
20  is around him and like a shield or a force field. And if you
21  hear evidence that convinces you that a person is not innocent,
22  it's like you just pop that bubble and it's gone. It doesn't
23  last throughout the trial. It's not insurmountable. You can't
24  get over it presumption. I mean, every single person who is in
25  TDC right now started with that same presumption of innocence,

32

1   all right? And I just don't want you to think that. Do you
2   have any questions about what the presumption of innocence
3   means or anything like that?
4       A.   No.
5       Q.   Okay. Okay, Mr. Vela. There are actually a couple
6   of things I want to talk to you about on your questionnaire.
7   The first one is you're into jujitsu?
8       A.   Yes.
9       Q.   How long have you done jujitsu?
10      A.   Not that long. I had to stop because work and stuff
11  like that. It was six months or so.
12      Q.   What kind of jujitsu did you do?
13      A.   Brazilian.
14      Q.   Brazilian?
15      A.   Yeah.
16      Q.   So you know who Hoyce Gracie is and those guys?
17      A.   Yes.
18      Q.   Do you watch the UFC stuff?
19      A.   Yes.
20      Q.   Is he still doing it, Hoyce Gracie?
21      A.   As far as I know, no.
22      Q.   Okay. He was pretty good though when he did it,
23  wasn't he?
24      A.   Yes.
25      Q.   Okay. So it's like, basically, is there a lot of

33

1   discipline in that?

2       A.   Yes.

3       Q.   My brother did that for a while but I didn't -- we

4   don't really talk about it much.

5       A.   Yes.  They teach you, you know, don't do this outside

6   of, you know, where you're practicing because you could get in

7   trouble, and stuff like that.  And don't start anything for

8   that reason too.  It's like boxers, you know, you kind of can't

9   fight outside because you're pretty much like registered as a

10  like a deadly weapon or whatever, because you've had practice

11  and training whereas most people haven't.

12      Q.   Yeah.  And that's different stuff.  There's a lot of

13  on the ground type battles, right?

14      A.   Yes.

15      Q.   It was just -- it was crazy seeing that guy fight

16  because he'd go in there and fight some guy twice his size and

17  as soon as they get on the ground he just would inch closer and

18  closer and finally that guy would just tap out?

19      A.   Yes, he did.

20      Q.   And you do that stuff too?

21      A.   Yes.

22      Q.   Some of your family works with law enforcement.  Like

23  I think you said your uncles are -- one of your uncles in the

24  Border Patrol?

25      A.   Yes.  He's retired now, but yeah.

34

1       Q.   And is one of your uncles with CCPD or another police

2   department?

3       A.   No.  I believe he lives in Jacksonville or something

4   like that, in Texas.

5       Q.   Okay.

6       A.   But, yeah, he's moved, you know.

7       Q.   Okay.  Are you guys very close?

8       A.   Yes, sir.  I mean, I haven't talked to him in a

9   while, but yeah.  There's nothing wrong with him or anything,

10  no problems with him.

11      Q.   Yes.  And one of your uncles, I think, you said was a

12  warden in Falfurrias?

13      A.   He was for a little bit.  He had like gone back, I

14  guess, boredom of not working, so they had a position open.  I

15  believe he went in as just a guard, but then I think they

16  offered him the position.  I'm not exactly sure if he took it.

17  I think he did but he's -- I don't believe he's no longer

18  working in there anymore.

19      Q.   Okay.

20      A.   The way they were running it I think he wasn't liking

21  it, so he got out of there.

22      Q.   Is there anything about your relationship with your

23  family that would cause you -- I mean, knowing that they do

24  that, would cause you not to be fair in this case?

25      A.   No.

35

1       Q.   I mean, you can still be open-minded here despite the

2   fact that, you know, maybe one of them is a jailer or --

3       A.   No, I mean, the way they are they've taught me as

4   well, you know, to say the truth pretty much, you know what I

5   mean?  That's the way they've grown up and especially being in

6   law and stuff like that, you know.  So I've just -- I've

7   learned a lot from them, but I also put my own two cents in and

8   say whether I feel something's right or wrong.

9       Q.   I think that's fair.  And another question I had for

10  you, is the book that you were just reading the (inaudible) --

11           THE REPORTER:  I didn't hear what you said.

12           MR. SCHIMMEL:  The book he was reading.

13           THE REPORTER:  Can you state the name of the

14  book because I didn't hear it.

15           MR. SCHIMMEL:  Yeah.

16      Q.   (BY MR. SCHIMMEL)  Could you state the name of the

17  book?

18      A.   *The Orc King.*

19      Q.   *The Orc King.*  Is that like Tolkien's stuff?

20      A.   Yeah, similar, yeah.  It's a different writer, but

21  yes.

22      Q.   Who wrote that book?

23      A.   R. A. Salvatore.

24      Q.   Okay.  I know who that is.  Do you like it?

25      A.   Yes.

36

1       Q.   Are you still reading it?

2       A.   I finished that one and I'm on to the next.

3       Q.   Have you ever read Tolkien?

4       A.   Not actually read them, but I know of them from my

5   brother who has.

6       Q.   I've read everything Tolkien wrote except this book

7   called *The Silmarillion* which is like reading the old

8   testament.  I can't get through it.

9           Okay.  I think that's all I have for you.  Do

10  you have any questions for me about anything?

11      A.   No.

12           MR. SCHIMMEL:  Okay.  Well, Mr. Vela, thanks

13  for talking to me and I'll let the defense ask you questions.

14           VOIR DIRE EXAMINATION

15  BY MR. JONES:

16      Q.   I want to start off talking the death penalty and the

17  fact that this case involves the death penalty is why we're

18  permitted to question you individually so we can find out more

19  of what your feelings are.  It is the -- law of Texas that

20  the death penalty is authorized for certain types of

21  requirements.  There are all homicides and murders and all of

22  them involve an additional aggravating circumstance as the

23  judge explained to you.

24           So I take it that you general ly agree with the

25  death penalty law?

37

1     A.    Yes, sir.

2     Q.    Do you think that Texas society benefits from the

3  death penalty?

4     A.    Yes.

5     Q.    How would you describe that benefit?

6     A.    Well, there's overpopulation and these people

7  honestly do need to be, I guess, put to death. It helps with,

8  you know, overpopulation. It's not, you know, the biggest

9  reason, but it's a reason. I believe some people in a way

10  deserve what they do. If they were to have committed a crime

11  as killing somebody, then I believe they should get that same

12  punishment on themselves. It's a -- you're taking away a life.

13  No reason why yours should still be given to you.

14     Q.    So the first benefit would be that it tends to reduce

15  our overpopulation?

16     A.    Yeah, I mean, not -- it's not a big reduction or

17  anything and we're not killing people every day because of it.

18  You know, some people don't deserve it, but it's -- you know,

19  it's a small portion.

20     Q.    Okay. Sometimes you hear people say that they're for

21  the death penalty or they're against let's say life without

22  parole because it costs so much money to keep people in prison.

23  Do you think we spend too much money keeping people in prison?

24     A.    I honestly don't know how much it is to keep one in

25  prison so I couldn't really comment on that.

38

1     Q.    Do you think the appeals take too long in these kind

2  of cases?

3     A.    I don't know. I've never been in one. I don't

4  really know.

5     Q.    You know, back in the old days, back when Texas was

6  still a frontier, executions were carried out at the public

7  square in public. Would you be in favor of public executions?

8     A.    No.

9     Q.    Why not?

10     A.    It's a -- I believe it's a cruel and unusual

11  punishment. I mean --

12     Q.    That's a violation of the Constitution, is it not?

13     A.    Yes, sir.

14     Q.    So -- but you're still in favor of it even though you

15  feel like it's a violation of the Constitution?

16     A.    Well, the manner in which it's done.

17     Q.    In the manner in which it's done?

18     A.    Yeah.

19     Q.    Okay. So you're against hangings then, I guess?

20     A.    Yes, sir.

21     Q.    In your questionnaire on page 26, item 115, "Do you

22  believe the death penalty is imposed too often, not often

23  enough, or about right?" You checked "not often enough." Why

24  did you pick that particular choice?

25     A.    I don't know. I feel there's a lot of people -- I

39

1  guess when I'm watching, you know, maybe something on TV that,

2  you know, my views. I don't hear all of the trial because I'm

3  not there, but I feel some people get off too lightly and may

4  possibly do it again if they're ever to get out, and too much

5  of a slap on the wrist and don't -- some of them really don't

6  learn from it.

7     Q.    All right. Now, the -- the procedure in this kind of

8  case is a little bit different from a noncapital case. One

9  thing that is the same is noncapital case is the case -- the

10  trial is divided into two parts. The first part considers or

11  takes up the problem of what?

12     A.    The guilty or not guilty.

13     Q.    That's right. In other words, is the defendant

14  guilty of the crime charged. If the jury finds the defendant

15  guilty, then they go to the second part of the trial, the

16  second phase which deals with what?

17     A.    Whether it should be a life sentence or a death

18  penalty, considering how the person is, acts and was, and how

19  he was raised.

20     Q.    How do we determine which one it is? How does a jury

21  decide which is life or death in this kind of case, from what

22  you've learned in the courtroom today?

23     A.    Based on the facts that are given, and what you might

24  perceive may happen, the possibility that he could, you know,

25  very well go out and do the same thing again if he -- if I did

40

1  find that he did, or maybe he --

2     Q.    So that would be the first special issue, right?

3     A.    What, the --

4     Q.    Off to your left hand there's a question.

5     A.    Yes, sir.

6     Q.    The jury's given two questions at the punishment

7  phase of the case and it's the answer to these questions which

8  determines whether life or death is gonna be the punishment.

9  And so, in order for there to be a death penalty, how would the

10  jury have to answer Special Issue No. 1? Keeping in mind that

11  these questions call for a yes or no answer, okay?

12     A.    Okay.

13     Q.    All right. So how does Special Issue No. 1 which is

14  off to your left hand there, what answer does the jury have to

15  give before the death penalty can be imposed?

16     A.    Yes.

17     Q.    That's correct. How many votes does it take to get a

18  yes answer?

19     A.    Twelve.

20     Q.    Correct. How many votes does it take to get a no

21  answer?

22     A.    One.

23     Q.    No. It takes 10.

24     A.    Oh.

25     Q.    That's a modification of the rule. A no answer would

41

1  be favorable to the defendant, right?
2      A.   Yes, sir.
3      Q.   Why?
4      A.   Because that would mean they have a little more time
5  to actually determine if he is truly guilty or not.
6      Q.   No.  A no answer means that there's not a danger that
7  he's gonna commit criminal acts in the future.
8      A.   Oh, okay.
9      Q.   And if that is so then the law says he gets a life
10  sentence.
11      A.   Okay.
12      Q.   Okay.  If the jury answers that question no,
13  deliberations stop.  The verdict form goes to the Court and the
14  Court imposes a life sentence as required by statute.
15          Let's say that the jury votes unanimously to
16  answer Special Issue No. 1 yes, then move to Special Issue No.
17  2, which is to your right hand.  Would you please read that
18  question to yourself and tell me when you're finished.
19      A.   (Venireperson complies.)  What did you want me to --
20  what was the question?
21      Q.   Have you read it?
22      A.   Yes.
23      Q.   Okay.  Is there any word or phrase in that question
24  that you do not understand?
25      A.   No.

42

1      Q.   What does the verb "to mitigate" mean?
2      A.   To lessen.
3      Q.   That's correct.  And when we talk about using that
4  verb "to mitigate" in the context of a criminal case, what does
5  a mitigating circumstance cause you to want to do?
6      A.   Lessen the charge.
7      Q.   Lessen the --
8      A.   Or the --
9      Q.   -- punishment.
10      A.   Yeah.
11      Q.   Okay.  You've already found him guilty --
12      A.   Yeah.
13      Q.   -- of the charge.  Okay.  Now you're concerned about
14  punishment.  So the question they ask you, Are there any
15  mitigating circumstances in the case, based on the evidence,
16  which would cause you to want to vote for a life sentence as
17  the most just punishment.  But the question goes a little bit
18  further and requires you to think about or to consider certain
19  things that may be in evidence before you.  For example, the
20  facts and circumstances of the offense, well, that's before you
21  because that was the first part of the trial.  The second, the
22  defendant's character and background.  What is the defendant's
23  character?  If I say you're a person of good character, what do
24  I mean by that?
25      A.   Generally make good decisions.

43

1      Q.   Do you agree that our society has a certain code of
2  conduct or a moral code that we all generally adhere to?
3      A.   Yes.
4      Q.   Rules of good behavior?
5      A.   Yes.
6      Q.   The Ten Commandments, the Boy Scout Law?
7      A.   Yes.
8      Q.   The Penal Code.  These rules are set out in those
9  sources, right?
10      A.   Yes, sir.
11      Q.   And if a person adheres to those rules, follows them,
12  we say he has good character, or if he deviates from them, then
13  he has what?
14      A.   Bad character.
15      Q.   Bad character.  Okay.  There's probably many degrees
16  of that, right?
17      A.   Yes.
18      Q.   What is a person's background?
19      A.   Childhood, jobs, where you've worked, if he's worked.
20      Q.   It's your biography, right, your history?
21      A.   Yeah.
22      Q.   So you would expect in this kind of case that you'll
23  hear evidence about the defendant's background.  And if you
24  hear evidence about the defendant's background, good or bad,
25  you're supposed to consider it, think about it with a view

44

1  toward doing what?
2      A.   (No response.)
3      Q.   We may be playing word games here.  If there's some
4  fact in the defendant's background, the question asks to think
5  about that with the idea that it might be something that would
6  cause you to vote for a life sentence.  For example, let's say
7  the defendant had a real bad child upbringing, his parents, you
8  know, mistreated him and didn't take care of him, didn't make
9  him go to school.  Maybe they've abused him physically or
10  sexually.  Would you consider something like that in a person's
11  background as being a possible mitigating factor?
12      A.   It's possible, yes.
13      Q.   Okay.  Which takes us to the next one, which is a
14  little more difficult.  What is moral culpability?
15      A.   To me, it just whether you know right from wrong,
16  like whether you feel the situation is right or wrong, the
17  decisions you make in any situation pretty much.
18      Q.   Okay.  Your answer comes pretty close to being what
19  I'm looking for.  Basically, when you think about moral
20  culpability, it has two components.  Okay.  One is -- involves
21  does the defendant know what the rules are.  How old are you?
22      A.   Twenty-four.
23      Q.   Do you know that it's wrong to steal?
24      A.   Yes.
25      Q.   Do you know that it's wrong to bear -- to bear false

45

1   witness against your neighbor in a court of law?

2       A.   Yes.

3       Q.   Okay.  Where did you learn that?

4       A.   That one's in the Ten Commandments.

5       Q.   Well, you learned it from your parents or you learned

6   it from your church, or the adults that you grew up with,

7   right?  They taught you those things?

8       A.   Yes.

9       Q.   And the second component which you alluded to in your

10  answer was you used the word "decisions."  Do you believe in

11  the doctrine of free will, that human beings have the right to

12  choose any course of action over another?

13      A.   Yes.

14      Q.   And sometimes our preachers talk about that and they

15  say, "Well, you know, why did God permit evil in the world?  If

16  he's all powerful, he could have just made us perfect and then

17  we wouldn't have to worry about it.  But, no, he created us

18  with free will so we can choose."  Don't know why but that's

19  what they say.

20      A.   Yeah.

21      Q.   So every person does have free will and I think most

22  of us would agree with that idea.

23           The next question is in the second component has

24  to do with a person's judgment about what course of action.

25  Now, you used the word decisions.  And do you believe there are

46

1   certain circumstances -- there can be certain circumstances in

2   a person's life that would affect his judgment?

3       A.   Yes.

4       Q.   In taking on a course of action?

5       A.   Yes.

6       Q.   For example, what if, you know, like the defendant

7   may be borderline retarded, or the defendant may lack

8   education, and you know, just has no education at all, or was

9   not exposed to any moral training when they were growing up.

10  That might affect their judgment, right?

11      A.   Yes, sir.

12      Q.   I recall in a juvenile case that I handled several

13  years ago there was a young fella, he was like 13 or 14 years

14  old, was accused of a sex crime, accused of abusing some

15  female, one of his female peers.  Well, it turned out that in

16  the evidence, that in the house that he lived in, that his

17  parents and other adults constantly were watching pornographic

18  movies.  Okay.  So that's where this young fella was picking up

19  his value system was from watching this stuff.

20      A.   Yeah.

21      Q.   And he thought that was okay because it was in the

22  movies, and his parent s said it was okay, so he thought it was

23  okay.  So can you see how some people might grow up and they

24  might get a distorted view of what the rules are for some

25  reason?

47

1       A.   Yes.

2       Q.   Would you consider that as a possible mitigating

3   factor?

4       A.   Yes.

5       Q.   Sometimes intoxication can be or mental illness.  A

6   person may have a bad mental illness that affects their

7   judgment when faced with a choice of whether to go this way or

8   that way.  Okay.  I think you understand that.  Do you have any

9   questions about Special Issue No. 2?

10      A.   No, sir.

11      Q.   Now, the jury's permitted to know the effect of their

12  answers and we've already discussed that for the person to get

13  the death penalty that first issue has to be answered yes.  How

14  does the Special Issue No. 2 have to be answered to get the

15  death penalty, yes or no?

16      A.   Yes.

17      Q.   Think about it.  What is the question asking?  Read

18  the last four lines out loud.

19      A.   "Is there a sufficient mitigating circumstance or

20  circumstances to warrant that a sentence of life imprisonment

21  rather than a death sentence be imposed?"  Well, then, it would

22  be no because there would have been.

23      Q.   So no means death?

24      A.   Yes.

25      Q.   Death is negative, no is negative.  If you answer

48

1   that question yes, it's positive, that means life, okay?  How

2   many votes does it take to get a no answer?

3       A.   The 12 -- I mean, 10.

4       Q.   Twelve.

5       A.   Oh, 12.

6       Q.   That's against the defendant.  Any vote against the

7   defendant requires unanimous.

8       A.   Okay.

9       Q.   But the rules change a little bit in each kind of

10  case.  How many votes does it take for a favorable vote, a yes

11  vote?

12      A.   One.  Oh, the 10?

13      Q.   Ten, two less than the majority -- than unanimous.

14  So if 10 jurors vote yes, and two vote no, you have a verdict.

15      A.   Okay.

16      Q.   You send that to the Court.

17      A.   Okay.

18           MR. JONES:  That's all the questions I have.

19           THE COURT:  Do you have anything else?

20           MR. SCHIMMEL:  Nothing from the State.

21           THE COURT:  All right.  Why don't you wait in

22  the jury room.  We'll get right back with you.

23           (Venireperson exits courtroom.)

