1

```
 1                      REPORTER'S RECORD
              APPELLATE COURT CAUSE NO. AP-76,100
 2            TRIAL COURT CAUSE NO. 04-CR-3453-C
                   VOLUME 16 OF 25 VOLUMES
 3
    THE STATE OF TEXAS      )     IN THE DISTRICT COURT
 4                          )
                            )
 5  VS.                     )     94TH JUDICIAL DISTRICT
                            )
 6  JOHN HENRY RAMIREZ      )     NUECES COUNTY, TEXAS

 7

 8

 9

10

11                 _____

12                   TRIAL PROCEEDINGS

13                 _____

14

15

16

17

18         On the 1st day of December, 2008, the

19  following proceedings came on to be heard in the

20  above-entitled and numbered cause before the HONORABLE

21  BOBBY GALVAN, Judge Presiding, held in Corpus Christi,

22  Nueces County, Texas:

23              Proceedings reported by Stenograph

24  Machine.

25
```

FILED IN
COURT OF CRIMINAL APPEALS

OCT 06 2009

Louise Pearson, Clerk

2

```
 1   APPEARANCES:

 2   MR. MARK SKURKA
     SBOT NO. 18475570
 3   MR. VERNON G. SCHIMMEL
     SBOT NO. 24033039
 4   ASSISTANT DISTRICT ATTORNEYS
     901 Leopard, Rm. 205
 5   Corpus Christi, Texas 78401
     Phone: (361) 888-0410
 6
     ATTORNEYS FOR THE STATE
 7
     -AND-
 8
     MR. EDWARD F. GARZA
 9   SBOT NO. 07731200
     ATTORNEY AT LAW
10   719 S. Shoreline, Suite 201
     Corpus Christi, Texas  78401
11   Phone: (361) 888-8877

12   MR. JOHN GRANT JONES
     SBOT NO. 10917000
13   ATTORNEY AT LAW
     5826 Beauvals Drive
14   Corpus Christi, Texas  78404-6173
     Phone: (361) 884-8141
15
     ATTORNEYS FOR THE DEFENDANT,
16   JOHN HENRY RAMIREZ

17

18

19

20

21

22

23

24

25
```

3

```
 1                          INDEX
                   VOLUME 16 OF 25 VOLUMES
 2                   TRIAL PROCEEDINGS
     DECEMBER 1, 2008                              Page   Vol.
 3   Commencement of trial proceedings..................  6     16
     Announcements of ready.............................  6     16
 4   Jury sworn.........................................  6     16
     Court's instructions to jury.......................  6     16
 5   Reading of indictment.............................. 11     16
     Defendant's plea of not guilty..................... 12     16
 6
     Opening statements by State........................ 12     16
 7   Opening statements by Defense...................... 36     16

 8   Rule invoked....................................... 41     16

 9   STATE'S WITNESSES            Direct Cross V.Dire Vol.
     LYDIA SALINAS.......................... 42,81  69          16
10   MARIANO CERVANTES ..................... 86    125          16
                                           136    138
11                                               Page   Vol.
     Hearing, In Re:  SX-17 ........................... 111     16
12   Court's ruling ................................... 116     16

13   STATE'S WITNESSES (Cont'd)   Direct Cross V.Dire Vol.
     MICHAEL WENZEL ....................... 142    189          16
14                                               Page   Vol.
     Hearing, In Re:  Exhibits ........................ 167     16
15   Court's ruling ................................... 171     16
     Defendant's objection to exhibits ................ 174     16
16   Defendant's further objection to exhibit ......... 180     16

17   STATE'S WITNESSES (Cont'd)   Direct Cross V.Dire Vol.
     KASHIF ISHAN BUTT .................... 193    216          16
18                                          222    224
     APRIL METTING ....................... 225    250          16
19                                          255
     GREG KINANE ......................... 259                  16
20

21

22

23

24

25
```

4

<pre>
 1                          INDEX
                VOLUME 16 OF 25 VOLUMES
 2                 TRIAL PROCEEDINGS
                      (Continued)
 3   DECEMBER 1, 2008                         Page   Vol.
     Adjournment   .................................. 274   16
 4
     Court Reporter's Certificate ...................... 275   16
 5
                ALPHABETICAL WITNESS INDEX
 6                            Direct Cross V.Dire Vol.
     BUTT, KASHIF ISHAN .................. 193     216          16
 7                                         222     224
     CERVANTES, MARIANO ................... 86      125          16
 8   KINANE, GREG ........................ 259                   16
     METTING, APRIL ...................... 225     250          16
 9                                         255
     SALINAS, LYDIA...................... 42       69           16
10   WENZEL, MICHAEL ..................... 142     189          16

11
                     INDEX TO EXHIBITS
12   FOR THE STATE:
     NO.         DESCRIPTION            Offered Admitted  Vol.
13   SX-1        Photo (victim/girlfriend) . 47      47        16

14   SX-2        Aerial map ............... 48       48        16

15   SX-3        Aerial photo.............. 60       61        16

16   SX-4-7      Photos (crime scene)....... 60      61        16

17   SX-8-15     Aerial photos ............ 105     105        16

18   SX-17       Photo (victim) ........... 111     116        16

19   SX-18-19    Photos (Id. Markers)....... 172    173        16

20   SX-20-22    Photos (Id. Markers)....... 172    174        16

21   SX-23       Photo  (Id. Marker)........ 172    174        16

22   SX-24       Photo (victim) ........... 178     178        16

23   SX-25-30    Aerial photos (Whataburger) 239    239        16

24   SX-31       Photo (Whataburger) ....... 239    239        16

25   SX-32-35    Photos (menu board) ....... 239    239        16
</pre>

5

INDEX
VOLUME 16 OF 25 VOLUMES
TRIAL PROCEEDINGS
(Continued)
DECEMBER 1, 2008

EXHIBITS
(Continued)
FOR THE STATE:

| NO. | DESCRIPTION | Offered | Admitted | Vol. |
|---|---|---|---|---|
| SX-36-40 | Photos (A. Metting vehicle) | 239 | 239 | 16 |
| SX-41 | Google map ................ | 237 | 237 | 16 |
| SX-42 | Photo (wallet) ........... | 248 | 248 | 16 |
| SX-43 | Photo (Visa card) ........ | 248 | 248 | 16 |
| SX-44 | Google map ................ | 269 | 269 | 16 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

6

P R O C E E D I N G S

December 1, 2008

1          THE COURT:  All righty.  Be seated,
2  please.  Okay, I think we have all 13 jurors.  You-all
3  be seated.  All right, we ready to go, gentlemen?
4          MR. SKURKA:  Yes, Your Honor.
5          THE COURT:  Okay.
6          MR. GARZA:  Yes, Your Honor.
7          THE COURT:  All right.  What I'm going to
8  do, I'm going to bring them -- I'm going to bring them
9  in, swear them in and read them instructions again.
10 So let's go ahead and do that.
11          Is there anything else we need to take up
12 before we bring the jury in?
13          MR. GARZA:  No, Your Honor.
14          THE COURT:  Okay.  All right, let's go
15 ahead and bring them in, Frank.
16          (Jury enters courtroom.)
17          THE COURT:  All right, be seated, please.
18 All right, ladies and gentlemen, as we talked about on
19 voir dire, there comes that point where I swear you
20 in, so at this point raise your right hand.
21          (Oath administered.)
22          THE COURT:  All right.  Now, we've
23 already gone over these instructions with you but I'm

7

1  going to go over them one more time just in case cause
2  with some of you it's been some time.
3          All right, no communication with you is
4  permitted, okay, which means if someone tries to talk
5  to you about this case, you need to let the bailiff
6  know so that I can know.  The lawyers know this
7  instruction and will not talk to you.  They may say
8  hello in the hallway but if they try to avoid you they
9  are not being rude, they are instructed to do that,
10 but if -- they understand the rules.  Sometimes
11 witnesses and other people do not so please let me
12 know if anyone tries to contact you.
13          And, of course, I've told you-all this a
14 couple of times:  Don't discuss this with anyone.
15 There is a temptation for friends and family when they
16 find out that you're on a jury to want to talk to you
17 about the case but you can't talk to them.  And I've
18 told you this as well, don't watch the local news or
19 read the local section of the paper.  There is a good
20 chance that this is going to get media attention
21 probably beginning tonight so please don't do that.
22          No outside investigation is permitted.
23 Do not go to the alleged scene of the crime.  Do not
24 do any research on your own, that is, do not get on
25 the Internet, do not look at Encyclopedias, do not

8

1  look in law books or anything, anywhere else other
2  than coming to court and -- and just come to court and
3  listen.
4          Now, I want you to pay attention because
5  it's not going to be repeated.  Now, this lady is
6  taking down everything that is stated.  However, it is
7  in a code form and so at the end of trial it is not in
8  a readable form so please pay attention, we do not
9  have transcripts, or at least we won't for some time.
10          The trial is going to go something like
11 this:  In a minute the Charge is going to be read to
12 the Defendant.  I expect that he will at that point
13 enter a plea of not guilty and then the lawyers will
14 make opening statements to you.  The State gets to go
15 first because they have the burden of proof.  The
16 Defense Counsel then gets to go.  The Defense Counsel,
17 if they choose, can reserve their part of the opening
18 statement till their part of the case or they can make
19 it now.
20          Then we'll have testimony.  The State
21 will present its evidence.  The Defense Counsel, if
22 they have any evidence to present to you, if they
23 choose to do so will do so.  Of course, they have no
24 burden, as we talked about in voir dire, so they may
25 not present any evidence to you, or they may, okay?

9

1  They don't have any burden.  The burden is always with
2  the State.
3          After the evidence is closed you'll hear
4  closing arguments and I will read the Charge to you,
5  which is your instructions and you'll get to take that
6  Charge back with you to the jury room and then you'll
7  begin your deliberations.
8          Now, you must -- remember, opening
9  statements and closing statements are not evidence.
10 They are -- opening statements are sort of a road map
11 that the lawyers try to give you to try to show you
12 what they believe the evidence will show but it's not
13 evidence.  Closing statements is what the lawyers
14 believe that the evidence has shown.  Once again, it
15 is not evidence.  The only thing that's evidence is
16 the testimony that comes through this witness chair
17 and the pieces of the exhibits that are admitted at
18 trial, okay?
19          Now, there will very likely be objections
20 in this trial.  I do not want you to penalize one side
21 or the other for making these objections.  These
22 objections are based upon our Constitution, both State
23 and Federal.  They are based upon the Rules of
24 Evidence, they are based upon the laws that are given
25 to us by the legislature and -- so I don't want you to

10

1  hold it against one side or the other for making those
2  objections.
3          Sometimes an objection is made and it is
4  sustained by the Court, however the witness blurts out
5  information that they shouldn't because the objection
6  has been sustained but witnesses don't always know the
7  procedures, and I may instruct you to disregard that
8  testimony and I know it's hard to do but that's what
9  you have to do cause that's what the law requires.
10  Sometimes I may instruct you to consider evidence for
11  a limited purpose and you must only consider that
12  evidence for that limited purpose.
13          I'm the judge of the law, you are the
14  judge of the facts, that is, you are to determine the
15  credibility of the witnesses.  You can believe all of
16  what a witness says, none of what a witness says,
17  somewhere in between.  Similarly, you are to judge the
18  pieces of evidence that are admitted in the same way.
19  You can give a piece of evidence as much weight as you
20  feel is appropriate.  That is your role in this case.
21          Now, you are not to begin your
22  deliberations until the trial is over with and you all
23  go back into the jury room to begin your
24  deliberations.  We once had a jury that felt like on
25  every break since they were all together in the jury

11

1  room they could deliberate; that is improper.  And so
2  what they were doing was they were deliberating on
3  every break.  That's not -- that's not proper, okay,
4  and please don't do that because it caused a mistrial
5  in that case and we don't want that in this case,
6  okay?  So do not do that.
7          And with that, I think you're now pretty
8  familiar with the instructions.  With that, the
9  Prosecutor will read the charge to the Defendant.
10          Defendant please rise.
11          (Defendant complying.)
12          MR. SKURKA:  "Cause No. 04-CR-3453-C,
13  The State of Texas versus John Henry Ramirez, Jr., the
14  charge:  Capital murder.  In the name and by authority
15  of the State of Texas, the duly organized grand jury
16  of Nueces County, Texas, presents in the District
17  Court of Nueces County, Texas, that John Henry
18  Ramirez, Jr., Defendant, on or about July 19th, 2004,
19  in Nueces County, Texas, did then and there
20  intentionally cause the death of an individual, Pablo
21  Castro, by stabbing Pablo Castro with a knife, while
22  in the course of committing or attempting to commit
23  the offense of robbery of Pablo Castro."
24          It's signed by the foreman of the grand
25  jury -- I'm sorry, "against the peace and dignity of

12

1  the State."  It's signed by the foreman of the grand
2  jury.
3          THE COURT:  To that charge, Mr. Ramirez,
4  how do you plead?
5          THE DEFENDANT:  Not guilty.
6          THE COURT:  All right, you may be seated.
7  The State may make its opening statement at this time.
8          MR. SKURKA:  Thank you, Your Honor.
9          July 19th, 2004, started off as an
10  ordinary day for Pablo Castro.  Pablo Castro worked at
11  a Times Market convenient store, an ordinary job.  He
12  had the support and friendship of his co-workers.  He
13  did ordinary tasks at this job but after 11:00 on July
14  14th -- July 19th, 2004, things did not go ordinary
15  anymore.  That's when he came in contact with this
16  Defendant, John Henry Ramirez.
17          The case starts out as an ordinary day
18  but it ends up with extraordinary facts and
19  circumstances that you will hear as part of this jury.
20  Our story begins with Pablo Castro on that day going
21  to work at his usual time, 4 or 5:00 in the afternoon,
22  doing his ordinary tasks, stocking the shelves at the
23  Times Market at 1902 Baldwin Street, stocking the
24  shelves and cleaning up while his -- his co-worker,
25  Lydia Salinas, manned the register.

13

1          It was a busy day that day.  Lydia
2  Salinas will testify that it was pretty strong, steady
3  customers most of the day until about 10:00 or 11:00
4  things finally kind of slowed down and they were able
5  to get something to eat.  After they ate something,
6  had something brought to them, Pablo Castro had
7  mentioned that he didn't have much money so they had
8  to get Wienerschnitzel coupons to go get hot dogs;
9  very ordinary meal.
10          Pablo Castro around 11:15 or so was
11  finishing up work and taking trash out to the
12  dumpster.  At this Times Market you have the pumps,
13  the store and kind of in the back corner of the
14  parking lot is an ordinary dumpster that Pablo Castro
15  would take the trash out at the end of the day, every
16  ordinary day.
17          This day was a little different.  Pablo
18  Castro, the evidence will show, went to take out the
19  trash at the dumpster and upon coming back into the
20  store was accosted by this man, John Henry Ramirez,
21  and someone else named Angela Rodriguez.
22          You will hear testimony that Pablo Castro
23  attacked by John Henry Ramirez with a knife, stabbed
24  29 times, including times in the neck and 4 times in
25  the chest.  These wounds were fatal to Pablo Castro.

14

1    The man who started off on a ordinary day got an
2    extraordinary death.
3         The reason we know what happened is
4    because you'll hear these witnesses.  You'll hear
5    Lydia Salinas, the co-worker, talk about how he went
6    to work that day and how he was taking out the trash
7    and when she got a call -- I'm sorry, a person came
8    in, a little girl came in and said, "Ma'am, there's
9    somebody bleeding out in the parking lot."
10        Lydia Salinas will testify that she went
11   out there and didn't even realize it was Pablo at
12   first.  She thought he was still stocking stuff in the
13   back of the store.  She went and called 911, went back
14   outside and realized "That's Pablo, that's his hat,
15   those are his shoes," and she went to see her
16   co-worker to see if she could do anything but it was
17   too late.
18        This case is based on eyewitnesses and
19   scientific evidence, and the first two eyewitnesses
20   that you will hear are two young men named Kashif Butt
21   and Mariano Cervantes.  Those two guys had gotten off
22   work themselves around 11:00 and they were going to a
23   car wash which was right next-door to the Times
24   Market.  This is the kind of car wash where it has
25   like the open bays and you spray down your car and

15

1    clean it, which is right next-door to the Times Market
2    on the side where the dumpster is.
3         These young men were cleaning up their
4    cars and were -- already pulled it out of the bay and
5    were in the back of the parking lot of the car wash
6    when they noticed the disturbance over here across the
7    street at the Times Market parking lot.  One of the
8    guys tapped his buddy on the shoulder and said "Hey,
9    look, they're fighting," and when they both turned and
10   watched you will hear them testify that they saw this
11   man, John Henry Ramirez, struggling with a person
12   later identified as Pablo Castro and making punching
13   motions, punching motions at him.  At that distance
14   they could not see the knife but they could see the
15   striking motion of John Henry Ramirez on Pablo Castro.
16        Those two young men will testify also
17   that as they witnessed this at first they thought it
18   was just some kind of fight between two guys but then
19   they saw the man go down, Pablo Castro go down, and
20   another woman, Angela Rodriguez, join the frey.
21   Angela Rodriguez is a person that John Henry Ramirez
22   was with that night, along with another lady named
23   Christina Chavez.
24        Well, you will hear that Christina Chavez
25   stayed in the van during the Times Market robbery and

16

1    the killing, that Angela Rodriguez and this man
2    struck, hit, kicked, Pablo Castro went down, and you
3    will hear testimony from these two young men that they
4    saw this man, John Henry Ramirez, going through the
5    dead man's pockets, going through them as he was on
6    the ground, going through his pockets as if to rob
7    him.
8         You'll also hear that Angela Rodriguez
9    did the same thing, either help strike him -- of
10   course, she didn't have a weapon but struck him and
11   tried to go through his pockets as he was laying on
12   the ground bleeding from those 29 stab wounds
13   inflicted by this man.
14        The two guys rallied and went over across
15   the street to try to help this man who was laying on
16   the ground bleeding.  They ran over there to try to
17   help him but it was too late.  As they were going over
18   there, they saw this man in one van and the two ladies
19   get in another van, and you're going to hear talk
20   about two vans that were used at the beginning and
21   sometimes throughout this robbery, that you will hear
22   that there was a red Ford van and a red Dodge van.
23        They'll testify that he got into the red
24   van, the Ford van, and the two women got into the
25   Dodge van and drove away down Riggan Street.  Riggan

17

1    Street is a street that cuts right between the Times
2    Market and the car wash, and you'll see some
3    photographs of these places to show that but they will
4    both identify this Defendant as the one who did those
5    stabbing or punching motions.
6         You'll hear that this isn't the only
7    robbery that they did that night.  You'll hear that
8    after they robbed and tried to rob Pablo Castro -- and
9    I forgot to tell you one thing.  During and after that
10   robbery it was found that this Defendant or Angela
11   Rodriguez told Christina Chavez and it came out that
12   all they got from Mr. Castro was a dollar twenty-five,
13   a dollar twenty-five he lost his life for.
14        After they left that place were they
15   through?  No.  Christina Chavez will tell you that
16   they had been partying for the last two or three days
17   over the weekend and that this was a Monday night and
18   their plan was to rob or jack people and get money to
19   buy things to party with.  They'll testify and you
20   will hear what happened not 15 minutes after this
21   robbery and killing took place at the Times Market on
22   Baldwin Street, about 10 or 15 minutes later another
23   robbery occurred.  That's when you'll meet the next
24   victim of that man.
25        You'll hear that April Metting, a young

18

1  girl about 19 years old was doing a very ordinary
2  thing. She was going to Whataburger. She was getting
3  a Whataburger at the Whataburger on Staples Street
4  real close to the intersection of Staples and Baldwin.
5  She was in the drive-through going to order a
6  hamburger with her two-year-old child in the back
7  seat.
8          As she went to that drive-through window
9  there's like an order board here where you kind of
10 drive up and you order and they talk to you, and a
11 women came to the front of her car, a woman she
12 identified as Christina Chavez who said "Please help
13 me," and she had blood on her -- or she said "Can I
14 use the phone, I need to borrow your phone," and April
15 Metting who's sitting in her car kept saying "Go use
16 their's inside," you know, "I'm not going to let you
17 use my phone, and go inside."
18          And as she's talking to this women on the
19 front left side of her car John Henry Ramirez comes up
20 from the back of the car and holds a knife to April
21 Metting's throat, reaches inside the car, puts his arm
22 around her with a headlock on her and holds a knife to
23 her throat saying "Give me your money, give me your
24 purse."
25          April Metting is hysterical. April

19

1  Metting goes "Don't hurt my child, take what you want,
2  here's my money," the money she had out for a
3  Whataburger. "Take the money." That wasn't enough
4  for this Defendant. "Give me your purse, give me your
5  purse, too," and she gave him her purse that contained
6  her wallet which had her husband's credit card and a
7  photograph, which you'll see why that's important in a
8  minute.
9          She gave him the stuff and you might
10 wonder why didn't she see him sneaking up. You'll see
11 photographs of her car. Her side mirror was broken.
12 You know that side mirror you have on the side of the
13 car was broken so she didn't see him sneaking up from
14 this side cause she was focusing on the girl on the
15 front left side.
16          He comes in and holds a knife. She tries
17 to fend him off and she'll tell you she got a little
18 cut on her hand. It wasn't very serious but, of
19 course, she's lucky that's all that happened because
20 he had a knife against her throat.
21          When that happens, they disappear. They
22 leave one of the two vans. Remember they had had two
23 vans at the Times Market? They left one of vans
24 behind, the Dodge Ram van, the Dodge van they left
25 behind and they all three of them with this Defendant

20

1  driving take off down the road.
2          They didn't get much money the first
3  time, a dollar twenty-five from Pablo Castro. They
4  got something from April Metting, including her wallet
5  and her money. I wish I could say the story ended
6  there but it doesn't because their plan was to rob
7  somebody or jack somebody so they could party.
8          Then you'll meet Ruby Pena. Ruby Pena
9  was doing a very ordinary thing. Ruby Pena was
10 getting a Whataburger. Ruby Pena works at Driscoll
11 Children's Hospital as a respiratory therapist. She
12 works the night shift so around midnight, 11:30, 11:45
13 or so she was going on her lunch break. I know it
14 sounds kind of funny going on your lunch break at
15 midnight but that's what happens when you work nights.
16          She was at Driscoll Children's Hospital
17 and went to the Whataburger right next to it or real
18 close to it which is the Whataburger at Alameda and
19 Texan Trail. She's sitting there in her car and all
20 of a sudden a very extraordinary thing happens as
21 she's trying to do an ordinary thing like buying a
22 Whataburger.
23          A woman comes to her door -- to the
24 window, I'm sorry, on the passenger side and says
25 "Help me, help me, I'm hurt. Can I use the phone,"

21

1  and this woman has blood on her. Obviously it looked
2  like she had been hurt. Little did we know at the
3  time that turns out to be Pablo Castro's blood on her
4  because that was Angela Rodriguez that came to that
5  woman.
6          She comes -- the woman comes to the
7  window and says "Help me, help me. Can I use your
8  phone," and she does pretty much what April Metting
9  did, she said "Use the phone in there, go inside
10 there," and so her attention, Ruby Pena's attention,
11 is directed over here at the passenger side window
12 when all of a sudden that man shows up at her driver's
13 side window. "Give me your money," as he brandishes a
14 knife to her, "Give me your money."
15          Ruby Pena very courageously did something
16 that maybe you and I wouldn't be able to do but she
17 thought very quickly and she raised her power window.
18 She had the controls down here and she raised the
19 power window on this guy's arm as he's got the knife
20 and his arm is getting caught on the window and he has
21 to withdraw the knife. Luckily Ruby Pena doesn't get
22 a headlock, doesn't get the knife put against her but
23 he's right there and she's thinking fast, rolls up the
24 window on him so he can't get to her.
25          Does that stop him? Nope. He goes

22

1  around the side of the car and comes to the driver's
2  side and pounds on the window with the tip of the
3  knife, making little chips in the window trying to rob
4  her. But, again, Ruby Pena, real smart, shoves it in
5  reverse, backs away from there so he can't get to her.
6          So, imagine what the evidence is going to
7  be, or I'll tell you what the evidence is going to be,
8  that the police department is having crime after crime
9  after crime happening. The officers working the Times
10  Market homicide and robbery hear about another robbery
11  right down the street, and guess what, they hear vans
12  are involved, red vans. That's because they hear the
13  call out about the Whataburger on Staples Street by
14  Baldwin. They work over there, they go over there.
15          As that's happening, boom, another one is
16  happening right down the street at Texan Trail and
17  Alameda as the police officers are running around
18  trying to catch these people and by that time they're
19  getting some more information that there's either one
20  or two red vans involved they find one of them at the
21  Whataburger, the first Whataburger.
22          They also start putting what's called
23  BOLOs out. BOLOs mean be on the lookout for. And so
24  we know that it's a Hispanic man and two women in
25  vans, especially red vans. So officers are starting

23

1  to come into the area. There's some officers at the
2  Whataburger, some at the Times Market, some at the
3  other Whataburger, but the other officers that are
4  coming to assist hear that BOLO call and so they're on
5  the lookout for a red van.
6          Bingo. Going down Staples Street you're
7  going to hear Officer Gray. Officer Lieutenant Gray
8  will testify he's coming down Staples kind of from Six
9  Points, I guess, toward Baldwin, toward Del Mar
10  College, and guess what, as they're crossing he sees
11  the red van and he sees this man, John Henry Ramirez,
12  driving that van. He thinks it's the van. He doesn't
13  have much of a description except for three people in
14  the van and it's a red van so he makes a U-turn and
15  starts coming up Staples after them.
16          He turns on his lights. At this time
17  this van was going pretty much at a regular speed, I
18  think it's 30, 35 miles an hour on there and he falls
19  in behind the red van, turns the lights on. The van
20  pulls over, Officer Gray pulls in behind him and
21  starts getting out of his car with a shotgun because
22  he knows that three robberies have just taken place,
23  armed robberies have taken place.
24          He gets out of the car to go approach the
25  van, and guess what happens, John Henry Ramirez, the

24

1  driver of the van, takes off in the van, takes off and
2  drives away at a high speed. The officer has to run
3  back to his car and he'll tell you that's happened to
4  him before when people are trying to run from the
5  police, they lure them over to the side, try to get
6  them out of the car and then take off.
7          Officer Gray will testify that he began
8  to chase the red van driven by this man, and chase him
9  he did, chased him down Buffalo Street which is right
10  over there by that junior high, chased him down Ayers
11  a little bit and chased him down Brownlee and chased
12  him down Brownlee all the way, all the way to 37. He
13  will testify that John Henry Ramirez in fleeing the
14  police was driving 60, 70, 80 miles an hour, busting
15  every stop sign, busting every red light, going
16  through intersections crazily.
17          The officer had to keep stopping to clear
18  the lights like at Agnes and Brownlee and Leopard and
19  stuff until finally he kept falling behind and he lost
20  sight of the van. He lost sight of the van right
21  around I think it was Sam Rankin and Brownlee,
22  somewhere across 37 in the north side area.
23          Well, these officers had to be careful
24  cause they don't want to cause a wreck themselves by
25  chasing these people and -- but they lose sight of

25

1  them and eventually lose them over there in that north
2  side area, and the last thing I think he will say was
3  that Officer Gray says "We lost him around Sam Rankin
4  and kind of over by Northside Manor."
5          Well, as you can imagine, every officer
6  in town is pretty much involved now it seems like
7  cause officers are coming from the south side to help
8  out. Officers are coming around looking for this van
9  and all the officers start flooding that area in the
10  north side area looking for that red van. There's a
11  bunch of them out there looking but they're not having
12  any luck, they're not having any luck. And if you
13  know that area, around that area, officers have worked
14  what we call the port area around that except there's
15  no -- not many, what do you call, houses, residents.
16  It's mostly industrial areas. You know, there's
17  companies, there's buildings except they're port
18  related, storage buildings, stuff like that, and
19  they're looking for him.
20          Well, Officer Frakes is driving down
21  Brewster Street. Brewster Street is a fairly remote
22  area. You might remember and you'll probably see it
23  on a map that it's kind of by Whataburger Field and
24  there's a Brewster Street Ice House there which wasn't
25  there back in 2004, but you'll hear this is kind of a

26

1  deserted area and there's this brushy area right off
2  Brewster Street at Sam Rankin.
3           This brushy area is so thick with trees
4  and wood and mesquite and brush it's almost
5  impenetrable but as Officer Frakes is driving down
6  the road, out of the corner of his eye he sees a
7  reflection, a metal, or a reflector.  He stops, backs
8  up, looks into this brushy area and there hidden and
9  about 40 yards in is a van, not an ordinary van, a red
10 van.  He sees that it's driven straight into the woods
11 so to speak and only the back of van is visible.
12          He puts it out on the radio, "I think I
13 found the van, I think I found the van."  Him and
14 Officer Delgado go to the van, approach it cautiously,
15 guns drawn, thinking the suspects may still be inside
16 that van, and he says pretty much -- he will tell you
17 pretty much it drove until it couldn't drive any
18 further, like there was trees.  I believe he will
19 testify that it was so wedged in there you could
20 hardly get the doors open because it was just driven
21 into the brush.
22          Officer Frakes will testify that when
23 Officer Delgado arrived at the van nobody was in
24 there.  Engine is still warm, the engine compartment
25 thing was still warm but nobody was in there.  They

27

1  called it out and put it on the radio.  As -- what the
2  police officers did in that case then was circle
3  around, check around other side streets, see where
4  these guys went that left the van or abandoned the
5  van.
6           At the other edge of this wooded area,
7  and it -- you'll have to think of and you'll see
8  picture of this, it's kind of a blocked area, this all
9  wooded area.  On the other side it's clear.  The tree
10 line ends, there's a path there and there's some
11 ditches and a railroad track.
12          One officer who knew the area says "Well,
13 I'm going to circle around the back.  Since these guys
14 are covering the front, I'll circle around the back,"
15 and those officer -- this other officer, there's two
16 of them, Vasquez and Chapa.  Officer Vasquez will
17 testify that he parks at the end of Sam Rankin and
18 looks down the tree line, looks down the tree line at
19 the back of the wooded area and the ditch, look and
20 say, "Well, maybe they went this way," and his search
21 was rewarded because as he looked down that area
22 coming out of the ditch he sees two white figures, and
23 it's very dark out there, all he could see was a blur
24 of white.
25          He goes over to them and who is it?

