1

```
 1                    REPORTER'S RECORD
            APPELLATE COURT CAUSE NO. AP-76,100
 2           TRIAL COURT CAUSE NO. 04-CR-3453-C
                 VOLUME 17 OF 25 VOLUMES
 3
THE STATE OF TEXAS      )      IN THE DISTRICT COURT
 4                      )
                        )
 5  VS.                 )      94TH JUDICIAL DISTRICT
                        )
 6  JOHN HENRY RAMIREZ   )      NUECES COUNTY, TEXAS

 7

 8

 9

10

11           _____

12                 TRIAL PROCEEDINGS

13                    (Continued)

14           _____

15

16

17

18

19          On the 2nd day of December, 2008, the

20  following proceedings came on to be heard in the

21  above-entitled and numbered cause before the HONORABLE

22  BOBBY GALVAN, Judge Presiding, held in Corpus Christi,

23  Nueces County, Texas:

24                Proceedings reported by Stenograph

25  Machine.
```

FILED IN
COURT OF CRIMINAL APPEALS

OCT 0 6 2009

Louise Pearson, Clerk

2

```
 1    APPEARANCES:

 2    MR. MARK SKURKA
      SBOT NO. 18475570
 3    MR. VERNON G. SCHIMMEL
      SBOT NO. 24033039
 4    ASSISTANT DISTRICT ATTORNEYS
      901 Leopard, Rm. 205
 5    Corpus Christi, Texas 78401
      Phone: (361) 888-0410
 6
      ATTORNEYS FOR THE STATE
 7
      -AND-
 8
      MR. EDWARD F. GARZA
 9    SBOT NO. 07731200
      ATTORNEY AT LAW
10    719 S. Shoreline, Suite 201
      Corpus Christi, Texas  78401
11    Phone: (361) 888-8877

12    MR. JOHN GRANT JONES
      SBOT NO. 10917000
13    ATTORNEY AT LAW
      5826 Beauvals Drive
14    Corpus Christi, Texas  78404-6173
      Phone: (361) 884-8141
15
      ATTORNEYS FOR THE DEFENDANT,
16    JOHN HENRY RAMIREZ

17

18

19

20

21

22

23

24

25
```

3

```
1                            INDEX
              VOLUME 17 OF 25 VOLUMES
2               TRIAL PROCEEDINGS
   DECEMBER 2, 2008                          Page  Vol.
3  Continuation of trial proceedings.................. 6    17

4  STATE'S WITNESSES (Cont'd)        Direct Cross V.Dire  Vol.
     GREG KINANE (Cont'd) .................       7         17
5  RUBY PENA HINOJOSA ..................  9     33         17
   TANYA FLORES OELSCHLEGEL ............ 39     63         17
6
   Hearing out of the presence of the jury............ 40   17
7     In Re:  Witness Tanya Flores Oelschlegel

8  STATE'S WITNESSES (Cont'd)        Direct Cross V.Dire  Vol.
   JAMES GRAY ........................... 65              17
9  MIKE FRAKES .......................... 99              17
   RALPH VASQUEZ ........................ 123    141       17
10                                      151
   ROBERT CHAPA ......................... 156             17
11 FRANK PEREZ .......................... 176    185       17
                                        187
12 VICTOR CASARES ....................... 191    202       17

13 Hearing out the presence of the jury .............. 203  17
14    In Re:  Graphic photos

   STATE'S WITNESSES (Cont'd)        Direct Cross V.Dire  Vol.
15 ALLEN KIRKSEY ........................ 211             17

16 Adjournment ...................................... 242   17

17 Court Reporter's Certificate ..................... 243   17

18           ALPHABETICAL INDEX TO WITNESSES
                             Direct Cross V.Dire Vol.
19 CASARES, VICTOR ...................... 191    202       17
   CHAPA, ROBERT ........................ 156             17
20 FRAKES, MIKE ......................... 99              17
   GRAY, JAMES .......................... 65              17
21 HINOJOSA, RUBY PENA .................. 9     33         17
   KINANE, GREG (Cont'd) ...............       7         17
22 KIRKSEY, ALLEN ....................... 211             17
   OELSCHLEGEL, TANYA FLORES ............ 39    63         17
23 PEREZ, FRANK ......................... 176    185       17
                                        187
24 VASQUEZ, RALPH ....................... 123    141       17
                                        151
25
```

4

```
 1                            INDEX
                     VOLUME 17 OF 25 VOLUMES
 2                      TRIAL PROCEEDINGS
                           (Continued)
 3    DECEMBER 2, 2008
                            EXHIBITS
 4    FOR THE STATE:
      NO.        DESCRIPTION           Offered Admitted Vol.
 5    SX-45-47   Aerial photos .............. 12      12      17

 6    SX-48-51   Aerial photos (Whataburger) 25      25      17

 7    SX-52      Photo (Whataburger) ........ 25      25      17

 8    SX-53-58   Photos (Ruby Pena's vehicle) 25     25      17

 9    SX-59      Photo (van) ................ 59      59      17

10    SX-60      Google map ................. 79      79      17

11    SX-61-69   Aerial photos .............. 116     116     17

12    SX-70      Google map ................. 111     111     17

13    SX-71-73   Photos (van) ............... 111     111     17

14    SX-74      Photo (Christina Chavez) ... 133     133     17

15    SX-75      Photo (Angela Rodriguez) ... 133     133     17

16    SX-76      Aerial photo ............... 154     154     17

17    SX-77      Photo (Christina Chavez) ... 150     151     17

18    SX-78      Photo (Angela Rodriguez) ... 150     151     17

19    SX-79-84   Photos (sandal) ........... 182     182     17

20    SX-85      Paper sack containing ...... 190     190     17
                 sandal
21
      SX-86-89   Photos (rag) .............. 199     199     17
22
      SX-90-91   Photos (victim) ........... 209     210     17
23
      SX-92-93   Sketches (crime scene) ..... 220     220     17
24
      SX-94-95   Photos (envelope) ......... 225     226     17
25
      SX-96-97   Photos (ball cap) ......... 228     228     17
```

