1

<pre>
 1                      REPORTER'S RECORD
                   APPELLATE COURT NO. AP-76,100
 2                TRIAL COURT CAUSE NO. 04-CR-3453-C
                     VOLUME 18 OF 25 VOLUMES
 3
   THE STATE OF TEXAS      )        IN THE DISTRICT COURT
 4                         )
                           )
 5   VS.                   )        94TH JUDICIAL DISTRICT
                           )
 6   JOHN HENRY RAMIREZ     )        NUECES COUNTY, TEXAS

 7

 8

 9

10

11                   _____

12                       TRIAL PROCEEDINGS

13                          (Continued)
</pre>

**FILED IN
COURT OF CRIMINAL APPEALS**

OCT 0 6 2009

**Louise Pearson, Clerk**

<pre>
14                   _____

15

16

17

18

19           On the 3rd day of December, 2008, the

20   following proceedings came on to be heard in the

21   above-entitled and numbered cause before the HONORABLE

22   BOBBY GALVAN, Judge Presiding, held in Corpus Christi,

23   Nueces County, Texas:

24           Proceedings reported by Stenograph

25   Machine.
</pre>

2

```
 1   APPEARANCES:

 2   MR. MARK SKURKA
     SBOT NO. 18475570
 3   MR. VERNON G. SCHIMMEL
     SBOT NO. 24033039
 4   ASSISTANT DISTRICT ATTORNEYS
     901 Leopard, Rm. 205
 5   Corpus Christi, Texas 78401
     Phone: (361) 888-0410
 6
     ATTORNEYS FOR THE STATE
 7
     -AND-
 8
     MR. EDWARD F. GARZA
 9   SBOT NO. 07731200
     ATTORNEY AT LAW
10   719 S. Shoreline, Suite 201
     Corpus Christi, Texas  78401
11   Phone: (361) 888-8877

12   MR. JOHN GRANT JONES
     SBOT NO. 10917000
13   ATTORNEY AT LAW
     5826 Beauvals Drive
14   Corpus Christi, Texas  78404-6173
     Phone: (361) 884-8141
15
     ATTORNEYS FOR THE DEFENDANT,
16   JOHN HENRY RAMIREZ

17

18

19

20

21

22

23

24

25
```

3

```
 1                           INDEX
                    VOLUME 18 OF 25 VOLUMES
 2                     TRIAL PROCEEDINGS
     DECEMBER 3, 2008                            Page   Vol.
 3   Continuation of trial proceedings ................ 5     18

 4   STATE'S WITNESSES (Cont'd)        Direct Cross V.Dire  Vol.
     ALLEN KIRKSEY (Cont'd) .............. 7     95          18
 5                                     106   108
     Brief hearing out of presence of jury ............ 5     18
 6       In Re:  State's Exhibit 109-146
     Hearing outside presence of jury ................ 85     18
 7       In Re:  Exhibit
     Hearing out of the presence of jury .............. 110    18
 8       In Re:  Extraneous offenses

 9   STATE'S WITNESSES (Cont'd)        Direct Cross V.Dire  Vol.
     CHRISTINA CHAVEZ ................... 114    158          18
10                                      181    185
     Witness admonished as to rule..................... 113    18
11   Hearing out of the presence of the jury ........... 173    18
         In Re: Videotaped statement of Christina Chavez
12   Court's ruling ................................... 176    18

13   STATE'S WITNESSES (Cont'd)        Direct Cross V.Dire  Vol.
     JOHN PREBUL ....................... 188   220   210    18
14                                      213
     MARSHA PARKER ..................... 222                 18
15   RUBY GARCIA ....................... 237   257          18

16   Adjournment ..................................... 269    18

17   Court Reporter's Certificate .................... 270    18

18                 ALPHABETICAL INDEX TO WITNESSES
                                 Direct Cross VDire Vol.
19   CHAVEZ, CHRISTINA ................... 114    158          18
                                          181    185
20   GARCIA, RUBY ....................... 237    257          18
     KIRKSEY, ALLEN (Cont'd) ............. 7,106  95,108       18
21   PARKER, MARSHA ..................... 222                  18
     PREBUL, JOHN ...................... 188   220   210     18
22                                      213
                          EXHIBITS
23   FOR THE STATE:
     NO.        DESCRIPTION           Offered Admitted Vol.
24   SX-105     Hanes T-shirt  ............ 10     10      18

25   SX-106     Rustler blue jeans ......... 13     13      18
```

4

```
 1                        EXHIBITS (Continued)
      FOR THE STATE:
 2    NO.        DESCRIPTION               Offered Admitted Vol.
      SX-107      Purple top tube ............ 17      17      18
 3
      SX-108      Blood swab (pay stub) ...... 21      21      18
 4
      SX-109-146  Photos ..................... 5       6       18
 5
      SX-147      CD-ROM case ................ 55      55      18
 6
      SX-148      White shirt  ............... 57      57      18
 7
      SX-149      Steering wheel cover ....... 60      61      18
 8
      SX-150      Vodka bottle ............... 63      63      18
 9
      SX-151      Two $1.00 bills ............ 63      64      18
10
      SX-152      Two Little Caesar receipts . 63      64      18
11
      SX-153      Visa card .................. 63      64      18
12
      SX-154      Photo (child) .............. 63      64      18
13
      SX-155      Gearshift lever ............ 63      64      18
14
      SX-156      Bic lighter ................ 63      64      18
15
      SX-157-167  Blood and control sample ... 63      64      18
16                swabs

17    SX-168-170  Latent fingerprint cards ... 83      84      18

18    SX-171-176  Photos (Angela Rodriguez) .. 195     196     18

19    SX-177-178  Photos (Carpris) ........... 195     196     18

20    SX-179-188  Photos (Christina Chavez) .. 195     196     18

21    SX-189      White rag .................. 210     217     18

22    SX-190      Clothing and changing sheet  219     219     18
                  (Angela Rodriguez)
23
      SX-191      Clothing and change sheet .. 220     220     18
24                (Christina Chavez)

25    SX-192-193  Fingerprints and palm prints 231     232     18
                  (John Henry Ramirez)
```

5

1          P R O C E E D I N G S
2     December 3, 2008
3          (Out of the presence of the jury.)
4          THE COURT:  All right, we're back on
5     the record.  I understand the State is moving to
6     pre -- well, I guess to admit some exhibits?
7          MR. SKURKA:  That's correct, Your Honor.
8          THE COURT:  You've shown them to Defense
9     Counsel?
10         MR. SKURKA:  Yes, Your Honor.  For the
11    record, Your Honor, the State has premarked Exhibits
12    109 through 146 as photographs taken by this witness
13    Allen Kirksey.  I have shown 109 through 106 -- I'm
14    sorry, 109 through 146 to Defense Counsel before
15    proceeding this morning and they have no objection to
16    their admission.
17         THE COURT:  All right.
18         MR. GARZA:  That's correct, Your Honor.
19         THE COURT:  They're admitted.
20         MR. SKURKA:  Thank you, Your Honor.
21         THE COURT:  All right.  I guess, Frank,
22    let's get the witness and then we'll bring in the
23    jury.  You want to get the witness first and then
24    we'll bring in the jury.
25         (Pause in proceedings.)

6

1          THE COURT:  Take the stand.  You've
2     already been sworn.  Bring them in.
3          (Jury enters courtroom.)
4          THE COURT:  All right, be seated, please.
5          All right, ladies and gentlemen of the
6     jury, for your information outside your presence I
7     have admitted Exhibits 109 through 146.  They are
8     photographs taken by this witness that pertain to his
9     testimony, all right?
10         So with that, you're still under oath.
11         Mr. Skurka, you may proceed.
12         MR. SKURKA:  Thank you, Your Honor.
13
14         ALLEN KIRKSEY,
15    having been previously duly sworn, testified as
16    follows:
17         DIRECT EXAMINATION (Cont'd)
18    BY MR. SKURKA:
19    Q.   I think we left off yesterday on page 2 of
20    your record, so I'm going to pick up there.  And I
21    think we -- yesterday we left off with all the
22    photographs and the evidence you collected at the
23    Times Market scene; correct?
24    A.   Yes, sir, that's correct.
25    Q.   I'm going to move on to the next thing you

7

1     did during this investigation, after you did the
2     investigation and your collection of evidence at Times
3     Market, so I want to switch gears to the next phase of
4     it.  What did you do then after the Times Market?
5     A.   The following morning I went by the Nueces
6     County Medical Examiner's Office and attended the
7     autopsy of Pablo Castro.
8     Q.   Why does an I.D. tech go to the autopsy?
9     A.   Basically, we go to the autopsy to photograph
10    the suspect -- the victim's injuries, collect any
11    physical evidence, and take postmortem fingerprints of
12    the victim.
13    Q.   So would it be fair to say you took
14    photographs and collected any of the belongings or the
15    clothing of the victim in this case, Pablo Castro?
16    A.   Yes, sir, it would be correct.
17    Q.   Okay.
18         MR. SKURKA:  May I approach the witness,
19    Your Honor?
20         THE COURT:  Yes.
21    Q.   (BY MR. SKURKA)  I'm going to show you a
22    package and I guess a brown paper sack and I'm going
23    to ask if you recognize that?
24    A.   Yes, sir, I do.
25    Q.   What is it?

8

1     A.   It's clothing of Pablo Castro that I
2     collected at the medical examiner's office.
3     Q.   How did we know it's that same clothing?
4     A.   It is still sealed with my name and employee
5     number.
6     Q.   Do you recognize that evidence tag as one
7     that you did?
8     A.   Yes, sir, I do.
9     Q.   What did you put in that bag?
10    A.   I put a pair of blue Rustler size 34 X 29,
11    blue jean pants, a Fruit of the Loom size large
12    underwear shorts, one Hanes large T-shirt, one pair of
13    white socks, and one black belt.
14    Q.   Was that the clothing that Pablo Castro was
15    wearing?
16    A.   Yes, sir, it is.
17    Q.   And since you were at the Times Market, is it
18    the same clothing that you retrieved at the morgue,
19    the same clothing he was wearing when he was found
20    deceased in the parking lot at the Times Market?
21    A.   Yes, sir, it is.
22    Q.   I would like you to open that, please, that
23    package.
24    A.   (Witness complying.)
25    Q.   For the record, you're opening the brown

9

1  paper sack containing those items from Pablo Castro;
2  correct?
3      A.   Yes, sir, that's correct.
4      Q.   What I'm interested in -- I noticed you said
5  there's about five things.  I'm interested in seeing
6  the shirt and the pants worn by the deceased, Pablo
7  Castro.  Why don't you use the scissors -- and for the
8  record, you're returning the other items to the bag,
9  except for the pants and the shirt; correct?
10     A.   Yes, sir, that's correct.
11     Q.   Okay.  Set that to the side for the time
12  being, if you would.  Now, which are the pants and
13  which is the shirt?  Let's start with the shirt,
14  first, please, I'm sorry.
15     A.   This will be the Hanes size extra large
16  T-shirt.
17     Q.   Okay.  Would you open that, please.
18     A.   (Witness complying.)
19     Q.   Okay.  Now, for the record, you've opened the
20  brown bag that you said contained the T-shirt worn by
21  the deceased, Pablo Castro.
22     A.   Yes, sir, I have.
23     Q.   I don't know if you can put this on
24  part of the shirt, but, first of all, I'd ask if you
25  can identify it as a shirt that you retrieved from Mr.

10

1  Castro?  Is that the same shirt in the condition that
2  you saw it at that time?
3      A.   Yes, sir, it is.
4      Q.   Okay.  And I'm going to put a tag on this as
5  State's Exhibit 105.  Do you know how to put these on
6  there?  Maybe you can do it better than me.  Thank
7  you.
8           MR. SKURKA:  Your Honor, I move for the
9  admission of State's Exhibit 105.
10          MR. JONES:  No objection.
11          THE COURT:  Admitted.
12     Q.   (BY MR. SKURKA)  Would you bring that down
13  here and show it to the jury, not the sack, but the
14  shirt itself, and show them the front of it.  And walk
15  down here, too.  Now, turn around to the back.  Don't
16  go back up, I'm not through, yet.
17          How many holes or -- do you see in back and
18  the front of that shirt?
19     A.   One, two, three, four.
20     Q.   Is that in the front or the back of the
21  shirt?
22     A.   That's in the back of the shirt.
23     Q.   Four marks or slits in the back of the shirt?
24     A.   Yes, sir.
25     Q.   Have you seen slits like that before in

11

1  wounded people?
2      A.   Yes, sir, I have.
3      Q.   And what do they represent to you?
4      A.   They appear to be apparent knife wounds.
5      Q.   Are they -- they're not actual wounds,
6  they're where the knife entered the shirt; correct?
7      A.   Yes.
8      Q.   Okay.  Now, turn around to the front.  You
9  need to stand in front of the jury, please, so they
10  can see what you're doing.  Do you see other similar
11  markings around that shirt, too?
12     A.   Small cut right here which could possibly be
13  a knife entry.
14     Q.   You don't have to have the exact count, Mr.
15  Kirksey, I just wondered do you see other similar
16  marks on the back and front of the shirt?
17     A.   Yes, sir, I do.
18     Q.   Thank you.  And that would be the medical
19  examiner to talk about that, too, rather than you;
20  correct?
21     A.   Yes, sir.
22     Q.   You just retrieved the clothing.
23     A.   Yes, sir.
24     Q.   Would you put that back up, please, now and
25  -- and just fold it lightly into the brown sack.  You

12

1  don't have to wrap it up as good as you did it.  You
2  must be very good at wrapping Christmas presents, the
3  way you wrapped that up so well.
4          Okay.  Now, let's look at the next thing.
5  Could you open the next item.  What is that identified
6  as, please?
7      A.   This is the pair of blue Rustler, size 34 X
8  29 blue jean pants.
9      Q.   Could you open the contents of that, please.
10     A.   (Witness complying.)
11     Q.   Would you put the little tag on it, first,
12  Mr. Kirksey, so then we can get it identified.
13     A.   (Witness complying.)
14     Q.   Now that you've put the tag number, for the
15  record, what is State's Exhibit 106?
16     A.   It's the Rustler's blue jean pants that I
17  recovered from Pablo Castro.
18          MR. SKURKA:  I move for their
19  admission, too, Your Honor.
20          MR. GARZA:  No objection, Your Honor.
21          THE COURT:  They're admitted.
22     Q.   (BY MR. SKURKA)  Again, would you please step
23  down in front of the jury and display this State's
24  Exhibit 106 to the jury, and let's just do the front
25  side first and then the back side, please.  Just

13

1  slowly walk down so everybody in the back row can see
2  them.
3      A.   (Witness complying.)
4      Q.   And would you turn them around, please.
5      A.   (Witness complying.)
6      Q.   And then walk, again, down to the other end.
7  Please, fold them back up and put them loosely in the
8  bag they came in.
9      A.   (Witness complying.)
10     Q.   Now, why do you put them in a brown paper bag
11 instead of those clear plastic things?
12     A.   Anything that's got blood on it are
13 biologicals.  If they're enclosed in plastic could
14 mold and contaminate the item.
15     Q.   So that's why bloody items are put in brown
16 paper sacks?
17     A.   Yes, sir.
18     Q.   And did there appear to be blood on those?
19     A.   Yes, sir, it did.
20     Q.   Okay.  Now, what do you do -- I noticed
21 there's some other markings on the brown paper sack.
22 Why are you so careful to label it and what are the
23 other evidence tags from?
24     A.   Okay, if you'll notice right here on the
25 sack, I put a little biological symbol on that.  That

14

1  means that it could be blood or could be semen or any
2  other type of biological thing.  That tells whoever
3  handled this package that it could be potentially
4  hazardous to them.  It could be blood, in this
5  instance, and in this case blood is a carrier of AIDS
6  and other communicable diseases that you want to be
7  careful not to contract.
8      Q.   Now, are there any other markings on that bag
9  besides the one that you put on there?
10     A.   Yes, sir, there are.
11     Q.   And what do they represent?
12     A.   This little blue sticker right here is an
13 evidence seal.  That is represented by somebody
14 opening this package.  In this case, it's going to be
15 the D.P.S. laboratory, where they conducted D.N.A.
16 analysis.
17     Q.   Okay.  So when you take the evidence or pick
18 it up at the morgue, what did you do with these two
19 items, where did you take them?
20     A.   These two items, I took them to the Texas
21 Department of Public Safety Laboratory for D.N.A.
22 analysis.
23     Q.   Does the Corpus Christi Police Department
24 have a crime lab that does D.N.A.?
25     A.   No, sir, they do not.

15

1      Q.   Is the D.P.S. lab the one that does the
2  D.N.A. analysis for surrounding law enforcement
3  agencies?
4      A.   Yes, sir.  D.P.S. here in Corpus does the
5  D.N.A. for surrounding areas.
6      Q.   Would you do me a favor and put those items
7  back behind where the court reporter put the shirt,
8  but we want to kind of keep the baggie around it
9  loosely, please.
10     A.   (Witness complying.)
11     Q.   Also while you're at the lab, did you
12 retrieve anything else from Dr. Fernandez, the medical
13 examiner, in relation to the victim's body?
14     A.   Yes, sir, I did.
15     Q.   What was that?
16     A.   It would be a purple top tube of the victim's
17 blood.
18     Q.   How is that obtained?
19     A.   That is obtained normally in, basically, a
20 test tube.
21         MR. SKURKA:  May I approach, Your Honor?
22         THE COURT:  Yes.
23     Q.   (BY MR. SKURKA)  I show you what's been
24 marked for purposes of identification as State's
25 Exhibit No. 107.  Can you look at that and tell me

16

1  what that is, please.
2      A.   It is going to be the purple top tube of the
3  victim's blood.
4      Q.   So, for the record, does State's Exhibit 107
5  contain a blood sample or blood vial containing Pablo
6  Castro's blood?
7      A.   Yes, sir, it does.
8      Q.   And that was retrieved by Dr. Fernandez?
9      A.   Yes, sir, it was.
10     Q.   And what did you do with 107 after it was
11 given to you at the morgue?
12     A.   I packaged it, submitted it to property and,
13 eventually, I ended up taking it to the D.P.S.
14 laboratory to be used as an exemplar to test for Pablo
15 Castro's blood with many of the items that I submitted
16 to analysis.
17         MR. SKURKA:  Judge, I tender 107 to
18 Defense Counsel and offer into evidence.
19         MR. GARZA:  No objection, Your Honor.
20         THE COURT:  It's admitted.
21     Q.   (BY MR. SKURKA)  Since you didn't do any
22 further testing on this blood, I'm not going to have
23 you open it at this time, we'll wait for the D.N.A.
24 expert to do that, okay?
25     A.   Okay.

17

1    Q.   I want to switch now from your time and your
2    investigation at the medical examiner's office to the
3    next thing that you did in this investigation.  Did
4    you have a chance to collect another item from -- or
5    one of the items collected from the Times Market in
6    reference to -- hold on just one second.
7         Did you collect some control swabs of items
8    that you collected from the Times Market parking lot.
9    A.   Yes, sir, I did collect a blanket control
10   sample from one of the items I collected from there.
11   Q.   And I'm looking at page 3, to make it easier,
12   of your report.  Did you collect some -- one like that
13   for the pay stub or the envelope that was found
14   alongside Pablo Castro's body in the Times Market?
15   A.   Yes, sir, I did.
16   Q.   And I believe it was labeled G --
17   A.   Yes, sir, it was.
18   Q.   -- in the photographs?
19        MR. SKURKA:  May I approach, Your Honor?
20        THE COURT:  Yes.
21   Q.   (BY MR. SKURKA)  I'm going to show you a
22   package, and I'm not going to mark the package at this
23   time, but I'm going to ask if you recognize that
24   package and its contents.
25   A.   Yes, sir, I do.

18

1    Q.   What is it?
2    A.   It is a package containing all the blood and
3    control samples that I collected reference this entire
4    case.
5    Q.   Those are all the swab samples?
6    A.   Yes, sir.
7    Q.   And you're the one that collected all those
8    swabs?
9    A.   Yes, sir.
10   Q.   How do we know?
11   A.   How do we know?  Because you can see my seal
12   up here.  It's got my initials and my employee number.
13   Again, my initials and employee number.
14   Q.   And are you the one collecting all those and
15   put them in that package?
16   A.   Yes, sir, I am.
17   Q.   And how many are in there, roughly?
18   A.   Roughly, I estimate probably anywhere from 25
19   to 35.
20   Q.   Okay.  And what happened to those swabs after
21   you collected them?
22   A.   After I collected them, I tagged them into
23   property, then eventually I ended up removing them
24   from property and submitting them to Texas Department
25   of Public Safety for laboratory analysis.

19

1    Q.   I'd like you to open that package, please.
2    Now, you're removing some packages.  And I'm going to
3    tell you, all I'm going to look at right now is No.
4    36, according to your report.  Did you find that one?
5    A.   Yes, sir, I did.
6    Q.   What is that?
7    A.   It is a blood and control sample that I
8    obtained from the front side of a white envelope
9    containing a pay stub that was found laying on the
10   cement parking lot, which was labeled as G in the
11   photographs.
12   Q.   Is that the photograph we showed to the jury
13   yesterday of that pay stub?
14   A.   Yes, sir, it is.
15   Q.   So that's a -- tell the jury what a blood
16   swab is, I guess.
17   A.   Basically, it's like a Q-tip swab with cotton
18   on it.  All we do is put some sort of distilled water
19   on the swab and swab the area of suspected blood, and
20   we also take a substrate, or, in this case, a sample
21   close to where the item was obtained, or we could end
22   up just taking -- just the swab of just plain, old
23   distilled water.
24        That control sample is used to eliminate any
25   contaminants that may be present with or alongside

20

1    where we collected the blood sample.
2    Q.   So do you actually take the item like the pay
3    stub to the D.P.S. lab, or do you take a swab that
4    shows the represented sample from the pay stub to the
5    D.P.S. lab?
6    A.   I could have did it either way.  In this case
7    I simply took the swab myself.
8    Q.   So the swab went to the D.P.S. lab, not the
9    actual receipt?
10   A.   Right.
11   Q.   Is there any difference between using it that
12   way?
13   A.   Well, sometimes D.P.S. may do other extensive
14   testing.  They may find additional blood swab areas
15   that I cannot see with the naked eye or something like
16   that.
17   Q.   So you took a swab from the envelope -- I'm
18   sorry, the pay stub that was done yesterday -- I mean,
19   shown to the jury yesterday, that picture?
20   A.   Yes, sir.
21   Q.   Okay.
22        MR. SKURKA:  I'm going to have you pick
23   put a sticker on that and we're going to label that
24   State's Exhibit No. 108, and I'm going to move for its
25   admissibility.

21

1        MR. GARZA: We don't have any objection.

2        THE COURT: All right, it's admitted.

3    Q. (BY MR. SKURKA) We're going to have some

4    other swabs in a minute, but we'll deal with that one

5    first. Now I want to switch gears and move to -- and,

6    again, does that item I just introduced, does that

7    also show that the D.P.S. lab analyzed it?

8    A. Yes, sir, it has their evidence seal on it,

9    their employee number and the initials, as well.

10   Q. So it shows that somebody else looked at it

11   or analyzed it after you gave it to them?

12   A. Yes, sir.

13   Q. Okay. Let's put that to the side for a

14   minute, and now I want to switch gears to a red Ford

15   van that you examined as part of your investigation,

16   and this was admitted yesterday. I'm going to show

17   you what's been marked as State's Exhibit No. 72. Do

18   you recognize that?

19   A. Yes, sir, I do.

20   Q. What is it?

21   A. It's the red -- a maroon or red, whatever you

22   want to call it, Ford van.

23   Q. Well, I tell you what, since everybody else

24   has been describing it as a red van, let's just call

25   it as "red Ford van."

22

1    A. Okay.

2    Q. Because there's another van involved;

3    correct?

4    A. Yes, sir.

5    Q. Okay. Where is that picture taken at?

6    A. That's at the Port warehouse at 1002 East

7    Port.

8    Q. Why do you use the Port warehouse?

9    A. Basically, any serious crime we try to

10   impound the vehicle to some secure location where we

11   can ensure that the vehicle has not been tampered with

12   or contaminated in any fashion.

13   Q. Okay. So that's just, essentially, another

14   storage room you have?

15   A. Yes, sir.

16   Q. And did you do any investigation in regard to

17   that red van, and if so, what?

18   A. Yes, sir, I did. Additionally, I took

19   overall photographs of it, then I ended up taking

20   interior photographs of it, I took photographs of all

21   the contents of the vehicle. In addition to that, I

22   took inventory of all the contents of the vehicle.

23   Finally, I collected any physical evidence that was

24   inside this van. I also collected blood swabs from

25   the van, and finally I processed this van for latent

23

1    fingerprints.

2    Q. So, essentially, your investigation included

3    photographs, looking and collecting physical evidence,

4    looking for blood samples or blood evidence, and then

5    maybe latent fingerprints --

6    A. Yes, sir.

7    Q. -- correct? Okay. At the time that you're

8    doing this, do you know what's important and what may

9    be necessary for the investigation this early on?

10   A. At the time, not necessarily.

11   Q. What do you mean?

12   A. Well, what do I mean? Basically, when I

13   arrived at the scene at the Times Market, basically,

14   all I was given was the victim's name, his date of

15   birth, the case number and the requesting officer's

16   name. That was the extent of my knowledge, other than

17   I had a dead body laying on the parking lot. Up until

18   -- and even till the day when I was processing this

19   van, I didn't know what happened. I didn't know that

20   this guy worked at that store, I didn't know this guy

21   was taking out the trash. I didn't know any of the

22   details of the case.

23   Q. So what are you looking for in the van, as a

24   trained technician?

25   A. You're looking for -- in this case, we know

24

1    it's a stabbing. We also know that there is going to

2    be apparent things that are going to have blood on it.

3    There's going to be things that the -- in this case,

4    suspect might have touched, things that might be

5    unusual that may end up having his fingerprints, or

6    whoever committed this, fingerprints on it.

7    Q. Would it be fair to say you found numerous

8    items of things inside that van?

9    A. Yes, sir.

10   Q. But maybe not all the items in that van were

11   technically, after being analyzed, turned into real

12   evidence?

13   A. Right.

14   Q. But you couldn't know that at the time.

15   A. No, sir, I don't.

16   Q. You have to wait for -- is it your testimony

17   then you collect the stuff, send it over to the lab

18   and then see if they can find anything from it?

19   A. (No response.)

20   Q. And I'm talking about blood samples or trace

21   evidence, like that.

22   A. Yes, sir.

23   Q. And you also are trained in the area of

24   fingerprints?

25   A. Yes, sir.

25

1  Q.  We'll talk about that in a minute.  Let's go
2  through the series of photographs that have already
3  admitted, and I'm going to ask you to describe what
4  we're seeing, to the jury.
5           MR. SKURKA:  Frank, would you mind
6  turning the lights off, please.
7  Q.  (BY MR. SKURKA) We'll start with 109.  What
8  is that a photograph of, please?  There's a laser
9  pointer in front of you somewhere.
10  A.  This is --
11  Q.  What does 109 depict?
12  A.  This is going to be the red Ford van.  In
13  this photograph, it depicts, basically, the passenger
14  side cargo door.  And in here, basically what we're
15  looking at here is we've got a red T-shirt -- not red
16  T-shirt -- white T-shirt.  And somewhere in this
17  facility you're going to have a dollar bill.
18  Q.  For the record, that is on a photograph of
19  the right passenger, I guess, cargo door or back door?
20  A.  I call it cargo doorstep.
21  Q.  Okay.  I show you the next photograph.  This,
22  I think, is a closer-up of that first one.
23  A.  Again, you see a white T-shirt on the
24  doorstep, along with other miscellaneous items.
25  Q.  Where is the white T-shirt, again?

26

1  A.  Right here.
2  Q.  The next photograph is 111.  What does that
3  depict?
4  A.  That's a close-up of the white T-shirt that
5  was on the doorstep.
6  Q.  What is that next or around the T-shirt?
7  A.  And then that's that dollar bill I was
8  talking about.
9  Q.  The next photograph is 112.  What is that?
10  A.  That's a even more close-up photograph of
11  that white T-shirt and dollar bill that was on the
12  doorstep.
13  Q.  Now, you take these photographs before or
14  after you've gone through the van looking for
15  evidence?
16  A.  This is before I looked for any evidence.
17  Q.  And why is that important?
18  A.  Because, initially, you don't want to disturb
19  anything.  You want to take photographs as you see it.
20  Q.  What did you see when you were looking at the
21  photographs marked State's Exhibit No. 113 that caught
22  your attention, and why did you take so many pictures
23  of it?
24  A.  I saw this white T-shirt, and I saw what
25  appeared to be an apparent blood stain on the T-shirt.

27

1  Q.  The next photograph is photograph 114.  What
2  is that, please.
3  A.  This is the white T-shirt that was on that
4  doorstep of that Ford van.
5  Q.  Okay.  Now, is that taken at the van or is
6  that taken back at the lab?
7  A.  Neither.  That's taken at Port warehouse.  We
8  put it -- paper on the floor and we ended up
9  photographing it on top of some butcher paper.
10  Q.  So when you first saw it would it be fair to
11  say it was bundled up or crumpled up, and this is laid
12  out --
13  A.  Yes, sir.
14  Q.  -- later on?  This was not how you found it?
15  A.  No, sir, it was not.
16  Q.  Show the jury what you saw, on that picture,
17  on the shirt.
18  A.  This is a pair of bloodstains that I saw on
19  the shirt.
20  Q.  And again, you're not the person that tests
21  those, somebody else does that?
22  A.  Yes, sir.
23  Q.  But based on your experience and training,
24  did it look like bloodstains to you?
25  A.  Yes, sir, it did.

28

1  Q.  Now, is that the front of the shirt or the
2  back of the shirt?
3  A.  That I couldn't tell.
4  Q.  Okay.  Let's look at the next photograph,
5  which is No. 115.  What does that depict?
6  A.  Again, that's the white T-shirt that was
7  laying on the doorstep of the maroon -- of the red
8  Ford van.  And you got a pair of bloodstains here and,
9  now, you could see the color of the shirt.  And it's
10  definitely the front side of the shirt.
11  Q.  So did you collect that item?
12  A.  Yes, sir, I did.
13  Q.  And did you send that to the D.P.S. lab?
14  A.  I did send that to the D.P.S. lab.
15  Q.  Okay.  The next photograph is 116.  Can you
16  tell us what that depicts, please.
17  A.  This is the cargo doorstep of the Ford van.
18  And on here you see a blue Bic lighter.
19  Q.  And why did you collect that -- that Bic
20  lighter, or why did you take photograph of the Bic
21  lighter?
22  A.  I took photographs of it, because it has an
23  apparent bloodstain on here.  And I think you can see
24  it.
25  Q.  I'm going to show you the next picture, 117.

29

1    It may be a closer-up of that.

2        A.    There we go.

3        A.    And you can see the apparent bloodstain right

4    here.

5        Q.    So 117 is a picture of the same blue Bic

6    lighter --

7        A.    Yes, sir.

8        Q.    -- and you said that -- was that found where

9    exactly in relations to where that white T-shirt was

10   found?

11       A.    Same doorstep, just a little further over on

12   the cargo doorstep.

13       Q.    And we're still talking on that passenger

14   cargo doorstep?

15       A.    Yes, sir.

16       Q.    The next photograph is 118. Can you tell the

17   jury what that is, please.

18       A.    Okay. This is basically --

19       Q.    Hold on a second, we're going to rotate it.

20   There you go.

21       A.    The front of the van is going to be right

22   here and this is going to be that cargo doorstep of

23   that van, and we're looking inside of the cargo area.

24       Q.    Okay. So at the bottom of the photograph,

25   that black area, is the step?

30

1        A.    Yes. This right here is the step.

2        Q.    Is that the step where you found those other

3    items that you showed to this jury?

4        A.    Yes, sir, it is.

5        Q.    Okay. What does that photograph No. 118

6    depict?

7        A.    Basically, the evidence that I observed in

8    here was a pair of pants, right here.

9        Q.    And why was that remarkable to you, or why

10   did that catch your attention?

11       A.    These pants appeared to have bloodstains on

12   them.

13       Q.    I show you what's been marked 119. What is

14   that?

15       A.    This is a close-up photograph of the same

16   pants that were on the cargo floor.

17       Q.    Was there anything as you -- and I'm assuming

18   you picked those pants up to remove them, to take them

19   to the lab; correct?

20       A.    Yes, sir, I did.

21       Q.    And were they Described as -- what brand name

22   were they, If you'll recall.

23       A.    I would have to look at my report.

24       Q.    Okay. That's okay, we'll just go on to the

25   next thing. When you moved or examined those pants,

31

1    did you find anything at or around or under those

2    pants?

3        A.    Yes, sir, I did.

4        Q.    Tell the jury what.

5        A.    Underneath the pants, I found a waded-up

6    dollar bill.

7        Q.    What was remarkable, if anything, about that?

8        A.    This dollar bill had what appeared to be a

9    pair of bloodstains on it.

10       Q.    I show you what's been -- is it visible in

11   119 or is it actually under the pants where you can't

12   see?

13       A.    It's actually under the pants.

14       Q.    I'm going to show you what's marked 119.

15   What is that?

16       A.    That's a dollar bill that I found underneath

17   the black pants that were on the cargo floor.

18       Q.    And what, again, did you think was remarkable

19   about 119?

