1

```
 1                    REPORTER'S RECORD
            APPELLATE COURT CAUSE NO. AP-76,100
 2           TRIAL COURT CAUSE NO. 04-CR-3453-C
                 VOLUME 19 OF 25 VOLUMES
 3
THE STATE OF TEXAS     )     IN THE DISTRICT COURT
 4                     )
                       )
 5   VS.               )     94TH JUDICIAL DISTRICT
                       )
 6   JOHN HENRY RAMIREZ )    NUECES COUNTY, TEXAS

 7

 8

 9

10

11            _____

12                  TRIAL PROCEEDINGS

13                     (Continued)

14            _____

15

16

17

18

19            On the 4th day of December, 2008, the

20   following proceedings came on to be heard in the

21   above-entitled and numbered cause before the HONORABLE

22   BOBBY GALVAN, Judge Presiding, held in Corpus Christi,

23   Nueces County, Texas:

24            Proceedings reported by Stenograph

25   Machine.
```

**FILED IN
COURT OF CRIMINAL APPEALS**

**OCT 0 6 2009**

**Louise Pearson, Clerk**

2

```
 1   APPEARANCES:

 2   MR. MARK SKURKA
     SBOT NO. 18475570
 3   MR. VERNON G. SCHIMMEL
     SBOT NO. 24033039
 4   ASSISTANT DISTRICT ATTORNEYS
     901 Leopard, Rm. 205
 5   Corpus Christi, Texas 78401
     Phone: (361) 888-0410
 6
     ATTORNEYS FOR THE STATE
 7
       -AND-
 8
     MR. EDWARD F. GARZA
 9   SBOT NO. 07731200
     ATTORNEY AT LAW
10   719 S. Shoreline, Suite 201
     Corpus Christi, Texas  78401
11   Phone: (361) 888-8877

12   MR. JOHN GRANT JONES
     SBOT NO. 10917000
13   ATTORNEY AT LAW
     5826 Beauvals Drive
14   Corpus Christi, Texas  78404-6173
     Phone: (361) 884-8141
15
     ATTORNEYS FOR THE DEFENDANT,
16   JOHN HENRY RAMIREZ

17

18

19

20

21

22

23

24

25
```

3

```
 1                              INDEX
                      VOLUME 19 OF 25 VOLUMES
 2                       TRIAL PROCEEDINGS
    DECEMBER 4, 2008                              Page  Vol.
 3  Continuation of trial proceedings................. 5    19
    State's case continued............................ 5    19
 4
    STATE'S WITNESSES              Direct Cross V.Dire  Vol.
 5  KELLY ISAACKS.........................5      47           19
    PAMELA SMITH.........................49                   19
 6  REY FERNANDEZ, MD, ME................129    182          19
                                        185
 7  Discussion on Defendant's plea of guilty.......... 120   19
    Court's admonition to Defendant. ................. 120   19
 8
    State rests ...................................... 188   19
 9  Defendant rests .................................. 188   19
    State closes ..................................... 188   19
10  Defendant closes................................. 188   19

11  Defendant's request for instruction............... 189  19
       In Re:  Lesser included of murder
12  Defendant's request for instruction .............. 189  19
       In Re:  Accomplice testimony
13  State agrees to lesser included of murder.......... 197  19

14  Adjournment....................................... 199  19

15  Court Reporter's Certificate...................... 200   19

16                  ALPHABETICAL WITNESS INDEX
                            Direct Cross V.Dire  Vol.
17  FERNANDEZ, REY, MD, ME................129   182          19
                                        185
18  ISAACKS, KELLY.........................5      47          19
    SMITH, PAMELA.........................49                  19
19
                           EXHIBITS
20  FOR THE STATE:
    NO.     DESCRIPTION              Offered Admitted Vol.
21  SX-194     2 tubes of blood
               (Rodriguez/Chavez)       43     43      19
22
    SX-195     2 tubes of blood
23             (J. Ramirez, Jr.)        46     46      19

24  SX-196     Summary serology results  77    78      19

25  SX-197     D.N.A. lab results        77    78      19
```

4

```
1                          EXHIBITS
                          (Continued)
2    FOR THE STATE:
     NO.         DESCRIPTION              Offered Admitted Vol.
3    SX-198      Work notes of P. Smith ..... 80      81      19

4    SX-199-224  Autopsy photos (Castro) . .. 125     126     19

5    SX-225-226  Autopsy diagram wounds ..... 125     126     19

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

5

```
 1                 P R O C E E D I N G S
 2   December 4, 2008
 3              (Jury enters courtroom.)
 4              THE COURT:  All right, be seated,
 5   please.
 6              All right, call your next witness, Mr.
 7   Skurka.
 8              MR. SKURKA:  We call Kelly Isaacks.
 9              THE COURT:  Kelly Isaacks.
10              (Oath administered.)
11              THE COURT:  Be seated.  You may proceed.
12              MR. SKURKA:  Thank you, Your Honor.
13
14                 KELLY ISAACKS,
15   having been first duly sworn, testified as follows:
16                 DIRECT EXAMINATION
17   BY MR. SKURKA:
18      Q.   Would you please introduce yourself to the
19   folks on our jury.
20      A.   Lieutenant Kelly Isaacks.
21      Q.   How are you currently employed?
22      A.   I am a patrol supervisor for the Corpus
23   Christi Police Department.
24      Q.   How long have you been with the Corpus
25   Christi Police Department altogether?
```

6

```
 1      A.   It will be 19 years next month.
 2      Q.   Did you have any other law enforcement
 3   experience before you joined the department?
 4      A.   Yes, I did.
 5      Q.   Where and when?
 6      A.   I spent two years with the Dallas Police
 7   Department before I came to Corpus Christi.
 8      Q.   And what was your duties, if anything, at the
 9   Dallas Police Department?
10      A.   I was a patrol officer there.
11      Q.   So you've been a patrol off -- I mean, a
12   policeman for -- police woman for 21 years?
13      A.   Yes.
14      Q.   Starting with what you did when you first
15   started at the police department here in Corpus
16   Christi, can you tell the jury briefly what divisions
17   or departments you've worked in, starting when you
18   first started up to your current assignment, please.
19      A.   Yes, I spent about -- after I graduated from
20   the Police Academy I spent about a year and a half on
21   the streets as a patrol officer, then I transferred to
22   the traffic section as an accident investigator.  I
23   spent about three-and-a-half years there, then I
24   transferred to the special services division.  I spent
25   two years there as a vice investigator.
```

7

```
 1      Q.   Slow down a second.  What is special services
 2   division?
 3      A.   It is vice and narcotics investigation, which
 4   involves -- and I went to the vice section, so I spent
 5   two years there basically investigating any kind of
 6   alcoholic, beverage commission offenses, prostitution
 7   crimes, and also assisted in narcotics investigation.
 8      Q.   Okay, I just wanted them to know what the
 9   special services meant.  What's the next assignment?
10      A.   Okay, then I transferred to the criminal
11   investigations division.
12      Q.   What is that?
13      A.   That is our division of detectives that
14   investigate all property crimes and all crimes against
15   persons.  They do the follow-up investigations after
16   an offense is reported and they ultimately investigate
17   the crime and file the charges and conduct all the
18   follow-up investigation of the offense, et cetera.
19      Q.   Would that be fair to say that's essentially
20   the detective bureau?
21      A.   Yes.
22      Q.   And it's divided in how many subsections, and
23   like what, give us an example.
24      A.   Family violence unit, burglary and theft,
25   financial crimes, and the homicide and robbery unit.
```

8

