1

```
                    REPORTER'S RECORD
              APPELLATE COURT NO. AP-76,100
             TRIAL COURT CAUSE NO. 04-CR-3453-C
                   VOLUME 20 OF 25 VOLUMES

THE STATE OF TEXAS      )      IN THE DISTRICT COURT
                        )
                        )
VS.                     )      94TH JUDICIAL DISTRICT
                        )
JOHN HENRY RAMIREZ      )      NUECES COUNTY, TEXAS
```

TRIAL PROCEEDINGS

(Continued)

FILED IN
COURT OF CRIMINAL APPEALS

OCT 0 6 2009

Louise Pearson, Clerk

On the 5th day of December, 2008, the following proceedings came on to be heard in the above-entitled and numbered cause before the HONORABLE BOBBY GALVAN, Judge Presiding, held in Corpus Christi, Nueces County, Texas:

Proceedings reported by Stenograph Machine.

```
 1                      APPEARANCES:

 2   MR. MARK SKURKA
     SBOT NO. 18475570
 3   MR. VERNON G. SCHIMMEL
     SBOT NO. 24033039
 4   ASSISTANT DISTRICT ATTORNEYS
     901 Leopard, Rm. 205
 5   Corpus Christi, Texas 78401
     Phone: (361) 888-0410
 6
     ATTORNEYS FOR THE STATE
 7
          -AND-
 8
     MR. EDWARD F. GARZA
 9   SBOT NO. 07731200
     ATTORNEY AT LAW
10   719 S. Shoreline, Suite 201
     Corpus Christi, Texas   78401
11   Phone: (361) 888-8877

12   MR. JOHN GRANT JONES
     SBOT NO. 10917000
13   ATTORNEY AT LAW
     5826 Beauvals Drive
14   Corpus Christi, Texas   78404-6173
     Phone: (361) 884-8141
15
     ATTORNEYS FOR THE DEFENDANT,
16   JOHN HENRY RAMIREZ

17

18

19

20

21

22

23

24

25
```

3

```
 1                         INDEX
                   VOLUME 20 OF 25 VOLUMES
 2                    TRIAL PROCEEDINGS

 3                                                   Page   Vol.
     DECEMBER 5, 2008
 4   Continuation of trial proceedings ................. 4    20
     No objections to Court's Charge .................... 4    20
 5
     Defendant rests and closes ......................... 5    20
 6   State rests and closes ............................. 5    20

 7   Reading of the Court's Charge ...................... 6    20

 8   State waives opening on closing argument ........... 17   20
     Defendant's closing argument ....................... 18   20
 9   State's closing argument ........................... 29   20

10   Alternate juror excused ............................ 46   20

11   Commencement of jury deliberations ................. 46   20
     Note from the jury ................................. 46   20
12   Continuation of jury deliberations ................. 47   20

13   Verdict of the jury ................................ 48   20
     Jury polled ........................................ 48   20
14
     Jury excused for noon recess ....................... 49   20
15   Discussion out of the presence of the jury.......... 49   20
     Noon recess ........................................ 51   20
16
     Conclusion of trial proceedings .................... 51   20
17   Court Reporter's Certificate ....................... 52   20

18

19

20

21

22

23

24

25
```

4

PROCEEDINGS

December 5, 2008

(Out of the presence of the jury.)

THE COURT: We have a copy of the Charge, we had some -- we talked yesterday about different things, but I think we have come to an agreement; is that correct?

MR. SKURKA: Yes, Your Honor.

THE COURT: All right.

MR. GARZA: That's correct, Your Honor.

MR. SKURKA: The State has no objection to the Court's proposed Charge.

MR. GARZA: Defense has no objection either.

THE COURT: All right. Both sides have asked for 20 minutes to argue, is that appropriate?

MR. SKURKA: That's correct, Your Honor.

MR. GARZA: Yes, Your Honor.

THE COURT: All right. Then what we're going to do is, Mr. Garza, we're going to bring the jury in, I'm going to let you rest in front of the jury, and then both sides will close and then I'll go right into reading the Charge.

MR. SKURKA: Could I have like a one-minute warning when I get close?

5

THE COURT: One minute. Both of you.

MR. GARZA: (Nods head.)

THE COURT: Okay. All righty, anything else we need to take up before we bring them in?

MR. SKURKA: No, Your Honor.

THE COURT: All right. Let's bring them in.

(Jury enters courtroom.)

THE COURT: All right, be seated, please. All right, Mr. Garza, what says you?

MR. GARZA: Defense rests and closes.

THE COURT: All right.

MR. SKURKA: The State rests and closes, also, Your Honor.

THE COURT: All right. Ladies and gentlemen of the jury, we are at the point at the trial where I'm going to read the Charge to you, that is, for those of you that have been on the jury before you know what this is. This is basically like your instruction booklet. I'm going to read the Charge to you. You do not have to memorize what I'm saying because you're going to get to take this back with you. This is all the instructions you're going to get, and then after I read the Charge to you, then the lawyers will argue the case to you.

6

All right. "Ladies and gentlemen of the jury: The Defendant, John Henry Ramirez, Jr., stands charged by indictment with the offense of capital murder, alleged to have been committed on or about the 19th day of July, 2004, in Nueces County, Texas. The Defendant has plead not guilty.

"A person commits capital murder if he intentionally or knowingly causes the death of an individual in the course of committing or attempting to commit robbery.

"A person commits the offense of robbery if, in the course of committing theft and with the intent to obtain or maintain control of the property, he intentionally, or knowingly . . . Causes bodily injury to another or intentionally or knowingly threatens or places another in fear of imminent bodily injury or death.

"A person commits the offense of theft if he unlawfully appropriates a property with the intent to deprive the owner of the property. Appropriation of property is unlawful if it is without the owner's effective consent.

"'Attempt' means to commit an act with specific intent to commit -- means to commit an act with specific intent to commit an offense where

7

the act committed amounts to more than mere preparation but fails to effect the commission of the offense intended.

"'Individual' means a human being who is alive including an unborn child at every stage of gestation from fertilization to birth.

"'Bodily injury' means physical pain, illness, or any impairment of physical condition.

"'Serious bodily injury' means a bodily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement or protracted loss or impairment of the function of any bodily member or organ.

"'Appropriation' means and 'appropriate' mean to acquire or otherwise exercise control over property other than real property.

"'Property' means tangible or intangible personal property or any document, including money, that represents or embodies a thing of value.

"'Deprive' means to withhold property from the owner permanently.

