1

```
 1                           REPORTER'S RECORD
                       APPELLATE COURT NO. AP-76,100
 2                   TRIAL COURT CAUSE NO. 04-CR-3453-C
                         VOLUME 21 OF 25 VOLUMES
 3
     THE STATE OF TEXAS      )      IN THE DISTRICT COURT
 4                           )
                             )
 5   VS.                     )      94TH JUDICIAL DISTRICT
                             )
 6   JOHN HENRY RAMIREZ       )      NUECES COUNTY, TEXAS

 7

 8

 9

10

11                    _____

12                    PUNISHMENT PROCEEDINGS

13                    _____

14

15

16

17

18            On the 5th day of December, 2008, the

19   following proceedings came on to be heard in the

20   above-entitled and numbered cause before the HONORABLE

21   BOBBY GALVAN, Judge Presiding, held in Corpus Christi,

22   Nueces County, Texas:

23            Proceedings reported by Stenograph

24   Machine.

25
```

FILED IN
COURT OF CRIMINAL APPEALS

OCT 06 2009

Louise Pearson, Clerk

2

```
 1   APPEARANCES:

 2   MR. MARK SKURKA
     SBOT NO. 18475570
 3   MR. VERNON G. SCHIMMEL
     SBOT NO. 24033039
 4   ASSISTANT DISTRICT ATTORNEYS
     901 Leopard, Rm. 205
 5   Corpus Christi, Texas 78401
     Phone: (361) 888-0410
 6
     ATTORNEYS FOR THE STATE
 7
     -AND-
 8
     MR. EDWARD F. GARZA
 9   SBOT NO. 07731200
     ATTORNEY AT LAW
10   719 S. Shoreline, Suite 201
     Corpus Christi, Texas  78401
11   Phone: (361) 888-8877

12   MR. JOHN GRANT JONES
     SBOT NO. 10917000
13   ATTORNEY AT LAW
     5826 Beauvals Drive
14   Corpus Christi, Texas  78404-6173
     Phone: (361) 884-8141
15
     ATTORNEYS FOR THE DEFENDANT,
16   JOHN HENRY RAMIREZ

17

18

19

20

21

22

23

24

25
```

3

```
 1                              INDEX
                       VOLUME 21 OF 25 VOLUMES
 2                        PUNISHMENT PHASE
     PROCEEDINGS                                    Page  Vol.
 3   Commencement of punishment proceedings............. 4    21
     Discussion, In Re:  Alternate juror .............. 4    21
 4   No objections from State/Defense ................. 4    21
     Discussion, In Re:  Media ........................ 4    21
 5   Rule invoked ..................................... 5    21
     Witnesses instructed on rule ..................... 6    21
 6   Jury enters courtroom ............................ 6    21
     Court's instructions to jury ..................... 6    21
 7   Opening statement by the State ................... 7    21
     STATE'S WITNESSES:
 8   Witness Name                  Direct  Cross V.Dire  Vol.
     BETTY MENDEZ ..................... 16                21
 9   MICHAEL WERTANEN.................. 30                21
     PATRICK McMENAMY................. 43                21
10   SYDNEY MORRIS.................... 60       77    86  21
     KELLY ISAACKS................... 96                21
11   Defense reserves opening ......................... 16    21
     DEFENDANT'S WITNESSES:
12   JOHN RAMIREZ, JR. ............... 114     123   131  21
     State rests on punishment ........................ 104   21
13   Opening statement by Defense ..................... 105   21
     Evening recess ................................... 133   21
14   Court Reporter's Certificate ..................... 134   21

15               ALPHABETICAL INDEX TO WITNESSES
     Witness Name                  Direct  Cross V.Dire  Vol.
16   ISAACKS, KELLY................... 96                21
     McMENAMY, PATRICK............... 43                21
17   MENDEZ, BETTY .................. 16                21
     MORRIS, SYDNEY.................. 60        77    86  21
18   RAMIREZ, JOHN, JR............... 114      123   131  21
     WERTANEN, MICHAEL.............. 30                21
19
                              EXHIBITS
20   NO.        DESCRIPTION              OFFERED ADMITTED VOL.
     SX-227     Photo of victim and wife ... 21      21    21
21   SX-228     Photo of victim and children 21      21    21
     SX-229     Photo ..................... 58      59    21
22   SX-230     Photo ..................... 58      59    21
     SX-231     Marine Corp. Records ....... 105     105   21
23   SX-232     Judgment .................. 70      70    21
     SX-233     SASSI Test ................ 92      93    21
24
     NO.        DESCRIPTION              OFFERED ADMITTED VOL.
25   DX-3       SASSI Test ................ 93      93    21
     DX-4       Educational assessment...... 95      95    21
```

4

1    P R O C E E D I N G S
2    December 5, 2008
3          (Out of the presence of the jury.)
4          THE COURT:  All right.  Now, I have --
5    I'm reseating the alternate juror.  Although the
6    alternate did not participate in deliberations I have
7    instructed the jurors prior to the alternate arriving
8    not to discuss their deliberations with the alternate
9    juror or one another or anyone else.  I'm going to do
10   that back on the record when we reconvene.
11         All right, any objection to that.
12         MR. SKURKA:  No, Your Honor.
13         MR. GARZA:  No, Your Honor.
14         THE COURT:  All right, the media is
15   here.  I will allow them to be present, that is, with
16   the cameras during the opening statements and then the
17   cameras have to turn off; and once again, the jurors
18   are not to be photographed.
19         So, are we ready.
20         MR. SKURKA:  Yes, Your Honor.
21         THE COURT:  All right.
22         MR. JONES:  Your Honor, I have some
23   witnesses in the courtroom who have been called.
24         THE COURT:  Yeah, we need to --
25         MR. SKURKA:  Can we bring them forward

5

1    and place them under the rule, Judge?
2          THE COURT:  Yes, we need to bring
3    everybody up front.  I guess, do we have any witnesses
4    from the State?
5          MR. SKURKA:  Judge, mine are all police
6    officers and they're all back there and I already told
7    them had the rule was.
8          THE COURT:  Okay.
9          MR. JONES:  Can they just stand right
10   here?
11         THE COURT:  They can stand right there.
12         MR. JONES:  Okay.  Just come up here to
13   the bar.
14         MR. SKURKA:  Judge, can we have them all
15   brought up and their names put on the record?
16         THE COURT:  Yeah, we'll put their name on
17   the record.
18         Okay, I might as well swear them in.
19         (Oath administered.)
20         THE COURT:  All right.  Could you
21   start -- can you read your names in the record
22   starting from there.
23         MS. RAMIREZ:  Ashley Ramirez.
24         THE COURT:  Okay.
25         MS. HINOJOSA:  Maria Hinojosa.

6

1          THE COURT:  All right.
2          MR. RAMIREZ, SR.:  John Henry Ramirez,
3    Sr.
4          THE COURT:  Okay.
5          MS. ALEJANDRO:  Lupita Alejandro.
6          THE COURT:  Lupita Alejandro.
7          All right, do you have any other
8    witnesses at this time?
9          MR. JONES:  No, we have one Monday but
10   we'll --
11         THE COURT:  Okay.  Well, you'll
12   instruct that witness.  All right, you're going to
13   have to wait outside while this testify is going on
14   you're not to discuss your testimony with anyone while
15   this trial is going on, all right.  Please wait
16   outside until you're called.
17         All right.  Now, Mr. Jones, you are going
18   to reserve or it's your intent to reserve your opening
19   statement till your part of the case?
20         MR. JONES:  That's correct.
21         THE COURT:  Okay.  All right, then let's
22   bring them in.
23         (Jury enters courtroom.)
24         THE COURT:  All right, be seated,
25   please.  All right, ladies and gentlemen, off the

7

1    record I instructed -- I had reseated the alternate
2    juror.  I had instructed you outside -- off the
3    record, that is, that you are not to discuss your
4    deliberations on the guilt or innocence stage with
5    anyone including one another and the alternate juror
6    and that's going to continue until this trial is
7    concluded, okay?
8          All right, now we are at the punishment
9    phase of the trial.  The State may make its opening
10   statement at this time.
11         MR. SKURKA:  May I proceed, Your Honor?
12         THE COURT:  You may.
13         MR. SKURKA:  Folks, I want to start off
14   by thanking you for your verdict in the first part of
15   the trial.  As you know, that's not the end of the
16   trial.
17         As we talked about in jury selection
18   there's two parts of the trial.  First, there's guilt
19   or innocence, and the second part is punishment, and
20   you know is very well through our time with you in
21   interviewing you -- with you during jury selection
22   that this is the most important decision you're going
23   to make now.  Now that you've found him guilty, John
24   Henry Ramirez, of capital murder, there can only be
25   two choices, death or life in prison.

8

1       And the Judge will give you those
2   questions.  Remember the special issues that you're
3   going to have to answer at the conclusion of the
4   testimony, and this is what's going to happen now.
5   Earlier today in this week you heard about what
6   happened this day leading up to these events and what
7   happened after these events.  Now you're going to hear
8   a little background information.
9       The State has got some additional
10  witnesses that will tell you more about this
11  Defendant's background and his history to help you
12  make that decision on how to answer those special
13  issues.  The State will not have a whole lot of
14  witnesses, and this is not going to take a whole week
15  or anything like that, but they are important
16  witnesses and we ask that you listen to each and every
17  one of them.
18      Essentially the State will put on Betty
19  Mendez.  Betty Mendez was Pablo Castro's common-law
20  wife at the time of his death.  She will tell you
21  about Pablo Castro, his family, his children, what
22  kind of person he was and how this killing has had an
23  affect on Betty Mendez.
24      You'll also get some records.  You will
25  find these records are certified copies of records

9

1   from the Marine Corp. That John Henry Ramirez, when he
2   got out of high school, went to the Marine Corp. And
3   was in there for about a year, year and a half
4   until he was discharged with a less than honorable
5   discharge.  You'll hear the violations he committed in
6   the Marine Corp. Against Marine Corp. Policy,
7   including talking back to an officer.  You're going to
8   hear about him drinking while he was a Marine, under
9   age drinking, and you will also hear that he went AWOL
10  when he was a Marine, absent without leave, and he was
11  finally terminated from the Marine Corp. And was
12  basically discharged with a less than honorable
13  discharge.  You'll have those records yourself to look
14  at.
15      You'll also hear evidence from several
16  officers.  You'll hear from an officer named Patrick
17  McMenamy.  Patrick McMenamy is an officer who was
18  working patrol the night around March 25th of 2004,
19  just a few months before this killing, this capital
20  murder.  Patrick McMenamy will tell you that he pulled
21  over a vehicle containing John Henry Ramirez for a
22  traffic violation, and as he pulls him over and was
23  interviewing him and trying to get his license and
24  such, give him a ticket, he noticed a gun underneath
25  John Henry Ramirez' feet on the floorboard on the

10

1   driver's side and that he was the only one in the car.
2       You'll hear that Officer Patrick McMenamy
3   got this gun, examined it and found out it was a .25
4   caliber Raven semiautomatic, and he'll tell you more
5   about that.  He will tell you he arrested this
6   Defendant for what the crime is called U.C.W. or
7   unlawful carrying a weapon.  Basically, can't carry a
8   gun like that.  And he was arrested, John Henry
9   Ramirez was arrested just a few months before this
10  happened.
11      He will also testify when he was
12  impounding and searching the car that he found a
13  marijuana cigarette in there, which is called a blunt.
14  That's basically a -- kind of like a cigar that's been
15  hollowed out and substituted marijuana instead of
16  tobacco leaves.  He will testify that was found in his
17  ashtray on the console of that car with John Henry
18  Ramirez so he additionally arrested him for something
19  else, having possession of marijuana, both being
20  misdemeanors.
21      You will hear that John Henry Ramirez
22  went to court on those.  You will hear that he was
23  placed on probation for the unlawful carrying a
24  weapon.  He was given, I believe it was nine months
25  probation for that, and as part of the plea bargain

11

1   the possession of marijuana charge was dismissed.  The
2   probation officer will tell you that the usual
3   arrangement sometimes when there's two cases they
4   plead to one and the other one gets dismissed.  So you
5   will hear about his conviction and see the certified
6   copy of the judgment from the Court showing that this
7   Defendant was convicted of carrying a weapon and, of
8   course, you'll hear that the possession of marijuana
9   was dismissed as part of that plea bargain.
10      Now, that took place -- the offense took
11  place in March.  He plead out in court, and you'll
12  hear that, and then you'll hear while he was on
13  probation he did not complete probation successfully.
14  The probation department will testify, the laying from
15  from -- the probation officer will testify that John
16  Henry Ramirez violated his probation by committing
17  another crime while he was on probation, and this
18  crime was a public intoxication.
19      You'll hear an officer, Officer Mike
20  Wertanen, testify that he was working and helping
21  another officer doing an investigation of a
22  disturbance at a house or apartment complex with a
23  bunch of people that were creating a disturbance, and
24  when another officer arrived at the scene a bunch of
25  people fled the scene.  And Officer Wertanen not being

12

1   the initial officer at the scene helped try to
2   apprehend these people who had just fled from the
3   disturbance.
4          Officer Wertanen will testify that after
5   chasing and tying to catch him, he found this
6   Defendant, John Henry Ramirez, had gone over
7   somebody's fence in the back yard of these streets
8   over by I think it's Ray High School, they all start
9   with Casa something, and he chased him down around
10  those streets and was able to find John Henry Ramirez
11  hiding out in some lady's back yard crouched down by
12  the porch as if to hide from Officer Wertanen.
13         He will testify that John Henry Ramirez
14  was arrested for public intoxication because he was so
15  intoxicated he did not have the normal use of his
16  mental and physical faculties and he was also caught
17  with two 18 packs of beer.  He will testify that he
18  took him back to the scene to try to have him
19  identified by the officer who initially made the call
20  but that officer had so many people running he
21  couldn't identify this guy.  So Officer Wertanen just
22  arrested him for the public intoxication.
23         You will also hear that Officer Wertanen
24  asked John Henry Ramirez, "Why didn't you run anymore?
25  I had to climb over all these fences I never would

13

1   have caught up to you," and this Defendant told him "I
2   couldn't run anymore because I'm recovering from
3   gunshot wounds."
4          Officer Wertanen will testify that as he
5   took him into custody this Defendant became violent
6   and aggressive and tried to shake off the officer and
7   either get away or resist the officer arresting him
8   for public intoxication.  You will hear that Officer
9   Wertanen had to take him to the ground to subdue him
10  to make him behave so he could arrest him, showing his
11  violent tendencies.
12         You'll also hear -- again, you'll hear
13  from Sydney Morris.  Sydney Morris is a probation
14  officer.  She will tell you what I just told you, that
15  the probation department was supervising this
16  Defendant and because he had been caught with this
17  public intoxication crime and some other technical
18  crimes that they had filed a motion to revoke
19  probation.  In other words, since he had these certain
20  rules to follow on probation if you don't follow them,
21  and some of the main things are reporting every week
22  or month and committing no crimes, that this
23  Defendant, John Henry Ramirez, had violated those
24  conditions of probation and so the probation
25  department had filed a motion to revoke probation

14

1   because of this new crime.
2          You'll hear that no one arrested him and
3   at the time of July 19, 2004, not only was he
4   convicted of this crime, he was on -- being on
5   probation for this crime but there was a warrant out
6   for his arrest at the time he killed Pablo Castro and
7   robbed those two people.  Sydney Morris will show you
8   the official record of his judgment showing he was
9   convicted of U.C.W.
10         Finally, you will hear from Kelly
11  Isaacks.  Kelly Isaacks, remember the case officer
12  that was in front of you telling you about how the
13  search was coordinated and how she was the case
14  officer working the crime?  She'll tell you that
15  during that investigation that night on July 19th,
16  2004 when it became obvious, remember when they
17  started talking about how they got the suspect and
18  they looked and found out it was a guy named John
19  Henry Ramirez, that she said "I know that guy, I
20  recognize him," that she had worked the case where he
21  had been shot before, that just a couple of months
22  before this killing that she was in charge of the --
23  the detective in charge of the case where he was a
24  victim of this shooting.
25         She will testify that she tried to assist

15

1   John Henry Ramirez in that case being a victim of
2   this shooting and that she went to the hospital to
3   visit with him and get a statement from him.  He was
4   highly intoxicated and was highly uncooperative, would
5   not cooperate with her, would not give her the
6   information, and good information about who had shot
7   him and turned out told a story to her.  She will also
8   testify that even before July 19th, 2004, that this
9   Defendant, her opinion of his reputation in the
10  community was that he was not a peaceful and
11  law-abiding citizen.
12         This is the evidence you will hear and,
13  of course, the Judge will tell you when we get to the
14  Jury Charge part again, you'll have those other
15  instructions read to you, that you can consider this
16  evidence that you're going to hear now along with all
17  the evidence that you heard from the first part of the
18  case.  Remember we talked about those special issues,
19  you can consider the events of that night and anything
20  else about his background.
21         Once you hear all that information we'll
22  come back to you on closing argument and make our
23  pleas to you on what is the proper punishment, and
24  I've told you today, like I'll tell you -- told you
25  the very first day, the State is going to ask after

