1

```
 1                    REPORTER'S RECORD
              TRIAL COURT CAUSE NO. 04-CR-3453-C
 2               APPELLATE COURT NO. AP-76,100
                   VOLUME 22 OF 25 VOLUMES
 3
    THE STATE OF TEXAS     )      IN THE DISTRICT COURT
 4                         )
                           )
 5  VS.                    )      94TH JUDICIAL DISTRICT
                           )
 6  JOHN HENRY RAMIREZ     )      NUECES COUNTY, TEXAS

 7

 8

 9

10

11                    _____

12               PUNISHMENT PROCEEDINGS

13                    (Continued)

14          _____

15

16

17

18

19          On the 8th day of December, 2008, the

20  following proceedings came on to be heard in the

21  above-entitled and numbered cause before the HONORABLE

22  BOBBY GALVAN, Judge Presiding, held in Corpus Christi,

23  Nueces County, Texas:

24          Proceedings reported by Stenograph

25  Machine.
```

FILED IN
COURT OF CRIMINAL APPEALS

OCT 06 2009

Louise Pearson, Clerk

2

```
 1                    APPEARANCES:

 2    MR. MARK SKURKA
      SBOT NO. 18475570
 3    MR. VERNON G. SCHIMMEL
      SBOT NO. 24033039
 4    ASSISTANT DISTRICT ATTORNEYS
      901 Leopard, Rm. 205
 5    Corpus Christi, Texas 78401
      Phone: (361) 888-0410
 6
      ATTORNEYS FOR THE STATE
 7
      -AND-
 8
      MR. EDWARD F. GARZA
 9    SBOT NO. 07731200
      ATTORNEY AT LAW
10    719 S. Shoreline, Suite 201
      Corpus Christi, Texas  78401
11    Phone: (361) 888-8877

12    MR. JOHN GRANT JONES
      SBOT NO. 10917000
13    ATTORNEY AT LAW
      5826 Beauvals Drive
14    Corpus Christi, Texas  78404-6173
      Phone: (361) 884-8141
15
      ATTORNEYS FOR THE DEFENDANT,
16    JOHN HENRY RAMIREZ

17

18

19

20

21

22

23

24

25
```

3

```
 1                            INDEX
                    VOLUME 22 OF 25 VOLUMES
 2                   PUNISHMENT PROCEEDINGS
     OCTOBER 8, 2008                              Page Vol.
 3   Continuation of punishment proceedings ............ 4    22
     Hearing out of the presence of the jury .......... 4    22
 4      In Re:  Defendant's instructions to Counsel
           regarding defense
 5   Discussion on Defendant's request ................ 4    22
        In Re:  Rest at punishment, no closing with
 6         exception of Bible Scripture
     Court's admonishments to Defendant ............... 6    22
 7
     Defendant's Evidence:
 8   Witness Name                     Direct   Cross V.Dire Vol.
     TROY MARTINEZ ....................... 11       8         22
 9
     Charge conference ................................ 12   22
10   State's response ................................. 15   22
     Court's rulings .................................. 16   22
11   No objections to Court's Charge .................. 18   22

12   Defense rests .................................... 20   22
     State rests and closes ........................... 20   22
13   Defense closes ................................... 20   22

14   Reading of Court's Charge ........................ 20   22
     State reserves right to open on closing .......... 27   22
15   Defendant's closing argument ..................... 27   22
     State's closing argument ......................... 28   22
16
     Court excuses alternate juror .................... 35   22
17   Commencement of jury deliberations ............... 35   22
     Note from the jury ............................... 35   22
18   Continuation of jury deliberations ............... 36   22

19   Verdict of the jury .............................. 36   22
     Jury polled ...................................... 37   22
20   Court sentences Defendant to death ............... 37   22
     Defendant's rights of appeal ..................... 37   22
21
     Jurors excused ................................... 38   22
22   Adjournment ...................................... 38   22
     Court Reporter's Certificate ..................... 39   22
23

24

25
```

**4**

1 　　　　　P R O C E E D I N G S

2 December 8, 2008

3 　　　　　(Out of the presence of the jury.)

4 　　　　　THE COURT: All right. Let's call the

5 case. We are back on the record.

6 　　　　　Okay, Mr. Jones.

7 　　　　　MR. JONES: Are we on the record.

8 　　　　　THE COURT: We are.

9 　　　　　MR. JONES: Your Honor -- John, you can

10 sit down. The -- we had a long meeting with

11 Mr. Ramirez last night in preparation for today, and

12 in that meeting -- that meeting was attended by

13 myself, by Mr. Garza, and by Dr. Troy Martinez, our

14 mitigation expert and psychologist who's been

15 assisting us in this case. We met for over an hour.

16 　　　　　At that meeting, Mr. Ramirez gave us

17 certain instructions. The first instruction he gave us

18 was that he wants us to rest our case on punishment

19 today, now, not call any -- any further witnesses. He

20 -- he also wishes -- has instructed us not to argue

21 against the death penalty at the closing arguments and

22 has instead requested that we merely read two passages

23 from the Bible, particularly Book of Psalms, two short

24 passages, and then to close our arguments.

