1

1                      REPORTER'S RECORD
            APPELLATE COURT CAUSE NO. AP-76,~~000~~  76100

2            TRIAL COURT CAUSE NO. 04-CR-3453-C
               VOLUME 23 OF 25 VOLUMES

3

THE STATE OF TEXAS       )     IN THE DISTRICT COURT

4                     )
                     )

5  VS.                 )     94TH JUDICIAL DISTRICT
                     )

6                     )
JOHN HENRY RAMIREZ       )     NUECES COUNTY, TEXAS

7

8  _____

9                MOTION FOR NEW TRIAL

10  _____

11

12                               **FILED IN**

13                  **COURT OF CRIMINAL APPEALS**

14                      OCT 0 6 2009

15                   **Louise Pearson, Clerk**

16

17

18

19

20     On the 5th day of February, 2009, the following proceedings

21  came on to be heard in the above-entitled and numbered cause

22  before the Honorable BOBBY GALVAN, Judge Presiding, held in

23  Corpus Christi, Nueces County, Texas:

24     Proceedings reported by Machine Shorthand.

25

2

```
 1   APPEARANCES:

 2   MR. MARK SKURKA
     SBOT NO. 18475570
 3   AND
     MR. STEPHEN FEIL
 4   SBOT NO. 24055474
     Nueces County Assistant District Attorneys
 5   901 Leopard Street, Room 205
     Corpus Christi, Texas 78401
 6   (361) 888-0410

 7   ATTORNEYS FOR THE STATE OF TEXAS

 8


 9
     MR. LARRY L. WARNER, SR.
10   SBOT NO. 20871500
     Attorney at Law
11   777 East Harrison Street, 2nd Floor
     Brownsville, Texas 78520
12   (956) 542-4785

13   AND

14   MR. HECTOR RENE GONZALEZ
     SBOT NO. 08127100
15   Attorney at Law
     2818 South Port Avenue
16   Corpus Christi, Texas 78405
     (361) 888-5279
17

18   ATTORNEYS FOR THE DEFENDANT,
     JOHN HENRY RAMIREZ
19

20

21

22

23

24

25
```

3

1                         INDEX
               VOLUME 23 of 25 VOLUMES
2                MOTION FOR NEW TRIAL

3   February 5, 2009
                                        Page    Vol.
4
    Court Calls Case for Motion for New Trial........  5     23
5   Opening Statement by Mr. Warner..................  5     23
    Opening Statement by Mr. Skurka.................. 12     23
6
    DEFENSE WITNESSES:
7
                        Direct   Cross   Voir Dire   Vol.

8   Ed Garza               17      43                  23
    Ashley Isaac        59,125     82        90        23
9   Frank Bautista      128,136   132                  23

10                                      Page    Vol.

11  Defense Rests.................................... 139     23
    State Rests and Close........................... 139     23
12  Defense Closes.................................. 139     23
    Closing Argument by Mr. Warner................. 139     23
13  Closing Argument by Mr. Skurka................. 148     23
    Closing Argument by Mr. Warner................. 153     23
14  Discussion In Re:  Bill of Exception.......... 164     23
    Proceedings adjourned.......................... 166     23
15  Court Reporter's Certificate................... 167     23

16
               ALPHABETICAL INDEX TO WITNESSES
17
    WITNESSES:
18
                        Direct   Cross   Voir Dire   Vol.

19  Bautista, Frank     128,136   132                  23
    Garza, Ed              17      43                  23
20  Isaac, Ashley       59,125     82        90        23

21
               INDEX TO EXHIBITS
22
    FOR THE STATE:
23
    NO.   DESCRIPTION           OFFERED    ADMITTED    VOL.
24
    4    Blowup layout photo     62,68        62        23
25  6    Diagram                 101         101        23
    7    Diagram                  76          76        23

4

1                    INDEX TO EXHIBITS

2    FOR THE STATE (Continued):

3    NO.    DESCRIPTION         OFFERED    ADMITTED    VOL.

4    8-28   Photographs           101        101        23

5

     FOR THE DEFENSE:
6
     NO.    DESCRIPTION         OFFERED    ADMITTED    VOL.
7
     1      Blowup layout photo  62,70       62         23
8    2      Diagram              101        101         23
     3      Diagram               76         76         23
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

5

P R O C E E D I N G S

(February 5, 2009)

1       THE COURT: All right. Let's call 04-CR-3453,
2   State of Texas versus John Henry Ramirez. Appearances,
3   please.
4       MR. WARNER: Good afternoon, Your Honor.
5   Larry Warner for John Henry Ramirez. We are present, we're
6   ready on our motion for new trial, and we're also asking the
7   Court, at this time, since the allegations in our bills of
8   exception are exactly the same on one of the points, paragraph
9   number 2, to consider the evidence presented on the motion for
10   new trial in determining the bills of exception.
11       I would like to make an opening statement once
12   counsel has made his appearance.
13       THE COURT: All right.
14       MR. SKURKA: The State of Texas is present and
15   ready, Your Honor. Mark Skurka representing the district
16   attorney's office.
17       THE COURT: Okay. You may make your opening
18   statement.
19       MR. WARNER: May it please the Court, Larry
20   Warner for John Henry Ramirez who is here present and who is
21   in custody.
22       There are two matters before the Court this
23   afternoon. The first matter is the motion for new trial. The

*(Line numbers re-enumerated below for the left column)*

1       THE COURT: All right. Let's call 04-CR-3453,
2   State of Texas versus John Henry Ramirez. Appearances,
3   please.
4       MR. WARNER: Good afternoon, Your Honor.
5   Larry Warner for John Henry Ramirez. We are present, we're
6   ready on our motion for new trial, and we're also asking the
7   Court, at this time, since the allegations in our bills of
8   exception are exactly the same on one of the points, paragraph
9   number 2, to consider the evidence presented on the motion for
10   new trial in determining the bills of exception.
11       I would like to make an opening statement once
12   counsel has made his appearance.
13       THE COURT: All right.
14       MR. SKURKA: The State of Texas is present and
15   ready, Your Honor. Mark Skurka representing the district
16   attorney's office.
17       THE COURT: Okay. You may make your opening
18   statement.
19       MR. WARNER: May it please the Court, Larry
20   Warner for John Henry Ramirez who is here present and who is
21   in custody.
22       There are two matters before the Court this
23   afternoon. The first matter is the motion for new trial. The

6

1   second matter is our bills of exception. We ask that you
2   consider the evidence presented in support of the motion for
3   new trial in determining the bills of exception.
4       On the motion for new trial, the first
5   paragraph -- paragraph 2, rather, of the motion for new trial,
6   I have filed and I have made a conscious, strategic, tactical
7   decision to abandon paragraph 2 of the motion for new trial
8   after conference with colleagues --
9       THE COURT: Okay.
10       MR. WARNER: -- in considering how I should
11   approach this matter. I know exactly what I'm doing. I'm not
12   gonna present any evidence in support of paragraph 2, and I
13   won't ask you to make a decision about it. But, let me tell
14   you, we cite you just so that we can be up to date. I'm
15   supposed to at least tell the trial court about the legal
16   matters that I intend to present to the Court of Criminal
17   Appeals.
18       THE COURT: Well, I have read your motion --
19       MR. WARNER: Yes.
20       THE COURT: -- I'll tell you that.
21       MR. WARNER: And I want to -- thank you very
22   much. I appreciate your attention to our motion.
23       May I say, as an aside, and tell the Court
24   here as its officer, that there is an affidavit of mailing
25   which we have sent to the Court. I represent to the Court

7

1   that on January 7th of 2009 at the medical complex in
2   Harlingen, Texas, at the mailbox that's located there, I
3   deposited the motion for new trial in that mailbox.
4       THE COURT: Well, I'm gonna -- I'm going to
5   allow you to go forward on your motion for new trial.
6       MR. WARNER: Very well, Your Honor.
7       THE COURT: It was --
8       MR. WARNER: I spoke to -- go ahead.
9       THE COURT: It was received or at least it was
10   filed stamped on the 12th --
11       MR. WARNER: That's true.
12       THE COURT: -- which is certainly within the
13   10 days --
14       MR. WARNER: Yes. I will represent to the
15   Court --
16       THE COURT: -- under the mailbox rule.
17       MR. WARNER: -- that I spoke to the clerk and
18   I'll tell you that the clerk told me that the matter had been
19   received earlier but they finally file marked it on January
20   12th. The rules cited in our affidavit of mailing and
21   provides that in the event that the motion for new trial is
22   filed timely and arrives within 10 days --
23       THE COURT: You've got --
24       MR. WARNER: -- it's timely filed.
25       THE COURT: You got 10 days.

8

1       MR. WARNER: And it's filed when it's put in
2   the mailbox, not when it's postmarked, not any other time
3   other than when it's put in the mailbox and that's -- I put it
4   in the mailbox on January 7th.
5       THE COURT: All right. Well I'm gonna find
6   that it was filed timely.
7       MR. WARNER: Thank you, Your Honor.
8       Paragraph 2 I won't present any evidence on,
9   but I should tell you this so that I can bring up the relevant
10   law on the subject in case you -- so I can bring up the
11   relevant law on the subject.
12       In a case called *Williams*, which is cited in
13   our motion for new trial, it says, what is the lawyer supposed
14   to do when his client says: I only want you to -- I don't
15   want you to put on any mitigating evidence? The rule that we
16   all learned in law school was, well, the client gets to decide
17   whether or not to testify, whether or not to have a jury
18   trial, and what plea to enter. Anything else? No. Well,
19   that's the lawyer rules.
20       The Court of Criminal Appeals in *Williams* -- I
21   don't know what the margin's going to be, probably 6 to 3, 7
22   to 2, 8 to 1. Right now with the opinion for the -- in
23   *Williams* cited in our motion which was decided in June and
24   reconsidered on October 29th, the opinion has not yet been
25   released. There are -- there is a dissenting opinion, a

9

```
1    dissenting and concurring opinion and another dissenting
2    opinion.  They say, We're gonna tell you what the law is and
3    here's what it is.  The defendant can make that decision.
4              I don't yet have the entire clerk's records so
5    I'm not prepared to put on any evidence or have that question
6    decided here.
7              THE COURT:  Okay.
8              MR. WARNER:  You'll recall that some courts,
9    maybe the Court of Criminal Appeals because I'm asking them in
10   John Henry Ramirez's case to let me intervene in Williams.  I
11   want to talk to them about it.  I want to talk to them about
12   whether or not the Court should require that the trial judge
13   conduct an extensive colloquy with the defendant at the second
14   punishment phase of the capital murder trial if he wants to
15   make that decision.
16             THE COURT:  Well, I mean, I will tell you that
17   I did --
18             MR. WARNER:  Yes.
19             THE COURT:  -- but that's not really -- I
20   mean, if you're not going forward on that motion, let's move
21   on.
22             MR. WARNER:  I understand.
23             THE COURT:  But I did.
24             MR. WARNER:  I'm gonna bring that -- yes, I
25   understand.  And it's gonna be like old Article 26.13 before
```

11

```
1    So that concludes my opening statement.  I
2    don't know whether the State intends to make one.  Then I'd
3    like to call my -- I'd like to call witnesses and I will
4    invoke the Rule on witnesses.  May I say, I expect two
5    officers of the court, Ed Garza to appear and Mr. Jones.  I'm
6    not accustomed -- even though it's the rule -- to subpoenaing
7    officers of the court.  Mr. Jones had planned to be here.  He
8    had a doctor's appointment and he can't be here.
9              THE COURT:  Mr. Garza's here.  I saw him.
10             MR. WARNER:  Yes.  So perhaps at least as to
11   the bills of exception you might -- you don't have to decide
12   those within 75 days of the date of the imposition of
13   sentence.  So you might -- Mr. Jones' promise to get me an
14   affidavit, which you may consider if you wish, in support of
15   the bill of exception.
16             THE COURT:  All right.  Mr. Skurka.
17             MR. SKURKA:  Judge, I don't have an opening
18   statement to make but I would like to address counsel's first
19   allegation about the timely mailing.  And I know the Court has
20   said that he accepted the timely mailing, but I would like to
21   respond to that, Judge, to hope that you reconsider that
22   ruling.
23             MR. WARNER:  Well, excuse me, but I must
24   object.  That's not within this Court's jurisdiction.  The
25   only court that can decide that is the Court of Criminal
```

10

```
1    people plead guilty they're gonna -- what I want to do is make
2    a list and say -- tell them these things.  But that hasn't
3    happened yet.  They haven't made that decision.
4              All right.  The rest of my opening statement.
5    Here's all I'm gonna put on evidence about today with the
6    Court's leisure.
7              There were concerns about security.  Our
8    position is that there was so much security that it impinged
9    on the presumption of innocence.  That's a legal conclusion
10   which you have to make.  I'm going to call all the witnesses
11   that I -- who know something about this, and put them on, and
12   then, I'll ask you to make a finding of fact about which
13   deputies were where.  If you'll notice in our motion, part of
14   it's pretty clear.  Mr. Isaac has a -- Lieutenant Isaac has a
15   diagram which we'll ask him to present.
16             Apparently, cases from other states are gonna
17   say, It matters to us whether or not those deputies were
18   seated out there with the audience, or whether or not they
19   were seated inside the bar.  I expect the evidence is going to
20   show that there was additional security seated inside the bar
21   and I expect to prove that today.
22             THE COURT:  Additional -- additional security
23   other than what?
24             MR. WARNER:  Other than the bailiff.  And the
25   position will be important.
```

12

```
1    Appeals.
2              THE COURT:  Well, I mean look, I've done an
3    investigation on this and, I mean, I'll hear you out.
4              MR. SKURKA:  Thank you, Judge.
5              Judge, as part of the deal I'd like the Court
6    to take judicial notice and I have got a copy of the docket
7    sheet from this case which I've marked as State's Exhibit No.
8    1.  The docket sheet and the Court's own recollection will
9    show that this case was decided and the case was over and the
10   defendant was sentenced on 12/5 of '08, December 5th of '08.
11   And we'd ask the Court to take judicial notice that that was
12   true, that he was sentenced on December 5th of '08.
13             THE COURT:  Let me see here.  That's certainly
14   a copy of the docket sheet.  It was a Monday.
15             MR. SKURKA:  It was a Monday, Your Honor.
16             THE COURT:  It was a Monday.  We came back
17   over the weekend.  I remember -- see, I think it was December
18   the 8th.
19             MR. SKURKA:  December 8th?
20             THE COURT:  Yeah.  I think -- I think it was
21   the 8th when that happened.  December 5th was the Friday.
22   I've got -- we had December 1st -- for some reason on the
23   docket sheet --
24             MR. SKURKA:  Does that docket sheet not say
25   December 5th, Judge?
```

13

1    THE COURT: It does.
2    MR. SKURKA: If somebody would bring a
3 calendar.
4    THE COURT: I've got one right here in my
5 phone.
6    MR. SKURKA: Because it looks like it says
7 December 8th and then it was changed to December 5th. On my
8 calendar downstairs --
9    THE COURT: See, we started -- let's see here.
10 We started -- we finished individual voir dire on -- in
11 November. We started the trial on December 1st and we were in
12 trial all that week. We began punishment on that Friday,
13 which was the 5th, and as you'll recall, the defense put on
14 one witness. I believe it was the defendant's father. Then
15 we went home for the weekend and then the issue Mr. Warner was
16 talking about occurred Monday morning which was the 8th.
17    MR. SKURKA: Okay. But does the Court see the
18 docket sheet? I got it out of the Court's file saying the
19 5th.
20    THE COURT: I do. And it looks like --
21    MR. SKURKA: It looks like there was an 8 and
22 scratched out and made a 5.
23    THE COURT: Yeah, and there's in another color
24 a 5. But I can tell you it was the 8th. That's an error.
25    MR. SKURKA: Judge, I'll withdraw my comments

14

1 until I check out those dates now that I've seen that thing.
2 I was relying on the Court's document that says it was the
3 5th.
4    THE COURT: For some reason it was changed.
5 And I recall I had -- I appointed counsel on the 8th. The
6 judgment was signed, counsel was appointed all in the same day
7 because the sentence came down in the morning, and by about
8 3:00, we had counsel appointed and the judgment was done and
9 everything. So that's -- I mean, I don't know if you want
10 to --
11    MR. SKURKA: Not now, Judge. I would like to
12 withdraw my comments. But I was relying on the docket sheet
13 that said clearly the 5th.
14    THE COURT: Yeah.
15    MR. SKURKA: And I'll look over the dates. If
16 I want to reopen it, I'll tell the Court.
17    THE COURT: Okay. Okay.
18    MR. SKURKA: Thank you, Your Honor.
19    THE COURT: Okay.
20    MR. WARNER: But the Court's made a finding of
21 fact on that issue.
22    THE COURT: Yeah, I mean, it was the 8th. I
23 recall it was the 8th. I signed the judgment on the 8th. The
24 8th was when the punishment was concluded and that's when the
25 jury came back with their answers.

15

1    MR. SKURKA: Judge, I'm not arguing with the
2 Court. I'm just pointing out that I was relying on what was
3 on the docket sheet --
4    THE COURT: No, I understand.
5    MR. SKURKA: And perhaps it would be good
6 thing to reform the docket sheet to show that correctly if
7 that's what the Court's finding is.
8    THE COURT: All right. Done. Okay.
9    MR. WARNER: And you found as a fact that the
10 motion for new trial was mailed on January 7th?
11    THE COURT: Well, I mean, that's your -- you
12 filed an affidavit.
13    MR. WARNER: Yes, I did.
14    THE COURT: And it was post -- the -- it was
15 file stamped -- the document file stamped on the 12th which
16 if, in fact, you mailed it on the 7th, that would have been
17 the 30th day.
18    MR. WARNER: Yes, that's true.
19    THE COURT: Excluding the 8th. You don't
20 count the 8th. And then with the mailbox rule you'd have 10
21 days from --
22    MR. WARNER: Yes.
23    THE COURT: -- the 7th. So I find it was
24 timely filed.
25    MR. WARNER: Very well.

16

1    THE COURT: Okay. Now call your first
2 witness.
3    MR. WARNER: I invoke the Rule on witnesses.
4    THE COURT: Okay. Bring in all the witnesses.
5    MR. WARNER: That would necessitate since I
6 called your bailiff as a witness, you'll need to appoint a
7 substitute bailiff. That's up to you.
8    THE COURT: Unless you want to call him first?
9    MR. WARNER: I'd rather call Mr. Garza first,
10 if I can.
11    THE COURT: Okay.
12    MR. WARNER: If he's available.
13    THE COURT: Okay.
14    MR. WARNER: These witnesses have not been
15 sworn. I haven't talked to counsel for the State. May I have
16 a moment to talk to him?
17    THE COURT: Yes.
18    MR. SKURKA: About what?
19    (Counsel conferring.)
20    MR. WARNER: These witnesses have not been
21 sworn. I'll waive the oath, if the Court please. As to
22 Mr. Garza, I'll waive the oath.
23    THE COURT: I mean, he's an officer of the
24 Court.
25    MR. WARNER: Okay. Well, he doesn't need to

17

1   be sworn. I understand the State does not object. The other

2   witnesses have not been sworn.

3           THE COURT: All right. Well, I guess let all

4   the witnesses come. These are the four.

5           All right. Raise your right hand.

6           (Four witnesses are duly sworn.)

7           THE COURT: All right. The Rule's been

8   invoked. You guys know what that means. Don't talk to

9   anybody except for the lawyers but not in the presence of

10  anybody else while this is going on. Don't talk about the

11  case.

12          MR. WARNER: We'll call Mr. Garza, Ed Garza.

13          THE COURT: All right. Ed Garza. Have a

14  seat.

15          You may proceed.

16          MR. WARNER: Thank you, Your Honor.

17              ED GARZA,

18  the oath having been waived, testified as follows:

19              DIRECT EXAMINATION

20  BY MR. WARNER:

21      Q.   Please state your name for the Court and record.

22      A.   Ed Garza.

23      Q.   What's your profession, sir?

24      A.   I'm a lawyer.

25      Q.   Were you the lawyer for John Henry Ramirez in Cause

18

1   No. 04-CR-3453-C now pending in this court at trial?

2       A.   Yes, I was.

3       Q.   Would you please describe the security conditions at

4   the venire panel if you're aware of that? Are you aware of the

5   venire panel security conditions? How many deputies were

6   there?

7       A.   I think there were about four, maybe five.

8       Q.   Were they in uniform?

9       A.   If I recall correctly, they were all in civilian

10  clothes, except for maybe one of the deputies might have been

11  in a uniform. But for the most part, what I do recall is that

12  they were in civilian clothing.

13      Q.   But one was in uniform?

14      A.   Correct.

15      Q.   At the venire, was there a metal detector?

16      A.   Outside the courtroom?

17      Q.   Yes.

18      A.   i believe there was.

19          THE COURT: Now, when you say at the venire,

20  you're talking about downstairs in the central jury room?

21          MR. WARNER: Yes, Your Honor, the venire, when

22  the people who are summoned generally for jury service come.

23          THE COURT: Okay.

24      A.   I believe there was. I don't recall.

25      Q.   (BY MR. WARNER) Okay.

19

1       A.   It wasn't anything I really paid a lot of attention

2   to.

3       Q.   Were these sheriff's deputies who were present in the

4   general jury room?

5       A.   Yes. Well, in the central jury room when the whole

6   panel was called?

7       Q.   Yes.

8       A.   There were several deputies that were in uniform and

9   I think I was confused by your question because there was an

10  occasion when we had individual voir dire --

11      Q.   Yes, yes.

12      A.   -- and don't know if you're ready to get to that.

13      Q.   Let me split this up. I'm gonna ask you about the

14  venire panel, when all the people who are summoned to be jurors

15  come. The next question will be about the voir dire which I

16  understand took place here?

17      A.   Correct.

18      Q.   With individual voir dire in the capital murder case?

19      A.   Correct.

20      Q.   And the last set of questions for Your Honor will be

21  at the trial. I'm gonna ask you about the security questions

22  under each one of those circumstances.

23      A.   Yeah. At the central jury room when the whole venire

24  was assembled, most all of the deputies were in uniform. And

25  there may have been as many as six or eight in that -- at that

20

1   time.

2       Q.   Can you be precise? Try to remember if you can.

3   Whatever you say is fine as long as it's true. Can you be

4   precise?

5       A.   I want to say there might have been at least six

6   deputies.

7       Q.   And were they -- did you say they were in uniform?

8       A.   Yes.

9       Q.   Were they armed?

10      A.   Yes.

11      Q.   How were they armed?

12      A.   I think they were wearing side arms.

13      Q.   Was one of the deputies armed with an AR-15?

14      A.   During one of the breaks I did notice that when they

15  were -- now, there were no -- what I recall is the courtroom

16  had been cleared, it was a break. There were no panel members

17  in the courtroom. I believe it was only personnel and

18  Mr. Ramirez being escorted back from lunch or being escorted

19  from a break, and at that time, I did observe that one of the

20  deputies had an AR-15 strapped across his body.

