Scanned  Jun 18, 2013

ARD/IEP Report                                                                                                    40.6503
                                                                                                                Rev.1994

Name: _Camarez, John_                                    Date: _2/17/95_

## Development of the Individual Educational Plan (IEP)

**IV. COMPETENCIES:** ☑ Discussed below   ☐ Reviewed at Initial/Annual ARD

A. 1. *Current academic/developmental skills: _John is able to write upper and lower case letters of the alphabet and words from dictation._

2. *Content areas in which the student's disability significantly interferes with his/her ability to meet regular academic mastery levels: _Written Language_

B. Physical, as it affects participation in: (Check the appropriate competencies)
   *1. Instructional settings: ☒ Normal Vision (___ with/ ✗ without glasses)  ☒ Normal Hearing
        ☒ Good General Health  ☐ Other: _____
        ☐ Visually Impaired

   *AND/OR*
   *2. Physical Education:   Student is capable of receiving instruction in the regular Physical Education program without modifications. ☒ Yes  ☐ No   If No, Document on Deliberations page.

C. *Behavioral/social as it affects:
   1. *Educational placement and programming: (Check the appropriate competencies)
      ☐ Interacts appropriately with peers   ☒ Interacts appropriately with adults
      ☐ Respects authority   ☐ Is cooperative
      ☐ Maintains attention to task   ☐ Adjusts easily to new situations
      ☐ Other _____

   2. *Ability to follow disciplinary rules: (Check the appropriate responses)
      ☐ Yes  ☒ No   The student is able to follow the student code of conduct without modification. If no, complete the ARD/IEP Supplement: Behavior Management Plan (BMP).

D. *Prevocational/Vocational (Prerequisite to Vocational Education) ✗ (Not required for students age 14 years or under)

   ☐ Keeps work area neat   ☐ Has good attendance   ☐ Is responsible
   ☐ Has good social skills   ☐ Follows directions   ☐ Is able to work on time schedule
   ☐ Is mechanically inclined   ☐ Is reliable   ☐ Cares for materials
   ☐ Has part time job   ☐ Others: _____

**V. IEPs FOR INSTRUCTIONAL AND/OR RELATED SERVICES:**

   ☐ Yes  ☐ No   *The ARD Committee reviewed achievement on each of the previous year's short-term objectives on the IEP.
   ☒ N/A   (Applicable to all but Initial ARD Committee meetings.)

   ☒ A. Annual goals and short term objectives developed.
   ☐ B. Based on above competencies (IV) and current functioning, no additional goals or objectives were developed at this meeting.
   ☐ C. Previous IEPs remain in effect.

WHITE-Exceptional Education Audit Folder
CANARY-Parent's Copy
PINK-Exceptional Education Teacher or Permanent Record folder, if student does not qualify
GOLDENROD-Exceptional Education Office                    *Denotes Required Items

ARD
Page _2_ of _14_

Scanned Jun 18, 2013

ARD/IEP Report Supplement

40.6509
Rev.1994

Name: _Lamering John_     Date: _2/17/95_

HOUSTON INDEPENDENT SCHOOL DISTRICT
EXCEPTIONAL EDUCATION DEPARTMENT
ARD/IEP SUPPLEMENT: Individual Education Plan (IEP)

☑ *Instructional Services _Listening Comprehension_ ☑ Draft _2/17/95_
(Subject area in which student's disability significantly     Date
interferes with his/her ability to meet regular academic standards.)    ☑ Accepted by ARD Committee _2/17/95_
          or                                     Date

☐ *Related Service(s) _Not Applicable_
           Specific Service(s)                       Position Responsible for Implementation
                                               (Required for Related Services)

*Duration of Services: from _2/17/95_ to _6/95_
                      Month/Day/Year    Month/Day/Year

ANNUAL GOAL: _John will work toward mastery of essential elements for Listening Comprehension, Grade 3,4._

| *Short Term Objectives[1] The student will be able to: | Indicate level of Mastery Criteria[2] | Evaluation Procedure[3] | *Schedule for Evaluation | EVALUATION CODES[4] | | | | Date Regression? |
|---|---|---|---|---|---|---|---|---|
| | | | | DT C/M | BE C/M | BT C/M | HD C/M | |
| (1) Recognize a speaker's purpose for a presentation. | 80% | 2,8 | 9 wks. | | | | | Y/N |
| | | | | | | | | Y/N |
| | | | | | | | | Y/N |
| (2) Respond to a speaker by asking questions and contributing information. | 80% | 2,8 | 9 wks. | | | | | Y/N |
| | | | | | | | | Y/N |
| | | | | | | | | Y/N |
| | | | | | | | | Y/N |
| (3) Distinguish between fact and opinion. | 80% | 2,8 | 9 wks. | | | | | Y/N |
| | | | | | | | | Y/N |
| | | | | | | | | Y/N |
| | | | | | | | | Y/N |
| | | | | | | | | Y/N |
| | | | | | | | | Y/N |
| | | | | | | | | Y/N |

Note: [1]Goals and objectives should reflect essential elements where ARD committee deems appropriate.

[2]Criteria and schedule must allow for determining student's passing grades and eligibility for participation in extracurricular activities. Grades in Exceptional Education classes reflect mastery of IEP objectives.

[3]Evaluation Procedure Codes:
1. Teacher-made tests
2. Observations
3. Weekly Tests
4. Unit Tests
5. Student Conferences
6. Work Samples
7. Portfolios
8. Other _Listening activities_

[4]Evaluation Codes:
C - Continue
M- Mastered

WHITE-Exceptional Education Audit Folder
CANARY-Parent's Copy
PINK-Exceptional Education Teacher or Permanent Record folder, if student does not qualify
GOLDENROD-Exceptional Education Office

*Denotes Required Items

Scanned Jun 18, 2013

40.6509
Rev.1994

Name: _Ramirez, John_  Date: _2/17/95_

HOUSTON INDEPENDENT SCHOOL DISTRICT
EXCEPTIONAL EDUCATION DEPARTMENT
ARD/IEP SUPPLEMENT: Individual Education Plan (IEP)

☒ *Instructional Services _Speech Therapy_  ☒ Draft _2/17/95_
(Subject area in which student's disability significantly
interferes with his/her ability to meet regular academic standards.)
  or                                      Date
☐ *Related Service(s)  _not required_    ☒ Accepted by ARD Committee _2/17/95_
                    Specific Service(s)                              Date

                                         Position Responsible for Implementation
                                         (Required for Related Services)

*Duration of Services:  from _2/17/95_ to _6/96_
                            Month/Day/Year   Month/Year

ANNUAL GOAL:  _Student will improve Language_
_Moderate      Skills_

| *Short Term Objectives¹ The student will be able to: | Indicate level of Mastery Criteria² | Evaluation Procedure₃ | *Schedule for Evaluation | EVALUATION CODES⁴ | | | | Date Regression? |
|---|---|---|---|---|---|---|---|---|
| | | | | DATE CM | DATE CM | DATE CM | DATE CM | |
| 1. Student will develop word association skills with similarities and relationships. | 85% | 2,8 | 9wks | | | | | Y/N |
| | | | | | | | | Y/N |
| | | | | | | | | Y/N |
| | | | | | | | | Y/N |
| 2. Student will increase Vocabulary skills | | | | | | | | Y/N |
| | | | | | | | | Y/N |
| Receptively | 90% | 2,8 | 9wks | | | | | Y/N |
| Expressively | 90% | 2,8 | 9wks | | | | | Y/N |
| 3. Student will use | | | | | | | | Y/N |
| target vocabulary | | | | | | | | Y/N |
| in written sentences | 85% | 2,8 | 9wks | | | | | Y/N |
| and conversation | 85% | 2,8 | 9wks | | | | | Y/N |
| | | | | | | | | Y/N |

Note: ¹Goals and objectives should reflect essential elements
where ARD committee deems appropriate.

²Criteria and schedule must allow for determining student's
passing grades and eligibility for participation in extracurricular
activities. Grades in Exceptional Education classes reflect
mastery of IEP objectives.

₃ Evaluation Procedure Codes:
1. Teacher-made tests
2. Observations
3. Weekly Tests
4. Unit Tests
5. Student Conferences  7. Portfolios
6. Work Samples       (8.) Other: _Oral Activities_

⁴Evaluation Codes:
C - Continue
M- Mastered

WHITE-Exceptional Education Audit Folder
CANARY-Parent's Copy
PINK-Exceptional Education Teacher or Permanent Record folder, if student does not qualify
GOLDENROD-Exceptional Education Office

*Denotes Required Items

IEP
Page _5_ of _11_

Scanned  Jun 18, 2013

40.6509
Rev.1994

Name: _Ramirez, John_   Date: _2/17/95_

## HOUSTON INDEPENDENT SCHOOL DISTRICT
### EXCEPTIONAL EDUCATION DEPARTMENT
#### ARD/IEP SUPPLEMENT: Individual Education Plan (IEP)

☑ *Instructional Services   _Speech Therapy_   Draft _2/9/95_

(Subject area in which student's disability significantly
interferes with his/her ability to meet regular academic standards.)

☑ Accepted by ARD Committee _2/17/95_
                                  Date

or

☐ *Related Service(s)   _not required_

Specific Service(s)

Position Responsible for Implementation
(Required for Related Services)

*Duration of Services:  from _2/17/95_ to _2/95_
                        Month/Day/Year    Month/Day/Year

ANNUAL GOAL: _Student will increase Articulation_
_Moderate_   _Skills with target phonemes /θ,v,s/_

| *Short Term Objectives¹ The student will be able to: | Indicate level of Mastery Criteria² | Evaluation Procedure³ | *Schedule for Evaluation | *Date CRM† | *Date CRM† | *Date CRM† | *Date CRM† | Date Regression? |
|---|---|---|---|---|---|---|---|---|
| 1. Student will produce target phonemes in sentences (structured) | 85% | 2,8 | 9wks | | | | | Y/N |
| | | | | | | | | Y/N |
| | | | | | | | | Y/N |
| 2. Student will produce target phonemes during reading | 85% | 2,8 | 9wks | | | | | Y/N |
| | | | | | | | | Y/N |
| | | | | | | | | Y/N |
| 3. Student will produce target phonemes during conversational speech (structured) | 85% | 2,8 | 9wk | | | | | Y/N |
| | | | | | | | | Y/N |
| | | | | | | | | Y/N |
| | | | | | | | | Y/N |
| | | | | | | | | Y/N |
| | | | | | | | | Y/N |
| | | | | | | | | Y/N |

Note:  ¹Goals and objectives should reflect essential elements
where ARD committee deems appropriate.

²Criteria and schedule must allow for determining student's
passing grades and eligibility for participation in extracurricu-
lar activities. Grades in Exceptional Education classes reflect
mastery of IEP objectives.

³Evaluation Procedure Codes:
1. Teacher-made tests
2. Observations
3. Weekly Tests
4. Unit Tests
5. Student Conferences  7. Portfolios
6. Work Samples  8. Other: _Oral Activities_

⁴Evaluation Codes:
C - Continue
M- Mastered

WHITE-Exceptional Education Audit Folder
CANARY-Parent's Copy
PINK-Exceptional Education Teacher or Permanent Record folder, if student does not qualify
GOLDENROD-Exceptional Education Office

*Denotes Required Item

IEP
Page _6_ of _14_

Scanned Jun 18, 2013

ARD/IEP Report Supplement

Name: _____ Ramírez , John _____ Date: 2/17/95

40.6521
Rev.1994

HOUSTON INDEPENDENT SCHOOL DISTRICT
EXCEPTIONAL EDUCATION DEPARTMENT
ARD/IEP SUPPLEMENT: Speech Modifications

Check all that apply.

I. ARTICULATION
- ☒ Do not penalize for spelling errors related to misarticulations.
- ☒ Do not penalize for phonetic errors related to misarticulations.
- ☒ Modify types of oral responses expected.
- ☒ Reduce expected length of oral responses.
- ☐ Use a signal to help student know when to _____
- ☐ Implement IEP classroom goals in cooperation with speech therapist.

II. DYSFLUENCY
- ☐ Grades should not be lowered because of a stuttering trait demonstrated during oral responses
- ☐ Increase wait time for oral responses.
- ☐ Reduce stress for student by _____
- ☐ Modify types of oral responses expected.
- ☐ Use a signal to help student know when to _____
- ☐ Reduce expected length of oral responses.
- ☐ Monitor for approriate rate of speech.

III. RECEPTIVE LANGUAGE
- ☒ Refine/reteach questionable vocabulary and concepts.
- ☒ Preferential seating
- ☐ Tape instructional materials.
- ☒ Model expected performance/response.
- ☒ Require students to repeat directions.
- ☐ Use key words when modeling expected performance.
- ☒ Keep testing vocabulary the same as teaching vocabulary.
- ☒ Encourage small group cooperative learning.
- ☒ Visual cues to accompany oral instructions.
- ☐ Change essential element requirements: _____
  _____
  _____

IV. EXPRESSIVE LANGUAGE
- ☒ Allow ample time for word retrieval.
- ☐ Use cueing hierarchy.
- ☒ Emphasize paper/pencil tasks.
- ☒ Modify length, type and/or complexity of expected oral response.
- ☐ Change essential element requirements: _____
  _____

V. VOICE
- ☐ Encourage vocal rest.
- ☐ Utilize a cue to remind student of appropriate vocal behavior.
- ☐ Assign a peer monitor.
- ☐ Utilize amplification for oral presentations.
- ☐ Shorten length of oral tasks.
- ☐ Monitor for appropriate voice quality.

WHITE-Exceptional Education Audit Folder
CANARY-Parent's Copy
PINK-Exceptional Education Teacher or Permanent Record folder, if student does not qualify
GOLDENROD-Exceptional Education Office

*Denotes Required Items

Speech
Page 7 of 14

Scanned  Jun 18, 2013

ARD/IEP Report

40.6504
Rev.1994

Name: _Lannering, John_     Date: _2/17/95_

VI. RECOMMENDATIONS: (*DENOTES REQUIRED ATTACHMENTS; √ all appropriate for this student)

A. ARD/IEP SUPPLEMENTS (Discussion to be recorded on *Deliberations* page)

- ❑ 1. Extended Year Services (EYS)
- ❑ 2. Failure Review
- ❑ 3. Transition Plan (ITP)
- ☒ 4. Speech Modifications
- ☒ 5. Individualized Education Plan
- ❑ 6. Least Restrictive Environment
- ❑ 7. Visually Impaired
- ❑ 8. Behavior

Management Plan/Autistic,

PDD, Multiply Impaired and Lifeskills Students

- ❑ 9. Graduation Provisions
- ❑10. Autistic Supplement
- ☒11. Services to be Provided
- ❑12. Out of District Placement
- ❑13. Behavior Management Plan (BMP)
- ❑14. Other: _____
- ❑15. Other: _____

B. ASSESSMENT OF ACADEMIC SKILLS (TAAS, Texas Assessment of Academic Skills)

- ❑ Criterion referenced assessment (TAAS) is not offered for this student this year
- ☒ Criterion referenced assessment (TAAS) is offered for this student next year

*or*

The student:

- ❑ 1. will take the TAAS--all areas

    *or*

- ☒ 1. Is exempt in all areas
- ❑ 2. Is exempt from TAAS reading
- ❑ 3. Is exempt from TAAS mathematics
- ❑ 4. Is exempt from TAAS writing _____
- ❑ 5. Is exempt from TAAS _____

                    AREA(S)

MODIFICATIONS as defined in test administration materials:

_____ None _____

*or*

_____

*Name of additional test(s)*

- ❑ 1. Will take all parts under standard conditions as defined in test administration materials
- ❑ 2. Will be included in optional testing group (describe)

_____

_____

[(SBOE §101.3 (d) Exemptions)]
[(SBOE §101.3( a-k) Exemptions pp. 77-78)]
[(SBOE §89.223( e) p. 76)]

WHITE-Exceptional Education Audit Folder
CANARY-Parent's Copy
PINK-Exceptional Education Teacher or Permanent Record folder, if student does not qualify
GOLDENROD-Exceptional Education Office

*Denotes Required Items

ARD,
Page _8_ of _11_

Scanned Jun 18, 2013

ARD/IEP Report

Name _Lanning, John_ Date _2/17/95_

40.6505
Rev. 1994

## VII. PLACEMENT ALTERNATIVES:

*Placement alternatives reviewed, including services in regular, bilingual/English as a second language and compensatory education for which the student is eligible and additional services needed, are identified below. Consideration of the occupational training needs for students at or before entry into high school or by age 14 was discussed. Check those reviewed:

☐ Regular Education only
☑ Regular Education with modifications in pacing, methods, or materials
☐ Regular Education with support services
☑ Resource Classroom (exceptional education)
☐ Compensatory Education
☐ Self-contained class (exceptional education)
☐ Regular Vocational Education
☐ Vocational Education for Handicapped
☐ On-the-Job Training
☐ Inclusion

☐ Alternative Schools
☐ Community Services Classes
☐ Homebound
☐ Homebased Instruction†
☐ Community Based Instruction
☐ Hospital Class
☐ Hospital Bedside
☐ Itinerant Teacher Services
☑ Speech Therapy
☐ Regional Day School Program for the Deaf
☐ Texas School for the Visually Impaired

☐ BIC (Behavior Intervention Center)
☐ BAC (Behavior Adjustment Center)
☐ Related Services: _____
☐ Related Services: _____
☐ Other _____
☐ Other _____
☐ Other _____

NOTE: *ARD/IEP Supplement: Least Restrictive Environment Justifications* should be completed before identifying the campus and instructional arrangement of the student who is to be in Exceptional Education classes for 50% or more of the school day.
†Recommended no more than ten (10) days with some direct services provided. If exceeds 10 days, a recent (within the year) assessment and ARD/IEP is needed.

## VIII. DETERMINATION OF PLACEMENT:

*The committee determined that the student's placement will be:

Jefferson El.     Regular | Resource Speech   2/17/95
CAMPUS     INSTRUCTIONAL SETTING†   PROGRAM   EFFECTIVE DATE OF CHANGE

☑ Yes ☐ No   *This is the campus which the student would attend if not disabled.

☑ Yes ☐ No   *This is the campus that offers the services as close as possible to the student's home. *If NO, explain reason for other placement: _____
_____

☐ Yes ☐ No
☑ Not Applicable   For students placed in the Regional Day School Program for the Deaf, the committee documents that the student's hearing loss severely impairs processing linguistic information even with recommended amplification and the loss adversely affects education performance.

## IX. ASSURANCES: (Check all applicable items)

The committee assures that exceptional education placement:
* A. for a national origin minority group student or linguistically different student is not based on criteria which was developed solely on command of the English language.
☑ Yes ☐ No   *BASIS FOR ASSURANCE: ☐ adaptations in testing procedures     ☐ use of interpreter
☑ parent/student information     ☑ language assessment
☐ bilingual assessment

** B. is not based on deficiencies identified as directly attributable to a different culture or lifestyle or lack of educational opportunities. ☑ Yes ☐ No   BASIS FOR ASSURANCE: ☑ parent/student information ☑ sociological assessment

C. ☑ Yes ☐ No   The committee assures that all instructional and related services specified in the IEP will be provided to the student at no cost. Fees normally charged to non-disabled students or their parents, as a part of the general education program, may be charged (i.e., art or laboratory fees).

## X. PARENT/STUDENT RIGHTS:

☑ Yes ☐ No  * Your rights were explained to you when you received the current copy of the booklet: *Special Education: Parent and Student Rights.* Please refer to page vi of this booklet or ask the exceptional education personnel for further explanations. Parent has acknowledged receipt of the *Special Education: Parent and Student Rights* and has no questions.  11-8-94
DATE

NOTE: If appropriate, complete the *ARD/IEP Supplement: Out of District Placement Verification* or *Referral to a Regional Day School Program for the Deaf.*
† Enter the instructional setting that meets the requirements listed in the Texas Student Attendance Accounting Handbook.

WHITE-Exceptional Education Audit Folder
CANARY-Parent's Copy
PINK-Exceptional Education Teacher or Permanent Record folder, if student does not qualify
GOLDENROD-Exceptional Education Office

*Denotes Required Items

Page _9_ of _11_   ARD

Scanned Jun 18, 2013

ARD/IEP Report Supplement

Name: _Tomise J. Dohn_                                   Date: _3/17/95_                40.6508
Rev.1994

## HOUSTON INDEPENDENT SCHOOL DISTRICT
### EXCEPTIONAL EDUCATION DEPARTMENT
**ARD/IEP SUPPLEMENT: *Services to be Provided, page 1**

Year _95_ Semester _SPA_.

| SUBJECT (OPTIONS) | Grade Assigned by† R | E | Off Level Grade (Elem.) Yes | No | Current Instructional Level | Min./Day Hours/Week in Regular Education* | Min./Day Hours/Week in Exceptional Education* | **REQUIRED MODIFICATIONS (if applicable) Write the code for each |
|---|---|---|---|---|---|---|---|---|
| Reading | ✓ | | | ✓ | 5.0 | 5.0 | | 1  4  12  13  14   15,20,29 |
| Writing | | ✓ | ✓ | | | | 2.5 | 1  4  12  13  14   15,20,29 |
| Spelling | ✓ | | | ✓ | 5.0 | 2.5 | | 1  4  12  13  14   15,20,29 |
| Math | ✓ | | | ✓ | 5.0 | 5.0 | | 1  4  12  13  14   15,20,29 |
| Science | ✓ | | | ✓ | 5.0 | 5.0 | | 1  4  12  13  14   15,20,26,29 |
| Social Studies | ✓ | | | ✓ | 5.0 | 5.0 | | 1  4  12  13  14   15,20,26,29 |
| P.E./Elective | ✓ | | | ✓ | 5.0 | 5.0 | | 1  29 |
| Speech Therapy | | ✓ | | ✓ | ~modified~ | 1.0 | | 1 |

† R - Regular Education    E - Exceptional Education    C - Combination    Total Exceptional Education hours per week _2.5_

| SUBJECT (OPTIONS) | Grade Assigned by† R | E | Off Level Grade (Elem.) Yes | No | Current Instructional Level | Min./Day Hours/Week in Regular Education* | Min./Day Hours/Week in Exceptional Education* | **REQUIRED MODIFICATIONS (if applicable) Write the code for each |
|---|---|---|---|---|---|---|---|---|
| Year ___ Semester ___ | | | | | | | | |
| | | | | | | | | |

Promotional ARD

Due Spring 1995

† R - Regular Education    E - Exceptional Education    C - Combination    Total Exceptional Education hours per week ___
NOTE: For Speech students, list Speech as a subject and indicate method (Direct, Consultation, Collaboration, Group) and include in *Total hours per week.*
** MODIFICATIONS required to assure success in regular, remedial, and support programs including eligibility for participation in extra-curricular activities are:

1. Changes in the pace of instruction
2. Oral tests
3. Short answer tests
4. Modified tests
5. Taped texts
6. Highlighted texts
7. Taping Lectures
8. Note taking assistance

9. Extended time for assignment completion
10. Behavior management plan
11. Shortened assignments
12. Assignment notebook
13. Study sheets
14. Repeated review/drill
15. Reduce pencil/paper tasks
16. Preferential seating

17. Calculators
18. Interpreter for hearing impaired
19. Frequent breaks
20. Oral directives
21. Peer tutoring
22. Concrete reinforcers
23. Defined physical space
24. Positive reinforcers

25. Special instructional/adaptive equipment

26. Changes in requirements of essential elements
27. Changes in project or report requirements
28. Changes in tools, equipment or machinery used in the classroom (Voc. Ed.)
29. Other (i.e., Other modifications for Speech) _Speech_

30. Other:

*Denotes Required Items

WHITE-Exceptional Education Audit Folder
CANARY-Parent's Copy
PINK-Exceptional Education Teacher or Permanent Record folder, if student does not qualify
GOLDENROD-Exceptional Education Office

Services   Page _10_ of _11_

Scanned Jun 18, 2013

ARD/IEP Report Supplement

40.6511
Rev.1994

Name: _Ramirez, John_ Date: _2/17/95_

### HOUSTON INDEPENDENT SCHOOL DISTRICT
### EXCEPTIONAL EDUCATION DEPARTMENT
### ARD/IEP SUPPLEMENT: *Services to be Provided, page 2

**LEARNING STYLE:**

☐ Auditory   ☐ Visual   ☐ Tactile   ☑ Multisensory

**SPECIAL CONSIDERATIONS:** _John's behavior does affect his_
_educational functioning._

**COORDINATON BETWEEN REGULAR EDUCATION AND EXCEPTIONAL EDUCATION:**

Responsibility for monitoring student performance in Regular Education: _Exceptional Ed. Teacher_
NAME                                                                                          TITLE

Frequency: _9 wks._    Method: _conference_
Schedule of evaluation participation in extracurricular activities: ☐ 3 wks  ☐ 6 wks  ☑ 9 wks  Other: _report card_

**RELATED SERVICES:**

| SERVICE | PROVIDER TITLE | TIME PER WEEK/ MONTH | DIRECT SERVICE/ CONSULTATION |
|---------|----------------|----------------------|------------------------------|
| None    |                |                      |                              |
|         |                |                      |                              |
|         |                |                      |                              |
|         |                |                      |                              |
|         |                |                      |                              |
|         |                |                      |                              |

**SPECIAL TRANSPORTATION:**

☐ Yes   ☑ No
*If yes, cite justification: _____
(for Parent or HISD)               _____

Provided by :   ☐ HISD   ☐ Parent

Type of bus:   ☐ Non-wheelchair bus   ☐ Wheelchair bus

WHITE-Exceptional Education Audit Folder
CANARY-Parent's Copy
PINK-Exceptional Education Teacher or Permanent Record folder, if student does not qualify
GOLDENROD-Exceptional Education Office

*Denotes Required Items

ARD/Services, con't.

Page _11_ of _14_

Scanned Jun 18, 2013

ARD/IEP Report

40.6507
Rev.1994

Name: Lansing, John                                   Date: 2-17-95

### Deliberations of the ARD/IEP Committee†

Record deliberations of ARD Supplements in minutes (if applicable).
Meeting audiotaped ☐ Yes ☑ No

The purpose of the ARD meeting was to initiate services for Exceptional Education. Mother was present for the meeting.

Marti Aratoon, Evaluation Specialist, explained the psychoeducational testing. John qualifies for the Learning Disabled (LD) handicapping condition in the criteria of Written Language and Listening Comprehension. Mrs. Aratoon added John has an average intelligence level but is having difficulty with his academics due to his behaviors.

Mrs. Stiles, regular classroom teacher, stated John tries hard in class but has great difficulty controlling himself. She added he displays inappropriate behaviors such as disruptive, disorganized, seldom finishes his work, rude behavior, and out of seat/area.

Mother stated John has been living with grandmother, and will be moving out of district with his grandmother.

Dissima Martinez, Speech/Language Therapist, explained John continues to qualify in Speech Therapy. She developed new IEP for speech.

The committee agreed the least restrictive environment was resource for writing, and speech therapy. All other academic subjects will take place in the regular classroom. Due to his easily frustration, it was recommended he be exempt from all areas of TAAS testing. It was recommended by the committee that a psychiatric

☐ ARD/IEP Report  received today by parent/guardian/surrogate parent/adult student
This entire document represents the actions of this committee.

Recorded by _____
              Signature                                    Title

WHITE-Exceptional Education Audit Folder
CANARY-Parent's Copy
PINK-Exceptional Education Teacher or Permanent Record folder, if student does not qualify
GOLDENROD-Exceptional Education Office

*Denotes Required Items

† Required for each ARD/IEP Meeting

ARD
Page 10 of 14

Scanned  Jun 18, 2013

ARD/IEP Report

40.6507
Rev.1994

Name: _Rannerig, John_                                     Date: _2/17/95_

### Deliberations of the ARD/IEP Committee†

Record deliberations of ARD Supplements in minutes (if applicable).
Meeting audiotaped ☐ Yes ☑ No

_evaluation be pursued. Mother agreed with the_
_committee._

☑ ARD/IEP Report received today by parent/guardian/surrogate parent/adult student
This entire document represents the actions of this committee.

Recorded by _Kathy Richards_ _Excep. Ed. Chairperson_
Signature                          Title

WHITE-Exceptional Education Audit Folder
CANARY-Parent's Copy
PINK-Exceptional Education Teacher or Permanent Record folder, if student does not qualify
GOLDENROD-Exceptional Education Office

*Denotes Required Items

† Required for each ARD/IEP Meeting

ARD/
Page _13_ of _14_

Scanned Jun 18, 2013

ARD/IEP Report

40.6506
Rev. 1994

Name: _Ramirez, John_                     Date: _2/29/95_

## XI. SIGNATURES OF COMMITTEE MEMBERS AND OTHER PARTICIPANTS

| SIGNATURE and TITLE MEMBERS: | POSITION | AGREE A | DISAGREE D |
|---|---|---|---|
| Guadalupe Alejandra Priscilla Ram | Parent(s) [1] | ✓ | |
| Argandung L. Farias Principal | Administrator [3] | ✓ | |
| Ana B. Ortiz | Regular Education Instructor [4] | ✓ | |
| Kathy Richards | Exceptional Education Instructor | ✓ | |
| Maria Cristina El Diaz | Assessor(s) [2] | ✓ | |
| OTHER PARTICIPANTS: | | | |
| Doris S. Kohry | Counselor | ✓ | |
| Lizalena Martinez | Speech Therapist | ✓ | |
| | | | |
| | | | |

[1] Parent/ Guardian/ Surrogate Parent/Adult Student
[2] Assessment personnel are required when interpretation of assessment data is being considered.
[3] May be LPAC representative, vocational administrator or designee.
[4] May be LPAC representative if the administrator does not represent LPAC or vocational teacher when appropriate.

**The committee mutually agreed to implement the program reflected in these proceedings.** ☑ Yes

☐    NO   *The members of this ARD committee have not reached mutual agreement. The school has offered and the parent has agreed to a recess of not more than 10 school days. During the recess the members shall consider alternatives, gather additional data, and/or obtain additional resource persons to enable them to reach mutual agreement. This recess does not apply if the student presents a danger of physical harm to himself or herself or others, or if the student has committed an expellable offense. The committee will reconvene on _____ at _____. Statements of the reason mutual agreement has not been reached may be attached.. _____

PLACE AND TIME                                                    DATE

## XII. FOR INITIAL PLACEMENT ONLY:

☑ Yes ☐ No   *I understand that my consent for placement is voluntary and may be withdrawn at any time prior to initial placement. However, if I revoke consent after initial placement, my child's/my placement will not change unless:
    (a) the school and I agree otherwise (following an ARD committee procedures), or
    (b) a due process hearing resolves the disputes.

☑ Yes ☐ No   *I have received and reviewed the Admission, Review and Dismissal (ARD/IEP) Committee Report dated _2-17-95_ that has been prepared for _John Ramirez_

☑ Yes ☐ No   *I understand and agree with the ARD/IEP Committee's decision and give my permission for the educational placement that has been proposed for my child.

_Priscilla Ram_                                             _2-17-95_
*Parent/ Guardian/ Surrogate Parent/Adult Student                      Date
_P. Guadalupe Alejandra_

WHITE-Exceptional Education Audit Folder
CANARY-Parent's Copy
PINK-Exceptional Education Teacher or Permanent Record folder, if student does not qualify
GOLDENROD-Exceptional Education Officer

*Denotes Required Items

ARD
Page _14_ of _14_

Scanned  Jun 18, 2013     CONFIDENTIAL

DATE OF MEETING:
3-29-95

COPY

☐ Admission
☑ Review
☐ Dismissal

West Oso Independent School District

## ADMISSION, REVIEW, AND DISMISSAL (ARD) COMMITTEE MEETING

Name John Domini DOB 6-29-84 School Carl Allen Grade 5
Parents Alejandro + Lucy Domini Address 438 Molina Phone 855-6296
Gender M Ethnic H SS# 454-71-36 ID# 20432 WkPh

☐ ☑ •An interpreter was used to assist in conducting the meeting. If YES, specify language:
YES NO

•REVIEW OF ASSESSMENT DATA (check (✓) if applicable)

  ☑ Assessment reports:

    ☑ Comprehensive individual assessment: 5/93, 1/95
                           DATE(S) OF REPORT(S)

    ☐ Assessment(s) for related services   Specify: none

    NAME OF SERVICE                   DATE OF REPORT

    NAME OF SERVICE                   DATE OF REPORT
none

    ☐ Vocational assessment: not age appropriate
                           DATE(S) OF REPORT(S)

☐ Information from the student's Individual Transition Plan
☐ Records from other school districts Houston ISD.
☐ Information from parents/student Mrs. Domini states she will take John to physic. for
☑ Information from school personnel tongue surgery finding
   Teachers reviewed competencies; dentist if available
☐ Information/records from other agencies or professionals services from appropriate Dr./dentist

☐ ☑ Additional assessment is needed: none,
YES NO
    Specify timeline for assessment to be completed[1] none,

•DETERMINATION OF ELIGIBILITY (check (✓) if applicable)

Based on the assessment data reviewed, the committee has determined that the student:

  ☐ does not meet eligibility criteria to receive special education services.

  ☑ meets eligibility criteria for: 1) Speech Handicapped,
                    DISABILITY 2) Learning Disabled,

[1] If additional assessment is recommended, it must be completed according to the timeline specified.
• Denotes required items

55

3/92
ARD-1

Scanned  Jun 18, 2013

Page _____ of _____

DEVELOPMENT OF THE INDIVIDUAL EDUCATIONAL PLAN (IEP)

☐ ☐ •The ARD committee reviewed achievement on each previous year's short-term objectives on the IEP.
YES  NO  (Applicable to all but initial ARD meetings.)   *not applicable*

**Present Competencies:**

•Physical, as it affects participation in:

•instructional settings: *normal vision, hearing, no reg. medic.*

•physical education: *Phys. disability in tongue movement for adequate speech mobility (tongue) - artic therapy contingent upon tongue surgery, (clipping)*

☐ ☐ The student is capable of receiving instruction in the essential elements of physical education through
YES  NO  the regular program without modification.

•Behavioral, as it affects:

•educational placement, programming, or discipline: *limited task completion when not on instructional level. Improved behaviors in co operation with peers. attention, organization, attentiveness.*

☐ ☐ The student is capable of following the Student Code of Conduct without modification. If NO,
YES  NO  complete ARD/IEP SUPPLEMENT, Behavior Management Plan (ARD Sup-BMP 1 & 2).

•Prevocational/Vocational (when appropriate):

•skills which may be prerequisite to vocational education: *not age appropriate.*

•Academic/Developmental (grade or age levels alone are not acceptable): *Read. & math - works with reg. class placement in reg. Ed. Cal. curr. with minimal modif. - written lang. requires more extensive modif. for academic progress*

•Indicate content areas in which the student's handicap significantly interferes with his/her ability to meet regular academic mastery levels: *Read, Lang., Math, Social Studies, Science, Speech.*

•Denotes required Items

5 6

3/92
ARD-2

Scanned Jun 18, 2013

☑ • Instructional Services

☐ • Related Services
Specify: _____

**•INDIVIDUAL EDUCATIONAL PLAN (IEP)[1]**

Page ____ of ____

☑ Draft 3-29-95
DATE

☑ Accepted by ARD
Committee

NAME OF STUDENT  John Ramirez        SCHOOL  Carl Allen      GRADE  5
(review renewal (year))

•Duration of services from: 3-30-95  to  3/96     Position responsible for implementation
mo/day/yr        mo/yr      (•Required for related services):
reg. teacher(s)

•GOAL: Improve reg. ess. Ele. cur. content skill areas
with reg. peers.

| •SHORT-TERM OBJECTIVES: THE STUDENT WILL BE ABLE TO: | •CRITERIA AND EVALUATION PROCEDURES (INDICATE LEVEL OF MASTERY)[2] | •SCHEDULE FOR EVALUATION | (✓) IF MET |
|---|---|---|---|
| A. Acquire reg. ess. Ele. cur. content skills in Read., Lang., Math, Social Studies, & Science with modifications. | 70% accuracy adapted book tests, teacher-made tests | 6 wks. progress reports | |

[1] Goals and objectives should reflect essential elements where ARD committee deems appropriate.
[2] Criteria and schedule must allow for determining student's eligibility for participation in extracurricular activities.

•Denotes required items

3/92
ARD-3

Scanned  Jun 18, 2013

Page _____ of _____

## •MODIFICATIONS DETERMINED BY ARD COMMITTEE

NAME OF STUDENT _John Ramirez_

CAMPUS _Carl Allen_

To assure coordination among regular, vocational, and special education, the checked adaptations have been approved by the ARD committee for the courses listed.

COURSE/CURRICULUM AREA

| | | | | | | ADAPTATION |
|---|---|---|---|---|---|---|
| | | | | | | 1. Leave class for resource assistance |
| | | | | | | 2. Oral tests |
| | | | | | | 3. Short answer tests |
| | | | | | ✓ | 4. Modified tests _written_ |
| | | | | | ✓ | 5. Taped texts |
| | | | | | ✓ | 6. Highlighted texts |
| | | | | | | 7. Taping lectures |
| | | | | | ✓ | 8. Note taking assistance |
| | | | | | ✓ | 9. Extended time for completion of assignments _written_ |
| | | | | | | 10. Shortened assignments |
| | | | | | | 11. Assignment notebooks |
| | ✓ | ✓ | ✓ | ✓ | | 12. Peer tutoring |
| | | | | | | 13. Study sheets |
| | ✓ | ✓ | ✓ | ✓ | | 14. Repeated review/drill/∙ |
| | | | | | | 15. Reduced pencil/paper tasks |
| | | | | | | 16. Calculators |
| | | | | | | 17. Preferential seating |
| | | | | | | 18. Interpreter for the deaf |
| | | | | | ✓ | 19. Frequent breaks |
| | | | | | | 20. Defined limits |
| | | | | | | 21. Cooling off period |
| | ✓ | ✓ | ✓ | ✓ | ✓ | 22. Concrete reinforcers |
| | ✓ | ✓ | ✓ | ✓ | ✓ | 23. Positive reinforcers |
| | | | | | | 24. Behavior management systems |
| | | ✓ | ✓ | ✓ | ✓ | 25. Special instructional or adaptive equipment: _assist. tech._ |
| | ✓ | ✓ | ✓ | ✓ | ✓ | 26. Increased verbal response time |
| | ✓ | ✓ | ✓ | ✓ | | 27. Directions given in a variety of ways |
| | ✓ | ✓ | ✓ | ✓ | ✓ | 28. Adjustments for misarticulation in responses _th  r  v  s_ |
| | | | | | | 29. Alternative materials |
| | | | | | | 30. Other: |
| | | | | | | 31. Other: |
| | | | | | | 32. Other: |
| | | | | | | 33. Other: |

Behavior Management Plan

☐ YES  ☑ NO

Regular Discipline Plan

☑ YES  ☐ NO

☐ Modifications not needed or not applicable

ADMINISTRATOR _Victor Foo_

ASSESSMENT 1) _Annette M Mendz_  2) _E.J. Jarbzewski_

TEACHER _Christine Steele_

DATE _March 29, 1995_

•Denotes required items

59

3/92
ARD-5

Scanned Jun 18, 2013

*John Ramirez*

## MATERIALS FOR STUDENTS WITH LEARNING PROBLEMS

### TACTILE-KINESTHETIC LEARNERS

Use real objects, models, three dimensional objects, and manipulative materials that can be touched and moved.

computers
globes
fingerpaints
models
relief maps
textured letters

typewriters
abacus
felt pens
calculators
pocket charts

### VISUAL LEARNERS

flashcards
filmstrips
Rebus stories
hooksboard

movies
charts, graphs, tables
pocket charts

### AUDITORY LEARNERS

Language Master
Speak'n Spell
records
audio visual aids
pocket charts

tape recorder
Speak'n Math
cassette tapes
movies
hooksboard

*Multi-Modality*

*Approach*

WEST OSO I.S.D.
SPECIAL EDUCATION DEPT.
SPEECH/HEARING THERAPIST
5050 ROCKFORD DR.
CORPUS CHRISTI, TEXAS 78416
(512) 855-3321

Scanned Jun 18, 2013

*John Ramirez*

### ADAPTING TEXTBOOKS

WEST OSO I.S.D.
SPECIAL EDUCATION DEPT.
SPEECH/HEARING THERAPIST
5050 ROCKFORD DR.
CORPUS CHRISTI, TEXAS 78416
(512) 855-3321

Adapting textbooks is necessary to provide materials at a level the student can master.

