Scanned  Jun 18, _013

1  on the case.

2     Q.  And procedurally speaking in a death case,

3  you receive a report from the mitigation expert and

4  then you take that report and then you incorporate

5  that into your decision-making process on what tests

6  to administer; correct?

7     A.  Most of the time, yes.  Occasionally, the

8  mitigation report may come in later, and then you have

9  to decide is there something else I need to do?

10     Q.  On all those cases that you've done the

11  psychological assessment for the capital case, that

12  was all completed prior to trial; correct?

13     A.  Way before trial.

14     Q.  Like a year, six months?  Well before trial?

15     A.  Well before trial.

16     Q.  You heard Dr. Martinez's testimony today and

17  you saw that summary of his records about when he

18  began the testing.  Did that cause you alarm?

19     A.  Yes.

20     Q.  Because of the untimeliness in the

21  investigation?

22     A.  Yes.

23     Q.  Now, do you have your report up there with

24  you, Dr. Murphey?

25     A.  Yes.

Scanned  Jun 18, 2013

1      Q.   Could you please tell us what testing you

2  administered to John Henry Ramirez in this case?

3      A.   Yes.   Clinical and mental status interview,

4  the Wechsler Abbreviated Scale of Intelligence.

5      Q.   Can't quite hear you, Doctor.

6      A.   I'm sorry.   Clinical and Mental Status

7  Interview, the Wechsler Abbreviated Scale of

8  Intelligence, Quickview Social History, the Minnesota

9  Multiphasic Personality, Personality Inventory-2

10  Reformulated, the Millon Index of Personality Styles,

11  and the Symptom Checklist - Revised, review of

12  collateral records, and telephone interview with

13  Dr. Troy Martinez.

14      Q.   Now, that testing that you performed, what

15  was your general conclusion about John Henry's state

16  of depression?

17      A.   That it was extremely high.

18      Q.   And what's that indicate to you?   In other

19  words, why do we care if his depression is high?

20      A.   Because it's going to influence his thinking.

21      Q.   In a negative way or a positive way?

22      A.   In a negative way.

23      Q.   And how so?

24      A.   Well, I guess it would be similar to if we

25  put on very dark-colored glasses.   We would view the

Scanned  Jun 18, 2013

114

1    world in a distorted and darker way than might be the

2    case.

3         Q.   Now, you heard Dr. Martinez testify today

4    that on December 7th, 2008 when he met with John Henry

5    at the jail, that from John Henry's point of view at

6    the time, his conclusions seemed logical and sound.

7    Did you hear that testimony today?

8         A.   Yes, yes.

9         Q.   Now, what is your thoughts about that?

10        A.   Well, on -- for example, on the MMPI-2, I

11   have never seen suicidal -- there's a scale called the

12   suicide index.  I've never seen one as high in my

13   years of practice.

14        Q.   As John Henry scored?

15        A.   That's correct.  So what it tells me is that

16   while he may not be crying and have obvious visual

17   signs of depression, that his thinking is certainly

18   suicidal -- highly suicidal, and there were

19   cynicism -- other scales consistent with that that

20   also were in the clinical range.

21        Q.   Now -- by the way, did you review

22   Dr. Martinez's report dated August 31st of 2011?

23        A.   Yes, I did.

24        Q.   And did you --

25             BY MR. GROSS:  May I approach, Your

MARY LOPEZ BUITRON, CSR, RPR
*Official Court Reporter - 94th District Court*

Scanned Jun 18, 2013

115

```
1    Honor?
2              THE COURT:  Yes, sir.
3         Q.  (BY MR. GROSS) Did you see in there on page 4
4    of 5 where Dr. Martinez says that -- that John Henry
5    Ramirez told Dr. Martinez that if he wasn't so
6    depressed, he probably would make a different decision
7    about this case?
8         A.  Yes.
9         Q.  And in context, Dr. Martinez was looking to
10   see if John Henry was okay to waive this writ; right?
11        A.  That's correct.
12        Q.  But the key I was wanting to note from you
13   about is how accurate that is in a statement by John
14   Henry?  If someone is that depressed, does that really
15   affect their decision-making process?
16        A.  Absolutely.
17        Q.  And that's something that Dr. Martinez saw on
18   August 31st, 2011; correct?
19        A.  Correct.
20        Q.  And it's consistent with what your testing
21   showed all the way back in 2009; right?
22        A.  Yes.
23        Q.  Now if you would please look at page 42 of
24   your report.
25        A.  Okay.
```

Scanned  Jun 18,  2013

1     Q.   In that second paragraph there --

2     A.   Okay.

3     Q.   -- the paragraph that begins,

4  "Dr. Martinez reported."

5     A.   Yes.

6     Q.   That paragraph deals with Dr. Martinez's

7  interview of John Henry Ramirez in the jail on

8  December 7th, 2008; correct?

9     A.   Yes.

10     Q.   Had you been the forensic psychologist on the

11  case and tasked with making a determination as to

12  whether or not John Henry could waive mitigation,

13  given the fact he had just been convicted of capital

14  murder two days before and just given the fact that

15  his father had testified at sentencing and given his

16  history in the Marine Corps; right?

17     A.   Yes.

18     Q.   Cause -- what was his history, by the way, in

19  the Marine Corps, psychologically?

