Scanned Jun 18, 2013

150

1    Q.   Now, what is your opinion in this case about

2 whether or not trial Defense Counsel were prepared for

3 the sentencing phase of the trial?

4    A.   It appears to me that there is no evidence

5 that -- that all of the witnesses -- all of the

6 potential witnesses that might have or could have

7 potentially testified in this trial had actually been

8 interviewed by the mitigation expert, even those

9 mitigation witness -- potential mitigation witnesses,

10 even those that the Defense identified as being

11 potential mitigation witnesses, it appears to me that

12 there is no evidence that the Defense Counsel actually

13 talked to any of those witnesses other than Mrs. --

14 the maternal grandmother, that they didn't talk to any

15 of these witnesses individually prior to short

16 conversations that they had with them in the hall

17 outside the courtroom.  It appears to me that there is

18 no -- there was no order set up for which witnesses

19 were going to testify and what information are those

20 witnesses going to present.

21    It would seem to me that since there has

22 been a great deal of testimony about the fact that

23 John was raised in a very chaotic and disorganized

24 environment, that one of the essential witnesses to

25 have present during a mitigation -- even planning a

MARY LOPEZ BUITRON, CSR, RPR
*Official Court Reporter - 94th District Court*

Scanned  Jun 18, 2013

151

1  mitigation strategy would have been his mother, who is

2  the person who raised him.  And there is no interview

3  with his mother.

4       Q.  By anybody?

5       A.  By anyone.

6       Q.  Until you did?

7       A.  Right.

8       Q.  Now, you said -- let me just interject real

9  briefly.  You said Defense Counsel never spoke to

10 these witnesses at all.  Now, you agree that when

11 Counsel first got on board on the case, there was a

12 meeting with the family and they gave him a general

13 overview of the case, but when you say "spoke to

14 them," you're referring to preparing them to testify

15 as a witness in the sentencing phase of this trial?

16      A.  Yes.  I'm talking about the attorney knowing

17 which witness is going to testify about what

18 information.  Actually, if you look at the transcript

19 and you look at the prosecutor's opening statement,

20 the prosecutor systematically goes through, "I am

21 going to put this witness on, this witness is going to

22 give you that testimony, then I am going to put this

23 witness on, and I'm going to -- and that witness is

24 going to give you this testimony."

25           It's a very systematic presentation which

1    to me reflects a strategy for what information is

2    going to be presented during the course of the

3    punishment hearing.  In the Defense's opening

4    statement, there is an overview of information about

5    the person, about John.  There are some references to

6    various family members will be here to testify, but

7    there isn't that linking of what person is going to

8    testify about what information.  And from my point of

9    view, that linkage needs to be made at least by the

10   attorney.  Maybe he doesn't present that to the jury

11   in that same format as the prosecutor did in this

12   case, but at least the attorney has that connection

13   between which witness and what information.

14            And then, of course, you have to do what

15   is required in order to make sure that those witnesses

16   are actually here out in the hall available, ready to

17   testify because oftentimes, you know, a witness is

18   more than happy to talk to you half a dozen times

19   leading up to trial; and when trial date comes,

20   they're gone.

21       Q.   So you want to have them subpoenaed and

22   ready?

23       A.   You need to have them subpoenaed and here for

24   trial.

25       Q.   And trial Counsel needs to interview the

Scanned  Jun 18, 2013

1  witnesses, not just the mitigation expert?

2      A.   I don't know how -- well, I'm not an

3  attorney, so I don't how an attorney would interview a

4  witness if they don't know the details of what that

5  particular witness can present and how that particular

6  witness fits into the story that the Defense is trying

7  to tell during the course of the punishment hearing.

8      Q.   Do you think that -- that a mitigation expert

9  who does not begin interviewing mitigation sentencing

10  witnesses until after jury selection has begun, is

11  that at any help at all to the Defense at that point?

