Scanned  Jun 18, 2013 *Scanning Cover Sheet*



2497634

CaseNumber: WR-72,735-03
EventDate: 09/13/2012
Style 1: RAMIREZ, JOHN HENRY
Style 2:
Event code: RR ADD'L VOLUME

EventID: 2497634
Applicant first name: JOHN HENRY
Applicant last name: RAMIREZ
Offense: 19.03
Offense code: Capital Murder
Trial court case number: 04-CR-3453-C(2)
Trial court name: 94th District Court
Trial court number: 321780094
County: Nueces
Trial court ID: 267
Event map code: GENERIC
Event description: Habeas Corpus - Capital Death
Event description code: 11.071
Remarks: VOL. 4 OF 6 VOLS.--WRIT HEARING HELD
OCT. 21, 2011

☐ Document Scanned                                    ☐ Created or
                                                      ☐ Appended

Scanned by          date          Image ID

Comment

Scanned  Jun 18, 2013

1



REPORTER'S RECORD
APPELLATE COURT NO. AP-76,100
TRIAL COURT CAUSE NO. 04-CR-3453-C
VOLUME 4 of 6 VOLUMES

| | | |
|---|---|---|
| THE STATE OF TEXAS | ) | IN THE DISTRICT COURT |
| | ) | |
| VS. | ) | 94TH JUDICIAL DISTRICT |
| | ) | |
| JOHN HENRY RAMIREZ | ) | NUECES COUNTY, TEXAS |

WRIT OF HABEAS CORPUS (Cont'd)

On the 21st day of October, 2011, the
following proceedings came on to be heard in the
above-entitled and numbered cause before the HONORABLE
BOBBY GALVAN, Judge Presiding, held in Corpus Christi,
Nueces County, Texas:

Proceedings reported by Stenograph
Machine.

COPY

MARY LOPEZ BUITRON, CSR, RPR
*Official Court Reporter - 94th District Court*

Scanned  Jun 18, 2013

```
 1   APPEARANCES:

 2   MR. MARK SKURKA
     DISTRICT ATTORNEY
 3   SBOT NO. 18475570
     MR. DOUGLAS K. NORMAN
 4   ASSISTANT DISTRICT ATTORNEY
     SBOT NO. 15078900
 5   901 Leopard, Rm. 205
     Corpus Christi, Texas 78401
 6   Phone: (361) 888-0410

 7   ATTORNEYS FOR THE STATE

 8   -AND-

 9   MR. MICHAEL CLARK GROSS
     LAW OFFICE OF MICHAEL C. GROSS, P.C.
10   SBOT NO. 08534480
     106 S. St. Mary's, Suite 260
11   San Antonio, Texas  78205
     Phone: (210) 354-1919
12
     ATTORNEY FOR THE DEFENDANT,
13   JOHN HENRY RAMIREZ

14

15

16

17

18

19

20

21

22

23

24

25
```

MARY LOPEZ BUITRON, CSR, RPR
*Official Court Reporter - 94th District Court*

### INDEX TO PROCEEDINGS
### VOLUME 4 OF 6 VOLUMES
### WRIT OF HABEAS CORPUS (Cont'd)

October 21, 2011                                          PAGE   VOL.
Court calls case........................................ 4      4
Continuation of Writ hearing ........................... 4      4
Appearances of parties.................................. 4      4

| Witness Name | Direct | Cross | V.Dire | | VOL. |
|---|---|---|---|---|---|
| GRANT JONES ........ | 5 | 10 | | | 4 |
| (Cont'd) | | | | | |
| ERIC PERKINS ....... | 16,67 | 37,72 | | | 4 |

Short recess............................................ 15     4
Defense rests .......................................... 73     4
Conclusion of writ proceedings ......................... 76     4
Court Reporter's Certificate ........................... 77     4

### ALPHABETICAL WITNESS INDEX

| Witness Name | Direct | Cross | V.Dire | | VOL. |
|---|---|---|---|---|---|
| GRANT JONES ........ | 10 | 5 | | | 4 |
| (Cont'd) | | | | | |
| ERIC PERKINS ....... | 16,67 | 37,72 | | | 4 |

### EXHIBITS

| NO. | DESCRIPTION | OFFERED | ADMITTED | VOL. |
|---|---|---|---|---|
| SX-4 | Juror questionnaires ......... (sealed) | 13 | 14 | 4 |
| DX-4 | Defense attorneys' voucher .. | 15 | 15 | 4 |

```
 1                    P R O C E E D I N G S
 2   October 21, 2011
 3             THE COURT:  All right.  Let's call
 4   Cause No. 04-3453-C, State of Texas versus John
 5   Ramirez.  Appearances?
 6             MR. NORMAN:  Doug Norman for the State
 7   of Texas, Your Honor.
 8             MR. GROSS:  Good morning, Your Honor.
 9   John Gross for John Henry Ramirez.
10             THE COURT:  All righty.  I suppose where
11   are we?  Is Mr. Jones on the stand?
12             MR. JONES:  Yes.
13             THE COURT:  His direct --
14             MR. NORMAN:  I believe we concluded
15   direct, Your Honor.
16             THE COURT:  We concluded direct, right.
17   So I guess you're on cross?
18             MR. GROSS:  Yes, sir.
19             MR. JONES:  You want me to take the
20   stand?
21             THE COURT:  Yes, sir.  I think you're
22   still under oath.
23             MR. JONES:  I'm still under oath.
24             THE COURT:  You may proceed.
25             MR. GROSS:  Thank you, Your Honor.
```

MARY LOPEZ BUITRON, CSR, RPR
*Official Court Reporter - 94th District Court*

1              GRANT JONES,

2    having been previously duly sworn, testified as

3    follows:

4                   CROSS-EXAMINATION (Cont'd)

5    BY MR. GROSS:

6        Q.  Mr. Jones, when we left off we were talking

7    about some vouchers that you had submitted in the

8    case, sir?

9        A.  Yes, sir.

10       Q.  And since then, I've found some more

11   vouchers, and I was wondering if I could show them to

12   you and make sure those look complete.

13              MR. GROSS:  May I approach, Your Honor?

14              THE COURT:  Yes, sir.

15              (Brief pause in proceedings.)

16       Q.  (BY MR. GROSS) What I did, Mr. Jones, is I

17   had the district clerk on Defendant's Exhibit 4 pull

18   up all of the invoicing for both Mr. Garza and for you

19   in the case.

20       A.  Uh-huh.

21       Q.  And what I was wanting to do is just confirm

22   that the pages that regard you and your billing is

23   accurate and complete.

24       A.  Looks like it.  Yep.  This -- this looks like

25   what I filed.  If this was in the clerk's record, then

1  this is it.

2      Q.   And if you could, please, Mr. Jones, just

3  look at those vouchers and make sure they accurately

4  reflect the hours you invested in the case.  I assume

5  they do, but I just want to make sure they look

6  correct to you.

7      A.   All I can tell you is that this looks -- this

8  appears to be an official copy of my fee application.

9  That's all I can tell you.

10      Q.   And like -- I assume like me, Mr. Jones, when

11  I do these trials on capital cases --

12      A.   Uh-huh.

13      Q.   -- I submit all my hourlies that I expend in

14  a case so that I'm properly compensated.  You do the

15  same?

16      A.   Right.  As I do -- as I do a task, I write it

17  down and how much time I spent on it, and then I tally

18  it up at some appropriate time.

19      Q.   And so the vouchers that you've looked at

20  this morning in that Defense exhibit, that accurately

21  reflects the time you spent on the case, correct?

22      A.   Yes, that's the time that I billed for, yes.

23      Q.   And the time you billed also includes all the

24  time you spent on the case, correct?

25      A.   Well, that's a good question.  I generally

Scanned Jun 18, 2013

1  spend more time on a case than I bill for, but -- and

2  I bill for things that I -- you know, that -- I don't

3  bill for all the time I'm thinking about the case or

4  if I'm doing -- but this is the best record of the

5  time that I spent on this case.

6      Q.  Okay.  And so, for instance, if you

7  interviewed witnesses or whatever, that would all be

8  reflected in your billings that you submitted in the

9  case?

10     A.  Should be, yes.  If I interviewed a witness,

11  the time that I took to do that, I would try to put

12  that down, yes.

13     Q.  Who would you say was in charge of the

14  sentencing phase of this trial, you or Mr. Garza?

15     A.  If I -- if I recall correctly I think it was

16  going to be my -- I was going to take the lead on that

17  part of the trial.

18     Q.  Had you had any -- with regards to jury

19  selection in the case, how did you and Mr. Garza

20  determine who was going to do the questioning of the

21  veniremen?  Was it just whoever came in you decided at

22  the time who was going to take that person?

23     A.  I don't recall if we had -- I'd have to go

24  back and look at the record whether we split -- I did

25  some and he did some.  I think I probably did more

MARY LOPEZ BUITRON, CSR, RPR
*Official Court Reporter - 94th District Court*

Scanned  Jun 18, 2013

8

1    than he did, but I -- I can't remember exactly.

2       Q.   What was the juror profile that you were

3    looking for, Mr. -- Mr. Jones?

4       A.   Now, that's a good question.  In a capital

5    murder case where the death penalty is possible, my

6    first concern is to identify the jurors who have

7    radical persuasions.  Many times those people are

8    discovered in the initial -- when the jurors are

9    qualified, and then before we get the panel, we

10   actually question them; and I want to identify those

11   that -- first, when I say radical persuasions,

12   particularly as to the death penalty.  And the best

13   indicator I found for that on the -- the

14   questionnaires, part of the questionnaire used in this

15   case, and this questionnaire is used, you know, pretty

16   regularly in this county, is the jurors are asked to

17   write in his own or her own handwriting how they feel

18   about the death penalty.

19            And I have found over the many cases that

20   I've tried is that is one of the best indicators of

21   where the person's mind is at, and many times in

22   cases, I will rate the juror.  Right up, without even

23   questioning him, I'll rate -- I'll target him for a

24   strike, I'll either try to get him for cause or try

25   to -- or I'll use a peremptory depending on how

MARY LOPEZ BUITRON, CSR, RPR
*Official Court Reporter - 94th District Court*

Scanned Jun 18, 2013

9

1  extreme it is.

2          The other thing I'm concerned about is

3  to -- I want to get jurors who are intelligent.  I

4  would rather get people who have educations or have

5  jobs that require education.  I like to have people

6  that have children.  I -- and then after that, I'm

7  particularly interested in does the juror understand

8  what the issues are in the case and what -- what

9  they're going to be asking -- be asked to do, and --

10      Q.   In this particular case --

11      A.   Yes.

12      Q.   -- Mr. Jones, did you have a juror profile

13  determined?

14      A.   A jury profile?

15      Q.   A juror profile in this particular case?

16      A.   What do you mean by that, sir?

17      Q.   Well, let me try it this way:  Who decided

18  who the mitigation investigator would be in this case?

