UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

JOHN H RAMIREZ,        §
§
       Petitioner,        §
VS.        §     CIVIL ACTION NO. 2:12-CV-410
§
WILLIAM  STEPHENS,        §
§
       Respondent.        §

## MEMORANDUM OPINION & ORDER

In 2008, a jury convicted John Henry Ramirez of capital murder for a killing committed during the course of a robbery.  A separate punishment hearing resulted in a death sentence.  After exhausting state avenues for relief, Ramirez now petitions for federal habeas corpus relief.  Respondent William Stephens has filed an answer.  Having reviewed the record, pleadings, and the applicable law—giving special consideration to the Anti-Terrorism and Effective Death Penalty Act's ("AEDPA") deferential standards—the Court will **deny** Ramirez's petition.

## I.      BACKGROUND

At around closing time on July 19, 2004, Pablo Castro exited the convenience store where he worked to empty the trash.  A few minutes later, a girl entered the store and told Castro's co-worker that a bleeding man was lying in the parking lot.  Castro's co-worker called 9-1-1 and went outside, only to find Castro covered in blood on the pavement.  Castro died from the 29 stab wounds that he received at Ramirez's hands.

At trial, Ramirez's co-defendant Christina Chavez described the events leading up to the murder and those that transpired afterwards.  Ramirez had spent a few days partying with Chavez and her girlfriend Angela Rodriguez.  The group binged on substances including cocaine, Xanax, "psych meds," marijuana, and alcohol.  Tr. Vol. 18, p. 130.[1]  When the group ran out of drugs and did not have any money to purchase more, they came up with a plan to "grab some people and not hurt them . . . just take their money and leave."  Tr. Vol. 18, p. 133.  They drove to the convenience store where Castro worked.  Chavez stayed in the car and watched the others approach Castro.  Ramirez began "wrestling around" with Castro and then was "just stabbing that man.  He was stabbing him until he fell on his knees."  Tr. Vol. 18, p. 137.  After Castro fell to the ground, Chavez saw Rodriguez searching the victim's pockets.  Other eyewitnesses testified that Ramirez also searched Castro's body for money.  They only took $1.25.  Ramirez and his friends then fled.

The group went to clean Castro's blood off before proceeding to attempt other robberies.  Police officers soon engaged the group in an extensive chase that ended with Chavez and Rodriguez under arrest.  Ramirez eluded the manhunt, but was finally apprehended four years later near the border with Mexico.

---

[1]   The state court proceedings resulted in a voluminous record.  The Court will cite the Clerk's Record containing trial court motions and docket entries as Clerk's Record, p. ___.  The state trial record, including pre-trial hearings and both phases of trial, will be cited as Tr. Vol. ___, p. ___.  The Court will refer to the record from Ramirez's state habeas proceedings as State Habeas Record, p. ___.  Citations to the transcript of the three-day state habeas evidentiary hearing will appear as Writ Hearing Vol. ___, p. ___.  The Court will refer to the state habeas court's findings of fact and conclusions of law found in the state record by its internal pagination as FFCL, p. ____.

The State of Texas charged Ramirez with intentionally or knowingly causing Castro's death by stabbing him while in the course of committing or attempting to commit robbery. Clerk's Record, p. 2; Tex. Penal Code § 19.03(a)(2). Ramirez stood trial in the 94th Judicial District Court for Nueces County, Texas, with the Honorable Bobby Galvan presiding. The trial court appointed Edward F. Garza and John Grant Jones to represent Ramirez at trial.[2]

The prosecution presented a highly incriminating case showing Ramirez's commission of the murder, and the subsequent attempts at aggravated robbery. The defense conceded that Ramirez killed Castro, but challenged the robbery element that elevated his crime to a capital offense. In particular, trial counsel disputed the eyewitness testimony that Ramirez had participated in searching Castro for money.[3] The jury found Ramirez guilty of capital murder.

After the jury convicted Ramirez, the trial court held a separate punishment hearing. A Texas jury determines a capital defendant's sentence through answers to special issue questions. In this case, the trial court's instructions required the jury to decide (1) whether Ramirez would be a future societal danger and (2) whether sufficient circumstances mitigated against the imposition of a death sentence. Clerk's Record, p.

---

[2]    Unless it is necessary to identify one individual, the Court will refer to Ramirez's defense attorneys collectively as "trial counsel."

[3]    The trial court's instructions allowed for Ramirez's capital-murder conviction based on the aggravated-robbery element if (1) he committed or attempted to commit the robbery or (2) if he "solicit[ed], encourage[d], direct[ed], or aid[ed] or attempt[ed] to aid" Rodriguez as she stole money from the victim. Clerk's Record, p. 235, 240. On direct appeal, the Texas Court of Criminal Appeals found that the record contained "ample evidence that [Ramirez] was guilty of the underlying robbery" and that "he was criminally responsible for Rodriguez's conduct." *Ramirez v. State*, No. AP-76100, 2011 WL 1196886, at *8 (Tex. Crim. App. 2011).

259; Tex. Code Crim. Pro. art. 37.071 § 2. The parties presented weighty evidence in the sentencing phase. The State's numerous witnesses described Ramirez's lengthy history of bad acts and lawlessness. *See Ramirez*, 2011 WL 1196886, at *1-6 (summarizing the prosecution's punishment-phase case). As its first witness, the defense called Ramirez's father to provide insight into his upbringing. The next morning, the defense announced that Ramirez had ordered them not to call any additional witnesses. After the trial court inquired into Ramirez's decision, the defense ended its punishment-phase case. Under Ramirez's direction, the defense's closing argument consisted of reading a single verse from the Holy Bible. The jury answered Texas's special issues in a manner requiring the imposition of a death sentence.

Through appointed counsel,[4] Ramirez challenged his conviction and sentence on automatic direct appeal to the Texas Court of Criminal Appeals. On March 16, 2011, the Court of Criminal Appeals affirmed in an unpublished decision. *Id. at *1*. Ramirez's conviction became final when the time for filing a petition for writ of certiorari to the United States Supreme Court expired.

Under Texas law, state appellate and habeas review run concurrently. Tex. Code Crim. Pro. art. 11.071 § 4. Through appointed habeas counsel, Ramirez filed a state application for a writ of habeas corpus raising five points of error that challenged his conviction and sentence, most of which he renews in federal court. Ramirez tried to dismiss his state habeas action. The state habeas court authorized an expert to perform a

---

[4]   The trial court appointed Larry Warner ("appellate counsel") to represent Ramirez on appeal.

competency evaluation, and the expert found Ramirez competent. Ramirez, however, apparently decided to continue judicial review of his habeas application.

The state habeas court designated issues needing resolution in an evidentiary hearing. State Habeas Record, pp. 366-67. The state habeas court held a three-day hearing in which several witnesses, including both trial attorneys, testified. On January 9, 2012, the state habeas court entered findings of fact and conclusions of law and recommended that the Texas Court of Criminal Appeals deny habeas relief. Based on the lower court's recommendation and its own review of the record, the Court of Criminal Appeals denied relief in an unpublished decision. *Ex parte Ramirez*, No. WR-72,735-03, 2012 WL 4834115 (Tex. Crim. App. 2012).

Federal review followed. Ramirez's federal habeas petition raises five grounds for relief:

1.    Ramirez's absence from the courtroom during a pre-trial hearing in which the parties agreed to excuse several veniremembers violated his due process rights.

2.    Closed proceedings during one day of voir dire violated Ramirez's federal right to a public trial.

3.    Ramirez's rights to due process and a fair trial were denied because the jury was aware that he had been shackled for trial proceedings.

4.    Trial counsel provided ineffective assistance by: (a) not adequately questioning potential jurors about their views on the death penalty; (b) inadequately presenting mitigating evidence; (c) failing to make certain objections; (d) not ensuring Ramirez's competency to waive the presentation of additional evidence during the penalty phase; and (e) failing to preserve a claim for appellate review.

5.    Vagueness renders Texas's capital sentencing statute unconstitutional.

Respondent has filed an answer arguing that procedural and substantive law precludes habeas relief on Ramirez's claims.  D.E. 23.  Ramirez has filed a reply.  D.E. 30.  This matter is ripe for adjudication.

## II.    LEGAL STANDARDS

The writ of habeas corpus provides an important, but narrow, examination of an inmate's conviction and sentence.  *See Harrington v. Richter*, 562 U.S. 86, 103 (2011); *Barefoot v. Estelle*, 463 U.S. 880, 887 (1983).  "Society's resources have been concentrated at [a criminal trial] in order to decide, within the limits of human fallibility, the question of guilt or innocence of one of its citizens."  *Wainwright v. Sykes*, 433 U.S. 72, 90 (1977); *see also McFarland v. Scott*, 512 U.S. 849, 859 (1994) (stating that a "criminal trial is the 'main event' at which a defendant's rights are to be determined").  States, therefore, "possess primary authority for defining and enforcing the criminal law. In criminal trials they also hold the initial responsibility for vindicating constitutional rights.  Federal intrusions into state criminal trials frustrate both the States' sovereign power to punish offenders and their good-faith attempts to honor constitutional rights." *Engle v. Isaac*, 456 U.S. 107, 128 (1982).  With that respect for the state-court system, several principles circumscribe both federal habeas review and the availability of federal habeas relief.

As an initial matter, AEDPA "unambiguously provides that a federal court may issue the writ to a state prisoner 'only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.'"  *Wilson v. Corcoran*, 562 U.S. 1, 16 (2010) (quoting 28 U.S.C. § 2254(a)).  Accordingly, "federal habeas corpus relief

does not lie for errors of state law." *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011) (quotation omitted); *see also Corcoran*, 562 U.S. at 16; *Estelle v. McGuire*, 502 U.S. 62, 67 (1991).[5]  How an inmate has litigated his claims in state court determines the course of federal habeas adjudication.  Under the exhaustion doctrine, AEDPA precludes federal relief on constitutional challenges that an inmate has not first raised in state court.  *See* 28 U.S.C. § 2254(b)(1).  As a corollary to exhaustion, the procedural-bar doctrine requires inmates to litigate claims in compliance with state procedural law.  *See Dretke v. Haley*, 541 U.S. 386, 392 (2004); *Lambrix v. Singletary*, 520 U.S. 518, 523 (1997); *Coleman v. Thompson*, 501 U.S. 722, 729 (1991).  A federal court may only review an inmate's unexhausted or procedurally barred claims if he shows: (1) cause and actual prejudice or (2) that "a constitutional violation has 'probably resulted' in the conviction of one who is 'actually innocent . . . .'"  *Haley*, 541 U.S. at 393 (quoting *Murray v. Carrier*, 477 U.S. 478, 496 (1986)).