24           THE COURT:  All right.  What says the State?

25           MR. SCHIMMEL:  Could we have just a second,

49

1    Your Honor?
2                THE COURT:  You may.
3                (Counsel conferring.)
4                MR. SCHIMMEL:  Your Honor, we'll accept this
5    juror.
6                THE COURT:  All right.  What says defense?
7                MR. GARZA:  If we may just confer for a
8    minute, Judge?
9                THE COURT:  Sure.
10               (Counsel conferring.)
11               MR. JONES:  We'll exercise a peremptory
12   challenge on this juror which leaves us with two more.
13               THE COURT:  Correct.  Let's bring him in.
14               (Venireperson enters courtroom.)
15               THE COURT:  All right.  Mr. Vela, you were not
16   selected to be on this jury but we appreciate your service.
17   If you need a work excuse, we can get that for you.
18               All right.  Thank you very much.
19               VENIREPERSON NO. 99:  Thank you.
20               (Venireperson exits courtroom.)
21               THE COURT:  Let's take a little break.  I've
22   got to make a phone call and we'll be right at it.
23               (Recess.)
24               THE COURT:  Let's bring in the next one.
25

50

1                VENIREPERSON NO. 100,
2                RUTH VERMACE,
3                VOIR DIRE EXAMINATION
4    BY THE COURT:
5         Q.   All right.  Come forward.  You are -- how do you
6    pronounce your last name, Vermas?
7         A.   Vermace.
8         Q.   Vermace.  Okay.  I'm sorry.
9         A.   Yes.
10        Q.   You are Ruth Vermace?
11        A.   That's correct.
12        Q.   Okay.  Ms. Vermace, obviously, you know we're looking
13   to pick a jury here for a capital murder and we're looking for
14   open-minded people.  You haven't heard anything about the case.
15   Can you keep an open mind?
16        A.   I think I can.
17        Q.   Okay.  All right.  Let's see here.  You have been on
18   a jury before?
19        A.   Uh-huh.
20        Q.   Okay.  Well, then, you're gonna know a lot of this
21   stuff we're gonna go over.  I'll run through it -- I'm gonna
22   run through some of this stuff quickly because you already know
23   this stuff.
24               Okay.  First of all, you know since you've
25   been on a criminal jury before, it's the State's burden of

51

1    proof.  The law says they brought the charges and they got to
2    prove them.  All right.  And as part of that, the defendant is
3    innocent until proven guilty.  Can you follow those laws?
4         A.   Yes, sir.
5         Q.   Okay.  The next thing, if you had to vote right now
6    how would you vote?
7         A.   Not guilty.
8         Q.   There you go.  The next thing, burden of proof is
9    beyond a reasonable doubt.  It's the high standard we have in
10   the law.  You've applied it before.  And would you hold the
11   State to that burden?
12        A.   Yes, sir.
13        Q.   All right.  Now, the Constitution says -- and it
14   really makes sense because if the State's got the burden of
15   proof, then the defense doesn't have to do anything, right?
16        A.   Yes, sir.
17        Q.   All right.  The defendant doesn't have to testify.
18   He's got a right not to --
19        A.   Right.
20        Q.   -- and it's even heavier than that.  The jury cannot
21   hold it against the defendant if he chooses to exercise that
22   right, okay?  Would you hold it against the defendant if he
23   chose to exercise his right not to testify?
24        A.   No, sir.
25        Q.   All right.  Now, let's talk a little bit about this

52

1    case, what the allegations are in this case.  This is a capital
2    murder, okay?  Of course, capital murder, obviously means that
3    murder is part of it.  All right.  So murder is the intentional
4    taking of the life of another.  Capital meaning death penalty's
5    a possibility.  So the legislature has drawn out -- got a
6    laundry list of what makes a capital murder, but in this case
7    the allegation is that the defendant committed a robbery or
8    attempted to commit a robbery, and in the course of doing so,
9    murdered someone.  That's the allegation, okay?
10        A.   Okay.
11        Q.   The legislature says if you put murder and robberies
12   together, two major felonies, well, then, you've got a capital
13   murder, okay?
14               All right.  Now, there's a lot of elements
15   obviously because we've got two crimes, not just one.  But the
16   law says the State has to prove them all, you know, get nine
17   out of 10 or 10 out of 11.  They've got to prove them all.  All
18   right.  Would you hold the State to that burden --
19        A.   Yes, sir.
20        Q.   -- make them prove them all?  All right.  Okay.  What
21   can happen in a capital murder?  Well, two things.  Life, if
22   he's found guilty, life or death.  All right.  Life in prison
23   or the death sentence.  Now, you know from prior service that
24   criminal trials are bifurcated, that is, we have two parts.
25   The first is guilt or innocent phase.  We determine whether the

53

1    State can prove their case beyond a reasonable doubt and the
2    jury deliberates and comes back with guilty, not guilty.  They
3    come back with not guilty, the case is over with.  They come
4    back with a guilty, we go to the second phase, the punishment
5    phase.  But there's only two possibilities.  So how do we get
6    there?  Well, we don't say life or death.  The jury doesn't go
7    back and deliberate.  They answer questions, all right?  Here's
8    the first one if you'll look over your shoulder here.
9              "Is there a probability that the defendant would
10   commit criminal acts of violence that would constitute a
11   continuing threat to society?"  All right.  What does that
12   mean?  Is it probable, more likely than not, okay, that the
13   defendant would be violent with people in the future?  All
14   right.  You can never know for sure, but, you know, the jury's
15   asked to decide that and answer yes or no.  After that's done,
16   then you answer Special Issue No. 2.
17             All right.  "After taking into consideration all
18   of the evidence, including circumstances of the offense" --
19   that's the first part of the trial -- "the defendant's
20   character and background."  Well, what's that, character?  You
21   know, what kind of guy is he?  Is he honest, truthful,
22   trustworthy, a good person?  Or is he a scoundrel, is he a liar
23   and a cheat, right?  And his background.  What's that all
24   about?  Well, his childhood, how he grew up.  And certainly, it
25   could be anything.  It could be work history, it could be

54

1    military history.  It could be anything in his past, okay?
2    "And the personal moral culpability of the defendant."  That is
3    legalese.  But let me see if I can -- if I can help explain it
4    in an example.
5        A.   Okay.
6        Q.   Two burglars.  One burglar was driven by his love for
7    cocaine abuse and prostitutes, okay?
8        A.   Okay.
9        Q.   So he breaks into a house, takes everything of value,
10   ransacks the houses, just trashes the place, takes all the TVs
11   and every electronic, all the jewelry, anything he can sell,
12   sells it all, spends it all on cocaine and hookers.
13       A.   Okay.
14       Q.   That's one person.  The second burglar, a hardworking
15   man, same job for 20 years, barely makes ends meet as it is,
16   but, you know, can barely make the bills at the end of the
17   month.  But he loses his job because there's a downturn in the
18   economy and they are absolutely flat broke and the kids haven't
19   eaten in about three days.  And he goes in an unlocked door and
20   takes food and he takes back the food to the kids and he feeds
21   them, starving himself, but he doesn't eat.  He wants to make
22   sure the kids eat.  Are they both guilty of burglary?
23   Absolutely.  Are both wrong?  Yes.  But their personal moral
24   culpability is different.  Their blameworthiness is at a
25   different level.  Do you agree?

55

1        A.   Yes, sir.
2        Q.   That's what that question's about.
3        A.   Okay.
4        Q.   I mean, that's what that piece of that question is
5    about.
6              All right.  "Is there sufficient mitigating
7    circumstance or circumstances to warrant a sentence of life
8    imprisonment rather than the death sentence be imposed?"
9    Okay.  Mitigating circumstances.  "Mitigate" meaning to lessen
10   circumstances.  Let's say, you know, at this part of the trial
11   -- all you're gonna hear at the first part is guilty, not
12   guilty, okay?  Did he do the crime or not?  The second part
13   you're gonna hear a lot of stuff, I think.  I mean, I don't
14   know, but I suspect you're gonna hear a lot more about his
15   background, all right?  You know, maybe he was a military hero
16   and saved a platoon of soldiers at the risk of his own life in
17   Iraq.  You may think that's a mitigating circumstance.  Maybe
18   he's an Eagle Scout, maybe he, you know, just did work for the
19   community.  All of those things could be mitigating
20   circumstances.  Only the jury gets to decide what is a
21   mitigating circumstance and what is not.  One juror may
22   believe being an Eagle Scout is one, another may not.  And
23   these lawyers will suggest to you what they believe are
24   mitigating circumstances and aggravating circumstances.
25   However, it is only within the jury's discretion to determine

56

1    what that is, all right?
2        A.   Okay.
3        Q.   And each juror determines for themselves what is and
4    is not a mitigating circumstance in their own mind.  And then,
5    to answer this question you say, "Is there sufficient
6    mitigating circumstances to warrant life in prison rather than
7    the death sentence?"  Maybe you think that that war hero thing
8    is a sufficient mitigating circumstance to warrant life rather
9    than death.  Does it excuse him for the crime?  No.  You found
10   him guilty.  He's getting life or death.  It's not an excuse
11   for the crime.  But is it a mitigating factor enough to warrant
12   it's life or death?  Maybe you find it's a mitigating
13   circumstance, but it's not sufficient to warrant life rather
14   than death.
15       A.   I understand.
16       Q.   Okay.  The jury has to answer yes or no to this
17   question.  And if they answered, yes, there are sufficient
18   mitigating circumstances, then he gets a life sentence.  Over
19   here, if he's not -- if there's a probability that he's going
20   to be a continuing threat to society, and it's answered yes,
21   then he may get the death sentence, okay?
22       A.   Yes, sir.
23       Q.   If he's not a continuing threat to society he's gonna
24   get a life sentence, okay?  Do you follow me?
25       A.   Yes, I do.

57

1    Q.   And the reason I'm going over this is because

2   obviously it's something that is going to be a possibility.

3   It's certainly not a foregone conclusion. The State still has

4   to prove their case beyond a reasonable doubt to get here. We

5   just don't get to talk to you about it. We only get to talk to

6   you once and we have to go through the whole thing, okay?

7     A.   Yes, sir.

8     Q.   But I -- at the beginning -- and you know this

9   because you've been on a jury before, right? You sat down at

10   the beginning of the trial after the jury was selected. The

11   judge raised his right hand and you raised your right hand and

12   you took an oath to render a true verdict based upon the law

13   and evidence presented to you, right?

14     A.   Yes, sir.

15     Q.   And then you put on your little juror tag. Okay. I

16   need to know from you if you can take that oath in this case.

17   And before you answer, some people tell me, "I cannot because I

18   cannot participate in a process that could possibly lead to the

19   death penalty." Others say, "I can give a fair trial on the

20   first part, but your law means nothing to me. If I find him

21   guilty of capital murder, I will not consider your questions.

22   I will figure out a way to vote so that he always gets the

23   death penalty regardless of what is presented." Neither of

24   those people can be fair in this case because they cannot

25   answer the questions truthfully. They cannot follow the law.

58

1            What I need to know from you is, can you follow

2   the law, or do you fit into one of those two categories?

3     A.   No, I can follow the law.

4            THE COURT: All right. Mr. Skurka.

5                VOIR DIRE EXAMINATION

6   BY MR. SKURKA:

7     Q.   Good morning, Mrs. Vermace. I said that right,

8   right?

9     A.   Yes, sir.

10     Q.   My name is Mark Skurka, I'm an assistant district

11   attorney, and along with Geordie Schimmel here, we'll be the

12   ones presenting the case to you if you're selected on this

13   jury. I will tell you right off at the beginning, there's no

14   right or wrong answers. We just want the hear how you feel

15   about some of the issues or the laws in this case. Please

16   don't answer in such a way you think, "Well, I better answer it

17   this way because the defense wants to hear me say it this way,

18   or the State wants to hear me say it." We just want to know

19   how you feel about the case -- the case and the issues here to

20   determine whether you can be qualified to sit on this jury.

21            Let me start off with some basic questions.

22   Let's start with the death penalty, since that's gonna be an

23   issue in this case. In general, how do you feel about the

24   death penalty?

25     A.   I believe if they're a threat to society, that it's

59

1   appropriate.

2     Q.   Okay. It sounds to me like you're saying that, I

3   believe in it, it's a good law, but only if the circumstances

4   and the evidence shows that that person could be a continuing

5   threat to society?

6     A.   Yes, sir.

7     Q.   Correct? And, of course, we've got that other caveat

8   that says, "and there's no mitigating circumstances that would

9   lower the punishment to life." And we'll talk about that in a

10   few minutes.

11            But, in general speaking, we have people

12   sometimes that say, "I believe in the death penalty, it's a

13   good law." We've had jurors come and say, "It's a good law, I

14   believe in it, I think we should have it, but don't make me

15   make that decision." Sometimes people come in and they think,

16   "Oh, I'm gonna get a DWI case or a shoplifting case, or a

17   contract dispute." And next thing you know, they're sitting

18   here thinking, "Oh, my gosh, the judge told me it was a capital

19   murder case. I may have to make a decision on whether somebody

20   lives or dies based on the evidence."

21            Can you participate in that type of decision if

22   the evidence is there that you feel that a person should

23   receive the death penalty?

24     A.   I think it's a big responsibility and it's something

25   that would take a lot of thought, but yes.

60

1     Q.   Okay. And that's exactly right. I don't think

2   anybody's volunteering to go to the head of the line and say,

3   "Hey, put me on this jury, I want to do this." It's an awesome

4   responsibility. But would you agree with me it's something

5   that our laws set up to let jurors make that decision because

6   it is such an awesome responsibility? As powerful as the

7   district judge is or the district attorney, they can't sentence

8   somebody to death, and that's probably good that the law says,

9   "only jurors of your peers can make that decision." Do you

10   agree with that part of the law?

11     A.   Yes, sir.

12     Q.   Now, put yourself in my perspective here. I don't

13   want people that can just say, "Well, yeah, it's a good law,

14   but, you know, I don't know if I can do it." You know, I want

15   to know if somebody can actually go through with it if they

16   really believe the evidence is there. Are you that type of

17   person?

18     A.   I guess you need to clarify what you mean "to go

19   through with it," to --

20     Q.   To act on the evidence in such a way that it might

21   result in the death penalty.

22     A.   Yeah, I could do that.

23     Q.   You could do that. Because that's who we're talking

24   about, that's him right over there, John Henry Ramirez. We're

25   not talking about somebody who you see on the news or read

61

1    about in the paper or somebody somewhere else.  It's here and
2    now.  Can you look at him and tell me you can participate in
3    that decision to end his life if the evidence calls for it?
4         A.    If the evidence and it proves that he would be, like
5    I said, a threat to society and would harm someone else, yes, I
6    think I could.
7         Q.    Okay.  I'm gonna ask it the other way around, just to
8    make sure you can be fair to both sides.  If the evidence is
9    such that you think that maybe he shouldn't get the death
10   sentence because you answered the question in such a way he
11   gets a life sentence, can you vote for a life sentence also?
12        A.    Yes, sir.
13        Q.    You're not leaning one way or the other at this
14   point?
15        A.    No.
16        Q.    And that's what we need jurors to do, they have to be
17   open-minded.  Because as the judge told you, when you vote
18   right now, you have to say he's not guilty because he's
19   presumed innocent.  That doesn't mean he is innocent.  That
20   just means right now you have to start him at innocent and it's
21   up to the State to prove the case beyond a reasonable doubt.
22   That's our burden in this case and in every criminal case.  So
23   -- and again, this is America.  We don't start people out
24   guilty and they have to prove they're innocent.  They're
25   innocent and the State's got to prove them guilty.  Do you

62

1    agree with that?
2         A.    Yes, sir.
3         Q.    And that makes sense.  It seems to me you want to
4    make a careful decision on such an awesome responsibility.  But
5    you think you could handle that awesome responsibility, if
6    called upon?
7         A.    Yes, sir.
8         Q.    Thank you.  Now, we talk about the death penalty in
9    making a decision on that, but it's a little different than
10   what we usually have.  Usually in the case you say whether a
11   person's guilty or not, and then you pick a number of how much
12   time he should be in prison for.  Say, for example, you're on a
13   burglary case and the range of punishment is two years to 20
14   years in prison, and the jury may say two years in prison, five
15   years in prison, 10 years in prison, 20 years in prison, and
16   that's because it's a long range.  Here there's only two
17   choices, death or life imprisonment.  And you don't really
18   vote, I check off death or I check off life.  You answer these
19   questions, unlike in a regular case where you pick a number.
20             Have you ever seen in the paper or heard on the
21   news maybe a case where you open the paper and they talk about
22   one burglar got 20 years in prison, and another guy charged
23   with burglary in a different case got probation.  And you
24   think, well, gosh, they're both guilty of burglary, why did one
25   guy get 20 years and one guy get probation?  Why would you

63

1    think that would be?
2         A.    I guess because of their background I would say.
3         Q.    Exactly.  It's because their background and the case
4    itself, the surrounding circumstances.  Remember the example
5    the judge gave you about how one burglar was kind of really,
6    really bad burglary, and the other one was maybe not such a bad
7    burglary?  And that's what I tell people all the time is that
8    every case is different, all the facts are different, and every
9    person is different.  Their backgrounds may be different.  So
10   that's what you have to look at and make a decision.  And
11   that's what the jury does, they make -- they don't make
12   decisions -- some people have come in and told us, "Well, gosh,
13   I thought every person who did a murder case automatically gets
14   the death penalty or eligible for the death penalty."  And we
15   have to tell them, "No, it's only those certain types of murder
16   cases, murder plus something else."  Like in this case, murder
17   plus robbery.  It could be murder plus robbery, kidnapping,
18   rape, burglary, or killing a child under six, or killing a
19   policeman on duty, something like that.  But that's what makes
20   you even eligible for the death penalty.  So not every murder
21   case is even eligible for the death penalty.  And then just
22   because they're convicted of the death penalty, do you just
23   shut the door and say, "Okay, we found him guilty, he
24   automatically gets the death penalty."  Of course not.  As the
25   judge said, "There's two choices."  And you answer these

64

1    questions and that kind of determines what the vote is going to
2    be or what the verdict's going to be.
3             And the first part again you hear probably just
4    what happened that day, the surrounding circumstances of the
5    crime itself and you decide is he guilty or not guilty.  Then
6    you go to the second part and the second part you decide what
7    kind of punishment to give.  And the punishment goes with these
8    two questions you answer.  You may have a little more evidence.
9    You might get to hear if he's got a bad background, good
10   background, you know, whatever it could be.  Then you answer
11   those questions.  The first question I'm gonna ask you to read
12   again with me and I want to point out some key words in there.
13   It says, "Is there a probability that the defendant would
14   commit criminal acts of violence that would constitute a
15   continuing threat to society?"  In other words, let's look at
16   the first line.  "Is there a probability."  It doesn't say
17   certainty.  I mean, there's no way, unless I got a crystal
18   ball, to prove to you for sure what's gonna happen in the
19   future.  And the law doesn't require me to do that.  It just
20   says probability.
21             The second part says, "would commit criminal
22   acts of violence."  Sometimes people say, "Well, I can only
23   give the death penalty if I think he's gonna murder somebody
24   again, or do another capital murder."  And I tell them, "No,
25   the law doesn't require that murder."  It just says commit

65

1  criminal acts of violence, which is pretty broad, right? It
2  could be almost any kind of act of violence. It doesn't
3  necessarily have to be killing somebody else.
4          And then the last part says, "would constitute a
5  continuing threat to society." We've mentioned that a couple
6  of times. What does that mean to you?
7      A.   I guess I look at it as would he commit the same
8  crime again, or anything that was put into the -- what I just
9  read, rape, robbery, anything that would be violent, what I
10  would consider violent.
11      Q.   Right. And it could be any kind of crime. It
12  doesn't necessarily have to be murder as we've talked about.
13  But do you think he's gonna -- he could do some other crime of
14  violence and hurt somebody? The key word in there is society
15  because here's the example. Sometimes folks will come into the
16  jury and they'll say, "Well, Mr. Skurka, you know, why do we
17  have to have the death penalty? We could lock them up in
18  prison and give them a life sentence instead of a death
19  sentence, and he'll never hurt anybody again because he's
20  locked up in prison." What's the problem with that answer?
21      A.   Well, I imagine he's gonna be violent in prison also.
22      Q.   Right.
23      A.   And he's not going to try to even better himself.
24      Q.   Who else is in a prison besides the prisoners?
25      A.   Other people from society.

66

1      Q.   Thank you very much. It's other prisoners, it
2  guards, the people that work at the prison. In other words,
3  you're not removed from society completely when you're in
4  there. It's kind of a trick question, but we don't put people
5  on a desert island where they're the only person out there and
6  they can't see anybody else. Have you ever heard of violent
7  acts happening in a prison where guards attack -- I mean,
8  prisoners attack guards, or prisoners attack other prisoners?
9  You've heard of that happening, right?
10      A.   Yes, sir.
11      Q.   The whole point I'm trying to make is just because
12  you're locked in prison doesn't mean you're completely removed
13  from society; would you agree with that?
14      A.   Yes, sir.
15      Q.   Okay. That's kind of where we're going at. So the
16  first question is what we call the future dangerousness
17  question. Is there a chance he's gonna be a danger in the
18  future to our society? And that's the key words, is there a
19  chance, you know, could he be hurting somebody in the future,
20  no matter what it is, rape, robbery, assault, beating somebody
21  up, whatever it is.
22          Then you go to the second question and you
23  answer that first question yes or no, and then you go to the
24  second question. And that's kind of what I call it like a
25  check on the jury. Do you remember the old checks and balances

67

1  thing? You've found a person guilty. Yes, he's guilty of
2  capital murder. You think he's a continuing threat to society,
3  but stop, jury. It looks like he's heading for the death
4  penalty, but the judge says, "Stop and look at that question
5  and see if there's any mitigating circumstances that would
6  cause you to lower the sentence to life instead of death. In
7  other words, he did the crime, but is there any mitigating
8  circumstances to warrant that you give him a life sentence
9  rather than a death sentence? And that's the key phrase. Is
10  there sufficient, is it enough of a circumstance to warrant
11  that you lower the sentence to life rather than death?
12          Mitigating is kind of the opposite of
13  aggravating. It means anything that would lessen or make less
14  severe the punishment. Again, he did the crime, but is there
15  any reason to give him a break on the sentence? Like the judge
16  was saying, maybe he was a war hero in Iraq and he saved a
17  bunch of people. Some people may say, "Yeah, that's a
18  mitigating circumstance, I'm gonna lower the sentence." Some
19  people may say, "I don't care if he did that or not, he's still
20  got to answer for this crime." See what I'm saying? In other
21  words, before you take that ultimate step of sentencing him to
22  death, you have to take into consideration all of the evidence,
23  including the circumstances of the offense, you know, what
24  happened that day and the surrounding circumstances, his
25  character, his background, is it good, is it bad? Does he have

68

1  -- you know, has he been to prison 10 times before, maybe he's
2  never been to prison. And the personal moral culpability of
3  the defendant. Is there a sufficient mitigating circumstance
4  or circumstances to warrant that a sentence of life rather than
5  the death be imposed? It's kind of like a final check on jury.
6  You're heading toward the death penalty because you think he's
7  guilty, you think he's a continuing threat to society, but is
8  there any reason we should give this guy a break? What is a
9  mitigating circumstance is up to the jury to decide, and how
10  much weight you give it is up to the jury to decide. Just
11  because you hear evidence that, well, maybe he was an orphan
12  you know, never had a mother or father that he knew when he was
13  growing up. Or maybe, you know, he made good grades in school,
14  he was an honor student. Maybe he was an Eagle Scout, you
15  know. Is that enough to lower the sentence rather than the
16  death sentence? So the jury then has to kind of do a balancing
17  test and they may say, "Well, yeah, there's some circumstances,
18  extenuating circumstances or mitigating circumstances that I
19  could lower the sentence." Other people may say, "Look, you
20  know, I don't care about if he was an Eagle Scout, I don't care
21  if he was an orphan, you know, he still did this crime and he's
22  still got to pay for it, he's a continuing threat to society."
23  It's kind of fair scheme so you don't rush into anything. You
24  have to be able to fairly consider things. Can you fairly
25  consider other things that might be a mitigating circumstance?

69

1       A.      Yes, sir.

2       Q.      And I can't tell you what they are.  That's up to the

3   jury.  And I can't even tell you how important they are.  All I

4   can tell you is just because you hear it that there's

5   mitigating circumstances, you don't automatically lower the

6   sentence.  You have to decide, is it sufficient, is it enough

7   to outweigh everything else?

8               One of the laws the judge may tell you is this

9   law that goes like this.  "Voluntary intoxication is not a

10  defense to crime."  Voluntary intoxication.  In other words, if

11  you go get yourself drunk or high on drugs voluntarily, that's

12  not an excuse to crime, and you can see that's probably obvious

13  why that law is.  You can't just get drunk and rob a bank and

14  say, "Oh, I'm not guilty.  I was drunk when I robbed the bank."