28

1  Angela Rodriguez and Christina Chavez crawling out of
2  the ditch trying to escape.  They had gone through the
3  wooded area where the van had only gone like 40 yards
4  in.  They went the rest of the way and came out the
5  other side.
6           The Officers Vasquez and Chapa confronted
7  these women, "Get down, get down on the ground."
8  Christina Chavez, the officers will testify, was very
9  compliant, immediately sat down on the ground and
10 didn't cause them any trouble, but you'll hear that
11 Angela Rodriguez did tell the officers "Shoot me,
12 shoot me, shoot me."  The officers didn't, of course,
13 and one officer held her on the gun -- held her by
14 gunpoint while the other officers basically came in
15 tap with her.  I think you'll hear evidence they
16 didn't have Tasers back then in 2004 but they took
17 Angela Rodriguez down.
18          They will testify both of these women
19 were very high at the time.  You'll hear that they
20 were captured, those two women, but no sign of John
21 Henry Ramirez.  You'll hear the officers flooded the
22 area looking for John Henry Ramirez with no luck.
23 They didn't know if he went across the railroad
24 tracks, through the ditch, through the waterway along
25 there.  The bottom line is he got away, but he left

29

1  something behind.  A white rag was found over there by
2  the edge of the tree line, a white rag with blood on
3  it.
4           You'll hear evidence that during these
5  killing -- this killing and during this robbery John
6  Henry Ramirez managed to cut his own hand and so he
7  was bleeding, too, not just Pablo Castro but his
8  blood.  The officers found a white rag with blood out
9  there.  They also found a sandal, a woman's sandal
10 with blood on it.  They collected that.
11          Well, the two women are in custody.  John
12 Henry Ramirez is at large.  What's the next thing that
13 happens and what will you hear?  You'll hear a lady
14 named Ruby Garcia testify.  Ruby Garcia is a young
15 women who happens to be the sister of Angela
16 Rodriguez.  She lives on York Street, actually where
17 Christina Chavez and Angela Rodriguez were staying
18 temporarily.  They were just in town for the weekend.
19          You will hear that Ruby Garcia sometime
20 after midnight, I think it was 12:30 or 1:30, I can't
21 remember exactly, and you'll hear the testimony.  Ruby
22 Garcia is awakened to a knock on the door.  She goes
23 to the door and who does she see?  John Henry Ramirez.
24          John Henry Ramirez is covered with sweat,
25 dirt, grass, really messed up and he's holding his

30

1   hand that's bleeding.  He's holding his hand that's
2   bleeding.  He says "Can you help me, can you help me,"
3   and she goes "Where's my sister," cause she knows that
4   her sister had gone off with this guy and her friend
5   Christina had gone off with him.  She says "Where's
6   my sister," and she hears John Henry Ramirez say "We
7   stabbed somebody, we stabbed somebody, I stabbed him,
8   she stabbed him, I stabbed Angela and Angela stabbed
9   me."  It's very confusing because he is so -- the
10  adrenalin is flowing, I guess, and he's very
11  confusing, and Ruby keeps saying "What do you mean,
12  Angela got stabbed, you got stabbed, who stabbed who,"
13  all this stuff, but he says they stabbed a guy and
14  that Angela stabbed him and he stabbed Angela.
15            You'll see that some of that is not true.
16  Angela is not stabbed at all.  The person who's cut
17  obviously are Pablo Castro and this man's hand is cut.
18            Ruby says "Where's my sister, where's my
19  sister," and refuses to help him.  She'll testify that
20  he came on foot, that he had apparently run all the
21  way from the port area to York Street where she lived
22  asking for help, and she'll testify to him being
23  sweaty, covered with grass, looked like he had been
24  running a long time.  She'll say that she wouldn't
25  help him because he wouldn't tell her anything where

31

1   Angela was and so he took off again on foot.
2            That's the last time anybody saw him for
3   about three-and-a-half years, and you'll hear an
4   officer testify about how he was finally apprehended.
5   Three-and-a-half years went by.  Did the police
6   officers stop their investigation?  Nope.  Because
7   they had the witnesses and the eyewitnesses talk about
8   what they saw and they identified this Defendant but
9   now it was time to look at some scientific evidence
10  because just like in an ordinary crime people leave
11  clues behind, and John Henry Ramirez left his
12  scientific mark behind.
13            Remember all the things we mentioned
14  about the Times Market parking lot, the Ford van, the
15  rag, all that stuff?  Well, guess what, they got some
16  blood samples off some of those things and they sent
17  them to the D.P.S. lab for D.N.A. analysis.  Now, they
18  only had three people to use for their D.N.A.  They
19  had Pablo Castro who died unfortunately and they had a
20  blood sample from him at the morgue.  They had
21  Christina Chavez' blood because she had been captured
22  and they got a blood sample from her.  They had Angela
23  Rodriguez' blood and they took that sample from them
24  and they sent that to the lab to compare it to all the
25  items that they had found either at the Times Market,

32

1   inside the van, the rag, and all that stuff.  And low
2   and behold, there was some matches.  There was some
3   matches to this man.
4            This man's blood, the testimony will
5   show, was found on the door handle of the red Ford
6   van.  You'll hear that his blood was found on the
7   steering wheel of the red Ford van.  You'll hear that
8   his blood since he had been cut was found on the
9   passenger door pocket of the red Ford van.  You'll
10  hear that there was a white T-shirt found inside the
11  van which ostensively I think the evidence will show
12  belonged to Angela Rodriguez, and his blood and Pablo
13  Castro's blood was found on that T-shirt.
14            You will hear the D.N.A. expert
15  testify that his blood was found on a Visa card found
16  in April Metting's wallet.  You'll hear that his blood
17  was found on a Bic lighter found inside the Ford van.
18  You'll hear that a wallet, April Metting's wallet, was
19  recovered inside the red van, and inside that wallet
20  was a Visa credit card that had the name of her
21  husband, Gilbert Lopez, or Gilbert Lopez, Jr.  You'll
22  also hear that there was a photograph of her son in
23  that wallet.
24            So, they found the blood of John Henry
25  Ramirez on that Visa card, and remember that white rag

33

1   found over there by Brewster Street by the wooded
2   area?  None other but John Henry Ramirez' blood on
3   that white rag.  Lots of physical evidence, lots of
4   physical evidence found that ties him in and
5   corresponds exactly to what happened and what the
6   ladies will say about him being cut and Ruby Garcia
7   saying he was cut.
8            Well, that's the D.N.A. and you'll hear
9   more D.N.A. stuff.  You'll hear about Pablo Castro's
10  blood found in certain locations.  You'll hear about
11  other people and stuff but you'll hear about all these
12  matches that came back because they had to go back
13  after he was finally apprehended and I think you'll
14  hear the testimony he was apprehended in February of
15  this year, they got his blood sample, and that's what
16  allowed them to try to match his stuff up and all
17  these came -- came back to John Henry Ramirez.
18            But that's not all the scientific
19  evidence.  Fingerprints and palm prints.  You'll hear
20  testimony from this witness stand from a lady named
21  Marsha Parker who works at the Corpus Christi Police
22  Department as a fingerprint analysis -- analyst.
23  You'll hear that all these places they tried to get
24  fingerprints, mostly the vans and stuff to see if they
25  could get fingerprints off of it, and you'll hear that

34

1    there were fingerprints wound from Angela, Christina,
2    and -- and Pablo Castro and stuff, but most
3    importantly, you will hear that this analyst matched
4    John Henry Ramirez' fingerprints to three items.
5                The first one was the driver's side
6    window -- I'm sorry, side mirror on the red van, the
7    Ford van.  They have John Henry Ramirez' print there
8    proving he was in that van or on the driver's side of
9    the van.
10               You'll hear they also matched his
11   fingerprint to that photograph of the small boy of,
12   April Metting's son, which would lead you to think
13   that he went through her wallet, the Visa card, and
14   the picture looking for money and left his print of
15   the picture of her son, also proving the robbery of
16   April Metting.
17               And, finally, they found his fingerprint
18   or palm print on another area, and that was on a C.D.
19   rom case like you make your own C.D.s in that little
20   plastic case.  They come in and they found his
21   fingerprint in the Dodge van.  Remember the other van
22   that they had been using earlier in the day?  His van
23   -- his fingerprint was on that C.D. case.
24               You'll hear from the case officer, Kelly
25   Isaacks, who pretty much put this together.  You'll

35

1    hear from those D.N.A. experts from the D.P.S. lab,
2    and finally you'll hear from the medical examiner, Rey
3    Fernandez.
4                Rey Fernandez will tell you in much more
5    detail than I've told you a minute ago about the 29
6    stab wounds.  He will tell that you that there's 29
7    stab wounds, 4 of them which are in the back.  One was
8    fatal from the back because it went in the lungs.  He
9    will tell you about both the artery and the vein
10   located in this area, the carotid artery, I believe,
11   and the jugular vein was cut -- was cut in pieces from
12   the wounds that John Henry Ramirez did on Pablo
13   Castro's neck.
14               You'll hear about the location of these
15   stab wounds, pretty much all over his body but mostly
16   around the face and the head and in the back.  You
17   will hear that Pablo Castro had defense wounds.  He
18   will testify that defense wounds are generally when
19   you're trying to fend off an attack and your hands get
20   cut -- the victim's hands get cut because somebody is
21   attacking you with a knife or sharp instrument, and
22   Pablo Castro had these kind of little cuts on his hand
23   where he tried to ward off the blows from this person.
24   And he'll tell you that the cause of death and the
25   manner of death and that he ruled this a homicide.

36

1                Not an ordinary case, not an ordinary
2    circumstance, but you have the ordinary duty in this
3    courtroom like in courtrooms across the land that at
4    the end of this trial based on the evidence I'm going
5    to ask you to return a guilty verdict against John
6    Henry Ramirez of a capital murder.
7                THE COURT:  Does the Defense wish to make
8    its opening statement at this time?
9                MR. GARZA:  We do, Your Honor.
10               THE COURT:  All right.
11               MR. GARZA:  May I proceed?
12               THE COURT:  Yes.
13               MR. GARZA:  Good morning, ladies and
14   gentlemen.  I'm Ed Garza, as I've introduced myself
15   previously to you.  I hope you-all had a nice
16   Thanksgiving, and now, of course, today, this morning
17   on December 1st you're being asked to come before this
18   Court and render your duty.
19               We were calling it coming to task, if
20   you'll recall when we were engaged in voir dire in
21   asking you about whether or not you understood the
22   concepts and what your duties were, and you conveyed
23   to us those duties because we ended up picking you-all
24   as the jurors to hear this case, and what we're going
25   to ask you to do is, once again, as the Judge had

37

1    instructed you, anything we say, the lawyers, Mr.
2    Skurka who eloquently laid out how he plans and
3    intends to hopefully prove his case to you is not
4    evidence, okay?
5                So in spite of the compelling matters
6    that Mr. Skurka has proffered to you without any
7    evidence we want to be able to ask you once again and
8    we want to be able to rely once again on your promise,
9    on your promise that until you hear all the evidence,
10   and whether or not it's convincing, whether or not
11   it's reasonable, whether or not it's reasonable
12   beyond -- I mean, whether or not it's sufficient
13   beyond a reasonable doubt before you make your
14   decision, before you make your decision.
15               We're asking you to come to task here
16   today with an open mind, in other words, and we're
17   asking you not to leave your common sense out in the
18   parking lot but bring it with you.  The Defense
19   Counsel is not going to sit by idly throughout this
20   whole proceeding, okay, but at this time I may not be
21   at liberty to discuss with you exactly what our
22   defense theory is and I don't have to do that.  Why?
23   Because we do not have that burden, they do.  Okay?
24               And I'm going to ask you to put them to
25   that burden.  Everything Mr. Skurka has said to you

38

1  this morning, like I said, is not evidence.  You're
2  going to have to put him to the test and we, as Mr.
3  John Henry Ramirez' Defense Counsel, Mr. Jones and I,
4  we are going to test their evidence through our
5  cross-examination, okay?  We are going to test their
6  evidence through our cross-examination.  We're going
7  to call into question each and every one of their
8  witnesses, each and every one of their experts, each
9  and all of their scientific evidence.  We're going to
10  call it all into question because if it does not rise
11  to the level of proof beyond a reasonable doubt then
12  you must acquit our client.  You have to acquit our
13  client.  You promised us that if they didn't bring
14  this case to you and prove it to you beyond a
15  reasonable doubt that you could do that and that you
16  would do that, okay?
17      So in spite of his compelling opening
18  argument of everything he has to prove which he has to
19  tell you and road map what his case is because he does
20  have the burden, you haven't heard anything yet, you
21  haven't heard a shred of evidence, a single lick of
22  evidence.  And what we're asking you on behalf of our
23  client, John Henry Ramirez, is to maintain and keep
24  that open mind until you hear all the evidence before
25  you make your decision.

39

1      This is a difficult case, it's a hard
2  case, it's an extraordinary case.  There was so many
3  events that went on that night, and my heart as human
4  being, Mr. Jones' heart, extends and goes out to the
5  Castro family for their loss.  It was terrible.  How
6  can you ever forego something like that?  How can you
7  get over something like that?  It's terrible, it's
8  tragic, it really is, but now we're left with another
9  tragic situation here, is having to decide what was
10  going to be the proper, just decision for you to make
11  in this case as to our client's guilt or innocence,
12  okay?  So we're left with still another bad situation
13  we're all going to have to decide to but this is jury
14  duty, folks, and you can do it.
15      We're in comfortable surroundings
16  You're going to be allowed to go to the bathroom,
17  you're going to be given breaks.  We're not storming
18  the beaches of Normandy, we're not having to avoid
19  I.E.D.s in Iraq, and I know you'll do your duty, but
20  once again, I want to reiterate:  Keep an open mind,
21  keep your decision to yourself until you're ready to
22  decide it based on the evidence, and that evidence is
23  going to come from there right, under sworn testimony,
24  under cross-examination for you to determine what you
25  want to believe.

40

1      Thank you.
2      THE COURT:  All right.  The -- the media
3  needs to turn the cameras of at this time and I would
4  remind them that I do not want the jury shown on T.V.
5      All right, Mr. Skurka, call your first
6  witness.
7      MR. SKURKA:  Lydia Salinas.
8      THE COURT:  All right.  Come forward.
9      (Oath administered.)
10      THE COURT:  Be seated.
11      MR. GARZA:  Your Honor, I'm sorry for
12  bringing this up.  I don't mean to inconvenience the
13  Court or the jurors but can we place the witness under
14  the Rule at this time?
15      THE COURT:  Yes.  Bring in all the
16  witnesses.
17      MR. SKURKA:  That's fine, Your Honor.
18  Mine are in the witness room or in the library.
19      (Brief pause in proceedings.)
20      THE COURT:  All right.  These are the two
21  we have at this point?
22      (Oath administered.)
23      THE COURT:  All right.  Your name is?
24      MR. BUTT:  Kashif Butt.
25      THE COURT:  All right.  And your name is?

41

1      MR. WENZEL:  Sergeant Mike Wenzel.
2      THE COURT:  All right.  The Rule has
3  been invoked.  What that means is you cannot discuss
4  your testimony with anyone other than the lawyers.
5  You can talk to the lawyers outside the presence of
6  any of the other witnesses but you may not discuss
7  your testimony with anyone else, and you must wait
8  outside the courtroom while these proceedings are
9  going on unless you're testifying, all right?  So,
10  please wait outside.
11      And, Mr. Skurka, and, Mr. Garza, please
12  instruct your witnesses accordingly.
13      MR. SKURKA:  I will, Your Honor.
14      MR. GARZA:  Yes, Your Honor.
15      THE COURT:  That -- that's going to
16  pertain to you as well.  Obviously you're in the
17  courtroom at this time and you're about to testify but
18  until this trial is over you may not discuss your
19  testimony with anyone else except for the lawyers.
20  You can speak to the lawyers but outside the presence
21  of the other witnesses, okay?
22      All right, Mr. Skurka, you may proceed.
23      MR. SKURKA:  Thank you, Your Honor.
24
25      LYDIA SALINAS,

42

1   having been first duly sworn, testified as follows:

2            DIRECT EXAMINATION

3   BY MR. SKURKA:

4     Q.  Good morning, ma'am.

5     A.  Good morning.

6     Q.  Could you introduce yourself to the folks on

7   our jury.

8     A.  Hi.  My name is Lydia Salinas.

9     Q.  Do you live here in Corpus Christi?

10     A.  I live here in Corpus Christi, yes, I do.

11     Q.  How long have you lived in Corpus Christi?

12     A.  More than 30 years.

13     Q.  Are you married?

14     A.  I am.

15     Q.  Any children?

16     A.  Three children.

17     Q.  Where did you go to school?  Did you go to

18   school in the Corpus Christi area, and I'm talking

19   about high school.

20     A.  No, I went to Robstown High School.

21     Q.  Robstown High School.  Where did you work

22   back on July 19th, 2004?

23     A.  At Times Market.

24     Q.  Where is that exactly located?

25     A.  1902 Baldwin.

43

1     Q.  Is that in Corpus Christi, Texas?

2     A.  In Corpus Christi, Texas.

3     Q.  How long had you worked at Times Market, and

4   I'm talking about July 19th, 2004?

5     A.  15 years.

6     Q.  What did you do there?

7     A.  I was a cashier and a manager.

8     Q.  What were your usual hours?

9     A.  I would go in at 6:00 in the morning till

10   3:00, take a break, come back at 6:00 in the evening

11   till midnight.

12     Q.  How many days a week did you do that?

13     A.  I do it about six days a week.

14     Q.  Can you tell us what your general duties as

15   cashier and manager were.

16     A.  Just taking care of customers, ordering

17   supplies, everything generally in the convenient

18   store, but mainly taking care of customers and doing

19   reports, counting money.

20     Q.  Just pretty much in the managerial

21   department?

22     A.  Correct.

23     Q.  Now, is that Times Market at 1902 Baldwin, is

24   that still in operation now?

25     A.  Yes, it is but it's under another business.

44

1     Q.  It's another business?

2     A.  We left that location.

3     Q.  Who's "we left that location"?

4     A.  Me and my boss.

5     Q.  Okay.  You don't own that store, somebody

6   else does?

7     A.  Yes, my boss owned the store at that time.

8     Q.  So you-all -- did you move the store to

9   another location?

10     A.  Yes, we did.

11     Q.  So if somebody went by there today, and I'm

12   not saying the jury is supposed to, it's not the same

13   company that owns it, it's a different --

14     A.  No, it's a different company.

15     Q.  It's a different company, okay.  Did you know

16   Pablo Castro?

17     A.  Yes, I did.

18     Q.  How did you know him?

19     A.  I knew him as a co-worker, and before he was

20   a -- a worker there he was a customer cause he just

21   lived down the street.

22     Q.  How long had you known Pablo Castro before

23   July 19th, 2004?

24     A.  10 to 15 years.

25     Q.  So you knew him as a customer first and then

45

1   an employee?

2     A.  Yes, and then I got him to be an employee,

3   yes.

4     Q.  I'm sorry, you got him --

5     A.  Yes, he was a customer and then I took him in

6   as an employee.

7     Q.  What was his job to do there?

8     A.  His job was coming in around 4, 5:00.  He

9   would do the cleaning, stocking the cooler, and

10   basically just help me with the customers in there.

11     Q.  Okay.  Was he -- did he like take turns with

12   you in the cashier or --

13     A.  No, he would never be in the cashier, he

14   would take out the trash, he would clean, he would

15   mop, he would stock the merchandise we would get; just

16   that, not in the cashier.  He would be in the cashier

17   part sometimes just helping me like bag if I needed

18   help bagging some stuff or --

19     Q.  So he was just kind of a general helper, too?

20     A.  Helper, yes.

21     Q.  Do you know anything about his family, who he

22   was living with or dating at that time, July 19th,

23   2004?

24     A.  At that time he was with his girlfriend

25   Betty.

46

1    Q.   Do you know what her last name is?
2    A.   Betty Mendez, and his two kids.
3    Q.   He lived with Betty Mendez and his two kids?
4    A.   Yes, Fernando and Pablo, Jr.
5    Q.   I'm sorry, you're going to have to say that
6    louder.
7    A.   Fernando and Pablo, Jr.
8    Q.   How many kids did he have himself do you know
9    of?
10   A.   Him, three.
11   Q.   He had three kids and he lived with two of
12   them at this time?
13   A.   Correct.
14   Q.   Where did the other kid live, if you knew?
15   A.   I believe he lived with one of his aunts,
16   great aunts.
17         MR. SKURKA:  May I approach the witness,
18   Your Honor?
19         THE COURT:  Yes.
20   Q.   (BY MR. SKURKA)  I'm going to show you a
21   photograph marked State's Exhibit No. 1.  Can you
22   identify that?
23   A.   That's Pablo and Betty.
24   Q.   Is that a photograph taken of him before his
25   untimely death?

47

1    A.   Right.
2          MR. SKURKA:  I'll tender State's
3    Exhibit -- Exhibit 1 to Defense Counsel and offer into
4    evidence.
5          MR. GARZA:  No objection, Your Honor.
6          THE COURT:  All right, it's admitted.
7          MR. SKURKA:  May I publish it to the
8    jury, Your Honor?
9          THE COURT:  You may.
10   Q.   (BY MR. SKURKA)  Do you know how old Pablo
11   was at the time of his death?
12   A.   I believe he was 40-something.  I don't
13   remember exactly how old he was.
14   Q.   Would that have been what he looked like
15   before he died?
16   A.   Yes, it is.
17         MR. SKURKA:  May I approach, Your Honor?
18         THE COURT:  Yes.
19   Q.   (BY MR. SKURKA)  I'll show you what's been
20   marked State's Exhibit No. 2.  It's a map I got off of
21   Google.  Can you look at that and tell me if that
22   shows the location where the Times Market at 1902
23   Baldwin is?
24   A.   Right here, yes.
25   Q.   Okay.  But is this a map that fairly and

48

1    accurately represents that area where the Times Market
2    is?
3    A.   Right.
4          MR. SKURKA:  I'm going to tender this
5    map to Defense Counsel and offer it into evidence,
6    Your Honor.
7          MR. JONES:  No objection.
8          MR. GARZA:  No objection, Your Honor.
9          THE COURT:  All right, it's admitted.
10   Q.   (BY MR. SKURKA)  Now that it's admitted I'd
11   ask you to get -- to borrow this pen from the court
12   reporter and put an X or a circle that shows where the
13   location of 1902 Baldwin is and then we'll show it to
14   the jury.
15   A.   Right here.
16         MR. SKURKA:  May I publish it to the
17   jury, Your Honor?
18         THE COURT:  Yes, you may.
19   Q.   (BY MR. SKURKA)  I just want to get them
20   oriented to where we are, Ms. Salinas.  If you look
21   beside you there's a little laser pointer.  Okay.  Can
22   you show us -- I believe this is what we call the
23   Crosstown Expressway?
24   A.   Where?
25   Q.   Okay.  Where is Baldwin Street on that map?

49

1    A.   On --
2    Q.   You can use the laser pointer, ma'am.
3    A.   Right here.
4    Q.   You have to hold the button in.
5    A.   Right there.
6    Q.   Okay.  So, you're showing Baldwin Street that
7    goes down to what's this over here?
8    A.   That's going towards Ayers.
9    Q.   Towards where?
10   A.   Ayers.
11   Q.   Well, what's this building over here?
12   A.   That's Del Mar.
13   Q.   Okay.
14         MR. SKURKA:  Why don't we go in a little
15   closer on that, please, Geordie.
16   Q.   (BY MR. SKURKA)  Okay.  Can you read that a
17   little better?  I'm getting old, I can't read that
18   print too well.  Okay, so this is Baldwin Street there
19   and you've drawn an X with a blue pen showing the
20   approximate location.
21   A.   Uh-huh.
22   Q.   So would it be fair to say it's just like one
23   street off, one or two blocks off of the freeway?
24   A.   Right.
25   Q.   And what's the name of the street that runs

50

1    along side of it?
2        A.   Riggan.
3        Q.   And what is located on this side of the Times
4    Market?
5        A.   The car wash.
6        Q.   The car wash, okay.  So that's where it's
7    located on Baldwin closer to the freeway?
8        A.   Correct.
9        Q.   Okay.  Thank you, ma'am.  I want to talk to
10   you now about that evening and what happened on this
11   particular -- now that the jury knows where we're --
12   the store is located and everything and who
13   Pablo Castro was.  So let's just start about what
14   happened on that day on July 19th, 2004.
15            What did -- how did that day begin for you,
16   what time did you come to work?
17       A.   I came in to work at 6:00.
18       Q.   And how long did you work?
19       A.   Well, I had worked that morning prior from
20   6:00 in the morning till 3.  I had gone home and
21   rested and came back 6:00 in the evening.  He was
22   already there, he had gotten there around 5:00.
23       Q.   When you say "he," who are you talking about?
24       A.   I'm talking about Pablo.
25       Q.   Okay.  It's helpful sometimes instead of

51

1    saying "he" or "she" to say the name of the person, if
2    you would, please.
3        A.   Okay.
4        Q.   So Pablo Castro had come in around 5:00 you
5    said?
6        A.   Correct.
7        Q.   And is that the time he usually came in?
8        A.   That was about 4 or 5 was usually his time to
9    come in and we were working as usual.  It was -- we
10   were busy working.  It was a busy day.  It got to
11   about 10:00, I had family from Florida here, and they
12   stopped by the store and we visit, and then they left
13   and we -- we were hungry, we got hungry, and finally
14   the store kind of slowed down a little bit and we --
15   we usually used to take turns buying dinner at night
16   so I asked him "It's your turn to buy dinner," and he
17   said --
18       Q.   And what happened when you were talking about
19   him buying dinner?
20       A.   He says "I'm broke, I only have a dollar."
21   He says "I can't buy dinner today."  I go, "Well, I'm
22   hungry," and he was hungry, "Well, I'm hungry, too,"
23   so I said "Okay, I'll -- we'll do the $3
24   Wienerschnitzel and I'll pay this time again."
25            And I called my sister-in-law from Florida,

52

1    she was here to visit, to go get us some
2    Wienerschnitzel because we were busy and we needed to
3    finish up but we were still wanting to eat something.
4        Q.   So you-all couldn't leave the store --
5        A.   We couldn't leave.
6        Q.   -- you had to get somebody to get it?
7        A.   Somebody would usually go get us something to
8    eat.
9        Q.   And so you had your sister-in-law?
10       A.   My sister-in-law went and got us
11   Wienerschnitzel.
12       Q.   About what time was that, do you think, that
13   she went to get the food for you-all?
14       A.   That was about 10, 10:30ish, somewhere around
15   there.  And when I called her, she came by and she
16   usually parked on the side towards the car wash and I
17   saw her pass in front of the store parking on the
18   other side, and I said "Why are you --"  When she came
19   in and dropped off the food, I said, "Why did you park
20   over there, you never park over there."
21       Q.   You talking about on the side -- the front of
22   the store?
23       A.   In front of the store.  She goes "Cause
24   there's a van there that's having trouble.  There's
25   people there working in the van."  I said, "Okay."

53

1    Well, we just left it at that.
2        Q.   Had you noticed that van or vans there
3    before?
4        A.   No, cause I hadn't gone out, I was -- Pablo
5    was the only one that would go out, throw trash and
6    come in and out.  I would stay there.
7        Q.   Cause you were the one watching the cash
8    register?
9        A.   Uh-huh, I stayed in the cashier.
10       Q.   Okay.  So you first were aware of this van
11   because of your sister-in-law?
12       A.   Yes, and then -- she just dropped it off
13   and left and we ate, like quick, really quick, and --
14       Q.   What happened then?  Does the store close at
15   a certain time?
16       A.   Yes, it would close at midnight.
17       Q.   So, what happened after you-all ate and about
18   what time was that?
19       A.   Well, that's when we started really cleaning
20   up and doing all -- getting ready for counting down
21   and getting stuff ready for the next day.
22       Q.   What were Pablo's duties like at closing
23   time?
24       A.   Pablo's duties was -- at closing -- right
25   before closing time he makes sure all the coolers are

54

1    stocked, all the beer is stocked, break up the boxes
2    and take them out to the trash and take out the trash,
3    so he --
4         Q.    Anything unusual happen on that night before
5    this happened?
6         A.    Right, this lady -- this girl came in and
7    asked me if she could use my facilities, and me and
8    Pablo looked at each other and went "There's never
9    nobody that comes in here and uses that word,
10   facilities." "Can I use your restroom, can I use your
11   john, or whatever," and we looked at each other and
12   it was kind of like "Oh, well, yeah, it's right there,
13   you can use it." So she came in and then --
14        Q.    Can you describe her for us, please --
15        A.    She was --
16        Q.    -- how she looked physically.
17        A.    She was Mexican, was wearing some Capri
18   shorts and a top and she had like a little satchel or
19   sack in the back and when she left she just looked at
20   me and said "Have a good evening." I said "Okay."
21        Q.    Had you ever seen her before as a customer in
22   the store?
23        A.    No.
24        Q.    Subsequently to this investigation were you
25   able to identify that person?

55

1         A.    Yes, I was.
2         Q.    As who?
3         A.    Ms. Ramirez.
4         Q.    Angela Ramirez?
5         A.    Yes.
6    stocked, I'm sorry, Angela Rodriguez?
7         A.    Yes.
8         Q.    I'm getting Ramirez and Rodriguez --
9         A.    And at that time --
10        Q.    Did she cause any problems there?
11        A.    She didn't cause no problems, she just went
12   and -- it was unusual for somebody to go in there and
13   talk to me in like that tone, you know, that kind
14   of -- I don't know, it was something unusual.
15        Q.    Now, when did that happen in relationship to
16   when you ate and when the other --
17        A.    That was after -- we had just finished -- we
18   were just finishing eating up, and after that I said,
19   "Okay, you need to hurry up and go finish your work so
20   we can get out of here in time." So he went --
21        Q.    About when time was that, would you say, that
22   the lady came in or you finished eating?
23        A.    I think it was close to 11.
24        Q.    Around 11?
25        A.    Uh-huh. And --

56

1         Q.    So you're doing your duties?
2         A.    I'm doing my counting of all of my money and
3    he's in the back.
4         Q.    When you say "the back --"
5         A.    There's a back room that we have. There's
6    the store and there's the back room and then there's
7    the cooler. There's a cooler and then there's like a
8    storage room in the back where we kept all the extra
9    beer and supplies and everything and he would make
10   ice. There was an ice maker.
11             He says "Well, I'm going to the back."
12             I go, "Okay, well, hurry up."
13             At that time, he had gone out -- he says
14   -- every time he would go out he would tell me, "I'm
15   going out, I'm going to go throw the trash, or I'm going
16   to go do this, I'm going to clean the parking lot," or
17   something.
18             He would always tell me so I would know he
19   wasn't inside the store and he says "I'm going out to
20   throw the trash," and I said, "Okay."
21             So I was more than sure that he had come
22   back in but then I was turning this way, busy counting
23   my money and everything so --
24        Q.    What's the the next thing that happened then?
25        A.    The next thing that happens is a little girl

57

1    walks into the store and tells me "There's a man lying
2    outside."
3         Q.    Did you know who the little girl was?
4         A.    No.
5         Q.    And she said that the -- just said a man was
6    lying outside?
7         A.    A man outside bleeding. So I said "Well, I'm
8    not going to call 911 until I go outside and see
9    what's going on."
10        Q.    So what did you do?
11        A.    So I -- I was going to go out so I screamed
12   to the back "Pablo, I'm going outside."
13        Q.    And why did you do that?
14        A.    Because that's our routine. When one leaves
15   the store you let the other one know you're not there.
16        Q.    And as far as you knew, Pablo had already
17   been back from taking out the trash?
18        A.    Supposedly, yes. And I told the little girl,
19   "Okay, let's go see if I can help or if I have to call
20   911, or what." So I went outside and I saw someone
21   lying in a pool of blood.
22        Q.    Did you recognize the person?
23        A.    I did not recognize him. So I ran inside and
24   called 911 and I kept screaming "Pablo, Pablo, where
25   are you? Pablo, where are you?"

58

1  Q.  You were screaming that inside the store?

2  A.  Inside the store, inside the store.

3  Q.  Why?

4  A.  Cause I wanted him to come to the front.

5  Q.  At that time, did you still think he was in

6  the back of the store stocking?

7  A.  Yes, I thought he was still in the cooler or

8  something.

9  Q.  What happened next, ma'am?

10  A.  So, I went back outside to see if I could

11  help, see what was going on.  I had already called 911

12  and that's when I noticed his shoes and his hat were

13  lying there and I noticed that it was him.

14  Q.  Where was he exactly?

15  A.  He was right next to -- well, in between my

16  truck and the dumpster, halfway.

17  Q.  After you saw that it was your co-worker,

18  Pablo Castro, what did you do?

19  A.  I was just screaming, I was going crazy, I

20  didn't know what to do.  I wanted to help him but

21  nobody would let me get close to him cause everybody

22  kept screaming "He's dead, he's dead, he's dead, he's

23  gone."

24  Q.  Who else was out there?

25  A.  Customers from the car wash that I had seen

59

1  came from over there, and the neighbor was there.  She

2  was the one holding me back from going to the body

3  because they would -- they all kept screaming that he

4  was dead.

5  Q.  Were you able to talk to the police that

6  night about what had happened?

7  A.  No.

8  Q.  Why not?

9  A.  I couldn't.

10  Q.  I'm going to show you some other

11  photographs --

12  MR. SKURKA:  May I approach, Your Honor?

13  THE COURT:  Yes.

14  Q.  (BY MR. SKURKA)  These are marked State's

15  Exhibits 3 through 7.  I'm going to ask you to look at

16  them and see if you can identify those, please.

17  A.  That's the store and the car wash next to it.

18  This is the parking lot and my truck parked right

19  there.

20  Q.  First of all, I'm just asking can you

21  identify them?

22  A.  Yes, uh-huh.

23  Q.  Do you know what those photographs represent?

24  A.  Yes.

25  Q.  What are they photographs of in general?

60

1  A.  The scene, the crime scene.

2  Q.  Okay, crime scene.  Now, just for the record,

3  4, 5, 6 and 7 appear to be taken at the nighttime;

4  correct?

5  A.  Yes, right.

6  Q.  Is that the same night as the incident?

7  A.  That's the same night, correct.

8  Q.  And State's Exhibit No. 3 appears to be an

9  aerial photograph taken during the day?

10  A.  Right.

11  Q.  Is there anything different about that

12  photograph that was different from that night?

13  A.  We had moved the garbage -- the trash can was

14  over here before and they had moved it to this side.

15  Q.  So the only thing different was the dumpster?

16  A.  Right.

17  Q.  Okay.  Otherwise, does the scene -- I mean,

18  the street, building, everything look the same?

19  A.  Uh-huh.

20  Q.  Everything except the dumpster.

21  MR. SKURKA:  Judge, I'll tender 3

22  through 7 to Defense Counsel and offer them into

23  evidence.

24  MR. GARZA:  We have no objection, Your

25  Honor.

61

1  THE COURT:  All right, they're

2  admitted.

3  Q.  (BY MR. SKURKA)  Now that they're admitted,

4  Your Honor, I'm going to have you come back up here.

5  Remember you said where the dumpster was found in this

6  aerial photograph --

7  A.  Right.

8  Q.  -- that was taken, I guess, later on.  Would

9  you put a little X -- not an X, but maybe a

10  little square or box showing where the dumpster was

11  located, please.

12  A.  (Witness indicating.)

13  Q.  Okay.  I'm going to put these up on the board

14  so everybody can see them.

15  Let's look at State's Exhibit 3 first.  What

16  is that a photograph of?

17  A.  That's the store in the parking lot.

18  Q.  I'm sorry, I didn't hear you.

19  A.  The store in the parking lot.

20  Q.  Okay.  Can you use the laser pointer again

21  and guide us to whatever we're talking about.

22  First of all, let's just pick out where

23  Baldwin Street is.  Which one is Baldwin Street?

24  A.  This one.

25  Q.  Just run the thing along side of it.  Okay.

62

1    That's the front of the store?
2        A.   Uh-huh.
3        Q.   And you said there was a store -- the street
4    between the store and the car wash is called what?
5        A.   Riggan.
6        Q.   And show us where that is.
7        A.   All this.
8        Q.   And show us the store itself.
9        A.   Right here.
10       Q.   And the gas pumps?
11       A.   (Indicating.)
12       Q.   And where the dumpster was.
13       A.   (Indicating.)
14       Q.   Okay.  And for the record, you've written on
15   State's Exhibit No. 3 a little blue box I guess that
16   represents where the dumpster was?
17       A.   Right.
18       Q.   Okay.  Can you show us in that picture where
19   the front door is.
20       A.   It's right here.
21       Q.   Okay.  And for the record, can you show us
22   where you said your car was parked or your truck was
23   parked?
24       A.   Right here.
25       Q.   Okay.  And you're saying -- is that the first

63

1    slot or the second slot on the side of the building?
2        A.   The second.
3        Q.   And for the record, we're looking at the
4    side, the building on the Riggan Street; correct?
5        A.   Correct.
6        Q.   So you were in the second lot over there?
7        A.   Right.
8        Q.   Okay.  Now, if a person -- is there a back
9    door I guess what I was trying to get at.  Is there
10   a back door to the place?
11       A.   No.
12       Q.   So when Pablo left to take out the trash,
13   could you show us a path or the door he would have
14   come out to and went to.
15       A.   He comes out through here and comes down this
16   way.
17       Q.   Okay.  For the record, you're showing the
18   path from the front door --
19       A.   The front door is going across over here.
20       Q.   Okay.  And, now, I want to show you -- now
21   that we have the overall view, I want to show you a
22   series of photographs showing it that night, okay?
23   There's four of them.  I'm going to go through them.
24            MR. SKURKA:  Excuse me, frank, is there
25   a way we can turn that light off behind there?

64

1    Actually that ring of lights behind it so it doesn't
2    wash it out too much.  Thank you.  That's fine.  This
3    picture is just a little darker.
4        Q.   (BY MR. SKURKA)  Now, show us what
5    prospective we're looking at from here.
6        A.   This is the side towards the car wash.
7        Q.   Where would the front door be?
8        A.   The front door would be around over here.
9        Q.   And whose vehicle is that in the picture?
10       A.   That's my vehicle so he would come around and
11   go this way.
12       Q.   And where are the gas pumps?
13       A.   The gas pumps are right here.
14       Q.   And where would the dumpster be?
15       A.   Over here.
16       Q.   Okay.  It's not shown on the photograph,
17   right?
18       A.   It's not showing, no.
19       Q.   Okay.  There seems to be a window right here
20   on that side of the building.
21       A.   Right.
22       Q.   Could you not see out that window to look and
23   see where Pablo was out there?
24       A.   No, it was covered with -- we had some
25   displays in front of the -- front of the window.