5

```
 1                              INDEX
                     VOLUME 17 OF 25 VOLUMES
 2                     TRIAL PROCEEDINGS
                          (Continued)
 3   DECEMBER 2, 2008

 4                          EXHIBITS
                          (Continued)
 5   FOR THE STATE:
     NO.          DESCRIPTION              Offered Admitted Vol.
     SX-98-99     Photos (ring) ............ 230     230    17
 6
     SX-100-101   Photos (ring) ............ 237     237    17
 7
     SX-102       Paper sack containing ball . 239   239    17
 8                cap

 9   SX-103       10K gold ring ............ 240     241    17

10   SX-104       Quarter .................. 242     242    17

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

6

1                     P R O C E E D I N G S
2    December 2, 2008
3              (Out of the presence of the jury.)
4              THE COURT:  You ready?
5              MR. SKURKA:  We're ready.
6              THE COURT:  You ready, too?
7              MR. GARZA:  We're ready, Judge.
8              THE COURT:  Where's Frank?  Is he in the
9    jury room?  Oh, Frank, I guess go get them.  Oh, and
10   we need the witness.
11             Yeah, you know what, Frank, why don't you
12   get the -- I'll get the witness, I'll get the witness.
13   You get the jury.
14             (Jury enters courtroom.)
15             THE COURT:  All right, come on in and
16   take your seat.  All right, be seated, please.
17             All right, cross.
18             MR. GARZA:  Yes, Your Honor.
19
20                  GREG KINANE,
21   having been previously duly sworn, testified as
22   follows:
23                CROSS-EXAMINATION
24   BY MR. GARZA:
25       Q.   Officer Kinane, good morning.  My name is Ed

7

1    Garza.  I think I had introduced myself to you in the
2    hallway previously.
3        A.   Yes, sir.
4        Q.   On that particular evening I want to direct
5    your attention where you investigated the alleged
6    robbery on Texan Trail.  By the time you arrived there
7    I guess it's safe to say that everything had already
8    happened; is that correct?
9        A.   Correct.
10       Q.   That which was reported to you, you did not
11   personally observe or witness yourself; is that
12   correct?
13       A.   Correct.
14       Q.   And you didn't have occasion to witness any
15   wrongdoing on the part of my client there at that
16   particular evening; is that correct?
17       A.   That is correct.
18       Q.   Nor anything else?
19       A.   Correct.
20       Q.   Okay.  I don't believe I have any other
21   questions of you, sir.
22             THE COURT:  All right.  Anything else,
23   Mr. Skurka?
24             MR. SKURKA:  No, Your Honor.
25             THE COURT:  May this witness be excused?

8

1              MR. SKURKA:  Yes, Your Honor.
2              THE COURT:  Please don't discuss your
3    testimony with anyone.
4              THE WITNESS:  Thank you.
5              THE COURT:  All right.  Call your next
6    witness.
7              MR. SKURKA:  Ruby Pena, Your Honor.
8              THE COURT:  All right.  Ruby Pena.
9              (Oath administered.)
10             THE COURT:  All right, be seated.  You
11   may proceed.
12             MR. SKURKA:  Thank you, Your Honor.
13
14                  RUBY PENA HINOJOSA,
15   having been first duly sworn, testified as follows:
16                DIRECT EXAMINATION
17   BY MR. SKURKA:
18       Q.   Would you introduce yourself to the folks on
19   our jury, please.
20       A.   Hello, I'm Ruby Pena Hinojosa.
21       Q.   How are you currently employed?
22       A.   How am I currently employed?
23       Q.   Where are you currently employed?
24       A.   Driscoll Hospital.
25       Q.   And what do you do there?

9

1        A.   I'm a respiratory therapist.
2        Q.   What does that mean?
3        A.   I work with the lungs basically.
4        Q.   How long have you worked at Driscoll
5    Children's Hospital?
6        A.   About 16 years.
7        Q.   Do have any special training to be a
8    respiratory therapist, education?
9        A.   Yes.
10       Q.   Could you briefly tell the jury what that
11   would be?
12       A.   Specialty exams and college basically.
13       Q.   Do you have a college degree?
14       A.   Yes, sir.
15       Q.   And can you tell us what that is in?
16       A.   It's respiratory therapy.
17       Q.   I'm going to direct your attention,
18   Ms. Hinojosa, to a time of July 19th, 2004, and ask
19   you if you were working that day.
20       A.   Yes, I was working that day.
21       Q.   What were your hours on that day?
22       A.   Night shift, 6 P. To 6 A.
23       Q.   Say that again.
24       A.   6 P. To 6 A., night shift.
25       Q.   So you work a 12-hour shift?

10

1    A.    Yes, sir.

2    Q.    Would you do me a favor and move that
3  microphone a little closer to you so we can hear you a
4  little bit better.

5    A.    I'll sit up.

6    Q.    Or you can sit up a little closer.  Thank you
7  very much.

8         So during that time when do you usually take
9  a -- I guess a dinner break or a lunch break?

10    A.    It varies.  I mean, I think that night I went
11  around 10:30, 11:00.

12    Q.    Where did you go on that evening to have
13  dinner or lunch?

14    A.    I went to the Whataburger on Alameda and
15  Texan Trail.

16    Q.    How far is that from Driscoll Children's
17  Hospital?

18    A.    Half a mile, I'm not sure.

19         MR. SKURKA:  May I approach the witness,
20  Your Honor?

21         THE COURT:  Yes.

22    Q.    (BY MR. SKURKA)  I have a series of
23  photographs, they're marked State's Exhibit 45, 46 and
24  47.  Could you look at them and tell me if you
25  recognize that?

11

1    A.    Yes.

2    Q.    What is it?

3    A.    It's the aerial view of the Whataburger and
4  the surrounding areas.

5         MR. SKURKA:  I'll tender 45, 46, and 47
6  to Defense Counsel and offer them into evidence.

7         MR. GARZA:  No objection, Your Honor.

8         THE COURT:  They're admitted.

9         MR. SKURKA:  May I publish them to the
10  jury, Your Honor?

11         THE COURT:  You may.

12    Q.    (BY MR. SKURKA)  Let's start with 45, and
13  there's a laser pointer there laying there in front of
14  you, and could you show us where this Whataburger is
15  in there, and I've got, like I said, three of them.
16  First of all, show us where Alameda is.

17    A.    I believe it's this street right here.

18    Q.    Okay.  So that's the road down at the bottom
19  left of the picture.  And where would Texan Trail be,
20  please?

21    A.    Right there.

22    Q.    Okay.  So then Texan Trail extends from
23  Alameda.  What would be the next street if you follow
24  it up Texan Trail?

25    A.    If I followed up Texan Trail this way?

12

1    Q.    Yes, ma'am.

2    A.    I think that hits Staples.

3    Q.    Okay.  Is Ray High School in that area?

4    A.    Back in here somewhere.

5         MR. SKURKA:  Let's show the next
6  photograph, please, 46.

7    Q.    (BY MR. SKURKA)  Does that also show the
8  Whataburger's location, ma'am?

9    A.    Right there.

10    Q.    And what is that big building to the left?

11    A.    This one here?

12    Q.    Yes, ma'am.

13    A.    I think that's Family Practice Associates and
14  Doctor's Regional next to it.

15    Q.    Okay.  And the next photograph, please.  Does
16  that show it a little closer up?

17    A.    Yes, it does.

18    Q.    And it shows where the Whataburger is?

19    A.    Yes, it does.

20    Q.    Okay.  You said you went to that Whataburger.
21  Why?

22    A.    I was hungry, it was my lunch break.

23    Q.    Where did you -- did you go inside or through
24  the drive-through?

25    A.    No, I went through the drive-through.

13

1    Q.    Tell the jury what happened as you were in
2  the drive-through at the Whataburger, please.

3    A.    I was at the menu board and there was a car
4  in front of me at the pick-up window and a van pulled
5  up to my right side and a lady got out and asked if
6  she could use my cell phone, and I gestured "No, go
7  inside," and when I pointed inside I saw through my
8  periphery a man at my driver's side window put a knife
9  to my neck and ask for my money and I told him I
10  didn't have any money and then he gestured again "Give
11  me your money," and I told him I didn't have any money
12  and leaned away and raised my window.

13         And at that point he went to the passenger
14  side and started I guess just banging at my window
15  with the knife as the girl was there watching as well.

16    Q.    Was he gesturing with a knife or actually
17  striking with the knife?

18    A.    He scratched my window with the blade of the
19  knife and then I back up and the van left and they
20  took off down Texan Trail.

21    Q.    Is the person who held a knife to you and
22  robbed you that night, is that person in the courtroom
23  today?

24    A.    Yes.

25    Q.    Can you point to him, describe something he's

14

1  wearing?

2  A.  A purple -- purple shirt.

3  MR. SKURKA:  Your Honor, may the record

4  reflect the witness has identified the Defendant?

5  THE COURT:  It will so reflect.

6  Q.  (BY MR. SKURKA)  You went through the story a

7  little fast so I'm going to go down and back up and

8  break it down first, okay?  You said that a van pulled

9  up.  Did the van pull up close to you in, like, a

10  parking space or by the -- in the drive-through?

11  A.  The driver -- there's the driver's lane A and

12  lane B.  They were in lane B.

13  Q.  Okay.  So you would have been in the lane

14  closest to the building.  Would that be fair to say?

15  A.  Yes.

16  Q.  And they were in the outside lane?

17  A.  Yes.

18  Q.  Can you describe this van or color, make or

19  model, or anything like that?

20  A.  Make and model, no.  It didn't have windows,

21  it's like panel van, a maroon color.

22  Q.  What do you mean, a panel van?

23  A.  It didn't have the windows on the side, it

24  was just -- I don't know what you call those.

25  Q.  And what color was it, if you recall?

15

1  A.  I believe maroon or burgundy, dark.

2  Q.  How many people did you see get out of the

3  van?

4  A.  A male and a female, there were two.

5  Q.  Did you see anybody else that remained in the

6  van?

7  A.  No, I didn't.

8  Q.  What did you think when you first saw these

9  people get out of the van and approach your car?

10  A.  Nothing, nothing of it.  I didn't think

11  anything of it.

12  Q.  Was there anything -- and when they

13  first approached your car, did they approach the

14  passenger side or the driver's side?

15  A.  It was just the female that approached my

16  car, I never saw the male come around my side.

17  Q.  That's what I was trying to say to you, you

18  said -- you said you saw both of them get out of the

19  van?

20  A.  Oh, I'm sorry.  No, I never saw them until --

21  I saw them leave together, put it that way.

22  Q.  Let's start at the beginning.  When you're

23  sitting in the -- in the drive-through, how many

24  people did you see --

25  A.  One.

16

1  Q.  -- get out of the van?

2  A.  One, a female; one female.

3  Q.  Okay.  And that's a female that you said

4  approached you; correct?

5  A.  Right.

6  Q.  Did you ever see the male until he appeared

7  at your driver's side window?

8  A.  Never saw him until he appeared at my

9  driver's side window.

10  Q.  How long was the female there I guess talking

11  to you or trying to use the phone?

12  A.  A minute.

13  Q.  Do you recall what she said, if anything?

14  A.  Just "Can I use your phone?"

15  Q.  That's all?

16  A.  Yes.

17  Q.  Could you see anything unusual about her

18  clothing?

19  A.  No.

20  Q.  Was your attention pretty much focused on her

21  when you were having a conversation with her?

22  A.  Yes.

23  Q.  How long did it take before the man showed up

24  at your driver's side window?

25  A.  Less than a minute.

17

1  Q.  And can you describe him, the general

2  description, how he looked that night.  I know that

3  you've described him in court, pointed him out in the

4  courtroom, but how did he look that night?

5  A.  I don't recall what he was wearing, I just

6  remember the face.

7  Q.  So mostly you focused on his face?

8  A.  Right.

9  Q.  How far away was his face from you when he

10  was at your window?

11  A.  12 inches.

12  Q.  Was there anything obscuring your view of

13  him?

14  A.  No.

15  Q.  How was the lighting out there by the menu

16  board?

17  A.  It was well lit.

18  Q.  So you got to see the Defendant some 12

19  inches away from your face?

20  A.  Yes.

21  Q.  How long -- when he was there, did he ask you

22  for anything else besides your money, like purse,

23  wallet, anything like that?

24  A.  No, sir.

25  Q.  Could you describe for us how he held the

18

1  knife at you, and I'll ask you to come on down here
2  and I'll just play you.  Come on down.
3      A.   Sure.
4      Q.   Now, if you would, pretend for me, if you
5  would, that I'm you sitting in the car driving and
6  tell me -- and you're him, and tell me where he came
7  from and what he did, and I'm going to give you this
8  pen to act as a knife and I want you to show the jury
9  exactly what happened as you're sitting in your car
10  like this.
11      A.   Well, just held the knife --
12      Q.   You have to talk loud.
13      A.   Held a knife to my neck and asked for my
14  money.
15      Q.   He had it to the side of your neck --
16      A.   Yes.
17      Q.   -- or to the front of your neck?
18      A.   The side.
19      Q.   Okay.  And was he using his right hand or his
20  left hand, can you tell?
21      A.   I don't recall.
22      Q.   And can you tell me his tone or demeanor as
23  he's doing this to you?
24      A.   Just simply "Give me your money."
25      Q.   He wasn't yelling at you?

19

1      A.   No.
2      Q.   Quiet to you?
3      A.   No.
4      Q.   Just a normal voice?
5      A.   Uh-huh.
6      Q.   And he held the knife against your neck for
7  how long?
8      A.   Well, it was like "Give me your money," and
9  then pulled away and then "Give me your money," and I
10  pulled away.
11      Q.   Okay.  So you were able to pull away from him
12  in the neck?
13      A.   Yes.
14      Q.   Where is your remote control for your
15  windows?
16      A.   On my left-hand side.
17      Q.   Your left-hand side here?
18      A.   Yes.
19      Q.   Okay.  Is that when you hit the window to --
20  when you hit the window to roll up the deal, and I'm
21  going to -- the window, how -- did his arm get caught
22  in the window or just --
23      A.   No, he just kind of swaggered back like this.
24      Q.   He swaggered back?
25      A.   Yes.

20

1      Q.   But he had to withdraw his hand, though,
2  right --
3      A.   Right.
4      Q.   -- did he not?  Thank you, you can go ahead
5  and have a seat.
6          Can you describe -- can you describe for us
7  the knife itself, length, height?
8      A.   It looked thick and about so long, serrated.
9          MR. SKURKA:  Frank, do we still have that
10  ruler up here?
11      Q.   (BY MR. SKURKA)  I have a ruler up here.
12  Maybe you can get how many inches you think it was
13  cause the jury can't see how many inches.  You say it
14  was thick and it had serrated edges?
15      A.   Yes, sir.
16      Q.   Could you tell if it was a folding-type knife
17  or a fixed-blade knife, or do you know?
18      A.   I don't know.
19      Q.   Do you know what I'm saying --
20      A.   Yes.
21      Q.   -- the difference between those?  You just
22  couldn't tell?  Here's a ruler, maybe that would help
23  you to estimate the length of the knife.
24      A.   As I recall, maybe five or six inches.
25      Q.   Five to six inches long?

21

1      A.   Uh-huh, yes, sir.
2      Q.   Can you recall anything else about it, the
3  color of it, the handle?
4      A.   No, sir.
5      Q.   Okay.  And you don't know if it was a fixed
6  blade or a knife that folds?
7      A.   No, sir.
8      Q.   How did you feel when he came up to you with
9  that knife?
10      A.   Well, threatened for my life.
11      Q.   How was it you were able to think clearly
12  enough to close the window on him?
13      A.   Good grace of God, I don't know.
14      Q.   Did he get any money from you?
15      A.   No, sir.
16      Q.   What was the woman doing?  As he's over on
17  this side with the knife, the woman had been on the
18  passenger side asking you for a phone or whatever.
19  What was she doing all this time?
20      A.   Well, my attention was on him but then when
21  he went to the other side with her I saw her crouch,
22  looking in through the other window.
23      Q.   The other window meaning?
24      A.   My right passenger side window.
25      Q.   So she still was there?

22

1      A.   Yes, sir.

2      Q.   Did you get a good look at her?

3      A.   Yes, sir.

4      Q.   And can you give us a description of her,

5   please.

6      A.   As I recall, she was -- I remember long hair,

7   long wavy hair.

8      Q.   Anything else you can recall about her?

9      A.   Thin.

10      Q.   Can you tell us after he had to pull back

11   from the driver's side where he went immediately?  Did

12   he go in front of the car, behind the car?

13      A.   He went behind the car.

14      Q.   And to what side?

15      A.   Behind the car to my passenger side.

16      Q.   You mentioned several times -- you mentioned

17   before that he actually struck your window with a

18   knife?

19      A.   Yes, sir.

20      Q.   What was his attitude or demeanor, what was

21   he saying when he was doing that?

22      A.   Well, I thought they were going to break my

23   window so I reversed the car.

24      Q.   Let me ask the question again:  Did he say

25   anything, or how was he acting when he was striking

23

1   your window?

2      A.   I don't recall what he was saying but it was

3   just repeatedly hitting my window with the blade.

4      Q.   And you reversed at that time?

5      A.   Yes, sir.

6      Q.   I'm going to show another series of

7   photographs, please.

8           MR. SKURKA:  May I approach?

9           THE COURT:  Yes.

10      Q.   (BY MR. SKURKA)  48 through 58.  Please take

11   a look at these to yourself.

12      A.   (Witness complying.)

13      Q.   Do you recognize what's depicted in the

14   photos?

15      A.   Yes, sir.

16      Q.   What are they?

17      A.   Some aerials of Whataburgers and some

18   snapshots of Whataburgers and some shots of my car.

19      Q.   Okay.  For the record, 48 through 51 appear

20   to be aerial photographs that were taken during the

21   day time; correct?

22      A.   Yes.

23      Q.   And would it be fair to say that 52 through

24   58 were taken that night at the scene?

25      A.   Yes.

24

1      Q.   But these pictures all fairly and accurately

2   represent the scene at this Whataburger; correct?

3      A.   Yes.

4           MR. SKURKA:  I'll tender 48 through

5   58 to Defense Counsel and offer them into evidence.

6           MR. GARZA:  No objections, Your Honor.

7           THE COURT:  All right, they're

8   admitted.

9      Q.   (BY MR. SKURKA)  I'm going to go through

10   these photographs with you for a minute and let's

11   start with the aerial photographs.  I'm going to show

12   you what's been marked State's Exhibit No. 48.

13           Using a laser pointer can you show us

14   essentially the parking lot and where you were at, if

15   that photograph shows it, and I've got some others too

16   if that doesn't show it very well.

17      A.   I was basically in this area.

18      Q.   For the record, you're showing the side of

19   the building there --

20      A.   The side of the Whataburger.

21      Q.   -- of the Whataburger on the left side?

22      A.   Yes, sir.

23           MR. SKURKA:  Thank you, Frank.

24      Q.   (BY MR. SKURKA)  I have some other angles,

25   49.  What does that depict?

25

1      A.   The Whataburger, and I was all the way back

2   in there.

3      Q.   Okay.  How do you get to the drive-through,

4   please?

5      A.   I had to enter here, drive all the way around

6   and order.

7      Q.   Okay.

8           MR. SKURKA:  Geordie, would you close in

9   on this part right here?

10           MR. SCHIMMEL:  Uh-huh.

11      Q.   (BY MR. SKURKA)  Now, what is this right in

12   here?

13      A.   That looks like the menu board.

14      Q.   Okay.  Were you at the menu board itself or

15   were you on your way up to pick up the food here?

16      A.   I was in between.

17      Q.   Okay.  So you were literally between the menu

18   board and the -- I call it the pick-up window, I

19   guess?

20      A.   Yes, sir.

21      Q.   Okay.  So you had already ordered, I'm

22   assuming?

23      A.   Yes.

24      Q.   Was there another car in front of you --

25      A.   Yes, sir.

26

1    Q.    -- at the pick-up window?

2    A.    Yes, there was.

3    Q.    Was there any car behind you?

4    A.    No.

5    Q.    Now, looking at that photograph, where would

6    your car be and where would the van be?

7    A.    My car would be in this lane and the van

8    would be in the lane next to me.

9    Q.    Okay.  Does this show it a little closer, No.

10   50?  Which shows the area better of where your car

11   would have been located?

12   A.    With the -- the wall right here.

13   Q.    Okay.  And the van would be next to it?

14   A.    Yes, sir.

15   Q.    I'll tell you what I'll do, then, I'm going

16   to have you look at this picture and what I'd like you

17   to do is draw a little rectangle showing your car and

18   then where the van is next to it.  Here's a pen.  Do

19   you understand what I'm saying?

20   A.    Draw a rectangle?

21   Q.    Well, where you would be to symbolize the

22   car.

23   A.    Do you want me to mark on your picture?

24   Q.    Yes.

25   A.    Okay, right here.

27

1    Q.    Okay.  And then where the van would be.

2    A.    About right here.

3    Q.    Okay.  And would you put an "R" on your

4    vehicle to show "Ruby" and a "V" on the other one

5    showing "van," okay?

6    A.    (Witness complying.)

7    Q.    Does that fairly and accurately represent

8    where the car was -- your car was in relationship to

9    the van?

10   A.    Yes.

11   Q.    Let me show that to the jury that you marked

12   now.  Okay.  Again, the R over the box is against the

13   wall, and in fact, in that picture there's a car

14   there, isn't there?  So was there any other people in

15   front -- any other cars I guess is what I'm saying in

16   front of the van or behind the van as it pulled up?

17   A.    No, sir.

18   Q.    I'm not asking this very well but what I'm

19   trying to say is you couldn't go forward because a car

20   was there.  Was there any car in front of the van so

21   they couldn't go forward?

22   A.    No, sir.

23   Q.    Okay.  The last picture on that sequence I'm

24   going to show you is 51.  And does that show the side

25   of building, too?

28

1    A.    Yes, it does.

2    Q.    Okay.  Thank you.  The next series of

3    photographs I have you've identified as the

4    Whataburger and I believe your vehicle, and let's just

5    start with 52.  What is that a photograph of?

6    A.    It's the side of -- front side of

7    Whataburger.

8    Q.    That would be -- would that be fair to say

9    that's the opposite side of the Whataburger you were

10   on?

11   A.    Yes, it is.

12   Q.    If somebody was walking in they would go in

13   that store; correct?

14   A.    Correct.

15   Q.    53, what is that a photograph of?

16   A.    That's my car.

17   Q.    What make and model, please?

18   A.    It's an '03 Thunderbird.

19   Q.    And 54, what does that show?

20   A.    The driver's side.

21   Q.    Is that the side that Mr. Ramirez approached

22   you on?

23   A.    Yes, sir.

24   Q.    And then I got a sequence of photographs and

25   we'll go with 55 and then 56.  What is that -- 55

29

1    depict?

2    A.    The passenger side.

3    Q.    And 56?

4    A.    The passenger side as well.

5    Q.    Okay.  Can you see the -- the scratch marks

6    or whatever on the window on that picture very well?

7    A.    Not at all.

8    Q.    Where would he have been striking that

9    window?

10   A.    Right in this area.

11   Q.    Okay.  I'm going to show you two more

12   photographs, 57 and 58.  What does 57 depict?

13   A.    That's the passenger side.

14   Q.    And the next one?

15   A.    That's the same thing, passenger side.

16   Q.    Okay.  What I'm going to ask you to do now is

17   --

18        MR. SKURKA:  This is number what?

19   Q.    (BY MR. SKURKA)  Okay, looking at 56 again,

20   again, you've already indicated -- you've indicated

21   where -- I don't know what you call it, scratch marks

22   made by the blade are, but would you kind of circle

23   the area on that, like just kind of how you pointed

24   here but let's just make a mark on the picture itself

25   where the marks from the window were.

30

1    A.    (Indicating.)

2    Q.    Okay.  So essentially right around the middle

3   of the window?

4    A.    Yes, sir.

5    Q.    So the marking you now put on 56 with the

6   little box I guess would be the area where he was

7   poking the window at?

8    A.    Yes, sir.

9    Q.    Can you tell me his demeanor when he was at

10   that side of the window, how he was acting?

11    A.    Just aggressively trying to break the window,

12   I thought.

13    Q.    How long was he at that side of the window

14   before you were able to reverse?

15    A.    About two minutes, three minutes.  It seemed

16   like forever.

17    Q.    Would you go back to one of the aerial

18   photographs on the drive-through.  I'm going to ask

19   you -- I'm going to show you -- have you show jury

20   where you reversed to and where the van left after you

21   went but I want to get the picture of the aerial

22   photograph up there, first.

23          Okay.  You indicated earlier where your car

24   would be about here and the van would be about here.

25   What did you do when you said reverse, where did you

31

1   go to?

2    A.    I -- to the menu board.  I reversed basically

3   to the menu board.

4    Q.    Why?

5    A.    So that I could get away from the knife.

6    Q.    Why did you stop at the menu board?

7    A.    It was far enough away.  They -- I saw them

8   walking into the van.

9    Q.    Can you show us on the diagram or the map

10   where they went?

11    A.    They exited and then went down Texan Trail.

12    Q.    So, after you reversed this way, they didn't

13   reverse with you, they went forward?

14    A.    Yes, they went forward.

15    Q.    And pulled out this way?

16    A.    And pulled out and went down Texan Trail.

17    Q.    So the last you saw them was going down Texan

18   Trail?

19    A.    Yes, sir.

20    Q.    And how many people did you see all together

21   during whole incident?

22    A.    Two.

23    Q.    Did you tell the police what you had seen?

24    A.    Yes, sir.

25    Q.    When the police got there, did you give them

32

1   -- were you able to give them a description of the van

2   or the people?

3    A.    I believe so.

4    Q.    Okay.  And -- thank you, Ms. Hinojosa.

5   That's all questions I have.

6          THE COURT:  All right.

7          MR. SKURKA:  I pass the witness.

8          THE COURT:  Cross?

9          MR. GARZA:  May I proceed, Your Honor?

10          THE COURT:  Yes.

11          MR. GARZA:  Thank you.

12          CROSS-EXAMINATION

13   BY MR. GARZA:

14    Q.    Ms. Hinojosa, I'm Ed Garza.  I think I

15   previously introduced myself to you at another

16   proceeding.  Good morning.

17    A.    Good morning.

18    Q.    I just want to ask you a few questions, if I

19   can.  On that particular evening, do you recall what

20   you ordered for your -- for your lunch or for your

21   supper that night?

22    A.    Yes, sir.

23    Q.    What did you order?

24    A.    A No. 7.

25    Q.    Great.  All right, the -- the lady that

33

1   approached you first in that car, were you ever asked

2   to later during the investigation of the case to

3   identify that person, and what I'm asking is were you

4   ever shown a lineup that night that included that

5   lady's picture in it?

6    A.    I don't recall.

7    Q.    You don't remember?

8    A.    No.

9    Q.    Now, you were shown a photo lineup of my

10   client; is that correct?

11    A.    Yes, sir.

12    Q.    Do you recall if that was the only one that

13   was ever shown to you?

14    A.    Yes, sir.

15    Q.    So that helps eliminate whether or not you

16   were shown another one of the other person --

17    A.    Right.

18    Q.    -- is that correct?

19    A.    Yes.

20    Q.    So for all intents and purposes, I think we

21   can factually establish the fact that nobody ever made

22   any effort to have you identify the Hispanic female?

23    A.    I don't recall that.

24    Q.    Okay.  Do you remember what she might have

25   been wearing that night?

34

1    A.    No, sir.

2    Q.    Any other features about her that you

3  described to the police that night?

4    A.    Just remember the long hair.  She was thin

5  built.

6    Q.    Okay.  Do you remember the color of the hair?

7    A.    Not at this point, no.

8    Q.    Anything at all about her facial features,

9  acne --

10    A.    No, sir.

11    Q.    -- scars, anything like that?

12    A.    No, sir.

13    Q.    Why would that be, it just happened too fast?

14    A.    She was on the passenger side and just -- I

15  dismissed her with "go inside" type thing, I didn't

16  really study her.

17    Q.    You didn't pay that much attention to her?

18    A.    Correct.

19    Q.    Were you able to pay more attention to our

20  client for a longer period of time compared to her?

21    A.    Yes, sir.

22    Q.    Do you recall what he was wearing?

23    A.    No, I don't, a T-shirt, I believe.

24    Q.    Do you recall anything significant about the

25  T-shirt?

35

1    A.    No, sir.

2    Q.    Was it -- was it blood stained, was it

3  splotched, have any spilled chocolate on it, anything

4  like that at all?

5    A.    No.

6    Q.    Nothing?  Anything at all about his hands or

7  arms that he appeared to have any wounds or bleeding

8  from any part of his limbs or his hands or anything

9  like that?

10    A.    No, sir.

11    Q.    The knife, what do you remember about the

12  knife?  Was it bloody, did it look rusty, did it look

13  damaged, did it look anything?

14    A.    No.

15    Q.    Nothing like that?

16    A.    No, sir.

17    Q.    You don't remember anything like that?

18    A.    I didn't see anything.

19    Q.    Okay.  Do you know if your car was ever

20  searched for -- if any of I.D. technician people that

21  came out to the scene looked for any bloodstains or

22  anything like that inside or outside your car?

23    A.    I'm not sure what they did.  I -- my

24  supervisor picked me up and I went back to work and

25  left my car there so I'm not sure what they did.

36

1    Q.    Okay.  Do you -- when did you get your car

2  back?

3    A.    About two hours later, two or three hours

4  later.  I was asked to go downtown.

5    Q.    To pick it up --

6    A.    Yes, sir.

7    Q.    -- or to obtain --

8    A.    Well, to -- for questioning.

9    Q.    Okay.

10    A.    Further questioning.

11    Q.    Is it -- and did you provide them with a

12  written statement at that time --

13    A.    Yes, sir, I did.

14    Q.    -- of what occurred?  When you backed the car

15  up and the van left the Whataburger, where did you

16  encounter the police?  Did you call the police

17  yourself?

18    A.    I called the police as I was pulling up to

19  pick-up window.

20    Q.    Okay.  So after they left you pulled up to

21  the window?

22    A.    Yes, sir.

23    Q.    And you called them on your cell phone, I

24  assume?

25    A.    Yes, sir.

37

1    Q.    Where did they meet up with you?

2    A.    On the opposite side.

3    Q.    Can you point?

4    A.    On the opposite side.  I pulled around to the

5  other parking area.

6    Q.    Okay.  And I noticed in the photographs your

7  car is backed up.  Did you park it that way or -- or

8  did they do that?

9    A.    I parked it.

10    Q.    You parked it?

11    A.    Yes, sir.

12    Q.    Okay.  And that's where you met up with

13  the -- I guess with Officer Kinane?

14    A.    Yes, sir.

15    Q.    Okay.  And you gave him the initial

16  information of what occurred that night --

17    A.    Yes, I did.

18    Q.    -- is that correct?

19    A.    Yes.

20    Q.    Thank you, ma'am.

21          MR. GARZA:  I'll pass the witness.

22          THE COURT:  Anything else?

23          MR. SKURKA:  No, Your Honor.

24          THE COURT:  All right.  You may stand

25  down.

38

1         THE WITNESS:  Thank you.

2         THE COURT:  Please do not discuss your

3  testimony with anyone while the trial is going on.

4         MR. SKURKA:  May she be excused, Your

5  Honor?

6         THE COURT:  She may.

7         MR. SKURKA:  Thank you.

8         THE COURT:  All right, call your next

9  witness.  Thank you.

10         MR. SKURKA:  We call Officer Gray.  I'm

11  sorry, Judge, I meant to call Officer Tanya Flores.

12         THE COURT:  All right.

13         (Oath administered.)

14         THE COURT:  All right, you may proceed.

15         MR. SKURKA:  One second, Your Honor.

16         THE COURT:  Okay.

17         (Pause in proceedings.)

18         TANYA FLORES OELSCHLEGEL,

19  having been first duly sworn, testified as follows:

20              DIRECT EXAMINATION

21  BY MR. SKURKA:

22     Q.   Please introduce yourself to the --

23         MR. GARZA:  Your Honor, I'm sorry, before

24  we proceed can we have a hearing outside the presence

25  of the jury before this witness testifies, Your Honor?

39

1         THE COURT:  Yes.  All right, let's take a

2  little break, ladies and gentlemen.  All rise for the

3  jury.

4         (Jury exits courtroom.)

5         THE COURT:  All right, be seated, please.

6  Yes, sir?

7         MR. GARZA:  I'm just a little

8  concerned in that as I was reading the -- got

9  reacquainted with Officer Flores' report, there's some

10  mention of another extraneous matter involving the van

11  having been reported stolen and I just want to make

12  sure that we weren't going to get into that and don't

13  think we've opened the door to it, but that's one of

14  the matters the Court has not ruled on.

15         MR. SKURKA:  No, I wasn't going to go

16  into that.  I think I told you not to mention that;

17  correct?

18         THE WITNESS:  Right, that's correct.

19         MR. GARZA:  Okay, well, I just wanted to

20  make sure.

21         THE COURT:  Okay.  Well, I guess we've

22  already put the jury in

23         MR. GARZA:  I'm sorry.

24         THE COURT:  That's fine.

25         MR. GARZA:  I just didn't want it to

40

1  happen, Judge.

2         THE COURT:  No problem, but we've already

3  put them in the box so let's give them a little break,

4  they'll probably use the facilities, so we'll take a

5  little break.

6         (Short recess.)

7         (Jury enters courtroom.)

8         THE COURT:  All right, be seated, please.

9  All right, Mr. Skurka, you may proceed.

10     Q.   (By MR. SKURKA)  Please state your full name

11  for the record.

12     A.   Officer Tanya Flores Oelschlegel.

13     Q.   How are you currently employed?

14     A.   I'm currently an investigator with the

15  criminal investigation division with the Corpus

16  Christi Police Department.

17     Q.   How long have you been with the Corpus

18  Christi Police Department?

19     A.   Almost 11 years.

20     Q.   Can you tell us what divisions or areas of

21  the police department you worked at from the beginning

22  to the current time.  Kind of tell me your different

23  assignments.

24     A.   Sure.  Of course, I initially began with the

25  Police Academy, which is about six to seven months

41

1  when you start, after that in -- in the patrol, and

2  worked in the patrol division for about seven years,

3  and the last year, year or so, I was a field training

4  officer, and then I got transferred over to the

5  criminal investigation division and the first two

6  years I primarily worked investigations with the

7  domestic crimes division, and I'm currently working

8  crimes against children for the last two years.

9     Q.   You said you were a field training officer.

10  Can you tell them exactly what that means, please?

11     A.   A field training officer, when cadets

12  graduate the academy and begin their training in the

13  field as a patrol officer they're assigned to

14  different field training officers each month and we

15  grade them and train them throughout the month so they

16  can transition from what they learn in the academy to

17  what they -- I guess to put it to field work.

18     Q.   Would it be fair to say that one of the new

19  recruits are paired with an older, more experienced

20  officer to help them learn the ropes?

21     A.   Yes, that's correct.

22     Q.   And how long were you a field training

23  officer all together, please?

24     A.   Approximately a year.

25     Q.   And you've been in criminal investigation

42