20       A.    A pair of bloodstains on the dollar bill,

21   here.

22       Q.    Okay. Can you put this one next to the other

23   one? I don't know -- what's that round thing there?

24       A.    I'm assuming it's a hair clip or band.

25       Q.    Okay. So that's a hair clip or band that's

32

1    in both photographs, but one shows the dollar bill and

2    one doesn't, right?

3        A.    Right.

4        Q.    Okay. The next area next series of

5    photographs I'm going to ask you -- take those off,

6    please. What's State's Exhibit 121?

7        A.    Before we move on, can we -- can I describe

8    something else about that dollar bill?

9        Q.    Sure, let's go back to the dollar bill. What

10   did you need to tell us about the dollar bill?

11       A.    Okay. This dollar bill, in addition to being

12   a dollar bill, it also was waded up. And inside this

13   waded-up thing was a white pizza, Caesars Pizza slip,

14   which also had a pair of bloodstains on it.

15       Q.    That's not visible in the photograph, is what

16   you're saying?

17       A.    I think you can see part of it right there.

18       Q.    Okay. I appreciate you pointing that out.

19   So that's really a dollar bill and a pizza receipt

20   within the dollar bill.

21       A.    Yes, sir.

22       Q.    Thank you. Anything else you need to

23   describe to the jury on that?

24       A.    No, sir.

25       Q.    Okay. Let's move on to the next photograph,

33

1  which is State's Exhibit 121.  What is that, please?
2      A.   This is the cargo area of the same van.  This
3  depicts a liquor or vodka bottle, and it's partially
4  under the front passenger seat of this van.
5      Q.   So that would be the same area, but further
6  down behind the passenger side seat?
7      A.   Yes, sir.
8      Q.   The front passenger seat?
9      A.   Front passenger seat.
10     Q.   Can you describe what you saw when you --
11  when you found that vodka bottle and why was it
12  remarkable to you?
13     A.   In this instance, it wasn't really anything
14  remarkable about it, other than the fact that it's a
15  good surface to possibly obtain latent fingerprints
16  from.
17     Q.   Okay.  State's Exhibit No. 122.  What is
18  that?
19     A.   That's just another angle of the same vodka
20  bottle that was laying underneath the passenger seat.
21     Q.   At that time could you tell if there was any
22  fingerprint or bloodstains, by looking at it, you
23  know, with the naked eye?
24     A.   Not at this time, no, sir.
25     Q.   Was that bottle also submitted to the D.P.S.

34

1  lab?
2      A.   No, sir.  But there were a pair of
3  bloodstains on it, which, when I got back to the lab,
4  I collect a control sample from it.
5      Q.   So what you're saying, at the scene you
6  couldn't actually see the bloodstains, but when you
7  got back to the lab you could?
8      A.   No, not exactly.
9      Q.   Explain.
10     A.   When I collected the item, I did observe a
11  pair of bloodstains on it.  But in addition to that, I
12  also observed a pair of bloody fingerprints on this
13  item.  I took it back to the lab to further enhance
14  these bloody fingerprints and also to collect the
15  blood and control sample from it.
16     Q.   And So did you that at the lab?
17     A.   Yes, sir.
18     Q.   So you processed the bottle and then sent it
19  up to the lab; correct?
20     A.   Correct.
21     Q.   I'm sorry, the sample to the lab.
22     A.   Yes, sir.
23     Q.   Thank you.  I show you what's been marked
24  State's Exhibit 123.  What is that a photograph of,
25  please?

35

1      A.   This is a photograph depliciting (sic)
2  basically the doorstep and the cargo area of the front
3  passenger seating area.
4      Q.   Okay.  So now this photograph shows the front
5  seat, not the back seat; correct?
6      A.   Yes, sir.
7      Q.   And what was remarkable about anything in the
8  front passenger side?
9      A.   Right here I observed what appeared to be a
10  bank card of some sort.  As it turns out it was a Visa
11  card.
12     Q.   For the record, you're indicating what you've
13  called, like, "the doorstep"?
14     A.   Yes, sir.
15     Q.   Of the side, going out to the door?
16     A.   Yes, sir.
17     Q.   Let me see if I've got a closer-up of that,
18  and it's 124.  What is 124, please?
19     A.   That's a close-up photograph of the doorstep,
20  on the front passenger doorstep.  And here you can see
21  a closer-up photograph of when appeared to be a bank
22  card.  In this case it was a Visa card.
23     Q.   And one more photograph of that, please.
24  What does that show?
25     A.   It's just, basically, a more close-up

36

1  photograph of the front passenger doorstep deplicting
2  (Sic) the Visa bank card.
3      Q.   What is this around here?
4      A.   It appeared to be a bloody napkin of some
5  sort.
6      Q.   Was that collected or not?
7      A.   No, sir.  I didn't collect that.
8      Q.   Why not?
9      A.   Basically, there were other blood items
10  around that I collected that were more suitable.
11     Q.   Okay.  Was there anything -- did you notice
12  anything about that Visa card that made you collect
13  it?
14     A.   Yes, sir, I did.
15     Q.   What?
16     A.   It appeared to have a pair of bloodstains on
17  it.
18     Q.   I'm going to show you a closer-up of that
19  that's already been admitted under State's Exhibit No.
20  43.  Is that the photograph of the same card?
21     A.   Yes, sir, it is.
22     Q.   And what name is shown on that card?
23     A.   Gilbert Lopez.
24     Q.   Did you know him to be a suspect or connected
25  with this case, at all?

37

1    A.   I didn't know who this person was, to begin
2  with, at all.
3    Q.   Okay.  All you did was find what was apparent
4  bloodstains on it; correct?
5    A.   Yes, sir.
6    Q.   Okay.  Let's go to the next series of
7  photographs after we've finished with the bank card.
8  I'm going to show you 126.  What is that, please?
9    A.   This here is actually a photograph of the
10  front passenger floorboard.  And in this photograph
11  you can see a red wallet right here.
12    Q.   Just to orient us, this is the front -- is
13  this a front passenger seat?
14    A.   Yes, sir, that's the front passenger seat,
15  over here the front passenger doorstep.
16    Q.   So this is the step where the other items
17  were found; correct?
18    A.   Yes, sir.
19    Q.   These items here?
20    A.   I guess you'd call it the center console.
21    Q.   Okay.  So, for the record, I guess the
22  reddish wallet is found to the left side of the
23  passenger seat; is that correct?
24    A.   Yes, sir.
25    Q.   Show you a close-up of that, which is marked

38

1  State's Exhibit 127.  Tell us why you photographed
2  that and what, if anything, was remarkable about that?
3    A.   Basically, it wasn't really anything
4  remarkable about it, but the wallet does contain items
5  inside the wallet that could be good possibility for
6  obtaining latent fingerprints from.
7    Q.   Did you examine that wallets and find the
8  contents of the wallet that showed any identification
9  of who the wallet belonged to?
10    A.   Yes, sir, I did.
11    Q.   Can you tell the jury whose wallet or I.D.
12  was found inside the wallet?
13    A.   If my memory serves correctly, I think it was
14  April Metting.
15    Q.   State's Exhibit No. 129.  What is that?
16    A.   It's a photograph of a close-up of the red
17  wallet that was laying on the passenger floorboard.
18    Q.   Now, what is this thing next to it?
19    A.   That is a photograph of a small boy.
20    Q.   Okay.  Now, just for the record, you don't
21  see an actual picture of the small boy; correct?
22    A.   Correct.
23    Q.   Is that the backside of it?
24    A.   That's the backside of it.
25    Q.   Did you collect that photograph of the small

39

1  boy and the red wallet together?
2    A.   Yes, sir, I did.
3    Q.   Why?
4    A.   Basically, to be processed for latent
5  fingerprints back at the lab.
6    Q.   Okay.  So, I know it's kind of deceiving, but
7  that is actually a photograph, even though it appears
8  to be just a white piece of paper?
9    A.   Right.
10    Q.   We want to make sure the record is clear.  To
11  show that was a photograph next to the wallet by those
12  two pennies in the picture; correct?
13    A.   Yes, sir.
14    Q.   Okay.  The next series of photographs, did
15  you -- after you took the overall photographs for the
16  items that you retrieved, did you then look for blood
17  samples or possible bloodstains or samples inside the
18  Ford van?
19    A.   Yes, sir, I did.
20    Q.   Where, if anything, did you locate these?
21    A.   Without referring to my notes, I would have
22  to say various areas.  But I -- right off the top of
23  my head, I did get apparent of bloodstains on the
24  steering wheel cover, I believe, the passenger side
25  door armrest, and I have to look at my notes on the

40

1  rest of it.
2    Q.   I tell you what, I'm not going to make it
3  hard for you, there's so many things.  Let's just go
4  through the photographs that have already been
5  admitted into evidence.  State's Exhibit 129.  What
6  does that depict?
7    A.   That's going to be the front passenger door
8  armrest.
9    Q.   The front passenger door armrest of the Ford
10  van?
11    A.   Yes, sir.
12    Q.   And can you show us where, if any,
13  bloodstains were found?
14    A.   Right, here appears to be a bloodstains.
15    Q.   For the record, you're showing above the
16  black handle?
17    A.   Yes, sir.
18    Q.   And I think I have some closer-ups of that,
19  we'll see.  130?  Does that show it a little closer,
20  with the scale in there?
21    A.   Yes, sir, it does.
22    Q.   And that would be on the, I guess, the
23  armrest above the black handle; correct?
24    A.   Yes, sir.
25    Q.   And finally, 131.  What is that photograph

41

1  of?

2     A.   That's going to be the same armrest without

3  the scale, though.

4     Q.   Okay.  And can you show -- was there one spot

5  of blood or more?

6     A.   I collected my sample here, but that could

7  also be blood there, but I didn't take a sample from

8  that area.

9     Q.   Okay.  Did you take a sample from this area

10  of -- that you thought was apparent bloodstain on the

11  right armrest of that Ford van?

12     A.   Yes, sir, I did.

13     Q.   Is it that the same way you did -- you talked

14  about, with the little Q-tip and distilled water, to

15  get the sample?

16     A.   Yes, sir, I did.

17     Q.   Do you take samples of every bloodstain in an

18  area?

19     A.   No, sir, you don't.

20     Q.   Can you tell the jury why not?

21     A.   Basically, you want to get blood samples from

22  at least three different areas.  In this case, this is

23  going to be at least three different areas, once we

24  get through the remaining evidence.  But, in this

25  case, let's say I got a bloodstain here, and I got a

42

1  bloodstain here.  I can pretty much presume that these

2  two bloodstains were from the same individual.  So it

3  really isn't to obtain two different bloodstains when

4  one would suffice.

5     Q.   So you did retrieve a swab from that door --

6     A.   Yes.

7     Q.   -- armrest.  You also said you found some

8  blood -- apparent bloodstains by the steering wheel;

9  correct?

10     A.   Steering wheel cover, yes, sir.

11     Q.   Steering wheel cover, I'm sorry.  I'm going

12  to show you what's been marked State's Exhibit No.

13  132.  We'll start with the series of photographs

14  there.  What does 30 -- 132 depict, please?

15     A.   That is the steering wheel cover on the red

16  Ford van.

17     Q.   The next photograph, 133, may be a little

18  closer-up of it.  And 130-- I tell you what, let's go

19  back to 132.  Did you find any apparent bloodstains

20  on -- on State's -- on the steering wheel or steering

21  wheel cover?

22     A.   Yes, sir, I did.

23     Q.   Can you show us where?

24     A.   In this photograph, it's almost impossible,

25  because of the color of the steering --

43

1     Q.   Okay.  We'll --

2     A.   -- cover.

3     Q.   -- go to it up closer, then, 133?  I think

4  there's a glare on there.  I'm not sure you can see

5  'Cause of that.  Does that show it?

6     A.   (No response.)

7     Q.   I'll show you the next one, then.

8     A.   Well, you can see bloodstain -- apparent

9  bloodstain right here.  I can't tell if that's going

10  to be a bloodstain or not.

11     Q.   Okay.  But you did find it -- let's just go

12  back to the full one.  You just can't remember exactly

13  where the bloodstain on that cover was; correct?

14     A.   Well, it's all over, basically, but it's so

15  fine that you can't really see it in these

16  photographs.

17     Q.   Okay.  But would the photographs accurately

18  show the -- at least the steering wheel cover show

19  where blood was on there?

20     A.   Yes, sir.

21     Q.   What about the actual part, here, the -- I

22  don't know, plastic or leather part here and here that

23  you said there was an apparent bloodstain?  Did you

24  take samples from that?

25     A.   No, sir.  Again, it's so close to the

44

1  original item that I collected bloodstains from that

2  wasn't really necessary for me to collect.

3     Q.   So are you testifying that there was more

4  than one bloodstain on the steering wheel or steering

5  wheel cover?

6     A.   Yes, sir, there was.

7     Q.   How many, do you recall?

8     A.   I didn't count them, no, sir.

9     Q.   Okay.  So there was blood on the steering

10  wheel and the steering wheel cover?

11     A.   Yes, sir.

12     Q.   Thank you.  And again, you took samples of

13  that, also?

14     A.   Yes, sir, I did.

15     Q.   The next series of photographs I have, I want

16  to show you, marked State's Exhibit No. 136 and these

17  have already been admitted into evidence, too.  What

18  does 136 show?

19     A.   I believe we now moved over to the maroon --

20  no, we didn't.

21     Q.   I'm going to look -- show you -- get your

22  bearings by showing the -- let's see here.  On page 10

23  of your report, and I'm about a quarter of the way up,

24  right past the part where you talk about the steering

25  wheel.

45

1      A.   Okay.

2      Q.   Okay.  Now, are we oriented, again?

3      A.   Yes, sir.

4      Q.   That's okay, you had a lot of photographs and

5   several vans to deal with.  Let's start with this,

6   again, State's Exhibit No. 136.  What does 136 depict,

7   please?

8      A.   That's going to be a photograph of the

9   interior of the front passenger door.

10      Q.   Why did you take a photograph of that and is

11   this anything remarkable you noticed on the front

12   interior of that door?

13      A.   I observed a pair of bloodstains on the door

14   pocket, in here.

15      Q.   And, for the record, the door pocket would be

16   this, I guess, pouch or pocket thing underneath the

17   door handle?

18      A.   Yes, sir.

19      Q.   It's like something you keep maps or other

20   stuff in?

21      A.   Yes, sir.

22      Q.   Okay.  And you refer to that as "door

23   pocket."  Let's see if you get a closer-up of 137 and

24   see what that shows, please.

25      A.   You can see an apparent bloodstain right here

46

1   on this door pocket.

2      Q.   Is that the only place that you saw it on?

3      A.   You also see apparent bloodstain right here.

4      Q.   Okay.  For the record, you're talking about

5   directly under the black handle?

6      A.   Yes, sir.

7      Q.   And you're also talking about the door pocket

8   itself.

9      A.   Yes, sir.

10      Q.   Let's see if I have a closer-up of that one.

11   I think there's one in here with a scale on it, 138.

12   What does that show?

13      A.   That is a close-up of the apparent bloodstain

14   on the front passenger door pocket of the Ford van.

15      Q.   And 139?

16      A.   That is a close-up of the apparent bloodstain

17   on the door pocket of the Ford van, without the scale.

18      Q.   And, essentially, that shows more than one

19   bloodstains, right?

20      A.   Yes, sir.  You got one here, one there and

21   one apparent there.

22      Q.   Does the sample you retrieved come from the

23   one right under the door handle or the two on the

24   pocket?

25      A.   It would have been this one right here.

47

1      Q.   Again, was there any reason to take a blood

2   sample or swab from these other two blood marks?

3      A.   No, sir.

4      Q.   Finally, the next series of photographs, 140,

5   what does that show?

6      A.   That is a photograph of the blood -- apparent

7   bloodstain just above the door pocket on the front

8   passenger door of the Ford van.

9      Q.   Was this a -- a consistent thing, when you

10   got some of these blood samples, there may have been

11   more than one blood spot, but you only took a swab

12   from one?

13      A.   Yes, sir.

14      Q.   So when we talk about the samples you have,

15   you may have taken, you know, say, ten blood samples,

16   but there may have been, you know, three times as much

17   blood spots.

18      A.   Yes, sir.

19      Q.   Would that be fair to say?

20      A.   Yes, sir.

21      Q.   Then that's just because you took a

22   representative sample?

23      A.   Yes, sir.

24      Q.   Okay.  We're almost through with the red van.

25   So here's the last two photographs on the red van.

48

1   And what is State's Exhibit No. 141 depict, please?

2      A.   Okay.  This is going to be the steering

3   column and steering wheel of the Ford van.

4      Q.   Why did you take that or what was remarkable

5   about that?

6      A.   On this gearshift here I observed what

7   appeared to be apparent bloodstains on it.

8      Q.   And I have a closer-up of that, please.  Is

9   that of the same photograph of the gearshift lever?

10      A.   Yes, sir, it is.

11      Q.   And show the jury where the blood sample was

12   are retrieved from.

13      A.   It's going to be right here on this overdrive

14   button.

15      Q.   So again, did you receive a swab or sample

16   from the gearshift lever on the overdrive button?

17      A.   Yes, sir, I did.

18          MR. GARZA:  Your Honor, could I get the

19   number of that --

20          THE COURT:  What is --

21          MR. GARZA:  -- photograph --

22          THE COURT:  -- the number of that?

23          MR. GARZA:  -- for identification

24   purposes?

25          THE COURT:  Of this photograph.

49

1     MR. SKURKA:  142.

2     THE COURT:  Okay.

3     MR. GARZA:  Thank you.

4     Q.   (BY MR. SKURKA) Now, to sum up, all the red

5  -- the samples taken from the red van, did you take

6  all the items that we've described in the photographs,

7  the items themselves, and either take a sample or the

8  items themselves to the D.P.S. lab for further

9  testing?

10    A.   Yes, sir, I did.

11    Q.   So you're in the chain of custody for all

12 those things.

13    A.   Yes, sir, I am.

14    Q.   Okay.  We'll get to those in a minute.  I'll

15 just show you a few more photographs.  And now I want

16 to switch gears and talk about another van that you

17 processed.  Were you in charge of processing another

18 van that was mentioned in these incidents?

19    A.   Yes, sir, I was.

20    Q.   Can you tell the jury how you did that and

21 where did that took place?

22    A.   It took place at the same Port warehouse,

23 which is located at 1002 East Port.  It was basically

24 a maroon Dodge van this time.

25    Q.   Okay.  And did you take photographs of all

50

1  that van?

2     A.   Yes, sir, I did.  I took photographs of the

3  exterior, interior, interior contents, as well.  And

4  then I also collected any physical evidence, collected

5  any blood samples and then finally processed it for

6  latent fingerprints.

7     Q.   Just to tell the jury, there were a lot more

8  pictures in that red Ford van; correct?

9     A.   Guesstimation, approximately 600 more photos.

10    Q.   Okay.  So we've only shown the jury the

11 photographs of the items that were tested and stuff;

12 correct?

13    A.   Yes, sir.

14    Q.   Okay.  State's Exhibit 59, what is that a

15 photograph of?  That's already been admitted into

16 evidence, too.

17    A.   That's going to be the maroon Dodge van.

18    Q.   Okay.  Did you examine the front of that and

19 take any pictures of items that you recovered, either

20 taking prints from or blood samples from?

21    A.   Yes, sir, I did.

22    Q.   I'm going to show you what's been marked

23 State's Exhibit 143 then, and ask you what that is.

24    A.   That is going to be the center console tray

25 of the Dodge van.

51

1     Q.   And what's remarkable about any items found

2  in that photograph?

3     A.   This recordable C.D. case was remarkable

4  about it because it is a good item to possess for

5  latent fingerprints.

6     Q.   I have another photograph, 144.  What is

7  that?

8     A.   That's a close-up of the same C.D. case that

9  was in the center console tray.

10    Q.   Again, for the record, that was in the Dodge

11 van, not the Ford van; correct?

12    A.   Yes, sir.

13    Q.   You said you got that because it was a good

14 surface to retrieve prints from?

15    A.   Yes, sir.

16    Q.   Tell the jury what you mean by that?

17    A.   Basically, fingerprints are -- consist of

18 moisture.  Moisture can be from oils, fats, salt,

19 amino acids, et cetera, et cetera.  In order to really

20 have a fingerprint on a surface, it has to be a

21 smooth, conductive surface to obtain prints from.  The

22 C.D. case happens to be a very smooth surface that I

23 could take fingerprints from.

24    Q.   Did you do that at the scene or back at the

25 lab, do the processing?

52

1     A.   Well, I did process it at the scene,

2  originally, but then I came back another day later and

3  I ended up collecting it as evidence.

4     Q.   Okay.  And did -- you did collect the actual

5  C.D. case.

6     A.   Yes, sir.

7     Q.   Okay.  The last two photographs I want to

8  show you are State's Exhibit 145.  What is that a

9  photograph of?

10    A.   It's a photograph of the front passenger door

11 on the Dodge van.

12    Q.   And why did you take that photograph or

13 what's remarkable about what you found there?

14    A.   I honestly don't remember.

15    Q.   I tell you what, why don't I show the next

16 picture that's been involved -- that's been taken and

17 maybe that will refresh your memory.

18    A.   Okay.

19    Q.   What is 146, please?

20    A.   We see an apparent bloodstain on this front

21 passenger door handle.

22    Q.   Let me go back to the other one, then, so you

23 can get your bearings about you.  I'm showing you the

24 whole door.  --

25    A.   Okay.  There's the door handle --

53

1    Q.   -- where was the blood sample found?
2    A.   Right about there.
3    Q.   For the record, you're indicating the door, I
4  guess, armrest --
5    A.   Armrest.  Yes, sir.
6    Q.   -- of the Dodge van on the passenger door.
7    A.   Yes, sir.
8    Q.   And now let's go back to the close-up,
9  please, and show us where the bloodstain was.
10    A.   Right here on the door.
11    Q.   Okay.  Did you take a sample from that area,
12  from the Dodge van?
13    A.   Yes, sir, I did.
14    Q.   And did you turn that in to the D.P.S. lab?
15    A.   Yes, sir, I did.
16    Q.   Okay.  Thank you.
17              MR. SKURKA:  May I approach, Your Honor?
18              THE COURT:  Yes.
19    Q.   (BY MR. SKURKA)  Now that we've got the
20  photographs in, I want to show you some of the actual
21  items and see if you can identify them.  I'm first
22  going to bring you this brown paper sack.  Can you
23  identify the contents of that, please.
24    A.   Yes, sir, I can.
25    Q.   What is it?

54

1    A.   It's going to be that Memorex C.D., compact
2  disk case that we saw laying in the center console
3  tray on the Dodge van.
4    Q.   Could you open it, please.
5              MR. SKURKA:  If we can have the lights
6  back on.
7    Q.   (BY MR. SKURKA)  Now you've removed the item
8  from that brown paper sack.  Do you see the CD-ROM
9  case in there?
10    A.   Yes, sir, I do.
11    Q.   I'm going to have you put a sticker on that.
12  And just for the record, it is encased in a plastic, I
13  don't know what you call them -- Ziploc bag.
14    A.   Well, sealed bag, I guess.
15    Q.   Sealed bag.  Okay.  Let's go ahead and put a
16  sticker on that.  And we'll mark it 147.  Is that the
17  CD-ROM case that you found in the Dodge van that was
18  depicted in the photographs?
19    A.   Yes, sir, it is.
20              MR. SKURKA:  I tender it to Defense
21  Counsel and offer 147 into evidence.
22              MR. GARZA:  I have no objection, Your
23  Honor.
24              THE COURT:  It's admitted.
25    Q.   (BY MR. SKURKA)  Now, you did process this for

55

1  prints; correct?
2    A.   Yes, sir, I did.
3    Q.   Okay.  I'm going to move this out of the way
4  and we'll talk about that in a minute.  The next item
5  I want to show you are some other items found in the
6  Ford van.  I'm going to show you this other brown
7  paper sack.  And what -- did you collect those items
8  in that sack?
9    A.   Yes, sir, I did.
10    Q.   And what does that sack contain?
11    A.   It contains a black ball cap, the black
12  Dickies pants, the steering wheel cover, the white
13  T-shirt and a black rubber sole of a shoe.
14    Q.   Okay.  I'm going to ask you to open -- is
15  that the same package that you put them in?
16    A.   Yes, sir, it is.
17    Q.   Okay.  I'm going to ask you to open that
18  package, please?
19    A.   (Witness complying.)
20    Q.   Okay.  I know there's five items in there and
21  I'll just make it simple for you.  We're only
22  interested in two things, the steering wheel cover and
23  the white T-shirt out of that bag, and just leave the
24  other things in there.
25    A.   (Witness complying.)

56

1    Q.   And, if you would, put them behind you so we
2  won't get them mixed up with the other stuff.
3    A.   (Witness complying.)
4    Q.   Let's go ahead and start with the white
5  T-shirt.  Which one is that?
6    A.   This packet right here.
7    Q.   Okay.  Are you the one that sealed it in that
8  package?
9    A.   Yes, sir, I am.
10    Q.   And was that also submitted to the D.P.D.
11  lab?
12    A.   Yes, sir, it was.
13    Q.   Can you please open that and remove the
14  contents.
15    A.   (Witness complying.)
16    Q.   What are the contents of that -- that bag?
17    A.   This is going to be the white T-shirt that
18  was laying on the cargo deps -- cargo step door on the
19  Ford van.
20    Q.   Is that the same one that was shown in the
21  photographs earlier to the jury?
22    A.   Yes, sir, it is.
23    Q.   I'm going to ask you to put a sticker on it.
24  And why don't you put it on the left -- the bottom
25  part of it, if you would, please, say, the bottom

57

1  front. And I'm putting State's Exhibit -- marking
2  that State's Exhibit 148. Is that the same white
3  shirt that you retrieved from the Ford van on the
4  doorstep?
5  A. Yes, sir, it is.
6          MR. SKURKA: Judge, we move for its
7  admission.
8          MR. GARZA: No objection, Your Honor.
9          THE COURT: It's admitted.
10  Q. (BY MR. SKURKA) Now, there's some other
11  markings on that -- that shirt since you saw it,
12  right?
13  A. Yes, sir, they are.
14  Q. And where did they come from?
15  A. This is going to be coming from the D.P.S.
16  laboratory. This is where they cut out samples of the
17  shirt to test it for D.N.A.
18  Q. So besides that, have there been any other
19  changes to it?
20  A. No, sir.
21  Q. I'm going to ask you to step down to show the
22  shirt to the jury, please.
23  A. (Witness complying.)
24  Q. Do what you did before, just go to one side
25  and then show them to the other side.

58

1  A. (Witness complying.)
2  Q. Can you turn around the back, too?
3  A. This is the --
4  Q. Oh, you did the back. I'm sorry, show us
5  where bloodstains were in the front of it, please.
6  A. (Witness complying.)
7  Q. They the same ones that were shown in the --
8  in the photograph, also?
9  A. Yes, sir.
10  Q. You said there were some holes or samples
11  taken from the D.P.S. lab. Where are they, or where
12  do you mean?
13  A. They're basically all over the shirt, but one
14  is right here.
15  Q. Just for the record, those holes weren't in
16  the shirt when you retrieved it.
17  A. No, sir.
18  Q. Those were made by the D.P.S. lab, when
19  they're doing their testing.
20  A. Yes, sir.
21  Q. Okay. You can return there. And would you,
22  please, put it, I guess --
23  A. Do you want me to show them the back of it?
24  Q. -- fold it up -- say it, again?
25  A. You want me to finish showing the back of it?

59

1  Q. Yes.
2  A. (Showing to jury.)
3  Q. So that's the -- that's an actual picture of
4  the same thing we saw on the photographs in 109, 110
5  and 111; correct?
6  A. Yes, sir.
7  Q. Okay. You can go ahead and put it back in
8  the -- loosely wrap it in the bag, if you would, and
9  then set the bag behind you, if you would, where the
10  court reporter has the other stuff, and we'll go to
11  next item.
12  A. (Witness complying.)
13  Q. Can you open the other bag -- or, first of
14  all, identify what's in that bag.
15  A. This is going to be the leopard print cloth
16  steering wheel cover that was on the steering wheel on
17  the Ford van.
18  Q. Are you the one that packaged it and
19  retrieved it from the van?
20  A. Yes, sir, I am.
21  Q. Are you the one that took it to the D.P.S.
22  lab?
23  A. Yes, sir, I am.
24  Q. Please open it.
25  A. (Witness complying.)

60

1  Q. For the record, what did you take out of the
2  brown paper sack?
3  A. This is going to be the leopard print
4  steering wheel cover that was recovered from the
5  steering wheel of the Ford van.
6  Q. Is that the one that you thought had apparent
7  bloodstains on it?
8  A. Yes, sir.
9  Q. And, again, you submitted that to the lab to
10  check on that; correct?
11  A. Yes, sir.
12          MR. SKURKA: I'll go ahead and tag that
13  as 149. Just put it somewhere on there. I'll let you
14  do it. And move for its admission.
15          MR. GARZA: No objection.
16          THE COURT: It's admitted.
17  Q. (BY MR. SKURKA) Okay. What are these
18  markings over here?
19  A. This marking is just an evidence tape that I
20  put on the back of it, showing my initials and
21  employee number so that I can identify this at a later
22  date.
23  Q. And are there markings on the bag that show
24  that the lab handled it, also?
25  A. Yes, sir, there are.

61

1    Q.   And what does that -- it says, "L3C."  What
2    does that mean?
3    A.   That is -- well, I can't really answer for
4    certain, but in my guess, that's going to be the lab
5    case number that D.P.S. assigns to this.
6    Q.   But it's clear the D.P.S. analysis --
7    analyzed that after you sent it to them; correct?
8    A.   Yes, sir.
9    Q.   Again, put that back in the bag.
10   A.   (Witness complying.)
11   Q.   And put it beside you.
12   A.   (Witness complying.)
13   Q.   The next item I have is in a brown paper
14   sack.  Would you look at that and tell me if you can
15   identify that.
16   A.   Yes, sir, I can.
17   Q.   What is it?
18   A.   That's going to be the vodka bottle that was
19   laying on the cargo floor and partially underneath the
20   passenger seat of the Ford van.
21   Q.   And we saw those photographs earlier
22   displayed to the jury?
23   A.   Yes, sir.
24   Q.   Would you, please, open that contents of that
25   -- open that bag and display the contents.

62

1    A.   (Witness complying.)
2    Q.   What are the contents of that bag, please?
3    A.   It's going to be the vodka bottle that I
4    recovered underneath the -- basically, underneath the
5    front passenger seat that was laying on the cargo
6    floor.
7    Q.   And you're the one who retrieved it?
8    A.   Yes, sir.
9    Q.   And you're the one that took it to the lab?
10   A.   Yes, sir.
11   Q.   I'm going to put a sticker on that as 150.
12   A.   However, can I make a correction?  I did not
13   take this bottle to the lab, but I did take the blood
14   control -- blood and control sample that I took to the
15   lab.
16   Q.   Thank you for bringing that up, because you
17   had mentioned that earlier, that you took a sample
18   from -- not the actual bottle.  Did you process it for
19   prints?
20   A.   Yes, sir.
21   Q.   Is that why the black powder is on it?
22   A.   Yes, sir.
23   Q.   Can you put this sticker on it, 150?
24   A.   (Witness complying.)
25        MR. SKURKA:  And we move for its

63

1    admission, Your Honor.
2         MR. GARZA:  No objection.
3         THE COURT:  It's admitted.  Let's go
4    ahead and take a break.
5         THE BAILIFF:  All rise for the jury.
6         (Jury exits courtroom.)
7         (Short recess.)
8         MR. SKURKA:  Your Honor, for the
9    record, Mr. Kirksey is still testifying, and we've
10   gone through some of his exhibits that he's going to
11   introduce, and just to make things a little quicker, I
12   think we have an agreement for the admission of the
13   following items: State's Exhibit 151, 152, 153, 154,
14   155, 156; and then 157 through -- what's your last one
15   going to be?  167.
16        THE COURT:  All right.
17        MR. GARZA:  That's correct, Your Honor,
18   and we've had an opportunity to review those and look
19   at the tags and we have no objection.
20        THE COURT:  All right.  Then those are --
21   Okay, let's over those numbers, again, so I can tell
22   the jury when they come in.
23        MR. SKURKA:  They're all admitted then;
24   correct?
25        THE COURT:  They're all

64

1    admitted.
2         MR. SKURKA:  That would be 151 through
3    167.
4         THE COURT:  Okay.  And these are pieces
5    of evidence?
6         MR. SKURKA:  Right.
7         THE COURT:  All right.  They're admitted.
8         MR. SKURKA:  Mary, I'll specify what they
9    are when they bring them in.
10        THE COURT:  All right.  Bring them in.
11        (Jury enters courtroom.)
12        THE COURT:  All right.  Be seated,
13   please.
14        All right, ladies and gentlemen, for your
15   information, I admitted Exhibits 151 through 167
16   outside of your presence.
17        All right.
18        MR. SKURKA:  May I proceed, Judge?
19        THE COURT:  You may.
20   Q.   (BY MR. SKURKA) Mr. Kirksey, would you take
21   the vodka bottle down and put it behind you, so we can
22   go on to next series of items.
23   A.   (Witness complying.)
24   Q.   I'm going to show you a series of exhibits,
25   now, and they're marked State's 151, 152, 153 and 154.