```
 1      Q.   And what department of that were you assigned
 2   to?
 3      A.   I spent a year in burglary when I first
 4   transferred to that division and then I transferred to
 5   the homicide and robbery unit.  I spent seven years
 6   there.
 7      Q.   So you were a robbery and homicide detective
 8   for seven years?
 9      A.   Yes.
10      Q.   Can you tell the jury essentially when your
11   duties were when you did that division?
12      A.   I would be assigned any crime against a
13   person, whether it be a sexual assault investigation,
14   a shooting, stabbing, robbery, any crime against a
15   person, all the way up to obviously homicide
16   investigations.  So the bulk of my -- of my
17   investigations were sexual assault investigations and
18   homicide investigations.
19      Q.   Apparently -- approximately how many homicide
20   investigations did you have occasion to work on when
21   you were in the detective bureau?
22      A.   I would say at least 50.
23      Q.   What was your next stop after you worked in
24   the homicide/robbery division?
25      A.   After I left there, I spent a year and a half
```

9

1  in the organized crime unit, and I ended up from --
2      Q.   Slow down.  What's the organized crime unit
3  that you were a year and a half with?
4      A.   It is long-term investigations of narcotics
5  trafficking, really a variety of -- embezzlement
6  cases, it was really a variety of different cases that
7  we would investigate.  We assisted F.B.I. and D.E.A.
8  on some of their long-term investigations and it
9  involved a lot of surveillance, a little more
10  low-profile type investigation, I guess you could say.
11      Q.   Would it be fair to say that's more of an
12  undercover type of group, they're not in uniform, are
13  they?
14      A.   No, it is an undercover assignment.
15      Q.   After a year in organized crime unit, what
16  did you do?
17      A.   I tested and promoted to lieutenant and then
18  was reassigned to the uniform division as a patrol
19  shift supervisor and I've spent the last
20  two-and-a-half years in that capacity.
21      Q.   So you became a lieutenant about
22  two-and-a-half years ago?
23      A.   Yes, sir.
24      Q.   Can you tell us generally what the difference
25  is of being a lieutenant as opposed to the other jobs

10

1  you've had in the police department?
2      A.   Basic differences is I'm a first-line
3  supervisor.  I supervise a group of nine patrol
4  officers in our daily patrol work and that's the basic
5  difference.  I am in a uniform and patrol car and we
6  are answering day-to-day calls and I am supervising to
7  do that.
8      Q.   Now, you have another assignment -- are you
9  still in that assignment right now?
10      A.   Yes.
11      Q.   But you are going to be reassigned shortly, I
12  believe in January, correct?
13      A.   Yes, I've received a transfer back to the
14  criminal investigations division.
15      Q.   So you're going to go back to being a
16  detective next month?
17      A.   No, I'm going to be a supervisor for several
18  detectives.
19      Q.   I'm sorry, I didn't mean to say just a
20  detective, you're going to be a lieutenant in charge
21  of several detectives now, correct?
22      A.   Yes; that's correct.
23      Q.   And what kind of crimes will you be working
24  there?
25      A.   Financial crimes, forgeries, embezzlement,

11

1  those type of offenses, crimes against property,
2  basically.
3      Q.   So essentially you've gone from patrol to
4  detective to supervisor in patrol and now you're going
5  to be back as a supervisor in detective next month?
6      A.   Yes.
7      Q.   I want to direct your attention now,
8  Lieutenant Isaacks, to a time of July 19, 2004, and
9  ask what division of the department you were working
10  in then.
11      A.   On that day I was assigned to the homicide/
12  robbery division, and I was the on-call investigator
13  that particular night and that meant -- meaning I was
14  subject to being called out for any serious crime that
15  may have been committed against a person, a homicide
16  or a shooting or stabbing, any -- any incident where
17  somebody had suffered serious bodily injury I was
18  available to be called out.
19      Q.   And yet, at that time, you were in the -- a
20  detective, correct --
21      A.   Yes, uh-huh.
22      Q.   -- you hadn't been promoted to lieutenant
23  yet, correct?
24      A.   No.
25      Q.   You said the call-out, you need a call-out

12

1  person.  Does C.C.P.D. have detectives, you know, at
2  the department 24/7?
3      A.   Most of the detectives in that division are
4  not -- do not work past the -- the time of 5:00;
5  however, the homicide unit, we would go on a rotation
6  where we would be on call for anything that would
7  occur after those hours, and basically that's what my
8  responsibility was that night.
9      Q.   So essentially, do you work a day shift and
10  then if something major happens you're called out?
11      A.   Yes.
12      Q.   Or what I'm trying to say is, you're not just
13  sitting at home waiting for somebody to call you --
14      A.   Oh, no.
15      Q.   -- all day, correct?
16      A.   No, we work our regular shift and then we
17  would usually go on an on-call after-hours schedule
18  for a week at a time.
19      Q.   And you happened to be the homicide detective
20  on call that night.
21      A.   Yes.
22      Q.   Let's go ahead and talk about that -- that
23  day, July 19th, 2004.  Were you -- were you in fact
24  called out that night to answer a major crime scene?
25      A.   Yes, I was.

13

1    Q.   Tell the jury what -- what -- how that came
2    about and what you did.
3    A.   About 11:30 that night on the 19th, I was
4    called at home and -- by the dispatch supervisor,
5    which is our regular procedure.  She called me and
6    advised that we needed to be in route to 1902 Baldwin
7    for a homicide, that it appeared that a store clerk at
8    the Times Market at that location, that he had been
9    beaten and robbed and that I needed to go ahead and
10   respond.
11   Q.   Did you know all the details that first time
12   when you got from the dispatcher?
13   A.   That was about all I knew.
14   Q.   So what did you do?
15   A.   I got dressed and got as quickly to the scene
16   as I could.
17   Q.   About what time was this?
18   A.   It was about 11:30 p.m.
19   Q.   When you arrived at the scene, what did you
20   find?
21   A.   I found -- when I arrived, the patrol
22   officers had -- had secured the -- the scene there in
23   the parking lot with yellow crime scene tape.  I --
24   when I got there, I spoke to some of the patrol
25   officers, the first ones that were at the scene, and

14

1    told them to tell me what they had and what they knew
2    so far.  We did not at that time have anybody in
3    custody, and -- and the deceased, the victim in this
4    case, was laying in the parking hot.  He was covered
5    with a sheet at the time because, of course, by this
6    time there were a lot of onlookers and a lot of people
7    across the street, across Baldwin.  So we were, in
8    essence, trying to protect them from -- from seeing
9    something.
10   Q.   Can you give the jury a general description
11   of what you observed when you first arrived at the
12   scene, the location of the body and that stuff.
13   A.   Okay.  The convenient store -- when I got
14   there, the -- like I said, everything was taped off,
15   and I had already requested some other detectives get
16   there so I was -- we were waiting for them to arrive.
17   I was advised that I had a couple of witnesses that
18   saw the -- what we still believed at this time was a
19   beating and they had witnessed what had happened.  I
20   was shown where they -- where they were when they saw
21   it.  And I spoke very briefly with them at the scene,
22   the two witnesses, and they -- they were very -- very
23   confident and expressed to me they were very confident
24   that they could make an identification if they saw the
25   individuals involved, if they saw them again, so --

15

1    Q.   So you just briefly talked to those witnesses
2    and then what happened with those witnesses?
3    A.   Well, they were separated when I got there.
4    They will not able to speak with each other, and the
5    officers did a good job in doing that.
6    Q.   Why is that important?
7    A.   So that they don't exchange stories, so that
8    we get an independent recollection from each of them
9    about what they saw and that they're not telling us
10   something that -- that the other witness may have seen
11   that they did not, so they were separated.  Like I
12   said, I spoke very briefly with them at the time and
13   obviously we -- we had a fairly large and bloody crime
14   scene.  We had some very -- a very distraught store
15   clerk that was working with -- Pablo Castro is the
16   individual that we ended up finding out he was the
17   deceased.
18   Q.   So the deceased was identified as Pablo
19   Castro?
20   A.   Yes.
21   Q.   And that was through the co-worker or other
22   store clerk --
23   A.   Lydia Salinas.
24   Q.   -- you said?
25   A.   A -- a co-worker that worked with him and

16

1    worked with him for quite some time.  She obviously
2    was very, very upset at the scene, but she -- she did
3    identify him.  He was identified when I got there.  I
4    already knew what his name was.
5    Q.   Can you tell the jury who may not have ever
6    been to a major crime scene how the work is divided
7    up, as you, the case officer, in charge of the
8    investigation, how do you divide up the case work and
9    make it into assignments to the patrol people, the
10   I.D. techs and maybe other detectives, what's the
11   procedure?
12   A.   Well, because I was the lead investigator on
13   this case and we did have some complicating factors
14   that we were dealing with at the same time when this
15   homicide occurred, the patrol officers, I just needed
16   to make sure that they were securing the crime scene,
17   that they were not allowing our witnesses to speak
18   with each other.  I also needed them to -- to attempt
19   to speak to people who may be in the crowd that may
20   have seen something that we hadn't identified them as
21   a witness yet.
22       So that was really their focus, was just
23   to maintain the crime scene, make sure that no one in
24   the crowd tried to enter the crime scene, and protect
25   it in that way.  When the other detectives arrived,

17

1  Detective Garcia, Detective Hugo Stimmler and
2  Detective Lee arrived at the -- well, actually
3  Detective Stimmler did not make it to the scene,
4  because, like I said, we had some other things going
5  on at the -- by this time, other things were happening
6  that I had to dispatch them and make sure that they
7  took care of those things.
8      Q.   And we'll talk about that in a minute.  Okay,
9  and you said other detectives came to assist you.  Is
10  that unusual to call out other detectives to assist --
11      A.   No.
12      Q.   -- in a case of this magnitude?
13      A.   No.  This is a capital murder.  I knew that
14  on the way to the scene.  I knew I was going to need
15  some other help.  The time is very precious at this
16  point.
17      Q.   Why?
18      A.   Because evidence could be lost, there are
19  people that we may not be able to contact.  We need --
20  I needed as much help as possible and that's why I
21  requested -- on the way to scene, I requested for my
22  supervisor that he get some more detectives on the
23  way, because this -- this was going to be a -- a very
24  serious crime, obviously, so --
25      Q.   How about the I.D. section, what is their

18

1  focus and what do you do with them?
2      A.   Basically, I fill them in on -- on what I
3  know of the scene, what we have recognized as
4  evidence.  And, obviously, there were some items there
5  that -- that were very obviously part of the crime, I
6  should say, or they were -- they were items of
7  evidence that we believed were -- were a part of the
8  homicide.
9      Q.   What items?
10      A.   There was a gold nugget ring that was laying
11  very near the victim's body, there was some papers and
12  things that were kind of laying near his body.  His --
13  there was a lot of blood evidence.  And -- and so we
14  wanted to make sure that they were aware of everything
15  that we had found, and yet, we will -- we will contain
16  the crime scene as long as it's necessary for them to
17  do a complete evaluation of the scene and make sure
18  that -- because I'm not going to see everything, they
19  have the time where they can spend so much longer at
20  the scene as long as is -- is needed.
21      Q.   So would it be fair to say you make a kind of
22  a preliminary viewing or observation of the scene, but
23  then you turn it over to the I.D. techs, so they can I
24  guess photograph it and record it and collect the
25  evidence?

19

1      A.   That's correct.
2      Q.   Is that pretty much how the procedure works?
3      A.   Yes.  And then they -- they essentially take
4  over the scene as far as physical evidence and --
5  and seizing any kind of property that is out there,
6  they do that.
7      Q.   You mentioned one of the items that was
8  located out there at the scene to be a gold nugget
9  ring, did you say?
10      A.   Yes.
11          MR. SKURKA:  May I approach, Your Honor.
12          THE COURT:  Yes.
13      Q.   (BY MR. SKURKA)  I'm going to show you what's
14  already been admitted into evidence as State's Exhibit
15  103.  Would you examine the contents of State's
16  Exhibit 103, please.
17      A.   (Witness complying.)  Okay.
18          MR. SKURKA:  May I publish it to the
19  jury, Your Honor?
20          THE COURT:  Yes.
21          MR. SKURKA:  I'm going to put this on the
22  screen so everybody can see it.  And, Geordie, do you
23  mind rotating it a little bit so they can see the top
24  of the ring.
25      Q.   (BY MR. SKURKA)  What is 103?

20

1      A.   The men's gold nugget ring that we found
2  very close to Mr. Castro's body.  It was actually in
3  his blood there next to his body.
4      Q.   Did you ever talk to the store clerk that you
5  said identified Mr. Castro as being the deceased and
6  ask him -- ask her any questions about this so-called
7  ring?
8      A.   Yes, I asked her if she could identify the
9  ring and she said it was Pablo Castro's ring.
10      Q.   So, for the record, 103 is the ring belonging
11  to Pablo Castro?
12      A.   Yes, sir.
13      Q.   And that was collected by I think the I.D.
14  tech?
15      A.   Yes, sir.
16      Q.   Okay.
17          MR. SKURKA:  You can turn the lights back
18  on.  Thank you, Frank.
19      Q.   (BY MR. SKURKA)  Now, let's talk about at the
20  Times Market.  You're doing this investigation, you
21  have detectives doing things, you have patrol
22  officers, you know, keeping the crowd away, you have
23  the I.D. techs coming in.
24          At that time, were any suspects
25  apprehended at or near the Times Market store?

21

1    A.   At or near the Times Market store?

2    Q.   At that time were any suspects --

3    A.   No.

4    Q.   -- apprehended?

5    A.   No, sir.

6    Q.   At that time did you have any information

7  from either the patrolmen, the witnesses, or the store

8  owner or anybody around there as a possible suspect or

9  suspect vehicle descriptions?

10   A.   Yes, we did.

11   Q.   And what evidence -- I'm sorry, what

12 information was broadcast out on the radio for that?

13   A.   The two witnesses that were Mariano Cervantes

14 and Kashif Butt who were at the car wash across the

15 street, or eyewitnesses in this case, gave a

16 description of two reddish-colored vans, large

17 full-sized vans that the -- that a male -- Hispanic

18 male suspect got into and a Hispanic female got into

19 the passenger side of the other van.

20        They told us that the -- they gave us a

21 very good description of the vans and also of the -- of

22 the male and the female that were out at the scene.

23   Q.   Was there only one female identified both of

24 the -- by both of the witnesses or two?

25   A.   Just one.  We knew that we had two --

22

1  obviously three suspects.  We had a driver of the

2  other van that the female got into the passenger side

3  of but we didn't know -- at that time, we didn't know

4  if it was another male or female.

5    Q.   Okay.  I don't think I asked this question

6  directly, but involved in the altercation out in the

7  parking lot, with the injuries to Pablo Castro, were

8  two or three people identified as actually doing the

9  injuries?

10   A.   Two.

11   Q.   And the third person you're saying was the

12 driver of one of the vans, correct?

13   A.   Yes, that's correct.

14   Q.   Okay.  And besides the general description of

15 Hispanic male and Hispanic female, did you also have

16 other things like height, weight, age, sex, race,

17 hair, all --

18   A.   Yes.

19   Q.   -- that stuff?

20   A.   Yes, we did.

21   Q.   Did the -- did the gentlemen give you a

22 fairly good description of the people?

23   A.   Yes.

24   Q.   And you said earlier that they were confident

25 they could describe them or identify them, correct?

23

1    A.   Yes, they -- they both seemed very confident.

2    Q.   Well, what's the next thing that happened

3  with those witnesses?

4    A.   Well, those witnesses were ultimately -- they

5  were transported back to the -- our -- our criminal

6  investigations division office for -- for statements

7  and for interviews, and ultimately that's -- that's

8  where they went.

9    Q.   And they give gave a final full-fledged, I

10 guess, statement to the officers --

11   A.   Yes, sir.

12   Q.   -- at the -- at the department, correct?

13   A.   That's correct.

14   Q.   Now, switching gears.  While you were at the

15 Times Market doing your investigation on -- I'm sorry,

16 you called it a capital murder, you knew it was a

17 capital murder.  Why did you think it was at that

18 time?

19   A.   Just per the preliminary information that I

20 got from the communication supervisor.  She indicated

21 it was a store clerk that had been robbed and

22 murdered, so that makes it a capital.

23   Q.   And what does robbery and murder equal in

24 Texas?

25   A.   Capital murder.

24

1    Q.   So while you're investigating this capital

2  murder investigation at the Times Market, did anything

3  else happen at a neighboring location that you thought

4  might be related to the incident that happened at 1902

5  Baldwin?

6    A.   Yes.

7    Q.   Can you tell the jury what that would have

8  been?

9    A.   Actually, by the time I got to the scene at

10 the Times Market, I -- the officers there were already

11 informing me that there had been, approximately ten

12 minutes after the assault on Pablo Castro was called

13 in, about ten minutes later an aggravated robbery was

14 called in at the Whataburger there at Staples and

15 Baldwin, which is a short distance from -- from the

16 Times Market.

17   Q.   How far away is that, would you guesstimate?

18   A.   Maybe two miles, three miles?  It's a guess.

19   Q.   Why did you think that was connected to this

20 -- or the officers think it was connected to this one

21 at Times Market?

22   A.   Well, the same description of the two

23 vehicles, the two large full-sized vans, red in color;

24 and we learned that one of vans had been left behind

25 there at the Whataburger at Staples and Baldwin.  It

25

1   matched the description of the -- of the vehicles that
2   were involved in this homicide.  They were close,
3   geographically, they were close in proximity to each
4   other, and the suspects were a male and a female,
5   Hispanic male and a female.  And so it -- it was -- it
6   was -- it seemed pretty simple to us, that there was a
7   relation there.
8       Q.   And besides the geographic proximity -- and
9   you said it was only about ten minutes later from the
10  first call?
11      A.   The calls that were -- yes, they were ten
12  minutes apart.
13      Q.   Was anybody hurt at the Whataburger?
14      A.   Yes, the victim in that case, April Metting,
15  reported that she had put her hand up to defend
16  herself, basically, from the Hispanic male who was
17  robbing her at knife point and she received a small
18  laceration on her finger from that.
19      Q.   Now, were you aware, or I guess based on your
20  experience as a homicide detective at this time, you
21  said you first went in there and thought Pablo Castro
22  had been beaten because of the, I guess, the radio
23  traffic, what you had heard from the dispatcher.  Did
24  you identify the body of -- I mean, observe the body
25  of Pablo Castro at the scene?

26

1       A.   Yes, I did.
2       Q.   And based on your experience and training,
3   did you think he had been beaten to death or what had
4   caused those wounds?
5       A.   No, as soon as we removed the sheet there was
6   no doubt in my mind he had been stabbed to death.
7       Q.   With what instrument?
8       A.   With a knife, it appeared to me.  The wounds
9   that I could see, and like I said, he was extremely
10  bloody, but it was apparent to me this was not a
11  beating.
12      Q.   So, the knife -- I'm sorry, at the -- at the
13  Whataburger you heard the call about from Staples
14  and -- at Baldwin, what instrument was used or item
15  was used in that robbery?
16      A.   A knife.
17      Q.   Now, did you go to that scene at that
18  Whataburger or did somebody else take care of that
19  scene?
20      A.   No.  Another detective went to that scene.
21      Q.   And that's -- I'm assuming, because you're
22  still at the 1902 Baldwin --
23      A.   Right, yes.
24      Q.   -- location, correct?  So you dispatch -- oh,
25  I'm sorry, I think you said that.  One of the officers

27

1   never made it to the 1902 Baldwin because you sent him
2   to the other place.
3       A.   Right.  Detective Stimmler I believe went to
4   that scene.
5       Q.   So that's the sequence of events.  So you
6   hear -- you know -- you're working this one scene and
7   then you hear about the Whataburger scene that
8   happened ten minutes later, you dispatched another
9   detective over there, what's the next thing that
10  happened?
11      A.   About seven minutes after that we got another
12  report of an aggravated robbery that occurred
13  involving a knife, a Hispanic male and Hispanic female
14  at the Whataburger at 510 Texan Trail, which is Texan
15  Trail and Alameda.  Once again, we're -- we had the
16  same description except now we only had one red van
17  because we had one red van that was still -- that as
18  left the scene at Staples and Baldwin.
19           So once again, we're -- you know, we are
20  very confident at this point that our suspects are still
21  moving and -- and still committing offenses.  So it was
22  shortly thereafter that we became in pursuit or
23  police officers came in pursuit of that vehicle.
24      Q.   Okay.  Before we go into that, I wanted to
25  ask you some follow-up questions at the other -- about

28

1   the other Whataburger.  Again, did the suspects'
2   vehicle description match the same description of the
3   vehicle or the vehicles that had been used in the
4   Times Market incident?
5       A.   Yes.
6       Q.   And did it also match the description of the
7   vehicle that was used in the first Whataburger
8   incident?
9       A.   Yes.
10      Q.   And the suspects' themselves description, did
11  that match, also?
12      A.   Yes.
13      Q.   Now, you mentioned earlier that Pablo Castro
14  had been stabbed, based on your experience and
15  training, with a knife?
16      A.   Yes.
17      Q.   Again, based on your experience and training,
18  is a knife considered -- could be a deadly weapon, in
19  that its manner and use is capable of causing serious
20  bodily injury or death?
21      A.   Yes.
22      Q.   And, for record, is 1902 Baldwin, is that
23  located in Nueces County, Texas?
24      A.   Yes, it is.
25      Q.   Where the Times Market store was.

29

1      A.   Yes.

2      Q.   Again, did you go to the Whataburger at the

3   Texan Trail thing or did you have another detective go

4   over there?

5      A.   No, I had another detective go there.

6      Q.   Now, you mentioned something about after that

7   Whataburger happened -- the second Whataburger robbery

8   occurred, you went to -- you heard about a pursuit

9   that took place.

10     A.   Yes.

11     Q.   Did you participate in the pursuit?

12     A.   No.

13     Q.   Did -- as the case officer, though, you are

14  aware of what happened at the pursuit, correct?

15     A.   Yes.

16     Q.   Were you aware or made aware, as a case

17  officer, that two people had been apprehended in the

18  area of Brewster Street by the Port area?

19     A.   Yes.

20     Q.   And who were -- had been apprehended?

21     A.   Christina Chavez and Angela Rodriguez.

22     Q.   Did anybody find the Defendant, John Henry

23  Ramirez, at that time?

24     A.   No.

25     Q.   Base -- and based on your time with this

30

1   investigation, what kind of efforts were made to

2   locate him that night?

3      A.   Really, unprecedented search in the City.  We

4   had our SWAT team, really every uniformed police

5   officer in Corpus Christi was looking for him.

6      Q.   I'm going to talk about that night and then

7   we'll talk about later on.

8      A.   Okay.

9      Q.   But let's talk about that night.  What --

10  what efforts were made to coordinate any possible

11  apprehension of the third suspect?

12     A.   Uh --

13     Q.   And, I'm sorry, before you say that, by that

14  time had you found -- or had him identified by one of

15  officers in the pursuit as the suspect?

16     A.   Uh, not at that -- not at that time, no.

17  We -- we had the helicopter -- we had a Coast Guard

18  helicopter looking; we had our SWAT Team out looking;

19  we had bloodhounds from the Beeville Corrections, the

20  prison there, they had brought their bloodhounds over,

21  we were searching for him with those dogs.  We had

22  just every available police officer in that area

23  searching, checking any kind of location.

24          This location was a very brushy area, kind

25  of over near Whataburger Field is now, but it

31

1   wasn't there then, and it was a very brushy, difficult

2   area to -- to search, but we searched all night long,

3   into the following day, and then the search obviously

4   continued much further after that, but --

5      Q.   So the police department searched all night

6   and into the following daytime, correct?

7      A.   Yes.

8      Q.   During that time of the search, were you able

9   to make an identification of who the third suspect

10  was?

11     A.   Yes.

12     Q.   How?  Or by who?

13     A.   Well, ultimately, the van that was left at

14  the Staples and -- and Baldwin restaurant, the

15  registration --

16     Q.   Well, I'm mostly asking about was anybody

17  able to identify the driver of the van during the

18  pursuit?

19     A.   During the pursuant -- later he was able to.

20     Q.   Okay.

21     A.   Later.

22     Q.   I know I'm getting fuzzy about what date and

23  what time it was --

24     A.   Okay.

25     Q.   -- but was an officer who was involved in the

32

1   pursuit able to identify the driver of the van he was

2   pursuing?

3      A.   Yes.

4      Q.   Who was that?

5      A.   That was Officer Jaime Gray, at the time.

6      Q.   And who, if anybody, did he identify as the

7   one driving the van during the dispute -- I mean,

8   during the pursuit?

9      A.   John Henry Ramirez, Jr.

10     Q.   Okay.  Is John Henry Ramirez, Jr. Present in

11  the courtroom today?

12     A.   Yes, he is.

13     Q.   Can you describe -- can you point to him and

14  describe something he's wearing?

15     A.   He's wearing kind of an orange-colored

16  long-sleeved shirt.

17          MR. SKURKA:  Your Honor, may the record

18  reflect the witness has identified the Defendant as

19  John Henry Ramirez, Jr.?

20          THE COURT:  It will so reflect.

21          MR. SKURKA:  Thank you.

22     Q.   (BY MR. SKURKA)  After this officer made the

23  I.D., you knew who you were looking for, correct?

24     A.   Well, the -- the identification -- the first

25  identification of John Henry Ramirez, Jr. Was not made

33

1  by that officer.
2      Q.   It was made by somebody else.
3      A.   Yes.
4      Q.   But once that officer made the
5  identification, did that identification go out to all
6  the people involved in the search?
7      A.   Oh, yes.
8      Q.   I guess what I'm trying to say, I always see
9  it on T.V., they all have like a picture or something,
10  they go look, or they have a general description.  Did
11  the officers all have that description --
12      A.   Uh --
13      Q.   -- or most of the officers have that
14  description?
15      A.   -- we didn't get the picture out that night,
16  um, but we had it out first thing in the morning.
17      Q.   But it was -- would it be fair to say,
18  though, you did have the general description provided
19  by the witnesses at the Times Market, correct?
20      A.   Yes, we did.
21      Q.   Looking all around that area of Brewster
22  Street and the Port area, was anybody ever able to
23  find him --
24      A.   No.
25      Q.   -- that night?

34

1      A.   No, sir.
2      Q.   Now, did you become aware, later, of a
3  witness who did see him that night -- earlier in
4  morning?
5      A.   Yes.
6      Q.   Who was that?
7      A.   That was Ruby Pena.
8      Q.   Would that be Ruby Pena or Ruby Garcia?
9      A.   Ruby Garcia, I'm sorry.  Ruby Garcia.
10      Q.   There's a lot of names in here.
11      A.   Yes, sir.
12      Q.   That's okay.  And how did you become aware of
13  Ruby Garcia?
14      A.   She -- I believe she called me the following
15  day.  I can't remember exactly how I came in contact
16  with her.
17      Q.   Were you able to obtain a statement and
18  interview Ruby Garcia?
19      A.   Yes, I went by and talked to her and she gave
20  me information that -- that John Henry Ramirez, Jr.
21  had come by that night while we were searching in the
22  Brewster area -- she lives off of York Street, which
23  is near Staples and -- and Texas Street, near that --
24  near that area -- but she said that he had -- he had
25  come to her door.

35

1      Q.   During that night of the chase or the --
2      A.   The night of the chase.
3      Q.   -- night of the pursuit?
4      A.   Yes, sir.
5      Q.   Did she know him from before?
6      A.   Yes.
7      Q.   And was she able to identify the person who
8  came to the door as John Henry Ramirez, Jr.?
9      A.   Yes.
10      Q.   So based on that, you were -- I guess you
11  became aware the next day that he apparently had
12  eluded the manhunt.
13      A.   Yes.  Somehow he did.
14      Q.   After that, after the fact -- I'm sorry, did