"'Effective consent' means assent in fact, whether express or apparent, and includes consent by a person legally authorized to act for the owner. Consent is not effective if induced by

Page 8

1  deception, coercion, force or threats.
2             "'Owner' means a person who has title to
3  the property, possession of the property, or a greater
4  right to possession of property than the person
5  charged.
6             "'Possession' means actual care, custody,
7  control or management of the property.
8             "You are instructed under our law
9  voluntary intoxication shall not constitute any
10 defense to the commission of a crime.
11            "By the term 'intoxication' as used
12 herein is meant disturbance of mental or physical
13 capacity resulting from the introduction of any
14 substance into the body.
15            "A person acts intentionally, or with
16 intent, with respect to the nature of his conduct or
17 to a result of his conduct when it is his conscious
18 objective or desire to engage in the conduct or cause
19 the result.
20            "A person acts knowingly, or with
21 knowledge, with respect to the nature of his conduct
22 or to circumstances surrounding his conduct when he is
23 aware of the nature of his conduct or that the
24 circumstances exist.  A person acts knowingly, or with
25 knowledge, with respect to a result of his conduct

Page 9

1  when he is aware that the conduct is reasonably
2  certain to cause the result.
3             "A person acts recklessly, or is
4  reckless, with respect to circumstances surrounding
5  his conduct or the result of his conduct when he is
6  aware of but consciously disregards a substantial and
7  unjustifiable risk that the circumstances exist or the
8  result will occur.  The risk must be of such a nature
9  and degree that its disregard constitutes a gross
10 deviation from the standard of care that an ordinary
11 person would exercise under all of the circumstances
12 as viewed from the Defendant's standpoint.
13            "A person is criminally responsible if
14 the result would not have occurred but for his
15 conduct.
16            "Now bearing in mind the foregoing
17 instructions, if you find from the evidence beyond a
18 reasonable doubt that on or about the 19th day of
19 July, 2004, in Nueces County, Texas, the Defendant,
20 John Henry Ramirez, Jr., did then and there
21 intentionally or knowingly cause the death of an
22 individual, Pablo Castro, by stabbing Pablo Castro
23 with a knife while in the course of committing or
24 attempting to commit the offense of robbery of Pablo
25 Castro, then you will find the Defendant, John Henry

Page 10

1  Ramirez, Jr., guilty of capital murder as charged in
2  the indictment.
3             "Unless you so find from the evidence
4  beyond a reasonable doubt, or if you have a reasonable
5  doubt thereof, you shall next consider the
6  lesser-included offense of murder.
7             "Now bearing in mind the foregoing
8  instructions, if you find from the evidence beyond a
9  reasonable doubt that on or about the 19th day of
10 July, 2004, in Nueces County, Texas, the Defendant,
11 John Henry Ramirez, Jr., did then and there
12 intentionally or knowingly cause the death of an
13 individual, Pablo Castro, by stabbing Pablo Castro
14 with a knife, but you do not believe or have a
15 reasonable doubt thereof that it was in the course of
16 committing or attempting to commit robbery, then you
17 will find the Defendant, John Henry Ramirez, Jr.,
18 guilty of the lesser included offense of murder.
19            "Unless you so find from the evidence
20 beyond a reasonable doubt, or if you have a reasonable
21 doubt thereof, you will find the Defendant not guilty.
22            "If you should find from the evidence
23 beyond a reasonable doubt that the Defendant is either
24 guilty of capital murder or murder, but you have a
25 reasonable doubt as to which offense he is guilty,

Page 11

1  then you should resolve that doubt in the Defendant's
2  favor, and in such event, you will find the Defendant
3  guilty of the lesser-included offense of murder.
4             "If you have a reasonable doubt as to
5  whether Defendant is guilty of any offense charged --
6  defined in this Charge, then you should acquit the
7  Defendant and say by your verdict 'Not guilty.'
8             "You are instructed that an 'accomplice,'
9  as the term is here used, means anyone connected with
10 the crime charged, as a party thereto, and includes
11 all persons who are connected with the crime by
12 unlawful act or omission on their part transpiring
13 either before or during the time of the commission of
14 the offense, and whether or not they were present and
15 participated in the commission of the crime.  A person
16 is criminally responsible as a party to an offense if
17 the offense is committed by his own conduct, by the
18 conduct of another for which he is not -- for which he
19 is criminally responsible, or by both.  Mere presence
20 alone, however, will not constitute one a party to an
21 offense.
22            "A person is criminally responsible for
23 an offense committed by the conduct of another if,
24 acting with the intent to promote or assist the
25 commission of the offense, he solicits, encourages,

12

1  directs, or aids or attempts to aid the other person
2  to commit the offense.  The term 'conduct' means any
3  act or omission and its accompanying mental state.
4          "A conviction cannot be had upon the
5  testimony of an accomplish unless the jury first
6  believe that the accomplice's evidence is true and
7  that it shows the Defendant is guilty of the offense
8  charged against him, and even then you cannot convict
9  him unless the accomplice's testimony is corroborated
10 by other evidence tending to connect the Defendant
11 with the offense charged, and the corroboration is not
12 sufficient if it merely shows the commission of the
13 offense, but it must tend to connect the Defendant
14 with the commission -- with its commission.
15         "You are instructed that accomplice
16 witness cannot corroborate one another.
17         "You are further instructed that the mere
18 presence of the accused in the company of an
19 accomplice witness shortly before or after the time of
20 the offense, if any, is not in -- in itself,
21 sufficient corroboration of the accomplice witness'
22 testimony.
23         "You are further instructed that while
24 the testimony of an accomplice must be corroborated by
25 proof that tends to connect the Defendant to the

13

1  crime, the Defendant's knowledge or intent may be
2  established by the uncorroborated testimony of the
3  accomplice.
4          "You are charged that Christina Chavez
5  was an accomplice if any offense was committed, and
6  you are instructed that you cannot find the Defendant
7  guilty upon the testimony of Christina Chavez unless
8  you first believe that the testimony of said Christina
9  Chavez is true and that it shows the Defendant is
10 guilty as charged in the indictment; and even then you
11 cannot convict the Defendant, John Henry Ramirez, Jr.,
12 unless you further believe that there is other
13 evidence in this case, outside the evidence of
14 Christina Chavez, tending to connect the Defendant
15 with the commission of the offense charged in the
16 indictment and then from all of the evidence you must
17 believe beyond a reasonable doubt that the Defendant
18 is guilty.
19         "You are instructed that if there is any
20 testimony before you in this case regarding the
21 Defendant having committed offenses other than the
22 alleged offense against him in the indictment in this
23 case, you cannot consider said testimony for any
24 purpose unless you find . . . Beyond a reasonable
25 doubt that the Defendant committed such other

14

1  offenses, if any were committed, and even then you may
2  only consider the same in determining the identity,
3  motive, opportunity, intent, or plan, of the
4  Defendant, in connection with the offense, if any,
5  alleged against him in the indictment in this case,
6  and for no other purpose.
7          "Our law provides that a defendant may
8  testify on his own behalf if he elects to do so.
9  This, however, is a privilege accorded a defendant,
10 and in the event he elects not to testify, that fact
11 cannot be taken as a circumstance against him.  In
12 this case, the Defendant has elected not to testify,
13 and you are instructed that you cannot and must not
14 refer or allude to that fact throughout your
15 deliberations or take it into consideration for any
16 purposes whatsoever as a circumstance against the
17 Defendant.
18         "At this stage of the trial, the jury
19 will restrict its deliberations solely to the issue of
20 guilt or innocence.
21         "All persons are presumed to be innocent
22 and no person may be convicted of an offense unless
23 each element of the offense is proved beyond a
24 reasonable doubt.  The fact that a person has been
25 arrested, confined, or indicted for, or otherwise