16

1    you hear all the evidence of the punishment phase and
2    putting it together with the guilt or innocence phase
3    to answer those specials in -- those special issues in
4    such a way that this Defendant, John Henry Ramirez, is
5    convicted and given the death sentence.
6            Thank you.
7            THE COURT:  All right.  And the Defense
8    wish to do its opening statement now or reserve it for
9    its part of the case?
10            MR. JONES:  For my part of the case,
11   Your Honor.
12            THE COURT:  All right.
13            MR. SKURKA:  We call Betty Mendez, Your
14   Honor.
15            THE COURT:  All right.
16            MR. SKURKA:  Frank, she's out here.
17            (Oath administered.)
18            THE COURT:  Be seated.  You may proceed.
19            MR. SKURKA:  Thank you, Judge.
20
21                BETTY MENDEZ,
22   having been first duly sworn, testified as follows:
23                DIRECT EXAMINATION
24   BY MR. SKURKA:
25       Q.   Could you introduce yourself to the folks

17

1    here on the jury.
2        A.   Hello, my name is Betty Mendez.  I'm the
3    common law of Pablo Castro.
4        Q.   The common-law wife of Pablo Castro?
5        A.   Wife.
6        Q.   At the time of July 19th, 2004, how long had
7    you and Pablo Castro been together?
8        A.   Four years.
9        Q.   Had you-all lived together during that time?
10       A.   Yes, sir.
11       Q.   Was Pablo Castro divorced from an earlier
12   wife when he met you?
13       A.   Yes.
14       Q.   And what was the name of his earlier wife?
15       A.   Diana.
16       Q.   Say again?
17       A.   Diana.
18       Q.   Do you know her has name?
19       A.   Saucedo.
20       Q.   Did you-all live here in Corpus Christi
21   together?
22       A.   Yes, sir, we did.
23       Q.   Can you tell the jury where you lived
24   together?
25       A.   We lived in 14th Street the first time and

18

1    the second time we lived in 109 Osage.
2        Q.   109 Osage Street?
3        A.   Yes.
4        Q.   At the time of his death where did you-all
5    live?
6        A.   109 Osage.
7        Q.   How close is that to the Times Market at 1902
8    Baldwin?
9        A.   You could say like about probably four miles,
10   five miles.
11       Q.   Four or five miles away?
12       A.   Around there.
13       Q.   Are you aware of Mr. Castro ever living in
14   that neighborhood of 1902 Baldwin before he met you
15   and cohabitated with you?
16       A.   He was living in Riggan Street.
17       Q.   He used to live on Riggan Street?
18       A.   Uh-huh.
19       Q.   Is that street, for the record, the one that
20   was identified earlier in the court as running between
21   the Times Market and the car wash?
22       A.   Yes.
23       Q.   So that was essentially where he had spent
24   time before he met you, correct?
25       A.   Yes, sir.

19

1        Q.   What was -- what did -- plans did you and him
2    have together to do in 2005?
3        A.   We were supposed to get married.  He
4    wanted -- he wanted to marry me (crying).  He wanted
5    to marry me.  I was young at the time.  I was 22 when
6    I was with him and he wanted to marry me cause he
7    wanted me to be happy and he wanted to be happy.  He
8    just wanted to marry me because he loved me and I
9    loved him.
10       Q.   How old was Pablo Castro when he died?
11       A.   He just turned 45.
12       Q.   Did Pablo Castro have any children himself
13   that -- that you -- that were around when you lived
14   with him?
15       A.   Yes, we had -- he had two of them lived with
16   us around that time.
17       Q.   How many children -- natural children did he
18   have all together, his natural children?
19       A.   Four.
20       Q.   Okay.  Who would that be?
21       A.   His daughter, Maria; his three sons, Jr.,
22   Aaron, and Fernando Castro.
23       Q.   When you say Jr., you mean Pablo Castro, Jr.?
24       A.   Pablo Castro, Jr.
25       Q.   Pablo, Jr.; Aaron; and Fernando?

20

1      A.   Castro.

2      Q.   Castro.  How old were they at the time of his

3   passing?

4      A.   They were real young.  Fernando was about 12,

5   Jr. Was about 14, 15, around there.

6      Q.   And Aaron?

7      A.   Aaron was probably about -- I think he was

8   14.  I -- I think Jr. Was probably around 16 and 14.

9      Q.   Okay.

10     A.   I don't really know really the age but I know

11   it was 12, 14 and around 15.

12     Q.   Now, who lived with you two?

13     A.   Pablo Castro, Jr., and Fernando Castro.

14     Q.   What about his daughter?

15     A.   She wasn't living with us at the time.

16     Q.   She was not living -- is she older or

17   younger?

18     A.   She was the oldest.

19     Q.   And where was Aaron living at the time of

20   Pablo's passing?

21     A.   With an aunt and uncle.

22     Q.   Had he lived with his aunt and uncle for some

23   time?

24     A.   Yes.

25     Q.   So essentially on Osage Street it was you;

21

1   Pablo; Pablo, Jr.; and Fernando?

2      A.   Yes.

3              MR. SKURKA:  Your Honor, I've showed

4   the two photographs to Defense Counsel of Mr. Castro,

5   227 and 228 and I ask if there's any objection to them

6   before I admit them.

7              MR. JONES:  No objection.

8              THE COURT:  They're admitted.

9      Q.   (BY MR. SKURKA)  I want to show you just two

10   photographs real quick.  Let's start with 227.  What

11   is that a photograph of, 227?

12     A.   Me and him.

13     Q.   When was that taken?

14     A.   Christmas day.

15     Q.   Sorry?

16     A.   Christmas day.

17     Q.   Christmas of 2000 and --

18     A.   3.

19     Q.   -- 3.  And that shows Pablo Castro before his

20   death along with you by the Christmas tree?

21     A.   Yes, sir.

22     Q.   Let me show you the next picture marked 228.

23   What is 228 a picture of?

24     A.   Him and his kids.

25     Q.   Okay.  There's a laser pointer up there.  Can

22

1   you identify who the kids are.

2      A.   I can't see.

3      Q.   First of all, apparently that pictures shows

4   an adult and three children.  First of all, show us

5   the picture of Pablo Castro.  That's the gentleman in

6   the middle?

7      A.   Yes.

8      Q.   And the child that's seated next to him, who

9   is that, using your laser pointer.

10     A.   That's his stepson.

11     Q.   Who is that?

12     A.   Michael.

13     Q.   That's Michael, his stepson?

14     A.   His stepson.

15     Q.   How about the other children in the picture?

16     A.   Fernando and Pablo Castro, Jr.

17     Q.   So that's Pablo Castro, Jr. To the rear and

18   Fernando, the shorter one, in the middle, on the

19   bottom?

20     A.   (Nods head.)

21     Q.   You have to say yes or no, you can't just

22   shake your head.

23     A.   Yes, yes, sir, I'm sorry.

24     Q.   Okay.  So that photograph shows two of his

25   natural sons and his stepson?

23

1      A.   Yes, sir.

2      Q.   Did he have stepchildren from his previous

3   marriage?

4      A.   Yes, sir.

5      Q.   Can you tell us who they were and I'm

6   assuming they're Saucedo since he was married to a

7   lady named Diana Saucedo?  Name me his stepchildren.

8      A.   It was Bobby, Mike, Issac, and three other

9   daughters that I -- I know just of them is Marivel.

10     Q.   I'm sorry, I didn't hear you.

11     A.   I only only know one of them is Marivel.

12     Q.   Marivel is one of the daughters' name?

13     A.   Yes.

14     Q.   Did his stepchildren all live in Corpus

15   Christi or did they live somewhere else?

16     A.   From what I know of they lived in Corpus

17   Christi.

18     Q.   All right.  Did he see his stepchildren

19   often?

20     A.   Yes.

21     Q.   Okay.  How about his ex-wife, where was

22   living at the time of his passing?

23     A.   I don't know, sir.

24     Q.   Okay.  Do you know where the rest of his

25   family, did he have any brothers and sisters?

24

1     A.   Yes, he did.

2     Q.   And do you know how many and what were they?

3     A.   What I know, I think it was about seven or

4   eight.

5     Q.   He had seven or eight siblings?

6     A.   Uh-huh.

7     Q.   And where did they live?

8     A.   Some lived in Mexico and like in Florida.

9     Q.   Some in Mexico and some in Florida?

10     A.   Right.

11     Q.   And were his parents alive when he died?

12     A.   Yes, they were.

13     Q.   And where do they live?

14     A.   They live in Juanjato, Mexico.

15     Q.   So he had quite an extended family, did he

16   not?

17     A.   Yes, he did.

18     Q.   What were his hobbies?

19     A.   His hobbies were playing pool, being with

20   family, barbecuing every weekend, every Sunday.

21   Sunday was his day for barbecue for everybody, for the

22   family.  He said it was family day.  Sundays,

23   especially on the weekends, Friday and Saturday we

24   would go out dancing, playing pool, spending time with

25   the kids, taking kids wherever they want to go.

25

1     Q.   Where did used to take the kids?

2     A.   We would go to the park, the movies, parties,

3   family parties.

4     Q.   Betty, I want to move to that night in

5   question, July 19th, 2004.  Had he gone to work that

6   day?

7     A.   Yes, he did.

8     Q.   What times did he used to go to work?

9     A.   Sometimes he would go at 4, sometimes he

10   would go at 5.

11     Q.   Had you-all gone and got something to eat

12   earlier that day before he went to work?

13     A.   Yes, we did.

14     Q.   Where at?

15     A.   Little Caesar's Pizza.

16     Q.   So you-all had purchased Little Caesar's

17   pizza earlier that day?

18     A.   Yes, we did.

19     Q.   When was he usually paid?

20     A.   Every week.

21     Q.   What day of the week is what I'm asking?

22     A.   Either Monday or Tuesdays.

23     Q.   Do you know if he had money on him that

24   Monday when he left for work?

25     A.   No, he didn't.  He only had a dollar cause

26

1   that was the left change that he had from the store we

2   went to buy Cokes.

3     Q.   So when he left you only knew him to have a

4   dollar with him?

5     A.   Yes.

6     Q.   What time did he usually get off of work?

7     A.   Sometimes he would get off like about --

8   well, he would get off at 12 but he won't get home by

9   12:15.  I knew he would be home by 12:15.

10     Q.   You're talking about midnight; correct?

11     A.   Midnight.

12     Q.   That night did he ever show up at 12, 12:15?

13     A.   No.

14     Q.   What did you think when he didn't show up

15   like he usually did?

16     A.   I thought he was playing pool at a bar.

17     Q.   You thought he had gone to play pool?

18     A.   After work.

19     Q.   So what did you do?

20     A.   I waited and I waited until I felt ugly in my

21   heart, that something happened so I got -- I got in

22   the car.

23     Q.   Where did you go?

24     A.   I left -- left my two stepkids at home cause

25   they were asleep at the time and I left them there and

27

1   I left and I was coming on Baldwin and I passed to the

2   bar we always go to play pool.  The bar was closed at

3   the time, it wasn't open so I went straight as of

4   Baldwin.  I stopped at a light because it was red.  It

5   didn't want to turn green, it was holding me back so

6   I --

7     Q.   Where were you heading?

8     A.   To the store.  I was heading to Times Market

9   where he worked at.

10     Q.   Did you get to the Times Market?

11     A.   Yes, I did.

12     Q.   Do you remember about what time that was?

13     A.   It was about 12, 12:40, 12:30, 1240.

14     Q.   What did you find when you arrived at the

15   Times Market?

16     A.   I saw crime scenes and cops, everything,

17   people everywhere, car wash.  I mean, I just saw them

18   but I didn't see him until right there I saw somebody

19   laying there covered with a white sheet.

20     Q.   And what did you do then?

21     A.   Until Lydia and the owner of the store came

22   up to me and I was telling them "Where's Pablo,

23   where's Pablo?  I want to see if he's okay."  That's

24   when they told me he was laying there and he was

25   laying there dead (crying).

28

1    Q.   Take a minute.  I just have a few more
2  questions, okay?
3    A.   He was just laying there dead with his blood
4  everywhere.
5    Q.   How did you react when you saw him there?
6    A.   I fell to my knees.  I -- I felt half of my
7  body was empty.  My other half wasn't there.  I fell
8  to my knees until they carried me into the store.
9    Q.   They had to carry you into the store?  Who
10  did?
11    A.   It was Lydia and the owner of the store and
12  like probably about three cops.
13    Q.   Did they try to comfort you?
14    A.   Yes, but I was -- I was out of it.  I just
15  kept saying "Let me see him, let me see him," and they
16  didn't let me.  I just wanted to die with him there
17  (Crying).
18    Q.   Are you okay?
19    A.   I just wanted him in my arms.
20    Q.   Betty, I'm sorry to put you through this, I
21  just have a few more questions.
22    A.   I know.  It's just --
23    Q.   Are you okay?
24    A.   I'm all right.  It's hard to remember because
25  I see him just earlier and I don't see him no more.

29

1    Q.   Betty, how has this effected your life with
2  Pablo no longer in it?
3    A.   Very bad.
4    Q.   What effect has it had on you specifically?
5    A.   Sometimes I -- I don't want to be in myself,
6  I don't want -- I just -- it hurts.  It hurts to lose
7  a person you love, that you be with everyday.  No
8  things -- it hurts.  It just hurts.
9    Q.   Betty, can you tell us how it effected his
10  kids and his stepkids that you're seen?
11    A.   They're hurt very much, just the way I am.
12    Q.   Both his stepchildren and his real children?
13    A.   His stepkids and his kids, including me,
14  including the workers, family, friends, it hurts us.
15    Q.   How are his sons doing now, little Pablo
16  Castro, Jr. And Fernando?
17    A.   Not the same how they were.  I know they're
18  not the same.
19    Q.   How has it effected them physically, his
20  boys?
21    A.   It hurts them.  It hurts them to lose a dad
22  and a best dad.
23    Q.   Thank you, Ms. Mendez.
24        MR. SKURKA:  I don't have any other
25  questions.

30

1        THE COURT:  Cross?
2        MR. JONES:  No questions.
3        THE COURT:  You may stand down.
4        MR. SKURKA:  We call Officer Wertanen,
5  Your Honor.
6        THE COURT:  All right.
7        (Oath administered.)
8        THE COURT:  You may proceed.
9        MR. SKURKA:  Thank you, Your Honor.
10
11        MICHAEL WERTANEN,
12  having been first duly sworn, testified as follows:
13        DIRECT EXAMINATION
14  BY MR. SKURKA:
15    Q.   Would you please state your full name for the
16  folks on our jury.
17    A.   Michael Everett Wertanen.
18    Q.   How are you currently employed?
19    A.   I work for the City of Corpus Christi Police
20  Department.
21    Q.   How long have you been so employed?
22    A.   About 18 years.
23    Q.   Can you tell us generally what your duties
24  are currently?
25    A.   I work in the uniformed patrol division.  I

31

1  work --
2    Q.   I'm sorry.
3    A.   What's that?
4    Q.   Go ahead.
5    A.   I work the uniform patrol division.  I work
6  on the weekends, Friday through Monday, 5 p.m. to 3
7  a.m.  I'm also a squad leader on the SWAT team and a
8  field training officer.
9    Q.   Have you worked in any other areas or
10  divisions of the police department or has it always
11  been in patrol?
12    A.   I had a brief, brief tour in JET and a little
13  bit of work with vice and narcotics for a very short
14  period of time, but for the most part mostly patrol.
15    Q.   Tell us what you do on the SWAT team and what
16  does it mean to be a squad leader?
17    A.   Squad leader just -- is just somebody second
18  in charge.  Like we have lieutenants that are team
19  leaders and they -- they -- if there's something to be
20  done they'll -- they'll tell you to get two or three
21  guys and go get this done, so just sort a middleman in
22  the chain of command as far as the SWAT team goes.
23    Q.   Do you have any special training in the area
24  of SWAT or SWAT team?
25    A.   Yeah, all of our officers go through a basic

32

1    40-hour SWAT school and we train two days a month to
2    update our skills on different tactics, things like
3    that.
4         Q.   How long have you been on a SWAT team?
5         A.   I want to say about 12 years.
6         Q.   You also said that you are a field training
7    officer.  Explain to us briefly what that would be.
8         A.   When police cadets graduate the police
9    academy, when they come out on to the the street for
10   the first five to six months of their training career
11   they're teamed up with a field training officer and we
12   teach them how to apply what they learn in the academy
13   to being on the street and we evaluate them every
14   night, just sort of a transition from classroom to
15   actually becoming a full-fledged patrol officer.
16        Q.   So that's their first step once they get out
17   of the academy they're teamed with a more experienced
18   officer?
19        A.   Yes, sir.
20        Q.   And how long have you been a field training
21   officer?
22        A.   I want to say off and on for about 12 years.
23        Q.   Officer Wertanen, I would like to direct your
24   attention back to May 31st of '04.  Did you have
25   occasion to come in contact with the Defendant in this

33

1    case, John Henry Ramirez?
2         A.   Yes, I did.
3         Q.   Can you tell the jury how you first got
4    called out on this case or how you assisted in this
5    case?
6         A.   We were dispatched to a disturbance, the Casa
7    Linda Apartments.
8         Q.   Where is the Casa Linda Apartments?
9         A.   3258 South Staples, right across from Ray
10   High School.
11        Q.   What were you called out for as a
12   disturbance, what does that mean?
13        A.   Disturbance can be anything from two people
14   arguing to loud music, to a party.  We were dispatched
15   to a disturbance.
16        Q.   In other words, you didn't have too much
17   information at the time?
18        A.   Exactly.
19        Q.   About what time was this, sir?
20        A.   About 11:00 in the evening.
21        Q.   What happened and where did you go exactly to
22   this disturbance?
23        A.   Well, we arrived.  At the time I didn't have
24   a recruit or a partner with me so they dispatched two
25   units.  The other officer arrived slightly before I

34

1    did and he advised that he had two people running from
2    him.
3         Q.   So what did you do when the officer told you
4    he had two people running from him?
5         A.   Tried to go to the area that they were headed
6    and they were running in the neighborhood behind the
7    apartment complex.
8         Q.   Tell the jury what you did exactly.
9         A.   By the time I got there he had already lost
10   sight of the individuals that had ran so we were just
11   looking in the neighborhood for them.
12        Q.   How did you look in the neighborhood for
13   these people that ran from him, what exactly did he do
14   and where did he go?
15        A.   Well, he -- he stayed in his car and just
16   cruised very slowing through the neighborhood, see if
17   anybody was moving.  11:00 at night in a residential
18   neighborhood there's probably not a whole lot of
19   people out moving around.  I had got off my car and
20   started looking over fences, over the privacy fences
21   in the yards to see if anybody was back there.
22        Q.   For the record, is the Casa Linda Apartments,
23   they actually kind of face Staples Street, do they
24   not?
25        A.   Yes, sir.