25 　　　　　During our conversation, it was

**5**

1 my impression that Mr. Ramirez had thought this out

2 very carefully. He articulated reasons for wanting to

3 take this course of action and we discussed all the

4 options and I -- I personally revealed my personal

5 position on the matter, and told him my view of the

6 matter and gave him my advice on the matter, but in

7 the end he clearly communicated to us that he wants to

8 take this course of action. I am inclined to -- to

9 take his instructions. I believe it is the correct

10 thing to do in this particular set of circumstances.

11 　　　　　Dr. Martinez is here if the Court wishes

12 to examine him concerning his -- his impressions about

13 our meeting and about the ability of the Defendant

14 to -- to make this request.

15 　　　　　THE COURT: Okay.

16 　　　　　MR. JONES: Should I call him.

17 　　　　　THE COURT: Let me -- let me ask --

18 　　　　　MR. SKURKA: Judge, I don't mind if he

19 steps in so he can hear this, too.

20 　　　　　THE COURT: You mind if I ask your client

21 some question about this issue?

22 　　　　　MR. JONES: No, I don't. Please stand up,

23 John.

24 　　　　　THE COURT: Mr. Ramirez, I understand

25 -- I mean, I just heard from your attorney that you --

**6**

1 you want -- you want them to rest, that is, not call any

2 other witnesses on Friday we did -- your father

3 testified and I believe there were three other family

4 members that were lined up to testify to include, I

5 believe, your grandmother, your sister, and I don't know

6 the other --

7 　　　　　THE DEFENDANT: And my other grandmother.

8 　　　　　THE COURT: Okay, your two grandmothers

9 and your sister.

10 　　　　　MR. JONES: And Dr. Martinez.

11 　　　　　THE DEFENDANT: And Dr. Martinez.

12 　　　　　THE COURT: Okay. And Dr. Martinez was

13 appointed for you as a mitigation expert --

14 　　　　　THE DEFENDANT: Yes, Your Honor.

15 　　　　　THE COURT: -- for this purpose.

16 　　　　　THE DEFENDANT: Uh-huh.

17 　　　　　THE COURT: And this is -- this is a

18 purpose that, you know, this is a practice that's

19 generally done in death penalty cases where the State

20 seeks the death penalty and we get to this point,

21 okay? It's my understanding that you do not want your

22 attorneys to put on any other evidence.

23 　　　　　THE DEFENDANT: That's correct.

24 　　　　　THE COURT: That -- that meaning your

25 family members and the mitigation expert.

**7**

1 　　　　　THE DEFENDANT: That's correct, Your

2 Honor.

3 　　　　　THE COURT: Okay. And -- okay. And this

4 is of your own free will?

5 　　　　　Yes?

6 　　　　　THE DEFENDANT: That's correct, Your

7 Honor.

8 　　　　　THE COURT: No one is forcing you to do

9 this?

10 　　　　　THE DEFENDANT: No, sir.

11 　　　　　THE COURT: No one is influencing you in

12 any way to do this?

13 　　　　　THE DEFENDANT: No, sir.

14 　　　　　THE COURT: Did you think about this long

15 and hard?

16 　　　　　THE DEFENDANT: Oh, yeah, I've thought

17 about this since the event occurred, you know.

18 　　　　　THE COURT: Okay.

19 　　　　　THE DEFENDANT: I knew what was coming so

20 I made my decision a long time ago.

21 　　　　　THE COURT: Okay. All right. All right,

22 why don't you have a seat, Mr. Ramirez.

23 　　　　　THE DEFENDANT: Thank you, Your Honor.

24 　　　　　THE COURT: Mr. Martinez, why don't you

25 come up here, Doctor. I want to -- I'm going to swear

8

1  you in.

2          (Oath administered.)

3          THE COURT:  All right.  Be seated,

4  please.

5

6          TROY MARTINEZ,

7  having been first duly sworn, testified as follows:

8          EXAMINATION

9  BY THE COURT:

10     Q.   Now, Doctor, I guess let's get your name for

11  the record.

12     A.   Troy Martinez or Martinez.

13     Q.   And you were appointed by this Court to

14  assist the Defense in this case, were you not?

15     A.   Yes, I was.

16     Q.   Okay.  And you've done some work on the case,

17  obviously?

18     A.   Yes, I have.

19     Q.   Okay, and in anticipation of the Defense's

20  request; is that right?

21     A.   Yes, I have.

22     Q.   Okay.  Why don't you tell us what -- not what

23  you've done necessarily but how long a time you've

24  spent both with Mr. Ramirez and working on the case.

25     A.   I've met with Mr. Ramirez on three separate

9

1  occasions personally.  On July 16th of 2008, we met

2  for just under two hours.  On November 1st of this

3  year, we met for just over two hours, and then again I

4  had the occasion of meeting with him in the presence

5  of both of his attorneys last night for a little over

6  an hour.

7     Q.   All right.  Now, his attorneys - and I

8  think you probably heard - his attorneys have

9  indicated to me and Mr. Ramirez has confirmed that he

10  is instructing his attorneys to rest, to not put on

11  three family members to include his two grandmothers

12  and his sister, and to put on -- and not to put on

13  your -- your part of the case.

14          All right, obviously, that's -- I'm not --

15  I don't want you to reveal what you were going to

16  testify or what the Defense Counsel was going to

17  elicit from you but obviously you have done some

18  extensive work on the case; is that right?