21      Q.   Okay. Just to make it clear then, would the venire

22  panel members have had a chance to see the deputy with the

23  AR-15?

24      A.   No.

25      Q.   All right.

21

1    A.    I would have objected to that.

2    A.    I understand.

3    A.    No, I don't recall that being the situation at all.

4    Q.    Where were the deputies, the six deputies you say at

5    the venire panel?  Where were they stationed?

6    A.    I want to say there was about two deputies sitting

7    somewhat close to my client and then the rest were at the

8    doorways.

9    Q.    All right.  Let's see how -- let me see.  Were the

10   deputies who were sitting close to your client in uniform?

11   A.    Yes.

12   Q.    Were they armed?

13   A.    Yes.

14   Q.    How far away were -- was each one the same distance

15   away from Mr. Ramirez?

16   A.    Probably.

17   Q.    How far away was each of the two deputies from

18   Mr. Ramirez at the venire panel?

19   A.    Well, where Mr. Ramirez was sitting is sort of where

20   I'm sitting right now and the judge was on the bench.  There

21   was a table going across here so I believe there was a deputy

22   sitting to the side and perhaps another one by the table.

23   Q.    Okay.  Well, we're gonna have a cold record, so could

24   you estimate in feet how far from your client -- from

25   Mr. Ramirez the two deputies --

22

1    A.    There was one deputy maybe about three feet away and

2    the other maybe about five.

3    Q.    Okay.

4    A.    Approximately.

5    Q.    Was Mr. Ramirez shackled at venire?

6    A.    I believe he was.

7    Q.    Could the venire panel members see the shackles?

8    A.    No.

9    Q.    Was he handcuffed?

10   A.    No, not to my recollection.  I believe he was

11   shackled possibly around his ankles, but I don't remember if he

12   -- if he was -- I don't think he was cuffed.

13   Q.    Was he -- were the shackles bolted to the floor at

14   venire?

15   A.    I don't know.  I couldn't see his -- I don't recall.

16   Q.    How was Mr. Ramirez dressed at venire?

17   A.    He was wearing civilian clothes.  I think he was

18   wearing black slacks and a green shirt.  I'm --

19   Q.    Could the venire panel members see the two deputies

20   who were seated three to five -- one three and one five feet

21   away from Mr. Ramirez at the venire panel?

22   A.    Probably about half of them could and the other half

23   could not.  The room is kind of like in a T and where

24   Mr. Ramirez was sitting there was only part of the panel that

25   could actually see him at one time.  There was another whole

23

1    part of the panel on the other side of the bench that probably

2    couldn't see him where he was sitting.

3    Q.    How many people, more or less, were on the venire

4    panel?

5    A.    A little over 200.

6    Q.    Were any of the people on the venire panel who could

7    see the two deputies, one three foot and one five feet away

8    from Mr. Ramirez?

9    A.    Yes.

10   Q.    Did any of those people make it to the voir dire

11   panel?

12   A.    I don't -- there might have been but I don't know for

13   sure because I didn't -- I didn't pay specific attention to

14   where they were sitting at the time when we started voir dire.

15   Q.    Okay.

16   A.    I don't -- I don't know for sure but there -- I'm

17   sure there had to have been.

18   Q.    Okay.  Did any of the people who were on the venire

19   panel who could see the two deputies seated three and five feet

20   away from Mr. Ramirez and the venire panel, did any of those

21   people make it to the -- on to the jury?

22   A.    Probably, Mr. Warner, but I don't know for sure.

23   Q.    All right.  Okay.  Now let's go -- just for the

24   Court's convenience, now let's go to the voir dire.

25              THE COURT:  Individual.

24

1              MR. WARNER:  Switch scenes to the individual

2    voir dire.

3    Q.    (BY MR. WARNER) Where was the individual voir dire

4    conducted?

5    A.    In this courtroom.

6    Q.    Are you talking about the district courtroom of the

7    94th District Court of Nueces County?

8    A.    Correct.

9    Q.    How many deputies were in the courtroom for the voir

10   dire panel?

11   A.    Usually there were -- there were about four deputies

12   including Mr. Bautista the bailiff.

13   Q.    Mr. Bautista was dressed in civilian clothes?

14   A.    Sometimes, but also, sometimes I believe he is with

15   one of the constable's offices assigned to this court though

16   and he was wearing some sort of I guess what you would call

17   like a polo shirt with the insignia of that constable office

18   that he works out of.

19   Q.    Okay.  The -- the voir dire in this capital murder

20   case was conducted individually, wasn't it?

21   A.    Yes.

22   Q.    So you had one juror at a time?

23   A.    Yes.

24   Q.    Okay.  Were you seated at counsel table?

25   A.    Yes.

25

```
1    Q.   Was Mr. Ramirez seated at counsel table?
2    A.   Yes.
3    Q.   And where did the -- where was the prospective juror
4  seated, where you're sitting now?
5    A.   Right here.
6         MR. WARNER:  The record -- may the record
7  reflect the distance between counsel table and the witness
8  chair is 15 feet?
9         MR. SKURKA:  I'm terrible at distances, Judge.
10 I don't want to stipulate.
11        THE COURT:  Maybe 15, I don't know, maybe 20.
12 I don't know.
13        MR. WARNER:  Okay.  All right.
14        THE COURT:  But more or less.
15   Q.   (BY MR. WARNER) Okay.  Now, where were the four
16 deputies at the individual voir dire stationed?
17   A.   Well --
18   Q.   This --
19   A.   -- they're pretty much sitting the way they are right
20 now.  Mr. Bautista would sit right there where (pointing) --
21   Q.   Okay.  You're pointing at the bailiff's --
22        MR. WARNER:  May I step away from counsel
23 table?
24        THE COURT:  Yes.
25   Q.   (BY MR. WARNER) You're pointing to the bailiff's
```

26

```
1  chair which is maybe six feet away from where the defendant's
2  seated?
3    A.   Correct.
4    Q.   Is that true?
5    A.   Correct.
6    Q.   Some of the time Mr. Bautista had an insignia?
7    A.   Correct.
8    Q.   Was -- he was armed or was he armed?
9    A.   Yes.
10   Q.   He was armed?
11   A.   Most of the time, yes.
12   Q.   A side arm?
13   A.   Yes.
14   Q.   A pistol you mean?
15   A.   Yes.
16   Q.   Okay.  Now where were the other deputies in the
17 courtroom?
18   A.   One of the other deputies would sit where that other
19 deputy is sitting behind this uniformed deputy.
20        MR. WARNER:  May the record reflect then that
21 the other deputy is again about six feet away from the
22 defendant?
23   A.   Correct.
24        MR. WARNER:  Would that be a fair estimation?
25 May the record so reflect, Your Honor?
```

27

```
1         THE COURT:  That seems about right.
2         MR. WARNER:  And the bailiff's chair is -- Mr.
3  Bautista's chair is about six feet away from the defendant?
4         THE COURT:  I'd say that's about right.
5    Q.   (BY MR. WARNER) The deputy who was seated behind the
6  bailiff, Mr. Garza, the bailiff's name is Bautista --
7         THE COURT:  Frank Bautista.
8    Q.   (BY MR. WARNER) The one who was seated behind Frank
9  Bautista, was that deputy in uniform or not?
10   A.   Every day I would -- I did notice that they would
11 change deputies.  It wasn't always just the same deputies day
12 in, day out, day in, day out.  So sometimes, I know this
13 gentleman sat through the trial and I know this other gentleman
14 sat through the trial.  I know this gentleman sat through the
15 trial for one or two days perhaps -- I mean, during the voir
16 dire.
17   Q.   When you say "this gentleman," are you talking about
18 this specific individual seated here?
19   A.   Yes.
20   Q.   Can you tell me his name?
21   A.   No, I don't know his name.  I'm sorry.
22   Q.   This particular individual?
23   A.   Yes.
24   Q.   Was he in uniform or was he in civilian clothes?
25   A.   Most of the time I saw him in civilian clothes.
```

28

```
1    Q.   Was he sometimes in uniform?
2    A.   No, I don't think I ever recall seeing him in
3  uniform.
4    Q.   Could you tell whether or not he was armed?
5    A.   No, you couldn't tell.
6    Q.   All right.  So that's two.  Where were the other
7  deputies in the courtroom during the voir dire individually in
8  this case?
9    A.   One of the other deputies would sit where this
10 deputy's sitting right now and then --
11   Q.   You say "this deputy," was it this particular
12 individual here?
13   A.   Yes, at times.
14   Q.   Do you know his name?
15   A.   No, I don't.  I'm sorry.
16   Q.   All right.  Where he's seated is important.  Can you
17 --
18        MR. WARNER:  May I have the witness stand
19 down, Your Honor?
20        THE COURT:  Sure.
21        THE COURT REPORTER:  Make sure you speak up
22 when you're over there so I can hear you.
23        THE WITNESS:  Okay.
24        MR. WARNER:  We'll speak up so that you can
25 hear us.
```

29

1    Q.    (BY MR. WARNER) Mr. Garza, can you show me where --
2    where the third deputy was seated?
3    A.    Right there where he's sitting right now.
4    Q.    In that chair right there?
5    A.    Yes, sir.
6    Q.    Could it have been inside this rail?
7    A.    No.  Most of the time I saw him sitting right there.
8    Q.    You're qualifying your answer with mostly.
9    A.    Yes.  I never -- I don't ever recall him sitting
10   inside the bar.
11   Q.    Could he have sat inside the bar?
12   A.    I don't know.  I don't recall.
13   Q.    Fair answer.
14   A.    I don't recall.
15   Q.    Thank you.  Was the deputy who was seated right --
16         MR. WARNER:  May the record reflect that the
17   witness has pointed out a chair which is just outside the bar?
18   And may the record reflect that the witness has pointed out
19   for the third deputy seated in the chair just outside the bar?
20         THE COURT:  The record will so reflect that
21   the third deputy is seated in plain, in a coat and tie outside
22   the bar.
23         MR. WARNER:  May the record reflect that that
24   third deputy is eight feet away from the defendant?
25         THE COURT:  Yeah, that's about right, eight or

30

1    10.
2          MR. WARNER:  May the record reflect that this
3    chair is not part of the chairs furnished to the general
4    audience?
5          THE COURT:  It will so reflect.
6          MR. WARNER:  Thank you, Your Honor.
7          MR. WARNER:  Please resume your witness stand,
8    Mr. Garza.
9          THE WITNESS:  (Witness complies.)
10   Q.    (BY MR. WARNER) All right.  Now we've gotten to three
11   deputies.  Let's talk some more about the third deputy.  Was
12   that third deputy -- I don't know if I asked this question or
13   not.  Was the third deputy in uniform or not?
14   A.    No.  I recall that almost every day they were wearing
15   civilian clothes.
16   Q.    Okay.  Almost qualifies your answer.  Was there a day
17   in which the third deputy, the one seated at this chair just at
18   the circular barrier between the general audience and the bar
19   inside which counsel sit, was that third deputy ever in
20   uniform?
21   A.    I don't recall.  I think -- no, I don't.  I almost
22   remember all the time that they were dressed in civilian
23   clothing.
24   Q..   Okay.  All the time is somewhat qualifying.  It's
25   okay.  Just whatever you remember is fine.  Can you remember

31

1    whether the third deputy was ever seated in a uniform or not?
2    A.    No.
3    Q.    You can't remember or, no, he was not?
4    A.    I can't remember that.
5    Q.    All right.  Could you tell whether he was armed?
6    A.    No, I couldn't.
7    Q.    All right.  Let's go to the fourth deputy.  Where was
8    the fourth deputy seated during voir dire -- individual voir
9    dire in this case?
10   A.    The fourth deputy was usually stationed at the door
11   and/or sometimes sitting on one side of the gallery seats or
12   the other.
13   Q.    Okay.  When you say "the door" do you mean -- you
14   pointed, did you not, to the door to the court?
15   A.    The door to the entrance of the courtroom.
16   Q.    Okay.  Was that fourth deputy -- you say the fourth
17   deputy was seated somewhere else in the courtroom?
18   A.    Sometimes that deputy might sit in one of the gallery
19   chairs.
20   Q.    Okay.  Was the fourth deputy in uniform --
21   A.    Yes.
22   Q.    -- or in civilian clothes?
23   A.    Generally, that deputy was always in uniform.
24   Q.    Was he armed?
25   A.    Yes.

32

1    Q.    With what?
2    A.    Side arm.
3    Q.    Pistol?
4    A.    Yes.
5    Q.    Were there ever more than four deputies in the
6    courtroom during the individual voir dire?
7    A.    Not to my recollection.
8    Q.    Okay.  Did the second, third or fourth deputy ever
9    come inside the rail, inside the bar?
10   A.    During voir dire?
11   Q.    Yes.
12   A.    I don't recall.
13         MR. WARNER:  All right.  Now for the Court's
14   clarification.  Now let's go to the trial, okay, and switch
15   scenes.  We're leaving the venire panel downstairs.  We're
16   gonna just go to the voir dire for a minute and then come back
17   to something.  Let's go to the deputies at the trial.
18   Q.    (BY MR. WARNER) Now, there were -- before we get to
19   the trial, at voir dire, were there guards outside the
20   courtroom?
21   A.    Yes.
22   Q.    How many guards were outside the courtroom?
23   A.    Generally two.
24   Q.    Was there a metal detector outside the courtroom
25   during the individual voir dire?

33

1    A.    I believe there was.

2    Q.    And who had to pass through the metal detector?

3    A.    Everybody. I mean, most of the spectators.

4    Q.    So did -- did the persons who were called to be

5    examined as members of the voir dire panel, people who were on

6    -- who were going to be asked questions on voir dire, those

7    prospective jurors, did they have to pass through the metal

8    detector?

9    A.    I don't remember. I don't know.

10   Q.    It was outside the door to the courtroom?

11   A.    Yes.

12   Q.    I notice that in this courtroom there is an entrance

13   through which counsel entered today?

14   A.    Correct.

15   Q.    Did the jurors come in through counsel's entrance?

16   A.    No, they always entered through the jury room door.

17   Q.    The jury room door.

18   A.    Correct.

19   Q.    The jury room is a closed room, isn't it?

20   A.    Correct.

21   Q.    There's only one way in and one way out?

22   A.    Well, I believe there's a door you can go in from the

23   hallway into the jury room and then come out through here

24   through this door.

25   Q.    So we're not clear at this moment whether the members

34

1    of the voir dire panel had to go through the metal detector or

2    not?

3    A.    I don't remember.

4    Q.    Okay.

5    A.    I don't know if they had to or not.

6    Q.    All right. Now, how many guards were outside the

7    door of the courtroom?

8          THE COURT: This is -- are we talking about

9    voir dire or trial?

10         MR. WARNER: No, sir. Excuse me, Your Honor.

11         THE COURT: Because I thought we moved to

12   trial.

13         MR. WARNER: I know. And I had to go back

14   after conference with my colleague.

15         THE COURT: Okay. So we're on individual?

16         MR. WARNER: We're still on individual voir

17   dire.

18   Q.    (BY MR. WARNER) All right. So there were guards

19   outside the courtroom at individual voir dire?

20   A.    Yes.

21   Q.    Could you tell us how many there were, if you know?

22   A.    Generally, there was always two.

23   Q.    Were they in uniform?

24   A.    Yes.

25   Q.    And were they armed?

35

1    A.    Yes.

2    Q.    How were they armed?

3    A.    Pistols, side arms.

4          MR. WARNER: May I have a moment?

5          THE COURT: Yes.

6          (Pause.)

7          MR. WARNER: Now then, I really will turn the

8    page, for clarification and go on to the trial.

9    Q.    (BY MR. WARNER) Mr. Garza, now let's go on to the

10   number of deputies and so on, and the security apparatus at the

11   trial. Was there a -- was there a metal detector at trial?

12   A.    Yes.

13   Q.    Where was the metal detector at trial?

14   A.    Right outside the courtroom door of the main entrance

15   to the courtroom.

16   Q.    Through which the --

17   A.    It was out there in the hallway.

18   Q.    Okay. The people who are in the audience have to

19   come in through there?

20   A.    Yes.

21   Q.    Did the jury have to come in through the metal

22   detector at trial?

23   A.    I don't remember. That, I don't remember.

24   Q.    All right. Now, how many deputies were there at the

25   trial?

36

1    A.    Generally, I want to say there were five also.

2    Q.    Were they in uniform?

3    A.    Usually only the one at the door was in uniform --

4    Q.    When you say "the door" you mean the door to the

5    courtroom?

6    A.    Correct.

7    Q.    Okay.

8    A.    And the other three deputies would -- would always

9    appear in civilian clothing to my recollection.

10   Q.    Was the deputy at the door in uniform armed?

11   A.    Yes.

12   Q.    How was he armed?

13   A.    A side arm pistol.

14   Q.    The deputies who appeared at the trial in civilian

15   clothes, had those deputies served at voir dire?

16   A.    Yes.

17   Q.    Okay.

18   A.    Uh-huh, yes.

19   Q.    The deputies who were in the courtroom at trial, had

20   those deputies served at the venire panel?

21   A.    Yes.

22   Q.    Did you tell me that the deputy at the door of the

23   courtroom who was in uniform was armed with a side arm, right?

24   A.    Correct.

25   Q.    Were the deputies at trial who were in civilian

37

1  clothes armed?

2      A.    If they were, I never saw their weapons.

3      Q.    Okay.

4      A.    But I'm -- I never saw their weapons, but there might

5  have been.  I don't know.

6      Q.    Okay.  All right.  Let's start with number one.

7  Deputy No. 1 is going to be the deputy at the door to the

8  courtroom.

9            MR. WARNER:  May the record reflect, Your

10 Honor, that the door to the courtroom is 45 feet from where --

11 from counsel table?

12           THE COURT:  Well, I guess.

13           MR. WARNER:  It's a guesstimate.

14           THE COURT:  I'm not real good with

15 measurements, but I guess that's as good a guess as any.

16     Q.    (BY MR. WARNER)  Now, there are four more deputies

17 left.  They're all in civilian clothes.  Could you please tell

18 me -- let's pick out -- let's call them Deputy No. 2, 3, 4 and

19 5.  Where is Deputy No. 2 seated or stationed?  Let's use that

20 word.

21     A.    There's one at the door and then there's one where

22 this gentleman is sitting right behind you.

23     Q.    Okay.  When you say this gentleman --

24     A.    Yes, sir.

25     Q.    -- we previously discussed this for voir dire.  We

38

1  were talking about a chair?

2      A.    Correct.

3      Q.    That's right at the bar; is that right?

4      A.    Yes.

5      Q.    And this is Deputy No. 2?

6      A.    Yes.

7      Q.    At the trial seated in a chair right at the bar

8  between counsel table, the judge's bench, the witness stand,

9  the bailiff's station?

10           THE COURT:  It's actually just outside the

11 bar.

12           MR. WARNER:  Just outside the bar.  I need to

13 ask him some questions about that because the chair's a

14 movable chair.

15           THE COURT:  But right now, the chair is just

16 outside the bar if the record so reflects.

17           MR. WARNER:  Let me ask the witness then.  May

18 I have the witness stand down?

19           THE COURT:  Sure.

20           MR. WARNER:  Would you please?

21           THE WITNESS:  Uh-huh.

22     Q.    (BY MR. WARNER)  So Mr. Garza, so talking about Deputy

23 No. 2 at trial in civilian clothes, you couldn't tell whether

24 or not he was armed.  Where -- where was the chair with respect

25 to the bar?  Was it outside the bar, was it inside the bar, or

39

1  was it at the bar?

2      A.    I think it was outside the bar actually.

3      Q.    But the chair was not part of the general seating for

4  the public, was it?

5      A.    No.

6            MR. WARNER:  Excuse me for leading.

7      Q.    (BY MR. WARNER)  Was it part of the general seating

8  for the public?

9      A.    No, it was an individual chair.

10     Q.    Very well.

11           MR. WARNER:  May we have the witness resume

12 the witness stand?

13           THE COURT:  Sure.

14     Q.    (BY MR. WARNER)  That's Deputy No. 2.  Deputy No. 1

15 was here during the entire trial, the one that's stationed at

16 the courtroom door?

17     A.    Yes.

18     Q.    Deputy No. 2 in the chair right outside the bar, was

19 he here through the whole trial?

20     A.    Yes.

21     Q.    All right.  Number 3 -- where was the third deputy

22 seated, please?

23     A.    Well, the other deputy would be sitting where this

24 other gentleman is with the blue coat, the blue coat and tie.

25     Q.    Okay.  And so we previously discussed this at voir

40

1  dire, but you're mentioning a movable chair that's seated

2  directly behind the bailiff?

3      A.    Correct.

4      Q.    Is that right?

5      A.    Correct.

6      Q.    That's --

7            MR. WARNER:  May the record reflect that this

8  second Deputy No. 3 is about six feet from the defendant?

9            THE COURT:  It's about six to eight feet.

10           MR. WARNER:  Okay.

11     Q.    (BY MR. WARNER)  All right.  And this Deputy No. 3 was

12 in civilian clothes did you say?

13     A.    Yes.

14     Q.    And you couldn't tell whether or not he was armed?

15     A.    No.

16     Q.    All right.  So we've got Deputy 1 at the courtroom

17 door, Deputy 2 seated right outside the bar, Deputy 3 seated

18 behind the bailiff; 2 and 3 are in civilian clothes, No. 1 is

19 in a uniform?

20     A.    Correct.

21     Q.    How about Deputy No. 4?

22     A.    That generally was the court bailiff, Mr. Bautista.

23     Q.    Okay.  Now, we discussed this at voir dire, but just

24 to make the record clear.  At trial, throughout the trial,

25 Mr. Frank Bautista who was -- was he wearing his constables

41

1   insignia on his shirt?

2       A.   Most of the time.

3       Q.   Okay.

4            MR. WARNER:  May the record reflect that the

5   bailiff is about -- at trial the bailiff was about six feet

6   from the defendant?

7            THE COURT:  It will so reflect.

8            MR. WARNER:  All right.  Thank you, Your

9   Honor.

10      Q.   (BY MR. WARNER) Okay.  Could you tell whether or not

11  Mr. Bautista was armed?

12      A.   Yes, most of the time.

13      Q.   You could tell whether or not?

14      A.   Yes, he was --

15      Q.   And was he or not?

16      A.   Yes, he was.

17      Q.   Okay.  All right.  And the fifth deputy, where was

18  Deputy No. 5?

19      A.   Well, those are the -- I guess 5 was usually

20  stationed outside the door.

21      Q.   You mean the door to the courtroom?

22      A.   Yes, sir.

23      Q.   Is that in addition to the two deputies that you

24  mentioned who were outside the courtroom all the time?

25      A.   That includes the two deputies that were outside.  In

42

1   other words, there was always two deputies stationed outside,

2   and then whenever the court proceedings would commence, one of

3   the two would come inside the courtroom.