1.  The simplest adaptation of a text is to tape it.

2.  Highlighting the main ideas and key concepts.

3.  The cut and paste technique. Only the main ideas or specific content are cut from the text and pasted on separate sheets of paper.

    Material can be arranged sequentially.
    Additional heading and key words can be added.
    Small parts can be presented singly.
    Eliminates the task of recopying.

4.  Transforming printed words into graphic aids.

    Charts            Maps
    Graphs            Illustrations        Models
                                            Concrete materials

5.  Materials can be reorganized. Small bits of information can be grouped into classifications or relationships to help students learn. Ideas, tasks, and directions should be arranged sequentially to aid memory. The former technique is called "chunking".

6.  Advanced Organizers prepare the student for the material he is about to read.

    Outlines
    Diagrammatic overviews
    Study guides
    Questions at end of chapter
    Directed previewing: charts, headings, etc.

## MODIFICATIONS OF TESTS
### for written tests

WEST OSO I.S.D.
SPECIAL EDUCATION DEPT.
SPEECH/HEARING THERAPIST
5050 ROCKFORD DR.
CORPUS CHRISTI, TEXAS 78416
(512) 855-3321

John Ramirez

1.  Too much detail may confuse and distract.

2.  Group material into small sections, separating questions with lines.

3.  Space the items on the page to avoid crowding.

4.  Limit the number of choices to three or four on multiple choice tests.

5.  Put the blank at the end of the sentence in fill-in-the-blank questions.

6.  Limit matching to no more than ten items in one section.

7.  Match the length of test to student's work period.

8.  Allow extra time to take the test.

9.  Supply diagrams or charts when applicable.

10. Allow book markers to help with visual placement.

11. Allow answers in the student's own words.  This ensures understanding.

Scanned  Jun 18, 2013

☐ • Instructional Services

☐ • Related Services
   Specify:

•INDIVIDUAL  EDUCATIONAL  PLAN  (IEP)[1]

Page _____ of _____

☐ Draft 3-29-95
         DATE

☑ Accepted by ARD
      Committee

NAME OF STUDENT  John   Ramirez      SCHOOL  Carl Allen      GRADE  5

•Duration of services from: 3-30-95  to: 3/96  *Review Re-Eval

mo/day/yr          mo/yr

Position responsible for implementation
(•Required for related services):
Speech Ther./Reg.+ Sp Ed. Tchr.

•GOAL: Improve Oral Language Communication

| •SHORT-TERM OBJECTIVES: Level III  THE STUDENT WILL BE ABLE TO: 15 min mthly   Inclusion: Level III | •CRITERIA AND EVALUATION PROCEDURES (INDICATE LEVEL OF MASTERY)[2] | •SCHEDULE FOR EVALUATION | (✓) IF MET |
|---|---|---|---|
| 1) Develop Language Form to use basic sentence patterns spontaneously | 70% mastery | 6week Report Card | |
| 2) Develop Language Content: a) to comprehend and produce vocabulary through category association | Teacher Observation | 5/96 SH Re Eval | |
| b) to comprehend and produce "yes/no" and "wh" questions | Student Participation | do 3/96 | |
| 3) Develop Language Use: a) to take turns in a conversation b) to maintain and conclude topics c) to comprehend Classroom information | Teacher-made task | | |

[1] Goals and objectives should reflect essential elements where ARD committee deems appropriate.

[2] Criteria and schedule must allow for determining student's eligibility for participation in extracurricular activities.

*Denotes required Items

57

3/92
ARD-3

Scanned  Jun 18, 2013

*SERVICES TO BE PROVIDED    curr. (6 ls)

Page _____ of _____

| INSTRUCTION | | | | | PROGRESS/GRADE DETERMINED BY: | | | |
|---|---|---|---|---|---|---|---|---|
| COURSE/CURRICULUM AREA | REG. ED. MODIFIED YES | NO | REG. ED. TIME | SP. ED. TIME | REG. ED. | SP. ED. | JOINT | COMMENT |
| Read. | ✓ | | 1/0 | | ✓ | | | |
| Lang | ✓ | | 1/0 | | ✓ | | | |
| math | ✓ | | 1/0 | | ✓ | | | |
| Social Studies | ✓ | | 1/0 | | ✓ | | | |
| Science | | ✓ | 1/0 | | ✓ | | | |
| Fine Arts/PE | | ✓ | 0.0 | | ✓ | | | |
| Speech Therapy | | | | 1ce/tt | | | | |

| RELATED SERVICES | AMOUNT OF TIME PER WEEK |
|---|---|
| | |
| none | |
| | |
| | |

COORDINATION BETWEEN REG. ED. AND SP. ED.

Responsibility for monitoring student's performance in regular education: _joint_

Frequency: _6 wks._
Method: _conference, progress reports_

Schedule for evaluating progress for participation in extracurricular activities will be:
   3wks _____  6wks ✓  other _____

☐      ☑ ✓   ●Special Transportation   ●If YES, cite justification:
YES   NO

*Criterion referenced assessment (TAAS):
   _____ will take mathematics
   _____ will take writing
   _____ will take reading
   _____ not offered for this student's grade placement
   _____ exempt in all areas

** Modifications as defined in test administration materials:
_____
_____
_____

Assistive Technology has been considered for this student. ✓ Yes _____ No

This student qualifies for Assistive Technology.
_____ No _____
_____

_____

1 ARD Committee decisions should be consistent with NAPT procedures
** Modifications needed to assure success in regular, remedial, and supportive programs including eligibility for participation in extracurricular activities are specified on the following page.
*Denotes required items

5 8

3/92
ARD-4

Scanned Jun 18, 2013

## DETERMINATION OF PLACEMENT

Page _____ of _____

Placement alternatives reviewed including services in regular education, bilingual education/English as a second language, and compensatory education for which the student is eligible and additional services discussed (Include consideration of occupational training needs for students at or before entry into high school or by age 14):

| | | |
|---|---|---|
| ___ Chapter 1 Compensatory | ___ Special Education Resource | ___ Homebound Services | ___ Regular Vocational |
| ___ Bilingual/ESL | ___ Special Education S/C or P/SC | ___ VAC | ___ Additional Sp. Ed. hours |
| ___ Regular Education | ___ Separate Special Ed . Campus | ___ Other : _____ | |
| ___ Modified Regular Ed. | | | |

☐   ☐   •Parents have been provided information about the Texas School for the Blind and Visually Impaired or
YES   NO   Texas School for the Deaf if student is visually or auditorally handicapped or deaf-blind.[1]

NOTE:   ARD/IEP SUPPLEMENT LEAST RESTRICTIVE ENVIRONMENT JUSTIFICATION SHOULD BE COMPLETED BEFORE IDENTIFYING CAMPUS AND INSTRUCTIONAL ARRANGEMENT IF STUDENT IS TO BE IN SPECIAL EDUCATION CLASSES FOR 50% OR MORE OF SCHOOL DAY.

The committee determined that the student's placement will be at:

_Carl Allen_

NAME OF SCHOOL CAMPUS

_Speech   001_

NAME OF INSTRUCTIONAL ARRANGEMENT[2]

☐   ☐   •This is the campus which the student would attend if not handicapped. If NO justify:
YES   NO

## ASSURANCES

The committee assures that special education placement:
- •is as close as possible to the student's home.
- •for national origin minority group students or linguistically different students is not based on criteria which were developed solely on command of the English language.
  - •Basis for assurance:

    ☐   adaptations in testing procedures
    ☐   use of interpreter
    ☐   review of parent/student information
    ☑   review of language assessment
- •is not based on deficiencies identified as directly attributable to a different culture, lifestyle, or lack of educational opportunities.
  - •Basis for assurance:

    ☐   review of parent/student information
    ☑   review of sociological assessment

The ARD committee assures that this student is being educated with students his/her age who do not have handicaps to the maximum extent appropriate to his/her overall educational needs (including academic and developmental areas such as language and socialization).

The committee assures that all instructional and related services specified in the IEP will be provided to the student at no cost. Fees normally charged to nonhandicapped students or their parents, as part of the general education program, may be charged (i.e., art or laboratory fees).

NOTE:   IF APPROPRIATE, COMPLETE ARD/IEP SUPPLEMENT: OUT-OF-DISTRICT PLACEMENT VERIFICATION (ARD SUP-OD) OR REFERRAL TO A REGIONAL DAY SCHOOL PROGRAM FOR THE DEAF (ARD SUP-RDSPD).

[1] Required only for initial placement.
[2] Enter instructional arrangement that meets requirements listed in the Texas Daily Register of Student Attendance.
•Denotes required items

60

Scanned Jun 18, 2013

Scanned Jun 18, 2013

* SIGNATURES OF COMMITTEE MEMBERS                    Page_____ of _____

| Signature | Position | Agree | Disagree |
|---|---|---|---|
| Guadalupe Olejandro | Parent/Adult Student | | |
| Victor M. | Administration | ✓ | |
| Christina Shah | Instruction *Reg.* | ✓ | |
| Sharon Musad | Special Education *Monitor* | ✓ | |
| Annette M. Mendez | Assessment[1] *Speech* | ✓ | |
| G. L. Jaroszewski | *assessment* | ✓ | |
| | | | |
| | | | |

☑ This IEP has been developed by the members of the ARD committee by mutual agreement.

OR

☐ The members of this ARD committee have not reached mutual agreement. *not applicable* The school has offered and the parent has agreed to a recess of not more than 10 school days. During the recess the members shall consider alternatives, gather additional data, and/or obtain additional resource persons to enable them to reach mutual agreement. This recess does not apply if the student presents a danger of physical harm to himself or herself or others, or if the student has committed an expellable offense. The committee will reconvene on _____ at _____ . [2] Statements of the reason mutual
DATE                          PLACE AND TIME
agreement has not been reached may be attached.

* Your rights were explained to you when you received the current copy of the booklet, Special Education: Parent and Student Rights. Please refer to page vi of this booklet for information on procedural safeguards.

* FOR INITIAL PLACEMENT    *not applicable*

☐     ☐   * I have received and reviewed the admission, review, and dismissal (ARD) committee report,
YES   NO     dated _____ , that has been prepared for: _____
                                                                    NAME OF STUDENT

☐     ☐   * I understand and agree with the ARD committee's decision and give my permission for the educational
YES   NO     placement that has been proposed for my child/me.

☐     ☐   * I understand that my consent for placement is voluntary and may be withdrawn anytime. However, if I
YES   NO     revoke consent after initial placement, my child's/my placement will not change unless:
             (a) the school and I agree otherwise (following ARD committee procedures); or
             (b) a due process hearing resolves the dispute.


* SIGNATURE OF PARENT, GUARDIAN, SURROGATE PARENT, OR ADULT STUDENT          DATE

SIGNATURE OF INTERPRETER, IF USED                                            DATE

[1] Assessment personnel are required when interpretations of assessment data are being considered.
[2] Include documentation concerning the reconvened ARD.
* Denotes required items                        6 1                              3/92
                                                                                 ARD-7

Scanned  Jun 18, 2013



DX-4

MARY LOPEZ BUITRON, CSR, RPR
*Official Court Reporter - 94th District Court*

Scanned Jun 18, 2013

09/19.2011 09:41 FAX



☑001



# PATSY PEREZ
## DISTRICT CLERK

DISTRICT COURTS / COUNTY COURTS AT LAW
901 LEOPARD STREET, ROOM 313
CORPUS CHRISTI, TEXAS 78401
361 888-0450 Fax 888-0571

ECNLOSED ARE THE COPIES OF FEE SHEETS THAT YOU REQUESTED ON
GRANT JONES AND EDWARD GARZA, PERTAINING TO CAUSE NUMBER
04-CR-3453-C, JOHN HENRY RAMIREZ......

THANK YOU

JOHN SAAVEDRA



DEFENDANT'S
EXHIBIT
4

Received Time Sep.19. E10:31AM • CORPUS CHRISTI, TEXAS 78403

Scanned Jun 18, 2013

09/19/2011 09:42 FAX                                                    002

## Attorney Fee Voucher
### Nueces County District Courts
Court # 94th

| | |
|---|---|
| PO# | (One PO# per case.) |

INSTRUCTIONS                                      Page 1 of 2
Show only one cause number per defendant.
Each claim must be printed or typed. Please do not use black ink.
Itemized statement on services rendered is required. See page 2.
Submit separate claims for investigations, expert witness costs and other expenses.
Forward completed claim to the court for approval.

Cause No.: 04-CR-3453-C    Offense: CAPITAL MURDER + Robbery    Degree: CM

In the case of : State of Texas vs  John Henry Ramirez    AG#

Case Level:
- [ ] Felony (CR)  [ ] Misdemeanor (CR)  [ ] Revocation-Felony (CR)  [ ] Revocation-Misdemeanor(CR)  [ ] Dismissal (CR)  [ ] Habeas Corpus
- [ ] Appeal (APA)  [ ] Juvenile (JUV)  [x] Capital Case (CM)  [ ] No Charges Filed (AR)  [ ] Divert/Other:

| | | Total Number of Hours/Days | Authorized Rates | Not to Exceed | |
|---|---|---|---|---|---|
| **Guilty Plea or Plea of True** | In court | | $250 to $450 | | Sub-total $ |
| | Out of court | | Flat fee | | $ |
| **Dismissal on State's Motion** | In court | See Attached | $100 to $400 | | Sub-total $ |
| | Out of court | EXHIBIT | Flat fee | | $ |
| **Nonjury Trial and Contested Hearings** | In court | | $60 to $80/hr | | Sub-total $ |
| | Out of court | | $30 to $60/hr | | $ |
| **Jury Trial** | In court | | $500 to $750/day $250 to $375/half | | Sub-total $ |
| | Out of court | | $30 to $60/hr | | $ |
| **Direct Appeal or Discretionary Review** | Death sentence case | | $50 to $75/hr | $10,000 | Sub-total $ |
| | Non-death capital, first or second degree case | | $50 to $75/hr | $3,000 | |
| | Third degree or state jail case | | $50 to $75/hr | $2,500 | |
| | Misdemeanor case | | $50 to $75/hr | $1,500 | |

NUECES COUNTY AUDITOR

JUL 17 2008

PAID

Reimbursable costs   (Please itemize on Page 2)    $

Total    $

Attorney Name:  Edward F. Garza    Vendor No.: V-04084

E-Mail Address:  eegarza@stx.rr.com

Mailing Address (Number, Street, Suite, City, State, Zip Code):
719 S. Shoreline #201
C.C. Texas 78401

For County Auditor Use
Dept - KeyCode:  3320-5344    Secondary Reference:  CM

State Bar Number:  07731200    Telephone Number: (361) 888-8877    Fax Number: (361) 888-8879

I, the undersigned attorney, certify that the above information is true and correct and in accordance with the laws of the State of Texas. The compensation and expenses claimed were reasonable and necessary to provide effective assistance of counsel. I further swear or affirm that I have not received nor will receive any money or anything else of value for representing the accused, except as otherwise disclosed to the Court in writing.

Time Period of Services Rendered: From  2-29-08  to  5-30-08    (Complete Page 2)

Have previous vouchers been sumitted for this case? YES or NO (Circle one)    Edward Garza  6-18-08
If yes, PO# required above.    Is this voucher for: [ ] Final payment  or  [x] Partial payment?    Signature and Date

SIGNATURE OF TRIAL JUDGE:  Keely Vh    /s/ Patsy Perez
Reason(s) for Denial or Variation:    6/30/08    $7540.00    Cindy L Martinez
Date    Amount    Recorded by: Patsy Perez, District Clerk by Deputy District Clerk (Signature)

✓ Copy    Received Time Sep.19. 10:31AM

Atto Voucher Form 2007

Scanned Jun 18, 2013
09/19/2011 09:42 FAX                                          ☒ 003

CAUSE NO.  04-CR-3453-C

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE DISTRICT COURT |
| | § | |
| VS. | § | 94TH JUDICIAL DISTRICT |
| | § | |
| JOHN HENRY RAMIREZ | § | NUECES COUNTY, TEXAS |

## EXHIBIT IN SUPPORT OF REASONABLE FEES
## FOR CAPITAL MURDER CASE

| DATE | ACTION TAKEN | TIME |
|---|---|---|
| 02/29/2008 | COURT APPEARANCE BY CLIENT TO APPOINT COUNSEL. | 00.50 |
| 02/29/2008 | CONFERRED WITH CLIENT AT COUNTY JAIL AFTER BEING APPOINTED AS COUNSEL. | 01.50 |
| 03/04/2008 | CONFERRED WITH CLIENT'S FAMILY AT OFFICE. | 01.50 |
| 03/06/2008 | CONFERRED WITH ASSISTANT D.A. SKURKA RE: DISCOVERY PACKET, JURY QUESTIONAIRES. | 00.50 |
| 03/06/2008 | CONFERRED WITH CLIENT AT COUNTY JAIL. | 01.00 |
| 03/14/2008 | CONFERRED WITH CLIENT AT COUNTY JAIL. | 01.00 |
| 03/21/2008 | CONFERRED WITH CLIENT AT COUNTY JAIL. | 01.00 |
| 03/28/2008 | CONFERRED WITH CLIENT AT COUNTY JAIL. | 01.00 |
| 04/04/2008 | CONFERRED WITH CLIENT AT COUNTY JAIL. | 01.00 |
| 04/11/2008 | CONFERRED WITH CLIENT AT COUNTY JAIL. | 01.00 |
| 04/17/2008 | CONFERRED WITH CO-COUNSEL GRANT JONES RE: TRIAL STRATEGY, AND DRAFTED MOTIONS FOR EXPERTS. | 03.00 |

Scanned Jun 18, 2013
09/19/2011 09:43 FAX                                        ☑004

| | | |
|---|---|---|
| 04/18/2008 | CONFERRED WITH CLIENT AT COUNTY JAIL. | 01.00 |
| 04/24/2008 | CONFERRED WITH ASSISTANT D.A. SKURKA RE: DISCOVERY AND DNA. | 00.50 |
| 04/29/2008 | JAIL VISIT WITH CLIENT RE: ADDITIONAL MOTIONS, DISCOVERY AND INVESTIGATION. | 00.20 |
| 04/30/2008 | STATUS HEARING & CONFERRED WITH CLIENT. | 04.00 |
| 05/02/2008 | CONTINUE REVIEWING DISCOVERY. | 02.00 |
| 05/03/2008 | CONTINUE REVIEWING DISCOVERY. | 03.00 |
| 05/14/2008 | CONFERRED WITH CO-COUNSEL JONES RE: EXPERTS AND EX-PARTE MOTION, AND CONFERRED WITH MITIGATION EXPERT. | 04.00 |
| 05/16/2008 | DRAFTED MOTIONS FOR MITIGATION EXPERT, PSYCOLOGIST AND INVESTIGATOR. | 01.50 |
| 05/18/2008 | RESEARCHED AND READ LEGAL MATERIALS RE: MITIAGATION EVIDENCE FOR CAPITAL MURDER CASES. | 05.00 |
| 05/21/2008 | FILED EX-PARTE MOTIONS, CONFERRED WITH COURT RE: EXPERTS. | 01.50 |
| 05/27/2008 | CONFERRED WITH CLIENT AT COUNTY JAIL. | 01.00 |
| 05/30/2008 | CONFERRED WITH CLIENT AND DELIVERED DISCOVERY AND OTHER LEGAL ARTICLES. | 01.00 |

**TOTAL HOURS: 37.70**

ATTORNEY SUBMITS THIS REASONABLE FEE APPLICATION
FOR 37.70 HOURS AT THE STATUTORY FEE OF $200.00 PER HOUR:   $7,540.00

**TOTAL: 7,540.00**



Received Time Sep.19. 10:31AM

Scanned Jun 18, 2013

09/19/2011 09:43 FAX @005

**Attorney Fee Voucher**
**Nueces County District Courts**
Court # 94th DIST COT

| | | | |
|---|---|---|---|
| PO# | | | Page 1 of 2 |

INSTRUCTIONS
Show only one cause number per defendant.
Each claim must be printed or typed. Please do not use black ink.
Itemized statement on services rendered is required. See page 2.
Submit separate claims for investigations, expert witness costs and other expenses.
Forward completed claim to the court for approval.

(One PO# per case.)

Cause No.: 04-CR-3453-C   Offense: CAPITAL MURDER   Degree: D/P

In the case of: State of Texas vs  JOHN Henry RAMIREZ   AG#

Case Level:
☐ Felony (CR)  ☐ Misdemeanor (CR)  ☐ Revocation-Felony (CR)  ☐ Revocation-Misdemeanor(CR)  ☐ Dismissal (CR)  ☐ Habeas Corpus
☐ Appeal (APA)  ☐ Juvenile (JUV)  ☑ Capital Case (CM)  ☐ No Charges Filed (AR)  ☐ Divert/Other:

| | | Total Number of Hours/Days | Authorized Rates | Not to Exceed | |
|---|---|---|---|---|---|
| Guilty Plea or Plea of True | In court | | $250 to $450 | | Sub-total |
| | Out of court | | Flat fee | | |
| Dismissal on State's Motion | In court | See Attached | $100 to $400 | | Sub-total |
| | Out of court | | Flat fee | | |
| Nonjury Trial and Contested Hearings | In court | Exhibit | $60 to $80/hr | | Sub-total |
| | Out of court | | $30 to $60/hr | | |
| Jury Trial | In court | | $500 to $750/day $250 to $375/half | | Sub-total |
| | Out of court | | $30 to $50/hr | | |
| Direct Appeal or Discretionary Review | Death sentence case | | $50 to $75/hr | $10,000 | NUECES COUNTY AUDITOR |
| | Non-death capital, first or second degree case | | $50 to $75/hr | $3,000 | DEC 12 2006 |
| | Third degree or state jail case | | $50 to $75/hr | $2,500 | PAID |
| | Misdemeanor case | | $50 to $75/hr | $1,500 | |

Reimbursable costs   (Please itemize on Page 2)

| | Total | |
|---|---|---|

Attorney Name: Edward F. Garza   Vendor No. V-04084

E-Mail Address: EPGarza@STX.RR.com

Mailing Address (Number, Street, Suite, City, State, Zip Code): 719 S. Shoreline #201 C.C. TEXAS 78401   Dept - Key Code: 3320-5344   Secondary Reference: CM   For County Auditor Use

State Bar Number: 07731200   Telephone Number: (361) 888-8877   Fax Number: (361) 888-8879

I, the undersigned attorney, certify that the above information is true and correct, and in accordance with the laws of the State of Texas. The compensation and expenses claimed were reasonable and necessary to provide effective assistance of counsel. I further swear or affirm that I have not received nor will receive any money or anything else of value for representing the accused, except as otherwise disclosed to the Court in writing.

Time Period of Services Rendered: From 6-13-08 to 11-20-08   (Complete Page 2)

Edward F. Garza 12-1-08
Signature and Date

Have previous vouchers been sumitted for this case? ☑ YES or ☐ NO
(Check one)
If yes, PO# required above.   Is this voucher for: ☐ Final payment   or   ☑ Partial payment?

SIGNATURE OF TRIAL JUDGE:   [signature]   12/3/08   $2100.00   151 Patsy Perez
Cindy J. Martinez

Reason(s) for Denial or Variation:   08 DEC -3 6:14 3:30   Date   Amount   Recorded by: Patsy Perez, District Clerk by Deputy District Clerk (Signature)

copy to files.
Atty Voucher   Received Time-Sep.19. 10:31AM

Scanned Jun 18, 2013

08/19/2011 09:44 FAX                                                    ☒006

## CAUSE NO. 04-CR-3453-C

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE DISTRICT COURT |
| | § | |
| VS. | § | 94TH JUDICIAL DISTRICT |
| | § | |
| JOHN HENRY RAMIREZ | § | NUECES COUNTY, TEXAS |

### EXHIBIT IN SUPPORT OF REASONABLE FEES
### FOR CAPITAL MURDER CASE

| DATE | ACTION TAKEN | TIME |
|---|---|---|
| 06/13/08 | CONFERRED WITH CLIENT AT COUNTY JAIL. | 00.50 |
| 06/18/08 | CONFERRED WITH CO-COUNSEL JONES & INVESTIGATOR BARRERA. | 01.00 |
| 06/20/08 | CONFERRED WITH CLIENT AT COUNTY JAIL. | 00.50 |
| 07/10/08 | CONFERRED WITH CLIENT & INVESTIGATOR BARRERA AT COUNTY JAIL. | 01.00 |
| 07/18/08 | CONFERRED WITH CLIENT & INVESTIGATOR BARRERA AT COUNTY JAIL. | 01.00 |
| 07/30/08 | CONFERRED WITH CLIENT & INVESTIGATOR BARRERA AT COUNTY JAIL. | 01.00 |
| 08/05/08 | CONFERRED WITH CLIENT, INVESTIGATOR BARRERA & DR. TROY MARTINEZ. | 01.00 |
| 08/07/08 | OBTAINED & REVIEWED AUDIO TAPE OF 911 DISPATCH CALL; VIDEO STATEMENT OF ANGELA RODRIGUEZ; VIDEO STATEMENT OF CHRISTINA CHAVEZ; NEWS REPORTS OF FOOTAGE FROM CHANNEL 6 NEWS. | 03.00 |
| 08/15/08 | CONFERRED WITH INVESTIGATOR BARRERA & DR. TROY MARTINEZ. | 01.50 |

Received Time Sep.19. 10:31AM

Scanned Jun 18, 2013

08/19/2011 09:41 FAX                                                    007

| | | |
|---|---|---|
| 08/20/08 | MET WITH CO-COUNSEL JONES, 1ST ASSISTANT D.A. SKURKA & 94TH DISTRICT JUDGE BOBBY GALVAN TO DISCUSS AND CONFER ABOUT NEW PRE-TRIAL & TRIAL DATES. | 01.00 |
| 09/05/08 | OBTAINED & REVIEWED WRITTEN TRANSCRIPT OF CO- DEFENDANT'S. | 02.00 |
| 09/06/08 | CONFERRED WITH CLIENT AT COUNTY JAIL RE: NEW TRIAL DATES AND NEW DISCOVERY MATTERS. | 01.00 |
| 09/19/08 | CONFERRED WITH CLIENT AT COUNTY JAIL RE: MORE DISCOVERY MATTERS. | 01.00 |
| 09/26/08 | CONFERRED WITH CLIENT AT COUNTY JAIL RE: UPCOMING PRE-TRIAL MOTIONS HEARING. | 01.00 |
| 10/03/08 | PRE-TRIAL MOTIONS HEARING RE: IDENTITY. | 03.00 |
| 10/07/08 | CONFERRED WITH INVESTIGATOR BARRERA RE: TRIAL STRATEGY. | 01.00 |
| 10/08/08 | CONFERRED WITH CLIENT AND INVESTIGATOR BARRERA AT COUNTY JAIL RE: UPCOMING GENERAL VOIR DIRE. | 01.00 |
| 10/22/08 | GENERAL VOIR DIRE; PASSED OUT QUESTIONAIRE. | 05.00 |
| 10/24/08 | OBTAINED BOXES OF COPIES QUESTIONAIRES. | 00.50 |
| 10/25/08 | READ AND REVIEWED QUESTIONAIRES. | 03.00 |
| 10/26/08 | CONTINUED READING & REVIEWING QUESTIONAIRES. | 04.00 |
| 10/29/08 | PRE-TRIAL RE: EXTRANEOUS MATTERS & 404B MATERIAL. | 01.00 |
| 10/29/08 | CONTINUED READING & REVIEWING QUESTIONAIRES. | 04.00 |
| 10/30/08 | CONTINUED READING & REVIEWING QUESTIONAIRES; MADE & COPIED NOTES FROM ASSISTANT D.A. SKURKA RE: AGREED STRIKES FOR CAUSE. | 04.00 |

Received Time Sep.19. 10:31AM

Scanned Jun 18, 2013

09/19/2011 08:44 FAX                                                    008

| | | |
|---|---|---|
| 11/04/08 | PRE-TRIAL RE: AGREED STRIKES FOR CAUSE; MATTERS READ INTO THE RECORD. | 00.50 |
| 11/07/08 | CONFERRED WITH CO-COUNSEL JONES AND INVESTIGATOR BARRERA AT OFFICE RE:TELE-CONFERENCE CALL WITH DR. MARTINEZ. | 01.00 |
| 11/10/08 | INDIVIDUAL VOIR DIRE; JURY SELECTION BEGINS. | 08.50 |
| 11/10/08 | READ & REVIEWED NEXT DAYS QUESTIONAIRES. | 01.00 |
| 11/12/08 | INDIVIDUAL VOIR DIRE CONTINUES. | 08.00 |
| 11/12/08 | READ & REVIEWED NEXT DAYS QUESTIONAIRES. | 01.00 |
| 11/13/08 | INDIVIDUAL VOIR DIRE CONTINUES. | 04.50 |
| 11/13/08 | READ & REVIEWED NEXT DAYS QUESTIONAIRES. | 01.00 |
| 11/14/08 | INDIVIDUAL VOIR DIRE CONTINUES. | 08.00 |
| 11/14/08 | READ & REVIEWED NEXT DAYS QUESTIONAIRES. | 01.00 |
| 11/14/08 | CONFERRED WITH CLIENT AFTER VOIR DIRE AT COUNTY JAIL AND CONFERRED WITH INVESTIGATOR BARRERA RE: SUBPOENAS. | 01.50 |
| 11/16/08 | REVIEWED JURY QUESTIONAIRES FOR NEXT WEEK. | 02.00 |
| 11/17/08 | INDIVIDUAL VOIR DIRE CONTINUES. | 10.00 |
| 11/17/08 | READ & REVIEWED NEXT DAYS QUESTIONAIRES. | 01.00 |
| 11/18/08 | INDIVIDUAL VOIR DIRE CONTINUES. | 08.00 |
| 11/18/08 | READ & REVIEWED NEXT DAYS QUESTIONAIRES. | 01.00 |
| 11/19/08 | INDIVIDUAL VOIR DIRE CONTINUES. | 04.50 |
| 11/20/08 | OFFICE MEETING WITH CO-COUNSEL JONES, INVESTIGATOR BARRERA & DR. MARTINEZ. | 02.00 |

08 DEC -3 AM 3: 30

TOTAL HOURS:                         107.50
TOTAL HOURS @ $200.00 =          $21,500.00
RECEIVED

Received Time Sep.19. 10:31AM

Scanned Jun 18, 2013

09/19/2011 09:45 FAX @009

| **Attorney Fee Voucher** | PO# | **INSTRUCTIONS** | Page 1 of 2 |
|---|---|---|---|
| Nueces County District Courts | | Show only one cause number per defendant. Each claim must be printed or typed. Please do not use black ink. Itemized statement on services rendered is required. See page 2. Submit separate claims for investigations, expert witness costs and other expenses. Forward completed claim to the court for approval. | |
| Court # **94th** | (One PO# per case.) | | |

Cause No.: **04-CR-3453-C**  Offense: **CAPITAL MURDER**  Degree: **CM**

In the case of: State of Texas vs **John Henry Ramirez JR** ✓  AG#

Case Level:
[ ] Felony (CR)  [ ] Misdemeanor (CR)  [ ] Revocation-Felony (CR)  [ ] Revocation-Misdemeanor(CR)  [ ] Dismissal (CR)  [ ] Habeas Corpus

[ ] Appeal (APA)  [ ] Juvenile (JUV)  [✓] Capital Case (CM)  [ ] No Charges Filed (AR)  [ ] Divert/Other:

| | | Total Number of Hours/Days | Authorized Rates | Not to Exceed | |
|---|---|---|---|---|---|
| **Guilty Plea or Plea of True** | In court | | $250 to $450 | | Sub-total $ |
| | Out of court | | Flat fee | | $ |
| **Dismissal on State's Motion** | In court | | $100 to $400 | | Sub-total $ |
| | Out of court | *See Attached* | Flat fee | | $ |
| **Nonjury Trial and Contested Hearings** | In court | *Exhibit* | $60 to $80/hr | | Sub-total $ |
| | Out of court | | $30 to $60/hr | | $ |
| **Jury Trial** | In court | | $500 to $750/day $250 to $375/half | | Sub-total $ |
| | Out of court | | $30 to $50/hr | | $ |
| **Direct Appeal or Discretionary Review** | Death sentence case | | $50 to $75/hr | $10,000 | $ |
| | Non-death capital, first or second degree case | | $50 to $75/hr | $3,000 | $ |
| | Third degree or state jail case | | $50 to $75/hr | $2,500 | $ |
| | Misdemeanor case | | $50 to $75/hr | $1,500 | $ |
| | Reimbursable costs (Please itemize on Page 2) | | | | $ |
| | Total | | | | $ |

NUECES COUNTY AUDITOR
DEC 22 2008
PAID PW

Attorney Name: **Edward F. Garza**  Vendor No.: **V-04084**

E-Mail Address: **EFGarza@STX.RR.COM**  For County Auditor Use

Mailing Address (Number, Street, Suite, City, State, Zip Code):  Dept - KeyCode: **3920-5344** ✓  Secondary Reference: **CM**
**719 S Shoreline #201**  **779-239**
**Corpus Texas 78401**

State Bar Number: **07231200**  Telephone Number: **(361) 888-8877**  Fax Number: **(361) 888-8879**

I, the undersigned attorney, certify that the above information is true and correct and in accordance with the laws of the State of Texas. The compensation and expenses claimed were reasonable and necessary to provide effective assistance of counsel. I further swear or affirm that I have not received nor will receive any money or anything else of value for representing the accused, except as otherwise disclosed to the Court in writing.

Time Period of Services Rendered: From **11-24-08** to **12-10-08**  (Complete Page 2)

**Edward F Garza**
Signature and Date

Have previous vouchers been submitted for this case? YES or NO  (Circle one)
If yes, PO# required above.  Is this voucher for: [✓] Final payment  or  [ ] Partial payment?

SIGNATURE OF TRIAL JUDGE: _____
12/15/08  $10,100.00  /s/ Patsy Perez
Date  Amount

Reason(s) for Denial or Variation: _____  Recorded by: Patsy Perez, District Clerk by Deputy District Clerk (Signature)

AttnVoucherForm 2007

Received Time Sep.19. 10:31AM

Scanned Jun 18, 2013

CAUSE NO. 04-CR-3453-C

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE DISTRICT COURT |
| | § | |
| VS. | § | 94TH JUDICIAL DISTRICT |
| | § | |
| JOHN HENRY RAMIREZ | § | NUECES COUNTY, TEXAS |

### EXHIBIT IN SUPPORT OF REASONABLE FEES
### FOR CAPITAL MURDER CASE

| DATE | ACTION TAKEN | TIME |
|---|---|---|
| 11/24/08 | CONFERRED WITH CO-COUNSEL JONES & INVESTIGATOR BARRERA AT OFFICE IN PREPARATION FOR START OF TRIAL. | 01.00 |
| 11/24/08 | INTERVIEWED MATERNAL GRANDMOTHER, MRS. ALEJANDRO IN PREPARATION FOR HER TESTIMONY RE: MITIGATION. | 01.50 |
| 11/24/08 | CONFERRED WITH CLIENT AT COUNTY JAIL TO DISCUSS TRIAL. | 01.50 |
| 11/30/08 | REVIEWED DISCOVERY & WITNESS STATEMENT IN PREPARATION FOR START OF TESTIMONY NEXT DAY. | 03.00 |
| 12/01/08 | 1ST DAY OF TRIAL. | 07.00 |
| 12/02/08 | 2ND DAY OF TRIAL. | 07.00 |
| 12/03/08 | 3RD DAY OF TRIAL. | 07.00 |
| 12/04/08 | 4TH DAY OF TRIAL. | 07.00 |
| 12/05/08 | 5TH DAY OF TRIAL. | 07.00 |
| 12/07/08 | CONFERRED WITH CO-COUNSEL JONES & DR. MARTINEZ AT OFFICE RE: CASE | 02.00 |

Scanned Jun 18, 2013

09/19/2011 08:46 FAX                                                                        011

| | | |
|---|---|---|
| 12/07/08 | CONFERRED WITH CLIENT, CO-COUNSEL JONES AND DR. TROY MARTINEZ AT COUNTY JAIL. | 01.00 |
| 12/08/08 | 6TH DAY OF TRIAL. | 04.50 |
| 12/10/08 | CONFERRED WITH APPEALS LAWYER LARRY WARNER VIA TELEPHONE RE: POTENTIAL APPELLATE ISSUES. | 01.00 |

**TOTAL HOURS:** 50.50
**TOTAL HOURS @ $200.00 =** **$10,100.00**

Scanned Jun 18, 2013

09/19/2011 09:46 FAX                                                                    ☑012

| **Attorney Fee Voucher** | PO# | | **INSTRUCTIONS** | | Page 1 of 2 |
|---|---|---|---|---|---|

**Attorney Fee Voucher**
**Nueces County District Courts**
**Court #** 94th

(One PO# per case.)

INSTRUCTIONS
Show only one cause number per defendant.
Each claim must be printed or typed. Please do not use black ink.
Itemized statement on services rendered is required. See page 2.
Submit separate claims for investigations, expert witness costs and other expenses.
Forward completed claim to the court for approval.

| Cause No.: 04-CR-3453-C | Offense: Capital Murder / Death Penalty | Degree: Capital |
|---|---|---|

In the case of : State of Texas vs John Ramirez                                      AOS

Case Level:
☐ Felony (CR)  ☐ Misdemeanor (CR)  ☐ Revocation-Felony (CR)  ☐ Revocation-Misdemeanor(CR)  ☐ Dismissal (CR)  ☐ Habeas Corpus
☐ Appeal (APA)  ☐ Juvenile (JUV)  ☒ Capital Case (CM)  ☐ No Charges Filed (AR)  ☐ Divert/Other:

| | | Total Number of Hours/Days | Authorized Rates | Not to Exceed | |
|---|---|---|---|---|---|
| **Guilty Plea or Plea of True** | In court | | $250 to $450 | | Sub-total |
| | Out of court | | Flat fee | | |
| **Dismissal on State's Motion** | In court | | $100 to $400 | | Sub-total |
| | Out of court | | Flat fee | | |
| **Nonjury Trial and Contested Hearings** | In court | | $60 to $80/hr | | Sub-total |
| | Out of court | | $30 to $60/hr | | |
| **Jury Trial** | In court   2nd chair | 39.5 | $150 / hr.* | | Sub-total |
| | Out of court  2nd chair | 18.8 | $150/ hr.* | | |
| **Direct Appeal or Discretionary Review** | Death sentence case | | $50 to $75/hr | $10,000 | Sub-total |
| | Non-death capital, first or second degree case | | $50 to $75/hr | $3,000 | |
| | Third degree or state jail case | | $50 to $75/hr | $2,500 | |
| | Misdemeanor case | | $50 to $75/hr | $1,500 | |

NUECES COUNTY AUDITOR
JAN 1 5 2009
PAID-JG

* 5th Adm. Jud. Dist. of Tx. Standards & Rules For Qualifications of Atty's For Appointment In Death Penalty Cases

Reimbursable costs    (Please itemize on Page 2)          Total

| Attorney Name: Grant Jones | Vendor No.: V- 02 530 |
|---|---|
| E-Mail Address: grant800@att.net | For County Auditor Use |
| Mailing Address (Number, Street, Suite, City, State, Zip Code): 5826 Beauvais Dr., Corpus Christi, Texas 78414 | Dept - KeyCode: 3320-5344          Secondary Reference: CM |
| State Bar Number: 10917000 | Telephone Number: 361-815-2470 | Fax Number: 1-866-243-9810 |

I, the undersigned attorney, certify that the above information is true and correct and is accordance with the laws of the State of Texas. The compensation and expenses claimed were reasonable and necessary to provide effective assistance of counsel. I further declare and affirm that I have not received nor will receive any money or anything else of value for representing the accused, except as otherwise disclosed to the Court in writing.