20     A.   Well, there was a significant suicide attempt

21  while in the Marine Corps.

22     Q.   And what did the -- the health care providers

23  in the Marine Corps, the psychologists and

24  psychiatrists, how genuine did they perceive John

25  Henry's suicidal ideations and attempts at suicide?

1   A.   As very genuine.

2   Q.   So there was no question that he was suicidal

3   and depressed in the Marine Corps; right?

4   A.   That's correct.

5   Q.   And given all the history you saw of the

6   depression, if you put yourself in Dr. Martinez's

7   shoes at the jail on December 7th, 2008, making a

8   determination as to whether someone was able to make a

9   rational decision, what would you have done

10  psychologically to help you decide whether or not the

11  Defendant could make such a decision?

12  A.   Psychological testing and a psychiatric

13  evaluation regarding possible medication.

14  Q.   And what kind of psychological -- further --

15  I mean, he did psychological testing, right, the PAI?

16  A.   Well, it was invalid.

17  Q.   And why?

18  A.   Well, I don't know why.  He just reported in

19  his report that the PAI was invalid, so there was no

20  data.

21  Q.   Which would cause you even more concern;

22  right?

23  A.   Yes.

24  Q.   So Dr. Martinez's file established the only

25  test he administered to John Henry was for whatever

MARY LOPEZ BUITRON, CSR, RPR
*Official Court Reporter - 94th District Court*

Scanned  Jun 18, 2013

118

1  reason invalid; correct?

2      A.   Yes.

3      Q.   And so did Dr. Martinez have any kind of

4  psychological testing basis whatsoever to make a

5  determination as to whether or not John Henry was

6  competent to make that decision on December 7th?

7      A.   No, no objective data.

8      Q.   You mentioned that you would have done

9  testing.  What kind of testing would you have done?

10 What you did in this case?

11     A.   Yes.

12     Q.   What did the testing that you performed in

13 this case show besides that high level of -- of

14 suicidal ideation?

15     A.   Well, it was very consistent with the

16 developmental history, family problems, issues with --

17 let me just look at it and I can tell you better.

18 Clinical elevation on a scale called demoralization

19 somatic complaints.

20     Q.   And what does that tell you?

21     A.   Feeling demoralized, feeling very badly about

22 himself.

23     Q.   And does that potential affect one's

24 decision-making ability?

25     A.   Yes.

MARY LOPEZ BUITRON, CSR, RPR
*Official Court Reporter - 94th District Court*

Scanned Jun 18, 2013

119

```
1        Q.    What else did you find?
2        A.    That he had had some anti-social behavior.
3  He had an elevation on hypomanic activation.
4        Q.    And what does that tell you?
5        A.    Well, need to rule out a bipolar disorder
6  would be my first thought.
7        Q.    And, of course, bipolar disorder is a severe
8  mental disease or defect; correct?
9        A.    That's correct.
10        Q.    And it could also affect decision-making
11  ability; right?
12        A.    Yes.  An elevation on malaise on neurological
13  complaints and --
14        Q.    Which tells you what?
15        A.    That he is complaining of bodily problems,
16  thinking problems, other problems, again, the suicidal
17  depth ideation almost off the chart.  It's as high as
18  it can go.  Helplessness, hopelessness, self-doubt,
19  anxiety elevations, that he had juvenile conduct
20  problems, had problems with substance abuse, family
21  problems, had interests in mechanical, physical
22  things.  Those are the --
23        Q.    So what do these things tell you about John
24  Henry's ability to make a -- a rational, logical
25  decision on whether to waive mitigation?
```

Scanned  Jun 18, 2013

120

1    A.  Well, this is a very depressed man making a

2   decision from that view, the view of a depressed man.

3    Q.  And when you look at page 42 of your report

4   in that second paragraph, towards the middle --

5    A.  Okay.

6    Q.  "-- Dr. Martinez did not indicate having

7   considered that John was clinically suicidal during

8   this time frame because of an undiagnosed mental

9   disorder.  When John made this essentially suicidal

10   statement, Dr. Martinez did not propose any further

11   specific testing for depression.  In fact,

12   Dr. Martinez never attempted specific testing for the

13   presence of depression or any other serious mental

14   disorder.  John's statement that he thought the

15   presence of the jury might do the opposite of his

16   request to ask for the death penalty is not a logical

17   statement.  However, Dr. Martinez did not consider the

18   statements potentially reflect of any distortion in

19   John's thought process.  In this evaluator's opinion

20   --" meaning yours "-- the evaluation of John's

21   decision to forego testimony about mitigating

22   circumstances was badly flawed.  It is more likely at

23   the time of making this decision John was suicidal and

24   irrational based on the data reported by

25   Dr. Martinez."

1        What -- what do you mean by all that in a

2   nutshell?  That Dr. Martinez screwed up and should

3   have done more testing?

4        A.  Well, obviously, that's not language I'm

5   going to choose to use, but what I would use is that I

6   think it did not meet the standard that most

7   psychologists would employ if they were going to offer

8   an opinion about somebody's mental function.

9        Q.  So -- so that did not meet the standard of

10  care that would be recognized in your -- in your

11  psychological field; correct?