12      A.   When I've been asked to work on cases that

13  are close to jury selection and there's been no

14  interview of witnesses gone on until that time, it's

15  been my common practice to ask the attorneys to obtain

16  a continuance in the case.

17      Q.   And had you had been on board in this case,

18  you know, Dr. Martinez said July of '08, with trial

19  jury selection scheduled for three months later, would

20  that have been your position in this case, there is no

21  way you could compile mitigation investigation in that

22  amount of time?

23      A.   It depends on -- you really don't know at

24  that point.  You don't know how available those

25  witnesses are going to be.  But having basically July,

1  August, September, begin jury selection in October, so

2  having a little more than 90 days in order to get that

3  done, one of the first things I would have said is

4  that it's more than possible that we are not going to

5  be ready to go at the time that jury selection is

6  going to start.

7       Q.   And having reviewed Dr. Martinez's file and

8  seeing the file on disk from Mr. Jones's and

9  Mr. Garza's testimony about the preparation, are you

10 convinced that they were not prepared for the

11 sentencing phase of this trial?

12      A.   Yes, I am.

13           MR. NORMAN:  Your Honor, I would just

14 object to that opinion.  He's not a legal expert.  He

15 has not been qualified as one.

16           THE COURT:  Well, that's sustained.

17      Q.   (BY MR. GROSS) As a mitigation expert, not as

18 a legal expert, would you agree the mitigation case

19 was not ready for trial in this case?

20      A.   Yes.

21      Q.   Now, you agree -- I think you've already said

22 that the attorneys did not talk to the mitigation

23 witnesses for their testimony; correct?

24      A.   Yes, except for the maternal grandmother.

25      Q.   And you heard testimony today that

MARY LOPEZ BUITRON, CSR, RPR
*Official Court Reporter - 94th District Court*

Scanned Jun 18, 2013

155

1    Dr. Martinez didn't even finish his report until the

2    day John Henry was convicted --

3        A.   Yes.

4        Q.   -- or possibly the day before, but the 4th or

5    the 5th, right around that time frame, in December;

6    correct?

7        A.   Yes.

8        Q.   Is there any way for the mitigation expert to

9    have helped trial Defense Counsel to form a strategy

10   in this case given the delay in the mitigation

11   investigation?

12       A.   Well, if I'm going to answer anyway, yes, you

13   can make some contributions; but until you have

14   witnesses identified who are going to testify to

15   particular facts that they could testify to to the

16   jury, you don't really know what your strategy is.

17       Q.   Now, do you think in this case that

18   Dr. Martinez's information that he obtained, you know,

19   these 5 out of 20 people and whatnot, was that

20   information limited, in your opinion?

21       A.   Somewhat.

22       Q.   Would you agree that you were able to

23   interview far more people than what Dr. Martinez did?

24       A.   Yes.

25       Q.   And those were people who could substantiate

1  the report that Dr. Martinez produced on December 4th

2  or December 5th?

3      A.   Yes.

4      Q.   How important is that to the mitigation phase

5  of the trial, substantiation witnesses?

6      A.   Well, only through substantiation witnesses

7  do you get facts in front of the jury.  As has just

8  occurred here, any other information that Dr. Martinez

9  might have obtained in talking to people really

10  wasn't -- you know, from a mitigation point of view,

11  isn't admissible at court because it's hearsay.  You

12  need the live witness to present that first-hand

13  observable information about the occurrences in the

14  person's developmental life.

15      Q.   And the last area I want to ask you about,

16  Mr. Byington, do you think that based on looking at

17  Grant Jones's limited file, hearing what Mr. Garza

18  said about his file today, seeing their vouchers that

19  they have submitted, did they have anything put

20  together, information-wise, strategy-wise to discuss

21  with John Henry on December 7th at the jail?

22      A.   In my opinion they didn't.

23      Q.   Did not?

24      A.   Did not.

25      Q.   Now, and this was two days after, maybe three

Scanned Jun 18, 2013

1    days after Dr. Martinez finished his report; correct?