19      A.   I did.  Well, I say I did.  We -- I think we

20  made an attempt to get -- try to get somebody from out

21  of town and it didn't work out so we ended up using

22  Dr. Martinez, I think was our main -- their main

23  investigation on that.

24      Q.   And I take it that --

25      A.   Martinez is still Martinez by the way, but

MARY LOPEZ BUITRON, CSR, RPR
*Official Court Reporter - 94th District Court*

1  he's from Louisiana.

2     Q.   And Dr. Martinez, you-all relied upon his

3  report in putting together your -- your mitigation

4  case, correct?

5     A.   His report is the primary source of the

6  Defendant's social history.  And in his report, which

7  is lengthy, the -- what mitigating factors are in the

8  case, probably most of them are found in that report,

9  or leads to them.

10     Q.   And so is it accurate to say that your

11  mitigation case relied upon his report?  That's fair

12  to say, right?

13     A.   Yes.  He was going to be called as a witness

14  for sure.  Uh-huh.

15              MR. GROSS:  No further questions, Your

16  Honor.

17              THE COURT:  All right.  Anything else?

18              MR. NORMAN:  Yes, Your Honor, just

19  briefly.

20              THE COURT:  Yes, sir.

21                  REDIRECT EXAMINATION

22  BY MR. NORMAN:

23     Q.   Mr. Jones, would your time sheets

24  specifically reflect the name of every witness that

25  you interviewed in this case?

Scanned  Jun 18, 2013

1     A.   I try.

2     Q.   Well --

3     A.   I -- I could not swear here that I had --

4  there was a witness -- if I interviewed a witness and

5  I didn't bill for it.  I couldn't say that occurred.

6  I know in other non -- just regular cases, that

7  sometimes I interview people and don't bill for it

8  because I don't make a memorandum and I can't go

9  back -- I can't remember how much time I spent, so I

10  just forget it.

11     Q.   Would they reflect, for instance, people that

12  you may have talked to at the time of trial in the

13  hallways or otherwise?

14     A.   No.  These are people where I would go visit

15  at their offices or homes or if I go out in the field

16  or having meetings at my office where I invite people

17  to come.  But casual, no, generally, I wouldn't bill

18  for that.  And I also don't bill for little short

19  telephone conversations that I have sometimes, you

20  know, little less than a minute 102 conversations.  I

21  just don't have time to write them down.

22     Q.   If you visited with the family as a whole,

23  would your time sheet reflect every name on the list

24  of family members?

25     A.   Not necessarily.  I might say "visit with the

MARY LOPEZ BUITRON, CSR, RPR
*Official Court Reporter - 94th District Court*

Scanned  Jun 18, 2013

12

1   Defendant's family" or -- it depends on, you know, the

2   situation.

3       Q.   Would your time sheet reflect every witness

4   that was interviewed on your behalf by your

5   investigator and mitigation expert?

6       A.   No.  In other words, I don't bill for -- I

7   didn't bill for -- no.  I just bill for things that I

8   personally did.

9       Q.   So --

10      A.   In other words -- like if Dr. Martinez

11  interviewed a witness, I would not bill for -- he

12  billed for that, not me.

13      Q.   Let me ask you:  Did your questioning -- do

14  you believe your questioning weeded out jurors who

15  would automatically vote for the death penalty based

16  purely on the guilt-innocence phase of trial?  In

17  other words, does your questioning weed out jurors who

18  would automatically vote for death simply because

19  Mr. Ramirez had been found guilty of capital murder,

20  murder in the course of robbery?

21      Q.   That was one of the principle objects, things

22  that we wanted to accomplish, is to weed out -- I have

23  an unflattering name for these people, people of

24  radical persuasions.  You know, that goes both ways.

25  There are some people that are radically opposed to

MARY LOPEZ BUITRON, CSR, RPR
*Official Court Reporter - 94th District Court*

Scanned  Jun 18, 2013

13

1   the death penalty, and there are some people that want

2   to be invited to the execution.

3              But once again, the best indicator or

4   clue as to where the juror's mind is and would direct

5   us in our later -- in our questioning of the juror was

6   that written -- where they were asked to write in

7   their own handwriting, and there's some astonishing

8   statements in some of those things.  But we would

9   target those, the radical ones that -- you know,

10  some -- we would target them for a challenge for cause

11  or to try to set them up for a challenge for cause or

12  mark them for a peremptory challenge if they were, you

13  know, close to the top of the list.

14       Q.   And would your evaluation of the jurors be

15  based both under questioning of them and on the juror

16  questionnaires, the written juror questionnaires?

17       A.   Yeah, both.

18       Q.   Both?

19       A.   Yeah, and then we would rate them.  We had a

20  one to -- I think we had a one to five, with one being

21  the best and five being the worst, and then -- and

22  then we would have to -- sometimes we would change

23  those, but tried to keep track of it as we went along.

24              MR. NORMAN:  Your Honor, at this time I

25  have copies of the juror questionnaires, confidential

MARY LOPEZ BUITRON, CSR, RPR
*Official Court Reporter - 94th District Court*

1    juror questionnaires.  Since Mr. Jones was a trial

2    participant, I would like to introduce these through

3    him.

4              THE COURT:  Okay.

5              MR. NORMAN:  May I approach the witness?

6              THE COURT:  Yes, sir.

7              MR. NORMAN:  Co-counsel I don't believe

8    has seen these.

9              MR. GROSS:  I take your word on it.  I

10   have no objection to admitting them, Your Honor.

11             MR. NORMAN:  If that's okay, I will offer

12   these and they are confidential so --

13             THE COURT:  Well, you can admit them

14   and then we'll put them under seal.

15             MR. NORMAN:  Exactly, Your Honor, I was

16   hoping to do that.

17             THE COURT:  Absolutely.

18             MR. NORMAN:  May I approach?

19             THE COURT:  Yes, sir.  No objection,

20   Mr. Gross?

21             MR. GROSS:  No objection.

22             THE COURT:  All right, it's admitted.

23             MR. NORMAN:  I pass the witness, Your

24   Honor.

25             THE COURT:  Anything else?

Scanned Jun 18, 2013

15

1        MR. GROSS:  Just wanted to clarify,

2   Your Honor, now that Defendant's Exhibit 4 has been

3   identified by both Mr. Jones and Mr. Garza as

4   accurately reflecting their time in the case, we would

5   would offer Defendant's Exhibit 4 into evidence.

6        MR. NORMAN:  I have no objection, Your

7   Honor.

8        THE COURT:  Admitted.

9        MR. GROSS:  And I have no further

10  questions.

11       THE COURT:  All right.  Mr. Jones, you're

12  free to go about your business, and I guess you have a

13  witness?

14       MR. GROSS:  Yes, Your Honor, and he's

15  indicated he's across the hall and available at 10:00.

16       THE COURT:  All right.  We'll resume at

17  10:00.

18       MR. GROSS:  All right, sir.  Thank you.

19       (Short recess.)

20       THE COURT:  Call your witness.  Call

21  Mr. Perkins?

22       MR. GROSS:  Yes, sir.

23       (Oath administered.)

24       THE COURT:  Be seated.  You may proceed.

25       MR. GROSS:  Thank you, sir.

MARY LOPEZ BUITRON, CSR, RPR
*Official Court Reporter - 94th District Court*

Scanned  Jun 18, 2013

```
 1                      ERIC PERKINS,
 2    having being first duly sworn, testified as follows:
 3                    DIRECT EXAMINATION
 4    BY MR. GROSS:
 5        Q.   Would you please tell us your name, sir.
 6        A.   Eric Perkins.
 7        Q.   What do you do for a living, Mr. Perkins?
 8        A.   I'm an attorney.
 9        Q.   What type of law do you practice?
10        A.   Largely criminal, but a smattering of family
11    law and general litigation and business practice.
12        Q.   How long have you been an attorney?
13        A.   22 years.
14        Q.   And what county primarily do you practice?
15        A.   Nueces.
16        Q.   Which is Corpus Christi?
17        A.   Yes, it is.
18        Q.   Are you board certified?
19        A.   I am not.
20        Q.   Have you handled capital murder death penalty
21    trials before?
22        A.   Trial, death penalty, yes.
23        Q.   Approximately how many?
24        A.   Well, I've had one death penalty trial, and
25    six other nondeath penalty cases.
```

MARY LOPEZ BUITRON, CSR, RPR
*Official Court Reporter - 94th District Court*

1  Q. Have you taken continuing legal education

2 classes regarding selection of juries, for instance,

3 in death penalty classes?

4  A. I have and I am currently a member of the

5 State Bar College.

6  Q. The -- the C.L.E. that you've taken, was it

7 offered by the Center for American International Law

8 or T.C.L.A. or which --

9  A. Both, both, and the Capital Defense Lawyer's

10 Project, and I think it's the American Center out of

11 Plano.

12  Q. Now, when you took the courses, for instance,

13 at C.A.I.L., C-A-I-L, the Center for American

14 International Law, did you take C.L.E. that covered

15 the -- what's called the Colorado method of Jury

16 Selection?

17  A. I've taken several courses on the Colorado

18 method, yes.

19  Q. And are you also familiar with the Texas

20 Standards for Capital Practioners?

21  A. I'm familiar with them, and I certainly

22 haven't committed them to memory.

23  Q. You are familiar, though, that the Texas

24 Standards for Capital Defenders of Trial Cases require

25 a mitigation expert in addition to a psychologist, in

MARY LOPEZ BUITRON, CSR, RPR

*Official Court Reporter - 94th District Court*

Scanned  Jun 18, 2013

1    addition to an investigator as a minimum for a trial?

2        A.   I -- I understand that those requirements

3    exist.  I also understand that those requests are not

4    always either granted or made, made or granted.

5        Q.   In Nueces County?

6        A.   And in some of the other counties I practice

7    in.  I had a capital case in Kindell County and ran

8    into the same problems.

9        Q.   Now, the --

10       A.   And -- and Jim Wells County just this year,

11   same problems.

12       Q.   Could you tell us just briefly what your

13   understanding of the Colorado method of Jury Selection

14   is in death cases?

15       A.   Sure.  The Colorado method asks the Defense

16   attorneys to make certain assumptions about a

17   person's -- the venireperson's either anti or pro

18   death penalty proclivties.  You rate those persons on

19   a scale of one to seven; seven being a person's

20   automatic death penalties is what we call them,

21   A.D.P.s.  And then number ones are called automatic

22   lifes.

23           The Colorado method involves categorizing

24   these people, at least giving them a preliminary

25   category prior to actually conducting the individual

Scanned Jun 18, 2013

1  voir dire.  And then during the course --

2     Q.  Let me pause you for just one minute to

3  interject.

4     A.  Sure.  So;.

5     Q.  Is it the accepted practice in the capital

6  defendant community at the trial level to make

7  decisions solely on questionnaires or does it also

8  require interviewing them at individual jury

9  selection?