If the inmate has presented his federal constitutional claims to the state courts in a procedurally proper manner, and the state courts have adjudicated their merits, AEDPA provides for a deferential federal review.  "[A] habeas petitioner has the burden under AEDPA to prove that he is entitled to relief."  *Montoya v. Johnson*, 226 F.3d 399, 404 (5th Cir. 2000); *see also DiLosa v. Cain*, 279 F.3d 259, 262 (5th Cir. 2002).  A petitioner cannot meet this burden by merely alleging constitutional error.  Instead, "focus[ing] on what a state court knew and did," *Cullen v. Pinholster*, ___ U.S. ___, 131 S. Ct. 1388, 1399 (2011), an inmate must show that the state court's adjudication of the alleged

---

[5]  The Court summarily denies any argument based only on state law.

constitutional error "was 'contrary to, or involved an unreasonable application of, clearly established Federal law.'"  *Berghuis v. Thompkins*, 560 U.S. 370, 380 (2010) (quoting 28 U.S.C. § 2254(d)(1)); *see also Thaler v. Haynes*, 559 U.S. 43, 47 (2010); *Bell v. Cone*, 535 U.S. 685, 698 (2002); *Early v. Packer*, 537 U.S. 3, 7-8 (2002); *Williams v. Taylor*, 529 U.S. 362, 413 (2000).

AEDPA also affords significant deference to a state court's resolution of factual issues.  Under 28 U.S.C. § 2254(d)(2) "a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding . . . ."  *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).  A federal habeas court must presume the underlying factual determinations of the state court to be correct, unless the petitioner "rebut[s] the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1); *see also Miller-El*, 537 U.S. at 341; *Young v. Dretke*, 356 F.3d 616, 629 (5th Cir. 2004) ("As a federal habeas court, we are bound by the state habeas court's factual findings, both implicit and explicit.").[6]  As the same judge presided over the trial proceedings and the state habeas action in this case, the presumption of

---

[6]  Ramirez argues that this Court should not apply the presumption of correctness to the state habeas court's factual findings because the trial judge signed the State's proposed findings and conclusions without making any alterations.  D.E. 6, pp. 129-32.  In another context, the Supreme Court has criticized the "verbatim adoption of findings of fact prepared by prevailing parties, particularly when those findings have taken the form of conclusory statements unsupported by citation to the record."  *Anderson v. City of Bessemer City*, 470 U.S. 564, 572 (1985); *see also Jefferson v. Upton*, 560 U.S. 284, 294-95 (2010) ("Although we have stated that a court's verbatim adoption of findings of fact prepared by prevailing parties should be treated as findings of the court, we have also criticized that practice.") (quotation omitted).  The Fifth Circuit, however, has rejected the contention that habeas findings adopted verbatim from those submitted by the State are not entitled to deference.  *See Basso v. Stephens*, 555 F. App'x 335, 342, 343 (5th Cir. 2014); *Green v. Thaler*, 699 F.3d 404, 416 n.8 (5th Cir. 2012).

correctness for state habeas factual findings is especially strong. *See Mays v. Stephens*, 757 F.3d 211, 214 (5th Cir. 2014); *Clark v. Johnson*, 202 F.3d 760, 764 (5th Cir. 2000).

With those standards in mind, the Court turns to Ramirez's federal petition.

## III.   ANALYSIS

### A.   Error in the Trial Proceedings (Claims 1-3 and 4(c))

Relying on an affidavit prepared by trial counsel Mr. Garza, Ramirez's state habeas application identified three alleged errors in the trial proceedings. State Habeas Record, p. 216. First, Ramirez asserted that his absence from a hearing violated his right to due process (claim 1). Second, Ramirez argued that his right to a public trial was abridged when the public was barred from attending a voir dire proceeding (claim 2). Finally, Ramirez claimed that his shackling at trial violated his right to a fair trial and to due process (claim 3). As a separate issue, Ramirez also argued that trial counsel provided deficient performance by not making a contemporaneous objection to those three alleged constitutional violations (claim 4(c)).

The state habeas court authorized factual development on several of Ramirez's habeas claims. Evidentiary hearing testimony, including from Ramirez's trial attorneys and the security officers involved in the trial proceedings, gave insight into the issues raised by Mr. Garza's affidavit. With that background, the state habeas court followed a similar pattern in adjudicating each of Ramirez's first three claims. Using identical language in each instance, the state habeas court first found that Ramirez had defaulted judicial consideration of the claims because trial counsel failed to make a contemporaneous objection. FFCL, pp. 1-3; *see also Livingston v. Johnson*, 107 F.3d

297, 311 (5th Cir. 1997) (discussing Texas's contemporaneous-objection rule that requires defendants to make "a timely objection with specific grounds for the desired ruling").  The state court then considered each claim in the alternative.  Reviewing the state habeas hearing record, the briefing, and the law, the state habeas court made crucial factual findings that undercut Ramirez's substantive constitutional arguments.  Finally, the state habeas court relied on its findings to deny Ramirez's claim that trial counsel had performed deficiently by not making adequate objections.

Respondent argues that the state-imposed procedural bar of claims one through three prohibits federal review of their merits.  The Fifth Circuit "has consistently held that the Texas contemporaneous objection rule constitutes an adequate and independent state ground that procedurally bars federal habeas review of a petitioner's claims." *Fisher v. Texas*, 169 F.3d 295, 300 (5th Cir. 1999); *see also Cotton v. Cockrell*, 343 F.3d 746, 754 (5th Cir. 2003).  Ramirez defaulted claims one through three by failing to comply with adequate and independent state law.

However, judicial accommodation prevents a state procedural default from becoming an insurmountable barrier to federal review.  The Supreme Court excuses a procedural bar if an inmate "can demonstrate *cause* for the default and *actual prejudice* as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a *fundamental miscarriage of justice*."  *Coleman*, 501 U.S. at 750 (emphasis added).  In an argument that merges his ineffective-assistance-of-counsel claims with his efforts to overcome the procedural bar, Ramirez contends that trial counsel's failure to lodge a timely objection in each circumstance provides cause to allow

federal review.  The Court considers trial counsel's efforts—both in the procedural-bar and merits context—under the *Strickland v. Washington*, 466 U.S. 668 (1984) framework that asks whether "a defense attorney's *performance* f[ell] below an objective standard of reasonableness and thereby *prejudice[d]* the defense." *Yarborough v. Gentry*, 540 U.S. 1, 4 (2003) (emphasis added); *see also Wiggins v. Smith*, 539 U.S. 510, 520 (2003).[7]

The state habeas court intertwined its discussion of procedural problems, its alternative merits review, and its assessment of whether trial counsel should have objected.  The posture of Ramirez's federal claims likewise interlinks the discussion of the procedural and substantive issues.  Because the state habeas court's alternative merits analysis underlies the defaulted *Strickland* claims, judicial economy suggests that the Court address together whether trial counsel provided ineffective assistance and the alternative merits of Ramirez's barred claims.  In doing so, the Court applies AEDPA deference to the state habeas court's alternative resolution of Ramirez's constitutional claims.  *See Busby v. Dretke*, 359 F.3d 708, 721 n.14 (5th Cir. 2004) (affording deference to a merits finding when state court "invoked a procedural bar as an alternative basis to

---

[7]   When evaluating counsel's performance, "[j]udicial scrutiny . . . must be highly deferential" because "[i]t is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." *Strickland*, 466 U.S. at 689.  Thus, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.*  A court measures prejudice by asking if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Lafler v. Cooper*, ___ U.S. ___, 132 S. Ct. 1376, 1384 (2012) (quoting *Strickland*, 466 U.S. at 694)  The state courts adjudicated each of Ramirez's ineffective-assistance-of-trial-counsel arguments on the merits.  While "[s]urmounting *Strickland*'s high bar is never an easy task," a habeas petitioner's duty to "[e]stablish[] that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010).  "The standards created by *Strickland* and § 2254(d) are both 'highly deferential,' . . . and when the two apply in tandem, review is 'doubly so.'" *Richter*, 562 U.S. at 105; *see also Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009). When a petitioner brings a *Strickland* claim under AEDPA, "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable." *Richter*, 562 U.S. at 101.

deny relief"); *accord Rolan v. Coleman*, 680 F.3d 311, 319 (3d Cir. 2012) (holding that "AEDPA deference applies when a state court decides a claim on procedural grounds and, alternatively, on the merits").  As discussed below, the Court finds that all three claims are procedurally barred, without merit, and insufficient to support a viable *Strickland* claim.

### 1.    Absence from Trial Proceedings (claim one)

Jury selection in this case spanned from October 22 to November 19, 2008. Ramirez argues that his absence from the courtroom during a November 4, 2008 hearing violated his constitutional rights.  The transcript of that hearing does not include any reference to Ramirez's absence.  Only Mr. Garza's affidavit indicates that Ramirez was not present in court on that date.[8]

The state habeas court summarized the purpose of the November 4 hearing: "a bench conference at which the parties simply read into the record the challenges for cause that they had already mutually agreed upon . . . ."  FFCL, p. 1.  Before the hearing, the parties met to "go through all of the other questionnaires to see if there were any potential jurors that [they could] agree on" for dismissal.  Tr. Vol. 8, p. 4.  The attorneys decided to strike numerous potential jurors without asking them questions.  Writ Hearing Vol. 4, p. 69.

---

[8]   Mr. Garza explained in his affidavit: "The prosecution and defense announced, on November 4, 2008, fifty-two agreed juror strikes for undisclosed reasons based upon a reading by counsel of the juror questionnaires.  *The Defendant, John Henry Ramirez, was not present during this proceeding.*"  State Habeas Record, p. 216 (emphasis added).

At the beginning of the hearing, the attorneys announced their agreement to remove fifty-two potential jurors from the panel. The trial court asked Ramirez's attorneys if they had "discussed this with your client and he's in agreement with this." Tr. Vol. 8, p. 7. Trial counsel affirmed that Ramirez knew about, and approved, the defense's actions.

On state habeas review, Ramirez complained that his absence from the November 4, 2008 hearing violated his right to due process and that trial counsel's failure to object to the proceedings amounted to constitutionally ineffective assistance. Ramirez, however, did not identify any dismissed potential juror who he wished had served at trial. He did not explicitly outline any instruction he would have given his trial attorneys had he attended the November 4, 2008 hearing. Instead, Ramirez seemed to argue that his absence from the hearing was per se prejudicial.