15  The law also says, though, intoxication, voluntary intoxication

16  may be a mitigating circumstance to lower the sentence.  It

17  may.  It may not.  Some people on the jury may say, "Yeah, he

18  robbed that bank, but, you know, he was drunk when he did it so

19  we're gonna give him a lower sentence."  Other people may say,

20  "I don't care if he was drunk or not.  You can't rob a bank.

21  You know, you've got to pay for that."  Do you see what I'm

22  saying?

23      A.      Yes.

24      Q.      Intoxication is not a defense to crime, but it's

25  something that you might consider.

70

1               What do you think about age as a possible

2   mitigating circumstance?  In other words, here's where I'm

3   going.  The law in Texas is you can't execute a kid under 18

4   years of age.  You can have a 16-year-old, a 17-year-old do the

5   worst crime imaginable.  He can't get the death penalty no

6   matter what.  The law kind of stops at 18.  Anybody over 18 can

7   get it.  Would you agree with me that people over 18, whether

8   they're, you know, 22, 32, 42, 52, by that time they've really

9   reached a maturity level where they know the difference between

10  right and wrong?

11      A.      I would hope so, yes.

12      Q.      Yeah, you would think so.  So a lot of times -- and

13  the reason I say that is because when some of the jurors come

14  in they say, "Gosh, look at him.  He doesn't look that bad.

15  He's so young looking."  And I always say, "Are you supposed to

16  judge a book by a cover?  Can you do that?  You're not supposed

17  to do that."  You should make a decision -- would you agree

18  with me you should make a decision on what a person did, not

19  what he looks like, or how old he is?  Would you agree with

20  that?

21      A.      Yes, sir.

22      Q.      And you could follow that, right?

23      A.      Yes, sir.

24      Q.      In other words, you make a decision on evidence and

25  facts, not, you know, how you feel, or, you know, something

71

1   like that.

2               Can you tell me a little bit about the case that

3   you were on before?  I saw that you've been on a jury before.

4   Can you tell me what kind of case that was and what of

5   happened?

6       A.      It was a sexual assault of a child and he was found

7   not guilty.

8       Q.      How long ago was that?

9       A.      Oh, it's been years ago.  I don't know the exact

10  time.

11      Q.      Many years ago, like over 10 or what?

12      A.      I would imagine close to 10 years ago.  Time flies.

13  I lose track of time.

14      Q.      Sometimes in those cases it's just like, for lack of

15  better word, he said she said.  Sometimes there's medical

16  evidence.  Sometimes there's DNA.  Did they have any scientific

17  evidence in that case that --

18      A.      No, it was more or less what you said, he said and

19  she said and so forth.

20      Q.      Sometimes in those kind of cases -- and you being a

21  nurse, you know -- sometimes there's physical evidence like,

22  you know, stuff that DNA is on and sometimes there's not.  But

23  it was just based on witnesses?

24      A.      Yes, sir.

25      Q.      Okay.  You were the foreman of that case?

72

1       A.      Yes, sir.

2       Q.      How did you get that job?

3       A.      I don't know.

4       Q.      Did you volunteer?

5       A.      I didn't volunteer but I ended up being the foreman.

6       Q.      Well, that's a pretty awesome responsibility.

7       A.      It was.

8       Q.      And I can see in that case you decided the

9   punishment, which there wasn't enough, and so you voted

10  appropriately.  If you think there is enough, you vote guilty.

11  If you think there's not enough, you vote not guilty.

12              Tell me about being a nurse and having the

13  decision of making a death sentence or not.  I don't know too

14  much about nursing and doctors and stuff, but I know they have

15  this oath that they're not supposed to hurt people and stuff

16  like that.  I know that doctors have what they call the

17  Hippocratic Oath?

18      A.      Yes, sir.

19      Q.      How do you feel about being put in that position?  I

20  mean, you're there to help people and save people and in a

21  medical field, but of course, this is a legal field.  Is that

22  gonna cause you any trouble?

23      A.      I think it's gonna take a lot of thought, and like I

24  said, a lot of responsibility and listening to the facts to

25  put, you know -- that's a big responsibility to take someone's

73

```
 1   life.
 2      Q.   Sure.
 3      A.   But I don't think it will be a conflict.
 4      Q.   Okay.  But that's -- I don't know if it is or not.
 5      A.   No.
 6      Q.   I'm just wondering if in the medical field were you
 7   taught something that you can't do that because, you know, the
 8   medical field has their oaths, and of course, you have an oath
 9   in here to follow the law.  And so you'll be able to follow the
10   law and that's not really going to affect you at all, being a
11   nurse?
12      A.   I guess when you say affect me, like I said, it's
13   gonna be a decision that I'm sure I'm going to have to ponder
14   over and maybe lose some sleep over if I get selected, but it's
15   not going to be something that I won't make a decision.
16      Q.   Yeah.  Well, that's what I'm trying to figure out
17   because say, for example, we have a doctor here and the doctor
18   says, "Look, I've been taught in medical school I cannot hurt
19   anybody, kill anybody," stuff like that.  And they may say,
20   "Hey, I believe in the death penalty, but I don't know if I can
21   follow the law."  Or maybe it's a preacher at a church that
22   says, "Look, God tells me only he can make that decision so I
23   can't make the decision."  There's nothing wrong with that.
24   I'm just wondering if that's gonna make -- is that gonna
25   interfere with you being on this jury?
```

74

```
 1      A.   No, I don't think so.
 2      Q.   Okay.  That's all I need to know.
 3           Okay.  A couple of legal parts is that remember
 4   that the defendant starts with the presumption of innocence.
 5   We've kind of covered that.  You don't have to -- he is not
 6   guilty until the State proves he's guilty, correct?  Remember
 7   the Fifth Amendment.  He can testify if he wants to, but if he
 8   doesn't testify, you cannot hold that against him.  Do you
 9   agree with that law?
10      A.   Yes, sir.
11      Q.   Because some people think -- naturally, a jury
12   thinks, well, you know, I want to hear both sides of the story
13   and I have to tell them, "You may want not hear his side of the
14   story.  He may choose not to testify and you can't hold that
15   against him."  The defense doesn't have to put on any other
16   witnesses.  Sometimes they do, sometimes they don't, but you
17   can't hold that against him because they're not required to put
18   on evidence because the burden rests on me, and it's a burden
19   we have on every case.  And you'll be able to follow that?
20      A.   Yes, sir.
21      Q.   I don't think I have any other questions.  Do you
22   have any other questions of me that maybe I didn't cover or go
23   over --
24      A.   No, sir.
25      Q.   -- with you?
```

75

```
 1           MR. SKURKA:  Ms. Vermace, thank you for
 2   talking to me.  I'll let the other lawyers talk to you now.
 3           MR. GARZA:  May I proceed, Your Honor?
 4           THE COURT:  Yes.
 5               VOIR DIRE EXAMINATION
 6   BY MR. GARZA:
 7      Q.   Good morning, Ms. Vermace.  As I had previously
 8   introduced myself, my name is Ed Garza and I represent John
 9   Henry Ramirez.  And my co-counsel here to my right is Mr. Grant
10   Jones, and he's also -- we're working together on this case,
11   okay?
12           In Texas, trial by jury requires that jurors be
13   fair and impartial.  What does impartial mean to you?
14      A.   It means that you look at all the evidence and don't
15   make any decisions without looking at everything together you
16   can't make a decision, a snap decision.
17      Q.   Is there anything at all that you've heard and seen
18   here this morning that would cause you to have formed an
19   opinion about this case already?
20      A.   No, sir.
21      Q.   Well, impartiality sort of has something a little bit
22   to do with that.  It has a lot to do with that.  Impartiality
23   basically asks of you to come into this task, if you are so
24   chosen to do, without any preconceived notions, no biases, no
25   leanings of any sort.  Is that -- does that sound fair to you?
```

76

```
 1      A.   Yes, sir.
 2      Q.   If you were in Mr. Ramirez's situation, is that the
 3   way that you want people to approach your -- your crisis?
 4      A.   Definitely.
 5      Q.   Okay.  And what we mean by biases, of course, is that
 6   like say, for instance, you were his aunt, if you were related
 7   to him or something, that would be a family bias.  You could
 8   not serve on that jury.  Wouldn't that be correct?
 9      A.   Yes.
10      Q.   And then let me sort of shift gears a little bit.
11   Let's just say that you were on trial for a DWI, do you think
12   you would feel comfortable having a highway patrolman on your
13   jury?
14      A.   I guess I would probably lean to the negative.
15      Q.   Okay.  Well, those are -- you know, those are what
16   we're talking about leanings, okay?
17      A.   Uh-huh.
18      Q.   And in that respect, when I was looking over your
19   questionnaire, when you were asked on a scale of 1 to 10 how
20   you felt about the death penalty, 1 being not very strong and
21   10 being the strongest, I noticed that you circled 10.
22      A.   Uh-huh.
23      Q.   Why was that?
24      A.   Because of a threat to society, I think.  Because
25   what I took in, when I read all the information that was given
```

77

1   to me, if the person, you know, committed the crime was found
2   guilty and is a threat and is gonna go out and do it again,
3   then I would lean very highly to the death penalty. So I think
4   that's probably what I was thinking. I don't even remember
5   what I circled, but I'm thinking that's probably what -- that's
6   what I'm thinking.
7       Q.   Okay. We need to know, is it safe for us to assume
8   though, that at this juncture, since you don't know anything at
9   all about this case, you don't know anything at all about the
10  character and background of our client, that you are basically
11  not leaning any way --
12      A.   That's correct.
13      Q.   -- one way or the other?
14      A.   That's correct.
15      Q.   Is that correct?
16      A.   Yes, sir.
17      Q.   Can we assume that?
18      A.   Yes.
19      Q.   I think you understand the general concepts of the
20  presumption of innocence. I think you understand that the
21  State has the burden to prove this case to you beyond a
22  reasonable doubt before you can reach a decision as to our
23  client's guilt or innocence. I think you understand that our
24  client, as he sits here today, is innocent, and he has a Fifth
25  Amendment right to not have to testify in this case, okay?

78

1       A.   Uh-huh.
2       Q.   So what we're left with is making sure that you
3   understand the process in this case in that Texas has
4   legislated that a person accused and found guilty of capital
5   murder faces two possible punishments, and only two, and that's
6   either life imprisonment or the death penalty. Either one is
7   not a very fruitful outlook. It's not something to look
8   forward to certainly. So that's why it's very important that
9   today when we talk to you -- because this is only time we get
10  to talk to you -- that we try and get it right. We're
11  certainly not perfect, but it's pretty much the best game in
12  town right now in so far as how we do this. Would you agree
13  with that?
14      A.   Yes, sir.
15      Q.   Okay. And the reason I say that is because maybe in
16  some instances you've had occasion to read in the paper lately
17  or magazine articles and things that you see on TV, like on
18  Oprah or any of these programs where people -- especially out
19  of the Dallas area -- have been accused and convicted of
20  certain crimes and spent quite a few years in jail, and then
21  later found to be factually innocent. Do you remember reading
22  anything about that or seeing it in the paper --
23      A.   Nothing specific.
24      Q.   But you're aware that it's happened before?
25      A.   Oh, sure, yes, definitely.

79

1       Q.   How does that make you feel?
2       A.   Well, again, I've -- I don't know how that makes me
3   feel, but, I mean, it's certainly that person served and lost a
4   lot of their life because of something that happened within the
5   system that was wrong.
6       Q.   I guess it comes down whose ox is getting gored, I
7   guess, so to speak. Some people might give it some serious
8   thought if it was happening to them, and if not, well, you just
9   -- maybe you might not think about it very much. But it does
10  happen and so that's another reason why we have to take this
11  pretty seriously and make sure --
12      A.   Right.
13      Q.   -- we get everything right, as right as we can.
14           Along the lines of your feelings toward the
15  death penalty, do you think that our society benefits from it?
16      A.   Benefits from it?
17      Q.   Yes.
18      A.   Well, I guess if the people -- if that person was
19  gonna go out and do violent crimes, the society benefited from
20  those people not being hurt or injured from those crimes so.
21      Q.   So we benefit from it as a form of protection?
22      A.   Yes, sir.
23      Q.   Okay. Any other benefits that you see?
24      A.   From the death penalty?
25      Q.   Yes.

80

1       A.   I don't think that there's that much of a benefit
2   when you're talking about benefits. I guess I don't understand
3   where you're coming from.
4       Q.   Some people say, "Well, I think it deters crime." Do
5   you think it deters crime?
6       A.   Oh, you're saying for someone else, if they know that
7   there's a death penalty, they might think twice before they
8   would do something?
9       Q.   I'm talking about in generalities. I'm not talking
10  about my client. I'm talking in general.
11      A.   Well, I don't know what the crime rate is, and we've
12  had the death penalty for quite sometime, so I don't know if
13  it's deterred crime that much because I don't know what the
14  actual numbers are. I mean, I would think twice before I -- of
15  course, before I committed a crime if I knew that the death
16  penalty was there but --
17      Q.   Right.
18      A.   So I'm not sure if that's what you're asking me.
19      Q.   Well, I'm just asking for your thoughts.
20      A.   Well, those are my thoughts.
21      Q.   Okay. Along those lines also and what I was talking
22  about previously about people -- innocent people being found
23  guilty of crimes --
24      A.   Yeah, that would be --
25      Q.   -- that would be a difficult thing?

81

1     A.    That would be a very hard thing to live with, yes.
2     Q.    To live with, wouldn't it?
3     A.    Yes.
4     Q.    So do you think that the benefit of having the death
5   penalty is worth the possibility that some innocent person
6   could possibly get put to death?
7     A.    Ooh, I never thought of it like that.
8     Q.    Well, everything we're talking about today is
9   something we ordinarily probably don't talk about at all and
10  maybe don't want to talk about it.  But I think you've answered
11  the questions --
12    A.    I think errors are made and I think it happens,
13  they're humans.  And again, I would hope that we're talking
14  about our judicial system that -- and we know that it has
15  happened.  But I would hope -- and I'm gonna stick with what
16  I'm saying -- if the person is found guilty and their
17  background is violent, and that they would be a threat to
18  society, then I would stick with the death penalty.
19    Q.    And once again, that's assuming that we get it
20  factually correct?
21    A.    Yeah.
22    Q.    Well, thank you.  I appreciate your candidness on
23  that.
24          Do you understand that the first phase of the
25  trial in this case is going to involve evidence from the State

82

1   trying to prove our client's guilt?
2     A.    Yes, uh-huh.
3     Q.    And if they meet that condition, if they meet their
4   burden, then and only then would you agree with me would we get
5   to these special issues?
6     A.    Yes.
7     Q.    Now, let's just presuppose that that does happen, but
8   if it doesn't, of course, we all just go home; it's over with?
9     A.    Uh-huh.
10    Q.    Okay?  But if it does, then we have to ask you to
11  then shift gears, hear more evidence about whether or not our
12  client is a continuing threat to society.  What kind of
13  evidence would you want to hear or would you need to hear to be
14  convinced of that probability?
15    A.    I would want to hear his background, his childhood,
16  other crimes that he's committed, I guess his family
17  environment.
18    Q.    Great.  His criminal history, if he has any, correct?
19    A.    Exactly, yes.
20    Q.    Okay.  What would you be instructed to do after you
21  hear that evidence is to decide, based on all of those things,
22  whether or not there is a probability that he would be a
23  continuing threat to society.  If you're not convinced of it
24  then you're entitled to vote no to that question, okay?
25    A.    Uh-huh.

83

1     Q.    Now, in order for you to proceed -- the group of you
2   to proceed to Special Issue No. 2, you-all would have to vote
3   unanimously that, yes, we feel, based on the evidence he is a
4   continuing threat to society.  Because obviously, it would be
5   something that would not inure to the benefit of our client so
6   that requires a unanimous decision, okay?  And those -- and
7   that special issue has to be proven to you beyond a reasonable
8   doubt as well.  That's the standard of proof, okay?
9     A.    Yes, sir.
10    Q.    Okay.  However, if you do not believe it's been
11  proven to you, then, like I said, you'd have the right to vote
12  no, and that would be something that would inure to the benefit
13  of our client, okay?  In that instance, we're gonna change --
14  the rules have been changed somewhat.  There would be a
15  requirement that only 10 of you would have to answer that no
16  and you would stop your deliberations and advise the client
17  (sic) of your finding.  I mean, I'm sorry, advise the Court of
18  that finding, okay?
19    A.    Yes, sir.
20    Q.    And then what would be the result of that answer?
21  What would the judge be authorized to do at that time?
22    A.    I guess, is that a mistrial or they'd have to --
23    Q.    No, ma'am, that would be a life sentence.
24    A.    Oh.
25    Q.    That would be --

84

1     A.    Are you saying that that's the new rule that 10 make
2   a decision instead of the 12?
3     Q.    No.  Ten make a decision as to the answering of no to
4   that issue.
5     A.    Oh, okay.
6     Q.    Okay.
7           THE COURT:  If it's against the defendant it's
8   always 12.
9     Q.    (BY MR. GARZA) If it's for the defendant then it's
10  only 10.
11    A.    Oh, okay.
12    Q.    Does that make sense?
13    A.    Come again, because I'm still mulling this over in my
14  mind here.
15    Q.    Okay.  Well, the judge did a much better job than I
16  did of explaining it.
17    A.    Okay.  So 10 people agree or disagree that he's --
18  and two didn't is what you're saying?
19    Q.    Correct.  Well, let me try to explain it as simply as
20  I can.  If it's something that is not going to go well for our
21  client in deciding that issue, it requires all 12 of you-all to
22  decide that way?
23    A.    Okay.
24    Q.    If it does not, then it requires only 10 of you.  In
25  order for him to benefit, it only requires 10 of you.  In order

85

1  for him not to benefit, it requires all 12 of you.
2      A.   Takes all 12.
3      Q.   Okay.  Does that make better sense?
4      A.   Yes.
5      Q.   Perhaps even at the time, if and when we get to that
6  juncture, the Court's instruction will be a lot more
7  instructional, okay?
8           But do you understand the difference?
9      A.   Yes.
10     Q.   Okay.  Now, if you get passed that issue of the
11 unanimous verdict, then you're gonna be required to start your
12 deliberations with respect to Special Issue No. 2, okay?  And
13 if I could ask you to turn and read that issue to yourself and
14 then let me know when you're done with it, I'll ask you some
15 questions about it.
16     A.   (Venireperson complies.)  Okay.
17     Q.   What is that issue asking you to consider?
18     A.   I think we've already discussed this, that it's
19 looking at all the defendant's of why this happened, and their
20 background, their character, their family, what involved or
21 brought up the action, why did it happen.
22     Q.   You're being asked to essentially look into his
23 character, his background, and his personal moral culpability.
24 See, at this point, you have found him guilty so all of those
25 matters that we're gonna present to you don't serve necessarily

86

1  as a defense, okay?  They serve as, as you said, why did it
2  happen?  Maybe an explanation, okay?  Maybe a door into this --
3  this happenstance and whether or not the evidence that we
4  present to you sufficiently mitigates or lessens his
5  culpability, his -- his blameworthiness enough for you to
6  consider that he should get a life sentence instead a death
7  sentence, okay?
8      A.   Yes, sir.
9      Q.   You're gonna have to use your common sense, your own
10 sense of, you know, what a person's character is about, what a
11 person's background is about, whether a person is capable of
12 knowing, or whether he was ever taught; what moral behavior he
13 should have acquired in order to understand what decisions he
14 made or she made, and how they were gonna affect them.  And
15 what we ask you to do is based on this Supreme Court -- this is
16 language from a Supreme Court case which requires us lawyers
17 now to have to show you, to have to investigate, to have to
18 produce the evidence on behalf of our clients of his background
19 so that you can make an informed decision about this, okay?
20     A.   Yes, sir.
21     Q.   We're required by law to do that in order for us to
22 effectively represent our clients.
23          So then, depending on your answer to this issue,
24 once again, that will instruct the judge on what sentence to
25 hand down to our client, okay?

87

1           So if you say yes to that, and you say yes to
2  this, what will be the sentence the judge will have to impose?
3      A.   The death penalty.
4      Q.   No, ma'am.  We're asking you to say yes to this
5  meaning; yes, I feel there are sufficient mitigating
6  circumstances --
7      A.   Oh, okay.  I thought you said -- oh, I see --
8      Q.   -- to warrant a sentence of life.
9      A.   -- what you're saying.
10     Q.   -- to warrant a sentence of life.
11     A.   Then he would get the life, yeah.
12     Q.   So it would have to be opposite answers.  Yes and no,
13 a death sentence.  Yes and yes, life?
14     A.   Okay.
15     Q.   Okay?
16     A.   Yes.
17     Q.   Are you confused?
18     A.   No, I understand it now.  You're saying that there
19 was.  -I thought you were saying that you didn't prove that
20 there was so, but I understand.
21     Q.   I don't think you're confused.
22     A.   Yeah.
23     Q.   I don't think you're confused at all.
24          MR. GARZA:  Thank you, ma'am.  I have no other
25 questions.

88

1           MR. SKURKA:  We don't have any other questions
2  either, Judge.
3           FURTHER VOIR DIRE EXAMINATION
4  BY THE COURT:
5      Q.   I just have one.  Now, I know you expressed to me
6  that this would be an important factor to you --
7      A.   Yes.
8      Q.   -- that he was a continuing threat to society.  But
9  you understand that you may still find that and he still not
10 get the death penalty if you go through this answer?
11     A.   Uh-huh.
12          THE COURT:  Okay.  All right.  Why don't you
13 wait in jury room and we'll be right with you.
14          (Venireperson exits courtroom.)
15          THE COURT:  All right.  What says the State?
16          MR. SKURKA:  We'll go ahead and accept her,
17 Judge.
18          THE COURT:  What says the defense?
19          MR. JONES:  Can we just talk a moment?
20          THE COURT:  You may.
21          (Counsel conferring.)
22          MR. GARZA:  We'll also accept her, Your Honor.
23          THE COURT:  You'll accept her?
24          MR. GARZA:  Yes, Your Honor.
25          THE COURT:  Let's bring her in.