65

1        Q.   You mean displays like --
2        A.   Like cigarettes.
3        Q.   Oh, like cigarette ads or something like
4    that?
5        A.   Uh-huh.  Through the inside we had racks that
6    we kept cigarettes in there.
7        Q.   So that's not a window you could just
8    normally look out and see what's in there?
9        A.   No.
10       Q.   The reason I asked is because you were
11   talking about your sister-in-law, where she parked.
12       A.   Uh-huh.
13       Q.   Did she indicate to you where the van was
14   parked or vans were parked?
15       A.   Right, I believe she had said in the first
16   stall.
17       Q.   Okay.  Where would that be in that picture,
18   please?
19       A.   On this side.
20       Q.   Okay.  To the -- against the right of where
21   your truck is?
22       A.   There was -- there's one.  I would always
23   park in the second one and there was one right here on
24   the other side of mine.
25       Q.   Okay.  The next one is State's Exhibit No. 5,

66

1      I believe.  What does that show?
2          A.    It shows more like the crime scene.
3          Q.    Okay.  Does that show the location?  Can you
4      show us where the location of Pablo's body was?
5          A.    (Indicating.)
6          Q.    The next one?  Is that from a different
7      angle?
8          A.    Correct.
9          Q.    And what does that show, please?
10         A.    It's still here.
11         Q.    Okay.  And show us where the dumpster would
12     be if it was in the photograph.
13         A.    You still can't see it, it's over here.
14         Q.    That would be off to the left of that
15     photograph?
16         A.    Right.
17         Q.    Okay.  And then the last one, please.  Does
18     that show a slightly different --
19         A.    It's just a little closer, yeah, of the scene
20     but you still -- the dumpster is still --
21         Q.    The dumpster would be over on the left?
22         A.    Right.
23         Q.    Is there any kind of -- what's the lighting
24     like out there that night?
25         A.    There was plenty -- I mean, the usual

67

1      lighting that we had.  You know, we had lighting from
2      our store and then the car wash was on there on the
3      other side, too, so --
4          Q.    So it wasn't --
5          A.    It wasn't really, really dark, no.
6          Q.    Okay.  Did you see John Henry Ramirez that
7      night, the Defendant?
8          A.    No, I didn't.
9          Q.    Do you know him?
10         A.    Yes, I do.
11         Q.    How do you know him?
12         A.    He had been a prior customer there at the
13     store.
14         Q.    So, when you found -- how did you find out he
15     was involved in this?
16         A.    Through the media.
17         Q.    And you recognized him as being a customer in
18     your store before?
19         A.    Correct, he used to hang right -- in the
20     picture right next to -- there was a house there that
21     he would visit some friends there.
22         Q.    Which house are you talking about?
23         A.    This one.
24         Q.    That yellow house in the picture?
25         A.    Right.

68

1          Q.    So you were familiar with him and seeing him
2      before?
3          A.    Correct.
4          Q.    And I'm not talking about that day.
5          A.    No, not that day but I had seen him prior.
6          Q.    So it would be fair to say that John Henry
7      Ramirez was familiar with this store?
8          A.    Correct, not an everyday customer but once in
9      a while, uh-huh.
10         Q.    I understand.  Ms. Salinas, thank you.
11               MR. SKURKA:  I pass the witness at this
12     time.
13               THE COURT:  Okay, you want to -- let's
14     take a little break and let's take a few minutes and
15     we'll get back at it.  All rise for the jury.
16               (Jury exits courtroom.)
17               (Short recess.)
18               THE COURT:  All right.  Ready, gentlemen?
19               MR. SKURKA:  Judge, we can turn the
20     lights back on.
21               THE COURT:  Yeah.
22               (Brief pause in proceedings.)
23               (Jury enters courtroom.)
24               THE COURT:  All right.  Be seated,
25     please.  All right, cross-examination.

69

1                MR. GARZA:  Yes, Your Honor.  May I
2      proceed?
3                THE COURT:  You may.
4                MR. GARZA:  Thank you.
5                     CROSS-EXAMINATION
6      BY MR. GARZA:
7          Q.    Ms. Salinas, good morning.
8          A.    Good morning.
9          Q.    My name is Edward Garza.  I don't think you
10     and I have ever met before, have we?
11         A.    No, we haven't.
12         Q.    And we have not had occasion to meet or
13     discuss any of your testimony here this morning; is
14     that correct?
15         A.    That's correct.
16         Q.    Have you had occasion to meet with Mr. Skurka
17     before your testimony here today?
18         A.    Yes, I have.
19         Q.    On how many occasions?
20         A.    I believe one -- one time -- one or two
21     times.
22         Q.    One time.  And then again this morning some
23     time?
24         A.    This morning I just came in.
25         Q.    Do you know when you had that meeting with

70

1  him?

2  A.   It was when the girls were going to trial and

3  then one last month earlier, when they --

4  Q.   One time last month?

5  A.   Uh-huh.

6  Q.   Ms. Salinas, I can only imagine how

7  traumatizing that evening back on the 19th must have

8  been for you, especially knowing Mr. Castro for as

9  many years as you knew him, but you did not personally

10  get to witness any of the events that led to his

11  death; is that correct?

12  A.   That is correct.

13  Q.   You did not see our client at the scene on

14  that particular evening; is that correct?

15  A.   That's correct.

16  Q.   Okay.  I believe you testified previously

17  this Angela Rodriguez, who you may have later

18  identified after this incident, is the person that you

19  recognized having gone into store that evening; is

20  that right?

21  A.   Right.

22  Q.   And do you recall -- I know it's been a

23  while, but do you recall what she was wearing?  I

24  think you've already described to the jury what she

25  was wearing.

71

1  A.   Sort of like short Capri, sort of like Capris

2  and a tank top.

3  Q.   Okay.  Do you know what color the tank top

4  was?

5  A.   It's been a while that I really can't recall

6  exactly the color, what it was.

7  Q.   Do you remember the color of the shorts?

8  A.   The shorts were like jeans.

9  Q.   Okay.  Were you given -- whenever you met

10  with Mr. Skurka -- well, that evening or some days

11  later as part of the police investigation do you

12  recall giving a statement to a Detective Lee?

13  A.   Yes, I do.

14  Q.   Okay.  And you gave essentially two

15  statements; is that correct?

16  A.   Correct.

17  Q.   I think you gave a statement on the 12th of

18  August of what you remember immediately as far as

19  going out and discovering the body; is that correct?

20  A.   That's right.

21  Q.   And then you gave another one how many days

22  later, do you recall?

23  A.   I don't recall.

24  Q.   Okay.  Was it a matter of months or days or

25  weeks, do you remember?

72

1  A.   I don't remember.

2  Q.   You don't recall?

3  A.   Nuh-huh.

4  Q.   Okay.  Did you have occasion to be given a

5  copy of that statement so that you could use it to

6  refresh your memory in anticipation of your testimony

7  here today?

8  A.   No, I haven't.

9  Q.   You did not?

10  A.   I didn't get no statement.

11  Q.   Okay.

12       MR. GARZA:  May I approach the witness,

13  Your Honor?

14       THE COURT:  Yes.

15  Q.   (BY MR. GARZA)  Let me hand you what I have

16  had marked for identification purposes Defendant's

17  Exhibit No. 1 and ask you if you can identify this

18  document.

19  A.   Yes, one of my -- when they asked me to

20  testify -- I mean --

21  Q.   That's one of your written statements?

22  A.   Written statement.

23  Q.   And how are you able to identify it?

24  A.   What's on there.

25  Q.   Okay.  And --

73

1  A.   And my signature.

2  Q.   And your signature, right?

3  A.   My signature.

4  Q.   Now, this is just a copy, I know it's not an

5  original but you are able to recognize it --

6  A.   My signature is on this.

7  Q.   -- as a signature?

8  A.   Uh-huh.

9  Q.   Is that correct?

10  A.   Correct.

11  Q.   Okay.  Can you read that to yourself and then

12  I'm going to re-ask you the question of the color of

13  clothing and see if it refreshes your memory.

14  A.   Uh-huh.

15  Q.   Do you remember now from having refreshed

16  your memory after reading your statement?

17  A.   Uh-huh.

18  Q.   Okay.  What color did you describe in that

19  statement -- when it was taken from you, what color

20  did you describe the blouse that Angela Rodriguez was

21  wearing that night?

22  A.   An aqua tank top.

23  Q.   And what about the shorts or Capris?

24  A.   Brownish-colored elastic shorts.

25  Q.   Okay.  Now, can you tell what date you gave

74

1   that statement from anywhere -- any indication above
2   there?
3       A.   Where -- it's on -- on the 12th.
4       Q.   The 12th of August; is that correct?
5       A.   Well, this is the day I see here.
6            MR. GARZA:  May I approach the witness
7   again, Your Honor?
8            THE COURT:  Yes.
9            MR. GARZA:  Thank you.
10      A.   That's the only day I see here.
11      Q.   (BY MR. GARZA)  On August the 12th; is that
12  correct?
13      A.   Correct.
14      Q.   So this is approximately maybe three -- three
15  weeks after the July 19th incident --
16      A.   Correct.
17      Q.   -- correct?
18      A.   Correct.
19      Q.   Okay.  And three weeks later you were able to
20  remember probably easier than --
21      A.   Right, it's a lot easier.
22      Q.   -- three years later --
23      A.   Right.
24      Q.   -- what she was wearing that evening when you
25  saw her?

75

1       A.   Correct.
2       Q.   Correct?  Thank you.
3            Now, I also believe it was your testimony
4   that she had walked in there just a few minutes, half
5   an hour, maybe an hour before the incident took place?
6       A.   Within 30 minutes, not half an hour.
7       Q.   Within 30 minutes or so?
8       A.   Not an hour.
9       Q.   Okay.  And the method in which she asked if
10  she could use your bathroom is what sort of caught
11  your attention or directed your attention?
12      A.   Right, there had never been anybody going in
13  there asking me for the --
14      Q.   To use your facilities?
15      A.   Right, uh-huh.
16      Q.   How long a period of time do you think that
17  exchange took between her coming into the store and
18  asking you to use the bathroom?
19      A.   How long?  I didn't understand your question.
20      Q.   How long a period of time did you get to
21  observe her there inside the store?
22      A.   How long she was in there?
23      Q.   Right.
24      A.   Maybe five, ten minutes, not even that long.
25      Q.   Okay.

76

1       A.   Cause she walked in, just asked me, and like
2   I tell you, I was busy doing my work, counting down my
3   register, so I really -- it was just like she was in
4   and out.
5       Q.   Now, is this a person that had ever in your
6   memory that you can remember having frequented the
7   store?
8       A.   As my memory, I can't remember her.
9       Q.   You didn't -- you never placed her --
10      A.   No.
11      Q.   -- coming in the store?
12      A.   No.
13      Q.   Okay.  When were you able to identify her as
14  the person that had been in the store that night?
15  When was the first time that she was ever brought to
16  your attention?
17      A.   I was really emotionally not well right after
18  that, so I'm not sure if it was a couple of days after
19  they called me in to the police station to -- for a
20  statement, but I don't remember the date, how long it
21  took or what.
22      Q.   So it was a matter of days?
23      A.   Uh-huh.
24      Q.   Okay.  Do you remember how she was brought to
25  your attention?

77

1       A.   They just said there was girls that they -- I
2   really don't -- I can't tell you.
3       Q.   Do you recall if you were shown a photo
4   lineup?
5       A.   They showed me a photo lineup, yes.
6       Q.   And did it include one of the girls in there?
7       A.   Right.
8       Q.   Did it include Angela Rodriguez in there?
9       A.   Yes.
10      Q.   Is that how you were able to identify her?
11      A.   Correct.
12      Q.   Okay.  Let me just go back again to that
13  evening.  When she first walked in and asked you to
14  use the bathroom, did she appear intoxicated to you?
15      A.   No.
16      Q.   She was not blurring -- she was not slurring
17  her speech or --
18      A.   No.
19      Q.   Okay.  Have you had occasion whenever people
20  come in the store to buy beer, maybe have had a few
21  too many already to observe or maybe smell on their
22  breath --
23      A.   I'm very good in observing people that are
24  drunk cause that's my -- if I get caught selling to
25  somebody that's drunk or a minor I'm responsible for

78

1    it so I really check on that.
2        Q.   Okay.  So you know how to observe and look
3    out for that kind?
4        A.   Yes, I do.
5        Q.   And she did not appear intoxicated to you
6    that evening?
7        A.   To me, no.
8        Q.   Okay.
9             MR. GARZA:  Judge, with the Court's
10   permission I would like to ask if I can recruit Mr.
11   Schimmel to assist us in the use of this machine.
12            THE COURT:  I'm sure Mr. Schimmel would
13   be --
14            MR. GARZA:  Mr. Jones and I are rather --
15            THE COURT:  -- happy to do so.
16            MR. GARZA:  -- old-school lawyers and we
17   don't know how to use this newfangled equipment.
18            MR. JONES:  Speak for yourself.
19       Q.   (BY MR. GARZA)  Now, I believe you previously
20   testified that you recognized this picture which was
21   probably taken obviously from the sky, it's an aerial
22   photograph, probably some time way after the incident,
23   and you've marked there the location of the
24   dumpster --
25       A.   Uh-huh.

79

1        Q.   -- is that correct?
2        A.   Correct.  Well, it's a little further over
3    here, but, I mean, it's in that location.
4        Q.   That's the proximity; is that correct?
5        A.   Uh-huh.
6        Q.   Okay.  Now, the light that is right here, is
7    that a pole?
8        A.   That's a light.
9        Q.   With a light?
10       A.   We had a security light there.
11       Q.   Okay.  Do you recall if it was working that
12   night?
13       A.   I don't recall.  I don't know.  To me it was,
14   I'm not sure if it was or not.
15       Q.   You're not sure if it was or not?
16       A.   Uh-huh.
17       Q.   But basically it was a light that can
18   illuminate the parking lot --
19       A.   Right.
20       Q.   -- is that correct?
21       A.   Correct.
22       Q.   Okay.  Let me also have you look at what's
23   been marked and admitted as State's Exhibit No. 6 and,
24   Geordie, can I ask you to move it more to the right of
25   the screen?  I think that picture can show us where

80

1    the dumpster is.
2             Now, is that the dumpster we're talking
3    about
4    that was there that evening?
5        A.   It looked like it is.
6        Q.   That would be the one where Mr. Castro would
7    have gone out to throw the trash --
8        A.   Correct.
9        Q.   -- correct?  Now, this area here, all around
10   in here, do you recall how well lit that was that
11   evening?
12       A.   I can't recall, it's been -- it was always
13   lit up cause I would get off and on my car at night on
14   there and we always had that security light and some
15   lights in the front.
16       Q.   Was there ever a time that you remember that
17   the security light was not working?
18       A.   I don't recall.
19       Q.   But to your knowledge -- and you believe it
20   might have been working that night but you're not
21   sure?
22       A.   I'm not sure but usually we were good on
23   having our lights, security lights fixed.
24       Q.   And who does that for you-all, your -- your
25   boss would do it or did you-all have a contractor?

81

1        A.   No, my boss would do it.
2        Q.   Okay.  I believe it's also your testimony
3    that until your sister-in-law came to bring you-all
4    some -- something to eat that evening you didn't get a
5    chance to see the -- the two vans we've been --
6    discussed here in the early parts of this trial?
7        A.   No, I didn't see it.  No, I did not see it.
8        Q.   You didn't see either one of them?
9        A.   (Shakes head.)
10       Q.   Okay.  And you didn't see any of the people
11   that may or may not have been occupying the
12   vehicles --
13       A.   No.
14       Q.   -- is that correct?
15       A.   That's correct.
16       Q.   Thank you, Ms. Salinas.  I don't have any
17   other questions of you.
18            THE COURT:  Anything else?
19            MR. SKURKA:  Yes, Judge, just a few
20   follow-up questions.
21            REDIRECT EXAMINATION
22   BY MR. SKURKA:
23       Q.   Ms. Salinas, just to follow-up a few things
24   that you were talking to the Defense about.  You
25   mentioned to him about the statement that he showed

82

1 you from August 12th and you said "I was not
2 emotionally and physically well right after the
3 incident," and if you gave that statement on the 12th,
4 that would have been three or four weeks or so after
5 the incident happened. How long did this affect you
6 and how did it affect you?
7     A. It still affects me. It's been, what, four
8 years, three years. It still affects me.
9     Q. So when you gave that statement on August --
10 on August 12th, did you -- I mean, were you still
11 affected by the loss of Pablo Castro at the time?
12     A. Right.
13     Q. And the statement, you -- you got to read the
14 whole statement, right?
15     A. I just glanced at it, I didn't read it all.
16     Q. Okay. But you saw that you -- you told the
17 officers pretty much what had happened that day and
18 you -- I think you said you had remembered more --
19     A. Right.
20     Q. -- and so you put that in there.
21     A. Right.
22     Q. The fact that the clothing that you described
23 here a minute ago, you said it was more blue jean
24 type, and then you said in the statement it was
25 brown --

83

1     A. Yeah.
2     Q. -- how do you account for that?
3     A. I'm nervous.
4     Q. Okay, I understand. Did you -- is there
5 anything else in the statement that's -- that may be
6 incorrect that you saw?
7     A. No.
8     Q. In other words, you did see Pablo Castro take
9 out the trash?
10     A. Right.
11     Q. That's what your statement said, right?
12     A. Uh-huh.
13     Q. You did see him lying in a pool of blood --
14     A. I did.
15     Q. -- correct? You did see the girl come in and
16 out of the store?
17     A. Right, I remember her. Exactly what she's
18 wearing and what color jeans and shirt she's wearing,
19 I mean, I try to block her off really, exactly what
20 everything happened, but I can't.
21     Q. But it was her no matter what color --
22     A. It was her. No matter what color she was
23 wearing, it was her.
24     Q. And Mr. Garza asked you about did she appear
25 intoxicated. Were you ever face-to-face with her when

84

1 she asked to go to the bathroom?
2     A. No, she just passed -- no, she just passed
3 by. She asked me for the -- I really -- like I told
4 you, I was counting money this way. She asked me and
5 I just turned, not -- not really looked her down
6 completely where I could, you know, but --
7     Q. Well, that's what I'm saying, were you ever
8 face-to-face with her?
9     A. No.
10     Q. And the time that she talked to you, she was
11 going by --
12     A. She was going by.
13     Q. So would it be fair --
14     A. She just looked at me and asked me if she
15 could use the facilities.
16     Q. Would it be fair to say that your contact
17 with her lasted only a couple of seconds?
18     A. Seconds.
19     Q. And you say I'm assuming as a store owner or
20 a person working the convenient store you're trained
21 or taught how to recognize people that are intoxicated
22 so you don't sell alcohol to them; correct?
23     A. Correct, but she wasn't buying or asking me
24 for anything.
25     Q. I understand.

85

1     A. She was just --
2     Q. If a person drank vodka, would that leave a
3 smell on their breath?
4     A. I'm not a drinker so I don't know.
5     Q. Okay. That's all the questions I have.
6 Thank you, ma'am.
7         MR. GARZA: No other questions, Your
8 Honor.
9         THE COURT: You may stand down. May this
10 witness be excused?
11         MR. SKURKA: Yes, Your Honor. You may be
12 excused, ma'am.
13         THE COURT: All right. Please don't
14 discuss your testimony with anyone.
15         All right. Mr. Skurka, call your next
16 witness.
17         MR. SKURKA: Mariano Cervantes.
18         THE COURT: All right. Come forward.
19         MR. SKURKA: Judge, he was not placed
20 under the Rule earlier.
21         THE COURT: All right.
22         (Oath administered.)
23         THE COURT: All right. Please be seated.
24 Now, the Rule has been invoked, and what that means is
25 that you can't talk to anybody about the facts of this

86

1   case while the case is going on, okay?

2           THE WITNESS:  Yes, sir.

3           THE COURT:  You can talk to the lawyers

4   but not in front of any of the other witnesses, okay?

5           THE WITNESS:  Yes, sir.

6           THE COURT:  All right.  You may proceed,

7   Mr. Skurka.

8           MR. SKURKA:  Thank you, Your Honor.

9

10          MARIANO CERVANTES,

11  having been first duly sworn, testified as follows:

12          DIRECT EXAMINATION

13  BY MR. SKURKA:

14      Q.   Would you please introduce yourself to the

15  jury.

16      A.   Yes, my name is Mariano Cervantes, III.

17      Q.   How old are you now?

18      A.   23.

19      Q.   And how old were you at the time of July

20  19th, 2004?

21      A.   I believe I was 19.

22      Q.   You -- you're getting over a cold or

23  something?

24      A.   Yeah.

25      Q.   If you need some water just help yourself.

87

1       A.   All right.

2       Q.   Did you in -- do you live here in Corpus?

3       A.   Yes, sir.

4       Q.   How long have you lived here in Corpus?

5       A.   My whole life.

6       Q.   And did you go to high school here in Corpus?

7       A.   Yes, sir.

8       Q.   Where did you go?

9       A.   Moody High School.

10      Q.   Did you graduate?

11      A.   Yes.

12      Q.   And when did you graduate?

13      A.   2003.

14      Q.   Back around the time of July 19th, 2004,

15  where were you working?

16      A.   2004?

17      Q.   The night of the incident.

18      A.   At CK Mart, a convenience store.

19      Q.   CK Mart?

20      A.   Yes.

21      Q.   That's a convenience store?

22      A.   Yes, sir.

23      Q.   Where is it located?

24      A.   It's on Baldwin and Port.

25      Q.   How long had you been working there?

88

1       A.   I think almost a year.

2       Q.   Almost a year?

3       A.   (Nods head.)

4       Q.   Did you know the people that owned that

5   store?

6       A.   Well, I knew Kashif and I knew his dad but I

7   didn't know his name or anything.

8       Q.   Okay.  When you say "Kashif," are you

9   referring to Kashif Butt?

10      A.   Yes, sir.

11      Q.   Okay.  His family owns that convenient store

12  you worked at?

13      A.   Yes, sir.

14      Q.   And so you knew Kashif through him, through

15  the work there?

16      A.   Uh-huh.

17      Q.   I want to direct your attention to that

18  evening at around 11:00 or so -- or where you were

19  working.  How long did you work that day?

20      A.   I think we worked till -- I think till 11.  I

21  think that's the time we closed.

22      Q.   And who were you working with that night?

23      A.   It was just me and Kashif that night.

24      Q.   Where did you go after you got off work at

25  the convenient store at Baldwin and Port?

89

1       A.   Well, Kashif wanted to wash his vehicle so we

2   went to the car wash at Baldwin and I just tagged

3   along with him.

4       Q.   Can you describe the car wash, where is it on

5   Baldwin?

6       A.   You go down Baldwin, it's like past the

7   freeway, past the overpass, and it's on your left side

8   like going down Baldwin.

9       Q.   What time were you there at the car wash if

10  you-all close at 11?

11      A.   I'm not sure exactly but maybe somewhere

12  around 11:30 or so.

13      Q.   Did you-all wash both cars or just your

14  car or his car?

15      A.   No, we washed both.  I washed mine, he washed

16  his.

17      Q.   After you washed your cars where did you go

18  or where did you move the cars to?

19      A.   What do you mean, like after we -- well, we

20  left our vehicles there.

21      Q.   Oh, you left them.

22      A.   Yeah.

23      Q.   I guess what I'm trying to say is this the

24  kind of car wash that has those open bays that you

25  spray them down with?

90

1    A.    Yeah, it's like has the dividers and stuff.

2    Q.    At the time that you were washing your cars

3  did you have anything that caught your attention

4  coming from the Times Market parking lot next-door?

5    A.    Yeah, well, it caught Kashif's attention

6  first when he noticed like a scuffle going on at the

7  store to our left.

8    Q.    What did you see?

9    A.    Well, he saw it first and then he tapped me

10 on the shoulder and told me to look in that direction

11 and it seemed like these two people were hitting, I

12 guess fighting this -- this older man.

13   Q.    Tell the jury exactly how far -- exactly what

14 you saw happen.

15   A.    Well, it was a lady and then a man, and there

16 was an older gentleman.  It looked like they were just

17 hitting him and the lady and the other younger man

18 were on either side of the gentleman and it just

19 looked like they were just like hitting him really

20 hard and like they were just in a fight.

21   Q.    And what happened next?

22   A.    Well, that's when I turned to Kashif and I

23 told him we should like try to help him and I put the

24 nozzle, the spray thing back in the -- the holder and

25 I just went across the -- like down the little hill

91

1  thing that they have and then I went across the

2  street.

3    Q.    Before you went across the street you said

4  you noticed they were hitting him.  Can you describe

5  how they were hitting him, please.

6    A.    Yeah, well, it just looked like -- I mean, it

7  was like kind of far away but it just looked like they

8  were punching him from what I could see.

9    Q.    Who was punching him, the man or the woman?

10   A.    Both of them, they were both like hitting

11 him.

12   Q.    Could you see anything in their hands?

13   A.    No.

14   Q.    Did you notice any weapon at the time?

15   A.    No, sir.

16   Q.    As they were hitting him was the man they

17 were hitting upright or on the ground?

18   A.    He was upright.  When I first saw him he was

19 upright and he was in the center of both of them.

20   Q.    Uh-huh.  And then what did you see?

21   A.    Just them, like just hitting him, hitting him

22 in the chest, hitting him in the arm and the face, and

23 he looked like he was trying to get out of the way.

24   Q.    You thought -- you said the guy looked like

25 he was trying to get out of the way?

92

1    A.    Yeah.

2    Q.    Did you see anything that happened before the

3  fight was going on like who came from what direction

4  or whatever?

5    A.    No, sir.

6    Q.    Did you ever see the man who was getting

7  attacked go to the ground?

8    A.    Yes, after --

9    Q.    Tell us about that, please.

10   A.    Well, after I put the nozzle -- like

11 everything was happening really fast and after I put

12 the nozzle in the holder, I started going to the

13 convenience store and then it looked like the man and

14 the woman that were hitting the older gentleman, they

15 got in their vehicles.  It was two vans and then those

16 vehicles like they started pulling out and then they

17 left by the time I got there, and that's -- at that

18 time the man was like -- I guess like kind of falling

19 down already.

20   Q.    Did you see -- before you went across the

21 street, did you see either the man or woman who was

22 attacking the one man try to do anything around his

23 clothing or get something from him?

24   A.    No, I didn't see that.

25   Q.    Did you see the woman do anything to go

93

1  through the man's pockets?

2    A.    No, sir.

3    Q.    Did you see the man do that?

4    A.    No.

5    Q.    What did you see?

6    A.    From what I saw, the short -- I mean, the --

7  the time that I saw it, it just looked like they were

8  hitting him, just hitting him a lot, hitting him

9  really hard.  It didn't look -- I mean, I couldn't

10 tell if they were trying to steal something from his

11 pockets because I wasn't really looking for that.  I

12 just saw these two people hitting this older man and

13 my first instinct was like "Let's help him out."

14   Q.    So what did you do?

15   A.    That's when I told me friend Kashif, you

16 know, to "Let's assist him, let's help him," and I put

17 the nozzle back in the thing and I went over there to

18 the convenient store.

19   Q.    Now, you said that two people left in the

20 van.  Tell me where the vans were parked and where the

21 people went.

22   A.    The vans, like they were -- they were in like

23 parking spaces.  There was one van and then there was

24 like an empty space and then there was another van to

25 the right of it, and they got in like the two separate

94

1  vehicles. I don't know like what side of the vehicle
2  they got in or -- I just saw them like run in. I
3  don't remember what side they got in or anything.
4      Q.  I understand but you did see two vans?
5      A.  Yes, sir.
6      Q.  Can you tell us the color, the make or model
7  of them?
8      A.  No, I don't remember.
9      Q.  And you're sure that they got in separate
10 vans?
11     A.  Yes, sir.
12     Q.  And which way did they go after they got in
13 the van?
14     A.  From what I could remember they kind of went
15 in -- after they reversed they went in like separate
16 directions like through -- as far as I can remember
17 they went through like two -- they reversed. One of
18 them went to the left through that little exit going
19 down that little ramp and the other one went the other
20 way.
21     Q.  Towards Baldwin or away from Baldwin?
22     A.  Toward Baldwin, and then the other one went
23 in that little street that separates the -- the
24 wash -- I mean, the car wash from the convenient
25 store.

95

1      Q.  Did you know the name of that street?
2      A.  No.
3      Q.  What did you do then?
4      A.  Well, that was when I was -- like when I got
5  there they were exiting, they were leaving, and then I
6  saw the man and he was on the floor.
7      Q.  Describe for the jury what you saw when you
8  approached the man on the ground.
9      A.  Well, when I was, you know, walking towards
10 him already it kind of -- I was preparing to see a
11 man, you know, that was beat up, and I was just going
12 to try to help him.
13     Q.  What did you see?
14     A.  Well, when I got closer -- sorry. When I got
15 closer I saw blood like on his face, and I told him, I
16 was like, "You're going to be all right, we're going
17 to get you help, you're going to be okay," and he
18 wasn't really responding to me or anything, like he
19 was like looking at me, he was conscious, he was still
20 -- he was awake, and I told him "You're going to be
21 all right, you're going to be okay." And I got a
22 little bit closer to him cause he was just laying on
23 the floor and then his head kind of just I guess fell
24 back. I mean, it's hard to explain. He was already
25 laying down but his head just kind of I guess like

96

1  tilted back and that's when I saw his throat, and
2  that's when I realized, okay, something serious, you
3  know, more than him being beat up happened.
4      Q.  What did you see on his throat?
5      A.  I saw a gash and I just saw a lot of blood
6  and a lot of fatty tissue and a lot of things just
7  hanging out.
8      Q.  What happened then?
9      A.  At that time I got on my knees and I started
10 like telling him, you know, "Calm down, we're going to
11 get you help, you're going to be okay, you're going to
12 be okay," just trying to help him.
13     Q.  What happened?
14     A.  Well, he was still kind of responsive. I
15 mean, he was still alive and --
16     Q.  Was he breathing?
17     A.  He was but it was like a lot of gargling, a
18 lot of blood was blocking his passageway and
19 everything.
20     Q.  Was he able to say anything to you?
21     A.  No.
22     Q.  You were basically trying to take care of him
23 or hold him?
24     A.  Yeah, just keep him till somebody, you know,
25 came along.

97

1      Q.  Did anybody call 911 like yourself or
2  anybody?
3      A.  I didn't call 911 but when I got there, like
4  I said, everything was happening really fast, and when
5  I got there the -- I guess one of the workers from the
6  store came out, this lady, and she was, you know, kind
7  of loud and she was saying, you know, "Who is it, is
8  it Pablo?" She was yelling and I told her "I don't
9  know, but we need help, call somebody," and I believe
10 she was the one that called 911 but I'm not sure. I
11 don't know who -- I'm pretty sure it was her but like
12 I asked her to.
13     Q.  What did you do with Pablo, with the man on
14 the ground?
15     A.  Well, he was there just laying down and he
16 kept gargling and spitting out blood and I just, you
17 know, tried to tell him, you know, "You're going to be
18 okay, you're going to be okay, we're getting help,"
19 and then he just kind of stopped and I started like
20 clapping in front of his face.
21     Q.  Why did you clap in front of his face?
22     A.  Well, I really didn't know what to do, I'm
23 not a, you know, a medic or anything, you know. I
24 really had no idea what to do but I was just trying to
25 just make a loud noise, see if it could bring him back

98

1  and it kind of did, like he kind of got responsive
2  again. And then I told him, you know, "We got help,
3  they're already on its way, you're going to be all
4  right," and then the second time like he stopped
5  moving again and that was it.
6      Q.   So are you saying that the first time you
7  clapped he kind of --
8      A.   He kind of like came back.
9      Q.   -- regained consciousness? And then what
10  happened?
11      A.   That's when I started, you know, telling him
12  again that help was on its way and to stay with us,
13  that he was going to be okay. And then after that,
14  that's when he stopped breathing the second time.
15      Q.   Were you literally like kneeling down to him
16  or next to him or --
17      A.   I think I was just on one knee.
18      Q.   -- were you touching him?
19      A.   No, I wasn't touching him. I didn't touch
20  him at all but the closest I got to him I was just
21  like -- I think I was just like on one knee and the
22  closest I got I was just clapping like close to his
23  face.
24      Q.   Did you know this man at all?
25      A.   No, sir.

99

1      Q.   What if any other injuries did you see around
2  him beside the one you described on his neck?
3      A.   From what I remember I just saw that cut on
4  his neck. I remember his shirt. I mean, there was a
5  lot of blood on it but I didn't really pay attention
6  to anything else except his face cause that's -- I was
7  just trying to get him to look at me and keep him --
8  you know, trying to keep him alive.
9      Q.   So would it be fair to say the only wound you
10  really noticed would the one on his neck?
11      A.   Yes.
12      Q.   Did you talk to the police when the police
13  got there?
14      A.   Yes.
15      Q.   And did you give them information about what
16  you had seen?
17      A.   Yes, sir.
18      Q.   Did you describe the people who you had seen
19  attack the man?
20      A.   I'm not sure if I told them right then and
21  there. I mean, I may have, it was so long ago but, I
22  mean, I'm pretty sure, you know, I described what had
23  happened.
24      Q.   You just don't remember exactly?
25      A.   Yeah, like at what time I told him -- I mean,

100

1  when exactly I told them.
2          MR. SKURKA:  Your Honor, may I approach
3  the witness?
4          THE COURT:  Yes.
5      Q.   (BY MR. SKURKA) Since you don't remember
6  some of the stuff that I asked you about I'm going to
7  show you a copy of your statement and I'm going to ask
8  you to read it to yourself, please. Take your time
9  and read it to yourself. Please take your time and
10  read it to yourself, and then I'm going to go over
11  some of questions about that, okay?
12      A.   Yeah.
13      Q.   Have you had a chance to read it now?
14      A.   (Nods head.)
15      Q.   Okay. Let me ask the question again. Do you
16  remember describing to the police what the people
17  looked like or what they were wearing?
18      A.   At this moment like I don't remember what the
19  vehicle looked like but in my statement at the time
20  like I had a perfect memory because it happened that
21  night and, you know, I told them the color of the
22  vehicles and everything.
23      Q.   Okay. I'm talking about the people, what
24  they were wearing and what they looked like.
25      A.   Oh, yes, sir.