1   division for the last four years?
2       A.   It will be four years in January.
3       Q.   I'm going to direct your attention back to
4   July 19, 2004.  What were you assigned to at that
5   time?
6       A.   I was a patrol officer at the time and
7   working the graveyard shift in the downtown area.
8       Q.   What was your usual areas?  I'm sorry, usual
9   hours to work?
10      A.   I -- at that time I believe I was on case
11  shift which I worked 5:30 p.m. to 3:30 a.m. on
12  Thursday evenings; and Friday, Saturday, and Sunday I
13  worked about 9 p.m. to 7 a.m.
14      Q.   And what was your general area of patrol?
15      A.   I worked what we call the Delta Division.  We
16  work out of the main station.  That covers -- or it
17  did cover, I think they changed it slightly since I
18  was in patrol, the Molina area through I guess the
19  downtown area, all of north side out to about
20  Navigation and it crosses all the way over to the
21  Molina area and to Horne, Horne and Ayers back
22  downtown.
23      Q.   So generally that large of an area?
24      A.   (Nods head.)
25      Q.   At the time of July 19, 2004, were you

43

1   familiar with that area of patrol?
2       A.   Yes.
3       Q.   How long had you been patrolling that area?
4       A.   I had been working that area since 1998.
5       Q.   So about --
6       A.   About -- almost six years.
7       Q.   -- six years?
8       A.   Uh-huh.
9       Q.   In the late evening hours of July 19, 2004,
10  did you become aware while you were on patrol of an
11  incident or crime that occurred at the Times Market at
12  1902 Baldwin?
13      A.   Yes, I did.
14      Q.   Can you tell the jury how you first heard
15  about that incident?
16      A.   I heard officers being dispatched to a
17  robbery with injuries.  Normally -- it sounded like
18  the injuries were pretty bad, maybe fatal at the
19  point.  Normally in that type of situation officers
20  that are available even if they're not dispatched you
21  tend to kind of go and case the area and I guess to
22  parallel the area to see if you come across any of the
23  suspects because there was a suspect -- there were
24  suspect descriptions given at the time.
25      Q.   Did you hear -- I'm assuming you heard about

44

1   it on the radio; correct?
2       A.   Yes.
3       Q.   And maybe -- although I don't know how the
4   radio works from the police department but what is
5   actually broadcast on the radio that would help other
6   officers arriving at the scene?
7       A.   For -- for robberies they using do a beep
8   tone which gets your attention.  It's usually a
9   three-tone beep and they advice that there was a
10  robbery, aggravated robbery that had just occurred and
11  they gave descriptions of a maroon van being involved,
12  two females and a male, and they gave the description
13  and the direction that they left, and the -- the
14  different -- that there's neighborhood streets in the
15  area so they were already -- when I got there I
16  already saw that the scene was secured so I started
17  checking the neighborhood areas, the small streets
18  leading away from that direction.
19      Q.   And let me go back.  You said something about
20  the color of the vehicle.  And how many vehicles were
21  there that you heard about on the BOLO?
22      A.   On the BOLO I believe there was -- I believe
23  they said there were two maroon vans at the time being
24  involved.
25      Q.   Okay.  At the Times Market?

45

1       A.   Right.
2       Q.   And the number of suspects and the
3   description of suspects were -- you knew at that time
4   were what?
5       A.   A male and possibly two females.
6       Q.   Did you have any more information besides
7   that?
8       A.   They --
9       Q.   And I'm talking about description of the
10  people.
11      A.   Oh, I know it was a Hispanic male, possibly
12  wearing a gray shirt; and a female, possibly wearing a
13  white shirt.  And they said Hispanic females also.
14      Q.   Okay.  So you base -- have a basic
15  description of people and the vehicle; correct?
16      A.   Correct.
17      Q.   Is that unusual when you get the initial BOLO
18  call?
19      A.   Is that usual -- unusual?
20      Q.   Is it unusual to have just that little
21  information at the time?
22      A.   No, no, that's -- that's pretty much our
23  basic that we get, is car and somewhat of a physical
24  person description.
25      Q.   So you headed over toward the Times Market at

46

1  1902 Baldwin; correct?

2     A.  That's correct.

3     Q.  But other officers were at the scene?

4     A.  Yes.

5     Q.  So what did you do?

6     A.  I turned off into the -- there's residential

7  neighborhoods directly across Baldwin from there so I

8  turned into those streets there and just as I did they

9  put out another call for aggravated robbery at the

10  Whataburger just down the road at 2018 South Staples.

11     Q.  At what?

12     A.  2018 South Staples.

13     Q.  2018 South Staples?

14     A.  Uh-huh.

15     Q.  Now, what time did you get the call to go to

16  the robbery at the Whataburger at 2018 Staples?

17     A.  Approximately 11:30 that evening.

18     Q.  Around 11:30 a.m. -- p.m., I'm sorry.

19     A.  P.M.

20     Q.  How much time passed between the robbery that

21  took place that you were I guess initially going by at

22  the Times Market on Baldwin and this Whataburger one?

23     A.  I don't know what time that one actually

24  occurred but I know when I arrived at the scene I

25  pulled up onto Baldwin and I saw the Times Market and

47

1  they were already taping off the area, the other

2  officers, so I turned into the neighborhood and just

3  as I turned in is when they dispatched that one so I

4  was right down the road, maybe, what, two, three

5  blocks away maybe.

6     Q.  But my question is how much time passed

7  between the initial call out for the Times Market to

8  the second one where you got called out?  I mean, how

9  many minutes, if you recall?

10     A.  I couldn't say the exact minutes.  I

11  wasn't actually dispatched to the original, I just

12  responded on my own so that wasn't something that was

13  documented on time specifically, but I would say

14  within five to ten minutes I would say.

15     Q.  The -- so you get this call to go to 2018

16  Staples.  How far is it from where you were at in the

17  area of Times Market?

18     A.  I would say --

19     Q.  Either blocks or miles?

20     A.  It's -- I would say it's less than a mile,

21  half a mile to a mile.

22     Q.  What did you do?

23     A.  I responded to the Whataburger there at

24  Staples, the one near the intersection at Baldwin.

25  When I pulled up, I saw a maroon van parked in the --

48

1  next to the dumpster in a little -- I guess it's a

2  parking area just behind the drive-through, on the

3  left of the drive-through, and the victim was further

4  around the drive-through near the windows but not in

5  the lane of traffic.  I guess they -- she moved out of

6  the way in case there were other customers and I made

7  contact with her there.

8     Q.  Did you notice anybody by the van when you

9  arrived?

10     A.  No, no, myself and the other officers showed

11  up and that's, of course, the first thing we do is

12  clear the van to make sure we don't have any suspects

13  still on the scene.

14     Q.  So did -- you didn't know if this maroon van

15  was involved or not, correct --

16     A.  It matched the description --

17     Q.  -- at that time?

18     A.  It matched the description, so, of course, I

19  mean, it's an officer safety issue so the first thing

20  we did was check them because that was on the side

21  that I approached first and it wasn't until I went

22  around the rest of the drive-through before I ran into

23  the victim there.

24     Q.  Now, did you know anything going over to this

25  Whataburger at 2018 Staples, any other description or

49

1  what had happened from your police dispatcher?

2     A.  At that point I had found out that the victim

3  at the Times Market had passed away, that it was now a

4  homicide.  I -- while I was there, another robbery

5  was -- came out over the radio with the same

6  description as well, down the road.

7     Q.  Okay.  We'll talk about that in a minute.

8  Let's just take them step by step.  We're back at the

9  scene where you see the van.  You check the van and no

10  one is in there.  What do you do next?

11     A.  I made contact with the victim to see if she

12  needed any emergency assistance, medically, and she --

13  she declined any medical assistance.  She did have a

14  cut on her right finger and she explained to me what

15  had occurred.

16     Q.  Had you -- when you first arrived, you said

17  that her car was over by the drive-through, by the

18  menu board; is that correct?

19     A.  Yes.

20     Q.  Do you remember what kind of car it was or

21  color or make?

22     A.  It was a silver Pontiac Grand Am.

23     Q.  Can you tell the jury the victim's reaction,

24  attitude or demeanor when you came up upon her, how

25  was she acting?

50

1      A.    She was crying, she was extremely terrified,
2   she had a toddler in the car with her, about a year
3   and a half, not quite two years old that she was
4   carrying and just holding, she didn't want to let go
5   of him.  She was somewhat relieved when we arrived
6   there but she was still frantic, looking around,
7   making sure that they weren't coming back.
8      Q.    Were you able to talk to her, get any other
9   kind of description that would aid in the
10  investigation?
11     A.    Yes, she explained to me what had occurred.
12  She advised she was at the drive-through with the --
13  where the intercom is at when she noticed -- there's a
14  kind of an island with bushes where the -- she noticed
15  the maroon van pull up and another maroon van similar
16  looking, a custom-type van, pulled up behind her, and
17  she heard like a commotion back there and all of a
18  sudden one of the Hispanic females came up to her car.
19  At the time, she only saw one, came up to her vehicle
20  and was asking her if she had a phone and saying she
21  was hurt and she needed a phone, and she was leery
22  about the situation and she said "No, but you might
23  check inside, they probably have one inside the
24  Whataburger."
25         And she wouldn't leave so she started to roll

51

1   her window up, and as she did that, the girl reached
2   into the car at her and just then a Hispanic male
3   reached -- came running up with a knife, grabbed her
4   by the throat, put the knife to her and took the money
5   from her.  And the description she gave was a Hispanic
6   male, about 20 to 30 years old, brown hair and brown
7   eyes, about 5-8, maybe 150, wearing a she believed --
8   what she believed was a gray shirt, and she said that
9   she -- at the time saw one Hispanic female, the
10  one that approached her.  She didn't know if there was
11  anybody else in the van besides the two, and she
12  described her as a Hispanic female about the same age
13  with some acne around her mouth and wearing a white
14  type of shirt with some blood on it and her hair was
15  either pulled up on a bun or a pony tail was the
16  description she gave.
17     Q.    Was she able to recite these facts and the
18  description even though she was upset?
19     A.    Yes.
20     Q.    Were you able to visit with her and get that
21  information pretty much right away?
22     A.    Yes, and as soon as I got that information it
23  was relayed over the radio to let other officers in
24  the area know for the -- and she also said that the
25  van -- they jumped in the van and -- they left the one

52

1   van there and they jumped into the van that was
2   parked -- stopped behind her and they left driving
3   southbound on Staples which is back towards Texan
4   Trail.
5      Q.    I'm not sure I followed you about the vans.
6   You said they left on van behind.  Is that the one
7   parked behind the store or the one parked behind her?
8      A.    The one that was parked behind the store is
9   the one that remained there and was still there when I
10  arrived.  They all left in the van that was stopped
11  behind her.
12     Q.    And they left toward Staples Street and down
13  towards Texan Trail?
14     A.    Yes.
15     Q.    I have a -- photographs to show you.  I'm
16  going to look at 28, it's already been admitted into
17  evidence.
18         What does that depict, please?
19     A.    This is the Whataburger at 2018 South
20  Staples.
21     Q.    Would that be fair to say that's kind of the
22  front of the store --
23     A.    Yes.
24     Q.    -- facing Staples?
25     A.    This is Staples that runs along here, this is

53

1   the entrance I pulled into on this side and you can't
2   see it.
3      Q.    Ma'am, there's a laser pointer in front of
4   you.
5      A.    Oh, thank you.
6      Q.    Maybe that will help you.
7      A.    Okay.  Over here is an entrance.  That's
8   entrance I entered through.  The initial van that was
9   parked and left was parked right in this area here.
10  She was at the first intercom here when it happened.
11  When I made contact with her, she had already pulled
12  up to this area here.  The van that was initially
13  parked here is the one that remained.  The van that
14  pulled up behind her is the -- is the van that the
15  suspects fled in.
16     Q.    I'm going to show you a picture, I think it's
17  the back part of that Whataburger, and this is State's
18  Exhibit 30.
19         MR. SKURKA:  Can you get a close-up of
20  that, please?
21     Q.    (BY MR. SKURKA)  Is that the same
22  photograph -- I'm sorry, the same scene but at the
23  back of the store?
24     A.    Yes, yes, it is.
25     Q.    Maybe that could show us a little better.

54

1    A.    Right, and this was the area where the one
2   van was parked.
3    Q.    And for the record, you're pointing
4   right behind the menu board?
5    A.    Right, this is the menu board she was at and
6   this is where the one van was parked and while the
7   other one pulled up behind her.
8    Q.    Okay.  Let me have the photograph.  I'm going
9   to have you just draw in a little box to show where
10  the van is -- was on this picture so the jury knows
11  exactly where it's found.  Just draw a little
12  rectangle and put a V inside it, you know, to show
13  where the van was at.
14   A.    Okay.
15   Q.    Was the van parked pointed in or like pointed
16  out?
17   A.    It was pointed -- the front end was pointed
18  in here.
19   Q.    Okay.  So that would -- what you're
20  indicating would be front part of the van.
21   A.    That's correct.
22   Q.    When you made contact with the young woman
23  you said that -- you mentioned earlier that she had a
24  cut on her hand or she had a small injury on her hand.
25  Can you tell us about that and describe it in some

55

1   detail, please.
2    A.    Yes, she explained when the -- when the male
3   male suspect reached in and grabbed her by the throat
4   and held the knife to her, she -- she remembered that
5   it was -- he grabbed her with the right hand by the
6   throat and he had the knife in his left hand and her
7   reaction was to stop or I guess to block him and she
8   ended up with a one-inch laceration cut to her right
9   index finger.
10   Q.    But you said she didn't need medical
11  attention, like go to the hospital or anything?
12   A.    Right, she declined any medical attention at
13  the time.
14   Q.    And did -- was she able to explain to you how
15  she had received that cut?
16   A.    Yes.
17   Q.    How?
18   A.    She -- when the male suspect reached into her
19  window and grabbed her by the throat, he put the -- a
20  knife to her face and demanded money and she put her
21  hands up to I guess it was a reaction to deflect or,
22  you know, to make sure he didn't I guess try to cut
23  her, and that's when she got cut on her hand by the
24  knife.
25   Q.    After -- did she tell you whether or not they

56

1   had gotten anything from her during the robbery?
2    A.    She said that she had her red purse on the
3   seat so when she they did that she grabbed it right
4   away and just gave it to them so they could leave.
5    Q.    Was the child okay that was in the car, too?
6    A.    The child you could see was visibly upset,
7   but physically he was not injured in any manner.
8    Q.    Based on the information she gave you about
9   the vans, what did you do with that information?
10   A.    I -- I relayed the information over the radio
11  to let the other officers in the area know the
12  description, if there was any.  I don't know if it
13  there was any added, there might have been slight
14  additional information from the prior robbery.
15   Q.    Well, that was my question.  Any information
16  you have for this witness match the information that
17  come out of the other BOLO call at the other scene?
18   A.    Yes, it was very similar.
19   Q.    And we talked about the knife but was she
20  able to describe the knife to you in any detail,
21  whether it was a folding knife, fixed blade, any other
22  description of the knife?
23   A.    She just said it was a large knife.  She
24  described it as a large knife.
25   Q.    Okay.

57

1         MR. SKURKA:  May I approach, Your Honor.
2         THE COURT:  Yes.
3    Q.    (BY MR. SKURKA)  I have one more document or
4   photograph to show you marked State's Exhibit 59.
5   Would you look at that and tell me if you can
6   recognize that, please.
7    A.    Yes, this is the maroon Dodge van that was
8   left parked in this parking space here.
9    Q.    Is that a photograph of the maroon van that
10  you found located behind the Whataburger at that
11  address on Staples Street?
12   A.    Yes, it is.
13   Q.    Now, the photographs of the van is not taken
14  at that Whataburger; correct?
15   A.    No.
16   Q.    Why would that be?
17   A.    We -- because we had multiple scenes now.  We
18  only had -- we usually only have two crime scene
19  investigators that are on the scene at the time and
20  they were tied up so they -- they showed up and we had
21  the van impounded to our safe lot garage where they
22  later processed it.
23   Q.    So this is a photograph of the van located
24  where at?
25   A.    At the -- I believe that's the one on Port.

58

1  I don't know if that's the one -- we have one on East
2  Port and we have one at the Police Academy.
3      Q.  The bottom line is, is it at the police --
4      A.  It's at one of our police garages.
5      Q.  Thank you.  But that is the same van?
6      A.  Yes.
7      Q.  Thank you.
8          MR. SKURKA:  I'll hand 59 to Defense
9  Counsel and offer into evidence.
10         MR. GARZA:  No objection, Your Honor.
11         THE COURT:  It's admitted.
12         MR. SKURKA:  May I publish it to the
13 jury, Your Honor?
14         THE COURT:  You may.
15     Q.  (BY MR. SKURKA)  Do you know what make or
16 model that van was?
17     A.  A Dodge.
18     Q.  It was a Dodge van?
19     A.  Yes.
20     Q.  And what color was it?
21     A.  Maroon, and it had -- I think it was a little
22 bit of a silver or gold type of stripes on it.
23     Q.  It just doesn't show up on that picture very
24 well, right?
25     A.  No.

59

1      Q.  And you're not the one that processed it for
2  fingerprints or anything like that, that would be one
3  of the I.D. techs; is that correct?
4      A.  Right, right, one of our crime scene
5  investigators.
6      Q.  Did you do anything else at the scene that
7  night at that Whataburger?
8      A.  When the description was given out we were
9  standing by for a -- to see what the crime scene
10 technicians were going to do and just then there was
11 -- I heard there was another robbery that was put out
12 at the Whataburger at Texan Trail and Alameda area.
13     Q.  What did you do?
14     A.  Right when that was pulled up I noticed a
15 maroon van driving on Staples that matched the
16 description of the one that fled, and just as I saw
17 it, I saw one of our patrol officers behind it
18 attempting to pull it over and they got into a vehicle
19 pursuit.  They -- it went on for a while and the
20 vehicle -- I guess they stopped over on north side in
21 some -- in a bush area, I'm not sure, I wasn't there,
22 but they were able to obtain the two female suspects
23 and they were brought back to the scene for our victim
24 to identify.
25     Q.  So as you're working the robbery at the

60

1  Staples Whataburger you hear on the radio about the
2  other one; correct?
3      A.  That's correct.
4      Q.  And so you know another maroon van is
5  involved?
6      A.  Right.
7      Q.  And you saw what you thought is that van
8  going down the street --
9      A.  That's correct.
10     Q.  -- before the police officers start getting
11 in pursuit of it?
12     A.  That's correct.
13     Q.  Now, were you part of that pursuit or was
14 that other officers?
15     A.  No, no, I was now glued to the scene.  I was
16 primary at the scene I was at so I -- I was not going
17 to leave it.  Just as I saw it, there were officers
18 behind it about to pull it over just at the same time
19 that I saw it and I -- I know that the victim I think
20 pointed and said "Yeah, that looks like it, that looks
21 like the van," and --
22     Q.  And that was right in front of the store on
23 Staples Street?
24     A.  It was going -- yeah.
25     Q.  What direction was it heading?

61

1      A.  We were a little further back.  It was headed
2  back north now on Staples.
3      Q.  Help us out --
4      A.  Toward Six Points.
5      Q.  -- which way was he going?
6      A.  Towards Six Points.
7      Q.  Towards Six Points.  Okay.  You said that
8  other officers affected the arrest of the two females.
9  Were they brought back to the Whataburger --
10     A.  Yes, sir.
11     Q.  -- that you were at?
12     A.  Yes, they were.
13     Q.  Did April Metting, the victim of that
14 Whataburger, identify either one of them?
15     A.  Yes, she identified one of the females as
16 being the one that approached her, her name was
17 Christina.  She was later identified as Christina
18 Chavez.
19     Q.  And April Metting was able to identify her?
20     A.  Yes.
21     Q.  And you were present when that happened?
22     A.  Yes, I was.
23     Q.  That was not a photo lineup but more of a
24 show up --
25     A.  Right.

62

1    Q.    -- at the scene?

2    A.    Right, the Officer, I believe it was Officer

3  Ralph Vasquez I know were there and also Officer

4  Robert Chapa.  I think they brought them in separate

5  vehicles and what they do is stand them up and, you

6  know, put the light on them so that she can identify

7  them.

8    Q.    So this one in the photograph?

9    A.    Not in the photo, live person, uh-huh.

10   Q.    I think that's all questions I have, Officer

11 Flores.  Thank you.

12         THE COURT:  All right, cross?

13         MR. GARZA:  May I proceed, Your Honor?

14         THE COURT:  Yes.

15              CROSS-EXAMINATION

16 BY MR. GARZA:

17   Q.    Officer Flores, good morning, my name is Ed

18 Garza.

19   A.    Good morning.

20   Q.    I represent John Henry Ramirez.  All these

21 matters that you've testified to this morning to the

22 jury were things that were related to you by

23 Ms. Metting; is that correct?

24   A.    Of what she told me, yes.

25   Q.    What she told you?

63

1    A.    Other than myself seeing the van and seeing

2  the other van pass by.

3    Q.    And as far as the acts, the committing of the

4  offense and all those, none of that was committed in

5  your presence --

6    A.    No, sir.

7    Q.    -- correct?  Okay, so basically the only one

8  thing that you did physically observe was the

9  existence of that van parked there, or abandoned, or

10 whatever.

11   A.    That, and her demeanor at the time, yes.

12   Q.    And also what you-all might have thought was

13 the other van involved in any other robbery or being

14 chased down Staples Street --

15   A.    That's correct.

16   Q.    -- correct?  But none of the suspects were

17 ever in your presence that you eyewitnessed or doing

18 anything --

19   A.    No.

20   Q.    -- correct?

21   A.    No.

22   Q.    All right.  Thank you, ma'am.

23         MR. GARZA:  I'll pass the witness.

24         THE COURT:  All right, anything else, Mr.

25 Skurka?

64

1         MR. SKURKA:  No other questions, Judge.

2         THE COURT:  All right.  You may stand

3  down.  Please don't discuss your testimony with anyone

4  while this trial is going on.  Call your next witness.

5         MR. SKURKA:  Officer Gray.

6         THE COURT:  All right.

7         (Oath administered.)

8         THE COURT:  You may proceed.

9

10              JAMES GRAY,

11 having been first duly sworn, testified as follows:

12              DIRECT EXAMINATION

13 BY MR. SKURKA:

14   Q.    Would you please introduce yourself to the

15 folks on our jury.

16   A.    Lieutenant James Gray.

17   Q.    How are you currently employed?

18   A.    Police officer with the City of Corpus

19 Christi Police Department.

20   Q.    How long have you been so employed?

21   A.    It will be 12 years in January.

22   Q.    Starting with how you -- starting with when

23 you started at the police department, can you tell the

24 jury some of your different assignments, what areas of

25 patrol -- I'm sorry, what areas of police

65

1  department you've worked in up until present?

2    A.    First two years of my career I worked in the

3  patrol division, worked on the south side of town,

4  Flour Bluff area.  Then I was transferred to the JET

5  Gang Unit, worked there for roughly eight years and

6  came out of the JET Unit three different times for six

7  months to do the field training program, train

8  recruits, and then be -- tomorrow is the date I was --

9  two years ago I was promoted to lieutenant.

10   Q.    What are your current duties as a lieutenant?

11   A.    I'm assigned to the -- what we call the Bravo

12 District which is part of the south side of Corpus,

13 Flour Bluff area and the Island that I supervise.

14   Q.    How many people do you supervise on a shift?

15   A.    Two days eight and two days nine.

16   Q.    Officer Gray, I'm going to direct your

17 attention back to July 19 of 2004.  What part or

18 division were you working out at that time?

19   A.    I was assigned to the gang unit, JET Team.

20   Q.    Can you tell the jury essentially what the

21 the JET Unit does, what your duties were back then?

22   A.    We -- it's as an intelligence gathering, we

23 contact gang members, document gang members.  We make

24 all -- we would make all the hot calls which would be

25 major calls, stabbing, shootings, robberies,

66

1    everything like that.  We were -- we were mandated and
2    go to all those calls.
3        Q.    Now, does a JET Unit have an area of patrol
4    or not?
5        A.    We can cover -- we have the whole City of
6    Corpus Christi.  Usually what it was, on certain
7    nights there would be -- depending on how many units
8    we had on we would be splitting between the north side
9    of town and Annaville or you work south side of town
10   and Flour Bluff area but if it was a hot call
11   everybody responded to assist a patrol.
12       Q.    What's a hot call?
13       A.    It would be, like I said, aggravated assault,
14   shootings, stabbings, robberies, any -- murders,
15   anything along that line.
16       Q.    But does a JET Unit have a certain area of
17   patrol like between this street and this street and
18   this street and this street?
19       A.    No, sir.
20       Q.    Back on that day, where were -- what areas of
21   town were you at, and did you have occasion to hear a
22   call that was involving a robbery, homicide that took
23   place at 1902 Baldwin Street at a Times Market
24   convenience store?
25       A.    Myself and my partner, Chris Crago, we were

67

1    working the -- we were in the general downtown area,
2    basically this area of town where we're at right now,
3    the courthouse, downtown, north side and over to the
4    west side, we were working this area.
5        Q.    When did you first get notified about this
6    major crime that took place?
7        A.    It was put out over the radio and it didn't
8    come out as a homicide at first and then there was a
9    couple of robberies and we weren't -- initially they
10   weren't -- we didn't tie them all together..
11       Q.    Okay, I didn't understand that last part.
12   What do you mean?
13       A.    There was one call where a lot of officers
14   responded to where the gentleman was killed.
15       Q.    Okay.  Was that the Times Market?
16       A.    That was the Times Market call.  And then
17   there was two subsequent robberies at two different
18   Whataburgers.  Since there was officers responding --
19   there was a large amount of officers responding to the
20   Times Market call, an officer already on the scene on
21   the first Whataburger call, we responded to the second
22   Whataburger call, hoping to try to find the suspect in
23   that call.
24       Q.    Did you get information over your I guess
25   channel or radio that talked about possible suspects

68

1    or possible suspect vehicles involved in any of these
2    three crimes?
3        A.    Yeah, the robbery -- the robbery at the
4    Whataburger we had information that it was a van, it
5    was a male and females.  The Times Market call, we
6    really didn't have any information on that at that
7    point.  Like I said, we didn't even realize they were
8    tied together, but initially, what we were looking
9    for, it was a custom van with a male and two females
10   and there -- like I said, it was a bunch of radio
11   traffic.  It was very busy at that point and they were
12   kind of almost frantic on the radio.
13       Q.    About what time was this that you got
14   involved in all this?
15       A.    I have to refer to my paperwork for that.
16       Q.    Would your copy of your report refresh your
17   memory?
18       A.    I have it with me, yes, sir.
19       Q.    Okay.
20       A.    It was a little after 10, 10 p.m.  I have --
21   I actually have 2330 so that would be between 10:30 --
22   or, I'm sorry, 11:30.
23       Q.    I thought you guys were better at military
24   time than we were.
25             (Laughter.)

69

1        A.    I've been under the weather for the last
2    couple of days, excuse me.
3        Q.    I'm sorry, I didn't realize you were sick.
4    But it was around 11:30.
5        A.    Yeah, I'm sorry, it was 2330.
6        Q.    So all this information going around on the
7    radio around 11:30 of the robbery, and would it be
8    fair to say all of them were kind of close in time to
9    each other?
10       A.    Yes.
11       Q.    You said something about piecing them
12   together.  What did you mean?
13       A.    Like I said, the -- both Whataburgers, they
14   were similar descriptions, vehicle descriptions, and
15   the Times Market we had a little -- initially there
16   was a little -- the suspect description on the radio
17   so -- and there was a lot of officers there so we
18   didn't even -- we would get in the way over there, and
19   the other stuff, the -- the Whataburger robberies were
20   basically in progress so that was the logical choice
21   for me and my partner to try to respond to that.
22       Q.    Now, you said the second Whataburger
23   robberies where you responded.  Which one was that,
24   which Whataburger?
25       A.    That was the one on Texan and Alameda.

70

1    Q.   Texan Trail and Alameda?

2    A.   That's correct.

3    Q.   And you said that earlier -- earlier you said

4  that it was downtown so which way did you go, what

5  route did you take to get down to the Whataburger at

6  Texan Trail and Alameda?

7    A.   Staples.

8    Q.   As you're driving down Staples toward the

9  Whataburger at Texan Trail and Alameda did you happen

10  to come across anything that matched the suspect

11  vehicle?

12    A.   Yes.

13    Q.   Can you tell the jury what happened?

14    A.   Like I said, we were going southbound on

15  Staples.  We cross paths with a -- coming to us you

16  could tell headlights, you could tell on a van, a car,

17  a truck or whatever, and we were looking for a van so

18  any van that crossed we put -- on the JET cars there's

19  spotlights on both sides of the units so we line up

20  everything we see, just, you know, looking, and we

21  crossed paths with this van, matched the general

22  description, male guy and a female up front we could

23  tell so we did a U-turn to attempt to catch up to the

24  vehicle and initiate a traffic stop.

25    Q.   Tell me what you mean when you say "cross

71

1  paths."

2    A.   We were going southbound, they were going

3  northbound on Staples Street.

4    Q.   Did you have occasion to shine the spotlight

5  on the van or identify it?

6    A.   Yes.

7    Q.   Was it a red van?

8    A.   Yes.

9    Q.   A reddish or maroon van?

10    A.   Yes.

11    Q.   Did it match the description?

12    A.   Yes.

13    Q.   Were you able to see the driver of the van at

14  that time as you're going face to face?

15    A.   Yes.

16    Q.   Is the driver of that van in the courtroom

17  today?

18    A.   Yes, he is.

19    Q.   Can you point to him and describe something

20  he's wearing?

21    A.   Wearing a purple shirt sitting right over

22  there.

23         MR. SKURKA:  Your Honor, may the record

24  reflect the witness has identified the Defendant?

25         THE COURT:  It will so reflect.

72

1    Q.   (By MR. SKURKA)  So you got to see him as

2  you're I guess face to face almost?

3    A.   Yes.

4    Q.   After you saw and recognized this as the

5  possible suspect and a possible suspect vehicle, you

6  said you made a U-turn.  Then what did you do?

7    A.   We turned on our lights and attempted to make

8  or conduct a traffic stop.

9    Q.   How were you going to do that and where was

10  that taking place?

11    A.   It was on Staples right around Buckaroos is

12  where -- as a reference point is what I put in my

13  report.  It's one of the cross streets on Staples.

14    Q.   What happened as you went and you and your

15  partner turned around and made the U-turn and came

16  after the car?  I'm sorry, before I get to that, as

17  the car was going northbound and you were going

18  southbound --

19    A.   That's correct.

20    Q.   -- was it traveling a high rate of speed or

21  normal rate of speed?

22    A.   It was going basically with the flow of

23  traffic, he wasn't going that fast.  We did the

24  U-turn, we were able to catch up pretty quick, you

25  know, the regular stuff, put out the license plate and

73

1  the vehicle continued for a little bit and then it

2  pulled over.

3    Q.   The vehicle pulled over and stopped?

4    A.   Briefly, yes.

5    Q.   Then what happened?

6    A.   I exited the -- the marked unit with a

7  shotgun and as I came around and opened the door of

8  the patrol unit the vehicle took off again.

9    Q.   Now, were you on the driver's side or the

10  passenger?

11    A.   I was on the passenger side.

12    Q.   So how long was the vehicle stopped

13  altogether when you were getting out of the car, your

14  car?

15    A.   A couple of seconds, just -- just literally

16  just long enough for me to open the door and hop out

17  with a -- pull a shotgun out and step around the open

18  door.  Excuse me.

19         MR. SKURKA:  You can move that back away

20  from you a little bit.

21    Q.   (BY MR. SKURKA)  So you were actually all the

22  way out of the car and around the door going toward

23  the front of your vehicle?

24    A.   That's correct.

25    Q.   Have you had cars like that take off before?

74

1    A.    That's pretty regular.  That's a pretty
2  regular thing.  That's how most pursuits start.
3    Q.    So what happened then after the van takes of?
4    A.    Get back in the unit and we take off after it
5  and starting putting out the description, direction
6  and --
7    Q.    Tell the jury where the van went and how fast
8  or slow it was going.
9    A.    I don't remember the exact speeds but it
10  was -- like I said, initially the vehicle was
11  traveling basically with the flow of traffic on
12  Staples then we -- it turned on to Brownlee and it
13  accelerated hard, it was going -- to the point it was
14  going -- it was going very -- it wasn't safe.  We were
15  traveling excess of 50, 60 miles an hour and 70 miles
16  an hour residential area.
17        We crossed -- Brownlee crosses Ayers.  Going
18  northbound there's a full traffic light there.  When I
19  say full traffic light, regular cycles to the red,
20  yellow, green.  They continued north.  There was a
21  bunch of residential area and the next major
22  intersection is Agnes.  There's a flashing red and a
23  stop sign.  At that point we're maintaining with the
24  vehicle at that point and they didn't even slow down
25  for that.

75

1    Q.    Didn't slow down for what?
2    A.    The red -- the flashing red and the stop sign
3  on Agnes Street.  Through all our guidelines with
4  pursuits and liability and everything else we have to
5  be a lot more careful than somebody running from us.
6  We had to clear the intersection.  My partner made a
7  good -- you know, you're anxious, you want to catch