65

1   Can you describe those -- and those have been admitted
2   into the evidence.  Please, can you go ahead and open
3   them and pick out the contents of each one.  Well,
4   let's -- first of all, tell us what they are.  What's
5   151?
6       A.   Exhibit 151 is two $1.00 bills.
7       Q.   Taken from?
8       A.   They were found inside the maroon 1999 Ford
9   van.
10      Q.   152, what does that consistent of?
11      A.   That is going to be two Little Caesar Pizza
12  receipts, and they were found inside the maroon 1999
13  Ford van.
14      Q.   153?
15      A.   One Frost Visa credit card.  And that was
16  found inside the maroon 1999 Ford van.
17      Q.   And 154?
18      A.   One wallet-size picture of a small boy.  And
19  that, again, was also found inside the maroon 1999
20  Ford van.
21      Q.   Now, all these things you've mentioned and
22  shown through the photographs; correct?
23      A.   Yes, sir, I have.
24      Q.   Go ahead and open all of those and we'll
25  display those items to the jury, please.  And for the

66

1   record, those are items either you processed or sent
2   to the lab for further testing; is that correct?
3       A.   That is correct.  Okay.  I'm opening State's
4   Exhibit 151, which is the two one-dollar bills.
5       Q.   What did you take out of there?
6       A.   Two small envelopes.
7       Q.   And each envelope contains a dollar bill?
8       A.   Yes, sir.
9       Q.   And that was further tested by the D.P.S.
10  lab; correct, or did you just give them to the D.P.S.
11  lab?
12      A.   Actually neither.  I took a swab off of them.
13      Q.   I'm sorry.  You took a swab off of those.
14  Okay.  Let's go to the next item, please.  Just put
15  those back in their package.
16      A.   Exhibit 152 is two Little Caesar Pizza
17  receipts.
18      Q.   Could you remove those, please.  What is the
19  content of that, please?
20      A.   Two small envelopes, each one of them
21  containing a pizza receipt.
22      Q.   Did you take that to the D.P.S. lab or did
23  you send the swab to the D.P.S. lab?
24      A.   Sent a swab to the D.P.S. lab.
25      Q.   You can go ahead and put those back in,

67

1   please.
2       A.   (Witness complying.)
3       Q.   The next item?
4       A.   State Exhibit 153, which is the Frost Bank
5   Visa card.
6       Q.   Can you take that out, please.
7       A.   (Witness complying.)
8       Q.   What is that?
9       A.   It is the Frost Bank Visa card.
10      Q.   Can you come down with the jury and show it
11  to the jury up close.  I know they may have some kind
12  of blood or fingerprint powder on it.
13      A.   (Witness complying.)
14      Q.   And what name is displayed on that card?
15      A.   Gilbert Lopez.
16      Q.   Now, is that the one that had apparent
17  bloodstains on it?
18      A.   Yes, sir, it is.
19      Q.   You can go down here and show the rest of the
20  jury.
21      A.   (Witness complying.)
22      Q.   Would you return it, now, to the packaging,
23  please.  And the item I gave you up there?
24      A.   State Exhibit 154, which is small picture of
25  a small boy.

68

1       Q.   Could you remove that, please.  And, again,
2   would you come down and show that to the jury.
3       A.   (Witness complying.)
4       Q.   And, again, those items that you showed,
5   either you processed them or sent them to the D.P.S.,
6   right?
7       A.   Or --
8       Q.   Or a swab, I'm sorry.
9       A.   Yes, sir.
10      Q.   Put those to the side, for a second, and then
11  I'm going to show you another bag, ask you if you can
12  identify the contents of this bag.
13      A.   Yes, sir, I can.
14      Q.   What is it?
15      A.   It's a paper bag containing several items,
16  one being a gearshift lever, one being a Bic --
17  plastic Bic cigarette lighter, and six PS Select
18  alcohol prep pads; one Marlboro cigarette box; one
19  Phillies Blunt Sour Apple cigar; cardboard box; one
20  plastic drinking straw; one latex glove; one clear
21  plastic Ziploc bag; and one key with an attached
22  light.
23      Q.   Okay.  I'm going to ask you to open that bag.
24  And the only thing I'm interested in out of that big
25  is the Bic lighter and the gearshift knob or lever.

69

1    A.   (Witness complying.)

2    Q.   Okay.  The other item that -- would you put

3  that back in the bag, and leave those other two out.

4  Move that bag out of the way, so -- we need a little

5  room.

6    A.   (Witness complying.)

7    Q.   Okay.  I'm going to put a tag 155 on -- 156

8  and 155, for these two items.  Can you identify what

9  155 would be, then, please.

10   A.   155 would be the gearshift lever that was

11 removed from the Ford van.

12   Q.   And 156?

13   A.   156 would be the blue plastic Bic lighter

14 that was laying on the cargo floor doorstep in the

15 Ford van.

16   Q.   Are you the one that retrieved that?

17   A.   Yes, sir.

18   Q.   And you're the one that processed it by

19 taking a swab from those items to send to the D.P.S.

20 lab?

21   A.   Yes, sir, I did.

22   Q.   Could you open both those items so we can

23 look -- to see if you can identify them.

24   A.   (Witness complying.)

25   Q.   Can you come down to show it to the jury,

70

1  please.  What is that?

2    A.   This is the blue Bic lighter that was laying

3  on the cargo doorstep of the Ford van.

4    Q.   Is that the photograph -- did we have a

5  photograph of that, earlier?

6    A.   Yes, sir, we did.

7    Q.   And did that have apparent bloodstains on it?

8    A.   Yes, sir, it did.

9         MR. SKURKA:  We move for it's

10 admission, Judge.

11        MR. SKURKA:  No objection.

12        THE COURT:  It's admitted.

13        MR. SKURKA:  We also move for the

14 admission of the other item, 156 -- I'm sorry -- 155

15 and 156.

16        MR. GARZA:  No objection, Your Honor.

17        THE COURT:  It's admitted.

18        MR. GARZA:  Which is which, if I may ask?

19        MR. SKURKA:  155 is the gearshift lever

20 and 156 is the Bic lighter.

21        Did you get that, Mary?

22        COURT REPORTER:  Thank you.

23   Q.   (BY MR. SKURKA) And open -- you're opening

24 155, now?

25   A.   Yes, sir.

71

1    Q.   What is that?

2    A.   It's the gearshift lever from the Ford van.

3    Q.   And can you come down and show the jury and

4  show where the blood was located on it, please.

5    A.   The blood was located right here on the

6  overdrive button.

7         MR. SKURKA:  Okay.  You can see it,

8  Counsel?

9    Q.   (BY MR. SKURKA) Now, you testified several

10 times during this time, but you said swabs of these

11 physical items, if you didn't send the physical items

12 itself to the lab for testing, you took that blood

13 swab -- or sample swab area from it; is that correct?

14   A.   Correct.

15   Q.   And do you keep those swabs together, too?

16 I'm sorry.  Did you keep -- did you identify all those

17 swabs before -- during the break?

18   A.   Yes, sir, I did.

19   Q.   And we actually had those all introduced into

20 evidence; correct?

21   A.   Yes, sir, you did.

22   Q.   I've got them here and they're all in order,

23 so be careful.  I'm going to start with 157 and ask

24 you to identify what 157 through 169 are.  What is

25 157?

72

1    A.   157 is the blood and control sample that I

2  obtained from the front driver's side steering wheel

3  on the maroon Ford van.

4    Q.   What is 158?

5    A.   158 is the blood and control sample swab that

6  I obtained from the interior of passenger side door

7  panel pocket from the maroon Ford van.

8    Q.   What is 159?

9    A.   159 is the blood and control sample swab that

10 I obtained from the interior front passenger side door

11 handle on the maroon Ford van.

12   Q.   160?

13   A.   160 is the blood and control sample swab that

14 I obtained from the back side of a Little Caesar Pizza

15 receipt, which was dated 7/19/04, with a time of 4:18

16 p.m., which is found waded up with a dollar bill of

17 the serial number 55644514B that was found laying

18 underneath the black pair of Dickies pants on the

19 middle passenger floorboard behind the driver's seat

20 on the maroon Ford van.

21   Q.   161?

22   A.   This is a blood and control sample swab that

23 came from the back side of a Little Caesar Pizza

24 receipt, which was dated 7/4/04, with a time of 4:51

25 p.m., which was found laying on the front passenger

73

1  side doorstep of the maroon van.

2     Q.  162?

3     A.  This is a blood and control swab that I

4  obtained on the back side of a Frost Bank Visa card

5  with the name of Gilbert Lopez, the account number of

6  4229680013424813, which was found laying in the

7  passenger side doorstep of the maroon van.

8     Q.  163?

9     A.  This is a blood and control sample swab that

10  was obtained from the exterior side of the clear 1.75

11  liter vodka bottle that was found laying on the middle

12  passenger side floorboard partially underneath the

13  front passenger seat on the Ford van.

14     Q.  163 -- sorry, 164, I guess.

15     A.  This is a blood and control sample swab that

16  I obtained from the blue plastic Bic lighter that was

17  found laying on the front passenger side cargo

18  doorstep of the Ford van.

19     Q.  I'm sorry, could you repeat that one, please.

20     A.  It's a blood and control sample swab that I

21  obtained from the blue plastic Bic lighter that is

22  found laying on the front passenger side cargo

23  doorstep step of the maroon van.

24     Q.  165?

25     A.  Blood and control sample swab that I obtained

74

1  from the exterior side of the interior front passenger

2  side door armrest on a maroon 1994 Dodge Ram van.

3     Q.  All the other items came out of the Ford van,

4  but this one is from the Dodge van?

5     A.  Yes, sir.

6     Q.  166?

7     A.  This is a blood and control sample that I

8  obtained on the exterior side of the gearshift lever

9  overdrive button from the maroon Ford van.

10     Q.  167?

11     A.  This is a blood and control sample swab that

12  I obtained from the backside of a one dollar bill,

13  with a serial number of A55644514B, which was found

14  underneath a pair of black Dickies pants that was

15  found laying on the middle passenger floorboard behind

16  the driver's seat on the maroon Ford van.

17     Q.  Is that the one this was in the picture waded

18  up with the Little Caesar Pizza receipt inside it?

19     A.  Yes, sir, it was.

20     Q.  And the Little Caesar receipt, was that the

21  one dated from July 19th?

22     A.  I'd have to look at my report for that.

23     Q.  Well, go on to something else.  That's okay.

24  168?

25     A.  That's all the packets that I got.

75

1     Q.  I'm sorry, I thought we had up to -- I'm

2  sorry, it was 167, not 168.  Okay.

3        Just for the record, all those samples -- and

4  there was a whole lot more samples that we went

5  through over the break; correct?

6     A.  Yes, sir, they were.

7     Q.  And these are the ones that you took to the

8  sample swabs to the D.P.S. for analysis.

9     A.  Yes, sir, they are.

10     Q.  Okay.  I think I have one last area to cover

11  with you.  We've take -- you've shown the pictures of

12  the items, the items themselves and the swabs of the

13  items taken, as far as for blood evidence; correct?

14     A.  Yes, sir.

15     Q.  Now, I want to switch gears to talk about any

16  latent fingerprint processing that you did on any of

17  these exhibits and that we've introduced or

18  photographs showing those items.

19     A.  Okay.

20     Q.  You've taken a lot of latent prints in this

21  case, right?

22     A.  Yes, sir, I did.

23     Q.  Did you take them at all the locations that

24  we've talked about or the items that we've talked

25  about --

76

1     A.  Yes, sir.

2     Q.  -- and probably more?

3     A.  Yes, sir, I did.

4     Q.  I'm going to consolidate all those and just

5  to three of the evidence, latent prints that you took,

6  okay?

7     A.  Okay.

8     Q.  Now, let's tell jury a little bit about

9  fingerprints.  Are you trained in the area of

10  fingerprint -- fingerprints or the collection of

11  fingerprints?

12     A.  Yes, sir, I am.

13     Q.  Tell the jury what training you've had in

14  that area.

15     A.  I've had 40 hours of basic fingerprint

16  pattern and classification.  I've had 24 hours of

17  latent print processing.  I've had 40 hours of

18  advanced latent print comparison.  And I've had

19  approximately a three-month F.B.I. school in

20  fingerprint examinations.

21     Q.  Can you tell the jury, basically, what a

22  latent print is.

23     A.  A latent fingerprint is basically a

24  fingerprint that is not visible.  In order to make it

25  visible we have to process it in some manner, whether

77

1    that be using powders or chemicals.  Latent
2    fingerprints basically are consisted of moisture.  The
3    moisture is either from your sweat, oils, fats or
4    amino acids.  When we process those items, the prints
5    become visible.  We could, then, either left them or
6    photograph them, depending upon how we process it.
7        Q.   Does everybody always leave a fingerprint on
8    every surface?
9        A.   No, sir, they do not.
10       Q.   Can you explain to the jury why not.
11       A.   Several factors of -- of -- make it that some
12   people don't leave fingerprints on every item they
13   touch.  One could be the emotional state of the
14   person.  He may not be sweating any, at all.  It may
15   be a cold day and he's perspiring or having any
16   moisture excreted from his pores.
17           He could be -- basically, it could be hot day
18   where he's sweating too much and the moisture from his
19   prints that he touches are actually excessive and it
20   basically wipes out the fingerprint or overfills the
21   valleys that were -- actually make the physical ridges
22   on the prints.  Them are some of the factors.
23       Q.   So, for example, if I touched a surface like
24   this, I may or may not leave a print?
25       A.   You may or may not, that's true.

78

1        Q.   Based on the oils and the moisture on my
2    fingers and the surface itself?
3        A.   The surface itself can be a factor, yes, sir.
4        Q.   That was the -- my next question, how can the
5    surface be a factor?
6        A.   Surface can be a factor because there can --
7    may not be smooth enough to obtain the prints from.
8    For example, if you were to look at the -- your
9    dashboard of your car, or, something like that, there
10   will be real fine, basically, hills and valleys
11   throughout that, that's not really a conducive surface
12   to obtain prints from because it's not really a flat
13   surface.
14           Then again, it may be a porous item that
15   you're talking about, such as paper or wood.  In that
16   case there, we would have to treat the item
17   chemically, and that actually cause the prints to come
18   to the surface.
19       Q.   So that makes it from invisible to visible?
20       A.   Yes, sir.
21       Q.   You mention earlier, remember, when you were
22   talking about that CD-ROM case, and you said you took
23   that, because you thought that would be a good
24   surface.
25       A.   Yes, sir.

79

1        Q.   Can you explain to the jury using that as an
2    example why you thought that was a good surface?
3        A.   The CD case is clear plastic surface.  It is
4    very smooth.  It's basically durable and relatively
5    easy to obtain fingerprints from.
6        Q.   Have you been qualified -- I'm sorry -- yeah,
7    have you been qualified to testify in the area of
8    fingerprints in courts in Nueces County or other
9    counties?
10       A.   In what regard, identifications?
11       Q.   No, I'm talking about in the obtaining of
12   fingerprints --
13       A.   Yes, sir, I have --
14       Q.   Or the lifting of fingerprints?  Now, you're
15   going on to something else, I was going to clear it up
16   for the jury.  Do you identify fingerprints and match
17   fingerprints or does somebody else do that?
18       A.   Somebody else does that.
19       Q.   Can you explain to the jury how that works,
20   the difference between what's found at the scene and
21   if you check them out to see if they match or somebody
22   else does?  Just briefly explain the procedure to the
23   jury.
24       A.   Okay.  Basically, anything that I process,
25   after I get done processing it, whatever fingerprints

80

1    I obtain, we get sealed-in envelopes, such as this
2    here.  These -- these envelopes then get submitted to
3    the latent examiners through a drop box.  Once they
4    look at them, they will determine whether or not they
5    are of value, and if they are of value, whether or no
6    they could be identified in some way.  They will then
7    determine whether or not they're IAFIS runnable, like
8    meaning IAFIS runnable, whether or not they could be
9    input into the computer and an automated search
10   conducted for the suspect.
11       Q.   Are you the one that does that, though?
12       A.   No, sir, I am not.
13       Q.   Okay.  Did somebody else do that in this
14   case?
15       A.   Somebody else did this in that case.
16       Q.   And who would that be?
17       A.   That would be Latent Print Examiner Marsha
18   Parker.
19       Q.   Okay.  Did you test -- or I'm sorry, process
20   some of the items in this case, in this investigation,
21   to see if you could recover latent prints?
22       A.   Can you repeat the question?
23       Q.   In this case, did you process to try to get
24   fingerprints or latent prints from items that we've
25   described in the testimony earlier?

81

1    A.   Yes, sir, I did.

2    Q.   You said earlier there was many of them;

3    correct?

4    A.   Yes, sir, there were.

5    Q.   Did you specifically have occasion to get --

6    fingerprint certain items in the area of the Ford van?

7    A.   Yes, sir, I did.

8    Q.   What did you try to fingerprint inside the

9    Ford van or on the Ford van?

10   A.   Too many items to mention, but I will specify

11   the entire exterior, the entire interior and basically

12   every item inside the van.

13   Q.   At the time you're trying to get these

14   prints, you don't know if there's actually going to be

15   prints of value or not, do you?

16   A.   No, sir, I do not.

17   Q.   Explain briefly to the jury what that means,

18   to be "prints of value."

19   A.   Prints of value basically need to have points

20   of characteristic.  Basically, the F.B.I. standard is

21   you need seven points of characteristic to positively

22   identify one person from another person.

23   Q.   Do all the times that you lift these prints

24   come up with those comparisons, enough points of

25   comparison?

82

1    A.   No, sir, they do not.

2    Q.   So, I guess, what I'm trying to say is, is

3    every fingerprint possibly a print that could be

4    matched?

5    A.   No, sir.

6    Q.   In fact, based on your experience, when we

7    take a lot of -- you hear on T.V. all the time there's

8    always fingerprints.  Is that true?

9    A.   No, there's not always fingerprints.

10   Q.   Did you fingerprint areas of the Ford van?

11   A.   Yes, sir, I did.

12   Q.   Did you retrieve any fingerprints from the

13   area of the Ford van mirror?

14   A.   Yes, sir, I did.

15         MR. SKURKA:  May approach the witness,

16   Your Honor?

17         THE COURT:  Yes.

18   Q.   (BY MR. SKURKA) I show you what's been marked

19   State's Exhibit No. 168.  Would you please look at

20   that and tell me if you recognize it.

21   A.   Yes, sir, I do.

22   Q.   What is it?

23   A.   It is a latent fingerprint card of a latent

24   that I obtained from the exterior side of the front

25   driver's side door mirror glass on the maroon, 1999

83

1    Ford E-150 van, bearing Texas license 3CMR01.

2    Q.   And you're the person that lifted that print?

3    A.   Yes, sir, I am.

4          MR. SKURKA:  Your Honor, I'd tender

5    State's Exhibit 168 to Defense Counsel and offer it

6    into evidence.

7          MR. GARZA:  Your Honor, I just want some

8    clarification that it's being offered as a print or a

9    latent that was actually obtained by Mr. Kirksey; is

10   that correct?

11         THE COURT:  Yes, that's --

12   Q.   (BY MR. SKURKA) You did obtain this latent

13   print, did you not?

14   A.   Yes, sir, I did.

15         MR. GARZA:  Then there's no objection.

16         THE COURT:  All right.  It's admitted.

17   Q.   (BY MR. SKURKA) Now, I'm going to go back and

18   show the jury what's been marked State's Exhibit 72.

19   What did you -- what was that identified as?

20         MR. SKURKA:  Do you mind getting the

21   lights, please, Frank?

22   Q.   (BY MR. SKURKA) What is that?

23   A.   That is the Ford van.

24   Q.   Can you show the area of the Ford van on that

25   photograph where you got this print from.

84

1    A.   That would be this driver's door mirror,

2    right here.

3    Q.   Now, the card, now that it's been admitted

4    into evidence, I'm going to show it to the jury.  What

5    information is contained on the card, please?

6    A.   Got the victim's name, got the offense

7    number, where the offense occurred at, the date the

8    offense occurred at, what the offense was, where I

9    obtained the latent fingerprint from, my signature,

10   and finally, my employee number.

11   Q.   I'm going to turn over to the back.  How do

12   you actually lift the print off --

13         MR. GARZA:  Your Honor, I'm going to

14   object to that being turned over.  Can we have a

15   hearing outside the presence of the jury, Your Honor?

16         MR. SKURKA:  Judge, it's admitted into

17   evidence.

18         MR. GARZA:  Well, I understand, Judge,

19   but --

20         THE COURT:  Well, I'll give you a hearing

21   outside the presence of the jury, but --

22         MR. GARZA:  Okay.

23         THE COURT:  -- it's admitted in evidence.

24   I mean -- all right.  All rise for the jury.

25         (Jury exits courtroom.)

85

1        THE COURT:  All right.  Be seated,
2   please.
3        All right.  Mr. Garza?
4        MR. GARZA:  Your Honor, I should have
5   objected to it, possibly, because -- since he's not
6   the person qualified to identify it.  There are some
7   markings on the -- on the fingerprint card that
8   contain, I believe, our client's name on there, Judge.
9        MR. SKURKA:  You want to look at it?
10       MR. GARZA:  Now, I know it's already been
11  admitted, but --
12       THE COURT:  I mean, you know, those were
13  --
14       MR. GARZA:  -- that's a mistake on my
15  part then, Your Honor.  I'll have to fall on my sword
16  on that one, if I have to, but --
17       THE COURT:  Let me see the exhibit.
18       MR. SKURKA:  Judge, I'll clarify what I
19  am going to do.  I am not going to ask this witness to
20  identify whose fingerprint that matched -- whose
21  person that print matched.  That's for the latent
22  examiner to do that.  All I was going to demonstrate
23  to the jury was how he actually put the print with the
24  -- what do you call it, the tape?
25       THE WITNESS:  Lift tape.

86

1        MR. SKURKA:  Lift tape, and put it on the
2   back of the card, but I was not going to ask him to
3   show the results or the analysis of who that matched.
4   I was going to show that to Ms. Parker, the latent
5   examiner.
6        MR. GARZA:  Well, but the problem I have
7   is that his name does appear on it, Judge, and it's
8   going to probably give some inference to the jury.
9        THE COURT:  Well, which side are you
10  going to show?
11       MR. SKURKA:  I was going to show both
12  sides, Judge.
13       THE COURT:  Well, I mean, his name is
14  here on the bottom.
15       MR. SKURKA:  Well, I can only --
16       THE COURT:  I agree with you that it's
17  been introduced into evidence, and I suppose if this
18  later comes.
19       MR. GARZA:  That's why I was asking for
20  some clarification that it be shown as an obtained or
21  collected --
22       MR. SKURKA:  I will tell the Court --
23       THE COURT:  Well, why don't you put it
24  up, let's see if we can even see it.  It's not very
25  visible, for one thing.  Well, it is on that one, but

87

1   it's not on this one.  It's really visible on that
2   one.
3        MR. GARZA:  That one has not been
4   introduced, yet.
5        MR. SKURKA:  No.
6        THE COURT:  Try it over here.
7        MR. SKURKA:  Why don't I do this, Judge,
8   I'm just going to try to make a shortcut here, and I
9   think it's going to be admissible and I think the
10  Judge can --
11       THE COURT:  I think it is going --
12       MR. SKURKA:  -- might proffer that the
13  witness is going to identify John Henry Ramirez as
14  being the person whose fingerprints are on these three
15  print cards.  That is going to be a witness after
16  lunch.  So with that proffer, I think the Court should
17  admit it.  If the Court --
18       THE COURT:  Well, it's already been
19  admitted.
20       MR. GARZA:  It's already been admitted,
21  unfortunately.
22       MR. SKURKA:  Okay, that was admitted, but
23  I have two others just like this, Judge, so I guess
24  what I could do is go ahead and -- and introduce these
25  three cards, but not publish it to the jury --

88

1        THE COURT:  Sure, that's fine.
2        MR. SKURKA:  -- until Marsha Parker comes
3   and testifies.
4        THE COURT:  That's fine.  And besides
5   that, you're going to show this image with Marsha
6   Parker, not this witness.  I guess let's do it that
7   way, and then that way, you know, if you got the
8   sponsoring witness there's no harm, it hasn't been
9   published to the jury at this point.  Let's work at it
10  that way.
11       MR. SKURKA:  Well -- and what I'm going
12  to do, Judge, is just have him explain how he puts the
13  latent print down there --
14       THE COURT:  Yeah, just have him explain
15  it.
16       MR. SKURKA:  -- but not talk about the
17  thing.  I'll just do it with this one card that's
18  already been admitted, but I won't with the other two.
19       THE COURT:  Well --
20       MR. SKURKA:  Or do you want me to wait?
21       THE COURT:  I prefer you wait.
22       MR. SKURKA:  I'll do that, Judge.
23       THE COURT:  And I got no problem with you
24  showing the other side, because it doesn't have his
25  name on it.

89

1    MR. SKURKA:  Then we'll do that.  I'll
2  just show him the front side, but when Ms. Parker
3  comes, I was going to use that to show how they
4  actually put the tape there.  I'll just show the front
5  part of the card.
6    THE COURT:  All right.  Let's bring them
7  back in.
8    (Jury enters courtroom.)
9    THE COURT:  All right.  All right.  You
10  may proceed.
11    MR. SKURKA:  I can proceed, Your Honor?
12    THE COURT:  Yes.
13  Q.  (BY MR. SKURKA)  Now, 168, you were
14  identifying the front of the deal.  Is the fingerprint
15  actually on the front of the card or the back of the
16  card?
17  A.  The front of the card.
18  Q.  Okay.
19  A.  I consider this the back of the card --
20  Q.  Okay.
21  A.  -- that's showing right now.
22  Q.  Good.  Now, you're helping me out, because I
23  was thinking -- anyway, this is the back of the card.
24  Tell the jury exactly how you retrieved the print like
25  off that side mirror and placed it on the back of the

90

1  card.  How did you do it?
2  A.  Basically, what we're putting on there is
3  what you might consider a large piece of Scotch tape.
4  It's specially formulated tape which has a little
5  higher density than normal Scotch tape.  Basically,
6  all you do is overlap the tape onto the fingerprint
7  card after you lift it off whatever surface you do.
8  You'll have a tab on top and extra tape at the bottom.
9  Once you smooth it down into the card you can cut the
10  tab on the top and remove your tape from the bottom.
11  Q.  So it's just simply putting tape on top of it
12  after you put the -- what do you call that powder?
13  A.  The latent image on the card?
14  Q.  No, I was talking about the powder.  What do
15  you call that powder?
16  A.  Just fingerprint powder.
17  Q.  Okay, fingerprint powder, I'm sorry.  So
18  you're able to lift it straight off.  Is glass or a
19  mirror a good surface to get prints off of?
20  A.  Yes, sir.
21  Q.  And you did get a print off that side mirror?
22  A.  Yes, sir, I did.
23  Q.  And did you get some other fingerprints?  And
24  I'm going to go ahead and show you what's marked
25  State's Exhibit No. 169 and 170.

91

1  A.  Yes, sir, I did obtain other fingerprints.
2  Q.  Say, again?
3  A.  Yes, sir, I did obtain other fingerprints.
4  Q.  I'm looking at 169 and 170.  Please take
5  those one at a time and ask me if you rec -- ask you
6  if you recognize those.
7  A.  Yes, sir, I do.
8  Q.  What is 169, please?
9  A.  169 is the latent fingerprint that I obtained
10  from the clear plastic Memorex CD-R compact disk case,
11  with "New CKRun?" Written on the CD, and "White Boy
12  John" written on the inside cover, which was found
13  inside of the top forward tray of the center console
14  on the maroon 1994 Dodge 250 van, bearing Texas
15  license J32RDM.
16  Q.  Are you the person that retrieved that print?
17  A.  Yes, sir, I am.
18    MR. SKURKA:  I move that that be
19  admitted into evidence, Your Honor.
20    MR. GARZA:  Your Honor, I have no
21  objection if it's only being admitted for the purpose
22  of identifying it as a print that was obtained from --
23  by this particular witness, but not for the purposes
24  of identification.
25    MR. SKURKA:  That's correct, Judge.

92

1    THE COURT:  All right.  It's admitted
2  for that limited purpose at this point.
3  Q.  (BY MR. SKURKA)  I'm going to show 169, the
4  front of that.  That's essentially what you read to
5  the jury; correct?
6  A.  Yes, sir, it is.
7  Q.  Now, earlier this morning I introduced
8  State's Exhibit No. 147.  Is that where the print
9  found on 169 came from?
10  A.  Yes, sir, it is.
11  Q.  And is that the CD-ROM case where you
12  obtained that print?
13  A.  Yes, sir, it is.
14  Q.  And, again, is that a good surface to get a
15  print off of?
16  A.  Yes, sir, it is.
17  Q.  The last one I want to show you is 170.  What
18  is 170, please?
19  A.  It is a latent fingerprint print that I
20  obtained from the backside of the wallet-size
21  photograph picture of the small boy, which was found
22  laying on the front passenger floorboard of the maroon
23  1999 Ford E-150 van, bearing Texas license 3CMR01.
24  Q.  Is that the same print -- is that the card
25  that you -- print that you retrieved from the back of

93

1    that photo of the small boy?
2        A.   Yes, sir.
3        MR. SKURKA:   Again, Your Honor, I'll
4    move for the admission of 170, after tendering to
5    Defense Counsel.
6        MR. GARZA:   Similar objection, Judge.  We
7    don't mind it being admitted as a piece of evidence
8    retrieved or obtained by this particular witness, but
9    not if it's going to be offered for identification
10   purposes.
11       THE COURT:   It's admitted for the
12   limited purpose at this point.
13       MR. SKURKA:   At this point, Judge, I
14   won't -- I'll reserve publishing the rest of this to
15   the jury, until the other witness testifies.
16       THE COURT:   All right.
17       Q.   (BY MR. SKURKA)  Now, there was an item I
18   introduced earlier to you, a photograph of a small
19   boy.  Do you remember seeing that?
20       A.   Yes, sir, I do.
21       Q.   Can you find that for me, please.
22       A.   (Witness complying.)
23       Q.   Did you find it?
24       A.   Yes, sir, I did.
25       Q.   Can you take it -- take it out of there,

94

1    please?
2        A.   (Witness complying.)
3        Q.   For the record, is that the photograph that
4    we've introduced as State's Exhibit No. 170 -- I'm
5    sorry, the fingerprint card that we introduced as 170,
6    is that the same print that you got off that State's
7    exhibit with the photo of the small boy, which is No.
8    -- what number is that one?
9        A.   State Exhibit 154.
10       Q.   154.
11       A.   Since I no longer have the latent card here,
12   I can't verify the State exhibit --
13       Q.   Do you need the latent card to verify it?
14   Okay.  Let me get that for you.
15       A.   Okay.  So State Exhibit 170 is the latent
16   print card that I did obtain from State Exhibit 154.
17       Q.   And, for the record, that also came as -- in
18   the picture marked State's Exhibit 42, that's the one
19   that was found by the red wallet inside the van?
20       A.   Yes, sir, it was.
21       Q.   Okay.  So that photograph is actually just a
22   piece of white paper, the back of it.
23       A.   Yes, sir.
24       Q.   And the fingerprint card came off of that.
25       A.   Yes, sir.

95

1        MR. SKURKA:   Okay.  Thank you.
2        Your Honor, I believe that's all the
3    questions I have of this witness.
4        THE COURT:   All right.  Cross?
5        MR. GARZA:   If I may, just a minute,
6    Judge.
7        THE COURT:   Okay.
8                    CROSS-EXAMINATION
9    BY MR. GARZA:
10       Q.   Mr. Kirksey, good morning.
11       A.   Good morning.
12       Q.   My name is Ed Garza.  I don't believe you and
13   I have had an opportunity to discuss any of your
14   testimony here before today; is that correct?
15       A.   Yes, sir.
16       Q.   Okay.  Basically, I believe it's your
17   testimony that all these items of evidence were
18   collected as part of your normal duties as a crime
19   scene technician; correct?
20       A.   Yes, sir, they were.
21       Q.   Okay.  So, essentially, your duties are to
22   observe the scene of the crime, try to make some
23   determination of what evidentiary value might be there
24   for you to collect, and, essentially, obtain it in a
25   way that does not taint that evidence any further if

96

1    it all ready has been; is that correct?
2        A.   Basically, yes, sir.
3        Q.   Okay.  Now, when you arrived at the scene out
4    there on Baldwin, was the area already taped off and
5    secured by other police officers?
6        A.   Yes, sir, it was.
7        Q.   Okay.  As far as the blood on the concrete
8    out there that evening, did you happen to observe or
9    see if there had been any print, any footprints or any
10   trampling, any walking over it, or anything like that,
11   that you might have observed?
12       A.   There was numerous bloody shoe impressions
13   and numerous bloody tire impressions throughout the
14   scene, yes, sir.
15       Q.   Okay.  And do you know who they might have
16   been made by?
17       A.   No, sir, I do not.
18       Q.   Okay.  Did you collect samples of those?
19       A.   Depends on what you're talking by samples.  I
20   did take photographs of them, if that's what you're
21   talking about.
22       Q.   Okay.  You took photographs of them.
23       A.   Yes, sir.
24       Q.   Okay.  Did you happen to ask any of the
25   officers out there if there had been any other

97

1  possibilities of other people being around there
2  effecting the scene or tainting it or possibly causing
3  any disruption of the scene?
4      A.  No, sir, I did not.
5      Q.  You did not inquire into that?
6      A.  No, sir.
7      Q.  Okay.  Some of your testimony was that you
8  had found a quarter somewhere out there on that
9  location close to the body; is that correct?
10     A.  Yes, sir.
11     Q.  Is that of any particular significance?
12     A.  Not in my point of view, no, sir.
13     Q.  When you recovered the quarter, was there any
14 blood on it?  I don't know if you testified as to
15 whether or not you found any --
16     A.  No, sir, there was not any.
17     Q.  This was not?  What about the gold ring that
18 you found close to Mr. Castro's body?
19     A.  What about it?  Are you wanting to know --
20     Q.  Do you recall if there was any --
21     A.  -- if there was blood on it?
22     Q.  -- blood on it?  Yes.
23     A.  I don't recall if there was or not but I'm
24 pretty certain there probably was.
25     Q.  Okay.  Were you able to determine who -- who

98

1  -- who that ring belonged to?
2      A.  No, sir, I wasn't.
3      Q.  Okay.  I believe you also found an envelope
4  with a pay stub, and the envelope did happen to
5  indicate the name of Pablo Castro on it; is that
6  correct?
7      A.  It did have a pay stub on it, and to my
8  recollection the pay stub was made out to Pablo
9  Castro.  In addition to that, it also had the first
10 name of Pablo written on the exterior side of the
11 envelope.
12     Q.  On the envelope itself.
13     A.  Yes, sir.
14     Q.  And the pay stubs were inside the envelope.
15             --
16     A.  Yes, sir.
17     Q.  -- is that correct?
18     A.  Yes, sir.
19     Q.  Okay.  Did the pay stubs inside the envelope
20 have any blood on them?
21     A.  No, sir, they did not.
22     Q.  Okay.  I believe you did testify, though,
23 that as far as the envelope that the pay stubs were
24 in, that you did take a control swab off of that, off
25 of the envelope; is that correct?