15  Ruby Garcia apprehend him or keep him there at her
16  house?
17      A.   No, she -- she was getting ready to have a
18  physical altercation with him and --
19      Q.   Why was she mad at him?
20      A.   Angela Rodriguez is her sister and she was
21  very angry for the situation I guess that Angela was
22  now in.
23      Q.   Did she help John Henry Ramirez at all?
24      A.   No.
25      Q.   That night, the next morning, did anybody in

36

1  Corpus Christi locate this Defendant you pointed out,
2  John Henry Ramirez?
3      A.   No, sir.
4      Q.   Tell us what efforts you made since -- the
5  police department -- since the night in question to
6  apprehend or find John Henry Ramirez.
7      A.   Basically for two years my task was to find
8  John Henry Ramirez, Jr.
9      Q.   What do you mean?
10      A.   When I -- when I was transferred to the
11  organized crime unit that was my responsibility,
12  number one, from the chief, to find John Henry
13  Ramirez.  That involved -- obviously, we asked for the
14  assistance from the F.B.I.  He was on Crime Stoppers,
15  relentlessly on T.V.  He was in the newspaper.  Anyone
16  -- anyone having any information regarding the
17  whereabouts of John Henry Ramirez, Jr. To contact me.
18          We formed a sort of task force with the
19  U.S. Marshals where we used a lot of their resources in
20  trying to track phone records.  I can't even tell you
21  how many hours of surveillance we conducted on his
22  family members around the time of John Henry's
23  birthday, around Mother's Day, any day -- any type of
24  significant day that we felt would be a day that John
25  Henry Ramirez, Jr. Might make an attempt to -- to see

37

1   his family.  It literally went on every day for about
2   two years.
3       Q.   You said something about phones.  What do you
4   mean, you did with -- something with the phones?
5       A.   Well, we -- we attempted to -- well, I'm
6   trying to think, here.  We set up a "trap and trace"
7   on his mother's phone.
8       Q.   Can you tell the folks what a "trap and
9   trace" means?
10      A.   Basically, we weren't able to monitor any
11  phone calls coming in or going out from his mother's
12  telephone.  And we felt if John Henry Ramirez was
13  going to make an attempt to get help or if he needed
14  money or if -- if he was going to make contact with
15  anyone it would -- I'm sorry, it would be with his
16  grandmother, not his mother, his grandmother.
17      Q.   So it was his grandmother's phone?
18      A.   His grandmother, yes, on his mother's side.
19      Q.   It would be his maternal grandmother.
20      A.   His maternal grandmother, thank you.
21      Q.   Now, is this -- a "trap and trace," is this
22  the kind you listen in on, like you hear taps on or is
23  this the one that just records what number's been
24  called or --
25      A.   This one is --

38

1       Q.   -- where it's coming from?
2       A.   Right, it -- it recorded -- we were not
3   listening to actual conversations.  We were simply
4   monitoring phone -- every phone call that came in,
5   what number it came from and every phone call that
6   went out, and who they were -- who that call was being
7   made to.  And we -- we tried to follow-up on every
8   single number that we could follow-up on.
9            We had other agencies in other cities
10  follow-up on phone numbers because we would have to
11  get a subpoena then to find out who the -- who the
12  phone number came back to.  It was a very -- really a
13  very long, tedious process.  And, you know, we tried
14  different ways of trying to spur activity, but --
15      Q.   So would it be fair to say that the search
16  was limited just to Corpus Christi?
17      A.   No, no, no.
18      Q.   Explain.
19      A.   After -- no, we -- obviously, we suspected
20  that he may have headed down towards -- down south
21  towards Mexico, so we had -- this information was
22  broadcast statewide.  We were able to get a segment of
23  this homicide and the information about John Henry
24  Ramirez, Jr., we were able to get that on America's
25  Most Wanted.

39

1            They broadcast that nationally.  It wasn't
2   a long segment, but it was -- it was broadcast on the
3   national program, which spurred a lot of -- all the
4   tips then came to me from America's Most Wanted.
5       Q.   For the record, what is America's Most
6   Wanted?
7       A.   It's a -- it's a national television show
8   that -- that basically they will showcase an offense
9   that occurs and a person that has eluded law
10  enforcement, they'll put their picture up on the -- on
11  the program and give a description of him, and, you
12  know, I believe a description of John Henry Ramirez'
13  tattoos were put on there so that if he had changed
14  his name, or anything like that, he would be
15  identifiable with some distinctive tattoos that he had
16  on his body.
17           It was a very -- very detailed
18  description.  We did -- that did generate quite a bit of
19  tips from all over the United States.
20      Q.   With any luck?
21      A.   No.
22      Q.   Did you trace -- track down all -- I'm sorry,
23  try to track down every tip that you received about
24  the whereabouts of John Henry Ramirez?
25      A.   Yes, we did.

40

1       Q.   And that was either locally or generated
2   nationally, correct?
3       A.   That's correct.
4       Q.   When was John Henry Ramirez apprehended
5   finally?
6       A.   He was apprehended on February 20th of this
7   year, 2008.
8       Q.   February 20th of 2008?
9       A.   Yes.
10      Q.   And what agency made that apprehension?
11      A.   The U. S. Marshal's Task Force apprehended
12  him.
13      Q.   What is the U. S. Marshal's Task Force, just
14  briefly.
15      A.   It's just a task force that had been working,
16  as well as on -- apprehending other -- other
17  criminals, they had been working on capturing John
18  Henry Ramirez, Jr.  They had -- they had worked with
19  us from the very beginning on this.
20      Q.   But would it be fair to say the U. S.
21  Marshal's Task Force is -- is -- their only purpose is
22  to go find wanted people?
23      A.   Exactly.
24      Q.   Because there are other duties U. S.
25  Marshal's have, like guarding the courthouse, or --

41

1  the federal courthouse, or escorting people, or doing
2  security at the courthouse, but this is a task force
3  just designed for the apprehension of felons, is it
4  not?
5      A.   That's correct.
6      Q.   And can you tell the jury approximately what
7  area on February 20th of 2008, Mr. Ramirez, the
8  Defendant in this case, was apprehended?
9      A.   He was apprehended near the Texas/Mexico
10 border.
11     Q.   By what town?
12     A.   Brownsville, I believe.
13     Q.   And, as you said it was February 20th, 2008.
14 How much time had passed from July 19th, 2004, to the
15 time this man was finally brought and apprehended?
16     A.   Almost four years, three-and-a-half years.
17     Q.   During your investigation, did you also have
18 opportunity -- and I'm going to backtrack, now, back
19 to the investigation of the two ladies that were
20 apprehended by Brewster Street.  You were the person
21 that was I believe helping the officer -- not officer,
22 the I.D. tech, Kirksey, collect their clothing after
23 they were apprehended; is that correct?
24     A.   Yes.
25     Q.   Okay.  That clothing has already been

42

1  admitted into evidence, but were you also present or
2  have a part in obtaining blood samples from Christina
3  Chavez and Angela Rodriguez?
4      A.   Yes, I did.
5          MR. SKURKA:  May I approach, Your Honor.
6          THE COURT:  Yes.
7      Q.   (BY MR. SKURKA)  Okay.  I show you what's
8  been marked for purposes of identification as 194.
9  Can you identify that?
10     A.   Yes.
11     Q.   What is it?
12     A.   It is an envelope containing the blood --
13 the tubes of blood from Angela Rodriguez and Christina
14 Chavez.
15     Q.   And you're the one that got that evidence?
16     A.   Yes, sir.
17     Q.   I'm going to ask you to open what's been
18 marked State's Exhibit 194.  And maybe open on the
19 other end where there's no seals so you don't disturb
20 any seals on there.
21     A.   (Witness complying.)
22     Q.   Do you recognize the contents of State's
23 Exhibit 194, please, and describe them for the jury.
24     A.   Yes, one is a plastic bag containing two
25 purple top tube bloods -- or two tubes of purple --

43

1  I'm sorry.
2      Q.   Start again.
3      A.   Two tubes of blood from Christina Chavez and
4  two tubes of blood from Angela Rodriguez.
5      Q.   And you were the one that witnessed that
6  blood being drawn from them?
7      A.   Yes, I did.
8          MR. SKURKA:  Your Honor, I tender
9  State's Exhibit No. 194, as a brown manilla envelope
10 containing two clear plastic envelopes of blood tubes.
11         Tender to Defense Counsel and offer them
12 in evidence.
13         MR. GARZA:  No objection, Your Honor.
14         THE COURT:  They're admitted.
15     Q.   (BY MR. SKURKA)  What did you do with these
16 after they were obtained?
17     A.   I took them over to D.P.S. for D.N.A.
18 analysis.
19     Q.   And was that for the purpose of having them
20 take D.N.A. samples from these items?
21     A.   Yes, sir.
22     Q.   And that way they would know where they came
23 from -- or who they came from, I'm sorry.
24     A.   Yes.
25     Q.   I show you the next exhibit, which is marked

44

1  195.  What is that?
2      A.   That is the two tubes of blood that were
3  taken from John Henry Ramirez, Jr.
4      Q.   Now, did you direct a detective to do that?
5      A.   Yes, I -- of course, I was no longer in this
6  division, so I directed Detective Garcia to have that
7  done after -- after John Henry Ramirez was apprehended
8  that night.
9      Q.   Is that the same Detective Garcia you
10 mentioned earlier that had helped you at the scene
11 that night?
12     A.   Yes.
13     Q.   And do you recognize his initials on the
14 package?
15     A.   Yes.
16     Q.   Could you open that package.
17     A.   Does it matter which end or --
18     Q.   Say again?
19     A.   Does it matter which end?
20     Q.   I don't know, just try not to disturb the
21 seals on there --
22     A.   Okay.
23     Q.   -- too much.  What does -- for the record,
24 State's Exhibit 195 is actually a manilla envelope and
25 you pulled out a clear plastic envelope from within

45

1    that, I guess, is similar to those other ones in 194.

2        A.   Yes.

3        Q.   What does that indicate it is, 195?

4        A.   Inside here?

5        Q.   Yes.

6        A.   Two tubes of the blood belonging to John

7    Henry Ramirez, that was removed from John Henry

8    Ramirez, Jr.

9        Q.   And that's the same person you've identified

10   previously in the courtroom?

11       A.   Yes.

12       Q.   And you know it's his because it has his name

13   and R. L. Garcia's name on it, too, correct?

14       A.   Yes.

15       Q.   Go ahead and put it back in there, and I'm

16   going to give it to Defense Counsel.  And was this

17   also submitted to the D.P.S. lab?

18       A.   Yes, it was.

19       Q.   And there's another person's name on here, I

20   believe, the evidence technician's name.  I'm sorry, I

21   shouldn't make you look from across the room.

22       A.   Yes, it looks like.

23       Q.   And the submission form on the back, who

24   submitted it to the lab?

25       A.   William Kirksey, one of our I.D. techs that

46

1    was out at the scene there.

2        Q.   So this does show it was taken to the lab,

3    correct?

4        A.   Yes.

5             MR. SKURKA:  I tender 195 to Defense

6    Counsel and offer into evidence.

7             MR. GARZA:  No objection, Your Honor.

8             THE COURT:  It's admitted.

9        Q.   (BY MR. SKURKA)  So that's what -- that last

10   item we introduced, 195, that's what would be called a

11   known sample of the Defendant, John Henry Ramirez,

12   correct?

13       A.   Yes.

14       Q.   Because they know where that blood came from.

15       A.   Yes, sir.

16       Q.   And those samples are necessary for the

17   D.N.A. people at the D.P.S. lab to do their analysis?

18       A.   Yes, sir.

19       Q.   And, in fact, in this case there was actually

20   four sets of blood that were given to the D.N.A. --

21   the D.N.A. people, correct?

22       A.   Yes, the victim.

23       Q.   Those three, plus the victim.

24       A.   Right.

25             MR. SKURKA:  Okay.  Hold on, Your Honor.

47

1             (Pause in proceedings.)

2             MR. SKURKA:  Thank you, Ms. Isaacks.

3    I pass the witness.

4             THE COURT:  Cross.

5             MR. GARZA:  Yes, Your Honor, if you

6    please.

7                  CROSS-EXAMINATION

8    BY MR. GARZA:

9        Q.   Detective Isaacks, basically, your testimony

10   is that on that evening you were on call, I guess, so

11   to speak, as the detective that was put in charge of

12   this investigation, correct?

13       A.   Yes.

14       Q.   And you had arrived at the scene after

15   everything had already happened, to gather

16   information?

17       A.   Yes.  Correct.

18       Q.   Okay.  And then, based on that information,

19   you started giving out tasks or directives to some of

20   the other police involved in the investigation that

21   evening --

22       A.   Yes, sir.

23       Q.   -- is that correct?  And then basically

24   followed up on everything as the investigation

25   continued.  Is that pretty much it?

48

1        A.   That's pretty much it.

2        Q.   Okay.  As well as this -- whatever physical

3    evidence you took charge of, whatever physical

4    evidence you turned over to D.P.S., that you were a

5    part of the chain of custody, so to speak, with regard

6    to maintaining some sort of custody of all this

7    evidence; is that correct?

8        A.   Right.  Well, the bulk of the physical

9    evidence that was out there and the vans that was

10   recovered, I did not --

11       Q.   You weren't involved in the gathering of

12   that, but that was somebody else's duties --

13       A.   Yes.

14       Q.   -- correct?

15       A.   Yes.

16       Q.   Okay.  And you weren't involved in the chase.

17   You didn't witness any part of that, didn't witness

18   anything going down at the Whataburgers or anything

19   like that either, correct?

20       A.   No.

21             MR. GARZA:  Okay.  Thank you.

22             I'll pass the witness.

23             THE COURT:  Anything else?

24             MR. SKURKA:  That's all the questions I

25   have, Judge.

49

1      THE COURT:  All right, you may stand
2  down.  Please don't discuss your testimony with anyone
3  while this trial's going on.
4      THE WITNESS:  Thank you.
5      THE COURT:  All right, call your next
6  witness.
7      MR. SKURKA:  Pam Smith.
8      THE COURT:  All right.  Pam Smith.
9      (Oath administered.)
10     THE COURT:  Be seated.
11     MR. SKURKA:  May I proceed, Your Honor.
12     THE COURT:  Yes.
13
14          PAMELA SMITH,
15  having been first duly sworn, testified as follows:
16          DIRECT EXAMINATION
17  BY MR. SKURKA:
18     Q.  Good morning.  Would you please introduce
19  yourself to the folks on the jury.
20     A.  My name is Pamela Smith.  I work for the
21  Texas Department of Public Safety in the Corpus
22  Christi Crime Laboratory.
23     Q.  How long have you been an employee of the
24  Department of Public Safety?
25     A.  For seven years.

50

1      Q.  What is your current occupation or role or
2  title with the Department of Public Safety?
3      A.  Currently, I'm the laboratory manager.
4      Q.  I know you're talking straight to the jury,
5  but you're getting away from the microphone a little
6  bit.  Would you push the microphone a little closer to
7  you.
8      A.  (Witness complying.)
9      Q.  Okay, thank you.  You're the laboratory
10 manager?
11     A.  Yes, sir.
12     Q.  I'm going to start off by talking to you
13 about your educational background and then I'm going
14 to switch to your work background, okay?  First, tell
15 the jury if you have a degree, and if so, where and
16 what schools did you attend?
17     A.  Yes, I have a Bachelor of Science in forensic
18 science from the University of Central Florida; and I
19 have a Master of Science in industrial chemistry, with
20 a focus on forensic D.N.A. analysis, also from the
21 University of Central Florida.
22     Q.  And when did you receive those degrees?
23     A.  I received my Bachelor's in 1978 and my
24 Master's degree in 2006.
25     Q.  And what's your Master's degree in, please?

51

1      A.  Industrial chemistry.
2      Q.  What does that mean?
3      A.  Well, this particular industrial chemistry
4  program focused on forensic D.N.A. analysis.
5      Q.  So you have a base -- I'm sorry, you have a
6  Bachelor's degree in forensic science; and then a
7  Master's degree in industrial chemistry, which really
8  focuses on D.N.A.
9      A.  Yes, sir.
10     Q.  Can you explain to the jury because I was an
11 English major, I don't know what forensic science
12 major means.  What does that mean?
13     A.  Well, forensic science is simply the
14 application of science to -- to the public arena or
15 the application of science, in this particular
16 instance, to the criminal justice system.
17     Q.  Now that we've talked about your background
18 and the fact you have a Bachelor's degree and Master's
19 degree, I want to start talking about your work
20 experience.  And I would like you start at the
21 beginning where you're first employed, moving up to
22 the jobs you've had and to your present job.
23     A.  Well, previously, I was employed by the
24 Florida Department of Law Enforcement and there I
25 completed a one-year training program in forensic

52

1  serology.  I later was employed by the Texas
2  Department of Public Safety.
3      Upon employment with them, I completed a
4  one-year training program in forensic serology in
5  D.N.A. analysis.  And I continued to participate in
6  continuing education on an annual basis.  That's a
7  requirement of my position.  I meet the educational
8  requirements as set forth for a Forensic D.N.A.
9  Examiner by the F.D.I., as their quality assurance
10 standards; and as a forensic scientist doing D.N.A.
11 analysis, I was proficiency tested about twice a
12 year.
13     Q.  Your work at the Florida Department of Law
14 Enforcement, is the department of law enforcement
15 similar to like the D.P.S. here in Texas?
16     A.  Yes, it is.  It's a state police
17 organization.
18     Q.  Just like D.P.S. is, correct?
19     A.  Yes, sir.
20     Q.  You said that you have a lot of -- working as
21 a technical leader and forensic scientist and
22 essentially your tenure with the D.P.S. has gone from
23 just a scientist to a supervisor to finally the lab
24 supervisor, correct?
25     A.  Yes, sir.

53

1    Q.   Tell the jury what your general duties were
2  when you first started with the D.P.S. lab and how
3  they've expanded into your present position.
4    A.   As a forensic scientist, I would receive
5  evidence into the laboratory.  I would examine the
6  evidence for the presence of hairs, fibers and
7  biological stains.  I make notations of the items that
8  may be of evidentiary value.  I would perform chemical
9  tests and write reports as to my results, and then
10  testify in court to my results.
11    Q.   When you -- as far as being, now, as the
12  laboratory manager, how many people do you supervise?
13    A.   13.
14    Q.   And how many of those are -- are D.N.A.
15  people or work with D.N.A.?
16    A.   5.
17    Q.   And what did the others do?
18    A.   Drug chemistry analysis, blood alcohol
19  analysis, and some technical support personnel.
20    Q.   Are one of the other people you supervise as
21  a D.N.A. scientist a person by the name of Robin Olson
22  Castro?
23    A.   Yes, sir.
24    Q.   Did she assist you in the production -- or
25  the -- the production of reports in this case?

54

1    A.   She performed some of the D.N.A. testing in
2  this case and issued a report.
3    Q.   And did you collaborate with her on some of
4  these reports?
5    A.   I --
6    Q.   Or a supervisor of her report, I'm sorry.
7    A.   She had a supervisor in between me, but I
8  have reviewed her work and reviewed her report.
9    Q.   And that's because that's -- as another part
10  of your duty, you did the first part of it and then
11  she did some of lab analysis, too, correct?
12    A.   That's correct.
13    Q.   Tell us about -- have you -- you seem to have
14  a lot of training in the area of D.N.A. analysis,
15  which I think you've already testified to.  Have you,
16  yourself, taught in the area of D.N.A. analysis?
17    A.   No, I have not.
18    Q.   Have you ever done any courses or other
19  training besides your educational background in
20  getting your Master's degree in the specific area of
21  D.N.A., either put on by D.P.S. or any other agency?
22    A.   Yes.  I receive regular training, up-dated
23  training on an annual basis in the field of D.N.A., as
24  a continuing education requirement.
25    Q.   Have you ever published or written any

55

1  articles about forensic serology or D.N.A.?
2    A.   Yes.  I published an article titled, Simplified
3  Low-Copy-Number DNA Analysis by Post-Pcr
4  Purification.
5    Q.   Whoa, that's a mouthful.  What is that about,
6  in layman's terms?
7    A.   Well, it's simply a technique to enhance the
8  sense of D.N.A. analysis.
9    Q.   P.C.R. is a different type of D.N.A. analysis
10  as one of the forms, correct?
11    A.   It's a form that is still in use today.
12    Q.   It's still used.  Have you also done any
13  presentations to any of your peers at any, like,
14  seminars, or so, in your field?
15    A.   Yes, I've presented my work at Human
16  Identification Conference, and also at the American
17  Academy of Forensic Science Conference.
18    Q.   You mentioned you wrote these articles.  What
19  -- this article.  Where is this article printed, is it
20  some kind of D.N.A. magazine or scientific magazine?
21    A.   It was published in the Journal of Forensic
22  Science in July of 2007.
23    Q.   What is the Journal of Forensic Science?
24    A.   The Journal of Forensic Science is put out by
25  the American Academy of Forensic Sciences.  It is the

56

1  premiere journal in forensic science in the United
2  States and much the country -- much of the world.
3    Q.   So it's not something we'd all read in the --
4  waiting for the doctor's office visits?
5    A.   No, sir.  You have to subscribe.
6    Q.   Okay.  Now, you said you've been published in
7  that article -- in that article in that -- in that
8  publication.  Have you also -- do you belong to any
9  professional organizations in your field?
10    A.   I'm a member of the Association of Forensic
11  D.N.A. Analysts and Administrators, and also a member
12  of the Southwestern Association of Forensic
13  Scientists.
14    Q.   And how long have you been members of those
15  organizations?
16    A.   Seven years.
17    Q.   Have you testified in courts before as an
18  expert witness in the area of D.N.A. or D.N.A.
19  comparisons?
20    A.   Yes, I have.
21    Q.   How many times?
22    A.   In excess of 20 -- in excess of between -- in
23  excess of 20.
24    Q.   Over 20 times?
25    A.   Yes.

57

1    Q.   And have you qualified as an expert test --
2   have you been qualified as an expert in this field in
3   the courts of Nueces County or any other counties?
4    A.   Yes, I have.
5    Q.   How many times?
6    A.   In excess of 20.
7    Q.   Now that we've talked about your background
8   and your qualifications, I want to switch gears and
9   now educate the jury a little bit about D.N.A.  First
10  of all, can you tell jury what D.N.A. is?
11   A.   Well, D.N.A. is the genetic material that you
12  inherit at conception.  You receive half from your
13  mother and half from your father.  D.N.A. is what
14  makes you unique to all other individuals.  It is
15  found in every cell of the body, with the exception of
16  mature red blood cells.  In blood we get D.N.A. from
17  the white cells.
18   Q.   What does -- does a person -- does a person
19  -- one person's D.N.A. different from another
20  person's?
21   A.   Yes.  Much of human D.N.A. is the same, as
22  you may have heard.  But I look specifically at
23  noncoding regions of the D.N.A. that are known to vary
24  greatly among individuals.
25   Q.   What about people that -- we had an expert

58

1   testify about fingerprints and no two fingerprints are
2   the same.  My next question to you is, do you have the
3   same thing in D.N.A.?  What about everybody have --
4   especially different D.N.A.?
5    A.   Well, D.N.A. is unique to each individual,
6   with one exception, and that is identical twins.
7   Identical twins do have the same D.N.A. profile.
8    Q.   And that's the only time?
9    A.   Yes.
10   Q.   What if they come from the same family, like,
11  you know, a mother and a daughter?  Wouldn't they have
12  the same D.N.A.?
13   A.   There would be similarities in their D.N.A.
14  profiles, but they would not have the same D.N.A.
15  profile.
16   Q.   In other words, it would match in some
17  places, but not match in other places on the D.N.A.
18  chain?
19   A.   Correct.
20   Q.   So is that how they can do paternity testing?
21  For example, you can tell a child came from this
22  mother or this father because of some of those
23  similarities?
24   A.   It's because they receive half their D.N.A.
25  from the mother and half the D.N.A. from the father.

59

1    Q.   Okay.  So that's where D.N.A. comes from,
2   it's genetic, it's inherited.
3    A.   Yes, it is.
4    Q.   But, again, the child wouldn't have the exact
5   same D.N.A. as the mother or father.
6    A.   Correct.
7    Q.   Does D.N.A. profile change over a person's
8   lifetime?
9    A.   No, it does not.
10   Q.   Why?
11   A.   Because your D.N.A. remains the same.
12   Q.   Because you were born with it and you die
13  with it, correct?
14   A.   That's correct.  It's in every cell of your
15  body and it cannot be changed.
16   Q.   The word D.N.A. profile, when I say D.N.A.
17  profile, can you explain to the jury what that means?
18   A.   Well, to obtain a D.N.A. profile, I look at
19  specific locations on the D.N.A. and I identify
20  different forms of D.N.A. that can occur at each
21  location.  Those forms are called, "alleles."  A
22  person has two alleles in each location, and those
23  alleles are identified by a number.
24       So if I can identify both alleles at all
25  the locations I examine, then I obtain a complete D.N.A.

60

1   profile.  Essentially, it looks like a list of
2   numbers.
3    Q.   And that profile is, again, inherent just to
4   that one person.
5    A.   Correct, with the exception of identical
6   twins.
7    Q.   With the exception of identical twins.  How
8   is the use of D.N.A. profile, how is that applied in a
9   forensic setting?
10   A.   Well, I receive a item of evidence that's
11  associated with a crime.  I perform presumptive tests
12  to look for biological stains, such as blood, semen
13  and saliva.  I then extract D.N.A. from the biological
14  stain to obtain a D.N.A. profile.  If I obtain a
15  D.N.A. profile from the evidentiary item, then I
16  compare that profile to the D.N.A. profile of known
17  individuals that were submitted to me to determine if
18  there's a match.
19       If there is a match then I perform a
20  statistical calculation to determine the significance
21  or weight of that match and I issue a report.
22   Q.   Well, let's talk about the first part and
23  then the second part you talked about.  You first
24  compare items to see if there's a match, and then you
25  compare a statistical report.  Let's start off with

61

1    the first part where you compare items.  What type of
2    items are submitted to you for comparison and what do
3    you compare them to?
4        A.    Well, it may be -- it would be any type of
5    evidentiary item.  It may be a swabbing taken from a
6    crime scene.  It could be clothing from a victim or a
7    suspect, any item that is collected at a crime or from
8    the victim or from a potential suspect that may be
9    associated with the crime that has taken place.
10       Q.    So it could be a physical object like a shoe,
11   a rag, a towel.
12       A.    Yes.
13       Q.    But it could also be a swabbing.
14       A.    That's correct.
15       Q.    Explain to the jury what a swabbing is.
16       A.    Well, a swabbing is literally a cotton swab,
17   much like a Q-tip swab that someone that is conducting
18   an investigation at the crime scene will collect the
19   evidence -- the stain that they see at the crime scene
20   onto the swab.  So I receive a cotton swab that may
21   have a -- it could have a bloodstain on it.  It could
22   have a semen stain on it.  It could have a saliva
23   stain on it.
24       Q.    Does it make any difference when you're
25   making your comparison whether you have the object

62

1    itself or a swabbing from it?
2        A.    No, it doesn't.
3        Q.    So a person, say for example, if there's a
4    bloodstain on my sock, you could either have the sock
5    or a swabbing from the sock and it would make no
6    difference in the scientific analysis.
7        A.    That's correct.
8        Q.    So a swabbing is just as good as the actual
9    item.
10       A.    Yes.
11       Q.    Is it -- and you mentioned something about
12   D.N.A., and you can get it from different things, and
13   you mentioned semen or blood.  Where is D.N.A. found
14   in the body?  And I'm not saying that right.  What
15   things can you extract D.N.A. from that people
16   produce?
17       A.    Well, I can extract D.N.A. from any cellular
18   material, but the cellular material that -- well, what
19   is most likely to leave a lot of cells from behind a
20   person is blood, semen or saliva.  In some cases where
21   something's been in contact with an individual's skin
22   repeatedly, skin cells can be rubbed off onto that
23   item.  We call those "epithelial cells."  And there
24   may be enough epithelial cells present for me to
25   obtain a D.N.A. profile on some items.

63

1        Q.    So would it be fair to say that, generally
2    speaking, you can extract D.N.A. from fluids, semen
3    blood and saliva?
4        A.    Correct.
5        Q.    And --
6        A.    And nasal secretions, I could add in there.
7        Q.    What secretions?
8        A.    Nasal secretions.
9        Q.    Nasal secretions, I'm sorry.  But, again, I'm
10   talking about basically fluids.
11       A.    Correct.
12       Q.    Okay.  But you said you can get stuff off
13   skin, and you called them epithelial skin cells.  How
14   does that work?
15       A.    As a person touches something or wears an
16   item of something and that rubs across the surface of
17   their skin, cells are sloughed off and can be