15

1  charged with, the offense gives rise to no inference
2  of guilt at his trial.  The law does not require a
3  defendant to prove his innocence or produce any
4  evidence at all.  The presumption of innocence alone
5  is sufficient to acquit the Defendant, unless the
6  jurors are satisfied beyond a reasonable doubt of the
7  Defendant's guilt after careful and impartial
8  consideration of all the evidence in the case.
9          "The Prosecution has the burden of
10 proving the Defendant guilty, and it must do so by
11 proving each and every element of the offense charged
12 beyond a reasonable doubt, and if it fails to do so,
13 you must acquit the Defendant.
14         "In the event you have a reasonable doubt
15 as to the Defendant's guilt after considering all of
16 the evidence before you, and these instructions, you
17 will acquit him and say by your verdict 'Not Guilty.'
18         "The jury is the exclusive judge of the
19 facts proved, of the credibility of the witnesses, and
20 the weight to be given their testimony.  In deciding
21 the question of guilt or innocence, the jury shall be
22 governed by the law as it is stated in this Charge.
23         "After entering the jury room, the jury
24 must first select a presiding juror.  The presiding
25 juror presides over the deliberations, speaks for the

16

1  jury when it wishes to communicate with the Court, and
2  votes with the jury on issues before it. Any verdict
3  reached must be unanimous --" with an exception and I
4  will -- we'll talk about that in a little bit.
5  "Verdict forms applicable to this case are attached to
6  the Charge. If a verdict is reached, it will be
7  indicated by the presiding juror signing his or her
8  name to the appropriate verdict form. Place your
9  verdict on the page containing verdict forms.
10         "During the deliberations, the jury may
11 not:
12         "Communicate with anyone except the Court
13 or officer in charge of the jury;
14         "Separate for any purpose without
15 permission of the Court;
16         "Discuss the case except with each other
17 in the privacy of the jury room; or
18         "Consider or discuss matters not in
19 evidence including personal knowledge or information
20 about any fact or person connected with this case.
21         "Communications to the Court must be in
22 writing. Written communications from the jury will be
23 delivered to the Court by the officer in charge of the
24 jury.
25         "After the arguments of Counsel, the jury

17

1  will go back to the jury room and begin
2  deliberations."
3         There are verdict forms, okay, and there
4  are places for three spots. One is "We, the jury,
5  find the Defendant guilty of capital murder, as
6  alleged in the indictment." "We, the jury, find the
7  Defendant, John Henry Ramirez, Jr., guilty of the
8  lesser-included offense of murder," that is, the
9  lesser included of capital murder if you find that
10 there is a reasonable doubt as to whether robbery or
11 attempted robbery was committed during the commission
12 of the offense; or, if you believe that the State has
13 not proven their case beyond a reasonable doubt, "We,
14 the jury, find the Defendant, John Henry Ramirez, Jr.,
15 not guilty," although the verdict must be unanimous by
16 the jury.
17         Okay. Now, the the State gets to go
18 first and last in their closing arguments. That's
19 because, of course, they have the burden of proof.
20 Mr. Skurka, you may begin your closing arguments.
21         MR. SKURKA: Your Honor, the State will
22 waive its right to open and reserve its right to close
23 in argument.
24         THE COURT: All right.
25         MR. GARZA: May I proceed, Your Honor.

18

1         THE COURT: You may. You want a
2  one-minute warning?
3         MR. GARZA: I probably won't need it but
4  anyway --
5         THE COURT: Okay.
6         MR. GARZA: Good morning, ladies and
7  gentlemen. We're at the crossroads now here at the
8  point of this trial where your task is --
9         JUROR: Can you turn that off.
10        MR. JONES: The -- she's referring to --
11        JUROR: The glare.
12        THE COURT: She's referring to the glare
13 that's coming up here.
14        MR. JONES: Can you turn that off.
15        MR. SKURKA: I'm going to use it.
16        JUROR: Oh, I'm sorry.
17        MR. GARZA: I'm sorry. Do you want me to
18 twist it around? Is that better for you?
19        JUROR: Thank you.
20        THE COURT: Now it's hitting me. Why
21 don't you -- can you turn it off and then turn it on
22 later?
23        MR. GARZA: How's that.
24        THE COURT: That's good.
25        MR. GARZA: Hopefully that won't start

19

1  burning and if it does it will create a tremendous
2  distraction here.
3         We're at the crossroads in this case
4  where you-all are going to have to start using your
5  independent judgment, your common sense, your good
6  sense, your open mind, everything that we've asked for
7  you to promise to us before you decide this case.
8         This is an overwhelming case,
9  undoubtedly. There's been more than 200 exhibits of
10 evidence introduced, a tremendous amount of testimony,
11 and it's a difficult case. It's a difficult case for
12 we, the lawyers, Mr. Jones and I, but I have always
13 been -- I've been doing this for 30 years now and I
14 always get excited over the fact that I have to argue
15 a case to a jury, and I always search my mind and say,
16 "Well, what are you going to tell these folks after
17 they've seen all this overwhelming evidence, what are
18 you going to tell them, what are you going to ask of
19 them and still maintain some semblance of
20 credibility"?
21        Well, I'm going to ask you and tell you
22 to use your best judgment in achieving the truth in
23 this case and achieving some sort of a settlement,
24 some sort of a decision, and for some of you, God
25 knows you've already made that decision. Hopefully

20

1  you haven't but perhaps you have. I've been watching
2  you-all through the trial and I've been seeing your
3  reactions to the evidence, and it's -- it has a
4  telling effect without a doubt, okay, without a doubt.
5  I'm a realist, Mr. Jones is a realist, okay?
6          I want to relay a story to you-all of a
7  case I had as a young lawyer many years ago in Houston
8  when I first started practicing law. I was
9  representing a young man that I had been appointed to
10 represent and it was a tremendous experience for me to
11 start practicing law in Houston because I had had the
12 opportunity while I was there to observe these great
13 lawyers like Percy Foreman and Dick DeGarren and
14 Racehorse Haynes, and we would leave law school, we
15 would leave the lecture halls to go down to the Harris
16 County Courthouse to watch these old lawyers, you
17 know, prance around the courtroom with, you know,
18 their great rhetoric and just, you know, watch their
19 style and everything. This was -- it was just
20 tremendous.
21         But I was representing this young man and
22 the -- it was a drug case where he had already been to
23 the penitentiary before and they had caught him again,
24 they caught him again, and he was a repeat offender,
25 in other words, he hadn't learned his lesson, and he