35

1         Q.   And what's behind the Casa Linda Apartments?
2         A.   There's a neighborhood back there, all the
3    "Casa" Streets, Casa Bonita, Casa Rosa, Case De Oro.
4         Q.   So that's the area you were looking at?
5         A.   Yes.
6         Q.   What, if anything, did you find as you were
7    looking over privacy fences and looking for the people
8    who had run from officer?
9         A.   I came across an individual in the back yard
10   that was not well lit.  I believe the address was 3225
11   Casa Bonita, I believe.  I don't have my arrest sheet
12   in front of me but the back yard was not well lit and
13   there was an individual kind of huddled up on the
14   patio kind of against the house.  I came over to the
15   fence and then it turned out to be the Defendant,
16   Mr. Ramirez.
17        Q.   You keep saying he was huddled up.  What do
18   you mean?  How was he acting or where was he located?
19        A.   He was kind of on the patio against the wall
20   kind of crouched down and huddled up against the wall.
21        Q.   What did that indicate to you?
22        A.   Well, at the time that, you know, maybe he
23   was just trying to hide, but, I mean, he clearly saw
24   me coming over the the fence and he didn't attempt to
25   run or anything but when I got back there he didn't

36

1  really have any good explanation as to what he was
2  doing in the back yard, he didn't know the people, he
3  didn't live there.
4      Q.   He didn't tell you -- you were able to
5  determine he did not live in the residence?
6      A.   Yes.
7      Q.   And he had no explanation of why he was
8  there?
9      A.   No.
10     Q.   What, if anything, did you find around him?
11     A.   There were two open 18 packs of Budweiser
12  beer.  They were in close proximity to him, they were
13  cold.
14     Q.   What did that indicate to you?
15     A.   Well, he had just run from the Casa Linda
16  Apartments and there had been some sort of party and
17  disturbance over there so that indicated to me that he
18  was probably the guy that ran from the -- our officer.
19     Q.   Again, was there any other sign of life
20  around the house or the residence of the house itself?
21     A.   No, it -- the back yard was very well kept.
22  It looked like probably older people lived this,
23  potted plants, very well manicured kind of yard.  It
24  was very dark.  Whoever was there, if this was anybody
25  there, was probably asleep because this was no

37

1  activity with him being in the back yard.
2      Q.   So would it be your testimony that he tried
3  to hide from you or huddle up so you wouldn't be able
4  to spot him?
5      A.   I -- I believe he was trying to hide from the
6  other officer.  I mean, when I came over the fence he
7  clearly saw me and I saw him.  He didn't make an
8  attempt to run.  Later I found out that he had an
9  injury and that might have something to do with
10  why he didn't run from me.
11     Q.   How did you find that out?
12     A.   He had -- he had mentioned after -- after the
13  arrest that -- that he was still recovering from a gun
14  shot wound.
15     Q.   Did you ask him directly why he hadn't run,
16  why he didn't run anymore?
17     A.   Well, I think -- I think it came out -- when
18  I contacted him it was very obvious he had been
19  drinking, his speech was slurred, you could spell it
20  on his breath, he was a little bit unsteady on his
21  feet, he had the beer right right there with him.  He
22  also at the time was 19 years old.  At that point I
23  placed him under arrest for public intoxication and
24  everything was -- was going fine up to that point.  He
25  didn't offer any kind of resistance or he wasn't

38

1  being, you know, rude or anything like that but as
2  soon as I put the handcuffs on him then he started
3  kind of running his mouth a little bit and telling me,
4  "Oh, I know you just want to kick my ass," this type
5  of thing, "that's what you cops like, you just like
6  beating on people."
7          And when I went to walk him out of the
8  yard he started trying to like pull away from me and
9  he said he didn't need me to escort him out of the
10  yard and at that point I swept his feet out from under
11  him, put him face down on the grass and jerked him up
12  by his handcuffs, kind of held him.
13     Q.   Why did you do that?
14     A.   Because he was starting to go down that road
15  of being uncooperative so I pulled him up by his
16  handcuffs and I explained to him in no uncertain terms
17  that I wasn't in the mood to put up with it and he
18  seemed to understand that and didn't have any problems
19  after that.  It was at that point that he was kind of
20  grimacing a little bit.  "What's wrong with you," and
21  he said I had been shot and I'm still recovering from
22  the gunshot wound.
23     Q.   So that's how you found out he had a gunshot?
24     A.   Yes.
25     Q.   Let me go back to your initial contact with

39

1  him.  You said he had slurred speech, unsteady on his
2  feet and smelled like alcohol, correct?
3      A.   Yes.
4      Q.   Have you had occasion in your 18 years with
5  the police department to arrest intoxicated persons?
6      A.   Yes.
7      Q.   Based on your experience and that night did
8  you believe that John Henry Ramirez did not have the
9  normal use of his mental and physical faculties
10  because of the intoxication?
11     A.   Yes.
12     Q.   So did you arrest him?
13     A.   Yes.
14     Q.   What did you arrest him for?
15     A.   Public intoxication.
16     Q.   What is the -- what was the drinking age back
17  in 2004?
18     A.   As long as I've been on, it's always been 21.
19     Q.   So he was actually under age be drinking
20  also; correct?
21     A.   Yes, sir.
22     Q.   You said something about cooperative until
23  the cuffs went on.  What did you mean?
24     A.   Well, just that.  I mean, he -- he didn't
25  offer any kind of resistance, he didn't attempt to run

40

1  from me, he was actually being fairly polite in
2  answering my questions but it seemed like once the
3  handcuffs went on like a switch was flipped and the
4  attitude got very kind of belligerent and
5  disrespectful and then trying to start pulling away
6  from me as I'm trying to escort him out of the back
7  yard.
8      Q.   When you say he pulled away from you, is that
9  something that would lead you to you arrest him for
10  resisting arrest, or did it get that far?
11     A.   I didn't let it get that far.  I suppose
12  technically you could probably call that resisting
13  arrest but the policy here in Nueces County unless a
14  prisoner actually tries to assault one of us the
15  district attorney won't accept those cases for
16  resisting arrest so we don't charge people if it's
17  just a matter of them using physical strength to try
18  to pull away from us.
19     Q.   And that's what he was doing, trying to pull
20  away?
21     A.   Exactly.
22     Q.   At the time that you said you were looking
23  over the privacy fence or getting over -- coming over
24  the privacy fence, is it possible he could have run
25  away from you since he was --

41

1      A.   Absolutely.  In fact, I was surprised he
2  didn't.
3      Q.   Tell us about that.
4      A.   Well, I mean, I saw him.  I illuminate with
5  my flashlight so he clearly saw me looking at him.
6      Q.   And you're on the other side of the fence,
7  though?
8      A.   Yeah, I'm on the other side of the fence and
9  I'm assuming that he's the same individual that --
10  that had run from the officer earlier so I was fully
11  expecting him to run but he didn't.
12     Q.   And you found out why he didn't run later on
13  when he told you he had -- recovering from a gunshot
14  wound?
15     A.   Yeah.
16     Q.   For the record, is the person who committed
17  these acts, the public intoxication, the pulling away
18  from you, the belligerence and disrespectful tone to
19  you, is that person in the courtroom today?
20     A.   Yes.
21     Q.   Can you point to him and describe something
22  he's wearing.
23     A.   Sitting right there in the light blue shirt.
24        MR. SKURKA:  Your Honor, may the record
25  reflect the witness has identified the Defendant.

42

1        THE COURT:  It will so reflect.
2      Q.   (BY MR. SKURKA)  Did you -- you said you
3  thought he had been the one that had run from the
4  other officer and then you thought he was going to run
5  if you.  Is there a crime that's called evading or
6  fleeing from a police officer?
7      A.   Yes, there is.
8      Q.   And why didn't you arrest him for that?
9      A.   Well, after I got him back out under the
10  street I had the other officer come by and take a look
11  at him and he -- the other officer, basically he
12  didn't get a good enough look to be a hundred percent
13  sure that this was the guy that ran from him but,
14  again, we didn't find anybody else in that area as to,
15  you know, what he was doing in a stranger's back yard
16  at that hour of night, the fact that he had the beer
17  with him, it probably was but he just -- the other
18  officer didn't really get a good look and saw him from
19  behind as they were running and he just really
20  couldn't say for sure so we didn't charge him with it.
21     Q.   So essentially the officer wasn't able to
22  affect a hundred percent I.D. of him?
23     A.   Exactly.
24     Q.   So you just arrested him for the P.I.
25     A.   Exactly.

43

1      Q.   If the officer had been able to arrest,
2  identify him, would you arrest him for --
3      A.   Yes.
4      Q.   -- evading?
5      A.   Yes.
6      Q.   Thank you.
7        MR. SKURKA:  I'll pass the witness.
8        MR. JONES:  No questions.
9        THE COURT:  All right, you may stand
10  down.  May this witness be excused?
11        MR. SKURKA:  Yes, Your Honor.
12        THE COURT:  All right, you're free to go
13  about your business.  Call your next witness.
14        MR. SKURKA:  Patrick McMenamy.  It's very
15  hard to say, Judge.
16        THE COURT:  Is that an officer?
17        MR. SKURKA:  Yes, he's an officer.
18        (Oath administered.)
19        THE COURT:  Be seated.  You may proceed.
20
21        PATRICK McMENAMY,
22  having been first duly sworn, testified as follows:
23        DIRECT EXAMINATION
24  BY MR. SKURKA:
25     Q.   Would you introduce yourself to the folks on

44

1    the jury, please.
2        A.   My name is Patrick McMenamy.
3        Q.   Could you spell your name for the court
4    reporter, please.
5        A.   It's M-c-M-E-N-A-M-Y.
6        Q.   How are you employed currently?
7        A.   I'm a police officer with the City of Corpus
8    Christi.
9        Q.   How long have you been so employed?
10       A.   Six-and-a-half years; April will be seven
11   years.
12       Q.   Can you tell us generally what area you've
13   worked in in the area of the police department or what
14   division or assignments you've had?
15       A.   The majority of my career I have been in the
16   uniform patrol division.
17       Q.   And what are your duties in that?
18       A.   I answer calls, I do traffic stops,
19   everything a police officer would do.  I enforce the
20   traffic violations, the narcofic laws, family
21   violence, just everything a police officer does.
22       Q.   Can you tell us about any specialized
23   training you've had, if any, since you got out of the
24   academy?
25       A.   Since I've been out of the academy I went to

45

1    a 40-hour ethics school.  It's basically a drug
2    enforcement pipe lining training.  I've attended my
3    general in-services every two years, just -- that's
4    about it.
5        Q.   Any training in the area of -- of certain
6    weapons?
7        A.   No specialized training.  I've been around
8    weapons all my life.
9        Q.   Back at the of -- in '04, did you have
10   occasion to come in contact with the Defendant in this
11   case, John Henry Ramirez?
12       A.   Yes, I contacted him on a traffic stop.
13       Q.   Can you tell us what date that was.
14       A.   It was March 25th of 2004.
15       Q.   How did -- how long had you been a police
16   officer at that time?
17       A.   I'd say a little over a year and a half.
18       Q.   About a year and a half?
19       A.   Somewhere around there, about that.
20       Q.   Where did you come in contact with the
21   Defendant in this traffic stop?
22       A.   At the intersection of Norton and Kostoryz.
23       Q.   Tell the jury what first caught your
24   attention in this case.
25       A.   I pulled up to the red light.  I was on

46

1    Norton traveling towards Kostoryz and there was a
2    vehicle, a Dodge Shadow, parked at the red light and I
3    noticed that the right rear passenger brake light was
4    out on the vehicle, which is a violation of the
5    traffic law, so when the light turned green I
6    initialed a traffic stop on the vehicle.
7        Q.   Where did you stop him or pull him over at?
8        A.   He made a left on Kostoryz like you're
9    heading towards Staples and pulled over to us right
10   there.
11       Q.   So this is essentially -- you're on Norton
12   turning left on to Kostoryz?
13       A.   Yes, sir.
14       Q.   Would that be back towards Staples and like
15   Ray High School?
16       A.   Yes, towards Staples.
17       Q.   What time of the night or day was this?
18       A.   It was approximately 11:00, I think just --
19       Q.   A.M. or P.M.?
20       A.   A few minutes before 11 p.m. actually.
21       Q.   P.M., at night?
22       A.   Yes, sir.
23       Q.   Okay.  So this March 25th date of '04 at
24   11:00 you pulled over the Dodge Shadow with him in the
25   car.  How many people were in the car?

47

1        A.   It was just Mr. Ramirez.
2        Q.   As you approached the car, what, if anything,
3    did you notice?
4        A.   When I contacted the driver, Mr. Ramirez, I
5    could smell an odor of burnt marijuana coming from the
6    passenger compartment of the vehicle.  I recognized
7    this odor from my training and experience as a police
8    officer.
9        Q.   So what did you do?
10       A.   Whenever -- as a police officer whenever I
11   can smell marijuana coming from the vehicle it gives
12   me probable cause to further my investigation to
13   search the vehicle for marijuana so I had Mr. Ramirez
14   exit the vehicle, I conducted a pat down for weapons,
15   make sure he didn't have any weapons on his person,
16   and then I detained him in the back of my unit.
17            After detaining him I called for another
18   unit and Officer Teed arrived.
19       Q.   When you patted him down, what were you
20   patting him down for before putting him in your unit?
21       A.   Weapons, handguns, pocket knives, pens,
22   anything that could be used to harm me or my partner.
23       Q.   Is that standard procedure for an officer to
24   do out in the field?
25       A.   Yes, any time we put anybody in the back of

48

1 the car, if I have reason to pat them down I want to
2 pat them down before I put them in the back of my
3 unit. It's officer safety.
4     Q.   Now, is this pat down a very extensive
5 search, like a strip search, or is it basically just
6 patting them down with your hands?
7     A.   It's just basically patting them down with my
8 hands, the outer portion of their clothing and their
9 pockets, under their waistband, around their belt
10 area, their back pockets and around their ankles where
11 weapons can be concealed. Sometimes if they have
12 pockets on their shirts you pat them down right here
13 also, anywhere a weapon can be concealed.
14     Q.   Did you find any weapons on John Henry
15 Ramirez' person?
16     A.   No, sir, I did not.
17     Q.   You testified then that you put him in the
18 back of your car and asked for backup.
19     A.   Yes, sir.
20     Q.   Explain the procedure to the jury why you
21 have to ask for backup if you've already got him in
22 the back of your car.
23     A.   Well, we always want to keep eyes on the
24 suspect because we're -- police officers are human and
25 we can miss things and you never know and it's just

49

1 good officer safety to have another officer there
2 because suspects have been known to kick out windows.
3 There's a majority of things that could happen and go
4 wrong so if you have another officer there to watch
5 the person that's in the back of your car while you
6 search the vehicle, it's just a safe way to go.
7     Q.   So who did you have back you up that day?
8     A.   Officer Teed arrived.
9     Q.   And what did he do once he arrived?
10     A.   He watched the suspect while I went to back
11 to the vehicle and started a search of the vehicle.
12     Q.   So it would be fair to say you're at the car
13 at the front where the suspect was driving and Teed
14 was back there with the -- with the suspect in your
15 car?
16     A.   Yes, sir.
17     Q.   What, if anything, did you find when you
18 entered the car driven by the Defendant, John Henry
19 Ramirez?
20     A.   When I searched the vehicle you want to start
21 at one point and work your way around. I started at
22 the driver's section of the vehicle, I opened the
23 door, and when I looked underneath the front of the
24 driver's seat I found a small caliber handgun. It's a
25 .25 Raven.