19     A.   Yes, I have.

20     Q.   Okay.

21          Now, my question to you is do you

22  believe that Mr. Ramirez is competent to make this

23  decision?

24     A.   Based on the -- the time that I've spent with

25  him, and specific to the issue Mr. Ramirez has discussed

10

1  that with me, he brought that up from the first  time

2  that we met, that issue, and so I believe I've had

3  an opportunity to discuss his thoughts and feelings

4  about that decision-making process and in the end I do

5  believe that he is competent in that respect.

6     Q.   Okay.  And you are qualified to make such a

7  diagnosis, are you not?

8     A.   Yes.

9     Q.   Why don't you put your qualifications on the

10  record.

11     A.   Well, I've got a Bachelor's degree in

12  psychology, I've got a Master's degree in clinical

13  psychology and I've got a doctorate in clinical

14  psychologist and specialization in neuropsychology but

15  since internship which amounts to the last 11 years

16  I've primarily been focusing my work in forensic

17  clinical psychologist, doing primarily clinical work

18  and I've evaluated individuals in legal issues or

19  psych legal from competency and various types of

20  competency to sanity, risk assessments, mitigation

21  work before.

22          And so I've been doing this type of work

23  for about 11 years.

24     Q.   Okay.  And you were present, is that right,

25  when Mr. Ramirez I guess discussed this issue with his

11

1  attorneys?

2     A.   Yes, I was.

3     Q.   Okay.  All right.

4          MR. JONES:  Can I ask him one question.

5          THE COURT:  You may.

6          DIRECT EXAMINATION

7  BY MR. JONES:

8     Q.   During the conversation, did Mr. Ramirez

9  articulate specific reasons for him wishing to do

10  this, that is, to tell us to stop putting on the case?

11     A.   Very specifically, very explicitly and in a

12  rational, goal-directed manner that as I've met with

13  him again on three occasions spanning about five or

14  six months has no adverse impact due to mental

15  illness, in my opinion.

16     Q.   So was it your impression that he had

17  carefully thought out this -- this course of action

18  before requesting us to do it?

19     A.   Yes.

20     Q.   All right.  Do you believe that after the

21  meeting was over that Mr. Ramirez' request for us to

22  not go forward and not to argue against the death

23  penalty was knowingly and voluntarily and

24  intelligently made?

25     A.   Yes, I do.

## 12

1   Q.   Okay.

2   THE COURT:  Anybody else have any

3   questions?

4   MR. SKURKA:  No, Your Honor, but I would

5   like to speak with Mr. Jones just one second.

6   (Brief pause in proceedings.)

7   THE COURT:  Okay.  All right, well,

8   then let's talk about the next thing.  If that's the

9   case, we're going to get to -- we're going to argue,

10   which means we need to talk about the Charge.

11   MR. SKURKA:  We've already submitted the

12   Jury Charge the other day.

13   THE COURT:  Yeah.  My question is does

14   anyone have any objections to the Charge as written?

15   MR. SKURKA:  The State does not.

16   THE COURT:  You want to take a look at

17   it?

18   MR. JONES:  Yes, I think I do have a

19   couple of objections to the Charge.

20   THE COURT:  Okay.  What are they.

21   MR. JONES:  Well, let's see, one of -- I

22   have them in writing here, it's a Charge that I've

23   made before is that -- can I submit those -- those two

24   motions?  I've got two motions.

25   THE COURT:  In fact, let's go ahead

## 13

1   and -- let's get off the record.

2   (Off the record.)

3   MR. JONES:  I filed two motions that

4   related to the wording of the Charge.  One has to do

5   with -- with the statutory phrase and the "militates

6   for."  Let's see, to mitigate -- let's see, just a

7   moment, Judge.

8   THE COURT:  Okay.

9   MR. JONES:  On paragraph 8 of the

10   proposed Charge, "You consider all the evidence

11   submitted to you during the whole trial as to

12   Defendant's background or character or the

13   circumstances of the offense that militates for or

14   mitigates against the impression of the death

15   penalty."

16   Two things.  First of all, the statute

17   says "You may --" it says "You can consider all the

18   evidence, including the Defendant's background and

19   character."  This can be read in a way that you should

20   only consider the Defendant's background and character

21   of the circumstances of the offense.

22   The second problem with paragraph 8 is

23   the use of the phrase "mitigates against."  It creates

24   a double negative, and in my motion, I -- with the

25   help of a grammarian described why that is so.  I

## 14

1   would ask the Court to change that to "militates for"

2   or "militates against the imposition of the death

3   penalty."  "Mitigates against" is a double negative

4   and I ask the Court to ask the -- well, I'll let the

5   Court read my motion.

6   THE COURT:  Okay.

7   MR. JONES:  All right, the other one

8   deals with the definition of -- let's see where is

9   that now.

10   THE COURT:  Paragraph 12.

11   MR. JONES:  Let's see, yes, I think you

12   anticipated.  "You are instructed --" down at the

13   bottom.