4       Q.   I see.

5       A.   To my recollection.

6       Q.   So in the courtroom presence we have a total of six

7   deputies, is that right; four inside and two outside?

8       A.   Yes.

9       Q.   So deputies -- Deputy No. 6 remains outside all the

10  time?

11      A.   Yes.

12      Q.   And Deputy No. 5 comes back and forth?

13      A.   Yes.

14      Q.   And what was the -- how far inside the courtroom did

15  the Deputy No. 5 come?

16      A.   Generally just there at the entrance of the door.

17      Q.   Did he approach the bar?

18      A.   Not that I recall.

19      Q.   Okay.  That's a qualified answer and that's okay.

20      A.   I don't recall.

21      Q.   If you can remember, did he come inside the bar?

22      A.   No.

23      Q.   Were Deputies No. 5 and 6 armed?

24      A.   Yes.

25      Q.   Were they in uniform?

43

1       A.   Yes.

2            MR. WARNER:  If I could have just a moment,

3   Your Honor?

4            THE COURT:  Yes.

5            (Pause.)

6            MR. WARNER:  I'll pass the witness, Your

7   Honor.

8            THE COURT:  All right.  Cross.

9            MR. SKURKA:  Thank you, Your Honor.

10           CROSS-EXAMINATION

11  BY MR. SKURKA:

12      Q.   Mr. Garza, you said during the general voir dire down

13  on the first floor that there was up to six guards inside the

14  big room?

15      A.   To the best of my recollection, yes.

16      Q.   Wouldn't it be --

17           MR. WARNER:  Pardon me, Mr. Skurka.  Can we

18  use the terms "venire" for the people downstairs and "voir

19  dire" for the individual voir dire, please?

20           MR. SKURKA:  Sure.

21      Q.   (BY MR. SKURKA) During the venire you testified that

22  there was up to six guards downstairs in venire room?

23      A.   That I recall.

24      Q.   Okay.  Were they all six of them inside the venire

25  room at all times, or would it be fair to say that some were

44

1   inside and some were outside the room?

2       A.   I only recall that most of the six that I recall were

3   inside, but there may have been others outside that I didn't

4   notice.

5       Q.   Where were the six or five, where were they located

6   inside the venire room?

7       A.   Well, I remember that two were pretty close to where

8   Mr. Ramirez was sitting, and then the others were stationed at

9   some -- at the doors, at the exit doors, entrance and exit

10  doors.

11      Q.   So based on what you're just saying, if there was

12  six, there was only two of them that were any close proximity

13  to Mr. Ramirez, correct?

14      A.   That I recall.

15      Q.   In other words, four of them were nowhere near

16  Mr. Ramirez, correct?

17      A.   No.

18      Q.   And it's your testimony that he was not shackled in

19  the venire room?

20      A.   I don't remember.  He might have been.  I don't

21  remember.

22      Q.   But you do remember that no juror during the venire

23  ever saw him in shackles or handcuffs, correct?

24      A.   No, I don't recall that that ever occurred.

25      Q.   Okay.

45

1    A.    That he was observed in that manner, no.

2    Q.    That's my question.  Would he have been seen by any

3    jurors in shackles or handcuffed?

4    A.    Not to my recollection.

5    Q.    And that's probably because you would sure as heck

6    object to that?

7    A.    Yes.

8    Q.    Okay.  So we can pretty much assure the Court that

9    there was none of that demonstrated to the jury because you

10   would have probably raised a stink about it?

11   A.    I was trying to be very cognizant of that.

12   Q.    And did you see that when the deputies and the guards

13   were transporting Mr. Ramirez in and out of that venire room?

14   Do you remember that process?

15   A.    Yes.

16   Q.    And that's because the court staff like you, and I

17   guess, the court reporter and court manager were in and out of

18   the room, correct?

19   A.    Yes.

20   Q.    Wouldn't it be fair to say, though, or would you

21   agree with me that these guards took extra precautions to make

22   sure the defendant, John Henry Ramirez, was never exposed in

23   shackles or handcuffs to any member of the venire?

24   A.    That's true.

25   Q.    That's true?

46

1    A.    Yes.

2    Q.    Because you were there to assure that, correct?

3    A.    Yes, uh-huh.

4    Q.    And you do recall that Mr. -- isn't it a fact that

5    Mr. Ramirez did not come into the venire room the same as the

6    jurors did, did he?

7    A.    No, he was brought in earlier.

8    Q.    He was brought in earlier before any juror was

9    allowed to come into that room, correct?

10   A.    Correct.

11   Q.    And isn't it true he was stationed at -- down there

12   it's like, I guess, a witness box, for lack of a better word?

13   A.    Yes.

14   Q.    He was stationed behind that, correct?

15   A.    Right.

16   Q.    Where nobody could see him even if he was handcuffed

17   or shackled, correct?

18   A.    Correct.

19   Q.    And I'm talking with any member of the jury --

20   A.    Correct.

21   Q.    -- panel?

22   A.    Correct.

23   Q.    And wouldn't it be fair to say -- would you agree

24   with me too that the guards, when they were taking him in and

25   out for like, I guess, bathroom breaks or you said earlier like

47

1    at lunch, they made sure to clear the room of all venire panel

2    members before they brought him in or out of the room?

3    A.    Correct.

4    Q.    Now, it might be true that when he would bring -- be

5    coming in from the outside entrance, he may have had several

6    guards around him escorting him to where they were gonna put

7    him in the witness box, correct?

8    A.    Yes.

9    Q.    In that time, they may have been close in proximity

10   to him, correct?

11   A.    Correct.

12   Q.    But isn't it true that once they left him and

13   stationed him in the witness box, none -- only a couple of the

14   guards stayed close to him?

15   A.    To my -- to the best of my recollection, that was it,

16   yes.

17   Q.    Were you satisfied -- were you and your co-counsel

18   Mr. Jones satisfied with the fact that no jury panel member saw

19   him in that -- in shackles or handcuffs?

20   A.    Yes.  On that particular morning I was -- I was

21   satisfied.

22   Q.    You never made an objection to Judge Galvan saying

23   that there is a -- oh, some of the jury panels may have seen

24   him this way?

25   A.    No.

48

1    Q.    You never --

2    A.    I didn't observe it.

3    Q.    So you didn't need to object to that, correct?

4    A.    Correct.

5    Q.    And you're saying in your testimony you don't know if

6    there was a bolt on the floor in the venire room where he was

7    bolted to the floor?

8    A.    I don't remember.

9    Q.    And during the venire he was dressed in civilian

10   clothes, was he not?

11   A.    Yes.

12   Q.    When he came into the jury room from that -- in the

13   venire room, isn't it a fact he came from an entrance that was

14   completely opposite on the side of the room where the regular

15   jurors would come in?

16   A.    Yes.

17   Q.    That's kind of like a back exit for lack of a better

18   word?

19   A.    Correct.

20   Q.    And you said at one time you saw a deputy sheriff or

21   a guard in uniform with a rifle, something like that?

22   A.    An automatic weapon, yes, sir.

23   Q.    Again, did any jury panel see this guard with this

24   automatic weapon?

25   A.    No.

49

1    Q.   Now I want to switch from the first floor venire to

2    the voir dire when we're talking about the individual jurors

3    come up one by one for questioning.  Do you remember that now?

4    A.   Yes, uh-huh.

5    Q.   And you were present during all of that, correct?

6    A.   Yes.

7    Q.   Isn't it a fact that the jurors that were brought in

8    on that time did not have to go through the metal detector

9    because the metal detector wasn't even set till the beginning

10   of the trial?

11   A.   I really don't remember that, Mr. Skurka, but it

12   could be, but I don't remember.

13   Q.   You recall the schedule we had, I think, about eight

14   of them scheduled a day and they would come in one by one

15   through the jury room and the jury door, correct?

16   A.   Right, right.

17   Q.   You just don't remember that there was no metal

18   detector back up there then?

19   A.   I don't.  I'm sorry, I don't.

20   Q.   That wouldn't surprise you though because you usually

21   don't have to have a metal detector for jurors, do you?

22   A.   I've never seen that.

23   Q.   Okay.

24   A.   To my recollection, I've never seen that.

25   Q.   So based on your experience here, they generally

50

1    wouldn't have a metal detector for jurors?

2    A.   Probably not.

3    Q.   Okay.  Now, you do recall that during the trial, once

4    the trial began and other people came in, like the defendant's

5    family and the victim's family and other people, there was a

6    metal detector, correct?

7    A.   Yes.

8    Q.   And that was for people, is it not, that came into

9    the spectator or gallery area?

10   A.   Yeah.  And I want to say the reason I remember that

11   too is because you generally see people lined up and so that --

12   that's more recollectable than whether or not the jurors went

13   through theirs or not.

14   Q.   Do you remember jurors lined up during the trial

15   going through the metal detector?

16   A.   No, that I don't remember.

17   Q.   So that probably didn't happen?

18   A.   Right, probably not.

19   Q.   Look at the set up in the courtroom right now where

20   the guards are and where they're sitting and they're stationed

21   right now.  Isn't it true that the way they're set up right now

22   is pretty much how it was during both the voir dire and the

23   trial --

24   A.   It is.

25   Q.   -- in this courtroom?

51

1    A.   It is.

2    Q.   And for the record, we're talking about the bailiff

3    sitting on the left side of the judge, correct?

4    A.   Correct.

5    Q.   And that would be Frank Bautista and he had a uniform

6    most of the time?

7    A.   Correct.

8    Q.   Because he's, I think, a part-time constable or

9    something?

10   A.   Right.

11   Q.   He had a constable's uniform?

12   A.   Yeah.

13   Q.   That uniform's different from the sheriff's offices

14   uniforms, right?

15   A.   Yes.

16   Q.   Okay.  Did Frank Bautista have anything to do with

17   the security of your client during the trial?

18        MR. WARNER:  That's a legal conclusion.

19        MR. SKURKA:  Well, let me rephrase it.

20        THE COURT:  Okay.  Rephrase it.

21   Q.   (BY MR. SKURKA) Based on your observation in the

22   courtroom, who was in charge of escorting the prisoner back and

23   forth to the cell, getting him in the courtroom, putting him at

24   counsel table; was it Frank Bautista the regular bailiff or was

25   it the other guards?

52

1    A.   I believe it was the other guards.

2    Q.   And that was because, isn't it true, that Frank

3    Bautista was in charge of just taking care of the jury?

4    A.   I saw him doing more jury handling or jury duties

5    with respect to whatever the jurors need more than attending to

6    Mr. Ramirez.

7    Q.   Yeah.  And you've tried cases in Nueces County for

8    many years, and generally speaking, the bailiff has to do a

9    little bit of everything, doesn't he?

10   A.   Yes.

11   Q.   They have to, you know, get papers for the judge,

12   they have to work with the jury and they have to work with the

13   defendants going back and forth to the holding cell and all

14   that, right?

15   A.   Yes.

16   Q.   This case was different, was it not?

17   A.   Yes.

18   Q.   Frank Bautista was pretty much assigned just to do

19   the jurors taking care of the jurors and left the security with

20   the other guards, correct?

21   A.   That's true.

22   Q.   So when you say he was sitting up there somewhat

23   close to the defendant, he wasn't there to guard the prisoner

24   as his primary duty, was he not, was he?

25        MR. WARNER:  I suggest that the witness may

53

1  not know that.

2  MR. SKURKA:  He can answer it if he knows or

3  not.

4  MR. WARNER:  He does not know what the duties

5  of the bailiff are.

6  THE COURT:  That's overruled.  He can give his

7  opinion as to what he believed he saw.

8  A.  I think he had simultaneous duties.

9  Q.  (BY MR. SKURKA) Sure.  And that's a fair answer

10  because he probably had to do that too.

11  A.  I think he had simultaneous duties.

12  Q.  But you would agree with me his primary focus was

13  working with the jurors and not courtroom security like it

14  usually is?

15  A.  Yes.

16  Q.  Now, you've mentioned that the security is pretty

17  much the same as it was, and just for the record, I want to

18  point out, at the same time in the regular jury trial during

19  the individual voir dire and the trial, how many uniformed

20  guards or deputies were present?

21  A.  The same as there are right now.

22  Q.  And for the record, there's two in uniform, correct?

23  A.  Correct.

24  Q.  Okay.  Is it fair to say too that during trial and

25  during the voir dire, the two other guards that were probably

54

1  closest to the defendant didn't have uniforms on and were in

2  plain clothes?

3  A.  Correct.

4  Q.  And isn't it true those guys in the plain clothes,

5  those guards -- I'll just call them plain clothes guards -- had

6  no weapons on them, had no side arm; isn't that correct?

7  A.  Nothing visible.  I never -- I mean, I didn't see --

8  Q.  We have to ask them.  If you didn't see, that's fine.

9  A.  I didn't see any weapons on them.

10  Q.  Okay.  You didn't see any weapons on them?

11  A.  Correct.

12  Q.  So anybody with a weapon on them was as far away back

13  as the uniform guard at the back of the room, correct?

14  A.  Yes.

15  Q.  Except for the bailiff?

16  A.  Yes.

17  Q.  So Mr. -- Mr. Ramirez did not have any armed guards

18  in uniform sitting at counsel table with him?

19  A.  No.

20  Q.  Correct?

21  A.  No.

22  Q.  You said that the closest one are to where these men

23  are right now, correct?

24  A.  Correct.

25  MR. SKURKA:  Okay.  Judge, may I make a short

55

1  demonstration?  We were doing some measurements earlier and I

2  just want to --

3  THE COURT:  Okay.

4  MR. SKURKA:  I was lucky enough to go find a

5  tape measure and I wanted to ask the Court if we can measure

6  the distance from this man to this man?

7  MR. WARNER:  No objection.

8  THE COURT:  All right.

9  MR. SKURKA:  And for the record, we're talking

10  about the plain clothes guard who is sitting behind the

11  bailiff.  How far away is that, Steve, or Larry, you tell me.

12  MR. WARNER:  I have 84 inches so that should

13  be seven feet.

14  MR. SKURKA:  So about seven feet away, Steve?

15  MR. FEIL:  About seven feet.

16  MR. SKURKA:  Okay.  And where the bailiff was

17  sitting, where Frank Bautista was sitting?

18  MR. WARNER:  I'd like the record to reflect

19  that counsel's measuring from the bailiff's shoulder.

20  MR. SKURKA:  He's got very big shoulders.

21  MR. WARNER:  Yes.  I see 71 inches or maybe

22  60.

23  MR. SKURKA:  So about six feet?

24  MR. WARNER:  Not quite feet.

25  MR. SKURKA:  Steve, would you go ahead and go

56

1  all the way to the back of the room, please, and tell me how

2  close the next armed guard was.

3  MR. FEIL:  Mark, here or back there?

4  MR. SKURKA:  Where the lady is in the uniform.

5  MR. WARNER:  I must object to the comment

6  because we don't know whether Deputy No. 3 who is seated in

7  the chair which is just outside the bar, we don't know whether

8  he was armed or not.

9  MR. SKURKA:  That's not what I'm -- I'm not

10  even asking that.

11  THE COURT:  That's not what he asked.  He said

12  -- I think the question was in the next deputy in uniform.

13  MR. WARNER:  I thought he said armed guard but

14  the Court will recall --

15  THE COURT:  Well, I --

16  MR. SKURKA:  I'll just make the record clear.

17  How far away is the next uniformed deputy from the defendant?

18  MR. FEIL:  About 25 feet.

19  MR. SKURKA:  Twenty-five feet away.  And the

20  last one I'd like you to measure --

21  Q.  (BY MR. SKURKA) And that deputy was armed, was he

22  not, Mr. Garza?

23  A.  Yes.

24  MR. WARNER:  We'll accept the statement from

25  the other counsel for the State.

57                                                                                           59

1    I didn't hear the witness's answer, however.
2        MR. SKURKA:  He said yes.
3        MR. WARNER:  Did he say how far?
4        MR. SKURKA:  Twenty-five feet.
5        THE COURT:  Yeah, he said 25 feet.
6        MR. WARNER:  Better than 40 feet.
7        THE COURT:  You said 45.
8        MR. WARNER:  I'd rather have 25 then.
9        MR. SKURKA:  And how far was the bailiff who
10   was in plain clothes -- I'm sorry, not the bailiff -- the
11   guard who was in plain clothes in relation to the defendant,
12   John Henry Ramirez?
13       THE COURT:  The one just outside the bar.
14       MR. SKURKA:  The one just outside the bar.
15   Thank you, Judge.
16       MR. FEIL:  Eight feet.
17       MR. SKURKA:  Eight feet away.  Okay.  Thank
18   you.
19       Judge, I appreciate you letting me do this
20   demonstration.  I'm no good at distances either.  I thought
21   this would make it certainly easier for the Court.
22       THE COURT:  Well, apparently I was better than
23   I thought because I picked this at six and that six to eight
24   so.
25       MR. SKURKA:  Good for you.

1        THE COURT:  All right.  Lieutenant Isaac.
2        MR. WARNER:  We'll have some exhibits, Your
3    Honor, which we'll mark.
4        THE COURT:  Okay.  You've been sworn.  Take a
5    seat.
6        MR. WARNER:  This witness has been sworn.
7        THE COURT:  This witness has been sworn.
8        MR. WARNER:  May I proceed?
9        THE COURT:  You may.
10            ASHLEY ISAAC,
11   having been previously duly sworn, testified as follows:
12            DIRECT EXAMINATION
13   BY MR. WARNER:
14       Q.   Good afternoon, Lieutenant.  How are you this
15   afternoon?
16       A.   All right.  Thank you, sir.
17       Q.   Would you please state your name for the Court and
18   the record?
19       A.   Ashley Isaac.
20       Q.   And what is your profession or your occupation, sir?
21       A.   Deputy sheriff.
22       Q.   For Nueces County, Texas, sir?
23       A.   Yes, sir, Nueces County Sheriff's Office.
24       Q.   You and I have discussed your testimony before we
25   began today, have we not?

58                                                                                           60

1        THE COURT:  All right.
2        Q.   (BY MR. SKURKA) And so this is pretty much how the
3    set up was then, although, you did say there was another guard
4    in uniform outside the door, correct?
5        A.   Yes.
6        Q.   And I assume that's the one doing the metal detector
7    or searching people out there?
8        A.   I believe so, yes.
9        MR. SKURKA:  Okay.  I'll pass the witness,
10   Judge.
11       THE COURT:  Okay.  Anything else?
12       MR. WARNER:  May I just have a moment?
13       THE COURT:  Sure.
14       (Counsel conferring.)
15       MR. WARNER:  That will conclude my direct
16   examination of this witness.  I have no more questions of this
17   witness.  He can be excused.
18       THE COURT:  Can Mr. Garza be excused?
19       MR. SKURKA:  Yes, Your Honor.
20       THE COURT:  All right.  You're free to go.
21       MR. WARNER:  Thank you, Mr. Garza.
22       THE WITNESS:  Thank you, Your Honor.
23       THE COURT:  All right.  Call your next
24   witness.
25       MR. WARNER:  I call Lieutenant Isaac, please.

1        A.   Yes, sir.
2        Q.   At the instance of the counsel for the State, you
3    prepared some exhibits, did you not?
4        A.   Yes, sir.
5        MR. WARNER:  May I approach the witness, Your
6    Honor?
7        THE COURT:  You may.
8        MR. WARNER:  I'll move as joint exhibits, once
9    they've been properly identified and marked.
10       Q.   (BY MR. WARNER) The exhibits that you made to show
11   the -- you made some exhibits to show the judge where the
12   deputies were stationed at venire, voir dire, and trial, didn't
13   you?
14       A.   At the two, the central jury room and the trial, yes,
15   sir.
16       Q.   Okay.  And then in between the central jury room,
17   which we're gonna call the venire.
18       A.   Okay.
19       Q.   In between the central jury room and the trial,
20   there's another part where they just have one person in here at
21   a time.  Okay.  That's called the voir dire.  You've made a
22   chart for that, too, or we can look at one of your charts and
23   tell --
24       A.   Yes, sir.
25       Q.   -- where the deputies were stationed at each one of

61

1 those stages, can't we?

2    A.   Yeah, but I didn't make one for that.

3    Q.   Okay. Well, we can look one of the other charts and

4 tell, can't we?

5    A.   Okay. Yes, sir.

6    Q.   Do you have those charts with you?

7    Mr. Skurka has them.

8    Q.   All right.

9        MR. WARNER: May I have the witness stand down

10 to get the exhibits?

11        THE COURT: Sure.

12        MR. WARNER: Okay. May I approach the

13 witness?

14        THE COURT: Sure.

15        MR. WARNER: You have a big chart, don't you?

16        MR. SKURKA: I think he's got it over there.

17        MR. WARNER: Let's look at the big chart.

18 Please resume your place in the witness stand.

19        MR. SKURKA: Can we go ahead and mark that,

20 Mr. Warner.

21        MR. WARNER: Yes, let's mark it as a joint --

22 shall we mark all the exhibits at one time?

23        THE COURT: Yeah.

24        MR. SKURKA: I've already got that marked.

25        THE COURT: Did you move to admit this or --

62

1        MR. SKURKA: I think I did not because I

2 withdrew that argument.

3        THE COURT: Okay.

4        MR. SKURKA: This one can be marked as Exhibit

5 No. 4 and I've already marked them as State's Exhibit 4, so if

6 you don't mind, we can just leave that and just -- I don't

7 mind it being a joint exhibit.

8        MR. WARNER: Do we have a sticker on this one?

9        MR. SKURKA: No, we have it right there.

10        MR. WARNER: All right. Well, I will add to

11 this -- we'll call it D1 and State's 4. How about that? And

12 today is February 5th.

13    Q.   (BY MR. WARNER) Okay. Would you please take your

14 witness stand?

15    A.   Yes, sir.

16        THE COURT: Okay. Are you moving to admit it?

17        MR. WARNER: As soon as I've identified it.

18        THE COURT: Okay.

19        MR. WARNER: Put on some evidence.

20        THE COURT: I mean, if he's not going to

21 object, I mean, we might as well --

22        MR. WARNER: Move to admit as a joint exhibit

23 State's Exhibit No. 4 which is Defendant's Exhibit 1. Will it

24 be admitted?

25        THE COURT: Yes, it's admitted.

63

1    Q.   (BY MR. WARNER) Lieutenant, at the request of counsel

2 for the State, and after I talked to you about this before we

3 began today, you prepared State's Exhibit 4/Defendant's Exhibit

4 1, didn't you?

5    A.   Yes, sir, I had it prepared.

6    Q.   And the point of this exhibit is to show the judge

7 where the deputies were seated during the trial, right?

8    A.   Where the officers were seated, yes, sir.

9    Q.   Okay. So there were different kinds of officers.

10 There were sheriffs deputies and a constable?

11    A.   No, sir, there were correctional officers that work

12 for the sheriff's office. They're assigned to the jail

13 division.

14    Q.   Okay.

15        MR. WARNER: Your Honor, shall I have the

16 witness stand closer to you so you can see the exhibit?