Time Period of Services Rendered:  From  11/20/2008          to  12/09/2008          (Complete Page 2)

Have previous vouchers been submitted for this case?  ☐ YES  or  ☐ NO
If yes, PO# required above.       Is this voucher for:  ☒ Final payment?  or  ☐ Partial payment?

Grant Jone     12-18-08

SIGNATURE OF TRIAL JUDGE:  Rudy Jr.     12/22/08          $8745          131 Patsy Perz
Cindy L Martinez

Reason(s) for Denial or Variance:                          Date          Amount          Recorded by: Patsy Perz, District Clerk by Deputy District Clerk (Signature)

Atty Voucher Form 2007

✓ copy to Sheri

Received Time Sep.19. 10:31AM

Scanned Jun 18, 2013

09/19/2011 09:46 FAX                                                    ☑013

## In Court Services

**Exhibit A**
Fee Application Number 2 Of Grant Jones
The State of Texas vs. John Ramirez
04-CR-3453-C
94th District Court
Nueces County, Texas

### DETAILS OF SERVICES PERFORMED -- ATTACHMENT

| Date of Service | Description of Service | Time |
|---|---|---|
| **In Court Services** | | |
| 12/01/2008 | In Court Appearance for trial on merits -- day 1 | 7.00 |
| 12/02/2008 | Court appearance for trial on merits-- day 2 | 7.00 |
| 12/03/2008 | In court appearance for trial on merits -- day 3 | 7.00 |
| 12/04/2008 | In court appearance for trial -- day 4 | 7.00 |
| 12/05/2008 | In court appearance for trial -- day 5 | 7.00 |
| 12/08008 | Court appearance for trial -- day 6 | 4.50 |
| | Subtotal | 39.50 |

## Out Of Court Services

### Conference With Defendant

| | | |
|---|---|---|
| 11/24/2008 | Meeting with defendant at jail | 1.50 |
| 12/07/2008 | Meeting with defendant at Nueces County Jail with Ed Garza and Dr. Troy Martinez | 1.00 |

Received Time Sep.19. 10:31AM

Scanned Jun 18, 2013

09/19/2011 09:47 FAX                                                   ☑014

| 12/09/2008 | Post trial visit with defendant at jail | 0.80 |
|---|---|---|
| | Subtotal | 3.30 |

### Conference With Others

| 11/20/2008 | Meeting with Ed Garza, Dr. Troy Martinez, and investigator Joe Barrera | 2.00 |
|---|---|---|
| 11/24/2008 | Meeting with defendant's maternal grandmother | 1.50 |
| 11/24/2008 | Meeting at Ed Garza office with Joe Barrera | 1.00 |
| 12/03/2008 | Tel conf with Dr. Troy Martinez | 0.20 |
| 12/07/2008 | Meeting at Ed Garza's office with Dr. Troy Martinez | 2.00 |
| 12/09/2008 | Conf with court manager and ADA Skurka ref transfer of defendant to Huntsville | 0.50 |
| 12/09/2008 | Tel conf with attorney Hector Gonzalez | 0.10 |
| | Subtotal | 7.30 |

### Other Services

| 11/25/2008 | Trial preparation of offense reports from continuous form offense report / organization of discovery materials for use in trial | 3.00 |
|---|---|---|
| 11/29/2008 | Preparation, of request for jury instruction on accomplice testimony; review of recent cases on law of accomplice testimony; and preparation of trial brief containing general rules relating to accomplice testimony | 2.00 |

Scanned Jun 18, 2013

| Date | Description | Hours |
|---|---|---|
| 12/06/2008 | Preparation of objections to punishment charge / filed in trial | 2.00 |
| 12/07/2008 | Review of case law relating to standard of review of future dangerousness issue and evidentiary factors that reviewing court considers | 1.20 |
| | Subtotal | 8.20 |
| | | 18.80 |
| | Total | |
| | | 58.30 |

Scanned Jun 18, 2013

09/19/2011 08:47 FAX ▲ ☑016

| Attorney Fee Voucher | PO# | | INSTRUCTIONS | Page 1 of 2 |
|---|---|---|---|---|

**Attorney Fee Voucher**
**Nueces County District Courts**
**Court # 94th**

PO# _____ (One PO# per case.)

INSTRUCTIONS — Page 1 of 2
Show only one cause number per defendant.
Each claim must be printed or typed. Please do not use black ink.
Itemized statement on services rendered is required. See page 2.
Submit separate claims for investigations, expert witness costs and other expenses.
Forward completed claim to the court for approval.

Cause No.: 04-CR-3453-C   Offense: Capital Murder / Death Penalty   Degree: Capital

In the case of : State of Texas vs John Ramirez   AG#

Case Level:
☐ Felony (CR)  ☐ Misdemeanor (CR)  ☐ Revocation-Felony (CR)  ☐ Revocation-Misdemeanor(CR)  ☐ Dismissal (CR)  ☐ Habeas Corpus
☐ Appeal (APA)  ☐ Juvenile (JUV)  ☒ Capital Case (CM)  ☐ No Charges Filed (AR)  ☐ Divert/Other:

| | | Total Number of Hours/Days | Authorized Rates | Not to Exceed | |
|---|---|---|---|---|---|
| **Guilty Plea or Plea of True** | In court | | $250 to $450 | | Sub-total |
| | Out of court | | Flat fee | | |
| **Dismissal on State's Motion** | In court | | $100 to $400 | | Sub-total |
| | Out of court | | Flat fee | | |
| **Nonjury Trial and Contested Hearings** | In court | | $60 to $80/hr | | Sub-total |
| | Out of court | | $30 to $60/hr | | |
| **Jury Trial** | In court  2nd chair | 49.1 hr. | $150 / hr.* | | Sub-total |
| | Out of court  2nd chair | 39.6 hr. | $150/ hr.* | | |
| **Direct Appeal or Discretionary Review** | Death sentence case | | $50 to $75/hr | $10,000 | Sub-total |
| | Non-death capital, first or second degree case | | $50 to $75/hr | $3,000 | |
| | Third degree or state jail case | | $50 to $75/hr | $2,500 | NUECES COUNTY AUDITOR |
| | Misdemeanor case | | $50 to $75/hr | $1,500 | DEC 12 2008 |
| | | Reimbursable costs   (Please itemize on Page 2) | | Total | PAID BB |

* 5th Adm. Jud. Dist. of Tx. Standards & Rules For Qualifications of Attys For Appointment In Death Penalty Cases

Attorney Name: Grant Jones   Vendor #: V-02530

E-Mail Address: grant800@att.net   For County Auditor Use

Mailing Address (Number, Street, Suite, City, State, Zip Code):
5826 Beauvais Dr., Corpus Christi, Texas 78414   Dept - Key/Code: 3320-5344   Secondary Reference: CM

State Bar Number: 10917000   Telephone Number: 361-815-2470   Fax Number: 1-866-243-9810

I, the undersigned attorney, certify that the above information is true and correct and is in accordance with the laws of the State of Texas. The compensation and expenses claimed were reasonable and necessary to provide effective assistance of counsel. I further swear or affirm that I have not received nor will receive any money or anything else of value for representing the accused, except as otherwise disclosed to the Court in writing.

Time Period of Services Rendered:  From 04/10/2008   to 11/19/2008   (Complete Page 2)

Have previous vouchers been submitted for this case? ☐ YES or ☐ NO (Check one)
If yes, PO# required above.   Is this voucher for: ☐ Final payment  or  ☒ Partial payment?

Signature and Date: Grant Jones  12/02/2008

SIGNATURE OF TRIAL JUDGE: Bobby Galvan   12/3/08

Capital Murder   12/3/08   13,305.00   BY Patsy Perez  Cindy J. Martinez

Reason(s) for Denial or Variation:   Date 08____   Amount   Recorded by: Patsy Perez, District Clerk by Deputy District Clerk (Signature)

✓ copy to Sheri

Received Time Sep.19. 10:31AM

Scanned Jun 18, 2013
09/19/2011 09:48 FAX                                     ☑017

**01 Exhibit A**
Fee Application Of Grant Jones
The State of Texas vs. John Ramirez
04-CR-3453-C
94th District Court
Nueces County, Texas

### DETAILS OF SERVICES PERFORMED -- ATTACHMENT

| Date of Service | Description of Service | Time |
|---|---|---|

**In Court Services**

| Date of Service | Description of Service | Time |
|---|---|---|
| 11/04/2008 | Court appearance for status conference on agreed juror exclusions | 0.00 |
| 11/10/2008 | Court appearance for voir dire -- day 1 | 8.00 |
| 11/12/2008 | Court appearance for voir dire -- day 2 | 8.00 |
| 11/13/2008 | Court appearance for voir dire -- day 3 | 4.00 |
| 11/14/2008 | Court appearance for voir dire -- day 4 | 7.80 |
| 11/17/2008 | Court appearance for voir dire -- day 5 | 9.80 |
| 11/18/2008 | Court appearance for voir dire -- day 6 | 7.00 |
| 11/19/2008 | Court appearance for voir dire -- day 7 | 4.50 |
| | Subtotal | 49.10 |
| Total | | 49.10 |

## Out Of Court Services

### Conference With Defendant

| | | |
|---|---|---|
| 06/13/2008 | Conf with defendant a jail | 1.00 |

Pa Received Time Sep. 19. 10:31AM

Scanned Jun 18, 2013

09/19/2011 09:48 FAX                                                    ☑018

| 11/24/2008 | Meeting with defendant at jail | 1.50 |
| | Subtotal | 2.50 |

### Conference With Others

| 05/14/2008 | Meeting with co-counsel to draft pretrial motions and to engage investigators and experts | 4.00 |
| 05/16/2008 | Conf with Dr. Troy Martinez ref his pending hiring as mental health expert | 0.20 |
| 06/13/2008 | Tel call to investigator Barrera ref jail conf with defendant | 0.10 |
| 06/18/2008 | Meeting at Ed Garza office | 1.00 |
| 10/17/2008 | Tel confs with lead counsel | 0.30 |
| 11/07/2008 | Meeting with investigator at Ed Garza's office | 1.50 |
| 11/20/2008 | Meeting with Ed Garza, Dr. Troy Martinez, and investigator Joe Barrera | 2.00 |
| 11/24/2008 | Meeting with defendant's maternal grandmother | 1.50 |
| 11/24/2008 | Meeting at Ed Garza office with Joe Barrera | 1.00 |
| | Subtotal | 10.60 |

### Other Services

| 04/10/2008 | Opening of file | 0.80 |
| 04/12/2008 | Download clerk docket sheets on co-defendant's Christina Chavez and Angela Rodriquez | 0.60 |

Scanned Jun 18, 2013

| | | |
|---|---|---|
| 04/17/2008 | Meeting with co-counsel Ed Garza at his office ref trial preparation and drafting of motions | 3.00 |
| 05/16/2008 | Copying of discovery | 1.50 |
| 05/16/2008 | Prep of draft for motion for hiring of mental health expert and transmittal to lead counsel | 1.20 |
| 05/16/2008 | Gathering and emailing of articles on mitigation case to lead counsel and Dr. Martinez | 0.50 |
| 06/09/2008 | Legal research on motion for appointment of DNA expert | 1.00 |
| 06/10/2008 | Preparation of motion for discovery of DNA testing records | 0.80 |
| 06/10/2008 | Preparation of motion requesting funds to hire DNA expert | 1.20 |
| 06/10/2008 | Tel conf with Dean Wideman, DNA expert of San Antonio ref an appointment | 0.30 |
| 06/10/2008 | Prep of motion relating to lineups and in court identification with supporting brief | 3.00 |
| 06/13/2008 | Drafting of general motion for discovery and transmittal to co-counsel | 0.80 |
| 06/13/2008 | Repeated calls to Jail Information to reserve attorney conference room | 0.80 |
| 10/18/2008 | Review of proposed jury questionaire | 0.60 |
| 10/19/2008 | Prep of draft of motion to sever counts to be filed by lead counsel | 1.00 |
| 11/06/2008 | Organization of jury questionaires for beginning of individual voir dire | 0.80 |

Scanned Jun 18, 2013

09/19/2011 09:49 FAX                                                              ☑ 020

| | | |
|---|---|---|
| 11/08/2008 | Organization of discovery materials for use in trial | 0.50 |
| 11/09/2008 | Downloaded news articles from Caller-Times relating to cased | 0.50 |
| 11/09/2008 | Trial preparation / reading and making of notes from statement of Ruby Pena | 0.60 |
| 11/09/2008 | Trial preparation / first reading of statement of April Metting, robbery victim | 0.20 |
| 11/09/2008 | Organization of discovery materials for use in trial | 0.80 |
| 11/25/2008 | Trial preparation of offense reports from continuous form offense report / organization of discovery materials for use in trial | 3.00 |
| 11/29/2008 | Preparation, filing, and service of request for jury instruction on accomplice testimony; review of recent cases on law of accomplice testimony; and preparation of trial brief containing general rules relating to accomplice testimony | 2.00 |

Subtotal    25.50

Grand Total                                          Total

Scanned Jun 18, 2013



DX-5

Scanned Jun 18, 2013

---

**FORENSIC AND CLINICAL PSYCHOLOGY**
TROY MARTINEZ, PSY.D.
LICENSE NO. 31,144

4925 Everhart, Suite 106
Corpus Christi, TX 78411
Tel: 361-851-0109
Fax: 361-851-0109

111 Soledad, Suite 300
San Antonio, TX 78205
Tel: 210-299-7685
t_martinez@stcstar.com

March 6, 2009

Mr. Michael Gross
106 South St. Mary's Street, Ste. 260
San Antonio, TX 78205

RE:   Cause No. 04-CR-3453-C
      State v. John Henry Ramirez

Mr. Gross,

Per your request and Authorization For Release of Records, I have attached a copy of my file in the above referenced matter. Do not hesitate to contact my office if you have questions.

Sincerely,

Troy Martinez, Psy.D.
Licensed Psychologist

---

**FORENSIC AND CLINICAL PSYCHOLOGY**
TROY MARTINEZ, PSY.D.
LICENSE NO. 31244

4925 Everhart, Suite 106
Corpus Christi, TX 78411
Tel: 361-851-0109
Fax: 361-851-0109

111 Soledad, Suite 300
San Antonio, TX 78205
Tel: 210-299-7685
t_martinez@stcstar.com

**FINAL BILLING STATEMENT**

December 8, 2008

The Honorable Bobby Galvan
94th District Court
901 Leopard St.
Corpus Christi, TX 78401

Re:  State of Texas vs. John Henry Ramirez, Cause No. 04-CR-3453-C

Below are my fees for services since my Brotherdose statement concerning the above referenced matter referred by defense counsel per ex parte Order. My vendor # is 29212.

| SERVICE | TIME | FEE |
|---|---|---|
| Consultation with Defense Counsel | 4.25 Hours | $ 637.50 |
| Record Review & Notes | 1 Hour | $ 150.00 |
| Meeting w/ Defendant & attys on 12/07/08 | 1 Hour | $ 150.00 |
| Collateral Interviews | 1.75 Hours | $ 262.50 |
| Report Preparation | 11.25 Hours | $ 1,687.50 |
| Total Fee | 18.25 Hours @ $150/Hour | $ 2,887.50 |

Please make payment and mail to:     Dr. Troy Martinez
                                      4925 Everhart, Suite 106
                                      Corpus Christi, TX 78411

Respectfully Submitted,

Troy Martinez, PsyD
Licensed Psychologist

Cc:    Ed Garza & Grant Jones via fax

---

**FORENSIC AND CLINICAL PSYCHOLOGY**
TROY MARTINEZ, PSY.D.
LICENSE NO. 31,244

4925 Everhart, Suite 106
Corpus Christi, TX 78411
Tel: 361-851-0109
Fax: 361-851-0109

111 Soledad, Suite 300
San Antonio, TX 78205
Tel: 210-299-7685
t_martinez@stcstar.com

December 8, 2008

The Honorable Bobby Galvan
94th District Court
901 Leopard St.
Corpus Christi, TX 78401

Re:  State of Texas vs. John Henry Ramirez, Cause No. 04-CR-3453-C

Judge Galvan,

Enclosed here is a second billing statement since my first and only previous billing statement that has not been paid/resolved as of this date. In summary form, my fee statements are listed below, with funds authorized via separate Court Orders.

(1) 16.25 hours @ $150/hr = $ 2,437.50 (statement dated 11/07/08)
(2) 19.25 hours @ $150/hr = $ 2,887.50 (statement dated 12/08/08)

Please call if you have questions or need additional information.

Sincerely,

Troy Martinez
Licensed Psychologist



**DEFENDANT'S EXHIBIT**
5

---

DEFENDANT: John Henry Ramirez          CAUSE NO: _____
REF SOURCE: _____                    CONTACT DATE: _____
REF QUESTIONS: _____                 COURT: _____

|  | DATE | HOURS | NE |
|---|---|---|---|
| Consultation w/ Attnys | 11/3/08 - 1.5 | | |
|  | 12/3 - .75 | | |
|  | 12/5 - 2. | | |
| Other Consultation: | | | |
|  | 12/3/08 w/Attnys - 1.0 | | |
| Record Review | 11/5 - .75 | | |
|  | 12/5 - .25 | | |
| Eval. w/ Defendant: | | | |
| Collateral Interview | 11/6 (Girl) - 1.5 | | |
|  | 11/6 (Bro) - .25 | | |
| Report Preparation | 11/9/08 - 2 | 11/5 - 1.75 | |
|  | 11/8 - 1.5 | 12/2 - 1.0 | |
|  | 11/5 - 2.5 | 12/5 - 2.0 | |
| Report Preparation | 12/8 - .25 | | |
| Records Received: | | | |

Interim Bill #1 - _____     #2 - _____     #3 - _____
#4 - _____     Final Bill - _____
Total Sum Billed For Case - $5,325.00

000001

Scanned Jun 18, 2013

## FORENSIC AND CLINICAL PSYCHOLOGY
TROY MARTINEZ, PSY.D.
LICENSE NO. 31244

4925 Everhart, Suite 106
Corpus Christi, TX 78411
Tel: 361-881-8102
FAX: 361-881-8109

111 Soledad, Suite 300
San Antonio, TX 78205
Tel: 210-299-7883
t_martinez@docter.com

### BILLING STATEMENT

November 7, 2008

The Honorable Bobby Galvan
94th District Court
901 Leopard St.
Corpus Christi, TX 78401

Re:   *State of Texas vs. John Henry Ramirez*, Cause No. 04-CR-3453-C

Below are my fees for services *to date* concerning the above referenced matter referred by defense counsel per *ex parte* Order approving expenses to employ a mental health expert.
My *vendor #* is 29212.

| SERVICE | TIME | FEE |
|---|---|---|
| Consultation with Defense Counsel & Investigator | 2.75 Hours | $ 412.50 |
| Record Review & Notes | 3.50 Hours | $ 525.00 |
| Evaluation of Defendant on 7/16 & 11/04/08 | 4.75 Hours | $ 712.50 |
| Collateral Interviews | 3.75 Hours | $ 562.50 |
| Report Preparation | 1.5 Hours | $ 225.00 |
| **Total Fee** | **16.25 Hours @ $150/Hour** | **$ 2,437.50** |

Please make payment and mail to:    Dr. Troy Martinez
4925 Everhart, Suite 106
Corpus Christi, TX 78411

Respectfully Submitted,

Troy Martinez, PsyD
Licensed Psychologist

Cc:   Ed Garza & Grant Jones via fax

## FORENSIC AND CLINICAL PSYCHOLOGY
TROY MARTINEZ, PSY.D.
LICENSE NO. 31244

4925 Everhart, Suite 106
Corpus Christi, TX 78411
Tel: 361-881-8102
FAX: 361-881-8109

111 Soledad, Suite 300
San Antonio, TX 78205
Tel: 210-299-7883
t_martinez@docter.com

November 7, 2008

Mr. Ed Garza & Mr. Grant Jones
Defense Counsel
FAX: 888-5879/866-243-9810

Re:   *State vs. John Henry Ramirez*, Cause No. 04-CR-3453-C

Mr. Garza & Mr. Jones,

Calling your attention to the Court Order signed by Judge Galvan on 03/27/08 in the above referenced matter, approval was authorized for expenses to employ a mental health expert, not to exceed $2,500 "without further approval from the Court." Attached here is a billing statement from me dated 11/07/08, in the amount of $2,437.50 for services provided to date. Given the need for considerably more mental health services in this Capital Murder case, I am asking that you request additional funds be approved by the Court. I would specifically ask that an amount equal to or greater than $5,000 be requested given the ongoing work necessary and expected.

Please do not hesitate to contact me if you have questions or need additional information.

Sincerely,

Troy Martinez, PsyD
Licensed Psychologist

---

DEFENDANT: John Ramirez
REF SOURCE: Def. Attys (Albert Jones & Ed Garza)
REF QUESTIONS: sentence

CAUSE NO: 04-CR-3453-C
CONTACT DATE: Aug '06 (Init.)
COURT: 94 @ St. Amezz.

| | DATE | HOURS | FEE |
|---|---|---|---|
| Consultation with Attys | 3/11/08 - .25 | 11/3/08 - .25 | |
| | 7/16/08 w/ J.D - 1.00 | | |
| | 11/01 - 1.0 | | |
| Other Consultations | | | |
| Soc/Ref (Init) - .5 | | | |
| Record Review | 7/15 - 1.25 | | |
| | 11/1 - 2.25 | | |
| Eval of Defendant | 7/16/08 - 2.5 | | |
| | 11/1/08 - 2.25 | | |
| Collateral Interviews | | | |
| 11/3 (1st) - 1.25 | | | |
| 11/3 (2nd) - 1.5 | | | |
| 11/4 (3rd) - .50 | | | |
| Report Preparation | 11/07 - 1.0 hrs | | |
| (Sp Exam) | | | |
| Testimony | | | |
| Records Received | | | |

Interim Bill #1 - **$2,437.50**   #2 - _____   #3 - _____
#4 - _____   #5 - _____   Final Bill - _____

Total Sum Billed Per Case - _____

---

Re: Forensic Evaluation

Name: John Henry Ramirez          Age/DOB: 24 / 06-29-84
SSN: 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                  Date of Exam: 7/16/08

Address: _____

Collateral Contacts (parents, siblings, friends, co-workers, employers, etc.):

* Name: Priscilla Hinostroz      Relation: (M) in CC c Mr.(D)
Telephone: (home) _____    (cell) _____

✓ Name: John H Ramirez, Sr.      Relation: (F) in CC
Telephone: (home) _____        (cell) 232-8582

✓ * Name: Guadalupe Alejandro    Relation: Grand(M) phs aternal
Telephone: (home) 867-0715       (cell) _____

* Name: Ashley Ramirez           Relation: full (S) 18 yo in CC
Telephone: (home) 854-5479       (cell) _____

000002

**Scanned Jun 18, 2013**

---

**FORENSIC CASE INFORMATION OVERVIEW**
Dr. Troy Martinez

Date of Contact: _April '08_          Source: _Court Lines_

County / Federal Court: _349th TDC., Nueces_

Judge: _Galvin_          Prosecutor: _M. Skurka & G. Schimd_
                                    Tel: _555-5517_
                                    FAX: _888-7774_

Defense Attny: _Ed Garza_          Tel: _515-2770_
                                    FAX: _1-546-393-7860_

Second Chair: _Grant Jones_

Investigator: _____          Tel: ____
                              FAX: ____

Ex Parte? _N_   Court Appointment: _P_ N   Private? _Y  N_

Trial Date: _____

DEFENDANT NAME: _John Henry Ramirez_

CAUSE NO(S): _04-CR-3453-C_

CHARGE(S): _Capital Murder_

SERVICE:  CST ____ Insanity ____ Mitigation ____ Risk: ____
          Other: _____

FEE AGREEMENT: _Court Orders signed 5/12/08_

Cap by Court? _N_ M   If Yes, amount: _$2,500 additional approval needed per mo_

OPEN DATE: _5/12/08_          CLOSE DATE: ____

STATUS:  Pre-Trial   Post-Trial

DISPOSITION (plea / trial result including sentence ):
_____

_Jun 08 08 03:20p   Edward P Ga          361-888-8878          p. 3_

---

No. 04-CR-3453-C

THE STATE OF TEXAS          §          IN THE DISTRICT COURT
                           §
VS.                        §          949TH JUDICIAL DISTRICT
                           §
JOHN HENRY RAMIREZ         §          NUECES COUNTY, TEXAS

**ORDER**

On this day came to be heard Defendant's ex Parte Request for Advanced Approval of Expenses to Employ Mental Health Expert.

The court finds the request is reasonable, and grants the motion.

The Court hereby authorizes defense counsel to hire Dr. Troy Martinez, Phd to conduct the requested investigation.

$ 2500   The Court approves the initial funding for the requested investigation in the amount of $2,500.00 for investigator time and for reasonable and necessary expenses incident to conducting the investigation.

The Court further orders that this motion and this Order be sealed.

Nueces County is directed to pay for the services of Dr. Martinez. All bills for services and expenses shall be submitted to the Court for approval. Dr. Martinez is authorized to bill monthly for his services as they are rendered. The amount of funds authorized for payment to Dr. Troy Martinez shall not exceed $2,500.00, without further approval from the Court.

Signed on this date _5/12/08_

_[signature]_
Judge Presiding

_6-3-08_

6

---

BOBBY GALVAN
JUDGE

Ann Maria Canad
Court Coordinator
888-0220

Cindy Martinez
Court Clerk
888-0669

Frank L. Sautana
Bailiff
888-0665

Mary Lopez Builtron
Official Court Reporter
888-8685

Kara Rivera
Deputy Court Reporter
888-0716

NINETY-FOURTH DISTRICT COURT
NUECES COUNTY COURTHOUSE
CORPUS CHRISTI, TX 78401
(361) 888-0220
Fax: (361) 888-0730

STATE OF TEXAS          §
                       §          CAUSE NO. 04-CR-3453-C
VS.                    §
                       §
JOHN HENRY RAMIREZ     §

**DOCKET CONTROL ORDER FOR CRIMINAL CASE**

On the 7th day of October, 2004, the Court finds that an Indictment has been returned against the Defendant. IT IS ORDERED that this matter is hereby set for:

(1)   September 26, 2008 by 4:00 p.m.   Deadline to file Pre-Trial Motions
(2)   October 3, 2008 at 1:30 p.m.      Pre-Trial Hearing (includes questionnaire)
(3)   October 23, 2008 at 8:30 a.m.     Voir Dire (General Panel)
(4)   Nov. 10 - 26, 2008 at 8:30 a.m.   Voir Dire (Individual)
(5)   Jury Trial will follow after Jury selection has been completed.

Additional ORDERS:

1)   A pre-trial hearing has been set by the Court. Please file all Pre-Trial Motions timely and serve upon the opposing party at the time of filing.

2)   If the Defendant is incarcerated at the Nueces County Jail, you shall deliver all clothing needed for all court hearings at least one (1) week prior to any Court settings.

Signed the 20th day of August, 2008.

_____
Judge Presiding

cc:   Defendant - John Henry Ramirez, Nueces County Jail
      Defense Attorney - Ed Garza, Fax: 888-8679
      Defense Attorney - Grant Jones, Fax: 866-343-9810
      Attorney for the State - Mark Skurka, Fax: 888-0369
      Attorney for the State - George Schimmel, Fax: 888-0399

To access a case on the Court's calendar: www.co.nueces.tx.us/districtclerk/dcalendar

---

**FORENSIC AND CLINICAL PSYCHOLOGY**
TROY MARTINEZ, PSY.D.
LICENSE No. 31244

4555 EVERHART, SUITE 105
CORPUS CHRISTI, TX 78411
TEL: 361-851-0100
FAX: 361-851-0100

111 SOLEDAD, SUITE 300
SAN ANTONIO, TX 78205
TEL: 210-880-7663
t_martinez@dmbr.com

December 4, 2008

Mr. Ed Garza
Defense Counsel
719 S. Shoreline, Ste. 201
Corpus Christi, TX 78401

Mr. Grant Jones
Defense Counsel
606 N. Carancahua, St.
Corpus Christi, TX 78401

Re:   State of Texas v. John Henry Ramirez
      Cause No. 04-CR-3453-C

**PRESENTENCE PSYCHOLOGICAL EVALUATION**

Dear Mr. Garza & Mr. Jones,

I offer the report below in response to your request for evaluation with your client, Mr. John Henry Ramirez.

Referral Information: Mr. Ramirez is a 34 year-old, Hispanic-American male currently charged with Capital Murder. Per the consent of referral, I conducted an evaluation of Mr. Ramirez's development, psychology, and mental state surrounding the time of alleged offenses. The purpose of this evaluation was to assist the trier-of-fact in better assessing the following:

1.   Mr. Ramirez background;
2.   Mr. Ramirez character;
3.   Mr. Ramirez personal moral culpability;
4.   Mr. Ramirez mental state at the time of alleged offense.

Notification: Prior to this evaluation, Mr. Ramirez was informed of the nature and purpose of this assessment and limits to confidentiality. He was advised that oral and written reports would be provided to his attorneys only, then his attorneys would decide if any report and testimony would be shared with the Court and District Attorney's office.

000003

Scanned  Jun 18, 2013

disciplinary rules.

A Houston ISD Child Study Dept.-Comprehensive Individual Assessment dated 01-09-95 was completed because of "John's inability to sustain attention or focus on the work. He is in constant motion and is disruptive, frustration with self because of attention deficits." Intellectual assessment (WISC-III) on 11-29-94: VIQ-107, PIQ-106, FSIQ-107. Parent reports John has a lot of anger. In school behavior: continually disrupts classroom, is never attentive, is highly disorganized, becomes extremely excitable, avoided by others, rejects responsibility, seldom finishes even with guidance and is always rude. Fourth grade teacher described him as "constantly disruptive verbally and at times he was physically disruptive ... hard time sitting at his desk and completing work ... had to do things his way on rules and instructions were hard for him to follow. His behavior around other children was understood as he did a lot of name calling and bragging to others." On 01-23-95, described by a different teacher describes him as "takes little self-initiative and/or has little self-discipline. He must be told repeatedly easy to follow instructions ... he is a slow boy who wants to please." On 01-20-95, described by a teacher as "generally anti-social with peers ... John's home environment is less than stable." Another teacher describes him as having "developed a close relationship to the teacher, the CIS worker, and the police officer ... John is a sweet child once you get to know him, he has been through a lot." Describing parent/home environment as "parent gets easily aggravated with child. Give him many chance to keep him busy. Keeps child from interacting with other children, could possibly explain why he does not get along so well with others."

John Henry moved out of the district that same year, with 3995 ARD meeting in 5th grade at West Oso ISD. Records indicate he was discharged from speech therapy in 09/95 while in 6th grade at age 11. ARD meeting dated 09-29-95 in 6th grade indicates the "possible need for medication" due to "hyperactive, distractible, inattentive, difficulty staying on task, aggressive, rough with other students ... experiencing failure because of inability to focus on tasks." ARD meeting dated 12-06-95 indicates "medication is not available at this time. The parent is unable to pay." It is notable that most ARD meetings were not attended by John Henry's mother or maternal grandmother with whom he lived. ARD meeting dated 01-19-96 indicates a second "handicapping condition" was added to the learning disability: ADHD. Mr. Ramirez was never prescribed medication though his mother (not present) could not provide the name. ADHD was identified as "moderate" in severity. ARD meeting dated 03-12-96 indicates he is taking Ritalin. Report notes "improvement seen with medication" but "without medication John is disruptive, talkative, out-of-seat, needs refocusing." ARD meeting dated 03-05-97 (6th grade) indicates Ritalin still prescribed but he is "disruptive, demanding of teacher's attention and off task." ARD meeting dated 05-18-98 indicates "very distractible, excessive talking to self and peers." Report indicates he "works well with supervision, takes pride in his work." Psychological test date 01-15-98 (age 13, 8th grade) indicates a non-verbal IQ of 110 (TONI-2) and WRAT-3 reading, spelling, and math scores of 92, 105, 104, respectively. ARD meeting dated 01-15-99 (9th grade) indicates John Henry is no longer taking medication for ADHD. ARD meeting dated 11-16-00 (10th grade, age 16) notes "could be moody. Can be disruptive/argumentative with authority." ARD meeting dated

01-21-00 indicates he failed classes due to excessive absences and incomplete assignments.

A psychology reevaluation dated 04-20-01 (10th grade, age 16) indicates referral due to disruptive, non-compliant classroom behavior. Report notes "acting was attempted on several occasions but could not be conducted due to John's excessive absenteeism ... attends Moody High School half-day and works off campus in the afternoons ... frequently skips school altogether." Describes John Henry as "a socially maladjusted individual, who chooses to violate school and community rules for personal gain. He is able to understand the consequences of his own behavior and, by his admission, is also in control of his behavior. He expresses no remorse for his actions and probably states that he has no intention to change ... John belongs to a peer group, possibly gang-like and its activities, which does not appear to value compliance with school and community rules ... may act inappropriately in order to preserve his reputation and esteem in his own eyes and in the eyes of his peer group." Test interpretation on 04-27-01 indicates John Henry "believes the tests are designed to make people feel bad about themselves. He also expressed anger about having been previously labeled LD and ADHD and placed in Special Education ... he attributed his failures to lack of effort, attendance, and content; but defended his ability to do the work ... John does not value or prioritize school. He expressed a general dislike of teachers and school. He does value his job and his peer group. However, he lost his job due to possession of marijuana and belongs to a delinquent peer group. John appears extremely wary of trusting others and states that he will purposefully lash out at any person he perceives to be disrespectful of him. He has done this in the past and has no remorse for his actions. Teachers describe him as an oppositional student with an attitude problem and suspect him of gang membership. They state that he has rejected efforts to help him meet his school goal. One of his teachers has established adequate rapport ... John does not attend his other classes at all."

A Functional Behavioral Assessment and Intervention Plan is finally completed on 11-28-00. As usual, a parent did not attend. A recommendation for removal/expulsion dated 11-06-00 resulted in a 3-day suspension for harming and threatening another student, this following a prior notice on 10-24-00. Several other referrals are available in records.

In summary form, available military records indicate John Henry was in the U.S. Marine Corps active duty from 12-03-02 through 03-09-04. His primary duty was that of a field radio operator. He was connected for deficiencies on 12-23-03, 12-24-03, and 02-03-04. Enlistment data indicates he reported having smoked marijuana 20 times before enlistment, with last use in June 2002. He reported having paid a fine for seizure in possession of alcohol at age 16. A document dated 02-19-04 indicates administrative discharge under Other Than Honorable conditions "by reason of misconduct due to a pattern of misconduct ... due to a personality disorder." Personal Data Sheet indicates John Henry enlisted on 12-03-02 for 4 years but served active duty for 1 year - 3 months. Awards included the National Defense Service Medal and a Letter of Appreciation. He was declared a "deserter" on 08-01-03, apprehended by the Corpus Christi Police Department on 11-14-03, and turned over to military authorities on 11-18-03.

On 12-23-03, John Henry was diagnosed as having a Personality Disorder NOS with Borderline, Antisocial, and Dependent Traits, with recommendation for "expeditious administrative separation." On 12-24-03 he was issued a Summary Court Martial Conviction for unauthorized absence, disrespectful language to a non-commissioned officer, failure to obey a lawful order (underage drinking), and drunk and disorderly. On 02-03-04, he was counseled for failure to follow verbal and written orders by consuming alcohol. On 02-06-04, he was reassessed by a military psychologist and provided the same diagnosis and recommendation. A Screening Report from the director of the Substance Abuse Counseling Center, dated 03-18-04, indicates John Henry "does not meet the criteria for alcohol abuse or dependence at this time ... (he) has no desire for treatment and no desire to sustain on active duty."

A Mental Health Evaluation dated 12-23-03 indicates John Henry was referred after making a suicide attempt on 12-19-03. According to report, "he jumped out a window on the second deck due to depressive issues involving his inability to see his fiancé ... (he) jumped out of this window earlier ... his fiancé was also the reason he became a deserter for about 4½ months." Report indicates he "appears to have a pervasive need to be with his fiancé to the extent that he becomes despondent and acts out his frustrations." Report indicates significant depressive issues that have "been present throughout much of his life to varying degrees with it being much more acute over the past two weeks." Report notes a history of being raised in a broken family "from the age of two, history of physical and emotional abuse, remedial education for learning disability, prior treatment with Ritalin for ADHD, and a history of school suspensions for fighting and disruptive behavior. He reported a long family history of legal problems due to violence. Report notes a "long history of being violent and acting out his needs. Mom recently due to the restriction of the USMC his anger has teased forward and he is now acting out some of his frustrations via suicidal thoughts and actions. This type of behavior will only likely continue especially given his history of problems ... from a mental health perspective this patient has a long-standing personality disorder that existed before he entered military service and renders him psychiatrically unsuitable for full duty. The personality disorder is not expected to improve with available military mental health treatment." A second mental health evaluation dated 03-08-04 indicates John Henry was released from the Brig on 01-17-04, released 5 days early "due to having good conduct while in the brig. After his release on or around the 23rd of January he participated in underage drinking ... He continues to have issues concerning separation from sea life around with his personality disorder."

Observations/Current Mental Status: Mr. Ramirez is a 24 year-old Hispanic-American male who was evaluated in a private room within the Nueces County jail on 07-16-08 and 11-04-08. He was dressed in standard jail clothing. Hygiene and grooming were unremarkable given the custodial setting. Motor activity was restricted some by ankle and wrist cuffs, with the exception of occasional psychological testing that indicates had not restrained so he could write. He had no problems understanding interview questions or task instructions. Speech was clear, fluent, spontaneous, and structurally organized. He was cooperative and compliant. He appropriately responded to direct questions and

volunteered information on a regular basis. Thought processes were logical, relevant, coherent, and goal-directed. His affect was stable and fairly broad on both interview dates. Mood in July was within normal limits. In November, he was initially rather animated and appeared agitated but this lessened as the interview progressed. He was attentive throughout and not distracted. He had no problems transitioning from one topic of discussion to another, demonstrating grossly intact short-term memory. Remote memory was also intact as he could provide meaningful and relevant background information; when this information could be cross-referenced to that provided by collateral sources, information provided by Mr. Ramirez was consistent with that other sources.