12       A.  I -- yes, that's correct.

13       Q.  And as a result of that, is it basically your

14  conclusion that they missed the boat, that John was

15  not able to make a rational decision to waive

16  mitigation?

17       A.  That's my opinion, yes.

18       Q.  And what other opinions did you have in this

19  case, Dr. Murphey?

20       A.  Well, that John is a bright man with a

21  horrific, absolutely horrific early childhood, that

22  there are possible post-traumatic issues for him,

23  combined with serious substance abuse, which is

24  self-medicating pain, and that had he grown up in a

25  different environment, he probably would be a very

1    productive member of society given his native

2    intelligence.

3        Q.   And this -- these opinions that you have

4    garnered on John Henry are based on the independent

5    affidavits provided by our mitigation expert,

6    Mr. Byington; correct?

7        A.   Yes.

8        Q.   And all the records that you reviewed?

9        A.   Yes.

10       Q.   But more importantly, wouldn't you agree,

11   that -- that they're confirmed by the family member

12   affidavits that Gerry Byington obtained in this case?

13       A.   Yes.

14       Q.   And the last question for you, all of the

15   concerns you have about John Henry's upbringing and

16   abusive childhood, those were all right out of the

17   records you reviewed in this case; correct?

18       A.   Yes.

19       Q.   And what you're outlining on those pages we

20   talked about in your report?

21       A.   Yes.

22       Q.   And the last question is how does abusive

23   childhood upbringing potentially affect one's

24   decision-making processes down the road?

25       A.   Well, we know that early severe abuse simply

1   rewires brain functioning, and that people who suffer

2   that, in fact, may never be really well; that it is

3   devastating, and the earlier and the more severe, the

4   more that seems to be the case.

5       Q.   And you agree that that's what John Henry

6   suffered from --

7       A.   Yes.

8       Q.   -- in part?  Thank you, ma'am.

9            MR. GROSS:  No further questions, Your

10  Honor.

11           THE COURT:  All right, cross?

12           MR. NORMAN:  Yes, Your Honor.

13               CROSS-EXAMINATION

14  BY MR. NORMAN:

15      Q.   Doctor, is being suicidal in itself a

16  clinical diagnosis indicating a mental illness?

17      A.   There's no DSM diagnosis for suicidal

18  ideations, no.

19      Q.   So isn't it possible that a rational mentally

20  healthy person could logically choose a course of

21  conduct that would, in effect, end his life -- his or

22  her life?

23      A.   Not in my opinion given good health.

24      Q.   So someone who's in good health could never

25  choose a course of conduct that would end their life,

Scanned Jun 18, 2013

1   logically choose that?

2       A.   That's correct.

3       Q.   So as -- if I'm understanding you, Doctor, no

4   one in Mr. Ramirez's situation even if he were

5   completely healthy, even if he had no symptoms at all

6   of depression, let's say, no one could logically have

7   made the decision he made to not present a -- a

8   mitigation case cause that would in effect end his

9   life?

10      A.   Well, in fact, suicidal ideation is very

11  connected to hopelessness, that a person can see

12  nothing good about their life and no chance for that

13  to change.  And that is kind of the key, if you read

14  literature on who takes their life, most people are

15  wanting out of the pain that they're in; and I think

16  there is always a level of depression in that.

17           I don't see a happy person going on in

18  their life coming in and saying, you know, "I think

19  I'll end my life today, just feels like a good day to

20  do that."

21      Q.   Are you saying then it would be illogical for

22  someone, let's say, with a severe form of cancer

23  suffering greatly to decide to discontinue treatments

24  and in effect die earlier rather than suffer the pain

25  of that disease?  That would not be a logical

Scanned  Jun 18, 2013

1  decision?

2      A.   Absolutely, I'm not saying that.   In that

3  situation, that might be a very logical and humane and

4  well thought-out decision.

5      Q.   So it is possible for a logical person to

6  decide on a course of conduct to end their life in a

7  shorter period of time?

8      A.   Yes.

9      Q.   Okay.   Doctor, you mentioned that

10  Dr. Martinez -- Martinez's report that there was a PIA

11  (sic) that was not completed.   Isn't it true that the

12  results were invalid due to overendorsement of signs

13  and symptoms of psychopathology ruling the remainder

14  of the instrument unintelligible?

15      A.   Yes.

16      Q.   So could you explain that to us in layman's

17  terms?

18      A.   Yes.   All good psychological instruments have

19  validity scales, the MMPI-2 by far having the most

20  stringent validity scales.   But the PAI does have I

21  think three.   It has at least two and maybe three,

22  so nothing like some other test instruments.   But if

23  you endorse over a certain number of problems, then it

24  will come back as invalid.

25      Q.   And could you explain -- when you say

1   overendorse, could you explain that in layman's terms,

2   Doctor?

3       A.   Sure.  If you admit to too many problems.

4       Q.   So, in other words, this is part of lack of

5   cooperation by the subject; isn't that correct?

6       A.   No.

7       Q.   Okay.  Could you explain that, Doctor?

8       A.   I think you'll find that the MMPI-2 that I

9   gave him that there was also a tendency to over-report

10  symptoms.  I think in its own way it is a cry for

11  help.  It is a way of saying, "I'm sick.  I am very

12  sick.  I don't think anybody is listening, look at how

13  many problems I have."