2        A.   Yes.

3        Q.   Thank you, sir.

4               MR. GROSS:  No further questions, Your

5    Honor.

6               THE COURT:  Cross?

7               MR. NORMAN:  Yes, Your Honor.  Thank you.

8                  CROSS-EXAMINATION

9    BY MR. NORMAN:

10       Q.   Good afternoon, Doctor.

11       A.   I'm not a doctor.

12       Q.   Oh, I'm sorry.  Mr. Boyington?

13       A.   Byington.

14       Q.   I apologize.  Mr. Byington, you never filed a

15    separate report and attach it to this writ, did you?

16       A.   No.

17       Q.   And you did prepare a report in connection

18    with this writ or with your testimony today?

19       A.   No.

20       Q.   So there is no written record of your

21    conclusions?

22       A.   No.

23       Q.   Okay.  Sir, there would be nothing

24    inconsistent about being both the psychologist and

25    mitigation expert, would there?

Scanned Jun 18, 2013

158

1    A.   The tasks are different.

2    Q.   Well, isn't it true that the Defense

3 psychologist expert and mitigation expert work closely

4 with each other with the same objective of helping

5 develop the mitigation case; isn't that true?

6    A.   The psychologist's role in a case is usually

7 to answer a specific question regarding the

8 psychological functioning of the Defendant.

9    Q.   And that's part of the mitigation case,

10 generally, isn't it?

11   A.   That's a piece of the mitigation case, yes.

12   Q.   They are never -- would you agree with me

13 that they are never working against each other?

14   A.   No.

15   Q.   Okay.  So there would be nothing inconsistent

16 about having both the psychologist and the mitigation

17 expert as the same person?

18   A.   No.

19   Q.   It's not illegal, is it?

20   A.   No.

21   Q.   There's nothing in the Code of Criminal

22 Procedure to prevent it, that you're aware of?

23   A.   No.

24   Q.   Okay.  Do you have any formal legal

25 education, sir?

MARY LOPEZ BUITRON, CSR, RPR

*Official Court Reporter - 94th District Court*

1      A.   No, not other than the T.C.D.L.A. and the

2  T.D.S. conferences I've attended.

3      Q.   Okay.  Do you have any training in how to

4  conduct voir dire?

5      A.   No, other than identifying characteristics of

6  witnesses -- or of jurors that may be helpful based on

7  various mitigating evidence.

8      Q.   Are you familiar with voir dire in a Texas

9  criminal capital case?

10     A.   I have been to the training seminars about

11 capital jury selection.

12     Q.   Okay.  Are you familiar with questions and

13 that sort of thing?

14     A.   The specifics of legal interaction with

15 clients, no, I'm not familiar with that.

16     Q.   So you're not familiar with what questions

17 can and can't be asked at voir dire?

18     A.   That's true.

19     Q.   Okay.  By the way, I'm sorry, Doctor, are you

20 from Texas?

21     A.   I'm from Wisconsin.

22     Q.   Wisconsin?

23     A.   Originally.

24     Q.   So you have no specific knowledge of Texas

25 law regarding capital sentencing, do you?

```
 1              MR. GROSS:  He means he's originally from
 2  Wisconsin.  He lives in Texas.
 3              MR. NORMAN:  Oh, he lives in Texas.
 4              MR. GROSS:  I'm sorry, I should have --
 5              THE WITNESS:  Yeah, I've lived in Texas
 6  since 1985.
 7       Q.  (BY MR. NORMAN) Are you familiar with Texas
 8  capital sentencing?
 9       A.  Yes.
10       Q.  Are you familiar with the two questions that
11  are asked --
12       A.  Yes.
13       Q.  -- to the jury?  Tell me how -- how could a
14  mitigation expert -- could a mitigation expert have
15  helped at all in voir dire concerning the question of
16  future dangerousness?
17       A.  The way a mitigation expert helps in voir
18  dire with the attorneys is to provide information
19  about the kinds of positive characteristics and
20  negative characteristics that the client has and to
21  speculate, basically, on characteristics of jurors
22  that are going to be -- more likely to be sympathetic
23  to that information.
24       Q.  Okay.  So with regards to future
25  dangerousness, there's nothing basically you could
```

Scanned  Jun 18, 2013

1  have provided to be helpful?