10     A.  Oh, absolutely.  No, the questionnaire, in

11  fact, can be a very misleading initial starting point.

12  So you've got to go over the questionnaires

13  exhaustively.  We try to rank the individuals off the

14  questionnaires to give them the preliminary ranking as

15  to automatic death penalty or automatic life or

16  somewhere on the one to seven scale prior to

17  interviewing them individually.

18          And then during the course of the

19  individual voir dire of the person, it's important to

20  have one member of the team just monitor the questions

21  and answers and to adjust the rankings accordingly by

22  the answers that are being given.

23     Q.  Now, have you been surprised, like I have

24  when I've tried death penalty trials where you thought

25  a venireman was, say, a one, and then after you've

1  interviewed them, they end up being like an eight or

2  nine?  Have you been surprised like that also and vice

3  versa?

4      A.   Yeah, and that happens frequently because

5  they either don't understand the questionnaire

6  questions, the questionnaire is not a well-written

7  questionnaire or you made assumptions about their

8  answers that weren't true, so yes.

9      Q.   So you were talking about after you've looked

10  at the questionnaires then the individual jury

11  selection itself, how does the Colorado method apply?

12      A.   Well, during the individual jury selection

13  method, after the Judge has done the initial voir

14  dire, explaining general concept of the law, after the

15  State has done their general questioning --

16          MR. NORMAN:  I'm sorry, Your Honor, but

17  the State, just for the record, would object that if

18  the suggestion is that the Colorado method is the

19  method that should have been used, it exceeds the

20  scope of the writ.  The State would object to that.

21          MR. GROSS:  Well, the writ says the

22  venireman were not properly death qualified, Your

23  Honor, and I'm getting to the point where the Colorado

24  Method is the way to properly qualify the jury -- the

25  venires death qualified, and I'm getting to that, Your

Scanned Jun 18, 2013

 1   Honor.
 2              MR. NORMAN:  May I respond, Your Honor?
 3              THE COURT:  Yes, sir.  You may.
 4              MR. NORMAN:  The writ, I believe,
 5   narrowed that down to a specific -- well, specific
 6   deficiency.  They said that Mr. Jones didn't
 7   adequately eliminate those jurors who would have voted
 8   strictly for death based on the guilt-innocence phase,
 9   that this was a murder with robbery.
10              And if the questioning is meant to elicit
11   testimony that he should have used a particular method
12   or additional questions, I mean, the nature of the
13   Colorado Method -- the State would just like it on
14   record, we would object, that would exceed the scope
15   of the writ.
16              MR. GROSS:  It's not the way I read the
17   writ, Your Honor, and I'm the one that wrote it.  It's
18   very clear what we're looking at here is given the
19   scant questioning by trial Defense Counsel, there's no
20   way they could have made a -- an intelligent decision
21   on whether or not these veniremen were death
22   qualified.  Beginning at page 49 of the writ, Your
23   Honor, I mean, the case law that's covered on page 49
24   and 50 covers exactly what I'm getting at right now
25   with -- with  Mr. Perkins.

Scanned  Jun 18, 2013

22

1          THE COURT:   I agree.   Objection is

2    overruled.   Go ahead.

3          Q.   (BY MR. GROSS) So we were talking about how

4    the Colorado method allows you to determine the

5    proclivities of the veniremen as to their attitude

6    towards the death penalty?

7          A.   That's the design of it, yes.

8          Q.   And could you please tell us -- and of

9    course, there's all kinds of way to do jury selection,

10   right?

11         A.   Well, actually, I did overhear some of the

12   questioning.   The Colorado method is the only method

13   that I'm aware of.   I mean, there are as many

14   different styles of voir dire as there are probably

15   lawyers; but the Colorado method is the only one that

16   I'm familiar with that has a pattern of -- of

17   questions that you need to be asking in order to get

18   to the core question of the death penalty voir dire,

19   which is whether or not the individual venire person

20   can actually consider something other than the death

21   penalty.

22         Q.   And how does that work?

23         A.   Well, after all, the general --

24         Q.   And by the way, the Colorado method has been

25   taught since approximately the last ten years, right?

MARY LOPEZ BUITRON, CSR, RPR
*Official Court Reporter - 94th District Court*

Scanned  **Jun 18, 2013**

```
 1        A.   Yeah, I think '97 is when it first came into
 2   vogue, but after the general questions by the Court,
 3   after the general instructions and questions by the
 4   State, and after the general filling-in-the-gap
 5   questions by the Defense, then you go into what's
 6   called the stripping question.
 7             And the stripping question basically asks
 8   the jury -- the juror to consider a hypothetical.
 9   "You have been on this jury.  You're on a hypothetical
10   capital case.  You and the other members of the jury
11   panel have gotten all the evidence, you've gone back
12   to the jury room.  You've considered all that
13   evidence.  You've rejected any possible defenses.
14   It's not an accident.  It wasn't self-defense.  It
15   wasn't a mistake.  It was this guy.  He's guilty of
16   capital murder as charged in the indictment.  Now,
17   with all that aside, how do you feel about imposing
18   the death penalty under these circumstances"?
19             And the whole point behind that stripping
20   question is to make sure that that individual venire
21   person is not clouding his answers to the questions
22   that you're asking him now with possible defensive
23   issues and things like that, which may say, "Well,
24   I'll keep an open mind.  I'm going to keep an open
25   mind until I hear all the evidence and only then will
```

1  I decide whether or not the death penalty should be
2  imposed or not."
3           Because the death penalty is not the
4  automatic default in the death penalty case, even
5  though it -- it sounds like it should be, but it's
6  not.  The death penalty -- the way the statute is
7  written in Texas favors as a default position for the
8  jury to give life unless the two questions can be
9  answered in the way that they need to be answered in
10 order to impose the death penalty.
11      Q.   The two special issues?
12      A.   That's correct.
13      Q.   And then after the initial stripping
14 question, then how does the Colorado method get you in
15 then two the special issues?
16      A.   Well, first of all, after the stripping
17 question and after the juror has been allowed to voice
18 a clear position as to whether -- where he is on that
19 spectrum of one to seven, whether he's an automatic
20 death penalty guy or an automatic life person, then --
21 then you start pinning them down in order to exercise
22 appropriate, either a challenge for cause because they
23 are a more than excludable juror, or you're going to
24 try to rehabilitate them if they're -- if they fall
25 into the category of a No. 1 or a would excludable

Scanned Jun 18, 2013

1   juror so that you can -- you can rehabilitate them and

2   potentially keep them on the juror -- jury as a valid

3   juror.

4            MR. GROSS:  May I approach, Your Honor?

5            THE COURT:  Yes, sir.

6       Q.  (BY MR. GROSS) I would like you to read

7   yourself two pages out of the writ I filed.  I also

8   had trial Defense Counsel, Mr. Garza, read them also,

9   and I provided them to you earlier, but I just want to

10  make sure you're familiar with them again.  On Page 49

11  and 50 is just the law as regards to getting veniremen

12  death qualified, and I would like you just to read to

13  yourself pages 49 and 50, please.

14       A.  (Complies.)  Does it end on 50?

15       Q.  It does, yes, sir.

16       A.  Okay.

17       Q.  Now, Mr. Jones -- Mr. Garza, first chair

18  counsel in this case, trial Counsel, he agreed with

19  the law as cited on those two pages that that

20  accurately states the law in the nation as far as

21  qualifying venireman death qualified, and I asked him

22  to look, as just an example, at the first venireman

23  who was selected in this case, I believe it was

24  Gilbert, and -- and he read at a break the -- the jury

25  selection that was conducted by Mr. Jones of the first

Scanned  Jun 18, 2013

1   venireman.

2           And then when Mr. Garza came back in, he

3   agreed that reading the transcript of the Defense's

4   questioning and State's questioning of that first

5   venireman, that they did not have a good idea as to

6   whether or not that venireman was death qualified.

7   Now, I asked you to do the same thing; correct?

8       A.   That's correct.

9       Q.   And, in fact, I sent you the individual jury

10  selection of all the veniremen selected in the case,

11  correct?

12      A.   That's correct.

13      Q.   And I sent you the sections of my writ and

14  the portions of the juror questionnaires that pertain

15  to that, so that you could review it as a summary

16  witness for today, correct?

17      A.   That is correct.

18      Q.   Now, after reviewing --

19           MR. GROSS:  May I approach, Your Honor?

20           THE COURT:  Yes, sir.

21      Q.   (BY MR. GROSS) After reviewing all the

22  transcripts that I sent you on jury selection and

23  looking at these two pages on the law of making

24  veniremen death qualified in Texas and in the nation,

25  did you arrive at a conclusion as to whether or not

1    the veniremen that I listed on -- on iii on the table
2    of contents, page iii, did you arrive at a conclusion
3    as to whether or not those veniremen were death
4    qualified or not in this case?
5        A.   They were not death qualified according to
6    the Colorado method.  It was difficult to determine
7    where their -- their views actually would have landed.
8        Q.   And according to go the case law on pages 49
9    and 50 in the writ, specifically where the Supreme
10   Court in *Morgan v. Illinois* warns about general
11   questions and general answers, correct?
12       A.   Right.  And that's the biggest danger area
13   because when you ask a juror any -- any normal
14   reasonable person says they can be fair and impartial
15   and things like that.  It's rare that you get an
16   answer from somebody like that that they cannot be.  I
17   mean, the automatic conclusion most people want to
18   have about themselves is that they are fair and
19   impartial, and that's not -- that's not the issue in a
20   death penalty case.  And so, asking that question is
21   not asking the right question.
22       Q.   And what is the right question to ask?
23       A.   The right question is whether or not you can
24   consider the -- the two -- the mitigation issue and
25   you can consider the future dangerousness issue in the

1  appropriate circumstances.

2     Q.   In the stripping questions that you talked

3  about earlier?

4     A.   Correct.

5     Q.   Now, when you read the testimony of

6  veniremens (sic) Gilbert, Castaneda, Benavidez,

7  Johnston, Baucom, Bowman, Light, Foutch, Lyles, Leal

8  and Vermace, what was your opinion about whether or

9  not you knew if they were death qualified or not?

10     A.   There was not -- there was no way to grade

11  their death qualification on a one to seven scale,

12  particularly since some of them had come in just a

13  preliminary grading, some of them in their jury

14  questionnaires were sevens.

15     Q.   Which is death?

16     A.   Yeah, they were automatic death.  They

17  were -- they were -- you know, if it was a homicide,

18  they were eye-for-an-eye type of personalities.  So

19  those persons clearly deserve far greater scrutiny.  I

20  don't remember exactly off the top of my head because

21  it's been a couple of weeks since I reviewed those,

22  but three or four at least out of the 12 were sevens,

23  and nothing done to --

24     Q.   To delve into that?

25     A.   Well, not so much delve into it, but to

Scanned Jun 18, 2013

1  eliminate that as a -- it was never delved.