The state habeas court found that "[n]o disputed factual issues exist concerning" the underlying constitutional issues, but still authorized the parties to develop the ineffective-assistance-of-counsel aspects of Ramirez's claims. State Habeas Record, pp. 366-67. The state evidentiary hearing did not provide any insight on why Ramirez was not present in court on November 4. Ramirez himself did not testify at the evidentiary hearing, leaving development of this claim to the questioning of his trial attorneys. Testimony from Ramirez's trial attorneys focused on whether Ramirez knew about the intended dismissal of jurors. Mr. Garza explained that the defense attorneys had "discussed with [Ramirez] right before jury selection . . . that there were probably going to be some people that we just didn't want to have to waste any time on . . . ." Writ

Hearing Vol. 4, p. 82.  Counsel advised Ramirez that the indicated venirepersons were "either way too favorable for the prosecution or they were way too favorable to the defense, and that they were not going to pass the proper scrutiny during jury selection . . . ."  Writ Hearing Vol. 4, p. 82.  After "explain[ing] that process to him," counsel asked for Ramirez's "permission . . . to use [their] discretion on these matters."  Writ Hearing Vol. 4, p. 83.  Ramirez agreed to the summary dismissal of unfavorable potential jurors.  Writ Hearing Vol. 4, p. 83.[9]  Trial counsel, however, did not give Ramirez the individual questionnaires to review or tell him which specific veniremembers that they would dismiss.  Writ Hearing Vol. 4, p. 90.

The state habeas court's decision focused on: (1) whether trial counsel sufficiently advised Ramirez of what they intended to do in court and (2) whether trial counsel's agreement to strike fifty-two jurors without questioning constituted ineffective representation.   Based on trial counsel's assurance that Ramirez knew what would happen in his absence, the state habeas court held that "[t]rial counsel had discussed agreed strikes with Ramirez before jury selection and that Ramirez had given his attorneys permission to use their discretion with regard to these strikes."  FFCL, p. 1.

---

[9]  Mr. Jones also testified:

> In a capital murder case where the death penalty is possible, my first concern is to identify the jurors who have radical persuasions. Many times those people are discovered in the initial—when the jurors are qualified, and then before we get the panel, we actually question them; and I want to identify those that—first, when I say radical persuasions, particularly as to the death penalty. And the best indicator I found for that on the—the questionnaires, part of the questionnaire used in this case, and this questionnaire is used, you know, pretty regularly in this county, is the jurors are asked to write in his own or her own handwriting how they feel about the death penalty.
>
> And I have found over the many cases that I've tried is that is one of the best indicators of where the person's mind is at[.]

Writ Hearing Vol. 4, p. 8.

Thus, the state habeas court found no "reasonably substantial relationship" between Ramirez's presence in the November 4 hearing and "his opportunity to defend."  FFCL, p. 2.  The state habeas court also found that trial counsel did not provide ineffective assistance by acting in Ramirez's absence.  FFCL, p. 9.

On federal review, Ramirez contends that he had a "right to be present in the courtroom during any agreement to excuse fifty-two jurors."  D.E. 30, p. 4.  "Under the Constitution, the right to presence is protected by both the Sixth Amendment Confrontation Clause, as well as the Fifth Amendment Due Process Clause."  *United States v. Thomas*, 724 F.3d 632, 642 (5th Cir. 2013).  The constitutional right to be present extends to jury impanelment.  *See id*. ("The right to be present at jury impanelment is protected by the Fifth Amendment Due Process Clause, rather than the Sixth Amendment Confrontation Clause, because it involves an instance where the defendant is not actually confronting witnesses or evidence against him.").  In fact, the Constitution guarantees "the right to be present at any stage of the criminal proceeding that is critical to its outcome if [a defendant's] presence would contribute to the fairness of the procedure."  *Kentucky v. Stincer*, 482 U.S. 730, 745 (1987).

Citing *Diaz v. United States*, 223 U.S. 442 (1912), Ramirez argues that a capital defendant "can never waive his right to be present at every stage of his trial because he does not have control over his presence or absence."  D.E. 20, p. 25.  However, the proposition that "a trial can never continue in the defendant's absence ha[s] been expressly rejected" by the Supreme Court.  *Illinois v. Allen*, 397 U.S. 337, 342 (1970); *see also Taylor v. United States*, 414 U.S. 17, 19-20 (1973) (recognizing that a defendant

can voluntarily absent himself from trial proceedings).   A defendant may waive his presence at a court hearing.  Concomitantly, "[t]he Supreme Court has declined to extend automatic reversal of a conviction to violation of a defendant's right to be present at all critical stages of the trial," and the Fifth Circuit "has consistently required a showing of prejudice to the defendant to constitute reversible error upon a defendant's absence from any part of the jury selection process." *Thomas*, 724 F.3d at 641.

The record does not disclose why Ramirez was absent from court during the November 4 hearing.   Nothing specifies whether Ramirez missed court proceedings because of choice, illness, inadvertence, state-imposed security concerns, coercive state action, or some other reason.  Importantly, Ramirez does not argue that he was prohibited from attending court that day.   The state habeas court instead presumed Ramirez's absence, and then focused on whether his trial attorneys had sufficiently apprised him of their intended actions at the hearing.

Ramirez has not shown a constitutional violation flowing from his absence during the summary dismissal of potential jurors.  The core concern of the right to courtroom presence is that a defendant's "absence might frustrate the fairness of the proceedings . . . ."  *Faretta v. California*, 422 U.S. 806, 820 n.15 (1975).  Due process does not require the defendant's presence when it would be useless or only slightly beneficial.  *See Snyder v. Massachusetts*, 291 U.S. 97, 106-07 (1934).   When there is no indication that the defendant "could have done [anything] had [he] been at the [hearing] nor would [he] have gained anything by attending[,]" a defendant's absence does not violate his due process rights.  *Stincer*, 482 U.S. at 747 (alterations in original).   In such a case, his "'presence

would be useless, or the benefit but a shadow . . . .'" *Id.* at 745 (quoting *Snyder*, 291 U.S. at 106-07).

Trial counsel discussed with Ramirez the strategy of summarily dismissing objectionable potential jurors. Ramirez has not presented any evidence that he was not fully informed of this strategy or that he did not give his attorneys permission to proceed as indicated. Although a client's input may be helpful, certain decisions regarding the conduct of jury selection are generally made by counsel alone. *See, e.g., Gonzalez v. United States*, 553 U.S. 242, 251-52 (2009) (holding that defense counsel may decide whether to consent to voir dire proceedings before a federal magistrate judge). An attorney often bases decisions during jury selection on informed expertise and experience. In fact, "[t]he conduct of voir dire 'will in most instances involve the exercise of a judgment which should be left to competent defense counsel.'" *Hovey v. Ayers*, 458 F.3d 892 (9th Cir. 2006) (quoting *Gustave v. United States*, 627 F.2d 901, 906 (9th Cir. 1980)).[10] The record suggests that trial counsel examined the jury questionnaires for any indication of whether veniremembers held extreme views on the death penalty. Using their experience, trial counsel filtered out those who would otherwise be subject to a challenge for cause.

Ramirez has not shown that he would have objected to the chosen course of action had he been in attendance on November 4, 2008, or that his presence would have

---

[10]    "An attorney undoubtedly has a duty to consult with the client regarding 'important decisions,' including questions of overarching defense strategy." *Florida v. Nixon*, 543 U.S. 175, 187 (2004) (quoting *Strickland*, 466 U.S. at 688). A defendant has "the ultimate authority" to decide "whether to plead guilty, waive a jury, testify in his or her own behalf, or take an appeal." *Jones v. Barnes*, 463 U.S. 745, 751 (1983). However, "[j]ust because a decision involves the defendant's constitutional rights does not mean that it must be made by him personally, instead of by his counsel." *Rault v. Louisiana*, 772 F.2d 117, 132 (5th Cir. 1985).

meaningfully contributed to the matters discussed that day.  Ramirez has never, by affidavit or by testimony, verified what he would have had counsel do differently had he been present at the hearing.  Ramirez has not shown that the allocation of responsibilities between defense counsel and client required his courtroom presence, especially because the attorneys only carried out the plan he had approved.  Thus, Ramirez has not shown that his presence would have had "[a] relation, reasonably substantial, to the fullness of his opportunity to defend against the charge."  *Stincer*, 482 U.S. at 745 (internal quotation marks and citation omitted).

The state habeas court was not unreasonable in finding that trial counsel's performance "did not fall below an objective standard of reasonableness under the prevailing professional norms, in light of the fact that he had already discussed agreed strikes with Ramirez and had his client's permission to use his own discretion on such strikes . . . ." FFCL, p. 9.  As in state court, Ramirez has "failed to show that his presence was necessary or that he could have meaningfully assisted his attorney in making or announcing those strikes." FFCL, p. 9.  Accordingly, the Court finds that Ramirez has not shown that he can overcome the procedural bar of his substantive absence-from-the-courtroom claim.  For the same reasons discussed above, the state habeas court was not unreasonable in the alternative denial of Ramirez's barred claim and its denial of his related *Strickland* claim.

### 2.     Right to a Public Trial (claim two)

Ramirez argues that security officers kept individuals from observing one day of the voir dire proceedings, thus violating his right to a public trial.  The Sixth Amendment

guarantees, in relevant part, that a criminal defendant "shall enjoy the right to a speedy and public trial . . . ."  "The right to a public trial helps ensure, *inter alia*, the fairness of the proceedings."  *United States v. Cervantes*, 706 F.3d 603, 611 (5th Cir. 2013).  "[T]he Sixth Amendment right to a public trial extends to the *voir dire* of prospective jurors."  *Presley v. Georgia*, 558 U.S. 209, 213 (2010).[11]

Mr. Garza was the only member of the defense team present on October 22, 2008, the first day of jury selection.  Writ Hearing Vol. 4, pp. 70-71.  On that day, the trial judge conducted the juror qualifications, exemptions, and general voir dire in a central jury room.  In his affidavit, Mr. Garza said that court security officers prevented the public from attending that hearing.  Mr. Garza explained that he "personally observed . . . uniformed guards posted at the entrance to the central jury room" who "prevented the general public from entering the central jury room . . . ."  State Habeas Record, p. 216.  Ramirez argues that the security officers violated his constitutional right to a public trial.  Ramirez also complains that his attorney should have objected to the closed proceeding.

The record in state court, however, did not verify that security officers prevented anyone from viewing any portion of voir dire.  In the state habeas hearing, Ramirez's state habeas attorney did not ask Mr. Garza any questions about the public-trial claim.  FFCL, p. 3 (observing that Ramirez "had the opportunity to develop these issues during

---

[11]   Ramirez argues that the state habeas courts improperly found that he had procedurally defaulted this claim. Ramirez contends that "[a] violation of the right to a public trial . . . does not require an objection to preserve the issue." D.E. 30, p. 5.  The Fifth Circuit, however, has found public-trial claims subject to the procedural bar doctrine in other cases.  *See Wilkins v. Stephens*, 560 F. App'x 299, 306 n.44 (5th Cir. 2014); *United States v. Reagan*, 725 F.3d 471, 488 (5th Cir. 2013); *cf. Peretz v. United States*, 501 U.S. 923, 936 (1991) (citing *Levine v. United States*, 362 U.S. 610, 619 (1960) for the proposition that "failure to object to closing of courtroom is waiver of right to public trial").