89

1             (Venireperson enters courtroom.)

2             THE COURT:  All right.  Ms. Vermace, you have

3    been accepted on this jury, okay?  The trial will begin, we

4    believe, December 1st.  We will be getting in touch with you

5    about that.  You're gonna get a call one way or the another to

6    tell you when to begin.

7             Now, you haven't heard anything.  I don't want

8    you to read the local section of the paper or watch the local

9    news while this is on, okay?  Because I want you to just get

10   your information from the courtroom.

11            JUROR NO. 12:  From this point on?

12            THE COURT:  From this point on.

13            JUROR NO. 12:  Okay.

14            THE COURT:  Because with all due respect to

15   the media, I can tell you they often get things wrong.

16            JUROR NO. 12:  Right.  I'm quite aware of

17   that.

18            THE COURT:  The second thing is, if something

19   -- you can't talk to anyone about this case.  If they try to

20   talk to you, say, "No, no, no, I can't talk to you.  After the

21   trial we can talk, if you want, but until this trial is

22   finished, I can't talk to anybody about it."  Okay?

23            JUROR NO. 12:  Yes, sir.

24            THE COURT:  That's about it.

25            JUROR NO. 12:  All right.

90

1             THE COURT:  Thank you very much.  We'll be in

2    touch.

3             MR. SKURKA:  Thank you, ma'am.

4             MR. GARZA:  Thank you.

5             (Juror exits courtroom.)

6             THE COURT:  All right.  Let's take a little

7    break and we'll be back at it.

8             (Recess.)

9             THE COURT:  All right.  What about the next

10   person?

11            MR. SKURKA:  Judge, I'll agree on her.  On

12   Question No. 37 she says she's bipolar.

13            THE COURT:  Okay.  Let's bring her in.

14            MR. JONES:  Which number is that?

15            MR. SKURKA:  101.

16            THE COURT:  101.  Wait.  Do you-all want to

17   agree on that one?

18            MR. GARZA:  Yes, we do, Your Honor.

19            THE COURT:  All right.  Let's bring in Marie

20   Rutledge.

21            (Venireperson enters courtroom.)

22            THE COURT:  All right.  Ms. Rutledge, we --

23   we're not gonna need you to stay, okay?  We do appreciate you

24   coming down here.  If you need a work excuse --

25            VENIREPERSON NO. 101:  I've already gotten

91

1    that taken care of.

2             THE COURT:  All right.  Thank you very much

3    for your time.  We appreciate it.

4             (Venireperson exits courtroom.)

5             THE COURT:  The next person is Felix Guajardo.

6             (Discussion off the record.)

7             THE COURT:  All right.  The next person is

8    Felix Guajardo.  Let's bring him in.

9

10                  VENIREPERSON NO. 102,

11                   FELIX GUAJARDO,

12                VOIR DIRE EXAMINATION

13   BY THE COURT:

14        Q.   All right.  You are Felix Guajardo?

15        A.   Yes.

16        Q.   Have a seat, sir.  All right.  Mr. Guajardo, we are

17   looking to pick a capital murder jury, okay?

18        A.   Okay.

19        Q.   Okay.  You know that.  Actually, we've got your

20   questionnaire here.  You haven't heard anything about the case.

21   You can be fair and impartial?

22        A.   Yes.

23        Q.   All right.  We also need people that can follow the

24   law.  We're gonna talk a little bit about that next.

25             All right.  You have been on a civil jury

92

1    before?

2         A.   Yes.

3         Q.   Okay.  All right.  Let's talk about some things.  In

4    that civil case you were on, the plaintiff, the one bringing

5    the lawsuit, had the burden of proof?

6         A.   Correct.

7         Q.   Okay.  In this case, it's kind of the same thing.  In

8    this case, the State is bringing the charges so the law says

9    the State has the burden of proof, okay?

10        A.   Okay.

11        Q.   All right.  You can follow that, right, hold the

12   State to their burden of proof?

13        A.   Yes.

14        Q.   Okay.  And let's talk a little bit about what that

15   burden is, okay?  In that case that you were on, it was a

16   contract?

17        A.   A contract.

18        Q.   Contract dispute.  Okay.  Contract disputes they work

19   like this.  One party sues another.  Party A sues Party B and

20   they've got -- they say breach of contract and they've got to

21   prove the breach, right?  And it's by preponderance of the

22   evidence, which is like 51 percent just tipping the scales a

23   little bit more than 50/50, okay?

24        A.   Okay.

25        Q.   There's also a higher standard than that called clear

93

1 and convincing evidence. That sounds pretty high, right?
2 That's the kind of evidence you would need if the State wanted
3 to remove children from -- terminate someone's parental rights,
4 okay?
5     A.    Okay.
6     Q.    All right. The burden of proof in this case is
7 higher than both of those. It's called beyond a reasonable
8 doubt, okay? Higher than the one you used in your civil case
9 --
10    A.    Right.
11    Q.    -- and higher than clear and convincing and it's up
12 here, okay? But it is not beyond all doubt. Because if it was
13 beyond all doubt -- the only way it could be beyond all doubt
14 is if you saw it yourself, right?
15    A.    Right.
16    Q.    You were there yourself. And that's an impossible
17 burden so it's not that high, okay? But it is a high burden
18 beyond a reasonable doubt. Can you hold the State to that
19 burden?
20    A.    Yes.
21    Q.    Now, this is -- in every criminal case, the law says,
22 "State, you bring the charges, you prove them, until you do,
23 defendant is innocent until proven guilty." That's all of our
24 rights.
25    A.    Okay.

94

1     Q.    Each and every person. You know, sometimes people
2 say each and every citizen. It's more than each and every
3 citizen. Each and every human being that's within the borders
4 of the United States of America has that right, okay?
5     A.    Okay.
6     Q.    And that doesn't mean the State can't prove that the
7 defendant's guilty, but they must do it with evidence, okay,
8 and they have to prove it to the people with evidence, okay?
9     A.    Okay.
10    Q.    But it's a little bit of an unfair question. But if
11 I had to ask you right now to vote, how would you have to vote,
12 guilty or not guilty?
13    A.    Not guilty.
14    Q.    That's right because you haven't been proven
15 anything.
16    A.    Right.
17    Q.    You haven't been presented any evidence. Okay. All
18 right. The next thing, the law says that the defense doesn't
19 have to do anything. It's only the State's burden to prove it.
20 The burden never shifts to this side. As part of that, the
21 Constitution says the defendant doesn't have to testify.
22 Because why? Because he doesn't have the burden to do
23 anything, right?
24    A.    Right.
25    Q.    He doesn't have the burden, he doesn't have to

95

1 testify. And his lawyers may advise him not to testify because
2 they think they haven't proven their case. Maybe he's not
3 somebody that does well in front of crowds. Some people are
4 good public speakers, others are not. Some people freak out in
5 front of a crowd and maybe his lawyer's advised him not to for
6 that reason. Maybe there's another reason, okay? The point is
7 this: There's a lot of reasons why somebody may not want to
8 testify, but the law says it's even stronger than he doesn't
9 have to testify. The law says you can't, as a juror, hold it
10 against him.
11    A.    Okay.
12    Q.    In other words, you can't go back to the jury room
13 and say, "Okay, let's see here. State put on their case, I'll
14 weigh that over here. Defense, they didn't do anything, so I'm
15 gonna put -- I'm gonna give that point to the State for them
16 not putting on a case." You can't do that. See a lot of
17 people say, "I want to hear both sides of the story." Look,
18 this isn't a race to the finish line between the State and the
19 defense. There's only one race going on and that's whether the
20 State can prove beyond a reasonable doubt to the jury of this
21 man's guilt, okay?
22    A.    Okay.
23    Q.    Can you follow that law and not hold it against the
24 defendant if he chose not to testify?
25    A.    Yes.

96

1     Q.    Okay. Let's talk a little bit about what type of
2 case this is. The allegation is capital murder. What does
3 that mean? Well, it's murder, right? Murder. Because it says
4 murder and murder is the intentional taking of the life of
5 another. Capital. What does that mean? Well, capital means
6 the death penalty's a possibility. And the legislature has
7 given us a laundry list of special circumstances in which the
8 death penalty's a possibility. See, a lot of people think
9 every murder has a possibility of a death sentence. That's
10 simply not the case. It has to be murder plus something else.
11 In this case, the State is alleging that it is murder while in
12 the course of committing a robbery, okay?
13           What's robbery? Well, it's the forcible taking
14 of property from another by the use of threats or violence,
15 okay? So if I came up and held a gun to you and I said, "Give
16 me your wallet." If you gave it to me, I've just committed a
17 robbery, okay?
18    A.    Okay.
19    Q.    If I pick your pocket and you never even knew I took
20 your wallet, it's not a robbery. It's theft, it's a theft from
21 a person, but it's not a robbery, okay?
22    A.    Okay.
23    Q.    Because I never threatened you with force or
24 violence. I never used force or violence against you.
25    A.    Okay.

97

1    Q.   Now, the law says that if you put robbery and murder
2    together, it's a capital murder.  Now, the law also says you
3    can put robbery and attempted robbery -- I mean, attempted
4    robbery and murder together and it will still have capital
5    murder, okay?
6    A.   Okay.
7    Q.   What does that mean?  The same facts.  I point the
8    gun at you and you -- I say, "Give me your wallet."  But you
9    are a martial arts expert and you roundhouse kick me in the
10   face and knock me out.  Okay.  Did I commit robbery?  No,
11   because I didn't finish, but I certainly did attempt, right?
12   A.   Right.
13   Q.   Okay.  The law says that's okay.  What the State
14   needs to prove is either robbery or attempted robbery, and that
15   in the course of doing so, this defendant, on the given date,
16   in Nueces County, Texas, committed murder, okay?
17   A.   Okay.
18   Q.   That's what they have to prove.  The law says they
19   have to prove all the elements of the crime, that is, you know,
20   all of the pieces of it.  All right.  Would you hold the State
21   to that burden and make them prove the whole case to you?
22   A.   Yes.
23   Q.   Okay.  Now, in Texas we have a bifurcated system.
24   What does that mean?  That's just a legalese word for saying
25   the trial is in two parts, okay?  Part one, guilty, not guilty

98

1    phase.  We call it guilt or innocence, but it's not that.  It's
2    the guilty/not guilty phase.  Okay.  And the jury hears
3    evidence and we see if the State can prove to the jury beyond a
4    reasonable doubt that the defendant's guilty.  Okay?
5    A.   Okay.
6    Q.   If the defendant is found not guilty of capital
7    murder, we go home.  If the defendant's found guilty, we go to
8    part two, second part of the trial, the punishment phase.  What
9    does this guy get, okay?
10   A.   Okay.
11   Q.   There's only two possibilities of capital murder,
12   life imprisonment or the death penalty.  So we say, okay, life
13   imprisonment or death.  But the jury doesn't go back and
14   deliberate and come to a vote and say life or death.  They
15   don't say that.  They answer questions, okay?  Here's the first
16   one if you'll look over your shoulder.
17        "Is there a probability that the defendant
18   would commit criminal acts of violence that would constitute a
19   continuing threat to society?"  Okay.  What does that mean,
20   probability?  Is it more likely than not that the defendant's
21   going to be violent with people in the future, okay?
22   A.   Okay.
23   Q.   And the jury would answer yes or no.  Then they'd go
24   to the second question, Special Issue No. 2.  "After taking
25   into consideration all of the evidence, including the

99

1    circumstances of the offense" -- what does that mean?  Well,
2    that's the first part of the trial, right?
3    A.   Right.
4    Q.   The part you already heard.  "The defendant's
5    character and background."  I expect that this part of the
6    trial you'll hear more about the defendant's life, like how he
7    grew up.  That's background, how he grew up.  What was his
8    childhood like?  Where did he work?  Has he been in the
9    military?  That's kind of his past, okay?
10   A.   Okay.
11   Q.   The defendant's character, what's all that about?
12   Were you a Boy Scout a long time ago?
13   A.   No.
14   Q.   Like some of us were?
15   A.   No.
16   Q.   All right.  Well, okay.  You know, in Boy Scouts they
17   have the creed, right?
18   A.   Right.
19   Q.   Honest and trustworthy, that kind of thing, all
20   right?
21   A.   Okay.
22   Q.   You know, is he an honest person, is he someone
23   that's reliable, is he a good guy, okay?  Is he a liar or a
24   cheat, or a scoundrel, you know.  That's character.
25        All right.  Then the personal moral

100

1    culpability of the defendant.  That's more legalese, right?
2    That's -- that's -- that comes from a case, but lawyers wrote
3    that, okay?  What does that mean?  Let me give you an example
4    of what that means.  Two burglars.  One burglar goes into a
5    house and trashes the place, just wipes it out, pulls
6    everything out, breaks things, takes everything of value, TV,
7    VCR, CD player, computer, jewelry, everything of value, sells
8    it.  And what does he do with the money?  He spends it on
9    hookers and cocaine, okay?
10   A.   Okay.
11   Q.   The second guy, a hardworking man, has got three
12   kids, is a single dad, okay?  He's got a job.  They barely make
13   ends meet, but, you know, he keeps -- he keeps the lights on
14   and food on the table.  Well, the economy's bad and he loses
15   his job and they run out of money almost immediately.  The kids
16   are hungry.  So he goes into -- he doesn't break into a house,
17   he goes through an unlocked door, and he steals food and takes
18   a bag and feeds the kids.  He's hungry but doesn't feed
19   himself.  He just makes sure the kids are fed.
20        You would agree with me that those people don't
21   have the same personal moral culpability, right?
22   A.   Right.
23   Q.   The same blameworthiness?
24   A.   Right.
25   Q.   That's what that's about.

## 101

1    A.    Okay.

2    Q.    Okay.  Personal being my -- you're the person.  Moral

3    is ethics.  Culpability is blameworthiness, okay?

4    A.    Right.

5    Q.    Are you following me?

6    A.    Yes.

7    Q.    All right.  That's what that part's asking you to

8    consider.  "Is there a sufficient mitigating circumstance or

9    circumstances that warrant a sentence of life imprisonment

10   rather than the death sentence be imposed?"  What is that

11   saying?  Well, mitigating circumstance.  "Mitigating" means to

12   lessen, lessening circumstances.

13          All right.  What if you heard that a defendant

14   is a war hero in Iraq and he saved 20 soldiers at the risk of

15   his own life and he got the Congressional Medal of Honor?

16   A.    Okay.

17   Q.    That might be a mitigating circumstance, okay?  You

18   might think, that is something in his favor.  That is a -- that

19   is a great thing that he has done if his past and you can

20   consider that as a mitigating circumstance.  Maybe he was an

21   Eagle Scout.  That can be a mitigating circumstance.  Anything

22   can be a making circumstance.  And these lawyers will try and

23   tell you what they think a mitigating circumstance is, or an

24   aggravating circumstance, which is the opposite, right?  Bad

25   things about him.

## 102

1    A.    Okay.

2    Q.    Okay.  So what this question is asking you to do is

3    weigh everything, weigh everything, that you're presented and

4    is there sufficient mitigating circumstances.  Is there enough

5    good about this person in his past that warrants a sentence of

6    life rather than death?  Maybe it's his background.  Maybe he

7    was abused as a child.  Maybe his father sexually molested him,

8    beat him all the time, and, you know, he basically grew up on

9    the streets.  That might be a mitigating circumstance.  But

10   only the jury gets to decide what is a mitigating circumstance.

11          Now, you may find that there are mitigating

12   circumstances lessening things, things in his favor, but they

13   may not be sufficient enough to warrant life rather than

14   death, okay?

15   A.    Okay.

16   Q.    That's what this question is asking you.  And you'd

17   answer yes or no to this, okay?

18   A.    Okay.

19   Q.    Taking into consideration everything.  Is there

20   something out there that warrants giving him life rather than

21   death.

22          All right.  Now, I need -- when we -- I'm sure

23   you went through this on this civil case.  Do you remember

24   what Court is it was in?

25   A.    It was Margarito --

## 103

1    Q.    Oh, that's been a while.  Margarito Garza?

2    A.    Yeah, Margarito Garza.

3    Q.    Well, I'm sure that when that trial began, he raised

4    his right hand --

5    A.    Right.

6    Q.    -- and he swore each one of you that -- swore you in

7    saying, "Do you solemnly swear that you will render a true

8    verdict based upon the law and evidence presented to you?"

9    Right?

10   A.    Right.

11   Q.    And then you put on your juror tag, right?

12   A.    Yeah.

13   Q.    Well, I'm gonna do that in this case, but I need to

14   know if you can do that in this case, you answer,

15   let me tell you, some people tell me, "I cannot take that oath

16   because I cannot participate in a process that can lead to the

17   death penalty."  Others tell me, "I don't care about your law.

18   I'll give him a fair trial on the first pat of the trial, but

19   if we get here, no way, man.  I'm not gonna consider this

20   stuff.  I don't care about your law.  I'm gonna answer these

21   questions so he gets death every time regardless of what's

22   presented."  Neither of those people can follow the law and

23   that's not fair, okay?  It's okay for them to feel that way,

24   it's just not okay for them to get on the jury.

25   A.    Right.

## 104

1    Q.    I need to know from you, can you follow the law, or

2    do you fit into one of those two categories I just mentioned?

3    A.    No, I can follow the law.

4          THE COURT:  Okay.  All right.  State.

5          MR. SCHIMMEL:  May I proceed, Your Honor?

6          THE COURT:  Yes.

7                VOIR DIRE EXAMINATION

8    BY MR. SCHIMMEL:

9    Q.    Hi, Mr. Guajardo.

10   A.    How are you doing?

11   Q.    My name is George Schimmel, I'm one of the

12   prosecutors in this court.  This is Mark Skurka.

13          MR. SKURKA:  Hi.

14   A.    How are you doing?

15   Q.    (BY MR. SCHIMMEL)  I'd like to just sort of follow up

16   on some of the questions the judge asked you and also talk to

17   you just a little bit about your questionnaire and see if you

18   have any questions for me about anything we talked about?

19   A.    Okay.

20   Q.    The first thing that I would like point out to you is

21   that there is absolutely no right or wrong answer to anything

22   I'm asking you.  There really isn't.  All I want to do is kind

23   of see how you feel about some of this and kind of take your

24   temperature.

25   A.    Okay.

105

1  Q.  The first thing I'd like to know is, you were on a
2  jury a long time ago, it was a civil jury?
3  A.  Right.
4  Q.  With Judge Garza?
5  A.  Right.
6  Q.  And it was a civil case.  This is a really different
7  kind of case.  How did you feel when you found out that you
8  were a possible juror on a death penalty case?
9  A.  Well, it's definitely something new to experience,
10  you know, that part of it.  I mean, I think it's gonna be a
11  challenge.
12  Q.  And a challenge in what way?  Like a challenge in
13  like climbing up a mountain is a challenge or --
14  A.  Well, different from -- I thought the civil case was
15  very interesting when I went through that, but I know that this
16  is totally something different.
17  Q.  Uh-huh.  Were you kind of excited about the
18  possibility about like learning, you know, new things?
19  A.  Yes.
20  Q.  Okay.  Well, how did you feel when you found out -- I
21  mean I guess know about knowing that somebody's life is
22  possibly on the line?  Do you feel like that's a decision that
23  you'd be able to make, or do you think that's just like too
24  much of a decision?
25  A.  No, I'd be able to make that.

106

1  Q.  Okay.  Well, let's talk about that.  How do you feel
2  about the death penalty in general?
3  A.  Well, I mean, if it -- just basically what I feel
4  about it is what the law states, and you know, what -- you
5  know, there's circumstances out there that will allow that to
6  happen, and I would just base it on the law itself --
7  Q.  Uh-huh.
8  A.  -- you know, whatever the law permits to happen.
9  Q.  Well, let's say that -- let's say that you're not
10  with AEP anymore and your new job is that you work with the
11  state legislature and your job is to make laws.  And it's just
12  come up for review, and actually, yours is the tie breaking
13  vote.  You get to say whether or not the death penalty stays
14  the law in Texas, or whether you just do away with it totally
15  and have the punishment as life imprisonment and that's it.
16  How do you think you'd vote in that case?
17  A.  I would still probably vote for the death penalty.
18  Q.  You think it's a good law?
19  A.  Yes.
20  Q.  Okay.  Why do you think we need that law?
21  A.  Why?
22  Q.  Yeah.
23  A.  Well, I guess there's individuals here in this
24  country that do wrong things and harm people and that's just
25  another way of allowing things to happen, you know, in life.

107

1  Q.  The death penalty is another way of allowing things
2  to happen?
3  A.  Yes.
4  Q.  What kind of things?
5  A.  Well by, you know, for the things that they've done
6  wrong, for the individuals going through court.
7  Q.  Okay.  It's another way to punish people?
8  A.  Right.
9  Q.  Okay.  What other benefits do you think that our
10  society benefits from the death penalty?
11  A.  Benefits?
12  Q.  Uh-huh.
13  A.  Well, as far as, I guess, not having that many
14  prisoners in prison.
15  Q.  Okay.  Do you think -- do you think if a criminal was
16  about to do a crime that they would think twice about it if
17  they thought there was a chance doing that crime could mean
18  that they died?
19  A.  I think so.
20  Q.  So maybe you think it has a deterrent effect also, it
21  deters people or stops them from committing crimes because they
22  don't want to die?
23  A.  Right, I would think so.
24  Q.  Okay.  Like the judge said, the death penalty in this
25  case only applies because this is a murder plus something else.