101

1      Q.   Can you tell what they looked like?
2      A.   I remember the girl, I believe she had like a
3  white T-shirt on, like a loose-fitted shirt.
4      Q.   And can you remember anything else about her?
5      A.   Just -- just baggy clothes and that's pretty
6  much all I can remember right now.
7      Q.   Now, you gave this statement I just showed
8  you, right, either the day or the next day, correct --
9      A.   Yes, sir.
10      Q.   -- on July 20th? Okay. Did you also tell
11  the police about seeing the woman do anything else
12  beside what you described today?
13          MR. GARZA:  I'm going to object to
14  leading, Your Honor.
15          THE COURT:  Sustained -- well, that's
16  not -- no, it's overruled.
17      A.   What?
18          THE COURT:  You can repeat the question.
19      A.   Yeah, can you repeat it, please? Sorry.
20      Q.   (BY MR. SKURKA) Did you also tell the police
21  something in the statement that you -- that you notice
22  about what the woman did beside what you testified a
23  minute ago?
24      A.   Yes, on the statement it shows that that
25  night I told them it looked like they were reaching

102

1    like stuff from his pockets and stuff.
2        Q.   Is that what you remember happening?
3        A.   Yeah, now I do.  I mean, from -- after
4    reading.
5        Q.   Okay.  You just couldn't remember that
6    earlier?
7        A.   Like I said, this is like four or five years
8    ago.
9        Q.   I know, I'm not fussing at you.
10       A.   No, I know.
11       Q.   I'm just trying to tell you -- show to the
12   jury that you did see it that night.
13       A.   Yes, sir.
14       Q.   So tell the jury exactly what you saw her do
15   or he do about taking something from the pockets.
16       A.   It looked like the girl, you know, was the
17   one that was kind of trying to take something from him
18   and both of them were I guess beating him, beating the
19   older gentleman.
20       Q.   Now, do you know who it was, the man who was
21   that attacked the man from this convenience store?
22       A.   I don't -- I didn't know him, I don't know
23   his name or anything but I knew his face.  Like as
24   soon as I saw him, like I -- it was a familiar face.
25       Q.   Is that person in the courtroom today?

103

1        A.   Yes, sir.
2        Q.   Can you point to him and describe something
3    he's wearing.
4        A.   Yes, he's wearing an orange shirt.
5        Q.   Is that the person that you saw attack the
6    man in the parking lot?
7        A.   Yes, sir.
8        Q.   You keep -- you keep saying he had a familiar
9    face.  Why is he familiar to you?
10       A.   The reason he was familiar is because I went
11   to school with him.  Like I didn't know him personally
12   or anything like that but I knew him, like we went to
13   the same school.
14       Q.   So you had -- before this night on July 19th,
15   2004, you knew who it was because you had gone to
16   school with John Henry Ramirez?
17       A.   Yeah.
18       Q.   Where, at Moody I'm guessing?
19       A.   Yes, sir.
20       Q.   And you're not saying that you were friends
21   with him or --
22       A.   No, we never spoke.
23       Q.   But when you talked to the police you were
24   able to identify him, were you not?
25       A.   Yes, sir.

104

1        Q.   Was the lighting good enough that you could
2    see John Henry Ramirez out in the parking hot?
3        A.   Yeah, I think they had like the -- the poles
4    were lit and everything.
5        Q.   And you're sure it was him?
6        A.   Yes, sir.
7        Q.   Did you know the girl at all?
8        A.   No.
9        Q.   I'm going to show you some photographs now,
10   they're marked State's Exhibit No. 8 through 15.  I'm
11   going to ask you to take a look at these aerial
12   photographs and see if you can recognize what they are
13   photographs of.  Just take your time and just look at
14   them to yourself.
15       A.   Yeah.
16       Q.   Do you recognize those photographs?
17       A.   Yes, sir.
18       Q.   What are they?
19       A.   It's of the car wash and the convenience
20   store.
21       Q.   They're what?
22       A.   It's pictures of the car wash and the
23   convenience store.
24       Q.   And do they fairly and accurately depict the
25   scene that day -- that night?

105

1        A.   Yes, sir.
2        Q.   Except for these are taken during the day;
3    correct?
4        A.   Yeah.
5        Q.   Is there any other differences that you see
6    in them?  Was the dumpster in the photographs there?
7        A.   Well, it's not there but at the time it was.
8        Q.   Other than that, is there any other
9    difference?
10       A.   Yeah.
11            MR. SKURKA:  I'll tender these
12   photographs to Defense Counsel and offer them into
13   evidence, too, Your Honor.
14            MR. GARZA:  No objection, Your Honor.
15            THE COURT:  They're admitted.
16            MR. SKURKA:  May I publish them to the
17   jury, Your Honor?
18            THE COURT:  You may.
19       Q.   (BY MR. SKURKA)  There's a laser pointer in
20   front of you that might help you show these to the
21   jury.  We'll start with No. 8.  Can you tell us where
22   the Times Market is in that photograph.  Let's start
23   with orienting the jury.  Where is the freeway?
24       A.   This is the freeway.
25       Q.   Okay.  That's Crosstown Freeway?

106

1    A.   Yes, sir.

2    Q.   And Baldwin?

3    A.   (Indicating.)

4    Q.   Okay.  And then go up to show us where the

5 car wash is.

6    A.   (Indicating.)

7    Q.   Right there?

8    A.   Yeah.

9    Q.   And I've got some closer-up of that, and then

10 where the Times Market is.

11   A.   It's right there.

12   Q.   Okay.  I've got another one here, No. 9.  And

13 does that show the car wash and the Times Market and

14 the relationship from the freeway?

15   A.   Yes, sir, car wash, and then the store.

16   Q.   Okay, I've got some more close-ups coming.

17 I'll show you No. 10.  What is that a photograph of?

18   A.   Oh, this right here?

19        MR. SKURKA:  Excuse me, Frank, can we

20 turn the light off behind this a little bit, please?

21   Q.   (By MR. SKURKA)  And what does that show?

22 Tell us what angle that's from.

23   A.   This is Baldwin.

24        MR. SKURKA:  Thank you, Frank.

25   A.   Car wash and then the store.

107

1    Q.   (BY MR. SKURKA)  That's essentially from

2 behind it, correct?

3    A.   Yes, sir.

4    Q.   Okay.  Now No. 11, and what does that show?

5    A.   It's like the front part of the cash wash and

6 the store right here and Baldwin.

7    Q.   Okay.  Where would the dumpster be in that

8 photograph?

9    A.   Somewhere right here.

10   Q.   Okay.  It's not in the photograph there but

11 you're indicating in front of the yellow house;

12 correct?

13   A.   Yes, sir.

14   Q.   And then 12.  Does that show it from a

15 slightly different angle?

16   A.   Yes, sir.

17   Q.   13.  Where was your car now and -- and

18 Kashif's car in that parking lot looking at State's

19 Exhibit 13?

20   A.   I'm not sure which little divide thing it was

21 but --

22   Q.   I call them stalls or bays.

23   A.   Yeah, the stall was.  It could have been the

24 second or the third but -- cause Kashif was in the

25 next -- the left one to me.

108

1    Q.   You're not sure but you think it was the

2 second or third one?

3    A.   Yeah, one of those.

4    Q.   Okay.  Then I'm going to show you 14.  Okay.

5 And then I'm going to show you 15.  I want to go a

6 little closer on 15.  Now that -- can you zoom in a

7 little bit on that, please, and focus.

8        What I want to do is look -- okay, go more

9 out.  Now, here's the car wash and here's the Times

10 Market; correct?

11   A.   Yes, sir.

12   Q.   Okay.  Okay, where were you and Kashif

13 standing when you're watching what's happened over

14 here by the dumpster?

15   A.   Like around here.

16   Q.   Okay.  So you were right here by the second

17 or third stall?

18   A.   Yeah, in front of our vehicles.

19   Q.   Now, was anything blocking your view?

20   A.   No, sir.

21   Q.   Now, there's a tree here, right?

22   A.   Yes, sir.

23   Q.   Was that blocking your view?

24   A.   No, sir.

25   Q.   Why not?

109

1    A.   It's kind of high up into where the actual

2 leaves and all that stuff start.

3    Q.   Okay, you're going to have to say that again

4 for me.

5    A.   Like where the leaves and all that stuff is

6 like pretty hard from the ground so like our view from

7 here to there, it's perfect.

8    Q.   So there was nothing -- was there anything

9 blocking your view is what I'm saying?

10   A.   No, sir.

11   Q.   And when you're saying is -- you're talking

12 about the foliage, the leaves and stuff were way off

13 the ground.  At eye level, was there anything blocking

14 your view?

15   A.   No, sir.

16   Q.   Was there any other bushes or anything

17 blocking your view from here to there?

18   A.   No, sir.

19   Q.   And you said something about lighting, and I

20 see right here there seems to be a picture of a street

21 light or a security light.  Do you remember if that

22 was working that night?

23   A.   I believe so.  I believe it was working

24 because there was a lot of light out.

25   Q.   That was my next question, was --

110

1    A.   I'm not sure if it was --
2    Q.   Okay, let me ask the question, Mariano.  Was
3  there enough lighting that you could see this area
4  where the struggle took place?
5    A.   Yes, sir.
6    Q.   Okay.  I'm going to -- let me have 15.  What
7  I want you to do is take No. 15 and I want you to put
8  two little Xs where you and Kashif were standing by
9  the car wash and then I want you to put an X kind of
10  where you saw the confrontation or the fight.
11    A.   (Witness complying.)
12    Q.   Let me put that back up for the jury to see.
13  Okay, for the record, this is State's Exhibit 15 and
14  the two Xs are drawn approximately where you and
15  Kashif were and the single X over here at the parking
16  lot shows approximately the area where the fight took
17  place; is that correct?
18    A.   Yes, sir.
19    Q.   Okay.  You were -- would it be fair to say
20  you were first one to get to the victim laying on the
21  ground?
22    A.   Yes.
23    Q.   So, was he -- do you remember if he was face
24  up or face down?
25    A.   I believe he was face up.

111

1    Q.   You think he was face up?
2    A.   Yes, sir.
3    Q.   And you were close enough to him but you
4  didn't touch him; correct?
5    A.   Yes.
6    Q.   I show you what's been marked State's Exhibit
7  No. 17 and ask if you can recognize that.  What is it?
8    A.   It's the victim.
9    Q.   Is that a photograph of the victim after you
10  found him?
11    A.   Yes, sir.
12    MR. SKURKA:  Your Honor, may I tender
13  State's Exhibit 17 to Defense Counsel and offer into
14  evidence.
15    MR. GARZA:  Your Honor, may we take up a
16  motion outside the presence the jury?
17    THE COURT:  Yeah.  In fact, let's do
18  this, ladies and gentlemen, we got to take up a motion
19  outside your presence.  It's a good time for me to
20  send you to lunch.  We'll see you back at 1:30 in the
21  jury room.
22    All rise for the jury.  Let's wait.
23  Let's let the jury clear the floor before anyone
24  leaves.
25    (Jury exits courtroom.)

112

1    THE COURT:  All right, be seated, please.
2  Okay.
3    MR. GARZA:  Your Honor, with respect to
4  State's Exhibit 17, the gruesome nature of picture,
5  basically I'm going to object under Rule 403 that it's
6  got a highly prejudicial effect and it far outweighs
7  its probative value.
8    MR. JONES:  Your Honor, can I -- I have
9  the exhibit.
10    THE COURT:  Can you proffer -- tender it
11  to me so I can take a look?
12    MR. JONES:  So the Court can look at it,
13  yes, sir.
14    MR. SKURKA:  May I respond, Your Honor?
15    THE COURT:  All right, Mr. Skurka?
16    MR. SKURKA:  Quite simply, Judge, this
17  witness has testified as a condition of the victim as
18  he found him.  This is the closest picture to show
19  what he observed at that time.  I will tell the Court
20  there are numerous, numerous pictures that I have of
21  Mr. Castro in the parking lot.  I will tell you, I
22  went -- gone through most of those pictures and tried
23  to eliminate ones; however, Judge, it's going to be
24  very clear that there's going to be a lot of pictures
25  and they're going to be worst than this one, Judge,

113

1  because they show the wounds.  I have other
2  photographs that show the wounds to his neck and the
3  other things.
4    I also have an I.D. tech who will
5  testify.  You'll see in that picture there's one cone
6  by the Defendant but there's really about seven or ten
7  cones all around him where they found various items
8  including his hat, ring, papers, and stuff that
9  belonged to Pablo Castro.  I don't think it's
10  prejudicial at all, Judge, because this is what the
11  witness saw when he first came out there.  The jury is
12  entitled to see the victim as he was at that time and
13  I can tell you, Judge, I've gone through a lot of
14  these other photographs and I understand their
15  objection but I don't think it's well-founded in this
16  case because it's probative cause this is how the
17  witness has said he found the man.
18    THE COURT:  Now, are you admitting -- or
19  seeking to admit State's Exhibit Exhibit 17 to show --
20  to prove that he was stabbed?
21    MR. SKURKA:  No, Judge, it's to prove --
22  to show the condition of the victim when the witness
23  came --
24    THE COURT:  Well, I understand that, but
25  you got an element here to prove.  If that's what

114

1   you're doing --
2           MR. SKURKA:  Yes, Judge.
3           THE COURT:  -- then I'll admit it, but
4   I'm not going to admit -- I'm not going to let
5   you admit a plethora of similar photographs.
6           MR. SKURKA:  And I understand that,
7   Judge.
8           MR. GARZA:  Not only that, Your Honor,
9   the State has the opportunity at a later date through
10  the medical examiner to prove up the cause of death,
11  also which is one of the elements of the indictment,
12  Judge --
13          THE COURT:  Well --
14          MR. SKURKA:  -- without having to
15  unfairly prejudice the jury.
16          THE COURT:  -- I'm going to allow this
17  photograph, Mr. Skurka, but this is the -- if this is
18  the photograph of the victim that you want --
19          MR. SKURKA:  Judge, there's going going
20  to be more photographs of the victim, Judge.
21          THE COURT:  Well, I may or may not let
22  you get them in.
23          MR. SKURKA:  I can't bring them in
24  through this witness, Judge, he's not the I.D. tech
25  that took the photographs.

115

1           THE COURT:  I understand that.
2           MR. SKURKA:  Oh, I understand.
3           THE COURT:  I'm going to let this
4   photograph in.  What I'm telling you is I may not let
5   a whole bunch of them in of this nature.
6           MR. SKURKA:  And I understand that,
7   Judge, and when we get to those other witnesses I
8   think we should probably do the same thing.
9           THE COURT:  Okay, I just want you to
10  know that if this is the photograph that you want then
11  that's fine, I think you're entitled to -- I think
12  you're entitled to bring in a photograph of the
13  victim's injuries and of the crime scene as it was, but I do --
14  scene of this nature, but beyond that, it's -- you
15  know, I'm going to look at a lot -- a lot more closely
16  because I think -- I think the Defense does make a
17  valid point although in Mr. Skurka's defense in this
18  particular situation I think he's allowed to show the
19  injuries and of the crime scene as it was, but I do --
20  I note your objection in that a large number of
21  photographs of this nature may be prejudicial, all
22  right?
23          So I'm going to overrule your objection
24  but I am taking it into consideration if the State
25  attempts to introduce photographs of this nature in

116

1   the -- in the future in this trial, okay?  So I'm
2   going to admit this over Defense's objection, I'm
3   going to overrule their objection, but I have
4   considered it and I am going to take it into
5   consideration for future rulings, all right?
6           MR. SKURKA:  Yes, Your Honor.
7           THE COURT:  All right, so State's Exhibit
8   No. 17 is admitted.  You're going to have to be here
9   after lunch.  Be here a little bit before 1:30.
10          Is there anything we need to take up?
11          MR. GARZA:  No, Your Honor.
12          MR. SKURKA:  No.
13          THE COURT:  All right, we'll see you-all
14  after lunch.
15          (Noon recess.)
16          THE COURT:  All right, be seated.  Then I
17  guess we got -- you're on cross.  I guess we need the
18  witness.
19          MR. GARZA:  I'm not on cross yet, Judge.
20          MR. SKURKA:  We had that last exhibit
21  that you made the ruling on --
22          THE COURT:  Oh, that's right.
23          MR. SKURKA:  -- that I haven't been able
24  to show them yet.
25          MR. GARZA:  I don't think the Prosecution

117

1   is done yet, Judge.
2           THE COURT:  You-all can be seated.
3           MR. SKURKA:  You probably need to make
4   the ruling on the record, I guess.
5           THE COURT:  Okay.
6           MR. SKURKA:  I identified it but then
7   they had an objection.
8           THE COURT:  All right.  Did we do that on
9   the record?
10          COURT REPORTER:  In front of the jury or
11  on the record?  We did it on the record.
12          THE COURT:  We did it on the record?
13          COURT REPORTER:  Yeah.
14          MR. SKURKA:  Okay.  So Exhibit 17 is
15  admitted?
16          THE COURT:  Exhibit 17 is admitted.  Mr.
17  Garza objected --
18          MR. SKURKA:  Okay.  Then I just --
19          THE COURT:  -- saying it was more
20  prejudicial than probative, and I'm going to overrule
21  that objection but I am -- it's -- it's so noted.  I
22  am going to take it into consideration as I stated
23  before for future possible photographs.
24          All right, so let's bring the witness in.
25  I guess go get the witness, Mr. Cervantes.

118

1          All right, Mr. Cervantes, have a seat.  I
2   guess let's bring in the jury.  All rise for the jury.
3          (Jury enters courtroom.)
4          THE COURT:  All right, ladies and
5   gentlemen, be seated, please.  We got started a little
6   later than we wanted here but as you -- as you can
7   tell Mondays are pretty hectic around here.  Tomorrow
8   will be better.
9          All right, Mr. Skurka, you may continue.
10          MR. SKURKA:  Thank you, Judge.
11          DIRECT EXAMINATION (Cont'd)
12   BY MR. SKURKA:
13     Q.   Before we took a break at lunch time I was
14   introducing an exhibit, State's Exhibit 17.  Now that
15   that's been admitted I'd like to show you -- publish
16   it to the jury, if I might, Your Honor.
17          THE COURT:  You may.
18     Q.   (BY MR. SKURKA)  I show you what's been
19   marked State's Exhibit 17.  Is that you said earlier
20   how you encountered Mr. Castro?
21     A.   Yes, sir.
22     Q.   Is that how he looked at the time?
23     A.   Yes.
24     Q.   And could you describe the area around him?
25   Did you see any personal affects or anything around

119

1   that?
2     A.   At the time I really didn't notice, like pay
3   attention to any other stuff besides him.
4     Q.   So that would be better asked another
5   witness.
6          You were more concerned with him; correct?
7     A.   Yes, sir.
8          MR. SKURKA:  Okay.  You can take that
9   down.
10     Q.   (BY MR. SKURKA)  Now, Mr. Cervantes, I want
11   to show you -- go ahead and change it.
12          At the break I showed you the diagram on
13   the  computer, not a diagram but a thing from Google
14   maps, how they have the streets.
15          Did you have a chance to review that?
16     A.   Yes, sir.
17     Q.   Okay.  I'm going to show it here with my
18   assistant and I want you to get the laser pointer out
19   again.  Now, what is this a photograph of?
20          MR. SKURKA:  Can we turn the lights off,
21   Frank, please?
22     Q.   (BY MR. SKURKA)  I say a photograph, but is
23   this a scene that you recognize?
24     A.   Yes, sir.
25     Q.   What does that depict?

120

1     A.   That's the car wash --
2     Q.   Okay.
3     A.   -- that I was at.
4     Q.   That's the car wash you were at on what
5   street?
6     A.   Baldwin.
7     Q.   Now, I'm going to go down this way.  Which --
8   where would the freeway be from looking at this
9   picture?
10     A.   Over --
11     Q.   On the left side of screen?
12     A.   Yes.
13     Q.   Okay, I'm going to slide it down a little
14   bit.  And what does that depict?
15     A.   The car wash right here and then the store on
16   this side.
17     Q.   All right.  Now, that shows what street here
18   going between the two buildings?
19     A.   I'm not sure, Riggan.
20     Q.   Riggan Street, okay.  And if we went down
21   Riggan Street, which way would we be going, away from
22   Baldwin --
23     A.   Yes.
24     Q.   -- is that correct?
25     A.   Yes.

121

1     Q.   Now, I'm going to turn it around.  What does
2   that depict?
3     A.   That's where I was, me and Kashif.
4     Q.   Okay.  So from the street view you can see
5   similar to what you showed us on the overhead
6   photograph, correct, aerial photograph?
7     A.   Yes, sir.
8     Q.   So -- and then looking back that way is
9   Baldwin Street; correct?
10     A.   Yes, right here.
11     Q.   Okay.  I'm going to go back over this and ask
12   you a couple of questions about this area.  Now,
13   remember in the aerial photographs, they had some
14   pictures of some trees; correct?
15     A.   Yes, sir.
16     Q.   Now, do you see the same trees in those
17   pictures?
18     A.   Yes.
19     Q.   And you were describing something about the
20   foliage or the leaves themselves.  What were you
21   saying before on that?
22     A.   That it's real high off the ground where it
23   begins.
24     Q.   Okay.  So at street level was there anything
25   in this area here to block your view to across the

122

1    street?
2        A.    No, sir.
3        Q.    Okay.  And then I'm going to turn it to
4    across the street.  And what does that show?
5        A.    This is where the crime happened.
6        Q.    Okay.  Is -- was -- where would the dumpster
7    have been?
8        A.    The dumpster was somewhere around here.
9        Q.    Okay.  So, from this area here where you say
10   the crime apparently happened here; correct?
11       A.    Yes, sir, I think like somewhere around here.
12       Q.    Okay.  And for the record, you're showing the
13   side of the building between the building and Riggan
14   Street, and then we have -- from there to back over
15   here, was there anything obstructing your view?
16       A.    No, sir.
17       Q.    Now, the Defense also asked you -- I'm sorry,
18   there was a question about lighting.  Now, I'm going
19   to go over here and ask you what this thing is over
20   here at the left side of the screen and I'm going to
21   go up.  What is that?
22       A.    The light pole.
23       Q.    You're going to have to talk louder.
24       A.    The light pole.
25       Q.    The light pole.  Was there this security

123

1    light around there that night?
2        A.    I believe so.
3        Q.    Okay.  So did that help illuminate the
4    parking lot?
5        A.    Yes, sir.
6        Q.    In fact, it's pointing toward the parking
7    lot, is it not, not Riggan Street?
8        A.    Yes.
9        Q.    So did you have anything obstructing your
10   vision and was there enough illumination that night?
11       A.    Yeah, there was nothing obstructing my
12   vision, it was very bright.
13       Q.    Do you recall -- and I know that there's some
14   other cars there, but do you recall exactly where the
15   vans were parked that you said they got into and drove
16   away in?
17       A.    I'm not sure exactly but I think there was
18   one here, an empty space, and then another one right
19   here.
20       Q.    So you're looking at like the second and
21   fourth one or something like that?
22       A.    Yes.
23       Q.    From the front of the building is where I'm
24   looking at.
25       A.    Yes.

124

1        Q.    Do you know how -- well, was there -- never
2    mind.  You said a minute ago, too, that when they left
3    one went out one exit and down Riggan and one down out
4    the other exit so I'm going to go down over here and
5    ask you to tell us what exit you're talking about.
6    Would that be a good picture to show?
7        A.    Yes.  Well, I saw one of them leaving this
8    way, I know for sure about that way.  The other one I
9    just saw leaving like right here so I really didn't
10   see, you know, whether it went through this one or the
11   one -- the other exit that way.
12       Q.    Okay.  So for the record you're talking about
13   at the scene toward that back fence --
14       A.    Yeah.
15       Q.    -- that exit?
16       A.    Yeah, for sure one went that way.
17       Q.    Let me see if I can zoom in on that.  There
18   we go.  Down back over here?
19       A.    Yes.
20       Q.    And then the other one you just saw back over
21   here?
22       A.    Like leaving this way.
23       Q.    And for the record, you're indicating between
24   the pumps and the corner, I guess?
25       A.    Yes.

125

1        Q.    Okay.  But you don't know exactly which way
2    that one went?
3        A.    Yeah, whether it was this way or the next
4    exit but I saw him going like to this direction.
5        Q.    You don't remember which -- the one with the
6    man or the women went which way, or do you remember?
7        A.    No, I don't remember.
8        Q.    You just remember they got in two different
9    vans?
10       A.    Yes.
11       Q.    Thank you, Mr. Cervantes.
12              MR. SKURKA:  I'll pass the witness, Your
13   Honor.
14              THE COURT:  All right, cross?
15              MR. GARZA:  May I proceed, Your Honor?
16              THE COURT:  Yes, you may.
17                    CROSS-EXAMINATION
18   BY MR. GARZA:
19       Q.    Mr. Cervantes, I believe you and I have met
20   one other time before today; is that correct?
21       A.    Yes, sir.
22       Q.    And I just want to ask you a few questions.
23   Earlier in your testimony you testified that you had
24   observed from where you were at at the car wash a
25   scuffle going on across the street at the Times

126

1    Market; correct?

2    A.   Yes, sir.

3    Q.   And you mentioned at that time that basically

4    all you observed was a scuffle, there was fighting,

5    some punching going on, and you did not mention

6    anything at all about people going or any of the --

7    any any of the assailants going through Mr. Castro's

8    pockets.  Is that because you had forgotten or you had

9    not refreshed your memory by reading this statement

10   before or --

11   A.   Yes, I didn't remember because it was four

12   years ago and until I -- we read this statement that's

13   when I remembered it.

14   Q.   Okay.

15   A.   Refreshed my memory.

16   Q.   Okay.  And when you gave the statement, was

17   it something that you did voluntarily or was it

18   something that was suggested to you by the police?

19   A.   I'm really not -- I really don't remember.  I

20   think -- I'm not sure if they asked me, you know, to

21   make the statement or if they just asked me what

22   happened.  You know, like -- and I just told them

23   pretty much, you know, what's on there.

24   Q.   Now, you had mentioned to me at one earlier

25   occasion that you recognized my client that night and

127

1    you pointed it out to the police officers and they

2    didn't include it in the statement; is that correct?

3    Do you remember telling me that?

4    A.   Yes, sir.

5    Q.   And you never did see it on the statement

6    after you saw it before I talked to you --

7    A.   Yeah.

8    Q.   -- correct?

9    A.   And that was the first time I -- I read the

10   statement since it happened.

11   Q.   And you brought that to my attention --

12   A.   Yes, sir.

13   Q.   -- didn't you, that it wasn't in there?

14   A.   Uh-huh.

15   Q.   Correct?

16   A.   Yes, sir.

17   Q.   Okay.  Were there any other things that you

18   might have told the police that night that weren't

19   included in your statement?

20   A.   I don't think so.

21   Q.   Okay.  Now, on that evening do you recall

22   what the female was wearing that night?

23   A.   I don't know exactly but it seemed like just

24   a baggy -- like a loose-fitting white shirt and just

25   some baggy pants.

128

1    Q.   What color were the pants, do you remember?

2    A.   I don't -- right now I don't remember.

3    Q.   Now, in your statement you mentioned a baggy

4    white shirt and some baggy pants --

5    A.   Yes, sir.

6    Q.   -- is that correct?

7    A.   (Nods head.)

8    Q.   At any time did you observe her wearing an

9    aqua blouse or brownish short pants?

10   A.   The blouse I don't remember but she may have

11   had like tan, kind of khaki-ish pants, but as far as

12   the blouse I don't -- I don't think I remember seeing

13   it.

14   Q.   Now, during the investigation the police

15   asked you further if you could identify the female and

16   you weren't able to do so at that time; is that

17   correct?

18   A.   Can you say that again, sorry.

19   Q.   I said later on in the investigation, later

20   on that day or the following day, whenever you were

21   further questioned by the police, you were not able to

22   effectuate an identity of the female.  You weren't

23   able to make an identification of her, were you?

24   A.   Honestly, I don't remember.  I -- I don't

25   remember if I was able to -- to point her out.

129

1    Q.   Do you recall if they were -- do you recall

2    if you were ever shown a lineup of her?

3    A.   I don't remember.

4    Q.   You don't remember?

5    A.   No, I didn't remember if that night they

6    showed me a lineup.

7         MR. GARZA:  May I approach the witness,

8    Your Honor?

9         THE COURT:  Yes.

10   Q.   (By MR. GARZA) I'm going to ask you to look

11   at this statement I'm going to have marked for

12   identification purposes as Defendant's Exhibit No. 2

13   and I think it's a similar statement that Mr. Skurka

14   gave to you that I want you to read, take your time

15   and read the whole thing to yourself.

16   A.   (Witness complying.)

17   Q.   Have you read it all?

18   A.   Yes, sir.

19   Q.   Okay.  Does it assist you in refreshing your

20   memory a little bit?

21   A.   Say that again, please, I'm sorry.

22   Q.   Does it assist you in refreshing your memory

23   a little bit --

24   A.   Yes, sir.

25   Q.   -- in reading this?

130

1        Okay.
2        At the very bottom paragraph I believe you
3    recall you were asked if you could recognize
4    Angela Rodriguez from a photo lineup and you weren't
5    able to do that; is that correct?
6        A.    Well, from what I read there it said that
7    they pointed her out like in -- at the -- I think -- I
8    believe at the Whataburger and that I wasn't able to
9    recognize her then but they didn't show me the photo
10   lineup.  She was there at the actual scene at the
11   Whataburger and that's when he asked, you know, "Can
12   you recognize her," and I said "At this time, you
13   know, it looks like her, I can't be sure cause, you
14   know, I --"
15       Q.    So it's safe to say you were not able to
16   identify her?
17       A.    Yeah, but not with the photo lineup --
18       Q.    Okay.
19       A.    -- cause as far as I remember right now they
20   didn't show me a photo lineup of her.
21       Q.    You just recall being taken to the
22   Whataburger to see if you could identify her?
23       A.    Right -- yeah, right now I remember that.
24       Q.    And were you able to identify her?
25       A.    I remember saying, you know, it looked like

131

1    her but I wasn't a hundred percent sure but it
2    resembled her and she was just wearing just a bra, she
3    didn't have her shirt on.
4        Q.    Okay.  So it's safe to say you weren't able
5    to identify her?
6        A.    Yes, but you asked me earlier about the photo
7    lineup, that I wasn't able to identify her but there
8    was no photo lineup of her.
9        Q.    So they never showed you a photo lineup of
10   her?
11       A.    I don't think so.
12       Q.    Okay.  But at the Whataburger you weren't
13   able to identify her either?
14       A.    Not completely.  I said it looked liked her
15   but I wasn't a hundred percent sure.
16       Q.    Okay.  Let me show you what's been marked and
17   admitted into evidence as State's Exhibit 4.
18            MR. GARZA:  Mr. Schimmel, can you sort of
19   focus that a little bit more?
20            MR. SCHIMMEL:  Uh-huh.
21       Q.    (BY MR. GARZA)  Do you recognize that
22   picture, sir?
23       A.    It's kind of -- yes, it's the convenient
24   store.
25       Q.    Okay.  Is that sort of what it looked like

132

1    that night?
2        A.    Yes, sir.
3        Q.    Do you remember that vehicle being parked
4    there that night?
5        A.    No.
6        Q.    You don't remember that --
7        A.    I don't remember whether it was there or not.
8        Q.    Okay.  Now, in proximity to that particular
9    vehicle, where do you remember the vans being parked?
10   If you don't mind using the pointer to show the jury.
11       A.    I think it was like one of them here, space,
12   and then the other one.
13       Q.    And so they were parked next to one another
14   with a space in between?
15       A.    Yes, sir.
16       Q.    Is that your testimony?
17       A.    Yes.
18       Q.    Okay.  Now, where -- if you can, point out to
19   us where do you remember locating the body of Mr.
20   Castro?
21       A.    I'm not sure exactly but I guess somewhere
22   around here.
23       Q.    All right.  Was the body at any time behind
24   any of the vans?
25       A.    What do you mean behind, like -- well, the

133

1    vans were like right here so behind as far as being
2    right here.
3        Q.    Right.
4        A.    But you mean like over here somewhere?  Is
5    that what you're trying to say?
6        Q.    Well, do you remember -- do you remember
7    where you saw most of the shuffle going on?  Was it
8    between the two vans, behind the vans?  Where do you
9    remember that happening?
10       A.    I think I remember starting like kind of
11   towards the middle of the van and then like it moving
12   towards this place.
13       Q.    Okay.
14       A.    And then this is like where --
15       Q.    And that would have been somewhere in
16   proximity to being --
17       A.    Where his body was --
18       Q.    -- behind the vans?
19       A.    Yes, sir.
20       Q.    Okay.  Once Mr. Castro fell down and you saw
21   him on the ground you saw the vans pull out; is that
22   correct?
23       A.    Yes, sir.
24       Q.    Were the vans parked in toward the building
25   or were they parked with the back of the vans toward

134

1    the building?
2        A.   I'm not completely sure but I remember one of
3    them actually having to reverse so, you know, the
4    front was towards here.  As far as the other one, I
5    really don't remember.
6        Q.   You don't remember how it ended up leaving
7    the parking lot?
8        A.   No, I don't remember how it -- it getting
9    out.  Like leaving the parking lot, yeah, one of them
10   was going towards this direction, and one of them left
11   here, and I remember one of them had to reverse, but
12   the other one, I don't know if it was facing like this
13   way going out or if it was positioned like this
14   vehicle here.
15       Q.   Okay.  Now, did -- were you able to witness
16   or observe any of the vans, you know, disturb the
17   body, like run over it or anything like that?
18       A.   No, sir.
19       Q.   No?  Nothing like that happened; is that
20   correct?
21       A.   Yes, sir.
22       Q.   Do you remember what color the vans were?
23       A.   No, it was too long ago.
24       Q.   You only saw two people accosting Mr. Castro;
25   is that correct?