8  bad guy.  My partner made the right decision, he
9  stopped, cleared the intersection which when you clear
10  an intersection you look all the way, make sure it's
11  clear and then you take off again.
12        At that time the vehicle got a little
13  distance on us, and you got a short block right there
14  and then you're on Laredo, which is -- there's not a
15  flashing light but there's a stop sign, and on your
16  right traffic is going westbound and on your -- you're
17  right on the corner and there's a blind corner facing
18  -- there's a building right against the sidewalk so we
19  had to stop, come to a complete stop again right here.
20  When the van just blew both those intersections we had
21  to stop and clear the intersections.
22    Q.    The van did what?
23    A.    It went straight through without slowing
24  down, traveling at a high rate of speed.  So at the
25  point of Agnes and Laredo progressively we lost

76

1  distance on the vehicle we were pursuing.  So, we
2  continued northbound, Brownlee runs into the -- the
3  access -- basically merges into the access and drops
4  down and crosses Leopard Street.  And when we came up
5  on the hump as we were dropping down where you can
6  actually physically see Leopard Street in front of
7  you, the van was already going underneath 37 so it had
8  gained a significant amount of ground on us.
9    Q.    Give us an idea, an estimate how far in front
10  of it was he, like by a mile or blocks or what?
11    A.    When you start thinking about distance and
12  everything, it's probably two -- a couple of blocks at
13  that point cause when you come over the top and -- you
14  come over the top of that -- the hump where you
15  physically have to drive.  I'm sure if you're from
16  Corpus you realize where you get off the exit to
17  Crosstown 286 northbound and you merge and then with
18  the access road then it drops down to Leopard, if you
19  can visualize that.
20        Right where we were coming down over that
21  hump you can physically under the freeway at that
22  point than the van was going underneath the freeway
23  and went into the north side of town so we're a couple
24  of blocks at that point.
25    Q.    So you're losing sight of it because you're

77

1  falling behind.  Where is the last time you see the
2  van?
3    A.    It was taking a right on I think it was
4  Winnebago, yeah, and that's -- yeah, on Winnebago, and
5  that's the last time we saw it.  We put as much
6  information out as we could.  There obviously a bunch
7  of more units responding to the area and basically as
8  many free units as we had cause there were people
9  coming from the south side of town, other districts.
10  We basically cut all the exits off to the north side
11  of town.
12    Q.    Did you ever find the van?
13    A.    No, I did not.
14    Q.    Did other officers find the van?
15    A.    Yes, they did.
16    Q.    Did you look in that area where you had last
17  seen the van toward this van?
18    A.    Yes.
19    Q.    But with no results?
20    A.    No.
21    Q.    Officer, you've talked about some -- some of
22  this stuff and I think maybe a map or a photograph
23  will show a little bit better.
24        MR. SKURKA:  May I approach, Your Honor?
25        THE COURT:  Yes.

78

1    Q.   (BY MR. SKURKA)  I've got a map here that I'm
2  going to mark as State's Exhibit 60.  Will you take a
3  look at that for me, please, and does that show the
4  area that you testified about, where your chase
5  started and where you lost sight of the van?
6    A.   Yes, sir.
7    Q.   What I'm going to have you do is use this red
8  -- yellow highlighter to kind of start where you first
9  came in contact with the van and then trace the -- the
10  roads that you went down to where you finally lost the
11  van at Winnebago Street.  Can you do that with that
12  map?
13    A.   Yes, sir.
14    Q.   Okay.  Thank you.
15         MR. SKURKA:  I tender State's Exhibit
16  60 to Defense Counsel and offer into evidence.
17         MR. GARZA:  No objection, Your Honor.
18         THE COURT:  All right, it's admitted.
19         MR. SKURKA:  May I publish to the jury?
20         THE COURT:  You may.
21    Q.   (BY MR. SKURKA)  We're going to start -- it
22  won't fit on the whole thing so I'm going to start at
23  the bottom and go up.  Using a laser pointer in front
24  of you can you trace your direction on where you
25  basically started.

79

1    A.   We started somewhere -- this is Staples
2  Street.  Is this basically -- we responded from up in
3  this area up here.
4    Q.   Is that the Six Points area?  Where would Six
5  Points be?
6    A.   There's Staples, Alameda, right here.
7    Q.   Okay.  That would be Six Points, and so were
8  you coming southbound?
9    A.   Yes.
10    Q.   Go ahead and show us where you came, and
11  where did you come in contact with the vehicle?
12    A.   Came in contact -- I'm going off.  And on
13  this, I don't know exactly where we saw it first but
14  it's right in there and it's right at Buckaroo's is
15  basically where we conducted the traffic stop and they
16  took off again, and then they proceed to go up
17  Brownlee.  Where is Ayers?  Again, there's a light
18  right here, full-cycling light, across that, continued
19  north on -- cross Morgan to full-cycling light there.
20         All these cross streets have stop signs so
21  Brownlee has the right-of-way but there's a light
22  here, light here, all these stop signs, and we
23  continue north.
24    Q.   Go ahead, go ahead.
25    A.   Basically further than that is residential

80

1  and this is where it merges in with the off ramp.  I
2  think this is where there's a flashing red and the
3  stop sign.  This is initially where we started losing
4  them right here.
5    Q.   And you're looking at the corner of Agnes
6  and --
7    A.   Brownlee.
8    Q.   Okay.
9    A.   This is where the Circle K is right here as a
10  reference point if you get off and you're going
11  downtown there the first Circle K on your right,
12  there's a stop sign and a flashing red.  The public,
13  when you're going this way, you see the flashing
14  yellow so they have the right-of-way.  The van just
15  flew through there.  We had to clear that intersection
16  and we continue, we had to stop here because there's a
17  blind corner here and a stop sign, and this is where
18  we really lost ground on the van.
19         And then we continue northbound along the
20  access road, and this is right -- right in this area
21  is where they kind of -- there's a drop off, it drops
22  down where you actually see Leopard.
23    Q.   Hold on a second.  You're at the corner of
24  Brownlee and where?
25    A.   That would be Mestina.  Mestina is right

81

1  here.  It's the first street before Leopard and then
2  Comanche.  I would say it was right in this area where
3  it kind of drops off where you can physically see, and
4  then you can see under the freeway and the last time
5  we saw the van it was turning right on Winnebago
6  Street.
7    Q.   What else is around that area around
8  Winnebago Street, please?
9    A.   You have the access road and you have the old
10  police station, the general area over here, and you
11  have -- there's a park right there that T's off, and
12  you have a bunch of housing over here.  We assumed
13  that the vehicle had gone over here on some of the
14  housing on the north side off of Alameda and that's
15  where we --
16    Q.   And that's where you looked?
17    A.   -- That's where we went but I guess I
18  circled back around more to the west.
19    Q.   Okay.  At the time there was other units
20  besides yours looking for this thing, right?
21    A.   Yes, as this progressed there was people
22  responding from, like I said, there was -- they were
23  pulling officers from the south -- the districts from
24  the south side of town and the Annaville area because
25  we had three major crimes occurring basically within a

82

1    short time frame.
2        Q.    Because of all of the crime scenes did you
3    have anything else to do with the apprehension of
4    these people --
5        A.    We --
6        Q.    -- or were those other officers that did
7    that?
8        A.    I didn't go to any other crime scenes
9    personally.  We -- we initially -- we helped search
10   the north side area, then we were told they found the
11   van, and -- and had two females in custody, and at
12   some point we went to the police station after that,
13   and then early in the morning, probably within a
14   couple of hours they brought in some blood hounds from
15   one of penitentiaries and we assisted with the search
16   until like 11 in morning, 11 or 12:00 in the morning.
17       Q.    So you were there most of that time?
18       A.    Yes.
19       Q.    Okay.  Let me go back to one last area.
20   We're going to switch this over and I'm going to try
21   to show you the area on the satellite photograph where
22   you began the chase, if I could, please.
23            Officer, I'm going to show you -- are you
24   familiar with Google maps?
25       A.    A little bit, yes.

83

1        Q.    They have this thing called "The Street View"
2    and I want to see if you can recognize it as we go
3    down the street.  And Mr. Schimmel is going to show
4    you this.
5            Okay.  Are you kind of oriented to where
6    we're looking at now?
7        A.    Yeah, I think so, yeah.
8        Q.    Okay.  Which way would we -- would we be
9    facing?
10       A.    We should be facing north.  Yeah, north, if
11   I'm not mistaken.
12       Q.    Would that picture if you kept following it
13   down would that go to Six Points?
14       A.    Yes.
15       Q.    Okay.  To the left on the picture --
16       A.    Is the school.
17       Q.    -- that's the school.  Where's Buckaloo
18   Street or Buckaroo Street, wherever you're saying?
19       A.    It should be up there on the left, if I'm
20   not mistaken.
21       Q.    Okay.
22       A.    It's a cut-through street.
23       Q.    So does this show where you pulled them over,
24   is this the close area or further up the street?
25       A.    I think it was up there on the -- right on

84

1    the left up there, if I'm not mistaken.
2            MR. SKURKA:  Go ahead and advance it.
3        Q.    (BY MR. SKURKA)  What is that now?
4        A.    Actually it's probably right around somewhere
5    in there.
6        Q.    According to the map it says Buckaloo Street,
7    right?
8        A.    Buckaroo.
9        Q.    Buckaroo Street, I'm sorry.  Is that the way
10   you went down that way?  Are you having a hard time
11   seeing it?  It's too close?
12       A.    Yeah, it's like -- sorry.
13       Q.    Are you aware if that street is a one-way
14   street or a two-way street?
15       A.    Sign says one way.
16       Q.    Okay.  So when they first started were they
17   going down the wrong way in a one-way street?
18       A.    I -- I'm not sure, I'm trying to remember.
19            THE COURT:  Let me ask you this, were
20   they going down -- cause I'm a little confused.  Did
21   they turn down Buckaroo or did they turn down
22   Brownlee, the next street down, cause Brownlee is the
23   next street over, isn't it?
24            THE WITNESS:  We went -- we pulled over
25   about even with Buckaroo but we ended up traveling --

85

1    all the traveling was going down -- was on Brownlee.
2            THE COURT:  Okay.
3            THE WITNESS:  So that's where I'm kind
4    of -- and everything is different at night, I work
5    graveyards for ten years and --
6        Q.    (BY MR. SKURKA)  Would the map help you get
7    oriented?
8        A.    Yes.  I'm a night person at heart but
9    everything is different.  Like I said, It's been like
10   four years now.
11       Q.    Now, Buckaroo, does it go on this side, too?
12       A.    No, it's a one-block street there one way.
13       Q.    So is it your testimony that you pulled over
14   -- pulled them over around this area before you got to
15   Buckaloo -- Buckaroo Street?
16       A.    No, right next to Buckaroo is where they
17   pulled over.  I'm thinking they pulled over on the
18   wrong side, if I'm remembering correctly.  I just need
19   time to reference them out.  I want to be as accurate
20   as possible here.
21            When I -- when you put your report you
22   want -- where you stop them or whatever, you stop them
23   at -- you put the closest cross street and not
24   necessarily turn down Buckaroo, it was at Buckaroo.  I
25   want to say they pulled over to the left side right at

86

1  Buckaroos or maybe it was somewhere right in here.
2  Q.    So they pulled to the wrong side of this
3  road?
4  A.    I'm trying to -- I'm trying to get my
5  bearings straight. To be honest with you, I don't
6  know exactly -- the exact location where they pulled
7  over. Now I'm trying to get myself confused, second
8  guessing myself.
9  Q.    Well, let's pick up where you did remember.
10 Was it on Staples or Buckaroo Street or Brownlee?
11 A.    Turned around on Staples, pulled -- we pulled
12 over right around Buckaroo and then the pursuant went
13 down Brownlee.
14 Q.    Okay.
15 A.    The only way we could have pulled over on
16 Buckaroo itself is if we made that full block the
17 wrong way and then went over and that didn't happen so
18 I'm assuming -- like I said, I'm assuming cause I
19 don't remember the exact location, it's such a compact
20 area right there, it's not even a full block, the
21 streets run parallel. It was only a building in
22 between them. It was right there at them.
23 Q.    So would it be fair then you went down
24 Brownlee, not Buckaloo -- Buckaroo?
25 A.    I never said I went down Buckaroo, I said I

87

1  pulled them over at Buckaroo.
2  Q.    Oh, Okay, That's what we're trying to figure
3  out. So then you went down Brownlee?
4  A.    Yes.
5  Q.    And this is Brownlee, is it not, by the
6  office depot?
7  A.    Yes.
8  Q.    Okay. How many traffic lights or signals or
9  whatever did they disregard during this whole chase,
10 if you recall?
11 A.    Well, like I said, you passed two full
12 cycling lights at Ayers and at Morgan and I don't
13 remember what those lights were on. I'm not going to
14 sit here and say they ran a red light, I don't know.
15 They -- I know they disregarded the -- the light at
16 Agnes and I know they disregarded the stop sign at
17 Laredo.
18 Q.    Okay. Is this intersection the intersection
19 of Ayers and Brownlee?
20 A.    Yes.
21 Q.    Okay. And so they continued through that
22 light, correct?
23 A.    That's correct.
24 Q.    Going down Brownlee.
25 A.    Correct.

88

1  Q.    Now, what would be the next major street past
2  Agnes?
3  THE COURT: Past Agnes or past Ayers?
4  Q.    (BY MR. SKURKA) Past Ayers, I'm sorry.
5  A.    Morgan. And it's not straight at Morgan, it
6  kind of makes a little bit of a turn to the right.
7  Q.    Okay. What's that?
8  A.    McKenzie, which is -- that's about halfway in
9  between.
10 Q.    So they continue on down Brownlee?
11 A.    Yes.
12 Q.    Okay. And this street?
13 A.    That was Elizabeth that you passed.
14 Q.    Elizabeth. About how far was this chase from
15 where it started to where it ended? How many miles or
16 whatever?
17 A.    I went back about a month ago and drove it
18 just to check it and be accurate and initially I
19 thought it was further than it was but it's roughly
20 two miles from Staples and Brownlee to Brownlee and 37
21 so I have two miles on my little car, my personal
22 vehicle.
23 Q.    And it's all this -- which intersection is
24 this now?
25 A.    That's Morgan.

89

1  Q.    That Morgan?
2  A.    Yes.
3  Q.    And that's one of the lights?
4  A.    That's where it kind of makes a little slight
5  dog leg to the right, and I don't -- it was a full
6  cycling light four ways. I don't recall what the
7  light was there, I'm assuming it was green because we
8  really didn't lose ground until we got up to -- to
9  Agnes and Laredo.
10 Q.    That's what we're going to show up next, but
11 all this time they're going 50, 60, 70 miles an hour?
12 A.    Yeah, I'm sure -- during pursuits police --
13 department policy is that you're putting out traffic
14 conditions, directions and speeds. That way if
15 there's -- there's a supervisor monitoring, if it
16 sounds like to him that it's getting dangerous, like
17 if it's -- you're going 100 miles an hour down a
18 residential street then it's the supervisor's
19 responsibility to make a call to terminate pursuit.
20 So we're required to put out speeds. If I
21 had -- you know, I don't know with the new system if
22 we can get back to recordings or whatever but I'm sure
23 at some point and once a second unit gets involved in
24 a pursuit, they take over all the talking on the radio
25 where the initial unit can concentrate on the driving

90

1  and what they're seeing.  So I'm sure at some point we
2  were putting out speeds put I don't recall what they
3  were, I didn't --
4      Q.   But it would be fair to say it was --
5      A.   Yeah, we traveling about -- I don't
6  remember -- like I said, initially when we crossed the
7  van it wasn't going fast, but when I stopped it, I got
8  out and then when it took off it was on then, they
9  were going at a high rate of speed.
10     Q.   And was there any other traffic out there
11 that time of night?
12     A.   Yes.
13     Q.   Heavy, light, medium?
14     A.   I say at least moderate traffic.
15     Q.   We're trying to get up to the area here where
16 Agnes Street is and tell us where that is.
17     A.   This is a really bad, blurry video.  It
18 should be coming close.
19     Q.   Okay.  What's that street?
20     A.   That's Agnes Street.
21     Q.   Back up a little bit on that one.
22     A.   That's your one way going back towards town.
23     Q.   Okay.  That's the one that you were talking
24 about that had the red lights?
25     A.   Yeah, you have a flashing red.  When you're

91

1  traveling on Brownlee you have a flashing red and when
2  you're traveling on Agnes each lane you have a
3  flashing yellow so the traffic has the right-of-way
4  going on Agnes and it's just a caution light for them
5  but you have the flashing red and you have the stop
6  sign obviously right there on your right so we got --
7  and you got a building post.  Those kind of deals --
8  and then you got the Circle K right here.
9          We had to clear the intersection.  We had to
10 slow down at least to the point where we could safely
11 cross it, and that's when it started -- the van
12 started gaining ground on us and you got a short block
13 after that to the next intersection.
14     Q.   But this intersection -- this intersection
15 they disregarded the stop sign and the red light?
16     A.   That's correct.
17     Q.   And the next intersection is coming up real
18 quick here?
19     A.   Yeah, this is a short block right here.  I
20 think you're about to pass it.  Yeah, this is Laredo.
21 It's a one way also but it's come from the downtown
22 area.  You have the stop sign, you have a building on
23 the right so it's a blind corner bad.  We had to ease
24 up and, like I said, the two -- those two are back to
25 back and really gaining ground on us so we had to

92

1  clear both those intersections.  They disregarded both
2  those traffic control devices.
3      Q.   So now we're getting up to the part where you
4  kind of lost them or going by to the access road?
5      A.   That's where they really gained ground on us
6  up there.
7      Q.   I may have asked this already but did you
8  have lights and sirens going on during this time,
9  during the whole pursuit?
10     A.   On the initial traffic stop we didn't have
11 sirens because usually you don't put sirens on unless
12 Somebody is not stopping, you just put lights on --
13     Q.   Uh-huh.
14     A.   -- but once you're in a pursuit, yes, you
15 have lights and sirens on.
16     Q.   Show us where we're going now here.
17     A.   You're continuing northbound, and to the left
18 up there you can see Crosstown Expressway or State
19 Highway 286, and you're going to go up there and it's
20 going to parallel right along side and becomes the
21 access road and you continue northbound.
22         THE COURT:  It's not letting you go?
23         MR. SKURKA:  No, I think that's as far as
24 it goes there.  Let's go to Winnebago and see if we
25 see that.

93

1      A.   There it is.
2      Q.   Now, is this the access road you're talking
3  about?
4      A.   Yeah, basically what I call the access road.
5      Q.   You said earlier something about a hump or
6  something, a hump in the road.  Where is that?
7      A.   Well, it's not as much as hump as it drops
8  off as you're going down in Leopard Street.  It's --
9  past -- you go up a little ways and actually you going
10 to have some -- think about it they ran -- there
11 would be some more traffic control device coming along
12 here on access coming to the courthouse.  You have a
13 stop over here, you would have two more, you have the
14 overpass that's going over 286 and now you're on the
15 access --
16     Q.   Now, this is the part -- one of these streets
17 would be the ones that you said turn to the
18 courthouse?
19     A.   Yeah, one up, should be one up.
20     Q.   Now, there's some stop signs along this area,
21 too, is there not?
22     A.   That's correct.  Now that I think about it
23 you got both these places here.
24     Q.   That would be Comanche and Lipan?
25     A.   Yes.

94

1    Q.   And there's stop signs at both those
2    intersections?
3    A.   That's correct.
4    Q.   Now, we're getting toward the part where you
5    said --
6    A.   I said the hump.  It drops off and we're
7    dropping off right here, or is it a little bit
8    further?
9    Q.   So they stayed on Brownlee Boulevard pretty
10   much the whole chase?
11   A.   Yeah, it was a straight shot.  I mean, you're
12   coming down and then you cross, yeah.
13   Q.   Now, where were you when they were up here
14   coming down toward what street is this?
15   A.   This is Leopard Street right here and you go
16   under -- under Interstate 37.
17   Q.   How far back were you from them at that time?
18   A.   We were further back at that point but it was
19   night and you were -- we're keeping track of the tail
20   lights and watching the vehicle and we were a little
21   further back but you could see them, they went up
22   under the freeway, you have the access road going one
23   way and they went up and the last safety call was
24   turning back to the right which would be -- should be
25   eastbound on Winnebago.

95

1    Q.   So it's just a few more blocks then?
2    A.   Yes.
3    Q.   Is that the freeway part you said they went
4    under?
5    A.   Yes, underneath 37.
6    Q.   Show us where the old police department is
7    coming up here.
8    A.   It should be on your right.  That was before
9    my time but, you know, obviously you heard about it.
10   Q.   Is that the freeway part you said they went
11   under?
12   A.   Yes, underneath 37.  That's where the --
13   underneath 37.
14   Q.   Is that the old police department there on
15   the right?
16   A.   Yeah -- yes, sir, excuse me.
17   Q.   How far up is Winnebago from there?
18   A.   It's just right there, that's the
19   intersection.
20   Q.   Oh, this is the intersection coming up?
21   A.   Yes.
22   Q.   How long -- we talked about how far you
23   traveled and you said two miles.  How long did all
24   this pursuit take, how many minutes or whatever?
25   A.   Oh, I don't know.  When you're in one of

96

1    those deals everything is -- you know, you don't --
2    the concept of time is kind of just thrown off.  It
3    seemed like a lot longer than it is.  In our previous
4    discussions on this I thought it had to be five or six
5    miles cause it seemed like it but I went back and
6    got -- when I left here that day and I went back and I
7    drove it, it was only two miles from Brownlee and
8    Staples to this intersection right here.
9    Q.   Is this the intersection where you last lost
10   -- where you lost him at Winnebago --
11   A.   That's correct.
12   Q.   -- and --
13   A.   Yeah, we were far back.  They took a right
14   and by the time we made this intersection they were
15   gone.
16   Q.   And is it your testify you circled around
17   that area looking for him toward the right of that
18   area supposedly, correct?
19   A.   That's correct.  There was I don't know how
20   many units but there was numerous other units in the
21   area, basically swarmed the -- swarmed the north side
22   area.  A lot of times when there's stolen vehicles and
23   then we get in pursuits people don't go in the north
24   side of town so there's a lot of pursuits end up over
25   this.

97

1    Q.   Is there anything else you did during this
2    investigation besides this chase where it ended right
3    here?
4    A.   We helped look for the vehicle a little bit.
5    Officers found the van, they took two females into
6    custody, took them downtown.  There was a -- at some
7    point during the early morning hours there was -- they
8    got some mug shot photos.  I saw the mug shot photos
9    and I -- and from me seeing the person driving the
10   vehicle to what they saw, that's how I -- when you
11   asked me earlier if I recognize the person, when I was
12   passing down the road and I put the stop light on
13   them, I didn't know the driver from anybody but when
14   had the mug shot pose, the females had identified who
15   was with them, and I said "Yeah, that's the guy," and
16   that's how I'm basing my testimony on being able to
17   identify the suspect.
18   Q.   And, again, that man you identified earlier
19   is the person you saw driving the van?
20   A.   That's correct.
21   Q.   Thank you, Officer.
22        MR. SKURKA:  I'll pass the witness.
23        THE COURT:  Cross?
24        MR. GARZA:  I have no questions.
25        THE COURT:  You may stand down.  Call

98

1    your next witness.

2             MR. SKURKA:  Officer Frakes.

3             THE COURT:  Please don't discuss your

4    testimony with anyone while this trial is going on.

5             You may proceed.

6             MR. SKURKA:  Thank you, Your Honor.

7             THE COURT:  Come forward.

8             (Oath administered.)

9             THE COURT:  Be seated.  You may proceed.

10           MR. SKURKA:  Thank you, Your Honor.

11

12             MIKE FRAKES,

13   having been first duly sworn, testified as follows:

14             DIRECT EXAMINATION

15   BY MR. SKURKA:

16   Q.    Would you please introduce yourself to the

17   folks on our jury.

18   A.    Good morning, my name is Michael Frakes.  I'm

19   employed by the Corpus Christi Police Department.

20   Q.    How long have you been with the Corpus

21   Christi Police Department?

22   A.    In January it will be ten years.

23   Q.    Can you tell us what area or division you

24   work in currently?

25   A.    I currently am on the south side of Corpus

99

1    Christi in the Charley district and I work the Charley

2    10 beat.

3    Q.    And what does that mean?

4    A.    It's -- each district is divided up into

5    beats and the District 10 is basically Ocean drive,

6    Staples, Alameda, from Everhart to Kostoryz.

7    Q.    What did you do before you were a police

8    officer or did you have any other police officer

9    experience before you joined the police department

10   here?

11   A.    Yes, I started off as a reserve police

12   officer which is a nonpaid volunteer program.  You're

13   basically just -- you're a police officer, you look

14   the same but you just do it as a voluntary basis like

15   a volunteer firefighter and I did that since 1987.

16   Q.    So you were a reserve for ten years and then

17   a full-time for ten years?

18   A.    Correct.

19   Q.    Tell us what area of patrol you were working

20   on or around the time of July 19th, '04.

21   A.    At that time I was on the -- we redid the

22   boundaries so I was Charley 20 which is the same beat

23   as Charley 10 now, they just switched them up so it's

24   basically the same area.

25   Q.    Can you give us a street?

100

1    A.    Yes, the boundary is Everhart and Gollihar

2    and it goes to Ocean Drive and then Ocean Drive to

3    Alta Plaza, Texan Trail to Kostoryz and then Kostoryz

4    to Gollihar, Gollihar all the way back to Everhart.

5    Q.    Essentially the south side?

6    A.    Yes, essentially the south side.

7    Q.    Had you ever worked in the area of the north

8    side or the Port area before this date?

9    A.    Yes.

10   Q.    Tell us when that was.

11   A.    That was back in I believe 2001 and 2002.

12   That's the Delta district, which is the downtown

13   district.

14   Q.    And are you familiar with that area?  How

15   long did you patrol it?

16   A.    Yes, I patrolled that area for about a year.

17   Q.    I'm going to ask you, Officer Frakes, if you

18   had occasion to be on duty on July, 19th, '04?

19   A.    Yes, I was.

20   Q.    And did you have occasion to get involved in

21   some investigations of various crimes that took place

22   before midnight around the Times Market convenient

23   store, a Whataburger on Staples Street and a

24   Whataburger on Texan Trail and Alameda?

25   A.    No, I did not get involved in those

101

1    assignments.  I was assigned after the vehicle pursuit

2    had started.

3    Q.    Okay.  So you didn't have anything to do with

4    the investigation of any of those scenes?

5    A.    No, sir.

6    Q.    So how did you get involved after they were

7    all over with?

8    A.    I got involved when -- I had heard the -- the

9    robberies go out broadcast because in -- in the City

10   of Corpus Christi when you have a robbery they

11   broadcast it basically to all districts so you can be

12   on the lookout for any vehicles or suspects that may

13   go into your area.  So I heard those and I basically

14   was just kind of like driving around and looking for

15   the vehicles involved and at the point where they had

16   spotted the vehicle and started the vehicle pursuant

17   the -- I believe it was one of the captains came on

18   the air and asked for, you know, all units that aren't

19   busy to get over to that area where the pursuant was,

20   and that's why I responded.

21   Q.    So, when you responded what were you supposed

22   to be doing?

23   A.    I was -- I had a description of the vehicle

24   and I basically rapidly got to the area, I came down

25   Ocean Drive and turned around the -- where the

102

1   American Bank Center is now and made my way towards
2   the -- the Port, Northside Manor area.
3       Q.   Why did you do that?
4       A.   That was the area that they had last seen the
5   vehicle in the pursuit.  I believe it was somewhere in
6   the Northside Manor area is where the last area where
7   they saw the van that they were pursuing them, they
8   lost sight of it, some of the JET Units lost it.
9       Q.   Okay.  You weren't involved in that part
10  either, correct?
11      A.   No, sir, I was not.
12      Q.   So what does the police department procedure
13  or policy when you're helping out other officers
14  looking for suspects?
15      A.   Just pay attention to the radio, listen for
16  the last known direction that that vehicle was seeing
17  traveling and you try to make a perimeter of any
18  potential escape routes in the area and to try to box
19  it in the best you can.
20      Q.   So, being familiar with that area, did you
21  know potential I guess hiding places or places where
22  the vehicles would go?
23      A.   Yes, I was real familiar with the Port area.
24  There's a lot of dead-end streets, there's a lot of
25  side streets so it's really a target area and -- so I

103

1   knew there were other units, there were a lot of units
2   in that area so I just kind of went where I would be
3   by myself kind of looking around.
4       Q.   Okay.  Another officer testified that he lost
5   the pursuant at the corner of I believe he said
6   Winnebago and Brownlee.  Were other officers working
7   that area around that north side there?
8       A.   Yes.
9       Q.   But you didn't go that way?
10      A.   No, I didn't go that way.
11      Q.   You went to the Port -- in the Port area.
12  And how far away is that for some of us that may not
13  know where that is from that area where the van was
14  last spotted?
15      A.   I would say that's probably maybe a half a
16  mile to maybe a mile.  It's really close.
17      Q.   So at the time you're looking by the Port,
18  most of the other officers are on the other side?
19      A.   There were officers just in the whole area.
20  I heard them everywhere on the north side area because
21  by the time I had traveled from where I was to that
22  area probably took me a good five, six minutes to get
23  there and so, you know, a vehicle can travel, you
24  know, quite a distance, you know, by the time I heard
25  that they had last their pursuant so the better -- you

104

1   know, the best thing to do is to span out and start
2   looking.
3       Q.   Where were you looking, what streets were you
4   looking at, if you recall their names?
5       A.   I believe I came down Port Avenue and I just
6   cruised around the Port where the warehouses are,
7   where Whataburger field is now and just slowly looked
8   around and my -- I ended up on Brewster Street.
9       Q.   As you were going down Brewster Street, can
10  you describe the area for me, please.
11      A.   Brewster Street is basically a lonesome
12  street.  There's really nothing on it.  There's some
13  brushy area bounded by railroad tracks and a large
14  canal, water canal, and then across the street from
15  that there's a business that's in a fenced-in
16  chain-link fenced area, I believe it's some type of
17  warehouse.  There's a little short little street,
18  there's not much on it.
19      Q.   As you're going down Brewster Street, did
20  anything catch your attention?
21      A.   I was driving down Brewster Street and I had
22  my lights off on my patrol car and I had my spotlight
23  on and I was looking around trying to, you know, be as
24  stealthy as I can and I'm driving and out of the
25  corner of my eye I see a red flash like a reflector

105

1   and I caught it, I rode past it, and I was like "What
2   did I see?"
3           And I reversed and I got a better look and I
4   shined my spotlight down there and I could see a
5   vehicle that had been driven off of the road into the
6   wooded area and, of course, I shut my light off right
7   away and called for assistance.
8       Q.   Did that vehicle you see, can you describe it
9   for us, please.
10      A.   From the road it looked like a red van,
11  that's all I can really see because it was back off
12  the road maybe about 40, 45 yards.
13      Q.   Can you see the front of the van, the side of
14  the van, the back of the van?
15      A.   It was the rear of van, it was the right rear
16  corner I can see.  That was the reflector that I
17  caught.
18      Q.   So what did you do then?
19      A.   Immediately I shut my lights off, I reversed,
20  tried to get out of the sight of that van.  I didn't
21  know if there was anybody in it or around it, you
22  know, it's a dangerous situation already because I
23  heard the, you know, the homicide go out so I didn't
24  know how many people were going to be there, what I
25  was going to encounter.  I was by myself, it's dark,

106

1    there's no street lights so I basically got out of the
2    car, drew my weapon, had my flashlight lit in hand and
3    I waited for a back-up officer which arrived within
4    probably 30 seconds to a minute.
5        Q.    Did you notice anybody -- any people on or
6    around the van?
7        A.    No, no, it was totally quiet.  I couldn't see
8    anybody.
9        Q.    What was the lighting out there?
10       A.    Pitch black dark except for stars above us.
11   It was a really dark area.
12       Q.    Once your back-up arrived, what did you do?
13       A.    Myself and Officer Delgado, who is my senior,
14   we basically, you know, approached the vehicle very
15   slowly, methodically because we had to watch the brush
16   area to make sure no one was going to run up on us or
17   come from behind, and we basically approached the van,
18   kind of like you would do a felony stop, if somebody
19   is going to be in there ready to take you out.
20            So we got up to the van and we found the van
21   empty.  There was no one around the van.
22       Q.    Could you tell the condition of the van if
23   anything about it?
24       A.    From what I could recall, it was an older
25   van, Ford, or E-150 van I believe it was, half ton

107

1    van, and it was conversion-style van, like a nice,
2    fancy van.  And we went up to see if it had been there
3    for a while or if it had just arrived and the engine
4    was hot.  You could tell that the vehicle had just
5    been abandoned, you know, pretty shortly after we
6    got -- before we got there.
7        Q.    But nobody was inside the van?
8        A.    No one was around the van, no.
9        Q.    After you see that there's nobody in the van,
10   what happened next?
11       A.    At that point we advised on the radio that
12   the van was empty so we know that whoever drove that
13   van in there is now scattered somewhere and we didn't
14   know how far away it could be cause it was very dense,
15   thick wood, so thick that you can hardly walk through