99

1      A.  I don't remember if I took it off the
2  envelope itself, but I did take a control swab, yes,
3  sir.
4      Q.  And the swab was then later submitted to
5  D.P.S.?
6      A.  Yes, sir, it was.
7      Q.  Okay.  Did you also take any swabs off of Mr.
8  Castro's clothing for any submission, of any sort?
9      A.  No, sir.  I submitted the clothing directly
10 to D.P.S., and they would have taken the swabs
11 necessary from the clothing themselves.
12     Q.  So you submitted the whole -- the whole piece
13 of clothing to them.
14     A.  Yes, sir.
15     Q.  Okay.  Including a blood vial, a vial of
16 blood of the vic -- of Mr. Castro?
17     A.  Purple top tube of the victim's blood, yes,
18 sir.
19     Q.  Okay.  Let me direct your attention to some
20 of these pictures that have already been admitted into
21 evidence.  Let me first ask you, with respect to
22 State's Exhibit 115.  You've identified that as a
23 T-shirt that was found in the Ford van?
24     A.  Yes, sir.
25     Q.  Is that correct?

100

1      A.  Yes, sir.
2      Q.  Okay.  And that it's quite obvious from this
3  picture that there appear to be some bloodstains?
4      A.  Yes, sir.
5      Q.  Correct?  Okay.  The T-shirt, I don't know if
6  you're -- are you able to identify whether or not it's
7  a man's or women's T-shirt?  Is it a blouse or is it a
8  T-shirt that could be either a man's T-shirt or a
9  women's T-shirt?
10     A.  I wouldn't venture to go that way.  It could
11 be worn by either male or female.
12     Q.  Okay.  Now, those bloodstains, how would you
13 describe those bloodstains, how they could have gotten
14 on there?
15         MR. SKURKA:  Judge, that calls for
16 speculation, unless --
17         MR. GARZA:  Well --
18         MR. SKURKA:  -- he's a blood expert.  I'm
19 not sure what he's asking.
20     Q.  (BY MR. GARZA) Do you have any training in
21 blood --
22         THE COURT:  Okay.
23     Q.  -- in blood --
24     A.  I got 40 hours of basic bloodstain analysis
25 training with D.P.S., but, I'm not a bloodstain

101

1   expert, so --

2      Q.   As far as knowing how those could have gotten

3   on there; is that correct?

4      A.   Yes.

5      Q.   You know how to obtain it and -- and prepare

6   it to be analyzed by some other expert, is that

7   correct, is that what you're testifying about?

8      A.   Basically, yes.

9      Q.   Okay.  All right.  Then I'll withdraw the

10  question.  Let me direct your attention to State's

11  Exhibit 131.  Can you identify that picture for us,

12  again?

13     A.   Yes, sir.  That is the front passenger door

14  handle to the Ford van.

15     Q.   Is it the passenger side or driver's side?

16     A.   Passenger side.

17     Q.   That's the passenger side?  Okay.  You made a

18  comment during your testimony with regard to this

19  particular exhibit.  There appears to be some blood on

20  the handle, I mean on the -- I guess, on the armrest

21  on the -- on the -- on the very top, to the left.

22  Yeah.

23     A.   Right there?

24     Q.   No.  This one over here to the left.  To my

25  left.  You made a comment to the jury that, basically,

102

1   you took a control swab of that area only.

2      A.   I took a blood and control swab.

3      Q.   I'm sorry?

4      A.   A blood and control.

5      Q.   Okay.

6      A.   Which means both, one blood sample swab and

7   one control sample swab.

8      Q.   Okay.  What are the differences?

9      A.   The blood sample swab is physically taking a

10  sample of the apparent blood.  The control sample swab

11  is a substrate of the -- basically the material that

12  we're using to obtain the blood sample from.  In this

13  case, it's going to be a substrate of the distilled

14  water.

15          Now, have I actually placed the -- or gotten

16  my control sample directly or near where I got this

17  here, it would be a substrate of what material was

18  actually on the door handle itself.  So if there was

19  some grease or something in there it could be used to

20  eliminate that item when D.P.S. goes to analyze it.

21     Q.   The comment you made, though, is that you

22  generally only take a sample from one general area,

23  instead of the whole area.

24     A.   Okay.  To clarify that, there are various

25  apparent bloodstains in this entire vehicle.

103

1      Q.   Correct.  There's several stains.

2      A.   I selected several bloodstains to take

3   samples from.  I don't necessarily have to take blood

4   samples of every bloodstain that's in the van.

5      Q.   Well, wouldn't it be wise to do that, in

6   order to qualify whose blood it might belong to, whose

7   blood it might not belong to?

8      A.   Okay.  Well, let's put it this away (sic), if

9   I was to take blood samples out at the scene of that

10  entire big pool of blood, I would have to take blood

11  samples every few inches in order to meet your

12  requirement.

13     Q.   Well, doesn't that requirement at least

14  narrow down the whole situation?  Doesn't it assist us

15  in trying to narrow down the situation, sir?

16     A.   Basically, I could see where you're coming

17  from.  But if you get a blood sample within the

18  general area where you're looking at --

19     Q.   That's enough for you.

20     A.   That's enough for me, yes, sir.

21     Q.   Okay.  Then you took a blood sample also of

22  the steering wheel in State's Exhibit 134.  --

23     A.   Yes, sir.

24     Q.   -- is that correct?

25     A.   Yes, sir.

104

1      Q.   Including the leopard patterned, what do you

2   call it, the cover?

3      A.   Cover, yeah.

4      Q.   Okay.  And that's somewhat in the same

5   proximity.

6      A.   Okay, yes.  I took a blood samples from

7   basically here, and I also collected the -- the

8   leopard skin --

9      Q.   Okay.

10     A.   -- steering wheel cover.

11     Q.   And then you also took a blood sample from

12  the passenger side door, as well; correct?

13     A.   Yes, sir.

14     Q.   Now it's conceivable, isn't it, Mr. Kirksey,

15  that those could have been made by two different

16  people?

17     A.   It's conceivable.

18     Q.   Maybe three different people.

19     A.   Could be.

20     Q.   Maybe just one person.

21     A.   Could be.

22     Q.   Maybe several persons.

23     A.   Could be.

24     Q.   But you made the decision to just take the

25  ones you felt were necessary.

105

1    A.   I took the blood samples from the various
2    areas that were important in my opinion, and I took a
3    representative sample of these areas.
4    Q.   And then, of course, you found blood in other
5    parts of the van, which were transferred to other
6    pieces of evidence, other pieces of materials, dollar
7    bills, Bic pens, vodka bottles, and things of that
8    nature; correct?
9    A.   That depends on how you state "transferred."
10   If you're stating transferred from the fingers of
11   somebody to the object, yes.  If you're talking about
12   transfer from one object to another object, then, no.
13   Q.   You didn't take any from one object to the
14   other.  Is that what you're telling me?
15   A.   I'm trying to understand your question, sir.
16   Q.   Okay, well, my question is simple.  You took
17   samples and collected evidence of other matters, other
18   materials such as dollar bills, a Bic pen, the vodka
19   bottle, that you observed to have some indication of
20   blood on it.
21   A.   Yes, I did take samples from the dollar
22   bills, Bic lighter, et cetera.  Yes, sir, I did.
23   Q.   Okay.
24   A.   But in regards to the transfer --
25   Q.   You've answered the question, sir.

106

1    A.   -- question that you answered (sic) --
2    Q.   I understand, Mr. Kirksey.  You've answered
3    the question.
4         MR. GARZA:  Your Honor, I don't have any
5    other questions.
6         THE COURT:  Do you have anything else?
7         MR. SKURKA:  Just a couple of follow-ups.
8         THE COURT:  Okay.
9              REDIRECT EXAMINATION
10   BY MR. SKURKA:
11   Q.   Mr. Garza did not let you finish answering
12   that question.  Did you have more to add to it?
13   A.   Yes, sir.  I was trying to understand what he
14   meant by the transferring blood samples from one item
15   to another item, whether he was talking about
16   transferring it from the hands or physically
17   transferring it from object to object.
18        And I was just trying to clarify which one he
19   wanted to specify.
20   Q.   Okay.  Going back to -- you kept saying that
21   you take a representative sample.  I'm going to show
22   you what's marked State's Exhibit No. 114.  How many
23   different dots or spots of blood were on that shirt?
24   Estimating.
25   A.   Estimating, probably 30, 40 different spots.

107

1    Q.   Based on your scientific training, do you
2    need to take a sample of this dot, this spot, this
3    spot, this spot, this spot, this spot, this spot, this
4    spot, all those things?
5    A.   No, sir, I do not.
6    Q.   What are you trained to do?
7    A.   Basically, you're trained to take three
8    basically -- in this case, three representative
9    samples of blood samples from various areas on this
10   T-shirt.
11   Q.   Is it conceivable or has it been in your
12   experience in 5,000 crimes?
13        Scenes that this blood would be the -- from
14   the source of 35 different people?
15   A.   No, sir.
16   Q.   What is your experience tell you?
17   A.   Well, basically, my experience would tell me
18   that this blood all came from one individual.
19   Q.   So, it would not be necessary to test all
20   those things?
21   A.   No, sir, it would not.
22   Q.   And if you saw the -- remember the photograph
23   of the victim in the crime -- Times Market scene, at
24   the -- at the scene?
25   A.   Yes, sir.

108

1    Q.   Would it be necessary to take the blood
2    sample from, you know, the top of the pool of blood,
3    to the one on the left side of the pool of blood, the
4    right side of the pool of blood, the bottom of the
5    blood to determine whose blood that was?
6    A.   No, sir, it would not.
7         MR. SKURKA:  Thank you.  I'll pass the
8    witness.
9         THE COURT:  Anything else?
10             RECROSS-EXAMINATION
11   BY MR. GARZA:
12   Q.   Mr. Kirksey, it is conceivable that there
13   could be two different people's blood on that T-shirt,
14   though, isn't it?
15   A.   It is conceivable, yes, sir.
16   Q.   Okay.
17   A.   That's why it's recommended that you take
18   three different samples.  So, in this case, you might
19   want to take one there, you might want to take one
20   there, you might want to take one right there.
21   Q.   Okay.
22   A.   And that would basically give you an overall
23   representative of the blood throughout the entire
24   T-shirt.
25   Q.   But it's not like Mr. Skurka would want to

109

1  suggest that all you need to do is just take one
2  sample from the T-shirt to determine whether or not it
3  all comes from one source or not. It's not that
4  simple, is it?
5      A.  It could be that simple.
6              MR. GARZA: Okay. I have no other
7  questions.
8              THE COURT: Anything else?
9              MR. SKURKA: No other questions, Judge.
10             THE COURT: All right. You may stand
11 down.
12             All right. Let's take a break for lunch.
13 We'll see you at 1:30.
14             All rise for jury.
15             (Jury exits courtroom.)
16             THE COURT: Well, Mr. Kirksey, I guess
17 you're excused.
18             THE WITNESS: Well, thank you, Judge.
19             THE COURT: Don't discuss your testimony
20 with anyone while this trial's going on, except the
21 lawyers.
22         THE WITNESS: Okay.
23             (Noon recess.)
24             (Out of the presence of the jury.)
25             MR. SKURKA: Do you want to put the

110

1  witness up here, first?
2              THE COURT: Yeah, I want to put the
3  witness on the stand. All right. You-all be seated.
4              Anything we need to take up?
5              MR. SKURKA: Yes, Judge.
6              THE COURT: What's that?
7              MR. SKURKA: As I recall, the Court had
8  made some rulings about extraneous offenses. This
9  witness was with the perpetrators that night in
10 question. She's a Co-Defendant --
11             (Witness Chavez enters.)
12             THE COURT: Okay.
13             MR. SKURKA: -- Christina Chavez. She is
14 going to testify about what happened that night, but
15 part of her testimony also includes being with the
16 Defendant earlier in the day before these incidents
17 happened and drug use between this -- this witness,
18 the Defendant and the other Co-Defendant.
19             Now, I don't have a specific crime that I
20 could tell Mr. -- Mr. Garza that they committed like
21 possession of cocaine or marijuana, but I want the
22 Court to be advised that I do intend to go into the
23 fact that they were partying. And the Court remembers
24 my --
25             THE COURT: Yeah, yes.

111

1              MR. SKURKA: -- opening statement, I was
2  very careful to say they were partying, but her
3  testimony is going to be that they were basically
4  doing drugs for that day and a couple of days before
5  that.
6              THE COURT: Okay. Do you -- first of
7  all, do you have any objection?
8              MR. GARZA: No, Your Honor.
9              THE COURT: I mean, that's just what -- I
10 mean, if that's what happened, that's what happened.
11             MR. GARZA: Correct.
12             MR. SKURKA: And I understand that, but I
13 --
14             THE COURT: Okay.
15             MR. SKURKA: -- just wanted to make sure,
16 I didn't want to violate anything.
17             THE COURT: All right. Along those
18 lines, is there anything going to come out about the
19 fact that the van was stolen?
20             MR. SKURKA: I have told Ms. Chavez --
21             Ms. Chavez, do you remember what I told
22 you about the van --
23             THE WITNESS: Yes.
24             MR. SKURKA: -- and that you didn't know
25 where the van came from or whether it was stolen or

112

1  not; correct?
2              THE WITNESS: Right.
3              MR. SKURKA: Okay, we're not going to
4  talk anything about the van being stolen or mention
5  that it was stolen or taken without permission or
6  anything, okay, just the fact that you-all were
7  driving around in the van.
8              THE COURT: Yeah, don't -- don't --
9              MR. SKURKA: Do you understand that
10 ruling?
11             THE WITNESS: Yes.
12             THE COURT: Don't bring that up, okay,
13 unless specifically asked by one of the lawyers, "Was
14 the van stolen," then you can answer. Other than
15 that, don't -- don't mention anything about it, okay?
16             THE WITNESS: Yes.
17             THE COURT: Do you understand what the
18 Judge ruled, too, remember we talked about the
19 partying and the drug usage, and stuff, between you
20 and Defendant? The Judge said you can talk about
21 that, okay?
22             THE WITNESS: Yes.
23             THE COURT: All right. All right. And I
24 guess -- you -- yes, why don't you -- your lawyer is
25 going to be sitting in the front row, all right.

113

```
1              All right.  Now let's bring them in.
2          THE BAILIFF:  All rise.
3          (Jury enters courtroom.)
4          THE COURT:  All right.  Be seated,
5   please.
6          (Oath administered.)
7          THE COURT:  All right.
8          MR. SKURKA:  Judge, I have previously
9   told her about the rule, but you might want to go over
10  that with her, please.
11         THE COURT:  All right.  The Rule has
12  been invoked, and what that means is that you can't
13  talk about the facts of this case with anyone while
14  this trial is going on, okay?  You can talk to the
15  lawyers, but not in front of any of the other
16  witnesses, okay?
17         THE WITNESS:  (Nods head).
18         MR. SKURKA:  May I proceed, Your Honor?
19         THE COURT:  Yes.
20
21              CHRISTINA CHAVEZ,
22  having been first duly sworn, testified as follows:
23              DIRECT EXAMINATION
24  BY MR. SKURKA:
25     Q.   Good afternoon, ma'am.  Could you tell the
```

114

```
1   folks on this jury your name, please.
2      A.   Christina Chavez.
3      Q.   Ms. Chavez, I'm going to ask you to put the
4   microphone a litter closer to you, if you could, and
5   speak into that so everybody can hear you, okay?
6      A.   Yes, sir.
7      Q.   Your name is Christina Chavez.  How old are
8   you now?
9      A.   27.
10     Q.   How old were you back on July 19th, 2004?
11     A.   23.
12     Q.   Where are you from?  You grow up in Corpus
13  Christi or where are you from?
14     A.   Corpus Christi.
15     Q.   Where were you born?
16     A.   Elgin, Illinois.
17     Q.   How long had you lived in Corpus Christi
18  before this incident?
19     A.   Basically, my whole life.
20     Q.   So you left Illinois when you were a young
21  child?
22     A.   Yes, sir.
23     Q.   Did you go to school here in Corpus Christi?
24     A.   Yes, sir.
25     Q.   Where did you go to school?
```

115

```
1      A.   Wynn Seale, Martin and Miller High School.
2      Q.   Wynn Seale and Martin.  And those are both
3   junior highs; correct?
4      A.   Yes, sir.
5      Q.   And you went to high school at Miller?
6      A.   Yes, sir.
7      Q.   How far did you get in school, Christina?
8      A.   I just passed 8th grade.
9      Q.   Just the 8th grade?
10     A.   Yes, sir.
11     Q.   Did you have any events that happened in your
12  life while you were in high school that prevented from
13  you finishing school?
14     A.   I got pregnant at a very young age.
15     Q.   How old were you when you got pregnant?
16     A.   14.
17     Q.   How many children do you have altogether?
18     A.   Five.
19     Q.   Are all of them alive?
20     A.   One passed away.
21     Q.   How often did you have children at that early
22  age?
23     A.   Basically, until I as 20.
24     Q.   So --
25     A.   Every year.
```

116

```
1      Q.   Every year you had a child till you were
2   about 20?
3      A.   Yes, sir.
4      Q.   Were they from the same man?
5      A.   Three of them, yes.
6      Q.   Three of them were?  And were you ever
7   married to any of those men?
8      A.   Common-law.
9      Q.   Common-law.  Have you ever worked?
10     A.   Yes.
11     Q.   Can you tell the jury -- or the folks on the
12  jury where you worked?
13     A.   Restaurants, temp jobs.
14     Q.   I'm sorry?
15     A.   Restaurants and temp jobs.
16     Q.   Temp jobs.  Did you ever work anywhere else?
17     A.   That's basically it.
18     Q.   Did you ever have a chance to work at a men's
19  entertainment place?
20     A.   Yes.
21     Q.   Tell the jury where you worked.
22     A.   Max's Gentlemen's Club.
23     Q.   Where is that?
24     A.   Between Calallen and Robstown.
25     Q.   Back around the time of July 19th, 2004, were
```

117

1    you involved in any relationships with anyone?

2        A.    Angela Rodriguez.

3        Q.    With Angela Rodriguez?  How did you and

4    Angela meet?

5        A.    Family, family friends.

6        Q.    Did you-all have a serious relationship or

7    sexual relationship?

8        A.    Yes, sir.

9        Q.    How long had you known Angela or been

10   involved in a relationship with Angela before this

11   date of July 19th, 2004?

12       A.    About nine months.

13       Q.    On July 19th, '04, were you living with

14   Angela Rodriguez?

15       A.    Yes, sir.

16       Q.    Where were you-all living?

17       A.    We were currently living in San Antonio, but

18   at that time when it happened, we were living at her

19   mother's house.

20       Q.    Okay.  You lost me, how could you be living

21   in both San Antonio and Corpus Christi?

22       A.    Well, we spent the weekend at her mother's

23   house.

24       Q.    But you had established a residence and had

25   like a house or apartment in San Antonio?

118

1        A.    Yes, sir.  We had a town home.

2        Q.    Just in -- just you two?

3        A.    And our kids.

4        Q.    Did she have any kids?

5        A.    Two.

6        Q.    So you had your kids and her kids and you-all

7    lived together in San Antonio?

8        A.    Yes, sir.

9        Q.    Now, you mentioned that you were staying --

10   you said "living" at first, but then you changed it to

11   the weekend at her mother's house; is that correct?

12       A.    Yes, sir.

13       Q.    Where was her mother's house located?  Do you

14   remember the street?

15       A.    York.

16       Q.    And why were you-all in Corpus that weekend

17   of July 19th, 2004?

18       A.    Just to visit.

19       Q.    Visit her mother and her family?

20       A.    Yes, sir.

21       Q.    Did you have family here in Corpus at the

22   time?

23       A.    Yes, sir.

24       Q.    Who?

25       A.    My grandmother, my aunts.

119

1        Q.    So even though you-all living in San

2    Antonio, you-all both had families still here in

3    Corpus Christi?

4        A.    Yes, sir.

5        Q.    Now, I think it's been presented that July

6    19th, 2004 was a Monday.  So you were in town for two

7    or three days before this incident took place?

8        A.    Yes, sir.

9        Q.    Before I want to go into the details of the

10   incidents that we're here to talk about today, I want

11   to talk about any potential plea bargains or plea

12   bargain agreement that you made with the State in

13   order for you to get a plea bargain in your case and

14   to testify in this case.  Do you remember that?

15       A.    Yes, I do.

16       Q.    Were you charged with capital murder?

17       A.    In my indictment, yes.

18       Q.    Were you charged with aggravated robbery?

19       A.    Yes.

20       Q.    Were you charged with another aggravated

21   robbery?

22       A.    Yes.

23       Q.    And were you charged with evading the police

24   in a vehicle?

25       A.    Yes.

120

1        Q.    Did you plead guilty or not guilty to those

2    crimes?

3        A.    Guilty on the aggravated robbery.

4        Q.    Okay.  So, did you have a trial like we're

5    having here?

6        A.    No, sir.

7        Q.    Did you plead guilty in front of the Judge

8    and accept responsibility for your actions?

9        A.    Yes, sir.

10       Q.    The difference, though, was the capital

11   murder case was reduced to aggravated robbery, was it

12   not?

13       A.    Yes, sir.

14       Q.    And you received how many years in prison for

15   that?

16       A.    25 years.

17       Q.    And the other case, the aggravated robbery --

18   and just for clarification, we're talking about a

19   Whataburger at the corner of Staples and Baldwin.  Did

20   you plead guilty in that case to aggravated robbery?

21       Q.    And what sentence did you receive in that

22   case?

23       A.    25 years.

24       Q.    Did you also plead guilty in your other

121

1  aggravated robbery case involving a robbery that took
2  place at another Whataburger?
3      A.  Yes, sir.
4      Q.  And how -- what was your sentence in that
5  case?
6      A.  25 years.
7      Q.  So, essentially, you received three 25-year
8  sentences.
9      A.  Yes, sir.
10     Q.  And you understand -- and I'm sorry -- and
11  what happened on the fourth case, the evading in a
12  vehicle?
13     A.  It got -- I don't know what's the word.
14     Q.  Would the word be dismissed --
15     A.  Yes.
16     Q.  -- or dropped?
17     A.  Yes, sir.
18     Q.  In fact, the State and me, I made an
19  agreement with you; correct?
20     A.  Yes, sir.
21     Q.  You testified in this court in front of a
22  different judge at the time?
23     A.  Yes, sir.
24     Q.  And I made a deal with you that if you would
25  plead guilty and testify truthfully in any case

122

1  involving Angela Rodriguez and-or John Henry Ramirez,
2  the Defendant in this case, that you would get this
3  sentence of 25 years?
4      A.  Yes, sir.
5      Q.  Now, for the record, do you understand what
6  "The law of parties" means or "accomplices" mean?
7      A.  Yes, sir.
8      Q.  What does that mean to you?
9      A.  It means everybody that is in the crime is
10  charged with the same.
11     Q.  Is charged with the same crime; correct?
12     A.  Yes, sir.
13     Q.  And have you ever heard that example used
14  about the getaway person who drives the bank (sic) and
15  the getaway driver?
16     A.  Yes, sir.
17     Q.  What does that example show?
18     A.  It shows that they're all in the same party,
19  which they're all going to get charged for it.
20     Q.  So they all participated in the crime, are
21  part of the crime, they all get charged with the
22  crime?
23     A.  Yes, sir.
24     Q.  And you were found basically guilty as a
25  party to this crime?

123

1      A.  Yes, sir.
2      Q.  And we're going to go into details in a
3  minute, but, essentially, you participated in the
4  crime at the Times Market by being the driver.
5      A.  Yes, sir.
6      Q.  Is that right?
7      A.  Yes, sir.
8      Q.  Okay.  When you pled guilty in court, did you
9  plead guilty because were you guilty of being a party
10  to these crimes?
11     A.  Yes, sir.
12     Q.  Now, in the case where it was evading in a
13  vehicle, were you driving the van as it was running
14  away from the cops?
15     A.  No, sir.
16     Q.  And so that case was dropped by the State?
17     A.  Yes, sir.
18     Q.  So you've got a promise and you got a deal in
19  this case, didn't you?
20     A.  Yes, sir.
21     Q.  And for next between 25 years or however long
22  the Parole Board keeps you there, that's what you have
23  to pay for this case?
24     A.  Yes, sir.
25     Q.  And you understand you're testifying today as

124

1  part of that agreement?
2      A.  Yes, sir.
3      Q.  Is anybody forcing you to testify or twisting
4  your arm to testify?
5      A.  No, sir.
6      Q.  And you've -- you and I have just met the
7  other day, about a week or two ago.
8      A.  Yes, sir.
9      Q.  Is that the first time I was able to talk to
10  you face to face?
11     A.  Yes, sir.
12     Q.  And did we go over details of the crime?
13     A.  Yes, sir.
14     Q.  Okay.  Now, I'm going to go into the details
15  of the crime, and I'm going to ask you, again, to
16  listen carefully to my questions and answer just the
17  questions I ask you, okay?
18     A.  Yes, sir.
19     Q.  Christina, were you on drugs that night on
20  July 19th of 2004?
21     A.  Yes, sir.
22     Q.  How did you-all meet?  How did you and
23  Angela, if you were here visiting your family at
24  Angela's house, how was it you came across the
25  Defendant in this case, John Henry Ramirez?

125

1    A.   He came over.

2    Q.   Did you know John Henry Ramirez from before?

3    A.   No, sir.

4    Q.   Had you met him at any time before this night

5    in question?

6    A.   No, sir.

7    Q.   Who was John Henry Ramirez more friends with,

8    you or Angela Rodriguez?

9    A.   Angela Rodriguez.

10   Q.   And do you know how that was?

11   A.   Family, I don't know.

12   Q.   Okay.  So before this night you really didn't

13   know him at all?

14   A.   No.

15   Q.   And he was closer to Angela?

16   A.   Yes.

17   Q.   You said that that day -- and let's just talk

18   about that weekend, you came in town for the weekend

19   with Angela; correct?

20   A.   Yes.

21   Q.   Before the night of July 19th, had you spent

22   time with John Henry Ramirez and Angela?

23   A.   No, sir.

24   Q.   Okay.  Before -- I'm talking about that

25   weekend, before the Monday of the incident that took

126

1    place.

2    A.   I don't remember.

3    Q.   Okay.  You don't remember being with him

4    earlier that day and the day before that?

5    A.   Earlier that day.

6    Q.   Okay.  Earlier that day --

7    A.   Yes.

8    Q.   -- is what you remember.

9    A.   Yes.

10   Q.   Okay.  When did you first see John Henry

11   Ramirez that day?  And I guess we're talking about

12   July 19th, 2004?

13   A.   No, I guess, the day before I met him, 'cause

14   he -- he was at her mother's house.

15   Q.   Okay.  Again, remember I told you the date of

16   July 19th was a Monday.

17   A.   Uh-huh.

18   Q.   So would you have met him on Monday or

19   Saturday or Sunday if you're there during the weekend?

20   A.   Sunday I believe.

21   Q.   So you think it was a Sunday you had met him.

22   What were the circumstances of you meeting him and

23   what did you do with John Henry Ramirez during that

24   time?

25   A.   Angela snuck him in the house because her

127

1    mother wouldn't allow him in there.

2    Q.   Angela smuggled him into the house?

3    A.   Yes.

4    Q.   Did his -- did Angela's mother -- and I'm

5    assuming you're talking about the one that lived on

6    York Street?

7    A.   Yes, sir.

8    Q.   Did she like -- not hike John Henry Ramirez?

9    A.   No, she did not.

10   Q.   So Angela had to smuggle him in?

11   A.   Yes, sir.

12   Q.   Did you know about John Henry Ramirez?  And

13   you hadn't met him face to face, but had you known who

14   he was or had Angela talked to him before that?

15   A.   No, not that I remember.

16   Q.   What were your plans when you first hooked up

17   with John Henry Ramirez or what did you-all do?

18   A.   He came in the house, and he had a knife with

19   him, we were doing until her mom came and found us and

20   started yelling, made a big fuss and kicked him out of

21   the house.

22   Q.   So that was on Sunday?

23   A.   Yes, sir.

24   Q.   And you said he had a knife.  Can you tell us

25   what kind of knife he had?

128

1    A.   Flip out kind of ridge -- ridge, some holes

2    in the end of the knife --

3    Q.   It was a knife --

4    A.   -- and you pull it out.

5    Q.   I'm sorry, I can't hear you.

6    A.   It was like a open-up knife, and ridges, like

7    holes when you pick up -- pick it up, there's holes

8    right there so -- when you pick it up.

9    Q.   And how would it come out that you saw this

10   knife?

11   A.   He just took it out and was playing with it.

12   Q.   So what else happened this day?

13   A.   Nothing, he went his way and we went our way

14   whenever Angela's mother kicked us out.

15   Q.   So he left the house on York Street.

16   A.   Yes.

17   Q.   Okay.  When's the next time you saw him?

18   A.   The next time I saw him was in the house.

19   Q.   I meant what day or what -- morning,

20   afternoon, what?

21   A.   No.  He -- Ruby -- Angela's sister came with

22   him to come pick us up at her friend's house, and we

23   went to go to a restaurant, then we went back to the

24   house.  Angela's mother wasn't there, so we stayed

25   there for a minute.

129

1    Q.   Okay.  So you also hooked up with Angela's
2  sister named Ruby?  Is that Ruby Garcia?
3    A.   Yes.
4    Q.   And you-all went to a restaurant together?
5    A.   No, we just went through drive-through.  She
6  got some breakfast.
7    Q.   Okay.  Now, what -- was that during the same
8  day or the next day?
9    A.   That was during the same day.
10    Q.   Okay.  So, then what happened after you-all
11  went to the restaurant and got the food to go with her
12  sister?
13    A.   We dropped Ruby off.
14    Q.   Where did you drop Ruby off?
15    A.   At York Street.
16    Q.   So who all was in the car after you dropped
17  Ruby off?
18    A.   Me, John and Angela.
19    Q.   What happened next?
20    A.   We went back to Angela's friend's house.  She
21  borrowed some of his stuff to go pawn.
22    Q.   Why did you-all pawn some stuff?
23    A.   So we can get some drugs.
24    Q.   Did you-all use drugs that night?
25    A.   Yes.