18   deposited on that item.  The amount of cells that are
19   deposited can vary greatly from item to item,
20   depending upon the individual wearer, the length of
21   time, when it may have been washed last.
22       Q.    Sounds like -- a little bit like
23   fingerprints, where fingerprints sometimes are left at
24   the scene and sometimes they're not, depending on
25   stuff.

64

1        A.    Yes.
2        Q.    So, I'm going to use my sock as an example.
3    If I took my sock off right now, there might be skin
4    cells coming off my foot that stayed with the sock.
5        A.    That's possible.
6        Q.    Okay.  So you can get it from any of these
7    sources, generally speaking.
8        A.    Yes.
9        Q.    Maybe not all the time, but these are the
10   places that -- things that are capable of coming from.
11   Okay.  So is it possible to take D.N.A. from
12   biological material found at a crime scene, then, and
13   compare it with D.N.A. from a blood sample, from a
14   suspect, and make a comparison of the two?
15       A.    Yes, it is.
16       Q.    How?
17       A.    Well, when I make the comparison, I determine
18   whether or not there's a match.  If there is not a
19   match, then I can say that that suspect is excluded
20   and could not have contributed the D.N.A. to this
21   stain.
22            If there is a match, then the suspect
23   could not be excluded and could have contributed the
24   D.N.A. that came from that stain.
25       Q.    Now, we mention -- I mentioned in my question

65

1  a second ago, "a known blood sample." What do I mean
2  by that?
3      A.   That is a blood sample that is taken directly
4  from an individual, I know who the source is.  It is
5  taken for comparison purposes so that I can determine
6  their D.N.A. profile and compare that D.N.A profile
7  from the D.N.A. profile I obtained from evidence.
8      Q.   So how -- how do you usually receive that
9  blood sample?
10     A.   It's submitted into the laboratory, much as
11 any other type of evidence.  It may be in a blood tube
12 container in a -- in a padded envelope.
13     Q.   But that's actually the fluid itself, the
14 blood itself in a -- in a vial?
15     A.   Oftentimes the blood is in a vial, sometimes
16 the blood's been taken from a vial and stained onto a
17 piece of paper that -- that is good for preserving
18 D.N.A.
19     Q.   Do you have to always have it in like a
20 liquid form in a vial or can you have it on this stain
21 that's put on another piece of paper or card?
22     A.   No.  The stain is absolutely fine.  When we
23 receive it in a liquid vial, we place it on a -- we
24 make a stain on a piece of this type of paper.
25     Q.   I just say that because you mentioned

66

1  something about preserving the evidence or preserving
2  things.  Again, is a vial of blood just as good as the
3  stain of the blood?
4      A.   Well, eventually, the vial of blood will --
5  will degrade because it's a liquid sample.  The stain,
6  once it's in placed on this paper and it dries, it can
7  be put in stored at room temperature for long periods
8  of time and the D.N.A. remains viable.
9      Q.   So when you get the blood vials, you say it's
10 your procedure at your lab to make a stain out of it,
11 anyway, so you don't have to worry about, I guess,
12 keeping it cold in the refrigerator or something like
13 that or else the blood would, what did you call it,
14 "Degrade"?
15     A.   Yes.
16     Q.   What does that mean?  How does blood degrade?
17     A.   It -- it breaks apart due to bacterial
18 growth, and that can break down the D.N.A.
19     Q.   Okay.  If that happened, you wouldn't be able
20 to preserve anything, correct?
21     A.   Correct.
22     Q.   Okay.  So that's why it's important to make a
23 stain, to keep it, make sure the blood doesn't
24 degrade.
25     A.   Yes.

67

1      Q.   Okay.  In my last question I asked you about
2  can you compare the thing and make a comparison of the
3  known blood sample with evidence you have.  What would
4  that comparison tell us?
5      A.   It would tell me whether or not the
6  individual was excluded as a contributor or could not
7  be excluded as a contributor.
8      Q.   So you can tell whether the blood or the
9  semen or saliva came from a person or not.
10     A.   Correct.
11     Q.   Is there a particular scientific method used
12 to obtain a D.N.A. profile from biological material?
13     A.   Yes.  I use a technique called "polymerase
14 chain reaction" or P.C.R., for short.
15     Q.   What is that?
16     A.   Well, P.C.R. is a process that mimics the
17 body's ability to make exact copies of D.N.A., as your
18 body does whenever you reproduce a cell.  It works
19 much like a Xerox machine makes exact copies of a
20 document.  P.C.R. allows me to look at certain
21 locations on the D.N.A. molecule and make exact copies
22 of those locations, turning a small sample into a
23 large enough sample for analysis.
24     Q.   When you do the P.C.R., you basically just
25 copy it, correct?

68

1      A.   Yes.
2      Q.   Okay.  And can you explain a little more
3  detail how that technique works?
4      A.   Well, it's fairly involved scientifically.
5  It replicates what your body does when it reproduces
6  D.N.A. as you grow.  You go through a process of
7  heating and cooling the D.N.A. in the presence of
8  certain molecules, primers and polymerases, and that
9  -- that mimics the copying process that takes place in
10 the body.
11     Q.   So is this something that's done like right
12 away, where you can go put a blood stain on there and
13 then do D.N.A. and it's ready in five minutes?
14     A.   No, it takes a period of time to do this.
15 There is an extraction process where the D.N.A. has to
16 be taken out of the stain, it has to be purified, and
17 then taken -- you have to determine how much D.N.A. is
18 present and then perform this P.C.R. process.
19     Q.   So about how long would it take to test for
20 D.N.A.?  The reason I ask you is on T.V. it happens in
21 30 minutes.
22     A.   Correct.
23     Q.   How does it really happen?
24     A.   Well, theoretically, if you just had one
25 sample and you were to take it through this process,

69

1  you could have results in two to three days.  However,
2  in the crime laboratory samples are batched, for
3  efficiency purposes, and from the beginning of
4  extracting D.N.A. to the time a report has been
5  reviewed and goes out, it could be a two-month period.
6      Q.   Do you trust -- test a person's entire D.N.A.?
7      A.   No.  I look at 16 specific locations on the
8  D.N.A. molecule.  As I mentioned, these locations vary
9  greatly from individual to individual, and I'm
10  identifying the forms of D.N.A. that can occur at each
11  of these locations.
12          And, also, as I mentioned, those forms are
13  called alleles.  The alleles are identified with a
14  number, say a 9, 12, 13, 14.  A person has 2 alleles
15  at each location.  If I examine the D.N.A. and I get 2
16  alleles at all 16 locations, then I have obtained a
17  full D.N.A. profile.
18      Q.   So you really only need to find 16 parts,
19  instead of the whole D.N.A. strain.  Is that fair to
20  say?
21      A.   Yes.
22      Q.   I'm trying to say it like a layman would say.
23      A.   Yes, that's --
24      Q.   I know you're -- I know you're laughing at me
25  because I'm not a scientist, but that's pretty much

70

1  what it is, right, just 16 locations?
2      A.   Yes.
3      Q.   Do you always obtain -- once you do that --
4  do that 16 thing, do you always obtain a full D.N.A.
5  profile?
6      A.   No.  Sometimes I only obtain a partial
7  profile, which means I dont' get results from all 16
8  locations.  That could be because of the small amount
9  of sample that I have to work with, or because the
10  D.N.A. has degraded.  Now, in some occasions I find
11  more than two alleles at a location, at some or all of
12  the location.  This indicates that it is a mixture and
13  that this D.N.A. -- that this stain contains D.N.A.
14  from two or more individuals.
15      Q.   But I thought you said a person only has one
16  D.N.A. to them?
17      A.   Yes.  But if I have D.N.A. from two different
18  people and they're combined together into one stain,
19  then that is indicated in the D.N.A. profile that I --
20  that I get.
21      Q.   So, how would that be possible?  How would
22  that happen?  Give us an example of how a mixture
23  could happen.
24      A.   Well, you have -- if the -- if the stain is
25  from blood, then you could have two persons that are

71

1  bleeding and each of them contribute to the blood
2  stain that -- that I test.  Someone may be bleeding
3  themselves, they may have blood from someone else on
4  their hand and touch something, you know, they've got
5  it on their hand and they touch something and the
6  mixture is there.
7      Q.   So, if -- again, we're going to use an
8  example, but we're not going to use my socks this
9  time.  If I touch a pen -- this pen, and I get sweat
10  on it, perspiration, or I put it in my mouth and get
11  saliva on it, and then somebody else picks it up and
12  skin cells come off on it, is that a way a mixture
13  could happen?
14      A.   Yes, correct.  I might very well find a
15  mixture when I determine D.N.A. -- the D.N.A. that's
16  present on that pen.
17      Q.   So that's all -- what does that mean, is just
18  basically two people may have come in contact with
19  that one item.
20      A.   Correct.  Two people have contributed to that
21  D.N.A. profile.
22      Q.   When you have a mixture, does that mean it's
23  always a 50/50 percent mixture?
24      A.   No.  It can vary greatly, and depending upon
25  how much D.N.A. is from one individual and how much is

72

1  from another.  Sometimes most of the D.N.A.s from one
2  individual and there's just a very little bit of
3  D.N.A. from the second individual.  Sometimes it is a
4  50/50 mixture.  It varies from stain to stain.
5      Q.   So when we say the word, "mixture," I just
6  want to make it clear, we're not talking it's always
7  half and half.  It could be 90 percent of one person's
8  D.N.A. and 10 percent of somebody else's.
9      A.   That's correct.
10      Q.   Okay.  Can you tell the jury why -- what the
11  procedure is with law enforcement agencies in this
12  area in working with the State-run D.P.S. labs and how
13  they test evidence for them, especially in the area of
14  D.N.A., how does that work?
15      A.   Well, if a law enforcement agency collects
16  evidence from a crime scene, they can bring it to our
17  laboratory for analysis.  We perform a free service.
18  They submit it into our laboratory, they fill out a
19  submission form, turn it into our laboratory and
20  request analysis on certain items.  It's assigned to
21  an examiner who then examines all the evidence,
22  looking for biological stains or anything that may be
23  of evidentiary value, goes through the process of
24  extracting D.N.A., obtaining D.N.A. profiles, and then
25  making comparisons to known profiles that the law

73

1    enforcement agency submits to us.

2        Q.   Do any of the local police departments, like

3    Corpus Christi Police Department, can they do D.N.A.

4    testing?

5        A.   No.  They do not have a D.N.A. unit.

6        Q.   And do you -- is your lab certified to do

7    D.N.A. testing?

8        A.   Yes, we are.  And I -- we are accredited by

9    the Association of Crime Lab Directors, and we are

10   also accredited by D.P.S. to perform D.N.A. analysis.

11       Q.   I may have used the wrong word, "certified,"

12   it's really accredited.

13       A.   That's correct.

14       Q.   Yours is an accredited facility and has been.

15       A.   Yes.

16       Q.   I want to direct your attention now to this

17   case and I want to ask you a couple of preliminary

18   questions.  First of all, how many reports were issued

19   in this case involving State of Texas versus John

20   Henry Ramirez?

21       A.   There are three reports and one amended

22   report.

23       Q.   Okay.  Were those reports either done by you

24   or the other lady, Robin Olson Castro?

25       A.   Yes, they were.

74

1        Q.   Can you tell us why another person did the

2    analyst -- analysis along with you or after you did

3    your initial one?

4        A.   I originally did this analysis in 2005.

5    Since that time I have left the bench as a D.N.A.

6    examiner and no longer participate in the proficiency

7    test cycle, therefore in 2007, a blood sample from

8    John Henry Ramirez was submitted to the laboratory,

9    and, at that time, I was not performing D.N.A.

10   examinations, so this was given to another examiner

11   to obtain a D.N.A. profile from him and compare that

12   profile to profiles that I had previously obtained in

13   2005.

14       Q.   Okay.  Let me back up on the date.  Are you

15   sure it was -- you got the one from him in 2007 or was

16   it 2008?

17       A.   Let me look.  I'm sorry, it was submitted in

18   March of 2008.

19       Q.   So, essentially, for the jury, you did some

20   blood testing in D.N.A. with the samples that you had

21   at the time, which would have been Pablo Castro, the

22   victim in this case; Angela Rodriguez, a suspect in

23   this case; and Christina Chavez, another suspect in

24   this case?

25       A.   Yes.

75

1        Q.   And you didn't -- were not able to do any

2    further testing on John Henry Ramirez back in 2005

3    because you did not have his blood sample.

4        A.   That's correct.

5        Q.   And your blood sample was received by your

6    lab this year, I think you said March?

7        A.   March.

8        Q.   Of 2008?

9        A.   Yes, March of 2008.

10       Q.   Is that when your lab received a blood sample

11   of the Defendant, John Henry Ramirez?

12       A.   Yes, it is.

13       Q.   Okay.  So, essentially, you did initial

14   reports with what you had at the time.  --

15       A.   Yes.

16       Q.   -- right?

17       A.   Yes.

18       Q.   And I'm talking about back in 2004.  But by

19   the time in 2008, you had already been bumped up and

20   you are now a supervisor, correct?

21       A.   That's correct.

22       Q.   And so you had one of your assistants do the

23   -- the rest of the testing once his known sample got

24   to your lab.

25       A.   Yes.

76

1        Q.   And I'm just trying to get the jury the

2    sequence of events.  And so based on that another lab

3    report was issued by Ms. Castro.

4        A.   Yes.

5        Q.   But you, again, supervised that and you have

6    her report and you've collaborated with her on those.

7        A.   Well, I have reviewed her work and reviewed

8    her report.

9        Q.   I keep saying, "collaborated."  I didn't mean

10   to say it that way.  But you're aware of her report

11   and the results she obtained.

12       A.   Yes, I am.

13       Q.   And did -- and in reviewing her reports, you

14   agree with them.

15       A.   Yes, I do.

16       Q.   Did I ask you before the trial, some time

17   ago, to come up with a chart or help us make a chart

18   of all the items that you've tested in this case?

19       A.   Yes.

20       Q.   In fact, offhand, there was probably 60, 70

21   or more items that were actually tested by the lab,

22   correct?

23       A.   I have to go back and count them, but there

24   were a large number of items, yes.

25       Q.   Did you -- did you and Ms. Castro assist me

77

1  by making a chart showing what items were tested and
2  what the results of those tests were?
3      A.   Yes, we did.
4      Q.   Are those charts -- would those charts help
5  aid the jury in recognizing the results of your
6  testing?
7      A.   Yes.
8          MR. SKURKA:  Your Honor, I tender State's
9  Exhibit 196 and -- well, first of all, I'll tender
10  them to defense -- to the witness.
11      Q.   (BY MR. SKURKA)  Do you recognize what's been
12  marked as 196 and 197?
13      A.   Yes.  This is a chart of the D.N.A. results
14  that Robin Castro and I prepared for you.
15      Q.   Okay.  Could you say the number of the
16  exhibit, please.
17      A.   It's Exhibit 19 -- State's Exhibit 197.
18      Q.   And what's 196?
19      A.   State's Exhibit 196 is a summary of the
20  serology results and D.N.A. results of all the items
21  that were tested.
22      Q.   Again, did you review that with Ms. Olson
23  Castro and agree with those, too?
24      A.   Yes, I did.
25          MR. SKURKA:  Okay.  Your Honor, I've

78

1  already previously given this to Defense, but I'll
2  show them what's marked as 196 and 197, and offer them
3  into evidence.
4          MR. GARZA:  No objection, Your Honor.
5          THE COURT:  They're admitted.
6      Q.   (BY MR. SKURKA)  For the record, I'm going to
7  show you 196 first.  Is that essentially a master list
8  of all the items that were tested, and 197 would be a
9  list of the ones that matches were obtained with
10  people involved in this case?
11      A.   That's correct.
12          MR. SKURKA:  Your Honor, this might be a
13  good time to take a break, because we still have --
14  I'm ready to go into the actual evidence.
15          THE COURT:  All right.  Let's take a few,
16  ladies and gentlemen.  All rise for the jury.
17          (Jury exits courtroom.)
18          (Short recess.)
19          THE COURT:  Have a seat, please.
20  Okay.  We're on the record.
21          MR. SKURKA:  Just briefly, Your Honor.
22          THE COURT:  Yes.
23          MR. SKURKA:  I introduced Exhibits No.
24  196 and 197 for the jury right before the break.
25          THE COURT:  Okay.

79

1          MR. SKURKA:  Those charts are so wide
2  they don't fit on the ELMO projector, so I took the
3  liberty of making 13 copies of what the exhibits were.
4  I've showed them to Mr. Garza.  I don't think there's
5  objection to it, but it might be easier for the jurors
6  to follow along with that --
7          THE COURT:  That's fine.
8          MR. SKURKA:  -- instead of having to keep
9  going back and forth on the ELMO.
10          THE COURT:  That's fine.
11          MR. SKURKA:  And I've laid them out there
12  for them.
13          THE COURT:  All right.  I'll -- I'll
14  explain that to the jurors.
15          MR. SKURKA:  Thank you, Judge.
16          THE COURT:  Anything else?
17          MR. SKURKA:  No, Your Honor.
18          MR. JONES:  So we need a legal size ELMO.
19          THE COURT:  I guess so.  All right.
20  Let's bring them in.
21          MR. SKURKA:  I am going to use the ELMO
22  in some places.
23          (Jury enters courtroom.)
24          THE COURT:  All right.  Be seated,
25  please.

80

1          All right, ladies and gentlemen, before
2  the break a couple of exhibits were introduced into
3  evidence.  On the bar, there, you have copies of those
4  exhibits.  Each one of you should get one of those.
5  They apparently don't fit neatly on the ELMO, so we've
6  given you copies so that you can follow the testimony.
7          All right.  You may proceed.
8          MR. SKURKA:  Thank you, Your Honor.  May
9  I approach?
10          THE COURT:  Yes.
11      Q.   (BY MR. SKURKA)  I show you what's now been
12  marked as State's Exhibit No. 198.  Can you identify
13  that?
14      A.   Yes.  State's Exhibit 198 is the copy of the
15  notes that I took as I examined each item of evidence,
16  other than the swabbings.  And it shows the stains
17  that were tested and where they were cut from.
18      Q.   For the record, State's Exhibit No. 198 is
19  actually one -- eight pages, correct?
20      A.   Yes.
21      Q.   And these are from your work notes or
22  sketches of the items that you tested, correct?
23      A.   That's correct.
24          MR. SKURKA:  I show Exhibit 198 to
25  Defense Counsel and offer them into evidence.

81

1        THE JUROR:  Can I ask a question.

2        THE COURT:  No.

3        MR. SKURKA:  The jury doesn't have this

4  copy.

5        THE JUROR:  Oh, okay.

6        THE COURT:  This is a different exhibit.

7        MR. JONES:  Okay.

8        MR. GARZA:  No objection, Your Honor.

9        THE COURT:  It's admitted.

10       MR. SKURKA:  Judge, just to clarify it

11  for the record and the jurors, State's 198 is not the

12  same thing they have in their hands.  These will fit

13  on the ELMO, so we can use that -- ELMO for that, but

14  these other charts aren't going to fit on there.

15    Q.  (BY MR. SKURKA)  Okay.  Ms. Smith, let's --

16  let's pick it up, and I'm going to show you those

17  other two exhibits, 196 and 197.  And so the jury will

18  know which one we're talking about, this diagram I'm

19  -- I'm sorry, that chart is what I've referred to as

20  the master list, correct?

21    A.  Yes.

22    Q.  And that shows, if you look at the last page,

23  there was some 62 items tested or looked at?

24    A.  Yes.

25    Q.  Now, did you find matches for D.N.A. purposes

82

1  on all those 62 items?

2    A.  No, only on some of them.  Only some of the

3  items were selected for D.N.A. testing.

4    Q.  Okay.  But that is the list of all the items

5  that were given you to look or observe and try to get

6  D.N.A. from.

7    A.  Yes, it is.

8    Q.  Okay.  Why -- I'm sorry, is the second list,

9  this chart, that looks more like a horizontal chart

10  than a vertical chart, that would be -- where it says

11  "D.N.A. Results," that's the one where the matches

12  were made, correct?

13    A.  Yes.  Those were the results for all the

14  items that I tested for D.N.A.

15    Q.  Okay.  Now, that we have that straight, I

16  want to show you, go back to 196, there's -- there's a

17  lot of items on there, but some of those items do not

18  have -- they say things like, "no testing done," or

19  "Trace amount not -- not tested."  I guess, what I'm

20  trying to ask is, did you try to get D.N.A. from each

21  and every one of those 62 items?

22    A.  No.  I selected a representative sample of

23  items from certain areas.  For example, numerous items

24  were submitted to me from a Ford van.  I selected a

25  representative sample of stains from the Ford van.

83

1  Some of my basis in selecting stains was the

2  concentration of the stain or how much stain was

3  present and the likelihood I felt that I would get a

4  D.N.A. profile.

5    Q.  What do you mean when you say,

6  "Representative sample," please?

7    A.  Well, it's not possible to test every single

8  stain that is at a crime scene.  D.N.A. testing is

9  involved, it's long, and it's a costly procedure.  So

10  I tested samples from various areas of the van, in

11  order to obtain the D.N.A. profiles.  If it was deemed

12  it was necessary to test -- do additional testing

13  later on, so -- just some of the testing failed, then

14  that option was used also.

15    Q.  Let's look at, say, for example, No. 1 on

16  that list.  It's identified as a "swab from the front

17  passenger side door panel of the Ford van."  It says,

18  "Apparent blood, but no D.N.A. evidence performed --

19  analysis performed."  Explain why not.

20    A.  Yes.  This was a very faint stain, and so,

21  instead I selected the swab from the passenger side

22  door handle, rather than the door panel.  It would be

23  in close proximity to one another.

24    Q.  Okay.

25    A.  And obtained a D.N.A. profile.

84

1    Q.  So, for example, if you're looking at items

2  one and two on this list, since you had them both from

3  the same area, you only tested one of them.

4    A.  That's correct.

5    Q.  That's not to say that wasn't John Henry

6  Ramirez' blood on there, that's just to say you didn't

7  test it.

8    A.  I didn't test it, so I can't tell you whose

9  blood it was.

10    Q.  Did you feel the need to test it or did you

11  think you had a representative sample?

12    A.  No, I felt that was a representative sample.

13    Q.  Looking at No. 3, for an example, "Swab from

14  the ignition switch of the Ford van," and it says,

15  although there was apparent blood, "No D.N.A. analysis

16  were performed."  Why not a D.N.A. analysis are

17  performed on that?

18    A.  Again, I selected a nearby location from the

19  steering wheel of the Ford van.

20    Q.  And, for the record, you're looking at No. 4.

21    A.  No. 4.

22    Q.  So you actually had two things, one from the

23  steering wheel and one from the ignition switch, but

24  you just tested one of them because of the proximity

25  of the stains to each other.

85

1    A.  Yes.

2    Q.  Is there a need, for example, if you had, oh,
3  my gosh, six stains from all parts of the steering
4  wheel, say, we're going around the signal -- the
5  steering wheel, do you need to test every stain on the
6  six different locations on the steering wheel?

7    A.  I would not typically test every stain.  I
8  would select some stains.  What I -- what I'm looking
9  to do is to, depending upon the circumstances,
10  associate a victim with the crime scene, a suspect
11  with the crime scene, or the crime scene with the
12  victim or the suspect, to interrelate those
13  participants in the crime.  And once I have done that,
14  then that element has been established.

15    Q.  Okay.  So, again, would it be necessary to
16  test all those things?

17    A.  No.

18    Q.  Earlier in the testimony we had somebody talk
19  about a pool of blood that was kind of a widespread
20  pool of blood at the scene.  And it was asked whether
21  they should -- need to examine every two inches of
22  that stain from the top of the stain to the side of
23  the stain to the -- each end of the stain.  Is that
24  necessary in something like that?

25    A.  No, sir.

86

1    Q.  So, if the I.D. tech was to testify that he
2  did not take a stain from each part of the blood
3  puddle, would that be wrong --

4    A.  No, it would not.

5    Q.  -- as he trained and your training in
6  the scientific community, to take a representative
7  sample?

8    A.  Yes.

9    Q.  Okay.  There was also testimony from an
10  identification technician that there was a shirt that
11  had blood spots all around the front of the shirt, and
12  his testimony was he didn't need to test all 35
13  bloodstains, he just obtained a representative sample.
14  Is he doing the right thing there?

15    A.  Yes.

16    Q.  So that's not unusual to have items submitted
17  to you that you don't test, ultimately.  --

18    A.  That's correct.

19    Q.  -- for a variety of reasons.  So looking at
20  these 62 items, you didn't -- you may not have tested
21  all those and you've listed in the charts what didn't
22  -- what you didn't test, correct?

23    A.  Yes.

24    Q.  Okay.  And you're giving us an explanation of
25  why they didn't -- why you didn't test it, correct?

87

1    A.  Yes.

2    Q.  Okay.  I'm going to switch from that list,
3  now, to what we call the D.N.A. testing, that's the
4  master list, and I want to switch to the second list,
5  if I could, please.  Now, your testimony -- and that's
6  State's Exhibit No. 197?

7    A.  Yes, 197.

8    Q.  Okay.  If everybody has their copy of that,
9  explain what the -- across the road -- I'm sorry
10  across the column, what that means.

11    A.  Well, the first column describes the item
12  number and a description of the evidence that was
13  submitted to me.  For example, in the very first row,
14  it says, "Item 2, apparent blood was detected on the
15  passenger door handle swab from the Ford van."  And
16  then a description of where it was taken, which is
17  actually repetitive, it was from the passenger side
18  door handle.  It was then collected by Bill Kirksey
19  and submitted to our laboratory on August 16th, of
20  200-- of August 16th of 2004, and it was submitted by
21  Bill Kirksey.  I then examined and performed the test
22  on that item of evidence.

23        Then the final column, it says, "D.N.A.
24  Results," describes the type of profile that I
25  obtained, which was a single source profile, which was

88

1  later found to be consistent with the D.N.A. profile
2  of John Henry Ramirez.

3        And then there's a probability statement.
4  This is the probability of randomly selecting an
5  individual out of the population that is unrelated who
6  could also be a contributor to this profile, and the
7  probability -- this is just one probability listed.
8  This probability is 1 in 17.79 quintillion, and --

9    Q.  Before we start talking about each thing in
10  the -- in the chart, tell us what you mean that you
11  had to do that statistical analysis to get those
12  numbers, and not just in that case, but how you do it
13  in D.N.A. testing.

14    A.  Correct.  Once I have a match, I can perform
15  a statistical analysis, calculating the frequency of
16  the profile with a population.  And that translates to
17  if I were to go out into a population and randomly
18  select someone that's not related to -- that's
19  unrelated, what is the probability that that person's
20  D.N.A. profile would also match the evidentiary
21  profile?  And you can see, particularly in this case,
22  the probability is very small that you would have a
23  match from someone else.

24    Q.  Okay.  Let's go back to the list again, the
25  master list.  Did you examine all the items on that

89

1  list marked State's Exhibit 197 and found matches on
2  just those items?
3      A.  (No response.)
4      Q.  I'm looking at 197.
5      A.  197, the D.N.A. chart.  Yes, I -- I examined
6  all of -- I performed testing on all of these items,
7  with the exception of some of the known blood samples
8  that were submitted.
9      Q.  I understand.  Let's go ahead and go down the
10 chart, please, now that it's admitted into evidence.
11 What is the No. 1 item on the chart?
12     A.  No. 1 is Item 2.  It's a blood swab from the
13 passenger door handle of the Ford van.
14             MR. SKURKA:  May I approach, Your Honor.
15             THE COURT:  Yes.
16     Q.  (BY MR. SKURKA) I'm going to show you what
17 we've set aside and has already been admitted into
18 evidence as State's Exhibit No. 159.  Can you identify
19 that?
20     A.  Yes, I can identify this by my case number
21 and my initials on the evidence.
22     Q.  Did you test State's Exhibit 197?
23     A.  I tested State's Exhibit 159.
24     Q.  I'm sorry, 159.  I'm getting the numbers
25 mixed up.  I apologize.

90

1      A.  Yes, I did.
2      Q.  And does that -- that item -- 159 correspond
3  to the No. 1 one on the list?
4      A.  Yes, it does.
5      Q.  Okay.  I think I've got your copy, and you've
6  got the -- I've got the one that's marked State's
7  Exhibit 197.
8      A.  This is mine.
9      Q.  Okay, that's yours?
10     A.  This is mine.  It was in my case file.
11     Q.  Okay.
12     A.  This is the State's exhibit.  You can use
13 that, if you would like to.
14     Q.  That's what I'd like to do because I'd like
15 for you to put the exhibit number that it went to.  If
16 you would write in the chart, on 197, what exhibit
17 number it was in that little box, just put SX-159.
18     A.  (Witness complying.)