21

1  was looking at going to the penitentiary for ten
2  years. Anyway, we -- we did a plea on a particular
3  day and then had to go back to court the next day for
4  his sentencing. I believe it was Judge Pete Moore who
5  was a very kindly old gentleman, and I -- I was always
6  in contact with his grandmother who was his greatest
7  supporter, bless her heart. She always had nothing
8  but kind things to say about the young man but he
9  wouldn't learn his lesson, and here he was again.
10         And she walks up to me and says "Mr.
11 Garza, I have a crucifix --" she showed me a
12 handkerchief, "I have a crucifix or a rosary, you
13 know, I would like for you to give to Daniel. If you
14 get a chance, can you ask the Judge if he'll be
15 allowed to take it with him?" And I said "Sure." I
16 didn't look at it or pay too much attention to it. I
17 grabbed the handkerchief, put it in my pocket.
18         I had to go to the bathroom and as I'm
19 sitting there washing my hands it occurs to me, I
20 said, "You know what, I better look in this thing and
21 see what she handed me." So I opened it up and, of
22 course, there was some pills in there, you know, and I
23 went "Jesus, what is this about, you know? Here I am
24 representing this young man and she's giving me these
25 darn pills, you know? I ought to just --" you know,

22

1  my natural, immediate reaction was to get angry, to
2  get mad. You know, here she's asking me to give him
3  more drugs and get me involved and, you know, maybe
4  have me charged for being in possession of them and
5  the whole deal, I mean, just everything and anything
6  was going through my mind, I was just erupting.
7          Came out of the bathroom, going down the
8  hallway and poor grandmother walks around to me and
9  says "Mr. Garza, I'm so sorry, I gave you the wrong
10 handkerchief, I gave you my heart medicine," okay?
11 Reasonable doubt, benefit of the doubt. That's what
12 we're talking about in this case.
13         Specifically, what I want to talk to you
14 about is our client is guilty of murder, quite
15 frankly. That's what he did, killed poor Pablo Castro
16 in the most ugly, vicious, awkward -- can't bring it
17 out to you in any more of a subtle form.
18         You heard the testimony of Christina
19 Chavez tell you that they had, you know, hit rock
20 bottom on their binge and the influence of drugs and
21 everything that was going on throughout their whole
22 three days had a tremendous contributing factor. It's
23 not a defense to it but it had a tremendous
24 contributing factor. They felt the need to try and
25 get more money from people and so robbery was their --

23

1  was their immediate motive, it was their immediate
2  motive. They were going to jack some people and steal
3  things from them, okay, to get more money to buy more
4  drugs, to buy more liquor, to get higher, to get just
5  totally obliterated, whatever.
6          Pablo Castro was not an intended robbery
7  victim, he really was not, and let me tell you why.
8  Get to thinking about this: The very first State's
9  witness, Ms. Salinas, comes in here and tells you
10 what? "I'm out there that day, we're tending the
11 store, and who walks into the store? Angela
12 Rodriguez, and asks -- caught my attention when she
13 asks can I use your facilities?" Okay, she walked in
14 there just a minute or two earlier than the whole
15 incident that occurred out in the parking lot.
16         What was she doing? She was casing the
17 place. Their intention was not to rob Pablo Castro,
18 their intention was to try and rob the store. It only
19 makes sense. Where's the money, where's the money if
20 you're going to take it from somebody? Where's the
21 money if you're going to rob somebody? It's in the
22 store, not poor Pablo Castro.
23         Pablo Castro was at the wrong place at
24 the wrong time and got confronted by the wrong person,
25 John Henry Ramirez, a very angry, a very disturbed,

Page 24

1  very intoxicated, very volatile time-ticking bomb.
2  Something had to have happened in that parking lot
3  after Angela got out of the store that just made John
4  Henry Ramirez explode and consequently brutally killed
5  Pablo Castro.
6            It was never -- they never robbed him. I
7  mean, the -- the very thought of all this other
8  evidence about "Well, Angela went and grabbed
9  something from his pocket, and grabbed it, it was
10 $1.00, $1.25," that's an afterthought, that's what
11 that was. After it was all said and done, after poor
12 Pablo Castro had been killed, that was an afterthought
13 and that constitutes nothing more than a theft. I
14 submit to you that for your consideration, okay?
15 You're going to consider it, I'm going to ask you to
16 consider it, and you may or may not agree with me but
17 either way, whatever I'm advocating here on behalf of
18 my client is advocacy. It's argument, it's not
19 evidence. You're going to have to look at the
20 evidence and decide that issue on your own, okay?
21           Now, you have the benefit that Mr. Skurka
22 is going to raise to you about the other two
23 robberies. Think about it, think about the other two
24 robberies. Nobody else was killed in the other two
25 robberies; nobody else was killed. Unfortunately, the

Page 25

1  very first encounter involved Pablo Castro and he lost
2  his life, and for that I know that Mr. Jones and I are
3  truly sorry, because that's awful, that's terrible
4  what he had to endure, to go through, it really was,
5  but there was no -- there was no robbery that took
6  place at that time. It was merely and unfortunately a
7  killing, it was a mere murder, and that's why we want
8  you to consider the lesser included offense of murder.
9            And that's our defense. That's our only
10 defense. The rest of the case is overwhelming,
11 undoubtedly. Look at all this evidence, look at all
12 the testimony you heard, look at all the eyewitnesses,
13 look at all the people that identified. This is not a
14 who done it. Can't possibly say we weren't there,
15 can't possibly use the SODDI defense, which is "some
16 other dude did it," can't possibly use an alibi, we
17 can't. There's -- there's prints, there's D.N.A., he
18 was there.
19           Pablo Castro lost his life, he lost his
20 life at the hand of our client. That's a given, but
21 this was no robbery. There was no robbery. Look at
22 it carefully, look at the definition of a robbery,
23 look at the definition of a theft.
24           Now, you have two other witnesses, Kashif
25 Butt. Kashif Butt says -- and this is only after he's

Page 26

1  had his memory refreshed by his previous statement,
2  "Well, I remember that there was a fight going on, a
3  struggle, you know, beating, punching, and then I
4  might have seen both of them or somebody going through
5  his pockets," okay? Well, okay. And then Mr.
6  Cervantes at first says "All I saw was the fight," and
7  it wasn't until afterwards when his memory is
8  refreshed again through his statement that he
9  remembers "Well, I think I saw the female go through
10 his pockets, okay?"
11           Then Christina Chavez, if you can even
12 believe any of her testimony at all because she comes
13 up here and, remember, and says "Well, Angela never
14 went inside the store." Well, who are you going to
15 believe, her or Ms. Salinas? Ms. Salinas I.D.'d her,
16 saw her, picked her out, said "I remember what she was
17 wearing, I remember seeing her," identified her by
18 size, facial, what she was wearing, the whole deal.
19 She -- she went into that store.
20           She was in that store. Christina is
21 lying about that and then she tries to deny that she
22 was involved at all in the subsequent Whataburger
23 robbery when April Metting I.D.'d her to the tee, the
24 acne around her face, and when she goes up here and
25 tells you "I didn't do it, Angela did it," okay?