50

1     Q.   Tell the jury exactly where it was found.
2     A.   Right underneath the front of the seat.
3 Could I use the seat for an example?
4     Q.   Sure.
5     A.   This is where the driver's seat is located
6 right there. The barrel was facing towards the rear
7 of the vehicle as if somebody had just placed it
8 underneath them.
9     Q.   So the barrel was pointing toward the back of
10 the car?
11     A.   Yes, sir.
12     Q.   Again, was there anyone else in the car?
13     A.   Nobody.
14     Q.   And describe the gun for us, please.
15     A.   It was a small caliber .25 automatic Raven
16 pistol. It would actually fit in the palm of my hand.
17     Q.   Now, did I ask you to bring that -- that gun
18 to the court today?
19     A.   Well, that gun is not available because it
20 was destroyed.
21     Q.   Okay. Did you -- before you came into court
22 today, were you able to look at a similar gun to
23 identify it as being similar to the gun that you
24 found?
25     A.   Yes, I was.

51

1     Q.   And had I asked you to look at it to see if
2 you could demonstrate to the jury to show the jury
3 what that gun looked at it?
4     A.   Yes, I did.
5     Q.   And have you looked at it before your
6 testimony today?
7     A.   Yes, sir, I looked at it in your office.
8         MR. SKURKA: May I approach, Your Honor?
9         THE COURT: Yes.
10     Q.   (BY MR. SKURKA) I'm going to ask you to look
11 inside this bag and for the Court's and the jury's
12 knowledge, I ask this officer to check this gun to
13 make sure it was safe and unloaded before he entered
14 the courtroom and I also asked the bailiff to do the
15 same thing. Would you pull out the item that we're
16 just describing -- that you're just describing, and,
17 again, make sure it's safe, would you.
18     A.   Okay.
19     Q.   Is it clear?
20     A.   Yes.
21     Q.   For the record, what was the brand name and
22 the make and model of the gun that you found with John
23 Henry Ramirez that day?
24     A.   It was a Raven .25 caliber automatic pistol.
25     Q.   Is that pistol that you're holding in your

52

1    hand for purposes of demonstrative evidence, is that
2    similar or look the same type of pistol that was found
3    by you that night?
4        A.   Yes, sir.
5            MR. SKURKA:  Your Honor, I ask that the
6    the officer be allowed to step forward and display it
7    to the jury, and obviously don't point it to the jury
8    but so they can get a good look at it for
9    demonstrative purposes.
10           THE COURT:  All right.
11           MR. SKURKA:  Come on down here, Officer,
12   and just start at one end or the other and just lay it
13   out for them so they can see it, please.
14           THE WITNESS:  (Complying.)
15       Q.   (BY MR. SKURKA)  What does .25 caliber mean?
16       A.   It's the size of the bullet.
17       Q.   Is that the smallest type bullet you could
18   have or gun you could have?
19       A.   It is a small caliber.  I say one of the
20   smallest is probably a .22.
21       Q.   .22 is a little smaller?
22       A.   Yes, sir.
23       Q.   Okay.  And you said it was a semiautomatic.
24   Can you explain to the jury how it operates as opposed
25   to a revolver?

53

1        A.   Well, a revolver has a cylinder and you only
2    have six shots, maybe seven shots depending on the
3    type of gun.  This is spring loaded, it operates off
4    of the power from the -- the cartridge, the explosion,
5    and what happens when you pull the trigger this side
6    will go back, one will go out and the magazine feeds
7    them in.
8        Q.   Can you take the magazine out to show the
9    jury what we're talking about.
10       A.   I already took it out for safety purposes.
11       Q.   Why don't you show that to them, too, please.
12       A.   (Complying.)
13       Q.   Now, the magazine, for the record, what does
14   it do?
15       A.   It holds the cartridges.
16       Q.   So it holds the bullets, the cartridges.
17   Okay.  What was the condition of the gun when you
18   found it?  In other words, was it loaded or not?
19       A.   It was loaded.  It didn't have a magazine but
20   it had a bullet in the chamber ready to go.
21       Q.   So there was a bullet in the chamber?
22       A.   Yes, sir.
23       Q.   Did you -- did you confiscate the gun then?
24       A.   Yes, sir.
25       Q.   Did you find anything else during your search

54

1    of the car in question driven by John Henry Ramirez?
2        A.   Yes, sir, I found a half smoked or half burnt
3    marijuana blunt in the ashtray.
4        Q.   For the folks on the jury who may not be
5    familiar with narcotics, what is a blunt?
6        A.   A blunt is you have a cigar and what they do
7    is they cut up the cigar, they cut it down the middle,
8    they empty the tobacco out and they'll put marijuana
9    in it and then they'll roll it back and then you have
10   a marijuana cigar, commonly referred to as a blunt.
11       Q.   So it looks like a cigar but it actually has
12   marijuana?
13       A.   Marijuana in it.
14       Q.   Instead of tobacco.
15       A.   Yes, sir.
16       Q.   Based on your experience and training with
17   the police department, have you seen these people?
18       A.   Yes, sir.
19       Q.   Are they common out on the street?
20       A.   Yes, sir.
21       Q.   And could that have been the source of the
22   marijuana smoke or the marijuana smell that you
23   smelled?
24       A.   Yes, sir.
25       Q.   Okay.  I've also asked you to bring in the

55

1    copy -- I'm sorry, was that marijuana available to
2    bring in as evidence?
3        A.   No, sir, it was not, it was also destroyed.
4        Q.   Just briefly, can you tell the jury why it
5    would be destroyed and this being 2008 and this case
6    was from 2004.  What's the procedure of the police
7    department?
8        A.   Usually after somebody has gone to court and
9    the case has been disposed of they plead guilty or not
10   guilty, et cetera, the evidence is destroyed after a
11   certain time period because we can't hold on to
12   everything at the police department, and so this case
13   had been disposed of, Mr. Ramirez was found guilty --
14   or plead guilty to the case and the evidence was
15   destroyed.
16       Q.   So, is that unusual to have the actual
17   evidence destroyed, you know, after four years?
18       A.   No, it's common actually.
19       Q.   So that's why we have these demonstrative
20   things, correct?
21       A.   Yes, sir.
22       Q.   Look in the bag again and see if there's a
23   demonstrative blunt or marijuana cigarette to show to
24   the jury, please.
25       A.   (Complying.)

56

1    Q.   Okay.  Can you explain to this jury and why
2    don't you do like you did the last time, take it out
3    of the baggie and show the jury what we're talking
4    about is the blunt and I just ask you to step down
5    with it and show it to the jury in the palm of your
6    hand, please.
7    A.   If you look closely you can see the line
8    where they sliced it.
9    Q.   You have to talk loud enough so the court
10   reporter can hear you.
11   A.   I'm sorry.  Okay, if you look closely you can
12   see where they slice the cigar down the center and
13   that's where they empty out the tobacco and fill it in
14   with the marijuana.
15   Q.   So from an outward appearance it appeared to
16   be a cigar?
17   A.   Yes, sir.
18   Q.   Okay.  Now, I know that's not the same one.
19   Was it half smoked or all the way smoked or partially
20   smoked?
21   A.   It was half --
22   Q.   The one you saw?
23   A.   The one I recovered was half.
24   Q.   And that appears to be a pretty much full
25   size blunt?

57

1    A.   Yes, sir.
2    Q.   But does that fairly and accurately
3    demonstrate what the blunt looked like at the time you
4    saw it except that the one you saw was more smoked?
5    A.   Yes, sir, the tip had a burned tip on it.
6    Q.   And it had a burned tip.  Could you tell, I
7    don't know how to say this, but was it freshly burned
8    or still blowing or anything, or could you tell?
9    A.   I don't recall, sir.
10   Q.   Did you retrieve both of those items that
11   night in question, both the marijuana and the gun and
12   tag them into evidence?
13   A.   Yes, I did.
14   Q.   And when I say "tag into evidence," what do I
15   mean?
16   A.   What we do is Mr. Ramirez was arrested for
17   possession of marijuana and unlawful carrying of a
18   weapon so as part of the procedure we take the
19   evidence to the main station where's it's tagged to
20   the case and put it in the property room at the police
21   department.
22   Q.   So that night what did you arrest John Henry
23   Ramirez for?
24   A.   The unlawful carrying of a weapon and
25   possession of marijuana.

58

1    Q.   And is the person that you arrested and did
2    these acts that you described in your testimony for
3    the lawful carrying of weapon and the possession of
4    marijuana, is he in the courtroom today?
5    A.   Yes, he is.
6    Q.   Can you point him, describe something he's
7    wearing?
8    A.   He's the gentleman sitting right next to the
9    door wearing a light blue shirt.
10   MR. SKURKA:  Your Honor, may the record
11   reflect the witness has identified the Defendant.
12   THE COURT:  It will so reflect.
13   MR. SKURKA:  Thank you.
14   Q.   (BY MR. SKURKA)  I'm going to show you -- now
15   that we've seen the demonstrative evidence itself I've
16   got pictures of them marked State's Exhibit 229 and
17   230.  Do those fairly and accurately represent the
18   items that you just demonstrated to the jury?
19   A.   Yes, they do.
20   Q.   Okay, thank you.
21   MR. SKURKA:  I move for their
22   admission into evidence, Your Honor.  I've already
23   shown them --
24   MR. JONES:  We've already -- we have no
25   objection.

59

1    THE COURT:  No objection?
2    MR. JONES:  No objection.
3    THE COURT:  All right, they're
4    admitted.
5    MR. SKURKA:  Judge, I don't have any
6    other questions of this witness but I ask if I can
7    just hand these to the jury to publish them to the
8    jury.
9    THE COURT:  That's fine.  Cross?
10   MR. JONES:  No questions.
11   THE COURT:  All right.  You may stand
12   down.
13   MR. SKURKA:  Officer, would you do me a
14   favor and take these down with you to our
15   investigator, Craig Hill, or Eddie Saldivar so they
16   can return them to the police department.
17   THE WITNESS:  Okay.  Am I excused?
18   THE COURT:  You are.
19   MR. SKURKA:  Thank you, Officer.
20   THE COURT:  Who's your next witness?
21   MR. SKURKA:  Sydney Morris, Your Honor.
22   THE COURT:  All right, Sydney Morris.
23   (Oath administered.)
24   THE COURT:  You may proceed.
25   MR. SKURKA:  Thank you.

60

1                    SYDNEY MORRIS,

2    having been first duly sworn, testified as follows:

3                    DIRECT EXAMINATION

4    BY MR. SKURKA:

5        Q.   Could you please introduce yourself to the

6    folks on the jury.

7        A.   My name is Sydney Morris.

8        Q.   Can you spell Sydney for the -- is it with a

9    I or a Y?

10       A.   It's with a Y.

11       Q.   Can you tell jury how you're currently

12   employed.

13       A.   I'm currently a supervising community

14   supervision officer with Nueces County Probation

15   Department.

16       Q.   How long have you been with the probation

17   department?

18       A.   12 years.

19       Q.   You said you were a supervisor.  How long

20   have you been a supervisor?

21       A.   I will be three years in February.

22       Q.   Can you tell us what training or education

23   you've had to become a probation officer.

24       A.   I have a four-year degree in sociology and

25   then I have certified state officer and we have to

61

1    maintain our certification and I have to do at least

2    40 hours of training or extra educational training

3    within the department every year.

4        Q.   Can you tell the jury basically what a

5    probation officer does, the duties.

6        A.   Supervision officer is an officer of the

7    Court.  We are part of the judicial system.  We answer

8    to the Court.  We are assigned case that the Courts

9    place on probation.  Offenders who get probation are

10   assigned an officer and we serve the Court.

11              We supervise the offender in the

12   community, make referrals, we're a resource for them,

13   we also hold them accountable when they violate their

14   conditions by reporting violations to the State and to

15   the Court.

16       Q.   Generally speaking, as a supervising person

17   for a person on probation, what -- and I don't want to

18   talk about all the conditions of probation, but what

19   are the usual conditions of probation that a judge may

20   put on somebody who's on probation?  Can you go the

21   base -- start with the basic ones and maybe some

22   specialized ones.

23              Yes, there are basic conditions of

24   supervision, that the person has to report as directed

25   by the Court or the officer.  That means report to the

62

1    the probation officer at least once a month or more

2    frequently, if necessary, or required to do so.  Don't

3    break the law, any local, state or any law of the

4    United States.  You can't use alcohol and drugs.  In

5    most cases, it's alcohol and drugs.  In some other

6    cases the person is not allowed to use illegal drugs

7    but may just alcohol, it depends on the case.

8              A person has to pay their fees.  Fees are

9    listed.  They can be court costs, fines, supervision

10   fees, they can be any kind restitution to the victim

11   that the Courts order that they pay whatever fees are

12   ordered.

13              The person has to remain in Nueces County

14   and -- but they may leave with permission from the

15   officer or the Court, so we don't let people just

16   travel around, they have to let us know where they're

17   going.  A person has to report a change of residence

18   to the officer within 24 or 48 hours, depending on the

19   case.  The offender also has to work at suitable

20   employment.  It's a condition of probation for

21   offenders who are able to be employed, they must be

22   employed.

23       Q.   So, all those conditions are quite extensive.

24   What are main ones that judges and probation officers

25   look for them to not violate?

63

1        A.   Well, the -- there are biggies, there are

2    some that are really important but they're all

3    important, the Courts consider all conditions

4    important but we really don't want them breaking the

5    law, don't want them using alcohol or drugs, we want

6    them to report as directed.  We can work with the

7    other things pretty easily.

8        Q.   So you're -- I think you pointed out the two

9    main ones you think are reporting as ordered and --

10   which basically means showing up to the probation

11   officer --

12       A.   Yes.

13       Q.   -- once a month or so and not breaking the

14   law; is that correct?

15       A.   Yes, yes.

16       Q.   Now, were you the probation officer for --

17   I'm sorry, before I get in that, what happens if a

18   person does not obey the conditions or procedure of

19   probation?  Can you explain the procedure to the jury

20   what happens then?

21       A.   Well, when someone get probation, they come

22   to the department for supervision and we start a

23   process of building a file.  A person gets probation

24   on the day and in a misdemeanor case the offender is

25   brought to our office in the -- it happens to be in

64

1    this building, and the person is given an appointment
2    to return -- to conduct a process we call intake.
3    They're tested, interviewed, given a copy of their
4    condition if they don't already have one and explain
5    that they have to report to another office.
6            Then that person comes down, completes
7    intake, then we forward the process – the file and
8    complete everything, send it over to our main office
9    on Trojan Drive where the offender will usually
10   report.  In some cases we do have offenders that will
11   report in a satellite office.  We have offices in
12   Flour Bluff and in Robstown, but they're assigned an
13   officer, they have to go to that officer to report.
14       Q.   Were you the officer in charge of the
15   Defendant in this case, John Henry Ramirez' case?
16       A.   Not at the time he got probation.
17       Q.   Okay, who was that officer at that time?
18       A.   In the beginning it was a court officer in
19   this building, Maria Balboa.
20       Q.   I'm talking about the person who actually was
21   in charge of supervising, not just the one who was in
22   court that first day.
23       A.   Okay.
24       Q.   Who was that?
25       A.   That would be Ronald Garcia.