14   THE COURT:  Uh-huh.

15   MR. JONES:  "-- that the term 'mitigating

16   evidence' as used here, means evidence that a juror

17   might regard as reducing the Defendant's moral

18   blameworthiness," and my objection is that that has a

19   tendency to limit the types of evidence to be

20   considered militate -- I mean, mitigating, and this

21   question has been taken up by the Court of Criminal

22   Appeals in Cantu v. State, and they basically said

23   that if you read this paragraph in connection with --

24   if you read Special Issue No. 2 and this together that

25   the jury gets the idea that they can consider all the

## 15

1   evidence in the case, not just -- and my objection is

2   that there ought to be some specific instruction here

3   that the two paragraphs should be read together, and

4   I -- I say it in my motion a lot better than I'm

5   saying it here.

6   I make these motions for -- for, you

7   know, for possible future appeals but I've made them

8   in other cases and they've been overruled.

9   THE COURT:  What do you say, Mr. Skurka.

10   MR. SKURKA:  Could I have one second.

11   THE COURT:  Yeah.

12   (Brief pause in proceedings.)

13   MR. SKURKA:  Judge, we object to the

14   inclusion of both of those languages.  I've talked to

15   our appellate lawyer.  He says that issue in the first

16   motion --

17   THE COURT:  It deals with paragraph 8.

18   MR. SKURKA:  Yes, he says he's dealt with

19   that one in another appeal and he believes that is

20   still the proper instruction, that we don't need to

21   have the other recommendation language -- the language

22   recommended by the Defense Counsel in that one so we

23   would ask that that one be denied.

24   Also, on paragraph 12, I think that's a

25   question of how you read it and Mr. Jones is saying

16

1 that just lacking those words "shall consider" is --
2 inhibits or restricts the statutory language but the
3 statutory language I believe is still very clear on
4 what the jury's instructions are so we ask that be
5 denied also.
6         THE COURT:  All right, let me take -- let
7 me take a look at these.  Let me take a look at these
8 a little more and I'll give you an answer shortly.
9         MR. SKURKA:  Yes, Your Honor.
10        (Pause in proceedings.)
11        THE COURT:  All right, let's go ahead
12 and take these two.  First of all there's an objection
13 to paragraph 12.  I looked at that.  I'm going to
14 overrule that.  That's overruled.
15        All right, the objection, paragraph 8.  I
16 mean, I -- I mean, I can see where the Defense is
17 coming from.  I don't -- I'm not sure language is the
18 best.  To militate means to have force or influence,
19 mitigate meaning to lessen.
20        So I guess your point, Mr. Jones, is to
21 say mitigation against means to lessen against, almost
22 implying that --
23        MR. JONES:  For it.
24        THE COURT:  I mean --
25        MR. SKURKA:  Excuse me, Judge, since the

17

1 Court took a quick break I've got a case to present on
2 that point, if I might?
3         THE COURT:  Okay.
4         MR. SKURKA:  Judge, I cite to the Court
5 Martinez v. State, 924 S.W.2d 693, opinion from the
6 Texas Court of Criminal Appeals from 1996, and I've
7 got a copy --
8         THE COURT:  Okay.
9         MR. SKURKA:  -- of the book and the
10 opinion that talks about that part and I'm at page
11 698.  Mr. Rosenkild was kind enough to get that for us.
12        THE COURT:  Okay.
13        MR. SKURKA:  And that issue was already
14 brought up to in the Johnny Joe Martinez case.
15 There's a copy of that --
16        THE COURT:  Okay.
17        MR. SKURKA:  -- specifically on that
18 issue.
19        THE COURT:  This is --
20        MR. JONES:  I was the attorney in that
21 case.
22        THE COURT:  -- 924 S.W.2d 693, court of
23 Criminal Appeals of Texas, en banc opinion.
24        MR. JONES:  They're endorsing bad grammar.
25        MR. SKURKA:  We made bad law again,

18

1 Judge.
2         THE COURT:  Maybe so but I am bound by
3 what the Court of Appeals tells me so your other point
4 is overruled.  Okay.
5         MR. SKURKA:  For record, both of the
6 Defendant's objections are overruled, Your Honor?
7         THE COURT:  Correct.  All right,
8 now, so with that, there's no objection to the Charge?
9         MR. SKURKA:  No, Your Honor.
10        MR. JONES:  No, Your Honor.
11        THE COURT:  And how much time do you want
12 to argue?
13        MR. SKURKA:  Ten minutes, Your Honor.
14        MR. JONES:  Five minutes.
15        THE COURT:  Okay.
16        MR. SKURKA:  Your Honor, should we call
17 the jury -- just out of abundance of caution, should
18 we call the jury back in and let us announce formally
19 that we rest and close?
20        THE COURT:  Oh, definitely.  I'm going to
21 let you rest in front of the jury and then I'll let
22 you argue, okay?
23        I told the media that I would give them a
24 chance to set up.
25        (Short recess.)

19

1         THE COURT:  All right, before we bring
2 jury, State has no objection to the Charge?
3         MR. SKURKA:  No, Your Honor.
4         DEPUTY BAILIFF:  Please rise for the
5 jury.
6         THE COURT:  Wait.  Wait.  Wait, just a
7 second.
8         DEPUTY BAILIFF:  I'm sorry.
9         THE COURT:  That's okay.  And except for
10 those two objections that have already been formally
11 made by the Defense Counsel there's no objections --
12 further okay to the Charge?
13        MR. JONES:  No objections.
14        THE COURT:  All right.  Then I'll let you
15 rest in front of the jury and we'll do closing
16 arguments.  All rise for the jury.
17        (Jury enters courtroom.)
18        THE COURT:  All right, be seated, please.
19 What says the Defense Counsel?
20        MR. JONES:  Your Honor, the Defense
21 rests.
22        THE COURT:  All right, State.
23        MR. SKURKA:  State rest and closes.
24        THE COURT:  All right.  You close?
25        MR. JONES:  Defense closes.