17        THE COURT: Yeah, I'll -- it's okay. I'll

18 come down so I can see because it's kind of hard for me to

19 see. Okay. Go ahead.

20    Q.   (BY MR. WARNER) Okay. Would you please point out for

21 the judge where the defendant was seated?

22    A.   The defendant was right here (indicating).

23    Q.   Okay. You've marked "defendant" there, right?

24    A.   Yes, sir.

25    Q.   And will you please point out where the lawyers were

64

1 seated?

2    A.   Defense, defense.

3    Q.   And please point out where the State's lawyer is

4 seated.

5    A.   Almost --

6        MR. WARNER: May I invite counsel for the

7 State to look at the exhibit while we're putting on the

8 testimony?

9        MR. SKURKA: I'm fine.

10    Q.   (BY MR. WARNER) There was a plain clothes bailiff,

11 wasn't there?

12    A.   Yes, sir.

13    Q.   And where was he seated?

14    A.   Here (indicating).

15    Q.   Okay. There was one -- you're pointing to one --

16    A.   That's the bailiff of the 94th.

17    Q.   You're pointing to the bailiff?

18    A.   Yes, sir.

19    Q.   And behind the bailiff there's a plain clothes

20 security; is that right?

21    A.   Yes, sir.

22    Q.   How far away is the plain clothes security from the

23 bailiff would you say?

24    A.   I'd probably say probably two feet.

25    Q.   Okay. Let's also identify -- you've marked bench, is

65

1   that where the judge was seated?

2   A.   Yes, sir.

3   Q.   You've marked where the court reporter was seated?

4   A.   Yes, sir.

5   Q.   And you've marked the witness chair where you're

6   seated now?

7   A.   Yes, sir.

8   Q.   And you've marked where the jurors were?

9   A.   Yes, sir.

10  Q.   Okay.  Now, right here at the bar between the general

11  audience and at counsel table, you've marked another plain

12  clothes security; is that true?

13  A.   Yes, sir.

14  Q.   Okay.  Could you say whether --

15       MR. WARNER:  May I have the witness stand

16  down, Your Honor?

17       THE COURT:  Sure.

18       MR. WARNER:  Would you come over here a

19  minute.  Come over here with this chart.

20  Q.   (BY MR. WARNER) And wouldn't you agree with me that

21  on your chart you have marked this plain clothes security chair

22  as being right here inside or right at the bar?

23  A.   Yes, sir.

24  Q.   Wouldn't you say?

25  A.   Yes, sir.

66

1   Q.   All right.  Now today, we have this individual who is

2   seated in this chair and he's right outside the bar.  Okay.

3   Where was the -- on your chart you've marked him as being right

4   inside right at the bar?

5   A.   Yes, sir, he was right here (pointing).

6        MR. WARNER:  May the record reflect that the

7   witness has pointed out when he says "right here" he's

8   pointing out in a line that's in line with the bar.  May the

9   record so reflect?

10       THE COURT:  It will so reflect.

11       MR. WARNER:  Please resume the stand.

12  Q.   (BY MR. WARNER) Now, you marked, for the judge's

13  benefit, you've marked here in the courtroom, this is at trial,

14  right?  State's 4 and Defendant's 1 is at trial?

15  A.   Yes, sir.

16  Q.   You've marked the audience.  That's where the people

17  are in the general gallery right now, right?

18  A.   Yes, sir.

19  Q.   And then there was another guard stationed at the

20  security station right at the door?

21  A.   Yes, sir.

22  Q.   And that person was in uniform; isn't that true?

23  A.   Yes, sir.

24  Q.   Then outside the door to the courtroom the one that

25  we found was -- I'll just tell you, other witnesses testified

67

1   that the door is 25 feet away from the defendant.  Outside that

2   door there's another uniformed security guard; isn't that true?

3   A.   Yes, sir.

4   Q.   Now, there was a metal detector outside the door of

5   the courtroom during the trial; isn't that true?

6   A.   Yes, sir.

7   Q.   The members of the audience had to go through the

8   metal detector to get into the courtroom during the trial?

9   A.   Yes, sir.

10  Q.   Is that true?

11  A.   Yes, sir.

12  Q.   I don't know so, just tell us, did the jurors have to

13  go through the metal detector to get in the courtroom?

14  A.   No, sir.

15  Q.   Okay.  The set up here on this chart, State's 4, was

16  it any different in voir dire?  Did you make a different chart

17  for voir dire?

18  A.   That would be the individual?

19  Q.   Yes.

20  A.   No, sir.

21  Q.   Same chart.  Would this chart, State's 4/Defendant's

22  1, would it accurately represent where people were seated for

23  the individual voir dire?

24  A.   I don't know because at the individual voir dire I

25  believe the bailiff had more control of that.  He would

68

1   remember more than I did on that.

2   Q.   All right.  When was the metal detector -- okay.

3   When was the metal detector set up?  Was it set up --

4   A.   The first day of trial.

5   Q.   Was it set up for voir dire?

6   A.   No, sir.  I don't believe, no.

7   Q.   Okay.  Well, now, wait.  It's okay.  You can say

8   whatever is true.  But you qualified your answer and you said,

9   "I don't know."  So it's okay if you don't know but --

10  A.   It was just at trial.

11  Q.   We need to know.

12  A.   No, it wasn't set up for individual voir dire.

13  Q.   Okay.

14       THE COURT:  But when you say "trial," are you

15  talking about once we stared opening statements and were

16  calling witnesses, or do you mean the individual jury

17  selection?

18       THE WITNESS:  When you were calling -- the

19  first day of trial when the audience -- the jurors were here.

20       THE COURT:  When the juror's fully seated.

21       THE WITNESS:  Right, and people were allowed

22  to come into the courtroom.  That's when the metal detector

23  was set up.

24       MR. WARNER:  Thank you, Your Honor.

25  Q.   (BY MR. WARNER) So are there any changes that you

69

1    need to make to State's 4/Defendant's 1 which shows us where
2    people were seated at the trial, was there anything different
3    for the individual voir dire where they talked to the people
4    one at a time who might be on the jury?
5    A.    I don't know.
6    Q.    Okay. It's okay to say "I don't know" if you can't
7    remember. But you told us there was not a metal detector
8    during voir dire?
9    A.    Right.
10   Q.    Are you pretty sure about that? Who is in charge of
11   the metal detector?
12   A.    I would have been in charge of setting it up and I
13   don't remember one set up for the individual voir dire.
14   Q.    Do you keep records of that?
15   A.    No, sir.
16   Q.    Okay. Could there have been a metal detector at the
17   voir dire?
18   A.    No, sir, there was not one.
19   Q.    Okay. All right, sir.
20         MR. WARNER: May I resume my seat at counsel
21   table?
22         THE COURT: Yes.
23         MR. WARNER: We'd move admission into evidence
24   of State's 4/Defendant's 1. I might need this for further
25   examination of the witness.

70

1          THE COURT: It's already admitted.
2          MR. WARNER: When I pass the witness I'll hand
3    it to counsel for the State.
4          THE COURT: Okay.
5          MR. WARNER: If I can just look at my notes
6    for a moment?
7          THE COURT: Sure.
8    Q.    (BY MR. WARNER) Okay. Now let's go to the central
9    jury room. I notice you have some notes there in front of you.
10   Did you make those notes --
11   A.    No, sir.
12   Q.    -- to prepare? Do you have your subpoena there or --
13   A.    No, sir.
14   Q.    What are you looking at there?
15   A.    This was given to me by Mr. Skurka. It's a question
16   about the central jury room.
17   Q.    Okay. Well, we'll get to that in a moment. Okay.
18   Let's go downstairs to the central jury room. We're gonna call
19   that the venire panel. That's where the 200 people came. Were
20   you -- you were in charge of security there, weren't you?
21   A.    Yes, sir.
22   Q.    Okay. So how many deputies did you have at the
23   central jury room?
24   A.    It was approximately seven.
25         MR. WARNER: Judge, I'm gonna come back to the

71

1    trial in just a moment, but let me finish this part first.
2          THE COURT: Okay.
3    Q.    (BY MR. WARNER) Okay. So we're at the central jury
4    room?
5    A.    Yes, sir.
6    Q.    And how long were the proceedings at the venire panel
7    in the central jury room? How long did they last, one day or
8    more than one day?
9    A.    I believe it was a day, a day and a half.
10   Q.    Were your -- well, you have to -- you have to pay
11   those people, don't you? I mean, they're not volunteers,
12   right?
13   A.    Right; yes, sir.
14   Q.    So you keep records of how many of them there are,
15   right?
16   A.    Yes, sir.
17   Q.    And every year your sheriff has to go to the
18   commissioners and get money for deputies and they find out how
19   many you've got and what they're doing, right?
20   A.    Yes, sir.
21   Q.    Okay. So you've got seven deputies. Were they in
22   uniform?
23   A.    Yes, sir.
24   Q.    And were they armed?
25   A.    Yes, sir.

72

1    Q.    How were they armed?
2    A.    With their regular uniform with the weapon.
3    Q.    Okay. When you say "weapon" you were pointing --
4    A.    The handgun.
5    Q.    You were moving toward your side you were grasping
6    your --
7    A.    Handgun.
8    Q.    -- handgun. What sort of handgun is it, 45?
9    A.    .357.
10   Q.    Okay. And each one of those deputies was in uniform
11   and each one had a side arm, a .357?
12   A.    Yes, sir.
13   Q.    Are those in a covered holster or they are an open
14   holster?
15   A.    They're open with a snap.
16   Q.    So the members of the voir dire panel could have seen
17   those a distance, couldn't they?
18   A.    Yes, sir.
19   Q.    Okay. Now, there was some discussion about someone
20   with an AR-15, one of your deputies. Did one of your deputies
21   have an AR-15?
22   A.    Yes, sir.
23   Q.    Could you tell the judge what an AR-15 is, please?
24   A.    It's semi-automatic rifle.
25   Q.    It's -- if you pull the trigger, it keeps on firing

73

1    till you run out of bullets; is that right?
2        A.    I think so; yes, sir.
3        Q.    So it's like a machine gun?
4        A.    No, not like a machine gun.  That's --
5        Q.    If you pull the trigger it keeps firing until you run
6    out of bullets?
7        A.    Right, yes, sir.
8        Q.    On the barrell --
9              THE COURT:  You have to keep pulling the
10   trigger?
11             THE WITNESS:  Yes, sir.
12             THE COURT:  It's not fully automatic.
13       Q.    (BY MR. WARNER)  It's semi-automatic?
14       A.    Yes, sir.
15       Q.    Each time you pull the trigger it fires?
16       A.    Yes, sir.
17       Q.    Okay.  So it fires and it reloads and that's how come
18   it's semi-automatic?
19       A.    Yes, sir.
20       Q.    Okay.  Do you see the deputy in the courtroom who had
21   the AR-15?
22       A.    Yes, sir.
23       Q.    Could you point him out, please?
24       A.    Deputy Ernest Moreno.
25       Q.    What's his last name?

74

1        A.    Moreno.
2        Q.    Moreno.  Okay.  Short vowel.
3              Did the members -- this is important.  You've
4    got to say what you remember.  Were you present during the
5    venire?
6        A.    Yes, sir.
7        Q.    Okay.  Did the members of the venire panel see Deputy
8    Moreno with the AR-15 or not?
9        A.    No, sir.
10       Q.    Okay.  How do you know that?
11       A.    Because I was there.
12       Q.    Okay.  Did you supervise Deputy Moreno all the time?
13       A.    Yes, sir.
14       Q.    Okay.  Going to the -- did you make a chart for the
15   venire panel, the central jury room; did you make a separate
16   chart for that?
17       A.    Yes, sir, there's a --
18       Q.    Okay.
19       A.    Yeah.
20             MR. WARNER:  I wonder if I could have that
21   exhibit, please.
22             MR. SKURKA:  I don't know which one he's
23   talking about.  You have to tell me.
24             MR. WARNER:  Okay.  The central jury room
25   chart.

75

1              MR. SKURKA:  No, I know that, but I'm just
2    saying there's no chart that looks like that one.
3              THE WITNESS:  Not like that one.  It's just a
4    diagram.
5        Q.    (BY MR. WARNER)  Do you have a diagram for the central
6    jury room?
7        A.    Yes, sir.
8              MR. SKURKA:  Why don't you ask him if it's
9    these because there's not one of just the jury room.
10             MR. WARNER:  Thank you.
11             May I approach the witness, Your Honor?
12             THE COURT:  Sure.
13       Q.    (BY MR. WARNER)  Please look at Exhibits 5, 6 and 7,
14   and tell me if any of those represents the central jury room.
15       A.    6 and 7.
16       Q.    6 and 7 represent the central jury room?
17       A.    Yes, sir.
18       Q.    Okay.  Could you please show us -- remember now, the
19   judge is gonna have to look at this.  Could you please -- I'm
20   gonna mark on this.  I'm gonna mark State's 7 as Defendant's
21   Exhibit No. 2 and State's 6 as Defendant's Exhibit 3.
22             Okay.  Could you please mark on State's
23   1/Defendant's Exhibit No. 2, could you show us by putting
24   numbers 1 through 7 where each deputy was, please?
25       A.    (Witness complies.)

76

1              MR. WARNER:  May I show this exhibit to
2    counsel for the State?
3              THE COURT:  Okay.
4              MR. SKURKA:  No objection, Your Honor.  Are
5    you offering it?
6              MR. WARNER:  I move admission into evidence of
7    Defendant's Exhibit No. 2/State's Exhibit No. 7.
8              MR. SKURKA:  No objection.
9              THE COURT:  It's admitted.
10             MR. WARNER:  May I question the witness from
11   this exhibit?
12             THE COURT:  Sure.
13             MR. WARNER:  But before I do that -- may I
14   say, Your Honor, it would be necessary --
15             THE COURT:  I might need to see this, right?
16             MR. WARNER:  It would be necessary for me to
17   amend -- well, I may have to withdraw some of my pleadings on
18   the motion for new trial because I haven't completely done and
19   completed every investigation before we got to the hearing.
20   So I wasn't positive where everybody was until I talked to all
21   the witnesses.
22             THE COURT:  Okay.
23       Q.    (BY MR. WARNER)  Okay.  So looking at State's Exhibit
24   7/Defendant's Exhibit No. 2, you've -- you've shown us numbers
25   1 through 7 of where the deputies were; is that right?

77

1    A.   Yes, sir.

2    Q.   And where did the jurors come from?

3    A.   They would have come in through the outside.  This

4  would be the main entrance.

5    Q.   Can you draw an arrow or something to show where they

6  would come?

7    A.   Yes, sir.  And then we had deputies here taking the

8  -- helping and there were these two lines to help get the jury

9  summons and detach them, and they'd come into the courtroom.

10    Q.   Okay.  Can you finish the line?

11    A.   Yes, sir.

12    Q.   So you've got two lines of people coming by deputies

13  No. 5, 6, 7 and 4?

14    A.   Yes, sir.

15    Q.   Is that right?

16    A.   Yes, sir.

17    Q.   And then, do you want to finish the line where they

18  come into the jury -- in the central jury room?

19    A.   (Witness complies.)  Then they would take their seats

20  and you'd have here, here, here and here.

21    Q.   Okay.  Could you put a big D where John Henry Ramirez

22  was seated?

23    A.   (Witness complies.)

24    Q.   Could you put defense where the lawyer was seated?

25    A.   (Witness complies.)

78

1    Q.   Okay.  Could you show the judge where the prosecutor

2  was seated?  Draw on there -- just put prosecutor, P-R-O, where

3  the prosecutor was seated in the courtroom, in the central jury

4  room.

5    A.   I don't recall where they were.

6    Q.   That's fine.  If you can't recall, that's perfectly

7  okay.

8        All right.  So, to reiterate, the members of

9  the venire panel, the ones who came through the central jury

10  room had to pass by Deputies No. 3, 5, 6, 7 and 4 to get into

11  the central jury room and there were two deputies in the

12  central jury room, Deputies No. 1 and 2; is that right?

13    A.   Yes, sir.

14    Q.   And I believe you said all those deputies were

15  uniformed deputies?

16    A.   Yes, sir.

17    Q.   And they all had side arms?

18    A.   Yes, sir.

19    Q.   And where was Deputy Moreno, the one with the AR-15?

20    A.   Deputy Moreno was -- well, the AR-15 he didn't have

21  only in the mornings.  He was not --

22    Q.   It's fine.  That's right.

23    A.   He didn't have it.

24    Q.   Tell us what really happened.  Pardon me?

25    A.   Deputy Moreno was ultimately here and on the inside.

79

1    Q.   So he's alternating between position 6 and 4?

2    A.   Yes, sir.  He would come in and he would go out.  He

3  would always be going in and out.  If somebody needed to go out

4  he would let them in.

5    Q.   Well, when was it that he had this AR-15?

6    A.   On capital murder trials we have to bring the

7  defendant from the jail outside the facility in the mornings

8  like it was about 7:15, 7:20 when they have him ready early in

9  the morning.  And when we brought him outside the facility in

10  the units, our warrant units, we came around to Leopard Street

11  and then came down to the -- there's a side street that we turn

12  on that leads to the underground parking, the parking garage.

13    Q.   Okay.

14    A.   Okay.  Now, in that area that's outside, there's a

15  chance anything can happen, so for security purposes, any

16  number of different security reasons he had his AR-15 and he

17  transported, and then we brought him in and then under the

18  garage, he had his AR-15.  When we got into the courtroom to

19  clear the courtroom to make sure nobody was in there, and also

20  to watch, as we were coming in, so nobody could come in from

21  the back.  So -- and then after getting him over here that's

22  when --

23    Q.   When you say "over here" you're pointing to the --

24    A.   To the defendant, yes.

25    Q.   To the same position --

80

1    A.   Right.

2    Q.   And you're diagramming State's Exhibit 7/Defendant's

3  Exhibit 2?

4    A.   Yes.  And nobody was in that courtroom but the

5  deputies, okay, and maybe Ann Lorentzen, the people there that

6  were there early to get the courtroom ready.  But at no time

7  did anybody see him, so that's when after that, I made him put

8  it up and then he came back into -- put up the AR-15.

9    Q.   When you say "anybody," do you mean members of the

10  venire panel?

11    A.   Nobody of the venire panel was there yet.

12    Q.   All right.  And you say "put it up."  Where did he --

13    A.   Well, he took it back and put it in the unit outside

14  in the parked garage.

15    Q.   Okay.

16    A.   Yes, sir.

17        THE COURT:  This parking garage is enclosed so

18  you can't see it from the outside?

19        THE WITNESS:  Right, yes, sir.  And as the

20  photos would indicate that we took that Mr. Skurka has, it

21  shows it.  He had us take pictures.  Nobody could see inside

22  there.

23        THE COURT:  And there are glass doors here?

24        THE WITNESS:  Yes, sir, and --

25        THE COURT:  But they are blacked out --

81

```
1              THE WITNESS: Yes, sir.
2              THE COURT: -- are they not?
3              THE WITNESS: Yes, sir, they are, Your Honor.
4     Q.     (BY MR. WARNER) So when the judge was saying "here"
5  he was pointing to the --
6     A.     -- entrance.
7     Q.     -- to the glass doors at the side of the entranceway
8  to the central jury room near position 4?
9     A.     Yes.  This is the entrance.
10    Q.     Yes.
11    A.     The main entrance.
12             MR. WARNER: Okay.  All right.  I'll leave it
13  to the State whether the State wants to use State's Exhibit
14  No. 6.  I think I've made my point with Defendant's Exhibit
15  No. 2, and we move that into evidence, and I believe it was
16  admitted; is that right?
17             MR. SKURKA: No, I have no objection.
18             THE COURT: I don't recall if I admitted it,
19  but if I haven't, it's admitted now.
20             MR. WARNER: Very well.
21             MR. SKURKA: I don't have any objection to all
22  three of those, but you're only introducing two of them?
23             MR. WARNER: I'm only asking to be admitted
24  and the Court has admitted Defendant's Exhibit No. 2.
25             THE COURT: Okay.
```

82

```
1              MR. WARNER: I think I've made the point
2  clear.
3              May I have just a moment to look at my notes,
4  Your Honor?
5              THE COURT: Sure.
6              MR. WARNER: May I hand the Court the two
7  exhibits that have been admitted into evidence, Defendant's 1
8  and 2 which are State's 4 — I think it's a 4.  It's Defendant
9  1.  I think it's State's 4.
10             May I hand these to the Court?
11             THE COURT: Sure.
12             MR. WARNER: I will pass this witness, Your
13  Honor.
14             THE COURT: Cross.
15             MR. SKURKA: Yes, Your Honor.
16             CROSS-EXAMINATION
17  BY MR. SKURKA:
18    Q.     Mr. Isaac, tell us what, if any, security concerns
19  did you or your department have in providing security for the
20  case of John Henry Ramirez?  That's a very broad question but I
21  just want you to start as what your plan and why you had it
22  planned that way.
23    A.     Yes, sir.  The security plans were two prong:
24  Potential threats of harm from the defendant, potential threats
25  and harm to the defendant and you had to balance those two
```

83

```
1  because of just the nature of the crime itself, what happened,
2  the victim's family, the defendant's family.  And on capital
3  murder trials because it's just a highly emotional on both
4  sides.  So we have a security concerns also for the court
5  staff, the attorneys, for the general area inside and outside
6  the courtroom.
7     Q.     Do you have that on every capital murder case, do you
8  usually have heightened security?
9     A.     Yes, sir, we do.
10    Q.     And have you participated and helped supervise
11  security in other high profile or capital murder cases?
12    A.     Yes, sir, I have.
13    Q.     This wasn't your first case, correct?
14    A.     No, sir.
15    Q.     So I'm gonna talk to you about some of the procedures
16  you've done in the past and ask you specifically what was done
17  in this case, okay?
18    A.     Yes, sir.
19    Q.     Now, just to start off with, you said that one of the
20  initial things you have to do is bring the defendant into the
21  courthouse from a different entrance that prisoners usually are
22  brought over to court?
23    A.     Yes, sir.
24    Q.     Okay.  Can you tell us, generally speaking in Nueces
25  County, how prisoners are brought to the courtroom in a usual
```

84

```
1  case?
2     A.     In a usual case, the prisoners are brought over
3  through the basement up the elevator to the prospective courts.
4     Q.     Is that a secured way to go?
5     A.     Yes, sir.
6     Q.     Why?
7     A.     Because you have -- you have the tunnel, you have --
8  it's secure, and then you have the transport team bringing them
9  over taking them up to the courts, and that's the -- that's the
10  way we do it.
11    Q.     Okay.  Do you have to have extra security by and
12  large for that type of system, because I guess for lack of a
13  better word, it's a closed system within the building?
14    A.     Yes, sir.  And transport would have additional
15  officers bring up the inmates over.
16    Q.     I understand.  In this case, because of John Henry
17  Ramirez, was the courtroom the usual courtroom in the tower of
18  courthouse?
19    A.     No, sir, it was not the usual courtroom.
20    Q.     And I'm talking about the venire, the initial day
21  when they had everybody coming in.  Isn't it fair to say that
22  it was different that you had to take the prisoner to the
23  central jury room?
24    A.     Yes, sir, it was a different way we had to bring him.
25    Q.     In other words, in -- why do you have to bring him
```

85

1  that way?