Mr. Ramirez completed the PAI on 07-16-08. Results were invalid due to over-endorsement of signs and symptoms of psychopathology, rendering the remainder of the instrument uninterpretable.

Mental State At Time Of Offense: A witness statement by Mariano Cervantes III, dated 07-30-04, indicates he and his friend, Kashif Butt, were at a car wash around 11:30 p.m. when observing "a male and a female and they were dancing on a van in the parking lot" across the street. The male was pushing on the shoulder of the other man who was on the ground. The female was "pulling stuff out of the man's pockets." The female got into one van and the male into another before leaving. A witness statement by Kashif Butt, dated 07-30-04, indicates he and his friend were at a car wash around 11:15 p.m. on and saw "two people beating another person" at the Times Market. The male and female were kicking the other male. He saw the "girl go through his back pocket and take something. The guy also checked the guy's pockets." The male then jumped into a van and drove off. The female jumped into the passenger side of another van before it left.

Witness statement by Tamaz Sifuentes, Jr., indicates he and two friends were brought to a lady's house on the afternoon of 07-19-04. The homeowner provided him with Xanax. He and his friends spent the night there until leaving the next afternoon. A guy by the name of "White Boy" (later identified as John Henry), along with two unidentified girls already at apartment, gave him and a friend a ride home. A witness statement by Myron Mendoza, indicates that on 07-19-04 he was dropped off at his apartment around 5:00 p.m. by John Henry and two other girls in a van.

A voluntary statement by Ruby Garcia, dated 07-21-04, indicates that on Monday night or early Tuesday morning, at about 12:30 a.m., John Henry Ramirez, a friend of hers, knocked on the door of her residence. She opened the door and found he was "all bloody. His right hand was all bloody ..." She went outside with Lavonne Gonela, her sister, and Sandra Oxena. He was stuttering when he spoke. "I asked him where my sister was. He said she was stabbed ... he said they had stabbed someone and then Angela stabbed him and then he stabbed her. He was in such a panic ... he wanted me to hit him in the knees. I told him I wasn't going to hit him in ... he said 'we were running and we split up. I don't know if they made it'." He then "took off running on foot down York St."

According to police reports, on the evening of 07-19-04, Pablo Castro was killed in

Scanned  Jun 18, 2013

Scanned Jun 18, 2013

criminality; *Peer Relations* - association with deviant peers, poor relationship skills, low association with prosocial peers; *School Factors* - low achievement, dropout, low commitment to education, aspects of the school such as weak structure and chaotic environment; *Neighborhood and Community Characteristics* - high mobility, low support available from sources like neighbors and church, high disorganization, criminal subculture. One need not look far to understand the origins of that portion of his personality structure since the vast majority are present in Mr. Ramirez's development.

7. Mr. Ramirez's military career reflects a particularly salient period in his life. Sources interviewed capture some of the succinct efforts in Mr. Ramirez's life when he strives toward stability and seeking gratification through relatively prosocial avenues. It seems clear this formed the basis of his decision to join the Marine Corps, motivated immediately by the intent to provide financially for the mother who rejected and abused as well as satisfying emotionally stimulating interpersonal masculine needs. It seems Mr. Ramirez found reasonable initial success, completing boot camp rather uneventfully and returning home with a demonstration of personal pride and accomplishment few if any had seen within him before. Eager perhaps to display this change, he returns to his home in Corpus Christi and meets a 16 year old female, employed as a stripper, who captures his romantic attention and provides for him a semblance of love and acceptance desperately absent in his life. Returning to duty for training before assigned to his permanent duty station, some of those in his life recognized impending problems with this new relationship, which usurped his own ability to focus, and discouraged Mr. Ramirez from returning home when next taking furlough. What would start as probably the single most promising source of pride and promise (success in the Marine Corps) would instead deteriorate into perhaps the most salient source of unraveling, foundationally derailed by the pull toward romantic acceptance and fueled by impaired personality structure to tolerate delayed gratification. Indeed, Mr. Ramirez's psychological decompensation occurs rather sudden once distracted by this pull, resorting to an earlier/default pattern of responding to responsibility. Back home, his newly integrating, healthy inclusion of Marine identity is abandoned to continued drug use and affiliation with antisocial environmental influences. Military records clearly document a course of deterioration and return to dysfunctional patterns of dealing with the world around him. At the same time, once discharged and free of what had become burdensome, it seems clear Mr. Ramirez experiences a more intense, perhaps qualitatively different level of anger and self-hatred as a result of failure for having let himself and others down.

With regard to *mental state at the time of alleged offense*, it should be noted that Mr. Ramirez claims partial amnesia for events around the time period under investigation and complete amnesia specific to contact with Mr. Castro as well as two robberies at Whataburger restaurants. With that said, there is no reliable method to determine the veracity of an individual's claim of amnesia, though his claim is plausible and becomes increasingly likely based on reports of intoxication from the combined effects of Xanax, Rohypnol, and possibly alcohol and marijuana.

Alprazolam/Xanax (a benzodiazepine) use, more common in higher doses, is associated with such psychological effects as euphoria, drowsiness, decreased inhibitions, no fear of danger (i.e., increased risk taking behavior), depressed mood with thoughts of suicide or self-harm or elevated mood and confidence, hallucinations, agitation and hostility, dizziness, feeling light headed or fainting, headache, speech problems, short-term memory loss (anterograde amnesia), concentration problems, unsteadiness and clumsiness (impaired coordination and balance), sweating, and rapid heartbeat.

Rohypnol (Roach pills), is a benzodiazepine similar to Xanax, though it has never been approved for medical use in the U.S.. Rohypnol is a powerful sedative whose effects can be noticed within 15 to 30 minutes and can last for several hours. Rohypnol affects both physical and mental functioning. Physically, motor functioning is impaired; the user may have difficulty walking or speaking clearly, become drowsy, dizzy, or lose consciousness. Effects on mental functioning include confusion, lowered inhibitions, impaired judgment, disorientation and partial or full amnesia. These effects can combine to make the person seem drunk. When combined with alcohol or other drugs, the effects can be much more serious.

According to available police records, it seems clear Mr. Ramirez's behavior during the time period under investigation was goal-directed and reasonably organized, though it is unclear what impact the presence of the two females had in terms of externally influencing the execution of behavior spanning the period of time across three distinct sets of criminal activity. That Mr. Ramirez was able to elude police following these incidents suggests a base level of organized behavior but also prevents examination of his behavior (per observations of others) while under the influence of these substances.

[signature] 12/4/08
Trey Martinez, Psy.D.
Licensed Psychologist, No. 31244

TCM/adm

# FAX

Date: 12-04-08

To: Mr. Grant Jones
Defense Counsel
FAX: 866-243-9810

Mr. Ed Garza
Defense Counsel
FAX: 888-7779

From: Dr. Trey Martinez
Forensic & Clinical Psychology
4925 Everhart, Ste. 106
Corpus Christi, Texas 78411
Telephone: 361-831-8102
Fax: 361-851-8109

Total Pages (including cover): 20

Comments: *Call with Qs and/or comments.*

-- CONFIDENTIAL --

This information has been disclosed to you from records whose confidentiality is protected by Federal Law. Federal Regulations (42 CFR Part 2) prohibit you from making any further disclosure of it without the specific written consent of the person to whom it pertains, or as otherwise permitted by such regulation. A general authorization for the release or other information is not sufficient for this purpose.

These documents are intended for viewing to the name of person or facility a used on this transmitted sheet. If the reader of this message/document is not the intended recipient, please be notified that any use, dissemination, distribution or copy of this information is strictly prohibited and may result in penalty. If you have received this information in error, please call the office of Dr. Trey Martinez, Forensic & Clinical Psychology, at 361-831-8102 to report the transmission error. Thank you for your cooperation.

## Mitigation Investigation: Defendant Self-Report Survey

Instructions: Answer every question. Put a star by any question you do not understand. Leave no blanks. Use the backs of pages if necessary. Your complete honesty is necessary. Write neatly and clearly. Go over your answers at least twice to ensure you answer each question completely. Details are important.

Your Name: John H. Ramirez, Jr. Date Completed: July '08
Social Security #: 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 Inmate No: 1013447

**Birth Information**

Date of Birth: 6-29-84 Place of Birth: Corpus Christi, Tx.

Did your mother have any complications with her pregnancy with you? If yes, explain:
Not sure

Did your mother have any complications with your birth? If yes, explain:
Not sure

**Family History**

Mother:
Mother's name: Priscilla Martinez Her Current Age: ____
If deceased, how old were you when she died? ____ How old was she? ____
What year did she die? ____ Cause of death? ____

Father:
Father's name: John H. Ramirez, Sr. His Current Age: 44
If deceased, how old were you when he died? ____ How old was he? ____
What year did he die? ____ Cause of death? ____

1. Did your natural parents raise you? Yes ___ No ✓ If no, explain: At around ten or so I was taken away from my mother and placed in my grandmother by CPS because the school nurse found a big lash

Age you left home? 9 or 10

000008

**Scanned  Jun 18, 2013**

List the members of your household from the time you were born to the time you left the household; include grandparents, cousins, etc. Also indicate the quality of the relationship between you and other household members, i.e. how well you got along with the person?

| Household Member | How Related | Quality Of the Relationship |
|---|---|---|
| | | |

**Family Environmental and Economic Conditions**

Father's usual occupation: _electrician_   Mother's occupation: _home keeping_

Other Family Income: _N/A_

What were your physical living conditions like growing up? Was there usually enough food in the house? Was there enough money for basic needs? Did you always have a place to live?

Describe in detail the emotional conditions of your home environment (emotional expressions of love, etc.) when you were growing up.

Describe in detail how and by who you were disciplined when you were a child (i.e., spanked, grounded, etc.)

Describe in detail any sexual behavior between your family members: _N/A_

Were allegations of child abuse or neglect ever made against any member of your family? If yes, explain.

---

Which of your family members have ever been suspected of having a drug and/or alcohol problem. List the type of drug/alcohol problem if known:

| Member | Substance |
|---|---|
| Robert Ramos Jr. | Alcoholic |
| Andrew Alexander | Crack cocaine |
| Melissa Villegana | Crack cocaine |
| David Villarreal | Crack cocaine |

Summarize your feelings about your family life as a child. Use the back of this sheet and other sheets if needed.

**Educational History**

List all the schools you EVER attended. List as much information as you know.

| School | Address | Years |
|---|---|---|
| | | |

What were your favorite teachers and why?

What was the highest grade you completed? _10th_   Where? _Tony G. Moody High School_

Did you progress from one grade to the next without being held back? If yes, explain.

---

Do you think you were abused as a child (i.e., physically, emotionally, sexually)? If so, explain in what manner and by whom.

Were your parents and/or siblings physically violent towards one another? Did you personally see it? Explain in detail.

List your previous addresses from the time of your birth to the time you were 18 years old. If you cannot remember the address, list the locations and approximate dates.

| Address | Years Lived There |
|---|---|
| | |

If your family ever became a jet, how did this affect you? Explain in detail.

Indicate any of your close relatives who have died, including approximate date of their death.

| Name | Relationship | Date & Cause of Death |
|---|---|---|
| Melissa Villarreal | Mum 2nd | |
| Edna Milton | Mum 2nd | |
| Alexander Martinez | Grandpa | Feb 23 2011 |

Which of your family members have been diagnosed or treated for any type of neurological, psychological, or emotional problems?

| Member | Disorder/Problem |
|---|---|
| | |

---

Were you ever tested and/or placed in learning disability or Special Education classes? If so, when and why?

Did you have any adjustment or behavioral problems in school? Please explain.

List any extracurricular activities when you were in school (i.e., cheerleading, football, band, 4-H, etc.) when you were in school.

Describe the quality of your relationships with teachers/coaches.

List any people (friends or family) other towards you received while in school.

Summarize your feelings about your school experience.

Describe your current educational plans.

000009

**Scanned Jun 18, 2013**

1. on top of ● head. From with my mother had hit me with the vacuum cleaner. And my mother and father reported when I was 2 so I was never raised by my father.

2.

| Household Member | How related | Quality of relationship |
|---|---|---|
| Guadalupe Alejandro | Grandma | 10 |
| Andrew Alejandro | Uncle | 5 |
| Andrea Alejandro | Aunt | 8 |
| Guadalupe Alejandro | Grandma | 10 |
| Andrew Alejandro | Uncle | 5 |
| Andrea Alejandro | Aunt | 8 |
| David Villarreal | Uncle | 5 |
| Melissa Villarreal | Aunt | 7 |
| Celestine Villarreal | Cousin | 7 |
| Chon Villarreal | Cousin | 7 |
| Priscilla Martinez | Mother | 10 |
| Alex Hernandez | Brother | 8 |
| Guadalupe Alvarez | Sister | 9 |
| Guadalupe Alejandro | Grandma | 10 |
| Andrew Alejandro | Uncle | 5 |
| Andrea Alejandro | Aunt | 8 |
| Priscilla Martinez | Mother | 10 |
| Alex Hernandez | Brother | 8 |
| Guadalupe Alvarez | Sister | 9 |
| Paul Ortiz | Mom's Boyfriend | 5 |

3(Cont) my mother would when I would mess up or get in trouble. That was the last move that I made.

4. A very short time with the Astros. I didn't last because of transportation problems, in other words I couldn't get to practice all the time.

5. USMC on left fore Arm. OS on right thigh. Cross with Ying-yang symbol in the middle on left thigh. Scripture from the Bible on left inner calf (John 3:16). Eye on right inner ankle. Pitbull on upper right arm. Homemade tattoos of a face with the words "Never Again" on stomach under Priscilla tattoo.

6. came back about 1 minute or so later. My heart was beating really fast and I couldn't see nothing at all. I was on the porch of a guy I had just met and when it happened I went into a panic and started telling him that I couldn't see. And he didn't believe me, As soon as my vision came back I went straight home And stayed there all day.

7. places and not know or remember how I got there. It would scare me but nothing serious or Anything to the point where me or nobody else would get hurt would ever happen.

3. When we first moved from Austin to C.C. we lived with my aunt Andrea. At her home on the way I was given a lot of chores but my cousins And my aunt and uncle would barely do Anything. When my mother finally came to C.C. also from Austin she didn't like the way I was made to do everything so she would fight with my Aunt And argue with my grandma. She would also tell me that as soon as she got her own place that I was going to move back with her. Then my grandma got an apartment in LA ARAMARA on Castilla St. where my grandma And her son and daughter And I stayed. My grandma would make me do a lot of chores, basically all of them while my aunt and uncle would do nothing. My mother would go and see me scrubbing the stairs and dusting the whole living room And she would get angry. My grandma would also send me to the H-E-B that used to be on Ayers and Port to buy grocery's walking. On one occasion A lady stopped me and offered me a ride home because she said she's seen me a bunch of times walking with alot of bags that I could barely carry. That lady later brought me A bike with a basket attachment. When my mom finally got an apartment in LA ARAMARA she told me to go live with her, so I did. The _____ _____ _____ would hit me And

000010

Scanned  Jun 18, 2013

**Employment History**

List as much information as you can about each and every job you have EVER had.

| Employer | Address | Years | Type of Work |
|---|---|---|---|

If you had any lengthy periods of unemployment, explain why: _____

Have you ever been involved in Worker's Compensation litigation? If yes, explain:
No

When your usual job duties particularly dangerous or stressful in any way? _____

When you ever exposed to harmful chemicals when you were working? _____

Describe your relationship with your supervisors (e.g. Which did you get along with and which did you not get along with and why?) _____

Summarize your attitude about your previous work environment and whether you are satisfied with your employment related to achievement. _____

**Military History**

If you were ever in the military, indicate the branch, time of service, your ID number, highest rank and type of discharge: _____

Have you ever had any disciplinary actions against you while in service? If yes, explain in detail: _____

Describe what your military experience was like: _____

Did you participate in combat? If yes, did you participate in killing anyone or observe a death?
No

Have you ever applied for Service Connection benefits? If yes, explain details and whether received: _____

Are you currently receiving VA benefits? If so, for what and how much money do you receive?
No

Did you attempt to enter the military but were denied entry? If yes, explain: _____

Summarize your feelings about your military service experience or inability to serve or decisions not to serve: _____

**Marital/Love Relationships**

How old were you when    you started dating? 13      become sexually active? 12
first married? N/A

How many marriages have you had? N/A    Divorces? N/A

List all marriages beginning with the most recent:

| Name of Spouse | Year Married | # Years Married | Number of Children | Reason Marriage Ended |
|---|---|---|---|---|
| N/A | | | | |

List any other long-term relationships that you have had:

| Name of Person | Years Together | Number of Children | Reason Relationship Ended |
|---|---|---|---|

Current Spouse's Name: N/A          Age: ___   Telephone #: ___
His/Her Education Level: ___          Health Condition: ___
Occupation: ___

What is your spouse's use of alcohol and/or drugs like? N/A

What is your spouse's mental health like? N/A

Does your current spouse have a criminal record? If yes, explain. N/A

Have you and your current spouse ever been separated? If yes, explain. No

Have you and your current spouse ever been violent with one another? If yes, explain. N/A

Describe your relationship with your current spouse. N/A

**Name of Your Child(ren):**

| Name | Current Age | Telephone # |
|---|---|---|
| Israel Alexander Ramirez | 2 y/o | N/A |

Which children have you actively participated in raising and when? _____

Do any of your children have physical or mental health problems? If yes, explain. _____

What type of discipline did/do you and your spouse use with your children (i.e. spanking, time-out, etc)? Explain in detail. _____

How do you perceive yourself as a parent? _____

List all others who live or lived in your household or nearby that have a significant role in your family:

| Name | Relationship |
|---|---|

Do any of your children have any arrest or police records? If yes, explain: N/A

000011

**Scanned  Jun 18, 2013**

Summarize your attitude and feelings toward each of your children:

_[handwritten, illegible]_

### Adult Residential History

List all your residences since leaving your childhood home. If you cannot remember the address, list the locations and approximate dates.

| Address | Years lived there |
|---|---|
| Raleburg Conv. Envirans... | _illegible_ |

If you moved around a lot during your adult life, explain why:

_[blank]_

### Religious History

Religious preference, if any:  Jehovah Witness

Do you attend church regularly?  No   How often?  _illegible_   Are you attending services while in jail?  No _Not allowed to because being housed in Close..._

Have you ever experienced any unusual religious experiences?  Every time I'm in _trouble I would pray and somehow someway I would be helped_

Are you licensed or ordained as a minister or counselor? If yes, explain:  No

### Hobbies And Interests

What do you usually like to do for entertainment?  _I like to read, play video games, and listen to music the most._

List your areas of interests and talent (i.e. art, music, sports):  _illegible_

---

As a child or adult, have you regularly participated in family recreation? Explain.

_[handwritten, illegible]_

Do/Did you participate in any volunteer work, clubs or civic activities? Explain:  Community Service since _illegible_

### Physical Health History

Do you have a community doctor/physician? If yes, list name and city telephone number also, if known)

_[blank]_

List all hospitalizations for physical health problems:

| Hospital/Doctor | Date | Health Problem Description |
|---|---|---|
| Christus... | _illegible_ | _illegible_ |

List all surgical operations you have had:

| Hospital/Doctor | Date | Description |
|---|---|---|
| Christus Spohn _illegible_ | _illegible_ | _illegible_ |

List any rare diseases or episodes of high fever you have had:  No

Are you currently taking medication? Explain in detail:  No

Do you have any physical disabilities? Explain:  No

Are you receiving medical treatment while in jail? Explain:  No

---

Summarize your current health status:  _Physically I need but mentally not but I feel like I need some..._

5.  Do you have any tattoos? If yes, describe each and its location:  _illegible_

### Mental and Neurological History

List all your hospitalizations for mental disturbances, neurological problems and head injuries:

| Hospital/Doctor | Address | Year | Diagnosis |
|---|---|---|---|
| _illegible_ | _illegible_ | _illegible_ | _illegible_ |

_[several lines handwritten, illegible]_

List the names and dosages of all psychiatric medications by the most recent prescriber:

Current:  _illegible_

Past:  _illegible_

Are you currently seeing a corrections counselor or psychologist? Explain:  No

Have you ever been traumatized? Explain in detail:  _Yes many times... [illegible]_

Have you ever applied for or received mental disability? Explain.  No

---

Summarize your perception of your current mental health:  _I think I'm..._

_[handwritten, illegible]_

Place a check beside each of the following that was a problem for you in your childhood:

| | | | |
|---|---|---|---|
| night terrors | ✓ | sleep difficulties | ✓ | unhappy childhood | ✓ |
| sleep walking | ✓ | very dreamy | | misbehaved a lot | |
| extremely religious | | shy & inhibited | | couldn't trust anyone | |
| bed wetting | ✓ | very lonely | | temper tantrums | |
| fire starter | | imaginary playmates | | lying | |
| harmed animals | | cried a lot | | extreme fears | |
| physically violent | ✓ | punished too severely | | sexually molested | |
| severe headaches | ✓ | reading problems | | ran away often | |
| stuttering | | suicidal thoughts | | masturbated a lot | |
| very nervous | ✓ | daydreamed a lot | | sick a lot | |
| seizures or spells | | often felt spacey | | traumatic event(s) | |
| was active | | accident prone | | witness to violence | ✓ |

Circle "B" for each of the following that applied to you BEFORE the alleged offense and circle "N" for those that apply to you NOW.

| | Before | Now | | Before | Now |
|---|---|---|---|---|---|
| seizures | B | N | shaky hands | B | N |
| extremely forgetful | Ⓑ | N | convulsions | B | N |
| dizziness, tingling | Ⓑ | Ⓝ | tremors | B | N |
| severe headaches | Ⓑ | Ⓝ | poor appetite | Ⓑ | N |
| nightmares | Ⓑ | Ⓝ | lightheaded | B | N |
| weight loss | B | N | very depressed | Ⓑ | Ⓝ |
| fainting spells | B | N | anxiety or fear | Ⓑ | Ⓝ |
| can't sit | B | Ⓝ | too drowsy | B | N |
| very restless | Ⓑ | Ⓝ | feel guilty all the time | Ⓑ | N |
| nausea or vomiting | B | N | often irritable | Ⓑ | Ⓝ |
| feel hopeless | Ⓑ | N | stomach problems | B | N |
| extremely tense | Ⓑ | Ⓝ | very withdrawn | Ⓑ | Ⓝ |
| breathing too fast | B | N | obsessive thoughts | Ⓑ | Ⓝ |
| suicidal thoughts | Ⓑ | N | heart beating fast | B | N |
| tired all the time | B | Ⓝ | sexual problems | B | N |
| sweaty hands | B | N | can't make decisions | Ⓑ | N |
| bad dreams | Ⓑ | N | cramped muscles | B | N |
| blurred vision | B | N | don't show affection | B | N |
| want to harm others | Ⓑ | Ⓝ | slurred speech | B | N |
| always busy | B | N | see things not present | B | N |
| déjà vu | B | N | often tell lies | B | N |
| hear things not present | B | N | memory disturbance | Ⓑ | N |
| often offend others | B | N | feel very _illegible_ | Ⓑ | N |

000012

6.  _[handwritten line, illegible]_

Scanned Jun 18, 2013

Dr. Troy C. Martinez                                            Page 14 of 17

micropsia                                                      ask and pout a lot
act within a thinking                                          extremely jealous
gullible                                                       blame others a lot
weight gain                                                    extremely religious
can't trust others                                            syphilis
sudden panes                                                   physically violent
easy drowning                                                  small things not present
daydreaming                                                    too excitable
ideas of persecution                                          easily dominated
whine and binds a lot                                          demanding
selfish                                                        overbearing

List all recent stressful situations and events: _____
_____
_____
_____
_____

Have you ever had court-ordered mental health evaluation in the past? _____
Name of Expert _____ Recommendation _____ Date _____

## Alcohol and Drug Use History

Did your mother ever drink alcohol? ✓ Yes ___ No
Did she drink alcohol during her pregnancy with you? ___ Yes ___ No ✓ Don't know
Type: Beer + liquor   Amount: _____

Did your father ever drink alcohol? ✓ Yes ___ No
Type: Beer   Amount: _____

Do you drink alcoholic beverages? ✓ Yes ___ No
Age You Started Drinking: 14
Type: Beer + liquor
Amount: _____

Have you suffered blackouts, D.T.'s, or other adverse effects? Explain: _____
_____
_____
_____

Dr. Troy C. Martinez                                            Page 15 of 17

Do you consider yourself to be an alcoholic? Explain: _____
_____
_____

Have you ever been treated for alcohol use? If yes, complete the following:
Doctor/Facility/Program _____ Address/Location _____ Year(s) _____
No

Did you successfully complete treatment? Explain: N/A

How long you stay off alcohol? _____
Did you ever use drugs? ✓ Yes ___ No   Beginning Age: 10
Types of drugs used (even if only once) and how (i.e., smoke, IV, snort): Marijuana
Cocaine, Acid (once), Codeine (cough syrup), Xanax pills

Have you ever suffered hallucinations, blackouts, flashbacks, or other adverse effects from drugs? _____
_____
_____

Do you consider yourself to be a drug abuser? ✓ Yes ___ No
Explain: _____
_____

Have you ever been treated for drug abuse? ___ Yes ✓ No   Year _____
Doctor/Facility _____ Address _____
N/A

Did you successfully complete treatment? Explain: N/A

Dr. Troy C. Martinez                                            Page 16 of 17

How long did you stay drug free? _____

Whether you have a substance abuse problem or not, were you under the influence of alcohol or drugs at the time of the current offense? Explain: _____
_____
_____

## Prior Criminal History

Age at time of incident        Charge        Disposition
_____
_____
_____
_____

How frequently were intoxicants/drugs an issue during the commission of offenses? _____
_____

Were you given the opportunity to seek treatment for any recognized problem? _____

If you have been incarcerated, describe the facility: include location, length of time you spent in each facility and what rehabilitation opportunities were available:
Facility _____ Rehab Opportunities _____

Did you receive any medical and/or psychiatric treatment while incarcerated? No

Did you receive disciplinary while incarcerated? If yes, what were the circumstances and were there repeated incidents? No

Dr. Troy C. Martinez                                            Page 17 of 17

Have you successfully completed probation in the past. Explain: _____
_____
_____

What additional information do you think is important, but has not previously been covered? _____
_____
_____

END

000013

Scanned  Jun 18, 2013

Scanned Jun 18, 2013

1/2

8. Guadalupe [illegible] ([illegible] in my office, [illegible]: 55[illegible]-[illegible])
60 yo
well dressed + attentive

[illegible] 3 sons. [illegible] 1st son. John + Priscilla [illegible] after [illegible] born 1st child. John 17/18 yo + Priscilla 16 yo + living with me/John's [illegible]. [illegible] JH born [illegible] 1 yr later. [illegible] [illegible] [illegible] into own apt [illegible]. [illegible] [illegible] [illegible] [illegible] in Houston.

John + Priscilla [illegible] by JH [illegible]. [illegible] 2 yo [illegible] started [illegible] back + forth [illegible] final sep. Priscilla to Houston [illegible], JH @ 3 yo. [illegible] John [illegible] physical to Priscilla [illegible] [illegible] to stopped. [illegible] [illegible]. [illegible] about 4 yo when Priscilla called me to take [illegible] but to keep J.H., saying "John [illegible] [illegible] [illegible]. [illegible] [illegible] but [illegible] [illegible]." So [illegible] always with me [illegible] now. JH has never lived with me.

([illegible]) [illegible] hardly saw him. JH raised in different type family than us. Think JH wanted attention + love but [illegible] how to show. [illegible] child support, [illegible] + [illegible]. [illegible] to see JH [illegible] Priscilla [illegible] [illegible]. [illegible] [illegible] [illegible] JH [illegible] [illegible]. [illegible] [illegible] [illegible] of [illegible].

After [illegible], he started drinking heavily, but [illegible] [illegible] on Priscilla + JH. [illegible]

JH [illegible] [illegible] [illegible] [illegible]. 1 yr [illegible] 5 yo [illegible] [illegible] by [illegible] 3 yrs. [illegible] [illegible] in Houston [illegible] to [illegible], JH [illegible] to [illegible] [illegible]. [illegible] [illegible] [illegible] [illegible] [illegible] + [illegible] [illegible] [illegible] + living with [illegible] since. [illegible] [illegible] + [illegible] + 1 x [illegible]. [illegible] [illegible] [illegible] OK.

[illegible] [illegible] [illegible] [illegible] [illegible]. [illegible] [illegible] + [illegible]. I [illegible] [illegible] [illegible] [illegible] + I [illegible] [illegible] with us. [illegible] [illegible]

2/3

[illegible] JH not allowed [illegible] with us. [illegible] JH [illegible] with me.
JH [illegible] [illegible] [illegible] a baby.
OK [illegible] [illegible] [illegible] not safe. [illegible] from us.
[illegible] [illegible] sports/social/school functions.

(JH [illegible]) when returned from military. [illegible] worse. "[illegible] so much anger [illegible] could see in him." "Looked ready to explode, attack, so much anger."
He talk nothing @ Marine Corp experience.

We proud of him, [illegible] [illegible] [illegible]. [illegible] [illegible] [illegible], [illegible] [illegible] [illegible] [illegible] [illegible]. He [illegible] [illegible] [illegible] [illegible] [illegible]. I [illegible] it. This X he not [illegible] ([illegible] + [illegible]) → [illegible] [illegible]. He [illegible] [illegible] [illegible] [illegible]. He [illegible] [illegible] [illegible]. I think [illegible] X he [illegible] [illegible] [illegible] with [illegible] [illegible] [illegible] [illegible] for him. Talked to [illegible] [illegible] "[illegible] [illegible] [illegible]." [illegible] [illegible] [illegible]. Priscilla [illegible] [illegible] to JH. [illegible] + JH [illegible]. [illegible] [illegible] [illegible] for him + they found him.
[illegible] [illegible] after [illegible] "[illegible] - like [illegible] ready to explode. Wicked, anger."

[illegible] him [illegible]. [illegible] [illegible] [illegible] (sic) [illegible] [illegible] [illegible] [illegible] in [illegible] [illegible] [illegible]. [illegible] [illegible] him on [illegible].
Day after [illegible], asked me + asked to stay home [illegible] [illegible] [illegible]. Told him yes. [illegible] [illegible] [illegible] [illegible] [illegible] [illegible] [illegible]. [illegible] [illegible] [illegible] since. [illegible] [illegible] [illegible] [illegible]. [illegible] [illegible] visit [illegible].

[illegible], speech impediment [illegible] + [illegible]. [illegible] "[illegible]" [illegible] [illegible] [illegible].
([illegible]) [illegible] [illegible] [illegible]. He [illegible] [illegible] + [illegible] [illegible] + [illegible] [illegible] [illegible]. He's [illegible] [illegible] [illegible]: Priscilla [illegible] [illegible] [illegible] + my son [illegible]

3/3

Priscilla [illegible] [illegible] [illegible] ~ 84 [illegible] [illegible], [illegible] [illegible] of JH [illegible] [illegible] + [illegible] X after [illegible] [illegible]" ~ [illegible] detached.
([illegible]) OK [illegible] [illegible].

([illegible]) [illegible], no - [illegible] [illegible] of violence ([illegible]) no, [illegible] [illegible] [illegible] [illegible] [illegible], [illegible] [illegible] [illegible], [illegible] [illegible]. He [illegible] [illegible] [illegible]. [illegible] [illegible] [illegible] [illegible] [illegible] ~ @ 14 yo [illegible] [illegible] [illegible] [illegible], plastic [illegible], [illegible] [illegible] [illegible] [illegible] [illegible] [illegible] [illegible] [illegible] [illegible] house.

[illegible] ([illegible]) [illegible], [illegible] [illegible] [illegible] [illegible] [illegible] [illegible] + [illegible]. [illegible]

1/2

10/5/[illegible] Josie Smithwick
[illegible] yo
retired English (Secondary) teacher
CCISD x 38 yrs. Retired '04
[illegible] [illegible] x 10-12 yrs, taught 9th - 12th grades, mostly 9th

[illegible] JH [illegible] different than [illegible]

J.H. 9th grade English teacher. [illegible] [illegible] school [illegible] subsequent yrs. Talk at least 1 x month. Never outside school. After he graduated, he returned to visit me @ classroom [illegible] Xs [illegible] school yr. Visit @ school [illegible] Marines, after Marines [illegible] [illegible] (though didn't know he [illegible] [illegible]).

9th student: didn't do much work but never a problem. [illegible], [illegible] to [illegible] but [illegible] never [illegible]. He [illegible] some occasions + [illegible] [illegible] [illegible] do the work but he didn't want to. [illegible] [illegible] [illegible], [illegible] [illegible] [illegible] to embarrass himself. So many yrs [illegible] [illegible] [illegible] + [illegible] [illegible] [illegible]. [illegible] a [illegible] in my class, [illegible] [illegible] [illegible] [illegible] [illegible], [illegible] [illegible] [illegible]. [illegible] all [illegible], [illegible] [illegible] [illegible]
["[illegible] [illegible] [illegible] [illegible]" [illegible] [illegible] + [illegible] [illegible] [illegible]]
to [illegible]. No fights. Grade: [illegible], [illegible] F. [illegible] [illegible] [illegible] [illegible] on [illegible] [illegible]
[illegible] [illegible] [illegible] [illegible] [illegible] he [illegible] [illegible] [illegible] [illegible] [illegible] [illegible] [illegible]/[illegible].

Reputation: "[illegible] [illegible] [illegible] John. [illegible] didn't [illegible] him [illegible]." [illegible] friends, [illegible] in particular, [illegible] [illegible]. Talk of gang affiliation but not [illegible] [illegible] gang signs. [illegible] [illegible] + [illegible] [illegible], [illegible] [illegible] [illegible] it.

Temperament: [illegible] [illegible] [illegible] [illegible] [illegible] [illegible] [illegible] [illegible]. [illegible] [illegible], [illegible] [illegible] him [illegible]. [illegible] [illegible] [illegible] [illegible] [illegible]. [illegible] [illegible] [illegible] [illegible] [illegible] [illegible] [illegible]: [illegible] [illegible] [illegible] [illegible] [illegible]. [illegible] [illegible] [illegible] [illegible]. [illegible]: [illegible] [illegible] [illegible] his environment, [illegible] [illegible] [illegible] [illegible] "[illegible] sensitive to [illegible] issues.

Scanned  Jun 18, 2013

Scanned Jun 18, 2013

3/3

[illegible]

2/2

[illegible]

Very little relevant info except his absence as a father

1/2

10/30/08 John H. Ramirez, Sr. (F) cell 232-3052

Knows very little of him.

[illegible]

7 DECEMBER 2008
RE STATE V. JOHN HENRY RAMIREZ
FILE NOTE/MEMO

Meeting with attnys Ed Garza and Grant Jones @ 4pm, then to jail to meet with JHR lasting 1.25 hours. As he discussed in prior contacts bw just us (at his initiation), JHR today advised his attnys of his wish to present no mitigation evidence/testimony (including myself) and offer no witness testimony (citing family in particular) during punishment phase of this trial. As I had done in the past, this day both attnys and I asked JHR a number of questions re his thoughts and feelings leading to this decision. Primary among these is his desire to avoid putting family through the process of pleading for his life and his wish to avoid a lengthy (life) prison stay. He reiterated no interest in spending the remainder of his life incarcerated and having to adapt to the prison culture. He instead asked that his attny read a passage from the Bible then close their case. He noted that he's devoted years (while on the run) thinking about this, anticipating that one day he would be arrested by police.

Throughout this meeting, as he has in prior conversations, JHR was calm, resigned in his attitude, and revealed goal-directed, rational, and organized reflections/statements and questions. He displayed a strong, consistent resolve in instructing his attny of these wishes. His preparedness and organization made clear that he had devoted considerable prior thinking to this in the event that was found guilty of CM. No evidence of psychosis or clinically significant mood disturbance.

JHR understands the potential consequences of instructing attnys not to advance mitigation testimony (and only reading Bible passage). Indeed, his hope is that jury will sentence him to death. He explained that he entertained testifying himself during punishment so that he might ask the jury for death sentence but, per this thinking, the jury might either intentionally give him the opposite of what he wants (another form of punishment) or perceive that he's trying to manipulate them. In the end, per his thinking, the most reliable way to increase his chances of getting death lays in simply offering no evidence for a life sentence.

Scanned  Jun 18, 2013

John Henry Ramirez

School Records:
Attended Moody High School from 9th grade through 12th. First in 9th grade from 08/98 to 05/99 then repeated from 08/99 to 05/00, 10th grade interrupted for unclear reasons, listed from 08/00 to 12/00 then 12/00 to 05/01. He was apparently then promoted to 12th grade from 08/01 to 05/02. Date of graduation on 05-24-02, ranked 312th of 395 students, with GPA of 74.1612. In 9th grade past the U.S. History portion of end-of-course standardized testing; in 9th grade past the Biology portion as well. Noted to be "absent" from exit level testing in 10th grade for writing, reading, math. Was exempt from exit level testing in 11th grade.

Admission, Review, and Dismissal (ARD)/Individual Education Plan (IEP) Committee Report from the Houston ISD; meeting dated 02-17-95 when Mr. Ramirez was 10-6 years-old and in 5th grade. He met criteria for disability based on learning disability and speech impairment. Listed as "average in all areas" for TAAS for the following year. Special Ed placement included regular education with modifications, resource classes, and speech therapy. His mother and maternal grandmother were present for the meeting. LD was noted to include written language and listening comprehension. Listed as having average intelligence. His regular classroom teacher "stated John tries hard in class but has great difficulty controlling himself ... he displays inappropriate behaviors such as disruptive, disorganized, seldom finishes his work, rude behavior, and out of seat/area ... due to his easily frustration, it was recommended he be exempt from all areas of TAAS testing. It was recommended by the committee that a psychiatric evaluation be reviewed. Mother agreed with the committee. Report indicates he "instructs appropriately with adults" but does not have the ability to follow disciplinary rules.

Houston ISD; Child Study Dept.-Comprehensive Individual Assessment dated 01-09-95. Referred because of "John's inability to sustain attention or focus on the work. He is in constant motion and is disruptive, frustrations with self/amounts of attention deficits." Intellectual assessment (WISC-III) on 11-29-94: VIQ-107, PIQ-106, FSIQ-107. Parent reports John has a lot of anger. In school behavior: continually disrupts classroom, is never attentive, is highly disorganized, becomes extremely workable, avoided by others, rejects responsibility, seldom finishes even with guidance and is always rude. Has attended Jefferson School since Kindergarten, with records indicating "good attendance." Achievement testing indicates deficits in written language and listening comprehension. Fourth grade teacher describes him as "constantly disruptive verbally and at times he was physically disruptive ... hard time sitting at his chair, not completing work ... had to do things his way as rules and instructions were hard for him to follow. His behavior around other children was undesirable as he did a lot of name calling and gesturing to others." On 01-23-95, described by a different teacher describes him as "takes little self-initiative under his little self-discipline. He must be told repeatedly easy to follow instructions ... he is a nice boy who wants to please." On 01-20-93, described by a teacher as "generally anti-social with peers ... he is very curious and enjoys learning ... John's home environment is less than stable." Another teacher describes him as having

intention to change ... John belongs to a poor group, possible gang-like and its activities, which does not appear to value compliance with school and community rules ... may act inappropriately in order to preserve his reputation and esteem in his own eyes and in the eyes of his peer group." Test interpretation on 04-27-01 indicates Mr. Ramirez "believes the tests are designed to make people feel bad about themselves. He also expressed anger about having been previously labeled LD and ADHD and placed in Special Education ... he attributed his failing grades to his lack of effort, attendance, and concern; but defended his ability to do the work ... John does not value or prioritize school. He expressed a general dislike of teachers and school. He does value his job and his peer group. However, he lost his job due to possession of marijuana and belongs to a disengaged peer group. John appears extremely wary of trusting others and states that he will purposefully lash out at any person he perceives to be disrespectful of him. He has done this in the past and has no remorse for his actions. Teachers describe him as an oppositional student with an attitude problem and suspect him of gang membership. They state that he has rejected efforts to help him meet his school goal. One of his teachers has established adequate rapport ... John does not attend his other classes much at all." Report indicates he does not demonstrate characteristics of emotional disturbance. A Functional Behavioral Assessment and Intervention Plan is finally completed on 11-28-00. As usual, a parent did not attend. Goals included improving school attendance, refraining from verbal and physical aggression, and complying with directives from authority figures. A recommendation for removal/expulsion dated 11-06-00 resulted in a 3 day suspension for harassing and threatening another student, this following a prior notice on 10-26-00. Several office referrals are available in records. An ARD meeting dated 05-23-02 indicates Mr. Ramirez is a full-time VAC student.