14      Q.   Well, in spite of being a cry for help, I

15  mean, isn't it true that it's basically saying you're

16  not being entirely truthful to the examiner?

17      A.   That is one possible conclusion that a person

18  can make if you think somebody is malingering in some

19  way.  The other is a cry for help.  And it simply is

20  up to the person evaluating the person to try to

21  decide what they think that validity scale represents.

22      Q.   And is it true that you didn't give him any

23  specific tests to rule out malingering?

24      A.   Well, certainly the MMPI-2 has ten validity

25  scales; and if he were malingering, that would be the

Scanned  Jun 18, 2013

1  best instrument probably to catch that.  There's

2  another test that would be the second called the Test

3  of Memory Malingering, or something like that that's

4  sometimes used, but there was no reason to -- to

5  suspect that Mr. Ramirez was malingering.

6      Q.  Well, Doctor, on page 2 of your report, you

7  also come to the conclusion Mr. Ramirez was attempting

8  to appear more pathological than the case may be?

9      A.  Yes.  He was definitely going to tell me

10  everything negative about himself and nothing

11  favorable.

12      Q.  Isn't that a form of malingering, Doctor?

13      A.  I think it's a cry for help.

14      Q.  It could also be a form of malingering,

15  couldn't it?

16      A.  It could be.  It's my opinion that it is not,

17  and that -- that is how I viewed Mr. Ramirez.

18      Q.  Isn't it true that Mr. Ramirez stated that he

19  wanted to be put to death because he didn't want to

20  spend the rest of his life on death row?

21      A.  Yes.

22      Q.  Is there anything illogical about someone

23  choosing death as more acceptable than life in prison?

24      A.  I've never been in prison.  I don't have a

25  basis to compare that, but I do think that a decision

Scanned  Jun 18, 2013

128

1  from a depressed person is not a rational decision. I

2  mean, we don't put people to death who are not

3  competent enough to be put to death.  And I don't

4  think that Mr. Ramirez is a person capable of making a

5  rational decision.

6      Q.  Doctor, are you familiar with the

7  standards -- the legal standards for competency to

8  stand trial?

9      A.  For competency to stand trial?

10      Q.  Yes.

11      A.  Yes, I am, and I'm certified to perform

12  competency evaluations.

13      Q.  Did you perform such evaluation on

14  Mr. Ramirez?

15      A.  No.

16      Q.  Do you have any reason to believe he was

17  incompetent to stand trial?

18      A.  No.

19      Q.  So he at least met the base requirements for

20  being competent to stand trial?

21      A.  I didn't do such evaluation on him.  I was

22  not asked to perform that type of evaluation.

23      Q.  Well, let me ask -- I'm sorry.

24      A.  I found no reason to suspect that he was not,

25  but I did not perform a competency evaluation.

MARY LOPEZ BUITRON, CSR, RPR
*Official Court Reporter - 94th District Court*

Scanned  Jun 18, 2013

1    Q.   Okay.  Well, let me just go over the two --

2    the two particular standards there.  You found nothing

3    to indicate that at the time of trial he didn't have

4    the ability to consult his lawyers with a reasonable

5    degree of rational understanding; isn't that correct?

6    A.   I didn't see him before his trial.

7    Q.   I'm asking you, you found nothing to suggest

8    that he didn't have that?  In other words, you had no

9    information that would challenge that?

10   A.   I never spoke with the attorneys who

11   conducted his trial so I would have no information

12   about that at all.

13   Q.   Okay.  You have no information --

14   understanding you didn't talk to him, but you have no

15   information at this point to say that he lacked

16   rational as well as the factual understanding of the

17   proceedings against him?

18   A.   No, I don't have any information, period.

19   Q.   Okay.  That's all I was asking about, Doctor.

20   Are you aware that Mr. Ramirez had been incarcerated

21   at least in county jail for some time before he made

22   the decision he did about mitigation?

23   A.   Yes.

24   Q.   Okay.  In that period of time, it would have

25   given him at least some indication about what life

1   behind bars was like, wouldn't it, what the jail or

2   prison culture was like?

3        A.   To some degree.

4        Q.   During your most recent visit, did

5   Mr. Ramirez ever indicate to you that he wished he

6   could have changed his decision at trial and instead

7   presented mitigation evidence?

8        A.   No.

9        Q.   So he's been consistent about that, has he

10  not?

11       A.   I did not speak to him at length about that.

12  But no, he did not say to me, "I made a bad decision,

13  and I wish I changed my mind."

14       Q.   And you have nothing to indicate that his

15  reasons for making that decision might have been

16  changed over time -- might have changed over time?

17       A.   Well, I do have some information about that

18  from the current mitigation specialist that in fact

19  that opinion has changed, reversed, and changed again.

20  So I think that as best I can understand it when

21  Mr. Ramirez feels that he has family support and

22  family contact that he considers that maybe life is

23  worth living, and when he does not, he feels that it

24  is not.

25       Q.   We're talking about one change of decision,

Scanned  Jun 18, _013

1    are we not, within the last couple of months?

2        A.   I have not had contact with him since I

3    finished my evaluation so I can't speak specifically

4    to that.

5        Q.   Okay.  Did Mr. Ramirez during your

6    discussions with him ever indicate that he was

7    mistaken how about prison culture was?  Did he ever

8    indicate to you that it was not as bad as he thought

9    it was going to be?