2      A.   Again, information about what characteristics

3  the client has, has demonstrated in the past.  Things

4  like if they have -- that can be used by the attorney

5  for questioning, for the kind of questioning that the

6  attorney then needs to do is selecting the voir dire

7  person.

8      Q.   And you're not even really familiar what kind

9  of questions they can ask in voir dire, are you?

10      A.   I am familiar in terms of putting a question

11  into the appropriate legal language to make that be a

12  question for a potential voir dire man (sic).  No, I'm

13  not familiar with the particular specifics, but I'm

14  familiar with the general issues that we can and

15  cannot ask.

16      Q.   Okay.  Do you have any formal training in

17  forensic psychology?

18      A.   No.

19      Q.   So you would not be qualified to determine

20  whether the Defendant is competent to stand trial?

21      A.   I have never gone -- I have never done that.

22      Q.   Okay.  Dr. -- I'm sorry.  Mr. Boyington

23  (sic), your information about who talked to

24  Mr. Ramirez's family and who didn't, that came from

25  the family members themselves; isn't that correct?

Scanned Jun 18, 2013

162

1    A.   Yes, and from the billing statements of

2 Dr. Martinez and Mr. Jones and Mr. Garza.

3    Q.   But you have no independent knowledge asides

4 from that as to whether they did or didn't talk to

5 family members in question?

6    A.   No.

7    Q.   Okay.  You're aware, of course, that the

8 family members themselves have an interest in helping

9 Mr. Ramirez at this time, are you not?

10    A.   Yes.

11    Q.   Doctor -- I'm sorry, I beg your pardon.  You

12 mentioned that you helped prepare a number of these

13 affidavits, is that correct, of the --

14    A.   Yes.

15    Q.   -- family members?  Isn't it true that a

16 large amount of the information here was redundant,

17 that one family member pretty much said the same thing

18 that the others did?

19    A.   To some extent, yes.

20    Q.   You would agree that there was a large amount

21 of redundance.  And isn't it true that the family

22 members largely painted the same picture of

23 Mr. Ramirez's early life?

24    A.   Through different details, yes.

25    Q.   Doctor, did you prepare these affidavits from

MARY LOPEZ BUITRON, CSR, RPR

*Official Court Reporter - 94th District Court*

Scanned Jun 18, 2013

163

1    the witnesses or from the potential witnesses, page 8,

2    did they narrate this to you or did you narrate the

3    events to them and ask them if that's correct or

4    incorrect?

5        A.   I interviewed all of these people and others

6    besides.  I then put together a draft affidavit.  I

7    sent the draft affidavit to the individual and asked

8    them to edit the draft.

9        Q.   And did you ever use your own language in

10   there when you prepared these or was it largely the

11   language of these witnesses you interviewed?

12       A.   Both.

13       Q.   Both, okay.

14       A.   And I asked them when they edited this to put

15   things in their own language, to use terms and phrases

16   that they would commonly use.

17       Q.   Doctor, there's an affidavit here from a

18   Priscilla Martinez.

19       A.   Yes.

20       Q.   She says, on I believe it's page 2, "Though I

21   was very ambivalent about it, I left Ashley -- I left

22   to take Ashley back to Corpus Christi."  Are those her

23   own words or was that your words?

24       A.   Ambivalent is probably my word.

25       Q.   Probably your word?

MARY LOPEZ BUITRON, CSR, RPR
*Official Court Reporter - 94th District Court*

Scanned Jun 18, 2013

1    A.   Right.

2    Q.   Okay.  So you did have a pretty good hand in

3 preparing these affidavits?