2      Q.  Were you alarmed at the lack of questioning

3  of these veniremen by the Defense as regards to

4  whether or not they were death qualified?

5      A.  Most of the questioning I read was fairly

6  routine questioning.  It was typical of voir dire

7  questioning.  It was not real specific to a death

8  penalty case.

9      Q.  And when you say "typical questioning," you

10  mean in a nondeath case?

11      A.  You know, "These are the principles of law,

12  you know.  You have to find him guilty beyond a

13  reasonable doubt.  You'll be getting some special

14  issues.  Can you consider mitigating evidence"?  None

15  of the specific questions that you would ask such as,

16  you know, "We understand you'll consider mitigating

17  evidence, but will you give true weight to it?  Will

18  you give it due consideration," not just a passing

19  consideration, which is the traditional way.

20      Q.  Were you alarmed or not at the lack of

21  information the obtained in their questioning of these

22  veniremen?

23      A.  I don't know if alarmed is the right word,

24  but certainly I noticed that the questions that needed

25  to be asked weren't being asked.

Scanned Jun 18, 2013

```
 1      Q.   Cause you concern?
 2      A.   Sure.
 3      Q.   Were you surprised?
 4      A.   Yeah, actually, I was.  Grant and Mr. Jones
 5  and Mr. Garza are -- are very good attorneys.  I
 6  consider them mentors.  I consult with them frequently
 7  in cases.  Grant is actually representing the death
 8  penalty client that I had a couple of years ago on his
 9  appeal, so sure.
10      Q.   So you were surprised at the deficiency, if
11  you will, of the questioning on these veniremen by
12  these people then?
13      A.   Yes, sir.
14      Q.   By these attorney.
15           Now, I also asked you to look at -- you
16  know, we talked a little bit earlier about the need
17  for a mitigation expert and a psychologist and an
18  investigator at minimum in a case, correct?
19      A.   That's correct.
20      Q.   And you've looked -- you've reviewed the --
21  the vouchers that were submitted by both attorneys in
22  Defendant's Exhibit 4, correct?
23      A.   Briefly.
24      Q.   And you've also been made aware that in
25  evidence are Defendant's Exhibits 6, 7, 8 and 9, which
```

1   are mitigation articles out of Mr. Garza's file,
2   correct?
3       A.   Briefly, yes.
4               MR. GROSS:  May I approach, Your Honor?
5               THE COURT:  Yes, sir.
6       Q.   (BY MR. GROSS) How important is it, do you
7   believe, that the mitigation investigation begin as
8   early as possible on a case?
9       A.   Mitigation in a -- in a clear-cut death
10  penalty case where guilt-innocence isn't really a huge
11  issue when you're really -- you're driving toward the
12  punishment phase of the trial, focuses the entire
13  investigation that Defense Counsel needs to be
14  involved in.  So without mitigation taking place at
15  least as a corollary to what you're doing regarding
16  preparing for the defense of the case, you -- you've
17  only completed half the job, and in some cases, not
18  even half the job.
19      Q.   And an early beginning of a mitigation
20  investigation in a case, how does that help with
21  regards to attorney-client relations, the trust
22  factor?
23      A.   Well, first of all, it demonstrates to the
24  client that no stone is being left unturned, and it
25  also helps the Defense Counsel because a portion of

MARY LOPEZ BUITRON, CSR, RPR
*Official Court Reporter - 94th District Court*

Scanned Jun 18, 2013

32

1  the case which is weighing on everybody's mind is
2  being dealt with by a professional at the same time
3  you're doing other work, so it helps with the stress
4  factor, with both the attorney's and client's, so the
5  client understands that he's being not just
6  adequately, built vigorously defended.
7      Q.  Now, in Defendant's Exhibit 6 that's in
8  evidence, it's an article out of Mr. Garza's file
9  dated April 1999 entitled *Capital Cases* by Russell
10  Stetler.  And in that article that I highlighted just
11  so no one has to look through too many pages, but it's
12  on page 3 of that article, it states that "Most
13  capital defense practitioners now recognize --" and,
14  of course, this is in 1999 "-- now recognize that it
15  is disastrous to wait until the eve of trial to
16  consult a mental health expert," or begin the
17  mitigation investigation.  Do you agree with that?
18      A.  It would be calamitous because if you just
19  had your mentally health expert on the eve of trial
20  and things suddenly arrive that needed to be dealt
21  with, it's too late.
22      Q.  Now in this case, Dr. Martinez acted as both
23  the forensic psychologist and the mitigation expert,
24  which of course you testified to earlier, the
25  standards in Texas have both -- have that separated

1  out as a mitigation expert and a psychologist; is that
2  correct?
3      A.  That's correct.
4      Q.  Now, I showed you earlier Dr. Martinez's --
5  on Defendant's Exhibit 10 is a summary of -- and
6  Dr. Martinez testified in this case, in this writ
7  hearing, and confirmed that everything on here is an
8  accurate summary of the time he spent in the case.
9  And knowing that jury selection began on October 23rd,
10 the first interviewing that was done of any mitigation
11 witnesses, it's undisputed in this case, didn't begin
12 until after jury selection began which was October
13 22nd of 2008.  Now, is that consistent or inconsistent
14 with Defendant's Exhibit 6 that was an article in
15 Mr. Garza's file in this case?
16      A.  Well, this article talks about mental health
17 experts.  This is actually going to -- to mitigation.
18 I'm not sure really whether this was referring to
19 mental health expert for the Defendant himself or for
20 outside witnesses, but what I can see here is he says
21 he interviewed John Henry back in July, but doesn't
22 begin what appears to be mitigation investigation
23 until after the trial has begun, which of course, is
24 rather hard to believe.
25      Q.  That's alarming, right?

Scanned  Jun 18, 2013

34

1    A.   Well, I -- I can't see of any -- any use that
2  it would be after that point.
3    Q.   Because don't you use the mitigation expert's
4  findings and the mental health expert's findings to
5  help determine a juror profile in a case?
6    A.   Well, you'd certainly use that as part of it.
7    Q.   And you want to be able to ask veniremen
8  about their thoughts on certain areas in general that
9  you think will come up in mitigation, right?
10    A.   Sure.  At least generally, you would want to
11 be able to talk, you know, "Would you consider
12 somebody's -- the fact that he was an abused child as
13 a -- or had -- you know, was homeless, or things like
14 that," to help focus your questioning of the
15 veniremen.
16    Q.   And also going along with Defense Exhibit 6
17 regarding mental health experts, it's undisputed in
18 this case that Dr. Martinez only administered one test
19 that was for approximately 30 minutes long that was
20 deemed invalid.  How does that -- is that consistent
21 or inconsistent with Mr. Garza's articles in his file,
22 particularly Defendant's Exhibit 6, with getting the
23 mental health expert done as far in advance of trial
24 as possible?
25    A.   Obviously, it's inconsistent.

Scanned Jun 18, 2013

1    Q.   Now, coupling what we just talked about with

2  Defendant's Exhibit 8, which is another article from

3  Mr. Garza's file from July 25th -- I'm sorry, from

4  July 2005, entitled *Mitigation in the Death*

5  *Belt Twelve Steps to Saving Clients' Lives*, it talks

6  about under step five what happens when a client

7  refuses to cooperate any longer regarding mitigation,

8  correct?

9    A.   That's correct.

10    Q.   And this article, what does it basically say

11  if a client refuses to cooperate?  It basically says

12  that you should go forward regardless, correct?

13    A.   Doesn't matter.

14    Q.   Right?

15    A.   That's right.

16    Q.   And by "doesn't matter," what do you mean by

17  that?

18    A.   The client, first of all, is not only a legal

19  expert; otherwise, he wouldn't be in the trouble that

20  he's in.  Number two, under the stress of the death

21  penalty case, the client's opinions about how the

22  legal Defense team should coordinate its activities

23  are, as far as I'm concerned, irrelevant.  They can

24  certainly contribute.  We need information from the

25  client.  They need to give us their cooperation, but

1  they don't drive the bus.

2      Q.   And what about a case where you have a client

3  like John Henry Ramirez was at the time who was

4  clinically depressed, severely clinically depressed,

5  suicidal, and had been administered only one

6  psychological test for 30 minutes the night before

7  they -- the night they made the decision not -- to

8  forego mitigation testimony, what's your opinion on a

9  defense attorney at that point?  Should they go ahead

10  and present their mitigation case or not?

11      A.   You absolutely have to.

12      Q.   And why is that?

13      A.   Because the client's mental condition is not

14  such that you can rely on him, you know, assuming the

15  client is still competent as that definition pertains,

16  you know, if he's still able to participate in his own

17  defense and contribute meaningfully to his own

18  defense.  It's the attorney's duty to defend his life

19  even if he's not interested in doing so.

20      Q.   Now, Defense Counsel then decided not to

21  present mitigating evidence like in this case with a

22  psychologically disturbed client.  Do you think that's

23  deficient performance?

24      A.   Absolutely.

25      Q.   And the -- the lack of death qualifying

1  questions that you saw for the veniremen we spoke

2  about earlier, did you view that as deficit

3  performance?

4       A.  I did.

5       Q.  And would you agree that those two coupled

6  together would cause you to not have confidence in the

7  verdict in that case?

8       A.  There's no other conclusion you can draw

9  other than that the death penalty was tainted by the

10 lack of questioning and qualification of that jury.

11            MR. GROSS:  Thank you, sir.  No further

12 questions, Your Honor.

13            THE COURT:  Cross?

14            MR. SKURKA:  Yes, sir.

15                 CROSS-EXAMINATION

16 BY MR. SKURKA:

17      Q.  Hi, Mr. Perkins.  My name is Mark Skurka.  I

18 have a few questions to ask you about this case.

19      A.  We've met.

20      Q.  We'll just start with the final conclusion.

21 That is your opinion that you think because of these

22 deficiencies that you say that's the only conclusion

23 you can reach that it was tainted.  That's what you

24 just said, correct?

25      A.  Just yes or no, then it's yes.

Scanned Jun 18, 2013

```
 1      Q.  Okay.  Isn't it a fact, though, that you
 2  really can't look into the minds of the jury and see
 3  what they decided on, and why they decided, correct?
 4      A.  No, but you can't on any jury.  That's
 5  exactly right.
 6      Q.  That's right.  So your opinion is something
 7  you think as a person who did not hear the testimony,
 8  correct?
 9      A.  It's --
10      Q.  You did not hear the testimony of the whole
11  trial like the jury did?
12      A.  No, I did not.  You're correct.
13      Q.  You did not hear the testimony done at the
14  guilt cr innocence phase, correct --
15      A.  Correct.
16      Q.  -- at all?  You did not hear the testimony or
17  every cne of the -- every bit of the jury selection
18  that took place in this case, just selected excerpts
19  that Defense Counsel provided you, correct?
20      A.  Correct.
21      Q.  And you weren't there actually in the
22  courtroom sitting next to Mr. John Henry Ramirez as
23  Mr. Jones and Mr. Garza were, correct?
24      A.  Correct.
25      Q.  Either at the very beginning of the trial or
```

1    that very last day of the trial?