Mr. Garza's testimony at the writ hearing but did not").[12]   The only relevant factual development on this claim came from Officer Ashley Isaac of the Nueces County Sheriff's Office who contradicted Mr. Garza's affidavit account.   Officer Isaac "supervised the security detail at *voir dire*, was personally present at *voir dire*, [and] would have seen or been informed if a member of the public had been turned away. . . ." FFCL, p. 2.  Officer Isaac testified that "the standard procedure if someone had wanted to enter the central jury room at the time of *voir dire* would have been to identify the person, his reason for being there, check for weapons, and then allow them entrance . . . ." FFCL, p. 2.  Officer Isaac "did not see anyone being turned away."  FFCL, p. 2.

Officer Isaac provided an explanation as to why Mr. Garza may have thought that people were excluded from the hearing: "it was quite common for people to simply ask for directions from the officers."  FFCL, p. 2.  The state habeas court found "it to be a credible inference that Mr. Garza was mistaken about the nature of what he saw occurring between members of the public and the deputies providing security at *voir dire* . . . ."  FFCL, p. 2.[13]  The state habeas court found that "no member of the public who wanted to enter was turned away."   FFCL, p. 2.  On that basis, the state habeas court denied Ramirez's public-trial and related ineffective-assistance-of-counsel claims.

---

[12]   Mr. Jones was not present at the October 22, 2008 hearing.  Nevertheless, the state habeas court found "credible attorney Grant Jones['s] testimony at the writ hearing that he did not remember the exclusion of people from the courtroom at *voir dire* being a problem[.]"  FFCL, p. 2.  The state habeas court particularly found Mr. Jones's testimony persuasive because "Mr. Jones is a perceptive attorney who would have remembered if the general public had been turned away from any portion of the proceedings."  FFCL, p. 2.

[13]   Partly because he had previously testified that he did not remember events from the voir dire proceedings, the state habeas court found that Mr. Garza's statements about the October 22 hearing were not credible.  FFCL, p. 3.

A federal court must presume the correctness of state court fact findings absent a rebuttal by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1). Aside from Mr. Garza's affidavit, nothing in the record supports Ramirez's claim that security officers turned away members of the public. Ramirez has not brought forth any evidence, much less of a clear and convincing nature, showing that the state habeas court was unreasonable in its consideration of the factual issues. As in state court, Ramirez has "failed to carry his burden to show that the public was excluded from any portion of the trial." FFCL, p. 9.

With the state habeas findings undisturbed, Ramirez has not shown that trial counsel should have objected to the alleged exclusion of the public. Accordingly, Ramirez has both failed to prove his *Strickland* claim and failed to overcome the procedural bar of his public-trial claim. Alternatively, Ramirez's public-trial claim is without merit.

### 3.    Shackling During Trial (claim three)

Ramirez was shackled throughout his trial. "[T]he shackling of a defendant during trial, a practice that potentially threatens the defendant's presumption of innocence, bears close scrutiny." *Bagwell v. Dretke*, 372 F.3d 748, 754 (5th Cir. 2004). The Constitution, however, does not absolutely prohibit the use of security restraints at trial. Federal law balances the presumption of innocence with the need for courtroom security by

forbidding the "routine use of *visible* shackles" except "in the presence of a special need." *Deck v. Missouri*, 544 U.S. 622, 626, (2005) (emphasis added).[14]

Ramirez does not provide any evidence that the jurors could see his shackles. In the evidentiary hearing, courtroom security officers testified that "the standard procedure for shackling was followed in Ramirez's case." FFCL, p. 2. The defense table "was located some 20 feet from the jury box" during trial. FFCL, p. 4. A barrier between the defendant and the jury box prevented jurors from seeing that Ramirez was shackled. Writ Hearing Vol. 4, p. 47. Trial counsel himself made "painstaking efforts" to prevent jurors from seeing Ramirez's restraints. Writ Hearing Vol. 4, p. 85.

Ramirez, however, argues that his constitutional rights were violated because jurors could hear the sound of the metal shackles as he moved. In his habeas affidavit, Mr. Garza asserted that "every time the Defendant arose or moved in his chair, the sound of the leg irons moving through the eye bolt was audible." State Habeas Record, p. 216. Ramirez argues that "[s]ince the shackling was audible in the courtroom, the case involved violent crimes, and the evidence was disputed, the trial judge's error in shackling [him] substantially influenced the jury's verdict." D.E. 20, p. 47.

The state habeas court authorized factual development of this claim. The testimony from the evidentiary hearing did not support Ramirez's contention that the jury could hear the movement of his shackles. The parties did not ask Mr. Garza any

---

[14] Ramirez argues that the improper shackling of a defendant is structural error that is not subject to the procedural-bar doctrine. The Fifth Circuit, however, has found shackling claims procedurally barred in other cases. *See Aguilar v. Dretke*, 428 F.3d 526, 535 (5th Cir. 2005).

questions relating to Ramirez's shackling.[15]  Co-counsel Mr. Jones testified in the habeas evidentiary hearing that he "was sitting closer to Ramirez during trial than the jury was" and he "did not remember hearing the sound of shackles during trial."  FFCL, p. 4.  A security officer who "was approximately five feet away" from Ramirez also did not recall hearing the shackles during trial.  Writ Hearing Vol. 3, p. 48.

Given the defense's efforts to prevent the jury from knowing about Ramirez's restraints, the state habeas court found that it would be "a credible inference that Mr. Garza would also have been alert to the noise of the shackles at the time of trial, and that his failure to object at trial casts doubt on his present assertions that the noise of the shackles was audible to the jury."  FFCL, p. 4.  The state habeas court concluded that "any minor noise caused by the shackles was generally inaudible to those around" Ramirez.  FFCL, p. 10.  Accordingly, the state habeas court did "not find credible attorney Ed Garza's assertion or implication in his affidavit that the sound of Ramirez's shackles was audible to the jury during trial."  FFCL, p. 5.  With the testimony from Mr. Jones and court security personnel, the state habeas court found that "Ramirez has failed to prove by a preponderance of the evidence that the noise of his shackles was audible to the jury or that, if some such noise was audible, it would have been distinguishable from other background noise and recognized by the jury as shackles."  FFCL, p. 5.[16]  Ramirez

---

[15]  Mr. Garza, however, had testified in the hearing on the motion for new trial:  "We didn't hear any evidence—I don't have any to present—that the jury ever saw the defendant in shackles or they ever saw him handcuffed, or that they knew that he was bolted to the floor, but they're pretty smart[.]"  Tr. Vol. 23, p. 144.

[16]  The state habeas court found in the alternative that Ramirez had:

> [P]resented nothing to suggest that Ramirez was unable to control the sound of the shackles, and that there is nothing to suggest that he attempted to quietly move his feet in order to prevent the sound of the shackles from being heard. The Court finds it to be a

thus "failed to carry his burden to show that the shackles were either seen or heard by the jury."  FFCL, p. 22.

Ramirez renews his shackling claims on federal review, but does not provide any legal argument or factual basis to discount the state court's assessment of his arguments. Ramirez has not rebutted the presumptively correct fact findings that undercut his federal habeas claims.  Ramirez has simply not shown that the jury was aware of his shackling or that his restraints otherwise prejudiced his constitutional rights.  Ramirez has not shown that trial counsel had a reasonable basis on which to make an actionable objection about the shackling.  Trial counsel's failure to make a meritless objection cannot serve as cause to forgive a procedural bar.  Consequently, Ramirez's third claim is procedurally barred from federal review and, alternatively, without merit.  Ramirez's related ineffective-assistance-of-counsel claim similarly lacks merit.

### 4.    Conclusion

Ramirez defaulted federal consideration of claims one through three by failing to present them to the state courts in a procedurally actionable manner.  Ramirez has not shown that trial counsel's representation should provide cause to overcome the procedural bar of those claims.  Relatedly, Ramirez has not shown that trial counsel provided ineffective assistance by not objecting to the alleged constitutional concerns

---

credible inference that, if the jury could hear the sound of the shackles, it was because Ramirez himself failed to reasonably control his movements and caused the jury to hear the sound.

FFCL, p. 5.

raised by claims one through three.  Alternatively, Ramirez has not met the AEDPA standard with regard to claims one through three, and the related portion of claim four.

**B.      Ineffective Assistance of Trial Counsel (claims 4(a), (b), (d), and (e))**

Aside from the *Strickland* arguments addressed above, Ramirez contends that trial counsel provided deficient performance by: (1) insufficiently questioning potential jurors about their views on the death penalty; (2) inadequately presenting mitigating evidence; (3) not ensuring Ramirez's competency to waive the presentation of mitigating evidence during the penalty phase; and (4) failing to preserve a claim for appellate review.  The state habeas court rejected each of these claims on the merits.

**1.      Questioning Potential Jurors (claim 4(a))**

Ramirez contends that trial counsel ineffectively questioned the jurors who eventually sat at trial.  Ramirez alleges that "defense counsel's questioning of [the potential jurors] gave only generalized answers instead of the specialized answers one would be looking for to death qualify a juror."  D.E. 30, p. 11.  Ramirez specifies that trial counsel's superficial questioning failed to filter out jurors who "were extremely in [f]avor of the death penalty . . . ."  D.E. 30, p. 11.

A defense attorney has an obligation to ensure that his client stands trial before an unbiased jury.  "*Voir dire* plays a critical function in assuring the criminal defendant that his [constitutional] right to an impartial jury will be honored."  *Morgan v. Illinois*, 504 U.S. 719, 729 (1992) (internal quotation marks and citation omitted) (alteration in original).  Capital defense attorneys bear a special burden in voir dire because a capital

defendant may challenge for cause any prospective juror who will automatically vote for the death penalty in every case.  *Id.*

Ramirez argues that trial counsel's questioning of potential jurors did not adequately sift out those jurors who harbored strong biases in favor of a death sentence. Ramirez faults counsel for not asking specific questions about whether: (1) a guilty verdict would automatically cause jurors to find that he would be a future danger; (2) such a conviction would cause jurors to ignore mitigating evidence; and (3) jurors would consider all the evidence offered by the defense.[17]  Ramirez contends that trial counsel's failure to make those inquiries prevented the removal of any juror who "had dogmatic views regarding the death penalty in the case at bar which would call into question whether the juror was truly fair and impartial."  D.E. 6, p. 65.