108

1  A.  Right.
2  Q.  It's kind of strange to think about it, but if you
3  could imagine the world's worst murder, I mean, a terrible,
4  terrible murder, even if you chopped up your 10-year-old
5  daughter because you just felt like it, that crime can't get
6  the death penalty.  I mean, it's really strange, but it's not
7  just for murders that are really bad.  It's for murder with
8  something else added to it.
9  A.  Right.
10  Q.  Murder plus a rape, murder plus a robbery, murder
11  plus a burglary, murder in another murder, something like that.
12  Do you think -- do you think we ought to have laws like that?
13  I mean, do you think -- do you think that's appropriate?  Do
14  you think it's okay to have the death penalty for a murder plus
15  something else?
16  A.  Yes.
17  Q.  Okay.  The way the trial works, like the judge said,
18  it's got -- it's got two parts.  There's probably kind of like
19  in a civil case too, there's the first part of the trial where
20  you make a decision.  In this case, you make a decision about
21  whether or not the defendant is guilty or not guilty.  If
22  you -- like the judge said, if you decide he's not guilty, the
23  trial ends, but if you decide that he is guilty, then you go to
24  the next part and in that whole part of the next part of the
25  trial is the punishment phase.  All that's about is that stuff

109

1 right behind you?

2     A.    Okay.

3     Q.    This Special Issue 1 and 2. That's the whole

4 punishment phase of the trial. And during the first part you

5 consider Special Issue No. 1 and there are a couple of things

6 about that that I'd like to go over with you because sometimes

7 jurors have questions about it. It says, "Is there a

8 probability that the defendant would commit criminal acts of

9 violence, and that he would be a continuing threat to society?"

10 Okay.

11     A.    Okay.

12     Q.    The first part is that word "probability." What does

13 that word mean to you, "probability"? What does it mean if

14 something's probable?

15     A.    Would he – as far as, I guess, would stand a higher

16 chance of committing the crime again.

17     Q.    Yeah. If it's probable that it's gonna rain

18 tomorrow, that means there's maybe better than a 50/50 chance,

19 right?

20     A.    Right.

21     Q.    Actually, it could be even a 51 percent chance. Just

22 if this was 50/50, it's a little bit more than 50/50. It

23 doesn't mean is there a certainty he's gonna go do bad stuff in

24 the future, right?

25     A.    Right.

110

1     Q.    That would be like 100 percent chance. Why is it you

2 think that the State doesn't have to show the jury that it's

3 certainty, that it's a sure thing that he's gonna go do bad

4 stuff in the future?

5     A.    That they don't?

6     Q.    Yeah. In other words, we don't have to prove to you

7 that there's 100 percent chance he's gonna do bad stuff in the

8 future. We only have to show you that there's a probability,

9 only a probability. Why do you think we only have to show you

10 a probability instead of having to show you that there's a 100

11 percent chance?

12     A.    I really wouldn't know how to answer that.

13     Q.    Well, let me ask you this. Is there any way that I

14 could show you that something's gonna happen with 100 percent

15 certainty?

16     A.    No.

17     Q.    I mean, how would I know that? I'd have to be God,

18 right?

19     A.    Right.

20     Q.    Or I'd have to have a crystal ball?

21     A.    Right.

22     Q.    Okay. I guess my point is just that because we can't

23 show you that stuff, there's no possible way that we can prove

24 to you something beyond, I mean, you know, to a certainty?

25     A.    Right.

111

1     Q.    Okay. The second issue is it says that a defendant

2 would commit criminal acts of violence there in the center.

3 Let me ask you this. Some jurors say, "Well, State, I just --

4 I'm not so sure that this person's gonna go out and commit

5 another murder. I think maybe he's learned his lesson about

6 murder and he's not going to do it again and so I don't know if

7 he would commit those criminal acts of violence." And the

8 answer's always this. The State doesn't have to show you that

9 a person is gonna go out and commit another murder, or a rape,

10 or something like that. It just says criminal acts of

11 violence. Can you think of any criminal act of violence?

12     A.    That this individual would create --

13     Q.    No. Just in general.

14     A.    Just in general?

15     Q.    Just anything, yeah.

16     A.    Well, just assault.

17     Q.    Sure. That's a great example. The State doesn't

18 have to show you that a person's gonna go out and do more

19 murders. All the State's got to show you is that a person

20 could go out and do an assault because that's a criminal act of

21 violence. Okay?

22     A.    Okay.

23     Q.    Another thing sometimes jurors wonder about is that

24 idea of a continuing threat to society. Have you ever heard

25 that expression before?

112

1     A.    Yes.

2     Q.    Like he's a threat to society –

3     A.    Yes.

4     Q.    -- or a public menace or something like that? Well,

5 let me ask you this. Sometimes people say, "Well, if you put

6 that guy in prison, well, he's really out of society. I'm not

7 going to see him on the street or anything like that, so he's

8 out of society, so how could he be a threat to?" Well, who

9 else is in prison with the prisoners?

10     A.    He's with other people, other prisoners.

11     Q.    Okay.

12     A.    Within their own society.

13     Q.    Sure. Other prisoners, sure. Who takes care of

14 those prisoners?

15     A.    Guards.

16     Q.    Uh-huh.

17     A.    Doctors.

18     Q.    Sure.

19     A.    Others.

20     Q.    Sure. People maybe who feed them, you know, people

21 who clean up there. The point is that there are a lot of other

22 people inside of a prison besides prisoners, including

23 prisoners, and those people make up society, right?

24     A.    Right.

25     Q.    So -- so just because someone gets put in prison

113

1  somewhere doesn't mean that they're out of society. That's
2  just something that sometimes is an issue and it comes up.
3        The other thing I want to talk to you about is
4  that Special Issue No. 2 stuff and there are a couple of words
5  there that I want to go over with you.
6     A.   Okay.
7     Q.   Basically -- basically what happens with number one
8  is you're saying whether or not you think this person's gonna
9  be a danger. Are they gonna go out -- it's the future danger
10  question is what they call it. Is that person gonna be
11  dangerous in the future? Are they gonna continue to commit
12  criminal acts if they're violent? If you say no, that's it.
13  If you think that he is gonna be dangerous in the future, then
14  the answer to No. 1 is yes and go to No. 2. And all really
15  this says -- there are a lot of strange words in it, but all it
16  really says is, is there anything about what you've heard,
17  anything you can come up with that you think would mitigate the
18  punishment? And all that means is make less. Is there
19  anything that you think would make the punishment less, would
20  take it from a death sentence to a possible life sentence?
21     A.   Okay.
22     Q.   Okay. And it could be -- really, it could be any
23  number of things. It could be that you heard evidence that
24  this defendant was a really great guy and helped his
25  grandmother, you know, with her lawn care business or

114

1  something. I have no idea. And maybe you think, gosh, that's
2  a -- he's a good guy, he did a bad thing, but he's a good guy
3  and so that mitigates or that lessens the punishment. Or maybe
4  you hear all that stuff and you think, gosh, I don't think that
5  mitigates it at all. I don't think that makes it less. It's
6  still a really terrible thing he did and it's horrible and it
7  doesn't. The only point about No. 2 is that you need to be
8  able, if you're picked as a juror, to be able to say, "Yes,
9  State, yes, defense, yes, Judge, I promise I could think about
10  that stuff. I'm not telling you what I'm gonna think about or
11  whether I'm gonna say yes or no or whatever, but my mind is
12  still open at this point."
13     A.   Yes.
14     Q.   Is that something you can do?
15     A.   Yes.
16     Q.   I mean, you could think one way or the other about
17  possible circumstances that would lessen the punishment?
18     A.   Yes.
19     Q.   Okay. I want to talk to you about a couple of legal
20  issues just very briefly. One is the indictment. Just because
21  a defendant is indicted it does not mean that he's guilty. All
22  it means is that basically they filed charges on him.
23     A.   Correct.
24     Q.   Okay. That's it. And can you basically promise if
25  you're a juror not to consider that against him?

115

1     A.   Yes.
2     Q.   Okay. Another issue is the Fifth Amendment, but
3  really, it's just the fact that this defendant doesn't have to
4  testify. We can't force him to testify. And, in fact, the law
5  says that if he doesn't want to testify for whatever reason, he
6  doesn't have to. And there could be 101 reasons why a person
7  might not want to testify. Maybe they get nervous, like the
8  judge would say. Maybe the lawyers just think the State hasn't
9  done a very good job and hadn't proved its case. Right?
10     A.   Right.
11     Q.   So if you're on the jury and you get -- you go back
12  there after you hear the State's case and the jurors, you know,
13  all say, "Well, I'm kind of on the fence." And you're like,
14  "You know, I'm on the fence too, but man, that guy didn't
15  testify, so I think he's probably guilty." I mean, you can't
16  do that. And you can't -- really, you can't even talk about
17  it.
18     A.   Okay.
19     Q.   But that's fair. I mean, the law says a person
20  shouldn't have to testify if they don't want to and you're not
21  gonna go against the law, I guess, right?
22     A.   No.
23     Q.   You're okay with that?
24     A.   Yes.
25     Q.   Okay. Another issue is the idea of the burden of

116

1  proof and beyond a reasonable doubt. And what that means is
2  that all the stuff that the State tries to prove to you the
3  State will prove to you beyond a reasonable doubt. That's our
4  standard of proof. It just means beyond a reasonable doubt.
5  There's not a definition for that. But the way that we hope
6  people understand it is just by saying it's a two-part thing.
7  You say to yourself, after you hear all the evidence, do I have
8  a doubt. And if you do -- if you don't have a doubt you --
9  your duty as a juror is to return a verdict of guilty.
10        But let's say that you say, "Well, I do have a
11  doubt." The next issue becomes, "Well, do I have a reason for
12  that doubt? Is there a reasonable doubt?" And that reason
13  has to be based on the evidence. Let's say that you hear the
14  State's witnesses and when it's -- and you believe them. But
15  at the end you say, "You know, I think I have a doubt because
16  I really feel sorry for the guy, or I think I have a doubt
17  because that guy sure does look like my nephew," or something
18  like that. Well, would that be a doubt based on evidence that
19  you heard?
20     A.   No.
21     Q.   No. It would just be based on feeling sorry for
22  somebody. And I'm not saying that that's a -- it's a human
23  response. But in that case, you would not have a reasonable
24  doubt even if you had a doubt because you wouldn't have a
25  reason for it?

117

1    A.   Right.

2    Q.   Okay. The last thing I want to go over with you is

3  what we call the presumption of innocence, and all that means

4  as he's sitting here right now, you have to presume that he's

5  not guilty.

6    A.   Right.

7    Q.   You have to presume him innocent.

8    A.   Right.

9    Q.   And that makes sense, doesn't it? You haven't heard

10  any evidence, right?

11    A.   Right.

12    Q.   It's like I think it was the first thing the judge

13  asked, "If you had to vote now, how would you vote?" It's a

14  strange question because, I mean, you would never be asked to

15  vote before a trial, but the fact is that you haven't heard any

16  evidence at all so, of course, you have to presume him

17  innocent?

18    A.   Right.

19    Q.   Because you haven't heard anything. But think of it

20  like a bubble, like a bubble around somebody. And if you hear

21  any evidence that would change your mind, it pokes that bubble

22  and that bubble just goes away. So the presumption of

23  innocence lasts only until you hear any evidence that would

24  change your mind basically?

25    A.   Right.

118

1    Q.   And another way of saying it is TDC, the Texas

2  Department of Corrections, prison, is full of people who

3  started with that presumption of innocence. It's not – it's

4  not like a mountain that the State can never get over --

5    A.   Okay.

6    Q.   -- is what I'm saying. Do you have any questions

7  about that?

8    A.   No.

9    Q.   Okay. It doesn't seem like you do. I just want to

10  cover that stuff.

11    A.   Yes, sir.

12    Q.   Mr. Guajardo, there are a couple of things I'd like

13  to talk to about on your questionnaire. The first one is I

14  just have to know this, are you a lefty? Are you left-handed?

15    A.   Yes.

16    Q.   My mom and my brother and my uncle and my grandfather

17  are all left-handed. I'm the one guy in my family whose not

18  left-handed, and I always really wanted to be, so I'm kind of

19  jealous of you. Anyway, on No. 8, I think that you had said

20  that the death penalty was okay when jurors were left with no

21  other choice. Let's see if that's exactly what you said.

22  Yeah. "When we as jurors are left with no other choice as the

23  law permits."

24          What -- could you explain that or just tell me

25  more or less what you meant?

119

1    A.   Well, basically, what I was getting to that was when

2  we were listening to the lawyers talk to us that afternoon --

3    Q.   Uh-huh.

4    A.   -- on that Monday when we showed up. And pretty much

5  kind of basically went through the law and-- because I didn't

6  -- I didn't know either that there was circumstances that, you

7  know, could get away from the death penalty. But it's all

8  based on the law, and, you know, that's basically what I was

9  basing it on. Do you follow me?

10    Q.   I think so. So basically, that if the law --

11    A.   I mean, because we're gonna have to go through --

12  through a jury and -- and we're gonna have to go through a

13  process by law, and if we're left with no other means then we

14  have to do what - what, you know, by the law.

15    Q.   Okay. Well, did you mean – let's see. You would

16  consider the death penalty when, I guess, after considering the

17  law, you felt like you had no other choice but the death

18  penalty?

19    A.   Right.

20    Q.   Okay. I think that's a fair thing to say. This is a

21  pretty serious thing that you're being asked to do.

22    A.   Right.

23    Q.   Right? And it's not something that you should enter

24  into lightly. I mean, obviously not. There's not a lot that's

25  more serious than a person's life, right?

120

1    A.   Right.

2    Q.   Do you think that if you did get selected to be on

3  this jury, and you found the defendant guilty, after you heard

4  the evidence, and then you went back to those questions and you

5  thought, yes, he's gonna do bad stuff in the future; no,

6  there's no reason why we shouldn't impose the death penalty; do

7  you think that you'd be able to do that?

8    A.   Yes.

9    Q.   Because, you know, we're not really talking about an

10  abstraction here, some theoretical possibility. We're talking

11  about a person. It's actually that guy sitting there.

12    A.   Right.

13    Q.   I mean, knowing it's a human being that's involved,

14  do you still think you could do that?

15    A.   Yes.

16    Q.   Okay. You, I think on some part of this we said,

17  "What are the best arguments for the death penalty and the best

18  arguments against it?" And not everybody answered this

19  question because they were just kind of going through and this

20  is a lot of stuff to answer.

21    A.   Yeah, it was.

22    Q.   Yeah. You didn't answer it. And I think we talked

23  about that a little bit, but what do you think would be a good

24  reason for it and another reason against it?

25    A.   Against the death penaty?

121

1    Q.   Uh-huh.

2    A.   I guess I would -- if an individual required a second

3    chance in life and wasn't given that opportunity.

4    Q.   Okay.  So a good argument against it would be second

5    chances?

6    A.   Right.

7    Q.   Okay.  But you'd have to think that a person deserved

8    a second chance?

9    A.   Yes.

10   Q.   And a good argument for it, like you said earlier,

11   would just be that it would take somebody out of society and it

12   punishes them for what they've done?

13   A.   Right.

14   Q.   Okay.  I know that you -- I know that you go to

15   church pretty often and you're Catholic?

16   A.   Right.

17   Q.   What is the Catholic church's position on the death

18   penalty, do you know?  I don't.

19   A.   To be honest with you, I don't.

20   Q.   Okay.  Is that a big deal to you?  If tomorrow the

21   Pope issued an edict and said, "Everybody who follows us, we

22   don't agree with the death penalty."  Would you have a problem

23   with that?

24   A.   No.

25   Q.   Okay.  How come?

122

1    A.   Well, I guess because I have it into my beliefs

2    already.

3    Q.   Okay.  I know -- I mean, you seem like the kind of

4    person that would make up your own mind?

5    A.   Right.

6    Q.   And that's what you're saying.  You said on one of

7    your questions that -- the question was whether or not you

8    thought that the police department was -- whether police as

9    witnesses would be more likely to tell the truth, less likely,

10   or it wouldn't make any difference.  They were just regular

11   people.  How do you feel about that?  Do you think a cop on the

12   stand would be more likely to lie or more likely to tell the

13   truth, or just the same as anybody else?

14   A.   I would think it would be the same.

15   Q.   Okay.  I think on the question that you actually

16   checked that they might be more likely not to tell the truth?

17   A.   Oh, I did?

18   Q.   Yeah, but I don't know.  You might have just checked

19   that off.  I don't know.

20   A.   Yeah, I don't remember, but that's how I feel now.

21   Q.   Okay.  Mr. Guajardo, if you give me just a second

22   I'll have one more question that I wanted to look at and I

23   think we're about done.

24   A.   Okay.

25   Q.   Tell me, I guess, in your own words, how you feel

123

1    about alcohol and drug abuse and stuff like that?

2    A.   Well, it's in our every day lives.  I've got two sons

3    myself and that's the biggest fear I had growing up or them

4    growing up.  And you try to lead them in the right direction,

5    the right road, but eventually, they're gonna have to make

6    their own choice as they get older.  But, you know, it's out

7    there for everybody to do.  You just have to make the right

8    choice.  And that's something that's not gonna go away.  You

9    just -- as individuals, as you get older, you make -- you start

10   making those choices, and if it's the right choice or wrong

11   choice, you're left with those choices.  You know, I've always

12   told my kids the same thing.  But it's -- it's not gonna go

13   anywhere.  It's everywhere.  I mean, you can police it for so

14   long and, you know, that's all we can do.

15   Q.   But you do think it is a problem?

16   A.   Oh, yeah.

17   Q.   Let me ask you this.  There's a pretty good chance

18   that you're gonna hear in this trial what the law is about

19   voluntary intoxication, and I'll just tell you quickly what it

20   is.  The law says that if I go home tonight and I get really

21   drunk, and then I go drive my car into somebody's house, that

22   that's my fault.  And if I go home tonight and I get really

23   drunk or stoned or something and I decide that I'm going to go

24   to my next door neighbor's house and just beat them up, it's my

25   fault.  I can't do that.  And when the cops get there the next

124

1    day and say, "Hey, man, why did you do that?"  I can't say,

2    "Hey, I was drunk.  You need to let me go now."  And they say,

3    "Oh, you were drunk?  Why didn't you say so, okay."

4         Okay.  All right.  In other words, voluntary

5    intoxication, getting intoxicated on your own like when you

6    mean to do it --

7    A.   Right.

8    Q.   -- is never a defense to prosecution, never a defense

9    to committing a crime.  Do you agree with that?

10   A.   Right.

11   Q.   Why do you think that?  Why do you think that makes

12   sense?

13   A.   Well, because you're in a different state of mind.  I

14   mean, when you're -- I mean, a sober person is not gonna think

15   of things like that to do than someone's that's intoxicated or

16   --

17   Q.   Right.

18   A.   I mean, their state of mind is different.

19   Q.   Right.  But I'm saying, the person can't get drunk

20   and say, "Hey, don't get mad at me, I was just drunk."

21   A.   Oh, no.

22   Q.   I mean, you can't say that?

23   A.   No.

24   Q.   It's not a defense to committing the crime?

25   A.   Right.

125

1    Q.   Do you think that makes sense?

2    A.   Yes.

3    Q.   Okay.  Why do you think that make sense?

4    A.   Well, because you're -- you're -- we're not allowed

5    to do that in real life society.  I mean, it's not -- to me

6    it's not the right thing to do.  I mean, it ain't fair.

7    Q.   Okay.  I think I agree with you.

8         Now, the law says, though, it's not a defense to

9    committing a crime.  It can, however -- it can be a mitigation

10   factor.  It can be one of these things that you think about

11   that might make you think that a person should be less culpable

12   or less blameworthy.  In other words, yes, you can't say, "I'm

13   not guilty because I was drunk."  You can't say that.  But you

14   can say, "Well, don't get as mad at me because I was drunk.  I

15   mean, yes, I know I'm guilty but, you know, it's not quite as

16   bad because I'm drunk."

17   A.   I wasn't the same person drunk or sober.

18   Q.   Right.

19   Q.   Right.

20   Q.   Okay.  And that's something that you would be able to

21   consider as a possible mitigation or a possible lessening

22   factor?

23   A.   Yes.

24   Q.   All right.  That's fair.  I think that's all the

25   questions I have for you, Mr. Guajardo.  Do you have any

126

1    questions about anything I asked you about?

2    A.   No.

3    Q.   Thanks you for your time.  I'll let the defense

4    talk to you now.

5    A.   Okay.  Thank you.

6         THE COURT:  Mr. Garza.

7         MR. GARZA:  Thank you, Your Honor.

8              VOIR DIRE EXAMINATION

9    BY MR. GARZA:

10   Q.   Good morning, Mr. Guajardo.

11   A.   Good morning.

12   Q.   My name is Ed Garza as I had previously introduced

13   myself to you a few weeks ago.  This is Mr. Grant Jones, my

14   co-counsel in this case.

15   A.   How are you doing?

16   Q.   And we represent John Henry Ramirez over on this

17   side.

18   A.   Okay.

19   Q.   I just want to ask you a few quick questions about

20   certain feelings you might have.  It's important that we

21   understand and feel like that we are confident in feeling that

22   you understand the process that we takes place in a capital murder

23   case, okay?

24   A.   Okay.

25   Q.   And it's important that we understand that you come

127

1    in here with an open mind, with no bias, opinions, no

2    predisposed opinions or thoughts about this case.  Is it safe

3    to assume, sir, that since we've heard no evidence at all about

4    this case, that as our client sits there today, he is innocent?

5    A.   Yes.

6    Q.   Now, do you understand how the trial would proceed?

7    A.   Yes.  As far as how it's gonna get started?

8    Q.   Yes.

9    A.   Yeah.  The State will represent their case and then

10   the defense.

11   Q.   Right.  Okay.

12   A.   And then it's closing arguments and then we'd come

13   back with a verdict.

14   Q.   You come back with a verdict, right?

15   A.   Right.

16   Q.   Okay.  Now, if the State of Texas doesn't prove their

17   case to you beyond a reasonable doubt, then your duty is to

18   acquit our client and find him not guilty?

19   A.   Right.

20   Q.   Is that correct?

21   A.   Right.

22   Q.   Okay.  So if that happens, well, we all get to go

23   home.  It's all over, right?