135

1        A.   Yes, sir.
2        Q.   I believe your previous testimony is that you
3    saw my client and one of the females that you weren't
4    able to identify --
5        A.   Yes, sir.
6        Q.   -- correct?
7        A.   Yes.
8        Q.   Okay.  Now, did you ever see my client do
9    anything to Mr. Castro as far as go through his
10   pockets or take anything from his person, from his
11   body, anything?
12       A.   Right now, all I can remember is that I saw
13   your client and then the female like just beating him
14   and then the female I guess going through his -- you
15   know, his pockets and stuff like that.  As far as him
16   like, you know, taking stuff from him I really don't
17   remember right now but what I do remember is him and
18   the female was hitting him.
19       Q.   But you do remember the female hitting him
20   also --
21       A.   Yes, sir.
22       Q.   -- striking him?
23       A.   Yes.
24       Q.   Correct?
25       A.   Uh-huh.

136

1        Q.   Okay.
2             MR. GARZA:  I'll pass the witness, Your
3    Honor.
4             THE COURT:  Anything else, Mr. Skurka?
5             MR. SKURKA:  Yes, Judge.
6                  REDIRECT EXAMINATION
7    BY MR. SKURKA:
8        Q.   You keep saying that "I remember this" and "I
9    remember that."  Do you remember reading your -- your
10   statement a few minutes ago when he showed it to you?
11       A.   Yes.
12       Q.   Did you ever say that you saw the woman
13   strike the man in the statement that you gave?
14       A.   Like from reading it right now?
15       Q.   Uh-huh.
16       A.   I think -- I think so.
17       Q.   All right.  Who was doing most of the
18   striking, the man or the woman, if you know?
19       A.   It might have been equal because they were
20   both hitting him.  I wasn't counting blows or anything
21   like that, it was just -- they were both hitting him.
22       Q.   And going back to what Mr. Garza was asking
23   you about identifying the other lady, you did say that
24   it looked like her but you just weren't a hundred
25   percent sure; correct?

137

1        A.   Yes.
2        Q.   Was there anything different from when you
3    saw her at the show up at the Whataburger than what
4    you saw at the scene at Times Market?
5        A.   What do you mean?
6        Q.   Well, do you remember when you -- Mr. Garza
7    asked you what clothing she was wearing and you
8    described her as wearing baggy shirt and baggy pants?
9        A.   Uh-huh.
10       Q.   Did she have her shirt off?
11       A.   No, she just had her bra on.
12       Q.   Okay.  So that may have been one of three
13   things that you saw that was different; correct?
14       A.   Yes, sir.
15       Q.   Okay.  So, could that have influenced you on
16   whether it was the same person or not because you
17   obviously didn't see her with a bra out in the parking
18   lot; correct?
19       A.   Yes, sir.
20       Q.   Okay.  But you told the officer what you just
21   told us, "It looks like her, I just can't be a hundred
22   percent sure"?
23       A.   Yes, sir.
24       Q.   Did she match the same physical description
25   like height, weight, race, stuff like that?

138

1   A.   She was skinny.

2   Q.   Did you know that lady from before --

3   A.   No.

4   Q.   -- like you knew John Henry Ramirez from

5   before?

6   A.   No.

7   Q.   You had never seen her before?

8   A.   No, sir.

9   Q.   So it would be fair to say it would be easier

10  for you to recognize somebody that you knew from

11  before rather than a complete stranger?

12  A.   Yes, sir.

13  Q.   And you did recognize her, you just weren't a

14  hundred percent sure?

15  A.   Yes.

16  Q.   Thank you.

17        MR. SKURKA:  That's all the questions I

18  have.

19        THE COURT:  Anything else?

20        MR. GARZA:  I have -- if I may, Judge?

21        THE COURT:  Yes.

22              RECROSS-EXAMINATION

23  BY MR. GARZA:

24  Q.   Are you farsighted or nearsighted?

25  A.   I'm nearsighted.

139

1   Q.   Okay.

2   A.   That's the one where you can see like far

3   away pretty clear.

4   Q.   You can see distance.

5   A.   Okay, well, that one, sorry.

6   Q.   You can see distances --

7   A.   Yes.

8   Q.   -- better than you can up close?

9   A.   No, actually -- yeah.

10  Q.   Or is it the reverse?

11  A.   I need to -- like far away it gets blurry.

12  Far away it gets blurry so I guess I'm --

13  Q.   Well, I noticed that you wear glasses.  Do

14  you wear them permanently?

15  A.   Yes, sir.

16  Q.   And do you wear them to drive?

17  A.   Yes.

18  Q.   Do you need them to drive?

19  A.   Yes.

20  Q.   Do you have difficulty observing other

21  traffic at a distance or anything like that if you

22  don't wear your glasses?

23  A.   I mean, I could see but it's just not

24  completely focused without my glasses.

25  Q.   How far -- how far -- let me --

140

1        MR. GARZA:  Can you set up the Google

2   thing again?

3        MR. SKURKA:  Uh-huh.

4   Q.   (BY MR. GARZA)  Let me ask you this:  If

5   you're somewhere back here behind one of these stalls

6   across the street at night in the dark, how far a

7   distance do you think it is from there to here?

8   A.   From this perspective as if right now or from

9   the time of me actually standing there?

10  Q.   Either one.

11  A.   Well, from here looking there that seems like

12  about --

13  Q.   That looks real short, in other words?

14  A.   Looks like about 30 yards, 35 yards,

15  something like that.

16  Q.   Okay.  Okay.  And all of this is happening in

17  just a matter of seconds, safe to say?

18  A.   Yes, sir.

19  Q.   Not minutes, just seconds.

20  A.   The whole thing maybe lasted a minute at the

21  most.

22  Q.   I don't know if Mr. Skurka already asked you

23  this or not but I'm going to ask it again.  Out of

24  those stalls, do you remember which one you were in

25  that you were washing your car?

141

1   A.   I'm not completely sure but I believe I was

2   in the second one and then Kashif was like the very

3   next one right here.

4   Q.   Okay.  And was there a reason you-all weren't

5   using the very first one?

6   A.   No.

7   Q.   Was there another car there?

8   A.   I don't think so.

9   Q.   It wasn't occupied?

10  A.   No.

11  Q.   It wasn't, okay.

12  A.   I mean, I'm not sure, a hundred percent sure,

13  but I don't think there was, and if there was they

14  might have left, you know, right when we pulled in or

15  something.

16  Q.   How well lit is the -- the car wash back

17  there behind the stalls compared to the grocery store

18  across the street?

19  A.   I think they were both pretty well lit, both

20  areas.

21  Q.   Okay.

22        MR. GARZA:  I'll pass the witness, Your

23  Honor.

24        MR. SKURKA:  No other questions, Judge.

25        THE COURT:  All right.  You may stand

142

1   down.  May this witness be excused?

2              MR. SKURKA:  Yes, Your Honor.

3              THE COURT:  Don't discuss your testimony

4   with anybody.

5              THE WITNESS:  Okay.

6              THE COURT:  Okay?

7              MR. SKURKA:  We call Officer Mike Wenzel.

8              THE COURT:  Okay.  Call Officer Mike

9   Wenzel.  Come forward.  I believe you've already been

10  sworn.

11             THE WITNESS:  Yes, sir, I have.

12             THE COURT:  Take a seat.

13             THE WITNESS:  Thank you, sir.

14             THE COURT:  All right, you may proceed.

15             MR. SKURKA:  May I proceed, Your Honor?

16             THE COURT:  Uh-huh.

17

18             MICHAEL A. WENZEL,

19  having been first duly sworn, testified as follows:

20             DIRECT EXAMINATION

21  BY MR. SKURKA:

22  Q.    Would you please state your full name for

23  the folks on the jury.

24  A.    Michael A. Wenzel.

25  Q.    Can you spell your name for the jury – the

143

1   court reporter, please.

2   A.    Michael, M-I-C-H-A-E-L, Wenzel, W-E-N-Z-E-L.

3   Q.    I figured she could spell Michael but thanks

4   anyway.

5   A.    Well, there are variations, I've seen them.

6   Q.    Okay.  How long have you been a police

7   officer?

8   A.    17 years, sir.

9   Q.    And have you always worked for the Corpus

10  Christi Police Department?

11  A.    Yes, sir.

12  Q.    What area or division do you work in?

13  A.    Currently I'm working in the patrol division.

14  Q.    Where were you working on July 19th, 2004?

15  A.    In the patrol division.

16  Q.    Have you worked in any other area of the

17  department?

18  A.    I spent one year in the JET team.

19  Q.    What is the JET team?

20  A.    It's the Juvenile Enforcement Team, the gang

21  unit.

22  Q.    But mostly you've been in patrol; correct?

23  A.    Yes, sir.

24  Q.    Before you joined the police department, what

25  did you do?

144

1   A.    I was a delivery clerk at Sears in San

2   Antonio and before that I was active duty military.

3   Q.    How long were you in the military and what

4   branch?

5   A.    I did four years in the active duty Army and

6   16 years in the Texas National Guard.

7   Q.    When you were in the military, did you work

8   in – I mean as a soldier or an M.P. or a policeman?

9   A.    I was in communications.

10  Q.    Communications.  Officer Wenzel, I'd like to

11  direct your attention back to July 19th, 2004, and ask

12  if you were on duty around the hours of 11:00, 11:30

13  that night?

14  A.    Yes, sir, I was.

15  Q.    Can you tell the jury what area of patrol

16  that you were -- had that week or that day?

17  A.    I was assigned to the patrol area called

18  Delta 50.  It basically encompasses an area between

19  Morgan, all the way out to where it turns into Old

20  Brownsville, to Horne Road, Horne Road back to 286 and

21  286 back to Morgan.  That's my regular patrol area.

22  Q.    And help us out when you say 286, what are

23  you --

24  A.    Crosstown Freeway.

25  Q.    Crosstown Freeway?

145

1   A.    Yes, sir.

2   Q.    I always get those mixed up.

3   A.    To a policeman the highway is 286, to

4   everybody else it's Crosstown.

5   Q.    So that was your area of patrol that night?

6   A.    That was my -- that's my usual area of

7   patrol, yes, sir.

8   Q.    How long have you been patrolling that area

9   around that time on July 19th?

10  A.    We came on duty at 9:30 that night.

11  Q.    What I meant was how long had you been

12  patrolling that --

13  A.    That particular area, for several years

14  already.

15  Q.    So you were familiar with the area I guess is

16  what I'm trying to say?

17  A.    Yes, sir.

18  Q.    Did you have occasion to get dispatched to --

19  on location at 1902 Baldwin?

20  A.    Yes, sir, I did.

21  Q.    Can you tell us what time you get that call?

22  A.    It was a little bit before 11:30.

23  Q.    And what was the call for?

24  A.    The call came in as a trauma call and the

25  body of the call said that the reporting party had

146

1    said that a male had been dropped off that was
2    bleeding.  In the call they noted that the caller, a
3    female, sounded like she was scared, or something
4    along that line, and hung up.
5        Q.   The caller was that?
6        A.   The caller was, yes, sir.
7        Q.   And you're in the police car and you're
8    getting sent over to that team.  Do you even know
9    who's called in the 911 --
10       A.   No, sir.
11       Q.   -- or how does that work?
12       A.   No, the call comes in to our 911 center and
13   they make the call, it goes to the dispatchers and
14   then the dispatchers give it to us.
15       Q.   Okay.  Can you tell the jury why you don't
16   have much information at that time?  Trauma call is
17   all you got from 911?
18       A.   Usually what they're going to be doing is
19   they're going to be -- in a call like that where
20   there's somebody that's possibly hurt they're going to
21   get it out as quick they can, they're going to just
22   put in just the bear minimal information, get it to
23   the dispatcher so the dispatcher can get it to us so
24   we can get in route to the location.  As we're in
25   route, the call -- if the person, the reporting party

147

1    that's calling this in is still on the line the call
2    taker will be getting additional information, asking
3    questions, you know, "what kind of injuries, what's
4    going on, is there anybody there," you know, suspect
5    information, anything along that line, and we'll get
6    those updates as we're in route from our dispatcher.
7        Q.   So is it unusual not to know if it's like a
8    bank robbery or a heart attack or a theft or a
9    burglary before you're first getting the call?
10       A.   No, not initially, no, because like I said,
11   they get the bare bones information and they get us
12   going.
13       Q.   Is it always a hundred percent accurate when
14   you get that first bare bones information?
15       A.   No, it's not always a hundred percent
16   accurate either.
17       Q.   So essentially you had what -- you went to
18   the scene with what little you knew about it?
19       A.   Yes, sir.
20       Q.   You said it was right before 11:30 and
21   that would happen.  How far away were you or where
22   were you patrolling if you recall that specific day?
23       A.   I -- when I got the call I was at the area of
24   the Stripes store right there at Morgan and Crosstown
25   Freeway.

148

1        Q.   How many exits down is Morgan from Baldwin I
2    guess?
3        A.   I guess you would say two -- one or two main
4    streets because 19th and Morgan is one exit together.
5        Q.   So it would be fair to say from the freeway
6    it's an exit or two?
7        A.   Yeah.
8        Q.   How long did it take you to get over there?
9        A.   I would say probably less than a minute.
10       Q.   Were you by yourself that night or did you
11   have a partner?
12       A.   No, sir, I was by myself.
13       Q.   As you were going over there, was your car
14   updated with more information from the dispatcher?
15       A.   No, I didn't note any updates in my report,
16   sir.
17       Q.   So what happened, did you go to 1902 Baldwin?
18       A.   Yes, sir, I did.
19       Q.   Tell us, the jury, essentially where that's
20   located at.
21       A.   1902 Baldwin would be between Staples and
22   Crosstown Freeway on Baldwin.
23       Q.   I'm going to show you a picture that might
24   help refresh your memory marked State's Exhibit No.
25   10.  There's a laser pointer in front of you.  Would

149

1    you tell us where the freeway is?
2        A.   That would be the freeway and I'm assuming
3    that's Crosstown Freeway.
4        Q.   And where is Baldwin?
5        A.   Baldwin is right there.
6        Q.   So for the purpose of the record you were
7    coming from the top or the bottom?
8        A.   I was coming from this direction and then I
9    would have went under the freeway cause I would have
10   went down the access road to go to Baldwin.  That
11   would have been the quickest way to get there.
12       Q.   Okay.  So as you come up Baldwin, which way
13   did you come, please?
14       A.   I came down this way.
15       Q.   Okay.  And is the Times Market in that
16   picture?
17       A.   Times Market is right there.
18       Q.   Okay.  Now we have the idea where you're
19   coming from.  Let's get back up and take up the
20   narrative and then you can refer to that if you need
21   to down the way.
22            You come from the freeway, you arrive at
23   the place.  What is the first thing you notice about
24   1902 Baldwin?
25       A.   Well, the first thing I notice there's a

150

1  dumpster that's located -- well, it was located right
2  about there. I pulled into this drive right here. I
3  noticed the man lying on the ground and he was kind of
4  a diagonal, kind of with his head on this end and his
5  feet down this way. He was laying on a big pool of
6  blood. There were people standing around him.
7              I exited my unit, I went up there to check
8  on him. He wasn't breathing, he wasn't conscious at the
9  time. It appeared that he had already passed away. I
10 went on ahead and had everybody back up that was
11 standing around. I was trying to secure the crime
12 scene to protect the evidence that may be there at the
13 scene.
14             At that same time I was also letting the
15 dispatcher know that I had a gentleman that was down,
16 you know, that he was already passed away and that I
17 needed more units, I needed a supervisor, I also
18 needed the I.D.
19    Q.   Well, let's take those one step at a time, if
20 we could, Officer, for some of you that may not be
21 familiar with police work. You're the first officer
22 at the scene; correct?
23    A.   Yes, sir.
24    Q.   What's your initial responsibility or duty?
25    A.   Well, primarily you want to check on your

151

1  victim and make sure you get the care that they're
2  going to need. The second thing you want to do is
3  make sure you secure your crime scene.
4     Q.   Going back to the first thing, you didn't
5  call paramedics or paramedics dispatch?
6     A.   The paramedics were already in route.
7     Q.   I'm sorry, who does that work with the police
8  department, do you call them or does the dispatcher
9  call them?
10    A.   Well, any trauma call like this the
11 paramedics are automatically sent and they get
12 dispatched about the same time we do.
13    Q.   So you don't have to wait to get there and
14 see what's happened and then call for a paramedic.
15    A.   No, what we do, usually protocol is when we
16 get there we access the situation and let our
17 dispatcher know and what she'll do is she'll tell
18 their dispatcher so that they have some idea what
19 they're looking at when they get there.
20    Q.   You mentioned that the body was located by --
21 in a pool of blood by the dumpster?
22    A.   Yes, sir.
23    Q.   Tell us what, if anything, you did to check
24 on the victim to see his condition. I mean, I don't
25 know if you tried first aid or you just assess them

152

1  like that or what.
2     A.   I walked up there, I looked at him, you know,
3  you could see he was not breathing, the amount of
4  blood and the trauma to his neck area, you know,
5  there's nothing moving around there, there was no --
6  no blood coming out anymore, which would be an
7  indication that the heart has already stopped beating
8  for us, and he did not appear to be conscious. So,
9  you know, that's what I told the paramedics that he
10 appeared to be already passed away.
11    Q.   Okay. I've got a little closer-up photograph
12 I'm going to show you, No. 3. That is reputed to
13 depict the same scene but let's go on a little closer
14 on just the parking lot. Another witness has drawn
15 that little box on that represents the dumpster. Is
16 that approximately the area it was in?
17    A.   Yeah, that would be about right.
18    Q.   Okay. And where do you approach and where is
19 the body located looking at that photograph, please.
20    A.   I approached in here and the body was right
21 -- about six feet in front of the dumpster, right
22 there.
23    Q.   So would it be fair to say the body was
24 closer to the dumpster than it was to the building?
25    A.   Yeah.

153

1     Q.   After you arrived at the scene and checked
2  his condition and you said he was obviously not
3  breathing any longer did you look or make an
4  assessment of what injuries that he had received and
5  the cause of such injuries?
6     A.   Well, just, you know, you don't want to --
7  it's a part of the crime scene so you don't want to be
8  moving things around and doing whatever until
9  detectives and the other people get out there but just
10 looking at his neck I could see that he had some
11 wounds on his neck, and judging by the amount of
12 blood, you know, it looked like he had been stabbed in
13 the neck or his throat might have been slashed. That
14 was my initial assessment of what had happened.
15    Q.   And I understand that you're not looking over
16 everything, I just want to know what -- the initial
17 assessment. But you said he looked like he was
18 stabbed in the neck or --
19    A.   Or his throat had been slashed or cut.
20    Q.   Have you had occasion in your 17 years as a
21 policeman to have seen stab victims before, victims of
22 knife stabbings?
23    A.   Yes, sir.
24    Q.   Was this consistent with that?
25    A.   Yeah, the wounds appear to be, yes.

154

1    Q.   I guess what I'm trying -- I'm not trying to
2  make you the medical examiner or something but there's
3  a difference in a gun shot, a stab wound, a blunt
4  force like getting hit on the head with a stick or a
5  bat.  Were these -- what categories would these fit
6  in?
7    A.   These fit in with more like wounds from a
8  knife, like he was cut.
9    Q.   By the way, is that location at the Times
10 Market at 1902 Baldwin, is that located in Nueces
11 County, Texas?
12   A.   Yes, sir, it is.
13   Q.   Could you tell by your initial assessment of
14 the victim how many wounds he had and if he had other
15 wounds beside the neck wounds?
16   A.   It looked like he had several on his neck but
17 the total number altogether, no, sir.
18   Q.   Did you see any wounds on any other parts of
19 his body?
20   A.   No.
21   Q.   And was he face up or face down?
22   A.   He was face up.
23   Q.   You said there were some other people around
24 there.  Can you describe who these other people were?
25   A.   There were several other people around there

155

1  and I had them all stand back.  They were just people
2  that like maybe saw him lying there and came over to
3  see what was going on or whatever the case was.  I had
4  them all move back to, you know, to clear that crime
5  scene area, and then once another unit got there then
6  I was able to go ahead and make contact with them and
7  find out if anybody had seen what was going on.  I was
8  able to identify two witnesses and I was also able to
9  identify a lady that works there at the store and she
10 was able to tell me that our victim was an employee
11 there at the store and that he had gone out to throw
12 the trash.
13   Q.   So you did get some initial information from
14 the folks around there?
15   A.   Yes, sir, from two witnesses that --
16   Q.   I'm just trying to get a handle on how many
17 people were out there around the body like -- you keep
18 saying "several," I don't really know what that means.
19   A.   I didn't put a specific number in my report,
20 sir, and I don't -- I know it wasn't a great number.
21   Q.   If you don't know, that's okay.
22   A.   Yeah.
23   Q.   I'm just trying to figure out is it a big
24 crowd or just a few people or what?
25   A.   I would say a few people.

156

1    Q.   Okay.  Now, you said that you got a hold of
2  these people I'm assuming after this other unit
3  arrived.  Why do you have to wait for another officer
4  to assist you?
5    A.   Well, the primary concern at this point is to
6  protect the crime scene and if I'm out there
7  contacting witnesses and trying to get information
8  from them and I'm not doing a very good job of
9  protecting the crime scene then those people are going
10 to be walking through there and, you know, doing
11 things that we shouldn't be allowing them to do.  So
12 the evidence -- you know, what evidence is there may
13 be lost or destroyed because of my not taking care of
14 it so that's what we need to be doing.
15   Q.   When you say "preserve the crime scene," how
16 do you do it?
17   A.   You put somebody over it and you just have
18 them keep everybody back away until you get some crime
19 scene -- the yellow tape that everybody I'm sure has
20 seen.  As soon as you can get some of that out there,
21 and that's in our supervisors' cars, and then at that
22 point we'll tape it all off to where we can keep
23 everybody out a lot easier.
24   Q.   But initially you're just there keeping
25 people away?

157

1    A.   Yes, sir.
2    Q.   So it wasn't you that taped off the crime
3  scene, it would have been somebody else probably or --
4    A.   I assisted with the taping off of the crime
5  scene once the supervisor got there.
6    Q.   Now, you said after your -- you first checked
7  the victim, then you next preserved the scene, then
8  you next try to find the witnesses --
9    A.   Yes, sir.
10   Q.   -- correct, in that kind of sequence?
11   A.   Yes, sir.
12   Q.   And what witnesses, if any, did you locate?
13   A.   I located two gentlemen, Mr. Butt and a Mr.
14 Cervantes.  They were -- what they had told me was
15 that they were over there at the car wash and had --
16 Mr. Butt said that he had noticed --
17        MR. GARZA:  Your Honor, I'm going to
18 object --
19        THE COURT:  Sustained, sustained.
20        MR. GARZA:  -- hearsay, Your Honor --
21        THE COURT:  Sustained.
22   Q.   (BY MR. SKURKA)  You can't say exactly what
23 they're saying.
24   A.   Okay.
25   Q.   That would be hearsay.  Were you able to get

158

1  information from them that showed that they were
2  possible eyewitnesses to the crime?
3      A.   Yes, sir.
4      Q.   And did you list that -- them as possible
5  eyewitnesses to the case?
6      A.   Yes, sir, I did.  I listed them as witnesses
7  on my offense report.
8      Q.   And just to help the jury that may not know
9  all the police procedure, do you do all the
10  investigation at the scene or you just do some initial
11  investigation and turn it over to somebody else?
12      A.   I do the initial investigation.  As the
13  primary or the first unit to arrive your
14  responsibility is to secure the crime scene, of
15  course, locate any witnesses and keep them separated
16  so that they're not talking to each other, and then
17  once you get supervisors there and people from our
18  criminal investigation division, detectives, then
19  they'll take over the primary investigation.
20      Q.   Okay.  So would it fair to say you get a
21  short rendition and then the detectives get them to
22  write out a long statement?
23      A.   Yes, sir.
24      Q.   Okay.  But you did get information that they
25  were witnesses to the crime.

159

1      A.   Yes, sir, I did get information from them.  I
2  also had developed some suspect information that I had
3  BOLO'd out.
4      Q.   We'll get to that in a second, okay?  You
5  were talking about the co-worker you were able to
6  identify.  Who was that?
7      A.   That was Ms. Salinas.
8      Q.   And how did you find out she was a co-worker?
9      A.   I had seen her and another lady.  When I
10  asked about witnesses they were crying and I asked
11  them if they had seen what had happened out there and
12  she had told me that the victim was her co-worker and
13  he had just gone out to throw the trash.
14      Q.   But she was not an eyewitness to what
15  actually happened; correct?
16      A.   No, sir.
17      Q.   Were you able to find out the victim's name
18  from her?
19      A.   Well, yes, sir, I was able to get his name
20  from her and then by going through our information
21  channel, our records management system like was able to
22  check the name and come up with a date of birth on
23  him.
24      Q.   And who was the person identified as?
25      A.   Pablo Castro, I believe it was.

160

1      Q.   So you were able to identify the victim as
2  Pablo Castro through the help of the lady and your
3  records management, sir.
4      A.   Yes, sir.
5      Q.   Now, let's switch.  After you talked about
6  finding the witnesses, you got some initial
7  information from them and then they get turned over to
8  the detectives but you said something about you were
9  able to get some suspect information that you BOLO'd
10  out.  What did you mean when you said that?
11      A.   Well, upon talking to the two gentlemen I was
12  able to determine that a male and female were
13  involved, that they were both about 5-8, the female
14  was slim build, about 20 to 30 years of age, wearing
15  blue jeans and a T-shirt.  The male was wearing also
16  blue jeans and a T-shirt.
17           I was able further to develop that the
18  female had gotten into a passenger side of a red,
19  full-size conversion van that was parked there and
20  then the male got into the driver's side of another
21  full-size red conversion van that was there, and that
22  both the vehicles had fled the scene.
23      Q.   So you were able to get information that
24  there was two vans involved?
25      A.   Yes, sir.

161

1      Q.   Did you know the make or model or color of
2  any of those at that time?
3      A.   No, sir.
4      Q.   Did you get any information about their
5  direction of travel when they left the scene?
6      A.   The van that the females were in were seen
7  going north on Riggan.  This would be Riggan right
8  here and they were going in this direction.
9      Q.   And for the record, you're pointing away from
10  Baldwin Street?
11      A.   Yes, sir, the opposite direction of Baldwin.
12      Q.   And the other van, do you remember any
13  information about that?
14      A.   No, sir, I do not.
15      Q.   Now, you mentioned BOLO where you get that
16  information out and put it out on a BOLO call.  Can
17  you explain to the jury what a BOLO call is?
18      A.   BOLO is a "Be on the lookout" for -- for an
19  A.P.B., "All points bulletin," if you see it on T.V.
20  And basically, I give the dispatcher the information,
21  she puts it in the call and then what she'll do is
22  she'll sound some tones, sound a tone that alerts
23  officers that some information is coming and then
24  she'll repeat the information that I had just given
25  her so that all the officers in the City have that

162

1   information available to them.
2       A.   Why is that needed?
3       Q.   Well, it's a very large city, you can get to
4   different places very quickly.  The officers, if they
5   have the information, if they see these vehicles or if
6   they see a vehicle that's similar they can go ahead
7   and stop it and see, you know, and see if it's
8   involved or if it's not involved.  You know, the more
9   information that we can get out to the officers that
10  are in the field, that are in the area, the better our
11  chances are of possibly catching who -- that committed
12  the act.
13      Q.   Is the information that goes out on a BOLO
14  always complete?
15      A.   No, sir.
16      Q.   Is it always completely accurate?
17      A.   No, it's just what we have right there and
18  then.
19      Q.   Why is it so important to get it out so fast
20  unless you have all the information, all of the stuff
21  to make sure it's accurate or not.
22           Well, that way the officers in the area,
23  like I said, can be looking around already.  You know,
24  even if you don't have all the information, if you
25  just got some, that helps.  If we waited until we get

163

1   all the information, it could be 15, 20, 30 minutes
2   later, and by that time, you know, 30, 40 minutes, you
3   can be in Mathis already.  So we want to get it, even
4   if it's just a little bit, get it out there so that
5   people can be looking around for them.
6       Q.   So the bottom line is you got information on
7   two vehicles and two people?
8       A.   Yes, sir.
9       Q.   But is it fair to say just general
10  description?
11      A.   Yes, sir, very general.
12      Q.   When you talked about the vans, was there
13  anything more specific about the vans as the color or
14  size of the vans?
15      A.   Yes, sir, they were red.  Described to me as
16  being red and full-size conversion vans.
17      Q.   What's that mean to you, "full-size
18  conversion vans"?
19      A.   Full-size conversion vans would be the vans
20  that are -- have been converted, you know, that may
21  have a couch in them or captain chairs all around.
22  They're -- they're an upgrade from what you would buy
23  out of a Chevrolet or a G.M. or Ford dealership.
24      Q.   Now, did you go off looking for the vans or
25  were your duties to stay at the crime scene?

164

1       A.   My duty is to stay there at the crime scene.
2       Q.   And you said also that you called out
3   identification section?
4       A.   Yes, sir.
5       Q.   What does that mean?
6       A.   Our I.D. team or crime scene people to come
7   out and photograph the scene and process the scene,
8   collect the evidence that's out there.
9       Q.   And did somebody arrive to do that?
10      A.   Yes, sir.
11      Q.   And what is their job?  I'm not going to ask
12  you too much, just tell us generally what they do.
13      A.   Generally, they work at the direction of the
14  officer or the investigators at the scene.  What
15  they're going to do is they're going to take
16  photographs, they're going to collect any kind of
17  physical evidence that may be there, they're going to
18  -- especially in a homicide they're going to draw a
19  diagram of the area, a sketch of the area.
20      Q.   Okay.  But you're there to make sure the
21  scene doesn't get disturbed so they can do the work?
22      A.   Yes, sir.
23      Q.   Are you there when they took the pictures?
24      A.   Yes, sir.
25      Q.   And were you there when they set out those

165

1   little cones that mark where evidence is?
2       A.   Yes, sir.
3       Q.   And you say -- have you seen photographs of
4   those?
5       A.   Yes, sir, I have.
6            MR. SKURKA:  May I approach, Your Honor?
7            THE COURT:  Yes.
8       Q.   (BY MR. SKURKA)  I'm going to show you a
9   series of photographs, Sergeant Wenzel, and ask you to
10  look at them to yourself.  They've not been admitted,
11  just look at them to yourself and don't show them to
12  the jury, and just tell me if you can recognize those.
13  Just go ahead and look at them all first.
14      A.   (Witness complying.)
15      Q.   Have you had a chance to look at them all?
16      A.   Yes, sir.
17      Q.   Would these photographs -- do these
18  photographs fairly and accurately represent the scene
19  as it was that night?
20      A.   Yes, sir.
21      Q.   Do those photographs fairly and accurately
22  show the location of the victim where he was on the
23  ground?
24      A.   Yes, sir.
25      Q.   Does it also fairly and accurately show the

166

1 location in perspective from where the dumpster is and
2 from where the Times Market is?
3    A.  Yes, sir.
4    Q.  And does it also show any items that may have
5 been found around Mr. Castro on the ground?
6    A.  Yes, sir.
7    Q.  And the yellow cones in there, those are
8 indicative of what?
9    A.  Physical evidence that was there or some
10 other type of evidence that needed to be collected or
11 have special attention brought to it, i.e., real
12 close-up photographs or anything along that line.
13    Q.  Do the photographs here also show the wounds
14 that you previously described to the jury and their
15 location?
16    A.  Yes, sir.
17         MR. SKURKA:  Your Honor, I'll tender
18 these series of photographs to Defense Counsel and
19 offer them into evidence.
20         MR. GARZA:  You want to mark them?
21    Q.  (BY MR. SKURKA)  While they're looking at
22 that, I want to ask you what F.T.O. means.
23    A.  Field training officer.
24    Q.  What is that?
25    A.  That means I get to train the young men and

167

1 women that just graduated from our last police
2 academy.
3    Q.  So, you're the one that they ride along with
4 for the first six months or so?
5    A.  Yes, sir.  They don't ride along with the
6 same F.T.O. for six months.  They're probably pretty
7 thankful for that.
8    Q.  So you basically help train the cadets coming
9 out of law school (sic)?
10    A.  Yes, sir.
11    Q.  Out of law school.
12    A.  Out of the academy, yes, sir.
13    Q.  And how long have you been a field training
14 officer?
15    A.  This will be my sixth or seventh class
16 already.
17         MR. GARZA:  Your Honor, at this time can
18 we have a hearing outside --
19         THE COURT:  Yes.  Ladies and gentlemen of
20 the jury, let's take a short break.  All rise for the
21 jury.
22         (Jury exits courtroom.)
23         THE COURT:  All right, be seated,
24 please.  All right, Mr. Garza?
25         MR. GARZA:  There are at least two

168

1 photographs to which we will probably have no
2 objections to; however, the other ones, once again,
3 we're going to urge the same objection.  We ask the
4 Court to review these pictures.  We feel that the --
5 due to their graphicness, and they're -- they're very
6 graphic, Your Honor, their prejudicial effect will far
7 outweigh their probative value.
8         THE COURT:  All right, let me take a
9 look.
10         MR. SKURKA:  May I proffer them to the
11 Judge?
12         MR. GARZA:  Okay.
13         MR. SKURKA:  First of all, the ones you
14 don't object to, let's just set them aside so if
15 you're not going to object to them.
16         MR. GARZA:  Here.
17         MR. SKURKA:  Those are those?
18         MR. JONES:  These are the ones that the
19 Defense Counsel objects to.
20         MR. SKURKA:  Okay.  I'll give the Judge a
21 minute to look at them, but essentially, Your Honor,
22 the witness has testified about the location of the
23 victim's body six feet from the dumpster.  He's
24 testified about the initial assessment showing the
25 wounds on Mr. Castro.

169

1         These photographs are very probative to
2 show the jury several things; No. 1, how the victim
3 was injured.  I have to prove that he was stabbed with
4 a knife and some of those wounds will show that.  I
5 also have to show the identify, that it's Pablo
6 Castro.
7         If the Court will recall, I did not show
8 Ms. Salinas those pictures because I didn't want to
9 upset her anymore to identify her co-worker but I
10 still have to identify that man through other police
11 officers who knew him or doing the investigation found
12 out who he was and through the medical examiner so I'm
13 certainly going to need the pictures of him out there
14 for that purpose.
15         Further, Judge, you'll see about -- I
16 count nine or ten cones around there to show the
17 location of where the evidence is next to the body.
18 I'm going to need all those to show the location of
19 where the items that the I.D. tech retrieved from the
20 scene at the time.  So, I understand the Judge has
21 some -- may have some reservation about that but I
22 think the jury is entitled to see the evidence as it
23 existed that night.  This is the first officer on the
24 scene and basically these pictures show a variety of
25 things, and I've looked through them, Judge, and I've

170

1  taken out a bunch of them that were duplicate and I
2  tried to make sure they're different angles and
3  different perspectives and I don't think you're going
4  to see a duplicate in that because I've already gone
5  those photographs.
6        THE COURT:  Well, I mean, look, I
7  understand your point about these cones, okay?  I have
8  two photographs here in which the body is covered that
9  show the cone, okay?  I got no problems with those, I
10  think -- I don't believe that these two photographs
11  that I have in my hand are more prejudicial than
12  probative, for several reasons; one, it's if a
13  distance, and, two; the body is for the most part
14  covered and it does -- and I think that the pictures
15  are of such a nature that really what's trying to be
16  shown here are the cones, and I understand, Mr.
17  Skurka, your point that you need to show where
18  different pieces of evidence were collected in
19  relation to the body.
20        I think these two exhibits certainly do
21  that, and I think for that purpose --
22        MR. SKURKA:  That's okay, Judge, we'll
23  just take them one at a time.
24        THE COURT:  These two are admissible, I
25  believe.