16   it, it was that thick.
17       Q.    After that, did you hear about any other
18   people, officers involved in the search?
19       A.    Yes.  As other officers were coming to the
20   area cause I had put out that I had found the van, of
21   course, that draws the attention of other officers in
22   the area.  Not everyone, but some of our officers had
23   responded and one of the other officers on the other
24   side of the brush were it ends and there's a railroad
25   track had come up a dirt road along the tracks and had

108

1    spotted with his light two individuals on the railroad
2    tracks.
3        Q.    Did you have anything to do with that
4    apprehension?
5        A.    No.
6        Q.    Okay.  Let's let them talk about that and
7    let's go back to the van with you.  So you weren't
8    involved in affecting the arrest of the other ladies,
9    correct?
10       A.    No, I just heard it, I just heard it on the
11   radio.
12       Q.    Let's give the jury a reference point to
13   where you were.  I'm going to show you a map.
14            MR. SKURKA:  May I approach, Your Honor?
15            THE COURT:  Yes.
16       Q.    (BY MR. SKURKA)  I'm going to show you a map
17   that's been marked State's Exhibit No. 70 and ask you
18   to look at that and then I'm going to ask you to look
19   at some photographs marked 71, 72 and 73.  Please look
20   at it yourself.
21       A.    Sure.
22       Q.    Can you identify the map listed as State's
23   Exhibit 70?
24       A.    Yes.
25       Q.    And can you identify what's been pictured in

109

1    71, 72 and 73?
2        A.    This is the van that was in the -- in the
3    woods.
4        Q.    Okay.  Does that map, No. 70, does that
5    accurately depict the roads and the streets that you
6    were around that night?
7        A.    Yes, it does.
8        Q.    And do those photographs, 71, -2, and -3
9    accurately depict the van as it was?
10       A.    Yes.
11       Q.    Now, for the record, the van is not
12   photographed in the actual woods; is that correct?
13       A.    Correct.
14       Q.    Where is the photograph at -- taken at, can
15   you tell?
16       A.    This looks like it's going to be at the Port
17   warehouse, I believe.
18       Q.    Is that where they removed the van to?
19       A.    I'm not sure but I've been to that warehouse
20   and it kind of looks like that.
21       Q.    But that is the van, is it not?
22       A.    Yeah, I can see the grass still underneath
23   it.  Yeah, that's the van.
24       Q.    I just want to make sure it's clear to the
25   jury even though the van is a fair and accurate

110

1  reproduction that's not how you saw it that night in
2  the woods?
3      A.   Not like that, no.
4              MR. SKURKA:  Your Honor, I'll tender
5  State's Exhibit 70, 71, 72, and 73 to Defense Counsel
6  and offer them into evidence.
7              MR. GARZA:  No objection, Your Honor.
8              THE COURT:  All right, they're
9  admitted.
10             MR. SKURKA:  May you publish them to the
11 jury, Your Honor?
12             THE COURT:  You may.
13     Q.    (BY MR. SKURKA)  I'm going to first show you
14 what's marked State's Exhibit 70.  Can you tell me
15 what that is, please?
16     A.    That is a picture you just showed me of the
17 area that I was -- that I found the van in.
18     Q.    Actually, it's not a picture, is it, it's a
19 map.
20     A.    It's a map.
21     Q.    There's a laser pointer in front of you that
22 you can use --
23     A.    Sure.
24     Q.    -- for the jury, and can you show us where
25 some main streets are?  And let's start with Brewster

111

1  Street, where you found the van.
2      A.    Sure, this area right here is Brewster and it
3  comes -- there's actually -- if you get off this map
4  just a little bit there's a -- a street that comes off
5  of Port, comes down and turns on to Brewster right
6  here and then Brewster comes back to Port Avenue.
7  This is -- this is Port, this is the main thoroughfare
8  to the Port area where mostly everybody goes to
9  Whataburger field, it's the main highway.
10     Q.    At this time Whataburger field was there or
11 not there?
12     A.    No, it was not there at the time, and at that
13 time this whole Port area, there was really -- it was
14 just industrial area, it's -- Brewster Street Ice
15 House was not there, that was just basically an
16 abandoned area as far as business.
17     Q.    You said over here on Brewster Street.  Where
18 -- is this the railroad tracks along here, is this the
19 railroad tracks?
20     A.    This is the railroad track, correct.
21     Q.    Now, show the jury when you were coming down
22 the street what area were you patrolling or looking
23 around when you first spotted the van?
24     A.    I had -- I had come down this street here,
25 and I had come down Port Avenue and I turned on a side

112

1  street, I'm not sure what street this is, it's a
2  little small street and I turned on Brewster and I was
3  driving this area right here.
4      Q.    For the record, you're showing from right to
5  left on Brewster Street?
6      A.    Correct, this would be -- this would be north
7  going I believe south, and when I got to about this
8  point about right in here is where I spotted the van
9  up in -- spotted in this area.
10     Q.    I'm going to go ahead and show you the map
11 and have you write it in little -- I guess a box or a
12 little rectangle indicating where the van was when you
13 located it.  Just approximate how far in and whatever.
14     A.    (Witness complying.)
15     Q.    And would you put a V on there that shows
16 it's a van.
17     A.    (Witness complying.)
18     Q.    I'm going to show the jury that now where
19 you're marking it.  In that wooded area or brushy area
20 how far in would you say the van was?
21     A.    I would say at least 40 yards.
22     Q.    40 yards inside?
23     A.    40 yards.  And the only way we could really
24 get to it was to follow the path of the van and cut
25 out the -- the brush.

113

1      Q.    Was there a pre-existing path?
2      A.    No, absolutely not.
3      Q.    I'm going to show you -- I'm sorry, I've
4  already admitted these.  71, what is State's Exhibit
5  71?
6      A.    That's the red van that was in there.
7      Q.    Is that the kind of angle or direction you
8  saw it from when you knew it was in the woods?
9      A.    It would have been more tilted towards the
10 right.  I can see the -- the corner of the back right
11 area and the license plate.  This area here.
12     Q.    Okay.  So it was more on that side but --
13     A.    It was used more like it --
14     Q.    And, of course, the only difference is this
15 was in a warehouse; correct?
16     A.    Correct.
17     Q.    We have the other two pictures, 72 and 73.
18 Does that also show the van?  And what does that show,
19 State's Exhibit 72.
20     A.    That would be the driver's side of the van.
21     Q.    And 73?
22     A.    That's the passenger side, grass and brush
23 still hanging, scratch marks from driving into the
24 trees and whatnot.
25     Q.    Now, you're familiar with this area and

114

1   you've gone back to this area or been there since this
2   time; correct?
3       A.   Correct.
4            MR. SKURKA:  Your Honor, may I approach?
5            THE COURT:  Yes.
6       Q.   (BY MR. SKURKA)  I have another series of
7   photographs marked 69 -- I'm sorry, 61 through 69.
8   Would you please take a look at those --
9       A.   Sure.
10      Q.   -- tell me what those are.
11      A.   This is an aerial view of the area.
12      Q.   Why don't you go through all of them before
13  you do them one at a time.
14      A.   Okay.
15      Q.   Have you had a chance to review those
16  photographs?
17      A.   Yes.
18      Q.   What are they essentially?
19      A.   It's basically an aerial view of the wooded
20  area where the van was found.
21      Q.   Does that show the area -- a fair and
22  accurate depiction of the area that the van was
23  located off Brewster Street?
24      A.   Yes.
25      Q.   And obviously these seem to be taken during

115

1   the daytime where you found it --
2       A.   Correct.
3       Q.   -- Correct?
4       A.   Correct.
5            MR. SKURKA:  Your Honor, I'll tender 61
6   through 69 to Defense Counsel and offer them into
7   evidence.
8            MR. GARZA:  No objection, Your Honor.
9            THE COURT:  They're admitted.
10           MR. SKURKA:  May I publish them to the
11  jury, Your Honor?
12           THE COURT:  You may.
13      Q.   (BY MR. SKURKA)  Starting with the first one,
14  61, and using the laser pointer, will you help show
15  the depiction of the satellite photograph of where
16  Brewster Street is.  Let's get oriented that way
17  first.  Where is Brewster Street on that?
18      A.   This would be Brewster Street right here.
19  This photo would be looking towards the Harbor Bridge
20  area so we're looking from the south to the north.
21      Q.   And where is the wooded area that you've been
22  talking about?
23      A.   This area right here.  Actually, much larger
24  than what it looks like.  To walk it, it's very --
25      Q.   We've got some more photographs to show so

116

1   let's go through those.
2            THE COURT:  Let me ask you this, where
3   would Whataburger field be now?
4            THE WITNESS:  Whataburger Field would be
5   right there.
6            THE COURT:  Okay.
7            THE WITNESS:  As a matter of fact, it's
8   in this photo.  This photo looks like it was taken
9   since that has been put up so this would be
10  Whataburger Field right here.
11           THE COURT:  Okay.
12      Q.   (BY MR. SKURKA)  Go ahead and show him the
13  next one, please.  What does that show?
14      A.   This is the -- this is Brewster Street and
15  this would be looking from west to east going this
16  way.
17      Q.   Okay.
18      A.   This is the railroad track that's behind the
19  area.
20      Q.   So where would you have been and where would
21  the car have been found?
22      A.   I was about right in here and the -- the
23  vehicle was like about right in here, in that area.
24           MR. SKURKA.  Go ahead and show the next
25  one.

117

1       Q.   (BY MR. SKURKA)  Now, what angle is that
2   taken from of the wooded area?
3       A.   This would be from the north being here
4   looking southbound, Brewster Street being right here
5   and the -- the area would have been like right in
6   through here.
7       Q.   What's that street down there at the bottom
8   of that photograph, please?
9       A.   This street right here, this is the street I
10  was telling you about on that other map and I'll have
11  to reference it if it's on here, it's a very small
12  street.  Let's see if I can see it on here.  I'm not
13  sure.  I know this is -- there's a street sign about
14  right here that shows 900 -- I believe it's 8 or 900
15  Brewster is this street but I'm really not sure what
16  street this is.  It's a -- not a well-maintained road.
17      Q.   Okay.
18           MR. SKURKA:  Next photograph, please.
19      Q.   (BY MR. SKURKA)  What angle is that taken
20  from of the wooded area?
21      A.   This would be from the the east looking west.
22  This would be going towards the -- the Port Channel
23  would be up to the top.  Whataburger Field would be
24  off this way.
25      Q.   So there's really only industrial sites

118

1   around there?

2        A.   Just industrial sites.

3        Q.   An the next one?

4        A.   This is just all dark.

5        Q.   What does that show?

6        A.   This would be looking from the -- the west to

7   the east, south and north.  This would be Brewster

8   Street right there.

9        Q.   Okay.  And the van would have been located

10  where?

11       A.   About right in this area.

12       Q.   Okay.  I'm going to go ahead and have you

13  draw on that one, too, and if you would, draw a little

14  box or rectangle or square to show approximately where

15  the van was and then put a V inside of it.

16       A.   Sure.

17       Q.   Does that fairly and accurately show

18  approximately where the van was found?

19       A.   Yes.

20       Q.   Okay.

21            MR. SKURKA:  The next -- I think we have

22  one more.

23       Q.   (BY MR. SKURKA)  Show us where we're at here,

24  where's Brewster Street?

25       A.   This is Brewster Street right here and this

119

1   is where I came on to Port this way.  This is the

2   direction I was traveling, this way.  The van would

3   have been right in this area right here.

4        Q.   Okay.  So you've given us an idea where the

5   van was.  I'm going to try something different here

6   and ask you to look at this Google street map and see

7   if you can trace where we're at.  Are you familiar

8   with Google maps?

9        A.   Yes.

10       Q.   It has this really neat thing that goes like

11  this.  Can you see where Brewster Street is there on

12  the street level?

13       A.   Sure can.

14       Q.   So is this the road that you were going down?

15       A.   That's the road I turned on off of this

16  street right here.

17       Q.   Is this the wooded area on the left?

18       A.   That's the wooded area.

19       Q.   And can you tell me how far down I should go

20  for you?

21       A.   It was about to that driveway right there.

22       Q.   Where that driveway is on the right?

23       A.   Uh-huh.  It would have been back in this --

24  off in this area here.

25       Q.   Let me see if I can rotate it a little bit.

120

1        A.   That's a little too far.  Back a little bit.

2   Right in through here.

3        Q.   Right in through that area?

4        A.   Uh-huh.

5        Q.   Is that pretty much how it looked that night?

6   I mean, beside it being dark?

7        A.   The light, the daylight.

8        Q.   Is it that thick in there?

9        A.   It's very thick.

10       Q.   And it's your testimony it went about 40

11  yards in there?

12       A.   About 40 yards from the roadway.

13       Q.   It doesn't appear to be any path at all.

14       A.   I'm sure this was several years after.

15       Q.   Okay.  And let me go back to this area.  Now

16  I'm going to go back to a bigger shot, a wider shot.

17  Does that show the Port area there?

18       A.   Yes.

19       Q.   Let's start with the Port and the bridge

20  where everybody can probably recognize.  Use your

21  laser pointer and show us where that is.

22       A.   This would be the Harbor Bridge going towards

23  Portland right here, the Whataburger Field would be --

24  I believe it's right in here?

25       Q.   Okay.  That's not shown in this photo, right?

121

1        A.   It's an old photo.

2        Q.   Now, which way do I go to find the place --

3        A.   Right here.

4        Q.   -- Brewster Street?  Right in there?

5        A.   Yes, this would be area.  So that street I

6   guess is Sam Rankin.

7        Q.   Let me see if I can go a little closer on

8   here.  Does that show the wooded area on the satellite

9   photo?

10       A.   Correct.

11       Q.   What are these things over here?

12       A.   Looks like trucks, tractor trailer trucks.

13       Q.   So that would be a satellite view of the

14  wooded area and the parts around it.  And indicate to

15  us where you were driving on Brewster Street and where

16  the van was.

17       A.   This way, go down Brewster.  Here's the

18  driveway you saw in the photos and right in through

19  here.

20       Q.   Officer Frakes, that's all the questions I

21  have, thank you.

22            THE COURT:  All right, cross?

23            MR. GARZA:  I have no questions, Your

24  Honor.

25            THE COURT:  You may stand down.  Call

122

1    your next witness.
2                    THE WITNESS:  Thank you, Your Honor.
3                    MR. SKURKA:  Officer Vasquez.
4                    THE COURT:  Please don't discuss your
5    testimony with anyone while this trial is going on
6    except the lawyers.
7                    THE WITNESS:  Yes, sir.
8                    THE COURT:  All right, come forward.
9                    (Oath administered.)
10                   THE COURT:  Be seated.  You may proceed.
11                   MR. SKURKA:  Thank you, Your Honor.
12
13                   RALPH VASQUEZ,
14   having been first duly sworn, testified as follows:
15                   DIRECT EXAMINATION
16   BY MR. SKURKA:
17       Q.    Would you please state your full name for the
18   the folks on the jury.
19       A.    Ralph Vasquez.
20       Q.    How are you currently employed?
21       A.    Police officer for the City of Corpus
22   Christi.
23       Q.    How long?
24       A.    This August I started my 30th year.
25       Q.    Well, congratulations, 30 years in one job is

123

1    a long stretch.
2        A.    Thank you.
3        Q.    Can you tell us what divisions or area you
4    worked in the police department and start from the
5    beginning to where you're at now, or have you always
6    worked in one area?
7        A.    I've worked patrol, I worked a year in
8    juvenile and the rest of time I worked patrol.
9        Q.    I'm sorry, I didn't hear the last part?
10       A.    I worked patrol most of the time.
11       Q.    Can you tell us where you were working or
12   what area of patrol you had back on July 19, 2004?
13       A.    I was working south side graveyard.
14       Q.    Did you have occasion to hear on the radio
15   about an incident that took place before midnight at
16   the Times Market on 1902 Baldwin, a Whataburger on
17   Staples Street and another Whataburger on Texan Trail
18   on Alameda?
19       A.    Yes, sir.
20       Q.    Now, were you involved in any of the
21   investigations of those locations?
22       A.    Not directly.
23       Q.    Okay.  How did you get involved -- did you
24   get involved in any attempted apprehension or chase of
25   any suspects of those -- involved in that crimes?

124

1        A.    Well, the dispatcher called out the robberies
2    and -- at those locations and one of our JET officers
3    got in pursuit of a vehicle that matched the
4    description northbound Staples.  As a general policy
5    what officers tend to do is they try to shadow or
6    parallel to the pursuit, just in case they break off
7    or the officer loses the vehicle.
8                When the JET officers were driving down
9    Staples northbound I headed on Alameda parallel the
10   pursuit just on the off chance that he would break off
11   or get lost in the pursuit.
12       Q.    Okay.  Were you in the pursuit of the van
13   yourself?
14       A.    No, sir.
15       Q.    Okay.  You were in a parallel pursuit to try
16   to locate the person; correct?
17       A.    Right.
18       Q.    Tell the jury what you did and how -- where
19   you went.
20       A.    Okay.  When the JET officer said that they
21   proceeded northbound past Morgan heading toward the
22   Sam Rankin area I proceeded down on Ocean Drive, went
23   down Ocean Drive to Shoreline and I was down --
24   downtown area on the off chance that they might, you
25   know, break off and head toward -- try to circle back

125

1    to the south side.
2        Q.    Did you find anything there?
3        A.    No, sir.
4        Q.    So where did you go?
5        A.    I just sat in the immediate area.  I think I
6    sat in the parking lot of Kinney and Shoreline.
7        Q.    Why?
8        A.    Like I said, on the off chance that maybe the
9    officers would lose them and they would come back,
10   circle back around.
11       Q.    Did you find anything there after you sat up
12   there for a while?
13       A.    No, sir.
14       Q.    What's the next thing you did?
15       A.    The next thing we heard is the JET officers
16   had lost the vehicle down in the Sam Rankin, north
17   Alameda area, and our uniform division commander came
18   on the air and stated that he wanted all the available
19   officers that were in the immediate area to go check
20   down in the Port area and search for this vehicle.
21       Q.    So what did you do?
22       A.    I went ahead and proceeded down Shoreline to
23   North Port down by the Bayfront, went that way and
24   started looking in the old industrial area.  There's a
25   lot of abandoned warehouses and, you know, places

126

1    where you can actually hide a van.

2        Q.    Are you familiar with that area in your 30

3    years of --

4        A.    I had worked that area about four years.

5        Q.    So you had patrolled that area before?

6        A.    Yes, sir.

7        Q.    Are there places to hide or hide a vehicle

8    around that area?

9        A.    Plenty of places.

10       Q.    So what did you -- where did you end up

11   going?

12       A.    I headed down Port Street toward Brewster.

13   May I look at my notes here?  I went down Port Street,

14   headed towards Sam Rankin and Brewster Street and was

15   looking around that area.

16       Q.    When you went to Brewster Street did you come

17   across any suspect or did you receive any information

18   about any suspects or vehicle?

19       A.    Well, when I was coming around Brewster

20   Street, one of the officers said that they spotted a

21   vehicle in a thick area, thick brushy area.

22       Q.    Do you recall what officer that was?

23       A.    I believe it was Frakes and Delgado.

24       Q.    Officer Frakes?  He had found the vehicle?

25       A.    Yes, sir.

127

1        Q.    Did you know the area where he had found it

2    on Brewster Street?

3        A.    Yes, sir.

4        Q.    So what did you do when you heard that the

5    vehicle had been found around Brewster Street?

6        A.    So I went ahead and came around the corner.

7    I was only right around the corner from where he was.

8    By the time I got there there was three officers there

9    approached the vehicle.

10       Q.    So what did you do?

11       A.    I watched as they approached the vehicle and

12   I started thinking "Well, if they're coming up towards

13   the vehicle that's in the brush area I'm going to go

14   circle around the other side, possibly I'll be able to

15   run across them there."

16       Q.    Did you?

17       A.    Yes, sir, I did.

18       Q.    Tell the jury what happened and where you

19   were when it happened.

20       A.    Well, when I left the area I come around the

21   corner from the brushy area and I was driving down I

22   believe it was Sam Rankin and once I got to the --

23   some railroad ties, it's a empty lot, there's thick

24   brush in it but you could still see.  It's maybe about

25   waist high out about 250, 300 feet.  It's dark out

128

1    there, you can see white shapes.

2        Q.    What do you mean white shapes?

3        A.    Well, from that distance they looked like --

4    like white garbage bags, you know, the kind you see

5    flowing around all over the place, and I noticed that

6    -- it's pitch dark out there.  I saw that and I kept

7    looking and you could see them moving unlike a regular

8    bag so I went ahead and turned my unit into the field,

9    headed out that way and spotted two females.

10       Q.    Where exactly did you spot them at?

11       A.    They were in the area next to the railroad

12   tracks next to a ditch on the opposite side of where

13   the van was.

14       Q.    So what did you do when you spot these two

15   females?

16       A.    Well, when I got there one of them was

17   standing up, the other one was sitting down, and they

18   were acting kind of crazy so when I got out I took my

19   my weapon down.  I told them to just sit there while I

20   asked for some assistance.

21       Q.    Had you received information over the radio,

22   the police radio about possible suspect vehicle and

23   the description of the people involved in these

24   robberies?

25       A.    Yes, sir, they had put out a description of

129

1    the vehicle, a van, I believe maroon or red color with

2    a male and two females.

3        Q.    Did these people match the description of the

4    suspects' information that had been out on the

5    vehicle?

6        A.    Yes, sir.

7        Q.    So as you came upon them you said something

8    about they were acting crazy.  Tell the jury exactly

9    what happened with the two women as you came up on

10   them, and were you on foot or in your police car?

11       A.    I was in the police car.  I rode right up

12   on -- popped on my overheads and my spotlight, side

13   spotlight and my take-down lights which were right on

14   top of the overhead lights so they were well

15   illuminated.

16       We had received information that they were

17   armed so when I got out of the unit, you know, I

18   had -- I had pointed my weapon at them, ordering them

19   not to move.  One female complied, she was the one

20   sitting down, she just sat there.  The other one kept

21   sitting there challenging us, or challenging me.

22       Q.    Define challenging you.

23       A.    Well, she was sitting there, you know, trying

24   to make an aggressive move toward me and yelling and

25   screaming, "Well, shoot me, shoot me, go ahead and

130

1    shoot me."  I was I'd say about five feet, six feet
2    away from her and every time she would move forward I
3    would take a step back.
4    Q.    Did she have a weapon?
5    A.    No, sir.
6    Q.    Did either of them have a weapon?
7    A.    Not that I could locate.
8    Q.    But the second one kept telling you to shoot
9    them?
10   A.    Right.
11   Q.    Did you?
12   A.    No.
13   Q.    What happened then?
14   A.    At that time another officer, Officer Chapa,
15   arrived and he went ahead and grabbed her, took her
16   down to the ground.
17   Q.    Grabbed who?
18   A.    The one that was standing up.
19   Q.    Okay.  Was Chapa I guess another officer who
20   had responded to the scene?
21   A.    Right.
22   Q.    So he's the one that actually took them down
23   -- took her down?
24   A.    Took her down, yeah, the one that was
25   standing.

131

1    Q.    Can you tell us how these ladies appear?
2    A.    Well, their clothing was soiled and there was
3    blood all over them.
4    Q.    Subsequently were you able to identify who
5    the people were?
6    A.    Yes, sir.  Let's see here, the female was
7    sitting on the ground.  Her name was Christina Chavez.
8    And the female that was standing up and challenging
9    me, her name was Angie -- Angelica Rodriguez.
10   Q.    Are you and Chapa the ones that actually put
11   them under arrest?
12   A.    Yes, sir.
13   Q.    And did you see them that night?
14   A.    Yes, sir.
15         MR. SKURKA:  I'm going to approach -- may
16   I approach, Your Honor?
17         THE COURT:  Yes.
18   Q.    (BY MR. SKURKA)  I'll show you what's marked
19   State's Exhibit 74 and 75, and ask you to look at
20   those and see if you recognize that.
21   A.    If I'm not mistaken this one is Angie.
22   Q.    Are these photographs of the two women that
23   were captured that night by you and Officer Chapa?
24   A.    Yes, sir.
25   Q.    Okay.

132

1          MR. SKURKA:  I tender State's Exhibit
2    74 and 75 to Defense Counsel and offer them into
3    evidence.
4          MR. GARZA:  No objection, Your Honor.
5          THE COURT:  All right, they're
6    admitted.
7          MR. SKURKA:  And may I publish them?
8          THE COURT:  Absolutely.
9          MR. SKURKA:  I'll publish them in a
10   minute, Judge.  I'll show them to the jury in just a
11   minute.
12   Q.    (BY MR. SKURKA)  Officer Vasquez, I want to
13   show you a map that's up on the wall behind you, it's
14   called -- it's a Google map thing and there's a laser
15   pointer in front of you.  Does that show the area
16   around Brewster Street that you were talking about
17   earlier?
18   A.    Yes, sir.
19   Q.    Can you show the jury where you were at and
20   what street you went down before you affected this
21   arrest?
22   A.    Okay.  When I was checking the -- when I was
23   checking the area, Officer Frakes and Delgado said
24   they spotted a vehicle right in this area here.  I had
25   come off of Port Street this way, stopped there and

133

1    observed that all the officers were sitting there
2    approaching the van.  I came down Sam Rankin and right
3    about here is where I spotted them, the two figures.
4    Q.    Where were the two figures?
5    A.    Right here.
6    Q.    What else is around that area between where
7    you were on the street and down this area?  Describe
8    that area, please.
9    A.    This is a ditch, about three and a half,
10   four-foot ditch.  It's not very tall, I'd say about
11   six feet wide.  These are railroad tracks right here.
12   Q.    And where were you, about over here?
13   A.    I was right here.
14   Q.    Okay.  I'm going to try something, it's
15   "Street View," and see if it works.  About right here?
16   A.    Uh-huh.
17   Q.    Oops.  There it goes.  Now, if you were at
18   that intersection of Sam Rankin -- let me turn this
19   around, would that show the area?  I think I went too
20   far.  If you continue down this street, where would
21   you go to?
22   A.    Let's see, if you're going back this way
23   you're going back into town.
24   Q.    Okay.  Well, I'm asking what street that
25   would be.

134

1    A.    This is Sam Rankin.  That one over there is
2  Brewster.
3    Q.    Okay.  So it would be fair to say you came
4  from Brewster to Sam Rankin; correct?
5    A.    Right.
6    Q.    See what I'm showing you?
7    A.    Yes, sir.
8    Q.    Does this show the area around Brewster
9  Street where you saw the other officers?
10    A.    Right.
11    Q.    Okay.  Now, let me go back down Sam Rankin.
12  What does this show here?
13    A.    Okay.  Well, before they had this I guess
14  clearing area I was right about here when I looked
15  back.
16    Q.    You have to use the laser.
17    A.    Right there.  That's where I spotted them,
18  the white objects.
19    Q.    So you could see down if -- the perspective
20  is from Sam Rankin Street; correct?
21    A.    Right.
22    Q.    What is this along here?
23    A.    This is a little ditch or a little gulley
24  area and that is railroad tracks.
25    Q.    And where does the tree line end?

135

1    A.    Well, at that time the tree line ended right
2  in here.
3    Q.    Okay.  But there's kind of a cut path.
4    A.    Right, there's a cut path on all this, all
5  right here.
6    Q.    Okay.  And where did you see the women at
7  first, the two shapes?
8    A.    Right there.
9    Q.    And for the record, you're showing at the end
10  where that little stream of water is?
11    A.    Where it curves.
12    Q.    Where it curves?
13    A.    Right, right, where it curves.
14    Q.    And where did the women -- where did you
15  drive your vehicle then --
16    A.    Well --
17    Q.    -- is it farther up the road?
18    A.    -- right through here.  All this was bushy
19  area.
20    Q.    Okay.
21    A.    I don't remember if this water was here at
22  that time but all I remember I did go straight down
23  this way.
24    Q.    Does this show a better perspective looking
25  from this angle or was it better the other way?

136

1    A.    A lot has changed in four years but I was
2  right here and went straight down the railroad cause
3  these railroad tracks haven't changed.
4    Q.    Okay.  Let me go back to the railroad tracks,
5  that might be easier to do.  Okay.  By the railroad
6  tracks, you were by them?
7    A.    Right, I was sitting right here and I was
8  looking that way.
9    Q.    Okay.  Let me turn it that way.
10    A.    Right there.
11    Q.    I guess what I'm trying to ask here were they
12  found on this side of the railroad tracks or this side
13  of the railroad tracks?
14    A.    They're sitting right there.  The railroad
15  tracks continue straight and this little ditch curves
16  back that way so that like section right there between
17  it's like a little Y section right there.
18    Q.    It was right there and you were able to keep
19  your vehicle up through here.
20    A.    Right.
21    Q.    Okay.  Is that caliche or just dirt or what?
22    A.    Yes, sir, it's kind of like caliche.
23    Q.    So you could spot them from way over there.
24  Is there any lighting around there at all?
25    A.    No, sir.

137

1    Q.    I'm just about finished here and I'm going to
2  switch this off with this satellite thing.  We have
3  some photographs that were already admitted into
4  evidence and I'm going to show you what's marked 67.
5  What does that show, please?
6    A.    Okay.  That's Brewster Street, that's Sam
7  Rankin over here, and this is about the area they
8  found the van.
9    Q.    Okay.  And where were you when you -- where
10  were the ladies when you spotted them?
11    A.    Right there.
12    Q.    Okay.  Now, there's some kind of vehicle or
13  machine --
14    A.    That's machinery.
15    Q.    Where exactly were the women?
16    A.    Right about here, right about there.
17    Q.    Okay, I'm just going to have you -- let me
18  see if there's another angle that will show that
19  better.  68, look at that.
20    A.    Right here.
21    Q.    Okay.  I'm going to show this to you and have
22  you draw two Xs where you saw the two women.
23        MR. SKURKA:  And can you put the two
24  women up on the board, Geordie, just laying side by
25  side, please.

138

1    Q.   (BY MR. SKURKA)  And this is how they looked

2    that night when they were captured?

3    A.   Yes, sir.

4    Q.   And that was you and Oscar Chapa?

5    A.   Right.

6    Q.   Okay.  And I just want to show the jury where

7    the two Xs are where you said they were actually

8    apprehended.

9    A.   (Indicating.)

10   Q.   And that would -- I don't know how to

11   describe that except that's kind of where it bends?

12   A.   Uh-huh.

13   Q.   Okay.  Did you find John Henry Ramirez, the

14   Defendant in this case that night?

15   A.   No, sir.

16   Q.   Did you look for him?

17   A.   Yes, sir.

18   Q.   Did you see anybody else around the two women

19   that were over there?

20   A.   No, sir.

21   Q.   Were other officers searching that area also?

22   A.   Yes, sir.  As a matter of fact, when I put

23   myself out on these two vehicles, Officer Chapa came

24   up this way since he saw my vehicle out there and

25   Grace Delgado came through the shrub area out this

139

1    way.

2    Q.   Was that shrub area pretty thick around here?

3    A.   Yeah, it was like thick.

4    Q.   And so Chapa came from this area, too?

5    A.   Yes, sir.

6    Q.   And that's where you had come also?

7    A.   He came right off of Sam Rankin.  He was

8    behind me.

9    Q.   You-all took the same path.

10   A.   Right.

11   Q.   Okay.  I think that's all the questions I

12   have, Officer Vasquez.  Thank you.

13             THE COURT:  Cross?

14             MR. GARZA:  Yes, Your Honor.  Can we

15   start right after lunch?

16             THE COURT:  Yeah, yeah.  All right, let's

17   go ahead and break for lunch at this time.  We'll see

18   you at 1:30.  All rise for the jury, please.

19             (Jury exits courtroom.)

20             THE COURT:  All right, you-all can be

21   seated.  Is there anything we need to take up

22   before --

23             MR. GARZA:  No, Your Honor.

24             THE COURT:  Okay, we'll see you at 1:30.

25             (Noon recess.)

140

1             (Jury enters courtroom.)

2             THE COURT:  All right, be seated, please.

3    Mr. Garza, your cross.

4             MR. GARZA:  Thank you, Your Honor.  May I

5    proceed?

6             THE COURT:  Yes.

7                   CROSS-EXAMINATION

8    BY MR. GARZA:

9    Q.   Officer Vasquez, good afternoon.  I have a

10   few questions I want to ask you about that evening

11   when you came into contact with the two female

12   suspects that we've been hearing you testify about

13   this afternoon.  What were they wearing, if you'll

14   remember, if you recall?

15   A.   Well, they were wearing white-colored

16   blouses.  Let me refer to my notes and I can tell you

17   exactly what I jotted down.

18   Q.   Okay.

19   A.   Okay.  Christina Chavez was wearing gray

20   warm-up pants, white muscle shirt, white tennis shoes;

21   and Angela was wearing a white sports bra and a jean

22   shorts.

23   Q.   Jean shorts?

24   A.   Uh-huh.

25   Q.   Okay.  Did they appear to have any sort of

141

1    blood on any of their clothing, the outer clothing?

2    A.   Yes, sir.

3    Q.   Would you describe it as a lot, moderate --

4    A.   Moderate.

5    Q.   -- very little?

6    A.   Moderate.

7    Q.   About moderate.  Both girls?

8    A.   Uh-huh.

9    Q.   Okay.

10             MR. GARZA:  May I have just a second?

11             THE COURT:  Uh-huh.

12   Q.   (BY MR. GARZA)  Let me show you what has

13   already been admitted as State's Exhibit 74.  Were you

14   able to determine who this person was in this

15   photograph?

16   A.   I believe that was Angela.

17   Q.   Are you sure?

18   A.   I believe so.

19   Q.   Okay.  And that the -- the shirt that she has

20   on, is that pretty much what she was wearing when you

21   encountered her?

22   A.   I believe so.

23   Q.   Do you know when this picture was taken?

24   A.   No, sir.

25   Q.   Would it have been after your arrest?

142