130

1    Q.   Did you use drugs the day before?
2    A.   Yes.
3    Q.   What drugs were you-all using?
4    A.   Pills, cocaine, alcohol.
5    Q.   What type of pills?
6    A.   Xanax, depressant pills, psych meds, Xanax.
7    Q.   I'm sorry, the court reporter didn't hear
8  you, either.  What are you saying?
9    A.   Xanax and psych meds.  I really don't --
10  psych meds.
11    Q.   Oh, psych meds.  Okay.  I thought you were
12  saying a brand name.  You're talking about psych meds?
13    A.   (Nods head.)
14    Q.   Whose pills were those?
15    A.   Angela's.
16    Q.   So they were basically Angela's pills?
17    A.   Uh-huh.
18    Q.   And you were mixing them with cocaine and
19  alcohol?
20    A.   Yes, sir.
21    Q.   Was any marijuana used at any time when
22  you-all were together?
23    A.   Yes, sir.
24    Q.   So you're using all these drugs for how long?
25    A.   Over a period of three days, or four with

131

1  Sunday -- I mean, with Monday, off and on.
2    Q.   Including up to the time that you-all were
3  caught in these crimes?
4    A.   Yes, sir.
5    Q.   Who was -- were all three of you using it?
6    A.   Yes, sir.
7    Q.   Including the Defendant John Henry Ramirez?
8    A.   Yes, sir.
9    Q.   Who was providing the drugs?  You said you
10  pawned the drugs, but who was providing them or buying
11  them?
12    A.   Well, basically, all of us.
13    Q.   All of you were buying it?  You said for
14  three days you-all were doing drugs.  Was there a time
15  that you slept or ate or went back to the house or
16  cleaned up, or whatever?
17    A.   Just basically nod off and wake up.
18    Q.   I'm sorry, say that again.
19    A.   We would nod off and wake up.  You would fall
20  asleep and just wake up, and you fall --
21    Q.   And then start, again?
22    A.   Yes, sir.
23    Q.   Where were your kids?  Where were your and
24  Angela's kids when all this was going on?
25    A.   My kids were with my mother.  Angela's kids

132

1  was with their father.
2    Q.   So you-all didn't have any kids with you that
3  weekend?
4    A.   No, sir.
5    Q.   So what's the next thing that happened?
6    A.   It was getting dark, and we ended up at
7  Angela's mom's house.
8    Q.   Now, this -- are we back to July 19th?
9    A.   We're back, I guess, you should say Sunday --
10    Q.   The day this happened?  Sunday or Monday?
11    A.   Sunday.  Well, it falls on a Monday, but it's
12  like midnight, and then, you know, so it would be
13  Sunday.
14    Q.   Tell us what you did -- you said that John
15  picked you and Angela up in the van?
16    A.   Yes.
17    Q.   About what time was it, if you recall?
18    A.   It was daytime.  I don't remember the time.
19    Q.   What did you-all do then?
20    A.   We went to his friend's house.  We did some
21  drugs there.
22    Q.   Did there ever come a time around July 19th,
23  2004, that you-all ran out of money or drugs?
24    A.   Yes.
25    Q.   Tell us how that happened?

133

1    A.   We just didn't have it anymore.
2    Q.   You just didn't have anymore?
3    A.   (Shakes head.)
4    Q.   So, what did you-all decide to do?
5    A.   So we went into the van -- well, came up with
6    a -- like "you -- you grab some people and not hurt
7    them," basically, "just take their money and leave."
8    Q.   Who came up with those ideas?
9    A.   All of us, basically.
10   Q.   And your plan was to grab some people and
11   take some money, but not hurt anybody?
12   A.   Yes, sir.
13   Q.   And where were you-all going to get this and
14   do this to these people?
15   A.   Excuse me?
16   Q.   Where were you-all going to do this?
17   A.   We didn't know.  We were just going to go
18   look for somebody.
19   Q.   Did you have a weapon?
20   A.   No, sir.
21   Q.   Did Angela Rodriguez have a weapon?
22   A.   No, sir.
23   Q.   Did John Henry Ramirez have a weapon?
24   A.   Yes, sir.
25   Q.   Say again?

134

1    A.   Yes, sir.
2    Q.   What did he have?
3    A.   He had that knife.
4    Q.   The same knife you talked about earlier with
5    the ridges?
6    A.   Yes, sir.
7    Q.   Had you seen that knife in all the time
8    you're doing the drugs and drinking this time?
9    A.   Yes, sir.
10   Q.   Did he have it all the time?
11   A.   Yes, sir.
12   Q.   So what happened next, that day of this event
13   in question?
14   A.   Well, we went to the Times Market.
15   Q.   Where at?
16   A.   I think it's Morgan.
17   Q.   I'm sorry?
18   A.   Is it Morgan?  I'm not sure of the street.
19   Q.   You don't remember the name of the street?
20   A.   No, sir.
21   Q.   But you remember it was a Times Market.
22   A.   Yes, sir.
23   Q.   Who -- what vehicle or vehicles were you
24   using at that time?
25   A.   We had two vehicles.

135

1    Q.   Tell us what they were and what they looked
2    like.
3    A.   They were like two maroon caravans.
4    Q.   Who was in which van?
5    A.   John was in a -- the brand-newer one and I
6    was in the oldest one, me and Angela.
7    Q.   Do you know the make or model, like if they
8    were, you know, Ford, Dodge, Chevy, whatever?
9    A.   No, sir, I just know they were caravans.
10   Q.   What's a caravan?
11   A.   Like a mobile van, you could take vacations.
12   Q.   Okay.  And you and Angela were in one van and
13   he was in the older (sic) van.
14   A.   Yes, sir.
15   Q.   And you only remember them as he had the
16   newer one and you-all had the older one?
17   A.   Yes, sir.
18   Q.   You don't know the make or model?
19   A.   No.
20   Q.   So what happened when you-all were in these
21   two vans, where did you-all go?
22   A.   We went to the Times Market.
23   Q.   What happened when you got to the Times
24   Market?
25   A.   Angela got off to go ask this man for

136

1    something, and she came back -- well, this man had a
2    bag with him, he was walking towards the -- I don't
3    know, I think he was just walking.  And all of a
4    sudden I see John and him fighting, and I tell Angela
5    and Angela comes back out to go see what's going on, I
6    guess.
7    Q.   Where were you at when this was going on?
8    A.   In the van.
9    Q.   Where was the van parked?
10   A.   To the right side of the store.
11   Q.   The right side of what?
12   A.   Of the store, on the corner.
13   Q.   Okay.  And where was John's van?
14   A.   To the left side.
15   Q.   Okay.  Did you see them -- where the man came
16   from or was going to?
17   A.   He came out of the store, and he -- he had a
18   trash bag or a bag, plastic bag.
19   Q.   And which way did he go?
20   A.   Towards the car wash.
21   Q.   You said Angela approached him first to ask
22   the man for something?
23   A.   Yes, sir.
24   Q.   What happened exactly?
25   A.   I don't know, I was in the van.  All I see is

137

1  them talking, Angela comes back.
2     Q.  Did Angela fight with him --
3     A.  No, sir.
4     Q.  -- at that time?
5     A.  No, sir.
6     Q.  Do you know if she was -- well, you said you
7  didn't know, so I won't ask that.  Did the man go on,
8  and what's the next thing that you noticed?
9     A.  I see John and him wrestling around.
10    Q.  What exactly -- tell the jury exactly what
11 you saw.
12    A.  I see John and him wrestling around, then I
13 see -- well, I tell Angela to go and see what's going
14 on.  Angela goes out and sees what's going on.  And I
15 look back, I see John just stabbing that man.  He was
16 stabbing him until he fell on his knees.
17    Q.  Did you see what he was stabbing him with?
18    A.  With the same knife he was playing with that
19 night.
20    Q.  Is the person that you saw stabbing the man
21 out in the Times Market parking lot, is that person in
22 the courtroom today?
23    A.  Yes, sir.
24    Q.  Can you point to him and describe something
25 he's wearing?

138

1     A.  That lime shirt.
2        MR. SKURKA:  Your Honor, may the record
3  reflect the witness has identified the Defendant.
4        THE COURT:  It will so reflect.
5     Q.  (BY MR. SKURKA) And how many times did you
6  see him stab him?
7     A.  Too many to count.
8     Q.  What did the man do?
9     A.  Nothing.  He just fell to his knees.
10    Q.  Then what happened?
11    A.  He fell to his back.  Angela -- Angela -- I
12 kind of reversed back.  Angela came to the van, John
13 left to his van.  I could see the man laying down,
14 gasping for air, and we took off.
15    Q.  What did -- what did Angela do?  You said
16 that she got out of the van to go over to see what was
17 going on.  What did Angela do?
18    A.  She was trying to -- I don't know if she
19 was -- she wrest -- she was trying to get them
20 away from each other.
21    Q.  What do you mean?
22    A.  She was trying to get John off of the man.
23    Q.  Did you see whether or not Angela struck
24 blows to the man, too?
25    A.  No, sir.

139

1     Q.  Were you watching this whole time?
2     A.  Yes, sir.
3     Q.  What do you mean?
4     A.  Excuse me?
5     Q.  What do you mean?
6     A.  What do I mean by what?
7     Q.  What do you mean about you saw -- I asked if
8  you -- if you were watching the whole thing and you
9  said, "I don't know." (Sic)
10    A.  Sorry.  Yes, I was watching the whole thing,
11 but I don't know if she hit him or anything like that.
12 All I saw was she trying to get him away from him.
13    Q.  So you can't tell us whether you saw your
14 girlfriend at the time hit him?
15    A.  No.
16    Q.  Who was the one doing the stabbing?
17    A.  John Ramirez.
18    Q.  Did you ever see Angela with a weapon?
19    A.  No.
20    Q.  Did you ever see Angela stab anybody out
21 there?
22    A.  No.
23    Q.  Do you know anything that happened between --
24 or did you see anything happen between Mr. Ramirez,
25 who you've identified, and the man before he started

140

1  stabbing him?
2     A.  Excuse me?
3     Q.  Did you see anything that went on between the
4  Defendant and the man before he started stabbing him?
5     A.  No, just the fact that they were wrestling
6  before that.
7     Q.  Did you ever get out of the van?
8     A.  No.
9     Q.  What happened after the man went to his
10 knees?
11    A.  He fell to his back.
12    Q.  Say again?
13    A.  He fell to his back.
14    Q.  And then what happened?
15    A.  Then I see John pointing to Angela, like --
16 he was just pointing, so she went and picked his
17 pocket.
18    Q.  So you saw Angela picking his pocket?
19    A.  Yes, sir.
20    Q.  Did you see him take anything -- her take
21 anything from him or John Henry Ramirez take anything
22 from the man?
23    A.  No, sir.
24    Q.  Did you see John Henry Ramirez also going
25 through the pocket?

141

1     A.  No, sir.

2     Q.  Well, after they did the stabbing and the man

3  fell to the ground, what's the next thing that

4  happened?

5     A.  Well, I just --

6     Q.  After you saw Angela take something from the

7  pocket.

8     A.  She came to the van.

9     Q.  What happened when she came to the van?

10    A.  She dropped $1.25 on the console.

11    Q.  And what did she say, if anything?

12    A.  She just -- I don't remember.

13    Q.  Well, where did the $1.25 come from?

14    A.  As far as I know from the man's pockets.

15    Q.  Did she have that $1.25 before that?

16    A.  I don't remember.

17    Q.  Did you see any other items of value taken

18  from the man?

19    A.  No, sir.

20    Q.  Did you and John Henry or did John Ramirez

21  ever tell you how much money they got off the guy?

22    A.  No, sir.

23    Q.  You just know that from Angela?

24    A.  Yes, sir.

25    Q.  What did you think of when you saw all that

142

1  happening?

2     A.  I was scared.

3     Q.  Did you go to help the man?

4     A.  No, sir.

5     Q.  Did you call the police?

6     A.  No, sir.

7     Q.  Why not?

8     A.  I was scared.

9     Q.  Why were you scared?

10    A.  'Cause what would happen to me.

11    Q.  What do you mean?

12    A.  If I did anything.

13    Q.  If you didn't what?

14    A.  If I did anything, what would happen to me.

15    Q.  Who were you afraid of?

16    A.  John.

17    Q.  What happened after Angela got back in the

18  car with the $1.25?

19    A.  We left the store.

20    Q.  Where did you go?

21    A.  To a paint and body shop.

22    Q.  Why did you go to a paint and body shop?

23    A.  So they could rinse off their blood.

24    Q.  Who?

25    A.  John Henry.

143

1     Q.  And who else?

2     A.  And Angela.

3     Q.  Did they have blood on both of them?

4     A.  Yes.

5     Q.  What was John Henry Ramirez wearing that

6  night?

7     A.  I don't remember.

8     Q.  What was Angela Rodriguez wearing that night?

9     A.  A white T-shirt, some pants.

10    Q.  What were you wearing that night?

11    A.  A muscle shirt, some jogging pants.

12    Q.  So they went to a paint and body shop, and

13  were they able to wash off the blood?

14    A.  Yes, sir.

15    Q.  Did both of them have blood on them?

16    A.  Yes, sir.

17    Q.  Do you know where the paint and body shop

18  was?

19    A.  I don't remember the street.  I think it's on

20  Ayers.

21    Q.  After they tried to clean up the blood, what

22  -- where did you-all go next?

23    A.  To the next Whataburger.

24    Q.  And tell us who was in what vehicle.

25    A.  We were in -- John was in the new one and I

144

1  was in the old one.

2     Q.  Again, he's in one van and you're in the

3  other two -- you two are in the other van?

4     A.  Yes, sir.

5     Q.  Where did you go next, which Whataburger?

6     A.  The one by Baldwin and Staples.

7     Q.  What happened when you went to the

8  Whataburger at Baldwin and Staples?

9     A.  John and Angela got off the car -- I mean,

10  the van.

11    Q.  And did what?

12    A.  They went toward the lady -- a car in the

13  drive-through window.

14    Q.  And what did they do?

15    A.  John went to the driver's seat, Angela went

16  to the passenger side to grab the bag and they came

17  back.

18    Q.  Did you -- how far away were you when this

19  happened?

20    A.  The entrance of the Whataburger.

21    Q.  Were you in the other van at the time?

22    A.  Yes, sir.

23    Q.  What happened then?

24    A.  They came to the van.  Angela told me to get

25  off the van and get into the other van, so I did, and

145

1  we took off in one van.
2     Q.  Why did you-all leave that -- that van behind
3  at the Whataburger at Staples and Baldwin?
4     A.  I'm not sure.
5     Q.  Was it running, was it operable?
6     A.  Yes, sir.
7     Q.  And then all three of you got in the same
8  van?
9     A.  Yes, sir.
10    Q.  Who was driving?
11    A.  John.
12    Q.  Did you see who they had robbed -- who was
13  robbed at the Whataburger at Staples and Baldwin?
14    A.  No, sir.
15    Q.  After you got in the one van, what happened?
16    A.  We went to another Whataburger.
17    Q.  Where was that Whataburger at?
18    A.  Texan Trail.
19    Q.  Why did you go to another Whataburger?
20    A.  I had no choice.  I wasn't driving.
21    Q.  Did you get money from the person that was
22  robbed at the Whataburger?
23    A.  The first one?
24    Q.  Yes.
25    A.  Yes, sir.

146

1     Q.  So you-all got money, didn't you?
2     A.  Yes, sir.
3     Q.  Why is it after you robbed the man -- after
4  they robbed the man at the Times Market that you-all
5  went to rob somebody else?
6     A.  I don't know, sir.
7     Q.  You went to the third one -- the second
8  Whataburger now.  What happened at the second
9  Whataburger at Texan Trail?
10    A.  John and Angela got off the car, again, the
11  van, and went up to the lady in that -- in a car, but
12  she, like, pulled back enough to close the window on
13  him.
14    Q.  You saw that?
15    A.  Yes, sir.
16    Q.  Where were you?
17    A.  In the van.
18    Q.  Where were -- where was the car that they
19  went to?
20    A.  In the drive-through window.
21    Q.  Did you get out of the van at that time?
22    A.  No, sir.
23    Q.  Could you see who they were trying to rob?
24    A.  I just see the car and someone leaning back
25  and closing the window and taking off.

147

1     Q.  Were they able to get any money from that
2  car?
3     A.  No, sir.
4     Q.  What was the plan after you left the Times
5  Market to do?
6     A.  There basically wasn't a plan.  It was just
7  done.
8     Q.  You just ended up at that Whataburger and
9  robbed somebody at the drive-through?
10    A.  Yes, sir.
11    Q.  Now, it may be for hard for the jury to
12  believe that you just went from the Times Market and
13  just happened upon somebody at the drive-through at
14  the Whataburger, by the menu board, and decided to rob
15  them at the last minute.  How did it really go down?
16    A.  I guess we didn't have any money so we went
17  to the next Whataburger.
18    Q.  Well, you got some money at that Whataburger.
19  Why did you go to the next Whataburger and rob them?
20    A.  I had no choice over that.
21    Q.  What do you mean you had no choice?
22    A.  I wasn't driving.
23    Q.  Christina --
24    A.  Yes, sir.
25    Q.  -- you could have gotten out of that van at

148

1  anyone of those places --
2     A.  Yes, sir.
3     Q.  -- at the Whataburgers, couldn't you have?
4     A.  Yes, sir.
5     Q.  You didn't, though, did you?
6     A.  No, sir.
7     Q.  After they left the Whataburger -- and you
8  said the lady pulled away and rolled the window up on
9  them, what happened then?
10    A.  We took off back towards I think it was
11  Baldwin -- or, no, Staples and we see a cop car.
12    Q.  Where did you see the cop car?
13    A.  Driving the opposite side.
14    Q.  So, what happened, after the cop car came by?
15    A.  Well, we turned -- we kept going straight,
16  but the cop car turned his lights on and started
17  tailing us.
18    Q.  And then what happened after the cop car
19  started tailing you?
20    A.  John took off.  He showed down for a minute
21  and then took off.
22    Q.  Which way did he go?
23    A.  He went straight.  All I can remember is
24  going on the side of Wynn Seale Middle School.
25    Q.  By the side of Wynn Seale Middle School?

149

1    A.   Yeah.

2    Q.   Do you know what that street is?

3    A.   No, sir.

4    Q.   Where were you in the van, and who all was in

5    the van and where were they sitting?

6    A.   I was in the back.  Angela was in the

7    passenger side and John was driving.

8    Q.   Is the person that's driving the same person

9    you identified earlier?

10   A.   Yes, sir.

11   Q.   Is the person that robbed the person at the

12   Whataburger on Staples and Baldwin, is that the same

13   person you identified earlier?

14   A.   Yes, sir.

15   Q.   And the person who robbed the person at the

16   Whataburger at Texan Trail, is that the same person

17   you -- you identified earlier?

18   A.   Yes, sir.

19   Q.   Did he use a knife during all those

20   robberies?

21   A.   Yes, sir.

22   Q.   So you're going down, and he's driving and

23   the police are chasing you.

24   A.   Yes, sir.

25   Q.   Tell us -- tell the jury what happened.

150

1    A.   All I can remember was I was trying to pour

2    down vodka out of the window.

3         COURT REPORTER:  Pour down what?

4         THE WITNESS:  Vodka.

5    Q.   (BY MR. SKURKA) You were trying to pour vodka

6    out the window?

7    A.   Yes, sir.

8    Q.   Why?

9    A.   Because, for some reason, I felt like I was

10   going to get in trouble for that so I was trying to

11   get rid of it.

12   Q.   Did you get rid of the vodka or tried to pour

13   it out?

14   A.   I tried to pour it out, ended up falling on

15   the floor, and I couldn't get back up cause John was

16   driving too fast.

17   Q.   Well, how was he driving and how fast was he

18   driving, if you know?

19   A.   He was driving too fast, so I couldn't pick

20   my body up and sit back down.  I remember he didn't

21   stop, not once, he just kept going.

22   Q.   Was the police officer chasing you with the

23   -- could you hear the lights or see the lights or

24   siren?

25   A.   Well, before I fell to the ground, yes, I saw

151

1    sirens -- well, saw the lights.

2    Q.   So there would be no doubt that the police

3    car was chasing you?

4    A.   No doubt at all.

5    Q.   How far or how long did the police chase you?

6    A.   A long time, until we stopped.  I don't

7    remember how long.

8    Q.   Tell us about how -- where you stopped and

9    how you stopped.

10   A.   We stopped in some bushes.  John drove

11   straight in there cause we were like -- we were

12   trapped in some bush -- bushes.

13   Q.   Did you know where you were, Christina?

14   A.   I knew I was in the -- near The Cuts cause

15   that's the area where I know that's -- it's that

16   crowded.

17   Q.   What do you mean "that crowded"?

18   A.   Like, unkept, the grass and stuff.

19   Q.   Okay.  Were you familiar with that area much?

20   A.   I wasn't familiar, but I know where it --

21   it's at.

22   Q.   And when we're talking about "The Cut," what

23   area of town is that?

24   A.   North side.

25   Q.   The north side?  Did you tell John Henry

152

1    Ramirez where to go?

2    A.   No, sir.

3    Q.   All right.  Did he know where to go or appear

4    to know where he was going?

5    A.   Apparently.

6    Q.   You said he drove into some bushes, so much

7    that you were trapped.  Explain that to the jury.

8    A.   He -- he was driving so fast that he drove in

9    some bushes, so we were -- we were trapped in that

10   area.

11   Q.   I guess what I'm trying to ask you is what do

12   you mean you were trapped?

13   A.   Well, we were surrounded by bushes.

14   Q.   So could you open the door doors on either

15   side easily?

16   A.   Well, yes, sir.

17   Q.   During this time, did you ever notice any

18   type of indication of wound that John Henry Ramirez

19   had sustained?

20   A.   I remember him having his hand hurt cause he

21   was trying to punch the window open so we won't open

22   the doors so the light won't show cause, for some

23   reason we lost the keys.  He had his hand like this,

24   and, well, they were trying to kick it, and Angela

25   tried to kick it, until they assumed, you know, they

153

1    couldn't break the window, so he opened the door and
2    we all jumped out.
3         Q.   And when you say "his hand was hurt," I guess
4    what I'm trying to figure out is was his hand hurt
5    from the previous robberies or was it hurt, are you
6    saying, from the -- trying to open the door or window?
7         A.   I wouldn't know.  That's the first time I
8    realized that his hand was wrapped up.
9         Q.   So his hand was wrapped when you were in the
10   van?
11        A.   Yes, sir.
12        Q.   Okay.  You just don't know when it happened?
13        A.   No, sir.
14        Q.   You jumped out into this brushy area that's
15   so tight you have a hard time getting out of the
16   doors.  Where do you go then?
17        A.   We started running.
18        Q.   Where did you go?
19        A.   We just started running.
20        Q.   Through what -- or what direction, toward
21   what?
22        A.   We just start running.  It -- it wasn't no --
23   no specific direction, we just started running.
24        Q.   Was there any plan, like, you go north, I go
25   south, whatever?

154

1         A.   No, we were just running.
2         Q.   Why were you running?
3         A.   To get away, I guess.
4         Q.   Did you hear police cars or see police cars
5    or sirens in the area at that time?
6         A.   No, sir.
7         Q.   What happened next?
8         A.   Well, we started running.  Angela fell.  John
9    went to go help her to get up.  We started running
10   again.  We ended up in the end of where the bushes
11   end, and I -- I went out first and went into the
12   ditch.  I came -- came on top of the ditch, and I seen
13   nothing but cop cars coming.  I turned around and I
14   see Angela just sitting on the floor on the grass and
15   I was don't see John no more.
16        Q.   What do you mean you didn't see John no more?
17        A.   He wasn't there anymore.
18        Q.   Where did he go?
19        A.   I don't know.
20        Q.   Do you recall what direction he went in?
21        A.   No, sir.
22        Q.   Did you see which way he went?
23        A.   No, sir.
24        Q.   What happened then?
25        A.   The cops came and told us to, "Put your hands

155

1    up in the air," arrested me, went to go grab Angela,
2    arrested her, took us back to Whataburger.
3         Q.   Did you cooperate with the police?
4         A.   Yes, sir.
5         Q.   Did Angela cooperate with the police?
6         A.   No, sir.
7         Q.   Tell us what happened.
8         A.   She refused to get handcuffed, so they had to
9    force to handcuff her.  They had to hog-tie her.  She
10   kept kicking them, the cop car windows, and screaming.
11        Q.   Did she give up to the police when the police
12   first approached her?
13        A.   Yeah, but they had to hold her down.
14        Q.   Did they have to do that with you?
15        A.   No, sir.
16        Q.   The police officers then took you back to the
17   Whataburger to see if the witnesses --
18        A.   Yes.
19        Q.   -- could identify you?
20        A.   Yes, sir.
21        Q.   And were they able to?
22        A.   Yes, sir.
23        Q.   How do you feel about what you did, Ang--
24   Christina?
25        A.   I feel bad.  Something I have to live with

156

1    the rest of my life.
2         Q.   What happened to the knife?
3         A.   I don't know.
4         Q.   Did Mr. -- Mr. Ramirez say anything about the
5    knife?
6         A.   He said he was going to keep it.
7              MR. GARZA:  Your Honor, I'm going to
8    object to whatever was said by my client at the time.
9              THE COURT:  Because?
10             MR. GARZA:  Well, as hearsay, Judge, and
11   also as a res gestae statement that doesn't fit the
12   exception either, Judge.
13             THE COURT:  Well, overruled.  These are
14   statements by a party opponents, not hearsay.
15        Q.   (BY MR. SKURKA) You can answer the question.
16        A.   He said he was going to keep it for a
17   souvenir.
18        Q.   He was going to keep the knife for a
19   souvenir, he said?
20        A.   Yes, sir.
21        Q.   When you and Angela were arrested, do you
22   know why -- did you expect John Henry Ramirez to be
23   arrested, too?
24        A.   Yes, sir.
25        Q.   You-all came out of that brush line or tree

157

1  line together, didn't you?
2      A.  Yes, sir.
3      Q.  Do you know which way he went?
4      A.  No, sir.
5      Q.  The police asked you if you knew where he
6  was, right?
7      A.  Yes, sir.
8      Q.  Were you able to tell them that, where he
9  was?
10     A.  No, sir.
11             MR. SKURKA:  I'll pass the witness.
12             THE COURT:  All right.  Cross?
13             MR. GARZA:  May I proceed, Your Honor?
14             THE COURT:  Yes.
15                  CROSS-EXAMINATION
16 BY MR. GARZA:
17     Q.  Ms. Chavez, my name is Ed Garza, I don't
18 think you and I have ever met before; is that correct?
19     A.  Yes, sir.
20     Q.  How old did you say you were back in '04 when
21 this incident occurred?
22     A.  I believe I was 23 -- 22 or 23.
23     Q.  22, 23?  And you only went as far as the 8th
24 grade, as far as your formal schooling?
25     A.  As far as up-to-date, now?

158

1      Q.  No, at that time.
2      A.  Oh, yes, sir.
3      Q.  Back at that time.
4      A.  Yes, sir.
5      Q.  And I believe you stated that your school got
6  interrupted because you got pregnant when you were 14
7  years old?
8      A.  Yes, sir.
9      Q.  Is that right?
10     A.  Yes, sir.
11     Q.  You've also testified that you have five
12 children.
13     A.  Uh-huh.  Yes, sir.
14     Q.  You had a child --
15     A.  One passed.
16     Q.  One right after the other?
17     A.  Yes, sir.
18     Q.  Okay.  Were you -- you were born in Illinois?
19     A.  Elgin, Illinois.
20     Q.  Okay.  Where does your mother live?
21     A.  San Antonio.
22     Q.  And your father?
23     A.  San Antonio.
24     Q.  Are they still married?
25     A.  No, sir.

159

1      Q.  Were they divorced?
2      A.  Yes, sir.
3      Q.  About when were they divorced?
4      A.  I don't know a specific date.
5      Q.  How old were you, do you remember?
6      A.  I was five years old when they separated.
7      Q.  Did you keep contact with your father?
8      A.  No, sir.
9      Q.  And have you had any contact with him at all?
10     A.  No, sir.
11     Q.  Do you have contact with your mother?
12     A.  Yes, sir.
13     Q.  Your five children, who takes care of them?
14     A.  Four children.  One passed away.
15     Q.  Okay.  Your four children, I'm sorry.  Who
16 takes care of your children?
17     A.  My mother and my sister.
18     Q.  How many brothers and sisters do you have?
19     A.  I have three sisters.
20     Q.  Older or younger?
21     A.  One older, two younger.
22     Q.  Do they live here in Corpus?
23     A.  They live in San Antonio.
24     Q.  And what do they do for a living?
25     A.  My baby sister works at Victoria Secret and

160

1  my mother works in a hospital.  She runs the floor --
2  the psych floor in a hospital in San Antonio.
3      Q.  Is she a nurse?
4      A.  She's nurse, she's everything.  She just runs
5  the floor.
6      Q.  Okay.
7      A.  And my other sister, she's going to college
8  and works three jobs.  And my older sister, I don't
9  know what she does.
10     Q.  Has your mother ever remarried?
11     A.  No, sir.  Oh, yes, sir, sorry.  She remarried
12 one time.
13     Q.  Are they still -- is she still married to
14 that person?
15     A.  No, sir.
16     Q.  They're divorced?
17     A.  Yes, sir.
18     Q.  Are you-all the only children that she has
19 had from her matrimony to your father?
20     A.  Yes, sir.
21     Q.  And right now, she's taking care of your
22 children, along with your sisters?
23     A.  Yes, sir.
24     Q.  How old are your children now?
25     A.  11, 10, 7, 6 -- 8 and 7, sorry about that, my

161

1    boys.

2        Q.   The father of these children, is he involved

3    in their lives at all?

4        A.   The first two, the oldest, yes.  And one of

5    the youngest, he pays child support, but he's not in

6    the child's life.

7        Q.   And the one who's paying the child support,

8    pays it to your mother or pays it through the State?

9        A.   Yes, sir.

10       Q.   The father of your oldest child, he is in

11   that child's life?

12       A.   Yes, the first two.

13       Q.   He visits with her regularly?

14       A.   Weekends, whenever my mother can come from

15   San Antonio to Corpus, so they can spend some time.

16       Q.   He lives here in Corpus?

17       A.   Yes, sir.

18       Q.   Okay.  Now, the other -- the other father who

19   pays the child support, does he exercise his

20   visitation rights?

21       A.   No, he doesn't.

22       Q.   So he's not in their lives at all?

23       A.   No.

24       Q.   Now, you've described that you were

25   relationally involved with Angela Rodriguez; is that

162

1    correct?

2        A.   Yes, sir.

3        Q.   You-all were involved in a gay relationship?

4        A.   Yes, sir.

5        Q.   Okay.  And for how long did you say?

6        A.   For about nine months.

7        Q.   About nine months?

8        A.   Uh-huh.

9        Q.   Okay.  Were you in possession of your

10   children at that time?

11       A.   At what time?

12       Q.   During the time you were in your relationship

13   with Angela?

14       A.   Yes, sir.

15       Q.   Were you caring for them solely?

16       A.   Yes, sir.

17       Q.   By yourself?

18       A.   Yes, with my mother's help, off and on.

19       Q.   I'm sorry?

20       A.   With my mother's help, off and on.

21       Q.   Okay.  And you mentioned that Angela had

22   children of her own --

23       A.   Yes, sir.

24       Q.   -- is that correct?  How many children did

25   she have?

163

1        A.   Two.

2        Q.   How many?

3        A.   Two.

4        Q.   Okay.  Did they live with you-all in San

5    Antonio during the time you-all were living in San

6    Antonio?

7        A.   Yes.

8        Q.   All of them?

9        A.   Yes, for a short -- for a short period of

10   time.

11       Q.   During the time you had possession of these

12   children, were you-all doing drugs, also?

13       A.   No, not while we had the children.

14       Q.   What about when you didn't have the children,

15   did you-all like to party with drugs?

16       A.   Yes, sir.

17       Q.   And was that pretty regularly?

18       A.   Not as -- no, not in San Antonio.

19       Q.   Did you have jobs?

20       A.   In San Antonio?

21       Q.   Uh-huh.

22       A.   No.

23       Q.   No jobs?

24       A.   No.

25       Q.   What were you-all living on?

164

1        A.   Excuse me?

2        Q.   What were you-all living on?

3        A.   My mother -- my mother paid my rent.

4        Q.   Any public assistance?

5        A.   Food stamps.

6        Q.   Now, you testified that your involvement in

7    these incidents was that you just kept going along,

8    sitting in the van.  Is that what you did?

9        A.   Yes, sir.

10       Q.   And for that you got 25 years?

11       A.   Yes, sir.

12       Q.   There's been some previous testimony here by

13   one of the victims at the Whataburger on Baldwin and

14   Staples who said that you were the person who got off

15   the van and asked her to use the cell phone.  Now, is

16   she lying or are you lying about that?

17       A.   I wasn't the one that went out that van and

18   asked for a cell phone.

19       Q.   She specifically named you, identified you by

20   clothing, by facial features, by name, okay, as the

21   person that got down and asked her to use her cell

22   phone.  She even mentioned the fact that you had

23   bloodstains on your clothing, okay?  So is it your

24   testimony, ma'am, that you're not that person?

25       A.   Yes, sir.

165

1   Q.   So she's lying, huh?
2   A.   (No response.)
3   Q.   Is that -- is that what's going on here, is
4   she lying about that?
5   A.   Are you asking a question, sir?
6   Q.   Yes.  Is she lying about that?
7   A.   (No response.)
8   Q.   Why would she have identified you, pointed
9   you out, called you by name, as the person involved in
10  that robbery?
11  A.   I'm not sure.
12  Q.   You think she made a mistake?
13  A.   Yes, sir.
14  Q.   Really?  Okay.  Do you remember giving the
15  police a statement some time in the afternoon the next
16  day after you were arrested?
17  A.   Yes, sir.
18  Q.   Do you remember what you were doing when you
19  gave them that statement?
20  A.   Yes, sir.
21  Q.   Do you feel like you were sober by that time?
22  A.   No, sir.
23  Q.   Were you pretty high?
24  A.   Yes, sir.
25  Q.   Pretty drunk?

166

1   A.   Yes, sir.
2   Q.   Pretty wasted?
3   A.   Yes, sir.
4   Q.   Been partying for three days, off and on,
5   using almost all kind of drugs.
6   A.   (Nods head.)
7   Q.   Is that right?
8   A.   Yes, sir.
9   Q.   Did you feel like you were sober when you
10  gave this statement?
11  A.   Sober enough.
12  Q.   Sober enough?
13  A.   Yes, sir.
14  Q.   Okay.  You also testified that whenever
15  everything happened over at the Times Market that
16  night, that you-all went to a paint and body shop so
17  that John and Angela could wash their clothes off.  Do
18  you remember where that was?
19  A.   As I remember, it was on Ayers.  That's all I
20  remember.
21  Q.   How long did that take?
22  A.   Not long.  Less than ten minutes.
23  Q.   Less than ten minutes.  Then after that is
24  when you went to the Whataburger on Baldwin and
25  Staples?