19     Q.  So, looking at 159, which is identified as
20 that swab from the Ford van passenger side door
21 handle, whose blood was on that?
22     A.  The D.N.A. profile obtained from it was
23 consistent with the D.N.A. profile of John Henry
24 Ramirez.  The probability of selecting an unrelated
25 person at random who could also be a contributor of

91

1  this D.N.A. profile would be would be 1 in 17.79
2  quintillion among Caucasians, or 1 in 46.88 sextillion
3  among Blacks, or 1 in 20.41 quintillion among
4  Hispanics.  So based upon these probabilities, I could
5  say to a reasonable degree of scientific certainty
6  that John Henry Ramirez is the source of the stain on
7  this swab.
8      Q.  And why is that?  Because how many people are
9  on the Earth's surface?
10     A.  About six and a half billion.
11     Q.  And how much is a quintillion?
12     A.  It's a very large number.
13     Q.  It's over that, isn't it?
14     A.  It has a -- it has a -- quintillion has 15
15 place values behind the decimal.
16     Q.  So you can say with a reasonable scientific
17 certainty that John Henry Ramirez left the blood on
18 the door handle.
19     A.  Yes, sir.
20     Q.  Let's go to the next item.  No. 2 says it's
21 "apparent blood on the steering wheel of Ford van."
22 And I'm going to show you what's been marked as
23 State's Exhibit -- and introduced as State's Exhibit
24 157.  Can you identify that?
25     A.  Again, I can identify this by my case number

92

1  and initials.
2      Q.  Does 157 represent the swab from the steering
3  wheel of the Ford van?
4      A.  Yes, it does.
5      Q.  And, again, could you put the State's exhibit
6  number on that.
7      A.  Yes, sir.
8      Q.  What was the result of testing No. 2 to
9  "Apparent blood on steering wheel of the Ford van"?
10     A.  I obtained a mixture.  The minor component of
11 the mixture was consistent with Pablo Castro.  The
12 major component of the mixture was consistent with
13 John Henry Ramirez.
14     Q.  So would it be fair to say you found both the
15 victim, Pablo Castro's blood on there, and John Henry
16 Ramirez on that swab?
17     A.  On --
18     Q.  On the steering wheel van -- steering wheel
19 of the van.
20     A.  Yes, sir.  The probability of selecting
21 unrelated person at random who could have contributed
22 the minor component that was consistent with Pablo
23 Castro would be approximately 1 in 833 for Caucasians,
24 1 in 722 for Blacks, and 1 in 393 for Hispanics in a
25 world population -- I stand corrected, it's 6.3

93

1  billion. In the major component of the profile that
2  was consistent with John Henry Ramirez, again, I could
3  state to a reasonable degree of scientific certainty
4  that John Henry Ramirez is the source of the stain.
5      Q.  Okay. So we know now that the source of the
6  blood on the steering wheel of the Ford van was Pablo
7  -- was John Henry Ramirez.
8      A.  Yes, sir.
9      Q.  Okay. Let's go to the next one, which is
10  marked No. 3 in the list, and it's been identified as
11  "Stains A & B, apparent blood on Pablo Castro's
12  jeans." Did you test Pablo Castro's jeans?
13      A.  Yes, sir.
14      Q.  And I'm going to show you what's been marked
15  as State's Exhibit No. -- do you recognize that item
16  I've placed in front of you?
17      A.  Yes. Again, I recognize this by my case
18  number and initials.
19      Q.  What is it?
20      A.  106. It's State's Exhibit 106.
21      Q.  What is it?
22      A.  These are jeans from Pablo Castro.
23      Q.  Did you also have some sketches to show where
24  exactly the stains were located on the jeans?
25      A.  Yes, I do.

94

1      Q.  I'm going to show you what's been marked
2  State's Exhibit 198, up on the ELMO. There should be
3  a laser pointer up there. Show us, using the sketch,
4  where the bloodstains, if any, were found on there and
5  which are the ones you tested.
6      A.  Well, these are my sketchings of the stains
7  that were on the pants. I selected the stain, here,
8  Stain A, and tested it for D.N.A.; and I selected
9  Stain B down here, and tested it for D.N.A.
10      Q.  Where were -- where was all the bloodstains
11  on all those, how many places was it in?
12      A.  All of these have the appearance of blood
13  that you see marked on this -- on the pants.
14      Q.  So there's numerous where that shaded area is
15  there.
16      A.  Yes. In fact, this is pretty much
17  blood-soaked. In this area was spottings of blood.
18  I'm looking for staining by their size and shape that
19  may be from someone other than the victim. Typically,
20  blood on the victim's clothing is from the victim.
21      Q.  So of all these other bloodstains you just
22  took two representative samples, here and here --
23      A.  Right.
24      Q.  -- correct? And can you tell the jury what
25  the results of that sample was?

95

1      A.  The D.N.A. profile obtained was a single
2  source profile consistent with Pablo Castro from both
3  Stains A and B.
4      Q.  So, again, to a scientific certainty, Pablo
5  Castro's blood are the ones that's on those jeans.
6      A.  Yes. In this instance, the statistics for
7  each population group are such that I could state to a
8  reasonable scientific certainty those stains are from
9  Pablo Castro.
10      Q.  Thank you. Let's go down to the next list.
11  And this one, I think there's about -- the next three,
12  which is on the list as 4, 5 and 6. I'm going to show
13  you an item that's already been admitted as State's
14  Exhibit 148. Can you look at that and examine it and
15  see if you recognize that.
16      A.  Yes. Again, I recognize it by my case number
17  and initials.
18      Q.  What is it?
19      A.  It is a T-shirt found inside the Ford van.
20      Q.  Okay. And can you open -- can you hold it up
21  and display it for the jury, please.
22      A.  (Witness complying.)
23      Q.  Is that the same shirt you tested?
24      A.  Yes.
25      Q.  And can you show us where you took the

96

1  samples from.
2      A.  I cut a blood stain from here, marked Stain
3  A, and a blood stain from here marked Stain B. I also
4  took cuttings from the collar in an attempt to find
5  epithelial cells, Stain C and Stain D.
6      Q.  So two of the items you were looking for
7  blood, and two you were looking for epithelial cells.
8      A.  Yes.
9      Q.  Let's go to the sketch now as part of State's
10  Exhibit 198. Is that a sketch of the same shirt that
11  you did in your work?
12      A.  Yes, it is.
13      Q.  Okay. Using the laser pointer, can you show
14  us where the bloodstains were and where you took the
15  sketch -- the cuttings or samples.
16      A.  I collected a sample here, marked Stain A,
17  and a sample here, marked Stain B, and then cut from
18  the neckline, Stain C and Stain D.
19      Q.  Would it be fair to say there was more
20  bloodstains than just the two that you tested here?
21      A.  Yes. Those are sketches of other areas that
22  have the appearance of blood.
23      Q.  Okay. Did you test all those?
24      A.  No, I did not.
25      Q.  Did you need to test all those?

97

1    A.   No, I did not.

2    Q.   Did you feel that this was a representative

3    sample of the bloodstains from that area?

4    A.   Yes, sir.

5    Q.   Why do you look at the neckline for

6    epithelial cells?

7    A.   This T-shirt was found inside the van, so I

8    looked at the neckline because it was relatively free

9    of bloodstains, and that's an area that tends to rub

10   against the body.  I'm looking to possibly identify

11   who may have worn the T-shirt.

12   Q.   So a collar of the shirt, for example, would

13   rub against the skin, causing some of those epithelial

14   cells to rub off?

15   A.   It can, yes.

16   Q.   Okay.  Now that you've looked at that exhibit

17   and tested it, what were the results of your stain

18   analysis or the epithelial analysis on that exhibit?

19   A.   The D.N.A. profile obtained from Stains A --

20   from Stains A and Stain B were consistent with the

21   D.N.A. profile of Pablo Castro.

22   Q.   Let's take that one at a time.  I'm sorry, go

23   ahead, were you just going to tell them the

24   probability?

25   A.   Yes.  I can say to a reasonable degree of

98

1    scientific certainty that Pablo Castro is the source

2    of Stain A and Stains B.

3    Q.   So, for the record, the white T-shirt that

4    was located inside the white (sic) van, that blood

5    here on the front of the shirt belonged to Pablo

6    Castro -- came from Pablo Castro.

7    A.   Stains A and B came from Pablo Castro,

8    excluding that he --

9    Q.   Red van.

10   A.   -- has an identical twin.

11   Q.   I meant to say red van, instead of white --

12   white van.  Okay, so those came from Pablo Castro.

13   What about the results of the epithelial cells from

14   the neckline?

15   A.   I tested Stain C and obtained a mixture that

16   was consistent with John Henry Ramirez, Angela

17   Rodriguez, and Pablo Castro.  And then I have

18   probabilities for those mixtures.

19   Q.   Tell us what those are, please.

20   A.   The stains -- what was consistent with John

21   Henry Ramirez, he could not be excluded, the

22   probability of selecting a unrelated person at random

23   who could also be a contributor to Stain C on this

24   item is approximately 1 in 7.199 billion for

25   Caucasians, 1 in 244.2 billion for Blacks, and 1 in

99

1    1.638 billion for Hispanics.

2    Q.   So what does -- who -- you said this was a

3    mixture.  So it is simply a mixture of John Henry

4    Ramirez, Angela Rodriguez and Pablo Castro's.

5    A.   Correct.

6    Q.   How can we have three people mixed in the

7    same place?

8    A.   Well, there are cells present on that collar

9    from three individuals.

10   Q.   And, just for record to be clear, those

11   aren't bloodstains.

12   A.   I -- there was no visible bloodstain there.

13   Q.   But you got -- what I meant was the D.N.A.

14   was obtained from the skin cells, not the blood.

15   A.   When I don't see blood, it's logical to

16   assume that it comes from skin cells.

17   Q.   Okay.  And all three peoples' skin cells were

18   on that shirt.

19   A.   I mean, there is a possibility of there being

20   some blood in a minute amount that could not be

21   detected.

22   Q.   Okay.

23   A.   I'm -- I'm sorry, but -- and that could be --

24   it could be contamination from one stain over to

25   another.  And I have the statistical probabilities for

100

1    the matches to Angela Rodriguez and Pablo Castro.

2    Q.   I -- I think those are probably already shown

3    in the charts.  I just want to verify that all of

4    three of them's skin cells were on Stain C.

5    A.   Correct.

6    Q.   And Stain D, what did that show?  And I'm at

7    the top of the second page, would be No. 6.

8    A.   Stain D was consistent with a mixture from

9    Angela Rodriguez and John Henry Ramirez.

10   Q.   So on that stain -- which one is D, up there?

11   This is D.?

12   A.   Yes.

13   Q.   So on that section of the cutting you took,

14   it consists of Angela Rodriguez and John Henry

15   Ramirez'?

16   A.   Correct.

17   Q.   Okay.  Let's go to the next item, which is

18   marked No. 7, and if I could approach and show you the

19   next item, and I'll give you the number, would be

20   State's Exhibit No. 153 and 162.  That would be --

21   153, identified as the Visa card itself, and 162 has

22   been identified as the blood sample or swab from the

23   Visa card.

24          Now, for the record, did you test the card

25   or the swab?

101

1    A.   I test the swab.

2    Q.   Okay.  But the swab came from the Visa card.

3    A.   Yes, it was identified to me as coming from

4    the Visa card.

5    Q.   What was the results of the testing of the

6    blood -- apparent blood on the Visa card that said

7    Gilbert Lopez, Jr. On it?

8    A.   I obtained a partial D.N.A. profile that was

9    consistent with John Henry Ramirez.

10   Q.   Was there a high probability of it's his

11   blood?

12   A.   The probability of selecting unrelated person

13   at random who could be a source of this profile is 1

14   in 243.6 billion for Caucasians, 1 in 17.36 trillion

15   for Blacks, and 1 in 496.8 billion for Hispanics.

16   Q.   So with a reasonable degree of scientific

17   certainty, did -- who left the blood on that Visa

18   card?

19   A.   Well, I'm not able to make that statement on

20   a partial profile.  I just have to leave it with the

21   probability that you have.  That's the probability of

22   going out into the population randomly selecting an

23   individual that their profile would also match this.

24   Q.   That's the difference of having a full

25   profile and a partial profile.

102

1    A.   Yes, sir.

2    Q.   Okay.  But that is -- it would be fair to say

3    that is a high probability; is it not?

4    A.   Yes, sir.

5    Q.   Let's go to the next one.  I'm going to show

6    you State's Exhibit No. 163 and State's Exhibit No. --

7    where is the number?  Oh, it's on the bottom.  I'm

8    sorry.  On the bottom itself, 150 and 163.

9    A.   I have 163 for this.

10   Q.   This is 162.

11   A.   153.

12   Q.   153.  Okay.  The next item I was showing you

13   is 163 and 150.  And those have been identified -- 163

14   has been identified as a swab taken from this vodka

15   bottle.  I know you didn't look at the bottle itself,

16   you looked at the swab, correct?

17   A.   Yes.

18   Q.   Tell the jury what the results of testing the

19   swab on the vodka bottle would be.

20   A.   I obtained a single source profile that was

21   consistent with Pablo Castro.  So I could state to a

22   reasonable degree of scientific certainty Pablo Castro

23   is the source of the stain, excluding an identical

24   twin.

25   Q.   So the blood found on that bottle came from

103

1    Pablo Castro?

2    A.   Yes, sir.

3    Q.   The next item were some -- I'm looking at No.

4    9 on the list, is apparent blood on pizza receipts.

5    I'm going to show you what's been marked as 161 and

6    160.  Those have been identified to the jury as coming

7    from the pizza receipts found in Item 152.  Did you test

8    the pizza receipts in this case?

9    A.   This is a separate receipt.

10   Q.   I know, 160 and 161.  Which one did you test,

11   do you recall?

12   A.   I repeated State's Exhibit 160.

13   Q.   Okay.  What was the result of your analysis

14   on the pizza receipt?

15   A.   It was apparent blood and I obtained a

16   partial mixture D.N.A. profile consistent with Angela

17   Rodriguez and Pablo Castro.

18   Q.   So, again, the -- the partial mixture means

19   that there was blood coming from Angela Rodriguez and

20   Pablo Castro there.

21   A.   Consistent with Angela Rodriguez and Pablo

22   Castro.

23   Q.   Angela Rodriguez and Pablo Castro.  So we

24   have two people on that.

25   A.   Correct.  And the probability of randomly

104

1    selecting a person who would match the profile

2    consistent with Angela Rodriguez is 1 in 545.6 billion

3    for Caucasians, 1 in 474.8 trillion for Blacks, and 1

4    in 13.13 billion for Hispanics.  And then, likewise,

5    for Pablo Castro, the probability of a random person

6    matching this profile is 1 in 421.2 million for

7    Caucasians, 1 in 17.12 billion for Blacks, and 1 in

8    154.1 million for Hispanics.

9    Q.   But the bottom line is the blood on the pizza

10   receipt looks like it came from Angela Rodriguez and

11   Pablo Castro?

12   A.   That's correct.

13   Q.   The next item is "apparent blood on an

14   armrest swab from the Dodge van."  And I show you

15   what's been marked as State's Exhibit 165.  Did you

16   test the swab contained in 165 from the armrest of the

17   Dodge van?

18   A.   Yes, I did.

19   Q.   With what results?

20   A.   There was apparent blood with a profile that

21   was consistent with Pablo Castro.  Again, I could

22   state to a reasonable degree of scientific certainty

23   Pablo Castro is the source of this stain.

24   Q.   So you can explain -- you can tell the jury

25   that Pablo Castro's blood was on the armrest of the

105

1 Dodge van?

2    A. That's correct.

3    Q. And the next item is dollar bills. And I'm

4 on the top of page 3. Did you test some dollar bills

5 in this case?

6    A. Yes, sir.

7    Q. I show you what's been marked as State's

8 Exhibit No. 167, which is -- was reported to be a swab

9 taken from Item No. 151, the dollar bills. Do you

10 recognize that swab?

11    A. Yes, I do.

12    Q. What is it? I'm sorry, I think I've already

13 explained what it is. Let just ask you what the

14 results of your testing was.

15    A. It was a swabbing of an apparent bloodstain

16 on a dollar bill in the Ford van. I obtained a

17 mixture of Pablo -- that was -- the major component of

18 the mixture was consistent with Pablo Castro, and

19 therefore, I could state to a reasonable degree of

20 scientific certainty the stain originated from Pablo

21 Castro.

22    Q. So we know Pablo Castro's blood was on that

23 dollar bill found under the Dickies pants in the Ford

24 van.

25    A. Yes, sir.

106

1    Q. The next item is No. 12 on the list, which is

2 the "apparent blood on gearshift from the Ford van."

3 Did you take a swabbing -- or test a swabbing from the

4 gearshift lever on the swab on the Ford van?

5    A. Yes, I did.

6    Q. And, again, the -- the gearshift lever has

7 been identified as State's Exhibit 155, but I'll show

8 you the exhibit of the swab, which is 166. You have

9 that?

10    A. Yes.

11    Q. Whose blood was found on the gearshift lever

12 of the Ford van?

13    A. I obtained a profile consistent with Pablo

14 Castro, and I could state to reasonable degree of

15 scientific certainty he is the source of the stain.

16    Q. So Pablo Castro's blood was found on the

17 gearshift lever.

18    A. Yes, sir.

19    Q. The next item is reported to be a Bic lighter

20 found in the Ford van. Did you test a swab or the Bic

21 lighter itself in that case?

22    A. Yes, sir. I tested the swab.

23    Q. Okay. And, for the record, the Bic lighter

24 has already been introduced as State's Exhibit No.

25 156, and 164 would be the swab taken from the

107

1 gearshift lever. Did you test that swab from the Bic

2 lighter?

3    A. Yes, I did. It was an apparent --

4    Q. With what results?

5    A. It was an apparent bloodstain consistent with

6 John Henry Ramirez, and I could state to a reasonable

7 degree of scientific certainty that John Henry Ramirez

8 is the source of this blood stain, excluding an

9 identical twin.

10    Q. So your testimony would be that John Henry

11 Ramirez left the blood on that Bic lighter.

12    A. Yes, sir.

13    Q. How about the next one where it said,

14 "Apparent blood on cloth steering wheel cover," what

15 were the results on that?

16    A. I did not obtain a D.N.A. profile that was

17 interpretable.

18    Q. Explain to the jury when that means.

19    A. Either the quality or quantity of the data

20 was such that I could not make a comparison.

21    Q. There just wasn't enough to test or it was

22 too degraded to test?

23    A. I -- in my opinion, it was too degraded to

24 test.

25    Q. Is that unusual for blood?

108

1    A. It does happen.

2    Q. Okay. Let's go to the next thing which

3 is "apparent blood from envelope swab from the parking

4 lot." I believe that would be swab No. -- State's

5 Exhibit No. 108. 108. Did you test the swab in

6 State's Exhibit No. 108 that's coming from the

7 envelope from the parking lot containing -- envelope

8 containing a pay stub from the parking lot?

9    A. Yes, I did. There was apparent blood. The

10 D.N.A. profile was consistent with that of Pablo

11 Castro, and I could state to a reasonable degree of

12 scientific certainty Pablo Castro is the source of

13 this stain.

14    Q. So that was Pablo Castro's blood on the pay

15 stub and envelope.

16    A. Yes, sir.

17    Q. The next page, and I'm looking at the top of

18 page 4, did you then test a "swab from the Ford van

19 front passenger side door pocket"?

20    A. Yes, I did.

21    Q. That has been admitted -- that swab has been

22 admitted in evidence as State's Exhibit 158. And

23 going across the chart, what was the results of your

24 analysis of the blood on the Ford van front passenger

25 side door pocket?

109

1    A.    It was an apparent blood stain.  The D.N.A.
2  profile was consistent with John Henry Ramirez, and I
3  could state to a reasonable degree of scientific
4  certainty that John Henry Ramirez is the source of
5  this stain, excluding an identical twin.
6    Q.    So the Defendant in this case, John Henry
7  Ramirez, left the blood on the front door pocket?
8    A.    Yes, sir.
9    Q.    The next item has several things.  I'm
10  looking -- I'm sorry, yeah, on Item 58-F that you've
11  labeled in your chart, that is "Christina Chavez'
12  white tank top."  And ask you to open this up, please.
13    A.    It is packaged well.
14    Q.    We know, we've spent a day yesterday
15  unpackaging a lot of stuff.  If you could display that
16  item to the jury, please, and tell us if you tested
17  that item.
18    A.    This is the item.
19    Q.    Identified as Christina Chavez' undershirt or
20  muscle shirt?
21    A.    That's correct.  I tested several stains and
22  I cut stains from here, Stain A, Stain B and Stain C
23  from the back of the T-shirt.
24    Q.    How about the front?  Can you show us the
25  front of the T-shirt?

110

1    A.    The front of the T-shirt shows areas that I
2  tested for the presence of blood.  I did not cut
3  stains from the front of the shirt.
4    Q.    I'm going to show you that diagram that was
5  introduced in evidence, 198.  I say, "diagram," it's
6  really a sketch, I suppose.  Using a laser pointer,
7  where is the front of the shirt in that picture?
8    A.    This is the front of the shirt.
9    Q.    And can you show us where you saw
10  bloodstains, first, and then show us the bloodstains
11  that you tested.
12    A.    Well, there are some weak staining here that
13  I did some testing on that was positive for apparent
14  blood, but the stains are very small and faint.  This
15  is the back of the shirt.  On the back of the shirt we
16  have Stain A, Stain B and Stain C that I also tested
17  for the presence of blood, and I cut these stains for
18  possible D.N.A. analysis.
19    Q.    Why didn't you test or cut out samples from
20  the front of the shirt?
21    A.    The stains were very small and the size of
22  the stain didn't lend them well for D.N.A. testing.
23    Q.    So you just decided to do the ones on the
24  back.  Did you figure that was a representative
25  sample?

111

1    A.    Yes, sir.
2    Q.    What were the results of testing the stains
3  on Christina Chavez' T-shirt or tank top?
4    A.    From Stain A, this stain, I obtained a
5  mixture.  The major component of that mixture was
6  consistent with Pablo Castro, to the extent that I
7  could say to a reasonable degree of scientific
8  certainty Pablo Castro is the source of Stain A.
9    Q.    So that's Pablo Castro's blood on the back of
10  Christina Chavez' shirt?
11    A.    Yes, sir.
12    Q.    And the other stain, Stain C?
13    A.    I tested Stain C, an apparent bloodstain, and
14  obtained a D.N.A. profile consistent with John Henry
15  Ramirez.  I could state to a reasonable degree of
16  scientific certainty John Henry Ramirez is the source
17  of Stain C on the T-shirt.
18    Q.    So your testimony would be John Henry
19  Ramirez, the Defendant in this case, left his blood on
20  the back of Christina's tank top.
21    A.    Yes, sir.
22    Q.    The next clothing item I have to show has
23  been introduced as the shorts worn by the other
24  Co-Defendant in this case, Angela Rodriguez.  And I'm
25  going to ask you to go ahead and open that up and tell

112

1  us if you tested that.
2    A.    I did not get the State's exhibit number from
3  the T-shirt written down.
4         MR. SKURKA:  What's the number for that.
5         It's on the other bag.  Let me get it for
6  you.
7         Would that be 199, Mary?
8         COURT REPORTER:  No, I don't -- the next
9  number, or what.
10         MR. SKURKA:  The one that says Angela
11  Rodriguez' clothes.
12         THE WITNESS:  Christina Chavez, the
13  T-shirt.
14         MR. SKURKA:  I'm sorry, Christina Chavez.
15         (Pause in proceedings.)
16         MR. SKURKA:  191.  Thank you, Mary.
17         COURT REPORTER:  You're welcome.
18    Q.    (BY MR. SKURKA)  Okay.  Now, we're going to
19  the one that's been marked as Angela Rodriguez'
20  shorts, and its number is --
21         MR. SKURKA:  I think that would be -- is
22  that 190, Mary?
23         COURT REPORTER:  On 190, I have "Clothes
24  of Angela Rodriguez."
25         MR. SKURKA:  That's 190, then.

113

1                    (Witness opening package.)
2        Q.   (BY MR. SKURKA) Okay.  Now that you've held
3    them up to the jury, can you describe them and where
4    the stains were that you found on those shorts.
5        A.    These are the blue jean shorts from Angela
6    Rodriguez.  I've tested various stains for the
7    presence of blood and selected cuttings from Stain A,
8    Stain B and from the back of the shorts, Stain C.
9        Q.    Okay.  We've put the sketch up there behind
10   you.  And using the laser pointer, can you show us
11   where the stains were and where you took the cuttings
12   from, please.
13       A.    From the front of the shorts, Stain A; I took
14   a cutting of Stain B; and a cutting of Stain C; and
15   Stains A and B were tested for D.N.A.
16       Q.    Were there more stains, though, besides just
17   the ones you tested, correct?
18       A.    Yes, sir.
19       Q.    Again, did you take a representative sample
20   from those shorts, instead of testing every stain on
21   the shorts?
22       A.    Yes, sir.
23       Q.    Tell the jury what the results of your blood
24   testing was, your D.N.A. testing, on the shorts worn
25   by Angela Rodriguez.

114

1        A.    The D.N.A. profile I obtained from Stain A
2    was consistent with a mixture.  Pablo Castro was the
3    major component of the mixture, so I could state to a
4    reasonable degree of scientific certainty Pablo Castro
5    is the source of Stain A.
6        Q.    And which one is Stain A, again?
7        A.    Stain A is this stain.
8        Q.    Thank you.
9        A.    And Stain B, I obtained a profile consistent
10   with Pablo Castro.  Again, I could state with a
11   reasonable degree of scientific certainty Pablo Castro
12   is the source of Stain B.
13       Q.    So your testimony would be that Pablo
14   Castro's bloods were on the front of Angela Rodriguez'
15   shorts?
16       A.    Yes, sir.
17       Q.    Two more items I need you to look at.  What's
18   been marked State's Exhibit No. 189, and ask you if
19   you can take the contents of that out and examine it,
20   please.  It's already been opened.  Hopefully, you
21   don't have to do that again.
22       A.    (Witness complying.)
23       Q.    Now that you've removed the contents of that
24   exhibit, can you display it to the jury and tell us
25   whether you tested that item.

115

1        A.    Yes.  This is a towel collected from Brewster
2    and Stroman.  I examined the item and selected two
3    stains for testing.
4        Q.    How many bloodstains were on that towel,
5    altogether?
6        A.    There are numerous stains on the towel.
7        Q.    Okay.  And do cuttings indicate that -- where
8    you took them from or to where?
9        A.    Yes.  I selected Stain A from this location
10   and Stain B from this location.
11       Q.    Does that correspond with the sketch that we
12   have on the board behind you of State's Exhibit No. --
13       A.    189.
14       Q.    -- 189?
15       A.    Yes, sir.  This is Stain A from the towel and
16   then Stain B from the towel.
17       Q.    Okay.  Again, did you need to test all the
18   blood from all that towel?
19       A.    No, sir.
20       Q.    Tell the jury what the results of the stain
21   testing that you did on the white towel found from the
22   brush along Brewster Street.
23       A.    Stain A, the D.N.A. profile was consistent
24   with John Henry Ramirez.  I can state to a reasonable
25   degree of scientific certainty John Henry Ramirez is

116

1    the source of the stain, excluding identical twins;
2    and from Stain B, I obtained a mixture.  A major
3    component of that mixture was from John Henry Ramirez.
4    Again to a reasonable degree of scientific certainty,
5    John Henry Ramirez is the source of Stain B.
6        Q.    So that's John Henry Ramirez, the Defendant's
7    blood on that rag?
8        A.    Yes, sir.
9        Q.    The next item that you tested is listed as
10   apparent bloodstain on the bottom of the sandal?  Did
11   you receive that item to test?
12       A.    Yes, sir.
13       Q.    What was the results of that testing from the
14   bloodstain found on the bottom of the sandal?
15       A.    I obtained a partial D.N.A. profile
16   consistent with Pablo Castro.
17       Q.    When you say, "partial profile," what does
18   that mean, again?
19       A.    It means I was not able to obtain data from
20   all 16 locations.
21       Q.    But you did find enough to do a partial
22   profile?
23       A.    Yes, sir.
24       Q.    And does that show that Pablo Castro could
25   have been the contributor for that blood on the

117

1    sandal?

2        A.   Yes, sir.

3        Q.   The last four things I want to show you, and

4    I think we'll be through, this was -- I think this was

5    admitted --

6            COURT REPORTER:  It's on the bottom.

7            THE WITNESS:  State's Exhibit --

8        Q.   (BY MR. SKURKA)  It's on the bottom, sorry.

9    State's Exhibit No. 85.  I forgot to give you the

10   number for that sandal.  That is the sandal that you

11   just testified that had Pablo Castro's blood on it,

12   right?

13       A.   Yes, sir.  I received a swab from the sandal.

14       Q.   A swab from that.  And go ahead and put the

15   number of the sandal, 85.

16       A.   (Witness complying.)

17       Q.   Okay.  These last few things are 107, 194 and

18   195.  On your chart you have it listed as blood sample

19   of Pablo Castro.  So what number would -- State's

20   exhibit number would that be to put on your chart?

21       A.   State's Exhibit 107.

22       Q.   And, for the record, that's a known sample of

23   Pablo Castro?

24       A.   Yes, sir.

25       Q.   Okay.  The next thing is blood sample of

118

1    Angela Rodriguez, and do you have an exhibit that

2    corresponds to that?

3        A.   State's Exhibit 194 contains a sample from

4    Angela Rodriguez and Christina Chavez.

5        Q.   Could you go ahead and write that in on the

6    chart, too, now that you have the State's exhibit

7    numbers.

8        A.   (Witness complying.)  And State's Exhibit