Page 27

1            So that's your credible witness testimony
2  you have to rely on. There's too many inconsistencies
3  about this case where it is our belief, our true
4  belief that the State has not met its burden in
5  proving to you this first situation involving a
6  robbery. There was no robbery. Unfortunately, they
7  were going to try to do a robbery, they were probably
8  going to do the robbery and try to rob the store,
9  which makes all the sense in the world because that's
10 where the money is, once again, not Pablo Castro.
11           Somehow or the other, John Henry Ramirez
12 was in the parking hot, met up with Pablo Castro, some
13 kind of words or something were exchanged and he went
14 off on him. Totally uncalled for, went off on him,
15 but Pablo Castro was not the intended victim of a
16 robbery, he was not, and you need to think about that,
17 and that's what we ask you to do.
18           The government, Mr. Skurka, is going to
19 come up here and tell you "Oh, yes, it is, that's
20 exactly what the motive was." They were going to
21 commit the robbery and what happened is Mr. Castro
22 gets killed, and it's obvious that they were going to
23 commit a robbery and they did kill him in the course
24 of committing a robbery because we proved these other
25 two for you. We've proven these other two for you.

Well, that's based on an evidently rule that allows him to do that, based on an evidentiary rule that allows him to do that, okay? But there's an instruction in here on how you're supposed to treat that evidentiary rule, okay. And you're going to have to read it, look it over, pick a presiding juror.

One of the suggestions I'm going to make to you, and then I'm going to sit down, is you read the Charge before you do anything. Read the Charge thoroughly amongst yourselves. Look at all the definitions, look and see and then start comparing the facts to the Charge, start comparing the facts to the law, and I think you'll agree that in this first instance what we have is a brutal murder. That's what we have, not a capital murder.

It just doesn't make sense. It doesn't make sense that poor Pablo Castro lost his life because they were intending to rob him. That was not the case, it just was not, and if anything, I mean, the evidence shows that there was some money taken from his pocket. It was an afterthought because Angela thought "Well, let's just go ahead and take his money."

Angela came out of that convenient store, you know, fixing to give them the news of whether or

not they could go in there and heist that place but it didn't happen because, unfortunately, our client came unglued, a time bomb went off and he killed Pablo Castro. They had to leave that scene, and went -- and think about it, they went to two other Whataburgers and identically tried to rob two ladies at the menu board in the same manner but they didn't kill them, they didn't kill them by the grace of God or whatever, but still, if Mr. Skurka tries to get up here and tell you that John Henry Ramirez is this monstrous, brutal killer, that's not the case because those other two people were not killed, which is not to say that Pablo Castro is any less subdued or less terrible than what happened to that poor gentleman. But we do not have a robbery in this case, it was merely a murder, still, a terrible, a terrible murder, without a doubt.

What we're going to ask you to do is look at everything very carefully and come back and return a verdict that it was a lesser included offense of murder in this case.

Thank you. Thank you so much for your attention.

THE COURT: All right. Mr. Skurka.

MR. SKURKA: May I proceed, Your Honor.

THE COURT: Yes.

MR. SKURKA: Thank you. A buck twenty-five. $1.25 doesn't really buy much these days, does it? It can't buy you a gallon of milk, can't buy you one of those fancy coffees they sell over at a Starbucks, can't even buy you a gallon of gas, but, boy, what a cost. $1.25 cost Pablo Castro his life. Pablo Castro who went from being a hard worker, loving father, was reduced from that to this by that man for the grand total of a buck twenty-five.

Hard to believe that the viciousness of this crime only netted the Defendant $1.25. Hard to believe that what started out as an ordinary day for Pablo Castro ended up with him laying in a pool of blood outside the place he had worked for 10, 15 years; hard to believe that such an ordinary evening could have turned into such an extraordinary crime spree. But you can believe one thing, you can believe that John Henry Ramirez murdered and robbed Pablo Castro that night. You can believe that because of the evidence that we've shown to you throughout this trial that adds up to that result.

Mr. Garza very ably tried to represent his client pleads for you, "This was just a murder, just a murder. There was no robbery. Find him guilty of the lesser included offense." So, remember when we

first were on jury selection, I told you that capital murder is robbery -- is murder, plus robbery. They've already agreed that the first prong is met, murder, so you don't even have to worry about that anymore. The lawyer got up here and said "He's guilty of murder," so let's -- you don't even have to worry about that too much because he's admitted that he's guilty of murder.

So, your question, I guess according to him is "only is there an issue of robbery," and, "boy, the evidence is overwhelming of robbery." That buck twenty-five came out of Pablo Castro's pockets or clothing and ended up with him and his cohorts.

He says these things, and the Judge told you at the very beginning, you have to remember to only go on the evidence you hear in the courtroom. He suggests that they had words out in the parking lot and he would have -- intent was to rob the store, his intent was to just kill Pablo Castro, robbery wasn't a deal, that he just somehow went off on him.

Did you hear anybody from the witness stand say anything like that? He went up there. There was no testimony toward that. You have to look and base your evidence on what the evidence was presented before you.

32

He says that some things happened out there that don't add up. Well, let's look at what the Judge tells you in the law. The law says to be guilty of capital murder it must be murder plus robbery. He defines murder and robbery and he tells you a couple of other things. Remember we talked about at jury selection, "You are instructed that under our law voluntary intoxication does not constitute any defense to the commission of crime," so whether they're on a three-day binge of drugs and alcohol or one-hour binge, that doesn't matter, that is not an excuse to crime.

Paragraph 8 is a paragraph I'd like you-all to concentrate when you-all go back there. That says "If you find that John Henry Ramirez committed murder while committing robbery, you find this Defendant guilty of capital murder."

The second one that Mr. Garza wants you to look at, paragraph 9, I scratched out of my thing because what it says is if you believe that he killed him but do not believe or have a reasonable doubt that it was in the course of committing or attempting to commit robbery then you'll find him guilty only of murder. That's simply not the evidence in the case so you should disregard No. 9.

33

It also says that you have to show that these other extraneous offenses, these other robberies are not used for the purpose of showing that he's guilty of those crimes but to show his intent, his motive, his plan, his opportunity. I can't tell you what's better to show that there was a robbery committed and then he commits two other robberies right after the fact.