65

1    Q.   Is Ronald Garcia still employed with the
2    probation department?
3    A.   No, he is not.
4    Q.   Are you the super -- have you, since Ronald
5    Garcia left, have been the one who's taken over the
6    file?
7    A.   Well, I'm one of several.
8    Q.   One of several.  What do you mean?
9    A.   Well, when we have someone who is assigned to
10   an officer and the offender doesn't report and despite
11   our efforts to locate the offender we have to complete
12   certain paperwork and send it to what we call our AWOL
13   unit, absent without leave, offenders who are -- who
14   need to be located and they go to the AWOL unit and
15   that officer tries to locate them through different
16   software, different contacts and other agencies try to
17   locate that person to bring them in.
18   Q.   So you -- it's your testimony that John Henry
19   Ramirez was in the AWOL unit, he hadn't shown up for
20   probation?
21   A.   That's correct.
22   Q.   When was he placed on probation and what for?
23   A.   He was placed on probation and it was
24   deferred adjudication probation for unlawfully
25   carrying a weapon on April 16, 2004.  He received nine

66

1    months probation.
2    Q.   April 16, 2004?
3    A.   Yes.
4    Q.   And that was for unlawful carrying a weapon?
5    A.   Yes.
6    Q.   And do you have a -- are you familiar with a
7    judgment or sentence from the Court and have you had a
8    chance to a review a certified copy of that judgment
9    of his conviction?
10   A.   Not certified copy but I have a copy in my
11   file.
12   Q.   You have a copy of it?
13       MR. SKURKA:  May I approach, Your Honor?
14       THE COURT:  Yes.
15   Q.   (BY MR. SKURKA)  I'm going to ask you to look
16   at what's been marked as State's Exhibit 232.  Compare
17   it to your copy in the file and tell me if that
18   appears to be a fair and accurate copy of this
19   judgment and have the certification of it.
20   A.   It is, it's on three pages.
21   Q.   So Exhibit 232, is that an official certified
22   copy of the judgment of John Henry Ramirez for the
23   conviction of --
24   A.   Yes.
25   Q.   -- unlawful carrying a weapon in Cause No.

67

1    04-2686-3?
2    A.   It is the certified copy of the judgment but
3    there was no conviction.
4    Q.   I'm sorry, when I say "no conviction," that's
5    because he was placed on deferred adjudication
6    probation, correct?
7    A.   That's correct.
8    Q.   Explain to the the jury what we're talking
9    about when we say "conviction" or "deferred
10   adjudication probation."
11   A.   When an offender appears before the Court the
12   offender may plead guilty, not guilty or nolo
13   contendre, and in this particular case Mr. Ramirez
14   appears to have plead guilty but in exchange for that
15   he was placed on deferred adjudication probation which
16   means the Court put off or deferred making a finding
17   of guilty and placed the person on probation.
18   Q.   That would be then the Judge got enough
19   evidence to find him guilty but has deferred that --
20   A.   Yes.
21   Q.   -- and placed him on deferred probation?
22   A.   Yes.  And if the person completes their
23   probation satisfactorily then there is no final guilt.
24   Q.   What are the consequences of a person who
25   does not complete his probation satisfactorily or

68

1    violates his conditions while he's on deferred?

2        A.    Well, there are a number of things that the

3    Court can do with a case like this. Once we file a

4    violation report with the State and the State files a

5    motion with the Court the offender's supervision can

6    be revoked and the person can be then adjudicated or a

7    finding of guilt can be paid and the offender can be

8    placed on what we call straight probation where they

9    have a sentence. The offender can also have the

10   probation -- probation may be revoked and the guilt is

11   adjudicated and they just go do jail time, they don't

12   get probation again.

13       Q.    So there's different things that can happen,

14   correct?

15       A.    Yes, yes.

16       Q.    Does deferred also expose a person to the

17   maximum sentence of that -- of that charge?

18       A.    It does. The Court still has the full range

19   of punishment available for the person if they're ever

20   adjudicated.

21       Q.    So, for example, how long was he on probation

22   for this case?

23       A.    He received nine months.

24       Q.    But if he was revoked, his probation was

25   revoked, he couldn't receive actually more than nine

69

1    months, couldn't you?

2        A.    Well, I think it's a Class A misdemeanor and

3    the range of punishment for that I believe is up to a

4    year.

5        Q.    So basically you can go over the range that

6    he's on for, correct?

7        A.    Yes, the supervision period, yes, the --

8    right.

9        Q.    That's what I -- I didn't say the word right

10   but he could be sent to something more than nine

11   months because it's a deferred probation?

12       A.    Yes, yes.

13       Q.    Where if it was straight probation the most

14   he could get is nine months if it was nine months --

15       A.    Yes, yes.

16       Q.    -- probated for nine months?

17       A.    Yes.

18       Q.    Does the judgment itself show the date of the

19   offense that this happened? You said he was put

20   placed on deferred adjudication on April 16, 2004.

21   Does the judgment also show the date of offense when

22   he committed the U.C.W.?

23       A.    It does.

24       Q.    What is that?

25       A.    March 25, 2004.

70

1        Q.    So we know that judgment, this was for an

2    offense that occurred actually on March 25th, 2004?

3        A.    Yes.

4        Q.    He was placed on probation some I guess three

5    or four weeks later?

6        A.    Yes.

7            MR. SKURKA:  Your Honor, I'll move for

8    the admission of State's Exhibit No. 232.

9            MR. JONES:  Is that the judgment?

10           MR. SKURKA:  Yes.

11           MR. JONES:  No objection.

12           THE COURT:  All right, it's made

13   admitted.

14           MR. SKURKA:  Your Honor, may I also

15   publish that to the jury?

16           THE COURT:  You may.

17       Q.    (BY MR. SKURKA)  Now that we've established

18   he was put on probation, how did he do on his

19   probation?

20       A.    Well, at this time there's a pending motion

21   to revoke against him.

22       Q.    Let's start off with how that came about.

23   Did the State or did the probation department ask the

24   State to file a motion to revoke?

25       A.    Yes.

71

1        Q.    And tell the jury what a motion to revoke is

2    called, I mean, what that is.

3        A.    Okay. A motion filed by the State with the

4    Court advising the Court that there have been certain

5    violations alleged in the motion and that the

6    recommendation may be -- or sometimes is revocation.

7    It's a way of noticing the Court of the violation.

8        Q.    Did you -- so a motion to revoke probation is

9    a method to bring to the Judge's attention that he's

10   supposedly violated --

11       A.    Yes.

12       Q.    -- one of his conditions of probation. I

13   forgot to ask you, I guess I'm going to go back to

14   something about the charge of U.C.W. Wasn't he also

15   arrested for another charge at the same time?

16       A.    According to the information we have in the

17   file, yes, this was a second -- there was an arrest on

18   the same day for a second charge.

19       Q.    And was that second charge possession of

20   marijuana?

21       A.    It was.

22       Q.    What happened to his possession of marijuana

23   charge?

24       A.    The State asked the Court to dismiss it

25   because Mr. Ramirez was pleading guilty in the U.C.W.

72

1    Q.   So is that -- have you ever heard of that
2    arrangement happening before where they take a plea on
3    one case and if he pleas on one case they dismiss the
4    other case?
5    A.   Yes.
6    Q.   That's pursuant to a plea bargain, is it not?
7    A.   Yes, it is.
8    Q.   Is that what appears to have happened in this
9    case?
10   A.   Yes.
11   Q.   So his possession of marijuana was dismissed
12   that occurred on the same date but he plead guilty on
13   the unlawful carrying a weapon and was placed on
14   probation for that, correct?
15   A.   That is correct.
16   Q.   Now, going back to the M.T.R.  What is the
17   process or procedure for the M.T.R. to go through the
18   system?
19   A.   Well, we're monitoring the case and we have a
20   connection to the jail records and one of the things
21   that will cause us to file a violation report is when
22   an offender is arrested for a charge and their name
23   comes up on the jail list when they're booked into
24   jail.  We also file violation reports for people who
25   don't report or are not paying and have the ability to

73

1    pay or other violations, using drugs, changing address
2    frequently, all kinds of different reasons.
3    Q.   Well, let's talk about in this case
4    specifically.  Was a motion to revoke filed on John
5    Henry Ramirez for not doing his probation, correct?
6    A.   Yes.
7    Q.   Can you tell us why or what the violations
8    were alleged to have been committed by the Defendant,
9    John Henry Ramirez?
10   A.   We have three allegations that we filed with
11   the the D.A.'s Office, that he committed the offense
12   of public intoxication on or about June 1st of 2004;
13   that he failed to report for the month of May, 2004;
14   and he failed to pay supervision fee for the month of
15   May, 2004.
16   Q.   You said it was alleged to have committed a
17   P.I. on what date?
18   A.   On or about June the 1st of 2004.
19   Q.   I'm sorry, say the date again.
20   A.   On or about June the 1st, 2004.
21   Q.   And that motion to revoke probation was filed
22   with the Court?
23   A.   Yes, on June 14th.
24   Q.   And at the time that he was arrested here in
25   February of 2008, did he still have a open warrant for

74

1    that motion to revoke probation?
2    A.   Yes, as far as I know the warrant was not
3    served until he was arrested in February.
4    Q.   Okay.  So all that time he had a motion to
5    revoke probation including the time of July 19, 2004,
6    there was an active warrant out for his arrest, wasn't
7    there?
8    A.   Yes.
9    Q.   So, just a few more questions, but
10   essentially he was placed on probation in April of
11   2004 and he didn't even complete one or two months
12   before he was -- had a motion to revoke probation
13   filed?
14   A.   That's correct.
15   Q.   Would you consider that to be a good
16   probationer, rather, when a motion to revoke is filed
17   on him right after he got on probation?
18   A.   No, but it does happen.  He was not -- not
19   someone I would consider a good probationer.
20   Q.   How many times did he fail to show up for his
21   probation department?
22   A.   He had a failure to report within one week.
23   Q.   Within one week of being placed on probation
24   he failed to report?
25   A.   Yes.  When he received probation on April 16,

75

1    he was given an appointment to report on April 20th to
2    complete the intake process and he failed to report.
3    So the officer called, left a message at the residence
4    or on a phone somewhere and was able to get him to
5    come in on the 27th.
6    Q.   Why would a person be ordered to come back to
7    report four days after they're put on probation?
8    A.   Because the department needs to talk
9    supervision of the offender and the file needs to be
10   completed because court services doesn't generally
11   supervise offenders so -- but they're in charge of
12   making sure the file gets completed and forwarded on
13   to Trojan.
14   Q.   So would it be fair to say that when a person
15   pleads guilty in court, like say on April 16th, not
16   all the paperwork and stuff is there because he
17   doesn't even know who his probation officer is yet?
18   A.   That's correct because --
19   Q.   So --
20   A.   -- we have so many offenders at one time it's
21   impossible to do all of them at once.
22   Q.   So you basically tell them to come back in a
23   few days?
24   A.   Yes.
25   Q.   Did he come back in a few days?

76

1    A.   No, not until he was called and had to come
2   in 11 days later.
3    Q.   Isn't it true there's some type of notice
4   that are given to him and the court may that tell them
5   exactly when to come back?
6    A.   Yes, the front desk, the reception area gives
7   them an agreement to return that they sign and they
8   leave telephone numbers, contact numbers on that form
9   so that in case we need to reach them we can call
10  those numbers.
11   Q.   Is that getting off to a good start on
12  probation missing your very first appointment you
13  have?
14   A.   Well, it's not a sign of good things to come
15  but it happens, people can forget appointments or, you
16  know, we could speculate all the different reasons but
17  it doesn't -- it's not critical.
18   Q.   Did he show up the next time after he was
19  told to come back?
20   A.   Yes.
21   Q.   How about the time after that?
22   A.   The instructions for him were to call the
23  Trojan office.
24   Q.   Did he ever make any other contact with the
25  probation department after that?

77

1    A.   No, he did not.  In fact, his appointment
2   date was 5-17-04.
3    Q.   5-17-04?
4    A.   Yes.
5    Q.   And he did not appear for that appointment?
6    A.   No, he did not.
7    Q.   So that didn't -- the first time he missed
8   the appointment, that didn't count against him?
9    A.   It didn't in the beginning but when we're not
10  able to find offenders we do have to make allegations,
11  unless something happens before we have three failure
12  to reports.
13        MR. SKURKA:  Thank you, that's all the
14  questions I have.
15        THE COURT:  Cross?
16        MR. GARZA:  Yes.
17             CROSS-EXAMINATION
18  BY MR. GARZA:
19   Q.   Ms. Morris, you talked about the intake
20  process.
21   A.   Yes.
22   Q.   Is it true that when a person who goes on
23  probation that they have to go through the intake
24  process?
25   A.   That is correct.

78

1    Q.   Would you tell the jury what's involved in
2   the intake process.
3    A.   When an offender reports back to the office
4   for intake they complete tests -- we call it testing
5   but it's assessments for drug and alcohol, and
6   educational testing.  We're required by the State to
7   do that testing.  They also are interviewed by the
8   officer, confirm the address, their residence, if
9   they're employed, some contacts.  They have to list
10  three conferences.  If we ever have to look for them,
11  those three people that might know where they are.
12   Q.   And according to your records Mr. Ramirez
13  appeared on April 27th for an intake session?
14   A.   Yes, sir.
15   Q.   Are the results of that intake session in
16  your file?
17   A.   Yes, sir.
18   Q.   So let's take a look at those.  First of all,
19  you say they give a standard procedure to give an
20  assessment, as you call it, to find out if if there's
21  any indication a person has a drug or alcohol problem.
22   A.   Yes.
23   Q.   And did the tester express an opinion as to
24  whether Mr. Ramirez showed a tendency?
25   A.   Well, it is not based on opinion.  It -- the

79

1   instrument scored will give a value of the responses
2   by the person being tested and there are two documents
3   or two tests here.  One for alcohol and drugs and one
4   for alcohol, and both results indicated serious
5   problems.
6    Q.   Serious problems.  Now, when you find a score
7   like that, that -- that information can be used by the
8   probation department to suggest conditions of
9   probation to the Court or programs that the Defendant
10  needs, et cetera?
11   A.   They do, they tell us what the need is.
12   Q.   Now, you said that you give an educational
13  assessment?
14   A.   Yes.
15   Q.   Now, what's involved with that?  Is that like
16  reading ability and literacy?
17   A.   Yes, the test that we use is the Adult
18  Placement Indicator.  It's one of several that are
19  used.  We don't -- this is the one that we're
20  currently using.  It measures vocabulary and
21  comprehension.  The test is timed and the person being
22  tested is given an opportunity to answer as many
23  questions in a certain amount of time.
24   Q.   Okay.
25   A.   And the score results for that, that he has

80

1   an 8.1 grade level.
2       Q.   So -- and how old was he when he began
3   probation?
4       A.   I believe he would be 19.
5       Q.   Okay.  So he passed the 8th grade in high
6   school?
7       A.   Yes.
8       Q.   And so at the time he was -- according to
9   this assessment he chose to have an 8th grade level?
10      A.   Yes.
11      Q.   What about employment?
12      A.   He did not report employment to us.  He told
13  us he was unemployed.
14      Q.   And did he give any references?
15      A.   He gave us two -- two people he identified as
16  his grandmother and his mother.
17      Q.   Okay.  And the grandmother's name?
18      A.   Lupe Alejandro.
19      Q.   And the mother?
20      A.   Priscilla Martinez.
21      Q.   Other than the intake information, do you
22  have any other information in your file about his
23  social history?
24      A.   We do an interview and ask questions about
25  drug and alcohol history --

81

1       Q.   Yes.
2       A.   -- use, and we do have that, that's called a
3   drug and alcohol supplement.
4       Q.   Uh-huh.
5       A.   And we ask questions, basically who, where,
6   why, when, how, on drug and alcohol use.
7       Q.   Okay.  And is that the extent of it?
8       A.   Yes, it's just self report.  We ask for
9   his -- to tell us what his history is.
10      Q.   That information supplements the -- that --
11  those assessment tests?
12      A.   Yes.
13      Q.   And did he -- did he participate in such an
14  interview?
15      A.   Yes, he did.
16      Q.   And who -- who writes down the -- are the
17  responses written down as they're given or --
18      A.   Yes.
19      Q.   Okay.
20      A.   Yes.
21      Q.   And how many pages do you have there?
22      A.   It's one item but it's two-sided.
23      Q.   Okay.  Well, can you tell us what's on there,
24  generally.  Generally what does it show?
25      A.   Okay.  The drug supplement answers questions

82

1   about drug use, the first time he tried marijuana, how
2   frequently he's using it now, if he's still using it,
3   what other drugs he's used, when he first began and
4   the last time he used it and what frequency.  We also
5   ask if he's injected or snorted a drug.  We ask what
6   percentage of his friends or acquaintances use drugs,
7   ask if someone close to him feels he has a problem
8   with drugs, if he's ever been in a drug treatment
9   program and why he uses drugs.
10      Q.   Okay.  Did he ever say he had been in a drug
11  treatment program?
12      A.   He said he had not.
13      Q.   What -- did he admit using drugs?
14      A.   Yes, he did.
15      Q.   To what extent and which drugs?
16      A.   He told us that he first tried marijuana at
17  age 12 years and that he smokes marijuana daily at the
18  present time, a half an ounce, and it has continued
19  the same up until recently.  He last smoked on
20  4-19-04.
21      Q.   Is that the only drug that he admitted
22  regular use of?
23      A.   No, sir.  Well, regular, yes.  He's admitted
24  to using cocaine one time and Xanax bars two times.
25      Q.   Okay.  Now, you've been in the -- oh, before