**20**

THE COURT:  All right, ladies and gentlemen, we are at the point where once again I read you the Charge and the lawyers will argue the case to you.

"Ladies and gentlemen of the jury:  By your verdict in this case you have found the Defendant, John Henry Ramirez, Jr., guilty of the offense of Capital Murder, which was alleged to have been committed on or about the 19th day of July, 2004, in Nueces County, Texas.  It is necessary, now, for you to determine, from all the evidence in the case, answers to certain questions called 'special issues' in these instructions.  The Court instructs you further as follows.

"The mandatory punishment for capital murder is death or confinement in the penitentiary for life.

"You are instructed that the Defendant may testify in his own behalf if he elects to do so, but if he chooses not to do so, that fact cannot be taken as a circumstance against him nor prejudice him in any way.  The Defendant has elected not to testify in this punishment phase of this trial, and you are instructed that you cannot and must not refer to nor allude to that fact throughout your deliberations or

**21**

take it into consideration for any purpose whatsoever as a circumstance against the defendant.

"During your deliberations upon the following 'Special Issues,' you must not consider, discuss, nor relate any matters not in evidence before you.  You should not consider nor mention any personal knowledge or information you may have about any fact or person connected with this case which is not shown by the evidence.

"You are further instructed that if there is any evidence before you in this case regarding the Defendant having committed an offense or offenses other than the offense alleged against him in the indictment, you cannot consider this evidence for any purpose unless you find and believe there is clear proof that the Defendant committed such other offenses, if any were committed, and even then you may only consider the same in determining the answers to the 'Special Issues.'

"You should -- should you return an affirmative finding on Special Issue No. 1 and a negative finding on Special Issue No. 2, the Court will sentence the Defendant to death.  Should you return a negative finding on Special Issue No. 1, the Court will sentence the Defendant to confinement in

**22**

the Institutional Division of the Texas Department of Criminal Justice for life.

"Under the law applicable in this case, if the Defendant is sentenced to imprisonment in the Institutional Division of the Texas Department of Criminal Justice for life, the Defendant will become eligible for release on parole, but not until the actual time served by the Defendant equals forty (40) years without consideration of any good conduct time.  Eligibility for parole does not guarantee that parole will be granted.  It cannot accurately be predicted how the parole laws might be applied to this Defendant if the Defendant is sentenced to a term of imprisonment for life because the application of those laws will depend on decisions made by prison and parole authorities.

"In determining your answers to the questions, or special issues, submitted to you, you shall consider all of the evidence submitted to you in this whole trial, which includes the -- that phase of the trial wherein you were called upon to determine the guilt or innocence of the Defendant, and this punishment phase of the trial wherein you are now called upon to determine the answers to Special Issues submitted to you by this Court.

"You shall consider all the evidence

**23**

submitted to you during the whole trial as to the Defendant's background or character or the circumstances of the offense that militates for or mitigates against the imposition of the death penalty.

"Voluntary intoxication may be considered as a mitigating factor.

"The burden of proof in Special Issue No. 1 rests upon the State, and it must prove the affirmative of such issue beyond a reasonable doubt.

"You are instructed that you may not answer Special Issue No. 1 'Yes' unless all of the jurors agree to such answer.  Further, you may not answer this Special Issue No. -- Special Issue 'No' unless ten (10) or more jurors agree.  It is not necessary that members of the jurors agree on what particular evidence supports a negative answer, that is, an answer of 'No' to Special Issue No. 1.

"Special Issue No. 1, with forms for answers, is as follows:

"Special Issue No. 1.  Is there a probability that the Defendant, John Henry Ramirez, Jr., would commit criminal acts of violence that would constitute a contributory threat to society?"  And there's a place for answers, and I'll read them to you.

24

1        "Answer: We, the jury, unanimously find
2  and determine beyond a reasonable doubt that the
3  answer to Special Issue is -- to this Special Issue is
4  'Yes,'" and there's a place for the presiding juror to
5  sign, or, "We, the jury, because of -- because at
6  least ten (10) jurors have a reasonable doubt as to
7  the probability that Defendant would commit criminal
8  acts of violence that would constitute a continuing
9  threat to society, determine that the answer to this
10  Special Issue No. 1 is 'No,' and there's a place for
11  the presiding juror to sign.
12        "In the event the jury is unable to agree
13  upon Special Issue No. 2 (sic) under the conditions
14  and instructions outlined above, the Presiding Juror
15  will not sign either form of answer to Special -- of
16  this Special Issue.
17        "You are further instructed that if the
18  jury makes an affirmative finding to Special Issue No.
19  1, that is, an answer of 'Yes,' then the jury shall
20  answer Special Issue No. 2 below.
21        "You will answer this Special Issue No. 2
22  'Yes' or 'No.'
23        "You may not answer Issue No. -- you may
24  not answer the Issue 'No' unless all jurors agree to
25  such answer and you may not answer such Issue 'Yes'