2      A.   Because if we brought him down through the tunnel,

3  the only way to get to the central jury room would be down the

4  main hallway on the first floor, across the information, the

5  hallway where everybody would see him, and thereby would

6  prejudice the jury.  So to be fair to the defendant, we have to

7  do it another way.

8      Q.   Okay.  So you -- if you would have taken him through

9  the building, he would have gone right through the pool of

10  jurors that were waiting to go in?

11     A.   Yes, sir, that is correct.

12     Q.   So you took him a different way, did you not?

13     A.   Yes, sir, that is correct.

14     Q.   Now, we've already got a diagram that you've

15  identified earlier and I'm gonna put it up here on the screen,

16  it's State's Exhibit No. 6, and I think Mr. Warner has

17  identified it as State's Exhibit -- I'm sorry, Defendant's

18  Exhibit 3.

19          THE COURT:  Mr. Skurka.

20          MR. SKURKA:  Yes, Your Honor?

21          THE COURT:  -- there's something I want to

22  clarify and it's going to back a little bit.  It's not really

23  on this issue.

24          Now, you mentioned earlier that there was --

25  the purpose of the security was to -- was to protect the

86

1  defendant from the gallery, to protect the staff, to protect,

2  I guess, the gallery from the defendant.  But, isn't it true

3  that at some point during the trial, tensions from the

4  victim's family and the defendant's family heightened?

5          THE WITNESS:  Yes, sir, it did.  On the first

6  day we had an incident.

7          THE COURT:  Okay.

8          THE WITNESS:  And may I go back to the --

9  another thing is the defendant was four years on the run.  And

10  I do also work with the U.S. Marshals.  We have a U. S.

11  Marshals Task Force that we participate in.  So, on a regular

12  basis, the U. S. Marshals would keep me informed of that they

13  believed the subject was in Mexico and that he was --

14          MR. WARNER:  Excuse me, I beg your pardon.

15  That's outside the record.  It's hearsay.  I object to it as

16  hearsay.  Please don't consider for any purpose.

17          THE COURT:  Well, I'm gonna overrule that

18  because, while it may be hearsay, it's important because it is

19  something that he considered in putting together the security

20  that he did, and it's not for the truth of the matter

21  asserted, but rather, for the security and what -- why he did

22  what he did.

23          MR. WARNER:  I understand the Court's ruling,

24  but I think that the witness probably accepted that as true,

25  and so, I'll ask -- I understand your ruling, but I'll ask you

87

1  not to consider it for any purpose whatsoever in your

2  deliberations on the motion for new trial or on the bills of

3  exception.

4          THE COURT:  Well, I mean, I'm gonna overrule

5  your objection.

6          MR. WARNER:  I understand, Your Honor.

7          THE COURT:  And he can --

8          MR. WARNER:  That's fine.

9          THE COURT:  You can make the pitch on closing

10  arguments.

11          MR. WARNER:  Very well.

12          THE COURT:  All right.

13     A.   So there was another threat that gang affiliations

14  would come --

15          MR. WARNER:  Now that's not responsive at all.

16     A.   -- and possibly --

17          MR. WARNER:  That's not responsive to the

18  question.  I object.  I object it's not responsive.

19          THE COURT:  All right.  What I want to know

20  is --

21          MR. WARNER:  Well, would you please note my

22  objection that it's not responsive?

23          THE COURT:  Well, okay, it's nonresponsive.

24  But I'm gonna ask another question.  And what I want to know

25  is --

88

1          MR. WARNER:  Okay.  Well --

2          THE COURT:  What I want to know is -

3          MR. WARNER:  If you're sustaining my objection

4  -- pardon, Your Honor, --

5          THE COURT:  I'm sustaining your objection.

6          MR. WARNER:  Okay.  Then I ask you please not

7  consider it for any purpose whatsoever in your deliberations

8  on our motion for new trial and the bill of exception because

9  it's not responsive.

10          THE COURT:  I will do that.  But, once again,

11  I want to ask you another question, and that is, what -- what

12  information did you get to -- that caused you to put together

13  the security that you did?

14          THE WITNESS:  The information was that the

15  cartel was hiding him in Mexico

16          MR. WARNER:  Pardon me, Your Honor.

17          THE WITNESS:  -- and that --

18          MR. WARNER:  Excuse me.  I beg your pardon.  I

19  object that's hearsay.

20          THE COURT:  Overruled.

21          MR. WARNER:  Okay.

22          THE COURT:  You may continue.

23          MR. WARNER:  I know that you have to decide

24  the motion for new trial, but more usually, the prosecutor

25  would inquire into those areas and I doubt he's familiar with

1  those matters.

2          THE COURT: Well, maybe so, but I asked the

3  question. There's nothing improper about what I've asked and

4  so --

5          MR. WARNER: I'm not suggesting that. It's

6  just -- it is an adversarial system. It's not an

7  inquisitorial system.

8          THE COURT: Well, except this is a motion for

9  new trial.

10          MR. WARNER: That's true, it is.

11          THE COURT: And I want to make the record

12  clear about all this because some of this I'm not privy to,

13  okay? So I need to know. This is a decision that I'm here to

14  make and I want to make an informed decision about these

15  facts.

16          MR. WARNER: I want you too as well, Your

17  Honor. I just suggest that State's counsel, with all his

18  resources can as easily inquire into that as you can.

19          THE COURT: So noted. Answer the question.

20          THE WITNESS: Okay. Your Honor, could I

21  please have it again?

22          THE COURT: Well, I mean, what -- what did you

23  use -- what information did you have, and as a result, what

24  did you do? In other words, what went into your assessment

25  for your security plan?

1          THE WITNESS: That in moving him from the

2  building that there was -- that we protect, also to try to

3  avoid an escape or someone coming to overpower us to free him

4  that was outside -- from the outside of the cartel that he was

5  involved with. So those were the main --

6          MR. WARNER: That's hearsay again. You

7  sustained my objection to his references to the cartel. I

8  object to his references to the cartel because it's hearsay.

9          THE COURT: Okay. It's hearsay but it's not

10  for the truth of the matter, I believe. So I'm not going to

11  consider it for the truth of the matter asserted, okay?

12          THE WITNESS: And in addition was the fact

13  that he fled and was gone for four years, so he was a flight

14  risk.

15          THE COURT: Okay.

16          THE WITNESS: An escape risk.

17          MR. WARNER: May I take this witness on voir

18  dire and see how he knows that?

19          THE COURT: Sure.

20          MR. WARNER: Now as an adverse witness, if you

21  please.

22          VOIR DIRE EXAMINATION

23  BY MR. WARNER:

24      Q.   You don't have any personal knowledge of this

25  happening, do you?

1      A.   No, sir.

2          MR. WARNER: I'll ask the Court to disregard

3  the last comment about having fled. The witness doesn't have

4  any personal knowledge.

5          THE COURT: Well, I mean, the Court heard a

6  lot of evidence in the trial about him having fled so.

7          MR. WARNER: I see.

8          THE COURT: I mean --

9          MR. WARNER: I'm sure counsel for the State

10  can produce that if he wishes to.

11          THE COURT: Well, I mean, it's already been

12  developed at the trial itself so it's before the Court.

13          All right. Anything else?

14          MR. WARNER: Nothing else on voir dire of this

15  witness, Your Honor.

16          THE COURT: All right.

17          MR. SKURKA: Shall I go ahead, Judge?

18          THE COURT: Okay. Go ahead.

19          CROSS-EXAMINATION (Continued)

20  BY MR. WARNER:

21      Q.   Lieutenant Isaac, isn't it true that in coming up

22  with a security plan, you have to consider all the information

23  you know about the defendant?

24      A.   Yes, sir, that is correct.

25      Q.   Isn't it also true that any time you have a prisoner

1  go outside the actual jail, that would call for an extra heavy

2  security measures, correct?

3      A.   Yes, sir.

4      Q.   In this case, did you have to take John Henry Ramirez

5  outside of the jail in order to get him to the courtroom that

6  the judge was gonna hear the venire at?

7      A.   Yes, sir, we did.

8      Q.   And did that cause concern for you?

9      A.   A lot of concern.

10      Q.   Is that why you had the extra security, including the

11  officer with the AR-15?

12      A.   Yes, sir.

13      Q.   Isn't it true that when the officer -- they had to

14  transport him from the jail to the entrance to the venire room,

15  that route is in the open?

16      A.   Yes, sir, it is.

17      Q.   Did that cause you concern?

18      A.   Yes, sir, it did.

19      Q.   Did you take extra precautions because of that?

20      A.   Yes, sir, we did.

21      Q.   When you went into -- when -- and would it be fair to

22  say, too, that another reason for your security concerns was

23  other information you had received from other law enforcement

24  agencies, the U. S. Marshals's office, or the nature of the

25  case itself?

93

1    A.   Yes, sir, all of those.

2    Q.   Isn't it true that you were aware that the U. S.

3 Marshals were looking for him?

4    A.   Yes, sir, that's correct.

5    Q.   Isn't it true that you -- to your knowledge, the

6 defendant had fled the jurisdiction for about four years?

7    A.   Yes, sir, that is correct.

8    Q.   Is it true -- were you aware that during the night of

9 this incident that he had fled and led the police on a

10 high-speed chase where a van had been abandoned over by the

11 port and he had escaped from the police?

12   A.   Yes, sir.

13   Q.   So all those factors were factors that you used in

14 considering your plan for security, correct?

15   A.   Yes, sir, that is correct.

16   Q.   And so you said a minute ago that he was a flight

17 risk?

18   A.   Yes, sir.

19   Q.   And you also said he was an escape risk?

20   A.   Yes, sir.

21   Q.   Did you take that escape risk pretty seriously?

22   A.   Yes, sir, I did.

23   Q.   So when you went in to take him over to the venire

24 room from the courthouse, I've got this diagram up here marked

25 State's Exhibit 6 and Defendant's Exhibit 3.  Does that show

94

1 that area where the jury is waiting, which I believe is the

2 atrium, correct?

3    A.   Yes, sir.

4    Q.   You called it where the information booth is and

5 stuff, but the atrium is where the jurors had to wait before

6 the -- coming into the central jury room, correct?

7    A.   Yes, sir, that's correct.

8    Q.   And this part here is the central jury room, correct?

9    A.   Yes, sir.

10   Q.   And this part out here shows the parking garage?

11   A.   Yes, sir.

12   Q.   And I believe down at the bottom of the diagram,

13 would that be what street?

14   A.   I believe that's Tancahua.

15   Q.   Okay.  Now, I'm gonna --

16        MR. SKURKA:  May I approach, Your Honor?

17        THE COURT:  Sure.

18   Q.   (BY MR. SKURKA) Now, I just want you to simply draw

19 the route where you came from from outside the building through

20 the parking garage to the door that you brought him into the

21 central jury room, please.  Draw the route, and you know, maybe

22 like an arrow to the door where you take him in from the

23 outside entrance into the venire room.

24   A.   (Witness complies.)

25   Q.   Okay.  Where it says atrium, would you put jurors

95

1 waiting --

2    A.   Yes, sir.

3    Q.   -- to show the area where the jurors are at?

4    A.   Yes, sir.  (Witness complies.)

5    Q.   And then, on that diagram, would you label the part

6 where they have the double glass doors with the main entrance

7 in the central jury room are and just put maybe a line to it

8 that says main entrance into the central jury room.

9    A.   (Witness complies.)

10   Q.   And then this door here was used to have him come

11 into the actual jury room, correct?

12   A.   Yes, sir.

13   Q.   I want you to put a little line off that and put

14 entrance used for defendant.

15   A.   (Witness complies.)

16   Q.   All right.  You've drawn an arrow to that?

17   A.   Yes, sir.

18   Q.   Or a line to that?

19   A.   It's an arrow.

20   Q.   It's an arrow.  Okay.  Now that you've made these

21 markings I'd like to again publish it on the screen.  This

22 would be the central jury room here, correct?

23   A.   Yes, sir.

24   Q.   This would be the main entrance to the central jury

25 room, correct?

96

1    A.   Yes, sir.

2    Q.   This atrium would be where the jurors were milling

3 around before they were called into the central jury room,

4 correct?

5    A.   Yes, sir.

6    Q.   This is where we started at.  You call it the sally

7 port.  And for somebody who may not know what that is, that's

8 the part of the jail where you come in and out with vehicles,

9 correct?

10   A.   Yes, sir, intake.

11   Q.   Police cars, paddywagon, stuff like that?

12   A.   Yes, sir, and when you want to unload and pick up

13 prisoners.

14   Q.   That's a secured area, though, correct, inside or

15 outside of the jail?

16   A.   Inside.

17   Q.   Inside.  So you load them up inside the jail,

18 correct?

19   A.   Yes, sir.

20   Q.   And then when you took this path, this is outside the

21 -- outside the jail, correct?

22   A.   Yes, sir.

23   Q.   This dotted line until it came into here.  What's

24 right here?

25   A.   That's --

97

1    Q.    Going into the parking garage?

2    A.    That's a gated area where the -- to get in for judges

3  and people who park in the underground.

4    Q.    Can you go ahead and write in gate?

5    A.    Yes, sir.

6    Q.    For somebody who may not be aware, what's done in

7  Nueces County, there's a gate to an underground parking garage

8  where the judges and other public officials park, correct?

9    A.    Yes, sir.

10    Q.    Can anybody get into that gate?

11    A.    No, sir.

12    Q.    Do you have to have, what do you call it, a swipe

13  card?

14    A.    A swipe card, yes, sir.

15    Q.    So is that a pretty secured area?

16    A.    Yes, sir, it is.

17    Q.    So after being outside on the street from the sally

18  port, your officers took him into the covered parking area

19  through this gate, correct?

20    A.    Yes, sir.

21    Q.    Was there any jurors around this area in the parking

22  garage?

23    A.    No, sir.

24    Q.    They were all out here, weren't they, at the atrium?

25    A.    They weren't there when we came.

98

1    Q.    I understand that.

2    A.    Yes.

3    Q.    But no jurors could go through this gate, correct?

4    A.    No, sir.

5    Q.    And so you came back in here and then following your

6  dotted line, you came in this room.  What is this area here?

7    A.    That's a maintenance area where they have coolers and

8  different mechanical equipment is kept there.

9    Q.    So that's not open to the public, is it?

10    A.    No, sir, it's not.

11    Q.    And you took him into this door here, correct?

12    A.    Yes, sir.

13    Q.    And then in through this door is the actual entrance

14  door into the central jury room?

15    A.    Yes, sir.

16    Q.    At any time, could any jurors see him going along

17  this route to where he finally came in the central jury room?

18    A.    No, sir.

19         THE COURT:  Now, Lieutenant, on the side there

20  it shows -- if you move it over a little bit, Mr. Skurka.

21         MR. SKURKA:  Left or right, Judge.

22         THE COURT:  Yeah, that way.

23         It shows that you're going right -- that's not

24  exactly right on the side there, right?  You're actually going

25  out on to Leopard.

99

1         THE WITNESS:  Well, yes, sir.  We -- we come

2  down out of the sally port, I believe that's Mestina Street,

3  and then we turn left on the side of Braslau's.  Then we come

4  down Leopard for about a block, then we swing into the side of

5  the CCISD, then we turn right into the -- into the parking

6  garage, the gated entrance.

7         THE COURT:  And that's the point where the

8  little card is?

9         THE WITNESS:  Yes, sir, that would be, I

10  think, the -- there's a little where you have to swipe your

11  card, I think that's what that is.

12         THE COURT:  Okay.

13    Q.    (BY MR. SKURKA) I think what the judge is trying to

14  establish is even though you've drawn the line right along the

15  side of the edge of the building, it's really a street out here

16  and it doesn't go right along the courthouse, does it?

17    A.    Right, yes, yeah.

18    Q.    You've just done this to show, in general, the area

19  that was outside the building?

20    A.    Yes, sir, right.

21    Q.    Okay.  Now, we've talked about how you brought him

22  into the central jury room.  And when he was in the central

23  jury room, approximately, where was he seated?  Was it true

24  that he was seated right over here by -- there's like by a

25  little bench --

100

1    A.    Yes, sir.

2    Q.    -- I don't know what you call it.

3    A.    Yes, sir.  There's a place where the defendant sits.

4    Q.    Okay.  Can you see it up here?  Can you draw it on

5  this diagram for me?

6    A.    Yes, sir.

7    Q.    Okay.  Just put a D for defendant or something.

8         THE COURT:  Do you need a break?

9         MR. WARNER:  Yes, please.

10         THE COURT:  Let's take a few.

11         MR. SKURKA:  Yes, Your Honor.

12         MR. GONZALEZ:  Our client needs to go to the

13  rest room.

14         THE COURT:  All right.  More than just him.

15         (Recess.)

16         THE COURT:  Mr. Skurka.

17         MR. SKURKA:  Yes, Your Honor, I'm still on.

18         THE COURT:  All right.

19         MR. SKURKA:  I think when we left off, Judge,

20  I was asking Mr. Isaac to draw on the State's Exhibit 6 where

21  the defendant was seated in the central jury room.

22    Q.    (BY MR. SKURKA) And during the break, Mr. Isaac, I

23  think you were writing it right here where the D is, correct?

24    A.    Yes, sir.

25         MR. SKURKA:  Judge, I'll move for the

101

1    admission of this exhibit. I don't think it's been admitted
2    yet.
3                THE MR. WARNER: I don't object.
4                THE COURT: All right. It's admitted.
5                MR. SKURKA: Judge, during the break also I
6    showed Mr. Warner a series of photographs I'm gonna go through
7    with the next witness. He's had a chance to review them.
8    They are marked State's Exhibit 8 through 28, and just to make
9    things move a little faster, I premarked them and ask that
10   they be admitted into evidence.
11               MR. WARNER: I don't object to the admission
12   into evidence of State's Exhibit 8 through 28.
13               MR. SKURKA: 8 through 28.
14               MR. WARNER: I don't object to the admission
15   --
16               THE COURT: There it is.
17               MR. WARNER: -- of State's 8 through 28.
18               THE COURT: Okay. Admitted.
19               MR. SKURKA: May I proceed then, Your Honor?
20               THE COURT: You may.
21       Q.   (BY MR. SKURKA) Now that these are admitted,
22   Mr. Isaac, I'm just gonna go through them, and you've already
23   shown me the location of some of these are on the diagram,
24   but if you need to look at the diagram to reference yourself,
25   just ask me and I can put the diagram back up there?

102

1        A.   Yes, sir.
2                MR. SKURKA: Can I get somebody to turn off
3    the light right behind there? It kind of washes out the
4    screen.
5                THE COURT: The lights are right outside that
6    door.
7                MR. SKURKA: It will be the last one he tries
8    probably. That's probably good enough.
9                THE COURT: There you go.
10       Q.   (BY MR. SKURKA) Now, this is what's been marked as
11   State's Exhibit 8. What does that depict, please?
12       A.   The central jury room.
13       Q.   From what angle or view?
14       A.   From the atrium standing outside looking at it.
15       Q.   Those are the ones I called earlier the double glass
16   doors, I think I said?
17       A.   Yes, sir.
18       Q.   Looking at that, is that the view that the jury who
19   are milling around out in the atrium as you described earlier,
20   is that the view they would have of the central jury room?
21       A.   Yes, sir.
22       Q.   Can they see in through those glass doors?
23       A.   No, sir.
24       Q.   Why not?
25       A.   Because they're covered with a dark tint.

103

1        Q.   And is that shown in the pictures there?
2        A.   Yes, sir.
3        Q.   I show you what's marked State's Exhibit No. 9. It
4    purports to be a little closer picture of that.
5                MR. WARNER: Pardon me, Mr. Skurka. Pardon
6    me, Your Honor. I've spoken with the chief and I don't intend
7    to call him. May he be released from the subpoena?
8                THE COURT: Sure.
9                MR. WARNER: Thank you.
10       Q.   (BY MR. SKURKA) Is this the same picture, just a
11   little closer?
12       A.   Yes, sir.
13       Q.   Now, looking at that picture, is that the way it was
14   that day for the general voir dire or in the venire it's
15   called?
16       A.   Yes, sir.
17       Q.   Was there anything else blocking those doors of that
18   doorway besides in the form of panels?
19       A.   Yes, sir.
20       Q.   Tell us about that, please.
21       A.   We had some panels put up that would have -- there's
22   a column just to the left here and they'll --
23       Q.   I'll give you the laser pointer so you can use it and
24   show us what we're talking about. Go ahead.
25       A.   There's a column right here, there's a column a few

104

1    feet -- there's a column here. There's also a column a few
2    feet just from that one. There's one here (indicating), and we
3    had columns, partitions put up to cover -- to cover the back --
4    the entrance so that no one could come through. We also had
5    them going across here, so they had to come from this -- on the
6    other side of this column here, so they really couldn't see but
7    that over the top right there because the columns would have
8    covered that height.
9        Q.   So, for the record, in addition to having glass doors
10   that were tinted and you couldn't see through, is it true then
11   that there was also solid panels that were in front of this
12   glass that would prevent the jurors from seeing what was
13   happening inside the central jury room?
14       A.   Yes, sir.
15       Q.   Okay. So there was kind of like a double barrier,
16   double protection, correct?
17       A.   Yes, sir, correct.
18       Q.   And was that up there to do just that, to prevent
19   jurors from sneaking in there or trying to get in there, or
20   being able to see through the glass?
21       A.   Yes, sir, and in addition, having just general people
22   walk up and say what's going on.
23       Q.   So it was an additional barrier guarded by security?
24       A.   Yes, sir.
25       Q.   And is that where the other security guards were at?

1    A.   They were inside.

2    Q.   They were between the glass and the panels?

3    A.   Yes, sir.

4    Q.   I see.  So the jurors didn't even see them until they

5    were let in, correct?

6    A.   Yes, sir.

7    Q.   Okay.  Now I'm going to show you what's marked

8    State's Exhibit 10.  What is that, please?

9    A.   That's on the inside of the central jury room.

10   Q.   Okay.  For the record, you're saying it's a view of

11   the inside of the central jury room looking toward the atrium,

12   correct?

13   A.   Yes, sir, correct.

14   Q.   Can you see through those double glass doors?

15   A.   No, sir.

16   Q.   And that's -- would that be fair to say that's from

17   the left side angle?

18   A.   Yes, sir, correct.

19   Q.   And I show you State's Exhibit No. 11.  Does that

20   show the same picture but it's kind of from the right side

21   angle?

22   A.   Yes, sir.

23   Q.   Again, could anybody from outside see in or anybody

24   inside see out?

25   A.   No, sir.

1    Q.   And again, I'm talking about that day?

2    A.   That day.

3    Q.   I'm gonna show you what's been marked State's Exhibit

4    No. 12 and admitted as State's Exhibit 12.  What is that a

5    photograph of, please?