*************************

According to available military records, Mr. Ramirez was in the U.S. Marine Corps active duty from 12-03-02 through 03-09-04. His primary duty was that of a field radio operator. He was counseled for deficiencies on 12-22-03, 12-24-03, and 02-03-04. Enlistment data indicates he acknowledged having smoked marijuana 20 times, with last use in June 2002. He reports having paid a fine for minor in possession of alcohol at age 16 (two years before). A military documents dated 02-19-04 indicates administrative discharge under other than honorable conditions "by reason of misconduct due to a pattern of misconduct ... due to a personality disorder." A Personal Data Sheet indicates Mr. Ramirez enlisted on 12-03-02 for 4 years but served active duty for one year - three months. Awards included the National Defense Service Medal and a Letter of Appreciation. He was declared a deserter on 08-01-03, apprehended by the Corpus Christi Police Department on 11-14-03, and turned over to military authorities on 11-18-03. On 12-22-03, he was diagnosed by a military psychologist as having a Personality Disorder NOS with Borderline, Antisocial, and Dependent Traits, with recommendation for "Expeditious Administrative Separation." On 12-24-03 he was issued a Summary Court Martial Conviction for unauthorized absence, disrespectful language to a non-commissioned officer, failure to obey a lawful order (underage drinking), and drunk and disorderly. On 02-03-04, he was counseled for failure to follow verbal and written orders

[illegible handwritten chart/graph]

INFORMED CONSENT FOR FORENSIC ASSESSMENT

Your attorneys have asked that I (Dr. Troy Martinez) perform a psychological evaluation in connection with your legal case. This form was written to give you information about the assessment process and to get your consent as a willing participant. The assessment will contain several parts and take several hours, perhaps across more than one day to complete. This evaluation may or may not help your case. This is an evaluation only and does not involve treatment of any kind.

One part will consist of an interview, when I will ask you questions about yourself and ask that you talk about yourself. There may be areas that you are reluctant to talk about and, if so, please be sure to tell me those questions are making you uncomfortable or that you have reasons for not providing the information. Although I will attempt to be thorough when interviewing you, I may not ask about some point or information that you believe is important. If so, please indicate any so that we can discuss it.

Some interview questions will ask about matters related to your legal case. You should be aware that information shared with me will not be held confidential and classifications part of Court record. You should also be aware that telling me certain types of special information may require or permit me to disclose this information to other people. Examples of such special information include reports of child or other abuse, plans of suicide, and/or threats to kill or violently attack a specific person.

You are encouraged to discuss any questions or concerns with your attorney before and after the assessment. You may also skip the evaluation at any time and for any reason, at which time I will inform your attorney of this decision.

Another part of the assessment may include one or more psychological tests. Some of these tests leave my right or wrong answers, while other tests do have either right or wrong responses. You will be given detailed instructions at the time tests are given. This part of the evaluation may assess intellectual abilities, personality, test taking attitude, how you view yourself and others, how you view the world, problem solving abilities, and other such matters emotional relevant and important.

It is very important that you be as honest as possible when answering interview and test questions. It is equally important that you put forth your best effort on tests. Information that is incomplete or misleading may be far more damaging to you later than if I am able to learn about it now and put it in context to my report and/or testimony.

Another part of the overall assessment will include my contacting by phone or in person, individuals or agencies who know you or have something about you that may be relevant to this evaluation and your case. It may also be necessary that I get existing records about you (i.e. medical, mental health, CPS, employment, and/or military and/or information). By your signature below, you are giving consent for me to receive information about you from people or agencies and to review and use the information I obtain when writing a report and/or during Court proceedings.

At the end of the assessment, I may write a report based on my findings from the evaluation. I will share information with and, if applicable, send a copy of the report to your attorneys and discuss my findings with them. I will not send you a copy of my report. You and your attorney will decide if my findings and/or report are shared with the prosecuting attorney and Court.

By your signature below, you are giving consent for me to testify about you and this assessment in hearings and trials related to your legal case.

I am a Psychologist licensed by the Texas State Board of Examiners of Psychologists (TSBEP). I will conduct this assessment in a professional manner and will be open to discussing any questions or complaints you may have in this regard. TSBEP receives questions and complaints regarding the practice of psychology: 333 Guadalupe, Suite 2-450, Austin, Texas 78701, (512)305-7700 or 800-821-3205.

000016

**Scanned Jun 18, 2013**

The 42-month search for John Ramirez is finally over. On February 20, 2008, a multi-jurisdictional effort resulted in Ramirez's capture down in the border town of Brownsville, Texas

OCTOBER 14, 2008

EDWARD F. GARZA/ATTORNEY AT LAW
719 S. SHORELINE BLVD., STE. 201
CORPUS CHRISTI, TEXAS 78401

J. E. BARRERA/INVESTIGATOR
POB 331535
CORPUS CHRISTI, TEXAS 78463

RE: JOHN HENRY RAMIREZ JR.
I HAVE MADE REPEATED EFFORTS TO CONTACT DEFENDANT'S BIO-MOTHER
THROUGH HER MOTHER, GUADALUPE ALEJANDRO WITH NO CONTACT MADE TO
THIS POINT. MRS. ALEJANDRO STATES SHE HAS GONE BY THE LOCATION WHERE
SHE BELIEVES THAT PRISCILLA MARTINEZ LIVES AND HAS YET TO LOCATE
ANYONE. SHE WILL KEEP TRYING. I HAVE KEPT DR. MARTINEZ APPRISED OF
THIS. I BELIEVE AT THIS POINT I WILL BEGIN TO ATTEMPT TO CONTACT THE
FATHER AND THE OTHER SIBLINGS.

10/5/2008. INTERVIEW OF JOHN HENRY RAMIREZ JR. AT NUECES CO. JAIL

AFTER OUR LAST MEETING WITH YOU AND DR. MARTINEZ, I WENT BY COUNTY
JAIL AND CONVEYED YOUR THOUGHTS TO JOHN HENRY RAMIREZ REGARDING
THE HEARING THAT HAD BEEN HELD. JOHN HENRY FELT THINGS WERE
ACCOMPLISHED AND FELT THAT HE WAS WELL REPRESENTED. IN THE COURSE
OF MY INTERVIEW WITH HIM I ASKED HIM IF HE RECALLED THE INCIDENTS THAT
WERE CONVEYED BY THE TWO VICTIMS OF THE ARMED ROBBERY AT THE
WHATABURGER FAST FOOD RESTAURANT'S AND HE GAVE ME A LONG...
STUDIED LOOK AND RESPONDED THAT HE REMEMBERED NOTHING OF THE
INCIDENTS. HE THEN QUALIFIED THAT AND COMMENTED THAT IT MUST BE THE
TRUTH, WHY WOULD THOSE TWO WOMEN MAKE UP SUCH STORIES AND THEN
SIT IN FRONT OF A JUDGE AND LAWYERS.
JOHN HENRY CONVEYS THAT AT THE TIME OF THE INCIDENTS HE WAS ON A
CONSTANT HIGH ON Z-BARS (XANAX) AND BOOZE WHICH HE ACQUIRED VERY
READILY THROUGH THE TWO LUP FEMALES AND "TWO TONE", MYRON
MENDOZA. IN CONJUNCTION WITH THIS HE INTRODUCED ALCOHOLIC
BEVERAGES TO SUSTAIN THE EUPHORIA.
JOHN HENRY GOES ON TO CONVEY THAT THIS WAS A WAY OF LIFE FOR HIM. SO
FEW THINGS TO LOOK FORWARD TO AND FAILING AT EVERYTHING THAT HE
TRIED TO ACCOMPLISH. I GUESS THIS WOULD LEAD US TO THE LACK OF
CONIZANCE OF HIS ACTIONS.
IN THIS ALSO JOHN HENRY RAMIREZ CONVEYS THAT HE HAD KNOWN
CYNTHIA AND ARLENE LUP TWO WEEKS BEFORE THE INCIDENTS THAT HE IS
CHARGED WITH. HE STATES THAT CYNTHIA WOULD PROVIDE BOOZE AND
PRESCRIPTION DRUGS TO MYRON MENDOZA AND HIM IN EXCHANGE FOR SEX.

THEY WOULD HANG OUT AND USE HER COMPUTER TO LOOK AT PORN SITES. GET
HIGH ON WHAT WAS HANDY AND SEXUALLY SERVICE CYNTHIA LUP. JOHN
HENRY STATES THAT THE DAUGHTER, ARLENE WOULD USUALLY NOT BE HOME
OR WOULD CONCERN HIMSELF TO HER ROOM. HE STATES THAT CYNTHIA LUP IS
A WHITE FEMALE, ABOUT 45 YEARS OF AGE AND OVERWEIGHT. HE BELIEVES
THAT CYNTHIA WAS MARRIED BUT HER HUSBAND WAS GONE FROM THE HOME
FOR EXTENDED PERIODS OF TIME.
JOHN HENRY CONVEYS THAT FROM THE AGE OF ABOUT 2 YEARS OLD UNTIL
ABOUT 10 YEARS OF AGE HE HAD NO CONTACT WITH HIS FATHER. HE LIVED
WITH HIS MOTHER IN THE HOUSTON AREA FOR THE MAJORITY OF THIS PERIOD
AND THEN THEY MOVED BACK TO CC. HE GOES ON TO RELATE THAT HIS
FATHER HAD LITTLE CONTACT WITH HIM EVEN WHEN THE OPPORTUNITY
PRESENTED ITSELF. AT ONE POINT JOHN HENRY RELATES THAT HE WAS
RUNNING AWAY FROM HOME A LOT BECAUSE OF A PRECARIOUS LIFESTYLE
AROUND HIS MOTHER AND HER ASSOCIATES. HE RECALLS GOING TO HIS
FATHER'S APARTMENT TO SEEK REFUGE AND HIS FATHER CALLING HIS MOTHER
TO COME GET HIM.
JOHN HENRY HAS AN OLDER SISTER, AND TWO YOUNGER BROTHERS, ASHLEY,
ALEX AND GUADALUPE ALVAREZ RESPECTIVELY.
JOHN HENRY RECALLS THAT HIS MOTHER WOULD DISCIPLINE HIM AND HIS
SIBLINGS BY HITTING THEM WITH WHATEVER WAS HANDY, CLOTHES HANGERS,
EXTENSION CORDS, BROOM STICKS ETC...AT TIMES HE WOULD INTERFERE WITH
HER ATTACKS ON HIS YOUNGER BROTHERS AND EARN ADDITIONAL
PUNISHMENT. AT THIS POINT HE RECALLS BECOMING VERY NUMB TO THE
ABUSE. HE WOULD SCREEN HIS MOTHER FROM HIS SIBLINGS WHEN SHE
BECAME ENRAGED AND TAKE THE ABUSE TO PRESERVE HIS YOUNGER SIBLINGS.
JOHN HENRY IS NOT SURE WHY HE WOULD DO THIS, NO BEING A HERO, JUST
BELIEVED IT WAS THE RIGHT THING TO DO. HE CAN RECALL THAT HIS MOTHER
WAS A VERY CRITICAL PERSON TOWARDS HIS ACTIONS AND HIS PERSON. HE
RECALLS UPS BECOMING INVOLVED TO THEM LIVES WHEN IN THE COURSE OF
BEING RUNNING PICK UP AT SCHOOL THAT FOUND HE HAD A RATHER LARGE
LACERATION ON HIS SCALP, UNDER THE HAIR, WHICH HAD OCCURRED IN THE
COURSE OF HIS BEING BEATEN BY HIS MOTHER. HE BELIEVES THAT ABOUT
FROM THE 3RD GRAND UNTIL ABOUT THE 6TH GRADE HE LIVED WITH HIS
MATERNAL GRANDMOTHER. HIS MOTHER AND HIS FATHER HAD LITTLE
INVOLVEMENT WITH HIS ONGOINGS AT SCHOOL OR AFTER SCHOOL. HE CAN
RECALL ONLY ONCE THAT HIS GRANDMOTHER CAME TO HIS SCHOOL BECAUSE
OF A SKIPPING COMPLAINT.
JOHN HENRY HAS A VERY VIVID RECOLLECTION OF ONE PURSUIT IN SCHOOL, OF
FIGHTING OTHER BOYS AROUND HIS AGE GROUP. WHAT IS STRIKING IS THAT
THE IMPETUS TO FIGHT IS GENERATED AROUND THE CONCEPT OF JOHN HENRY'S
SENSE OF RIGHT AND WRONG. AS HE STATES, "THEY WOULD DO STUPID
THINGS" AROUND HIM OR AROUND OTHERS. THIS WOULD BEGIN TO ENRAGE
JOHN HENRY WHO WOULD LOOK FOR THE OPPORTUNITY TO ENGAGE THEM IN A
FIGHT. STRANGELY ENOUGH, JOHN HENRY WHEN ASKED AT WHAT POINT HE

WOULD CARRYING ON THE ENGAGEMENT (3RD OR 5TH GRADE BOY) STATES THAT
HE WOULD BEAT THEM IN THIS HOPES OF "FUCKING THEM UP". GIVING UP, OR
GIVING IN WERE NOT ACCEPTABLE CONCEPTS. JOHN HENRY WANTED TO BUST
THEM UP, BREAK THEM UP, SHOOT THEM OR KILL THEM. JOHN HENRY SEEMS TO
CONVEY THAT EVEN AT THIS YOUNG AGE HIS EMOTIONAL STATE OF MIND
WOULD CONSUME HIM. I CAN ONLY LABEL THIS AS REVISION OF PERCEIVED
INDISCRETIONS THAT HE BELIEVED WERE COMMITTED AGAINST HIM. JOHN
HENRY IS VERY SENSITIVE TO RIDICULE AND/OR MOCKING OF HIS PHYSICAL
PERSON AND/OR HIS INTELLECTUAL ABILITIES. THIS MAY BE ONE OF THE
REASONS FOR THE "SELF MEDICATION" ON DEPRESSANT TYPES OF DRUGS AND
ALCOHOL, TO KEEP HIS ANGER CONTAINED.
JOHN HENRY SEEMS TO HAVE VERY GOOD RECOLLECTION OF VIOLENCE IN THE
COURSE OF HIS LIFE. HE RECOUNTS BEING AT THE BEACH WITH HIS AUNT,
ADELA ALEJANDRO, HIS MOTHER'S SISTER AND SHE COMPLAINED TO HIM OF
BEING AT ODDS WITH A MALE SUBJECT. JOHN HENRY CONVINCED HER TO TAKE
HIM TO HIS APARTMENT AND HE BEGAN TO BREAK DOWN THE DOOR. THE MALE
SUBJECT SHOT HIM TWICE THROUGH THE DOOR AND HIS AUNT TOOK HIM TO
THE HOSPITAL.
THIS CONVERSATION IS VERY UN-EMOTIONAL TO JOHN HENRY.
JOHN HENRY MENTIONED THAT CYNTHIA LUP ROUTINELY ALLOWED HIM AND
MYRON MENDOZA TO USE THE VEHICLES FROM THAT HOUSEHOLD.
JOHN HENRY DOES NOT HAVE A CLEAR MEMORY ABOUT WHAT OCCURS ON THE
DAY OF THE MURDER. HE RECALLS THAT MAJORITY OF THE EVENTS FROM THE
DOCUMENTS THAT HAVE BEEN PROVIDED TO HIM. HE DOES RECALL THAT
WHILE IN THE LUP VEHICLE HE GOES LOOKING FOR A GIRL NAMED LAVERNE,
BUT SHE IS GOING OUT WITH OTHER PEOPLE AND HE DECIDES TO PARTY WITH
ANGEL CRUZ AND CHRISTINA CHAVEZ. HE RECALLS THAT AT THIS POINT HE IS
ON A STEADY DIET OF XANAX AND BEER.
JOHN HENRY RELATES THAT IN THE COURSE OF THE POLICE PURSUIT OF THE
VAN HE COMES TO A SENSE OF REALITY. HE RECALLS DRIVING INTO THE NORTH
SIDE OF TOWN AND DITCHING THE VAN NEAR AN ENCLOSED, LARGE STORM
DRAIN AND RUNNING THROUGH THIS UNTIL HE COMES TO THE END OF IT. HE
RECALLS THIS WAS A "JAM" IN FRONT OF HIM AS HE PULLED HIMSELF UP OUT
THE PIPE.
JOHN HENRY IS ASKED WHAT HAPPENED IN THE MILITARY AND HE RECOUNTS
THAT HE WAS TOLD THAT HE HAD ASSAULTED THE OFFICER IN CHARGE OF THE
QUARTERS WHERE HE WAS UNDER OBSERVATION AND FIGHTING WITH HIM
OVER A WEAPON. CONSEQUENTLY IN THE COURSE OF THIS HE JUMPS OUT OF
THE SECOND STORY OF THE BARRACKS.

RE. I WILL CONTINUE INTERVIEWING JOHN HENRY AND MAKING
ARRANGEMENTS TO CONTACT THE OTHER PARTIES THAT MAY PROVIDE
INFORMATION ON JOHN HENRY'S HISTORY. AS SOON AS I CONTACT LUP I WILL
LET YOU KNOW TO SEE IF SHE WILL COME IN TO BE INTERVIEWED...
THANKS...

000019

Scanned  Jun 18, 2ʋ13



1
2
3
4
5
6
7
8
9
10
11
12
13        DX-6
14
15
16
17
18
19
20
21
22
23
24
25

MARY LOPEZ BUITRON, CSR, RPR
*Official Court Reporter - 94th District Court*

Scanned  Jun 18, 2013

April 1999

Capital Cases
By Russell Stetler

> Russell Stetler is the Director of Investigation and Mitigation at the
> Capital Defender Office in New York City. He has investigated
> death penalty cases since 1980 . From 1990 to 1995 he served as
> chief investigator at the California Appellate Project which co-
> ordinated post-conviction litigation on behalf of the hundreds of
> prisoners under the death penalty in California. He has lectured on
> capital case investigation for many years at the annual death
> penalty defense seminar in Monterey.

<center>Mental Disabilities and Mitigation</center>

Mental disabilities1 pervade the capital client population. Many lives
are spared in sentencing proceedings when jurors come to understand
empathetically the disabilities, brain damage, and tormented psyches
that help to explain our clients' behavior. Mental conditions which
inspire compassion, without justifying or excusing the capital crime,
can be powerful mitigation. But these same disabilities and disorders
can be lethal when they interfere with the defense team's effort to
establish trust. Mentally ill clients can be self-destructive. Their
paranoia may prevent their accepting sound legal advice about the
wisdom of a plea offer. Their bizarre symptomatology may be
misunderstood by the defense team as willful un-cooperativeness - or
so feared by jurors that the disability becomes an excuse to kill the
client ("surgery to excise the cancer"2) instead of a basis for reduced
moral blame and mercy. This column will address the unique
constellation of problems presented by our clients' mental disabilities
in death penalty cases - especially in the area of mitigation evidence.

Cynicism About Mental Disabilities
Capital counsel's ultimate task is to overcome juror cynicism toward
mental health issues in criminal cases. But the first task is often to
overcome the cynicism within ourselves - the tendency to view mental
conditions as convenient "defenses" in our litigation, rather than tragic
disabilities which have caused profound suffering in our clients' lives.

Shortly after the death penalty was restored in California, two beloved
political leaders - San Francisco's first openly gay supervisor, Harvey
Milk, and its liberal mayor, George Moscone - were assassinated by a
former member of the board of supervisors, Dan White.



DEFENDANT'S
EXHIBIT
6

Scanned  Jun 18, 2013

A homophobic arch-conservative, Dan White opposed everything in politics that Milk and Moscone stood for. His constituency was the working-class Irish Catholic district in which he grew up. Dan White was their all-American boy - star quarterback at a local high school, then a firefighter and a police officer, and finally an elected official in city government. But his life spiraled downward. When he could no longer tolerate city politics, White abruptly quit his position on the board. When he changed his mind and asked to get his job back, the mayor refused to reappoint him - and relished the opportunity to replace him with someone more progressive.

Dan White was well known at city hall, but climbed through a basement window on the day of the assassinations to avoid metal detectors. After killing the mayor, he reloaded his service revolver before walking down the hall to kill Supervisor Milk. When the killing was done, he went straight to confession. After finishing with his priest, he surrendered to one of his closest friends, a homicide inspector who'd played on the same softball team when White was an officer. White continued pouring out the story of what he had done.

His defense team successfully conveyed his mental deterioration to the jury - not just through experts, but with lay testimony that vividly captured his desperate downward spiral (former cop and public official reduced to selling baked potatoes to tourists at Fisherman's Wharf) and bizarre nutritional detour (from athlete with healthful diet to slothful recluse surviving on junk food - particularly Hostess Twinkies). When the jury agreed with the defense contention that Dan White lacked the requisite mental state for murder, the tabloids responded with the "Twinkie Defense" headline - and the legislature forever eliminated diminished capacity from the California penal code.

The popular assumption was that mental-state defenses were cynical concoctions - the inventions of sleazy defense counsel and their hired-gun experts. The forgotten footnote to this San Francisco tragedy is that Dan White served his manslaughter sentence, remained tormented by the demons of depression, and took his own life shortly after his release. The mental illness was real, but two decades later the headlines still portray this case with callous indifference to that reality.3 This denial of psychiatric disability deeply infects juror attitudes toward expert witnesses around the country.4 Sadly, many criminal defense practitioners also view their own experts as little more than mercenaries - thus often denying or devaluing authentic client disabilities.

Experts' Range of Roles

Scanned  Jun 18, 2ᴜ13

Unfortunately for defense counsel, there is no quick fix to the complex problems associated with the mental disabilities of capital clients. The solution to the problems posed by mental illness in these cases is not simply to "call a doctor." Contacting a mental health expert is a litigation decision with many grave implications, which vary widely in different litigation environments. Most capital defense practitioners can now recite the lessons of Ake v. Oklahoma.5 They feel entitled to competent expert assistance. Most capital defense practitioners now recognize that it is disastrous to wait until the eve of trial to consult a mental health expert,6 but many over-compensate for this risk by consulting experts too early.

It is essential not only for counsel and the defense team to build a foundation of trust with the client before involving experts in the case, but also to develop an independently corroborated multi-generational social history that will highlight the complexity of the client's life and identify multiple risk factors and mitigation themes.7

In the paradoxical universe of mitigation investigation, it is often unclear whether a particular fact will be viewed as aggravating or mitigating - or even which information is reliable and credible. Involving experts before these ambiguities have been resolved can be dangerous, and the choice of expert may inadvertently and prematurely focus the mitigation case too narrowly. Also, mental health experts need the social history information to enable them to conduct a thorough evaluation, if that is their assignment.

Mental health experts are neither all-purpose generalists nor interchangeable. They represent many disciplines (e.g., psychiatry, neurology, psychology, neuropsychology, pharmacology, addiction medicine), and they have specialized knowledge and experience based on their research and clinical practices. Familiarity with cultural norms for the community in which the client grew up may be critical.

One question that needs to be addressed before retaining any mental health expert is what role the expert is going to play. A mental health expert might, for example, join the capital defense team as a consultant whose job it is just to help develop themes to integrate the first and second phases of the trial (e.g., to explain the connection between the client's behavior in the capital crime and his or her mental infirmities). A consultant might also be called upon to decode and deconstruct prior mental health evaluations of the client: to look beneath the labels at the clusters of symptoms which were detected and to suggest alternative hypotheses for explaining those behaviors or traits.

Scanned  Jun 18, 2013

Another role for a mental health consultant is quasi-therapeutic intervention: to assist the legal team in dealing with the client. The expert might provide insight into team interactions with the client and suggest ways to make the team work better with the client. The mental health consultant might assist the client in enduring the stress of a capital trial, even advising when medication might be indicated. The consultant might play an integral role in helping the client to maintain appropriate decorum in the courtroom or to help counsel explain the cultural and psychological underpinnings of behavior which might be easily misinterpreted by jurors.

Finally, the consultant might help counsel recognize the client's self-destructive behaviors, and help the team to address those risks.8

Another role for a mental health expert is as a fact gatherer, an investigator with specialized expertise, someone who can elicit sensitive information which the client (or family members) won't disclose to others on the team. The expert may be a skilled listener or a highly-trained interviewer. The goal may be just to elicit the information, or to evaluate the credibility and reliability of disclosures.

A clinician with expertise in sexual trauma, for example, might be not only skilled in eliciting the client's most shameful secrets, but also in identifying the indicia of reliability when the disclosures come.

Another fact-gathering role involves the use of testing to assess intellectual functioning - or other neuropsychological deficits which affect behavior and potentially diminish culpability. Or the expert might serve as a skilled observer whose job would be to describe psychiatric symptomatology more richly and systematically than the team's lay observers.

In some cases, fact gatherers may become testifying experts - the storytellers who will narrate and interpret the client's life history for the sentencing jury. This narration may or may not include a diagnosis of the client's mental disorders. There may be an attempt to explain why the crime occurred.

Defining the expert's role will help counsel to identify who the expert should be; but the unique needs of the individual case will also dictate what type of expertise is needed and what subspecialty, if any, fits the special needs of the case. If the role involves fact gathering, it is particularly important also to consider how the expert will relate to and connect with the client. How will the expert's age, race, ethnicity, gender, sexual orientation, and personality affect rapport with the

Scanned  Jun 18, 2ᴜ13

client? If the role involves testimony, the key question is who will be
most credible and persuasive to the fact-finders in the case? Another
consideration is how the expert's qualifications will look to a
reviewing court. Counsel must also conduct a thorough investigation
of the expert's background and prior testimony in anticipation of cross-examination.

What Will the Expert Do for Your Client and You?
Mental health experts consulted in capital cases are asked to address a
wide range of referral questions. They are not simply called upon to
"evaluate" the client. When experts are retained, it is essential to be
clear and explicit about the absolute confidentiality of the consultation
and the precise referral question or questions to be addressed.9 The
legal issues which might be addressed range from all the questions
traditionally implicated in non-capital cases to those unique to capital
sentencing. The traditional questions in forensic mental health include
competency to stand trial and to aid and assist counsel,10
responsibility (not guilty by reason of insanity, diminished capacity,
extreme emotional disturbance, etc.), mental status at the time of the
offense (including capacity to premeditate, deliberate, and form
specific intent), capacity to make a knowing and intelligent waiver of
rights (including Miranda rights, right to counsel, right to be present,
right to trial and appeal, right to testify), and the voluntariness and
reliability of all statements to law enforcement. These questions
pertain not only to the capitally charged offense, but also to all prior
offenses, including all convictions by negotiated dispositions involving
waivers. This is relatively familiar territory for most lawyers and many
experts, and involves clearly articulated legal standards. But
developing mitigating evidence is quite different.11

Why Mitigation Is Different
It is incumbent upon capital counsel to educate experts to be sure that
they understand that mitigating evidence relating to mental conditions
is defined by what it is not. Mitigation is not a defense to prosecution.
It is not an excuse for the crime. It is not a reason the client should "get
away with it." Instead, it is evidence of a disability or condition which
inspires compassion, but which offers neither justification nor excuse
for the capital crime.

Unlike the insanity and competency requirements, mitigation need not
involve a mental "disease" or "defect." Mitigation does not require a
diagnosis. The expert who assists a capital defense team is not there
for either the traditional forensic purpose (assessing competency
and/or responsibility) or for the routine goals of a clinician (diagnosis
in order to prescribe treatment). If the expert testifies, it may simply be
to help jurors appreciate the world as the client experiences it.

Scanned  Jun 18, 2013

Even where statutory mitigating factors have been codified, there is no simple legal standard to guide mental health experts. In New York, for example, four of the six statutory mitigating factors relate to mental health issues:

"The defendant was mentally retarded at the time of the crime, or the defendant's mental capacity was impaired or his ability to conform his conduct to the requirements of law was impaired but not so impaired in either case as to constitute a defense to prosecution.

"The defendant was under duress or other domination of another person, although not such duress or domination as to constitute a defense to prosecution.

"The defendant was criminally liable for the present offense of murder committed by another, but his participation in the offense was relatively minor although not so minor as to constitute a defense to prosecution.

"The murder was committed while the defendant was mentally or emotionally disturbed or under the influence of alcohol or any drug, although not to such an extent as to constitute a defense to prosecution."12

A fifth factor has the catchall language of Lockett and its progeny:

"Any other circumstance concerning the crime, the defendant's state of mind or condition at the time of the crime, or the defendant's character, background or record that would be relevant to mitigation or punishment for the crime."13

Mitigation is the biography of mental disability. It is the explanation of what influences converged in the years, days, hours, minutes, and seconds leading up to the capital crime, and how information was processed in a damaged brain. It is a basis for compassion - not an excuse.

Interdisciplinary Teamwork

Mental health experts study four areas of functioning: cognition (how we understand ideas, intellectual capacity), social functioning (how we understand and respond appropriately to our environment, quality of thought and judgment), emotional functioning (mood control: depression, mania, anger), and behavior (impulsivity, violence, substance abuse, etc.). Their expertise can help a capital defense team

Scanned  Jun 18, 2013

identify deficits, describe symptoms, and understand the interaction of multiple disabling conditions. Sometimes they can communicate effectively to jurors who the client is and why she behaves as she does.

In the domain of cognitive functioning, experts can vividly convey the impact of mental retardation or learning disabilities on everyday life. For example, an expert can tell the jury about the IQ test and go through specific examples of words or concepts your client did not know, or tasks she could not perform. Jurors can be moved by learning that the client could not define simple words, explain a proverb, or navigate a city's public transportation system on her own.

In the 13 capital jurisdictions where mental retardation is a statutory bar to the death penalty,14 experts will be critical in establishing the three-prong test of (a) significantly subaverage intellectual functioning, existing concurrently with (b) deficits in adaptive behavior (c ) manifested developmentally (prior to age 18).15

Adaptive functioning "refers to how effectively individuals cope with common life demands and how well they meet the standards of personal independence expected of someone in their particular age group, sociocultural background, and community setting."16 It is affected by education and child rearing, motivation, personality characteristics, social and vocational opportunities, and the mental disorders and general medical conditions that may coexist with mental retardation. Some mental disorders are three to four times more prevalent among the mentally retarded than they are in the general population, and every variety of mental disorder can coexist with mental retardation. Diagnosis of either condition, however, may be complicated by the presence of the other. Severe mental retardation may make mental illness harder to detect. Phobias and paranoia may interfere with cognitive testing or mask adaptive deficits. Mood disorders are among the mental disorders commonly associated with mental retardation.

Mental health experts can also explain to jurors the effects of mental diseases and disorders on cognitive functioning or the extent to which psychiatric disabilities are masked by high intellectual functioning. Some psychiatric conditions frequently co-exist with high IQs, and it is important for jurors to appreciate the distinct disabilities which may lie beneath the surface of the client whose intelligence seems apparent.

But before mental health experts are added to a capital defense team, counsel needs to be clear about why the expert is being retained, and the expert needs to be clear about the rules of the litigation (e.g.,

Scanned Jun 18, 2013

confidentiality, discovery, etc.), the referral question, the role the expert is to play, and how that role fits into the needs of the team.

Before the expert joins the team, the team should already have assembled a rich documentary history of the client's life through painstaking mitigation investigation. This multi-generational inquiry will have uncovered genetic predispositions; toxic exposure in the physical environment; psychosocial stressors and trauma in the client's family and surrounding community and culture; head injuries; substance abuse; and the myriad other factors that affect our clients. The social history gathered by the defense team will be more accurate and more complete than the client or any family member alone could provide. It must also be impeccably corroborated with contemporaneous records and third-party interviews.17

The mental health expert will also benefit from a thorough physical examination of the client, including a neurological examination as one means of detecting brain injury. A standard textbook notes that psychiatrists may have other physicians conduct physical examinations, but they "still should be expected to obtain detailed medical history and to use fully their visual, auditory, and olfactory senses. Loss of skill in palpation, percussion, and auscultation may be justified, but loss of skill in observation cannot be. If the detection of non-verbal psychological cues is a cardinal part of the psychiatrists' function, the detection of indications of somatic illness, subtle as well as striking, should also be part of their function."18 Every member of the defense team should also be aware of physical signs relevant to mitigation - including needle tracks, scars, tremors, tics, ulcerated nasal passages, facial asymmetry, paralysis, weight fluctuations, etc.

Defense team observations of client behaviors over the life of the case can also assist the mental health expert whose contact with the client is less extensive. Psychologist and mitigation specialist Deana Logan has provided an exhaustive list of noteworthy behaviors,19 including:

1. Reality confusion (hallucinations: hearing voices, "seeing things," olfactory, tactile, and gustatory false sensations; illusions: such as misperception of harmless image as threatening; phobias: irrational fears, such as fear of leaving one's cell; disorientation: seeming confused about people and surroundings; delusions: consistent false beliefs, such as lawyers out to get him, guard in love with him, food being poisoned)

2. Speech and language problems (incoherence, neologisms, and illogicality: nonsensical speech, including new word formations

Scanned  Jun 18, 2013

and non sequiturs; poverty of speech and thought: half answers, monosyllabic or lengthy, but empty; distractibility: changing subjects midsentence; tangentiality: irrelevant answers; derailment: slipping off track from one oblique thought to another; circumstantiality: long-winded and tedious, loss of goal; perseveration: persistent, inappropriate repetition; pressured speech: rapid, racing speech; blocking: mind goes blank mid-thought; paraphasia: substitution of inappropriate words; slurring; monotone; stilted speech; micrographia; hypergraphia; dyslexia)

3. Memory and attention issues (amnesia; confabulation: filling in details of faulty memory; hypermnesia: extraordinary ability to recall; limited attention span; selective inattention on emotionally charged issues)

4. Medical complaints (hypo-chondria; self-mutilation; accident-proneness; insomnia; hypersomnia; anorexia and changes in eating habits; blurred vision; hearing problems; ringing in ears; head-aches; dizziness; nausea; fatigue; loss of control of bodily functions)

5. Inappropriate emotional tone (anxiety; suspicion; depression; hostility; irritability; excitement; flat affect; emotional instability; inappropriate laughter)

6. Personal insight and problem solving difficulties (self-esteem too high or too low; frustration; denial of mental problems; difficulty planning; difficulty changing plans when necessary; impaired ability to learn from mistakes)

7. Problems related to physical ability (agitation; hypervigilance; psychomotor retardation; slow reactions in movements or while answering questions; clumsiness; tension)

8. Unusual social interactions (isolation/estrangement; difficulty perceiving social cues; suggestibility; emotional withdrawal; disinhibition)

Testing
Whether a client should be tested by a psychologist or other expert is a complex question, affected by the rules of the litigation (e.g., discoverability20), cost and budget, the nature of the referral questions being considered (e.g., assessment of intellectual functioning), the richness of the past documentary record (e.g., whether the client has been tested before, and, if so, when and under what circumstances), the client's own attitude and relationship with the capital defense team, and

Scanned  Jun 18, 2013

other case-specific considerations. It is beyond the scope of this column to address testing issues in detail, but it is important to note that decisions about testing have profound litigation consequences and should be made with the greatest care.

One category of test assesses cognitive functioning, including intellectual abilities, academic abilities, and neuropsychological integrity. Mental retardation could not be established without some measure of current intellectual functioning - the traditional IQ tests such as the Wechsler Adult Intelligence Scale (WAIS, WAIS-R), the Wechsler Intelligence Scale for Children (WISC, WISC-R, WISC-III), and Stanford Binet Intelligence Scale. These tests include a range of individual subtests whose scores are combined to yield an overall IQ. Learning disabilities are detected by measuring the gap between intellectual ability and academic functioning. Academic tests, such as the Wide Range Achievement Test (WRAT) and Woodcock Johnson Psychoeducational Battery, assess specific skills and knowledge in various areas.

Neuropsychological testing assesses how the brain is functioning, and it is used in a variety of clinical settings to assess a wide range of brain-related conditions, including stroke, head injury, tumors, aneurysms, malformations of the blood vessels in the brain, etc. The same behavioral and mental capacities (such as memory, language functions, orientation) that are evaluated in neurological examinations can be assessed more precisely and objectively through neuropsychological testing. The tests are standardized and yield quantifiable reproducible results, using scores that can be compared to persons of similar age and demographic background as the person being tested. Test batteries may be fixed (one prespecified group of tests used on every subject, e.g., Halstead-Reitan or Luria Nebraska Neuropsychological Battery) or flexible (subtests selected according to individual history, referral question, and performance on core tests). Even most subtests measure multiple domains of functioning, and each domain of cognitive function consists of overlapping subfunctions. Convergence of data from multiple tasks yields the strongest conclusions.

Neuroscience is evolving rapidly and shifting from a narrow "locationist" (e.g., focal lesion) framework to a more subtle understanding of neural systems and networks. But neuropsychologists are able to draw reliable inferences about lateralization and localization of brain damage, as well as the severity of lesions, from patterns of neuropsychological test scores. This information can be of dramatic importance in understanding how a client's violence has been

Scanned  Jun 18, 2013

influenced by the specific damage his or her brain has suffered. According to current research, "In general, the anterior parts of the brain are more involved in the outflow or 'expressive behavior,' whereas the posterior parts regulate sensory perception, computation, understanding of material, and generally 'receptive' processing. Thus, the back of one's brain 'perceives,' 'evaluates,' and 'thinks,' while the front plans and acts. The laterality effects . . . suggest that left hemisphere regions are superior for language analysis and speech production whereas the right hemisphere serves spatial abilities. Other evidence suggests hemispheric asymmetry for emotional processing, although it is generally believed that subcortical regions play the more prominent role in emotional regulation."21

Neuropsychological tests can be administered with relative confidentiality in jail settings because the apparatus is portable. By contrast, the brain-imaging technologies generally cannot be used without court orders to remove clients to the medical centers which offer the testing. These tests are usually ordered and interpreted by a neurologist or neuroradiologist. Interpretation can be controversial (raising the specter of another battle of the experts), and false negatives can be harmful because absence of discernible damage may be falsely construed as establishing the brain's integrity. These tests include:

CT (Computerized Tomography), which uses X-rays passed through the brain from multiple locations to detect density differences and generates three-dimensional images by computer analysis of density information to reveal brain structure only, typically with poor resolution and potential distortion;

MRI (Magnetic Resonance Imagery), which uses magnetism and radio frequency to trigger resonance in subatomic particles of brain substance and generates images of brain structure by computer analysis of resonance data, with good resolution owing to differences in the imaging parameters of various brain tissues, such as white matter, gray matter, cerebrospinal fluid, blood, and diseased tissue;

BEAM (Brain Electrical Activity Mapping), which measures EEG activity and uses a computer to integrate electrical activity to generate topographic mapping of brain electrical activity, typically with poor resolution;

RCBF (Regional Cerebral Blood Flow), which uses isotopic techniques to measure simultaneous blood flow from both hemispheres and multiple brain regions based on active neurons'

Scanned  Jun 18, 2013

metabolic need for oxygen and glucose;

PET (Positron Emission Tomography), which measures metabolic activity (glucose utilization) to reveal functional brain activity during particular tasks, with computerized color imaging and moderate three-dimensional resolution; and

SPECT (Single Photon Emission Com-puterized Tomography), which uses photon-emitting radionuclides that, unlike positron emitters, do not require the availability of a dedicated cyclotron.