10       A.   No, we didn't talk about that at all.  He

11   made a statement about, like, it being a trash life or

12   something like that, but other than that, we did not

13   discuss his incarceration.

14       Q.   Okay.  Now, Doctor, in your report on page

15   42, I believe you mentioned Mr. Ramirez's statement

16   that he decided not to ask the jury for the death

17   penalty because he was afraid they might do the

18   opposite.  You mentioned that this was not a logical

19   statement.  Why is that not a logical statement?

20       A.   I just don't see that asking a jury to put

21   you to death would keep a jury from making a finding

22   one way or the other.

23       Q.   Well, isn't it logical to suppose that some

24   jurors might feel sufficiently angry with Mr. Ramirez

25   after the case had been presented against him that

Scanned  Jun 18, 2013

1    they would want to give him what he considered to be

2    the harshest sentence, which in his mind would be a

3    life sentence?

4         A.   Well, I guess anything is possible, but I

5    think most rational jurors would hopefully make a

6    decision based on the evidence presented and the

7    mitigating evidence and that's what they should make

8    their decision on.

9         Q.   So it is possible you could have some jurors

10   out there who are angry with Mr. Ramirez who would

11   want to give him what they consider the harshest

12   sentence?

13        A.   You could have that regardless.

14        Q.   Okay.  Are you aware that even if one juror

15   was angry by some such feelings -- angry by such

16   feelings, one juror could have changed the result, and

17   Mr. Ramirez could have gotten the life sentence rather

18   than the death sentence?

19        A.   Sure, I'm aware of that.

20        Q.   Okay.  Doctor, is it rational as well for a

21   defendant to want to spare his family embarrassment of

22   coming in and testify in a trial like this?

23        A.   Ask that question again.

24        Q.   Sure.  Isn't it rational for a defendant to

25   want to spare his family of the embarrassment and pain

1    of testifying in court and being subject to

2    cross-examination?

3         A.    I don't know the answer to that.

4         Q.    Doctor, in your report you mentioned that

5    Mr. Ramirez is not cognitively or intellectually

6    impaired, but he may harbor distorted or even

7    delusional beliefs.  What sort of distorted or

8    delusional beliefs are you referring to?

9         A.    Well, there's a tremendous amount of

10   cynicism.  I think the things that I went over in the

11   MMPI that, in fact, people may be out to do him harm

12   when no harm is intended.  He's very suspicious.  That

13   he sees things through the lens of an abused child,

14   and that's how he views the world.

15        Q.    You have no indication that he's delusional

16   in a clinical sense, do you?

17        A.    No.

18        Q.    Okay.  Doctor, it's normal for someone under

19   death sentence to be depressed, wouldn't you agree?

20        A.    Mostly, yes.

21        Q.    So if you're comparing someone under a death

22   sentence as opposed to someone who's, let's say in a

23   normal situation, then you would expect that person to

24   be more severely depressed, wouldn't you?

25        A.    Yes.

```
 1        Q.   Okay.
 2        A.   And not just the death sentence itself, but
 3   the circumstances that these people often find
 4   themselves in.
 5        Q.   Well, wouldn't it be, in fact, normal for
 6   them tc be depressed?
 7        A.   Yes, actually, the biggest complaint is sleep
 8   disorders.
 9        Q.   You mentioned, Doctor -- if you look at the
10   screen here -- the doctoral degree, and Dr. Martinez,
11   I believe, you mentioned he had a PsyD.  Would someone
12   with a PsyD, wouldn't that qualify them to a greater
13   extent to do counseling than, in fact, a
14   research-oriented doctoral degree?
15        A.   No.
16        Q.   No?
17        A.   No, my training was psychoanalytical.  So I
18   was very well-trained in the techniques of
19   psychotherapy, but we also had to do a year of
20   research, so like it or not, you do it.
21        Q.   Would you agree that Dr. Martinez, his degree
22   focused -- his degree focused, in fact, on the
23   clinical counseling aspects of psychology?
24        A.   Likely, I -- I don't know for sure his
25   curriculum, but that's not likely.
```

Scanned  Jun 18, 2013

```
1        Q.   So you don't really know what his curriculum
2    was --
3        A.   No, I'm just seeing his curriculum --
4        Q.   -- what the requirements --
5        A.   -- from his PsyD program.
6        Q.   Okay.  You have no training as a mitigation
7    expert, do you?
8        A.   I have no specific training as a mitigation
9    expert.  Obviously, I do C.E. hours and know some
10   about that, but I would never take a job as a
11   mitigating expert.
12       Q.   Isn't it true that a mitigation case would be
13   billed over time, and you would be continuing updating
14   that, wouldn't it, even until the first of trial?
15       A.   Yes, and I think it also -- the skill also
16   has a lot to do with jury selection, which is an art
17   or science to itself.  And so, if you are going to do
18   that, you need to be someone well-versed in all
19   those elements.  I know very little about jury
20   selection.
21       Q.   You couldn't point to any one particular
22   thing that you've discovered during your analysis of
23   Mr. Ramirez that would have been a key concept in
24   mitigation that was not available to the defense team
25   at the time he made the decision he did, can you?
```

MARY LOPEZ BUITRON, CSR, RPR
*Official Court Reporter - 94th District Court*

Scanned  Jun 18, 2013

1    A.   I don't know.  I think that's a question for

2   Mr. Byington because he has done the mitigation

3   review; and whether he's uncovered additional

4   information that was not available then, I do not

5   know.