4    A.   The rest of the statement is hers, though.

5    Q.   Okay.

6         MR. NORMAN:  I pass the witness, Your

7 Honor.

8         THE COURT:  All right.  Anything else of

9 this witness?

10         MR. GROSS:  Real briefly, Your Honor.

11         THE COURT:  Okay.

12         MR. GROSS:  May I approach, Your Honor?

13         THE COURT:  Yes, sir.

14                  REDIRECT EXAMINATION

15 BY MR. GROSS:

16    Q.   The last thing I wanted to ask you about,

17 Mr. Byington, is in the writ -- and I know I've shown

18 it to you before where -- where I put together the

19 statement of facts based upon the affidavits you

20 obtained in your information, the writ from page 4 to

21 page 13 that incorporates all the information from

22 your affidavits and all the information from

23 Dr. Murphey, that's the type of opening statement

24 you're talking about at the sentencing phase of John's

25 death penalty trial; correct?

Scanned  Jun 18, 2013

1      A.   Yes.

2      Q.   And that's the type of specificity and -- and

3   specific instances of things that are happening that

4   should be raised at the opening statement of the

5   punishment phase of a death trial; correct?

6      A.   Yes.

7      Q.   Now, when you looked at Mr. Jones's opening

8   statement, he didn't cover hardly any of these

9   specifics, did he?

10     A.   No, he covered the general chaos during the

11  course of John's development.

12     Q.   Thank you, sir.

13          MR. GROSS:  No further questions, Your

14  Honor.

15          THE COURT:  Anything else?

16          MR. NORMAN:  Just one short question,

17  Your Honor.

18          THE COURT:  Yes, sir.

19                 RECROSS-EXAMINATION

20  BY MR. NORMAN:

21     Q.   Isn't it true that not being an attorney, you

22  have no idea of what Mr. Jones's trial strategy was in

23  preparing his opening statements or whether he was

24  going to save some of that for his closing?

25     A.   True.

MARY LOPEZ BUITRON, CSR, RPR
*Official Court Reporter - 94th District Court*

Scanned Jun 18, 2013

166

```
 1          THE COURT:  Anything else?
 2          MR. GROSS:  Based on that, Your Honor,
 3  just one brief follow-up.  May I approach, Your Honor?
 4          THE COURT:  Yes, sir.
 5              REDIRECT EXAMINATION
 6  BY MR. GROSS:
 7      Q.  Now, you know that on Mr. Jones's file that
 8  he had, there are no notes whatsoever about
 9  sentencing; correct?
10      A.  True.
11      Q.  And the only thing we found on that file was
12  this snippet of information about his argument;
13  correct?
14      A.  Yes.
15      Q.  And is there anything in there that says
16  anything about the specificity we're talking about on
17  those pages of the writ I just showed you?
18      A.  No.
19      Q.  And this is out of Mr. Jones's file; correct?
20      A.  Right.
21          MR. GROSS:  Please mark that.
22          COURT REPORTER:  Uh-huh.
23      Q.  (BY MR. GROSS) And that's what's been marked
24  as Defense Exhibit 11; correct?
25      A.  Yes.
```

MARY LOPEZ BUITRON, CSR, RPR
*Official Court Reporter - 94th District Court*

1     Q.  Great.

2            MR. GROSS:  Your Honor, it's already in

3 evidence but since -- I don't want anyone to have to

4 go through a bunch of pages on the disk, if it's okay,

5 we're going to offer Defendant's 11 just as an

6 addendum to Mr. Jones's -- an example of what is in

7 Mr. Jones's file.

8            MR. NORMAN:  You know, I don't know

9 whether I can verify this or not, but I accept

10 Mr. Gross is an honorable man and if he represents

11 that's what is on the disk, then I'll accept that.

12            THE COURT:  All right.  Then it's

13 admitted subject to it being on the disk; and if it

14 turns out that it's not on the disk, then it's not

15 admitted.

16            MR. GROSS:  Yes, sir.  And that's all we

17 have, Your Honor.