2        A.    Never.

3        Q.    Okay.  So, again, you are making an opinion

4    based on things that you've been provided by the

5    Defense without having the entire scope of the trial

6    and its recordings available to you, correct?

7        A.    I was given the information based on the

8    scope of what I was to testify about, that's right.

9        Q.    But it's fair to say, you don't know

10   everything that happened in this court?

11       A.    Okay.  No question.

12       Q.    And you're only basing it on what was

13   provided you by Defense Counsel?

14       A.    That's correct.

15       Q.    Now, you also mentioned something about --

16   there's a lot to go over and let's just go back to the

17   beginning, okay?

18       A.    Sure.

19       Q.    We're going to go back to the Colorado method

20   that you first were called to testify to.  When did

21   you first start hearing about the Colorado method?

22       A.    That's tough to say.  Probably five or six

23   years.

24       Q.    Five or six years ago?  And wouldn't it be

25   fair to say -- and I know I came in a little bit late.

Scanned  Jun 18, 2013

40

1   You've only actually done one capital murder case; is

2   that right?

3        A.   One death penalty case.

4        Q.   One death penalty case.  Was that in this

5   county or another county?

6        A.   Here.

7        Q.   In Nueces County?  When was that?

8        A.   Carlos Lopez in 19 -- I'm sorry, 2005.

9        Q.   Carlos Lopez.  Is he the one that killed the

10  two ladies at the hospital?

11       A.   Uh-huh.

12       Q.   Okay.  And were you first chair on that?

13       A.   I'm sorry, I'm sorry.  Carlos Lopez and

14  Charles Orr, two years ago.

15       Q.   Charles Orr was more resent than Carlos

16  Lopez, right?

17       A.   Yeah, two years ago, 2009.

18       Q.   I'm sorry?

19       A.   2009.

20       Q.   2009.  And did the State seek the death

21  penalty in both those cases?

22       A.   Yes.

23       Q.   And were you first chair or second chair on

24  those cases?

25       A.   Second chair in both.

MARY LOPEZ BUITRON, CSR, RPR
*Official Court Reporter - 94th District Court*

Scanned  Jun 18, 2013                                          41

1          Q.    Second chair, okay.  So the record should

2    reflect that you've actually never been a lead

3    attorney in a death penalty case?

4          A.    That's correct.

5          Q.    That's correct.  And are you familiar with

6    Mr. Jones and Mr. Garza's amount of times they've been

7    first chair in those case -- type cases?

8          A.    Absolutely.  Extensively.

9          Q.    Extensively, right?

10         A.    Uh-huh.

11         Q.    Would it be fair to say much more extensive

12   than your experience?

13         A.    Much more extensive.

14         Q.    In fact, I bet you could probably not argue

15   with me if I said they've each done probably more than

16   ten or so death penalty cases.  Wouldn't you agree

17   with that?

18         A.    Far more than ten.

19         Q.    Far more than ten cases.  So if we're looking

20   at people that's actually been experienced in death

21   penalty cases, prosecuting them and actually defending

22   them, correct?

23               Let me rephrase the question.  In fact,

24   Mr. Jones used to be the district attorney, correct?

25         A.    Correct.

Scanned  Jun 18, 2013

1    Q.   For, I don't know, about 15 years or 12 years

2    or something like that?

3    A.   I have no idea.  I mean, it was a long time.

4    He was D.A. when I first started here, so --

5    Q.   But it was fair to say it was a long time,

6    like probably more than 10 years, correct?

7    A.   And Mr. Garza as well.

8    Q.   And Mr. Garza was his first assistant

9    district attorney for about the same a time or a

10   similar time, around 10 years?

11   A.   I don't know.

12   Q.   I don't know the exact dates either, so we're

13   together on that.  So -- and as prosecutors, both

14   Mr. Jones and Mr. Garza prosecuted people for the

15   death penalty and -- a number of times, correct?

16   A.   As far as I know, yes.

17   Q.   And once they became -- got out of the

18   prosecution business and went to the Defense side,

19   they probably, would you agree with me, that they

20   probably defended about an equal number of death

21   penalty cases?

22   A.   I really wouldn't have anyway, but I'm

23   comfortable with that.

24   Q.   Okay.  And I don't know the exact numbers

25   either, but it's fair to say they have extensive

1   history in both prosecuting and defending capital
2   murder cases, correct?
3        A.   Correct.
4        Q.   And not to be -- you know, just to point out
5   that -- that it's far more than you, correct?
6        A.   No question about it.
7        Q.   And have you ever taught on the Colorado
8   method?
9        A.   No.
10       Q.   How many seminars have you gone to about the
11   Colorado method?
12       A.   I go to two every year, so -- and Colorado
13   method is usually taught as a portion of those capital
14   murder seminars, so more than -- more than a few
15   times.
16       Q.   Okay.  So you've never been to a seminar
17   that's only on the Colorado method, correct?
18       A.   Yes.
19       Q.   You have been?
20       A.   Yes.
21       Q.   And where was that?
22       A.   Austin.
23       Q.   When?
24       A.   A couple of years ago, probably last spring.
25       Q.   So this is 2011, so probably 2009?

MARY LOPEZ BUITRON, CSR, RPR
*Official Court Reporter - 94th District Court*

Scanned  Jun 18, 2013

44

1    A.   No.   It would have been 2010, but there were
2 times in 2009 as well.
3    Q.   And -- well, of course, this case was tried
4 in 2008, correct?
5    A.   I believe so.
6    Q.   Okay.  So when you started going to these
7 seminars, it was even after this trial began, correct,
8 2008?
9    A.   That's correct.
10    Q.   Okay.  How many people -- I'm sorry.  Do you
11 have any kind of -- when you talked about the Colorado
12 method, is that something that is done throughout
13 Texas in your information?
14    A.   From the people I have contacted with the
15 death penalty qualified lawyers who attend these are
16 from all over the State, everybody to the best of
17 their ability employs the Colorado method.
18    Q.   How many times have you seen it employed in
19 Nueces County?
20    A.   I think Mr. Gonzales and I employed it for
21 the first time that we're aware of here in Nueces
22 County during the Charles Orr trial.
23    Q.   That would have been two years ago?
24    A.   2009.
25    Q.   Okay.  So after all this time in Nueces

1     County, really it's only been used one time?

2         A.   To my knowledge.  I mean, obviously, there's

3     not going to be any documentation --

4         Q.   Sure.

5         A.   -- as to whether or not a particular -- you

6     would have to check the transcripts of every death

7     penalty trial that's been conducted here to find out

8     whether or not those attorneys were employing the

9     Colorado method.

10        Q.   Well, as the prosecutor who's tried most of

11    the capital murder cases in the last 25 years,

12    would it be surprising to know that I've never seen

13    anybody use it like that?

14             MR. GROSS:   Objection, Counsel is

15    testifying.

16             THE COURT:   Sustained.  You can't

17    testify.

18             MR. SKURKA:   I understand.

19        Q.   (BY MR. SKURKA) Would it -- are you aware

20    besides the time you and Mr. Gonzales did it of any

21    other specific cases where lawyers used that in town?

22        A.   I'm not aware.

23        Q.   Okay.  So you, of course, are testifying that

24    these gentlemen, Mr. Garza and Mr. Jones, should have

25    used this -- this procedure about a procedure you

```
 1   didn't even start learning about until 2009?
 2            MR. GROSS:  I object to that, Your Honor.
 3   He says that he's learned about it before then, and he
 4   said it's been around since the '90s.  That's
 5   mischaracterizing his testimony.
 6            THE COURT:  He can ask the question.
 7            MR. SKURKA:  I'll just go onto something
 8   else, Judge.
 9            THE COURT:  Okay.
10       Q.  (BY MR. SKURKA) What date or what case has
11   the Colorado method become this so-called standard
12   in -- in Texas?
13       A.  Oh, I don't think it's become the standard,
14   and that's unfortunate because it's a fairly effective
15   method.
16       Q.  Okay.  And let's talk about that for a
17   minute.  You agree with me that there is no standard
18   in Texas of using the Colorado method for seating
19   jurors in capital murder cases?
20       A.  Absolutely no standard.
21       Q.  So the fact that Mr. Jones and Mr. Garza may
22   have not used this doesn't violate any standard that's
23   known in Texas, does it?
24       A.  No.  I mean, it doesn't violate a particular
25   standard.
```

Scanned  Jun 18, 2013

47

1    Q.   It doesn't violate any kind of ethical
2    standard of what you have to do?
3    A.   I -- I wouldn't be inclined to go that far.
4    I mean, if you're aware of a procedure that is better
5    than another procedure and you don't have a real good
6    explanation of why you're not using it, it's -- you
7    know, you've got general concepts of Sixth Amendment
8    right to counsel and there's plenty of Supreme Court
9    cases that talks about what you got to do in order to
10   sustain that very high obligation to your client.
11       Q.   What disciplinary rule are you quoting there?
12       A.   No disciplinary rule.
13       Q.   No ethical rule?
14       A.   No.
15       Q.   Okay.  In fact --
16       A.   Sixth Amendment.
17       Q.   Say again?
18       A.   Sixth Amendment to the Constitution.
19       Q.   Sixth Amendment.  I understand, but we're
20   talking about the Colorado method, and we're talking
21   about the lack of using it does not violate any
22   ethical or gold standard in Texas, does it?
23       A.   But I think you're missing the point.  It's
24   that it's not necessarily the method itself, it's what
25   the method derives to get as information from the

MARY LOPEZ BUITRON, CSR, RPR
*Official Court Reporter - 94th District Court*

1   jurors that's not being obtained through the

2   traditional questioning of a jury by asking the

3   questions such as "Can you be fair and impartial, can

4   you consider mitigating evidence, can you consider the

5   issue of future dangerousness"?

6       Q.   Are you saying that those lawyers who never

7   used it in any one of those veniremen at all during

8   the testimony and during the -- during of the jury

9   selection phase of this trial, never used those words?

10      A.   No, they asked those questions.

11      Q.   Of course, they did.

12      A.   They asked those questions.

13      Q.   They asked those questions and the fact that

14  they didn't ask them in a structured way, perhaps as

15  the Colorado method suggests, doesn't mean they

16  weren't arriving at those conclusions, does it?

17      A.    It -- it's much more difficult to get around

18  implanted and difficult to derive personally held

19  beliefs without the stripping question because it's --

20  it's --

21      Q.   Unless you have maybe 30 years experience --

22           MR. GROSS:  Object to Counsel

23  interrupting the witness's answer.

24           THE COURT:  Sustained.  Mary is going to

25  get mad at us.