In the evidentiary hearing, trial counsel discussed their strategy for jury selection. Mr. Jones testified that the defense team "spent some considerable time planning for the *voir dire*."  Writ Hearing Vol. 3, p. 10.  Trial counsel hired an expert to assist with jury

---

[17]   Ramirez provides the same description for each juror regarding how trial counsel deficiently conducted voir dire:

> Defense counsel failed to probe the juror regarding the juror's views on the death penalty in the case at bar--i.e., for someone convicted of murder in the course of committing robbery.  Defense counsel failed to ask the juror if such a conviction would cause the juror to automatically believe that Mr. Ramirez would be a future danger regarding special issue one.  Defense counsel failed to ask the juror if such a conviction and a finding of future dangerousness would cause the juror to not consider mitigating evidence.  Defense counsel failed to ask if the juror would be able to consider and give effect to all relevant mitigating evidence offered by Mr. Ramirez.  Defense counsel, in effect, failed to determine whether the juror had dogmatic views regarding the death penalty in the case at bar which would call into question whether the juror was truly fair and impartial. It may be that this juror could in good conscience, swear to uphold the law and yet be unaware that maintaining such dogmatic beliefs about the death penalty in the case at bar would prevent the juror from being truly fair and impartial.  Mr. Ramirez was on trial for his life and counsel should have ascertained whether this prospective juror functioned under such misconception. The risk that such jurors may have been empaneled in this case and infected Mr. Ramirez's capital sentencing is unacceptable in light of the ease with which that risk could have been minimized had counsel conducted a proper *voir dire*.

DE 20, pp. 64-65, 67-68, 70, 72-73, 75-78, 80-83, 85-88, 90-91.

selection.  Writ Hearing Vol. 3, pp. 10-11.  Mr. Jones outlined trial counsel's approach to questioning: "you're most concerned about the jurors' views on the death penalty and whether they can consider mitigating evidence and did they understand what that means." Writ Hearing Vol. 3, p. 10.  Still, Mr. Jones explained: "The record is the best evidence of the questions that we asked."  Writ Hearing Vol. 3, p. 10.

Trial counsel strategically used the jury questionnaires to weed out objectionable potential jurors.  Mr. Garza testified the parties relied on the questionnaires to not "waste any time on" certain prospective jurors who "were not going to pass the proper scrutiny during jury selection" because "they were either way too favorable for the prosecution or they were way too favorable to the defense . . . ."  Writ Hearing Vol. 4, p. 82.  To that end, the parties agreed to dismiss a large number of potential jurors without questioning them.

At the state habeas hearing, Ramirez tried to show that his trial attorneys' questioning did not uncover the prospective jurors' biases regarding the death penalty. Mr. Garza agreed that it "could be said" that the trial attorneys' questions in at least one instance resulted in "only generalized answers instead of the specialized answers that one would be looking for to death qualify a juror . . . ."  Writ Hearing Vol. 4, p. 100.  Trial counsel, however, still had asked that juror whether she could consider all the evidence in answering the special issues.  Writ Hearing Vol. 4, p. 101.

The state habeas court did not find any constitutional concern in trial counsel's approach to voir dire.  The state habeas court found "that all of the potential jurors were examined extensively by defense counsel . . . although not questioned in exactly the

manner now suggested by Ramirez . . . ." FFCL, p. 7. The state habeas court found that "each juror was asked, in one form or another, whether he or she could fairly consider all of the evidence before determining the future danger and mitigation issues . . . ." FFCL, p. 7. The state habeas court further noted that the "questioning conform[ed] to the *voir dire* question, 'If you found [Defendant] guilty, would you automatically vote to impose the death penalty no matter what the facts are?' as required . . . [by the Supreme Court] in *Morgan v. Illinois*, 504 U.S. 719, 723, 112 S. Ct. 2222 (1992)." FFCL, p. 7. The state habeas court found that "each juror's testimony showed that they would consider such evidence and would not automatically answer the questions in such a manner as to cause Ramirez to be sentenced to death." FFCL, p. 7. [18]

While "[t]he adequacy of *voir dire* is not easily the subject of [post-judgment] review," the Supreme Court has "not hesitated, particularly in capital cases, to find that certain inquiries must be made to effectuate constitutional protections." *Morgan*, 504 U.S. at 730. Still, an "attorney's actions during *voir dire* are considered to be a matter of trial strategy." *Teague v. Scott*, 60 F.3d 1167, 1172 (5th Cir. 1995). "The selection of a jury is inevitably a call upon [an attorney's] experience and intuition. The trial lawyer must draw upon his own insights and empathetic abilities. Written records give us only shadows for measuring the quality of such efforts." *Romero v. Lynaugh*, 884 F.2d 871,

---

[18]    The state habeas court found no *Strickland* prejudice "in light of [Ramirez's] own decision not to present a mitigation defense at trial or for his attorneys to argue against the imposition of the death penalty." FFCL, p. 9. Additionally, Ramirez did not show "by a preponderance of the evidence that any member of the jury that tried him actually harbored the sort of extreme views about the death penalty that additional questioning might have exposed," or "that any member of the jury actually chosen would have harbored such extreme views[.]" FFCL, p. 9.

878 (5th Cir. 1989).  "The Constitution, after all, does not dictate a catechism for *voir dire*, but only that the defendant be afforded an impartial jury."  *Morgan*, 504 U.S. at 729.

By the time that the parties began questioning individual jurors, they had already removed from the panel all those who would automatically give, or not give, a death sentence.  To some extent, the panel had already been cleared of those whose extreme views of the death penalty would impair their ability to serve.  Trial counsel then asked questions that revealed whether jurors would approach questions of guilt and death-worthiness as separate issues.  The defense attorneys asked jurors to consider all of the evidence in weighing mitigation.  They inquired about whether each juror could fairly answer the future-dangerousness issue.  *See* D.E. 23, p. 46 (listing the instances in which trial counsel made adequate inquiries).  Perhaps trial counsel did not ask questions in the same manner or to the same depth as Ramirez proposes in his federal petition.[19]  Yet, nothing requires a "defense attorney to ask specific questions at *voir dire*."  *Garza v. Stephens*, 738 F.3d 669, 676 (5th Cir. 2013).  The state habeas court was not unreasonable in concluding that Ramirez did not show that "his trial attorneys' performance during *voir dire* was deficient in any way" or that "his trial attorneys' manner of questioning the veniremen . . . [fell] below an objective standard of reasonableness under the prevailing professional norms."  FFCL, p. 8.

---

[19]   Some questioning in the evidentiary hearing focused on why the trial attorneys did not use the "Colorado method" for selecting jurors.  Writ Hearing Vol. 4, p. 79.  The Colorado method "was developed for use [in] capital cases to rate potential jurors on a scale of 1 through 7 based on their views on the death penalty, with 1 being a juror who would never under any circumstances give death, and 7 being a juror who would always give death."  *Fulks v. United States,* 875 F. Supp. 2d 535, 600 (D.S.C. 2010).  Ramirez has not pointed to any case law requiring attorneys to use the Colorado method, or any other questioning technique, to arrive at an impartial jury.

## 2.    Punishment Phase Defense (claims 4(b) and (d))

Ramirez contends that trial counsel made inadequate efforts to investigate and prepare evidence to militate for a life sentence.  After the jury found Ramirez guilty of capital murder, the trial court held a separate hearing in which the parties could present "any matter that the court deems relevant to sentence, including evidence of the defendant's background or character or the circumstances of the offense that mitigates against the imposition of the death penalty . . . ."  Tex. Code Crim. Pro. art. 37.071 § 2(a)(1).  On the first day of the sentencing hearing, the State called five witnesses to describe the pervasive bad behavior and lawlessness in Ramirez's life.  After the State rested, trial counsel Mr. Jones gave an opening statement that mapped out the mitigation case which the defense intended to present.  The defense, however, only put a portion of that evidence before the jury.   Ramirez now complains that trial counsel made constitutionally insufficient efforts to defend against a death sentence.  For the reasons discussed below, Ramirez has not shown that the state court's rejection of this claim was contrary to, or an unreasonable application of, federal law.  *See* 28 U.S.C. §2254(d)(1).

### a.    Background

Trial counsel began preparing a mitigation case well before trial.[20]  Trial counsel initially experienced some difficulty obtaining funds for a mitigation investigation.  Writ Hearing Vol. 4, pp. 65-66.   Eventually, trial counsel obtained the services of an investigator and an expert witness, Dr. Troy Martinez, who would help develop mitigating evidence for trial.  Writ Hearing Vol. 4, p. 74.  Dr. Martinez collected

---

[20]   Mr. Jones was primarily responsible for developing a mitigating defense.  Writ Hearing Vol. 4, pp. 72-73, 78.

information "that would be relevant to a psychological evaluation that from a legal standpoint . . . could be also considered mitigation."   Writ Hearing Vol. 4, p. 40. Additionally, the defense met with family members—both in their office and at the individuals' homes—to prepare for their punishment-phase testimony.  Writ Hearing Vol. 4, pp. 90-93.

The defense team held meetings to coordinate the development of mitigating evidence.  Writ Hearing Vol. 4, pp. 30-31, 74-75.  The defense, however, did not engage in full preparation for the punishment phase until after the start of jury selection.  Writ Hearing Vol. 4, p. 28.  Dr. Martinez did not submit his report to trial counsel until the day before jury selection began.   Writ Hearing Vol. 4, p. 30.   Dr. Martinez, nonetheless, believed that he had amassed sufficient information for the attorneys to develop an adequate mitigation case.  Writ Hearing Vol. 4, p. 46.

After the State rested in the penalty phase, trial counsel Mr. Jones gave an opening argument, presumably based on the mitigation investigation.  Mr. Jones told jurors that a "major problem of our American civilization . . . is the breakdown of the American family."  Tr. Vol. 2, p. 107.  Mr. Jones promised jurors: "[W]e're going to argue that . . . the breakdown of this family, if they ever started in the first place, has cost my client's life, you know, he's giving up his liberty and cost the life of Pablo Castro."  Tr. Vol. 21, p. 113.  Mr. Jones described Ramirez's turbulent upbringing.   Ramirez's parents were teenagers when he was born and divorced when he was a toddler.  "[H]is father never had anything else to do with him. He never paid child support, he never came to visit him, he just disappeared."  Tr. Vol. 2, p. 108.  His mother "lacked capacity to care for children . .

. her parenting skills were close to zero." Tr. Vol. 21, p. 108. From a young age, his mother verbally abused him, saying: "I do not want you, you fucked up my life, I hate you." Tr. Vol. 21, p. 108. His mother lived an unstable, irresponsible life. She frequently left Ramirez in charge of two younger siblings born from her relationships with different men. Ramirez would often visit his grandmother to escape his difficult home life. Mr. Jones told jurors that, after graduating from high school, Ramirez joined the Marine Corps against the wishes of his family. Ramirez completed boot camp, but left the service after his commission because "he just couldn't handle it." Tr. Vol. 21, p. 112.

Mr. Jones promised that Dr. Martinez would describe how Ramirez's "abusive upbringing, particularly his contacts with his mother when he was a young child, caused him severe emotional and psychological damage, severe." Tr. Vol. 21, pp. 112-13. Dr. Martinez would attribute Ramirez's subsequent violent acts to "free floating rage" that was "tear[ing] at [him]" which "can explode." Tr. Vol. 21, p. 113. With that overview, the defense began the presentation of evidence and testimony.