24   A.   Right.

25   Q.   Okay.  But if the State should prove their case to

128

1    you beyond a reasonable doubt, then you're going to be asked to

2    participate in the second part of the trial which is to

3    determine what sentence or what punishment our client should

4    receive --

5    A.   Right.

6    Q.   -- okay?  Now, if you found him guilty of capital

7    murder, what are the two punishments that he could only

8    receive?

9    A.   Imprisonment and the lethal injection.

10   Q.   Okay.  Meaning a life sentence or a death penalty?

11   A.   Right.

12   Q.   Okay.  And the death penalty is inflicted by a lethal

13   injection?

14   A.   Right.

15   Q.   That's correct.  What kind of evidence would you need

16   to hear to be convinced with regard to Special Issue No. 1 that

17   our client or anyone accused of a capital murder would be a

18   future danger to society?

19   A.   I guess, based on the witnesses that would come in

20   here and speak on his behalf.  You know, I guess, background,

21   his background.

22   Q.   Okay.  Sure, sure.  Whether he's got a criminal

23   history or not?

24   A.   Right, that would lead us to believe otherwise.

25   Q.   Whether he's committed any other violent criminal

129

1    acts, things of that nature?

2    A.    Right.

3    Q.    Versus what if he has no record, what if this is the

4    only time he's ever made a big mistake, okay?  Now, the law

5    says, based on the circumstances of the case, you can still

6    decide that issue if you want to, okay?

7    A.    Okay.

8    Q.    But would it be safe to say that you can rely on the

9    fact that you will remain objective until you hear the evidence

10    before you make that decision?

11    A.    Sure.

12    Q.    Okay.  Now, if you-all decide Special Issue No. 1 as

13    true, okay, or that it is -- that you do believe that he is a

14    future dangerousness, then you'll go over here to this Special

15    Issue No. 2, okay?

16    A.    That's right.

17    Q.    And you'll be asked to take into consideration all

18    the evidence of the case, including the circumstances of the

19    events, the defendant's character and his background, and the

20    personal moral culpability of that defendant.  And after you

21    hear all of that, do you feel there is sufficient mitigating

22    circumstances that would warrant a sentence of life rather than

23    death?

24    A.    Yes.

25    Q.    Okay.  So if you answer that yes and you say, "Well,

130

1    now that I've heard that, I've also heard that maybe he didn't

2    have a very good childhood.  He didn't have two good dependable

3    parents, never learned any ethics, any rules; never was taught

4    any."  Do those things -- are those things the things that you

5    can give some consideration to or some effect as to whether or

6    not that might lessen his blameworthiness or his guilt?

7    A.    Yes.

8    Q.    Can you do that?

9    A.    Yes.

10    Q.    Why would you do that?

11    A.    Well, basically -- well, what I'm going by is the

12    process of the whole case.

13    Q.    Uh-huh.

14    A.    You know, we're gonna hear the case and then we're

15    gonna come back with a verdict.  And then, if he's found

16    guilty, then we're gonna go to these two questions over here.

17    And my personal feeling about it is I'm -- I'm gonna hear all

18    the evidence and then I'll base my -- we'll base our decision

19    on that.  So to answer that question, I would have to say until

20    it actually, you know, whoever comes and speaks on his behalf,

21    you know, I'd be able -- it's just based upon what I hear, what

22    -- you know, witnesses you-all might have.

23    Q.    Okay.

24    A.    Did I answer that question?

25    Q.    Sort of.  Well, when Mr. Schimmel asked you a

131

1    question about how you felt about the death penalty and I think

2    you answered something to the effect that, "Well, if the law

3    provides it, then I'm for it."

4    A.    We go through the -- you know, if we go through the

5    process as far as the law, and if that -- if it comes down to

6    that, then it is the law, and that's basically what I -- what I

7    meant by it.

8    Q.    Well, does it mean that that's the way that you would

9    vote on this matter or the way you would lean in this matter

10    automatically?

11    A.    No, no.  No.  I wouldn't -- I wouldn't do it that way

12    until I hear all the evidence.

13    Q.    Okay.  Because when you say that, sometimes it makes

14    me a little nervous.

15    A.    Even when you go through these -- I mean, we would

16    have to go through these two -- through this process too, you

17    know.

18    Q.    See, that is -- that is something that's written out

19    of the Supreme Court case, okay, that was decided and made

20    the lawyers who represent people in these death penalty cases

21    have to investigate the background of these folks in order for

22    us to present that sort of evidence to you for your

23    consideration.

24    A.    Right.

25    Q.    Okay?

132

1    A.    Right.

2    Q.    They felt that it was important that that sort of

3    evidence about a person in this kind of a case where he runs

4    the risk of having his life ordered to be taken from him be

5    presented to a jury, okay?

6    A.    Okay.

7    Q.    And so we are duty bound nowadays to have to look

8    into his background and things of that nature in order to set

9    those matters out for you in an acceptable evidentiary way for

10    you to consider.

11    A.    Sure.

12    Q.    Okay?  Now, you've been given the examples about the

13    differences of the degree of guilt.  See, the things that we're

14    talking about his character and background, the second stage of

15    the trial, if we've already found him guilty, those are not

16    defenses that we're trying to present to you, okay?

17    A.    Right.

18    Q.    Those are merely mitigating circumstances,

19    circumstances that would lessen his guilt, okay?

20    A.    Right.

21    Q.    Not completely absolve him of the guilt because

22    you've already found him guilty, okay?

23    A.    Right.

24    Q.    And what we need to know is that, once you've made

25    that decision, well, you know, the train is sort of rolling

133

1   down the track, don't you agree?
2       A.   Yes.
3       Q.   We're leading toward some serious, serious decision
4   making, okay?  And we need to know whether you're the type of
5   person that will sit on this jury and decide these issues
6   objectively, independently, and on your own.  Will you use your
7   own manner of trying to decide this case versus whatever the
8   other 11 people might be asking you to do?
9       A.   Yes.
10      Q.   Can you do it independently?
11      A.   Yes.
12      Q.   And will you do it independently?
13      A.   Yes.
14           MR. GARZA:  I don't think I have any other
15  questions.  Thank you.
16           THE COURT:  Do you have anything else?
17           MR. SCHIMMEL:  No questions.
18           THE COURT:  Why don't you wait in the jury
19  room, Mr. Guajardo, and we'll be right back with you.
20           VENIREPERSON NO. 102:  Okay.  Thank you.
21           (Venireperson exits courtroom.)
22           THE COURT:  All right.  What says the State?
23           MR. SKURKA:  Your Honor, we'll accept this
24  juror.
25           THE COURT:  What says defense?

134

1           MR. GARZA:  Can we confer just a moment?
2           THE COURT:  You may.
3           (Counsel conferring.)
4           THE COURT:  What says the defense?
5           MR. GARZA:  We'll accept him also, Judge.
6           THE COURT:  Let's bring him in.
7           (Venireperson enters courtroom.)
8           THE COURT:  All right.  Mr. Guajardo, you have
9   been selected to be an alternate on this jury.
10          ALTERNATE JUROR NO. 1:  Okay.
11          THE COURT:  What that means is that one of the
12  jurors that's already been selected from now until the time
13  that the verdict comes back becomes disabled, or for whatever
14  reason we can't use them, you're first up, okay?
15          ALTERNATE JUROR NO. 1:  Okay.
16          THE COURT:  You're gonna have to treat it as
17  if you were one of the jurors, all right?
18          Now, I don't want you -- from here on out, I
19  don't want you to read the local paper, I don't want you to
20  watch the local news because, you know, we want you to get
21  your information from what comes in through evidence in the
22  courtroom, okay?
23          ALTERNATE JUROR NO. 1:  Okay.
24          THE COURT:  If someone tries to talk to about
25  the case, say, "No, no, no.  If you like, I will talk to you

135

1   about the case afterwards, but until a verdict comes back, I
2   will not speak with anybody about the facts of this case."
3   Okay?
4           ALTERNATE JUROR NO. 1:  Okay.
5           THE COURT:  We'll be keeping in touch.  We
6   believe the trial will we begin December 1st.  We will give
7   you a call back either way and give you instructions on when
8   to come back, okay?
9           ALTERNATE JUROR NO. 1:  Okay.  Thank you.
10          THE COURT:  Thank you, Mr. Guajardo.
11          MR. SKURKA:  Thank you, sir.
12          MR. GARZA:  Thank you.
13          THE COURT:  Okay.  Gentlemen, we need to put
14  something on the record.  Apparently, Juror No. 104 has got
15  some kind of a problem.  She won't tell Frank what the problem
16  is.
17          MR. SKURKA:  Do you want me to tell you what
18  it is?
19          THE COURT:  What is it?
20          MR. SKURKA:  She says that she has got medical
21  problems, that she has hot flashes, and what was the other
22  one?
23          MR. GARZA:  Is this the one that's menopausal?
24          MR. SKURKA:  That's why I put menopausal, I
25  think.

136

1           THE COURT:  Okay.  She said -- apparently,
2   Juror No. --
3           MR. SKURKA:  She's menopausal, she has hot
4   flashes, cries a lot, and is on medication.
5           THE COURT:  So what do you-all want to do?
6           MR. JONES:  Excuse her.
7           THE COURT:  You want to excuse her?
8           MR. SKURKA:  That's okay with me.
9           THE COURT:  Because she's apparently already
10  expressing her concern.
11          MR. JONES:  She'll melt down.
12          MR. SKURKA:  For the record, the State will
13  agree to excuse Juror No. 104 because of those medical
14  problems.
15          MR. GARZA:  We concur, Your Honor.
16          THE COURT:  All right.  Then 104 is excused by
17  agreement.
18          Frank, why don't you go tell her she's free to
19  go.
20          THE BAILIFF:  You want Robert in here now?
21          THE COURT:  Yeah, Robert DeLeon, bring him in.
22          MR. JONES:  Is that --
23          THE COURT:  That's 103.
24          MR. JONES:  103.  Is that our next one?
25          THE COURT:  Yeah, that's our next one.

137

1    MR. JONES:  Judge, I'm going to take a brief
2    --
3    THE COURT:  Okay.  You-all want to take --
4    MR. GARZA:  Can we just take --
5    THE COURT:  We'll take a little break.
6    (Recess.)
7    THE COURT:  All right.  Let's do this, Frank.
8    We're gonna talk to Robert DeLeon.  Have the other -- I guess
9    it's really just the other juror, Cynthia Bueno come back at
10   1:30.
11   All right.  Let's bring in Robert DeLeon.
12   (Venireperson enters courtroom.)
13
14   VENIREPERSON NO. 103,
15   ROBERT DELEON,
16   VOIR DIRE EXAMINATION
17   BY THE COURT:
18   Q.    All right.  Come forward.  All right.  You are Robert
19   DeLeon; is that right?
20   A.    Yes, sir.
21   Q.    Have a seat.  Sorry to keep you waiting.
22   A.    Not a problem.
23   Q.    We're going as quickly as we can but this is a
24   serious case.
25   A.    I understand.

138

1    Q.    We're having to take and give it the necessary time
2    and effort that it needs, okay?
3    All right.  You are Robert DeLeon.  Let's see
4    here.  We are looking for people that can keep an open mind and
5    can follow the law, okay?
6    A.    Yes, sir.
7    Q.    I see you have not heard anything about the case.
8    Can you keep an open mind?
9    A.    Yes, sir.
10   Q.    Okay.  Next thing, we need to have people that can
11   follow the law so we're gonna talk to you about that next.
12   You've never been on a criminal jury before or any jury, that's
13   fine.  No experience necessary.  Okay.  Let's talk about some
14   stuff.  First of all, this is a criminal case.  In every
15   criminal case the law says, "State of Texas, you brought the
16   charges, you've got to prove them."  Okay.  Do you agree with
17   that?
18   A.    Yes, sir.
19   Q.    All right.  And the law also says until those charges
20   are proved beyond a reasonable doubt, if at all -- of course,
21   they may not be able to, and we'll talk about the burden in a
22   second -- the defendant is innocent until proven guilty.  Okay.
23   Do you agree with that?
24   A.    Yes, sir.
25   Q.    And what that means is this:  Is that if you had to

139

1    vote right now, you'd have to vote not guilty, right?
2    A.    Yes, sir.
3    Q.    Because you haven't heard anything.  No one has
4    proven anything to you.  They haven't presented anything to
5    you, right?
6    A.    Uh-huh.
7    Q.    Okay.  And, of course, that's all of our rights.
8    That's a right we all have.  The government doesn't just get to
9    say, "Hey, you're guilty and we have to prove our way out of
10   it."  Huh-uh.  You got to prove to the people of this country
11   when someone -- you say someone's guilty, you've got the goods
12   on them, fine, show me, okay?
13   Now, the burden of proof is called beyond a
14   reasonable doubt, and I think the best way to illustrate what
15   it is is to illustrate what it's not.  The burden of proof
16   let's say in a civil case, right, let's say a company sues
17   another one, that's preponderance of the evidence.  The
18   plaintiff, which is sort of like the State in this case, in
19   that case, the one bringing the lawsuit would have the burden
20   of proof like the State does in this case.  But, the burden it
21   would be much lower.  Okay.  The burden in that case is
22   preponderance of the evidence.  It's sort of like tipping the
23   scales of justice ever so slightly, 51 percent, if you will.
24   There's a higher burden called clear and
25   convincing evidence, and that sounds pretty strong, right,

140

1    clear and convincing?
2    A.    Uh-huh.
3    Q.    We've got preponderance and we have clear and
4    convincing, a higher burden.  The scales get tipped, and to
5    get tipped further.  That's the kind of -- that's the kind of
6    burden we have in some civil cases, most notably, in cases
7    where the State is trying to terminate a person's rights as a
8    parent and they have to prove by clear and convincing evidence.
9    This burden beyond a reasonable doubt is higher than that.  So
10   we have 51, clear and convincing, whatever that is, and then
11   reasonable doubt, okay?  Typically.  Now, what it is not, it is
12   not beyond all doubt because if it was beyond all doubt, the
13   only way it could be is if you saw it for yourself, right?
14   A.    Uh-huh.
15   Q.    And if you saw it for yourself, these guys would be
16   calling you as a witness.  You'd actually be disqualified from
17   being a juror, okay?
18   A.    Uh-huh.
19   Q.    All right.  So that's that.  You think you kind of
20   get an idea of what reasonable doubt is?
21   A.    Yes, sir.
22   Q.    Okay.  I mean, the key word in that is reasonable,
23   beyond a reasonable doubt.
24   Okay.  Next thing, the law says the State always
25   has the burden of proof.  It never shifts over here to the

141

1  defense side. And what that means is, is that the defense
2  doesn't have to prove anything. In fact, they can -- they
3  could sit on their hands this whole trial and do nothing, and
4  if these guys don't prove their case beyond a reasonable doubt,
5  you have to vote not guilty. Do you follow me?
6      A.   Yes, sir.
7      Q.   As part of that, the defendant doesn't have to
8  testify. The law says in the Constitution of the United States
9  says that the defendant doesn't have to testify. And it's even
10 stronger than that. Not only can he not be made to testify,
11 but the jury can't hold it against him. In other words, the
12 State can't put on their case and you say, "Okay, look, I
13 already considered the State's case. The defendant didn't put
14 on anything. Well, if they didn't put on anything, I'm gonna
15 put points over here for the State because they didn't tell me
16 their side." This isn't about -- and some people say, "Well, I
17 want to hear both sides." This isn't about -- this isn't a
18 race between the State and the defense. The only race that's
19 going on here is to see if the State can cross that finish line
20 beyond a reasonable doubt. That's the only thing here, okay?
21     A.   Uh-huh.
22     Q.   Now, could you follow that law and not hold it
23 against the defendant if he chose not to testify?
24     A.   Yes, sir.
25     Q.   Okay. Let's talk about the allegation here, what

142

1  kind of case this is specifically. Because all that stuff
2  we've talked about before, that's true in every criminal case.
3  Let's talk specifics now. Capital murder, that's the charge.
4  What is that? Well, it says murder, so it's got to involve
5  murder, right? Okay. What's murder? Murder is the
6  intentional taking of the life of another, killing somebody
7  intentionally, okay?
8          And capital, what does that signify? Well,
9  capital signifies that the death penalty is a possibility here.
10 And the legislature has given us a laundry list of special
11 circumstances, all of them involving murder, in which the death
12 penalty is a possibility. Murder plus, okay? In this case,
13 the allegation is murder plus robbery, okay? The legislature
14 says, "If you have these two serious felonies, murder plus
15 robbery, and you mix them, capital murder is the charge."
16         Okay. What's a robbery? Well, if I came up
17 with a gun and held it to you and I said, "Hey, Mr. DeLeon,
18 give me your wallet." If you gave me your wallet, I would
19 have committed a robbery. Why? Because I took from -- I
20 stole from you with the use of either force or threats of
21 force, okay? What if I picked your pocket and you never knew?
22 Not a robbery, okay? A theft, theft from a person, a crime,
23 but not a robbery, okay?
24         What if I held a gun to you and said, "Give me
25 your wallet," and you were a karate expert and you round

143

1  housed me and knocked me out? Okay. Not a robbery but an
2  attempted robbery, okay? The law says this. The law says,
3  "It can still be a capital murder if someone attempts to rob
4  somebody, and in the process, kills them, okay? Do you follow
5  me?
6      A.   Yes, sir.
7      Q.   Okay. So what the State has alleged and what they
8  have to prove is that this defendant on the given day alleged
9  in the indictment, in Nueces County, Texas, did commit a murder
10 while in the course of robbing or attempting to rob the victim.
11 It's a lot of stuff they've got to prove, okay? There's a lot
12 of elements. The law says State has to prove all the elements,
13 okay? Would you -- would you require them, as the law says, to
14 prove all their elements?
15     A.   Yes, sir.
16     Q.   Now, capital murder, if someone's found -- let me
17 back up. We have a bifurcated system in Texas. That is a --
18 that's lawyer talk for two parts. The trial has two parts,
19 okay? The first part, guilt or innocence phase. Can the State
20 prove beyond a reasonable doubt that the defendant's guilty,
21 okay? And if the jury says, not guilty, the case ends right
22 there, okay? If, however, the defendant's found guilty, we go
23 on to the second phase. What's that called? It's called the
24 punishment phase. Now, there's two things that can happen if
25 you're found guilty in Texas of capital murder and there's only

144

1  two things, life imprisonment or the death penalty, okay? Do
2  you follow me?
3      A.   Yes, sir.
4      Q.   Okay. But you don't go back and deliberate and say,
5  "All right, everybody, what do you think? Let's take a vote,
6  life? Or how about let's take a vote, death." We don't do
7  that. Okay. You answer questions. The jury will answer
8  questions. And here's the first one. "Is there a probability
9  that the defendant would commit criminal acts of violence that
10 would constitute a continuing threat to society?" What does
11 that mean? Well, is it probably true that the defendant is
12 going to be violent in the future with people, okay? You
13 answer that yes or no.
14         The second question, Special Issue 2, over
15 your right shoulder. "After taking into consideration all of
16 the evidence, including the circumstances of the offense" --
17 what's that mean? Well, that's the first part of the trial.
18 You've already heard that, okay? The guilt or innocence
19 phase. "-- the defendant's character and background." Okay.
20 Character. Were you ever a Boy Scout?
21     A.   No.
22     Q.   Okay. Well, you know, the Boy Scouts they have that
23 creed where they talk about honesty and trustworthy. Do you
24 know what I'm talking about?
25     A.   Yes, sir.

145

1    Q.   Okay.  Those are aspects of character, okay?  Are you
2    honest, are you a good person, are you loyal, all of those
3    things?  Are you a scoundrel, are you a thief, are you a liar?
4    Okay.  That's his character.
5              The second part, background.  What does that
6    mean?  Well, his childhood, okay, his work history, his
7    military history, you know.  What is his family history like?
8    Did his father beat him up every day?  Was he sexually
9    molested.  Did he have a great upbringing?  Did he have two
10   parents that were always supportive?  That's background, okay?
11   "-- and the personal moral culpability of the defendant."  More
12   lawyer talk, okay?  But what does it mean?  Personal.  Personal
13   means yourself, right?  Moral, that's your ethics, okay?
14   Culpability.  That's your blameworthiness, okay, right?
15   A.   Yes, sir.
16   Q.   You know, culpability.  What is that?  Well, I have
17   an example and I'm gonna illustrate it for you, okay, what
18   they're talking about there.  Two burglars.  One burglar breaks
19   into a house and just rips the place to shreds, steals
20   everything of value, TVs, VCRs, all the electronics.  They have
21   a computer.  The lady's got jewelry.  He just takes everything.
22   Goes out, sells it, spends the money on hookers and cocaine,
23   okay?
24             The second guy, a hardworking guy, 20 years
25   worked at the same job, hardworking guy, a person of good

146

1    character, if you will, okay?  He takes care of his family,
2    he's a single dad, he's got three kids.  It's tough, but he
3    keeps the lights on and food on the table, okay?  But the
4    economy's bad and the company -- because the company's not
5    doing well he loses his job.  It's not his fault but sometimes
6    things happen, right?
7    A.   Yes, sir.
8    Q.   And they run out of money real fast.  So the kids
9    don't have enough to eat and he goes into a house -- doesn't
10   break in -- he opens the door, and it's unlocked, and he takes
11   food and he goes back and he feeds the kids.  And he's hungry,
12   I'll get out, but he doesn't eat himself because he wants the
13   kids to eat.  Their personal moral culpabilities are different
14   those two people, wouldn't you say?
15   A.   Yes, sir.
16   Q.   That's what that's talking about, okay?  "Is there
17   sufficient mitigating circumstance or circumstances to warrant
18   a sentence of life rather than death sentence be imposed?"
19   Okay.  What does that mean?  Mitigating circumstances,
20   mitigating means to lessen, lessening circumstances.  Well,
21   what does that mean?  Well, I like to use the example, let's
22   say you find out the defendant's a war hero, he went to Iraq
23   and he saved a bunch of soldiers one day at the risk of his own
24   life, and he got a medal for it.  You might think that is a
25   mitigating circumstance.  Does it excuse his behavior?  No.