171

1        MR. JONES:  Are those --
2        THE COURT:  They're not marked so I can't
3  really refer to which ones I'm talking about.
4        MR. GARZA:  Can we mark them for purposes
5  of the record, Judge, for identification?
6        THE COURT:  Yeah, maybe we should.
7        MR. SKURKA:  The point of doing this is
8  they objected to it last time.  I didn't want to
9  object -- I didn't want to mark 15 pictures if the
10  Judge only let, you know, 10 of them in.
11        THE COURT:  No, that's fine, he certainly
12  can --
13        MR. SKURKA:  We'll certainly make a
14  record of this and we'll mark them now.
15        THE COURT:  Yeah, we'll make a record
16  with the one.  Now, this one right here, here's
17  another one with the body covered and it shows a
18  marker K.  I think that's admissible as well for the
19  same reasons that I've already stated.
20        MR. JONES:  Just a second.
21        THE COURT:  I mean, I suppose some of
22  these other photographs of the wounds themselves may
23  be admissible at some point, maybe perhaps when the
24  I.D. tech takes the stand, but I don't think this is
25  the proper moment, some of these others of the wound.

172

1  And when the I.D. tech takes the stand I may -- I may
2  allow some photographs of the wounds specifically of
3  themselves, okay?
4        Okay.  Can you get me those photographs
5  that we've already -- because I -- I've separated --
6  I've basically separated the photographs into two
7  groups and one of them essentially is the wounds.
8  That's these, Mr. Skurka.
9        MR. SKURKA:  That you want to wait?
10        THE COURT:  I want to wait on those at
11  this point.  I think these all are -- I got -- are
12  okay, the ones I've got over here.  I just have to
13  determine -- I got to make sure.  I'm going to take a
14  look here.
15        I think this photograph although the body
16  is not covered it does not show the wounds and it's
17  not overly graphic.
18        Okay.  These are the ones I think -- let
19  me hand you these photographs, Mr. Skurka.  Now, some
20  of these may not be objected to.  I suppose that's
21  State's Exhibit --
22        MR. SKURKA:  We've already --
23        THE COURT:  -- well, I don't know which
24  ones they are.  I think these are all fine.
25        MR. SKURKA:  Okay.

173

1        THE COURT:  Okay?  So, let's do this,
2  which ones of those does the Defense Counsel not
3  object to?  Let's get this sorted out.  There was a
4  couple that the Defense Counsel did not object to.
5        MR. SKURKA:  He's marking the last one.
6  All the others have been marked.  Judge, I tender
7  State's Exhibit No. 18, 19, 20, 21, 22 and 23 to
8  Defense Counsel.
9        THE COURT:  Okay.
10        MR. SKURKA:  The Court has made a
11  preliminary --
12        THE COURT:  Preliminary ruling.
13        MR. SKURKA:  -- ruling.
14        MR. GARZA:  Initially, Judge, we had not
15  objected to No. 18 --
16        THE COURT:  Okay.
17        MR. GARZA:  -- State's Exhibit 18.
18        THE COURT:  All right, 18 is admitted.
19        MR. GARZA:  Or 19.
20        THE COURT:  18 and 19 are admitted.
21        MR. GARZA:  But we had included 20, 21,
22  22 and 23 as part of our objection.
23        THE COURT:  Okay.  Why don't you give
24  those back to me.  All right, let's take a look.  All
25  right, then --

174

1       MR. GARZA: Those two --

2       THE COURT: Okay.

3       MR. GARZA: -- we have objection.

4       THE COURT: All right. 18 and 19 are

5   admitted without objection.

6       MR. SKURKA: And is the Court going to

7   rule on the other ones?

8       THE COURT: I am. 20, 21 and 22 show a

9   mostly covered body and depict the markers presumably

10  of the I.D. tech who placed them there for evidentiary

11  purposes, okay? I don't believe that these

12  photographs are overly gruesome or more prejudicial

13  than probative, so as to these exhibits, your

14  objection is overruled.

15      MR. GARZA: Your Honor, I just -- I

16  make the objection out of an abundance of caution to

17  protect the record on behalf of our client --

18      THE COURT: I understand that.

19      MR. GARZA: -- regarding the graphicness

20  of these photographs.

21      THE COURT: I understand that and the

22  Court is trying to be extremely careful on this for

23  that reason.

24      MR. GARZA: And I appreciate that.

25      THE COURT: Okay. State's Exhibit No.

175

1   23, although it is an uncovered depiction of the body,

2   it is from the position of the feet. It is in an

3   angle that although blood is present it is not an

4   overly gruesome photograph that rises to the point

5   where I believe it's more prejudicial than probative

6   and does once again give perspective on the different

7   exhibits that are -- I guess they're really just

8   markers and the markers have letters on them,

9   presumably I'm sure an I.D. tech is going to come in

10  here and tell us that these correspond with items that

11  were collected at the scene so I believe that 23 --

12  I'm going to overrule your objection on 23 because I

13  do not believe 23 is more prejudicial than probative,

14  all right, so these are admitted.

15      Now, Mr. Skurka, as to these other

16  photographs, you're going to have to show me where

17  there are markers that are not depicted in the photos

18  that were admitted, and I may have missed them because

19  there's a lot of markers --

20      MR. SKURKA: I understand, Judge.

21      THE COURT: -- that you need a particular

22  photograph because the photographs that have been

23  admitted into evidence do not depict a particular

24  marker.

25      MR. SKURKA: Mostly, Judge, I brought

176

1   these in because they showed the different angles. I

2   know that there's -- that the Court letting one angle

3   in from the feet but this also shows the perspective

4   that other areas around where the body was located and

5   it's not not just to show the markers but the position

6   of the body and how Mr. Castro was found out there and

7   I think the jury has a right to see the body as the

8   witnesses found him and as the I.D. tech found him to

9   do this, and most of these, again, show perspective.

10  There's different perspective.

11      Like this one shows where the dumpster

12  is, this one doesn't show where the dumpster is, but

13  this one does. This one shows where the side of the

14  building is, this one doesn't. This one does show

15  where the perspective of the building is.

16      So when you're talking about them,

17  they're not overly cumulative or duplicative because

18  they're all different angles except I have to agree

19  that this one is just close-up of this one, I guess,

20  but all the other ones are of different angles, Your

21  Honor.

22      THE COURT: Well, I mean, I think that

23  the ones that I have admitted sufficiently show the

24  markers, however, if at some point when you're going

25  through these photographs you notice that one of these

177

1   markers is not visible or not noticeable, I know we're

2   in the middle of testimony here, but maybe after

3   you've had some time to look maybe one of these

4   markers is not noticeable or it's just to difficult to

5   tell, I'll reconsider these photographs at that time.

6       Now, on the other issue of the wounds,

7   I -- I'll wait for the I.D. tech and I'll consider at

8   that time and I may allow you to get into photographs

9   of each wound.

10      MR. SKURKA: Judge, and I understand --

11      MR. GARZA: And the other caution we have

12  is the cumulative factor, Your Honor.

13      THE COURT: I understand that.

14      MR. SKURKA: I understand. And, Judge, I

15  don't want to beat a dead horse here but I would ask

16  you to reconsider this one because that shows the

17  location to the dumpster and none of these show that.

18      THE COURT: Okay, well, let me see the

19  photographs that I've admitted.

20      (Exhibits tendered.)

21      THE COURT: Okay.

22      MR. SKURKA: These are marked on the

23  back --

24      THE COURT: Okay. Well, State's Exhibit

25  No. 20 does, but I agree with you that this photograph

178

1  does show --
2  MR. SKURKA: It shows something the other
3  ones don't.
4  THE COURT: It shows something the other
5  ones don't, and that is, the angle in which the body
6  is pointing in relation to the building.
7  MR. JONES: Which one is it?
8  THE COURT: It's not marked --
9  MR. JONES: Oh, it's not marked yet,
10  okay.
11  THE COURT: -- but I will tell that you
12  I -- it is from some distance and although you can see
13  some blood I don't believe it is in this context
14  overly graphic.
15  MR. SKURKA: And there is one of that
16  that's a close-up and that's a further one away.
17  THE COURT: Okay, this one I think -- I
18  think you've got a point, Mr. Skurka, it is from a
19  distance, blood is -- is apparent, however, it doesn't
20  look overly graphic in relation to the other
21  photographs and I do not believe that it is more
22  prejudicial than probative. I am going allow you to
23  get this exhibit in, but you have to mark it.
24  MR. SKURKA: I will, Judge.
25  MR. GARZA: Note our objection.

179

1  THE COURT: Why don't you mark it and
2  then you can object to it.
3  MR. JONES: And then --
4  MR. SKURKA: Then I'm going to make a
5  record as to the ones you put in --
6  THE COURT: Now, that being said, that
7  being said, at this time I have -- I did not admit 1,
8  2, 3, 4, 5, 6 photographs that Mr. Skurka attempted to
9  admit into evidence --
10  MR. JONES: They're not marked.
11  THE COURT: -- that are not marked, but
12  that I think -- I feel may be more prejudicial than
13  probative first. And, in addition, cumulative.
14  All right. I'm -- okay, Mr. Jones?
15  MR. JONES: Well, I was just going to ask
16  after we get the last picture marked and admitted into
17  evidence before we assume can we please have those
18  three exhibits to show to the Defendant because he
19  requested to look at them.
20  THE COURT: Oh, sure, the exhibit that
21  we're admitting. Absolutely. Yeah, we'll take a
22  little break.
23  MR. SKURKA: Judge, just for the record
24  then the Court's ruling is State's Exhibit 18, 19, 20,
25  21, 22, 23, and 24 are admitted, and there's -- did

180

1  you say 6 or 7 that were not?
2  THE COURT: Six that were not admitted of
3  that --
4  MR. SKURKA: Right.
5  THE COURT: -- of that batch, and then
6  there was another batch, I think there's another six
7  that were not admitted of the wounds and very
8  close-ups. I suppose the last exhibit I was talking
9  about was -- the last picture became 24, is that
10  correct, Mr. Skurka?
11  MR. SKURKA: Yes, Judge.
12  MR. GARZA: We would ask the Court to
13  note our objection with respect to the admittance of
14  No. 24 as well.
15  THE COURT: So noted, and I have
16  considered your objection and I have --
17  MR. GARZA: For the same reason.
18  THE COURT: -- sustained your objection
19  to six photographs that were -- that Mr. Skurka
20  proffered and that I did not admit into evidence,
21  okay.
22  MR. SKURKA: And just for the record,
23  those weren't marked and I'll just keep them to the
24  side saying they weren't admitted --
25  THE COURT: Okay.

181

1  MR. SKURKA: -- so the jury won't see
2  them.
3  THE COURT: All right, let's take a
4  little break. Your client can --
5  MR. GARZA: Thank you.
6  THE COURT: -- view the photographs and
7  we'll take a little break and we'll be right back out.
8  (Short recess.)
9  THE COURT: All right, bring them in.
10  (Jury enters courtroom.)
11  THE COURT: All right, be seated, please.
12  All right, Mr. Skurka, you may proceed.
13  MR. SKURKA: Thank you, Your Honor.
14  Q.   (BY MR. SKURKA) Before the break, Mr.
15  Wenzel -- or Officer Wenzel, I showed you a series of
16  photographs that you previously identified as from the
17  Times Market that night.
18  A.   Yes, sir.
19  Q.   I want to show them to you one at a time now
20  on the stand so you can tell the jury what they
21  depict, okay? We're going to start with photograph
22  No. 18, State's Exhibit 18.
23  MR. SKURKA: Frank, can you get the
24  lights, please.
25  THE COURT: And for the jury's

182

1 information, the Court admitted several exhibits into
2 evidence while you were on a break.
3     Q.   (BY MR. SKURKA)  Okay.  There's a laser
4 pointer in front of you, please.
5     A.   Uh-huh.
6     Q.   Oh, you got it, okay.  Can you show us where
7 the perspective or where that picture is taken, like
8 the foreground, first of all.  What angle or what
9 direction is it taken from?
10     A.   You would be looking towards Staples from the
11 side street Riggan that I showed you earlier, and that
12 would be the side of store right there.
13     Q.   And where was Mr. Castro found?
14     A.   Mr. Castro is right here.
15     Q.   And for the record, you're showing the area,
16 the body drapped in white there?
17     A.   Yes, sir.
18     Q.   The next photograph is No. 19.  Please take a
19 look at that and identify what's on there for the
20 jury.  And let's just -- I don't care where you
21 start, at the middle or the end, but tell us what's on
22 there.  Let's start at the right end, I guess.
23     A.   Over here?
24     Q.   Yes.
25     A.   Okay, that's going to be the building again,

183

1 and this is the body, and that's the dumpster that I
2 was referring to earlier.
3     Q.   And what is this item going across like this?
4     A.   It looks like crime scene tape.
5     Q.   And you testified earlier that the body was
6 located within about six feet of the dumpster; is that
7 correct?
8     A.   I guessed about six feet in front of the
9 dumpster.
10     Q.   You didn't take a ruler out and measure it at
11 that time?
12     A.   No, no.
13     Q.   Okay.  What are those -- looks like traffic
14 cones or what are those little yellow things?
15     A.   The little yellow things are markers that our
16 I.D. techs will put out at the crime scene.  Like I
17 said earlier, they go out there and these yellow
18 markers that they use, they can have a letter or a
19 number on, and then what the crime scene people will
20 do, they'll take a photograph of it, whatever marking,
21 and then when they do their report they can refer back
22 to this "Letter A was put where they found X and I
23 photographed X and collected X" and then, you know,
24 later on they can present X.  That way you can show
25 somebody where it was and the layout of the crime

184

1 scene, the overall layout:
2     Q.   Okay.  You're not in-charge of doing that,
3 that would be the I.D. tech, though; correct?
4     A.   Yes, sir, that's their job.
5     Q.   The next one is State's Exhibit No. 20.  What
6 does that show, please?
7     A.   Okay, that would be the side of the store
8 right there.  There's the dumpster, and Mr. Castro,
9 then some more markers that were marking different
10 pieces of evidence.
11     Q.   That would be a prospective of looking back
12 toward the back of the lot; correct?
13     A.   Yeah, that would be kind of looking more
14 north to east, I guess.
15     Q.   Okay.  The next photograph, please, is
16 State's Exhibit 21, I believe.  What does that show?
17     A.   That's the -- the victim right there, and
18 then like I said, more crime scene markers here.  You
19 can actually see the letters on some of them.
20     Q.   Now, just for the record, that sheet was not
21 on the body at the time you arrived; correct?
22     A.   No, sir, it was not.
23     Q.   Who puts that on there?
24     A.   The paramedics would put that on there.
25     Q.   State's Exhibit No. 22, what does that

185

1 depict?
2     A.   Once again, it's Mr. Castro, and then the
3 crime scene or a marker.  I couldn't tell you exactly
4 what he's marking here.  Like I said, the I.D. techs
5 are the ones that go out and mark those.
6     Q.   And I understand, I'm not going to ask you
7 what a mark -- that's just -- it says the marker K.
8     A.   Correct.
9     Q.   The next photograph is State's Exhibit No.
10 23.  Can you tell us what that depicts and from what
11 angle?
12     A.   I'm going to say that's looking more towards
13 the -- the southeast.  You would be back --
14     Q.   Help us out, don't say southeast.  What part
15 of the property are you saying?
16     A.   Yeah, I'm trying to.  If you remember where
17 the dumpster was, okay, if you were standing -- it's
18 kind of --
19     Q.   Okay, where would the dumpster be in that
20 picture?
21     A.   The dumpster would be like right in this area
22 here.  You can see where my pointer is, if that
23 gives you some idea.
24     Q.   But for the record, that photograph is the
25 one showing perspective from I guess the feet of the

186

1  victim?
2     A.   Yes, sir, the feet of the victim.
3     Q.   And is that the position of the body as you
4  found it?
5     A.   Yes, sir.
6     Q.   Did you turn over the body or touch the body
7  in any way?
8     A.   No, sir, I did not touch the body in any way.
9     Q.   So that's how he was found; correct?
10    A.   Yes, sir.
11    Q.   Next and finally in this series of
12  photographs is State's Exhibit 24, and I'll start with
13  the top left.  If you can tell me what's shown in the
14  top left of that.
15    A.   That right there is the dumpster.
16    Q.   So that gives a perspective, and the building
17  would be?
18    A.   That would be the building right here.  Yeah,
19  that's the building.
20    Q.   And does that show the condition of Pablo
21  Castro as he was that night when you arrived?
22    A.   Yes, sir, that's the position that he was in
23  when I arrived.
24    Q.   And that does not have the white sheet over
25  him at that time?

187

1     A.   No, sir, it does not.
2     Q.   Could you tell -- earlier you said something
3  about you could tell he was not breathing or alive
4  because blood was not coming out or something?  What
5  do you mean by that?
6     A.   Well, when you pass away your heart stops
7  beating so when your heart stops beating there's no
8  blood flow so that's one indicator of whether an
9  individual is live or not.  If you still see blood, if
10  they're still bleeding, then the heart is still
11  beating.  Also, you know, you can look and see if his
12  chest is rising and falling, if he's breathing, plus
13  especially like the wounds that he had on his neck,
14  you could probably see something there that he was
15  breathing but, like I said, when I looked at Mr.
16  Castro it pretty evident to me he had already passed
17  way.
18    Q.   And the I.D. tech would be the one that had
19  more pictures of that scene, correct, or -- and
20  to describe what those cones are for?
21    A.   Yes, sir, the I.D. tech would be the one that
22  would be able to tell you what each one of those
23  markers is marking.
24    Q.   I was a little awkward in asking you, but
25  you're not the one who searches the immediate area of

188

1  the body looking for items; correct?
2     A.   If we see something when we initially arrive,
3  you know, like if there's a weapon laying around or some
4  -- we'll point that out to them but they're the ones
5  that will mark it and photograph it and collect it later
6  on, and the -- the detectives that come to investigate
7  it cause basically in a case like this what patrol's
8  response is just to lock the scene down, protect your
9  crime scene, keep the witnesses separated and then our
10  detectives will come in and then they're the ones that
11  go, "Well, we want this, we want this, we want that,"
12  and they'll get -- like Mr. Skurka said, they'll get
13  longer statements from the witnesses.
14    Q.   How about the initial examination of the
15  body?  Did you see any obvious weapons around Mr.
16  Castro, like a gun, a knife, something like that?
17    A.   No, sir.
18    Q.   Did you notice anything around his hands, his
19  body about it that could be a possible weapon?
20    A.   No, sir.
21    Q.   You mentioned the wounds to his neck.  Did
22  you see any other marks like bruises or contusions on
23  his body?
24    A.   Not when I initially looked at him, no, sir.
25    Q.   Again, that would be for probably somebody

189

1  else who did the closer examination?
2     A.   Yes, sir.
3     Q.   Officer Wenzel, I think that's all questions
4  I have.  Thank you, sir.
5           THE COURT:  Cross?
6           MR. GARZA:  Yes, Your Honor.  May I
7  proceed?
8           THE COURT:  Yes.
9              CROSS-EXAMINATION
10  BY MR. GARZA:
11    Q.   Officer Wenzel, you and I have never met
12  before; is that correct?
13    A.   No, sir.
14    Q.   I've never had an opportunity to interview
15  you prior to your testimony?
16    A.   No, sir.
17    Q.   Have you ever had occasion to meet with Mr.
18  Skurka?
19    A.   Yes, sir, I did.
20    Q.   On how many occasions?
21    A.   One occasion, sir.
22    Q.   Okay.  That was today or some other -- during
23  the week?
24    A.   A couple of weeks ago, I think, or maybe
25  three.

190

1     Q.   Let me direct your attention to what's
2  already been admitted as State's Exhibit 18.  The
3  people standing in the background back there --
4     A.   Yes, sir.
5     Q.   -- are you able to identify who some of those
6  people are?
7     A.   No, sir.  A couple of them look like they
8  might be police officers, I'm not real certain.  It's
9  pretty blurry in order for me --
10    Q.   Okay.
11    A.   If we can distinguish.
12    Q.   Okay.  If we can focus a little further.  At
13 this point in time if you can recollect, are any --
14 are most of these people possibly police personnel or
15 some of these people some of the witnesses?
16    A.   That would appear to be a police officer, and
17 that would appear to be a police officer, and I'm --
18    Q.   What about the gentleman in the middle in the
19 T-shirt --
20    A.   I'm not --
21    Q.   -- leaning against that --
22    A.   I'm not sure who that would be, sir.
23    Q.   Would that be a police personnel or would it
24 be a potential witness?
25    A.   It's probably a potential witness or a

191

1  possible witness.
2     Q.   What about the other two people on the other
3  side to the left?
4     A.   I can't make out anything there at all.
5     Q.   Okay.  But those two people on the left, not
6  knowing who they are, they don't appear to be
7  separated as far as part of your task of separating
8  witnesses?
9     A.   Well, it looks like this individual is
10 engaged in a conversation.  It looks like he's holding
11 a piece of paper maybe or something there but without
12 being able to see their faces I wouldn't be able to
13 tell you exactly.  It could be one of the detectives
14 talking to that individual as far as that goes --
15    Q.   Okay.
16    A.   -- but I'm not -- I can't really tell you for
17 certain.
18    Q.   Now, how much time has elapsed at this time
19 in so far as the taking of this picture where there's
20 been enough time to tape the area off, the I.D. techs
21 -- the paramedics have obviously come and they've
22 covered the body, I.D. tech has come and laid out the
23 things that they're interested in trying to collect,
24 how much time has elapsed at this time?
25    A.   To be exact, I couldn't tell you, sir.

192

1  Probably -- I would say approximately 30, 40 minutes
2  by the time we get the detectives.  They get called
3  out from the house and they have to get dressed and
4  get out there and they get briefed by their boss and
5  then they start going about their business.  I.D., you
6  know, by the time they go through the crime scene and
7  I.D. puts out all the markers for all the stuff that
8  is out there and they start taking their pictures, it
9  takes quite a bit of time.
10    Q.   Okay.  Do you recall how long you were at the
11 scene before you finally cleared?
12    A.   I was the last one to clear the scene, sir,
13 and that was well over sunrise in the morning cause
14 before I cleared the scene after they had already
15 removed the body and everybody was already gone, I had
16 an engine company come out here for a wash down at the
17 scene.
18    Q.   Okay.  So several hours later?
19    A.   Oh, yes, several hours.  It was at least --
20 you know, it was sunrise, after sunrise when I left
21 the scene.
22    Q.   And it's quite safe to say when you arrived
23 whatever took place out there that caused Mr. Castro's
24 death had already occurred?
25    A.   Oh, yes, sir, yes.

193

1     Q.   You were not a witness to any of it?
2     A.   No, sir, I was not.
3     Q.   You don't -- you don't recognize my client as
4  being the person who committed any of these acts or
5  anything like that?
6     A.   No, I -- as a witness, no, sir.
7     Q.   Thank you.
8          MR. GARZA:  I'll pass the witness.
9          MR. SKURKA:  No other questions, Judge.
10         THE COURT:  All right.  May this witness
11 be excused?
12         MR. SKURKA:  Yes, Your Honor.
13         THE COURT:  All right.
14         THE WITNESS:  Thank you, Your Honor.
15         THE COURT:  You can go about your
16 business.
17         THE WITNESS:  Thank you, sir.
18         MR. SKURKA:  We call Kashif Butt.
19         THE COURT:  All right.  All right, come
20 forward.
21         (Oath administered.)
22         THE COURT:  All right, be seated.  You
23 may proceed.
24         MR. SKURKA:  Thank you, Your Honor.
25

194

KASHIF ISHAN BUTT,

1                 KASHIF ISHAN BUTT,
2 having been first duly sworn, testified as follows:
3             DIRECT EXAMINATION
4 BY MR. SKURKA:
5      Q.   Could you please introduce yourself to the
6 folks on our jury.
7      A.   Yeah, my name is Kashif Butt.
8      Q.   Can you spell that for the court reporter,
9 please.
10      A.   It's K-A-S-H-I-F I-H-S-A-N and B-U-T-T.
11      Q.   How old a person are you?
12      A.   I'm 28 years old.
13      Q.   How old were you back on July 19, 2004?
14      A.   24 years old.
15      Q.   Are you married?
16      A.   Yes, sir.
17      Q.   Do you live here in Corpus Christi?
18      A.   Yes, sir.
19      Q.   How long have you lived in Corpus Christi?
20      A.   Almost ten years.
21      Q.   Where are you from originally?
22      A.   From Pakistan.
23      Q.   Does your family own any businesses here in
24 town?
25      A.   Yes, sir.

195

1      Q.   Can you tell the jury what that would be and
2 where it is?
3      A.   It's a small convenient store at -- called CK
4 Mart on Port and Baldwin.
5      Q.   How long have they owned that?
6      A.   Almost ten years now.
7      Q.   And do you work for that store?
8      A.   I own that store.
9      Q.   You own that store, I'm sorry. Did your --
10 is it your dad or your family used to own it and then
11 you bought them?
12      A.   No, actually it's me and my brother, we
13 co-owner of that store.
14      Q.   Okay, it's you and your brother. I'm sorry,
15 I thought it was your father. How far is that store
16 from the store at 1902 Baldwin at Times Market, would
17 you say?
18      A.   I would say about two blocks maybe, more or
19 less.
20      Q.   Were you working at that place at your store
21 on July 19th, 2004?
22      A.   Yes, sir.
23      Q.   Who else was working with you?
24      A.   Mariano was working.
25      Q.   Would that be Mariano Cervantes?

196

1      A.   Yes, sir.
2      Q.   Had he been working at that store with you
3 before?
4      A.   Yes, sir.
5      Q.   He was an employee there?
6      A.   Yes, sir.
7      Q.   How long had he worked at the store with you?
8      A.   Not too long, maybe a month, two months.
9      Q.   So at that time he was only working -- had
10 only been working with you-all a short time?
11      A.   Yes, sir.
12      Q.   What time were your hours at that place?
13      A.   We open from 7 to 11.
14      Q.   So 7 in the morning till 11 p.m.
15      A.   11 p.m.
16      Q.   That night after you got off work, and I'm
17 talking about July 19, 2004, did you close the store
18 at 11?
19      A.   Yes, sir.
20      Q.   Was Mariano Cervantes with you?
21      A.   Yes, sir.
22      Q.   Where did you-all go afterwards?
23      A.   After we closed the shop we went to the car
24 wash next to that Times Market.
25      Q.   Why?

197

1      A.   Get our car cleaned.
2      Q.   I know that sounded like an obvious question,
3 didn't it? Whose idea was it to go to the car wash?
4      A.   Mine.
5      Q.   And why did you go to that one?
6      A.   Because it was the nearest one and it was my
7 idea.
8      Q.   Can you describe that type of car wash, what
9 kind it is.
10      A.   It's a hand wash place.
11      Q.   Were both of you-all washing your car or just
12 one of you washing your car?
13      A.   We were about to start. I mean, I remember
14 we put the quarters in the machine and as we were
15 about to start this incident happened.
16      Q.   Tell us -- tell the folks on the jury what's
17 the first thing you noticed that caught your attention
18 as you were going to wash your car.
19      A.   I heard a couple of noises coming from the
20 parking lot.
21      Q.   What parking lot?
22      A.   Across the street, Times Market parking lot
23 and that's what it was.
24      Q.   What kind of noises did you hear?
25      A.   Like somebody arguing or fighting.

198

1    Q.    What did you see?

2    A.    I saw the victim getting beat up by a male

3    and a female at that time.

4    Q.    Where exactly were you at or were you

5    standing when you saw this?

6    A.    I was -- I was in the parking lot of the car

7    wash.

8    Q.    Was there anything blocking your view from

9    the car wash to where these people were?

10   A.    No, sir.

11   Q.    Please go into detail and tell us exactly

12   what you saw when you said they were beating him.

13   What did you see?

14   A.    They were punching him in the face and

15   kicking him.  They beat him until he dropped and they

16   still kept kicking him.

17   Q.    So at first when you saw the victim he was

18   upright?

19   A.    Right, sir.

20   Q.    Can you describe the motions that the people

21   were making.  You say a punching motion.  Can you show

22   the jury, describe what kind of motion it was?

23   A.    Like punching with fists and you want to make

24   a --

25   Q.    Just demonstrate what kind of motion you saw.

199

1    A.    Just like punching in the face and kicking

2    with legs.

3    Q.    Could you tell if either one of the persons

4    had a weapon on them?

5    A.    No.

6    Q.    To you from where you were at you just saw

7    them punching, in a punching motion?

8    A.    Yes, sir.

9    Q.    Around the face and where?

10   A.    And probably stomach or in the back.

11   Q.    Did you see anything that led up to this?

12   A.    No, sir.

13   Q.    In other words, did you see one person

14   approach the other person or somebody come up to each

15   other or when you caught your attention it was already

16   in the middle of it?

17   A.    They were already in the middle.

18   Q.    You understand my question?

19   A.    Yes.

20   Q.    What was the answer then?

21   A.    Well, I can't tell what they were fighting

22   for.  As far as I know, I mean, the fight was going on

23   when I saw it.

24   Q.    Okay.  That's what I'm trying to figure out

25   is did you see one person go to the other person or

200

1    was it already under way when you noticed it?

2    A.    It was already started.

3    Q.    Okay.  Where was it taking place, please?

4    A.    The fight?

5    Q.    Yes, what part of the parking lot?

6    A.    It was at the side -- side parking lot across

7    the street from the car wash.

8    Q.    Can you describe the two people that you saw

9    in general description.  You said it was a male and a

10   female.

11   A.    Yeah, female --

12   Q.    Can you tell us generally what the male and

13   female looked like?

14   A.    Male was kind of mid range, maybe 5-6, 5-4,

15   and the female was about the same height.

16   Q.    Can you tell me what their race, White,

17   Hispanic, Black or whatever?

18   A.    I'm not -- Hispanic.

19   Q.    Could you tell their approximate ages?

20   A.    Not too clear about that.

21   Q.    How about the build of the people?

22   A.    Sir, I didn't get that.

23   Q.    Say again?

24   A.    I didn't get that part.

25   Q.    Okay.  So you don't know if they were like

201

1    small, medium, large, you know, built, skinny,

2    whatever?  If you don't know --

3    A.    The girl was skinny and the guy was kind of

4    built.

5    Q.    How about the victim, can you describe things

6    like that on him, age, weight, height, race?

7    A.    What I can tell you was in 40s and, yeah, he

8    was full.

9    Q.    He was what?

10   A.    He was heavy and about the same height.

11   Q.    What was he doing as these people were

12   punching or kicking him?

13   A.    He was trying to defend himself.

14   Q.    How?

15   A.    By blocking the punches and kicks.

16   Q.    Describe that or motion to the jury how he

17   was doing that.

18   A.    I'm not really sure how to do it.

19   Q.    You're just basically saying how, to put his

20   hands up or arms up --

21   A.    Right.

22   Q.    -- to ward off the blows?

23   A.    Yes.

24   Q.    Was he successful in warding off the blows?

25   A.    No, sir.

202

1    Q.    At the time that you saw this, you said the
2    guy was upright at first and then he fell down?
3    A.    Uh-huh.
4    Q.    And I'm talking about the victim.  Can you
5    tell us what, if anything, you saw happen after he
6    went to the ground?
7    A.    As he went down they kept beating him and
8    after a while they went through his pockets.  I think
9    they got something out of his pocket and then took
10   off.
11   Q.    When you say that they went through his
12   pockets, who are you saying?
13   A.    I'm talking about the guy and the girl.
14   Q.    And when you said you think they got
15   something, are you talking about the man or the woman?
16   A.    I can't tell the exact but it seems like they
17   had something.
18   Q.    Okay.  You couldn't see what they took, is
19   that what you're saying?
20   A.    Right.
21   Q.    But you see where they got it from?
22   A.    From the victim's pocket.
23   Q.    So what you're saying is they got something
24   from the pocket, but you didn't see exactly what it
25   was?

203

1    A.    Yes, sir.
2    Q.    But are you sure it came from the victim's
3    pocket?
4    A.    Yes, sir.
5    Q.    Could you tell during the fight and both when
6    it started or the part you saw and toward the end who
7    was doing most of the hitting or more of the hitting?
8    Was it a male or female or was it equal?
9    A.    It was equal.
10   Q.    Could you see any weapons in either one of
11   the persons' hands, the male or female?
12   A.    No, sir.
13   Q.    Did you see any weapons in the hands of the
14   victim, Pablo Castro?
15   A.    No, sir.
16   Q.    In other words, when you said he was trying
17   to ward off the blows, did you see him with a knife, a
18   bat, a stick, a gun --
19   A.    No, sir.
20   Q.    -- anything like that?  How long did this go
21   on?
22   A.    Not too long, maybe less than a minute.
23   Q.    And when you say they took out something from
24   his pocket are you saying it was both of them or the
25   male or the female?

204

1    A.    I'm not sure who got it, it was somebody.  I
2    mean, somebody did get something out of it.
3    Q.    And after they got something out of the
4    pocket, what happened?
5    A.    They went -- they approached the van that was
6    parking in the parking lot and took off in it.
7    Q.    Okay.  Can you tell us a little bit about the
8    van and where it was?
9    A.    It was parked in one of the parking lot areas
10   and it was a big red -- red van.
11   Q.    What do you mean, big van?
12   A.    R.V. type one.
13   Q.    R.V. type?
14   A.    Yeah.
15   Q.    How many vans did you see them leave in?
16   A.    I only saw one.
17   Q.    Saw one of them?
18   A.    Uh-huh.
19   Q.    Could you tell if they were -- what make or
20   model they were?
21   A.    I think it was Ford.
22   Q.    Was there anyone -- or do you remember -- do
23   you remember if somebody was already in the van that
24   they went into --
25   A.    Yes, sir.