```
1     A.   Yes, sir.
2     Q.   Probably at the station?
3     A.   Probably.
4     Q.   Okay.  And what about this person here?
5     A.   That would be -- that's Christina, I think.
6     Q.   Is that what she was wearing that particular
7   evening when you arrested her?
8     A.   Well, I can't tell with her hair --
9     Q.   Well, let me see if we can --
10    A.   No, she was wearing something else.
11    Q.   What would she have been wearing?
12    A.   Well, according to my -- my notes here she
13  was wearing white muscle shirt, gray warm-ups.
14    Q.   Could it be you have them reversed then?
15    A.   No, I don't think so.
16    Q.   Well, it's okay if you're mistaken about it,
17  it's not going to make -- it's not going to make or
18  break the situation but you don't know for sure?
19    A.   That was four years ago.
20    Q.   I understand but you're really not sure
21  basically which is which?
22    A.   I -- about 99 percent.
23    Q.   Okay, well you're dead wrong, I can tell you
24  right now.  You've got them reversed.  Is that --
25  okay, so you think this person was wearing something
```

143

```
1   else?
2     A.   (Nods head.)
3     Q.   What was she wearing?
4     A.   Well, like I said, what I put down on my
5   report is what she was wearing when I picked her up.
6     Q.   Okay.  So reread your report.  You said that
7   one of girls was wearing a sports bra and that as
8   Angela Rodriguez.
9     A.   No, Angela Rodriguez wearing a white sports
10  bra and blue jean shorts.
11    Q.   Well, the person in this picture appears to
12  be wearing a white sports bra, does she not?
13    A.   And the other picture it seems like also.
14    Q.   Okay, All right.  Well, anyway, if this is
15  the person you think is Christina Chavez, you are
16  trying to tell this jury that she may have ben wearing
17  something else before this photograph was taken;
18  correct?
19    A.   Right.
20    Q.   Like what was she wearing?
21    A.   I don't know.  What I put on my report -- you
22  know, the detectives took her clothing, after they got
23  to the station, the I.D. techs took her -- whatever
24  clothing she was wearing.
25    Q.   Okay.  Well, let me ask you this just for
```

144