167

1   A.   Yes, sir.
2   Q.   And it's your testimony you stayed in the
3   truck or the van.  Do you remember which van you
4   stayed in while they were doing everything over there?
5   A.   The oldest van.
6   Q.   Which is which one?  You don't -- you don't
7   know the name of the van?
8   A.   No.
9   Q.   Okay.  What color was it, do you remember?
10  A.   Maroon.
11  Q.   How long do you think you were at that
12  Whataburger?
13  A.   I don't remember.  It was fast.
14  Q.   Five, ten minutes?
15  A.   I should say.
16  Q.   Okay.  Let me show you some pictures, okay?
17       MR. SKURKA:  I think Mary has them.
18       MR. GARZA:  May I approach the --
19       THE COURT:  Yes.
20       MR. GARZA:  -- court reporter, Judge?
21       THE COURT:  Yes.
22       MR. GARZA:  May I have just a minute,
23  Judge, to refer to my notes?
24       THE COURT:  Sure.
25       (Brief pause.)

168

1   Q.   (BY MR. GARZA) Let me show you what's been
2   admitted into evidence already as State's Exhibit 27,
3   and ask you to turn around and take a look at that
4   picture.  Do you recognize what that is a picture of?
5   A.   Yes, sir.
6   Q.   What is it of?
7   A.   The Whataburger on Staples.
8   Q.   Okay.  Is that the one that you-all went to
9   after the Times Market incident?
10  A.   Yes, sir.
11  Q.   And where was the van parked that you were
12  sitting in?
13  A.   Right here in the entrance, on the side where
14  that red Explorer is at.
15  Q.   Okay.  I'm going to use this laser pointer,
16  okay?  Now, where do I need to move it so you can show
17  the members of the jury where you were sitting in the
18  van and where it -- you were parked?
19  A.   Right there.
20  Q.   Right there, or was it up against this way or
21  up against this way?
22  A.   In the middle.
23  Q.   Right in the middle?
24  A.   Yes, sir.
25  Q.   Just right there?

169

1    A.   Yes, sir.

2    Q.   In the driveway?

3    A.   Yes, sir.

4    Q.   That's where you were parked?

5    A.   Yes, sir.

6    Q.   That's where you were sitting?

7    A.   Yes, sir.

8    Q.   Is that where you left the van after you-all

9    piled into the other one, all three of you together?

10   A.   As I remember, yes, sir.

11   Q.   That's where you left it?

12   A.   Yes, sir.

13   Q.   Let me also show you State's Exhibit No. 3.

14   Can you identify what's in this picture?

15   A.   The Times Market.

16   Q.   Okay.  I'm going to point this over here and

17   ask you if you remember where your van or the van that

18   you were in was parked that night.  Where do I need to

19   move this pointer to?

20   A.   To my right.

21   Q.   This way?

22   A.   Yes, sir.

23   Q.   Is that where you were sitting --

24   A.   More.

25   Q.   -- or is that where the van was parked that

170

1    you were sitting in?

2    A.   Yes, sir.

3    Q.   Do you remember if there was another vehicle

4    next to you?

5    A.   Yes, sir.

6    Q.   Okay.  And where was the other van parked?

7    A.   In between.

8    Q.   Further this way?

9    A.   Yes, sir.

10   Q.   Okay.  And where did all the ruckus or the

11   scuffle take place between Angela, Mr. Castro and my

12   client?

13   A.   Where you have your laser at.

14   Q.   Right in there, in the middle?

15   A.   Not towards the parking lot -- I mean, the

16   parking spaces, put more towards the back.

17   Q.   More this way?

18   A.   Yes, sir.

19   Q.   Okay.  During the fight or the scuffle was

20   there a lot of moving around or did it all take place

21   in just one central area?

22   A.   It was more of where the parking and then it

23   escalated a little bit off.

24   Q.   Okay.  Now, you testified that -- that Angela

25   was not involved in any of the fighting.  --

171

1    A.   As far as --

2    Q.   -- is that true?

3    A.   Yes, sir.  Well, she was trying to get them

4    apart, as far as I know.  That's all I could see.

5    Q.   You don't remember if she was involved in

6    doing any of the punching?

7    A.   No.

8    Q.   She didn't do anything either, huh?  She was

9    trying to break up the fight?

10   A.   As far as I could see, sir.

11   Q.   And what was she guilty of that she went to

12   the penitentiary for life?

13   A.   I'm not part of that, just this to --

14   Q.   According to your testimony, all she did was

15   get in the middle of everything trying to break them

16   up?

17   A.   Yes, sir.

18   Q.   Do you remember at all, or are you trying to

19   cover up for her?

20   A.   Is that a question, sir?

21   Q.   Yes.

22   A.   I remember.

23   Q.   Okay.  Then what was she doing?

24   A.   Like I said, all I saw was she was trying to

25   get them apart.

172

1    Q.   Okay.  So you're telling us that you never

2    saw her hit Pablo Castro?

3    A.   As far as I know, no.

4    Q.   You never saw her stab Pablo Castro?

5    A.   No, sir.

6    Q.   You never saw her kick Pablo Castro?

7    A.   No, sir.

8    Q.   You never saw her punch Pablo Castro?

9    A.   No, sir.

10   Q.   Okay.  So, what is it that you did see her

11   do?

12   A.   Try to pull them apart.

13   Q.   All right.  Okay.  Okay.  Now, there's been a

14   couple of other people who were eyewitnesses to the

15   incident from across the street in this area where

16   that car wash was.

17   A.   Yes, sir.

18   Q.   Guess what, they described the whole

19   different situation than what you're describing.  Are

20   they lying about it?

21   A.   I wouldn't know, sir.  My whole attention

22   wasn't on them the whole time.

23   Q.   Okay.

24        MR. GARZA:  Judge, I want to continue

25   with another line of questioning, but can we have a

173

1   short recess to set up the evidence we need in this
2   matter to proceed?
3           THE COURT:  Yes.  All right, let's take a
4   little break, ladies and gentlemen.
5           All rise for the jury.
6           (Jury exits courtroom.)
7           THE COURT:  All right, Mr. Garza, what do
8   you need?
9           You-all can be seated.
10          MR. GARZA:  Your Honor, I'm going to
11  impose on the State, and hope that they have the --
12  the videotaped statement that she made the next day in
13  the CD form.  Unfortunately, I didn't bring ours with
14  us.
15          MR. SKURKA:  It's downstairs.  I don't
16  have it with me.  It's down in the appellate
17  conference room.
18          MR. GARZA:  If we can borrow it, Judge,
19  it will be appreciated.
20          MR. SKURKA:  That's okay.
21          THE COURT:  Well, I mean, we can do that,
22  but, I mean, what are you going to do with it?
23          MR. GARZA:  I'm going to offer it into
24  evidence.
25          THE COURT:  Impeach her?

174

1           MR. GARZA:  I'm going to offer it into
2   evidence.  Yes, sir, to use it to impeach her.
3           THE COURT:  Do you have any objection of
4   the offering of that evidence?
5           MR. SKURKA:  Well, I have to think for a
6   minute.  I don't really understand why they need to
7   have the video statement because my understanding of
8   the rules is once you get the person testifying, you
9   don't need that, the rest of that is hearsay --
10          THE COURT:  Unless -- I mean --
11          MR. SKURKA:  -- unless you're going to
12  impeach him and he has a transcript of the video.
13          MR. GARZA:  Well, here's the other thing
14  I want to do, Judge.
15          MR. SKURKA:  It's up to the Judge.
16          THE COURT:  Okay.
17          MR. GARZA:  The other thing I want to
18  establish is that I want the jury to see what her
19  state of mind and how she was acting that night, and
20  how she appeared to be still quite high.
21          MR. SKURKA:  Well --
22          MR. GARZA:  I want to show that to the
23  jury.
24          THE COURT:  Well, she's admitted that she
25  was high.  She was -- she's -- she agreed with you, as

175

1   I recall.
2           MR. SKURKA:  So I don't see the area of
3   impeachment, then, Judge.
4           THE COURT:  She said she was high.  I
5   mean, I'll -- I'll look at the item.  I'll look at it.
6   We can play it up here.
7           MR. GARZA:  Okay.
8           MR. SKURKA:  And, Judge, like he said, if
9   he's going to do it from impeachment, he's got a
10  transcript that's if she said something different from
11  what she says in the video --
12          THE COURT:  Yeah, I agree.  You can --
13          MR. SKURKA:  He can use her --
14          THE COURT:  -- you can ask her, and then
15  --
16          MR. SKURKA:  -- use the transcript.
17          THE COURT:  -- and then -- and then she
18  can then deny or admit.
19          MR. SKURKA:  It's hard to impeach her
20  when she says she was drunk or high or whatever.
21          THE COURT:  I mean, that's -- that's
22  how we're going to have to do it.  If she's testified
23  differently today than she did on that video, ask her
24  now.  If she admits it, then you can ask her in front
25  of the jury.  If she denies it, you can impeach her

176

1   with it, but --
2           MR. GARZA:  Okay.
3           THE COURT:  If you-all want a few minutes
4   to look over it --
5           MR. GARZA:  Yes.
6           THE COURT:  -- I'll give you do that.
7           (Pause in proceedings.)
8           (Jury enters courtroom.)
9           THE COURT:  All right.  Be seated,
10  please.  Okay.  Cross?
11          MR. GARZA:  May I proceed, Your Honor?
12          THE COURT:  You may.
13  Q.   (BY MR. GARZA) Ms. Chavez --
14  A.   Yes, sir.
15  Q.   -- when you-all ran out of drugs and whatever
16  else you think you needed to keep partying that night,
17  had you-all planned or was it your intention between
18  you and Angela Rodriguez and my client to go to the
19  Times Market and rob somebody?  Was that your plan to
20  do, to go over there and do that?
21  A.   No, sir.
22  Q.   It wasn't?
23  A.   No.
24  Q.   So you-all hadn't planned that at all.
25  A.   We planned on robbing somebody, but not there

177

1  exactly in Times Market next to a car wash, with other
2  people. No, sir.
3      Q.   Not there in front of a lot of witnesses or
4  anything like that?
5      A.   No, sir.
6      Q.   Really?
7      A.   No, sir.
8      Q.   Okay. So that wasn't the plan --
9      A.   No, sir.
10     Q.   -- at all?
11         MR. SKURKA:  Judge, excuse me.  I think
12  the microphone got turned off during break or
13  something.  Can we turn it back on?
14         Thank you, Mary.
15         COURT REPORTER:  Uh-huh.
16     Q.   (BY MR. GARZA)  After that, did you-all make
17  any plans to go and rob anybody at the Whataburger on
18  Baldwin and Staples?
19     A.   As far as I remember, we just ended up there.
20     Q.   I'm sorry?
21     A.   As far as I remember, we just ended up there.
22     Q.   So you hadn't made -- you hadn't made any
23  plans to go rob anybody over there?
24     A.   As far as I remember, we just ended up there.
25     Q.   Had you made any plans or entered into any

178

1  agreements to go and rob anybody at the Whataburger on
2  Texan Trail?
3      A.   We just ended up there.
4      Q.   You just ended up there.  Then what did you
5  plead guilty to?
6      A.   Aggravated robbery, three counts, running
7  concurrent for 25 years.
8      Q.   Just for sitting in the van, huh?
9      A.   Someone died, sir.  That's the least I can
10  do.
11     Q.   Had there been any discussions about going to
12  the Times Market and killing anybody?
13     A.   No, sir.
14     Q.   Had there been any discussion about going to
15  the Whataburger and killing anybody?
16     A.   No, sir.
17     Q.   Either one of them?
18     A.   No, sir.
19     Q.   When you left the Times Market to go to the
20  Whataburger on Staples and Baldwin, did you notice or
21  do you remember if our client had any sort of wounds
22  on his hands or was he bleeding from any part of his
23  body?
24     A.   No, sir.
25     Q.   What about at the Whataburger -- what about

179

1  when you left there and went to the Whataburger on
2  Texan Trail, did you notice if he was bleeding from
3  any part of his body?
4      A.   No, sir.
5      Q.   I believe it's your testimony that at one
6  time, I guess, whenever the -- the chase was over with
7  and you-all ran the van into the brushy area over in
8  the Port area, you-all had to break windows to get
9  out?
10     A.   That's the first time I noticed that he hurt
11  his hand.
12     Q.   That was the first time.
13     A.   Yeah, that he had it wrapped up.
14     Q.   Was he -- did he have it wrapped up to break
15  the window or had he already --
16     A.   He had it --
17     Q.   -- wrapped it up --
18     A.   -- wrapped up before he hit the window.
19     Q.   And, at that time, did you notice if he had
20  injured himself or was bleeding from any part of his
21  body?
22     A.   At that time, I saw that he injured himself.
23     Q.   That time.
24     A.   He was hurt.  He was hurt, yes.
25     Q.   As part of the deal that you made with the

180

1  State for your 25 years, that was for you to also come
2  in here and testify against John Henry Ramirez if it
3  was ever going to be needed; is that correct?
4      A.   If they ever captured him, yes.
5      Q.   Uh-huh.  That was part of your deal?
6      A.   Yes, sir.
7      Q.   Okay.  Do you-all have any kind of a deal to
8  reduce your sentence after you've testified now?
9      A.   No, sir.
10         MR. GARZA:  Okay.  I'll pass the witness,
11  Your Honor.
12         THE COURT:  Redirect?
13         MR. SKURKA:  Just a few follow-up
14  questions, Judge.
15         REDIRECT EXAMINATION
16  BY MR. SKURKA:
17     Q.   So is it your testimony that John Henry
18  Ramirez possibly hurt his hand before you were caught
19  in the bushes in the van?
20     A.   Yes, sir.
21     Q.   You just hadn't notice it before?
22     A.   No, sir.
23     Q.   Mr. Garza kept asking you was there a
24  specific plan to rob a Whataburger, was there a
25  specific plan to rob a Times Market, was there a

181

1  specific plan to rob a Whataburger, do you remember
2  those questions he was asking you?
3      A.   Yes, sir.
4      Q.   Did have a specific place or person you-all
5  were going to go rob?
6      A.   No, sir.
7      Q.   What was the general plan?
8      A.   Just to go rob somebody and don't get nobody
9  hurt.
10     Q.   Okay.  That's what you said earlier in
11  your -- your direct examination.
12     A.   Yes, sir.
13     Q.   To grab some people and get some money but
14  try not to hurt anybody.
15     A.   Not to hurt anybody, yes, sir.
16     Q.   Okay.  Why did you think nobody was going to
17  get hurt if he had a knife?
18     A.   To just scare them with the knife but not
19  hurt them.
20     Q.   Oh, you thought he was just going to scare
21  them with the knife?
22     A.   Yes, sir.
23     Q.   Had you seen him with that knife earlier?
24     A.   Yes, sir.
25     Q.   And what was he doing with that knife

182

1  earlier?
2      A.   Playing with it.
3      Q.   What do you mean, "playing with it"?
4      A.   Looking at it, polishing it, playing with it.
5      Q.   Where was this that he was looking at it and
6  polishing it?
7      A.   Angie's mother's house.
8      Q.   Can you tell us the circumstances of that,
9  why was he showing that knife to you or whatever?
10     A.   He just took it out, just playing with it.
11     Q.   Say that again?
12     A.   He just took it out to just play with it.
13     Q.   One last area I want to talk about.  You said
14  when the Defense Counsel was asking you about where
15  the fight took place --
16     A.   Yes, sir.
17     Q.   -- you remember this?
18     A.   Yes, sir.
19     Q.   Is it -- was it your testimony that the fight
20  started kind of over here by the parking spaces and it
21  moved out toward the middle of the lot?
22     A.   Yes, sir.
23     Q.   Say that again?
24     A.   Yes, sir.
25     Q.   So it didn't all just happen right here, did

183

1  it?
2      A.   No, sir.
3      Q.   And over here would be parking spaces where
4  either his van or your van was in?
5      A.   My van was -- well, the van --
6      Q.   I tell you what, there's a laser pointer in
7  front of you.  Why don't you use that and show us
8  where your van and where the other van was.  Show us
9  where your van was parked, the van you were driving.
10     A.   Well, somewhere in there.
11     Q.   Okay.  So, for the record, you're showing
12  closer to the front door, one of the spaces closer to
13  the front door.
14     A.   Yes, sir.
15     Q.   And where was the van John Henry Ramirez was
16  driving?
17     A.   Over there.
18     Q.   It was parked more towards the back, towards
19  the dumpster in the back spaces?
20     A.   Yes, sir.
21     Q.   Okay.  And it didn't just take place in one
22  area, it started here by the spaces.  Does it end over
23  here?
24     A.   Yes, sir.  Like, scuffle right here, and
25  ended up right here.  I remember driving out and

184

1  seeing the body right here.
2      Q.   When Angela went out of the van the first
3  time, did she get in a fight with the man by herself?
4      A.   No, sir.
5      Q.   Was the man going to the dumpster or coming
6  back from the dumpster when the fight took place --
7      A.   I don't --
8      Q.   -- if you know?
9      A.   I don't remember because he was -- he was
10  walking.
11     Q.   Who's "he"?
12     A.   I think -- the man.  I don't know his name.
13     Q.   If you don't know it's okay to say you don't
14  know.
15     A.   I don't know.
16     Q.   I don't want you to guess if you don't know.
17     A.   I don't know.
18     Q.   The main thing is you done know if he was
19  coming or going the dumpster but the fight took place
20  starting at the parking space and then over here more
21  in front of the dumpster.
22     A.   Yes, sir.
23          MR. SKURKA:  Okay.  That's all the
24  questions I have, Judge.
25          THE WITNESS:  Yes, sir.

185

1      THE COURT:  Any recross?

2      MR. GARZA:  Yes, Your Honor, if I may.

3           RECROSS-EXAMINATION

4  BY MR. GARZA:

5      Q.   Ms. Chavez, when you-all drove up to Times

6  Market, I believe it's your testimony you-all drove up

7  this in two vans; is that correct?

8      A.   Yes, sir.

9      Q.   Were you driving one of vans?

10     A.   Yes, sir.

11     Q.   You were driving which one, the older one --

12     A.   The older one.

13     Q.   -- that you described?

14     A.   Yes, sir.

15     Q.   And you parked it right there where you've

16 indicated, as per your testimony before the jury.

17     A.   Yes, sir.

18     Q.   And were you in the van by yourself?

19     A.   At the time when I parked it?

20     Q.   Yes.

21     A.   Angela was with me.

22     Q.   She was with you?

23     A.   Yes, sir.

24     Q.   And Mr. Ramirez was in the other van.

25     A.   Yes, sir.

186

1      Q.   Is that correct?

2      A.   Yes, sir.

3      Q.   Okay.  Now, after the incident when you left

4  there, were you driving the van, also?

5      A.   Yes, sir.

6      Q.   And did Ms. Rodriguez get in the van with

7  you?

8      A.   Yes, sir.

9      Q.   And she's the one that plopped down the

10 $1.00, $1.25, or whatever, in the console of the van;

11 is that correct?

12     A.   Yes, sir.

13     Q.   Is she the one that went into Mr. Castro's

14 pockets and took it out of his pockets?

15     A.   Yes, sir.

16     Q.   Did you ever observe my client take anything

17 from Mr. Castro?

18     A.   No, sir.

19     Q.   Okay.  Was there a time when you-all pulled

20 up to the Times Market and did Angela ever walk into

21 the Times Market?

22     A.   No, sir.

23     Q.   At all?

24     A.   No, sir.

25     Q.   Did you?

187

1      A.   No, sir.

2      Q.   Did John Henry walk in there?

3      A.   No, sir.

4      Q.   None of you-all walked into the Times Market?

5      A.   No, sir.

6      Q.   Okay, thank you.

7           MR. GARZA:  I'll pass the witness.

8           THE COURT:  Anything else?

9           MR. SKURKA:  No other questions, Judge.

10          THE COURT:  All right.  You may stand

11 down.

12          MR. SKURKA:  May she be excused?

13          THE COURT:  Yes, she may be excused.

14 Let's take a little break then we'll be right back at

15 you.

16          All rise for the jury.

17          (Jury exits courtroom.)

18          (Short recess.)

19          (Jury enters courtroom.)

20          THE COURT:  All right.  Call your next

21 witness.

22          MR. SKURKA:  John Prebul, Your Honor.

23          THE COURT:  All right.

24          (Oath administered.)

25          THE COURT:  You may be seated.  You may

188

1  proceed.

2           MR. SKURKA:  Thank you, Your Honor.

3

4             JOHN PREBUL,

5  having been first duly sworn, testified as follows:

6           DIRECT EXAMINATION

7  BY MR. SKURKA:

8      Q.   Please state your full name for the folks on

9  the jury, please.

10     A.   John Prebul.

11     Q.   I'm going to ask you to move the microphone

12 maybe a little closer to you so that we make sure we

13 hear you.  How are you currently employed?

14     A.   I'm currently employed as a crime scene

15 investigator with the Corpus Christi Police

16 Department.

17     Q.   How long have you been with the Corpus

18 Christi Police Department?

19     A.   I've been with the police department since

20 1997, initially as a fingerprint technician, and in

21 the crime scene unit since 1999.

22     Q.   So two years as fingerprint technician?

23     A.   Correct.

24     Q.   And what were your duties as a fingerprint

25 technician?

189

1    A.   To process prisoners in the jail, taking the
2 necessary fingerprint cards and palm cards.
3    Q.   And since 1999 you've been a crime scene
4 technician?
5    A.   A crime scene investigator; correct.
6    Q.   Crime scene investigator.  Could you tell the
7 jury essentially what a crime scene investigator does,
8 and then your specific training to become one.
9    A.   A crime scene investigator responds to a
10 request to document and process a crime scene.  The
11 documentation is generally done with photography and,
12 in cases, a sketch is prepared in the case of major
13 cases.  That provides a -- sort of a bird's eye view
14 of the crime scene and the relation of evidence to the
15 crime scene.
16         Additionally, a crime scene technician
17 will assist in the identification, collection and
18 processing of items of evidence left at the crime
19 scene.  That -- it's not limited to fingerprints.  It
20 can be trace evidence such as blood.  In case of
21 firearms examples, casings or bullets left at the
22 scene.  Those items are either processed for
23 examination locally, such as fingerprints, or
24 preserved and sent off to another laboratory for
25 analysis.

190

1         My particular function, we have a program
2 that lasts through a year that provides the necessary
3 skill options in forensics in each of the basic basic
4 disciplines, such as firearms, fingerprints, trace
5 collection, packaging, preserving, photography
6 associated with our duties.  And that usually goes
7 through about a three to four-month period, and then
8 we have a two to three-month field training where we
9 are paired with a seasoned crime scene investigator
10 where you observe, participate and then do before
11 being on your own.
12    Q.   Is there a course you take or a class?  Do
13 you graduate from college or something to be a crime
14 scene investigator?
15    A.   There are programs currently established that
16 have course that leads to a discipline in forensic
17 science.  There are various courses provided by
18 different agencies such as the Department of Public
19 Safety in certain disciplines, such as, example,
20 firearm reconstruction or blood spatter interpretation
21 or latent fingerprint development.
22    Q.   But there's no degree or something that you
23 get or have to get to become a crime scene
24 investigator?
25    A.   No.  We generally try to take an individual

191

1 that has some experience, either within criminal
2 justice or physical sciences and has a degree.
3    Q.   The classes you've attended in the area of
4 crime scene investigation, are those taught in-house
5 or by an agency?
6    A.   Both.
7    Q.   Tell us a little bit about that, please.
8    A.   The in-house training, of course, was the
9 initial training that we go through.  I have also been
10 to latent fingerprint development courses, blood
11 spatter interpretation and firearms reconstruction.
12    Q.   And how long do these courses last and where
13 are they taught?
14    A.   The particular courses were taught at the
15 Department of Public Safety in Austin and they were
16 two-week schools.
17    Q.   Have you had occasion to testify as an expert
18 in the area of criminals investigation -- crime scene
19 investigations in Nueces County and other counties?
20    A.   Yes, I have.
21    Q.   How many times have you testified in that
22 regard?
23    A.   Well in excess of 20 or more.
24    Q.   Have you had occasion to work different --
25 how many crime scenes in your time with the police

192

1 department?
2    A.   A lot.
3    Q.   Hard to put a number on it?
4    A.   It's hard to put a number on it.
5    Q.   Is it as exciting as they show it on T.V. as
6 C.S.I.?
7    A.   It is not as -- there's a lot of
8 embellishment on the television.
9    Q.   You're kidding me.
10         JUROR:  He's under oath.
11    Q.   (BY MR. SKURKA)  You're kidding me.
12    A.   I have yet to wait for my Hummer.
13    Q.   Okay, that's pretty good.  I hadn't thought
14 of that.  Okay, we'll get serious now.  I want to talk
15 to you about your work on a case that we're here for
16 today, in the State of Texas versus John Henry
17 Ramirez, and ask if you had occasion to be involved in
18 the investigation of a -- a murder and robbery at the
19 Times Market or the Whataburger at Staples and Baldwin
20 or Whataburger at Texan Trail and Alameda, and the
21 subsequent chase of a vehicle that ended up on
22 Brewster Street?
23    A.   Yes, I have.
24    Q.   I know that's kind of broad but I'm going to
25 go more specific now.  On July 19th, 2004, what was

193

1    your primary responsibility, what were you dispatched
2    to do that night?
3        A.   On that particular evening, I was actually
4    arrived on the 20th, which was after midnight.  My
5    initial call-out was to the Whataburger on Texan
6    Trail.
7        Q.   Okay.  And did you take some of the
8    photographs that have already been admitted into
9    evidence from that Whataburger?
10       A.   Yes, I did.
11       Q.   Just for record, you weren't what they call
12   "The primary crime scene investigator" on this case;
13   correct?
14       A.   Not on the -- on the robberies I was.  I was
15   the sole tech.
16       Q.   Well, I'm talking about the Times Market
17   murder.
18       A.   At the Times Market, no.  I wasn't --
19       Q.   Can you tell the jury the difference between,
20   like, the primary and assisting on those type of
21   cases, the major homicides or whatever?
22       A.   The primary is the individual that gets the
23   initial call.  He's responsible for the scene as the
24   primary technician investigator.  Other individuals
25   will assist, as necessary.  There may be multiple

194

1    scenes which sometimes can be more involved or less
2    involved than the primary scene.  They will go out to
3    those scenes and work the -- independently, but it is
4    still -- the overall primary has the -- the case.
5        Q.   Did you have occasion to assist the primary
6    in this case?  I think his name is Mr. Kirksey.
7        A.   Correct, William Kirksey.
8        Q.   Were you directed either to Mr. Kirksey or
9    the case officer to take some photographs of some
10   suspects who had been apprehended in this case?
11       A.   Yes.  That would have been at the direction
12   of the criminal investigations detective which was
13   Kelly Isaacks' case.
14       Q.   Okay.  So Kelly Isaacks was the case officer
15   working as a detective?
16       A.   That is correct.
17       Q.   And Mr. Kirksey was the I.D. tech working for
18   the I.D. section.
19       A.   Correct.
20       Q.   Okay.  So, what did Officer Isaacks direct
21   you to do?
22       A.   Well, they had -- the first individual, I was
23   asked to document the condition of the individual and
24   then to collect clothing.  Obviously, Ms. Isaacks
25   collected the clothing, specifically, and then turned

195

1    it directly over to me.
2        Q.   Were you the person -- did you take
3    photographs of the suspect, Angela Rodriguez, in this
4    case?
5        A.   Yes, I was.
6        Q.   Did you take photographs of the other suspect
7    in this case, Christina Chavez?
8        A.   Yes, I did.
9            MR. SKURKA:  Judge, I believe we have
10   an agreement at the break.  Mr. Garza already reviewed
11   these and I would like to move for the admission of
12   State's Exhibit No. 171 through 188.
13           MR. SKURKA:  That's correct, Your Honor.
14           THE COURT:  All right.  They're
15   admitted.
16       Q.   (BY MR. SKURKA) Now that they're admitted
17   into evidence, I want to show you some of these.  And
18   we'll start with 171.  What is that a photograph of?
19       A.   That is a photograph of Angela Rodriguez.
20       Q.   Is that how she looked that day?
21       A.   Yes.
22       Q.   What was she wearing?
23       A.   She was wearing a sports bra, sort of
24   shortish-type pants, and pretty much that was about
25   it.

196

1        Q.   I'm going to show you 172.  What does that
2    depict?
3        A.   Those are the pants she was wearing.
4        Q.   We're going to take it all the way out.  Now,
5    you said that they're shorts.
6        A.   I call them shorts.  I guess, some people
7    would call them capris.  They're not a full-length
8    pair of pants.
9        Q.   And State's Exhibit No. 173, what does that
10   depict?
11       A.   That shows the back and the sides of --
12   pretty much a backside view of how she looked.
13       Q.   And that's all she was wearing, the sports
14   bra and those pants?
15       A.   Yes.
16       Q.   Or shorts, whatever you call them?
17       A.   I don't know if they were panties, but they
18   didn't collect them.
19       Q.   And 174, what is that a photograph of?
20       A.   It shows the condition of her arms.
21       Q.   Okay.  I'm sorry, there's a laser pointer in
22   front of you --
23       A.   Oh.
24       Q.   -- if you need to use that.
25       A.   Okay.  It shows the condition -- the upper

197

1   body in relation to --
2       Q.   Okay.  You have to say the word, sir, you
3   can't just --
4       A.   Oh, I'm sorry.  It shows the condition of her
5   arms and her hands at the time.
6       Q.   Okay.  What were the conditions of her arms
7   and hand at the time?
8       A.   You could see there's some soiling and some
9   redness along there:
10      Q.   Were there any cuts or open wounds on this
11  person?
12      A.   I didn't notice any distinct cuts or open
13  wounds.
14      Q.   How about 175, what is that a photograph of?
15      A.   Photograph that shows condition of her hands
16  at the time.
17      Q.   And, for the record, that would be the inside
18  or outside of her hands?
19      A.   That would be the outside.
20      Q.   Or the back of her hands.
21      A.   Or back of her hands; correct.
22      Q.   Okay.  Again, are there any wounds or cuts
23  that you saw that were bleeding or open wounds that
24  night?
25      A.   No.

198

1       Q.   176, when is that?
2       A.   That would show the palm or condition of
3   those hands.
4       Q.   Again, any cuts or wounds or marks on that?
5       A.   No specific.
6       Q.   177, what is that?
7       A.   Those were the pants that she was wearing the
8   day that I photographed her and collected those pants
9   through Ms. Isaacks.
10      Q.   Now, for the record, the difference in this
11  picture is that she's not wearing the pants?
12      A.   That is correct.
13      Q.   They're laying on a paper or something?
14      A.   It's on a paper.
15      Q.   Did you see any obvious bloodstains or, I
16  guess, soiling, or anything, on that -- those pants
17  from the naked eye?
18      A.   Yes.
19      Q.   What did you see?
20      A.   It looked like it was a stain.
21      Q.   Where?
22      A.   Along here, and, I believe, on the back now.
23      Q.   Okay.  I'm going to show you the back now.
24  I'm sorry, where were these on the front?  And you
25  have to please state -- describe the area.

199

1       A.   Well, it's not showing it very good but up in
2   this area, if I'm not --
3       Q.   You can't just say, "up in this area."  You
4   need to say "the pocket, the front."
5       A.   The pocket area.
6       Q.   Okay.  So, for the record, you're showing the
7   right front pocket area?
8       A.   Uh-huh.
9       Q.   Okay.  And the next thing is 178.  What does
10  that show?
11      A.   (No response.)
12      Q.   What is that a picture of?
13      A.   That's the back of it.  It shows -- I believe
14  you have staining along the left and I believe some
15  along in here.
16      Q.   So, on the left -- for the record, you're
17  indicating the left side of the back of the pant?
18      A.   Yes, and the -- the right.
19      Q.   The right side of the back of the pants?
20      A.   Uh-huh.
21      Q.   Okay.  Now, are you -- did you get those
22  clothes from Angela or did you get them from Kelly
23  Isaacks, the case officer?
24      A.   I specifically got them from Ms. Isaacks.
25      Q.   Ms. Isaacks was there to supervise the

200

1   removal of those clothes?
2       A.   Yes, because they were both females.
3       Q.   Okay.  I'm going to take those to the side
4   for a minute.  Now, did you actually retrieve those
5   items themselves, the shorts, the -- I guess the
6   sports bra, the pants, all that stuff?
7       A.   Yes.
8       Q.   And what did you do with them?
9       A.   I secured them until packaging them and
10  sending them off to the Department of Public Safety
11  for analysis.
12      Q.   We'll get to that for a minute.  I want to go
13  and ask if Officer Isaacks had you look at --
14  I'm sorry, photographed the other Co-Defendant,
15  Christina Chavez, and collect the clothing she was
16  wearing?
17      A.   Yes.
18      Q.   I show you what's been marked and admitted
19  into evidence as 179.  What does that show?
20      A.   That is the photograph of Ms. Chavez.
21      Q.   Did you see any wounds or -- on Ms. Chavez at
22  all?
23      A.   No.
24      Q.   Did you notice any blood or bloodstains on
25  any parts of her clothing?