9    195 contains a known blood sample from John Henry

10   Ramirez.

11       Q.   Okay.  Could you write that in the chart,

12   please.

13       A.   (Witness complying.)

14       Q.   And then, finally, for the record, all those

15   blood samples of Pablo Castro, Angela Rodriguez,

16   Christina Chavez and John Ramirez that were just shown

17   to you, those were the samples you used to identify

18   those other exhibits, correct?

19       A.   Those were the samples that I obtained the

20   D.N.A. profiles from to compare to the other exhibits,

21   yes.

22       Q.   Just as you said at the beginning, you have a

23   known sample and test it against these other samples.

24       A.   Yes, sir.

25            MR. SKURKA:  I think that's all the

119

1    questions I have.  Thank you, Ms. Smith.

2            THE COURT:  You want to --

3            MR. GARZA:  Can we wait till after lunch,

4    Your Honor?

5            THE COURT:  Yes, you can.  All right,

6    ladies and gentlemen, here's -- we're going to do

7    something a little bit different today.  Don't -- I'm

8    not going to need you till 2:00 today, so take a

9    leisurely lunch, but we'll see you back at 2:00.

10           All rise for the jury.

11           (Jury exits courtroom.)

12           THE COURT:  Okay.  Now, Mr. Garza --

13           MR. GARZA:  Your Honor --

14           MR. SKURKA:  Shall we approach, Your

15   Honor?

16           MR. GARZA:  Yeah, we'd rather do that,

17   Your Honor --

18           THE COURT:  Okay.

19           MR. JONES:  -- or if we could ask the

20   Court to clear the courtroom, so I can take up a

21   matter.

22           THE COURT:  Okay.  Let's just wait till

23   the jurors clear the floor and we'll take a little

24   break and we'll have a little conference.

25           (Pause in proceedings.)

120

1            (Proceedings continued outside presence of

2    jury.)

3            THE COURT:  All right.  Let's on the

4    record.

5            Mr. Ramirez, I understand from your

6    attorneys that you may want to plead guilty.

7            THE DEFENDANT:  I might.

8            THE COURT:  All right.  It's your choice.

9            THE DEFENDANT:  Yes, sir.

10           THE COURT:  Okay.  It's not your

11   attorney's choice, it's always your choice, okay?

12           I'm going to take a little bit of extra

13   time.  You know, that's why -- that's why we're not

14   bringing the jury back until 2:00.  This is an

15   important decision for you to make.  It is your

16   choice, but I do want you to go over these -- over

17   your options with your attorneys, okay?  That's why

18   I'm -- that's why I'm giving this extra time for you

19   to do that, okay?

20           These attorneys are very well experienced

21   in capital cases.  They have probably tried more

22   capital cases than any two defense lawyers in the

23   county.  That's why I appointed them to represent you,

24   okay?  You must know, and, of course, they've probably

25   already told you this, but you must know that even if

121

1  you do plead guilty on the guilt or innocence phase,
2  then we'd still go into the punishment phase because
3  the punishment phase is not a part of the phase that
4  the law allows you to plead guilty when the State
5  seeks the death penalty, okay?  They've probably
6  already told you that, but I wanted to inform you of
7  that on the record, okay?
8           THE DEFENDANT:  Okay.
9           THE COURT:  So, I want -- I want to --
10 you're going to go, I guess, visit with him --
11          MR. GARZA:  Right, Your Honor.
12          MR. JONES:  We'll be --
13          THE COURT:  -- over the lunch hour.
14          MR. JONES:  Yeah, we'll be over there
15 about 1:00.  He's going to have to eat.
16          THE COURT:  Okay.  About 1:00.  I need --
17 the jail does need to give him -- his attorneys some
18 time to talk to -- to their client.
19          MR. JONES:  Yeah, if you could inform
20 them that we'll be over there right around 1:00.
21          THE COURT:  Okay.
22          MR. GARZA:  So he'll have time to eat.
23          THE COURT:  Yeah, we want him -- we want
24 you to eat --
25          THE DEFENDANT:  Yes, sir.

122

1           THE COURT:  -- Mr. Ramirez.  And,
2  obviously, I want to give you some time to think about
3  this, okay?
4           THE DEFENDANT:  All right.
5           THE COURT:  But I do understand from what
6  I -- from what I was told by your Defense Counsel,
7  that you handed them a note, that it was your
8  suggestion to do this.
9           THE DEFENDANT:  Uh-huh.
10          THE COURT:  Is that right.
11          THE DEFENDANT:  Yes, sir.
12          THE COURT:  Okay.  I guess sometime this
13 morning you handed one of your lawyers a note that
14 stated, "Can I still plead guilty?"
15          THE DEFENDANT:  Yes, sir.
16          THE COURT:  And -- and that you wanted to
17 talk to them about this.
18          THE DEFENDANT:  Correct.
19          THE COURT:  Okay.  Well, I'm going to
20 give you that chance.
21          THE DEFENDANT:  All right.
22          THE COURT:  Okay.
23          THE DEFENDANT:  Thank you.  Appreciate
24 it.
25          THE COURT:  Okay.  Thank you.

123

1           All right, well, we'll see you-all at, I
2  guess, at 2:00?
3           MR. GARZA:  Yes.
4           MR. SKURKA:  Yes, Your Honor.
5           THE COURT:  And, in the meantime, I
6  suppose the State should -- should Mr. Ramirez take
7  that option, I guess, the State --
8           MR. SKURKA:  I'll have my witness on
9  standby.
10          THE COURT:  Have all your witnesses on
11 standby, just in case he decides not to.  It's
12 certainly his right not to plead guilty if he chooses.
13          MR. SKURKA:  Yes, Your Honor.
14          THE COURT:  But, if he does choose to
15 plead guilty I guess start working on the paperwork.
16          MR. SKURKA:  Mr. -- Mr. Schimmel's going
17 to assist me with that, Your Honor.
18          THE COURT:  Okay.  All right.  Well,
19 we'll see you-all after lunch.  2:00.
20          (Noon recess.)
21          (Out of the presence of the jury.)
22          THE COURT:  Okay.  All right.  Be seated,
23 please.  Okay.  We're back on the record.  Now, I
24 understand -- you-all can be seated.  I understand
25 we've got -- well, let me do this, I understand that

124

1  the -- that, Mr. Ramirez, you -- you've decided --
2  you've spoken with your lawyers.
3           THE DEFENDANT:  Uh-huh.
4           THE COURT:  I gave you time to do that.
5           You did speak with them; is that right.
6           THE DEFENDANT:  Yes, sir.
7           THE COURT:  Okay.  And I guess between
8  your counsel with them you've decided to continue on
9  with the trial, and that's fine.
10          THE DEFENDANT:  Yes, sir.
11          THE COURT:  Okay.  All right.  Then have
12 a seat and we'll -- we'll move along.
13          Okay.  To that end, I understand the
14 State has some exhibits they want to introduce and
15 you've shown them to the Defense.
16          MR. SKURKA:  We have, Your Honor.
17          THE COURT:  These are -- these are
18 photographs that are going to -- I think pertain to
19 Dr. Fernandez' testimony, your next witness.
20          MR. SKURKA:  That's correct, Your Honor.
21          MR. GARZA:  That's correct, Judge.
22          THE COURT:  Okay.  And do we have the
23 numbers on these?
24          MR. SKURKA:  We're just finishing tagging
25 them.

125

1          THE COURT:  Okay.  All right.  Well, you
2    tell me when you're done and we'll go --
3          (Exhibits marked.)
4          MR. SKURKA:  Judge, I got a note from the
5    witness office says, "Dr. Fernandez on his way in from
6    Calallen.  It may take a little bit to get here."
7          THE COURT:  Hum.
8          MR. SKURKA:  I called him right at 2:00,
9    Judge, so he's only had, like, 10 minutes head start.
10          THE COURT:  Okay.  Well, we'll have to
11    deal with that.  Okay.
12          MR. SKURKA:  But, actually, Calallen's
13    not very far.
14          THE COURT:  Yeah, it's not very far once
15    you get on the freeway.  It's about 15 minutes.
16          We still got to take care of this,
17    anyway.
18          (Pause in proceedings.)
19          THE COURT:  Okay.
20          MR. SKURKA:  Judge, for the record,
21    Co-Counsel has marked State's Exhibit 179 -- I'm
22    sorry, that's a 9, right -- 199 through 224 --
23          THE COURT:  Okay.
24          MR. SKURKA:  -- as photographs taken
25    of the deceased Pablo Castro and/or his clothing.

126

1    These exhibits I intend to introduce to the medical
2    examiner, Ray Fernandez.  I also have State's Exhibit
3    225 and 226.  For the record, those are diagrams also
4    done by Dr. Fernandez showing the location of the
5    wounds.  I offer those into evidence at this time.
6          THE COURT:  All right.
7          MR. GARZA:  We reviewed those photos and
8    we have no objection, Your Honor.
9          THE COURT:  Okay.  So it's 2- what to
10    226?
11          MR. SKURKA:  199 through 226.
12          THE COURT:  Okay.  All right, then,
13    they're admitted.
14          All right.  So I guess we're just waiting
15    for Dr. Fernandez.  Let's go ahead and put her on and
16    then we can get her out of here.
17          MR. SKURKA:  Pam Smith.
18          THE COURT:  Pam Smith.  Let's put her on
19    the stand.
20          (Witness enters courtroom.)
21          THE COURT:  All right.  You may take the
22    stand.
23          All right.  Bring them in.
24          (Jury enters courtroom.)
25          THE COURT:  All right.  Be seated,

127

1    please.
2          All right, cross?
3          MR. GARZA:  Your Honor, we have no
4    questions of this witness.
5          THE COURT:  All right.  And --
6          MR. SKURKA:  No follow-up questions, Your
7    Honor.
8          THE COURT:  -- any other questions?  All
9    right.  You're free to go about your business.  Please
10    do not discuss your testimony with anyone while the
11    trial is going on, save the lawyers.  All right?
12          THE WITNESS:  Thank you.
13          THE COURT:  Thank you very much.
14          (Witness exits courtroom.)
15          THE COURT:  Ladies and gentlemen, I will
16    tell you that I have, outside of your presence,
17    admitted some exhibits that will pertain to the next
18    witness' testimony.  Those exhibits are 199 through
19    226.
20          Mr. Skurka, the witness is not here, yet?
21          MR. SKURKA:  Judge, I'm ready to call Dr.
22    Fernandez, but I got a note from the witness office
23    said he's on his way in from Calallen.  He should
24    arrive here shortly.
25          THE COURT:  All right.

128

1          MR. SKURKA:  But he would be my next
2    witness and final witness, I believe, Your Honor.
3          THE COURT:  All right.
4          All right, then, Ladies and gentlemen, I
5    expect he'll be here shortly.  We'll -- we'll bring
6    you right back out when he gets here.
7          So all rise for the jury.
8          (Jury exits courtroom.)
9          THE COURT:  I guess there's nothing else
10    we need to take up at this time?
11          MR. GARZA:  No, Your Honor.
12          THE COURT:  Okay.
13          MR. SKURKA:  No, Your Honor.
14          (Short recess.)
15          (Jury enters courtroom.)
16          THE COURT:  Raise your right hand.
17          (Oath administered.)
18          THE WITNESS:  I do.
19          THE COURT:  Be seated.
20          Mr. Skurka, you -- you may proceed.
21          MR. SKURKA:  Thank you, Your Honor.
22
23
24
25

129

1            REY FERNANDEZ, M.D., M.E.,

2 having been first duly sworn, testified as follows:

3            DIRECT EXAMINATION

4 BY MR. SKURKA:

5     Q.   Please introduce yourself to the folks on the

6 jury and tell them your full name.

7     A.   I'm Dr. Rey Fernandez.

8     Q.   How are you currently employed?

9     A.   I'm a medical doctor employed as medical

10 examiner for Nueces County.

11     Q.   Can you tell the jury, basically, what the

12 duties of the medical examiner would be?

13     A.   The medical examiner's required by State law

14 to investigate any violent deaths, or unexpected

15 deaths, to examine the body, complete a report and

16 determine the cause of death, the manner of death.

17     Q.   And what kind of -- can you briefly explain

18 to the jury your educational background, what schools

19 you attended and degrees you may hold.

20     A.   I graduated from Del Mar College and the

21 University of Texas in Austin. I completed medical

22 school in 1989 from the University of Texas, San

23 Antonio, Texas. 1990, I completed a hospital

24 internship in Philadelphia, Pennsylvania. It was six

25 months working with patients with medical problems,

130

1 six months working with patients with surgical

2 problems. '90 to '94, I completed hospital pathology

3 residency, University of California, Irvine, where I

4 worked in a hospital lab. '94 to '95, I completed

5 medical examiner training at the medical examiner

6 office in Miami, Florida. '95 to 2002, I was employed

7 as a medical examiner in Miami, Florida. 2002, I was

8 employed as a medical examiner in Dallas, Texas. And

9 in 2003, I became employed as a medical examiner here

10 in Nueces County, in Corpus Christi.

11     Q.   So you've been a medical examiner in Nueces

12 County since 2003.

13     A.   That's right.

14     Q.   But altogether you've been either an

15 assistant medical examiner in Florida, or whatever, or

16 Dallas. For how long altogether have you been a

17 medical examiner?

18     A.   Since '94, I was a medical examiner.

19     Q.   Can you tell the jury any special license you

20 may hold or certification you may hold.

21     A.   I have a license, Texas medical license from

22 the Texas Medical Board, and then I have a Florida

23 medical license from the Florida Medical Board, and

24 then I have a certification in three areas, a

25 certification in anatomic pathology, certification in

131

1 clinical pathology and a certification in forensic

2 pathology.

3     Q.   Let's break that down. First of all, what's

4 that mean? How do you get certified in those areas?

5     A.   Well, certification means you've completed

6 the training that's a recognized postgraduate training

7 in that area, and then you submitted the -- passed the

8 examination in that area, and then completed the

9 application fee for the -- for the certification.

10     Q.   You said there's three areas that you're

11 certified in pathology, anatomical, clinical and

12 forensic?

13     A.   That's right.

14     Q.   What is pathology? Can you explain that to

15 the jury, please.

16     A.   Pathology is a study of the changes in the

17 tissues in the body due to disease or injury.

18     Q.   Do pathologists only -- are pathologists only

19 medical examiners?

20     A.   No. They're --

21     Q.   What do they do?

22     A.   Most pathologists are hospital pathologists.

23 There's a lot them working in the hospital pathology

24 lab.

25     Q.   What do they do?

132

1     A.   These are -- this type of work in the

2 hospital involves looking at specimens from the

3 operating room, deciding if the section that's been

4 removed during surgery is benign or a malignant tumor.

5 It involves doing the hospital laboratory testing in

6 the different section of the lab, for instance, the

7 blood bank, testing the blood for H.I.V., hepatitis,

8 for pathogens, doing other chemistry tests in the lab

9 for different enzymes, looking at the bone marrow,

10 different patients, to see if there's a different type

11 of cancer in the bone marrow or lymph nodes.

12     Q.   How is that, Doctor, how is that kind of

13 pathologist different from what you do as a forensic

14 pathologist? Could you explain that term, "forensic

15 pathology," to the jury.

16     A.   Forensic pathology has to do with the

17 application of laboratory methods for the

18 investigation of medical. That would mean doing

19 procedures in the lab like an autopsy procedure,

20 examining the body for injuries, reporting --

21 documenting those injuries and making a report, and

22 also collecting any evidence and doing any testing of

23 the body that might help determine the cause of death.

24     Q.   Would it be fair to say, then, that -- that

25 hospital pathologists work with defining diseases or

133

1   help people determine what the cause of disease or
2   tumors are, where forensic pathology is more in tune
3   with the legal system and courts?
4       A.   That's true, except that about 90 percent of
5   the cases that the medical examiner handles has
6   nothing to do with the court system.
7       Q.   Well, explain.
8       A.   Well, a lot of the cases are -- most of the
9   cases the medical examiner is involved in are natural
10  deaths.  Most of those are heart disease.  And in
11  about 30 percent of those end up having to do with
12  other types of deaths, like accidental death or
13  suicides, and a lot of those cases there's a report
14  completed.  And just like any case that comes in the
15  office there's a report completed.
16      Q.   So what you're saying is the medical examiner
17  doesn't necessarily work on criminal cases or -- or
18  cases involving homicide, do they?
19      A.   That's correct.
20      Q.   Tell them what the, I guess, the statutory
21  requirements of the medical examiner in Texas to
22  investigate what type of death, please.
23      A.   Any deaths that are -- deaths that are
24  reported to the medical examiner, the medical examiner
25  will do what's called an inquest, where there's an

134

1   investigation done.  And that may involve information
2   collected over the phone, it may involve collected
3   medical records, it may involve also to the point of
4   bringing the body to the office and having the body
5   the examined and doing an examination of the body.
6   And those are the cases where the person dies in the
7   hospital within 24 hours of admission.  All those
8   cases are, by law, supposed to be reported to the
9   medical examiner.  Any case where the body is going to
10  be -- the family or funeral home is talking about
11  trying to get the body cremated, those bodies are also
12  investigated by the medical examiner.  Any violent
13  deaths, unexpected deaths, those are also supposed --
14  required by law to be reported to the medical examiner
15  to investigate.
16      Q.   So you don't end up testifying in court about
17  the cause of death or manner of death in just criminal
18  cases or homicide cases, you actually may issue
19  reports in these other types of deaths.
20      A.   That's correct.
21      Q.   And, in order to do an investigation, do you
22  always have to do an autopsy?
23      A.   No.  That's at the discretion of the doctor
24  doing the investigating.
25      Q.   What is an autopsy?

135

1       A.   An autopsy is a laboratory procedure involved
2   looking at the outside of the body for any disease or
3   injury on the outside of the body, and then making an
4   -- an incision on the front of the body, what's called
5   a "Y incision," to expose the chest cavity, the
6   abdominal cavity, and then an incision is also made at
7   the top of the head to expose the cranial cavity, to
8   look inside the skull.  So the doctor looks inside the
9   skull, looks inside the chest cavity, abdominal
10  cavity, examines all those organs in those cavities.
11  Then those organs are removed, they're examined and
12  they're weighed and they're looked at to determine if
13  they have any injury or disease.
14      Q.   So -- but not everybody you have to do an
15  autopsy on, correct?
16      A.   That's correct.
17      Q.   How many autopsies have you done in your life
18  or how many do you average a year as a medical
19  examiner?
20      A.   Up to now, I've probably done more than
21  3,000.  And we do probably about maybe at least 300 a
22  year, here.
23      Q.   When you do an autopsy are the purposes of
24  that is to determine the cause of death and manner of
25  death?

136

1       A.   Yes.  That's part of the reason that the
2   medical examiner is doing the investigation, to
3   determine the cause of death and manner of death.
4       Q.   And let's talk with those terms of art.
5   First of all, what does "cause of death" mean?
6       A.   The cause of death is that disease or injury
7   that leads to the person dying.
8       Q.   And "manner of death," what does that mean?
9       A.   The manner of death tells us the cause of
10  death comes about.  If it's an injury that happened
11  from a -- a fall or from a motor vehicle crash, it may
12  be an accidental type of manner of death.  If it's a
13  injury that's caused by themselves, like a hanging or
14  shooting themselves, it would be classified as
15  suicide.  If it --
16      Q.   I'm sorry.
17      A.   If they die from a natural cause, heart
18  disease, cancer, medical illness, things like that
19  would be natural for the manner of death.  If it's
20  death at the hands of another person, then those are
21  classified as homicides.
22      Q.   So you have about five different
23  classifications?
24      A.   Yes.
25      Q.   Homicide, suicide, accidental, natural --

137

1    A.   And natural.

2    Q.   Okay.  So those are generally the four types

3  of manner of death.

4    A.   Yes.  There's another classification called

5  "undetermined," where after all the testing is done

6  the cause of death, the manner of death at that point

7  in time is undetermined.

8    Q.   Do you work with law enforcement agencies or

9  review reports from law enforcement agencies or your

10  own investigators in -- before you start on your

11  autopsies, or your examination or issuing an autopsy

12  report?

13    A.   Routinely, an investigator makes a report and

14  he gets his report from investigators to complete the

15  medical examiner investigator report, then I review

16  that report as part of doing the medical examiner

17  examination on the body.

18    Q.   So you don't just rely on just the work that

19  you do inside the lab, you also depend on reports from

20  other agencies or your own investigator that helps you

21  determine -- help you make your determination,

22  correct?

23    A.   That is correct.

24    Q.   Let's talk about -- a little bit about -- you

25  mentioned your training and your certifications.  Do

138

1  you keep up with your training and doing some type of

2  continuing education that's required by the State for

3  your license?

4    A.   Yes.  In order to maintain the Texas medical

5  license, we're required to complete what's called

6  "Continuing medical education credits," which you get

7  through conferences or reviewing different journal

8  articles, and then taking tests or examinations having

9  to do with the contents of those articles or

10  conferences.

11    Q.   So the learning doesn't stop just when you

12  get out of law school, huh?

13    A.   Or medical school, either way.

14    Q.   Medical school, I'm sorry.  Did I say law

15  school?  I'm sorry, medical school.  Also, do you

16  attend conferences and keep up-to-date with published

17  journals in your field and -- or by your associations?

18    A.   That's correct.

19    Q.   Do you belong to any professional

20  organizations in your field and, if so, what are they?

21    A.   Yes, I'm a member of the College of American

22  Pathologists, the American Society of Clinical

23  Pathologists, American Academy of Forensic Sciences,

24  and the National Association of Medical Examiners.

25    Q.   Have you been qualified as an expert to

139

1  testify in Nueces County or any other county as an

2  expert as a medical examiner?

3    A.   Yes, I have.

4    Q.   How many times?

5    A.   Probably at least a hundred.

6    Q.   Doctor, I now want to turn your attention to

7  a postmortem examination or autopsy of the person

8  identified as Pablo Castro, and Medical Examiner's

9  Report No. 04-908.  Are you one who did the autopsy on

10  the victim in this case, Pablo Castro?

11    A.   That's correct.

12    Q.   And were you able to determine his age during

13  your investigation?

14    A.   The age we had noted was 46.

15    Q.   Is that correct on the autopsy report?

16    A.   That's correct.

17    Q.   Okay.  So, when you did your examination

18  what's the first thing you do when you start the

19  examination of the victim in this case, Pablo Castro?

20    A.   There's an examination made of the outside of

21  the body, it's called an "external examination,"

22  noting the person's height, the weight.

23    Q.   Okay.  And was everything pretty much routine

24  about the person's -- I'm sorry, let me rephrase that.

25  Before you also do the examination, do you notice any

140

1  clothing on the body?

2    A.   Yes, there's an inventory made of the

3  clothing on the body.

4    Q.   Did this victim have his clothes on when he

5  was brought to you?

6    A.   That is correct.

7    Q.   I want to talk to you specifically about the

8  upper clothing, the shirt of this victim.  Did you

9  examine that victim shirt while he was -- before your

10  autopsy began?

11    A.   Yes.

12    Q.   There's an exhibit in front of you marked

13  State's Exhibit No. -- what is that?  Let me show you

14  a couple of photographs.  This is marked, for purposes

15  of the record, as State's Exhibit No. 105.  Do you

16  recognize that?

17    A.   Yes, sir.

18    Q.   What is it?

19    A.   This is a shirt that we removed from the

20  decedent.

21    Q.   I'll show you what's been already admitted

22  into evidence as 199 and 200.  Do you recognize those?

23    A.   Yes, sir.

24    Q.   What are they?

25    A.   These are photographs of the same shirt

141

1   showing the -- the cuts on the shirt.

2       Q.   Were these photographs taken at or near the

3   time of the autopsy?

4       A.   Yes, sir.

5           MR. SKURKA:  May I publish them to the

6   jury, Your Honor?

7           THE COURT:  You may.

8       Q.   (BY MR. SKURKA) Before we get to the

9   examination of the body, I want to start with the

10  photographs, and we'll look at 199.  Turn the lights

11  off, please.  There should be a laser pointer there in

12  front of you, somewhere there.  There it is.  Can you

13  tell us what we're looking at in 199.  There it is.

14      A.   This is a photograph that shows the -- the

15  front surface of the -- of the shirt, shows the blood

16  staining at the top half, and at the left shoulder

17  area it has areas where the shirt is -- has defects,

18  or -- or cuts.

19      Q.   Just for record, is that the front of the

20  shirt or the back of the shirt, that picture?

21      A.   This is -- looks to be the front of the

22  shirt.

23      Q.   Tell us about the defects you saw in the

24  shirt, as you examined it.

25      A.   The defects were noted at the top left upper

142

1   arm area, the left -- and the front top of the left

2   shoulder area.

3       Q.   What do you mean when you say, "defects"?

4       A.   Those are areas where the shirt, the

5   material's been separated or cut.

6       Q.   Looking at State's Exhibit No. 200, is that

7   the same shirt, but just the back side of it?

8       A.   Yes, sir.

9       Q.   And does it show -- what would your

10  examination of the shirt reveal?

11      A.   This is -- showed the -- the back part of the

12  shirt and the bloodstains at the back, and also showed

13  similar four-type defects at the left upper back.

14      Q.   Based on your experience and training as a

15  medical examiner, do you have an opinion as to what

16  caused those defects in the shirt, both on the front

17  and the back?

18      A.   The opinion I have is that the shirt was worn

19  at the time the cuts happened, and these cuts on the

20  shirt correspond to the -- to the sharp force injuries

21  or cuts on the surface of the body.

22      Q.   Are those cuts or defects in the shirt

23  consistent with knife wounds?

24      A.   Yes, sir.

25      Q.   And are they consistent with the location of

143

1   the wounds you found on Pablo Castro?

2       A.   Yes, sir.

3       Q.   In other words, where we see the holes in the

4   shirt, when you did the autopsy there were wounds

5   underneath that, correct?

6       A.   That is correct.

7       Q.   And the shirt itself is there in front of us

8   and that does show the same things, too, does it not?

9       A.   Yes.

10      Q.   Okay.  Now, let's take the shirt off and go

11  to the next thing that you did.  Once you said you did

12  the -- the removal of the shirt, did you also look for

13  any other injuries?

14      A.   Yes.

15      Q.   And can you tell us your evidence of injury

16  that you saw when you first viewed the body?

17      A.   The notation was that there was a total of 29

18  sharp force injuries.  This included 10 that were

19  called "stab wounds," which means they were

20  penetrating-type wounds.  Those are wounds where they

21  actually penetrated into the body, and then there was

22  19 incised wounds.  Those are longer than they are

23  deep.  They run parallel to the surface of the body.

24      Q.   Can you tell us, you said, "sharp force

25  wounds."  What does "sharp force wounds" means?

144

1           Sharp force means they're done with an

2   object, sharp edged-type weapon that cuts the body.

3   It's not blunt force trauma.  It's not from a blunt

4   force applied to the body, it's from a sharp force

5   applied to the body.

6       Q.   Give us an example of a blunt force, as

7   opposed to a -- what was called a blunt force trauma,

8   as opposed to sharp force injury.

9       A.   Well, a blunt force would be like wood or an

10  object striking the surface of the body that's blunt

11  shape, not sharp edged, and caused bruising or tearing

12  of the skin.  Sharp force injuries are the ones where

13  the sharp edged-type weapon actually cutting the

14  surface of the body, cutting the skin, actually

15  penetrating into the body.

16      Q.   You mentioned that 10 of these 29 wounds were

17  stab wounds.  How far did some of those stab wounds

18  penetrate the body of Mr. Castro?

19      A.   Some of them went about three-and-a-half

20  inches to four inches.

21      Q.   We'll go into detail on which ones did what,

22  but some of the penetrating wounds you say went three

23  and a half to four inches in the person's body?

24      A.   That's right.

25      Q.   Are those consistent, those penetration or

145

1   stab wounds, consistent with being stabbed with a
2   knife that may be five and a half or six inches long?
3       A.   Yes, it would be.
4       Q.   Just for the record, you said it was
5   consistent with knife stab wounds, correct?
6       A.   That's right.
7       Q.   Is a knife a deadly weapon in that it's
8   capable of causing serious bodily injury or death in
9   the manner and means of its use?
10      A.   Yes, it is.
11      Q.   Again, the difference between stab wounds and