And, finally Christina Chavez, the Judge gave you some instructions that she's an accomplice at law, and that's a legal term that basically means you cannot have a conviction rest on just the testimony of Christina Chavez. If Christina Chavez had gotten on this stand and said it was John Henry Ramirez that did this crime, I wouldn't have had enough evidence. I wouldn't have had enough because you can't believe her because she's a Co-Defendant, she's tainted, and I'm not going to stand up here and tell you that Christina Chavez is a shining example of honesty and truthfulness because there's clearly things she lied about. I mean, she was trying to go help out her lover saying that "Oh, Angela was are trying to help the guy get -- help John Henry Ramirez get off the guy, was trying to help the man. Oh, yeah, I didn't know what was going on," you know. She obviously

34

knew what was going on. She knew, she was in the middle of all of that stuff so she's trying to do what every co-defendant does is take the burden off her and put it on somebody else, and she's trying to say this so I'm in telling you that you can believe everything she can say but you can sure believe one thing, that he was the one that did the stabbing. The evidence is clear to that.

We've had four days of testimony, four days, and I was thinking last night "How can I show this to the jury in a way we can all understand that?" I certainly don't want to go every piece of evidence, every witness' testimony so I thought I'd do it the simple way, by the numbers. So let's look at that and review the evidence together.

By the numbers, we start with this number, $1.25. Evidence show that $1.25 was taken by the man. You remember that when Lydia Salinas and the Defendant -- the victim Pablo Castro were talking about getting something to eat, he said he only had a dollar, so she had to pay for it again that night. He only had a dollar.

You remember that there was another quarter found in the parking hot by the van in the deal. He may have had some change on him. You

35

remember his ring was found out there in the parking lot where the parking spaces were. You remember that Ang -- Christina Chavez said they got $1.25. I think Angela brought it back into the play (sic).

You remember the bloody dollar bill that's up here that was identified with the pizza receipt, remember? They said it was a pizza receipt from that same day from Pablo Castro. So, I mean, clearly they got a dollar, dollar twenty-five. And remember what I told you at the very beginning, what does the law say that the Judge says, "If it's within the course of committing or attempting to commit robbery."

It really doesn't matter if he got a dollar, a quarter, or anything, or nothing, as long as it's in the course of committing robbery, and all that evidence points to that $1.25 was taken from the victim Pablo Castro. That's the money taken from Pablo Castro so let's go to the next number, 3, number of Defendants. We don't just have one person, John Henry Ramirez, we have three persons.

In fact, the next number is not just the number of crimes but the number of victims of John Henry Ramirez that were shown to you. Pablo Castro, April Metting, Ruby Hinojosa Pena, all victims of this

36

man, all victims of? Robbery, robbery. It's funny that Mr. Garza gets up this and says "Well, they were trying to case the joint over at the Times Market. They were really intending to hit the Times Market, not Pablo Castro."

Well, if you go with that logic, folks, why didn't John Henry Ramirez and the girls go into the Whataburgers? That's where the money is, not some poor lady sitting in the drive-through. If you want to go with his theory that he was trying to case the Times Market, well, then, he was trying to case the Whataburgers, too. But what are the three similar things that happened to each of those crimes? They didn't rob the stores, they robbed an innocent person sitting out doing an ordinary thing.

Pablo Castro was doing an ordinary thing by taking out the trash. April Metting doing an ordinary thing, buying a hamburger at the drive-through at Whataburger. Ruby Pena Hinojosa doing an ordinary thing, buying a hamburger at the drive-through on Whataburger. So how can you say that wasn't their intent? That's what they were looking for, folks.

I don't know too much about wildlife but I know these things called predator and prey.

37

Predators don't go pick on predators their own size or a tough target. What do they look for? The weak, the single person, the single victim, the single animal, whatever it may be. They look at something they can attack easy. You don't see a pack of wolves attacking one cow. They attack -- I'm sorry, a pack of cows, they attack one, you know, they don't go after all that stuff, they go after the one defenseless person. And what could be more defenseless than some poor guy coming in from taking out the trash, some poor lady sitting in the parking lot at the drive-through because that's what he is, a predator; three victims.

The number 4 means the number of crimes committed by John Henry Ramirez. And just to refresh your memory we have the crimes committed were the capital murder, the robbery, the other robbery and the then the evading the police in a vehicle, which is another crime. All that big chase is another crime so that night he committed not one but four crimes.

What's our next number we're adding up? The number of fingerprints or palm prints linking John Henry Ramirez to the crime. You heard a very qualified fingerprint expert, Marsha Parker, tell you that in that red van, in that side mirror, remember who's prints? John Henry Ramirez, linking them to the

38

crime. That red van was driven by John Henry Ramirez and it's pretty obvious he was there because his fingerprints are right there on that mirror.

Next, we know he was in that other van, that Dodge van some time during the night because on this C.R. rom case Marsha Parker testified that boom, John Henry Ramirez' fingerprints were found, and remember that spree started with two vans, shows him linked to both of the vans.

And, finally, and this is really good, she said John Henry Ramirez' prints were found on that photograph of the little boy by the wallet, and remember April Metting said that was her wallet and the I.T. tech says that is the back of the photograph there where the print was done. It's face down so you can't see the face of the little boy, but what does that tell you? It's petty clear that John Henry Ramirez went through this wallet. He went through this wallet to look for money or valuables and he left his print on the photograph of the little boy.

He had taken April Metting's money at the drive-through. He had taken her purse and some time after that went through that wallet to see what other money is in there and I can tell you even more why that's important, not just the fingerprint on there,

39

but remember the Visa card, the blood evidence on that. My gosh, he didn't just leave his fingerprint on the April Metting's and the photo up there but he left his blood on Gilbert Lopez, April Metting's husband credit card. So you know he was rifling through that wallet so I don't know how he can say there was no robbery when you have a person, the second victim, had her wallet gone through.

What's the next number we want to add to the mix? Eyewitnesses to John Henry Ramirez striking or stabbing Pablo Castro. Don't forget Kashif Butt and Mariano Cervantes. They said "We're across the street in the parking lot. We looked across and saw the fight and it was this man, John Henry Ramirez is the one that did the punching or stabbing motions." Mariano Cervantes said "I knew him because I had gone to school with him."

Obviously Christina Chavez identified him during the stabbing but remember she's an accomplice so maybe you can't believe her all the way. You don't even need her. The two eyewitnesses nailed him as the person doing the stabbing or striking of John -- of Pablo Castro.