83

1   I get to that, does your file indicate that he -- that
2   Mr. Ramirez had ever been on probation in your
3   department before this time?
4       A.   I don't believe he had been.  The file
5   doesn't -- as far as we know, no.
6       Q.   Okay.  Now, it's obvious, I mean, I don't
7   think you need to explain why the department is
8   interested in drug use, but how long you've been a
9   probation officer?
10      A.   12 years.
11      Q.   And is marijuana use of a particular concern
12  to -- to a probation officer?
13      A.   Yes.
14      Q.   And tell the jury why marijuana is a problem.
15  How does it effect -- how does the regular use of
16  marijuana effect a -- a person's ability to -- to
17  conform to the rules and conditions of his probation?
18      A.   I -- I don't believe I can really answer
19  that.
20      Q.   You're no qualified to answer that?
21      A.   Well, no, but -- no, other than just I don't
22  know how it would effect this individual.  We do --
23  from my experience offenders who use marijuana on a
24  regular basis before they come to probation have a
25  difficult time stopping the use because they develop

84

1    not a habit but a dependence on the drug and it's
2    difficult to comply with conditions when they're not
3    really all there. It -- the attitude seems to be just
4    whatever happens, there's not a lot of motivation.
5        Q.   So -- so in your experience, probationers who
6    regularly use marijuana may have trouble holding a job
7    or -- or being goal oriented or like meeting
8    conditions of their probation?
9        A.   Yes, they'll have that problem. They've have
10   trouble concentrating and the difficulty is finding
11   jobs because they can't pass the drug test.
12       Q.   Okay. So he admitted daily use of marijuana
13   when he took -- in April of 2004?
14       A.   Yes.
15       Q.   Okay. Before the -- before we started our
16   afternoon hearing, did I request you to look up a
17   certain a probationer in your department?
18       A.   You asked me to look up a name, it turns out
19   to be a probationer.
20       Q.   Okay. The name being Priscilla Martinez?
21       A.   Yes, but it's -- it's in our system a little
22   bit different last name.
23       Q.   Okay, it was Ramirez, I think?
24       A.   Yes.
25       Q.   And what -- when you checked with your

85

1    department what was the status of that case?
2        A.   The person is on probation.
3        Q.   For what on information?
4        A.   Possession of controlled substance, felony.
5        Q.   And the status of the probation you found to
6    be --
7        A.   We don't know where the offender is at the
8    present time.
9        Q.   Is there an outstanding warrant for that
10   person?
11       A.   Not -- well, there may be now but earlier
12   this morning there was not.
13       Q.   Was not. Do you happen to know that person?
14       A.   I do not.
15       Q.   Okay. Did the department get to the point of
16   ever suggesting that Mr. Ramirez, you know, go through
17   any particular program? Did they get that far?
18       A.   No, we did not get that far.
19       Q.   So he stopped reporting basically or
20   didn't -- you didn't get far enough into it with
21   sending him to classes or programs that might assist
22   him?
23       A.   That is correct, he comitted the offense of
24   public intoxication, we were obligated to file a
25   violation report.

86

1        Q.   Right.
2            MR. JONES:  No further questions.
3            THE COURT:  Anything else?
4            MR. SKURKA:  Yes, Judge.
5                REDIRECT EXAMINATION
6    BY MR. SKURKA:
7        Q.   The report you said where you tested him out
8    and he was an 8.1 grade level, remember that?
9        A.   Yes.
10       Q.   You are aware, though, that he has a degree
11   from Moody High School?
12       A.   No.
13       Q.   Okay.
14       A.   I don't know where the degree is from but he
15   reports to us that he has a diploma.
16       Q.   Okay. So he does -- you knew he had a college
17   degree, correct -- not a college, high school degree?
18       A.   He reported to us that he had a degree.
19       Q.   Okay. And the way to get your -- your level
20   of what grade level you-all use is really just a very
21   short test that's a one page, with the answers on one
22   page, right?
23       A.   That is correct.
24       Q.   Would it be fair to say that this test is I
25   don't want to say "inconsequential" but it's hard to

87

1    judge what a person knows in one test, correct?
2        A.   Yes. The purpose of that test is to
3    eliminate those that have a sixth grade or less.
4        Q.   Why is that?
5        A.   Because under State law someone who has sixth
6    grade level or less or less than sixth grade level
7    must be referred to educational classes.
8        Q.   Because?
9        A.   We want to bring that educational level up
10   because they're more productive citizens and hopefully
11   they would be able to hold jobs.
12       Q.   Did any of the things in your file indicate
13   that John Henry Ramirez had any kind of mental
14   illness?
15       A.   There's nothing indicated here.
16       Q.   Is there anything that indicates that he had
17   a low I.Q.?
18       A.   No.
19       Q.   Did you also do a test, what's called a SASSI
20   test?
21       A.   Yes.
22       Q.   What is the SASSI test? I know that's an
23   acronym but I don't know what it stands for.
24       A.   Okay, SASSI is --
25       Q.   SASSI?

88

1    A.  -- is the Substance Abuse Self Screening
2  Inventory.
3    Q.  And what happened is that used for?
4    A.  It's for measuring whether or not there is a
5  low or a high probability that an offender has a
6  substance abuse problem.
7    Q.  And did John Henry Ramirez take that test?
8    A.  Yes, he did.
9    Q.  And do you have a copy of that test with you?
10   A.  I do.
11   Q.  He's the one that takes that test and then he
12  scored in it; correct?
13   A.  That's correct.
14   Q.  I want to draw your attention to some of his
15  questions and answers on that test and it consists of
16  about I think 67 questions; correct?
17   A.  Yes, there's two sides.
18   Q.  Two sides, okay.  You're talking about the
19  alcohol and other drugs thing?
20   A.  On the SASSI?
21   Q.  Yes?
22   A.  There's one side with statement, true/false
23  statements.
24   Q.  Right.
25   A.  And the other side, alcohol and other drugs.

89

1    Q.  Okay.  I want to look at the first page on
2  there where that true and false questions that he
3  filled out.  Are you with me?
4    A.  Yes, they're statements.
5    Q.  Okay.  I want you to look at No. 6.  What was
6  that question?
7    A.  It's a statement and not a question.
8    Q.  I'm sorry, a statement.
9    A.  That's okay.  And the person taking the -- or
10  filling out the test has to respond whether or not it
11  is true or false for that person.
12   Q.  And what did John Henry Ramirez say to that
13  statement "My troubles are not all my fault"?
14   A.  "True."
15   Q.  So he didn't think his troubles were -- he
16  was at fault for his troubles?
17   A.  It says generally, tends to be -- he says it
18  tends to be true for him, that his troubles are not
19  all his fault.
20   Q.  Look at No. 17.  What was his statement on
21  that one?
22   A.  "I am very respectful of authority."
23   Q.  And did he answer true or false to the fact
24  that he thought it was tended to be true or false for
25  him?

90

1    A.  He said it was false for him.
2    Q.  So he admitted to the probation department he
3  is not respectful of authority?
4    A.  Well, it --
5    Q.  Essentially?
6    A.  I don't know it was an admission.  In this
7  statement he felt it was generally false for him.
8    Q.  Well, wouldn't that lead you to believe that
9  it was false that he was respectful of authority?
10   A.  Yes, that he considers himself to be
11  generally not respectful.
12   Q.  Okay.  And he admits that --
13   A.  Yes.
14   Q.  -- basically when he says that.  And No. 18,
15  what was the statement in his answer to that?
16   A.  "I like to obey the law."  He answered
17  "True."
18   Q.  He said that he liked to obey the law?
19   A.  Yes.
20   Q.  Look at Question No. 23 on that SASSI test
21  done by John Henry Ramirez and, in fact, you know it's
22  him because his name is signed on the bottom, is it
23  not?
24   A.  It is.
25   Q.  What was the statement on No. 23?

91

1    A.  "Some crooks are so clever that I hope they
2  get away with what they have done."  He answered
3  "True."
4    Q.  So he -- so it was true to him that some
5  crooks are so clever that I hope they get away with
6  what they've done?
7    A.  Yes.
8    Q.  26, what was the statement in his response to
9  that?
10   A.  "I need to have something to do so I don't
11  get bored."  He answered "True."
12   Q.  No. 29, the statement in his response?
13   A.  "Sometimes I wish I could control myself
14  better."  He answered "True."
15   Q.  So, would that indicate to you that he could
16  not control himself and he wished he could control
17  himself better?
18   A.  No.
19   Q.  What does it indicate to you?
20   A.  It tells me that he sometimes wishes he could
21  control himself better but I don't know in what area
22  because this is not what that's measuring.
23   Q.  Okay.  Question No. 32, what is that
24  statement and what was John Henry Ramirez' response?
25   A.  "I break more laws than many people."  He

92

1   answered "True."

2       Q.   No. 36, what was the statement and what is

3   his response?

4       A.   "I have sometimes been tempted to hit

5   people."

6       Q.   True or false?

7       A.   He answered "True."

8       Q.   No. 39 when he gave the assessment, what was

9   his statement?

10      A.   "I have never broken a major law."

11      Q.   Did he say that was true or false?

12      A.   He answered "False."

13      Q.   No. 56, what was his statement and what was

14  his response?

15      A.   "While I was a teenager I began drinking or

16  using other drugs regularly."  He answered "True."

17      Q.   And finally, on No. 67, what was the

18  statement that John Henry Ramirez answered to?

19      A.   "I am a binge drinker/drug user."  He

20  answered "False."

21      Q.   So he said he wasn't a binge drinker or drug

22  user?

23      A.   Yes.

24      MR. SKURKA:  Your Honor, I will mark

25  State's -- this as State's Exhibit No. 233 as being

93

1   SASSI test taken by John Henry Ramirez with the

2   probation department and offer into evidence.

3       MR. JONES:  Your Honor, can you also

4   mark it Defense -- as Defense Exhibit 1?

5       THE COURT:  Mark it however you like, I

6   guess --

7       MR. JONES:  I have no objection.

8       THE COURT:  -- if you want it

9   admitted, I guess.  I take it by your remark that you

10  have no objection to --

11      MR. JONES:  I have no objection.  The

12  jury needs to see the whole document.

13      THE COURT:  All right.

14      COURT REPORTER:  I'm going to mark it 3,

15  though, because you already had a 1 and 2 that wasn't

16  admitted.

17      MR. JONES:  All right, No. 3 then, I'm

18  sorry.  I forgot, yeah.

19      MR. SKURKA:  May I publish this to the

20  jury by showing it to them?

21      THE COURT:  In fact, let's go ahead --

22      MR. SKURKA:  Judge, I'm through with this

23  witness anyway.

24      THE COURT:  Are you done?

25      MR. JONES:  No, I've got -- if you can

94

1   wait just two minutes.

2       THE COURT:  Okay, all right.

3               CROSS-EXAMINATION

4   BY MR. JONES:

5       Q.   On the other -- the other assessment, on the

6   educational assessment --

7       A.   Yes.

8       Q.   -- is there a document for that also?

9       A.   Yes.

10      Q.   Is it one document?

11      A.   It is, it's the answer sheet.

12      Q.   Okay.  Does this document show the grade

13  level? Yes, it does; is that correct?

14      A.   Yes.

15      MR. JONES:  Would you mark this as the

16  next Defense Exhibit.  I think it's 5.

17      COURT REPORTER:  It's 4.

18      MR. JONES:  4?  Again, I'm having trouble

19  keeping up with them.

20      Your Honor, the -- the probation officer

21  has asked permission to make a copy of these two

22  exhibits so that --

23      THE COURT:  We'll do that on a break.

24      MR. JONES:  Okay, fine.

25      THE COURT:  Are you moving to admit this?

95

1       MR. JONES:  Yeah, I move to admit

2   Defense Exhibit 4.

3       MR. SKURKA:  Can you just show it to me

4   real quick?  I think I have a copy.

5       Yes, Judge, I've seen it.  I have no

6   objection to it.

7       THE COURT:  It's admitted.

8       MR. JONES:  May I hand it to the jury?

9       THE COURT:  Yes.  Anything else?

10      MR. JONES:  One other question.

11      Q.   (BY MR. JONES)  On the educational

12  assessment, what range of grade does that assessment

13  measure, do you know, like 1st grade to 12?

14      A.   6 to 9.

15      Q.   6 to 9?

16      A.   Yes.

17      Q.   So that range.

18      MR. JONES:  All right.  No further

19  questions.

20      MR. SKURKA:  No other questions, Judge.

21      THE COURT:  All right, then you may stand

22  down.  Let's go ahead and take a break.  All rise for

23  the jury.

24      (Jury exits courtroom.)

25      (Short recess.)

96

1          (Jury enters courtroom.)

2          THE COURT:  All right, be seated.  Mr.

3  Skurka, call your next witness.

4          MR. SKURKA:  We call -- recall Kelly

5  Isaacks.

6          THE COURT:  All right, Kelly Isaacks.

7  All right, you're still under oath.  Take the stand.

8  Thank you.

9

10          KELLY ISAACKS,

11  recalled as a witness, testified as follows:

12          DIRECT EXAMINATION

13  BY MR. SKURKA:

14    Q.  For the record, you're the same officer or

15  Lieutenant Kelly Isaacks that testified earlier in

16  this trial?

17    A.  Yes.

18    Q.  And, again, as the Judge said, I'll remind

19  you you're still under oath and under the rule.

20    A.  I understand.

21    Q.  I want to direct your attention to the time

22  you were back as a detective in the criminal

23  investigation division and ask if you had occasion to

24  be the case officer investigating a case where the

25  Defendant in this case, John Henry Ramirez, was a

97

1  victim of a gunshot?

2    A.  Yes, I was.

3    Q.  I don't want to go into all the details about

4  you being a detective but as part of your work as a

5  detective were you supposed to go interview the victim

6  in that case to get statement from him?

7    A.  Yes.

8    Q.  Is that a typical thing to do for a detective

9  after someone is shot or the victim of an aggravated

10  assault?

11    A.  Yes, it is.

12    Q.  And I say "gunshot," but we're really talking

13  about aggravated assault, are we not?

14    A.  Yes, the offense is aggravated assault.

15    Q.  Did you go to see him at the hospital after

16  he had been shot?

17    A.  Yes, I did.

18    Q.  And do you recall about what time or date

19  that was?

20    A.  I was called out about -- well, the date was

21  March 13th of 2004 so about four months prior to this

22  homicide occurring.

23    Q.  So four months prior to the capital murder at

24  the Times Market on Baldwin you were called out to an

25  aggravated assault on March 13th, 2004?

98

1    A.  Yes.

2    Q.  Did you go contact the victim of that

3  so-called aggravated assault?

4    A.  Yes, I did.

5    Q.  And did you identify who the victim was of

6  that -- of that aggravated assault?

7    A.  Yes, I did.

8    Q.  Who was it?

9    A.  It was John Henry Ramirez, Jr.

10    Q.  Is that the person you identified previously

11  in the courtroom as John Henry Ramirez, Jr.

12    A.  Yes, it is.

13    Q.  And in that case, you were working with him

14  as a victim, not a suspect; correct?

15    A.  That's correct.

16    Q.  Did you arrive at the hospital and talk to --

17  to try to talk to him?

18    A.  Yes.

19    Q.  Would you describe his condition, attitude or

20  demeanor when you came to see him at the hospital to

21  get a statement from him.

22    A.  Yes, I -- I was called out about 11:00 p.m.

23  and when I got to the hospital I learned from the

24  doctors that he -- his injuries were not

25  life=threatening at that point and that he was

99

1  conscious, and so while he was being treated in one of

2  rooms I went in there to speak with him to find out

3  who had shot him, what had happened and get started

4  with the investigation.

5    Q.  Now, on that day of March 13, 2004, did you

6  know John Henry Ramirez from Adam?

7    A.  No, I didn't.

8    Q.  So you went to talk to him and you said

9  that -- was he conscious?

10    A.  Yes, he was.

11    Q.  I know that sometimes you see on T.V. the

12  police go to interview them and they're hooked up to

13  machines and ventilators and they can't even, you

14  know, talk at all.  Were you able to be able to talk

15  to him --

16    A.  Oh, yes.  Yeah, he wasn't hooked up to

17  anything that was -- he was aware I was there.  I

18  introduced myself to him and I immediately smelled a

19  very strong odor of alcohol coming from him, and then

20  I -- I began to ask him what had happened, if he knew

21  who shot him -- and you want me to go into that?

22    Q.  Well, let's go back to the thing.  I just

23  want to make it clear, was there any medical reason

24  that would prevent him from talking to you or giving a

25  statement to you?

100

1    A.   No, no.

2    Q.   And how many times he had been shot and

3  where?

4    A.   He had two gunshot wounds to the right side

5  of his upper torso, one kind of in the abdomen area,

6  one kind of up in the right shoulder area.

7    Q.   But these were not life-threatening injuries?

8    A.   No, no, they weren't.

9    Q.   So you went to talk to him, you smelled

10 alcohol.  Describe that in detail, please.

11   A.   Just I had to -- I leaned down kind of close

12 to him.  He was lying down on a bed inside this

13 examining room and, you know, I told -- once again I

14 told him who I was and why I was there, and it was --

15 it a extremely strong, the smell of alcohol.  It was

16 very obvious to me he had been consuming alcohol.