25

1  unless (ten) 10 or more jurors agree to such answer.
2        "The jury, however, need not agree on
3  what particular evidence supports an affirmative
4  finding on this Special Issue.
5        "You are instructed that the term
6  'Mitigating evidence' as used herein, means evidence
7  that a juror might regard as reducing the Defendant's
8  moral blameworthiness.
9        "Special Issue No. 2" with forms for
10  answer is as follows: "Special Issue No. 2. Whether,
11  taking into consideration all of the evidence,
12  including circumstances of the offense, the
13  Defendant's character and background, and the personal
14  moral culpability of the Defendant, there is a
15  sufficient mitigating circumstance or circumstances to
16  warrant that a sentence of life imprisonment rather
17  than the death sentence be imposed.
18        "Answer: We, the jury, unanimously find
19  and determine beyond a reasonable doubt that the
20  answer to this Special Issue is 'No." There's a place
21  for the Presiding Juror to sign, or
22        "Answer: We, the jury, because at least
23  ten (10) jurors find there is sufficient mitigating
24  circumstance or circumstances to warrant that a
25  sentence of life imprisonment rather than a death

26

1  sentence be imposed, answer this Special Issue 'Yes,'
2  and there's a place for the Presiding Juror to sign.
3        "In the event that the jury is unable to
4  agree upon an answer to this Special Issue under the
5  conditions and instructions given herein, the
6  Presiding Juror will not sign either form of answer to
7  the Special Issue.
8        "During the deliberations, the jury may
9  not communicate with anyone except the Court or the
10  officer in charge of the jury; separate for any
11  purpose without permission of the Court; discuss the
12  case except with each other in the privacy of the jury
13  room; or consider or discuss matters not in evidence
14  including personal knowledge of information about any
15  fact or person connected with the case.
16        "Communications to the Court must be in
17  writing. Written communications from the jury will be
18  delivered to the Court by the officer in charge of
19  jury.
20        "After arguments of counsel, the jury
21  will go to the jury room to begin its deliberations."
22        And once again, the State gets to go
23  first and has because they've got the burden of proof.
24        MR. SKURKA: Your Honor, the State
25  again will waive its right to opening and reserve its

27

1  right to close on arguments.
2        THE COURT: All right. Mr. Jones, would
3  you --
4        MR. JONES: Yes, sir.
5        THE COURT: -- like to do closing
6  argument at this time?
7        MR. JONES: Yes.
8        May it please the Court and Counsel for
9  the State and ladies and gentlemen of the jury, I'm
10  reading from the Holy Bible, the New International
11  version, Psalm 51, verse 3. "For I know my
12  transgressions and my sin is always before me. Amen."
13        THE COURT: All right. Mr. Skurka.
14        MR. SKURKA: We started down the road
15  about a month, month and a half ago. We started down
16  the road in this courtroom -- actually the courtroom
17  downstairs and where that road was supposed to take us
18  was one place, justice. The road to justice started in
19  a courtroom.
20        You'll remember about a month ago, month
21  and a half ago we were down there on the first floor
22  with about 2 or 300 people. Nobody knew what they were
23  there for except for one thing, to do their civic duty
24  and to answer the call to jury duty. Some of us may not
25  have wanted to be there, some of us may have thought

28

1    about other things, work, family, that might interfere
2    with this, but everybody, and especially you who have
3    ended up on this jury, agreed to one thing:  As
4    jurors, you would do what was right, not what was
5    easy, not what was hard, but do what was right for
6    justice because this courtroom is just like every
7    other courtroom across our Country.  People like you
8    are willing to come in and sit in judgment of people
9    like him.
10           That road started that first day down on
11   the central jury room, came up here as you-all were
12   interviewed to see if you were being qualified to sit
13   on this jury.  You went down that road and found out
14   you were qualified and the Judge told you to come back
15   at a certain time.  That road then went on with an
16   opening statement, with evidence showing that this
17   Defendant was guilty of capital murder.  That road
18   then went to your decision and your just decision of
19   finding this Defendant guilty of capital murder.
20           But the trip doesn't end there.  The road
21   does doesn't end there.  The road now goes to the
22   punishment phase where we told you that you would have
23   to make a decision, and not an easy one, not a happy
24   one, but perhaps a necessary one, and we're right now
25   at the end of that road for justice.

29

1           This Defendant, John Henry Ramirez, went
2    down a road himself.  You saw some of his background
3    and history that I brought to you the second part of
4    the trial.  You saw that at early ages, John Henry
5    Ramirez got himself in trouble, that John Henry
6    Ramirez' road contained things like drug use, alcohol
7    use, guns, going into the Marines, and getting
8    discharged from the Marines.
9           You will hear that the road he took was
10   even when he was on probation for carrying a gun.  He
11   didn't complete that probation successfully; that he
12   committed another crime, public intoxication while he
13   was on there.  You heard that he had been shot by a
14   gun, you heard he had a bad reputation or Officer
15   Issacks talking about his -- her opinion of him in the
16   community for being a peaceful and law-abiding citizen
17   was bad.
18           Every day in our lives we go down roads,
19   every day in our lives we have forks in those roads.
20   We have to decide to go left, to go right, to go
21   forward, to go back.  Every day we have to make that
22   decision to do what's right and go down that road.  He
23   went down the road, too, that should culminate in
24   justice, justice given by you, and justice for Pablo
25   Castro.