6    A.   That's the gate to the parking garage.

7    Q.   Is that the gate that you talked about earlier and

8    showed on the diagram that only certain judges or public

9    officials could get to --

10   A.   Yes, sir.

11   Q.   -- in that parking garage?

12   A.   Yes, sir.

13   Q.   Again, could any jurors have gone through?

14   A.   No, sir.

15   Q.   I show you what's marked State's Exhibit 13.  What is

16   that a photograph of?

17   A.   That's a photograph of inside the parking garage.

18   Q.   And what are these things that look like windows or

19   something here?

20   A.   They're blinds.

21   Q.   What do you mean blinds?

22   A.   Well, panels to put up so no one can look in.

23   Q.   So nobody could even look into the parking garage if

24   you're bringing the prisoner in through there?

25   A.   That's right, nobody —

1    Q.   Is that correct?

2    A.   That's correct.

3    Q.   It's been my experience sometimes parking garages are

4    opens and some are enclosed.  On this day when you brought the

5    prisoner in, could anybody have seen him being transported

6    through a police car, or whatever, a paddywagon you used or

7    whatever?

8    A.   No, sir.

9    Q.   From the outside?

10   A.   No, sir.

11   Q.   Did these shutters or blinds prevent that from

12   happening?

13   A.   They prevented that from happening.

14   Q.   I show you what's been marked as State's Exhibit 14.

15   What is that, please?

16   A.   That's another view of the parking garage coming in

17   and that would be the south side of the parking garage with the

18   panels.

19   Q.   Is the door visible that you take the prisoner in

20   from in this picture?

21   A.   No, sir.

22   Q.   But that's just showing the general layout of the

23   parking garage, correct?

24   A.   Correct.

25   Q.   And again, no one else has access to that?

1    A.   No one else.

2    Q.   I mean jurors?

3    A.   No jurors.

4    Q.   What does State's Exhibit 15 show?

5    A.   Okay.  That is the entrance from the mechanical room

6    I talked about earlier, coming from the garage, that's the

7    second door that we would have gone in that leads to the

8    central jury room.

9    Q.   So, for the record, that is the door going into the

10   central room that you brought the prisoner in this case in

11   through the mechanical room?

12   A.   Yeah.

13   Q.   And the viewpoint is from the inside the mechanical

14   room to the central jury room, correct?

15   A.   Yes, sir, correct.

16   Q.   Then what is State's Exhibit 16, please?

17   A.   Okay.  That is the hallway to the south side

18   entrance from the – that's the entrance to the south side

19   entrance to the central jury room.  This is the hallway here.

20   You can come down the hallway from inside – from the outside

21   and go right down that hallway.

22   Q.   Okay.  Let me get to the crux of the matter.  At this

23   area here, these doors that say exit on them, did you have a

24   guard stationed on there to make sure no juror members could go

25   down that hall and accidentally get into the jury room?

109

1    A.    Yes, sir, we did.

2    Q.    Where was the guard stationed?

3    A.    We had a panel similar to the ones that was in front

4 of the central jury room.  We had a panel here and an officer

5 on that -- on the watch on the outside of that.

6    Q.    So the juror coming in that day, the panel coming in

7 that day would not even see this hallway because the panel is

8 blocking it?

9    A.    Correct.

10    Q.    And so that -- would it be fair to say that's another

11 way your department ensured that nobody would actually come

12 into the central jury room from that other south side door?

13    A.    Yes, sir.

14    Q.    Okay.  I'm gonna go back to the parking garage for a

15 minute here.  State's Exhibit 17, what does that show?

16    A.    That's the -- as you come in from the entrance you

17 turn left -- you can only turn left and you go down and you

18 would turn left about right here (indicating).

19    Q.    To go to where?

20    A.    To eventually turn right again to go into the

21 entrance of where to the central jury room.

22    Q.    Isn't it true the gate would be kind of you've just

23 gone in from the left side of the photograph?

24    A.    Yes, sir.

25    Q.    So that's kind of entering once you get passed the

110

1 gate, correct?

2    A.    Yes, sir, right.

3    Q.    All right.  What is State's Exhibit No. -- State's

4 Exhibit No. 18, what is that?

5    A.    That is the entrance from the garage, the parking

6 space where we park, unload here, and walk in.

7    Q.    Does this photograph represent then where the

8 prisoner was brought in from the parking garage through this

9 door here and into the mechanical room?

10    A.    Yes, sir, that's correct.

11    Q.    And is -- what is State's Exhibit 19?  You may not be

12 able to see the perspective but I might show you State's

13 Exhibit 18 again and if you look closely --

14    A.    That's the entrance.

15    Q.    See that yellow thing right there?

16    A.    Oh, okay.  Yeah that, right.

17    Q.    Through that door?

18    A.    That's a close up view of it, the entrance, right.

19    Q.    All right.  I knew you'd get it.  That's a closer up

20 view of 19, right?

21    A.    Yes, sir.

22    Q.    It's 18.  But again, that shows the mechanical room

23 that you take the prisoner in?

24    A.    Correct.

25    Q.    Again, would any jurors have been able to view that?

111

1    A.    No, sir.

2    Q.    State's Exhibit No. 20, what is that, please?

3    A.    That is inside the jury -- in the central jury room.

4    Q.    And is that angle from where the jurors were seated?

5    A.    Yes, sir.

6    Q.    For the record, the part in the middle is, I guess,

7 where the judge would sit?

8    A.    Yes, sir.

9    Q.    Correct?

10    A.    Correct.

11    Q.    And the jurors could sit on the foreground or in the

12 background, correct?

13    A.    Correct.

14    Q.    The next is from a different angle, it's No. 21.

15 What angle is that shown from?

16    A.    Okay.  That angle is shown from the south side of the

17 central jury room which the door is -- there's a door over here

18 that you had earlier that shows an exit.

19    Q.    You can't just say here.  Let's just say the left

20 side of the picture in State's Exhibit 21?

21    A.    The left side of the picture.

22    Q.    That would be where that door I showed -- you showed

23 us where the panel blocked it off, correct?

24    A.    Correct.

25    Q.    And again, in this picture in the upper right part of

112

1 the photograph is where the judge would be sitting and where

2 the defendant and the lawyers would be sitting, correct?

3    A.    Correct.

4    Q.    And I'm gonna go in a bit closer on that part and

5 does that show the witness box or the jury box -- the witness

6 box where the defendant was seated?  And just for reference

7 point right in front of the flags, I guess, which is where the

8 box was.

9    A.    Yes, sir.

10    Q.    Is that where John Henry Ramirez was seated?

11    A.    Yes, sir.

12    Q.    You said earlier that you had some armed guards in

13 there.  Were any of the guards -- were the guards stationed

14 close to the jury box or where else in the room?

15    A.    They were stationed away from the jury box to the

16 left and then up to the right toward the entrance.

17    Q.    How many juror -- guards were by the jury -- the

18 defendant himself, armed guards or uniformed?

19    A.    While the people were seated?

20    Q.    Yes.

21    A.    None.  Only the bailiff was in that close proximity.

22    Q.    So only the bailiff was close by when the jury was

23 seated in there?

24    A.    Yes, sir.

25    Q.    Okay.  Were the other guards -- I think you testified

113

1  earlier with Mr. Warner they were stationed at the exits?

2     A.   Yes, sir.

3     Q.   Or at the doorways coming in?

4     A.   Correct.

5     Q.   So is it your testimony that there were no -- there

6  was only one armed guard, the bailiff, in close proximity to

7  the defendant during the general voir dire?

8     A.   Yes, sir.

9     Q.   State's Exhibit 22, what is that?

10    A.   That's a view of the -- where the potential jurors

11  will be seated.

12    Q.   What is this door or item here in the upper right

13  part of the State's Exhibit 22, please?

14    A.   Okay.  That would be the door coming from the garage,

15  the entrance that opens up that we bring the defendant into.

16    Q.   So in State's Exhibit 22, for the record, the door at

17  the back right part of the photograph is the door that you

18  brought the prisoner in?

19    A.   Yes, sir.

20    Q.   Okay.  And I may have a couple of closer up shots of

21  that, 22 -- I'm sorry, 23.  What does that show?

22    A.   Okay.  That shows the -- another seated area where

23  the potential jurors will sit and --

24    Q.   Does that show the door you brought the prisoner in?

25    A.   Yes, sir.

114

1     Q.   And where is that on the photograph, please?

2     A.   Right here (indicating).

3     Q.   Okay.  And for the record, you're looking at the left

4  upper part of the photograph on State's Exhibit 23, correct?

5     A.   Correct.

6     Q.   It's kind of dark there but it looks like kind of

7  like a dark square in this photograph, right?

8     A.   Right.

9     Q.   Next is State's Exhibit 24.  What does that show,

10  please?

11    A.   Okay.  Again, that shows the same area but from a

12  different angle.

13    Q.   Is that the door, again, that you brought the

14  prisoner through?

15    A.   Yes, sir.

16    Q.   State's Exhibit 25, what does that depict?

17    A.   That's the exit door on the south of the central jury

18  room.

19    Q.   Is that the exit door that you said that you-all had

20  blocked off so jurors can get in through there?

21    A.   Yes, sir.

22    Q.   And you had a guard on the outside of that door,

23  correct?

24    A.   Yes, sir.

25    Q.   That would be the entrance -- I'm sorry, the exit

115

1  from looking at it from the inside the jury room, correct?

2     A.   Yes, sir.

3     Q.   Okay.  But again, no jurors could go in there either

4  from the outside or inside to get to see the defendant when

5  he's being brought over, correct?

6     A.   Yes, sir.

7     Q.   Just a couple of more photographs I have is State's

8  Exhibit 26.  What is that?

9     A.   That is the box where the defendant sits behind

10  there.

11    Q.   Okay.  And for the record, the defendant in this

12  case, John Henry Ramirez, was seated at that part or that box,

13  that witness box?

14    A.   Yes, sir.

15    Q.   And was he always seated before the jury members were

16  allowed to come in the jury panel?

17    A.   No, sir, he was standing.

18    Q.   Oh, he was standing when they came in?

19    A.   Yes.

20    Q.   Okay.  But he was always located through the -- at

21  that point when jurors were allowed to come into the room?

22    A.   Yes, sir.

23    Q.   Okay.  I probably didn't phrase this right, but did

24  any juror see him coming or going from that box?

25    A.   No, sir.

116

1     Q.   Behind the next picture is 27.  What does that

2  depict, please?

3     A.   That depicts the area where the defendant -- where

4  Mr. Ramirez was sitting.

5     Q.   And for the record, that's just a close up and a side

6  angle of the witness box where he was sitting?

7     A.   Yes, sir.

8     Q.   There's no picture -- there's no chair in that

9  picture, but he was sitting in the chair, was he not?

10    A.   He was sitting there, yes, sir.

11    Q.   And State's Exhibit 28, what does that show?

12    A.   Okay.  Now that actually shows the inside of the box

13  up where he would -- we would -- he would be -- his feet would

14  essentially sit.

15    Q.   In this case, was there an eyebolt sunk in the floor

16  where Mr. Ramirez on the first floor central jury room was

17  shackled to the floor?

18    A.   Yes, sir, right there (indicating).

19    Q.   You can see it in that picture?

20    A.   Yes, sir.

21    Q.   Oh, is it right here?

22    A.   Right here (indicating).

23    Q.   Let me get closer.

24    A.   There you go.  You see the little --

25    Q.   Oh, I see it.  Defense counsel wasn't sure if he was

117

1   bolted to the floor or not, but you're saying he was, correct?
2   A.   Yes, sir.
3   Q.   And that shows that.  Is that visible to the jury?
4   A.   No, sir.
5   Q.   So any -- was he handcuffed during that time or just
6   bolted to the floor?
7   A.   He was bolted to the floor.
8   Q.   So his hands were free?
9   A.   Yes, sir.
10  Q.   The jury could see that his hands were free?
11  A.   Yes, sir.
12  Q.   He was not in handcuffs?
13  A.   No, sir.
14  Q.   But could the jury see where his legs or, I guess,
15  ankles were bolted to the floor?
16  A.   No, sir.
17  Q.   Okay.  And when I say bolt to the floor, I'm not
18  using very good language, but there's like a set of handcuffs
19  on his ankles and then that in turn is bolted to the eyebolt,
20  correct?
21  A.   Yes, sir, correct.
22  Q.   Okay.  Now, you said earlier that the only person
23  close to him was the bailiff.  And were the bailiff -- and I'm
24  just going back to State's Exhibit 27 -- where would he have
25  been in this picture?

118

1   A.   Actually, in close proximity to the judge in this
2   area because he would have had to handle excuses and help --
3   Q.   And just to help you out here, that black chair is
4   like where the judge sits?
5   A.   The judge sits, right.
6   Q.   All right.  So Mr. Bautista was in that area out
7   here, outside the witness box and out there by the judge?
8   A.   Yes, sir.
9   Q.   Okay.  But none of your other armed guards were over
10  there by him, were they?
11  A.   No, sir, they weren't.
12  Q.   Did they need to be?
13  A.   No, sir.
14  Q.   Why not?
15  A.   Because he was secured to the floor.
16  Q.   So you felt that there was no need to have armed
17  guards on either side among the central jury room because of
18  the fact that he was bolted to the floor, correct?
19  A.   Correct.
20  Q.   Okay.  Now that's all the questions I'm gonna ask you
21  about the first floor.  And you can turn the lights back on.
22       I'm gonna switch now to the courtroom that
23  we're presently in the 94th District Court.  And we've already
24  got the diagrams and I'm not gonna spend a lot of time on
25  those, but I want to ask you some questions on that.

119

1   Q.   When you had Mr. Ramirez in the courtroom, was
2   he surrounded by armed guards?
3   A.   No, sir.
4   Q.   Why not?
5   A.   He was not surrounded by armed guards because we
6   didn't want to prejudice the jury, and as far as anybody would
7   know, they would just be plain clothes, people that could
8   belong to the court staff -- I mean to the legal staff, but
9   primarily not to prejudice the jury.
10  Q.   Okay.  There were some testimony by Mr. --
11       MR. WARNER:  Now he can't compare testimony,
12  Your Honor.
13       MR. SKURKA:  I'm sorry.
14       THE COURT:  Sustained.
15       MR. SKURKA:  I'll rephrase that.
16  Q.   (BY MR. SKURKA) Is the set up that we have currently
17  in the courtroom, is that similar to the way it was when the
18  individual voir dire was going on and when the actual trial was
19  going on as far as where the guards were located?
20  A.   Yes, sir, for the actual trial.
21  Q.   Okay.  So when we're talking about that, we're
22  talking about the man in the uniform over here to the left side
23  of the judge can be where Mr. Bautista sat, correct?
24  A.   Correct.
25  Q.   The man behind him is in plain clothes and there was

120

1   a plain clothes officer then too, correct?
2   A.   Correct.
3   Q.   There was also an officer seated behind the defendant
4   like right along the edge of the bar?
5   A.   Yes, in that area.
6   Q.   I know we were talking about inside or outside or
7   right in line with the bar, but that's where the other plain
8   clothes one was, correct?
9   A.   Yes, sir.
10  Q.   And there was a uniformed or armed guard at the end
11  of door; isn't that true?
12  A.   True.
13  Q.   Okay.  So that's -- the set up we have today is
14  pretty much similiar to the way it was then in the courtroom,
15  correct?
16  A.   Yes, sir.
17  Q.   The two gentlemen that were sheriff deputies or, I
18  don't know what you call them, correctional officers, did they
19  have weapons?
20  A.   No, sir, they didn't.
21  Q.   Why not?
22  A.   They didn't have weapons because of they had to
23  handle the defendant and we didn't want the defendant to be
24  close to him where he could grab a weapon and take it from him.
25  Q.   So the two guards that were closest to him, except

121

1    for maybe the bailiff, didn't even have weapons, did they?
2        A.    No, sir, they didn't.
3        Q.    So it's not that they were concealed. They just
4    didn't have any weapons?
5        A.    They didn't have any weapons.
6        Q.    Is that a typical security reason because you don't
7    want the person grabbing the gun?
8        A.    Well, in this case, it was a security concern.
9        Q.    And the close -- would it be fair to say besides the
10   bailiff who was up here, the closest armed guard in uniform was
11   at the back of the room at the door coming into the courtroom?
12       A.    Correct, yes, sir.
13       Q.    So is it fair to say that there's armed -- heavily
14   armed guards on either side of the defendant, would that be
15   correct or not correct?
16       A.    Not correct.
17       Q.    When the defendant was brought in and out of this
18   courtroom, like for lunch breaks or bathroom breaks and stuff
19   like that, when the Court took the breaks, what precautions
20   were done by your department to make sure the jurors who were
21   seated on the jury, the 12 or 14 jurors, did not have any
22   contact or see him being led in and out of the courtroom?
23       A.    The jurors would have been excused earlier before he
24   was -- had to go to the bathroom.
25       Q.    So did any juror see him in shackles, handcuffs,

122

1    being taken bolted from the floor, anything like that?
2        A.    No, sir.
3        Q.    They would be in the jury room, correct?
4        A.    Correct.
5        Q.    And in fact, unlike the other central jury room, you
6    don't have to go outside the building to go to the rest room.
7    He would have been taken to the holding cell right outside the
8    door -- I mean, right outside the courtroom, I'm sorry?
9        A.    Across --
10       Q.    Across the hall?
11       A.    Yes, sir.
12       Q.    But did your guards make sure that no jurors could
13   have contact with him?
14       A.    Yes, sir.
15       Q.    Were guards or armed guards or uniformed guards ever
16   seated at counsel table next to him?
17       A.    No, sir.
18       Q.    Who was seated next to him?
19       A.    His counsel.
20       Q.    His two attorneys?
21       A.    Two attorneys.
22       Q.    Did you, as head of the security in this case, have
23   occasion to have any security meetings with other members of
24   the court staff, like the bailiff or judge, before the trial
25   actually began?

123

1        A.    Yes, sir, we did.
2        Q.    Did you -- isn't it true that you-all discussed
3    certain security measures that your department was gonna do
4    both on the first floor and on this floor?
5        A.    Yes, sir.
6        Q.    And was the judge present for that?
7        A.    Yes, sir, he was.
8        Q.    And did the judge approve of your measures?
9        A.    Yes, the judge did.
10       Q.    The last area I want to cover is the metal detector.
11   At any time did jurors have to go through the metal detectors
12   here on the ninth floor?
13       A.    No, sir.
14       Q.    What -- when were the metal detector -- if there was
15   a metal detector, when was it set up?
16       A.    The first day of the trial.
17       Q.    Isn't it true that during the jury selection, when
18   they were bringing the jurors over individually one at a time,
19   there was no metal detector out there?
20       A.    No metal detector was there.
21       Q.    So the metal detector didn't become present until the
22   first day of the actual trial beginning?
23       A.    Yes, sir, correct.
24       Q.    Did any of the 12 or 14 final jurors ever have to go
25   through the metal detector?

124

1        A.    No, sir.
2        Q.    Why do you have a metal detector out there?
3        A.    For the security of the courtroom so that nobody can
4    sneak in weapons, knives, guns, knives.
5        Q.    In this particular case, did you have concerns that
6    somebody from the defendant's family may try to bring in a
7    weapon or try to free him or help him?
8        A.    Yes, sir, I did.
9        Q.    You had concerns about that?
10       A.    Yes, sir.
11       Q.    Is that one of the reasons you had the metal
12   detector?
13       A.    Yes, sir.
14       Q.    Isn't it also true that you may have had concerns
15   that a member of the victim's family or extended family may try
16   to harm the defendant?
17       A.    Yes, sir, by what -- by what happened, yes, sir, I
18   did.
19       Q.    Okay. So you had control -- concerns both ways?
20   Isn't it true, that he could do something, somebody could get
21   something to him from his family, but you also had concerns
22   from the victim's family, correct?
23       A.    Yes, sir, that is correct.
24       Q.    And that's not too unusual based on your experience,
25   right?

125

1      A.   Right.

2      Q.   So would you -- would the security -- the very first

3   question I asked you, the security was indeed designed to help

4   him or protect him as well as others, correct?

5      A.   Yes, sir, correct.

6           MR. SKURKA:  Thank you.  I pass the witness.

7           MR. WARNER:  Mindful of the time, I'll ask

8   this witness one question and I have one more witness.

9           THE COURT:  Okay.  I mean, you know, we can

10  run to five, and if we have to come back another day, we'll

11  find some time for you.

12          MR. WARNER:  I appreciate your patience.

13          THE COURT:  I count today's day 64 so I have a

14  little bit of time.

15          MR. WARNER:  Yes, Your Honor.  I have 11 days

16  from today.  I'm at the Court's -- I appreciate your patience.

17          THE COURT:  Okay.

18          REDIRECT EXAMINATION

19  BY MR. WARNER:

20     Q.   Lieutenant, it's true the bailiff was armed, isn't

21  it?

22     A.   Yes, sir.

23     Q.   He was armed during the trial, wasn't he?

24     A.   Yes, sir.

25     Q.   You can't dispute the bailiff was perhaps six feet

126

1   from the defendant; isn't that true?

2      A.   Yes, sir.

3      Q.   That was during the whole trial?

4      A.   Yes, sir.

5      Q.   The bailiff was in -- at least he had his insignia on

6   when he was at the -- downstairs at the venire panel when the

7   people came to the central jury room; isn't that right?

8      A.   Insignia?

9      Q.   He had a constable's insignia on his shirt, didn't

10  he?

11     A.   Yes, sir, he did.

12     Q.   You don't mean to say that the jurors couldn't figure

13  out that your plain clothes men were plain clothes --

14          MR. SKURKA:  I'm going to object to that.  It

15  calls for speculation on the part of the jurors.

16          THE COURT:  Sustained.  Sustained.

17     Q.   (BY MR. WARNER)  Did the members of the jury pass

18  through the hall outside the courtroom during the trial?

19     A.   Yes, sir.

20     Q.   So they could have seen the metal detector even

21  though they didn't have to go through it?

22     A.   Yes, sir.

23     Q.   Couldn't you have gotten John Henry Ramirez to the

24  courtroom of the 94th District Court through the tunnel the way

25  you normally get people here?

127

1      A.   That's the way he was brought up during the trial.

2      Q.   Didn't you say that you used some extraordinary

3   routes to get him here?

4      A.   That was for the venire.

5      Q.   I see.

6      A.   That day and a half downstairs.

7           MR. WARNER:  May I have just a moment to

8   review my notes?

9           THE COURT:  Sure.

10          MR. WARNER:  I'll pass the witness.

11          THE COURT:  Anything else?

12          MR. SKURKA:  No other questions.

13          THE COURT:  You may stand down.  May this

14  witness be excused?

15          MR. SKURKA:  Yes, Your Honor.

16          MR. WARNER:  Yes, Your Honor.

17          THE COURT:  Next witness.

18          MR. WARNER:  We call Mr. Bautista, the

19  bailiff.