In addition to litigation issues of confidentiality and cost, researchers suggest three main reasons why neuropsychological testing may be preferable to imaging technologies in detecting brain damage:

"First, neuropsychological assessment is a non-invasive, essentially risk-free procedure that can be used to aid in the determination of whether there is indication for CT or MRI when the index of suspicion is low.

"Second, lesions with substantial impact on behavior may still be undetected even with the highest resolution of MRI available. This holds for many instances of epilepsy, but also for many other patients likely to come to the attention of psychiatrists following head injuries, substance abuse, or exposure to toxins or to rule out dementia. Some of these lesions are too diffuse to be detectible; some do not involve anatomic destruction but are a result of metabolic aberrations that are not seen on CT or MRI. Even small destructive lesions in 'strategic' areas can have devastating behavioral effects. This is particularly the case in subcortical regions where important functions are regulated by small nuclei.

"Third, the MRI or CT may show the region of anatomic destruction but will tell us nothing about the effect of the lesion on behavior. Neuropsychological deficits may be caused by remote metabolic suppression of brain regions functionally linked to the anatomically damaged area, and there is the 'domino' effect in which a behavioral dimension can be impaired because of a lesion affecting an essential component required for its regulation. Conversely, rather sizable lesions in areas that do not play a major role in regulating behavioral functions, or old lesions for which neural plasticity has already enabled the evolution of compensatory processes, may have little behavioral effect. Thus, neuropsychological assessment is essential for the psychiatrist to make the link between brain dysfunction and behavior."22

Scanned  Jun 18, 2013

The other broad category of tests used by psychologists assesses personality functioning to help in the evaluation of intrapsychic organization and conflicts.23 These include objective tests like the Minnesota Multiphasic Personality Inventory (MMPI), Millon Clinical Multiaxial Inventory (MCMI), and the Child Behavior Checklist (CBCL), which rely on self-reporting on carefully specified questions with a limited range of answers. Examples include inventories of statements which the respondents endorse as true or false (such as, "I am afraid of losing my mind", "I am full of energy", or "My sex life is satisfactory") or behavioral descriptions with answers within a range of choices (such as, "withdraws from others": "never", "sometimes", or "frequently"). These tests are often scored and interpreted based on computer programs.

Personality functioning is also assessed with projective tests like the Rorschach, the Thematic Apperception Test (TAT), Incomplete Sentences, and Projective Drawings (House-Tree-Person, Draw a Person). These rely on highly ambiguous stimuli (such as inkblots) to maximize freedom to respond uniquely. Faced with unstructured and plastic stimuli in an undefined and uncertain test situation, the individual is assumed to impose organization and meanings on the stimuli. Methodologies include association, construction, completion, and expressive techniques.

Personality testing, whether objective or projective, may be harmful in two ways and should never be administered without a clear, thoughtful reason for doing so in the context of the particular case and client. To the extent that they yield results which are subject to more than one interpretation, they create the "battle of the expert" which removes empathetic focus from the client. To the extent that they create data that a prosecution expert might interpret to support a harmful diagnostic label – such as any of the so-called personality disorders - they are a needless risk. (It should be noted that some states specifically identify personality disorders as not satisfying statutory criteria for affirmative defenses based on insanity.24)

Prior Evaluations
Many of our clients, of course, have already suffered from harmful labeling in past evaluations, particularly the cursory, superficial intake evaluations that often occur when people are incarcerated for the first time. Absent a documented and reliable life history, the evaluator probably took the social history entirely from the client's self-report, augmented only by the anti-social behaviors enumerated in the rap sheet or presentence report. Absent reliable medical history or neuropsychological testing, little consideration has been given to

Scanned  Jun 18, 2013

developmental or acquired abnormality in brain function. Given the presenting offense and the absence of floridly psychotic symptoms, the drive-by evaluator is predisposed to the usual diagnosis: anti-social personality disorder, a pervasive and unremitting maladaptive pattern of behavior viewed as not particularly responsive to any treatment and significantly interfering with functioning, or causing marked subjective distress. Estimates of an anti-social personality disorder diagnosis in an incarcerated population range from 49 to 80 percent of male prisoners.25

It is essential to collect and analyze all prior client evaluations, both to identify major mental illness and related treatment, but also to look behind the misleading and harmful labels which have been applied to the client in the past. Often the evaluator will accurately note symptoms or behaviors, but lack the historical information to understand the context. Drug use, for example, may be accurately documented, but its contextual significance could depend on corrupting influence of caretakers or attempts at self-medication following trauma. Moreover, diagnostic labels will have been applied in their own historical settings, which themselves evolve over time.

The bible of psychiatric diagnosis is the Diagnostic and Statistical Manual of Mental Disorders, first published by the American Psychiatric Association in 1952 and last revised in 1994 as the DSM-IV. Since 1980, the DSM has utilized a multiaxial system of diagnosis, which requires simultaneous consideration of a complex set of factors, including major mental illness (Axis I), longstanding and enduring personality traits and/or maturational delays (Axis II), medical illnesses that may affect psychological functioning (Axis III), environmental and psychosocial stressors that may influence psychological functioning (Axis IV), and the delineation of a longitudinal context (the so-called Global Assessment of Functioning, or GAF) for appraising psychological functioning (Axis V).

Noting that, especially in post-conviction death penalty litigation, our clients and their families have received multiple prior mental health diagnoses, clinical psychologist Kathleen Wayland has pointed out: "In order to understand fully these prior diagnoses, it is important to have an historical awareness of the context in which prior diagnoses were rendered. . . . Thus, a complete, current, and accurate mental health evaluation of a particular client may require a critique of prior evaluations and diagnoses. This may include the ability to identify at what point in time the DSM was consulted, and may also necessitate an understanding of the theories and theoretical assumptions dictating the formulation of prior diagnoses."26

Scanned  Jun 18, 2013

Elsewhere, Dr. Wayland comments, "It is important to recognize that because changes in the DSM's were guided by an effort to strengthen its empirical bases, with the goal of increasing reliability and validity, evaluations conducted under older versions of the DSM, particularly DSM-I and DSM-II, may carry a greater likelihood of misdiagnosis, inaccurate diagnosis, or failure to identify the existence of particular mental disorders."27

Prosecutorial Rebuttal
In addition to pre-existing hostile evaluations of capital clients, counsel must be prepared to contend with the likelihood of encountering highly paid rebuttal experts in death penalty cases. The New York Daily News recently noted that state courts limit the rates and total amounts which the defense can pay in death penalty cases, but prosecutors "can pay whatever rates they choose." In New York's first post-Furman death penalty trial, prosecutors paid California-based neuropsychologist Daniel Martell nearly $50,000 (at $300 per hour) to interview the defendant and "testify that the defendant didn't suffer an emotional breakdown."28 In most jurisdictions, evaluations by prosecution mental health experts will be demanded if the defense proffers an expert at any point in the proceeding. Since this area of law varies from one jurisdiction to the next and is still evolving, counsel should assess carefully how to respond to such demands.29 Even if the rebuttal expert has no direct access to the client, rebuttal testimony can be expected. The background and qualifications of rebuttal experts should be investigated meticulously.30

Five years ago, the New Yorker profiled psychiatrist Park Dietz,31 who was then the prosecution's expert witness in the Long Island trial of an alleged serial killer of prostitutes. Dr. Dietz had already testified in several high-profile cases, including the trials of Jeffrey Dahmer, Arthur Shawcross, and Betty Broderick. Dr. Dietz is a consultant to the Federal Bureau of Investigation's Profiling and Behavioral Assessment Unit and the New York State Police Forensic Sciences Unit. He has no clinical practice, but only a lucrative forensic practice billed in 1994 at $3000 a day or $250 per hour.

In the Long Island case, a defense expert had tested the client and found him "off the scale" for paranoid schizophrenia. The defense expert testified that the alleged serial killer had "an extreme inability to think logically or experience time." Dr. Dietz countered that the client's behavior was highly organized, and his memory of what he had done was cogent and precise. According to Dr. Dietz, the alleged killer had acted out asphyxiations inspired by a graphic scene in a Hitchcock

Scanned  Jun 18, 2013

film; dismembered his victims; stuffed the parts into barrels and milk crates; and disposed of them in rivers, culverts, and wooded areas - often after driving around in his pickup with the corpses straddling him.

Dr. Dietz testified that Jeffrey Dahmer knew right from wrong based on Dahmer's need to consume alcohol before he killed and dismembered his victims. He inferred that Dahmer found those acts aversive; he needed alcohol to overcome his moral inhibitions.

Dr. Dietz calls his discipline "medical criminology." He relies heavily on traditional forensic pathology in homicide cases: for example, proving intent in asphyxiation cases by knowing how much pressure is required to strangle someone, or proving that a shooter aimed carefully by showing that an inaccurate firearm was employed. He prides himself on being interested in physical evidence surrounding the homicide, rather than the client's life history. He refutes impulsive, spontaneous, ungoverned behavior by showing planning and calculation, consciousness of guilt, and self-awareness.

His colleague, psychologist Daniel Martell, has relied heavily on the Hare Psychopathy Checklist32 to establish that defendants are cold-hearted and remorseless. Martell's testimony stresses the traditional test of responsibility: that a defendant was able to conform his conduct to the requirements of the law and had no significant impairment in his ability to control his behavior at the time of the offense. He will concede mental and emotional problems, but dispute severity - to establish that the defendant has not attained a level of "extreme emotional or mental disturbance."

In a Texas case where Dr. Martell was not permitted to examine the defendant,33 he based his testimony on 2000 pages of police reports, witness statements, and the reports and test data of other mental health experts. The defense had presented testimony about child abuse, including neglect, physical maltreatment, and sexual abuse. His rebuttal was two-pronged:

  1. The defense evidence of abuse was anecdotal, rather than officially documented.

  2. Some research suggests that there is little or no correlation between child abuse and adult violent behavior.

The defense had also presented testimony of brain dysfunction. Dr. Martell used imaging reports to minimize anatomical findings,

Scanned  Jun 18, 2013

attributed low cognitive functioning in some neuropsychological tests
to the effects of situational depression arising from the capital charges
and the conditions of confinement, but conceded, nonetheless, some
brain damage in the form of occipital or parietal lobe damage. He
found "limited" brain damage insufficient to cause the defendant not to
be able to control his behavior as he carried out the crime.

Dr. Martell exploited defense expert disagreements about the extent of
the client's depression to rule out, in his own diagnosis, severe
depression. He then went on for eighteen pages of uninterrupted
testimony to offer his "forensic behavior assessment" - that is, the
client's behavior during the course of the offense as an indication of
mental state. His assessment emphasized various points:

  1. Preparation and stalking, showing foresight, not impulsivity;

  2. Selection of victim;

  3. Getaway planning;

  4. Coverup activities.

In a federal death penalty trial in New York,[34] Dr. Martell did not
score the Hare Psychopathy Checklist himself, but instead offered its
criteria to the jury as a sort of do-it-yourself test of psychopathic evil -
listing glibness, grandiosity, proneness to boredom, pathological lying,
manipulativeness, lack of remorse, shallow affect, lack of empathy,
parasitic lifestyle, poor behavioral controls, promiscuity, early
behavior problems, lack of realistic long-term plans, impulsivity,
irresponsibility, multiple marital relationships, failure to accept
responsibility, juvenile delinquency, poor risk for conditional release,
and criminal versatility. Capital defense counsel can anticipate jurors
hearing these criteria in some form or other whenever rebuttal experts
come forward.

Dr. Dietz discussed five categories among mentally disordered
offenders at an American Bar Association (ABA) panel in 1997:[35]

  1. Crime committed in response to psychotic symptoms;

  2. Crime committed to gratify compulsive desires;

  3. Crime reflecting a personality disorder;

Scanned  Jun 18, 2013

4. Crime that is coincidental with a mental disorder; and,

5. True or feigned mental disorder in response to crime.

Dr. Dietz argued that only the first category contains valid insanity, diminished capacity, or mens rea defenses. He went on to suggest that the appropriate professional role for a mental health expert is to function as a forensic scientist, not as an advocate nor as a clinical psychiatrist. According to the report of his presentation, "Whereas the clinical psychiatrist 'wants to help' and is not concerned with evidentiary issues or the truth, the forensic psychiatrist is concerned with truth and should not allow empathy to intrude." [Emphasis added]36

Explain, But Never Excuse

Mental disabilities are part of the "diverse frailties of humankind"37 that need to receive individualized consideration in capital sentencing. They may explain, but never excuse, tragic crimes. They may evoke empathy from jurors without needing to reach the legal standards associated with competency and responsibility. If experts testify, their job is to help the jury to understand the human context, to see the impact of disability on the range of choices the capital client could make in everyday life, and to trace the origin of the disabilities to biological, environmental, psychological and social influences which the client never chose. They must draw upon all their understanding of the human brain and human behavior to evoke empathy for the individual who suffers the disability and damage of neurological and/or psychiatric deficits. In doing so, they may also help to impart a larger public-health lesson - one modest case study towards a better understanding of violence and homicide in the twilight of the twentieth century.

Notes

1. I have chosen the term "disability" to encompass the broad range of mental conditions which handicap clients emotionally, intellectually, psychologically, and socially and thus render them potentially less culpable. These incapacitating or diminishing conditions include, but are not limited to, mental "disease" and "defect," in the traditional legal nomenclature of sanity and responsibility.

2. As Professor Craig Haney has pointed out, "Human beings react punitively toward persons whom they regard as defective, foreign, deviant, or fundamentally different from themselves. Sobering histories recount the ways in which 'scientific' attempts to prove defect or deviance have served as a prelude to mistreatment and extermination." See, Craig Haney, Violence and the Capital Jury: Mechanisms of Moral Disengagement and the Impulse to Condemn to

Scanned  Jun 18, 2013

Death, Stanford Law Review, v. 49 (July 1997), pp. 801-821, at p. 814.

3. See, Elinor J. Brecher, The Devil (TV, Twinkies) Made Me To It: Why Do So Few People Take the Blame for their Actions? The Journal News (Knight Ridder Newspapers), January 25, 1999, p. 3E.

4. See, Scott E. Sundby, The Jury as Critic: An Empirical Look at How Capital Juries Perceive Expert and Lay Testimony, Virginia Law Review, v. 83, n. 6, at 1109-1188 (September 1997).

5. 470 U.S. 68 (1985) (denial of expert psychiatric assistance to indigent defendant where defendant's sanity was a significant factor at both guilt and penalty phases of trial constituted a denial of due process).

6. See, e.g., Bloom v. Calderon (9th Cir. Dec. 24, 1997) 132 F.3d 1267, 1997 WL 786920 (trial counsel's lack of effort to obtain psychiatric expert until days before capital trial, combined with counsel's failure to prepare expert adequately and then present him as trial witness, was constitutionally deficient performance).

7. See Russell Stetler, Mitigation Evidence in Death Penalty Cases, The Champion, v. xxiii, n. 1 (January-February 1999), pp. 33-38, at 36.

8. Self-destructive behaviors can include efforts to provoke a death verdict at trial - or to waive appellate review of a death sentence. Eleven of the 68 prisoners executed in 1998 had dropped their appeals, compared to six in 1997. Six prisoners had executions stayed in 1998 because counsel filed for stays over the prisoners' objections. Over the past four years, one in seven executions has involved a prisoner who "volunteered" by waiving appeals. See Richard Willing, Death Row Inmates Asking More To End Court Appeals, Be Executed, Ithaca Journal (Gannett News Service), February 1, 1999, p. 1A.

9. See Charles M. Sevilla, Making Sure Your Expert Does Not Become Their Expert, California Attorneys for Criminal Justice, Forum, v. 21, n. 4 (December 1994), pp. 35-39. This article includes a model retention letter.

10. For an expanded consideration of traditional competency questions, see Michael N. Burt and John T. Philipsborn, Assessing Client Competence: A Review of Approaches, California Attorneys for Criminal Justice, Forum, v. 25, n. 1 (March 1998), pp. 20-29.

11. Capital cases raise other unique mental-disability issues besides those relating to mitigation - most importantly, competency to be executed. See Ford v. Wainwright, 477 U.S. 399, 106 S. Ct. 2595, 91 L. Ed. 2d 335 (1986) (Eighth Amendment prohibits the execution of the insane; state procedures which place the ultimate decision wholly within the Executive Branch and deny the condemned the right to submit evidence or challenge or impeach the state-appointed psychiatrists are insufficient; because Ford's procedures in state court were inadequate, he is entitled to a hearing in federal court on his competency to be executed). See also Michael L. Radelet, Executing the Mentally Ill (Newbury Park, Ca.: Sage Publications, 1993), for full

Scanned  Jun 18, 2013

discussion of the issues raised in the case of Alvin Ford.

12. NY Crim Pro §§ 400.27.9(b) - (e).

13. NY Crim Pro §§ 400.27.9(f). Lockett v. Ohio, 438 U.S. 586 (1978).

14. In addition to the federal government, 12 states bar execution of the mentally retarded: Arkansas, Colorado, Georgia, Indiana, Kansas, Kentucky, Maryland, Nebraska, New Mexico, New York, Tennessee, and Washington. See George S. Baroff, Ph.D., Why Mental Retardation Is Mitigating, The Champion, v. xxii, n.7 (August 1998) at 33-35.

15. See NY Crim Pro §§ 400.27.12 (e) and American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, fourth edition (hereinafter, DSM-IV) (Washington, DC: American Psychiatric Association, 1994), p. 37.

16. DSM-IV, p. 40.

17. See Sean D. O'Brien, Investigating Psychological Defenses, in Missouri Capital Case Resource Materials (2d ed., February 1995), published by the Missouri Capital Punishment Resource Center and also reprinted in California Attorneys for Criminal Justice and California Public Defenders Association, California Death Penalty Defense Manual (Los Angeles and Sacramento, California, 1993 edition; 1996 Supplement, vol. II). O'Brien notes, "It is well recognized that the patient is often an unreliable data source for his own medical and social history. 'The past personal history is somewhat distorted by the patient's memory of events and by knowledge that the patient obtained from family members.' [citation omitted] Accordingly, 'retrospective falsification, in which the patient changes the reporting of past events or is selective in what is able to be remembered, is a constant hazard of which the psychiatrist must be aware.' [citation omitted]"

18. Harold I. Kaplan, M.D., and Benjamin J. Sadock, M.D., Comprehensive Textbook of Psychiatry, 4th ed. (Baltimore: Williams and Wilkins, 1985), p. 544.

19. See Deana Dorman Logan, Learning to Observe Signs of Mental Impairment, California Attorneys for Criminal Justice, Forum, v. 19, n. 5-6 (1992), pp. 40-49.

20. It is also prudent to note that the rules of litigation change over the long life of a capital case, particularly where post-conviction proceedings may be involved. Even in jurisdictions where test results or reports of nontestifying experts may not be discoverable at trial, counsel should consider the likelihood that they will be exposed to different discovery ground rules in both state and federal post-conviction litigation.

21. Ruben C. Gur and Raquel E. Gur, Methods for the Study of Brain-Behavior Relationships, in Alan Frazer, Perry B. Molinoff, and Andrew Winokur, eds., Biological Bases of Brain Function and Disease (New York: Raven Press Ltd., 1994), ch. 15, pp. 261-279, at p.

Scanned  Jun 18, 2013

266  In this chapter, see also Table 1, at p. 269, "Deficits in behavioral dimensions and corresponding areas of brain damage associated with these deficits," identifying which different regions are associated with deficits in abstraction and mental flexibility, memory, face recognition, emotional expression, etc.

22. Ruben C. Gur, Andrew J. Sakin, and Raquel E. Gur, Neuropsychological Assessment in Psychiatric Research and Practice, in Robert Michaels, ed., Psychiatry, revised edition - 1991 (Philadelphia: J. P. Lippincott Company, 1991), ch. 72, pp. 1-16, at pp. 5-6.

23. It should be noted that psychiatrists are not trained to administer psychological tests. If there is a thoughtful decision to go forward with testing, it should always be administered by a psychologist with appropriate training and experience.

24. See, for example, California Penal Code §§ 25.5: "In any criminal proceeding in which a plea of not guilty by reason of insanity is entered, this defense shall not be found by the trier of fact solely on the basis of a personality or adjustment disorder. . . ."

25. T. A. Widiger and E. Corbitt, Antisocial Personality Disorder, in W. J. Livesley, ed., The DSM-IV Personality Disorders (New York: Guilford Press, 1995), pp. 103-134.

26. Kathleen Wayland, Ph.D., The DSM: Review of the History of Psychiatric Diagnosis in the U.S., National Legal Aid and Defender Association, Capital Report, n. 40 (November- December 1994), pp. 1-7, at p. 1.

27. Kathleen Wayland, Ph.D., Depression by Any Other Name Might Look the Same: The Reasons for the Development of, and Changes in, Diagnostic Nomenclature, National Legal Aid and Defender Association, Capital Report, n. 42, pp. 2-7, at p. 6.

28. Lawrence Goodman, Death Penalty Bonanza, New York Daily News, August 2, 1998, p. 40.

29. See, e.g., Welsh S. White, Government Psychiatric Examinations and the Death Penalty, Arizona Law Review, n. 37, pp. 869-894.

30. See Lindh v. Murphy (7th Cir., 1997) 124 F.3d 899 (defendant's confrontation rights were prejudicially violated at the mental-conviction phase of his murder trial where the trial court prohibited defendant from impeaching the prosecution's psychiatrist with evidence that the psychiatrist had sexually abused some of his patients, was about to lose his medical license and his prestigious faculty positions, and stood a chance of going to prison, since the prosecution portrayed the expert as an eminent psychiatrist with impeccable credentials).

31. Joyce Johnson, Witness for the Prosecution, New Yorker, May 16, 1994, pp. 42-51.

32. R. D. Hare, The Hare Psychopathy Checklist - Revised (Toronto: Multi-Health Systems, 1991). The psychopathy checklist attempts to

identify a smaller universe of deviants than the broader criteria of antisocial personality disorder, using a structured interview and records review to measure maladaptive personality traits and deviant lifestyle based on twenty items scored 0, 1 or 2 (total score = 0 to 40), with diagnosis of psychopathy requiring score of 30.

33. United States v. Louis Jones (Northern District of Texas, 1995).
34. United States v. Tyrone Walker and Walter Diaz (Northern District of New York, 1996).
35. ABA Panel Discussion Explores Insanity Issues, 61 CrL 1539-43 (Sept. 17, 1997).
36. Id. at p. 1541.
37. Woodson v. North Carolina, 428 U.S. 280 (1976), at 304.

Editor's Note: This column is the second in a series that will address specifics of investigating, developing, and presenting mitigation evidence in death penalty cases. The first column appears in the January/February 1999 issue.

Readers wishing to contribute information, ideas or articles for this column should contact:

Tanya Greene
NACDL Death Penalty Research Counsel
83 Poplar Street NW
Atlanta GA 30303
Phone (404) 688-1202
Fax (404) 688-9440
e-mail tgreene@schr.or

National Association of Criminal Defense Lawyers (NACDL)
1025 Connecticut Ave. NW, Ste. 901, Washington DC 20036
www.criminaljustice.org / www.nacdl.org
(202) 872-8600 / FAX(202) 872-8690 / assist@nacdl.com

Image Not Available



DX-7

MARY LOPEZ BUITRON, CSR, RPR
*Official Court Reporter - 94th District Court*

Scanned  Jun 18, 2013

# Mitigating Circumstances in Death Penalty Decisions: Using Evidence-Based Research to Inform Social Work Practice in Capital Trials

*Julie Schroeder, Cecile C. Guin, Rene Pogue, and Danna Bordelon*

Providing an effective defense for individuals charged with capital crimes requires a diligent, thorough investigation by a mitigation specialist. However, research suggests that mitigation often plays a small role in the decision for life. Jurors often make sentencing decisions prematurely, basing those decisions on their personal reactions to the defendant (for example, fear, anger), their confusion about the rules of law, and their lack of understanding regarding their role and responsibilities. This article proposes an evidence-based conceptual model of the complicating problems surrounding mitigation practice and a focused discussion about how traditional social work mitigation strategies might be evolved to a set of best practices that more effectively ensure jurors' careful consideration of mitigation evidence.

KEY WORDS: *capital mitigation; death penalty; forensic social work*

Social workers are increasingly assuming the role of mitigation specialist and becoming central figures in multidisciplinary capital defense teams (Guin, Noble, & Merrill, 2003; Schroeder, 2003; Stetler, 1999). Those who advocate for social workers' entry into this emerging field argue that the profession is rooted in and distinguished by traditions of advocating for the powerless and working for social justice (Roberts & Brownell, 1999). Advanced clinical skills (Alfonso & Baur, 1986; Andrews, 1991; McCoy, 1999) as well as training in systems and ecological theoretical approaches (Schroeder) appear to be very useful in uncovering and interpreting the biopsychosocial realities of individuals charged with capital offenses. In fact, the gold standard for mitigation practice is reliance on focused investigation and presentation of evidence about a defendant's life and character that is sufficient to compel jurors to consider a complexity of personal, social, and ecological issues in deciding attribution of responsibility that mitigate defendants' legal accountability in capital offenses. This article presents a conceptual framework of problems that surround mitigation practice and argues that better practices can be crafted from a broader systemic approach that is grounded in empirical evidence and practice and goes beyond current parameters of mitigation practice.

## EMERGENCE OF CONTEMPORARY MITIGATION PRACTICE STANDARDS

In the incidence of capital cases, the U.S. Supreme Court has recognized what research has long shown: Jurors often make sentencing decisions prematurely, and they often base their decisions on their personal reactions to the defendant, their confusion about the rules of law, and their lack of understanding regarding their own role and responsibilities (Bowers, Sandys, & Steiner, 1998; Sandys, 1995). In an effort to safeguard against jurors' "unguided emotional response[s]" when determining punishment for capital defendants, the Court set forth a legal standard that requires defense teams in capital cases to conduct thorough investigations into the defendants' backgrounds. If the defendant is found guilty, the information gleaned from that investigation must then be presented as mitigating evidence during the penalty phase of the trial (*Furman v. Georgia*, 1972). The Court's monumental decision has led attorneys to seek the aid of social workers

CCC Code: 0037-8046/06 $3.00 ©2006 National Association of Social Workers

DEFENDANT'S EXHIBIT
7

Scanned  Jun 18, 2013

to conduct extensive social history investigations on clients who are defendants in capital cases. As noted by Schroeder (2003):

> The capital mitigation process comes to life when a social worker, using a life history model of investigation, assumes the role of mitigation specialist, who, by capitalizing on social work theory and research, practice knowledge and skills yields vital information that, through objective presentation of fact, guides sentencing decisions. (p. 424)

The life history model relies on traditional practice methods including case history development, multidimensional assessment, record review, mediation, and multidisciplinary teamwork. This extensive case investigation yields rich historical data that are then considered in light of factors empirically linked with criminal behavior. This method provides the legal team with a consistent defense theme that is infused throughout both the evidence and penalty phases of the trial. A mitigation outcome is considered ineffective when the jurors fail to comply with the rules and the roles that are imposed on them as jurors, for example, in making premature decisions.

## CHALLENGING TRADITIONS

The established mitigation strategy that relies on social histories and life-stories survives and thrives as a legal mandate and preferred approach in capital cases despite of a lack of empirical research that demonstrates it is an effective strategy. In fact, available empirical legal research suggests the contrary: Jurors often disregard or misunderstand mitigating circumstances when making sentencing decisions (Diamond & Levi, 1996; Eisenberg, Garvey, & Wells, 1996, 1998; Garvey, Johnson, & Marcus, 2000; Luginbuhl & Howe, 1995; *McDougall v. Dixon*, 1990). The evidence against the potency of presenting defendants on the witness stand to influence sentencing decisions is compelling and warns attorneys and social worker mitigation specialists that current legal and practice standards are perhaps too unreliable and ineffective to be considered the best possible practice. When practice and empirical evidence from a range of disciplines that hold stake in jurisprudence is considered, problems with currently preferred tactics are more visible, and a more complex set of practice methods and strategies is sug-

gested. Furthermore, the literature suggests certain implications for research and practice, including how mitigation activities are conceptualized and conducted and the effectiveness of the social work mitigation specialist in presenting the information that has been developed.

## PENALTY-PHASE JUROR DECISION MAKING

Professional literature demonstrates that many disciplines have an interest and a stake in the legal process and outcomes related to capital offenses. The existing body of knowledge, however, is at once complex and disjointed, but provides a conceptual framework of the problems that surround mitigation work and potential best practices to evolve effectiveness. From one perspective, cognitive psychologists seek to understand the role that strong emotions play in creating feelings often tied to pre-existing beliefs, which in turn lead to actions that help to dissipate those strong feelings (Werner, 1986). In addition, attribution theorists examine the manner in which people interpret and explain events (Fincham & Jaspars, 1980), leading to their assignment of responsibility and blame (Coates & Penrod, 1981). This provides a foundation for understanding how and why jurors decide to impose the ultimate punishment. These processes are elaborated by descriptive studies that identify how jurors' strong emotional reactions to capital defendants often result in a death verdict (Eisenberg et al., 1998, Steiner 1999; Sundby, 1998; Tomes, 1997). At times made prematurely, jury decisions appear to be based largely on personal values and emotional responses that rarely relate to the facts of the case and the potential mitigating influences on criminal behavior. Jurors often make decisions on the basis of their personal reactions to the defendant that are developed during the guilt phase of the trial (Garvey, 1998; Garvey, 2000). Furthermore, there appears to be misunderstanding of the statutory obligations that specifically dictate juror roles and responsibilities.

### Juror Emotion

Jurors have reported a full range of emotional responses, from fear, anger, and disgust to sympathy and positive regard (Eisenberg et al., 1998; Garvey, 2000; Slobogin, 2003; Sundby, 1998; Tomes, 1997). Such a complicated mixture of emotions combined with the often-incomprehensible language of capital punishment statutes often results in a recipe for

errors in judgment on life and death decisions (Eisenberg et al., 1998; Steiner, 1999). In attempting to understand the interaction of personal values and emotions with decision making, the field of cognitive psychology offers a possible explanation for the complex activities that may take place in the mind of the juror. Taken together, these findings advise social work practitioners who act as mitigation specialists to consider the role personal values and emotional reactions play in jury decision making as well as the effect juror ignorance of process may produce.

The literature demonstrates that other factors complicate jury decision making. For example, Luginbuhl and Howe (1995) found that jurors expressed fear about making a decision in a capital case because they were confused about the statues regarding sentencing options. Jurors' fear about a defendant's future dangerousness mixed with erroneous beliefs concerning sentencing limits was found to lead to an erroneous belief that capital defendants may serve a sentence of less than 20 years and may be afforded parole opportunities. Similarly, Eisenberg and colleagues (2001) and Sandys (1995) found that fear about parole was cited as an important rationale behind some jurors' vote for death. As a whole, these findings suggest that part of mitigation process and practice should involve clarifying, in practical terms, the actual consequences of sentencing options and other complex legal considerations surrounding death penalty decisions.

**Juror Perception**

Defendant behavior while in custody (Sundby, 1998) and demeanor during the trial (Eisenberg et al., 1998; Tomes, 1997) have been demonstrated as additional complicating features of the problems that surround death penalty decisions and that often give rise to anger among jurors. In fact, these two factors were shown to receive jurors' greatest consideration during deliberations. Jurors were also often angered when a defendant appeared bored or uninterested in the trial proceedings, and their anger often translated into a belief that the defendant lacked remorse. These perceptions that defendants lack remorse invoked anger, often mixed with disgust, regarding aggravating circumstances and were associated with death verdicts, regardless of the mitigating evidence produced during the penalty phase (Eisenberg et al., 1998). A remorseful defen-

*Remorse is a significant issue to consider when communicating mitigating influences to a jury.*

dant, who appears to take responsibility for his or her actions, evokes juror sympathy and support (Tomes). Remorse appears to work in the defendant's favor in two ways. First, jurors view defendants' apparent remorse as being the correct moral reaction to the crime. Second, perceived remorse on the part of a defendant is viewed as evidence that the defendant will not be dangerous in the future (Eisenberg et al., 1998). Sundby hypothesized that some jurors determine remorse by the manner in which the case is presented to them, rather than the actual remorse shown by the defendant in the courtroom. Nonetheless, remorse is a significant issue to consider when communicating mitigating influences to a jury. Taken together, evidence from these studies cautions those who act as mitigation specialists to help defense teams find ways to frame evidence and highlight reported and observable behavior in ways that suggest and underscore a defendant's remorse.

**Statutory Disregard or Confusion**

Luginbuhl and Howe (1995), Tiersma (1995), Ritter (2004), and Wiener and colleagues (2004) argued that jurors do not understand mitigation because the instructions they receive are presented in legal language that is difficult for laypeople to understand. When jurors cannot rely on the guiding legal principles, they often fall back on prior or folk knowledge as a basis for decision making (Steiner, 1999; Wiener et al.).

Furthermore, capital jurors report frequent confusion over the issues of aggravating and mitigating circumstances and the level of agreement needed for each. Such confusion often results in a death verdict (Eisenberg & Wells, 1993; Wiener et al., 2004). When Garvey (1998) queried jurors about what, according to statute, and in their minds, constituted aggravating factors, respondents reported that especially brutal murders, child victims, future dangerousness, and lack of remorse were the most salient aggravating circumstances. The defendant's prior criminal record and history of alcohol or drug abuse were lesser, yet pertinent, aggravating circumstances.

Scanned  Jun 18, 2013

The legally required level of agreement about aggravating circumstances has been found to be especially confusing to jurors when weighing them in the punishment phase of a trial. Legal scholars have found that jurors incorrectly believed aggravating factors did not have to be proven beyond a reasonable doubt (Eisenberg & Wells, 1993), and they mistakenly believed anything could be considered aggravating, even evidence not put forth in the state's argument (Luginbuhl & Howe, 1995). Furthermore, many jurors believed that the death penalty was absolutely required when crimes were considered heinous (Eisenberg et al., 1996; Garvey, 2000; Garvey et al., 2000; Sandys, 1995).

Jurors' confusion about aggravating circumstances is also evident in research on the effect of mitigating evidence. Jurors stress the importance of certain mitigating factors considered during deliberations, including residual doubt about the defendant's guilt, mental retardation, and youthfulness of the defendant at the time of the crime, circumstances out of the defendant's control, and circumstances that diminish the defendant's responsibility for the crime (for example, multiple defendants). Factors receiving less consideration, yet still considered to be mitigating, include victims with criminal histories and defendants with histories of mental illness, child abuse, poverty, and time spent in state institutions (Garvey, 1993). Many jurors incorrectly believe mitigating factors must rise to the reasonable doubt burden of proof when in fact mitigating factors need only outweigh the state's presented aggravating circumstances (Luginbuhl & Howe, 1995). Jurors also mistakenly assume mitigating circumstances require the jury's unanimous vote when in fact, only one juror need consider a life circumstance to be mitigating (Garvey, 2000; Luginbuhl & Howe).

In theory, legal process in capital cases is expected to proceed in a stepwise fashion. In practice, jurors appear to "multitask" in ways that undermine the intent of prescribed process and significantly influence juror decision making. For example, the law requires jurors to withhold consideration of punishment during the guilt phase and make this decision after aggravating and mitigating circumstances are presented during the penalty phase of the trial (*Furman v. Georgia,* 1972). Yet, nearly one-half of jurors in one study (Bowers et al., 1998), and 70 percent of jurors in another (Sandys, 1995) indicated they had decided on punishment during the guilt phase of the trial before aggravating and mitigating circumstances were presented. Of those jurors who decided the punishment during the guilt portion of the trial, more than half of them maintained that decision throughout the trial. Jurors who reported reaching early decisions about punishment did so because of their predisposition about crime, punishment, the death penalty, and experiences during the guilt phase. Surprisingly, on hearing the state's evidence, a significant number of jurors decided that the death penalty was not only acceptable punishment for first-degree murder, but also for other types of murder as well. These findings advise mitigation practices that ensure jurors' thorough understanding of the legal issues that surround individual cases and options of legal response and, as important, trial strategies that remind jurors over and over again of their specific responsibilities associated with each step of the judicial process.

## Abdication of Responsibility

Jurors who do not understand what is legally expected of them in capital trials are more likely to abdicate the responsibility for their decisions to others. When jurors fail to maintain a sense of responsibility for deciding verdicts and sentences, they are also less likely to critically consider the influence of mitigating circumstances on criminal behavior. Jurors tend to abdicate independent responsibility in a number of ways. For example, it is the sole responsibility of each juror to independently vote for life, life without parole, or death. Empirical evidence suggests however, that some capital jurors who vote for the death penalty are likely to rationalize a death vote by abdicating responsibility for that decision to the trial judge, the community, other jurors, the law, and the defendant (Eisenberg et al., 1996; Hoffman, 1995; Sherman, 1995).

Abdicating independent responsibility to the judge occurs more frequently among premature decision makers (Eisenberg et al., 1996), who believe that their verdict is merely a recommendation (Hoffman, 1995; Sherman, 1995). Sherman also argued that when jurors consider the judge as the final decision maker, they feel less responsibility for the verdict. Moreover, jurors who believe that they are merely representatives of the greater community feel less responsible for their decisions about punishment. Yet, they may paradoxically see themselves as only one vote and look to the voting

behavior of their fellow jurors as a means of relinquishing personal responsibility.

There are a number of other risky situations when jurors abdicate their independent responsibility in decision making that should concern practitioners and legal advocates. One risk is that jurors may rely on the legal system to avoid taking personal responsibility for their decision. For example, jurors who falsely believe that the law requires a verdict of death for certain types of murder (Eisenberg et al., 1996; Sherman, 1995) frequently feel that the responsibility for a death sentence belongs to the legal system. In addition, beliefs about how the judicial system's appeal process operates have also been found to influence jurors' the level of personal responsibility. The appeals process is touted as a lengthy, time-consuming procedure, and jurors who do not think executions are actually carried out on a regular basis are less likely to accept responsibility for the verdict. Finally, research indicates that two critical factors appear to be associated with the ease with which a juror abdicates responsibility for his or her decision. These are when the juror views the crime as being especially brutal or premeditated (Sherman). Because crimes that lead to capital charges often dehumanize defendants proportion-

ately to the crimes against their victims, it is especially important that social workers serving as mitigation specialists present evidence with some finesse that humanizes defendants and clearly informs jurors about the scope of consequences that will arise from their decision.

In summary, it is clear that life and death verdicts are made for a variety of reasons unrelated to the actual facts of the case, the legal responsibilities of the jury, and the weight of the mitigating evidence that is presented. The literature clearly delineates the problem areas that can guide the interventions by social work practitioners involved in mitigation work and suggests important areas for forensic social work education and training.