6    Q.   Okay.  But you can't as a psychologist -- as

7   a forensic psychologist point to one smoking gun there

8   and say, "Ah-ha, if he only had that it would have

9   made a difference in the mitigation case," and it's

10   clear he didn't have that?

11    A.   No, I can't do that.

12           MR. NORMAN:  Okay.  I pass the witness,

13   Your Honor.

14           THE COURT:  Anything else?

15           MR. GROSS:  No more questions, Your

16   Honor.

17           THE COURT:  All right.  You're free to go

18   about your business.  Call your next witness.

19           MR. GROSS:  Gerry Byington, Your Honor.

20           THE COURT:  Okay.

21           MR. GROSS:  Your Honor, can we take a

22   brief five-minute comfort recess?  He is my last

23   witness today, and he should only last about an hour.

24           THE COURT:  Yes, sir.

25           MR. GROSS:  Cause after him all I have

MARY LOPEZ BUITRON, CSR, RPR
*Official Court Reporter - 94th District Court*

1    left, Your Honor, is the cross of Mr. Jones.

2              THE COURT:  Okay.  I mean, here's the

3    thing, that's about what we have is about an hour.

4              MR. GROSS:  Oh, okay.

5              THE COURT:  Okay.

6              MR. GROSS:  If we just have a real brief

7    five-minute --

8              THE COURT:  Yeah, okay.

9              THE BAILIFF:  All rise.

10             (Brief recess.)

11             THE COURT:  All right.  Call your next

12   witness.

13             MR. GROSS:  Gerald Byington.

14             (Oath administered.)

15             THE COURT:  All right.  You may proceed.

16

17                   GERALD BYINGTON,

18   having been first duly sworn, testified as follows:

19                 DIRECT EXAMINATION

20   BY MR. GROSS:

21        Q.   Would you please tell us your name, sir.

22        A.   Gerald Byington.

23        Q.   And what do you do for a living?

24        A.   I'm a mitigation specialist.

25        Q.   Could you please tell us your educational

1    background.

2        A.    I have a Bachelor's with a double major in

3    political science and psychology, and a Master's

4    degree in social work from the University of

5    Wisconsin, Milwaukee.

6        Q.    And what does your practice mainly involve

7    currently?

8        A.    At this point, for the last ten years, I've

9    been doing -- providing mitigation to attorneys who

10   are representing capital death penalty clients.

11       Q.    And real approximately, real roughly, how

12   many cases have you acted as the defense mitigation

13   expert in a death case?

14       A.    In excess of a hundred.

15       Q.    Now, you heard the testimony by Dr. -- and at

16   my request, you were appointed as the defense

17   mitigation expert on this writ; correct?

18       A.    Yes.

19       Q.    And as a result of that, you conducted a

20   mitigation investigation for me; correct?

21       A.    Yes.

22       Q.    And the attachments to the writ from the

23   affidavits that -- Exhibit D through J that the Judge

24   has taken judicial notice of already, are affidavits

25   from Guadalupe Alejandro; Maria Hinojosa; John

1    Ramirez, Sr.; Priscilla Martinez; Vicky Rivas; Ashley

2    Ramirez; and Alex Hernandez.   Those are all based upon

3    your mitigation investigation in the case; correct?

4        A.   Yes.

5        Q.   And those affidavits correctly reflect the

6    information that you obtained from those witnesses?

7        A.   Yes.

8        Q.   In fact, you're the one that drafted those

9    affidavits; correct?

10       A.   Yes.   I drafted the affidavit, then I would

11   send it back to the individual for corrections and

12   additions, deletions, then I would put in there

13   additions, deletions, and send it back to them until

14   we got it to the form where they could sign it and

15   notarize it.

16       Q.   So these affidavits correctly reflect the

17   information that you reviewed in records or obtained

18   personally from witnesses in this case; correct?

19       A.   Yes.

20       Q.   Now, you heard the -- the testimony by

21   Dr. Martinez, today; correct?

22       A.   Yes.

23       Q.   And you were present in the courtroom during

24   all that testimony?

25       A.   Yes.

1    Q.   Have you ever been involved in a case where

2  the forensic psychologist was also the mitigation

3  expert?

4    A.   No, but that would be redundant if I'm the

5  mitigation expert also having the psychologist who's

6  involved in the case also be the mitigation expert,

7  but I've never been in that situation.

8    Q.   Have you ever heard of a case where the

9  psychologist was also the mitigation expert?

10    A.   This morning from Dr. Martinez.

11    Q.   Is that the first time you ever heard of

12  that?

13    A.   Yes.

14    Q.   What -- what types of continuing education

15  courses have you taken regarding mitigation

16  responsibilities?

17    A.   Every year since 2000 I've attended the

18  capital death penalty training seminar by N.A.D.L.A.,

19  the National Legal Defense Association.  I've gone to

20  trainings on an annual basis here in Texas that are

21  put on by either the Texas Defender Service or the

22  Texas Criminal Defense Lawyers Association, and I

23  usually go to at least two of those a year that are

24  specifically about mitigation in capital cases.