18            THE COURT:  All right.  You're free to go

19 about your business unless you have anymore questions

20 to ask.  Do you have anymore questions?

21            MR. NORMAN:  Well, I'm tempted to ask one

22 other question, Your Honor.

23            THE COURT:  Okay.  You can.

24

25

Scanned  Jun 18, 2013

168

```
 1                    RECROSS-EXAMINATION
 2  BY MR. NORMAN:
 3       Q.   Because -- Mr. Byington, because his client
 4  decided not to put on mitigation expert -- mitigation
 5  testimony and instructed his attorney how to argue at
 6  closing, we really don't know, do we, what Mr. Jones
 7  would have argued to the jury had a mitigation case
 8  been completely put on, do we?
 9       A.   No.
10              MR. NORMAN:  I pass, Your Honor.
11              THE COURT:  All right.
12              MR. GROSS:  Last question, Your Honor.
13              THE COURT:  Last, last, last question.
14              MR. GROSS:  Yes, sir.  Yes, Your Honor.
15                    REDIRECT EXAMINATION
16  BY MR. GROSS:
17       Q.   But since there is nothing in Mr. Jones's
18  file about strategy on mitigation, you heard Mr. Garza
19  say today he had no strategy on mitigation because it
20  was Mr. Jones's duties, you haven't seen anything
21  other than Defendant's 11 of any thoughts of trial
22  Defense Counsel on closing argument on sentencing;
23  correct?
24       A.   No.
25       Q.   And that's all you saw; right?
```

MARY LOPEZ BUITRON, CSR, RPR
*Official Court Reporter - 94th District Court*

Scanned  Jun 18, 2013

1      A.   Right.

2      Q.   And to you, that's nowhere near what you

3  found in your mitigation investigation; correct?

4      A.   Right.

5           MR. GROSS:  No further questions, Your

6  Honor.

7           MR. NORMAN:  No further questions.

8           THE COURT:  All right.  You're free to go

9  about your business.

10           THE WITNESS:  Thank you.

11           THE COURT:  And --

12           MR. GROSS:  All we have left, Your Honor,

13  is to finish with Mr. Jones.

14           THE COURT:  Are you going to put on

15  Mr. Perkins?

16           MR. GROSS:  Oh, yes, sir, and

17  Mr. Perkins, but we were going to do that with

18  Mr. Jones if that was all right.

19           THE COURT:  Yeah, that's fine.  We just

20  need to -- we need to kind of talk about a time.  You

21  are free to go.

22           THE BAILIFF:  All rise.

23           THE COURT:  Talk about a time today.

24           MR. GROSS:  Yes, sir.

25           (Recess in proceedings.)

MARY LOPEZ BUITRON, CSR, RPR
*Official Court Reporter - 94th District Court*

1   THE STATE OF TEXAS )

2   COUNTY OF NUECES    )

3        I, Mary Lopez Buitron, Official Court Reporter

4   in and for the 94th Judicial District Court of Nueces County,

5   State of Texas, do hereby certify that the above and foregoing

6   contains a true and correct transcription of portions of

7   evidence and other proceedings requested in writing by counsel

8   for the parties to be included in this volume of the Reporter's

9   Record, in the above-styled and numbered cause, all of which

10   occurred in open court or in chambers and were reported by me.

11        I further certify that this Reporter's Record of

12   the proceedings truly and correctly reflects the exhibits, if

13   any, admitted by the respective parties.

14        WITNESS MY OFFICIAL HAND this the 6ᵗʰ day of

15   December_____, A.D., 2011.

16

17   MARY LOPEZ BUITRON, CSR, RPR, Texas CSR #2731
      Expiration Date: 12/31/2011

18   Official Court Reporter
      94th District Court

19   Nueces County, Texas
      901 Leopard, Room 901

20   Corpus Christi, Texas 78401
      (361)888-0658

21

22

23

24

25

MARY LOPEZ BUITRON, CSR, RPR
*Official Court Reporter - 94th District Court*