MARY LOPEZ BUITRON, CSR, RPR
*Official Court Reporter - 94th District Court*

Q.   (BY MR. SKURKA) Go ahead and finish?

A.   The stripping question is very important of the Colorado method because it makes sure that the attorney and the potential venireperson are dealing with each other on an apples to apples, rather than apples to oranges basis.  The venireperson has to understand that you're talking about somebody that they have convicted beyond a reasonable doubt of capital murder without the veneer of any defenses, mistakes, accidents or other justifications clouding the issue; and that's the whole point behind the stripping question is to make sure you're dealing apples to apples with the jury -- with the venireperson.

Q.   And I understand you're quoting the platitudes of --

A.   No, no, no., I'm not quoting platitudes.

Q.   -- of the Colorado method?

A.   No, these aren't platitudes, Mark.  These are really important considerations because without getting to go that core that you know that you're dealing with the jury -- the juror on the -- the basic core belief of death penalty, whether or not they can consider mitigation and they can properly consider the question of future dangerousness, you're not asking

1   the right questions.

2       Q.   But that's just your opinion that they didn't

3   ask the right questions.  Those gentlemen, would you

4   agree with me, with all their combined 60 or more

5   years of experience were sitting at counsel table,

6   could see the witness or the potential juror on the

7   stand, could figure out based on their experience and

8   what answers they're getting from the person on the

9   stand, and from their demeanor and how they appeared

10  that they could make those decisions without these --

11  these questions set up by the Colorado method?

12      A.   And then taking that, I guess, to it's --

13  it's obvious conclusion that an attorney with enough

14  experience wouldn't need to ask any questions

15  whatsoever and could just look at somebody and decide

16  whether or not they're --

17      Q.   But that's not my question, Mr. Perkins.

18      A.   It --

19      Q.   That's -- that's absurd.  I didn't ask that.

20  I said, "Based on their experience and training,

21  wouldn't you agree with me that they could come up

22  with a set of questions based on their experience and

23  training that didn't necessarily have to rely on the

24  Colorado method"?

25      A.   No, Mark, because it doesn't depend on your

MARY LOPEZ BUITRON, CSR, RPR
*Official Court Reporter - 94th District Court*

Scanned  Jun 18, 2013

1   experience and training.  It depends on your ability

2   to get jurors to answer the questions honestly and

3   deal with the issues.  It doesn't matter how much

4   training you get, individuals are individuals.  You

5   got to ask them the appropriate questions or you're

6   not going to get the right answers.

7       Q.  But you agreed with me a little while ago

8   that they did ask some of those appropriate questions.

9       A.  No, I told you they asked the traditional

10  questions, "Can you be fair --"

11      Q.  No --

12      A.  "-- can you be impartial, will you consider

13  mitigating evidence"?  That's not enough.

14      Q.  Well, those weren't the questions I was

15  referring to in your prior testimony, but have you

16  seen other attorneys that may be just as experienced

17  as Mr. Jones or Mr. Garza use the Colorado method or

18  not -- or use their own method?

19      A.  Again, you know, I'm not familiar with

20  another method per se.

21      Q.  Well --

22      A.  We have our techniques.  We use our

23  individual experience, you know, the same things

24  you've built up over your many years of experience.

25  You would incorporate that in, but I would expect -- I

MARY LOPEZ BUITRON, CSR, RPR
*Official Court Reporter - 94th District Court*

Scanned  Jun 18, 2013

52

1   would expect that you would adapt your -- your

2   techniques to the individual circumstances of the

3   case, and that's what the Colorado method requires.

4   It imposes an obligation on the attorney to ask the

5   appropriate questions to fit jurors into this scale of

6   one to seven as a way of getting a good snapshot of

7   what -- whether you're dealing with an automatic death

8   penalty or an automatic life person, so you can make

9   educated decisions about executing peremptory

10   challenges because that's the eat whole point behind

11   the voir dire process is to get enough information so

12   that you can intelligently exercise peremptory

13   strikes.

14       Q.   So are you tell -- is it your testimony that

15   Mr. Jones and Mr. Garza did not intelligently use

16   their experience, their training, the seminars they've

17   been into, the methods they've acquired in trying many

18   more capital murder cases than you to employ their way

19   of rating or finding out which jurors would be the

20   best for the Defense?

21       A.   Oh, there's no question they did that.

22       Q.   All right.  And you don't have to rely on

23   that.  Other lawyers such as Doug Tinker, Rick Rogers,

24   other people who tried many capital murder cases, they

25   could rely on their own style or their own methodology

MARY LOPEZ BUITRON, CSR, RPR
*Official Court Reporter - 94th District Court*

1  and not even use the Colorado method or use parts of

2  it; isn't that true.

3      A.   Yeah.   Again, there is no ethical

4  consideration that requires any attorney in the State

5  of Texas to use the Colorado method.

6      Q.   Thank you.   And there is no guarantee using

7  the Colorado method; isn't that true?   You can't tell

8  this Court or this record -- tell this record -- tell

9  this Appeals Court that if, in fact, Mr. Jones and

10 Mr. Garza had used the Colorado method, the verdict

11 would have been different; he would have got a life

12 sentence.   You can't tell the judge that, can you?

13     A.   No, I can't I can tell the Judge that.

14     Q.   Of course not.

15     A.   I can tell the judge this, that since

16 the Colorado method --

17     Q.   You have to wait until I ask you a question

18 before you can tell Judge this.   I know what you're

19 going to say -- well, never mind.   I won't get into

20 that.

21     A.   Okay.

22     Q.   You talked about -- hold on just a second.

23 Let me see the next part I want to go to.   Going back

24 to being in the courtroom, you would agree, would you

25 not, that the sworn testimony -- and, of course, the

MARY LOPEZ BUITRON, CSR, RPR
*Official Court Reporter - 94th District Court*

Scanned  Jun 18, 2013

 1    jurors are up there, the potential jurors are up

 2    there.   They're sworn to tell the truth and to give

 3    true answers to the questions propounded to them.   You

 4    can't tell the Court here that these jurors lied to

 5    Mr. Garza or Mr. Jones when they were asking them

 6    questions, correct?

 7         A.   I was never asked to evaluate whether they

 8    told the truth or not.

 9         Q.   Well, the reason I'm saying is that you said

10    that these lawyers have to ask these stripping

11    questioning in order to get at the truth?

12         A.   The stripping question --

13         Q.   Well --

14         A.   -- and --

15         Q.   But let me --

16              COURT REPORTER:   I can't get both.

17              THE WITNESS:   Sorry.

18         Q.   (BY MR. SKURKA) Let me finish my question.

19    You can't tell whether or not the jury did not

20    respond or reply truthfully to Mr. Jones's questions

21    or Mr. Garza's questions without having the stripping

22    question answered -- asked them, correct?

23         A.   The stripping question does not go to whether

24    or not they're testifying truthfully or not.   It goes

25    to the issue of whether or not they fully understand

MARY LOPEZ BUITRON, CSR, RPR
*Official Court Reporter - 94th District Court*

1   the issue and what is being asked of them in -- in a

2   capital murder trial death penalty case.

3        Q.   And I understand that, but if you don't ask

4   the stripping question, you can still get an idea if a

5   person understands a legal concept, can't you?

6        A.   It's not so much whether or not they

7   understand the legal concept, it's whether or not you

8   are dealing with them on -- again, on an apples to

9   apples, rather than apples to oranges basis.  You got

10  to get the potential venireperson past the point of

11  considering defenses or justifications or other things

12  like that.  You got to make sure that they understand

13  you're talking about a jury that has convicted a

14  person of the charge of capital murder.  Only then can

15  you be asking them intelligent questions about whether

16  or not they could consider or not consider the death

17  penalty.  That's all.

18       Q.   But I am not asking this question about the

19  stripping question.  I'm asking you how do you know

20  that through their sworn testimony and the demeanor of

21  their response and how they acted that Mr. Garza and

22  Mr. Jones sitting over there that wasn't sufficient

23  enough to show they could give honest answers and

24  understood the questions?

25       A.   Because you cannot confirm that they are not

MARY LOPEZ BUITRON, CSR, RPR
*Official Court Reporter - 94th District Court*

Scanned  Jun 18, 2013

56

1   laying that veneer of justification of self-defense or

2   other possible defenses, such as lack of I.D., any of

3   those things that might prevent a verdict on

4   guilt-innocence as opposed to punishment.  That's the

5   point.

6       Q.   Well, you are aware, are you not that the

7   stripping question -- that your stripping question may

8   not add specific facts of the case without becoming an

9   improper commitment question?

10      A.   Absolutely, absolutely.

11      Q.   It could become an improper commitment

12  question?

13      A.   You don't make the stripping questions case

14  specific.  It doesn't have to be.

15      Q.   Okay.  And that would make a commitment

16  question, correct --

17      A.   Sure.

18      Q.   -- if it did that?  Without the specific

19  facts of this case, your stripping question really

20  doesn't go any further than the questions asked --

21  that were already asked in the case, does it?

22      A.   No, it does because, again, it goes to the

23  point of making sure that the juror is not confusing

24  the issue with guilt-innocence points, such as

25  defensive issues, justification, improper I.D.,

MARY LOPEZ BUITRON, CSR, RPR
*Official Court Reporter - 94th District Court*

Scanned  Jun 18, 2013

1   whether or not the person is guilty or not guilty.
2   You're getting them to strip that away, that's the
3   whole point for the question.  We are at the
4   conclusion of the trial.  You have found the Defendant
5   guilty beyond a reasonable doubt of capital murder.
6   "There.  Are no longer any questions in your mind,
7   Mr. Venireperson, that the Defendant is guilty.  Now,
8   let's talk about the death penalty."
9       Q.   But, of course, doesn't that beg the
10  question -- you keep saying this question, like, make
11  sure that it is and it guarantees and make sure
12  that -- but isn't it a fact that lawyers can make
13  sure -- or sure of what witnesses are -- or potential
14  jurors are saying by the fact that their responses,
15  their demeanor, and their attitude toward the juror --
16  to the lawyer?  They can do that, can't they?
17      A.   Okay.  You know, we don't drive around in
18  horses and buggies anymore, but you can.
19      Q.   I know, but what you're -- I know, but you're
20  arguing that they're not adopting modern methods;
21  correct?  That's essentially what you're saying.
22      A.   It's not so much a modern method, it's a
23  particularly effective method.  It's so effective that
24  the State of Colorado moved away from jury punishment
25  on capital murder cases because of the Colorado

Scanned  Jun 18, 2013

1    method.

2        Q.   But we are not here to argue about the

3    validity of the Colorado method and what Colorado did.

4        A.   It's got nothing --

5        Q.   We're talking about Texas law.  Texas law

6    does not require it, does it?

7        A.   It's got nothing to do with validity, Mark.

8    It's got to do with effectiveness.

9        Q.   Well, the question on effectiveness is

10   something that somebody else would have to agree, but

11   you've already told us that many lawyers are effective

12   without using the Colorado method; correct?

13       A.   Yes.

14       Q.   And isn't it a fact that many of the lawyers

15   across this State obtain life sentences on capital

16   murder cases without utilizing the Colorado method?