Trial counsel began presenting the defense's case through Ramirez's father, John Henry Ramirez, Sr. Ramirez's father described his early marriage and his eventual abandonment of the family. After he divorced his wife, Ramirez's father had little involvement in his life. The divorce decree did not require him to pay child support. Ramirez's father testified that, looking back, he feels "[t]errible. I should have done more. I should have been more involved in his life." Tr. Vol. 21, p. 122. On cross-examination, Ramirez's father explained that, while not living with Ramirez, he still saw

him at birthdays, holidays, parties, and at Ramirez's grandparent's house.   Ramirez's

father testified that he loved his son.

That, however, was the end of the defense's case.   At the beginning of trial the

next morning, trial counsel explained that Ramirez had directed counsel not to present

any additional evidence:

> [W]e had a long meeting with Mr. Ramirez last night in preparation for
> today, and in that meeting—that meeting was attended by myself, by Mr.
> Garza, and by Dr. Troy Martinez, our mitigation expert and psychologist
> who's been assisting us in this case.   We met for over an hour.   At that
> meeting, Mr. Ramirez gave us certain instructions.   The first instruction he
> gave us was that he wants us to rest our case on punishment today, now, not
> call any—any further witnesses.   H—he also wishes—has instructed us not
> to argue against the death penalty at the closing arguments and has instead
> requested that we merely read two passages from the Bible, particularly
> Book of Psalms, two short passages, and then to close our arguments.
>
> During our conversation, it was my impression that Mr. Ramirez had
> thought this out very carefully.   He articulated reasons for wanting to take
> this course of action and we discussed all the options and I—I personally
> revealed my personal position on the matter, and told him my view of the
> matter and gave him my advice on the matter, but in the end he clearly
> communicated to us that he wants to take this course of action.   I am
> inclined to—to take his instructions.   I believe it is the correct thing to do in
> this particular set of circumstances.

Tr. Vol. 22, pp. 4-5.

Trial counsel was not "surprised" by Ramirez's choice to forgo presenting

evidence because he had "talked a lot about it."   Writ Hearing Vol. 3, p. 13.   Ramirez

explained to his attorneys that his "main concern was he didn't want to spend the rest of

his life in prison."   Writ Hearing Vol. 3, p. 13; Writ Hearing Vol. 4, p. 88.   Ramirez told

them that he did not "want[] to . . . have to put his family through . . . testify[ing] about

his childhood and certain things that occurred to him during that childhood and things of

33 / 52

that nature.  He was real concerned about putting his family through that."  Writ Hearing Vol. 3, p. 88.  Trial counsel had "intense conversations" with Ramirez and explained to him the risk of not putting on evidence.  Writ Hearing Vol. 3, pp. 13-14.  Trial counsel tried to "talk him out of" abandoning the punishment-phase defense.  Writ Hearing Vol. 4, p. 80.  Ramirez, nonetheless, persisted in his "extraordinary request" that the defense not rebut the State's case for death.  Writ Hearing Vol. 3, p. 14.

Ramirez gave every indication that he "was making a conscious, intelligent choice.  It was not emotional . . . ."  Writ Hearing Vol. 3, p. 15; Writ Hearing Vol. 4, p. 88.  Trial counsel did not observe any indication of mental impairment or incompetence.  Writ Hearing Vol. 3, p. 18; Writ Hearing Vol. 4, p. 89.  Mr. Jones testified on habeas review: "[I]n the end it was my personal opinion that he was making a conscious, intelligent choice based on the—on the information that he had been given that he was—and we chose to honor that choice or to comply with it."  Writ Hearing Vol. 3, pp. 16-17.[21]

After trial counsel expressed Ramirez's wishes in open court, the trial court engaged Ramirez in a colloquy about his decision to forgo the presentation of mitigating evidence.  Ramirez explained that "his two grandmothers and . . . sister" were ready to testify in his behalf.  Tr. Vol. 22, p. 6.  Ramirez testified that he made the decision to end

---

[21]  Mr. Jones later explained:

> Once we decided that we were going to comply with his request, we had a probably our most intense meeting on whatever—you know, what we were going to do.  We had the psychologist who had examined him sit in on the meeting . . . just to make sure that. . . . he was competent to make that decision, and then . . . we made a—a record, a disclosure to the Court in open court exactly what the—the Defendant wanted to do.

Writ Hearing Vol. 2, pp. 13-14.

the penalty defense under his own free will, without anyone else's influence.  Tr. Vol. 22, pp. 6-7.  Ramirez explained that he had "thought about this since the [crime] occurred . . . I knew what was coming so I made my decision a long time ago."  Tr. Vol. 22, p. 7.

The trial court asked Dr. Martinez to testify about Ramirez's mental state.  Dr. Martinez explained that he had "met with Mr. Ramirez on three separate occasions personally."  Tr. Vol. 22, pp. 8-9.  Dr. Martinez said that Ramirez approached the decision "[v]ery specifically, very explicitly and in a rational, goal-directed manner.''  Tr. Vol. 22, p. 11.  His decision had "no adverse impact due to mental illness."  Tr. Vol. 22, p. 11.  Dr. Martinez testified that he had "an opportunity to discuss his thoughts and feelings about that decision-making process and in the end I do believe that he is competent in that respect."  Tr. Vol. 22, p. 10.  After the trial court's inquiry into Ramirez's decision, the defense did not call any additional witnesses.

Ramirez gave his attorneys explicit instructions regarding closing arguments. Under Ramirez's direction, trial counsel stood before the jury and said: "May it please the Court and Counsel for the State and ladies and gentlemen of the jury, I'm reading from the Holy Bible, the New International version, Psalm 51, verse 3. 'For I know my transgressions and my sin is always before me. Amen.'"  Tr. Vol. 22, p. 27.  After the prosecution made their closing arguments, the jury retired for deliberations and returned answers to the special issue questions requiring the imposition of a death sentence.

In the state habeas application, Ramirez argued that his trial attorneys provided ineffective representation by not presenting mitigating evidence.[22]  Ramirez relied on affidavits from family members who could have provided insight into his background and personal life. [23]  Recognizing that he had short-circuited the defense's punishment case, Ramirez argued that he was incompetent to waive his constitutional rights.  The state habeas court allowed the parties to address Ramirez's *Strickland* claims in the state evidentiary hearing.  Beginning with the competency to waive a mitigation defense, the Court will review the state court findings and conclusions under the AEDPA's deferential standards.

### b.    Competency

The state habeas court allowed Ramirez to develop his argument that "counsel were ineffective in failing to recognize that [Ramirez] was unable and incompetent to direct counsel to not call any further witnesses during the punishment phase of trial." State Habeas Record, p. 117.  The Constitution generally "grants to the accused personally the right to make his defense" because "it is he who suffers the consequences if the defense fails." *Faretta*, 422 U.S. at 819-20.  A criminal defendant's rights are his

---

[22]    Ramirez first argued in his motion for a new trial that "[t]he defendant's decision not to present mitigation evidence was not fully informed and warrants a new sentencing trial."  Clerk's Record, p. 280.  Ramirez subsequently withdrew that allegation.  Clerk's Record, pp. 324-35.

[23]    The state habeas court found that Ramirez had

> [N]ot raised a complaint in his present application that his trial attorneys were ineffective for failing to investigate mitigation evidence, but has instead limited his ground on mitigation evidence to a complaint that, "counsel were ineffective in failing to recognize that John was unable and incompetent to direct counsel to not call any further witnesses during the punishment phase of the trial," and that "Defense counsel's performance was deficient in failing to present this mitigation testimony."

FFCL, p. 13.

alone—he is the "master of his own defense." *Moore v. Johnson*, 194 F.3d 586, 606 (5th Cir. 1999).  A criminal defendant, however, must be competent before waiving various rights.

Ramirez based his state habeas argument on an April 7, 2011 evaluation by clinical psychologist Dr. Joann Murphey.  Dr. Murphey extensively reviewed Ramirez's history, including Dr. Martinez's trial data.  Dr. Murphey conceded that Ramirez "is not cognitively or intellectually impaired, but he may harbor distorted or even delusional beliefs that affect his decision-making . . . ."  State Habeas Record, p. 214.  Dr. Murphey criticized Dr. Martinez for not adequately assessing whether Ramirez suffered from depression or other mental disorders. State Habeas Record, p. 213.[24]  Dr. Murphey's report linked Ramirez's past suicide attempts to his decision to forgo a mitigation case. She opined that Dr. Martinez's "evaluation of [Ramirez's] decision to forego [sic] testimony about mitigating circumstances was badly flawed.  It is more likely at the time of making this decision that [Ramirez] was suicidal and irrational[,]" particularly in light of his history of suicide attempts.  State Habeas Record, p. 214.

During the state habeas process, Ramirez moved to dismiss his habeas application. Writ Hearing Vol. 3, p. 6; Writ Hearing Vol. 4, pp. 114-15. The record does not contain any hearings or proceedings aimed at addressing Ramirez's competency to waive habeas review.   The state habeas court, however, had Dr. Martinez perform a competency evaluation which provides insight into Ramirez's mental state and thought process.

---

[24]   Dr. Murphey's examination resulted in a diagnosis of polysubstance abuse by history, depressive disorder with recurrent depressive episodes, and borderline personality disorder by history.  State Habeas Record, p. 214.

Dr. Martinez examined Ramirez on August 29, 2011.  Dr. Martinez interviewed Ramirez on death row to ascertain whether he was "in control of his faculties, competent to choose to decline to pursue an appeal or writ, and has made an intelligent waiver of his right to pursue postconviction relief."  State Habeas Record, p. 541.  By then, Ramirez had become uncertain about his decision to waive habeas review.  Still, Ramirez wanted to proceed with the examination "in the event he retains his decision to waive appeals now and/or if he chooses to file an application for writ of habeas corpus now but later decides to waive these rights.  If the latter occurs, it is his hope this current evaluation can and will apply to the future decision he makes."  State Habeas Record, p. 543.[25]

Dr. Martinez excluded suicidal ideation and depression as motivators in Ramirez's contemporaneous decision making.[26]  While the conditions of death row and Ramirez's isolation from family reinforced his decision to waive additional judicial review, Dr. Martinez tied Ramirez's choice to waive habeas review back to his cessation of the defense's punishment-phase case:

> At this time, his decision to waive appeals is made without influence of psychosis, major mood disturbance, cognitive impairment, or more severe

---

[25]   Ramirez attributed his "new indecisiveness" to recently developed "interest in getting to know his sister during his lifetime."  State Habeas Record, p. 543.