147

1    He's been found guilty and he's either gonna get the death
2    sentence or life imprisonment.  It doesn't excuse what he did,
3    but is it a mitigating circumstance?  Maybe, okay?  Maybe -- I
4    don't know -- maybe he teaches little kids to read that
5    otherwise would never get the opportunity.  Maybe he's an Eagle
6    Scout, maybe -- maybe he's just, you know, an all around good
7    guy, okay?  All of those things might be mitigating
8    circumstances.  Maybe you look at his background and maybe he
9    was abused as a child.  You might think that's a mitigating
10   circumstance, okay?  What is a mitigating circumstance is only
11   what the jurors believe, okay?  It's up to you to think --
12   because see, one juror could say, "Hey, the fact that he was
13   abused as a child is a mitigating circumstance to me."  The
14   next juror can say, "Not to me, I don't think it's a mitigating
15   circumstance."  And these lawyers will try to tell you what is
16   a mitigating circumstance.  They'll suggest it to you, okay?
17   They might suggest to you what's an aggravating circumstance,
18   which, of course, is the opposite, bad things about the person.
19   Like maybe his criminal history's bad.  This isn't the first
20   time he's been in trouble.  Maybe he's a bad -- a person of bad
21   character, okay?  I guess really what this question asks you to
22   do is to weigh everything, just take everything in that is
23   presented to you at the trial and mix it all up, okay?  Take it
24   all in, all of it.  Because see, at the first part of the trial
25   all you're gonna hear about is the guilt or innocence part.

148

1    The second part -- I mean, I don't know, but I suspect you're
2    going to hear more about it.  I suspect you're gonna hear about
3    his background and stuff like that, okay?  And what this
4    question asks you to do is take it all in and say, "Are there
5    enough mitigating circumstances, sufficient mitigating
6    circumstances that warrant life rather than death?  Is there
7    enough good stuff here about him to say I should give him life
8    rather than death?"  Okay.  Because you might say, "Hey, you
9    know that war hero thing, it is a mitigating circumstance, but
10   it isn't sufficient to warrant life rather than death, okay?
11   Or maybe it is.  And that's the question that the jury would
12   have to answer.
13   A.   Yes, sir.
14   Q.   Okay.  Now -- and they'd answer yes or no, okay?
15            Okay.  At the beginning of every trial, I always
16   raise my right hand and the jurors do the same and I say, "Do
17   you solemnly swear that you will render a true verdict based
18   upon the law and the evidence presented to you?"  And they say,
19   "yes."  Now, I'm gonna ask you the same here -- actually, I'm
20   gonna ask you to take the oath if you're selected, but I need
21   to know that you can.  Some people can't because some people
22   tell me, "I cannot take the oath because I cannot participate
23   in a process that may lead to the death penalty."  Okay?
24   A.   Yes, sir.
25   Q.   Or they may say, "I'll give him a fair trial in the

149

1  first part, but if I find him guilty, see these two issues, I'm
2  not gonna follow your law. I'm not gonna consider them. I'm
3  gonna figure out a way to answer them so he gets the death
4  penalty and I'm gonna shut all that out. I will not consider
5  these things." Neither of those people can take the oath,
6  okay? I'm not criticizing them. It's okay for them to feel
7  that way but it is not okay for them to sit on this jury
8  because it's not fair to one side or the other, okay?
9      A.   Yes, sir.
10      Q.   So we want people that are gonna be fair. I need to
11  know from you, can you follow that law?
12      A.   Yes, sir.
13           THE COURT: All right. The lawyers are gonna
14  talk to you but I don't -- I don't think they're gonna have
15  enough chance to really get started. Why don't we do this.
16  Let's come back after lunch, 1:30, and we'll start with you
17  again.
18           VENIREPERSON NO. 103: Yes, sir.
19           THE COURT: So be back in the jury room at
20  1:30 and we'll finish you up.
21           (Noon recess.)
22           THE COURT: Are you ready to bring this guy
23  back, Robert DeLeon?
24           THE BAILIFF: He's here now, sir.
25           THE COURT: Let's bring him in. Come on in

150

1  and have a seat. Now the State's prosecutor is going to talk
2  to you and then the defense will talk to you.
3           MR. SKURKA: May I proceed, Judge?
4           THE COURT: Yes.
5           VOIR DIRE EXAMINATION
6  BY MR. SKURKA:
7      Q.   Hi, Mr. DeLeon. As the judge introduced me, my name
8  is Mark Skurka and this is Geordie Schimmel and together, we'll
9  be presenting this case to you if you're selected on this jury.
10  I want to start off by telling you there's no right or wrong
11  answers to anything you say. We just want to know where you're
12  coming from and how you feel about some of the issues in this
13  case. If I'm not explaining things very well, just stop me and
14  say, "I didn't understand that, go back over that." It's no
15  problem at all. We've been doing this for like a week and a
16  half so we've kind of got it down and we always forget that
17  you-all are brand new because this is first time you've heard
18  it. So I'm gonna go over some of the things the judge said
19  earlier before lunch and probably go over a few other things,
20  just kind of feel out how you feel about sitting on this kind
21  of case. Okay?
22      A.   Yes, sir.
23      Q.   The first question I have is one of the main issues
24  in this case is the death penalty. Tell me in your own words,
25  in general, how you feel about the death penalty.

151

1      A.   As far as the death penalty goes, I'm not saying I'm
2  biased on it. I can see some few situations that the death
3  penalty would be, I guess, adequate for as punishment, and in
4  some cases I would see, I guess, the life sentence would be
5  adequate or something minimal would be adequate. But it's a
6  bias situation. I can't say it's right for everything, but I
7  can see it as adequate for some situations.
8      Q.   Okay. And bias pretty much means you're leaning
9  toward a certain way, you're being for it. But I think what
10  you're really saying is you're not biased either way, right?
11      A.   Yeah, I can go either way.
12      Q.   Okay. And that's what we're trying to figure out,
13  because obviously, the judge is trying to qualify you to see if
14  you're on the jury, and if you're leaning one way or the other,
15  you probably wouldn't be a good juror on this kind of case.
16  It's like somebody who, you know, maybe they're picked for a
17  DWI case and their father was an alcoholic and they just hate
18  alcoholics, you know, and so it doesn't even matter if they
19  thought they were guilty or not, they're gonna vote against the
20  person just because their dad was an alcoholic, or they're
21  biased against people who drink. Do you see what I'm saying?
22      A.   Yes, sir.
23      Q.   And in this case, we can't have people who say, "I'm
24  always gonna give the death penalty." And we can't have people
25  that say, "I'm always gonna give a life sentence." You've got

152

1  to have people who can consider both of them equally. Are you
2  that kind of a person?
3      A.   Yes, sir.
4      Q.   Okay. Good. And that's what it looks like from your
5  deal. I just want to clear that up a little bit because some
6  people get mixed up about like, okay, am I this or that, you
7  know. It's just got to be even. It's got to be equal.
8           And have you always thought that way about the
9  death penalty? Have you ever given it much thought before you
10  had to come in --
11      A.   Actually, yes.
12      Q.   -- and answer that question? Tell me about that.
13      A.   Watching TV or a conversation amongst family members
14  that seeing something on TV where the death penalty's adequate
15  or they're for it or against it. I've always felt that way for
16  some situations I can see it, that that would be adequate
17  punishment, and then some others, you know, something minimal
18  or something different, depending on the, I guess, charges
19  brought against them or criminal act they may have performed.
20      Q.   Have you seen that lately? Like it seems like on TV
21  they've been having a lot about people getting executed lately,
22  and then you have certain people that you think, Well, gosh,
23  you know, they sound like really horrible crimes, right? And
24  they always say, "This guy did this how many years ago and this
25  guy did this." And the law pretty much does what you say

153

1   you're doing. It's not just for every case. Few cases even
2   qualify to be a death penalty case. You know, I think as the
3   judge said, "If you have just plain murder you just kill one
4   person and all things being equal, you can't even get the death
5   penalty." So I like to tell people the law kind of filters out
6   those lesser crimes and only makes it for the highest crimes.
7   In other words, if you had every murder case could get the
8   death penalty, well, that would be one thing. And a lot of
9   people think that. They come in here and they say, "Well, I
10   thought every murder case is eligible for the death penalty."
11   And we have to stop them and say, "No. The law says only those
12   certain murder plus something else cases are eligible for the
13   death penalty." So it sounds like you go along with the law
14   that it's not every murder case, it's only in certain cases?
15      A.   Yeah, certain situations I would see that it would be
16   adequate, and in some cases I would see a life imprisonment
17   without parole would be, in a sense, harsher punishment for the
18   crime they committed, and in some cases, the death penalty
19   would be in a sense -- I don't want to say, for lack of a
20   better term, an easy way out. They don't feel the punishment
21   for what they may have committed. You know, a life sentence,
22   every day they're gonna feel the punishment. They're gonna
23   remember what they performed and why they're there so.
24      Q.   And a lot of people have told us that. They think a
25   life sentence is more severe than the death penalty because

154

1   they wouldn't want to be sitting there forever thinking about
2   this crime. Now -- and truly, I don't know if people sit on
3   death row thinking about the crime, or they may just think
4   about, you know, being happy to have every second on earth
5   instead of being killed.
6          In our law though it's set up, that clearly, the
7   death penalty is harsher than a life sentence.
8      A.   Yes.
9      Q.   And I know each person may feel different because I'd
10   hate to be locked up, you know, for a long time too, just
11   thinking about that. But other people say, "Look, I'd rather
12   be locked up and be alive than being killed, than being
13   executed." And that's kind of what we're looking at. We want
14   to know if people can listen to the law, listen to the evidence
15   and make a decision. And I told you the very first day that
16   the State's gonna seek the death penalty. I mean, I don't like
17   to lie behind the law or sandbag you. I'm gonna come out and
18   tell you, we're here because we're gonna try to see that the
19   jury executes this person for what he did. And that's him over
20   there. We're not talking about somebody you see about on the
21   news or read it in the paper. That's him. Can you look at him
22   with me right now --
23      A.   Oh, yes, sir.
24      Q.   -- and tell me that you can send -- answer the
25   questions in such a way that he could be executed if you think

155

1   the law requires that --
2      A.   If --
3      Q.   -- and it calls for that?
4      A.   Yes, sir. If the law requires it and everything's, I
5   guess, headed that way, and as it was put forth to me,
6   everything's put without reasonable doubt, yes.
7      Q.   Okay. And do you see where I'm coming from?
8      A.   Yes, sir.
9      Q.   I don't want somebody that just says, "Well, you
10   know, I think the death penalty's good I think, it's a good
11   law, I'm glad Texas has the death penalty, but Mr. Skurka,
12   don't make me make that decision. I believe in it, but I can't
13   carry through with it. I can't follow through." And if you
14   feel that way, that's okay. I just need to know. Are you that
15   kind of person that can't carry through it?
16      A.   If it was a decision that was upon me that I needed
17   to make, yes.
18      Q.   Okay.
19      A.   For reasons being if I make a wrong decision,
20   somebody -- you know, whatever the case may have been -- of
21   course, in this case murder -- in a sense that later on, if I
22   don't feel that he's set for society and managed to somehow
23   parole out or something like that, he could have been sent for
24   the death sentence and committed another crime for somebody
25   else, and then that would be something I would have to be

156

1   weighed on.
2      Q.   Sure. Well, let's put it this way. It's a big
3   decision. It's an awesome responsibility that the jury has.
4   And some people can do it, some people can't. People -- very
5   nice people come up and say, "Well, you know, I believe in the
6   death penalty, and I think it's good, but, you know, looking at
7   him over there, I don't think I can make that decision. That's
8   too heavy a decision for me." Did you feel that way when you
9   first heard it was that kind of case?
10      A.   It weighed on my mind for a second, but as I just
11   weighed everything out and really thought about everything, I
12   feel as though, yeah, if it came to that, I could make that
13   decision.
14      Q.   Because you see what I'm saying is if you sit on this
15   jury, you have to be able to say I'm open-minded --
16      A.   Yes.
17      Q.   -- and I can go for the death penalty, if the
18   evidence points that way, but if the evidence points toward a
19   life sentence, I can go that way?
20      A.   Yes, sir.
21      Q.   Do you see what I'm saying? I just want to make sure
22   I have somebody in you, Mr. DeLeon, that will follow through
23   with it if they think that's what's necessary?
24      A.   Yes.
25      Q.   And the other way is true too.

157

1    A.   Yes.

2    Q.   Will you follow through with it if you think it

3    should be a life sentence?

4    A.   Yes, sir, following through our decision which

5    there's actually only two decisions I guess here, unless found

6    not guilty.  Then, yes, if the decision needed to be made, I

7    would be able and open-minded to do it.

8    Q.   I just want to know that.  I'm not trying to pin you

9    down.  It's just you know what I'm saying, some people say,

10   "Yeah, it's good, but just don't make me do it and everything."

11   And if they feel that way, that's fine.  I didn't think you

12   felt that way but I wanted to explore that with you.

13        So how did you feel when you heard it the first

14   time, remember that day we were all in that big courtroom

15   downstairs?

16   A.   Yes, sir.

17   Q.   Oh, my gosh, there was like two or 300 people in

18   there and you probably didn't know what kind of case it was

19   till the judge came down and said, "This is a criminal case and

20   that man right there could be facing the death penalty."

21        When you heard it was that kind of case, what

22   was your first reaction?

23   A.   It's a pretty big case and it's a -- basically, a

24   pretty big decision, and it's a life changing decision for

25   somebody, if not multiple people.

158

1    Q.   And after the initial kind of thing wore off, what

2    did you think?

3    A.   Pretty much the same thing still.

4    Q.   All right.  The reason I ask that, I don't know if

5    you notice your neighbors sitting around downstairs.  When the

6    judge told them that, I saw some people going like, "Oh, my

7    gosh, this kind of case."  They thought they were gonna get a

8    DWI or a shoplifting case, and then boom, they found out they

9    may have to make that ultimate decision.  And other people sat

10   there and said, "Oh, man, that's a serious case, I better pay

11   attention.  I better, you know, listen when the judge says

12   because I understand that's gonna be my civic duty to do it if

13   I need to."  Tell me how you fit in there?

14   A.   Basically, along the lines, a decision -- excuse me,

15   either which way is heavy, whether it's to find them not

16   guilty, sentence to a life sentence or death penalty.  It is a

17   heavy decision either way.  In a sense, I feel it's my civic

18   duty to be up there as an option, not to say that I have to be

19   there, or somebody's got to do it, if not, somebody else than

20   me.  If I'm chosen for whatever reason, I'm open-minded, strong

21   minded to do what I would feel would be the right decision.

22   Q.   So you feel it's your ultimate -- your civic duty to

23   follow -- to do and follow the law and be in this case no

24   matter what?

25   A.   Yes, sir.

159

1    Q.   Okay.  Because it sounds to me like you're the kind

2    of person that says, you know, I'd be fair in any case.  If I

3    had a burglary case --

4    A.   Yes, sir.

5    Q.   -- if I had a DWI case, if I had a shoplifting case.

6    This may be a little more serious, but it's still the same

7    duties.

8    A.   Yes.

9    Q.   I don't want to put words --

10   A.   No, but --

11   Q.   -- in your mouth but is that how you feel?

12   A.   A capital murder case, like I said, DWI, theft,

13   everything, especially through the judicial system, is

14   fairness.  Right or wrong, will it be proven at the end.

15   Q.   You hit the nail on the head about fairness.  I think

16   the judge asked you the first question, can you be fair, can

17   you be open-minded.  We want jurors who can do that because,

18   you know, it's a very powerful or awesome decision and you

19   don't really want one person to make that decision, right?  I

20   mean, the judge is a powerful judge but he can't sentence

21   somebody to death in Texas.  The district attorney, my boss,

22   Carlos Valdez, he may be a very powerful man, but he can't just

23   say who lives and who dies.  We, the people, put that power in

24   the people.  The jury makes that decision.  That way he's not

25   responsible, the DA's office not responsible but the jury is

160

1    the ultimate decider.  Do you think that's a fair way to

2    decide?

3    A.   Yes, sir.

4    Q.   The best system we got here, okay?  You know, there's

5    some people that make fun of the justice system, but show me

6    something better, you know.  We always complain about things

7    that our system may not be perfect, but it's still the best

8    system in the world if you ask me.  Do you kind of feel that

9    way too?

10   A.   Yes, sir.  I don't think there's anything that's

11   perfect.  There's things that may be close, but I don't think

12   anything's perfect.

13   Q.   And you probably want to have somebody that -- that

14   have that power to make decisions.  It's not something you

15   should be happy about or be, you know, oh, I'm lucky I'm being

16   on this jury, but it's one of those things too.  Okay.  It's a

17   decision through our justice system.  If I'm picked, I have to

18   serve.  I'm gonna do my best.  Is that kind of how you feel?

19   A.   Yes, sir.

20   Q.   Super.  Let's talk about the next thing, why this is

21   capital murder.  We heard it was murder plus robbery and you

22   know that because you can't just have plain murder.  It's got

23   to be in connection with another felony like robbery,

24   kidnapping, rape, burglary, or killing a special person, like a

25   child under six years old or something like that.  That's what

161

1  makes it capital murder. And so we have to prove both of those
2  things to you beyond a reasonable doubt. And by no means is it
3  automatic. Sometimes people come in here and they say, "Well,
4  I thought every murder case could be facing the death penalty,"
5  and we have to tell them no, not every murder case is a death
6  penalty case. And then they come in and say, "Well, if he's
7  found guilty of capital murder, it's automatically he gets the
8  death penalty, and I have to tell them, no, nothing's automatic
9  on here. What you do is you have a second part of the trial.
10  You might get to hear additional evidence about his background
11  and circumstances, and then you answer certain questions to
12  decide whether he gets death or life. In other words, if
13  you're like on a -- well, let's just say a burglary case. A
14  burglary case the range of punishment may be two years in
15  prison to 20 years in prison and the jury picks a number.
16  They'll say, okay, this one 13 years or seven years, or
17  whatever it is.
18        Why do you think there's a range that's so
19  different from two years to 20 years? Why aren't they all
20  exactly the same?
21     A.   As it was put forth earlier, the mitigating
22  circumstances. Some people's reactions later on in life are
23  based upon their childhood or every day lives, what they're
24  doing then and there may cause them to stress out, do wrong or
25  one way or the other. So I figure that's why there's a range.

162

1  He did make a mistake, he had these reasons why he probably did
2  it so it may not be as extensive as he needed the 20 years,
3  but, as you said, seven, 13 years up front to understand what
4  he did was wrong and he will be punished.
5     Q.   Okay. And what I'm gonna try to boil down what you
6  said is the reason those sentences can be different is because
7  every person is different and every case circumstances are
8  different.
9     A.   Yes, sir.
10     Q.   Have you ever seen in the paper sometimes where
11  you'll see in one court the guy got 20 years for burglary and
12  in the other court the guy got two years like probation for
13  murder?
14     A.   Yes, sir.
15     Q.   And my wife always asks me, "Well, how did that guy
16  get 20 years and that guy got probation if it's both burglars?"
17  And I always have to say, "Wait a minute. Maybe one guy had
18  been to prison before, you know, and he got a higher sentence.
19  Maybe one guy had never been to prison and so he got
20  probation." Maybe one person, like the judge said, trashed the
21  house, and one person he just stole food or something. It all
22  depends on what the facts and circumstances are.
23     A.   Yes, sir.
24     Q.   Okay. So the second part of the trial we agree that
25  it's not automatic. You go to the second part of the trial.

163

1  If you find him guilty and you answer two questions. And
2  they're on the board behind you and I want you to look at
3  Special Issue No. 1 for me. Now, that's presupposing that you
4  found him guilty and you've heard some other evidence maybe.
5  "Is there a probability that the defendant would commit
6  criminal acts of violence that would constitute a continuing
7  threat to society?" We call that the future dangerousness
8  question. In other words, do I think this guy is gonna be a
9  danger to our society in the future?
10        A couple of key words I want to point out to you
11  in there is the first one says, "Is there a probability." It
12  doesn't say certainty because unless you're a psychic or you
13  can read into the future, you can't tell for sure what a
14  person's gonna turn out to be. And the law doesn't require it.
15  It doesn't say is it certain that he's gonna do that. It just
16  says is it probable that he is.
17        The next part says, "would commit criminal acts
18  of violence." Sometimes people say, "Well, Mr. Skurka, I can't
19  vote for death only on this case unless I think he's gonna
20  murder somebody else, or gonna commit another capital murder."
21  And I tell them, "It doesn't say murder. It doesn't say would
22  commit murder in the future." It just says, "Would he commit
23  criminal acts of violence?" That could be, you know, hurting
24  somebody, robbing them, beating them up, assaulting them,
25  anything like that. And then the last part of the question

164

1  says, "would constitute a continuing threat to society."
2  Here's the kicker on that one. People know what a continuing
3  threat to society is, but sometimes they tell me, "Well, why do
4  we have to give him the death penalty? Why don't you just give
5  him a life sentence and that way he's locked up in prison and
6  he can't hurt anybody if he's locked up in prison?" And I
7  always say, "Wait a minute, who else is in prison besides that
8  person?"
9     A.   In some cases some people feel though that person
10  along with the family is --
11     Q.   Well, I'm talking about whose actually placed -- who
12  else is in the prison itself --
13     A.   Other --
14     Q.   -- besides the prisoner?
15     A.   Other criminals.
16     Q.   Right, other prisoners. Who else?
17     A.   Guards.
18     Q.   Right. Who else?
19     A.   The warden, helpers, trustees.
20     Q.   Exactly. People that work at the prison, maybe
21  they're maintenance people, or people that feed the prisoners
22  or something like that, or the warden or his staff, guards. Do
23  you see what I'm saying? Even though you're put in prison,
24  does that completely remove you away from society?
25     A.   No.