205

1    Q.    -- or they went to?
2    A.    Yes.
3    Q.    Tell me about that.
4    A.    There was a third person sitting in the van
5    as a driver.
6    Q.    Did the third person ever get out of the van?
7    A.    No, sir.
8    Q.    Where did the van go?
9    A.    He went down the street.
10   Q.    Which street?
11   A.    I don't know the name of the street, sorry.
12   Q.    Well, what street was it in location to in
13   reference to the Times Market and the car wash?
14   A.    The street we were standing at.  I mean,
15   the --
16   Q.    So, would it be fair to say it was the street
17   between the car wash --
18   A.    Yes, sir.
19   Q.    -- and the Times Market?
20   A.    Yes, sir.
21         MR. GARZA:  Your Honor, I'm going to
22   object to the leading that's going on, Your Honor.
23         MR. SKURKA:  I'll rephrase it, Judge.
24         THE COURT:  All right, sustained.
25   Q.    (BY MR. SKURKA)  Are you sure -- how many

206

1 vehicles did you see around the -- the guy?

2    A.  I don't remember now. I only remember one

3 though at that time. I remember seeing one.

4    Q.  Okay. Do you remember giving a statement to

5 the police right after this happened?

6    A.  Yes, sir.

7    Q.  Would looking at that statement help refresh

8 your memory of how many vans there were? If I gave

9 you a chance to read over that statement would it help

10 refresh your memory?

11    A.  Yes, sir.

12    Q.  And just for record, you gave a statement to

13 the police on or around that same day, July 19th or

14 July 20th; correct?

15    A.  Uh-huh.

16    Q.  I'm going to ask you to read that to

17 yourself, please.

18    A.  Yes.

19    Q.  Okay. Have you read it to yourself?

20    A.  Yeah.

21    Q.  Okay. I know this is about three and a half,

22 four years ago, so I'm going to ask you again. Now

23 that you've read your statement have you refreshed

24 your memory on how many vans there were?

25    A.  Yeah, just my statement as it says there were

207

1 two vans.

2    Q.  Okay. Did the man and women get in the same

3 van or did one get in one van and one get in the

4 other?

5    A.  Both of them got into the same van.

6    Q.  What did you do after the van drove off or

7 what did you and Mariano do while you were watching

8 all this?

9    A.  Me and Mariano, we rushed toward the victim.

10 He was already on the ground and we tried to help him,

11 but at the same time the clerk from the store, she

12 came out, and I believe she called the cop -- the

13 police already so --

14    Q.  Were you able to help the man?

15    A.  No, sir.

16    Q.  Tell us exactly what you saw as you

17 approached the man who was laying on the ground.

18    A.  There was blood coming out of him from --

19 from the throat and he was bleeding badly and he also

20 had like punching wounds all over his face.

21    Q.  What do you mean punching wounds all over his

22 face?

23    A.  Like you can see his face kind of swollen.

24    Q.  Was he alive when you reached him?

25    A.  Barely.

208

1    Q.  I'm sorry?

2    A.  He was barely alive.

3    Q.  Barely alive. Were you able to try to give

4 him first aid, like, you know --

5    A.  No, sir.

6    Q.  Who was with him, closer, you or Mariano, or

7 both of you there?

8    A.  We were both there at the same time.

9    Q.  Did you know the person?

10    A.  No, sir.

11    Q.  You said another person came out from inside

12 the Times Market.

13    A.  Yes, sir.

14    Q.  Who was that, if you know?

15    A.  I don't know her but I think she was a clerk

16 at the store.

17    Q.  Was she able to identify who it was out there

18 on the street?

19    A.  Yes, sir.

20    Q.  Who did she identify them as?

21    A.  She identified them as the stocker of the

22 store.

23    Q.  Describe the person's injuries that you saw,

24 either on his face or around his body.

25    A.  Like I say, his face was swollen and I

209

1 could -- what I could see was blood was coming out of

2 his throat area.

3    Q.  Could you see -- never mind. So what did you

4 and Mariano do?

5    A.  We waited for the cops and after that we went

6 to the station.

7    Q.  You waited for the cops and then went to the

8 station?

9    A.  Yes, sir.

10    Q.  Why was that?

11    A.  Because they wanted to take our statement.

12    Q.  Okay. While you were looking at the person

13 in the parking lot and the fight in the parking lot,

14 was there anything obstructing your view from the car

15 wash to the Times Market?

16    A.  No, sir.

17    Q.  How was the lighting that night?

18    A.  This was a street light, it was good. It was

19 on.

20    Q.  So you could see the persons attacking the

21 man?

22    A.  Yes, sir.

23    Q.  Can you identify the person who attacked the

24 man in the crime -- in the parking lot? Is he in the

25 courtroom today?

210

1    A.   Yes, sir.

2    Q.   Can you point to him and describe something

3 he's wearing, please.

4    A.   He's wearing the blue shirt -- I mean,

5 the blue -- sorry, he's wearing the orange shirt.

6          MR. SKURKA:  Your Honor, may the record

7 reflect the witness has identified the Defendant.

8          THE COURT:  It will so reflect.

9    Q.   (By MR. SKURKA)  That is the -- this man over

10 here is the same person you saw attack that man?

11   A.   Yes, sir.

12   Q.   I have a few photographs to show you, if I

13 could, please.  State's Exhibit 13, what is that a

14 photograph of?  Okay, there's a laser pointer there in

15 front of you.

16   A.   Yeah, this is the car wash, and behind it,

17 this is where I was standing, and this is the store

18 right there.

19   Q.   Okay.  And where is Baldwin Street?

20   A.   This is Baldwin.

21   Q.   Okay.  I have another picture and it's going

22 to show kind of the back part of the parking lot.

23 Well, here's another picture.  What number is that,

24 Geordie?

25          MR. SCHIMMEL:  3

211

1          MR. SKURKA:  3.

2    Q.   (By MR. SKURKA)  It's purported that that

3 little blue box drawn in there is where the dumpster

4 was at.  Would that be a fair and accurate

5 statement --

6    A.   Yes.

7    Q.   -- it was around that area?  And show us

8 where you were standing at when you saw this.

9    A.   I was around here.

10   Q.   And I have one more photograph to show you,

11 which is No. 15.  Now, that purports to be an angle

12 from the other side looking from the back of both the

13 store --

14          MR. SKURKA:  Can you go a little closer,

15 please?

16   Q.   (By MR. SKURKA)  -- toward Baldwin --

17          MR. SKURKA:  Too much.  Go to the left.

18 There you go.  Go up a little bit.

19   Q.   (By MR. SKURKA)  What is this right here?

20   A.   This is Baldwin.

21   Q.   And what is this?

22   A.   That's the street they took off.

23   Q.   Okay.  Now, can you tell us, do these --

24 there's some Xs drawn on here?

25   A.   Uh-huh.

212

1    Q.   Do the two Xs over here represent

2 approximately the area that you and Mariano were at?

3    A.   Yes, sir.

4    Q.   And does this X over here represent

5 approximately the area where the fight took place?

6    A.   Yes.

7    Q.   There's no dumpster in there, right?

8    A.   Yes, sir.

9    Q.   Okay.  But does that approximately represent

10 the areas?

11   A.   Yes.

12   Q.   And does it fairly show and accurately show

13 that there's nothing in between here that obstructed

14 your view?

15   A.   Yes, sir.

16   Q.   What is this thing here?

17   A.   The street light over here.

18   Q.   Okay.  Is that street light, was it working

19 that night?

20   A.   Yes, sir.

21   Q.   Okay.  Just a couple of areas I want to go

22 over with you.  First of all, I'm going to show what's

23 marked State's Exhibit No. 17.

24          MR. SKURKA:  Just a second, Geordie.

25          MR. SCHIMMEL:  Uh-huh.

213

1    Q.   (By MR. SKURKA)  What does 17 depict?  It's

2 already been admitted into evidence.  What is that a

3 photograph of, please?

4    A.   Of the victim.

5    Q.   Is that the way he looked, fairly and

6 accurately looked to you that day when you came up to

7 him with Mariano?

8    A.   Yes.

9    Q.   Thank you.  Now I'm going to show you one

10 more thing, area.

11          MR. SKURKA:  Go ahead, Geordie.

12   Q.   (By MR. SKURKA)  Do you recognize the scene

13 depicted up there off the Google maps?

14   A.   Yes, sir.

15   Q.   Okay.  You do?

16   A.   Yes, sir.

17   Q.   Okay.  What is it?

18   A.   This is Baldwin Street.

19   Q.   Can you show -- is the car wash on there?

20   A.   Yes, sir, right there.

21   Q.   Now, where -- do you remember what stall you

22 and Mariano were in or behind the stall, or where were

23 you?  Show us on that picture, please.

24   A.   We were either this one or that one right

25 here.

214

1    Q.    Okay.  Hold on just a second, I'm going to
2  try to get this a little closer for you.  How is that,
3  does that show?  Do you remember which one?
4    A.    It was the second one and the third one, I
5  believe.
6    Q.    Okay.  For the record, you're starting at the
7  far right would be the No. 1 stall, and 2, 3 and 4,
8  and then like a little office thing here?
9    A.    Uh-huh.
10    Q.    So it's your testimony that you were in the
11  second and third stalls?
12    A.    Yes, sir.
13    Q.    Now, were you actually in the stalls or on
14  the back part of the lot when you saw this happen?
15    A.    We were at the back side.
16    Q.    Okay.  Could you have seen if you were in the
17  stall?
18    A.    No, sir.
19    Q.    Why not?
20    A.    It blocks the view.
21    Q.    All right.  Now, I want to go back out and
22  show you something else.  Now, what does that show?
23    A.    There's the parking lot, that parking lot at
24  the Times Market.
25    Q.    And where would you have been at, you and

215

1  Mariano standing?
2    A.    We should be right over there behind this.
3    Q.    Okay.  I'm going to go down that street.
4  Does that show a good picture of the area you were at?
5    A.    Yes, sir.
6    Q.    Can you show with the laser pointer where you
7  and Mariano were.
8    A.    Around here.
9    Q.    So for the record you're showing between the
10  fence and the stalls themselves; correct?
11    A.    Yes, sir.
12    Q.    Now, I'm going to switch it over to this
13  side.  What does this depict?
14    A.    This is where he was lying out there.  He was
15  beaten.
16    Q.    And where was the dumpster?
17    A.    Around this way.
18    Q.    Okay.  So, looking at that view I just showed
19  you from where you were at and to this parking lot is
20  there anything blocking your view from seeing
21  anything?
22    A.    No, sir.
23    Q.    And looking over at this thing -- let me go
24  up.  What is that?
25    A.    Street lights.

216

1    Q.    Okay.  Was that light operating and working
2  that night?
3    A.    Yes, sir.
4    Q.    So, essentially would it be fair to say that
5  is all you-all did was look across the street and see
6  what happened?
7    A.    Yes, sir.
8    Q.    Okay.  Thank you, Mr. Butt, I don't have any
9  other questions.
10        THE COURT:  All right, cross?
11        MR. GARZA:  May I proceed, Your Honor?
12        THE COURT:  Yes.
13            CROSS-EXAMINATION
14  BY MR. GARZA:
15    Q.    Mr. Butt, my name is Ed Garza.  I think you
16  and I have met one previous occasion; is that correct?
17    A.    Yes, sir.
18    Q.    Okay.  Your testimony at the outset was that
19  you recall as of today only having seen one van out
20  there at the night of the incident; is that correct?
21    A.    Like I say, it happened four -- four years
22  ago, I kind of forgot about that.
23    Q.    Okay.  So the use of the statement assisted
24  you in being able to refresh your memory to make you
25  remember a little bit better what happened that night?

217

1    A.    Yes, sir.
2    Q.    Is that correct?
3    A.    Yes, sir.
4    Q.    Now, after the -- after the scuffle that had
5  been going on, did you happen to see which way the
6  vans left the parking lot?
7    A.    Down -- down on Riggan Street.
8    Q.    Both of them?
9    A.    No, just one of them.
10    Q.    Where did the other one go?
11    A.    I don't remember that.
12    Q.    Do you remember -- do you remember where the
13  the vans were parked?
14    A.    I remember one was parked -- if you show me.
15  Maybe in -- about right there somewhere.
16    Q.    One was?
17    A.    Yes, sir.
18    Q.    You remember one of them.  What about the
19  other one?
20    A.    I don't remember.
21    Q.    You don't remember where it was parked?
22    A.    No, sir.
23    Q.    Do you remember what color they were?
24    A.    Like I said, it was red.
25    Q.    Both of them or one of them, if you remember.

218

1    A.    Red van.
2    Q.    Okay.  Now, earlier in your testimony also
3  which was rather unusual you told the jury that there
4  was already a person inside one of the vans?
5    A.    Yes, sir.
6    Q.    And then that right after the scuffle you saw
7  two people jump in that van and that all three of them
8  left together.
9    A.    Yes, sir.
10   Q.    You said that, didn't you?
11   A.    Yes, sir.
12   Q.    Were you confused about that?
13   A.    No, sir.
14   Q.    You think you were sure about that?
15   A.    I'm pretty sure about that.
16   Q.    Are you still sure about that?
17   A.    Yes, sir.
18   Q.    Even after Mr. Skurka has shown you your
19  statement?
20   A.    I'm sure about that.
21   Q.    So if three people left in one van there
22  would have been a fourth one in the other one that
23  drove off; is that what your testimony is today?
24   A.    Like I said, I don't remember the other one
25  correctly.

219

1    Q.    Even though you mentioned it in your -- in
2  your statement, you're not really sure about that, are
3  you?
4    A.    Yes, sir.
5    Q.    Okay.
6          MR. GARZA:  Can I approach the witness,
7  Your Honor --
8          THE COURT:  Yes.
9          MR. GARZA:  -- and ask the witness to
10  step down --
11         THE COURT:  Yes.
12         MR. GARZA:  -- for demonstrative
13  purposes?
14         THE COURT:  Can you step down, please?
15   Q.    (BY MR. GARZA)  Mr. Skurka asked you - if you
16  don't mind standing right there - asked you what was
17  it that you observed the people accused of killing Mr.
18  Castro were doing to him.  You describe punching.  How
19  were they punching?  Just pretend that I'm Mr. Castro.
20  How were they doing it?
21   A.    Well, like I said, I mean, they were going
22  all over his face, his chest, they were kicking him,
23  and this is just what I saw.
24   Q.    Okay, and how were they punching him exactly?
25  Just pretend that I'm Mr. -- I mean, you don't have to

220

1  hit me or anything like that to pretend.  I wouldn't
2  want you to do that but just pretend that I'm Mr.
3  Castro.
4    A.    They were like straight punch or side
5  punches.
6    Q.    Okay.  Was there any punching like this?
7    A.    No, sir.
8    Q.    Any movement like that, anything like that?
9  Anything that looked like a stabbing movement?  Do you
10  recall anything like that?
11   A.    No, sir.
12   Q.    Nothing but punching?
13   A.    Yes, sir.
14   Q.    You don't recall any stabbing movements?
15   A.    Yes, sir.
16   Q.    You don't?
17   A.    I don't.
18   Q.    Thank you.  You can have a seat in your
19  chair.  How far do you think you're away from what you
20  witnessed there that night, in distance?  Like, let me
21  point out, you had said you were back behind that
22  second stall.
23   A.    Yes, sir.
24   Q.    So how far would it be from back there to
25  right here, in your estimation?

221

1    A.    Maybe 200 meters, 150.
2    Q.    That much?
3    A.    I'm not good with the meters.
4    Q.    What about yards?  Let me give you an
5  example.  Would it have been a football field?
6    A.    No, sir.
7    Q.    Half a football field?
8    A.    No.
9    Q.    Longer than a football field?
10   A.    No, it's not longer than a football field.
11   Q.    Okay.  Was it smaller than a football field?
12   A.    Yes, sir.
13   Q.    Okay.  Maybe 50 yards, 75 yards?
14   A.    It could be from here to that door on the
15  other side of the -- the next door on the other side.
16  It could be the part that's further.
17   Q.    Okay, all right.  And it's your testimony
18  that there was a clearly lighted area where you could
19  see everything that was going on --
20   A.    Yes, sir.
21   Q.    -- correct?
22   A.    Yes.  Now, let me talk to you a little quick
23  minute about this situation where these people were
24  going through Mr. Castro's pockets.  Did you see both
25  of them do it, one of them do it, how many people do

222

1    it?
2        A.   I'm pretty sure both of them are doing it.
3        Q.   Is this after he's already gone to the
4    ground?
5        A.   That's after, yeah.
6        Q.   How long did that take?
7        A.   What, his falling down to the ground?
8        Q.   No, no, the people going through his pocket.
9        A.   Didn't take long, maybe -- maybe a few
10   seconds.
11       Q.   Okay.  And you were able to see all that?
12       A.   Yes, sir.
13       Q.   Okay.  Do you recall if anything was taken
14   from Mr. Castro's pockets?
15       A.   It seemed like there was something.
16       Q.   What was it?
17       A.   I can't tell, it was further away.
18       Q.   But you don't know what it was?
19       A.   Yes, sir.
20       Q.   I believe that's all the questions I have of
21   you.  Thank you, Mr. Butt.
22            MR. SKURKA:  Just a couple of follow-ups,
23   Judge.
24            THE COURT:  Okay.
25            REDIRECT EXAMINATION

223

1    BY MR. SKURKA:
2        Q.   You said earlier that between your memory of
3    four years ago and your statement you're really not
4    sure how many vans there were; correct?
5        A.   Yes, sir.
6        Q.   Okay.  But you are -- are you sure that he's
7    the man that you saw do the attack?
8        A.   Yes.
9        Q.   And when Mr. Garza was asking you about the
10   punching -- or this punching motion or stabbing
11   motion, remember he was doing this or this -- okay.
12       A.   It seemed like more like punches.
13       Q.   Okay, I understand, but would you agree with
14   me that this is a -- could be a stabbing motion, too,
15   it doesn't have to be going down.
16            MR. GARZA:  Objection, leading, Your
17   Honor.
18            THE COURT:  Well, let me -- rephrase it.
19       Q.   (BY MR. GARZA)  Did you see a stabbing in a
20   downward motion?
21       A.   No, sir.
22       Q.   Did you see a stabbing motion in a forward
23   motion, a stabbing or punching motion?
24       A.   I see a forward punching motion.
25       Q.   Okay.

224

1            MR. SKURKA:  That's all the questions I
2    have.
3            THE COURT:  Anything else?
4            MR. GARZA:  Your Honor, just a couple of
5    other real quick questions, if I may?
6            THE COURT:  Okay, sure.
7            RECROSS-EXAMINATION
8    BY MR. GARZA:
9        Q.   When the people were fixing to leave the
10   parking lot, who did you see get in what van?  What do
11   you remember specifically about that?
12       A.   I saw him and another girl get into a van and
13   with another girl, sorry.
14       Q.   With another girl?
15       A.   A person.
16       Q.   With another person?
17       A.   Yeah, at that time I wasn't sure.
18       Q.   At any time did the other girl get into the
19   other van?
20       A.   No, sir.
21       Q.   So you just recall our client and the other
22   female jump in a van that already had another female
23   in it or another person?
24       A.   Right.
25       Q.   That's your testimony?

225

1        A.   Yes, sir.
2        Q.   Okay.  Thank you, sir.
3            MR. GARZA:  Pass the witness.
4            THE COURT:  Anything else?
5            MR. SKURKA:  No, Your Honor.
6            THE COURT:  All right, you may stand
7    down.  May this witness be excused?
8            MR. SKURKA:  Yes, Your Honor.
9            THE COURT:  All right.  Please don't
10   discuss your testimony with anyone except the lawyers.
11           All right, call your next witness.
12           MR. SKURKA:  April Metting.
13           THE COURT:  All right.
14           (Oath administered.)
15           THE COURT:  Be seated.  You may proceed.
16
17           APRIL METTING,
18   having been first duly sworn, testified as follows:
19           DIRECT EXAMINATION
20   BY MR. SKURKA:
21       Q.   Please introduce yourself to the folks on our
22   jury.
23       A.   My name is April Metting.
24       Q.   How are you currently employed?
25       A.   How am I currently employed?

226

1    Q.   Are you currently employed?
2    A.   Yes.
3    Q.   Where do you work?
4    A.   Humpal Physical Therapy.
5    Q.   I'm sorry, you're going to have to talk a
6    little louder.
7    A.   Humpal Physical Therapy.
8    Q.   Do you mind putting the microphone a little
9    closer to you so I could hear you a little better?
10   A.   I'll scoot up.
11   Q.   Thank you.  How old a person are you?
12   A.   How old?
13   Q.   I'm sorry, I'm not supposed to ask a woman
14   that, it's for the record.
15   A.   26.
16   Q.   22?
17   A.   26.
18   Q.   23?
19   A.   26.
20   Q.   26, I'm sorry.  How old were you on or about
21   July 19th, 2004?
22   A.   22.
23   Q.   Did you go to school here in Corpus Christi?
24   A.   Yes, I did.
25   Q.   Where did you go to school?

227

1    A.   Ray High School.
2    Q.   And did you graduate from there?
3    A.   No, I didn't.
4    Q.   How far did you go?
5    A.   10th grade.
6    Q.   Are you married?
7    A.   Common law.
8    Q.   And what does your husband -- common-law
9    husband's name?
10   A.   Gilbert Lopez.
11   Q.   Do you have any children with him?
12   A.   Yes, I have one.
13   Q.   And what is his name?
14   A.   Gilbert Lopez, III.
15   Q.   Ms. Metting, I want to direct your attention
16   back to the time of July 19, 2004, and ask you if you
17   had occasion to go to the Whataburger located at the
18   corner of Texas Trail and Alameda?
19   A.   Yes, I did.
20   Q.   Can you tell us what time you went there?
21   A.   It was around 11 at night.
22   Q.   11 at night?
23   A.   Yes.
24   Q.   Around 11 at night?
25   A.   Yes.

228

1    Q.   As you were at the Whataburger -- I'm sorry,
2    I -- I think I misspoke.  I'm sorry, I meant the
3    Whataburger -- I need to change that.  It's the
4    Whataburger at Staples and Baldwin?
5    A.   Baldwin, yes.
6    Q.   Did you go to that one?
7    A.   Yes.
8    Q.   I misspoke and said Texan Trail and Alameda.
9    A.   No, it was Baldwin and Staples.
10   Q.   Okay.  If I make a mistake like that feel
11   free to correct me, okay?
12   A.   Okay.
13   Q.   Okay.  So you're over there at the Staples
14   and Baldwin Whataburger.  Why?
15   A.   I was going to go get some food.
16   Q.   Who was with you, if anybody?
17   A.   My son.
18   Q.   And how old was your son at that time?
19   A.   He was two.
20   Q.   Was he in the front seat with you, in the
21   back seat or where?
22   A.   He was in the back seat.
23   Q.   When you were up there at the Whataburger,
24   what, if anything, happened to you?
25   A.   What if anything happened to me?

229

1    Q.   What happened?
2    A.   When I pulled up at Whataburger I was going
3    to order.  I was looking at the menu and Christina
4    Chavez came up from the left side of the menu and
5    approached me and asked me if I had a phone she could
6    borrow.  I -- then I told her she --
7    Q.   Excuse me just a second.  You were at the
8    drive-through part?
9    A.   Yes, at the drive-through.
10   Q.   Okay.  Were you at the window or the -- I
11   don't know what you call it, the menu board or
12   something?
13   A.   Yes, I was at the menu board.
14   Q.   What else is around the menu board, anything?
15   A.   No, there was just a menu board and then
16   there was a little parking lot behind it.
17   Q.   And a person came up to you by the name of
18   Christina Chavez?
19   A.   Yes.
20   Q.   Did you know her at the time or did you
21   realize that through the investigation?
22   A.   I realized that through the investigation.
23   Q.   What did she ask for?
24   A.   She asked if I had a phone she could use.
25   Q.   Why?

230

1     A.    She says she had just gotten in a fight and
2   she had pointed at her blood stains on her shirt and I
3   told her to go inside Whataburger and use their's and
4   --
5     Q.    Did she?
6     A.    No.
7     Q.    What happened next?
8     A.    That's when John Henry Ramirez came up and
9   put a knife to my neck.
10     Q.    Tell us exactly what he did to you.
11     A.    He just popped up from my window and he put a
12   knife to my neck and he asked me to give him all my
13   money.
14     Q.    How did you react to that?
15     A.    I screamed.  The minute -- when he jumped up
16   I screamed.  I didn't, you know, expect that.
17     Q.    What kind of knife did he have?
18     A.    It was like a Dagger's knife.
19     Q.    What do you mean?
20     A.    It was -- I don't know how long it was.  It
21   was probably about this long and it had wedges on the
22   side, like ridges.
23     Q.    Ridges?
24     A.    Yeah.
25     Q.    Do you know what the word serrated means?

231

1     A.    I don't.
2     Q.    Okay.  But it had the bridges on the side?
3     A.    Yes.
4     Q.    And how -- what direction did he come from?
5     A.    He came from the back of the driver's side.
6   I didn't have a window on the driver's inside, it was
7   broken off.  I mean, I'm sorry, a mirror, so I didn't
8   see him coming and that's when Christina was
9   distracting me, I guess, for him so that's where he
10   came out from.
11     Q.    So what did he say exactly?
12     A.    He said "Give me all your money," and I
13   reached -- he said "Give me all your money and give me
14   your purse."  I gave him my purse.  I told him,
15   "Please, don't do this in front of my son."
16     Q.    Did you give him your money?
17     A.    Yes, I gave him everything I had.
18     Q.    Did you give him your purse?
19     A.    Yes.
20     Q.    How did you feel at that time when he was
21   doing that to you with your child in the back seat?
22     A.    I was scared, I didn't want him to hurt me in
23   front of my child.
24     Q.    Did he just put the knife against your throat
25   or did he grab you in any way?

232

1     A.    With his right hand he grabbed me from the
2   back of my neck and he put the knife to my neck like
3   (indicating) and he told me to give him all my money
4   and I kept telling him "Please, not in front of my
5   son, not in front of my son," and he said "Shut up,
6   bitch," and Christina was also telling me to shut up
7   and just give them my purse.
8     Q.    You were -- would you stand up for a minute,
9   please.  I'm going to pretend to be you and you tell
10   me -- well, I'll tell you what, let's go down here at
11   this chair cause that one is the wrong angle.  I'm
12   going to pretend to be you.  You come over here next
13   to me and I'm sitting here at the driver's side and
14   you're him and I'm going to pretend this is a knife
15   and you're looking forward and this is where Christina
16   Chavez was up here.
17     A.    Yes, she was right here.
18     Q.    Where was the menu board?
19     A.    The menu board is right here, Christina
20   Chavez was standing right here.
21     Q.    Demonstrate to the jury.  Pretend you're John
22   Henry Ramirez and I'm you.  I'm clearly not as pretty
23   as you but please demonstrate what Mr. Ramirez did to
24   you.
25     A.    Okay.  The menu board is right here,

233

1   Christina Chavez, I was speaking with her.  John Henry
2   Ramirez came out from the back of the side.  He came,
3   he -- I guess he was lowered down like this.  He got
4   up, he got me from the neck and put the knife and said
5   "Give me all your money, give me your purse," and from
6   there that's when Christina was asking me also to give
7   her my purse so for the record he had his right hand
8   on your --
9     A.    His right hand was on the back of my neck and
10   the knife was right here on the side of my neck.
11     Q.    Did he have the knife in front of your neck
12   or poking into the side of your neck?
13     A.    He had it on the side like this.
14     Q.    Now, did you do anything to try to ward him
15   off or fight him off?
16     A.    When he first jumped like that I screamed and
17   I grabbed the knife and pushed it back.
18     Q.    How did you do that, show me.
19     A.    He --
20     Q.    With your hands.
21     A.    Yes, I just grabbed the knife and I pushed it
22   back.  I said, "Please, please, not in front of my
23   son," and I let go and that's when he grabbed me by
24   the back of my neck.
25     Q.    Did you get hurt or cut by the knife that he

234

1    had?
2        A.    It was just a little slash.
3        Q.    Just a little slash on your fingers?
4        A.    Yes.
5        Q.    Okay.  Go ahead and sit back down.  Thank
6    you.
7                  Were you in fear of your life --
8        A.    Yes, I was.
9        Q.    Were you in fear of your child's life?
10       A.    Definitely.
11       Q.    Do you know how much money he got from you?
12       A.    Maybe about 30, $40.
13       Q.    Okay.
14       A.    That I can remember.
15       Q.    You said, too, that he took your purse.  What
16   was inside your purse, if you can tell me.
17       A.    In my purse I had a wallet, I had a money
18   order for the day care, I had pictures in my wallet, a
19   credit card.  I'm not sure how much money I had in
20   there.
21       Q.    How long did all this go on?
22       A.    It felt like forever.  I'm not sure, maybe
23   about five to seven minutes if you actually sit down
24   and count.
25       Q.    Did you give John Henry Ramirez your purse?

235

1        A.    Yes, I did.
2        Q.    Did you give him your money?
3        A.    Yes.
4        Q.    Then what happened?
5        A.    Him and Christina walked off and they got in
6    the van.
7        Q.    They walked off and went into a van?
8        A.    Yes.
9        Q.    Can you describe where the van was and what
10   color it was?
11       A.    There was a gray van and a brown van and I
12   believe they took off in the brown van, if I'm not
13   mistaken, and that was in the parking lot, the little
14   parking lot behind the menu board which is I guess the
15   parking lot for the employees.
16       Q.    Ms. Metting, is the person who robbed you and
17   held that knife to your neck, is that person in the
18   courtroom today?
19       A.    Yes.
20       Q.    Can you point to him and describe something
21   he's wearing, please.
22       A.    He's sitting right there in orange.
23       Q.    An orange shirt?
24       A.    Yes.
25             MR. SKURKA:  Your Honor, may the record

236

1    reflect the witness has identified the Defendant.
2            THE COURT:  It will so reflect.
3        Q.    (BY MR. SKURKA)  What happened after they
4    took your money and they got in the van?  Where did
5    they go?
6        A.    I'm not sure, they just took off.  That's
7    when the employee from Whataburger came out.  I told
8    her to go get the license plate number.  She ran off
9    and got it and we waited for the cops there.
10       Q.    Did you call the police or did they call the
11   police?
12       A.    They called the police.
13       Q.    And did the police come?
14       A.    Yes.
15       Q.    Did you tell --
16       A.    They called the police, but I also spoke to
17   the police on the phone.
18       Q.    How was your little boy?
19       A.    How was he?
20       Q.    Yeah, after this happened?
21       A.    He -- he cried, but I guess he just -- he
22   didn't -- I mean, he was two, he didn't really know
23   too much, but I'm sure he was terrified of seeing me
24   crying.
25       Q.    I've got some photographs and a map to show

237

1    you.
2            MR. SKURKA:  May I approach the witness,
3    Your Honor?
4            THE COURT:  Yes.
5        Q.    (BY MR. SKURKA)  I'm going to show you what's
6    been marked State's Exhibit No. 41.  It purports --
7    it's a Google map.  Would you show us the date and
8    time and location of the Whataburger on that map,
9    please.
10       A.    This is Staples and this is Baldwin in this
11   area.
12       Q.    Okay.  I want you to just put a little X
13   where you think that area is.  Is it more on Staples
14   or more on Baldwin?
15       A.    More on Staples.
16       Q.    Okay.  Go ahead and put a little X there.
17   Okay.
18            MR. SKURKA:  Your Honor, I tender
19   State's Exhibit No. 41 to Defense Counsel and offer it
20   into evidence.
21            MR. GARZA:  No objection, Your Honor.
22            THE COURT:  It's admitted.
23            MR. SKURKA:  Can I publish it to the
24   jury, Your Honor?
25            THE COURT:  You may.

238

1    MR. SKURKA:  Let the jury see
2  approximately where this location is, and you've
3  written a little X on it, I believe.
4    MR. SKURKA:  Can you point it a little
5  closer, Geordie?
6    Q.   (BY MR. SKURKA)  There's a laser pointer in
7  front of you.
8    MR. SKURKA:  Frank, could I get you to
9  get the lights, please.
10   Q.   (BY MR. SKURKA)  There's Del Mar College;
11 correct?
12   A.   Yes.
13   Q.   Show us with laser pointer where you made the
14 mark.
15   A.   Right there.
16   Q.   Okay.  So it would be right there close to
17 the corner of Staples and Baldwin?
18   A.   Yes.
19   Q.   All right.  Now, I'm going to show you a
20 series of photographs.  What kind of car were you
21 driving that night, by the way?
22   A.   It was a Silver Grand Am.
23   Q.   Okay.  I'm going to show you what's marked 25
24 through 40.  Look at them to yourself, please, if you
25 will, and tell me if you can identify them.  Can you

239

1  kind of keep them in order, too, please.
2    A.   Uh-huh.  You want me to identify --
3    Q.   Just look through them to yourself first and
4  then I'll ask you some questions.
5    A.   (Witness complying.)
6    Q.   Have you gotten a chance to look at them all?
7    A.   Uh-huh.
8    Q.   Do these photographs fairly and accurately
9  portray where the Whataburger is through the aerial
10 photographs?
11   A.   Yes.
12   Q.   Do they also show the Whataburger that night?
13   A.   Yes.
14   Q.   And do they show the area in the
15 drive-through and the menu board that you were talking
16 about?
17   A.   Yes.
18   Q.   And do they fairly and accurately show the
19 vehicle that you were driving that night?
20   A.   Yes.
21     MR. SKURKA:  I tender Exhibits 25
22 through 40 to Defense Counsel and offer them into
23 evidence.
24     MR. GARZA:  Your Honor, can we have a
25 minute to confer with regard to the photographs?

240

1    THE COURT:  Uh-huh.
2    MR. GARZA:  No objections, Your Honor.
3    THE COURT:  All right, they're
4  admitted.
5    MR. SKURKA:  Thank you.  Maybe may I
6  publish them to the jury, Your Honor?
7    THE COURT:  You may.
8    Q.   (BY MR. SKURKA)  Okay, Ms. Metting, let's
9  start with No. 25.  And, again, there's a laser
10 pointer up next to you.  Can you describe what we're
11 looking at?
12   A.   We're looking at the Whataburger right here.
13   Q.   And where's Staples Street?
14   A.   Staples Street is right -- yeah, right there.
15   Q.   You're pointing in front of the Whataburger?
16   A.   Yes.
17   Q.   And then what's that road going kind of from
18 the bottom to the top?
19   A.   That's Baldwin.
20   Q.   That's Baldwin.  So the Whataburger is where?
21   A.   Right here.
22   Q.   Okay.  I've got another picture of it from a
23 different angle, No. 26.  Does that --
24     MR. SKURKA:  Can you get a little closer
25 on that?