```
1   purposes of establishing certain facts in the record.
2   When you arrested these two females is this pretty
3   much what they looked like and what they were wearing
4   that night, more or less?
5     A.   More or less.
6     Q.   Okay.  Now, in your report, Angela Rodriguez
7   was wearing a sports bra with some sort of jeans
8   short --
9     A.   Right.
10    Q.   -- according to your report --
11    A.   Uh-huh.
12    Q.   -- is that correct?
13    A.   Yes, sir.
14    Q.   And Christina Chavez was wearing some sort of
15  a muscle shirt, you said?
16    A.   Gray warm-ups and a white muscle --
17    Q.   A white muscle shirt, okay.
18         And I think you did indicate that they
19  were -- they looked somewhat soiled and you did notice
20  blood on their clothing --
21    A.   Right.
22    Q.   -- correct?
23    A.   Uh-huh.
24    Q.   Okay.  Now, one of the females was sitting on
25  the ground basically not giving you too much
```

145

```
1   trouble --
2     A.   Right.
3     Q.   -- Correct?
4     A.   Uh-huh.
5     Q.   And the other female was acting in a little
6   more of an assertive manner, actually asking you to
7   shoot her --
8     A.   Right.
9     Q.   -- is that correct?
10    A.   Uh-huh.
11    Q.   And then Officer --
12    A.   Chapa.
13    Q.   -- Chapa ended up having to take her down and
14  I guess subdue her and cuff her --
15    A.   Yes.
16    Q.   -- for security reasons --
17    A.   Right.
18    Q.   -- and bring her under control --
19    A.   Uh-huh.
20    Q.   -- is that correct?
21    A.   Yes, sir.
22    Q.   And who -- and that person was Angie
23  Rodriguez --
24    A.   Right.
25    Q.   -- who was acting in that more assertive
```

146

1  role.
2      A.   Right.
3      Q.   Okay.  A little more aggressive.
4      A.   Uh-huh.
5      Q.   Okay.  Did either of these two girls appear
6  to be intoxicated or under the influence of drugs --
7      A.   Yes, sir.
8      Q.   -- in your opinion?
9      A.   Yes, sir.
10      Q.   Both of them?
11      A.   Both of them.
12      Q.   Okay.  How would you describe their -- their
13  demeanor, their attitude, the way they were acting?
14      A.   Well, when I first came in contact with them
15  Angela was the one standing up, she was being the
16  aggressor.  She was waving her arms around, acting
17  real crazy.  Christina was the one sitting down.  When
18  ordered to remain there, she stayed there passively.
19  Once we restrained them and put -- placed them in her
20  car, they started getting crazy, starting making faces
21  at each other like, you know, like a childish
22  demeanor.  It was all a big joke to them.
23      Q.   So each of them with placed in a different
24  car --
25      A.   Yes, sir.

147

1      Q.   -- before they were transported off?
2      A.   Right.
3      Q.   And where were they transported off to, to
4  your knowledge?
5      A.   After we placed them under arrest we
6  transported them to Baldwin and Staples, to the
7  Whataburger there so they could be identified by the
8  victims there.
9      Q.   Were you -- were you present --
10      A.   Yes, sir.
11      Q.   -- during that show up?
12      A.   Yes, sir.
13      Q.   And were they identified?
14      A.   Yes, sir.
15      Q.   And then where were they taken from there?
16      A.   Taken to the City Jail, the main station, the
17  C.I.D. office.
18      Q.   So you had one of them in custody in your
19  vehicle?
20      A.   Yes, sir.
21      Q.   And the other one was in another vehicle?
22      A.   Right.
23      Q.   Who would that be, Officer Cantu?
24      A.   No, Chapa.
25      Q.   I mean, Officer Chapa?

148

1      A.   Yes, sir.
2      Q.   Okay.  All right.  So then at that time they
3  with both taken to --
4      A.   To the main station.
5      Q.   -- to the main station --
6      A.   Yes.
7      Q.   -- is that correct?
8      A.   Yes.
9      Q.   Thank you.
10          MR. GARZA:  I'll pass the witness, Your
11  Honor.
12          THE COURT:  All right.  Anything else,
13  Mr. Skurka?
14          MR. SKURKA:  Yes, Judge, I have some
15  follow-up here.
16          THE COURT:  Okay.
17              REDIRECT EXAMINATION
18  BY MR. SKURKA:
19      Q.   Officer, a minute ago there there was some
20  questions about your identification of these females
21  and I want to put the two photographs that have
22  already been admitted into evidence side by side.
23  Clearly they just show I guess the top part and mostly
24  the face; correct?
25      A.   Yes, sir.

149

1      Q.   I'm going to --
2          MR. SKURKA:  May I approach, Your Honor?
3          THE COURT:  Yes.
4      Q.   (BY MR. SKURKA)  I'm going to show what's
5  marked 77 and 78.  These are purportedly full-length
6  pictures of the two people in question.  Do you
7  recognize the two pictures marked 77 and 78?
8      A.   Yes, sir.
9      Q.   Is that what the females looked like and what
10  were wearing that night?
11      A.   That's what I described in my report.
12      Q.   And it's the same people that were -- that
13  are shown in these other pictures; correct?
14      A.   Uh-huh.
15          MR. SKURKA:  I'll tender these two
16  pictures to Defense Counsel and offer them into
17  evidence, 77 and 78.
18          MR. GARZA:  No objection, Your Honor.
19          THE COURT:  They're admitted.
20          MR. SKURKA:  Thank you.
21      Q.   (BY MR. SKURKA)  Just to clarify, Defense
22  Counsel said you were dead wrong but I think you just
23  didn't have the benefit of seeing the whole
24  full-length pictures and so now I'm going to show them
25  to you and look at your report again and how did you

150

1  describe in your report Christina Chavez, what she was
2  wearing?
3      A.   Okay.  The description I gave of Christina
4  was a Hispanic female, 22 years of age, medium built,
5  shoulder length hair, thick hair, wavy, acne, gray
6  warm-ups, white muscle shirt and white tennis shoes.
7      Q.   Okay.  The three things I'm going to talk to
8  you about was the acne, the muscle shirt, and what did
9  you say were her pant bottoms?
10     A.   Gray warm-ups.
11     Q.   Okay.  I'm going to put State's Exhibit No.
12 74 right next to 77.  Now, looking at that, does that
13 change your mind about who was wearing the muscle
14 shirt and the gray warm-up pants and who was the acne?
15     A.   Right, Christina.
16     Q.   Let me go a little closer on that.  Okay.
17 Isn't it fair to say that that's Christina Chavez --
18     A.   Yes.
19     Q.   -- according to your record?  So you were
20 just mistaken because you didn't have the whole -- I
21 don't know what you call, figure -- full-length
22 picture of it?
23     A.   After four years I've only scene the picture
24 once in four years.
25     Q.   And I understand, we're not trying to fuss

151

1  with you --
2      A.   Right.
3      Q.   -- we're just trying to make it easier for
4  you to see the whole picture.  Okay.  So that, for the
5  record, 74 and 77, appear to be Christina Chavez for
6  identification; correct?
7      A.   Yes, sir.
8      Q.   So I'm going to show you 75 and 78, and again
9  78 appears to be a full-length picture of what was
10 depicted in 74?
11     A.   Right.
12     Q.   And looking at your report --
13     A.   Right.
14     Q.   -- who would that have been?
15     A.   Yeah, her physical description shows age 30,
16 medium built, long hair, thick, wavy, medium
17 complexion, blue jean shirts, white sports bra.
18     Q.   And the person in that photograph marked 78?
19     A.   That would be Angela.
20     Q.   So just -- and I'm not trying to fuss with
21 you again but this is Angela Rodriguez, the other one
22 is Christina Chavez?
23     A.   Right.
24     Q.   And you're aware that when the officers
25 who -- the detectives or I.D. takes them to the

152

1  station, they take photographs of everything --
2      A.   Right.
3      Q.   -- and reportedly what they were wearing at
4  the time of the event; correct?
5      A.   Right.
6      Q.   So would it be fair to say based on your
7  testimony and your memory now this is how they looked
8  that night, both the face and the full length to show
9  what clothes they were wearing?
10     A.   Yes, sir.
11     Q.   Okay, now that we've got that cleared up I
12 just have one more exhibit to show you and it's been
13 marked as State's Exhibit 76.  I'm going to show this
14 to you and ask if you can identify it.
15     A.   That's the area in -- the Port area off of
16 Brewster, east Port, Chaparral, Harbor Drive.
17     Q.   Is that photograph or that satellite
18 photograph clearly and accurately represent the area
19 and the street and the wooded area off Brewster Street
20 where these ladies were captured?
21     A.   Yes, sir.
22          MR. SKURKA:  I tender Exhibit 76 to
23 Defense Counsel offer into evidence.
24     Q.   (BY MR. SKURKA)  While he's looking at that,
25 I'm just going to ask you:  Is that essentially the

153

1  same kind of picture that you saw earlier through the
2  Google map thing on the stand?
3      A.   Basically.
4          MR. GARZA:  No objection, Your Honor.
5          THE COURT:  It's admitted.
6          MR. SKURKA:  I'll display that to the
7  jury.
8      Q.   (BY MR. SKURKA)  And using your laser pointer
9  can you point out where the Port is, where the Harbor
10 Bridge is, and where the wooded area on Brewster is?
11     A.   This is the Port area, Harbor Bridge is right
12 here.  Brewster Street is right here, Sam Rankin
13 Street is here.
14     Q.   Okay.  And just for the record, that's just a
15 physical representation of what we're looking at the
16 satellite pictures earlier?
17     A.   Yes.
18     Q.   But that does show the area of Brewster
19 Street and Sam Rankin?
20     A.   Yes.
21     Q.   Thank you.  You said there under -- when they
22 were captured both were under the influence of alcohol
23 or drugs or what?
24     A.   Combination of both.
25     Q.   Okay.  How can you tell?

154

1    A.    The way they act.

2    Q.    Have you had occasion in your 30 years as a

3  police officer to arrest or recognize the signs of

4  intoxication, either through alcohol or drugs?

5    A.    Yes, sir.

6    Q.    And did they exhibit those?

7    A.    Yes, sir.

8    Q.    Thank you.

9          MR. SKURKA:  That's all the questions I

10  have.

11         MR. GARZA:  I have no other questions,

12  Judge.

13         THE COURT:  You may stand down.  May this

14  witness be excused?  Hearing nothing you're excused.

15         MR. SKURKA:  Thank you, Your Honor.

16         THE COURT:  Please don't discuss your

17  testimony with anyone.  All right.  Call your next

18  witness.

19         MR. SKURKA:  Robert Chapa, Officer Chapa.

20         THE COURT:  All right.

21         MR. SKURKA:  Mary, do you have anymore

22  evidence tags?

23         THE COURT:  All right, come forward.

24         (Oath administered.)

25         THE COURT:  Be seated.  All right, Mr.

155

1  Skurka, you may proceed.

2          MR. SKURKA:  Thank you, Your Honor.

3

4          ROBERT CHAPA,

5  having been first duly sworn, testified as follows:

6              DIRECT EXAMINATION

7  BY MR. SKURKA:

8    Q.    Would you please introduce yourself to the

9  folks on the jury, please.

10   A.    Senior Officer Robert Chapa.

11   Q.    How are you employed currently?

12   A.    I'm employed with the Corpus Christi Police

13  Department.

14   Q.    How long have you been with the Corpus

15  Christi Police Department?

16   A.    For 14 years.

17   Q.    Do you work in any particular division of

18  C.C.P.D.?

19   A.    I'm currently assigned to the patrol division

20  and I'm also assigned to the SWAT team.

21   Q.    Have you worked in any other areas or

22  division of the police department besides the patrol?

23   A.    No.

24   Q.    How long have you been on the SWAT team?

25   A.    Ten years.

156

1    Q.    And do you have any specialized training in

2  the area of the SWAT Team?

3    A.    Just everything the SWAT Team is all about,

4  all the units is a specialized unit.

5    Q.    Okay.  I guess what I'm trying to say is

6  there's a specialty that you have in the SWAT Team

7  like, I don't know, demolition or explosives or --

8    A.    I'm a sniper for the team.

9    Q.    Okay.  Officer Chapa, I'm now going to direct

10  your attention back to the time of July 19, 2004, and

11  ask you if you got involved in a search for some

12  suspects in three robberies that occurred earlier

13  during that night?

14   A.    Yes, I did.

15   Q.    Can you tell the folks on jury how you first

16  got involved in the situation?

17   A.    Well, I was on patrol that night on my

18  regular patrol duty and there was a kind of a

19  back-to-back series of calls coming out, a couple of

20  robberies and a possible homicide and a lot of

21  officers were changing information on the radio and

22  dispatchers giving us information on, you know, what

23  was involved in the three -- they were trying to link

24  them together so that's the kind of information we

25  were getting at the time.

157

1    Q.    Did you have any information as a type of

2  suspect or the type of suspect vehicle that was BOLO'd

3  out to you or the other officers?

4    A.    I remember there were -- they were mentioning

5  a van was involved.

6    Q.    Do you remember the color of the van or

7  anything like that?

8    A.    Yeah, it was -- it was a red -- the way they

9  described it was a red van with a gray stripe.  I

10  never -- I never saw the van in motion so --

11   Q.    Okay, I'm not asking about that, I'm just

12  saying did you hear over the radio what kind of

13  vehicle they were looking at?

14   A.    Yes, it was a van.

15   Q.    Okay.  What about suspect description, did

16  you hear any suspect description broadcast over the

17  BOLO channel?

18   A.    The information I received was two females

19  and a male were involved.

20   Q.    What was your regular area of patrol that

21  night?

22   A.    The -- the area that I was assigned to was

23  the north side of town which is 37 north toward the --

24  to the ship channel.

25   Q.    Did that include the Port area, then?

158

1    A.    Yes.

2    Q.    Did you have any -- did you also hear on the

3  radio any indication of a pursuit that took place

4  involving a red van?

5    A.    Yes, I did.

6    Q.    Now, you were in the part of that pursuit;

7  correct?

8    A.    Correct.

9    Q.    And for the record, you weren't part of the

10 investigation of the three robbery locations; correct?

11   A.    Correct.

12   Q.    Your role was, I guess, just be -- to assist

13 in trying to apprehend the folks?

14   A.    That's correct.

15   Q.    Okay. So tell us where you went. When you

16 hear this call, did you also -- were you aware where

17 Officer Gray lost the van in his pursuit, the area?

18   A.    Sure.

19   Q.    Where was that?

20   A.    It was -- it was actually in the beat area

21 that I as assigned to work so the last information

22 that we got the vehicle was last seen on the north

23 side area of town, and that was my particular area of

24 patrol so I kind of knew the area that, you know, that

25 they had has seen vehicle, the --

159

1    Q.    Are you familiar with that area, how -- how

2  long had you patrolled that area before this night?

3    A.    At the time about eight-and-a-half years.

4    Q.    Eight-and-a-half years. So would it be fair

5  to say you were very familiar with that area?

6    A.    Yes.

7    Q.    Are you aware if that's a good -- can you

8  tell us what the area is like, is it residential,

9  business, industrial, what?

10   A.    That particular area is -- part of it is

11 housing or residential and a lot of it is more of a

12 industrial-type buildings, closer toward the Port.

13   Q.    I'm sorry, I didn't mean to interrupt, go

14 ahead. When you heard the pursuit was coming over at

15 your location or your beat, what did you do?

16   A.    Well, I wasn't too close to it but I was

17 headed that direction to see if I could intercept or

18 parallel. That's what we do when there's multiple

19 vehicles involved in a pursuit. We don't five, six

20 cars behind a pursuit, we parallel so if they're going

21 to go through the neighborhood, so that's what I was

22 doing, just paralleling the pursuit, see if they

23 would go down my way.

24   Q.    Are you aware of any streets that are like I

25 guess main thoroughfares that a person going into that

160

1  area would have to come in through or leave from?

2    A.    Well, the main streets going into the north

3  side area are Staples and Sam Rankin, Winnebago, and

4  Port -- north Port.

5    Q.    So where did you head for?

6    A.    I started going off Sam Rankin towards the

7  Port, and at that time the officers that were in

8  pursuit of the vehicle had last seen the suspect

9  vehicle in the area of Staples and Winnebago which is

10 in that general area.

11   Q.    So how many officers were out there in that

12 north side area of Port Ayers looking around?

13   A.    I couldn't give you a number, there was quite

14 a few though.

15   Q.    So you said you went down Sam Rankin toward

16 Port. Why that area?

17   A.    Well, there's really -- there's not a lot of

18 ways out of that -- that area, you know, those streets

19 dead end at the ship channel.

20   Q.    And are you aware of the buildings, fields,

21 locations around that area --

22   A.    Yes, sir.

23   Q.    -- that you had been patrolling for

24 eight-and-a-half years?

25   A.    Yes, sir.

161

1    Q.    Are there places around there where a person

2  could hide or a vehicle could be hidden?

3    A.    Oh, yeah, definitely.

4    Q.    Like what, what do you mean?

5    A.    Well, the area that -- closest to the Port

6  there are a lot of industrial buildings. At that time

7  of night everything is closed so it's dark, there's a

8  lot of hiding spots in between the buildings. There's

9  not a lot of general population out there at that time

10 of the night.

11   Q.    So as you headed down Sam Rankin towards

12 Port, what happened?

13   A.    There was a search for the vehicle. Nobody

14 -- you know, they had last seen vehicle in that

15 general area and then an officer found the van hiding

16 in some -- in some brushy area.

17   Q.    Do you recall that officer's name?

18   A.    Frakes, I believe.

19   Q.    So how did you -- how were you informed of

20 this, him finding the van? Were you there or did you

21 hear it on the radio?

22   A.    On the radio, that information was being put

23 on the radio.

24   Q.    So what did you do when you found that, did

25 you know the area where the van had been found?

162

1    A.   Yes, he -- he gave out a street name of
2  Brewster so I knew where Brewster was and we kind of
3  centralized that area where the van was seen.  There's
4  only so many directions, you know, anybody could go at
5  that point so I went to that general area.
6    Q.   So tell the jury exactly where you went
7  around Brewster Street, please.
8    A.   Well, I started going down Sam Rankin towards
9  Brewster Street and then some further information came
10  out shortly after that.
11    Q.   Which was?
12    A.   Officer Ralph Vasquez, he got on the radio
13  and I -- I caught a tail end of what his
14  description was on the -- on the radio, but I caught
15  him saying something about he had somebody at gunpoint
16  by the railroad tracks.  Now --
17    Q.   What did that indicate to you?
18    A.   Well, being from the area and indicating
19  where they last -- where they found the van and just
20  getting the information about railroad tracks I knew
21  exactly where Ralph was, you know, it was kind of an
22  isolated area, dirt road.
23    Q.   Officer, I'm going to show you a picture
24  that's up on the board and see if you can orient
25  yourself to this photograph.  What is that a

163

1  photograph of?
2    A.   That's a ship channel.
3    Q.   And where is the Harbor Bridge?  There's a
4  laser pointer in front of you, I'm sorry, I forgot to
5  tell you.  Show us where the Harbor Bridge is.
6    A.   It looks like it's right here.
7    Q.   Okay.  And where is Sam Rankin on this?
8    A.   Right here.
9    Q.   Okay.
10         MR. SKURKA:  Why don't we go a little
11  closer on that if we would, please, Geordie, and
12  center it over backwards.
13    Q.   (BY MR. SKURKA)  Does that show the area
14  we're talking about?
15    A.   Yes, sir, it does.
16    Q.   Okay.
17         MR. SKURKA:  Go in a little closer,
18  please.  Thank you.
19    Q.   (BY MR. SKURKA)  Okay, using the laser
20  pointer where were you coming from and where did you
21  go to?
22    A.   Okay, I was coming from Sam Rankin, this
23  area.  I was going north towards the -- towards the
24  Port Channel.
25    Q.   Okay.  So for the record, you're showing from

164

1  the bottom of the photograph toward the top?
2    A.   Yes.
3    Q.   And where did you -- where was Officer
4  Vasquez calling you from?
5    A.   Okay.  Officer Vasquez was -- I mean,
6  there's -- there's some railroad tracks going right
7  down this area so he was right in this area right
8  here.
9    Q.   So he was not on the road itself?
10    A.   There's a dirt road that runs in here and
11  that's the road that led me to him.  There's a dirt
12  road.
13    Q.   Okay.  Let's go back and tell the jury what
14  happened now that we're oriented to where it happened.
15  Tell the jury what you saw when you arrived at that
16  location off Sam Rankin and I guess the railroad
17  tracks?
18    A.   Yes.
19    Q.   Tell the jury what you did.
20    A.   Okay.  Well, as I was approaching -- well,
21  when I was going to the area I knew that Ralph was by
22  himself and really nobody knew -- they didn't have
23  a clear idea where he was so when I started heading to
24  where I, you know, thought that he would be I saw him
25  and he was out of his unit and he had his weapon drawn

165

1  out on two females and I noticed one female was
2  standing up and one was sitting down and, you know, I
3  got there as quickly as I could and I exited my
4  vehicle and started approaching the two females at a
5  safe distance just to back up the officer.
6         When I exited the vehicle I heard Ralph --
7  I'm sorry, Officer Vasquez giving commands to get on
8  the ground, get on the ground, and the female standing
9  up was not complying with those orders.
10    Q.   So what did you do?
11    A.   Well, I started -- I started doing, you know,
12  an officer safety-type approach, you know, coming
13  toward -- to the side of the female and she was
14  yelling out, she had her arms spread out just like
15  this yelling "shoot me, shoot me," and Ralph continued
16  to give her commands to get to the ground and she
17  wasn't complying so I was getting closer to her, she
18  turned around and gave us her back as if she was going
19  to maybe attempt to flee again and -- so I started
20  approaching her faster.  I started closing that
21  distance at a faster pace and she turned back around
22  facing towards us and then I took her to the ground.
23    Q.   How did you do that?
24    A.   I just physically took her to the ground.
25    Q.   Like grabbed her, tackle her, or what?

166

1    A.   Almost like a tackle, I guess you would say.

2    Q.   Now, did you -- did the Officer Vasquez have

3  his gun drawn?

4    A.   Yes.

5    Q.   Did you have your gun drawn?

6    A.   I don't believe I ever did.  You know,

7  Officer Vasquez had his weapon on the two suspects so

8  my job at that point would be to, you know, take them

9  to custody.

10   Q.   So, essentially you were backing up Officer

11 Vasquez who was covering you?

12   A.   Yes.

13   Q.   I have another photograph that's a closer up

14 of 68.  Now, Officer, and that's purportedly the

15 wooded area off Brewster Street and Officer Vasquez

16 has told us that the two Xs represent the area where

17 the women were captured; is that correct?

18   A.   That's correct.

19        MR. SKURKA:  Okay.  Go down to the bottom

20 left of that, Geordie, please.  No, bottom left.

21 There you go.

22   Q.   (BY MR. SKURKA)  Where were you -- how did

23 you get to that area?  Can you show us with the laser

24 pointer --

25   A.   Sure.

167

1    Q.   -- what road or whatever you went down?

2    A.   Okay.  This down here is Sam Rankin.  This --

3  this way is leading towards the Port.  So I was coming

4  down Sam Rankin and I turned into the dirt road and

5  Ralph was in the general area right here -- I'm sorry,

6  Officer Vasquez was.

7    Q.   What is this over on this side?

8    A.   It's like a -- it was like just a caliche

9  paved area, you know, storing stuff there I think at

10 one time.

11   Q.   And what is this along here?

12   A.   It's a railroad track.

13   Q.   So it's your recollection that they were

14 found around this area?

15   A.   That's correct.

16   Q.   Now, at the time you didn't see them by the

17 ditch or in the ditch; correct?

18   A.   That's correct.

19   Q.   Officer Vasquez would be the first one to

20 spot them?

21   A.   Yes, sir.

22   Q.   After you took them to the ground what

23 happened?

24   A.   I secured the -- the female that was standing

25 up and I -- the one I took to the ground was -- we

168

1  secured her and arrested her and then -- and Officer

2  Vasquez approached and we arrested the other female.

3    Q.   I'm going to switch this -- this angle and

4  show you another angle using the Google maps and I'm

5  going to ask you to look at that, please.  It's going

6  to come up in a second.

7         Okay.  This is purportedly Sam Rankin Street

8  and you said you were going toward the Port this way,

9  correct?

10   A.   That's correct.

11   Q.   Does that show the area or the location where

12 the people were found?

13   A.   Yes, it does.

14   Q.   Show us, please, with the laser pointer.

15   A.   Right in this area right here.

16   Q.   Okay.  And does that photograph show the -- I

17 guess the caliche road or the dirt road you were

18 talking about?

19   A.   Yes, this in here, this were also in here.

20   Q.   Okay, you're going to have to talk louder.

21   A.   Oh, I'm sorry, this section right here as

22 well as this -- this section over here.

23   Q.   Now, can you -- is this the view you had when

24 you first arrived at the scene looking back down in

25 this way or over here?

169

1    A.   Well, there was a distinctive dirt road and

2  this may have been blown over by now.  It -- it

3  appears to be this -- you know, this dirt road right

4  here.

5    Q.   Okay.  So it looks like it's this road.

6    A.   Correct.

7    Q.   And I don't want to -- you kind of called it

8  the caliche road?

9    A.   Yes.

10   Q.   Okay.  So that's the view you had and the

11 area where they were located, correct?

12   A.   Yes, sir.

13   Q.   Now, did you find the male subject that you

14 were looking for?

15   A.   No, sir, I did not.

16   Q.   When you were assisting Officer Vasquez, did

17 you see any male running around -- away from that

18 area, too?

19   A.   No, sir.

20   Q.   What else is around there?  If you were to go

21 further down the back end of this --

22        MR. SKURKA:  And let's get that other

23 photograph back up.  No, never mind, just go ahead and

24 go back in there.

25   Q.   (BY MR. SKURKA)  What is back there?

170

1    A.    Where is that, sir?

2    Q.    Well, what I'm trying is say is what's past

3  here?  We can't say from this angle and I'm going to

4  get the aerial photograph.  I just want to know if

5  they were captured over here in this area where the

6  two Xs were that you saw a second ago?

7    A.    Yes, sir.

8        MR. SKURKA:  That's good.  Thank you,

9  Geordie.

10   Q.    (By MR. SKURKA)  If this is Brewster Street

11 over here and Sam Rankin is on the bottom and they're

12 over here and you came down this way, what is over

13 here on this side?  If somebody was to run away where

14 could they go, what's over here?

15   A.    Okay, well, there continues to be wooded area

16 but I don't think you can see in this picture but

17 there is a large -- I guess a -- I'm at a loss for

18 words here -- like a drainage ditch, there you go, a

19 drainage ditch that runs all the way to the Port, all

20 the way out.  I think it ends in Winnebago, maybe a

21 little further than that.

22   Q.    So it's a water way?

23   A.    Yes.

24   Q.    Okay.  If you're over here by Sam Rankin in

25 this part and you're looking down this way could

171

1  you -- and you saw these people here, could you see

2  people over here from this angle from over here?

3    A.    From here to there?

4    Q.    Right.

5    A.    Probably not, especially with the lighting

6  conditions as well.

7    Q.    What were the lighting conditions?

8    A.    Very dark.  The only lights out there were

9  the lights to our units, our police cars.

10   Q.    Okay.  So would it be fair to say that

11 anybody looking from this end down the edge of the I

12 guess tree line or brush line would only be able to

13 see about this far and anything over this way they

14 would not be able to see?

15   A.    That's correct.

16   Q.    Okay.  So could you see anything down

17 there --

18   A.    No, sir.

19   Q.    -- over here?

20   A.    No.

21   Q.    So is it conceivable somebody could come --

22 just be a few feet over on this side and over here and

23 not be seen by the officer down here?

24   A.    That's correct.

25   Q.    Okay.  Did you assist the other officers

172

1  after -- after Angela Rodriguez and Christina Chavez

2  were captured?  Did you assist the officers in looking

3  for the other suspect, John Henry Ramirez?

4    A.    It was several hours later that I assisted in

5  this portion of it as I was -- I was tied up with one

6  of the females.

7    Q.    Tell us what you did.

8    A.    Well, from there, you know, we secured those

9  females, mirandized them, and then being that there

10 was a -- an aggravated robbery that had just occurred

11 prior to that I transported Angelia Rodriguez to

12 another location where Officer Flores was and -- you

13 know, to have her positively identified by one of the

14 victims over there.

15   Q.    So you were tied up taking one of ladies back

16 over to the scene at the Whataburger, correct?

17   A.    That's correct.

18   Q.    Later on, were you aware of any other

19 officers continuing the search around here for

20 Hispanic male that was supposed to be with these two

21 females?

22   A.    Oh, yeah, they had an extensive search going

23 on at that time.

24   Q.    How long did they search?

25   A.    Till the next day till sunrise at least and

173

1  then to that day.

2    Q.    How long -- you said you went back out there

3  later to help them?

4    A.    My shift didn't end till 7:30 in the morning

5  and I can't even recall, I may have worked late that

6  morning.

7    Q.    Did you go back to this area and help them

8  search?

9    A.    Yes.

10   Q.    And was there any -- what was the results of

11 the search for the other Defendant, John Henry

12 Ramirez?

13   A.    Well, there was nothing, nothing came up,

14 unable to find him.

15   Q.    Do you recall what the ladies -- the girls

16 were wearing, the ladies were wearing when they were

17 captured and the condition of their clothes?

18   A.    One of them was wearing like a white muscle

19 shirt, like an undershirt, under muscle shirt; and the

20 other one was wearing like a white halter top, I

21 think, something like that.

22   Q.    Like a white halter top?

23   A.    Yeah.

24   Q.    Did you notice any other conditions of their

25 clothing?

174

1      A.    The female that was wearing the white muscle

2    shirt had blood on her shirt, I recall that.  Other

3    than her clothing I guess just kind of looked -- a lot

4    of laughing going on, a lot of giggling, talking back

5    and forth.

6      Q.    Did they appear to be intoxicated or under

7    the influence of drugs to you?

8      A.    Oh, definitely, yes.

9      Q.    I'm sorry?

10     A.    Definitely, yes.

11     Q.    Drugs or alcohol, or can you tell?

12     A.    I couldn't tell.

13     Q.    Once they were identified you mentioned that

14    when you first came to them one was complying with Mr.

15    Vasquez' order and one was not.  Which is the one that

16    you had to tackle that wasn't comply with the orders?

17     A.    Angela.

18     Q.    That would be Angela Rodriguez?

19     A.    Correct.

20     Q.    Thank you, Officer Chapa.

21            MR. SKURKA:  No other questions.

22            THE COURT:  Cross?

23            MR. GARZA:  Judge, I don't think I have

24    any questions of Officer Chapa.

25            THE COURT:  All right.  You -- may this

175

1    witness be excused?

2            MR. SKURKA:  Yes, Your Honor.

3            THE COURT:  All right, you're free to go

4    about your business.  Do not discuss your testimony

5    during this trial.  All right, call your next witness.

6            MR. SKURKA:  Officer Perez.

7            THE COURT:  Come forward.

8            (Oath administered.)

9            THE COURT:  Be seated.  You may proceed.

10

11            FRANK PEREZ,

12    having been first duly sworn, testified as follows:

13            DIRECT EXAMINATION

14    BY MR. SKURKA:

15     Q.    Please state your full name for the record.

16     A.    My name is Frank B. Perez.

17     Q.    How are you currently employed?

18     A.    I'm employed with the City of Corpus Christi

19    Police Department.

20     Q.    How long have you been so employed?

21     A.    15 years.

22     Q.    Do you work in any particular division?

23     A.    Yes, sir, I work with the bike patrol.

24     Q.    How long have you been in the bike patrol?

25     A.    I've been in bike patrol for about four

176

1    years.

2      Q.    Before that, what did you do?

3      A.    I was in the uniformed division patrol

4    officer in a unit.

5      Q.    For how long?

6      A.    Pardon me?

7      Q.    How long were you in the patrol division?

8      A.    I was in the patrol division for about 11

9    years.

10     Q.    11 years.  What do your current duties

11    entail?

12     A.    Entail I patrol on the bicycle to northwest

13    part of the city.

14     Q.    Do you go with the partner or by yourself?

15     A.    With a partner.

16     Q.    Officer Perez, I want to direct your

17    attention back to July 19, 2004, and ask you if you

18    had occasion to assist in a search over off the area

19    of Brewster Street by the Port for some suspects who

20    were initially suspected in some robberies?

21     A.    Yes, sir.

22     Q.    Can you tell the jury how you first got

23    involved in the case?

24     A.    On this particular day when we came in, my

25    supervisor ordered us to go out to the area in order

177

1    to attempt to look for suspects or evidence.  During

2    the time when the incident had occurred it was pretty

3    dark so they wanted us to go out there and kind of

4    look over the area again in case someone was missing

5    the evidence while they were attempting to look

6    through the area.

7      Q.    Okay.  You're dropping your voice at the end

8    of your sentence.

9      A.    I'm sorry, let me move up here a little bit.

10    At that particular time we were ordered by our

11    supervisor to go out there to look at Sam Rankin,

12    Brewster, in that area cause some suspects had

13    abandoned a vehicle there and it was during the night

14    so it gets pretty dark out there so they wanted us to

15    go out there and take a look and see if we could

16    possibly contact the suspects and-or evidence possibly

17    in the area.

18     Q.    Can you describe the area for jury, please.

19     A.    The area is a pretty vegetated, there's a lot

20    of trees and a lot of grass growing.  Like I said,

21    it's pretty dark out there.

22     Q.    Were you familiar with that area?

23     A.    We've patrolled that area on occasion.

24     Q.    As you were going to that area, what, if

25    anything, did you discover?

178

1    A.    While looking through the area I observed a
2  black sandal laying in the grassy area close to --
3  away from the area where the suspect vehicle had been
4  abandoned.  This particular sandal had blood on it.
5  So I immediately contacted my supervisor who in turn
6  got a hold of an I.D. tech to go out there and
7  process the area and take control of the sandal that
8  was possibly abandoned by the suspects.
9    Q.    Can you tell the folks on the jury why you
10 don't pick that up and collect it, why you have to
11 call an I.D. tech?
12   A.    I don't want to touch it because in case
13 there was evidence on there I didn't want to taint it
14 in any way.
15   Q.    That's just typical procedure; correct?
16   A.    Yes, sir, it is.
17   Q.    I'm going to show you what's already been
18 admitted into evidence as State's Exhibit No. 64.  Do
19 you recognize that area?
20   A.    Yes, sir.
21   Q.    Can you tell us what that is, please.
22 There's a laser laser pointer in front of you, you
23 don't have to get up and show it.
24   A.    700 block of Brewster here.  This area right
25 here is kind of like an area for them to -- the

179

1  workers out there in order to lay out -- lay their
2  equipment.  I believe around here in this area there's
3  kind of water.
4    Q.    Okay.  And is that -- does that photograph
5  show the area where you found the sandal, or do I need
6  to get another one?
7    A.    This part would be about this area right here
8  where I located the sandal.
9    Q.    Okay.  I'm going to show you another
10 photograph.  This is No. 67.  Does that show the area
11 where you're searching?
12   A.    Yes, sir.  Actually, we were all throughout
13 this area right here and we came out over here and I
14 was able to locate the sandal around this area.
15   Q.    Were you there when the women were captured
16 or the van was found?
17   A.    No, sir.
18   Q.    Do you know where Officer Vasquez found the
19 women?
20   A.    No, sir, offhand I don't.
21   Q.    Okay.  I would like to take this up to you --
22 I want to have my assistant go up there and show you
23 this photograph and would you draw in a circle to show
24 where the sandal was found.
25   A.    (Witness complying.)

180

1         MR. SKURKA:  May I publish that to the
2  the jury, Judge?  That's already been admitted in
3  evidence.
4         THE COURT:  Yes.
5    Q.    (BY MR. SKURKA)  I'm going to show this to
6  the jury and you've indicated where the sandal is
7  found?
8    A.    Yes.
9    Q.    And is that little red -- that little blue
10 dot where the sandal was found?
11   A.    Yes, sir, uh-huh.
12   Q.    While I'm doing this, I would like you to
13 look at the next series of photographs, and I'm going
14 to write under where you put the -- put the sand on
15 I'm going to put the word sandal, okay?
16   A.    Yes, sir.
17   Q.    Have you looked at that next series of
18 photographs?
19   A.    Yes, sir.
20   Q.    And for the record, what are they called?
21        MR. SKURKA:  What are they, Geordie, I
22 forgot?
23        MR. SCHIMMEL:  79 through 84.
24   Q.    (BY MR. SKURKA)  79-84.  Do these photographs
25 fairly and accurately represent the scene as it was

181

1  that night?
2    A.    Yes, sir.
3    Q.    Do they show the area where the sandal was
4  found?
5    A.    Yes, sir.
6    Q.    And does this show the actual sandal itself
7  that looks like maybe taken at the lab?
8    A.    Yes, sir.
9    Q.    Or at the police department?
10   A.    Uh-huh.
11        MR. SKURKA:  Judge, I'll tender these
12 to Defense Counsel and offer them into evidence.
13        MR. GARZA:  No objection, Your Honor.
14        THE COURT:  They're admitted.  What
15 numbers are those?  What numbers are they?
16        MR. GARZA:  79 through 84, your Honor.
17        THE COURT:  Okay.
18        MR. SKURKA:  79 through 84, Mary.
19   Q.    (BY MR. SKURKA)  Let's start with the ones
20 that are out in the field.  I show you what's been
21 marked 79.
22        MR. SKURKA:  Can you get the lights?
23 Where is the Frank?  Thank you, sir.
24   Q.    (BY MR. SKURKA)  Okay.  What does that show,
25 State's Exhibit 79?

182

1    A.    It's the sandal laying on the ground.

2    Q.    Can you point to it using a laser point where

3 the sandal is found.

4    A.    Yes, sir, the sandal is here.

5    Q.    Is that you in the picture?

6    A.    No, sir, that's another officer.

7    Q.    That's who?

8    A.    Another officer, another bike officer.

9    Q.    Okay. Is that the kind of dirt road or

10 whatever you said?

11    A.    Yes, sir, it's -- you could see where a lot

12 of vehicles go through here.  They were doing some

13 construction work and lot of vehicles were going

14 through here and they have an area where they lay out

15 their equipment that they're using.

16    Q.    And what's that part behind this officer?

17    A.    This one right here?  It's like a creek of

18 some sort that runs alongside.

19    Q.    And that was shown on the other satellite

20 picture; correct?

21    A.    Yes, sir.

22    Q.    Two other photographs, 80 and 81, what do

23 those depict?

24    A.    Again, that's the sandal laying on the deck

25 right here?

183

1    Q.    And the next one?

2    A.    The sandal again.

3    Q.    Now, what caught your attention about this

4 particular sandal?

5    A.    This sandal had blood on it.

6    Q.    Can you remember what part of the sandal had

7 blood on it?

8    A.    If I remember correctly it was -- a lot of

9 blood this sitting here where the foot is actually.

10    Q.    Where the foot would rest?

11    A.    Yes, uh-huh.

12    Q.    I have some other photographs, 82, 83 and 84.

13 What are they?

14    A.    The sandal itself again.

15    Q.    And the last one?

16    A.    The sandal.

17    Q.    Those are actually photographs of the same

18 sandal but they're not out in the field; correct?

19    A.    No, sir.

20    Q.    And that would show both the top and the

21 bottom of the sandal; correct?

22    A.    Correct.

23    Q.    Who was the one that actually came out and

24 collected the sandal, if you recall?

25    A.    It was I.D. tech Hopkins.

184

1    Q.    Hopkins?

2    A.    Yes, sir.

3    Q.    And so it was turned over to the I.D.

4 department?

5    A.    Yes, sir, they came and turned -- took

6 photographs and took it into custody.

7    Q.    And so the I.D. technicians took it and you

8 haven't seen it since then?

9    A.    No.

10    Q.    Thank you.

11        MR. SKURKA:  I'll pass the witness at

12 this time.

13        THE COURT:  Cross?

14        MR. GARZA:  Yes, Your Honor.

15            CROSS-EXAMINATION

16 BY MR. SKURKA:

17    Q.    Officer Perez, I notice that there's a ruler

18 of some sort on that sandal?

19    A.    Yes, sir.

20    Q.    Do you know the exact measurement or was it a

21 small -- is that a pretty small sandal, or do you

22 remember?

23    A.    I can't say if it was pretty small, I really

24 don't remember to be quite honest with you.

25    Q.    Is that like about a six-inch ruler or how

185

1 big is it?

2    A.    I can't really tell.

3    Q.    You don't remember?

4    A.    No, sir.

5    Q.    Okay.  Could you tell if it was a female's

6 sandal or was it coed or a man's sandal?

7    A.    It looked possibly coed.

8    Q.    Coed, okay.  And this was the next day during

9 daylight hours?

10    A.    I was -- well, I don't know exactly what time

11 the incident took place but it was on the 19th, I

12 believe.

13    Q.    On the 19th?

14    A.    Yes, sir, uh-huh, at 10:30 hours in the

15 morning.

16    Q.    According to your report?

17    A.    Yes, sir.

18    Q.    Okay.

19        MR. GARZA:  Pass the witness, Your Honor.

20        THE COURT:  Anything else?

21        MR. SKURKA:  Yes, Judge.  May I approach?

22        THE COURT:  Yes.

23

24

25

186

REDIRECT EXAMINATION

1    REDIRECT EXAMINATION
2    BY MR. SKURKA:
3        Q.   We have what's marked State's Exhibit No. 85.
4    Do you recognize what this yellow thing is on the --
5        A.   Yes, sir, that's a property tag.
6        Q.   It's a property tag.  And who signed that
7    property tag?
8        A.   Hopkins.
9        Q.   Okay.
10       A.   I.D. tech Hopkins.
11       Q.   And does it identify the contents of State's
12   Exhibit No. 85?
13       A.   Yes, sir, the property tag indicates one
14   black vinyl size 5 sandal.
15       Q.   And does it indicate the location where it
16   was found?
17       A.   1902 Baldwin.
18       Q.   Okay.  He didn't find it in 1902 Baldwin, did
19   he?
20       A.   No, sir.
21       Q.   Okay.  And is Fletcher Hopkins still with us?
22       A.   No, sir, unfortunately he passed away.
23       Q.   I'm going to ask you to open what's been
24   marked as State's Exhibit No. 85 and not destroy the
25   seals part, just open the parts that haven't been

187

1    sealed.
2        A.   This part here?
3        Q.   Yes.  And retrieve the content of State's
4    Exhibit No. 83, please -- 85, I'm sorry.
5        A.   You want me to destroy the seal?
6        Q.   You can open it, just try not to tear up the
7    seal is why I gave you the scissors.
8        A.   Okay.  I'm not very good at this.
9        Q.   They seal them up pretty good, don't they?
10       A.   Oh, yeah.
11       Q.   For record, State's Exhibit No. 85 is a paper
12   sack, and what does it contain?
13       A.   It contains --
14       Q.   Can you bring it out, please.
15       A.   It's a sandal.
16       Q.   Is that the sandal that you found out there
17   at the scene?
18            THE COURT:  There's some gloves if you
19   want to use them.
20       A.   Yes, sir, yes.
21       Q.   (BY MR. SKURKA)  And that's the same as
22   depicted in the photograph and that you found out in
23   the grass.  That's the actual sandal, is it not?
24       A.   Yes, sir, it is.
25       Q.   Can you tell by looking at the sandal what

188

1    size it is or if it's a male or a female sandal?
2        A.   Indicates at the bottom that it's a size 5,
3    seems to be pretty small statute.  Again, you really
4    can't tell if it's coed.
5        Q.   Okay.  And can you demonstrate to the jury
6    where -- the area you saw the blood on it.  Hold it up
7    for the jury to see.
8        A.   The area of the blood that I saw was right
9    here, underneath the foot.
10       Q.   For the record, you're pointing to the top
11   part of the sandal where I guess the toes would be?
12       A.   Yes, sir.
13       Q.   That's where you saw?
14       A.   Uh-huh.
15       Q.   How much blood was there?
16       A.   It was a good amount.
17       Q.   Okay.  You can't see it right now very well,
18   can you --
19       A.   No, sir.
20       Q.   -- after four years?  Okay.
21            MR. SKURKA:  That's all the questions I
22   have, Judge.
23            THE COURT:  Okay.  Anything else?
24            MR. GARZA:  No.
25            MR. SKURKA:  I'm sorry, did I offer it?

189

1    State's Exhibit 85 has been admitted?
2            THE COURT:  I don't think so.  Are you
3    moving to admit it?
4            MR. SKURKA:  We move to admit it.
5            MR. GARZA:  No objection, Your Honor.
6            THE COURT:  It's admitted.  Nothing
7    else?
8            MR. GARZA:  No.
9            THE COURT:  All right, you're free to go
10   about your business.
11           THE WITNESS:  Thank you, Your Honor.
12           THE COURT:  Please don't discuss your
13   testimony with anyone --
14           THE WITNESS:  Yes, sir.
15           THE COURT:  -- while the trial is going
16   on.  All right, call your next witness.
17           MR. SKURKA:  Officer Casares.
18           (Oath administered.)
19           THE COURT:  You may proceed.
20           MR. SKURKA:  Thank you, Your Honor.
21
22
23
24
25

190

1              VICTOR CASARES,
2   having been first duly sworn, testified as follows:
3              DIRECT EXAMINATION
4   BY MR. SKURKA:
5       Q.    Would you please introduce yourself to the
6   folks on the jury.
7       A.    My name is Victor Ray Casares.
8       Q.    How are you currently employed?
9       A.    I am a police officer with the Corpus Christi
10  Police Department.
11      Q.    How long have you been an officer employed by
12  Corpus Christi Police Department?
13      A.    Seven years for this department.
14      Q.    Have you had any law enforcement experience
15  before your seven years with the Corpus Christi Police
16  Department?
17      A.    Yes, I was ten years with the Nueces County
18  Constables's Office, Precinct One, which is the
19  Constable's Office in the courthouse.
20      Q.    Who are the constables you worked under?
21      A.    Worked under Johnny Alaniz, Natie Alaniz, and
22  Rudy Casares, Constable Rudy Casares.  He's currently
23  a constable.
24      Q.    So all together would it be fair to say you
25  have 17 years in law enforcement experience?

191

1       A.    That's correct.
2       Q.    Tell us where you work now or what area of
3   division you work now, please.
4       A.    I'm assigned to the uniform division, I work
5   patrol.
6       Q.    How long have you been in patrol?
7       A.    All seven years.
8       Q.    Do you have any military experience in your
9   background?
10      A.    I have some Coast Guard Reserve experience.
11      Q.    How long have you been in the Coast Guard
12  Reserve?
13      A.    I was in the reserves for eight years.
14      Q.    I want to direct your attention back to July
15  19th, 2004, and ask if you were on duty that night.
16      A.    Yes.
17      Q.    Where were you working that night?
18      A.    I was working on the south side of town.  I
19  worked out of the Corona substation at that time and I
20  was on patrol on that side of town, Staples, Airline
21  area.
22      Q.    At that time, did you have occasion to hear
23  radio traffic or BOLO calls in reference to a robbery,
24  homicide that took place at Times Market and two other
25  aggravated robberies that took place at the

192

1   Whataburger on Staples Street and a Whataburger on
2   Texan Trail and Alameda?
3       A.    Yes.
4       Q.    You can keep track on all that stuff even
5   though you're on the other side of town?
6       A.    Yes, because when they broadcast out they
7   broadcast out a major crime to all channels so any
8   district that you're in you can hear it over the
9   radio.
10      Q.    What did -- were you aware of any pursuit
11  that took place of those suspects or vehicle they were
12  driving?
13      A.    Yes, and that's what brought me from the
14  south side to downtown was the -- the BOLO of pursuit.
15  I had heard that.  The JET Unit, which is the Juvenile
16  Enforcement Team, was in pursuit of a vehicle fitting
17  the description of the robbery and the murder and --
18  and that's when I came to this side of town to assist.
19      Q.    So were you told to go over to that side of
20  town or was it just kind of routine procedure you go
21  over there to help out?
22      A.    It's just routine procedure, you just let the
23  the dispatcher know I'm in route to that location to
24  assist.
25      Q.    Just to make the record clear, you didn't

193

1   have any part of the actual investigation of those
2   three crimes or the pursuit; correct?
3       A.    That's correct.
4       Q.    All you did was go to help find the suspect
5   or the suspect vehicle?
6       A.    That's correct.
7       Q.    As you went over to that north side of town
8   where the pursuit was taking place or ending, what, if
9   anything, were you hooking for?
10      A.    I was looking for a full-sized van, I heard
11  red or maroon color was the description, and it was
12  last seen in the north side of town and the BOLO had
13  mentioned one male and at least one female inside the
14  van.
15      Q.    Were you aware during the time you were
16  either going over there or arriving at that area that
17  the van had been located and some of the suspects had
18  been located?
19      A.    Yes.
20      Q.    How many of suspects had been located that
21  you knew about?
22      A.    Well, the first thing that I heard was that
23  the van was spotted by a fellow officer that works in
24  the same shift and so I began to drive down there.  I
25  saw where the van was, and that's when I began to park

194

1    my vehicle and I got off on foot to search for the
2    suspects.
3        Q.    Can you tell us specifically where you got
4    out to search?
5        A.    I parked my vehicle in the -- in the Brewster
6    Street and at the end of Brewster Street right at --
7    was it Stroman at that intersection.
8        Q.    And what did you do then?