201

1     A.   I noticed it on the shirt.

2     Q.   Where?

3     A.   I believe it was along the -- the breast

4  area, and I think there was some on the back.

5     Q.   Okay.  And, for the record, you meaning the

6  right breast area or the left breast area?

7     A.   That and I believe down on -- see, down in

8  this area some staining.

9     Q.   For the record, you're showing the bottom

10  part on the stomach?

11     A.   Right.

12     Q.   On the left side of that photograph?

13     A.   (Nods head.)

14          MR. SKURKA:  Okay.  Maybe if you go in

15  closer, maybe that will help us see it.

16     Q.   (BY MR. SKURKA) I don't know if they're

17  visible or not in that picture.  You tell me.

18     A.   There's some staining there around the

19  breast, the center and I believe that down in the

20  lower torso.

21     Q.   Okay.  Now, clearly, you didn't test this for

22  blood or anything --

23     A.   No.

24     Q.   -- correct?  And I'm not trying to put you on

25  the spot saying whether that was blood or not, I just

202

1  wanted to know if you noticed anything while you were

2  examining her.

3          We also have State's Exhibit No. 180.  What

4  is that?

5     A.   That again, is a photograph of Ms. Chavez.

6  It reflects just her overall condition and places the

7  hands with the face.

8     Q.   Okay.  I want to go in closer on the hands.

9  Were there any marks or wounds on the hands or cuts or

10  sores like that?

11     A.   Nothing specific.

12     Q.   181.  What is that a photograph of?

13     A.   That's a picture of the back of her shirt,

14  and it has staining along the center of the back.

15     Q.   And I think I have some close-ups of that,

16  and we'll go to the next one, 170 -- I'm sorry, 182?

17  Can you show us where the staining you noticed,

18  please.

19     A.   This area.  And, of course, there is some

20  soiling, also.

21     Q.   Can you tell at the time if that's soiling

22  from like dirt or blood?

23     A.   No.

24     Q.   What did you notice, if you can recall?

25     A.   I -- I can't recall.  That -- that's some

203

1  like greenish color, but what it is, determination of

2  those stains would normally be done by the Department

3  of Public Safety.

4     Q.   But clearly, you took photographs of them

5  because you noticed those stains.

6     A.   I noticed them; correct.

7     Q.   The next photograph shows I think a little

8  closer view of that?

9     A.   Yes.  You can see the areas.

10     Q.   So you're showing the right -- right side, I

11  guess --

12     A.   I guess, yeah, you can call it --

13     Q.   -- closer to the right --

14     A.   -- the right back.

15     Q.   -- right back of the shirt?

16     A.   You can look at this as down the center.

17     Q.   And 184.  What does that show?

18     A.   Again, it's a closer picture of the same area

19  that we described before.

20     Q.   And I now show you what's marked State's

21  Exhibit 185.  What is that?

22     A.   That is the sweat jeans she was wearing at

23  the time.

24     Q.   Okay.  Would you describe those as gray, like

25  sweat pants or jogging pants, or whatever?

204

1     A.   Gray sweat pants and jogging pants.

2     Q.   And that's the back view, correct?

3     A.   That is the back view.

4     Q.   And what was their condition?

5     A.   They there was a lot of soiling to the legs.

6     Q.   186, what does that show?

7     A.   It shows the front view.  Again, you have --

8  they appear wet or soiled along the bottom, and then

9  some discoloration along the knee area.

10     Q.   What does that indicate to you?

11     A.   Came in contact with water somewhere.

12     Q.   Okay.  Would it be fair to say was that dirt,

13  mud or water --

14     A.   Uh --

15     Q.   -- or can you tell?

16     A.   I can't really tell.

17     Q.   Let me give you another close-up picture,

18  187.  What does that show?

19     A.   Again, that's a close-up.  The shoes, of

20  course, are definitely soiled, and that could be

21  pretty much murky water or cloudy water.

22     Q.   That view is taken from the front of the

23  pants?

24     A.   That's taken from the front.

25     Q.   At the bottom of the pants near the shoes.

205

1    A.    At the bottom of the pants.  There's the
2  front of the shoes.
3    Q.    And the last photograph I have is 188.  What
4  does that depict?
5    A.    I just had her lift her leg to show the tread
6  pattern of her shoes.
7    Q.    But, for the record, too, that also shows the
8  back of the pants and the bottom of the shoe.
9    A.    That is correct.
10    Q.    Now, a minute ago when we were showing you
11  pictures of Angela Rodriguez, did she have any shoes
12  on?
13    A.    No.  She had no footwear whatsoever.
14    Q.    So no footwear was recovered from her when
15  you photographed her?
16    A.    No, she did not --
17    Q.    Again --
18    A.    -- come in with footwear.
19    Q.    Okay.  Again, after you photo -- took these
20  photographs of Christina Chavez, did you take her
21  clothes with the help of Officer Isaacks?
22    A.    That is correct.
23    Q.    And, just for record, when I say, "Kelly
24  Isaacks," Kelly is a female; correct?
25    A.    That is correct.

206

1    Q.    Okay.  The next thing I want to talk to you
2  about now --
3        MR. SKURKA:  If we could have the lights
4  on, please, Frank.
5    Q.    (BY MR. SKURKA) -- is what you did with these
6  items that we've shown photographs of.  What, if
7  anything, did you take to the lab?
8    A.    I took the clothing of each individual, along
9  with a -- some other items for analysis.
10    Q.    Did you have occasion to take a white -- come
11  in contact with a white rag that was found in the area
12  of 800 Brewster Street?
13    A.    Yes, I did.
14    Q.    And what did you do with that rag?
15    A.    That rag was eventually taken to the
16  Department of Public Safety for analysis.
17    Q.    Okay.  All these items, you're the one that
18  took these items to the Department of Public Safety
19  lab?
20    A.    Of the items that I collected, correct.
21    Q.    Right.  And I've got them all here in a box.
22  And can you identify that box and the contents of
23  that.
24    A.    This is the box that had in the clothing that
25  I collected from Christina Chavez, Angela Rodriguez,

207

1  and the hand towel from Brewster Street.
2    Q.    Okay.  I'm going to ask you to open that,
3  now.  And there's -- I think she's got some scissors
4  up there, and there's some gloves up there, too, if
5  you need them.
6    A.    (Witness complying.)
7    Q.    Now, for the record, you're not the only one
8  that's handled that evidence.  Who else took care of
9  it after you took it to the lab?
10    A.    The Department of Public Safety would have
11  opened each item, including the seal, the blue seal,
12  their closure tag; and then I have the tape initialed
13  on the outside.
14    Q.    So does that show that was sealed by you, and
15  then sealed by the Department --
16    A.    Department of Public Safety lab.
17    Q.    -- of Public Safety lab, prior to you opening
18  it today?
19    A.    Yes.
20    Q.    There's only a few things I want you to take
21  out of there, and I want to first start with the white
22  rag, and then I'm going to want the clothing from the
23  women, please.
24    A.    (Witness complying.)
25    Q.    Just set it to the side until we get to the

208

1  other ones.
2    A.    (Witness complying.)
3    Q.    Okay.  Let's do one at a time.  And I'm going
4  to show you what's been marked State's Exhibit No.
5  189, and ask you what that contains?
6    A.    State's Exhibit 189 is a stained hand-type
7  white towel from the brush area long the ditch of
8  Brewster and Stroman.  And I have my seal intact and
9  then there's a closure seal from the Department of
10  Public Safety.
11    Q.    And you recognize those evidence tags or
12  seals from the Department of Public Safety?
13    A.    Yes, I do.
14    Q.    Okay.  For the record, are you the one that
15  collected the towel or found the towel over on
16  Brewster Street?
17    A.    An officer originally found it.  I collected
18  it and there was an issue.  I released it back to the
19  officer, and then at the completion of what he needed,
20  he brought it back to me.
21    Q.    I'm just going to show you what's been marked
22  State's Exhibit No. 189.  Is that a -- that's already
23  been admitted into evidence.  Is that a photograph of
24  the rag that we're talking about?
25    A.    Yes, it is.

209

1     Q.   And that was where it was found in the grass;
2  correct?
3     A.   Yes.
4     Q.   Now, I'd like you to open 189 and tell us
5  what the contents are, and show it to the jury.  And
6  you may want to use the gloves that are back there,
7  too.
8     A.   (Witness complying.)  Okay.
9     Q.   Okay.  Is the white -- the bag containing the
10 white rag in there?
11    A.   Yes, it is.
12    Q.   Can you open that.
13    A.   (Witness complying.)
14    Q.   How many times did you-all wrap that thing?
15    A.   May I?
16          THE COURT:  Yes.
17          MR. SKURKA:  Yes.
18    Q.   (BY MR. SKURKA) Have we got to the white rag,
19 yet?
20    A.   Yes.
21    Q.   Okay.
22    A.   We're at the rag.
23    Q.   Now, for the record, is that the same white
24 rag that was found over on Brewster Street by the
25 officer that you took to lab?

210

1     A.   Yes.
2          MR. SKURKA:  May I -- I'm going to move
3  for the introduction of State's Exhibit 189.
4          MR. GARZA:  Can I just ask a few
5  questions on voir dire, Your Honor?
6          THE COURT:  Yes.
7               VOIR DIRE EXAMINATION
8  BY MR. GARZA:
9     Q.   Insofar as the chain of custody on that
10 matter, Mr. Prebul, I'm a little concerned about a
11 statement you made awhile ago.  That rag, or that
12 towel was found by an officer out there during the
13 daylight hours on the next day; is that correct?
14    A.   No.  That's incorrect.
15    Q.   Okay.
16    A.   I was called out to that area at night.  He
17 drove me out to the area.  I collected that particular
18 item.
19    Q.   That night?
20    A.   That night.
21    Q.   Okay.
22    A.   The issue came up, they wanted to utilize
23 this rag for scent dogs, and wanted the rag.  I
24 challenged, I didn't want to give it up.  The captain
25 on scene said, "Release it back to Officer Carrasco,"

211

1  who was the officer that went out there, and I
2  effected that custody back to him.  At the end of
3  their use of the thing with the dog, he returned it
4  back to me the following day and I took custody of it.
5     Q.   What were you -- what did you-all do to
6  maintain the chain of custody on that?
7     A.   It was released back to the officer who
8  originally located it, Officer Carrasco.
9     Q.   Just gave it to him like that?
10    A.   I had him -- gave it to him in sealed bag,
11 and this is the bag, and he returned it back to me.
12    Q.   And were you there --
13    A.   It was in his custody during that time.
14    Q.   Okay.  And were you there personally to
15 observe whatever was done with the rag?
16    A.   No.  During -- during the evolution with the
17 dog, I was not.
18    Q.   At all?
19    A.   No.
20    Q.   Do you recall whether or not it was returned
21 to you in the same shape?
22    A.   As best as I could tell, other than it had
23 staining on it.  I -- whether or not it had dog
24 slobber on it I don't know.
25    Q.   You have no idea.

212

1     A.   No.  That was my concern when they -- they
2  wanted it.
3     Q.   And so, at that point, after -- after you
4  first obtained it and -- and collected it from the
5  crime scene, it was turned back over to a police
6  officer out there the next day.
7     A.   Who was -- who was on scene at the time.
8     Q.   Okay.
9     A.   We were --
10    Q.   And whatever happened to the rag at that time
11 is beyond your knowledge or control.
12    A.   Until he returned it back to me.
13    Q.   Okay.
14    A.   From the point of I picking it up --
15    Q.   Like you said, we don't know --
16    A.   -- releasing it.
17    Q.   -- we don't know what happened to it, what,
18 if anything, could have been done to the rag to alter
19 it, or anything, if it's --
20    A.   You would have to --
21    Q.   -- got any dog slobber or anything.
22    A.   You would have to talk to Officer Carrasco on
23 that.  Beyond -- after releasing it to his custody and
24 him returning it, I cannot attest to those events.
25    Q.   So -- and you're not sure whether it's been

213

1    altered in any way, whether any other substances may
2    have been introduced to it at that time or anything
3    like that.
4        A.    I could not neither confirm nor deny any of
5    that.   After it was released back to him, he would
6    have to be the one to say how he maintained that
7    chain.
8            MR. GARZA:   I have no other questions,
9    Your Honor.
10           THE COURT:   All right.
11               DIRECT EXAMINATION
12               (Continued)
13   BY MR. SKURKA:
14       Q.    Mr. Prebul, looking at the rag that you
15   received back from ?
16       Q.    Officer Carrasco after he used it for the --
17   those are actually called the scent dogs.  I also call
18   them bloodhounds, but what do they do?  Don't they
19   just give the dog something to sniff?
20       A.    The way he explained, because we had --
21       Q.    I don't want you to talk about what he said
22   or some kind of hearsay --
23           THE COURT:   If you don't know, it's -- if
24   you don't, then it's fine.
25           THE WITNESS:   Okay.

214

1        Q.    (BY MR. SKURKA) But they don't tear up the
2    rag, do they?
3        A.    No.
4        Q.    Do they add substances to the rag?
5        A.    No.
6        Q.    Based on your understanding and knowledge,
7    don't they just give the dog an item of clothing or
8    something to sniff?
9        A.    Correct.
10       Q.    Would that change any chemical compositions
11   on the rag if they're looking for blood analysis or
12   anything?
13       A.    It shouldn't.
14       Q.    Okay.  Looking at the rag, was it in the same
15   condition that you received it back from Officer
16   Carrasco as when you gave it to Officer Carrasco?
17       A.    It was, except for the holes taken by D.P.S.
18   for samples.
19       Q.    Okay.  That's the next thing I was going to
20   talk about.  But when you received the rag back from
21   Officer Carrasco that you had just given to him a few
22   hours earlier for the scent dogs, were there any
23   change -- or did you notice any change?
24       A.    Nothing specific.
25       Q.    Was it in the same or substantially the same

215

1    condition as it was when you gave it to him?
2        A.    It was in substantially the same condition as
3    he gave it to me.
4        Q.    Now, you said that there's some changes since
5    that, and that's because of the markings or the
6    cuttings from the D.P.S. lab.
7        A.    That is correct.
8        Q.    Can you explain that to the jury.
9        A.    Okay.
10       Q.    Now, you can't show it to the jury yet
11   because it's not admitted.
12       A.    This particular -- there are holes in the
13   cloth where the Department of Public Safety cut out
14   specific areas to analyze the blood.
15       Q.    Okay.  So -- and -- and based on that, your
16   testimony is the rag is in the same or substantially
17   the same condition as I was before you gave it to the
18   D.P.S. lab, except for the cuttings that they took out
19   --
20       A.    That is correct.
21       Q.    -- the sample cuttings.  And you've seen
22   those before, have you not?
23       A.    Yes, I have.
24       Q.    Is that standard procedure for the lab to
25   take their samples?

216

1        A.    They'll cut of section out, correct.
2        Q.    And they actually mark on the item itself
3    what they took out.
4        A.    Yes, they did.
5            MR. SKURKA:   Judge, I'll go ahead and
6    now reoffer that into evidence.
7            MR. GARZA:   Well, Your Honor, my
8    objection is that it's a chain of custody matter that
9    I don't think it's been properly established yet for
10   it to be ripe for introduction at this time, but the
11   Court may disagree.  And I know that the chain of
12   custody is only a weight of the evidence issue --
13           THE COURT:   Yeah, I think -- I think all
14   they need is the beginning and the end --
15           MR. GARZA:   Well --
16           THE COURT:   -- and the rest goes to
17   weight, and you can use your cross-examination for
18   that purpose.
19           MR. GARZA:   Thank you, Your Honor.
20           MR. SKURKA:   Is it admitted, then, Judge?
21           THE COURT:   So it's admitted into
22   evidence.  I overrule your objection.
23       Q.    (BY MR. SKURKA) Okay.  Let's set that aside,
24   for now because you are just in the chain of custody
25   and we'll have the D.N.A. person from the D.P.S. lab.

217

1      Put all that stuff back into the bag that you
2  got it from. And I'm sure glad you don't wrap my
3  Christmas presents, I'd be there an hour trying to
4  open them up.
5      A.    (Witness complying.)
6      Q.    And, if you would, just set that behind you
7  on the floor for the time being.
8      A.    (Witness complying.)
9      Q.    Okay. Now, let's look at the next bag which
10  is marked 189. What is that -- I'm sorry, 190.
11      A.    State's Exhibit 190 is clothing items taken
12  from Angela Rodriguez.
13      Q.    Are you the one who took those clothing
14  items?
15      A.    Yes.
16      Q.    Are you the one who took it to the D.P.S. lab
17  for testing?
18      A.    Yes.
19      Q.    I want you to just cut open the top, and
20  confirm those are the same clothing items that you
21  took to the lab. I don't really want you to take out
22  them out at this time. We'll have the D.P.S. person
23  do that.
24      A.    Again, my original seal is intact, and I
25  recognize the D.P.S. closure seal on the bag.

218

1      Q.    Okay. You've removed about three or four
2  little bags from the bigger bag. What are they?
3      A.    There are two bags, each containing clothing
4  item, and a third bag which contains the changed
5  sheet, which I had Ms. Rodriguez stand on when she
6  removed her clothes.
7      Q.    So would it be fair to say those items
8  contained the sports bra she was wearing and the
9  shorts she was wearing?
10      A.    Yes. The shorts, my seals are intact; the
11  same with the D.P.S. closer seal on both items,
12  including the change sheet.
13      Q.    And they have the D.P.S. markings on those
14  also; correct?
15      A.    Yes.
16      MR. SKURKA: Okay. I'm going to ask you
17  to return that to the bag.
18      And I'm going to offer State's Exhibit
19  No. 190 into evidence.
20      MR. GARZA: No objection, Your Honor.
21      THE COURT: All right. 190's admitted.
22      Q.    (BY MR. SKURKA) If you would, put those back
23  in the box there, and then the final item I have is
24  191. And I'll ask you to look at that, and it's
25  described as a brown paper sack. What are the

219

1  contents -- or do you recognize 191?
2      A.    State's Exhibit 191 is the clothing from
3  Christina Chavez, which includes the clothing she was
4  wearing and the change sheet I had --
5      Q.    How do we know it's her clothing?
6      A.    Huh?
7      Q.    How do we know it's her clothing?
8      A.    Because I packaged them, my seals are intact,
9  and the only other is the D.P.S. opening and closure,
10  their seal.
11      Q.    Would you please open that exhibit and
12  confirm the contents of that.
13      A.    (Witness complying.)
14      Q.    Okay. Now that you've taken all the packages
15  out, can you confirm the contents of State's Exhibit
16  191 as being Christina Chavez' clothing?
17      A.    Yeah, these are the items I collected. My
18  seals are intact, with the D.P.S. opening, and they're
19  items that I collected.
20      Q.    So, for the record, State's Exhibit 191,
21  which is a big brown bag containing two, four -- how
22  many little bags?
23      A.    One, two, three, four, five, six, seven,
24  which would be six clothing items and a change sheet.
25      MR. SKURKA: Thank you. I move for the

220

1  admission of 191.
2      MR. GARZA: No objection.
3      THE COURT: It's admitted.
4      MR. SKURKA: I believe that's all the
5  questions I have of this witness, Your Honor.
6      THE COURT: Cross?
7          CROSS-EXAMINATION
8  BY MR. GARZA:
9      Q.    One quick question, Mr. Prebul. With regard
10  to that rag that you collected and recovered in the
11  brush out there that next day or that evening, do you
12  recall if there was any glass on that towel, any
13  pieces or shreds of glass or shreds --
14      A.    I do not recall any glass on there.
15      Q.    Okay. Thank you sir.
16      MR. GARZA: That's all the questions I
17  have.
18      THE COURT: Anything else?
19      MR. SKURKA: No, Your Honor.
20      Could you put those back in the stack,
21  please, before you leave the stand?
22      THE COURT: Okay.
23      (Witness complies.)
24      THE COURT: May this witness be excused?
25      MR. GARZA: Yes, Judge.

221

1          THE COURT: All right.

2          THE WITNESS: Here?

3          MR. SKURKA: Yeah, you might --

4          THE COURT: Yeah, just leave it there.

5          MR. SKURKA: -- want to leave it up

6    there.

7          THE WITNESS: Okay.

8          MR. SKURKA: Those are all admitted, so

9    the court reporter will take care of that. Just kind

10   of move it over to the side so she can get to it in a

11   little bit.

12          Thank you, Mr. Prebul.

13          THE COURT: All right. Don't discuss

14   your testimony while this trial's going on.

15          THE WITNESS: Thank you, Your Honor,

16   ladies and gentlemen.

17          THE COURT: All right. Come forward.

18          (Oath administered.)

19          THE COURT: Be seated.

20          MR. SKURKA: May I proceed?

21          THE COURT: Yes.

22

23

24

25

222

1              MARSHA PARKER,

2    having been first duly sworn, testified as follows:

3              DIRECT EXAMINATION

4    BY MR. SKURKA:

5    Q.   Please introduce yourself for the folks on

6    the jury.

7    A.   My name is Marsha Parker.

8    Q.   How are you currently employed?

9    A.   I'm a latent fingerprint examiner with the

10   Corpus Christi Police Department.

11   Q.   How long have you been with the Corpus

12   Christi Police Department?

13   A.   Approximately 25 years.

14   Q.   What are your duties at the Corpus Christi

15   Police Department, please?

16   A.   As a latent examiner, I compare latent prints

17   recovered from crime scenes, to either eliminate them

18   or possibly identify a defendant. I also assist on

19   major crime scenes.

20   Q.   When you say, "assist on major crime scenes,"

21   what do you do exactly?

22   A.   Most of the work entails assisting a crime

23   scene technician in the collection of evidence and the

24   processing and documentation.

25   Q.   And do you do the fingerprints -- we've had

223

1    somebody -- oh, I'm sorry, let me start, again. What

2    qualifications or training have you had in the area of

3    fingerprint or fingerprint identification, please?

4          MR. GARZA: Your Honor, the Defense

5    Counsel will stipulate to Ms. Parker's qualifications,

6    Your Honor.

7          MR. SKURKA: That's fine, Judge. I'll

8    just take a lot of shortcuts.

9          THE COURT: Okay.

10          MR. SKURKA: I want the jury to know a

11   little bit about her training.

12          THE COURT: Okay.

13   Q.   (BY MR. SKURKA) Can you just briefly give us

14   an idea of what training you've had in the area of

15   fingerprint recognition.

16   A.   My initial training was with the F.B.I. I

17   worked there for six years as a fingerprint examiner.

18   I then came to Corpus Christi Police Department, where

19   I've attended several schools: Advanced latent

20   fingerprint training, techniques of developing latent

21   fingerprints. I'm a certified instructor. I'm also

22   certified automated fingerprint identification system

23   operator. I've taken courses in ridgeology,

24   bloodstain pattern interpretation. That's it.

25   Q.   Okay. And have you been qualified as an

224

1    expert in fingerprint examination in the area of

2    fingerprint recognition in the courts of Nueces County

3    or other counties?

4    A.   Yes, I have.

5    Q.   How many times would you say you've qualified

6    as an expert and testified in that regard?

7    A.   Probably well over a hundred times.

8    Q.   I'd like to talk to you about -- a little bit

9    about the science of fingerprints, to start with. And

10   we've had another person that talked a little bit

11   about latent prints and how they are -- become visible

12   and how they're transferred and lifted and put on the

13   cards, okay?

14   A.   Uh-huh.

15   Q.   I think the jury knows about that end of the

16   fingerprints. Tell them how that's different and how

17   a latent examiner works when they get those kind of

18   fingerprint cards.

19   A.   Basically, what we do is examine the ridge

20   detail that is present on a latent lift card to the

21   ridge detail in a known print of a subject to see if

22   an identification can be effected. And what we're

23   doing is we're looking for points of minutia, we're

24   looking for clarity and the unit relationship between

25   the those points of minutia.

225

1   Q.   How is ridge detail left for a fingerprint?

2   A.   Located on your fingers, your palms, soles of

3   your feet and bottoms of your toes are raised portions

4   of skin, and they're referred to as "friction ridges."

5   Now, at the tops of these friction ridges are minute

6   pores.  These pores are constantly secreting moisture.

7   If an area of that skin comes in contact with an

8   object, it may leave a reproduction of those ridges on

9   this object, and we use powders and chemicals in order

10  to enhance them and make them visible to the naked

11  eye.

12  Q.   Does it -- does anything -- the fingerprint

13  -- are fingerprints always left by a person or on a

14  surface after touching it?

15  A.   No, sir.

16  Q.   Can you explain to the jury why or why not.

17  A.   In order for a latent print or a fingerprint

18  to be left, there has to be something on the fingers

19  that would transfer onto an object.  Now, if your

20  fingers are dry, more than likely you will not leave a

21  print.  And then it also depends on the condition of

22  an object.  If an object, let's say, for instance, is

23  dusty and I have moisture on my fingers, but I put my

24  fingers in the dust, what happens, instead of leaving

25  ridge detail, what I'm doing is actually acting like a

226

1   sponge and picking up the dust on my fingers.

2           There's also physical barriers.  People

3   wear gloves.  You can pick up an object.  Let's say,

4   for instance, you pick up an object and you use a

5   towel, anything that will come between the friction

6   ridges and the object you're touching.  There's also

7   physiological factors.  The older we get these pores

8   on the friction ridges have a tendency to close up and

9   become smaller so you don't exude as much moisture.

10  Q.   So it depends on the person an any oils or

11  moisture they have on their hands and the surface

12  itself?

13  A.   Absolutely.  There's a lot of variables

14  involved.

15  Q.   For example, if I was to hold up a -- a glass

16  and touch that, is glass a good surface?

17  A.   Yes.  It's a smooth, normally clean, dry

18  surface.

19  Q.   What about if I was to touch my lapel on my

20  suit, would that leave a fingerprint?

21  A.   More often than not I would say no.

22  Q.   Why?

23  A.   Because the material will absorb the oils or

24  the moisture, whatever it happens to be leaving into

25  that, it gets absorbed into it, so therefore, there's

227

1   no transfer actually of the ridge detail onto that

2   object.

3   Q.   Generally speaking, then, would it be fair to

4   say that it's easier to retrieve a print off a smooth

5   surface than a rough or rugged surface?

6   A.   Generally, yes.

7   Q.   And an example of a smooth surface, could

8   that include like a piece of plastic, a glass, a

9   mirror, things like that?

10  A.   Yes.

11  Q.   Is there a way, and has it been recognized in

12  the courts of the United States and other countries,

13  the science of fingerprint recognition and

14  identification through fingerprints?

15  A.   Yes.

16  Q.   Is that a well-accepted science in our

17  courts?

18  A.   Yes, it is.

19  Q.   Do any -- you mentioned somebody -- every

20  person has these -- these ridges and stuff on their

21  fingertips, palms and the bottom of your feet, right?

22  A.   Yes, sir.

23  Q.   Does anybody in the history of -- recorded

24  history, has there ever been any evidence of people

25  having the same duplicate prints?

228

1   A.   No.

2   Q.   Is that possible?

3   A.   I don't believe so.

4   Q.   Why not?

5   A.   It's like snow flakes.  That's how I look at

6   it.  No two fingerprints after a hundred years of

7   examining prints have there ever been found to be two

8   alike.  The ridge detail and the make-up and the

9   occurrences of these ridges is unique and specific to

10  each individual, not only to that individual but to

11  that finger.

12  Q.   What about -- you know, people in the same

13  family or twins?  Would they still the -- wouldn't

14  they have the same fingerprints?

15  A.   No.  As a matter of fact, I have an identical

16  twin sister, and when I first started working with

17  fingerprints, the first thing I did was fingerprint

18  her to make sure, and no two people have ever been

19  found to have the same fingerprints.

20  Q.   You mean, you used your own sister as a

21  guinea pig?

22  A.   Absolutely.  (Laughter.)

23  Q.   Okay.  Now, let's get to this case, now that

24  you've explained a little bit about the science of

25  fingerprints.  Is it possible, then, to compare a

229

1　latent print to a known fingerprint and effect a
2　match?
3　　A.　Yes, sir.
4　　Q.　Just again, for the record, what is a latent
5　print?
6　　A.　A latent print is a reproduction of the
7　friction ridges and, normally, it is enhanced and made
8　visible to the naked eye normally by powder or
9　chemical means.
10　　Q.　What is known as -- what is called "a known
11　print"?
12　　A.　Known prints are inked prints.  They're
13　intentional, as opposed to latent prints which are
14　normally accidental.  Known prints are the inked
15　prints that you know the subject that you're taking
16　the fingerprints of, the subject is next to you.  You
17　take each finger, you roll it in an ink slab, and it's
18　rolled on a eight-by-eight white stock card.
19　　Q.　And so would it be fair to say, I guess for
20　layman's sake, you know who left those prints on the
21　known card because you've seen them leave the prints.
22　　A.　Right.
23　　Q.　For example, if you're doing a burglary
24　investigation and fingerprints are found at the scene,
25　you don't know who left those prints are until you can

230

1　compare them to the known print card; correct?
2　　A.　That is correct.
3　　Q.　And as opposed to if you were sitting right
4　here with me and you see me put a fingerprint right
5　here and you lift the print, and then you look at my
6　known prints, you can make that comparison; correct?
7　　A.　Correct.
8　　Q.　I'm going to show you what's been marked as
9　State's Exhibit No. --
10　　MR. SKURKA:　May I approach, Your Honor?
11　　THE COURT:　Yes.
12　　Q.　(BY MR. SKURKA) -- 193 and -- I'm sorry, 192
13　and 193.  Can you identify those for the jury, please.
14　　A.　These are known fingerprints and known palm
15　prints of John Henry Ramirez.
16　　Q.　How do you know that they're the known
17　prints?
18　　A.　I took them.
19　　Q.　Could you -- could you point -- is the person
20　that you took these fingerprint and palm prints, is
21　that person in the courtroom today?
22　　A.　Yes, sir.
23　　Q.　Can you point to him and describe something
24　he's wearing.
25　　A.　The green shirt.

231

1　　MR. SKURKA:　May the record reflect the
2　witness that has identified the Defendant, Your Honor?
3　　THE COURT:　It will show reflect.
4　　Q.　(BY MR. SKURKA)　And you are the person that
5　put his fingerprints on the cards?
6　　A.　Yes, sir.
7　　Q.　And they're actually called ten print cards
8　or palm print cards; correct?
9　　A.　Yes, sir.
10　　MR. SKURKA:　Okay.  I tender State's
11　Exhibit 192 and 193 to Defense Counsel, and offer them
12　into evidence.
13　　MR. GARZA:　No objection, Your Honor.
14　　THE COURT:　All right.  They're
15　admitted.
16　　MR. SKURKA:　Mary, I'm going to need
17　Exhibit 167, please.
18　　Q.　(BY MR. SKURKA)　Okay.  Now that you've
19　identified this Defendant as making these print cards,
20　were you -- I'm going to show you what's already been
21　admitted into evidence as 168, 169 and 170.  Now,
22　these are all admitted into evidence.  So, first of
23　all, tell me what's 168, 169 and 170.
24　　A.　These are latent lift card.
25　　Q.　Taken by who?

232

1　　A.　They were obtained by Allen Kirksey, a crime
2　scene investigator.
3　　Q.　Are you familiar with those?
4　　A.　Yes, sir.
5　　Q.　Did you try to make effect of a comparison of
6　fingerprints in this case involving a murder that took
7　place at the Times Market, a Whataburger on Texan
8　Trail, a Whataburger at Staples and Baldwin, and any
9　other items collected at or near two -- two vans
10　involved in this case?
11　　A.　Yes.
12　　Q.　You looked at a lot of fingerprint cards, did
13　you not?
14　　A.　Yes, I did.
15　　Q.　Did you find any in your -- in your matching
16　that -- that matched John Henry Ramirez?
17　　A.　Yes.
18　　Q.　And which ones were they?
19　　A.　Exhibits 170, 168 and 169.
20　　Q.　Okay.  Let's take them one at a time, and
21　we'll start with 168.  Where did that fingerprint come
22　from?
23　　A.　I'm quoting the back of his latent lift card.
24　"Exterior side of the front driver's side door mirror
25　glass of a maroon 1999 Ford E-150 van bearing Texas

233

1  license 3CM-R01."

2     Q.   So 168 came from a driver's side mirror glass

3  of a Ford van?

4     A.   Yes, sir.

5     Q.   And you said earlier that mirror or glass

6  would be a good surface for that?

7     A.   Yes.

8     Q.   169, where did that come from?

9     A.   Again, I'm quoting the back of his latent

10  lift card. "Exterior front side of a clear plastic

11  'Memorex' CD-R compact disk case with new C.K. Run

12  written on the CD and 'White Boy John' written on the

13  inside cover found inside of the top fold-out tray of

14  the center console of a maroon 1994 Dodge Ram, 250 van

15  bearing Texas license 332-RDN."

16     Q.   So that came from the compact disk case of

17  the Dodge van.

18     A.   Yes.

19     Q.   And 170, what did -- where did that come

20  from?

21     A.   Once again, I'm quoting the back of this

22  latent lift card. "Backside of a wallet-size

23  photograph picture of a small boy that was found

24  laying on the front passenger floorboard of a maroon

25  1999 Ford E-150 van bearing Texas license number

234

1  3CM-R01."

2     Q.   Did you examine State's Exhibit No. 168, 169,

3  and 170 and compare them to the known fingerprints of

4  the Defendant John Henry Ramirez?

5     A.   Yes, I did.

6     Q.   Can you tell the jury what the results of

7  your examination were?