12  incise wounds, you mentioned incise wounds are longer
13  than deeper.  What do you mean by that?
14      A.   That means a cut on an inside wound would be
15  cutting along the surface of the body, or cutting
16  through the skin itself, but not penetrating deeper
17  below that.  If you measure the stab wound, it may
18  have three-and-a-half inches on its depth, go
19  three-and-a-half inches deep into the body, but the
20  surface on the outside of the body is was only an inch
21  or an inch and a half.
22      Q.   What is -- are any of these wounds, would you
23  describe them as slashes or stab marks or both?  How
24  would you describe them?
25      A.   The incise wounds where they're cutting

146

1   parallel to the surface of the body, cut along the
2   surface, those would be the type that you would call
3   slash-type wounds.
4       Q.   Okay.  So, Mr. Castro had 29 wounds, 10 of
5   them stabs or penetrating wounds and 19 slash wounds.
6       A.   That's correct.
7       Q.   Okay.  I'm just trying to put it down in
8   layperson's terms.
9       A.   Yes.
10      Q.   Okay.  You said that you started your
11  evidence -- I'm sorry, your examination.  Do you start
12  from head to toe, or how do you start it?
13      A.   Yes.  There's an examination started from the
14  outside of the body and looking at the -- the surface
15  of the body for the -- for the injuries on the surface
16  of the body.
17      Q.   I'm going to just go along with your report
18  and ask, as the first part, what did you see first
19  when you did your examination of Mr. Castro?
20      A.   There was four stab wounds that were noted at
21  the back of the body, at the left back.
22      Q.   Okay.  I'm sorry, I'm looking at the -- page
23  2.  I think you're already ahead of me.  Where it
24  says, "Evidence of Injury"?
25      A.   Yes, sir.

147

1       Q.   Okay.  I'm talking about the area -- did you
2   have a part that looked around the face of Mr. Castro?
3   I want to start with that area, first --
4       A.   Oh, okay.
5       Q.   -- the head and the face.  Are you with me
6   there?
7       A.   Yes.  Under "Evidence of Blunt Force Trauma."
8   The section under blunt force trauma, there's a
9   notation is that the right upper eyelid, there was a
10  one-half inch round contusion or bruise in the right
11  upper eyelid.
12      Q.   Now, a minute ago you said these other 29 are
13  sharp stab wounds or incise wounds, but now you said
14  you did see some blunt force trauma.
15      A.   Correct.
16      Q.   What is that indicative of?
17      A.   That's evidence of that part of the body that
18  was impacted, the surface impacted against that part
19  of the body, or that part of the body was impacted
20  with some blunt surface.
21      Q.   Could that be consistent with being hit with
22  a hand or a fist or a punch?
23      A.   Yes.
24      Q.   Or a kick, maybe?
25      A.   Yes.

148

1       Q.   Okay.  So he had a bruise or contusion around
2   his right upper eyelid; is that correct?
3       A.   That's right.
4       Q.   And what other contusions, if any, did he
5   have as a result of blunt force trauma?
6       A.   The right side of the neck had a similar
7   one-half inch contusion or bruise.
8       Q.   And the lower lip -- I'm sorry, where's the
9   next -- did you find any other marks on the person's
10  face?
11      A.   The next section is a -- below there.  It's a
12  lower lip at the left side.  There was a one-quarter
13  inch laceration or tear.
14      Q.   These photographs have already been admitted
15  into evidence, and I want to ask you to look at them
16  and see if you can show the jury what we're talking
17  about with these bruises.  I'm going to show you
18  what's marked State's Exhibit No. 214.  What does that
19  show?  And using the laser pointer, please.
20      A.   The left eyelid -- on the right eyelid area,
21  there was -- that's where a discoloration was or where
22  the bruise was.
23      Q.   That's the one you've previously described?
24      A.   Yes, sir.
25      Q.   And right now I'm just talking about those

149

1 parts of the bruises. We'll get to the other wounds
2 in a minute. What about -- you said there was also a
3 bruise on the right side of the neck; is that correct?
4    A.   Yes, sir.
5    Q.   I'm going to show you what's marked 222 and
6 see if that shows that bruise.
7    A.   Yes.
8    Q.   Can you show the jury where we're looking at?
9    A.   This is the right side of the neck here, and
10 at the center here is the bruise, the right side of
11 the neck.
12    Q.   And you said there was also a laceration, a
13 small laceration of the lower lip at the left side; is
14 that correct?
15    A.   Yes.
16    Q.   Okay. Now let's move to the next part that
17 you examined wounds on, and I think you were going to
18 talk about the back. Can you tell us what, if
19 anything, you saw on the back of Mr. Castro in the
20 area of wounds.
21    A.   The surface of the back, that's where the
22 four stab wounds were noted.
23    Q.   Where exactly -- can you tell us or describe
24 the type of injuries? Were those penetrating wounds
25 or incise wounds?

150

1    A.   These were penetrating, they were stab
2 wounds. They went deep into the underlying muscle and
3 the tissue in that underlying area.
4    Q.   I'm going to show you what's been introduced
5 as State's Exhibit No. 209. Is that a 4 or a 9? 209.
6 What does that photograph depict?
7    A.   This is a photograph that shows the back
8 surface of the body, shows the left back, and it shows
9 the -- the four stab wounds that were noted at the
10 left back here, here, here, and at this location.
11    Q.   Would you start at the top right and then go
12 to the left and go down and describe in detail those
13 wounds that Mr. Castro suffered as a result of stab
14 wounds in his back.
15    A.   This was a wound at the back that had a
16 pointed -- when you looked at it, you could see a
17 pointed margin at the top here, and at this area it
18 was flattened. So it would be like triangular shape,
19 with the base down here and a pointed margin at that
20 top area.
21    Q.   What does that indicate to you, if anything?
22    A.   That would be an indication to me of a sharp
23 edged weapon that penetrated into that part of the
24 body with one of the edges being sharp.
25    Q.   Is that consistent with a knife wound?

151

1    A.   Yes, sir.
2    Q.   What damage, if anything, did that wound
3 cause and how far did it penetrate?
4    A.   That wound at the -- at the back --
5    Q.   And just for the record, we're talking about
6 looking at the back in the upper right.
7    A.   That one went about four-and-a-half inches
8 down into the soft tissue in the muscle, in that area.
9    Q.   It penetrated four-and-a half inches into
10 Pablo Castro's body?
11    A.   Yes.
12    Q.   Did it hit anything, I know what they call
13 them, "vital organs"?
14    A.   That one did not get into the lung in that
15 area. It went into the soft tissue of the muscle and
16 went downward.
17    Q.   Is that a fatal wound?
18    A.   That by itself contributed to the death, but
19 it's not considered itself a fatal-type wound.
20    Q.   Let's get that cleared up with the jury.
21 What does "a fatal wound" mean?
22    A.   A fatal wound would be one that cuts through
23 some -- a major blood vessels or goes into some of the
24 vital organs in the body.
25    Q.   So when you say it was a contributing wound,

152

1 what did you mean?
2    A.   That means there is some blood loss from that
3 wound, but it's not hitting a major artery, or a major
4 vein or organs.
5    Q.   So although that wasn't a fatal wound, it was
6 a contributing cause of Pablo Castro's death?
7    A.   Yes, sir.
8    Q.   Let's go to the -- that -- the left of that
9 wound, and I'm talking about the top wound of the
10 three there on the left side of the picture we're
11 looking at.
12    A.   This wound at the left was a wound that was
13 going into the -- the back. And it did go four
14 inches, but it took more of a path into the -- into
15 the cavity. And it actually went into the -- the
16 left -- the left lung.
17    Q.   So that wound that you've shown on the left
18 of the one on the top, three wounds, the one on the
19 top, it penetrated four inches into Mr. Castro?
20    A.   That's correct.
21    Q.   And what damage, if any, did it cause?
22    A.   That one actually cut the underlying organ
23 that's the left lung.
24    Q.   What damage does it cause when your lung is
25 cut by a knife?

153

1        There is a couple of changes that happen.
2   One of them is blood loss going into that -- to that
3   part of the body.  The -- also that left lung is
4   collapsing.  The -- also, it's supposed to be able to
5   expand and collapse, but when you injure it that way,
6   it collapses.  So there's difficulty with breathing,
7   because the lung is injured and it also has difficulty
8   with breathing because the blood is starting to fill
9   into that side of the chest.
10       Q.   And what would that cause?
11       A.   That's a fatal-type injury.
12       Q.   So it's your -- your testimony that that is a
13   fatal wound?
14       A.   Yes, sir.
15       Q.   The next wound underneath it, in the middle
16   of those three in a row, can you describe that wound,
17   the depth of that wound and what, if any, injury it
18   caused --
19       A.   This --
20       Q.   -- the damage it caused.
21       A.   This wound at this location also has the
22   pointed margin at the top and the slanted margin at
23   the bottom, and it went -- it went into the body and
24   it went downward, downward into the soft tissue of the
25   muscle about four inches.

154

1        Q.   Again, did that cause any -- or hit any vital
2   organs?
3        A.   No.  That did not go into the lung itself.
4   It went into the soft tissue of the muscle.
5        Q.   Would that be also a contributing wound, if
6   it wasn't a fatal wound?
7        A.   That is correct.
8        Q.   The final one on his back of the four wounds
9   Mr. Castro received on the back, the one at the
10  bottom, can you tell us -- describe that wound, how
11  far it went in and what damage, if any, it caused.
12       A.   This one, at this location, also had the
13  flatten marks at the bottom and pointed mark at the
14  top and went into the soft tissue of the muscle, and
15  it went about four inches in depth, also.  It didn't
16  go into the lung and didn't go into the chest cavity.
17       Q.   So, again, it went into the soft issue or the
18  muscle area?
19       A.   That's correct.
20       Q.   But it went in four inches, correct?
21       A.   Yes, sir.
22       Q.   Did that -- was that a fatal wound to Mr.
23  Castro?
24       A.   No.  That's not a fatal wound by itself, but
25  it's the wound that contributed to the death.

155

1        Q.   So of those -- in summation, before we move
2   on to the next area, of those four wounds, there was
3   only one of those which is the fatal wound, which is
4   the one you indicated on the top left?
5        A.   This location here.
6        Q.   Okay.  And the other ones were contributing
7   factors?
8        A.   Yes, sir.
9        Q.   Now, based on the results of those stab
10  wounds in the back, would that result in any type of
11  amount of blood being found in the chest cavity or the
12  body cavity?
13       A.   Yes.
14       Q.   Can you explain to the jury how much blood
15  was found and where it was found?
16       A.   The left side of the chest had about 200 cc's
17  of blood.  Normally, there's no blood in that -- in
18  that -- in that chest cavity, so this has about 200
19  cc's of blood in that chest cavity.
20       Q.   So in that -- would that be the left lung or
21  chest cavity, is were the left lung is?
22       A.   Inside the left chest cavity is where the
23  left lung is.
24       Q.   Okay.  So in that cavity there would usually
25  be no blood at all.

156

1        A.   That's correct.
2        Q.   And there was 200 cc's -- and, I'm sorry, we
3   don't know the metric system very well, so can you
4   tell us approximately how much 200 cc's of blood would
5   be?
6        A.   If you had a soda can, that would be about
7   350 cc's, so this would be about half or -- somewhere
8   close to half of a soda can.
9        Q.   And was that blood -- based on your medical
10  experience and training, was that blood the result of
11  that wound to the left lung?
12       A.   Yes, sir.
13       Q.   Let's move on to the next part of your
14  report, unless there's anything else -- I'm sorry,
15  I've got a couple of more photographs to show you,
16  208.
17            MR. SKURKA:  Show them that, briefly,
18  please.
19       Q.   (BY MR. SKURKA) Does that show the same
20  wounds or just all three of them a little closer up?
21       A.   Yes.
22       Q.   And 207, does that show the other wound on
23  the back, just in closer detail?
24       A.   Yes, sir.
25       Q.   Can you show us -- you were talking about the

157

1  edge of the wound, or something, to show them the
2  shape that you can tell it's a knife would.  Maybe --
3  there you go.  Might be a little closer on that.
4      A.   As you get to the edge over here, you've got
5  -- you see where it's kind of pointed, and you see
6  another side here where it's more flattened, so it has
7  a large triangular shape, and that's the typical shape
8  for a stab wound.
9      Q.   Okay.  So that -- all those wounds in the
10 back are consistent with knife stab wounds.
11     A.   Yes, sir.
12     Q.   Okay.  Let's move on to the next area, if we
13 could, please.  In your report -- and I believe that's
14 in I guess the front or the upper torso?  You tell me
15 what we're looking at.
16     A.   It's the right -- right collar bone area.
17 It's the second paragraph on page 3.
18     Q.   Okay.  That's the right shoulder or the left
19 shoulder?
20     A.   That would be the right one.
21     Q.   Okay.  What did you find when you examined
22 the right shoulder?
23     A.   Over the right -- right clavicular, the right
24 collar bone area, there was a stab wound.  It had a
25 pointed margin at the top and a flat margin at the

158

1  bottom.  That stab wound was about half an inch --
2  inch and a half on its outside surface.  It went
3  two-and-a-half inches deep into the soft tissue and
4  into the muscle.
5      Q.   I have a photograph marked State's Exhibit
6  No. 221.  Does that show that wound?
7      A.   Yes, sir.
8      Q.   And, for the jury, can you use the laser
9  pointer and show which one we're talking about?
10     A.   At this location here.
11         MR. SKURKA:  If could you go in closer on
12 that, Mr. Schimmel, please.  All the way in.
13     Q.   (BY MR. SKURKA) You said that wound was
14 one-and-a-half inches long?
15     A.   On the outside surface.
16     Q.   We'll get it focused here in a second.  Okay.
17 So that was one-and-a-half inches long and it
18 penetrated how deep?
19     A.   It went about two-and-a-half inches deep.
20     Q.   But did this hit any fatal -- I'm sorry, any
21 vital organs or anything?
22     A.   No.
23     Q.   So was that not -- that was not a fatal
24 wound, it was a contributory wound?
25     A.   That's correct.

159

1      Q.   What is the next wound that you saw on Mr.
2  Castro?
3      A.   It's noted the third paragraph, the left
4  collar bone area, it was an stab wound that had
5  the flat margin at the bottom and the pointed margin
6  at the top.  It was an inch and a half and it went
7  about three-and-a-half inches --
8      Q.   Is that --
9      A.   -- deep into the body.
10     Q.   I'm sorry.  Is that wound shown on that
11 photograph?
12     A.   It's going to be -- you might have a
13 photograph that shows --
14     Q.   It's more in the left shoulder?
15     A.   It's starting to come out here.
16     Q.   Okay.  State's Exhibit No. 220, maybe that's
17 -- you want the left side of the neck, is what you're
18 saying, correct?
19     A.   Yes.  All this area in here.
20     Q.   Okay.  Is that a better photograph of it?
21     A.   Yes, sir.
22     Q.   Okay.  Show us which one we're talking about
23 and I'll have him close in on it a little bit.
24     A.   The right -- the left collar bone area had
25 the wound.  It -- you're starting to see some of it,

160

1  here but it's kind of out of focus.
2      Q.   I'm sorry, I didn't hear what you said.
3      A.   I think you're getting out of focus in here.
4      Q.   Okay.  Let me see if I can get a better
5  photograph of that.  Let's show you 217.  Does that
6  show the wound?
7      A.   Can you lift it up a little?
8      Q.   Yes.
9      A.   Yeah, they're getting better; there.  Yes,
10 sir.
11     Q.   Thank you.  Show us that wound and describe
12 the damage it did, please.
13     A.   There's one that's one and a half inch here,
14 and then the other one that's closest, it's two inches
15 here.
16     Q.   What damage, if any, did that cause?
17     A.   This was a wound that went into the soft
18 tissue.  It didn't go into any of the vessels or any
19 of the organs.
20     Q.   So was that a fatal wound to Mr. Castro?
21     A.   No.
22     Q.   What's the next -- what other wounds did you
23 notice at or around the neck area?
24     A.   The one next to it here at this location was
25 a two-inch stab wound.

161

1    Q.   I'm sorry, let me turn that --
2          THE COURT:  Maybe if you back that up,
3    Doctor, just a little bit.
4          (Witness complying.)
5          THE COURT:  There we go.
6    Q.   (BY MR. SKURKA) I tell you what, Doctor,
7    let's switch photographs and show you 219.  Maybe
8    that's a better shot to get a better perspective of
9    the other wounds.  Let's go back to this one.  I don't
10   think we've talked about that one yet.  Can you show
11   us the area of damage or what it did.
12   A.   The one here, that's another -- that's a stab
13   wound at the front of the left shoulder, and that's a
14   one-and-a-half inch stab wound.  That wound went into
15   the underlying soft tissue of the muscle.  It went
16   about three-and-a-half inches deep.
17   Q.   Three-and-a-half inches deep?
18   A.   Yes.
19   Q.   Was that a fatal wound there?
20   A.   Well, that went into the soft tissue and the
21   muscle, didn't hit the -- the vital organs or the
22   major artery.
23   Q.   What about the -- this wound over here?
24   A.   The wound you pointed here at this part of
25   the upper arm, that was at the outer surface of the

162

1    left upper arm.  That one went in about
2    three-and-a-half inches into the muscle, the soft
3    tissue of the muscle in the left upper arm.
4    Q.   Was that a fatal wound?
5    A.   That's another wound that is not fatal.  It
6    didn't hit the organs.
7    Q.   And that was three-and-a-half inches deep?
8    A.   Yes, sir.
9    Q.   Let's go back to the area at the base of the
10   neck, and I'm going to let you describe for the jury
11   what we're seeing and what these wounds were and what
12   damage they caused, and I'm looking at 217.  Can you
13   describe the wounds found on Mr. Castro on or around
14   his neck area.
15   A.   At the left side of the neck, at the lower
16   left side of the neck here, there's one stab wound
17   this location that's a triangular shape.  It's a
18   one-inch stab wound, and it went three-and-a-half
19   inches deep into the tissue.  That stab wound is one
20   that cut one of the vessels in the neck that are
21   called the jugular -- "external jugular vein," and
22   that's a major vein at that part of the neck.  That --
23   that caused severe bleeding or blood loss in that
24   part.
25   Q.   Is this wound that you pointed down here, is

163

1    that -- was that a fatal wound by cutting the external
2    jugular vein?
3    A.   Yes, sir.
4    Q.   Why?
5    A.   That's a major vessel and it caused blood
6    loss from that part of the body.
7    Q.   What, if any other wounds can you describe
8    for the jury that we're seeing in that photograph
9    around the neck area?
10   A.   The other wound that's noted right here at
11   this -- this left side of the neck is a three-inch
12   wound measured in this location, is three inches, and
13   then it's deep, three inches deep.
14   Q.   Three inches long and three inches deep?
15   A.   Yes, sir.
16   Q.   What, if anything -- damage did that cause?
17   A.   There's a muscle that runs underneath here
18   that controls the turning of the head from one side,
19   turning it to the other side.  That muscle was
20   transected.  It was cut.  Underneath that muscle is
21   the carotid artery, it's a major artery in the left
22   side of the neck.  That artery was cut in two.  The --
23   next to that artery is a vein called "the internal
24   jugular vein."  That vein was cut in two.  So that's
25   injury causing severe blood loss from that -- from

164

1    those -- that artery in the vein.  The vein is
2    draining the blood from the head, from the brain out
3    back -- back toward the heart, and the artery is
4    carrying the blood up to that -- to that part of the
5    body.
6    Q.   So the carotid artery that was transected or
7    cut in half, as you said, is one that would supply
8    blood to, like, the brain?
9    A.   It's carrying blood to the face, to the head
10   -- to the brain, to the head, those structures.
11   Q.   All that area in the head.
12   A.   Yes, sir.
13   Q.   Is the internal jugular vein, is that a major
14   vessel, also?
15   A.   Yes, sir.
16   Q.   So the combination -- what happens when you
17   get both of those cut, the carotid artery and the
18   internal jugular vein?
19   A.   The vein is draining blood from that part of
20   the body, so that's going to be oozing blood out from
21   the vein.  The -- the artery is -- is carrying the
22   blood from the heart to the brain and into the head.
23   Every time the heart pumps a burst of blood is going
24   through that artery that's going shooting up toward --
25   toward the head and the brain.  So every time the

165

1 heart pumps, you're going to have a burst of blood
2 being pumped out that artery.
3     Q.  Is that a fatal -- both of those fatal
4 wounds?
5     A.  Yes, sir.
6     Q.  How long would -- could a person survive with
7 that cut, the damage you've seen inflicted?
8     A.  It's not an instant death. It's not at that
9 instance the person dies. It's going to be a rapid
10 death, very quick. They're going to -- they're going
11 to collapse, go into shock, probably, within a few
12 minutes, within five minutes, and then within another
13 10 minutes or 15 minutes they're going to be -- their
14 heart's going to shut down, their organs are going to
15 shut down and they're going to die.
16     Q.  Now, that's not the only fatal wound. Is
17 that also what's going on in the back? You said that
18 one of the back wounds is a lung. That, in connection
19 with this one, what is it doing?
20     A.  You have a combination of different fatal
21 wounds acting to cause the person to die.
22     Q.  I'm going to show you what's marked State's
23 Exhibit 221, and I want to ask you about these other
24 wounds and, I guess, the chin and underneath the chin?
25 What, if any damage did that cause and could you

166

1 describe those for the jury?
2     A.  Yes, there was -- at the lower chin area,
3 there's an incise, in other words, just cutting along
4 the surface of the -- the skin. It's not cutting into
5 the -- a major vessel or any organs. It was just
6 cutting along the surface there. There's -- at the
7 right chin there's another incise wound that's going
8 -- cutting parallel to the surface, slashing along the
9 surface. It's not cutting -- it's not a stab wound.
10 It's not penetrating into the body. It's not hitting
11 any of the organs or vessels into the area.
12     Q.  So that would have been one of the
13 slashing-type wounds?
14     A.  Those would be slashing-type wound.
15     Q.  What other wounds, if any, can you describe
16 for the jury that you noted around the neck area?
17     A.  On the lower neck there was another slashing
18 wound or incise wound going across the surface at the
19 front.
20     Q.  Are those other wounds fatal wounds, those
21 slashing-type wounds around the chin?
22     A.  No. These are not fatal type.
23     Q.  Are those consistent with stab wounds or stab
24 slash -- or knife slashing?
25     A.  They're consistent with knife slashing.

167

1     Q.  Now that we've talked, is there any other
2 wounds on the neck that you haven't described to the
3 jury yet that I've missed?
4     A.  No, sir.
5     Q.  I'm going to show you what's been marked as
6 State's Exhibit 220. And you pretty much described --
7 you pretty much described the wounds along Mr.
8 Castro's neck and upper shoulder and back. I want to
9 know about the rest of his body, his torso, abdomen,
10 legs. Did he have any wounds there?
11     A.  This was no injuries noted at the -- at the
12 legs or the thighs or the rest of the left -- the rest
13 of the -- the left arm or left hand. There was no
14 injuries noted to those parts of the body.
15     Q.  So as far as his abdomen is concerned or this
16 area here and down here, there was no other stab
17 wounds, they were all concentrated around the head,
18 neck and shoulder.
19     A.  That's right.
20     Q.  And the back, I'm sorry.
21     A.  And the back.
22     Q.  Okay. Now, let's go to the next part of the
23 body I want to talk to you about is the head. And
24 I've got a series of photographs that will show the
25 areas of the head. And I want to start with State's

168

1 Exhibit No. 223.
2     MR. SKURKA: And would you go in a little
3 closer on that, Mr. Schimmel.
4     Frank, do you mind turning this light off
5 a little bit? I think that's making a glare.
6     THE COURT: I don't think that one goes
7 off completely.
8     MR. SKURKA: Well, that's a little
9 better.
10     THE COURT: That's about as good as
11 you're going to get.
12     MR. SKURKA: Okay.
13     Q.  (BY MR. SKURKA) What, if any injuries did you
14 see on Mr. Castro's face and head?
15     A.  The nose, the surface of the nose had areas
16 where there was small cuts or what we call "incise
17 wounds" or "slash wounds" on the surface of the nose.
18 The upper part of the nose, up in this location, going
19 up toward the -- the upper eyelid on the right was a
20 slash or incise wound that went along this surface.
21     Q.  Are any of these on his face penetrating
22 wounds or are they slash wounds?
23     A.  These are slash-type wounds.
24     Q.  I have another close-up of the area around
25 the nose. It's marked State's Exhibit 213. Does that

169

1   show any of the wounds to Mr. Castro?

2       A.   Yes, it shows the line I described at the top

3   upper part of the nose and then on the front lower

4   part of the nose at the left side of the nose.

5       Q.   Is this what you're talking about a slash

6   wound that would be into the eye and goes down to the

7   edge of the nose?

8       A.   This one here would be a slash, these two

9   would be a slash, this one would be a slash.

10      Q.   Okay.  Let's go back off of that one and go

11  to the sides of the head, and I'm going to show you

12  what's marked State's Exhibit 216.  What does that

13  depict, please?

14      A.   In front of the left ear there was another

15  slash wound or incise wound that was at this location.

16      Q.   So, for the record, you're showing right on

17  the -- right in the -- to the left of the left ear,

18  correct?

19      A.   Just in front of the -- of the left ear and

20  also this photograph shows about the same level as

21  this one at the earlobe.

22      Q.   What about this one down here, is that the

23  one that you described earlier on the neck or is that

24  just one under the ear?

25      A.   This photograph shows some of the same ones

170

1   we described before, but the -- the skin is -- is

2   being pushed back.  But there is some -- there is an

3   incise wound behind the ear and -- and in this area

4   here and in this area here.

5       Q.   Okay.  What about this area here in the

6   hairline here and up here, did you notice any other

7   kind of wound or marks -- and I think I may have --

8   well, how about over here, what is this?

9       A.   There's some blood staining in this area, and

10  then, there's some -- also this -- it looks like it's

11  got darker area where there's some -- some superficial

12  cutting, also.

13      Q.   I have another close-up marked 215.  What

14  does that depict?

15      A.   This is a photograph that shows the -- the

16  left side of the head at the left ear.  It shows some

17  blood on the surface of the ear.  It shows the slash

18  wound into the skin in front of the left ear and also

19  some more on the slash area here on the earlobe.

20      Q.   What about these spots that are up here in

21  the hair above the left ear, what are they?

22      A.   Some of these -- these are at the -- there's

23  no cuts that were noted in that part, but it looks

24  like it's got the same dark staining that's probably

25  from the blood area.

171

1       Q.   Is that consistent -- you mentioned all these

2   wounds around the neck, the back, the side of the

3   face, the face, is that consistent with a person

4   turning or twisting as they're being stabbed?

5       A.   Yes.  It could be consistent with the person

6   getting those injuries at the time they're moving and

7   those injuries are happening.

8       Q.   Okay.  Would it have been in your experience

9   and your training would people stand still when they're

10  getting stabbed?

11      A.   Most of the time, no.

12      Q.   What do you mean?

13      A.   Most of the time if they're awake, they're

14  alert, they're getting injured, they're moving around

15  trying to get away from the attack.

16      Q.   Are these wounds in the whole body of Pablo

17  Castro consistent with that scenario?

18      A.   Yes, sir.

19      Q.   Now that we've finished with the head area, I

20  want to go into a little more detail with the ones

21  around the left shoulder.  And I've got two

22  photographs marked 218 and 212 to show you.  And we'll

23  start with that one.  What does that depict?

24      A.   This shows the stab wound at the top of the

25  left shoulder, the inch and a half stab wound, and

172

1   this shows the stab wound at the outside part of the

2   left upper arm or the outer left shoulder area.

3       Q.   Are they always that wide like that?

4       A.   They -- depending on how the body's resting,

5   they can close up.  If you turn the body a certain way

6   or the way that the body is put a certain way it

7   causes them to open up more.

8       Q.   And finally -- I'm sorry, 218.  Is that a

9   close-up of the one on the outside of the left arm?

10      A.   Yes, sir.

11      Q.   Let me take that off.  I want to switch

12  gears.  You've talked about a lot of the wounds that

13  you've seen and on the torso, meaning the abdomen, the

14  front, the back, the neck, the head.  I want to talk

15  to you, now, about something that's called defense