So what's the next number we have? 1. 1, 1 pool of blood that he was left in, one pool of

40
1  blood Pablo Castro reduced to as his life drains out
2  there on the place where he worked for the last 10, 15
3  years.
4          The next numbers, 10 to 15.  That
5  represents how long it took John Henry Ramirez to
6  commit an aggravated robbery after robbing and killing
7  Pablo Castro.  10 to 15 minutes later after you've
8  reduced this man, stabbed him some 29 times in the
9  neck and in the the back, boy, there's not much
10 remorse there, is there?  "We kill somebody, I stabbed
11 him 29 times but, hey, let's go on to the next place,
12 let's find another victim.  I'm the predator, let's
13 find some more prey."
14         Not much talking about it, not much
15 thinking about it but sure was a lot of action.  10 to
16 15 minutes after committing a capital murder he's out
17 this committing an aggravated robbery, holding a knife
18 on poor April Metting in her car as she's trying to
19 get a hamburger.
20         And what does that mean?  One and a half.
21 Remember how old her child was?  Remember April
22 Metting saying "Please don't hurt me or my child, my
23 child is here.  Please don't hurt me in front of my
24 child."  April Metting couldn't give him the money
25 fast enough.  She gave him the money, she gave him her

41
1  purse with the wallet with all her valuables.  She
2  wanted out.  She did not resist him except to put her
3  hand to block that knife against her throat, and she
4  only thought not for herself but she thought about her
5  child.
6          John Henry Ramirez didn't seem to care
7  because remember what he told her, "Shut up, bitch."
8  That's what he told her.  "Oh, sir, help me, leave me
9  alone, don't hurt my child."  "Shut up, bitch, give me
10 your purse."  Shows a lot of remorse.  Actually shows
11 you what kind of person he is.
12         10 to 15, the next number.  Well, gosh,
13 after committing your capital murder and then a
14 robbery -- an aggravated robbery of a Whataburger of a
15 young lady with a small child in the back, it takes
16 you all of 10 or 15 minutes to do it all over again.
17 He goes to the next Whataburger and robs Ruby Pena
18 Hinojosa not 10 to 15 minutes later.
19         Wow, let's see, Mr. Garza says he wasn't
20 trying to commit robbery, he wasn't trying to commit
21 robbery.  Within 20, 30 minutes he commits two more of
22 them so don't tell me it wasn't his intent to commit
23 robbery because he committed it.
24         5 to 6, those numbers represent the
25 inches of the blade length of the knife.  Remember

42
1  both of those ladies testified it was 5, 5 and a half,
2  6 inches in length.  April Metting testified about it
3  being against her neck.  Ruby Pena Hinojosa testifying
4  about how this serrated knife came in the window.  5
5  to 6 inches of length of that knife, but here's the
6  next number, it's really forever.
7          Remember they told us, I said "How long
8  did this all take," and they said "two to three, four
9  minutes but it seemed like forever when I was being
10 robbed."  And I've never luckily been robbed at knife
11 point put just put yourself in their positions, it
12 probably did feel look forever.
13         2 to 3.  Well, that number represents a
14 mile that John Henry Ramirez alluded the police.
15 Remember the officer said he drove back over the route
16 and said it was about two miles, and remember, too, he
17 said "Man, there were so many traffic signals and stop
18 signs that he went through.  I can't even remember how
19 many there were."  So not only does he do the
20 robberies and the capital murder but he commits -- he
21 enters in flight from them and flight is always
22 evidence of guilt, and why did we know that?  Because
23 if he didn't do anything wrong he didn't have nothing
24 to run from.
25         This guy had to run from a capital murder

43
1  and two aggravated robberies so when those police
2  lights come over he even tries to duke the cop into
3  stopping behind him and then he takes off again and
4  leads them on a two-mile chase through our streets.
5          50, 60, 70 are the next numbers.  Those
6  numbers represent the officers saying how fast they
7  were going.  50, 50, 70 miles an hour down Brownlee,
8  down -- the area around by the courthouse and the old
9  police department until they finally lost him cause
10 the cops had to be safe and not get in a wreck.  50,
11 60, 70 miles.  Boy, that sounds like somebody who's
12 really running from the cops.  This isn't one of those
13 low-speed pursuits, he's running for his life because
14 he's already taken a life and robbed two other people.
15         1, when number would that represent?
16 Well, that would be Ruby Garcia.  Remember Ruby
17 Garcia?  He runs up to her all hot and sweaty covered
18 with grass, had blood on himself and says they had
19 stabbed a guy.
20         THE COURT:  You have one minute.
21         MR. SKURKA:  Thank you, Judge.
22         He admits that they had stabbed a guy and
23 he also talks about Whataburgers.
24         A few more slides here and we'll go with
25 8.  That's the items of evidence that John Henry

44

1   Ramirez Ramirez' D.N.A. was found linking him to the
2   crime. You'll have this evidence back there. His
3   blood is on the door pocket, the door handle, the
4   steering wheel, the white shirt, the Visa card, the
5   Bic lighter, the side of the passenger door of the
6   van, Christina Chavez' T-shirt, and most importantly,
7   that white rag found out by the wooded area where he
8   dumps the van, John Henry Ramirez' blood. 8 times.
9         12 times we have items of evidence that
10  Pablo Castro's blood is on it, that John Henry Ramirez
11  had contact or access to. And wasn't that kind of
12  funny, you have a vodka bottle with Pablo Castro's
13  blood on it. After they robbed and killed Pablo
14  Castro his blood is on the vodka bottle. They must
15  have been celebrating. And look at all these other
16  items that Pablo Castro's blood is on, all items that
17  John Henry Ramirez had access to or touched.
18        29, and I'm finishing up, number of stab
19  wounds inflicted by Pablo -- on Pablo Castro by John
20  Henry Ramirez. I hate to show those photographs to
21  you but I had to have the medical examiner show the
22  cause of death, but check that out, 29 times; 3 of
23  them were fatal wounds. Remember, the neck, the
24  jugular, the other one on the neck and the one in the
25  back, fatal wounds. The other ones were slashing

45

1   wounds or penetrating wounds, and remember how deep
2   they went? 3 and a half, four inches deep.
3         Then we have 8. 8 would be the number of
4   defense wounds Pablo Castro had. The difference in
5   robbing Pablo Castro and the girls is the girls didn't
6   fight back but Pablo Castro did, he tried to protect
7   himself and ended up getting stabbed 8 more times.
8   And, of course, the important thing, I believe, is the
9   stab wound located on the back. I mean, him fighting
10  back too much or he's going down he gets stabbed in
11  the back and one of those is fatal.
12        0 is the knives recovered by the police
13  or at the crime scene. They couldn't find the knife
14  in the van or any of those places but the next number
15  tells it all, because No. 1 was the knife kept, the
16  numbers of knives kept by John Henry Ramirez as a
17  souvenir.
18        So, folks, let's finish up by talking
19  about this, 3 1/2 years it took him to be found and
20  brought to justice. Remember Kelly Isaacks said it
21  was an unprecedented manhunt. She had a -- her whole
22  job was to find this guy and thanks to the U. S.
23  Marshals they found him some 3 1/2 years later to
24  bring him to justice.
25        And then our final number is 12, and