17   Q.   How old was he at that time?  Let me rephrase

18 the question.  Was he under the drinking age, under

19 age for drinking?

20   A.   I believe so but I really -- he was born in

21 '84, 6-29-84, and this was 3-13 of '04 so he was 20.

22   Q.   Okay.  So was that -- was he of legal age to

23 drink?

24   A.   No.

25   Q.   You said that you started to talk to him and

101

1  ask him who -- I guess who, what, where and how kind

2  of questions --

3    A.   Right.

4    Q.   -- right?

5    A.   Right.

6    Q.   Did you -- what kind of questions would you

7  have asked him?

8    A.   If he knew who shot him and -- and I asked

9  him to tell me what had happened because I had already

10 heard a preliminary story about what had occurred and

11 I wanted to hear it from him and he told me he did

12 not -- he did not want to get his friends involved and

13 he wasn't going to cooperate and he didn't -- he

14 refused to answer any questions at that point.

15   Q.   What do you mean getting his friends

16 involved?

17   A.   That's what he told me, he didn't want to get

18 his friends involved.

19   Q.   But you're asking who shot him?

20   A.   That's correct.

21   Q.   So he refused or did not tell you who shot

22 him?

23   A.   No.

24   Q.   Were you ever able to determine where this

25 incident had actually taken place?

102

1    A.   Well, I was --

2    Q.   I'm talking about later on, not that night.

3    A.   Later on, yes.

4    Q.   But that night were you able to find out

5  where the incident had taken place?

6    A.   That night I did not, we did not.

7    Q.   So he wouldn't tell you where it happened or

8  who had done it?

9    A.   No, or who was with him.  He wouldn't give

10 any information other than to tell me that he just

11 didn't -- he wasn't going to cooperate, he didn't want

12 to get his friends involved is what he told me.

13   Q.   So, based on your experience as a detective

14 and a police officer, what did that indicate to you?

15   A.   In my experience and in these types of cases

16 where someone is -- is injured is really as seriously

17 as he was, to have them not want to cooperate

18 indicates to me that they're trying to hide something,

19 they're possibly involved in something that they don't

20 want us to know about, which may have led to him being

21 shot.  So that was -- that's been my experience in

22 these type of cases where we have somebody that's

23 seriously injured.

24   Q.   Did you think so in this case?

25   A.   Yes, I did.

103

1    Q.   And this happened on March 13th, 2004?

2    A.   Yes, it did.

3    Q.   The -- how -- or how did you make the

4  connection between John Henry Ramirez the night of

5  July 19, 2004 with your previous contact with him, how

6  did that come about?

7    A.   Once we got the name, John Henry Ramirez, Jr.

8  as our suspect in the homicide the name sounded

9  immediately familiar to me but I didn't put it

10 together until we pulled a mug shot picture of him and

11 as soon as I saw him, I knew, "I now this guy, I just

12 worked a shooting with him, you know, what, four

13 months prior."  So -- you know, and I remembered

14 conversations I had with his family and so on at the

15 hospital so I was -- I already had kind of a head start

16 on knowing something about him before --

17   Q.   But that's how it came about the night of the

18 Times Market killing?

19   A.   Yes, it's -- that's where I first realized I

20 knew him from before.

21   Q.   Based on your knowledge of John Henry Ramirez

22 before July 19, 2004, do you have an opinion on

23 whether or not he's a peaceful and law-abiding

24 citizen?

25   A.   Yes, I do.

104

1    Q.   And what is that opinion?

2    A.   He is not.

3    Q.   Are you aware of what happened to the

4    Co-Defendant -- the other Co-Defendant in this case,

5    Angela Rodriguez?

6    A.   Yes.

7    Q.   Was she also sentenced to prison for this

8    crime?

9    A.   Yes, she was.

10    Q.   And do you know what sentence she received?

11    She received a life sentence.

12            MR. SKURKA:  Pass the witness.

13            THE COURT:  Cross?

14            MR. JONES:  No questions.

15            THE COURT:  All right, you may stand

16    down.

17            MR. SKURKA:  We have no other questions,

18    Judge.  Thank you, Ms. Isaacks.

19            THE WITNESS:  Thank you.

20            THE COURT:  You rest?

21            MR. SKURKA:  Your Honor, at this time

22    the State rests on punishment.

23            THE COURT:  All right.  Mr. Jones, would

24    you like to make your opening statement?

25            MR. JONES:  I would.

105

1            THE COURT:  All right.

2            MR. SKURKA:  Judge, I'm sorry, before

3    he begins -- I apologize, Mr. Jones.  I did have the

4    certified copies of the records from the Marine Corp.

5    I marked them 231 but I forgot to introduce them.  I

6    move for their admission at this time.

7            MR. JONES:  No objection.

8            THE COURT:  They're admitted.

9            MR. SKURKA:  Thank you, Judge.  I'm

10    sorry, Mr. Jones.

11            MR. JONES:  Do you want to give those to

12    the --

13            MR. SKURKA:  Judge, I'll publish them

14    during my closing arguments.

15            THE COURT:  Okay.  Of course, Mr. Jones,

16    you're welcome to use them.

17            MR. JONES:  May it please the Court,

18    Counsel for the State and ladies and gentlemen of the

19    jury.  I believe it was Thursday, Thanksgiving, or the

20    day before, I can't remember, you-all remember if

21    you take the Caller Times.  I went out to get the

22    morning paper and it was real fat and so I took it

23    into the house and I opened it up and there were all

24    these ads from all the stores reminding me that the

25    day after Thanksgiving was Black Friday.

106

1            And when I saw that, I said "What is

2    Black Friday"?  At that point I had never heard of

3    such a thing and, of course, it means if you go to

4    shop on the day after Thanksgiving all the shops will

5    be in the black, I guess, you know, for the year so

6    it's a good thing for you to do.

7            I noticed that J. C. Penney was to be

8    opened at 4:00 in the morning for your shopping

9    convenience.  So, Thanksgiving comes and goes, Back

10    Friday comes and goes.  I did not go to J. C. Penney

11    at 4:00 in the morning nor did I stand in line outside

12    of Kohl's.

13            The following day -- the following day, I

14    guess Saturday morning, I pick up the paper and notice

15    that some poor man up in New York or someplace who was

16    a temporary employee was standing at the door of a

17    Wal-Mart on Friday morning and the crowd was so great

18    that it pushed him against the door, broke the door,

19    shattered the glass door and stampeded into the store,

20    killing him.  And I said, "My goodness, what a way to

21    go," and I really felt bad about that.

22            A few days later on the opinion page of

23    the Caller Times I noticed an editorial written by

24    Leonard Pitts of the Miami Harold, who's one of my

25    favorite editorial writers who wrote an obituary, if

107

1    you will, for this poor man who got crushed in the

2    stampede.  And I was moved by this editorial, and I

3    sent a copy of it to my brother and on the subject

4    line of my e-mail I said "Our country is not well,"

5    and he e-mailed me back, he said "This is an example

6    of why our civilization is in a deep, steep decline."

7            I don't know that I would go so far as to

8    say that but in this case at this stage of trial it is

9    my intent and Mr. Garza's intent to prove to you a --

10    an extreme example of another major problem of our

11    American civilization, a problem that cost Mr. Castro

12    his life, and that problem is the breakdown of the

13    American family.  It seems that just recently one of

14    our federal agencies, I can't remember which one it

15    is, recorded that 37 percent of all the births in the

16    United States last year in 2008 or 2007 were out of

17    wedlock.  Now, that's all groups, all states, and I

18    thought to myself when I read that statistics "My

19    goodness, that's a lot.  That's a pretty high

20    percentage, that's over -- you know, almost close to

21    one third or over a third."

22            In this case, we expect -- not exact, we

23    will prove that the Defendant was born to his mother

24    and father who were married to their -- I think at the

25    time of his birth.  I don't know if they were married

108

1  at the time of his conception. His mother was 16
2  years old and his father was 18 years old when they
3  got married. Shortly after his birth his parents
4  separated and divorced while he was still a toddler
5  and after that his father never had anything else to
6  do with him.
7          He never paid child support, he never
8  came to visit him, he just disappeared. He didn't --
9  he was there but he never -- he left the mother to
10  take care of young John. As the years rolled by, as
11  John grew into -- to be a little boy his mother had
12  two other unions which produced two other children,
13  his half siblings, and during that period of time I'm
14  going to call other family members to report, and also
15  Dr. Martinez, the psychologist is going to report that
16  during this time John's mother demonstrated beyond a
17  reasonable doubt that she lacked capacity to care for
18  children, she had -- her parenting skills were close
19  to zero.
20          From the very -- from almost the time
21  that John could walk his mother told him "I do not
22  want you, you fucked up my life, I hate you." You
23  know, that was what he was getting from his mother.
24  At some point in time his sister who was the first
25  child born to the couple, and you'll hear from her

109

1  also, his sister from the time that she was an infant
2  went to live with the paternal grandparents, okay?
3          John's mother decided not to let him go
4  and she decided to keep him and one of the reasons
5  that she decided to keep him was to help her out with
6  the two younger children that she brought into the
7  world. In other words, he was -- when she was out
8  doing whatever she was doing, he was expected to take
9  care of his siblings and a job for which he did not
10  get much credit or praise.
11          We expect to show that as John was
12  growing up that he tried repeatedly, repeatedly to get
13  his mother to -- he tried to make his mother happy, he
14  wanted her approval and he never could get it. There
15  was nothing that he could do to win what he considered
16  to be a manifestation of her love for him. And that's
17  what -- that was the situation he grew up -- as he
18  approached his teenagehood, that's the environment
19  that he grew up in.
20          There was a period when they lived for a
21  short time in Houston where his maternal grandmother
22  who will testify lived right below. There are two
23  apartments, one on top of the other. Mother and John
24  and his siblings lived upstairs and grandma lived
25  downstairs, and she will report that frequently he

110

1  would come down and escape into her apartment because
2  his mother was verbally abusing him, okay, and he
3  would come down all hysterical and upset.
4          There will also be evidence about the
5  mother, you know, she had her boyfriends come over to
6  the house, you know, and they -- they were unkind to
7  John and he had to put up with all that. There will
8  be evidence that as John went through school, he made
9  it through elementary school and got into the high
10  school system and his disciplinary record in high
11  school is awful. And he -- he got a high school
12  diploma but he really didn't graduate from high
13  school, it was a social promotion and they just let
14  him go after he got to a certain point.
15          Shortly -- right at the end of his -- the
16  record is going to show that right at the end of his
17  high school the school system was permitting the
18  military to recruit the seniors because the Iraq war
19  is going on and there's a shortage of enlistments so
20  there was increased enlistment activity in the high
21  schools and colleges. So John was exposed to this --
22  these solicitations and decided to join the Marine
23  Corp. And he did, against the advice of his
24  grandmother.
25          And so he did and he went off to -- I

111

1  don't know where the -- the boot camp is, it's Paris
2  Island. It's one of the east coast, west coast, and
3  he went to Marine boot camp and he finished and he got
4  his commission. He got his blue uniform and his green
5  uniform. For any of us that have been in the military
6  going through, you know, Army or Marine Corp. Boot
7  camp is no small accomplishment so -- but he did it.
8  And he, as is customary, the evidence will show that
9  after he finished his boot camp he went on leave to go
10  home and then later to report to his active duty
11  station.
12          The evidence is going to show that
13  shortly -- I mean, almost as soon as he got back to
14  town he went to visit some people, not just -- dressed
15  in his military uniform, and one of the people that he
16  went to visit was a lady named Ms. Smithwick who is a
17  teacher, now a retired teacher at the high school
18  where he went to high school. And Ms. Smithwick is
19  one of the teachers, and we all remember teachers like
20  this, who kind of took an interest in spite of his
21  behavior. She shook and interest in him and he liked
22  her and trusted her and confided in her in various
23  their contacts in high school so she was one of first
24  people he came back to see.
25          And according to Ms. Smithwick that when

112

1  he appeared before her that he was happy, he was
2  radiant and as if to tell her that "Look, I have done
3  something that you can be proud of. I just want to
4  let you know, you know, I was a bad boy in high school
5  and here I am, look I've done." She also recalls
6  times when John had confided in her before he went off
7  to the Marine Corp. At one point he actually called
8  her mother.
9         Shortly after he got back here on leave,
10  the time -- leave was up and somehow he -- the -- he
11  got his airline tickets messed up to go back to his
12  duty station so he called up the duty, he made the
13  phone call, and I don't know who he talked to but
14  whoever told him said, "Well, U.A. is U.A. get back
15  here and you're probably going to get sanctioned," and
16  I don't know what happened but he decided that that
17  was just too much, he just couldn't handle it, and the
18  psychologist will describe to you the mental that
19  probably went on there.
20         Dr. Troy Martinez, the psychologist who
21  examined social history in our case will give his
22  expert opinion about the dynamics that are going on
23  here. He's going to testify that because of John's
24  abusive upbringing, particularly his contacts with his
25  mother when he was a young child, caused him severe

113

1  emotional and psychological damage, severe. And he
2  will explain to you, you know, why -- why he had so
3  much trouble.
4         One of consequences of that upbringing
5  and the reason -- and I'll let the psychologist
6  explain to you is that people that grow up in these
7  kinds of situation can become angry, very angry.
8  They -- they get a kind of a free floating rage, and
9  the problem is that the anger which they feel is
10  toward someone that they love and so it tears at them
11  but it's there and he'll describe to you how that
12  anger is created, and how, you know, unless it's dealt
13  with, can explode.
14         And we're going to argue that that's what
15  happened out on the parking lot, that this terrible
16  history, the breakdown of this family if they ever
17  started in the first place, created a situation that
18  has cost my client's life, you know, he's giving up
19  his liberty and cost the life of Pablo Castro. And
20  I'm going to argue and give you more reasons that
21  this -- this social history we're to going to prove to
22  you is -- creates a basis for you to conclude his
23  moral culpability in his case, remember we discussed
24  that, is reduced to the extent that you can seriously
25  consider that life is the more just punishment than

114

1  death.
2         You know, no one -- none of us can choose
3  who we're born to. I mean, isn't that amazing we
4  can't choose who we're born to? Babies talking to the
5  world and what happens to them after they come into
6  the world is important, and this case will demonstrate
7  how when you don't take it -- people don't take
8  it seriously what can happen.
9         So, with that, I will call our first
10  witness --
11         THE COURT: All right.
12         MR. JONES: -- which will be John
13  Ramirez, Sr.
14         THE COURT: All right. Come forward. I
15  believe you've been sworn.
16         THE WITNESS: Yes, sir. Take a seat.
17         THE COURT: All right, you may proceed.
18
19         JOHN HENRY RAMIREZ, SR.,
20  having been previously sworn, testified as follows:
21         DIRECT EXAMINATION
22  BY MR. JONES:
23  Q.  Tell jury your name, please.
24  A.  John Henry Ramirez, Sr.
25  Q.  And do you live here in Corpus Christi?

115

1  A.  Yes, I do.
2  Q.  Have you lived here all of your life?
3  A.  Yes, for a brief moment I lived in Houston
4  for five years.
5  Q.  But you're basically a native of Corpus?
6  A.  Yes, sir.
7  Q.  And how old are you?
8  A.  44.
9  Q.  And how do you make your living?
10  A.  Delivery service at the moment.
11  Q.  Okay. So let's say the past 10 years, what's
12  the principle way you've made your living?
13  A.  Electrical.
14  Q.  Electrical?
15  A.  Electrician.
16  Q.  Now, you know -- the Defendant is your son,
17  right?
18  A.  That's correct.
19  Q.  Okay. Is -- and he is your second child?
20  A.  That is correct.
21  Q.  He has a sister who's older than he?
22  A.  That is correct.
23  Q.  And what is her name?
24  A.  Ashley Ramirez.
25  Q.  Ashley.

116

1      A.   Marie Ramirez.
2      Q.   Okay.  How old were you when -- well, what is
3   the name of John's mother, John, Jr.'s mother?
4      A.   Maiden, Priscilla Martinez.  When we got
5   married, Ramirez.
6      Q.   Okay.  So Priscilla Martinez is John's
7   mother, the Defendant's mother, right?
8      A.   Correct.
9      Q.   And how old were you and how old was she when
10  you got married?
11     A.   I was 18, she was 16.
12     Q.   And was John born after you were married?
13     A.   Yes.
14     Q.   Okay.  And so let's see, so how old was
15  Ashley -- how old was --
16     A.   When he was born?
17     Q.   No, no, when you -- when Ashley was born, how
18  old were you?
19     A.   I was still a junior in high school.
20     Q.   What?
21     A.   I was still a junior in high school.
22     Q.   And how old were you?
23     A.   17.
24     Q.   17?
25     A.   I would assume that.