30

1           Promise me one thing.  When you're back
2    there in the jury room, every time you think about
3    this Defendant, please, don't forget Pablo Castro.
4    Please don't forget the man who was in front of you,
5    was shown before you with his family, when you go back
6    there because it's real easy for you to look across
7    the courtroom and see him but, please, don't forget
8    Pablo Castro, what this trial is all about, justice
9    for him.
10           When we talked about punishment phase,
11   remember when our jury -- in our jury questionnaire it
12   said something how do you feel, what's the purpose of
13   punishment?  Some people put rehabilitation,
14   deterrence, punishment, just strict punishment.  I
15   want to add one more thing to you, it's also for
16   protection, protection.  The society needs protection
17   from people like John Henry Ramirez and the things
18   that he did.
19           You can tell very easily that that road
20   that John Henry Ramirez was on with these crimes that
21   he had, albeit minor, the drugs, the alcohol, the gun,
22   culminated that night on July 19th in a terrible,
23   terrible bump in that road.  The death of one person,
24   an innocent person for $1.25; the aggravated robbery
25   of April Metting, a young girl who was just getting a

31

1    Whataburger with her kid; the other robbery of April
2    Metting (sic).
3           So what do we as jurors need?  What do we
4    as society need?  Deterrence?  Yes.  Punishment?  Yes.
5    But more importantly, we need protection from people
6    like him and you have that responsibility to do that
7    because who could doubt -- who could doubt after the
8    evidence that you've heard that we don't need
9    protection from a person like him?  Who could doubt
10   that John Henry Ramirez has gone down that road toward
11   evil, toward death and destruction.
12           Well, when I interviewed each one of you
13   on this chair before we started you promised me
14   something, you promised me and Mr. Schimmel that if I
15   brought you the appropriate facts, the appropriate
16   circumstances, you could answer certain questions in
17   such a way that would lead to the death penalty for
18   that man right there.  That promise, again, is not
19   based on feelings, sympathy, empathy, it's based on
20   evidence, and I think I delivered on that promise to
21   you.
22           I brought you the evidence of that night
23   of the killing and the robberies and I brought you
24   evidence of his background that shows how those
25   questions should be answered because the evidence only

32

1  points one way, folks. The two questions that you
2  have to answer, the first Special Issue, remember the
3  future dangerousness issue, is this a chance, is this
4  a probability that he could hurt other people in the
5  future and be a danger to our society? The evidence
6  is clearly that he could, clearly that he could. It's
7  even evident that night. Just think, Pablo Castro,
8  remember the defense wounds, probably fought back. If
9  April Metting hadn't be given him the money and the
10  purse, she could have ended up the same way. If Ruby
11  Pena hadn't been smart enough to open and close the
12  window on him, she could have ended up the same way.
13  We might have been here with three victims instead of
14  one.
15         But Pablo Castro fought, he fought for
16  his life. We are so lucky that April Metting and Ruby
17  Hinojosa did not become victims of himself so looking
18  at all the evidence, both that night and his past,
19  it's clear that question should be answered yes.
20         The second question, the mitigation
21  question, is there anything based on the circumstances
22  of the offense, Defendant's character, and his
23  personal moral culpability, is there any reason that
24  sentence should be lowered to life? Clearly the scale
25  is out balanced this way so much. It's not even a

33

1  close call. All this evidence shows that there's
2  nothing, nothing that mitigates that he should get a
3  life sentence instead of a death sentence. The scales
4  of justice weigh heavily against him to the answer of
5  no.
6         When you go back there and make that
7  decision, think of all the evidence, think of the
8  questions the Judge has instructed you to answer, and
9  think to yourself about this, "Yes, the death penalty
10  does act as a deterrent." It may act as a deterrent
11  to other people who may hear about this case and say
12  "I better not do anything like that, I better not
13  commit crimes or else that could happen to me," but
14  think about this more than anything, it will certainly
15  deter one person and that's him. We don't want him to
16  hurt anybody else.
17         When you go back there and decide "Is
18  there anything for punishment," clearly, yes, he needs
19  to be punished for what he did. Is it a
20  good punishment for the death penalty? In this case,
21  yes, because the facts and circumstances matter, but
22  more importantly, when you answer those questions
23  "Yes" for the first one, "yes, he is a continuing
24  threat to society and, no, there's no reason to lower
25  the sentence," what you have done in this courtroom is

34

1  something that couldn't be done out on the road of
2  John Henry Ramirez' life.
3         Protection. You are protecting society
4  from people like him when you answer those questions
5  yes or no. Unfortunately, it's too late to offer
6  Pablo Castro protection. It's too late to offer April
7  Metting and Ruby Hinojosa protection from that man, but
8  we know one thing, you have the power to protect us, our
9  society, from him. And the only way you can do that
10  is based on the evidence in front of you to answer yes
11  to the first question and no to the second question.
12         Give Pablo Castro justice. Make this
13  road end in justice.
14         THE COURT: All right. At this time, I
15  am going to release the alternate, Mr. Robert DeLeon.
16  You are not to deliberate with the rest of the jurors,
17  however, it is a possibility that we may need your
18  services still, so be available, but do not -- do not
19  begin your deliberations with the other jurors.
20         As for the rest of the jury, I now send
21  you to the jury room to begin your deliberations. All
22  rise for the jury.
23         (Jury exits courtroom.)
24         THE COURT: All right, be seated, please.
25  We'll await the decision of the jury.