20          THE COURT:  Okay.  All right.

21          You've been sworn.

22          MR. WARNER:  May I proceed, Your Honor?

23          THE COURT:  You may.

24          FRANK BAUTISTA,

25  having been previously duly sworn, testified as follows:

128

1          DIRECT EXAMINATION

2   BY MR. WARNER:

3      Q.   Would you kindly state your name for the court

4   record?

5      A.   Frank Bautista.

6      Q.   You're the bailiff of the 94th District Court, aren't

7   you?

8      A.   That is correct.

9      Q.   You were the bailiff during the trial during the

10  trial of John Henry Ramirez seated here to my right, weren't

11  you?

12     A.   That is correct.

13     Q.   Most of the trial you were seated right there at the

14  bailiff's station --

15     A.   Yes.

16     Q.   -- about six feet from the defendant; isn't that

17  true?

18     A.   That's true.

19     Q.   Could you outline for the judge where the other --

20  where the deputies were in the courtroom?

21     A.   Deputies were sitting there -- I mean, standing there

22  and outside.

23     Q.   When you say there, are you --

24     A.   Standing there as she is standing right by the --

25     Q.   At the door of the courtroom?

129

1    A.    -- exit door and outside.

2    Q.    Okay.

3    A.    And the two correction officers are sitting right

4    there and here in plain clothes.

5    Q.    Okay.  I've got -- I've got -- got to get specific.

6    A.    Specific with plain clothes.

7    Q.    Okay.  So where was the first corrections officer?

8    A.    Sitting down here (indicating).

9            MR. WARNER:  Okay.  May I have the witness

10   stand down?

11           THE COURT:  Yeah.

12           MR. WARNER:  Could you come over here just a

13   moment.

14           THE WITNESS:  (Witness complies.)

15   A.    Well, I'm just gonna say that he'll be the first one.

16   I can pick him first.

17   Q.    (BY MR. WARNER)  Well, okay.  Please let me ask the

18   questions.

19           Okay.  So there's a plain clothes officer

20   here, right?

21   A.    Right.

22   Q.    And this is during the entire trial.  Do you know

23   whether he was armed or not?

24   A.    (Inaudible response.)

25           THE REPORTER:  I can't hear what he's saying.

130

1            MR. WARNER:  She's got to hear you.

2    A.    He's a correction officer unarmed from the jail in

3    plain clothes.

4    Q.    (BY MR. WARNER)  Here's a movable chair right here

5    where this man is seated.  Where was the corrections officers

6    seated during the trial?  Was he seated there right outside

7    this rail --

8    A.    He was --

9    Q.    Wait just a minute.  Let me finish my question.  Was

10   he seated right here at the rail or seated right inside the

11   rail?

12   A.    Right there (indicating).

13   Q.    You're saying right there, you mean outside the rail?

14   A.    As you stated at first, sir, right there.

15   Q.    Okay.  All right.  And then there was another you

16   said?

17   A.    The other one is seated where he is at this time

18   number 2.

19   Q.    Okay.  Would you resume your seat.

20   A.    (Witness complies.)

21   Q.    The corrections officers that was seated behind you

22   was in plain clothes?

23   A.    That is correct.

24   Q.    He was not armed?

25   A.    That is correct.

131

1    Q.    And he was seated two or three feet behind you?

2    A.    I don't have a measuring stick, sir, but as he is

3    right up against the wall.

4    Q.    Okay.  During the time that you were the bailiff in

5    the court, were you dressed -- you were dressed in civilian

6    clothes or in uniform?

7    A.    Both.

8    Q.    Okay.  Some of the time you had on your constables

9    insignia?

10   A.    That is correct.

11   Q.    While you were downstairs -- let's change the subject

12   to the venire panel downstairs, the central jury room.  You

13   were in uniform there, weren't you?

14   A.    I can't remember that far back.

15   Q.    Okay.  You had your side arm with you when --

16   A.    Always.

17   Q.    -- went the -- okay.  Three different stages.  At the

18   central jury room you had your side arm with you; is that true?

19   A.    When I'm a bailiff, sir, to make it clear, I'm always

20   armed.

21   Q.    Okay.  At the central jury room you had your side

22   arm?

23   A.    Always, yes.

24   Q.    The voir dire is the part where the lawyers ask one

25   person at a time questions to see whether that person's gonna

132

1    be on the jury.  During that time you were armed, true?

2    A.    That is correct.

3    Q.    During the trial you were armed?

4    A.    That is correct.

5            MR. WARNER:  Okay.  Pass the witness.

6            THE COURT:  All right.  Cross.  Mr. Skurka.

7            MR. SKURKA:  Just one moment, Judge.

8            THE COURT:  Okay.

9            CROSS-EXAMINATION

10   BY MR. SKURKA:

11   Q.    Mr. Bautista, just a few follow-up questions, please.

12   Would it be fair to say that during this trial, although you

13   had concerns and were involved in the security of the prisoner,

14   actually, what the either the judge or what was decided is that

15   you were really going to be focusing with the jury and let the

16   other guards take care of the prisoner?

17   A.    That is correct.

18   Q.    Okay.  Generally speaking, as the bailiff of the 94th

19   District Court, you had to kind of wear a lot of hats, right?

20   A.    That is true.

21   Q.    You're going in and out, you're guarding prisoners,

22   you're taking care of the jury and stuff?

23   A.    Yes, sir.

24   Q.    But in this particular case, I believe you were

25   directed to take care of the jury and because of the presence

133

1    of the other people to assist you in guarding the prisoner?
2        A.    True.
3        Q.    Is that correct?
4        A.    That's correct.
5        Q.    And that's not to say -- I mean, you were there
6    available, if necessary, but your focus was mostly on the jury,
7    right?
8        A.    Right.
9        Q.    So when the jury was in or out of the courtroom, you
10   were usually with them, you know, shuffling back in and out and
11   everything, correct?
12       A.    Yes.
13       Q.    Leaving the actual guarding of the prisoner during
14   transfers and breaks to the other guards, correct?
15       A.    Correct.
16       Q.    Now, you were aware and he was talking about
17   insignia, and it's really just kind of a white officer's shirt
18   with, I guess a patch or something, and maybe a name tag or
19   something, the constable's office name or something, correct?
20       A.    Correct.
21       Q.    And you were -- you were armed, correct?
22       A.    Correct.
23       Q.    And in fact, isn't it true that you were the only --
24   the only armed guard that was anywhere close in proximity to
25   this defendant?

134

1        A.    Correct.
2        Q.    Okay.  Because as you just testified, isn't it true,
3    the other guards were not armed?
4        A.    Correct.
5        Q.    The closest armed guard besides you was way at the
6    back of the courtroom, correct?
7        A.    Correct.
8        Q.    Or outside the courtroom, correct?
9        A.    Correct.
10       Q.    So if counsel was to allege that there was armed
11   guards all surrounding the defendant --
12             MR. WARNER:  I wish to withdraw the averment
13   that I made in good faith when I filed the motion for new
14   trial that there were armed guards seated at the counsel
15   table.  That was the information that I got from some
16   witnesses.  I didn't call those witnesses.
17             THE COURT:  Okay.
18             MR. WARNER:  And I didn't put on that
19   evidence.
20             THE COURT:  All right.  So he's not asserting
21   that.
22             MR. SKURKA:  I understand.
23       Q.    (BY MR. SKURKA) So you were the only guard close to
24   him with a gun?
25       A.    Yes, sir, I was.

135

1        Q.    And going back to the central jury room, or for the
2    general voir dire, weren't you the only guard that was anywhere
3    close to him when the jury was there?
4        A.    True.
5        Q.    Is that -- and that's because the other guards were
6    stationed at exits and entrances and kind of back there again
7    helping the jurors come in?
8        A.    Yes.
9        Q.    Okay.  And no -- was there a presence of a lot of
10   guards in uniform with guns next to the defendant on the first
11   floor?
12       A.    That's correct.
13       Q.    There were or there weren't?
14       A.    There were not.
15       Q.    There were not.  Okay.  Just you --
16       A.    Just me.
17       Q.    -- as the bailiff?  And would it be fair to say that
18   during the trial and during the voir dire, you were not --
19   although you were the closest to him at about six feet away or
20   so, you weren't there all the time, were you?
21       A.    That's correct.
22       Q.    Because you were doing your other bailiff duties?
23       A.    That's true.
24             MR. SKURKA:  That's all the questions I have,
25   Judge.

136

1             THE COURT:  Anything else?
2             MR. WARNER:  May I ask the witness some
3    questions?  I wonder if I could have the big chart that was
4    admitted through Lieutenant Isaac.
5             THE COURT:  Yeah.
6             MR. WARNER:  May I approach the witness, Your
7    Honor?
8             THE COURT:  Sure.
9             REDIRECT EXAMINATION
10   BY MR. WARNER:
11       Q.    Let me show you State's Exhibit 4, which is
12   Defendant's Exhibit 1 which has been admitted into evidence.
13   This accurately reflects where people were seated, doesn't it?
14   Why don't you look at the names of the people here and tell me
15   whether or not you agree with this -- whether that accurately
16   represents where people were seated.
17       A.    Yes.
18       Q.    And the metal detector that's outside is one that
19   jurors could have seen, although they didn't have to go through
20   it?
21       A.    That's true.
22       Q.    Okay.
23             MR. WARNER:  I wonder if I could have the
24   other exhibit, the one that shows the central jury room, the
25   venire panel.

137

1        (Court hands exhibit to Mr. Warner.)

2            MR. WARNER:  Thank you, Your Honor.

3        Q.    (BY MR. WARNER) Let me show you State's Exhibit No. 7

4    which has been marked Defendant's Exhibit No. 2 and admitted

5    into evidence.  It's true that at the venire panel, that's the

6    central jury room downstairs with the 200 people, there were

7    seven officers there, weren't there?

8        A.    I didn't count them.

9        Q.    Okay.  Well, there were more than five, weren't

10   there?

11       A.    I didn't count them, sir.  My main concern was to

12   assist the people in handing out the paperwork.  The one that

13   was in charge of that was the – the deputies, the people from

14   the jail, the people from warrants.

15       Q.    Okay.  Did you ever see Mr. -- do you know Mr. Moreno

16   who is seated there?

17       A.    Yes, yes.

18       Q.    Did you ever see him when he had the AR15?

19       A.    Yes.

20       Q.    Okay.  And where was he when he had the AR-15?

21       A.    Well, he walked across over here but there was nobody

22   here.  There was no civilians just --

23            MR. WARNER:  The answer's really not

24   responsive.  I object.

25            THE WITNESS:  Well, what's the question?

138

1            THE COURT:  Re-ask it.

2            MR. WARNER:  The judge gets to tell me –

3            THE COURT:  All right.  Re-ask the question.

4        Q.    (BY MR. WARNER) So you saw Mr. Moreno who is seated

5    here present?  And for the record, Mr. Moreno's dressed in a

6    sheriff's uniform, isn't he, deputy sheriff?

7        A.    Yes.

8        Q.    And he had the AR-15; isn't that true?

9        A.    Yes.

10       Q.    And he walked through the central jury room with the

11   AR-15?

12       A.    Yes.

13       Q.    Right?

14       A.    Right.

15       Q.    Okay.  All right.  Were you present when that

16   happened?  Did you see that happen?

17       A.    If I say yes it's because I was present, sir.

18       Q.    And what time of day was that?

19       A.    I do not know, sir.

20       Q.    All right.  Were the other officers, however many

21   there were, were they also present when you saw Mr. Moreno with

22   this AR-15?

23       A.    I couldn't tell what their locations were.

24       Q.    Okay.

25            MR. WARNER:  May I hand these back to the

139

1    Court?

2            THE COURT:  Sure.

3            MR. WARNER:  Thank you.

4            I believe I'll pass the witness, Your Honor.

5            MR. SKURKA:  No questions.

6            MR. WARNER:  May I have a moment just to

7    consider?

8            THE COURT:  Uh-huh.

9            MR. WARNER:  I'll rest, Your Honor --

10           THE COURT:  Okay.  You may step down.

11           MR. WARNER:  -- on the motion for new trial.

12           MR. SKURKA:  I have no evidence to present,

13   Your Honor.

14           MR. WARNER:  I'll close.

15           MR. SKURKA:  State closes.

16           THE COURT:  Okay.

17           MR. WARNER:  I move the Court to -- I would

18   like to be heard on the motion for new trial.

19           THE COURT:  You may make your argument.

20           MR. WARNER:  I appreciate it.  I move the

21   Court to take into consideration enacting under our bills of

22   exception the evidence that we've admitted that has been

23   admitted at the motion for new trial.

24           THE COURT:  Well, let me ask you about the

25   bills of exception.

140

1            MR. WARNER:  Yes, of course.

2            THE COURT:  Because Rule 33.2 states 'that the

3    purpose is to complain on appeal about a matter that would not

4    otherwise be in the record," and what -- I mean, a lot of this

5    stuff you are correct would not have appeared in the record

6    but I think you've developed it pretty well today.

7            MR. WARNER:  But somebody has to decide and

8    you get to decide.  And here's what you get to decide under

9    the rules of exception --

10           THE COURT:  Well, I guess--

11           MR. WARNER:  Excuse me, go ahead.

12           THE COURT:  I mean, I guess it says here you

13   present this to me, and then if the parties agree, I guess you

14   got to get with Mr. Skurka and see if you-all agree.

15           MR. SKURKA:  I do not agree --

16           THE COURT:  – before I make a decision.

17           MR. SKURKA:  -- to those bills of exceptions,

18   Judge.  I can tell you that right off.

19           MR. WARNER:  We can make -- as counsel, as

20   advocates and lawyers and officers of the court, I have

21   proposed, as you may know – as you may note, to some of them,

22   I don't know.  I mean, I talked to witnesses and different

23   witnesses gave me different answers about how many deputies

24   there were and whether or not they were in uniform and how

25   many of them had guns and how many of them had AR-15s, and

141

```
1   where they were and whether they were at the venire or the
2   voir dire of the trial.  So you get to listen to the
3   witnesses, and then if we cannot agree, we have time.  I mean,
4   I don't have to file them --
5               MR. SKURKA:  Well --
6               MR. WARNER:  Excuse me, just a minute.  I
7   don't have to file them until day 90.  I already filed them.
8   And on bills of exception, you can consider what you remember,
9   you can consider the evidence.  There's an affidavit that I
10  expect to submit from Mr. Jones, Grant Jones who tried -- also
11  tried the case.  You can consider all those things.
12              THE COURT:  I mean, I think, in light of what
13  the testimony that has occurred today, some of these, I think
14  perhaps you need to redraft these.
15              MR. WARNER:  I can do that.
16              THE COURT:  Because I think that -- I mean,
17  they're just -- I mean, I understand how you would come to
18  these by talking to some witnesses, and I believe that in good
19  faith you drafted these in good faith, but I don't think they
20  necessarily reflect what the -- what came out today.
21              MR. WARNER:  Okay.  Well, here's what I'll do,
22  with the Court's leave.  You don't -- it doesn't really say
23  when you have to make a decision on the bills of exception.
24  It does tell me how long I have to file them.  If I file a
25  timely motion for new trial and you've already found it was
```

142

```
1   timely, I have until the 90th day after sentence was imposed
2   to file it.  I've already filed these.  It doesn't say
3   anything about amending but I'll amend them.
4               THE COURT:  Sure.  Why don't you amend them
5   and maybe if you amend them, after you amend them, you and
6   Mr. Skurka can come to language that -- that you can both live
7   with on these issues.
8               MR. WARNER:  Okay.
9               THE COURT:  And then, if you can't, then I
10  suppose I'll make the ruling but --
11              MR. WARNER:  Very well.  I can --
12              THE COURT:  But you still have time.
13              MR. WARNER:  This is part of the motion for
14  new trial, but this is gonna be -- I think, this is gonna be
15  what's going to be the critical thing on the bill of
16  exception:  Where was Deputy No. 3 seated?  Where was Deputy
17  No. 4 seated?  Where was Deputy No. 3 seated?  And was there a
18  person who had been at the venire or the voir dire in uniform?
19  We heard that testimony from one witness and it was
20  uncontradicted that one of the -- the Deputy No. 3 let's call
21  him, the one who is in plain clothes, that deputy had been
22  either at the venire or the voir dire, so the jurors could
23  have seen him.  They would have seen him before.  They see him
24  in the courtroom, although this time he's got on a suit.  The
25  fact question to be determined is, well, was he seated inside
```

143

```
1   the rail or not?  I think there's a case that deals with that.
2   I think that's one of the questions you'll have to decide.
3               I will address the Court on my motion for new
4   trial and see if counsel and I can agree on the bills of
5   exception.  If we cannot, then we'll present you the ones we
6   can agree on --
7               THE COURT:  Yeah, maybe you can agree with
8   some on not others.
9               MR. WARNER:  Very well.
10              May it please, the Court on our motion for new
11  trial.  As the Court may recall, I've withdrawn paragraph 2
12  for strategical and tactical reasons, and after discussing it
13  with my colleagues, John Niland and Katherine Kasten and Phil
14  Wischkaemper, and considering the matter myself, and taking
15  into consideration whether or not the decision in Williams
16  which has yet to be released.  I made a tactical decision
17  fully knowing what I'm doing not to present any evidence on
18  paragraph 2 and not to ask any -- not to ask the Court to make
19  a decision.
20              And number three, did the presence of so many
21  armed guards overcome the presumption of innocence?  Counsel
22  didn't bring it out during the motion for new trial.  The
23  Court will recall.  The Court normally tells the jurors at the
24  beginning, the defendant's presumed innocent at the beginning
25  of the trial.  And you always tell them in the written
```

144

```
1   instructions at the end of the trial, the defendant's proved
2   innocent -- presumed innocent.
3               I suggest that the evidence here today on the
4   motion for new trial has shown that the security was such that
5   even though you told them at the beginning of the trial that
6   the defendant's presumed innocent, and even though you told
7   them again at the end of the trial in the written instructions
8   to the jury, the defendant's presumed innocent, they just had
9   to figure out there's something wrong.  This fella must be
10  guilty.  If not, why would they have so many -- so much
11  security in this courtroom.  We didn't hear any evidence -- I
12  don't have any to present -- that the jury ever saw the
13  defendant in shackles or they ever saw him handcuffed, or that
14  they knew that he was bolted to the floor, but they're pretty
15  smart.  They can figure out that if a man in a suit like the
16  one that the individual is wearing who is seated behind
17  Mr. Moreno is seated there, they can figure out he's a
18  security man.  They can figure out that the man who is seated
19  over here in the position that we call Deputy No. 3, they can
20  figure out that he's a security person.
21              The important case that we called your
22  attention to that we distinguish, in one of the cases cited in
23  our motion for new trial, a court had to make a decision like
24  the one you have to make and said, well, wait a minute, there
25  were four uniformed deputies but they were seated out there
```

145

1  with the rest of the jurors – with the rest of the public and
2  we don't think that overcame the presumption – we don't think
3  that so impinged on the presumption of innocence that we ought
4  to give you a new trial. How's that different from what
5  happened in our case?
6            Well, in addition to the bailiff we have at
7  least two pretty close to the defendant. We measured one
8  eight feet, seven feet from the defendant, and I just suggest
9  to you that the jurors would have figured out that those were
10  security people. How is that different from the case that we
11  cite you to? Well, the case we site you to, the extra
12  security was seated out there with the audience, and they
13  said, well, you know, the jurors might have just figured, gee
14  whiz, they were just police officers in there to support their
15  colleagues.
16           But in our case, we say, our case is different
17  from theirs, from that one, because, I mean, you've got to
18  decide a fact question. Deputy No. 3 was probably, we
19  suggest, was seated at the bar or inside the bar, but he
20  certainly wasn't seated out there with the rest of the people
21  in the audience. And the deputy who sat or the -- one of the
22  witnesses called him a corrections officer who sat behind the
23  bailiff certainly was seated inside the bar.
24           I suggest that in the light of all the
25  security inside the bar, the jury just had to figure out this

146

1  fellow, gee whiz, he must be guilty because there's so much
2  security. I suggest that the presumption of innocence was so
3  impinged upon that you ought to grant the defendant a motion
4  for new trial on that basis.
5            There is a legal matter that doesn't require
6  the -- it doesn't require the presentation of evidence and
7  that is in paragraph 6 which I'll get to in a moment. We note
8  in Marquez which is at page 21 of our motion for now new
9  trial, which is cited in the Long against the State, a
10  decision of the Court of Criminals Appeals -- that's cited at
11  page 20 of our motion for new trial -- that the Court ought to
12  have made findings in the record about why so much security
13  was necessary, and why the circumstances were exceptional, and
14  why there was a specific need for so much security. I bring
15  that out because it's my duty -- in candor to the Court, I
16  know you were aware of the security situation.
17           So, in closing on that paragraph, on the
18  security one, I just suggest that so much security -- if we
19  can call it that -- just overcame the presumption of
20  innocence, and that on that ground alone, the Court ought to
21  grant a motion for new trial and it doesn't matter if the
22  corrections officers were dressed in suits or in uniforms.
23  The jurors are smart enough to figure out who those people are
24  and why they're there.
25           The last matter is simply a legal matter and

147

1  is addressed. I should mention it. I will bring it up later
2  once I have the complete court record. But the question for
3  us is, and for you -- all right, well – did the State prove
4  -- here's what they had to prove. They had to prove murder
5  and robbery at the same time. Well, they've got an eyewitness
6  who says murder. He shot, I saw it.
7            THE COURT: Or attempted robbery.
8            MR. WARNER: Okay. Well, how did -- the
9  question is gonna be – and it would be much easier for me to
10  go into great detail once I have the complete court reporter's
11  record. I appreciate the advance on the court reporter's
12  record. So what testimony did the State put on to prove
13  robbery?
14           From what I can gather, the testimony that was
15  put on to prove robbery was the testimony of accomplices and
16  the testimony of accomplices has to be corroborated and it has
17  to show more than just a crime -- that a crime was committed.
18  It's got to connect the defendant to the robbery. I wasn't
19  able to determine from talking to the lawyers who tried the
20  case that there was sufficient evidence to corroborate the
21  testimony of the accomplices. We're dealing here with memory.
22  The Court may remember, counsel may remember. At the end of
23  the day, we'll have to rely on the court reporter's record.
24           But in closing, we give the jurors so much
25  credit that they can -- they're supposed to be able to tell

148

1  who is telling the truth and who is not. They can tell that
2  the corrections officers that are dressed like these
3  individuals here in the courtroom today, they can tell those
4  people are plain clothes officers and that they're here for a
5  reason, and that there were so many of them that they're so
6  close to this defendant that he must be guilty. That's why
7  you ought to give him a new trial.
8            Another reason you ought to give him a new
9  trial is I suggest the proof just fails. What other proof is
10  there beyond the testimony of the accomplices to show robbery?
11  Because if all they proved was murder, then, it's a first
12  degree offense and the death penalty is not applicable. If
13  the proof fails to show that he's responsible for this first
14  robbery, then it fails to prove capital murder, and you ought
15  to grant appropriate relief, and that's what we ask you to do
16  grant him a new trial. Thank you.
17           THE COURT: Okay.
18           MR. SKURKA: In response, Judge, I will
19  address his points in the way he made them going down the line
20  on those.
21           First of all, the armed deputies at venire,
22  which is included in his points 3, 4 and 5, essentially,
23  Mr. Warner did not have the advantage of being there like we
24  did. I think the testimony adduced today at court clearly
25  showed that there was no heavy presence of heavily armed

1    guards.  In fact, there was only one guard close to him at

2    both the general voir dire and during the trial and the

3    individual voir dire that even had a gun or was even in

4    uniform.  Defense counsel and the other witnesses all

5    testified -- I mean, defense counsel, Ed Garza testified that

6    there were no armed guards next to him or people in uniform

7    except for Frank Bautista the bailiff who was other -- doing

8    other duties.  Although there was a heavy presence of guards

9    at the general voir dire escorting the prisoner in and out

10   from the unsecured area, none of that was seen by the jurors

11   who took part in the venire.