## A MODEL TO INFORM PRACTICE

When practice and empirical evidence is considered, the problems that surround juror decision making and mitigation practice are more complex than implied by the legal remedy (*Furman v. Georgia*, 1972) that requires evidentiary presentation of a thorough investigation of a defendant's background. Based on issues identified in a broad body of literature, the conceptual problem model shown in Figure 1 demonstrates the complicating feature



**Figure 1: Factors Influencing Sentencing Decisions Problem Conceptualization**

**PERSONAL VALUES OF JUROR**

of the problems that surround death penalty decisions. During preparation for trial, social workers must remain cognizant of how jurors' personal values and emotions will likely affect their decision making.

## Research and Practice Implications

The model delineates the areas that social work mitigation specialists are advised to consider when devising ways in which to improve practice outcomes in capital trials. It is clear that practice and empirical evidence on juror decision making suggests certain practical implications for social work mitigation specialists and legal professionals, allowing us to expand on traditional methods of inquiry and investigation and develop ways to use social work skills and advanced professional competencies to counter the effects of juror emotion, confusion, and abdication of roles and responsibilities. By broadening the focus of intervention beyond a psychosocial investigation of mitigating factors in a defendant's background, social workers create possibilities for intervening at multiple points in the legal system and process. A more systems-oriented approach requires social workers who act as mitigation specialists to take a more proactive role in the entire defense process. Going beyond the interpersonal work required to develop mitigating evidence to using education and advocacy strategies that provide richer, more fruitful consultancy to attorneys and the courts. A multidimensional, systems-oriented approach should help social work mitigation specialists apply the practice and empirical evidence discussed earlier to carve out a larger role in capital cases and improve both the mitigation investigation and work as part of a defense team. Proactive intervention at multiple points in the system and in the legal process promises better prospects for creating a link among the client, the defense team, and the jury. In the end, a larger role that applies practice and empirical evidence to social work and legal processes can help protect against the possibility that the evidence-based factors identified in our model will prevent jurors from concentrating on the mitigating circumstances detailed in the defendant's life story.

## Intervening in the System

*Intervening with Defense Attorneys.* To ensure that defense strategies that neutralize factors negatively influencing juror decision making, we advise social

workers to use relationship-building strategies that encourage a larger advisory role. Educating attorneys about the full range of social work skills and qualifications facilitates a more maximal social work role in the defense process. Informing attorneys about the risks outlined in professional literature and depicted in our model helps them plan trial strategies that may offset undesired decision-making factors and processes. Likewise, helping defense attorneys to develop improved relationship-building and interviewing skills not only enhances their ability to connect with potential jurors during voir dire (jury selection), but also results in thoughtful answers during voir dire on potentially life-threatening issues. This personal connection, and the resultant information gleaned from potential jurors, could assist the defense team in selecting individuals who will remain cognizant of the impact that their emotions have on their ability to make decisions. Jurors relate to the best communicator, and social workers can assist attorneys in learning how to communicate to the laypeople who will eventually become jurors (Caldwell, Perrin, & Frost, 2002).

*Intervening with the Team.* Through relationship building and education strategies, social workers can increase their role as a vital link between the defendant and members of the defense team (Schroeder, 2003). Using basic and advanced interpersonal skills, social workers acting as mitigation specialists can expand their role by facilitating communication and collaboration and helping counsel recognize the effects of the existing power differential among themselves, the defendant, and jurors (Alfonso & Baur, 1986). Affecting inherent power differentials, social workers must model advocacy skills to help attorneys identify with and advocate for jurors in need of clarification as well as assist in creating an atmosphere that promotes supportive development of relationships. It is vital that judges provide clear instructions, and if they do not, jurors must be empowered to keep asking questions until they fully understand their obligations under the law. Attorneys must also advocate for the defendant, and this commitment must be clear to the defendant so he or she will cooperate with the attorney and the mitigation specialists during the trial. Finally, social workers must model advocacy skills to help attorneys identify with and advocate for changes in the legal system that must be made to deal with problems such as juror confusion and misunderstanding. The practitioner's role

as advocate should extend to state legislatures where court procedures regarding jury instructions, jury questioning of the judge and witnesses, and juror note taking must be addressed by statute.

### Intervening with the Jury

*Selecting the Jury.* Like their highly trained forensic psychologist counterparts who have been working with attorneys to select juries for many years (Cutler, 1990; Fischoff, 2003; Vore, 1989), social workers who—as a group—have been long employed to complete legally mandated defendant background investigations are increasingly being used by public defenders. Consequently, a growing number of social workers will undoubtedly find themselves in the position of assisting defense attorneys in jury selection. Social workers can most effectively intervene in this point of the legal system by applying best practices in assessment and in questionnaire development to the jury selection process to identify and screen out jury candidates who will be most likely to demonstrate potential for severe or erroneous decision making identified in the literature and our proposed model. For example, a large body of research suggests that early decision makers are more likely to vote for death, largely because they have not considered mitigating factors. So, it is vitally important to identify people with these tendencies during voir dire.

Using best research practices, survey questions should be structured in ways to identify jurors who have authority and compliance issues. These qualities can be determined by asking questions about issues not related specifically to the law but regarding biopsychosocial factors that jurors might respond to more readily and comfortably, such as medication compliance, paying taxes, and dealing with coworkers or neighborhood associations. To be sure, many potential jurors with compliance issues will be deemed appropriate (death qualified) for service. Therefore, it is vital for the defense team to identify the most "dangerous" of that group using peremptory challenges to exclude them from service. Being close to the jury selection process also helps mitigation specialists when developing the penalty phase testimony of experts, family, and friends. Knowing the jurors' attitudes, values, and personal life experiences provides details that can be used to personalize the penalty phase testimony.

*Educating the Jury.* Social work mitigation practitioners should develop educational interventions

*Social work mitigation practitioners should develop educational interventions for the defense team to use to improve juror understanding of aggravating and mitigating circumstances.*

for the defense team to use to improve juror understanding of confusing issues, such as aggravating and mitigating circumstances. Clear language and rephrasing techniques should be used to guarantee that each juror has a clear understanding of and can explain, in his or her own words, what constitutes mitigating and aggravating circumstances.

Life history timeline diagrams, models of pathways into criminal behavior, and photographs are commonly used to help jurors come to know the defendant during the penalty phase (Guin & Merrill, 2000). Ogloff's ("Jurors Can't Understand," 1998) preliminary use of decision trees to help jurors understand substantive instructions in making their decisions offers promise and could prove useful in assisting jurors in using mitigating evidence in their decision making in capital trials. Visual reinforcement of the rules and their application helps jurors use all of the information presented to them in an objective manner and promotes the integration of mitigating evidence into their overall deliberations. Decision trees can provide structure and organization to illustrate, explain, and simplify the penalty phase evidence and issues guiding jurors' decisions with clarity that words alone cannot accomplish.

Furthermore, by sharing with the defense team knowledge of human behavior, social workers can help the team predict and develop trial strategies that are likely to minimize or neutralize jurors' responses to complicated and often gruesome information about violent criminality and victimization. In addition, practitioners must also recommend competent experts who can discuss troublesome issues that often result in confusion and misunderstanding. For example, identification and recruitment of a correctional expert to testify about the realities of sentencing (life without the benefit of parole) and prison security issues during the penalty phase of the trial should alleviate juror confusion, frustration, and the desire "to know what the punishment would actually be if they did not

impose a death sentence" (Bowers & Steiner, 1999, p. 605).

*Intervening with Defendant Clients.* Work with the defendant must include efforts to address negative pretrial demeanor and trial behavior that negatively affect juror's decisions. Remorse and responsibility are exceptionally difficult issues for many defendants to demonstrate, particularly defendants who suffer from mental illness or retardation and those who maintain their innocence. Helping clients understand the effects of their verbal and nonverbal communication styles and the defendant's active involvement in improving on those elements may increase the likelihood that he or she might build a more positive relationship with jurors. Bem's (1978) pioneering research purported that an individual's body language reveals more than two-thirds of the emotional meaning of a message. It is vitally important that social workers help defendants understand what their nonverbal behavior communicates to jurors and that those jurors may ascribe meaning to each and every gesture or expression both intentional and unintentional.

Often defendants admit to having some involvement in the crime for which they are being tried. It is important that the client admit being present or partially responsible for the outcome of the incident, if this is consistent with the legal strategy. Clients must understand the gravity of their behavior and the feelings of loss that the victim's loved ones are experiencing. In this way, jurors can see that although the client maintains that he or she did not kill the victim, he or she admits to playing some role in the victim's demise. Honest and sincere client reaction to the aggravating circumstances must reflect feelings of sadness, regret, remorse, and responsibility.

Attorneys often have difficulty working with clients to develop these feelings so they can be appropriately displayed on the witness stand; thus, the issue must be dealt with very early in the investigation and relationship-building process. Investigating the client's feelings regarding the crime may help elicit genuine responses that can be developed through journaling, artwork, and frank discussion later taken into the courtroom to mitigate the effects of the aggravating circumstances.

The defendants themselves often do not understand how they can participate in their own defense. Social workers who have developed a solid relationship with their client can assist him or her

in understanding what he or she can do to affect the sentencing outcome. Some will have little problem with this; however, many capital defendants are poorly educated, have borderline intelligence, or are mentally retarded or mentally ill. They will not make a positive impression in the courtroom without a great deal of education on the courtroom setting and roles and responsibilities of various court personnel, followed by practice or role playing. Role playing is especially helpful for the undereducated or disabled client to assist him or her in speaking clearly with proper tone and rate. Public speaking skills will also enhance the defendant's acceptability during pretrial status hearings if the judge speaks directly to the defendant. Proper grammar and syntax will give the client confidence and work to humanize him or her.

Later, during voir dire, if the defendant has the opportunity to speak before the jury selection pool, proper elocution gives potential jurors the opportunity to develop a larger construct of who this individual is. A person without a voice remains a mystery. A person charged with a heinous killing who is not allowed a voice becomes a silent beast to jurors as the evidence is put forth during the trial. Judgments are often made about people based on their physical appearance and verbal communication skills. The social worker is well equipped to assist difficult clients in presenting themselves in a manner that could be helpful to their defense.

## CONCLUSION

Because of the advocacy and social justice traditions of the profession as well as their specialized education, training, and experience, social workers are particularly well suited to work as part of a defense team in capital cases. Increasingly, social workers are becoming widely accepted and employed to complete legally mandated investigations, convey relevant information to officers of the court, and provide evidentiary presentations of death penalty defendants' background to juries. In this respect, social workers have gained entry into an area of practice that can be significantly improved by expanding their role to include interventions at multiple points in the legal system and process.

However, most social workers are added to defense teams composed of public defenders representing indigent clients. Consequently, there is a risk that social workers' role will be restricted because of misconceptions about the full range of

their potential as defense team members. In contrast to higher paid psychologist—often in private practice—who act as trial and jury selection specialists, social workers may suffer the social bias and prejudice about competency and range of skill that comes from being viewed as public servants. We advise social workers to use their professional skills to gain the standing—enjoyed by too few in our profession—that is necessary to engage fully in mitigation practice that applies a systems approach and evidence-based knowledge.

The empirical evidence discussed here clearly delineates how juror emotion, confusion and disregard, and abdication of responsibility can lead juries to overlook mitigation evidence in capital trials. We propose a greater role for social workers as mitigation specialists in death penalty cases by using a systems approach that is informed by practice and empirical evidence to intervene at multiple points in the legal system and process. To accomplish this aim, social workers must be cognizant of the factors that influence juror decision making and the skills required to intervene to ensure a just legal process. A critical requirement of best practice in this arena is that social workers remain up to date on current legal research on juror decision making in capital trials, use traditional social work methods most effectively, and develop new competencies to meet the needs of the defense team, the client, and society.

Armed with an intellectual understanding of the value of mitigating circumstances, the practitioner must build relationships with the client and the client's friends and family to dig deeply into the recesses of spoken and recorded history to discover stories that depict the client accurately throughout the court process. Strong relationships must be built among defense team members and everyone involved in the client's life. These relationships may place the client at greater ease, improving his or her demeanor with resultant interactions witnessed by jurors working to humanize the defendant. By developing the conceptual problem model depicting the causal factors underlying the ineffectiveness of mitigation evidence in capital trials, it is hoped that social workers serving as mitigation specialists begin to link traditional social work skills to these points of intervention. From the initial meeting with the client until the last appeal is denied in a capital case, social workers must use their skills to educate, advocate, and build important relationships to ensure that the critical human issues that propel a person into criminality are made very clear throughout each phase of the trial. This may include the use of pictures, graphics, compelling expert testimony, and life history information that demands the undivided attention of jurors so they will retain key facts and carefully consider the issues.

The problem conceptual model must eventually lead to a multilevel intervention framework that can be formalized and tested using multivariate analysis to determine the effectiveness of mitigation when the issues identified in this article are actively addressed. Effective interventions will create opportunities for classroom instruction, field placement, and interdisciplinary collaboration among social work and law students, as well as much needed postgraduate and continuing education for the social work mitigation specialists and attorneys who currently fight for just decisions in capital trials. **SW**

## REFERENCES

Alfonso, C., & Baur, K. (1986). Enhancing capital defense: The role of the forensic clinical social worker. *The Champion, 6*, 6–29.

Andrews, A. B. (1991). Social work expert testimony regarding mitigation in capital sentencing proceedings. *Social Work, 36*, 440–445.

Bem, P. A. (1978). *Social behavior: Fact and falsehoods about common sense, hypnotism, obedience, altruism, beauty, racism and sexism.* Chicago: Nelson Hall.

Bowers, W. J., Sandys, M., & Steiner, B. D. (1998). Foreclosed impartiality in capital sentencing: Jurors' predispositions, guilt-trial experience and premature decision making. *Cornell Law Review, 83*, 1476–1541.

Bowers, W. J., & Steiner, B. D. (1999). Death by default: An empirical demonstration of false and forced choices in capital sentencing. *Texas Law Review, 77*, 605–717.

Caldwell, H. M., Perrin, L. T., & Frost, C. L. (2002). The art and architecture of closing argument. *Tulane Law Review, 76*, 961–1072.

Coates, D., & Penrod, S. (1981). Social psychology and the emergence of disputes. *Law and Society Review, 15*, 665–659.

Cutler, B. L. (1990). Introduction: The status of scientific jury selection in psychology and law. *Forensic Reports, 3*, 227–232.

Diamond, S. S., & Levi, J. N. (1996). Improving decisions on death by revising and testing jury instructions. *Judicature, 79*, 224–232.

Eisenberg, T., Garvey, S. P., & Wells, M. T. (1996). Jury responsibility in capital sentencing: An empirical study. *Buffalo Law Review*. Retrieved April 20, 2001, from, http://www.lawschool.cornell.edu/library/death/cjp_publ.htm

Eisenberg, T., Garvey, S. P., & Wells, M. T. (1998). But was he sorry? The role of remorse in capital sentencing. *Cornell Law Review*. Retrieved April 20, 2001, from, http://www.lawschool.cornell.edu/library/death/cjp_publ.htm

Scanned  Jun 18, 2013

Eisenberg, T., Garvey, S. P., & Wells, M. T. (2001). Forecasting life and death: Juror race, religion, and attitude toward the death penalty. *Journal of Legal Studies*. Retrieved January 28, 2002, from http://www.lawschool.cornell.edu/library/death/cjp_publ.htm

Eisenberg, T., & Wells, M. T. (1993). Deadly confusion: Juror instructions in capital cases. *Cornell Law Review*. Retrieved April 20, 2001, from http://www.lawschool.cornell.edu/library/death/cjp_publ.htm

Fincham, F. D., & Jaspars, J. M. (1980). Attribution of responsibility: From man the scientist to man as lawyer. *Experimental Social Psychology, 13*, 81–82.

Fischoff, S. (2003). Stuck and sway: The new science of jury consulting. *Political Psychology, 24*, 628–631.

*Furman v. Georgia*, 408 U.S. 238 (1972).

Garvey, S. P. (1998). Aggravation and mitigation in capital cases: What do jurors think? *Columbia Law Review*. Retrieved April 20, 2001, from http://www.lawschool.cornell.edu/library/death/cjp_publ.htm

Garvey, S. P. (2000). The emotional economy of capital sentencing. *New York University Law Review*. Retrieved April 20, 2001, from http://www.lawschool.cornell.edu/library/death/cjp_publ.htm

Garvey, S. P., Johnson, S. L., & Marcus, P. (2000). Correcting deadly confusion: Responding to jury inquiries in capital cases. *Cornell Law Review*. Retrieved April 20, 2001, from http://www.lawschool.cornell.edu/library/death/cjp_publ.htm

Guin, C. C., & Merrill, T. S. (2000, May). *Life or death? Using multi-disciplinary life history research in forensic social work*. Paper presented at the meeting of the National Organization of Forensic Social Workers, Palm Springs, CA.

Guin, C. C., Noble, D. E., & Merrill, T. S. (2003). From misery to mission: Forensic social workers on multi-disciplinary mitigation teams. *Social Work, 48*, 362–373.

Hoffman, J. L. (1995). Where's the buck? Juror misperception of sentencing responsibility in death penalty cases. *Indiana Law Journal*. Retrieved April 20, 2001, from http://www.lawschool.cornell.edu/library/death/cjp_publ.htm

Jurors can't understand instructions, study finds. (1998, November, 19). *Simon Fraser News, 13*(6). Retrieved November 20, 2002, from http://www.sfu.ca/mediapr/sfnews/1998/Nov 19/oglogg.html

Luginbuhl, J., & Howe, J. (1995). Discretion in capital sentencing instructions: Guided or misguided? *Indiana Law Journal*. Retrieved April 20, 2001, from http://www.lawschool.cornell.edu/library/death/cjp_publ.htm

McCoy, D. (1999). Mitigation strategies in death penalty cases. *The Advocate, 21*(1). Retrieved April 20, 2001, from http://dpa.state.ky.us/library/advocate/jan99/mitigation.html

*McDougall v. Dixon*, 921 F2nd 518, 539 (4th Cir.) (1990).

Ritter, J. L. (2004). Your lips are moving...but the words aren't clear: Dissecting the presumption that jurors understand instructions. *Missouri Law Review, 96*, 163.

Roberts, A. R., & Brownell, P. (1999). A century of forensic social work: Bridging the past to the present. *Social Work, 44*, 359–369.

Sandys, M. (1995). Cross-over-capital jurors who change their minds about the punishment: A litmus test for sentencing guidelines. *Indiana Law Journal*. Retrieved April 20, 2001, from http://www.lawschool.cornell.edu/library/death/cjp_publ.htm

Schroeder, J. (2003). Social work's role in death penalty mitigation investigations: Forging a new practice area. *Families in Society, 84*, 423–432.

Sherman, S. J. (1995). The role of responsibility and how psychology can inform the law. Symposium: The Capital Jury Project. *Indiana University Law Journal, 70*, 1241. Retrieved April 20, 2001, from http://www.lawschool.cornell.edu/library/death/cjp_publ.htm

Slobogin, C. (2003). What Atkins could mean for people with mental illness. *New Mexico Law Review, 33*, 293–314.

Steiner, B. D. (1999). Folk knowledge as legal action: Death penalty judgments and the tenet of early release in a culture of mistrust and punitiveness. *Law and Society Review*. Retrieved April 20, 2001, from http://www.lawschool.cornell.edu/library/death/cjp_publ.htm

Stetler, R. (1999). Why capital cases require mitigation specialists. *The Champion, 1*, 35–40.

Sundby, E. (1998). The capital jury and absolution: The intersection of trial strategy, remorse and the death penalty. *Cornell Law Review*. Retrieved April 20, 2001, from http://www.lawschool.cornell.edu/library/death/cjp_publ.htm

Tiersma, P. M. (1995). Dictionaries and death: Do capital jurors understand mitigation? *Utah Law Review*. Retrieved April 20, 2001, from http://www.lawschool.utah.edu/library/death/cjp_publ.htm

Tomes, J. P. (1997). Damned if you do, damned if you don't: The use of mitigation experts in death penalty litigation. *American Journal of Criminal Law, 24*, 359–398.

Vore, D.A. (1989). Psychological consultation for systematic jury selection. *American Journal of Forensic Psychology, 7*(4), 21–36.

Werner, H. D. (1986). Cognitive theory. In F. J. Turner (Ed.), *Social work treatment* (3ed ed., pp. 91–130). New York: Free Press.

Wiener, R. L., Rogers, M., Winter, R., Hurt, L., Hackney, A., Kadela, K., Seib, H., Rauch, S., Warren, L., & Morasco, B. (2004). Guided jury discretion in capital murder cases: The role of declarative and procedural knowledge. *Psychology, Public Policy, and Law, 10*, 516–576.

*Julie Schroeder, PhD, is associate professor, Department of Criminal Justice, Fayetteville State University, 2500 Murchison Road, Fayetteville, NC 28301; e-mail: jschroeder@uncfsu.edu. Cecile C. Guin, PhD, is associate professor, School of Social Work, Louisiana State University. Rene Pogue, PhD, is a visiting professor, Texas State University at San Marcos. Danna Bordelon, MSW, is research assistant, School of Social Work, Louisiana State University.*

Original manuscript received September 9, 2002
Final revision received July 29, 2004
Accepted August 15, 2005

Copyright of Social Work is the property of National Association of Social Workers and its content may not be copied or emailed to multiple sites or posted to a listserv without the copyright holder's express written permission. However, users may print, download, or email articles for individual use.

Scanned Jun 18, 2013



DX-8

MARY LOPEZ BUITRON, CSR, RPR
*Official Court Reporter - 94th District Court*





# Champion Magazine
## NATIONAL ASSOCIATION OF CRIMINAL DEFENSE LAWYERS

Who We Are
Press Room
News & Issues
CLE & Events
Committees
Members Only
Champion Magazine
Indigent Defense
Federal Legislation
White Collar
State Legislation
Affiliate Organizations
Lawyer Resources
...ndation

NACDL.org

🖶 Print or Email This Page

July 2005, Page 18

## Mitigation In The Death Belt - Twelve Steps To Saving Clients' Lives
### By Natman Schaye; Roseann Schaye-Glos

Working in Arizona (state motto: "striving to be like Alabama"), we painfully learned the grand scope of ignorance among counsel and the courts in understanding the importance of mitigation. While Arizona may be near the end of the death belt, our western outpost is unquestionably very much a part of it. And Arizona has suffered from special problems with regard to mitigation.

As the nation learned from Ring v. Arizona,1 our state is one of the little band that does not believe that jurors should be troubled with questions of life versus death.2 Judges, of course, know how to sentence people. They were not to be troubled with mitigating evidence. They could just read the pre-sentence report, watch Mama cry, impose death, and still make it to the Mountain Oyster Club for an early lunch with cocktails. Arizona did not have "penalty phase trials." It had "sentencings."

What was the result? We packed our death row with 126 of our clients. That may not sound so bad, but our small population consistently places us near the top in death row inmates per capita. For purposes of context, consider the other members of the Four Corners Society — New Mexico, Colorado, and Utah. They have a total death row population of 16. Arizona has executed 22, more than three times the number of our sister states combined. And those states do not share Arizona's good fortune of being in the Ninth Circuit.

### Into The Light

A beacon of hope shined upon the death belt in recent times. Any doubt about the importance — make
that necessity — of thoroughly gathering and persuasively presenting mitigating evidence disappeared as the result of three missives sent from Washington in the past couple of years. First, in Ring, the Supreme Court required that juries, not judges, decide whether an individual may be sentenced to death. Lawyers in Arizona and similar enclaves were forced to recognize that capital punishment is doled out at a penalty-phase trial, not simply a "sentencing." Second, in February 2003, the American Bar Association issued revised "Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases"3 ("ABA Guidelines"), setting a substantially higher standard of professionalism in capital representation. Finally, the recent decision in Wiggins v. Smith4 clearly and conclusively established the necessity of extensive mitigation work and the persuasive authority of the ABA Guidelines.

### Say Good-Bye To Business As Usual

DEFENDANT'S
EXHIBIT
8

"Mama Cried" (with apologies to Merle Haggard) capital sentencing should never be seen again. So said the Supreme Court in Kevin Wiggins' case.

Kevin was convicted of drowning a 77-year-old woman and rifling her home.5 At the penalty phase, his lawyers focused their efforts on the claim that he did not personally commit the murder. They did not present traditional mitigation evidence. The jury returned a death verdict.6

In post-conviction proceedings, new counsel presented extensive evidence of Kevin Wiggins' tragic life history, including physical, sexual and emotional abuse at the hands of his natural mother and foster parents.7 His trial attorney testified that defense counsel chose to pursue their client's lack of personal responsibility for the murder instead of focusing on his history. Although the trial judge stated "that he could not remember a capital case in which counsel had not compiled a social history of the defendant," he denied the ineffective assistance claim because the absence of investigation was a matter of strategy.8

The case eventually reached the Supreme Court, where habeas corpus standards required Kevin Wiggins to demonstrate that the state courts' denial of his ineffective assistance claim was not simply error, but "objectively unreasonable."9 The Court applied the standard to the familiar two-pronged performance and prejudice test of Strickland v. Washington.10

The Court noted that the trial attorneys retained a psychologist to conduct numerous tests on their client, reviewed a pre-sentence report, and social service records.11 The Court found that the attorneys' failure to obtain a complete social history violated Kevin Wiggins' Sixth Amendment rights. The decision is critically important in at least two respects. First, the Court's decision recognized that it has "long" relied on ABA standards "as 'guides to determining what is reasonable.'"12 The same is true of federal circuit courts.13

Second, the Court specifically noted that the Wiggins attorneys failed to comply with former ABA Guideline 11.4.1(C), which requires that mitigation investigations include "efforts to discover all reasonably available mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor."14 Making itself perfectly clear, the Court continued:

Despite these well-defined norms, however, counsel abandoned their investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources. Cf. id., 11.8.6, p. 133 (noting that among the topics counsel should consider presenting are medical history, educational history, employment and training history, family and social history, prior adult and juvenile correctional experience, and religious and cultural influences) (emphasis added). . . .15

The trial attorneys were found to have been ineffective both for failing to conduct a sufficiently broad investigation and for failing to follow leads presented by the limited records they obtained.16 Similar failures occur regularly in America's courts.

The Court concluded that the defense established prejudice sufficient to require a new penalty trial. While the standard for ineffectiveness is always high, the Court shed an additional ray of hope as to this prong of the Strickland test, "Had the jury been able to place petitioner's excruciating life history on the mitigating side of the scale, there is a reasonable probability that at least one juror would have struck a different balance."17 A showing of prejudice does not require evidence sufficient to move an entire jury panel, only one of twelve members.

Teachings Of The ABA Guidelines —Twelve Steps To Saving Clients' Lives

The ABA has become a powerful ally in the campaign to bring the death penalty era to a close. The new Guidelines are one of the most important steps taken to ensure that, if the death penalty is going to be around, it must be administered with a modicum of fairness.

The Guidelines make no bones about their goal "The objective of these Guidelines is to set forth a national standard of practice for the defense of capital cases in order to ensure high quality legal representation for all persons facing the possible imposition or execution of a death sentence by any jurisdiction."18 The Guidelines apply to every stage of a case from the time of

Scanned Jun 18, 2013

Mitigation In The Death Belt – Twelve Steps To Saving Clien...

a rest through clemency proceedings.19 The Guidelines have plenty to say about mitigation.

From these sources, as well as the teachings of many outstanding litigators and mitigation specialists, comes Twelve Steps to Saving Clients' Lives.

Step One: Form A Defense Team Consisting Of At A Minimum Two Lawyers, One Investigator And One Mitigation Specialist20

The defense team must be assembled ("team" being the operative word) "as soon as possible" after lead counsel is assigned.21 At a minimum, "The defense team should contain at least one member qualified by training and experience to screen individuals for the presence of mental or psychological disorders or impairments.22 Mental status is relevant to the ability to understand Miranda warnings, competency, sanity, capacity to premeditate, capacity to waive rights, mental retardation, and the imposition of a death sentence. Further:

Creating a competent and reliable mental health evaluation consistent with prevailing standards of practice is a time-consuming and expensive process. Counsel must compile extensive historical data, as well as obtaining a thorough physical and neurological examination. Diagnostic studies, neuropsychological testing, appropriate brain scans, blood tests or genetic studies, and consultation with additional mental health specialists may also be necessary.

Counsel's own observations of the client's mental status, while necessary, can hardly be expected to be sufficient to detect the array of conditions (e.g., post-traumatic stress disorder, fetal alcohol syndrome, pesticide poisoning, lead poisoning, schizophrenia, mental retardation) that could be of critical importance. 23

A lawyer does not have the time, the insight, the ability, or the skills to fulfill this role. No matter what the local pattern or practice has been, no matter what trial judges may say, this is not pie-in-the-sky stuff. This is a fundamentally necessary resource to which every one of our clients is entitled. A mitigation specialist is not a paralegal, investigator/ex-cop, or former probation officer. While there are exceptions, most mitigation specialists have graduate degrees in social work or a mental health discipline and plenty of field experience. They are not underlings whose opinions are of little importance and whose role is to spend time at the jail to "keep the client happy." Mitigation specialists are experts.

Step Two: Develop A Relationship Of Trust With The Client And Witnesses
Without trust, there cannot be effective communication or information gathering. The ABA illustrates:

Mitigation specialists possess clinical and information-gathering skills and training that most lawyers simply do not have. They have the time and the ability to elicit sensitive, embarrassing and often humiliating evidence (e.g., family sexual abuse) that the defendant may have never disclosed. They have the clinical skills to recognize such things as congenital, mental or neurological conditions, to understand how these conditions may have affected the defendant's development and behavior, and to identify the most appropriate experts to examine the defendant or testify on his behalf.24

Clients suffering from mental illness or retardation are often quite skilled in hiding it, and expertise is required to uncover these facts.25 It is not helpful, and can in fact be detrimental to ask a client or family member to fill out a "mitigation questionnaire." Such information must be obtained during personal interviews. And it is not enough that a relationship of trust exist between the mitigation specialist and the client. The relationship must extend to defense counsel and to those who play an important role in the client's life:

Establishing a relationship of trust with the client is essential both to overcome the client's natural resistance to disclosing the often personal and painful facts necessary to present an effective penalty phase defense ... and to ensure that the client will listen to counsel's advice on important matters such as whether to testify and the advisability of a plea. Client contact must be ongoing. An occasional hurried interview with the client will not reveal to counsel all the facts needed to prepare for trial, appeal, post-conviction review, or clemency. Similarly, a client will

Scanned Jun 18, 2013

not — with good reason — trust a lawyer who visits only a few times before trial, does not send or reply to correspondence in a timely manner, or refuses to take telephone calls. It is also essential for the defense team to develop a relationship of trust with the client's family or others on whom the client relies for support and advice.26

The development of trust takes time and skill on the part of the mitigation specialist as well as teamwork throughout the defense team. Is this an easy task? Of course not. Our clients would not be where they are if they were effective communicators, open about their problems, and able to develop healthy relationships. But these problems are inherent in capital defense work and must be addressed, "Often, so-called 'difficult' clients are the consequence of bad lawyering . . ."27 Keep in mind that our clients are usually very different from the members of the defense team in significant respects such as age, race or ethnicity, religion and economic status. In forming the team, try to include members with whom the client may more easily identify. We must overcome these difficulties and differences to develop a relationship of trust. "[T]he failure to maintain such a relationship is professionally irresponsible."28

Step Three: Gathering All The Information Records

It is nearly impossible to have lived in this day and age without leaving a long paper trail. As to a client, relevant records begin "with the moment of conception."29 And records on the client are not nearly enough. It is critical to obtain records for as many generations as possible, but always as far back as grandparents and as far out as first cousins, "A multi-generational investigation frequently discloses significant patterns of family dysfunction and may help establish or strengthen a diagnosis or underscore the hereditary nature of a particular impairment."30

Hard work is necessary to gather all the information. Records to be collected on the client and family include those relating to birth, death, arrests, court proceedings including civil court, divorce, employment, jail and juvenile, marriage, physical or mental health, military service, incarceration, probation or parole, school, social services, INS, and Social Security administration for a start.31

One reason mitigation work needs to begin at the beginning is that records can take up to a year to arrive, particularly military and Social Security records. The mitigation specialist can acquire authorizations for release during the initial meetings with the client and family. Record requests can begin well before the relationships develop unless there is an individual who refuses to sign a release form initially. This individual may be persuaded to be co-operative during future visits. This individual requires return visits. If refusal continues, however, that can also become a mitigating factor. In some cases, subpoenas may be necessary.

Records may be hard to locate and the record keeper may be loath to provide assistance. A mitigation specialist must therefore be tenacious. Often this requires personal appearances where the records are located. Identifying the right person in the records department — and buying them flowers — can aid in locating old records stored on microfiche or in a dank basement. And do not accept a clerk's statement that the records have been destroyed without digging further to ensure that the clerk does not really mean, "It would be too much trouble."

Records can also lead to additional witnesses. An example would be Baptismal records that show the names of godparents. These witnesses would likely have knowledge of at least some of the early history of the child and family and possibly of the existence of other records.

Step Four: Gathering All The Information Interviews

As with obtaining records, everyone must be interviewed, a daunting, but necessary task. We have learned, "[P]enalty phase preparation requires extensive and generally unparalleled investigation into personal and family history."32 The next door neighbor when the client was six may remember the name of a neighbor across the street. The neighbor across the street may have had a nephew who saw the client raped by his mother's boyfriend. Interviewees must include family members, friends, ex-wives or girlfriends, neighbors, teachers, doctors, counselors, probation officers, employers, co-workers, cell mates, and on and on.33 And repeated interviews may be required of many of these individuals. People develop trust on different schedules; some will take much longer than others before divulging information. In

Case 2:12-cv-00410   Document 31-72   Filed on 01/26/15 in TXSD   Page 105 of 124

Scanned Jun 18, 2013

Mitigation in the Death Belt - Twelve Steps to Saving Clients...

addition, the mitigation specialist may determine that another defense team member would be more effective interviewing a boyhood friend (for example) than the mitigation specialist would.

The client and witnesses must understand that they must not edit reality and only provide "the good stuff." If the client hurt a pet or molested a friend's little sister, the defense team needs to know. These are not facts to learn during the penalty phase trial. More importantly, it is critical to understand everything about the client. Depraved conduct does not develop from thin air. There are causes. And causes found lead to evidence in mitigation.

A client's history may require specialized, expert assistance during the investigation. Is there evidence that the client suffers from fetal alcohol syndrome? Was the client raised in a culture that did not match his or her ethnicity? Was the client exposed to toxins as a child, perhaps from a nearby landfill or factory, or from pesticides in a migrant farm working environment?34 And if the client suffered prior convictions, they must be investigated to determine what actually occurred and whether they are subject to attack.35

Of course, obtaining the necessary information usually "requires overcoming considerable barriers, such as shame, denial and repression, as well as other mental or emotional impairments from which the client may suffer."36 This may lead a client to object to the mitigation investigation.

Step Five: The Investigation Must Go On

Every measure must be taken to obtain the client's and witnesses' cooperation. This begins with Step Two, developing a trusting relationship. The client must receive assurances that the investigation is run-of-the-mill in every case. If the client objects, the mitigation specialist must work to determine whether this is the product of a mental or emotional problem which may require proceeding — at least initially — without the client's assistance. Bring in people the client loves or trusts — or even a former death row inmate — to obtain cooperation. If the client claims to be innocent and would rather die than be imprisoned for life explain that the mitigation investigation may convince the prosecution to drop its quest for death pretrial, which means no "death qualified" jury, which means a much better chance of acquittal. Further, let the client know that the mitigation investigation will allow counsel to personalize the client and will therefore help convince the jury that the client is innocent. Even if convicted, the mitigation case can help convince an appellate court to reverse. No matter what, do not give up on obtaining cooperation.37

But what is to be done if, despite the team's every effort, the client refuses to cooperate? The team's duty remains clear, "The investigation regarding penalty should be conducted regardless of any statement by the client that evidence bearing upon penalty is not to be collected or presented."38 In an early post-Wiggins appellate decision, the Sixth Circuit held that the failure to follow this edict supported a claim of ineffective assistance of counsel.39 So keep up the good work!

Step Six: The Mitigation Theme Must Be Developed Early And Woven Through Every Part Of The Case

Mitigation specialists play a defining role in developing the theme that will be used to achieve the goal — not try the case, get an acquittal, or look good in court — the goal is always to save the client's life.

Perhaps most critically, having a qualified mitigation specialist assigned to every capital case as an integral part of the defense team insures that the presentation to be made at the penalty phase is integrated into the overall preparation of the case rather than being hurriedly thrown together by defense counsel still in shock at the guilty verdict. The mitigation specialist compiles a comprehensive and well-documented psycho-social history of the client based on an exhaustive investigation; analyzes the significance of the information in terms of impact on development, including effect on personality and behavior; finds mitigating themes in the client's life history; identifies the need for expert assistance; assists in locating appropriate experts; provides social history information to experts to enable them to conduct competent and reliable

Scanned Jun 18, 2013

evaluations; and works with the rest of the defense team and experts to develop a comprehensive and cohesive case in mitigation.40

This is of critical importance, because, "Counsel should seek a theory that will be effective in connection with both guilt and penalty, and should seek to minimize any inconsistencies."41 The theme must be consistently applied to obtain resources, pursue motions, exclude evidence, secure a plea agreement, voir dire potential jurors, and — if all else fails — succeed at trial.

It is in this step that we begin to think about how to humanize the client to the jury. We want to show the jury from the outset that our client is a human being with family, feelings, family, disappointments, and the like. It is much harder for a jury to kill someone that they know.

Step Seven: Developing Depictions Of The Client's Life And Family History

We have learned that people — lawyers, defense teams, judges, jurors and yes, even prosecutors, need visual depictions to best absorb, organize, and integrate information. This is particularly important with complex issues, such as a client's life and family history. The defense team, led by the mitigation specialist, must draw a genogram or family tree of the client's family. This helps the team recall who is who as information becomes available.

In addition, a genogram can lead to exhibits that provide powerful demonstrative evidence. For example, one client was adopted as an infant and raised in a stable, nurturing family. The social history investigation of the families of the client's biological parents demonstrated long histories of mental illness, drug abuse, and anti-social behavior. The defense theme was that the client was, to a large extent, biologically programmed in such a way that he had many problems which were not discovered until it was too late. By creating large genograms of the biological and adoptive families, with color coding of illness, abuse, and anti-social behaviors, the defense team presented a powerful picture comparing the adoptive family's pure white genogram with the biological family's, which was as colorful as a Christmas tree.

On an even larger scale, a time line of the client's history and life must be created. This begins as far back as information gathered allows, hopefully at least as far back as the great grandparents. This can be done visually, with an actual line and events marked on the line or by a written description of events. The advantage of seeing events on a line can have an impact and may be developed into a powerful exhibit.

Demonstrative materials for use in plea negotiations, motions or at trial are, of course, not limited to genograms or time lines. Guideline 10.11(F)(5) provides that, for a penalty phase, materials to be considered regarding the client include, "Demonstrative evidence, such as photos, videos, and physical objects (e.g. trophies, artwork, military medals), and documents that humanize the client or portray him positively, such as certificates of earned awards, favorable press accounts, and letters of praise or reference." The development of effective demonstrative evidence is limited only by the combined imagination of the defense team. Of course, sometimes imaginations, ideas and egos can run wild.