25    Q.   Would you agree with me that -- that the

MARY LOPEZ BUITRON, CSR, RPR
*Official Court Reporter - 94th District Court*

Scanned Jun 18, 2013

1    opinions of the -- of the mitigation community and the

2    legal community is that there should be one person

3    acting as the mitigation expert and one -- and a

4    different person acting as the psychological expert?

5         A.   Yeah.   I think that's even somewhat codified

6    in the American Bar Association Guidelines in Death

7    Penalty Cases and the Texas Bar Association Guidelines

8    in Death Penalty Cases.

9         Q.   In fact, it is codified that way; correct?

10        A.   Yes.

11        Q.   Now, the -- the problems that can arise,

12   you've seen Defendant's Exhibit 5 in this case, right,

13   the report -- the file of Dr. Martinez?

14        A.   Yes.

15        Q.   And, for instance, that list of 20 witnesses

16   that were identified by John Henry in the case, you

17   saw that list; right?

18        A.   Yes.

19        Q.   In fact, you reviewed all of Dr. Martinez's

20   file; correct?

21        A.   Yes.

22        Q.   Is -- is there a concern about the -- the

23   standard of care or the level of quality of

24   representation if only 5 of 20 witnesses are

25   interviewed?

MARY LOPEZ BUITRON, CSR, RPR
*Official Court Reporter - 94th District Court*

Scanned Jun 18, 2013

142

```
1      A.   Yes.

2      Q.   And what is that concern?

3      A.   The concern is that really the amount of

4  information and the nature of information that's

5  available to the Defense during the course of the

6  capital trial only really becomes significant if you

7  have a witness who can testify to that information and

8  so if you have a list of -- like in this case, 20

9  people, you would need to interview those people in

10 terms of determining what information does an

11 individual have, what firsthand information does an

12 individual have that that individual could actually

13 testify to so that they could present that information

14 to the jury.

15           With a list of 20 individuals in

16 attempting to have the most impact with a juror, you

17 want to pick the best witness to present the testimony

18 that you want to present.

19     Q.   You -- you saw in this case, the -- Defense

20 Exhibit 10, I believe it is, the -- the summary chart

21 of -- of Dr. Martinez's work in this case; correct?

22     A.   Yes.

23     Q.   In fact, you're the one that looked through

24 all the records and compiled this chart; correct?

25     A.   Yes.
```

MARY LOPEZ BUITRON, CSR, RPR
*Official Court Reporter - 94th District Court*

Scanned  Jun 18, 2013

```
 1        Q.   Have you -- does it cause you any concerns,
 2   the fact that the mitigation investigation in this
 3   case did not begin interviewing witnesses until after
 4   jury selection began?
 5        A.   Yes.
 6        Q.   Why does that cause you concern?
 7        A.   A thorough mitigation investigation needs to
 8   result in a strategy for punishment, and that strategy
 9   for punishment needs to be available for the defense
10   team prior to jury selection because there's
11   information in that strategy for punishment that the
12   attorneys are going to need to use in order to select
13   appropriate jurors to hear that punishment case.  And
14   so if you don't have that information accumulated and
15   known in terms of what information are we actually
16   going to be able to present to the jury through some
17   specific witness prior to jury selection, you can't --
18   the attorney's in a situation where they can't really
19   evaluate the juror for "Are they an appropriate jury
20   for this case in punishment?"
21        Q.   Now, you saw the writ that I put together in
22   this case; correct?
23        A.   Yes.
24        Q.   And you saw my summaries of what trial
25   Defense Counsel questioned the veniremen on for jury
```

Scanned  Jun 18, 2013

144

1   selection in the writ.  Do you agree that nowhere in

2   jury selection did the trial Defense Counsel ask the

3   prospective jurors any questions regarding their

4   feelings about a case that would have facts such as

5   John Henry's?

6        A.   From reviewing the transcript, it appears to

7   be that way.

8        Q.   Now, you also reviewed the -- the vouchers

9   for trial Defense Counsel; correct?

10       A.   Yes.

11       Q.   Did you notice in there at any time that

12  trial Defense Counsel recorded having interviewed any

13  mitigation witnesses?

14       A.   I noticed one interview with -- I believe it

15  was the maternal grandmother between the attorneys and

16  a potential mitigation witness.

17       Q.   And was that during jury selection?

18       A.   I believe it was after jury selection.

19       Q.   Have you as a mitigation specialist ever been

20  involved with the attorneys during jury selection?

21       A.   Yes.

22       Q.   How so?

23       A.   Usually, I'm involved with the attorneys in

24  the process of identifying characteristics of

25  potential jurors that may assist us in the process of

Scanned Jun 18, 2013

1    a punishment hearing or may be detrimental to us in

2    the process of a punishment hearing.

3        Q.   In other words, compiling a juror profile

4    that would reflect who would be most sympathetic to

5    the facts of your case?

6        A.   Yes.

7        Q.   Now, did you find any indication in the

8    records of Dr. Martinez or the records of Dr. --

9    Mr. Jones or Mr. Garza that that was ever done in this

10   case?