17       A.   I'm assuming it's happened because not

18   everybody gets convicted of capital murder; you're

19   correct.

20       Q.   Okay.

21            THE COURT:   Anything else?

22            MR. SKURKA:   If I can have just a moment,

23   Your Honor?

24            THE COURT:   Okay.

25       Q.   (BY MR. SKURKA)  Switching a little bit now to

MARY LOPEZ BUITRON, CSR, RPR
*Official Court Reporter - 94th District Court*

1   the mitigation part that you were talking about.

2       A.   Uh-huh.

3       Q.   You said the area about mitigation is very

4   important, to start that early and getting that worked

5   on early on.   And it is true, though, through the

6   records that Mr. Gross showed was that Dr. Martinez

7   was hired early and spoke to Mr. -- Mr. Ramirez like

8   in July or something, way before the trial; correct?

9       A.   Well, I don't know about way before the

10  trial.   I don't know how early on the case was

11  indicted but, I mean, mathematically, it was three

12  months before the trial.

13      Q.   Okay.   And is there any magic number or days

14  or months that a mitigation expert has to be in touch

15  with a client to make it, you know, acceptable or

16  nonacceptable?

17      A.   No.

18      Q.   So you're not saying that just because he

19  started in August and maybe the trial selection -- the

20  jury selection started in October 23rd, that's not per

21  se too late or last minute; is it?

22      A.   No.

23      Q.   The question -- I guess, going to the crux of

24  the matter was whether -- when he interviewed these

25  mitigation witnesses.   I think that was the point you

1    were trying to make, that he should have interviewed

2    them earlier; correct?

3         A.    He started interviewing them after the trial

4    began.

5         Q.    I know.  And your point was he should have

6    started earlier?

7         A.    Yeah.  He should have started probably before

8    the trial began.

9         Q.    And I understand that.  And wouldn't it be

10   fair to say, though, if he had already received the

11   information from his client, Mr. Ramirez had

12   identified who were -- the possible mitigating

13   witnesses were, he had probably a pretty good idea of

14   what these witnesses were going to say anyway before

15   he did a formal interview with them?  Wouldn't that be

16   fair to say?

17        A.    No.  No, that would not be fair to say.

18        Q.    So the client wouldn't tell him -- well, when

19   he asked the client, "Who would be a good mitigating

20   witness for me to call," and he would say, "Well, my

21   grandmother because she raised me and she knows the

22   trouble I went through," and -- blah, blah, blah, and

23   told him all this stuff.  You're saying that would be

24   valueless to Dr. Martinez before he could even talk to

25   the grandmother?

MARY LOPEZ BUITRON, CSR, RPR
*Official Court Reporter - 94th District Court*

Scanned  Jun 18, 2013

1     A.   I think the value would be limited to in

2  identifying who a potential mitigating witness would

3  be, but even then, if you're only going to rely on

4  your client to provide you evidence of mitigation,

5  you're missing the point.

6     Q.   But I didn't say he was relying on his

7  client.   What I said was his client provided that

8  information to him at a time, and it was easy enough

9  for him to follow up, whether it was a week before the

10 trial, during the trial, or five months before the

11 trial.

12     A.   I'm going to take the position right here and

13 now that mitigating -- interviewing mitigating

14 witnesses after the trial has begun is probably per se

15 deficient behavior.

16     Q.   Well, the question he's talking about is

17 interviewing them.   My question is, isn't it a fact --

18 a fact that you have to identify those people first

19 before you can go interview them; correct?

20     A.   At a minimum, sure.

21     Q.   Sure.   So the more important thing is what

22 mitigating factors can you identify and find and stuff

23 before you actually interview the person.   And he had

24 those, didn't he?

25     A.   It's difficult to tell from Dr. Martinez's

Scanned  Jun 18, 2013

62

1    billing that anything other than he interviewed

2    Mr. Ramirez on July 16th.  That's all I can derive

3    from that.

4         Q.   But if he had gotten that information from

5    Mr. Ramirez on July 14th or whatever date it was, he

6    would have that information available to him; correct?

7         A.   I can't tell from his billing whether or not

8    that happened and if he did anything with it prior to

9    the trial commencing.

10        Q.   Okay.  The fact of the matter is you're

11   talking about the mitigation part.  He should have

12   interviewed those people earlier, and you agreed with

13   that; correct?  That doesn't necessarily mean the

14   verdict would change if he had interviewed them two

15   months before the trial, would it?

16        A.   No.

17        Q.   You can't tell the -- the Court that -- that

18   because he interviewed them a week before or a month

19   before, two months before, that would change the

20   verdict; correct?

21        A.   No, I can't tell anybody that.

22        Q.   The bottom line is before that evidence was

23   presented to the jury, there was some interviews made

24   for the mitigation; correct?

25        A.   I -- I can't tell from the billing that

Scanned  Jun 18, 2013

1    Dr. Martinez provided whether anything took place

2    other than him interviewing Mr. Ramirez.

3        Q.   But if there was testimony from other

4    witnesses, you wouldn't dispute that, that there was

5    mitigation work done ahead of time?

6        A.   No, sir.

7        Q.   The last part I want to talk about is the --

8    the talking about whether -- who gets to make the

9    decision to go forward on the punishment phase of the

10   trial, and that's the last area I would like to cover

11   with you.

12             Are you aware that if the client is

13   deemed to be competent to be tried, he can also be --

14   that could also be interpreted that he is competent to

15   instruct his attorney what to do and help prepare his

16   defense or present his defense?

17       A.   A client doesn't help prepare a defense by

18   telling his attorney not to present helpful evidence.

19       Q.   The point is, if he's competent, he is

20   competent to make all decisions related to the defense

21   of his case by the virtue of him being competent;

22   isn't that true?

23       A.   I disagree.  I disagree.

24       Q.   Well -- okay.  Let's go with the law then.

25   Does the law prevent him from making decisions if he's

Scanned  Jun 18, 2013

64

1  otherwise competent in his case?

2      A.  His attorneys' ethical obligations to their

3  client prevent them from following that advice.

4      Q.  If a doctor gets up on the stand, and says:

5  I'm Dr. Martinez.  I've been this guy's lawyer -- I'm

6  sorry, psychologist for five or six months, or

7  whatever, has known him for all that time, has been

8  with him many, many times during the course of the --

9  his investigation, and he gets up on the stand and

10  tells a judge that this man is competent to make these

11  decisions, he knows what he's doing, his wits and his

12  faculties are about him, are you saying that kind of

13  evidence should be ignored by the trial counsel?

14      A.  I'm not sure what you're saying.

15      Q.  I'm saying if the doctor says he's -- he is

16  competent, that he's not suffering from suicidal

17  ideations, and not suffering from depression and that

18  he is competent to assist his attorneys in his

19  defense, a trial judge should disregard that witness's

20  statement?

21      A.  No, I wouldn't expect -- I'm not sure what

22  the point of that witness's statements are being used.

23      Q.  Well, if a lawyer -- if you were a lawyer,

24  it's obvious you would have done something different

25  from Mr. Jones and Mr. Garza; correct?

Scanned Jun 18, 2013

65

1    A.   Correct.

2    Q.   And you say that makes them deficit because

3  they have a different approach?

4    A.   I'm saying allowing a client to -- to control

5  the presentation of evidence in his defense is a

6  mistake.

7    Q.   Well -- excuse me just a second.

8         So what you're saying is if you were in

9  the same position and you had a person telling you to

10  not put on a defense in your case, you would have done

11  exactly the opposite?

12    A.   I would have put on the defense without -- I

13  would have ignored his request.

14    Q.   And that's, again, your decision.  That's

15  what you think your ethical obligation was?

16    A.   Yes, that's correct.

17    Q.   And, of course, that -- that doesn't mean

18  your ethical obligation -- that your feeling is cited

19  in a court of law; correct?

20    A.   I'm sorry?

21    Q.   The -- there's no -- the basis for your

22  decision is your personal decision, not an ethical

23  rule, not a standard in the courts that a lawyer has

24  to do; correct?

25    A.   Sixth Amendment right to counsel guarantees a

MARY LOPEZ BUITRON, CSR, RPR
*Official Court Reporter - 94th District Court*

1  person that he is going to have effective
2  representation through every phase of his trial.  For
3  an attorney at the most critical phase of his trial to
4  not put on evidence that would save his client's life
5  is deficient.
6      Q.  Well, again, that is your opinion.  But the
7  fact is you don't know whether or not that would have
8  saved his life or not?
9      A.  I know he would have had a better chance if
10 that evidence had been presented.
11     Q.  But the simple fact is you -- you -- when you
12 talked to counsel, you said their performances were
13 deficient, also leads --
14     A.  In that respect, that's correct.
15     Q.  -- also leads to the conclusion that it might
16 have been a different verdict, but you can't tell the
17 Court that, can you?
18     A.  No, I mean --
19         MR. GROSS:  I object to that, Your Honor.
20 The standard is whether you lack confidence in the
21 verdict, not whether it would be a different verdict.
22         THE COURT:  Well, that's overruled.  You
23 can answer the question.
24     Q.  (BY MR. SKURKA) Well, the fact is you can't
25 guarantee the Judge that the verdict would have been

Scanned Jun 18, 2013

1  different?

2      A.  No.

3      Q.  In fact, if Mr. -- carrying it further, if

4  Mr. Jones and Mr. Garza had disregarded Mr. Ramirez's

5  wishes and presented this evidence, the jury could

6  still have given found him guilty -- still could have

7  given him a death sentence; correct?

8      A.  Sure.

9      Q.  You just don't know, do you?

10      A.  No.

11          MR. SKURKA:  All right.  We'll pass the

12  witness.

13          THE COURT:  All right.  Anything else?

14          MR. GROSS:  Real briefly, Your Honor.

15          THE COURT:  Okay.

16              REDIRECT EXAMINATION

17  BY MR. GROSS:

18      Q.  The -- starting with the last part of the

19  cross-examination, Mr. Perkins, on the competency to

20  make the decision, again, you realize that was

21  Dr. Martinez's conclusion was based on one 30-minute

22  psychological evaluation that was deemed invalid;

23  correct?  You had understand that, right?

24      A.  Yes, I do.

25      Q.  Now, looking at those Defense exhibits that I

1  showed you earlier that were the articles out of
2  Mr. Garza's own trial Defense Counsel files, his own
3  file -- his own article said you still proceed with it
4  regardless; correct?
5        A.   That's correct.
6        Q.   And that's the standard under which Mr. Garza
7  was operating out of his file; correct?
8             MR. SKURKA:  I'm going to object to that.
9  That's not a standard because you have an article in
10 your -- in your briefcase saying what strategy you
11 should do.  That's no standard, Your Honor.
12            THE COURT:  What's the objection?
13            MR. SKURKA:  Okay.  Let me think for a
14 second.  I object that it's an improper question,
15 Judge, because it calls for a conclusion on the part
16 of the witness that's not based on the facts.
17            THE COURT:  Well, that's overruled.
18       Q.   (BY MR. GROSS) Going back to the Colorado
19 method, you said that since the Colorado method wasn't
20 used when talking about the stripping questions and
21 whatnot, you were cut off by the prosecutor and
22 weren't allowed to finish your answer regarding
23 sufficient information from the juror since the
24 Colorado method wasn't used.  Do you recall that?
25       A.   Yes.