[26]   Ramirez denied any suicidal thoughts or desires.  State Habeas Record, p. 544.  Dr. Martinez specifically asked Ramirez if he was depressed.  Dr. Martinez's report provides:

> When asked specifically about depression . . . , he replied, "Hell yea.  Who (on [death row])'s not.  This is a sad-ass existence."  He explained that, for him, "being bitter, exhausted, (and) hatred turns into sadness, depression, and frustration" and this cycles over time.  Asked if he thinks he would feel differently about waiving his application for writ of habeas corpus and other post-conviction proceedings if he did *not* feel depressed, he replied, "Of course. But why stall the inevitable?  It's on their terms.  I'd understand if I had support, (someone to) just show me you care.  Since that's not happening . . . They say keep fighting:  for what?  I prefer to go on my own terms.  It's a personal choice, not like I'm being forced to the decision."

State Habeas Record, p. 544. (emphasis in original)

forms of psychopathology. He is aware of his impending execution and the reason for it. He understands his waiver will result in his death. He is adequately in control of his faculties despite the existence of personality dysfunction and associated periods of mood dysregulation. It is notable that his deliberation about and decision to waive appeals spans a period of years, as opposed to a recent or abrupt decision reflective of emotional reactivity that does characterize aspects of his personality structure (in this way, his recent *uncertainty* toward waiving appeals actually reflects the deviation from his more stable rationale for waiving appeals, rather than the inverse). In the end, it is my opinion that Mr. Ramirez's decision to waive application for a writ of habeas corpus and other postconviction proceedings reflects a voluntary, knowing, and intelligent waiver of his right to pursue post-conviction relief.

State Habeas Record, pp. 544-45.

While not clear from the record before the Court, Ramirez must have rescinded his attempt to waive state habeas review before the state evidentiary hearing. Both Dr. Martinez and Dr. Murphey testified in the state habeas evidentiary hearing about Ramirez's waiver of mitigating evidence. Dr. Martinez testified that nothing about Ramirez's decision to end his defense suggested that he was incompetent. Dr. Martinez said that Ramirez "had obviously given it a considerable amount of thought because he looked at it from multiple angles in terms of what would be most effective." Writ Hearing Vol. 4, p. 50. Ramirez "was well aware that there was information to be presented." Writ Hearing Vol. 4, p. 48. Dr. Martinez observed that Ramirez was "calm and resigned in his attitude." He was "goal-directed[,] rational[,] and organized" in his "strong and consistent resolve" based on "considerable prior thinking." Writ Hearing Vol. 4, pp. 33, 47. Ramirez "underst[ood] the potential consequences of instructing attorneys not to advance mitigation testimony . . . . Indeed his hope [was] that the jury [would] sentence him to death." Writ Hearing Vol. 4, p. 34. Dr. Martinez explained that

Ramirez was not delusional, but had rational reasons for wanting to end the mitigation case:

> I believe his thinking at the time certainly was a product of—had been thought out for a while.  Was it rational?  Yes, given the perspective that he was coming from. Not wanting to put his family through things, had given considerable amount of time to if [*sic*] he would ever get convicted of a capital murder charge, that it was going to be his desire—he had long thought—thought about it.  He would not want to spend his life in prison. Meaning, once—if he would be convicted.  So he had given considerable thought. I mean, really a span—at least periodically, a span of years.  And that was still in his mind when he was sitting in jail.

Writ Hearing Vol. 4, pp. 48-49.

Dr. Murphey, however, thought that Dr. Martinez had not fully appreciated the pervasiveness of Ramirez's suicidal thinking, particularly because she had never seen anyone score as high on the "suicide index" as Ramirez.  Writ Hearing Vol. 4, pp. 114, 121.  Dr. Murphey testified that Ramirez was "a very depressed man making a decision from that view, the view of a depressed man."  Writ Hearing Vol. 4, p. 120.  On cross-examination, however, Dr. Murphey conceded that she did not have any reason to believe that Ramirez had been incompetent to stand trial.  Writ Hearing Vol. 4, p. 128.  Dr. Murphey explained she simply believed that no one could ever make a rational decision to end their own life.  Writ Hearing Vol. 4, pp. 124-25.

With that background, the state habeas court rejected Ramirez's claim that trial counsel should have probed his competency before honoring his client's wish to abandon a mitigation defense.  AEDPA presumes that the state court's fact findings are correct, unless Ramirez rebuts them with clear and convincing evidence.  *See* 28 U.S.C. § 2254(e)(1).  The state habeas court observed that "no suggestion has been made that

Ramirez was generally incompetent to stand trial, nor has he pointed to anything that would raise a bona fide doubt as to whether he was legally competent at the time of trial." FFCL, p. 15. The state habeas court found credible the testimony that trial counsel had discussed Ramirez's options with him and advised him on the presentation of mitigating evidence. FFCL, p. 14. Trial counsel explained "the rules concerning mitigation evidence and the risks of not putting on such evidence." FFCL, p. 14. "Ramirez was calm, rational, and consistent in instructing his attorney of his wishes . . . . understood the potential consequences of instructing his attorney not to present mitigation evidence, and . . . hoped that the jury would sentence him to death . . . ." FFCL, p. 15. Ramirez "believed that the most reliable way of getting the death penalty was to simply offer no evidence." FFCL, p. 15. Ramirez had carefully considered his decision, and was "coherent and logical" when he made "a conscious, intelligent choice" in a "rational and goal-directed manner." FFCL, p. 14. In sum, Ramirez's decision to halt the mitigation case was "knowingly, voluntarily, and intelligently made." FFCL, p. 14.

The state habeas court rejected Dr. Murphey's opinion because she had testified that Ramirez "never indicated that he wished he could have changed his decision not to present a mitigation case and . . . that it is normal for someone under a death sentence to be depressed." FFCL, p. 15 (citation omitted). Dr. Murphey's opinion was also tainted by her "extreme views that no rational person in good health would ever [forgo judicial review of a death sentence], that a depressed person could not make a rational decision, and her inability to answer the question whether it was rational for a defendant to want to spare his family the embarrassment and pain of testifying in court." FFCL, p. 15 (Writ

41 / 52

Hearing Vol. 4, pp. 121-24, 127-28, 132-33).

The state habeas court found that "Ramirez's trial attorneys[] explained to him the consequences of his decision, that he was rational and coherent in his explanation for that decision, and that nothing indicated that his decision was involuntary or unknowing or that Ramirez was then incompetent to stand trial."  FFCL, p. 16.  Given the whole of the evidence, the state habeas court found that Ramirez's trial attorneys

> [M]ade a reasonable determination, based on the facts available to them at the time, that they did not need a professional evaluation of, or further investigation into, Ramirez's psychological condition, and that they had no reasonable grounds to oppose or question the competency or voluntariness of Ramirez's decision not to present a mitigation case.

FFCL, p. 16.

Ramirez has not rebutted the state habeas court's findings that he was competent when he chose to forestall the defense's punishment-phase case.  Trial counsel assessed Ramirez's mental state and consulted with a psychological expert when Ramirez asked them to stop the mitigation case.  The trial court made specific inquiries to assure Ramirez's competency.  Dr. Martinez's habeas testimony reiterated that he had taken into account Ramirez's full mental state and contemporaneous condition when he assessed Ramirez's desire to end the mitigation case.  Ramirez's decision reflected rational thought divorced from the immediate emotional climate of the proceedings.  In short, nothing hinted that Ramirez was incompetent to make defensive decisions, even ones that would guarantee a death sentence.  The record does not contain any suggestion of incompetency that would have required the trial court to explore Ramirez's mental state

any further.  Given the record and this Court's deference to the state court findings, the state habeas court was not unreasonable in concluding that trial counsel did not provide ineffective representation by not engaging in further inquiry about his competency.

c.    Presentation of mitigating evidence

Ramirez contends that trial counsel should have presented additional mitigating evidence.  Ramirez bases this claim on several affidavits he presented on state habeas review.  Ramirez submitted affidavits from his two grandmothers, both of his parents, a maternal aunt, and two siblings.  State Habeas Record, pp. 134-70.  The state habeas court summarized the content of the affidavits as "traumatic events that occurred during Ramirez's childhood, including his parent's divorce, abandonment by his father, the tough neighborhood that he grew up in, abusive conduct by his mother, seeing his mother being stabbed by one of her boyfriends, and being shot himself . . . ."  State Habeas Record, p. 534.

Before the evidentiary hearing, the state habeas court took judicial notice of the habeas affidavits.  Writ Hearing Vol. 3, p. 4.  The parties extensively questioned members of the defense team about their efforts to develop a mitigating case for trial.  Ramirez relied on the affidavits to argue that trial counsel failed to probe his background sufficiently.  The state habeas court provided three reasons for denying Ramirez's ineffective-assistance-in-presenting-mitigating-evidence claim.  First, the state habeas court observed that "all of the affidavits of persons who could have testified to mitigating evidence at trial . . . were from Ramirez's family members."  FFCL, p. 18.  Of the habeas affiants, Ramirez's father testified at trial.  The defense tried to arrange for all of the

others except one sibling to testify.  The state habeas court found that "Ramirez['s] instruction for his attorneys not to call his family members as witnesses would apply to all of these potential witnesses."  FFCL, p. 19.  Ramirez's decision to end the mitigation case prevented the information in the habeas affidavits from coming before the jury.

Second, independent of Ramirez's choice to end the punishment defense, the state habeas court found that trial counsel provided competent representation in the investigation and presentation of mitigating evidence:

> The Court finds that Ramirez has failed to prove by a preponderance of the evidence that his trial attorneys' investigation and development of mitigation evidence was deficient in any way.  Specifically, the Court finds that Ramirez's trial attorneys questioned a sufficient number of witnesses and made sufficient preparation for them to testify at the punishment hearing in order to present a convincing mitigation case and to show Ramirez's background and social history, and that the additional witnesses suggested by Ramirez in the present writ proceeding would not have been able to add any significant additional details.

FFCL, p. 19.  While the habeas affidavits certainly contained some details not present in trial counsel's opening argument or in the limited punishment-phase testimony, the trial and habeas record suggest that counsel understood Ramirez's background and was prepared to put that information before the jury.

Finally, the state habeas court held that trial counsel's representation did not result in a reasonable probability of a different result:

> [A]ny deficient performance in the investigation and development of a mitigation case by Ramirez's trial attorneys did not cause prejudice, and specifically that there is not a probability sufficient to undermine confidence in the outcome that, but for this complained-about deficiency, the result of the proceeding would have been different, both in light of the mitigation evidence that was already available to the defense and in light of

Ramirez's own decision not to present a mitigation defense at trial or for his attorneys to argue against the imposition of the death penalty.

FFCL, p. 19.

Ramirez has not shown that the state habeas court's decision was contrary to, or an unreasonable application of, federal law. The defense team investigated mitigating evidence for the punishment phase. In his opening argument, trial counsel provided broad outlines of what evidence the defense wanted to present. The substance of the road map trial counsel placed before the jury corresponds with the details found in the habeas affidavits. Ramirez has not identified any witness other than family members who could provide testimony exceeding trial counsel's opening argument.