165

1  Q.  No.  And because there's other people.  It sounds
2  funny, but prison is actually, you're still in society if
3  you're in prison, right?
4  A.  True.
5  Q.  That sounds -- I mean, you've got limited rights but
6  you still interact with other human beings.  In fact,
7  sometimes, have you ever heard of prisoners hurting other
8  prisoners or guards while they're in prison?
9  A.  Yes, sir.
10  Q.  So would you agree with me that just putting somebody
11  in prison doesn't guarantee you can't hurt anybody again?
12  A.  True.
13  Q.  See, that's what I'm trying to get to it, because
14  some people say, "Well, you just lock him up and he won't hurt
15  anybody."  And I have to say, "Well, wait a minute, what about
16  this and that?"  Okay.  So the bottom line is that question is
17  answered yes or no.  Is there a chance he's gonna hurt somebody
18  in the future in our society, or no, there's no chance he's
19  gonna do that, okay?
20  A.  Yes, sir.
21  Q.  If you answer that question, yes, you go to the next
22  question.  The second question is the mitigating circumstances
23  question.  And the key word in there that the judge has pointed
24  out to you already is mitigating.  The word mitigating means
25  anything that would lessen or make less severe the punishment.

166

1  In fact, it means that he did the crime, but is there a reason
2  to lower the sentence and make it life rather than death?  Is
3  it enough of a circumstance to make death?  Mitigating is kind
4  of the opposite of aggravating circumstances.  You know, some
5  things maybe make the sentence go high, maybe some things make
6  the sentence go low.  All the judge is telling you to do is
7  open your mind and consider any of these other things.  Does it
8  mean if you hear mitigating circumstance you automatically
9  lower it?  No.
10  A.  No.
11  Q.  Because why?  You have to balance it out.  Say, for
12  example, they prove a guy his background was he was an orphan,
13  you know, he didn't have a mama and dad and so he grew up
14  without a parent -- without parents, or you know, he was on the
15  honor roll in high school; he made very good grades in high
16  school.  Or, you know, he was a war hero in Desert Storm.  He
17  won a metal for Desert Storm.  Some people may say, "Well,
18  those are mitigating circumstances.  Because he came from a
19  broken home or he was an orphan, maybe I'm gonna lower the
20  sentence.  Other people may say, "Look, I don't care if he was
21  a war hero in Desert Storm, he still did this crime and he's
22  got to pay for this crime."  You see what I'm saying?  It's
23  that balancing act.  It's like is there enough good stuff to
24  outweigh the bad stuff, you know, and you have to decide
25  whether that's enough, because guess what?  Only the jury can

167

1  decide.  This judge is not gonna tell you, "Okay, folks on the
2  jury, this is automatically a mitigating circumstance and you
3  automatically lower the sentence."  He leaves it up to you-all
4  to decide.  Because essentially what happens is you think he's
5  guilty of capital murder, you think he's a continuing threat to
6  society, before you issue the death penalty take into
7  consideration all of the evidence, including the circumstances
8  of the offense, the defendant's character, and his background.
9  Is it good character, bad character?  You know, what are the
10  circumstances of the offense?  How bad a crime was it?  And his
11  personal moral culpability.  Is there enough, is it sufficient
12  of a mitigating circumstance to warrant that a sentence of life
13  rather than death be imposed?  In other words, you got to do
14  that balancing test.  Yeah, I've heard some things that might
15  be mitigating circumstances, but are they enough of a
16  mitigating circumstance to outweigh what he did?  Do you see
17  what I'm saying?
18  A.  Yes, sir.
19  Q.  And it's kind of a fair question because you don't
20  want to rush into anything.  You want to look at everything.
21  And you may say, "Hey, you know, this guy did do good things
22  when he was a kid."  Maybe he was -- you know, volunteered at
23  the church or something like that, or maybe he did do that.
24  But is it enough to outweigh the bad he did in this case and
25  the other bad things he's done in his life?"  Do you see what

168

1  I'm saying?
2  A.  Yes, sir.
3  Q.  You have a child, right?
4  A.  Yes, sir.
5  Q.  Sometimes you have to balance things out.  You know,
6  he did something bad -- he or she did something bad but, you
7  know, overall, is he really a bad person or is he a good person
8  just because they did this?  No.  You have to look at
9  everything.
10  One other thing the judge may talk to you about
11  is called voluntary intoxication.  Voluntary intoxication, the
12  law says, is not a defense to crime.  In other words, if you go
13  get yourself drunk voluntarily or get yourself high
14  voluntarily, you can't go and say, "I'm not guilty of that
15  crime."  You can't get drunk, rob a bank, and then go to court
16  and say, "I'm not guilty, I was drunk that day."  You can't do
17  that.  That's not an excuse to crime.  The law does say it's a
18  possible mitigating circumstance, you know, you were drunk when
19  you did it.  Maybe somebody on the jury is going to say, "Well,
20  you know, he did rob that bank, but he was drunk so I'm gonna
21  go with a lower sentence."  Other people may say, "I don't care
22  if he was drunk or not, that's not enough to give him a lower
23  sentence.  He still robbed the bank."
24  A.  Yes, sir.
25  Q.  You see what I'm saying?  That's kind of an example

169

1   of a kind of possible mitigating circumstance, but of course,
2   it's up to the jury to decide what is really a mitigating
3   circumstance and how much weight you want to give that to the
4   person.
5           So do you think you can listen to mitigating
6   circumstances --
7       A.   Yes, sir.
8       Q.   -- and make a decision on that?  Okay.  A couple of
9   last things I want to talk to you about are some legal things.
10  The first thing is do you think you should make a decision
11  based upon what a person looks like or how old they?
12      A.   No.
13      Q.   Why?
14      A.   I don't think that has any weight on any decision
15  they have made.
16      Q.   That's exactly right.  What do you make your decision
17  based on?
18      A.   Yourself, your own thinking mind.
19      Q.   Well, if you're on the jury, what do you base it on?
20      A.   Oh, my decision would be based on the facts.
21      Q.   The facts and the evidence.  You know, sometimes
22  people come in here, and we've had ladies come in and say,
23  "Well, the first thing I saw was him, he looked so young.  It
24  doesn't look like he'd hurt a fly."  And I always say, "Wait a
25  minute.  Don't judge a book by the cover."  Wouldn't you want

170

1   to know what he did instead of how he looks like?
2       A.   Yes, sir.
3       Q.   Right?
4       A.   Yes, sir.
5       Q.   So you'd agree with me that those things, like how
6   they look, or how they look now, or how old they are, as long
7   as they're over 18 they should face the responsibility of the
8   consequences?
9       A.   Yes, sir.
10      Q.   I mean, in Texas, we don't try to execute
11  13-year-olds and 15-year-olds.  That's just not right.  You've
12  got to be over 18, which is fair too.
13          Another legal thing we talk about is the
14  indictment.  Just because he's charged with a crime, does that
15  mean he's guilty of the crime?
16      A.   No.
17      Q.   No.  Because the State has to prove the case.  As he
18  starts now, he's presumed innocent.  That doesn't mean he is
19  innocent.  It just means he's presumed at this time.  Why?
20  Because we haven't brought any evidence together.  In other
21  words, you can't be leaning one way that he may be guilty.  You
22  have to say, "He's innocent and the State has to prove the case
23  beyond a reasonable doubt."  Can you do that?
24      A.   Yes, sir.
25      Q.   And beyond a reasonable doubt is the standard in this

171

1   case and all it means is it's enough for you, but it doesn't
2   have to be beyond all doubt, beyond any doubt, beyond a shadow
3   of a doubt.  We always hear that on TV, right, "shadow of a
4   doubt."  Well, that's not what the standard is.  It just says
5   beyond a reasonable doubt.  Put it this way.  Say you have a
6   case, you're doing a bank robbery case, you're on the jury.
7   And the first juror comes up -- and I'm sorry, the first
8   witness comes up and says, "There's the guy that robbed me.  I
9   recognize his face, he stuck a gun in my face, and I had to
10  give him all the money.  That's him.  He was wearing a yellow
11  shirt that day."
12          The second person comes in, "Well, that's him,
13  I recognize him, that's the guy that robbed the other teller.
14  I saw him carrying a bag of money and a gun as he left the
15  teller stand.  I got a good look at him and that's him, and
16  yeah, he was wearing a yellow shirt that day."
17          Then the next person comes up, he's a bank
18  guard, who actually captured the guy like on the sidewalk
19  right outside the bank and he says, "Yup, there's the guy;
20  that's the guy who robbed the bank, I recognize his face, he
21  was carrying a bag of money and a gun in his hand, and that
22  day he was wearing an orange shirt."  Well, you've got a
23  little discrepancy, right?  Two people said yellow shirt, one
24  person said orange shirt.  But do I have to prove what kind of
25  shirt he's wearing?  Everybody says it's him.  You see what

172

1   I'm saying?
2       A.   Yes, sir.
3       Q.   There's no way I can prove it to you 100 percent
4   unless you were like a witness and saw the thing yourself,
5   okay?
6       A.   Yes, sir.
7       Q.   That's why the judge talked about beyond a reasonable
8   doubt.  I mean, you may have a doubt of whether he was wearing
9   a yellow shirt or orange shirt, but do you have a doubt of
10  whether it's the guy?  Probably not in that circumstance.  Do
11  you see what I'm saying?
12      A.   Yes, sir.
13      Q.   So beyond a reasonable doubt, even though it may be a
14  high burden, it doesn't mean it's an impossible burden.  That's
15  the kind of case we have on every case.  We have that in every
16  shoplifting case, burglary case, whatever.  It's nothing
17  special just because it's a capital murder case.  And it's
18  certainly not anything that's unobtainable, because obviously,
19  people are found guilty all the time beyond a reasonable doubt.
20          Let me think.  The Fifth Amendment.  Remember
21  the defendant doesn't have to testify if he doesn't want to and
22  you can't hold that against him?
23      A.   Yes, sir.
24      Q.   He may testify, he may not.  I have no idea.  That's
25  up to him and his lawyers.  But if he doesn't testify, I can

173

1    pretty much guarantee you this judge is gonna give you an
2    instruction that says, "You cannot hold that against him if he
3    doesn't testify." Will you follow that law?
4        A.   Yes, sir.
5        Q.   And remember, they don't have to put on any evidence.
6    They may put on witnesses, they may not put on witnesses. It
7    doesn't matter. You can't hold it against him. You can only
8    go with what the evidence you have is, okay?
9        A.   Yes, sir.
10       Q.   Is there any reason you couldn't be fair and
11   impartial in this case?
12       A.   No, sir.
13       Q.   Do you think you could listen to all the evidence and
14   make a decision based on this?
15       A.   Yes, sir.
16       Q.   Do you have any questions of me about anything we've
17   talked about?
18       A.   No, sir.
19           MR. SKURKA: Thank you for your attention,
20   Mr. DeLeon. I'll let the other attorneys talk to you now.
21           VENIREPERSON NO. 103: Thank you.
22           MR. GARZA: May I proceed, Your Honor?
23           THE COURT: Yes, sir.
24
25

174

1                VOIR DIRE EXAMINATION
2    BY MR. GARZA:
3        Q.   Mr. DeLeon, good afternoon, sir.
4        A.   Good afternoon.
5        Q.   My name is Ed Garza. I think you might remember that
6    I introduced myself back a few weeks ago when you-all were
7    downstairs. I don't really want to belabor too much of the
8    points that were made because I think you understand the
9    concepts of law that you need to understand to be a fair and
10   impartial juror in this case.
11           Do you understand that there's two phases for
12   this trial. They'll be the guilt/innocence phase where this
13   case has to be proven to you beyond a reasonable doubt?
14       A.   Yes, sir.
15       Q.   And if the Government or the State of Texas succeeds
16   in doing that, and you enter a verdict, then we'll proceed to
17   these two issues, at which time the law prescribes that one who
18   is found guilty of capital murder faces the only two possible
19   punishments. And I think you know what those are?
20       A.   Yes, sir.
21       Q.   What are they?
22       A.   Life imprisonment or the death penalty.
23       Q.   Okay. And you know how you arrive at that decision
24   based on how to answer these issues?
25       A.   Yes, sir.

175

1        Q.   Is that correct?
2        A.   Yes, sir.
3        Q.   Okay. When you were first told to look at this
4    questionnaire, there was a list of people whose names appeared
5    on there. Did you look over that list and read over all those
6    names?
7        A.   Yes, sir.
8        Q.   Did anyone there pop out that you might think you
9    know?
10       A.   No, sir.
11       Q.   At all?
12       A.   No, sir.
13       Q.   Okay. How long have you been working for the City of
14   Corpus Christi?
15       A.   Going on four years in February.
16       Q.   Okay. You were once arrested and convicted of DWI?
17       A.   Yes, sir.
18       Q.   Anything at all about that experience that would make
19   you -- left a bad taste in your mouth about the judicial system
20   or anything?
21       A.   No, sir. That was my mistake and I was fully aware
22   of it when I did it so.
23       Q.   Okay. In other words, you wouldn't -- you were
24   prosecuted probably by -- was that here in Corpus or --
25       A.   Yes, sir.

176

1        Q.   -- by the district attorney's office? Anything about
2    that experience that would make you biased against them or
3    anything like that?
4        A.   No, sir.
5        Q.   You've been with the City now for three years?
6        A.   Going on four years, yes, sir.
7        Q.   Going on four years, about four years. Okay. You
8    worked at Academy?
9        A.   Yes, sir, briefly.
10       Q.   Have you got any pull over there?
11       A.   I wish. I coach youth football. It gets expensive.
12       Q.   Do the give discounts on fishing gear or anything
13   like that? I want to get a job there when I retire and I want
14   to be the greeter and Mr. Jones wants to back me up over there.
15       A.   Cake walk job.
16           MR. SKURKA: I'd work there too if you'd get a
17   discount.
18           MR. GARZA: I don't think I have any other
19   questions of you, Mr. DeLeon. Thank you.
20           THE COURT: Anything else?
21           MR. SKURKA: I don't have any questions.
22           THE COURT: Mr. DeLeon, please wait in the
23   jury room and we'll be right with you, okay?
24           VENIREPERSON NO. 103: Yes, sir.
25           (Venireperson exits courtroom.)

177

1    THE COURT: All right. What says the State?

2    MR. SKURKA: We'll accept, Judge.

3    THE COURT: What says the defense?

4    MR. GARZA: We'll also accept.

5    THE COURT: We have our jury. Okay. Call him

6  back in.

7    (Venireperson enters courtroom.)

8    THE COURT: All right. Mr. DeLeon, you were

9  selected to be on this jury. Now, you are an alternate, but

10  that means that if one of the jurors becomes disabled or for

11  whatever reason can't serve, you are going to be the juror,

12  okay? But you're gonna come and listen to the whole case, all

13  right?

14    ALTERNATE JUROR NO. 2: Yes, sir.

15    THE COURT: This case is gonna take -- we're

16  not gonna start till December 1st. It will take at least that

17  week and maybe into the next week, so there's a reasonable

18  chance that you might actually be called to serve on this jury

19  to deliberate on this case. So I want you to follow some

20  instructions.

21    One, I don't want you to watch the local news

22  or read the local section of the paper until this case is over

23  with. If someone tries to talk to you about the facts of the

24  case say, "No, no, no, I can't talk to you. After the case is

25  over with, after we finished maybe, but not right now."

178

1    ALTERNATE JUROR NO. 2: Yes, sir.

2    THE COURT: Can you do that?

3    ALTERNATE JUROR NO. 2: Yes, sir.

4    THE COURT: Okay. We will be keeping in touch

5  with you. Like I said, I think it's gonna begin December 1st

6  so you might want to tell your employer about that. If that

7  changes, we'll call you, but either way we're gonna call you

8  and let you know for sure when to be here, okay?

9    ALTERNATE JUROR NO. 2: Yes, sir.

10    THE COURT: If you need a work excuse the

11  bailiff can help you with that.

12    ALTERNATE JUROR NO. 2: Okay. Thank you.

13    THE COURT: Thank you very much.

14    (Venireperson exits courtroom.)

15    THE COURT: Let me let -- let me go tell the

16  rest of the jurors that we've got a jury and we no longer need

17  their services. I guess let's call off the 3:00 people.

18    MR. SKURKA: Judge, before we go off the

19  record on this on this, I was hoping we could all make sure we

20  have our numbers straight and who is on the jury and who is

21  not, because we'll go through different court reporters, if

22  that's okay. It will only take a second.

23    THE COURT: Okay. Yeah, let me do this first.

24    (Recess.)

25    MR. SKURKA: Do you have your list?

179

1    THE COURT: I do.

2    MR. SKURKA: Maybe you can read it off and we

3  can make sure.

4    THE COURT: Yeah, let's go down the line I

5  guess.

6    MR. SKURKA: I just had one time I was picking

7  a jury with Judge Banales and we thought something was right

8  and the strikes were all messed up and jurors were leaving and

9  we were going, "Oh, my gosh."

10    THE COURT: Okay. Let me get it in order

11  here. All right. I have Juror No. 1 is Mary Ann Gilbert.

12    MR. SKURKA: And she's No. 17?

13    THE COURT: Yes.

14    MR. SKURKA: Correct?

15    THE COURT: Yes. Juror No. 2, Roberto

16  Castaneda. He's No. 22 on the list.

17    MR. SKURKA: Correct.

18    THE COURT: Juror No. 3, Jeremy Calbat, No.

19  23. Juror No. 4, Noe Benavidez, No. 34. Juror No. 5, Lonnie

20  Johnston, Juror No. 38.

21    MR. SKURKA: Correct.

22    THE COURT: Juror No. 6, Reid Baucom, No. 44.

23    MR. SKURKA: Okay.

24    THE COURT: Juror No. 7, Jeanne Bowman, Juror

25  63. Juror No. 8, Gloria Light, No. 65. Juror No. 9,

180

1  Christine Foutch, No. 84.

2    MR. SKURKA: Yes.

3    THE COURT: Juror No. 10, Dale Lyles, No. 90.

4  Juror No. 11, Lorraine Leal, No. 97. Juror No. 12, Ruth -- I

5  never remember how to say her name --

6    MR. SKURKA: Vermace.

7    THE COURT: -- Vermace, No. 100. Alternate

8  No. 1, Felix Guajardo, 102. And our last one was Alternate

9  No. 2, Robert DeLeon No. 103. So we're all on the same page?

10    MR. SKURKA: I think we've got it. Do you-all

11  agree with that?

12    MR. GARZA: Yes, sir.

13    MR. SKURKA: Thank you, Judge.

14    THE COURT: All right. We'll start on

15  December 1. If anything comes up, let me know.

16    MR. SKURKA: Judge, I think the only thing

17  I've talked to Mr. Garza about, he wanted to have a meeting

18  and look over the physical evidence, and I had some of it

19  brought over, but we haven't had a chance to do it because of

20  the jury selection. Now we've got a few days to do that. And

21  I think I've given you all the stuff you've wanted except I

22  need to check about that criminal history of some of the

23  witnesses. Did we give him that or not? I think we'd run

24  them. But if you have any other discovery things, Ed, and

25  make sure you want to look at them, you can come by the office

181

1   and look at it.

2              THE COURT:  And then the only other thing is I

3   still need to make a ruling on -- on the evading detention.

4              MR. SKURKA:  Did you get the case law I sent

5   up, Judge?

6              THE COURT:  I did, but I haven't read it.

7              MR. SKURKA:  Okay.

8              THE COURT:  Have you all submitted anything?

9              MR. GARZA:  No, Your Honor.

10             THE COURT:  If you want to you can.  I haven't

11  made a ruling on it.

12             MR. GARZA:  I haven't seen the case law.  I'd

13  like a copy of it.

14             MR. SKURKA:  I may have it downstairs.

15             THE COURT:  Why don't you provide him a copy

16  of it.

17             MR. SKURKA:  I think what we did was just kind

18  of that morning, you kind of held off, and so we -- I sent

19  some up that afternoon.  We never really --

20             THE COURT:  I have not -- I haven't read it, I

21  haven't considered it.  You-all want -- if you-all want to

22  submit something to me.  I mean, you don't even have to do it

23  in the form of the brief.  If you want to just submit it to me

24  in the form of case law, or if you want to do it in the form

25  of a brief, whatever you want to do.

182

1              MR. SKURKA:  Judge, what I intend to also do

2   is go ahead and start the secretary working on a proposed

3   charge, so I'd ask the defense if they have any special

4   instructions.  I will give you and them kind of a plain

5   vanilla charge, but just so we don't have to stop and hassle

6   over that.  At least we can start working on something like

7   that with the jury charge.

8              THE COURT:  Okay.

9              MR. GARZA:  Sure.

10             MR. JONES:  Sounds good to me.

11             THE COURT:  We'll see you-all soon.

12             MR. SKURKA:  Thank you, Judge.

13             (End of Voir Dire Proceedings.)

14

15

16

17

18

19

20

21

22

23

24

25

183

1   THE STATE OF TEXAS          *

2

3   COUNTY OF NUECES            *

4

5          I, Sara E. Rivera, Official Court Reporter,

6   in and for the 94th District Court of Nueces County, State of

7   Texas, do hereby certify that the above and foregoing contains

8   a true and correct transcription of all portions of

9   evidence and other proceedings requested in writing by

10  counsel for the parties to be included in this volume of the

11  Reporter's Record, in the above-styled and numbered cause,

12  all of which occurred in open court or in chambers and were

13  reported by me.

14         I further certify that this Reporter's Record of the

15  proceedings truly and correctly reflects the exhibits,

16  if any, admitted by the respective parties.

17         WITNESS MY OFFICIAL HAND, this the 25th day of

18  September A. D., 2009.

19

20

21  _____
    SARA E. RIVERA, Texas CSR 4626
22  Expiration date:  12/31/09
    Official Court Reporter
23  94th & 117th District Courts
    901 Leopard Street, Room 402
24  Corpus Christi, Texas 78401
    Telephone:  361-888-0751
25  Facsimile:  361-888-0209