241

1    Q.   (BY MR. SKURKA)  Is that -- what is that a
2  photograph of?
3    A.   That's the Whataburger right here, and that's
4  Staples.
5    Q.   For somebody who may not have been to that
6  show us where you go to the drive-through.
7    A.   I was right here in the driveway.
8    Q.   I think I may have some closer photographs.
9  That's the next one, 27.  What does that show?
10   A.   The Whataburger and that's where I was at.
11   Q.   Okay.  For the record, you're indicating the
12 menu board top at the top of the Whataburger --
13   A.   Yes.
14   Q.   -- picture there?
15   A.   Yes.
16   Q.   Now, there's an inside lane and an outside
17 lane?
18   A.   Yes.
19   Q.   Do you remember which one you were in?
20   A.   I was in the inside right here.
21   Q.   The inside lane, and that's the menu board.
22 And where's the actual window that you put up your
23 food at?
24   A.   Right here.
25   Q.   Where that covered area is?

242

1    A.    Yes.

2    Q.    Could you -- that may not be the best

3  picture, let me come to another one.  How about this

4  one, No. 28?  Now, that's a closer-up of the same

5  picture but you said something about they came from a

6  van or went into a van.  Where was the van parked?

7  Does that photograph show that area?

8    A.    The vans were parked back here in this little

9  parking lot.

10   Q.    So you're talking about the area parking

11 directly by the Whataburger --

12   A.    Yes.

13   Q.    -- on the side of the menu board?

14   A.    Yes.

15   Q.    And let me see here.  Look at 29.  What is

16 that a photograph of?

17   A.    Whataburger also.

18   Q.    Does that show back area where the van would

19 have been parked?

20   A.    No, the back area is back here.

21   Q.    Okay, right over there?

22   A.    Yes.

23   Q.    And I think I have one that's No. 30 that may

24 be a better picture.  Where was the van parked in this

25 picture?

243

1    A.    Right here in this area.

2    Q.    Right out the back door so to speak?

3    A.    Yes.

4    Q.    Now, I'm going to go -- these are aerial

5  photographs.  Now I'm going to show you the next

6  series of photographs that you've identified as being

7  the Whataburger that night.  Is that a photograph of

8  the front of the Whataburger?

9    A.    Yes.

10   Q.    Is that the way it looked that night?

11   A.    Yes.

12   Q.    Now, I've got two more photographs.  I'm

13 sorry, three.  Let's look at them, 32, 33, 34, and do

14 them one at a time, Geordie, please.

15               Let's see here, we'll start that way.

16 What is that a photograph of?

17   A.    That's a photograph of the menu board that I

18 was at.

19   Q.    What else is around the menu board over to

20 the left and right of the menu board?

21   A.    Trees and shrubs.

22   Q.    Trees and shrubs?

23   A.    Yeah.

24   Q.    So could you see anybody around here or

25 around here?

244

1    A.    No.

2    Q.    Where did Christina Chavez come from on that

3  picture?

4    A.    She came through these bushes and that's when

5  she came right here next to this menu board.

6    Q.    So for record you're indicating on that

7  picture anyway the side to the menu board?

8    A.    Right.

9    Q.    And that's where Christina Chavez came?

10   A.    Right.

11   Q.    Where did John Henry Ramirez come from?

12   A.    He came from back here.

13   Q.    Okay.  Did he come through the shrubs or the

14 the bushes here or did he come around the driveway?

15   A.    I'm not sure, I didn't see him when he went

16 from the back.

17   Q.    Okay.  The next photograph?

18         MR. GARZA:  What number is that for the

19 record?

20         MR. SKURKA:  33.

21   Q.    (BY MR. SKURKA)  What does that show?

22   A.    That shows the menu board.

23   Q.    Okay.  From what angle or perspective?

24   A.    This is coming from driving through the

25 drive-through.

245

1    Q.    So if you were coming through the

2  drive-through just show us where your vehicle would

3  have been going.

4    A.    It would be going this way.

5    Q.    So that would be -- you're at the back of the

6  store here --

7    A.    Yes.

8    Q.    -- going toward the front of the store?

9    A.    Yes.

10   Q.    And is this the menu board you're talking

11 about?

12   A.    Yes.

13   Q.    The next photograph is No. 34, I believe.

14 I'm sorry, 32.  Now, that's a different angle, is it

15 not?

16   A.    Yes.

17   Q.    What would that show?

18   A.    That's coming from the front of the store.

19   Q.    Okay.  Would be the same menu board but just

20 from the opposite direction?

21   A.    Right.

22   Q.    Okay.  So what menu board were you in front

23 of?

24   A.    In front of this one.

25   Q.    And the drive-through window itself would be

246

1    where?
2        A.   Right over here.
3        Q.   And for the record, you're indicating to the
4    right of that?
5        A.   Yeah.
6        Q.   And for the record, you're indicating the
7    menu board on the right instead of the one in the
8    middle, right?
9        A.   Right, right.
10       Q.   The last one I have of that set that might be
11   a closer-up is 35.  Does that show -- what does that
12   show?
13       A.   The menu board that I was at.
14       Q.   And, again, could you show the jury where
15   Christina Chavez came from?
16       A.   She came from that right in this area.
17       Q.   You're indicating the right side of the menu
18   board?
19       A.   Yes.
20       Q.   And where did John Henry Ramirez come from?
21       A.   He came from back here.
22       Q.   I have another set of photographs I'd like to
23   show you and they're marked State's Exhibit 36 through
24   40, and I'm going to have Geordie show them all to you
25   first and then I'm going to ask you some questions.

247

1        36 through 40, what do they depict?
2        A.   That is the vehicle that I was in that night.
3        MR. SKURKA:  Okay.  Show them all,
4    please.  We're just going to go through all of them
5    and we'll -- I'm going to come back to them.
6        Q.   (BY MR. SKURKA)  Essentially those -- would
7    it be fair to say those are photographs of all -- just
8    different angles of the car you were in that night?
9        A.   Uh-huh.
10       Q.   Now, I want to go in closer on State's
11   Exhibit No. 40 and 39.  You said earlier that you were
12   missing what from -- piece of equipment from your car?
13       A.   I was missing my mirror.
14       Q.   So the side mirror is not there?
15       A.   Right.
16       Q.   If the side mirror would have been there
17   would you have been able to see Mr. Ramirez approach
18   you?
19       A.   Yes.
20       Q.   But it wasn't there?
21       A.   Right.
22       Q.   Okay.  Okay, I just have a few last
23   questions.  You said something that your purse was
24   stolen.  Did you have any type of wallet or change
25   purse inside your purse?

248

1        A.   I had a wallet in my purse.
2        Q.   And can you describe what the wallet looked
3    like?
4        A.   It was a black wallet, a black and red
5    wallet.  It had -- it opened like it had velcro on it.
6        Q.   Okay.  And inside that, did you have anything
7    that belonged to your husband?
8        A.   Yes, I had a credit card.
9        MR. SKURKA:  May I approach, Your Honor?
10       THE COURT:  Yes.
11       Q.   (BY MR. SKURKA)  I show you what's been
12   marked as State's Exhibit No. 42 and 43, and do you
13   recognize the photograph of 42?  What is that
14   photograph of?
15       A.   Yes, that is my wallet.
16       Q.   Okay.  Would that be the wallet you had that
17   night that John Henry Ramirez took from you?
18       A.   Yes.
19       Q.   And 43, what is that?
20       A.   That's my husband's credit card.
21       Q.   Okay.  Did you see these after that night?
22       A.   No.
23       Q.   But you can identify that's what you had
24   before the robbery took place; correct?
25       A.   Yes.

249

1        MR. SKURKA:  We tender 42 and 43 to
2    Defense Counsel and offer them into evidence.
3        THE COURT:  Any objection?
4        MR. GARZA:  No objection, Your Honor.
5        THE COURT:  All right, they're
6    admitted.
7        MR. SKURKA:  May I publish them to the
8    jury?
9        THE COURT:  You may.
10       Q.   (BY MR. SKURKA)  Now that they're admitted,
11   Ms. Metting, we'll go ahead and show them to the jury
12   and we'll start with 42, please.  Show us the wallet
13   in that photograph.
14       A.   Right here.
15       Q.   And for the record, you're indicating a I
16   guess reddish wallet with a black stripe.  I guess
17   that's where it opens up?
18       A.   Yeah, that's where it would open.
19       Q.   And the next item I showed you earlier, 43,
20   what is that a photograph of?
21       A.   That's my husband's credit card.
22       Q.   And does it have his name on it?
23       A.   Yes, it's right here.
24       Q.   So the last time you saw that was at the
25   Whataburger drive-through before you handed your purse

250

1  with the wallet to him?
2      A.   Yes.
3      Q.   Ms. Metting, thank you for answering my
4  questions.  I have no more questions at this time.
5  The Defense lawyers may ask you some questions.
6          THE COURT:  All right, cross?
7          MR. GARZA:  Yes.  May I proceed, Your
8  Honor?
9          THE COURT:  Yes.
10              CROSS-EXAMINATION
11  BY MR. GARZA:
12     Q.   Ms. Metting, my name is Ed Garza.  I think
13  I've already introduced myself to you at one other
14  time at another proceeding; is that correct?
15     A.   Yes.
16     Q.   Okay.  In your testimony you testified that
17  Christina Chavez walked up to you and asked you if she
18  could use your phone --
19     A.   Yes.
20     Q.   -- is that right?
21     A.   Yes, that's correct.
22     Q.   Do you remember what she was wearing?
23     A.   She was wearing a white T-shirt with blood
24  spots on her shirt.
25     Q.   What else?

251

1      A.   She had a black rosary on and her hair was
2  pinned up in a bun.
3      Q.   Okay.  Do you recall what she was wearing as
4  far as pants or shorts?
5      A.   I know she had pants but I'm not sure what --
6  if they were dark jean, light jean, I'm not sure.
7      Q.   Do you recall what John Henry Ramirez was
8  wearing that night?
9      A.   If I'm not mistaken he was wearing a gray
10  shirt and he -- his hair -- he didn't have any hair,
11  it was kind of short shaved, bald or --
12     Q.   Short shaved or bald hair?
13     A.   Uh-huh.
14     Q.   Was it a button shirt or a T-shirt?
15     A.   A T-shirt.
16     Q.   Was it like a T-shirt neck or one that
17  buttons like a golf shirt?
18     A.   No, it was just a T-shirt, a regular T-shirt.
19     Q.   And you remember if he was wearing shorts or
20  jeans?
21     A.   I didn't see that.
22     Q.   Sneakers, slaps, anything like that?
23     A.   I didn't see.
24     Q.   You didn't see anything?
25     A.   No.

252

1      Q.   How long would this incident have lasted in
2  its entirety?
3      A.   I'd say about maybe about five minutes, I'm
4  not too sure.
5      Q.   Okay.  Did you -- did you happen to notice if
6  John Henry Ramirez was wearing any sort of a bandage
7  on his hands, either of his hands?
8      A.   No.
9      Q.   Did you happen to notice if he had any wounds
10  on any of his hands?
11     A.   No.
12     Q.   Do you know if he would have left any blood
13  in your car?
14     A.   No.
15     Q.   Do you know if your car was ever inspected by
16  any of the investigators, the detectives --
17     A.   Yes.
18     Q.   -- the I.D. techs?
19     A.   Yes, it was inspected.
20     Q.   And did they inspect it for blood or anything
21  inside your car?
22     A.   I believe so.  I know they inspected inside
23  and out.  They dusted the whole outside for
24  fingerprints.
25     Q.   Do you know if they found any blood in your

253

1  car?
2      A.   I don't recall.
3      Q.   Do you remember how many vans you saw in the
4  parking lot?
5      A.   A total of two.
6      Q.   What color were there?
7      A.   If I'm not mistaken, one of them was brown
8  and the other one was gray.
9      Q.   Brown and gray?
10     A.   Yes.
11     Q.   I believe you gave a statement to the police
12  shortly thereafter that you saw only one of the -- you
13  saw all -- well, who did you see jump into what van
14  after the robbery took place?
15     A.   After I was robbed I seen -- I saw all three
16  of them jump into one van and I believe that was the
17  brown van.
18     Q.   Okay.  So you -- so then you saw a third
19  person also jump all in one van?
20     A.   Yes.
21     Q.   And they all drove off together?
22     A.   Yes.
23     Q.   Do you remember what the other person looked
24  like?
25     A.   I'm not too sure.  I know she was a little

254

1   dark complected, she had dark hair. I'm not sure, I
2   don't remember her name, I know it was Rodriguez.
3       Q.   Do you remember what she was wearing?
4       A.   I don't remember what she was wearing.
5       Q.   You didn't know any of these people at all --
6       A.   No.
7       Q.   -- that particular night?  Never seen them
8   before, didn't know who they were?
9       A.   No.
10      Q.   Hadn't gone to school with you, anything like
11  that?
12      A.   No.
13      Q.   At all?
14      A.   At all.
15      Q.   And subsequently you learned their names
16  through the course of the investigation.
17      A.   Yes.
18      Q.   And that's the only reason you know who they
19  are by name --
20      A.   Right.
21      Q.   -- is that correct?
22      A.   Yes.
23      Q.   Did you notice whether there was any blood on
24  John Henry Ramirez' clothing?
25      A.   No, I didn't notice any of that.

255

1       Q.   All right.
2              MR. GARZA:  I'll pass the witness, Your
3   Honor.
4              THE COURT:  All right.
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

256

1              REDIRECT EXAMINATION
2   BY MR. SKURKA:
3       Q.   Ms. Metting, going back to the knife, I know
4   you said it was about this big but can you tell me
5   about how many inches it was?
6       A.   I'm not too sure about inches.  I'm sure
7   about --
8       Q.   Do you remember telling the police how many
9   inches it was?
10      A.   I don't remember.
11      Q.   Okay.  If I got a ruler would you be able to
12  measure it with it?
13      A.   Uh-huh.
14             MR. SKURKA:  I'm sorry, Judge, I didn't
15  bring a ruler.  Do we have a ruler anywhere in the
16  courtroom?  Maybe Ann.
17      Q.   (BY MR. SKURKA)  While they're looking for
18  that I'll just go ahead and ask you a few more
19  questions.  Do you know what a -- was it a
20  folding-type life or a fixed-blade knife?
21      A.   No, it was a fixed-blade knife.
22      Q.   A fixed-blade knife?
23      A.   Yes.
24      Q.   And could you tell what color the handle was
25  or anything like that?

257

1       A.   I'm not too sure what the handle -- I'm not
2   too sure what it was.
3       Q.   Okay.  All you can say it was a fixed-blade
4   knife.
5       A.   Yes.
6       Q.   And now that you have a ruler maybe that can
7   help you measure.
8       A.   I want to say maybe about five and a half,
9   six inches.
10      Q.   And I know you don't know the exact thing but
11  you think it's five and a half to six inches long?
12      A.   Yes.
13      Q.   Okay.  And it had those groove things you
14  said on the side?
15      A.   Right.
16      Q.   When you were struggling with him with the
17  knife you said you tried to push the knife away?
18      A.   Uh-huh.
19      Q.   You said you had a little cut --
20      A.   Right.
21      Q.   -- right?  Did you see if he had a cut on any
22  part of his hand?
23      A.   No.
24      Q.   Do you know where the Times Market on 1902
25  Baldwin is?

258

1    A.   Yes.

2    Q.   How far is that Times Market at 1902 Baldwin

3  from the Whataburger you were at Staples and Baldwin?

4    A.   I want to say maybe a mile or two, I'm not

5  too sure.

6    Q.   And do you recall the exact time that this

7  happened?

8    A.   Around -- about 11.

9    Q.   Around 11:00. Okay. Thank you.

10            MR. SKURKA: That's all the questions I

11  have.

12            THE COURT: Okay. Anymore recross?

13            MR. GARZA: No, Your Honor.

14            MR. SKURKA: All right. You may stand

15  down.

16            THE COURT: May this witness be excused?

17            MR. SKURKA: Yes, Your Honor.

18            THE COURT: Please don't discuss your

19  testimony with anyone until the trial is over with.

20            All right, call your next witness.

21            MR. SKURKA: Judge, I need to see if

22  Officer Kinane here. Is Officer Kinane here?

23            THE BAILIFF: Yes, he is.

24            MR. SKURKA: That will be the next

25  witness then, Judge.

259

1            THE COURT: Okay.

2            MR. GARZA: Your Honor, may we approach

3  the bench?

4            THE COURT: Yeah.

5            (Bench conference.)

6            MR. JONES: In the audience is the

7  Defendant's maternal grandmother. She's a potential

8  witness, not at this stage of the trial.

9            MR. SKURKA: At the guilt or innocence or

10  punishment?

11            MR. JONES: Punishment.

12            MR. SKURKA: Oh, it's okay if she's here.

13            MR. JONES: It's okay?

14            THE COURT: Okay.

15            MR. JONES: I just wanted to make sure

16  she's -- you know, she's not -- she knows nothing

17  about the case.

18            MR. SKURKA: I have the victim's girl

19  here, too, and she's going to testify at punishment

20  and I told Ed and he said that was okay so it's okay

21  with me.

22            THE COURT: Okay, that's on the record.

23            (End of bench conference.)

24            THE COURT: All right, call the witness.

25            MR. SKURKA: Officer Kinane.

260

1            (Oath administered.)

2            THE COURT: You may proceed.

3

4            GREG KINANE,

5  having been first duly sworn, testified as follows:

6            DIRECT EXAMINATION

7  BY MR. SKURKA:

8    Q.   Good afternoon, sir.

9    A.   Good afternoon.

10    Q.   Could you introduce yourself to the folks on

11  our jury.

12    A.   I'm Greg Kinane. I'm an officer for the

13  Corpus Christi Police Department.

14    Q.   How long have you been so employed?

15    A.   22 years.

16    Q.   Do you work in any particular division of the

17  police department?

18    A.   I'm a uniformed officer right now.

19    Q.   Have you worked in any other division of the

20  police department?

21    A.   I've worked as a gang officer.

22    Q.   Is that with the JET team I think they call

23  it?

24    A.   Yes, sir.

25    Q.   How long were you in the JET team?

261

1    A.   I was with them seven years.

2    Q.   Have you been in any other department besides

3  the patrol division and/or the gang unit?

4    A.   No, I haven't.

5    Q.   Did you have any other law enforcement

6  experience before you joined the department?

7    A.   No, I haven't.

8    Q.   Did you have any military before you joined

9  the department?

10    A.   Yes, sir.

11    Q.   Tell us what you did and what branch.

12    A.   I was a security force member for the United

13  States Air Force.

14    Q.   How long were you in the Air Force?

15    A.   Active duty and reserve 33 years.

16    Q.   How long active and how long reserve?

17    A.   Total of about 7 years.

18    Q.   For active?

19    A.   Active and the rest were -- the rest were

20  reserve.

21    Q.   Now, you said security force. I don't know

22  too much about the military, I know they have what's

23  called M.P.s in the army, military police. Is that

24  what the security force is called like in the Air

25  Force?

262

1    A.   Correct, it used to be M.P.s, then it went to
2 air police, then it went to security police, and the
3 it went to security forces.
4    Q.   They change the names all the time but really
5 you're the policeman for the Air Force?
6    A.   Correct, I did security and law enforcement,
7 yes.
8    Q.   Okay.  So you have worked in law enforcement
9 besides just your time in the police department;
10 correct?
11    A.   Correct.
12    Q.   You just worked at an Air Force.  I want to
13 go ahead and get to the part we're here for today, and
14 that's on July 19, 2004.  Did you have occasion to get
15 a call out to a potential robbery out there at the
16 corner of Whataburger -- I'm sorry, at the corner of
17 Texan Trail and Alameda?
18    A.   Yes, I did.
19    Q.   Can you tell us what time you were called out
20 on that?
21    A.   The call came out around 11:40 in the
22 morning -- or in the evening, actually.
23    Q.   11:40 in the evening?
24    A.   Correct.
25    Q.   And where exactly were you dispatched to?

263

1    A.   Actually, I wasn't dispatched, I actually
2 took the call.  There had been other calls in the area
3 for robbery and we were looking for a vehicle, and
4 about that time, this -- this robbery at the
5 Whataburger at 510 Texan Trail was broadcast.  Another
6 unit was sent to -- to respond to that.
7    Q.   Okay, let me go back and get the sequence, I
8 just want to make sure I have it right.  You got
9 called to this Whataburger at Texan Trail at around
10 11:40, right?
11    A.   That was when --
12    Q.   I'm sorry, that's when the call went out.
13    A.   That's when the call went out, correct.
14    Q.   Explain to the jury what you mean when you're
15 talking about "take the call and dispatch," and what's
16 the difference between that?
17    A.   All right.  This call was dispatched to
18 another unit.  This was a series of calls that were
19 going out as far as robberies that were going on.  I
20 was coming from the south side of town actually coming
21 up Kostoryz and I was going to the area to see if I
22 could find the vehicle that was broadcast that was
23 supposed to be involved in this -- these incidents.
24    Q.   Okay.  So you weren't the one that the
25 dispatcher, the 911 dispatcher said "go to this

264

1 Whataburger" but you were available so you took the
2 call?
3    A.   Correct.
4    Q.   Okay.  Let's go back to the sequence of
5 events.  You said there were several times on the
6 radio that night.
7    A.   Right.
8    Q.   What was the first one?  Where would the
9 first one take place?
10    A.   The first one was on Baldwin, somewhere
11 Crosstown.
12    Q.   Okay.  And what location or store was that?
13    A.   I believe that was a convenient store, I'm
14 not sure which one it was.
15    Q.   Okay.  And I understand that you weren't the
16 one who investigated that, I just want to know how the
17 police talked to each other on the radio.  Did you
18 hear all that happened at the convenience store
19 on Baldwin store?
20    A.   Right, that -- because it was a major
21 incident they broadcast that to all the channels and
22 give you information that they have about the call and
23 what to look for, and because of that, that's why I
24 was going from the south side to the other side of
25 town to see if I could help with the investigation.

265

1    Q.   So you were basically helping out by going to
2 the first scene, --
3    A.   Correct.
4    Q.   -- the convenient store.  Did you also hear
5 about another robbery that took place involving a
6 Whataburger?
7    A.   Correct, it was one right after that, the
8 Whataburger on Staples and Baldwin, that's I believe
9 why I was going up Kostoryz because they seemed to be
10 going towards the south side of town so I was hoping
11 to maybe intercept them on Staples and Kostoryz area.
12    Q.   During -- after both of those robberies at
13 the convenient store on Baldwin and the Whataburger at
14 Staples and Baldwin, was there any information put out
15 on the radio as to suspects, their identities, their
16 descriptions or any vehicles they were driving?
17    A.   I believe what we had was a red van and
18 Hispanic man, Hispanic female -- or two Hispanic
19 females that were supposed to be involved in these
20 incidents.
21    Q.   And that's the information that they get out
22 on the BOLO call?
23    A.   Correct.
24    Q.   So do you know anything else besides red van
25 and a Hispanic man and two females?

266

1    A.    No.

2    Q.    So you're going to go help out on those

3    scenes or the first scene and you get a call about

4    another Whataburger; correct?

5    A.    Correct.

6    Q.    And where is this Whataburger at?

7    A.    This one is on Texan Trail, 510 Texan Trail

8    on Alameda and Texan Trail behind the Ray High School.

9    Q.    Even though you weren't the first officer –

10   I mean, the officer dispatched, were you the first

11   officer that arrived at the scene at that Whataburger?

12   A.    Yes, I was.

13   Q.    Tell the jury what you found when you first

14   got there.

15   A.    When I got there I contacted the victim who

16   was in a Ford Thunderbird, lady named Ruby Pena.  She

17   had said she was approached by –

18          MR. GARZA:  Objection to whatever she

19   said, Your Honor.

20          THE COURT:  Sustained.

21          MR. GARZA:  It's hearsay.

22          THE COURT:  It's sustained.

23   Q.    (BY MR. SKURKA)  As the first officer at the

24   scene, what is your primary responsibility?

25   A.    To secure the scene and get witness

267

1    information, and be able to broadcast any information

2    on suspects, their descriptions and their --

3    Q.    Were you -- I'm sorry, I didn't mean to

4    interrupt you.  Were you able to determine – locate

5    the victim of that robbery at that Whataburger?

6    A.    Yes, sir, I was.

7    Q.    And you're identified her as a person named

8    Ruby Pena?

9    A.    Correct.

10   Q.    Were you also able to identify where the

11   crime scent took place, inside the Whataburger,

12   outside the Whataburger, or wherever?

13   A.    Correct, it was -- it happened outside the

14   Whataburger in the drive-through lane.

15   Q.    Can you tell us what kind of vehicle the

16   victim was driving?

17   A.    She was in a Ford Thunderbird.

18   Q.    Do you recall the color?

19   A.    I'm not positive.

20   Q.    If you don't know, that's okay, I'm just

21   asking.

22   A.    I was thinking it was like a light blue.

23   It's one of those retro ones, the smaller ones, the

24   two-seaters.  I think it was a light blue.

25   Q.    When you came in contact with this person,

268

1    Ruby Pena, can you tell me what her attitude, her

2    demeanor was?

3          MR. GARZA:  Once again, Your Honor,

4    objection to hearsay.  He's asking for hearsay based

5    on what her reaction was.

6          MR. SKURKA:  Judge, I asked him for her

7    attitude or demeanor.

8          THE COURT:  Yeah, that's overruled.

9    Don't tell us what she said but what was her demeanor.

10         THE WITNESS:  She was a little upset that

11   she had been just robbed and –

12         THE COURT:  Well, don't tell us what she

13   said but, I mean, you can tell us she was upset.

14   Q.    (BY MR. SKURKA)  Do you understand what the

15   objection is?

16   A.    Yes.

17   Q.    How was she acting is what I'm asking.

18   A.    She was -- she was upset --

19         THE COURT:  Okay.

20   A.    -- and a little excited.

21   Q.    (BY MR. SKURKA)  Was she able to give you any

22   information toward the suspects, their vehicle, or

23   direction of travel?

24   A.    Yes, she did.

25   Q.    Did you put any information out on the radio

269

1    about that information?

2    A.    Yes, I did.

3    Q.    I'm sorry, let me ask that question again.

4    Did that information that you received from her, did

5    that match some of the information that had already

6    been put out on the previous BOLO calls?

7    A.    Yes, it did.

8    Q.    So what did you do with the information you

9    received from the victim?

10   A.    I broadcast it to all the other -- to the

11   dispatcher to broadcast to all the other units.

12   Q.    And what did you put out on your broadcast,

13   what did you say out on the radio?

14   A.    I said it was a red van with a Hispanic male

15   and two Hispanic females and they had left towards Ray

16   High School from 510 Texan Trail.

17   Q.    And in what direction were they heading

18   from -- or heading toward when they left that

19   location?

20   A.    Heading towards Staples.

21   Q.    All right.

22         MR. SKURKA:  May I approach, Your Honor?

23         THE COURT:  Yes.

24   Q.    (BY MR. SKURKA)  I've got a map here I want

25   to show you.  It's just a little Google map, State's

270

1    Exhibit No. 44.  Can you look at that and tell me if
2    that shows the location of where this Whataburger was
3    or is.
4        A.   Yes, it does.
5        Q.   Can you get this pen and draw an X to where
6    that area is.
7        A.   (Witness complying.)
8        Q.   What else is around there?
9        A.   It's a couple of hospitals and the shopping
10   center right down road from it.
11           MR. SKURKA:  I'm going to tender 44 to
12   Defense Counsel and I'll offer into evidence.
13           MR. GARZA:  No objection, Your Honor.
14           THE COURT:  It's admitted.
15           MR. SKURKA:  May I publish it to the
16   jury, Your Honor?
17           THE COURT:  You may.
18       Q.   (BY MR. SKURKA) I'm going to put that up on
19   the board and I'd like you to show what area that is.
20           MR. SKURKA:  And let's start with the
21   wide angle, Geordie, please.
22           Thank you, Frank.
23       Q.   (BY MR. SKURKA)  Okay.  Show me where Alameda
24   Street and Texan Trail are.  There's a laser pointer
25   right there in front of you, I'm sorry.

271

1        A.   It's Texan Trail right here and South Alameda
2    runs this way.
3        Q.   Okay.
4            MR. SKURKA:  Go in closer, please, to
5    that area.
6        Q.   (BY MR. SKURKA)  Okay.  Where the X you've
7    drawn is where that actually is and there's another
8    little street behind there.  What's that called?
9        A.   I can't remember what it is.
10       Q.   Okay.  I'm talking about this one right
11   here.
12       A.   Oh, Gordan Street.
13       Q.   Okay.  The Whataburger is actually at the
14   corner, is it not, or closer to the corner?  And what
15   I'm trying to say does it face more Texan Trail or
16   Alameda?
17       A.   It faces -- Texan Trail is actually like a
18   convenient store right here on Alameda so it's this
19   half of that piece of property.
20       Q.   Now, if you said that the information you got
21   it was heading towards Texan Trail down towards
22   Staples, and show where that would be on the map.
23       A.   Down here and towards Staples
24   here.
25       Q.   And for the record, you're showing from the

272

1    middle of the map down to the bottom left of the map?
2        A.   Right.
3        Q.   If you went up to Staples this way what would
4    you run into?
5        A.   That way up Staples you're heading towards
6    Six Points.  You hit Baldwin and then Six Points.
7        Q.   Go ahead and up there.  And I believe this
8    would be Del Mar College, right?
9        A.   Correct.
10       Q.   So if you went up Staples this way, would you
11   be close to Staples and Baldwin?
12       A.   Yes, sir, you would.
13       Q.   So, were you aware that the Whataburger at
14   Staples and Baldwin there had been a robbery there,
15   too?
16       A.   Yes.
17       Q.   But how far is it when you say approximately
18   from down here to up there?
19       A.   About a mile and a half.
20       Q.   From that Whataburger to the other
21   Whataburger?
22       A.   Right.
23       Q.   And if you went to the left down Baldwin,
24   what was down that way?
25       A.   That was where the first robbery was down

273

1    here someplace.
2        Q.   Okay.  I think my map cuts it off here closer
3    to the freeway; correct?
4        A.   Correct.
5        Q.   But is it your understanding that the
6    convenient store was down here of this Baldwin --
7        A.   It's down here.
8        Q.   -- this part of Baldwin?  How far is that one
9    from the Staples Street Whataburger?
10       A.   Less than a mile.
11       Q.   So all these calls, and we're now on the
12   radio, how soon did they -- I mean, how close in time
13   were they together?
14       A.   They were pretty close, maybe 15 minutes
15   apart.
16       Q.   And you testified the sequence of events
17   would have been the convenience store and the
18   Whataburger at Staples and Baldwin and then the one
19   that you went to; correct?
20       A.   Correct.
21       Q.   And all within 15 minutes or so of each
22   other?
23       A.   Correct.
24       Q.   Did you have any -- you talked about the
25   physical -- I'm sorry, the description of the van and

274

1   there was this Hispanic male and female.  Did you also
2   put out any other particular description of the male
3   or females, and I'm talking about age, height, weight,
4   sex, race, all that?
5       A.   Yes, I did.
6       Q.   What did you put out on the radio?
7       A.   That the male was 17, 19 years old, with
8   short hair, maybe shaved head, and the female had
9   shoulder length hair, about the same age, 17 to 19
10  years old.
11      Q.   Was there any other information you put
12  out -- apparent weapon that you put out on the radio?
13      A.   Yes.
14      Q.   What was the information you put out on the
15  radio?
16      A.   That it was a serrated bladed knife.  Instead
17  of a straight edge it has a kind of a serrated -- a
18  wavy-like cutting edge.
19      Q.   And that's pretty much all the information
20  you had at that time?
21      A.   Correct.
22      Q.   Now, did you have anything else to do with
23  the investigation or did you just preserve the crime
24  scene until a detective or other officer came to
25  assist you?

275

1       A.   I preserved the crime scene until a
2   identification technician came by.
3       Q.   Thank you.
4            MR. SKURKA:  That's all the questions I
5   have of this Officer, Judge.
6            THE COURT:  All right, let's ahead and
7   let's break for the day.  Your cross-examination will
8   have to be in the morning.
9            So let's break for the day, ladies and
10  gentlemen.  We'll start up at 9:00 in the morning
11  tomorrow so we'll see you then.  All rise for the
12  jury.
13           (Jury exits courtroom.)
14           THE COURT:  All right, is there anything
15  we need to take up before we break for the day?
16  You-all can be seated, by the way.
17           MR. GARZA:  No, Your Honor.
18           THE COURT:  All right.
19           MR. GARZA:  Not on behalf of the Defense
20  Counsel.
21           THE COURT:  All right, we'll see you-all
22  at 9:00.
23           (Adjournment.)
24
25

276

```
 1    THE STATE OF TEXAS )

 2    COUNTY OF NUECES    )

 3                    I, Mary Lopez Buitron, Official Court Reporter

 4    in and for the 94th Judicial District Court of Nueces County,

 5    State of Texas, do hereby certify that the above and foregoing

 6    contains a true and correct transcription of portions of

 7    evidence and other proceedings requested in writing by counsel

 8    for the parties to be included in this volume of the Reporter's

 9    Record, in the above-styled and numbered cause, all of which

10    occurred in open court or in chambers and were reported by me.

11                    I further certify that this Reporter's Record of

12    the proceedings truly and correctly reflects the exhibits, if

13    any, admitted by the respective parties.

14                    I further certify that the total cost for the

15    preparation of this Reporter's Record is $_____ and was

16    paid/will be paid by_____.

17                    WITNESS MY OFFICIAL HAND this the ___ day of

18    _____, A.D., 2009.

19

20    _____

21    MARY LOPEZ BUITRON, CSR, RPR, Texas CSR #2731
      Expiration Date: 12/31/2009
22    Official Court Reporter
      94th District Court
23    Nueces County, Texas
      901 Leopard, Room 901
24    Corpus Christi, Texas 78401
      (361)888-0658
25
```