9        A.    I began to walk around on foot around the
10   wooded area as it was being surrounded by officers.
11       Q.    I'm going to show you what's been marked
12   State's Exhibit 66 and ask if you recognize that.
13       A.    Yes.
14       Q.    What is that area?
15       A.    That's the brushy area where this crime scene
16   ended up at. The vehicle was found there.
17       Q.    There's a laser pointer in front of you.
18   Maybe that will help you.
19       A.    Okay.
20       Q.    First of all, tell us where Brewster Street
21   is.
22       A.    This right here is Brewster Street.
23       Q.    And where was the van located?
24       A.    Somewhere in -- in this area. It had driven
25   into the woods so you could hardly see it.

195

1        Q.    So for the record, you're talking about kind
2    of toward the middle of the brushy area?
3        A.    Right, towards the middle of the brushy area.
4    It was in -- in the brush about a hundred feet or so.
5        Q.    As you arrived at the location, did you --
6    were you aware that the females had been apprehended
7    already?
8        A.    No.
9        Q.    Had they been apprehended already?
10       A.    No.
11       Q.    Where were you?
12       A.    I parked my vehicle on this side, at the
13   corner of -- off the dirt right off of the side of
14   Stroman man and Brewster here and then I began to walk
15   on foot.
16       Q.    Okay. What -- we're looking at State's
17   Exhibit 66. Okay. As you were walking down that road
18   show us where you went and what you were looking for.
19       A.    I was looking in the brush with my
20   flashlight. Everything was extremely dark so I just
21   was walking around looking for any movement down the
22   road, all around, but mainly hooking into the brushy
23   area since I saw the vehicle had been located over
24   here, the -- we figured that somewhere in this brushy
25   area had to have been where the suspects are either

196

1    still are or were escaped from.
2        Q.    As were you looking for them, what did you
3    find?
4        A.    As I was walking around the corner I heard
5    that the -- the officers had located the females and
6    so they had said by the ditch so I began to run to
7    this area to see if I can assist the officers and take
8    them into custody but at that point they were already
9    enough officers giving commands and taking control of
10   the situation.
11       Q.    You talking about in the capture of the
12   women?
13       A.    Exactly.
14       Q.    Okay. I'm going to show you what's been
15   marked as State's Exhibit 68. That's a same scene but
16   from a different angle, and that would be Brewster
17   Street on the right, I believe.
18       A.    That's right.
19       Q.    And so where were you at?
20       A.    About over here.
21       Q.    Okay. Officer Vasquez and Chapa have just
22   testified that these two Xs represent approximately
23   the area where the two women were apprehended. You
24   said that you were coming down this road.
25       A.    Right.

197

1        Q.    What, if anything, did you find along the
2    tree line if you -- when you're coming down the road?
3        A.    Well, as these females were being apprehended
4    I began to look into the wooded area more closely as I
5    figured that they must have come out through here
6    since the van was located over here somewhere so as I
7    began to look through the brush line I discovered a
8    white towel, like a hand towel.
9        Q.    Was it in the open area or was it in the
10   brush?
11       A.    It was in the brush, in the grassy -- on the
12   grass along the brush line.
13       Q.    I'm going to have you mark on the diagram
14   where exactly you found it. I'm sorry, not on the
15   diagram, on this picture. I'm going to show you
16   marked State's Exhibit 66 and I would like you to draw
17   a circle or an X where you found the rag and just put
18   like a circle or X and then put rag next to it.
19       A.    Okay.
20       Q.    Is that a better picture or one of the other
21   pictures better?
22       A.    No, that's good.
23       A.    Let me show that to the jury now. You've
24   drawn a circle and then the word rag right by there.
25            THE COURT: Are you moving to introduce

198

1  this?

2              MR. SKURKA:  I'm sorry, it's already been

3  introduced, Judge.

4              THE COURT:  Oh, it has, okay.

5              THE WITNESS:  Yes.

6      Q.   (BY MR. SKURKA)  So that's the approximate

7  area where you found it.

8      A.   Approximate.

9      Q.   Approximate.  Okay, I'm going to show you a

10  series of photographs now marked 86, 87, 88 and 89,

11  and ask you to look look at those to yourself.

12      A.   (Witness complying.)

13      Q.   Have you recognized what's depicted in

14  State's Exhibit 86 through 89?

15      A.   Yes, that was the rag that I found.

16      Q.   Is this a fair and accurate representation of

17  rag as you found it in the grass?

18      A.   Yes.

19              MR. SKURKA:  I show 86 through 89 to

20  Defense Counsel and offer them into evidence.

21              MR. GARZA:  No objection, Your Honor.

22              THE COURT:  All right, they're

23  admitted.

24      Q.   (BY MR. SKURKA)  Now that they're admitted I

25  want to show them to you in the sequence and we'll

199

1  start with 86.  Show us what that picture depicts.

2      A.   This is the rag right here that I found.

3      Q.   And 87?

4      A.   A more close-up view of the rag.

5      Q.   And 88?

6      A.   An even closer view of the rag and you can

7  see the -- the grass had been mashed down.

8      Q.   And 89?

9      A.   This is just a real close-up of the same rag,

10  the same position.

11      Q.   When you saw this rag, what made you catch --

12  what caught your attention with it?

13      A.   Well, the first thing was the blood.

14      Q.   How much blood was on it?

15      A.   It was enough blood that you could see it

16  as -- it had different spots that had blood on it but

17  the -- most importantly is the fact that the color of

18  the blood appeared fresh, it didn't have the -- that

19  old, non-glossy look that old blood has when it dries.

20  This one was still fresh on the rag, it wasn't cracked

21  or hazed over.

22      Q.   Is that a rag that's a rag by itself or

23  appeared to be torn off of something else?

24      A.   When I just looked at it, it was just like

25  this, kind of looked like a hand towel.

200

1      Q.   And could you see any other things around the

2  towel or rag that indicated how long it had been

3  there?

4      A.   Well, the -- the fact that the grass around

5  it had been meshed down, it was pretty clear to me

6  that someone had just mashed that grass down and threw

7  that towel there very recently.

8      Q.   What made you think that?

9      A.   Just because the grass didn't look like that

10  on the other parts where -- of the other areas that we

11  were searching it, it was still standing up and this

12  area it had looked like someone had just passed

13  through there and then the towel being in the path of

14  the smashed grass just gave me the impression that

15  someone had just been there recently.

16      Q.   Was that area fairly overgrown?

17      A.   Yes.

18      Q.   Was there anything over -- I don't know how

19  to say this, grass covering it or weeds coving this

20  rag?

21      A.   No.

22      Q.   Did you find the male suspect that they were

23  looking for?

24      A.   No.

25      Q.   Did you continue to look after you found the

201

1  rag for him?

2      A.   Yes.

3      Q.   Was he ever located that night or the early

4  morning hours to your knowledge?

5      A.   No, sir.

6      Q.   What -- who came and collected the rag?

7      A.   It was I.D. Tech Prebul.

8      Q.   And why was that?

9      A.   We just called for I.D. tech and they send us

10  one out to collect the evidence.

11      Q.   So you didn't retrieve this rag or take

12  custody of it or anything?

13      A.   That's correct.

14      Q.   But that is an accurate photograph of it?

15      A.   Yes.

16              MR. SKURKA:  That's all the questions I

17  have then, Judge.

18              THE COURT:  Cross?

19                  CROSS-EXAMINATION

20  BY MR. GARZA:

21      Q.   Mr. Casares, when you were out there looking

22  and searching, the consequence of your duties that

23  night, you didn't have any idea who had dropped that

24  in there or placed that there --

25      A.   No, sir.

202

1    Q.  -- did you? And you really didn't have any
2    idea how long it had been there, did you?
3        A.   Not as far as an actual time, no.
4        Q.   Okay.
5            MR. GARZA:  That's all I have, Your
6    Honor.
7            THE COURT:  Anything else?
8            MR. SKURKA:  No, Your Honor.
9            THE COURT:  You may stand down.  You're
10   free to go about your business.
11           THE WITNESS:  Thank you.
12           MR. SKURKA:  This next witness is going
13   to take a little bit.
14           THE COURT:  Let's take a break.
15           MR. SKURKA:  This may be a good time to
16   take a break.
17           THE COURT:  All right, all rise for the
18   jury.
19           (Jury exits courtroom.)
20           (Short recess.)
21           (Out of the presence of the jury.)
22           THE COURT:  Mr. Skurka, I understand that
23   this next witness you're probably going to introduce
24   some photographs of graphic nature.
25           MR. SKURKA:  They are, Judge.  I'll let

203

1    you look at them and decide.
2            THE COURT:  Let's take a look so we
3    can -- once we get the jury in we can continue.
4            MR. SKURKA:  Good idea, Judge.
5            THE COURT:  Why don't we do this, why
6    don't you show me those photographs and show me the
7    other photographs of the -- of the victim so that I
8    can kind of compare.
9            MR. SKURKA:  Most of these I think you
10   didn't admit the other day were of the wounds --
11           THE COURT:  The wounds itself, okay.
12           MR. SKURKA:  -- and of the face.  I don't
13   think any of those have come in.
14           THE COURT:  Okay.
15           MR. SKURKA:  I mean, I know they haven't
16   come in.
17           THE COURT:  Okay.  All right, let's take
18   a look here.
19           MR. SKURKA:  Those are just the ones you
20   looked at the other day.  The other ones -- I mean,
21   there's more that I've taken out, too.
22           THE COURT:  Okay.  You want to take a
23   look, Mr. Garza?
24           MR. GARZA:  Yes, Your Honor.
25           THE COURT:  Why don't you -- still, I

204

1    want to see the pictures of the ones we've admitted
2    that show the body.  I just -- I think it would be
3    helpful to me.
4            All right, Mr. Garza?
5            MR. GARZA:  Well, Your Honor, I'm going
6    to lodge the same objection that I had previously.
7            THE COURT:  Okay.
8            MR. GARZA:  They are rather gruesome and
9    they also are cumulative and we need to know to what
10   issue are they going to relate that the State is
11   needing to use them --
12           THE COURT:  Okay.
13           MR. GARZA:  -- that the other pictures
14   couldn't accomplish.
15           THE COURT:  Well, let me take a look.
16           MR. SKURKA:  You'll see a big difference.
17           THE COURT:  Okay.  Most -- let's see,
18   most of these photographs don't really show the
19   wounds.  The only photograph that really does somewhat
20   show the wound is State's Exhibit 17.  The rest of
21   them are really from a pretty far distance and I think
22   17 is still from a distance.
23           MR. SKURKA:  It doesn't show any
24   close-ups of the face or the wound.
25           THE COURT:  It doesn't show any close-ups

205

1    of the body.  It does show --
2            MR. GARZA:  Okay.
3            THE COURT:  -- you can see in State's
4    Exhibit 17 if you really look at least two puncture
5    wounds on the neck and then we have this other --
6    okay.
7            MR. SKURKA:  And, Judge, I can understand
8    if you go through them and not admit all of them but,
9    you know, I'm going to admit -- I'm going to ask you
10   to get the ones that aren't duplicative and show the
11   different angles of the wounds.  The man was stabbed
12   29 times, Judge, and quite a few of them, the doctor
13   will testify, were from around that area.
14           THE COURT:  I mean, I think this
15   photograph shows the wound on the neck.  I think it
16   shows all of them from what I can tell.  And if you
17   can -- if you can show me wounds that aren't in this
18   photograph -- of course, we don't have them marked
19   yet --
20           MR. SKURKA:  Sure.
21           THE COURT:  -- in here that are not
22   visible, that particular photograph, I'll consider it.
23           MR. SKURKA:  This looks pretty much the
24   same.  This one looks pretty much the same.
25           Judge, this one shows more of the left --

206

1  I'm sorry, yeah, the left shoulder than this one does
2  and there's some stab wounds around that part, too.
3  One of them is shown on this picture but the other one
4  --
5          THE COURT:  Now you're referring to
6  State's Exhibit 17.
7          MR. SKURKA:  Right.
8          THE COURT:  Okay.
9          MR. SKURKA:  I don't remember seeing the
10  wounds on the right side.  Let me look at my autopsy
11  diagram.
12          THE COURT:  Okay.
13          MR. SKURKA:  Okay, that shows the neck.
14  Did Rupp -- I'm sorry, going back in time.
15          THE COURT:  Going backwards.
16          MR. SKURKA:  Dr. Fernandez showed me
17  where all the wounds were and does that show the right
18  chin?  Okay, there's a wound right here that was not
19  shown on the other pictures.  There's one on the right
20  side of the neck.
21          THE COURT:  Okay, this picture here I
22  think shows.
23          MR. SKURKA:  Okay.
24          THE COURT:  Okay.  There's one on the
25  right side of the neck.  There's one in -- looks a

207

1  little bit to the left of the thorax.
2          MR. SKURKA:  There's not one on the right
3  side of the neck.  Okay, the right side of the neck
4  doesn't have any wounds so I can eliminate that.
5  They're all on the left side of the neck.
6          THE COURT:  I really think we ought to
7  mark those.  We can mark them like some astronomical
8  number.
9          MR. SKURKA:  I know, Judge, but we'll
10  settle it right here.
11          THE COURT:  Okay.
12          MR. SKURKA:  So which are the two that
13  you have?
14          THE COURT:  This one here.  Now, this
15  one --
16          MR. SKURKA:  That's the one I showed you
17  that has more back here on the left shoulder that's
18  not shown on this part.
19          THE COURT:  Okay.  I think that's --
20          MR. SKURKA:  But I'll go ahead and take
21  these others out.
22          THE COURT:  I think that's reasonable.
23  Why don't we mark those so the Appeals Court can --
24  should we get to that point.
25          MR. SKURKA:  If you want me to, Judge, I

208

1  will.
2          THE COURT:  I mean, you can mark them 200
3  to whatever.  I think those are repetitive and I
4  do agree with you that you do need to show the wounds,
5  but due to the graphic nature of these photographs I'm
6  only going to allow one photograph to illustrate those
7  and I think these two photographs can illustrate all
8  of the wounds that are on the neck and this other one
9  can show you the wounds that are on the shoulder and I
10  don't think it's necessary to introduce all of those.
11          MR. SKURKA:  Okay.
12          THE COURT:  So I'm going to let you --
13  over Defense Counsel objection, I'm going to allow you
14  to introduce those two.  Why don't we mark them.
15          MR. SKURKA:  What are our next two
16  numbers?
17          MR. GARZA:  For the record, Judge, I just
18  want to restate the same objection before and the
19  other -- the other photos seem to have a cumulative
20  effect which I understand that the -- the Court is
21  going to sustain that part of the objection.
22          THE COURT:  That's -- sustain that part
23  of the objection.
24          MR. GARZA:  And if the State can state
25  the reasons or articulate the reason as to why they

209

1  need those pictures in the first place.
2          MR. SKURKA:  I think I already did that
3  and the Judge has already ruled so I'll go ahead --
4          THE COURT:  Okay.  You want to call those
5  what?
6          MR. SKURKA:  I'm going to call this --
7  first of all, Geordie, what are these next ones?
8          MR. SCHIMMEL:  90 and 91 are the ones I
9  just marked.
10          THE COURT:  Okay.
11          MR. SKURKA:  90 and 91 are the ones the
12  Judge has accepted.
13          THE COURT:  Okay, I'm going to admit
14  those.
15          MR. SKURKA:  This is 500, 501, 502, 503,
16  504, 505, and 506 is the ones the Court did not allow
17  in.
18          THE COURT:  Okay, so I'm going to
19  sustain your objection as to the ones from 500 to 506.
20  I'm going to overrule your objection as to 90 and 91.
21  90 and 91 I guess I might as well just -- we'll just
22  admit them at this point.
23          MR. SKURKA:  That's what I was going to
24  ask, Judge, can we just go ahead and move to admit
25  them?

210

1    THE COURT:  Let's go ahead and admit
2  them.  That will save a little time.  All right, are
3  we ready?
4    MR. SKURKA:  Yes, Judge.
5    THE COURT:  All right, let's get the
6  witness.  I guess somebody get the witness.
7  Mr. Schimmel, I mean, I don't know if you-all want
8  these photographs now.  These are the ones that have
9  already -- this is -- these are already admitted that
10  you showed me.
11    All right, you can go ahead and take the
12  stand, and let's bring them in.
13    (Jury enters courtroom.)
14    THE COURT:  All right, be seated, please.
15    MR. SKURKA:  Thank you, Your Honor.
16    THE COURT:  Oh.
17    (Oath administered.)
18    MR. SKURKA:  Your Honor, may I proceed?
19    THE COURT:  Yes.
20
21    ALLEN KIRKSEY,
22  having been first duly sworn, testified as follows:
23    DIRECT EXAMINATION
24  BY MR. SKURKA:
25    Q.   I'm not sure if I've informed you this, Mr.

211

1  Kirksey, but you're under the rule.
2    A.   Yes, sir, you did.
3    Q.   I did inform you?  Okay.  You know what that
4  entails?
5    A.   Yes, sir, I do.
6    Q.   Okay.  Let's go ahead and get started by
7  telling us your full name.
8    A.   William Allen Kirksey.
9    Q.   How are you currently employed?
10    A.   I'm a crime scene technician with the Corpus
11  Christi Police Department.
12    Q.   How long have you been a crime scene
13  technician with the Corpus Christi Police Department?
14    A.   11 years and months.
15    Q.   Can you tell the jury exactly what a crime
16  scene technician does for the City Police Department?
17    A.   Basically what we do is we photograph the
18  scene by documenting it, with taking notes, possibly
19  doing a sketch on it, we collect any physical
20  evidence, and finally, we'll process the scene for my
21  latent fingerprints.
22    Q.   Explain to the jury what training you've had
23  to become a crime scene technician.
24    A.   Okay.  I have a Bachelor's degree in computer
25  science, I've had 40 hours of TCLEOSE credit in the

212

1  fundamentals of crime scene investigation and evidence
2  collection, I've had 24 TCLEOSE credit hours in
3  shooting incident reconstruction, I've had 40 hours
4  of TCLEOSE credit in basic bloodstain analysis, I've
5  had 24 hours of TCLEOSE credit -- no, 16 hours of
6  TCLEOSE credit in courtroom testimony, I have 40 hours
7  of TCLEOSE credit in basic -- 40 TCLEOSE hours in
8  fingerprint, patterns and classifications, I've had 40
9  basic hours as a breath test operator, I've had 24
10  hours in techniques of latent fingerprint processing,
11  I've had 24 hours of introduction to crime scene
12  techniques, I've had 40 hours of computer assisted
13  crime scene mapping, I've had 16 hours of field
14  sobriety and courtroom testimony.
15    That's basically the extent of my basically
16  schooling, and then I've had on-the-job training.
17    Q.   Before you go on, I want to ask you, you keep
18  saying TCLEOSE training.  Can you explain to the folks
19  on the jury what TCLEOSE means, or what that
20  organization is.
21    A.   TCLEOSE is basically accredited law
22  enforcement credits toward law enforcement training.
23    Q.   And how often do you have to get that or is
24  that required?
25    A.   This is no really requirement to get it, and

213

1  in our profession, we do have a career ladder where we
2  have to meet certain TCLEOSE credit hours to obtain
3  the next certification level.
4    Q.   And are you certified as a crime scene
5  technician?
6    A.   Not at the moment.
7    Q.   And how many hours do you have to have?
8    A.   I have to have 144.
9    Q.   Okay.  And how many do you have?
10    A.   I got about 209, somewhere around there.
11    Q.   You're not certified and you have 209 hours?
12    A.   They just implemented this last year --
13    Q.   Oh.
14    A.   -- and we have to wait a year before we were
15  eligible to take it.
16    Q.   I see, so what you're saying is you have
17  enough hours but the certification process has just
18  been put in place?
19    A.   Right.
20    Q.   Okay.  So you actually have more -- twice as
21  much as what's required?
22    A.   Yes, sir.
23    Q.   Okay.  Tell us -- you were talking about
24  besides the schooling, what on-the-job training have
25  you received?

214

1    A.    On-the-job training, approximately 3 months
2  of on-the-job physical training where they supervise
3  basically every step that you do as your crime scene
4  technician from taking the photographs to latent print
5  processing to actually going out to the scene and
6  physically being observed doing what you have to do
7  out at the scene by already certified crime scene
8  investigator.
9    Q.    And how long did you go through that training
10  with another person helping training on the -- in the
11  field?
12    A.    Approximately three months.
13    Q.    What tools do you use in your job?
14    A.    Well, we use a 35-millimeter camera, we use a
15  digital camera, we use a tripod, we use fingerprint
16  brushes, fingerprint powders, alternate light sources,
17  Microseal, dental stone, measuring tape, various hand
18  tools such as saws, screw drivers, ladders, amido
19  black chemicals of various types.
20    Q.    How many crime scenes have you worked as
21  your -- what did you say, 11 years as a crime scene
22  technician, would you guesstimate?
23    A.    Estimate about 30 calls a week, times 52
24  weeks per year times, what, 11, almost 12 years, just
25  guesstimating, a good 5- to 8,000, at least.

215

1    Q.    And those -- those range from smaller crimes
2  to capital murder cases?
3    A.    Yes, sir, it does.
4    Q.    Okay.  Have you testified in court before as
5  an expert in crime scene or crime scene work?
6    A.    Yes, sir, I have.
7    Q.    How many times have you testified in court in
8  that regard?
9    A.    I would say a good 500 times at least.
10    Q.    Mr. Kirksey, I now want to direct your
11  time -- your attention back to a time of July 19th,
12  2004, and ask you if you had occasion to be called out
13  to assist in an investigation at or near the 1902
14  Baldwin Street which is referenced as the Times
15  Market?
16    A.    Yes, sir, I did.
17    Q.    Can you tell the folks on the jury when you
18  got called out and how you were called out?
19    Q.    At that time I was working the graveyard
20  shift which was 11 p.m. to 7 a.m.  At approximately
21  11:47 p.m. I received a radio call from the dispatcher
22  asking me to be in route to 1902 Baldwin.  In this
23  case, she said for an injured party.  Upon my arrival
24  I discovered that it was actually a homicide.
25    Q.    What did you do then?

216

1    A.    I basically took notes, located any physical
2  evidence that was there, photographed the scene, and
3  collected any of the physical evidence.
4    Q.    Did you also talk with any detectives or
5  officers at the scene and directing you to what
6  happened or what they think happened or where the
7  items -- evidence were?
8    A.    Basically the officer gave me a little run
9  down of what he knew at the time and really not even
10  that much of it.  He basically gave me the case number
11  and the victim's name, and basically that was it.
12  Other than that, they basically went and started
13  interviewing the witnesses that were on scene.
14    Q.    So you just had the peripheral knowledge of
15  what had happened?
16    A.    Basically, yes, sir.
17    Q.    So what did you do?
18    A.    Basically I located any of the physical
19  evidence, I placed markers down on this evidence, I
20  then photographed the scene, I then did a rough crime
21  scene sketch of the scene.  I then collected the
22  physical evidence and then I departed the scene until
23  the next day when I went to the morgue to attend the
24  autopsy.
25    Q.    Okay.  Let's start at the Times Market.  I

217

1  know you did a whole lot of stuff on this case but
2  let's start at the Times Market, okay?
3    A.    Okay.  Now, for the record, you wrote like a
4  26-page report on this case; correct?
5    A.    Yes, sir.
6    Q.    And the Times Market was not the only thing
7  that you did in this case but it's one of the things
8  that you did; correct?
9    A.    Yes, sir.
10    Q.    Let's start with that then and I'm going to
11  ask you, can you describe the scene as you saw it that
12  night?  What did you find when you arrived at the
13  scene?
14    A.    Basically, I observed the victim laying on
15  his back in what appeared to be a pool of blood.
16  Surrounding the victim was numerous pieces of loose
17  paper, white envelopes, paper sacks, ball cap, a gold
18  ring, and in one of parking spaces this was a quarter.
19  In addition to that, I saw numerous bloody -- a pair
20  of bloody shoe impressions and tire impressions around
21  the body.
22    Q.    When you say -- you said that you took
23  photographs first.  Did you come to draw a crime scene
24  diagram or to scale -- not to scale, or to scale?
25    A.    Yes, sir, I did.

218

1        MR. SKURKA:  May I approach?

2        THE COURT:  Yes.

3    Q.   (BY MR. SKURKA)  I show you what's already

4   been admitted into evidence as State's Exhibit 17.  Do

5   you recognize that?

6    A.   Yes, sir, I do.

7    Q.   What is it?

8    A.   It's Pablo Castro and it also shows a letter

9   marker of K.

10   Q.   Okay.  Is that the scene as Pablo Castro

11  appeared that night?

12   A.   Yes, sir, it is.

13   Q.   I show you two other items that have already

14  been admitted as State's Exhibit 90 and 91.  What are

15  those?

16   A.   91 is a close-up of one of Pablo Castro's

17  neck wounds.

18   Q.   And 90?

19   A.   Basically it's a close-up of Pablo Castro's

20  face, also showing the neck wound.

21   Q.   Okay.  And you're the one that took those

22  photographs?

23   A.   Yes, sir.

24   Q.   And do these photographs fairly and

25  accurately represent Pablo Castro as he looked that

219

1   night?

2    A.   Yes, sir.

3    Q.   I show what's marked State's Exhibit 92 and

4   93 and ask if you can identify them.

5    A.   Yes, sir I can.

6    Q.   What are they?

7    A.   These are the final drawings to the sketch

8   that I performed at the scene at the Times Market that

9   evening.

10   Q.   What is the difference between 92 and 93, if

11  anything?

12   A.   92 is the entire overall scene, 93 is a

13  close-up just basically surrounding the body of Pablo

14  Castro.

15   Q.   Okay.

16        MR. SKURKA:  Judge, I believe that 91

17  and 90 have already been admitted so I move that 92

18  and 93 be admitted into evidence after showing them to

19  Defense Counsel.

20        MR. GARZA:  No objection, Your Honor.

21        THE COURT:  All right, they're

22  admitted.

23   Q.   (BY MR. SKURKA)  Would these items help the

24  jury coordinate and help you show to the jury where

25  these certain items were found that you're going to

220

1   testify to?

2    A.   Yes, sir, it would.

3    Q.   And you've already -- I've already shown you

4   State's Exhibit 17.  I'm now going to show you if you

5   were -- were you able to get close enough to examine

6   the victim's body?

7    A.   Yes, sir, it I was.

8    Q.   And see the wounds?

9    A.   Well, some of the wounds, yes.

10   Q.   Some of the wounds.  And I'll show you what

11  the Judge has -- had -- I'm sorry, what we've marked

12  as 90 and 91 and ask if you can identify --

13        MR. SKURKA:  May I publish them to the

14  jury?

15        THE COURT:  Yes.

16   Q.   (BY MR. SKURKA)  Okay.  I'm going to show you

17  what's No. 90.  What is that a photograph of?

18   A.   That is a photograph of Pablo Castro's face

19  and --

20   Q.   There's a laser pointer in front of you.

21   A.   Right in this vicinity, I can't tell which

22  one, either that or that there is a knife wound to his

23  neck.

24   Q.   Now, at the time you're out there do you

25  have -- do you look for every wound that's on his

221

1   body?

2    A.   No, sir, I do not.

3    Q.   Were these just the obvious wounds that you

4   can see?

5    A.   Just the obvious wounds that I can see.

6    Q.   And is that the appearance, how he appeared

7   that day?

8    A.   Yes, sir.

9    Q.   I'll show you a more close-up which is marked

10  91.  What is that?

11   A.   That is a close-up of Pablo Castro's neck and

12  you can see a pair of knife wounds right there on his

13  neck.

14   Q.   Thank you.  Now let's look at 91 -- I'm

15  sorry, 92.  What does 92 depict?

16   A.   It looks like 92 depicts the entire crime

17  scene.

18        MR. SKURKA:  Would you go a little

19  closer on that, Geordie.  Okay, now move to the right.

20   Q.   (BY MR. SKURKA)  Just to orientate yourself

21  because I need to get closer to show the jury what

22  we're talking about.  Using the laser pointer, can you

23  show me where the building is and where the body was

24  located, please.

25   A.   This here is the physical Times Market, the

222

1    front entrance to the Times Market.  Basically over
2    here if I remember right is a car wash and the
3    physical body is here.  There's a street going right
4    across here and then there's another street going over
5    in this direction.
6        Q.    Okay.  Let me take this out wider to show you
7    that.  Now, are you sure the street is behind that at
8    the top of that item or is it to the left?
9        A.    Talking about Riggan Street here?
10       Q.    Yes?
11       A.    Okay, it's on the left, yes.
12       Q.    And where would Baldwin Street be?
13       A.    I believe it's going to be up here but I'm
14   not entirely certain without seeing the rest of
15   the scene.
16       Q.    Do you mean the rest of the scene in the
17   photographs?  I'll show you what's marked State's
18   Exhibit 3 which you said was a closer-up view of the
19   items that you mentioned?
20       A.    Yes, sir.
21       Q.    What does that show?
22       A.    Start off over here, this is a pair of tire
23   track.  I can't tell you whether it's a tire track or
24   just a normal tire track.  Again, here's another tire
25   track, and all these little dots here which is too

223

1    small for me to read is various pieces of evidence.
2        Q.    Let's go in a little closer then.  I assume
3    that body diagram is where Pablo Castro lay?
4        A.    Yes, sir.
5        Q.    And can you tell us what those numbers
6    represent all around the body?
7        A.    Not without referring to my notes.
8        Q.    Okay, go ahead.  Well, can you tell us
9    generally what they are?
10       A.    Okay, generally, they're going to be tire
11   tracks, shoe impressions, paper sacks, envelopes, gold
12   ring, ball cap, quarter, basically all the evidence
13   that I mentioned earlier that was surrounding his
14   body.
15       Q.    I'm going to go through the diagram and go
16   through your report and ask you about certain items
17   that you recovered and the corresponding number.
18   Would that be easier to go by?
19       A.    Yes, sir.
20       Q.    Okay.  Let's look at page 1 of your report
21   then, and I'm going to direct your attention to item G
22   labeled item G.  Where is that found on the diagram?
23       A.    It would be located right here.
24       Q.    And what was item G, please?
25       A.    Item G was a white envelope containing a pay

224

1    stub.
2        Q.    And was there anything else on the pay stub?
3        A.    It had a -- what appeared to be apparent
4    bloodstain on it.
5              MR. SKURKA:  May I approach the witness,
6    Your Honor?
7              THE COURT:  Uh-huh.
8              MR. SKURKA:  May I approach?
9              THE COURT:  Yes, yes.
10       Q.    (BY MR. SKURKA)  I show you what's been
11   marked State's Exhibit No. 94 and 95.  What do those
12   depict, please?
13       A.    94 is the picture of the envelope as it
14   appeared out at the scene.
15       Q.    And what is 95?
16       A.    95 is a lab photograph that I took of the
17   same envelope depicting apparent bloodstain that was
18   on the envelope.
19       Q.    So 94 and 95 are the same thing, one is just
20   taken at the scene and one is at the lab?
21       A.    Yes, sir.
22             MR. SKURKA:  I tender State's Exhibit
23   No. 94 and 95 to Defense Counsel and offer into
24   evidence.
25             MR. GARZA:  No objection, Your Honor.

225

1              THE COURT:  They're admitted.
2        Q.    (BY MR. SKURKA)  Now I'm going to show them
3    to the jury and, again, they correspond to the letter
4    G on there; correct?
5        A.    Yes, sir, they do.
6        Q.    What does G show and using your laser
7    pointer.
8        A.    G shows the white envelope here on the -- I
9    don't know if you can see it.  Yeah, you can see it.
10   On the outside you'll see Pablo's first name and right
11   here you can see the apparent bloodstain on it.
12       Q.    Can we show lab picture now, which is State's
13   Exhibit 95.  What is that?
14       A.    That is the same envelope, G, that was found
15   out at the scene.  You can see Pablo's name on the
16   outside of it and you can see the apparent bloodstain
17   right here.
18             MR. SKURKA:  Judge, these are little
19   layered on so do you mind if I publish them to the
20   jury by hand, hand them to the jury, is that okay?
21             THE COURT:  Yeah, that's fine.
22             MR. SKURKA:  So they can look at them
23   themselves?
24             THE COURT:  That's fine.
25             MR. SKURKA:  I'll start up here and then

226

1  you-all can pass them down this way.
2      Q.   (BY MR. SKURKA)  So you collected that and
3  labeled that, correct?
4      A.   Yes, sir, I did.
5      Q.   What is the next thing you saw according to
6  your report?  And I'm going to direct you back to N,
7  the letter N.
8      A.   Letter N will be black and yellow K-Products
9  ball cap.
10     Q.   And where was that found in location and
11  direction to the body?  I'm sorry, I guess the diagram
12  would help you see that; correct?
13     A.   Yes, sir.
14     Q.   Where would N be?
15     A.   N would be right there.
16     Q.   And N represents the location of the ball
17  cap?
18     A.   Yes, sir, it does.
19         MR. SKURKA:  May I approach, Judge?
20         THE COURT:  Yes.
21     Q.   (BY MR. SKURKA)  I show you 96 and 97.  What
22  are they?
23     A.   Okay.  Evidence 96 is a close-up of the ball
24  cap labeled as N that was originally at the crime
25  scene.

227

1      Q.   What's the other one?
2      A.   Exhibit 97 is basically the mid range of this
3  photograph that shows a little more detail of various
4  other items surrounding the ball cap --
5      Q.   So would it be fair -- I'm sorry, I didn't
6  mean to interrupt.  Go ahead and finish.
7      A.   Labeled as N.
8      Q.   Okay.  So would it be fair to say that one of
9  them is a mid-range shot and one is a more close-up
10  shot of the ball cap?
11     A.   Yes, sir.
12     Q.   And that was taken by you?
13     A.   Yes, sir.
14     Q.   And do they fairly and accurately represent
15  the scene as it was that night?
16     A.   Yes, sir, they do.
17         MR. SKURKA:  I show State's Exhibit 96
18  and 97 to Defense Counsel and offer them into
19  evidence.
20         MR. GARZA:  No objection, Your Honor.
21         THE COURT:  All right, they're
22  admitted.
23         MR. SKURKA:  May I publish them to the
24  jury, Your Honor?
25         THE COURT:  You may.

228

1          MR. SKURKA:  Would you show them up on
2  the screen so everybody can see them, please.
3      Q.   (BY MR. SKURKA)  What does that show, that
4  would be 95, I believe?
5      A.   97.
6      Q.   That's 97, I'm sorry.
7      A.   97 here which is the photograph being shown
8  is the mid-range photograph showing the ball cap N
9  along with various other items that were found at the
10  crime scene.
11     Q.   And the next one 95 -- or 96, I'm sorry?
12     A.   That is the ball cap, a close-up of the ball
13  cap and letter labeled as N in the crime scene.
14     Q.   Going back to the diagram, please, what is
15  the next thing you found after the ball cap that you
16  labeled, and I'm going to direct your attention to
17  label P as in Paul?
18     A.   Letter P is right here near the body on the
19  diagram and that is going to be a 10K gold ring.
20     Q.   And for record, that's showing slightly to
21  the right of the body in the diagram?
22     A.   Yes, sir.
23         MR. SKURKA:  May I approach?
24         THE COURT:  Yes.
25     Q.   (BY MR. SKURKA)  I show you what's marked

229

1  State's Exhibit 98 and 99.  Can you identify those for
2  the jury, please.
3      A.   Exhibit 98 a mid range of the letter P which
4  depicts the gold ring, and Exhibit 99 is a close-up of
5  this gold ring labeled as P in the photograph.
6      Q.   And that's the same thing that's represented
7  in the diagram next to the body?
8      A.   Yes, sir.
9          MR. SKURKA:  I show Defense Counsel 98
10  and 99 and offer them into evidence, Your Honor.
11         MR. GARZA:  No objection.
12         THE COURT:  All right, they're
13  admitted.
14         MR. SKURKA:  Now that they've been
15  admitted into evidence I'll have them published to the
16  jury.
17     Q.   (BY MR. SKURKA)  What does 98 now that's been
18  admitted show?
19     A.   That is the mid-range photograph of the crime
20  scene showing the letter P which was the gold ring.
21     Q.   Why do you-all use those little -- I don't
22  know what they call them, markers or cones there?
23     A.   It makes it a lot easier to distinguish the
24  evidence, especially in far-away photographs.  In
25  addition to that, sometimes -- you can't see it here

230

1 but there's a scale on the bottom of the thing which
2 will enable you to determine size.
3     Q.   So P represents where the ring was found;
4 correct?
5     A.   Yes, sir.
6     Q.   And we'll show up the close-up now.  And what
7 does that depict, State's Exhibit 99?
8     A.   99 is a close-up of the letter P which is the
9 10K gold ring, and you can see it right there and this
10 is the scale that I was talking about.
11     Q.   And where is -- indicate the ring for the
12 jury, please.
13     A.   The ring is right there.
14     Q.   So that was found -- going back to the other
15 photograph before that, how far is that from the body?
16     A.   Oh, I could only give you an estimate,
17 probably no more than three feet, if that.
18     Q.   You didn't measure that part?
19     A.   Well, I have to have the crime scene sketch
20 shown and then I would have to take a ruler to it.
21     Q.   Okay.  That's all right, the estimate is fine
22 at this time.
23     What is the next thing you found in relation
24 to the body, and I'll direct your attention to the
25 report and the letter T.

231

1     A.   That would be a quarter.
2     Q.   And looking at the diagram again.
3     A.   You'll have to move out.  It's going to be in
4 the parking space way over here.
5     Q.   It's where?
6     A.   In one of parking spaces and I think it's
7 over here.
8     Q.   Is it on the other diagram --
9     A.   Yes, sir.
10     Q.   -- is that what you're saying?  Okay, we'll
11 switch diagrams then.
12     A.   I believe it's going to be that there but I
13 have to see a close-up of it.
14     Q.   We're coming for you.
15     A.   Right there.
16     Q.   Okay.  So this was a quarter found in the
17 parking space.  And which parking space is that?  How
18 many over from the front of the store?
19     A.   Two over this direction, five over from the
20 other direction.
21     Q.   Okay.  You can't say "other direction," the
22 record doesn't show what that is.  From the front of
23 the store?
24     A.   Now, there's directions, I don't know which
25 way you're going.  Two from the north and five from

232

1 the south.
2     Q.   Okay.  From the front of the store, sir.
3     A.   This is going to be the front.
4     Q.   Isn't the front of the store right
5 here, sir?
6     A.   That's the store but you're talking about how
7 many parking spaces over.  That's one, two, and that's
8 going to be facing north.  This is south down here,
9 that's going to be one, two, three, four, five from
10 the south end.
11     Q.   Okay.
12     A.   Maybe I'm not following question that you're
13 asking.
14     Q.   All I'm trying to figure out is a reference
15 point to how many spaces over from the front door of
16 the store, the front area of parking lot is.  That
17 would be five, would it not?
18     A.   The front door to the store is actually right
19 here so it would be right in front of the door.
20     Q.   Let me show you a photograph of the front of
21 the store, please.  I'm going to show you a couple of
22 photographs marked 5 and 4.  Please take a look at
23 these and tell me if the front of the store is over on
24 the side of the building where the parking spaces are?
25     A.   The front of the store is going to be located

233

1 over here.
2     Q.   And where are the parking spaces?
3     A.   The parking spaces there and I think you also
4 got some over here but I'm not entirely certain.
5     Q.   Okay.  But where did you find -- where would
6 T be in that picture?
7     A.   If I remember it's going to be over here but
8 I can't see clear enough in the photograph to tell you
9 for certain.
10     Q.   How about an aerial photograph, would that
11 help you?  Yes, no?
12     A.   Might.
13     Q.   I'm going to show you what's marked State's
14 Exhibit 13 and give you a better reference point,
15 please.  That's already been admitted into evidence.
16 Where would the crime scene be in relationship to the
17 store, is it the front of the store or the side of the
18 store?
19     A.   Right in this area right here.
20     Q.   And where are the parking spaces?
21     A.   You got parking spaces right back here, and
22 you might have some up here but I would have to see
23 beyond this.
24     Q.   The photographs that you saw a minute ago,
25 are they over here and the body was found there or

234

1  here?
2      A.   The body was found right over here.
3      Q.   Where was the dumpster?
4      A.   Dumpster should have been somewhere in this
5  vicinity but it's not here.
6      Q.   Okay.
7          MR. SKURKA:  May I have just a moment?
8          THE COURT:  Yes.
9          MR. SKURKA:  I'm sorry, we're having
10  trouble finding the right picture.  State's Exhibit 19
11  might be better.
12      Q.   (BY MR. SKURKA)  Does that show a different
13  perspective or angle where the body was and where the
14  dumpster was?
15      A.   You got the driveway there, you're going to
16  have another driveway over here, you're going to have
17  a street over here, you got the store here, and you're
18  going to have another street over here.
19      Q.   I understand.  Wasn't the dumpster back
20  toward the back fence, not on the side?
21      A.   Okay, might be closer to the fence, yes, sir.
22      Q.   Okay.  It would be fair to say it's closer to
23  the back fence than it is to the exit that you pointed
24  out earlier; correct?
25      A.   Right.

235

1      Q.   Okay.  I know it's been four years ago so I
2  want to make sure we have the angle right and
3  everything.  Let's go back to T.  You said it was a
4  quarter that was found over there?
5      A.   Yes, sir.
6          MR. SKURKA:  And let's go back to the
7  diagram, Geordie.  Maybe we can use that as a
8  reference point.
9          May I approach, Your Honor?
10          THE COURT:  Yes.
11      Q.   (BY MR. SKURKA)  I show you what's been
12  marked State's Exhibit No. 100 and 101.  Can you look
13  at those and see if you can recognize those?
14      A.   100 is going to be the mid-range photograph
15  of the letter T which represents the quarter that was
16  found laying in the parking space at the crime scene,
17  and Exhibit 101 is going to be a close-up of the
18  quarter labeled as T that was laying in the parking
19  space at the crime scene.
20      Q.   And can you show us again on the diagram
21  where that was?
22      A.   Right here.
23      Q.   Okay, thank you.
24          MR. SKURKA:  I tender 100 and 101 to
25  Defense Counsel and offer them into evidence.

236

1          MR. GARZA:  We have no objection, Your
2  Honor.
3          THE COURT:  They're admitted.
4          MR. SKURKA:  May I publish them to the
5  jury, Judge?
6          THE COURT:  You may.
7      Q.   (BY MR. SKURKA)  What is that, please, No.
8  100?
9      A.   100 is going to be the mid-range photograph
10  of the letter T which represents the quarter that was
11  laying in the parking space at the crime scene.
12      Q.   And 101?
13      A.   Is going to be a close-up photograph of the
14  letter labeled T which is the quarter that was laying
15  in the parking space at the crime scene.
16      Q.   And did you collect that piece of evidence
17  also?
18      A.   Yes, sir, I did.
19      Q.   Now, did you take photographs of the scene
20  and the body in relation showing to all the -- I'm
21  sorry, all cones?
22      A.   Yes, sir, I did.
23      Q.   Okay.  I'm going to show you 24 and 23.  Do
24  those show the location of the various cones found
25  around the victim's body?

237

1      A.   Yes, sir, they do.
2      Q.   And if we move in closer in on it you can see
3  the actual letters; correct?
4      A.   Yes, sir, you could.
5      Q.   Now, after you took pictures of these and
6  you -- we've shown you the pictures, did you actually
7  collect those items themselves?
8      A.   Yes, sir, I did.
9          MR. SKURKA:  May I approach, Your Honor?
10          THE COURT:  Yes.
11      Q.   (BY MR. SKURKA)  No. 102, I'm going to show
12  you, a packet marked State's Exhibit 102.  Can you
13  identify what that is?
14      A.   Yes, sir, I can.
15      Q.   What is it?
16      A.   It's going to be the ball cap labeled as N I
17  believe in the photographs.
18      Q.   Would you go ahead and open that package and
19  don't disturb the other seals.  Are you the one that
20  packaged it and put it inside that brown paper sack?
21      A.   Yes, sir, I am.
22      Q.   Would you open it and retrieve the item
23  within it.
24      A.   (Witness complying.)
25      Q.   Can you identify the content of that exhibit,

238

1   please.
2       A.   Yes, sir, I can.
3       Q.   What is it?
4       A.   It's going to be the black and yellow
5   K-Products ball cap labeled as N that was in the crime
6   scene.
7       Q.   Is that the same one that's depicted in the
8   photographs and in the diagram that you showed
9   earlier?
10      A.   Yes, sir, it is.
11          MR. SKURKA:  Your Honor, I move for the
12  admission of that exhibit.
13          MR. GARZA:  No objection, Your Honor.
14          THE COURT:  It's admitted.
15          MR. SKURKA:  Just set it on top of that
16  stack.  Judge, I have about two or three more items
17  and then I think I'll have a stopping point.
18          THE COURT:  Okay.
19      Q.   (BY MR. SKURKA)  And for the record, 102 is
20  actually a paper sack that contains the ball cap
21  itself, right?
22      A.   Yeah, Exhibit No. 102.
23      Q.   I show you what's marked State's Exhibit No.
24  103.  Can you recognize that?
25      A.   Yes, sir, I can.

239

1       Q.   What is it?
2       A.   It is going to be the 10K gold ring that was
3   found at the crime scene.
4       Q.   How do we know it's the same one.
5       A.   Because it is in the same envelope that I
6   sealed it in when I collected it at the crime scene.
7       Q.   And did you fill out the evidence tag?
8       A.   Yes, sir, I did.
9       Q.   I'm going to ask you to open up State's
10  Exhibit 103 with the scissors, please.
11      A.   (Witness complying.)
12      Q.   Were you able to take that out?  What is it?
13      A.   It's the 10K gold ring that I found at the
14  crime scene.
15      Q.   Is that the same gold ring you found at the
16  crime scene labeled what was the number on there?  The
17  letter, I'm sorry.
18      A.   P, I believe.
19          MR. SKURKA:  Your Honor, we'd ask him
20  to show that to the jury and first move for its
21  admission.
22          THE COURT:  Any objection?
23          MR. GARZA:  No objection, Your Honor.
24          THE COURT:  It's admitted.
25      Q.   (BY MR. SKURKA)  Can you show it to the jury,

240

1   please.  Is that -- is that the same ring that you
2   showed in the photograph earlier?
3       A.   Yes, sir, it is.
4       Q.   Okay.  You can set that down and now I'm
5   going to show you what's marked State's Exhibit 104.
6   Can you identify State's Exhibit 104, please.
7       A.   It's going to be the quarter that I found at
8   the crime scene.
9       Q.   And what does -- what letter does it --
10  corresponds to the coin?
11      A.   That's going to be the letter T.
12      Q.   That's the letter T that you said you found
13  in the parking -- I'm sorry, the quarter found in the
14  parking space on the side of the building?
15      A.   Yes, sir, it is.
16      Q.   Can you open that and see if you can identify
17  the contents of 104?
18      A.   Yes, I can.
19      Q.   What is it?
20      A.   It's the quarter that I found at the crime
21  scene.
22      Q.   How do we know it's the same one?
23      A.   Cause it's still in the sealed clear plastic
24  bag that I put it into.
25      Q.   Is it the same condition as it was when you

241

1   found it?
2       A.   Yes, sir, it is.
3           MR. SKURKA:  We move for its admission,
4   Judge, State's Exhibit 104.
5           MR. GARZA:  No objection, Your Honor.
6           THE COURT:  It's admitted.
7       Q.   (By MR. SKURKA)  And could you hold it up and
8   show that to the jury, please.
9       A.   (Witness complying.)
10          MR. SKURKA:  Judge, I believe this is all
11  I have from this scene.  I ask this we continue
12  tomorrow morning.
13          THE COURT:  Okay.  All right, ladies and
14  gentlemen, let's break for the day.  We'll see you at
15  9:00 tomorrow.  Let's all rise for the jury.
16          (Jury exits courtroom.)
17          THE COURT:  Be seated.  Anything we need
18  to take up before tomorrow?
19          MR. GARZA:  No, Your Honor.
20          THE COURT:  Okay.  See you-all tomorrow.
21          (Adjournment.)
22
23
24
25

242

```
 1   THE STATE OF TEXAS )

 2   COUNTY OF NUECES    )

 3             I, Mary Lopez Buitron, Official Court

 4   Reporter in and for the 94th Judicial District Court of

 5   Nueces County, State of Texas, do hereby certify that

 6   the above and foregoing contains a true and correct

 7   transcription of portions of evidence and other

 8   proceedings requested in writing by counsel for the

 9   parties to be included in this volume of the Reporter's

10   Record, in the above-styled and numbered cause, all of

11   which  occurred in open court or in chambers and were

12   reported by me.

13             I further certify that this Reporter's

14   Record of the proceedings truly and correctly reflects

15   the exhibits, if any, admitted by the respective

16   parties.

17             I further certify that the total cost for

18   the  preparation of this Reporter's Record is $_____

19   and was  paid/will be paid by_____.

20             WITNESS MY OFFICIAL HAND this the ____

21   day of ____October_____, A.D., 2008.

22

23   MARY LOPEZ BUITRON, CSR, RPR, Texas CSR #2731
     Expiration Date: 12/31/2009
24   Official Court Reporter, 94th District Court
     Nueces County, Texas, 901 Leopard, Room 901
25   Corpus Christi, Texas 78401
     (361)888-0658
```