8     A.   On Exhibit 168, I identified the left palm

9  print of John Henry Ramirez. On Exhibit 169, the

10  compact disk, I identified the right thumb print of

11  John Henry Ramirez. And on State's Exhibit 170, I

12  identified the left middle fingerprint of John Henry

13  Ramirez.

14     Q.   So, for the record, again, is the person

15  sitting in the courtroom that you've identified as

16  John Henry Ramirez, is he the one that made those

17  fingerprints on those three cards from those three

18  locations?

19     A.   Yes.

20     MR. SKURKA:  Judge,  I'll pass the

21  witness.

22     THE COURT:  Cross?

23     MR. GARZA:  Your Honor, I have no

24  questions of Ms. Parker.

25     THE COURT:  All right.  You may stand

235

1  down.  Please don't discuss your --

2     MR. SKURKA:  Excuse me, Judge --

3     THE COURT:  -- testimony --

4     MR. SKURKA:  -- I didn't know he wasn't

5  going to have cross.  I have one more question to ask

6  her.

7     THE COURT:  Okay.

8     MR. SKURKA:  These weren't displayed to

9  the jury, earlier, Judge, so I just want to show them

10  the other side of the cards, if I might.

11     THE COURT:  Okay.

12     Q.   (BY MR. SKURKA)  There's three of these, and

13  the jury will have a chance to look at them

14  themselves, but I just want to show the jury what

15  you're talking about.  And let's just take one of

16  them.

17     MR. SKURKA:  168, put that up on the

18  board, if you would, please.  You may have that upside

19  down.

20     THE WITNESS:  I think it's upside down.

21     MR. SKURKA:  Thank you.  Did it go out?

22     Q.   (BY MR. SKURKA)  Okay.  What is 168?  We're

23  showing the front side of that card.  What does that

24  show?

25     A.   That is a latent print.

236

1     Q.   Okay.  Is that the print that you identified

2  as John Henry Ramirez'?

3     A.   Yes.

4     Q.   And did you write up here to indicate it was

5  the left palm print and who it matched to?

6     A.   Yes.

7     Q.   Okay.  I just wanted to show the jury an

8  example of what one looked like.

9     MR. SKURKA:  Thank you, Judge.  That's

10  all the questions I have.

11     THE COURT:  All right.  Please don't

12  discuss your testimony with anyone except for the

13  lawyers while this trial's going on, and you're free

14  to go about your business.

15     THE WITNESS:  Thank you, Your Honor.

16     THE COURT:  All right.

17     MR. SKURKA:  Ruby Garcia.

18     THE COURT:  Come forward.

19     (Oath administered.)

20     THE WITNESS:  Uh-huh.

21     THE COURT:  Yes?

22     THE WITNESS:  Yes.

23     THE COURT:  Be seated.  You may proceed.

237

1             RUBY GARCIA,

2    having been first duly sworn, testified as follows:

3             DIRECT EXAMINATION

4    BY MR. SKURKA:

5        Q.   Hi.  Could you tell the folks on the jury

6    your full name.

7        A.   Roberta Garcia.

8             THE COURT:  Why don't you pull the

9    microphone real close.

10            COURT REPORTER:  Say your name again.

11            THE WITNESS:  Roberta Garcia.

12            MR. SKURKA:  She's got a cold, too,

13   Judge.

14            THE COURT:  All right.

15            MR. SKURKA:  Her voice isn't too good.

16            THE COURT:  I -- I understand.  I had --

17   I had one running through jury selection.  So I feel

18   for her.

19            MR. SKURKA:  Did you get that, Mary?

20            COURT REPORTER:  Did you say Roberta?

21            THE WITNESS:  Uh-huh.

22            COURT REPORTER:  Thank you.

23       Q.   (By MR. SKURKA) Do you also go by Ruby?

24       A.   Yes.

25       Q.   Do you mind if I call you Ruby?

238

1        A.   Sure.

2        Q.   How old a person are you now?

3        A.   26.

4        Q.   How old were you back on July -- July 19th of

5    2004?

6        A.   21.

7        Q.   Are you related to anybody involved in this

8    case?

9        A.   Yes.

10       Q.   Who are you related to?

11       A.   Angela.

12       Q.   Angela Rodriguez?

13       A.   Yes.

14       Q.   How are you related to her?

15       A.   She's my sister.

16       Q.   Did you go to school here in Corpus Christi?

17       A.   Yes.

18       Q.   Where did you go to school?

19       A.   I last attended Ray High School.

20       Q.   How far did you get at Ray High School?

21       A.   To the 11th grade.

22       Q.   Did you go to any other schools besides Ray

23   High School?

24       A.   Alternative schools.

25       Q.   What's alternative school?

239

1        A.   Other than the main high schools.

2        Q.   I'm sorry?

3        A.   Other than the main high schools.

4        Q.   Other than the main.  Well, what are

5    alternative high schools for?

6        A.   A quicker way to get a diploma.

7        Q.   Was there a reason you went to this other

8    school?

9        A.   I was pregnant.

10       Q.   Cause you were pregnant?  When did you become

11   pregnant?

12       A.   Uh --

13       Q.   How old were you is what I'm asking?

14       A.   16.

15       Q.   Sorry?

16       A.   16.

17       Q.   16 years old?

18       A.   Uh-huh.

19       Q.   How many children do you have?

20       A.   Five.

21       Q.   And from what age to what age are they?

22       A.   From eight to three years.  I have five.

23       Q.   From eight years old to three years old?

24       A.   Yes.

25       Q.   Do you work?

240

1        A.   No.

2        Q.   Have you worked in the past?

3        A.   Yes.

4        Q.   Can you tell us -- the jury a little bit of

5    what place you've worked at?

6        A.   Waitress, at a bar, cashier.  And that's it.

7        Q.   So you've worked as a waitress and cashier

8    for awhile, or before?

9        A.   Right.

10       Q.   How many -- how many -- I'm sorry, in what

11   age relation is Angela Rodriguez to you?  Is she an

12   older sister, a younger sister?

13       A.   She's my older sister.

14       Q.   And how much older is she than you?

15       A.   I'm not sure.  I know she was born in the

16   year of '74.

17       Q.   And what year were you born in?

18       A.   '82.

19       Q.   So that would be about eight years?

20       A.   Right.

21       Q.   Okay.  You're a little nervous today, aren't

22   you?

23       A.   Yes.

24       Q.   Okay.  Well, I'm just going to go real slow

25   with you, all right?  I'm going to talk to you about a

241

1   time around July 19th, 2004, the events that happened
2   occurring at the Times Market and two Whataburgers and
3   the apprehension of your sister, Angela Rodriguez,
4   okay?
5       A.   (Nods head.)
6       Q.   Do you remember that time?
7       A.   Yes.
8       Q.   I want to ask you, do you know the Defendant
9   in this case, John Henry Ramirez?
10      A.   Yes.
11      Q.   How do you know him?
12      A.   A mutual friend.
13      Q.   Mutual friends?
14      A.   Yeah.
15      Q.   How long had you known him?
16      A.   Probably about five months.
17      Q.   Five months before this happened?
18      A.   Right.
19      Q.   Did you meet him through your sister, Angela,
20  or somebody else in the family?
21      A.   No.  From my other sister.
22      Q.   What other sister?
23      A.   Laverne.
24      Q.   Laverne?  Had John Henry Ramirez -- how well
25  did you know him and how well did he know your family?

242

1       A.   I knew him well enough to go out with him,
2   and stuff like that, go hang out at the bars.
3       Q.   Go hang around with him?
4       A.   Uh-huh.
5       Q.   Okay.  Was he a closer friend to you or your
6   sister, Laverne, or your sister, Angela?
7       A.   My sister, Laverne.
8       Q.   Okay.  So you knew him, but it would be fair
9   to say your sister was closer to him than you; is that
10  right?
11      A.   Yes.
12      Q.   How often would you see him at your house, or
13  did he ever come over to your house before this night
14  in question, July 19th, 2004?
15      A.   Probably three times a week.
16      Q.   Three times a week?
17      A.   Right.
18      Q.   Did you know him by any other names besides
19  John Henry Ramirez?  Did he have any nicknames or
20  anything?
21      A.   We called him "Guero."
22      Q.   Guero?
23      A.   Yeah, "White Boy John."
24      Q.   He went by "Guero" or "White Boy John"?
25      A.   Yeah.

243

1       Q.   What does Guero mean?
2       A.   White, in Spanish.
3       Q.   Before this events happened on July 19th, did
4   you have time to -- did you have occasion to hang
5   around with John Henry Ramirez and your sister?
6       A.   Uh-huh.
7       Q.   Under what circumstances?  How were you-all
8   doing it and where?
9       A.   Well, those days of partying, I was also
10  partying with them, as well.
11      Q.   So he was partying with you and your sister?
12      A.   Right.
13      Q.   And what do you mean by when you say
14  "Partying", Ruby?
15      A.   We -- we drank, we smoked, did some illegal
16  substances.
17      Q.   Okay.  You keep dropping your voice.  I'm not
18  sure the court reporter and I can hear you.
19      A.   We were drinking alcohol and doing drugs.
20      Q.   What kind of drugs were you doing?
21      A.   Smoking marijuana and cocaine.
22      Q.   You were smoking cocaine or just using?
23      A.   Just using it.
24      Q.   So how often were you-all doing this?
25      A.   Uh --

244

1       Q.   I'm sorry, what period of time were you-all
2   doing this?
3       A.   It was an ongoing thing.
4       Q.   For how long, how many days?
5       A.   For about three days.
6       Q.   Who else was in involved with this?
7       A.   A couple of his friends at point in times.
8       Q.   Okay.  What about from your family?
9       A.   Just -- that's it.
10      Q.   Well, was Angela doing this --
11      A.   Oh, right.
12      Q.   -- also?
13      A.   Angela and Christina.
14      Q.   Who's Christina?
15      A.   Her -- her girlfriend at the time.
16      Q.   So it was Angela, Christina, John Henry
17  Ramirez, you, Ruby Garcia --
18      A.   Right.
19      Q.   -- several -- couple of his friends at
20  different times during those three days?
21      A.   Uh-huh.
22      Q.   Did you see him the morning of July 19th?
23      A.   Yes.
24      Q.   Where did you see him?
25      A.   We were hanging out.  He had -- that morning

245

1  I'd asked him to drop me off because I was -- I was
2  done partying, I was finished.  I didn't want to hang
3  out anymore.
4      Q.   So he dropped you off back at your house?
5      A.   Right.
6      Q.   Where is that house at?
7      A.   Off of York, 1306.
8      Q.   1306 York Street?
9      A.   Right.
10     Q.   Did he drop you off?
11     A.   Yes.
12     Q.   What about Christina and Angela?
13     A.   He dropped them off as well but he later
14  picked them back up that night.
15     Q.   So he dropped all three of you off and then
16  later picked the two up?
17     A.   Uh-huh.
18     Q.   What were you-all in, what vehicle were you
19  in, what did it look like?
20     A.   A big van.
21     Q.   Do you remember the color?
22     A.   No, not really.
23     Q.   You just remember it was a big van?
24     A.   Right.
25     Q.   Did he come back later to pick them up?

246

1      A.   Yes.
2      Q.   About what time was that?
3      A.   Probably around 7:30.
4      Q.   7:30 at night?
5      A.   Yes.
6      Q.   Now, did you see them again after -- I'm
7  sorry, you saw them all leave together?
8      A.   Right.
9      Q.   And when I say, "they," I meant John Henry
10  Ramirez, Christina and --
11     A.   Angela.
12     Q.   -- Angela?
13     A.   Right.
14     Q.   You saw them all leave your house at 1306
15  York.
16     A.   Yes.
17     Q.   About 7:30?
18     A.   Yes.
19     Q.   When is the next time that you saw John Henry
20  Ramirez?
21     A.   When he came back from apparently stabbing
22  someone.
23     Q.   What time was that?
24     A.   12:30 at night.
25     Q.   So that would have been the next day, the

247

1  19th, probably?  If you had seen him at 7:30 one day,
2  the 19th, it would have been the 20th the next day?
3      A.   Right.
4      Q.   So you saw him at 12:30 in the morning or
5  afternoon, is what I'm getting at.
6      A.   In the morning.
7      Q.   12:30 in the morning.  Where did you see him
8  at, Ruby?
9      A.   At -- he came knocking on our front door.
10     Q.   At 12:30 at night?
11     A.   Right.
12     Q.   At the same address you talked about, York
13  Street?
14     A.   Yes.
15     Q.   Tell the jury, please, what happened when you
16  went to answer the door.  What did you see?
17     A.   I saw John.  And he was -- his clothes were
18  dirty with grass and he was in a -- a sweat panic kind
19  of mode, and he was -- he was just gasping for his
20  breath there, and -- like he had been running, and I
21  asked him what happened, what was wrong, you know, and
22  he -- then he tried to explain to me, speaking very
23  fast, that the cops -- he was running, and that he
24  was -- that they'd stabbed someone, and I wasn't too
25  sure who, or anything.  I was just worried about my

248

1  sister, and I asked him where he -- she was, and he
2  didn't say much, just that he didn't know, he didn't
3  know, that they got -- they got away, or I don't know,
4  and that he stabbed her.
5          So with that in my head, when he said he
6  stabbed her, I asked where she was.  He said, "I don't
7  know, Whataburger, Whataburger," and so I told him to
8  leave and I got in a vehicle of my friend's, Sandra's,
9  and went looking for her, because I assumed she was
10  stabbed and hurt or something.
11     Q.   So at the time you thought she had been
12  stabbed, also.
13     A.   Right.
14     Q.   But you said earlier that they -- they
15  stabbed someone?
16     A.   Right.
17     Q.   So you thought it was someone else besides
18  your sister; correct?
19     A.   Right, right, and I really didn't care too
20  much cause, like, it was something normal for John's
21  actions, like the type of person he is.
22     Q.   Okay.  Let's stop and go back to what he was
23  looking like and what he was wearing.  What was he
24  wearing that night?
25     A.   His shirt was white, and some gym shorts.

249

1    Q.   And describe his physical appearance, or
2  general appearance.
3    A.   He was all drenched in sweat.
4    Q.   Did you see how he arrived at your house?
5    A.   Nope.
6    Q.   I mean, did a car drop him off, a bus bring
7  him, a taxi bring him?
8    A.   No.
9    Q.   How did you see him approach or leave your
10  house?
11    A.   Running.
12    Q.   When he left your house, how did he leave?
13    A.   He left running.
14    Q.   He left running?
15    A.   Right.
16    Q.   And is it your testimony he appeared to be
17  gasping for breath because he had been running?
18    A.   Right.
19    Q.   What did he want when he came over to your
20  house?
21    A.   I guess he wanted help, for me to let him
22  inside.
23    Q.   Did you let him inside?
24    A.   No.
25    Q.   Did you notice anything else beside the

250

1  clothing, about his hands or anything else?
2    A.   He was -- had an incision, like a cut on his
3  right hand, and it was bleeding pretty profusely.
4    Q.   So he was cut on his right hand?
5    A.   Uh-huh.
6    Q.   Can you show the jury where on his hand he
7  was cut?
8    A.   Probably about right here.  It was a big
9  gash.
10    Q.   For the record, okay, you held up your left
11  hand, I guess.
12    A.   Oh, no.
13    Q.   Was it his left hand or right hand, or do you
14  remember?
15    A.   It's this hand, yeah.  He was standing across
16  from me.
17    Q.   So it would have been his right hand?
18    A.   Right.
19    Q.   And, for the record, you're showing your palm
20  of your hand open --
21    A.   Right.
22    Q.   -- kind of underneath the fingers toward the
23  middle?
24    A.   Uh-huh.
25    Q.   And you say -- you describe it was a gash or

251

1  a cut?
2    A.   Right.  Not a cut because a cut's pretty
3  small.  It was big.
4    Q.   Was it open?
5    A.   Like a chunk.  Yeah, there was no skin there.
6  It was gone.
7    Q.   So he --
8    A.   And it was just bleeding.
9    Q.   Okay.  A gash or a chunk of skin was missing?
10    A.   Uh-huh.
11    Q.   Did he have a towel or a rag around there or
12  was it just open?
13    A.   No, it was just open.
14    Q.   What did you think when you saw all that and
15  heard all this?
16    A.   I just thought for my sister's safety, where
17  she was and if she was all right, because I couldn't
18  make out or put together what he was trying to tell me
19  or say.
20    Q.   You said earlier he was in a sweat panic kind
21  of mode.  What does that mean?
22    A.   Like he was going fast, everything was just
23  coming out fast and not making sense at all.
24    Q.   But you did hear him say he had stabbed
25  someone?

252

1    A.   Right.
2    Q.   When you said he took out on foot, what
3  direction did he go by or go toward?
4    A.   If you're standing in front of my house, it
5  would be towards the right side of York Avenue.
6    Q.   Is that toward Staples or away?
7    A.   Towards Staples.
8    Q.   Towards Staples?
9    A.   Right.
10    Q.   How did he feel or how did he react when you
11  didn't let him in the house or wouldn't help him?
12    A.   Uh --
13    Q.   How did he act or react when you wouldn't let
14  him in the house or help him?
15    A.   He didn't say anything, he was just confused.
16  He had that look in his face like what he was going to
17  do.  I just told him to leave now, and he kind of took
18  like a second, like he wanted to stay there, but he
19  knew if he did the cops would be there so he took off
20  running.
21    Q.   Away from your house?
22    A.   Right.
23    Q.   Did you see a weapon with him that night,
24  that night when he came to your door?
25    A.   No, not on him.  I seen something -- a knife

253

1 earlier in the day when I was hanging out with them.

2    Q.  Okay.  So you didn't see a knife that night

3 but had you seen a knife earlier that day?

4    A.  Yes.

5    Q.  Can you tell us the circumstances of that,

6 where and what happened?

7    A.  Oh, we were driving around in the van that he

8 had and he had shown me the knife, and it was a fairly

9 large knife to medium-sized.  It wasn't a pocket

10 knife, it was like one that you might buy from the

11 Trade Center or something, like kind of for -- for

12 display or something that you would put it on at your

13 house or something.  It was a -- it was just large, I

14 know that.

15    Q.  You don't remember how big it was or how long

16 it was?

17    A.  Uh --

18    Q.  I think there's a ruler up there somewhere.

19 Maybe you can use that to help measure.  Can you give

20 us an approximate length of the knife that you saw,

21 using a ruler?

22    A.  I'd say eight inches.

23    Q.  And do you know that for sure?

24    A.  Yes, more or less.  It was big -- it was a

25 big knife.

254

1    Q.  It was a big knife.  But you didn't take a

2 ruler out and measure it at that time, did you?

3    A.  No.

4    Q.  Okay.  This is going to sound stupid.  Do you

5 know much about knives?

6    A.  Yes, not really, but --

7    Q.  Well, I guess, what I'm trying to say is

8 could you see the handle of the knife when he was

9 showing it earlier?

10    A.  Uh-huh.

11    Q.  And was it like a regular handle, was it like

12 a wood handle, was it --

13    A.  It was a metal, like a metal handle.

14    Q.  You said metal?

15    A.  Yeah.

16    Q.  And the blade, can you tell me -- you're

17 talking about how long it was, what did the blade look

18 like?

19    A.  The blade had like three ridges to it, like

20 -- it had the main blade and then like it went down

21 into two smaller blades poking out, kind of like teeth

22 on the side of it.

23    Q.  So it looked like teeth?

24    A.  Right.

25    Q.  Okay.  Do you know what that kind of knife is

255

1 called?

2    A.  No.

3    Q.  But it just wasn't like a straight knife or

4 it just had this -- had these ridges on it.

5    A.  Yeah, it didn't fold or nothing.

6    Q.  How -- how was it that you saw it earlier in

7 the day, and what was he doing with it earlier in the

8 day?

9    A.  Just showing it off to me.

10    Q.  Showing it off to you?

11    A.  Right.  He was just showing me, check out his

12 knife, you know, like a friend will do.

13    Q.  How did you feel -- what were you going to do

14 when he was telling you the stuff that you thought he

15 had maybe stabbed Angela?

16    A.  Coming from John, it was kind of not a normal

17 thing, but he comes from a rough background.

18    Q.  Okay.  I'm asking you about what you thought,

19 how you felt toward him at that time when you thought

20 he had hurt your sister?

21    A.  Well, I was angry and I wanted to know where

22 she was, and he didn't -- he couldn't tell me where

23 she was because he had no idea.  He said -- he just

24 mentioned Whataburger so I went looking at the

25 Whataburgers for her.

256

1    Q.  Did he tell you anything about the police

2 chasing him?

3    A.  No.

4    Q.  Did he say anything about the two little

5 girls that got caught by the police?

6    A.  All he said is that, "I think they got away."

7    Q.  You heard him say, "I think they got away?"

8    A.  Right.

9    Q.  Is the person who came to you that night with

10 his cut hand and said that they had stabbed someone,

11 is that person in the courtroom, today?

12    A.  Yes.

13    Q.  Can you point to him and describe something

14 he's wearing.

15    A.  (Pointing) John.

16    Q.  Okay.  Can you say what color of shirt he's

17 wearing, please.

18    A.  Green.

19       MR. SKURKA:  Your Honor, may the record

20 reflect the witness has identified the Defendant.

21       THE COURT:  It will so reflect.

22       MR. SKURKA:  I'll pass the witness, then.

23 Thank you, Ms. Garcia.

24       MR. GARZA:  Just a second, Judge.

25       THE COURT:  Sure.

257

CROSS-EXAMINATION

1     CROSS-EXAMINATION
2   BY MR. GARCIA:
3     Q.   Ms. Garcia, my name is Ed Garza, and I
4   represent John Henry Ramirez.  I don't think you and I
5   have ever met before; is that correct?
6     A.   Right.
7     Q.   Have you met Mr. Barrera, our investigator in
8   this case?
9     A.   I don't know.
10    Q.   Have you ever had occasion to meet him?
11    A.   No.
12    Q.   No?  You don't recall?
13    A.   No.
14    Q.   Okay.  Prior to your testimony here today,
15  did you have occasion the speak to Mr. Skurka before
16  your testimony?
17    A.   Right.
18    Q.   How many times?
19    A.   Once.
20    Q.   Okay.  Would that have been this week some
21  time?
22    A.   No.
23    Q.   Or some other time?
24    A.   Some other time.
25    Q.   How long ago?

258

1     A.   Probably a week ago.
2     Q.   Okay.  Now, going back to 2004 at the time of
3   this incident, I believe it's your testimony that you
4   were 21 years old?
5     A.   Right.
6     Q.   Okay.  Now, at that time, did you already
7   have five children?
8     A.   No.
9     Q.   How many children did you have at that time?
10    A.   I think I had four.
11    Q.   You had four children?
12    A.   Right.
13    Q.   All from the same father?
14    A.   Right.
15    Q.   Okay.  Is he close to the children?  Are
16  you-all married?  I mean, are you-all together?
17    A.   No.
18    Q.   You're not?
19    A.   No.
20    Q.   You're separated?
21    A.   Right.
22    Q.   Were you-all formally married or just --
23    A.   No, just together.
24    Q.   Just together?
25    A.   Right.

259

1     Q.   And you-all aren't together anymore?
2     A.   No.
3     Q.   Does he help support these children?
4     A.   Yes.
5     Q.   He does?
6     A.   Yes.
7     Q.   Okay.  Does he pay a court-ordered child
8   support amount?
9     A.   No.
10    Q.   Then how does he help the children?
11    A.   He works.
12    Q.   Okay.  But how do you get money from him?
13    A.   I don't, he -- he houses the two older ones,
14  the eight year old and seven year old, and I have the
15  three babies.
16    Q.   So he houses the two older children and you
17  have three other younger children.
18    A.   Right.
19    Q.   And -- but does he give you any money for the
20  younger children?
21    A.   No.
22    Q.   No.
23    A.   No.
24    Q.   Okay.  How do you support those children?
25    A.   My mom and dad.

260

1     Q.   Do you work right now?
2     A.   No, not at the moment.
3     Q.   Are you presently employed?
4     A.   No.
5     Q.   Okay.  Are you pregnant right now?
6     A.   No.
7     Q.   No?  Okay.  So I believe it's your testimony
8   a while ago that you have known or had known John
9   Henry Ramirez through your sister, Laverne --
10    A.   Right.
11    Q.   -- for about five months prior to this
12  incident.
13    A.   Uh-huh.
14    Q.   Is that correct?
15    A.   Yes.
16    Q.   Okay.  Earlier in the day -- and I guess
17  throughout that weekend when Angela and Christina were
18  down here from San Antonio, is it your testimony that
19  you had joined in on the partying that was going on
20  between them and John Henry Ramirez?
21    A.   Yes.
22    Q.   For two or three days?
23    A.   Right.
24    Q.   Using drugs and alcohol?
25    A.   Uh-huh.

261

1   Q.   Is that correct?

2   A.   Yes.

3   Q.   Okay.  On the day of July the 19th when

4   you-all had gone out earlier, do you remember what

5   John Henry Ramirez was wearing, what he was wearing

6   that day?

7   A.   Just a shirt and shorts.

8   Q.   What kind of shirt and shorts?

9   A.   White shirt and some black or blue shorts.

10  Q.   Black or blue shorts.

11  A.   That went past the knee.

12  Q.   I'm sorry?

13  A.   That went past the knee.

14  Q.   Okay.  Do you know what he was wearing when

15  he came back that evening, according to your

16  testimony, and picked up your sister and Christina?

17  A.   No.

18  Q.   Were you at home when he came to pick them

19  up?

20  A.   Yes.

21  Q.   Okay.  But you didn't get a chance to see

22  what he was wearing?

23  A.   No.

24  Q.   Okay.  So then they left --

25  A.   Right.

262

1   Q.   -- correct?  Okay.  Now, the next time you

2   saw Mr. Ramirez would have been at 12:30 that night --

3   I mean, after that night, so it would have been like

4   12:30 in the morning --

5   A.   Right.

6   Q.   -- of the 20th?

7   A.   Right.

8   Q.   Is that correct?

9   A.   Yes.

10  Q.   And at that time you observed him wearing

11  blue shorts, like gym shorts and a white T-shirt.

12  A.   Yes.

13  Q.   I think that's your testify, right?

14  A.   Yes.

15  Q.   Okay.  And you noticed -- did you notice any

16  blood on his clothing?

17  A.   Yes.

18  Q.   You did?

19  A.   Yes.

20  Q.   Okay.  And also that he looked like he was

21  sweating, wet?

22  A.   Yes.

23  Q.   Any kind of mud or green grass or anything

24  like that?

25  A.   Grass stains.

263

1   Q.   I'm sorry?

2   A.   Grass.

3   Q.   Okay.

4        MR. SKURKA:  I'm sorry, did she say grass

5   or grass stains?

6        THE WITNESS:  Grass.

7   Q.   (BY MR. GARZA) Did you saw grass stains or

8   just pieces of grass on him?

9   A.   Pieces of grass on him.

10  Q.   Piece of grass on him?

11  A.   Yeah.

12  Q.   Okay.  And you stated that he was saying that

13  they had stabbed someone.

14  A.   Yeah.

15  Q.   Meaning he and your sister?

16  A.   Well, I don't know.  I mean, he was with him

17  and his friends and my sister.

18  Q.   Okay.  But you said in your testimony that

19  you had asked for your sister when he came knocking at

20  the door, right?

21  A.   Yes.

22  Q.   And what did he tell you?

23  A.   He said he didn't know, that he thinks they

24  got away.

25  Q.   Okay.  But did he mention to you that they

264

1   had stabbed someone?

2   A.   Yes.

3   Q.   "They" meaning who?

4   A.   Well, I don't know.  I didn't ask him who.

5   Q.   Now, you -- you didn't witness anything that

6   occurred at the Times Market, did you?

7   A.   No.

8   Q.   You didn't witness anything that happened at

9   the Whataburger?

10  A.   No.

11  Q.   On Staples and Baldwin --

12  A.   No.

13  Q.   -- correct?  And you didn't witness anything

14  that happened on the Whataburger on Texan Trail.

15  A.   No.

16  Q.   Okay.  Now, you mentioned that you witnessed

17  or saw a gash on his right -- on his right palm in

18  here?

19  A.   Uh-huh.

20  Q.   And you don't know how that happened, either,

21  do you?

22  A.   No.

23  Q.   Okay.  Now, you did testify that there was

24  some mention made, or something, in his panic state,

25  that he may have mentioned something about stabbing

265

1  your sister?

2      A.   Yes.

3      Q.   You remember that specifically?

4      A.   Uh-huh.

5      Q.   That he said that?

6      A.   Yes.

7      Q.   Okay.  Now, he didn't have anything wrapped

8  around his hand or anything?

9      A.   No.

10     Q.   Okay.  Do you know how he could have gotten

11 bloody?

12     A.   Uh -- no.

13     Q.   The knife that you described to the members

14 of this jury, what -- was it the kind of knife that

15 had a fixed blade or was it one that could be folded?

16 Do you remember?

17     A.   It had a fixed blade.

18     Q.   Okay.  So it wasn't one that could be folded?

19     A.   No.

20     Q.   Okay.  And I think you testified that you

21 thought it was about eight inches long?

22     A.   Right.

23     Q.   Was that the blade alone or the blade and the

24 handle together?

25     A.   The blade and the handle.

266

1      Q.   How many other sisters and brothers do you

2  have?

3      A.   I have six sisters and three brothers.

4      Q.   And as far as their ages, are you like one of

5  younger sisters or older or --

6      A.   Right, younger.

7      Q.   You're one of the younger sisters?  Okay.

8  All right.  Thank you, Ms. Garcia.

9          MR. GARZA:  I don't have any other

10 questions, Your Honor.

11         THE COURT:  All right.

12         MR. SKURKA:  Mr. Skurka?

13         MR. SKURKA:  Judge, I don't think I have

14 any questions, either.

15         THE COURT:  All right.  Then we'll break

16 for the day.  So ladies and gentlemen of the jury,

17 we'll see you tomorrow at 9:00.

18         All rise for the jury.

19         (Jury exits courtroom.)

20         THE COURT:  All right.  Do we need to

21 take up anything before tomorrow?

22         MR. SKURKA:  No, Your Honor.  I just

23 wanted to give the Court alert of where we're at.  I

24 think I have the other Co-Defendant possibly to

25 testify tomorrow, I have the D.N.A. expert or experts,

267

1  both of them, and then Dr. Fernandez so I'm getting

2  down toward the end.  I just wanted to give the Court

3  and the Defense an appraisal of how much more I intend

4  to introduce.

5          I think the D.N.A. expert obviously will

6  take a long time, and I think the medical examiner

7  will take a long time.  And --

8          THE COURT:  But we're done with

9  Ms. Garcia.

10         MR. SKURKA:  Yes, Judge.  I was just

11 going to wait for Frank to escort her out.

12         THE COURT:  Yeah, yeah.

13         MR. GARZA:  And I just wanted to give Ed

14 a chance to -- and Mr. Grant Jones a chance to know

15 where we're at in the trial.

16         THE COURT:  Okay.

17         MR. GARZA:  We appreciate that, Judge.

18         THE COURT:  All right.

19         MR. SKURKA:  And I will tell the Court,

20 too, I know he's probably going to talk about this,

21 but I will try to go through the autopsy pictures that

22 I'm going to have with Dr. Fernandez to show the

23 wounds, the 29 stab wounds.  I will try to go through

24 those tonight or tomorrow morning, and we might have

25 to have a hearing on that.  I'm sure Mr. Garza would

268

1  want that ahead of time, but maybe I can show them

2  some proffers of stuff we can maybe agree on some of

3  them, but --

4          THE COURT:  And some of them probably can

5  be shown by some of the pictures that we've already

6  introduced.

7          MR. SKURKA:  That could be true, Judge,

8  but the problem is, some of those things are covered

9  up.  If you look --

10         THE COURT:  Some of them.

11         MR. SKURKA:  -- there's a bunch of slits

12 in the shirt and --

13         THE COURT:  Some of them, I agree.  I

14 agree.

15         MR. SKURKA:  I'm just giving you a

16 heads-up, Judge.

17         THE COURT:  Okay.

18         MR. GARZA:  I appreciate that, also,

19 Judge.

20         (Adjournment.)

21

22

23

24

25

269

```
 1   THE STATE OF TEXAS )

 2   COUNTY OF NUECES   )

 3                I, Mary Lopez Buitron, Official Court

 4   Reporter  in and for the 94th Judicial District Court of

 5   Nueces County, State of Texas, do hereby certify that

 6   the above and foregoing  contains a true and correct

 7   transcription of portions of evidence and other

 8   proceedings requested in writing by counsel for the

 9   parties to be included in this volume of the Reporter's

10   Record, in the above-styled and numbered cause, all of

11   which  occurred in open court or in chambers and were

12   reported by me.

13                I further certify that this Reporter's

14   Record of the proceedings truly and correctly reflects

15   the exhibits, if  any, admitted by the respective

16   parties.

17                I further certify that the total cost for

18   the  preparation of this Reporter's Record is $_____

19   and was  paid/will be paid by_____.

20                WITNESS MY OFFICIAL HAND this the _____

21   day of _____, A.D., 2009.

22   _____

23   MARY LOPEZ BUITRON, CSR, RPR, Texas CSR #2731
     Expiration Date: 12/31/2009
24   Official Court Reporter, 94th District Court
     Nueces County, Texas, 901 Leopard, Room 901
25   Corpus Christi, Texas 78401
     (361)888-0658
```