16  wounds.  Can you explain to the jury what I mean when

17  I say defense wounds?

18      A.   Defense wounds would be the type you'd expect

19  to see on the hands or the back of the arms, that

20  someone is trying to defend themselves when they're

21  being attacked.

22      Q.   Can you demonstrate or show on your own body

23  how those -- where those usually are?

24      A.   If someone is coming at the person with a

25  sharp-edged knife and they're being attacked, the

173

1  person may block it with their hand or they may end up
2  having their hand come in contact with it and get cut
3  in the back, or their forearm get cut in the back.
4      Q.   What does that indicate to you when you see
5  the presence of defense wounds on a victim?
6      A.   Well, that would indicate the person -- the
7  victim's alive and they're conscious during the
8  attack, and they're trying to defend themselves from
9  the attack.
10     Q.   Did you find examples of defense wounds on
11  the victim in this case, Pablo Castro?
12     A.   Yes, sir.
13     Q.   Where?
14     A.   The back of the right forearm, or on this
15  area, there was a half-inch slash at the back of that
16  right forearm.
17     Q.   I believe I have a photograph of it marked
18  State's Exhibit 206.  Is that visible on that
19  photograph?
20     A.   This is a photograph that has some stain on
21  it, but it's starting to show up in this area.
22     Q.   Okay.  I think I have the other one, 205.
23     A.   Yes, sir.
24     Q.   Now, using your own arm, can you corres -- or
25  show us where that corresponds to.

174

1      A.   That would correspond to the part on the --
2  on the arm, on the forearm, at the top of the forearm.
3      Q.   And would you classify that as a defense
4  wound on Pablo Castro's right forearm?
5      A.   Yes.
6      Q.   You also mentioned there may be defense
7  wounds on the hands as if to fend off an attack.  Did
8  you find any evidence of defense wounds on Mr.
9  Castro's hands?
10     A.   Yes.
11     Q.   Where?
12     A.   The back area of the right hand, in the palm
13  surface, there was a quarter-inch cut, incise wound in
14  that area.  The back of the left small finger of the
15  -- the right small finger, there was another one-half
16  inch cut.  The back of the right middle finger had two
17  quarter-inch cuts.  The palm surface -- actually on
18  the palm surface, on the right hand, on the same hand,
19  had another cut at the bottom of the fingers that was
20  an inch and a half.  And the palm surface on the right
21  ring finger also had a cut going along the surface.
22  And the thumb on the right palm had a half-inch cut.
23     Q.   I've lost count of how many defense wounds,
24  but how many defense wounds would that be altogether,
25  including the forearm and the hand?

175

1      A.   That's a total of eight.
2      Q.   Now, are those included in your total of the
3  29 wounds?
4      A.   Yes.
5      Q.   Okay.  So eight of those wounds are ones that
6  he received by trying to defend himself?
7      A.   Yes.
8      Q.   I've got some photographs.  I know you used
9  your own hand to describe to the jury where these are
10  and what they look like, but let's show photographs to
11  the jury.  204, what is that a photograph of?
12     A.   This is a photograph of the -- the back of
13  the right hand, showing some of the cuts at the back
14  of the -- of the middle finger, and then had cuts at
15  the -- at the back of the ring finger.  You can start
16  to see some of the cuts here at the edge on the -- of
17  the palm, but it's got a -- it's a dark area on the
18  photo.
19     Q.   What about the area right here in the middle
20  between I guess your middle and ring finger?
21     A.   There's some bloodstain here.  This is --
22  this is the cut here on the -- on the middle finger.
23     Q.   Okay.  So this isn't a cut, this is just a
24  stain?
25     A.   Yes, sir.

176

1      Q.   The cuts are actually down here, around here
2  and here?
3      A.   Yes, and in this location, but it's dark in
4  the photograph.
5      Q.   You just can't see it, 'cause it's dark in
6  the photograph?  Are the hands showing any evidence of
7  bruising or just the cuts and the bloodstains?
8      A.   There's some bleeding in the tissue around
9  it.
10     Q.   What does that indicate to you?
11     A.   You get some bleeding around it from the --
12  from the knife itself bruising the tissue.
13     Q.   By the penetration of the knife, that causes
14  the tissue to bruise or bleed around it?
15     A.   By compressing the tissue and breaking some
16  of the small vessels.
17     Q.   I've got another photograph that's a close-up
18  of the outside of the finger, I believe, 224?  What
19  does that show?
20     A.   This is a photograph that shows the -- the
21  finger, the back of the finger, and the cuts along the
22  back of the finger.
23     Q.   Could you tell us what finger that is.
24     A.   It looks like the ring or the small finger on
25  the right hand.

177

1    Q.   The pinky finger?

2    A.   Yes.  Pinky.

3    Q.   I'm sorry, I -- I'm real technical medical,

4    aren't I, the pinky finger.

5    A.   Yes, sir.

6    Q.   Okay.  So that's the back of the pinky

7    finger.  Does that -- that shows a defense wound, too,

8    that you've described to the jury?

9    A.   Yes, sir.

10    Q.   Okay.  That's the outside of the back of the

11    hands.  I have three more photographs to show you of

12    the palm itself, or the inside of the hand.  And let's

13    just start with State's Exhibit 202.  Using your laser

14    pointer, was that the left or right hand of Mr.

15    Castro?

16    A.   All these injuries that we've noted -- have

17    been noted on the right hand.  This is a photograph

18    that shows the right hand, and it shows the cut on

19    the -- the center part here, on the -- on the thumb,

20    on the right thumb; then along here at the base, where

21    the -- where the middle finger and the ring finger are

22    attached at the front of the palm, there's another

23    slash right there.  And then the -- the ring finger

24    itself, there's another cut around the surface here.

25    Q.   So you can -- you've located on the palm

178

1    itself, or the inside of the hand, cuts on the thumb,

2    the bottom of the fingers and then this finger,

3    itself.

4    A.   Yes, sir.

5    Q.   I think I've got another close-up of that,

6    203.  Does that show those kind of injuries maybe a

7    little more close-up?

8    A.   Yes.  It shows the cut on the -- on the

9    thumb, the cut on the -- the base here, the -- of the

10    -- the palm and the base of the fingers.

11    Q.   And State's Exhibit No. 201, what does that

12    show?

13    A.   It is a photograph, a close photograph,

14    showing the cuts at the -- at the thumb.

15    Q.   Is that one cut or more than one cut along

16    the thumb?

17    A.   There's a cut that's noted here and another

18    one above it here, and one here, and then maybe also

19    in this location that looks like he had another one

20    there.  So you have at least four there.

21    Q.   Okay.  And those are -- are those penetrating

22    wounds or incise wounds?

23    A.   Those are incise wounds.  He's just cut on

24    the surface.

25    Q.   Okay.  So those are, of course, not fatal

179

1    wounds, are they?

2    A.   No, sir.

3    Q.   In -- are all these wounds that these last

4    series of photographs show you on his forearm, the

5    back of his hands and the palm of his hands, all

6    consistent with defense wounds for Pablo Castro?

7    A.   Yes.

8    Q.   Are they consistent with defense wounds

9    against a sharp pointed instrument like that's

10    consistent with a knife?

11    A.   Yes.

12    Q.   The last -- the items I want to show you on

13    the exhibits are some exhibits you gave me when I

14    spoke with you a few weeks ago, 225, and that's

15    already been admitted into evidence.  What is that?

16    A.   This is a diagram that shows the -- the case

17    number for this case, then it has the front -- a

18    diagram of the front of the body and a diagram showing

19    the back of the body.  And on the diagram there's

20    notations made where the stab wounds are and incise

21    wounds or slashes were.  These are the ones that are

22    noted at the back, and then these other ones here were

23    the ones noted at the hand, and then -- the back of

24    the right hand and then also at the front of the right

25    hand.  And this is -- shows some of the -- of the

180

1    injury at the right thumb, the face is cut off.

2    Q.   Do those diagrams represent the wounds found

3    on Pablo Castro by you?

4    A.   Yes, sir.

5    Q.   And do they show them on the front of his

6    body, the back of his body and his hands?

7    A.   It's his right hand.

8    Q.   Right hand.  There were no defense wounds on

9    his left hand?

10    A.   There's none noted on the left hand.  The

11    front of the right hand and the back of the right

12    hand.

13    Q.   And State's Exhibit 226, what would that be?

14    A.   This is diagram that shows the -- the face

15    area, the head area, that shows the -- the front, and

16    then the -- the right side and the left side of the

17    face and neck area.

18    Q.   Those are essentially just diagrams of the

19    head and neck area, instead of the whole torso,

20    correct?

21    A.   Yes, sir.

22    Q.   And do both of those diagrams that I've

23    introduced show the location of the wounds that you

24    noted in your report and that you've described for the

25    jury, either through your testimony or through the

181

1 photographs shown to the jury?

2    A.  Yes.

3        MR. SKURKA:  Thank you.

4        Frank, can I have the lights, now,

5 please?

6    Q.  (BY MR. SKURKA) I just had a couple of more

7 questions to finish up with, Doctor.  Based on your

8 overall examination of the victim identified as Pablo

9 Castro in this case, did you -- were you able to

10 determine the cause of death?

11    A.  Yes, sir.

12    Q.  Can you tell the jury your official ruling in

13 the cause of death.

14    A.  The cause of death was multiple sharp force

15 injuries.

16    Q.  And are those multiple sharp force injuries,

17 again, consistent with being stabbed by a knife?

18    A.  Yes.

19    Q.  Did you also rule in the manner of death in

20 this case involving Pablo Castro?

21    A.  Yes, sir.

22    Q.  And what was the ruling as far as the manner

23 of death?

24    A.  The manner of death was classified as

25 homicide.

182

1    Q.  And what does homicide mean?

2    A.  Homicide means death at the hands of another.

3    Q.  Was any knife ever presented to you as part

4 of your investigation, what type or kind of knife that

5 was found or recovered by the police?

6    A.  No.

7    Q.  Okay.  But it's still your testimony that it

8 was a knife wound.

9    A.  Consistent with a knife.

10    Q.  Consistent with a knife wound.

11    A.  Yes.

12        MR. SKURKA:  Dr. Fernandez, thank you.  I

13 don't think I have any other questions.

14        THE COURT:  All right.  Cross.

15        MR. GARZA:  May I proceed, Your Honor.

16        THE COURT:  Yes.

17            CROSS-EXAMINATION

18 BY MR. GARZA:

19    Q.  Dr. Fernandez, from the amount of the -- of

20 stab wounds, are you able to tell how long it took for

21 them to be inflicted?

22    A.  As far as the amount of time it would take

23 for the stab wounds, as far as there being ten stabs

24 wounds, enough time to stab someone, or, you know, to

25 move the hand with a sharp-edged knife ten times, that

183

1 would be the minimum.

2    Q.  In that amount of time.  What -- what would

3 that infer to you?

4    A.  As far as the -- the injuries themselves, you

5 look at the pattern of the injuries or the stab

6 wounds, for instance, the ones on the back, they're

7 clustered together, they're close together, the ones

8 in the neck are close together, so that indicates to

9 me it's probably a very, very rapid-type action.  With

10 the four stab wounds in the back are a cluster of

11 wounds that happened one after -- probably one right

12 after another.  The ones in the neck, they're close

13 together, they're probably wounds that happened one

14 right after the other.

15    Q.  So does it infer that they were done rapidly?

16    A.  Yes, sir.

17    Q.  Does it also infer a sense of rage, perhaps?

18        MR. SKURKA:  Objection.  That calls for

19 speculation.

20        THE COURT:  Well, I'm going to overrule

21 that.  I mean, I -- can -- can you determine that,

22 Doctor?

23        THE WITNESS:  As far as determining

24 what -- the type of mental state the person's in

25 that's causing these injuries, I can't tell from the

184

1 injuries themselves.

2        THE COURT:  All right.

3    Q.  (BY MR. GARZA) Are you familiar with the

4 term, "perseveration"?

5    A.  I don't remember when I've heard that.

6    Q.  So you're not familiar with it?

7    A.  Off the hat, it doesn't ring a bell.

8    Q.  The wounds that you've described to the jury

9 are -- some of them are different sizes; is that

10 correct?

11    A.  Yes, sir.

12    Q.  Could that be due to the use of different

13 knives, perhaps?

14    A.  It's possible.

15    Q.  Okay.  Now, as far as the use of a serrated

16 knife, does a serrated knife have a tendency to leave

17 some sort of different indications in their wound

18 patterns?

19    A.  A serrated knife may or may not leave a

20 different mark on the surface of the body.

21    Q.  Can you explain that?

22    A.  With a serrated knife, it would be an edge

23 that has different ridges to it, a ridge pattern from

24 the sharp edges.  And if it scrapes along the surface

25 of the knife or if it drags along the surface of the

185

1  body, then you may see a pattern on the surface of the
2  body that would be consistent with a serrated-type
3  knife.
4      Q.  Were there any indications from any of these
5  wounds that you examined as to whether or not they
6  could have been caused by a serrated knife?
7      A.  I didn't see anything specifically on the
8  surface that looked to me look a pattern from a
9  serrated knife, but I can't say whether it is a
10 serrated knife or not a serrated knife.
11             MR. GARZA:  Thank you, Doctor.
12             Pass the witness.
13             THE COURT:  Anything else?
14             REDIRECT EXAMINATION
15 BY MR. SKURKA:
16     Q.  The fact that the wounds are different sizes,
17 does that necessarily mean there's two different or
18 three different knives?
19     A.  No, it doesn't necessarily mean that.
20     Q.  What does -- what does it mean?
21     A.  Well, you can have two different wounds --
22 two difference appearances of the wound on the body
23 because of different factors.  One of them may be the
24 knife goes in at a different angle, the person is
25 moving that's being attacked and it causes a change in

186

1  the shape of it.  There's different factors that can
2  cause you can have a different depth to the wound,
3  also, from the same knife.
4      Q.  So if you had one knife that was five or six
5  inches long and you did different stabbings, as
6  opposed to angle, depth, direction, it might appear
7  that they're different size wounds, but they could all
8  be coming from the same knife, could they not?
9      A.  Yes.  Those are the type of factors that
10 would cause that.  That's right.
11     Q.  And did you see any evidence in Mr. Castro's
12 wounds that a knife was, like you said, dragged along
13 the body, that would reveal a serrated knife?
14     A.  No.  I didn't see anything that I'd call a
15 pattern from a serrated knife.
16     Q.  So it is -- your testimony is that it could
17 be a serrated knife, you just can't tell the
18 difference if it's a serrated knife or straight edge.
19     A.  That's correct.
20     Q.  Okay.  The last question I want to ask you,
21 did Mr. Cast -- did you do a toxicology screen on Mr.
22 Castro?
23     A.  Yes.
24     Q.  Can you tell the jury what you're talking
25 about when I say "a toxicology screen"?

187

1      A.  Toxicology involves testing the blood for
2  drugs, drugs of abuse, alcohol.
3      Q.  Did you do that test on -- on the victim in
4  this case, Pablo Castro?
5      A.  Yes, sir.
6      Q.  Did you find evidence of alcohol in Mr.
7  Castro's body?
8      A.  There was none detected.
9      Q.  Did you find evidence of marijuana in Mr.
10 Castro's body?
11     A.  Yes, there was none detected.
12     Q.  There was none detected.  How about cocaine
13 or heroin or any other abusive or illegal drugs?
14     A.  Yes, those drugs of abuse were tested for and
15 they were none detected.
16     Q.  So Mr. Castro had no drugs or anything in his
17 body, correct?
18     A.  For those tests, there were none detected.
19             MR. SKURKA:  Thank you.
20             I'll pass the witness.
21             THE COURT:  Anything else?
22             MR. GARZA:  No other questions.
23             THE COURT:  All right.  You may stand
24 down.
25             MR. SKURKA:  May he be excused, Your

188

1  Honor?
2              THE COURT:  Yes, he may.
3              Please don't discuss your testimony with
4  anyone, except for the lawyers.
5              THE WITNESS:  Yes, sir.
6              MR. SKURKA:  Your Honor, at this time
7  the State rests its case.
8              THE COURT:  All right.  Ladies and
9  gentlemen, I'm going to go ahead and let you go for
10 the day, all right?  Be back at 9:00 tomorrow and we
11 will resume the trial.
12             All right, all rise for the jury.
13             (Jury exits courtroom.)
14             THE COURT:  All right.  Be seated.  What
15 says Defense Counsel?
16             MR. GARZA:  Your Honor, at this time,
17 the Defense Counsel also rests.
18             THE COURT:  All right.  I suppose there
19 being no rebuttal, therefore --
20             MR. SKURKA:  No, Your Honor, no rebuttal.
21             THE COURT:  -- both sides close.
22             MR. SKURKA:  Yes, Your Honor.
23             MR. GARZA:  That's correct.
24             THE COURT:  Okay.  I'll let you -- what
25 we'll do is I'll let you rest in front of the jury in

189

1  the morning, and then we'll go into closing arguments.

2         Now, let's talk a little bit about the

3  Charge.  I've got a Charge here.  Is the Defense

4  requesting any instructions, additions -- in addition

5  to what we have here?

6         MR. GARZA:  Your Honor, I think there's

7  some indication possibly from some of

8  my cross-examination, where I would ask the Court to

9  consider inserting in the Charge a -- an instruction

10  as to a lesser included offense.

11         THE COURT:  Being murder.

12         MR. GARZA:  Murder.  Yes.  And also

13  accomplice, the -- the instruction on accomplice

14  testimony.

15         THE COURT:  Oh, yeah.  I think the

16  accomplice testimony definitely needs to be in there.

17         MR. JONES:  This is an accomplice as a

18  matter of law because he's a Co-Defendant.

19         THE COURT:  Uh-huh.

20         MR. SKURKA:  And my response, Your

21  Honor, to the first thing, I don't see any evidence of

22  it being a lesser included of murder.  The evidence is

23  clear that this was a robbery.  We've had, I know,

24  evidence all over the place about this being a

25  robbery, both from the Co-Defendants and the actual

190

1  evidence shown from the trial.  I would -- I would

2  reject the motion for the lesser included.

3         As for the accomplice witness I guess I

4  probably don't have a choice on that --

5         THE COURT:  I don't you do.

6         MR. SKURKA:  -- in saying that the

7  accomplice witness should probably go in, and I'm

8  assuming that we're -- we're talking about Christina

9  Chavez --

10         THE COURT:  Uh-huh.

11         MR. SKURKA:  -- and the instruction says,

12  "You instructed -- instructed that she's an accomplice

13  witness, as a matter of law," and then the law of

14  corroboration on that.  That -- that's the instruction

15  you're talking about, Mr. Jones and Mr. Garza?

16         MR. GARZA:  Correct.

17         MR. JONES:  Right.

18         MR. SKURKA:  Okay.

19         THE COURT:  Okay.

20         MR. SKURKA:  If the Court requires that,

21  I can put that in --

22         THE COURT:  Yeah, let's put --

23         MR. SKURKA:  -- but that has to be

24  corroborated.

25         THE COURT:  Yeah, let's put that in.  I

191

1  don't -- the question -- okay, so that's agreed.

2  We'll put that in.

3         The question then becomes lesser included

4  of murder.  Let's see, what evidence do we have that

5  there was a robbery or attempted robbery?  Well, we

6  have the -- the -- the Co-Defendant certainly

7  testified that they had planned the robbery; we have

8  the Defendant running from the scene, running to

9  one -- not that Co-Defendant's sister's house, but

10  another one, stating that they had robbed somebody; we

11  have --

12         MR. JONES:  No, they didn't --

13         THE COURT:  -- testi --

14         MR. JONES:  No.  They said they stabbed

15  somebody.

16         MR. GARZA:  No, a stabbing, that they

17  stabbed somebody.

18         THE COURT:  Oh, okay, all right.  All

19  right, then, scratch that.

20         MR. GARZA:  I don't know that robbery was

21  ever mentioned.

22         MR. SKURKA:  Judge, may I clarify, too,

23  that -- and I don't know, the Court probably hadn't

24  forgotten this, but the two eyewitnesses, Kashif Butt

25  and Mariano Cervantes, both testified that the

192

1  Defendant and his Co-Defendant were going through the

2  pockets of the person as he fell to the ground.

3  That's clearly evidence of robbery, going through the

4  pockets.

5         THE COURT:  Now, I -- I know that --

6  that, certainly -- I recall Mr. Butt testifying as to

7  that after you showed him the statement.  The other

8  witnesses, I recall, though, recalled --

9         MR. GARZA:  Nothing about that until he

10  was reminded of it.

11         MR. SKURKA:  Well --

12         THE COURT:  Well, one of the witnesses, I

13  believe, recalled it and one of them did not, until he

14  was reminded.

15         MR. SKURKA:  That's right.  And just to

16  clarify the record, Mr. Butt said that both of them

17  had gone through the pockets.  Mr. Cervantes did not

18  remember it, until he refreshed his memory, and said

19  that I think the girl had gone through the pockets.

20         THE COURT:  Yeah, then we also had

21  testimony from the Co-Defendant that -- that --

22         MR. SKURKA:  $1.25.

23         THE COURT:  The $1.25, that she saw the

24  other Co-Defendant run in with $1.25, and I think that

25  the $1.25 was later recovered.

193

1   MR. SKURKA:  The dollar was recovered.

2   THE COURT:  It was bloody.

3   MR. SKURKA:  And it was bloody.  And it

4   was found in the Ford van.

5   THE COURT:  Okay.

6   MR. SKURKA:  Also, I would point out,

7   Judge, the extraneous offenses that were brought in to

8   show the intent, or the other thing of robbery --

9   THE COURT:  Well --

10  MR. SKURKA:  -- since he robbed the two

11  Whataburgers, I brought those in to show the intent or

12  motive or plan or intent was to rob, and the other

13  ones since they just kept doing robberies.

14  THE COURT:  But the question is, do they

15  have any evidence to show the lesser included?  I

16  mean, you've certainly got evidence to get to the

17  jury.  I mean, I -- I don't think -- I don't think

18  they're --

19  MR. JONES:  It's not an option.

20  THE COURT:  -- they're saying that.

21  MR. JONES:  No.

22  THE COURT:  That's no even the issue.

23  The issue becomes whether there's --

24  MR. SKURKA:  But the Blockburger test

25  shows that it's -- to get a lesser included, you have

194

1   to have evidence of the lesser included.

2   MR. GARZA:  Well, some of the evidence

3   that we would like to be able to be allowed to argue

4   as part of our argument to the jury is that it could

5   have just constituted a theft, Judge, and --

6   MR. JONES:  Well, but -- but can I join

7   in here?

8   THE COURT:  Uh-huh.

9   MR. JONES:  All right, the question is

10  here, at the time the homicide took place, what was

11  the purpose of the homicide?  In other words, was it

12  -- was it committed in order to affect or to get the

13  money?

14  THE COURT:  Or was it just committed just

15  for the fun of it?

16  MR. JONES:  Or was it -- was it just a --

17  just kill the guy cause he wanted to kill him, okay?

18  THE COURT:  Cause he wanted to kill him

19  or --

20  MR. JONES:  So now, the -- the --

21  THE COURT:  That's all we have, really.

22  MR. SKURKA:  But there's no evidence of

23  this being an after-the-fact murder.

24  MR. JONES:  But those two fellows that

25  were across the car wash, in their first testimony,

195

1   they -- they -- their in-court memory was that they

2   didn't see the Defendant going through the pockets.

3   The actual money that -- the dollar bill came from

4   Angela and not the Defendant.

5   Also, the -- the manner -- the

6   Co-Defendant said when they set out to so-called "go

7   rob some places," their agreement was that nobody

8   would be hurt.  And so him -- the Defendant stabbing

9   somebody is inconsistent with that agreement.

10  THE COURT:  Well, but if --

11  MR. JONES:  He may have been operating

12  from some --

13  MR. SKURKA:  Except he carried a knife to

14  that robbery.

15  MR. JONES:  He may have been operating

16  under some -- some different motive at the time of the

17  actual -- because that raises an issue, which I think

18  --

19  THE COURT:  Well, that -- that pitch

20  isn't a good one.  I -- I disagree with you.  I mean,

21  if you believe her, that they set out to do a robbery,

22  then I don't think you get there.  The question is, if

23  the jury does not believe her in any way, shape or

24  form, and they reject her testimony, is there evidence

25  to support the lesser included.

196

1   That's where I -- that's where I'm coming

2   from because if you believe her --

3   MR. JONES:  Well, let's -- let's follow

4   that.

5   THE COURT:  I think you're --

6   MR. JONES:  Let's see --

7   MR. SKURKA:  But it's not just her,

8   Judge.  Remember -- and disagreeing with Mr. Jones, it

9   was established that Mr. Butt did see both of them go

10  through pockets.  It was that one witness that only

11  saw her go through the pockets, but under the law of

12  parties, it doesn't really matter.

13  MR. JONES:  But the testimony of those

14  two guys across the street, you know, is, you know,

15  the jury's told they can believe all the testimony or

16  part of the testimony of the witnesses.  It's a

17  possibility that -- that the jury could -- could

18  actually not believe --

19  THE COURT:  Yeah.

20  MR. JONES:  -- Christina Chavez at all,

21  because she -- she had some serious discrepancies in

22  her testimony about whether -- which -- which goes to

23  her credibility.  So if you exclude -- if the jury

24  doesn't believe her, then what are you left with?  So

25  if -- if the jury --

197

1      MR. SKURKA:  There's other evidence of
2  robbery.
3      MR. JONES:  Let me finish.
4      THE COURT:  Let him finish.
5      MR. JONES:  If the jury believes --
6  taking the two witnesses at the car wash, if they
7  believe that their in-court testimony before they were
8  impeached is -- is what happened, then all
9  he's guilty of is -- is a homicide.
10      MR. SKURKA:  Judge --
11      MR. JONES:  And we don't -- we don't know
12  the motive, and they don't have to prove the motive.
13      MR. SKURKA:  I'll make it easy for the
14  Court, I'll take away the appellate issue and agree to
15  a lesser included --
16      THE COURT:  Okay.
17      MR. SKURKA:  -- of murder.
18      THE COURT:  Okay.
19      MR. SKURKA:  I don't want this coming
20  back because of the lesser included.
21      THE COURT:  Okay.  Well, then, done.
22  Let's stick it in there and we'll -- and you going to
23  put the accomplice witness --
24      MR. SKURKA:  Yes, sir.
25      THE COURT:  We've got pretty much an

198

1  agreement on the Charge.  Why don't you be here a
2  little early so --
3      MR. JONES:  Yes.
4      THE COURT:  -- so we can look at the
5  language.
6      MR. SKURKA:  In fact, Judge, if -- if
7  Co-Counsel and Counsel will agree --
8      THE COURT:  Yeah, let's just wait.
9      MR. SKURKA:  -- I'll just get my
10  secretary to go work on it right now and then before
11  they leave today we can hammer it out.
12      MR. GARZA:  We can hang around.
13      THE COURT:  Yeah, let's do that.  We've
14  got --
15      MR. GARZA:  We'll stick around.  We don't
16  have to leave.
17      THE COURT:  We've got plenty of time.
18      MR. SKURKA:  Actually, if you'll wait
19  here a minute, I'll just call down to Loretta and have
20  another version brought up.
21      If you don't mind, we can work in here --
22      THE COURT:  Yeah, let's work it.  Let's
23  do it.
24      (Short recess.)
25      THE COURT:  You-all working on some

199

1  agreements?
2      MR. SKURKA:  That's what we're working
3  on, the Charge.  It should be ready in a few minutes.
4      THE COURT:  Okay.  You-all work it out.
5      MR. JONES:  We agreed.
6      THE COURT:  Okay.
7      MR. SKURKA:  Yeah, that's --
8      THE COURT:  Okay.
9      MR. SKURKA:  You need to come back here
10  and look at this other part.
11      MR. GARZA:  On the lesser included.
12      MR. SKURKA:  No, the part about the
13  lesser included.
14      THE COURT:  If you-all can agree, it's
15  fine by me.  You're working hard.
16      (Short recess.)
17      (Adjournment.)

200

```
 1   THE STATE OF TEXAS )

 2   COUNTY OF NUECES    )

 3               I, Mary Lopez Buitron, Official Court Reporter

 4   in and for the 94th Judicial District Court of Nueces County,

 5   State of Texas, do hereby certify that the above and foregoing

 6   contains a true and correct transcription of portions of

 7   evidence and other proceedings requested in writing by counsel

 8   for the parties to be included in this volume of the Reporter's

 9   Record, in the above-styled and numbered cause, all of which

10   occurred in open court or in chambers and were reported by me.

11               I further certify that this Reporter's Record of

12   the proceedings truly and correctly reflects the exhibits, if

13   any, admitted by the respective parties.

14               I further certify that the total cost for the

15   preparation of this Reporter's Record is $_____ and was

16   paid/will be paid by_____.

17               WITNESS MY OFFICIAL HAND this the  4th  day of

18   _October_____, A.D., 2009.

19

20   _____

21   MARY LOPEZ BUITRON, CSR, RPR, Texas CSR #2731
     Expiration Date: 12/31/2009
22   Official Court Reporter
     94th District Court
23   Nueces County, Texas
     901 Leopard, Room 901
24   Corpus Christi, Texas 78401
     (361)888-0658
25
```