46

1   that's you, 12 jurors have been selected and hopefully
2   to bring justice. Add up all the numbers, what does
3   it add up to? He is guilty of capital murder. Go
4   back and by your verdict say so.
5         THE COURT: All right, ladies and
6   gentlemen, at this time I am going to excuse the
7   alternate juror, Mr. Robert De Leon.
8         Mr. De Leon, you are not going to
9   deliberate with the jury. I will instruct you,
10  however, do not discuss this case with anyone as it is
11  possible that you may still be called upon -- your
12  service may still be called upon so please don't
13  discuss this with anyone but I'm going to excuse you
14  at this time.
15        The other 12 jurors will go into the jury
16  room and begin their deliberation. So with that, all
17  rise for the the jury.
18        (Jury exits courtroom.)
19        THE COURT: All right, be seated. Is
20  there anything we need to take up?
21        MR. SKURKA: No, Your Honor.
22        MR. GARZA: No, Your Honor.
23        (Commencement of jury deliberations.)
24        (Note from the jury.)
25        THE COURT: All right. We got Note No. 1

47

1   from the jury. They want copies of the Charge, each
2   one of them, 12.
3         MR. SKURKA: State has no objection.
4         MR. GARZA: No objection, Your Honor. I
5   think they should have one.
6         THE COURT: Yeah, that's fine. That's
7   fine. You know what, Frank, why don't you go in there
8   and get the Charge and let's run them 12 copies.
9         MR. SKURKA: I was going to say, I wrote
10  all over mine. I don't know if I have a clean Charge.
11        THE COURT: No, we're just going to copy
12  the one we have.
13        (Continuation of jury deliberations.)
14        THE COURT: All right, we have a verdict.
15  Go find Mr. Skurka. You-all can be seated. Go find
16  Mr. Skurka.
17        All right. We have a verdict. So you
18  ready to take verdict of the jury, Mr. Skurka?
19        MR. SKURKA: Yes, sir.
20        THE COURT: All right. Mr. Garza, you
21  ready?
22        MR. GARZA: We're ready, Your Honor.
23        THE COURT: All right. Let's bring them
24  in.
25        (Jury enters courtroom.)

48

1  THE COURT: All right. Be seated,
2  please. Okay. All right, ladies and gentlemen of the
3  jury, you reached a unanimous verdict?
4  JURORS: Yes.
5  THE COURT: All right. Defendant will
6  please rise. Verdict of jury is as follows: "We, the
7  jury, find the Defendant, John Henry Ramirez, Jr.,
8  guilty of the offense of capital murder as alleged in
9  the indictment," signed the foreperson of the grand
10 (Sic) jury. Please be seated.
11 All right. And --
12 MR. SKURKA: There's no reason to -- no
13 objection by the State to receiving that verdict, Your
14 Honor.
15 THE COURT: All right, I'm going to go
16 ahead and poll the jury.
17 MR. GARZA: Thank you, Your Honor.
18 THE COURT: All right, I'm going to poll
19 the jury, that is, I want a show of hands of the
20 jurors that voted with this verdict, that is, voted
21 for guilty. Do I have a show of hands?
22 (Indicating.)
23 THE COURT: All right. Let the record
24 reflect that all 12 jurors have raised their hands,
25 that being all of you voted for guilty; is that

49

1  correct?
2  JURORS: Yes.
3  JURORS: Yes, that's correct.
4  THE COURT: All right. Okay, I'm going
5  to go ahead and let you go for lunch at this time,
6  okay? I'll see you back at 1:30 and we'll begin the
7  punishment phase of the trial. So with that, all rise
8  for the jury.
9  (Jury exits courtroom.)
10 THE COURT: Okay, let's do a little
11 housekeeping. Okay, after lunch we're ready for
12 opening statements. Mr. Skurka, you have witnesses
13 ready to go?
14 MR. SKURKA: Yes, Your Honor, I'll have I
15 think five witnesses.
16 THE COURT: Okay.
17 MR. SKURKA: And I've got three of them
18 coming in already, I need to call one or two but I
19 will have them ready.
20 THE COURT: All right, Mr. --
21 MR. SKURKA: And, Judge, I'm going to --
22 I'm sorry, I didn't mean to interrupt. I'm just going
23 to make a very short opening statement, though.
24 THE COURT: Okay. And I suppose, Mr.
25 Jones, you're going to make an opening statement?

50

1  MR. JONES: Yes.
2  THE COURT: Okay. I guess have some
3  witness available this afternoon, Mr. Jones.
4  MR. JONES: Okay.
5  MR. SKURKA: My witnesses will not be
6  very long, Judge. I think there may be an officer or
7  two that may take a little bit but they won't be very
8  long.
9  THE COURT: Now, I know that the Defense
10 has told me that one of their witnesses is unavailable
11 but if you could have the other witnesses available.
12 MR. JONES: I can put on some. The key
13 witness is not available.
14 THE COURT: The key witness -- I
15 understand one of your key witnesses isn't available.
16 That's fine, we can put that witness on on Monday, but
17 if you can have your other witnesses available we'll
18 go as far as we can.
19 MR. JONES: Okay.
20 THE COURT: Okay.
21 MR. SKURKA: May I be heard on that
22 point, Judge?
23 THE COURT: Yes.
24 MR. SKURKA: I understand -- my
25 understanding is that Defense has hired a mitigation

51

1  expert, Dr. Troy Martinez, to testify. It is my
2  belief that if he testifies and has a report to that
3  I'm going to ask the Court for a copy of his report
4  while he testifies. I will also probably be asking
5  for -- for some time to review that report before I
6  begin my cross-examination and I'm just asking him to
7  make things go a little faster since we're going to
8  have to wait until Monday is there any way I can get a
9  copy of the report over the weekend so I can look at
10 it so I don't have to slow down the Court on Monday
11 and have time to review that report.
12 MR. JONES: I'll get it to him.
13 THE COURT: All right.
14 MR. SKURKA: Thank you, Judge.
15 THE COURT: All right, we'll see you-all
16 at 1:30.
17 (Noon recess.)
18 (Conclusion of trial proceedings.)

```
 1   THE STATE OF TEXAS  )
 2   COUNTY OF NUECES    )
 3              I, Mary Lopez Buitron, Official Court Reporter
 4   in and for the 94th Judicial District Court of Nueces County,
 5   State of Texas, do hereby certify that the above and foregoing
 6   contains a true and correct transcription of portions of
 7   evidence and other proceedings requested in writing by counsel
 8   for the parties to be included in this volume of the Reporter's
 9   Record, in the above-styled and numbered cause, all of which
10   occurred in open court or in chambers and were reported by me.
11              I further certify that this Reporter's Record of
12   the proceedings truly and correctly reflects the exhibits, if
13   any, admitted by the respective parties.
14              I further certify that the total cost for the
15   preparation of this Reporter's Record is $_____ and was
16   paid/will be paid by_____.
17              WITNESS MY OFFICIAL HAND this the  4th  day of
18   ____October_____, A.D., 2009.
19
20   _____
21   MARY LOPEZ BUITRON, CSR, RPR, Texas CSR #2731
     Expiration Date: 12/31/2009
22   Official Court Reporter
     94th District Court
23   Nueces County, Texas
     901 Leopard, Room 901
24   Corpus Christi, Texas 78401
     (361)888-0658
25
```