117

1      Q.   Okay, and -- and Priscilla was what, 15?
2      A.   Yeah, that sounds about right.
3      Q.   Okay.  And you weren't married then?
4      A.   No, sir.
5      Q.   Okay.  After Priscilla was born -- and I take
6   it both of you were still in high school, right?
7      A.   After Priscilla was born?
8      Q.   I mean, Ashley, Ashley, I'm sorry.  After
9   Ashley was born you were still in high school?
10     A.   Yes, sir.
11     Q.   Did -- did you finish high school?
12     A.   Yes, sir.
13     Q.   Did Priscilla finish high school?
14     A.   No, sir.
15     Q.   She dropped out?
16     A.   Yes, sir.
17     Q.   After Ashley was born, did you -- where did
18  you live, where did you personally live after Ashley
19  was born?
20     A.   Government housing for a while and then
21  apartments.
22     Q.   Okay.  Did you live with Priscilla?
23     A.   Yes.
24     Q.   Okay.  So you started -- you started living
25  together?

118

1      A.   A life together, yes.
2      Q.   Okay.  But you were not married, not legally
3   married?
4      A.   We were married when we moved in together.
5   We weren't married when -- when I was still in school.
6      Q.   Okay.  But when Ashley was born you were not
7   legally married, you didn't have a marriage license,
8   correct?
9      A.   That's correct.
10     Q.   All right.  And -- but when John was born,
11  when John -- the day he was born you had gone and got
12  a marriage license and got married, right?
13     A.   Yes.
14     Q.   Okay.  And when John was born --
15     A.   Well, actually we had been married briefly
16  after my daughter, in between my son.
17     Q.   Okay.  All right, and --
18     A.   Between that time frame.
19     Q.   And when you say "get married," go down and
20  get a marriage license?
21     A.   Yes.
22     Q.   Did you have a ceremony?
23     A.   Reception, yes.
24     Q.   A reception?
25     A.   Yes.

119

1      Q.   Were you married with a clergyman, a preacher
2   come and --
3      A.   Yes.
4      Q.   -- and do this -- all right, and I guess that
5   occasion was attended by family?
6      A.   That's correct.
7      Q.   Okay.  After you were -- were officially
8   married did you continue to live together as man and
9   wife with your baby Ashley?
10     A.   Yes, sir.
11     Q.   And then John was born?
12     A.   That's correct.
13     Q.   And, now, did you later get a divorce?
14     A.   Yes, sir.
15     Q.   Did you get a divorce through the courts?
16     A.   Yes, sir.
17     Q.   Okay.  You know, they come down here and they
18  file a petition and you --
19     A.   That's what I did.
20     Q.   Okay.  And how old was John when you got the
21  divorce?
22     A.   If I can recollect, I'd say -- his age?
23     Q.   Huh?
24     A.   His age?
25     Q.   Yeah, was he still a little kid, wasn't he a

120

1    little boy?
2        A.   Yes.
3        Q.   Was he walking, was he a toddler?
4        A.   He was walking.
5        Q.   Okay.  But he hadn't started school yet?
6        A.   Not that I can recall, no.
7        Q.   Okay.  And I'm sure there was a reason why
8    you-all got a divorce?
9        A.   Yes, sir.
10       Q.   And I'm sure there's two sides to the story,
11   right?
12       A.   I'm sure there is.
13       Q.   All right.  But anyway, you did get a
14   divorce?
15       A.   Yes.
16       Q.   In the divorce, were you given visitation
17   rights?
18       A.   No, not really with -- separated.
19       Q.   No -- when the divorce decree was signed and
20   there's children usually the Court will say that we
21   give custody to one of the parents and the other
22   parent gets a right to visit, you know, like every
23   weekend and holidays and so forth.
24       A.   Right.
25       Q.   Did you have visitation rights?

121

1        A.   Yes.
2        Q.   Okay.  And were you ordered to pay child
3    support, to contribute to the support of your
4    children?
5        A.   No, not at that time.
6        Q.   Your divorce decree did not have an order to
7    pay child support?
8        A.   She didn't want child support.
9        Q.   She did not want child support?
10       A.   That's correct.
11       Q.   And why not?
12       A.   I have no idea.  She wanted to raise them on
13   her own.
14       Q.   Okay.  And you -- you were okay with that?
15       A.   Well, not necessarily but that's what she
16   wanted.
17       Q.   Okay.  Well, whether there was a court order
18   for you to pay child support or not, did you give her
19   money to help her pay for food and rent and other
20   things that were necessary for the food, clothing and
21   shelter and medical?
22       A.   At various times.
23       Q.   But not regularly?
24       A.   Not frequently, no.
25       Q.   Okay.  As John was growing up as a young boy

122

1    and he entered school, did you regularly visit him?
2        A.   No.
3        Q.   You basically abandoned him, did you not?
4        A.   I guess.
5        Q.   That's a harsh word.
6        A.   I guess so to speak.
7        Q.   So you left it to Priscilla to raise him up?
8        A.   That's correct.
9        Q.   Okay.  So, when young John was growing up as
10   a school boy and as a high school boy, he did not have
11   the benefit of your presence?
12       A.   That's correct.
13       Q.   Looking back, how do you feel about that?
14       A.   Terrible.  I should have done more, I should
15   have been more involved in his life.
16       Q.   Since you divorced Priscilla, have you been
17   married again since then?
18       A.   No, sir.
19       Q.   Okay.  Have you had any other children since
20   then?
21       A.   No, sir.
22       Q.   Yes.  Now, when you got a divorce how old was
23   Ashley?  She was about how old do you think?  Do you
24   remember?  She was a little kid, right?
25       A.   Probably about five or six, seven.  Between

123

1    five and seven, I would assume.
2        Q.   At some point did Ashley go to live with your
3    parents?
4        A.   Yes, sir.
5        Q.   Okay.  Do you -- do you -- were you any part
6    of that decision?
7        A.   Yes, my ex-wife and my mom had decided that
8    she would raise my son and my mom would raise my
9    daughter.
10       Q.   Okay.  And -- well, we'll ask -- what -- what
11   was the reason for doing that?
12       A.   I guess my mom wanted a daughter, I guess.
13   I'm not so certain about the reasoning behind that.
14       Q.   Okay.  But at a very young age Ashley went to
15   live and basically was raised by your mother, right --
16       A.   That's correct.
17       Q.   -- and your father, right?
18       A.   That's correct.
19       Q.   But John stayed with his natural mother,
20   right?
21       A.   That's correct.
22            MR. JONES:  No further questions.
23            THE COURT:  Cross?
24
25                 CROSS-EXAMINATION

124

1  BY MR. SKURKA:
2      Q.  Hello, Mr. Ramirez.  My name is Mark Skurka.
3  I'm the assistant district attorney and I just have a
4  few questions for you.  You said that there were
5  visitation rights that you had with your child after
6  your divorce, correct?
7      A.  That's correct.
8      Q.  And you did take advantage of those
9  sometimes?
10     A.  Sometimes.
11     Q.  When you -- define "sometimes."  Did you see
12 him once a month, once a year?
13     A.  Holidays, birthdays.
14     Q.  All right, so did you see him on his
15 birthdays?
16     A.  Yes, sir.
17     Q.  Okay.  Holidays, Christmas, --
18     A.  Yes.
19     Q.  -- stuff like that?
20     A.  Yes.
21     Q.  You give him presents on his birthday, give
22 him presents on Christmas?
23     A.  Yes.
24     Q.  How about other family get-togethers like
25 your -- I guess your mom or dad's birthday or

125

1  anniversary parties or barbecues at their house or
2  your house?
3      A.  A few times.
4      Q.  So you did have him over at your house a few
5  times?
6      A.  At my mom's house we would have pizza parties
7  and so forth but that was the get-together, or
8  barbecue.
9      Q.  I'm sorry, I didn't mean to interrupt.  I
10 didn't hear that last thing you said.
11     A.  Pizza parties or, for example, barbecues, you
12 know, usually at my mom's house, my parents' house,
13 you know, get together for his party and, you know.
14     Q.  And I didn't understand.  Did your mom and
15 dad live in Houston or Corpus?
16     A.  Here in Corpus.
17     Q.  In Corpus.  So you lived in Corpus, correct?
18     A.  That's correct.
19     Q.  Your mom and dad lived in Corpus, correct?
20     A.  That's correct.
21     Q.  The Defendant, John Henry Ramirez, Jr., your
22 son, lived in Corpus; correct?
23     A.  That's correct.
24     Q.  It's not like you-all lived in different
25 universes, you did see each other once in a while?

126

1      A.  That is correct.
2      Q.  Not everyday.
3      A.  That is correct.
4      Q.  But you did see him at various times during
5  the year for holidays or family get-togethers;
6  correct?
7      A.  That's correct.
8      Q.  Do you have a big family?
9      A.  Not necessarily.
10     Q.  Well, how many people do you have in your
11 family circle?
12     A.  You talking about aunts, uncles?
13     Q.  Yes, everybody, aunts, uncles, brothers,
14 sisters, cousins.
15     A.  It's a pretty huge family.
16     Q.  Pretty huge family?  In fact, I think I have
17 a family like that, too, because it seems like there's
18 always somebody's birthday coming up or somebody's
19 party to go to.
20     A.  That's true.
21     Q.  Okay.  So John Henry Ramirez wasn't kept away
22 from those, were they -- was he?
23     A.  No.
24     Q.  You weren't kept away from those, were you?
25     A.  No, but I didn't always attend them all

127

1  either.
2      Q.  And I understand and I'm not trying to say
3  you attended every one but it's fair to say you went
4  to most of the ones that you could with your family.
5      A.  That's correct.
6      Q.  And you saw your son there, correct?
7      A.  Yes, sir.
8      Q.  So it's not like you-all were not talking to
9  each other, correct?
10     A.  That's correct.
11     Q.  It's not like you hated your son, correct?
12     A.  That's absolutely correct.
13     Q.  You love your son?
14     A.  That's absolutely correct.
15     Q.  You may not have been there every day for
16 him, though, be fair.
17     A.  That's correct.
18     Q.  But were you there for him?
19     A.  No.
20     Q.  Well, if -- for example, you said you gave
21 him presents and stuff.
22     A.  I said he received presents on his birthdays
23 and certain holidays and so forth.
24     Q.  I understand but you did see him and have
25 some kind of interaction with him at various times,

128

1  didn't you?

2  A.  Yes, yes, sir.

3  Q.  Call him on the phone, talk to him on the

4  phone, ever?

5  A.  Hardly, not as much as --

6  Q.  Not much on the phone?

7  A.  Not as much as when we had events.

8  Q.  Okay.  So it would be fair to say you saw him

9  more face to face than on the phone?

10  A.  Correct.

11  Q.  Okay.  And did you understand his living

12  arrangements with your ex-wife?  Let me -- I didn't

13  ask -- let me ask it again.  It was decided by you and

14  your ex-wife to let your son live with her, correct?

15  A.  That's correct.

16  Q.  And that's probably because he was very

17  young, right, and it would be easier for a woman to

18  raise him instead of a man?

19  A.  I would assume, yes.

20  Q.  And I'm not trying to be sexist or anything

21  but that's just the facts.

22  A.  I assume so, yes.

23  Q.  Okay, it's not that you weren't incapable of

24  raising him but it would probably be better for him to

25  be with his mother, is that what you-all decided?

129

1  A.  That's correct.

2  Q.  So this -- he wasn't kept away from you or

3  you weren't keep way from him because you didn't love

4  him, right?

5  A.  That's correct.

6  Q.  You were probably working hard, right?

7  A.  Working odd jobs trying to make a living,

8  yes.

9  Q.  Okay.  Did you have more than one job at any

10  time?

11  A.  When we were married I had three.

12  Q.  You had three jobs?

13  A.  (Nods head.)

14  Q.  That would have been hard for you to have

15  visitation with your child, isn't it?

16  A.  Well, I was talking about when we were

17  married.

18  Q.  Okay, when you were married?

19  A.  Yes, to support the family and keep the

20  family together I was working three jobs at one point.

21  Q.  What I'm trying to say is you weren't kept

22  apart from your son deliberately, were you?

23  A.  No, sir.

24  Q.  You did have access to him, didn't you?

25  A.  At certain points.  Sometimes I didn't, she

130

1  had moved out of town and --

2  Q.  Is that the time when she had moved to -- is

3  it Houston or something?

4  A.  Houston.

5  Q.  Okay.  But that wasn't your doing, was it?

6  A.  No, sir.

7  Q.  That was because the family had just moved to

8  Houston?

9  A.  As far as I know.

10  Q.  Was that to be with her mother, around her

11  mother?

12  A.  I couldn't tell you.

13  Q.  Okay.

14  A.  I couldn't tell you the reason why they

15  moved.

16  Q.  Okay, I understand.  When you visit with your

17  son did you try to act like a father to him?

18  A.  I do now with the situation.

19  Q.  Okay, I'm talking about these family

20  get-togethers and such as he's growing up.

21  A.  No, he's already grown up and I had missed

22  parts of his life.  I mean, it's like we were playing

23  catch when he were 2 where he's 7 now, you know, but

24  yes, I tried to interact with him as much as possible.

25  Q.  So you would try to do as much as possible?

131

1  A.  That's correct.

2  Q.  Thank you, Mr. Ramirez.  I don't have any

3  other questions.

4       THE COURT:  Any redirect?

5       REDIRECT EXAMINATION

6  BY MR. JONES:

7  Q.  Well, the truth of the matter is that you --

8  after you got the divorce and after you agreed to a

9  divorce decree that did not require you to pay child

10  support.  You basically were washing your hands of any

11  responsibility of raising your child, were you not?

12  A.  So to speak.

13  Q.  Okay.  I think the word you used was that she

14  wanted to -- she wanted to take over -- she wanted to

15  take over raising the child with me not being around?

16  A.  That's basically true.

17  Q.  And that's what happened, right?

18  A.  Basically, yes.

19  Q.  You know, sometimes people get a divorce, you

20  know, happens all the time where there are children,

21  but the biological parents, they talk to each other,

22  you know, they -- they exercise visitation rights, --

23  A.  They communicate.

24  Q.  -- they pay child support, they help out,

25  they join forces when the kids are in trouble or they,

132

1   you know, meet at sports events and all kind of things
2   in spite of their being divorced but they still are
3   parents.
4        A.   Right.
5        Q.   Okay.  I think we've -- I think you made a
6   clear statement.
7                MR. JONES:  I have no further questions.
8                THE COURT:  Anything else?
9                MR. SKURKA:  Just a couple of follow-ups.
10                REDIRECT EXAMINATION
11   BY MR. SKURKA:
12        Q.   But didn't you say a minute ago that you did
13   try to contribute money even though you weren't
14   required to pay child support to help him and his
15   mother out?
16        A.   To him basically when we would have
17   get-togethers and so forth.
18        Q.   Okay, so it's not like you abandoned him, you
19   gave him money once in a while when you could.
20        A.   Whatever little I had, yes, sir.
21        Q.   Okay.  Thank you.
22                MR. SKURKA:  That's all.
23                THE COURT:  Anything else?
24                MR. JONES:  No.
25                THE COURT:  All right.  You may stand

133

1   down.  Call your next witness.
2                MR. JONES:  Your Honor, we've got 15
3   minutes to go before 5 and my next witness may take
4   longer than that.
5                THE COURT:  Do you have any -- I mean, I
6   don't know, but do you have any short witnesses?
7                MR. JONES:  I really don't so...
8                THE COURT:  Okay.
9                THE WITNESS:  Am I excused?
10                THE COURT:  Yes.
11                MR. JONES:  Yes, and watch your step.
12                THE COURT:  All right.  Well, we can --
13   we'll resume on Monday again.
14                MR. JONES:  At 9:00.
15                THE COURT:  9:00.  So we'll see you,
16   ladies and gentlemen, on Monday at 9:00.  All rise for
17   the the jury.
18                (Jury exits courtroom.)
19                (Evening recess.)
20
21
22
23
24
25

134

```
 1   THE STATE OF TEXAS )

 2   COUNTY OF NUECES    )

 3                   I, Mary Lopez Buitron, Official Court Reporter

 4   in and for the 94th Judicial District Court of Nueces County,

 5   State of Texas, do hereby certify that the above and foregoing

 6   contains a true and correct transcription of portions of

 7   evidence and other proceedings requested in writing by counsel

 8   for the parties to be included in this volume of the Reporter's

 9   Record, in the above-styled and numbered cause, all of which

10   occurred in open court or in chambers and were reported by me.

11                   I further certify that this Reporter's Record of

12   the proceedings truly and correctly reflects the exhibits, if

13   any, admitted by the respective parties.

14                   I further certify that the total cost for the

15   preparation of this Reporter's Record is $_____ and was

16   paid/will be paid by_____.

17                   WITNESS MY OFFICIAL HAND this the 4th day of

18   October_____, A.D., 2009.

19

20   _____

21   MARY LOPEZ BUITRON, CSR, RPR, Texas CSR #2731
     Expiration Date: 12/31/2009
22   Official Court Reporter
     94th District Court
23   Nueces County, Texas
     901 Leopard, Room 901
24   Corpus Christi, Texas 78401
     (361)888-0658
25
```