35

1         (Commencement of jury deliberations.)
2         (Note from the jury.)
3         THE COURT: We have Note No. 1.
4  A.  "SASSI question and results (assessments) and
5  personal assessments, military record." I take it
6  from this that they want the evidence that was
7  introduced at the punishment phase. I am going to
8  send the evidence that was introduced at the
9  punishment phase.
10         Mr. Skurka, do you have an objection to
11  that?
12         MR. SKURKA: No, Your Honor, and
13  I'll just point out for the record that I think what
14  they're talking about is State's Exhibit 30 -- 231,
15  232, 233 and Defense Counsel Exhibit No. 4.
16         THE COURT: All right.
17         MR. JONES: That's fine, no objection.
18         THE COURT: All right, it's going in.
19  Let me just sign it and I'll give it to you.
20         (Continuation of jury deliberations.)
21         THE COURT: All right. We have a
22  verdict. Now, we're about to take the verdict. I
23  want to caution the audience, I don't want any
24  outbursts, I want this done in an orderly fashion,
25  okay?

36

1          All right.  Frank, is the jury ready?
2    All right, bring them in.
3          (Jury enters courtroom.)
4          THE COURT:  All right, be seated,
5    please.  All right, will the Defendant please rise?
6          Verdict of the jury is as follows:  As to
7    Special Issue No. 1, "We, the jury, unanimously find
8    and determine beyond a reasonable doubt that the
9    answer to Special Issue No. 1 is 'Yes,'" signed the
10   foreperson of the grand jury.
11         As to Special Issue No. 2, "We, the jury,
12   unanimously find and determine beyond a reasonable
13   doubt as to Special Issue is 'No.'"
14         All right.  And the jury having answered
15   "Yes" to Special Issue No. 1 and "No" to Special Issue
16   No. 2, let me -- before we do that, I'm going to poll
17   the jury.
18         MR. JONES:  Okay.
19         THE COURT:  Can I get a show of hands
20   of all of the jurors who voted as to Special Issue No.
21   1 yes?
22         (A show of hands.)
23         THE COURT:  Let the record reflect that
24   all 12 hands have gone up.
25         Can I get a show of hands as -- from the

37

1    jurors as to all the jurors that voted no to Special
2    Issue No. 2?
3          (A show of hands.)
4          THE COURT:  Let the record reflect
5    that all 12 hands are raised at this time.
6          All right.  At this time, Mr. Ramirez,
7    the jury having found you previously guilty of the
8    offense of capital murder and the jury having answered
9    yes to Special Issue No. 1 and no to Special Issue No.
10   2 I hereby sentence you to death as prescribed by law.
11         There is an automatic appeal to Court of
12   Criminal Appeals.  You have already qualified for
13   court-appointed counsel.  I will appoint you an
14   attorney to counsel with you on the appeal.  I will
15   also appoint you an attorney to counsel with you on
16   your writ --
17         THE DEFENDANT:  Uh-huh.
18         THE COURT:  -- and those attorneys will
19   be contacting you within the next few days, all right?
20         THE DEFENDANT:  Yes, Your Honor.
21         THE COURT:  All right.  You can be
22   seated.  All right, ladies and gentlemen, I thank you
23   for your service.  You do not have to speak to anyone
24   about this, that is your prerogative.  If you never
25   want to speak to anyone about this, that is fine,

38

1    that's up to you.
2          So with that, all rise for the jury.
3          (Jury exits courtroom.)
4          (Adjournment.)

39

```
 1   THE STATE OF TEXAS )

 2   COUNTY OF NUECES    )

 3              I, Mary Lopez Buitron, Official Court Reporter

 4   in and for the 94th Judicial District Court of Nueces County,

 5   State of Texas, do hereby certify that the above and foregoing

 6   contains a true and correct transcription of portions of

 7   evidence and other proceedings requested in writing by counsel

 8   for the parties to be included in this volume of the Reporter's

 9   Record, in the above-styled and numbered cause, all of which

10   occurred in open court or in chambers and were reported by me.

11              I further certify that this Reporter's Record of

12   the proceedings truly and correctly reflects the exhibits, if

13   any, admitted by the respective parties.

14         I further certify that the total cost for the

15   preparation of this Reporter's Record is $_____ and was

16   paid/will be paid by_____.

17              WITNESS MY OFFICIAL HAND this the  4th  day of

18   __Octaber_____, A.D., 2009.

19

20   _____

21   MARY LOPEZ BUITRON, CSR, RPR, Texas CSR #2731
     Expiration Date: 12/31/2009
22   Official Court Reporter
     94th District Court
23   Nueces County, Texas
     901 Leopard, Room 901
24   Corpus Christi, Texas 78401
     (361)888-0658
25
```