12            Mr. Warner expects that jurors can

13   automatically see through everything to see that these people

14   were, of course, guards or security, or probably armed.  I'm

15   not willing to concede the fact because I'd ask the Court,

16   what else could they do?  They bring two men in here, they

17   don't give them weapons, they put them in plain clothes, they

18   station them seven and nine feet away from the prisoner.  I'm

19   not willing to concede the fact that jurors are automatically

20   gonna think that these are extra security people when every

21   precaution is done to aid that defendant in preserving his

22   presumption of innocence by putting no armed guards next to

23   him, by putting no people with guns next to him.  And the

24   Court can see in the layout that was shown today and shown at

25   the trial and the Court's own view showed that no juror saw a

1    presence of heavily armed guards around this man, either on

2    the first floor or on this floor during the trial.

3            Just because -- and I don't want to belabor

4    the point, Judge, but think of the precautions that we brought

5    out that were used for security in this place.  The windows

6    were blacked out, there was panels in front of the windows so

7    the jurors couldn't see him.  The defendant was brought in

8    from another entrance that the jurors could never have seen

9    him from.  Mr. Isaac -- Lieutenant Isaac talked about why the

10   precautions were needed because of the information they had

11   received and the fact that the defendant was an escape risk

12   and a flight risk and how they did that.  So when we talk

13   about that and the cumulative effect of that evidence is there

14   was no heavily armed presence of guards surrounding this

15   defendant that unfairly prejudiced or impinged upon his right

16   to a fair trial or the presumption of innocence.

17            Mr. Warner also talked about in point 6,

18   there's no proof of robbery.  And I'm sorry, Judge, I need to

19   back up before I go into that.  I agree with Mr. Warner.  I

20   think -- I invite the Court to make findings of fact to show

21   or state on the record why based on what the Court's knowledge

22   in the fact that this defendant had killed -- had been

23   allegedly killed somebody, had run from the -- had robbed two

24   other people, allegedly, had run from the cops in an evading a

25   vehicle case, who had abandoned the van, who had escaped and

1    been gone for three and a half, four years, plus the

2    information received by the Court and the concerns of the

3    security guards, the Court should make findings on the record

4    as to why these precautions were necessary and why the armed

5    response -- I'm sorry, the guards were there to facilitate the

6    security in this case.  I don't have a problem with the Court

7    making those findings because the Court was there present

8    during the general voir dire, the individual voir dire, and

9    the trial itself.

10            Now, going on to point 6, no proof of robbery.

11   Again, Mr. Warner operates without the benefit of the record,

12   but as the Court will recall the testimony, there was an

13   eyewitness from across the street of this murder/robbery

14   Kashif Butt who testified right up there on that stand that he

15   saw this defendant going through the pockets of the victim,

16   going through the pockets, the robbery, how it started, how it

17   ended, all were evidence from Kashif Butt, an independent

18   witness who said that this defendant participated in the

19   robbery of Pablo Castro.

20            We also had a codefendant Christina Chavez

21   testify that their plan was they had run out of money for

22   drugs and they were gonna go basically rob people, looking for

23   people to rob, and Mr. Castro unfortunately was the first one

24   to come in front of him, but certainly not the last.

25            We also had evidence, physical evidence of the

1    blood stained dollar bill that the Court could see, and I

2    believe there was testimony from one of them that they came --

3    returned to the van with a $1.25.  They said, we got $1.25 out

4    of that and blood on the bill.  That, again, is physical

5    evidence corroborates the fact that there was a robbery along

6    with the codefendants.

7            So there was evidence, and I'm not even -- I

8    haven't got to the part about the other two things, was the

9    extraneous offenses that the Court allowed of the other two

10   robberies.  Mr. Warner says there was no showing that he would

11   -- intended to rob or tried to rob Mr. Pablo Castro.

12   Unfortunately, the evidence in front of the jury was that

13   right after he had robbed Pablo Castro, minutes later, he had

14   robbed April Metting at knifepoint, and then a few minutes

15   after that, robbed Ruby Pena Hinojosa at knifepoint.  So that

16   evidence was also in front of the jury that the jury could see

17   or deduce that his intent was to do the robbery of Pablo

18   Castro because he robbed like three people in a row.

19            Also, defense counsel argues in his motion

20   that this is really an after the fact theft, that he blew up

21   at the victim and attacked him, and then a robbery or theft

22   was in -- was something that happened after the fact.

23   Mr. Garza espoused that theory at trial.  The problem was

24   there was no evidence and no basis for that.  There was no

25   evidence that showed it happened that way.

153

1    We have a plan that they were gonna rob
2  somebody, they found an innocent victim, and Mr. Ramirez did
3  exactly that what the plan was, to get the money for drugs.
4    Judge, I can probably talk more about some of
5  the things in the motion, but I think I will rest at this
6  point.
7    MR. WARNER: If I could reply?
8    THE COURT: Sure.
9    MR. WARNER: Let me direct the Court's
10 attention, if you please, to pages 21 and 24 of our motion for
11 new trial.
12   THE COURT: Okay.
13   MR. WARNER: First --
14   THE COURT: All right. Let's see. 21.
15   MR. WARNER: At page 21 we cite the *** Ford
16 Marquez, and that is the case upon which we rely for the
17 proposition that the security, if you will, the overwhelming
18 presence of the deputies in courtroom inside the bar overcame
19 the presumption of innocence.
20   Counsel for the government mentions that
21 Christina said, well, we had this planned. Christina was an
22 accomplice. And my argument is what is there to corroborate
23 the testimony of the accomplice? Here's why that's important.
24 If the State proved that the defendant was guilty of murder,
25 well then, they proved the first degree offense. But to make

154

1  the defendant guilty of capital murder, they have to prove
2  murder plus robbery at the same time in the same transaction.
3  Well, what kind of proof do we have on robbery? Answer:
4  Accomplice. What kind of proof do we have to corroborate the
5  accomplice witness that does more than just show that a crime
6  took place, but that also shows that the defendant committed
7  the crime? Well, here's where Brewer comes in. Brewer's
8  cited at page 24.
9    THE COURT: Well, I mean, what do you say to
10 the fact like he says that another witness, not an accomplice
11 witness, saw your client going through his pockets?
12   MR. WARNER: I got it. It's on page 24, Your
13 Honor.
14   THE COURT: Okay. I'm having trouble with my
15 Westlaw here for some reason.
16   MR. WARNER: It's on page 24 of our motion for
17 new trial.
18   THE COURT: I'm there.
19   MR. WARNER: On line 13. Starting at line 12.
20 We say, "The proof is no stronger in Ramirez than it was in
21 Brewer. The evidence in Ramirez tended to show that the
22 accomplice rifled the pockets of the man who was stabbed."
23 Then they say that the defendant rifled the pockets, that the
24 State did have a witness to that effect.
25   Look what happened in Brewer which is higher

155

1  up on page 24 in which the Court of Appeals found that the
2  evidence was legally -- that's important. That means no
3  evidence -- to convict a defendant in the underlying robbery
4  offense. The wallet's found near the body but there's no
5  evidence that the defendant robbed the person. I --
6    THE COURT: Well --
7    MR. WARNER: How do they -- I mean, they don't
8  --
9    THE COURT: But it's robbed or attempted to
10 rob.
11   MR. WARNER: Well --
12   THE COURT: That's how they charged it. And
13 in addition to that, there was evidence from a police officer
14 that he saw the defendant in a van that was described by
15 witnesses leaving -- well, going down Staples, it was
16 consistent with where they would have been. The van was
17 pursued, it was ditched, later found. There were items found
18 in the van that corroborated some of the other robberies that
19 occurred that evening. So, I mean, it's more than just that.
20 I mean, I'll go through -- I'll go through -- I'm not sure if
21 the court reporter's got the full record, but, you know, I can
22 go through that again. But I think there's more than just
23 rifling through the pockets and the coconspirator, codefendant
24 saying such.
25   MR. WARNER: It would be useful for both of

156

1  us, for me and for you, and since we have 11 days, I don't
2  really care if all the commas are in the right place or it's
3  beautiful. Perhaps the court reporter has the --
4    THE COURT: I don't know. I mean, I --
5    MR. WARNER: I'll find out.
6    THE COURT: I mean, I'm sure I could --
7    MR. WARNER: A rough copy is okay with me. We
8  just kind of know -- we don't care whether it's t-h-e-r-e or
9  t-h-e-i-r, we just need to know --
10   THE COURT: I'll see where she's is on that.
11 But I can tell you there was more than just rifling through
12 the pockets in the codefendant. There was items in the van
13 that were taken from some of the other robbery. There was
14 blood evidence in the van, and there was fingerprints in the
15 van linking your client.
16   MR. WARNER: To the van.
17   THE COURT: To the van and to the murder and
18 to the robbery.
19   MR. WARNER: Well --
20   THE COURT: So it's more than just that.
21   MR. WARNER: We have to follow what the State
22 says in its indictment and --
23   THE COURT: Robbed or attempted -- committed
24 the murder while robbing or attempting to rob this individual.
25   MR. WARNER: And the evidence has to match the

157

1  allegations.
2          THE COURT:  I agree.
3          MR. WARNER:  And I suggest that just rifling
4  -- well, just rifling through the pockets, I have reservations
5  about whether or not that's gonna prove robbery or not.
6          THE COURT:  Yeah, but like I said, I think
7  it's more than that.  I mean, you might be right, but I think
8  it's more than that.
9          MR. WARNER:  You mean the rifling, Your Honor,
10  or there was more proof?
11          THE COURT:  There was more proof.  I mean,
12  I'll look at it again.  I mean, you know --
13          MR. WARNER:  Does the proof depend on
14  inference?  I mean, there's the van.  The defendant's
15  associated with the van.  There are -- there's physical
16  property in the van that's associated with these other -- with
17  other robberies other than the robbery of the person who was
18  shocked and who died or stabbed --
19          THE COURT:  Or stabbed the other one.
20          MR. WARNER:  One has to draw inferences from
21  the physical evidence to associate the defendant with the
22  other robberies 2 and 3.
23          THE COURT:  Yeah.  I mean, it's basically what
24  circumstantial evidence is all about.
25          MR. WARNER:  Well, but we also have to look at

158

1  the charging document, the indictment, to see whether the
2  State -- they can't convict him of a crime they didn't write
3  down in the indictment.
4          THE COURT:  I agree.
5          MR. WARNER:  And they have to have
6  specifically charged this murder and this robbery in the same
7  transaction.
8          THE COURT:  I agree.
9          MR. WARNER:  All right.  Well, since you have
10  a few days, if you'll indulge me with letting me see if the
11  reporters can give us a rough copy of the rest of the
12  Reporter's Record.
13          THE COURT:  Well, I mean, I'm not gonna give
14  you an answer today.
15          MR. WARNER:  That's fine.
16          THE COURT:  I'm gonna think about this matter
17  again --
18          MR. WARNER:  Thank you.
19          THE COURT:  -- and I'm gonna --
20          MR. WARNER:  Good.  I appreciate that very
21  much.
22          THE COURT:  -- look at these cases again.  I
23  did read your motion and I went through these cases, but I
24  want to look at the ones -- now that we've heard the evidence,
25  I want to -- I want to focus a little bit more now that we've

159

1  heard some evidence today and look at this before I make a
2  decision on this issue.  Now, I do think on these -- on this
3  other issue on the bill of exceptions, I think --
4          MR. WARNER:  Before we get to that, maybe we
5  could try to focus in on -- counsel may wish to address this
6  -- on focusing in on the decision you got to make.  Does the
7  State really say in its indictment that the murder of the man
8  who was stabbed is associated with robberies 2 and 3?  Weren't
9  robberies 2 and 3 let in?  The State --
10          THE COURT:  Oh, yeah, yeah.
11          MR. WARNER:  I argued --
12          THE COURT:  404(b).
13          MR. WARNER:  -- or complained about that and
14  say that was -- you oughtn't to have done that.  But didn't
15  they really come in to show intent, scheme, plan, design or
16  motive?  But they didn't really write those down in the
17  indictment and say, look, you stabbed this man and you robbed
18  somebody in robbery 2, and therefore, you're guilty of capital
19  murder.  They didn't really say, you stabbed this man and
20  killed him, and you robbed somebody in robbery 3, or at least
21  you're responsible for robbery 3, therefore, you're guilty of
22  capital murder.  They didn't write that down in their
23  indictment.
24          THE COURT:  Well, they did.  I mean, in a way
25  they did, but it got -- it got severed out.  I mean, they

160

1  didn't exactly write what you said.  They did indict all those
2  charges in the indictment but Mr. Jones and Mr. Garza moved to
3  sever and we severed the counts out.
4          MR. WARNER:  Okay.  But then the State goes to
5  trial and the defendant is placed in jeopardy on the pleadings
6  on the live indictment as soon as the jury is selected,
7  impaneled and sworn.  That's when the jeopardy attaches and
8  it's based on the indictment as it existed at the time --
9          THE COURT:  No, I agree.
10          MR. WARNER:  -- that jeopardy attached which
11  in a state criminal jury trial is when the jury is selected,
12  impaneled and is sworn.
13          THE COURT:  No, I agree.
14          MR. WARNER:  So don't they have -- for the
15  State to prove robbery -- murder plus robbery, don't they have
16  to prove murder for the stabbing, and then, don't they have to
17  prove robbery of whoever they said was robbed in their
18  indictment?
19          THE COURT:  Or attempted robbery.
20          MR. WARNER:  I'm -- I suggest a 19 -- George
21  Gowan who was the judge of the 181st District Court, when they
22  were redoing the Penal Code, they just don't really exactly
23  have a defense called attempted robbery.  But it doesn't
24  matter.  I suggest that the rifling doesn't prove robbery.
25          THE COURT:  Okay.  Well, I --

161

1   MR. WARNER: And if it doesn't -- and who have
2   they -- they've got to prove that he murdered the man who was
3   stabbed and that he robbed the man who was stabbed.
4   THE COURT: I understand, Mr. Warner, and I
5   understand your point, and I understand their point. I mean,
6   you're welcome to talk about it some more, but I got to tell
7   you --
8   MR. WARNER: I appreciate it.
9   THE COURT: -- I understand your point. I
10  know where you're coming from, and you know, I don't know what
11  else -- I don't know what else we can say about it. I follow
12  you.
13  MR. WARNER: Well, if you'll look at page 23
14  of our motion for new trial, we cite you to *Herrin*,
15  H-E-R-R-I-N. It's down at the bottom of the page.
16  THE COURT: Okay.
17  MR. WARNER: That looks like the afterthought
18  case. There is an afterthought case. There is a case where
19  the Court of Criminal Appeals says, ummm, looks like
20  afterthought and the State had to prove that at the time --
21  they had to prove that the robbery and the murder go together.
22  If the robbery occurs later, as an afterthought, they didn't
23  prove capital murder.
24  THE COURT: I agree.
25  MR. WARNER: That's what *Harian* is all about.

162

1   THE COURT: I agree that if that, in fact,
2   occurred, if someone goes and murders someone, starts to walk
3   off and then says, you know what, let me check his pockets,
4   that is not a capital murder. It's a murder and a theft of --
5   perhaps a theft.
6   MR. WARNER: Okay. All right. Well, who has
7   the burden of proof? The gunman has the burden of proof, and
8   as you told the jury, it never shifts to the defendant.
9   They've got to prove that it wasn't an afterthought. He
10  doesn't have to prove that it was an afterthought, although
11  counsel for the defense did argue that just because the jury
12  found him guilty doesn't mean that it doesn't change what the
13  evidence is.
14  There's one more thing, letting in robberies 2
15  and 3. In the case that we cite to you complaining about
16  letting in the extraneous offenses, they say, well, trial
17  judge, it was a mistake to let in the extraneous offenses and
18  here's how come the defendant really got tried for the
19  extraneous offenses. The State spent lots and lots of time
20  and lots of effort and lots of argument on proving the
21  extraneous offenses, and they ought not to have done that.
22  Well, the trial Court ought not to let the extraneous offenses
23  in.
24  The State had direct evidence which you've
25  cited. And one of the things they can -- they look at in

163

1   should these extraneous offense have been let in is how much
2   time, how much effort, how much argument did the State spend
3   on those extraneous offenses, and could the State have proven
4   its case without the extraneous offenses? Well, they do have
5   this person who says that the defendant was rifling the
6   pockets. They do have somebody who says, I saw him and it
7   looked to me like he was stabbing him. So they got direct
8   evidence. What do they need the other evidence for? Oh,
9   they're gonna say intent, scheme, plan, design or motive.
10  THE COURT: Well, and they also have the --
11  they also have the accomplice who testified that their plan
12  was to go rob somebody.
13  MR. WARNER: Yes, but even with the testimony
14  of the accomplice what the plan was, the evidence of robberies
15  2 and 3 are really extraneous offenses and the question is --
16  THE COURT: No doubt.
17  MR. WARNER: -- ought you to have done that?
18  I mean, reconsidering in the light of the cases that we cite
19  you to which say, well, if he really got tried for those
20  extraneous offenses, and if the State could have proven its
21  case without those extraneous offenses, don't let them in.
22  It's something that you have to consider.
23  THE COURT: I will tell you I'm gonna
24  reconsider. But I've got to tell you, that was not a decision
25  that I made quickly.

164

1   MR. WARNER: I'm sure.
2   THE COURT: I did think about this.
3   MR. WARNER: I'm sure you did, Your Honor.
4   Well, that will conclude my closing remarks.
5   I appreciate your consideration. I'd appreciate a chance to
6   visit with the court reporter and see if we can get a rough
7   draft of the complete record and I will get that to you
8   immediately.
9   THE COURT: Well, I mean, I'll ask her myself.
10  Really and truly what I -- I mean, I'm not sure I need a rough
11  draft of the complete record for these issues because there's
12  a whole lot of testimony I certainly wouldn't need for these
13  issues. I certainly wouldn't need the voir dire, I certainly
14  wouldn't need a lot of the -- a lot of the witnesses'
15  testimony. I mean, I could -- I could talk to the court
16  reporter and focus it because I know exactly where these
17  things would be.
18  MR. WARNER: It would help me to know which
19  witnesses you thought we ought to focus in on and maybe I can
20  do that as well.
21  THE COURT: Well, I mean, I would think for
22  one, that the two the I. D. techs that talked about what was
23  found in the van.
24  MR. WARNER: Okay. Perhaps we can move on
25  then to the bills of exception. I will -- I haven't until day

165

1  90 to file them.  It doesn't tell me how long I have to modify

2  them so I'll -- I've already filed them well before day 90.  I

3  will follow the rule and submit them to counsel for the

4  government -- counsel for the State and try to conform them

5  generally to what we heard here in the courtroom today.  But

6  you are going to comment about that.

7              THE COURT:  Well, I mean, I would think the

8  prudent thing to do is to file any amendments before the 90

9  days are done.

10             MR. WARNER:  Okay.  We need belt suspenders

11 and safety pins.  Just if we file it before the 90 days we

12 don't need know how long you have --

13             THE COURT:  And then I guess show them to

14 Mr. Skurka, because quite frankly, I think -- I think there

15 are some things in here that are perhaps true enough.  They're

16 just not precise.

17             MR. WARNER:  Well, I can make them more

18 precise in conformity with the evidence that we've heard

19 today, and the only fact question that you'll have to decide

20 in so far as I can tell, Your Honor, the fact question is

21 going to be how about Deputy No. 3 or person No. 3?  Let's get

22 -- one of the witnesses called him a corrections officer.

23 Where was he seated?  We heard some witnesses who said he was

24 outside the bar, we heard one would told us he was at the bar,

25 and all of them told us he was not out there seated in the

166

1  general audience.  So I'll conform these bills of exception to

2  that.

3              THE COURT:  Okay.

4              MR. WARNER:  Those will conclude my remarks on

5  the motion for new trial and on the bills of exception.

6              THE COURT:  Okay.

7              MR. WARNER:  That will conclude our business.

8  May we be excused?

9              THE COURT:  You are.

10             MR. WARNER:  Thank you.

11             THE COURT:  All right.

12             (Proceedings adjourned.)

13

14

15

16

17

18

19

20

21

22

23

24

25

167

1   THE STATE OF TEXAS          *

2

3   COUNTY OF NUECES            *

4

5           I, Sara E. Rivera, Official Court Reporter,

6   in and for the 94th District Court of Nueces County, State of

7   Texas, do hereby certify that the above and foregoing contains

8   a true and correct transcription of all portions of

9   evidence and other proceedings requested in writing by

10  counsel for the parties to be included in this volume of the

11  Reporter's Record, in the above-styled and numbered cause,

12  all of which occurred in open court or in chambers and were

13  reported by me.

14          I further certify that this Reporter's Record of the

15  proceedings truly and correctly reflects the exhibits,

16  if any, admitted by the respective parties.

17          WITNESS MY OFFICIAL HAND, this the _25th_ day of

18  _September_, A. D., 2009.

19

20

21  _Sara E. Rivera_
    SARA E. RIVERA, Texas CSR 4626

22  Expiration date:  12/31/09
    Official Court Reporter

23  94th & 117th District Courts
    901 Leopard Street, Room 402

24  Corpus Christi, Texas 78401
    Telephone:  361-888-0751

25  Facsimile:  361-888-0209



94th District Court

NOT TO SCALE









STATE'S
EXHIBIT
10







STATE'S
EXHIBIT
12



STATE'S
EXHIBIT
13



STATE'S
EXHIBIT
14











FILED

FEB 11 2009

PATSY PEREZ, CLERK
COUNTY & DISTRICT COURTS NUECES COUNTY, TEXAS
BY _____ DEPUTY

STATE'S
EXHIBIT
9











STATE'S
EXHIBIT







STATE'S
EXHIBIT

FILED

FEB 11 2009

PATSY PEREZ, CLERK,
COUNTY & DISTRICT COURTS, NUECES COUNTY, TEXAS
BY_____ DEPUTY



94th District Court