Step Eight: The Mitigation Specialist Must Act As A Liaison Within And Beyond The Defense Team

This role continues throughout the case and, while it may arise in a variety of circumstances, it can be broken into two categories. The first category involves communication. The defense team must be kept apprised of the status of the mitigation investigation and the client. With e-mail, it is easy to keep the entire team apprised of everything that occurs. And the mitigation specialist can also be given the primary role of ensuring that the client is kept current on events in the case. Being a liaison not only reduces communication problems, but can avoid conflicts. Clients have no control of events inside jail, let alone outside jail, and may obsess on minor issues. One client, several months before trial, was extremely worried about what his wife would wear during the trial. The mitigation specialist can help the client resolve the issue without discounting the client's concern and leave the lawyers free from having to deal with such issues.

Scanned Jun 18, 2013

Mitigation In The Death Belt - Twelve Steps Toward the Clients



The second category involves conflict resolution. Conflicts may arise between the client and the lawyer, the lawyer and the client's family, the client and the family and so forth. The mitigation specialist — typically far better at listening and at dispute resolution than a lawyer — is able to diffuse and settle disagreements that may otherwise have disastrous consequences.

Step Nine: The Mitigation Specialist Must Take The Lead In Identifying Categories Of Experts And Locating Experts Who Will Personalize The Client And Explain The Client's Misconduct

It is critically important that the defense team not be in too much of a rush to take this step.

In the upcoming Diagnostic and Statistic Manual,42 the leading guide for mental health professionals, a complete social history will be required as a part of a psychiatric or psychological evaluation. What "complete" means will be open to interpretation, but it is very helpful to the expert if the social history investigation is nearing completion so that all relevant information is available. This is the reason that the defense team needs to wait if at all possible, to initiate the assessment(s). Occasionally, an evaluation needs to be "buried." However, the best experts are able to discover what it is that really makes our clients tick.

The time for selection of experts is the point at which the mitigation specialist's mental health background is particularly significant.43 The specialist must conduct a casual assessment of the client to aid in choosing the types of experts, as well as the specific individuals to do the evaluations. Oftentimes an attorney will want to use the same neuropsychologist repeatedly, but it is doubtful that any person could be the best person to work with every client. Individual clients have individual, frequently very specific needs, often requiring the defense team to obtain the assistance of experts who are outside of the locality or state where the litigation takes place. But experts, no matter how impressive, must not be left to make their own decisions regarding a client's needs.

Step Ten: The Mitigation Specialist Must Ensure That Experts Serve Their Purpose

Experts are very smart people. They often want to take control of the situation, diagnose, and treat the client. This can result in disaster. Each expert is employed for a specific purpose and is a cog in the greater machine designed to save the client's life. This maxim must guide all decisions regarding experts, which consider all relevant facts, including what information may end up in the hands of the prosecution. Each expert's role must be clearly defined and communicated by the defense team, usually with the mitigation specialist in the lead.

For example, psychiatrists and psychologists use personality testing to aid in diagnoses. Such testing, using instruments like the Minnesota Multi-Phasic Personality Inventory (MMPI), may provide helpful treatment tools, but can be extremely damaging for a capital penalty trial and should virtually never be administered to a client (for reasons beyond the scope of this article). Suffice it to say that the purpose of a thorough evaluation is not to diagnose the client, but to understand how the client's symptoms led to the capital crime. More than one psychologist has claimed — contrary to the teachings of endless prior cases — that their evaluation would have no credibility if personality testing was not done. Experts have given such tests after being specifically told not to do so. The mitigation specialist should be present during testing, if at all possible. Experts must not run the show. Strong oversight and intervention from the defense team is necessary to avoid runaway experts.

If all of these steps are followed, the team can close in on the home stretch.

Step Eleven: The Defense Team Must Put Everything Together To Develop A Compelling Picture
Of The Client's Life

The goal must never be "to justify or excuse the crime 'but to help explain it.'"44 Stated more expansively:

Equally important, mitigation is the unique set of facts surrounding one defendant's life. Its



Scanned Jun 18, 2013

Mitigation in The Death Belt - Twelve Steps To Saving Clients

specificity and concreteness attach to one individual. Mitigation is not a conclusory label ("abuse"), but a biography of disability and deficits, hardships and unchosen life experiences.45

The most effective presentation is composed of extensive lay testimony enhanced with demonstrative evidence that provide the elements of the picture that shows the path that led the client to kill. The elements are brought together through the testimony of the experts.

Step Twelve: Seek A Non-Trial Disposition

The goal of resolution is beyond question, "Counsel at every stage of the case has an obligation to take all steps that may be appropriate in the exercise of professional judgment in accordance with these Guidelines to achieve an agreed-upon disposition."46 Undoubtedly, the defense must be careful not to unnecessarily reveal mitigation evidence when doing so will work to the client's disadvantage at trial. That said, the duty to seek a plea for life lies at the foundation of the defense team's goal. Simply put, non-trial resolutions are not "reached" in death cases, they are won.

Never Give Up

The judicial system — and therefore capital litigation — is littered with politics and bureaucrats. Defense teams must continue to fight and fight even harder to get the time, the support and the resources necessary to defend our clients as required by these standards. If we do that much, the shame of putting our people to death will surely be erased from the halls of American justice. Notes

1. 536 U.S. 584, 122 S. Ct. 2428, 153 L. Ed. 2d 556 (2002).

2. Regardless, because judges shouldn't have all the fun, jurors were still death qualified — required to promise that they could kill to be allowed to sit in capital cases.

3 The Guidelines are reproduced with excellent commentary at http:// www.abanet.org/ deathpenalty/HofstraLawReview.pdf 31 Hofstra L. Rev. 903 (2003).

4. 539 U.S. 510, 123 S. Ct. 2527, 156 L. Ed. 2d 471 (2003).

5. 123 S.Ct. at 2531-2532.

6. Id. at 2532.

7. Id. at 2532-2533.

8. Id. at 2533.

9. Id. at 2535.

10. 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

11. 123 S.Ct. at 2536.

12. Id. at at 2536-2537, quoting Strickland v. Washington, 466 U.S. at 688.

13. See, e.g., Coleman v. Mitchell, 268 F.3d 417, 450 (6th Cir. 2001), quoting Carter v. Bell, 218 F.3d 581, 596 (6th Cir. 2000); Frye v. Lee, 235 F.3d 897, 904 n.7 (4th Cir. 2000).

14. 123 S.Ct. at 2537 (emphasis in original).

15. Id.

16. Id. at 2537-2538.

17. Id. at 2543 (citation omitted) (emphasis supplied).

18. Guideline 1.1(A).

19. Guideline 1.1(B).

20. Guideline 4.1(A)(1).

21. Guideline 10.4(C); commentary to Guideline 10.7 at 82.

22. Guideline 4.2(A)(2).

23. Commentary to Guideline 4.1 at 31 (footnotes omitted).

24. Id. at 33 (footnotes omitted).

25. Commentary to Guideline 10.7 at 71 n.181.

26. Commentary to Guideline 10.5 at 70 (footnote omitted).

27. Id.

28. Id. at 72 (footnote omitted).

29. Commentary to Guideline 10.7 at 81 (footnote omitted).

30. Id. at 83 (footnote omitted).

31. Id. at 84.

32. Commentary to Guideline 10.7 at 81, quoting Stetler, Mitigation Evidence in Death Penalty Cases, The Champion at 35 (Jan./Feb. 1999).

33. Id. at 81-82.

34. Id. at 84.

35. Id. at 85.

36. Id. at 82.

37. Commentary to Guideline 10.7 at 71.

38. Guideline 10.7(A)(2).

39. Hamblin v. Mitchell, 354 F.3d 482, 493 (6th Cir. 2003).

40. Commentary to Guideline 4.1 at 33 (emphasis supplied). This is of critical importance, because, "Counsel should seek a theory that will be effective in connection with both guilt and penalty, and should seek to minimize any inconsistencies."

41. Guideline 10.10.1(A).

42. American Psychiatric Association, 5th ed.

43. Commentary to Guideline 10.11 at 108, quoting Sundby, The Jury as Critic: An Empirical Look at How Capital Juries Perceive Expert and Lay Testimony, 83 Va. L. Rev. 1109, 1140-41 (1997).

44. Stetler, Mitigation Evidence in Death Penalty Cases, The Champion at 40 (Jan./Feb. 1999).

45. See Commentary to Guideline 10.11 at 108-109.

Scanned Jun 18, 2013

46. Guideline 10.9.1(A). n

**National Association of Criminal Defense Lawyers (NACDL)**
1150 18th St., NW, Suite 950, Washington, DC 20036
(202) 872-8600 • Fax (202) 872-8690 • assist@nacdl.org

Scanned  Jun 18, 2013



DX-9

MARY LOPEZ BUITRON, CSR, RPR
*Official Court Reporter - 94th District Court*

Scanned Jun 18, 2013



# Champion Magazine

### NATIONAL ASSOCIATION OF CRIMINAL DEFENSE LAWYERS

Who We Are

Press Room

News & Issues

CLE & Events

Committees

Members Only

Champion Magazine

Indigent Defense

Federal Legislation

White Collar

State Legislation

Affiliate Organizations

Lawyer Resources

Foundation

NACDL.org

DEFENDANT'S
EXHIBIT
9

🖨 Print or Email This Page



June 2004, Page 31

## Capital Cases-- Dimensions of Mitigation
*By Russell Stetler; Kathleen Wayland*

**Capital Cases-- Dimensions of Mitigation**

A process that accords no significance to relevant facets of the character and record of the individual offender or the circumstances of the particular offense excludes from consideration in fixing the ultimate punishment of death the possibility of compassionate or mitigating factors stemming from the diverse frailties of humankind. It treats all persons convicted of a designated offense not as uniquely individual human beings, but as members of a faceless, undifferentiated mass to be subjected to the blind infliction of the death penalty. *Woodson v. North Carolina*1

In 1976, the Supreme Court began defining what constitutes mitigation in capital cases, and it did so in the broadest conceivable terms — speaking of the "diverse frailties of humankind" as the source of mercy and empathy. Decades earlier the writer Arthur Koestler spoke of the "shuddering recognition of a kinship" which evokes the response "here but for the grace of God, hang I" in the face of a condemned prisoner at the gallows.2 The diverse frailties bestow the kinship of humankind. We all have them, to varying degrees. For most of us, the frailties are more than offset by the protective supports of family and society, as well as our individual strengths. For many capital clients, the frailties are overwhelming, and the supports are absent. Eighth Amendment jurisprudence confers compensatory protection to allow life-and-death decision makers to extend compassion on an individual basis.

Although many cases recite the tripartite formula of character, record, and circumstances of the offense, the U.S. Supreme Court has made clear that this formula is not a boundary. In *Skipper v. South Carolina*,3 the Court held that the defense should have been permitted to introduce evidence of "good adjustment" to jail even though it "would not relate specifically to petitioner's culpability for the crime he committed" because "there is no question but that such inferences would be 'mitigating' in the sense that they might serve as a basis for a sentence less than death."4

In *McCleskey v. Kemp*,5 the Court reminded that "States cannot limit the sentencer's consideration of any relevant circumstance that could cause it to decline to impose the penalty. In this respect, the state cannot channel the sentencer's discretion, but must allow it to consider any relevant information offered by the defendant."6

With *Atkins v. Virginia*,7 the Court extended a categorical protection to those prisoners who meet the criteria for mental retardation. These prisoners have been deemed so disabled as to require exemption from the capital punishment sentencing scheme altogether. But the Court has also recognized in its two recent ineffective counsel cases (*Williams v. Taylor*8 and *Wiggins*

Scanned Jun 18, 2013

Capital Cases-- Dimensions of Mitigation

*v. Smith9)* that even individuals who do not meet the strict criteria for exemption lie close enough on a spectrum of disability that their limited intellectual functioning also constitutes powerful mitigation.

The spectrum of disability that characterizes limited intellectual functioning has also been recognized by researchers in the mental health field. As noted in a discussion on the classification of mental disorders, "intelligence is a multifactorial construct with a variety of complexly interacting etiologies that is best described as a continuous variable . . . there does not appear to be a discrete break in its distribution that would provide a qualitative distinction between normal and pathologic intelligence."10 Although considerable thought and research support a selection of an IQ of 70 as providing a meaningful and reasonable point at which to characterize lower levels of intelligence as resulting in clinically significant impairment and the possible need for clinical intervention, this point of demarcation does not distinguish the presence versus absence of an underlying pathology. It is only one point along a continuous distribution of cognitive functioning. In addition, there are persons with IQs below 70 for whom a qualitatively distinct physical disorder is evident, such as Down's or Fragile X Syndrome, that can often be traced to a specific biological event.

The 2002 report of the President's Commission on Special Education also addressed the dimensionality of mental retardation, in this instance in the educational context. Speaking of mental retardation and other developmental disorders, the report noted that there are objective criteria for identifying the disorders, but continued, "However, the model for identification is like that used for obesity or hypertension, not measles or meningitis. The disorder is always a matter of degree on a dimension, not a disorder that you have or do not have, and identification is ultimately a judgment based on the need for services."11

Indeed, the need for services and the availability of funding for these services have always influenced the legal criteria for mental retardation. When the first Diagnostic and Statistical Manual (DSM) was published by the American Psychiatric Association in 1952, the degrees of intelligence defect used the same nomenclature as in later editions (mild, moderate, or severe) but very different numerical cutoffs:12

**DSM I (1952) DSM III (1980)**
Mild 70 to 85 55 to 70
Moderate 50 to 70 35 to 49
Severe below 50 20 to 34

In effect, the definition of mild (compared to severe) mental retardation was changed from subaverage intellectual functioning falling one standard deviation below the mean to two standard deviations. This adjustment sharply reduced the population eligible for services: a full scale score of 80 on the Wechsler IQ test ranks in the ninth percentile, whereas a score of 70 ranks in the second.

In *Williams v. Taylor*, one of the five categories of mitigating evidence which trial counsel had failed to introduce was borderline mental retardation13 and Williams' failure to advance beyond sixth grade in schooling.14 In *Wiggins v. Smith*, limited intellectual capacity,15 also characterized as borderline retardation16 and reflecting a full scale IQ of 79,17 is part of what the Court found to be powerful mitigation which the jury should have heard about.18

The Court's recognition of dimensionality in the area of mitigation is not new at all. Its most eloquent discussion, in fact, came in *Eddings v. Oklahoma*.19 While it declined to exempt from execution an individual who was only sixteen years old at the time of the crime, the Court noted:

But youth is more than a chronological fact. It is a time and condition of life when a person may be most susceptible to influence and to psychological damage. Our history is replete with laws and judicial recognition that minors, especially in their earlier years, generally are less mature and responsible than adults. . . . Even the normal 16-year-old customarily lacks the maturity of

Scanned Jun 18, 2013

Capital Cases - Dimensions of Mitigation

an adult. In this case, Eddings was not a normal 16-year-old; he had been deprived of the care, concern, and paternal attention that children deserve. On the contrary, it is not disputed that he was a juvenile with serious emotional problems, and had been raised in a neglectful, sometimes even violent, family background. In addition, there was testimony that Eddings' mental and emotional development were at a level several years below his chronological age. All of this does not suggest an absence of responsibility for the crime of murder, deliberately committed in this case. Rather, it is to say that just as the chronological age of a minor is itself a relevant mitigating factor of great weight, so must the background and mental and emotional development of a youthful defendant be duly considered in sentencing. 20

The reference to mental age "several years below his chronological age" is another way of describing low intellectual functioning, which is assessed in relation to age peers.

Neuroscientific research in the intervening two decades since Eddings has provided further evidence that the human brain continues to develop as individuals reach their early twenties.21 For example, maturational processes such as the increase and subsequent elimination ("pruning") of the brain's gray matter may not be completed until late adolescence. Research shows that myelination, the process by which the brain's white matter, or "insulation," refines the operation of neural networks regulating behavior, continues into the early twenties. Further, the brain myelinates from the more primitive to the more complex areas, with the frontal lobes being the last part of the brain to undergo this process. As the frontal lobes are the part of the brain that govern impulsivity, judgment, planning for the future, and ability to anticipate consequences, this research shows that neurodevelopmentally adolescents are less able to control and plan their behavior than are adults:

[B]rain scan techniques have demonstrated conclusively that... phenomena observed by mental health professionals in persons under eighteen that would render them less morally blameworthy for offenses have a scientific grounding in neural substrates.22

Taken together, brain anatomy data indicate that people are not biologically prepared to exercise mature emotional and behavioral control until they reach adulthood.

In the case of both age and intellectual functioning, the law has drawn a variety of bright lines. There is a minimum age to operate a motor vehicle, to vote, to drink alcohol, to serve in the armed forces, to serve as President of the United States, or to be eligible for execution. Numerous state and federal statutes have defined intellectual disabilities for purposes of benefits and protections. These bright-line tests provide a clear answer to some questions: a fifteen-year-old may not drink alcohol and a 29-year-old may not be elected president, regardless of their individual reputations for maturity and wisdom. The tests exclude or include individuals in particular legal categories. But they often tell us nothing beyond that legal fact. They tell us which individuals meet certain criteria for exclusion, but they tell us nothing about the individual characteristics of those who are not excluded.23

Age is more than a chronological fact, and intellectual functioning is more than an IQ score. The individual who has attained the minimum age to be served alcohol does not automatically drink responsibly. The individual whose IQ is in the 80s has an intellectual handicap, even if she does not meet the criteria for mental retardation. (And a generation earlier, when the criteria were different, she would have qualified!)

In medicine, the dimensionality of many disorders is well understood by physicians and patients alike. Obesity is well defined (body mass index of 30 or more), but the overweight individual (body mass index = 25.0 to 29.9) who does not quite meet the criteria for obesity is still at risk for heart disease, certain cancers, type 2 diabetes, stroke, arthritis, breathing problems, and psychological disorders (such as depression). Hypertension also has clear definition (blood pressure of 140 or more, over 90 or more). Borderline elevation (130-139 over 85-89) still puts the patient at risk to damage arteries, heart and kidneys, or suffer atherosclerosis or stroke. Large-scale epidemiologic studies have increased our awareness of the dimensional relationship between blood pressure and risk, and led to continual downward adjustments of readings considered to be problematic. 24

Scanned Jun 18, 2013



In mitigation, the dimensionality of human frailty means that categorical compassion (protection from execution for people with mental retardation or teenagers below a certain age) merely anchors one end of a spectrum. Those who are nearer that end are still very disadvantaged, even when they are outside the exempt category. They are functioning with brains that are damaged or not yet fully developed. They are behaving impulsively not by choice but because their regulatory apparatus is not working. We can all glimpse in the mirror of our own lives or those of our children how that impulsivity takes hold, and this glimpse, in turn, helps us to understand in our imagination how these capital clients see and experience the daunting world around them. It is a glimpse at once of frailty and kinship.

The mental health field has long recognized the importance and role of dimensionality in the expression of mental disorders. Physical disorders and diseases often have a specific, discrete event, pathogen or lesion, a core pathophysiology, and an associated array of signs and symptoms that mark the disorder as a discrete clinical condition. In contrast, mental disorders are often characterized by an "extraordinary and obstinate heterogeneity," whose richness is best captured on a dimensional model:

.. [W]e have overwhelming evidence that . . . disorders of behavior are, with minimal exception, the products of countless discrete, dimensional, interactive, and sequential influences: biological, psychosocial, and sociocultural; historic and current; "hardware" (i.e. innate brain characteristics and any acute or persistent physical insults to the central nervous system) and "software" (i.e. the "programs" and data loaded into that hardware system from birth to present); planned and accidental, including random bad luck.... To anticipate that the outcomes of these multiple, complexly interwoven and . . . highly idiosyncratic antecedent processes . . . will fall out naturally into neat, digital packages of the kind envisaged by a . . . [categorical] diagnostic system is to strain the limits of credibility.25

As is evident from the above, it is often more common for patients to exhibit co-occurring diagnoses than to meet criteria for a single diagnosis only.26 Anecdotal experience with many clients on death row suggests that this tendency towards co-occurrence, which is prevalent in the general population, is even more pervasive in capitally charged and convicted clients. The heightened vulnerability of this group may be understood in the context of the psychological literature on risk factors and resilience,27 which shows that exposure to adversity is not evenly distributed across the population. For example, children with competent and effective parents are exposed to fewer adverse life events than are children with less effective parents. Moreover, the accumulation of concurrent risk exposures is strongly related to poor outcomes on multiple measures of development. Severe marital discord, low socio-economic status, overcrowded living conditions, paternal criminality, maternal psychiatric disorder, and out-of-home placement are all variables associated with child psychiatric disorder. Children exposed to two of these factors have a fourfold risk of developing a psychiatric disorder than do children exposed to just one; with exposure to more than two of these factors, as is true for many capitally charged clients, the risk is exponentially increased. 28

Research also shows that for certain patients, symptoms remission is relatively rare. Again, this finding is true for clinical populations, where (in contrast to capitally charged and convicted clients) there is a greater likelihood of family support and access to psychopharmacologic treatment and other clinical interventions to address psychiatric difficulties. Given a very vulnerable population, it is likely that the general problems with symptom remission may be greatly exacerbated.

In the current DSM, criteria have been set to establish or rule out particular diagnoses (e.g. does the person meet five of nine possible symptoms, or three of seven, or two of five, etc.?). While empirical data provided the basis for decisions about criteria for some of the disorders, later research has sometimes shown that the criteria would have been different if the data had been collected in different settings, suggesting how arbitrary these decisions can be.29 The heterogeneity of mental disorders is a problem of such magnitude that the developers of the DSM-V face important decisions about whether to include alternative criterion sets for different ethnic, gender and cultural groups.30

Scanned   Jun 18, 2013

The problem of how to identify the boundaries between what is viewed as normal and what is considered abnormal is also seen in the addition of new diagnoses to subsequent editions of the DSM: the purpose of most new additions is to fill in the holes and gaps along the boundaries of existing categories,31 i.e., to describe a clinical problem which appears to occur on a continuum between an existing category of mental disorder and normal functioning.32  For example, recurrent brief depressive disorder is major depression with shorter episodes; acute stress disorder is PTSD with a shorter duration; mixed anxiety-depressive disorder describes subthreshold cases of mood and anxiety disorders; binge eating disorder concerns subthreshold cases of bulimia nervosa; bipolar II disorder fills in gaps between bipolar I and cyclothymia; and mild neurocognitive disorder concerns subthreshold cases of dementia, delirium, or amnestic disorder.  In each of these cases, the attempt was to capture clinically significant phenomena that signaled psychiatric difficulty but did not meet diagnostic criteria for an established disorder.

Dimensional approaches to the classification of mental disorders have gained support among some clinicians and researchers because of the recognition that many patients meet criteria for a number of different mental disorders.  For example, the average number of personality disorder diagnoses is often greater than four,33 and patients may meet criteria for as many as 7, 8, 9 and even 11 personality disorder diagnoses.34  Not surprisingly, the personality disorder diagnosis most frequently given is "Personality Disorder Not Otherwise Specified."

Ironically, the theory underlying the personality disorder category is that there is a clearly defined personality to be described ("persons have only one personality").35  While the categories as described in the DSM provide vivid and clear images of various personality disorders, when, as frequently occurs, the patient is not a prototypical type, the diagnosis is misleading and stereotypical, and fails to capture the complexity that actually exists.36  While the personality disorders are particularly problematic, the "Not Otherwise Specified" category is the most frequently provided diagnosis in general clinical practice,37 presumably because diagnostic nomenclature in its current form is inadequate in its ability to classify actual clinical phenomena under the time constraints of typical clinical practice.

Depression has been described clearly by physicians since antiquity, but it may also be a condition best understood using a dimensional approach.  In depression the debate over categorical versus dimensional models can be traced back for almost a century.

38  The current focus of the discussion is whether subclinical forms of depression lie on a continuum with clinical cases, or whether subthreshold and clinical cases represent qualitatively distinct phenomena.  A considerable body of data shows there are significant links between subclinical and full syndromal forms of depression, indicating that depressive syndromes occur on a continuum, i.e., that major depression as articulated in the DSM-IV may be a diagnostic convention imposed on a continuum of depressive symptoms of varying severity and duration.39

Observations of the longitudinal course of mental disorders reveal that the interweaving of some disorders is so frequent and pervasive that there is a basis to consider them alternative manifestations of a single disorder rather than co-occurring disorders.  For example, about 75 percent of patients with dysthymic disorder have a lifetime history of suffering from major depression.  As noted by leading researchers in this area:

How reasonable is it to consider these individuals as having two distinct disorders rather than a single disorder with more chronic and more episodic manifestations?  Such a view would be analogous to a chronic physical disorder (e.g. arthritis, asthma, or diabetes) in which acute exacerbations occur from time to time.  That some individuals do not have acute exacerbations (i.e., do not have major depressive episodes within dysthymia) or that others suffer primarily from relatively discrete episodes is not an argument against this view.  Rather, it speaks simply to the longitudinal heterogeneity of clinical presentation, which is likely as common among psychological disorders as physical illness 40

The dissociative disorders represent another cluster of conditions whose diagnosis is so subtle that clinicians, required to indicate a diagnosis if only for billing purposes, most frequently make the vaguest choice: "Not Otherwise Specified."  A more precise diagnosis will require not only

Scanned Jun 18, 2013

longitudinal observation, but also a meticulously documented social history. "Not Otherwise Specified" may in reality refer to many possibilities, from Post Traumatic Stress Disorder to Dissociative Identify Disorder or even Schizoaffective Disorder.

In the context of mitigation (as opposed to treatment), diagnostic precision is less significant than a rich and detailed inventory of symptoms, a carefully chronicled phenomenology of the client's mental anguish. Mitigation is an area where the law does not ask what mental disease or defect affects an individual's present functioning or mental state at the time of the offense. Instead, the law asks how individual frailties manifested over the course of a lifetime, whether through co-occurring mental disorders or chronic and episodic manifestations of one disorder.

Diagnostic debate often overshadows the tragic reality that two clinical snapshots may both reflect symptoms of frailty which should inspire compassion or mercy. Just as youth is still mitigating beyond statutory cut-offs and subaverage intellectual functioning is mitigating whether it measures one or two standard deviations on the spectrum of cognitive disability, so too are the waxing and waning symptoms of mental and emotional distress, even when there is diagnostic ambiguity. It is the symptoms themselves which are capable of evoking empathy and kinship, by providing context, explanation, and insight into the world as the capital client experiences it.

Notes:
1. 428 U.S. 280 (1976), at 303.
2. 2 As quoted in Witherspoon v. Illinois, 391 U.S. 510 (1968), at 520, n. 17. Koestler's Reflections on Hanging, 166-167 (1956).
3. 476 U.S. 1 (1986).
4. Skipper, at 4-5. The Ninth Circuit has recently interpreted Skipper as providing an "alternative forward-looking purpose" for mitigating evidence. In this view, "This alternative purpose has nothing to do with persuading the jury that the defendant is less culpable with respect to the crime because of some aspect of his family background, personal history, character, or mental capacity. Rather, as defined by the Supreme Court in Skipper v. South Carolina, the jury must 'consider[ ] a defendant's past conduct as indicative of his probable future behavior' and 'draw[ ] favorable inferences' about a defendant's 'probable future conduct if sentenced to life in prison.' 476 U.S. at 4-5 (emphasis added)." Belmontes v. Woodford, No. 01-99018, 2003 U.S. App. LEXIS 14127, at *93 (9th Cir. July 15, 2003). Indeed, in another recent California case, the Attorney General argued that it is too burdensome to ask prosecutors to produce "generic" mitigation evidence under Brady because "mitigation is in the eyes of the beholder" and "What may be offered as mitigating is really only limited by the imagination and creativity of defense counsel." In re Steele, No. S114551, Return to Order to Show Cause and Memorandum of Points and Authorities in Support of Return, filed June 27, 2003, at pp. 20 and 21.
5. 481 U.S. 279 (1987).
6. McCleskey, at 306.
7. 536 U.S. 304 (2002).
8. 529 U.S. 362 (2000).
9. 539 U.S. 510, 123 S.Ct. 2527 (2003).
10. T. A. Widiger and A. J. Frances, "Toward a dimensional model for the personality disorders," in P. T. Costa and T. A. Widiger, eds., Personality Disorders and the Five-Factor Model of Personality, 2nd edition (Washington, D.C.: American Psychological Association, 2002).
11. In October 2001, President Bush established the President's Commission on Excellence in Special Education to recommend reforms to improve the educational performance of children with disabilities. On July 9, 2002, the Commission issued its report, "A New Era: Revitalizing Special Education for Children and Their Families," available at the Department of Education's Web site at http: //222.ed.gov/inits/commissionsboards/whspecialeducation. See"Assessment and Identification" section, at p. 21.
12. American Psychiatric Association, Diagnostic and Statistical Manual, Mental Disorders (Washington, D.C.: American Psychiatric Association, 1952), pp. 23-24. American Psychiatric Association, Quick Reference to the Diagnostic Criteria from DSM-III (Washington, D.C.: American Psychiatric Association, 1980), pp. 25-26.
13. Williams, at 372, n. 4.
14. Id, at 396.
15. Wiggins, at 2532.

Scanned Jun 18, 2013

16. Id, at 2533.

17. Id, at 2536.

18. The category of "Borderline Intellectual Functioning" is now discussed under "Other Conditions That May Be a Focus of Clinical Attention": "This category can be used when the focus of clinical attention is associated with borderline intellectual functioning, that is, an IQ in the 71-84 range. Differential diagnosis between Borderline Intellectual Functioning and Mental Retardation (an IQ of 70 or below) is especially difficult when the coexistence of certain mental disorders (e.g., Schizophrenia) is involved." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, 4th edition, Text Revision (Washington, D.C.: American Psychiatric Association, 2000), p. 740.

19. 455 U.S. 104 (1982).

20. Eddings, at 115-6.

21. See Sharon Begley, "Getting Inside a Teen Brain," Newsweek, February 28, 2000, pp. 58-59, reporting findings of Jay Giedd of the National Institute of Mental Health (corpus callosum, the cable of nerves connecting the right and left hemispheres, "continues growing into your twenties") and Elizabeth Sowell of UCLA's Lab of Neuro Imaging (frontal lobes –responsible for such "executive functions as self-control, judgment, emotional regulation, organization and planning – undergo the greatest change between puberty and young adulthood). See also Jay N. Giedd et al., "Brain development during childhood and adolescence: a longitudinal MRI study, " Nature Neuroscience, v. 2, n. 10 (1999), pp. 861-3; and Elizabeth Sowell et al., "In vivo evidence for post-adolescent brain maturation in frontal and striatal regions, " Nature Neuroscience, v. 2, n. 10 (1999), pp. 859-61.

22. Declaration of Ruben C. Gur, Ph.D. in Patterson v. Texas, Petition for Writ of Certiorari to U. S. Supreme Court, J. Gary Hart, Counsel. Available online at www.abanet.org/crimjust/juvjus/ Gur%20affidavit.pdf.

23 See Susan L. Pollet, "Defining Adolescence and the End of Childhood in Family Court," New York Law Journal, August 18, 2003, pp. 4, 6. Quoting Wallace J. Mylniec, Pollet notes that "the law recognizes rigid demarcations between adulthood and childhood based on age. The age at which a child legally becomes an adult may vary from 14 to 21 for a particular event." (Mylniec, "A Judge's Ethical Dilemma: Assessing a Child's Capacity to Choose," 64 Fordham L. Rev. 1873, March 1996)

24. See The Seventh Report of the Joint National Committee on Prevention, Detection, Evaluation, and Treatment of High Blood Pressure, reported in the Journal of the American Medical Association (May 21, 2003), recommending a more aggressive approach to the diagnosis and management of hypertension and defining as prehypertensive systolic BP readings of 120 or more and diastolic BP readings of 80 or more.

25. R. C. Carson, "Dilemmas in the pathway of the DSM-IV," Journal of Abnormal Psychology, v. 100, n. 3 (1991), pp. 302-307.

26. T. A. Widiger and L. A. Clark, "Toward DSM-V and the classification of psychopathology," Psychological Bulletin, v. 126, n. 6 (2000), pp. 946-963.

27. See Ann S. Masten, "Ordinary Magic: Resilience Processes in Development," American Psychologist, v. 56, n. 3 (2001) for a discussion of factors associated with risk and adversity exposure and resilience.

28. See Michael Rutter, A. Cox, C. Tupling, M. Berger, W. Yule, "Attainment and Adjustment in Two Geographical Areas: The Prevalence of Psychiatric Disorder," British Journal of Psychiatry, 126, 1975, 493-509; Michael Rutter, B. Yule, D. Quinton, O. Rowlands, W. Yule, M. Berger, "Attainment and Adjustment in Two Geographical Areas: Some Factors Accounting for Area Differences," British Journal of Psychiatry, 126, 1975, 520-533; both in Michael Rutter, "Protective Factors in Children's Responses to Stress and Disadvantage," in Martha Whalen Kent, Jon E. Wolf, eds., Primary Prevention of Psychopathology: Social Competence in Children, 3, (Hanover, NH: University Press of New England, 1979), 51-53.]

29. Widiger and Frances, op. cit.

30. Widiger and Clark, op. cit.

31. Widiger and Clark, op. cit.

32. Thus, the number of diagnoses in the DSM has grown from approximately a hundred in the original edition (1952) to roughly three hundred in the latest (1994).

33. A. E. Skodol, L. Rosnick, H. D. Kellman, J. Oldhan, and S. E. Hyler, "Validating structured DSM-III-R personality disorder assessments with logitudinal data," American Journal of Psychiatry, v. 43, n. 6 (1988), pp. 1297-1299; T. A. Widiger. T. J. Trull, S. Hurt, J. Clarkin, and A.

Scanned Jun 18, 2013

Frances, "A multidimensional scaling of the DSM-III personality disorders," Archives of General Psychiatry. v. 44 (1987), pp. 557-563; and P. T. Costa and T. A. Widiger, "Introduction: Personality disorders and the five-factor model of personality," in P. T. Costa and T. A. Widiger, eds., Personality Disorders and the Five-Factor Model of Personality, 2nd edition (Washington, D.C.: American Psychological Association, 2002).

34. Widiger and Francis, op. cit.

35. T. A. Widiger, "Mental disorders as discrete clinical conditions: dimensional versus categorical classification," in S. M. Turner and M. Hersen, eds., Adult Psychopathology and Diagnosis, 3rd edition (New York: John Wiley & Sons, Inc., 1997).

36. To address this problem, some current research proposes the adoption of a dimensional, five factor model of personality disorders.

37. Widiger and Clark, op. cit.

38. S. A. Shankman and D. N. Klein, "Dimensional diagnosis of depression: Adding the dimension of course to severity, and comparison to the DSM," Comprehensive Psychiatry, v. 43, n. 6 (2002), pp. 420-426.

39. K. S. Kendler and C. O. Gardner, "Boundaries of major depression: An evaluation of DSM-IV criteria," American Journal of Psychiatry, v. 155, n. 2 (1998), pp. 172-177; Shankman and Klein. op. cit.

40. Widiger and Clark, op. cit., p. 956.

**National Association of Criminal Defense Lawyers (NACDL)**
1150 18th St., NW, Suite 950, Washington, DC 20036
(202) 872-8600 • Fax (202) 872-8690 • assist@nacdl.org

Scanned Jun 18, 2013



DX-10

MARY LOPEZ BUITRON, CSR, RPR
*Official Court Reporter - 94th District Court*

Scanned  Jun 18, 2013

**Dr. Martinez Time**
**John Henry Ramirez, Jr.**

| Date | Who Dr. Martinez met with | Time |
|---|---|---|
| 7/3/2008 | Jail | .25 |
| 7/16/2008 | John Henry Ramirez, Jr. | 2.5 |
| 7/18/2008 | Attorneys | 1.0 |
| 10/8/2008 | Attorneys | 1.0 |
| 10/15/2008 | Records Review | 1.25 |
| 10/27/2008 | Records Review | 2.25 |
| 10/27/2008 | Collateral Interview (Guadeloupe Hinojosa – Paternal Grandmother) | 1.75 |
| 10/27/2008 | Report Preparation | 1.5 |
| 10/29/2008 | Collateral Interview (Josie Smithwick - Teacher) | 1.5 |
| 10/30/2008 or 11/1/2008 | Collateral Interview   (Father?) | .5 |
| 11/1/2008 | John Henry Ramirez, Jr. | 2.25 |
| 11/9/2008 | Report Preparation | 2.0 |
| 11/12/2008 | Report Preparation | 1.5 |
| 11/15/2008 | Report Preparation | 2.5 |
| 11/15/2008 | Collateral Interview  (Guadalupe Alejandro – Maternal Grandmother) | 1.5 |
| 11/16/2008 | Collateral Interview (Guadalupe Alvarez – younger ½ sister) | .25 |
| 11/20/2008 | Attorneys | 1.5 |
| 11/28/2008 | Records review | .75 |
| 11/28/2008 | Report Preparation | 1.75 |
| 12/2/2008 | Report Preparation | 1.5 |
| Wednesday 12/3/2008 | Attorneys | .75 |
| 12/3/2008 | Records review | .25 |
| Friday 12/5/2008 | Report Preparation  (19 page Report dated 12/4/2008 - Thursday) | 2.0 |
| Sunday 12/7/2008 | John Henry Ramirez, Jr. & Attorneys | 1.0 |
| 12/7/2008 | Attorneys | 2.0 |
| Monday 12/8/2008 | Court – Testifying | .75 |



DEFENDANT'S
EXHIBIT
/0

Scanned Jun 18, 2013



DX-11

MARY LOPEZ BUITRON, CSR, RPR
*Official Court Reporter - 94th District Court*

Scanned  Jun 18, 2013

Ramirez arguments 112708.txt

People are not born criminals
People are not born with bad judgment
Ramirez was abused by his mother / she destroyed his ability
to feel self esteem / he belittled him / there was nothing he could
do right / here was nothing he could do to please her / he wanted
her love and wanted to please her / he was a runt / the boy called
it / he was abandoned by his father/ he had not role model/

he joined the Marine Corps to make a new beginning / he wanted to do
something he could call his own / something he could claim as a basis for people
to respect him / visited his old school teacher in his uniform / look what I have
done / I know I was bad in high school, but not I have done something that
will make you proud of me  / he was seeking love, approval, respect


attitude makes the difference



DEFENDANT'S
EXHIBIT
4

Page 1

Scanned  Jun 18, 2013

```
 1  THE STATE OF TEXAS )

 2  COUNTY OF NUECES   )

 3

 4       I, Mary Lopez Buitron, Official Court Reporter in and

 5  for the 94th District Court of Nueces County, Texas, do hereby

 6  certify that the following exhibits constitute true and

 7  complete duplicates of the original exhibits, excluding

 8  physical evidence, offered into evidence during the trial in

 9  the above-entitled and numbered cause as set out herein before

10  the Honorable Bobby Galvan, Judge Presiding for the 94th

11  District Court of Nueces County, Texas, and a Writ hearing,

12  heard on September 14, 2011; September 26, 2011; and October

13  21, 2011.

14

15  WITNESS MY OFFICIAL HAND on this,

16  the 6th day of December, 2011.

17

18

19  MARY LOPEZ BUITRON, CSR, RPR, Texas CSR #3720
    Expiration Date:  12/31/2013
20  Official Court Reporter,
    94th District Court
21  Nueces County, Texas
    901 Leopard, Room 901
22  Corpus Christi, Texas 78401
    (361) 888-0658
23

24

25
```

MARY LOPEZ BUITRON, CSR, RPR
*Official Court Reporter - 94th District Court*