11       A.   No.

12       Q.   Did you see any records at all when you --

13   you've seen the -- the C.D. that's in evidence of

14   Mr. Jones's file.  There is absolutely no recording at

15   all of any idea of the strategy for mitigation;

16   correct?

17       A.   No.

18       Q.   And so you haven't -- have you seen anything

19   in anyone's file in this case where they had a

20   strategy for the sentencing phase in this case?

21       A.   No.

22       Q.   Now, are there two different paths of

23   strategies on a death penalty sentencing case?  In

24   other words, future dangerousness and mitigation?

25       A.   Actually, in those terms, I would say there

MARY LOPEZ BUITRON, CSR, RPR
*Official Court Reporter - 94th District Court*

Scanned  Jun 18, 2013

146

```
 1   are three different strategies.  The first strategy is
 2   to address those issues that are going to be brought
 3   by the State in the 404(b) issues, and then there are
 4   what kind of information are you going to present
 5   during the -- directed at the issue of future
 6   dangerousness, and what information -- what witnesses
 7   and information are you going to present regarding the
 8   mitigation issue, the moral blameworthiness issue.
 9        Q.   How -- how do you focus, as an mitigation
10   expert, helping the defense on future dangerousness?
11   What do you look at?  State's witnesses?
12        A.   We both look at State's witnesses in terms
13   of -- oftentimes the -- the charge that someone has
14   been charged with is not totally reflected of the
15   circumstances in which that charge occurred.  And so
16   there may be some exploration that you want to do as
17   the mitigation expert in terms of talking to witnesses
18   about what actually occurred, what was actually going
19   on during the course of that incident that is going to
20   lead to the State's witness that is being put on.  You
21   also want to -- in terms of future dangerousness, you
22   want to identify witnesses who can testify about the
23   whole history of the person in terms of both their
24   tendency for aggressiveness in terms of what elicits
25   that tendency for aggressiveness, as well as their
```

Scanned  Jun 18, 2013

1    tendency for being kind, considerate of others.

2        Q.   The -- during jury selection, does a

3    mitigation expert help the defense in deciding how to

4    best qualify a juror for the death sentence in a given

5    case?

6        A.   Yes.  In terms of providing a -- information

7    about potential juror profile or characteristics that

8    you are looking for, know in terms of -- I usually

9    don't come to jury selection and actively participate

10   with the attorneys on deciding about an individual

11   juror.  There's enough going on there with -- without

12   me being there.

13       Q.   Now, you read the -- the first day of the

14   punishment proceedings in this case, Volume 21 of 25;

15   correct?

16       A.   Yes.

17       Q.   You saw in there where the rule was invoked;

18   correct?

19       A.   Yes.

20       Q.   And you saw there where Defense Counsel said

21   that the witnesses would be Ashley Ramirez; Maria

22   Hinojosa; John Henry Ramirez, Sr.; Lupita Alejandro;

23   who is in all likelihood Guadalupe Alejandro.  You saw

24   those names; right?

25       A.   Yes.

Scanned Jun 18, 2013

```
 1        Q.   And you spoke to Ashley Ramirez; right?
 2        A.   Yes.
 3        Q.   And what did she say about trial Defense
 4   Counsel ever talking to her before trial?
 5             MR. NORMAN:   Objection, that would be
 6   hearsay, Your Honor.
 7             MR. GROSS:   Well, it's in her affidavit,
 8   Your Honor, and you've already taken judicial notice
 9   of it.
10             THE COURT:   It will be -- yeah, it's
11   still hearsay at this point, so that's sustained.
12             MR. GROSS:   I'll offer it as a bill, just
13   so --
14             THE COURT:   All right.
15             MR. GROSS:   -- I won't take too long.
16        Q.   (BY MR. GROSS) As a bill of exception, what
17   did Ashley Ramirez tell you that trial Defense --
18   about contact with trial Defense Counsel prior to her
19   being listed as a witness on December 5th, 2008?
20        A.   She said that the attorneys had spoken to her
21   briefly out in the hall.
22        Q.   That day?
23        A.   That day.
24        Q.   For about five or ten minutes?
25        A.   Right.
```

MARY LOPEZ BUITRON, CSR, RPR
*Official Court Reporter - 94th District Court*

1    Q.   And Maria Hinojosa, what did she say about

2  that?

3              MR. NORMAN:  I'm sorry, Your Honor, but

4  can I have a running objection on these?

5              THE COURT:  Yes, sir.  So you object this

6  is hearsay as well?

7              MR. NORMAN:  Exactly.

8              THE COURT:  All right.  Do you have any

9  response, Mr. Gross?

10             MR. GROSS:  Well, it's not offered for

11  the truth -- well, I guess it is.  It's offered for

12  the truth, Your Honor, but since the Court's already

13  taken judicial notice of it and it's in that person's

14  affidavit -- I guess, I could do it easier.  I will

15  rephrase, Your Honor.

16             THE COURT:  Okay.

17    Q.   (BY MR. GROSS) I'll try it this way:  All

18  these witnesses' affidavits that you prepared that are

19  attached to my writ, Mr. Byington -- okay, you follow

20  me?

21    A.   Yes.

22    Q.   All of these witnesses, what they say about

23  their contact with trial Defense Counsel prior to

24  trial beginning came directly from them; right?

25    A.   Yes.