Scanned Jun 18, 2013

69

1    Q.   And is that what you were getting at?  We

2  don't have enough information now because the Colorado

3  method wasn't used?

4    A.   Correct.

5    Q.   The prosecutor said you can't look into the

6  minds of the jury in this case and -- and make a

7  determination; but that's also because of insufficient

8  questioning by the trial Defense Counsel; correct?

9    A.   That's correct.

10    Q.   Now, the prosecutor asked you about whether

11  or not you thought the jurors were lying or not or

12  giving honest answers.  Do you recall that part of his

13  cross?

14    A.   I do.

15         MR. GROSS:  May I approach, Your Honor?

16         THE COURT:  Yes, sir.

17    Q.   (BY MR. GROSS) On page 50 of my writ that I

18  asked you to look at, citing the *Morgan v. Illinois*

19  U. S. Supreme Court case on page 50 towards the top,

20  even the Supreme Court says that it may be -- on this

21  issue, "It may be that a juror could in good

22  conscience swear to uphold the law and yet be unaware

23  that maintaining such dogmatic beliefs about the death

24  penalty would prevent him or her so from doing so."

25    A.   That's exactly right because without asking

MARY LOPEZ BUITRON, CSR, RPR
*Official Court Reporter - 94th District Court*

Scanned Jun 18, 2013

1  the appropriate questions, you cannot exercise

2  peremptory challenges or actually challenges for cause

3  on individuals who -- whose dogmatic beliefs you can't

4  uncover.

5      Q.   Especially, since even the jurors themselves

6  don't realize that it's an improper belief; right?

7      A.   That's right.

8      Q.   And then also, you read the general

9  questioning regarding fairness and impartiality that

10  was asked by trial Defense Counsel in this case;

11  correct?

12      A.   Yes.

13      Q.   And you would agree again in that *Morgan* case

14  from the U. S. Supreme Court at the top of page 50

15  where they say, "As to general questions of fairness

16  and impartiality, such jurors could in all truth and

17  candor respond affirmatively, personally confident

18  that such dogmatic views are fair and impartial, while

19  leaving the specific concern unprobed," which is their

20  views on the death penalty in that case; correct?

21      A.   That is the exact purpose of the stripping

22  question.

23      Q.   And then when that happens, you have an

24  inadequacy of voir dire that leaves the reviewing

25  Court to doubt that the Defendant was sentenced to

MARY LOPEZ BUITRON, CSR, RPR
*Official Court Reporter - 94th District Court*

Scanned Jun 18, 2013

71

```
 1   death by a jury properly impaneled under the 14th
 2   Amendment; correct?
 3        A.   That's correct.
 4        Q.   Which is what the U. S. Supreme Court was
 5   saying at the bottom of page 49; right?
 6        A.   That's correct.
 7        Q.   Now, the prosecutor was asking you about the
 8   experience that Mr. Garza and -- and Mr. Jones;
 9   correct?
10        A.   Yes, sir.
11        Q.   Now, I'd like to show you pages 98 and 99 out
12   of the record from Mr. Jones -- from Mr. Garza's
13   testimony where he looked at the -- at the questioning
14   of Venireman Gilbert, the first venireman in the case.
15   And after a recess over the lunch hour when Mr. Garza
16   was given the opportunity to review the entire
17   questioning, you understand that he said that after
18   looking at pages 49 and 50 of the writ that you and I
19   just covered just now, that he agreed that Mr. Jones's
20   questioning of Venireman Gilbert gave only generalized
21   answers instead of specialized answers required, and
22   he said he agreed to that; correct?
23             MR. SKURKA:   Objection, Your Honor.  This
24   has been asked and answered, Your Honor, on direct.
25             THE COURT:   Sustained.
```

1      Q.   (BY MR. GROSS) So what I am getting at is
2  just because these folks have some more experience
3  than maybe someone else does, they can still be
4  ineffective in a case; correct?
5      A.   Sure.
6      Q.   And you're confident in this case that their
7  performance was deficient in the questioning of these
8  veniremen; correct?
9      A.   And, again, I don't know -- any of the rest
10 of their performance, again, I -- they're both really
11 good attorneys, but from what I have seen they -- they
12 were not asking the proper questions during the course
13 of the impaneling of the jury.
14             MR. GROSS:  No further questions.
15             THE COURT:  Anything else?
16                 RECROSS-EXAMINATION
17 BY MR. SKURKA:
18     Q.   Mr. Gross was talking about the -- he
19 didn't -- Mr. Garza didn't follow the articles that he
20 had in his briefcase or in his box.  That wouldn't
21 make a difference on the outcome of the case, could
22 it, by the fact you don't follow an article?
23     A.   I wouldn't have any idea, Mark.
24     Q.   In fact, I have got an article here about how
25 to cross-examine defense lawyers on the Colorado

MARY LOPEZ BUITRON, CSR, RPR
Official Court Reporter - 94th District Court

```
 1   method --
 2       A.   Has it worked?
 3       Q.   -- of jury selection, and I am just wondering
 4   if I don't follow this article does that mean it's
 5   wrong, that it's deficient performance because I
 6   didn't follow that in cross-examining you the way it
 7   says I should?  Doesn't mean I'm deficient, does it?
 8       A.   No.
 9       Q.   Okay.  Thanks.
10               THE COURT:  Anything else?
11               MR. GROSS:  No, sir.
12               THE COURT:  All right.  You may stand
13   down.
14               THE WITNESS:  Thank you, Your Honor.
15               MR. GROSS:  We rest, Your Honor.
16               THE COURT:  All right.  Anything else?
17   Any other witnesses?
18               MR. NORMAN:  State has no other
19   witnesses, Your Honor.
20               THE COURT:  All right.  Do you-all want
21   to do closing arguments on this matter?
22               MR. GROSS:  It -- it would be real brief,
23   Your Honor.
24               THE COURT:  Okay.
25               MR. GROSS:  It's all pretty -- pretty
```

Scanned  Jun 18, 2013

74

1   straightforward.  Now, by the way, I know I mentioned
2   before, but I just wanted to clarify that Mr. Norman
3   and I did discuss to save time, we weren't calling the
4   family members and that the affidavits would be
5   sufficient in this case, and that's still okay, I
6   assume?
7           MR. NORMAN:  Yes, we won't object to the
8   affidavits of the family members.  State wouldn't
9   object to the affidavits in general, the Court
10  considering the affidavits on file.
11          THE COURT:  Okay.
12          MR. GROSS:  Now, usually I just rely,
13  Your Honor, on my findings of facts and conclusions of
14  law in a case that I submit to the Court, and I don't
15  know how busy you are, if you're going to be able to
16  go over those.
17          THE COURT:  I am.
18          MR. GROSS:  I have some judges, Your
19  Honor, you know, I won't do closing if you do like
20  some judges where they ask that we submit them
21  electronically, so the Judge --
22          THE COURT:  I would prefer that.
23          MR. GROSS:  -- would have their own
24  finding of facts and conclusions of law instead of
25  just signing off on someone's findings of facts and

MARY LOPEZ BUITRON, CSR, RPR
*Official Court Reporter - 94th District Court*

Scanned Jun 18, 2013

75

 1   conclusions of law.

 2            THE COURT:  I would prefer that you

 3   submit them electronically.  Let's see, they have to

 4   be submitted -- let's see here, let me give you a day.

 5   Today is the 21st of October.

 6            How about by the 11th of November?

 7            MR. GROSS:  I would respectfully request

 8   30 days from when the record is completed, Your Honor,

 9   if that would be okay, and I don't know how -- I would

10   say the majority of the record is done.

11            THE COURT:  I think the majority of the

12   record is done in speaking with Mary because she has

13   been kind of doing it as she goes, so all she really

14   has to do is today's and --

15            MR. GROSS:  I won't be able to draft them

16   real well, Your Honor, unless I have a copy of the

17   exhibits, except for the school records, and the

18   record on my desk so I can draft them that way.

19            THE COURT:  Okay.

20            MR. GROSS:  So we can do 30 days from

21   that.

22            THE COURT:  I'll give you -- why don't we

23   do this, as soon as Mary files the -- the transcript,

24   I'll set a date and let you-all know.

25            MR. GROSS:  Yes, sir.

MARY LOPEZ BUITRON, CSR, RPR
Official Court Reporter - 94th District Court

Scanned  Jun 18, 2013

```
1              THE COURT:  Okay?
2              MR. NORMAN:  Yes, sir.
3              THE COURT:  And then please submit them
4    electronically so I can --
5              MR. NORMAN:  We -- would it be proper to
6    submit them both on paper and electronically?
7              THE COURT:  Yeah, you can do both.
8              MR. NORMAN:  Okay.
9              THE COURT:  Absolutely.
10             MR. GROSS:  Is WordPerfect okay, Judge?
11   Do you have WordPerfect?
12             THE COURT:  I prefer Word.
13             MR. GROSS:  Okay.
14             THE COURT:  I think the newest version
15   converts pretty good, but I prefer Word.
16             MR. GROSS:  Okay.  Thank you.
17             THE COURT:  All right.  Thank you much.
18             (Conclusion of Writ proceedings.)
19
20
21
22
23
24
25
```

MARY LOPEZ BUITRON, CSR, RPR
*Official Court Reporter - 94th District Court*

1   THE STATE OF TEXAS )

2   COUNTY OF NUECES   )

3               I, Mary Lopez Buitron, Official Court Reporter

4   in and for the 94th Judicial District Court of Nueces County,

5   State of Texas, do hereby certify that the above and foregoing

6   contains a true and correct transcription of portions of

7   evidence and other proceedings requested in writing by counsel

8   for the parties to be included in this volume of the Reporter's

9   Record, in the above-styled and numbered cause, all of which

10  occurred in open court or in chambers and were reported by me.

11              I further certify that this Reporter's Record of

12  the proceedings truly and correctly reflects the exhibits, if

13  any, admitted by the respective parties.

14              WITNESS MY OFFICIAL HAND this the ___7th___ day of

15  __December_____, A.D., 2011.

16

17  MARY LOPEZ BUITRON, CSR, RPR, Texas CSR #2731
    Expiration Date: 12/31/2013
18  Official Court Reporter
    94th District Court
19  Nueces County, Texas
    901 Leopard, Room 901
20  Corpus Christi, Texas 78401
    (361)888-0658

21

22

23

24

25

MARY LOPEZ BUITRON, CSR, RPR
*Official Court Reporter - 94th District Court*