Ramirez decided to forgo a mitigation defense. Trial counsel discussed with Ramirez the mitigating evidence available, the consequences of abandoning the defense, and the surety of a death sentence. Ramirez made the fully informed and competent decision to end the mitigation case. As Ramirez has not shown circumstances that would call into question his mental state, his "directions were entitled to be followed." *Lowenfield v. Phelps*, 817 F.2d 285, 292 (5th Cir. 1987); *see also Roberts v. Dretke*, 356 F.3d 632, 638 (5th Cir. 2004); *Autry v. McKaskle*, 727 F.2d 358, 362 (5th Cir. 1984). "Under Fifth Circuit case law, 'when a defendant blocks his attorney's efforts to defend him, including forbidding his attorney from interviewing his family members for purposes of soliciting their testimony as mitigating evidence during the punishment phase of the trial, he cannot later claim ineffective assistance of counsel.'" *Sonnier v. Quarterman*, 476 F.3d 349, 362 (5th Cir. 2007) (quoting *Roberts*, 356 F.3d at 638).

"Cutting through the smoke, it is apparent that [this Court is] being asked to permit a defendant to avoid conviction on the ground that his lawyer did exactly what he asked him to do. That argument answers itself." *United States v. Masat*, 896 F.2d 88, 92 (5th Cir. 1990).   Ramirez, therefore, has not shown that the state habeas court was unreasonable in rejecting his claim that trial counsel provided ineffective representation in the preparation and presentation of mitigating evidence.   The Court will deny this claim.

### 3.      Failure to Preserve Error (claim 4(e))

Ramirez makes a cursory argument that trial counsel provided ineffective assistance by not preserving for appellate review a claim about the introduction of extraneous evidence in the guilt/innocence phase.  D.E. 6, pp. 114-15.  Aside from the murder for which he received a death sentence, the indictment against Ramirez alleged three other crimes: two counts of threatening bodily injury with a weapon during the course of a theft and one count of fleeing from police officers.  Clerk's Record, pp. 3-4. These charges resulted from the aggravated assault, attempted aggravated assault, and subsequent police chase that transpired after the murder.  Before trial, trial counsel filed a general discovery motion under Tex. R. Evid. 404(b) for notice of the State's intent to introduce guilt/innocence phase evidence of "other crimes, wrongs, or acts not arising in the same transaction as the offense charged."  Clerk's Record, p. 74.  Generally, Texas does not permit the admission of extraneous offenses in the guilt/innocence phase.  Such evidence, however, may "be admissible for other purposes, such as proof of motive,

opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident . . . ."  Tex. R. Evid. 404(b).

Trial counsel filed a motion to sever the capital-murder charge from the other counts of the indictment.  The trial court granted that motion.  Tr. Vol. 5, pp. 4-5.  In a pre-trial hearing, however, the prosecutor explicitly gave notice of his intent to introduce the evidence of those crimes during his case in chief.  Tr. Vol. 5, p. 8.  The prosecutor told the trial court that the crimes would come before the jury "since these incidents all happened right at the same time."  Tr. Vol. 5, p. 8.  Trial counsel conceded that the three crimes were "clearly going to be admissible in that regard."  Tr. Vol. 5, p. 8.  Trial counsel, however, unsuccessfully argued that the evidence should be suppressed because it was more prejudicial than probative under Tex. R. Evid. 403.  Trial testimony in the guilt/innocence phase substantiated Ramirez's commission of the three extraneous offenses.

Ramirez raised two complaints about the extraneous evidence on direct appeal.  First, Ramirez argued that the State had provided inadequate notice of its intent to present the evidence, presumably because it had not done so in writing.  Second, Ramirez complained that the evidence was inadmissible under Tex. R. Evid. 404(b).  The Court of Criminal Appeals found that Ramirez had procedurally defaulted both arguments by not making similar objections at trial.  *See Ramirez*, 2011 WL 1196886, at *14-15.  The Court of Criminal Appeals also found that the State had provided sufficient notice and that "the evidence was admissible."  *Id.*

On state habeas review, Ramirez argued that trial counsel provided ineffective assistance by not preserving error relating to the extraneous evidence.  While Ramirez's cursory briefing seemed to focus only on whether trial counsel should have objected to the admissibility of the evidence, State Habeas Record, pp. 100-01, the state habeas court also considered whether trial counsel received adequate notice of the State's intent to use it at trial.  The state habeas court found that trial counsel was not surprised by the extraneous-offense evidence, that the law was not settled as to whether such evidence required notice, that oral notice sufficed to alert the defense to the prosecution's reliance on that evidence, and that additional notice would not have changed the defense's trial strategy.  FFCL, p. 12.  Also, the state habeas court found that, even if trial counsel should have objected, there was "not a probability [of prejudice] sufficient to undermine confidence in the outcome . . . ."  FFCL, p. 12.

Ramirez's federal petition reurges his state habeas claim using substantially the same language as contained in the state habeas application.  *Compare* D.E. 6, pp. 114-15 *with* State Habeas Record, pp. 105-06.  Ramirez has made no effort to show that the state habeas court's adjudication of his claim was contrary to, or an unreasonable application of, federal law.  *See* 28 U.S.C. §2254(d)(1).  Even so, the state courts found that Ramirez had received adequate notice of the extraneous offenses and that they were admissible. Federal habeas courts do not "sit to review the mere admissibility of evidence under state law."  *Little v. Johnson*, 162 F.3d 855, 862 (5th Cir. 1998); *see also Derden v. McNeel*, 978 F.2d 1453, 1458 (5th Cir. 1992) ("Errors of state law, including evidentiary errors, are not cognizable in habeas corpus."); *Porter v. Estelle*, 709 F.2d 944, 957 (5th Cir.

1983) ("We have repeatedly admonished that we do not sit as a super state supreme court on a habeas corpus proceeding to review error under state law."); *Estelle*, 502 U.S. at 67-68 ("In conducting a federal habeas analysis, it is irrelevant whether the evidence was correctly admitted pursuant to state law.").  The Supreme Court has "repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005).

Ramirez has not shown that trial counsel possessed a meritorious objection either to the notice or the admissibility of the extraneous evidence.  Moreover, Ramirez has not shown that, had trial counsel objected, the state courts would not have allowed that evidence to come before the jury in the guilt/innocence phase.  As Ramirez has not met the AEDPA standard, this Court will reject his failure-to-object claim.  *See* 28 U.S.C. §2254(d)(1).

### C.    Texas' Statutory Sentencing Scheme

The jury instructions only authorized a death sentence after an affirmative answer to the future-dangerousness question: "Is there a probability that the defendant, JOHN HENRY RAMIREZ, JR. would commit criminal acts of violence that would constitute a continuing threat to society?"  Clerk's Record, p. 253.  Ramirez argues that the future-dangerousness special issue is unconstitutionally vague and does not adequately channel the jury's discretion, particularly because it does not define terms such as "probability," "criminal acts of violence," and "continuing threat to society."

The state habeas court held that Ramirez defaulted judicial review of his "complaint concerning the punishment charge" because it "was not raised at trial by either objection or request." FFCL, p. 20. Ramirez has not shown cause or actual prejudice to overcome the procedural bar of that claim.

In the alternative, the state court concluded that "Ramirez's complaint that the punishment charge failed to define the aggravating factors employed in the Texas capital sentencing scheme has been repeatedly rejected by the Court of Criminal Appeals and is without merit." FFCL, p. 22. The Fifth Circuit has also observed that this claim is "far from novel." *Green v. Johnson*, 160 F.3d 1029, 1043 (5th Cir. 1998). Federal courts have repeatedly found that the future-dangerousness question is not vague and that it adequately channels a jury's discretion. *See Jurek v. Texas*, 428 U.S. 262, 270-71 (1976); *Trevino v. Thaler*, 449 F. App'x 415, 426-27 (5th Cir. 2011); *Kerr v. Thaler*, 384 F. App'x 400, 404 (5th Cir. 2010); *Scheanette v. Quarterman*, 482 F.3d 815, 827-28 (5th Cir. 2007); *Leal v. Dretke*, 428 F.3d 543, 553 (5th Cir. 2005); *Rowell v. Dretke*, 398 F.3d 370, 379 (5th Cir. 2005); *Woods v. Johnson*, 75 F.3d 1017, 1033-34 (5th Cir. 1996); *James v. Collins*, 987 F.2d 1116, 1120 (5th Cir. 1993). The Fifth Circuit has consistently upheld the special issues against challenges to the phrases "probability," "criminal acts of violence," and "continuing threat to society." *See Sprouse v. Stephens*, 748 F.3d 609, 622 (5th Cir. 2014); *Parr v. Thaler*, 481 F. App'x 872, 878 (5th Cir. 2012); *Turner v. Quarterman*, 481 F.3d 292, 299-300 (5th Cir. 2007); *Hughes v. Johnson*, 191 F.3d 607, 615 (5th Cir. 1999); *Nethery v. Collins*, 993 F.2d 1154, 1162 (5th Cir. 1993); *Thompson v. Lynaugh*, 821 F.2d 1054, 1060 (5th Cir. 1987); *Milton v. Procunier*, 744 F.2d 1091,

1095-96 (5th Cir. 1984).  The terms "have a plain meaning of sufficient content that the discretion left to the jury is no more than that inherent in the jury system itself."  *Paredes v. Quarterman*, 574 F.3d 281, 294 (5th Cir. 2009).  Accordingly, the state court's alternative rejection of this claim was not contrary to, or an unreasonable application of, federal law.  *See* 28 U.S.C. § 2254(d)(1).

## IV.   CERTIFICATE OF APPEALABILITY

AEDPA bars appellate review of a habeas petition unless a district or circuit court certifies specific issues for appeal.  *See* 28 U.S.C. § 2253(c); Fed. R. App. P. Rule 22(b).  Ramirez has not sought a Certificate of Appealability ("COA"), though this Court can consider the issue sua sponte.  *See Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000).  The Court must address whether the circumstances justify an appeal before issuing a final judgment.  *See* Rule 11, Rules Governing Section 2254 Cases in the United States District Courts.

A COA may issue when "[a petitioner] has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2); *see also Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  Settled precedent forecloses relief on Ramirez's claims.  Because Ramirez has not shown under the appropriate standard that any issue deserves appellate review, this Court will not certify any of his habeas claims for consideration by the Court of Appeals for the Fifth Circuit.

## V.   CONCLUSION

For the reasons described above, the Court finds that Ramirez has not shown an entitlement to federal habeas relief.  This Court **denies** Ramirez's petition and **dismisses**

this case **with prejudice**.   The Court **denies** all remaining requests for relief.   No Certificate of Appealability will issue in this case.

    The Clerk will deliver a copy of this Order to the parties.

ORDERED this 10th day of June, 2015.

NELVA GONZALES RAMOS
UNITED STATES DISTRICT JUDGE